UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA

                                        **16-CR-091 (PKC)**

      - against -

SCOTT TUCKER AND TIMOTHY MUIR,

                 **Defendants.**
-------------------------------------------------------x

## JOINT MEMORANDUM OF LAW OPPOSING GOVERNMENT'S MOTIONS IN LIMINE

JAMES M. ROTH
Stampur & Roth
299 Broadway, Suite 800
New York, NY 10007
(212) 619-4240

LEE GINSBERG
NADJIA LIMANI

Attorneys for Scott Tucker


THOMAS J. BATH, JR.
Bath & Edmonds, P.A.
Historic Voigts Building
7944 Santa Fe Drive
Overland Park, Kansas 66204
(913) 652-9800

MARC AGNIFILO

Attorneys for Timothy Muir

Beverly Van Ness, Of Counsel
February 17, 2017

# TABLE OF CONTENTS

INTRODUCTION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      OPPOSITION TO MOTION TO ADMIT PRIOR BAD ACTS
        EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

II.     OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OF
        RELATED COURT DECISIONS AND ORDERS . . . . . . . . . . . . . . . . . . . . . . . .  12

III.    OPPOSITION TO MOTION TO ADMIT DON BRADY AUDIO HEARSAY . . .  18

IV.     OPPOSITION TO MOTION TO PRECLUDE ADVICE OF COUNSEL
        DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

V.      OPPOSITION TO MOTION THAT COURT SHOULD INSTRUCT THE JURY
        ON THE RELEVANT ELEMENTS OF STATE LAW . . . . . . . . . . . . . . . . . . . . .  21

VI.     OPPOSITION TO MOTION TO PRECLUDE ALL EVIDENCE AND
        ARGUMENT RELATED TO LEGALITY OF OR POLICY ARGUMENTS
        REGARDING PAY DAY LENDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

# INTRODUCTION

The government has filed a memorandum with seven motions in limine (ECF #129). The defendants submit this joint response, addressing the motions in the order in which the government presented them.

# ARGUMENT

## I.    OPPOSITION TO MOTION TO ADMIT PRIOR BAD ACTS EVIDENCE

Pursuant to Fed. R. Evid. 404b, the government seeks to admit evidence relating to two 26-year-old convictions of Scott Tucker, as well as alleged false statements he made in a personal bankruptcy petition filed in 1997. Alternatively, the government seeks to introduce the latter as direct evidence of the charged racketeering conspiracy (see ECF #129, pp. 6-17 of 69). These motions should be denied.

### A.    The Conduct Underlying Mr. Tucker's 1991 Convictions Is Not Sufficiently Similar to the Charged Conspiracy to Be Relevant to Knowledge and Intent under Rule 404b, and the Remoteness of this Evidence Further Reduces its Probative Value. The Evidence Should Also Be Excluded under Rule 403.

To be admissible under Fed. R. Evid. 404(b), evidence of uncharged criminal conduct must be offered for a proper purpose – one other than to show the accused's propensity to commit the crime for which he is on trial – and relevant (see Fed. R. Evid. 401, 402). Even then, the evidence must be excluded if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed. R. Evid. 403; see Huddleston v. United States, 485 U.S. 681, 691 (1988); United States v. Gordon, 987 F.2d 902, 908 (2d Cir. 1993). The government is the proponent of the uncharged crimes evidence and bears the burden of establishing its admissibility. See, e.g., United States v. Stein, 521 F.Supp.2d

266, 268 incl. n.3. (S.D.N.Y. 2007); United States v. Nachamie, 101 F.Supp.2d 134, 137-38
(S.D.N.Y. 2000).

In this case, the government seeks to introduce evidence of two prior crimes on the issue
of Mr. Tucker's knowledge and intent (ECF #129, pp. 14-17 of 69). But the government has not
"establish[ed] the relevance of th[is] evidence" to Mr. Tucker's state of mind, as it is required to
do. United States v. Garcia, 291 F.3d 127, 137 (2d Cir. 2002) ("The government may not invoke
Rule 404(b) and proceed to offer, carte blanche, any prior act of the defendant in the same
category of crime."). The prior act must not be merely similar, but "sufficiently similar" to the
charged conduct to be relevant; if it is not, or if "'the chain of inferences necessary to connect
evidence with the ultimate fact to be proved' were unduly long," the admission of uncharged
crime evidence constitutes "an abuse of discretion." United States v. Peterson, 808 F.2d 969,
974 (2d Cir. 1987) (internal citation omitted). More specifically, "'[s]imilarity, being a matter of
relevancy, is judged by the degree in which the prior act approaches near identity with the
elements of the offense charged. There is no necessity for synonymity but there must be
substantial relevancy. . . .'" United States v. Afjehel, 869 F.2d 670, 674 (2d Cir. 1989), quoting
with approval United States v. Kasouris, 474 F.2d 689, 692 (5th Cir. 1973) (emphasis in
original); reaffirmed in, e.g., United States v. Aminy, 15 F.3d 258, 260 (2d Cir. 1994).

