H9cWtuc1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                       16 Cr. 91 (PKC)

SCOTT TUCKER and
TIMOTHY MUIR,                  Trial

          Defendants.

------------------------------x
                             New York, N.Y.
                             September 12, 2017
                             12:30 p.m.


Before:
                   HON. P. KEVIN CASTEL

                             District Judge
                              and a jury
                    APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:   NIKETH V. VELAMOOR
     HAGAN C. SCOTTEN
     SAGAR K. RAVI
     Assistant United States Attorneys

FREEMAN NOOTER & GINSBERG
     Attorneys for Defendant Tucker
BY:   LEE A. GINSBERG
     NADJIA LIMANI
       -and-
STAMPUR & ROTH
BY:   JAMES M. ROTH

BATH & EDMONDS, P.A.
     Attorneys for Defendant Muir
BY:   THOMAS J. BATH
       -and-
BEVERLY VAN NESS

1          (A jury of twelve and six alternates was impaneled and

2     sworn)

3          THE COURT:  Thank you, ladies and gentlemen.  We will

4     now excuse our other jurors, again with the appreciation of the

5     Court, and you can return to the jury room.  Thank you very

6     much.

7          In a moment, ladies and gentlemen, my jurors, Flo is

8     going to take you into the jury room.  You're going to have the

9     opportunity to have notepads with you.  You can take notes

10    during the trial, and I'll tell you how that all works.  We're

11    going to break now for lunch.  It's 12:40.  Let's pick up at

12    1:45 sharp, and at 1:45 I will have about five minutes of

13    preliminary instructions, and then you will hear the government

14    deliver its opening statement.  The defendants are not

15    obligated to do anything in a criminal trial.  If they elect to

16    deliver an opening statement, they may do so.  And then the

17    first witness will be called.

18         Have a great lunch, and see you at 1:45 sharp so we

19    can get a good start and have a good afternoon --

20         JUROR:  This room?

21         THE COURT:  Pardon me?

22         JUROR:  In this room?

23         THE COURT:  Yes, in this room.  Thank you.

24         (Jury not present)

25         THE COURT:  Sir, please come here.  Who are you, sir?

H9cWtuc1

1      MR. THORNTON:  I'm ASAC Andrew Thornton, with IRS,

2   sir.

3      THE COURT:  Your name is?

4      MR. THORNTON:  Andrew Thornton.  I'm with the IRS,

5   criminal investigations.

6      THE COURT:  What were you doing sticking your head in

7   the jury room?

8      MR. THORNTON:  I was going to notify Flo they had one

9   too many jurors, sir.

10      THE COURT:  It's none of your business, sir, and

11   that's not your job.

12      MR. THORNTON:  Yes, sir.

13      THE COURT:  All right?  Thank you very much.

14      MR. THORNTON:  No problem.

15      THE COURT:  Let me inquire of the government.  Are you

16   aware of us having one too many jurors?

17      MR. SCOTTEN:  We didn't count, your Honor, so I have

18   no --

19      THE COURT:  Are you aware of us having one too many

20   jurors, any of the defense counsel?

21      MR. GINSBERG:  Not that we were aware of when we

22   selected or -- I didn't count them as they went into the room.

23      THE COURT:  I certainly observed the process, and it

24   appeared to me that --

25      Yes.  I have someone in the back with their hand up.

H9cWtuc1

1          SPECTATOR:  Yeah.  I also saw an extra person walk

2     from the bench back to the jury room.

3          THE COURT:  All right.  We'll get to the bottom of

4     that after the lunch break and find out what happened, because

5     no one should be in the jury room other than jurors.

6          MR. GINSBERG:  I just didn't hear exactly what the

7     gentleman described to you that he actually did in terms of the

8     jury room door.

9          THE COURT:  All I saw was that he inserted his head

10    into the jury room in an effort to inform Flo that, in his

11    opinion, there were one too many jurors.

12         I'm going to ask my law clerk to go into the jury room

13    and have Flo come out now.

14         THE LAW CLERK:  OK.

15         THE COURT:  Please be seated.

16         MR. SCOTTEN:  Judge, when we have a quick minute, we

17    noticed the Court's rules say that the parties should show

18    demonstratives to the Court if they intend to use them.

19         THE COURT:  No.  Show them to the other side.

20         MR. SCOTTEN:  Already done, and I think neither side

21    objects to the other's.

22         THE COURT:  OK.  That's sufficient.

23         MR. GINSBERG:  I was just asking somebody in the

24    courtroom.  They think that somebody did go out the wrong way,

25    didn't realize they were supposed to go out the main door, but

H9cWtuc1

1    we'll find out.

2         Can I also inquire, in any event, what association

3    that IRS gentleman has to do with the government team here?

4    Because if he does have anything to do with the government

5    team, I think we're going to discuss among us whether we have

6    anything to say about what happened, after we speak to

7    Florence.

8         THE COURT:  Listen, this is a public courtroom.

9         MR. GINSBERG:  It's a public courtroom until you put

10   your head in the jury room.

11        THE COURT:  I understand that, but I observed what I

12   observed.  I did not observe any comment.  I think he was about

13   to make a comment, but --

14        Sir, did you say anything?

15        MR. THORNTON:  No, sir.

16        THE COURT:  I didn't think you did.

17        Go ahead.

18        Madam Deputy, are you aware of there being an

19   unauthorized person in the jury room, an additional juror?

20        THE DEPUTY CLERK:  No.

21        THE COURT:  How many jurors do you have in the jury

22   room?

23        THE DEPUTY CLERK:  18.

24        THE COURT:  Do you have 19?

25        THE DEPUTY CLERK:  I don't have 18.  I --

1        THE COURT:  You have 18, not 19, correct?  Please

2    verify that you have 18 jurors in the jury room.

3        THE DEPUTY CLERK:  I have, I think.  They all walked

4    out.

5        THE COURT:  All right.  But was it your understanding

6    you had 18 jurors in there?

7        THE DEPUTY CLERK:  That I only had 18.

8        THE COURT:  All right.

9        THE DEPUTY CLERK:  However, I have to say one thing.

10   I made 18 slips, and I'm missing one.  I'm missing -- there's

11   one that I need to make another one for, so that's an odd thing

12   that you're saying that.

13       THE COURT:  All right.  Well, we will wait.

14       THE DEPUTY CLERK:  I have to wait.

15       THE COURT:  At this point, we will wait until 1:45,

16   and we'll see where we are.  The jurors have left on their

17   lunch break.

18       Thank you all very much.  We are adjourned.

19       MR. SCOTTEN:  Thank you, your Honor.

20       (Luncheon recess)

21

22

23

24

25

H9cWtuc1

AFTERNOON SESSION

1:45 p.m.

1    (Jury not present)

2    THE COURT:  Please be seated.  We'll wait a moment for

3    my deputy.

4    Why don't you bang on the jury room door and let Flo

5    know that we're ready.

6    THE LAW CLERK:  OK.

7    MR. ROTH:  Judge, I was informed that some of the jury

8    monitors -- I don't know if it's critical -- are not working.

9    THE COURT:  Well, it may be critical.  Let's see what

10   happens.  Sometimes in my experience, they take a minute or two

11   to go on, Mr. Roth.  What's the basis for your knowledge?

12   Mr. Roth, what's the basis for your knowledge?

13   MR. ROTH:  My paralegal tested it.

14   THE COURT:  Your paralegal went into the jury box?

15   MR. ROTH:  No.  On the side there, Judge.

16   THE COURT:  Where?

17   MR. ROTH:  I'm not sure, Judge.

18   THE COURT:  Then what would you like me to do?

19   MR. ROTH:  Nothing, Judge.  I'm fine.

20   THE COURT:  I'm advised by my courtroom deputy that

21   juror 18 did not know that she was not called and went into the

22   jury room, and she was sent downstairs to the jury assembly

23   room; she was not a called juror.  Any questions?

1          MR. SCOTTEN:  Nothing from the government, your Honor.

2          THE COURT:  All right.  Bring our jury in, please.

3          (Jury present)

4          THE COURT:  Please be seated, ladies and gentlemen.

5          All right.  Good afternoon, ladies and gentlemen.  I

6   hope you can see me where you're seated.  I will try and adjust

7   my chair.  OK.  That's great.  Terrific.  Thank you.

8          At the conclusion of this case, I will give you

9   detailed instructions on the law that governs this case, and

10  I'm going to speak those instructions, but I'll also give you

11  the typed text of those instructions.  But there are several

12  instructions that I will give you at the outset of this case

13  which you should be aware of.

14         Now, you have already heard from me that it is the

15  judge's job to instruct on the law that governs and controls in

16  the case.

17         This is a criminal case.  An indictment filed by a

18  grand jury sitting in this district has charged Scott Tucker

19  and Timothy Muir, the defendants, with conspiracy to collect

20  unlawful debts, collection of unlawful debts, conspiracy to

21  commit wire fraud, wire fraud, conspiracy to commit money

22  laundering, promotion of money laundering, concealment of money

23  laundering and making false disclosures under the federal Truth

24  In Lending Act.

25         The indictment is not evidence of anything.  It's an

H9cWtuc1

1    allegation.  It simply contains the charges that the government

2    is required to prove to the satisfaction of the jury by proof

3    beyond a reasonable doubt.

4            Defendants Scott Tucker and Timothy Muir have entered

5    a plea of not guilty to the indictment.  The law presumes

6    Mr. Tucker and Mr. Muir to be innocent of all the charges

7    against them.  The burden is on the prosecution to establish

8    the defendants' guilt beyond a reasonable doubt with respect to

9    each element of the offenses charged.  The burden of proof

10   never shifts to the defendant, and the law never imposes on a

11   defendant the obligation of doing anything in a criminal trial.

12           The presumption of innocence remains with the

13   defendants throughout the trial unless and until after hearing

14   and considering all the evidence and my final instructions you,

15   as jurors, unanimously are convinced of the defendants' guilt

16   beyond a reasonable doubt.  Until it is time to deliberate at

17   the conclusion of the case, it is important that you keep an

18   open mind.

19           You must pay close attention to all the evidence

20   presented.  Evidence consists only of the testimony of

21   witnesses, documents and other things admitted into evidence,

22   or stipulations agreed to by the attorneys.  Certain things are

23   not evidence and must not be considered by you.  I'm going to

24   list them for you.

25           Statements, arguments and questions by lawyers are not

1    evidence, nor are my own statements to you.  So when the

2    lawyers get up to deliver opening statements -- and again, I

3    know the government is going to deliver an opening; the

4    defendant need not deliver an opening statement -- but opening

5    statements are not evidence.  They're previews of what the

6    lawyers believe the evidence will be in the case.

7        Questions by lawyers are not evidence.  When a witness

8    is asked a question, "Were you at the Barclays Center on

9    January 15, 2013, after the major snowstorm that hit Brooklyn

10   and shut everything down," and the witness says no, that's not

11   evidence of anything.  You're not to sit there and say, Oh, the

12   Barclays Center, snowstorm, January.  No.  A question asked of

13   a witness is not evidence of anything.  It's the witness's

14   answer, taken with the question, that is the testimony.

15       And of course, when I'm speaking to you now, this is

16   not evidence.  This is the judge's instructions.  That's

17   different than evidence.

18       Something else that's not evidence are objections to

19   questions and objections to evidence.  They are not evidence.

20   Lawyers have an obligation to their clients to make an

21   objection when they believe evidence is being offered

22   improperly under the rules of evidence.  You should not be

23   influenced by the objection or by the Court's ruling on the

24   objection.  If the objection is sustained, ignore the question

25   and any answer that may have been given.  If it is overruled,

1  treat the answer like any other.  If you're instructed that

2  some item of evidence is received for a limited purpose only,

3  you must follow that instruction.

4  Something else that's not evidence is testimony that

5  the Court has excluded or stricken or I've told you to

6  disregard.  That's not evidence and must be not considered.  It

7  may be there's a line of questioning on a subject, and then on

8  occasion, because of some development or some argument that's

9  advanced, I'll conclude that that was an improper line of

10  questioning and I'll tell you to disregard that testimony on

11  that subject.  You must follow that instruction.  That is no

12  longer evidence in the case.

13  In deciding the facts of the case, you will have to

14  decide the credibility of the witnesses; that is, how truthful

15  and believable they are.  How do you decide what to believe and

16  not to believe?  You're going to listen to the witnesses, watch

17  them and observe them, and then decide as you would decide such

18  questions in your ordinary life.  Did they know what they were

19  talking about?  Were they candid, honest, open, and truthful?

20  Did they have a reason to falsify, exaggerate, or distort their

21  testimony?

22  Sometimes it's not what a witness says but how he or

23  she says it that may give you a clue as to whether the witness

24  is telling the truth and whether to accept that witness's

25  version of an incident or an event as credible or believable.

1    In short, the way a witness testifies may play an

2    important part in your reaching a judgment as to whether or not

3    you can accept the witness's testimony as reliable.

4    You will use your common sense and good judgment to

5    evaluate their testimony based on all the circumstances.  I

6    cannot emphasize too strongly that you must keep an open mind

7    until the trial is over.  A case could be presented only step

8    by step, witness by witness, and it would be unfair to one side

9    or the other if you made up your mind until you heard all the

10   evidence.

11   You know from experience that you'll hear a person

12   give a version of events which sounds impressive, it sounds

13   right, and yet when you hear another person's version of the

14   same event, or even the same witness being questioned about it,

15   what seemed so impressive and right may completely wash away.

16   You will use your common sense and good judgment to evaluate

17   testimony based on all the circumstances.  You must keep an

18   open mind until the trial is over.  You should not reach any

19   conclusions until you have heard all the evidence.

20   Each defendant -- Scott Tucker and Timothy Muir -- is

21   charged separately, and you must separately consider the

22   evidence as it relates to each defendant.  Some evidence may

23   only relate to one defendant, and in some instances, if I'm

24   requested to do so, I will give a limiting instruction in that

25   regard.

1      Now, there are some rules that are going to govern

2   this trial and your conduct in this trial, and I will give you

3   those instructions.  These are orders from the Court which you

4   must obey.

5      First, do not discuss the case among yourselves or

6   with any person.  When a witness finishes or you're on a break

7   and you go back to the jury room, you don't talk about what the

8   witness had to say or what you thought about the witness,

9   Wasn't he or she smart or dumb or telling the truth, not

10  telling the truth?  You don't comment on it.  That's a

11  violation of your oath as jurors and my instructions to you.

12  You do not talk about the case among yourselves or with anyone.

13     Now, at the end of the case, in deliberations, you

14  must talk about the case.  You should talk about the case.

15  You'll have an opportunity to say to your fellow jurors

16  everything you think about the case, and when the case is over,

17  you can tell that to your family and friends.  But tonight,

18  when you go home, it's what I said to you in jury selection, a

19  little mystery, perhaps, "Yes, I'm sitting on a jury, and I've

20  been instructed by the Court, by the judge, that I cannot

21  discuss the case at all, and I'm going to follow that

22  instruction."  And that's what you're required to do.

