H9D8TUC1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          16 Cr. 91 (PKC)

 5   SCOTT TUCKER,
     TIMOTHY MUIR,
 6
                    Defendants.            Trial
 7
     ------------------------------x
 8                                         September 13, 2017
                                           10:20 a.m.
 9
     Before:
10                       HON. P. KEVIN CASTEL

11                                             District Judge

12                            APPEARANCES

13   JOON H. KIM
          Acting United States Attorney for the
14        Southern District of New York
     BY:  NIKETH V. VELAMOOR
15        HAGAN C. SCOTTEN
          SAGAR K. RAVI
16        Assistant United States Attorneys

17   FREEMAN NOOTER & GINSBERG
          Attorneys for Defendant Tucker
18   BY:  LEE A. GINSBERG
          NADJIA LIMANI
19            -and-
     STAMPUR & ROTH
20   BY:  JAMES M. ROTH

21   BATH & EDMONDS, P.A.
          Attorneys for Defendant Muir
22   BY:  THOMAS J. BATH
              -and-
23   BEVERLY VAN NESS

24

25
```

H9D8TUC1

1           (Trial resumed; jury not present)

2           THE COURT:  Please remain standing and bring our jury

3    in.

4           MR. RAVI:  Your Honor, I just want to note the parties

5    would like to start off reading a stipulation.

6           THE COURT:  OK.  That's fine.

7           (Jury present)

8           THE COURT:  Good morning, ladies and gentlemen.  I

9    hope you had a reasonably easy time in and a good evening last

10   night.  We are ready for action.

11          I know that two of you have asked for notes for your

12   employers, and we will work on that, and I will personally sign

13   the notes.

14          One of you received a jury summons from the state

15   court in the Bronx.  Under our wonderful United States

16   Constitution and its supremacy clause, this will not be a

17   difficulty.  We will write to the clerk of the supreme court,

18   and give you a copy of the letter, indicating that you are

19   actually engaged in this trial and cannot comply with the

20   subpoena, and that we request that jury service be adjourned to

21   another date.

22          Another of our jurors has a note from a doctor setting

23   an appointment for tomorrow, and we will call and get that

24   appointment adjourned to a more convenient time so that we can

25   continue.

H9D8TUC1

1        So we will be back to you with those notes and with

2    the updated information.

3        And with that, I am told that there is a stipulation

4    between the parties that one side wishes to read at this time.

5        You may do so.

6        MR. RAVI:  Thank you, your Honor.

7        At this time, I will be reading --

8        THE COURT:  Is it a factual stipulation or a

9    testimonial stipulation?

10        MR. RAVI:  It is a testimonial stipulation.

11        THE COURT:  OK.

12        A testimonial stipulation is a stipulation that, if a

13    witness were called to testify in the case, the witness would

14    testify that such and such is true.

15        When there is a stipulation, all of the parties to the

16    case have agreed that this is in fact the case that the witness

17    would so testify, and to make the trial proceed in a more

18    efficient manner, they have agreed that there is no need to

19    have that witness take the stand and so testify.

20        You must accept that the witness, if called, would so

21    testify.  You must accept that.  But the weight to be given the

22    significance of that testimony is entirely up to you to decide.

23        You may proceed.

24        MR. RAVI:  Thank you.  I will be reading from

25    Government Exhibit 5002, a stipulation captioned United States

H9D8TUC1

1    of America v. Scott Tucker and Timothy Muir.

2              "It is hereby estimated and agreed by and among United

3    States of America, by Joon H. Kim, Acting United States

4    Attorney for the Southern District of New York, Niketh

5    Velamoor, Hagan Scotten and Sagar Ravi, Assistant United States

6    Attorneys, of counsel, Scott Tucker, the defendant, by his

7    attorneys, James Roth, Esq. Lee Ginsberg, Esq., and Nadjia

8    Limani, Esq., and Timothy Muir, the defendant, by his

9    attorneys, Tom Bath, Esq. and Marc Agnifilo, Esq., that:

10             "1.  If called as a witness at trial, a representative

11   of the each of the following producing institutions -- defined

12   the 'Institutions' -- would testify that the documents within

13   the following Bates ranges consist of true and accurate copies

14   of records of the institutions:

15             "AMG, with Bates ranges AMG-513-00000001-00003228,

16   AMG-922-00000001-00007215, AMG-SDNY-00000001-03906035.

17             "BA Services, with Bates ranges BAS000001-033255."

18             THE COURT:  Let me pause.  What is a Bates range?

19             A Bates range is a company called Bates, and they make

20   stamping machines, or they did in the old days.  And when a

21   party produces documents, they will produce them in sequential

22   order.  The first document number one, the second one number

23   two.  This is so you can come back and see what it is you have

24   produced, you have a number range.  I don't know whether they

25   actually used a Bates stamping machine, but it has become a

H9D8TUC1

1    popular term to indicate it's the range of numerical sequence

2    of the documents that were produced.

3           So if somebody asked you to produce certain records

4    from your files and you were working with an attorney, the

5    attorney would say, well, before we do this, we are going to

6    assign numbers to these documents so we know what we did and

7    there is no dispute about it down the road.

8           Go ahead.

9           MR. RAVI:  Thank you, your Honor.

10          "Level 5, with Bates range LV0000011-177993.

11          "Miami Nation Enterprises ('MNE'), with Bates ranges

12   MNE-922-00000001-00012011, as well as

13   MNE-SDNY-00000001-00181988.

14          "Red Cedar Services --"

15          THE COURT:  Pause.  So the other thing is you notice

16   that there are some letters, some initials.  Well, maybe a

17   bunch of people are going to be producing things, so you might

18   have your initials before the number so it doesn't get confused

19   with somebody else's document 732.  So it would be your

20   initials, or a company's initials for example, and then the

21   number.  That's what the letters mean.  It's not as complicated

22   as it sounds.

23          Go ahead.

24          MR. RAVI:  Thank you.

25          "Red Cedar Services, RCS00000001-00031095.

H9D8TUC1

1          "Santee Financial Services ('SFS'), with Bates ranges

2     SFS00000001-00025456.

3          "It is further stipulated and agreed that this

4     stipulation, marked as Government Exhibit 5002, is admissible

5     in evidence at trial."

6          It's signed by the parties.

7          At this time, the government offers Government Exhibit

8     5002.

9          THE COURT:  Any objection?

10          MR. BATH:  No, Judge.

11          THE COURT:  It's received.

12          (Government's Exhibit 5002 received in evidence)

13          THE COURT:  Thank you.

14          You may call the witness back to the stand for the

15     continuation of cross-examination.

16          MR. RAVI:  Thank you.

17          (Continued on next page)

18

19

20

21

22

23

24

25

H9D8TUC1                        Hamner - Cross

1    RICHARD HAMNER, resumed.

2             THE COURT:  Come on up, Mr. Hamner.  Please be seated.

3             The Court reminds you, sir, that you are still under

4    oath.

5             THE WITNESS:  Yes, your Honor.

6             THE COURT:  Mr. Bath, you may continue.

7             MR. BATH:  Thank you, Judge.

8    CROSS-EXAMINATION (Cont'd)

9    BY MR. BATH:

10   Q.  Mr. Hamner, we left off yesterday looking at Government

11   Exhibit 2701.

12            MR. BATH:  If we could have that on the screen,

13   please.

14   Q.  I think you have that before you as well.  If it's easier

15   for you to look at the hard copy, please do.

16            I am going to direct your attention to page 2.  I

17   think those are front to back copies.  And we have two on the

18   screen.

19            Is that the one you have, Mr. Hamner?

20   A.  Yes, sir, it is.

21   Q.  In the very far bottom right-hand corner of the screen, you

22   see there is a letter, it says AMG-513 with some other letters?

23   A.  Yes, I see it.

24   Q.  You don't know anything about those letters, correct?

25   A.  No, sir.

1    Q.  Very well.

2              I want you to go back up now to the top third, we are

3    going to highlight and enlarge the top third of that document.

4              That document tells us that there was going to be a

5    pay off due date 11/2 of '12 for 325.  Do you see that?

6    A.  Yes, I see it.

7    Q.  Overnight were you able to look at any additional documents

8    at all?

9    A.  No, sir.

10   Q.  So we are really just picking up where we left off

11   yesterday?

12   A.  That's correct.

13   Q.  In that highlighted to the right, you will see it says,

14   "renewal due date," and it says "NA".

15   A.  Yes.

16   Q.  Then below that, we have $75 and NA and a 250, correct?

17   A.  That's correct.

18   Q.  That adds up to the 325, correct?

19   A.  That's correct, yes.

20   Q.  Now, go down then to the middle of the page, on the lower

21   third I guess, and there is -- he's going to blow that up for

22   you.

23              Do you see on the right-hand side of that box it says

24   "payment schedule"?

25   A.  Yes.

1  Q.  It says, "You must make one payment of 325 on 11/2 of '12

2  if you choose to pay off your loan rather than renew."

3  Correct?

4  A.  That's what it says, yes.

5  Q.  Finally, at the bottom of that page, it says, "You have

6  selected to pay your total balance of 325 on 11/2 of '12.  Any

7  previous schedule you may have selected has now been replaced

8  with this new selection."

9          Did I read that correctly?

10 A.  Yes, sir.

11 Q.  And there is an electronic signature, is there not with

12 Richard Hamner there?

13 A.  I see my name and a date.

14 Q.  Fair enough.

15          The date is 10/21 of '12?

16 A.  That's correct.

17 Q.  As I understand it, you don't have any recollection, or you

18 can't recall whether you went into the system and selected this

19 date?

20 A.  That's correct, I don't remember.

21 Q.  I also recall yesterday us discussing that you weren't sure

22 if that 11/2 of '12 was a pay date for you.  Do you remember

23 that, we discussed that?

24 A.  I'm sorry, which date?

25 Q.  The date it was going to be paid was 11/2 of '12, and you

1   couldn't recall if that was a date that you would be paid or

2   not?

3   A.  Is that in regards to this date on the screen?

4   Q.  You see, "You have selected to pay your total balance of

5   325 on 1/2 of '12."  Do you see that?

6   A.  Yes, sir.

7   Q.  You were uncertain whether that was an every two-week pay

8   date for you, correct?

9   A.  That appears to be a pay date, yes.

10  Q.  If we look at the Wells Fargo, which we will do in a

11  minute, that will help refresh your memory maybe as to whether

12  that was a pay date from the scooter store?

13  A.  Yes.

14  Q.  Because that's where you were working at the time?

15  A.  That's right.

16  Q.  If we go to page 1 of 2702, please.

17          The top of that document says 10/25 of '12, is that

18  right?

19  A.  That's correct.

20  Q.  And this document says -- it's an e-mail to you, correct?

21          Do you remember whether you got it or not?

22  A.  I don't remember seeing this e-mail.

23  Q.  That date, the 10/25 date, is four days after the document

24  we just looked at, the 325 pay off document, correct?

25  A.  That's correct, yes.

1    Q.  So this document we are looking at on the screen would have

2    come four days after -- it was produced four days after that

3    document, correct?

4    A.  Yes, that's correct.

5    Q.  And 2702, the first page, again has this minimum payment of

6    325 on it, does it not?

7    A.  Yes, it does.

8    Q.  Now, I want to look at 2703.  I think you have those in

9    front of you.  Those are the Wells Fargo documents?

10   A.  Yes.

11   Q.  I am going to direct your attention -- I want to go to that

12   date, that 11/2 date, which is page 4 of 7 of the October

13   statement.  It may take you a couple of minutes because it's a

14   pretty thick document.  Let me know when you're there.

15   A.  OK.  I see it.

16   Q.  OK.  We are getting it up on the screen.

17              While they are doing that, let me ask you a question.

18   The Wells Fargo account, was that a checking account, a debit

19   account, what kind of an account was it?

20   A.  It was a checking account.

21   Q.  So you had the ability to pay bills by check?

22   A.  That's correct.

23   Q.  Write checks yourself?  Do you write checks off of that

24   account?

25   A.  I have the ability to do so, yes.

H9D8TUC1                        Hamner - Cross

1   Q.  Or electronic transfers?

2   A.  Correct.  Yes.

3   Q.  If we could look at that on 2703, it's the date of 11/2.

4           MR. BATH:  If we could highlight from 11/1 down.

5           Thank you.

6   Q.  OK.  You recall, Mr. Hamner, the document we saw earlier

7   had the 11/2 date on it, correct?

8   A.  Yes, that's correct.

9   Q.  That document said the 325 was going to be debited from

10  your account, correct?

11  A.  Yes.  That does state that.

12  Q.  Before we get there, let's look at the firm that this was a

13  pay date for you.  And we see on 11/2, there is a deposit from

14  the scooter store, is that correct?

15  A.  Yes.

16  Q.  For 1,198.11, correct?

17  A.  Yes, sir.

18  Q.  Then we have a couple below that.  There are a couple of

19  transactions, credit card transactions.  But then we have two

20  cash withdrawals, do we not?

21  A.  Yes, we do.

22  Q.  We have an ATM withdrawal, on that same date of 11/2, of

23  $200, am I correct?

24  A.  Yes, sir.

25  Q.  And on 11/2, we also have a $905 cash withdrawal from a

H9D8TUC1                         Hamner - Cross

1    branch store?

2    A.  Yes.

3    Q.  I assume because of the time gone by you don't really

4    remember?

5    A.  No, sir, I don't.

6    Q.  What we do know from looking at this is that the day that

7    essentially $1200 went into your account, somebody, either you

8    or an authorized user, drew out $1100 of it, correct?

9    A.  That's correct, yes.

10   Q.  That then left a negative balance at least to try to cover

11   the 325, correct?

12   A.  To cover 325, yes, that's correct.

13   Q.  We see the One Click Cash debit, as promised on 11/2, hits

14   for 325, do we not?

15   A.  Yes, we do.

16   Q.  As an auditor, I assume you're sort of used to looking at

17   these kind of documents?

18   A.  That's correct.

19   Q.  Had you gotten your master's yet at this time?

20   A.  No.  This was prior to completion of my bachelor's degree.

21   Q.  You were still in accounting classes?

22   A.  Yes, I believe so.

23   Q.  So what happens when that 325 doesn't clear, there is a

24   debit reversal of 325?

25   A.  That's what it says.

1    Q.  Then it shows a return on item fee for $35, correct?

2    A.  Yes, that's correct.

3    Q.  That's Wells Fargo that is doing that, correct?

4    A.  Yes.

5    Q.  In other words, when you signed up with Wells Fargo, you

6    agreed that if you overdrew your account, they could charge you

7    some money?

8    A.  That's correct.

9    Q.  I mean, do you remember signing that or you just know

10   that's what happens?

11   A.  I don't remember specifically signing that, but I do know

12   that that's what happens, yes.

13   Q.  Then on 11/5, you have three transactions there:  Carl's,

14   York Photo, and McDonald's?

15   A.  Yes, that's correct.

16             MR. BATH:  If we can go to the top of the next page.

17             Can we highlight all those transactions?

18   Q.  Then we have a $39 transaction to Auto Fair, and then a

19   5.37 at Burger King, correct?

20   A.  Yes, that's correct.

21   Q.  Then there is an overdraft fee because of the Burger King,

22   correct?

23   A.  That's right, yes.

24   Q.  And that $35 fee, again, that's Wells Fargo doing that,

25   correct?

1   A.   That's correct, yes.

2   Q.   Essentially, Wells Fargo loaned you the 5.37 for the Burger

3   King and they charged you $35 for that?

4   A.   Essentially, yes.

5   Q.   For one day, correct?

6   A.   Correct.

7   Q.   I assume you don't know what that APR is?

8   A.   Not off the top of my head, no.

9   Q.   So as we continue down then --

10           THE COURT:  Well, the $35, what was that charge for?

11           THE WITNESS:  This is an overdraft fee.

12           THE COURT:  What is the bank you were doing business

13   with?

14           THE WITNESS:  Wells Fargo, your Honor.

15           THE COURT:  Does the overdraft fee have anything to do

16   with the length of time that the check was overdraft for?  In

17   other words, if a check bounces, do you get the $35 fee, right?

18           THE WITNESS:  That's correct.  I believe so.

19           THE COURT:  For one minute, one hour, or one day,

20   right?

21           THE WITNESS:  I think it's one day, yes.

22           THE COURT:  One day.  OK.

23           Is it a daily charge?

24           THE WITNESS:  No, I believe it's a one-time charge.

25           THE COURT:  So it's a charge that relates not to

1    borrowing money from the bank, but from your causing a check to

2    bounce?

3              THE WITNESS:  That's correct, your Honor.

4              THE COURT:  Just wanted to clear that up.

5              Go ahead.

6              MR. BATH:  Thank you, judge.

7    BY MR. BATH:

8    Q.  Then as we go down further, these are the transactions you

9    were asked on direct.

10             We continue in your history to 11/7, and that's when

11   then the 250 and the 75 on 11/7 is attempted to be taken out,

12   correct?

13   A.  That's correct, yes.

14   Q.  Those two, obviously, add up to 325, do they not?

15   A.  Those two transactions?

16   Q.  Yes.  250 and 75 is 325?

17   A.  That's correct.

18   Q.  Do you now remember that relates back to the 325 from 11/2

19   that relates back to the transaction in October?

20   A.  I don't remember the relation, no.

21   Q.  OK.  Then there is on 11/8 a return NFS, $35 that Wells

22   Fargo charges you, correct?

23   A.  That's correct, yes.

24   Q.  Because the authorized debit didn't go through, the 325,

25   correct?

H9D8TUC1                         Hamner - Redirect

1   A.  The NFS return item fee is relating to 250 on 11/7.

2   Q.  We then continue on -- am I correct to say from 11/2

3   through this 11/7 period, the $1100 that was taken in cash was

4   not deposited back into this account, was it?

5   A.  I don't know.

6            MR. BATH:  That's all I have.  Thank you.

7            THE COURT:  Any other cross-examination?

8            MR. ROTH:  No, your Honor.

9            THE COURT:  Any redirect?

10            MR. RAVI:  Yes, your Honor.

11            THE COURT:  All right.

12   REDIRECT EXAMINATION

13   BY MR. RAVI:

14   Q.  Mr. Hamner, defense counsel showed you -- Mr. Bath showed

15   you Exhibit D1200, correct?

16            MR. RAVI:  Would you please publish that?

17   Q.  It should be on your screen.  Correct?

18   A.  Yes, that's correct.

19   Q.  What is the date on this e-mail?

20   A.  August 12, 2012.

21   Q.  Is it dated before or after you applied for the loan?

22   A.  This is after I applied for the loan.

23   Q.  Is it dated before or after you came to an understanding

24   that your $300 loan would cost you $90?

25   A.  This is after I obtained that understanding.

```
1    Q.  Do you recall reading this e-mail when it was sent?

2    A.  I recall seeing it.  I don't recall reading it in its

3    entirety.

4    Q.  Mr. Hamner, even reading it now, does it change your

5    understanding that your $300 loan cost $90?

6    A.  No, it doesn't change that understanding.

7    Q.  Did you ever understand that you had to do something in

8    order to pay $90 for your loan?

9    A.  No.  I assumed the full amount would be withdrawn from my

10   account.

11   Q.  That was the $390?

12   A.  That's correct, yes.

13   Q.  Did you ever agree to a renewal of your loan?

14   A.  Not that I'm aware of, no.

15   Q.  Did you ever agree to an automatic renewal of your loan?

16   A.  Not that I recall, no.

17   Q.  Was there any other reason you believed that your loan

18   would not be automatically renewed?

19   A.  That it would not be automatically renewed?

20   Q.  You had already taken out payday loans, correct?

21   A.  That's correct.

22   Q.  The other payday loans you have taken out, did those have

23   automatic renewals?

