H9e1tuc1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                   16 Cr. 91 (PKC)

SCOTT TUCKER,
TIMOTHY MUIR,

            Defendants.

------------------------------x
                        September 14, 2017
                        10:32 a.m.

Before:
                HON. P. KEVIN CASTEL

                            District Judge

                  APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  NIKETH V. VELAMOOR
     HAGAN C. SCOTTEN
     SAGAR K. RAVI
     Assistant United States Attorneys

FREEMAN NOOTER & GINSBERG
     Attorneys for Defendant Tucker
BY:  LEE A. GINSBERG
     NADJIA LIMANI
      -and-
STAMPUR & ROTH
BY:  JAMES M. ROTH

BATH & EDMONDS, P.A.
     Attorneys for Defendant Muir
BY:  THOMAS J. BATH
      -and-
BEVERLY VAN NESS

1          (Trial resumed; jury not present)

2          THE COURT:  You don't need to sit down at the moment.

3   I've marked Court Exhibit 3 and Court Exhibit 4.  Court

4   Exhibit 3 is the limiting instruction tendered by the parties.

5   Court Exhibit 4 is the Court's markup of it, and you can take a

6   look at it and let me know.  Is this coming up immediately

7   or --

8          MR. VELAMOOR:  No.

9          THE COURT:  All right.  So you can take a look at my

10  markup and let me know what you think.

11         And bring our jury in, please.

12         (Continued on next page)

1           (Jury present)

2           THE COURT:  Please be seated.

3           Good morning, ladies and gentlemen.  I'm well aware of

4    the transportation difficulties this morning, and thank you for

5    your efforts to be here.  We're ready to go.

6           Please, when we pick up, have the witness on the

7    stand, all right?  And this applies to both sides.  If we go to

8    break and you're going to have a new witness, when we resume,

9    have the new witness in the box so that no time is taken out

10   for the additional step of getting the witness.  Thank you.

11          Good morning.  Please be seated.

12          Sir, the Court reminds you that you're still under

13   oath.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Okay.  You may continue, Mr. Roth.

16          MR. ROTH:  Thank you, your Honor.

17   RUSSELL BRADLEY, resumed.

18   CROSS EXAMINATION

19   BY MR. ROTH:

20   Q.  I just have a few more questions for you today, sir.

21   A.  Okay.

22   Q.  I think where we left off was a discussion regarding the

23   articles of incorporation for the KLC, Inc. corporation.

24          MR. ROTH:  Judge, on consent from the government, I

25   would ask that that be admitted, D 125.

1          THE COURT:  Any objection?

2          MR. VELAMOOR:  No, your Honor.

3          THE COURT:  Received.

4          MR. ROTH:  And I'd ask that that be published to the

5   witness and to the jury.

6   BY MR. ROTH:

7   Q.  Can you take a moment, sir, and look at that exhibit, and

8   that's -- I'm sorry.  I'm sorry.  125 -- I apologize.

9          That's the executed service agreement, is that right?

10  Take your time and look through it, sir, if you will, the

11  pages.  It's a multipage document.

12  A.  Yes.

13         MR. ROTH:  Could we take that down for a second,

14  Judge.  I'm sorry.

15         156, Ely, is the --

16         THE COURT:  Is that in evidence?

17         MR. ROTH:  Judge, I can proceed with this one, Judge,

18  while we find --

19         THE COURT:  D156 is in evidence, is that correct?

20         MR. ROTH:  By consent, yes.

21         THE COURT:  Have you offered it?

22         MR. ROTH:  No.

23         THE COURT:  Mr. Roth, have you offered it?

24         MR. ROTH:  I'm offering it and --

25         THE COURT:  Is there an objection?

1      MR. VELAMOOR:  Judge, may we have one moment.

2      THE COURT:  Sure.

3      (Counsel conferring)

4      MR. ROTH:  I'm sorry.  There was a confusion of the

5  extent that the consent was on.

6      Could we have the second page of that, Eli.

7      THE COURT:  You offered D156.  Is there an objection?

8      MR. VELAMOOR:  Your Honor, I think on agreement, this

9  exhibit, the second page and onwards, there's no objection.

10      THE COURT:  I didn't understand what you said.  As to

11  the second page and onwards?  What did you say before the words

12  "second page and onwards"?  I didn't hear you.

13      MR. VELAMOOR:  Your Honor, this, as it's been

14  presented, there's a letter on front.  We have no objection to

15  the service agreement that's attached to this letter, nor do we

16  have any objection to the check that's attached to this letter,

17  so we would propose that 156 be amended to include those pages,

18  and to the extent those are offered, we have no objection.

19      THE COURT:  Are you offering just this one page or are

20  you offering additional pages at this time?

21      MR. ROTH:  At this time, your Honor, I will just offer

22  the pages that the government consents to.

23      THE COURT:  Well, you have to identify it.  Listen, we

24  make a record here.  The reason Khris is here is because we

25  make a record of the proceeding, and that is a permanent record

1    of the trial, what's been admitted, and at a later date, one

2    can go back and see what happened.  In order for that to be an

3    intelligent process, the parties, both sides, have to identify

4    what they're offering with some precision so that I could look

5    at the record at a later date and see what happened.

6              So tell me what you're offering.

7              MR. ROTH:  The second -- I'll do it piece by piece,

8    Judge.  Judge, I'll be referring to it by the Bates stamp.

9              THE COURT:  Why don't you offer it.  You offered D156.

10   Why don't you offer 156A and 156B, if there are two pages.

11   I've never seen the document so I wouldn't know.

12             MR. ROTH:  I apologize.

13             THE COURT:  Don't talk over me, Mr. Roth.

14             Okay?  Would that be acceptable?

15             MR. ROTH:  Absolutely, your Honor.

16             THE COURT:  Okay.

17             MR. ROTH:  I would offer at this time 156A, 156B, and

18   156C.

19             THE COURT:  All right.  And D156A is what I'm looking

20   at on my screen as D156, is that the way you're doing it?

21             MR. ROTH:  That is correct, your Honor.

22             THE COURT:  All right.  And you're going to so mark

23   each of these exhibits?

24             MR. ROTH:  Yes, your Honor, absolutely.

25             THE COURT:  Okay.  Is there an objection to D156A,

1    156B, 156C?

2              MR. VELAMOOR:  Judge, as I understand it, we have no

3    objection to D156B or D156C.

4              THE COURT:  Okay.  Do you have an objection to D156A?

5    This is not a parlor game.

6              MR. VELAMOOR:  Yes, your Honor.

7              THE COURT:  What's the basis for your objection?

8              MR. VELAMOOR:  Because it's -- this is a --

9              MR. SCOTTEN:  He's not saying the first page is 156A.

10             MR. VELAMOOR:  Then I'm misunderstanding.

11             THE COURT:  You're basing your misunderstanding on

12   some sidebar talk on something that's not part of the record.

13   I didn't hear what you were saying.  I don't think the court

14   reporter got it down.  So if you have something to say for the

15   record, please say it for the record, okay?

16             MR. VELAMOOR:  We have no objection to the document

17   Bates stamped COH-000116, which is currently I believe on the

18   screen.

19             THE COURT:  All right.  That leaves us in the dark as

20   to the two other documents that have been offered.  There have

21   been three documents offered, as I understand it, by Mr. Roth.

22   The question I'm asking you is:  Do you have an objection to

23   all of them, some of them, or none of them?  I now know you

24   don't have an objection to -- and is 116 D156B?

25             MR. ROTH:  No.  That's A, your Honor.

1        MR. VELAMOOR:  And we have no objection to that.

2        THE COURT:  All right.  Somebody give me the hard copy

3   of these documents, because I don't have anything but what's on

4   the screen here.

5        MR. ROTH:  Absolutely, your Honor.

6        THE COURT:  And forgive me if I'm being precise about

7   this, but all the parties have hard copies of this, I do not.

8   I don't know what you're talking about.

9        So D156A is not D156, it's a different document,

10  correct?

11       MR. ROTH:  Yes, your Honor.

12       THE COURT:  Now you have something that's marked 156.

13  What's this document?  It looks like a service agreement and

14  you just have the number 156 on it.  Is that 156, is it 156A?

15       MR. ROTH:  Judge, perhaps --

16       THE COURT:  Let me see Mr. Roth and counsel at

17  sidebar.

18       Ladies and gentlemen, if you'd please return to the

19  jury room for a moment.

20            (Continued on next page)

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  I want Mr. Ginsberg and Mr. Bath up here

3     also and the other two government counsel so you can see what

4     I'm dealing with here.

5          Now I had something up on the screen that was labeled

6     D156.  You all saw it.  You heard that there were two

7     additional documents Mr. Roth was going to mark.  And I said,

8     "Why don't you mark them D156A and D156B."  I was then told

9     that there's a D156A, B, and C, which is perfectly fine.  And

10    there's a dispute.  Mr. Velamoor's telling me he consents to

11    one page but not to another page, and so I've asked Mr. Roth to

12    hand this up.  So tell me what this is, Mr. Roth.  What's the

13    exhibit number?

14          MR. ROTH:  156B, your Honor.

15          THE COURT:  That's what you see there, sir?

16          MR. ROTH:  No, I don't, your Honor.

17          THE COURT:  Then don't say that, sir, on the record.

18    What do you see marked on what you've handed me?

19          MR. ROTH:  156, Judge.

20          THE COURT:  And how am I supposed to know what this

21    is?

22          MR. ROTH:  I thought we put on the record the Bates

23    stamp numbers.

24          THE COURT:  I don't have the document.

25          MR. ROTH:  I know, Judge.  I understand.

H9e1tuc1                    Bradley - Cross

1           THE COURT:  Didn't I ask you to mark the document?

2           MR. ROTH:  Yes, your Honor.

3           THE COURT:  Okay.  Now tell me what exhibit this is

4    supposed to be.

5           MR. ROTH:  I mark them --

6           THE COURT:  No.  Just tell me what's marked on the

7    document.

8           MR. ROTH:  156A.

9           THE COURT:  Okay.  Now tell me, Mr. Roth, what this is

10   marked as.

11          MR. ROTH:  156A.

12          THE COURT:  So what you've tendered up to me as

13   Defendant's Exhibit 156A, B, and C are two exhibits marked

14   D156A and one exhibit marked D156.  You heard what I said about

15   making a record at this trial.  I can't understand what the

16   government's position is on any of these documents.  You rattle

17   off, both sides, Bates numbers.  They mean nothing to me.  I

18   don't have the documents.  They haven't been tendered to me.

19   This is unacceptable.

20          MR. ROTH:  I take responsibility for that.

21          THE COURT:  Do you have an objection?  First of all,

22   remark them, and then offer them, and let me see if there's an

23   objection.

24          (Counsel conferring)

25          THE COURT:  You all may be seated.

1          Wait a minute.  Is somebody going to tell me whether

2     the government has an objection?  Have you marked them,

3     Mr. Roth?

4          MR. VELAMOOR:  Well, we're going to staple it so it's

5     clear what one document is.

6          Judge, I believe defense counsel is about to mark up

7     one two-page document --

8          THE COURT:  Let's have it marked, then it's going to

9     be shown to me.  I can't trust the oral representations.

10          You're welcome to consider the Court as being

11     nitpicky.  I don't consider this nitpicky.

12          MR. ROTH:  Nor do I, Judge.

13          THE COURT:  So what are you offering now?

14          MR. ROTH:  I'm offering these two documents --

15          THE COURT:  No.  That's not how we do that in a

16     federal trial.

17          MR. ROTH:  156A --

18          THE COURT:  Excuse me a second, Mr. Roth, because you

19     have to learn this.  I've been making the point all along,

20     that's not how one speaks on the record in a federal trial.

21     "What are you offering?"  "I'm offering these two documents."

22     How would a Court of Appeals know what that means?  How would I

23     know, if there are any further motions in this case?  "These

24     two documents."  Could you please identify the documents you're

25     offering.

1      MR. ROTH:  I'm offering 156A and 156B.

2      THE COURT:  As marked.

3      MR. ROTH:  Yes.

4      THE COURT:  You're not offering Defendant's 156,

5  correct?  You're withdrawing that.

6      MR. ROTH:  That is correct.

7      THE COURT:  All right.  And there is no Defendant's

8  156C, is that correct?

9      MR. ROTH:  That is correct, your Honor.

10      THE COURT:  All right.  Mr. Velamoor, on behalf of the

11  government, do you have an objection to Defendant's

12  Exhibit 156A and 156B as now presently marked?

13      MR. VELAMOOR:  No, your Honor.

14      THE COURT:  Okay.  They are received into evidence.

15  Bring our jury in.

16      (Defendant's Exhibits 156A and 156B received in

17  evidence)

18      THE COURT:  And Defendant's 125 is withdrawn, is that

19  correct?

20      MR. ROTH:  I apologize, your Honor?

21      THE COURT:  Defendant's 125, is that withdrawn?

22      MR. ROTH:  Yes, Judge.

23      THE COURT:  Okay.  So that's withdrawn and stricken.

24      (Continued on next page)

25

1          (Jury present)

2          THE COURT:  Please be seated.

3          Ladies and gentlemen, we had a housekeeping detail or

4    two, as we have in every federal trial.  We've resolved them.

5          And Mr. Roth, whenever you're ready.

6          MR. ROTH:  Thank you, your Honor.

7          Could we publish 156A, please.

8    BY MR. ROTH:

9    Q.  Sir, can you identify what that is.

10   A.  That's a copy of a check that was issued to Kickapoo Tribe.

11   Q.  In what amount, sir?

12   A.  $20,000.

13   Q.  And there's a memo on that check, sir?

14   A.  Yes.  "Tribal management fee."

15   Q.  And what date is that check dated, sir?

16   A.  The date of the check is --

17   Q.  Can you read that there?  Maybe Eli can highlight that.

18   A.  Oh.  February the 2nd, 2004.

19   Q.  Thank you.  And to the best of your knowledge, has that

20   check been issued in connection with your activities as a

21   lender for the KLC Corporation?

22   A.  Yes.

23          MR. ROTH:  Could we have 156B published.

24          And the second page, Eli.

25   Q.  Do you see that document in front of you, sir?

1    A.  There is no document in front of me.

2    Q.  Oh, I'm sorry.

3           MR. ROTH:  Is it up there, Eli?

4    Q.  Can you see now, sir?

5    A.  Yes.

6    Q.  Okay.  And do you recognize that document?

7    A.  No.

8    Q.  Is that a copy of the service agreement that you identified

9    earlier on the government's -- in response to the government's

10   questions?

11          THE COURT:  If you know.

12   Q.  If you know.  The draft.

13   A.  Yes.

14          THE COURT:  No, no, no.  Sustained as to form.

15          The question, "Is that a copy of the service agreement

16   that you identified earlier on the government's -- in response

17   to the government's questions?  If you know.  The draft."

18   That's sustained as to form.  Put a new question to the

19   witness.

20   BY MR. ROTH:

21   Q.  Do you recognize that agreement, sir?

22   A.  No.

23   Q.  Could you go to the third page.

24          Do you recognize the signature above the line on the

25   last page KLC, Inc.?

1    A.   No.

2    Q.   Do you recognize the name, the printed name there?

3    A.   The printed name is Steve Cadue, but the signature doesn't

4    quite match what I remember it to be.

5    Q.   And he's the president, is that correct?

6    A.   He was the chairman at the time.

7    Q.   And going back to the first --

8              THE COURT:  Chairman of what?

9              THE WITNESS:  Chairman of the Kickapoo Tribe.

10             THE COURT:  Okay.  Thank you.

11   Q.   Going back to the first page, sir, does that indicate that

12   this is a service agreement that was entered into on

13   January 28, 2004 between the KLC, Inc., KLC, a corporation

14   chartered pursuant to the laws of the Kickapoo Indian tribe,

15   the Kickapoo Reservation, in Kansas, and Universal Management

16   Services, Inc. (UMS)?

17   A.   I have never seen this agreement before.

18   Q.   Now reading it now, does it seem to reflect the terms that

19   you described the tribe entered into an agreement with UMS to

20   do tribal lending?

21   A.   Yes, I believe that's the case, yes.

22   Q.   Okay.  That the UMS was going to provide the capital to the

23   tribe for the payday lending, right?

24   A.   Yes.

25   Q.   And National Money Services was going to service the loans,

1    is that correct?

2    A.  Yes.

3             MR. VELAMOOR:  Objection.

4             THE COURT:  What basis?

5             MR. VELAMOOR:  I believe that -- withdrawn, your

6    Honor.  I saw the transcript.

7             THE COURT:  All right.  The answer stands.  Go ahead.

8             MR. ROTH:  Thank you.

9    BY MR. ROTH:

10   Q.  And it indicated that the fee arrangement was going to be,

11   on paragraph 6 there --

12            MR. ROTH:  If you could highlight that, Eli.

13   Q.  -- $20,000 per month, a minimum fee while the agreement is

14   in force, with a maximum fee equal to 1 percent of the gross

15   collected revenue of the payday loan operation, is that

16   correct?

17            THE COURT:  No, no.  I'm not sure I understand the

18   question you asked.  Are you asking this witness is that what

19   the piece of paper says?  Is that your question?

20            MR. ROTH:  That's my first question, yes, Judge.

21            THE COURT:  Okay.

22   A.  As I recall, yes.

23   Q.  And, well, is that what this piece of paper says, the

24   service agreement?

25   A.  It goes with the -- my earlier testimony on the documents

1  that Universal Management Service gave to the tribe when they

2  made an agreement to the proposed -- proposal given to them to

3  make a decision on.

4  Q.  So in addition to reading that in the service agreement,

5  that's also your understanding about the terms of the

6  arrangement between your tribe and UMS?

7  A.  Yes.

8  Q.  Thank you.  Could we --

9         MR. ROTH:  Judge, I'd move Defendant's 147 into

10  evidence, on consent.

11         THE COURT:  Any objection?

12         MR. VELAMOOR:  May we just have a moment to see it on

13  the screen.

14         No objection, your Honor.  I've seen it.

15         THE COURT:  Okay.  Defendant's 147 is received into

16  evidence.

17         (Defendant's Exhibit 147 received in evidence)

18  BY MR. ROTH:

19  Q.  Do you see that in front of you, sir?

20  A.  No.

21  Q.  Oh.

22  A.  Okay.

23  Q.  Taking a while to do.

24         Is that document the articles of incorporation for

25  KLC, Inc.?

1  A.  That's what it says.

2  Q.  And it says it's a corporation organized under Kickapoo

3  Tribe of Kickapoo Reservation in Kansas, tribal corporation

4  code, is that correct?

5  A.  That's what it says.

6  Q.  And it says, "These articles of incorporation, in order to

7  form a corporate entity, pursuant to Kickapoo Tribe of the

8  Kickapoo Reservation in Kansas, tribal corporation code,

9  provide as follows," and then it goes on, is that correct?

10  A.  Yes.

11          MR. ROTH:  And Eli, could we have the last page of

12  that document, please.

13  Q.  And can you determine, sir, the names of the incorporators

14  that are listed there, that's highlighted in paragraph 13.1?

15  Do you recognize those names?

16  A.  I recognize Emily Conklin, who was the -- I believe the

17  vice chair at the time.

18  Q.  Of the?

19  A.  Of the Kickapoo Tribe.

20  Q.  Of the Kickapoo Tribe.  You just can't read the others, is

21  that fair to say?

22  A.  The others, I cannot define who they are.

23  Q.  I'd ask you to look at paragraph 12.2 of the agreement on

24  page 3 of the agreement.  We'll bring it up for you, sir.

25          Take a moment and read that, if you will, sir.

H9e1tuc1                    Bradley - Redirect

1  A.  Yes.

2  Q.  And that states, "The corporation shall be solely owned by

3  the Kickapoo Tribe of the Kickapoo Reservation in Kansas and

4  shall enjoy all of the privileges and immunities of the

5  Kickapoo Tribe of the Kickapoo Reservation in Kansas, including

6  but not limited to the right of sovereign immunity from

7  unconsented civil suit."  Is that correct?

8  A.  Yes.

9  Q.  Okay.  So do you see any, from your review of this

10  document, any waiver of sovereign immunity by the tribe?

11  A.  To me, this -- no, this is not waivering the sovereign

12  immunity.

13  Q.  It doesn't waive it, that's correct?

14  A.  No.

15  Q.  Is that correct, your testimony?

16  A.  Correct, yes.

17  Q.  And so this is one of those corporations of the tribe which

18  enjoys tribal sovereign immunity, is that right?

19          THE COURT:  Sir, do you know the answer to that

20  question?

21          THE WITNESS:  Yes, that is true.

22          THE COURT:  Okay.  All right.

23  Q.  That's true, you said?

24  A.  Yes, it is.

25          MR. ROTH:  Thank you.  No further questions.  Thank

1   you, sir.

2              THE COURT:  All right.  Any cross?

3              MR. BATH:  No, sir.  Thank you.

4              THE COURT:  Redirect?

5              MR. VELAMOOR:  Thank you, your Honor.

6   REDIRECT EXAMINATION

7   BY MR. VELAMOOR:

8   Q.  Mr. Bradley, just a few questions.

9              You were asked about some of the time you spent

10  looking for additional documents.  Do you recall that?

11  A.  What's that?  Could you ask that again.

12  Q.  Mr. Bradley, you testified that you searched for documents

13  after being contacted by the government, right?

14  A.  Yes, I did.

15  Q.  Okay.  And did you also search for documents way back in

16  2005 after you became the chairman again of the Kickapoo tribal

17  council?

18  A.  Yes, I did.

19  Q.  And at that time did you find any documents pertaining to

20  the end of any relationship with Mr. Tucker or any of his

21  companies?

22  A.  I couldn't find anything in relationship to this.

23  Q.  Okay.  Now you were also asked about bank accounts.  And I

24  believe you testified, sir, that as the treasurer, you had

25  access to tribal bank accounts, correct?

1   A.  Yes.

2   Q.  But did you have any access to the bank accounts of the

3   payday lending operation along with Mr. Tucker?

4   A.  No.

5   Q.  And that includes, for example, the US Bank accounts that

6   we asked you about which were on Government Exhibit 205,

7   correct?

8           MR. VELAMOOR:  Could we please put up 205 for the

9   witness.  And zoom in on the accounts at the bottom.

10  Q.  Let me ask the question again.  Mr. Bradley, you didn't

11  have any access to any of those US Bank accounts relating to

12  payday lending, correct?

13  A.  That's correct.

14  Q.  Now you were also asked about, and it was mentioned, the

15  Kickapoo Tribe's activities as a lender.  Do you recall that?

16  A.  Yes.

17  Q.  Now to be clear, did the Kickapoo Tribe or any Kickapoo

18  entity put up any money to offer any loans?

19  A.  No.  No one put up any money for loans.

20  Q.  Now you were also shown Defense Exhibit 147.

21          MR. VELAMOOR:  Can we please put that back up on the

22  screen, please.

23          And can we also zoom in on the paragraph that Mr. Roth

24  focused on, which is 3.1.

25  Q.  Now it's true, sir, that this paragraph refers to providing

H9e1tuc1

1    or administering short-term loans on lands of the Kickapoo

2    Tribe, correct?  That's what it says.

3    A.   That's what it says, yes.

4    Q.   But did anything happen on Kickapoo lands relating to the

5    payday loan business?

6    A.   No.

7    Q.   And to be clear, did the Kickapoo Tribe or any tribal

8    entity do anything except create documents like this or the KLC

9    Corporation, for this business?

10   A.   To my knowledge, yes.

11   Q.   I'm sorry.  Let me be clear.  Apart from creating this

12   corporation, did the Kickapoo Tribe do anything else relating

13   to the payday loan business?

