1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          16 Cr. 91 (PKC)

5  SCOTT TUCKER and
   TIMOTHY MUIR,                       Trial
6
                Defendants.
7
   ------------------------------x
8                                      New York, N.Y.
                                       September 18, 2017
9                                      10:10 a.m.

10

   Before:
11                   HON. P. KEVIN CASTEL

12                                      District Judge
                                         and a jury
13                        APPEARANCES

14 JOON H. KIM
        Acting United States Attorney for the
15      Southern District of New York
   BY:  NIKETH V. VELAMOOR
16      HAGAN C. SCOTTEN
        SAGAR K. RAVI
17      Assistant United States Attorneys

18 FREEMAN NOOTER & GINSBERG
        Attorneys for Defendant Tucker
19 BY:  LEE A. GINSBERG
        NADJIA LIMANI
20          -and-
   STAMPUR & ROTH
21 BY:  JAMES M. ROTH

22 BATH & EDMONDS, P.A.
        Attorneys for Defendant Muir
23 BY:  THOMAS J. BATH
            -and-
24 BEVERLY VAN NESS

25

1        (Trial resumed)

2        THE COURT:  Good morning.  I understand counsel want

3   to be heard on some issues.

4        MR. VELAMOOR:  Judge, I spoke with Mr. Roth over the

5   weekend.  He intends, I think, during the cross-examination of

6   Mr. Rubin to offer some exhibits we object to.  Rather than

7   wait for the jury to come out, we thought we might be able to

8   address it.

9        THE COURT:  Let me find out whether our jurors are

10  here.

11       They're here.  I think we ought to get going with the

12  jury.  If you want to point the exhibits out to me, I can take

13  a look at them.  Which exhibit numbers are they?

14       MR. VELAMOOR:  They are defense exhibits 39 through

15  42.

16       THE COURT:  All right.

17       MR. VELAMOOR:  39, 40, 41 and 42.

18       THE COURT:  I have a 38, a 39, a 40, a 41, a 42, a 43

19  and a 44, but the objection from the government is only 39

20  through 42.  Is that correct?

21       MR. VELAMOOR:  That's correct.

22       THE COURT:  OK.

23       MR. ROTH:  That's correct, your Honor.

24       THE LAW CLERK:  I'll hear you gentlemen on a break.

25  Let me get our jurors.

1      The question I have for the government, besides

2  Crystal Grote and this witness, how many other witnesses do you

3  have in this case?

4      MR. VELAMOOR:  Several, Judge, approximately, at least

5  10 to 12 at this point.  I don't have the list in front of me.

6      THE COURT:  Thank you.

7      MR. ROTH:  Judge, just a minor housekeeping thing for

8  the record, we introduced on Friday 3501-02.  We ask that that

9  be marked defense 38, and the government is aware of that.

10     THE COURT:  You marked the exhibit.

11     MR. ROTH:  It's already marked, yes, for the record.

12     THE COURT:  And you're offering Defense Exhibit 38,

13  which has been previously marked, correct?

14     MR. ROTH:  It's been introduced as 3501-02.

15     THE COURT:  And you're now offering it as Defense

16  Exhibit 38, correct?

17     MR. ROTH:  For the clarity of the record, yes, Judge.

18     THE COURT:  And seeking to strike the other exhibit

19  number?

20     MR. ROTH:  3501-02.

21     THE COURT:  Do you have any objection to the

22  defendant's offer and the striking of the alternate version?

23     MR. VELAMOOR:  No, your Honor.

24     THE COURT:  All right.  Received as such.

25     (Defendant's Exhibit 38 received in evidence)

1          MR. VELAMOOR:  Judge, can I just correct, 10 to 12, I

2    think, was a low estimate.  Just on the list it's more than 10

3    to 12.  I will say that after this week, we do expect our

4    witnesses to all become much shorter that the ones we've had so

5    far.  We front-loaded the longer witnesses, but I don't want to

6    leave a misimpression.  I think the number is higher than 10 to

7    12.

8          THE COURT:  Bring our jury in, please.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Jury present)

2     THE COURT:  Please be seated.  Good morning, ladies

3     and gentlemen.  I hope you had a good weekend.  I'm sure you

4     had lots of things to do, but we also had some pretty good

5     weather along the way.  I hope you got outside and enjoyed some

6     of it.

7     There's one programming note that I wanted to give

8     you.  This Wednesday is the eve of Rosh Hashana; it begins at

9     sundown, and I wanted to change our schedule so that we can

10    have a good day of work but also let everybody get home in a

11    timely manner.  As you know, we're not going to sit on Thursday

12    or Friday of this week, so this is the sacrifice that I'm going

13    to ask you to make for this one time Wednesday: that we start

14    court at 9 a.m. and that we go until 1:30, and then at 1:30 we

15    would end our day.

16    You can bring snacks with you, we'll have some snacks

17    provided for you, but we'll work with breaks.  We'll take

18    15-minute breaks when needed, but we'll work from 9 to 1:30.

19    At 1:30 our workday is over and we will reconvene the following

20    Monday.  Unless that poses some special hardship to anyone,

21    which you'll let me know by note, that's what we'll do, and

22    I'll reconfirm all this to you tomorrow.  All right?

23    Thank you, ladies and gentlemen.

24    Mr. Rubin, the Court reminds you that you're still

25    under oath.

1            THE WITNESS:  Yes, your Honor.

2     ADRIAN RUBIN, resumed.

3            THE COURT:  Mr. Roth, whenever you're ready.

4            MR. ROTH:  Thank you, your Honor.

5     CROSS-EXAMINATION CONTINUED

6     BY MR. ROTH:

7     Q.  Good morning, Mr. Rubin.

8     A.  Good morning, Mr. Roth.

9     Q.  When you testified on direct examination on Thursday, in

10    response to the government's questions, you didn't reveal all

11    of your illegal and criminal activities, did you, sir?

12    A.  To the best that I could remember, I did.

13    Q.  Let's pick up in the year 2003, the period of time that you

14    left County Bank.  Were you operating a check-cashing place in

15    Delaware called Quick Cash?

16    A.  I, I, I, I don't remember the name, but I was operating in

17    Delaware, yes.

18            THE COURT:  What year are we talking about, Mr. Roth?

19            MR. ROTH:  Around 2003, Judge, I said.  I said the

20    time.

21            THE COURT:  OK.  Thank you.

22            MR. ROTH:  Yes.  I'm sorry.

23    Q.  Sir, is it not correct that you were operating that without

24    a license?

25    A.  I, I applied for the license but started business prior to

1    receiving the license.

2    Q.  So you were operating without a license, is that correct,

3    sir?

4    A.  That's correct.

5    Q.  And that check-cashing store was shut down, was it not?

6    A.  No, sir.  That, that was not a check-cashing store.  That

7    was a payday loan operation.

8    Q.  That was shut down, was it not, by regulators?

9    A.  That's correct.

10   Q.  Now, you didn't mention that on direct examination, did

11   you?

12   A.  I was -- no, I did not.

13   Q.  And during that period of time, 2003, did you start a

14   payday operation called Global Pay Day Loans?

15   A.  That is correct.

16   Q.  And that was operating illegally, is that correct?

17   A.  Well, that, that, I did receive a, through a straw person,

18   a license in Utah, and we were operating in Utah, but we were

19   also, had a call center in Delaware, and we were doing payday

20   loans throughout the United States.

21   Q.  But you weren't licensed to DO the payday loans in the

22   other states, is that correct, sir?

23   A.  That is correct.

24   Q.  In answer to my question, sir, I'll reask it, you were

25   operating illegally for at least two reasons: because you had a

1    straw person whose name the corporation was in, and you didn't

2    have licenses to loan in several states in the United States.

3    Is that correct?

4    A.  That is correct.

5    Q.  Those were illegal and criminal operations?

6    A.  That is correct.

7    Q.  And did you tell the members of the jury on Thursday about

8    that operation when you were answering questions in response to

9    the government, when you were answering the questions of the

10   government?

11   A.  I, I don't remember the government asking me about anything

12   other than the tribes and County Bank, but I was certainly

13   being 100 percent honest with that.  There was also another

14   company called First --

15   Q.  Thank you, sir.

16      By the way, when you were meeting with the government for

17   over a dozen times trying to get the cooperation agreement

18   during these so-called proffer sessions, am I correct that a

19   ground rule that was set forth for you was that you had to

20   divulge all of your criminal activity?  Is that correct?

21   A.  That's correct.

22   Q.  And that included, even if you were not directly asked a

23   question, you could not by omission leave something out; in

24   other words, you had to tell all?

25   A.  That's correct.

1    Q.  Now, you indicated, sir, that you opened up Global Pay Day

2    Loans in Utah under a straw name.  That was your father-in-law,

3    is that correct?

4    A.  Yes.

5    Q.  And his name is Jules Shore, is that correct?

6    A.  Yes.

7    Q.  Did you give Mr. Shore any financial help as a result of

8    him helping you open up that company?

9    A.  Minimal.

10   Q.  What do you consider minimal, sir?

11   A.  I can't recall giving him any sums of money.

12   Q.  Did you buy him a Cadillac?

13   A.  Yes.

14   Q.  Did you pay off his mortgage?

15   A.  Yes.

16   Q.  How much was his mortgage, sir?

17   A.  Somewhere, I think, around 80,000.

18   Q.  And did you pay for his medical benefits?

19   A.  Yes.

20   Q.  Were the payments that you made to Mr. Shore understood by

21   Mr. Shore to be for consideration for his involvement in your

22   criminal enterprise?

23   A.  Absolutely not.

24   Q.  He had no idea about that?

25   A.  He knew that I -- you know, he knew that I was using his

1  name.

2  Q.  So would it be fair to say, Mr. Rubin, that he thought the

3  payments were just out of the goodness of your virtue as his

4  son-in-law?

5  A.  100 percent.

6  Q.  You deceived him; is that a fair way of saying it?

7  A.  That is not a fair way of saying it.

8  Q.  Well, you didn't tell him I'm paying you this money because

9  really I'm using your name to further my criminal enterprise,

10  is that correct?

11  A.  That is not correct.  I did it out of the goodwill.  He was

12  a very good man, and he was good to my wife, and it was in no

13  way, shape or form the way of putting it.

14  Q.  Well, you never told him that you were using his name in a

15  criminal enterprise, right?

16  A.  I told him I was using his name, but not in a criminal

17  enterprise.

18  Q.  That was the key factor, was it not, in the use of his

19  name?

20  A.  Yes.

21  Q.  Now, did you involve any other of your immediate family

22  members or extended family members besides your son Chase, your

23  son Blake and your father-in-law Jules Shore, any other family

24  members or immediate family members that you involved in your

25  criminal enterprise?

1    A.  There was a close family friend by the name of Vincent --

2    Q.  I'm talking about, confine yourself at this point --

3              THE COURT:  Well, wait.  Whoa.

4    A.  And --

5              THE COURT:  Excuse me a second.  Ask the question,

6    have an answer, and you can ask a follow-up question.  Just let

7    the witness finish.  If you don't like the answer, you can't

8    cut it off.

9              MR. ROTH:  I appreciate it, your Honor.

10              THE COURT:  OK.  Go ahead.

11              MR. ROTH:  It was nonresponsive.

12              THE COURT:  All right.  Let's hear what he has to say.

13              Go ahead, sir.

14    A.  And at times there was, there was my wife.

15    Q.  You involved your wife in your criminal enterprise?

16    A.  I don't remember her signing on documents for the

17    corporation, but there was other documents that were part of

18    the enterprise that I had her sign on.

19    Q.  Did you ever involve Jules Shore, your father-in-law's

20    wife, Rhoda Shore?

21    A.  That is correct.

22    Q.  So that's somebody else that you didn't mention, is that

23    correct?

24    A.  That is correct.  She passed away quite a long time ago,

25    and I didn't recall that.

1  Q.  You recall that she passed away, but you didn't recall that

2  you used her on documents, is that fair to say, in your

3  criminal enterprise?

4  A.  That is correct.

5  Q.  And when you used her name, Rhoda Shore, your

6  mother-in-law, did you tell Ms. Shore that you were using her

7  name?

8  A.  That is correct.

9  Q.  You did tell?

10  A.  That's correct.

11  Q.  You told her that you were going to make her a member --

12  withdrawn.

13      Did you make her a member of Global Pay Day Loan LLC?

14  A.  If you have something to show me that I did -- I remember

15  using her name.  I don't remember specifically what it was.

16  Q.  OK.  And sir, did you, on more than one occasion, forge

17  Jules Shore's name?

18  A.  On every occasion.

19  Q.  On every occasion, OK.  And you wrote checks in his name?

20  A.  Yes.

21  Q.  Did you have a signature block in his name?

22  A.  A stamper, yes.

23  Q.  And did you sign his name, ever, in front of a notary

24  public, a notary public?

25  A.  I can't recall, but if you have something to show me that

1  can refresh my memory --

2  Q.  Sure.

3          MR. ROTH:  If the witness could be shown D38.

4          Judge, I apologize.  I'm told our screen is not

5  working.

6          THE COURT:  Is the projector working?

7          MR. ROTH:  I believe so, Judge.

8          THE COURT:  OK.  Take your time then.

9  BY MR. ROTH:

10 Q.  I'm going to show you D43 --

11         MR. ROTH:  Just to the witness.

12 Q.  -- and ask you, sir --

13         MR. ROTH:  We're trying to see how this gets projected

14 to the witness.  It's being projected on here, Judge.

15         THE COURT:  You can --

16         MR. ROTH:  I'll walk it up.

17         THE COURT:  I think it can be done through the

18 projector.

19         MR. ROTH:  I'm sure.

20         THE COURT:  But I don't know how to do it.

21         MR. ROTH:  I'm showing the witness what has been

22 marked as Defense Exhibit D43.

23 Q.  Do you recognize that document, sir?

24 A.  Yes.

25 Q.  And what do you recognize that document to be?

1    A.  An amendment to the articles of organization of Global Pay

2    Day Loan, LLC.

3    Q.  And after seeing that document, sir, does that refresh your

4    recollection as to, one, whether you used Rhoda Shore and named

5    her as a member of the LLC?

6    A.  Yes.

7              THE COURT:  Wait a minute.  The document is not in

8    evidence.  You're asking him whether it refreshes his

9    recollection.  Don't read from the document.

10             MR. ROTH:  Fine.

11             THE COURT:  OK.

12   BY MR. ROTH:

13   Q.  Does that refresh your recollection, sir, as to whether or

14   not you named Ms. Shore as a member of the LLC?

15   A.  Yes.

16   Q.  And does it refresh your recollection, sir, as to whether

17   you signed Jules Shore's name, forged his name on that

18   document?

19   A.  Yes.

20   Q.  And does it refresh your recollection, sir, that you forged

21   his name before a notary?

22   A.  Yes.

23             MR. ROTH:  I'd offer this document at this point, your

24   Honor.

25             THE COURT:  All right.  Any objection?

1          MR. VELAMOOR:  No, your Honor.

2          THE COURT:  Received.

3          (Defendant's Exhibit D43 received in evidence)

4   BY MR. ROTH:

5   Q.  When you signed that, what's your understanding of the

6   procedure to sign, to take a signature before a notary?

7   A.  That it has to be the correct person signing in, in front

8   of the notary.

9          MR. ROTH:  Can we publish that document, Judge?

10         THE COURT:  You may.

11         MR. ROTH:  Thank you.

12  Q.  And that's the notary stamp on the bottom there of D43, is

13  that correct?

14  A.  Yes.

15  Q.  And do you know that person, the signature there, that

16  notary's signature?

17  A.  No.

18  Q.  And am I correct that the procedure when you take a

19  signature before a notary, you show -- the person signing,

20  executing the document shows proof in this case that they're

21  Jules Shore?  Is that correct?

22  A.  That's the, that's the norm.  That's correct.

23  Q.  OK.  What proof did you show to this notary that you were

24  Jules Shore?

25  A.  I, I don't remember.

1   Q.  Was this a valid notary?

2   A.  I assume it was.

3   Q.  Well, did you as a matter of course use fake notaries or

4   who were in complicity with you?

5           THE COURT:  Break that down.  It's two questions.

6   Q.  Did you have a fake notary stamp?

7   A.  No.

8   Q.  Did you have somebody in your office who would take Jules

9   Shore's signature that you signed?

10  A.  There was a period of time when I had a notary within my

11  office.  I don't recognize this particular name.

12  Q.  And I assume that the notary that you had in your office

13  knew that you were not Jules Shore, is that correct?

14  A.  That is correct.

15  Q.  But did you employ that employee to take your signature as

16  Jules Shore?

17  A.  On what occasion?

18  Q.  I'm sorry?  On any occasion.

19  A.  There must have been a time.

20          MR. ROTH:  We can take that down now.  Thank you,

21  Judge.

22  Q.  There came a time when Global was closed down, is that

23  correct?

24  A.  Yes.

25  Q.  And is it fair to say, sir, that you then just changed the

1  name to another corporation, First National?

2  A.  Yes, the same way I did when I left County Bank for

3  Rehoboth Beach, Delaware.

4  Q.  And you operated business as usual under First National, is

5  that right?

6  A.  That's correct, the same way I did at Global.

7  Q.  Illegally, that is to say?

8  A.  That is correct.

9  Q.  And Thursday, when the government questioned you, you

10  didn't reveal your criminal activities with First National, did

11  you?

12  A.  I don't believe they asked me that question, sir.

13  Q.  And your understanding is you only had to -- you didn't

14  have to volunteer your criminal activities?

15  A.  No.  The government is well aware from back in 2012 of all

16  the corporations that you're mentioning.  It's -- they're very

17  well aware of it.  I went over it in detail with them at all

18  the proffers and here in the Southern District.

19  Q.  But the jury's not aware of it, is that fair to say?

20  A.  That's correct.

21  Q.  And how did you set up First National Services?

22  A.  There was another straw who I mentioned earlier, who was

23  Vincent Ventriglia.

24  Q.  And he was a family friend, you said?

25  A.  Yes.

1   Q.  And that family friend, did you tell Vincent that you were

2   getting him involved in a criminal enterprise?

3   A.  No.  I told him I was getting him involved in a payday loan

4   business, but not a criminal enterprise.

5   Q.  You deceived him, is that right?

6   A.  That is correct.

7   Q.  And did you compensate him for his efforts?

8   A.  I think I might have bought him a little truck.  I paid

9   some of his alimony money, and again, there could have been a

10  few other things that he was compensated for, not necessarily

11  for being used as a straw similar to Mr. Shore, but just

12  because he was a close family friend.

13  Q.  And his medical bills too?

14  A.  That is correct, paid his monthly medical bill.

15  Q.  So you're telling the jury that you made these payments

16  purely out of friendship to him?

17  A.  Mr. Ventriglia was by my mother's side for three to four

18  years before she passed, before she passed away and took care

19  of her for three to four years.  I think he deserved that and

20  more.

21  Q.  Can you answer my question, sir?  Was it just out of the

22  goodness of your heart that you made those payments to him?

23  A.  100 percent.

24  Q.  It wasn't so that you could continue using his name in your

25  criminal enterprise?

1    A.  Absolutely not.

2    Q.  Well, the money that you gave him was from the profits of

3    your criminal enterprise, is that correct?

4    A.  That is not a hundred percent correct.

5    Q.  Well, how did you -- did he pay taxes on the income from

6    First National Services?

7    A.  Yes.

8    Q.  And he personally, out of his pocket?

9    A.  No.

10   Q.  Well, who paid them?

11   A.  I believe FNS paid them out of their account, and it went

12   as a distribution.

13   Q.  At your direction?

14   A.  That is correct.

15   Q.  And did you write checks in his name?

16   A.  All the time.

17   Q.  And did you have a stamp with his name on it as well?

18   A.  A facsimile signature, yes.

19   Q.  And that operation, that payday operation, was run

20   illegally, just like Global was, is that correct?

21   A.  That is correct.

22   Q.  Did you tell the members of the jury Thursday when you

23   testified --

24          MR. VELAMOOR:  Objection, your Honor.  May we briefly

25   approach on this?

1          (At sidebar)

2          THE COURT:  We have more coming.

3          I don't know where we're going, so I need to hear

4     first.  Where are we going?

5          MR. VELAMOOR:  Your Honor, prior to the testimony of

6     this witness, defense counsel raised the concern that we were

7     calling Mr. Rubin to essentially be an expert witness on all

8     different ways in which payday lending was illegal, and we were

9     cautioned by the Court and by defense counsel to limit our

10    examination to those areas of illegality that pertained

11    directly to this case and specifically to Mr. Tucker.  And now,

12    having obtained, having made that objection, the government

13    limited its questioning to the County Bank scheme and to the

14    tribal scheme.

15         THE COURT:  Hang on a second.  We have a transcript,

16    so this is a good thing.  It's always a good thing, but I

17    recall saying that for both the government and defense you

18    can't call a witness who is to describe how one lawfully or

19    unlawfully operates a payday loan business in general,

20    something along those lines, that we're not going to have

21    witnesses instruct jurors on the law.  I don't recall

22    restricting what the government could bring out as prior bad

23    acts of a cooperator or what the defense could cross-examine as

24    to prior bad acts of the cooperator.

25         MR. VELAMOOR:  That's certainly the case, and we

1    elicited from Mr. Rubin that he'd been engaged in illegal

2    payday lending since he joined County Bank, and that was clear

3    on the record.  But it was clearly discussed before the witness

4    was called to the stand that we did not want to make this case

5    about licensing, we do not want to make this case about

6    operating payday lending enterprises without a license, and

7    specifically as a result, we did not elicit that detail.

8              THE COURT:  OK.  I don't want to tell anybody how to

9    do their business, but if what you tell me is correct, I assume

10   you would ask this witness on redirect if he disclosed to the

11   government A, did you disclose to the government B, did you

12   disclose to the government C.  Right?

13             MR. VELAMOOR:  We'll certainly do that.

14             THE COURT:  I don't understand.  Why are we here?

15   What do you want me to do?

16             MR. VELAMOOR:  I think we certainly object to some of

17   this questioning.

18             THE COURT:  You want me to cut off the

19   cross-examination, the defendant's cross-examination of this

20   witness.

21             MR. VELAMOOR:  Certainly not.

22             THE COURT:  Is that what you want?

23             MR. VELAMOOR:  Certainly not, but we would ask that to

24   the extent to which this be about what the government did and

25   did not ask him about on the direct examination, I think I

1    would ask that that be limited to a certain degree, because

2    there is a reason for that that I've articulated already.

3            THE COURT:  Before I give an instruction on that,

4    you've got to give me a page and a line of a transcript where I

5    made a ruling which foreclosed you from getting into it.  You

6    might have it.  I might have said that.  I don't recall saying

7    that, but if you have that, show me that and then I'll instruct

8    the jury, Ladies and gentlemen, you should be aware that I did

9    restrict the government's ability to question in this area, and

10   I'll so instruct.  If you have that now, show it to me now.

11           MR. ROTH:  Judge, by the way, I'm about done with this

12   area; I'm just saying whether it's illegal, not getting into

13   the particular substance.

14           THE COURT:  I haven't heard any problem with your

15   cross-examination as far as I'm concerned, but again, if I

16   limited the government as to what they could ask on direct and

17   you have such a ruling, kindly show it to me, and if

18   appropriate, I'll tell the jury right now, or before your

19   redirect, that there were certain areas I said you couldn't get

20   into, including whatever it was.  But in light of the cross,

21   I'm now going to let the defense do it.  But I think it's a

22   tempest in a teapot.

23           MR. VELAMOOR:  We'll take a look at the transcript if

24   we can do that in time.

25           THE COURT:  OK.

1           (In open court)

2           MR. ROTH:  May I continue, your Honor.

3           THE COURT:  Go ahead.

4           MR. ROTH:  Thank you.

5    Q.  Mr. Rubin, you operated First National Services from

6    approximately 2006 to 2011, is that correct?

7    A.  I think it was 2007 when we started until the end of 2011.

8    Q.  Did there come a time, sir, when you got your two sons

9    involved in the payday lending business as well?

10   A.  Yes.

11   Q.  And did you give them some payday stores, if you will, or

12   companies?

13   A.  Yes.

14   Q.  And one of them was called BJR, is that correct?

15   A.  No.  Let me just back up one second.  When you said stores,

16   you mean that to be payday loan businesses operating over the

17   Internet?  Because there was two different scenarios, sir.

18   Q.  Yes, but in either scenario you gave them a payday lending

19   operation, is that fair to say?

20   A.  Yes.

21   Q.  And you gave Chase one as well, besides your son Blake?

22   A.  Yes.

23   Q.  And, but you actually were overseeing them, is that fair to

24   say?

25   A.  100 percent.

1  Q.  Your sons, one son was 20 at the time, is that fair to say?

2  A.  Approximately.

3  Q.  And those were run illegally, is that correct?

4  A.  Yes.

5  Q.  Switching topics, sir, you testified that you testified in

6  a civil action involving Mr. Hallinan and Mr. Carlson, is that

7  correct?

8  A.  Yes.

9  Q.  And what did that case involve, if you will?

10 A.  That was a case that involved Mr. Hallinan, Mr. Carlson,

11 and there was a dispute amongst the two partners that were

12 involved in the payday loan business.

13 Q.  And were you deposed in that case?

14 A.  I don't think I was deposed.  I did go as a witness at

15 trial.

16 Q.  And you testified in trial; was that a jury trial or what

17 we call a bench trial?

18 A.  It was a bench trial.  I'm not a hundred percent sure, but

19 I believe so.

20 Q.  That was 2004, is that correct?

21 A.  2004 is correct.

22 Q.  And that was the first time that you sat in a witness stand

23 like you're in the witness box like you're in now, or seat, is

24 that fair to say?

25 A.  Yes.

1    Q.  And there was a judge there, is that right?

2    A.  Yes.

3    Q.  And you were under oath, is that correct?

4    A.  Yes.

5    Q.  And how long was your testimony, number of hours, if you

6    recall?

7    A.  I don't recall.  Could have been one, one hour to two

8    hours.  I don't remember being all day.

9    Q.  And you told us that you lied in your testimony in regard

10   to the operation of your company CRA after you sold your

11   shares, is that correct, about how it operated?

12   A.  Yes.

13   Q.  That you sold your shares to Mr. Shore but you were really

14   still operating, is that correct?

15   A.  That is correct.

16   Q.  And you lied in your trial testimony in regard to whether

17   or not at that period of time, 2004, whether you were operating

18   any payday loan companies, is that correct?

19   A.  That is correct.

20   Q.  And you were also questioned about the operation and

21   procedures that you followed in respect to your duties as a

22   loan servicer for County Bank, is that correct?

23   A.  Repeat that, please?

24   Q.  Did you also testify in regard to the functions and your

25   operations as a servicer for County Bank during their loan

1    program?

2    A.  Yes.

3    Q.  And when you testified at that trial, under oath before the

4    judge, was your demeanor essentially the same as it is today?

5            MR. VELAMOOR:  Objection, your Honor.

6            THE COURT:  If you know.

7    A.  It was not.

8    Q.  Did you lie with a straight face?

9    A.  Yes.

10   Q.  Now, there came a second time when you told us that you

11   committed perjury, or lying under oath, is that correct?

12   A.  Yes.

13   Q.  And that was in 2006, is that correct?

14   A.  Yes.

15   Q.  And that was in an action brought by the New York State

16   Attorney General against County Bank and some other parties, is

17   that correct?

18   A.  Yes.

19   Q.  And you were under oath at that time and swore to tell the

20   truth, is that correct?

21   A.  Yes.

22   Q.  And your testimony is that during that deposition, you

23   told -- you testified as to your functions as a loan servicer

24   for County Bank, is that correct?

25   A.  Say that again, please?

1    Q.  You testified in that deposition of what you did as a loan

2    servicer for County Bank, is that correct?

3    A.  Yes.  I completely lied regarding the servicing functions

4    that I performed for County Bank of Rehoboth Beach, Delaware.

5    Q.  But that wasn't my question.  My question was, you told

6    them about the operation and that it complied with the manuals

7    and procedures that were laid down by County Bank for loan

8    servicers such as yourself, is that correct?

9    A.  As I just said, that was a total lie.

10   Q.  But my question, sir, is not whether it was a lie at this

11   point.  My question to you, sir, is, did you go through, step

12   by step, the functions of a loan servicer such as yourself for

13   County Bank, and did you testify to them?

14   A.  Yes.

15   Q.  And you testified that you did everything in accordance

16   with the County Bank manual and procedure book, is that

17   correct?

18   A.  Yes, that was a lie.

19   Q.  And once again, during that testimony, you failed to

20   disclose that at that time, in 2006, you were still involved in

21   payday lending, is that correct?

