H9J8TUC1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          16 Cr. 91 (PKC)

5   SCOTT TUCKER,
    TIMOTHY MUIR,
6
                 Defendants.
7
    ------------------------------x
8                                          September 19, 2017
                                           10:10 a.m.
9
    Before:
10                       HON. P. KEVIN CASTEL

11                                         District Judge

12                            APPEARANCES

13  JOON H. KIM
         Acting United States Attorney for the
14       Southern District of New York
    BY:  NIKETH V. VELAMOOR
15       HAGAN C. SCOTTEN
         SAGAR K. RAVI
16       Assistant United States Attorneys

17  FREEMAN NOOTER & GINSBERG
         Attorneys for Defendant Tucker
18  BY:  LEE A. GINSBERG
         NADJIA LIMANI
19            -and-
    STAMPUR & ROTH
20  BY:  JAMES M. ROTH

21  BATH & EDMONDS, P.A.
         Attorneys for Defendant Muir
22  BY:  THOMAS J. BATH
              -and-
23  BEVERLY VAN NESS

24

25

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  I understand there is an

3     issue.  Can it wait or does it relate to something that is

4     coming up right now?

5          MR. SCOTTEN:  It will likely come up before the next

6     break.

7          THE COURT:  What is the issue?

8          MR. SCOTTEN:  Your Honor, defense moved in limine to

9     keep out references to other violations of state law.  I think

10    in particular they were concerned with the lack of licensing

11    here.  We agreed we had no interest in bringing up licensing.

12    However, you may recall, your Honor may recall, in the

13    cross-examination of Mr. Rubin there was a great deal of

14    exploration of unlicensed payday lending.

15         So the government is now concerned we are going to

16    create a false impression that there is some legality to the

17    defendant's business that Mr. Rubin's did not possess.  We

18    would like to ask this witness whether the business was in fact

19    licensed in any state, to which we believe she will respond no.

20         Frankly, your Honor, we think this would always have

21    been admissible if we cared.  It is extrinsically related to

22    the charged conduct.  But since there was some motion in limine

23    practice on it, we are now bringing it up only because the

24    defense opened the door, and I do think Mr. Ginsberg objects.

25         THE COURT:  Let me here Mr. Ginsberg.

1    MR. GINSBERG:  We don't think we opened the door.  The

2    questions were asked on cross-examination of a cooperating

3    witness to show other bad acts that he committed that hadn't

4    been brought out on direct examination by the government.  I

5    don't think that equates to overriding the 404, 403 issue as to

6    a defendant in the case.  We just did it to show that he held

7    back on certain material, not necessarily per se for the

8    underlying licensing, but just having to do with his direct

9    examination.

10    I don't think it's a fair comparison to say because we

11    did that, then the licensing issue with Mr. Tucker comes in.  I

12    think it's really different in kind because one is a

13    cooperating witness, one is a defendant, different rights flow

14    to the defendant.  The cooperating witness doesn't have the

15    same 403, 404, unless the government had made that application

16    as well.

17    THE COURT:  This is my ruling on this.  First of all,

18    door opening is not -- I think I might have said this once

19    before at sidebar -- it is not an argument that anyone is

20    guilty of a moral shortcoming.  It's something that happens in

21    trials.  I think it's appropriate for the government to be able

22    to ask the question, although I think a limiting instruction is

23    appropriate, if desired, that evidence on this point is not a

24    substitute for evidence of the crime charged in the indictment,

25    which I will give unless somebody doesn't want me to give it.

1          MR. GINSBERG:  I think we want you to give it if it's

2     going to be admitted, and I think you heard my position.

3          THE COURT:  I did.  I appreciate that.  If I am not

4     doing it at the right juncture or you want me to do it a second

5     time, you will let me know on the limiting instruction.

6          MR. GINSBERG:  Yes, your Honor.

7          THE COURT:  Bring our jury in, please.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2      CRYSTAL GROTE, resumed.

3          THE COURT:  The Yankees had a pretty exciting finish

4      to the game last night against Minnesota.  Their closer is back

5      in action.  So let's see what happens from here on out.

6          The court reminds you that you are still under oath.

7          I didn't really say good morning.  So let me say good

8      morning to all of you and it's good to see you smiling, and

9      that's what we all need to do.  Take deep breaths and relax and

10     smile.

11         Without further ado, you may continue with your

12     examination.

13         MR. SCOTTEN:  Thank you, your Honor.

14     DIRECT EXAMINATION (Cont'd)

15     BY MR. SCOTTEN:

16     Q.  Ms. Grote, I just want to ask you a few questions to get us

17     back to where we were and resituate things.

18     A.  OK.

19     Q.  When we finished off, you were testifying about these

20     things called portfolios, and the first one of those was called

21     500 FastCash.  Is that right?

22     A.  Yes.

23     Q.  What were the next four after those?

24     A.  Ameriloan, United Cash Loans, One Click Cash and US

25     FastCash.

1    Q.  And they had other names also, correct?

2    A.  They did.

3    Q.  What were those?

4    A.  The first name, Cash Advance.  United Cash Loans was always

5    United Cash Loans.  One Click was previously referred to as

6    Cash Loans.  And US FastCash was always US FastCash.

7    Q.  Am I correct that you testified that Scott and Blaine

8    Tucker started those portfolios during the period when 500

9    FastCash was lending with the County Bank name, but those other

10   portfolios were not lending with the County Bank name, is that

11   correct?

12   A.  Correct.

13   Q.  And also the employees who did lending under those

14   portfolio names were all lending out of the same big call

15   center?

16   A.  Correct.

17   Q.  The payroll for the employees who did this lending, who

18   managed that payroll?

19   A.  Blaine Tucker.

20   Q.  Do you know what it said on the paychecks that these

21   employees received during the period when 500 FastCash was

22   using County Bank?

23   A.  I believe it said NM Services.

24   Q.  Can you remind the jury what NM Services was?

25   A.  National Money Service.  That was the actual name of 500

1    FastCash.

2    Q.  So the paychecks of employees working for any portfolios

3    had NM Services on them?

4    A.  In the beginning, yes.

5    Q.  Who were the managers over these portfolios?

6    A.  Tim Buckley managed the Cash Advance portfolio or

7    Ameriloan, and I managed the other four.

8    Q.  Who did you and Tim Buckley report to?

9    A.  Scott and Blaine.

10   Q.  Could an employee work on loans that were issued in more

11   than one portfolio name?

12   A.  Not at the same time.

13   Q.  When you say "not at the same time," what do you mean?

14   A.  So we had a designated area for each portfolio.  So if an

15   agent needed to assist in another portfolio, they actually had

16   to get up from their seat and walk to that department and log

17   into that system.

18   Q.  When you say "that department," you mean just to another

19   part of the same call center room?

20   A.  Yes.

21   Q.  What are some of the reasons that an employee would do

22   that?

23   A.  Staffing is really the number one reason.  If we were short

24   staffed in another portfolio, then we might borrow an agent

25   from one for the day.

1   Q.  Now, could a customer have loans under more than one

2   portfolio?

3   A.  They could.

4   Q.  And so if a customer service rep was helping a customer

5   with a loan under, say, One Click Cash and that customer also

6   had a cash under 500 FastCash, could that customer service rep

7   help with both?

8   A.  They could not.  At their station they only had access to

9   that one portfolio.

10  Q.  Were they allowed to tell the customer, call me right back

11  in a minute, I am going to go down to the next station?

12  A.  No.  We had a policy to tell the agents that we were not

13  affiliated with the other companies.

14  Q.  Where did this policy come from?

15  A.  From Scott and Blaine.

16  Q.  How did they communicate it to you?

17  A.  They just would have told me that was our company policy.

18  It was for a long time.

19  Q.  Did it change at some point?

20  A.  We stopped saying that they were affiliated with, but we

21  did not do what you are suggesting by saying that one agent

22  could still help another agent.  Excuse me.  One agent could

23  help a customer, excuse me, in multiple portfolios.

24  Q.  Did Scott Tucker explain to you why you couldn't admit the

25  portfolios were affiliated?

1    A.  Not other than the fact that we just had each one siloed.

2    So there wasn't any reason.  We just siloed each one and kind

3    of ran them individually from a customer service standpoint.

4    Q.  But he didn't say why they were siloed?

5    A.  No.

6         MR. SCOTTEN:  Can we show the witness 1726.

7    Q.  Ms. Grote, do you recognize this?

8    A.  Yes.

9    Q.  What is it?

10   A.  It is a log of a biweekly team meeting minutes.  So a log

11   what they were discussing in a team meeting for One Click Cash

12   production.

13        MR. SCOTTEN:  The government offers 1726.

14        THE COURT:  Any objection?

15        MR. GINSBERG:  Just one second, your Honor.  Our

16   particular screen is not working.  So we are pulling it up on

17   our computer.

18        THE COURT:  Take your time.

19        MR. GINSBERG:  No objection.

20        THE COURT:  Received.

21        (Government's Exhibit 1726 received in evidence)

22        MR. SCOTTEN:  May we publish?

23        THE COURT:  You may.

24        MR. SCOTTEN:  So can we please zoom in on the line

25   right below biweekly team meeting where it says "meeting called

1   by."

2   BY MR. SCOTTEN:

3   Q.  Ms. Grote, do you know who Susan James was?

4   A.  Susan was the manager of One Click Cash collection.

5   Q.  Can you just read what it says where it says "type of

6   meeting."

7   A.  "One Click Cash collection team meeting."

8           MR. SCOTTEN:  Can we now zoom in on what I believe is

9   the second agenda item, which begins "company confidentiality."

10  BY MR. SCOTTEN:

11  Q.  Ms. Grote, can I ask you to read the discussion line.

12  A.  Out loud?

13  Q.  Please.

14  A.  "We work for One Click Cash or OCC and only OCC.  We are

15  not affiliated with anyone else.  We are not sister companies

16  with anyone.  We don't know them."

17  Q.  Is that a true statement at the time it was made?

18  A.  It was not.

19  Q.  Was OCC in fact affiliated with the other portfolios?

20  A.  Yes.

21  Q.  Did it share payroll and management and lending process

22  with them?

23  A.  It did.

24  Q.  Were the people being asked to say this in fact sometimes

25  sitting right next to people from the other portfolios?

1   A.   Yes.

2   Q.   And sometimes themselves working for those portfolios?

3   A.   Sometimes, yes.

4             THE COURT:  Avoid leading.

5             MR. SCOTTEN:  Thank you, your Honor.

6             We can take that down.

7   Q.   So, Ms. Grote, other than the portfolio names, National

8   Money Service, and then those bank account names you went over

9   yesterday, were there any other company names used during your

10  time there?

11  A.   There were two other small portfolios created, ACS, or Ace

12  and Star, and then there was also CLK Management and AMG

13  Services.

14  Q.   As to CLK Management and AMG Services, did one come before

15  the other?

16  A.   CLK was first.

17  Q.   What was CLK?

18  A.   Management company for the employees for employees for IT,

19  HR.

20  Q.   What is the difference between CLK and National Money

21  Service?

22  A.   National Money Service was still kind of tied to or was 500

23  FastCash, and CLK was only a management company.  It did not

24  give any loans at any time.

25  Q.   So you testified earlier that Scott and Blaine Tucker

1   started each of the portfolios.  How did CLK start?

2   A.  I believe the same way.  I don't even remember that, other

3   than we have -- we made an announcement to employees that they

4   were going to have different paychecks.  But I don't remember

5   anything.  We had to do some stuff with IT, but I wasn't really

6   involved with that.

7   Q.  So other than a change of names on the paychecks, were

8   there any substantive changes in how the business worked when

9   the CLK name started to be used?

10  A.  Not from our operational side and customer service, no.

11  Q.  I think you said yesterday that around 2004, 500 FastCash

12  stopped being affiliated with County Bank?

13  A.  Yes.

14  Q.  Did there come a time that payday lending business you

15  worked at ever got involved with other outside entities?

16  A.  The tribal entities, yes.

17  Q.  When you say the tribal entities, do you remember the names

18  of the entities?  Do you remember the names of any entities?

19  A.  The Santee tribe, the Modoc, and the Miami tribe.

20  Q.  How did you learn these tribes were somehow involved?

21  A.  Scott and Blaine told me and we had to update some

22  documents and training material.

23  Q.  Do you remember anything that Scott Tucker might have said

24  about why these tribes were involved?

25  A.  No.  I didn't ask why.

1    Q.  Other than using their names, were there any changes

2    initially?

3    A.  No.

4    Q.  When you said change on the training material, were you

5    changing anything other than the names on the training

6    material?

7    A.  No.

8    Q.  At this time that you learned or that Scott Tucker told you

9    the tribes were involved, did the lending business change its

10   location?

11   A.  No.

12   Q.  At this time, when you were told tribes were involved, did

13   Scott Tucker's role in the company change?

14   A.  No.

15   Q.  Just for the jury's clarity, was Tim Muir working at the

16   company at this time?

17   A.  I don't think so.  It kind of all happened at the same

18   time, but I don't think he was.

19   Q.  You said earlier that you went to Scott Tucker for major

20   decisions that affected the whole business.  Did that change

21   after he told you the tribes were involved?

22   A.  No.

23   Q.  Did you ever see anyone overrule Scott Tucker on any

24   decision related to the payday lending business?

25   A.  No, not that I recall.

1    Q.  Did Scott Tucker ever tell you that he couldn't do

2    something because he needed someone else to approve it?

3    A.  No.

4    Q.  OK.  Let's shift to the loan process.  I want to start with

5    how the loan process worked in the time using the Internet.

6         How did you first find out about a possible borrower?

7    A.  In the time we were using the Internet, the borrowers would

8    go online and apply.  We had a user tool software for customer

9    service agents, and the application would come into the

10   Internet.  It would enter a thing we called a ping tree.  That

11   ping tree would disburse the application to one of the

12   portfolios after running some of the business rules.  And if

13   the application passed, it would be automatically imported into

14   the customer service software.

15   Q.  Let me just ask you a couple of questions about that.

16        Ping tree, is that a word used for some kind of

17   computer program?

18   A.  Yes.  It is what we call -- literally the application would

19   come in and then follow the tree to the appropriate company.

20   Q.  You said the business rules.  What are the business rules?

21   A.  The basic business rules and checks.  So whether the

22   customer was 18 years of age, if they had the appropriate

23   amount of income.  There was numerous checks that were done

24   online.

25   Q.  So I think you said if these checks were passed, then ping

1  tree sent the applicant to a particular portfolio?

2  A.  Yes.

3  Q.  How did it determine which portfolio to send the applicant

4  to?

5  A.  Well, in a round-robin, so whichever company was next on

6  the list.  However, two of the companies purchased a greater

7  number than the other three.  UCL and AML purchased a higher

8  number.

9  Q.  Was there another portfolio that got a lower number?

10 A.  I'm not remembering fully.  I think 500 FastCash and US

11 FastCash received the same amount and they were the lowest.

12 Q.  Did these proportional divisions change in the period after

13 you learned or Scott Tucker told you the tribes were involved?

14 A.  No.

15 Q.  So how did you decide whether or not a particular applicant

16 actually got a loan?

17 A.  When the application was received in the software, they

18 were preapproved for a loan.  The agent would do checks on the

19 application based off what we called triggers.  So the software

20 would say, something is wrong with this phone number, or the

21 work number matches the cell phone number, which would trigger

22 the agent to take an additional action.  And the agent would

23 follow whatever steps would be required.  Maybe call the

24 employer to verify with the employer whether the customer is

25 actually employed.  And if that was the case, then the customer

1   service agent would put the application in an approved status

2   into the queue to be funded that day.

3   Q.   When you say the application was preapproved, is that what

4   the business rules did?

5   A.   Yes.

6   Q.   That was an automated process?

7   A.   Yes.

8   Q.   So assuming an applicant is approved, what is the next

9   step?

10  A.   The next step is applications are approved throughout the

11  day.  At the end of business, all applications that were

12  approved are put into a batch for funding.  The system

13  generates a file that is sent to the company Intercept, and

14  then intercept disburses the money to the company -- excuse me,

15  the customers' bank accounts that night.

16  Q.   So a couple of questions.

17            Intercept, that's the same company we were looking at

18  those applications yesterday that had the portfolio names and

19  the bank account names?

20  A.   Yes.

21  Q.   This daily batch, did anyone from the company approve it

22  before it went to Intercept?

23  A.   An agent had to review every application, but no one really

24  approved it.  The fraud department looked at the applications

25  and pulled some out sometimes, but nobody approved it.

1  Q.  So once it goes to Intercept, how does the money get to the

2  customer?

3  A.  Intercept creates a file, sends it through the Federal

4  Reserve, and disburses it to customer accounts.  Pulls it

5  from -- I am not a hundred percent if they pulled it directly

6  from the company's bank account or if then we had to wire money

7  to Intercept the next day.  So pulled it from one of their own

8  accounts.

9           MR. SCOTTEN:  Let me show the witness 1715.

10  Q.  Ms. Grote, do you recognize this document?

11  A.  Yeah.  This is the request from Intercept, instructions to

12  send a wire.  That is forwarded from Intercept to Blaine.

13  Excuse me.  To Scott from Blaine.

14           MR. SCOTTEN:  Your Honor, the government offers 1715.

15           MR. GINSBERG:  No objection.

16           THE COURT:  Received.

17           (Government's Exhibit 1715 received in evidence)

18           MR. SCOTTEN:  Mr. Beer, would you please put it up for

19  the jury.

20  BY MR. SCOTTEN:

21  Q.  Let's just start on the second page where the e-mail

22  begins.

23           So that first column there, Ms. Grote, is that

24  Intercept?

25  A.  Yes.

1    Q.  You see four names in the next column?

2    A.  Yes.

3    Q.  Are those the portfolio names?

4    A.  Yes.

5    Q.  Do you see a total amount depicted in this portion of the

6    chart?

7    A.  Yes.  Total advances?

8    Q.  Yes.

9         Can I ask you to read.

10   A.  $3,277,585.

11   Q.  So if we can go to the first page now.  Just focus on the

12   whole bottom half, if you can.

13        At the bottom there, what is in that last line?  The

14   first line.

15   A.  I'm sorry.  What?

16   Q.  In the bottom e-mail, do you see four boxes?

17   A.  Yes.

18   Q.  Is that just the top of the chart that's carried over to

19   the next page?

20   A.  Yes.

21   Q.  Is that another portfolio name there?

22   A.  Yes.  That would have been included in the total advances.

23   Q.  Then looking up at the top of the zoomed-in area, do you

24   recognize the person from line?

25   A.  Yes.  Joanne from Intercept.

1    Q.  Who is this being sent to?

2    A.  Angela Hildebrand, Blaine Tucker, myself, and Stacy Boch.

3    Q.  You mentioned yourself and Blaine Tucker before.  Who are

4    the other two people?

5    A.  Angie and Stacy were in charge of the processing

6    department.  So they would take some action or manage the

7    people that took action to send the batch every day.

8            MR. SCOTTEN:  Then, Mr. Beer, can we go to sort of the

9    second top half of this e-mail.

10   Q.  Ms. Grote, without reading it, can you just sort of

11   describe what Scott and Blaine Tucker are discussing here.

12   A.  Yes.  Blaine was giving Scott an update about the number of

13   loans that we funded over a holiday weekend, and Scott said

14   wow.

15   Q.  So that 3 million and change figure that we looked at

16   earlier, what period of time was that for?

17   A.  It was for about three and a half days.  I'm sorry.  It

18   would be four days because Monday was a holiday.

19           MR. SCOTTEN:  We can take that down.

20   Q.  Going back to the loan process, how did the customer pay

21   the lending company back?

22   A.  The money was automatically debited from the customer's

23   bank account that they provided during the application.

24   Q.  Where did that money go?

25   A.  Directly into the portfolio account, I believe, although it

1   would have went through Intercept again.  So I don't know how

2   it happened.

3   Q.  From Intercept to the portfolio account?

4   A.  Yes.

5   Q.  You don't know how Intercept did business?

6   A.  Right.

7   Q.  Did you ever have trouble with customers not repaying their

8   loans?

9   A.  Yes.

10  Q.  Was there a department to handle that?

11  A.  There was.  We had two collection departments actually.

12  One kind of tied in to the customer service department and then

13  one that we called second tier collection.

14  Q.  So a couple of questions.  Where were all of those

15  collection departments located?

16  A.  The first round collection was located on the same floor as

17  customer service.  The second tier collection was located on a

18  different floor.

19  Q.  Same building though?

20  A.  Same building.

21  Q.  Did the second tier collection service have its own

22  corporate name?

23  A.  At one time they were Pinion Management.  I don't know if

24  they kept that because we started calling them recovery and

25  final collection and we didn't use Pinion anymore.  So I don't

1   know what they were at that point.

2   Q.  To your understanding, were they all part of the same

3   overall business, though?

4   A.  Yes.

5   Q.  Is it fair to say you described the necessary steps for

6   sending out a loan from start to finish?

7   A.  I believe so.

8   Q.  At any point did you mention the involvement of Indian

9   tribe?

10  A.  No.

11  Q.  How about the involvement of County Bank?

12  A.  No.

13  Q.  You mentioned earlier that any employee could work on a

14  loan with more than one portfolio name.  Did that change after

15  the tribes were involved?

16  A.  No.

17  Q.  You mentioned earlier that employees were not allowed to

18  say the portfolios were affiliated.  Did that change after you

19  were told that the tribes were involved?

20  A.  No.

21  Q.  Did you ever receive any guidance from tribes on loan

22  approval criteria?

23  A.  No.

24  Q.  Did the loan approval criteria change at all after you were

25  told tribes were involved?

1   A.  No.

2   Q.  Did you ever speak to a tribe member about which particular

3   loan had to be funded before it went out?

4   A.  No.

5   Q.  Did you ever have to wait for a tribe to approve a daily

6   batch or sending money out?

7   A.  No.

8   Q.  I am going to show you what's marked as Government Exhibit

9   1702.

10          Do you recognize this?

11  A.  It does look like an e-mail between Scott, Blaine and

12  myself.

13  Q.  When you say Scott and Blaine, Scott and Blaine Tucker?

14  A.  Yes.

15          MR. SCOTTEN:  Government offers 1702.

16          MR. GINSBERG:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 1702 received in evidence)

19  BY MR. SCOTTEN:

20  Q.  Again, let's start with the second page.

21          MR. SCOTTEN:  Can we blow up the original message?

22  Q.  So who is this e-mail from, Ms. Grote?

23  A.  From Scott Tucker.

24  Q.  Who is it to?

25  A.  Don Brady.

1   Q.  Do you know who Don Brady is or was?

2   A.  He managed the payday side for the Miami tribe.

3   Q.  Let's go to the first page.

4           Ms. Grote, without going into detail, can you describe

5   what this e-mail is about?

6   A.  So I believe Ed had created a loan approval tool that Don

7   could access to see what loans were going to be funded for that

8   day.

9   Q.  So who is Ed?

10  A.  Ed was in charge of IT.

11  Q.  Do you know if this system actually worked?

12  A.  I believe the system worked.

13  Q.  What did it do?

14  A.  It gave Don access to a list of customers that were funded,

15  or going to be funded for that day.

16  Q.  So Don Brady could see who was going to be funded?

17  A.  Yes, he could.

18  Q.  Did you ever have to wait for Don Brady to do anything with

19  this list?

20  A.  We did not.

21  Q.  Did you ever receive guidance from Don Brady on whether to

22  fund a loan?

23  A.  No.

24  Q.  Then just to be clear, who are you discussing this

25  informational system with in this e-mail?

1   A.  With Scott Tucker.

2           MR. SCOTTEN:  We can take down 1702.  Thank you.

3   Q.  Did you ever receive any guidance from the tribes on

4   collections?

5   A.  No.  We would receive guidance on individual customers, but

6   not necessarily -- I would not have received directly any

7   guidance on collection processes or policies.

8   Q.  We will talk in a second.  You said a couple of individual

9   customers?

10  A.  Yes.  If individual customers had either complained or had

11  additional questions and called the tribe directly, then the

12  tribe would call me to figure out how we were going to handle

13  that customer.

14  Q.  So let me ask you this.  Other than what you just

15  mentioned, up to -- as long as the CLK was being used, did the

16  tribes play any role at all in lending?

17  A.  No.

18  Q.  How long was the CLK name used?

19  A.  Until about 2008, I believe.

20  Q.  How did it change?

21  A.  It changed to AMG Services.

22  Q.  Who told you the name was changed?

23  A.  Scott Tucker, Blaine Tucker, Tim Muir.  I don't remember

24  which one.

25  Q.  I guess I should ask.  You mentioned Blaine Tucker a lot.

1  Did there come a time that he was no longer involved in the

2  lending process?

3  A.  Yes.

4  Q.  Why is that?

5  A.  He died.

6  Q.  So as to Scott Tucker and Tim Muir, did either of them say

7  why the name was being changed?

8  A.  I don't remember them telling me exactly why.  I do know

9  that the Miami tribe owned AMG.  I don't really remember who

10  owned CLK.

11  Q.  When you say the Miami tribe owned AMG, did you see some

12  kind of purchase deed?

13  A.  No.

14  Q.  Did you see any paperwork that explained how the Miami

15  tribe claimed to own AMG?

16  A.  No.

17  Q.  So who told you -- who initially told you this happened?

18  A.  Initially it would have been Scott, Tim or Blaine.

19  Q.  Were there any consequences of this supposed ownership?

20  A.  Document changes.  Again, we would have changed the

21  documents to AMG.  Employees would have received AMG on their

22  paychecks.  So the name would have changed on the paychecks.  I

23  don't remember if anything else changed.

24  Q.  So other than changing names on documents, do you remember

25  any other changes?

1   A.  I don't remember any.

2   Q.  Did the loan terms change?

3   A.  No.

4   Q.  Did the substance of the training documents change?

5   A.  No.  They naturally would have changed over time, but not

6   because we became AMG.

7   Q.  What about the policy about hiding affiliation between

8   portfolios?

9   A.  No.

10  Q.  Is there a policy about telling customers that CLK and AMG

11  were overall the portfolios handling the loans?

12  A.  No, we were not to do that either.

13  Q.  Where did that policy come from?

14  A.  Scott, Tim or Blaine.  I don't remember which.

15  Q.  When you say Scott, Tim or Blaine, do you have any sense

16  that only one of those three knew about the policy?

17  A.  No, I believe they all knew.

18  Q.  You believe you spoke with all of them about it or why do

19  you believe that?

20  A.  Yes, I think we would have talked about that.  We did talk

21  about that in company meetings.  I think the entire company

22  knew the policy.

23  Q.  You had mentioned a minute ago that Scott Tucker, Tim Muir

24  or Blaine Tucker told you that the Miami owned AMG.

25  A.  Yes.

1   Q.  Did you ever see any persons from that tribe actually in

2   your office?

3   A.  Yes.

4   Q.  Who was the person you saw most often?

5   A.  Most often was Don Brady.

6   Q.  You mentioned him a minute ago.  Can you remind the jury

7   who he was?

8   A.  I don't know exactly what his title was, but he was

9   responsible for the payday company for the Miami nation.

10  Q.  Did he have an office in the building?

11  A.  He did.

12  Q.  Where was that office located?

13  A.  Over by Scott's office.

14  Q.  Was either of those offices a corner office?

15  A.  Yes.

16  Q.  Which one?

17  A.  Scott's.

18  Q.  Whose office was bigger?

19  A.  Scott's.

20  Q.  When Don Brady travelled between Miami and Kansas City, how

21  did he travel?

22  A.  I believe he drove.

23  Q.  Did Scott Tucker ever travel down to Miami?

24  A.  Yes.

25  Q.  How did he travel?

1    A.   I believe he flew.

2    Q.   What did he fly?

3    A.   In his plane.

4    Q.   His plane?

5    A.   Yes.

6    Q.   Did Don Brady own a plane?

7    A.   Not that I know of.

8    Q.   Did you ever see Don Brady give Scott Tucker an order?

9    A.   No.

10   Q.   Can I show you Government Exhibit 1710.

11        Do you recognize it?

12   A.   Yes.  An E-mail between Don, Blaine and Scott that was

13   forwarded to me.