The first act the government seeks to admit concerns Mr. Tucker's participation in a loan
brokerage business in early 1990 (see indictment, part of Exhibit A to ECF #129). He
represented that he had access to financing through his company, which was owned by a
conglomeration of institutions for which it was named (Chase and Manhattan Bank, Lloyds of
London and J.P. Morgan); he accepted advance fees from clients in order to obtain loans for

2

them.  But the company was actually owned by Mr. Tucker, and he did not have the access to financing that he represented (id.).   It is not clear how many clients he had, but the restitution ordered upon his guilty plea – in June, 1991, for using the mail in a scheme to defraud – was in the amount of $2,500, payable to one individual (see judgment, p. 4, which is part of Exhibit A to ECF #129).

Clearly, the requisite "close parallel" between this conduct and that charged in the current indictment is lacking.  See United States v.Corey, 566 F.2d 429, 431 (2d Cir. 1977).  The prior act involves misrepresentations that may have induced one or more people to advance Mr. Tucker a fee, in the expectation that he would be able to obtain a loan for them from third parties. In contrast, he is currently charged with participation, with others, in a very lengthy and complex conspiracy involving his association with pay day lending operations that extended loans to others.  The operations were affiliated with federally-recognized Indian tribes, and the defendants will contend they believed the loans were exempt from state usury laws as a result of tribal sovereign immunity.  The government alleges the tribes' involvement was a "sham," which the defendants fostered through myriad acts – few of which, upon information and belief, were actual misrepresentations, and some of which were committed by others.  Further, the 1990 crime concerned representations made in order to induce people to pay a fee for a service.  In contrast, the pay day borrowers at issue in the current indictment were not induced to take out a loan by any claimed misrepresentation about the ownership of the business.  The borrowers wanted a short-term loan; it was of no consequence who the lender was.

In United States v. Corey, supra, the defendant was charged with knowingly signing false documents acknowledging receipt of supplies by his employer.  The government was allowed to

introduce evidence that he had been fired from a prior job for falsifying his W-2 and overtime

records. 566 F.2d at 431. Noting that there was "some similarity in method – the submission of

false documents to an employer . . . . the fact that Corey may have deliberately falsified his own

overtime hardly proves that he had the knowledge or intent to falsify purchases of supplies by

Hartz Mountain from third parties." 566 F.2d at 432. The Court of Appeals held that the

"attenuated similarity between the two acts demonstrates the low probative value of the [prior

act] as circumstantial evidence of intent to commit the crimes here charged." Id. See also

United States v. Baljit, 207 F.Supp.2d 118, 121-22 (S.D.N.Y. 2002) (excluding evidence that

defendant – charged with an extensive postage meter fraud that cost the United States Postal

Service millions of dollars – had previously knowingly and intentionally hidden metered mail in

violation of U.S.P.S. rules and regulations); United States v. Alfonso, 1995 U.S. Dist. Lexis 6285

(S.D.N.Y. 1995) (in narcotics conspiracy case involving quantities of cocaine exceeding four

kilograms, evidence that defendant had made three prior trips to obtain small quantities of

cocaine was insufficiently similar to be admissible under Rule 404b to prove knowledge).[1]

As the Court of Appeals has noted, "Rule 404b does not authorize the admission of any

and every sort of other-act evidence simply because a defendant proffers an innocent explanation

---

[1] The government has cited three cases for the proposition that "[e]vidence of prior fraudulent activity and false statements . . . has been routinely found to be admissible under Rule 404(b) in fraud cases" (ECF #129 at p. 12 of 69). In two, United States v. Kalish, 403 Fed.Appx. 541, 546-47 (2d Cir. 2010), and United States v. Mahler, 579 F.2d 730, 736 (2d Cir. 1978), the nature of the prior crimes evidence is not discussed in the opinions, nor was its similarity to the charged conduct argued or discussed. Indeed, in Mahler, the defendant did not contest the admissibility of uncharged crime proof under Rule 404(b). 579 F.2d at 736, n. 20. In the third, United States v. Birrell, 447 F.2d 1168, 1171-72 (2d Cir. 1971), the uncharged conduct involved the very stock at issue in the charged fraud but as to different investors; the facts relating to one of those investors had been the subject of a count in the indictment, dismissed "for failure to establish connection of the telephone call with the fraud."

for the charged conduct." United States v. Gordon, supra, 987 F.2d 902, 909 (precluding, on

relevancy grounds, evidence of defendant's prior cocaine possession conviction in narcotics

prosecution, in part because amount involved was "not at all similar" to amount accomplice

transported).  Moreover, the lack of relevance of the prior crime "is further buttressed by its

remoteness in time." United States v.Corey, supra, 566 F.2d 429, 432 (prior crime committed 16

years before trial, and 5 to 7 years before start of charged fraudulent conduct); accord, United

States v. Garcia, supra, 291 F.3d 127, 138.  Remoteness is not necessarily a ground for per se

exclusion, but it remains a factor in 404(b )relevancy analysis.  Here, the prior conviction was

based on conduct that occurred almost 27 years ago.