23     The other thing is you may not, and you're not

24  permitted to, read anything about this case online, in

25  newspapers, anywhere, or watch any broadcasts or radio,

1  Internet.  I'm not saying there will be any publicity about

2  this case, but in federal court that sometimes happens.  I told

3  you, it would be terribly unfair to one side or the other if

4  you took that into account.  You wouldn't want that if you or a

5  family member were on trial.  You would want it to come out in

6  the courtroom so that everybody can hear it, people can make

7  their arguments about it, they can address it.  So no research

8  about the case.  You're not to Google or conduct any search on

9  any name, event, terminology, laws, legal concepts or any

10  matter touching in any way upon the trial.  It is a violation

11  of your oath as a juror and a violation of the Court's order to

12  seek out your own information about any matter touching upon

13  the trial, including the people and events, or to research the

14  law.  Your considerations must be based only on what you hear

15  and observe in the courtroom.

16          The next instruction is that you may not send or

17  receive any electronic communications about the case.  This

18  includes texting, emailing, blogging, posting information on

19  social media sites, including Facebook, or others, or using any

20  electronic communications to discuss or even mention this case.

21  "Well, I'm not discussing the case; I'm just mentioning that

22  I'm a juror in this case."  That's wrong.  That's a violation

23  of the Court's order.  This also means no communications with

24  fellow jurors, lawyers, witnesses, spectators or anyone.

25          Now, another instruction which might strike you a

little bit unusual is, let's say something occurs or you saw something or you need to tell me something, and that can sometimes happen, send me a note, but when you come into the jury room, write the note. The other jurors will see you write the note. You'll think to yourself: It's terribly rude. I'm serving with these people. I need to tell them what I'm writing to the judge about. They might even ask me.

Don't do that. Why? Occasionally something occurs that could require a juror to withdraw from the case, and if that information is shared with the other jurors, it could result in the disqualification of other jurors as well, so your fellow jurors are not being rude; they're following my instructions when that note comes directly to my deputy to be handed to me and is not shared with your fellow jurors.

You're not allowed to speak to anyone about this case. If you're approached by anyone to speak about it, and I don't think you will be, politely tell them the judge has directed you not to do so. If any person seeks to contact you about the case, you're required to report the incident promptly to me.

Be sure that I'm informed if any person that you know comes into the courtroom. This is a public trial, so that could happen, but it's important that you do not hear from them what may have happened in the court while the jury was not present. So if you see a friend or relative come into the court, please send a note and let me know.

1        The attorney, the defendants, the witnesses are under

2   my instruction not to talk to the jury outside the courtroom,

3   not even to offer a friendly greeting.  So if you happen to see

4   any of them outside the courtroom, they will not and should not

5   speak to you.  Please take no offense at this.  They will only

6   be acting properly by doing so.

7        In this case, I will allow the lawyers to leave the

8   courtroom without announcement or interruption at any time so

9   long as one lawyer for a party remains.  Please take no offense

10   if this occurs.  It is in compliance with my rules and may

11   facilitate the movement of the trial.

12        Finally, let me say a few words about trial procedure.

13        First, the lawyers have the opportunity, but are not

14   required, to make opening statements.  As I said, they're not

15   evidence.  Then we will begin with the witnesses.  What will

16   happen in this case is first the government will call its first

17   witness.  They will conduct a direct examination of the

18   witness.  Then the witness may be cross-examined by each set of

19   defense counsel, and then the government is allowed to do a

20   brief redirect.  In extraordinary circumstances, at the request

21   of a party, I may allow further questioning.

22        Then, when all of the evidence in the case is in, the

23   parties will have the opportunity to sum up, and again, the

24   summations -- or closing arguments -- will not be evidence.

25   They are the attorneys' view of what they think the evidence

1    has shown.

2           Now, if in the course of any opening statement or

3    closing argument any lawyer states a principle of law which is

4    different than the law as I give it to you, it's the law as I

5    give it to you that you must follow.  And similarly, when we

6    get to the end of the case, if any lawyer states a recollection

7    of what the evidence was that's different from what you

8    remember, it's your recollection that controls.

9           Now, at this point, the government is going to deliver

10   an opening statement, and it's going to be delivered by?

11           MR. SCOTTEN:  Hagan Scotten, your Honor.

12           THE COURT:  OK.  Mr. Scotten, you may proceed.

13           MR. SCOTTEN:  Thank you, your Honor.

14           Good afternoon.

15           This is a case about greed and lies.  It's a case

16   about how this man -- the defendant, Scott Tucker -- got rich

17   by charging illegal, sky-high interest rates for payday loans.

18   It's a case about how this man -- the defendant, Timothy

19   Muir -- helped Tucker build a web of lies that hid who was

20   making those loans.  It's a case about how together both these

21   men built an illegal payday lending empire that took billions

22   of dollars from millions of people who were struggling to get

23   by and how they hid that crime from the law for over a decade.

24           Ladies and gentlemen, those crimes are why we are all

25   here in federal court today.  They are why it's my job this

1    afternoon to explain to you what I expect the evidence in this

2    case will show.

3              In short, I expect it will show three things:  First,

4    that the defendants charged interest rates far higher than the

5    law allowed, interest rates higher than 600 percent per year;

6    second, that they used lies to hide the fact that it was they

7    who were making those loans, because they knew it was illegal;

8    third, that they also used lies to drain countless victims of

9    that illegal interest in cycle after cycle of abusive debt.

10             So let's talk about each of those three things one at

11   a time; first, the illegal interest rates.  You'll learn that

12   what the defendants offered were called payday loans.  I

13   mentioned them a minute ago.  And these loans target working

14   people who are short on cash.  In the defendants' case, it

15   worked like this.  A borrower would sign up to go to a website.

16   There, she would make an agreement to get a couple hundred

17   dollars deposited into her account.  In return, she agreed to

18   let the lender automatically take money out of her account when

19   she got paid.  That's why it's called a payday loan.  The idea

20   is that the borrower borrows the money until she gets paid and

21   then she can pay it back.

22             For the defendants' loans, on every hundred dollars

23   they lent out, they charged $30 in interest per pay period,

24   meaning $30 to borrow a hundred dollars for something like just

25   two weeks.  And the defendants had a system to ensure their

1    borrowers paid that interest for as long as possible.  You'll

2    learn that the defendants set up their loans so that that first

3    pay period, that end of two weeks, they would take money out,

4    but they would only apply it to interest.  None of that payment

5    would go to the borrower's debt, so the debt didn't go down and

6    the borrower kept paying interest.  That way, under the

7    defendants' system, the interest maintains the same.  It's what

8    they called automatic renewal.  This automatic renewal went on

9    and on, paying that 600 percent or more interest every two

10   weeks again and again.  Only after five cycles of paying just

11   interest did the borrowers start to pay off their debt $50 at a

12   time, still while paying that huge interest rate.

13        Let's take a specific example of how the defendants'

14   loans worked.  This chart is taken from the defendants'

15   training materials, what they used to tell their employees how

16   their loans worked.  This is a chart for a $300 loan.  This

17   line here depicts the pay period, so one of these could be two

18   weeks, whenever the borrower got paid.  This column here is the

19   service charges, the interest, how much they're paying that

20   didn't go to their debt.  Where it says principal payment,

21   we're talking about the payments toward the debt.  And then

22   total amount here, just like it says, is the total amount of

23   the payments.

24        So here's how this worked.  The borrower got $300.

25   Her first pay period, the defendants take $90 from her, $30 per

1   hundred, but none of that goes to the debt.  The next pay

2   period it's $90 again, still all interest, her debt isn't going

3   down and again the next pay period and then again.  Her debt

4   still hasn't gone down.  Now, in a fifth pay period what she's

5   paying actually goes up, because now she's paying back her debt

6   $50 at a time.  You can see how that works:  Pay periods 6

7   through 10, another 10 weeks from any borrowers, she pays off

8   her debt.  And in the end, this is what happened:  She got

9   $300.  In return for that, if you add this column up here,

10  she's paid $675 in interest.  Put another way, someone so

11  desperate for money that they needed a $300 loan has now given

12  the defendants, if you add this column up, has now given the

13  defendants $975.

14          If those interest rates sound like a crime to you,

15  you're right, they are.  Many states, including New York, make

16  it a crime to charge interest anywhere near that high.  The

17  defendants knew this.  They knew that states like New York

18  could come after them if they made these 600 percent or more

19  interest rates to their citizens, so the defendants had to hide

20  it from the law.  That's going to bring us to the second part

21  of the defendants' crimes, the lies they used to hide who was

22  making these loans.

23          Tucker came up with the first scheme, even before Muir

24  joined him.  You'll learn that throughout this case, Tucker did

25  his lending from a headquarters just outside Kansas City.  But

1    he started routing some of his loans through a bank in

2    Delaware, making it seem like the loans came from that bank and

3    not him.  For other loans he set up shell companies in Nevada.

4    To set these fronts up, he hired other people to appear on

5    paper as the presidents and owners of these companies.  But

6    often, they didn't even know what the companies did.  They

7    never even met Tucker.  He hired them through third parties to

8    further hide his involvement in the lending business.

9          But it was still Tucker's lending operation.  In the

10   end, it was still Tucker's money that was lent out.  It was

11   still Tucker's employees in Kansas City who were lending it

12   out.  It was still lent out under the terms Tucker set, and it

13   was still all making huge profits for Tucker.  Only by passing

14   those loans through the Nevada companies or the Delaware Bank,

15   he tried to hide the fact that it was he who was breaking the

16   law.

17         Now, those schemes didn't last.  The Delaware bank

18   started putting restrictions on how Tucker did business, and

19   the Nevada shell companies started getting investigated by

20   states who wanted to know who was behind them.  So Tucker came

21   up with a new scheme.  This time he tried to make it look like

22   the loans were coming from Native American Indian tribes.

23   Again, it's Tucker hiding the fact that it was him making the

24   loans behind someone else.  And by using these tribes, Tucker

25   gave another advantage, because Native American Indian tribes

 1  have a special legal status that makes it very difficult for

 2  states to investigate anyone claiming to be run by a Native

 3  American tribe.

 4       Tucker knew that many tribes, like the borrowers,

 5  needed money, so Tucker offered them a deal.  A tribe would

 6  agree to say that it owned one or more of Tucker's lending

 7  websites, and in return, Tucker would give that tribe 1 percent

 8  of the profits from the loans made through that website.  Now,

 9  that 1 percent wasn't much to Tucker, but it was a huge amount

10  for the tribes.  And in return for that tiny part of his money,

11  Tucker could hide behind the tribe while still remaining in

12  control of his lending business.  It was still Tucker's money

13  that was lent out, by Tucker's employees in Kansas City, under

14  the loan terms Tucker set, and still make huge profits for

15  Tucker.  So because Tucker was still making and controlling

16  these loans, it took a lot of work to make it seem like a

17  Native American tribe did it.  That is where Muir came in.

18       You'll learn that over a decade ago, Muir became

19  Tucker's main lawyer.  Muir led a team dedicated to maintaining

20  the lie that these loans came from Native American tribes and

21  not Tucker.  Lawyers paid by Tucker and supervised by Muir

22  drafted bogus resolutions that they directed the tribes to pass

23  to make it seem like the tribes owned part of Tucker's

24  business.  They filed false affidavits lying to the courts

25  across the country, claiming that the tribes, not Tucker, were

1   doing the lending.  Eventually they even orchestrated a sham

2   merger of Tucker's payday business into a tribal entity to make

3   it appear that one of the tribes had bought the business.

4        And it went further than that.  You're going to learn

5   that Tucker's employees were directed to lie about where they

6   were located when they spoke on the phone to customers.  Even

7   though these employees were in Kansas City, or right outside

8   it, they were told to say they were on tribal reservations in

9   Nebraska or Oklahoma to further the lie that it was Native

10  American tribes who were doing this.  The employees were even

11  given daily weather reports for the reservations so they could

12  chat with the borrowers about the weather in other states,

13  pretending they were there, pretending the loans were coming

14  from that reservation.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. SCOTTEN:  Eventually the defendants actually put a

2   couple of employees on two of the reservations.  But nobody

3   expected this tiny handful of the employees to add anything to

4   the business, except to make more convincing lies about who the

5   lender actually was and who actually controlled the money.

6          But that is all they were, lies.  The tribes claimed

7   to own the businesses, but they never actually bought them.

8   The defendants set up bank accounts in the tribes' names, but

9   Tucker actually controlled them.  In fact, you will learn that

10  Tucker used these supposedly tribal accounts as his personal

11  piggy banks, paying for a private jet, a mansion in Aspen, and

12  a fleet of Ferraris that he raced around the world, with this

13  money that supposedly belonged to the tribes.

14         The tribes also claimed to approve the loans here, and

15  you will learn that they just went through the motions.  You

16  will learn that a couple of tribes had an official log-on to a

17  computer once a day to approve a batch of loans by pushing a

18  button, but those loans often went out before the button was

19  even pushed, or whether it was pushed at all.

20         Another tribe didn't even do that.  Tucker and Muir

21  made loans in this tribe's name every day without even pretend

22  approvals from that tribe.

23         So that is the second part of the defendants' crimes,

24  the lies about who was making the loans here.

25         Now let's talk about the third lie:  Lies about the

1    terms of the loans.

2           You remember that example we talked about a few

3    minutes ago, the borrower who owed $300 and ended up paying

4    975?  Some borrowers signed up for that, but a lot of borrowers

5    did not really want that kind of deal.  They might try to pay

6    back the loan as soon as possible to prevent the defendants

7    from pulling all that interest out.  So the defendants made it

8    hard to learn about this automatic renewal process, that

9    process that got them paying that sky-high interest week after

10   week, pay period after pay periods.  They hid the fact that

11   unless the borrower did something, she would never start paying

12   her loan until five pay periods in.

13          You will learn that a federal law called the Truth in

14   Lending Act -- or TILA -- requires lenders to state the key

15   terms of their loans in a simple chart, it's called a TILA box,

16   where a borrower can easily read and understand those terms.

17   The defendants' TILA boxes made it look like there was no

18   automatic renewal.  So that same borrower that we have been

19   discussing, when she looked at her TILA boxes, it would look

20   like she was going to pay $90 in interest, not 675.

21          To learn about the automatic renewal before the

22   borrower took out the loan, she would have to notice, read and

23   understand confusing language hidden below the big clear terms

24   at the top of the TILA box.  The defendants knew most of their

25   victims did not read the rest of the contract.  After all, the

1    whole point of the TILA box is you can look right there and

2    know the terms of the loan.  So putting misleading terms in the

3    TILA box was enough to get borrowers on the hook for those huge

4    interest payments.

5         And the language in the rest of the contract wasn't

6    confusing, or hidden, because the defendants didn't know how to

7    explain their loan terms clearly.  You will learn that after

8    their victims had signed up for the loans, the defendants sent

9    a letter laying out the loan terms, and it was very different

10   than the TILA box, the place where the customer was supposed to

11   be able to look to understand her loan before she took it out,

12   the place where the defendants lied, the place where it really

13   mattered.

14        So that's the third part of the defendants' crimes,

15   the lies to mislead their victims about the terms of their

16   loans.

17        Now, what I have just discussed is what the evidence

18   will show, but in the end, all those lies came crashing down.