24           MR. BATH:  I object to other payday loans.

25           THE COURT:  Overruled.
```

1    A.  I'm sorry.  Can you repeat the question?

2    Q.  You had taken other payday loans out?

3    A.  That's correct.

4    Q.  In connection with those, were there automatic renewals?

5    A.  No, there were not.

6    Q.  How did that affect your understanding as to whether there

7    would be an automatic renewal for this particular loan with One

8    Click Cash?

9    A.  I believed that this would follow the same pattern and not

10   renew unless I chose to renew it.

11   Q.  In other words, for those other loans not involving One

12   Click Cash, you had to do something in order to get a renewal,

13   correct?

14   A.  That's correct, yes.

15   Q.  What was the basis for why you understood your loan would

16   cost $90?

17   A.  The finance charge listed on the application.

18   Q.  In those boxes we previously discussed?

19   A.  That's correct, yes.

20          MR. RAVI:  Would you put up GX 2701, at page 7.

21   Q.  Are these the boxes on page 7 of GX 2701?

22   A.  Yes, they are.

23          MR. RAVI:  Thank you.  You can take that down.

24   Q.  Mr. Hamner, defense counsel showed you several e-mails

25   regarding amounts of payments that were due on your loan,

1    correct?

2    A.   That's correct.

3            MR. RAVI:   Can we show, for example, page 8 of

4    Government Exhibit 2702.

5    Q.   Is this one of those e-mails?

6    A.   Yes, it appears to be, yes.

7    Q.   What is the date on this?

8    A.   August 14, 2012.

9    Q.   Was this e-mail sent to you before or after you applied for

10   the loan?

11   A.   After.

12   Q.   Did these e-mails specify whether the payments were going

13   to be going towards principal and interest?

14   A.   No, they did not.

15   Q.   When the withdrawals were made from your bank account, did

16   you think they were going towards the $390 you owed or

17   something else?

18   A.   I believed they were going towards the $390 that I owed.

19   Q.   Turn now to page 1.

20           Mr. Bath focused on a $325 payment, is that correct?

21   A.   That's correct, yes.

22   Q.   Also, on page 2 of GX 2702, if we can turn to that, this is

23   again page 2 regarding that same $325 payment, correct?

24   A.   Yes.

25           MR. RAVI:   If we can actually go back to page 1, Ms.

1   Grant.

2   Q.   What is the date of this e-mail?

3   A.   October 25, 2012.

4            MR. RAVI:   If we can put Government Exhibit 2704 next

5   to it.

6   Q.   Now, Mr. Hamner, by the time that e-mail was sent on

7   October 25, 2012, had $500 already been withdrawn from your

8   bank account by One Click Cash by the time that e-mail was

9   sent?

10  A.   That's correct, yes.

11  Q.   Did you agree to make that payment after you had spoken

12  with One Click Cash?

13  A.   I'm sorry, the $325 payment?

14  Q.   After there had been $500 in withdrawals, did you agree to

15  make additional payments to One Click Cash?

16  A.   Yes, I did.

17  Q.   Did you agree to make those payments after you had spoken

18  to One Click Cash?

19  A.   Yes, that's correct.

20  Q.   Why did you agree to make those payments?

21  A.   I felt like I didn't have a choice, I needed to make

22  additional payments to close the account.

23  Q.   What did they tell you to make you feel that way?

24  A.   They told me that they were part of a sovereign nation and

25  not subject to U.S. law, and that I would have to make payments

1    or additional debits would come out of my account.

2    Q.  Did you also, after you had already made the additional

3    payments we see on the chart, did you have a second

4    conversation with them?

5    A.  Yes, I did.

6    Q.  Did you agree to make that final $32.50 payment?

7    A.  Yes, I did.

8    Q.  Why did you agree to make that payment?

9    A.  I was told that was the amount needed to close my account.

10   Q.  Were you told anything about why you had to make that

11   payment?

12   A.  Not that I remember, no.

13   Q.  In total, after you made that $32.50 payment, Mr. Hamner,

14   how much did you pay back for your $300 loan?

15   A.  $937.50.

16            MR. RAVI:  No further questions.

17            THE COURT:  All right.  You may step down.

18            (Witness excused)

19            THE COURT:  Call your next witness.

20            MR. VELAMOOR:  The government calls Kelly Rogers.

21            THE COURT:  Ms. Rogers, follow this young lady here

22   and she will give you directions as to where to go.

23            Thank you.

24            (Continued on next page)

25    KELLY ROGERS,

1              called as a witness by the government,

2              having been duly sworn, testified as follows:

3                   THE DEPUTY CLERK:  State your name and spell it for

4        the record, please.

5                   THE WITNESS:  My name is Kelly Ann Rogers.

6                   THE COURT:  Would you mind spelling it.

7                   THE WITNESS:  K-E-L-L-Y, A-N-N, R-O-G-E-R-S.

8                   THE COURT:  Thank you.

9                   You may inquire.

10       DIRECT EXAMINATION

11       BY MR. VELAMOOR:

12       Q.  Good morning, Ms. Rogers.

13                   Where are you from?

14       A.  Originally I am from Olathe, Kansas.

15       Q.  When were you born?

16       A.  March 31, 1981.

17       Q.  How far did you go in school?

18       A.  I graduated high school and I have some college.

19       Q.  How much college did you say?

20       A.  I have about a year.

21       Q.  What did you do after you had spent a year in college?

22       A.  I entered the work force.

23       Q.  What kind of work?

24       A.  I did inventory management at first.

25       Q.  How long did you do that?

1   A.  I'm sorry?

2   Q.  How long did you do that kind of work for?

3   A.  For about two years.

4   Q.  After two years of inventory management, what did you do

5   next?

6   A.  I got employed at CLK Management.

7   Q.  What kind of company was CLK Management?

8   A.  They were an online payday loan lending company.

9   Q.  When you say online payday lending, briefly, what do you

10  mean?

11  A.  That's a short-term loan to be paid back on your payday.

12  Q.  You said you started at CLK Management.  How long did you

13  remain at that company?

14  A.  I worked for CLK for about 11 years total.

15  Q.  When you started, you said the company was called CLK

16  Management.  Did the company also have another name?

17  A.  Yes, it did.  It turned to AMG.

18  Q.  At the time you first started, it was CLK Management.  Was

19  there also another name at that time?

20  A.  There was National Money Services.

21  Q.  So, initially, it's CLK and National Money Services?

22  A.  Yes.

23  Q.  And National Money Services went by NMS?

24  A.  Yes.

25  Q.  How did CLK and NMS relate to each other?

1   A.  They were sister companies.

2   Q.  What do you mean by that?

3   A.  They were directly related.  They were on the same floor

4   with each other so they did the same business.

5   Q.  Did you observe any differences in their operations?

6   A.  No.

7   Q.  You said that you initially were employed by CLK.  Did you

8   only work for CLK?

9   A.  No.  I also worked for NMS as well.  I worked for CLK

10  during the daytime, and then for a short period at night I

11  worked for National Money Services.

12  Q.  When you started, how many employees did these two

13  companies have together?

14  A.  Probably around 60 or so.

15  Q.  Did they share employees in common?

16  A.  Yes, they did.

17  Q.  I believe you said at some point the company became AMG?

18  A.  Yes.

19  Q.  Did anything change apart from the name?

20  A.  No.  The processes were still the same.

21  Q.  By the way, do you know what CLK and AMG stood for?

22  A.  CLK and AMG were models of Mercedes cars, and that's what I

23  always knew, that they were chosen because they liked those

24  cars.

25  Q.  When you first started working at the company, what year

H9D8TUC1                          Rogers - Direct

1   was that?  Was that around 2001?

2   A.   2001.

3   Q.   What was your position?

4   A.   I was a loan officer.

5   Q.   When you say loan officer, what do you mean?

6   A.   I would review over customers' applications and make sure

7   that they had all of the proper documentation, reviewed over

8   their applications and then approved it to be approved so they

9   could get their loan.

10  Q.   At some point did you get promoted from the loan officer

11  position?

12  A.   Yes.  I became a supervisor.

13  Q.   What did you do as a supervisor?

14  A.   You would manage the loan officers, make sure that they are

15  doing what they need to be doing, and just make sure that their

16  productivity is where it needs to be.

17  Q.   How long did you remain as a supervisor?

18  A.   About a year.

19  Q.   Did you take on a different position at that point?

20  A.   Yes, I became a manager.

21  Q.   What did you do as a manager?

22  A.   You still managed the employees, plus the supervisors.  You

23  do reports, you hire, you fire people.

24  Q.   Did you have any involvement in training as a manager?

25  A.   Yes.  Whenever you are a manager or a supervisor, you sit

H9D8TUC1                         Rogers - Direct

1    in on the training class, and you take notes and make sure that

2    the training manual is being followed.

3    Q.   I believe you said you worked at the company for about 11

4    years?

5    A.   Yes.

6    Q.   Did you work continuously for 11 years at the company?

7    A.   No.

8    Q.   Did you leave at some point?

9    A.   Yes, I did.

10   Q.   Approximately when was that?

11   A.   Around 2008.

12   Q.   How come you left at 2008?

13   A.   There were multiple reasons.  One was I felt like the

14   company was lying to the customer.  The upper management was

15   hard to get along with.  You couldn't, you know, do things the

16   right way.  And then, also, they were giving higher loan

17   amounts to customers that received disability and government

18   benefits, disability and Social Security benefits.

19   Q.   You started out by saying you felt the company was lying to

20   customers.  What kinds of things in general would the company

21   lie to customers about?

22   A.   The loan documents stated that the amount that they would

23   be paying back is not the actual amount that they would

24   original pay back based on the process that the loan would go

25   through, as well as the location of where the business was

1    located.

2    Q.  We will talk about those issues more in a minute.

3         How long were you gone from the company for?

4    A.  About eight months.

5    Q.  How come you went back?

6    A.  The pay was better than what I was making at my other job

7    that I was working.

8    Q.  How much better?

9    A.  Substantially better.

10   Q.  Ms. Rogers, are you testifying here today pursuant to an

11   agreement that you have with the government?

12   A.  Yes.

13   Q.  What is your understanding of what you have to do under

14   that agreement?

15   A.  Under that agreement, I have to truthfully state my

16   experience with the company, and also not get into any trouble,

17   any further trouble, and --

18   Q.  If you fulfill your obligations under the agreement, what

19   is your understanding of what the government will do?

20   A.  They will not prosecute me.

21   Q.  So I think before we spoke about the agreement we were

22   talking about your salary.

23        Approximately how much were you paid at AMG?  Maybe

24   start when you were a loan processor.

25   A.  A loan processor, if I remember right, it was around about

H9D8TUC1                    Rogers - Direct

1    nine, ten dollars an hour.

2    Q.  Did you only get an hourly wage or was there other

3    compensation?

4    A.  No, there was also bonuses as well.

5    Q.  We will talk about that breakdown in a second.  But in

6    total, around how much did you think you were making as a loan

7    processor?

8    A.  Maybe 25, 30,000.

9    Q.  You said you moved on to be supervisor.  I am assuming you

10   made more.  How much were you making as a supervisor?

11   A.  If I guessed, probably around, probably closer to 40,

12   maybe.

13   Q.  Then as a manager, around how much were you making?

14   A.  About 60 to 65,000.

15   Q.  Now, as a manager, did you also get an hourly wage?

16   A.  Yes.

17   Q.  How much was that?

18   A.  $18 an hour.

19   Q.  Did you also get bonuses?

20   A.  Yes.

21   Q.  Approximately how much were you getting in bonuses?

22   A.  It was around 2 to 3,000.

23   Q.  Generally, how were those bonuses determined?

24   A.  They were determined by multiple different factors, such as

25   how many loans were processed, how many employees you retained

1    in your group, how many customers paid off or paid down, or

2    different factors like those.

3    Q.  Were all employees at AMG eligible for bonuses?

4    A.  Yes.

5    Q.  Generally, do you know how all those different bonuses were

6    determined?

7    A.  Depending on what the position was, it would be based on

8    what your work was.  So if you were a loan officer, for

9    example, how many loans were funded, or if you were customer

10   service rep, it would be how many calls were answered.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H9d1tuc2                         Rogers - Direct

 1  BY MR. VELAMOOR:
 2  Q.  And when you finally left the company, how come you left?
 3  A.  I was terminated.
 4  Q.  How come?
 5  A.  I was not performing my job duties and I was missing work;
 6  I was missing time.
 7  Q.  How come?
 8  A.  I had a custody battle for my son and so I had to miss a
 9  lot of work then.
10  Q.  Okay.  All right.  Let's talk a little bit more about the
11  company when you first started working there.  At that time
12  where was it located?
13  A.  It was located in Overland Park.  No, sorry.  Shawnee
14  Mission.
15  Q.  Shawnee Mission, is that S-H-A-W-N-E-E?
16  A.  E-E.
17  Q.  And where is that based?
18  A.  It's in Kansas.
19  Q.  At that time how much space was the company occupying?
20  A.  They had one floor on a building called the Friends
21  University Building.
22  Q.  How long did you stay in that building in Shawnee Mission?
23  A.  About maybe a year and a half.
24  Q.  And after a year and a half did you move somewhere else?
25  A.  Yes.

H9d1tuc2                          Rogers - Direct

1   Q.  Where did you go?

2   A.  We moved to a building in Overland Park.

3   Q.  Let me show you what's been marked as Government

4   Exhibit 4009.

5            Did you have a chance to look at 4009?

6   A.  Yes, sir.

7   Q.  And what is this?

8   A.  This is the Overland Park building.

9   Q.  Is it a photo of it?

10  A.  Yes, it is.

11           MR. VELAMOOR:  Your Honor, the government offers 4009.

12           THE COURT:  Any objection?

13           MR. ROTH:  No, Judge.

14           THE COURT:  Received.

15           (Government's Exhibit 4009 received in evidence)

16           MR. VELAMOOR:  May I show it to the jury?

17           THE COURT:  You may.

18           MR. VELAMOOR:  Thank you.

19  BY MR. VELAMOOR:

20  Q.  Okay.  So by the way, where is Overland Park?

21  A.  It's in Kansas.

22  Q.  Is it near any major city?

23  A.  It's very close to Kansas City.

24  Q.  And is that the building that you worked out of for many

25  years?

H9d1tuc2                          Rogers - Direct

1   A.  Yes.

2   Q.  And around the time you got to the new building, the one

3   we're looking at, about how big was the company?

4   A.  It was probably around 200 people.

5   Q.  And about how much of that building did the company occupy

6   initially?

7   A.  Starting off?

8   Q.  Yes.

9   A.  They had a floor in the building.

10  Q.  Did it grow from that?

11  A.  Yes.

12  Q.  How so?

13  A.  They ended up doing -- getting all of the floors that were

14  in the building.

15  Q.  To your knowledge did the company ever -- well, did the

16  company ever move to another building while you were there?

17  A.  Not that I'm aware of.

18  Q.  And to your knowledge did the company have any other

19  buildings anywhere else?

20  A.  Not that I was aware.

21  Q.  Were any other offices anywhere else?

22  A.  No.

23  Q.  All right.  When you first started, can you describe the

24  management structure of the company, maybe starting at the top.

25  A.  Starting at the top, there would have been the owner, Scott

H9d1tuc2                              Rogers - Direct

1    Tucker.

2            THE COURT:  What did you say before Scott Tucker?

3            THE WITNESS:  I'm sorry?

4            THE COURT:  What did you say before Scott Tucker?  I

5    didn't hear it.

6            THE WITNESS:  The owner of the company.

7            THE COURT:  Thank you.

8    A.  Then from there, they had directors of operations, which

9    would have been Joel Tucker, Blaine Tucker, and Tim Buckley and

10   Crystal Cram.

11   Q.  You named four people -- Joel Tucker, Tim Buckley, Blaine

12   Tucker, and Crystal Cram?

13   A.  Yes.

14   Q.  And what positions did they have?

15   A.  They were like director of operations.

16   Q.  And are you familiar with someone named Norma Tucker?

17   A.  Yes.

18   Q.  And what position did that person have?

19   A.  She was like the manager of our fraud and compliance

20   department.

21   Q.  Okay.  You mentioned I think a few people named Tucker --

22   Scott, Joel, Blaine, and Norma?

23   A.  Yes.

24   Q.  Were they related to each other?

25   A.  Yes, they were.

H9d1tuc2                              Rogers - Direct

1    Q.  How so?

2    A.  Norma was their mother and all the rest are brothers.

3    Q.  And are you familiar with someone named Anita Finney?

4    A.  Yes.

5    Q.  Who is she?

6    A.  She would have been Scott Tucker's assistant or secretary.

7    Q.  Okay.  And I believe you started by mentioning Mr. Tucker

8    as the owner.  Do you see Mr. Tucker in the courtroom here

9    today?

10          You can stand up if you need to if the monitor's in

11   the way.

12   A.  Yes, I do.

13   Q.  Can you identify him by mentioning something he's wearing

14   or where he's sitting.

15          MR. ROTH:  Judge, we'll concede identification.

16          THE COURT:  Well, do you see Mr. Tucker?

17          THE WITNESS:  Yes.

18          THE COURT:  Where is he?

19          THE WITNESS:  He's over here.

20          THE COURT:  What table, first or second?

21          THE WITNESS:  The second table back.

22          THE COURT:  And what is he wearing?

23          THE WITNESS:  He has a black suit with a red tie.

24          THE COURT:  Thank you very much.  Identification

25   noted.  Thank you.

H9d1tuc2                          Rogers - Direct

1    BY MR. VELAMOOR:

2    Q.   Now you mentioned Mr. Tucker, your understanding, was the

3    owner of the company.  What was your understanding based on?

4    A.   I was told when I first started working there that he was

5    the owner of the company.

6    Q.   Told by who?

7    A.   By my manager.

8    Q.   Was there anything else that gave you the understanding

9    that he was the owner?

10   A.   He had a corner office.  Usually, you know -- everybody

11   just made it seem like he was the owner of the company.

12   Q.   Was there any discussion of getting his approval or

13   consulting with him on any matters?

14   A.   Yes, he was frequently carbon-copied on emails, dealing

15   with different processes or with reports that would go out.

16   Q.   At any time while you were at the company did your

17   understanding of Mr. Tucker's role ever change?

18   A.   No.

19   Q.   Do you know whether Mr. Tucker had any other companies?

20   A.   I do know one other company.

21   Q.   Which one was that?

22   A.   Called Level 5.

23   Q.   What was Level 5?

24   A.   It was a like race car company, where he raced Ferraris.

25   Q.   How did you know about Level 5?

H9d1tuc2                          Rogers - Direct

1  A.  We got invited to one of his races, all of the management.

2  Q.  Now how much interaction did you have with Mr. Tucker other

3  than on email?

4  A.  Very little.

5  Q.  How so?

6  A.  I was told that you don't go into his office, you don't

7  speak with him normally.

8  Q.  Now what names did the company do business under?

9  A.  There were different loan portfolios.  There was United

10 Cash Loans, One Click Cash, 500 FastCash, Ameriloan, Ace, and

11 Star Cash Services.

12 Q.  And was there a term for all these different names?

13 A.  They were different loan portfolios or profiles.

14 Q.  And were all these names around when you first started at

15 the company?

16 A.  No.

17 Q.  How did they change over time?

18 A.  One Click Cash originally was Preferred Cash Loans and then

19 its name was changed.  And 500 FastCash was originally Fast

20 Cash.

21       MR. VELAMOOR:  We can take down 4009.

22 Q.  I'm going to show you what's been marked as Government

23 Exhibit 1901.

24       Okay.  Have you had time to look at that exhibit?

25 A.  Yes.

H9d1tuc2                          Rogers - Direct

1    Q.   What is it?

2    A.   This would be an email that was circulated about the new

3    phone system.

4    Q.   Phone system where?

5    A.   At AMG.

6    Q.   Are you copied on this email?

7    A.   Yes, I am.

8               MR. VELAMOOR:  Your Honor, the government offers 1901.

9               THE COURT:  Any objection?

10              MR. ROTH:  No, your Honor.

11              THE COURT:  Received.

12              (Government's Exhibit 1901 received in evidence)

13              MR. VELAMOOR:  May we publish it?

14              THE COURT:  You may.  If a document or exhibit is

15   received into evidence, then either side may publish it to the

16   jury, once it is received into evidence and not before.  Go

17   ahead.

18   BY MR. VELAMOOR:

19   Q.   All right.  So you said that this was an email about a

20   phone system, is that right?

21   A.   Yes.

22   Q.   It goes on for a few pages, is that right?

23   A.   Yes.

24   Q.   Generally speaking, what kinds of issues are being

25   discussed?

1   A.  It is about a recording for the new phone system.

2   Q.  Okay.  And on each -- are the same people addressed and

3   copied on each of the emails in the chain?

4   A.  I'm sorry.  Can you say that again?

5   Q.  Are the same people copied and addressed on each of the

6   emails in the chain?

7   A.  Yes.

8   Q.  So let me just focus on the top email on the front.  Do you

9   see yourself on that?

10  A.  Yes, I do.

11  Q.  And are you -- which, are you from, sent to, or cc'd?

12  A.  I am cc'd.

13  Q.  And is Mr. Tucker also cc'd on this?

14  A.  Yes, he is.

15          MR. VELAMOOR:  Okay.  We can take that down.

16  Q.  How often were you and Mr. Tucker on the same emails?

17  A.  Very frequently, within kind of management emails.

18  Q.  And so you said you were copied on the same emails fairly

19  frequently.  On what kinds of topics were these emails about?

20  A.  Anything to do with any processes or any management type

21  discussions.  And also reports.

22  Q.  Okay.  And by the way, I should just clear it up.  Did you

23  have a different last name when you first stated at the

24  company?

25  A.  Yes, I did.

1  Q.  What was that name?

2  A.  It was Heath.

3  Q.  Okay.  Was AMG organized into different departments?

4  A.  Yes.

5  Q.  What were some of those departments?

6  A.  We had the customer service department, the processing

7  department, operations department, the fraud and compliance

8  department, legal department.

9  Q.  Do you recall seeing Mr. Tucker meeting with anyone at any

10  of these departments?

11  A.  I would see him meet with the fraud and compliance

12  department.

13  Q.  And how were you able to see him meeting with those people?

14  A.  You see them in the conference rooms.

15  Q.  Were the conference rooms through the --

16  A.  Yes, they were made of -- they had glass -- the walls were

17  glass.

18  Q.  What, generally speaking, would the fraud and compliance

19  department do?

20  A.  The fraud and compliance department, they reviewed over

21  customers' like complaints, so if we received any complaint

22  from the customer saying something like "US Attorney" or

23  "Attorney General" or "Better Business Bureau," those

24  complaints would be sent to the fraud and compliance

25  department.

H9d1tuc2                          Rogers - Direct

1   Q.  Okay.  And so the title you mentioned before, director of

2   operations --

3   A.  Yes.

4   Q.  -- what did people with that title generally do?

5   A.  They would basically do all of the different processes and

6   keep -- they would look over all the different loan portfolios.

7   Q.  Were they pretty high-level managers?

8   A.  Yes, yes.

9   Q.  Did you ever see Mr. Tucker meeting with directors of

10  operations?

11  A.  Yes.

12  Q.  And you also mentioned a legal department.  Who was in this

13  department?

14          MR. ROTH:  Judge, could we have time frames.  I'm

15  sorry.

16          THE COURT:  Yes.  Could you set a time frame, please.

17          MR. VELAMOOR:  Sure.

18  Q.  How long after your time at the company did you come to

19  learn there was a legal department?

20  A.  I started hearing more about the legal department when I

21  became a manager.

22  Q.  And approximately when was that?

23  A.  Are you wanting a year?

24  Q.  The best that you can do, approximately.

25  A.  2005, '6.

1    Q.   Okay.  And during that time period who was in the legal

2    department?

3    A.   I knew of Tim Muir, he was like the head or the manager of

4    legal department, and there was a couple other lawyers but I

5    didn't know their name and never met them.

6    Q.   Who did you understand to be the most senior person in that

7    department?

8    A.   Tim Muir.

9    Q.   And what did you understand his role to be?

10   A.   That he was the attorney for the actual company AMG.

11   Q.   And is it your understanding that his role ever changed

12   while you were at the company?

13   A.   No.

14   Q.   Did you ever work directly with Mr. Muir?

15   A.   No, I did not.

16   Q.   Now when the name of the company changed to AMG, did you

17   ever perceive any change in Mr. Tucker's role?

18   A.   No.

19   Q.   Or Mr. Muir's role?

20   A.   No.

21   Q.   Do you remember ever being told that either of them had a

22   different role?

23            MR. ROTH:   Objection.  Leading.

24            THE COURT:   Again, avoid leading, please.

25   Q.   Were you ever given any instructions about what to say

1    concerning Mr. Tucker at the company?

2    A.  We were told that we could not tell the customer that he

3    was the owner of the company.

4    Q.  Now when you first started at the company, how did

5    customers go about taking out a loan?  How did the process

6    work?

7    A.  They had to go online and fill out a loan application

8    and -- you're asking when I first started?

9    Q.  Yeah, when you first started.

10   A.  They had to go online and print out an application, so

11   they'd fill out their application and fax that back with their

12   document -- their personal documentation, such as a voided

13   check, a bank statement, and a paycheck stub.

14   Q.  Okay.  So they had to send back an application.  Any other

15   documentation they had to send back?

16   A.  The application.

17   Q.  Anything other than the application?

18   A.  Well, the application I guess consists of the actual

19   application page with like their personal information and then

20   any loan note disclosure and authorization agreement.

21   Q.  Now I think you started by saying that the person had to

22   print it out and send it back.  Did that part ever change?

23   A.  Yes.

24   Q.  Approximately how long after you were at the company?

25   A.  Whenever we moved to the new building, basically same time

1    that they changed the name to AMG, they -- the customers go

2    online and fill out their application.

3    Q.  Okay.  And so they didn't have to print and send anything

4    back.

5    A.  Correct.

6    Q.  Showing you what's been marked as Government Exhibit 1918.

7         What is that exhibit?

8    A.  This would be screenshots of the website.

9    Q.  Whose?

10   A.  This is for 500 FastCash.

11        MR. VELAMOOR:  Your Honor, the government offers 1918.

12        THE COURT:  Any objection?

13        MR. ROTH:  No, Judge.