14   A.   No.  That was it.  We just went into the formal process of

15   agreeing to agree.

16            MR. VELAMOOR:  Nothing further, your Honor.

17            THE COURT:  All right.  You may step down.  Thank you

18   very much.

19            THE WITNESS:  Thank you.

20            (Witness excused)

21            MR. VELAMOOR:  Your Honor, may we at this time offer

22   Government Exhibit 206.

23            THE COURT:  All right.  Is that the matter as to which

24   the proposed instruction was tendered this morning?

25            MR. VELAMOOR:  No, your Honor, it is not.

H9e1tuc1                    Martin - Direct

1           THE COURT:  Okay.  Go ahead.  Any objection to

2   Government Exhibit 206?

3           Can we bring the witness in in the meantime?

4           MR. VELAMOOR:  Surely.  That's fine.

5           THE COURT:  Yes.  Bring the next witness in.

6           MR. SCOTTEN:  The government calls Tafoya Martin.

7           THE COURT:  Say the name again?

8           MR. SCOTTEN:  Tafoya Martin.  T-A-F-O-Y-A, Martin,

9   common spelling.

10           THE COURT:  All right.

11           (Witness sworn)

12           THE COURT:  All right.  Thank you, Mr. Martin.  Just

13   pause for a second.

14           Now the government offered Exhibit 206.  Is there an

15   objection?

16           MR. ROTH:  No, your Honor.

17           THE COURT:  All right.  That's received.

18           (Government's Exhibit 206 received in evidence)

19           MR. VELAMOOR:  And may we show it to the jury, your

20   Honor.

21           THE COURT:  Yes, you may.

22           MR. SCOTTEN:  And Ms. Grant --

23           THE COURT:  One second.  One second.

24           MR. SCOTTEN:  And your Honor, if I may, I'm just going

25   to highlight a couple portions.

1          THE COURT:  You may highlight if you want.

2          MR. SCOTTEN:  Ms. Grant, can you please go to the

3    middle email, as it were, and highlight, just the From box.

4    That's fine.

5          And then we can take that highlight down.  And then

6    I'm going to ask you to highlight just the subject and the very

7    short body.

8          And if we could take that down.  And now can you just

9    highlight the body of the bottom email.

10          All right.  Thank you, Ms. Grant.  And we can take

11    that down, please.

12    TAFOYA MARTIN,

13          called as a witness by the Government,

14          having been duly sworn, testified as follows:

15    BY MR. SCOTTEN:

16    Q.  So good morning, Mr. Martin.

17    A.  Good morning.

18    Q.  Mr. Martin, can I ask where you live.

19    A.  I live in the Bronx.

20    Q.  And how long have you lived in the Bronx?

21    A.  Just over 19 years.

22    Q.  How old are you, sir?

23    A.  I'm 31.

24    Q.  Are you from the Bronx?

25    A.  No.  I was born in Jamaica, West Indies.

1    Q.  And how far did you go in school, sir?

2    A.  I got up to my third year in college.

3    Q.  And when was it that you left college?

4    A.  In 2010.

5    Q.  After you left college where did you go?

6    A.  I started working full time at Target as a --

7    Q.  What did you do at Target?

8    A.  I was a logistic team leader.

9    Q.  And what's that?

10   A.  Basically I controlled the inbound/outbound shipment in the

11   store, so I replenished the store.

12   Q.  And where do you work now?

13   A.  I work for Kmart stores.

14   Q.  Go ahead.  What do you do for them?

15   A.  Overnight store manager.

16   Q.  You're the overnight store manager?

17   A.  Right.

18   Q.  How long have you been up, sir?

19   A.  Maybe 14 hours.

20   Q.  Well, thank you for coming.

21        Let me ask you this:  Where were you working in 2011?

22   A.  I was working at Target.

23   Q.  And do you remember about how much you were making at the

24   time?

25   A.  A little under 40,000.

1   Q.  That's per year?

2   A.  Yeah.

3   Q.  Did you get involved with payday loans in 2011?

4   A.  I did.

5   Q.  And what caused you to get involved with payday loans?

6   A.  In April of 2011, my grandmother had a heart attack and I

7   had to get back home, so I needed a little extra cash to get

8   back to Jamaica.

9   Q.  And did you find a particular payday loan company?

10  A.  I did.  There was a commercial on TV, one with Montel

11  Williams, and on the commercial they explained that if you

12  needed cash, quick cash, you could go online or call a number

13  and you could secure money.

14  Q.  And so when you saw that ad, what did you do?

15  A.  I went online to MoneyMutual.com, and through the website,

16  I was able to get to the company One Click Cash.

17  Q.  And so once you got to that company, did you go to their

18  website?

19  A.  Yeah.

20  Q.  And so what happened at the One Click Cash website?

21  A.  I was able to apply for a loan and it was approved.

22  Q.  What kind of information did you have to put in to get that

23  loan?

24  A.  Your address, how much you made, a couple references,

25  personal references.

H9e1tuc1                    Martin - Direct

1    Q.  Do you remember if there were any documents associated with

2    the loan when you saw it?

3    A.  There was a -- I believe some kind of loan authorization

4    form.

5    Q.  Did you read that document?

6    A.  I skimmed through it.

7    Q.  Did you focus on any particular parts?

8    A.  I believe there was some boxes of -- highlighted with the

9    amount you borrowed, the interest, the total amount you'd

10   repay.

11   Q.  After you read those boxes did you feel you understood the

12   terms of your loan?

13   A.  I did.

14   Q.  Sir, I'm going to show you Government Exhibit 2401.  And if

15   you could please just flip through this and kind of look up

16   when you've taken a quick look.

17          Do you recognize it?

18   A.  I do.

19   Q.  And what is it?

20   A.  This is the form I had to sign to authorize the loan.

21          MR. SCOTTEN:  Your Honor, government offers

22   Exhibit 2401.

23          THE COURT:  Any objection?

24          MR. ROTH:  No.

25          THE COURT:  Received.

1          (Government's Exhibit 2401 received in evidence)

2          MR. SCOTTEN:  And if we could just put up the first

3    page.  And I'm going ask Ms. Grant to highlight the very upper

4    left corner where it says Applicant and Loan ID.

5    BY MR. SCOTTEN:

6    Q.  Sir, is that your name?

7    A.  That is.

8    Q.  And does it list the company that you took this loan from?

9    A.  It does.  One Click Cash.

10         MR. SCOTTEN:  And if we can take that down, Ms. Grant,

11   and just go to the upper right corner where it says Date.

12   Q.  And sir, what was the date you took this loan?

13   A.  April 5, 2011.

14         MR. SCOTTEN:  And Ms. Grant, if we can then go take

15   that highlight down and go to a little further down on the

16   right where it says Applicant's Address.

17   Q.  Now is that blacked-out portion there your exact street

18   address?

19   A.  If I could see it, but the zip code matches my zip code, so

20   I assume so.

21   Q.  And did you in fact live in the Bronx, New York at the time

22   you took this loan?

23   A.  I did.

24         MR. SCOTTEN:  Okay.  If we could take that down and go

25   to I believe the third page.

1    Q.  So looking at this page, do you see that box you referred

2    to before?

3    A.  Yes.

4    Q.  And when you referred to the four, the bold boxes, is that

5    those top four boxes?

6         Do you see the bold boxes in particular, are those the

7    boxes you referred to before?

8    A.  Yes.

9    Q.  I want to make sure we highlight the right thing.

10        MR. SCOTTEN:  So can we highlight those four boxes,

11   Ms. Grant.

12   Q.  Now looking at this, did you have an understanding of how

13   much of a loan you were taking out?

14   A.  I did.

15   Q.  And do you see that listed there?

16   A.  Yes.  The loan was for 350.

17   Q.  And what tells you that?

18   A.  The third box.

19   Q.  And if I can ask you just to read it.

20   A.  "The amount of credit provided to you on your behalf,

21   $350."

22   Q.  Did you have an understanding of how much interest you were

23   going to pay?

24   A.  I did.

25   Q.  And what box tells you that?

H9e1tuc1                    Martin - Direct

1    A.  The second box, "The dollar amount the credit will cost

2    you, 105."

3    Q.  And did you have a sense of the total amount you were going

4    to pay?

5    A.  I did.

6    Q.  And what box told you that?

7    A.  The fourth box.

8    Q.  What does it say on the fourth box?

9    A.  "The amount you will have paid after you have made the

10   scheduled payments, $455."

11   Q.  After you read that, did you have any confusion or lack of

12   clarity as to what your scheduled payments were going to be?

13   A.  No.

14        MR. SCOTTEN:  If we can take down that highlight.

15   Q.  So after you received these loan documents, did you in fact

16   get the loan?  Did you get the $350?

17   A.  I did.

18   Q.  And do you remember what happened next with respect to this

19   loan?

20   A.  So the money was deposited in my account, and basically --

21   basically on the day I would get paid, which I was paid

22   biweekly, I would repay the loan on those days.

23   Q.  And do you remember how many payments you made at first?

24   A.  I believe I made four payments of 105.

25   Q.  I'm going to show you what is marked as Government

1    Exhibit 2402.  Can you take a flip through these, starting at

2    the back, and then just look up when you're familiar.

3    A.  Yeah.

4    Q.  And what are we looking at, or what are you looking at

5    right now?

6    A.  These were the payments that I repaid.

7              MR. SCOTTEN:  Government offers 2402.

8              THE COURT:  Any objection?

9              MR. ROTH:  No, your Honor.

10             THE COURT:  Received.

11             (Government's Exhibit 2402 received in evidence)

12             MR. SCOTTEN:  And can we publish the last page to

13   start, Ms. Grant.

14             And can we just highlight the only part that actually

15   has text on it so it's a little bigger.  Thank you.

16   BY MR. SCOTTEN:

17   Q.  So Mr. Martin, can you just explain to the jury what we're

18   looking at here.

19   A.  That's the first payment I paid back on the loan.  This was

20   taken from my account automatically.

21   Q.  And what date was it?

22   A.  This was April 29, 2011.

23   Q.  And what was the payment you made?

24   A.  It was $105.

25             MR. SCOTTEN:  I'm just going to leave this up for a

1  minute.

2  Q.  Can I ask you, after you made those four payments, what

3  happened?

4  A.  I went online to One Click Cash to check if my loan was

5  satisfied, and it stated that it was not.

6  Q.  Do you remember how much you still owed?

7  A.  The full amount.  I still owed everything.

8  Q.  How many payments had you made at that point?

9  A.  Four.

10  Q.  Of how much?

11  A.  105.

12  Q.  And your recollection is you still owed everything?

13  A.  Yeah.

14  Q.  So looking at this first payment form here, do you see

15  where it tells you that none of that was going to pay down your

16  loan?

17  A.  No.

18  Q.  Does it say anything about only being interest?

19          THE COURT:  You're referring to what's up on the

20  screen, the email reminder, sir?

21          MR. SCOTTEN:  Yes, sir.

22          THE COURT:  Okay.  Thank you.

23          (Continued on next page)

24

25

1   BY MR. SCOTTEN:

2   Q.  Does anything on this e-mail reminder tell you anything

3   about where your money was going, whether it was to principal

4   or interest?

5   A.  It does not show.

6   Q.  When you received this, did it change your view in any way

7   as to what your loan terms were?

8   A.  No.

9           MR. SCOTTEN:  If we could just, Ms. Grant, cycle to

10  the next one up.

11  Q.  What is the date here?

12  A.  This is May 13, 2011.

13  Q.  Do you remember how much you paid then?

14  A.  It was 105.

15  Q.  Anything on this reminder indicate to you that you were not

16  paying down your loan?

17  A.  No.

18          MR. SCOTTEN:  Can we go to the next one, Ms. Grant.

19  Q.  I just want to draw your attention to the date.  Does this

20  appear to be a duplicate?

21  A.  It is.

22  Q.  Let's go to the next one.

23          What is the date here, sir?

24  A.  May 27.

25  Q.  How much was the payment?

1    A.  105.

2    Q.  Anything here indicate that you were not paying down your

3    loan?

4    A.  No.

5          MR. SCOTTEN:  Take down the highlight.

6    Q.  So that's the four payments you had made before you went

7    online?

8    A.  Yes.

9          MR. SCOTTEN:  Let's go to the fifth one, please.

10         I'm sorry.  The next one after that.

11   Q.  How much was the payment here?

12   A.  It was 155.

13   Q.  Do you remember actually making a $155 payment?

14   A.  I did.

15   Q.  How did you learn about that payment?

16   A.  So I checked my account, and I saw that it was actually two

17   amount that was deducted from my account.

18   Q.  What were those two amounts?

19   A.  It was 105 and $50, same day but separate transactions.

20   Q.  Were you expecting that?

21   A.  No.

22   Q.  Were you surprised?

23   A.  I was.

24   Q.  What did you do when you were surprised by that $155

25   payment?

1    A.   I called the number for One Click Cash.

2    Q.   Did you get through?

3    A.   I did.

4    Q.   Can you describe the conversation, as best you remember it.

5    A.   From what I remember, I was told that I was paying the

6    interest on my loan, and I still owed the full amount.

7    Q.   Did you agree to keep paying?

8    A.   No.  I told them I would not pay a single more payment.

9    Q.   What happened after that?

10   A.   My account was charged again, I believe for 140.

11   Q.   After you were charged $140, despite saying you wouldn't

12   pay, did you do anything else?

13   A.   I called my bank and I told them to stop the payments.

14   Q.   After you called your bank to stop the payments, is that

15   the end of your dealings with One Click Cash?

16   A.   No.

17   Q.   What happened?

18   A.   There were, I believe, collection calls.

19   Q.   How often?

20   A.   Daily, weekly, while I was at work.

21   Q.   You were called while you were at work?

22   A.   Yeah.

23   Q.   Did you receive a lot of these calls?

24   A.   I did.

25   Q.   How did that make you feel?

1   A.  Like I did something wrong.

2   Q.  Did you believe you had done anything wrong?

3   A.  No.

4   Q.  Did those calls eventually stop?

5   A.  It stopped after I agreed to settle the payments.

6   Q.  What did you have to do to settle the payments?

7   A.  I had to pay that amount back to the company.

8   Q.  Over and above what you had already paid?

9   A.  Yeah.

10  Q.  Do you have a sense of how much in total you paid for this

11  $350 loan?

12  A.  I don't know the exact amount, but I know it's over $600.

13          MR. SCOTTEN:  Nothing further, your Honor.

14          THE COURT:  All right.  Cross-examination.

15  CROSS-EXAMINATION

16  BY MR. BATH:

17  Q.  Mr. Martin, I understand this took place some time ago so

18  you may not remember all the details, is that fair to say?

19  A.  That's fair.

20  Q.  So when you were asked about the timing of some of those

21  payments and when you paid them, you're sort of using your best

22  recollection, is that fair?

23  A.  That's fair.

24  Q.  Did you pull or have you seen your bank records from back

25  then to help you refresh your memory?

1    A.  I did look at them last week.

2    Q.  Oh, OK.  So you have looked at them, but you don't have

3    them with you here today?

4    A.  No.

5    Q.  So because they are not here, that's why you're still

6    saying, I think I paid about X amount, fair to say?

7    A.  That's fair.

8    Q.  All right.

9        You said in 2011 you were working at Target?

10   A.  Yes.

11   Q.  You made about 40,000 a year?

12   A.  Under.

13   Q.  Do you remember how much you made?

14   A.  Maybe 38,000.  I'm not sure.

15   Q.  Just under 40?

16   A.  Yeah.

17        MR. BATH:  Can I have Government's Exhibit 2401,

18   please.

19   Q.  Do you remember seeing that just a minute ago, it's the

20   application, Mr. Martin?

21   A.  Yeah.

22   Q.  Now, we looked at the first page earlier.  I want you to

23   look at the second page, please.

24        Had you seen this document before you came in here

25   today?

1   A.  I have.

2   Q.  I assume you met with agents of the government and looked

3   at this?

4   A.  Yeah.

5   Q.  If you need more time, just let me know.  All right?

6           Do you see the first third of the page down it says

7   "application supplement," do you not?

8   A.  Yeah.

9   Q.  Do you see that last sentence --

10          THE COURT:  Can we blow up this last sentence in that

11  first paragraph, Eli, please, "you may want."

12  Q.  Was that sentence in these documents when you signed this?

13  A.  I assume so.

14          MR. BATH:  Go down to the next paragraph for me.  It

15  begins "you will be charged."

16  Q.  Was this also in those documents?

17  A.  I assume so.

18  Q.  Is this part where you said earlier you sort of skimmed the

19  documents?

20  A.  Yeah.

21  Q.  So is it fair to say then you didn't read them carefully?

22  A.  I didn't.

23  Q.  Your education is you had college, three years of college?

24  A.  Yes.

25  Q.  Is that yes, sir?

1    A.  Yes.

2    Q.  What were you studying?

3    A.  Engineering.

4    Q.  What kind of engineering?

5    A.  Mechanical.

6    Q.  The information in this paragraph that I have highlighted

7    talks about renewal of the loan, does it not?  Do you see that?

8    A.  Yes.

9    Q.  Again, fair to say you didn't really pay close attention to

10   that?

11   A.  I didn't.

12          MR. BATH:  If we can go to the next page, please.

13          And if we can highlight the top third there, please,

14   Eli.

15   Q.  We are seeing -- these are the boxes that you were shown on

16   direct, correct?

17   A.  That's correct.

18   Q.  Under the boxes, the first sentence says, "Your payment

19   schedule will be one payment of 455 due on 2011/4/29 if you

20   decline asterisk the option of renewing your loan."

21          Did I read that correctly?

22   A.  You did.

23   Q.  Then if we can go to the fifth page, please, sir.

24          At the very bottom is your electronic signature, is

25   that correct?

1    A.  Yes.

2    Q.  That was done on 4/5 of '11, correct?

3    A.  Yes.

4    Q.  Above that, paragraph 8 has some language that's boxed,

5    correct?

6    A.  Yes.

7    Q.  This information was all in these documents as well, was it

8    not?

9    A.  I assume so.

10   Q.  And in this payment options it talks -- the first paragraph

11   talks about renewal again, does it not?

12   A.  It does.

13   Q.  And the last sentence of that paragraph (a) says, "Any fees

14   accrued will not go toward the principal amount owed."

15          Do you see that?

16   A.  I do.

17   Q.  Did I read that correctly?

18   A.  Yes.

19   Q.  Mr. Martin, I am going to hand you what has been marked as

20   Defendants' Exhibit 1205.

21          Do you recognize that as being an e-mail you had

22   received from One Click Cash?

23   A.  I don't remember receiving this.

24          MR. BATH:  I offer 1205.

25          THE COURT:  Any objection?

1              MR. SCOTTEN:  Foundation, your Honor.

2              MR. BATH:  I believe this has been stipulated to.

3              MR. SCOTTEN:  Not authenticity.  The witness doesn't

4    remember.  He said he doesn't recall it.  It has no relevance.

5              THE COURT:  It's been stipulated as to authenticity?

6              MR. SCOTTEN:  Yes, your Honor.

7              THE COURT:  I thought you said not as to authenticity.

8              MR. SCOTTEN:  No doubt as to authenticity.  The

9    witness doesn't seem to remember it.

10             THE COURT:  You can probably get it into evidence

11   through another witness, but through this witness, unless you

12   want to try again, Mr. Bath.

13             MR. BATH:  Understood.

14   BY MR. BATH:

15   Q.  Mr. Martin, let me ask you this.  You said earlier when the

16   government asked you some questions that you got online.  Do

17   you remember that?

18   A.  Yeah.

19   Q.  How did you know to get online?

20   A.  I wanted to check how much the payments were.

21   Q.  That was why you wanted to get online.  How did you get the

22   information to tell you to get online?

23   A.  What do you mean?  I went to my bank.

24   Q.  I see.  Did you ever go in and just -- when you said you

25   went online, you went onto the bank or you went onto One Click

1  Cash?

2  A.  I went to my bank.  I was looking up the payments that got

3  taken out of my account.

4  Q.  I thought you said on direct testimony that you went online

5  and you could see something wasn't being applied towards

6  principal.  Did I misunderstand?

7  A.  No, I did say that, yeah.

8  Q.  Well, your bank records wouldn't show you that, correct?

9  A.  No.

10  Q.  So you got online to the Web site for One Click Cash, did

11  you not?

12  A.  I did.

13  Q.  And you must have gotten information from One Click Cash to

14  know to do that, correct?

15  A.  No.  I was talking about back when I took the loan out.

16  This was recently.

17  Q.  Some document or information was given to you by One Click

18  Cash to tell you how to check the loan, correct?

19  A.  Yeah.

20  Q.  Any of the documents that we saw when the government asked

21  you questions, do any of those documents have that information

22  in them?

23  A.  I don't recall.

24  Q.  So perhaps there are other documents you got that we

25  haven't seen?

1    A.  The only paper I recall was the first one that I was shown

2    with the repayment amounts.

3    Q.  Would you agree with me, if those documents don't have

4    information on how to get online, you must have received

5    something else?

6    A.  It's probable.

7    Q.  And you just don't remember as you sit here today?

8    A.  Right.

9    Q.  It's possible you got other documents in this process as

10   well that we haven't seen, is that fair to say?

11   A.  That's fair.

12   Q.  You just can't remember, right?

13   A.  Yeah.

14   Q.  All right then.  Thank you.

15           MR. BATH:  That's all I have.

16           THE COURT:  Any redirect?

17           MR. SCOTTEN:  Briefly, your Honor.

18   REDIRECT EXAMINATION

19   BY MR. SCOTTEN:

20   Q.  Sir, do you remember the attorney here asked you if you

21   remembered all the details of your payments?

22   A.  Yeah.

23   Q.  And you said you don't quite, it's been a while?

24   A.  Yeah, it's been about seven years.

25   Q.  Did you make a complaint at the time that this occurred?

1    A.  I did.

2    Q.  Did you send that complaint to the Better Business Bureau?

3    A.  I did.

4    Q.  Did you make that complaint at the time --

5            MR. BATH:  Objection.  Outside the scope.

6            THE COURT:  I will allow it.

7    Q.  Did you make that complaint at the time the events were

8    fresh in your memory?

9    A.  Yes.

10   Q.  Do you believe your recollection then was accurate?

11   A.  Yeah.

12   Q.  I am going to show you what I have now marked as Government

13   Exhibit 3524-02.

14           MR. SCOTTEN:  The defense will have it as 3524-02 in

15   the 3500.

16           I am going to hand up a copy to the Court.

17   Q.  Can you just take a look at that and tell me if you

18   recognize mostly this text right here?

19   A.  Yes.  This is the complaint I made to the Better Business

20   Bureau.

21           MR. SCOTTEN:  The government offers 3524-02 as a past

22   recollection recorded.

23           THE COURT:  Any objection?

24           MR. BATH:  Yes, Judge.  He didn't record that

25   recollection.  It was another company.  It's hearsay and lack

1    of foundation.

2    Q.  Are those words that you wrote, Mr. Martin?

3    A.  I did.

4          THE COURT:  It seems to me that your objection is

5    sustained for the bottom half of the page, carrying over to the

6    other page, because that extends beyond this individual's

7    statements and recollection.  Otherwise it's received.

8          3524-02 is received redacted for the information that

9    may have been recorded by another party.

10         MR. SCOTTEN:  Understood, your Honor.

11         (Government's Exhibit 3524-02 received in evidence)

12   Q.  Can you read the part that you wrote starting right here?

13   A.  "On April 5, 2011 --"

14   Q.  You will have to read it slowly for the court reporter.

15   A.  "On April 5, 2011, I took out a loan with One Click Cash in

16   the amount of $350."