22   A.  Yes, as I previously testified earlier.

23   Q.  So this is the second time that you lied under oath, is

24   that correct?

25   A.  Yes.

1    Q.  And is it fair to say, sir, it's your testimony that you

2    lied under oath to protect yourself and others?

3    A.  Yes.

4    Q.  In that testimony, in the New York Attorney General's case

5    in 2006, you indicated that your company, CRA, was subject to

6    regular audits from the FDC, the bank and other regulators, is

7    that correct?

8    A.  I remember saying it was the FD -- FD --

9    Q.  IC.

10   A.  I'm sorry.

11   Q.  FDIC.

12   A.  FDIC, yes.

13   Q.  And you were subject to regular audits, internal audits by

14   the bank's auditors, is that correct?

15   A.  They were -- yes, on occasion.

16   Q.  And on occasion, did you testify -- I'm sorry.

17       Did you also testify that on occasion the state of

18   Delaware's auditors came in as well?

19   A.  That I don't, I don't believe is correct.

20   Q.  But that wasn't a lie when you talked about the auditing

21   procedures for the loan processors, is that correct?

22   A.  No.  The FDIC did come in in early 2000 and did an audit.

23   Q.  Well, in fact, the audit revealed that you were a convicted

24   felon, isn't that right?

25   A.  100 percent.

1    Q.  Do you recall saying in that deposition, the New York

2    Attorney General's deposition, that other than talking to

3    Mickman, one of your partners in Hallinan, you didn't speak to

4    any other servicers about the operations?

5    A.  One more time, please?

6    Q.  Certainly.  Do you recall in that deposition stating that

7    you didn't talk to anyone other than Mickman and Hallinan

8    about -- any other servicers about the operations of the loan

9    servicers?

10   A.  Yes, that was agreed upon between myself and Mr. Hallinan

11   before.

12            MR. ROTH:  Judge, I'd just ask that he -- it calls for

13   a yes-or-no answer.

14            THE COURT:  Try to answer the question if you can,

15   Mr. Rubin, in a yes-or-no fashion.  The question was, Do you

16   recall in that deposition stating that you didn't talk to

17   anyone other than --

18            Who is it?

19            MR. ROTH:  Mickman and Mr. Hallinan.

20            THE COURT:  -- Mickman and Hallinan about -- any other

21   servicers about the operations of the loan servicers?

22            THE WITNESS:  The answer is yes.

23            THE COURT:  OK.  Thank you.

24   BY MR. ROTH:

25   Q.  You weren't trying to protect Mr. Tucker at that point, is

H9iWtuc1                    Rubin - Cross

1    that correct?

2    A.   That is incorrect.

3    Q.   Now, isn't it a fact, sir, that you claimed that

4    Mr. Goodman, the attorney for the bank, suborned perjury in

5    that New York Attorney General's deposition?  Is that correct?

6    A.   One more time, please?

7    Q.   Isn't it a fact that you claimed that Mr. Goodman, the

8    attorney -- you know who Mr. Goodman is, is that correct?

9    A.   Yes.

10   Q.   Do you know what the term "suborn" means?

11   A.   I don't think so.

12   Q.   OK.  That he assisted and was complicitous with you in your

13   false testimony before the New York Attorney General.

14   A.   Yes.

15   Q.   And you made that claim, did you not, to the government in

16   this case in November of 2016, after the New York prosecutors

17   got involved?

18   A.   One more time, with the dates?

19   Q.   In November 2016, after you had gotten your plea agreement

20   and you met with members of the prosecution team, did you

21   indicate at that time that Mr. Goodman assisted you in

22   perjuring yourself?

23             MR. VELAMOOR:  Objection.  Objection, your Honor.

24   Hearsay.

25             THE COURT:  Yes.  Rephrase that question, please.

1          MR. ROTH:  OK.  I'll withdraw it at this point.

2     Q.  You understood, did you not, once the New York prosecutors

3     got involved in the investigation sometime in 2015, that your

4     testimony, that you gave in the New York Attorney General's

5     case -- that the loan servicing program was run properly -- was

6     inconsistent with the government's theory of prosecution?  Is

7     that fair to say?

8     A.  In -- I don't, I don't believe I can answer that without an

9     explanation, so -- I can't answer that yes or no.

10    Q.  Did you, sir, also accuse another lawyer who was in

11    attendance at that deposition at the New York Attorney

12    General's lawsuit in 2006, Susan Verbonitz, of assisting you in

13    perjuring yourself?

14          MR. VELAMOOR:  Objection, your Honor.  Hearsay.

15          THE COURT:  It's not being offered for the truth of

16    its content.

17          You may answer if you can.

18    A.  To the best that I could remember, I remember that

19    Mr. Goodman assisted with a gentleman by the name, another

20    attorney in that case, Mr. Dubrow -- Goodman, Mr. -- along with

21    myself, along with Mr., my -- and Mr. Hallinan, prepped us as

22    to what to say and what not to say.

23    Q.  So --

24    A.  I don't, I don't --

25    Q.  So --

1          THE COURT:  Excuse me.  Are you finished?

2          THE WITNESS:  Yes.

3          THE COURT:  Thank you.

4          MR. ROTH:  I'm sorry.  I thought he was.

5     Q.  So your testimony now is that Mr. Dubrow, yet another

6     member of the bar, assisted and prepared you to lie in that

7     deposition?

8     A.  Yes.

9     Q.  Is it fair to say, sir, for what you say are your two acts

10    of perjury -- one in the 2004 Carlson case and the second time

11    in the 2006 New York Attorney General's case -- it's your

12    understanding that you're not going to be prosecuted for those

13    acts of perjury?

14    A.  Not to the best of my knowledge.

15    Q.  Well, you've already pled guilty and you have no charges

16    pending at this point, is that correct, no other charges?

17    A.  I pled guilty to tax evasion, and we spoke earlier about

18    that.  I believe the judge will take into consideration me

19    lying under oath along with the tax evasion.

20    Q.  You just said you pled guilty to tax evasion; you didn't

21    plead guilty to tax evasion, is that correct?

22    A.  If I said that, I misspoke, that he would take that under

23    consideration as relevant conduct.

24    Q.  But you didn't plead guilty to the actual separate crime of

25    perjury, two counts, is that correct?

1    A.   That is correct.

2    Q.   Now, you testified that in County Bank, the whole loan

3    servicing program was governed by a policy manual with rules

4    and regulations, is that correct?

5    A.   Yes, that was a lie, and I think I stated earlier.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. ROTH:

2    Q.  Was it a lie that there was a policy and manual book that

3    governed the rules and regulations, the procedures that people

4    like yourself were supposed to follow?

5    A.  Mr. Hallinan provided me with that document, yes.

6    Q.  Did you ever get that document directly from Mr. Goodman

7    who represented the bank?

8    A.  I don't believe so.

9    Q.  Did you receive any amendments to the policy directly from

10   the bank, policy amendments to the manual?

11   A.  Some from the bank and some from Mr. Goodman.

12   Q.  So you're saying you didn't get the entire manual but you

13   did get portions of it?

14   A.  I didn't say I didn't get the entire manual.  I said the

15   bank didn't give it to me, that Mr. Hallinan gave it to me.

16   Q.  I would like you to look at what has been marked as

17   Defendant Exhibit No. 39 and ask you whether this was a

18   document that you received in your capacity as a loan servicer.

19            MR. ROTH:  I'm sorry, Judge.  It's still not working.

20            THE COURT:  Ladies and gentlemen, why don't you stand

21   up and stretch.

22   Q.  Do you see that document, sir?

23   A.  I would like to read it, if I can.

24   Q.  Sure.

25   A.  I think it might take me five or ten minutes to read it.

1    So if you want to ask me any specific questions.

2    Q.  I am not asking you to read the entire document.

3    A.  I'm sorry.

4    Q.  My first question, sir, do you recognize that document that

5    is addressed to yourself as something you read and received?

6    A.  It was addressed to me.  I assume I read it and received

7    it, yes.  So the answer is yes.

8    Q.  Without getting into all the particulars --

9           MR. ROTH:  Judge, I would move that in at this point.

10          MR. VELAMOOR:  Objection.  This is the previously

11   stated objection.

12          THE COURT:  That we just discussed at the sidebar?

13          MR. VELAMOOR:  No, your Honor, prior to court this

14   morning.

15          THE COURT:  So we really didn't discuss.  Would you

16   like a sidebar, is that what you would like to do?

17          MR. VELAMOOR:  Yes, your Honor.

18          (Continued on next page)

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Let me hear you.

3          MR. VELAMOOR:  Judge, we object.  These letters

4    offered by the defense are hearsay.  They are being offered for

5    the truth to show that County Bank was in fact setting these

6    policies and distributing them to servicers.  So therefore they

7    are hearsay.  There is no relevance to offering them for the

8    effect on Mr. Rubin.  So it's also an attempt, frankly, to get

9    in additional legal discussion and information coming from

10   lawyers, the notion that lawyers were involved in this entire

11   program.  The purpose of admitting these documents from the

12   defense perspective, we believe there is no basis for that and

13   they are hearsay.

14         THE COURT:  What nonhearsay purpose are you offering

15   them for, or you urge they are admissible regardless of whether

16   they are hearsay?

17         MR. ROTH:  I do.  I am not offering them for the truth

18   of it, Judge.  One is, the government elicited from this

19   witness that he received the exact document like this on their

20   case, I think it was Exhibit 101, another part of the policy

21   manual.  And my next exhibit is talking about Mr. Goodman

22   talking about the policy manual, and it is offered in terms of,

23   under 803.  It's an exception that -- it goes to the witness's

24   state of mind in respect to how he formulated this opinion that

25   the whole policy was not accurate and was not followed.

1            THE COURT:  I have lost you.

2            First of all, I thought at the outset, and maybe I

3    misheard you, that you're not offering it for the truth of its

4    content.

5            MR. ROTH:  I am not.

6            THE COURT:  Then what does the hearsay exception have

7    to do with it?

8            MR. ROTH:  I take that back, Judge.  I am not offering

9    it for the truth, just that he read it, he received it, and it

10   was part of how he formed his mind.

11           THE COURT:  On what?

12           MR. ROTH:  On the opinion of whether he followed the

13   procedures or not, not whether or not it was lawful or not.

14           THE COURT:  Well, have you asked him whether he

15   followed the procedures of the County Bank?

16           MR. ROTH:  No.

17           THE COURT:  So why don't you ask him that?

18           MR. ROTH:  First, we have to know what the procedures

19   are too, Judge.

20           THE COURT:  Well, you know what they are, right?

21           MR. ROTH:  I do know what they are, but they were also

22   laid out in the manual.

23           THE COURT:  I understand that.  Why can't you ask

24   him -- in other words, it seems to me that this is pretty far

25   afield and there is the danger of jury confusion for the

1    precise reason given by the government, which is it creates an

2    aura that lawyers are all over these things and lawyers are

3    watching.  That's not probative of anything relevant here and

4    it's not even the reason that you are offering it.  I

5    understand that.  But you want to offer it to show that he knew

6    the rules of the County Bank and he didn't follow them, right?

7    Isn't that the point?

8                MR. ROTH:  Judge --

9                THE COURT:  Answer my question.  Because I could be

10   wrong.  You can just say no, Judge.

11               MR. ROTH:  I am not conceding that he didn't follow

12   the rules, or that Mr. Tucker didn't follow the rules.

13               THE COURT:  Here's the problem then.  My next question

14   is, if he did follow the rules, how is that relevant to

15   anything?

16               This is Mr. Roth's witness.  I am going to hear from

17   Mr. Roth.  If you want to meet with him in private, you can.

18               MR. GINSBERG:  I will.

19               THE COURT:  If your point is that he complied with the

20   rules, then how is that relevant?

21               MR. ROTH:  Because then if he complied with the rules,

22   then his conclusion that it was a fake program, he's impeached,

23   is he not?

24               If he followed the rules, and he said he didn't follow

25   them, and the rules were there, and they were laid out to be

1    followed, and he didn't follow those rules, then he is not

2    being credible.

3          THE COURT:  I lost you.  So there are two

4    possibilities, right?  I guess there are multiple

5    possibilities.  One is he complied with the rules.  One is he

6    didn't comply with the rules.  And I guess a third is he

7    sometimes complied with the rules and sometimes didn't.  OK.

8          But if he complied with the rules, I don't understand

9    how that is relevant to anything.

10          MR. ROTH:  Judge, one of the other four exhibits is

11   from a compliance officer that he was directly on the e-mail

12   chain about, and he as well as Goodman are talking about

13   compliance, that he must comply.

14          My point is, to be able to bring out the fact that if

15   he really wasn't following the rules, it would have been

16   detected and his activities would have stopped.  He would have

17   been kicked out of the program.

18          THE COURT:  That you can't do.  That you can't do.

19          The probative value, if any, is slight.  It is for the

20   truth of its contents.  You're asserting that, my goodness,

21   these letters demonstrate they had a good monitoring system in

22   place that would have caught him if he was violating the rules.

23          MR. ROTH:  But he has already testified to that in

24   terms of the FDIC coming in and finding him, one of the

25   auditors.

1          THE COURT:  You can ask him those questions.  It won't

2    necessarily be hearsay in that context.  Did you believe or was

3    it your understanding that your actions were being monitored,

4    and how did that affect your thinking?

5          But the way you have described it -- first of all, the

6    record will reflect that I really haven't, and I don't mean

7    it -- it sounds critical, but I don't mean it to be critical.

8    I haven't gotten straight answers to the questions I have asked

9    because I am not sure there are good answers to the questions,

10   and I think the answers to the questions reveal that it's not

11   relevant.

12         If he didn't comply, you can ask him, isn't it a fact

13   that you didn't comply with the rules of the bank, and see what

14   he says.  And if he says, what rules are you talking about, you

15   can try and refresh his recollection with the exhibits.  And if

16   he says, he did comply with the rules, then I'm not sure how

17   it's relevant.  It's a form of remote collateral impeachment.

18         In any event, the probative value of the documents,

19   and having looked at them now -- could you please keep it down,

20   ladies and gentlemen.  If you don't mind, keep it down.

21         -- 39, 40, 41, 42, the probative value is outweighed

22   by the danger of jury confusion in this context.

23         So that's what I am allowing you to do and what I am

24   not allowing you to do.

25         I am sustaining the objection.

1          MR. ROTH:  Judge, is it fair game for me to ask him if

2    he received legal opinions from Goodman, the bank's attorney,

3    indicating how the program work was legal?

4          THE COURT:  This is getting to the heart of why I

5    sustained the objection.  Now the cat is out of the bag.

6    That's what this is all about.  That's what this is all about

7    and that's why I sustained the objection.

8          No, you can't do that.

9          MR. GINSBERG:  Can I talk to him for a minute?

10          THE COURT:  You can go back to your seats.

11          (Continued on next page)

1         (In open court)

2    BY MR. ROTH:

3    Q.  Mr. Rubin, were you aware that there was a bank compliance

4    officer?

5    A.  Yes.

6    Q.  Do you recall his name?

7    A.  It's on this document you gave me.  It is Scott Walsmith.

8    Q.  Was he an internal auditor as well, to your knowledge?

9    A.  Yes.

10   Q.  Prior to your testimony on Thursday in respect to how you

11   say you ran your loan servicing portion of the County Bank

12   program, did you have an occasion to review the banking records

13   of CRA for the relevant period of time?

14   A.  Just so I am clear, when you say the bank statements?

15   Q.  Your banking records, the banking records that encapsulate

16   the flow of money that you described, the loan money that you

17   described during the period of time that you were participating

18   as a loan servicer for County Bank.

19   A.  If I understand the question correctly, did I review that

20   recently?  The answer is no.

21   Q.  Do you have those records?

22   A.  No.

23   Q.  So in terms of your description about how the servicing

24   portion that you performed for County Bank operated, in terms

25   of money going into one account and out of another account, you

1    have no physical documentation to support that, is that

2    correct?

3    A.   That's correct.

4    Q.   There is nothing to corroborate, it's just your word, is

5    that correct?

6    A.   That's correct.

7    Q.   In your efforts to get a cooperation agreement, did you

8    offer to secretly record Mr. Hallinan?

9    A.   Yes.

10   Q.   And the government took you up on that offer to secretly

11   record Mr. Hallinan?

12   A.   Yes.

13   Q.   For how long did you secretly record Mr. Hallinan?

14   A.   One to two years.  I don't remember the specific date.  One

15   to three years.

16   Q.   How many conversations did you record with Mr. Hallinan

17   over that two- or three-year period?

18   A.   Specifically, I can give you a range.  7 to 11 times,

19   somewhere in that range.

20   Q.   How lengthy were those conversations?

21   A.   Very lengthy.

22   Q.   What does that mean to you, sir?

23   A.   One to three hours.

24   Q.   What type of device or devices did you use to record

25   Mr. Hallinan?

1   A.  It was a key chain.

2   Q.  A key chain?

3   A.  Yes.

4   Q.  Was that supplied to you by the government?

5   A.  Yes.

6   Q.  Is it fair to say, sir, that you were monitored very

7   closely in your use of that recording device?

8   A.  I'm not sure what that means, but they gave me the device

9   and I held it in my hand and that's what I did.

10  Q.  But it was set up in such a way that the government knew

11  when you started recording and when you stopped recording

12  Mr. Hallinan on any given date and time, is that correct?

13  A.  Yes.

14  Q.  You weren't just told, go out there with your iPhone and

15  record him willy-nilly, is that correct?

16  A.  Yes, that's correct.

17  Q.  That's to preserve the integrity of the conversations, is

18  that fair to say?

19  A.  I did what the government asked, so I assume that's

20  correct.

21  Q.  Is it fair to say, sir, Mr. Hallinan was a mentor of yours?

22  A.  Absolutely.

23  Q.  Is it fair to say that although we are calling him

24  Mr. Hallinan in this courtroom, you called him Charlie, is that

25  correct?

1    A.  On occasion I called him Charlie, and out of respect I

2    called him Mr. Hallinan on occasion.

3    Q.  You had formed over the years, am I correct, a deep

4    confidence and trust with him?

5    A.  Regarding the business, yes, the payday loan business.

6    Q.  Did you have any difficulty, despite that confidence and

7    trust, in deceiving him that your conversations were in

8    confidence?

9    A.  I did have trouble with that.

10   Q.  But you were able to pull it off, is that correct?

11   A.  I was able to record the conversations, yes.

12   Q.  For two or three years without him realizing you were

13   deceiving him, is that correct?

14   A.  Somewhere in that time frame, that's correct.

15   Q.  You met with you said the Pennsylvania prosecutors starting

16   in approximately 2012, is that correct?

17   A.  Yes.

18   Q.  And you met with them dozens and dozens of times, sometimes

19   for a day or more, is that fair to say?

20   A.  No.

21   Q.  What is fair to say?

22   A.  Dozens and dozens is like 24, 36.  I don't remember that

23   many meetings.

24   Q.  OK.  More than a dozen times?

25   A.  Approximately.

1    Q.  And some of those meetings were for a day or more?

2    A.  Yes.

3    Q.  Do you recall that at some point the gentlemen at this

4    table, the New York prosecutors, joined the investigation in

5    around April of 2015?

6    A.  Yes.

7    Q.  And they were focusing on gathering, trying to gather

8    evidence to prosecute Mr. Tucker, is that right?

9    A.  Yes.

10   Q.  And it is at that time, sir, that you still had not gotten

11   a cooperation agreement, is that correct?

12   A.  Yes.

13   Q.  It was at that time for the first time that you relayed

14   conversations that you say were incriminating conversations

15   between Mr. Tucker and Mr. Hallinan that had occurred almost 20

16   years ago, is that correct?

17   A.  I'm not sure if I can answer that 100 percent correct.

18   Q.  What part can't you answer, sir?

19   A.  The conversations that I had with the Southern District

20   were explaining how the County Bank program really worked, and

21   there were a few conversations that -- one meeting and a few

22   conversations that I had with Mr. Tucker and Mr. Hallinan at

23   Mr. Hallinan's office.

24   Q.  And that was back around, the last one, sometime around

25   2000, is that correct?

1   A.  The conversation, sir?

2   Q.  Yes.

3   A.  No, I don't believe it was -- at the very beginning when I

4   was speaking to Mr. Hallinan about getting involved in the

5   business and that was sometime in '98.

6   Q.  And when you relayed to the prosecutors at this table here

7   about your recollection of those conversations, you hadn't seen

8   Tucker in more than a dozen years, is that fair to say, or

9   spoken to him?

10  A.  More than that.

11  Q.  More than that.  15, 20 years almost?

12  A.  15, 17 years, somewhere around there.

13  Q.  Is it correct, sir, that after your meeting with the

14  government that is seated at this table, the New York

15  prosecutors, that within two or three months thereafter you got

16  what you wanted, which was a cooperation agreement, and pled

17  guilty?

18  A.  Yes.

19  Q.  What crimes did you plead guilty to in connection with your

20  cooperation agreement?

21  A.  RICO.

22  Q.  For those of the members of the jury who may not know what

23  RICO is, can you explain your understanding of the acronym that

24  you just said?

25          THE COURT:  That's a legal point, ladies and

1   gentlemen.  RICO is the initials of the statute which is the

2   Racketeering Influenced and Corrupt Organizations Act.  That's

3   the name that Congress gave to a law.  They can call a law

4   anything they chose to call it.  That's what they called it.

5          MR. ROTH:  Thank you, your Honor.

6   BY MR. ROTH:

7   Q.  What else did you plead guilty to besides RICO, sir?

8   A.  Conspiring for mail fraud and wire fraud, along with aiding

9   and abetting, and those two counts were for -- those three

10  counts were regarding the Platinum credit card and the first

11  one, that was for the payday loans.

12  Q.  How much total prison time did you face for exposure for

13  those crimes?

14  A.  65 years.

15  Q.  What was the maximum fine, if you recall?

16  A.  1 million.

17  Q.  You were not required to plead guilty to the perjury, is

18  that correct?

19  A.  That's correct.

20  Q.  Before you entered that plea, pursuant to your cooperation

21  agreement, did you make a payment of approximately $2.5 million

22  to the IRS for taxes?

23  A.  Yes, there was payments made to the IRS and others.  Yes.

24  Q.  I am just talking about the tax payment.  Do you recall it

25  was approximately $2.5 million?

1    A.   That is correct.

2    Q.   And in return for that payment of $2.5 million, you were

3    not prosecuted for tax evasion, is that correct?

4    A.   As I said before, that is not one of the -- the answer is

5    correct.

6    Q.   And at the time of your sentence, did you also not pay,

7    roughly, $7.5 million in satisfaction of the Platinum Trust

8    credit card?

9    A.   I have not been sentenced.

10             MR. VELAMOOR:  Objection to form.

11             THE COURT:  Rephrase the question, please.

12   Q.   Before you pled guilty, had you already paid back

13   approximately $7.5 million?

14   A.   Yes.  In reference to the FTC case, all of the money that

15   was taken from the consumers, and the consumers were

16   approximately 70,000 consumers to the total of 7.5 million, all

17   was paid back to the FTC and to the best of my knowledge the

18   FTC returned it to the consumers.

19   Q.   But you paid that, is that correct?

20   A.   No, that's not correct.

21   Q.   You didn't pay that money?

22   A.   I think I might have paid a portion of it along with my two

23   children.

24   Q.   What portion did you pay, sir?

25   A.   I can't recall.

1   Q.  Seven-and-a-half million dollars is a lot of money.  How

2   much, roughly, did you pay?

3   A.  I really can't recall.

4   Q.  This was just less than two years ago, is that correct?

5   A.  I believe it might have been longer than that.

6   Q.  During this case, the pendency of this case and your

7   cooperation agreement and now that you have pled, have any of

8   your assets been restrained or seized by the government?

9   A.  Yes.

10  Q.  What assets are those, sir?

11  A.  Initially when the FTC came in, they froze numerous

12  accounts of myself and my children, business accounts, personal

13  accounts.  Sometime thereafter they released the freeze of a

14  majority of my accounts and froze a majority of my children's

15  accounts.

16  Q.  Did the U.S. Attorney's Office freeze any of your accounts

17  or put any liens on any of your properties or holdings?

18  A.  They did not.

19  Q.  Are you under a duty, sir, to disclose all of your

20  financial holdings prior to sentence?

21  A.  Yes.

22  Q.  Since you started cooperating in this case in 2012, or

23  trying to cooperate, have you caused any transfers to be made

24  of any of your properties?

25  A.  Yes.

1  Q.  What properties are those, sir?

2  A.  There is a condominium that I lived in in Florida.

3  Q.  Starting there, when did you transfer that, sir?

4  A.  2012 or '13 or '14, somewhere in that range.

5  Q.  Who did you transfer that to, sir?

6  A.  It was -- I misspoke.  That property was in -- I don't

7  believe it was transferred.  It was sold.

8  Q.  Who was it --

9  A.  May I, sir?

10  Q.  Yes.

11  A.  At one point the property was owned I believe in my wife's

12  name and my name.  Shortly thereafter my estate attorney put it

13  into what is called a qualified personal residential trust and

14  it was -- I can't remember the specific name of the trust.

15      Then sometime later, meaning in the '12, '13, '14 range, I

16  believe that trust was -- that property was sold.  OK.  And

17  then some of the money went to purchase a new property, if I

18  remember correctly, and some of it went into a trust account

19  with the same name.

20      Sometime in that time frame, many, many bank accounts that

21  were in my name were closed out because of the RICO case,

22  probably five to ten bank accounts, one of them being the trust

23  account.  And many accounts with like TD Ameritrade and a few

24  brokerage accounts, we gave all that information to the

25  government, telling them that these accounts have been closed.

1    Q.  I think you have answered my question.  Thank you.

2    A.  I'm sorry.

3    Q.  The condo that you're speaking about, was that in South

4    Beach that you were living in and sold in 2014?

5    A.  Yes.  It was at 16 -- 1455, units 1603 and 1604.

6    Q.  What were those units sold for, sir?

7    A.  I purchased them for approximately --

8    Q.  My question is what were they sold for.

9    A.  6.5 million.

10   Q.  That was an arm's-length transaction?

11   A.  Yes.

12   Q.  You reinvested some of those proceeds into another unit, is

13   that correct?

14   A.  Yes.

15   Q.  How much did you purchase that for, sir?

16   A.  2.7, I think it was.

17   Q.  That's where you're residing now?

18   A.  No.

19   Q.  Do you have another home in Pennsylvania, sir?

20   A.  Yes.

21   Q.  Is that home encumbered or restrained or frozen in any way?

22   A.  No.

23   Q.  What is the value of that home, sir?

24   A.  Approximately 1.5 to 1.8 million.

25   Q.  And you have other businesses besides payday loan

1   businesses, is that correct?

2   A.  I had a few, but no longer.  I'm sorry.  I do have one

3   other business, a real estate business.

4   Q.  You have other real estate holdings as well?

5   A.  Yes.

6   Q.  So is it fair to say, sir, that despite the payments that

7   you have made today, you're still a very comfortable man?

8   A.  Yes.

9   Q.  Did you write an article last year, sir, that was published

10  in which you lamented about your current legal predicament?

11  A.  I'm not sure what lamented means.

12  Q.  In which you expressed how you felt about your current

13  legal predicament.

14  A.  I'm sorry.  Yes.

15  Q.  In that article, did you express, sir, that you committed

16  the crimes that you did out of greed and for the money?

17          MR. VELAMOOR:  Objection, your Honor.

18          THE COURT:  I will allow it.

19  A.  Yes.

20  Q.  And you said, sir, how sorry -- you expressed how sorry you

21  were for the effect of your actions on your family members, is

22  that correct?

23  A.  I think it was my family members along with the people that

24  I cheated.

25  Q.  Is it fair to say, sir, that this article that you

1    authored, self-pity speech, was essentially a carbon copy of

2    the speech that you made to the judge 20 years ago in a plea

3    for mercy?

4    A.  Not at all.

5    Q.  You expressed the same feelings back then for getting your

6    children and family involved, is that correct?  That was 20

7    years ago, is that correct?

8    A.  I don't believe the intent of this article was anywhere

9    near the same as 20 years ago.

10   Q.  Did you not express your regret for getting your children

11   involved in the scheme 20 years ago and again last year?

12   A.  Getting my children involved 20 years ago, is that what

13   you're saying?

14   Q.  Well, you then bring disrepute on your family members, your

15   wife and family members.  Your boys were young then, is that

16   correct?

17   A.  That is correct, but there were other parts of the article

18   that you're failing to mention.

19   Q.  The article was a statement by you of the agony you were in

20   facing a sentence, is that correct in part?

21   A.  In part, yes.

22            MR. ROTH:  I have no further questions.

23            THE COURT:  Ladies and gentlemen, let's take our

24   mid-morning break.