14        MR. SCOTTEN:  Government offers 1710, your Honor.

15        MR. GINSBERG:  No objection.

16        THE COURT:  Received.

17        (Government's Exhibit 1710 received in evidence)

18        MR. SCOTTEN:  Can we zoom in on the bottom, the first

19   e-mail.

20   BY MR. SCOTTEN:

21   Q.   Who is this e-mail from, Ms. Grote?

22   A.   From Don Brady.

23   Q.   Who is it to?

24   A.   To Blaine Tucker.  Scott is cc'd.

25   Q.   Can I ask you to just summarize what Don Brady is asking

1    for here.

2    A.   Yes.  Don is asking if it's OK if we could have a lady from

3    the tribe come up into our office and work for the summer.

4    Q.   In what sort of position?

5    A.   Call center agent, I believe.  It doesn't say, actually,

6    but I think that's what we were going to do with her.

7    Q.   Can you read the subject line.

8    A.   Summer intern.

9         MR. SCOTTEN:  If we can zoom out and zoom in on the

10   top portion.

11   Q.   Again, without reading it, can you just summarize what

12   Blaine Tucker's response was?

13   A.   Blaine tells him that it's fine and he is going to get me

14   to coordinate.

15   Q.   Just to be clear, who is asking whose permission here?

16   A.   Don asked Blaine if it was OK.

17   Q.   As between Blaine and Scott, who is senior?

18   A.   I believe Scott was.

19   Q.   When you say you believe Scott was senior, is that based on

20   your observations or what?

21   A.   Yes, based on observations.  But as things progressed, then

22   Blaine took on a more senior role, had more responsibility and

23   answered more questions.

24   Q.   At any time did he displace Scott Tucker as the ultimate

25   authority?

1    A.  No, I don't believe so.

2              MR. SCOTTEN:  We can take this down.

3    Q.  Let's go into loan documents for a minute.

4              What was the interest rates on your loans when you

5    first started working, I guess with National Money Service at

6    the time?

7    A.  It was $30 per 100.

8    Q.  And can you play it out a little bit more.  For how long a

9    period?

10   A.  It depended on the customer's pay period.  If they were

11   paid weekly or biweekly, that loan period was roughly two

12   weeks.  So next Friday, two Fridays.

13             If they were paid monthly, then they would be due

14   monthly, on their next payday.

15   Q.  Did this $30 per 100 ever change during the time of Scott

16   Tucker and later Tim Muir?

17   A.  No.

18   Q.  So when the customers' first paydays came, how much did

19   they pay?

20   A.  During what period?

21   Q.  Good question.  What was the minimum they had to pay?

22   A.  The minimum they had to pay would be $30 if they took out a

23   $100 loan.

24   Q.  Could they potentially have to pay back the entire amount

25   of the loan?

1    A.  Yes.

2    Q.  Was there a term they used when the entire amount of the

3    loan was paid back?

4    A.  A renewal or refinance.

5    Q.  So let's start in the period before County Bank, as you

6    recall it.

7            How did renewals work?

8    A.  I believe they were automatic.  The customer was

9    automatically renewed.  So only the finance charge was debited.

10   Q.  When did they start paying down the loan?

11   A.  They did not during that time that I remember.  They had to

12   ask to pay off the loan.

13   Q.  What happened if they didn't ask?

14   A.  I believe they kept being renewed or refinanced.

15   Q.  Forever?

16   A.  Potentially.

17   Q.  Did that change when you understood County Bank to be

18   involved?

19   A.  Yes.

20   Q.  How did it change?

21   A.  The customer was not automatically renewed.  The customer

22   was scheduled to pay out on their first payday.  They could

23   request a renewal.  They could do that four times.  On the

24   fifth time they had to start paying down the principal of the

25   loan, and they had to $50 on the principal of their loan every

1   time thereafter until they were paid in full.

2   Q.  So the renewals for County Bank were not, in your

3   recollection, automatic?

4   A.  Correct.

5            MR. SCOTTEN:  Can we show the witness 1701, please.

6   If you can just flip to the second page.

7   Q.  Ms. Grote, do you recognize this?

8   A.  A loan note and disclosure during the County Bank time.

9   Q.  What is the first page?

10  A.  I faxed that to Scott Walsmith, the bank.

11           MR. SCOTTEN:  Your Honor, the government offers 1701.

12           MR. GINSBERG:  No objection.

13           THE COURT:  Received.

14           (Government's Exhibit 1701 received in evidence)

15  BY MR. SCOTTEN:

16  Q.  I am just going to leave up the fax cover page for a

17  second.  I won't ask any questions.

18           We can go to page 2.  Is this the loan note you

19  mentioned a second ago?

20  A.  Yes.

21  Q.  Ms. Grote, are you familiar with the term TILA box?

22  A.  Yes.

23  Q.  Do you see a TILA box on this loan note?

24  A.  The TILA box is the top portion of the loan note.  It has a

25  border around it, the four top boxes and the box below.

1              MR. SCOTTEN:  Can we zoom in on just that, Mr. Beer.

2    Q.  How much was this loan for?

3    A.  $200.

4    Q.  Where do you see that?

5    A.  In the third box, amount financed.

6    Q.  What was the finance charge going to be on this loan?

7    A.  $60 in the finance charge box.

8    Q.  How is that calculated?

9    A.  The $30 per 100.

10   Q.  Do you see where it says "total payments?"

11   A.  Yes.

12   Q.  Can you read that?

13   A.  "The amount you will have paid after you have made the

14   schedule payment, $260."

15   Q.  Is that accurate?

16   A.  Yes.

17   Q.  Was the borrower in fact scheduled to make a $260 payment

18   under County Bank?

19   A.  Yes.

20             MR. SCOTTEN:  Can we take that down, please.

21   Q.  Can we next -- let me ask you this.  So in that situation,

22   there is no automatic renewal, correct?

23   A.  There was no automatic renewal.

24   Q.  Did FastCash make more money if the customer paid the loan

25   off or if it renewed the loan?

1    A.  If they renewed the loan and then eventually paid the

2    principal.

3    Q.  Did you ever discuss renewals with Scott Tucker?

4    A.  We would have discussed renewals.  We did discuss renewals.

5    I don't remember specific conversations.

6    Q.  Based on your recollection of those conversations, what was

7    Scott Tucker's understanding of the profitability of renewals

8    versus immediate repayment?

9    A.  I believe he understood if a customer renewed, refinanced,

10   then the company gets more money.

11   Q.  You say you believed.  How certain are you?

12   A.  I'm certain of that.

13   Q.  Let me next show you what is in evidence as Government

14   Exhibit 1706.

15        MR. SCOTTEN:  I am just going to ask Mr. Beer to zoom

16   in on the top portion, the sort of final e-mail.

17   Q.  Ms. Grote, who is this e-mail from?

18   A.  From Kelly Heath.

19   Q.  Can I ask you to read who is in the cc line.

20   A.  Scott Tucker and Blaine Tucker.

21   Q.  Would you please read what Ms. Heath wrote in this e-mail?

22   A.  Out loud?

23   Q.  Please.

24   A.  "I like it as well.  Also, this may decrease the PIF,"

25   which is pay in full, "and people will pay down the loan

1   instead."

2   Q.  What is pay in full or PIF?

3   A.  That would be the customer paying the $260.

4   Q.  What would be a pay down instead?

5   A.  A pay down would be a customer paying $60 and then say $50

6   of the principal or whatever amount they choose.

7   Q.  What is Ms. Heath suggesting here about why she likes

8   something?

9   A.  She is suggesting that the update to the account summary

10  will encourage customers or will decrease the pay in fulls and

11  create more renewals or pay downs.

12  Q.  So you testified a minute ago that while County Bank was

13  involved in 500 FastCash, Scott and Blaine Tucker directed you

14  to start new portfolios, is that correct?

15  A.  Yes.

16  Q.  What was renewal process for those portfolios?

17  A.  They had an automatic renewal process.  The customer would

18  be debited for the finance charge four times and then on the

19  fifth time, if they had not previously elected to pay out, then

20  we would start debiting the $50 per principal.

21       MR. SCOTTEN:  Let me take that down and show you

22  Government Exhibit 1731.  Then if we can go one page forward so

23  Ms. Grote can see the whole document.  Maybe one more.

24  Q.  Ms. Grote, do you recognize this document?

25  A.  This is an application for a loan.

1    Q.   What is the first page?

2    A.   The first page, it's kind of what I called our application

3    set.  It was the cover page, application, and it would have

4    been the loan note and other pages part of this set.

5    Q.   I apologize.  Can we click back to the first page.  Not the

6    loan set.

7    A.   It's a fax from Scott to Kevin Brannon and Ellen Bachman.

8             MR. SCOTTEN:  Government offers 1731.

9             THE COURT:  Any objection?

10            MR. GINSBERG:  No objection.

11            THE COURT:  Received.

12            (Government's Exhibit 1731 received in evidence)

13            MR. SCOTTEN:  Mr. Beer, can we blow up the center

14   portion that has all the action going on.

15   BY MR. SCOTTEN:

16   Q.   Do you recognize the signature above the name Scott?

17   A.   Scott's signature.

18   Q.   Can I ask you to read the handwriting?

19   A.   "A sample of typical documents we get executed to fund a

20   loan."

21            MR. SCOTTEN:  If we can take that down.  Just blow up.

22   Q.   Let's go to page 6.  Ms. Grote, do you see a TILA box here?

23   A.   Yes, at the top of the page.

24            MR. SCOTTEN:  Mr. Beer, can you highlight everything

25   from the TILA up.  I also want to capture the top matter above

1   that.  Perfect.

2   Q.  So before we get into the TILA box, do you see a date here?

3   A.  June 18, 2003.

4   Q.  Can you tell what lender this application is for?

5   A.  United Cash Loans.

6   Q.  So is this during the period when 500 FastCash is using

7   County Bank's name?

8   A.  I believe so.

9   Q.  But this is a different portfolio that was started?

10  A.  Yes.

11  Q.  How much is this loan for?

12  A.  $300.

13  Q.  What is the finance charge?

14  A.  $90.

15  Q.  Do you see the total payments box?

16  A.  Yes.

17  Q.  I ask you to read it.

18  A.  "The amount you will have paid after you have made the

19  scheduled payment, $390."

20  Q.  Is that accurate?

21  A.  No.

22  Q.  Was the customer in fact scheduled to make the $390

23  payment?

24  A.  No.  They would have been scheduled to make a $90 payment

25  and then they would have to take action to decline renewal.

1    Q.  Do you know if they stuck to their schedule about how much

2    the customer would end up paying on this $300 loan?

3    A.  Just under a thousand dollars.

4         MR. SCOTTEN:  Let's take that down and if we could put

5    up what is also already in evidence as Government Exhibit 1911.

6         Can we blow up the box.

7    Q.  Ms. Grote, what are we looking at here?

8    A.  This is an example of what the loan looks like if it is

9    renewed all the way to the end of loan.

10   Q.  The process that you just described is automatic?

11   A.  Yes.

12   Q.  Does this accurately describe the automatic renewal

13   process?

14   A.  If the customer does not make a change, yes.

15   Q.  Do you know whether Scott Tucker was aware of this process?

16   A.  Yes.

17   Q.  What about Timothy Muir?

18   A.  Yes.

19   Q.  How do you know Timothy Muir was aware of?

20   A.  We drew this out on the board, we white boarded so he could

21   understand how it worked.

22   Q.  Was this chart provided to a customer, to your knowledge?

23   A.  Not that I believe, no.

24   Q.  Where would this chart have been found at the company?

25   A.  In the training manual or in the customer's -- the customer

1   service agent's cubicles.

2   Q.  Can we pull that down and put up -- I wanted to ask you,

3   when County Bank left, did 500 FastCash change its renewal

4   terms?

5   A.  It did.

6   Q.  What did they change to?

7   A.  It moved to match the other companies with automatic

8   renewal.

9            MR. SCOTTEN:  Let's go ahead and put up 1707.

10           Let's start again at the top and do just the headers

11   of the two e-mails together.

12   Q.  Ms. Grote, who is the original message from?

13   A.  Glenn Fisher.

14   Q.  Who is it to?

15   A.  Blaine Tucker, Timothy Muir, Tim Buckley, myself, Natalie

16   Dempsey, Ed Cross and Chris Becker.

17   Q.  It's fair to say you have identified those folks as

18   managers in the company before?

19   A.  Yes.

20   Q.  Who does this get forwarded to?

21   A.  To Scott Tucker.

22   Q.  Just in general terms, can you describe what was in this

23   e-mail?  I know you have seen it before.

24   A.  Yeah.  It was an outline and note action items for the

25   compliance meeting that we had.

1        MR. SCOTTEN:  Let's now zoom in on the portion that's

2   going to include action items 1 and 4.

3   Q.  I know you have read this in your testimony yesterday.  I

4   just want to ask you about action items 1 and 4.

5        The written training material and CLK handbook that

6   Tim Muir is described as reviewing, is that the sort of

7   training material we are discussing with respect to this loan

8   chart?

9   A.  Yes.

10       MR. SCOTTEN:  Let's put up what is also in evidence as

11  2401.  Specifically, page 3 of 2401.

12       Actually, Mr. Beer, can you go back one page real

13  briefly.

14       Can you just highlight the applicant name and date.

15  Q.  Can I just ask you to read the applicant name and date

16  here?

17  A.  Tafoya Martin.

18  Q.  And the date?

19  A.  4/05 of 2011.

20  Q.  So is this in a period where you have been told tribes are

21  involved?

22  A.  Yes.

23       MR. SCOTTEN:  Now can we go to page 3.

24  Q.  Ms. Grote, do you see a TILA box here?

25  A.  Yes.  In the same spot at the top of the borders.

H9J8TUC1                        Grote - Direct

1          MR. SCOTTEN:  Can we please highlight the TILA box.

2     Q.  Ms. Grote, how much is this loan to Tafoya Martin for?

3     A.  $350.

4     Q.  Is there a total payments listed?

5     A.  $455.

6     Q.  Is that in fact the number of payments Tafoya Martin was

7     scheduled to make?

8     A.  No.  She would be scheduled to make the finance charge of

9     105, would be renewed, and would have to take some action to

10    not be renewed again.

11    Q.  On the schedule of this loan, how much was Martin going to

12    end up paying?

13    A.  I don't know the total of it.  Over a thousand dollars.

14    Q.  Is this an accurate document?

15    A.  I believe so.

16          I'm sorry.  It was what we used at the time, yes.  I

17    do not believe the total of payments was what the customer

18    would have to pay.

19    Q.  Do you see a bunch of language below the box?

20    A.  Yes.

21    Q.  Can you identify for the jury where in there it says the

22    customer is going to automatically be renewed?

23    A.  It does not say the word automatic or automatically.  It

24    does not say that.

25    Q.  Well, do you see where it is talking about declining

1    option?

2    A.   Yes.

3    Q.   Does that imply to you there is an automatic renewal?

4    A.   It would to me because we used this and we knew it was

5    automatic renewal.

6    Q.   Because you knew you used automatic renewals?

7    A.   Yes.

8            MR. SCOTTEN:  Let's take that down.

9    Q.   Ms. Grote, who physically created the templates for these

10   loan documents we have been looking at?

11   A.   Actually typed them up, I would have done them originally,

12   and then the IT and web team would have created templates also.

13   Q.   When you were creating these templates, did you come up

14   with the contents on your own?

15   A.   No.

16   Q.   Who told you what to put in these loan documents?

17   A.   Scott Tucker and Timothy Muir.

18   Q.   I am going to show you Government Exhibit 1703.

19           Do you recognize this?

20   A.   An e-mail from myself to Scott.

21           MR. SCOTTEN:  The government offers 1703.

22           THE COURT:  Any objection?

23           MR. GINSBERG:  No, your Honor.

24           THE COURT:  Received.

25           (Government's Exhibit 1703 received in evidence)

1    BY MR. SCOTTEN:

2    Q.  Ms. Grote, I think you already said this is an e-mail from

3    you to Scott Tucker.

4          It has a very short body.  Can you just read?

5    A.  "Look at the account summary.  Specifically, the payment

6    options and notices section.  Is this what you were wanting?"

7    Q.  Are there attachments to this?

8    A.  The loan document and the account summary.

9    Q.  What are you doing here?

10   A.  I had made some changes to the documents in the payment

11   options and notices section and sent that over to Scott for

12   approval.

13   Q.  Do you where it says "is this what you were wanting?"

14   A.  Yes.

15   Q.  At whose direction were you making these changes?

16   A.  Scott's.

17   Q.  What is the purpose of this e-mail?

18   A.  I needed to know that I had done the thing that he wanted

19   me to do.  I was looking for approval to put them live.

20   Q.  Just to be clear, what does "put them live" mean?

21   A.  Start using them with customers.

22   Q.  Ms. Grote, let me ask you this.  Did customers ever

23   complain about their loan terms?

24   A.  They did.

25   Q.  What kind of complaints did you receive?

1    A.  Customers complained that -- some customers complained they

2    didn't understand the loan terms.

3    Q.  I will ask you about that one for now.

4         If a customer complained they didn't know about the

5    automatic renewal term, was there a policy that you followed?

6    A.  Yes.  We would refer the customer back to their loan note

7    disclosure and read that to them.

8    Q.  That's the part you showed us before that doesn't say

9    automatic renewal?

10   A.  Correct.

11        MR. SCOTTEN:  Can we show the witness 1910.

12   Q.  What are we looking at here, Ms. Grote?

13   A.  This is a collection role playing script and DNO

14   settlement.  So this is from the training manual.

15        MR. SCOTTEN:  Your Honor, the government offers 1910.

16        MR. GINSBERG:  No objection.

17        THE COURT:  Received.

18        (Government's Exhibit 1910 received in evidence)

19        MR. SCOTTEN:  Can we publish and just blow up the top

20   portion, collection role playing script.

21   Q.  So can you describe what a script is here.  Explain how

22   this works, this training document.

23   A.  So this script allows the agent to do role playing or hear

24   what the customer might say and then how they should respond.

25   Q.  So where it says customer, I have already paid and goes

1  from there, what is that supposed to be?

2  A.  An example if the customer called and said I have already

3  paid blank, why do I have still have a balance.

4  Q.  You can finish up the line.

5  A.  It is illegal to charge this much interest in the state of,

6  wherever they are located.

7  Q.  Then where it says "rep," what are those two bullet points

8  about?

9  A.  The rep was to respond with:  Fees are service charges on

10  the loan and failure to read contract, clearly states the terms

11  and conditions.

12  Q.  How does that address the customer's complaint that it's

13  illegal to charge that much interest in a given state?

14  A.  I don't believe it does.

15  Q.  So where it says "customer," what is going on here?  What

16  is that supposed to be?

17  A.  If the customer then responds, I still have paid too much

18  money and I still have a balance.  After doing some research, I

19  have found that the most interest you can charge is blank, then

20  the agent was to give them the compliance script.  Then if the

21  customer started to question the laws and they did not have the

22  answer, then the agent was to send the account to compliance to

23  handle.

24  Q.  What is the compliance script?

25  A.  There was actually a script that said someone will be

1    contacting you and kind of gave the customer instructions on

2    the next steps.

3    Q.  Do you know whether Scott Tucker was aware of this policy?

4    A.  Yes.

5    Q.  How do you know that?

6    A.  He was part of the creation of compliance.

7    Q.  What about Timothy Muir, do you know if he was aware of

8    this policy?

9    A.  Yes.

10            MR. ROTH:  I object as to the time period.

11            THE COURT:  Can you set a time period, please.

12   Q.  Once Timothy Muir started working at the company, do you

13   know if he became aware of this script?

14   A.  He became aware of it, yes.

15   Q.  How do you know that?

16   A.  I believe he helped write this script and he knew that we

17   were sending applications or customers to the compliance

18   department because he helped give direction on what the

19   compliance reps were supposed to do with the customers.

20            MR. SCOTTEN:  Let's put back up 2401, page 23, for

21   just a second.

22            Can we again highlight the TILA box.

23            The lower portion too, please.

24   Q.  So leaving aside the four big top boxes, based on your

25   experience in this company, did you develop an understanding of

1    whether customers actually read the words below the big four

2    top boxes?

3    A.  I believe a lot of customers did not read the entire

4    window.

5    Q.  Do you know if that belief was widely shared with the

6    company?

7    A.  I don't think that it was something we talked about often,

8    or maybe not ever really, but we knew the customers did not

9    understand the loan terms and if they were to read them, they

10   would understand.  So the assumption was they had not read it

11   in the first place.

12   Q.  Did you ever have a customer refuse to pay a loan?

13   A.  Yes.

14   Q.  What were some of the reasons customers who refused to pay

15   loans might give?

16   A.  They could not afford to repay the loan.  They had already

17   paid too much.

18   Q.  Did they ever complain about the legality of the loans?

19   A.  Yes.

20   Q.  Were the reasons they would give, they asserted the loans

21   were illegal?

22   A.  Yes.  They were referred to the script we just read.  They

23   would call and say they had done research and the interest rate

24   was too high for their state and the loans were illegal in

25   their state.

1    Q.  Other than interest rates, any reasons they gave that loans

2    would be illegal?

3    A.  The business was not licensed in their state.

4    Q.  To your knowledge, by the way, was this business licensed

5    to lend in any state?

6    A.  I don't believe so.  We had a tribal license.

7    Q.  What about before the tribes were involved?

8    A.  I don't know that answer.

9    Q.  Do you recall being licensed in any state before that?

10             MR. GINSBERG:  Objection, your Honor.

11   A.  I don't know that.

12             THE COURT:  Ladies and gentlemen, evidence of this

13   sort is not a substitute for evidence of the crimes charged.

14   It's simply background information and you can only take it for

15   that limited purpose, not for proof of the crimes charged

16   alone.

17             You may continue.

18             MR. SCOTTEN:  Thank you, your Honor.

19   Q.  So let's return then to the complaints about interest rates

20   being illegal under state law.

21             Do you know whether Scott Tucker or Timothy Muir were

22   aware of these complaints?

23   A.  Yes.

24   Q.  How do you know that?

25   A.  Not all of them, but individual customers had been sent to

1  them throughout time and, again, they were

2  involved -- especially Tim.  He was involved with the

3  complaints department.

4  Q.  I am going to show you what is marked as Government Exhibit

5  1724.

6        MR. SCOTTEN:  If we can just scroll to the second page

7  quickly so Ms. Grote can see all of it.

8  Q.  Ms. Grote, do you recognize what you're looking at?

9  A.  An e-mail from Scott to Tim and myself.

10        MR. SCOTTEN:  The government offers 1724.

11        MR. GINSBERG:  No objection.

12        THE COURT:  Received.

13        (Government's Exhibit 1724 received in evidence)

14  BY MR. SCOTTEN:

15  Q.  Again, let's start at the second page.

16        MR. SCOTTEN:  Can you blow up the entire lower e-mail.

17  Q.  So, Ms. Grote, starting at the top, who is this e-mail

18  from?

19  A.  Scott Tucker.

20  Q.  Who is it to?

21  A.  To myself.  Tim is cc'd.

22  Q.  Does Scott Tucker provide any instructions?

23  A.  He wanted me to handle the complaint that the tribe

24  received.

25  Q.  I am not going to ask you to read the entirety of this

1  e-mail, but do you know who this e-mail is from?

2  A.  From a customer.

3  Q.  Can you just give us a sense of what the customer is

4  complaining about?

5  A.  The customer had a loan, it looks like with three

6  companies, and they were revoking authorization and said that,

7  if you look at the bullet bottom, the company was not licensed

8  in Florida.

9  Q.  You can also look at that middle paragraph.  Was licensing

10 the only complaint the customer made?

11 A.  The interest rates were too high was another complaint and

12 that no rollovers were allowed.

13         MR. SCOTTEN:  Let's zoom out and look at sort of the

14 next portion of the e-mail.  I think we can scroll up to the

15 next page.

16         Go ahead and highlight the bottom two e-mails.

17 Q.  Starting at the bottom, the next e-mail, who is that from

18 and to?

19 A.  I replied only to Scott.

20 Q.  Can you explain your one-line response?  What are you

21 telling Scott Tucker?

22 A.  "The second tier collection company was going to contact

23 them and settle for the balance only."

24 Q.  Did Scott Tucker reply to you?

25 A.  Yes.  He wanted to be sure that I had talked to Tim and we

1    did not want to mess around with her unless she agreed to pay

2    the balance only.

3    Q.  I ask you to read that one line.

4    A.  "I talked to Tim about this.  I do not want to screw around

5    with her unless she agrees to pay balance only."

6    Q.  Who is the "Tim" that Scott Tucker is referring to there?

7    A.  Tim Muir.

8    Q.  Did you have an understanding as to why Scott Tucker was

9    telling you to talk to Tim Muir?

10   A.  I couldn't decide how to handle this on my own.  I would

11   have had to have direction on how to handle it.

12              MR. SCOTTEN:  If we can take that down.

13              Just zoom out.  My mistake.

14              Then if we can just blow up the top portion.

15   Q.  Did you write Scott Tucker back?

16   A.  Yes.  I let him know I had already gotten with Tim and I

17   just did not tell him that in the first e-mail.  We were

18   collecting on principal and we had let the other parties in the

19   second tier know.

20              MR. SCOTTEN:  Now we can take it down.

21   Q.  So for times when these went to employees and not straight

22   to Scott Tucker, was there guidance on how employees should

23   handle a complaint that interest rates were illegal?

24   A.  There was.

25   Q.  I want to show you Government Exhibit 1713.

1          Can you describe what we are looking at here?

2    A.  An e-mail from Jared Marsh to Tim Muir.

3    Q.  Who is Jared Marsh?

4    A.  Jared Marsh was also an attorney.

5    Q.  Do you have a sense of who was senior to who?

6    A.  Tim was.

7    Q.  And Jared worked for Tim?

8    A.  Yes.

9          MR. SCOTTEN:  The government offers 1713.

10         MR. ROTH:  No objection.

11         THE COURT:  Received.

12         (Government's Exhibit 1713 received in evidence)

13         MR. SCOTTEN:  Can you blow it back up.

14   Q.  I am not going to ask you about every portion of this.  For

15   now, I just want to ask you whether there were attachments to

16   this e-mail.

17   A.  Yes.

18   Q.  For now, can you read the title of the second attachment?

19   A.  Customer QA Version 3.

20         MR. SCOTTEN:  Now I would like to show the witness

21   1712.

22   Q.  Ms. Grote, do you recognize what you're looking at here?

23   A.  Yes.

24   Q.  Does it have a title?

25   A.  Yes.  Confidential Draft Version 3, 9/22/11, Customer QA.

1           MR. SCOTTEN:  The government offers 1712.

2           MR. GINSBERG:  No objection.

3           THE COURT:  Received.

4           (Government's Exhibit 1712 received in evidence)

5           MR. SCOTTEN:  Can we publish it, Mr. Beer.  For now I

6    would just like to go to the second page.

7           Can you outline the question and answer at the top.

8    Q.  Ms. Grote, can I ask you to read the question and answer,

9    but only the first two bullets for now.

10   A.  Start with the question?

11   Q.  Yes.

12   A.  "Question:  The TV said you're illegal.  I'm not going to

13   pay."

14          The answer:  "You are obligated to pay back this loan

15   as when you signed your original contract.

16          "We are fully regulated by sovereign law.

17          "We are fully compliant with all federal laws."

18   Q.  So who is supposed to give this answer?

19   A.  The agents on the floor.

20   Q.  Who is the hypothetical questioner here who is saying the

21   TV said you're illegal?

22   A.  The customer.

23   Q.  What is "we are fully regulated by sovereign law" a

24   reference to?