     For the reasons stated, evidence of Mr. Tucker's 1991 conviction for using the mail in a

scheme to defraud is insufficiently similar to, and too remote from, the charged conduct to be

relevant to his knowledge and intent.  It is therefore inadmissible under Rule 404b.  The

uncharged crime consists of a simple misrepresentation made to induce the payment of a fee; the

charged conduct involves a complex business model, involving multiple entities, through which

small loans were extended.  The principal issue for the jury will be whether the defendants

knowingly and intentionally sought to evade state usury laws through the use of this business

model.  The government seeks to inform the jury that Mr. Tucker made a misrepresentation in

the distant past, and argue that this makes it more likely that his pay day business association

with Indian tribes was a sham.  This argument should be precluded.  The  uncharged conduct is

nothing more than "propensity evidence in sheep's clothing." United States v. McCallum, 584

F.3d 471, 477 (2d Cir. 2009).

Evidence of the prior crime should also be precluded under Rule 403, even if the Court concludes it has some relevance. That the prior bad act resulted in a conviction "easily lends itself to generalized reasoning [by the jury] about a defendant's criminal propensity and thereby undermines the presumption of innocence." McCallum, suprta, 584 F.3d at 476. A conviction "bear[s] the imprimatur of the judicial system and indicia of official reliability." Id. Thus, it is imperative for the District Court to make a particularly careful and conscientious assessment of prejudice and probative value when the prior conduct resulted in a criminal conviction. Id. As applied here, the probative value of the proffered evidence is slight, due to its dissimilarity with the charged offenses and its staleness. This cannot override the danger that its admission will cause unfair prejudice to Mr. Tucker's defense.

In addition, the government has made no claim that the evidence is necessary to prove Mr. Tucker's state of mind: his knowledge of the allegedly nefarious nature of the pay day operation and his intent to evade usury laws. The availability of other evidence to meet the government's burden is an important factor in Rule 403 balancing, as it serves to further reduce the probative value of the prior conviction. McCallum, 584 F.3d at 477 ("Given all of [the other] evidence [available to the government], we are at a loss to understand how the court or the government could believe that the prior convictions were necessary to prove [the defendant's] intent and knowledge and that they passed muster under Rule 403"). Put another way, "[i]f the existence of other evidence makes the prior convictions less necessary to the Government's case, then a court should give more weight to the risk of prejudice to the defendant." United States v. Nachamie, supra, 101 F.Supp.2d 134, 144-45 (excluding prior conviction as "cumulative" of other potential evidence and the "risk of unfair prejudice"). Proving the conduct underlying the

6

conviction will also likely result in a mini-trial, and risk confusing the issues and unnecessarily delaying the proceedings.  See Fed. R. Evid. 403 ("confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence" are grounds for excluding relevant evidence).

The second act the government seeks to admit should be precluded on the same grounds, based on the same analysis.  It concerns Mr. Tucker's false representation that he owned a Porsche, which he pledged as collateral when he sought a $50,000 loan from American Bank of Kansas City; he also submitted a title document supporting the representation.  This conduct occurred on April 11, 1988, and Mr. Tucker subsequently pleaded guilty to making a false statement to a bank to acquire a loan.  He was sentenced to 12 months' imprisonment (for this and for the loan brokerage business crime to which he also pleaded guilty), and ordered to pay $55,734.75 to the bank as restitution (see indictment and judgment, part of Exhibit B to ECF #129).

As with the other stale conviction already discussed, there is not a "close parallel" between this conduct and the charged conduct as required for 404b admission.  See United States v.Corey, supra, 566 F.2d 429, 431.   The conviction rests on a single, obvious misrepresentation by Mr. Tucker, made almost 30 years ago, in order to obtain a small loan for himself.  This evidence is insufficiently similar to, and too remote from, the charged conduct to be relevant to his knowledge or intent.  It should also be excluded under Rule 403, for the reasons previously discussed.

  **B.**  **The Government's Assertions about the Relevance of Certain Statements Made by Mr. Tucker in a 1997 Bankruptcy Petition Are Incorrect and**

**Speculative.  This Evidence Is Inadmissible as Direct Evidence of the
Charged Conspiracy and under Rules 403 and 404(b).**

The government flags two statements made by Mr. Tucker when filing for bankruptcy in

1997: (a) a false claim that he was not an officer, director, partner or managing executive of a

corporation, partnership or sole proprietor, when there was evidence that he was, at that time, an

"agent and one of the incorporators" of National Leasing Service, Inc., and its president; and (b)

his failure to disclose that he had signed a revolving note of credit of up to $500,000 with

Halinan Capital Corp., on behalf of NLS; at some point – the government does not specify a date

– he drew $50,000 against this note (see ECF #129, pp. 9-10 of 69).