19   Reporters began looking into whether Tucker's companies were

20   really owned by the tribes, and federal regulators began

21   looking into the defendants' lending practices.  The tribes got

22   nervous.  They started wondering what they had gotten

23   themselves into for just a little part of Tucker's money.  So

24   the tribes began trying to take control of the Web sites and

25   bank accounts that the defendants had put in their names.

1      The defendants couldn't do much to stop them.  They

2  knew they had committed crimes.  That's why they were hiding

3  behind the tribes in the first place.  Now that all the

4  scrutiny was on them, you couldn't just step forward and take

5  control of the whole enterprise.  Showing that they controlled

6  it would prove their guilt.  The pressure just kept building.

7  And in 2013, the defendants were finally forced out of lending

8  in New York.

9      As I said a second ago, that is what the evidence in

10  this case will prove.  Before I sit down, I also want to take a

11  few minutes to discuss how the evidence will prove it, how the

12  evidence is going to show what I have been talking about.

13      A lot of the evidence will be in the defendants' own

14  words, e-mails they sent while running this operation.  You

15  will see e-mails Tucker sent admitting that the lending

16  businesses were in fact his, and he only used the tribes to

17  protect himself.

18      You will see an e-mail where Tucker coaches an

19  employee on how to lie about the business's location.

20      You will see an e-mail where he encourages employees

21  to write off a loan because he doesn't want to get caught by a

22  borrower who had discovered that his interest rates were

23  illegal.

24      And you will see e-mails from Muir, too.  For example,

25  you will read as Muir brags about a sham lawsuit he engineered,

1    where he had one of his clients, which is a payday lending

2    company controlled by Tucker, sue another one of his clients,

3    which was also a payday lending company controlled by Tucker,

4    in order to confuse the states that were investigating them.

5    Basically, Muir had Tucker sue himself, all to further this

6    lie.

7             You will also hear from witnesses, men and women who

8    will take that stand right there and testify before you.  You

9    will hear from victims, the working men and women the

10   defendants exploited.  They will testify to you about the high

11   interest rates and automatic renewals we have discussed.  And

12   they will explain how the defendants deceived them.  How they

13   made their payments and then were shocked to find out payments

14   later that their loans hadn't been decreased by one penny

15   because the defendants said it was all going to interest.

16            They will tell you how the defendants took advantage

17   of their sham relationship with the Native American tribes to

18   get the borrowers to pay up.  How when the borrowers complained

19   that their loan terms were illegal, the defendants' employees

20   said they had to pay anyway because state law didn't apply to

21   them.

22            Witnesses who were part of the defendants' operation

23   will also testify.  You will hear from the defendants'

24   employees.  They will tell you how the defendants ran the show

25   in Kansas City, how they directed the deceptive and illegal

1    lending practices here, and the lies that hid those practices

2    from the law.

3         You will also hear testimony from the outside entities

4    the defendants hid behind.  The people who set up those shell

5    corporations, they will tell you how that was done and explain

6    how it was done to benefit Tucker.

7         Witnesses from the tribes will testify too.  They will

8    explain about how all this pretend about tribes being involved

9    meant nothing.  How the tribes played no meaningful role in

10   this lending operation.  How all the money came from the

11   defendants' operation in Kansas City.

12        As you can probably tell, some of these witnesses will

13   have been involved in the defendants' crimes.  So they will be

14   testifying here under different forms of legal protection.

15   Some of them will have court-ordered immunity, meaning that

16   they can testify about what they did here, and what they say

17   can't be used to prosecute them.  Others will have what are

18   called non-prosecution agreements.  That means the government

19   has agreed not to prosecute them, again, so long as they come

20   here to testify truthfully.

21        Still others will have what are called cooperation

22   agreements.  Now, a cooperation agreement means they pled

23   guilty to certain crimes and are hoping to get a lighter

24   sentence by testifying truthfully.  One of those witnesses will

25   have participated with Tucker in that scheme to make illegal

1    loans through the Delaware Bank.  Another one of those

2    witnesses started near the bottom of the defendants' operation

3    and rose near the top, helping them perpetrate the lies that

4    hid it from the law.

5            So make no mistake about it, like the defendants,

6    those witnesses have committed crimes.  But they have already

7    pled guilty.  So the question for you isn't whether you approve

8    of them or what they did.  It's only what you can learn from

9    them about what the defendants did.

10           Now, witnesses and e-mails and the defendants' own

11   words are not the only evidence you are going to see.  I won't

12   go into all of it now, but as you can imagine, an operation

13   this large leaves behind a trail of documents.

14           So you will see the loan papers proving the

15   defendants' illegal interest rates.

16           You will see the bank records showing the money

17   flowing into the payday lending Web sites and then out to

18   Tucker's personal expenses, those Ferraris and the private jet.

19           You will see the weather reports that were circulated

20   to the defendants' employees, so that an employee looking out

21   his window at a sunny day in Kansas City could tell a better

22   lie about being in Nebraska where it was raining.

23           You will see the false declarations filed in court by

24   tribal officials trying to hide the fact that Tucker controlled

25   the lending businesses.

1        You will see lie after lie ordered and approved by the

2   defendants.

3        Now, ladies and gentlemen, what we have just discussed

4   is only an overview of the evidence.  The actual evidence will

5   have to come in one piece at a time.  Because this was a huge

6   conspiracy that went on for over a decade, no one e-mail or

7   single witness can tell you the full story of the defendants'

8   crimes.  And unlike television shows you may have seen, the

9   evidence is not going to come in in the same order the

10  defendants' crimes occurred.  But as the case goes on, you will

11  understand the basic crimes the defendants committed and the

12  core lies they told to hide them.

13       And until then, I want to caution you not to be

14  intimidated by the layers of deception and legal paperwork the

15  defendants used to hide what was going on here.  In the end,

16  this was a simple crime:  The defendants charged sky-high

17  illegal interest rates forbidden by the law.  They also told

18  lies to hide the fact that it was them charging those loans

19  because they knew it was illegal.  And they also used lies to

20  hide the terms of those loans so they can pull as much interest

21  as possible from the struggling victims.

22       So for now I want to ask each of you to do three

23  things:  Listen carefully to the evidence as it comes in.  Pay

24  close attention to Judge Castel's instructions.  He will tell

25  you how to apply the law to the facts in this case.  And use

1    your common sense.  The same common sense you use every day and

2    in every decision you have to make.  If you do those three

3    things, I am confident you will return the only verdict

4    consistent with the law, the evidence, and common sense:  That

5    the defendants are guilty.

6            THE COURT:  Thank you, Mr. Scotten.

7            Mr. Roth.

8            MR. ROTH:  Good afternoon, ladies and gentlemen.

9            Scott Tucker is an entrepreneur who looked for

10   opportunities where other persons couldn't see them.  You are

11   going to find from the evidence that he is a very intelligent

12   man, who had developed considerable expertise in the payday

13   lending business.  He played an instrumental role in creating

14   the software which drives that industry which everybody must

15   use in the companies that they have and depend on.  He fostered

16   strong relationships with the banks which were necessary to

17   process the loans.  He developed connections to the nation's

18   lead generators from which the companies get the leads to have

19   the payday loans to the customers.

20           This is a case about his efforts to expand and find

21   ways to profit from this expertise and experience that he

22   developed.  The evidence will show that he spent an enormous

23   amount of money to invest in an extensive legal team, with

24   particular legal experts in particular areas of law, and he

25   identified a way to make a legal relationship with Native

  1    American tribes to make the loans, as a loan servicer for them.

  2            The government you just heard has wrongly criminalized

  3    his actions as a loan servicer for both the County Bank, which

  4    you heard about, and the Native American tribes.  First the

  5    County Bank in the 90s, late 90s, and then he transferred to

  6    what we call the tribal model method with the Native American

  7    tribes.

  8            The opening that you just heard from the government is

  9    not the real story, and the judge told you what I say and what

 10    the government says, it's not evidence.  You are going to be

 11    the ones who determine what the evidence is.

 12            You were introduced before to Mr. Tucker's legal team,

 13    and it's our obligation to protect his rights, and I suggest to

 14    you it's an awesome obligation and that I ask you to join with

 15    me in protecting those rights.

 16            You have heard that Mr. Tucker was arrested, he was

 17    arrested and he was indicted, and Judge Castel told you that's

 18    not any evidence of any wrongdoing.  He entered a plea of not

 19    guilty, and that's what brings us here today to the starting

 20    point of this case.  You have to be confident that you can look

 21    across the room at Mr. Tucker and say, I presume you innocent.

 22    The judge put it in a more eloquent way than I did in terms of

 23    your obligation to honor that presumption of innocence.  You

 24    have to believe and imagine that God forbid that you or one of

 25    your loved ones was in this proverbial hot seat that he is

1    sitting in.  And you have to hold the government to their

2    burden of proof beyond a reasonable doubt, which goes with him

3    right into the jury room.

4           The judge is going to explain to you what that burden

5    of proof beyond a reasonable doubt is.  Suffice to say, it's a

6    different standard and it's a standard that's imposed on the

7    government to protect the individual from the awesome power of

8    the government.  It may look like we have equal numbers at this

9    table here, but the government has far greater resources at

10   their disposal.  They have the FBI, which you will hear about,

11   that investigated this case.  They have the IRS as well.  They

12   have almost unlimited resources.  And for that reason, that is

13   why the law imposes the burden of proof beyond a reasonable

14   doubt.

15          The government just suggested you will hear about some

16   civil suits.  In civil suits, what is at stake is a question

17   of, you sue me or I sue you, and it's for some monetary

18   judgment, whether it's a car suit or something else.  That's

19   different and that has a standard of proof by a preponderance,

20   a greater than 50 percent of the evidence.  The standard in

21   this case, proof beyond a reasonable doubt, is a much greater

22   standard, and it's a greater standard because of what is at

23   stake here.  Scott's freedom is at stake in this case.

24          You are going to learn a lot about --

25          THE COURT:  Excuse me.  We will take a ten-minute

1    recess.  Ladies and gentlemen, please do not discuss the case

2    among yourselves or with anyone.  We will be back in action in

3    ten minutes.  You can return to the jury room.  Or you can

4    stay.

5           (Recess)

6           THE COURT:  I would ask counsel to remain at counsel

7    table.  We have our jurors in the courtroom.

8           Mr. Roth, you may continue.

9           MR. ROTH:  Thank you.

10          Payday lending.  Payday lending is a lifeline for some

11   people who don't have access to other ordinary lines of credit,

12   traditional lines of credit.  It offers small loans to millions

13   of people who survive on paycheck to paycheck.  Think about

14   somebody who is in that situation and their car breaks down,

15   and they need their car to go to work, but they don't have the

16   money.  They can either not go to work and get fired.  They

17   don't have access to a credit card like many of us do.  And so

18   they take a payday loan to get out of an emergency situation.

19   You may be morally opposed to the practice of payday lending

20   because of the interest rates associated with it, but this case

21   is not a moral referendum on payday lending.

22          Another thing that this case is not about, and is a

23   distraction that the government suggests, is Scott's lifestyle.

24   Admittedly, when you hear about his lifestyle, it may sound

25   like the lifestyle of the rich and famous.  You will hear about

1   Ferraris and jets, but don't let that distract you.  Make

2   believe you're watching that TV show and shut it off.  Because

3   Scott earned the money, and he deserves to be able to spend it

4   the way he chooses.

5        He searched out opportunities, and in his effort to

6   expand his business in the County Bank and in the tribal

7   models, he approached both with caution, because he knew, just

8   as the government said, that this is a highly regulated area of

9   law, some of the law is unsettled, some of the areas there is

10  no precedent in, and he knew though that he could make a

11  mutually beneficial agreement with the tribes, something that

12  would benefit them and benefit him, and he could serve those

13  tribes as lender and make loans in a lawful manner.  This was

14  not some conspiracy hatched in some dark room.

15       By the way, I hope that there is none of you on the

16  jury that adhere to the Shakespeare quote from Henry VI, "First

17  thing we do is have to kill all the lawyers."  Because if you

18  do, we are at a disadvantage, an unfair disadvantage.  Because

19  you're going to hear about a lot of legal advice that Scott

20  got.  And it wasn't legal advice from a Jacoby & Meyers or a

21  storefront or a Lincoln lawyer.  He spent literally tens and

22  tens of millions of dollars on legal advice.  We don't deny

23  that, what the government said.  And he asked these law firms

24  to spare no expense.  And while you may not admire the fact

25  that Scott asked these lawyers to take full advantage of the

1    law, that's what he did, and it was lawful.  And he acted on

2    that advice in good faith, after he got that advice.

3           Now, the government has suggested that his

4    relationship as a loan servicer for the County Bank of Delaware

5    and Rehoboth was a sham operation.  I think they said that he

6    created that situation.  Scott didn't create that situation.

7    He went to that bank when he heard they were offering a program

8    for people like him who wanted to service loans.  What did he

9    do?  He met with the president of the bank, Harold Slatcher.

10   He met with the bank's attorney, Stephen Goodman.  He met with

11   Dave Gillan, who is the current to this day, that was in 1998,

12   and Gillan is now the CEO and president of that bank.  He

13   served on the Federal Reserve board in Philadelphia.

14          The premise of that model was created because a bank

15   like that, by virtue of the National Banking Act, was able to

16   apply its federally chartered bank, to apply loan rates, where

17   they were permitted to loan in Delaware, to what we call export

18   those interest rates to other states, such as New York.  It's a

19   doctrine which is called federal preemption.  It's a lot to

20   swallow, but you're going to hear in this trial, from that

21   witness stand, from Mr. Goodman about that legal premise.  He

22   is a retired partner from a prominent Philadelphia law firm.

23          He didn't embark, Scott didn't embark on that model on

24   anything other than in good faith after Goodman gave him an

25   actual legal opinion.  That was a situation where the FDIC was

1    all over those loans, monitoring those loans and loan

2    practices.

3              So who is the government going to call to support

4    their contention that County Bank was a sham?  They are going

5    to call a fellow named Adrian Rubin.  Adrian Rubin is a

6    two-time convicted felon, who for the last almost 30 years led

7    a life of fraud.  He is going to be testifying from that

8    witness stand, by virtue of an agreement with this government,

9    to try to save not only himself from a potential sentence of 65

10   years, but also to save his two sons that he got embroiled and

11   enmeshed in a separate fraud.

12             This is his second time cooperating.  You are going to

13   hear the man.  He cooperated in another case a long time ago.

14   You are going to hear the testimony of a man who is well

15   rehearsed, a man who knows his role to please the government in

16   a cooperation deal.  He is going to tell you, if asked what's

17   required of me, and he will say, just to tell the truth.  He

18   knows that's not right.  He knows that for him to get the deal

19   from the government that he wants to keep from under a 65-year

20   sentence, he has to testify in a fashion consistent with the

21   government's case.

22             He came under investigation in Philadelphia, and as a

23   result -- a federal investigation -- he started to cooperate a

24   number of years ago, almost four years ago.  And you're going

25   to hear a lot about this when Mr. Rubin is on the witness

1  stand.  To get a deal, you have to go in and attend what is

2  called a proffer session, a meeting with the government.  They

3  just don't say, Oh, Mr. Rubin, we are going to make a deal with

4  you, everything is good for what you have done.  You have to

5  meet with them, and it's really like a beauty show.  You have

6  to convince them -- and they are the judges -- that you have

7  something that they want.