14        THE COURT:  Received.

15        (Government's Exhibit 1918 received in evidence)

16        MR. VELAMOOR:  Ms. Grant, can we publish 1918, please.

17   BY MR. VELAMOOR:

18   Q.  All right.  So what are we looking at on the first page of

19   1918?

20   A.  This would be like the application page where the customer

21   would put in their personal information.

22        MR. VELAMOOR:  Okay.  And I want to enlarge the

23   personal information that they asked for.

24   Q.  Okay.  So generally speaking, basic biographical

25   information?

1   A.  Yes.

2            MR. VELAMOOR:  Why don't we back out of that.  And

3   move to the second page.

4   Q.  So what kinds of information is called for on the second

5   page?

6   A.  This is employment information.

7   Q.  Okay.  To find out the type of income, is that right?

8   A.  Yes.

9   Q.  Name of the employer, income, and how the person received

10  that income?

11  A.  Yes.

12  Q.  And looking to the third page, what kinds of information is

13  asked for on the third page?

14  A.  It's their banking information and their routing and

15  account number.

16  Q.  And why did the company need that banking information?

17  A.  This is how the money was deposited into their account by

18  direct deposit and then also withdrawn from the account as

19  well.

20  Q.  All right.  Let's move on to the next page.

21            What kinds of information is called for here?

22  A.  This is for personal references.

23  Q.  Okay.  And is there any other information that they have to

24  provide?

25  A.  No, not any of their personal information, no.

1    Q.  Turn to the next page.  So at this point I want to focus on

2    the top.  So it says "Congratulations," and then what's written

3    below that?

4    A.  Under "Congratulations"?  It says, "500 FastCash has

5    preapproved you for up to $400."

6    Q.  Okay.  And then down below is the customer given an option

7    or a choice about what to do?

8    A.  Yes.

9    Q.  What is that?

10   A.  That is if they don't want to take $400, they want to take

11   a lower amount, they can select a lower amount.

12   Q.  And then focus on the next section.  What's the purpose of

13   this section?

14   A.  That would be like the loan note disclosures, so they would

15   checkmark the boxes if they agree to the terms of the loan.

16   Q.  Okay.  And do they have to actually read any of these

17   documents in order to move the process forward?

18   A.  No, not that I was aware of.  They have to checkmark the

19   boxes.

20   Q.  Now there's a reference there to, on the third line down,

21   to a read and accept the terms of the authorization agreement,

22   do you see that?

23   A.  Yes.

24   Q.  What is being authorized in that agreement?

25   A.  From what I understood, it was where they were authorizing

1   the company to debit and also credit their account.

2   Q.   And below that there's a reference I think to a document

3   you talked about before, the loan note and disclosures?

4   A.   Yes.

5   Q.   And what was that document about?

6   A.   That document stated what their loan amount was, what the

7   finance charge, service charge would be for the loan.

8   Q.   We'll talk more about that in a second.

9            And then move below and there's a blank line.  So

10   what's the purpose of this part of the page?

11   A.   That is where they do their electronic signature.  So they

12   would just type in their name.

13   Q.   And then what else do they have to do?

14   A.   I'm sorry?

15   Q.   Do they have to do anything else?

16   A.   Not that I'm aware of, no.

17   Q.   So from inside of the company, after this process, after

18   the customer has provided all the information, what happens

19   next at the company?

20   A.   The company would receive the customer's application, it

21   would go to a loan officer, where the loan officer would review

22   over all the customer's information, verify employment,

23   possibly, if they needed to; and then they would approve the

24   loan to be sent out that night.  It would go to kind of a group

25   of loans called the batch.  That would sit there until it was

H9d1tuc2                          Rogers - Direct

1    processed at the end of the day.

2    Q.  Okay.  So I think you may have started to explain this, but

3    a batch was a group of loans?

4    A.  Yes.  The group of people that had been approved that day.

5    Q.  And how big were the batches?

6    A.  For like example, UCL was one of the bigger companies --

7              MR. ROTH:  Judge, could we have a time frame, please.

8              THE COURT:  Again, if you could.

9              MR. VELAMOOR:  Sure.

10   Q.  Perhaps around the -- at its highest point, around 2010,

11   '11, during that time period.

12             MR. ROTH:  Objection, Judge, to leading.

13             THE COURT:  No.  I think that's appropriate leading.

14   Not all leading is impermissible.  The government is allowed to

15   ask about a particular time frame.

16             Go ahead.

17   Q.  Let's focus on the 2011 time frame.  Approximately how big

18   were the batches around that time period?

19   A.  Around then, like UCL could be sending out a million

20   dollars in loans.

21   Q.  And what was the average amount of a loan the company was

22   sending out?

23   A.  An average would be about $300.

24   Q.  So just doing rough math, how many $300 loans does it take

25   to get to about a million dollars?

H9d1tuc2                           Rogers - Direct

1   A.   About around 3,300 loans a day.

2   Q.   And how many batches were there at a time?

3   A.   There was one batch for every single one of the loan

4   portfolios.

5   Q.   And I think you mentioned them before, the names of them.

6   Approximately how many of those were there?

7   A.   Six, seven loan portfolios.

8   Q.   And I believe you mentioned UCL.  Were all the portfolios

9   similar in size or did they vary?

10  A.   No, they varied.

11  Q.   Now once loans were in a batch, who would typically check

12  in on them?

13  A.   Anybody in like management could check in on them as well

14  as operations, fraud and compliance, they could all go over --

15  review over the batch throughout the day.

16  Q.   And after they'd been looking it over, what would happen at

17  the end of the day?

18  A.   At the end of the day, the processors, whoever's processing

19  for that loan portfolio, would process it and basically create

20  an electronic file which contained all of the customers that

21  were going to be funded that night, and that would be sent over

22  to the operations department.

23  Q.   And once it got to operations, what would happen there?

24  A.   As far as what I know, operations would then complete the

25  whole process and send that file to the bank to distribute

1   money to the customer.

2   Q.   And was there one or more than one employee involved in the

3   process that you just described?

4   A.   There was more, I guess, than one employee, yeah.

5   Q.   And where were all these employees located when they were

6   performing these functions?

7   A.   They were all at the AMG building in Overland Park.

8   Q.   Do you know whether anyone outside of the building at

9   Overland Park ever played any role in the process?

10  A.   Not that I was aware of.

11  Q.   Did you ever hear of anyone outside of Overland Park being

12  involved in any part of that process?

13  A.   Not that I was aware of.

14  Q.   So what happens at the end of the process?  Can you

15  describe.

16  A.   It would go to the operations department and they would

17  finalize it to go to the bank so the bank could then send the

18  funds out to the customer.

19  Q.   Okay.  Let's talk a little bit about the cost of the loan.

20  How much did AMG charge for its loans?

21  A.   It was $30 per hundred dollars that was borrowed.

22  Q.   So did that mean that a $300 loan cost the customer 390?

23  A.   No, not necessarily, no.

24  Q.   Why not?

25  A.   Because the loans were set up as an automatic renewal

1    process, where they would pull just the finance charge from the

2    account, and they would accrue another finance charge for

3    having that loan out longer.

4    Q.  And when you say it was automatically renewed, what do you

5    mean by automatic?

6    A.  That's the way that the loan was just set up originally.

7    That was what their schedule was, I guess I'd say.

8              THE COURT:  All right.  Ladies and gentlemen, I think

9    it's time for our midmorning break.  So please do not discuss

10   the case among yourselves or with anyone, keep an open mind,

11   and we'll see you in ten minutes.  Have a good break.

12             (Jury not present)

13             THE COURT:  See you in ten minutes.

14             (Recess)

15             (In open court; jury present)

16             THE COURT:  Please be seated.

17             Hope you had a good break.

18             To promote the element of surprise, you will not know

19   when there will be or won't be a treat in the jury room, but

20   this will keep your attention level very high.  And please

21   don't hold it against my valuable courtroom deputy Flo.  These

22   decisions are made at the very highest level.  But I appreciate

23   your attention in the case.

24             So you may continue.

25             MR. VELAMOOR:  Thank you, your Honor.

H9d1tuc2                          Rogers - Direct

1    BY MR. VELAMOOR:

2    Q.   Ms. Rogers, when we broke, I believe we were talking about

3    the automatic renewal process that was in place in the loans,

4    is that --

5    A.   Yes.

6    Q.   So I'm going to show you what's been marked as Government

7    Exhibit 1911.

8    A.   Thank you.

9    Q.   What is that exhibit?

10   A.   This is the automatic renewal process that is in the

11   training manual.

12   Q.   And when you say the training manual, what do you mean?

13   A.   It's the training manual that you -- that trains new hires.

14   So whenever a new hire comes in, this would be what they would

15   be trained on, the renewal process.

16             MR. VELAMOOR:   Your Honor, the government offers 1911.

17             THE COURT:   Any objection?

18             MR. ROTH:   No.

19             THE COURT:   All right.   Received.

20             (Government's Exhibit 1911 received in evidence)

21             MR. VELAMOOR:   Ms. Grant, can we show that to the

22   jury.

23   BY MR. VELAMOOR:

24   Q.   Okay.   So let's start focusing on the chart towards the

25   middle.

H9d1tuc2                          Rogers - Direct

1   A.   Mm-hmm.

2   Q.   Now does this chart accurately reflect the repayment

3   process for the loans at the company?

4   A.   Yes.

5   Q.   And I think we may have cut it off, but what is the amount

6   of the loan that's described here?

7   A.   This is for a $300 loan.

8   Q.   Okay.  So can you walk us through how that $300 loan was

9   set to work.

10  A.   On the first due date, it would be just the finance charge

11  or the service charge that would be directed out of the

12  customer's account.

13  Q.   Just to be clear, so you're on line 1.

14  A.   Line 1, yes.

15  Q.   Okay.

16  A.   And then -- then on line 2 --

17  Q.   Well, let's -- so there's 0 below the principal payment.

18  What does that mean?

19  A.   Just -- the $90 is just a fee.  It's not to go towards the

20  principal of the loan.

21  Q.   So how much does that person pay on that first date?

22  A.   $90.

23  Q.   Okay.  So now go on to the second.

24  A.   On the second one, same as the first.  It is just the $90

25  service charge, no principal payment, for the total of $90.

H9d1tuc2                          Rogers - Direct

1    Q.   Okay.  Go on to the third line.

2    A.   The third is the same as well.  $90 service fee, nothing

3    towards the principal payment, and just $90.

4    Q.   And onto the fourth?

5    A.   The fourth is as well the same.  $90 service fee, nothing

6    towards the principal, and $90 would be directed from the

7    customer's account.

8    Q.   So at this point we've hit four paydays, is that right?

9    A.   Yes.

10   Q.   And the customer has paid how much?

11   A.   They have paid $360 in finance charges.

12   Q.   How much do they owe at this point on the $300 loan?

13   A.   Still $390.

14   Q.   So what takes place on the fifth date?

15   A.   On the fifth date, the loan goes into automatic paydown,

16   where the service charge is drafted plus a principal payment of

17   $50.

18   Q.   So how much is the service charge?

19   A.   The service charge is 90, and the principal payment is $50,

20   for the total of $140.

21   Q.   Okay.  And at this point how much does the customer owe on

22   the $300 loan?

23   A.   At this point, after this payment, they would owe 250 in

24   principal and $75 in service fees, so $325.

25   Q.   And why is the service charge now less, now 75 instead of

1    90?

2    A.   There's been a $50 principal payment that was applied to

3    the amount that was borrowed, so it also lowers the finance

4    charge on the next due date.

5    Q.   Okay.  So it's 90 for the first hundred -- sorry -- 30 for

6    the first hundred, 30 for the second hundred, and then just 15

7    for the next 50?

8    A.   Correct.

9    Q.   And does that process then continue?

10   A.   Yes, the automatic paydown continues.

11   Q.   And by the time the customer has finished making payments

12   in the process, how much has the customer paid on the $300

13   loan?

14   A.   On this $300 loan, the customer would have paid $975.

15   Q.   Now if it had been a $400 loan, how would the processes

16   have been different?

17   A.   The actual process wouldn't have been different, just the

18   service fee would have been a different amount.  Since it's a

19   higher loan amount, it has a higher finance charge or service

20   charge, and that service charge would have been 120 instead of

21   90.

22   Q.   So initially it would have been four -- the first four pay

23   dates it would have been a payment of 120 each time?

24   A.   Yes.

25   Q.   And I believe on this, the $300 loan example, there are six

1   paydown periods, is that right?

2   A.  Yes.

3   Q.  How many paydown periods would there be in a $400 loan?

4   A.  There would be eight.

5   Q.  And why is that?

6   A.  Because it's $100 more than the $300 loan, so a $50 payment

7   twice, so that would be two extra payments.

8   Q.  So it was a $50 paydown regardless of the size of the loan.

9   A.  Yes.

10  Q.  Now from your time with the company are you aware of

11  customers who went through this entire payment schedule?

12  A.  Yes.

13  Q.  Was that a common or uncommon occurrence?

14  A.  It was common.

15  Q.  How did you know that?

16  A.  I was a manager so I looked at customers -- customer

17  profiles all the time and saw all their debits that were coming

18  out of their account.

19  Q.  Did you also have access to summary type reports?

20  A.  Yes.

21  Q.  And, you know, it's been a while.  Roughly speaking, what

22  percentage of customers do you think went all the way through

23  this paydown process?

24          MR. ROTH:  Objection, your Honor.

25          THE COURT:  Rephrase it, please.

H9d1tuc2                          Rogers - Direct

1   Q.  From your time with the company approximately what

2   percentage of customers went through the entire paydown process

3   that's described here in this exhibit, 1911?

4   A.  I would say around 60 percent.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. VELAMOOR:

2    Q.  Now, this process in 1911 I believe involves a pay down

3    process beginning on the fifth payment, is that right?

4    A.  Yes.

5    Q.  Is that automatically in place?

6    A.  Yes.

7    Q.  Was it always the case that it was an automatic pay down in

8    place beginning on the fifth period?

9    A.  No.  Whenever I originally started with the company, they

10   didn't have any kind of automatic pay down and the loan would

11   just keep renewing.

12   Q.  For how long?

13   A.  Forever, until the customer finally, I guess, called in and

14   said, why are you still debiting my account?

15   Q.  How long do you recall this indefinite automatic renewal

16   process going on for?

17   A.  It was probably about a year from the time that I started.

18          MR. VELAMOOR:  We can take down 1911 for the moment.

19   Q.  How much did the company tell customers the loans would

20   cost before the customers got the loans?

21   A.  If the customer reviewed over their loan note disclosure,

22   on the loan disclosure it showed that their total payments

23   would be their principal plus one finance charge.

24   Q.  So on a $300 loan?

25   A.  It would be $390.

H9D8TUC3                              Rogers - Direct

1  Q.  I am going to show you what has been marked as Government

2  Exhibit 2202.

3        OK.  So what is 2202?

4  A.  This would be a customer's application for 500 FastCash.

5  Q.  Is this the application for any particular customer?

6  A.  The customer's name is Athena Sanchez.

7  Q.  Does it say where Athena Sanchez lives?

8  A.  The Bronx, New York.

9        MR. VELAMOOR:  The government offers Government 2202.

10        THE COURT:  Any objection?

11        MR. ROTH:  No, your Honor.

12        THE COURT:  Received.

13        (Government's Exhibit 2202 received in evidence)

14        MR. VELAMOOR:  Ms. Grant, can we show 2202 to the

15  jury.

16        Why don't we start by expanding the name and the

17  address of the applicant.

18  Q.  Is that where you got the person's name and address?

19  A.  Yes.

20  Q.  Now, you mentioned before a loan note disclosure where the

21  total of payments was mentioned.  Which page of the exhibit is

22  that?

23  A.  That would be on page 3.

24        MR. VELAMOOR:  Why don't we turn to page 3.

25  Q.  On page 3, what part of page 3 were you speaking about?

1  A.  Up at the top, there's the four boxes, and the very right

2  box, it says "total of payments."

3  Q.  What amount is in that "total of payments" box?

4  A.  $390.

5  Q.  Does 390 accurately reflect what customers paid in total if

6  they took no other action on a $300 loan?

7  A.  No.

8  Q.  Below total of payments there is a sentence written there.

9  Can you read that?

10  A.  It says, "The amount you will have paid after you have made

11  the scheduled payment."

12  Q.  Was $390 the scheduled payment on a $300 loan?

13  A.  No, it was not.

14  Q.  Did the scheduled payment or payments add up to $390?

15  A.  No, they did not.

16  Q.  What did the scheduled payment or payments add up to?

17  A.  For a $300 loan in this case, it would have been $975.

18  Q.  So what payment or payments were actually scheduled when a

19  person got a $300 loan?

20  A.  The automatic renewal process is what would have been

21  scheduled for the customer.

22  Q.  That's the schedule that we talked about in 1911?

23  A.  Yes.

24  Q.  Now, the finance charge box, do you see that?

25  A.  Yes.

H9D8TUC3                          Rogers - Direct

1    Q.   What is the amount listed in the finance charge box?

2    A.   $90.

3    Q.   Does that accurately reflect what customers paid in

4    interest or finance charges on a $300 loan?

5    A.   No.

6    Q.   What is the accurate number?

7    A.   For the $300 loan, in finance charges the customer would

8    have paid $675.

9    Q.   Is that the difference, essentially, between 975 and $300?

10   A.   Yes.

11   Q.   Let's take a look at the annual percentage rate box.  What

12   is listed there?

13   A.   576.32 percent.

14   Q.   From your time at the company, what was the rough range of

15   percentage rates that you saw on loan documents?

16   A.   The interest rates were always above 100; they were always

17   in the 100s, even up to the thousands.

18   Q.   Now, could a customer pay back the loan in a different

19   manner if he or she wanted?

20   A.   Yes, they could.

21   Q.   How would the customer have to do that?

22   A.   They would either have to log on to the Web site and

23   schedule a different payment, like a payout or a pay in full to

24   do a pay down.

25   Q.   Is what you just said explained anywhere in the loan

1   contract?

2   A.   If they would log in, I guess, through the account summary.

3   It's not explained clearly, but that's what they would need to

4   do.

5   Q.   OK.   Let's go back to 1911 for a second.

6           So, again, this is from the training manual, is that

7   right?

8   A.   Yes.

9   Q.   Again, who was trained using this document and the rest of

10  the manual?

11  A.   All AMG employees.

12  Q.   So is the payment schedule process explained in this

13  document as well?

14  A.   Yes, it is.

15  Q.   Where?

16  A.   It states on there that the customer's due date -- there

17  would always be three ways to pay back the loan:   Renewal, pay

18  down, and pay in full.

19  Q.   The first paragraph, let me highlight that.

20          There is a sentence there, beginning in the second

21  line, it says, "On the customer due date there are three ways

22  they may pay back their loan:   Renewal, pay down or payment in

23  full."   Do you see that?

24  A.   Yes.

25  Q.   Why don't we go to the second paragraph.

1                It says, "If a customer is unable to pay the loan and

2       the service charge back on the first assigned due date, the

3       account will automatically renew."

4                Do you see that?

5       A.   Yes.

6       Q.   Let's go to the third paragraph.

7                "To renew an account, means the customer will only pay

8       the service charge and the principal balance will remain

9       untouched for the first four pay dates."

10               Do you see that?

11      A.   Yes.

12      Q.   How many sentences did I read?

13      A.   Three.

14      Q.   Do those three sentences explain the renewal process?

15      A.   Yes, they do.

16      Q.   Why don't we go back to 2202, back to the third page where

17      we were before.

18               Is there a part of this document that also refers to

19      the payment schedule?

20      A.   You have the -- it says "your payment schedule," the box

21      under the four boxes.

22      Q.   Can you read what it says in that box?

23      A.   It says, "Your payment schedule will be one payment of $390

24      due on 2010/7/21 if you decline -- and then it has an

25      asterisk -- the option of renewing your loan.  If your pay date

1   falls on the weekend or a holiday and you have direct deposit,

2   the account will be debited on a business day prior to your

3   normal pay date.  If renewal is accepted, you will pay the

4   finance charge of $90 only on 2010/7/21.  You will accrue a new

5   finance charge with every renewal of your loan.  On the due

6   date resulting from the fourth renewal, and every renewal due

7   date thereafter, your loan must be paid down by $50.  This

8   means your account will be debited the finance charge plus $50

9   on that due date.  This will continue until your loan is paid

10  in full."

11          Then this is where the asterisk is.  "To decline the

12  option of renewal, you must select your payment options using

13  the account summary link sent to your e-mail at least three

14  business days before your loan is due.

15          Then it says, "Security:  This loan is unsecured.

16          "Prepayment:  You may prepay your loan only in

17  increments of $50.  If you prepay your loan in advance, you

18  will not receive a refund of any finance charge.  The annual

19  percentage rate is estimated based on the anticipated date that

20  proceeds will be deposited to or paid on your account, which is

21  7/2/2010."

22  Q.  We could stop at that point.

23          Back on 1911, the third paragraph, there is a

24  reference to "the principal balance will remain untouched."  Do

25  you see that?

1    A.  Yes.

2    Q.  Does the word "principal" appear anywhere in the payment

3    schedule language that you just read from the loan contract?

4    A.  No, it does not.

5    Q.  That's, to be clear, 2202?

6    A.  Yes.

7    Q.  Why don't we go back to 2202, please.

8             MR. VELAMOOR:  Just highlight the first line of "your

9    payment schedule."

10   Q.  It says, there is a language there, "if you decline,

11   asterisk, the option of renewing your loan."  Do you see that?

12   A.  Yes.

13   Q.  Before the customer signed up for the loan, was he or she

14   presented with options to either have an automatic renewal or

15   not?

16   A.  No.

17   Q.  Was there a point in which the company described payment

18   options to the customer?

19   A.  Not before their loan.  After they were approved for the

20   loan, they got a congratulations letter, which kind of

21   explained the payment options.

22            MR. VELAMOOR:  I will mark this 2201.

23   Q.  Did you have a chance to look at 2201?

24   A.  Yes.

25   Q.  What is it?

1  A.  This is a congratulations letter that the customer would

2  have received after the loan was approved.

3          MR. VELAMOOR:  Your Honor, the government offers 2201.

4          THE COURT:  Any objection?

5          MR. ROTH:  No, your Honor.  I think it's the same

6  document we introduced as -- I'm sorry.  I apologize.  No

7  objection.

8          THE COURT:  Any objection, Mr. Bath?

9          MR. BATH:  No, sir.

10          THE COURT:  It's received.

11          (Government's Exhibit 2201 received in evidence)

12          MR. VELAMOOR:  Ms. Grant, can you show this to the

13  jury?

14  BY MR. VELAMOOR:

15  Q.  Does this also relate to Athena Sanchez's loan?

16  A.  Yes.

17  Q.  Where is the language on this that relates to the renewal

18  process?

19  A.  It's at the bottom of page 1.

20  Q.  Does it carry over onto the next page?

21  A.  Yes, it does.

22  Q.  Why don't we go back to the previous page.

23          Do you want to read out what it says under "renewal"?

24  A.  "Your loan is always due on your pay days.  By receiving a

25  loan through 500 FastCash, you agree that your loan will be

1  renewed unless you request to pay down an additional amount

2  against your principal or pay out the balance in full.

3  Renewing your loan means that you will pay the renewal fee only

4  on the due date.  Every time your loan is renewed, you will

5  accrue a new renewal fee.  You can renew your loan four times.

6  On the fifth renewal, you must pay the renewal fee plus pay

7  down your balance by $50.  This is called an automatic pay

8  down. (Example:  For a $300 loan the fee is $90.  On the fifth

9  renewal, you will pay $140, which equals the $90 renewal fee

10 plus the $50 pay down.  If you renew your loan again on the

11 next due date, your principal balance will be $250 and your new

12 renewal fee will be $75.  When the automatic pay down process

13 is in effect this will decrease the principal loan amount and

14 your renewal fee.)  After your fifth renewal, your loan must be

15 paid down every due date until it is paid in full."

16 Q.  Now, do you find this language to be clearer than the

17 language in the loan contract?

18 A.  Yes.

19 Q.  Do you find it to be as clear as the language in the

20 training manual?

21 A.  No.

22 Q.  Just on the renewal paragraph, on the second page, there is

23 a reference to an automatic pay down.  Do you see that?

24 A.  Yes.

25 Q.  On the previous page, do you ever see any reference to an

1    automatic renewal?

2    A.   No.

3    Q.   So the word automatic appears by pay down but not by

4    renewal?

5    A.   Correct.

6    Q.   Was the language in the training manual ever, to your

7    knowledge, included in the contract?

8    A.   No, it was not included in the contract.

9    Q.   Was the somewhat clearer language in the congratulations

10   e-mail, to your knowledge, ever included in the contract?

11   A.   No.

12   Q.   Or presented in any way to the customer before the customer

13   got the loan?

14   A.   No.

15   Q.   Did you ever recommend that the chart on the training

16   manual 1911 ever be included in the loan contract or presented

17   to the customer some other way before the customer got the

18   loan?

19   A.   I vaguely remember suggesting that.

20   Q.   Did it ever happen?

21   A.   No, it did not.

22   Q.   I think there are some terms that have come up, but let's

23   make sure they are clear.

24           Are you familiar with the terms "pay out" or "pay in

25   full"?

H9D8TUC3                          Rogers - Direct