17         THE COURT:  That was One Click Cash, right?

18         THE WITNESS:  Yes.

19         THE COURT:  Go ahead.

20   A.  "It was my understanding that I would repay One Click Cash

21   through" -- I believe that's a typo.

22         THE COURT:  It says the word "aromatic,"

23   A-R-O-M-A-T-I-C.

24         Go ahead.

25   A.  "Through automatic debit taken from my account biweekly in

1    the amount of $105 at a time.  The total I would pay $455

2    through my scheduled payments.  On April 29, the first debit

3    was taken from my account in the amount of 105.  The second was

4    on May 13 for 105.  On May 27, the third debit was 105.  The

5    fourth on June 11 for 105.  Today, June 24, I noticed two debit

6    of 105 and $50.  I then decided to check my One Click Cash

7    account to see if my debit was satisfied.  It was not --"

8            THE COURT:  "I noticed it was not."  Is that correct?

9    A.  "I noticed it was not and that a future debit was scheduled

10   for July 8 in the amount of $140.  I thought they had made a

11   mistake so I called to ask for an explanation on the charges to

12   my account.  I wanted to know why it was still being charged

13   for a loan of $350 if I had paid in total $575 since April 29.

14   I was then told that the $575 does not satisfy my loan balance

15   and the payment that was debited was finance charges."

16           THE COURT:  Was?

17           THE WITNESS:  Was finance charges.

18   A.  "I am very unhappy with this company.  I think they take

19   advantage of people who are financially unstable and think I

20   was overbilled and they should repay me $120."

21   Q.  Thank you, sir.  You can put that down.

22           Just a couple of other questions.

23           MR. SCOTTEN:  Can we put back up 2401, the loan

24   document.

25   Q.  Do you remember a minute ago the defense attorney walked

1    you through many provisions in there?

2    A.   I do.

3    Q.   And he read you many provisions?

4    A.   He did.

5    Q.   Did you have an attorney sitting with you when you read

6    this?

7    A.   No.

8    Q.   When you read this for the first time, was an attorney

9    standing over your shoulder to point you to particular

10   provisions?

11   A.   No.

12          MR. SCOTTEN:  Can we go to the third page?

13          If we can just blow up the box that says "total

14   payments."

15   Q.   After you read this, did you feel you had a competent

16   understanding of the loan terms?

17   A.   I did.

18   Q.   Did you feel any need to consult with an attorney?

19   A.   No.

20   Q.   Have any desire for an attorney to walk you through these

21   loan documents?

22   A.   No.

23          MR. SCOTTEN:  Thank you.  No further questions, your

24   Honor.

25          THE COURT:  You may step down, sir.  Thank you.

1          (Witness excused)

2          MR. VELAMOOR:  Should we call our next witness?

3          THE COURT:  You should call your next witness.

4          Ladies and gentlemen, we are going to take our break

5     and the government will have their next witness on the stand

6     when we get back from the break.  So see you in ten minutes.

7          Before you leave, please do not discuss the case among

8     yourselves or with anyone.  Keep an open mind.  See you in ten

9     minutes.

10         (Jury exits courtroom)

11         THE COURT:  Any objection to Court Exhibit 4, which is

12    the Court's markup of the tendered agreed upon instruction,

13    limiting instruction?

14         MR. RAVI:  Not from the government.

15         MR. GINSBERG:  Not from the defendant.

16         MR. BATH:  No, sir.

17         THE COURT:  Thank you.

18         (Recess)

19         (Continued on next page)

20

21

22

23

24

25

H9E8TUC2                    Rubin - Direct

1          THE COURT:  Bring our jury in, please.

2          (Jury present)

3          THE COURT:  Sir, if you will remain standing.

4          MR. VELAMOOR:  The government calls Adrian Rubin.

5    ADRIAN RUBIN,

6         called as a witness by the government,

7         having been duly sworn, testified as follows:

8          THE DEPUTY CLERK:  State your name and spell it for

9    the record, please.

10          THE WITNESS:  Adrian, A-D-R-I-A-N, Rubin, R-U-B-I-N.

11   DIRECT EXAMINATION

12   BY MR. VELAMOOR:

13   Q.  Mr. Rubin, how old are you?

14   A.  I'm 60 years old.

15   Q.  Where are you from?

16   A.  Philadelphia, Pennsylvania.

17   Q.  How far did you go in school?

18   A.  I went to graduate school, graduated with a master's

19   degree.

20   Q.  In what?

21   A.  Business finance.

22   Q.  When did you get that degree?

23   A.  Sometime around 1982.

24   Q.  After you got that degree, what did you do next?

25   A.  After, I went to work for a mortgage banking firm in North

1    Jersey for a few months.

2    Q.  After those few months, what did you do next?

3    A.  After that, I got involved in the check cashing business in

4    Philadelphia.

5    Q.  Briefly, what do you mean by a check cashing business?

6    A.  A retail location where an individual would come in and

7    either cash a check or buy money orders or pay bills, a normal

8    retail check cashing agency.

9    Q.  How long did you remain in that kind of business?

10   A.  From approximately 1983 until 2015.

11   Q.  Did you also engage in other businesses during that time

12   period?

13   A.  Yes.

14   Q.  Briefly speaking, what kind of other businesses?

15   A.  I was involved in the payday loan business.

16   Q.  How long were you involved in just the check cashing

17   business?

18   A.  The check cashing business was, again, from approximately

19   1983 until 2015.

20   Q.  After you started in the check cashing business, did you

21   commit any crimes?

22   A.  I did.

23   Q.  When?

24   A.  It was sometime around 1995 that I was not paying my taxes

25   and I evaded taxes, and I also did not file what is called a

1    currency transaction report.  When an individual comes in and

2    cashes a check over 10,000, that's a requirement by the IRS,

3    and I did not do that.

4    Q.  How much in taxes did you evade?

5    A.  It was approximately 1.6 million.

6    Q.  Were you prosecuted for evading your taxes?

7    A.  I was.

8    Q.  Did you plead guilty or did you go to trial?

9    A.  I pleaded guilty.

10   Q.  How much of a sentence did you get?

11   A.  The sentence was one year and one day.

12   Q.  How much did you ultimately serve of that sentence?

13   A.  Ten and a half months.

14   Q.  Did you do anything in that case to try to reduce the

15   sentence that you got?

16   A.  Yes.

17   Q.  What did you do?

18   A.  I cooperated with the government.

19   Q.  Briefly, what kind of cooperation did you provide to the

20   government during that case?

21   A.  I cooperated with the government regarding my tax evasion

22   and explained to them how much I evaded and how I evaded the

23   tax.  I cooperated against certain individuals that were coming

24   into my check cashing agency that were -- one was a Jamaican

25   group of individuals that were sending Western Union money

1    illegally, and I cooperated regarding that.  I think there was

2    another individual that was cashing checks that -- I can't

3    remember specifically -- that was not doing the right thing.

4    Q.  I believe you mentioned that you ended up serving a bit

5    under a year for that case?

6    A.  Yes, it was approximately ten and a half months.

7    Q.  When did you approximately get out of jail after that

8    sentence?

9    A.  I think it was in December of '97.

10   Q.  What kind of work did you do after you got out of jail?

11   A.  When I got out of jail, I still had a few check cashing

12   agencies, and I was buying some real estate for a period of

13   time.  And then sometime in '98, I got involved in the payday

14   loan business.

15   Q.  How did you first become involved in the payday loan

16   business?

17   A.  I heard an advertisement on the radio saying, if you need a

18   payday loan, please call this 800 number.  And the loans were

19   provided by County Bank of Rehoboth Beach, Delaware.

20   Q.  Is that what the advertisement said, that the loans are

21   provided by County Bank in Delaware?

22   A.  Yes.

23   Q.  That advertisement was directed at possible payday loan

24   customers, right?

25   A.  Yes.  I believe the name also mentioned in that ad was

1    Telecash.

2    Q.  After you saw the advertisement, what did you do next?

3    A.  I first tried to call the 800 number to find out if I can

4    get more information, and I couldn't.  Then I contacted County

5    Bank of Rehoboth Beach, Delaware and spoke to a gentleman by

6    the name of Harold Slatcher.

7    Q.  Who is Mr. Slatcher?

8    A.  Mr. Slatcher at that time was the president of County Bank.

9    Q.  Did Mr. Slatcher direct you to do anything?

10   A.  He did.  He told me if I wanted any more information, it

11   would be best if I called a gentleman by the name of Charles

12   Hallinan.

13   Q.  You said Charles Hallinan?

14   A.  Yes, Mr. Hallinan.

15   Q.  Did you in fact contact Mr. Hallinan?

16   A.  I did.

17   Q.  What happened when you contacted Mr. Hallinan?

18   A.  When I contacted Mr. Hallinan, I told him that -- I met

19   with him and his partner, who was Rick Mickman, and that I was

20   interested in getting some knowledge about how the payday loan

21   business worked.  Then we had a conversation regarding how it

22   worked and spoke about it in general terms.

23   Q.  We will talk a lot more about that payday loan business in

24   a minute.

25            Did you ultimately agree to get involved in payday

1   lending with Mr. Hallinan?

2   A.  With Mr. Hallinan and Mr. Mickman I did.

3   Q.  How long did you remain in the payday lending business?

4   A.  From approximately October late '98, somewhere around

5   October '98 until 2012.

6   Q.  Did you also commit crimes in connection with your payday

7   lending business?

8   A.  Yes.

9   Q.  Did you ultimately plead guilty to those crimes?

10  A.  Yes.

11  Q.  Did you plead guilty here in New York or somewhere else?

12  A.  I pleaded guilty in Philadelphia, in the Eastern District.

13  Q.  When did you plead guilty?

14  A.  I think it was approximately around June or July of 2015.

15  Q.  What did you plead guilty to?

16  A.  I pleaded guilty to RICO.  I pleaded guilty to -- which

17  involved the payday loan business.  I pleaded guilty to

18  conspiring in another related business that I was involved in,

19  which was a credit card business, along with aiding and

20  abetting regarding the credit card business.

21  Q.  So it sounds like you pleaded guilty to crimes in

22  connection with two businesses that you were involved in?

23  A.  That's correct.

24  Q.  First you mentioned was the payday lending business, is

25  that right?

1    A.  Yes.

2    Q.  And you pleaded guilty to RICO charges in connection with

3    the payday lending business?

4    A.  I did.

5    Q.  What did you do that made you guilty of RICO in connection

6    with the payday lending businesses?

7    A.  I conspired with County Bank of Rehoboth Beach, Delaware,

8    and an Indian tribe by the name of Guideville to pretend that

9    they were the lenders, to evade state laws and state

10   regulators, because I was charging exorbitant rates amongst all

11   the states within the United States.  That's part of my RICO

12   charge.

13   Q.  When you say exorbitant rates, what do you mean?

14   A.  Exorbitant rates meaning that in giving a loan out to a

15   consumer, the rates that were being charged, the annual

16   percentage rates, ranged from in the 700 percent annual

17   percentage rate to possibly 1200, 1500 annual percentage rate.

18   Q.  Now, you mentioned that you conspired to pretend that both

19   County Bank and a tribe was the lender, right?

20   A.  That is correct.

21   Q.  We will talk about the County Bank piece in a minute.

22   Let's start with the tribe.  Which tribe did you use for your

23   business?

24   A.  The tribe was called the Guideville tribe.

25   Q.  How did you use that tribe to pretend that the tribe was

1    the lender?

2    A.   Well, documents were prepared by a gentleman by the name of

3    Wheeler Neff, who was an attorney, to pretend that the tribe

4    was the true lender and that the tribe -- it was the tribe's

5    money, and that the tribe would be approving the loans.  The

6    money that I deposited, which was my money, went into a tribal

7    account that I had control over.  So the whole tribal model,

8    let's call it, was a total sham.

9    Q.   What was the idea behind using a tribe to pretend the tribe

10   was the lender?

11   A.   Again, it was to pretend that the tribe was the lender,

12   when it was not, and that would be another way, similar to the

13   County Bank model, that would be a way to evade state usury

14   laws and state regulators.

15   Q.   How could pretending that the tribe was the lender be a way

16   to evade usury laws?

17   A.   Because supposedly the tribe had sovereign immunity.

18   Q.   Briefly, what do you mean by sovereign immunity?

19   A.   It was told to me by the attorney, attorneys, that a

20   federally recognized tribe in the United States has sovereign

21   immunity, meaning that if there was any inquiries from any

22   state regulators or banking commissions or attorneys, where

23   they would issue a subpoena questioning the legality of the

24   payday loan, that the tribe would not have to respond to it

25   because they had sovereign immunity and by law they would not

1    have to respond to the inquiries.

2           THE COURT:  Ladies and gentlemen of the jury, as I

3    have told you throughout the case, at the conclusion of this

4    trial, I will give you the instructions on the law as relevant

5    to the charges in this case, and it's my instructions on the

6    law alone that you must consider.

7           Go ahead.

8           MR. VELAMOOR:  Thank you, your Honor.

9    BY MR. VELAMOOR:

10   Q.  What were the basic terms of your financial arrangement

11   with the tribe?

12   A.  The financial arrangement with the tribe was to pay a

13   minimum monthly amount of approximately $22,000 a month, or 1

14   percent of the gross income minus the bad debt, whichever was

15   greater.

16   Q.  What was the purpose of paying the tribe that amount?

17   A.  It was to, in essence, rent the tribe's name, to make

18   believe that the tribe was the actual payday loan lender.

19   Q.  Did you enter -- I believe you mentioned this.  You entered

20   into some contracts with the tribe or certain tribal entities?

21   A.  Yes.

22   Q.  How did these contracts relate to how you actually

23   conducted the payday loan business?

24   A.  There was -- when I entered the tribe day one, there was no

25   difference than a day before that I was doing business in the

1    payday loan business, with the exception that on all the

2    documents changed, that the tribal entity was the lender, when

3    in fact they weren't, along with bank accounts moved from my

4    company name prior to that, which was First National Services,

5    into a tribal bank account, but I had full control of the

6    moneys, which was my money, in the tribal accounts.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. VELAMOOR:

2    Q.  So did the documents and the contracts accurately describe

3    how you were conducting the business?

4    A.  No.

5    Q.  How long did you remain in the payday lending business with

6    the tribe?

7    A.  It was a very short period of time, from the beginning of

8    January until approximately mid March, three months later, that

9    we stopped giving out loans, and after that point in time --

10              MR. ROTH:  Judge, can we have the year, please.

11              THE COURT:  Yes.  Set a period of time.

12   Q.  I believe you said it was just a few months.  Just a few

13   months of what year?

14   A.  I'm sorry.  It was January of 2012 to March of 2012 that we

15   gave out loans under the tribal entity, and then a few months

16   thereafter, we did not give out any money, any loans, but we

17   collected some of the money that was due.

18   Q.  So just to be clear, was your tribal relationship the last

19   relationship you entered into relating to your payday lending

20   business?

21   A.  Yes.

22   Q.  And how come you stopped payday lending?

23   A.  Sometime January 31st of 2012, the FTC, regarding the

24   credit card business, came into three of offices, one being my

25   office and two being offices of my two sons.

1   Q.  And were you also contacted by other parts of the

2   government?

3   A.  Sometime, a month later to a month and a half later, when

4   we were cooperating with the FTC regarding the credit card

5   business, the Department of Justice in Philadelphia sent a

6   letter saying that they were going to investigate the credit

7   card business.

8   Q.  Okay.  And you entered the credit card business.  I believe

9   you also mentioned that you also committed crimes in connection

10  with that business, right?

11  A.  That is correct.

12  Q.  What did you do that made you guilty of crimes in

13  connection with your credit card business?

14  A.  Originally the credit card business was a business where we

15  were telemarketing for another company called Cubis, and our

16  job was to get individuals to buy this $9500 credit card that

17  was only to be able to be used on a specific website and not as

18  a general purpose credit card, such as a regular Visa or

19  MasterCard.  And the -- and that we -- and that we were paying

20  Cubis for every customer that we got, then a fee --

21       MR. ROTH:  Could we have a definition of "we," or is

22  he talking the first person?

23       THE COURT:  We'll get that clarified.

24       Go ahead.  Continue your answer.

25  A.  Okay.  That we would pay them -- I can't remember the

1    amount, I believe it was $10 or so for each transaction that we

2    got a member to join.  And --

3              THE COURT:  All right.  What do you mean by "we" in

4    your last answer?

5              THE WITNESS:  "We" is myself and my two sons.

6              THE COURT:  Thank you.

7              Next question.

8    Q.  So to be clear, did you commit crimes in connection with

9    your credit card business with your two sons?

10   A.  Yes.  What happened, as the business evolved, the

11   telemarketers and myself and my two sons knew and -- that the

12   telemarketers were lying to the customers, telling them that

13   the credit card could not only be used on that specific website

14   but could also be used as a general purpose card, meaning down

15   the street at the grocery store or Walmart or Target.

16             The second part of the crime was that we were telling

17   the customers that they -- we were going to report to a credit

18   agency that would hopefully improve their credit, and -- and

19   they were the lies and the crime that was committed.

20   Q.  Did you also, in connection with your payday lending

21   business, use other people to hide your involvement in that

22   business at any time?

23   A.  Yes.

24   Q.  What did you do?

25   A.  When I got involved with County Bank of Rehoboth Beach,

1   Delaware, I signed the agreements with them with my name, and

2   sometime around the beginning of 2000, the FDIC, who regulates

3   the bank, went to the bank and audited the bank and -- and then

4   went out to the so-called servicers to audit them, because it

5   was an arm of the bank.  When they went to my location, which

6   was in the Philadelphia area, they came in, audited everything,

7   and I guess looked at my background, and they reported back to

8   the bank that I had a felony conviction for tax evasion a few

9   years -- I guess it would have been a year or two or -- prior

10  to the beginning of 2000.

11  Q.  And so once they found out about that, did you use someone

12  to hide your involvement?

13  A.  Yes.  The bank --

14  Q.  Who did you use?

15  A.  It was my father-in-law.  And what happened is, the bank

16  contacted me and said that the company, which was called CRA

17  Services, would no longer be allowed to be in the bank program

18  or that I would have to sell my shares if CRA was going to stay

19  in the bank program, and at that point I used my father-in-law

20  as a straw to say that he was taking ownership of the shares

21  and that he would be responsible for the business and that I

22  would no longer be responsible.

23  Q.  Okay.  So was the FTC contact the way you first learned

24  that any of your businesses were being investigated by the

25  government?

H9e1tuc3                    Rubin - Direct

A.  Yes.  And if I may, when I said that my father-in-law was

the straw, that meant it was just on paper.  I was the true

owner and operator of the business.

Q.  Okay.  So you were contacted by the FTC, but you also said

you were contacted by the Department of Justice in Philadelphia

shortly thereafter, right?

A.  Yes.  Sometime in -- in early March or mid March.

Q.  And when you were contacted by these agencies, what did you

decide to do?

A.  Originally, regarding the FTI -- FTC, we cooperated

immediately, and then when we received a letter from the

Department of Justice, we cooperated regarding -- the letter

was regarding the credit card business, but we cooperated with

that and told them at that point in time the related business,

which was the payday loan business, was also an illegal

business, and then --

            MR. ROTH:  Could we have clarification as to the "we."

            THE COURT:  If you can make that plain.

            THE WITNESS:  "We" would be, again, myself and my two

children.

            THE COURT:  Now follow the thought, because I lost

where you were.

            THE WITNESS:  Oh, I'm sorry.

            THE COURT:  Go ahead.  You don't have to apologize.

A.  Okay.  Shortly thereafter, when we began explaining how the

1    related payday loan business was illegal, approximately a month

2    later, in April of 2012, we received a grand jury subpoena

3    regarding the payday loan business along with -- along with

4    other businesses that I was involved with.

5    Q.  Okay.  So fair to say, just to summarize, you were

6    initially contacted about your credit card business, correct?

7    A.  Yes.

8    Q.  And what's your understanding about how law enforcement

9    first learned about your involvement in illegal payday lending?

10   A.  I told them about it, or we told them about it.

11   Q.  Now you mentioned that the credit card business, that you

12   committed crimes in connection with that business along with

13   your sons, correct?

14   A.  That's correct.

15   Q.  Now have your sons also pled guilty to crimes?

16   A.  They have.

17   Q.  And are you, Mr. Rubin, testifying here today pursuant to

18   an agreement that you have with the government?

19   A.  Yes.

20   Q.  Now to be clear, is that an agreement with our office here

21   in New York or is it an agreement with some other office?

22   A.  It's an agreement with -- it's an agreement within the

23   Philadelphia office.

24   Q.  The U.S. Attorney's Office in Philadelphia?

25   A.  Yes.

1    Q.  And what are your understandings, or what is your

2    understanding of your obligations under that agreement?

3    A.  To tell the truth, to testify if they ask me to testify,

4    and not to commit another crime.

5    Q.  And if you live up to your obligations under the agreement,

6    what is your understanding about what the government will do?

7    A.  It was told to me that the US -- the AUSA in Philadelphia,

8    if they felt that I lived up to the agreement and that I was

9    honest, that they would give the judge a letter explaining my

10   cooperation, and the judge then would make a decision as to

11   what my sentence would be, and hopefully it would be a lower

12   sentence than the, you know, than the 65 years that I pleaded

13   guilty to.

14   Q.  And just because you mentioned the term "AUSA," what do you

15   mean by that?

16   A.  Yes.  That is the -- I believe it's the assistant US

17   attorney.

18   Q.  Is that the same job I have?

19   A.  That is.

20   Q.  And you said you're facing 65 years and you're hoping to

21   get less than that from your cooperation, is that right?

22   A.  I'm hoping to get less than that, yes.

23   Q.  Now what's your understanding about whether either

24   Mr. Tucker, Mr. Muir, or anyone else on trial anywhere else

25   needs to be convicted in order for you to get your letter from

1    the government?

2    A.  I was told by the government that my testimony here has

3    nothing to do at all with -- with the possible conviction or

4    not conviction of Mr. Tucker and Mr. Muir.

5    Q.  Now we talked about a lot of criminal conduct, but as part

6    of cooperating with the government, did you admit to even more

7    criminal conduct?

8    A.  I did.

9    Q.  What additional criminal conduct did you admit to?

10   A.  I admitted to -- during the term of my involvement in the

11   payday loan business, there was a few years I evaded taxes

12   again.  They were in the years of 2007 to 2011.  I voluntarily

13   amended my returns, of which the government saw and agreed

14   upon, and paid the taxes that were owed on that, which were

15   approximately 2.5 million.

16   Q.  And so this time when you committed tax evasion, you evaded

17   about $2.5 million?

18   A.  That's correct.

19   Q.  And again, is your tax evasion, the second time, something

20   that you brought to the attention of the U.S. Attorney's Office

21   in Philadelphia?

22   A.  That's correct.  It was voluntary.

23   Q.  And as part of your agreement, did you have to plead guilty

24   to additional tax evasion crimes as part of that agreement?

25   A.  It was in the agreement.  I believe they called it relevant

1    conduct.

2    Q.  But did you have to plead to separate charges, separate

3    offenses for tax evasion?

4    A.  No.

5    Q.  What's your understanding about whether your additional tax

6    evasion can be considered by the judge when you ultimately get

7    sentenced?

8    A.  I believe he will take that into consideration.

9    Q.  Okay.  Apart from this additional tax evasion, have you

10   committed any other crimes?