25            Please do not discuss the case among yourselves or

1    with anyone.

2              We will be back in action in ten minutes.  Thank you.

3              (Jury exits courtroom)

4              THE COURT:  See you in ten minutes.  Thank you.

5              (Recess)

6              THE COURT:  Any redirect?

7              We need a jury.  That always helps.

8              MR. ROTH:  My partner would like to do some cross.

9              THE COURT:  Both of those requests are quite

10   reasonable, that you have a jury and that you continue

11   cross-examination.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2     ADRIAN RUBIN, resumed.

3          THE COURT:  Please be seated.

4          Mr. Bath, you may inquire.

5     CROSS-EXAMINATION

6     BY MR. BATH:

7     Q.  Do I understand you got involved in County Bank in the late

8     1990s?

9     A.  Yes.

10    Q.  And you had a relationship with the bank at Rehoboth Beach,

11    correct?

12    A.  Yes.

13    Q.  The government, when you were on the stand on direct, put

14    on Exhibit 101.

15         MR. BATH:  Can we have that up, please, Eli.

16    Q.  Let me know if it is in front of you on the screen.

17         Is it?

18    A.  No.

19         Now it is, sir.

20    Q.  You recognize seeing that earlier when Mr. Velamoor was

21    questioning you?

22         Take a second.  Take all the time you need.

23    A.  Yes.  I'm looking at page 1.  I believe there was a page 2

24    to this document.

25         MR. BATH:  This is in evidence.  If we can publish,

1    please.

2    Q.  You have just the first page up right now, correct?

3    A.  Yes.

4    Q.  It's from Weir & Partners, is that right?

5    A.  Yes.

6    Q.  From Leonard Goodman, correct?

7    A.  Yes.

8    Q.  Leonard Goodman is a lawyer in Philadelphia?

9    A.  Yes.

10   Q.  And this is July 6th of 2000, correct?

11   A.  Yes.

12   Q.  It lists various persons there, including yourself,

13   correct?

14   A.  Yes.

15   Q.  Down to the "Re" line, it says, "Amendments to Section 2 of

16   the policy manual," correct?

17   A.  Yes.

18   Q.  Is that this manual you have been discussing on direct and

19   cross with Mr. Roth?

20   A.  This is the manual.  The answer is yes.

21   Q.  I think you had said you're not sure where it came from,

22   but you had the manual?

23   A.  Yes.

24   Q.  This is an amendment to that manual, correct?

25   A.  Yes.

1  Q.  And these documents, a document like this, Government's

2  101, you received a lot from Mr. Goodman, didn't you, during

3  your relationship with County Bank?

4          MR. VELAMOOR:  Objection, your Honor.

5          THE COURT:  Rephrase your question.

6  Q.  You received correspondence from time to time from

7  Mr. Goodman?

8  A.  Mr. Goodman and the bank, yes.

9  Q.  This 101 isn't the only document you ever got from

10  Mr. Goodman?

11  A.  No.

12  Q.  Page 2, the first paragraph says, "Enclosed please find the

13  new page 2-1."  Is that correct?

14  A.  It's not up on my screen.

15  Q.  The bottom of page 1 isn't?

16  A.  I'm sorry.  Yes, it is there.

17  Q.  And it's telling you in this letter to insert a new page

18  2-1 into the manual, correct?

19  A.  Yes.

20          MR. BATH:  If we can go to page 2, Eli.

21  Q.  The government's exhibit goes on to say in that first

22  paragraph, it tells you about changes to Section 2 of the

23  policy, limit, loan, renewals, correct?

24  A.  Yes.

25  Q.  It quotes the best practices of the Community Financial

1  Services Association of America, does it not?

2  A.  Yes.

3  Q.  What is that?

4          MR. VELAMOOR:  Objection.

5          THE COURT:  Basis.

6          MR. VELAMOOR:  A prior ruling regarding extrinsic

7  legal evidence.

8          THE COURT:  Sustained.

9  Q.  Did you keep a copy of this letter in your files, if you

10  know?

11  A.  I do not know.

12  Q.  The last paragraph tells you to please incorporate the

13  enclosed pages into the manual, correct?

14  A.  Yes.

15  Q.  And it copies some people down there, correct?

16  A.  Yes.

17  Q.  Harold Slatcher, president?

18  A.  Yes.

19  Q.  He is the president of the bank?

20  A.  Yes.

21  Q.  And then Scott, who is the compliance officer?

22  A.  Yes.

23  Q.  And he is the compliance officer you mentioned earlier, is

24  that right?

25  A.  Yes.

Q.   Then it says David Gillan.  Who is he?

A.   Mr. Gillan was a gentleman that was brought into the bank

sometime early 2000 to mid-2000 range, I'm not exactly sure, to

run the payday loan program for County Bank.

Q.   When you said the FDIC did an audit of you, did they also

do an audit of County Bank, if you know?

A.   I don't know.  I know they did it to numerous servicers.  I

am not sure -- I thought they did it to County Bank because we

were the payday loan lenders operating under County Bank.

Q.   You don't know for sure?

A.   I don't.

Q.   So you have involvement with County Bank from '99 until

whenever it ends.  What was the approximate year?

A.   Early 2003.

Q.   I am trying to understand your testimony.  Then there is a

lawsuit by the New York Attorney General's Office sometime in

'05 or '06, correct?

A.   Yes.  I believe it might have started earlier.  I'm not

sure of the exact date.

Q.   Certainly by '06 because you were asked to give sworn

testimony?

A.   That's correct.

Q.   And you were asked to give a deposition where you would

testify?

A.   That was a deposition, sir.

1  Q.  So you show up at some law office or somewhere and you are

2  going to asked questions about County Bank, correct, and your

3  relationship with them?

4  A.  I believe one of the meetings was at Mr. Hallinan's office

5  and not at the attorney's office.

6  Q.  Bad question.  My fault.

7      Ultimately you show up to be questioned about your

8  relationship with County Bank?

9  A.  Yes.

10  Q.  And you were put under oath and you do so?

11  A.  Yes.

12  Q.  And you're asked lots of questions about what your

13  relationship with County Bank was?

14  A.  Yes.

15  Q.  And you indicate in that deposition that your relationship

16  with County Bank is all fine and on the up-and-up, is that

17  right?

18  A.  It was a lie, that's correct.

19  Q.  No, no.  I am sorry if I am being confusing here.

20      Did you say in that deposition that your relationship with

21  County Bank was fine and proper?

22  A.  Yes, which was a lie.

23  Q.  My question is, did you say in the deposition that your

24  relationship with County Bank was fine and proper?

25          MR. VELAMOOR:  I believe the question is asked and

1   answered twice.

2          THE COURT:  Did you say in the deposition that your

3   relationship with County Bank was fine and proper?

4          MR. BATH:  Yes, sir.

5          THE COURT:  I believe the witness responded, according

6   to what I am reading, "Yes, which was a lie."

7          MR. BATH:  I would move to strike as nonresponsive.

8          THE COURT:  Well, it seems it was pretty responsive.

9   His answer was yes.

10          MR. BATH:  Fair enough, Judge.

11   Q.  In that deposition you said to the New York Attorney

12   General, I'm going to lie to you about my relationship with

13   County Bank?

14   A.  That's what I said in the deposition, it was a lie.

15   Q.  You told them you were lying?

16   A.  I did not tell them.

17   Q.  You didn't say anything about lying in 2006?

18   A.  I'm getting confused, sir.

19   Q.  In your deposition, when you were being asked questions by

20   the New York Attorney General, did you tell them you were

21   lying?

22   A.  No.

23   Q.  Did you tell them that in 2007?

24   A.  I don't believe I was deposed in 2007, sir.

25   Q.  Did you ever pick up the phone in '07, '08, '09, '10, and

1    say to anybody I lied in that deposition?

2    A.  No.

3    Q.  You got involved I think you said in 2015 with the Southern

4    District of New York in this case, correct?

5    A.  Yes.

6    Q.  It's after then that you then came forward and said, I lied

7    in 2006 in a depo, isn't that true?

8    A.  No.

9    Q.  When is the first time you told anybody in authority that

10   you lied in that '06 depo?

11   A.  Sometime after 2012, some of it with my attorneys and with

12   the government.

13   Q.  So that means sometime after 2012 until last week?

14   A.  Well, I'm going to rephrase that.  Sometime between May of

15   2012 and prior to when I met with the Southern District.

16   Q.  Do you know what date that was, what proffer session that

17   was?

18   A.  As I said earlier, there were many, maybe eight, 10, 15

19   proffers.

20   Q.  And it is your claim that Steve Goodman knew or encouraged

21   you to lie in that deposition?

22   A.  Yes.

23   Q.  And also Mr. Dubrow, an attorney?

24   A.  Yes.

25   Q.  Any other lawyers encourage you to lie in that deposition?

1   A.  I don't remember.  I remember other lawyers that were

2   involved in the case, but none that I think -- where we

3   discussed what we were going to say in my deposition.

4   Q.  You testified for quite a while.  My question is regarding

5   anything you have testified about, and that is, did you ever

6   talk with Tim Muir?

7   A.  I don't know what Tim Muir looks like or who he is.  I know

8   that he is involved in this case.

9   Q.  To your knowledge, you have never met or talked to him?

10  A.  I have never.

11          MR. BATH:  Thank you.

12          THE COURT:  Any redirect?

13          MR. VELAMOOR:  Yes, your Honor.

14  REDIRECT EXAMINATION

15  BY MR. VELAMOOR:

16  Q.  Mr. Rubin, Mr. Roth started his cross-examination by saying

17  for the last 30 years you have conducted yourself as a

18  fraudster and a liar.  Do you recall that?

19  A.  Yes.

20          (Continued on next page)

21

22

23

24

25

1   BY MR. VELAMOOR:

2   Q.  And you agreed with that, right?

3   A.  I did.

4   Q.  Because it's true, right?

5   A.  It is a hundred percent true.

6   Q.  Were your payday lending activities part of those 30 years

7   of fraud?

8   A.  Yes.

9   Q.  Did that include your payday lending at County Bank as part

10  of the so-called County Bank program?

11  A.  Yes.

12  Q.  And to be clear, so everyone's clear, that's the program in

13  which so-called servicers were, in fact, also the lenders

14  putting up their money, right?

15  A.  Yes.

16  Q.  And you were not the only so-called servicer that was part

17  of that program, right?

18  A.  That is correct.

19  Q.  Was Mr. Tucker also a so-called servicer in that program?

20  A.  He was.

21  Q.  Now, you were also asked questions about that program and

22  the fact that there was involvement by Mr. Goodman.  Do you

23  recall that?

24  A.  Yes.

25  Q.  And that Mr. Goodman was an attorney for County Bank,

1  right?

2  A.  Yes.

3  Q.  Was Mr. Goodman also at the same time acting as the

4  attorney for the so-called servicers?

5  A.  I know that he was acting as the attorney for myself and

6  Mr. Hallinan.

7  Q.  And you were one of the so-called servicers, right?

8  A.  That is correct.

9  Q.  And was Mr. Goodman, did Mr. Goodman know, to your

10  understanding, that it was the so-called servicers' money that

11  was being put up for these loans to consumers?

12  A.  Yes.

13  Q.  And just to make sure we're clear, from your direct

14  testimony, was it Mr. Goodman who helped come up with the

15  so-called loan approval process wherein data was sent to County

16  Bank and immediately bounced back with green lights and red

17  lights?

18          MR. BATH:  Objection.

19          THE COURT:  No.  I'll allow it.

20  A.  Yes, Mr. Goodman was part of that conversation with

21  Mr. Gary Gordon and Mr. Hallinan.

22  Q.  And those loans, to be clear, had already been approved by

23  the so-called servicers, right?

24  A.  Yes.

25  Q.  And also, this County Bank program was shut down by

1    regulators, is that correct?

2    A.   That is correct.

3    Q.   And the New York Attorney General brought an action against

4    County Bank related to this program, right?

5           MR. ROTH:  Objection, your Honor, to its conclusion.

6           THE COURT:  How is this relevant?

7           MR. VELAMOOR:  Your Honor, there was a suggestion that

8    because certain of these people were involved, including

9    compliance officer and others, in the program, that it was

10   somehow appropriate, and I think the full factual picture

11   should include the fact --

12          THE COURT:  I'll allow it.  Go ahead.

13          THE WITNESS:  I'm sorry.  Could you repeat that?

14   BY MR. VELAMOOR:

15   Q.   Did the New York Attorney General bring an action against

16   County Bank as well as certain of the so-called servicers

17   relating to the County Bank program?

18   A.   Yes, the regulators terminated the program and issued a

19   fairly large fine to the bank.

20   Q.   Now, you were also asked about your, the extent of your

21   illegal payday lending activities, do you recall that?

22   A.   Yes.

23   Q.   What was the first phase of your illegal payday lending

24   activities?

25   A.   It was with County Bank of Rehoboth Beach, Delaware.

1   Q.  We discussed how in that program so-called servicers, in

2   fact, were also the lenders, correct?

3   A.  Yes.

4   Q.  What was the next phase of your illegal payday lending?

5   A.  The first, the first phase, as you mentioned, was the

6   rent-a-bank model.  The second phase of the payday loan illegal

7   activity was where I received a license from a particular state

8   and with that license, since there was -- it was a faxing

9   environment at that time, that I, I, I loaned, loaned the

10  payday loans across the United States and thought that

11  having -- I knew it was wrong, thought that having the license

12  in Utah would allow me to go across multiple states when, in

13  fact, I really knew that was wrong.

14  Q.  And while you had this so-called license in Utah, did you

15  continue to have your payday lending operations outside of

16  Utah?

17  A.  Not sure of the question.

18  Q.  Where were your primary operations in your payday lending

19  operations?

20  A.  OK.  When I was with County Bank, in the very beginning,

21  they were in the Philadelphia suburbs.  Then we moved to a very

22  large, not very large, large call center in Delaware.  Once

23  County Bank terminated me, the next day all the loans that were

24  in County Bank were now in Global's portfolio, so one day I was

25  operating under the County Bank name, the next day the same

1   loans that were initiated by County Bank were being, were being

2   run by Global Pay Day Loan.

3   Q.  And yet during this time period, you were suggesting to the

4   world that your operations were in Utah, is that right?

5           MR. ROTH:  Objection, your Honor.  Leading.

6           THE COURT:  Take a look at the rule on leading

7   questions.  Overruled.

8   A.  May I answer?

9   Q.  Yes, you may answer.

10  A.  Repeat the question, please.

11  Q.  During this time period when, as you put it, your

12  operations remained on the Delaware-Pennsylvania area, you were

13  suggesting to the world that your operations were primarily in

14  Utah, correct?

15  A.  Yes, when that was incorrect.

16  Q.  How long did your lending under this illegal Utah model

17  continue for?

18  A.  It was until, until -- very early 2003 until very early of

19  2007, might have ended right around the end of 2006.

20  Q.  OK.  And at that time period, did you continue payday

21  lending at that point?

22  A.  Yes, when I left the Utah, I then formed another company

23  called First National Services, and I again moved the portfolio

24  from Global Pay Day Loan to -- the following day to First

25  National Services.

1    Q.  And what, during the First National Services time period,

2    were you doing to hide or protect yourself from laws relating

3    to payday lending?

4    A.  Nothing, meaning that at one point I had -- I was under the

5    County Bank program, at another point I was operating under a

6    Utah lender's license.  And then when I was operating under

7    First National Services, there was, as I'll call it, no

8    umbrella.

9    Q.  Did you use straws or other people, use their names on

10   documents relating to the companies?

11   A.  At all time after, starting sometime in 2000 to mid-2000,

12   after the FDIC came in and told County Bank that I previously

13   had a felony conviction and the bank asked me to leave, then

14   from then on I used a straw.

15   Q.  OK.  And while you were just using a straw, and I believe

16   you testified about this on direct, were you attempting to form

17   a relationship with an Indian tribe?

18   A.  Yes.

19   Q.  And you were seeking out, I believe, Mr. Hallinan's help

20   for that, correct?

21   A.  Yes.  Again, as the gentleman who -- Mr. Roth, I believe,

22   was his name -- said he was my mentor and he was primarily the

23   only person that I spoke to in the payday loan business, other

24   than Mr. Tucker, which was very brief, and he refused to get me

25   into the Indian tribe that he was involved with along with

Mr. Tucker.  Because of my felony conviction, he thought it

might be a problem, and that was from the years of, somewhere

around 2003 and up until the end of 2011, so I did ask him on

a, on numerous occasions if I would have the opportunity, but

he did decline me.

Q.  And so during this time period, just to be clear, after

Utah, you were simply hiding behind a straw, is that fair to

say?

A.  That is correct.

Q.  But did Mr. Hallinan ultimately help you find a tribe to

use for another phase of illegal payday lending?

A.  Yes.  Sometime, sometime in 2011, I did ask Mr. Hallinan

again, and he said there might be an opportunity that's coming

up soon that he can get me involved with a new tribe that he

just got involved with, which was called the Guideville tribe,

and sometime, I'm going to say mid to late 2003 -- I'm sorry,

2011, he put me in touch with his, with the attorney that we

both knew for many years by the name of Mr. Neff, and allowed

me to -- allowed Mr. Neff to prepare the documents for me, and

starting probably around early January of 2012 is when I

changed the documents to say I was under the tribal umbrella

and moved the portfolio under the tribal portfolio, and also

moved the funds from the banks that I was associated with, with

First National Services, into the tribal banks.

Q.  And was your lending with the involvement of the tribe also

1    part of your illegal payday lending?

2    A.  Yes.

3    Q.  Now, when you -- to be clear, when you first met with the

4    investigators in Pennsylvania, way back in 2012, is it true

5    that you discussed each of the phases of your payday lending

6    that you just described in your testimony today?

7    A.  Absolutely.

8    Q.  Among other things, you had described during that time the

9    County Bank program, correct?

10   A.  Absolutely.

11   Q.  And you said, among other things, that Goodman assisted in

12   developing a relationship between Mr. Slatcher of County Bank

13   and CRA Services, that Goodman wrote up the agreement between

14   County Bank and CRA Services --

15              MR. ROTH:  Judge, I object.  He's reading from

16   something.

17              THE COURT:  Yes.  If you're reading from something

18   that's not in evidence, avoid that.

19              MR. VELAMOOR:  Judge, I'm trying to elicit a prior

20   consistent statement prior to the time period where defense

21   counsel suggested that the defendant had a motive to invent

22   testimony.

23              THE COURT:  And you're going to be offering this

24   statement if you lay a foundation?

25              MR. VELAMOOR:  To the extent the witness doesn't

1   recall making the statements, I will certainly show him the

2   documents to refresh his recollection of them.  I don't

3   believe -- these are, of course, notes of the sum and substance

4   of the statements.

5           THE COURT:  Why can't you just ask him what he said,

6   and if he doesn't remember, show him the document and refresh

7   his recollection?

8           MR. VELAMOOR:  That's what I was trying to do.  I'll

9   try again.

10          THE COURT:  Then don't read from a document not in

11  evidence.  It's the same thing that I've pointed out and

12  stopped when the defense has done it, unless you want the

13  defense to start reading from internal memos and debriefings.

14          MR. VELAMOOR:  Fair enough, Judge.

15  Q.  Mr. Rubin, do you recall on cross-examination being asked

16  questions about your initial meeting with prosecutors from New

17  York?  Do you recall that?

18  A.  Yes.

19  Q.  And that meeting, to be clear, first meeting was in 2015,

20  correct?

21  A.  The meeting with the Southern District, yes, somewhere

22  around there.

23  Q.  And prior to that meeting, did you have any idea whatsoever

24  that prosecutors from New York were interested in either

25  meeting you or even potentially obtaining your testimony in any

1  case?

2  A.  No.

3  Q.  Yet you had been meeting with prosecutors from Philadelphia

4  since way back in 2012, correct?

5  A.  That is correct.

6  Q.  And do you recall during your first, if not your, one of

7  the first, if not the first meeting with prosecutors in

8  Philadelphia, that you discussed in detail the County Bank

9  program?

10  A.  Yes.

11  Q.  And do you recall discussing in detail that that program

12  was a sham in part because the servicers were putting up the

13  money and not County Bank?

14  A.  Yes.

15  Q.  And do you recall testifying in detail that Mr. Slatcher of

16  County Bank was aware that the servicers were putting up the

17  money?

18       MR. ROTH:  Judge, I'll object to testifying it's our

19  position.

20       THE COURT:  Overruled.

21  A.  Mr. Slatcher was aware that the bank was not putting any

22  money and the so-called servicers were putting up the money.

23  Q.  Do you recall testifying the prosecutors in those very

24  early meetings that Mr. Goodman had written up the agreement

25  between County Bank and the so-called servicers?

1    A.  Yes.

2    Q.  And that that agreement created the impression that County

3    Bank was making the loans?

4    A.  Yes.

5    Q.  When, in fact, the servicers or the so-called servicers

6    were making the loans?

7    A.  Yes.

8    Q.  And do you also recall in that, one of, if not the first

9    meeting with prosecutors, that you discussed how the loan

10   disclosures that were sent to customers were misleading and

11   causing confusion among borrowers?

12   A.  Yes.

13   Q.  And specifically in that context, you discussed the fact

14   that the way the renewal process was presented to borrowers was

15   misleading?

16   A.  Yes, it was -- it was misleading, certainly was.

17   Q.  And do you also recall discussing during those early

18   meetings with prosecutors the Utah model that you just

19   testified about?

20   A.  Yes.

21   Q.  As well as the different straws that you used as part of

22   your illegal lending activities?

23   A.  Yes.

24   Q.  As well as, for example, your use of Mr. Ventriglia and

25   your illegal lending under First National Services?

1   A.  Yes.

2   Q.  And do you also recall mentioning during those early

3   meetings Mr. Tucker?

4   A.  Yes.

5   Q.  And specifically, do you recall during those early meetings

6   mentioning your face-to-face meeting with Mr. Tucker that you

7   testified on direct examination?

8   A.  Yes, the meeting we had in a Philadelphia restaurant.

9   Q.  Again, to be clear, you mentioned that meeting to

10  investigators in Philadelphia, correct?

11  A.  Yes.

12  Q.  Who were at that time principally, if not entirely, focused

13  on Mr. Hallinan and his activities, correct?

14  A.  That is correct.

15  Q.  And even in the context of those meetings, you mentioned

16  Mr. Tucker, including your first face-to-face meeting with

17  Mr. Tucker, right?

18  A.  Yes.

19          MR. ROTH:  Objection, Judge.

20  Q.  Including the meeting --

21          THE COURT:  Hold on.  Hold on.

22          MR. VELAMOOR:  Sorry, your Honor.

23          THE COURT:  Overruled.

24  BY MR. VELAMOOR:

25  Q.  Again, including mentioning during those first meetings

1   that you had a face-to-face meeting with Mr. Tucker over a

2   meal, correct?

3   A.  Yes.

4   Q.  Now, as part of your guilty plea, do you recall the

5   government filing a document setting forth what you did that

6   made you guilty of the crimes you pleaded guilty to?

7   A.  Yes.

8   Q.  And did that document, which was publicly filed, include a

9   detailed discussion of each of the different phases of your

10  illegal payday lending activities?

11  A.  Yes.

12  Q.  Including the County Bank phase, right?

13  A.  Yes.

14  Q.  The Utah phase?

15  A.  Yes.

16  Q.  The just "hiding behind the straw" phase?

17  A.  Yes.

18  Q.  As well as the travel phase, right?

19  A.  That was disclosed almost in the first, second or third

20  proffer, if not the first one.

21  Q.  And also disclosed in publicly filed documents when you

22  ultimately pled guilty, right?

23  A.  That is correct.

24  Q.  Now, as part of your guilty plea, you were also asked

25  questions about your assets, what you've paid and what you are

1    yet to pay, do you recall that?

2    A.  Yes.

3    Q.  Now, as part of your guilty plea, are you subject to the

4    forfeiture of assets, including anything you obtained through

5    any of the crimes you've been convicted of?

6    A.  Yes.

7    Q.  And has your forfeiture been determined yet?

8    A.  It has not.

9    Q.  Will that be something that's determined by the judge at

10   sentencing?

11   A.  That is correct.

12   Q.  And you were also asked about the lies and the lying

13   testimony you've given in the past, right?

14   A.  Yes.

15   Q.  And in fact, you have lied on more than one occasion in

16   prior testimony?

17   A.  Yes, I have.

18   Q.  And as defense counsel asked you, in those instances, you

19   were lying to protect yourself, right, to use counsel's words?

20   A.  That is correct.

21   Q.  In part because you were lying to conceal your ongoing

22   activities in illegal payday lending, right?

23   A.  That is correct.

24   Q.  You wanted those illegal payday lending activities to

25   continue, correct?

H9iWtuc3

1   A.   That is correct.

2   Q.   What is your understanding as to whether your lies in prior

3   testimony can and will be considered by the judge who

4   ultimately sentences you in this case?

5   A.   I believe he will consider it.

6   Q.   And to be clear, what are you facing in terms of a maximum

7   sentence in connection with your sentence?

8   A.   65 years.

9   Q.   And what is your understanding of what can happen to your

10   cooperation agreement if you're found to have lied in either

11   testimony in this case or in any other case?

12   A.   I think that would, that would hurt me dramatically if I

13   was lying in any way, shape or form.

14           MR. VELAMOOR:   Nothing further, your Honor.   Thank

15   you.

16           THE COURT:   Thank you very much.   You may step down,

17   sir.

18           (Witness excused)

19           THE COURT:   Call your next witness.

20           MR. VELAMOOR:   Judge, prior to doing so, there are

21   three exhibits we wish to offer.

22           THE COURT:   All right.   Go ahead.

23           MR. VELAMOOR:   The exhibits are 104, 105 and 107.

24           THE COURT:   All right.   Any objections?

25           MR. ROTH:   No, your Honor.

H9iWtuc3

1          MR. GINSBERG:  Yes, your Honor.  I think we're going

2     to have to approach.

3          THE COURT:  All right.

4          Ladies and gentlemen, stand up and stretch for a

5     moment and let me talk to the lawyers at the sidebar.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  OK.  Let's start with 104.

3          MR. GINSBERG:  I have no objection.

4          THE COURT:  Any objection to 104?  No.  OK.  104 is

5    received.

6          (Government Exhibit 104 received in evidence)

7          THE COURT:  What's the next one?

8          MR. GINSBERG:  105.

9          THE COURT:  And there's an objection to 105?

10         MR. GINSBERG:  Yes.

11         THE COURT:  Go ahead.

12         MR. GINSBERG:  If your Honor looks at it, it's an

13    email.

14         THE COURT:  It's a very young looking picture of the

15    governor, maybe overly flattering, and maybe that's a basis to

16    sustain it.

17         MR. GINSBERG:  It is.

18         THE COURT:  Go ahead.

19         MR. GINSBERG:  The top portion I don't really have a

20    problem with.  It's hard to see what that top portion would

21    really be relevant for, leaving how it is for now.  The fact

22    that the bottom portion is basically an article from what's

23    called, apparently, Legal NewsLine, which is their reporting of

24    the payday loan scheme I think is not admissible.

25         Now, the government may argue that Mr. Tucker saw the

1   article and knew about the article, but to have the article

2   come in with the opinions of the writer in the article, I think

3   you have a real serious 403 issue.

4           THE COURT:  All right.  For one thing, I take it that

5   the article is not being offered for the truth of its content.

6           MR. VELAMOOR:  That's correct, your Honor.

7           THE COURT:  All right.  It seems to me that a lot of

8   it is not relevant, and I don't see any reason for it to come

9   in.  What I think is relevant and does come in is the first

10  sentence, which uses the words "illegal payday loan scheme,"

11  because that explains the reaction from Scott Tucker.

12          MR. GINSBERG:  You mean the first sentence on the

13  first portion, on the top?

14          THE COURT:  No.  I'm talking about the first sentence

15  of the article.  It appears the words "illegal payday loan

16  scheme" in Scott Tucker's email on November 18, 2009, is

17  quoting from the email which Scott Tucker sent to Mr. Muir and

18  Blaine Tucker annexing an article, and I take your point, I

19  don't see the reason for getting into all the particulars that

20  were found interesting or important by the author of the

21  article, but the fact that the article used the term "illegal

22  payday loan scheme" and that caused Mr. Tucker to send it on, I

23  guess it was -- maybe I have the timing wrong.