25   A.  The tribal law, the tribes.

1          MR. GINSBERG:  I am sorry, Judge.  I think there is a

2     more fuller answer there and I don't know if the government

3     intends that not to be read.

4          THE COURT:  Is there more to this?

5          MR. SCOTTEN:  I don't know.  We can certainly show it.

6          THE COURT:  I'm sorry?

7          MR. SCOTTEN:  I am not sure, your Honor.

8          THE COURT:  OK.

9          Would you like, under the doctrine of completeness,

10    would you like that, Mr. Ginsberg?

11         MR. GINSBERG:  I would like it, yes.

12    Q.  Ms. Grote, go ahead and read the bottom two bullets also.

13         MR. SCOTTEN:  Let's blow it back up so she can read it

14    more easily.

15    A.  "We offer impartial arbitration for any conflict resolution

16    and our uniform rules and regulations are the same across the

17    country, as compared to the conflicting and confusing rules

18    promulgated by the various states, some of which regulate

19    lending, others of which do not."

20    Q.  Just to complete this, would you describe the role of

21    impartial arbitration in your business?

22    A.  I don't think I have a very complete understanding.  I do

23    know that a customer could -- they agreed to arbitrate disputes

24    as part of their application.  They could opt out of that if

25    they wanted to by crossing it out on the application.

1           THE COURT:  Slow down and speak distinctly, please.

2    A.   They can cross out and decline arbitration.  That's really

3    about as far as my knowledge goes.

4    Q.   Thanks.

5           Were you involved in a lot of arbitration at your time

6    there?

7    A.   No.

8    Q.   Did you see a lot of customer complaints for arbitration?

9    A.   No.

10          MR. SCOTTEN:  Take that down.

11          THE COURT:  All right, ladies and gentlemen.  This is

12   a good time for our mid-morning break.

13          Please do not discuss the case among yourselves or

14   with anyone.

15          We will be back in action in ten minutes.

16          (Jury exits courtroom)

17          THE COURT:  See you in ten minutes.  Thank you.

18          (Recess)

19          (Continued on next page)

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Please be seated.

3              You may continue.

4              MR. SCOTTEN:  Sorry, your Honor.  Did you say I could

5    proceed?

6              THE COURT:  You may continue.

7              MR. SCOTTEN:  Thank you, your Honor.

8    Q.  We were talking about complaints before the break, is that

9    right, Ms. Grote?

10   A.  Yes.

11   Q.  Did customers who said their interest rates were illegal

12   ever threaten to inform law enforcement agencies?

13   A.  They did.

14   Q.  What kind of law enforcement agencies?

15   A.  The attorney general probably most commonly, and other law

16   enforcement agencies, but the Better Business Bureau also.

17   Q.  I'm going to show you again Government Exhibit 1707.

18             MR. SCOTTEN:  We can show everybody, actually,

19   Mr. Beer.

20   Q.  And just quickly, could you summarize what this document

21   is?

22   A.  This is a summary of the meeting we had with the management

23   team over compliance review.

24   Q.  And Timothy Muir and Scott Tucker on either on the original

25   email or the forwarded version?

1   A.  Yes.

2           MR. SCOTTEN:  Could we go to action item 15, I

3   believe.

4   Q.  Can I ask you to read that?

5   A.  "Phone calls or any written correspondence from attorneys,

6   state or federal agencies, Better Business Bureau must

7   immediately be directed to the compliance department by fax or

8   email."

9   Q.  Does that accurately reflect the company's policy towards

10  these complaints from law enforcement agencies and attorneys

11  and the Better Business Bureau?

12  A.  Yes --

13          THE COURT:  You have to keep your voice up and speak

14  slowly.  "Yes, but I don't think we would ever fax them"; is

15  that what you said?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  OK.  You can finish your sentence.

18  A.  I do not believe we ever faxed the documents to the

19  compliance department.

20  Q.  Email?

21  A.  Yeah.

22  Q.  Was there a standard practice for handling customers who

23  would threaten to go to or who had in fact gone to law

24  enforcement?

25  A.  Yes, there was.

1  Q.  What was that?

2  A.  They changed a bit over time.  At one point the customer

3  service agent could give a script, respond like that one that

4  we looked at before, and then we got to a point where we just

5  directed all complaints of that nature to the compliance

6  department.

7  Q.  Ms. Grote, I know you said this yesterday, but can you

8  remind the jury how old you were when you started working in

9  payday lending with Scott Tucker?

10 A.  19.

11 Q.  And what was your salary at that time?

12 A.  Less than $500 a week.

13 Q.  And what was the highest salary you recall being paid at

14 any point when you were working for Scott Tucker?

15 A.  A little over 800,000 a year.

16 Q.  How was your salary determined?

17 A.  I received a base salary, and on top of that -- that was

18 about 80,000.  On top of that I received commission and

19 bonuses.

20 Q.  What sort of things did you get bonuses for?

21 A.  Bonus for my position was kind of a flat bonus, so it was

22 just a standard amount for whatever customer service

23 responsibilities I had.

24 Q.  Were there other employees who got bonuses?

25 A.  Yes.

1   Q.   What sort of things did they get bonuses for?

2   A.   Depending on the department, some of them were also a flat

3   bonus amount.  Most were production-based, how many

4   applications they handled and how many phone calls they took.

5   Q.   Did you receive any other financial benefits from Scott

6   Tucker?

7   A.   I did.

8   Q.   What were they?

9   A.   I had my mortgage paid off.

10  Q.   Anything regarding vehicles?

11  A.   Yes.  He built a car for my dad, and then I had a leased

12  car that they reimbursed me for.

13  Q.   Let me go back to that mortgage for a second.  Who told you

14  that your mortgage would be paid off?

15  A.   Scott did.

16  Q.   Do you remember around when he said that would happen?

17  A.   It was really early on, maybe 2003.

18  Q.   What did you have to do to get that mortgage paid off by

19  Scott Tucker?

20  A.   We had a goal for the number of active advances.  It was a

21  huge goal, and whenever we reached that goal, he said he would

22  pay off my house.

23  Q.   And when did you, in fact, reach that goal?

24  A.   2011, I think.

25  Q.   Well, let me show you what's marked as Government Exhibit

1   1719.

2          MR. SCOTTEN:  Could we just blow up the portion of the

3   email -- sorry.  I meant everything but the white space.

4   Q.  Ms. Grote, do you recognize what you're looking at?

5   A.  Yes, that's the check to pay off my mortgage.

6          MR. SCOTTEN:  Your Honor, the government offers 1719.

7          MR. GINSBERG:  No objection.

8          THE COURT:  Received.

9          (Government Exhibit 1719 received in evidence)

10  BY MR. SCOTTEN:

11  Q.  Ms. Grote, how much was paid off on your mortgage?

12  A.  $233,500.

13  Q.  And that was, why did you get that?

14  A.  Because we had hit that goal of active advances.

15  Q.  And when was this in fact made?

16  A.  In 2011.

17  Q.  Was that before or after AMG was used as the name of the

18  business?

19  A.  It was after.

20  Q.  And do you see who issued this check here?

21  A.  AMG Services.

22  Q.  Do you remember speaking with a tribal official about

23  paying off your mortgage?

24  A.  No.

25  Q.  Do you know if any tribal official ever approved paying off

1   your mortgage?

2   A.  Not that I know of.

3        MR. SCOTTEN:  Let's take down 1719, and we can show

4   the witness 1716.

5   Q.  Ms. Grote, do you recognize this?

6   A.  It looks like my W-2 from 2012.

7        MR. SCOTTEN:  Your Honor, I'd like to offer 1716,

8   subject to redaction.  I realize there's some personal

9   information on there that we'll want to take off before it goes

10  back.  I think it can be shown now, but there's a social

11  security number on there that should come off before it's made

12  part of the record.

13       THE COURT:  Before the document is physically

14  received.

15       MR. SCOTTEN:  Yes.

16       THE COURT:  All right.  With that understanding, you

17  may display it.

18       MR. SCOTTEN:  First we offer it, your Honor.

19       THE COURT:  OK.  Any objection?

20       MR. GINSBERG:  I have no objection.

21       THE COURT:  Received.

22       (Government Exhibit 1716 received in evidence)

23       MR. SCOTTEN:  And may we publish it?

24       MR. GINSBERG:  Does she want to take the personal

25  stuff off?

1              THE COURT:  No.  I'm going to allow it.

2              Ladies and gentlemen, disregard any private

3      information.  When we assemble the exhibits for this case and

4      when it goes back to the jury room in the intervening time

5      period, we'll eliminate things like social security numbers,

6      because they really are not relevant to this case, and a person

7      reasonably would want to keep those private, but for today's

8      purposes, I'll allow it to be displayed.

9              MR. SCOTTEN:  And Mr. Beer, can you just blow up, say,

10     the top left box.

11     Q.  Ms. Grote, do you see a column now or a box down on the

12     lower right labeled "state wages, tips, etc."?

13     A.  Yes.

14     Q.  Can you read the amount in there?

15     A.  $809,016.90.

16     Q.  Ms. Grote, who paid you this much, according to your W-2?

17     A.  AMG Services.

18     Q.  Do you remember, do you know who determined your salary?

19     A.  Scott and Blaine Tucker.

20     Q.  When your compensation was $800,000 a year, do you remember

21     that being approved by a tribal official?

22     A.  Not that I'm aware of.

23     Q.  Ever speak to a tribal official about how much you were

24     going to get paid?

25     A.  No.

H9jWtuc2                     Grote - Direct

1        MR. SCOTTEN:  All right.  Let's take that down.

2     Q.  Was there ever a time -- turning your attention to 2009,

3     was there ever a time that anyone involved in lending with you,

4     Scott Tucker, and Muir were working somewhere other than Kansas

5     City?

6     A.  Yes, we had call centers in the Miami office -- Miami,

7     Oklahoma, office, and the Nebraska office.

8     Q.  And the Miami office, was that associated with the Miami

9     tribe?

10    A.  Yes.

11    Q.  And did you also say the Nebraska office?

12    A.  Yes, with the Santee tribe.

13    Q.  So when I asked you earlier about tribes, you also

14    mentioned -- what was the third tribe?

15    A.  The Modoc.

16    Q.  And the Modoc tribe, did they ever have anything related to

17    payday lending on their reservation?

18    A.  They didn't have a call center, no.

19        MR. SCOTTEN:  OK.  Let's turn to --

20    Q.  Well, let me ask you this.  You said the Miami had a person

21    you dealt with named Don Brady?

22    A.  Yes.

23    Q.  I think you described him earlier as a manager?

24    A.  Yes.

25    Q.  What did he manage?

1    A.   I believe he managed kind of the relationship with Scott

2    and -- I don't know, I don't really know other than that.  He

3    worked with Scott and Blaine.

4    Q.   Did he have any substantive involvement in the lending

5    process?

6    A.   No.

7    Q.   And did the other tribes have similar persons that managed

8    their relationship with Scott?

9    A.   Yes.

10   Q.   And do you remember their names?

11   A.   Lee Ickes for the Santees and Troy Littleaxe for the

12   Modocs.

13   Q.   All right.  Let's turn back to 2009.  Do you remember which

14   tribe first had a call center?

15   A.   The Miami tribe did.

16   Q.   And how soon after did the Santee Sioux start having a call

17   center?

18   A.   Right away, a few months, if that long.

19   Q.   Did you ever visit these locations?

20   A.   I never have been to the Nebraska office, but I did visit

21   the Oklahoma office.

22   Q.   And were you involved in the setup of these call centers?

23   A.   Yes.

24   Q.   Who told you to set these up?

25   A.   If you mean who told me first, it was Scott, Blaine or Tim.

1    Q.  Were both Scott Tucker and Tim Muir involved in this

2    decision?

3    A.  Yes.

4    Q.  And did they give you a reason for their being set up?

5    A.  No, I don't remember them giving me a specific reason.

6    Q.  And to be clear, before these call centers were set up, was

7    there any activity for the Miami or the Santee Sioux in the

8    lending business on the reservation?

9    A.  No, not that I'm aware of.

10   Q.  And you supervised the lending process from start to

11   finish?

12   A.  Yes.

13   Q.  Once these call centers started, what area of the business

14   did they work in?

15   A.  It was a department called teleloan, which was in the loan

16   acquisitions, so we tried to get an application complete and

17   ready for funding.

18   Q.  And what other portions of the business other than teleloan

19   were there?

20   A.  Customer service and collection, two levels of collection.

21   Q.  About how many folks worked in teleloan in Overland Park,

22   Kansas?

23   A.  Hundreds.

24   Q.  And --

25   A.  No, I'm sorry.  Not in teleloan.  That was the entire call

1   center.  In teleloan, it was probably at the very max 130.

2   Q.  And then how many people worked in teleloan on the Miami

3   reservation?

4   A.  About five, give or take.

5   Q.  And the Santee Sioux?

6   A.  Three.

7   Q.  And you said there were folks working outside teleloan down

8   in Overland Park, Kansas?

9   A.  Yes.

10  Q.  How many?

11  A.  That would have been the hundreds, by the time you added

12  collection, customer service.

13  Q.  So these eight employees that were in other locations --

14  well, let me ask you this first.

15       Were there performance standards for the teleloan employees

16  at Overland Park, Kansas?

17  A.  Yes.

18  Q.  Could you give us an example of what those standards would

19  be like?

20  A.  They would have, they had a responsibility to handle so

21  many applications per hour and then so many per day, like maybe

22  eight per hour and 50 per day.  I don't remember exactly what

23  they were.

24  Q.  And what could happen if an employee didn't meet those

25  standards?

1   A.  They would get put on a production probation and then could

2   possibly move into discipline, up to termination.

3   Q.  Did these standards apply to the eight or so employees who

4   were?

5   A.  We did not use the same standards for them.

6   Q.  What happened if -- let me ask you this.  Scott Tucker

7   aware that these standards were not being enforced with respect

8   to the eight employees?

9   A.  Yes.

10  Q.  How do you know that?

11  A.  I struggled a little bit in the beginning with how to

12  handle their lack of production and took that to both -- all,

13  Scott, Blaine and Tim at some point or another.

14  Q.  And did you receive guidance?

15  A.  Yes.  I was really told that the management that was in the

16  tribal location managed them more directly.

17  Q.  And who was it you spoke with for the Miami?

18  A.  Mostly Gena Lankford.

19  Q.  And I think you mentioned earlier that you occasionally

20  received information from the Miami about customer complaints?

21  A.  Yes.

22  Q.  Was that from Gena Lankford?

23  A.  Yes, most of the time.

24  Q.  Other than complaints that happened to go straight to the

25  tribe, did you ever receive any guidance from the tribes?

1    A.   No.

2    Q.   Let me ask you a bit about some of the locations involved.

3    For 500FastCash, during the early days of the business, what

4    address did you use if you had to give a customer an address?

5    A.   We had a P.O. Box in Overland Park.

6    Q.   And when these other portfolios were created, do you

7    remember what address you used for them?

8    A.   We had an address in Carson City, Nevada.  Each one had

9    their own.

10   Q.   Who told you to use this address in Carson City, Nevada?

11   A.   Scott and Blaine Tucker.

12   Q.   Do you know what was located in Carson City, Nevada?

13   A.   No.

14   Q.   Based on your 15 years or so in this business, did you ever

15   learn anything to be located there?

16   A.   No.

17   Q.   To your knowledge, did customers ever ask the person they

18   were speaking with at the business where they were located?

19   A.   Yes.

20   Q.   Did you have an answer or a policy as to what answer to

21   give?

22   A.   Yes.  We had a policy not to give the location Overland

23   Park, but to use the location of the address we used.

24   Q.   So at the time, the Carson City address for these other

25   four portfolios?

1   A.  Correct.

2   Q.  I'm going to show you Government Exhibit 1705.  Do you

3   recognize this?

4   A.  An email from myself to Scott and Ed Cross.

5   Q.  And can you just remind the jury who Ed Cross is?

6   A.  He's the IT officer.

7            MR. SCOTTEN:  Your Honor, the government offers 1705.

8            MR. GINSBERG:  No objection.

9            THE COURT:  Received.

10            (Government Exhibit 1705 received in evidence)

11            MR. SCOTTEN:  Could you publish it, Mr. Beer, and

12   let's start by blowing up sort of the bottom half, including

13   both the original message -- yes, exactly.  That's exactly

14   right.

15   Q.  OK.  So Ms. Grote, what's going on here?

16   A.  Brandy Pummill sent me the instant message asking what we

17   should say to people who questioned the 913 area code that does

18   not match the Nevada address.

19   Q.  And who was Brandy Pummill?

20   A.  She was a manager for Cash Advance, or Ameriloan, the

21   company that Tim Buckley managed.

22   Q.  What did you do with this question from Brandy Pummill?

23            THE COURT:  Excuse me.

24            What did you understand by the term "Nevada address";

25   what did that refer to?

1          THE WITNESS:  That Carson City address that we

2     associated with the company that she was working in.

3          THE COURT:  Thank you.

4     BY MR. SCOTTEN:

5     Q.  So when Brandy Pummill sent you this question about the

6     Nevada address, the Carson City address, what did you do with

7     it?

8     A.  I forwarded the email to Scott and Ed.

9          MR. SCOTTEN:  If we could now go up to the next

10    message alone.

11    Q.  Did you receive a response from Scott Tucker?

12    A.  I did.

13    Q.  And if I can ask you to read it.

14    A.  "All of our phone systems are voice over Internet IP and

15    that is where our switch is that routes all of our calls."

16    Q.  And was that the reason that, in fact, you were displaying

17    a 913 area code?

18    A.  I believe that's where the switch is, which is why we were

19    displaying a 913 area code.

20    Q.  Where were you located at the time?

21    A.  In -- the 913 area code is Overland Park.

22          THE COURT:  Speak more distinctly, please.

23          THE WITNESS:  OK.

24          THE COURT:  The 913 area code -- overton park, is that

25    what you said?

1              THE WITNESS:  Overland.

2              THE COURT:  Overland Park.

3              THE WITNESS:  Overland Park.

4              THE COURT:  Thank you.  Speak slowly and distinctly,

5    if you don't mind.

6              THE WITNESS:  OK.

7    BY MR. SCOTTEN:

8    Q.  To be clear, the fact that the 913 number was appearing,

9    was that explained by switches or by the fact that you were in

10   Overland Park, Kansas?

11   A.  I believe because we were actually located in Overland

12   Park.

13   Q.  Was there any need to refer to a switch to explain why the

14   913 area code was appearing?

15   A.  No.

16             MR. SCOTTEN:  Could we please go to the top of the

17   email.

18   Q.  So based on this email, did you implement the suggestion

19   that Scott Tucker gave you?

20   A.  Yes.

21   Q.  Do you know whether the company later came up with a

22   different fix to this problem?

23   A.  I believe we were able to modify the phone number that was

24   displayed for caller ID to be the actual 800-number for the

25   company.

1  Q.  Which could be anywhere in the country?

2  A.  Yes.

3          MR. SCOTTEN:  We can take down 1705.

4  Q.  Now, after Scott Tucker told you tribes were involved, did

5  the policy change as to what address to give?

6  A.  Yes.

7  Q.  What address were you supposed to give now?

8  A.  A tribal address associated with the portfolio.

9  Q.  And to be clear, did that policy apply even to the 99

10 percent of employees who were never on a tribal reservation?

11 A.  Yes.

12 Q.  I'm going to show you again Government Exhibit 1726.

13         MR. SCOTTEN:  And if we can scroll down one page.

14 Q.  Before we zoom in, can you just remind the jury what this

15 is we're looking at?

16 A.  Meeting minutes.

17 Q.  A little more detail.

18 A.  I don't have -- I'm sorry.  He went too fast.

19         MR. SCOTTEN:  Go back to the top.

20         THE COURT:  The two of you should not be speaking at

21 the same time.  Pause, then put your question.  OK?

22         MR. SCOTTEN:  Yes, your Honor.

23         THE COURT:  Thank you.

24 BY MR. SCOTTEN:

25 Q.  Looking at this page, does this email specify what meeting

1    this is for?

2    A.   OneClickCash collection team meeting.

3    Q.   And what year?

4    A.   2010.

5         MR. SCOTTEN:  OK.  So let's go to the second page, and

6    Mr. Beer, can we highlight the agenda item at the top.

7    Q.   And Ms. Grote, can you please read the discussion and

8    conclusions?

9    A.   "Never state we are in Kansas.  Always say Nebraska."

10        "Never state we are in Kansas."

11   Q.   To be clear, where were the employees who were being given

12   this training?

13   A.   In Kansas.

14   Q.   And what does Nebraska have to do with it?

15   A.   That was the tribal location.

16   Q.   Which tribe was this for?

17   A.   The Santee tribe.

18   Q.   They were supposedly affiliated with OneClickCash?

19   A.   Yes.

20   Q.   Who told you to implement this policy about tribal

21   locations?

22   A.   Scott or Blaine Tucker.

23   Q.   And do you know whether Tim Muir had any involvement in

24   this policy?

25   A.   Yes, I believe he knew of the policy.

1  Q.  How do you know that?

2  A.  I believe the entire company knew of the policy.

3  Q.  And I want to show you again 1707.  And is this, again, the

4  list of action items from a meeting that was sent to

5  management, including Scott Tucker and Tim Muir?

6  A.  Yes.

7           MR. SCOTTEN:  Can you highlight action item No. 3.

8  Q.  Ms. Grote, can you please read that?

9  A.  No. 3, "When customers ask, Where are you located?  Answer

10  city, state of the loan portfolio.  This change has been

11  communicated to the employees of both collections groups."

12  Q.  Can you explain what that means?

13  A.  This is ensuring that all departments are using the city of

14  the state of the tribal location and not the Kansas location.

15  Q.  Even for all the employees who were not there?

16  A.  Yes.

17  Q.  So other than the area code problem that we already

18  discussed, were there other problems the business had in hiding

19  its location?

20  A.  Small talk in the customers mentioning the weather.

21  Q.  All right.  I want to start with a different email.  Can I

22  show you 1721?  Do you recognize this?

23  A.  An email from Susan James, the manager of OCC collection,

24  to her team, and I'm copied on it.

25           MR. SCOTTEN:  Your Honor, the government offers 1721.

1          MR. GINSBERG:  No objection.

2          THE COURT:  Received.

3          (Government Exhibit 1721 received in evidence)

4          MR. SCOTTEN:  And if we could display it.  And

5    Mr. Beer, can you just highlight the body of the email,

6    including the subject line.

7    Q.  Ms. Grote, can you just read the whole thing; it's pretty

8    short?

9    A.  "We've had a couple of customers who had lived in Nebraska

10   asking where Niobrara is, exactly.  It's on the Nebraska-South

11   Dakota border northwest of Sioux City, Iowa, by Yankton,

12   Nebraska."

13   Q.  Can you explain what the significance of this information

14   being communicated is?

15   A.  Some of the agents in the Kansas office had no idea where

16   Niobrara was located, and this explained it to them.

17   Q.  And why would they need this explanation?

18   A.  In case a customer asked and they were anywhere in Nebraska

19   and, say, they had no idea where Niobrara was.

20          MR. SCOTTEN:  Can we take that down and show the

21   witness 1722.

22   Q.  Do you recognize this?

23   A.  This is an agenda for a customer service meeting we are

24   having with the customer service managers.

25          MR. SCOTTEN:  Your Honor, the government offers 1722.

1          MR. GINSBERG:  No objection.

2          THE COURT:  Received.

3          (Government Exhibit 1722 received in evidence)

4          MR. SCOTTEN:  May we publish it?

5          THE COURT:  You may.

6          MR. SCOTTEN:  And can we just blow up the top two

7    bullet points.

8    Q.  All right.  Ms. Grote, can you just read the bottom one

9    first?

10   A.  "Reps are not to disclose to customers that we are located

11   in Kansas.  Regardless if it was a mistake or not, they will

12   receive disciplinary action."

13   Q.  And then now if you'd read the top one.

14   A.  "Reps should not talk about the weather to customers.

15   Please add this to your meeting agendas.  Small talk is OK, but

16   the weather subject should be avoided."

17   Q.  Now, I think you started to explain the weather problem a

18   minute ago, but can you please explain the significance of this

19   bullet point?

20   A.  Yes.  Sometimes a customer that might be located near the

21   tribal location would mention the weather, maybe a large storm

22   coming through or hot temperatures, and if that weather was not

23   in the Kansas location, the agent would have a hard time

24   answering, because they were saying they were in Oklahoma, when

25   they were not.

1     THE COURT:  They were saying they were in --

2     THE WITNESS:  Oklahoma when they were not.

3     THE COURT:  Thank you.

4  Q.  And just to be clear, so where were they?

5  A.  In Kansas.

6  Q.  So it was difficult for them to convince folks they were

7  somewhere else if they didn't know the weather?

8  A.  Yes.

9     MR. SCOTTEN:  We can take that down.

10  Q.  And now, if I could show you 1723.  Ms. Grote, do you

11  recognize this?

12  A.  Team meeting minutes for the OCC customer service

13  department.

14     MR. SCOTTEN:  Your Honor, the government offers 1723.

15     MR. GINSBERG:  No objection.

16     THE COURT:  Received.

17     (Government Exhibit 1723 received in evidence)

18     MR. SCOTTEN:  And if we could please publish it.

19  Q.  And before we zoom in, Ms. Grote, am I correct that before

20  you identified the OCC team meeting with Susan James in charge?

21  A.  Yes.

22  Q.  Who is calling this meeting?

23  A.  Andrea Kelly.

24  Q.  And who is she?

25  A.  She was the manager at that time.

1   Q.  So these were different times?

2   A.  This was the customer service.  Susan was collection.

3   Q.  Understood.

4           MR. SCOTTEN:  Can we please blow up the top agenda

5   item, reading "weather," and just the top half of that, if you

6   would, Mr. Beer.  Great.  Thanks.

7   Q.  Ms. Grote, can you just read the weather bullet?

8   A.  "Weather:  Do not talk about the weather.  Weather is the

9   No. 1 way to get backed into a corner about our location.  We

10  do not know what the weather is like in Niobrara, Nebraska, so

11  we should not be discussing it.  If you choose to engage in

12  small talk, think of something else to say."  If we ask about

13  the weather -- excuse me.  "If asked about the weather, just

14  reply, 'it's fine' and move on to the next subject."

15  Q.  Now, did you eventually come up with a solution to this

16  problem of getting backed into a corner on the weather?

17  A.  We did.

18  Q.  And where did that solution come from?  How did it happen?

19  A.  From one of the employees on my team?

20  Q.  What was the proposal?

21  A.  To provide the weather report for the location we were

22  supposed to be located in, so the agents knew, had something to

23  talk about.

24          MR. SCOTTEN:  All right.  I'd like to show the witness

25  1711.

1    Q.   Do you recognize this?

2    A.   An email from Angela Hildebrand to myself.

3              MR. SCOTTEN:  Your Honor, the government offers 1711.

4              MR. GINSBERG:  No objection.

5              THE COURT:  Received.

6              (Government Exhibit 1711 received in evidence)

7              MR. SCOTTEN:  And if we could publish it.

8    Q.   All right.  Ms. Grote, can you describe what this weather's

9    about -- sorry, what this email is about?

10   A.   The email is a plan to send the weather emails to the

11   management staff.

12             MR. SCOTTEN:  And if we can blow up the top portion.

13   Q.   What is a task reminder?

14   A.   I don't -- I don't know if it was a program or she logged

15   something in her email.

16   Q.   You understand the purpose behind it?

17   A.   Yeah, the -- a schedule, give her alerts whenever they,

18   whenever it became 6:45 each morning.

19   Q.   For what purpose?

20   A.   So she would remember to send the weather report.

21             MR. SCOTTEN:  And if we can back out of that, and I'm

22   not going to ask you to zoom in, because it's spread out.

23   Q.   Do you see a list of names at the bottom there.

24   A.   Yes.

25   Q.   What's that list of names?

1   A.  It looks like the managers.

2   Q.  And do you see where it says Niobrara 68760 OCC?

3   A.  Correct.

4   Q.  Do you understand the significance of those letters and

5   numbers after Niobrara?