The government has not attached the bankruptcy petition as an exhibit to its motion, and

fails to acknowledge that it was filed by Mr. Tucker as an individual.  Since the note of credit

was issued to NLS, not to Mr. Tucker personally, he had no obligation to disclose any

information about it on his personal bankruptcy petition.  Nor did he have the right to discharge

any debt incurred, since any money drawn on the note belonged to NLS.  This may explain why

Mr. Tucker did not disclose that he had an association with this company; he should have, but

since NLS was formed just weeks before the petition was filed, and Mr. Tucker's association

with it did not involve any personal assets or debts, this failure was probably an oversight.[2]

 For the reasons discussed in the prior section, this misstatement certainly does not

constitute the kind of deliberate falsehood that would be relevant to Mr. Tucker's state of mind

with respect to the current criminal charges.  There is no proof it was an intentional falsehood, it

---

[2] On information and belief, a note of credit is not considered an asset for bankruptcy
purposes in any event, and monies drawn on the note would not have to be listed as a debt unless
they were received prior to the filing and the debt remained outstanding.  As mentioned, the
government does not provide a date for when money was drawn on the note of credit.

is not sufficiently similar conduct to the charged crimes to be relevant to his knowledge and intent, it is remote, and it would unfairly suggest a propensity to lie. The government's motion to admit this evidence under Rule 404(b) (see ECF #129, p. 18 of 69) should be denied.

So, too, should the government's application to admit proof of Mr. Tucker's involvement with NLS, including the note of credit, as direct evidence (see ECF #129, pp. 10, 18 of 69). The government contends this is "necessary to complete the story of the defendants' crimes at trial"; it claims that by filing for bankruptcy, Mr. Tucker sought to "clear his debts" and "protect his newly-formed payday lending entity [NLS] and seed capital he had received for the purpose of building that business" (id., p. 18). As already noted, the bankruptcy petition did not concern NLS. The government does not explain how shielding Mr. Tucker's association with NLS in his personal bankruptcy filing – assuming, for the sake of argument, this was deliberate – could "protect" NLS or "seed money." Nor can it: the note of credit was NLS's, not Mr. Tucker's. Thus, even if he had drawn $50,000 on the note by the time the petition was filed (the government does not allege, much less proffer evidence, that he did), in his capacity as an officer of the corporation, the debt would have been a company debt, not a personal one.[3] If it was a personal debt, moreover, it would have been in Mr. Tucker's interest to disclose it, not to conceal it. The purpose of the bankruptcy was to discharge his debts so that he could start anew.

The government's contention is accordingly not merely rank speculation, it is demonstrably incorrect. We also note that NLS had nothing to do with the loans at issue in the charged conspiracy. Notably, the government does not contend otherwise. It was National

---

[3] On information and belief, Mr. Tucker was not the owner of NLS as the government asserts (ECF #129, pp. 10, 18 of 690. Blaine Tucker was.

Money Services that engaged in the bank lending referenced in the indictment. NLS had a different business – consumer leasing – which operated in Missouri. There was nothing underhanded about the way NLS did business or its demise, and it was not "merged into" NMS as the government asserts; rather, NMS simply purchased the assets of NLS.

In sum, there is no need for the jury to learn about this company. It does not "complete the story" of the charged crimes, it is instead totally irrelevant. Permitting the government to go this far back in time, for no proper purpose, will simply immerse the jurors in a time-wasting, confusing aside. <u>See</u> Fed. R. Evid. 403.

The Court should accordingly preclude the government from introducing evidence about Mr. Tucker's bankruptcy filing and NLS.

## II. OPPOSITION TO MOTION TO PRECLUDE EVIDENCE OF RELATED COURT DECISIONS AND ORDERS

The government seeks a blanket preclusion of evidence of any and all court decisions and orders "in other proceedings" that involved the defendants and the payday lending businesses at issue in this case – except for information about them that supports the government's case (ECF #129, p. 20 of 69). This motion should be denied.

The government has cited several decisions from around the country involving the subject lending businesses. It asserts that "the existence of these proceedings and the submission of materially false and misleading affidavits by the defendants in connection with these proceedings are highly relevant to the offense conduct" (<u>id.</u>). It does not explain why, or provide more than a cursory description of the purported false and misleading affidavits. While evidence of these actions and affidavits are to be used against the defendants, the government wants to preclude

any additional evidence concerning them under Rule 403: it asserts that such evidence is "of little probative value" and "would unfairly prejudice both parties" (id., pp. 20-21 of 69).

The government has not supported its request for a blanket exclusion of all material relating to these proceedings – save for whatever the government believes will help prove its case. It does give lip service to the distinction between the admissibility of evidence for its truth versus evidence that is relevant to the defendants' state of mind, which is not hearsay (id., at p. 24). But it moves to preclude the latter anyway.

The government does not reveal exactly what it thinks is relevant to prove guilt, and the defendants cannot, at this juncture, identify what might be relevant to the defense. As the government's filing makes clear, there are many prior proceedings, and appeals and remands, in different jurisdictions, which present a variety of issues (id., at pp. 21-22 of 69).

The defendants agree that any decisions that post-date the indictment here could not be relevant to either side. As for the content of prior opinions or their holdings, the defendants have not determined what, if anything, is pertinent to their good faith defense, and they should not have to now. The tribal lending portion of the indictment goes back 13 years before charges were filed in this case, and the trial does not begin for another two months.