8          He was meeting with the government in Philadelphia,

9  federal agencies, for four years trying to get this deal.

10  Finally, the Southern District became involved in these

11  meetings, and lo and behold, Mr. Rubin remembers so-called

12  incriminating conversations that he had with Scott almost 17

13  years ago.  What an exquisite coincidence.  He knows there is

14  nothing really to back him up with, that it's a Hail Mary, but

15  after maneuvering for all those years to get a deal, after he

16  gives them that information, he gets a deal, an agreement to

17  testify here and in Philadelphia on that case.

18          He has got a problem though.  He had spoken a little

19  bit about County Bank before, but now he has a problem because

20  he failed to disclose to the government that in 2006, when he

21  was deposed in a civil lawsuit concerning County Bank, what did

22  he say?  He was asked about the lending procedures, all the

23  underwriting procedures.  He was asked about the practices, the

24  supervision of the loans, the execution of the loans.  And he

25  testified that everything was fine, as far as he knew, it was

1    100 percent legal.

2              So he didn't disclose -- and now he is saying to the

3    government, because he wants to conform to their theory of the

4    case, I lied, I lied in those depositions.  And, by the way, as

5    an absolute condition of proffer sessions, the government tells

6    you right up front when you're sitting there as a potential

7    witness, you have to tell us everything.  You have to tell us

8    all your crimes.  And even if I don't ask you a direct

9    question, if you know you committed a crime, you have to

10   divulge that, you have to self-reveal that crime.

11             Well, he never told the government that he lied in

12   those depositions.  So what does he do?  For the first time,

13   after speaking to the government almost a dozen times, he says

14   that the lawyers -- Goodman, who was at that deposition, not

15   only Goodman, but at least one or two other lawyers who were

16   there -- told him to lie, told him to suborn perjury.  It is an

17   outrageous claim.

18             I suggest to you he is a fraudster who knows the art

19   of the deal.  And the judge is going to tell you that if you

20   believe that Rubin or any other witness lies about a portion of

21   his testimony, that you can disregard that portion of the

22   testimony or the entire testimony of that witness.  That's your

23   province as a juror.  I like to use the example of you go to a

24   luncheonette, a diner, you order some vegetable soup.  You

25   start eating it and the potatoes in it are rotten.  You don't

 1    have to just pick out the potatoes, you can return the whole

 2    soup.  And I expect that you will reject, after you hear it,

 3    the testimony of Mr. Rubin.

 4            Scott left -- his companies left County Bank sometime

 5    in the early 2000s, when the Internet was in its infancy stage

 6    and was just booming.  And he wanted to ride that wave.  And he

 7    knew that there was a way to make loans at rates -- service

 8    loans at rates that exceeded what you heard about, it's called

 9    the state usury restrictions, caps of interest rates in various

10    states.

11            By the way, why did these loans have to be so

12    expensive, carry such high interest rates?  It's your common

13    sense.  If you go out to take a mortgage to buy a house, the

14    lender is looking at your credit score.  The better the credit

15    score that you have, the lower the interest rate on the loan.

16    The reality is that the borrowers who avail themselves of

17    payday loans don't have great credit, in most instances no

18    credit, but more importantly, the loan rate is over 30 percent.

19    As a result of that, the rates have to be high on the interest

20    rates.

21            Scott knew of such laws like the National Banking Act

22    that let states, which have variable interest rates, like

23    Nevada, South Dakota and other states, export their interest

24    rates, because their interest rates were higher and permitted

25    their loans to be exported to states like New York and exceed

1   the 16 percent interest rate there if their interest rate in

2   their home state was greater than that.  It happens all the

3   time.  And that's why when the judge was asking you about

4   relationships with banks, and many of you said that you had

5   credit cards, if you look at where those companies are,

6   Citibank, etc., the companies are based in those states.

7           An example of a permissible high interest rate, called

8   the APR if it's annualized out, if you fail to make a payment

9   on your credit card or you get a return check -- let's say you

10  get a check that's returned for insufficient funds, it's only a

11  $50 check, and you get a check fee for insufficient funds of

12  $25 for the overdraft, the annualized percentage rate becomes

13  over 2,000 percent, but it's a lawful rate to charge because of

14  where the companies are situated.

15          Scott learned that various tribes, including the

16  Miami -- and that's how you pronounce -- Miami of Oklahoma were

17  looking for businesses, the kind of businesses that Scott had.

18  In fact, the Miami had an actual tribal business development

19  authority code that identified the kind of businesses that they

20  wanted to partner up with, high-tech businesses that had the

21  ability to infuse capital into their tribes and develop and

22  manage those businesses.  Scott knew a legal way to take

23  advantage of that and partner with the tribes.

24          You are going to hear from a government witness, Jerry

25  Aday, in the next few days, who worked for a tribe, the

1   Kickapoo tribe, who worked as an economic development person

2   for that tribe.  And Scott read an article in the newspaper

3   about a water development project that Jerry was doing with the

4   tribe, trying to develop it.  And so he met with Jerry, and

5   they talked about Scott making an arrangement with the Kickapoo

6   to be a servicer for a loan operation that could be developed

7   there that would benefit the tribe, in terms of getting

8   resources for the water project, for education, for housing for

9   trailers, scholarship for the kids, and he developed a business

10  plan.

11          But before he did that, he went to a lawyer, Ellen

12  Bachman, a prominent lawyer of a large law firm, and wanted to

13  know, is this feasible?  And Ellen Bachman, who happens to have

14  Native American ancestry, she came up with a plan, based on

15  legal research, based on the premise that the government told

16  you about, about sovereign immunity.  Native American nations

17  enjoy sovereign immunity, which nobody else has.  They are a

18  nation unto themselves, like a state.  And that those tribes,

19  under their rules and regulations, can pass laws and form

20  another corporation, which becomes what we call an arm of the

21  tribe, in this case lending corporations, and enjoy that tribal

22  sovereign immunity, to be able to export interest rates

23  above -- legally export interest rates that are above state

24  usury laws and have those loans enforceable.  She developed a

25  blueprint of nonexclusive practices to do that.

1     Scott engaged another lawyer, a commercial business

2   lawyer, Cliff Cohen, to put a business deal together and to put

3   a service agreement together to encapsulate the terms of the

4   relationship.  And they brought it to the tribes.  And Scott

5   made presentations there.  And these tribes are not backward

6   tribes.  They may be in the back woods in terms of not having

7   resources and developments, but the tribes had lawyers.

8     And Scott got them another lawyer, Conly Schulte, who

9   you will hear about in great detail.  And Conly Schulte is a

10  member of the preeminent Native American, a nationwide law firm

11  on Native American rights.  And he was representing Scott for a

12  while.  He was representing the tribes for a while.  And he

13  blessed, he wrote a legal opinion as well endorsing this tribal

14  model.

15    So you had three sets of eyes on the model.  It's what

16  we call due diligence.  It was always clear from the beginning

17  that these lawyers, through the years, including when they got

18  to Tim, would have to be on the defensive.  And they didn't shy

19  away from those words, to be on the defensive, and to

20  constantly react to regulators, to conform to the law, to

21  conform to the law, not to evade the law.

22    You are going to hear that in the course of it, Scott

23  literally spent tens of millions of dollars on legal fees, tens

24  of millions of dollars that translated to tens and tens of

25  thousands of dollars of legal research.

1          Eventually his business, the lending business of

2     servicing the lenders grew to almost 1500 people.  As the

3     company grew servicing these loans, and the legal problems and

4     the legal attacks from regulators grew, Scott brought in Tim

5     Muir in 2006.  What was Tim's function?  Tim's function was to

6     be what we call in-house counsel.  He was helping managing the

7     lawsuits, managing and being a liaison with the other lawyers

8     who had to be engaged for the various lawsuits.  And his job

9     first and foremost was to constantly be vigilant and defend and

10    make sure that Scott's servicing operation was a legal

11    operation.

12         And the government is going to claim that the -- you

13    heard them stand up here and say it's a sham, the tribes owned

14    the loan operation.  Well, how do we know that this is not a

15    sham?

16         First of all -- you can look at your screens here.  I

17    hope they are all working, but you can share somebody else's

18    screen if they are not.

19         THE COURT:  Can you see, ladies and gentlemen?

20         MR. ROTH:  First of all, the tribes were registered

21    under a tribal charter.

22         The tribes amended their lending codes to permit the

23    loans.

24         The bank accounts were owned by the tribes.

25         The tribes knew the loan criteria and approved it.

1    They could terminate the relationship any time they wanted with

2    Scott's companies.  And if they terminated the relationship,

3    they kept the money and the intellectual property that was

4    associated with it.  They had the final say.

5            Another argument that the government has is that

6    because Scott was managing many aspects of the business, that

7    he had to be the owner.  Well, it's not unusual for a manager

8    to take over many aspects of a business, and it doesn't make

9    them the owner.  With the chance of offending any Met fans

10   here, I am using Brian Cashman as an example.  As a GM, he

11   hires the staff, he directs the player development, makes

12   trades, may not like them.  He signs the free agents, he

13   influences the coaching.  But none of us in this room here

14   today would contend that Brian Cashman owns the Yankees.

15           What is another factor to prove that the tribes were

16   the actual owners?  One tribe, the Miami, decided to get out of

17   the business altogether.  They fired Scott.  Have you ever

18   heard of a situation where other than the owner fires somebody?

19   It doesn't happen.  And not only that, you will hear that

20   Miami, when they fired Scott, they kept the money that was in

21   their bank, which they are saying is Scott's money, to the tune

22   of hundreds of millions of dollars.

23           The evidence will show that two of the tribes that you

24   will hear testimony about, the Santee and the Modoc, are still

25   operating today, without Scott, just as they were operating

 1    before.  And Conly Schulte, the lawyer that you are hearing

 2    about, he will tell you that he is still representing tribes in

 3    the payday lending business.

 4            The government mentioned what they termed as a 99 to 1

 5    split.  They said that the Native American tribes only got 1

 6    percent of the profits.  That's not what the service agreement

 7    that was created by the lawyers and signed by the represented

 8    Native American tribes said.  They had an option of either

 9    getting $20,000 a month or 1 percent of the gross revenue,

10    gross revenue.  So, in other words, they were guaranteed an

11    income stream even if Scott -- Scott was guaranteed nothing.

12    If all of the expenses were stripped out and nothing was left

13    over, Scott would get nothing.

14            You are also going to hear that this relationship, the

15    government is suggesting it's so one-sided, but you will hear

16    that the tribes made money.  It was a common practice when

17    outside ventures came to the tribes and partnered up with them

18    that these kind of splits existed then, in the early 2000s, and

19    exists today to this point.  And just because of the split, it

20    doesn't mean that Scott is the owner.

21            You are also going to hear that the tribes gave a

22    power of attorney to Scott over their bank accounts, and Scott

23    could operate freely with that power of attorney with the money

24    that was in those bank accounts.  That doesn't prove that Scott

25    is the owner.  It proves the exact opposite fact.  If I give

1   you a power of attorney over my affairs, which happens all the

2   time, I can withdraw that power any time.  It's my power.  Only

3   the owner can give that power.

4           You also heard the government say that all of the

5   operations, the loan servicing operations, were in Kansas, and

6   that must mean that Scott is the owner.  But they were in

7   Kansas for a very obvious reason.  The payday loan servicing

8   business requires Internet access, high-speed fiberoptics.

9   High-speed fiberoptics don't exist in the rural areas of

10  Oklahoma and where the tribes were in Nebraska.  It also needs

11  Internet IT experts, which did not exist in the tribal areas,

12  but existed in Kansas City.  His work staff population grew to

13  1600.  It was projected to expand well beyond that.  The remote

14  tribal areas did not have that kind of work force.

15          In short, when you consider all of the criteria that

16  the government is suggesting that show that Scott -- the tribes

17  are the owner, they are false.

18          Let me turn to the loans for a second and explain to

19  you what happened.  The government acknowledged that you apply

20  for the loan on a Web site.  And it's correct that we use the

21  example that a traditional loan amount is around $300.  And

22  after the applicant fills out his application information, he

23  is provided with the loan contract that explained the terms of

24  the loan, the required TILA -- you are going to learn a new

25  vocabulary here -- Truth in Lending Act.  And it shows the cost

1   of the loan.

2           Just as the government and we concede, that the cost

3   of a loan for 14 days is a $90 finance charge.  And if the

4   applicant reads the loan terms, he or she will see that if they

5   do nothing at the end of that period, that loan will

6   automatically renew.  We concede that many people don't read

7   those terms the first time that they take out a loan.  But the

8   reality is, as soon as that loan is approved, they get an

9   e-mail, an approval e-mail is sent to them, and it has in it

10  the words, 15 times, either renewal, renewed or renew.  It has

11  in bolded letters, some reminders regarding your loan.  You see

12  them in there.  And it clearly tells what the renewal process

13  is, that unless the lender is notified in advance, the loan

14  will be renewed.  And it tells, if the loan is renewed five

15  times, on the fifth time of the renewal, he will start paying

16  down his loan in increments of at least $50, like in the chart

17  the government showed you.

18          Secondly, at least three days before any payment is

19  due, he receives a payment reminder e-mail, and in the payment

20  reminder e-mail it tells him the payment is due on a specific

21  date.  It tells him the payoff amount, how much the renewal

22  payment amount is, and provides payment options, three days

23  before it is due.  The disclosures are clear and obvious to the

24  applicants.

25          By the way, we call them customers, not victims.  The

1   government has selected a handful of unhappy customers among

2   millions and millions of satisfied customers, including many

3   repeat customers.

4          I am about to sit down.  It's been a long day.  The

5   judge is going to tell you, as he has told you before, and he

6   will tell you at the end of the case, that Scott doesn't have

7   to testify.  He doesn't have to take the witness stand.  And if

8   he decides at the end of the case not to take the witness

9   stand, you can't hold that against him.  And it stands to

10  reason.  He may decide not to take the witness stand because I,

11  in my infinite wisdom or lack of wisdom, say, Scott, you don't

12  have to take the witness stand, they didn't prove their case.

13  You can't speculate.  But whatever he does, he will do.  But

14  you are going to hear shortly from Mr. Muir's lawyer that Tim,

15  his in-house counsel, is going to take the witness stand in

16  this trial, is going to take the witness stand.

17         Now, you may have heard that expression that your

18  lawyer is your mouthpiece.  Well, in this case, you are going

19  to hear it from the mouthpiece.  I suggest to you that Tim is

20  going to join the long chorus of advocates in Scott's defense.

21         At the end of this case, when you go to deliberate, I

22  am going to ask that you remember the words of a famous trial

23  attorney, Abraham Lincoln.  Abraham Lincoln said, "In the jury

24  room, one is a majority."

25         If you have a reasonable doubt, which I suggest you

1    will, hold on to that reasonable doubt.  Don't surrender it

2    under the pressure of the moment.  You are going to go back,

3    four weeks or so from now, back to the affairs of your life, as

4    I will and the government will.  But Scott is going to live

5    with your verdict for the rest of his life.

6            I am confident that you are going to deliver a verdict

7    consistent with the evidence, and that verdict will be one of

8    not guilty.