```
 1   A.  Yes.

 2   Q.  What do those terms mean?

 3   A.  That would be when the customer would pay in full the loan

 4   or they would pay off the loan by paying the full balance, so

 5   the amount that is left in principal and a service fee.

 6   Q.  Does payout mean something different or slightly different

 7   than pay in full?

 8   A.  No, they are the same thing.

 9   Q.  Pay out is the same as pay in full?

10   A.  Yes.

11   Q.  From your time in the lending business, did you receive or

12   were you instructed about any goals for management regarding

13   whether pay outs should be increased or decreased?

14   A.  Yes.  It was discussed multiple times that they'd rather

15   have the customer pay down the loan instead of paying in full

16   the loan, so as trying to decrease pay in fulls.

17   Q.  So they wanted more pay downs, is that what you said?

18   A.  Yes.  More people just to renew the loan.

19   Q.  What would be the difference from a pay down to a pay in

20   full?

21   A.  A pay down is just where they pay part of the principal,

22   and not paying the full amount of principal.  So then on their

23   next due date, they would receive another finance charge.

24   Q.  In which case would they receive another finance charge?

25   A.  If they paid down the loan.
```

1    Q.  As opposed to?

2    A.  Paying in full.

3    Q.  Was it explained to you or did you have an understanding as

4    to why it was the company's goal to discourage pay outs or pay

5    in fulls?

6    A.  If the customer doesn't pay their loan off in full, then

7    they could accrue more finance charges, the company could.

8    Q.  I am going to show you two exhibits, one marked 1917 and

9    one marked 1902.

10           You can take the exhibits out and take a look at them.

11           Have you had a chance to look at 1917 and 1902?

12   A.  Yes, sir.

13   Q.  What are they?

14   A.  This is an e-mail communication over the account summary

15   document.

16   Q.  Do both e-mails relate to that issue?

17   A.  Yes, they do.

18   Q.  Are you copied on these e-mails?

19   A.  Yes, I am.

20           MR. VELAMOOR:  The government offers 1917 and 1902.

21           THE COURT:  Any objection?

22           MR. ROTH:  No, your Honor.

23           THE COURT:  Received.

24           (Government's Exhibits 1917 and 1902 received in

25   evidence)

1           MR. VELAMOOR:  Let's start with 1917 and show that to

2     the jury.

3     Q.  In a general sense, this first e-mail, this is an e-mail

4     from Crystal Cram, right?

5     A.  Yes.

6     Q.  Who is she sending it to you?

7     A.  She is sending it to all of the managers, as well as cc'ing

8     Scott and Blaine Tucker.

9     Q.  This e-mail is about what?

10    A.  This is about the account summary, which is a pay off

11    document so the customer can pay off the loan.

12    Q.  So this is from 2005, right?

13    A.  Yes, it is.

14    Q.  Why don't we turn to the next page.

15          You said this is the account summary document.

16    Generally speaking, what was this document all about?

17    A.  It was, the customer would sign it at the bottom, and that

18    meant that they would agree to pay off their loan in full, is

19    what the original document was for.

20    Q.  So if the customer wanted to pay the loan in full, this is

21    the document they needed?

22    A.  Yes.

23    Q.  What would the customer have to do with this?

24    A.  They would sign it and then they would fax it back to the

25    company.

1                MR. VELAMOOR:  So why don't we zoom in on the bottom

2      section of the document.

3      Q.  So what is Ms. Cram proposing with respect to this account

4      summary document?

5      A.  In this proposal, it was to add the line that says,

6      "Initial here to pay down the principal balance of your loan by

7      $50 plus pay the renewal charge."

8      Q.  So previously there was no option to initial for a pay

9      down?

10     A.  Correct.

11     Q.  So signing this document and sending it back would have

12     what results?

13     A.  That would result in the customer paying off their loan in

14     full and having the full amount debited from their account.

15     Q.  So she circulates this around for comments?

16     A.  Yes.

17     Q.  Why don't we turn to 1902.

18                Let's start with the bottom e-mail.  Is that

19     essentially the same e-mail without the attachment that we just

20     looked at?

21     A.  Yes.

22     Q.  Why don't we just go to the top, which is your ultimate

23     response.  Do you see that?

24     A.  Yes.

25     Q.  What is your response there?

1    A.  My response is that, "I like it as well.  Also, this may

2    decrease the PIF and people will pay down instead."

3    Q.  When you say "this may decrease the PIF," exactly what is

4    being decreased?

5    A.  Decrease the amount of customers that pay in full, and

6    instead of paying in full, they would do a pay down.

7    Q.  Between people who pay in full and people who pay down, who

8    pays more finance charges?

9    A.  Somebody who just pays down.

10   Q.  So would this be increasing the number of people that paid

11   more finance charges?

12   A.  Yes.

13   Q.  You're suggesting that you like it.  What is the reason

14   why?

15   A.  Because the goal was to decrease the pay offs, and if you

16   could get a customer to pay down the loan instead of paying it

17   in full, then the company could debit more service fees from a

18   customer's account, and that's what the goal was.

19   Q.  And on this e-mail, you're listed as Kelly Heath, your

20   former name?

21   A.  Yes.

22   Q.  Was your e-mail also sent to Scott Tucker?

23   A.  Scott Tucker and Blaine Tucker both cc'd on this well as.

24   Q.  Did you ever receive a correction or a response from Mr.

25   Tucker to your e-mail?

H9D8TUC3                           Rogers - Direct

1   A.  No, not to my knowledge.

2   Q.  Why don't we turn to a different topic.

3           You may have mentioned these names before.  What names

4   appeared on the company's Web sites?

5   A.  The different Web sites were One Click Cash, United Cash

6   Loans, US FastCash, 500 FastCash, Ameriloan, Ace Cash Services

7   and Star Cash Services.

8   Q.  Were those the names you previously referred to as either

9   the portfolio or profile names?

10  A.  Yes.

11  Q.  Did the Web sites for any of these companies ever mention

12  the names of the companies you were actually working at, like

13  CLK or AMG?

14  A.  No.

15  Q.  Did employees ever identify themselves to customers as CLK

16  or AMG employees?

17  A.  No.

18  Q.  How did they identify themselves?

19  A.  They identified themselves as whichever loan company they

20  were working in.

21  Q.  Why was that?

22  A.  You couldn't say that you were affiliated with any of the

23  rest of the loan companies.  So if you were working in United

24  Cash Loans, then you would answer the phone United Cash Loans.

25  Q.  You started by saying "you couldn't say."  What do you mean

1  by you couldn't say?

2  A.  You couldn't tell a customer that One Click Cash and United

3  Cash Loans, for example, were affiliated or sister companies.

4  Q.  Was there a policy in place about that?

5  A.  Yes.

6  Q.  Where did that policy come from?

7  A.  That policy would have came from management, upper

8  management.

9  Q.  I think you started to say, but if the customer called

10 asking for one Web site like 500 FastCash, could the same

11 customer service rep offer them a loan for One Click Cash?

12 A.  No.

13 Q.  Do you know why this policy was in place?

14 A.  We were told that the companies -- that we couldn't tell

15 the customer that the companies were located in the same

16 building or that they were affiliated.

17 Q.  Do you know why, what the reason was for that policy?

18 A.  It would be so they could offer a loan to the same customer

19 in different loan portfolios.

20 Q.  Did you have customer service reps who from time to time

21 worked for different portfolios?

22 A.  Yes.

23 Q.  Did they at any times find it hard to keep straight which

24 one they were working for on any given day?

25 A.  Yes.

1   Q.  What, if anything, did the company do to address this

2   issue?

3   A.  There was a policy put into play that if you stated the

4   wrong company name, whenever you answer the phone for example,

5   then you would have a disciplinary action up to termination.

6   Q.  How did the employees for the different loan portfolios

7   spread out in the office?

8   A.  We were all on one big floor, just separated by -- we were

9   grouped together, but not separated by walls or anything like

10  that, so it was just cubicles.  So you had a partition in some

11  cases that just separated one company to the next.

12  Q.  Let me ask you about a couple of other names.

13          In your time with the lending company, do you remember

14  ever hearing the name County Bank?

15  A.  I recall it, but I don't know what it was.

16  Q.  In your time with the company, did you ever hear anything

17  about Indian or Native American tribes being involved?

18  A.  Yes, I heard that.

19  Q.  Approximately when?

20  A.  I would have heard more about the tribes whenever I became

21  a manager.

22  Q.  What, if anything, were you instructed on that issue?

23  A.  That we were affiliated with them in some kind of way.

24  Q.  Now, did you ever interact with any officials from any

25  Native American tribes?

H9D8TUC3                         Rogers - Direct

1   A.  Officials, no.

2   Q.  Any other people associated with Native American tribes?

3   A.  They did have a couple of employees that were located in

4   Niobrara, Nebraska, and Miami, Oklahoma.

5   Q.  What was the significance of those two locations, Niobrara

6   and Miami?

7   A.  From what I knew, that's where the Indian tribes were

8   located.

9   Q.  Approximately how many employees were there?

10  A.  As far as what I know, it was just the two ladies that did

11  outbound phone calls.

12  Q.  When you say "outbound phone calls," what do you mean?

13  A.  We had a group called the teleloan group, and they made

14  outbound phone calls to customers who -- let's say they were on

15  the Web site and they didn't complete the application and they

16  would maybe close the browser, those would go into a phone

17  queue so a customer service rep could call them and maybe walk

18  them through the loan application, maybe they got confused or

19  something like that.  So it was just a courtesy call basically.

20  Q.  When you were a manager, were you familiar with the hours

21  and the amount of time these employees were working?

22  A.  Yes.  They did minimal work.  A lot of times they left

23  early for the day, and the agents that were at AMG in Kansas

24  would have to take over their calls.

25  Q.  When you say take over their calls, what do you mean?

1   A.   Move it from one -- we had different phone queues.  So they

2   had their own phone queue.  So we would take the calls from

3   that queue and move them over to a queue at AMG.

4   Q.   Now, you mentioned that teleloan was, essentially, if

5   people fell off the Web site when they tried to get a loan,

6   they would then get a phone call from a teleloan person?

7   A.   Yes.

8   Q.   Approximately what percentage of loans generally involved

9   an outbound call from the teleloan group?

10  A.   I would say probably 40 to 50 percent.

11  Q.   How many full-time teleloan people were working in Overland

12  Park?

13  A.   With the ones that I was involved in, about 50.

14  Q.   Roughly, what percentage of teleloan calls do you think

15  were handled by these employees who were located in Miami or

16  Niobrara?

17  A.   Probably less than five percent.

18  Q.   To your knowledge, were the Miami and Niobrara employees

19  involved in any other part of the customer service or lending

20  process?

21  A.   Not that I was aware of, no.

22  Q.   When, as you put it, the tribe became involved in the

23  business, became affiliated with the business, did anyone at

24  Overland Park change their business location or their office

25  location?

H9D8TUC3                           Rogers - Direct

1   A.   No.   We all stayed where we were.

2   Q.   From time to time, did customers on the phone with customer

3   service representatives ever ask where the representatives were

4   located?

5   A.   Yes.   Sometimes just in casual chitchat or conversation on

6   the phone, the customer would ask where we were located.

7   Q.   What were customer service representatives instructed to

8   say to customers in terms of where they were located?

9   A.   Depending on what company they were taking the call  --

10             MR. ROTH:   Can we just get a response as to who

11   instructed her to say what?

12             THE COURT:   Why don't you put it in context.

13             MR. VELAMOOR:   Sure.

14   Q.   Approximately what time during your time at the company did

15   this issue of employee location come up?

16   A.   I'm not real sure as to what time frame.

17   Q.   Was it an issue, for example, that came up when the company

18   went by the name AMG?

19   A.   Yes.

20   Q.   You mentioned that you received instructions.   Where did,

21   to your knowledge, the instructions come from regarding what

22   representatives could say about where they were located?

23   A.   All the instruction that I took would have come from my

24   direct manager.

25   Q.   Who was that?

1    A.  That would have been Crystal Cram.

2    Q.  Now, based on her instructions, what were customer service

3    representatives instructed to say about where they were

4    located?

5    A.  Depending on what loan portfolio they were taking inbound

6    calls for or calling out for depended on where they said they

7    were located.  So United Cash Loans, US FastCash and 500

8    FastCash was in Miami, Oklahoma, and One Click Cash was in

9    Niobrara, Nebraska.

10   Q.  When you say UCL, 500 and FashCash were in Miami, what do

11   you mean?

12   A.  That's where you would tell the customer you were located

13   at, were in those cities and states.

14   Q.  What about Ameriloan, what was the travel location for

15   Ameriloan?

16   A.  I'm not real sure which one it was.

17   Q.  I will show you what has been marked as 1903.

18        Have you had a chance to look at 1903?

19   A.  Yes.

20   Q.  What it is?

21   A.  These would be team meeting minutes, is what they were

22   called.  So it's notes, basically, of the team meeting that I

23   would have had with my team of customer service reps.

24   Q.  What is the date?

25   A.  The date is December 4th of 2009.

1          MR. VELAMOOR:  The government offers 1903.

2          THE COURT:  Any objection?

3          MR. ROTH:  No, your Honor.

4          THE COURT:  All right.  Received.

5          (Government's Exhibit 1903 received in evidence)

6          MR. VELAMOOR:  Ms. Grant, can you show 1903.

7          Why don't we start by highlighting just the top.

8  Q.  So this meeting was called by you when you were known as

9  Kelly Heath?

10 A.  Yes.

11 Q.  What is the significance of the date and time?

12 A.  I'm sorry?

13 Q.  What is the significance of the date and time?  Was that

14 when the meeting was or when you made the notes?

15 A.  That is when the meeting was.

16 Q.  Who attended this meeting?

17 A.  This would have been a meeting with all of the teleloan

18 employees.  It's not pictured on the picture.  And then me, of

19 course.  And then Holly and Robin, they would have been from a

20 different department.

21 Q.  You mentioned these were teleloan employees.  These are

22 teleloan employees working where?

23 A.  At AMG.

24 Q.  Where was that?

25 A.  In Kansas.

H9D8TUC3                          Rogers - Direct

1   Q.  Let's turn to the second page.

2           There is an agenda item regarding location.  Do you

3   see that?

4   A.  Yes.

5   Q.  Did you present on that topic?

6   A.  Yes.

7   Q.  Can you read out what the presentation was on the topic of

8   location?

9   A.  "Do not tell the customer our location in Kansas.  Only

10  give them the Oklahoma or the Nebraska address, depending on

11  which company you are working.  Giving out Kansas is grounds

12  for termination."

13          Then in the conclusions, "Do not disclose the actual

14  location to customers."

15  Q.  It says "KS."  KS means Kansas in this document?

16  A.  Yes.

17  Q.  OK.  The references to the OK or NE address, what does that

18  mean again?

19  A.  That is abbreviations for Oklahoma and Nebraska.

20  Q.  What was in Oklahoma and Nebraska?

21  A.  That would be where the Indian tribes were located.

22  Q.  Now, it says there that giving out Kansas is grounds for

23  termination.  Do you see that?

24  A.  Yes.

25  Q.  During your time in the business, was anyone actually fired

1   for giving out the company's actual Kansas location?

2   A.  Yes, I do recall at least two employees.

3           THE COURT:  I'm sorry.  I didn't hear what you said.

4   I do recall?

5           THE WITNESS:  At least two employees.

6           THE COURT:  Thank you.

7   Q.  Now, did customer service representatives ever encounter

8   any difficulties when they were telling customers that they

9   were sitting in Miami or Niobrara?

10  A.  Yes.

11  Q.  What kinds of problems?

12  A.  One kind of major problem was like what the weather is

13  doing there.  You know, a customer may ask, Well, how's the

14  weather there?  And the employees didn't know what to say.

15  They didn't know if they were having storms there or if it was

16  a nice sunny day.

17  Q.  Let me show you what has been marked as 1904.

18          What is 1904?

19  A.  This is an e-mail that came from the operations department

20  about the customer service, like agenda, reminders.  So stuff

21  that we needed to remind our employees.

22  Q.  Was it sent to you?

23  A.  Yes, it was.

24          MR. VELAMOOR:  The government offers 1904.

25          THE COURT:  Any objection?

1          MR. ROTH:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 1904 received in evidence)

4          MR. VELAMOOR:  Ms. Grant, would you publish 1904.

5   Q.  What is the subject of this e-mail?

6   A.  The subject says "customer service agenda reminder."

7   Q.  What is the first item on the agenda?

8   A.  It says, "Reps should not talk about the weather to

9   customers.  Please add this to your meeting agendas.  Small

10  talk is OK, but the weather subject should be avoided."

11  Q.  All right.  So this issue of the weather topic came up.

12  Did the business come up with a solution?

13  A.  Yes.

14  Q.  What was the solution?

15  A.  What they ended up doing was sending out like a weather

16  report daily so the customer service reps would know what the

17  weather is doing in Miami, Oklahoma, and Niobrara, Nebraska.

18  Q.  I will show you what has been marked as 1906 and 1909.

19          Have you had a chance to look at 1906 and 1909?

20  A.  Yes, sir.

21  Q.  What are they?

22  A.  These would be the weather e-mails that were sent out to

23  the customer service reps.

24          MR. VELAMOOR:  The government offers 1906 and 1909.

25          THE COURT:  Any objection?

1          MR. ROTH:  No, your Honor.

2          THE COURT:  Mr. Bath.

3          MR. BATH:  No.

4          THE COURT:  Received.

5          (Government's Exhibits 1906 and 1909 received in

6   evidence)

7          MR. VELAMOOR:  Ms. Grant, why don't we start with

8   1906.

9   BY MR. VELAMOOR:

10  Q.  What is the date of this e-mail?

11  A.  This would have been February 28, 2011.

12  Q.  What is the subject?

13  A.  Weather for 2/28/2011, Miami, Oklahoma.

14  Q.  Were any of the people to whom this e-mail is sent actually

15  in Miami, Oklahoma?

16  A.  No, they were not.

17  Q.  Where were they?

18  A.  All of these people were located in Kansas, at the AMG

19  building.

20  Q.  Why don't we go down and just take a look at the body of

21  the e-mail.

22          Can you read the body of the e-mail?

23  A.  Yes.  It says, "Right now:  36 and cloudy.

24          "Today:  49 and a.m. T-storms and winds.

25          "Tonight:  29 and clear.

 1              "Tomorrow:  65 and sunny."

 2   Q.  Why don't we turn to 1909.

 3              What is the date of this e-mail?

 4   A.  January 17, 2012.

 5   Q.  Now, there are a lot of names to whom this e-mail is sent.

 6   Can you take a second and familiarize yourself with all the

 7   people to whom this e-mail was sent?

 8   A.  This would have went to the customer service reps.

 9   Q.  Are you among the people to whom this is sent?

10   A.  Yes.

11   Q.  Again, when you were known as Kelly Heath?

12   A.  Yes.

13   Q.  To your knowledge, are any of the people to whom this

14   e-mail is sent located in either Miami, Oklahoma, or Niobrara,

15   Nebraska?

16   A.  No, they were located in Kansas.

17   Q.  The subject of this e-mail is what?

18   A.  Is January 17, 2012 weather.

19   Q.  This is about a year after the previous e-mail I showed

20   you?

21   A.  Yes.

22   Q.  Why don't we just take a look at the body of it.

23              Go ahead and read what it says.

24   A.  Niobrara, Nebraska is currently 10 degrees and mostly

25   cloudy.  The forecast is 19 degrees and partly cloudy.

1              Miami, Oklahoma is currently 27 degrees and sunny.

2    And the forecast is 48 degrees and mostly sunny and windy.

3    Q.  I will show you one more, Government Exhibit 1908.

4              Have you had a chance to look at 1908?

5    A.  Yes, sir.

6    Q.  What is 1908?

7    A.  It is another e-mail in correspondence to the weather

8    e-mails that were sent out.

9              MR. VELAMOOR:  The government offers 1908.

10             MR. ROTH:  No objection.

11             MR. BATH:  No objection.

12             THE COURT:  Received.

13             (Government's Exhibit 1908 received in evidence)

14             MR. VELAMOOR:  May we show 1908, please.

15   Q.  First of all, what is the date of this e-mail?

16   A.  The date is August 11, 2011.

17   Q.  What is the subject?

18   A.  Weather e-mails.

19   Q.  Why don't we just focus on the second full paragraph.

20             Can you read that and explain roughly what it means?

21   A.  It says, "I am setting a task reminder for all OPS that

22   will alert them each morning at 6:45 a.m.  If they are the

23   person scheduled on the earliest shift, it will be their

24   responsibility to send.  If they are not, they can simply press

25   dismiss or complete.  I've asked that I'm cc'd to ensure it's

1   handled.  This process will be discussed in department meeting

2   on Tuesday."

3   Q.  Do you know what a task reminder for all OPS is?

4   A.  OPS stands for OPS, so the operations department.

5   Q.  What is Ms. Hildebrand explaining that she has done?

6   A.  Anybody that was in the operations department would receive

7   a reminder at 6:45 in the morning that any weather e-mail will

8   need to be sent out.

9   Q.  After customers received their loans, did you or people you

10  worked for ever speak with customers again?

11  A.  Yes.

12  Q.  What context, how would you hear from them again?

13  A.  They may just be inquiring about their loan or what would

14  be debited from their account.  Sometimes it was also that a

15  customer was upset that we have debited either so much money or

16  that we have debited more money than what they were expecting

17  us to.

18  Q.  If customers were upset, what kinds of things were

19  customers typically upset about?

20  A.  Customers were upset about the amount of finance charge

21  that was coming out of their account, or maybe they went into

22  their automatic pay down, and so you're debiting more money

23  from the customer's account and they are used to just a service

24  fee, but now it's a service fee plus $50.  Some customers were

25  upset that they may have looked into it that the finance charge

1    was -- they couldn't charge that in the state that they lived

2    in.

3    Q.  Did you or others at the company keep tallies or summaries

4    of the complaints and the different kinds of complaints?

5    A.  Yes.  There was some recording that was done as to the

6    different types of complaints and what they were.

7    Q.  You mentioned that the fifth due date was often a time when

8    you would hear from customers?

9    A.  Yes.

10   Q.  Again, can you explain why that was?

11   A.  Well, before the fifth due day, being debited from the

12   customer's account would have just been the service fee.  So,

13   for example, if it was a $300 loan, then just $90 would be

14   coming out of the account.  But on the fifth due date is when

15   the $50 that would go towards the actual principal of the loan

16   would also come out.  So they would have a debit for $90 and

17   also another debit for $50, and a lot of customers didn't

18   understand what was going on.

19   Q.  You mentioned that the volume and nature of the complaints

20   were summarized or tallied?

21   A.  Yes.

22   Q.  Did you discuss complaints at meetings?

23   A.  At manager meetings, yes, different complaints were

24   discussed.

25   Q.  Did you discuss in these meetings whether customers were

1    reading the terms of the contract?

2    A.  Yes.

3    Q.  What was the discussion about that?

4    A.  The discussion was -- well, the conclusion of that

5    discussion would have been that the customer really doesn't

6    read their loan note, they don't understand it in most cases,

7    so that's why the customer then is calling later on and

8    complaining.

9    Q.  Was there a common discussion specifically about the TILA

10   boxes we talked about?

11   A.  I can't really recall a specific -- you know, looking at or

12   reviewing over those boxes I guess.

13   Q.  I will show you what has been marked as 1907.

14           Have you had a chance to look at 1907?

15   A.  Yes.

16   Q.  What is that?

17   A.  This is an e-mail that is coming from Robert Tasby.  He

18   would have been a customer service rep that answered e-mails

19   from customers.

20           MR. VELAMOOR:  The government offers 1907.

21           THE COURT:  Any objection?

22           MR. ROTH:  No.

23           MR. BATH:  No, sir.

24           THE COURT:  Received.

25           (Government's Exhibit 1907 received in evidence)

1    Q.  Why don't we start at the bottom e-mail from Mr. Tasby.

2            That's an e-mail sent to which address?

3    A.  It was sent to CMG suggestions.

4    Q.  What was CMG suggestions?

5    A.  It would have been -- CMG would have stood for Crystal's

6    management group.

7    Q.  What was Crystal's management group?

8    A.  It would have been all of the managers over each one of the

9    loan profiles that Crystal was over.

10   Q.  Can you read the text of Mr. Tasby's e-mail?

11   A.  Yes.

12           "I think we should change the way the loan contract

13   reads in regards to pay in full or pay down.  The contract

14   states that the customer has to fax us a request to pay in

15   full.  I just got an e-mail from a customer who was upset

16   because she didn't have a fax, and the contract says that she

17   had to fax something when she had already set up a pay in full

18   via the Web site.  I think it would be a good idea to add the

19   loan forms that we can request the pay down or pay in fulls via

20   e-mail or on the Web site.  I think it would be helpful for

21   us -- it would help us get some more customers because I've

22   seen some customers cancel because they don't have any

23   access --"

24           THE COURT:  They say they don't.

25   A.  "They say they don't have any access to a fax and our

 1   contract clearly states that you will need to have access to

 2   require any -- or request any arrangements.  Just a thought."

 3   Q.  Did you respond to that?

 4   A.  Yes, I did.

 5   Q.  Why don't we go up to your response.

 6   A.  Would you like me to read it?

 7   Q.  Yes.

 8   A.  "I think this will be a very good idea to update our loan

 9   document with all of the new payment options."

10   Q.  What is Ms. Cram's response?

11   A.  "We cannot make changes to the loan contract.  Legal has

12   been in review of the contracts for about a year and a new

13   version should be coming soon."

14   Q.  What did you understand the word "legal" to mean or to

15   refer to?

16   A.  Our legal department, which would have been headed up by

17   Tim Muir.

18   Q.  To your knowledge, was this change that Mr. Tasby proposed

19   adopted into the loan contract?

20   A.  No, it was not.

21   Q.  You also mentioned, I think, complaints about whether the

22   amount of interest was legal under the laws of certain states?

23   A.  Yes.

24   Q.  Typically, what kinds of complaints did you get on that

25   topic?

1    A.  That a customer has looked up the laws in their state and

2    that a company can't charge that much or that amount for a

3    payday loan.

4    Q.  Do you know whether that complaint, the volume of those

5    complaints was also discussed at meetings with management?

6    A.  Any time that we received any kind of complaint such as

7    those, or anything that stated attorney general or state laws

8    or anything like that, that would have to go to the compliance

9    department.  So those were forwarded over.  So any time we got

10   a customer complaint like that, they were forwarded to the

11   compliance department.

12   Q.  Let me show you what has been marked as 1910.

13            Have you had a chance to look at 1910?

14   A.  Yes.

15   Q.  What is 1910?

16   A.  This would be out of the training manual.  This would be

17   like a collections role playing script.

18            MR. VELAMOOR:  The government offers 1910.

19            THE COURT:  Any objection?

20            MR. ROTH:  No, your Honor.

21            THE COURT:  Mr. Bath, any objection?

22            MR. BATH:  No.

23            THE COURT:  It's received.

24            (Government's Exhibit 1910 received in evidence)

25            MR. VELAMOOR:  Ms. Grant, why don't we start by

1    enlarging the top half of the document.

2              Actually, even do the title.

3    Q.  The title says "collections role playing scripts."  Do you

4    see that?

5    A.  Yes.

6    Q.  What exactly is this?

7    A.  This would be, like, maybe a response that the customer

8    would give, and then it shows what the rep's response should

9    be, or what they should do.

10   Q.  So this is a script for what situation?