11   A.  Yes.

12   Q.  What other crimes?

13   A.  I committed a crime of perjury, which was lying under oath

14   in a trial regarding the payday loan business, and re -- and

15   lied under oath in a deposition regarding the payday loan

16   business with the Attorney General of New York.

17   Q.  Okay.  So let's start at the end.  You said there was a

18   deposition regarding the payday loan business, and that

19   deposition was taken by the New York Attorney General?

20   A.  That is correct.

21   Q.  And you said you lied during that deposition.

22   A.  Most of my testimony in that deposition was lies.

23   Q.  And what kind of things did you lie about in that

24   deposition?

25   A.  I lied in that deposition that my father-in-law was the

 1  owner of CRA, which was my payday loan business; I lied -- I

 2  lied that I was no longer in the payday loan business, when in

 3  fact I was in the payday loan business; I lied regarding County

 4  Bank of Rehoboth Beach, Delaware, that I -- that they were the

 5  true lender of the -- of the program when in fact they were

 6  not; I lied to help Mr. Hallinan out regarding his involvement

 7  with County Bank.  He had a financial liability in the case.  I

 8  lied regarding Mr. Hallinan's involvement with the Indian

 9  tribes at that point, and his partners, or partner.  Most of my

10  testimony was not truthful.

11  Q.  And you said that that was a deposition conducted by the

12  New York Attorney General, is that right?

13  A.  That is correct.

14  Q.  And did the New York Attorney General, to your knowledge,

15  take action as a result of its investigation?

16  A.  Yes.

17  Q.  Did you personally face any consequences from the New York

18  Attorney General?

19  A.  I did not.

20  Q.  Why not?

21  A.  As time moved on through the -- through the case -- it

22  lasted a few years -- CRA was no longer in business and had no

23  more assets.  I had told my attorney in Philadelphia and my

24  attorney in New York that I no longer wanted them to represent

25  me in the case and I wanted to discharge them.  They then wrote

1    a letter to the Attorney General of New York saying they

2    were -- that I was discharging them, and that pretty much ended

3    my involvement in that case.

4    Q.  To your knowledge was the Attorney General under the

5    impression that you had no money for them to go after?

6    A.  I don't know.  I don't know that answer.

7    Q.  You also mentioned that you lied in a trial relating to

8    payday lending, is that what you testified?

9    A.  That is correct.

10   Q.  Briefly, what was that trial about?

11   A.  The trial was a dispute between Mr. Hallinan and a partner

12   of Mr. Hallinan's in the payday loan business.

13   Q.  And briefly, what were they at trial against each other

14   about?

15   A.  At one point they were partners in the payday loan

16   business, and to the best that I can remember, there was a

17   dispute where Mr. Hallinan decided that he wanted Mr. Carlson

18   to leave the partnership and pretty much took over the company

19   and -- and that was the essence of the dispute.  I don't

20   remember the details.

21   Q.  Okay.  And you mentioned -- and you were called as a

22   witness in that trial?

23   A.  I was called as a witness, yes.

24   Q.  And you gave false testimony.  So what kinds of things did

25   you lie about in that testimony?

1   A.  I lied that -- again, that I was no longer in the payday

2   loan business when I was; I lied regarding, again, certain

3   aspects of the County Bank program that was a lie, where again,

4   they were the true lender and they were approving the loans and

5   things of that nature.

6   Q.  Now did the U.S. Attorney's Office in Philadelphia require

7   that you plead guilty to lying under oath as part of your

8   agreement with them?

9   A.  They did not.

10  Q.  But what's your understanding about whether the judge who

11  ultimately sentences you can consider your lying under oath

12  when deciding your sentence?

13  A.  I'm almost sure that he will consider that.

14  Q.  Okay.  So let's go back to the 1997, 1998 time period, is

15  that right, when you got out of jail the first time?

16  A.  Yes.

17  Q.  And you testified I believe that you heard an advertisement

18  about payday lending and you were ultimately put in touch with

19  Mr. Hallinan, is that right?

20  A.  That is correct.

21  Q.  And so what role was Mr. Hallinan playing at that time in

22  connection with the payday lending business?

23  A.  Mr. Hallinan was the gatekeeper to getting involved with

24  County Bank of Rehoboth Beach, Delaware.

25  Q.  What do you mean by the fact that Mr. Hallinan was the

1  quote-unquote gatekeeper?

2  A.  That unless you went through him at that time, you were not

3  going to get involved in the payday loan business with County

4  Bank.

5  Q.  Okay.  Now you mentioned this entity County Bank a couple

6  times.  I mean, what, where, what and where was this bank,

7  County Bank?

8  A.  County Bank was located -- at that time I believe they were

9  a one-branch bank located in Rehoboth Beach, Delaware.

10  Q.  And generally speaking, what was the County Bank payday

11  loan program?

12  A.  It was where County Bank would be the lender and they would

13  provide the money to lend out to the consumers and that we

14  would be the so-called servicers servicing the loans.

15  Q.  Was that actually how the business was conducted?

16  A.  Not at all.

17  Q.  And you said "we" in terms of the servicers.  How many

18  so-called servicers were there?

19  A.  At that point in time, which was somewhere in '98, there

20  was three so-called servicers.  One was Mr. Hallinan and his

21  partner, Mr. Mickman, who was trading under the name of CR

22  Services; another one was Mr. Hallinan, Mr. Mickman, and

23  myself, which was trading under CRA Services; and another one

24  was Mr. Hallinan and Mr. Tucker, which was trading under a name

25  that was called NMS, or National Money Services.

1    Q.  You said Mr. Tucker.  Do you know Mr. Tucker's first name?

2    A.  Scott.

3    Q.  Now you briefly explained earlier what the idea was behind

4    the tribal model.  Briefly, what was your understanding of the

5    idea behind this County Bank model?

6    A.  When I met with Mr. Hallinan on one or two or three

7    occasions before we started the partnership and agreed on the

8    terms of the partnership, he was explaining to me that -- I

9    asked him, what was the reason for the bank to be involved, and

10   he said that the reason for the bank to be involved was because

11   they -- they had a -- what was called a federal charter, the

12   way they formed the bank, and by them having this federal

13   charter, they were allowed to export rates across the United

14   States based upon their home state, meaning that in Delaware,

15   there is no limit on what a bank can charge a consumer, whether

16   it be 1 percent or 1,000 percent.  So when -- with that

17   capability, if they were the true lender, they would be allowed

18   to give out payday loans across the United States legally

19   because that there was no usury rates or no limits on interest

20   rates in the state of Delaware.

21   Q.  Mr. Rubin, I'm going to show you what's been marked as

22   Government Exhibit 101.

23   A.  Yes, I -- yes.

24   Q.  What is Government Exhibit 101?

25   A.  This is a document that was prepared by the bank's

1    attorneys, which the name of the law firm is called Weir &

2    Partners, and the lawyer who represented the bank --

3    Q.  Just before you get into that, briefly, who was this letter

4    sent to?

5    A.  It was sent to the so-called servicers of County Bank.

6              MR. VELAMOOR:  Your Honor, the government offers 101.

7              THE COURT:  Any objection?

8              MR. ROTH:  No, your Honor.

9              THE COURT:  Received.

10             (Government's Exhibit 101 received in evidence)

11             MR. VELAMOOR:  Ms. Grant, can we show this letter to

12   the jury.

13   BY MR. VELAMOOR:

14   Q.  And let's just start by just focusing on the name of the

15   firm at the top.

16   A.  The name of the firm is Weir & Partners.

17   Q.  Okay.  And who did Weir & Partners represent?

18   A.  They represented County Bank of Rehoboth Beach, Delaware.

19   Q.  And did they -- as part of this program, did they only

20   represent the bank?

21   A.  I don't know.  I believe they represented other people, but

22   I know that they represented the bank.

23   Q.  Now there's a --

24             MR. VELAMOOR:  Can you zoom in on that for a second.

25   Q.  There's a name of an attorney on the left.  Top left.

1   There's an attorney mentioned, Leonard S. Goodman.  Do you see

2   that?

3   A.  Yes.

4   Q.  Who was Mr. Goodman?

5   A.  Mr. Goodman was the attorney representing the bank from,

6   you know, from when I got started with Mr. Hallinan.

7   Q.  And he was at the firm of Weir & Partners?

8   A.  Yes.

9   Q.  Now this letter is dated July 6, 2000, is that right?

10  A.  Yes.

11  Q.  And it's addressed to you said the so-called servicers?

12  A.  Yes.

13  Q.  Do you see yourself as an addressee?

14  A.  I do.

15  Q.  You're the second name from the top on the right column, is

16  that right?

17  A.  Yes.

18  Q.  And Cashnet, what was Cashnet?

19  A.  Cashnet was the -- that's the name we did business as.

20  Q.  And what's the name above you?

21  A.  It is Scott Tucker.

22  Q.  And the entity below?

23  A.  National Money Services.

24  Q.  And can you read out the address.

25  A.  7916 Santa Fe Drive, Overland Park, Kansas.

1    Q.  And I believe you mentioned that National Money Service was

2    a partnership between Mr. Tucker and Mr. Hallinan?

3    A.  That's my understanding.

4    Q.  And was that based on your conversations with Mr. Hallinan

5    and Mr. Tucker?

6    A.  That is correct.

7    Q.  I believe on the left column, the third name down, do you

8    see Mr. Hallinan, is that right?

9    A.  Yes.

10   Q.  And the entity below him is what?

11   A.  TC Services Corp.

12   Q.  And what was TC Services Corp.?

13   A.  I believe that was the corporation that Mr. Hallinan owned.

14   Q.  Was that one of his other partnerships that was part of

15   this program?

16   A.  I believe that was the partnership with Mr. Hallinan and

17   Mr. Mickman.

18   Q.  Okay.  Now you testified earlier that when you first

19   started, there were just a few so-called servicers in the

20   program, is that right?

21   A.  Yes.

22   Q.  Did that grow?  Did the number of servicers grow over time?

23   A.  Yes, to quite a few.

24   Q.  And this letter I guess is July 6, 2000, so by this time

25   were there many more so-called servicers?

1   A.  Yes.

2   Q.  Now this letter, the subject of it is Amendments to

3   Section 2 of the Policy Manual.  Do you see that?

4   A.  Yes.

5   Q.  Did County Bank, through its lawyers, Weir & Partners,

6   periodically send down policy directives and other things to

7   the so-called servicers?

8   A.  Yes.

9   Q.  And were the servicers subject to some of the same policies

10  and rules as part of being in the program?

11  A.  Yes.

12  Q.  Now just so I'm clear, you mentioned that Mr. Hallinan had

13  one partnership with Mr. Mickman, that's right?

14  A.  Yes.

15  Q.  And one with Mr. Tucker, correct?

16  A.  Yes.

17  Q.  And from your conversations what did you understand to be

18  the split of ownership that Mr. Hallinan had with Mr. Tucker?

19          MR. ROTH:  Objection.  Conversations with whom, your

20  Honor?

21          THE COURT:  Rephrase it.

22  Q.  Did you have conversations with Mr. Hallinan about his

23  business arrangement with Mr. Tucker?

24  A.  Yes.

25  Q.  And from those conversations, what was your understanding

1  of his arrangement with Mr. Tucker?

2  A.  Mr. Hallinan told me that it was a 50/50 split and

3  Mr. Hallinan told me that he provided approximately 500,000 to

4  a million dollars to invest in that partnership.

5  Q.  And to be clear --

6              THE COURT:  Who is "he"?

7              THE WITNESS:  I'm sorry.  Mr. Hallinan told me that he

8  invested --

9              THE COURT:  "Mr. Hallinan told me that he provided."

10  Who is the "he"?

11              THE WITNESS:  Mr. Hallinan.

12              THE COURT:  Thank you.

13  Q.  And for further clarification, he provided that money to

14  whom?

15  A.  National Money Services.

16  Q.  Now you said you met with Mr. Hallinan initially to discuss

17  payday lending as part of this program, right?

18  A.  That I wanted to get involved in the payday loan business.

19  Q.  Okay.  And during those conversations did you discuss

20  Mr. Hallinan's experience in payday lending with both

21  Mr. Mickman and Mr. Tucker?

22  A.  It was -- yes, there was -- Mr. Hallinan told me that he

23  was involved with the payday loan business for approximately a

24  year or so at that point in time, and -- and, you know, his

25  involvement with County Bank, and when I walked in his office,

1    he had quite a few employees, and sometime during the initial

2    meetings, whether it was before we formed the partnership or

3    right before or right around then, either Mr. Tucker called in

4    to Mr. Hallinan's office or Mr. Hallinan called out -- I really

5    don't remember, it was maybe 18 to 20 years ago -- and

6    introduced me to Mr. Tucker as a partner or potential partner,

7    and it was a very brief phone call.  Mr. Tucker said that he

8    was knowledgeable in the payday loan business.

9    Q.  Let me stop you there.  There are too many subjects.

10   Mr. Tucker said who was knowledgeable?

11   A.  That Mr. Hallinan was knowledgeable and that he was a good

12   guy, and that was about it.

13   Q.  And again, who was saying who was a good guy?

14   A.  I'm sorry.  That Mr. Tucker said that Mr. Hallinan is a

15   good guy.

16   Q.  Now during your initial conversations, your initial

17   conversation with Mr. Hallinan, did he explain how the County

18   Bank program worked in terms of what the so-called servicers

19   did and what County Bank did?

20   A.  He told me in general terms that the County Bank name would

21   be on the documents, that if I wanted to get involved, the

22   agreement would be that I would put up all the money and that I

23   would kind of be involved in the day-to-day business and

24   Mr. Hallinan would support me with key employees to start the

25   business and all the documentation.  His responsibility would

be to set me up with the ACH processor, who was a company that

would facilitate the money leaving the bank account of CRA

Services or County Bank and move to the customer, along with,

when the money was due from the customer, that the money would

be moved back from the customer's account to the accounts I

just mentioned.

Q.  Okay.

A.  Along with advertising and everything else to get set up in

the business.

Q.  Okay.  Now did you, in these initial conversations, discuss

who would put up the money for the loans that were sent to the

customers?

A.  Yes.  It would be my money.

Q.  As opposed to whose money?

A.  County Bank's money.

Q.  And did you discuss who would actually manage and control

the payday lending operation?

A.  I would.

Q.  So you mentioned that you had initial conversations with

Mr. Hallinan as well as a brief conversation with Mr. Tucker,

is that right?

A.  That is correct.

Q.  And after those conversations what did you decide to do?

A.  I decided to go in partnerships with -- with Mr. Hallinan

and Mr. Mickman with the premise that I would put up all the

1    money and he would guide me along for a period of time or for

2    an indefinite period of time to make the business profitable.

3    Q.  Okay.  So it was a three-way partnership, is that right?

4    A.  Yes.

5    Q.  And did your partnership have a name?

6    A.  It was C for Charlie, which was Charlie Hallinan's first

7    name, R for Rick, which was Rickman -- Rick Mickman's, first

8    letter of his name, and A for Adrian Rubin, which obviously was

9    first initial of my name.  CRA Services.

10   Q.  Okay.  And how much money did you put up towards this

11   partnership?

12   A.  Initially, it was approximately half a million dollars.

13   Q.  And were you equal owners as part of this partnership, at

14   least initially?

15   A.  Yes, it was approximately 33 percent each.

16   Q.  And was this partnership you were forming going to be a

17   part of this County Bank program?

18   A.  Yes.

19   Q.  Was there a name that you decided to do business under?

20   A.  It was Cashnet.

21   Q.  And so you said Mr. Hallinan helped you initially by

22   providing you information and people to help you get off the

23   ground, is that right?

24   A.  Everything necessary to start the business, and the key

25   employees were very knowledgeable.  He allowed me to hire one

1  of my own employees to train a month or two or three before I

2  started business.  He set me up with the ACH processor, who was

3  Intercept.  He set me up with advertising campaigns, which were

4  at that time I believe radio and some print.  He set me up with

5  all the documents necessary to conduct the business.  Almost

6  every aspect of the business.

7  Q.  And as you moved forward with CRA Services, did you model

8  how you did business on what you'd learned from Mr. Hallinan?

9  A.  Absolutely.

10  Q.  And as you proceeded with your business, did you have

11  additional conference calls to discuss the business and how to

12  operate it and how to move forward?

13  A.  In the first few months to a year, or at least in the first

14  few months, I would have, if not daily calls, every-other-day

15  calls with Mr. Hallinan and with Mr. Hallinan's -- I believe

16  his title was CFO, I called him the right-hand man of

17  Mr. Hallinan -- who knew every aspect of the payday loan

18  business.  His name was Gary Gordon, and it was Gary Gordon who

19  developed software for the payday loan business, of which

20  obviously Mr. Hallinan allowed me to use to run the other

21  partnership that he had, you know, that I -- that I was in

22  partners with him.

23  Q.  Okay.  And you're now talking about calls that you had with

24  Mr. Hallinan and Mr. Gordon, right?

25  A.  Many calls.

1   Q.  And did Mr. Hallinan's partnership with Mr. Tucker ever

2   come up in these conversations?

3   A.  Occasionally they would come up.

4   Q.  What kinds of things came up about his partnership with

5   Mr. Tucker?

6   A.  I can't remember any specifics, but it was always he was

7   very happy with --

8               MR. GINSBERG:  Objection, your Honor.

9               THE COURT:  Basis.

10              MR. GINSBERG:  The beginning of the answer was, "I

11  can't remember any specifics," and he's about to go on to

12  something that sounds pretty generic to me.

13              THE COURT:  Well --

14              MR. GINSBERG:  And conclusory.

15              THE COURT:  You're allowed to testify to the sum and

16  substance of the conversation that you remember, but you're not

17  allowed to speculate or guess as to what was said.  You're only

18  allowed to testify as to what you remember.  Do you understand

19  that instruction?

20              THE WITNESS:  I believe I do, your Honor.

21              THE COURT:  All right.  You may continue.

22  A.  That Mr. Tucker was doing very well in the payday loan

23  business.

24  Q.  And did you discuss in general terms some of the reasons

25  why Mr. Tucker was doing so well?

1  A.  I -- I'm not sure of the question.  Please.

2  Q.  During these initial conversations with Mr. Hallinan and

3  Mr. Gordon, you mentioned that Mr. Tucker's business came up

4  and Mr. Hallinan's partnership with Mr. Tucker, correct?

5  A.  Yes.

6  Q.  And you mentioned a moment ago that some of the things you

7  remember was that Mr. Tucker's business was doing well.

8  Correct?

9  A.  Yes.

10  Q.  Do you remember in general terms any discussion of any of

11  the reasons why Mr. Tucker's business was doing so well?

12          MR. GINSBERG:  Objection to leading, and may we

13  approach, your Honor, briefly.

14          THE COURT:  Objection to leading is overruled.  Go

15  ahead.

16  A.  Again, over a time period, there was -- there was things

17  that Mr. Hallinan told me about Mr. Tucker regarding his

18  portfolio, which means the amount of loans that he had, in

19  essence, out on the street.  He regarded Mr. Tucker as very

20  smart, he regarded Mr. Tucker as very aggressive in his

21  advertising campaigns, in his knowledge of the business.  At

22  one point --

23          THE COURT:  I think you've answered the question.

24          Ladies and gentlemen, we're going to take our break

25  for lunch two minutes early.  But anyway, we'll pick up at

H9e1tuc3

1    2:00.

2         And remember, as always, keep an open mind.  Also, do

3    not discuss the case among yourselves or with anybody.

4         See you for a prompt 2:00 start.

5         (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.

3          Yes, Mr. Ginsberg.

4          MR. GINSBERG:  I'm just waiting for --

5          Your Honor, I believe I may have raised this issue

6     pretrial when we were first given 3500 material and became

7     aware that Mr. Rubin was going to be a witness.  I had some

8     serious concerns because, at least in my view, the Court had

9     been pretty clear about its rulings that either side could call

10    effectively an expert on payday lending.  And from my initial

11    reading of Mr. Rubin's testimony, he had very little if

12    anything to say about Mr. Tucker, and my concern was that the

13    government was going to use him to sort of paint an overview of

14    the payday lending business, as we hear now to some degree

15    County Bank, a lot about Mr. Hallinan, and maybe some things

16    specifically about Mr. Tucker.  Your Honor observed, heard and

17    observed the answers that related to Mr. Tucker, and I think

18    that one of the most telling things was, it was a very long

19    pause when he was asked basically if he remembered specific

20    things that Mr. Hallinan said about Mr. Tucker and, you know,

21    what Mr. Hallinan had said, if anything, about Mr. Tucker and

22    the business.  There was a very long pause.  He then said, "I

23    don't understand the question," which was, to me, at least, a

24    very simple question.  And then when he did begin to answer,

25    he's answering in a very sort of, in my view, at least, in a

1 very sort of roundabout way, almost as if these are sort of

2 conclusions, that Mr. Hallinan would say these things over some

3 long period of time and it's this witness' conclusion that

4 Hallinan was expressing that Mr. Tucker was a good businessman,

5 he was aggressive, he was making money, and I think there's a

6 very big danger here, real 403 danger and issue, that this

7 witness has very little to offer about the facts in this case.

8 He may have a lot to offer about how to be a criminal and about

9 payday lending, but the limited amount that he may have, if

10 it's specific at all about Mr. Tucker, I think is far

11 outweighed by everything else that we're going to hear.

12      Now I don't know what else the government's going to

13 do, and to some degree I can only go by now what I've heard and

14 what I've also read in the 3500 material, but I have very, very

15 heightened concerns now that there could be a very serious

16 problem, and I wanted to raise it.  As I said, I believe I had

17 raised it pretrial, and now hearing this testimony, I'm raising

18 it at this point.

19      MR. VELAMOOR:  Certainly, your Honor.  Frankly, I'm

20 not sure what the concern is for the Court.  Certainly

21 Mr. Ginsberg is raising issues that he can explore on

22 cross-examination and that the jury can consider in its role as

23 the trier of fact, and if Mr. Ginsberg is correct that the

24 pauses or the way in which the defendant -- sorry -- the

25 witness is answering questions bears on his credibility, the

H9e1tuc3

1    jury will certainly decide that.  But Mr. Rubin is not being

2    called as an expert witness.  He's being called as a

3    co-conspirator of Mr. Tucker.  And we've I think established

4    and laid the foundation for that.  After going through

5    Mr. Rubin's *Giglio* material, which will certainly be the

6    subject of I'm sure extensive cross-examination, we've now

7    established that they were partners and they were all -- they

8    had interconnected partnerships as part of this County Bank

9    program.  Mr. Rubin has made clear that that program was a sham

10   and a fraud.  We've established that Mr. Rubin modeled his

11   business in part on discussions with Mr. Hallinan.  There was a

12   conversation directly with Mr. Tucker.  They were figuring out

13   how to move forward with the business, deciding to do business

14   in similar ways.  We're going to elicit shortly that there were

15   conversations with Mr. Tucker himself on the line, which is not

16   necessary, but it's also the case that they had additional

17   conversations where they discussed how to move forward with the

18   business, and from these conversations, Mr. Rubin gained an

19   understanding of how the program worked, and how the program

20   worked was a sham, as Mr. Rubin testified.  It was not

21   consistent with the documents that they put in place.  And

22   we'll explore those issues.  But he is by no means being called

23   as an expert witness.  He's being called about a conspiracy

24   that he was involved in along with Mr. Hallinan with respect to

25   Mr. Tucker.

1          In addition, I would add, the Court is going to hear

2    in this case that Mr. Hallinan's partnership with Mr. Tucker

3    continued for many years and will show up later in the case in

4    that at a certain point Mr. Hallinan believed that Mr. Tucker

5    had essentially started denying Mr. Hallinan Mr. Hallinan's

6    fair share of the National Money Service partnership.  They had

7    a dispute, litigation between them ensued, and among other

8    things, substantial payments were made from tribal bank

9    accounts to settle this arrangement and this dispute between

10   Mr. Tucker and Mr. Hallinan, which just goes to show that,

11   among other things, that the partnership and the conspiracy and

12   the interconnection between these defendants continued for many

13   years, well past the time period that Mr. Rubin's been

14   testifying about.