24          Maybe it was Blaine Tucker who sent it to Scott

25  Tucker, "Hmm...wow," and thereafter Scott Tucker responded to

1    Blaine Tucker with the words.

2              MR. GINSBERG:  Right.

3              THE COURT:  Yes.

4              MR. GINSBERG:  That's why I said the first portion I

5    wasn't objecting to.  But the second portion is basically the

6    article, except maybe for the first line.  I think the better

7    way to do it --

8              THE COURT:  With all due respect, I think you have a

9    better argument for eliminating the first line and the

10   portrait.  The thing that seems to be relevant is that they're

11   reporting on an article that says what it says and it's not for

12   the truth of its content, and it's that article that uses the

13   four words "illegal payday loan scheme," which are the four

14   words which Mr. Scott Tucker picks up in his email.

15             MR. GINSBERG:  But it's --

16             MR. SCOTTEN:  Your Honor, I think this might help

17   clarify.

18             MR. VELAMOOR:  A couple things.

19             THE COURT:  Back up.

20             MR. VELAMOOR:  Sure.  I think we understand the

21   Court's view that the entire article doesn't come in.  We would

22   ask that the second paragraph also come in.  One, it makes

23   clear that this is about the same County Bank program that

24   they've talked about.  TC Services is Mr. Hallinan's entity.

25   There will be further testimony from Ms. Grote and otherwise

1    relating to TC Services.  And furthermore, in the last email

2    that we're offering, 107, Mr. Muir refers to Cashnet, which is

3    Adrian's company, and it's mentioned slightly later on in the

4    article.

5           THE COURT:  I may have lost something here, and it's

6    entirely possible, because I see that the first sentence is,

7    "New York lawyers victimized by two companies operating a

8    payday loan scheme will receive portions of a $5.2 million

9    settlement, State Attorney General Andrew M. Cuomo has

10   announced."  I see.  And then the second sentence begins with

11   the words "County Bank."

12          Well, it's the second sentence together with the first

13   sentence, which is picked up in the "re" line that I think you

14   can get in.

15          MR. GINSBERG:  Your Honor, I don't see the fact --

16          THE COURT:  And only that much.

17          MR. GINSBERG:  The fact that there's an article --

18          THE COURT:  Back up.  There's airspace.

19          MR. GINSBERG:  Got it.

20          The fact that there's going to be information out

21   there before the jury that essentially there was a finding of

22   sorts, or an agreement, that people were victimized by County

23   Bank, and got a settlement, puts the stamp of approval on the

24   government's argument, that the County Bank's operation was

25   illegal, and I don't see how this differs, therefore, with

1    opinions that we've talked about that cannot come into evidence

2    from various state courts that found over the years that the

3    payday lending schemes were not illegal, and now we're going to

4    have this battle, and I think we should be able to get in some

5    of these other things where they find that it's not illegal and

6    not improper.

7            My suggestion is, because I think County Bank is the

8    real difficulty, that the top line of the second email, "New

9    York AG gains restitution for victims of payday loan scheme,"

10   with the first email where the response is "illegal payday loan

11   scheme," "Hmm...wow," is sufficient for the purposes of the

12   government's trying to argue in front of the jury without

13   telling the jury that there's already been a finding, not

14   necessarily by a court but possibly approved by a court, of a

15   settlement saying that it was a scam and people were paid their

16   money back, because that really puts the stamp of approval on

17   it, and I think that creates a real problem.

18           THE COURT:  All right.  I would deal with it a

19   different way, which would be to allow in the top two emails,

20   and the bottom email the "to," "from," "sent" and "subject"

21   lines, only up to here.

22           MR. GINSBERG:  I'm talking about --

23           THE COURT:  I'm talking about up to here.

24           MR. GINSBERG:  Right.

25           THE COURT:  And then a statement that it's agreed that

1    the email attached an article which referred to County Bank of

2    blah, blah, blah Delaware as operating an "illegal payday loan

3    scheme," period, not mentioning attorney generals or who won,

4    who found what, whether they admitted, whether they denied,

5    whether they did anything.  But that is necessary, it seems to

6    me, for this reason: what is Scott Tucker reacting to?  He's

7    reacting to an operation of which he has personal knowledge.

8             MR. GINSBERG:  Right.

9             THE COURT:  Which is being called in the article --

10   never mind the attorney general, I get your point -- being

11   called in the article illegal payday loan scheme.  That takes

12   the sting of any attorney general finding, any admission, any

13   of that out of it and gets what I think is the evidentiary

14   point.

15             MR. GINSBERG:  But putting in illegal payday loan

16   scheme from County Bank, coming from a news article, I think,

17   is what does the damage.

18             THE COURT:  That's, in fact, what he's responding to.

19             MR. GINSBERG:  It's almost one of the questions that

20   the jury's going to be asked to decide at the end of the case,

21   if part of the conspiracy is charged as the County Bank.  If

22   this comes in, this is like saying the government has proven

23   that that was true because there had been a finding previously

24   about that.

25             THE COURT:  Mr. Ginsberg, I don't know whether you're

1    closing to the jury --

2              MR. GINSBERG:  I am.

3              THE COURT:  -- or Mr. Roth is closing to the jury.

4              MR. GINSBERG:  I am.

5              THE COURT:  And I don't want to plant any ideas, but I

6    think if I were so lucky as to have a job as a defense counsel

7    or a prosecutor in this courthouse, and I've never done either

8    in a criminal case, I probably would say:  Look what he said,

9    it's in quotes here; he was reacting with surprise and

10   amazement that somebody should call this illegal.  It proves

11   exactly the opposite of what the government argues.

12             MR. GINSBERG:  You're right.  However, my job when

13   something like this is about to be introduced, in the first

14   instance, is to prevent it from coming into evidence, for two

15   reasons: one, that's my job, and two, if I don't do it and I've

16   made a mistake, then I've raised an issue for appeal.

17             THE COURT:  It is your job, and I respect that.  And I

18   don't fault you for objecting.  All I'm saying is that the

19   parade of horrors from this is, in my judgment, eliminated by

20   cutting the government off at the subject line, down here, on

21   Government Exhibit 105, which would be the subject line of the

22   November 18 email, and then say the November 18 email at 1536

23   attached an article which referred to County Bank as having

24   operated an "illegal payday loan scheme," period, period,

25   period.  No finding, no lawsuit, no admission.

H9iWtuc3

1            MR. VELAMOOR:  Certainly agreed on no finding, no

2       lawsuit.  What we would only ask is that the description

3       include the names of the two entities.

4            THE COURT:  Why the other entity?

5            MR. VELAMOOR:  To give it context and also to respond,

6       to explain exactly what the defendants mention, Cashnet was

7       Adrian Rubin.

8            THE COURT:  TeleCash.

9            MR. VELAMOOR:  TeleCash and Cashnet, TeleCash meaning

10      the entity that's going to come up as being Mr. Hallinan's

11      entity, there will be additional testimony about that, and

12      Cashnet being Mr. Rubin's entity mentioned by the defendants in

13      their follow-up emails, and also to give explanation for it.

14           THE COURT:  Oh, I see.  I didn't see the reference to

15      Cashnet.

16           So you could say that the author of the article

17      referred to County Bank, TC Services and Cashnet as having

18      operated an "illegal payday loan scheme."  All right?

19           MR. VELAMOOR:  Could I say TC Services doing business

20      as and CRA Services doing business as?

21           THE COURT:  Yes.  CRA Services doing business as, no.

22      Where do you -- I see --

23           MR. VELAMOOR:  Yes.

24           THE COURT:  That is correct, it's in the article.

25      Yes, you can do that much.

H9iWtuc3

1          MR. VELAMOOR:  To be clear, I'll be saying that it's

2     agreed that the article references an illegal payday loan

3     scheme involving County Bank of Delaware, TC Services doing

4     business as TeleCash and CRA Services doing business as

5     Cashnet.

6          THE COURT:  That's right.  And I will point out,

7     Ladies and gentlemen, the reference to the article, in fact,

8     none of these are admitted for the truth of their content, the

9     fact that they were said.

10         Mr. Bath.

11         MR. BATH:  Thank you, Judge.  I haven't joined in on a

12    lot of the objections because, frankly, it hasn't involved me,

13    but I think I need to join Mr. Ginsberg's objection and

14    argument.

15         THE COURT:  Of course.

16         MR. GINSBERG:  That it's more prejudicial than

17    probative.

18         Moving forward on these sidebars, do you want me to

19    say I join Mr. Ginsberg?  I don't want to necessarily have to

20    repeat things and delay us.  I just want to make sure the

21    record's clear.

22         THE COURT:  That's fine.  Unless the government has

23    any objection, I would assume and be willing to assume that any

24    objection made by one defendant was, to the extent applicable,

25    on behalf of any other defendant.

H9iWtuc3

1          Is that all right with the government?

2          MR. VELAMOOR:  That's certainly fine.  I would just

3     say to the extent that there are issues that particularly

4     Mr. Muir's focus, for example, Mr. Tucker's prior conviction,

5     we would ask that Mr. Muir's counsel articulate that

6     specifically.

7          THE COURT:  Absolutely, of course, but I will treat an

8     objection by one as made on behalf of the other to the extent

9     applicable in context.  All right?

10         MR. BATH:  Did we have one other exhibit as well?

11         THE COURT:  Is there one other?

12         MR. VELAMOOR:  No.  This is all three we're going to

13    do.

14         THE COURT:  OK.  Thank you.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Mr. Velamoor.

3          MR. VELAMOOR:  Yes, your Honor.  The government offers

4     104, 105 and 107, subject to the Court's rulings at sidebar.

5          THE COURT:  Yes.

6          (Government Exhibits 104-105 and 107 received in

7     evidence)

8          THE COURT:  Go ahead.

9          MR. VELAMOOR:  Could we show 104 first, but only the

10    top.

11          Before I begin, I will note, as discussed, that the

12    emails that the jury will be seeing were sent and received in

13    response to an article that was about an illegal payday loan

14    scheme involving County Bank of Rehoboth Beach, Delaware; TC

15    Services Corp., doing business at TeleCash; and CRA Services

16    Inc., doing business as Cashnet.

17          THE COURT:  More particularly, it was an article in

18    which that's what the writer of the article referred to.  And

19    ladies and gentlemen, that's not offered for the truth of its

20    content, but there are arguments that can be made about when

21    this information was transmitted, how people reacted to it.

22    I've allowed it in for that limited purpose.

23          Go ahead.

24          MR. VELAMOOR:  104 is now before the jury.  Can we

25    just highlight the bottom email.

1          Just for the record, the first email displayed is from

2     Tim Muir to Scott Tucker, dated November 18, 2009, 3:30 in the

3     afternoon.

4          THE COURT:  So the bottom one is the first in time,

5     ladies and gentlemen.  The one on top is second in time.  You

6     know how this works with email chains; it's kind of backwards.

7          Go ahead.

8          MR. VELAMOOR:  And the subject of the initial email is

9     regarding New York AG & payday, the question "when did this

10    come out?"  Subsequent response from Tucker to Mr. Muir, dated

11    November 18, 2009, same subject, substance, "Cashnet was Adrian

12    Rubin."

13         Move to 105, just the top, before it's displayed to

14    the jury.

15         Again, for the record, starting at the bottom, the

16    initial email from Scott Tucker to Tim Muir, Blaine Tucker,

17    Wednesday, November 18, 3:36 p.m.  The subject "New York AG &

18    payday," same article discussed below.

19         Initial response from Mr. Blaine Tucker to Scott

20    Tucker above that, "Hmm... wow."

21         And there was a final email, at the top.

22         THE COURT:  It's off my screen.  Do you have anything

23    displayed?  No.

24         MR. VELAMOOR:  No, 105.  105.

25         THE COURT:  Just the top.

1          MR. VELAMOOR:  Just the top.

2          In quotes, "illegal payday loan scheme," for the jury.

3          THE COURT:  Do you have it, ladies and gentlemen?

4          All right.

5          OK.

6          MR. VELAMOOR:  Then 107, your Honor.

7          THE COURT:  Go ahead.  Any objection there, 107?

8          MR. GINSBERG:  No, your Honor.

9          MR. VELAMOOR:  The bottom email from Mr. Muir to

10   Mr. Scott Tucker and Mr. Blaine Tucker, copying Matt Dykstra,

11   December 10, 2009, 8:49 a.m., a link to an article, "while

12   Cashnet was part of the scheme, the company is now defunct and

13   therefore is not contributing to the settlement."

14          Mr. Tucker's response to Mr. Muir, Mr. Tucker copying

15   Mr. Dykstra, "Yep, Adrian was no dummy.  He bailed early on in

16   this deal."

17          THE COURT:  All right.  Call your next witness,

18   please.

19          MR. VELAMOOR:  Your Honor, the government calls Lisa

20   Adams.

21          THE COURT:  All right.

22    LISA ADAMS,

23       called as a witness by the Government,

24       having been duly sworn, testified as follows:

25          THE COURT:  You may inquire.

1          MR. VELAMOOR:  Thank you, your Honor.

2     DIRECT EXAMINATION

3     BY MR. VELAMOOR:

4     Q.  Good morning, Ms. Adams.

5     A.  Good morning.

6     Q.  Where are you from?

7     A.  I am from South Bend, technically.

8     Q.  And when were you born?

9     A.  1962.

10    Q.  Where did you grow up?

11    A.  I grew up in Chicago, New York, Long Island and Los

12    Angeles.

13    Q.  What do you do for a living?

14    A.  I'm an attorney.

15    Q.  When did you graduate from law school?

16    A.  In 1990.

17    Q.  Did there come a time when you started working for the

18    Yurok tribe?

19    A.  Yes, in October of 2002.

20    Q.  And the Yurok tribe, is that spelled Y-U-R-O-K?

21    A.  Yes.

22    Q.  Where is the Yurok tribe?

23    A.  It's in remote northern California, in the Redwood Forest,

24    in between Crescent City and Eureka.

25    Q.  You said you started there in 2002, is that right?

1    A.  Yes, I did.

2    Q.  How long did you continue to work there?

3    A.  I worked there until March of 2006.

4    Q.  And what position did you have when you were at the Yurok

5    tribe?

6    A.  I was hired to be their first in-house senior attorney.

7    Q.  How was the Yurok tribe doing financially when you started

8    there in 2002?

9    A.  Terribly, actually.  They had just had a major fish kill

10   that made national news.  The salmon fishing industry was very

11   strong there, and it was basically wiped out.  There was no --

12   there was no independent revenue for the tribe at all at that

13   time.  They didn't have a casino, they didn't have any

14   businesses, other than a local hotel.  The town of Klamath,

15   population of about 800 people.

16   Q.  OK.  Did there come a time after you started working there

17   that the tribe received a proposal to become involved in a

18   lending business?

19   A.  Yes.

20   Q.  And who presented that proposal, initially?

21   A.  A gentleman named Terry Handran presented it, and he was

22   accompanied by Steve Potter.

23   Q.  And did he present the proposal to you?

24   A.  Yes, he did.  He was directed to me by the tribal council.

25   Q.  How did Mr. Handran and Mr. Potter describe the proposal to

1    you?

2    A.  Originally they stated it was going to be a bank, a bank,

3    and that changed later, with time.

4    Q.  A bank where?

5    A.  On Yurok land, specifically a vacant piece of land just

6    across the street from my office -- you could see it from my

7    window -- where the casino now sits.

8    Q.  And a bank to do what?

9    A.  Well, that wasn't clear at first.  Of course, when someone

10   says a bank, I'm thinking, you know, a place where you have

11   accounts and you have checking, savings, typical bank.  Later,

12   it was characterized more as a micro-lending type institution,

13   but again, not in the traditional lending sense of like only

14   loans but certain types of loans.

15   Q.  And you said micro-loans?

16   A.  Yes.

17   Q.  What do you mean by that?

18   A.  Well, at the time loans with less than $5,000 that were

19   unsecured and tied up only to one's employment were becoming --

20   they were just coming into existence, and so it was presented

21   to me as a micro-lending operation in that sense.

22   Q.  OK.  And was it presented that this venture would create

23   jobs for people who were part of the Yurok tribe?

24   A.  Yes, and there was radical unemployment on the reservation.

25   Q.  And did --

1   A.  No employment opportunities.

2   Q.  I'm sorry.

3   A.  It's OK.

4   Q.  Did Mr. Handran and Mr. Potter make presentations to the

5   tribal council?

6   A.  Yes, they did.

7   Q.  And did you attend that presentation?

8   A.  Not that I recall, I don't believe I did.

9   Q.  After they made their presentation, did you receive any

10  instructions?

11  A.  Yes.  The tribal council asked me to do due diligence on

12  both Mr. Handran, Mr. Potter and the idea generally that they

13  had presented.

14  Q.  Did you have, as part of that process, additional

15  discussions with Mr. Handran and Mr. Potter?

16  A.  Yes.  At the point that the tribal council was interested

17  in pursuing Mr. Handran's proposal, Mr. Handran wanted to speak

18  to all -- myself, the tribal president, Howard McConnell, the

19  then executive director, Troy Fletcher, and myself on a

20  conference call with a person he called his principal.

21  Q.  Just to be clear, a person who called his principal?

22  A.  Terry Handran.

23  Q.  So Mr. Handran said he wanted you to have a call with his

24  principal?

25  A.  Correct.

1  Q.  Did he say who that gentleman was?

2  A.  Yes, a gentleman named Scott Tucker.

3  Q.  When he said he wanted you to have a call with Mr. Tucker,

4  did you in fact have a call with Mr. Tucker?

5  A.  Yes, we did.  It was in my office.

6  Q.  What, if anything, do you recall about that call?

7  A.  Well, Mr. Tucker was very personable, and if we were to put

8  it in business terms, it was like a meet-and-greet but you

9  couldn't actually see the person, obviously, it was a telephone

10  conference.  And Mr. Tucker expressed his enthusiasm about

11  engaging in business with the tribe and looked forward to a

12  positive relationship with regard to this business, and he also

13  wanted to -- well, he wanted -- he invited Mr. McConnell,

14  Mr. Fletcher and myself to come to his office in Kansas City,

15  Kansas, not Missouri.

16  Q.  During the call, did Mr. Tucker say anything about his

17  existing business?

18  A.  Not really.  He just said that he was in a -- I don't want

19  to misquote and I don't want to misstate, but it reiterated the

20  micro idea and that he felt it would be very lucrative for the

21  tribe to engage in that activity.

22  Q.  OK.  So you mentioned that Mr. Tucker invited you to a

23  meeting?

24  A.  Yes, he did.

25  Q.  Prior to that meeting, did the tribe take any steps to show

1   its interest in potentially doing business with Mr. Tucker?

2   A.  Yes.  Mr. Handran and Mr. Potter, the two gentlemen who

3   initially approached the tribe about this venture, did have

4   occasion to meet with both the tribal president and some of the

5   council members away from a generic council meeting.  There

6   were discussions, so yeah, there was a general enthusiasm

7   because the gaming compact had fallen through with the state of

8   California, so they had no economic development at that time.

9   Q.  Are you familiar with the Yurok Lending Corporation?

10  A.  Yes, I am.

11  Q.  Were any steps taken with respect to that corporation prior

12  to the meeting with Mr. Tucker?

13  A.  Yes.  Terry Handran produced the document entitled Yurok

14  Lending Corporation, called YLC, and what it was -- it wasn't

15  incorporation under a tribal structure, which is similar to

16  incorporating in a state, and so it created the Yurok Lending

17  Corporation under the tribal authority to create corporations.

18  Q.  OK.  You also mentioned there was a meeting in Kansas City.

19  Just so we're clear, who went to this meeting?

20  A.  It was myself, the tribal president, Howard McConnell, Troy

21  Fletcher, council member Larry Hendricks, my husband Mel, and

22  that's about it, and I believe Terry Handran -- yeah, Terry

23  Handran was with us as well.

24  Q.  How did you get to the meeting?

25  A.  Mr. Tucker flew us in a Learjet.

Q.   Did you understand that to be his jet?

A.   Yes.

Q.   And where did he take you in the jet?

A.   He took us to a business park.  I want to say it was

Overland, Overland, Kansas.  It was not far away from the

airport.  It was, you know, he had a car pick us up and they

took us there.

Q.   And what did you observe when you got to the Overland

location?

A.   It was really beautiful.  It was really beautiful.  I mean,

it was a modern building, well-manicured grounds.  He took us,

met us downstairs, took us into the building, up to -- I don't

remember which floor, but if you can picture an entire floor of

a business center, full of cubicles, lots of noise, phones

ringing, people talking to people.  We were escorted down this,

like, corridor of cubicles to a conference room, and we were --

we sat down at a conference table, and there were some people

from his company there and his mother.

                (Continued on next page)

1   BY MR. VELAMOOR:

2   Q.  When you say "his," you mean Mr. Tucker?

3   A.  Yes.

4   Q.  When you sat down at the conference table, what happened at

5   the meeting?

6   A.  Well, Mr. Tucker showed us a commercial for his payday

7   lending company in Kansas.  Now, I don't know whether he was

8   already running that commercial in the market or not, but he

9   showed it to us -- so he showed us the commercial.  And then

10  when the commercial was over, there was a little bit of a

11  presentation about the business, what it did, how it would work

12  in Yurok country, and the potential for revenue to come to the

13  tribe through that business.

14  Q.  When you say there was a discussion of how it would work

15  and what revenue would come to the Yurok tribe, what do you

16  recall about that?

17  A.  I remember him saying that -- OK.  The loans that he was

18  referring to were usually made at that time probably less by

19  Internet, more by phone, because Internet wasn't really that

20  big yet.  He said that the applications would come in to the

21  call center, which was apparently where we were, so I will call

22  it his business center.  And then he would fund -- he would

23  fund the loans through the Yurok Lending Corporation, who would

24  then send the loans out, and then the people would send the

25  payments to the Yurok Lending Corporation on Indian territory.

1    And then they would send the checks back to him in Kansas, and

2    then the tribe would receive 1 percent of the amount of

3    payments that came in.

4    Q.  You said they would send the checks back to Kansas?

5    A.  Yes.

6    Q.  Who do you mean by "they"?

7    A.  Mr. Tucker's company.

8    Q.  Sending the checks, do you mean the borrowers would send

9    the checks?

10   A.  Yes.

11   Q.  What would the Yurok tribe or YLC get out of this?

12   A.  They would receive 1 percent of all revenue received from

13   those payments that people would send to the Yurok Lending

14   Corporation in Yurok country.

15   Q.  Do you recall a name during this meeting that Mr. Tucker's

16   business was currently doing business under?

17   A.  It was something -- it had cash in it, quick cash, fast

18   cash, something like that.

19   Q.  Now, was there any discussion at the meeting of what, if

20   any, role the tribe or YLC, Yurok Lending Corporation, would

21   play as part of Mr. Tucker's proposal?

22   A.  Well, in the beginning, it seemed like a job creator for

23   Yurok tribal members, where they would actually be originating

24   the loans, taking applications, doing what one normally does.

25   That changed.  So during the meeting with Mr. Tucker, he had

1   said that to show his good faith for entering into a business

2   deal with him, they would -- they being Mr. Tucker's company --

3   would make good-faith payments to the tribe in exchange for

4   engaging in this lending business.

5   Q.  Do you recall how much the good-faith payments would be?

6   A.  At that time, it was 12,500, and that figure appeared later

7   after the meeting.

8   Q.  So you said you were there with Mr. McConnell and other

9   members of the tribal council?

10  A.  Yes.

11  Q.  How did they receive Mr. Tucker's presentation?

12  A.  They were impressed.  They liked the idea of bringing some

13  solid revenue into the tribal government, into the tribe

14  itself, because like I said, it was very impoverished and had

15  lost their gaming compact.

16  Q.  As the meeting was breaking up, did you observe anything

17  else?

18  A.  Yes, I did.  As I was leaving, I wanted to thank Terry for

19  the time -- it was a professional thing that you do -- and as I

20  was leaving, I was looking for him, and I happened to turn

21  around and look over my shoulder, and I saw Mr. Tucker go to

22  shake Terry's hand and he had in it what appeared to me to be a

23  large quantity of cash.

24  Q.  Who handed who cash?

25  A.  Mr. Tucker handed Mr. Handran some cash.

1    Q.  After the meeting, did you receive any further instructions

2    from Mr. McConnell?

3    A.  Yes.  The tribal president was very enthusiastic about this

4    project, and he basically directed me to do what I had to do to

5    get it done.

6    Q.  As part of that, did you have further interactions with Mr.

7    Tucker about the business opportunity?

8    A.  Yes.  I did a follow-up e-mail, as I usually do to folks

9    that want to do business in Indian country.  It's usually left

10   on the attorney to do these types of things.  And I expressed

11   my gratitude for having us come to his place of business.

12   Additionally, I had suggested that perhaps as part of what we

13   were going to be doing, that maybe he could create some kind of

14   an internship for Yurok students, maybe so that they can learn

15   the business, something to bring this element of giving tribal

16   members jobs.

17   Q.  Let me show you what is marked --

18              THE COURT:  I am going to hold you in suspense, ladies

19   and gentlemen, over the lunch break.  Please do not discuss the

20   case among yourselves or with anyone else, and we will pick up

21   at 2:00.  Thank you very much.

22              (Jury exits courtroom)

23              THE COURT:  Have a pleasant lunch.

24              (Luncheon recess)

25

1                          AFTERNOON SESSION

2                             2:00 p.m.

3              THE COURT:  Please bring our jury in.

4              (Jury present)

5    LISA ADAMS, resumed.

6              THE COURT:  I want to say that you, ladies and

7    gentlemen, are a pleasure to have as jurors.  You really pay

8    attention.  You're good on time.  And it makes the whole

9    experience better for everyone.  And you can just imagine how

10   one little breakdown can cause things to come off the rails.

11   So I am very grateful for your hard work.

12             You may continue.

13             MR. VELAMOOR:  Thank you, your Honor.

14   BY MR. VELAMOOR:

15   Q.  Ms. Adams, when we broke for lunch, I believe you were

16   talking about the e-mail you sent to Mr. Tucker after the

17   meeting in Kansas City?  Do you recall that?

18   A.  Yes.

19   Q.  I am going to show you what has been marked as Government

20   Exhibit 901.

21             What is 901?

22   A.  It is my e-mail to Mr. Tucker thanking him for his

23   hospitality on behalf of the tribal council members, executive

24   director and myself, for the meeting in Kansas City, and his

25   response to me indicating that he was going to send a contract,

H9I8TUC4                    Adams - Direct

1   basically.

2           MR. VELAMOOR:  On that basis, the government offers

3   901.

4           THE COURT:  Any objection?

5           MR. GINSBERG:  No objection, your Honor.

6           THE COURT:  Received.

7           (Government's Exhibit 901 received in evidence)

8           MR. VELAMOOR:  May we show it to the jury, please.

9           THE COURT:  You may.

10  Q.  Why don't we start on the second page.

11      I believe you discussed the "thank you" portion of the

12  e-mail that you sent him, correct?

13  A.  Yes.

14  Q.  You state there on the top, "The powers that be here were

15  most impressed and enthusiastic about this endeavor."  Do you

16  see that?

17  A.  Yes.

18  Q.  Now, at the bottom you state, "Per Terry's request, I have

19  attached the agreement between CVC and YLC for your signature."

20          What did you mean by CVC?

21  A.  CVC was the acronym for the company that was later changed.

22  It was the company -- YLC was the Yurok Lending Corporation;

23  CVC would have been, we'll call it, the servicing company.

24  Q.  Whose company was CVC?

25  A.  Scott Tucker's.

1    Q.  That's an e-mail signed by yourself?

2    A.  Yes.

3    Q.  Why don't we move to Mr. Tucker's response.

4         MR. VELAMOOR:  Can we enlarge that, please.

5    Q.  That response is dated May 11, 2004, correct?

6    A.  Yes.

7    Q.  So initially he mentions that he enjoyed meeting you and

8    the others at the meeting, right?

9    A.  Yes.

10   Q.  In the second line he references the Federal Express.  We

11   will talk about that in a second.

12        He also references a check, per our agreement, for the

13   first payment?

14   A.  Correct.

15   Q.  Did he in fact send a check?

16   A.  Yes.

17   Q.  What was that check for?

18   A.  It was one of the good-faith payments that he referenced.

19   He said that he would send six months, I believe six months of

20   good-faith payments to the tribe.

21   Q.  On the last line, "We will start funding this business."

22   Do you see that?  Do you see that?

23   A.  Yes.

24   Q.  What did you understand him to mean by "we will start

25   funding this business"?

1    A.   That Universal Management Services, Inc., formerly CVC,

2    will begin funding the lending operation of YLC.

3            And basically ramping up the business to me meant you

4    are going to start making lending transactions through the YLC

5    in Yurok country.

6    Q.   When did you understand Mr. Tucker wanted to start doing

7    that?

8    A.   Well, he made it clear at the meeting, not as to the exact

9    date, but that he wanted to get things going as soon as

10   possible.  So that's two weeks later, a little more than two

11   weeks later.

12   Q.   So the e-mail is May 11 and the reference from Mr. Tucker

13   is June?