6   A.  It's OneClickCash and the ZIP code, I believe.

7   Q.  When you say the ZIP code, the ZIP code of what?

8   A.  Of the Niobrara address.

9   Q.  And then scrolling down, do you see the same thing for

10  Miami?

11  A.  Yes.  And it's the -- I believe the ZIP code for the Miami

12  address, for 500 UCL Inc., FastCash.

13  Q.  And then do you see a couple names below that?

14  A.  Yes.

15          MR. SCOTTEN:  Could we scroll to the next page.

16  Q.  And who are these names below that?

17  A.  Managers who would have, some of them were responsible for

18  these departments.

19  Q.  Now, do you remember whether Scott Tucker or Tim Muir were

20  aware of these weather reports that were sent out?

21  A.  I do not believe they were.

22  Q.  Why did you have them sent out?

23  A.  I was trying to look for a way to help my agents complete

24  the company policy, to not get in trouble for breaking that

25  policy.

H9jWtuc2                    Grote - Direct

1    Q.  Where did that policy come from?

2    A.  Scott Tucker.

3    Q.  What was Tim Muir's role in the policy?

4    A.  He knew of the policy.

5    Q.  This practice of telling callers you were located on tribal

6    land ever end?

7    A.  It was changed, I think, or clarified after the FTC filed

8    against the company.

9    Q.  When you say clarified, was it clarified or changed?

10   A.  It was changed.

11   Q.  And without getting into what the legal claims were, what

12   do you mean when you refer to the FTC investigation?

13            MR. GINSBERG:  Objection, your Honor.

14            THE COURT:  Basis.

15            MR. SCOTTEN:  Basis for future action, your Honor.

16            THE COURT:  No.

17            MR. SCOTTEN:  Oh.

18            MR. GINSBERG:  I think we had pretrial discussions

19   about this.  I can't say I know what the answer's going to be,

20   and it could be problematic.

21            THE COURT:  All right.  I need to hear this at the

22   sidebar.

23            Ladies and gentlemen, please stand up and stretch.

24            (Continued on next page)

25

1          (At sidebar)

2          MR. SCOTTEN:  Can we do the white noise, your Honor?

3          THE COURT:  Please.

4          What's the basis for getting into the FTC case?

5          MR. SCOTTEN:  So the FTC --

6          THE COURT:  I know the case, but what's the basis?

7   Why are you getting into it?

8          MR. SCOTTEN:  It's going to be the cause for a lot of

9   future actions that are significant.  In this case most

10  directly it's going to be the reason which Ms. Grote tells a

11  lie, which is what she's going to admit to as part of

12  explaining her cooperation agreement.  But more generally, when

13  the FTC becomes involved, there are a whole lot of actions that

14  are taken by the conspiracy, including some I think the

15  defendants are going to elicit, that the tribes start taking

16  more control over the bank accounts, that the defendants start

17  taking different actions.  There's a whole funds transfer that

18  I think will be coming in that takes place because of the FTC

19  investigation.  It caused a very significant change in the

20  behavior of the defendants, affiliated tribes, the witnesses,

21  and I don't think there's a pretrial ruling on it, but

22  Mr. Ginsberg may correct me, your Honor.

23         THE COURT:  I recall ruling that the outcome of

24  certain cases, including, but not limited to, specifically the

25  FTC case would not come in in this trial.  Now, when did the

1    FTC investigation begin?

2            MR. SCOTTEN:  I'm not sure when it begins.  It really

3    becomes a factor for the defendants, which is significant; they

4    become aware of it in the 2012, 2013 time frame.

5            THE COURT:  All right.  Go ahead.

6            MR. GINSBERG:  I think the problem is if the

7    government is going to begin to elicit all these different

8    things that happened, changes that were made as a result of the

9    FTC lawsuit, the clear inference is going to be that the FTC

10   was making rulings or making allegations that the way things

11   were being done before it filed the action was not proper, so

12   the defendants and the companies began to change things, which

13   would lead to the inference that they were acting improperly

14   and illegally, and the FTC stepped in to stop it.

15           THE COURT:  And without that, the evidence that they

16   increased tribal involvement and they did things differently,

17   the fair inference would be that's because they're just good,

18   law-abiding people, and that's why the government is allowed to

19   bring it out.

20           Now, there will not be and cannot be, and I'm

21   prohibiting, any reference to any outcome of any such case.

22   And you're planning on referring to it as an investigation?

23           MR. SCOTTEN:  Yes, your Honor.

24           THE COURT:  All right.  I'll ask you, Mr. Ginsberg,

25   Mr. Bath -- I don't know the answer; you would know -- is it

 1   better or worse to describe it as a governmental investigation

 2   without referring specifically to the Federal Trade Commission?

 3            MR. GINSBERG:  A, I don't know, but B, it's already

 4   been referred to.  I mean, it's there at the moment.  You could

 5   give an instruction.

 6            THE COURT:  I understand, but it's not that there's

 7   anything wrong with referring to it in that regard.  That's

 8   accurate, and that's the virtue of it, because the witness will

 9   know exactly what's being referred to.

10            MR. GINSBERG:  How about we call it governmental

11   agency inquiries?

12            THE COURT:  I don't think that's accurate either, and

13   I see Mr. Bath.

14            Mr. Bath.

15            MR. BATH:  Judge, this is where we may have a little

16   split between Mr. Tucker and Mr. Muir, because Mr. Muir, when

17   he testifies, will talk about actions he took, and so the

18   government's correct.  We're going to want to at least elicit

19   some information about why he took some action, when he took

20   it.

21            THE COURT:  Right.

22            MR. BATH:  I think my preference would be that -- I

23   think the FTC is fine.  I think civil action, civil regulatory

24   action, something along those lines is what I'd suggest.

25            MR. GINSBERG:  Given what Mr. Bath intends to do, I

 1  think I can't really argue the government shouldn't be able to

 2  bring it out now if he's going to then bring it out on

 3  cross-examination.

 4              THE COURT:  Right.

 5              MR. GINSBERG:  But I guess it's just the way that --

 6              MR. ROTH:  It's civil, and that makes a difference.

 7              MR. GINSBERG:  And there may be some instruction.

 8              THE COURT:  I'm open to that.  First of all, I think

 9  it's right to keep it as the FTC investigation, because it

10  dispels any notion that this was a criminal investigation or

11  some such thing, which I think makes it worse.  If you would

12  like, I can charge the jury right now, You should infer nothing

13  from the fact that a governmental agency commenced an

14  investigation.  The only reason I've allowed any reference to

15  this is it may bear some influence on the actions that people

16  took in response.

17              MR. GINSBERG:  I think that would be fine.

18              MR. BATH:  Yes.

19              THE COURT:  Let me do that from the sidebar right now

20  before I forget how to phrase it.

21              (Continued on next page)

22

23

24

25

1    (In open court)

2    THE COURT:  Ladies and gentlemen, if you'll please

3    take your seats.  I'll wait for everybody to sit down.

4    I've allowed the witness to testify as to a civil

5    investigation that was commenced relating to certain matters

6    not because you should draw any conclusion from the fact that a

7    civil investigation was commenced, but because it may have

8    influenced the actions of people in response to that

9    investigation.  That's the only purpose for which that

10   testimony and any similar testimony as to the existence of an

11   investigation is being offered.

12   Thank you.

13   MR. SCOTTEN:  Thank you, your Honor.

14   THE COURT:  You may continue.

15   BY MR. SCOTTEN:

16   Q.  Ms. Grote, I can't remember if this was completed, when did

17   this practice of telling callers you were on tribal lands end?

18   A.  Sometime after the FTC investigation.

19   Q.  And do you know what FTC stands for?

20   A.  Federal Trade Commission.

21   Q.  And as part of this civil investigation by the FTC, did you

22   speak with the FTC?

23   A.  Yes.

24   Q.  Did you prepare before speaking with the FTC?

25   A.  I did.

1    Q.  How did you prepare?

2    A.  With Kirkland & Ellis attorneys, for about a day.

3    Q.  And these attorneys, did you hire them?

4    A.  I did not.

5    Q.  How did you find out you were going to meet with these

6    attorneys if you didn't hire them?

7    A.  Scott and Tim told me I was going to meet with them and

8    give a deposition for the FTC.

9    Q.  Was that Scott Tucker and Tim Muir who told you you were

10   going to meet with these lawyers?

11   A.  Yes.

12   Q.  And how long did you prepare with these lawyers that Scott

13   Tucker and Tim Muir hired for you?

14   A.  At least a full day.

15   Q.  And I'm not going to ask you about what you said with them,

16   but after you spoke with these attorneys hired by defendants,

17   did you in fact speak with the FTC?

18   A.  I did.

19   Q.  Did you tell the truth?

20   A.  Not fully, no.

21   Q.  Did you lie?

22   A.  Yes.

23   Q.  Did you lie under oath?

24   A.  Yes.

25   Q.  What were some of the things you lied about?

1    A.  The weather report; I said that I did not know why we were

2    providing the weather report, and I did know why we were

3    providing the weather report.

4    Q.  Were there other things you lied about?

5    A.  Yeah, I was not very candid and did not explain at all

6    about the questions about payouts and renewals.  I was asked

7    about whether the company cared about renewals and whether we

8    had an initiative to increase renewals and decrease payouts,

9    and I tried to avoid that question and answer differently.

10   Q.  Were those the only things where you lied or got in the way

11   of the investigation?

12   A.  I'm sorry?

13   Q.  Are those the only two things, or are those just examples?

14   A.  Just examples.

15   Q.  And why were you lying or deceiving about these things?

16   A.  I don't know exactly.  I just wanted to, you know, do a

17   good job and try to portray the company in the best light.

18   Q.  Who were you trying to do a good job for?

19   A.  The company.

20   Q.  Who ran the company?

21   A.  Scott and Tim.  Scott, I guess.

22   Q.  Is that the only time you were less than honest with the

23   government, less than straightforward?

24   A.  The first time that I met with you and your team in August,

25   I was not as candid as I have been since.

1              THE COURT:  August of what year?

2              THE WITNESS:  Sorry.  2016.

3              THE COURT:  Thank you.

4    BY MR. SCOTTEN:

5    Q.  Now, as a result of these lies with the FTC, you pled

6    guilty to a federal crime?

7    A.  I have.

8    Q.  And what crime did you plead guilty to?

9    A.  Providing false or misleading information.

10   Q.  Did you plead guilty to what's known as a cooperation

11   agreement?

12   A.  Yes.

13   Q.  Now, I want to be clear.  When you were less than candid

14   with the government in August of 2016, had you entered a

15   cooperation agreement yet?

16   A.  No.

17   Q.  Around when did you sign this agreement?

18   A.  August of this year.

19   Q.  And I'm going to show you what's marked as Government

20   Exhibit 1730.  Do you recognize this?

21   A.  Yes.

22   Q.  And what is it?

23   A.  It is the cooperation agreement.

24   Q.  Did you sign a copy of that today, just to have in the

25   record?

1   A.  Yes.

2   Q.  When did you originally sign it?

3   A.  In, in August.

4           THE COURT:  Of what year?

5           THE WITNESS:  This year.

6           MR. SCOTTEN:  I'm going to offer 1730.

7           THE COURT:  Any objection?

8           MR. GINSBERG:  No, your Honor.

9           THE COURT:  Received.

10          (Government Exhibit 1730 received in evidence)

11          MR. SCOTTEN:  Can we just show it on the screen,

12  Mr. Beer.

13  Q.  Can you explain what you understand a cooperation agreement

14  to be?

15  A.  So I'm agreeing to provide testimony and provide any

16  answers the government is asking, and to do that truthfully.

17  Q.  Other than providing truthful answers to questions and

18  testifying, do you have any other obligation?

19  A.  To be available to meet, if necessary.

20  Q.  Are you allowed to commit further crimes?

21  A.  No.

22          MR. SCOTTEN:  I want to turn to page 2, and Mr. Beer,

23  can you blow up the second paragraph, the first full paragraph.

24  Q.  Ms. Grote, do you see about halfway down where there's a

25  little letter (i) surrounded by parentheses?

1   A.  Yes.

2   Q.  Do you understand the words right there?

3   A.  Yes.

4   Q.  And what do those words concern; what are they describing?

5   A.  The making of the false and misleading statements during a

6   deposition with the FTC.

7   Q.  Is that crime a felony?

8   A.  Yes.

9   Q.  And then can I ask you to read little Roman "i," the one

10  with parentheses and the two I's?

11  A.  Out loud?

12  Q.  Please.

13  A.  "Payday lending enterprise orchestrated by Scott Tucker,

14  from in or about 1999, up to and including in or about January

15  2017, to the extent that she has disclosed such participation

16  with this office as of the date of the agreement."

17  Q.  And what's the significance of those words being included

18  in the plea agreement?  Let me ask you more specifically.

19      Are you protected from prosecution for any crimes you may

20  have committed in that enterprise described there?

21  A.  Yes.

22  Q.  Can the judge who sentences you consider whatever you may

23  have done to further that enterprise when he determines your

24  sentence?

25  A.  Yes.

1   Q.  And do you know what judge is going to sentence you?

2           MR. GINSBERG:  Objection, your Honor.

3           THE COURT:  Sustained.

4           MR. SCOTTEN:  Can we go back to the first page, and

5   can you please expand the first paragraph.

6   Q.  Now, Ms. Grote, looking at this paragraph, what's the

7   maximum sentence you face?

8   A.  Five years' imprisonment; maximum supervised release of

9   three years; a maximum fine of $250,000, or twice the gross

10  gain from the offense or twice the gross loss from any persons

11  resulting from the offense.

12  Q.  Does the sentencing judge have to give you a five-year

13  sentence?

14  A.  No.

15  Q.  What's the judge's discretion?

16  A.  He could give me zero years.

17  Q.  And how much could the sentencing judge give you?

18  A.  He could give me five years.

19  Q.  Ms. Grote, if you live up to the commitments you discussed

20  earlier, testifying truthfully, showing up, does the government

21  have any obligations under this agreement?

22  A.  They have agreed to give me a letter.

23  Q.  And when you say give you a letter, who does the government

24  write the letter to?

25  A.  To the judge.

1  Q.  And what does the letter describe?  Do you have an

2  understanding of the contents of this letter?

3  A.  Basically that I did cooperate, that I showed up and I told

4  the truth.

5  Q.  Does it include any other information?

6  A.  Not that I can think of.

7  Q.  Will it include anything about what you've done?

8  A.  I believe that it's a statement of what I am guilty of.

9  Q.  Does the government recommend any sentence?

10  A.  No.

11  Q.  Has anyone promised you a sentence?

12  A.  No.

13  Q.  Who determines what your sentence will be?

14  A.  The judge.

15  Q.  Ms. Grope, are you hoping to get a lower sentence because

16  you testified and cooperated?

17  A.  Yes.

18  Q.  Do you have any guarantees?

19  A.  No.

20  Q.  As you understand it, does the outcome of this trial have

21  any effect on your sentence?

22  A.  No.

23  Q.  If these defendants are convicted, would you get a lighter

24  sentence?

25  A.  No.

1   Q.  If they're found not guilty, will they get a heavier

2   sentence; does that affect your sentence at all?

3   A.  No.

4   Q.  What happens if you're found to have lied?

5   A.  Then I face a stiffer penalty.

6           MR. SCOTTEN:  We can take that down.

7   Q.  Ms. Grote, do you know whether there was any media interest

8   in the payday lending business you did with the defendants?

9   A.  Yes, there was.

10          MR. GINSBERG:  Objection, your Honor.

11          THE COURT:  Pause, please.

12          Sustained.

13  Q.  Ms. Grote, was there any guidance circulated while you were

14  working there in addressing media?

15  A.  There was.

16  Q.  Ms. Grote, I'm going to show you what's already in evidence

17  as Government Exhibit 1714.

18          MR. SCOTTEN:  My apologies.  We should take that down.

19  Can you show just me and the witness 1713.

20  Q.  All right, Ms. Grote --

21          MR. SCOTTEN:  We can now show that to the jury too.

22  Q.  And we saw this before, but can you remind the jury what

23  we're looking at?

24  A.  An email from Jared to Tim regarding a memo to employees

25  and customers Q & A.

1    Q.  Can you read the title of the first attachment now?

2    A.  "Draft memo to employees, 9.26.11, version 3."

3             MR. SCOTTEN:  Can we take that down and show just the

4    witness Government Exhibit 1714, and if we could show defense

5    counsel too, we may --

6             MR. GINSBERG:  I have an objection, your Honor.

7             MR. SCOTTEN:  We may need to approach to discuss it,

8    your Honor.

9             THE COURT:  All right.  Ladies and gentlemen, we're

10   going to break early.  I have 12:58 on the clock here, so this

11   is an early lunch break.  We'll pick up at 2.  Remember, please

12   do not discuss the case among yourselves or with anyone.  Keep

13   an open mind.  There's more to come.  See you after lunch.

14   Thank you.

15             (Jury not present)

16             THE COURT:  You may step down.

17             (Witness not present)

18             (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Please be seated.

3          All right.  What's the witness's testimony going to be

4     about this?

5          MR. SCOTTEN:  The witness's testimony, your Honor, is

6     really just going to be that these first two statements that

7     were circulated to the employees were not accurate; they were

8     part of a general approach to concealing Scott Tucker's role in

9     the business.  The reason I want to make sure defense counsel

10    had an opportunity to object is there is content in there about

11    the CBS News story, which is what provoked this memo.

12         Your Honor, the CBS News story is very similar,

13    actually, to the FTC issue you reached.  It caused a lot of

14    reaction to come up with a lot of witnesses who took action

15    based on it.  Sequentially, although this is simplification,

16    things coming to light here begin with the CBS story, very

17    negative press, caused a lot of reactions.  Subsequent to that

18    is the FTC investigation, and these are sort of a series of

19    downward steps for this enterprise as more and more people

20    focused scrutiny on it.

21         THE COURT:  Let me hear from the defendants.

22         MR. GINSBERG:  Even based on the government's

23    explanation, I don't see how this becomes admissible.  Once

24    again, this is now I think the third document.  There was that

25    other document from yesterday, if your Honor remembers, with

1    the picture of the governor on it in reference to a news

2    article.

3           Here, there's reference directly to the CBS story

4    about some of the businesses, and then it goes on to respond, I

5    guess the internal response to some of the things that were

6    said.  Then the concluding paragraph talks about the broadcast

7    again, and then compliance issues.  It's effectively a

8    media-driven article that's taken and put into a different

9    format and relayed to the employees.

10          Now, beyond the fact that I don't think that this is

11   necessarily admissible, because of the problems I point out,

12   the government has already elicited the FTC lawsuit, changes

13   that happened as a result of the FTC lawsuit.  They're

14   essentially going to try to do the same thing based on this

15   email and the underlying article or news piece by CBS News to

16   show that, again, in response to some negative press, people in

17   the company or the company itself began to react in a certain

18   way.

19          Beyond that, it would be my view that if your Honor

20   were to permit this in, which talks about the negative article

21   by CBS and things negative that CBS had to say and things that

22   were changed, there is a letter written by one of the

23   government witnesses who's not yet testified, Chief Tom Gamble,

24   directly to CBS in response to the piece that they wrote, and

25   his views about how the article was incorrect, why it was

1    incorrect, that they haven't done their due diligence, and that

2    his lending operation from the Miami tribe is legitimate, that

3    they are the lenders.  And so if something like this were to

4    come in, I think we would have every right to introduce

5    something that would be to the contrary, because it responds

6    directly to what's going on here and the inferences that the

7    government seeks to draw from this email, which is based upon

8    the CBS News piece.

9              THE COURT:  Yes, Mr. Bath.

10             MR. BATH:  Thank you, Judge.

11             In addition, I join Mr. Ginsberg's arguments, but

12   there's a more fundamental problem, I think, and that is Jared

13   Marsh apparently wrote this.  He's not here, we don't have a

14   right to confront him.

15             Second, it says confidential draft.  I don't think

16   there's any evidence -- I understand what Ms. Grote might say,

17   but there's not evidence that this draft didn't get modified

18   and given, and maybe I'm wrong and the government can correct

19   me if I'm wrong, but we don't have a right to confront the

20   author of this document, nor is there proof, besides the

21   prejudicial evidence, that this really got distributed.

22             THE COURT:  I think it's a very fair point you raise,

23   and I can't possibly rule on that at this juncture, so let me

24   say that the --

25             You can be seated, sir.

1         MR. SCOTTEN:  Yes, your Honor.

2         THE COURT:  The foundational question remains very

3    much up in the air in my mind, and I take your point that it's

4    labeled as a confidential draft, so nothing may come in.  But I

5    am reluctant to allow in a reference to CBS News because I

6    think it creates the aura of what used to be known as the three

7    major networks having their shoulder behind this, or one of

8    them, at least.

9         I also note that in September 2011, there were, as the

10   common experience of folks on the jury would be, a lot of

11   people out there publishing stories in one way or another, and

12   the fact that somebody said this in a story is not necessarily

13   taken as a given.  The reason this appears to me to be

14   probative, to state the obvious, is that one inference to be

15   drawn is that a false version of the facts is being put out to

16   employees, if it was put out to employees, and that's the

17   foundation question, and that may be relevant.

18        If you take a pencil, I'll tell you where -- in fact,

19   can you print out a hard copy of this?  I can give you my

20   proposed redactions.

21        MR. SCOTTEN:  I think we have one, your Honor.  I'll

22   just bring it up.

23        THE COURT:  Yes.  And the jury will see it's redacted.

24        The defendants' objection to any use of the memo is

25   noted.  I'm not ruling on the foundation, but if the foundation

1    can be laid, then I will allow its introduction with the

2    redactions I've made here, and I will instruct the jury that it

3    refers to some kind of a news story and who it's by or from is

4    not at all relevant, You shouldn't speculate on it; it's only

5    for the purpose of any influence it may have had on anybody who

6    saw it.

7              Is the government done reviewing that?

8              MR. SCOTTEN:  Yes, your Honor.

9              THE COURT:  Hand it to defense counsel, please.

10             MR. GINSBERG:  I appreciate what your Honor's trying

11   to do.  The question is going to become -- it's almost the

12   same.  The redactions your Honor's made leave it almost intact

13   except for the blank spaces, and the blank spaces, when they

14   keep appearing, for example, "We are disappointed by the

15   misleading story that" blank "chose to run.  Regardless of

16   reckless allegations set forth in the" blank "story" -- I mean,

17   there is the strong potential for rampant speculation that this

18   is some newspaper, news media, some kind of an outlet was

19   running, because it keeps getting redacted and blanked out in

20   these little spots, so the jury's going to think, Well, who ran

21   it?  Somebody ran this, somebody wrote a piece, and I don't

22   know if that's better or worse.

23             THE COURT:  That's up to you to decide whether it's

24   better or worse.

25             Flo, take it back and mark it as the next court

1  exhibit.

2         If your request is that it not be redacted, that's

3  fine.  What I indicated is, coupled with the redactions, I

4  would say:  The government has offered this article.  It refers

5  to a story.  The story is not important.  Who wrote the story,

6  none of that is important.  It's not anything for you to

7  consider.  The only reason I've allowed it in is because of how

8  it may have affected the conduct of others.

9         MR. GINSBERG:  No.

10        THE COURT:  You tell me, do you want CBS News in

11 there?

12        MR. GINSBERG:  If those are the alternatives, no.

13        THE COURT:  No, what?

14        MR. GINSBERG:  No, I don't want CBS News in.

15        THE COURT:  OK.

16        MR. GINSBERG:  But I will, maybe tomorrow, hopefully,

17 hand up a copy of the other document that I referenced to the

18 Court.  I think there may be two, but at least one that was

19 written in response to this by the chief of the Miami tribe,

20 which is marked as a government exhibit, by the way.

21        THE COURT:  All right.  I'm not going to rule on

22 anything that's not before me, but part of the reason for the

23 redaction is because this is only relevant to how it influenced

24 the actions of coconspirators, and beyond that, it has no

25 relevance in this case.  I don't know that that can be said

H9jWtuc2

1    about a letter from someone else, but I'll take it up when I

2    have to take it up.

3              MR. GINSBERG:  Yes, your Honor.

4              THE COURT:  Enjoy lunch.  See you at 2:00.

5              MR. SCOTTEN:  Thank you, your Honor.

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                           AFTERNOON SESSION

1                                2:00 p.m.

2

3          (Jury present)

4   CRYSTAL GROTE, resumed.

5          THE COURT:  Good afternoon, ladies and gentlemen.  We

6   are back in action.

7          You may continue.

8   BY MR. SCOTTEN:

9   Q.  Ms. Grote, when we left off, you were looking at an

10  attachment to an e-mail sent by Jared Marsh to Timothy Muir, is

11  that correct?

12  A.  Correct.

13  Q.  I want to ask you a couple of questions about it.

14         Does that contain some kind of guidance to employees?

15         MR. SCOTTEN:  Can we put that back up?

16  Q.  Does that contain some sort of guidance to employees?

17  A.  It was a memo to employees, yes.

18  Q.  Is the version we are looking at here substantively the

19  same as one you recall being circulated?

20  A.  Version 3 on the same date, yes.

21  Q.  Is this substantively the same as the one that actually

22  went out to employees?

23  A.  Yes, I believe so.

24         MR. SCOTTEN:  Your Honor, the government offers 1714.

25         THE COURT:  Subject to the discussion at the sidebar,

1    it's received.

2             (Government's Exhibit 1714 received in evidence)

3             THE COURT:  Ladies and gentlemen, let me explain to

4    you, you're going to see some redactions or black markings on

5    this memo, Government Exhibit 1714.  They were at my direction.

6    It talks about some kind of a story or article, and the story

7    or article proves nothing.  The only reason I have allowed it

8    is because you may hear testimony about what persons who were

9    alleged to be co-conspirators with the defendants, or the

10   defendants, may have done in response to the article.  And you

11   can only consider it in the context of looking at what the

12   response to it is.  Who the article is or what it said is not

13   particularly important, and you're not to speculate about it.

14   Actually, I will say it's not important at all to this case.

15            So with that, you may publish the article.

16            MR. SCOTTEN:  Thank you, your Honor.

17   BY MR. SCOTTEN:

18   Q.  Ms. Grote, is this guidance circulated to employees in

19   response to the story that was just discussed?

20   A.  Yes.

21   Q.  Can I just ask you to read the two bullet points -- there

22   are only three bullet points.  I ask you to read the top two.

23   A.  "Scott Tucker does not own or operate any online lending

24   business.

25            "Just like you, Scott Tucker is an employee of AMG

1   Services, Inc."

2   Q.  Starting with that middle bullet, if you were trying to

3   accurately describe Scott Tucker's position in the business,

4   would you have said he is just an employee?

5   A.  No, he was a decision-maker.

6   Q.  Then turning to the first bullet, was it a true statement

7   at that date to say that Scott Tucker did not operate an online

8   lending business?

9   A.  No, he did operate the businesses.

10          MR. SCOTTEN:  Nothing further, your Honor.

11          THE COURT:  All right.

12          Any cross-examination?

13          MR. GINSBERG:  Yes, sir.

14  CROSS EXAMINATION

15  BY MR. GINSBERG:

16  Q.  Good afternoon.

17  A.  Hi.

18  Q.  At the beginning of your testimony you went through a

19  series of different lending companies, and you gave us the name

20  of four or different five companies that you and Scott Tucker's

21  entities were associated with, is that correct?

22  A.  Yes.

23  Q.  Could you tell us the time periods for each one of those

24  one by one?

25  A.  The time period they were started?

1  Q.  Well, as far as you knew.  From the time that you came on,

2  tell us the year that you came on and what was in place at that

3  time.

4  A.  1999, when I started, there was only National Money

5  Service, which became 500 FastCash.

6          And I believe all of the other four were started in

7  2001, although the last one, US FastCash, might have been in

8  2002 or '03.  It was later.