We note that in connection with the government's contention that evidence of a witness's subjective belief as to legal ownership should be precluded (ECF #129, p. 40 of 69), the government has not sought preclusion per se. Instead, it has cited discussions among counsel about the issue, and states that "to the extent there is any disagreement that requires intervention by the Court," the Court will be advised so the matter can be resolved (id., p. 41). We request that the same course of action be ordered as to the admissibility of proof relating to prior

proceedings. The defendants intend to present a defense that they believed, in good faith, that the payday loans at issue here were lawful, and that they did not knowingly and wilfully seek to evade state usury laws or any other laws applicable to the business.[4] It is premature for the government to seek preclusion of an entire category of evidence at this stage.

## III.    OPPOSITION TO MOTION TO ADMIT DON BRADY AUDIO HEARSAY

Pursuant to Fed. R. Evid. 801(d)(2)(E), the government seeks to introduce recorded statements made by Don Brady, an alleged coconspirator (see ECF #129, pp. 26-31 of 69). This motion should be denied, because there is evidence that the tapes have been altered and are incomplete. The defense has not been provided with accurate copies and, upon information and belief, the originals are no longer available.

The government has moved to admit Mr. Brady's recorded statements, but it has not identified which tapes or sections of tapes it wishes to play for the jury. We ask the Court to direct it to do so, and to schedule a hearing, before trial, to determine the admissibility of any tape the government proffers.

### A.    The Recordings the Government Has Provided to Defense Counsel Are Not Complete and Accurate.

Recognizing that "recorded evidence is likely to have a strong impression upon a jury and is susceptible to alteration," the Court of Appeals "ha[s] adopted a general standard, namely, that the government 'produce clear and convincing evidence of authenticity and accuracy' as a foundation for the admission of such recordings." United States v. Fuentes, 563 F.3d 527, 532

---

[4] See memorandum of law in support of including "knowingly, wilfully and unlawfully" scienter elements in racketeering instructions, and, specifically, a wilfullness mens rea as to the collection of unlawful debt.

(2d Cir. 1977), quoting United States v. Knohl, 379 F.2d 427, 440 (2d Cir. 1967); accord United States v. Bakal, 20 Fed.Appx. 37, 41 (2d Cir. 2001).  In some cases, allegations of possible tampering have been deemed to go to the weight of the prospective evidence, not to its admissibility.  In Fuentes, for example, the defendant raised a tampering claim on appeal, which was dismissed as "completely speculative" and belied, as a factual matter, by common sense. See 563 F.2d at 532.[5]  Similarly, defendant's claim as to missing or inaudible parts of a tape was rejected in Knohl, with the Court noting that such defects do not render a tape inadmissible per se, and that "there was very substantial evidence of authenticity and accuracy."  379 F.2d at 440.

Significantly, the Knohl decision cautioned that the degree to which a tape had been altered was relevant to admissibility, which was a matter for the District Court's discretion: there may be cases where "so much of a tape recording is inaudible or the circumstances surrounding it are so suspicious and make it so untrustworthy that it should be not be admitted into evidence." Id.  This is such a case.

Here, defense counsel has encountered several serious problems across the fourteen recordings, originally made by Carolyn Williams and provided by the government in discovery. Four of these recordings are conversations between Carolyn Williams, Don Brady and other individuals and the remaining ten recordings are recorded tribal board meetings.  In addition to the recordings, defendants were provided with transcripts of five of the recordings. After our review of both the recordings and the provided transcripts, it is clear there are significant amounts of white noise/redactions on the audio files, which renders sections of the

---

[5] At trial, defendants objected to admission of the tapes on other grounds: "their inability to confront [the informant with whom they spoke on the recording] and the government's insufficient demonstration of [the informant's] consent [to taping]."  563 F.2d at 531.

conversation on the recordings inaudible. For example, in the audio recording Bates stamped MNE-SDNY-00139670, there is white noise from 00:38:14 to 00:42:24. Similarly, on the audio recording Bates stamped AMG-SDNY-03028387, there is white noise from 00:06:34 to 00:09:53. There are numerous other examples of white noise obfuscating large portions of audio material in the same manner. In addition, there are lines of text present on the transcripts provided by the government (although not drafted by the government) that are not included on the audio recording. For example, in the transcript of the conversation between Don Brady and Carolyn Williams, June 19, 2012 (Bates No. MT0078775-786), there are multiple passages that are present on the transcript but redacted on the audio recording. Due to these numerous instances of white noise (redactions), these recordings are significantly incomplete and as Ms. Williams has previously stated, the original recordings have been destroyed, there is no way to restore these recordings to a complete version or to access complete versions.