9            Thank you.

10           THE COURT:  Thank you, Mr. Roth.

11           Ladies and gentlemen, why don't you stand up and

12   stretch for a moment.

13           If you would like to take a break, you can indicate to

14   me that you would like to take a break, and then we will take a

15   break.  I am going to take it that you would like to take a

16   break.  So the jury will retire to the jury room for ten

17   minutes for a break and then we will pick up.

18           (Jury exits courtroom)

19           THE COURT:  We are in recess for ten minutes.

20           (Recess)

21           (Continued on next page)

22

23

24

25

1        (In open court; jury present)

2        THE COURT:  Please be seated, ladies and gentlemen.

3        At this time, Mr. Bath is going to deliver an opening

4   statement on behalf of Timothy Muir.

5        Mr. Bath, whenever you're ready.

6        MR. BATH:  Yes, your Honor.

7        May it please the Court, counsel, ladies and gentlemen

8   of the jury.  I've been thinking a long time about what I might

9   say to you in this opening statement.  It's not often that

10  somebody from rural Kansas gets asked to come all the way to

11  New York City and represent a client and his family.  It's an

12  important trial for him, and I hope today and the rest of the

13  trial I'm up to that task.

14        My name is Tom Bath.  I'm an attorney in Kansas City,

15  a small town in Kansas City, about five lawyers, and it's an

16  honor --

17        THE COURT:  Mr. Bath, you can give an opening

18  statement overviewing the evidence, if you will, please.

19        MR. BATH:  Yes.  Thank you.

20        It's an honor to represent Timothy Muir, who is a

21  practicing lawyer in Kansas City.  He lives there with his wife

22  Stephanie and his two children.  She also practices law, Ms.

23  Muir does, not with him necessarily, but sometimes they're on

24  cases together.  Tim graduated high school in 1989.  He went to

25  college and then worked some before he went to law school, not

 1   graduating law school until approximately 1989 -- 1999, I'm

 2   sorry -- just about ten years before -- strike that.

 3          '89, high school; 2002 he went to law school.  So

 4   there's some time in between undergrad and law school.

 5          Tim was part of a large nationwide team who worked in

 6   an unsettled area of law concerning economic development for

 7   Native American tribes.  He didn't start until 2006, because he

 8   was in law school in 2002 and worked for another firm from 2004

 9   to 2006.  He was neither an owner or operator of his

10   businesses, though.  He gave legal advice on private

11   sovereignty, sovereign immunity and anything else he was asked,

12   but he didn't run the business.  He wasn't part of the

13   financial aspect of the business.  He didn't keep profits of

14   the business.  His sole role was to provide legal advice where

15   he was asked.

16          He's going to testify and he's going to tell you about

17   this, that when he joined in 2006, there were lots of things

18   already in place.  The relationships between Scott Tucker and

19   the tribes were already in place.  Other lawyers had already

20   set that up.  You heard that from Mr. Roth.  Conly Schulte,

21   Cliff Cohen all set those relationships up in 2003 and '4, so

22   when Tim joined in 2006, he was one of many lawyers who worked

23   on this case.  Bachman was another name of a lawyer.  Bachman

24   was located in Seattle.  Cohen -- Conly, rather, in Nebraska

25   cliff Cohen was in Kansas City.

 1      Tim lives in Kansas City, went to high school there,

 2   joined Scott Tucker in '06, but Tim's the only one charged.

 3   Ask yourself that throughout this trial.  Tim is the kind of

 4   lawyer you'd want to work for you.  He's hardworking.  He's

 5   smart.  He does a lot of research, does a lot of online

 6   research, legal research, which is how it's done nowadays.

 7      When he joined 2006, he began to look at this law.  He

 8   didn't know a lot about it.  He had some familiarity, because

 9   the firm he worked with did some work for Mr. Tucker.  But he

10   taught himself this law.  He connected with other top lawyers

11   across the country on Native American law.  He learned about

12   sovereignty.  He learned about sovereign immunity.  He did

13   research.  He went to CLEs.  He went to court hearings across

14   the United States, because tribes are often in regulation with

15   the states and the federal government.

16      Tribal government is often being told by other states

17   and federal government it can't do things, it's not good

18   enough, You don't collect enough taxes, so the tribes are often

19   in these kind of disputes, and payday lending was no different.

20    So when Tim joined in '06 and he began to learn about this, he

21   worked hard.  He worked hard for Mr. Tucker, and he worked hard

22   to learn  about the law, and he came to the same conclusion

23   that many lawyers, because you've heard from the team, which

24   was there was nothing illegal about what was going on here.

25   Just because they were in state court, just because there's

1    regulation doesn't mean anybody's committing a crime.

2            He's going to tell you, he's going to testify, he

3    never for a moment believed that anything they were doing was

4    illegal, that it was a crime.  He believed in good faith, based

5    on some case law, including the highest courts of the United

6    States, that what he was doing, what they were doing, what he

7    was giving legal advice on, was completely legal.  He had a

8    good faith basis to believe that.

9            Now, the government wants you to hold him responsible

10   because they said he joined this conspiracy, and they charged

11   this conspiracy from 1998, this County Bank, things you heard

12   about the Kickapoo, first starting with the tribes, the Santee,

13   the Miami and the Modoc.  That all started before Tim was even

14   there, before he was even in law school.  Yet they argue and

15   charged him for being involved because he joined the

16   conspiracy.  The fact of the matter was he wasn't involved.  He

17   can't give you information about that because he wasn't there.

18   Doesn't mean it's illegal or improper, but like the judge told

19   you, look at each piece of evidence, the evidence the state or

20   the government gives you, against each person individually.

21   And the fact of the matter is Tim Muir didn't change anything

22   when he came in in 2006.  The relationships were established.

23   He was there to watch over litigation, because there was state

24   regulation law.  He was there to interface with the other

25   lawyers, like Conly Schulte.  And you'll hear about Conly

1    Schulte and Conly Schulte's firm, which is out in Nebraska,

2    primarily, or started in Nebraska, but now they have offices

3    across the nation.

4           So Tim gets involved.  As Mr. Roth told you, as the

5    judge has told you, this case is a textbook case regarding

6    three principles we have from the Constitution.  One, Tim is

7    presumed innocent unless and until you find differently;

8    second, the burden is on the government to prove everything

9    they say, all their claims are true, and they must prove them

10   beyond a reasonable doubt.  Not probably, not maybe, but beyond

11   a reasonable doubt.

12          Mr. Roth mentioned this case is not about payday

13   loans.  You may not like them.  You may abhor them.  We can

14   argue on the courthouse steps about whether they should be

15   made.  Lots of industries we may not like, cigarettes, tobacco,

16   liquor.  But this isn't about payday lending.  It's a bit

17   ironic, though, that the government is going to call witnesses

18   who were involved in payday lending.  They're going to call

19   people from the Modoc and the Santee, who are doing payday

20   lending today at the rate on the chart, at that rate.  That's

21   their witnesses.  Take advantage of the -- let's see, what was

22   it they said, the working people, the struggling people.

23   They're calling witnesses who are involved in payday lending,

24   yesterday, today, have been, since they fired Scott Tucker;

25   those two tribes were involved, their own witnesses who were

1    involved, being tribal members who head up the tribes.

2          But that's not what it's about here, so don't be

3    misguided about all the claims about the working and the

4    struggling people when the government's putting people on the

5    stand who work in this industry.

6          We will show you documents.  Mr. Roth told you about

7    the short-term lending, what the customer got.  The customer

8    received a "congratulations" email.  You saw that on the screen

9    briefly, but you'll see it again.  And you'll see that the

10   customer was told, This loan is going to be renewed, and if you

11   didn't want to renew the loan, you merely just sent an email.

12   You just had to do it three days before the due date, which was

13   two weeks out.  And if you wanted to pay it off, if you wanted

14   to pay the $90 on the $300 loan, that's all you had to do.  And

15   some people did that.  Many people didn't do that, but it's not

16   like they didn't have a choice.  It's not like they were forced

17   to do this pay down.

18         And the government will call witnesses who tell you

19   that many, many customers, liked the auto renewal.  Essentially

20   they were just renewing that loan.  They have witnesses who

21   told them that that was a feature that people liked, and as

22   Mr. Roth told you, there were millions of these loans that were

23   made, millions of customers.  You'll hear from the government's

24   witnesses about the repeat customers, numerous repeat customers

25   who come back.  And again, we're not here to debate whether

 1    payday loans should be made or not made.  We're here to debate

 2    whether it was done criminally, whether it was done illegally.

 3          Mr. Roth told you about the tribal governments and

 4    about the tribes in general, and tribes are sovereign nations.

 5    They predate the Constitution.  We don't want to think of them

 6    as governments because, frankly, where they've been placed:

 7    Miamis in Oklahoma, the Modocs in Oklahoma.  The Santee are up

 8    in northeast Nebraska, and they're not placed on lands that

 9    most of us would want to live.  They're not placed where you

10    can get broadband, Internet.  You can't get good quality

11    workforce, but the fact of the matter is they're self-governing

12    governments.  The Constitution provides that.

13          Conly Schulte will tell you about that.  They make

14    their own laws, and as Mr. Roth told you, you know why Capital

15    One can charge you more than twice the usury rate?  Because

16    they're in South Dakota, and South Dakota passed the law.

17    That's why.  Your credit card rates are twice that rate if you

18    don't pay it.  Some credit cards are, not all.  Tribes have

19    economic development, and they're trying to get into

20    businesses, but because of where they're located, because of

21    the workforce, because of the shortage of IT, they can't just

22    start a business up.  And Mr. Roth mentioned that to you

23    earlier, but you're going to see and hear about the Miami's

24    2000, the Miamis of Oklahoma 2001 annual report, before they

25    even had any contact with Scott Tucker.

1            It says, "The mission of the Miami Tribe Business

2     Development Authority is to identify, develop and manage

3     high-tech business enterprises with minimal tribal operating

4     risk and capital."  Minimal risk, minimal capital.  The Miami

5     were looking for opportunities.  They were encouraged to find

6     opportunities just like that, but they didn't have to put any

7     money out and they weren't at any risk for losing any money.

8     The federal government has passed laws that say similar things.

9     In 2000, the National American Business Development Act --

10            MR. SCOTTEN:  Objection.

11            THE COURT:  Basis.

12            MR. SCOTTEN:  Motion *in limine*, extrinsic legal

13     evidence.

14            THE COURT:  All right.

15            Ladies and gentlemen of the jury, there's only one

16     person in this courtroom who can tell you what the law is.

17     That's me.

18            If you want to move on to evidence, if you're going to

19     be offering evidence, then you can talk about the evidence

20     you're going to be offering.

21            MR. BATH:  The evidence I will offer is that tribal

22     witnesses from the government will tell you that they're

23     encouraged by the federal government to seek businesses where

24     they have minimal capital and low risk, and that's been proven

25     over and over.  And they'll tell you that's why they get in

1    these kind of businesses.

2          The evidence will be that when they talked to

3    Mr. Tucker, he made an offer of the $20,000 a month or 1

4    percent of the revenues, not profits.  You will hear witnesses

5    tell you this.  You will hear tribal witnesses that these guys

6    right here will call and tell you and they're going to say:

7    "That's exactly the kind of deal we want as tribes.  We want to

8    get in those because if we get in a deal where it's 1 percent

9    of the profits," and that's what was told to you in opening by

10   the government, "well, then somebody always messes with the

11   profits.  Right?  Oh, there's an expense here and expense here

12   and drives the profit down.  If we get topline revenues, that's

13   what we want.  We're involved in those kind of ventures."

14         Tribes are involved in all kinds of those businesses.

15   They're involved in mining operations.  They're involved in

16   casinos.  You think they really run the casinos?  No.  You

17   think they go out and buy mining equipment?  No, they don't do

18   that.  These are the partnerships that these tribes make.

19         Now, in this sense here, before Tim here joined, Conly

20   Schulte gave advice, and they had to pass laws, because they're

21   governments, and the Miami tribe and the Santee and the Sioux

22   all passed, and you're going to hear about those and you're

23   going to see those laws.  They incorporated tribal entities,

24   business entities.  They passed resolutions.  They had boards

25   of directors.  They had voting rights.  They had tribal

1    councils for board of directors.  Tribal entities received

2    employee identification numbers from the IRS.  They opened bank

3    accounts, as Mr. Roth told you.  They gave Mr. Tucker power of

4    attorney.

5              You think when a casino on Indian land wants to write

6    a check for water or for a piece of machinery --

7              THE COURT:  Confine yourself to the evidence in the

8    trial.

9              MR. BATH:  Thank you.

10             The evidence from the tribal people the government

11   will call is that this business ran just like all the other

12   businesses and many of the businesses they're involved in, and

13   that's going to be the evidence in this case.  And you listen

14   to those tribal people.  You listen to Mr. Ickes.  You listen

15   to Troy Littleaxe.  Their thing, too, is about other lawyers

16   being involved.  They were not only lawyers from Mr. Tucker's

17   side who were involved -- this is before Mr. Muir joined -- but

18   there were lawyers on the tribes' side.  Troy Littleaxe, who's

19   going to testify for the Santee, he's a lawyer.  There's a

20   lawyer who is on the board at the Miami tribe, Ken Bellmard.

21   He was on the board of directors.  He was involved when these

22   businesses were first started.  Nobody was trying to hide

23   anything.  Nobody was trying to lie were anything.  These

24   tribal businesses were known to the federal government for

25   many, many years.

1          Mr. Muir went to many meetings.  In 2013, in 2014, for

2     example, he met with the chairman of the FDIC, and that

3     included Chief Lankford from the Miami.

4          MR. SCOTTEN:  Objection.

5          THE COURT:  Basis.

6          MR. SCOTTEN:  The Court has ruled on this.  State of

7     mind, it needs to be things he heard beforehand, the extrinsic

8     legal evidence objection the Court ruled on.

9          THE COURT:  Do you want a sidebar, Mr. Bath?

10          MR. BATH:  No.  I can make argument from here, if you

11     like, Judge.

12          THE COURT:  No.  We'll do it at the sidebar.

13          Ladies and gentlemen, you can stand up and stretch.

14          (At sidebar)

15          THE COURT:  What are you planning on saying?

16          MR. BATH:  I'm planning on saying Tim Muir is going to

17     testify.

18          THE COURT:  Please put the white noise machine on.

19     Thank you.

20          MR. BATH:  Planning on saying that Tim Muir is going

21     to testify that he went and met with federal regulators, and he

22     was with tribe members during the charged conduct, Judge.

23          THE COURT:  All right.  So you're not going to open to

24     the jury on what someone else said?

25          MR. BATH:  No, no, no.

1          THE COURT:  OK, because I was looking at what you

2     said, and it sure sounded that way to me.

3          All right.  Any objection to an overview of what the

4     testimony will be as to what Mr. Muir was told?

5          MR. SCOTTEN:  Not if that's what it is, your Honor,

6     but I'm trying to keep this to a minimum.  We had already

7     specific opening on the ground that our motion couldn't be more

8     clear on, which was just getting what lawyers were involved.

9     The Court has ruled very expressly that shouldn't come in,

10    tried to hold back on that.