11   A.  A situation where the customer states that they have

12   already paid such amount and they want to know why they still

13   have a balance.

14   Q.  The title there says the customer states what?

15   A.  Illegal interest rate in their state.

16   Q.  So they are pretending what the customer might say in a

17   certain situation?

18   A.  Yes.

19   Q.  In this situation they are imagining, what does the

20   customer say?

21   A.  That the customer says, I have already paid blank amount.

22   Why do I still have a balance?  It's illegal to charge this

23   much for interest in the state of blank.

24   Q.  What appears next in the document?

25   A.  The rep says, "Fees are service charges on a loan.  And

1    failure to read the contract clearly states the terms and

2    conditions."

3    Q.  What is the significance of what is written there?  Is that

4    what the customer service representative is supposed to say?

5    A.  Yes.

6    Q.  The first thing is, "Fees are service charges on the loan"?

7    A.  Yes.

8    Q.  The second is, "Failure to read contract clearly states

9    terms and conditions."

10   A.  Yes.

11   Q.  So what comes next?  What is the purpose of the next part

12   of this document?

13   A.  The next part is what another customer would say.

14   Q.  Go ahead and read that.

15   A.  "I have still paid too much money and I still have a

16   balance of blank.  After doing some research, I have found that

17   the most interest that you can charge is blank."

18   Q.  What is the representative, according to this, supposed to

19   do when a customer says that?

20   A.  They are supposed to give them the compliance script.

21          Then it says, "If the customer starts questioning laws

22   and you don't have the answers, send the account to compliance

23   to ensure that the customer is being informed of the correct

24   information."

25   Q.  What would, roughly speaking, compliance do?

1   A.  Roughly speaking, it would have something to pertain to --

2   that your complaint has been sent to compliance and that they

3   will contact you within a certain amount of hours.

4   Q.  Is that the same department you talked about before?

5   A.  Yes.

6           MR. VELAMOOR:  You can take that down.

7   Q.  I will show you what has been marked as 1905.

8           THE COURT:  Ladies and gentlemen, you are going to be

9   in suspense as to Government Exhibit 1905.  You will have to

10  wait until after the lunch break.  We will pick up at 2.

11          Please remember, do not discuss the case among

12  yourselves or with anyone else.  We will back in action at

13  2:00.

14          I think the weather is pretty good out there, and I

15  hope you enjoy it.

16          (Jury exits courtroom)

17          THE COURT:  We are in recess.  Thank you.

18          (Luncheon recess)

19

20

21

22

23

24

25

H9d1tuc4                        Rogers - Direct

1                          AFTERNOON SESSION

2                              2:12 p.m.

3           (In open court; jury not present)

4           THE COURT:  I received a note from one of the jurors.

5    It's marked as Court Exhibit 2.  "Please don't remove exhibits

6    from the screen so fast until we've had enough time to examine

7    them."  I will let them know they'll have the exhibits with

8    them in the jury room.

9           Bring our jury in, please.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H9d1tuc4                        Rogers - Direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              Thank you, ladies and gentlemen.  You are the best.

4     So that we can get back in action.

5              Bring our witness in and put the witness on the stand,

6     if you will, please.

7              And one thing I wanted to mention.  I received a note

8     about the amount of time that exhibits are up on the screen and

9     it's a little bit difficult getting through the entirety of the

10    document seeing it there.  This is what I want you to know.

11    I've informed counsel of this so they're all aware of it.  But

12    at the end of the case, you will have all of the exhibits that

13    are received into evidence with you in the jury room, so that

14    you can look at them, read them, you'll have hard copies, so

15    just know that as well.  That's also the case.

16              All right.  And you may continue.

17              MR. VELAMOOR:  Thank you, your Honor.

18    BY MR. VELAMOOR:

19    Q.  Ms. Rogers, I believe when we left off before lunch, we

20    were talking about the compliance department and when people

21    made complaints about loans violating state laws.

22    A.  Yes.

23    Q.  Do you recall that?  Okay.  And you I think talked about

24    the compliance script.  Can you just tell us again what the

25    compliance script was and when it was used.

1   A.  It had basically that your complaint has been sent to the

2   compliance department and that you'll be contacted by them

3   within a certain amount of hours.

4   Q.  Okay.  I'm going to show you what's been marked as

5   Government Exhibit 1905.

6           Have you had a chance to look at 1905?

7   A.  Yes.

8   Q.  And what is it?

9   A.  It is the compliance procedures.

10          MR. VELAMOOR:  Your Honor, the government offers 1905.

11          THE COURT:  What's it describe, ma'am?  What is it

12   labeled?

13          THE WITNESS:  It's labeled as complaint procedures.

14          THE COURT:  But they're actually compliance

15   procedures?

16          THE WITNESS:  Yeah, it would be the complaints that

17   were sent to compliance and what to send to compliance.

18          THE COURT:  Thank you.  Now I understand.

19          Go ahead.  You're offering it?

20          MR. VELAMOOR:  Yes, your Honor.  Thank you.

21          THE COURT:  Any objection?  Mr. Roth?

22          MR. ROTH:  No, your Honor.

23          THE COURT:  Received.

24          MR. ROTH:  Is that the entire manual there?

25          THE WITNESS:  The entire complaint manual?  I'm -- I

1    don't know if it --

2              THE COURT:  What is the document that's in front of

3    you?

4              THE WITNESS:  It is the AMG Services complaint

5    procedure.

6              THE COURT:  All right.  Mr. Roth, would you like to

7    look at it or --

8              MR. ROTH:  No, no, no.  I have the exhibit.  I just

9    don't know -- it's not paginated, so I didn't know if that was

10   the complete sum total of the complaint procedures.

11             THE COURT:  Is that the sum total of the complaint

12   procedures?

13             THE WITNESS:  As far as I know, yes.

14             THE COURT:  Okay.  Thank you.  Received into evidence.

15             (Government's Exhibit 1905 received in evidence)

16             MR. VELAMOOR:  Thank you, your Honor.  And can we show

17   it to the jury.

18             THE COURT:  You may.

19   BY MR. VELAMOOR:

20   Q.  So these are procedures that are dated July 13, 2010, is

21   that right?

22   A.  Yes.

23   Q.  Let me turn to the next page.

24             MR. VELAMOOR:  And if we enlarge the top paragraph.

25   Q.  And Ms. Rogers, can you read what it says.

H9d1tuc4                          Rogers - Cross

1   A.  Yes.  "If you receive any form of communication from one of

2   the following, please forward it immediately to the compliance

3   department:  U.S. Attorney's Office; Attorney General office;

4   any government agency; any investigator for the government

5   entity; Better Business Bureau; from any attorney who was

6   retained by a customer or any communication that includes cease

7   and desist statement that is not a D&O, with a existing process

8   or procedure."

9   Q.  Now once the complaints were sent to the compliance

10  department, were you involved in what happened to them at that

11  point?

12  A.  No.

13          MR. VELAMOOR:  No further questions, your Honor.

14          THE COURT:  All right.  Cross-examination?

15          MR. ROTH:  Thank you, your Honor.

16  CROSS EXAMINATION

17  BY MR. ROTH:

18  Q.  Good afternoon, Mrs. Rogers.

19  A.  Hello.

20  Q.  You indicated that you were working at CLK for a period of

21  time, is that correct?

22  A.  Yes.

23  Q.  And then you were fired, is that correct?

24  A.  Are you talking about whenever I left or --

25  Q.  Well, were you --

1   A.  Because I did not continuously work there.

2   Q.  Right.  Well, how many times did you leave and come back?

3   A.  Just once.

4   Q.  Okay.  And when was that?

5   A.  Around 2008, I believe, whenever I left.

6   Q.  And when you left, what was the name of the company?

7   A.  AMG Services.

8   Q.  Okay.  And when you came back, what was the name of the

9   company?

10  A.  AMG Services.

11  Q.  Did you ever work for CLK?  You were always working for

12  AMG, never for CLK?

13  A.  No.  CLK, I worked for them in the beginning, whenever I

14  first started.

15  Q.  Right.  So there were two separate entities, is that

16  right --

17  A.  I --

18  Q.  -- CLK and AMG?

19  A.  CLK was what I initially started to work for back in 2001.

20  Q.  Right.

21  A.  And then they renamed the company AMG, and as far as what I

22  knew, CLK went away, and it was just AMG.

23  Q.  But when you say it went away, that's just from what we

24  call cooler room talk around the water cooler?

25  A.  I never knew of CLK being used any further after it was

H9d1tuc4                          Rogers - Cross

1    named AMG.

2    Q.  Okay.  But you're not aware -- when you talk about who you

3    thought was the owner of those companies, you never saw any

4    corporation documents or anything.

5    A.  No documentation, no.

6    Q.  Okay.  Did you receive paychecks from both separate

7    entities?

8    A.  I received paychecks from CLK whenever it was CLK, plus

9    National Money Service paychecks as well, and then whenever the

10   name switched to AMG, then I received AMG paychecks.

11   Q.  Okay.  And you were there, though, working when it became

12   AMG?

13   A.  Yes.

14   Q.  Okay.  You indicated that there was a fraud unit in the

15   operation, is that correct?

16   A.  Yes.

17   Q.  And I believe you testified that -- I think you said that

18   the compliance and fraud unit was one.  Is that accurate?

19   A.  Yes, my -- to my understanding, that's -- it was kind of

20   the same group.  The same group kind of handled both -- both of

21   the things, fraud and compliance.

22   Q.  Do you know what the functions of the fraud unit was?

23   A.  Not necessarily, no.  I don't know all the little ins and

24   outs to it.  The only thing, from my understanding, is that any

25   time you might have customers that just randomly fill out

H9d1tuc4                          Rogers - Cross

1   applications to get loans, with the intention of not paying

2   them back, you did have those kind of customers that came up,

3   and the fraud department would handle those and go through the

4   different applications to recognize if that was the same person

5   that maybe is applying in somebody else's name, for example.

6   Q.  So in other words, sometimes people tried to perpetrate

7   identity theft, is that fair to say?

8   A.  Yes.

9   Q.  And were you aware that the fraud unit cooperated with

10  various law enforcement agencies to try to prevent that and to

11  prosecute those people?

12  A.  I'm not --

13            MR. VELAMOOR:  Objection, your Honor.

14            THE COURT:  Basis.

15            MR. VELAMOOR:  Relevance.

16            THE COURT:  Sustained.

17  Q.  You referred very often in your testimony to management.

18  Let's go over who management is that you were referring to in

19  regard to yourself.  Who was above you?

20  A.  Who would have been directly above me would have been

21  Crystal Cram, and that's who I would have took a lot of my

22  direct orders from.

23  Q.  And when you say direct orders, what kind of supervisor was

24  she, or manager of you?

25  A.  She would have been my manager.

1   Q.  No.  But I mean in terms of style.  Did she micromanage

2   you, is that fair to say?

3   A.  Yes, she did.

4   Q.  Okay.  And nothing got done without her approval, is that

5   fair to say?

6   A.  Yes, she -- you would have to get stuff approved through

7   her.

8   Q.  And you were not involved in many of the conversations that

9   she had with people who were above her, is that correct?

10  A.  Correct.

11  Q.  So other than Crystal Grote, what other people did you

12  refer to as upper management?

13  A.  Above her or upper management would have been Scott Tucker

14  and then Blaine and Joel Tucker, Norma --

15  Q.  How about Natalie Dempsey?

16          THE COURT:  Well, don't interrupt the witness during

17  the answer.

18          MR. ROTH:  I apologize.

19          THE COURT:  Were you finished with your answer?

20          THE WITNESS:  Yes.

21          THE COURT:  Thank you.  Go ahead.

22  A.  And did I say -- I wasn't sure.  I can't remember if I said

23  Tim Buckley or not.

24  Q.  You did not.

25          Was she a strict manager in respect to people adhering

1   to the employee handbook and the regulations that she imposed?

2   A.  Yes, she was strict.

3   Q.  Did she have anything to do with forcing employees out?

4   A.  I'm not real sure what you mean.

5   Q.  Well, did she ever take exception to actions of employees

6   and as a result of that, force them out of the company?

7   A.  No, not that I was aware of.

8   Q.  Okay.  Was she virtually in contact and aware of all

9   operations that you were aware of?

10  A.  That I was aware of, yes, she would know of them.

11  Q.  And the converse, if you will, the opposite of that is

12  that, fair to say that you were not aware of a lot of the

13  dealings that she had and the knowledge that she had in terms

14  of dealing with management above her?

15  A.  Yes, I was not aware of those dealings.

16  Q.  You were not in on the inner circle, is that correct?

17  A.  Correct.

18  Q.  I mean, is it fair to say -- I think you used the words

19  that you were looking in in some respects to --

20          You were talking about Crystal before, right, in terms

21  of the -- her practices, Crystal Grote's, her management

22  practices to you?

23  A.  Yes.

24  Q.  Supervisory practices to you.

25  A.  Right, to -- yes.

1    Q.  Okay.  Oh, I'm sorry.  I'm being asked to clarify.  Grote,

2    she has two names, like you.  What are her two names?

3    A.  Well, she technically has three all together, because she

4    was three different last names while I was there.

5    Q.  Right.

6    A.  But the most time she was --

7    Q.  They're not aliases, though, right?

8    A.  No, they were not aliases.  They were just maiden names.

9    But it was Crystal Stubbs and Crystal Cram and then Crystal

10   Grote.

11   Q.  Okay.  Thank you.

12   A.  All the same person.

13   Q.  And you indicated at one point that some of your

14   observations were almost through a conference room glass, if

15   you were, of management talking?

16   A.  Yes, yeah, they would have meetings, and you'd be able to

17   see them in there having meetings.

18   Q.  Right.  You'd be able to see them, but you wouldn't hear

19   what they were saying, is that right?

20   A.  Correct.

21   Q.  So some of what you testified about is a little bit of

22   speculation, is that fair to say, in terms of the conclusions?

23   A.  All I said was they had meetings.  I don't know what they

24   were discussing.

25   Q.  Okay.  I'd like to go over with you some of the exhibits

1   that the government introduced.

2           MR. ROTH:  1904, could we bring that up.

3   Q.  On that exhibit, that's the one that you're on and Crystal

4   is copied on, and that discusses whether or not people should

5   discuss the weather location at your Kansas location, is that

6   correct?

7   A.  Yes.  This would be an email that had a number of different

8   items on it that we needed to discuss with customer service

9   reps.

10  Q.  Okay.  And Scott Tucker is not on that email chain, is he?

11  A.  No, he is not.

12  Q.  Okay.  And what about Tim Muir?

13  A.  He is not on here either.

14          MR. ROTH:  And could we bring up 1906.

15  Q.  That's another email that the government introduced where

16  you're copied on that, and that's the one about weather

17  reports, is that correct?

18  A.  Correct.

19  Q.  And on that email, is Scott Tucker copied on that?

20  A.  No, he is not.

21  Q.  Is Tim Muir copied on that?

22  A.  No, he is not.

23          MR. ROTH:  1909, if we could have that.

24  Q.  That's another email that the government introduced in

25  regard to weather reports, is that right?

H9d1tuc4                          Rogers - Cross

1    A.  Yes, it is.

2    Q.  And you're copied on that, is that correct?

3    A.  Yes, I am.

4    Q.  Is Scott Tucker copied on that?

5    A.  No, he is not.

6    Q.  And how about Mr. Muir?

7    A.  He is not as well.

8    Q.  By the way, when you indicated that Scott Tucker was on

9    some other emails that you were on, the email chain, you didn't

10   actually email with Scott Tucker, is that fair to say?

11   A.  No, I did not email directly with Scott Tucker, no.

12   Q.  And Scott Tucker never directly emailed with you, is that

13   right?

14   A.  Correct.

15   Q.  And the same holds for Tim Muir, is that correct?

16   A.  Correct.

17   Q.  And is it fair to say in that regard that you never had any

18   substantive conversations, business conversations with

19   Mr. Tucker?

20   A.  No, I did not.

21   Q.  How many people did the company grow to by the time that

22   you left?

23   A.  It was over 300.

24   Q.  That's the maximum number of people in the entire building

25   that took -- when you say they took over all the floors?

H9d1tuc4                          Rogers - Cross

1   A.  I am not aware of the exact number, but 300 is what I would

2   be aware of.

3   Q.  You had mentioned that when you were a team leader, after

4   the loan applications were gathered, you batched them up to

5   send them on to the next step, is that correct?

6   A.  Yes.

7   Q.  Okay.  Do you know whether those loans were actually

8   processed on site or off site by a processor?

9   A.  I'm not sure what the -- the process would have been once

10  it left my department that I was working in.

11  Q.  Okay.  Fair enough.  Did Crystal make a -- I want to say

12  crystal clear point, but did she make it emphatic to you that

13  you and other employees should not be going to Mr. Tucker to

14  discuss complaints, your own complaints or anything else, that

15  everything had to be channeled through Crystal?

16  A.  Yes, she did.

17  Q.  And as you sit here now, is it clear in your mind that

18  Crystal was the one who came up with this discussion about

19  weather reports and location?

20  A.  I don't know who originally made it up or brought it up.

21  Q.  She's the one who had the policy, is that correct?

22  A.  It was the policy that -- whenever she gave the policy,

23  yes, it came from her.

24  Q.  Okay.  And she was the one who advised persons like

25  yourself in the customer service department to never tell

H9d1tuc4                          Rogers - Cross

1    customers that you were located in Kansas, is that right?

2    A.  Yes, that -- that directive did come from her as well.

3    Q.  Okay.  And was there a directive that said to indicate

4    those two areas of the Miamis and the Modocs or the Santees,

5    their location consistent with the information provided in the

6    loan portfolios that was related to their location?

7    A.  I'm not understanding your question.

8    Q.  Okay.  I'll repeat it.  It's my fault.

9            You had different loan portfolios, is that right?

10   A.  Correct.

11   Q.  That were associated with different Native American tribes,

12   is that right?

13   A.  As far as what I know, yes.

14   Q.  Well, it was --

15   A.  That they were associated, yes.

16   Q.  And it was documented on the loans, right?

17   A.  Right.  Right.

18   Q.  Okay.  And so you were told, were you not, to indicate to

19   customers, when you were asked where you were located, either

20   Nebraska, or depending on what portfolio you were dealing with?

21   A.  Yes.

22   Q.  Okay.  And to your knowledge documentation came actually

23   from customers to that location that was listed on the loan

24   documents, to the tribes?

25   A.  I don't know.

H9d1tuc4                        Rogers - Cross

1    Q.  You didn't see mail coming back from the tribes to you?

2    A.  No, I did not.

3    Q.  Okay.  And you had indicated that there were several

4    people, personnel -- I think you said two or three, and I

5    wasn't clear whether it was two or three people at each tribe

6    that was dealing with the loans, the customers.

7    A.  No.  What I knew of was two representatives, one from each

8    tribe.  So one was at each tribe, basically, at that location.

9    Q.  And you spoke to those people.

10   A.  I didn't speak with them normally over the phone.  It was

11   usually through email.  And the communication that I had with

12   them a lot of times was they wanted to leave for the day but

13   they still had calls in their queues to make, and so they would

14   send over an email requesting to leave and then I would send

15   that request over to Crystal, and then I would get a response

16   back if they could leave or if they needed to stay.

17   Q.  Mm-hmm.  Did you ever ask -- were you ever told by Crystal

18   that the reason that the loans could carry such high interest

19   rates was because the company was owned by Indian tribes that

20   were not required to follow state law?

21   A.  No.

22   Q.  You were never told that?

23   A.  No, not that I can recall, no.

24   Q.  Do you recall ever telling the United States Attorney when

25   you were meeting, or during your meetings for preparation for

1    your testimony today that you had told them that?

2    A.  I don't --

3    Q.  That Crystal had told you that?

4    A.  I don't remember saying that.

5    Q.  Is it possible that you did?

6    A.  It could be possible, but I don't remember it.

7              MR. ROTH:  1908 is another one, if we could bring that

8    up.  1908, Government 1908.

9    Q.  That's another email concerning setting up what was called

10   a task reminder about weather reports.  Do you see that?

11   A.  Yes.

12   Q.  And that was to the entire group, is that right, from

13   Angela?

14   A.  Yes, it's from Angela to --

15   Q.  Crystal?

16   A.  -- to Crystal, yes.

17   Q.  Okay.  And once again, Mr. Muir is not on there and

18   Mr. Tucker is not on there, is that correct?

19   A.  That is correct.

20   Q.  Do you recall being told by Crystal that when customers

21   complained about interest rates to provide, you were instructed

22   to say:  We do not reside in your state and your state's

23   lending laws do not apply?

24   A.  I don't recall if I said that or not.

25   Q.  Possible you did?

1   A.  I don't recall if I did or not.

2   Q.  Did you tell that to the government in your preparation?

3   A.  I don't remember if I did or not.

4   Q.  You made a claim that there was a loan product that renewed

5   forever, if you will, is that right?

6   A.  Whenever I first started working there, yes, the loans were

7   just automatically renewed.

8   Q.  Forever.

9   A.  Yeah.  If they still had a loan, then if they didn't pay it

10  off in full, then it just kept continually being renewed.

11  Q.  And do you have any documentation to support that claim?

12  A.  No, I do not have documentation of that.

13  Q.  Did you show any documentation to the government concerning

14  that?

15  A.  No, I did not.

16  Q.  You indicated that there was a legal department, is that

17  right?

18  A.  Yes.

19  Q.  And was there a fellow named Jared Marsh in the legal

20  department?

21  A.  That name doesn't ring a bell.

22  Q.  Who was the head of HR?

23  A.  That would have been -- I can't remember her name.

24  Q.  Okay.  You never had any actual contact with the legal

25  department, is that right?

1   A.  No.

2   Q.  You never had any contact with Mr. Muir, is that right?

3   You never had a conversation about any of the policies, is that

4   right?

5   A.  Correct, I did not.

6   Q.  And you didn't actually write any of the so-called scripts

7   that the customer services reps were supposed to follow, is

8   that right?

9   A.  Scripts for what exactly are you asking for, or asking

10  about?

11  Q.  Well, for instance, you didn't write the weather script, is

12  that right?

13  A.  No.

14  Q.  Okay.  Or location script.

15  A.  No.

16  Q.  That would be Crystal, is that fair to say?

17  A.  I got my direction or the script came from her.

18  Q.  Directly.

19  A.  Directly.

20  Q.  And she's the one who told you to follow that script, is

21  that right?

22  A.  Yes, that would have been who I got all my direction from.

23  Q.  You were talking before about your recall of how many

24  complaints came in and the different categories of complaints

25  from customers that you serviced.  Do you recall that?

1   A.  Can you say the question one more time.

2   Q.  Yeah.  You were testifying about what you -- you gave

3   numbers of percentage of complaints, what they were about, that

4   the customers were calling about --

5            MR. VELAMOOR:  Objection, your Honor.

6   Q.  -- the nature of the complaint.

7            MR. VELAMOOR:  Mischaracterizes the testimony.

8            THE COURT:  All right.  Do you recall giving that

9   testimony?

10            THE WITNESS:  I recall giving testimony that -- of the

11   different types of complaints.

12            THE COURT:  Thank you.

13            Next question.

14   BY MR. ROTH:

15   Q.  Okay.  And how many customers were dissatisfied, if you

16   know?

17   A.  I wouldn't be able to say like a percentage or anything

18   like that.

19   Q.  Could you accept that of all the applicants, less than

20   1 percent were complaints?

21   A.  I wouldn't be able to say.

22   Q.  And that is complaints about either the loan terms and

23   conditions; that's what I'm talking about, in part.

24   A.  I wouldn't be able to give you an amount or a -- a number

25   as to how many there were.

1    Q.  And that's virtually because you were not privy, you didn't

2    have the knowledge of any records tallying up the amount of

3    customers who were satisfied versus unsatisfied, is that right?

4    A.  There was reports of different kinds of complaints, but I

5    don't remember the numbers of those.

6    Q.  You're just not in a position to say, is that right?

7    A.  I don't know the numbers.

8            MR. ROTH:  I'd like to turn to 2202, the Sanchez loan

9    note.  If we could bring that up.

10           And the second page.

11           Is this 2202, the loan note?  And is there a third

12   page there?  Yes.  Okay.  And if you could highlight the line

13   right under the TILA box, the promise to pay, under the TILA,

14   all the way down after the TILA box ends, all the way down.

15   Thank you.  Blow that up.

16   BY MR. ROTH:

17   Q.  Do you see the section called Promise to Pay?

18   A.  Yes.

19   Q.  In there it indicates that there's a promise --

20           MR. ROTH:  I'm sorry.  Could you go up under the

21   bigger box first, Eli, right under the numbers for the TILA

22   box, the APR.  Right up at the top, under the APR.  Right

23   there.  Thank you.

24   Q.  Can you read to me that first full sentence.

25   A.  "Your payment schedule will be one payment of $390 due on

1   2010/7/21, if you decline the option of renewing your loan."

2   Q.  And there's an asterisk by "decline," is that right?

3   A.  Correct.

4   Q.  The client, the customer there is told that the payment is

5   $390 due on the first due date if they decline the option, is

6   that what that says?

7   A.  That is what that says, yes.

8         MR. ROTH:  Okay.  And could we have 2201.

9   Q.  This is the -- you call this the confirmatory email?

10  A.  The congratulations email.

11  Q.  Congratulations, or it's confirming in the terms of the

12  loan, that the loan has been approved, is that correct?

13  A.  Yes, it's telling the customer, "Congratulations, you've

14  been approved for your loan."

15  Q.  Okay.  And do you see the language in there about renewal

16  on the bottom there?

17  A.  Yes.

18        MR. ROTH:  And Eli, if you could highlight for me how

19  many times "renewal" -- or "renew" or "renewal."

20  Q.  Well, as you read through it yourself while he's doing

21  that, how many times does that appear in the entire document

22  there?

23        THE COURT:  The document is in evidence.  The jury can

24  see.  It's just a counting exercise.  Move on.

25  Q.  Okay.  Is it clear there that that talks about what happens

1    only if there's a renewal?

2              MR. VELAMOOR:  Objection, your Honor.  I don't --

3    form.

4              THE COURT:  Rephrase, please.

5    Q.  Under Renewal, under the Renewal section there, it's

6    highlighted.

7    A.  Yes, sir.

8    Q.  You have the option to have it not renewed if you pay in

9    full, is that correct?  That's what the customer is told.

10             MR. VELAMOOR:  Objection.  That's not what it's --

11             THE COURT:  Yes.  That's not what it says.

12   Q.  Well, read me the first two sentences there.

13   A.  The first two sentences?

14   Q.  Under Renewal.

15   A.  "Your loan is always due on your due dates.  By receiving

16   your loan through 500 FastCash, you agree that your loan will

17   be renewed unless you request a paydown and an additional

18   amount against your principal or pay out the balance in full."

19   Q.  Okay.  So that means you could -- that's the paid in full

20   option, right?

21   A.  If you're paying the balance in full, is that what you're

22   asking?

23   Q.  Yes.

24   A.  Yes, if you pay your loan in full is the payoff option.

25   Q.  Okay.

H9d1tuc4                          Rogers - Cross

1              THE COURT:  Do you have to request that in advance?

2              THE WITNESS:  You have to request that in advance of

3     any due date if you're wanting to pay it off, yes.

4              THE COURT:  So you cannot pay down the outstanding

5     balance on the due date unless you've in advance indicated that

6     you're planning on doing this.

7              THE WITNESS:  Correct.

8              THE COURT:  And so if you said, "Here's the amount of

9     the outstanding balance" on the due date but did not give any