15          THE COURT:  Thank you, Mr. Velamoor.

16          At this stage the objection is overruled.  We'll see

17   where we go.

18          Have a pleasant lunch.

19          (Luncheon recess)

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:00 p.m.

3          (Jury not present)

4          THE COURT:  Why do we not have a witness in the

5     witness box?

6          MR. RAVI:  Before the witness comes on, the government

7     would like to read a stipulation, the stipulation for which the

8     limiting instruction has been agreed upon, and we want to do

9     that outside the presence of the witness.

10         THE COURT:  All right.

11         MR. RAVI:  I will also be introducing one more exhibit

12    at this time, Government Exhibit 4015.

13         THE COURT:  Bring the jury in.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good afternoon, ladies and gentlemen.

3   Thank you for being back so we can get going.

4          I understand there is a stipulation the government

5   wants to read?

6          MR. RAVI:  Yes, that's correct, your Honor.

7          THE COURT:  And this is a testimonial stipulation or a

8   stipulation of fact?

9          MR. RAVI:  A fact stipulation.

10         THE COURT:  Ladies and gentlemen, a stipulation of

11  fact is the parties' agreement that a certain fact is so, is

12  true.  You must establish that fact --

13         MR. SCOTTEN:  My apologies, your Honor.

14         THE COURT:  You must establish that fact as proven.

15  However, the weight, if any, to be given to that fact is

16  entirely up to you, the jury.

17         Go ahead.

18         MR. RAVI:  At this time, the government offers

19  Government Exhibit 5004.

20         THE COURT:  Any objection?

21         MR. ROTH:  No, your Honor.

22         MR. GINSBERG:  No, your Honor.

23         THE COURT:  Received.

24         (Government's Exhibit 5004 received in evidence)

25         MR. RAVI:  I will now read the stipulation, captioned

1  United States of v. Scott Tucker and Timothy Muir.

2  "It is hereby stipulated and agreed" -- Mr. Beer, can

3  you publish that to the jury.

4  "It is hereby stipulated and agreed by and among the

5  United States of America, by Joon H. Kim, Acting United States

6  Attorney for the Southern District of New York, Niketh

7  Velamoor, Hagan Scotten, and Sagar Ravi, Assistant United

8  States Attorneys, of counsel, and Scott Tucker, the defendant,

9  by his attorneys, James Roth, Esq., Lee Ginsberg, Esq., and

10  Nadjia Limani, Esq. that:

11  "On June 11, 1991, Scott Tucker, the defendant,

12  pleaded guilty and was convicted in the United States District

13  Court for the District of Kansas of committing mail fraud.  In

14  connection with the mail fraud referenced above, Scott Tucker,

15  the defendant, operated a company known as Chase, Morgan

16  Stearns & Lloyd that was in the business of obtaining loans and

17  letters of credit for clients in exchange for advance fees.

18  Tucker made false statements in order to induce clients to give

19  him the advance fees.  In particular, Tucker falsely told

20  clients that Chase, Morgan, Stearns & Lloyd was owned by Chase

21  and Manhattan Bank, Lloyd's of London, and JP Morgan, and

22  therefore had access to financing.  In truth and in fact,

23  Chase, Morgan, Stearns & Lloyd was owned by Tucker himself, and

24  he did not have access to financing.

25  "The mail fraud referenced above took place in

1 Overland Park, Kansas.

2 "It is further stipulated and agreed that this

3 stipulation, marked as Government Exhibit 5004, is admissible

4 in evidence at trial."

5 It's dated September 12, 2017, and signed by the

6 parties.

7 THE COURT: Ladies and gentlemen, this evidence of Mr.

8 Tucker's prior conviction was received for a limited purpose,

9 and you may consider it only for that limited purpose. The

10 government offered this evidence with regard to the offenses

11 charged in the indictment to endeavor to establish what it

12 views as defendant Tucker's intent and knowledge, and the

13 absence of mistake or accident.

14 You may not consider this evidence as a substitute for

15 proof that the defendant Tucker committed the crimes charged in

16 the indictment. Nor may you consider this evidence as proof

17 that the defendant Tucker has a criminal personality or bad

18 character or propensity to commit any kind of a crime. The

19 evidence of the defendant Tucker's prior conviction may not be

20 considered by you for any other purpose than what I have just

21 explained to you.

22 This evidence may not be considered by you as to

23 Defendant Muir.

24 Your witness.

25 MR. VELAMOOR: At this time, the government also

H9E8TUC4

1    offers Government Exhibit 4015.

2              THE COURT:  Any objection?

3              MR. ROTH:  No, your Honor.

4              THE COURT:  Received.

5              (Government's Exhibit 4015 received in evidence)

6              MR. RAVI:  Mr. Beer, can you publish it?

7              I would like to zoom in on certain portions.

8              If we can zoom in on the top right under "Intercept,"

9    around "Intercept EFT."

10              You can take that down.

11              Zoom now next to "company legal name."

12              Please now move to zoom in on the portion below that

13    next to "entity," including the officer, owner, partner and

14    member.

15              Turn now to the second page and zoom in on question 3.

16              Please now focus in on question 2.

17              Please now focus on question 7.

18              Please now turn to page 4, and zoom in on the area

19    acknowledgement and signature and the language below it.

20              Finally, if we could just turn to the last portion

21    under "officer/owner/partner/member," focus in on that.

22              Thank you, your Honor.

23              THE COURT:  All right.  Have the witness resume the

24    witness stand, please.

25              (Continued on next page)

1    ADRIAN RUBIN, resumed.

2              THE COURT:  You may continue.

3              MR. VELAMOOR:  Thank you, your Honor.

4    BY MR. VELAMOOR:

5    Q.  Mr. Rubin, before the lunch break I believe we stopped when

6    we were talking about conversations you had with Mr. Hallinan

7    and Mr. Gordon.  Do you recall that?

8    A.  Yes.

9    Q.  Again, generally speaking, what was the purpose of those

10   conversations?

11   A.  Just talking about the payday loan business in general.

12   Q.  You mentioned that Mr. Tucker came up during those

13   conversations, right?

14   A.  Yes.

15   Q.  Generally speaking, how did Mr. Tucker come up in those

16   conversations?

17   A.  Mr. Tucker was a partner with Mr. Hallinan, and

18   Mr. Hallinan spoke very highly of Mr. Tucker, and told me he

19   was doing very well, and nothing at that point in time was

20   negative, everything was positive.

21   Q.  Now, did you also have, during this time period,

22   conversations with Mr. Hallinan and Mr. Tucker?

23   A.  There were a few conversations in Mr. Hallinan's office.

24   Q.  Approximately how many?

25   A.  After that initial conversation, when I got started, it

1    could have been three or four, no more than five, maybe three.

2    Q.  In a general sense, what was the purpose of those

3    conversations with Mr. Hallinan and Mr. Tucker?

4    A.  Well, it was in Mr. Hallinan's office, and we would speak

5    in general about the payday loan business and different

6    advertising campaigns or our portfolios, how they were doing in

7    comparison, maybe some issues about collections and bad debt.

8    Q.  Were these conversations important to you in deciding how

9    to conduct CRA?

10   A.  I was always looking to better the operation at CRA if

11   somebody had, you know, a better way to go about it.

12   Q.  At that point, did Mr. Hallinan and Mr. Tucker have more

13   experience in the payday lending industry than you had?

14   A.  Yes.

15   Q.  Did they discuss their experiences during these joint

16   conversations?

17   A.  Yes.

18   Q.  Now, did you discuss the general process by which you found

19   and contacted customers as part of this County Bank program?

20   A.  Yes.

21   Q.  How did that process generally work?

22   A.  We would advertise and come up -- usually advertise on the

23   radio or in print to get customers if they were interested in

24   getting a payday loan.

25   Q.  Once you advertised, what generally happened next?

A.  They would apply --

Q.  Let me stop you there.  Who is "they"?

A.  The customers would apply, call up the 800 number, and ask about how it worked and, you know, what information they needed to supply us.  We -- when I say "we," CRA, myself, Mr. Hallinan and Mr. Mickman, we would then ask them, if they were interested, to fax in certain documents, documents such as their pay stubs, their voided check.  We would ask them to fill out an application that would be faxed to them.

That information would be sent back to us.  We would review it.  If in fact we -- again, meaning CRA, myself, Mr. Hallinan and Mr. Mickman -- if we felt that it should get approved for a certain amount, whether it be 200, 300 or 500, we then would contact them.  We would fax them documents to be signed, such as a loan document -- loan note and disclosure, I believe it was called.  They would have to sign an ACH authorization document allowing us to deposit money in their account, along with withdrawing money from their account.

That's the majority of the documents that would be transpired between the customer and CRA.

Q.  All this documentation, did customers send them back to the so-called servicers or to County Bank?

A.  They sent it back to the so-called servicers.

Q.  Did any of the process that you just described, did any of that take place at County Bank?

1    A.  No.

2    Q.  Now, was there an agreement in place between County Bank

3    and each of the so-called servicers?

4    A.  Yes.

5    Q.  Did you have an agreement yourself, CRA Services, with

6    County Bank?

7    A.  Yes.

8    Q.  To your knowledge, did the other payday lenders in the

9    program enter into the same agreements?

10   A.  Yes.

11   Q.  How do you know that they were entering into the same

12   agreements?

13   A.  Because when the agreement was presented to me and

14   Mr. Hallinan and Mr. Mickman, before I was asked to sign it, I

15   asked Mr. Hallinan, is this the same agreement that you signed

16   with your other partners, meaning Mr. Hallinan and Mr. Mickman

17   and Mr. Hallinan and Mr. Tucker, and he said yes.

18   Q.  Generally speaking, did County Bank require common

19   documentation for all of the so-called servicers in the

20   program?

21   A.  At that time, I believe they did.

22   Q.  I am going to show you two exhibits marked as Government

23   Exhibit 103 and Government Exhibit 102.

24   A.  OK.

25   Q.  Have you had a chance to look at 103 and 102?

1    A.   Yes.

2    Q.   What is 103?

3    A.   103 is the nonexclusive master sale participation servicing

4    and indemnification agreement, that was dated October 21st,

5    between County Bank of Rehoboth Beach, Delaware and CRA

6    Services.

7    Q.   CRA was your payday lender?

8    A.   That's correct.

9    Q.   Was this, generally speaking, at least a foundational

10   agreement governing your relationship with County Bank?

11   A.   Yes.

12             MR. VELAMOOR:  Your Honor, the government offers 103.

13             THE COURT:  Any objection?

14             MR. ROTH:  Yes, your Honor, I have an objection.

15             THE COURT:  Basis.

16             MR. ROTH:  Your Honor, the copy that I have does not

17   indicate CRA is the servicer.

18             THE COURT:  All right.

19             MR. ROTH:  We have two government 103s, Judge.

20             No objection, Judge.

21             THE COURT:  All right.  Received.

22             (Government's Exhibit 103 received in evidence)

23             MR. VELAMOOR:  Mr. Beer, why don't we show 103 to the

24   jury.

25             Let's just start initially with the top, the title in

1    the top paragraph.

2    BY MR. VELAMOOR:

3    Q.  So do you see County Bank referenced there?

4         Do you see County Bank referenced in the top line?

5    A.  Yes.

6    Q.  And CRA Services is mentioned as well?

7    A.  Yes.

8    Q.  The day is October 21, 1998, right?

9    A.  Yes.

10   Q.  At the top right it says "County/CRA"?

11   A.  Yes.

12   Q.  I have also shown you what has been marked as Government

13   Exhibit 102.

14        What is Government Exhibit 102?

15   A.  The nonexclusive master sale participation servicing and

16   indemnification agreement between County Bank and National

17   Money Services.

18   Q.  Again, what was National Money Services?

19   A.  National Money Services was the partnership between

20   Mr. Hallinan and Mr. Tucker.

21   Q.  Have you had a chance to look at these agreements before

22   today?

23   A.  Yes.

24   Q.  How do they compare with each, other than the identity of

25   the servicer?

1    A.  I believe they are identical.

2            MR. VELAMOOR:  Your Honor, the government offers 102.

3            THE COURT:  Any objection?

4            MR. ROTH:  No, your Honor.

5            THE COURT:  Received.

6            (Government's Exhibit 102 received in evidence)

7    Q.  Let's work through 102.

8            MR. VELAMOOR:  Can we put that up on the screen,

9    please.

10   Q.  Let's start with the title in the top paragraph again.

11   A.  "Nonexclusive master sale participation servicing and

12   indemnification agreement."

13   Q.  What is the date on this?

14   A.  June 22, 1998.

15   Q.  Again, the parties to this agreement are what?

16   A.  County Bank and National Money Services.

17   Q.  To be clear, County Bank is referred to in this agreement

18   as what?

19   A.  Seller.

20   Q.  And National Money Service, Inc. is referred to in this

21   agreement as what?

22   A.  Buyer.

23   Q.  Can we focus in on the paragraph 1(a).

24   A.  Yes.

25   Q.  You mentioned before that the seller is County Bank, right?

1   A.  Correct.

2   Q.  And that the buyer is the so-called servicer, in this case,

3   National Money Service, right?

4   A.  Correct.

5   Q.  So the first sentence there says, "Seller makes loans to

6   consumers in the normal course of business."

7           Do you see that?

8   A.  I do.

9   Q.  Does that accurately describe how the County Bank program

10  worked?

11  A.  It does not at all.

12  Q.  Why is that?

13  A.  Because the payday loan lender CRA provided the money that

14  went to the consumers.

15  Q.  So as between the seller, which is here County Bank, and

16  the buyer, which is NMS, who actually made the loans?

17  A.  In reference to this exhibit, it would have been National

18  Money Services.

19  Q.  Now, following along in this paragraph, it says, "Seller in

20  its sole discretion determines all of the conditions, terms,

21  services and features offered to borrowers.  By way of example

22  and not limitation, seller shall solely determine finance

23  charge rates and other charges, credit limits, credit

24  standards, collection procedures, and asset quality of the

25  loans."  Do you see that?

1    A.  I do.

2    Q.  Is that an accurate description of how the County Bank

3    program worked?

4    A.  It is not.

5    Q.  Why not?

6    A.  Because the buyer, in this case --

7    Q.  Go ahead.

8            MR. VELAMOOR:  I'm sorry, Judge.

9            THE COURT:  You can continue.

10   A.  The buyer, in this case would have been National Money

11   Services, where in the other exhibit would have been CRA, they

12   were approving the loans and the credit standards and the

13   collection practices of the loans given out by the buyer.

14   Q.  Let me just take a step back.  We talked about how the

15   servicers were the ones making the loans, the so-called

16   servicers, right?

17   A.  Yes.

18   Q.  As part of this program, whose bank accounts did the money

19   for the loans come from?

20   A.  It came from a bank account of County Bank.

21   Q.  Initially were the bank accounts at County Bank or were

22   they elsewhere?

23   A.  I think for a very short period of time CRA opened up an

24   account that was for the operating account and the funding

25   account.

1   Q.  Initially where did you at CRA open up your account?

2   A.  I don't remember the bank's name, but it was a local bank

3   in Philadelphia.

4   Q.  Was it a bank other than County Bank?

5   A.  Yes.

6   Q.  So initially, the loans didn't even come from a County Bank

7   bank account?

8   A.  That's correct.

9   Q.  You said that changed relatively soon thereafter.  How did

10  it change?

11  A.  County Bank, the attorney for County Bank, Mr. Goodman,

12  asked us, the so-called servicers, to open up an account under

13  County Bank's name at any bank that we would choose, and that's

14  what we did.

15  Q.  Did County Bank ever deposit any money into these accounts?

16  A.  No.

17  Q.  So whose money was in these accounts?

18  A.  It was my money.

19  Q.  Where did the bank statements for these accounts go, at

20  least initially?

21  A.  Initially the bank statements went to my office.

22  Q.  Did that change at some point?

23  A.  At some point in the near future, we received a letter from

24  Mr. Goodman or the bank saying that he would like the bank

25  statements to go to County Bank at their address in Delaware,

1    and once they reviewed the bank statement, they then would

2    forward it to myself in the Philadelphia area.

3    Q.  Did County Bank actually review the bank statements?

4            MR. ROTH:  Objection, your Honor.

5            THE COURT:  Rephrase it.

6    Q.  Did you ever get the statements back after they had been

7    sent initially to County Bank?

8    A.  Yes, from County Bank.

9    Q.  How did they arrive when they got to you?

10   A.  Unopened.

11   Q.  Was that consistent with what Mr. Goodman said they would

12   do with the statements?

13   A.  No.

14   Q.  Now, to be clear, regardless of whose names the bank

15   accounts were in, whose money was in these bank accounts?

16   A.  It was always my money.

17   Q.  Was that true of the servicers in the program, or the

18   so-called servicers?

19           MR. ROTH:  Objection, your Honor.

20           THE COURT:  To the extent that you know.

21   A.  To the extent that I know, the answer is yes.

22   Q.  Again, what was the money in those accounts used for?

23   A.  It was used to provide loans to the consumers in the payday

24   loan program.

25   Q.  To be clear, who were the lenders in the County Bank

1  program?

2  A.  The so-called servicers were the true payday loan lenders.

3  Q.  On the documentation, who was actually listed as the

4  lender?

5  A.  County Bank of Rehoboth Beach, Delaware.

6  Q.  Now, we also talked about some of the terms and conditions

7  of the loans.  Did County Bank set or attempt to set any

8  policies on these topics?

9  A.  They did.

10  Q.  How did they do that?

11  A.  Mr. Hallinan provided me with a, I believe it was called a

12  policy and procedural manual that Mr. Goodman prepared for the

13  bank.

14  Q.  Were the policies and procedures in that manual always

15  followed by the servicers?

16  A.  They were not.

17  Q.  Now, going back to the agreement we were looking at, can we

18  come out of that paragraph and zoom in on 1(b).

19  A.  OK.

20  Q.  It says, "Seller has agreed to sell a continuing 95 percent

21  participation in all existing and future loans to buyer."

22          Do you see that?

23  A.  I do.

24  Q.  Again, just so we have our terms clear, the seller, again,

25  is County Bank, right?

1   A.   Yes, that's correct.

2   Q.   And the buyer is the so-called servicer, right?

3   A.   That is correct.

4   Q.   In this case, NMS for this agreement.

5        It says here that seller has agreed to -- so County

6   Bank has agreed to sell a continuing 95 percent participation

7   in all existing and future loans to NMS.  Is that a fair

8   reading?

9   A.   Yes.

10  Q.   So what is a participation, in simple terms?

11  A.   In simple terms, is that if a loan was given out, which it

12  wasn't, by County Bank, the next day County Bank -- the

13  so-called servicer would buy 95 percent of that particular

14  loan.  So if it was a $100 loan, we would have to forward $95

15  of that amount to the bank, and they would retain a five dollar

16  interest or 5 percent interest.

17  Q.   Again, you say "they" would retain a 5 percent?

18  A.   County would retain a 5 percent interest.

19  Q.   So as contemplated at least in the agreement, County Bank

20  would initially make the loan, but then sell 95 percent of the

21  interest in that loan to the so-called servicer?

22  A.   Yes.

23  Q.   Did that actually happen?

24  A.   It did not.

25  Q.   So what is the purpose of these references to the

1    participation and the sale of the participation to the

2    so-called servicers?

3    A.   As I found out, that was to create the appearance that they

4    were doing it -- they meaning County Bank was providing the

5    money and then selling the next day the participation to the

6    so-called servicer, but in reality that did not happen.

7    Q.   So what actually happened in reality?

8    A.   The reality is the so-called servicer provided all the

9    money that went to the consumer.

10   Q.   Directly?

11   A.   Directly through County Bank's account that I had full

12   control over.

13   Q.   Now, according to the agreement then, at least how the

14   agreement is written, if the bank was selling 95 percent of the

15   loan to the so-called servicer, the bank was retaining a 5

16   percent interest.  Is that how the agreement reads?

17   A.   That's correct.

18   Q.   Did the bank in fact have the 5 percent interest in the

19   loan?

20   A.   They did not.

21   Q.   So what did they have?

22   A.   Zero.

23   Q.   Did they have a 5 percent interest in anything?

24   A.   They had a 5 percent interest in the fee collected or not

25   collected when the loan became due.  So if the individual,

H9E8TUC4

1    hypothetically, got a $300 loan and the interest on that loan

2    was $90, 5 percent of the $90, whether it was collected or

3    whether it was not collected, would be due to the bank.

4    Q.  OK.  If, for example, the -- did the bank face any risk of

5    loss on the amount of the loan?

6    A.  They never had any risk of loss in the program.

7    Q.  So if the bank had a 5 percent interest in the fees

8    generated, who in fact was paying who 5 percent?

9    A.  The so-called servicer would pay the bank the 5 percent.

10   Q.  So what was the purpose of paying the bank the 5 percent?

11   A.  We, meaning myself, Mr. Hallinan, Mr. Mickman, called that

12   a fee to rent the bank's name; it was the rent that we owed the

13   bank.

14   Q.  Now, continuing on that same part, it says -- the same

15   section of the agreement that is highlighted -- it says,

16   "Seller has provided to buyer the terms of the loans and will

17   timely provide to buyer all information provided and to be

18   provided by the borrowers to the seller."  Do you see that?

19   It's in 1(b).

20   A.  I see it.

21   Q.  It should be enlarged on the screen in front of you.

22   A.  OK.

23   Q.  Again, just so we have our terms correct, the seller,

24   again, is County Bank?

25   A.  Correct.

1   Q.   And the buyer is the so-called servicer?

2   A.   Correct.

3   Q.   So here it says that County Bank has provided to the

4   servicer the terms of the loans and will timely provide to the

5   so-called servicers all information provided and to be provided

6   by the borrowers to County Bank.  Do you see that?

7   A.   I do.

8   Q.   In essence, is this essentially saying that the seller has

9   provided to the buyer -- that County Bank has provided to the

10  servicers the terms of the loans and will give the servicers

11  anything they get from the borrowers?

12  A.   That's what it says.

13  Q.   Is that how it happened?

14  A.   Absolutely not.

15  Q.   What actually happened?

16  A.   The so-called servicer had all the buyer's information, and

17  the terms were with the so-called servicer.

18  Q.   Did County Bank have any of this information?

19  A.   They did not have it initially when the loan was provided

20  to the customer.  And in the first initial months, I believe,

21  of the program, we were required to fax the loan documents to

22  the bank, of which we did for a short period of time.

23  Q.   Let me stop you.  The agreement says, essentially, that

24  County Bank will send the documentation to the servicers,

25  right?

1    A.  It does.

2    Q.  But in reality, the servicers were sending it to the bank?

3    A.  That is absolutely correct.

4    Q.  Did the servicers continue to do that?

5    A.  No.

6    Q.  Why not?

7    A.  The faxing of documents from multiple servicers became

8    voluminous for the one branch bank.