14   A.   Yes.

15   Q.   Now, we will go back to the previous two paragraphs.  You

16   mentioned that the initial company name was CVC and that

17   changed?

18   A.   Yes.

19   Q.   Is that the reference by Mr. Tucker there to the change in

20   name?

21   A.   That's correct.

22   Q.   So it was changed to Universal Management Services?

23   A.   Yes, or UMS.

24   Q.   Did he in fact send you by Federal Express, which is

25   referenced in the e-mail, a contract?

1   A.  Yes, he did.

2   Q.  I will show you what has been marked as Government Exhibit

3   909.

4   A.  OK.

5   Q.  Have you had a chance to look at 909?

6   A.  Yes.

7   Q.  What is 909?

8   A.  909 is a photocopy of a Federal Express envelope, addressed

9   to me at the Yurok tribe from Scott Tucker, front and back, as

10  well as a copy of an executed services contract between United

11  Management Services, I will refer to as UMS, and YLC, Yurok

12  Lending Corporation.

13  Q.  You said United Management Services.  Did you mean --

14  A.  Universal.

15          MR. VELAMOOR:  The government offers 909.

16          MR. GINSBERG:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 909 received in evidence)

19          MR. VELAMOOR:  May we show it to the jury, please.

20  Q.  So the first page, is this the image of the FedEx envelope?

21  A.  Yes.  The air bill, yes.

22  Q.  The sender here is S. Tucker, National Money Service, to

23  Lisa Adams at the Yurok tribe, senior attorney?

24  A.  Yes.

25  Q.  Turn to the next page.

1          MR. VELAMOOR:  Can you highlight part C?

2     Q.  First of all, this is an agreement between Universal

3     Management Services located in Nevada -- do you see that at the

4     top?

5     A.  That's correct.

6     Q.  -- and Yurok YLC?

7     A.  Yes.

8     Q.  Is that the corporation that the tribe created before the

9     meeting in Kansas City?

10    A.  Correct.

11    Q.  Can you go ahead and read C?

12    A.  "UMS is a Nevada corporation in the business of providing

13    capital, processing and management services to consumer and

14    commercial finance lenders and credit service providers,

15    including but not limited to the small loan industry."

16    Q.  Down to D.  Can you read that?

17    A.  Yes.

18          "YLC is desirous of obtaining capital and

19    administrative support from UMS for the purpose of operating a

20    nationwide (all 50 states) lending and credit services business

21    on tribal land and for the benefit of the tribe and its

22    members."

23    Q.  Were you aware at the time you received this contract that

24    the intention was to operate a nationwide lending business?

25    A.  No.  Initially it was presented to me as a local operation,

1    and initially it went from within the Yurok reservation to

2    local, meaning as far north as Crescent City, possibly as far

3    south as Del Norte and Humboldt counties.

4    Q.  Are those counties in the vicinity of Yurok tribe?

5    A.  Yes.  The Klamath River divides the reservation, Humboldt

6    is on one side and Del Norte is on the other.

7    Q.  Can we turn to the next page.

8        There is a part 2.  Do you see that?

9    A.  Yes.

10   Q.  Part 2 sets forth what UMS would be doing as part of this

11   agreement.  Do you see that?

12   A.  Yes.

13   Q.  Can you read part 2?

14   A.  "Services.  UMS shall exclusively provide the following

15   management services to YLC:

16       "A.  All aspects of staffing this type of business.

17       "B.  All aspects of the marketing of this type of business.

18       "C.  All aspects of the servicing of this type of business.

19       "D.  All aspects of collection for this type of business.

20       "E.  All aspects of financial administration of this type

21   of business.

22       "F.  All aspects of the processing for this type of

23   business.

24       "G.  All aspects of administering this type of business."

25   Q.  UMS, to be clear, was whose company?

1   A.   Scott Tucker's.

2   Q.   Why don't we move on to 3.

3        There is a sentence on the third line at the end beginning

4   with "parties."  Do you see that?

5   A.   Yes.

6   Q.   Can you read that sentence to the end of the paragraph?

7   A.   "Parties understand that UMS will be responsible for

8   sourcing all moneys lent by the YLC to borrowers from various

9   institutions.  UMS is liable for the loss of those moneys.  YLC

10  agrees that UMS shall have total authority over all bank

11  accounts that handle any funds for management and servicing of

12  the business."

13  Q.   So after you received this agreement, what role did you

14  understand that YLC would be making as part of this business?

15  A.   Existing on the reservation.

16  Q.   When you say existing, what do you mean?

17  A.   Having a physical location within reservation boundaries

18  which, unless it's fee land or allotment land, means tribal

19  land.

20  Q.   What role did you understand that YLC would be playing in

21  making any loans?

22  A.   Based on this agreement, none.

23  Q.   Who did you expect to be the source of capital for making a

24  loan?

25  A.   UMS exclusively.

1   Q.  What role did you expect YLC to play in setting payment

2   terms?

3   A.  None.

4   Q.  Interest rates?

5   A.  None.

6   Q.  The amount of loans?

7   A.  None.

8   Q.  Credit decisions?

9   A.  None.

10  Q.  Enforcement decisions?

11  A.  None.

12  Q.  Why don't we turn to the next page.

13      So there is a compensation section.  Do you see that?

14  A.  Yes.

15  Q.  Then there's three paragraphs A, B and C relating to the

16  payments to the tribe.  Do you see that?

17  A.  Yes.

18  Q.  It's broken down into:  "YLC shall pay UMS fees of 99

19  percent of gross profits."  Do you see that?

20  A.  Yes.

21  Q.  "YLC shall retain 1 percent of the gross profits."

22  A.  Yes.

23  Q.  And, "UMS guarantees the monthly payments will be $12,500."

24  A.  Yes.

25  Q.  Now, based on your discussions with Mr. Tucker, did you

1   expect that YLC or the Yurok tribe would be sending any checks

2   to Mr. Tucker for the 99 percent of gross profits?

3   A.  No.  Based on this, the express language, meaning the

4   language as it's written, implies that it will, but what we

5   were told at the meeting was all of the payment checks would

6   be -- and I will quote him -- opened at the Yurok facility,

7   whatever that facility turned out to be, and then sent to his

8   office, his headquarters.

9   Q.  Who would actually be cutting checks for the tribe's

10  portion?

11  A.  That would be UMS.

12  Q.  So the tribe would receive its payment?

13  A.  Quarterly.

14  Q.  And those payments equaling the 1 percent?

15  A.  That's correct.

16  Q.  Would come from Mr. Tucker?

17  A.  Correct.  And the payments under the agreement would be at

18  least 12,500 because that was the amount that was guaranteed.

19  Q.  Let me turn to the fifth page.

20      Who signs on behalf of Universal Management Services?

21  A.  Scott Tucker.

22  Q.  After you got this agreement, did you have a discussion

23  with Mr. Tucker?

24  A.  Yes, I did.

25  Q.  What did you express to him after you got the management

1   agreement?

2   A.  I still wasn't clear about what the tribe's role would be.

3   As initially presented, this was going to be a -- I hate to use

4   this phrase, but a win-win for both the tribe and for Mr.

5   Tucker.  But when I saw this agreement, it was clear that any

6   discretion, any decision-making with regard to any of the

7   lending activities that he was proposing in Yurok territory,

8   meaning on the reservation, will be carried out by Universal

9   Management Services, that the tribe literally would have a

10  place for something to happen, and that something would be

11  receiving payments and then forwarding them on, and that is

12  almost literally what it says, and that concerned me.

13  Q.  Did you express those concerns to Mr. Tucker?

14  A.  I did.  But, you know, to go back almost 14 years and

15  recall the exact conversation, I can just give you the gist of

16  it, which is that when I questioned the -- we will call it the

17  negotiability of this agreement, there was none.  And that when

18  I asked questions, some of which came from some of the tribal

19  council members who had not attended the trip, the question

20  was, what is the tribe exactly going to be doing here?

21  Q.  How did he respond?

22  A.  He got mad.  When you're speaking to someone on the phone,

23  you can tell when their voice changes from -- normally, Mr.

24  Tucker was very congenial, very nice, and when I started asking

25  questions about this agreement, his voice got more terse.  He

1   didn't yell.  You could tell that he was -- angry, that implies

2   kind of an explosive emotion.  It was more like irritated.  He

3   didn't want to be questioned, was the impression that I got.

4   Q.  You mentioned that you expressed your questions about the

5   tribal role orally.  Did you also express them in writing?

6   A.  Yes, I did.  Anything that I spoke to Scott Tucker about,

7   for the most part I had sent an e-mail.  Because usually

8   council members do come in and ask a question -- I can't really

9   go into that, but, yes, I followed up in writing nine out of

10  ten.

11  Q.  I am going to show you what has been marked as Government

12  Exhibit 902.

13  A.  Yes.

14  Q.  What is 902?

15  A.  It's an e-mail that I sent to Mr. Tucker after receiving

16  the management services contract.  Basically -- and his

17  response.

18  Q.  OK.  We will get into the substance in a minute.

19              MR. VELAMOOR:  The government offers 902.

20              MR. GINSBERG:  No objection.

21              THE COURT:  Received.

22              (Government's Exhibit 902 received in evidence)

23              MR. VELAMOOR:  Show 902 to the jury.

24  Q.  Let me start with your e-mail at the bottom, June 7, 2004.

25  Do you see that?

1    A.  Yes.

2    Q.  There is a sentence you begin with "hey."  Do you see that?

3    A.  Yes.

4    Q.  You mentioned, "Hey, perhaps --

5            THE COURT:  Begin again.

6    Q.  As you mentioned, "Hey, perhaps down the line apiece you

7    might consider actually having a call center here -- nothing

8    huge -- that could employ tribal members from the Yurok and

9    Karuk tribes."  You mentioned some other tribes there?

10   A.  Yes.

11   Q.  Turning to the next page.

12       Then you go on on the second line, about halfway, "We are

13   so rural that the employment opportunities of any substance

14   are, well, nonexistent outside of the casino"?

15   A.  Yes.

16   Q.  You talk about tribal members learning a marketable skill?

17   A.  Yes.

18   Q.  In the next paragraph you propose a different idea.  What

19   is the idea you propose in the second paragraph?

20   A.  Sponsoring a paid internship in his headquarters in Kansas

21   City and the benefit to him, because we are talking about a

22   business relationship, and there are certain tax credits that

23   you get for employing Native Americans, federal tax credits.

24           So, basically, what I was looking for was some more

25   substantive tribal people participation in his business as it

1   was going to be set up in tribal territory, in the Yurok's

2   nation.

3   Q.   Why don't we turn to Mr. Tucker's response.

4        Go ahead and read the first paragraph.

5   A.   "I would be very interested in exploring some of the ideas

6   and options you are discussing below.  We could start slow and

7   build from there."

8   Q.   Go ahead.  Continue.

9   A.   "The first one that comes to mind is:

10       "For all of the financial services business that I am

11  involved with the tribe I would start having all of the mail

12  that is associated with that or those businesses sent directly

13  to the business address at the reservation.  There would be

14  some employees that would be responsible for collection of all

15  the mail and forwarding it to us for processing on a daily

16  basis.  It does not sound like much but it is a start.

17       "Let me know what you think."

18  Q.   Now, was receiving and forwarding mail what you had in mind

19  in terms of tribal involvement in the business?

20  A.   Absolutely not.

21  Q.   Did Mr. Tucker ever propose anything beyond the processing

22  of mail?

23  A.   No.

24  Q.   How many times did you raise, in the course of your

25  discussions with Mr. Tucker, how many times did you raise the

1   role that tribal balance members would play as part of this

2   operation?

3   A.   Numerous.  Because, again, when you come to a tribe with a

4   business proposal, regardless of whether it, quote unquote,

5   makes money for the tribe, you're dealing with, nine out of

6   ten, an impoverished area with low employment rates.  And so

7   the more tribal members that you can get involved in learning

8   that business and ultimately running it, it benefits the tribe

9   to a degree and to an extent that would be beneficial to the

10  tribe as a home and make them more independent from the federal

11  government.

12  Q.   Did Mr. Tucker, in the course of those discussions, ever

13  describe anything beyond processing and forwarding mail?

14  A.   No.

15  Q.   So from this point on, how did the process go forward in

16  the tribe in terms of this proposal from Mr. Tucker?

17  A.   Well, like any government, in order to create certain

18  things, meaning certain activity, whether it be creating a

19  crime by enacting a statute -- in tribal speak that means an

20  ordinance -- to make something illegal, or carry on certain

21  transactions in Indian country, you have what is called a

22  tribal code.  And in this case, what we were told -- we being

23  the tribe, meaning myself and Troy Fletcher, the executive

24  detector -- is that Mr. Tucker would be sending an ordinance

25  that would, quote unquote, cover the lending activity -- so

1    it's an enabling statute -- that would allow Yurok Lending

2    Corporation to exist as well as carry on lending activities in

3    the Yurok reservation, on the Yurok reservation, with all

4    lending services governed by and overseen by and carried out by

5    UMS.  It all tied together.

6    Q.  So you mentioned that Mr. Tucker sent this lending

7    ordinance?

8    A.  Yes, he did.

9    Q.  Who typically drafted the tribe's ordinances?

10   A.  I did.

11   Q.  Did you have any role in drafting this particular

12   ordinance?

13   A.  No.

14   Q.  Now, in order to go forward after receiving the ordinance,

15   briefly speaking, what happens after that?

16   A.  OK.  The Yurok tribe had an initial reading of the

17   ordinance, where the tribal council would vote either to pass

18   it or not at that first reading.  The first reading of this

19   ordinance, it passed.

20        At that point, it would go out for public comment.

21   The Yurok tribe had a headquarters, the main government office

22   was in Klamath, and there was another office up river at

23   Weitchpec.  The ordinances would be posted in the tribal

24   offices, and then the ordinance opened for public comment.

25        My staff attorney, John Corbett, went up to the

1    Weitchpec office and attended the public hearing there.  I

2    attended the public hearing in Klamath.  That public hearing

3    phase is, under the Constitution, 30 days.

4        After that 30 days, the council reconvenes, provided there

5    is a quorum, which is not necessarily predictable, and they

6    review the comments, they make whatever changes they deem are

7    reasonable or acceptable to them, and then that ordinance

8    becomes a law of the tribe and is included in the tribal code.

9    And in this case, it would have been a chapter in the business

10   corporation's code.

11   Q.  The process you described, how long could such a process

12   take?

13   A.  Well, the public hearing process is fairly quick, but it's

14   the getting the council quorum part that could be a bit of a

15   challenge.  It was a council of, I believe, nine.  If two

16   people are traveling you don't have a quorum.  So it could be

17   anywhere from 30 to 180 days, sometimes more, after an

18   ordinance has already gone through public hearing to actually

19   be enacted into a law.

20   Q.  So it could take months?

21   A.  Oh, yeah.

22   Q.  So did this process begin with respect to the lending

23   ordinance received from Mr. Tucker?

24   A.  Yes.  Tribal council passed it and then sent it out for

25   public hearing.

1   Q.  But it wasn't finally approved?

2   A.  No.

3   Q.  As the process was moving forward, did you have discussions

4   with Mr. Tucker about it?

5   A.  Yes, several.  Again, it was a long time ago, but the gist

6   of the discussions were, why is it taking so long, what are

7   they doing, what's happening, and I am paraphrasing here.

8   Q.  Who was asking, why is it taking so long?

9   A.  Mr. Tucker was.

10  Q.  During at least some of this time period, was the tribe

11  continuing to receive the good-faith checks that you discussed

12  earlier?

13  A.  Yes.  They received checks, I don't recall the months, but

14  at one point after -- I don't remember how many discussions we

15  had about, why isn't the council passing this ordinance yet.

16  Sometime after one of those discussions, the checks stopped

17  coming and the council expressed concern, as did the fiscal

18  director.

19  Q.  Let me show you what has been marked as Government Exhibit

20  905.

21  A.  OK.

22  Q.  In the course of your conversations with Mr. Tucker about

23  the ordinance process, did Mr. Tucker ever ask that the process

24  be expedited in any way?

25  A.  He never directly asked it, but again, one can tell from

1    the tone of voice and the fact that nothing was really

2    happening beyond a public hearing at that point, you could tell

3    it bothered him.

4    Q.  I showed you what has been marked as Government Exhibit

5    905.

6    A.  Yes.

7    Q.  What is 905?

8    A.  905 are photocopies of checks that were made out to the

9    Yurok tribe and reflected the $12,500 good faith amount that

10   Mr. Tucker had agreed to provide the tribe, which at some point

11   they would be expected to repay once the lending business got

12   started.

13            MR. VELAMOOR:  The government offers 905.

14            MR. GINSBERG:  No objection.

15            THE COURT:  Received.

16            (Government's Exhibit 905 received in evidence)

17            MR. VELAMOOR:  May we show it to the jury, Mr. Beer.

18   Q.  So there are several checks as part of this exhibit,

19   correct?

20   A.  Yes.

21   Q.  Now, on the first check, this is from which entity?

22   A.  It came from Universal Management Services, Inc.

23   Q.  It's in the amount of $12,500?

24   A.  Yes, sir.

25   Q.  It's to the Yurok tribe?

1    A.  Yes.

2    Q.  The memo there says "tribal management fees"?

3    A.  Correct.

4    Q.  What did you understand that to mean?

5    A.  You know, I don't know.  In light of the UMS agreement

6    itself, the plain language says that UMS is managing

7    everything.  It would make no sense for it to be a management

8    fee to itself.  I would have preferred it would say something

9    like a good faith -- something reflecting what he said it was.

10   So, honestly, I don't know what tribal management fees means.

11   Q.  Why don't we turn to the next page.

12       This check is from CLK Management?

13   A.  Yes, that's correct.

14   Q.  Now, if you go through these checks, there appear to be in

15   some cases multiple checks for the same month?

16   A.  Yes.

17   Q.  For example, the second page says October management fees,

18   correct?

19   A.  Yes.

20   Q.  And on the page after that, there is another check with a

21   different date, it's also for October management fees?

22   A.  That's correct.

23   Q.  Do you know why there was multiple checks for the same time

24   period?

25   A.  Yeah.  There was something that had to do with where it

1    went.  Honestly, I don't really recall the details, but there

2    was some kind of strange kerfuffle with the check for October.

3    And beyond that, honestly, I couldn't tell you.  But there were

4    multiple checks issued for that month.

5            MR. VELAMOOR:  We can take that down.

6    Q.  You said at a certain point these good-faith payments

7    stopped.  Did you know why?

8    A.  Yes.  Basically, the council wasn't moving to pass the

9    ordinance.  Again, when you're in October and November,

10   September, in Yurok country, there's a lot of things going on;

11   it's hard to get a quorum.  Basically, Mr. Tucker was

12   expressing his frustration, he said, well, words to the effect

13   of, why would I pay something to the tribe and get nothing in

14   return, why would I pay something for nothing?  And that, I

15   believe, was a reference to the fact that without the

16   ordinance, YLC could not -- it could exist, but it couldn't

17   carry on business.  And so he is losing money for every month

18   that that company is not up and running in Yurok country, is

19   what it amounts to from a business standpoint.

20   Q.  So you mentioned that the tribe never ultimately adopted

21   the ordinance as a final matter?

22   A.  To the best of my knowledge, they did not.

23   Q.  What ultimately happened with respect to the relationship

24   with Mr. Tucker?

25   A.  It ended.  I don't want to give the misimpression that we

1   had this conversation and then it just stopped.  The tribe was

2   notified that there was litigation possibly pending, or that

3   could arise somewhere else, and that he was going to focus more

4   on that and basically put a hold on everything that was

5   happening with the Yurok tribe, because the ordinance hadn't

6   been passed yet, to focus on that litigation.

7   Q.  To the end, did you continue to have discussions with Mr.

8   Tucker about what the business would look like and what the

9   tribal role would be in that business?

10  A.  Yes.  As a matter of fact, the tribal council did want to

11  still see where this might go.  And to that end, as is typical

12  with tribal councils, they wanted to meet Mr. Tucker and one of

13  his attorneys.  They wanted these two individuals face-to-face

14  in council chambers to ask questions.  They got tired of me

15  being the middleman, which often happens with tribal councils.

16  They want to bring somebody in front of them, to look at them,

17  to assess are these people truthful, do we believe them, we

18  want to ask you questions, that type of thing.  So they wanted

19  a face-to-face, which they had never gotten.

20  Q.  Did you express the council's desire to meet Mr. Tucker and

21  his attorney --

22  A.  Yes.

23  Q.  -- to Mr. Tucker?

24  A.  Yes.  In an e-mail, yes.

25  Q.  Did either Mr. Tucker or his attorney ever come to the

1    council to appear?

2    A.   No.

3    Q.   Did YLC ever, to your knowledge, engage in any lending

4    operations?

5    A.   To the best of my knowledge, no.

6            MR. VELAMOOR:  No further questions, your Honor.

7            THE COURT:  All right.  Cross-examination.

8            MR. GINSBERG:  Thank you, your Honor.

9    CROSS-EXAMINATION

10   BY MR. GINSBERG:

11   Q.   Good afternoon, Ms. Adams.

12   A.   Hello.

13   Q.   The bottom line is that no final transaction or no final

14   business took place between Yurok and Scott Tucker or one of

15   the companies that he was involved in, is that fair to say?

16   A.   Yes.

17   Q.   Would it also be fair to say that the beginning of the

18   discussions about this possible business happened either in

19   early 2004 or late 2003?

20   A.   My recollection is 2004.

21   Q.   The communications that you referenced between yourself and

22   Mr. Tucker and other individuals continued throughout the 2004

23   period all the way through till about August of 2005?

24   A.   That sounds about right.

25   Q.   And then that was the point that this all ended, is that

1  correct?

2  A.  Yes.

3  Q.  You have expressed to us that you received various

4  documents, in fact, some of the exhibits that were shown to you

5  here by the government today, correct?

6  A.  Yes.

7  Q.  And you expressed to us that on at least some occasions,

8  you weren't clear about the language in the documents, or it

9  wasn't what you had expected to see, is that fair to say?

10  A.  That would be fair to say.

11  Q.  First of all, let's go back to, is it Mr. Handran?

12  A.  Terry Handran, yes.

13  Q.  He was the first person who introduced some kind of a

14  financial concept to you and the tribe, and that was about a

15  bank?

16  A.  That's correct.

17  Q.  What was his relationship to the tribe at the time?

18  A.  He didn't have any that I knew of.  Generally speaking,

19  in-house attorneys for tribes will be sent people with business

20  proposals to listen to what they have to say and then take it

21  up with either the executive director and the tribal president,

22  usually.  That's generally how things are done.

23  Q.  He didn't have a position with the tribe?

24  A.  No.

25  Q.  As far as you know, he wasn't a tribal member?

1    A.  Correct.  He stated he was a member of the Cherokee nation.

2    Q.  But he came to you or the council with this concept, this

3    idea --

4    A.  Correct.

5    Q.  -- of starting a bank?

6    A.  Yes.

7    Q.  At some point, you did some due diligence about him, is

8    that correct?

9    A.  Yes.

10   Q.  And that's how this whole process started?

11   A.  Correct.

12   Q.  As it moved further down the line, it became more of a

13   discussion about a micro-lending or something similar to that

14   kind of a business, correct?

15   A.  Yes.

16   Q.  And very early on Mr. Tucker invited you to come, you told

17   us, to Kansas City and you got flown out there?

18   A.  Yes.

19   Q.  And it seems from your letter to him you all had a good

20   time in Kansas City?

21   A.  Yes, it was a very nice experience.

22   Q.  And you came back and you wrote him a relatively pleasant

23   letter thanking him, correct?

24   A.  Yes.

25   Q.  And his response to you was, I look forward to doing

1  business with you?

2  A.  Yes.

3  Q.  And in addition, he responded by saying, he looked forward

4  to doing business with you in the near future or as soon as it

5  could get started, is that fair to say?

6  A.  Yes.

7  Q.  And that was in June of 2004?

8  A.  Correct.

9  Q.  By August of 2005, when all of this ended, the tribe had

10 still not passed all of the regulations or ordinances or

11 statutes or whatever that needed to be done in order for this

12 business to get started, is that fair to say?

13 A.  That's a correct statement.

14 Q.  And during this period of time, you indicated that there

15 were some conversations you had with Mr. Tucker where you

16 detected his tone of voice changed, that he seemed to be

17 getting aggravated or frustrated, is that fair?

18 A.  Yes.

19 Q.  How much money had he already -- by August 2005, when this

20 all ended, how much money had Mr. Tucker or any of his entities

21 sent to the Yurok tribe?

22 A.  Well, if I could refer to the exhibit.

23 Q.  Do you have the hard copy in front of you?

24 A.  Yes, I do.  Understanding that one of these checks was a

25 duplicate --

1  Q.  You can do the math and discount that one check.

2  A.  About 48 to 50,000, maybe a little more.

3  Q.  So the tribe had received almost $50,000, correct?

4  A.  Correct.

5  Q.  And this was being sent to the tribe as good-faith

6  payments, correct?

7  A.  That's what he said.

8  Q.  And the good faith was that the tribe would complete

9  everything they needed to do --

10  A.  Yes.

11  Q.  -- so that there could be a business started, correct?

12  A.  Correct.

13  Q.  But the tribe never did that?

14  A.  They never completed it.

15  Q.  By August 2005, they never completed all of the things that

16  were necessary, correct?

17  A.  Yes.

18  Q.  But they had the $50,000, correct?

19  A.  Yes.

20  Q.  Did the Yurok tribe send that money back to Scott Tucker?

21  A.  Honestly, I don't know.  That would have come from fiscal.

22  Q.  Well, while you were there and while you were overseeing

23  this back and forth with Mr. Tucker, did you become aware at

24  all of whether any money went back to Mr. Tucker?

25  A.  No.  No, I never did.  I was just in charge of keeping in

1   touch with him about the progress of the ordinance and the

2   legal matters, not the fiscal matters.

3   Q.  You explained to us that the tribe was not doing well

4   financially, is that fair to say?

5   A.  Yeah.  When he first -- well, when Mr. Handran first came,

6   that would be an understatement actually.

7   Q.  So now, all of a sudden the tribe had almost $50,000,

8   correct?

9   A.  Correct.

10  Q.  And as time moved on, it was becoming unclear as to whether

11  or not this business would ever get done with Mr. Tucker or his

12  entities, is that fair to say?

13  A.  That's fair to say, yes.

14  Q.  Did you, as the attorney for the tribe, ever speak to the

15  council or the leader or the chief, whoever the head people

16  are, and say, we have all this money, we haven't completed what

17  we were supposed to complete, we could have a problem here?

18          MR. VELAMOOR:  Objection, your Honor.

19          THE COURT:  Basis.

20          MR. VELAMOOR:  She is an attorney and he is asking

21  about her communications with her client.

22          THE COURT:  You need not disclose any confidential

23  communications between yourself and your client for the purpose

24  of securing legal advice.

25          THE WITNESS:  Yeah, because I don't have a waiver.

1    A.  Could you repeat your question?

2    Q.  The easy way to do this is, did you have a conversation

3    with any of the tribal council members or the leader of the

4    tribe concerning the fact that the tribe had received

5    substantial amounts of money and the business was not yet

6    getting underway?

7    A.  No.

8    Q.  Did any of the tribal members come to you to express a

9    concern about the fact -- just yes or no -- that all this money

10   had come into the tribe and the business did not get started

11   yet?

12   A.  No.

13   Q.  By August 2005, did the tribe have available funds to pay

14   the $50,000 back?

15   A.  I don't know.  I don't know.  They were building a gas

16   station and convenience store.  I don't recall when the

17   construction ended and when it opened.

18   Q.  To your knowledge, were they using the money that they were

19   receiving to pay for that, the convenience store?

20   A.  The gas station and C store was grant funded through

21   federal sources.

22   Q.  Wasn't there some kind of rent or payment that was due

23   monthly for the convenience store or other things located with

24   the convenience store?

25   A.  Honestly, there might have been, but since the Yurok tribe

1  built it and it was -- well, I don't remember, but if there had

2  been, it would have been to the Yurok Economic Development

3  Corporation.

4  Q.  Wasn't there a $12,500 obligation every month by the Yurok

5  tribal foundation to pay for services related to that

6  convenience store?

7  A.  There very well might have been.  I just don't remember.

8  Q.  You just don't remember?

9  A.  Yeah.

10  Q.  I want to go back for a moment to Government Exhibit 909.

11  Do you have that in front of you still?

12  A.  I have got 905.

13  Q.  That's the management services agreement.  You don't have

14  that in front of you?

15  A.  No.

16          MR. GINSBERG:  So the rule is I don't have to ask

17  permission.