9  Q.  You also talked about County Bank, correct?

10  A.  Correct.

11  Q.  At what point in time, to the best of your recollection,

12  was there affiliation between the lending companies and County

13  Bank?

14  A.  Sometime about 2000, 2001 to 2004.

15  Q.  And you were employed there at that time, is that correct?

16  A.  I was.

17  Q.  How did you become aware of that association between the

18  lending companies and the County Bank?

19  A.  From Scott and Blaine Tucker.

20  Q.  In addition, did you see documents with County Bank's name

21  on them?

22  A.  Yes.

23  Q.  What type of documents were they?

24  A.  Faxes from the bank.  I actually had to modify the

25  templates to include County Bank's name on it.  The

1   application, the loan note disclosure.

2   Q.  Did you ever have any contact with County Bank personnel?

3   A.  I did.

4   Q.  Who did you have contact with?

5   A.  Most often, Scott Walsmith, sometimes Steve Goodman.

6   Q.  Who is Scott Walsmith?

7   A.  I believe he was in charge of compliance.  I would have to

8   submit things to him for approval; marketing material, changes

9   that we had.

10  Q.  So you would have to submit things for him to approve

11  because he was the compliance manager for County Bank, is that

12  correct?

13  A.  Not 100 percent what his title was, but yes, I believe that

14  was his role as far as I was dealing with him.

15  Q.  How about Mr. Goodman, who was he?

16  A.  He was the bank's attorney.

17  Q.  What kind of dealings did you have with him?

18  A.  Mostly I just copied him on things.  Or if he had changes,

19  Scott would talk with him, Scott Walsmith would talk with him,

20  and send me changes that I needed to make.

21  Q.  So sometimes the changes would come through Scott Walsmith,

22  but it had originated from Mr. Goodman, is that correct?

23  A.  Yes.

24  Q.  Is it fair to say that the lending entities that Scott

25  Tucker was involved in were required by the bank to follow the

1    compliance directions from County Bank?

2    A.  Yes.

3    Q.  Were you aware that County Bank had set out its own

4    criteria for purposes of making loans?

5    A.  Yes.

6    Q.  Were you aware that those criteria were set out by

7    Mr. Goodman and others who were associated with the bank?

8    A.  I don't know who created that, but under the bank's

9    guidelines we had to follow.

10   Q.  So they were in charge of setting forth the guidelines, in

11   terms of the lending, correct?

12   A.  In terms of any marketing and lending, they actually

13   reviewed customer files, they did audits to ensure that we

14   followed the guidelines.

15   Q.  Did this continue to occur through the entire period of

16   time that there was an association between Scott Tucker and the

17   entities you mentioned and County Bank?

18   A.  Yes.  We had audits, and we had to submit changes to them

19   during that time, yes.

20   Q.  And when you say "we had audits," what kind of audits were

21   they?

22   A.  We had two different types of audits.  One in which we had

23   to send customer files to the bank via fax; I believe possibly

24   e-mail, but I believe we faxed them.  And then we also had

25   in-house audits, where they sent representatives to our office

1  to review anything they needed to.

2  Q.  Now, at any point in time, did you ever read or review an

3  actual agreement between County Bank and the entities that

4  Scott Tucker was operating?

5  A.  Not that I recall.

6  Q.  Were you aware that there was such an agreement?

7  A.  I was aware there was a relationship with the bank, but I

8  don't know what the agreement was in any way.

9  Q.  Was that because that wasn't part of your job title or

10  function, is that fair to say?

11  A.  Yes.

12  Q.  In addition, as time progressed, you told us that there

13  then became relationships between various Native American

14  tribes and Scott Tucker and entities associated with him, is

15  that correct?

16  A.  Yes.

17  Q.  Did you ever see or review any of the agreements between

18  the tribes and Scott Tucker and his entities?

19  A.  No.

20  Q.  Did you ever see the service agreements?

21  A.  No.

22  Q.  Did you ever review any language in any documents where it

23  indicated that the tribes were the lenders of the money?

24  A.  Only in the loan note disclosure that we would provide to

25  customers, but no contract between the tribes and Scott or

1   company, nothing like that.

2   Q.  So you saw it in the loan disclosures, correct?

3   A.  Yes.

4   Q.  But you didn't see it in any other documents because you

5   never reviewed any of the other documents, is that fair to say?

6   A.  Correct.

7   Q.  And you knew that Scott employed a number of different

8   lawyers working on behalf of his entities, is that fair to say?

9           MR. SCOTTEN:  Objection.

10          THE COURT:  I will allow it as a yes or no.

11  A.  Yes.

12  Q.  Did you ever have any interactions with a gentleman by the

13  name of Conly Schulte?

14  A.  Limited.

15  Q.  Did you know who he was?

16  A.  Yes.

17  Q.  Who was he?

18  A.  I believe he represented the tribes directly.  I'm not sure

19  if it was all tribes or not.

20  Q.  Did you have any contact with a gentleman by the name of

21  Cliff Cohen?

22          MR. SCOTTEN:  Objection.

23          THE COURT:  Relevance.

24          MR. GINSBERG:  The relevance is that Mr. Cohen was an

25  attorney early on after the -- at around the time of County

1   Bank.

2           THE COURT:  How is that relevant?

3           MR. GINSBERG:  Because she has testified already that

4   she didn't ever see any agreements or documents, and I am

5   trying to establish that she didn't because she didn't deal

6   with the people who were drafting them and writing them.

7           THE COURT:  If she doesn't know whether they were

8   drafting them or writing them, then it's not relevant.  Why

9   don't you see if you could establish that.

10          Did you know who was drafting and writing documents?

11          THE WITNESS:  No.

12          THE COURT:  Next question.

13  Q.  But you did know -- I think as you said before -- that Mr.

14  Tucker had counsel assisting him, correct?

15  A.  Yes.

16  Q.  And then eventually there was in-house counsel working for

17  Mr. Tucker, is that correct?

18  A.  Yes.

19  Q.  Who were the people who were in-house counsel for Mr.

20  Tucker?

21  A.  Timothy Muir was the first.

22  Q.  Then after that?

23  A.  Matt Dykstra, Jared Marsh, Kent -- I'm forgetting his last

24  name right now -- Jonathan Gilmore.

25  Q.  Did you have any interactions with those gentlemen in

1    relation to any agreements that they drafted between or among

2    the Tucker entities and any of the Native American tribes?

3    A.  No.

4            THE COURT:  Do you know whether they had anything to

5    do with it?

6            THE WITNESS:  Had anything to do with?

7            THE COURT:  Drafting agreements with Native American

8    tribes?

9            THE WITNESS:  No.

10           THE COURT:  Thank you.

11           Next question.

12   Q.  Did you not know what their roles were of the in-house

13   counsel lawyers?

14   A.  I know that they assisted with the tribal lending, the

15   in-house lawyers, they answered questions, they helped work on

16   customer documents, but I knew their role from an operational

17   side and not from a business setup or contractual side.

18   Q.  So there was effectively a separation within the

19   organization between the operational side and the legal side,

20   and maybe other divisions as well, is that fair to say?

21   A.  Yes.

22   Q.  At the outset, when you first started working with Mr.

23   Tucker, what were your specific roles?

24   A.  I was a customer service agent and administrative duties.

25   Q.  Over a period of time, did those roles change?

1    A.   I continued to take on more duties, yes.

2    Q.   Did you continue to, for lack of a better word, sort of be

3    promoted to higher positions?

4    A.   Yes.  It kind of grew underneath and I was pushed up really

5    more.  It just got bigger and the responsibilities came with

6    that.

7    Q.   What was the last position you held within that set of

8    companies that Scott Tucker was related to?

9    A.   An operational manager.

10   Q.   Would it be fair for most of the time that you were there,

11   if not all the time, you were in that area of the business,

12   correct?

13   A.   Yes.

14   Q.   But with different roles and different titles, correct?

15   A.   Correct.

16   Q.   When you had your final position in the company, were you

17   in charge of a number of other people in terms of being their

18   supervisor?

19   A.   Yes.

20   Q.   And approximately how many people were you supervising at

21   that point in time?

22   A.   Hundreds, like 500.

23   Q.   500?

24   A.   Yes.

25   Q.   Were those 500 people in different sort of groups or

1   categories of employees?

2   A.  Multiple different groups, yes.

3   Q.  What were those multiple different groups?

4   A.  We had the teleloan side of the business, which was new

5   loan acquisition for the multiple portfolios.  Then we had

6   customer service, one department for each portfolio.  We had a

7   processing department to send the money to the bank and process

8   returns from the customer, and the collection side for each

9   portfolio.

10  Q.  Underneath you were there managers who supervised some of

11  those other people?

12  A.  Yes, multiple layers, the managers, the supervisors, team

13  leads, then employees.

14  Q.  But ultimately did the managers or whoever was on that

15  level right below you, did they all report to you?

16  A.  Yes.

17  Q.  So would it be fair to say that you had a lot of different

18  roles during that last period of time?

19  A.  Yes.

20  Q.  And you had to be familiar with pretty much all of the

21  different forms of operations for the companies, is that

22  correct?

23  A.  Yes.

24  Q.  In addition to being in that position, were you responsible

25  for training?

1    A.  Yes.

2    Q.  Did you conduct training sessions?

3    A.  Yes.

4    Q.  How frequently would you conduct training sessions?

5    A.  To be more clear, I did not personally conduct training

6    sessions, but the managers that reported to me did.  We

7    conducted training sessions when new employees were hired, and

8    they had weekly meetings -- biweekly meetings in each

9    department to talk about any issues and to have ongoing

10   training sessions.

11   Q.  Would you attend some or all of those meetings?

12   A.  Some, definitely not all.

13   Q.  Would the managers, either before or after they conducted

14   those meetings, would they report back to you in some fashion,

15   whether they called you or sent you an e-mail, to apprise you

16   of what was taking place?

17   A.  There was a meeting agenda and meeting minutes kept for

18   each meeting that were e-mailed out to the entire group.  I was

19   on those e-mails.

20   Q.  Now, was there also a training manual that was developed to

21   be used for employees, particularly, employees who were working

22   under you in the operations department?

23   A.  There was.

24   Q.  Who developed that training manual?

25   A.  It was created by that management team, team leads I

1   believe that were employees that actually worked on it also.

2   Q.  Did you work on development of the training manual at all?

3   A.  I did not write much of the training manual, but yes, I

4   participated in the development.

5   Q.  In the development of it?

6   A.  Yes.

7   Q.  Are you aware of the contents of the training manual?

8   A.  Most of it, yes.

9   Q.  And it would be fair to say that the purpose of the

10  training manual was so that each employee would have a set of

11  the rules and regulations and how the company wished those

12  employees to operate?

13  A.  We would call them company policies and procedures, yes.

14  Q.  I would like to show you what has been marked as

15  Defendants' Exhibit D1312.

16          MR. GINSBERG:  If you can put it up on the screen.

17  Q.  Do you have that in front of you?

18  A.  I do.

19  Q.  Do you recognize what this is?

20  A.  Yes.  The customer service and processing manual.

21  Q.  The page that you're looking at right now, it says on the

22  top right page 1, is that correct?

23  A.  The cover page, yes.

24  Q.  And that's the cover page of a relatively thick document

25  that has all kinds of information in it for the purposes of

1  training the employees, is that correct?

2  A.  Yes.

3          MR. GINSBERG:  Your Honor, I offer Defendants' Exhibit

4  D1312.

5          MR. SCOTTEN:  We object, your Honor.

6          THE COURT:  Let me see you all at sidebar.

7          Ladies and gentlemen, you can stand up and stretch.

8          (At the sidebar)

9          MR. SCOTTEN:  Your Honor, to start with, it's a

10  several hundred page document.  It's a document of many hundred

11  pages, so the vast bulk of it is not relevant.  There may be

12  specific portions that there is an admissible basis for, but

13  putting in a 300-page manual that we would have to pick and

14  choose from, we would have to object now.  I think there's

15  probably going to be other objections to certain portions, but

16  the whole thing shouldn't come in on relevance grounds alone.

17          MR. GINSBERG:  First of all, it's all relevant.  Her

18  job was to oversee, train, supervise all the employees.  This

19  is essentially all the work that she did, and she was

20  responsible for making sure the employees did, as opposed to

21  the legal aspects of the business.

22          THE COURT:  That wouldn't make the entire manual

23  necessarily all admissible.

24          Do you have a copy?  Can somebody pull a copy that I

25  can see?

1           MR. GINSBERG:  We have another one.  I will give you

2      mine.

3           THE COURT:  So what in here is relevant and why?

4           MR. GINSBERG:  First of all, I would say that almost

5      everything that's in here has been testified to orally by one

6      or more of the government witnesses already -- the loan

7      process, the call center answering process, the application for

8      the loans, the charges, the renewals, the paydowns.

9           THE COURT:  That doesn't make the document necessarily

10     relevant.

11          MR. GINSBERG:  It shows that this was the company

12     policy.  To the extent there has been testimony that something

13     other than the company policy was done or followed by any of

14     the employees, it shows that this is the policy that was set up

15     by the company to be followed.

16          MR. SCOTTEN:  It sounds not only not relevant, but

17     cumulative, to the extent you're just proving what we already

18     proved that there is policy.  To the extent Mr. Ginsberg would

19     want to introduce a portion that differs from what the witness

20     testified to, I think that would be hearsay for the truth of

21     the matter asserted, trying to say, well, let me show you this

22     policy, therefore X witness lied about what was being done.

23     They need a witness who actually said that.

24          Your Honor, a lot of it is how you log into a Web

25     site, etc.  It's not even that.  It's just not relevant.

1          MR. GINSBERG:  These are things that either the

2     government witnesses who were employees testified to, or the

3     government questioned some of the customers about logging in

4     and how it was done and what happened once they logged in.  The

5     cumulative response just doesn't apply.  Just simply because

6     the government put some of this in doesn't mean I can't do it

7     in my own way.  It doesn't make it cumulative.

8          THE COURT:  Is it your position that any of this is

9     inconsistent with the testimony of any of the witnesses?

10          MR. GINSBERG:  There are various places where it's

11     inconsistent with some of the testimony by the witnesses.

12          THE COURT:  Well, I think it might help your cause if

13     you tell me what it is you plan to cross-examine on.

14          MR. GINSBERG:  There are so many different things,

15     your Honor.

16          THE COURT:  Start with a for instance.

17          MR. GINSBERG:  Well, for instance, this is the manual

18     that trains the employees as to what to tell the customers.

19     There is nothing in here that says to the employees, we want

20     you to mislead the customers in telephone calls with

21     information, we want you to encourage people to continue

22     renewals, we want you to -- if they say it's unclear, we don't

23     want you to clarify it for them.  I mean, it's rife throughout

24     this showing that that was not what the company policy was.

25          THE COURT:  Pause.  Isn't that fair game for

1    cross-examination?  You have a company manual that doesn't say

2    anything about these things.

3         MR. SCOTTEN:  I think that's a perfectly reasonable

4    question, your Honor.  I don't think admitting 300 pages that

5    don't say that is relevant.  The question is, these things

6    weren't in the company manual.  He can ask that.  It almost

7    makes this more relevant.  If the answer is it's not in there,

8    then I'm not sure why you have to admit 300 pages of log-in

9    guidance to establish that.

10        THE COURT:  I think it's fair game for you to put the

11   manual in front of the witness and say, Where does it come

12   from, etc.  Who is it distributed to?  Please take a moment and

13   take a look at the manual.  Is there anything in there about

14   lying to customers about this or misrepresenting that or any of

15   those things?  I think that's fair game for cross-examination,

16   and I will allow it.

17        MR. GINSBERG:  My ultimate point would be she can

18   answer those, but this is a document from the corporation that

19   corroborates what I am going to be asking her, and I think I

20   should be entitled to do that.

21        THE COURT:  At the end of the examination you can

22   renew your offer, and I will see at that point.

23        MR. GINSBERG:  Thank you.

24        (Continued on next page)

25

1              (In open court)

2     BY MR. GINSBERG:

3     Q.  Now, you told us that you're familiar with this manual,

4     correct?

5     A.  Yes.  This looks like a manual that we used.

6     Q.  I couldn't hear you.

7     A.  Yes.  This looks like a manual that we used.

8     Q.  In this manual -- first of all, would it be fair to say

9     that the manual is about 130 pages long?

10    A.  Yes.

11    Q.  Is there anyplace in this manual where the employees are

12    instructed to lie to customers who call the call center?

13             MR. GINSBERG:  Judge, I have to interrupt.  If the

14    only way she can do that is by looking through each page, I

15    think I am going to have to figure out a different way because

16    otherwise we will be here forever.

17             THE COURT:  Well, as we all know, it is possible for a

18    lawyer to maybe offer a representation to a witness and see

19    whether the witness is comfortable in accepting that or wishes

20    to go through the document.  I don't know how else to help you.

21             MR. GINSBERG:  I guess I wasn't asking for help.  I

22    was trying to avoid inefficiency.

23             Let me go back and do this again with the witness so

24    maybe it's a little easier.

25    BY MR. GINSBERG:

1    Q.  You told us that you are familiar -- from all the years

2    that you were working at the company, and the training and the

3    supervision that you did, that you were familiar with this

4    document, is that correct?

5    A.  Yes.

6    Q.  And you have seen and read this document before, is that

7    correct?

8    A.  Yes.

9    Q.  From your recollection of having seen and read this

10   document before, does it say anyplace in this document that the

11   employees are to lie to customers who call the call center?

12   A.  I mean, I am specifically looking for the location and

13   whether it says anything about that in here, which I don't see

14   right now.

15   Q.  Well, you had great familiarity with this document,

16   correct?

17   A.  Sir, there were a lot of documents.  This is not the only

18   one we used for customer service.  We had a floor packet.  This

19   was just one department of the floor.  There is no way I am

20   going to remember all of that stuff.

21   Q.  So you just don't remember whether there was anything in

22   the policy manual from the business that told employees whether

23   or not to lie to customers?

24   A.  Well, the location is specifically what I would be looking

25   for that I would be -- that I would think would most likely be

1   in here.  And if that's not here, then no, I don't know how to

2   answer that question.  I don't remember word for word or

3   subject by subject what this document is.

4   Q.  Well, let me ask you something else about it.

5        Let me ask you another question first.  Whose idea was

6   it to tell customers about the weather in locations other than

7   Kansas City when they called?

8   A.  My team.

9   Q.  Specifically, was there a person in your team who came up

10  with an idea?

11  A.  There was.

12  Q.  Did that person communicate that idea to you?

13  A.  In a team meeting, yes.

14  Q.  Were you the supervisor or boss or manager of that person?

15  A.  I was.

16  Q.  And you heard that from an employee, correct?

17  A.  Yes.

18  Q.  And you decided to adopt that, and you decided to tell the

19  people who you supervised that they should do that, correct?

20  A.  That is correct.

21  Q.  And that was the wrong thing to do, is that correct?

22  A.  It was consistent with what our policy was, and I was

23  trying to make it easier on the agents.

24  Q.  Where in this manual does it say, consistent with the

25  policy, tell customers what the weather is like in places other

1  than Kansas City?

2  A.  It does not.

3  Q.  It was consistent with your policy to do that, correct?

4  A.  It was consistent with the policy we had to state that we

5  were located in the tribal location.

6  Q.  Did Scott Tucker tell you to say that to customers?

7  A.  That we were located in the tribal location?

8  Q.  The weather report.

9  A.  No, he did not.

10  Q.  You did that, right?

11  A.  I did.

12  Q.  On your own, correct?

13  A.  With my team, yes.

14  Q.  Your team didn't do it.  You were their boss, correct?

15  A.  Correct.

16  Q.  And if you had said to that employee, this is not a good

17  idea, don't do it, and don't have anybody on the team do it,

18  they likely wouldn't have done it or they would have gotten in

19  trouble, correct?

20  A.  That's correct.

21  Q.  But you didn't do that, did you?

22  A.  I did not.

23  Q.  You encouraged them, correct?

24  A.  Yes.

25  Q.  There were other teams also, weren't there?

1    A.   There were.

2    Q.   And there were other teams that you did not supervise,

3    correct?

4    A.   Correct.

5    Q.   And those other teams had supervisors, correct?

6    A.   Yes.

7    Q.   And none of those other supervisors told their employees to

8    tell them about the weather report, false weather reports, did

9    they?

10   A.   No one else sent out the weather report, I do not believe.

11   Q.   In fact, when you pleaded guilty, the example that you

12   gave -- you said there were a number of things you didn't do

13   right, but the example that you gave when you pleaded guilty

14   was doing this false thing concerning the weather report, is

15   that correct?

16   A.   Yeah.  We sent out a weather report that was true in order

17   to help the agents deal with the fact that we were not actually

18   located where we were saying we were located.

19   Q.   But what you did specifically, and what you specifically

20   pled guilty to, was doing that, which was a crime, correct?

21   A.   Sending out the weather report was a crime?

22   Q.   When you pled guilty, didn't you say sending out the

23   weather report the way you did to mislead customers was a crime

24   and therefore that was a false statement?

25   A.   I said I did not know why we sent out the weather report.

1    That was false.

2    Q.  Were you deposed in a proceeding?

3    A.  Yes.

4    Q.  During that proceeding, did you deny having these weather

5    reports, these false weather reports sent out?

6    A.  I believe that I denied knowing why we were sending them

7    out.

8    Q.  And that wasn't true, was it?

9    A.  It was not true.

10   Q.  So that was a lie?

11   A.  It was.

12   Q.  And sending weather reports out the way you did was

13   something that was misleading, isn't that true?

14   A.  Sending out the weather reports was to help the agents

15   mislead the customer where we were located.

16   Q.  So not only did you want to lie, but you wanted to help the

17   agents mislead the customers, correct?

18   A.  I wanted them to be able to answer company policy.

19   Q.  Well, you wanted to make more commission, because the more

20   loans that came in, the more loan money that came in, the more

21   that the company made, your salary and commission increased, is

22   that correct?

23   A.  That is true.

24   Q.  You went from making $500 a week in 1999 to making $800,000

25   a week?

1  A.  A year.

2  Q.  A year.  I'm sorry.

3  A.  Yes.

4  Q.  And that was because of the increase in the volume of the

5  business, correct?

6  A.  Yes.

7  Q.  And that was because more people took out loans or took

8  longer to pay the loans back and more money was made, correct?

9  A.  Yes, and I had more responsibility.

10  Q.  So it was self-serving for you to try to send out this

11  false information because it might lead to more money coming in

12  and more money for you, is that fair to say?

13  A.  Well, I do not believe the weather report made any more

14  money for me, no.

15  Q.  Did the weather report help you get to pay your mortgage?

16  A.  No.

17  Q.  The increase in amount of loans did, didn't it?

18  A.  Yes.

19  Q.  And the purpose of giving the false information about the

20  weather report was to enhance the business, that's what you

21  said?

22  A.  I believe it was to make the agents have an easier time

23  stating the company policy.

24  Q.  That's all?  That's the reason?

25  A.  I do not believe the weather contributed to whether the

1   customer signed a loan note disclosure or not.

2   Q.  That's fine.  So you don't think the information about the

3   weather was material at all to the customers who were taking

4   out the loans?

5   A.  Most of the customers did not hear the weather.

6   Q.  Let's talk about the ones who did.

7   A.  Yes.

8   Q.  Are you suggesting it wasn't important to them and material

9   to them what the weather was either in Kansas City or Oklahoma

10  or Nebraska or any other place?

11  A.  I do not believe it had an effect on their loan.

12  Q.  Now, in addition to this 130-page training manual, was

13  there another manual that was prepared for the lenders of the

14  money, that is, the tribes?

15  A.  I don't remember.  I don't know exactly what you're

16  referring to.

17          MR. SCOTTEN:  Objection to form.

18          THE COURT:  Rephrase it.

19  Q.  Was there a manual that was prepared for Tribal Financial

20  Service regarding a policy and procedures manual for short-term

21  loans?

22  A.  I believe, yes, we had a policy and procedures manual for

23  short-term loans.  I don't know if that was given to the tribes

24  or exactly what you're referring to.

25          MR. GINSBERG:  D955A, would you please put that up on

1   the screen just for the parties and the judge and the witness.

2   Q.  Do you see that in front of you now?

3   A.  I do.

4   Q.  Do you recognize what D955A is?

5   A.  I would have to see more pages than just this cover.

6           So I recognize this document.  In flipping through I

7   would remember this more from County Bank, but imagine that was

8   adopted for the tribal entities whenever we started that

9   relationship.

10  Q.  Even if it was developed by the County Bank, it was adopted

11  for the tribal lending done by the entities that you were

12  working for, is that fair to say?

13          MR. SCOTTEN:  Objection to form.

14          THE COURT:  Try it again.

15  Q.  You indicated that you would recognize it at first as

16  something that the County Bank may have developed, correct?

17  A.  Correct.

18  Q.  But that you believe it was adopted by the other entities

19  that you worked for after the County Bank and you were working

20  with tribal lending with Mr. Tucker's entities?

21          MR. SCOTTEN:  Objection to form.

22          THE COURT:  Do you understand the question?

23          THE WITNESS:  I believe so.

24          THE COURT:  You may answer it.

25  A.  I would not have used this document with my team in the

1    operational aspect.  I do not remember or know whether the

2    tribes were given this document.  I don't have any reason to

3    believe that it's not valid, but this is not something that we

4    used on a daily basis.

5    Q.  That wasn't my question.

6    A.  Then I don't understand.

7    Q.  My question was whether you recognize what it is.

8    A.  Yes.  I recognize it from the County Bank side.  I don't

9    know that I have seen -- honestly, it's very possible that I

10   helped create this document, but I do not remember it.

11   Q.  Well, is there writing on the top right-hand side of that

12   document, is there something handwritten on the top right-hand

13   side of that document?

14   A.  I believe it says Miami Nation Enterprises.

15            THE COURT:  Say that again, please.

16            THE WITNESS:  Miami Nation Enterprises.

17            THE COURT:  Thank you.

18   Q.  Was Miami Nation Enterprises part of the County Bank

19   program?

20   A.  No.

21   Q.  So it would be fair to say, if that's written on the top,

22   this document would have been used in relation to the Miami

23   Nation Enterprises, is that fair?

24   A.  And not County Bank, correct.  I just don't know what it

25   was used for.

1   Q.  Well, underneath the handwritten part, does it say Tribal

2   Financial Service?

3           MR. SCOTTEN:  Your Honor, it's not in evidence, and we

4   would object to its entry.

5           THE COURT:  I think the questioning is for the purpose

6   of establishing what, if any, relationship this witness has to

7   the document.  I will allow it.

8   A.  Can you ask again?

9   Q.  I think the last question was, can you read what is written

10  under the handwritten part that says Miami Nation Enterprises?

11  A.  Tribal Financial Service.

12  Q.  Do you know what Tribal Financial Service is?

13  A.  So I am not 100 percent sure.  I know we would have used

14  TFS on some paperwork, possibly bank accounts, but I didn't use

15  those names, I didn't use any of the company legal names.  I

16  used 500 FastCash, Ameriloan, more of their marketing type

17  names.

18  Q.  But what you first said was TFS?

19  A.  Yes.

20  Q.  What is the first initial in Tribal?

21  A.  T.

22  Q.  First initial in Financial?

23  A.  F.

24  Q.  The first initial in Service?

25  A.  S.

 1   Q.  Is that the same TFS as Tribal Financial Service?

 2   A.  I don't know.  I would have seen TFS, which is why I would

 3   assume that would be tied to this, but I don't know exactly

 4   what TFS stood for.  I am just making that assumption because

 5   the letters match, just like you said.

 6   Q.  The letters match, and you were working for this company

 7   for?

 8   A.  For 16 years.

 9   Q.  16 years?

10   A.  Yes.

11   Q.  But you don't know if TFS is the same as Tribal Financial

12   Service?

13   A.  We didn't use that.  I used the other terms.  I used US

14   FastCash and Ameriloan, which is on the operational side.  We

15   didn't present this.