There is, accordingly, substantial evidence that the tapes the government has provided to us are incomplete. It is also unclear where these tapes came from, who made the transcripts the government gave us and when, and where the originals are if they still exist. As set forth in the Affirmation of Lee Ginsberg (attached to this memorandum as Exhibit A), Carolyn Williams, who made the recordings primarily on her telephone, has testified that she no longer has the phone and does not know where it is, and that she does not have any original recordings; she also acknowledged that the phone changed hands several times. She has further testified that she has no knowledge of the source of any white noise or of the recordings being corrupted, thereby absolving herself of responsibility for the gaps we have identified. The Court should have serious reservations about Williams' credibility, however, given that she made the recordings in

16

anticipation of commencing a "whistleblower" lawsuit which she hoped would be lucrative for her. That she was selective in her recording, or perhaps the instrument of some of the alterations, cannot be discounted.

The bottom line is that the tapes have been altered, however the alterations may be explained (if they can be). This undermines their accuracy and, hence, their reliability. See McAlinney v. Marion Merrell Dow, Inc., 992 F.2d 839, 842 (8th Cir. 1993) (upholding District Court's exclusion of audiotapes, which were "mostly garbled, often unintelligible, and suffer from an excess of background noise"; they also "exhibit[ed] serious problems of continuity because . . . there are numerous blank spots," and, therefore, there were "serious issues . . . concerning whether changes, additions, or deletions have been made"); cf. United States v. Hamilton, 334 F.3d 170, 186-87 (2d Cir. 2003) (noting that defendants "do not challenge the authenticity or accuracy of the recordings," and "any question as to the veracity of the recorded statements and the credibility of the speakers goes to the evidence's weight rather than to its admissibility") .

Concerns about the tapes' reliability, in turn, affect their admissibility under Rule 403. Cf. Jian An Li v. Canarozzi, 142 F.3d 83, (2d Cir. 1998) (fact that evidence is not excludable as hearsay under a federal rule of evidence does not make it admissible; it can still be precluded under Rule 403); United States v. Willie, 308 F.Supp.2d 724, 725-26 (E.D. Va. 2004) (despite some areas of inaudibility, recording was "'trustworthy' enough to be probative" on the issues for which it was offered, and did not pose danger of unfair prejudice under Rule 403). Indeed, the balancing required by Rule 403 is a vehicle for excluding unreliable evidence. See United States v. Aguiar, 975 F.2d 45, 47 (2d Cir. 1992). In Jian An Li, supra, the Court upheld the District

Court's exclusion of the deposition transcript of an uncalled witness, under Rule 403, primarily because it had "'serious doubts . . . as to the accuracy of the transcript." 142 F.3d at 89. Such inaccuracies diminish the probative value of the evidence, and increase the danger of unfair prejudice to the opposing party.

        **B.**        **The Court Should Hold a Hearing on Admissibility.**

The defense does not know how many tapes the government wishes to introduce, or which portions. Accordingly, we cannot now make specific objections based on the substantial evidence of alterations we have described. We ask the Court to direct the government to provide that notice, by referencing the audiotapes to which it has access (providing the subject, date, and time on the tape that the proffered statements were made).

We also request a hearing on admissibility, so that the accuracy of the tapes can be vetted and the Court can make informed Rule 403 rulings. See United States v. Willie, supra, 308 F.Supp.2d 724, 725 (court held hearing on motion to exclude tape of "poor quality"); United States v. Dinero Express, Inc., 2000 U.S. Dist. Lexis 11314 (S.D.N.Y. 2000), *8 at n.2 (noting District Court's scheduling of hearing "to determine whether [a] tape has been tampered with"); cf. Krutikov v. United States, 324 F.Supp.2d 369, 372 (E.D.N.Y. 2004) (upon review of 2255 petition, court notes that none of the defendants "complain[ed] about the quality of the tape recordings prior to trial when a hearing could have been held").

**IV.**        **OPPOSITION TO MOTION TO PRECLUDE ADVICE OF COUNSEL DEFENSE**

Although the title of the government's motion is one to prohibit the defense from presenting evidence concerning advice of counsel (ECF #129, p. 31 of 69), the substance of the

motion, with respect to Mr. Tucker, is a request for discovery. The government also makes the sweeping claim that Mr. Muir, in his defense, may not rely on his knowledge of other lawyers' opinions because he is not entitled to present an advice of counsel defense. We do not oppose providing discovery, and are prepared to start doing next week. We oppose the motion to preclude Mr. Muir from relying on the opinions of other lawyers, to the extent such reliance is relevant to his (and Mr. Tucker's) good faith defense.

The government acknowledges that it is "already privy to some (but likely not all) of the legal advice Tucker received concerning his payday lending operations" (ECF #129, p. 33 of 39). It asks the Court to direct us to disclose "all advice he received" by the date our response to its motions in limine is due: February 17, 2017. Id., p. 34. The Court has not issued such an order. Nevertheless, we have been diligently gathering and reviewing relevant materials, as part of preparation for trial. We expect to be in a position to start turning over documents relevant to advice of counsel next week, and will turn over additional documents on a rolling basis.