11         THE COURT:  No.  If it's in the context of what

12    Mr. Muir heard or was told, it's a different story.

13         MR. SCOTTEN:  If it's that, your Honor.

14         THE COURT:  OK.

15         That's what it is?

16         MR. BATH:  That's what it is.

17         MR. SCOTTEN:  Oh, and your Honor, 2014 is not within

18    the charged conduct, so I think the Court's ruling is pretty

19    clear.  You can't be saying --

20         THE COURT:  That it's beyond the charged conduct.

21         MR. BATH:  Some of these were '13, Judge.  I'll focus

22    on the '13 dates.

23         MR. SCOTTEN:  If it's after the crimes were

24    committed --

25         THE COURT:  I'm sorry.  After the?

1          MR. SCOTTEN:  After the crimes were started.  We had

2     argument on this, Judge.  We said, What does it matter what

3     somebody told him in 2013?  How can you say, "I've been

4     committing crimes for seven years on the advice" --

5          THE COURT:  You'll have the opportunity to make your

6     points.  Thank you.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Good ahead, Mr. Bath.

3          MR. BATH:  Thank you, Judge.

4          As I was saying, in 2013, Mr. Muir will testify that

5     he went and met with the FDIC and the chairman of the FDIC and

6     state regulatory agencies for the New York department of

7     finance and that there were tribal people with him.  This goes

8     to the government's claim of, This was hiding and lies.  There

9     was no hiding or lies about this company and what was going on

10    with this company.

11         The state, or the government, rather, argued that

12    there was a sham lawsuit.  Didn't give you any specifics but

13    suffice to say you'll hear evidence about that.  You'll hear

14    evidence about the lawyer that was hired by Mr. Muir to

15    represent Scott Tucker.  You'll hear and see the pleadings that

16    were filed.  You will hear from the lawyer, like I said, who

17    filed the lawsuit, and Mr. Muir will tell you about the

18    lawsuit.  And there's nothing about a sham about that lawsuit.

19    There was a judge involved.  You'll hear discussions that

20    happened with this judge, who signed the order in Kansas, and

21    you'll get a chance to see that for yourselves.

22         There's been mention by the government about weather

23    reports and that people were told to lie to customers.  There's

24    a couple things you're going to hear about that.  The first is

25    the person who came up with the weather reports that's going to

1    be called by the government is going to admit that she came up

2    with the weather reports, it was her idea.  She's not going to

3    connect that to Tim Muir in any way, shape or form.  In fact,

4    she's one of them who's here under an agreement with the

5    government because she's pled guilty to that, because she was

6    deposed by the federal regulators a number of years ago and

7    asked specifically about the weather reports.  And she lied

8    about that; that's the crime she committed and that's the crime

9    she pled to.  It has nothing to do with Tim Muir.  It has

10   nothing to do with these allegations.

11        On the other hand, there are times when people would

12   ask where they could mail payments.  The payments were mailed

13   to where the business is located, which is the reservation.

14   That's because the tribes owned the businesses.  That's going

15   to be the evidence.  The evidence wasn't going to be -- I

16   believe the evidence won't be that anybody was being lied to

17   about the locations because Tim Muir asked them to lie or had

18   anything to do with any of that, talking to customers about the

19   location of the tribes.

20        What does an owner have a right to do?  You're going

21   to hear evidence an owner has a right to fire somebody, and the

22   tribes fired Scott Tucker.  The owner has the right to stay in

23   business, and the Santee and the Modocs stayed in business.

24   The same name, 500FastCash, you heard the name of that

25   business.  That's one of the names of the businesses, a

portfolio.  The tribes kept the portfolios.  They stayed in

business, and as of August 31, 2013, this is just snapshot, the

money in the bank at the time was the Modoc had 23 million, the

Santee 22 million in their account, and the Miami had 117

million.  The government is saying these are Scott Tucker's

businesses, and if that's true, then that was Scott Tucker's

money, and he should have got that money back.  Well, it's not

his business, so that wasn't his account, and he didn't get the

money back.  The tribes kept all that money, and the Miami

tribe in particular kept the money because they made a deal

with the government and the government blessed them keeping the

money in the account.  That's fine, because it was their money,

because they were owners, because they were the ones who were

making the loans.  That's going to be the evidence in this

case.

         Tim Muir is going to testify, as I told you.  He's

going to get on the stand and he's going to tell you about

this.  He never believed anything was criminal.  He's going to

face this team of prosecutors, and I'm confident when all the

evidence is in, you're going to find Tim Muir not guilty of all

the counts.

         Thank you.

         THE COURT:  Thank you, Mr. Bath.

         All right.  I'm going to let the government call its

first witness.

1      Let me reiterate what I've told you, ladies and

2 gentlemen.  In this trial it will not be up to you, ladies and

3 gentlemen, to have to worry about developing legal principles.

4 In a trial the parties to the case are able to advance legal

5 arguments to the Court, and then the Court formulates the

6 instructions on the law that govern the case, and that's the

7 division of labor in a trial between a judge and a jury and the

8 lawyers.  So law will not be a matter of evidence in the case,

9 the governing legal principles.  That will be something that I

10 will instruct you at the end of the case so you will know what

11 the legal principles are that govern the charges in this case.

12 OK, ladies and gentlemen?

13      With that, the government may call its first witness.

14      MR. RAVI:  Your Honor, the government calls Richard

15 Hamner.

16      THE COURT:  All right.

17      MR. RAVI:  Your Honor, may I move the podium, please?

18      THE COURT:  You absolutely may.

19  RICHARD HAMNER,

20      called as a witness by the Government,

21      having been duly sworn, testified as follows:

22      THE COURT:  All right.  You may inquire.

23      MR. RAVI:  Thank you, your Honor.

24 DIRECT EXAMINATION

25 BY MR. RAVI:

1    Q.  Good afternoon, Mr. Hamner.

2    A.  Hello.

3    Q.  How old are you?

4    A.  I'm 34.

5    Q.  Where were you born?

6    A.  Nevada City, California.

7    Q.  Where do you live now?

8    A.  In Sacramento, California.

9    Q.  Did you graduate high school?

10   A.  Yes, I did.

11   Q.  What did you do after you graduated high school?

12   A.  After high school I joined the army and spent eight years

13   in the army, six years on active duty and two years reserves.

14   Q.  What year did you start with the army?

15   A.  In 2002.

16   Q.  And did you start in active duty?

17   A.  Yes, I did.

18   Q.  And when did you start active reserve, approximately?

19   A.  2008.

20   Q.  And where did you serve?

21   A.  For my active duty, I was stationed in Italy from where I

22   deployed to Iraq for a year and Afghanistan for another year.

23   Q.  What did you do after you served in the army?

24   A.  I got out and I went to college on the GI bill.

25   Q.  And where did you attend college?

1   A.  I got my bachelor's degree in accounting from the

2   University of Phoenix in Sacramento, California.

3            THE COURT:  I didn't hear that.  The university of?

4            THE WITNESS:  Phoenix.

5            THE COURT:  Phoenix.  Thank you.

6   BY MR. RAVI:

7   Q.  When did you graduate?

8   A.  In 2013.

9   Q.  Did you obtain any other degrees?

10  A.  Yes, I did.  I received a master's degree in finance.

11  Q.  And where did you receive that from?

12  A.  From Kaplan University.

13  Q.  And when did you graduate?

14  A.  In 2015.

15  Q.  Are you currently employed, Mr. Hamner?

16  A.  Yes.

17  Q.  Where are you employed at?

18  A.  I work for the state of California as an internal auditor

19  for the state employees retirement system.

20  Q.  Does that have a name?

21  A.  CalPERS.

22  Q.  And how long have you worked there?

23  A.  Four years.

24  Q.  Are you married?

25  A.  Yes, I am.

1    Q.   Do you have any kids?

2    A.   Yes, I have three boys.

3    Q.   What are their ages?

4    A.   I have a four-year-old, a three-year-old and an

5    eight-month-old.

6    Q.   Mr. Hamner, did there come a time when you applied for a

7    payday loan from a company called OneClickCash?

8    A.   Yes, in 2012.

9    Q.   And what prompted you to get this payday loan?

10   A.   I was working and going to school at the time.  My wife and

11   I had just gotten married that year, and we had our first baby

12   on the way.  We were a little behind on bills at the time, and

13   with the baby on the way, we had a lot of new purchases coming

14   up and also the holidays, Christmas coming up as well.

15   Q.   What did you do in order to find this payday loan?

16   A.   I went online and did a Google search, and this was one of

17   the companies that came up.  And I went to their website and

18   did an application online.

19   Q.   How much of a loan did you take out for this payday loan?

20   A.   $300.

21           MR. RAVI:  Your Honor, may I approach the witness?

22           THE COURT:  You may.

23           Attorneys for both sides have an irrevocable license

24   to approach the witnesses in this trial.  If they behave, that

25   will be fine.  If they misbehave, I'll revoke their license,

1    but you're permitted to approach.

2                MR. RAVI:  Will do, your Honor.

3    Q.  Mr. Hamner, I put in front of you a number of exhibits.

4    One of them is Government Exhibit 2701.  What is this?

5    A.  This is the application for the loan.

6    Q.  And when is it dated?

7    A.  August 11, 2012.

8    Q.  And did you sign this -- where did you fill out this

9    application?

10   A.  Online.

11   Q.  Did you sign this application?

12   A.  Not physically, no.  But I believe I agreed to it online.

13   Q.  Did you electronically sign it?

14   A.  Yes.

15               MR. RAVI:  Your Honor, the government offers

16   Government Exhibit 2701.

17               THE COURT:  Any objection?

18               MR. BATH:  No objection.

19               MR. ROTH:  No, your Honor.

20               THE COURT:  Received.

21               (Government Exhibit 2701 received in evidence)

22               MR. RAVI:  Ms. Grant, you can publish Government

23   Exhibit 2701.

24   Q.  What's the date on the application?

25   A.  8/11, 2012.

1                MR. RAVI:  Now zoom in on the large box in the top

2      half.

3      Q.  Mr. Hamner, can you generally describe what kind of

4      information you provided on this application?

5      A.  Personal information: name, address, social security

6      number, date of birth, employment and income information, and

7      banking information, my checking account number; and personal

8      references.

9      Q.  Where were you working at the time you submitted this

10     application?

11     A.  I worked at a company called the Scooter Store.  It's a

12     medical equipment company, and I worked as a service

13     technician.

14                THE COURT:  As a what technician?

15                THE WITNESS:  A service technician.

16                THE COURT:  Thank you.

17     BY MR. RAVI:

18     Q.  Did you also have to provide information about income?

19     A.  Yes.

20     Q.  What information did you provide about your income?

21     A.  My income at the time was $3,000 a month.

22     Q.  And how often did you get paid?

23     A.  Every two weeks.

24     Q.  Mr. Hamner, how much did you think that this $300 loan

25     would cost you?

1    A.  $390 total.

2    Q.  And why did you think that?

3    A.  In the application there are some boxes that state the loan

4    interest rate, the loan amount, the finance charge and the

5    total amount of the loan.

6    Q.  And when did you first see those boxes?

7    A.  When I first looked at the application.

8            THE COURT:  Now, Mr. Hamner, when you filled out this

9    application that is up on the screen in front of the jury, were

10   there the black boxes that we see on the screen now?

11           THE WITNESS:  No.

12           THE COURT:  OK.  Now, is that information which has

13   been covered, to your knowledge?

14           THE WITNESS:  Yes, your Honor.

15           THE COURT:  For privacy reasons?

16           THE WITNESS:  Yes.

17           THE COURT:  OK.  Thank you.  Next question.

18           MR. RAVI:  Thank you, your Honor.

19           If we could turn now to page 7 of Government Exhibit

20   2701, and if we could zoom in on the large box as well as down

21   further as well.  Thank you, Ms. Grant.

22   Q.  Do you recognize what's shown on the screen right now on

23   page 7 of Government Exhibit 2701?

24   A.  Yes.

25   Q.  And what do you see?

1    A.  I see the boxes I just referenced about the annual

2    percentage rate, the finance charge, the amount financed and

3    the total of payments.

4    Q.  Mr. Hamner, what was the amount of the loan you took out

5    again?

6    A.  $300.

7    Q.  And where do you see that in these boxes?

8    A.  Under the "amount financed" block.

9    Q.  Is that the third box from the left?

10   A.  Yes.

11   Q.  Can you please read what's above the $300?

12   A.  It states, "Amount financed, the amount of credit provided

13   to you on your behalf."

14   Q.  Mr. Hamner, what did you understand to be the finance

15   charge for that $300 loan?

16   A.  $90.

17   Q.  Where do you see that?

18   A.  Under the "finance charge" block, second from the left.

19   Q.  Can you please read what's above the $90 in that box?

20   A.  Yes.  It states, "Finance charge, the dollar amount the

21   credit will cost you."

22   Q.  In total, Mr. Hamner, after you took out the $300 loan, how

23   much did you expect you were going to have to pay back?

24   A.  $390.

25   Q.  Do you see that on any of these boxes?

1    A.  Yes, in the "total of payments" box.

2    Q.  Is that the fourth box from the left?

3    A.  Yes.

4    Q.  Can you read what's above the $390?

5    A.  "Total of payments, the amount you will have paid after you

6    have made the scheduled payment."

7    Q.  Do you also see an annual percentage rate there?

8    A.  Yes.

9    Q.  Where is that located?

10   A.  The first block on the left.

11   Q.  And what is the annual percentage rate?

12   A.  995.45 percent.

13   Q.  And what does it say above that percentage?

14   A.  "Annual percentage rate, the cost of your credit as a

15   yearly rate."

16   Q.  Mr. Hamner, was there any other reason besides these boxes

17   that you thought it would cost $390 to get a $300 loan?

18   A.  My experience with previous payday loans are such that you

19   receive a certain amount, and you pay back that amount plus the

20   finance charge.

21   Q.  And approximately how many times had you previously taken

22   out payday loans?

23   A.  Two or three times.

24   Q.  And had you previously taken out payday loans with

25   OneClickCash or other companies?

1    A.  Other companies.

2    Q.  Was this the first time that you had ever applied or taken

3    a loan from OneClickCash?

4    A.  Yes.

5    Q.  Mr. Hamner, at the time that you applied for and decided to

6    take this loan, did you read the language that is below these

7    four boxes?

8    A.  I don't remember if I read it.

9    Q.  Can you please read now the portion, the first paragraph

10   that says "payment schedule" --

11   A.  Yes.

12   Q.  -- that begins right below the annual percentage rate box?

13   A.  "Payment schedule, one payment of $390 due on August 24,

14   2012.  If you decline," and there's an asterisk here, "the

15   option of renewing your loan, if renewal is accepted, you will

16   pay the finance charge of $90 only on 8/24, 2012.  You will

17   accrue a new finance charge at each renewal of your loan on the

18   due date resulting from a fourth renewal and every due date

19   thereafter.  The outstanding principal of your loan must be

20   paid down by $50.  This means your account will be debited for

21   the finance charge plus a $50 principal payment on the due

22   date.  This will continue until your loan is paid in full.  If

23   your pay date falls on a weekend or a holiday and you have

24   direct deposit, your account will be debited on the business

25   day prior to your normal pay date.