10    advance notice, you could not pay down that amount, is that

11    correct?

12             THE WITNESS:  Yes, you would not be able to pay down.

13    You would have to do that in advance.

14             THE COURT:  And if you tried to pay it down on the due

15    date and you hadn't given notice in advance, the loan would be

16    renewed.

17             THE WITNESS:  Correct.

18             THE COURT:  Okay.  Thank you.

19    BY MR. ROTH:

20    Q.  And you had three -- you were told that you had three-day

21    notice in advance of the due date to notify them, the company,

22    that you didn't want the loan renewed, is that right?

23    A.  Yes.  They would have to notify at least three days, three

24    business days before their due date.

25    Q.  And it was clearly stated, right?

 1    A.  It is stated on that document, yes.

 2              MR. ROTH:  Okay.  Could we have 1917 brought up,

 3    please.

 4              The next page.  The bottom of that page.  Could you

 5    blow up the bottom of that page.

 6    Q.  This is the online summary, is that right?

 7    A.  Yes, it is.

 8    Q.  Okay.  And it says clearly here that you have to initial

 9    here to pay down on the principal balance in the amount of $50

10    plus the renewal charge or initial here if you want to pay your

11    loan in full, the total principal plus the renewal charge, is

12    that right?

13    A.  That is what it says.

14    Q.  And then there's an electronic signature box, is that

15    correct?

16    A.  Either electronic signature or you could actually print

17    that out and manually sign it.

18    Q.  But you have to affirmatively initial something, is that

19    right?

20    A.  Yes.

21    Q.  And if you're doing it electronically, you can't proceed

22    and process that document unless you're initialing there, is

23    that correct?

24    A.  I'm not sure if it -- if it worked that way where you had

25    to initial it whenever you did the electronic signature.  I

 1    don't know that process of the document, like if that's the way

 2    it was created.

 3              MR. ROTH:  One second, your Honor.

 4              Judge, I'll let Mr. Bath pick up from here.

 5              THE COURT:  All right.  Mr. Bath.

 6              MR. BATH:  Eli, could you put up 1918 for me, please.

 7    CROSS EXAMINATION

 8    BY MR. BATH:

 9    Q.  I'm going to direct your attention to 1918.  It's on the

10    screen.  It's been admitted.  You may have it in written form

11    too, Ms. Rogers.  Do you recognize that?

12    A.  Yes, sir.

13    Q.  I think you said earlier, this came maybe from the training

14    manual?

15    A.  I believe so, yes.

16    Q.  And whether it came from the training manual or not, this

17    is a document that would have been followed at least some of

18    the time when you were in the company, correct?

19    A.  Yes.

20    Q.  It's an application process, correct?

21    A.  Yes, it is.

22              MR. BATH:  If we could go to page 5, please.  That

23    gray box down at the bottom, could we please enlarge that, Eli.

24    Thank you.

25    Q.  That says, "By clicking on 'I agree' below, I understand

H9d1tuc4                          Rogers - Cross

1   and agree that I will receive this loan from Red Cedar

2   Services, Inc., doing business as 500 FastCash, a tribal

3   lending entity, direct to my bank account and agree to be bound

4   by the terms and provisions of all the loan documents above."

5   Did I read that correctly?

6   A.  Yes, you did.

7   Q.  Now on this document we have a circle, we have some little

8   check boxes, correct?

9   A.  Yes.  Up at the top?

10  Q.  Yeah.  The one that Jim, Mr. Roth just showed you a minute

11  ago had some initials down at the bottom.  Do you remember that

12  one?

13  A.  The last one, the account summary, yes.

14  Q.  Yes, ma'am.  Is this different versions of the last page,

15  the one he -- you showed with him and this one here, if you

16  know?

17  A.  These are not the same pages.

18  Q.  Different process?

19  A.  Well, this is part of the application, and the account

20  summary is something that the customer would have used after

21  they got their loan.

22  Q.  So the one Mr. Roth showed you was an account summary

23  document.

24  A.  Yes.

25  Q.  That's one where somebody goes in and says, hey, I want to

1    pay down my loan.

2    A.  Yes, pay down or pay off.

3    Q.  Right.  This is the application process.

4    A.  Correct.

5    Q.  Okay.  If you know, what is Red Cedar Services?

6    A.  I am unaware.

7    Q.  Okay.  And on these documents, this is 500 FastCash,

8    correct?

9    A.  Correct.

10   Q.  If it was One Click Cash, that would have different

11   verbiage; it would identify as One Click Cash, would it not?

12   A.  Yes, it would.

13   Q.  And One Click Cash would have been not Red Cedar Services,

14   it would have been a different company.

15   A.  I -- yes, since they -- that was a different location that

16   I was aware of than --

17   Q.  Who would have One Click Cash been?

18   A.  I'm not sure of the actual tribe's name.

19   Q.  Okay.  How about Ameriloan?

20   A.  Ameriloan, I don't know their name so I can't -- it would

21   have been under the same one as 500 FastCash.

22   Q.  So some portfolios were with one tribe and some tribes had

23   different portfolios.

24   A.  Correct.

25   Q.  Is it fair to say on this document, this 1918, you'd never

1   see in here the name CLK on any of these documents, did you?

2   A.  No.

3   Q.  Or AMG, correct?

4   A.  No.

5          MR. BATH:  Okay.  Thank you, Eli.

6   Q.  I take it then you don't have any -- you're not here to

7   tell us about when Red Cedar Services got created.

8   A.  No.  I have no clue.

9   Q.  Right.  Same with the different tribal entities, you don't

10  know anything about that.

11  A.  No.  I don't know when they were created or anything.

12  Q.  Fair enough.  You talked about the training manual earlier,

13  do you remember that?

14  A.  Yes.

15  Q.  Okay.  And we saw a few pages of that when the government

16  introduced some of that to you, correct?

17  A.  Correct.

18  Q.  Now the training manual was a big binder, was it not?

19  A.  Yes, it was.

20  Q.  And how many pages or how big?  Can you give us, the jury

21  an idea?

22  A.  I'm not even sure exactly how many pages.  It was at least

23  a good inch, probably about an inch, inch and a half thick.

24  Maybe about a ream of paper, which is what, 300 pages, maybe?

25  Q.  So it was well over a hundred pages, the manual, correct?

1    A.  Yes, it was.

2    Q.  And everybody who came and got trained would get one of

3    those training manuals?

4    A.  Yes, they would have one in training class.

5    Q.  Now do you just get a training manual and they're like, oh,

6    here, you know, start right away, or is there some kind of

7    process?

8    A.  No.  You had a class that lasted a couple weeks, and every

9    day you'd go through a certain section of the training manual.

10   Q.  Okay.  So there would be multiple days of training to work

11   you through that manual, is that correct?

12   A.  Correct.

13   Q.  If customers wanted to know where to mail a payment, let's

14   say they're old-fashioned and wrote checks, where would they be

15   told to mail the payment?

16   A.  I don't recall.  I do know that there was customers that

17   did request that, but I cannot remember.

18   Q.  Do you know if it went to the reservations or the federally

19   recognized tribes or it went to Overland Park, if you know?

20   A.  I'm trying to remember.  I'm sorry.

21   Q.  That's okay.

22   A.  No.  Those payments would go to the tribe address in

23   Niobrara or Miami, Oklahoma.

24   Q.  We talked about Crystal.  She went by Cram or Grote or --

25   A.  Stubbs.

H9d1tuc4                          Rogers - Cross

1    Q.  Stubbs.  I'm sorry.

2    A.  Yes.

3    Q.  Okay.  And was she in charge of a certain group?  Was there

4    a Crystal group?

5    A.  Yes.

6    Q.  Okay.  And tell us, explain to the jury, what does that

7    mean, Crystal's group?

8    A.  She had certain loan portfolios, so she had United Cash

9    Loans, One Click Cash, US FastCash, and 500 FastCash.

10   Q.  So for instance, she did not have Ameriloan --

11   A.  Correct.

12   Q.  -- because that was somebody else's group.

13   A.  Right.

14   Q.  All right.  Now on the documents that we saw about what I'm

15   going to call weather reports, do you know what I'm talking

16   about?

17   A.  Yes.

18   Q.  All right.  Is it fair to say those were all Crystal's

19   group?

20   A.  I'm un -- I'm unaware if it was just hers or not.

21   Q.  Well, and that's the point is that -- and I can pull them

22   up if you needed to, but do you recall that those weather

23   reports all fell within Crystal's groups?

24   A.  Yes, they did.

25   Q.  You haven't seen any documents that showed weather report

1    emails in the other portfolios, did you?

2    A.  Correct.

3    Q.  Does that lead to your belief that in fact Crystal was in

4    charge of that?

5    A.  I don't know.

6    Q.  But you hadn't seen emails with the other groups involving

7    weather.

8    A.  No, I have not.

9    Q.  Just a couple more questions I have for you.

10            I think you've told us that you were never in any

11   meetings with Tim Muir.

12   A.  Correct.

13   Q.  And that legal was separate from what you did, correct?

14   A.  Yes.

15   Q.  Okay.  And there was an email you were shown by the

16   government, 1907, and I can pull it up if you need to see it,

17   but it talked about Crystal said that legal was working on

18   something.  Do you remember that email?

19   A.  I might need you to pull it up just so I can --

20   Q.  Yes, absolutely.

21            MR. BATH:  1907, please.

22   Q.  You've probably seen a lot of documents, right?

23   A.  Yes.

24   Q.  Do you recognize this as the 2011 -- up at the top, it

25   says, "We cannot make changes to the loan contract.  Legal has

H9d1tuc4                          Rogers - Cross

1    been in review of the contracts for about one year, and the new

2    version should be coming soon."  Do you see that?

3    A.  Yes.

4    Q.  Okay.  All right.  Do you know whether that's accurate

5    information or not?

6    A.  I'm kind of unclear as to what you're asking.

7    Q.  Let me put it another way.  Did you get any more

8    communication, for instance, from legal about a new contract?

9    A.  No, I did not receive any communications from legal.

10   Q.  Did you talk to legal about that?

11   A.  No, mm-mm.  Not myself.

12   Q.  I'm sorry.  Have you seen any other emails regarding this

13   that corroborates what Crystal says here?

14   A.  No, I don't recall any other further emails.

15   Q.  You said you'd left in 2008, and part of the reason was

16   dealing with management.

17   A.  That was part of it, yes.

18   Q.  Right.  Was that Crystal?

19   A.  Yes, it was.

20   Q.  Okay.  Finally, did you ever meet with attorney Cliff

21   Cohen?

22   A.  That name does not ring a bell --

23   Q.  How about --

24   A.  -- at all.

25   Q.  -- attorney Lance Morgan?

1   A.   No.

2   Q.   Or attorney Conly Schulte?

3   A.   No.

4            MR. BATH:  Thank you so much.

5            THE COURT:  All right.  Redirect?

6            MR. VELAMOOR:  Yes, your Honor.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   REDIRECT EXAMINATION

2   BY MR. VELAMOOR:

3   Q.  Ms. Rogers, just a few questions.

4   A.  Yes, sir.

5   Q.  You were asked by Mr. Roth about the name change from CLK

6   to AMG.  Do you recall that?

7   A.  Yes.

8   Q.  From your perspective as an employee, did anything at the

9   company change in terms of operations when that name change

10  took place?

11  A.  No, all the processes were still the same.

12  Q.  Now, in terms of the loan process, the last stage at

13  Overland Park was sending it over to which department?

14  A.  An electronic file was named through the database and that

15  file was sent over to the operations group.

16  Q.  What did the operations group do?

17  A.  As far as I know, they were the ones that send it to the

18  bank to send money to the customer's account.

19  Q.  So to complete the process of offering and providing

20  someone a loan, right?

21  A.  Correct.

22          MR. VELAMOOR:  Can we put up on the screen 2202.

23          THE COURT:  While we do that, ladies and gentlemen,

24  let's stand up and stretch.

25          If necessary, I am going to appoint a calisthenics

1    coach for the jury.

2              MR. VELAMOOR:  Can we go to the third page of 2202.

3              Can we highlight the portion that Mr. Roth, I believe,

4    highlighted during his cross-examination.

5    Q.   The first line:  "Your payment schedule will be one payment

6    of 390 due on 2010/7/21 if you decline the option of renewing

7    your loan."

8              Do you see that?  Do you recall Mr. Roth asked you

9    about that?

10   A.   Yes.

11   Q.   Does it say anywhere that your loan will be renewed unless

12   you do something?

13   A.   It does not say that your loan will be renewed, no.

14   Q.   Does it say in that sentence that your loan will be

15   automatically renewed?

16   A.   Not, not automatically renewed.

17             MR. VELAMOOR:  Can we move on to 2201.

18             Let's go to the next page.

19   Q.   There is a discussion that picks up at the top on the pay

20   down process.  Do you see that?

21             I'm sorry, the top paragraph, the top unfinished

22   paragraph.

23             You see in the second line there, there is a

24   straightforward reference to an automatic pay down?

25   A.   Yes.

1          MR. VELAMOOR:  Can you turn to the previous page.

2     Q.  Now, you were asked, I think, to do a counting exercise for

3     the number of times you saw the word renewal.

4          Do you see anywhere the word automatic anywhere near

5     the word renewal?

6     A.  No, the word automatic is not in there.

7     Q.  Now, you were also asked about unhappy customers.  Do you

8     recall that?

9     A.  Yes.

10    Q.  You also testified that you left the company one time

11    initially, right?

12    A.  Yes.

13    Q.  And part of that was because of management issues, correct?

14    A.  Correct.

15    Q.  Was there another reason why you left?

16    A.  Yes.  Because I thought the company was lying to the

17    customers.

18          MR. ROTH:  I will object.  It's beyond the scope.

19          THE COURT:  I will allow it.

20    A.  And, also, a policy was put into play where customers that

21    had disability and Social Security benefits, that they could

22    get a higher loan amount, and I know that those customers that

23    are on a fixed income would probably not be able to pay that

24    back.

25    Q.  Now, you were also asked some questions about who was not

1  on certain e-mails.  Do you recall those questions?

2  A.  Yes.

3  Q.  Some of those questions related to the weather and things

4  like that.  Do you recall that?

5  A.  Yes.

6  Q.  Now, in terms of the issue of location and what you were

7  supposed to say, if a customer service representative had said

8  to a customer that the company's address was in Miami or

9  Niobrara, but I'm here in Kansas, what would have happened to

10  that customer rep?

11  A.  That customer rep would get a disciplinary action up to

12  being terminated.

13  Q.  You were also asked about where you got your direction and

14  where that direction was coming from.  Do you recall that?

15  A.  Yes.

16  Q.  Specifically, questions about Ms. Grote, right?

17  A.  Yes.

18  Q.  It is the case, I think you testified, that you got your

19  directives from her, right?

20  A.  Yes.

21  Q.  To your understanding, was Crystal, for the most part,

22  making policies herself or transmitting to you and the other

23  managers policies set by others?

24  A.  I was not under the assumption that she was making them

25  herself.

1   Q.  Why was that?

2   A.  There would be plenty of times that she would say, well, I

3   am going to have to run that by Scott or by legal, or I have

4   got to talk to compliance about that, depending on what the

5   situation was and who she needed to talk to.

6           MR. VELAMOOR:  Your Honor, may we display just for the

7   witness Government Exhibit 1914.

8   Q.  Now, are you on this e-mail, Ms. Rogers?

9   A.  No, I'm not.

10  Q.  Have you ever seen it before?

11  A.  No, I have not.

12  Q.  Who is it an e-mail between?

13  A.  It is from Tim Buckley to Blaine Tucker and Scott Tucker.

14          MR. VELAMOOR:  The government offers 1914 pursuant to

15  the stipulation.

16          THE COURT:  Any objection?

17          MR. ROTH:  We object, your Honor, in terms of

18  relevance to this witness, her knowledge.

19          THE COURT:  It's not a question of whether it's

20  relevant to the witness.

21          MR. BATH:  I object on hearsay and right to

22  confrontation.

23          THE COURT:  Let me see you at sidebar.

24          (Continued on next page)

25

1              (At the sidebar)

2              THE COURT:  Who is Tim Buckley?

3              MR. VELAMOOR:  Tim Buckley was a director of

4    operations at the company.  The witness testified to that

5    earlier.  Scott and Blaine Tucker's roles have been well

6    established.

7              THE COURT:  Is he a co-conspirator?

8              MR. VELAMOOR:  Tim Buckley?

9              THE COURT:  Yes.

10             MR. VELAMOOR:  I think this is offered for several

11   different reasons.  Obviously, it is offered for the knowledge

12   given to the defendant, Scott Tucker.  This is information

13   provided to Scott Tucker.  So it's relevant to his state of

14   mind, information being provided to him.  So I don't think we

15   need to reach whether or not Mr. Buckley is a co-conspirator.

16             THE COURT:  Let me ask you the next question.

17             What kind of stipulation is there?  Is it a

18   stipulation about authenticity or what?

19             MR. VELAMOOR:  With respect to the AMG documents, we

20   have a stipulation with respect to authenticity.  Its

21   admissibility and its relevance is established by its content,

22   which clearly is describing issues customers are having with

23   the pay down process to the defendant.  It's relevant to his

24   state of mind.

25             THE COURT:  Let me hear from defense counsel.

1          MR. GINSBERG:  It wasn't my witness, but as you heard,

2     we only stipulated as to authenticity.  We don't have the

3     parties to this e-mail.  We don't have a right to confront the

4     principal party to the e-mail.  To say that this is admissible

5     because it somehow imparted knowledge to Mr. Tucker, when we

6     don't know that for sure, because we don't have Mr. Buckley, we

7     don't know if Mr. Tucker received it or read it or responded to

8     it, I think it probably can come in with some other witness,

9     but not with some witness who has no further -- who actually

10    has no knowledge of this, only because there is authenticity

11    stipulation.

12         MR. VELAMOOR:  This is going to come up several times

13    in our case, where there are several e-mails involving

14    primarily just the defendants, and their statements are

15    obviously not hearsay, their statements are obviously

16    admissible.  But there is no rule that says we need to have a

17    witness on the stand who is a participant in an e-mail in order

18    for the e-mail to come into evidence.  There is no

19    confrontation clause question with respect to a statement

20    either to the defendant or by the defendant.

21         THE COURT:  Any of the prior e-mails that you

22    introduced, was Mr. Tucker on the e-mails?

23         MR. VELAMOOR:  The previous e-mails that I introduced

24    to Ms. Rogers?

25         THE COURT:  Yes.

1          MR. VELAMOOR:  Yes.  He was copied on, I can think of

2     at least two exchanges.

3          THE COURT:  So would she have knowledge of the e-mail

4     address customarily used by Mr. Tucker?

5          MR. VELAMOOR:  First of all, my understanding is that

6     Mr. Tucker -- I have seen several different e-mail addresses

7     for Mr. Tucker.  I have seen Scott, I have seen 500, I have

8     seen Scott Tucker.  I think the point from our perspective is

9     these have been stipulated as authentic documents.

10          My point is his e-mail address does not appear on this

11     document.

12          MR. GINSBERG:  Just to be clear, it's not a statement

13     of his.  At most, he is copied on it.  In some way or another,

14     they are sort of arguing it is an adopted statement or

15     admission of his because he's copied on it.

16          THE COURT:  It's not a statement of Mr. Tucker's.

17     It's not admitted as any kind of an admission by Tucker.  It's

18     not admitted so far as a statement by a co-conspirator in

19     furtherance of the conspiracy.  It would only be admissible for

20     the limited purpose of what Mr. Tucker knew.

21          MR. GINSBERG:  That's a problem, because to say that

22     Mr. Tucker knew -- I know it's hypothetical, but this witness

23     can't even say that Mr. Tucker knew because she knows that Mr.

24     Tucker received it and read it and knew it.

25          THE COURT:  I think we are getting caught up on the

1    witness.  Let's assume this witness finishes, and then the

2    government stands up and says, I offer the document.  It has

3    nothing to do with the witness.

4              MR. GINSBERG:  I think there has to be some

5    intermediary individual who can somehow confirm Mr. Tucker

6    received the knowledge and knew the knowledge.  Otherwise we

7    don't know that.

8              (In open court)

9              THE COURT:  Ladies and gentlemen, we will be in recess

10   for ten minutes.  You may return to the jury room.  Do not

11   discuss the case among yourselves or with anybody else.

12             (Jury exits courtroom)

13             (At the sidebar)

14             MR. GINSBERG:  I can take a gross example and then try

15   to narrow it down.  I know this isn't Pacer, but for better or

16   worse, any case that I am involved in on Pacer, if there is a

17   file on it, I get an e-mail bounce.  I don't want to be held

18   ineffective on some other case, but I don't look at every

19   single e-mail bounce that comes to my e-mail address on every

20   single thing that's addressed to me, and therefore I wouldn't

21   necessarily know what was in it, and I would have no knowledge

22   imputed to me.

23             Now, if your Honor says, well, that's too vague,

24   that's your fault, you could have read it, that's a different

25   story.  But I think that's the nature of e-mails, especially

1    when there are multiple people on the e-mails.

2              THE COURT:  And it's the nature of any communication.

3    You can mail a letter certified mail; it doesn't prove the

4    person read it.  You could mail it snail mail; it doesn't mean

5    they read it.  You can slip it under their door; it doesn't

6    prove they read it.  But it is some evidence that they were on

7    notice of it.  It doesn't prove it conclusively, period.

8              MR. GINSBERG:  How does it even prove that they were

9    on notice -- let's take your example.  If they didn't receive

10   it, they couldn't be on notice about it.  And it's particularly

11   important in this case because what we are talking about is

12   notice which then leads to state of mind.  And if you didn't

13   read it and didn't have notice, it couldn't have affected your

14   state of mind, which is really where they want to go with this.

15             THE COURT:  Let me hear the words of the stipulation

16   on authenticity.

17             MR. RAVI:  I will get it.

18             MR. SCOTTEN:  Judge, there is a second reason it's

19   admissible.  We think we have already laid the foundation, at

20   the very least, that Tim Buckley is an employee of Scott Tucker

21   and that he was acting within the scope of his duties.  And

22   under 801(d)(2)(D), statements of an employee acting in the

23   scope of their duties are admissible.  It's the same as a

24   co-conspirator statement.  The difference is we are not going

25   to try to prove Buckley's mens rea here to make him a

1    co-conspirator.  We don't need to.  He is unquestionably an

2    employee.  So a statement in the scope of his duties -- he is

3    talking to Scott Tucker -- is admissible for the truth of the

4    matter asserted, as well as the grounds your Honor identified

5    separately.  So it's not hearsay and it's not a confrontation

6    clause problem.

7            MR. VELAMOOR:  I placed this on the screen.  I don't

8    have a hard copy.

9            THE COURT:  I will read it aloud.

10           "If called as a witness at trial, a representative of

11   each of the following producing institutions would testify that

12   the documents --

13           By the way, you're excused.  You can step down.

14   You're in recess.

15           (Witness exits courtroom)

16           THE COURT:  -- would testify that the documents within

17   the following Bates ranges consist of true and accurate copies

18   of records of the institutions."

19           And the producing entity here was AMG?

20           MR. VELAMOOR:  Correct.

21           MR. GINSBERG:  Getting back to the last point, it

22   sounds like they are arguing agency, that he is an employee

23   agent, Mr. Buckley, of Mr. Tucker's AMG, but it still is not

24   sufficient to use it for the purpose they are trying to use it

25   for.  They are not just trying to use it for the fact that it

was said.  They are trying to use it for the state of mind,

which goes beyond the fact that it was said.  It's almost like

the division rule between admitting something for the fact that

it was said versus the fact that the defendant did it or knew

it or was the one who said it.  Just because he is an agent,

it's not an admission against him, it's not an admission of a

party opponent.  You don't go from agency to someone else's

state of mind.  That's the problem I have.  I think there is a

little piece missing.  I hope I am articulating it correctly.

THE COURT:  It's not conclusive on anything, and I'm

not admitting it at this point for the truth of its content.

But if you lay a foundation again as to who Mr. Buckley was at

the time, what his responsibilities were at the time of the

e-mail, that together with the stipulation, I will allow it in,

and I will tell the jury that it's not for the truth of its

content, but that it may bear upon the information that Mr.

Tucker had at the time.  Of course, the fact that an e-mail was

sent does not conclusively establish that the e-mail was read.

We are in recess.

(Recess)

(Continued on next page)

1          THE COURT:  Bring our jury in.

2          (Jury present)

3   KELLY ANN ROGERS, resumed.

4          THE COURT:  You may continue.

5          MR. VELAMOOR:  Thank you, your Honor.

6   BY MR. VELAMOOR:

7   Q.  Ms. Rogers, do you know somebody by the name of Tim

8   Buckley?

9   A.  Yes.

10  Q.  Who is Tim Buckley?

11  A.  He would have been the director of operations for

12  Ameriloan.

13  Q.  Did you ever report to Tim Buckley?

14  A.  Yes, when I first started to work there.

15  Q.  How long was Mr. Buckley the director of operations for

16  Ameriloan?

17  A.  I don't know how long he had been.

18  Q.  Was he director of operations when you joined the company

19  initially?

20  A.  Yes.  Whenever I started in 2001, he was the director of

21  operations that I was under.

22  Q.  Did he remain in that position throughout your time at the

23  company?

24  A.  As far as I knew, yes.

25          MR. VELAMOOR:  Your Honor, the government offers 1914.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  Subject to the discussion at the sidebar,

2      it's received.

3          (Government's Exhibit 1914 received in evidence)

4          THE COURT:  Ladies and gentlemen, this is a document,

5      you recall the stipulation that if a witness was called the

6      witness would testify that certain documents were true and

7      correct copies of documents from the files of the institution

8      referenced.  And in this case, the institution is AMG, and this

9      was produced from its files.

10          I am admitting it not for the truth of its content,

11      but for the fact that it may bear on information that was

12      provided to defendant Tucker.  As we know from our life

13      experience, the fact that an e-mail was sent doesn't

14      necessarily mean it was received.  The fact that it was

15      received doesn't necessarily mean that it was read, which is

16      true for many types of written communications.  Nevertheless,

17      Government Exhibit 1914 is received into evidence.

18          MR. VELAMOOR:  Thank you, your Honor.

19          May I show it to the jury?

20          THE COURT:  You may.

21          MR. VELAMOOR:  Why don't we just start by expanding

22      the top.

23      Q.  Who is this e-mail from?

24      A.  It's from Tim Buckley.

25      Q.  To who?

H9D8TUC5                         Rogers - Redirect

1   A.  To Blaine Tucker and Scott Tucker.

2   Q.  What is the subject?

3   A.  It says "idea."

4   Q.  Why don't we one paragraph at a time expand it and read

5   through it slowly for the jury.

6   A.  It says, "90 of the issues we have with customers stem from

7   them not understanding our process of renewals and pay downs.

8   We are constantly battling with them because they don't get it.

9   My proposal is this:  Pay down the customer $25 every pay

10  period from the first due date.  Here is how it boils down."

11  Q.  Move to the next paragraph, please.

12  A.  "Current method:  $250 loan:  $75" -- I am guessing that's

13  just the service fee.

14  Q.  Just read it, please.

15  A.  "$75 - $75 - $75 - $125 - $110 - $95 - $80- $65 equals

16  $775."

17  Q.  The next line, just read it.

18  A.  "Proposed method:  $250 loan:  $100 - $92.50 - $85 - $77.50

19  - $70 - $62.50 - $55 - $47.50 - $40 - $32.50 equals $662.50."

20  Q.  Go to the next paragraph.

21  A.  "I know this does not appear as profitable as the current

22  method, but the fact that the average loan only goes four pay

23  periods would make up a large part of the difference since we

24  would collect more in those periods."

25              "We are actively trying to reduce the customer's