9    Q.  So what happened after that?

10    A.  After that, there was a conversation with Mr. Goodman, who

11    was the attorney for the bank, with Mr. Hallinan, Mr. Gary

12    Gordon, and myself as to how to get the information to County

13    Bank, and that was the conversation we had.

14    Q.  Just so we are clear, Mr. Goodman, again, was the attorney

15    whose name is on the partner's letter we looked at, Government

16    Exhibit 101?

17    A.  Yes.

18    Q.  You said there was a discussion about how to get some of

19    this information to the bank?

20    A.  Correct.

21    Q.  Was there a solution developed as part of the conversation?

22    A.  Yes.  It was Mr. Gordon's software that we were using, and

23    he was very familiar with it.  He suggested that we come up

24    with a plan to take out of the software the individual's name,

25    how much they got in a loan, their address and certain

1    criteria, create a file, send it to the bank with --

2    hypothetically, for that particular day, we approved 50 loans,

3    with the 50 names, and hypothetically that there were three

4    customers that we denied -- for that file to be sent to the

5    bank, and to wait 10 minutes, 20 minutes, 30 minutes, I don't

6    remember the time frame, and if there was no response back from

7    the bank in that time frame, then it would come back to the

8    software as a green light, meaning that we can now send the

9    money to the customers, and a red light saying that those

10   customers will be denied.

11   Q.  So what was the purpose of this entire process to send

12   electronic information and have lights, information bounced

13   back within a certain amount of time?

14   A.  It was just to create the illusion that the bank was

15   approving the loans, when in fact the bank never even looked at

16   it.  And in the four or five years that I was involved with the

17   bank, there was never one time that we sent anything to the

18   bank as an approval that the bank said, no, don't approve this,

19   or a denial, where the bank said you can approve this.

20   Q.  So was this solution that you just described, was that

21   implemented for the County Bank program?

22   A.  It was.

23   Q.  Again, to be clear, this is something that you discussed

24   and developed with Mr. Goodman?

25            MR. ROTH:  Objection, Judge.

1    THE COURT:  Refrain from leading.

2  Q.  I believe you testified to this earlier.  Did you discuss

3  and develop this solution with Mr. Goodman?

4  A.  With Mr. Goodman, Gary Gordon, and Mr. Hallinan.

5  Q.  Did this solution apply to all the servicers that were in

6  the County Bank program?

7  A.  I would say all the servicers that were in the County Bank

8  program that were using Mr. Gordon's software.

9  Q.  Now, in the course of lending as part of this County Bank

10  program, did County Bank require any documentations from the

11  servicers?

12  A.  Yes.

13  Q.  What documentation?

14  A.  On a daily basis they wanted, at the end of the day, a

15  participation schedule to be filled out and to be faxed to

16  them.

17  Q.  You said participation schedule.  What was the

18  participation schedule?

19  A.  The participation schedule consisted of how many loans were

20  given out that day, how many loans were given out the previous

21  day, how many loans were paid back from consumers on that

22  particular day.  And then some mathematical formula would come

23  about, where 95 percent of the previous day's loans that were

24  given out would be bought by the so-called servicer.  And

25  regarding the fees that were collected, or not collected, would

1    be 5 percent of the total fees that were due, not necessarily

2    collected, would have to go to the bank as part of the rent

3    that we owed them or fees, whatever.

4    Q.  Was what you just described what was on these certificates?

5    A.  Yes.  There could have been a few things other than that,

6    but I can't remember exactly, it was a long time.

7    Q.  Did these certificates accurately describe what was

8    actually happening?

9    A.  I am almost positive they called it a participation

10   schedule, and no, that was not what was happening at all.

11   Q.  In what way?

12   A.  We did not purchase 95 percent participation in the day

13   before's loans that were given out because it was all my money

14   to begin with.

15   Q.  So what was the purpose of generating these participation

16   schedules?

17   A.  Again, it was to create the facade that this was really

18   happening, when it wasn't.

19   Q.  Did County Bank representatives ever explain why they

20   wanted these participation schedules?

21   A.  No.

22   Q.  Let's go back to the agreement.

23         On 2(d), section 2(d).

24   A.  OK.

25   Q.  It says, "Seller shall retain legal" -- again, seller is

1  County Bank?

2  A.  Yes.

3  Q.  Seller shall retain legal title to all loan documents,

4  which shall remain solely in County Bank's name.  Nonetheless,

5  until the loans are paid in full, County Bank shall hold title

6  to the loan documents as trustee for the so-called servicers,

7  right?

8  A.  Yes.

9  Q.  To the extent of the servicer's participation.

10  A.  That is correct.

11  Q.  So true and complete copies of all loan documents shall be

12  delivered by County Bank to the servicers promptly on the

13  request of the servicers.

14       Did that actually happen?

15  A.  No.  County Bank never had possession of the documents

16  after the first few weeks or months of the program.

17  Q.  So let's move to the third paragraph.

18  A.  Paragraph (c)?

19  Q.  I'm sorry.  Paragraph 3.

20       There is a sentence, I think on the fourth line down,

21  towards the right, beginning with the word "buyer."

22  A.  OK.

23  Q.  "Buyer shall recommend."

24  A.  Yes.

25  Q.  So "buyer shall recommend to seller whether or not a loan

1    should be made based on seller's credit standards."

2              So, again, this is so-called servicers recommending to

3    County Bank whether or not a loan should be made.  Do you see

4    that?

5    A.  Yes.

6    Q.  Is that how the program operated?

7    A.  No.

8    Q.  How so?

9    A.  The buyer had already made the determination of approving

10   the loan or not approving the loan.

11   Q.  Let's turn to the next page.

12              In 4(a) -- section 4 is entitled, "Servicing of loans

13   by the buyer."  Do you see that?

14   A.  Yes.

15   Q.  The first sentence in (a) says, County Bank hereby

16   authorizes so-called servicer to perform County Bank's duties

17   under the loan documents as marketer, servicer, processor, and

18   undisclosed agent of the seller.  Do you see that?

19   A.  Yes.

20   Q.  So what does this sentence mean?

21   A.  Let me read it one more time, please.

22              I believe it's saying that County Bank is authorizing

23   the servicer to be a marketer, servicer, and processor.

24   Q.  Is it the case that the so-called servicers performed the

25   marketing and processing functions as part of the program?

1    A.   Yes.

2              THE COURT:  Stop.

3              Ladies and gentlemen, let's stand up and stretch.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Do you have much longer, Mr. Velamoor?

2    MR. VELAMOOR:  30 to 45 minutes, your Honor.

3    THE COURT:  I'm sure you can do better than that.

4    MR. VELAMOOR:  Okay.  Okay.  Understood.

5    THE COURT:  I know you can do better than that, in

6  fact.

7    MR. VELAMOOR:  Even more clearly understood.

8  BY MR. VELAMOOR:

9  Q.  Apart from the servicing function you just mentioned,

10  marketing and processing, is that all that the so-called

11  servicers did?

12  A.  We also provided the money for the loans.

13  Q.  Now let's turn to 5A, and this will be the last part of the

14  agreement that we go through.

15    Okay.  So this reads, "Buyer and seller's agents --"

16  again, the servicers -- "shall receive into the operating

17  account all amounts as the same are paid in connection with or

18  arising out of the loans."

19    THE COURT:  Are these documents in evidence?

20    MR. VELAMOOR:  Yes.

21    THE COURT:  The jury will have them in the jury room.

22  You can tell the jury in closing argument what you think they

23  mean.

24    MR. VELAMOOR:  Okay.

25  Q.  Mr. Rubin, why don't you read that paragraph to yourself,

1    quickly.

2    A.   Okay.

3    Q.   Okay.  What is the essence of what that paragraph says is

4    supposed to happen?

5    A.   It's saying that whether or not the person pays the money

6    on the time that it is due, that the bank is entitled to their

7    5 percent, whether it's collected or not, and in that sentence

8    alone, they never provided any money to the customer.  It also

9    says that the bank is entitled to 5 percent of the interest

10   that was due, whether it was collected or not, to the bank.

11   Q.   And so to be clear, how much risk is the bank facing on

12   loans as part of this agreement?

13   A.   Zero.

14   Q.   Okay.  We can put the agreement aside.

15        Now you mentioned before that the bank issued certain

16   policies and amendments to the servicers over time, right?

17   A.   That is correct.

18   Q.   Generally speaking, how did the rules change over time?

19   A.   There was various amendments.  One amendment was that

20   initially, when the program started, if a person did not want

21   to pay the entire amount of the loan -- using the example of

22   $300 and the interest being 90, with total money due 390, and

23   the customer did not want to pay the entire amount, and let's

24   assume the customer wanted to pay only the interest, which was

25   90, we were required to send the customer a new set of

1   documents for them to fill out for them to just pay the $90,

2   and then a new loan would be created, so the next payday of the

3   customer, they would still owe the $300 plus another $90 for a

4   total of 390 that would be due on their next payday.

5   Q.  And so initially you're saying the bank required

6   essentially that the customer send in all new paperwork.

7   A.  I'm sorry.  We did receive an amendment from either

8   Mr. Goodman or the bank saying that they were going to revise

9   that policy, that the customer could renew or roll over the

10  loan, the interest on the loan for four times, and then after

11  the four times, they would have to pay down the loan principal

12  in $50 increments plus whatever interest was due on the

13  remaining principal.

14  Q.  And so I believe you mentioned -- well, let's put up

15  Government Exhibit 101 on the screen quickly.

16          And this is an exhibit we looked at before, correct?

17  A.  Yes.

18  Q.  Let's turn to the second page, on the top line.

19          And so it says there that the changes to Section 2 of

20  the policy limit loan renewals to four.  Do you see that?

21  A.  I do.

22  Q.  So is this how County Bank essentially announced to all the

23  so-called servicers that you could do renewals but only four?

24  A.  Yes.

25  Q.  And were you then permitted to do the renewals without

1   getting all new paperwork from the borrowers?

2   A.   Yes.

3   Q.   Now prior to the bank making this change, had you discussed

4   the previous policy on renewals in joint conversations with

5   Mr. Hallinan and Mr. Tucker?

6   A.   Yes.

7   Q.   And that policy -- by that policy, I mean the requirement

8   that borrowers send in all new paperwork.

9   A.   Yes.

10  Q.   And what had you discussed with Mr. Hallinan and Mr. Tucker

11  about that?

12  A.   That was a huge nuisance to the so-called servicers to try

13  and fax documents a day or two before, to get the customers to

14  sign it and send it back, and if in fact they didn't send it

15  back, we would have to debit their account for the full $390.

16  Q.   And so did that make renewals more or less likely if

17  customers had to send in all new documentation?

18  A.   It made renewals less likely, and the profit in the payday

19  loan business came from the renewals, or the rollovers.

20  Q.   Now did County Bank also set policies regarding the

21  documentation that was sent to the borrowers?

22  A.   Yes.

23  Q.   Including, for example, the loan note and disclosure?

24  A.   Yes.

25  Q.   And on the loan note and disclosure, how was the cost of

1  the loan described?

2  A.  In -- in -- on the truth in lending document, similar to if

3  you got a car loan or a mortgage, the first box would say how

4  much the customer is getting, and as an example, let's say

5  $300; not sure of the next box, but I believe it would have

6  been how much in interest was charged on it, and in this

7  particular case it would have been $90; the next box would have

8  been how much total payments would be, if in fact the loan was

9  paid, which would be 390; and then the next box would be the

10  annual percentage rate.

11  Q.  And initially, when the borrower had to essentially submit

12  documentation for a new loan, were those disclosures accurate?

13  A.  Yes.

14  Q.  Well, when the bank allowed renewals and at least up to

15  four automatic renewals, did the disclosures change?

16  A.  They did not.  They became inaccurate.

17  Q.  How so?

18  A.  Well, if the customer by default did nothing, the policy

19  was to roll over the loan and just take $90 out of their next

20  pay, and then if the customer did nothing again, would be just

21  to take $90, and that went on and on.  So in fact, the total

22  payments that was given to the customer said 390, but in

23  reality it was much, much more than 390, which made that box

24  incorrect, along with the APR incorrect.

25  Q.  Okay.  Then you mentioned earlier, Mr. Rubin, that during

1   your joint conversations with Mr. Hallinan and Mr. Tucker --

2   and by the way, sitting here today, do you remember the details

3   of all these conversations?

4   A.  I don't remember the details, no, not -- it was close to 15

5   to 20 years ago.

6   Q.  That said, do you remember some of what was discussed

7   during these calls?

8   A.  We talked about the business in general, how our portfolio

9   was doing, talked a little bit about bad debt, advertising,

10  different credit criteria in general terms.

11  Q.  All right.  Let me stop you there.  You mentioned

12  advertising.  Were there any advertising restrictions that you

13  discussed during these joint calls?

14  A.  There was a -- I don't remember if that was during one of

15  the calls or I had a face-to-face meeting with Mr. Tucker at a

16  steak restaurant in Philadelphia along with Mr. Hallinan, and I

17  recall that coming up in the conversation.

18  Q.  Specifically what coming up?

19  A.  Regarding the -- the advertising and that County Bank

20  wanted us -- they believed we were targeting certain areas in

21  our advertising, and those areas were usually minorities, and

22  the bank wanted us to advertise in a more broad picture opposed

23  to targeting certain radio stations and print and things like

24  that.

25  Q.  And did you discuss what the bank wanted the servicers to

1    do during either the joint call or during the meeting at the

2    steakhouse?

3    A.  To advertise in areas that we knew would not produce any

4    customers and that obviously would cost us more money and

5    produce very little, if any, results from an interested party

6    wanting a payday loan.

7    Q.  And was that an opinion that was shared by the three of you

8    during this joint conversation?

9    A.  Yes.

10   Q.  Now you mentioned that at times you discussed the relative

11   sizes of each of your payday loan companies during these joint

12   conversations?

13   A.  Yes.

14   Q.  How was that?  How did you refer to the amount of money

15   that your companies had lent out?

16   A.  It was the -- the amount of money that was out on the

17   street or the amount of money in our portfolios, and I don't

18   remember the exact time frame, but it was certainly between '98

19   and 2001-ish, 2000, 2001, that my portfolio and Mr. Hallinan's

20   portfolio were similar.  Mr. Hallinan had a little bit more.

21   And Mr. Tucker's portfolio was much, much higher than ours.

22   Q.  Now during these calls was there ever any reference to how

23   much money County Bank had on the street, or how much money the

24   bank was putting up?

25   A.  No, because we knew that County wasn't putting out any

1    money.

2    Q.  Now did you, during any of these joint conversations,

3    discuss regulators?

4    A.  Yes.

5    Q.  Specifically which kinds of regulators?

6    A.  Whether they be attorney generals in different states or

7    whether they be state banking commissions in other states, and

8    in some cases attorneys.

9    Q.  And specifically how was your company -- on the loan

10   documents that you sent to borrowers, how was your company

11   identified?

12   A.  On the loan documents that were provided to me by

13   Mr. Hallinan, originally they had County Bank as the lender and

14   then a few paragraphs down it had CRA Services as the servicer.

15   Q.  So in your loan documentation you included the name CRA

16   Services?

17   A.  Which was the company name.

18   Q.  Did you ever have a discussion with Mr. Tucker about what

19   names or name he used on his loan documentation?

20   A.  That did come up on -- again, I can't remember it was at

21   the meeting at the steak restaurant or in a conversation, that

22   it would be better to use the "doing business as" name, which

23   in my case was Cashnet, in the case of Mr. Hallinan it was

24   called Telecash, and in the case of Mr. Tucker, FastCash or 500

25   Cash or something like that.

1   Q.  And did Mr. Tucker explain why he thought it was better to

2   use the d/b/a name?

3   A.  If there was a regulator that was looking to inquire as to

4   what was going on, it would be harder to find the servicer than

5   if we used the d/b/a name opposed to the -- the company name.

6   Q.  Now lastly, did you discuss collections during any of these

7   joint conversations?

8   A.  That was always a topic of, you know, bad debt, we called

9   it, or collections.

10  Q.  And according to these conversations, how did your rates of

11  bad debt compare to the others?

12  A.  Again, my -- my bad debt and Mr. Hallinan's bad debt was

13  similar.  Mr. Tucker's bad debt was higher.  And when

14  questioned about that -- and again, I think this was more at

15  the dinner -- Mr. Tucker said not to worry about the bad debt,

16  just lend out as much money as you can and the profits would

17  overcome the -- the bad debt.

18  Q.  Now did you also discuss, during any of these

19  conversations, the importance of the language in loan

20  documentation that was sent to borrowers?

21  A.  Only to the extent that we believed that a majority of the

22  customers did not read the documents and I don't remember ever

23  getting one complaint in the entire time I was in the business

24  where a customer said, can you explain to me line 10 on the

25  second page of your agreement, so we were under the impression

1   that the customers did not read the documents.

2   Q.  Now you mentioned that you had a meeting with Mr. Tucker at

3   a steakhouse?

4   A.  Yes.

5   Q.  Who else was at that meeting?

6   A.  Mr. Hallinan.  I was invited to that meeting by

7   Mr. Hallinan.

8   Q.  Okay.  Apart from what you already testified to, what was

9   the general discussion at that --

10          MR. ROTH:  Judge, can we have a time frame.

11          MR. VELAMOOR:  Fair question.

12  Q.  Approximately when was that steakhouse meeting?

13  A.  I -- I'm not exactly sure.  I think it was in the 2000,

14  2001 range, but I can't be positive.

15  Q.  Okay.  What --

16  A.  It was a long time ago.

17  Q.  I'm sorry.  What was the general discussion at that meeting

18  at the restaurant?

19  A.  Some of the pol -- some of the things I just went over, and

20  I believe Mr. Tucker suggested that the bank was giving more

21  and more restrictions and that we could make more money -- "we"

22  meaning Mr. Hallinan, myself, and Mr. Tucker -- if we left the

23  bank and moved out of the bank model.

24  Q.  During your conversations did you ever express any

25  frustration with County Bank?

H9e1tuc5                    Rubin - Direct

1   A.  Regarding certain restrictions, but mostly how much we were

2   paying the bank for them doing absolutely nothing except

3   renting their name.

4   Q.  Is that also something that the three of you agreed on from

5   time to time?

6   A.  That the bank was -- was doing almost nothing and making a

7   lot of money, yes.

8   Q.  Now you mentioned that Mr. Tucker suggested that you leave

9   County Bank.  Did you leave County Bank?

10  A.  I did.  I was terminated from County Bank I believe it was

11  sometime around late '02 or early 2003, somewhere in that

12  range.

13  Q.  And prior to that time frame in approximately 2000 did your

14  relationship with County Bank change?

15  A.  Yes.  In the beginning of 2000, as I mentioned earlier, the

16  FDIC came in and did an audit, they notified County Bank that I

17  had a felony conviction, and at that point they wanted me to

18  sell my shares or get out of the program entirely, and I sold

19  my shares to my father-in-law.

20  Q.  And was that real or a sham transaction with your

21  father-in-law?

22  A.  It was a sham transaction.

23  Q.  And so you said you remained in the program until 2002 or

24  2003?

25  A.  I believe it was early 2003.

1    Q.   And how come you left in 2003?

2    A.   Discussions with Mr. Hallinan, we -- we thought that,

3    because of the FDIC and other scrutiny the bank was coming

4    over, that the program would end.  I got a letter from the bank

5    I believe giving me a fine for my collection department being

6    too aggressive in the collection practice, something regarding

7    advertising.  Shortly thereafter they sent a termination

8    notice, giving me a period of time to get out of the program,

9    and on the termination notice there was no reason why they were

10   terminating me.

11   Q.   Okay.  Despite being terminated by County Bank, did you

12   continue in the payday lending business?

13   A.   I did.

14   Q.   And according to your discussions with Mr. Hallinan, did he

15   also remain involved in payday lending?

16   A.   He did.

17   Q.   Did he remain involved in payday lending through his

18   partnership with Mr. Tucker?

19   A.   Yes.

20   Q.   And from time to time did you discuss with Mr. Hallinan

21   which states to do business in and which states to avoid?

22   A.   Yes.

23   Q.   What discussion did you have about that?

24   A.   There were certain states that was very aggressive against

25   the payday loan business, their attorney general, which was

1    North Carolina, Georgia, West Virginia, and there was probably

2    one or two more.  I can't remember right now.

3    Q.  And were there any states that you continued to do business

4    in even though you believed the regulators to be particularly

5    hostile to payday lending?

6    A.  I think California might have been one of them.

7    Q.  And how come you stayed -- how come you continued to do

8    business in California?

9    A.  That was a state that a lot of customers wanted payday

10   loans, and I -- I did continue doing business with them and

11   I -- I never had a problem with that state.  I knew that

12   Mr. Hallinan did though.

13   Q.  Now did you ever -- you said Mr. Hallinan was involved with

14   a tribe, correct?

15   A.  Yes.

16   Q.  Did you seek out Mr. Hallinan's help in obtaining a tribal

17   relationship as well?

18   A.  I did.  And for quite a few years he refused me.

19   Q.  Did Mr. Hallinan mention where he had gotten the idea of

20   using a tribe?

21   A.  Yes.

22   Q.  What did he say about that?

23   A.  Mr. Tucker.

24   Q.  And specifically what did he say about which tribe

25   Mr. Tucker was using?

1  A.  Well, he said that it was Mr. -- it was Mr. Tucker's idea

2  and he was very happy about that, and the tribe's name was -- I

3  think it was like Miami, something of Miami tribe.

4          THE COURT:  All right.  Ladies and gentlemen, this is

5  a good time for a break.  Please do not discuss the case among

6  yourselves or with anyone.  We'll be back in action in ten

7  minutes, and this will give Mr. Velamoor an opportunity to

8  review his notes and shrink down the balance of his

9  examination, I'm sure.

10         (Continued on next page)

1          (Jury not present)

2          MR. VELAMOOR:  I just have two or three more questions

3    and I'm done.

4          THE COURT:  Oh.  Okay.  All right.  If I had known, I

5    would have --

6          MR. VELAMOOR:  Well, I didn't --

7          THE COURT:  I got it.  I got it.  Good.

8          The jury will be impressed, I'm sure.

9          (Recess)

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Please be seated.

3              All right.  Mr. Velamoor, you may continue.

4              MR. VELAMOOR:  Thank you, your Honor.  Just a few more

5    questions.

6              THE COURT:  Okay.

7    BY MR. VELAMOOR:

8    Q.  Mr. Rubin, when we left off, I believe you were discussing

9    conversations you had with Mr. Hallinan about Mr. Tucker's

10   tribe.  Do you recall that?

11   A.  Yes.

12   Q.  And I believe you testified that Mr. Hallinan described it

13   as a tribe of Miami or something like that?

14   A.  Yes.

15   Q.  Did Mr. Hallinan explain how Mr. Tucker had chosen the

16   tribe?

17   A.  No.

18   Q.  Did he explain how Mr. Tucker had decided which type of

19   tribe to do business with?

20   A.  Mr. Hallinan said that -- when I asked him about the tribe,

21   and he said that, that the tribe was -- that they looked for a

22   tribe that was a poor tribe that might want to get involved in

23   this particular business and not like a tribe like a -- that

24   was involved in casinos or something like that, that a poor

25   tribe would be more likely to want to get involved in this

1  business.

2  Q.  And did Mr. Hallinan describe how the relationship between

3  Tucker and Hallinan on one side and the tribe, how that

4  relationship worked?

5  A.  He only mentioned that it was similar to the way the bank

6  model worked, the County Bank model worked.