18          THE COURT:  Your license is still good, Mr. Ginsberg.

19          MR. GINSBERG:  That's bigger than I was just asking

20  for.

21          THE COURT:  Your license to approach.

22          MR. GINSBERG:  I understand.  License means a lot of

23  things.

24  Q.  You now have that document in front of you, Exhibit 909?

25  A.  Yes.

1    Q.  And you told us that the first page is the cover from a

2    FedEx envelope, is that correct?

3    A.  Yes.

4    Q.  And it's from Scott Tucker to you, correct?

5    A.  Yes.

6    Q.  Does it appear to be dated on May 11?

7    A.  Yes.

8    Q.  The second page, does it appear to be a stamp that has the

9    date May 12 on it?

10   A.  Correct.

11   Q.  Indicating it was received by the Yurok tribe?

12   A.  Yes.  It looks like specifically received by the chair, but

13   I can't tell if that is checked off.

14   Q.  At least it appears that it was received by the tribe?

15   A.  Yes.

16   Q.  Then following that is this management services agreement,

17   correct?

18   A.  Correct.

19   Q.  And the management services agreement, if we can go to the

20   last two pages, are signature pages, is that correct?

21   A.  Yes.

22   Q.  And the first of the two signature pages, that would be

23   page 5?

24   A.  Yes.

25   Q.  Has Mr. Tucker's signature on it, is that correct?

1    A.   That's correct.

2    Q.   And that page is not notarized, is that correct?

3    A.   Correct.

4    Q.   On page 6, the signature is Terry Handran's signature,

5    correct?

6    A.   That's correct.

7    Q.   It says, "Terry Handran, attorney in fact"?

8    A.   That's correct.

9    Q.   Can you tell us what that means, attorney in fact, as a

10   general matter?

11   A.   Sure.  Terry Handran signed as an incorporator for YLC when

12   the YLC articles were created, OK.  He did this with the

13   express permission of the tribal president, because obviously

14   as the in-house attorney, I cannot sign for anything like that.

15   So he signed as the attorney in fact for this particular set of

16   transactions.  The notary, Teela Robison, was a tribal

17   employee.  So he did this at the tribal headquarters on May 12,

18   2004.

19   Q.   Which appears to be the same day that the document was

20   received by the tribe, is that correct?

21   A.   Yes.  That's what the documents indicate.

22   Q.   When he signed that as attorney in fact, right above his

23   name it says YLC, is that correct?

24   A.   That's correct.

25   Q.   Then it says later on that he is an authorized

1   representative of YLC, correct?

2   A.   Correct.

3   Q.   Who was it that authorized this?

4   A.   Howard McConnell, the then tribal president.

5   Q.   Your name was on the front cover of this FedEx, correct?

6   A.   Correct.

7   Q.   Do you recall receiving it yourself first and looking at

8   it?

9   A.   Actually, I would have, yes, it would have come to me.  I

10  don't recall when in the sequence of time during that

11  particular day Terry Handran would have received it and signed

12  it, but he was often -- he had a lot of conversations, ask a

13  number I can't tell you, but he had numerous conversations with

14  Howard McConnell without me or the executive director present.

15       So, yes, this came to me.  Yes, Terry Handran signed it.

16  When?  Honestly, I couldn't say.

17  Q.   But based on what you have told us, he was authorized to

18  sign it and it was notarized by a tribal member.  In fact, you

19  told us before one of the multiple counties where the tribe is

20  located is Del Norte County, correct?

21  A.   Correct.

22  Q.   And this notary happens to be licensed or registered in Del

23  Norte County?

24  A.   Yes.

25  Q.   So this was a valid agreement, correct?

1   A.   Yes.

2   Q.   Was this the first signed document between Universal

3   Management Services and YLC, to your knowledge, in relation to

4   the transactions we have been talking about?

5   A.   To the best of my knowledge, it's the only one.  I don't

6   recall.

7   Q.   Excuse me.

8   A.   I don't recall any amendments being done to this agreement.

9   Q.   This would have been, as best you know, the first document

10  signed?

11  A.   Yes.  Between both parties, yes.

12  Q.   You were asked to read various portions of this by the

13  government?

14  A.   Yes.

15  Q.   You said, looking at page 1 of 6, and when you were

16  referred to paragraph D, you said you were -- I don't want to

17  paraphrase, but you didn't expect to see it or you were

18  surprised that it said that there would be a lending and credit

19  service business operating nationwide, correct?

20  A.   Correct.

21  Q.   Up until that point in time, that's not something that had

22  ever been discussed?

23  A.   Again, sometimes I can barely remember what happened last

24  Saturday, and we are talking 13 years ago.  In the multitude of

25  discussions with Terry Handran and Scott Tucker and Howard and

1  Troy in my office, with various people present, usually Terry

2  until Terry disappeared, it was always stated that it was to

3  keep it local.  Now, clearly here it says nationwide, all

4  right.  So yes, I was surprised.

5  Q.  Would it be fair to say, based on, in fact, your last

6  answer, that there were conversations that were had between

7  Terry Handran and tribal members that you were not necessarily

8  present for?

9  A.  Correct.  Not tribal members, tribal council.

10  Q.  I apologize.

11      So if this was discussed in one of those meetings, you

12  wouldn't have known because you wouldn't have been there,

13  correct?

14  A.  That's correct.

15  Q.  In fact, at one point when you were meeting with the

16  government, I think you told the government that one problem or

17  difficulty in representing either a Native American tribe or

18  this Native American tribe is they would sort of sometimes just

19  act on their own without coming to you for advice?

20  A.  That's typical in Indian country, absolutely.

21  Q.  I think you also said sometimes they acted almost out of

22  control?

23  A.  I don't know that I'd say out of control, but sometimes

24  they did things --

25          MR. VELAMOOR:  Objection.

1            THE COURT:  Overruled.

2    A.   Sometimes they did things that were against the advice of

3    counsel.

4    Q.   And sometimes they didn't even bother to come to counsel?

5    A.   That's true.

6    Q.   Did that happen on a regular basis?

7    A.   Define regular basis.  I don't mean to be contrary.

8    Q.   That's a good question.  I guess if I said often, we would

9    have the same problem.

10   A.   I wouldn't say more often than not, but I wouldn't say it's

11   entirely unusual either.  I apologize for being nebulous and

12   vague.

13   Q.   You're not being nebulous.  Those words can mean a lot of

14   things.

15            As a lawyer, did it happen more often than you would have

16   liked?

17   A.   Yes.  Yes.

18   Q.   Because it sometimes could put you in a bad position

19   because you don't know what they are doing and you're their

20   lawyer?

21   A.   Correct.

22   Q.   Now, after this management services agreement was signed,

23   do you recall what the next steps were that took place?

24   A.   To get the ordinance passed.

25   Q.   That's the beginning of the process that you said could

1    take a long time?

2    A.  It could.  When you have a tribal council, like I said,

3    getting a quorum -- and I believe at Yurok two-thirds of

4    council members present would constitute a quorum -- could be

5    difficult sometimes.

6              Number one, a fair number of the council members lived

7    up river, and you have to understand, up river doesn't mean up

8    river with roads, it's up river with dirt switchbacks, down

9    treacherous mountain paths.  If it's fishing season, good luck

10   with that one, getting a quorum, because everyone is out on the

11   river.  If it's any of the traditional dance days, you will

12   have those things happening.  Council traveled to D.C.

13       What took the council's precedence during this time is the

14   Iron Gate Dam and the damming of the Klamath River that led to

15   the fishkill.  So if they needed to be in Washington, D.C.,

16   they went there.  So there were any number of things that could

17   have -- excuse my colloquialism -- blown a quorum while waiting

18   for this ordinance to get passed.

19   Q.  First of all, I appreciate your explanation because some of

20   us who live in New York City don't have these switchbacks.

21              THE COURT:  Questions, please.

22              MR. GINSBERG:  Sure.

23   Q.  Now, in addition to having contact with Scott Tucker, there

24   came a time where you asked for some more from Scott Tucker,

25   that is, you wanted information about legal principles involved

1   in this payday lending, is that correct?  Just yes or no.

2               MR. VELAMOOR:  Objection.

3               THE COURT:  Basis.

4               MR. VELAMOOR:  The same recurring issue about

5   extrinsic legal evidence.

6               THE COURT:  You can answer it as a yes or no question.

7   A.  Can you repeat the question, please?

8   Q.  There came a time or more than one time when you asked

9   Scott Tucker --

10  A.  Yes.

11  Q.  -- for information, more information regarding the

12  transaction that the two of you had contemplated getting

13  involved in, is that correct?

14  A.  Yes.

15  Q.  Specifically, about legal advice.  Just yes or no.

16  A.  Yes.

17  Q.  In fact, he complied with your request by sending you

18  certain materials, is that correct?

19  A.  That's correct.

20  Q.  And one of the things that he sent you -- and I am not

21  going into the details of it now because of the rule -- is

22  that --

23              THE COURT:  Just ask the question.

24  Q.  He sent you a copy of a legal opinion that he had received

25  from his lawyers, correct?

1   A.   That's correct.

2   Q.   And in addition to doing that, he sent you other -- I think

3   there were faxes, which he attached information about the

4   firms?

5   A.   Yes.

6            MR. VELAMOOR:  Objection.

7            THE COURT:  Sustained.

8            The last answer is stricken.

9   Q.   At one point you became concerned about wanting to deal

10  directly with Scott and his lawyer, correct?

11  A.   Yes.

12  Q.   And you began writing e-mails saying that some of the

13  tribal council members or others were concerned that the

14  payments had stopped and they wanted to know why, is that

15  correct?

16  A.   That's correct.

17  Q.   And they wanted a fuller explanation, is that correct?

18  A.   Yes.

19  Q.   And during that period of time, you had some communication

20  with a lawyer by the name of Conly Schulte, is that correct?

21           MR. VELAMOOR:  Objection, your Honor.

22           MR. GINSBERG:  Just yes or no, your Honor.

23           THE COURT:  Relevance.

24           MR. GINSBERG:  The relevance would become clear if I

25  could follow this, because there were discussions and material

H9I8TUC4                    Adams - Cross

1    which was responsive to her questions about why this deal

2    wasn't going forward.

3              THE COURT:  Let me see you at sidebar.

4              Ladies and gentlemen, why don't you stand up and

5    stretch for a moment.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Explain it to him.

3          MR. GINSBERG:  First of all, the government on direct

4     asked the question about the lawyer not meeting with the tribal

5     council or the tribe, and that the tribal council was concerned

6     that they weren't able to have a direct meeting with the

7     lawyer.

8          THE COURT:  I am not doubting you.  I am just trying

9     to put it in context because I'm not remembering the reference

10    to the lawyer.  Go ahead.

11         MR. GINSBERG:  The reference was that there was

12    unclarity about the various iterations, if you will, of what

13    the business was going to be like, what the business was going

14    to do, and the tribe was basically saying, we want to hear

15    directly from the lawyer, we don't want to just keep sending

16    e-mails and talking to him on the phone.  We want him to come

17    here and meet with us and explain what's going to take place.

18    And then later, near the end, the witness writes a letter to

19    that same lawyer, sort of a little exasperated that this deal

20    is not happening and why isn't it happening, and he responds by

21    saying -- remember, she said before about, I don't want to pay

22    something for nothing.  That's where it comes from.  It comes

23    from an e-mail where the lawyer explains, my clients paid this

24    money, you haven't passed all the ordinances, and he just

25    doesn't want to pay any more money until all of that is done.

1        So that's the context of it.  I am not going to go

2   into any legal advice, other than responses to her or the

3   tribal questions as to why isn't this happening, come meet with

4   us, and what he says in response to that.

5            THE COURT:  What does he say?

6            MR. GINSBERG:  Well, he doesn't really want to go to

7   travel there, so he writes to them and explains, these are what

8   the problems are.

9            THE COURT:  What does he say the problems are?

10           MR. GINSBERG:  The problems are that you haven't

11  passed the ordinances, you haven't done this, you haven't done

12  that, my client has been paying money, and we are not prepared

13  to go forward until you do that.  And then, finally, there is a

14  last letter, because she writes back again -- frankly, they

15  were begging to have a deal done.  And he finally writes back

16  and says, look, we are just not going forward with this.  There

17  was a problem both with the ordinances not being passed and the

18  client not wanting to pay more money, and other litigation had

19  started to pop up in other states, and so he decided until that

20  stuff gets resolved they didn't want to start up any other

21  business.  That's the bottom line.  And I can avoid a lot of

22  those little things, but this is the series of the

23  conversations, which begins from where they began and it takes

24  it to the end.

25           THE COURT:  I want to hear from the government because

1   what the jury heard, what I heard was that Mr. Tucker began

2   making what was described as good-faith payments, and then he

3   stopped.  And one inference is that he welched on an

4   arrangement or he was in effect cheating them by not making the

5   payments.  That's one possible inference.

6          Why isn't the defendant allowed to bring this out to

7   at least rebut the implication that Mr. Tucker did anything

8   bad -- to use a colloquial expression -- in stopping making the

9   payments?

10          MR. VELAMOOR:  I believe defense counsel already did

11  elicit a lot of facts on that issue, made clear through the

12  earlier cross-examination of Ms. Adams that these were payments

13  that were made with the understanding that the tribe would

14  actually move forward with the process, and that the tribe

15  didn't move forward with the process so Mr. Tucker stopped.

16  That was already elicited through Ms. Adams based on her

17  conversations with Mr. Tucker.  There is no reason why they

18  need to elicit the same reason coming from Mr. Schulte, apart

19  from the desire to bring in, again, the role of lawyers, the

20  role of this other lawyer who is advising Mr. Tucker.

21          I totally agree that defense counsel has an absolute

22  right to explore that issue, and that issue I think was put to

23  bed through the earlier cross-examination of Ms. Adams, that

24  the reason, exactly the same as what Mr. Ginsberg just

25  proffered a moment ago, would be the reason for Mr. Schulte.

1   Mr. Schulte said the same thing, that the payments stopped or

2   should stop because the tribe is not moving ahead with the

3   ordinance.  That was already established through the earlier

4   cross-examination based on the witness's recollection of the

5   conversations with Mr. Tucker.  And defense counsel very

6   effectively established the fact that Mr. Tucker had paid

7   $50,000, that he did that with the understanding that the tribe

8   could move forward.  The tribe did not move forward and didn't

9   return the money.  So there is no reason other than to, again,

10  introduce this additional notion of lawyers to establish the

11  point that counsel has every right to make.

12          MR. GINSBERG:  If I may, Judge.  First of all, they

13  specifically on direct examination raised the issue about the

14  tribe wanting the lawyer to come and meet with them, and he

15  didn't meet with them.  So they raised it.  If they do it in

16  two questions and I do it in a different way, I am not stopped.

17          Secondly, every time we seem to have a sidebar on this

18  issue about lawyers, your Honor hasn't ruled that we can't

19  bring up the word lawyer.  We heard it a million times already

20  in a lot of different contexts.  The question I think your

21  Honor ruled on and made clear is not to go into legal advice or

22  opinions about sovereign immunity, tribal lending, which I am

23  not doing.  This just completes the picture of -- and this

24  witness also testified just now she was asking for something

25  from Mr. Tucker, was asking for the lawyer to respond.  She

1  wrote a letter to him, tell me what the problem is.

2          THE COURT:  Mr. Ginsberg raises the point that she was

3  asking what the problem was from the lawyer, and he raises the

4  point that the government elicited testimony that the tribe

5  wanted a lawyer to come out and explain this, Mr. Tucker's

6  lawyer to come out and explain this.

7          Why isn't fair cross-examination to bring out, well,

8  the lawyer never came, right?  He never came.  But he did write

9  you letters, didn't he?  So although he didn't come, he wrote

10 letters stating his position or his client's position.  Why

11 isn't that a fair response to what you elicited?

12         MR. VELAMOOR:  I think that has already come out.  I

13 think the question that we were objecting to is the broader

14 invocation that she had -- they started with a discussion about

15 the legal opinion that Mr. Tucker sent.  It was moving towards,

16 you had several back and forth discussions with Mr. Schulte.

17         Just to be clear, this witness has a very sharply

18 negative view of the legality of this operation.  We were very

19 careful in direct examination not to elicit her opinions or

20 views on the legality of the operation so that we could make

21 this argument to the Court.

22         THE COURT:  Understood.

23         MR. GINSBERG:  Judge, I think I am being very careful

24 in the way I am phrasing my questions so as not to go into

25 opinion advice.  Even when I asked about the letter that was

1    sent that was legal advice, I just asked, did you ask for it

2    and was it sent to you?

3            THE COURT:  This has been helpful.  Why don't you put

4    a new question to the witness.  I will listen.  If there is an

5    objection, I will rule.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2      BY MR. GINSBERG:

3      Q.  Ms. Adams, I believe you told us earlier that either

4      yourself or yourself and the tribal council or tribal members

5      wanted to directly meet with a lawyer who was representing Mr.

6      Tucker, is that correct?

7      A.  That's correct.

8      Q.  And the reason for that is there was some unclarity, based

9      upon various discussions and review of documents, as to exactly

10     what this business model was going to be, correct?

11     A.  Yes and no.  There were two parts to it.

12     Q.  Sure.

13     A.  The first part was purely business.  The second part goes a

14     little bit more into the Yurok traditional culture of meeting

15     people you do business with face-to-face.  Terry Handran was

16     the face of Mr. Tucker's company until Mr. Tucker made his

17     appearance.  When his attorneys made an appearance, it's

18     only -- without sounding crass -- traditional for a tribal

19     council to want to meet the person in charge.

20            And in this case, it would have been Mr. Tucker

21     because the council had received the documents Mr. Tucker sent

22     me from his legal counsel.  Those were all provided to tribal

23     council.  So they had questions, it was important to them that

24     he appear, and they could see his face, they could make a

25     character assessment.  And that's very traditional, it's very

1    common.

2    Q.  OK.  Also, since the initial opinion letter and other

3    documents you received were from a different lawyer, they

4    wanted to meet the lawyer who actually was going to be working

5    with the tribe and negotiating with the tribe?

6    A.  That's correct.  Because understand my role, and I don't

7    mean any disrespect to other attorneys, but there was in-house

8    counsel and then there was out-house counsel.

9              THE COURT:  In-house counsel at the tribe?

10             THE WITNESS:  Yes.  That was me.

11   A.  Then there were counsel who were from elsewhere, and it was

12   my job to oversee their activities as well.

13             THE COURT:  What do you mean by counsel from

14   elsewhere?  Working for the tribe?

15             THE WITNESS:  No, outside counsel.  It's common for an

16   Indian tribe to have in-house attorneys, and nowadays an entire

17   legal team in-house.  But the tribal sold contract with outside

18   counsel, and when they do business transactions with people,

19   sometimes they will hire outside counsel and sometimes the

20   in-house counsel will meet with those attorneys from the other

21   side.  So in this case, the council wanted to meet directly

22   with Mr. Schulte.

23   Q.  Mr. Schulte?

24   A.  Yes.

25   Q.  And you communicated this to Mr. Schulte, is that fair to

1    say?

2    A.  Yes.

3    Q.  You communicated to Mr. Schulte the reasons why -- I don't

4    know if you went into the tribal history of this face-to-face,

5    but the business reasons why the tribal council wanted to meet

6    with him face-to-face, is that fair to say?

7    A.  Yes.

8    Q.  In fact, on August 24, 2005, you sent a letter, or an

9    e-mail I should say, to Conly Schulte laying out the issues

10   that the council had and why they wanted to meet with him, is

11   that correct?

12           MR. VELAMOOR:  Objection.

13           THE COURT:  Overruled.

14   A.  Yes.

15   Q.  In that letter, you explained to him first, as you said

16   before, they want to meet with you directly, correct?

17   A.  Yes.

18           MR. VELAMOOR:  Objection.

19           THE COURT:  Basis.

20           MR. VELAMOOR:  Hearsay.

21           THE COURT:  No.  You elicited this testimony on the

22   direct examination, did you not?

23           MR. VELAMOOR:  I don't believe I discussed this

24   e-mail.

25           THE COURT:  You just objected to a question

1   about -- the question was:  In that letter, you explained to

2   him first, as you said before, they want to meet with you

3   directly, correct?

4            What is the basis for the objection to that?

5            MR. VELAMOOR:  It's about an out-of-court statement.

6            MR. GINSBERG:  I didn't hear the last part.

7            THE COURT:  Just speak up.

8            MR. VELAMOOR:  It's an objection to reading

9   essentially from an out-of-court statement.

10           MR. GINSBERG:  I can make it easier.

11           THE COURT:  Make it easier.

12           MR. GINSBERG:  Again, I have license to approach.

13  BY MR. GINSBERG:

14  Q.  I am going to show you what has been marked Government

15  Exhibit 908, which is a two-page document, and ask you if you

16  can look at that and tell us if you recognize what that is.

17  A.  Yes.

18  Q.  You recognize it from having authored part of it, is that

19  correct?

20  A.  Yes.

21  Q.  Could you tell us, without telling us the contents at the

22  moment, what is it that you have in front of you as Government

23  Exhibit 908?

24  A.  Summary of an impasse.  It's an e-mail.

25  Q.  It's an e-mail, correct?

1    A.   Yes.

2    Q.   And it's an e-mail first from you to Conly Schulte and then

3    from Conly Schulte to you, correct?

4    A.   That would be correct.

5              MR. GINSBERG:  I would offer Government Exhibit 908.

6              THE COURT:  Objection.

7              MR. VELAMOOR:  The same objection.

8              THE COURT:  The thing I want to caution is that a

9    party may not open a door and then argue that the door is

10   opened.

11             MR. GINSBERG:  I understand.

12             THE COURT:  Objection overruled.  Government Exhibit

13   908 is received.

14             (Government's Exhibit 908 received in evidence)

15   BY MR. GINSBERG:

16   Q.   Ms. Adams, could you kindly read Government Exhibit 908 --

17   it looks to me, and correct me if I am wrong, that the e-mail

18   on the bottom from you to Mr. Schulte came first, and then

19   there was a response that's on the top, is that correct?

20   A.   That's correct.

21   Q.   Would you please read it in that order.

22             Read the e-mail first that you sent and then his

23   response.

24   A.   Sure.

25        I wrote, "Good morning, Conly.

1      "First, thank --"

2              THE COURT:  It's in evidence.  The jury can read it on

3      the screen.  If there is a sentence you want to focus on,

4      that's fair.

5      Q.  We already established that you asked him to meet with the

6      tribal council directly, correct?

7      A.  Yes.

8      Q.  And you also asked that you needed a definitive answer

9      about the payments having stopped in October, is that correct?

10     A.  That's correct.

11     Q.  You further said that you or the tribal council believe

12     that there was good faith on his part to make the payments and

13     now he stopped making the payments and they wanted to know why?

14     A.  Not correct.  You stated that from mine or the council's

15     perspective, and the e-mail is clear that the "their," as is

16     referred to in that e-mail, refers to the tribal council.

17     Q.  I misspoke.  I used the wrong word.

18         The tribal council was concerned that they weren't getting

19     the $12,500 every month, correct?

20     A.  Correct.

21     Q.  And then you go on to talk about how tribal council members

22     believed that there was some agreement, and now they believe it

23     has changed, and that's why they really want to see him and

24     talk to him in person and get this straightened out, correct?

25             THE COURT:  The document speaks for itself.  If there

1    is some language in there that you want the witness to explain,

2    you can try.

3    Q.  On the bottom of the page from your e-mail -- it's easier

4    if I just read it.

5        "Prior to your involvement in this business endeavor,

6    promises were made that the council now deem broken."  Correct?

7    A.  Correct.

8    Q.  That was another reason to want to have him come and

9    discuss it, correct?

10   A.  Yes.

11   Q.  And he responds, "Lisa, I will discuss this with Scott and

12   get back to you," correct?

13   A.  Yes.

14           MR. GINSBERG:  You can take that down now.

15   Q.  Not long after that e-mail, did you receive a further

16   e-mail or e-mail with a letter attachment where Mr. Schulte

17   explains to you, we can't go forward with this business, all of

18   the ordinances were not passed, we are not going to be able to

19   do business until that happens?

20           MR. VELAMOOR:  Objection.

21           THE COURT:  I will allow it.

22   A.  I'd have to see it because, again, there are a lot of

23   e-mails.

24   Q.  I understand.

25   A.  13 years ago, 12 years ago.

Q.   Before I do that, I am going to go backwards a little bit.

             THE COURT:  Well, in that case, we are going to have

our mid-afternoon break and go forward in that direction.

             Ladies and gentlemen, please do not discuss the case

among yourselves or with anyone.  We will be back in action in

ten minutes.  Thank you.

             (Jury exits courtroom)

             THE COURT:  See you in ten minutes.

             (Recess)

             (Continued on next page)

1        THE COURT:  Please be seated.

2        Bring our jury in, madam deputy.  Thank you.

3        (Jury present)

4        THE COURT:  Please be seated.

5        Mr. Ginsberg, you may continue.

6        MR. GINSBERG:  Thank you, your Honor.

7   Q.  Shortly after the last exchange between yourself and

8   Mr. Schulte, that we were discussing before, do you recall on

9   or about August 23, 2005, receiving a letter from Mr. Schulte

10  basically explaining there are reasons we can't go forward with

11  this, we're sorry, we'll keep in touch with you in the future?

12  A.  Vaguely, yes.

13       MR. GINSBERG:  Nothing further.

14       THE COURT:  All right.  Any redirect?

15       MR. VELAMOOR:  Yes, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. VELAMOOR:

18  Q.  Ms. Adams, you were asked about the good faith payments

19  which ultimately stopped, do you recall that?

20  A.  Yes.

21  Q.  And those were payments, as you understood it, that

22  Mr. Tucker agreed to make while the Yurok tribe went forward

23  with the process, correct?

24  A.  That's correct.

25  Q.  And was the tribe, in fact, going through that process?

1    A.   Yes.

2    Q.   Was part of that process figuring out what the tribe's role

3    or YLC's role would be in the business?

4    A.   Yes.

5    Q.   And did the tribal council continue to ask you questions

6    about that tribal role?

7    A.   Yes.

8    Q.   Did it ever receive any information about what that role

9    would be, other than receiving and forwarding mail?

10   A.   No.

11   Q.   Now, you were also asked about conversations you had with

12   Mr. Tucker, correct?

13   A.   Yes.

14   Q.   As well as with Mr. Schulte, right?

15   A.   Correct.

16   Q.   Mr. Schulte was Mr. Tucker's lawyer, is that right?

17   A.   That's correct.

18   Q.   You had also received a proposed management agreement,

19   correct, concerning this project?

20   A.   Yes.

21   Q.   And after receiving that document and having discussions

22   with Mr. Tucker and Mr. Schulte, what was your understanding of

23   the nature of the business that Tucker was proposing?

24   A.   My understanding?

25   Q.   Yes.

1    A.  That he was going to run money through the Indian country.

2              MR. VELAMOOR:  No further questions, your Honor.

3              THE COURT:  All right.  You may step down.  Thank you

4    very much.

5              (Witness excused)

6              THE COURT:  You may call your next witness.

7              MR. RAVI:  Your Honor, the government calls Amy

8    Weatherwax.

9     AMY WEATHERWAX,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12              THE COURT:  You may inquire.

13   DIRECT EXAMINATION

14   BY MR. RAVI:

15   Q.  Good afternoon, Ms. Weatherwax.

16   A.  Hi.

17   Q.  How old are you?

18   A.  I'm 42.

19   Q.  Where do you currently live?

20   A.  I live in Ballston Spa, New York.

21   Q.  Where is that in New York State, approximately?

22   A.  It's about an hour drive from Albany, New York.

23   Q.  How far did you go in school?

24   A.  I graduated high school.

25   Q.  Do you currently work?

1   A.  Yes, I do.

2   Q.  What do you do?

3   A.  I work at a company called Quad Graphics, which is a

4   magazine company, and I assemble magazines on an assembly line.

5   Q.  What shifts do you normally work?

6   A.  I work the night shift.  It's 12-hour shifts.

7   Q.  How long have you worked as Quad Graphics?

8   A.  I've been there 23 years.

9   Q.  Do you have a family?

10  A.  Yes, I do.

11  Q.  Who is in your family?

12  A.  I have an eight-year-old girl and I have a 15-year-old boy.

13  Q.  Ms. Weatherwax, have you ever taken out what's called a

14  payday loan?

15  A.  Yes, I have.

16  Q.  How many payday loans have you taken out?

17  A.  One.

18  Q.  And how did you learn about this payday loan?

19  A.  I learned about the payday loan from much watching TV.

20  There was an advertisement on there with Montel Williams as the

21  spokesmodel, and I always watched his show and I looked at him

22  as a respected role model.