16   Q.  But you said you saw it, you recognized something about

17   this when I first asked you, correct?

18   A.  Yeah.

19              THE COURT:  This being Defendants' Exhibit?

20              MR. GINSBERG:  D955A.

21   A.  Yes.  This document seemed familiar to me.

22   Q.  So even if you're saying now that you didn't use it, you

23   are familiar with this document as being a document that was

24   part of the business that you were working for for 16 years,

25   correct?

1    A.  I believe this document originally started with County Bank

2    and was in use with County Bank, yes.  I believe it is very

3    possible this document was used with the tribal entities, but

4    it is not something that I used with my team.

5    Q.  OK.  Again, no offense, but that wasn't the question I

6    asked you.

7         My questions are directed simply towards your

8    familiarity with this document as being a document that was

9    used in the company and by the company that you worked for for

10   16 years, whether you used it with your team or not?

11   A.  I do not believe I used this with my team.

12   Q.  Are you aware if other people used it in the business?

13   A.  I don't know.  We also had a lot of documents so I just

14   might not be remembering what was used at what time.  I just

15   don't remember this.

16   Q.  If you don't remember it --

17        MR. GINSBERG:  I will move on, Judge, quickly.

18   Q.  If you don't remember it, how was it that you recognized it

19   at first as being something that you believe was prepared at

20   the County Bank?

21   A.  The format, I recognize the format, and how they have

22   exhibits in this document, which is why I do not believe I used

23   it for agents.  It's possible that we did.  I just don't

24   remember.  But this is how County Bank documents were

25   presented.  They had different exhibits and check boxes and

1    things that you had to complete, reasons for denial that we

2    would have used during that time frame.

3    Q.   During the time frame of the County Bank?

4    A.   Correct.

5    Q.   Even though you said to us that Miami Nation Enterprises

6    was not working with the County Bank and that's written on the

7    top right-hand portion?

8    A.   Correct.  So it's possible that we just adopted this

9    document once we were working with or were Miami Nation

10   Enterprises.

11   Q.   Were you aware in general, even if you didn't use it with

12   your group, that there were manuals prepared by Scott Tucker

13   and the company associated with him regarding policy and

14   procedures for short-term loans?

15   A.   We had policies and procedures for short-term loans, and we

16   had documents, yes.

17   Q.   Were you aware that there were also policy and procedure

18   manuals for short-term loans that were prepared for the tribal

19   entities that were making the loans?

20             MR. SCOTTEN:  Objection to form.

21             It's the premise of the question, your Honor.

22             THE COURT:  Overruled.

23             I think the proper way to phrase it is, to your

24   knowledge, were there, and then you can ask the question.

25   Q.   To your knowledge, were there manuals, policy and procedure

1  manuals, about short-term loans prepared for the purpose of the

2  tribal lending entities, like Miami Nation Enterprises?

3  A.  Yes.

4  Q.  And to the best of your recollection, is this one of them?

5  A.  This looks to be an accurate document, but I do not

6  remember what we used it for.  But some of the things in here I

7  can say that, yes, we used.

8          MR. GINSBERG:  Have I gotten far enough to offer it

9  into evidence, your Honor?  I would like to offer it.

10         THE COURT:  I thought we were back on 1312.  What

11 happened there?

12         MR. GINSBERG:  1312, we had our discussion about that.

13 Now I am referring to D955A, and it's my belief currently that

14 she has now testified sufficiently for this to be admitted into

15 evidence.

16         THE COURT:  Let me see you at sidebar.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  OK.  Do you have a copy of the document so

3       I can see it?

4              MR. GINSBERG:  I think we tried to put everything

5       together this morning.

6              THE COURT:  Is it maybe in one of these binders here?

7              MR. GINSBERG:  Yes.

8              THE COURT:  955A.

9              MR. GINSBERG:  We have been trying to avoid making you

10      go to those big books.

11             THE COURT:  That's all right.

12             MS. LIMANI:  It's in 955.  So somewhere in there it

13      starts.

14             THE COURT:  OK.  So it's from within 955?

15             MS. LIMANI:  Exactly.

16             THE COURT:  The problem, unlike the other document,

17      which the witness embraced, you were able to ask the witness,

18      well, do you see anywhere in here where certain statements are

19      made or you were told to lie, etc., and that was permissible.

20      But this is a different situation where she has not, as far as

21      I can tell, embraced this.  So now we are in a different

22      territory.  So you can't ask her, is there anyplace in here

23      where it tells somebody else to lie?  She didn't use the

24      document.

25             MR. GINSBERG:  I agree.  But here I think it's a more

1    either holistic or generic point.  On direct examination, she

2    at least, directly or indirectly, made it appear from her

3    answers that the tribes were not doing anything or not doing

4    the lending.

5              THE COURT:  Right.

6              MR. GINSBERG:  This manual, the whole manual, is

7    directed from the company to the tribes as to what the

8    procedures are for them to do the lending.

9              The problem I think I am having is that she is sort of

10   three-quarters of the way to, I recognize it, I remember it, we

11   didn't particularly use it, but she did just say, I think there

12   are things in here that we did use, even though she hasn't said

13   every page.

14             THE COURT:  A couple of problems.  One of the problems

15   is whether she used some of the information in here doesn't put

16   it at the feet of the tribes.

17             Let me back this up and say that I think the basis

18   that you said you want to put it in for, offhand, subject to

19   hearing what anyone else wants to say, sounds plausible to me.

20   The government's contention is the tribes didn't do anything,

21   they were not really working at this, and this document would

22   tend to show a different take on the story.  So it's an

23   entirely different type of an issue.

24             MR. GINSBERG:  I agree.

25             THE COURT:  So you're welcome to have at it on the

1    foundation, but I have to have her embrace it.  You can try and

2    get it in through another witness.

3            MR. GINSBERG:  I think, frankly, for a lot of reasons,

4    that would be better.

5            THE COURT:  If a foundation is laid, you don't have

6    any objection to this exhibit, do you?

7            MR. SCOTTEN:  I think we will, your Honor.  I don't

8    think it's coming in through this witness so we can brief it if

9    you want.

10           THE COURT:  What is your basis?

11           MR. SCOTTEN:  It's being offered to establish -- it

12   depends on what the witness would say.  We don't think there is

13   such a witness.  We might not have an objection depending on

14   what the witness said.

15           THE COURT:  I think if a foundation was laid, it would

16   be offered to rebut the government's evidence that the tribes

17   didn't do anything.

18           MR. SCOTTEN:  That I think would be problematic

19   because it's very classic hearsay.  Look, here are all these

20   words that nobody wrote about a tribe doing lending.

21           THE COURT:  It's not offered for the truth of its

22   contents, as I understand it, not in that context.

23           MR. SCOTTEN:  If the point is there is a manual that

24   has a stamp on it that says tribes.  But if the point is, let's

25   look at the contents and then talk about lending, that's

1    contents, truth of the matter asserted.

2            THE COURT:  Your objection is sounding more and more

3    like a foundation objection.

4            (In open court)

5            THE COURT:  We will take a very brief recess if

6    someone needs to use the rest room.

7            In fact, if you would prefer, we could take our

8    mid-afternoon break right now.

9            THE JURY:  No.

10           (At the sidebar)

11           MR. SCOTTEN:  We will take a look at the contents of

12   the manual and see if we have an objection.  If it's not coming

13   in now, I don't want to take the Court's time any further.

14           THE COURT:  If it's the functional equivalent of the

15   stamp of the tribe on it, i.e., a witness who says the tribe

16   used this document, then it's not for the truth of its

17   contents.  It's for the fact that this is something they used.

18   A statement made on page 22 of the manual is not asserted to be

19   a truthful statement.  It's the manual they used.  That's all.

20           Thank you.

21           (Continued on next page)

22

23

24

25

1          (In open court)

2               THE COURT:  All right.  You may continue.

3               MR. GINSBERG:  Thank you, your Honor.

4    BY MR. GINSBERG:

5    Q.  Ms. Grote, when was the first time that the government

6    contacted you in relation to this case?

7    A.  I received, I believe, a subpoena; the FBI came and knocked

8    on my door in 2013.

9    Q.  After you received the subpoena, when was the first time

10   that you had any conversations with representatives of the

11   government other than taking the subpoena and saying thank you

12   or no thank you?

13   A.  I actually came to speak with them in August of 2016.

14   Q.  That was the first time?

15   A.  Yes.

16   Q.  Without telling us the content of any conversation, between

17   the time you got the subpoena and meeting with the government

18   in August of 2016, were you represented by a lawyer?

19   A.  Yes.

20   Q.  To the best of your knowledge, without telling us the

21   content, while you didn't speak directly with the government

22   during those years, was your lawyer speaking with the

23   government?

24   A.  Yes.

25   Q.  Would it be fair to say that during some or all or most of

1    the time, the government was attempting to get you to cooperate

2    with them?

3    A.   Yes.

4    Q.   And for most of that time you resisted, is that correct?

5    A.   Yes.

6    Q.   And that was because you didn't believe you did anything

7    wrong, is that correct?

8    A.   I was taking the advice of my attorneys.

9    Q.   Eventually you did plead guilty?

10   A.   I did.

11   Q.   And that was this year, correct?

12   A.   Yes.

13   Q.   In fact, it was in August of 2017, is that correct?

14   A.   Correct.

15   Q.   Prior to pleading guilty, was it conveyed to you the nature

16   of the charges that the government intended to bring against

17   you if you didn't cooperate?

18   A.   Yes.

19   Q.   And what were those charges?

20   A.   I'm not sure exactly, but I believe they were similar, if

21   not the same, to the charges against Timothy Muir and Scott

22   Tucker.

23   Q.   When you pled guilty, were you required to plead guilty to

24   all of those charges?

25   A.   I was not.

1    Q.  In fact, you ended up pleading guilty to one charge,

2    correct?

3    A.  Correct.

4    Q.  And that was, basically, making a false statement or

5    statements in the deposition, is that correct?

6    A.  Correct.

7    Q.  And the maximum penalty for that charge is five years, is

8    that correct?

9    A.  Correct.

10   Q.  At that point, when that was offered to you, you agreed to

11   plead guilty, correct, in August of 2017?

12   A.  I did.

13   Q.  In August of 2017, when you pleaded guilty or before you

14   appeared in court to actually enter your plea, you received a

15   letter from the government that went over all the conditions of

16   your plea, is that fair to say?

17   A.  My cooperation agreement?

18   Q.  Yes.

19   A.  Yes.

20   Q.  And that was on August 16, 2017, or shortly before that, is

21   that correct?

22   A.  Yes.

23   Q.  Prior to August of 2017, had you received a previous

24   cooperation agreement offer in June of 2017?

25   A.  Yes.

1  Q.  Do you know what changes, if any, were made between the

2  initial June 15, 2017 cooperation agreement and the August 16,

3  2017 agreement?

4  A.  The difference was a forfeiture, but that's all that I

5  really understand.

6  Q.  Well, do you know what forfeiture means?

7  A.  To give up, to turn over.

8  Q.  And in this case, it would have been to give up or turn

9  over profits or proceeds that you made while you were involved

10 in some kind of improper or illegal activity, is that fair to

11 say?

12 A.  Yes.

13 Q.  And there was a paragraph that specifically addressed that

14 in the June 2017 agreement that you did not finalize, correct?

15 A.  I don't remember exactly how it was worded.

16 Q.  Do you recognize what is on the screen before you right

17 now?

18 A.  Yes.  It looks like the original document from June 15.

19 Q.  Is it fair to say that you reviewed that with your

20 attorney?

21 A.  Yes.

22 Q.  But you didn't finalize this, in other words, you didn't

23 sign this one and this is not the one that the government

24 showed us before, correct?

25 A.  Correct.

1   Q.  But there is no doubt that this is something that you

2   received and went over with your attorney, correct?

3   A.  Correct.

4          MR. GINSBERG:  Your Honor, I would offer 3517-11.

5          THE COURT:  Any objection?

6          MR. SCOTTEN:  No, your Honor.

7          THE COURT:  Received.

8          (Government's Exhibit 3517-11 received in evidence)

9   Q.  In the fourth paragraph down it says, "Grote further agrees

10  to pay to the United States, by the time of sentencing, a sum

11  of money in United States currency as a substitute res for

12  proceeds from the offenses alleged in United States v. Tucker,

13  et al., S1 16 Cr. 091."  And in parentheses after that is the

14  judge's initials.  And then after that it refers to that as

15  "the payment."  Do you see that?

16  A.  I do.

17  Q.  And it says, "Grote also agrees that she will not file a

18  claim or a petition for remission or mitigation in any

19  forfeiture proceeding involving the payment, and will not cause

20  or assist anyone else in doing so."  Is that correct?

21  A.  Correct.

22  Q.  Then finally it says, "It is further understood that any

23  forfeiture of the payment shall not be treated as satisfaction

24  of any fine, restitution, cost of imprisonment, or any other

25  penalty the court may impose upon her."  Is that correct?

1    A.  Correct.

2    Q.  So that this paragraph was requiring you to make a payment

3    of some amount of money to the government in addition to any

4    other fines or restitution that might be imposed upon you, is

5    that correct?

6    A.  Correct.

7                 (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. GINSBERG:

Q.  And then when you pleaded guilty to the cooperation

agreement, that paragraph was removed, is that correct?

A.  Correct.

Q.  So it's no longer in your cooperation agreement, correct?

A.  Correct.

Q.  Now, have you forfeited any money to the government?

A.  I have not.

Q.  And was that one of the reasons why, in addition to not

having the other charges brought against you, that you decided

to plead guilty to the current cooperation agreement?

A.  Yes, I was very concerned about the other charges.

Q.  You were concerned about the other charges and you were

also concerned about the forfeiture, correct?

A.  It was -- I'm, I'm still concerned about all of it,

actually, but -- all of it's concerning to me.

Q.  Well, it made it a little easier to you when that

forfeiture paragraph was taken out of the cooperation

agreement, is that fair to say?

A.  That made it easier, yes.

Q.  Now, you told us that you met with the government in August

of 2016?

A.  Yes.

Q.  Is that correct?

        And I believe you mentioned on direct examination that

1    you weren't completely truthful or candid, correct?

2    A.   Correct.

3    Q.   When you went to that meeting, were you told at the

4    beginning of the meeting that you had an obligation to be

5    completely truthful, candid, tell anything you knew and not

6    leave anything out?

7    A.   Truthful, yes.  I don't know about the rest of it.

8    Q.   You don't recall being told you had to be candid?

9    A.   Correct, I don't -- I needed to tell the truth, and I just

10   didn't tell the entire story in the first meeting.

11   Q.   And do you understand that to withhold information is also

12   not being truthful?

13   A.   Yes.

14   Q.   And did you do that at the first meeting?

15   A.   Correct.

16   Q.   In addition to making statements that were not true, is

17   that correct?

18   A.   I don't believe I made any statements that weren't true in

19   that first meeting.

20   Q.   So what you did is you withheld information, correct?

21   A.   Correct.

22   Q.   Even though you had been warned at the beginning of the

23   meeting not only did you have to do that if you wanted to

24   proceed towards a cooperation agreement, but it could be a

25   separate crime to make false or misleading statements during

1   that meeting?

2   A.  Yes.

3   Q.  So even knowing that, you withheld information, correct?

4   A.  Well, I, I went in with my attorneys who sat there and gave

5   me direction on what to answer, and I did that, on that day,

6   yes.

7   Q.  Are you suggesting that your attorneys told you to

8   purposely withhold information from the government during the

9   first meeting?

10  A.  It was not a very -- I don't, I don't remember how long it

11  was.  I know that we were covering a limited amount of topics,

12  and I did not share all of the information I knew at that time.

13  Q.  Well, whether it was three topics or 20 topics, once you

14  had been told not to withhold information, you withheld it

15  anyway, correct?

16  A.  Correct.

17  Q.  And my question to you is, are you suggesting to us that

18  you did that because your attorneys told you to do that, or did

19  you, Crystal Grote, decide to do that on your own?

20  A.  No, it would be on the advice of my attorneys.

21  Q.  I'm sorry.  I'm not sure -- are you saying that the advice

22  of your attorneys was to withhold information and effectively

23  lie to the U.S. Attorney's Office?

24  A.  I'm saying that we -- I was answering very specific

25  questions that day and not sharing the entire story.

1   Q.  And do you think that was being truthful?

2   A.  I felt like I was telling the truth that day, yes.  I just

3   didn't share the entire story.

4   Q.  So had they been asking you about a car accident and you

5   were the driver of the car and you had said to them "I was in

6   the car" but didn't say you were the driver, that would have

7   been OK?

8   A.  No, I'm not saying that.

9   Q.  Well, notwithstanding the fact that you did not completely

10  tell the truth in the first meeting, you had another meeting

11  with the government, is that correct?

12  A.  Yes.

13  Q.  And you had counsel then too?

14  A.  Yes.

15  Q.  Same counsel?

16  A.  Yes.

17  Q.  Did they suggest to you before the second meeting that it

18  would be OK to leave out information?

19  A.  No.  I don't remember exactly when we had the second

20  meeting.

21  Q.  Well, how about if I --

22          MR. GINSBERG:  Can I do this, Judge, or can I just

23  show it to her?  I don't want to be improper.  Can I suggest a

24  date?

25          THE COURT:  From which document?

1                MR. GINSBERG:  It's 3517-03.

2                THE COURT:  Why don't you show it to her and ask her

3       if it refreshes her recollection.

4                MR. GINSBERG:  OK.

5                THE COURT:  Is that going to do it?

6                MR. GINSBERG:  OK.

7                THE COURT:  Let's see whether that does it.

8       BY MR. GINSBERG:

9       Q.  If you look at this document, 3517-03, and look at the top

10      of the document and tell us if that refreshes your recollection

11      as to when the next meeting was.

12      A.  It looks like it was September of 2016.

13               THE COURT:  Is that your recollection, or is that what

14      you're looking at on a page?

15               THE WITNESS:  Sorry.  It's what I'm looking at on a

16      page.

17               THE COURT:  Well, what do you recall?

18               THE WITNESS:  I believe we did meet again shortly

19      after the first meeting.

20               THE COURT:  OK.

21      BY MR. GINSBERG:

22      Q.  So you met again, and the second time you met on September

23      13 from 2:08 to 7:20 p.m.  Is that about correct?

24      A.  I don't remember what time we stopped, but yes, it was the

25      afternoon.

1   Q.  Was it about, do you remember it being about five hours,

2   into the early evening?

3   A.  Yes.

4   Q.  And then you met again the next day for about three more

5   hours, correct?

6   A.  Yes.

7   Q.  And you're telling us that this time you did not lie and

8   you did not leave anything out?

9   A.  I don't -- I did not lie.  I don't recall leaving anything

10  out.  I don't know.

11  Q.  You don't recall leaving anything out; does that mean you

12  might have left something out?

13  A.  I did not -- I don't recall leaving anything out, no.

14  Q.  Now, during that meeting, two meetings, which total about

15  eight hours, fair to say you were asked a lot of questions?

16  A.  Yes.

17  Q.  And some of the questions that you were asked were whether

18  or not you believed that the tribes, Native American tribes,

19  were the lenders of the loans, is that correct?

20  A.  I had been asked that, yes.

21  Q.  And you told the government in this meeting that you did

22  believe that the tribes were the lenders of the loans, is that

23  correct?

24  A.  I believe so, yes.

25  Q.  And you still believe that, correct?

A.   I believe at the time that the tribal entities owned the

company, yes.

Q.   But the tribal entities, as far as you knew, owned the

companies and were making the loans, correct?

A.   Yeah, where the money came from I never really knew.  I

knew we processed the applications.  The tribal entities were

the owners, as far as I know.

Q.   OK.  You just didn't know what the initial source of the

funds were --

A.   Yeah.

Q.   -- that were then used to make the loans, would that be

fair to say?

A.   Correct.

Q.   And you also told the government that based on everything

you knew, in your experience at the company and review of

whatever materials that were available to you, you believed

that the loans were enforceable, is that correct?

A.   Yes.

Q.   Now, you talked a little bit before about training.  Most

of the training that you did and the supervising was done in

Overland Park, is that correct?

A.   Yes.

Q.   Did there come a time when you were asked to go to the

tribal land to train tribal employees to be involved in the

loan process?

1    A.  I went to the Miami, Oklahoma, location, yes.

2    Q.  On how many occasions did you do that?

3    A.  A handful, or less.  Not very many.

4    Q.  So a handful, like three, four, five?

5    A.  Yeah, some managers under me also meant, but yeah, I would

6    have went three, four, five times.

7    Q.  And the managers under you who went, did they go separate

8    from the times that you went?

9    A.  At least once, we went together, and yeah, separate.

10   Q.  And the whole purpose of that was to try to train tribal

11   employees in doing the lending and the processing and answering

12   the phone calls in the proper way, is that correct?

13   A.  So the call center was, they were responsible for that loan

14   completion, so they tried to get the customer to sign the loan

15   that would then be submitted to the processing department, and

16   we were training them on how to handle that teleloan process.

17   Q.  When you did that, did you have any interaction with Don

18   Brady?

19   A.  Yes.

20   Q.  And did you have interaction with Don Brady prior to going

21   to the reservation?

22   A.  Yes.

23   Q.  And was there a discussion about your coming to do that

24   kind of work?

25   A.  Yes.

69jWtuc4                    Grote - Cross

1   Q.  When you went to the reservation to do this training, was

2   Don Brady there?

3   A.  At least one time, yeah.

4   Q.  Did you ever see him in his office on the tribal land?

5   A.  On the tribal land just that one time.

6   Q.  But you saw him in his office that one time, right?

7   A.  Yes.

8   Q.  And I think you said that in addition he had a smaller, but

9   not corner office in Overland Park, correct?

10  A.  Correct.

11  Q.  And he was the, if you know, he was the CEO for the Miami

12  tribe and the tribal lending that they were involved in, is

13  that correct?

14  A.  I did not know his title, but we also didn't really use

15  titles very much.  It was very uncommon to use a title.

16  Q.  It was uncommon?

17  A.  Very.

18              THE COURT:  Ladies and gentlemen, would you like to

19  take a break at this point, midafternoon?  Let's take ten

20  minutes and then we'll pick up again.  Thank you very much.

21              (Jury not present)

22              THE COURT:  See you in ten minutes.

23              (Recess)

24              (Jury present)

25              THE COURT:  Please be seated.  Remember tonight,

1    ladies and gentlemen, you're going to have to set those alarm

2    clocks an hour early.  All right?  We all do.  We'll talk more

3    about that in a few minutes.

4              Go ahead, Mr. Ginsberg.

5              MR. GINSBERG:  Thank you.

6    Q.  Ms. Grote, a few more questions.  One of the topics you

7    discussed on direct examination was the change in the renewal

8    policy for the loans, automatic and then not automatic?

9    A.  Correct?

10   Q.  Correct?

11             And would it be fair to say that the customers did not

12   like the idea that County Bank had a renewal policy that they

13   had to do something affirmatively?  They didn't like that idea;

14   they preferred the other method?

15   A.  Yes, it was very difficult for customers to get that

16   renewal document back in time, and it was all very frustrating.

17   Q.  So eventually, as the business moved on, it went back to

18   automatic renewals unless the customer gave notice, I think,

19   three or more business days in advance, is that correct?

20   A.  Yes.

21   Q.  And that was largely done because of customer

22   dissatisfaction of the other method?

23   A.  Yes.

24   Q.  Would it also be fair to say that there was a relatively

25   high rate of repeat customers?

1    A.  There were.

2    Q.  And would it be fair to say that by comparison to the total

3    number of loans that were being made, year by year over the

4    years, there was a relatively low rate of complaint?

5    A.  Yes.

6              MR. SCOTTEN:  Objection.  Speculative.

7              THE COURT:  Sustained.  Sustained.

8    Q.  Were there statistics kept as to how many loans were made

9    every year?

10   A.  Yes.

11   Q.  And by month?

12   A.  Yes.

13   Q.  And were there statistics kept as to how many complaints

14   were called in or emailed in?

15   A.  Not called in, but there were statistics kept for how many

16   complaints went to the compliance department, and if they went

17   to the compliance department, we kept them.  But then a call

18   from a customer was not logged.

19   Q.  Just as to any complaint that went past the initial call,

20   to the compliance level, there was a relatively low rate, is

21   that correct?

22   A.  That's correct.

23              MR. SCOTTEN:  Your Honor, objection.  I think we may

24   have to approach.  Not sure I can fairly make a basis point

25   from here, fairly to the defense.

1          THE COURT:  Sustained as to form.  Let's see where it

2    goes.

3          The term "relatively low rate" is imprecise.

4          MR. GINSBERG:  I understand.

5          THE COURT:  Relative to what?  Put a new question.

6          MR. GINSBERG:  It's not that significant.  I'll move

7    on.

8          THE COURT:  OK.

9    BY MR. GINSBERG:

10   Q.  You told us earlier that you had lawyers present at the

11   proffer sessions with the government, is that correct?

12   A.  Correct.

13   Q.  And then you told us at the first proffer session you had

14   your lawyers there and you left some things out, by omission,

15   and you had discussions with your lawyers before those proffer

16   sessions, correct?

17   A.  Correct.

18   Q.  Now, you also gave a deposition at an earlier date, is that

19   correct?

20   A.  I did.

21   Q.  And you had lawyers who represented you at that time too,

22   is that correct?

23   A.  I did not.

24   Q.  Were you represented by lawyers from Kirkland & Ellis?

25   A.  I was not.  The company was.

1   Q.   Were they there with you?

2   A.   Yes.

3   Q.   Did you speak to them prior to your deposition?

4   A.   Yes.

5   Q.   Did they discuss with you what the nature of the deposition

6   was going to be like?

7   A.   They did.

8   Q.   Did you go over what you were likely to be asked during the

9   deposition?

10          MR. SCOTTEN:  Objection.  Privileged.

11          THE COURT:  I'll simply say to the witness that you

12   need not disclose any communications to a lawyer or from a

13   lawyer, your lawyer I'm talking about, for the purpose of

14   obtaining or receiving legal advice.  You need not respond with

15   anything that you told your lawyer or your lawyer told you for

16   those purposes.

17          With that excluded, why don't you put a fresh

18   question.

19   BY MR. GINSBERG:

20   Q.   Did you speak to those lawyers prior to the deposition?

21   A.   Kirkland & Ellis lawyer, yes.

22   Q.   And did you have a discussion about what the topics were

23   going to be that you were going to be asked about during your

24   deposition?

25   A.   We talked about the business.

1    Q.  Did any of those lawyers tell you to lie during the

2    deposition?

3    A.  They did not.

4    Q.  So if you lied during the deposition, which you told us you

5    did, you did that on your own, correct?

6    A.  I did.

7    Q.  Now, there came a time, I guess at the end of your time

8    when you were working for all the tribes, when the Miami

9    stopped doing business, is that correct?

10   A.  Yes.

11   Q.  But the Modoc and the Santee tribes continued to do

12   business, correct?

13   A.  They did.

14   Q.  They continued to make the loans, correct?

15   A.  Correct.

16   Q.  And you continued to work for them, is that correct?

17   A.  I worked for the Modocs only.

18            MR. SCOTTEN:  Objection.  Outside the scope.

19            THE COURT:  I'll allow it.

20   Q.  For how long did you work for the Modocs after the Miami

21   stopped their business?

22   A.  The fall of 2014 until 2016.

23            MR. GINSBERG:  I have nothing further.  Thank you,

24   your Honor.

25            THE COURT:  All right.  Mr. Bath, at your convenience.

1   CROSS-EXAMINATION

2   BY MR. BATH:

3   Q.  Ms. Grote, I want to make sure I clarify something, and

4   that is the lawyers from Kirkland & Ellis that were at the

5   deposition represented the company, is that right?