As for Mr. Muir, although he is not in a position to present an advice of counsel defense per se, he is going to present a good faith defense to the charges. As part of that defense, he intends to rely on information received from a variety of sources, including, bnut not limited to, legal opinions, which informed his belief that the payday loans at issue here were lawful. This information will support his defense that he was not giving legal advice regarding the knowing and willful evasion of state usury laws or any other laws applicable to the business.[6] The

---

[6] See memorandum of law in support of including "knowingly, wilfully and unlawfully" scienter elements in racketeering instructions, and, specifically, a wilfullness mens rea as to the collection of unlawful debt.

government is free to argue that the defendants lacked good faith, but it cannot preclude them

from presenting evidence relevant to their state of mind.

## V.     OPPOSITION TO MOTION THAT COURT SHOULD INSTRUCT THE JURY ON THE RELEVANT ELEMENTS OF STATE LAW

The defendants acknowledge that it is within the province of the Court to provide

instructions on state laws relevant to the crimes charged.  However, this is not mandatory, as the

government seems to suggest.  So long as the appropriate law is conveyed to the jury – these are

legislative facts – the government will not be prejudiced by having this information introduced in

the evidentiary portion of the trial.   This can be done either through witnesses or by stipulation.

The Modern Federal Jury Instruction the government cites,  Instr. 6.18.1962C-9,

contemplates a straightforward case involving an alleged usurious loan in a single jurisdiction.

This case, in contrast, charges a conspiracy to violate usury laws all over the country, and

substantive unlawful debt collections in eight states.  The government has proposed a charge that

reflects state laws in twelve or fourteen jurisdictions (the list in the body of the request does not

match the statutes cited in the footnote, see ECF #127, p. 20 of 86), and this list is not

exhaustive: some of the states implicated in the substantive RICO counts are not mentioned in

the government's charge request.  The list cannot be finalized until after the parties rest.  It is not

clear whether the usury rates have changed over the course of the conspiracy, whether usury or

payday lending rates are applicable when a jurisdiction has both, and whether the criminal or

civil cap should apply in jurisdictions which have criminal usury laws.  Moreover, the law of

three different federally-recognized Indian tribes is of material importance to the defense, and the

jury will need to be informed about it.

In sum, this case implicates myriad state and tribal laws, some of which will be the subject of testimony. Indeed, the government contemplates that some of its witnesses will discuss usury laws (ECF #129, p.35 of 69, n. 5). Other statutes, or a summary of all the relevant statutes and tribal law, can be presented as evidence by way of a stipulation. The government can "reject a proposed stipulation in order to present a 'coherent narrative' of its case." United States v. Ferguson, 676 F.3d 260, 274 (2d Cir. 2011), quoting Old Chief v. United States, 519 U.S. 172, 191-92 (1997). But a stipulation of the relevant laws will, in this instance, be an eminently "coherent" way to present the information, just as simple and straightforward as including it in a jury instruction. Judicial notice is, in effect, a vehicle for providing evidence to the jurors that they need to determine the issues. Using witnesses and/or a stipulation will serve the same purpose, but avoid any prejudice to the defendants: including state usury laws in the charge will necessarily highlight those laws, and may suggest that the Court is endorsing the government's view that the loans here were illegal. There is no need to take that risk.

We propose that the parties try to work out what state and tribal laws are relevant – which is not a simple undertaking in itself -- and agree on an appropriate way to present them to the jury during the evidentiary portion of the trial. If the matter cannot be resolved, we will ask the Court to intervene.

## VI.    OPPOSITION TO MOTION TO PRECLUDE ALL EVIDENCE AND ARGUMENT RELATED TO LEGALITY OF OR POLICY ARGUMENTS REGARDING PAY DAY LENDING

With the exception of the two categories listed below, the defendants do not oppose the government's request to preclude policy arguments (see ECF # 129, p. 37 of 69).

**"Whether and under what circumstances payday should be legal"**

The government's motion reads as though it believes all short term lending is illegal. The government contends the defendants should be precluded from offering evidence or argument about policies regarding the legality of payday lending. This request has no basis. The government concedes that payday lending is legal in some circumstances and effectively prohibited in other circumstances (superseding indictment, ¶ 8-9). Moreover, the defendants obviously do not concede that the loans at issue in this case were unlawful. Clearly, evidence of short term lending, as well as State regulation of these loans, will be the subject of evidence presented by both parties.

**"Whether federally recognized Indian Tribes engaged in payday lending should be permitted to use their sovereignty to evade state regulation"**

The ability, manner, and form in which federally-recognized Indian Tribes may engage in commerce free from state regulation is at the center of the defendants' defense. As set forth in numerous pleadings, the defendants believe these loans were lawful and, even if they are not lawful, they had a good faith belief that they were. In sum, this case is all about the "legality of short term lending by Native American Tribes," and defendants should not be precluded from offering evidence concerning the circumstances in which payday lending may be legal or may be illegal, including, without limitation, the identification of parties to a loan transaction, how and where a loan transaction is consummated, the manner in which consumer consent is obtained, and the laws applicable to any given loan transaction.

## CONCLUSION

For the reasons stated, the defendants respectfully asks this Court to grant the relief requested.