1          "To decline the option of renewal, your signed account

2    summary document must be received in our office at least three

3    business days before your loan is due.  This loan may be

4    renewed on the payment of the finance charge only."

5    Q.  You mentioned there was an asterisk, correct?

6    A.  Yes, that's correct.

7    Q.  Does that asterisk connect to any other language?

8    A.  Yes, the second-to-the-last sentence.

9    Q.  Can you point out for the jury where you see that, or read

10   what's next to it?

11   A.  It states, "To decline the option of renewal, your signed

12   account summary document must be received in our office at

13   least three business days before your loan is due."

14   Q.  Now, Mr. Hamner, that whole paragraph that you read, did

15   you understand that?

16   A.  No.  It's very confusing.

17   Q.  Did you understand you needed to do anything in order to

18   just pay the $90 finance charge?

19   A.  No, I didn't.

20          MR. RAVI:  We can take down Government Exhibit 2701.

21   Q.  Mr. Hamner, did you receive the money for the loan?

22   A.  Yes, I did.

23   Q.  And how much did you receive?

24   A.  $300.

25   Q.  Do you remember when you received it?

1    A.   August 13, 2012.

2    Q.   Mr. Hamner, if you would turn to Government Exhibit 2703,

3    which I believe is also in front of you in the exhibits I

4    provided you.  Do you have it in front of you?

5    A.   Yes.

6    Q.   What is in Government Exhibit 2703?

7    A.   These are my bank statements from August -- or from July

8    2012 to December 2012.

9    Q.   And do these bank statements relate to a certain bank

10   account?

11   A.   Yes, my checking account.

12   Q.   At which institution?

13   A.   Wells Fargo.

14   Q.   Is this the same bank account you provided to OneClickCash?

15   A.   Yes, it is.

16   Q.   Do these statements reflect transactions relating to

17   OneClickCash?

18   A.   Yes, they do.

19            MR. RAVI:  The government offers Government Exhibit

20   2703.

21            THE COURT:  Any objection?

22            MR. BATH:  No, your Honor.

23            MR. ROTH:  No, Judge.

24            THE COURT:  Received.

25            (Government Exhibit 2703 received in evidence)

1          MR. RAVI:  Just publish 2703 for the jury.

2    Q.  Does that state your name there, Mr. Hamner?

3    A.  Yes, it does.

4    Q.  Is there another name next to it?

5    A.  Yes, that's my wife's name.

6          MR. RAVI:  If we would turn to page 5 of Government

7    Exhibit 2703.

8    Q.  Mr. Hamner, if you look to the middle of that page, do you

9    see a deposit of $300?

10   A.  Yes, I do.

11   Q.  Can you please read what the line item is?

12   A.  "OneClickCash credit 081312 12830509 Hamner, Richard."

13   Q.  Do you know what those numbers signify, Mr. Hamner?

14   A.  No, I don't.

15   Q.  Now, Mr. Hamner, after you received this money on August

16   13, 2012, when did you understand you would have to make any

17   payment on this loan?

18   A.  I understood that the full amount of $390 would be

19   automatically withdrawn from my account in two weeks.

20   Q.  And what was the significance of the two weeks?

21   A.  I was paid every two weeks, from my work.

22   Q.  How would the money be withdrawn?

23   A.  Just automatically from my account.

24   Q.  And were there withdrawals that were made from your

25   account?

1    A.  Yes, there were.

2              MR. RAVI:  Let's go now to page 11 of Government

3    Exhibit 2703.

4    Q.  Mr. Hamner, do you see a withdrawal that was made?

5    A.  Yes, on August 24, in the amount of $90.

6    Q.  And was this the amount you were expecting to pay back?

7    A.  No.  I was expecting to pay the full 390.

8    Q.  And at this point in time, when this withdrawal was made,

9    did you realize there was any problem?

10   A.  I -- I didn't realize it at the time, no.

11   Q.  Were you tracking these withdrawals at the time?

12   A.  Not at the time.

13             MR. RAVI:  Turn now to page 12.

14   Q.  Mr. Hamner, is there another withdrawal that was made?

15   A.  Yes.

16   Q.  What is the date of this withdrawal?

17   A.  September 7.

18   Q.  What is the amount?

19   A.  $90.

20             MR. RAVI:  Let's turn now to page 18.

21   Q.  Is there also another withdrawal?

22   A.  Yes, on September 21, for another 90.

23   Q.  This is also for OneClickCash, is that correct?

24   A.  That's correct.

25   Q.  Is this the third withdrawal?

1   A.  Yes.

2          MR. RAVI:  Turn now to page 21.

3   Q.  Is there a fourth withdrawal, Mr. Hamner?

4   A.  Yes, on October 5, for $90.

5          MR. RAVI:  Turn now to page 25.

6   Q.  Mr. Hamner, were there some withdrawals on a fifth

7   occasion?

8   A.  Yes, there were two on October 19 in the amounts of $90 and

9   $50.

10  Q.  Both of these were for OneClickCash?

11  A.  Yes, that's correct.

12  Q.  Mr. Hamner, did you understand why there were two separate

13  withdrawals in different amounts on October 19, 2012?

14  A.  No, I do not.

15  Q.  Mr. Hamner, at some point was there an issue regarding your

16  loan payment?

17  A.  Yes.  It seemed like an excessive amount of money at this

18  time, and it was at this point that I contacted OneClickCash.

19  Q.  And how much had you paid by the time you contacted

20  OneClickCash?

21  A.  Approximately $500.

22  Q.  And again, how much did you expect to have paid?

23  A.  $390.

24  Q.  How did you contact OneClickCash?

25  A.  I contacted them by phone.

1    Q.  Were you able to get a hold of someone?

2    A.  It was very difficult to get a hold of somebody, but after

3    two or three calls I was.

4    Q.  And describe the conversation that occurred when you were

5    able to get a hold of someone at OneClickCash.

6    A.  I asked the representative to explain all these

7    withdrawals.  I stated that it seemed like this was fraudulent,

8    like something illegal was going on.  It was at that point that

9    the representative had stated that they were, that the company

10   was affiliated with a certain Native American tribe and that

11   this tribe was considered a sovereign nation and therefore not

12   subject to U.S. law.

13   Q.  Did the conversation regarding OneClickCash's affiliation

14   with a tribe or a sovereign nation occur more than once?

15   A.  Yes, it did.

16   Q.  Approximately how many times?

17   A.  Two separate calls that I remember.

18   Q.  But on this call was it mentioned more than once that

19   OneClickCash was affiliated with a tribe or a sovereign nation?

20   A.  Yes, they stated sovereign nation several times.  It seemed

21   like the standard response to any of my questions was sovereign

22   nation.

23   Q.  And we're talking about one single call, correct?

24   A.  Yes.  This call, yes.

25   Q.  Do you know approximately how many times it was mentioned?

1   A.  Maybe four or five times.

2   Q.  What impact did that have on you, Mr. Hamner?

3   A.  I felt like there was nothing I could do, like I was

4   trapped and I would have to pay or the money would just keep

5   coming out of my account.

6   Q.  What did you do as a result?

7   A.  I made additional payments that I felt would close my

8   account, and that wasn't the case.

9   Q.  Well, why did you make the additional payments?

10  A.  I felt like I didn't have a choice.

11  Q.  Well, what made you think that making additional payments

12  would close your account?

13  A.  I was told that by the representative.

14  Q.  Was there anything else you thought you could do at that

15  time?

16  A.  No.

17  Q.  Did you end up making additional payments?

18  A.  Yes, I did.

19         MR. RAVI:  Let's turn now back to Government Exhibit

20  2703 and turn to page 27, towards the lower half of the page.

21  Could you just highlight transactions of November 2 and

22  November 5.  Just rezoom, and include the second transaction as

23  well.  Thank you, Ms. Grant.

24  Q.  Mr. Hamner, do you see some transactions on November 2 and

25  November 5, 2012?

1   A.  Yes.

2   Q.  And what are these transactions?

3   A.  On November 2, OneClickCash withdrew $325 from my account,

4   and on November 5, this was reversed.

5           MR. RAVI:  Actually, if we can rezoom and include the

6   next transaction as well, all three, Ms. Grant.

7   Q.  And is there a third transaction there?

8   A.  Yes.  This is an overdraft fee from my bank in response to

9   the original $325 withdrawal that overdrafted my account.

10  Q.  Sir, at that point, there's a negative $207.82 that was

11  there after the withdrawal of $325, is that correct?

12  A.  Yes, that's correct.

13  Q.  Again, what was that fee for?

14  A.  This was an overdraft fee from my bank.

15  Q.  Do you know what NSF stands for?

16  A.  Nonsufficient funds, I believe.

17  Q.  Did you understand why there was a debit and then a

18  reversal?

19  A.  No, I don't.

20          MR. RAVI:  Turn now to page 28 of Government Exhibit

21  2703, and actually if we can get, yes, all of those.  Thank

22  you.

23  Q.  Now, Mr. Hamner, let's go through each of these

24  transactions one by one.  What was the first line item date?

25  A.  November 7, there was an automatic debit to OneClickCash in

1   the amount of $250.

2   Q.  And what was the second?

3   A.  And then the second, on November 7, the same date, another

4   debit from OneClickCash in the amount of $75.  And then a third

5   debit from OneClickCash in the amount of $30.

6   Q.  Was there a fourth transaction on November 8, 2012?

7   A.  Yes.  The $250 was reversed.

8   Q.  And then are there two further transactions?

9   A.  Yes.  Nonsufficient-funds fee from my bank in the amount of

10  $35 and then -- for the $250 amount; and then an overdraft fee

11  for the $75 amount, another $35.

12  Q.  Is there also another transaction below these on November

13  13, 2012?

14  A.  Yes, there's -- November 13, there's a check card purchase

15  payment to OneClickCash in the amount of $250.

16  Q.  Mr. Hamner, what was the purpose of these payments that you

17  were making?

18  A.  I was told over the phone that these payments would close

19  my account.

20  Q.  And did those payments close your account?

21  A.  No, they did not.

22  Q.  Did you make any other payments?

23  A.  Yes.

24          MR. RAVI:  Let's turn now to page 33.

25  Q.  What is this transaction that occurred on November 16,

1    2012?

2    A.  November 16, OneClickCash did another automatic debit of

3    $50.

4    Q.  At this point did you have any other conversations with

5    OneClickCash?

6    A.  Yes, I did contact them again.

7    Q.  And were you able to get a hold of somebody?

8    A.  I, I called once and asked for a supervisor and was

9    transferred to a message machine.  I left a message, and no one

10   called me back for two days, and I called back again and was

11   able to get a hold of somebody, and they stated that I needed

12   to pay another $32.50 to close the account in full.

13   Q.  And to be clear, Mr. Hamner, that conversation occurred

14   after this $50 deposit -- withdrawal was made on November 16?

15   A.  Yes.

16   Q.  Was there anything else that was discussed on that call?

17   A.  Again, I just had voiced my concern that I felt like this

18   was illegal and that these, these charges were not authorized.

19   And again I was met with the statement regarding the sovereign

20   nation.

21   Q.  How many times was it mentioned that OneClickCash was

22   affiliated with a sovereign nation or a tribe?

23   A.  Multiple times.

24   Q.  And so how did that phone call end?  How did you leave it

25   with the representative of OneClickCash?

1   A.  I made an additional payment of 32.50.

2   Q.  Why did you make that payment?

3   A.  Because I was told that this would close my account

4   finally.

5           MR. RAVI:  Let's turn now to page 33 of Government

6   Exhibit 2703.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. RAVI:  Actually, zoom in now at the bottom, the

2    second to last transaction.

3    BY MR. RAVI:

4    Q.  Mr. Hamner, was there a transaction November 21, 2012?

5    A.  Yes.

6    Q.  What is that transaction?

7    A.  It's a check payment to One Click Cash in the amount of

8    32.50.

9    Q.  After you made this payment, did you voice a complaint to

10   anyone else?

11   A.  Yes, I did.  I filed a complaint with the Better Business

12   Bureau.

13   Q.  Why did you file that complaint?

14   A.  Because I felt that it might motivate One Click Cash to

15   take action to resolve the issues that I had with them.

16   Q.  Describe specifically what you stated in that complaint.

17   A.  I stated details regarding my experience with One Click

18   Cash, and what they had stated to me regarding sovereign nation

19   and details regarding the various fees that were taken out of

20   my bank account.

21   Q.  Can you describe how the process works with the Better

22   Business Bureau?  You submitted a complaint, correct?

23   A.  Yes.

24   Q.  Were you supposed to receive anything in response?

25   A.  Normally, the company will respond to Better Business

1   Bureau complaints.

2   Q.  Did you receive a response to your Better Business Bureau

3   complaint?

4   A.  Yes, I did.

5   Q.  What was that response?

6   A.  It seemed like a standard response stating that One Click

7   Cash cannot discuss the account details with the Better

8   Business Bureau.

9   Q.  Did you have any further discussions with anyone at One

10  Click Cash?

11  A.  No.

12  Q.  Were there any other withdrawals that you're aware of?

13  A.  No.  Not that I am aware of, no.

14  Q.  Mr. Hamner, I would like you to turn now to Government

15  Exhibit 2704.

16      Do you recognize that?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  This is a summary of deposits and withdrawals to and from

20  my bank account in regard to One Click Cash.

21  Q.  Is that a summary of the various deposits and withdrawals

22  that we have already gone through in your testimony today?

23  A.  Yes, that's correct.

24  Q.  Did you also review your bank records that are Government

25  Exhibit 2703 and compare them with what is contained in this

1   chart in Government Exhibit 2704?

2   A.  Yes, I did.

3   Q.  Does Government Exhibit 2704 accurately reflect the dates

4   and the various transactions that are relating to One Click

5   Cash in your bank statement?

6   A.  Yes, it does.

7           MR. RAVI:  At this time, the government offers

8   Government Exhibit 2704.

9           THE COURT:  Any objection?

10          MR. BATH:  No, your Honor.

11          THE COURT:  Received.

12          (Government's Exhibit 2704 received in evidence)

13          MR. RAVI:  Government publishes Government Exhibit

14   2704.

15          THE COURT:  Do you have that, ladies and gentlemen?

16          JUROR:  We did for a minute.

17          MR. RAVI:  One moment, your Honor.

18          THE COURT:  Yes, sir.

19          Ladies and gentlemen, we will take a five-minute

20   recess.  If you prefer to wait in the jury box you can do that.

21          (Recess)

22          THE COURT:  Any objection to proceeding, Mr. Roth?

23          MR. ROTH:  No, your Honor.

24          THE COURT:  Thank you.

25   BY MR. RAVI:

1   Q.  So, Mr. Hamner, on August 13, 2012, you received a $300

2   deposit, correct?

3   A.  Yes, that's correct.

4   Q.  Was that the loan amount that you had taken out?

5   A.  Yes, it was.

6   Q.  Then subsequent to that August 13, 2012 deposit, there were

7   a number of withdrawals that we have gone through, correct?

8   A.  Yes, that's correct.

9   Q.  Are those depicted on the chart?

10  A.  Yes.

11  Q.  In the third column, what is that?

12  A.  These are overdraft/return item fees from my bank.

13  Q.  Now, Mr. Hamner, in total, how much did you expect to pay

14  for the $300 loan that you took out?