```
 1   principal on every transaction which makes us look better than
 2   the current method, and I think reduce the issues we are
 3   currently having within the companies."
 4          "Just throwing it out there for you to chew on."
 5   Q.  What is the date on this e-mail?
 6   A.  It is November 14, 2006.
 7          THE COURT:  You were not copied on this e-mail?
 8          THE WITNESS:  No, I was not.
 9          THE COURT:  Thank you.
10   Q.  Now, the current method that is listed on the e-mail, is
11   that consistent with your understanding of how the renewal
12   process worked on a $250 loan?
13   A.  Yes.
14   Q.  To your knowledge, was the proposed method ever adopted by
15   the company?
16   A.  No.
17          MR. GINSBERG:  Objection, your Honor.  She was only
18   there for certain periods of time.
19          THE COURT:  Focus your question.
20   Q.  At any time while you were at the company, were you aware
21   of the proposed method ever being adopted?
22   A.  No.
23   Q.  You were also asked questions about the issue of what
24   customer service representatives were saying about their
25   location.  Do you recall that?
```

1   A.  Yes.

2   Q.  You were also asked about meetings and discussions that you

3   were not a part of.  Do you recall that?

4   A.  Yes.

5              MR. VELAMOOR:  Your Honor, for similar reasons, the

6   government offers 1707.

7              THE COURT:  Any objection?

8              Let me see it up on the screen.

9              How does this relate to the cross-examination?

10             MR. VELAMOOR:  Your Honor, the cross-examination

11  focused on the extent to which instructions were coming solely

12  from Ms. Grote, without the either direction or knowledge of

13  anyone above Ms. Grote.  It also discussed the extent to which

14  Ms. Grote was forming policies or simply implementing other's

15  policies.  This e-mail, among others, certainly pertains to

16  that, to the extent to which things were coming with either the

17  knowledge or the direction from those above.

18             THE COURT:  Any objection from defendants?

19             MR. GINSBERG:  Yes.  Based on your question,

20  notwithstanding the response, and yes, based on our -- if your

21  Honor is inclined to admit it, I think it's in the same

22  category as the previous exhibit.  And I believe, just to

23  shorten this, I believe there may be another.

24             THE COURT:  Is there another one?

25             MR. GINSBERG:  Another one?

1              THE COURT:  Yes.

2              MR. VELAMOOR:  Correct.  Although the other one

3     includes some statements by one of the defendants.

4              MR. GINSBERG:  The first objection we would have

5     outside the scope, and secondly, the other objection we raised

6     before.

7              Mr. Bath, I think, may have a separate objection

8     because I am not sure that his -- on this one it does, but I

9     think there were some where his client's name does not appear.

10    So that's a separate issue.

11             THE COURT:  Overruled.  It's received into evidence.

12             (Government's Exhibit 1707 received in evidence)

13             MR. VELAMOOR:  May I show it to the jury?

14             THE COURT:  Yes.

15    BY MR. VELAMOOR:

16    Q.  Ms. Rogers, do you know who Glenn Fisher is?

17    A.  I know of him.

18    Q.  What do you know of him?

19    A.  That he was an employee at AMG.  I am just not sure of what

20    his title was.

21             MR. VELAMOOR:  We enlarge initially Glenn Fisher's

22    e-mail, please.

23             Why don't you just start with the top part.

24    A.  You want me to read it?

25    Q.  No.  The enlarging part.

1          So this is an e-mail from Mr. Fisher to several

2     people, right?

3     A.   Yes.

4     Q.   Who is this e-mail addressed to?

5     A.   It's addressed to Blaine Tucker, Tim Muir, Tim Buckley,

6     Crystal Cram, Natalie Dempsey, Ed Cross, and Chris Becker.

7     Q.   What is the subject?

8     A.   Compliance review.

9     Q.   Again, you were not copied on this e-mail, correct?

10    A.   No, I was not.

11    Q.   Have you ever seen this e-mail before?

12    A.   No.

13    Q.   Let's start with the body of that e-mail.

14          THE COURT:  It's now in evidence.  We are not engaged

15    in a reading exercise.  If you want to highlight portions, the

16    jury can read it.

17          MR. VELAMOOR:  Can we highlight number 1.

18          Can we highlight number 3.

19    Q.   Now, Ms. Rogers, at the company, what was understood to be

20    the city and state of each loan portfolio?

21          THE COURT:  If there was an understanding.

22    A.   It would have been Niobrara, Nebraska, or Miami, Oklahoma.

23          MR. VELAMOOR:  Can we highlight number 4, please.

24          Can we turn to the next page at the bottom, number 14.

25          Onto the next page, please, to number 15.

1          Turn to the next page, please, and highlight number

2     19.

3     BY MR. VELAMOOR:

4     Q.  Ms. Rogers, at any time when you were at the company, did

5     you know anyone by the name of Tim Meir, M-E-I-R?

6     A.  Yes, I knew of him.

7     Q.  Spelled M-E-I-R?

8     A.  Sorry.  No.  Sorry.

9          MR. VELAMOOR:  Can we turn to Government Exhibit 1915,

10    please.

11         Sorry.  Can we go back quickly to 1707, the very top

12    of the first page, please.

13    Q.  Who does Blaine Tucker forward this e-mail to?

14    A.  Scott Tucker.

15    Q.  Thank you.

16         MR. VELAMOOR:  Your Honor, can we put 1915 up.

17         Your Honor, again, for similar bases, the government

18    offers 1915.

19         THE COURT:  Any objection?

20         MR. GINSBERG:  We just make the same objections as

21    before, your Honor.

22         THE COURT:  Overruled.

23         (Government's Exhibit 1915 received in evidence)

24         THE COURT:  These are subject to the same instructions

25    that I gave you before.  They are not for the truth of the

1    content, but the fact that they were said and the fact that it

2    may bear on what information was made known to one or the other

3    defendant.

4              Go ahead.

5              MR. VELAMOOR:  Your Honor, the middle e-mail actually

6    is a statement by the defendant.

7              MR. BATH:  I object to them showing the middle of the

8    e-mail if it's going to be attributed to Mr. Muir.

9              MR. VELAMOOR:  I am not publishing it.  I am just

10   showing it to the judge.

11             THE COURT:  So a statement by a party can be and is

12   admissible against the party.  And to the extent there is a

13   statement by Mr. Muir, you can consider that statement against

14   Mr. Muir.

15             Go ahead.

16             MR. VELAMOOR:  Could we start at the bottom e-mail on

17   the first page.  And just enlarge the signature part.

18   Q.  This is an e-mail from Christian Corley to Tim Muir,

19   copying Glenn Fisher, correct?

20   A.  Correct.

21   Q.  October 11, 2007?

22   A.  Yes.

23             MR. VELAMOOR:  Turn over to the next page.  And just

24   highlight and enlarge each paragraph.

25             THE COURT:  OK.

1                  MR. VELAMOOR:  Onto the next one, please.

2                  OK.

3                  OK.  All the way to the bottom.

4                  Can we now go to the previous page, please.  And just

5       highlight the middle e-mail.

6                  Then the e-mail at the top.

7                  OK.  You can take it down.

8                  No further questions, your Honor.

9                  THE COURT:  All right.  You may step down.  Thank you.

10                 MR. BATH:  Your Honor, because that was a new

11      document, am I able to ask her a couple of questions.

12                 THE COURT:  You may.  Sure.

13                 MR. BATH:  Can you put 1915 back up, please.

14      RECROSS-EXAMINATION

15      BY MR. BATH:

16      Q.  Mr. Muir replies there, Ms. Rogers, and talks about first

17      party collector.

18                 MR. BATH:  Can we highlight that response?

19      Q.  You see that language "first party collector"?

20      A.  OK.  Yes.

21      Q.  When you had training, did you have any training on the

22      difference between whether you're trying to collect on your own

23      loan or a second party's loan?  Do you know anything about that

24      at all?

25      A.  No, I don't.

1          MR. BATH:  That's all I have.   Thank you very much.

2          THE COURT:  Anything further, Mr. Roth or Mr.

3    Ginsberg?

4          MR. ROTH:  No.

5          THE COURT:  You may step down.

6          (Witness excused)

7          THE COURT:  Call your next witness.

8          MR. VELAMOOR:  The government calls Russell Bradley.

9    RUSSELL BRADLEY,

10        called as a witness by the government,

11        having been duly sworn, testified as follows:

12          THE DEPUTY CLERK:  State your name, spell it for the

13   record, please.

14          THE WITNESS:  My name is Russell Bradley, Russell A.

15   Bradley.

16   DIRECT EXAMINATION

17   BY MR. VELAMOOR:

18   Q.  Good afternoon, Mr. Bradley.

19          Where were you born?

20   A.  I was born in St. Joe, Missouri.

21   Q.  Is that short for St. Joseph?

22   A.  Yes.

23   Q.  How far did you go in school?

24   A.  I went through two years of college, business college.

25   Q.  Are you a member of any Native American tribes?

1    A.  Yes.  I am a member of the Kickapoo tribe of Kansas.

2    Q.  When did you finish your schooling?

3    A.  I finished my business college at Haskell Institute in

4    1962.

5    Q.  After you finished, what did you do next?

6    A.  I took a job with an oil company in Dallas, Texas, later

7    got drafted in the United States Army, and then moved to

8    California, San Jose, California, where I worked as an

9    accountant for a brewing corporation.

10   Q.  How long did you do that for?

11   A.  I was there for five years.

12   Q.  Approximately what year are we up to now?

13   A.  I left there in 1971.

14   Q.  After that, what did you do?

15   A.  I went to work for some Indian tribes in North and South

16   Dakota.  I worked for virtually every Indian tribe in North and

17   South Dakota for a period of four years.

18   Q.  After that?

19   A.  I went to work for the federal government as an agency

20   superintendent for the Department of Interior.

21   Q.  Any particular part of the Department of Interior?

22   A.  Yes.  I was a superintendent, an agency superintendent in

23   five different agencies throughout the United States over 27

24   years.

25   Q.  Briefly, what is an agency superintendent?

1    A.  An agency superintendent is a federal manager who handles

2    all kinds of activities within each reservation.  I ran law

3    enforcement.  I ran education.  I ran social services.  I

4    managed over six million acres of land for the Department of

5    Interior.  I ran social services, leasing and buying of lands,

6    and the maintenance of government facilities.

7             THE COURT:  What does the Department of Interior have

8    to do with Indian affairs?

9             THE WITNESS:  The Bureau of Indian Affairs is a branch

10   of the Department of Interior.

11   Q.  You also mentioned that you were a member of the Kickapoo

12   tribe?

13   A.  Yes.

14   Q.  You also served as an officer or a member of the tribal

15   council for that tribe?

16   A.  I held a number of positions over the last 15 years with

17   the tribe.

18   Q.  What are some of the positions that you have held?

19   A.  I have been treasurer, going on my fourth year, and it's

20   the third time I have been treasurer.  I have been chairman

21   twice and I have been vice chairman once.

22   Q.  Let me turn your attention to around 2003.  Did you have a

23   position at the tribe around that time?

24   A.  Yes.  I became -- I got elected to the tribal council and

25   became the tribal treasurer.

1    Q.  During that period, did the tribe receive a proposal about

2    a business opportunity relating to payday lending?

3    A.  Yes, we did.

4    Q.  How did that make its way to the tribe?

5    A.  It came to us in a proposal through one of our business

6    managers who runs economic development for the tribe and the

7    owner of the payday loan corporation, and they proposed to

8    us -- they wanted to partner with us.

9    Q.  You mentioned two people.  Who is the owner of the payday

10   lending company?

11   A.  Scott Tucker.

12   Q.  Who was the other person?

13   A.  A guy named Jerry Aday; he was the business manager for our

14   enterprise development on the reservation.

15   Q.  What did Mr. Aday do in that job?

16   A.  He managed four other enterprises that we had ongoing on

17   the reservation:  A construction company, we ran a truck plaza

18   and a trading post and a farm, which is farming about 1600

19   acres of land.

20   Q.  You mentioned that the two of them brought a proposal to

21   the tribe.  Did they come to a meeting and present it?

22   A.  What's that?

23   Q.  Did those two gentlemen, Mr. Tucker and Mr. Aday, present

24   their proposal to the tribe?

25   A.  Yes, they did.

H9D8TUC5                      Bradley – Direct

1    Q.   Specifically, which body of the tribe?

2    A.   It was to the tribal council.

3    Q.   What was the proposal that they made?

4    A.   The proposal was to go into business with the tribe so that

5    they could establish a payday loan business, using the tribe as

6    an umbrella to get around state regulatory activities.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. VELAMOOR:

2    Q.  So according to the presentation, was Mr. Tucker already in

3    the payday lending business?

4    A.  Yes.  He -- he was the owner and the person who was putting

5    up the money to make it work.

6    Q.  And you said that you -- that the idea was to get an

7    umbrella.  Can you explain what you meant by that.

8    A.  The tribe has sovereign immunity and its own -- that

9    they're not under state jurisdiction over civil issues, so with

10   that, within the reservation boundary, we're exempt from any

11   kind of state regulatory activity.

12   Q.  And so what, if anything, did Mr. Tucker and Mr. Aday say

13   in the meeting about why they were interested in partnering

14   with the tribe?

15   A.  It was mainly because they wanted to get around the

16   activity of the states establishing more regulation to deal

17   with the payday loan type businesses.

18   Q.  Okay.  Did they say how much this opportunity would cost

19   the tribe?

20   A.  It wouldn't cost the tribe anything.

21   Q.  Who said that at the meeting?

22   A.  Mr. Tucker.

23   Q.  And was that important to the tribe's consideration of

24   the --

25   A.  Oh, yes.  We didn't, you know -- it brought the tribe

H9d1tuc6                          Bradley - Direct

1     something for nothing is what it amounted to.

2     Q.  And did the tribe have money that it could have put up for

3     something like this?

4     A.  No.

5     Q.  Was there any discussion about whether there were any other

6     tribes who were interested in a similar partnership?

7     A.  They explained that if we didn't want to partner with them

8     that there were other tribes in northeast Oklahoma that were

9     interested in a venture like this.

10    Q.  And was there any discussion about what the tribe could get

11    out of it?

12    A.  That we'd be guaranteed $20,000 a month, plus anything

13    over -- a percentage over $2 million in lending per month.

14    Q.  Now was the idea that this would be a tribal, tribally

15    owned business?

16    A.  Yes, it would be.  It would have to be considered as a

17    tribally owned business in order to get around state type

18    regulation.

19    Q.  And now according to Mr. Tucker's proposal, in what way was

20    this going to be a tribal or tribally owned business?

21    A.  That we would be the owners and that they would be the

22    managers of the company, they'd put up the money and -- and

23    they would make us a regular check every month.

24    Q.  But in what way would the tribe be the owners of this

25    company?

1    A.  What's that now?

2    Q.  In what way would the tribes be the owners of the company?

3    A.  Well, they -- according to the documents that were signed,

4    it says that the tribe would be the owners.  It's -- they would

5    be incorporated under the tribe.

6    Q.  Apart from documents, was there any other way in which the

7    tribe --

8    A.  No.

9         THE COURT:  I didn't hear your question.

10   Q.  Apart from the documents, was there any other way that the

11   tribes were going to be owners of the business?

12   A.  There were none.

13   Q.  Now was there any discussion about what activity in the

14   business would actually take place on tribal land?

15   A.  There would be no activity other than the fact they knew

16   they had to establish an office on a reservation in order to

17   show that they were operating from a reservation and that that

18   would be the main thing.  I did not -- and I -- at the time of

19   the meeting, I chose that they not set up a lending office on a

20   reservation because I felt it was vulnerable to the members.  I

21   don't -- I don't necessarily buy payday lending or loan

22   sharking or anything like that as a person.

23        MR. ROTH:  Objection, your Honor.

24        THE COURT:  Sustained.  Stricken.  Go ahead.

25   Q.  Let me show you what's been marked as Government

1    Exhibit 208.

2              Mr. Bradley, have you had a chance to take a look at

3    208?

4    A.  Yes, I have.

5    Q.  What is 208?

6    A.  208 is a proposed agreement between Fast Cash Lending

7    Company and the Kickapoo tribe in which they are proposing to

8    go into an agreement to pay $20,000 a month for the purpose of

9    establishing this payday loan business.

10   Q.  Okay.  Now this relates to the payday business we've been

11   talking about today?

12   A.  What's that?

13   Q.  Does this relate to the payday business we've been talking

14   about today?

15   A.  Yes.

16             MR. VELAMOOR:  Your Honor, the government offers 208.

17             THE COURT:  Any objection?

18             MR. ROTH:  No, your Honor.

19             THE COURT:  Received.

20             (Government's Exhibit 208 received in evidence)

21             MR. VELAMOOR:  Could we show it to the jury and start

22   on the last page.

23   BY MR. VELAMOOR:

24   Q.  Who was this document signed by?

25   A.  I don't know that signature.  It's Scott Tucker's, I

H9d1tuc6                    Bradley - Direct

1   assume.

2   Q.  What's written below the signature?

3   A.  National Money Service.

4   Q.  Is there a name above it?

5   A.  Scott Tucker, President.

6   Q.  And let's go back to the first page.

7   A.  Yes.

8   Q.  What's the date on this?

9   A.  September the 24th, 2003.

10          MR. VELAMOOR:  Okay.  Now could we just highlight the

11  first paragraph, please.

12  Q.  Can you read that paragraph.

13  A.  "I am the founder and president of National Money Service,

14  a highly successful corporation that has been involved in the

15  payday loan business throughout the United States for the past

16  six years.  National Money Service, Inc. employs nearly 300

17  people and has its principal offices in Mission, Kansas near

18  the Interstate 35 on Metcalf Avenue."

19  Q.  And can we focus on the middle part of this paragraph --

20  the second paragraph, please.

21  A.  "The National Money Service markets short-term loans to

22  individuals throughout the entire United States via radio, TV,

23  newspaper, direct mail, internet, which is typically repaid

24  within 17 days --"

25          THE COURT:  You have to slow down, sir, because that

1  nice young lady there is taking this all down.

2          THE WITNESS:  Oh.  I'm nervous, your Honor.  That's

3  all.

4          THE COURT:  No, that's all right.  So we're going to

5  try and make it a little easier for her.  Thank you.

6          THE WITNESS:  Should I start again, sir?

7          THE COURT:  Do you have it?

8          THE REPORTER:  Just continue after "17 days."

9  A.  "-- within 17 days and involves loans varying from $100 to

10  $500."

11  Q.  Stop there for a second.

12          Okay.  Go ahead.

13  A.  "The money loaned to an individual is electronically

14  transferred to that person's bank account where the customer

15  deposits his paycheck."

16  Q.  And after that does it say on the agreed repayment date,

17  typically their pay date, the amount of the loan plus the fee

18  are electronically transferred to National Money Service by

19  prior written agreement?  Do you see that?

20  A.  Yes.

21  Q.  Okay.  Now it then goes on to talk about the proposed

22  agreement with the Kickapoo tribe.  So I believe it says,

23  "National Money Service hereby proposes to enter into a written

24  agreement with the Kickapoo tribe in Kansas whereby the tribe

25  will become an authorized lender and earn substantial income

1    while relying upon an authorized subsidiary of National Money

2    Service to provide not only the capital to fund all loan

3    transactions and working capital requirements but also the

4    personnel, equipment, and knowledge to make the business an

5    immediate success."  Do you see that?

6    A.  Yes.

7    Q.  Is that consistent with the proposal that Mr. Tucker made

8    at the meeting?

9    A.  Yes.

10   Q.  Is that a type of proposal he described as something for

11   nothing, from the tribe's perspective?

12   A.  Yes.  Yes, it is.

13   Q.  So turn to the next page, Part 3.

14           "The tribe and the proposed tribal entity will not be

15   required to provide any investment, cash, or its equivalent and

16   will not be responsible for any losses."  Do you see that?

17   A.  Yes.

18   Q.  And the next paragraph, I believe you talked about the

19   financial arrangement earlier?

20   A.  Yes.

21   Q.  And you mentioned a minimum $20,000 per month.  Do you see

22   that?

23   A.  Yes.

24   Q.  And in addition to the $20,000, you also talked about a

25   percentage of gross revenues.  Do you see that?

H9d1tuc6                         Bradley - Direct

1   A.   Yes.

2   Q.   And that's written here as well.  "The contract will set

3   forth an agreed percentage of gross revenue as the tribe's fee,

4   which is estimated to be as much as 40,000 per month within the

5   term of the agreement."

6        Okay.  Now there's also -- the last one is Part 6.  Do

7   you see Part 6?

8   A.   Yes.

9   Q.   And you mentioned before that there was some thought of

10  setting up some kind of office on tribal land.  Do you recall

11  that?

12  A.   Yes.

13  Q.   Does this relate to that topic?

14  A.   Yes, it does.

15  Q.   Okay.  It talks about incorporating and providing office

16  space on tribal land.  "The tribe must designate at least two

17  individuals to serve as officers and to be responsible for

18  working with UMS."  Do you see that?

19  A.   Yes.

20  Q.   So we can put that document aside.  This is obviously the

21  proposal that Mr. Tucker made, correct?

22  A.   Yes, it is.

23  Q.   Now what was your impression of the proposal?

24  A.   Well, to me, it was -- it sounded like a good deal, but at

25  the same token it was still getting something for nothing.

1  Q.  Now did you support the Kickapoo tribe forming an agreement

2  with Mr. Tucker?

3  A.  No, I had -- no, I didn't.

4  Q.  You were on the tribal council?

5  A.  Yes, I was.

6  Q.  Which way did you vote?

7  A.  I voted no.

8  Q.  What did the council as a whole ultimately decide to do?

9  A.  Well, this was proposed to us on this date, but it was

10  brought back to us three, four months later.

11  Q.  And what did the council ultimately decide to do?

12  A.  They ultimately decided to -- the vote was two to two, and

13  the chairman said yes so the vote was yes, they went into

14  business with this -- with this corporation.

15  Q.  Okay.  Let me show you what's been marked as Government

16  Exhibit 201.

17          All right.  What is 201?

18  A.  201 is a service agreement with -- between the tribe and

19  the Universal Management Services, Incorporated.

20  Q.  Okay.  And whose company was Universal Management Services?

21  A.  What's that now?

22  Q.  Whose company, whose company was Universal Management?

23  A.  Scott Tucker's company.

24          MR. VELAMOOR:  Now, your Honor, the government offers

25  201.

1              THE COURT:  Any objection?

2              Received.

3              (Government's Exhibit 201 received in evidence)

4    Q.  Now, Mr. Bradley, this is not a signed version of the

5    agreement, correct?

6    A.  Yes, it's true, it's not a signed version.

7    Q.  Was there a signed version available at some point?

8    A.  There should have been.  I haven't found one.

9    Q.  Now let me just turn to the second page, the seventh

10   paragraph, the fee agreement.

11             Okay.  Does that paragraph say that UMS will pay the

12   tribe a minimum fee of 20,000 and 00/100, $20,000 per month

13   while the agreement is in force, with a maximum fee equal to

14   1 percent of the gross collected revenue of the payday loan

15   operation?

16   A.  Yes.

17   Q.  Was that essentially the financial terms of the arrangement

18   the tribe entered into with Mr. Tucker?

19   A.  Yes, that was the arrangement.

20   Q.  Okay.  Paragraph 12 and 13.  Bottom.

21             Okay.  So under Investment and Risk, do you see that?

22   A.  Yes.

23   Q.  "The tribe shall have no obligation to invest money or pay

24   expenses of the operation except for its office expenses on the

25   reservation and the salary and expenses of its administrators."

1   Do you see that?

2   A.  Yes.

3   Q.  And Indemnification.  "UMS does hereby indemnify --" do you

4   know what that means, by the way, to indemnify?

5   A.  Means exempt us from any -- they would take the -- they

6   would take the cost of any -- anything that would -- that went

7   wrong.

8   Q.  "UMS does hereby indemnify the tribe against all loss,

9   damage, and expense arising out of the payday loan business

10  except for intentional wrongdoing on the part of the tribe."

11          And then if you read further on, "In particular, UMS

12  will, in the event of any claim, suit, administration --

13  administrative action, or other adverse action against the

14  tribe or KLC, Inc., secure the services of an attorney and pay

15  that attorney to defend any and all matters alleged."  Do you

16  see that?

17  A.  Yes.

18  Q.  Now there's a reference there to KLC, Inc.  What was KLC,

19  Inc.?

20  A.  Kickapoo Loan Corporation.  I believe that's what it was.

21  That's what I always referred to it as Kickapoo Loan.

22  Q.  Was that the tribal corporation of the company?

23  A.  Yes, that was the tribal corporation.

24  Q.  Now apart from the agreement that I've shown you, are you

25  aware of any other agreement that the tribe entered into with

H9d1tuc6                          Bradley - Direct

1    Mr. Tucker or any of his businesses?

2    A.  I'm not aware of any other agreements, no.

3    Q.  Are you aware of any agreement by which the tribe purchased

4    or acquired any part of Mr. Tucker's business?

5    A.  No.  I'm not aware of that.

6    Q.  So after entering into the agreement, what did the tribe

7    set up on its land?

8    A.  The business office that was created for the purpose of

9    their organization was -- actually a computer setup was put in

10   our attorney's office, which would give us supposedly financial

11   data about the business.  There were no staff, no other people

12   to manage it.  It was put there.

13   Q.  And so you said "supposedly."  What was this computer used

14   for?

15   A.  There were financial reports that had come through there,

16   but I wasn't sure exactly what they were.  I got -- I got to be

17   able to observe them at one time, but like I say, we had no one

18   who manages them, so we couldn't interpret what was coming

19   from -- coming through them except that was supposed to be the

20   office of their business.

21   Q.  So was that office used for anything related to the

22   business?

23   A.  No.

24   Q.  And did anyone provide any training to any tribal members

25   on how to either use the computer or do anything in that

1   office?

2   A.   No, there was no training, or person trained to run that

3   system.

4   Q.   Showing you what's been marked Government Exhibit 202.

5        Have you had a chance to look at 202?

6   A.   Yes.

7   Q.   What is it?

8   A.   It's a special power of attorney of corporate resolution

9   which was granted to Scott Tucker, Universal Management

10  Services by Steve Cadue, the tribal chairman of the Kickapoo

11  tribe.

12  Q.   Do you recognize Mr. Cadue's signature?

13  A.   Yes, I do.

14       MR. VELAMOOR:   Your Honor, the government offers 202.

15       MR. ROTH:   No objection.

16       THE COURT:   Received.

17       (Government's Exhibit 202 received in evidence)

18       MR. VELAMOOR:   Okay.   Could we show 202 to the jury,

19  please, Ms. Grant.

20       Okay.   So let's focus on the top part of the document.

21  BY MR. VELAMOOR:

22  Q.   Okay.   It says it's special power of attorney and corporate

23  resolution granted to Scott Tucker, Universal Management

24  Services, and NM Service Corp.   Do you see that?

25  A.   Yes.

1   Q.   And what's the purpose of this document?

2   A.   It serves as a -- as a -- as a tribal endorsement of Scott

3   Tucker's handling -- or attorney in fact for the benefit of

4   this payday -- or Universal Management Services Incorporated.

5   Q.   And if you look at paragraph 1, does it relate to any

6   particular issues?  Do you see that?

7   A.   Oh, paragraph 1?  Okay.

8            Authorizes him to open up a checking account on behalf

9   of the corporation.

10  Q.   And a checking account where?

11  A.   At US Bank.

12  Q.   Okay.  Was that a bank on Kickapoo tribal land?

13  A.   No.

14  Q.   And it says, "Open, maintain and operate a checking account

15  at US Bank and any other qualifying and acceptable bank for the

16  purpose of depositing and expending funds to facilitate the

17  operation of KLC, Inc."  Do you see that?

18  A.   Yes.

19  Q.   Okay.  We can come out of that.

20           So who handled the banking issues for the payday

21  lending partnership with Mr. Tucker?

22  A.   It would be Mr. Tucker and his organization.

23  Q.   So I believe you mentioned that the tribe opened, created a

24  tribal corporation, correct?

25  A.   Yes.

1    Q.  And that was KLC, Inc.?

2    A.  Yes.

3    Q.  And were you an officer of that corporation?

4    A.  No, I wasn't.

5    Q.  Apart from creating that corporation, what else did the

6    tribe do in connection with this business?

7    A.  Actually, nothing.

8    Q.  Did you ever go to Mr. Tucker's office?

9    A.  Yes.  They invited us down to do the walkthrough, and

10   several of us council people went down to see their offices,

11   which they had about 3 or 400 people employed.

12   Q.  Where was that office?

13   A.  It was in Overland Park, Kansas, as I recall.

14   Q.  What do you recall seeing when you went there?

15   A.  What's that now?

16   Q.  What do you recall seeing when you went there?

17   A.  Oh, we saw a number of people working.  I guess they were

18   processing loans.  I have no idea what they were doing.

19   Q.  Did anyone from there train any tribal people on what they

20   were doing?

21   A.  No, but they had mentioned they would offer the opportunity

22   to members if they wanted to go to work there.

23   Q.  Did that ever happen?

24   A.  No.

25   Q.  Now did the tribe receive monies in this arrangement?

1  A.  Oh, yeah, we did.  Once the business was established or

2  agreement was done, we were getting $20,000 plus a month.

3  Q.  And how did the tribe receive that money?

4  A.  They got -- they received a check monthly, which

5  probably -- it did have some identification over amount of

6  loans that were made versus the check itself, 20,000 plus

7  1 percent over 2 million.

8  Q.  So I showed you what's been marked as Government

9  Exhibit 203.  Do you see that?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's a check from KLC Management, LLC.

13  Q.  And did you see checks like this from time to time

14  resulting from the relationship with Mr. Tucker?

15  A.  Yes.  I went out of office three months prior, or four

16  months prior to this check, but I did see checks of this nature

17  had come to the tribe.

18          MR. VELAMOOR:  And your Honor, the government offers

19  203.

20          THE COURT:  Any objection?

21          MR. ROTH:  No, your Honor.

22          THE COURT:  Received.

23          (Government's Exhibit 203 received in evidence)

24          MR. VELAMOOR:  And may we show it to the jury.

25          THE COURT:  You may.

H9d1tuc6                          Bradley - Direct

1              MR. VELAMOOR:  Ms. Grant.  It's a little bit hard to

2     tell, so why don't we just, first of all, zoom in on the top

3     left.

4     BY MR. VELAMOOR:

5     Q.  Where the money is coming from, do you see that?

6     A.  Yes.

7     Q.  What does that say?

8     A.  The KLC Management, LLC, Overland Park, Kansas.

9     Q.  CLK, right?

10    A.  Yes, CLK, yes.

11    Q.  And this check is paid to which entity?

12    A.  What's that?  Could you --

13             MR. VELAMOOR:  Could you zoom back out and go to the

14    To line, please.

15             Okay.

16    A.  It was payable to the KLC.

17    Q.  Okay.  And can you tell from the top there which bank this

18    check is drawn on?

19    A.  It's drawn on US Bank.

20    Q.  And we won't try to read the number from there, but there's

21    a memo on the bottom left.

22             MR. VELAMOOR:  Can you zoom in on the memo.

23    Q.  And what --

24    A.  2005 tribal management fees.

25    Q.  January 2005?

1    A.  Yes, January 2005.

2              MR. VELAMOOR:  Okay.  All right.  And I believe the

3    amount is clearer on the bottom, so why don't we zoom in on the

4    payment on the bottom right.

5    A.  $32,172.47?

6    Q.  Yes.

7    A.  Yes.

8    Q.  Now did the tribe get any financial information from time

9    to time from Mr. Tucker?

10   A.  They were -- we were able to get from time to time, yes, a

11   listing of the amount of monies that they had loaned on a

12   monthly statement to reflect how much our benefit was from

13   those loans.

14   Q.  Or in other words, to reflect what the 1 percent came from?

15   A.  Yes.

16   Q.  Show you what's been marked as Government Exhibit 204.

17             What is that, 204?

18   A.  It's a Preferred Cash Loan statement of -- for January 2005

19   report from the KLC Incorporated.

20   Q.  Is this one of the financial summaries that the tribe

21   received?

22   A.  Yes.

23             MR. VELAMOOR:  Your Honor, the government offers 204.

24             MR. ROTH:  No objection.

25             THE COURT:  Any objection?

H9d1tuc6                              Bradley - Direct

1              MR. ROTH:  No, your Honor.

2              THE COURT:  Received.

3              (Government's Exhibit 204 received in evidence)

4              MR. VELAMOOR:  And why don't we just zoom in on the

5    top.

6    BY MR. VELAMOOR:

7    Q.  Okay.  The heading says KLC, Inc., d/b/a Preferred Cash

8    Loans, January 2005 report.  Do you see that?

9    A.  Yes.

10   Q.  Do you know what Preferred Cash Loans was?

11   A.  That's the -- the lending corporation of Scott Tucker,

12   management services.

13   Q.  Why don't we focus on the -- just one, the total of the

14   daily gross loan fees collected.

15   A.  The total is $3,217,247 for the month.

16   Q.  And am I right the check that you just looked at before,

17   203 --

18             MR. VELAMOOR:  If you put that back up on the screen.

19   Or you could put it next to it, actually.  That would be

20   easier.

21   Q.  So the amount of the check was 32,172, right?

22   A.  Yes.

23   Q.  So it's about 1 percent of the 3.217 million?

24   A.  Yes.

25   Q.  Now did you have any way of -- or did the tribe have any

H9d1tuc6                    Bradley - Direct

1    way of checking if the information on 204 was correct for

2    Preferred Cash Loans?

3    A.   Not that I'm aware of.

4    Q.   Did it have any of the records that it could have used to

5    check that?

6    A.   No.  We had -- we don't have a record to show how they

7    would accumulate all of their loans.

8    Q.   Show you what's been marked as 205.  What is 205?

9    A.   It's a corporate fax that came from -- it's the

10   commercial -- commercial services from US Bank.

11   Q.   Okay.  Does it list KLC, Inc. on it anywhere?

12   A.   Yes.  There's a list of transactions that were taken in

13   during the period of March 2004.

14            MR. VELAMOOR:  Your Honor, the government offers 205.

15            THE COURT:  Any objection?

16            MR. ROTH:  No, your Honor.

17            THE COURT:  Received.

18            (Government's Exhibit 205 received in evidence)

19            MR. VELAMOOR:  Okay.  Could we just highlight the top.

20   BY MR. VELAMOOR:

21   Q.   That's from corporate legal relating to US Bank, right?  US

22   Bank I think is above that.

23   A.   Yes.

24   Q.   And there's a list of entities, various d/b/a's below.

25            MR. VELAMOOR:  That's good.  Can you go down to the

1  list, highlight the entities, or expand the entities below.

2  Q.  Okay.  Do you see the various different d/b/a's listed

3  there?

4  A.  Yes.

5  Q.  Listed there?  And indications that accounts were opened in

6  March 8, 2004?

7  A.  Yes.

8  Q.  Do you recall seeing any checks or anything relating to any

9  of these d/b/a's other than Preferred Cash?

10  A.  No.

11  Q.  Did you ever become aware that the Colorado Attorney

12  General had served subpoenas on the Kickapoo's loan business?

13  A.  No, I'm not.

14  Q.  If that had happened to one of the tribe's businesses,

15  would you have expected to know about that?

16  A.  Yes, I would have expected to be known about that.

17  Q.  So how long did the relationship with Mr. Tucker continue

18  for?

19  A.  It -- it ran into the early part of 2005.  I wasn't on the

20  tribal council when it was terminated, and I haven't been able

21  to find out any information about it.

22  Q.  Have you looked into any documentation that exists that may

23  relate to how the relationship ended?

24  A.  I've attempted to find that documentation through our legal

25  files and other things working with our attorney, and I have

1    found nothing about the termination agreement.

2    Q.  Okay.  Or whether there even was one?

3    A.  Or even if there was one.

4    Q.  Have you ever been able to find out anything about what

5    happened to any US Bank accounts relating to KLC?

6    A.  No, I haven't been able to find out anything about the

7    business.

8    Q.  By the way, at any point did the tribe end up with any kind

9    of windfall of money that may have been in any KLC bank

10   accounts from the business?

11             MR. ROTH:  Objection to the characterization.

12             THE COURT:  Yes.  Rephrase your question.

13             MR. VELAMOOR:  Certainly, your Honor.

14   Q.  Do you recall if, at the end of the relationship with

15   Mr. Tucker, the tribe ended up with any money that was in KLC

16   bank accounts?

17   A.  No.  There was no money.

18   Q.  So did the tribe ever receive any money from the business

19   other than the monthly checks?

20   A.  Not to my knowledge.

21   Q.  Now did you become -- I believe you mentioned that you were

22   not on the tribal council for a certain time period in 2005, is

23   that right?

24   A.  I came back on in late 2005.  I was off for a year.

25   Q.  And when you came back on in 2005, did you become familiar

H9d1tuc6                          Bradley - Direct

1    with the finances of the business?

2    A.  I attempted to find the finances of the business because I

3    wanted to know why the agreement was terminated.

4    Q.  And did you find -- let's put 204 back on briefly.

5            So there's a column there that says the total gross

6    fees collected.  We looked at that before.  That's about

7    $3.2 million, right?

8    A.  Yes.

9    Q.  And there's a column also that says Dollar Amount Funded on

10   each of the days, and there's a total for that, too, right?

11   A.  Yes.

12   Q.  It's about $2 million?

13   A.  Yes.

14   Q.  So the difference, would you agree, is about $1.2 million,

15   roughly?

16   A.  Yes.

17   Q.  When you looked into the finances, when you became -- when

18   you got back on the council in 2005, did you find or uncover

19   the tribe had an additional 1 million or so dollars?

20   A.  No.  I didn't find anything.

21   Q.  By the way, Mr. Bradley, you mentioned there's a

22   corporation KLC, Inc., right?

23   A.  Yes.

24   Q.  To your knowledge did Mr. Tucker ever become an officer or

25   have any position on KLC, Inc.?

1    A.  Not to my knowledge.

2    Q.  And is that something you would have known about?

3    A.  I would have known about it, yes.

4    Q.  Did Mr. Tucker ever become a secretary of KLC, Inc. or any

5    other tribal corporation?

6    A.  No.  He wouldn't have been.

7    Q.  I'm going to show you what's been marked as Government

8    Exhibit 209.  Okay.  What is 209?

9    A.  Corporate certificate of authority.

10   Q.  And do you see KLC, Inc. anywhere there?

11   A.  Yes.  It's -- it's listed -- it's Scott Tucker certifies as

12   secretary of the KLC.

13            MR. VELAMOOR:  First of all, before we go through the

14   document, your Honor, the government offers 209.

15            THE COURT:  Any objection?

16            MR. ROTH:  No, Judge.

17            THE COURT:  Received.

18            (Government's Exhibit 209 received in evidence)

19            MR. VELAMOOR:  Ms. Grant, why don't we now display it

20   for the jury and highlight the first paragraph.

21            Okay.  "I, Scott Tucker, do hereby certify that I am

22   secretary of KLC, Inc., a corporation organized under the laws

23   of the state of Kickapoo reservation, that the following is a

24   true, complete, and correct copy of resolutions adopted at a

25   meeting of the board of directors of said corporation, duly and

H9d1tuc6                    Bradley - Cross

1    properly called and held on the 3rd day of March 2004."

2              Okay.  Can you come out of that for a second.

3              And go to the next page.  And can you highlight the

4    signature.

5    BY MR. VELAMOOR:

6    Q.  And what's the name written there?

7    A.  The name is Scott Tucker.

8    Q.  There's also a signature above that.

9              Okay.  Mr. Bradley, have you ever seen this document

10   before?

11   A.  No, I've never seen it before.

12             MR. VELAMOOR:  No further questions.

13             THE COURT:  All right.  Cross-examination.

14             MR. ROTH:  Thank you, your Honor.

15   CROSS EXAMINATION

16   BY MR. ROTH:

17   Q.  Good afternoon, sir.

18   A.  Good afternoon.

19   Q.  Had you met -- did you meet Mr. Tucker when you went up to

20   his facility?

21   A.  I don't recall meeting him up there.  I recall meeting with

22   some of his people.  We were -- we were led with our business

23   manager, Jerry Aday, who, you know, set up the -- and arranged

24   for us to come down there, so I don't recall meeting with him

25   at all.

H9d1tuc6                         Bradley - Cross

1    Q.   And you mentioned that Jerry Aday is your business manager,

2    business development manager, is that correct?

3    A.   Yes.

4    Q.   Okay.  And why is it that the Kickapoo tribe needs a

5    business development manager?

6    A.   Because we needed someone to oversee and enhance our

7    current business operations that exist on the reservation.

8    Q.   And at that time period, in 2003, what were the economic

9    conditions of the Kickapoo tribe?

10   A.   We really weren't bad off at the time.  We had a casino

11   that was -- was working pretty well, but we didn't have other

12   businesses, but our existing businesses were kind of stagnated.

13   They needed to be enhanced.

14   Q.   Okay.  And are you in a remote area?

15   A.   Yes, we are.

16   Q.   And when you say remote, to me it may be different than to

17   you, with all the land that you have.

18   A.   Yes.

19   Q.   So how would you describe that, sir?

20   A.   Well, one of the problems we have and difficulties is we

21   don't have any motels within 20 miles of the reservation, but

22   we do have the casino and we do have this truck plaza and a

23   trading post.

24   Q.   The casino is on the reservation?

25   A.   Yes, it is.

H9d1tuc6                          Bradley - Cross