7          MR. VELAMOOR:  No further questions, your Honor.

8          THE COURT:  You may cross.

9          MR. ROTH:  Thank you, your Honor.

10 CROSS EXAMINATION

11 BY MR. ROTH:

12 Q.  Good afternoon, Mr. Rubin.

13 A.  Good afternoon.

14 Q.  My name is James Roth, and I represent Scott Tucker.

15          We've never met before, is that correct?

16 A.  That's correct.

17 Q.  Is it fair to say, Mr. Rubin, that for the last 30 years

18 you've conducted your life as a fraudster and as a liar to take

19 advantage and benefit from other people?

20 A.  That is correct.

21 Q.  And yet you're asking us to believe what you say today, is

22 that fair?

23 A.  That's a hundred percent correct.

24 Q.  Now you indicated, sir, that you started evading taxes in

25 around 1983, is that correct?

H9e1tuc5                    Rubin - Cross

1    A.   That is incorrect.

2    Q.   When was it, sir?  1988?

3    A.   I think it was in the early '90s.

4    Q.   In the early '90s?

5    A.   I can't remember exactly.

6    Q.   Okay.  Is your memory faulty about the first time that you

7    evaded taxes?

8    A.   No.  I remember when the IRS agents came and, you know --

9    to my locations.  I believe that was sometime in '95.

10   Q.   Okay.  And they were investigating your tax evasion for

11   what period of time?

12   A.   I believe it was for the past three to five years prior to

13   that.  I can't remember exactly.

14   Q.   And I think you indicated on direct, did you not, that you

15   owed $1.6 million in back taxes?

16   A.   I believe that was the amount.  I can't be exactly sure.

17   It was a long time ago.

18   Q.   It could be higher?

19   A.   I don't remember the exact figure.  Could be a little bit

20   lower or a little bit higher.  I don't remember.

21   Q.   And tell us how you came to owe that amount of money to the

22   IRS.

23   A.   Because when -- the income that I was -- it was primarily a

24   cash business, and the income that I --

25   Q.   You're referring to your --

1    A.  Check cashing business, yes.  That the income that I was

2    deriving was not reported entirely on the -- on my tax returns.

3    Q.  And tell us exactly the scheme that you devised to evade

4    those taxes.

5    A.  At the end of the week or at the end of the month, I would

6    deposit X amount and keep in cash Y amount.

7    Q.  And did you have two sets of books?

8    A.  Yes.

9    Q.  And who created those books?

10   A.  It was my accountant that worked in my office with me.

11   Q.  And your accountant was complicitous with you?

12   A.  Yes.

13   Q.  For this entire period of time?

14   A.  Yes.  He also got charged with a crime.

15   Q.  And sir, at the time that you started evading these taxes,

16   the federal taxes, was it just personal taxes and employee

17   taxes, withholding benefits?

18   A.  It was just personal taxes.

19   Q.  And what was your economic circumstance then at that period

20   of time?

21   A.  I'm not exactly sure of the question.

22   Q.  Well, were you rich, were you poor?

23   A.  I was rich.

24   Q.  You were rich, and you got richer after you started putting

25   the cash in your pocket?

1   A.  That is correct.

2   Q.  Okay.  And when you say rich, how rich were you when you

3   started -- what was your net worth roughly at the period of

4   time that you started evading taxes?

5   A.  I can't remember that.  I don't know what that is.

6   Q.  Well, how many millions are we talking about, sir?

7   A.  I can't remember, but I would have to make up a figure that

8   might be a few million dollars.

9   Q.  And that's give or take a few million dollars or --

10  A.  Yes.

11  Q.  Okay.  And how did you make that money, sir?

12  A.  Made that money from my check cashing business.

13  Q.  And that's not counting the cash that you put in your

14  pocket, is that right?

15  A.  That is correct.

16  Q.  And when the IRS came to you, after a short period of time

17  you decided to cooperate with them, is that right?

18  A.  Almost immediately.

19  Q.  And did you get the U.S. Attorney's Office involved too?

20  A.  I don't -- no.

21  Q.  Were you --

22  A.  The answer is no.

23  Q.  Did you ultimately get prosecuted, sir?

24  A.  Oh, I am sorry.  I am sorry.  The answer to that is yes,

25  okay, that the IRS and I think other departments of the

H9e1tuc5                    Rubin - Cross

1   government came to my -- at that time I think I had about 30

2   retail check cashing stores, give or take a few, and they came

3   to all the locations along with my home on that day and, you

4   know, took all the money and -- and paperwork and everything

5   else.

6   Q.  They didn't seize all your millions, though, at that time,

7   is that right?

8   A.  They did.  They froze my accounts.

9   Q.  Okay.  But not your property, at that time, when they first

10  came.

11  A.  No, I don't remember the property being seized.

12  Q.  Okay.  So at some point the federal government in

13  Philadelphia, the United States Attorney's Office, the

14  counterpart of those people who are sitting at that table

15  there, got involved in the investigation, is that right?

16  A.  Yes.

17  Q.  And what year was that, if you recall?

18  A.  I have to say it was around 1995.

19  Q.  Okay.  And at that point, sir, you realized that you were

20  facing a significant criminal penalty, is that fair to say?

21  A.  Yes.

22  Q.  Okay.  And ultimately you were facing 45 years, is that

23  correct?

24  A.  I -- I don't remember that number.

25  Q.  Is there anything that would help refresh your recollection

H9e1tuc5                    Rubin - Cross

1    as to what you were facing, sir?

2    A.  If you could provide me with that, it might refresh my

3    memory.

4    Q.  I'd ask that the witness be shown 3501-2, page 5.

5            You can read the first page of the document so you can

6    know what the document is, sir.  All the way back to the front.

7            Are you familiar with that document, sir?

8    A.  I am not familiar with that document.

9    Q.  So could you turn to the page that I indicated, page -- I'm

10   sorry.  Page 4.  Are you familiar with that portion of that

11   document?

12   A.  If I take the time to read it and -- from page 1 to its

13   entirety --

14   Q.  No, I'm not asking you to do that, sir.

15           THE COURT:  You can ask him whether it refreshes his

16   recollection.  So point him to the part that you'd like him to

17   read to see whether it refreshes his recollection.

18           MR. ROTH:  Certainly.

19   Q.  Under the section Maximum Penalties that is on page 4,

20   starting at the top and concluding on the last line of that,

21   the last sentence of that paragraph, paragraph 2, Maximum

22   Penalties, I'd ask you to direct your attention to that.

23           MR. ROTH:  Eli, could you highlight the top box to

24   make it easier for --

25   A.  I have read that, sir.

1    Q.  Okay.  Does that refresh your recollection now as to

2    whether you were facing a 45-year sentence on the tax evasion

3    case?

4    A.  Yes.

5    Q.  Okay.  So you were facing a 45-year sentence, and is it

6    fair to say, sir, at that point you made a calculated decision

7    to do whatever you could to try to minimize that 45-year

8    sentence, potential sentence?

9    A.  Yes.

10   Q.  Okay.  And you were represented by counsel at that point?

11   A.  I was.

12   Q.  Okay.  And did you strike a deal with the United States

13   government, United States Attorney's Office in Philadelphia,

14   the counterpart of these gentlemen who are seated here today?

15   A.  I'm not sure what you mean by strike a deal.

16   Q.  Did you strike a cooperation deal?

17   A.  Cooperation agreement, yes.

18   Q.  Okay.  And when did you do that relative to the discovery

19   of the fraud, the tax evasion?

20   A.  I -- I don't remember exactly when the cooperation

21   agreement was signed, but I know that I started cooperating,

22   regardless of the cooperating agreement, immediately.

23   Q.  And as part of your cooperation agreement, sir, did you

24   agree to tape record people?

25   A.  Yes, sir.

1    Q.  Did you agree to video people, videotape people?

2    A.  Yes, sir.

3    Q.  And did you do some of that before the government was

4    involved?

5    A.  I don't -- I don't think so.

6    Q.  Okay.  And tell us, sir, isn't it a fact that you videoed

7    and recorded people on at least half a dozen or more occasions?

8    A.  It could very well be.  It was over 20 some years ago, so I

9    don't remember exactly.

10   Q.  And, well, had you ever surreptitiously videotaped or

11   recorded somebody, that is, without their knowledge, before

12   that time?

13   A.  I don't think so.

14   Q.  Well, do you have any doubt in your mind?

15   A.  No.

16   Q.  And describe, if you would, for the members of the jury,

17   how you went about that.  Were you wearing a body wire or --

18   A.  The video was relating to the Jamaicans who were laundering

19   money by sending money through Western Union using multiple

20   people to -- and the government -- I explained that to the

21   government.  At that point the government asked -- I owned

22   the -- I'm not sure if I owned the building or not at that

23   time, but they asked if they could set up some kind of

24   surveillance on the second floor above the check cashing agency

25   to videotape what was going -- who or what was going in and out

 1    of the store, the check cashing location, regarding the --

 2    regarding the Jamaicans that were sending the money.

 3    Q.  Okay.  And those Jamaicans, did they have any names?

 4    A.  No.  I mean, I assume they have names.  I don't -- I don't

 5    know who they are.  I don't remember their names or --

 6    Q.  And did you also, sir, in connection with those activities,

 7    wear a body wire at any time to record anyone?

 8    A.  Yes.

 9    Q.  And describe for the members of the jury that process.

10    A.  They put some kind of recording mechanism on me and

11    encouraged me to interact not only with the Jamaicans but with

12    two other individuals that were cashing checks with me.

13    Q.  And to do so you had to, in essence, deceive them to make

14    it like it was a normal relationship, is that correct?

15    A.  Yes.

16    Q.  And was that difficult for you, sir?

17    A.  May I ask you what you mean by deceive them?

18    Q.  Well, if you have a conversation with somebody and you're

19    wearing a wire, you're not going to reveal that in the course

20    of the conversation, right?  You're just going to make like

21    it's a normal conversation, if you will.

22    A.  That is correct.

23    Q.  That was the intent, right?

24    A.  That is correct.

25    Q.  To just deceive them and make it seem like it was a normal

1  conversation.

2  A.  I understand your question now and you are correct.

3  Q.  And by the way, you also pled guilty to a violation of what

4  they call a CTR.  Could you explain to the members of the jury

5  what a CTR is.

6  A.  CTR is a form that anybody that is cashing a check or

7  transaction of money over the amount of $10,000, that a form

8  should be filled out and sent to the IRS stating who, you

9  know -- who cashed the check or the money transacted, and

10  information regarding that person such as identification.

11  Q.  And did you fail to report -- how many times did you fail

12  to report a CTR?

13  A.  I believe my -- I believe it was one.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. ROTH:

2  Q.  Who would give you that money, sir?

3  A.  If I remember correctly, it was an undercover agent that

4  gave me -- it wasn't they gave me money.  They gave me checks

5  that exceeded 10,000, the undercover agent, and that's who I

6  failed to provide the CTR for.

7  Q.  So are you saying that you actually physically received

8  that check and didn't report it?

9  A.  No, I reported the check.

10 Q.  But not the cash that was derived from it?

11 A.  Not the cash that was handed to the undercover agent.

12 Q.  You did a swap, right?

13 A.  I charged a fee to cash the check.

14 Q.  So you made some interest on it?

15         THE COURT:  Let the witness finish his answer.

16 A.  In the normal course of the check cashing business, you

17 charge a fee of approximately 1 to 2 percent of the value of

18 the check.  And he gave me the check, or checks, I don't

19 remember if it was one or more than one, and I charged him the

20 fee and handed him the money, which exceeded $10,000.

21 Q.  You had 30 stores, but you were actually in the front of

22 one of those stores, actually operating one of those stores?

23 A.  What had happened was that I bought the check cashing

24 service that was under investigation, and they already had

25 undercover agents in that particular location.  Then I became

1   the new owner of that.  And at the time, I was going in and out

2   of that store and the undercover agent befriended me to a

3   certain extent.  And then when I moved back to my office, which

4   was right next to one of the check cashing stores, he started

5   to come to that location and ask me to meet him there.

6   Q.  Did there come a point in time, sir, when you wind up

7   pleading guilty to the charge of tax evasion and violation of

8   the currency transaction reporting?

9   A.  Yes.

10  Q.  Failure to file?

11  A.  Yes.

12  Q.  Is it fair to say that was around two years after you had

13  been cooperating, trying to benefit yourself in a sentence, is

14  that right?

15  A.  Somewhere in that time frame.

16  Q.  Do you recall if you were sentenced on that case in

17  Philadelphia on September 18, 1997?

18  A.  I don't remember that specific date, but I know when I pled

19  guilty I refused bail and I surrendered and went to prison, and

20  then sometime, approximately eight months or so, give or take a

21  little bit, when I was in prison, that's when the sentencing

22  happened, and then I got out -- I served two and a half months

23  more in prison.  So if I got out of prison around December of

24  '97, I assume two or three months prior to that is when I got

25  sentenced.

1    Q.  Would it be fair to say, Mr. Rubin, that that sentencing

2    date in that court was the most important day of your life, up

3    to that point?

4    A.  It was very important.

5    Q.  What, if anything, was a more important date to you up to

6    that period of time?

7    A.  My children being born.

8    Q.  You have two children?

9    A.  I do.

10   Q.  They are more precious than your freedom?

11   A.  Yes.  More precious than my freedom you said?

12   Q.  Would you do anything to keep them out of jail?

13   A.  No.

14   Q.  Anything legally to keep them out of jail, you personally?

15   A.  I'm sorry.  Go ahead.

16   Q.  You personally.

17   A.  I would try my best, as I believe any father would, to keep

18   their children out of jail, if I was being honest.

19   Q.  I didn't hear the last part.

20   A.  If I was being honest.

21   Q.  That's a difficulty for you, is that fair to say?

22   A.  In the past it certainly has been a major problem.

23   Q.  In your examination today with the government, in your

24   response to their questions, you haven't admitted all the

25   crimes that you have committed, have you?

1   A.  To the best of my knowledge I have, unless I forgot

2   something.

3   Q.  We will get to that.

4            By the way, your children's names, what are their

5   names?

6   A.  Blake and Chase.

7   Q.  So you're getting ready for this sentence, and the sentence

8   was in a federal courthouse much like this, maybe not as nice

9   as this, but with a federal judge sitting up on the bench, is

10  that correct?

11  A.  Yes.

12  Q.  And leading up to that sentence, you had spent eight months

13  in jail, is that right?

14  A.  That's correct.

15  Q.  And that's the first time you have ever been in jail,

16  right?

17  A.  That's correct.

18  Q.  And you hope it's your last?

19  A.  At that time I was hoping it was my last.

20  Q.  Is it fair to say, sir, that you had a tremendous amount of

21  time in jail to think of what presentation, what you were going

22  to say to the judge who was going to pronounce sentence on you

23  to try to avoid the 45-year sentence?

24  A.  Yes, I had a lot of time on my hands when I was in prison.

25  Q.  And you thought about -- you composed a speech, so to

1    speak, is that fair to say?

2    A.  Yes.

3    Q.  And you wrote letters to your lawyer about how you were

4    feeling, is that right?

5    A.  Yes.

6    Q.  Is it fair to say, sir, that you told them that the root of

7    your larcenous behavior, your fraud and theft, dated way back

8    to your childhood?

9    A.  Yes.

10   Q.  What did you tell the judge about that?

11   A.  I honestly can't remember what I said in 1997 with the

12   judge.

13   Q.  Those weren't casual words, were they?

14   A.  I'm not sure what you mean by casual.

15   Q.  They weren't just off-the-cuff remarks?

16   A.  No.

17   Q.  Do you recall telling the judge that when you were young

18   you used to go to the movies down the street from your house

19   with a bunch of kids, and you used to go to Sunray drugstore

20   and buy candy because it was cheaper there than buying it in

21   other movies, and it was a cool thing to do to pay for four

22   items and put another item in your pocket?

23             MR. VELAMOOR:  Objection, your Honor.

24             THE COURT:  First of all, you can't read from a

25   document not in evidence, Mr. Roth.  You can show the document

1   to the witness and you can ask him whether it refreshes his

2   recollection on what he told the judge.  You could try and

3   offer the document into evidence, and we can see if there is an

4   objection.

5           MR. ROTH:  Judge, I will offer what has been marked as

6   Defendants' 37, which is the transcript of the sentencing

7   hearing in federal court on September 18, 1997.

8           THE COURT:  Any objection?

9           MR. VELAMOOR:  Yes, your Honor.

10          THE COURT:  Basis.

11          MR. VELAMOOR:  Hearsay.

12          MR. ROTH:  It's an official document.

13          THE COURT:  That may be an issue, but is it being

14  offered for the truth of the statements made by the witness on

15  that date or the fact that he said it.

16          MR. ROTH:  Just the fact that he said it.

17          THE COURT:  I will allow it.

18          (Defendant's Exhibit 37 received in evidence)

19          MR. ROTH:  I would ask, Eli, if you would put up page

20  51 of the document, please.

21          I would ask you to go down to the bottom part, the

22  last paragraph, highlight that.

23  BY MR. ROTH:

24  Q.  To save time, can you read that to yourself, Mr. Rubin, as

25  the jury reads it to themselves.

1   A.  I read this part.

2   Q.  OK.  Do you recall now telling the story about stealing as

3   a child and how from there on you were a greedy man?

4   A.  I remember I was very upset that day and I lost my

5   composure, and it's refreshing my memory that I did say things

6   regarding my childhood.  I don't remember saying anything about

7   being greedy, unless it's in this document.

8           MR. ROTH:  Page 52, I would ask you, Eli, to highlight

9   the second paragraph there.

10  Q.  Does that refresh your recollection, sir?

11  A.  I do.

12  Q.  You talked about your family as well, is that right?

13  A.  That's correct.

14  Q.  And what the terrible mistake you made, is that right?

15  A.  That's correct.

16  Q.  And that you came from a good background and you were

17  financially successful, is that right?

18  A.  That's correct.

19  Q.  And you indicated that you would never, in essence, make a

20  mistake again, is that right?

21  A.  I guess I would have to read that part.

22  Q.  OK.

23          MR. ROTH:  Page 52, at the bottom.

24  Q.  Does that summarize what I just said?

25  A.  Yes.

1    Q.  Did you talk about the shame and the embarrassment that

2    your actions that led you to jail caused your family?

3    A.  Yes.

4    Q.  And that's your wife who was your first love as well?

5    A.  Yes.

6    Q.  By the way, do you recall at the time that the United

7    States attorney's office and the judge remarked that at that

8    time, in Philadelphia, that that case, your case, was the

9    largest tax evasion case of somebody who was running what we

10   call a C corp.?

11   A.  I don't remember that.

12   Q.  You don't dispute it if it's in the minutes, is that fair?

13   A.  If it's in the documents, then it's in the documents.

14   Q.  So your ultimate sentence, you wound up doing eight months,

15   is that right?

16   A.  That's incorrect.

17   Q.  You got sentenced to a year and a day, is that right?

18   A.  That's correct.

19   Q.  You did ten months?

20   A.  Ten and a half months.

21   Q.  But your plea to the judge worked and you didn't get 45, is

22   that right?

23   A.  I did not get 45.

24   Q.  And do you recall, sir, that when the government spoke on

25   your behalf to the --

1        MR. ROTH:  You can take that down Eli.

2   Q.  -- to the court, that they indicated that your cooperation

3   led to the conviction of at least one of the people that you

4   had testified about?

5        MR. VELAMOOR:  Objection, your Honor.  Form.

6        THE COURT:  Rephrase it.

7   Q.  Did the United States government inform the judge at your

8   sentence that the information you provided in your cooperation

9   led to the conviction of one person?

10  A.  I don't remember that.

11       MR. ROTH:  Eli, if you could go back to 3501-02, the

12  first page.

13       Judge, if it's easier to move things along, I am happy

14  to move this in.  It's a filed government document again.

15       THE COURT:  You decide what you want to do.

16       MR. ROTH:  I would offer it.

17       THE COURT:  Any objection?

18       MR. VELAMOOR:  Presuming it's not being offered for

19  the truth, but just for the effect on Mr. Rubin, we have

20  objection.

21       THE COURT:  Not for the truth of its content, but the

22  fact that it was said by the government at the time and how it

23  might have affected Mr. Rubin.

24       Go ahead.

25       (Government's Exhibit 3501-02 received in evidence)

1            MR. ROTH:  Can you highlight the bottom of the first

2    page of 3501-02.

3    BY MR. ROTH:

4    Q.  Does that refresh your recollection as to whether or not

5    the government indicated that one of the persons has been

6    convicted?  The last line.

7    A.  It does not.

8    Q.  That document, the top of it, that's a motion filed in your

9    case, United States of America v. Adrian Rubin, is that

10   correct?

11   A.  That is correct.

12   Q.  So you were sentenced sometime in September 1997, is that

13   right?

14   A.  I believe that's the approximate date.

15   Q.  Let's fast-forward ahead in time to when you started your

16   next fraud or next crime, you started to commit your next

17   crime, or one of the next crimes, to the Platinum card scam.

18            You recall that?

19   A.  I recall the Platinum credit card scam, yes.

20   Q.  That wasn't the first crime that you committed since you're

21   released from jail, is that right?

22   A.  That's correct.

23   Q.  Is it fair to say, again, that the words that you told the

24   judge at your sentencing under oath were false, that you would

25   lead a law-abiding life?

1  A.  Yes.  At that time, I would hope that I would lead a

2  law-abiding life, but I went back to do criminal offenses after

3  that point in time.

4  Q.  Shortly after that period of time, right, which we will get

5  back to what you say was criminal involvement in County Bank,

6  right?

7           THE COURT:  Do you understand the question?

8  A.  Could you repeat it again?

9  Q.  Sure.  You got released in, I think we decided, December

10  '97, is that right?

11  A.  Yes.

12  Q.  And you signed documents with County Bank in 1998, is that

13  right?

14  A.  Yes.  But I did not believe I was getting involved in a

15  legal organization at that point.

16  Q.  You didn't decide it was legal until you started

17  cooperating in this case, is that fair to say?

18  A.  100 percent incorrect.

19  Q.  Let's talk about the Platinum card scheme, the

20  telemarketing scheme, if you will.  OK?

21           Whose idea was that?

22  A.  It was a gentleman that came in for an interview for a

23  managerial job to my office.

24  Q.  What was that gentleman's name?

25  A.  His first name was Corby.  I don't recollect his last name.

1    Q.  What did he tell you, sir?

2    A.  He told me that he was leaving a company that was a

3    telemarketing company and that what they were doing is buying

4    leads from some lead generator or somebody, I can't remember,

5    and he explained to me that they would call the customer, that

6    first they used a company called Cubis, who was the individual

7    company that provided the credit card, who provided the Web

8    site, who mailed the credit card to the individual that wanted

9    the card, and that Cubis provided the script that they used to

10   solicit -- to tell the customers how to buy the credit card.

11           At that point, it sparked my interest.  I spoke to him

12   a few times.  I then hired him and then looked into that

13   business a little bit more.  It was told to me that it was

14   somewhat of a subsidiary of another company I was doing

15   business with, which was Selling Source, which was a lead

16   generator company, which I bought leads from.  I then called my

17   representative, who was Peter Flynn at that time, and asked him

18   if he knew about it, and he put me in touch with the Cubis

19   people, I can't remember the gentleman's name right now, and we

20   spoke.  I started to understand what was going on, and then at

21   that point I opened up a company with my children trading on

22   the name of Platinum Trust.

23   Q.  If I could stop you there.

24   A.  Yes, sir.

25   Q.  You made it sound like you were doing due diligence as you

1    would to get into a company, is that right?

2    A.  Yes.

3    Q.  You decided it was a good opportunity for your children to

4    get into, is that right?