23  Q.  And so what did you do after you saw this commercial with

24  Montel Williams?

25  A.  There was a website to go on, and so I went on to the

1   website.

2   Q.  And what was the name of that website?

3   A.  Money Mutual.

4   Q.  What happened when you went to the Money Mutual website?

5   A.  It had directed me to a lender that was willing to lend me

6   money.

7   Q.  What was the name of that lender?

8   A.  500FastCash.

9   Q.  What was the amount of the loan that you wanted to take

10  out?

11  A.  $500.

12  Q.  And when did you go and try to take out this loan?

13  A.  It was December of 2012.

14  Q.  Ms. Weatherwax, why did you want this $500 loan?

15  A.  I had recently separated from my kids' father, and it was

16  around Christmastime, and I wanted them to have a great

17  Christmas, like they'd always been -- had.  And I had always

18  bought a big gift for my kids during Christmastime, so I wanted

19  to do the same thing.  And there was a device called Wii U, and

20  I wanted to purchase it for my kids.  It was marked up

21  extremely high because it was supply and demand; it was a hard

22  item to find.  So that's what I wanted to do with the money.

23  Q.  And at this point -- I'm sorry.  Did you finish?

24  A.  Yes.

25  Q.  At this point in time, who was raising your kids?

1   A.  I was.

2   Q.  Was anyone else?

3   A.  My son, he went back and forth with his dad, but my

4   daughter I had all the time.

5   Q.  Now, Ms. Weatherwax, what did you need to do in order to

6   get this loan?

7   A.  What I needed to do was to fill out an application.

8   Q.  I'm handing you a number of exhibits.  Could you take a

9   look first at Government Exhibit 2301.  What is this?

10  A.  This is the application that I filled out.

11          MR. RAVI:  The government offers Government Exhibit

12  2301.

13          THE COURT:  Any objection?

14          MR. BATH:  No.

15          THE COURT:  Received.

16          (Government Exhibit 2301 received in evidence)

17          MR. RAVI:  Mr. Beer, could you publish Government

18  Exhibit 2301 and focus in on the top half of the document.

19  Q.  Ms. Weatherwax, what's the date on this application?

20  A.  12/6, 2012.

21  Q.  Could you generally describe what information you had to

22  provide on this application?

23  A.  I had to provide my name, my address, my phone number, and

24  I also had to provide my employment, where I worked.  I had to

25  provide the -- how often I got paid, how much I made for the

1    month, the bank that I banked with and the account number and

2    also two family members.

3    Q.  And how much were you earning at the time you took out this

4    loan?

5    A.  I was roughly earning about 31,000 a year.

6    Q.  And what was the monthly income that you listed on this

7    application?

8    A.  $2,690.

9    Q.  Were you still working at Quad Graphics at that time?

10   A.  Yes.

11              MR. RAVI:  We can take that down, Mr. Beer.

12   Q.  The amount of loan you wanted to take out was $500,

13   correct?

14   A.  Yes, it was.

15   Q.  And when you applied for this loan, what did you understand

16   that $500 loan to cost you?

17   A.  What I understood was that it was going to be a $500 loan

18   with a $150 finance charge, so it was going to be $650 in all.

19   Q.  And how did you come to that understanding?

20   A.  There was boxes along the top that were in bold squares,

21   and it broke down and showed the finance charge, and the last

22   rectangle had showed what the total cost was going to be.

23   Q.  If you could turn now to Government Exhibit 2303, do you

24   recognize this document?

25   A.  Yes, I do.

1    Q.  What is it?

2    A.  This is where it breaks down the loan, and it shows the

3    total amount that I was going to be paying.

4            MR. RAVI:  The government offers Government Exhibit

5    2303.

6            MR. BATH:  No objection.

7            THE COURT:  Received.

8            (Government Exhibit 2303 received in evidence)

9            MR. RAVI:  Please publish it, Mr. Beer.

10   Q.  Ms. Weatherwax, could you please point out where on

11   Government Exhibit 2303 is the amount of the loan that you took

12   out?

13   A.  It's the 500.

14   Q.  And is that the -- are you looking at the third box from

15   the left?

16   A.  Yes.

17   Q.  Could you just read what's in that box?

18   A.  "Amount financed, the amount of credit provided to you or

19   on your behalf, $500."

20   Q.  How did you come to understanding that the loan would cost

21   you $150 in charges?

22   A.  The box that's on, the second one labeled finance charge.

23   Q.  What does it say in that box?

24   A.  "Finance charge, the dollar amount the credit will cost

25   you, $150."

1    Q.  Is there somewhere on this document that tells you how

2    much, the total you're going to pay back after you took out the

3    loan?

4    A.  Yes, there is.  It's the last square where it shows total

5    payments.

6    Q.  That's the fourth box from the left?

7    A.  Yes, it is.

8    Q.  Could you please read what's in that box?

9    A.  "Total of payments, the amount you will have paid after you

10   have made the scheduled payment, $650."

11   Q.  Do you also see a box relating to the annual percentage

12   rate?

13   A.  Yes, I do.  It's the very first box.

14   Q.  What was the annual percentage rate?

15   A.  644.12 percent.

16   Q.  Ms. Weatherwax, do you see the language that's below those

17   four boxes?

18   A.  Yes, I do.

19   Q.  And did you read that language at the time you took out the

20   loan?

21   A.  I don't remember at the time when I took out the loan if I

22   had read that or not.

23   Q.  Could you read what it says in payment schedule?

24   A.  "1 payment of $650 due on 2012-12-27.  If you decline the

25   option of renewing your loan.  If renewal is accepted, you will

1    pay the finance charge of $150 only on 2012-12-27.  You will

2    accrue a new finance charge at each renewal of your loan on the

3    due date, and on the due date resulting from a fourth renewal

4    and every due date thereafter.  The outstanding principal of

5    your loan must be paid down by $50.  This means your account

6    will be debited for the finance charge plus a $50 principal

7    payment on the due date.  This will continue until your loan is

8    paid in full.  If your pay date falls on a weekend or a holiday

9    and you have direct deposit, your account will be debited on

10   the business day prior to your normal payday."

11   Q.  Let me stop you there, Ms. Weatherwax.  I know you said you

12   didn't recall reading this at the time, but sitting here today

13   reading it, does this language change your impression or

14   understanding that your loan cost a total of $650?

15   A.  I still seen it as having to pay $650.

16        MR. RAVI:  You can take this down, Mr. Beer.

17   Q.  What happened after you submitted this loan application?

18   A.  Once I submitted it, within four days later, the $500 was

19   deposited into my checking account.

20   Q.  And when was going to be the payment date?

21   A.  It was going to be a quick loan.  It was going to be paid

22   by my next couple paychecks.

23   Q.  And how did you understand that payment was going to be

24   made?

25   A.  They had took my bank account information and they were

1    going to be taking the payments right out of my bank account.

2    Q.  It would be taken automatically?

3    A.  Yes, it would.

4    Q.  Did you understand that the loan would be automatically

5    renewed at any point?

6    A.  No, I did not.

7    Q.  Did you ever agree to a renewal of your $500 loan?

8    A.  No.

9    Q.  Ms. Weatherwax, did you encounter any problems with this

10   loan?

11   A.  Yes, I did.

12   Q.  And when did you first realize there was a problem?

13   A.  It was June, in 2013, when I looked at my statement.

14   Q.  And what was the problem?

15   A.  The problem with my statement was in June there was still

16   money that was being taken out of my account from 500FastCash.

17   Q.  And was that after you had already paid $650?

18   A.  Yes, it was.

19   Q.  And why did you only notice that there was a problem in

20   June, which is about six months after you took out this loan?

21   A.  Because I was working the night shift and I was -- you

22   know, I worked 12 hours, nights, and I would come home and I

23   had a three-year-old and a ten-year-old to take care of, and

24   after working a 12-hour shift, the only time that I was able to

25   sleep was -- well, when my little girl was sleeping, and it was

1    a very difficult time.  When I did have to go to work, I was

2    driving my daughter 40 miles to be, to go to the babysitter,

3    and then I was driving an additional 30 miles to go back to

4    work and then repeating it on the way home, so I was totally

5    exhausted, and --

6    Q.  So were you not checking your bank accounts regularly?

7    A.  I was not.

8    Q.  Ms. Weatherwax, if you could turn now to Government Exhibit

9    2304, which should be in front of you, what is Government

10   Exhibit 2304?

11   A.  This is my bank statements.

12   Q.  And are there a number of bank statements in that exhibit?

13   A.  Yes, there's tons of them.

14   Q.  Does that span from November 2012 to June 2013?

15   A.  Yes, it does.

16          MR. RAVI:  The government offers Government Exhibit

17   2304.

18          THE COURT:  Any objection?

19          MR. BATH:  No, sir.

20          THE COURT:  Received.

21          (Government Exhibit 2304 received in evidence)

22   Q.  Ms. Weatherwax, turn your attention to the first page.

23          MR. RAVI:  We can published this to the jury.

24   Q.  Do you see the first deposit of $500 made into your

25   account, and if we could highlight that, on December 7, 2012.

1          MR. RAVI:  If you could highlight that, Mr. Beer.

2    Q.  Is that the $500 deposit for your loan?

3    A.  Yes, it is.

4    Q.  And who made that deposit?

5    A.  500FastCash.

6          MR. RAVI:  Turn now to page 8.

7    Q.  And was there a withdrawal of $150 on December 27, 2012?

8    A.  What was the date again?

9    Q.  December 27, and Ms. Weatherwax, if you want to look at the

10   screen, that might be helpful.

11   A.  OK.  Yes, there was.

12   Q.  Who made that withdrawal?

13   A.  It was 500FastCash.

14         MR. RAVI:  Please turn now to page 9.

15   Q.  Was there another withdrawal of $150 on January 10, 2013?

16   A.  Yes, there was.

17   Q.  And who made that withdrawal?

18   A.  500FastCash.

19         MR. RAVI:  Turning now to page 12.

20   Q.  Was there another withdrawal made of $150 on January 24,

21   2013?

22   A.  Yes, there was.

23   Q.  And who made that withdrawal?

24   A.  500FastCash.

25         MR. RAVI:  Turn now to the following page, 13.

1    Q.  Was there another withdrawal of $150 on February 7, 2013?

2    A.  Yes, there was.

3          MR. RAVI:  Turn now to page 15.

4    Q.  And what happened on February 21 of 2013, Ms. Weatherwax?

5    A.  On February 21, there was two withdrawals made.  One was in

6    the amount of 150 and the second was in the amount of $50.

7    Q.  So at this point in time, have you paid now more than the

8    $650 that you believed you owed for this loan?

9    A.  Yes, I had.

10   Q.  And did the withdrawals continue to happen?

11   A.  Yes, they did.

12   Q.  And did they continue to happen on a regular basis through

13   June of 2013?

14   A.  Yes, they did.

15         MR. RAVI:  You can take that down, Mr. Beer.

16   Q.  Ms. Weatherwax, do you recall the exact dates and amounts

17   of each of the withdrawals?

18   A.  No, I do not.

19   Q.  Now, at some point, on the day that you discovered these

20   withdrawals, did you review all of your bank accounts?

21   A.  Yes, I did.

22   Q.  And did you create a record, a note of the dates and

23   amounts of each of the withdrawals?

24   A.  Yes, I did.

25   Q.  And at the time you wrote down all those dates and the

1    amounts of withdrawals, were they accurate?

2    A.  Yes, they were.

3    Q.  I'm going to show you now Government Exhibit 2309.  Is this

4    the record that you kept of the dates of the withdrawals and

5    the amounts of withdrawals?

6    A.  Yes, it is.

7         MR. RAVI:  The government offers Government Exhibit

8    2309.

9         MR. BATH:  No objection.

10        THE COURT:  Received.

11        (Government Exhibit 2309 received in evidence)

12        MR. RAVI:  Please publish that for the jury.

13   Q.  And when did you create this document?

14   A.  It was created on 6/13.

15   Q.  And what are the dates on the left?

16   A.  The dates on the left are the dates that the money was

17   withdrawn from my bank account.

18   Q.  And what are the numbers on the right side?

19   A.  That's the amount of money that was taken from -- for that

20   particular day, from 500FastCash.

21   Q.  What was the total amount of withdrawals that are reflected

22   as being taken out from December of 2012 through June of 2013?

23   A.  $1,860.

24   Q.  And you believed that you only had to pay $650, correct?

25   A.  That's correct.

1  Q.  How did you feel when you realized all of these withdrawals

2  had taken place?

3  A.  I felt horrible.  I felt violated.  I had gone right to the

4  bank.  I felt helpless.  I didn't know what to do, so --

5  Q.  So what did you do when you realized all these withdrawals

6  had been made?  You said you went to the bank?

7  A.  I did go to the bank.

8  Q.  What did you do at the bank?

9  A.  I sat down with a bank representative, and I went through

10  my bank statements and tried to figure things out.  I also made

11  a phone call to 500FastCash while I was sitting at the bank.  I

12  talked -- I talked to an Ashley and Malocci, and they weren't

13  of much help.  I was telling them how I still had money coming

14  out of my bank account and that it should have definitely been

15  paid off and I didn't understand why all this money was coming

16  out of my account.

17  Q.  What was the response you got from 500FastCash?

18  A.  They had stated that they were an Indian tribe and that

19  this was just the way they did it, and I wasn't getting

20  anywhere in the conversation, so eventually I just hung up.

21  Q.  Was there any discussion on that phone call with

22  500FastCash whether you still had amounts that you needed to

23  pay?

24  A.  Yes, there was.  They were stating that my next payment was

25  going to be $65 and that I still owed more money.

1   Q.  And just to be clear, when did this conversation with

2   500FastCash take place?

3   A.  That conversation happened 6/13.

4   Q.  That's June 13 of 2013?

5   A.  Yes.

6   Q.  After you had already paid $1,860?

7   A.  Yes, it was.

8   Q.  How did the call end; you said you hung up or they hung up?

9   A.  It was kind of -- I hung up because I wasn't getting any

10  type of resolution.

11  Q.  Did you take any actions with your bank at that time?

12  A.  Yes, I did, being that --

13  Q.  What did you do?

14  A.  Being that they told me that my next payment was going to

15  be $65 that they were going to take out of my account, I made a

16  stop payment and dispute -- I disputed as many charges as I

17  could with the bank representative, and then I also looked at

18  the figures and we were trying to see which was the most common

19  number, because they were pretty much taking out all different

20  amounts of money, so we stopped payment on the most common

21  amounts, and that's where I was that day.

22  Q.  Were you successful in being able to stop any further

23  withdrawals?

24  A.  No other payments were taken after I had done that.

25  Q.  Did you contact anyone else to complain about what had

1  happened?

2  A.  Yes, I did.  On that same particular day, after I had left

3  the bank, I had went home and I got on my computer and I wrote

4  the Better Business Bureau.

5  Q.  And why did you do that?

6  A.  I felt like I needed help.  I felt like I was done wrong,

7  so I was trying to get help.

8  Q.  Did you get any response to your complaint through the

9  Better Business Bureau?

10  A.  Yes, I did.

11  Q.  And what was that?  And this was in response to

12  500FastCash?

13  A.  Yes, it was.

14  Q.  What was the response?

15  A.  Their response was to contact the compliance department.

16  Q.  And did you try to contact the compliance department?

17  A.  I did not only because I had prior, and I couldn't get

18  through to anybody.

19  Q.  Did you ever get a refund of any of the amounts that you

20  paid to 500FastCash?

21  A.  No, I did not.

22  Q.  Were you ever charged any fees by your bank for withdrawals

23  by 500FastCash?

24  A.  Yes, I was.

25  Q.  What kind of fees?

1    A.  I was charged with overdraft fees because I was unaware of

2    all this money coming out of my account.

3    Q.  And how much, approximately, in overdraft fees did you have

4    to pay?

5    A.  For my bank it's $35.

6    Q.  Do you know the total of how much in overdraft fees you had

7    to pay as a result of 500FastCash withdrawals?

8    A.  I do not.

9    Q.  Ms. Weatherwax, how much in excess payments do you believe

10   you paid for your $500 loan?

11   A.  Over a thousand dollars.

12   Q.  What was the impact of this experience on you?

13   A.  It was very tough.  It took me a long time to recuperate

14   from this, and I would never take a loan out ever again.  I'm

15   not as trusting.  If I ever had to take a loan out, it would be

16   with my bank.  It was a really bad experience.  I didn't even

17   answer the phone.  I mean, I, I just wasn't as trusting.  I do

18   things differently now.  I actually have the mobile banking

19   right on my phone, and I monitor it every single day.

20           MR. RAVI:  No further questions, your Honor.

21           THE COURT:  Cross-examination.

22   CROSS-EXAMINATION

23   BY MR. BATH:

24   Q.  Ms. Weatherwax, I just have a few questions, and I want to

25   go to Government Exhibit 2301.  I think you have that in front

1   of you.  If you don't, let me know, please.

2       Do you have that in front of you?

3   A.  Yes, it is.

4   Q.  All right.  Ma'am, that's the application you filled out;

5   you went over that with the government, correct?

6   A.  Yes, I did.

7   Q.  OK.  All right.  And that's the document you first sent in;

8   did you do this by the Internet or by fax?

9   A.  I did this by the Internet.

10      MR. BATH:  And then the next document is 2303, if we

11  could have that up.

12  Q.  And that's the loan note disclosure, is that correct?

13  A.  It is the loan note.

14  Q.  OK.  And those are the boxes you went over with us before,

15  correct?

16  A.  These are the boxes that I was talking to, yes.

17  Q.  Right.  So you first sent in the application and then the

18  company sends back this loan note disclosure to you?

19  A.  I sent in the loan application.

20  Q.  Yes.

21  A.  And then they sent me an email stating that I was approved

22  and within four days the money would be put into my account.

23  And then I believe I got the loan note after.

24  Q.  After that?

25  A.  Yes.

1  Q.  Let me show you what's marked as Defense Exhibit 1207.

2  Ms. Weatherwax, do you recognize that?

3  A.  Yes, I do.

4  Q.  And this is the email you got from the company telling you

5  about you're going to get the loan?

6  A.  Yes.

7         MR. BATH:  Offer 1207.

8         THE COURT:  Can we redact the user name and password?

9         MR. BATH:  I'm sorry, Judge.  Yes, sir.  I'll do that

10  before.

11         THE COURT:  OK.  Thank you.

12         Any objection to the exhibit, redacted?

13         MR. RAVI:  No, your Honor.

14         THE COURT:  OK.  Received.

15         (Defendant's Exhibit 1207 received in evidence)

16  BY MR. BATH:

17  Q.  I'm just going to ask you some questions, and that is, you

18  get an email from the company that tells you how to log online,

19  is that correct?

20  A.  It's showing the user name and the password, yes.

21  Q.  Right, and you remember you got this in the course of the

22  transactions with them, correct?

23  A.  I had gotten it because -- let's see.  Because I knew the

24  money was going to be put into my account.

25  Q.  Right.  And this told you how you could log on and check

1    the summary and check anything you wanted online, correct?

2    A.  It does show that, but I did not do that.

3    Q.  So you got the email, but you never followed up with this?

4    A.  I did not.

5    Q.  OK.  Fair enough.

6        I'm going to show you 1208.  Take a look at this document,

7    defense 1208, and let me know if you recall that document.

8    A.  I do not.

9    Q.  Irrespective of 1208 then, do you remember you got email

10   notices from the company about payments?

11   A.  No.

12   Q.  No, you don't remember, or no, you never got them?

13   A.  I don't believe I got them.

14   Q.  OK.  So other than the one email we went over, 1207, you

15   never got any more emails from the company, is that what you

16   recall?

17   A.  If I had gotten them, I didn't read them.

18   Q.  OK.  And as I understand it, it was a pretty hectic time in

19   your life?

20   A.  It was.

21   Q.  And fair to say maybe you weren't checking your emails as

22   diligently as you might now?

23   A.  Yes.

24   Q.  OK.  I'll take 1208 back, since you don't recognize that.

25   Thank you.

1    So it's possible the company sent you a number of emails

2  telling you about, information about the loan?

3  A.  I believed that the loan had been paid back quickly, so

4  that's one of the reasons why I didn't think anything more of

5  it.

6  Q.  But it's possible that you got these emails from the

7  company -- not these, just any emails from the company, and you

8  just don't remember?

9  A.  I wasn't checking my email.

10  Q.  That's --

11  A.  On a regular basis, yeah.

12  Q.  So that's possible it could happen?

13  A.  It's possible.

14  Q.  I'm going to show you Government Exhibit 2302.  Does that

15  email look familiar to you at all?

16  A.  Yes, it does.

17  Q.  Do you remember seeing that from the company, telling you

18  about the loan?

19  A.  I do, because, you know, I wanted my money to be able to

20  spend, and it tells me when it was going to be deposited into

21  my account.  So after I seen the date that it was going to be

22  deposited in my account, I didn't think any more of it.

23            MR. BATH:  Offer Government Exhibit 2302 in evidence.

24            THE COURT:  Any objection?

25            MR. RAVI:  No objection.

1          THE COURT:  Received.

2          (Government Exhibit 2302 received in evidence)

3          MR. BATH:  Could we please publish that.

4     Q.  At the top there, we see that payment on December 6 of '12

5     about 10:00 at night, is that right?  The very second line from

6     the top.

7     A.  Yes, it shows the date and time.

8     Q.  OK.  All right.  It tells you then, we go down to the

9     congratulations email, which is the first top third, and it

10    tells you that your loan's been approved, correct?

11    A.  Yes.

12    Q.  And that the money, $500, is going to be put in your

13    account on or about 12/6, correct?

14    A.  Yes.

15    Q.  OK.  Then probably fair to say that once you got, you saw

16    that and you were getting a loan, you probably didn't read the

17    rest of the language?

18    A.  I did not.

19    Q.  OK.  Fair enough.  So you're not disputing what it says on

20    the document; you're just telling us today you just didn't read

21    it?

22    A.  I did not read it, no.

23    Q.  Fair enough.

24    A.  I don't recall reading it.

25    Q.  2304 has been admitted, and those are your bank records and

1    there's a whole stack of them.  We're going to try to put them

2    on the screen for you, but if you prefer hard copy, I think you

3    have it.  Is that correct?

4    A.  Yes.

5    Q.  OK.  Now, do I understand, what you said was you thought

6    that this loan would be paid off in a couple of payments?  Did

7    I write that down correctly?

8    A.  Yes.

9    Q.  All right.  In a couple of payments, do you mean the next

10   two times, your next paychecks?

11   A.  I just remembered that it was a very short loan and that it

12   was going to be taken out of my first couple paychecks.

13   Q.  Right, so that's what you testified on direct; I'm correct

14   in what I remember?

15   A.  Yeah.

16   Q.  All right.  You got the money on 12/6, and that means,

17   then, your next paycheck would have been, I think the day they

18   would have taken that money --

19   A.  I didn't get the money on 12/6.

20   Q.  You did?

21   A.  I did not.  I got it four days later.

22   Q.  Well, look at the first page of 2304.

23          MR. BATH:  Let's blow up the 12/7 line.

24   Q.  See if this refreshes your memory.  Do you see on 12/7,

25   there's an ACH deposit?

1    A.  Yes.

2    Q.  OK.  You agree with me you got the $500 on 12/7?

3    A.  OK, yes, I did.

4    Q.  OK.  Fair enough.  Let's look at your next paycheck, and

5    that would have been on which date?  Do you remember?

6    A.  I had -- well, I received child support at the time too, so

7    I did receive that on 12/11, but my next paycheck after that

8    would have been 12/13.

9    Q.  OK.  You didn't expect it to come out on the 12/13, though;

10   that's seven days, did you?  Or did you?

11   A.  I really wasn't monitoring it.  I knew they had my bank

12   accounts.  I knew they were going to be taking the money out --

13          MR. BATH:  Let's look at page 9, the daily balance

14   summary.  If we could look at --

15   Q.  12/26 would have been one of your paydays, is that correct,

16   12/26, 27, that range?

17          MR. BATH:  Down below those, down below there.

18   Q.  Do you see those daily balances?

19   A.  Yes, I do.

20   Q.  And you remember your payday would have been about 12/26?

21   Is that correct?

22      Look at -- let me help you.  I'm sorry.  There's a lot of

23   documents.

24          MR. BATH:  Could we go to page 5, if we could blow up

25   the 12/26 time period.

1  Q.  On 12/26, there's a number of deposits there.  Are any of

2  those your paydays?

3  A.  My pay date was 12/27.

4  Q.  OK, so 12/27.  Now go to page 9 for me and let's go to

5  12/27, the daily balance summary, and we see on 12/26 you're

6  negative, then 12/27 you're 122.25, correct?

7  A.  Yes.

8  Q.  If they were going to take out your next two paydays, and

9  it was only 650 --

10      That's what you understood, correct?

11  A.  Yes.

12  Q.  -- they would have had to take out three and a quarter.  Is

13  my math correct?

14  A.  Yes.

15  Q.  All right, but you wouldn't have had three and a quarter

16  there?

17  A.  I would not, but --

18  Q.  Go ahead.  I'm sorry.

19  A.  With my bank account there had been times where if I didn't

20  have the funds, then I knew that I would be hit with an

21  overdraft fee, and I was aware of it and I was all right with

22  it.

23  Q.  OK.  So even though the funds weren't there, and they

24  probably wouldn't have been there the next time either, the

25  three and a quarter, would they have been?

1  A.  I got paid on a weekly basis, so I had the two paychecks

2  going in and my paychecks varied.

3  Q.  You said earlier that one of its impacts was that this

4  company took some overdraft fees from you, correct?

5  A.  Yes.

6  Q.  And that was part of the total moneys that were taken from

7  you?

8  A.  It was part of -- yes, it was part of my loss.  Yes.

9  Q.  Right.  And you described how it made you feel and you

10  don't trust people and you check your mobile app, those things,

11  correct?

12  A.  Yes, I do.

13  Q.  Looking at page 1 of 2304, and Ms. Weatherwax, this first

14  statement is a statement that -- it's the first page of the

15  bank records, correct?

16  A.  Yes, it is.

17  Q.  That means you haven't got the loan from FastCash yet,

18  correct?

19  A.  They didn't -- not until the 12/7.

20  Q.  Not until the 12/7, but up top here, in the middle of the

21  page, there's a section here that talks about overdrafts for

22  the year.  Is that right?

23  A.  Yes, there is.

24          MR. BATH:  Could we highlight that box.

25  Q.  So prior to your getting the loan from FastCash, you had

1    $4,275 in overdrafts that year, is that correct?

2    A.   Total year to date, yes, I did.

3    Q.   And that's before FastCash was, you were involved with them

4    at all, correct?

5    A.   Yes, because I was a single mom, it was very tough.

6    Q.   And that's why you're telling us that even though you may

7    not have had the money in there for the two payments like you

8    understood, you felt the bank was going to cover it and you

9    were OK with that?

10   A.   That, when I was aware of the overdraft, then I knew what

11   to expect.  But with the money that was coming out I wasn't

12   aware of, I was making additional purchases that I may have not

13   done because I had no idea this money was coming out; I knew

14   roughly what my paycheck was.  And they just continued to take

15   them out on different dates and I was not aware of it, so I

16   spent more thinking that I had more in my account.

17   Q.   You said you were unaware of it, but it's possible that

18   those emails that came to you that you didn't pay attention to

19   told you about that; isn't that possible?

20            MR. RAVI:  Objection.

21            THE COURT:  Well, anything is possible.  Sustained.

22   Rephrase it.

23   Q.   You got email communications from the company, correct?

24   A.   I did, but I didn't see them, yes.

25   Q.   You chose not to read them?

1  A.  Yes.

2          MR. BATH:  OK.  Thank you so much.

3          THE COURT:  All right.  Any other cross?

4          MR. ROTH:  No, your Honor.

5          THE COURT:  Ma'am, you may step down.  Thank you.

6          (Witness excused)

7          THE COURT:  Mr. Ravi, do you want to call your next

8  witness?

9          MR. RAVI:  No further redirect, your Honor.

10          THE COURT:  Oh, any redirect?  I'm sorry.  I cut you

11  off.

12          MR. RAVI:  No, your Honor.

13          THE COURT:  Thank you.

14          MR. SCOTTEN:  Your Honor, the government calls Crystal

15  Grote.

16          THE COURT:  OK.

17   CRYSTAL GROTE,

18      called as a witness by the Government,

19      having been duly sworn, testified as follows:

20          THE COURT:  You may inquire.

21          MR. SCOTTEN:  Thank you, your Honor.

22  DIRECT EXAMINATION

23  BY MR. SCOTTEN:

24  Q.  Good afternoon, Ms. Grote.

25      Ms. Grote, where do you live now?

1   A.  Cleveland, Missouri.

2   Q.  And is Cleveland, Missouri, near another larger city the

3   jury might have heard of?