6   A.  Yes.

7   Q.  And that was AMG?

8   A.  Yes.

9   Q.  Which they represent the tribe?

10  A.  Yes.

11  Q.  And you met with them and prepped for the deposition,

12  correct?

13  A.  Correct.

14  Q.  And that's not me, correct?

15  A.  Right.

16  Q.  None of the lawyers here were involved in any of that,

17  correct?

18  A.  No.

19  Q.  You told us that you started at the company late 1990s; you

20  were there for 16 years, correct?

21  A.  Yes.

22  Q.  One of five people that started that company, correct?

23  A.  Yes.

24  Q.  So you were one of the few that essentially helped build

25  that business, right?

1    A.   I mean, there were a lot of people employed over the course

2    of time, yes.

3    Q.   But you were in the first five?

4    A.   Yes.

5    Q.   And you said you sort of got pushed up as the years went

6    by?

7    A.   Correct.

8    Q.   Which eventually landed you director of operations, is that

9    right?

10   A.   Correct.

11   Q.   And part of what you did was you'd oversee collections?

12   A.   Yes.  Not the entire time, but eventually I did.

13   Q.   Would it be fair to say that the company had, and I know

14   we're going over a certain time period, so we'll just call it

15   CLK, had strict rules on what the collections people could do

16   and could tell customers and not tell customers?

17   A.   Yes.

18   Q.   And there were strict policy manuals?

19   A.   Yes.

20   Q.   And those were followed when AMG began business, correct?

21   A.   Yes.

22        MR. BATH:  Could you show the witness 1319, please.

23   Q.   Do you have that in front of you on your screen?

24   A.   I do.

25   Q.   And is that a document from the training manual about

1    collection protocol, compliance?

2    A.  Yes.

3    Q.  Does that fairly represent some of the requirements that

4    collections had in place?

5    A.  Yes.  This, these were requirements for zero tolerance, so

6    if any of these were committed it would be grounds for

7    immediate termination.

8              MR. BATH:  I offer 1319.

9              THE COURT:  Any objection?

10             MR. SCOTTEN:  Yes, your Honor.  Hearsay.

11             THE COURT:  No.  I'm going to allow it.

12             This was a collection protocol compliance agreement

13   between whom?

14             THE WITNESS:  AMG Services and the employee.

15             THE COURT:  And the employee of AMG Services?

16             THE WITNESS:  Yes.

17             THE COURT:  All right.  I'll allow it.

18             Go ahead.  It's received.

19             (Defendant's Exhibit 1319 received in evidence)

20   BY MR. BATH:

21   Q.  You told us, Ms. Grote, earlier that this was essentially a

22   zero tolerance, is that right?

23   A.  Yes.

24   Q.  I'm not going to have you read the whole document, but, for

25   instance, one of the things is you can't terminate a phone

1    call, is that right?

2    A.  Correct.

3    Q.  In other words, you told your employees no matter how bad

4    it gets on the phone call, no matter how upset a customer might

5    be, you don't hang up that call?

6    A.  They should get a manager on the phone.

7    Q.  One of the other things is employees are not to make any

8    arrangements with the customers bank accounts without their

9    permission, is that correct?

10   A.  Correct.

11   Q.  And if you found out anybody did any of that, you would

12   terminate them, wouldn't you?

13   A.  Correct.

14   Q.  And you did terminate people for doing that, didn't you?

15   A.  Yes.

16   Q.  And you would set forth in the termination letter exactly

17   what they did, correct?

18   A.  I didn't write those; their direct manager would, but yes.

19   Q.  People under you wrote those?

20   A.  Correct.

21   Q.  All right.  Depending on what year we're in, right?

22   Earlier in your career you might have written them, later on

23   you wouldn't?

24   A.  Yes, but we didn't have this zero tolerance policy earlier

25   either.

1  Q.  OK.  When did you remember 1319, the zero tolerance policy?

2  A.  I don't remember when.  I'm sorry.

3  Q.  Do you remember the range of years?

4  A.  No.  No.

5  Q.  OK.  Fair enough, fair enough.  But essentially, you had

6  the ability to check in on customer calls, didn't you?

7  A.  Yes, we recorded the calls.

8  Q.  All the calls are recorded, weren't they?

9  A.  They were.

10  Q.  Starting when?

11  A.  As far back as I can remember.  We had storage issues,

12  because there were so many calls, we didn't know what kind of

13  system to put them on.  But we recorded calls for a number of

14  years.

15  Q.  And there were people who were in charge of going back and

16  checking those calls?

17  A.  We had quality assurance department, yes.

18  Q.  How big was that quality assurance department?

19  A.  Eight to ten people.

20  Q.  And what did they do -- one of the things they did was

21  listen to calls?

22  A.  This was their primary job, yes.

23  Q.  Like eight hours a day?

24  A.  Yes.

25  Q.  So did they have to go through so many calls per day; was

1    it sort of a benchmark?

2    A.   Yes.

3    Q.   How many calls would they go through?

4    A.   I don't remember exactly how many.  I don't remember how

5    many.

6    Q.   At least 10 or 20 calls in a day?

7    A.   At least 10, probably closer to 20 or 30, but yeah, at

8    least 10.

9    Q.   Hundreds of calls per week would be looked at by your QA

10   people?

11   A.   Yes.

12   Q.   And one of the things they looked at was set forth in this

13   1319?

14   A.   Yes.

15   Q.   And if they found a problem, they reported it to one of

16   your managers?

17   A.   Yeah, depending on what it was in the report.  Some of

18   these they would report directly to HR, or Jared Marsh, and

19   sometimes they would report to myself or the manager.

20   Q.   You mentioned Jared.  Jared's an attorney?

21   A.   Yes.

22   Q.   Jared worked with Tim?

23   A.   He did.

24   Q.   Jared came in when, do you know, what year?

25   A.   I don't know what year.

1    Q.  After Tim?

2    A.  Yes.

3    Q.  Jared at some point in time began handling some of those

4    issues?

5    A.  Yes.

6            MR. BATH:  All right.  Thank you.  We can take 1319

7    down.

8    Q.  You talked earlier about first-party collections and

9    second-party collections, do you remember?

10   A.  First party -- we had regular a collection group and we had

11   a second tier group, not really first and second party.

12   Q.  OK.  All right.  First-party collections and second tier,

13   do I have that right?

14   A.  Yes.

15   Q.  And they were on different floors?

16   A.  Yes.

17   Q.  Is there, as you understand it, is there a difference

18   between whether you're calling on a debt that's owed you versus

19   you're calling on a debt that's owed somebody else; do you

20   know?

21   A.  Well, that's why I was concerned where you said first party

22   and second party, because we only called on debts that were

23   owed to the loan portfolio.

24   Q.  Right.

25   A.  So the second tier wasn't a party; it was just how the

1   accounts aged and what we called that department.

2   Q.  Let me ask you this question.  You had different

3   portfolios, correct?

4   A.  Yes.

5   Q.  Like OneClickCash, correct?

6   A.  Yes.

7   Q.  Could somebody working for OneClickCash call on a debt

8   that's owed by 500FastCash?

9   A.  No.  In my department, you could only work on one at a

10  time.

11  Q.  All right.  And why?  If you know, legally, why is that?

12          MR. SCOTTEN:  Objection.

13          THE COURT:  Sustained.

14  Q.  There was a policy that they couldn't, they could only deal

15  with their portfolio, is that fair to say?

16  A.  Yeah, we had every, every portfolio kind of siloed.

17  Q.  Right, and that's why one portfolio would say -- couldn't

18  say they had a loan with somebody else, they couldn't talk to

19  them about that?

20  A.  Right.

21  Q.  And do you know what the reasoning behind the policy was?

22  A.  No, other than we were siloed, so we were individual

23  departments.

24  Q.  You never discussed, for instance, with Tim Muir the legal

25  implications of that?

1          MR. SCOTTEN:  Objection.

2          THE COURT:  No.  I'll allow it.

3    A.  Not that I recall.

4    Q.  All right.  And that's so there wouldn't be something you

5    wouldn't discuss, would it?

6    A.  No.

7    Q.  OK.  Tim starts about the middle of 2006, does that sound

8    right?

9    A.  I would have said mid-2005, but yes, that's close enough.

10   I'm really bad with dates.

11         THE COURT:  All right.  Slow down so the court

12   reporter can get you down and we can all understand.  All

13   right?

14         THE WITNESS:  Yes.

15         THE COURT:  Thank you.

16   BY MR. BATH:

17   Q.  And by 2006, the lending business, when Tim came, the

18   lending business was already in progress?

19   A.  Yes.

20   Q.  Had been for years?

21   A.  Yes.

22   Q.  You're past County Bank at this time, correct?

23   A.  Yes.

24   Q.  But your tribal affiliations were up and running?

25   A.  Yes.

1    Q.  Those had been up and running for at least a year or two?

2    A.  Yes.  I don't know exactly what time we started.

3    Q.  OK.  And CLK was in business at that time?

4    A.  I believe so, yes.

5    Q.  And was there some litigation with states at that time, do

6    you know?

7    A.  I didn't really know much of it, about the litigation with

8    states.

9    Q.  All right.  You're not involved in that part, correct?

10   A.  No.

11   Q.  But you were never given the impression or told that -- Tim

12   was not an owner of the companies, was he?

13   A.  No.

14   Q.  As far as you know, he didn't share any profits, did he?

15   A.  I have no idea.

16   Q.  Did you work with Tim on a very frequent basis?

17   A.  In the end, yes.

18   Q.  When you say in the end --

19   A.  Toward --

20   Q.  -- what years?

21   A.  Oh, really probably 2007.  Increasingly 2008 on, I worked

22   with him closely, yes.

23   Q.  Maybe the first year not so much?

24   A.  Yes.

25   Q.  After that it built up?

1  A.  Yes.

2  Q.  And let's say in '8 or '9 or '10, how long or -- not how

3  long, how often would you talk to Tim?

4  A.  Often, depending on what was going on.  If we were making a

5  change to the website or something like that, we worked very

6  close together, you know, until we got that project done.  And

7  then there would be times I wouldn't really need to talk with

8  him because it was normal, kind of normal course of business;

9  there was nothing new.

10  Q.  Was he a hard worker?

11  A.  Yeah.

12  Q.  When you asked him a question, sometimes you asked him from

13  a legal perspective, I assume, right?

14  A.  Yeah, or just business policy, so I mean, I assumed he was

15  giving me his legal and business opinion, yeah.

16  Q.  And sometimes he'd tell you he'd have to get back to you?

17  A.  Yes.

18  Q.  Sometimes he'd say I need to call somebody or look up the

19  law, or something like that?

20  A.  Yeah.  He would not tell me what he was going to do, but he

21  would have to get back with me.

22  Q.  Sometimes he had an immediate response, and sometimes he

23  didn't?

24  A.  Yes.

25  Q.  All right.

1            MR. BATH:  Can we put up Government Exhibit 1712,

2      please.  I believe it's been admitted.

3            MR. SCOTTEN:  Could you take it down for one second.

4            MR. BATH:  Yes, we can take it down.

5            MR. SCOTTEN:  One second, your Honor.

6            MR. BATH:  Actually, let's take a look at 1701.

7      Q.  Do you remember, Ms. Grote, this document?

8      A.  Yes.

9            MR. BATH:  It's been admitted.  We can publish that.

10     Q.  This is a fax from you back in -- my eyes aren't very

11     good -- April of 2002?

12     A.  Yes.

13     Q.  Correct?

14     A.  Yes.

15     Q.  All right.  And this has to do with County Bank, correct?

16     A.  It does.

17           MR. BATH:  All right.  But if we could look at the

18     next page, Eli, please, and if we could look at what we'd be

19     calling the TILA box, could you blow that up for me, please.

20     Q.  You told us earlier about the TILA boxes and the four boxes

21     there, correct?

22     A.  Yes.

23     Q.  In all the documents we've seen, including this one, the

24     boxes are highlighted, two of them, is that correct?

25     A.  The first two bold, more bold, is that what you mean?

1    Q.  Uh-huh.

2    A.  Yes.

3    Q.  And do you know why that is?

4    A.  I -- no.  I learned from the bank that's just the

5    requirement of TILA, but I don't really know why.

6    Q.  My point is every document you've ever seen, whether it's

7    this company or County Bank or whatever, are those boxes

8    highlighted?

9    A.  I don't know about other documents.  I know these County

10   Bank documents, that was something that was very important.  We

11   had an issue one time where they were not bold, and I can

12   remember Walt Smith saying, you know, this is a violation, it

13   needs to be bolt.

14   Q.  Fair enough.  This obviously TILA box was back in '02, so

15   this was pre-Tim Muir, correct?

16   A.  Yes.

17          MR. BATH:  You can take that down, and please put up

18   Government Exhibit 1731.  That's been admitted as well.

19   Q.  And this is a fax that you identified earlier from 2003, is

20   that correct?

21   A.  I believe so.  Hard for me to read the date also.

22   Q.  All right.  Well, we can blow that up if you'd like to.

23   A.  Yes.

24   Q.  OK.  2003, is that right, June?

25   A.  Yes.

1    Q.  All right.  And you identified this, the government asked

2    you to identify this, did they not?

3    A.  They did.

4    Q.  It's to Kevin Brandon and Ellen Bachman.  Do you know who

5    they are?

6              MR. SCOTTEN:  Objection.

7              THE COURT:  Overruled.

8    A.  I do not know who they are.

9              MR. BATH:  OK.  If we can go to the next page, I think

10   there's going to be a TILA box.  Let's go after, keep going on.

11   There you go, on page 5 of 6 of the document.

12   Q.  Again, we see a TILA box there, do we not?

13   A.  We do.

14             MR. BATH:  Blow that up for us.

15   Q.  And this is a fax that's being sent by Scott to these

16   couple people you don't know who they are, correct?

17   A.  Correct.

18   Q.  And this is another example that the government showed you

19   about the TILA box, correct?

20   A.  Correct.

21   Q.  And again, this is in '03, so this is before Tim Muir was

22   there, correct?

23   A.  Correct.

24   Q.  All right.  I thought I heard you say on direct examination

25   that you were asked by Tim to type up these boxes.  Did I

1    mishear you?

2    A.  I -- it would have been Scott also, Scott before Tim came,

3    but then Tim would, in the later years once Tim was there, I

4    would have received direction from both Tim or Scott on how to

5    modify these documents, before you not this particular document

6    with Tim.  He was not there.

7    Q.  Right.  But are you saying you were asked to modify the

8    TILA boxes by Tim Muir, ever?

9    A.  I don't know specifically the TILA box or what changed

10   when, but if there were document changes necessary, I -- I know

11   that that happened and that I received them from Tim, and we

12   would -- I would create a template.  I wasn't the only one to

13   do it, but -- but yes, changes were made, I don't know

14   specifically in the TILA box.

15   Q.  That's my point.  There are a lot of documents involved in

16   this business, are there not?

17   A.  There are.

18   Q.  And there are a lot of documents that might govern a

19   privacy policy?

20   A.  Yes.

21   Q.  Or the loan note?

22   A.  Which is this.

23   Q.  Right.  Or the application?

24   A.  Yes.

25   Q.  And what you tell us is that you understand maybe at some

 1    point in time, Tim made some changes to some documents, but you

 2    can't specify it's any TILA document?

 3    A.  No.

 4              MR. BATH:  OK.  You can take that down.

 5    A.  Maybe not the TILA section, because I think that entire

 6    document, it's like the truth in -- I don't really know if

 7    that's the TILA box or the entire document is TILA.

 8    Q.  All right.  Have you seen any documents that were emailed

 9    to you and Tim showing any changes in the TILA boxes?

10    A.  Not that I recall.

11    Q.  Fair enough.  The TILA boxes that we just looked at right

12    there, part of your job was to monitor other companies making

13    loans across the nation to see what their loan docs looked

14    like, didn't you?

15    A.  Sometimes, yes.

16    Q.  In fact, you asked employees to go online and make

17    applications to competitors, right?

18    A.  Yes.

19    Q.  And you had their loan documents printed off, correct?

20    A.  Yes.

21    Q.  The TILA boxes that were being used, starting in '02 or '03

22    with County Bank all the way to the FTC, were industry

23    standard, were they not?

24              MR. SCOTTEN:  Objection.

25              THE COURT:  Sustained.

1          Do you know what the industry standard was?

2          THE WITNESS:  No.

3          THE COURT:  OK.  Next question.

4   BY MR. BATH:

5   Q.  Did you look at other documents from across the nation?

6   A.  Yes.

7   Q.  And that was part of your job responsibility?

8   A.  Yes.

9   Q.  All right.  Why were you doing that?

10  A.  I was asked to.

11  Q.  By whom?

12  A.  Scott and Tim.

13  Q.  And then what did you do once you got those documents from

14  other people?  Did you turn them over?

15  A.  Sometimes.

16  Q.  All right.  Did you give them to Tim?

17  A.  Sometimes.

18  Q.  And from that point forward, you didn't have any more

19  information; Tim didn't get back to you on the documents, you

20  just forwarded other documents from other lenders to Tim?

21  A.  Yeah, I don't recall him responding back.

22          MR. BATH:  Can we put up for the witness 2700, only

23  for the witness and us.

24          If I could have just one second, Judge.

25  Q.  Defense 2700 on the screen in front of you?

1    A.  It is.

2    Q.  Take a second and look at that and tell me if you

3    recognize -- and if you need the second page, I'll get that for

4    you.  Do you recognize that document?

5    A.  It looks like minutes from a meeting we had with the

6    managers in AMG, tribal managers.

7    Q.  And you were present at that meeting?

8    A.  This says I was, yes.

9    Q.  All right.  Do you recall having a meeting?

10   A.  I don't fully remember the meeting.  I can -- I remember

11   maybe one time that they came in to meet us, but I don't

12   remember the context of the meeting.

13   Q.  Well, I understand, but you remember being at the meeting?

14   A.  I mean, I assume I'm at the meeting because I'm listed as

15   an attendee on this, but I do not remember the meeting.

16   Q.  Let me ask you this.  Do you remember meeting with Miami

17   tribal officials?

18   A.  At this time, you mean?

19   Q.  Yes.

20   A.  I don't particularly remember this meeting.

21   Q.  Well, not just this meeting, did you ever meet Chief Tom

22   Gamble?

23   A.  I did.

24   Q.  And do you remember meeting the second chief, Doug

25   Lankford?

1    A.  I did.

2    Q.  And Don Brady being present?

3    A.  Yes.

4    Q.  OK.  And you were present?

5    A.  I have met with them.  I still don't remember this meeting.

6    Q.  We're going to get there.  Give me a second.

7    A.  OK.

8    Q.  How many different meetings did you have with tribal

9    officials?

10   A.  A large meeting like this, not -- we didn't really have a

11   lot of meetings like this, but I would have met with Tom

12   Gamble, Doug Lankford and Don Brady off and on through the

13   course of business.

14       MR. BATH:  We can take that down.  I don't want to get

15   distracted on that meeting.

16   Q.  How many different times do you think you would have met

17   with Chief Gamble?

18   A.  At least a dozen.

19   Q.  In person or on the phone?  When you say meetings, you mean

20   in person?

21   A.  Yeah, he would come into our office.

22   Q.  What would be the purpose of your meeting with him?

23   A.  He would not normally meet with me.  He would come into the

24   office and meet with Scott or Tim, but he would -- he would

25   stop by and just check in.

1    Q.  Oh, OK.  So when you say you met with him, you just mean

2    you may have said hello in passing?

3    A.  Yes.  I did not have regular meetings with anyone on that

4    list.

5    Q.  Do you remember having any formal meeting with anybody from

6    the Miami tribe?

7    A.  I only vaguely remember one meeting where everybody came

8    up, but I just -- I don't remember it very well, no, and I only

9    remember that one that they came up.

10   Q.  Fair enough.

11          MR. BATH:  Can we put up defense 1304, please, just

12   for the witness.

13   Q.  Do you have 1304 in front of you, Ms. Grote?

14   A.  Yes.

15   Q.  All right.  Is that an email from Tim Muir and to you and

16   others?

17   A.  It is.

18          MR. BATH:  I'd offer 1304.

19          MR. SCOTTEN:  Objection.

20          THE COURT:  Basis.

21          MR. SCOTTEN:  It's hearsay.  It's not a party opponent

22   admission, like how we would offer something like this.  It's

23   hearsay.

24          THE COURT:  Did you receive this email at or about the

25   date it bears?

1          THE WITNESS:  I believe so.

2          THE COURT:  All right.  I'm going to receive it not

3    for the truth of its content but the fact that it was said by

4    Mr. Muir, and it was an instruction that appears to have been

5    given to other employees.

6          (Defendant's Exhibit 1304 received in evidence)

7          MR. SCOTTEN:  Then we'll object on relevance grounds,

8    your Honor.

9          THE COURT:  Well, then I'll overrule it.

10          MR. SCOTTEN:  All right.

11          MR. BATH:  We can publish it, please.

12   Q.  This email went out on March 26 of '09, is that correct?

13   A.  Yes.

14   Q.  And it went to a whole number of people, I don't need to

15   read them all, but you were one of them, correct?

16   A.  Correct.

17   Q.  And this discusses Jared Marsh, correct?

18   A.  Yes.

19   Q.  And you talked about him earlier, correct?

20   A.  I did.

21   Q.  And he was an attorney who worked with Tim?

22   A.  Correct.

23   Q.  And this is obviously in March of '09 and saying that Jared

24   is going to sort of take, pick up day-to-day legal issues,

25   operations, correct?

1  A.  Yes.

2  Q.  Does this help you with the timing?  Earlier you weren't

3  sure when Mr. Marsh started.  Does this help you with that?

4  Not when he started, but at least he started before this date?

5  A.  Yes, he started before March 24 -- March of 2009.

6  Q.  Do you recall he'd take over day-to-day operations at some

7  point, legal?

8  A.  Yes.

9  Q.  And how long had he been there before he did that, if you

10  know?

11  A.  At least a year, possibly longer.

12          MR. BATH:  Thank you.  You can put that down.

13          Could I have the witness shown Exhibit D1305.

14  Q.  Take a look at that, Ms. Grote, to yourself, and let me

15  know if you have had a chance to take a look at it and if you

16  recognize it.

17  A.  I do.

18  Q.  Is this an email you would receive in the normal course of

19  business?

20  A.  Yes.

21  Q.  All right.  And actually, your last email you sent back,

22  correct?

23  A.  I sent this to Jared, yes.

24          MR. BATH:  Offer 1305.

25          THE COURT:  Any objection?

1              MR. SCOTTEN:  Objection.  Same grounds as the last

2     one, your Honor.

3              THE COURT:  Received.

4              (Defendant's Exhibit 1305 received in evidence)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. BATH:  Can you publish it?

2           Does this have a second page to it?

3           Go to the last page.

4    BY MR. BATH:

5    Q.  Generally, Ms. Grote, what this is is a discussion about

6    scripts that might be used by customer service, is that right?

7    A.  Collection, but yes.

8    Q.  Collections, right.

9           This is between a number of people, including you,

10   talking about what scripts should be crafted, correct?

11   A.  Yes.

12   Q.  And Jared Marsh, the attorney, is in on that at the very

13   end of it, is that fair to say?

14   A.  In this e-mail string, yes.

15   Q.  Again, because by this time -- this is after the last one

16   we saw -- he is doing day-to-day legal for operations?

17   A.  Yes.

18          MR. BATH:  We can take that down.

19   Q.  We saw a number of e-mails, first with Ms. Rogers and then

20   some with you I think, about the weather reports.  Do you

21   remember seeing some of those?

22   A.  Yes.

23   Q.  Is it fair to say Tim Muir wasn't on any of those, was he?

24   A.  He was not.

25   Q.  This was not done at the direction, the weather reports, of

1    Tim Muir?

2    A.  No.

3              MR. BATH:  Just one second.

4              That's all I have.  Thank you.

5              THE COURT:  Redirect.

6              MR. SCOTTEN:  Thank you, your Honor.

7    REDIRECT EXAMINATION

8    BY MR. SCOTTEN:

9    Q.  Ms. Grote, do you remember when the cross-examination

10   started a couple of hours ago and the defense attorney had you

11   looking through a training manual to see if there was

12   information in there about lying about location?

13   A.  Yes.

14   Q.  You really started digging through that manual, right?

15   A.  Right.

16   Q.  Because you thought you might find it in there?

17   A.  Yes.

18   Q.  Because you have no doubt that lying about location is

19   company policy, right?

20   A.  Correct.

21   Q.  We showed you just a couple of e-mails where that was put

22   out as a company policy.

23              MR. GINSBERG:  Objection.

24              THE COURT:  Stop the speeches.  You can save that for

25   your closing argument.  Ask a question.

1          MR. SCOTTEN:  Appreciate it, your Honor.

2     Q.  Moving on, do you remember when Mr. Ginsberg was asking you

3     about lending entities and sets of companies that worked with

4     County Bank?

5     A.  Yes.

6     Q.  I just want to be clear, there was only one portfolio name

7     used with County Bank, right?

8     A.  Yes.

9     Q.  That was 500 FastCash?

10    A.  Correct.

11    Q.  There were no other names used with County Bank?

12    A.  No.

13    Q.  They were lending at the same time 500 FastCash was using

14    the County Bank name?

15    A.  Correct.

16    Q.  But they weren't affiliated with County Bank?

17    A.  Correct.

18    Q.  At that time, there was no claim that they were affiliated

19    with the tribes, was there?

20    A.  I don't recall any.

21    Q.  You were asked about customer dissatisfaction in the loan

22    renewal process.  Do you remember that?

23    A.  Yes.

24    Q.  Customers who wanted to renew were sometimes unhappy when

25    they had to do it manually as opposed to automatic?

1    A.   They were.

2    Q.   I just want to make sure we are clear.  Were you testifying

3    that customers were unhappy when they didn't have to pay down

4    the principal or just about the automatic versus manual nature?

5    A.   The manual nature was cumbersome to them.

6              THE COURT:  The what nature?

7              THE WITNESS:  The manual nature.

8    Q.   You were asked a couple of questions about Mr. Muir's

9    involvement.  When you were asked whether any of the lawyers

10   here were involved in your preparation for the FTC deposition,

11   was Mr. Muir one of the people who brought the lawyers to you?

12   A.   Yes.

13   Q.   And he is an attorney, right?

14   A.   Yes.

15   Q.   So you weren't saying he wasn't involved in bringing them

16   to you?

17   A.   No.  He just wasn't involved in my prep that day, so I

18   might have misunderstood that.

19   Q.   Do you remember being asked about a forfeiture provision

20   that was in one of the earlier documents you saw that you

21   didn't end up having in your plea?

22   A.   Yes.

23   Q.   Are you facing any fines as a result of your guilty plea?

24   A.   Up to $250,000.

25   Q.   Ms. Grote, do you have a lot more than $250,000 left?

1    A.   No.

2    Q.   Do you have anything in your savings?

3    A.   I have an IRA, but no savings.

4    Q.   And you have a little bit of equity in your home also,

5    right?

6    A.   I do.

7    Q.   Is your impression that as a result of pleading guilty,

8    that could all be taken from you by the fine?

9    A.   Yes.

10   Q.   I think you were asked questions about how broad the

11   weather lie or the weather report circulation was, is that

12   correct?

13   A.   Yes.

14   Q.   You said there were some other managers that didn't use

15   that weather device?

16   A.   Correct.

17   Q.   Who was that?

18   A.   I was the only one that used that for my departments.  Tim

19   Buckley did not, Glenn Fisher did not, Chris Becker did not.

20   Q.   Does that mean they were not all lying about location?

21   A.   I believe we all had the same policy for location.  I was

22   just the only one that used the weather report.

23   Q.   That was something you came up to help carry out that lie?

24   A.   Yes.

25   Q.   Were you also all lying about the affiliation between the

1    portfolios?

2    A.  We all said we were not affiliated with each other.

3    Q.  I think you were asked about the business continuing on

4    post-2013?