/s/_____
JAMES M. ROTH
on behalf of Scott Tucker

/s/_____
THOMAS J. BATH, JR.
on behalf of Timothy Muir

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**UNITED STATES OF AMERICA**

                                        **16-CR-091 (PKC)**

       **- against -**

                                       **Affirmation in Opposition to**
**SCOTT TUCKER and TIMOTHY MUIR,**        **Government's Motion in Limine**
                                       **Concerning Coconspirator**
                                       **Hearsay**

                      **Defendants.**
-------------------------------------------------------x

       Lee Ginsberg, an attorney duly admitted to practice law before the Courts of New York

State and in the Southern District of New York, under penalties of perjury, hereby affirms that

the following statements are true, except those made upon information and belief, which he

believes to be true:

       1.  I am an attorney for Scott Tucker in this action. The information set forth below is

derived from my personal review of discovery material and other documents, as well as on

information supplied by other defense counsel, the defendants, and other sources familiar with

aspects of the case.

       2.  I submit this declaration, in part, to advise the Court of our unsuccessful efforts to

obtain complete and accurate audio files of statements made by Donald Brady, whom the

government alleges is a coconspirator.  The government seeks to introduce certain statements

made by Mr. Brady, a former official of the Miami Tribe of Oklahoma, "to other tribal

employees in order to convince [them] not to disrupt the existing arrangement with Tucker"

(ECF #129, p. 26 of 69).

3.  Upon information and belief, all the recordings were made to or in the presence of Carolyn Williams during her employment with the Miami Tribe of Oklahoma; the recordings were surreptitiously made by her.  The government raised the issue of Don Brady and the admissibility of the Williams recordings during an informal attorney conference call on December 22, 2016.  Thereafter, defense counsel reviewed the discovery materials provided by the government to determine whether we had received these recordings as part of Rule 16 disclosures.  We could not locate them in the Relativity database.  On January 5, 2017, defense counsel Nadjia Limani sent an e-mail to the government inquiring whether these recordings had been produced as discovery material.  On January 5, 2017, AUSA Velamoor provided Bates Stamp numbers for the recordings.  However, we later discovered that these Bates Stamp numbers correlated to nine recorded tribal board meetings, not the recorded conversations between Williams and Brady.

4.  On January 12, 2017, Ms. Limani sent another e-mail to the government specifically requesting the Williams recordings with Brady.  AUSA Velamoor provided Bates Stamp numbers for both the transcripts of the recordings and the recordings themselves.  Upon review of the transcripts, the formatting appeared to be altered in such a way that made the text unintelligible .  Also, when we located the recordings in the Relativity database, it appeared that there were no native files in the system, meaning there were no audio files to play.  After additional conversations with Modus staff and the government, on January 19, 2017, AUSA Velamoor provided defense counsel with correctly formatted transcripts of the recordings.  On January 20, 2017, we were provided with a disk containing five recordings.  This is in addition to

the nine recorded board meetings that we were able to previously locate within the Relativity system.

5. After a thorough review of the newly-produced five recordings and the previously-produced nine recordings, we discovered evidence of alteration: there is white noise, which effectually redacts audio from the recording, and there are lines of text within the transcripts that have been removed from the audio file. Defense counsel has never been provided with the opportunity to review the original recordings. Upon information and belief, as set forth below, we have reason to believe the originals are no longer available.

6. Upon information and belief, Ms. Williams was terminated from her employment with the Miami Tribe for stealing its confidential and privileged documents. Ms. Williams was not a board member of the Miami Tribe, but rather was the "loss center manager" and was from time to time tasked with recording the minutes of board meetings, not with secretly recording the meetings. Moreover, Ms. Williams has testified under oath that she made her secret recordings after having looked into the idea of making a "whistleblower" claim and realizing that it could be "lucrative."

7. Ms. Williams has also testified that after she hired a law firm to pursue her supposed whistleblower claim, over the course of the next nine months she not only made her surreptitious recordings, she also repeatedly, without authorization, accessed the then CEO's computer. During this same time frame, while purportedly performing job duties of organizing litigation materials, she repeatedly removed documents from the tribe's offices for her own use in pursuing her whistleblower claim. These documents included attorney-client privileged materials, which she and her lawyers then shared with third parties, including the United States Attorney's office for the Southern District of New York. Her "sharing" continued after Ms. Williams was

terminated for stealing this very information from the Miami Tribe. When the Miami Tribe demanded she return the stolen documents, Ms. Williams claimed she destroyed the documents at her lawyers' direction such that she no longer retains any "original" recordings.

8. Ms. Williams further testified that she made her secret recordings primarily on her personal cellular telephone using a voice memo application. She provided the telephone to her attorneys, who gave it back to her, and later provided it to lawyers for the Miami Tribe. She claims those lawyers refused to return her telephone to her and she has no knowledge of its whereabouts. When questioned as to the appearance of "white noise" on the recordings, Ms. Williams indicated that she had no knowledge of anyone adding white noise to the recordings or of the recordings being corrupted or having lost any data.

Dated: New York, New York
February 17, 2017

/s/_____
          Lee Ginsberg