15  A.  $390 total.

16  Q.  How much did you end up paying in the withdrawals?

17  A.  Over $900.

18  Q.  How much in total did you have to pay with respect to fees

19  relating to One Click Cash?

20  A.  Over a thousand dollars, total.

21  Q.  Over 1,000 if you total up the withdrawals as well as the

22  fees?

23  A.  Yes, that's correct.

24  Q.  Mr. Hamner, what was the impact of this loan on you?

25  A.  It presented a hardship for me.  This was a very busy time

1  in my life.  I had just got married.  We had a baby on the way.

2  We had the holidays coming up and to have to pay this much

3  money for a $300 loan was most certainly a hardship.

4         MR. RAVI:  No further questions, your Honor.

5         THE COURT:  Any cross-examination?

6         MR. BATH:  Yes, sir.

7  CROSS-EXAMINATION

8  BY MR. BATH:

9  Q.  Mr. Hamner, I understand you have a degree in accounting,

10  is that right?

11  A.  That's correct.

12  Q.  Also a master's in finance?

13  A.  Yes.

14  Q.  So you work with numbers a lot?

15  A.  Yes.

16  Q.  Those degrees came a little bit after you got these loans?

17  A.  That's correct.

18         MR. BATH:  Would you put up Government Exhibit 2701,

19  please.

20  Q.  I want to show you Exhibit 2701, which is a government

21  exhibit that has been admitted.

22         MR. BATH:  If we can go to the seventh page of that,

23  please.

24         Judge, I think this is a new version.

25         THE COURT:  Perhaps the government can put it up for

1   you.  2701, the seventh page, is that correct?

2            MR. BATH:  Yes, sir.

3            If you could highlight for me below the "promise to

4   pay" box.

5   BY MR. BATH:

6   Q.  I am not going to have you read this, Mr. Hamner, but you

7   remember you saw this earlier when the government was asking

8   questions, correct?

9   A.  Correct.

10  Q.  The first line says, "You promise to pay to us to our order

11  on the date indicated in the payment schedule," is that

12  correct?

13  A.  That's what it says, yes.

14  Q.  Below, if you can --

15           THE COURT:  I will just note that there was more to

16  the sentence, but thank you.

17  BY MR. BATH:

18  Q.  Mr. Hamner, you read that whole sentence earlier, did you

19  not, when you were on direct examination?

20           If you didn't, I'm sorry.  I apologize.

21  A.  No, I did not.

22  Q.  Then go ahead and read that whole sentence.

23  A.  The first sentence?

24  Q.  Yes.  "You promise to pay us."

25  A.  "You promise to pay us or to our order on the date

1   indicated in the payment schedule the total of payments unless

2   this note is renewed."

3   Q.  That payment schedule is the paragraph above there, it says

4   "payment schedule."

5       That amount due was 390 on 8/24/12, correct?

6   A.  Correct.

7   Q.  You understood from this document that 390 was going to be

8   taken from your account on the 24th of August, correct?

9   A.  That's correct.

10          THE COURT:  Well, it says, "Payment of 390 due on

11  2012/08/24 if you decline the option of renewing your loan."

12          MR. BATH:  Yes, sir.

13  Q.  That's the sentence, Mr. Hamner, you read earlier in the

14  government's examination, correct?

15  A.  That's correct.

16  Q.  That's the date you had in your mind, wasn't it?

17  A.  Correct.

18  Q.  Because that's your next payday?

19  A.  Yes.

20  Q.  You then received a loan approval for an e-mail, did you

21  not?

22  A.  Yes, I did receive e-mails.

23          MR. BATH:  Your Honor, these are new exhibits based on

24  information we got just recently, and these are copies for the

25  Court.

1    Q.  I am going to hand you Exhibit 1202.  Is that one of the

2    e-mails you received?

3              THE COURT:  I have D1200 and D1201.

4              MR. BATH:  I'm sorry, Judge.  You don't have 1202?

5              THE COURT:  Not in the materials you just handed me.

6              I found it here.  Thank you.  I have it now.

7    Q.  Mr. Hamner, you have 1202 in front of you?

8    A.  Yes, sir.

9    Q.  This is an e-mail you received as part of your application

10   process, correct?

11   A.  Correct.

12             MR. BATH:  I offer 1202.

13             THE COURT:  Any objection to Defendants' 1202?

14             MR. RAVI:  No objection.

15             THE COURT:  Received.

16             (Defendants' Exhibit 1202 received in evidence)

17             MR. BATH:  May we publish, please.

18   Q.  Just take a look at the top of the document.  That came in

19   on 8/11 of '12, correct?

20   A.  Correct.

21   Q.  At about 6:39 p.m.?

22   A.  Yes.

23   Q.  Do you remember it was the same day you would have put your

24   application in?

25   A.  That's correct, yes.

1   Q.  This essentially tells you -- again, we have the black

2   personal information marked out, correct?

3   A.  Yes, sir.

4   Q.  This tells you how you can essentially log on to see your

5   payment schedule and history, correct?

6   A.  Yes.

7   Q.  You later on did that, did you not?

8   A.  I believe so.

9   Q.  Do you remember if you did or not?

10  A.  No.

11  Q.  Fair enough.  It tells you in the second paragraph, it

12  says, "To view your loan status at any time, you may visit our

13  Web site."  Correct?

14  A.  Yes, that's what it says.

15  Q.  Then the next line says, "You will receive a link with

16  payment options"?

17  A.  Yes.

18  Q.  Do you remember getting that link?

19  A.  No, I don't.

20  Q.  I am going to show you Exhibit D, as in dog, 1200.

21          Can you identify that as a document you got?  Do you

22  remember that, Mr. Hamner?

23  A.  Yes, I do.

24          MR. BATH:  I offer that in evidence.

25          MR. RAVI:  No objection.

1            THE COURT:  Received.

2            (Defendants' Exhibit 1200 received in evidence)

3            MR. BATH:  May we publish?

4            THE COURT:  You may.

5    Q.  Again, we have a black box that marks out your personal

6    information.  Correct, sir?

7    A.  That's correct.

8    Q.  At the top of the letter -- this was an e-mail, wasn't it?

9    A.  Yes, it was.

10   Q.  It came in at 8/12 at 4:04, is that correct?

11   A.  That's correct.

12   Q.  And essentially then -- do you remember receiving this back

13   in August of 2012?

14   A.  I don't remember.

15   Q.  Did you see it in your preparation with the government

16   before today?

17   A.  Yes, I did.

18   Q.  So right now is not the first time you have seen it,

19   correct?

20   A.  That's correct.

21   Q.  When you saw it when you met with the government, did you

22   remind you, Oh, I got this e-mail?

23   A.  Yes, it did.

24   Q.  Under the "please review," there is a lot of language in

25   there about -- the first sentence under "loan receipt" says,

1   "By receiving a loan through One Click Cash, you agree that

2   your loan will be renewed on every due date unless you request

3   to pay in full or to pay down your principal amount borrowed at

4   least three full business days prior to your next due date."

5   Do you see that?

6   A.  Yes, I see it.

7   Q.  Obviously, you don't remember this back in '12, but seeing

8   it in the last couple of days, do you see in here where the

9   word "renewal" is listed multiple times?

10  A.  Yes, I see the word renewal.

11  Q.  If we can go to the second page, the top, Mr. Hamner.

12       Do you see the first paragraph talks about an example of a

13  $300 loan?

14  A.  Yes, I see it.

15  Q.  You had a $300 loan, did you not?

16  A.  That's correct.

17             MR. BATH:  You can pull that down.  Thank you.

18             May I talk to Mr. Ravi?

19             THE COURT:  Yes.

20  Q.  I am going to show you Government Exhibit 2702, Mr. Hamner.

21       That's another e-mail you received from One Click Cash?

22  A.  Yes.

23             MR. BATH:  I offer 2702.

24             THE COURT:  Any objection?

25             MR. RAVI:  No, your Honor.

1    THE COURT:  Received.

2    (Government's Exhibit 2702 received in evidence)

3    MR. BATH:  May I publish, Judge?

4  Q.  This document is multiple pages, is it not, Mr. Hamner?

5  A.  I'm sorry.  The e-mail is multiple pages?

6  Q.  2702 has multiple pages to it, correct?

7  A.  Yes, to the exhibit, yes.

8  Q.  That's what I mean.  If you go to the last page of that

9  exhibit -- they are in reverse chronological order, so if you

10 would go to the last page.

11 A.  OK.

12 Q.  I will get that up on the screen for you.

13    You see at the top, this is 8/14 of '02, at 2:50 there is

14 an e-mail to you, correct?

15 A.  8/14/2012.

16 Q.  I'm sorry.  At 2:20 a.m.

17    Do you remember getting these e-mails?

18 A.  No, I do not.

19 Q.  Do you remember getting e-mails from One Click Cash?

20 A.  Yes, I do.

21 Q.  Do you recall by even looking at this, does it remind you

22 that you got one on 8/14?  It says the minimum payment due was

23 $90 on 8/24/12?

24 A.  I don't remember seeing this e-mail.

25 Q.  Did you see this when you prepped with the government

1    recently?

2    A.  Not that I recall remember, no.

3    Q.  Working backwards from that document, let's go to the

4    second to last page.

5        That's an e-mail that was on 8/30 of '12, correct?

6    A.  Yes.

7    Q.  Again, it has this log-in to review your statement.  Do you

8    see that there?

9    A.  Yes.

10   Q.  In the box?

11   A.  Yes.

12   Q.  Do you remember you can click on that, and you in fact

13   reviewed your statement at one time, didn't you?

14   A.  I don't remember.

15   Q.  That's fair enough.

16       I don't need to publish every one of these, but if you

17   would just look at these and agree with me if I have got the

18   dates.

19       There is an e-mail in here on 9/13 to you, correct?  It's

20   the next document going backwards.

21   A.  Yes, 9/13.

22   Q.  Telling you the minimum payment due was 90?

23   A.  That's what it states, yes.

24   Q.  If we got the chart out that the government had for you,

25   those amounts and those dates would match with what the company

1    was telling you was going to happen, does that sound correct?

2    A.  Yes, the dates do match.

3    Q.  So the company sent you an e-mail and told you that the

4    minimum payment was 90 those first few times, and that's

5    exactly what they did, correct?

6    A.  I don't remember receiving these e-mails.

7    Q.  You don't have any reason, if they were in the books and

8    records that were subpoenaed by the government, to think --

9            MR. RAVI:  Objection.

10            THE COURT:  Sustained.

11    Q.  Are you suggesting that these are not accurate or you just

12    don't remember?

13    A.  I don't remember.

14    Q.  I want you to look at 2702, the second page.

15            MR. BATH:  Can we have that published again?

16    Q.  You see at the top of that document it says "One Click Cash

17    account summary"?

18    A.  Yes, I do see that.

19    Q.  Do you remember in those e-mails that we just went over,

20    you were told by the company you could click on the account

21    summary at any time?

22    A.  The e-mails do state that, yes.

23    Q.  As you look at this document in front of you, Government

24    Exhibit 2702, this says it's an account summary, does it not?

25    A.  That's what it states, yes.

1          MR. BATH:  That box that says "payoff amount," can you

2     highlight that box?

3     Q.  You see that says payoff due date on 11/2 of '12 for 325.

4     Do you see that?

5     A.  Yes, I see that.

6     Q.  Do you now recall that you went in -- you clicked on the

7     computer and you went in and you told them, hey, I want to pay

8     this loan off?

9     A.  I don't remember.

10    Q.  Is it possible you did that?

11    A.  Anything is possible.

12    Q.  Did you look at this document prior to testifying?

13    A.  No, I don't recall seeing this document.

14    Q.  You don't have any recollection -- you see down at the

15    bottom of that document --

16         MR. BATH:  If we can highlight the electronic

17    signature.

18    Q.  You don't recall that on 10/21 of '12, you logged in and

19    you said, I want to pay this off on 11/2 of '12?

20    A.  I don't remember.

21    Q.  Would that have matched up with any of your pay dates?  You

22    got paid every two weeks?

23    A.  It doesn't appear to match with the pay date, no.

24    Q.  Do you remember after you had the conversation with the

25    customer service at One Click Cash, is it possible that they

1   told you, hey, you need to go to your account summary and you

2   need to say that you want to pay off this loan, and that's

3   exactly what you did here?

4   A.  I don't remember.

5   Q.  And that amount was, according to this document, 325 on

6   11/2 of '12.  Do you see that?

7   A.  Yes, I see it.

8   Q.  I want to now go to Government Exhibit 2703.  Those are the

9   Wells Fargo documents.  Do you remember those, sir?

10  A.  Yes, I do.

11  Q.  Actually, I apologize.  Let's go back to 2702.  Do you have

12  that there, the one you had just in front of you?

13      The first page, do you have that?

14  A.  Yes.

15          MR. BATH:  Can we have that on the screen?

16  Q.  You see that's 10/25 of '12, correct?

17  A.  Yes, that's correct.

18  Q.  That's four days after the document that said you were

19  going to pay the 325, do you remember that, it's four days

20  later?

21  A.  I'm sorry, it's four days later from which document?

22  Q.  Page 2, the 325, the electronic signature says that you

23  signed that on 10/21 of '12?

24  A.  Yes.

25  Q.  This is four days later, this document that is on the

1  screen, correct?

2  A.  That's correct, yes.

3  Q.  It is an e-mail to you, correct?

4  A.  Yes.

5  Q.  And it's telling you, now there is a minimum payment of

6  325, correct?

7  A.  That's what it states, yes.

8  Q.  Now, looking at 2703, Government's Exhibit 2703.

9          THE COURT:  Ladies and gentlemen, I hate to leave you

10  in suspense, but you will not get to see the Wells Fargo

11  document until tomorrow.

12          We have had a long day today, as we did yesterday, and

13  I appreciate your cooperation in helping us move forward.

14          So we are going to pick up tomorrow morning with a

15  10:00 start.  We are going to stay on schedule.  So please try

16  to get here ten minutes before so that we can have that good

17  10:00 start.

18          Remember, do not discuss the case among yourselves or

19  with anyone.  Keep an open mind.  Remember the instructions I

20  gave you before.  And see you bright and early tomorrow

21  morning.  Thank you.

22          (Jury exits courtroom)

23          THE COURT:  See you tomorrow morning.  Thank you.

24          (Adjourned to September 13, 2017, at 10:00 a.m.)

25

1                    INDEX OF EXAMINATION

2     Examination of:                        Page

3     RICHARD HAMNER

4     Direct By Mr. Ravi . . . . . . . . . . . . . .85

5     Cross By Mr. Bath  . . . . . . . . . . . . . 110

6                    GOVERNMENT EXHIBITS

7     Exhibit No.                          Received

8      2701    . . . . . . . . . . . . . . . . . .89

9      2703    . . . . . . . . . . . . . . . . . .96

10     2704    . . . . . . . . . . . . . . . . . 108

11     2702    . . . . . . . . . . . . . . . . . 117

12                    DEFENDANT EXHIBITS

13    Exhibit No.                          Received

14     1202    . . . . . . . . . . . . . . . . . 113

15     1200    . . . . . . . . . . . . . . . . . 115

16

17

18

19

20

21

22

23

24

25