```
 1   Q.  And when did you develop that casino, sir?

 2   A.  The casino itself I believe was developed in 1998.

 3   Q.  And in conjunction with who, the venture?

 4            MR. VELAMOOR:  Objection, your Honor.

 5            THE COURT:  Overruled.

 6   A.  The -- in conjunction with who, you say?

 7   Q.  Yeah.  Who brought that venture?  Who created it?

 8   A.  Well, the -- the tribe itself decided to go into it,

 9   establish the means with organizing under the national gaming

10   laws.

11   Q.  That's the IGRA, they call it?

12   A.  Yes, it is, IGRA.

13   Q.  IGRA.  But who did they partner with?  Did somebody come --

14   let me go back a question.

15            Did somebody come and approach the tribe and say, I

16   have a proposal for gambling, setting up a casino, like

17   Mr. Tucker approached the Kickapoo?

18   A.  Yeah, they -- they had an org -- they had a management firm

19   come in from South Dakota.

20   Q.  Uh-huh.  And do you know the name of that management firm?

21   A.  I believe it was Calumet was the name of it.

22   Q.  Mm-hmm.  And the tribe met and decided to make a joint

23   venture with them, so to speak?

24   A.  Yes.

25   Q.  And by the way, the tribe was represented by attorneys, you
```

H9d1tuc6                         Bradley - Cross

1    had tribal attorneys at that time?

2              MR. VELAMOOR:  Objection, your Honor.  Relevance.

3              THE COURT:  Sustained.

4    Q.  Okay.  And let me just, if I may -- you said that the

5    company was going to manage the casino.  Was the company going

6    to fund the operation, build the operation?

7              MR. VELAMOOR:  Objection, your Honor.  Relevance.

8              THE COURT:  Sustained.

9    Q.  Well, how many -- you said Mr. Aday's role with the tribe

10   was to bring business ventures to you, is that right?

11   A.  Right.

12   Q.  And approximately during the period of time before

13   Mr. Tucker, through the services of Mr. Aday, brought this

14   venture to the Kickapoos, how many solicitations did your tribe

15   receive?

16   A.  None that I know of.  His job was to enhance the businesses

17   as they exist.  It is also to attempt to bring in economic

18   development opportunity, and that was a new position, by the

19   way.

20   Q.  Okay.  And since that time have you had others?

21   A.  No.

22   Q.  And do you operate the tribe or does the outside company

23   operate the tribe?

24   A.  No.  The tribe is run by the tribal council, business

25   committee.

H9d1tuc6                          Bradley - Cross

1    Q.  The casino itself, though.

2    A.  The casino is operated --

3            MR. VELAMOOR:  Objection, your Honor.

4            THE COURT:  Sustained.

5            THE WITNESS:  Yes.

6    Q.  Okay.  At the time that Mr. Aday brought that proposal to

7    the Kickapoos, the Kickapoo had an attorney, is that right?

8            MR. VELAMOOR:  Your Honor, which -- I'm not sure which

9    proposal we're talking about.

10   Q.  The Tucker proposal.  The payday lending one; the one

11   that's introduced into evidence that you just talked about.

12   A.  At the time he came on board, we had an attorney who was

13   new out of law school.  That's all we had at the time.

14   Q.  And what was the name of that attorney?

15   A.  Damon Williams.

16   Q.  Did you have another attorney named Elsa Smith?

17           MR. VELAMOOR:  Objection, your Honor.

18           THE COURT:  Overruled.

19   Q.  Do you remember the name Elsa Smith?

20   A.  Yes, I do remember Elsa Smith.

21   Q.  Was she an attorney that was employed by the Kickapoo

22   tribe --

23   A.  Yes.

24   Q.  -- at the time?

25   A.  She was the associate to Damon Williams.

H9d1tuc6                          Bradley - Cross

1    Q.   Okay.  Was she just out of law school, too?

2    A.   No.  I'm not sure where she -- she came from.

3    Q.   But I mean, you expressed that the other fellow seemed a

4    little wet under the ears.

5    A.   Yes.

6             MR. VELAMOOR:  Objection.  These are attorneys for the

7    tribe, your Honor.  Relevance.  These are attorneys, as I

8    understand it, for the tribe.

9             MR. ROTH:  For the tribe, yes.

10            THE COURT:  Yes, I understand.  Overruled.  I'll allow

11   it.

12   BY MR. ROTH:

13   Q.   Who's the current chief of the Kickapoo?

14   A.   We don't have a chief.  Chairman is a guy named Lester

15   Randall.

16   Q.   And he's running the tribe now?

17   A.   No.  It's run through our -- we have an executive director

18   who oversees the tribe's activities.

19   Q.   Okay.  And why isn't he running the tribe?

20   A.   Who, the chairman?

21   Q.   Yes.

22   A.   Because he has other duties to carry out, and under our

23   constitution, it says the chairman shall be able to -- shall

24   carry out duties under the -- prescribed by the tribal council,

25   and -- and right now the vice chairman is handling that, those

H9d1tuc6                          Bradley - Cross

1    duties as executive director.

2    Q.  When the proposal was brought to you with Mr. Aday, do you

3    recall an attorney being provided by Mr. Tucker to represent

4    the tribe in addition to the attorneys that you had?

5    A.  I recall him -- there being another attorney, yes, with

6    him.

7    Q.  Do you recall the name Cliff Cohen, by chance?

8    A.  I'll be honest with you, no, I don't have a recall for who

9    the name of the attorney was.

10   Q.  But that attorney -- was it your understanding that that

11   attorney who came with Mr. Tucker to make the presentation was

12   paid by Mr. Tucker to represent the tribe?

13   A.  I'm not aware of that.

14   Q.  In respect to -- you seemed to say that you've done a lot

15   of searching for records, I assume at the behest of the

16   government, is that correct?

17   A.  Yes, I would have to accurately say yes, at their request,

18   but by the same token for my own information.

19   Q.  Right.  But the government contacted you in this case way

20   back in 2011, is that right?

21   A.  I don't recall that they -- they've never contacted me till

22   just recently.

23   Q.  Okay.  Did you have an attorney named David Prager at the

24   time in 2011?

25   A.  Yes, we did.

1    Q.  And do you recall having conversations with your attorney

2    David Prager?

3              MR. VELAMOOR:  Objection, your Honor.

4              MR. ROTH:  Well, I'm not going to get into the

5    substance of them.

6              THE COURT:  Ask your question.  Let's hear the

7    question.

8              MR. ROTH:  Thank you.

9    BY MR. ROTH:

10   Q.  In terms of responding to a subpoena, that was issued to

11   the tribe?

12             THE COURT:  I don't think I have the first part of the

13   question.  What are you asking him to tell you?

14   Q.  Do you recall having a conversation with your attorney at

15   the time, David Prager, in regard to a subpoena that the tribe

16   received from the United States government?

17             THE COURT:  That's a yes or no question.

18   A.  No.

19             MR. ROTH:  Could we have 3502-01 just shown to the

20   witness.

21   Q.  Do you recall, sir, ever having a conversation with

22   Mr. Prager concerning the --

23             MR. VELAMOOR:  Objection, your Honor.

24             MR. ROTH:  I'm not asking about the content yet,

25   Judge.

1           THE COURT:  Let me hear the question.

2           MR. ROTH:  We're having a technical issue.

3           THE COURT:  At this point the witness has testified

4    that he does not recall having a conversation with Mr. Prager

5    on the subject you pointed to.  Now if you'd like to show him a

6    document to see whether you can refresh his recollection --

7           MR. ROTH:  That's what I'm trying to do.  We're having

8    technical problems, Judge.

9           THE COURT:  All right.  Now during the technical

10   problems, let me talk to you about what it means to refresh a

11   recollection.  You're here in New York, and this is a city

12   where we have two baseball teams -- New York Yankees, New York

13   Mets.  I happen to be a Mets fan.  Now if you asked me, when

14   did the Mets last win the World Series, I'd tell you it was in

15   the fall of 1986.  Now if you said to me, what date did they

16   win, I'd say I don't remember.  Now you could show me a

17   newspaper article and the newspaper article or the headline

18   could be "Mets Win the World Series," talking about the game

19   the night before, and it has a date on the newspaper.  And I'll

20   look at that, and two things are possible.  One is I look at

21   that and I say, well, it looks like a newspaper, looks

22   authentic, they say it was on this date, they must know what

23   they're talking about, but it doesn't refresh my recollection.

24   The document just says that.  It looks like a good document, it

25   doesn't look like a good document, but it just says it.  It

H9d1tuc6                          Bradley - Cross

1   doesn't refresh my recollection.

2           The other possibility is you look at it and you see a

3   paper from October 28 talking about a game the day before on

4   October 27th, and you say, I remember this now.  That was my

5   nephew's birthday, and we had a birthday party and, you know, I

6   remember that.  I remember it like it was yesterday.  And

7   looking at that piece of paper refreshes your recollection.

8           So what you're being asked to do is take a look at

9   this piece of paper, read it to yourself, and the question is:

10  Does it refresh your recollection?

11          Did you grab the gist of what I was saying?

12          THE WITNESS:  Yes.

13          THE COURT:  Okay.  Thank you.

14  A.  Now the question is, you're saying do I recall this?

15  Q.  Do you recall being contacted by a government agency in

16  2011 regarding the affairs of --

17  A.  I don't recall that.

18  Q.  And that document doesn't help refresh your recollection?

19  A.  No, it doesn't.

20  Q.  Thank you.  When was the first time you were contacted by

21  anybody at the front table there, in regards to this

22  investigation?

23  A.  I believe it was probably about six months ago.

24  Q.  Is that physical contact or personal contact as well?

25  A.  It was by phone.

H9d1tuc6                           Bradley - Cross

1    Q.   And you think that that was six months ago, sometime in

2    2017 or 2016?

3    A.   I would say '17.

4    Q.   And that was the very first --

5    A.   No.  I think it's 2016.  Because we're in '17, and I

6    believe it was late in the year when they called and were

7    asking questions about this.

8    Q.   So that was the first time.  Do you know which of these

9    gentlemen you spoke to?

10   A.   I don't recall.  I know that the -- the first contact that

11   I became aware of was with the tribal attorney, who in fact

12   told me that they had -- they were inquiring about this and

13   wanted to visit with me about it.

14         MR. ROTH:  Okay.  I'm going to ask that the witness be

15   shown 3502-02 and ask him if that refreshes his recollection

16   when the first time he had contact with anybody at the first

17   table.

18         THE COURT:  So the question is, does it refresh his

19   recollection on the date.

20         MR. ROTH:  On the date, yes, the date and the year.

21   A.   Yeah, I -- I believe I remember -- yeah, I remember this.

22   Q.   Okay.  So now is your recollection refreshed as to the

23   first time that any of the gentlemen seated at the first row

24   contacted you in regard to this investigation?

25   A.   Yes.  I don't remember the names.

H9d1tuc6                       Bradley - Cross

1   Q.  Okay.  Forget the names.  We're just trying to get at the

2   date.  After reading that document, having your memory

3   refreshed, is it fair to say it would be --

4            THE COURT:  No.  Ask the witness.  Go ahead.

5            What's your refreshed recollection as to when you were

6   first contacted by the government?  If you have one.

7            THE WITNESS:  I don't have details on when they

8   actually called, but I -- the discussion, yes, I believe was

9   held back then.

10           THE COURT:  Back when?

11  BY MR. ROTH:

12  Q.  Back when?

13  A.  Back in December of 2014.

14  Q.  So that was the first time.  It wasn't 2016.

15  A.  It wasn't 2016.  I got a lot of things I have to worry

16  about than dates, so --

17  Q.  Okay.  We all do.

18           Okay.  So from that time, December, in December 2014,

19  did the government ask you to make efforts to search all your

20  records, the Kickapoo tribe's records that were in your

21  possession concerning this investigation?

22  A.  I believe they asked if we had those records and we

23  searched.

24  Q.  Okay.  And what did you come up with, sir?

25  A.  What we came up with is what I -- the first document you

H9d1tuc6                         Bradley - Cross

1  saw regarding the proposal they made to the tribe.

2  Q.  And you couldn't come up with the signed copy of the

3  service agreement?

4  A.  No.

5  Q.  And did you have the financials --

6  A.  No.

7  Q.  -- that were shown?

8  A.  No.

9  Q.  Do you have -- do you keep copies of the tribal board

10 meetings?

11 A.  We have -- yes, we have records of tribal council meetings,

12 yes.

13 Q.  Okay.  Did you search for a copy of any resolutions

14 incorporating what you referred to as the KLC Corporation, the

15 tribal lending corporation that was formed?

16 A.  I found a document that -- where it was -- where it was

17 first proposed to the tribe and acted on by resolution, and

18 that's the one I testified on just earlier, where the vote was

19 two to two.

20 Q.  Right.  But my question to you, sir, is:  Did you find any

21 articles of incorporation?

22 A.  No.

23 Q.  And do you have any question in your mind that the

24 corporation was formed?

25 A.  No.

1   Q.  So you believe it was formed.

2   A.  Yes, I do.

3   Q.  Okay.  I'm going to show you, sir, what has been marked as

4   Defendant's 124 and ask you to review that document.  You don't

5   have to read the whole thing, it's a lengthy document, but if

6   you can skim that.

7   A.  I don't recall the document itself, no.

8   Q.  Can you recognize the signature, sir, on the last -- on the

9   eighth page?

10  A.  The signature is Kenneth Jessepe, yes, who was the tribal

11  secretary at the time.

12  Q.  He was the secretary?

13  A.  He was the tribal secretary at the time.

14  Q.  And what time was that, sir?

15  A.  It had to have been in 2004.

16  Q.  And were you on the tribal council then?  What was your

17  position?

18  A.  I was the treasurer at the time.

19  Q.  So would you have had to have voted on the formation of

20  this tribal entity?

21  A.  We would have -- we would have voted.  I don't recall

22  voting on this particular entity.  I recall voting on this --

23  the tribal council minutes which said two to two and the

24  chairman voting the tie.  That's all I recall.  I don't recall

25  seeing any documents that came from that meeting.

H9d1tuc6                        Bradley - Cross

1              And in fact, in my records, in the records that I

2      maintain, I usually keep jackets and files of transactions of

3      the tribe, and I don't have anything on it.

4      Q.   A tribal corporation such as KLC that was formed under the

5      articles of the tribe, the tribal law, that becomes what we

6      call an arm of the tribe, is that correct?

7      A.   Yes.

8      Q.   And could you explain for the members of the jury what an

9      arm of the tribe is.

10             MR. VELAMOOR:   Objection, your Honor.

11             THE COURT:   Sustained.

12     Q.   Is it your understanding, sir, that the KLC Corporation

13     enjoyed tribal immunity, sovereign immunity?

14             MR. VELAMOOR:   Objection.

15             THE COURT:   I'll allow it.

16     A.   No, they don't have tribal sovereign immunity.

17     Q.   And what is that answer based on, sir?

18     A.   It would be written into the articles of incorporation

19     where the tribe would give them the option of waivering that.

20     Q.   Of waiving it?

21     A.   Yeah, of waivering -- of waiving those issues.

22     Q.   And you haven't read the whole document, is that right?

23     A.   No, I haven't.   It's the first time I'd seen it.

24     Q.   Now you said you received various checks from the UMS, is

25     that correct?

H9D8TUC7                          Bradley - Cross

1    A.  Yes.

2    Q.  Okay.  And by the way, in terms of the checks that you

3    received, you indicated that there was a computer and that

4    there was access in this makeshift office, office on the tribal

5    grounds where one could access the financial records, is that

6    right?

7    A.  To my understanding, that's right.

8    Q.  Well, I thought I heard you say -- and correct me if I'm

9    wrong -- that you on occasion accessed them.

10   A.  I did not access it.

11   Q.  Okay.  Did you see anyone else access them?

12   A.  No.

13   Q.  Did you ask or know of anybody who asked to access them

14   from UMS?

15   A.  No.

16   Q.  Do you know of any occasion when requests were made for

17   financial records that was not granted by UMS?

18   A.  No.

19   Q.  Do you know, did you have access to all of the tribal bank

20   accounts in 2004?

21   A.  The tribal bank accounts, yes.

22   Q.  And how many tribal bank accounts did you have?

23   A.  I can't answer that.  There were numerous ones.

24              (Continued on next page)

25

H9D8TUC7                         Bradley - Cross

1    BY MR. ROTH:

2    Q.  How many different banks?

3    A.  Probably about ten.

4    Q.  You were the treasurer?

5    A.  Yes.

6    Q.  When the service agreement -- you said you couldn't find an

7    executed copy of the service agreement, is that correct?

8    A.  Yes.

9            MR. ROTH:  I am going to ask that the witness be shown

10   Defendants' 125.

11           THE COURT:  Ladies and gentlemen, I hate to leave you

12   in suspense, but you are going to have to wait until tomorrow

13   morning on that.

14           So, ladies and gentlemen, you know what I am going to

15   tell you, but I am going to say it anyway.  Do not discuss the

16   case among yourselves.  Do not discuss the case with anybody.

17   Do not do any research on your own, no Internet searches, no

18   conversations with anyone, no study on your own.  Put it out of

19   your mind.  You will be back tomorrow.  It's soon enough.  You

20   have plenty of things to do.

21           See you tomorrow, 10 minutes to 10 for a 10:00 start.

22           (Jury exits courtroom)

23           THE COURT:  Have a very pleasant evening, everyone.

24           Thank you.

25           (Adjourned to September 14, 2017, at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                          Page

RICHARD HAMNER

Cross By Mr. Bath . . . . . . . . . . . . . . . 130

Redirect By Mr. Ravi . . . . . . . . . . . . . 140

KELLY ROGERS

Direct By Mr. Velamoor . . . . . . . . . . . 146

Cross By Mr. Roth . . . . . . . . . . . . . . 224

Cross By Mr. Bath . . . . . . . . . . . . . . 245

Redirect By Mr. Velamoor . . . . . . . . . . 254

Recross By Mr. Bath . . . . . . . . . . . . . 275

RUSSELL BRADLEY

Direct By Mr. Velamoor . . . . . . . . . . . 276

Cross By Mr. Roth . . . . . . . . . . . . . . 305

GOVERNMENT EXHIBITS

Exhibit No.                                          Received

 5002   . . . . . . . . . . . . . . . . . . . 129

 4009   . . . . . . . . . . . . . . . . . . . 155

 1901   . . . . . . . . . . . . . . . . . . . 161

 1918   . . . . . . . . . . . . . . . . . . . 167

 1911   . . . . . . . . . . . . . . . . . . . 175

 2202   . . . . . . . . . . . . . . . . . . . 182

 2201   . . . . . . . . . . . . . . . . . . . 189

 1917 and 1902   . . . . . . . . . . . . . . 193

 1903   . . . . . . . . . . . . . . . . . . . 204

```
1                          GOVERNMENT EXHIBITS
                               (Continued)
2     Exhibit No.                                      Received

3      1904      .  .  .  .  .  .  .  .  .  .  .  .  .  . 207

4      1906 and 1909    .  .  .  .  .  .  .  .  .  . 208

5      1908      .  .  .  .  .  .  .  .  .  .  .  .  .  . 210

6      1907      .  .  .  .  .  .  .  .  .  .  .  .  .  . 213

7      1910      .  .  .  .  .  .  .  .  .  .  .  .  .  . 216

8      1905      .  .  .  .  .  .  .  .  .  .  .  .  .  . 223

9      1914      .  .  .  .  .  .  .  .  .  .  .  .  .  . 267

10     1707      .  .  .  .  .  .  .  .  .  .  .  .  .  . 271

11     1915      .  .  .  .  .  .  .  .  .  .  .  .  .  . 273

12     208       .  .  .  .  .  .  .  .  .  .  .  .  .  . 284

13     201       .  .  .  .  .  .  .  .  .  .  .  .  .  . 290

14     202       .  .  .  .  .  .  .  .  .  .  .  .  .  . 293

15     203       .  .  .  .  .  .  .  .  .  .  .  .  .  . 296

16     204       .  .  .  .  .  .  .  .  .  .  .  .  .  . 299

17     205       .  .  .  .  .  .  .  .  .  .  .  .  .  . 300

18     209       .  .  .  .  .  .  .  .  .  .  .  .  .  . 304

19

20

21

22

23

24

25
```