5    A.  Yes.

6    Q.  But you were not approaching that at all in just a legal

7    manner, is that right, your actions in doing due diligence and

8    approaching it?

9    A.  I was approaching it in a legal manner again, yes, the

10   answer is yes.

11   Q.  From the beginning to the end?

12   A.  That is incorrect.  From the beginning.

13   Q.  Did you sign a contract with Cubis?

14   A.  I don't remember if my signature was on the document, if I

15   presented a straw person on the document.  I believe it was a

16   straw person.

17   Q.  Well, how many times have you used a straw person that you

18   can't remember whether you used a straw person to sign this

19   contract with Cubis, up to that point?

20            MR. VELAMOOR:  Form, your Honor.  Objection.

21            THE COURT:  Pardon me?

22            MR. VELAMOOR:  Objection to form.

23            THE COURT:  Do you understand the question?

24            THE WITNESS:  I do.

25            THE COURT:  You can answer it.

1    A.  To the best that I can recollect, two or three straws that

2    I used over the period of time.

3    Q.  You already told the jury that you involved your

4    father-in-law, is that correct?

5    A.  That's correct.

6    Q.  Mr. Shore?

7    A.  That is correct.

8    Q.  On more than one occasion?

9    A.  That is correct.

10   Q.  What other straw names did you utilize?

11   A.  There was a close family friend by the name of Vincent

12   Ventriglia.

13   Q.  So among the straw names that you have used over the course

14   of time before signing this document with Cubis, do you recall

15   which straw name it was that you used to sign the contract?

16   A.  I can't recall right now.

17           MR. ROTH:  Eli, I am going to ask you to show just the

18   witness 3501-08, page 7.

19           If you could highlight the third paragraph in there.

20   Q.  I would ask you to just read that to yourself, sir.

21   A.  Yes, I have read it.

22   Q.  Does that refresh your recollection as to the name that you

23   used?

24   A.  It does.  That was one of the other straws that I said was

25   possibly another one.

1   Q.  And share with the members of the jury what that straw name

2   is.

3   A.  Colin McCarthy.

4   Q.  Who is Colin McCarthy to you?

5   A.  Colin McCarthy was an ex-employee of mine.

6   Q.  Did Colin McCarthy know that you used his name illegally?

7   A.  He did not.

8   Q.  How long was the Platinum credit card program running

9   before the FTC shut it down?

10  A.  From approximately 2009 to January 31, 2012.

11  Q.  You certainly learned, during the course of the operation

12  of that, that you and your sons were running an illegal

13  operation, illegal fraudulent telemarketing operation, is that

14  correct?

15  A.  Not in the beginning, but eventually it turned into an

16  illegal operation.

17  Q.  Well, it was your operation, is that right?

18  A.  Yes.

19  Q.  Tell us what your involvement was in it to turn it into an

20  illegal operation.

21  A.  My involvement in the credit card business was that it was

22  Mr. Kirby's idea, of which I did some due diligence with Cubis

23  and provided the leads from my payday loan business for the

24  telemarketers to call.  It was my software, my proprietary

25  software, that was used to manage the credit card business.

1      In the beginning of the telemarketing, we followed the

2  script of what Cubis provided us, which was marketing a $9500

3  credit card to a specific Web site.  As time moved on -- and

4  that they were reporting -- that Cubis was reporting to a

5  credit agency.  And Cubis told us that they were reporting to a

6  credit agency.  As we later found out, it was not the top three

7  credit agencies but some type of other credit agency.  OK.

8      As time moved on and the business progressed, the

9  telemarketers, and myself and my sons knowing that they were

10  lying to the customers, the telemarketers were telling the

11  customers it could be used not only on that specific Web site,

12  but as a general purpose card that can be used, as I said

13  earlier, at a Target or a Wal-Mart or a local grocery store,

14  and that was a lie.

15      The second part of it was that it was being reported

16  to a credit agency to improve their credit.  That was a lie

17  because we found out later that Cubis had stopped reporting to

18  any credit agency.  So that created the fraud, and at any time

19  I could have honestly stopped the fraud by cutting off the

20  leads and by cutting off the software, but I did not.

21  Q.  Wasn't there a third component to the fraud involved, in

22  terms of their ability for a one-time offer to get that card,

23  that it would normally be several hundred dollars and they

24  could purchase it early for a discounted price?

25  A.  That I don't remember, sir.

1    Q.  When it was clear to you that you were involved in this

2    additional criminal activity, you didn't tell your kids to stop

3    their involvement, did you?

4    A.  I did not.  It was a horrible mistake that I did not do

5    that.

6    Q.  Is that because they were making too much money?

7    A.  As I look back -- as I look back now, I don't know what I

8    was thinking at the time, and I have no excuse.

9    Q.  Did you ever tell the federal government when you were

10   being interviewed in preparation for this case that you did not

11   believe that the federal authorities would look at the case,

12   would not be under federal investigation, your operation?

13   A.  I'm sorry.  Can you say that again?

14   Q.  I'm sorry.  You have been interviewed many times in

15   preparation for this testimony today, is that right?

16   A.  There's been several times I met with Mr. Velamoor, yes.

17   Q.  I am not just going to limit myself to Mr. Velamoor and the

18   Southern District's team here.  To your knowledge, they are

19   working with the Eastern District United States Attorney's

20   Office as well, is that correct?

21   A.  I know they have been talking together.

22   Q.  Well, Mr. Rubin, how many times have you met with

23   representatives of this office, the Southern District of the

24   United States?

25   A.  I think four or five times.

1    Q.  And at those times, were there not members of the United

2    States Attorney's Office from Philadelphia present?

3    A.  They were present, yes.

4    Q.  So they were working together, were they not?

5    A.  I can assume that.

6    Q.  Well, you testified on direct, did you not, that part of

7    your obligation to cooperate is to testify here and to testify

8    in the case in Philadelphia against your former partner

9    Hallinan, is that right?

10   A.  I don't remember saying that.  I remember saying that part

11   of the cooperation plea was to testify.

12   Q.  As you sit here today, do you have any doubt in your mind

13   that you will testify in that case if it proceeds to trial, the

14   Hallinan case?

15   A.  I absolutely will testify.

16   Q.  So there is no question that you will testify if called?

17   A.  I am misunderstanding what you're saying by working

18   together.

19          THE COURT:  The question you're being asked is, is

20   there any question that you will testify if you're called to

21   testify.

22          THE WITNESS:  The answer is absolutely not, I will

23   testify.

24          THE COURT:  Next question.

25   Q.  Now, is it fair to say that you told the government you

1   thought that you could get your kids out of the problem, that

2   you could always make things right?

3   A.  I did tell my children that, yes.

4   Q.  That was a lie too, it turned out to be a lie, is that

5   correct?

6   A.  It did.

7   Q.  You testified before, just a few moments ago, that you had

8   met several times with the government, is that right?

9   A.  Yes.

10  Q.  Can you tell the members of the jury approximately -- when

11  you say several, you're talking about two or three times with

12  both teams, or the teams combined, is it several times or more

13  than several times?

14          MR. VELAMOOR:  Objection, your Honor.  Form.

15          THE COURT:  Rephrase your question.

16  Q.  How many times in the course of your cooperation would you

17  estimate that you sat down and were questioned by United States

18  attorneys, by either the Southern District or the Eastern

19  District of Pennsylvania, in connection with your cooperation

20  in this case?

21  A.  I believe with the Southern District, it was approximately

22  four, five or six times.  Regarding the Eastern District, I am

23  going to estimate it was many, many, many times.  I'm going to

24  say 10 to 15 times.  It's an estimate.

25  Q.  Fair enough.

1            Of those times, those meetings, how many hours would

2    each of them, on the average, last?

3    A.  In meetings here?

4    Q.  You can start here.

5    A.  Meetings with the Southern District, some were a few days

6    and some were a half a day.

7    Q.  Just to be clear, when the FTC shut down the Platinum

8    credit card scheme, you tried to start to initiate cooperation

9    with the United States government, is that right?  That was in

10   2012.

11   A.  Initially, myself and my two children cooperated in any way

12   possible with the FTC, and shortly after, within 30 days or so,

13   the Department of Justice sent a letter to us saying that they

14   were going to investigate the FTC issue, the Platinum issue,

15   and at that point in time we told the government that not only

16   would we cooperate with the Platinum issue, but also regarding

17   the illegal activities regarding the payday loan issue.  And

18   then within a month after that, give or take a little bit, the

19   government issued a grand jury subpoena regarding the payday

20   loan business, along with the check cashing business and other

21   businesses that I had.

22   Q.  So to be clear, this was a similar situation, where you

23   were under investigation by a governmental agency, and you

24   decided to so-called get ahead in your efforts to escape

25   punishment by offering to cooperate with the authorities, is

1    that fair to say?

2    A.  It's fair to say that --

3    Q.  That's a yes or no answer.

4         THE COURT:  Do you want the question again or do you

5    understand the question?

6         THE WITNESS:  I do.

7         THE COURT:  Go ahead.

8    A.  I can't really answer that yes or no without a brief

9    explanation.

10   Q.  From that period of time, which was roughly sometime in May

11   2012, you made an effort to get a cooperation agreement with

12   the United States attorney's office, is that fair to say?

13   A.  That's 100 incorrect.

14   Q.  How is that incorrect?

15   A.  I believe the cooperation agreement wasn't in place until a

16   few years after that point in time.

17   Q.  That's my point, sir.  I apologize if I was not clear.

18        From May or so 2012, you went to a series of meetings

19   trying to get a cooperation agreement, which, as you say,

20   didn't come for many years later, in an effort to get the

21   cooperation agreement with the deal on the case that you pled

22   guilty to, the second time?

23   A.  I don't see it that way, sir.

24   Q.  Do you recall the very first time you had a meeting with

25   the Eastern District of Pennsylvania, the United States

1   attorney's office?

2   A.  I do.

3   Q.  When was that?

4   A.  I believe it was sometime in May.

5   Q.  At that time, sir, that meeting was conducted under what we

6   call a proffer agreement, is that right?

7   A.  That is correct.

8   Q.  And could you explain to the members of the jury what your

9   understanding of a proffer agreement is?

10  A.  I began cooperating with the government knowing that, in

11  essence, I got caught with my hands in the cookie jar and knew

12  that I should cooperate to the best that I could because I knew

13  I was conducting criminal activities.  And a proffer agreement

14  is when you go in and you speak to the AUSA, the U.S.

15  attorneys, and tell them about how all this came about, with

16  details to the best that I could, regarding the crimes that I

17  committed.

18  Q.  OK.  But to be clear, sir, was it your understanding in May

19  2012 that you had a cooperation agreement with the government?

20  A.  That is incorrect, sir.

21  Q.  You were trying to get a cooperation agreement by meeting

22  with them and giving them information, is that correct?

23  A.  I didn't know if they were going to give me a cooperation

24  agreement or not.  I just was cooperating.

25  Q.  You had no interest in getting a cooperation agreement that

1  would help you minimize your sentence, the 65 years you

2  ultimately faced?

3  A.  It was not -- my attorneys probably, that was their

4  position on it, but I knew that I had to cooperate because I

5  got caught.

6  Q.  You had to cooperate to what end, to try to get your

7  sentence down, is that not correct?

8  A.  That would be an ultimate position that the judge would

9  have to make, yes.

10  Q.  Right.  But the judge could not consider a cooperation

11  agreement until and unless you got that cooperation agreement

12  with the United States attorney's office, is that correct?

13  A.  That's my understanding of how it works, yes.

14  Q.  So you met with them for all of these times in an effort to

15  get a cooperation agreement in conjunction with your plea, is

16  that right?

17  A.  Yes.

18  Q.  And they were the ultimate arbiters or decision-makers of

19  whether they would grant you that cooperation agreement, is

20  that right?

21  A.  They will be.  They haven't given me anything.  That would

22  be my hope.

23  Q.  You don't have a cooperation agreement now?

24  A.  I have a cooperation agreement but --

25  Q.  So you have got a cooperation agreement?

1          THE COURT:  Let him finish his answer.

2   A.  But again, I don't know, to be honest with you, all the

3   technical stuff, but I do have a cooperation agreement, but I

4   don't believe it's been decided that the government will

5   present the document to the judge regarding my cooperation

6   agreement.

7   Q.  You say, sir, all the technical stuff.  This is not your

8   first case, you have been through this before, is that correct?

9   A.  Yes.

10  Q.  So you have seen what it takes to get a cooperation

11  agreement, what it takes to get a recommendation from the

12  government to a judge to reduce your sentence; you're familiar

13  with this process, are you not?

14  A.  It happened to me many, many years ago.  To say that I was

15  familiar with it, it happened to me every day would not be

16  correct.

17  Q.  I am sorry, I don't understand.

18  A.  My attorneys --

19          THE COURT:  Is that a question?

20          MR. ROTH:  I will phrase it as a question, yes, your

21  Honor.

22  A.  I rely on my --

23          THE COURT:  Stop.  There is no question pending.

24  Q.  Every time you go into a meeting with the United States

25  attorney's office, in this district or the other district in

1    Pennsylvania, am I correct, sir, that you sign a proffer

2    agreement?

3    A.  At the end of the meeting, I sign a document; is that what

4    you're asking?

5    Q.  Yes.  Or the beginning of the meeting.

6    A.  I don't believe that's correct, no, sir.

7    Q.  The first time that you sat down with the government they

8    didn't explain and make you sign a proffer agreement?

9    A.  I don't remember.  But I know that when I met just recently

10   with the Southern District, I did not sign at the end of our

11   meetings a document.

12   Q.  When you say just recently, are you talking about last

13   night or yesterday?

14   A.  In the past few weeks.

15   Q.  Did you not meet with the United States attorneys or speak

16   to them on the phone this week?

17   A.  Yes.

18   Q.  How many times?

19   A.  In the past two or three weeks, it was four to six times.

20   Q.  I am just talking about this week.  Today is Thursday.

21   A.  Three times.

22   Q.  Sir, do you read documents that you sign before you sign

23   them?

24   A.  Not all the time.  If my attorney advised me to sign it, I

25   do not, because he has read it and he asked me to sign it.

1    Q.  Do you recall signing a proffer agreement the first time

2    when you met in May with United States attorneys in

3    Pennsylvania?

4    A.  I do not recall that.

5         MR. ROTH:  I would ask that the witness be shown

6    3501-06.

7    Q.  I would ask you to read that, sir, and see if that

8    refreshes your recollection.

9         You can start with the second page, the signature

10   page.

11        MR. ROTH:  Eli, if you could just highlight the second

12   paragraph there.

13   Q.  You tell us, sir, when you want us to go back to the first

14   page.

15   A.  I signed that document.

16   Q.  Go back to the first page, sir, and see if that's the

17   document you signed the first time you met and you were, what

18   we call, proffering.

19   A.  I signed it.  I signed it in the presence of my attorney,

20   or one of my attorneys, Mr. LaCheen.  To be honest with you, I

21   probably was explained that.  I probably showed it to

22   Mr. LaCheen, or he read it, and he said it was OK for me to

23   sign it.  I didn't recognize when you said proffer agreement

24   that this is a document that is a proffer agreement.

25   Q.  And you signed it more than once, is that correct,

1    directing your attention to the second page?

2    A.  I see my signature there.

3    Q.  Two more times.  You signed it initially May 22, and then

4    you signed it May 29 and June 11, is that correct?

5    A.  That is correct.

6    Q.  And the fourth paragraph of that agreement, does that

7    indicate, sir, that it's not a plea agreement or a cooperation

8    agreement, nor is it a precursor to or part of such an

9    agreement?

10            MR. ROTH:  I would move it into evidence.  I will let

11    the witness answer first.

12    A.  I read what is on the screen.

13    Q.  Does that refresh your recollection, sir, if you had a

14    cooperation agreement at that point?

15    A.  It says that I do not have a cooperation agreement.

16    Q.  Or a plea agreement, right?

17    A.  That's correct.

18    Q.  And that's what you were trying to meet to get, is that

19    correct, that was the goal of these meetings with the

20    government?

21    A.  That was the ultimate goal, but again, as I said

22    previously, I knew that I did criminal crimes with the two

23    businesses and that I wanted to immediately cooperate.  It

24    wasn't in my mind that I was, you know, going to be presented

25    with a cooperation agreement at some time in the future.  I

1    just wanted to immediately cooperate, knowing that hopefully it

2    would maybe reduce my sentence.

3    Q.  You didn't just go in and plead guilty to the court and

4    say, mea culpa, these are my crimes, is that right?

5    A.  I don't know what mea culpa means.

6    Q.  It means I'm guilty.  You didn't say, I'm guilty.  You

7    spoke to your lawyer and engaged in the process --

8    A.  I believe --

9               THE COURT:  Pause, sir.  Let him finish the question.

10              Put a single question to the witness, and then we will

11   give the witness an opportunity to answer.  Then you can ask

12   another question and he will answer.

13   Q.  You engaged in these proffer sessions in the hope of it

14   leading to a cooperation agreement, is that correct?

15   A.  Yes.

16   Q.  This wasn't done out of all altruism or for the goodness of

17   yourself, is that correct?

18              MR. VELAMOOR:  Objection to form.

19              THE COURT:  Do you understand the question?

20              THE WITNESS:  I don't.

21              THE COURT:  Rephrase it.

22   Q.  Did you agree to cooperate against your sons, if necessary?

23   A.  I don't remember that, but if that was -- I don't remember

24   that, but -- I don't remember that.

25   Q.  Were the ground rules that you had to divulge all of your

1    criminal activity with anyone you participated with?

2    A.  Yes.

3    Q.  And was there any exception made to say, because you're the

4    father, you don't have to cooperate against your children?

5    A.  No.

6            THE COURT:  Switch that up.  You're using the term

7    cooperate.  You flipped between the word cooperate and provide

8    information about.  Put a question to the witness.  Let's see

9    what the answer is.

10   Q.  Was there any, what we call, a carve out that --

11           THE COURT:  From what, the proffer agreement or the

12   cooperation agreement?

13   Q.  From the proffer agreement that you had with the government

14   that said you did not have to speak about your sons' criminal

15   activity?

16   A.  Not to the best of my knowledge.

17   Q.  One of the conditions of the proffer agreement, is it not,

18   that you cannot lie to the government in the course of the

19   meetings?

20   A.  Yes.

21   Q.  Was it made clear to you, sir, from the very first proffer

22   agreement with the government that lies could be committed by

23   omission, by failing to say something, by withholding

24   information?

25   A.  I don't remember that, but I was not withholding

1    information.

2    Q. The entire time that you met with the government, from

3    approximately May 2012 until you ended your plea sometime in

4    2015, during the course of all those meetings, it's your

5    testimony you did not fail to disclose some of your criminal

6    activities?

7    A. None that I -- everything that I could remember I

8    disclosed. If there were certain things that I didn't

9    remember, because this was going back from 1998, and then we

10   were in 2012 and '13 and '14 and '15, which was 10, 15, 18

11   years ago, if there was something that I omitted, it's because

12   I didn't remember it. But everything that I remembered I told

13   the government.

14   Q. So it's fair to say, sir, that your memory of events with

15   the passage of time has diminished?

16   A. I am 60 years old, so I do not have the memory that I once

17   had, so some of it has diminished, yes.

18   Q. How old were you, sir, when you did that plea for leniency

19   before the judge in Pennsylvania?

20   A. 38, 39.

21   Q. How old was Blake and Chase, your children, at that point?

22   A. 10, 12, in that range.

23        THE COURT: With that, ladies and gentlemen, we are

24   going to end for the week.

25        You may step down, sir.

1    THE WITNESS:  Thank you.

2    THE COURT:  A few things.

3         This is the end of our workweek together.  I feel like

4    I have known you forever.  Right?  We have been doing this for

5    some time.  We are making wonderful progress in the case.  We

6    are not falling behind in any respect.  I will continue to be

7    jealous of your time, meaning I will see to it that we proceed

8    at a good pace and that things do not linger.

9         So now that you're coming up on a weekend, I want to

10   remind you that it's very important you follow my instructions

11   about not talking about the case with anyone.  That's going to

12   be hard, but you must follow that.  You're the only ones who

13   are hearing the testimony, seeing the witnesses, seeing the

14   exhibits.  No one else's opinion matters in this.  This is not

15   entertainment.  This is a difficult task you have as jurors,

16   but it's a task on your shoulders.  When this is over, you can

17   talk to anybody you want about it, but not now.  So remember

18   that.  There is no blogging, e-mailing, texting, social media,

19   Facebooking, Instagraming, Twittering, none of that, none of

20   that, none of that to anybody.

21        Then the other thing, which I have said to you, is no

22   research, no Googling about personalities, people in the case,

23   names or terms you have heard.  It's not fair.  It's not fair.

24   Let it come out in the courtroom.  Let both sides be heard on

25   it.  That's the only fair way that we do things.  And that's

1    what you'd want if you or a family member were involved in a

2    case of this nature.  So follow that rule as well.

3            You can go back to your daily routine tomorrow.  I am

4    sure all of you have a ton of things to do, things that you put

5    off because you're here every day, and I so admire you for

6    working so hard.

7            So I will see you bright and early on Monday morning

8    for a 10:00 start.  Mondays are tough days commuting of course,

9    so you might have to leave a little extra early.  Please try to

10   get here so you're downstairs a little bit early.  There are

11   extra lines on Monday mornings and we can't start until all of

12   you are here.  You have done a great job.  And when you're all

13   here, we can get going, and the sooner we get going, the sooner

14   we can get our jobs done in this case.

15           So with that, I wish you a great weekend, a relaxing

16   weekend.  Do yourself a favor.  Wipe this out of your mind for

17   the weekend.  You will be back to thinking about it soon enough

18   on Monday, but put it out of your mind for the weekend, and I

19   will see you on Monday morning.  Thank you.

20           (Jury exits courtroom)

21           THE COURT:  Have a very good weekend.  Have a safe

22   weekend.  Have a safe Friday.  And I will see you bright and

23   early for a prompt start on Monday morning.

24           Thank you all.

25           (Adjourned to September 18, 2017, at 10:00 a.m.)

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    RUSSELL BRADLEY

4    Cross By Mr. Roth . . . . . . . . . . . . . . 326

5    Redirect By Mr. Velamoor . . . . . . . . . . 343

6    TAFOYA MARTIN

7    Cross By Mr. Bath . . . . . . . . . . . . . 359

8    Redirect By Mr. Scotten . . . . . . . . . . 366

9    ADRIAN RUBIN

10   Direct By Mr. Velamoor . . . . . . . . . . . 372

11   Cross By Mr. Roth . . . . . . . . . . . . . 456

12                    GOVERNMENT EXHIBITS

13   Exhibit No.                          Received

14    206  . . . . . . . . . . . . . . . . . . . 346

15    2401   . . . . . . . . . . . . . . . . . . 351

16    2402   . . . . . . . . . . . . . . . . . . 354

17    3524-02  . . . . . . . . . . . . . . . . . 368

18    101  . . . . . . . . . . . . . . . . . . . 396

19    5004   . . . . . . . . . . . . . . . . . . 413

20    4015   . . . . . . . . . . . . . . . . . . 416

21    103  . . . . . . . . . . . . . . . . . . . 421

22    102  . . . . . . . . . . . . . . . . . . . 423

23

24

25

1   3501-02   . . . . . . . . . . . . . . . . . 474

2                    DEFENDANT EXHIBITS

3   Exhibit No.                                Received

4    156A and 156B   . . . . . . . . . . . . . 335

5    147   . . . . . . . . . . . . . . . . . 340

6    37   . . . . . . . . . . . . . . . . . 471

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25