4   A.  Kansas City.

5   Q.  About how far?

6   A.  30 miles.

7   Q.  How long have you lived there?

8   A.  Off and on, my entire life.  I went to high school there,

9   lived with my parents there, moved to Kansas City-Overland Park

10  area before that and then moved back there in 2012.

11  Q.  You said you went to high school.  How far total did you go

12  in school?

13  A.  I had two years of college.

14  Q.  Did you get a degree?

15  A.  No.

16  Q.  Ms. Grote, where do you work now?

17  A.  I'm a real estate agent.

18  Q.  How long have you been doing that?

19  A.  About a year and a half.

20  Q.  What did you do before then?

21  A.  Worked in the payday loan industry.

22  Q.  Did you interview for your job in the payday industry?

23  A.  I did.

24  Q.  Who interviewed you?

25  A.  Scott Tucker.

1    Q.  Do you see Scott Tucker in the courtroom today?  You can

2    stand up.

3    A.  I do.

4    Q.  Can you identify him by where he's sitting and what he's

5    wearing?

6    A.  He's the fourth person over, in the white shirt and the

7    blue tie.

8            THE COURT:  First table or the second table?

9            THE WITNESS:  At the second table.  Sorry.

10           THE COURT:  Thank you.

11           So noted.

12   BY MR. SCOTTEN:

13   Q.  When you interviewed with Scott Tucker for this payday

14   lending job, how old were you?

15   A.  19.

16   Q.  How long did you work with Scott Tucker in payday lending?

17   A.  About 15 years.

18   Q.  During your involvement in payday lending with Scott

19   Tucker, did you commit any crimes?

20   A.  I did.

21   Q.  Are you testifying here today as part of what's called a

22   cooperation agreement?

23   A.  I am.

24   Q.  OK.  I'm going to ask you more about that in a minute.  For

25   now I just want to ask you generally about your career in

1   payday lending with Scott Tucker.  Can you sort of take us

2   through your career progression, in summary, from when you

3   started at 19 until you finished working with him?

4   A.  I started just as a customer service agent, an

5   administrative agent, filing paperwork and helping customers.

6   And when I stopped working with him, I was manager of multiple

7   portfolios.

8   Q.  So what were the steps in between there?

9   A.  I just kind of took on customer service management;

10  funding, customer loan application, funding management, and

11  then collection management also.

12  Q.  And when you said that you were a manager of multiple

13  portfolios and you did these things, how senior were you in the

14  company?

15  A.  I was a senior manager.

16  Q.  And who were you reporting to directly during your time

17  there?

18  A.  Blaine Tucker and Scott Tucker.

19  Q.  And who is Blaine Tucker?

20  A.  Scott's brother.

21  Q.  I'm going to show you what's in evidence as Government

22  Exhibit 4009.  Do you recognize it?

23  A.  Yes.

24  Q.  What is it?

25  A.  The office in Overland Park that we were at for many years.

1    MR. SCOTTEN:  If we can put that up for the jury.

2    Q.  Now, during your time in this business, who were the people

3    you would go to for guidance on decisions that you made?

4    A.  Blaine Tucker, Scott Tucker, Timothy Muir.

5         MR. BATH:  I object on the time period, if we could

6    have some --

7         THE COURT:  Why don't you have the witness identify a

8    time period so we can make it clear.

9         MR. SCOTTEN:  Sure.

10   Q.  When you first started there, who were you going to, and

11   when you were 19 years old, who were you going to for

12   decisions?

13   A.  Blaine Tucker, Scott Tucker and Norma Tucker.

14   Q.  And who is Norma Tucker?

15   A.  Their mother.

16   Q.  You mentioned a minute ago Timothy Muir.  Were you taking

17   guidance from him at that time?

18   A.  No, he was not there.

19   Q.  When did you start taking guidance from Mr. Muir?

20   A.  About 2005.

21   Q.  Do you see Timothy Muir in the courtroom today?

22   A.  Yes.

23   Q.  Can you identify him by where he's sitting and what he's

24   wearing?

25   A.  Yeah, he's the second table, the very end, the red tie.

1          THE COURT:  So noted.

2     Q.  When you needed guidance on systematic decisions, that

3     would affect the whole business, who did you go to?

4     A.  Like a company policy?  It would be to Scott Tucker.

5     Q.  Now going back to -- well, actually, let me ask it this

6     way.  Based on your interaction with the Tuckers there, did you

7     ever an understanding of who was overall in charge of this

8     business?

9     A.  Scott Tucker.

10    Q.  Did that ever change during your time in the business?

11    A.  It did.  As things evolved, he stepped out of that role a

12    bit, and Blaine become much more responsible, so I would take a

13    lot of stuff to him, and some things to Tim Muir also.

14    Q.  In the period where you were taking things directly more

15    often to Blaine Tucker and Tim Muir, did you perceive them as

16    senior to Scott Tucker?

17    A.  Not necessarily, no.

18    Q.  Who in the end still had the final say on decisions?

19    A.  Scott Tucker.

20    Q.  Did you ever send documents to Scott Tucker to review?

21    A.  Yes.

22    Q.  What sort of documents?

23    A.  Customer applications, loan note disclosures, those

24    documents -- we call them document sets, so anything that we

25    would email a customer as part of the loan application process.

1    Q.  And so just to be clear, you're not saying you ran

2    individual emails by him; you ran the template by him?

3    A.  Yes, exactly.

4    Q.  During the time in this business, did you use training

5    materials?

6    A.  Yes.

7    Q.  Did you send those to Scott Tucker for review?

8    A.  Sometimes, not all of them.

9    Q.  I think you said a minute ago you started bringing stuff to

10   Tim Muir in 2005, 2006, is that right?

11   A.  Yeah, probably a little bit later.  He had limited

12   involvement in the beginning, but that grew over the course of

13   time.

14   Q.  What was Muir's role in handling the business?

15   A.  He was our in-house attorney.

16   Q.  How closely did you work with Muir?

17   A.  Very closely towards the end.

18   Q.  What were some of the things you worked on him with --

19   worked on with him?  Pardon me.

20   A.  Their website and Internet changes that we might have and

21   the document sets.

22   Q.  So other than sending him loan document sets, were there

23   other types of documents you sent him?

24   A.  Yeah, he would have -- he did receive screenshots from the

25   web, from the Internet, from our website.  He would have

1   received some training manuals, not all of them, but some.

2   Collection letters, he received those.

3   Q.  What about the loan applications themselves?

4   A.  Yes.

5   Q.  And the loan disclosure notes?

6   A.  Yes.

7   Q.  I'm going to show you what I believe is already in evidence

8   as Government Exhibit 1707.

9          MR. SCOTTEN:  And if we could just highlight the top

10  which has the headers for both the original message and the

11  subsequent message.  No.  Sorry, Mr. Beer.  Could you blow up

12  the whole top of the document so the witness can see it.

13  Q.  OK.  So where it says original message, who was this

14  message from?

15  A.  Glenn Fisher.

16  Q.  Who is he?

17  A.  Glenn managed a second-tier collection department we had.

18  Q.  And the "to" line, I see Blaine Tucker and Tim Muir?  Who

19  were the other people on that line?

20  A.  Tim Buckley and myself managed portfolios.  Natalie Dempsey

21  managed a lot in the different vendor accounts.  Ed Cross, in

22  IT, and Chris Becker managed the other part of the collection

23  group.

24  Q.  You said yourself.  What name are you listed by there?

25  A.  Crystal Cram.

1    Q.  And Crystal Cram, Crystal Grote, were there any other names

2    you had there?

3    A.  Crystal Stubbs.

4    Q.  And are all those a result of marriages?

5    A.  Yes.

6    Q.  Now at the top, can you tell if this email was forwarded?

7    A.  It was forwarded from Blaine to Scott.

8         MR. SCOTTEN:  And could we zoom out of that and then

9    zoom to the first two action items, as they're labeled.

10   Q.  And Ms. Grote, can I just ask you to read the two action

11   items.  You don't need to read the date above it.

12   A.  Read them out loud.

13   Q.  Please.

14   A.  "Tim Muir will review and provide an opinion, email letter,

15   mini Miranda, training materials; No. 2, Tim Muir will provide

16   us access to a website for bankruptcy verification.  Review

17   entire bankruptcy process."

18   Q.  I notice you read that as Tim Muir, but how is it spelled?

19   A.  M-E-I-R.

20   Q.  Did you know a Tim M-E-I-R in your time there?

21   A.  No.

22   Q.  So who do you think that could be?

23   A.  Timothy Muir.

24   Q.  Anyone else that's possible it could be in your mind?

25   A.  Not at all.

1    Q.  Could you sort of describe in general terms to the jury

2    what those two action items mean?

3    A.  Yeah.  In the first action item, we were going to give Tim

4    emails that we were sending to customers.  The mini Miranda was

5    a statement that we read to the customers whenever we called

6    them.  And then written training material, we were just going

7    to forward that to him for review.

8    Q.  And as to the second line?

9    A.  He was going to give us access for bankruptcy verification.

10   There was some website you could log into to tell you if a

11   customer had filed bankruptcy or not.

12           MR. SCOTTEN:  Mr. Beer, could we now go to the fourth

13   page.  And can you please blow up action item 19.

14   Q.  And again, if I could just ask you to read that, Ms. Grote.

15   A.  "Tim Meir will be developing universal scripts for all

16   portfolios to cover some of the most important compliant --

17   complaint issues that we are faced with while on the phone."

18   Q.  What's a universal script?

19   A.  Scripts that all departments and all agents would use.

20   Q.  And you sort of stumbled on it.  What do you think

21   compliant, actually, is likely to say?

22   A.  Those were kind of what we would consider maybe escalated

23   complaints from customers.

24   Q.  What's an example of an escalated complaint?

25   A.  Customer who threatened to reach out to the Better Business

1   Bureau or government agency, attorney general, something like

2   that.

3          MR. SCOTTEN:  Can we take that down.

4   Q.  OK.  Anything atypical about that, sending those sort of

5   things to Muir?

6   A.  No.

7   Q.  Let's go back to the start of your payday lending career.

8   When you were 19 and you first started working with Scott

9   Tucker, what was the name of the company?

10  A.  NM Service, or National Money Service.

11  Q.  About how many people were at National Money Service when

12  you started there?

13  A.  Four other employees.

14  Q.  And who were the supervisors over those employees?

15  A.  The family: Scott, Blaine, Joel Tucker and Norma were there

16  also.

17  Q.  I think you mentioned everybody but Joel before.  Who is

18  Joel Tucker?

19  A.  Joel is the brother also.

20  Q.  Who is the oldest brother, by the way?

21  A.  Scott is.

22  Q.  At any time were any of the other brothers senior to him

23  over the management of this operation?

24  A.  I don't think so.

25  Q.  Do you remember physically where Money National Service was

1    located in 1999?

2    A.  Yes, in Overland Park, or Shawnee, off of 75th Street,

3    building, kind of brick-and-mortar building next to an

4    insurance agency.

5    Q.  How big was the building?

6    A.  Very small.

7    Q.  So it's not that large corporate headquarters we showed you

8    before?

9    A.  No.

10   Q.  And when you first started working there at 19, what were

11   you doing?

12   A.  Customer service and, and administrative duties.

13   Q.  You said that before.  I apologize.

14       When you were doing customer service, how were people

15   getting in touch with National Money Service to get a loan at

16   that time?

17   A.  Phone and fax.

18   Q.  And when you first spoke to customers, did you give them a

19   company name?

20   A.  Yes, National Money Service is what I think we were using

21   at that time.

22   Q.  Did that change?

23   A.  Yes, became 500FastCash.

24   Q.  Why did you start using 500FastCash?

25   A.  Scott told me to.

1    Q.  Did Scott -- is that Scott Tucker?

2    A.  Yes.

3    Q.  Did Scott Tucker say why to use that name?

4    A.  No.  It was just a new d/b/a or trade name that we were

5    using.

6    Q.  When you say d/b/a, what do you understand d/b/a to stand

7    for?

8    A.  Doing business as, another name.

9    Q.  And the money that FastCash lent out, do you know where it

10   came from?

11   A.  It had came from a bank account and ACHed into the

12   customer's bank account.

13   Q.  What is ACH?

14   A.  Like an electronic deposit.

15   Q.  And you know what the customer saw on their check or the

16   money order that put the money into their account, what names

17   showed up?

18   A.  Once we started using the trade name 500FastCash, it said

19   500FastCash.

20   Q.  Did the National Money Service name go away?

21   A.  We still used that on -- it was phone applications also, so

22   it didn't fully go away.

23   Q.  Did customers some point down the future start getting in

24   touch with you by means other than fax and phone?

25   A.  Email and Internet.

1  Q.  And how did the Internet interaction work?

2  A.  There was a website.  Customers could apply for a loan at

3  that time.  In the beginning they could only enter their

4  information and then they still had to fax documents.

5  Eventually that evolved into that they could do everything that

6  they could in the future online.

7  Q.  Around when was it that you first started using the

8  Internet?

9  A.  2000, around early 2000 or 2001.

10  Q.  And in this period, after you started using the Internet,

11  did other names start appearing on the loan documents?

12  A.  We started using County Bank.

13  Q.  And who told you to put County Bank on the loan documents?

14  A.  Scott Tucker.

15  Q.  Did Scott Tucker say why County Bank was now being put on

16  the loan documents?

17  A.  I don't remember specifically asking him why.  We had a

18  business relationship with them so the money was coming from

19  County Bank of Delaware.

20  Q.  And during the time you were involved, you had a business

21  relationship with County Bank, do you know whether it was

22  involved with other payday lenders?

23  A.  I'm sorry.  Our business was?

24  Q.  No, sorry.  County Bank's.

25  A.  I believe they were, yes.

1   Q.  What's the basis for that belief?

2   A.  I can't remember exactly how it came up, but I know that

3   County Bank was trying to allow a software or training

4   material, and TeleCash was struggling with that also.  They

5   were the first ones to move over to the new system, and they

6   were struggling with that.  I can remember hearing the

7   TeleCashers having issues.

8   Q.  What's TeleCash, to be clear?

9   A.  Another, another payday company.

10  Q.  Do you know who was in charge of TeleCash?

11  A.  Charlie Hallinan.

12  Q.  How did you learn that Charlie Hallinan was in charge of

13  TeleCash?

14  A.  I learned that from Scott or Norma Tucker.

15  Q.  Let's go one at a time.  What did Norma say about Charlie

16  Hallinan?

17  A.  So I learned from Norma about Charlie kind of helping Scott

18  get started in payday, and Scott would talk to Charlie every

19  week.

20  Q.  How do you know that Scott -- Scott Tucker?

21  A.  Yes.

22  Q.  How do you know Scott Tucker would talk to Charlie Hallinan

23  every week?

24  A.  I would hear him.

25  Q.  Where?  Tell the jury a little more.  How did you know who

1   he was talking to, where were you?

2   A.   Yeah.  I would hear him talk on the phone with him.  I

3   wasn't in his office, but every Saturday I would be outside his

4   office working, and I would hear him speak to Charlie.

5   Q.   Did the business change when Scott Tucker told you that

6   County Bank was involved somehow?

7   A.   Yes.

8   Q.   How did it change?

9   A.   Documents changed, the name changed, and the actual process

10  of how a customer received their loan changed.  The customer

11  had limits on how many refinances or renewals they could do.

12  And then they also had to start paying down on their principal

13  amount at, for 50, in the amount of $50 on the fifth renewal

14  and then every one thereafter until they were paid off.

15  Q.   I'm going to ask you a bit more about the whole loan

16  process later.  For now let me just ask you a couple questions

17  about County Bank.  Who did the borrower apply to you, you or

18  County Bank?  Your business?

19  A.   They applied 500FastCash.

20  Q.   Not to County Bank?

21  A.   No.

22  Q.   Do you recall County Bank ever sending you lenders and

23  saying -- or borrowers and saying they were approved?

24  A.   No.

25  Q.   And who did the approvals of the borrowers?

1  A.  Well, we had agents on the floor that kind of checked all

2  the boxes off and processed the application.

3  Q.  So did County Bank play any role in the approvals?

4  A.  Other than setting the guidelines and then they also

5  audited our files, so they didn't actually approve, but they

6  audited and ensured that you were following the processes.

7  Q.  My question is if they approved any borrowers.

8  A.  No.

9  Q.  Did you ever wait on County Bank to send money out?

10  A.  No.

11  Q.  Anybody tell you you had to wait on approval from County

12  Bank for any reason?

13  A.  No.

14  Q.  Was County Bank's name used on loan documents the entire

15  time you worked for Scott Tucker?

16  A.  No.

17  Q.  Around when did you stop using County Bank's name?

18  A.  About 2004.

19  Q.  Why did you stop using County Bank's name?

20  A.  Scott told me that we were no longer in a relationship with

21  County Bank.

22  Q.  Did he say why you were no longer in it?

23  A.  No.

24  Q.  During the time that 500FastCash was using the County Bank

25  name, was it the only name used in lending?

1  A.  There were other portfolios, so that was the only one that

2  portfolio used, but there were also other portfolios.

3  Q.  Do you know how those other portfolios got started?

4  A.  The first one, Cash Advance, was started with Scott and

5  Blaine, Joel Tucker and Tim Buckley.

6  Q.  And did Cash Advance always go by that name?

7  A.  No.  They became Ameriloan.

8  Q.  Is that A-M-E-R-I loan?

9  A.  Yup.

10  Q.  And I'm going to show you what's marked as Government

11  Exhibit 1734.  And do you recognize the signature on the bottom

12  of that?

13  A.  That's Scott's signature.

14  Q.  And in general terms, can you describe what this is?

15  A.  It looks like an application to Intercept, to create an

16  account within the customer's money.

17          MR. SCOTTEN:  Your Honor, the government offers 1734.

18          THE COURT:  Any objection?

19          MR. GINSBERG:  No objection.

20          THE COURT:  Received.

21          (Government Exhibit 1734 received in evidence)

22          MR. SCOTTEN:  Can we put that up on the screen.

23  Q.  Before I blow anything up, do you see in the right corner

24  where it says in big letters Intercept?

25  A.  Yes.

1    Q.  What is Intercept?

2    A.  Intercept is the processing company that we used to

3    actually send the money from -- in this case the account at

4    U.S. Bank -- to the customer's individual account.

5              MR. SCOTTEN:  Mr. Beer, can you please blow up sort of

6    the top portion from where it says EFT applications, procedures

7    and requirements down to the email address.  Perfect.

8    Q.  Over there on the right, do you see where it says d/b/a

9    name?

10   A.  Yes.

11   Q.  Can you just read it?

12   A.  Cash Advance.

13   Q.  Is that the portfolio we just discussed?

14   A.  Yes.

15   Q.  And then what's it say on the left for the company legal

16   name?

17   A.  C.B. Service Corp.

18   Q.  Do you have any idea what that is?

19   A.  Yeah, that was the legal name for Cash Advance.  All of

20   them had some sort of other name.  I just worked in operations,

21   so I would know Cash Advance.

22   Q.  And do you see where it says legal address?

23   A.  Yes.

24   Q.  Are you familiar with that address?

25   A.  It is an address in Carson City that we used for the

1   portfolios.

2   Q.  Was anything physically located there?

3   A.  No.

4   Q.  Do you have any idea what the point of having a Nevada

5   address was?

6   A.  No.

7           MR. GINSBERG:  Objection, your Honor.

8           THE COURT:  Overruled.

9           MR. SCOTTEN:  We can take down the blowup, and

10  actually the whole document.

11  Q.  What was the next portfolio that you started after Cash

12  Advance?

13  A.  United Cash Loans.

14  Q.  And how did that start, or how did you learn it started?

15  A.  Scott and Blaine said that we were starting another

16  company.  At that point they had a company set up but I was

17  going to manage that one, so I was involved with getting the

18  computers, employees, kind of coordinating everything to get

19  that one going.

20  Q.  When you say they had the company set up, what does that

21  mean to you?  What do you mean they had?

22  A.  They had the names, bank accounts.

23  Q.  I'm going to show you what's marked as Government Exhibit

24  1736.  Is this another Intercept application?

25  A.  Yes.

1    Q.  Do you recognize the signature?

2    A.  Scott Tucker's.

3            MR. SCOTTEN:  Your Honor, the government offers 1736.

4            THE COURT:  Any objection?

5            MR. GINSBERG:  No.

6            THE COURT:  Received.

7            (Government Exhibit 1736 received in evidence)

8            MR. SCOTTEN:  And again, please blow up that same

9    portion.

10   Q.  The d/b/a name there, again, United Cash Loans, the name

11   you know?

12   A.  Yes.

13   Q.  What's it say to the left?

14   A.  Silver State Business Inc.

15   Q.  Other than being the company's legal name, are you aware of

16   any legal significance -- sorry.  Was there any significance to

17   that name?

18   A.  I think it was on the bank account.  That's all that I

19   know.

20   Q.  And that address there, is that the Carson City address

21   again?

22   A.  Yes.

23           MR. SCOTTEN:  OK.  We can take that down.

24   Q.  What was the next portfolio that Tucker set up?

25   A.  Preferred Cash Loans.

1  Q.  Did that keep the same name the whole time?

2  A.  No.  It became OneClickCash.

3  Q.  And how did you learn that it had been started?

4  A.  That was the same way as United Cash Loans, Scott and

5  Blaine said they were starting another company and had the bank

6  account and company name, and then I set up everything else.

7          MR. SCOTTEN:  Could we show the witness 1735.

8  Q.  Ms. Grote, can you describe what you're looking at here?

9  A.  Yeah, this is the same application, or an application to

10  Intercept for the same type of account for Preferred Cash

11  Loans, which was Executive Global Management Inc.

12  Q.  Do you recognize the signature?

13  A.  Scott Tucker's.

14          MR. SCOTTEN:  Your Honor, the government offers 1735.

15          MR. GINSBERG:  No objection.

16          THE COURT:  Received.

17          (Government Exhibit 1735 received in evidence)

18          MR. SCOTTEN:  If we can blow up that same portion

19  briefly; I won't ask any questions about it.

20          OK.  Can we take that down and show the witness 1727.

21  Q.  Ms. Grote, do you recognize what I'm showing you?

22  A.  Yes.

23  Q.  And in general terms, what is it?

24  A.  An email that I sent Scott and Blaine that was then

25  forwarded to Larry Thistle.

1          MR. SCOTTEN:  Your Honor, the government offers 1727.

2          MR. GINSBERG:  No objection.

3          THE COURT:  Received.

4          (Government Exhibit 1727 received in evidence)

5          MR. SCOTTEN:  Can we go to the second page here and

6     publish that for the jury.

7     Q.  Ms. Grote, what is Scott Tucker asking for here?

8     A.  He asked for stats for the portfolio for OneClickCash, how

9     many loans and reactivations we had sent.

10         MR. SCOTTEN:  And can we now go to page 2 -- sorry.

11    Page 1.  Can you just blow up the bottom email that Ms. Cram at

12    the time sent back.

13    Q.  Ms. Grote, can I just ask you to read the body of this

14    email you sent to Scott Tucker?

15    A.  "Preferred Cash Loans-Executive Global was started in 2002.

16    It was converted to OneClickCash-Executive Global in May 2003

17    and that was converted to OneClickCash Santee in September

18    2005."

19    Q.  I'll ask you about that "Santee" word in a second, but for

20    now, do you believe all these dates to be accurate?

21    A.  Yes.

22         MR. SCOTTEN:  You can take that down -- well, let's

23    leave it up for a second for the jury.

24    Q.  And then finally, Ms. Grote, what was the last -- well,

25    what was the next portfolio to be started?

1    A.   US FastCash.

2    Q.   And how did that get started?

3    A.   That was the same with the others, they had the company set

4    up and so then I handled the operational side of everything.

5             MR. SCOTTEN:  Can we show Ms. Grote 1737.

6    Q.   And Ms. Grote, what are we looking at here?

7    A.   The same type of application.  This one is for US FastCash,

8    which had the legal name of Universal Management Services.

9    Q.   Do you recognize the signature?

10   A.   Yes.  Scott Tucker.

11            MR. SCOTTEN:  Your Honor, the government offers 1737.

12            MR. GINSBERG:  No objection.

13            THE COURT:  Received.

14            (Government Exhibit 1737 received in evidence)

15            MR. SCOTTEN:  Can we publish it.

16   Q.   Is Universal Management Services again the name used on the

17   bank account?

18   A.   Yes.

19   Q.   Was that again the Carson City address you referred to

20   earlier?

21   A.   Yes.

22   Q.   Ms. Grote, when we've been going through this, you've been

23   referring to these all as portfolios.  Is that the term used in

24   the company?

25   A.   It is.

1    Q.  Now, did the portfolios other than 500FastCash also use

2    County Bank's name on their lending documents?

3    A.  They did not.

4    Q.  Did Scott Tucker ever explain to you why he wanted to start

5    additional portfolios?

6    A.  No, with the exception of US FastCash that we started to be

7    a test company.

8    Q.  So for the other three, no reason given?

9    A.  No.

10   Q.  Were there specific employees who worked on lending

11   associated with specific portfolios?

12   A.  Yes.

13   Q.  Where did these employees work?

14   A.  We had a call center, so they had a cubicle.

15   Q.  Did each of these portfolios have its own call center?

16   A.  No.

17   Q.  Were they next to each other?

18   A.  They were.  They just had designated areas kind of assigned

19   to each portfolio.

20   Q.  Who managed the employees?

21   A.  Tim Buckley and myself were the kind of direct managers.

22   Q.  And do you know who managed their payroll?

23   A.  I believe Blaine Tucker, with ADP.

24   Q.  Let's take the period of, say, 2002 to 2004, at least

25   during the County Bank period.  Do you know what name appeared

1    on the paychecks?

2    A.  I --

3           THE COURT:  Ladies and gentlemen, you're going to be

4    in suspense overnight.  See you tomorrow for a 10:00 start.

5    Thank you for being so conscientious, working hard.

6           One thing I need to instruct you is that you leave

7    your notepads in the jury room overnight.  You can pick a spot

8    in there; they'll be undisturbed, but you leave them in the

9    jury room overnight.

10          Put the case out of your mind, and what else am I

11   going to tell you?  Do not discuss the case among yourselves or

12   with anyone, keep an open mind, there's a lot more to come.

13   Thank you.

14          (Jury not present)

15          THE COURT:  Have a pleasant evening.  See you tomorrow

16   morning.  Thank you.

17          MR. SCOTTEN:  Thank you, your Honor.

18          (Adjourned to September 19, 2017, at 10:00 a.m.)

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

ADRIAN RUBIN

Cross By Mr. Roth . . . . . . . . . . . . . 505

Cross By Mr. Bath . . . . . . . . . . . . . 555

Redirect By Mr. Velamoor . . . . . . . . . . 563

LISA ADAMS

Direct By Mr. Velamoor . . . . . . . . . . . 593

Cross By Mr. Ginsberg . . . . . . . . . . . 626

Redirect By Mr. Velamoor . . . . . . . . . . 658

AMY WEATHERWAX

Direct By Mr. Ravi . . . . . . . . . . . . . 660

Cross By Mr. Bath . . . . . . . . . . . . . 676

CRYSTAL GROTE

Direct By Mr. Scotten . . . . . . . . . . . 687

```
1                    GOVERNMENT EXHIBITS

2      Exhibit No.                              Received

3      104   . . . . . . . . . . . . . . . . . 580

4      104-105 and 107   . . . . . . . . . . . 590

5      901   . . . . . . . . . . . . . . . . . 605

6      909   . . . . . . . . . . . . . . . . . 608

7      902   . . . . . . . . . . . . . . . . . 615

8      905   . . . . . . . . . . . . . . . . . 622

9      908   . . . . . . . . . . . . . . . . . 654

10     2301  . . . . . . . . . . . . . . . . . 663

11     2303  . . . . . . . . . . . . . . . . . 665

12     2304  . . . . . . . . . . . . . . . . . 669

13     2309  . . . . . . . . . . . . . . . . . 672

14     2302  . . . . . . . . . . . . . . . . . 681

15     1734  . . . . . . . . . . . . . . . . . 704

16     1736  . . . . . . . . . . . . . . . . . 707

17     1735  . . . . . . . . . . . . . . . . . 708

18     1727  . . . . . . . . . . . . . . . . . 709

19     1737  . . . . . . . . . . . . . . . . . 710

20                    DEFENDANT EXHIBITS

21     Exhibit No.                              Received

22     38   . . . . . . . . . . . . . . . . . . 502

23     D43  . . . . . . . . . . . . . . . . . . 514

24     1207 . . . . . . . . . . . . . . . . . . 678

25
```