5    A.  Yes.

6    Q.  Was Scott Tucker involved after that point?

7    A.  He was not.

8    Q.  After that point, did you change your loan disclosures?

9    A.  The loan disclosures changed sometime late 2012, 2013.

10   Q.  Were they made more accurate?

11   A.  Total of payments was modified.

12   Q.  To be more accurate?

13   A.  Yes.

14   Q.  After this 2013 period when the business continued on, did

15   you know if you were still lending in New York?

16   A.  I do not recall.

17   Q.  Do you know if you stopped lending in New York at some

18   point?

19   A.  Yes.

20   Q.  The business, was it smaller or larger?

21   A.  Smaller.

22   Q.  How much smaller?

23   A.  Substantially.  It went from a thousand agents total to, in

24   Red Cedar alone, 30 agents or something like that.

25   Q.  So was it making far, far less money?

1  A.  Yes.

2  Q.  Ms. Grote, you testified today that you lied on multiple

3  occasions, correct?

4  A.  Yes.

5  Q.  And you lied to protect this business?

6  A.  Yes.

7  Q.  You also lied to protect yourself?

8  A.  Yes.

9  Q.  As you stand now, do you think lying will protect yourself

10  in any way?

11  A.  No.

12  Q.  What do you think would happen if you were found to be

13  lying today?

14  A.  I could go to jail for five years.

15  Q.  Anything causing you to lie about these defendants?

16  A.  No.

17  Q.  Finally, I just want to ask you a bit more about policy.

18          MR. SCOTTEN:  Can we show 1724.

19  Q.  While we are getting that, let me ask you a couple of other

20  questions about Mr. Muir.

21          You mentioned that Jared Marsh became the day-to-day

22  person?

23  A.  He did.

24  Q.  Is that because Mr. Muir left the business?

25  A.  No.

1   Q.  Did he become more or less senior at that point?

2   A.  I think he was senior always.

3   Q.  Was he senior or junior to Mr. Marsh?

4   A.  Senior.

5   Q.  Then you gave a couple of answers about modifying the loan

6   disclosures.  You weren't sure if Mr. Muir asked you to change

7   the TILA box specifically?

8   A.  Right.  I don't recall if I changed that.

9   Q.  But the loan disclosure notes, did you go to Mr. Muir for

10  guidance on changes on those?

11  A.  Yes.

12          MR. SCOTTEN:  Ms. Grant, can we highlight the second

13  e-mail from the bottom, the one from Scott Tucker.

14  Q.  Can you remind the jury what's going on here?

15  A.  Scott is asking me to get with Tim about a customer that he

16  wants to make happy.

17  Q.  Make happy, do not screw around with?

18  A.  Yes.

19  Q.  This is about one customer?

20  A.  Right.

21  Q.  Writing off a loan for a single customer?

22  A.  Yes.

23  Q.  And you were not allowed to do that without running it by

24  Muir?

25          Let me rephrase.  Scott Tucker wanted to make sure you

1    would talk to Tim Muir before doing that?

2    A.   He did.

3    Q.   So these policies about lying about location, affiliation,

4    the TILA boxes, did you have any authority to make those

5    policies?

6    A.   No.

7    Q.   Who did?

8    A.   Scott and Tim.

9            MR. SCOTTEN:  Nothing further, your Honor.

10           THE COURT:  You may step down.

11           (Witness excused)

12           THE COURT:  Call your next witness, your Honor.

13           MR. SCOTTEN:  Your Honor, we have two exhibits to

14   introduce.

15           THE COURT:  Yes.

16           MR. SCOTTEN:  The first is 1729.

17           If we can show it first to the defendants and the

18   Court.

19           May we offer 1729?

20           THE COURT:  Any objection?

21           MR. SCOTTEN:  There is a second page.

22           MR. GINSBERG:  No objection.

23           THE COURT:  Received.

24           (Government's Exhibit 1729 received in evidence)

25           MR. SCOTTEN:  May we publish it?

H9J8TUC5

1          Ms. Grant, in the middle of the screen, you see where

2     it says "from" and there is a name.  Highlight that.

3          If we can zoom out of that and zoom on to the notes,

4     the remarks.

5          If we can zoom out of that.

6          Would you highlight the date?

7          Then if we can go to page 2.

8          You see where there is some scratch marks on it.  If

9     you can highlight the line that the scratch marks are on, the

10    address.

11         We can take that down.

12         Then if we can go to 1733, please.

13         Your Honor, the government offers 1733.

14         THE COURT:  Any objection?

15         MR. SCOTTEN:  I think this exhibit is going to need

16    some redactions, your Honor.

17         THE COURT:  Well, I am looking -- I see, yes.

18         MR. SCOTTEN:  What I propose to do is offer it subject

19    to redaction.  I think Ms. Grant can blow up the portions that

20    we care about and don't include that.

21         THE COURT:  What are you going to show?

22         MR. SCOTTEN:  Essentially the to, froms, and the

23    bodies, but not the subject header, which I think is the only

24    issue.

25         THE COURT:  Show me what you are going to show.

H9J8TUC5

1    MR. SCOTTEN:  We can offer this another time.

2    THE COURT:  Thank you.

3    MR. VELAMOOR:  Your Honor, I believe there is an issue

4    as to the next witness that counsel would like to address at

5    sidebar.

6    THE COURT:  Ladies and gentlemen, please stand up and

7    stretch.

8    (At the sidebar)

9    THE COURT:  Who is the witness and what is the issue?

10   MR. VELAMOOR:  The government intends to call Ashley

11   Lane.  She is a customer victim witness.  We received yesterday

12   or we saw for the first time yesterday bank records and turned

13   them over to defense counsel, and we intend to offer as part of

14   her testimony the records, but primarily a summary chart of the

15   payments taken from the bank records.  My understanding from

16   Mr. Bath is that he has not had a chance to look at those

17   records yet and he would like us not to call that witness.

18   THE COURT:  Then call a different witness.

19   MR. VELAMOOR:  Our concern is Ms. Lane has travelled

20   from Upstate New York.  There are scheduling issues with her.

21   It's a matter of her job obligations and limited means.  And

22   also the fact that we are in a short week with a very tight

23   schedule and we are trying to get as much done as we can.

24   THE COURT:  Are we at the point of cumulativeness?

25   MR. VELAMOOR:  I don't believe so, no.

1          THE COURT:  The point of cumulative is that will be

2     after 27 witnesses?

3          MR. VELAMOOR:  No, your Honor.

4          THE COURT:  Tell me, how many victim witnesses are you

5     calling?

6          MR. VELAMOOR:  Three or four more at the most.

7          THE COURT:  I would have thought you were about at

8     cumulativeness level right now.  You have made your point

9     through the witnesses.  It's repetitive.  I can do the

10    cross-examination.  It's very fine cross-examination, by the

11    way.  I can do it in my sleep.  I think I was doing it last

12    night in my sleep, and so can the jury.

13         MR. VELAMOOR:  I understand the Court's point.

14    Defense counsel has argued that we cherry-picked the victims.

15    I think it's important for us to demonstrate --

16         THE COURT:  Are you arguing cherry-picking?

17         MR. VELAMOOR:  They opened specifically on the idea

18    that we cherry-picked victims and we scoured victims to try to

19    find people to tell certain stories.  We need to show a certain

20    volume.  There are also different victims that show a different

21    aspect of the impact.

22         Ms. Lane, for example, is going to tell how certain

23    loans lead to force victims to take out additional loans.  Now,

24    the point has been made that a lot of these customers wanted to

25    renew their loans.  I think it's important for the jury to know

1    that part of the reason why that happens --

2              THE COURT:  When did you disclose Ms. Lane's

3    testimony?

4              MR. VELAMOOR:  Ms. Lane's testimony has been disclosed

5    since when we turned over 3500 initially.  The only issue is

6    with respect to the bank records.

7              THE COURT:  What did you turn over with your 3500

8    material?

9              MR. VELAMOOR:  We turned over whatever we had at the

10   time.

11             THE COURT:  What did you have?

12             MR. VELAMOOR:  The loan file, the interview notes,

13   TILA disclosures.

14             THE COURT:  I am going to allow the witness to be

15   called at this point.  I don't think there is going to be any

16   prejudice.  These are very simple, straightforward.  I am at

17   the point, though, where if I am satisfied that there is not

18   going to be an argument of cherry-picking, then I will be

19   inclined to consider a cumulativeness objection.  If there is

20   going to be an argument about cherry-picking, then I suppose

21   you could call hundreds of people.

22             MR. VELAMOOR:  We have no intention of calling

23   hundreds, but we do want to call a certain number of victims

24   from each of the portfolios.  We want to show commonality

25   between the different portfolios.

1     THE COURT:  Well, I think you're going to have a

2     problem because I think it's getting to the cumulative point.

3     You have heard what I have said.  You want to go do some

4     research because I am probably going to sustain the next

5     objection.  So you should get ready on that.

6     MR. BATH:  Just for record purposes, Judge, I respect

7     the Court's ruling.  I got the bank records at about 3:20

8     today, and I have had somebody in the back sort of tag what

9     could be relevant markings to them.  I will do my best, but I

10     think for record purposes, I want to let you know.

11     THE COURT:  Thank you.  I appreciate that.

12     MR. BATH:  I propose that they can call her without

13     going into the bank records.  They can offer the documents they

14     gave us in the 3500.

15     THE COURT:  What are you going to get out of the bank

16     records?

17     MR. VELAMOOR:  They are demonstrating the amount of

18     payments, the sequencing of the loans, the timing of the

19     different loans.

20     THE COURT:  I am going to allow it.

21     MR. VELAMOOR:  Judge, if the government is going to be

22     limited in terms of number of victims, I think our inclination

23     would be to call a different witness at this point.

24     THE COURT:  Then call a different witness.

25     (Continued on next page)

1          (In open court)

2          MR. SCOTTEN:  The government calls Aaron Shoaf.

3    AARON SHOAF,

4        called as a witness by the government,

5        having been duly sworn, testified as follows:

6          THE COURT:  State your first and last name and spell

7    both.

8          THE WITNESS:  Aaron Shoaf, A-A-R-O-N, S-H-O-A-F.

9          THE COURT:  You may inquire.

10   DIRECT EXAMINATION

11   BY MR. SCOTTEN:

12   Q.  Good afternoon, Mr. Shoaf.

13   A.  Good afternoon.

14   Q.  Mr. Shoaf, where are you from?

15   A.  Cedar City, Utah.

16   Q.  How far did you go in school?

17   A.  Past my bachelor's degree.

18   Q.  Do you work?

19   A.  Yes, I do.

20   Q.  What do you do?

21   A.  I own an incorporation company.  We incorporate businesses

22   in Nevada and Wyoming.

23   Q.  What is the name of your business?

24   A.  Silver Shield Services, Inc.

25   Q.  What is an incorporation business?

1    A.  We form corporations, LLCs, limited partnerships, for

2    people that are looking to start businesses, looking to protect

3    assets, reduce taxes.

4    Q.  You mentioned you do this in two states, Nevada and

5    Wyoming?

6    A.  Correct.

7    Q.  Why in those states?

8    A.  Those states are the most favorable, as far as they have no

9    state taxes, they have minimal reporting, they design their

10   laws to try to encourage businesses to incorporate there.

11   Q.  What is your understanding of the purpose of incorporating

12   with you as opposed to some other way?

13   A.  We have been in this business for a long time so we know

14   what we are doing.  We can get it done efficiently and fast.

15   As I said, we know what we are doing.  We can show you the ins

16   and outs of what to do and what not to do.

17   Q.  Mr. Shoaf, do you typically meet the owner of these

18   corporations you set up?

19   A.  No.

20   Q.  How do you typically get hired to set up these

21   corporations?

22   A.  Most of them come from the Internet and from referral.

23   Q.  But even when you're referred, do you eventually meet the

24   person who you set up the corporation for?

25   A.  No.  I think in the last 20 something years, I have met

1    maybe 3 percent of my clients.

2    Q.  Do you typically know what the business you're

3    incorporating does?

4    A.  No.

5    Q.  I am going to hand you a pile of exhibits.  They should be

6    in order.

7            For now, just take a look at Exhibit 2001.

8            MR. SCOTTEN:  Ms. Grant, can we put that up on the

9    screen.

10   Q.  Do you recognize this?

11   A.  Yes, I do.

12   Q.  What is this?

13   A.  This is the documents changing the resident agent from

14   Laughlin to myself and the list of officers that were filed

15   from the years.

16   Q.  Is it for a particular corporation?

17   A.  Yes, it is.

18   Q.  What is the name of that corporation?

19   A.  NM Service Corp.

20           MR. SCOTTEN:  The government offers 2001.

21           THE COURT:  Any objection?

22           MR. ROTH:  No, your Honor.

23           THE COURT:  Received.

24           (Government's Exhibit 2001 received in evidence)

25           MR. SCOTTEN:  Ms. Grant, can we highlight the very

1    top.

2    Q.  Would you again read the name of the corporation?

3    A.  NM Service Corp.

4          MR. SCOTTEN:  Ms. Grant, can we highlight the large

5    box at the bottom.

6    Q.  Mr. Shoaf, what are we looking at here?

7    A.  This is a list of the officers for the company, showing

8    myself being the president, treasurer, secretary and director.

9    Q.  What did you do as the president, secretary, treasurer and

10   director of NM Services?

11   A.  I did absolutely nothing.  I went on as the officers and

12   resigned that day.

13   Q.  What is the purpose of doing that?

14   A.  The purpose is to provide anonymity to the owners and

15   principals of the company so that nobody knows who it is.

16          MR. SCOTTEN:  If we can shrink down the blowup and

17   highlight the date real quickly.

18   Q.  Now, is there a page 3 to your document, sir?

19   A.  OK.

20          MR. SCOTTEN:  Can we highlight the bottom box again.

21   Q.  What are we looking at here, Mr. Shoaf?

22   A.  This is a list of officers where we put Carmela Terpening

23   on as the officers.

24   Q.  Is this still for the same corporation?

25   A.  Yes.

1    Q.  Who is Carmela Terpening?

2    A.  She is my ex-sister-in-law.

3    Q.  Why is she the president, secretary, treasurer and director

4    of NM Services at this point?

5    A.  I was requested to put somebody other than myself, and so I

6    asked who at that time was my sister-in-law to do it for a fee.

7    Q.  When you say a fee, how much did Ms. Terpening get paid to

8    show up here?

9    A.  $100.

10   Q.  Did she do anything for this corporation?

11   A.  No, she did not.

12   Q.  Do you understand the purpose of having somebody other than

13   you show up as the officers of these corporations?

14   A.  I have no idea.

15   Q.  First, to be clear, is this legal?

16   A.  Yes, it is.  In Nevada it's perfectly legal.  In fact, at

17   one point our secretary of state said they knew that over 50

18   percent of the officers on record were not the actual officers

19   of the companies.

20   Q.  Did Ms. Terpening ever have any actual involvement,

21   anything happen as a result of her appearing on this document?

22   A.  She got served with something that caused me a nightmare.

23   Q.  Without going into the details of anything that might have

24   been the substance of that, what do you mean by got served?

25   A.  She was served from a process server for a court.

1   Q.  Can you take a look at 2002 now?

2            What are you looking at here, sir, in general terms?

3   A.  The list of officers for the year February 2009 to February

4   2010 for NM Service Corp. with Carmela Terpening.

5            MR. SCOTTEN:  The government offers 2002.

6            THE COURT:  Any objection?

7            MR. ROTH:  No objection.

8            THE COURT:  Received.

9            (Government's Exhibit 2002 received in evidence)

10  Q.  How many pages does that document have, sir?

11  A.  One page.

12  Q.  I ask you to take a look at 2003.

13  A.  OK.

14  Q.  What are you looking at now?

15  A.  I am looking at a list of officers for February 2011 to

16  February of 2014.

17  Q.  Sir, are you sure you're looking at Government Exhibit

18  2003?  It would be the yellow sticker.

19           So what is the first page there?

20  A.  The first page is where I accept as the registered agent,

21  which has to be done any time a company has been in revoke

22  status.

23           MR. SCOTTEN:  The government offers 2003.

24           MR. ROTH:  No objection.

25           THE COURT:  Received.

1          (Government's Exhibit 2003 received in evidence)

2          MR. SCOTTEN:  If we can publish it.

3          Can we just blow up the top portion.

4    Q.  Sir, what is the date here?

5    A.  March 14, 2013.

6    Q.  Do you see an address in the upper left for the secretary

7    of state?  Where is the secretary of state located on this

8    form?

9    A.  202 North Carson Street, Carson City, Nevada  89701.

10          MR. SCOTTEN:  If we can just zoom back out.

11   Q.  Again, what business is this for?

12   A.  NM Service Corp.

13   Q.  Can I show you 2004.

14          Do you recognize this?

15   A.  Yes.  This is a list of officers for February 2014 to

16   February 2015.

17   Q.  For what company?

18   A.  NM Service Corp.

19          MR. SCOTTEN:  The government offers 2004.

20          MR. ROTH:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 2004 received in evidence)

23          MR. SCOTTEN:  Can we blow up that large bottom box.

24   Q.  Mr. Shoaf, who are the president, secretary, treasurer and

25   director listed now?

1    A.  Scott Tucker.

2    Q.  Do you know Scott Tucker?

3    A.  No.

4    Q.  Have you ever met him?

5    A.  No.

6    Q.  Did you put his name on this form?

7    A.  Yes.

8    Q.  Why?

9    A.  I was requested to per the law firm that had hired me.

10   Q.  Do you see a date there down on the bottom right-hand

11   corner?

12   A.  Yes.  2/24/14.

13   Q.  Does Mr. Tucker's presence on this document indicate

14   anything to you, based on your experience in the industry?

15   A.  That there was no reason anymore to have anonymity on this

16   company.

17            MR. ROTH:  Objection, your Honor.

18            THE COURT:  That's speculation.  Sustained.

19            MR. SCOTTEN:  We can zoom out.

20   Q.  Can I show you 2005.

21            If you would grab 2005 and flip through it.

22   A.  OK.

23   Q.  Do you recognize these papers, in general?

24   A.  Yes, I do.

25   Q.  Can you describe what the stack of papers is collectively?

1    A.   This is the paperwork for Executive Global Management,

2    where they changed from registered agent of Laughlin to myself,

3    and the next three years worth of officers' list filings.

4    Q.   For what company?

5    A.   Executive Global Management.

6              MR. SCOTTEN:  The government offers 2005.

7              MR. ROTH:  No objection.

8              THE COURT:  Received.

9              (Government's Exhibit 2005 received in evidence)

10             MR. SCOTTEN:  Can we publish it.

11   Q.   Let's just start on page 3.

12   A.   OK.

13   Q.   Mr. Shoaf, what is it we are looking at now?

14   A.   This is my acceptance of appointment as a director of the

15   company.

16   Q.   For what purpose are you accepting being director of

17   Executive Global Management?

18   A.   So that I can file the list of officers.  Without being

19   appointed a position, I can't file a list with my name on it.

20   Q.   Other than filing this list -- who did you file it with?

21   A.   Secretary of state of Nevada.

22   Q.   Other than that, did you do anything for this company?

23   A.   No.

24             MR. SCOTTEN:  If we can zoom out and go up to page 2.

25   Q.   What are we looking at here, sir?

1  A.  This is myself giving permission for somebody else to go on

2  the company as a director.

3  Q.  Did you create this?

4  A.  Yes, I did.

5  Q.  Why is it blank?

6  A.  Wait a minute.  This one is for me to be appointed.  It's

7  blank because I don't know who was appointing me or what they

8  were doing.  I don't know who was an officer at the time.

9  Q.  Did you ever find out?  How did this get filled out?

10  A.  That gets filled out inside the corporate records of the

11  company.

12  Q.  So would you find out who was appointing you?

13  A.  No, not unless they told me.

14  Q.  I believe you flipped through this earlier, but if you need

15  to again, can you just tell me what years this reflects for

16  Executive Global Management?

17  A.  December of '06 through December of '09.

18  Q.  Let me show you 2006.

19        Do you recognize these papers?

20  A.  Yes.  This is the same as the last one, except here for

21  Silver State Business Administrators --

22        MR. SCOTTEN:  The government offers 2006.

23  A.  -- instead of me as Chris Larson.

24        THE COURT:  Any objection?

25        MR. ROTH:  I note that it's unsigned.

1    Q.  Did you create these documents?

2    A.  I did.

3            MR. SCOTTEN:  The government offers 2006.

4            THE COURT:  I will allow it.

5            MR. ROTH:  No objection.

6            THE COURT:  Received.

7            (Government's Exhibit 2006 received in evidence)

8    Q.  What is the name of this company?

9    A.  Silver State Business Administrators, Inc.

10   Q.  You had said that the registered agent that you filed on

11   these papers is Chris Larson?

12   A.  Yes.

13   Q.  Who is that?

14   A.  That's a food friend of mine.

15   Q.  What did Chris Larson do for Silver State Business

16   Administrators?

17   A.  Nothing.  He went on the list of officers and resigned the

18   same day.

19   Q.  Why did Chris Larson do that?

20   A.  We were requested to have somebody different than myself.

21   Q.  Then finally, can I show you Government Exhibit 2007.

22           Would you flip through that and tell me if you

23   recognize that?

24   A.  Yes.  These are the documents that I drew up for Universal

25   Management Services.

1    Q.  Similar to the other ones?

2    A.  Similar as the other ones with Chris Larson.

3           MR. SCOTTEN:  The government offers 2007.

4           MR. ROTH:  No objection.

5           THE COURT:  Received.

6           (Government's Exhibit 2007 received in evidence)

7           MR. SCOTTEN:  If we can publish the first page.

8    Q.  I think you already said this is Universal Management

9    Services?

10   A.  That is correct.

11   Q.  What years was Chris Larson serving this function for

12   Universal Management Services?

13   A.  December of '06 through December of '09.

14   Q.  For all of these companies we discussed, did you ever learn

15   with certainty who the owners were?

16   A.  No.

17   Q.  Did you ever speak to the owners, as far as you know?

18   A.  No.

19   Q.  Did you ever find out what these companies did?

20   A.  No.

21          MR. SCOTTEN:  Nothing further.

22          THE COURT:  Cross-examination.

23          MR. ROTH:  Thank you, your Honor.

24   CROSS-EXAMINATION

25   BY MR. ROTH:

1  Q.  Good afternoon, Mr. Shoaf.

2  A.  Good afternoon.

3  Q.  You have been doing your job for a long time, is that

4  correct?

5  A.  That is correct.

6  Q.  It seems like you take great pride in your job, is that

7  fair to say?

8  A.  That is fair to say.

9  Q.  I believe on your direct testimony you said, we know what

10  we are doing, is that correct?

11  A.  That is correct.

12  Q.  When you said that, you mean you know what you're doing and

13  you do everything legally in compliance with the laws of

14  Nevada, is that correct?

15  A.  That is correct.

16  Q.  And when you said you know the ins and outs of what you're

17  doing, that just means the ins and outs but in a legal way, is

18  that correct?

19  A.  That is correct.

20  Q.  And it is not unusual, sir, is it, with this client or any

21  other client not to ever know the identity of the client, is

22  that correct?

23  A.  It's very common.

24  Q.  Finally, sir, in all of the actions you took that you just

25  described in the various exhibits, everything that you did for

1   your client that you just testified about were legal and

2   lawful, is that correct?

3   A.  That is correct.

4          MR. ROTH:  No further questions.

5          THE COURT:  Mr. Bath.

6   CROSS-EXAMINATION

7   BY MR. BATH:

8   Q.  Sir, you mentioned earlier that you were hired by a law

9   firm.  Was that law firm out of Nevada, if you know?

10  A.  Yes.

11  Q.  You know it was out of Nevada?

12  A.  It was out of Nevada.

13  Q.  You never had any contact with Tim Muir at all, did you?

14  A.  I don't even know who he is.

15         MR. BATH:  That's all I need.  Thank you.

16         THE COURT:  Any redirect?

17         MR. SCOTTEN:  No.

18         THE COURT:  You may step down.

19         (Witness excused)

20         THE COURT:  Well, the clock that I go by on my phone

21  says it's exactly 5:00.  Tomorrow morning we are going to start

22  at 9:00.  We are going to have some refreshments in the jury

23  room as of 8:30.  So that's a little inducement to try and

24  remind you.  So you're going to go home.  You're going to set

25  your alarm clocks.  You're going to get to bed early.  No

1  staying up too late.  And this is all a worthwhile thing we are

2  doing to keep this case moving.  I think by now, ladies and

3  gentlemen, you have the sense that I don't tolerate anybody

4  wasting your time.  I am very jealous of your time.  And if at

5  times I am abrupt, it's because I am doing my job, which is to

6  keep the faith with you and get this case done in a timely

7  fashion.

8          We are on schedule.  We haven't fallen behind.  I am

9  hoping that at some point I will be able to give you a better

10  schedule update as to where we are.  But I will see you bright

11  and early.  If you get here at 8:30 or so, just ten minutes

12  before so you can get a nice 9:00 start.  Do not discuss the

13  case among yourselves or with anyone.  Have a very pleasant

14  evening.

15          (Jury exits courtroom)

16          THE COURT:  See you all tomorrow morning.

17          (Adjourned to September 20, 2017, at 9:00 a.m.)

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                          Page

CRYSTAL GROTE

Direct By Mr. Scotten . . . . . . . . . . . 719

Cross By Mr. Ginsberg . . . . . . . . . . . 819

Cross By Mr. Bath . . . . . . . . . . . . . 874

Redirect By Mr. Scotten . . . . . . . . . . 898

AARON SHOAF

Direct By Mr. Scotten . . . . . . . . . . . 911

Cross By Mr. Roth . . . . . . . . . . . . . 922

Cross By Mr. Bath . . . . . . . . . . . . . 924

GOVERNMENT EXHIBITS

Exhibit No.                          Received

1726 . . . . . . . . . . . . . . . . . . . 723

1715 . . . . . . . . . . . . . . . . . . . 731

1702 . . . . . . . . . . . . . . . . . . . 736

1710 . . . . . . . . . . . . . . . . . . . 742

1701 . . . . . . . . . . . . . . . . . . . 746

1731 . . . . . . . . . . . . . . . . . . . 750

1703 . . . . . . . . . . . . . . . . . . . 756

1910 . . . . . . . . . . . . . . . . . . . 758

1724 . . . . . . . . . . . . . . . . . . . 763

1713 . . . . . . . . . . . . . . . . . . . 766

1712 . . . . . . . . . . . . . . . . . . . 767

1719 . . . . . . . . . . . . . . . . . . . 774

1   1716 . . . . . . . . . . . . . . . . . . 775

2   1705 . . . . . . . . . . . . . . . . . . 783

3   1721 . . . . . . . . . . . . . . . . . . 789

4   1722 . . . . . . . . . . . . . . . . . . 790

5   1723 . . . . . . . . . . . . . . . . . . 791

6   1711 . . . . . . . . . . . . . . . . . . 793

7   1730 . . . . . . . . . . . . . . . . . . 804

8   1714 . . . . . . . . . . . . . . . . . . 818

9   3517-11 . . . . . . . . . . . . . . . . . 858

10  1729 . . . . . . . . . . . . . . . . . . 905

11  2001 . . . . . . . . . . . . . . . . . . 913

12  2002 . . . . . . . . . . . . . . . . . . 916

13  2003 . . . . . . . . . . . . . . . . . . 917

14  2004 . . . . . . . . . . . . . . . . . . 917

15  2005 . . . . . . . . . . . . . . . . . . 919

16  2006 . . . . . . . . . . . . . . . . . . 921

17  2007 . . . . . . . . . . . . . . . . . . 922

18                   DEFENDANT EXHIBITS

19  Exhibit No.                           Received

20   1319 . . . . . . . . . . . . . . . . . . 876

21   1304 . . . . . . . . . . . . . . . . . . 894

22   1305 . . . . . . . . . . . . . . . . . . 896

23

24

25