H9kWtuc1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        16 Cr. 91 (PKC)

5    SCOTT TUCKER and
     TIMOTHY MUIR,                       Trial
6
               Defendants.
7
     ------------------------------x
8                                        New York, N.Y.
                                         September 20, 2017
9                                        9:20 a.m.

10

     Before:
11                      HON. P. KEVIN CASTEL

12                                       District Judge
                                            and a jury
13                      APPEARANCES

14   JOON H. KIM
          Acting United States Attorney for the
15        Southern District of New York
     BY:  NIKETH V. VELAMOOR
16        HAGAN C. SCOTTEN
          SAGAR K. RAVI
17        Assistant United States Attorneys

18   FREEMAN NOOTER & GINSBERG
          Attorneys for Defendant Tucker
19   BY:  LEE A. GINSBERG
          NADJIA LIMANI
20            -and-
     STAMPUR & ROTH
21   BY:  JAMES M. ROTH

22   BATH & EDMONDS, P.A.
          Attorneys for Defendant Muir
23   BY:  THOMAS J. BATH
              -and-
24   BEVERLY VAN NESS

25
```

H9kWtuc1

1          (Trial resumed)

2          MR. SCOTTEN:  Your Honor, one brief point.  We've

3     handed up an instruction that I think the defendants are going

4     to request with our first exhibit.  I just wanted to make sure

5     we brought it to the Court's attention before the jury came in.

6          THE COURT:  When you say we've handed it up, do you

7     mean the government's handed it up?

8          MR. SCOTTEN:  The government has handed it up.  The

9     defense has also reviewed it and it's my understanding consents

10     to it.

11          THE COURT:  And both sides want me to give this

12     instruction?

13          MR. SCOTTEN:  Yes, your Honor.

14          THE COURT:  Is that right?

15          MR. GINSBERG:  Yes, your Honor.

16          THE COURT:  All right.  This is in connection with

17     1733.  Didn't I give an instruction along these lines?

18          MR. SCOTTEN:  You did, your Honor.  It is essentially

19     identical.  We're doing another response to a similar story.

20          THE COURT:  I see.  That's fine.

21          Bring our jury in, please.

22          (Continued on next page)

23

24

25

H9kWtuc1

1          (Jury present)

2          THE COURT:  Please be seated.

3          Good morning, ladies and gentlemen.

4          The government may call its next witness.

5          MR. SCOTTEN:  And, your Honor, we're going to do that

6   one exhibit that we handed up the instruction for.

7          THE COURT:  Are you offering the exhibit?

8          MR. SCOTTEN:  We are, your Honor.

9          THE COURT:  Why don't you offer it.

10         MR. SCOTTEN:  1733, your Honor.

11         THE COURT:  Any objection to Government Exhibit 1733?

12         MR. BATH:  No, your Honor.

13         MR. ROTH:  No, your Honor.

14         THE COURT:  All right.

15         Ladies and gentlemen, let me explain to you, you're

16  going to see some redactions or black markings on this exhibit,

17  Government Exhibit 1733.  They were at my direction.

18         The exhibit talks about some kind of a story or

19  article, and the story or article proves nothing.  The only

20  reason I've allowed any reference to it is because you may hear

21  testimony or see what persons who were alleged to be

22  coconspirators with the defendants, or the defendants, may have

23  done in response to the story or article, and you can only

24  consider the story or article in the context of looking at what

25  the response to it is.  Who the article is by or what it said

H9kWtuc1

1    is not particularly important, and you're not to speculate

2    about it.

3         Actually, I will say it's not important at all to this

4    case.

5         All right.  You may display the exhibit.

6         (Government Exhibit 1733 received in evidence)

7         MR. SCOTTEN:  Ms. Grant, can we highlight the second

8    email from the bottom, including the body.  Perfect.

9         Can you highlight the "from" and now the "to" and then

10   finally the body.

11        Could we zoom out of that and zoom into the next email

12   above it, and again, if you'd highlight the "from," the "to"

13   and the body.

14        Can we move on to the next one and, again, highlight

15   the "from," the "to" and the body.

16        And the last email in this chain.

17        And we can take that down, Ms. Grant.

18        Your Honor, the government calls James Fontano.

19        THE COURT:  All right.

20   JAMES FONTANO,

21       called as a witness by the Government,

22       having been duly sworn, testified as follows:

23        THE COURT:  All right.  You may inquire.

24        MR. SCOTTEN:  Thank you, your Honor.

25        (Continued on next page)

1    DIRECT EXAMINATION

2    BY MR. SCOTTEN:

3    Q.  Good morning, Mr. Fontano.

4    A.  Good morning.

5    Q.  Mr. Fontano, where are you from?

6    A.  Cedar City, Utah.

7    Q.  How far did you go in school, sir?

8    A.  Some college.

9    Q.  Do you work?

10   A.  No.  I'm retired.

11   Q.  Did you work before you retired?

12   A.  Yes.

13   Q.  What did you do?

14   A.  I owned and operated a corporate management business.

15   Q.  And what did that business do?

16   A.  Basically what we did is provide officers and directors for

17   out-of-state owners of Nevada and Wyoming corporations.

18   Q.  And did your business have a name?

19   A.  Yes.

20   Q.  What was that name?

21   A.  It was called Privatech Group.

22   Q.  And what was the purpose of providing officers and

23   directors for out-of-state owners in Nevada and Wyoming

24   corporations?

25   A.  For all intents and purposes, it was to provide privacy for

1   those owners.

2   Q.  And why did you incorporate in Nevada and Wyoming?

3   A.  They both had the strongest corporate laws as far as being

4   difficult to break the corporate veil.

5   Q.  And where was Privatech located when you were in this

6   business?

7   A.  Carson City, Nevada.

8   Q.  Did you charge for these services?

9   A.  I'm sorry?

10  Q.  Did you charge, did you get paid to do this?

11  A.  Yes.

12  Q.  How much would you charge for basic services?

13  A.  It depended on what level of service, but it was somewhere

14  between 500 and $2,400 a year.

15  Q.  And who would pay you?

16  A.  The beneficial owners.

17  Q.  What do you mean when you say the beneficial owner?

18  A.  Well, each company had to have somebody that was benefiting

19  from the ownership of the corporate structure, and that person

20  is who would pay us.

21  Q.  Sir, I'm going to hand you what's marked as Government

22  Exhibit 2104 and ask you if you recognize it.

23  A.  Yes, I do.

24  Q.  And what is it?

25  A.  It is the nominee agreement.  It's the agreement that we

1  would enter into with the owner of the corporate structure to

2  provide our services.

3  Q.  And what is the name of the corporation in this nominee

4  agreement?

5  A.  This one is CB Service Corp.

6          MR. SCOTTEN:  Your Honor, the government offers 2104.

7          THE COURT:  Any objection?

8          MR. ROTH:  No, your Honor.

9          THE COURT:  Received.

10          (Government Exhibit 2104 received in evidence)

11  BY MR. SCOTTEN:

12  Q.  And sir, can you just describe in general terms how this

13  agreement works?

14  A.  The agreement was entered into to provide our services, and

15  the agreement basically spelled out what we could and could not

16  do.

17          MR. SCOTTEN:  Ms. Grant, could we please highlight the

18  top paragraph and the few lines right below it.

19  Q.  Mr. Fontano, who is this agreement between?

20  A.  It was between Privatech Group and CB Service Corporation

21  and Scott Tucker.

22  Q.  And what is Scott Tucker's position here?

23  A.  He would be the beneficial owner of the corporation.

24          MR. SCOTTEN:  And we'll put this back up in a second,

25  but just for a moment, Ms. Grant, can you put up 1734.  And if

1    you would highlight the top area where it says company legal

2    name and d/b/a name.

3    Q.  Mr. Fontano, do you see a d/b/a name listed here for CB

4    Service Corp.?

5    A.  Yes.

6    Q.  What is it?

7    A.  Cash Advance.

8             MR. SCOTTEN:  All right.  If we could take that down

9    and put up 2104.

10   Q.  Now, you had said Scott Tucker was the beneficial owner.

11   Have you ever met Scott Tucker?

12   A.  I don't recall ever meeting him in person.

13   Q.  Have you spoken with him?

14   A.  Yes.

15   Q.  Corresponded with him?

16   A.  Yes.

17   Q.  How?

18   A.  Telephone and email.

19            MR. SCOTTEN:  Can we turn to the second page of this

20   agreement, Ms. Grant.  And could you zoom in on paragraph C,

21   with the initials.

22   Q.  Mr. Fontano, do you have an understanding of whose initials

23   those are?

24   A.  Yes.  Scott Tucker.

25   Q.  And can you describe what's going on in this paragraph, why

1    it's initialed and what that paragraph means?

2    A.  I had partners who provided people that were offshore who

3    would stand in as a nominee shareholder, and the service was

4    provided through PTG.

5    Q.  All right.  So you said before you provided officers and

6    directors?

7    A.  Yes.

8    Q.  What's the difference between nominee officers and

9    directors and nominee shareholders?

10   A.  The shareholders would actually appear as the stockholders

11   of the corporate structure as opposed to the nominee officers

12   and directors, who would be on public record; the shareholders

13   were not, generally speaking, part of the public record.

14   Q.  And do these nominee shareholders actually own the

15   corporation in a meaningful sense?

16   A.  No.  They were nominees.

17   Q.  So what is their purpose, then?  What do they do?

18   A.  For all intents and purposes, it would be to provide

19   anonymity or privacy.

20   Q.  How does that work if they're not on the public record

21   either?

22   A.  Well, if, if somebody was to look or somehow demand

23   knowledge of who the shareholders were, say through a court

24   proceeding, they would then be listed as the shareholders.  The

25   nominee shareholders would be listed.

1   Q.  So if these nominee shareholders are listed, who are the

2   real owners?

3   A.  The real owner is, again, the beneficial owner, who would

4   be Scott Tucker in this example.

5   Q.  You said these nominee shareholders were provided by a

6   partner business of yours?

7   A.  Well, a business that my partners in Privatech Group owned.

8   Q.  And what was the name of this business?

9   A.  I honestly don't remember.  I remember that it was in

10  Nevis.

11  Q.  What's Nevis?

12  A.  Nevis is an island in the Caribbean.

13  Q.  Is there a reason it's located in Nevis?

14  A.  I'm sorry?

15  Q.  Is there a reason it was located in Nevis as opposed to,

16  say, Nevada, where you were?

17  A.  Well, being offshore was more difficult to get to.  If

18  somebody wanted to get in touch with these nominee

19  shareholders, they would have to travel to Nevis to get there,

20  and that was the headquarters of my partners' business.

21  Q.  So with you acting as nominee officers and the folks in

22  Nevis acting as nominee shareholders, how could somebody

23  outside the corporation know who was actually in charge or

24  owned it, or anything like that?

25  A.  It would be very difficult.

1    MR. SCOTTEN:  Can we turn to the last page of this

2    agreement.  And if we could blow up that last paragraph.

3    Q.  If you could read that quickly to yourself, I'm going to

4    ask just one or two questions about it.

5    A.  OK.

6    Q.  What did you understand -- as a party to this agreement,

7    what did you understand this paragraph to mean?

8    A.  Basically that this agreement was confidential, and the

9    only way that it could be disclosed or any information could be

10   disclosed would be either at the request of the beneficial

11   owner or by an order of the court.

12   MR. SCOTTEN:  And can we take that down -- actually,

13   sorry.  I just meant the blowup.  My mistake.  And could you

14   then please highlight the signature matter.

15   Q.  Sir, do you have an understanding of who signed this

16   agreement, in agreement with you?

17   A.  My understanding was that it was Scott Tucker.

18   Q.  And could I just ask you what date Scott Tucker entered

19   this agreement with your company?

20   A.  What state?

21   Q.  Sorry.  The date.  Date.

22   A.  Oh, the date?  6/10 of '02.

23   MR. SCOTTEN:  All right.  We can take that down.

24   Q.  Sir, I'm going to hand you what has been marked as

25   Government Exhibit 2108.  Please take a look at it and tell me

1    if you recognize it.

2    A.  Yes, I do.

3    Q.  And what is this exhibit?

4    A.  This is a newer version of the nominee agreement.

5    Q.  And is it with a particular company?

6    A.  The company is Silver State Business Administrators.

7            MR. SCOTTEN:  Your Honor, the government offers 2108.

8            MR. ROTH:  No objection.

9            THE COURT:  Received.

10           (Government Exhibit 2108 received in evidence)

11   BY MR. SCOTTEN:

12   Q.  All right.  Mr. Fontano, this agreement looks different

13   than the last one we saw.  Is it different?

14   A.  The biggest difference is that this updated version does

15   not list the beneficial owner.

16   Q.  And is that a change you made to your form?

17   A.  Well, it was a change that was recommended by one of the

18   attorneys that worked for my partners.

19   Q.  And what was the purpose of this change?

20   A.  Just to keep the beneficial owner's name off of this

21   document.

22   Q.  To what end?  Why?  Why?

23   A.  Again, for privacy reasons.

24           MR. SCOTTEN:  Can we just highlight the top matter,

25   above services.

1   Q.  Who is this agreement between?

2   A.  It's between Privatech Group and Silver State Business

3   Administrators Inc.

4           MR. SCOTTEN:  And could we please, very briefly, get

5   ready to show 1736, and could you just highlight the company

6   legal name and d/b/a name.

7   Q.  Mr. Fontano, do you see a doing-business-as name --

8   A.  Yes.

9   Q.  -- for Silver State Business?

10          And if I could ask you to read it?

11  A.  United Cash Loans.

12          MR. SCOTTEN:  OK.  We can take that down and go back

13  to 2108.  Can you please highlight the paragraph beginning

14  third-party shareholders.

15  Q.  And what are we looking at here, Mr. Fontano?

16  A.  Well, again, this is the third-party shareholders portion

17  of the agreement where the third-party shareholders, or nominee

18  shareholders, are provided.

19  Q.  And sir, have you reviewed this document before testifying

20  today?

21  A.  I've seen it before, yeah.

22  Q.  Is it in any other significant ways, other than dropping

23  the beneficial owner's name, different than the previous

24  document we looked at?

25  A.  Not really.

1     MR. SCOTTEN:  And could we just go to the last page.

2     And if we can just blow up sort of the whole signature matter.

3     Q.  Sir, do you have an understanding of who the beneficial

4     owner was for Silver State Business Administrators?

5     A.  Yes.

6     Q.  Who is that?

7     A.  It was Scott Tucker.

8     Q.  And do you see anything here that confirms that for you?

9     A.  Well, the same mailing address, the same email address and

10    phone numbers as the other agreement.

11         MR. SCOTTEN:  All right.  We can take that down.

12    Q.  And now I'm going to hand you what is marked as 2107, and

13    if you could please again just take a look at it and tell me if

14    you recognize it.

15    A.  Yes, I do.

16    Q.  And what is it?

17    A.  It is a specific power of attorney.

18    Q.  And is it between -- well, who are the parties to this

19    specific power of attorney?

20    A.  There's actually three parties, Silver State Business

21    Administrators Inc. and CB Service Corp. and Scott Tucker.

22         MR. SCOTTEN:  The government offers 2107.

23         MR. ROTH:  No objection.

24         THE COURT:  Received.

25         (Government Exhibit 2107 received in evidence)

1          MR. SCOTTEN:  If we could actually start with the

2     second paragraph.

3     Q.  All right.  Can you summarize what this specific power of

4     attorney does?

5     A.  Basically, it gives the agent or attorney in fact full

6     power and authority to act "on my behalf" as the president or

7     other officers of both of those corporations.

8     Q.  Do you see those corporation names here?

9     A.  Yes.  Silver State Business Administrators and CB Service

10    Corp.

11         MR. SCOTTEN:  Can we now go up to the first, very

12    short paragraph.

13    Q.  So who here is appointed the attorney or agent of these

14    corporations?

15    A.  Scott Tucker.

16    Q.  If Scott Tucker is both a beneficial owner of these

17    corporations and their agent, did you have any control or

18    authority over these corporations at all?

19    A.  No.

20    Q.  What purpose did your involvement serve?

21    A.  Basically, my -- my only purpose here would be to provide

22    my name on the public record.

23    Q.  So all these documents, other than getting your name on the

24    public record, did they serve any purpose?

25    A.  With, with the power of attorney, not that I can think of.

1   Q.  All right.  I'm going to show you what's marked as

2   Government Exhibit 2105, and please just again take a look and

3   tell me if you recognize it.

4   A.  Yes, I do.

5   Q.  What is it?

6   A.  It is, again, it's a nominee agreement between Privatech

7   Group and Executive Global Management Inc.

8            MR. SCOTTEN:  Your Honor, the government offers 2105.

9            MR. ROTH:  No objection.

10           THE COURT:  Received.

11           (Government Exhibit 2105 received in evidence)

12   Q.  Mr. Fontano, you said this was with Executive Global

13   Management Inc.?

14   A.  Yes.

15           MR. SCOTTEN:  Can we very briefly show 1735.  And you

16   can either highlight a little bit more -- see where the line

17   goes up to the company legal name?  Perfect.

18   Q.  And Mr. Fontano, do you see a doing-business-as name here

19   for Executive Global Management?

20   A.  Yes.

21   Q.  And what is it?

22   A.  Preferred Cash.

23           MR. SCOTTEN:  Let's go back to 2105.

24   Q.  Sir, is there any significant difference between this

25   document and the previous document we looked at for Silver

1    State Business Administrators?

2    A.  Only the name of the client.

3              MR. SCOTTEN:  And can we just go ahead to the last

4    page.  If you could highlight that and blow it up, that would

5    be great.

6    Q.  Mr. Fontano, looking at this, do you have an understanding

7    of who the beneficial owner of Executive Global Management was?

8    A.  Yes.

9    Q.  Who was that?

10   A.  Scott Tucker.

11   Q.  And how do you know that?

12   A.  Again, the postal address, the phone numbers and the email

13   address.

14             MR. SCOTTEN:  All right, if we could take that down,

15   and could we show 2112.

16   Q.  We're just going to show you 2112 on your monitor.  Sir, do

17   you recognize Government Exhibit 2112?

18   A.  Yes.

19   Q.  What is it?

20   A.  It is a, it's an appointment of an agent plenipotentiary

21   for Executive Global Management Inc.

22             THE COURT:  Plenipotentiary, is that what you said?

23             THE WITNESS:  Yes.

24             THE COURT:  Thank you.

25             MR. SCOTTEN:  Your Honor, the government offers 2112.

1    MR. ROTH:  No objection.

2    THE COURT:  Received.

3    (Government Exhibit 2112 received in evidence)

4    MR. SCOTTEN:  Ms. Grant, I think we want the whole

5    thing on here, but if you could, blow up just the portion with

6    text on it so it will be easier to read.

7    Q.  Mr. Fontano, what does the appointment of an agent

8    plenipotentiary do?

9    A.  From a technical standpoint, it's very much like giving a

10   power of attorney, but here it's just creating the position of

11   an agent and allowing them certain things that they can do in

12   the name of the corporation.

13   Q.  And who is being appointed an agent plenipotentiary of

14   Executive Global Management here?

15   A.  Scott Tucker.

16   Q.  Is this substantively different from the specific power of

17   attorney we saw before for Silver State Business Administrators

18   and CB Services?

19   A.  Technically it's the same thing.

20   Q.  So again, sir, if Scott Tucker is both the beneficial owner

21   and agent plenipotentiary of Executive Global Management, what

22   purpose are you serving?

23   A.  I'm only on the public record for privacy purposes.

24   Q.  And other than these three companies we've gone through

25   today, did you serve as a nominee officer for any other

1    corporations in which Scott Tucker was the beneficial owner?

2    A.  I believe that there were several companies.

3    Q.  Do you remember all of their names?

4    A.  I don't.

5    Q.  I'm going to show you Exhibit 3521-04.  Sir, can you just

6    read this document to yourself and look up when you're done

7    reading it.

8        Does that refresh your recollection as to the name of any

9    other corporations that you acted as nominee for and were owned

10   by Scott Tucker?

11   A.  Yes.

12   Q.  And what's the name of that company?

13   A.  That one is Pinion Management.

14   Q.  Do you remember about how long you acted as a nominee for

15   Scott Tucker's corporations?

16   A.  If my recollection is correct, probably about three years,

17   maybe four years.

18   Q.  So around when do you remember stopping doing so?

19   A.  Around 2005.

20   Q.  And after you stopped acting in that capacity, did you have

21   any further dealings concerning Mr. Tucker's businesses?

22   A.  Not that I recall.

23   Q.  Were you ever contacted by someone based on having been

24   involved with those businesses?

25   A.  Yes.

1    Q.  What happened?

2    A.  I was contacted by the state of Colorado with regards to a

3    legal proceeding that I was supposed to appear at, that I had

4    failed to appear because I wasn't aware of it.

5    Q.  Sir, do you remember the name of the person from the state

6    of Colorado who contacted you, asked you to come appear?

7    A.  I believe his name was Paul Chessin.

8    Q.  And did you, in fact, meet with Mr. Chessin?

9    A.  Yes, I did.

10   Q.  I'm going to show you what has been marked as Government

11   Exhibit 2113.  We'll put it up on the screen, but I'll also

12   hand you copies so you can see all the pages.

13        Sir, do you recognize 2113?

14   A.  Yes.

15   Q.  What is it?

16   A.  It is an affidavit of James Fontano in support of a motion

17   to quash subpoena.

18   Q.  When did you first see this affidavit, Mr. Fontano?

19   A.  I first saw it when Mr. Chessin, from the -- I believe he

20   was with the state attorney general's office in Colorado,

21   showed it to me.

22   Q.  And do you purport in this affidavit to be president of a

23   business?

24   A.  Yes.

25   Q.  What's the name of that business?

1    A.  Cash Advance.

2              MR. SCOTTEN:  Your Honor, the government offers 2113.

3              MR. ROTH:  No objection.

4              THE COURT:  Received.

5              (Government Exhibit 2113 received in evidence)

6              MR. SCOTTEN:  And let's actually start at the back

7    page.

8    Q.  Sir, do you see a signature block that says James Fontano?

9    A.  Yes.

10   Q.  And the date next to it -- or right above it, I should say?

11   A.  Yes.

12   Q.  Did you, in fact, sign this affidavit on the 29th of

13   September 2003?

14   A.  No.

15   Q.  Did you, in fact, sign this affidavit at any point in time?

16   A.  No.

17   Q.  Had you ever seen it before Mr. Chessin handed it to you?

18   A.  No.

19             MR. SCOTTEN:  Could we go back to the first page, and

20   if you could just blow up paragraph 1, including the -- great.

21   Q.  Sir, if you can just briefly read that paragraph to

22   yourself and look up when you're done.

23        Did you, in fact, have personal knowledge of Cash Advance's

24   business?

25   A.  No.

1  Q.  Or the truth of the matters in the affidavit?

2  A.  No.

3  Q.  Were you prepared to competently testify about the

4  statements in this affidavit?

5  A.  No.

6          MR. SCOTTEN:  Can we go to the second paragraph.

7  Q.  Sir, do you, in fact, know whether any of the statements in

8  this paragraph are true?

9  A.  Not to my knowledge.

10  Q.  Let me be clear.  You're not saying they're lies?

11  A.  No, I just -- I have no idea.

12          MR. SCOTTEN:  Could we go to the third paragraph,

13  please.

14  Q.  Same question, Mr. Fontano, do you know whether any

15  statements in this paragraph are true?

16  A.  I don't know.

17  Q.  Were you prepared to testify to them?

18  A.  No.

19          MR. SCOTTEN:  And then finally, if we can highlight

20  the last two sentences on the page, beginning paragraph 4.  And

21  on to the final page, and again highlight now the last two

22  sentences in that paragraph.

23  Q.  And again, sir, do you have any idea of whether these

24  statements were true or whether you could testify to them?

25  A.  I -- I don't know.

1    Q.  Sir, do you know who signed this document?

2    A.  I don't.

3              MR. SCOTTEN:  Nothing further, your Honor.

4              THE COURT:  All right.  Cross-examination.

5              MR. ROTH:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. ROTH:

8    Q.  Good morning, Mr. Fontano.

9    A.  Good morning.

10   Q.  How long ago did you retire, sir?

11   A.  Approximately five years ago.

12   Q.  And how long were you operating Privatech, sir?

13   A.  I'm sorry?

14   Q.  How long were you operating Privatech, your company, for?

15   A.  The company was actually owned and operated for about 20

16   years.

17   Q.  And you personally were involved for a period of time?

18   A.  Yes, most of that time.

19   Q.  OK.  And would it be fair to say, sir, that you'd

20   characterize it as a service industry?

21   A.  Yes.

22   Q.  And you were providing a service for corporations and

23   individuals, is that correct?

24   A.  Yes.

25   Q.  Sometimes wealthy individuals?

1    A.  I -- yes.

2    Q.  That wanted to protect their assets or for security

3    reasons, is that fair to say?

4    A.  Yes.

5    Q.  And corporations, to protect their identity, to protect

6    themselves from lawsuits, for instance, is that correct?

7    A.  Yes.

8    Q.  And in some instances, for both corporations and

9    individuals, for tax minimization purposes, is that correct?

10   A.  Yes.

11   Q.  And over the course of time that you were involved with

12   Privatech, sir, how many corporations did you represent, or

13   individuals, if you can estimate?

14   A.  I believe at one time it was in the neighborhood of 750,

15   780.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1    Q.  And is that at any given time over the course of say a year

2    that you had 700, 750 corporations?

3    A.  No, that was probably during the 20 years.

4    Q.  OK.  Sir, it would not be unusual for you to have a

5    relationship, a client that had more than one corporation that

6    you were servicing, is that fair to say?

7    A.  Yes.

8    Q.  And Mr. Tucker, the number of corporations he had, there

9    was nothing unusual about that, is that fair to say?

10   A.  Yes.

11   Q.  Sir, is it fair to say that everything that you did at

12   Privatech you did in accordance with the laws, is that correct?

13   A.  Yes.

14   Q.  In fact, I believe you just testified that you had an

15   attorney who oversaw matters, is that correct?

16   A.  He wasn't my attorney, but he was an attorney of my

17   partner's who looked at a lot of things that we did.

18   Q.  If you had a question about something, whether it was

19   lawful or how best to do it, for instance, the contract would

20   be revised in accordance with what the lawyer said, is that

21   correct?

22   A.  Yes.

23   Q.  How many employees, sir, at the height of your operation

24   did you have, sir?

25   A.  I believe 13.

1    Q.  When you were interfacing or speaking, interacting with the

2    corporations that you represented, were there many times when

3    you spoke with their attorneys as opposed to the individuals

4    themselves?

5    A.  That happened on occasion, yes.

6    Q.  And you were called upon, were you not, on more than one

7    occasion to pass resolutions on behalf of the corporations, is

8    that fair to say?

9    A.  Yes.

10   Q.  And you did that in your capacity as a nominee officer, is

11   that correct?

12   A.  Yes.

13   Q.  You indicated, sir, that in respect to Government Exhibit

14   2113 -- do you have that still in front of you, sir?

15   A.  Yes.

16   Q.  That's a statement that you said you did not make, is that

17   correct?

18   A.  That's correct.

19   Q.  By the way, is that an affidavit, was that sworn before a

20   notary?

21   A.  I don't see one on there.

22   Q.  Is it fair to say, sir, that -- withdrawn.

23        Is it fair to say, sir, that people in your office in

24   Privatech had your signature stamp, a facsimile of your

25   signature?

1   A.   There were times that that was used, yes.

2   Q.   My first question is, did they have your signature, a block

3   of your signature?

4   A.   Yes.

5   Q.   When you say there were times that that was used, was that

6   used for convenience when say you were out of town or on

7   vacation or on a business trip?

8   A.   Yes.

9   Q.   Besides the employees in Privatech, did anyone else have

10  your signature block, for instance, any of the related

11  companies?

12  A.   Not that I'm aware of.

13  Q.   Did somebody at Laughlin, which was a related corporation,

14  have a stamp?

15  A.   I don't believe they did.

16          MR. ROTH:   I would ask that the witness just be shown

17  3521-04, page 112.

18  Q.   I ask you to read that to yourself at the bottom there,

19  sir, and see if that refreshes your recollection.

20      Does that refresh your recollection now, sir, that somebody

21  in the Laughlin group had your signature stamp?

22  A.   Yes, it looks like they did.

23  Q.   Sir, is it also fair to say, sir, that there would be

24  people who had access to your signature stamp that signed

25  documents without consulting you first from time to time, not

1   as a regular matter, but from time to time?

2   A.  Not that I'm aware of.

3          MR. ROTH:  I would ask that the witness be shown in

4   the same 3500 series, page 113 at the top.  The second

5   question -- if you could highlight that Eli -- and the answer

6   that follows that.

7          Blow that up, and as well the next.

8   Q.  Take a moment and read that, sir.

9   A.  OK.

10  Q.  Now, does that refresh your recollection whether on

11  occasion, on occasion, people signed your name without your

12  authority?

13  A.  According to that --

14         THE COURT:  No, no.  Sir, the question is, take a look

15  at it, read it.  Then put it aside and ask yourself the

16  question, having read that, do you now have a new and refreshed

17  recollection on the subject.  That's what you're being asked.

18         So read it, take a look at it, think about it, and do

19  you have a new and refreshed recollection?  The answer is yes,

20  you do; no, you don't.

21  A.  I guess I'd have to say yes.

22  Q.  Thank you, sir.

23         MR. ROTH:  No further questions.

24         THE COURT:  Any further cross?

25         MR. BATH:  No, sir.  Thank you.

1          THE COURT:  Go ahead.

2     REDIRECT EXAMINATION

3     BY MR. SCOTTEN:

4     Q.  Mr. Fontano, do you still have that signature page in front

5     of you --

6     A.  Yes.

7     Q.  -- on that affidavit?

8          Is that your signature?

9     A.  No.

10    Q.  How do you know it's not your signature?

11    A.  Because it doesn't look anything like my signature.

12    Q.  Did you have any signature stamps that had signatures that

13    didn't look anything like your signature?

14    A.  No.

15    Q.  So is there any chance that's a signature stamp you had or

16    authorized somebody to use?

17    A.  No.

18    Q.  To be clear, how common was it in your business to find out

19    that someone signed a false court affidavit in your name?

20    A.  It was not common at all.

21          MR. SCOTTEN:  No further questions.

22          THE COURT:  Sir, you may step down.  Thank you.

23          (Witness excused)

24          THE COURT:  Government may call its next witness.

25          MR. SCOTTEN:  The government offers Exhibit 2109.

1          THE COURT:  Any objection?

2          MR. ROTH:  No objection, Judge.

3          THE COURT:  Received.

4          (Government's Exhibit 2109 received in evidence)

5          MR. SCOTTEN:  Would you publish it to the jury.

6          Blow up everything above the signature block to make

7     it easier to read.

8          Ms. Grant, I would ask you to highlight who this

9     message is from and who it is to.

10          Ms. Grant, if you see the name Chessin anywhere in

11     there, you can highlight it.

12          If we can remove those highlights, just highlight the

13     last sentence in the main paragraph beginning "bad news."

14          All right.  We can take that down.

15          Your Honor, the government also offers 2111.

16          MR. ROTH:  No objection, Judge.

17          THE COURT:  Received.

18          (Government's Exhibit 2111 received in evidence)

19          MR. SCOTTEN:  And if we can start by blowing up the

20     top half.

21          Ms. Grant, can I ask you to highlight both the cc and

22     the subject.

23          We can zoom back out and I am just going to ask you to

24     zoom in on a couple of names so the jury can see them.

25          Can you start with CB Services Corporation.

1              Can we also do NM Service Corp.

2              Above that, zoom in on Executive Global Management.

3              Then at the bottom of the page, Pinion Management.

4              We can go to the second page.

5              There, Silver State Administrators.

6              And Universal Management Services.

7              Then finally, can you just highlight the address and

8     the words "overnight to."

9              MR. VELAMOOR:  The government calls Alton Irby.

10     ALTON IRBY,

11          called as a witness by the government,

12          having been duly sworn, testified as follows:

13              THE DEPUTY CLERK:  State your name and spell it for

14     the record, please.

15              THE WITNESS:  Alton Irby.  A-L-T-O-N, I-R-B-Y.

16              THE COURT:  You may inquire.

17     DIRECT EXAMINATION

18     BY MR. VELAMOOR:

19     Q.  Good morning, Mr. Irby.

20     A.  Good morning.

21     Q.  How old are you, sir?

22     A.  I'm 77.

23     Q.  How far did you go in school?

24     A.  How far did I?

25     Q.  Go in school.

1    A.  I have got a bachelor's degree from Georgia Institute of

2    Technology.

3    Q.  When did you get that degree?

4    A.  I graduated in 1962.

5    Q.  What did you do after you graduated?

6    A.  I joined the U.S. Marine Corp.

7    Q.  After you finished your service, what kind of work did you

8    do next?

9    A.  I was an insurance broker in Atlanta, Georgia.

10   Q.  Are you familiar with a company called London Bay Capital?

11   A.  I am.

12   Q.  How are you familiar with it?

13   A.  I formed London Bay Capital in early 2007 with two

14   partners.

15   Q.  Who were the two partners you formed it with?

16   A.  Sam Humphreys and Douglas Tulley.

17   Q.  What kind of business is London Bay Capital?

18   A.  It's a private equity investing firm.

19   Q.  When you say private equity, what do you mean?

20   A.  On behalf of ourselves and other investors we invest money

21   in companies.  We buy companies and operate them and eventually

22   sell them.

23   Q.  As part of your work at London Bay Capital, are you

24   familiar with a company called Selling Source?

25   A.  I am.

1    Q.  How did you first hear about this company?

2    A.  I heard about Selling Source in 2006 from my partner Sam

3    Humphreys.

4    Q.  At that time what did you know about Selling Source?

5    A.  That it was in the business of producing leads for subprime

6    lenders, payday lenders.

7    Q.  Do you know whose company it was at the time?

8    A.  I learned at the time that it was owned principally by two

9    people, Scott Tucker and Derek LaFavor.

10   Q.  When you heard about it from Sam Humphreys, your partner,

11   were you and he at London Bay interested in acquiring Selling

12   Source?

13   A.  He mentioned to me as a potential acquisition, yes.

14   Q.  Did you have further discussions about a possible

15   acquisition of Selling Source?

16   A.  We did.

17   Q.  Did you ultimately in fact buy it?

18   A.  We in fact did buy it.

19   Q.  Before we talk about that purchase, tell me a little bit

20   more about Selling Source.  Were there different components to

21   that business?

22   A.  The principal components of the business was what we call

23   lead generation, and that was done by the principal's

24   subsidiary called PartnerWeekly.  It was in the business of

25   procuring customers for subprime lenders, mainly online, on the

1  Internet.  It had a second business that was called DataX.

2  Q.  Before you talk about DataX, when you say procure lenders,

3  in essence, did PartnerWeekly find possible or potential payday

4  borrowers and find them on behalf of the payday lenders?

5  A.  Yes.  We found potential borrowers and we then sold those

6  leads or those applications for loans to a number of payday

7  lenders.

8  Q.  Now, you mentioned PartnerWeekly.  You were about to talk

9  about DataX.

10  A.  Yes.

11  Q.  What was DataX?

12  A.  DataX was a newly-formed subsidiary that was a credit

13  reporting agency.

14  Q.  When you said "credit reporting," what do you mean?

15  A.  It validated the credit of potential borrowers.

16  Q.  Is it sort of like an Equifax or --

17  A.  Much smaller, but yes.

18  Q.  Are you familiar with something called eCash?

19  A.  Yes, I am.

20  Q.  Was that also part of Selling Source?

21  A.  It was.  It was a software program that was used to process

22  the leads that we sold to lenders.

23  Q.  So now you testified before that London Bay Capital

24  ultimately purchased Selling Source, right?

25  A.  That's correct.

1    Q.  And again, who did London Bay Capital purchase Selling

2    Source from?

3    A.  The principal owners of Selling Source was Scott Tucker and

4    Derek LaFavor.

5    Q.  How much, approximately, did London Bay Capital pay Tucker

6    and LaFavor for Selling Source?

7    A.  It was approximately $90 million.

8    Q.  Was all of that cash or were there other components?

9    A.  Roughly 60 million in cash and 30 million in notes.

10   Q.  When you say "notes," what do you mean?

11   A.  That was debt that was owed to Tucker and LaFavor over a

12   period of years.

13   Q.  As far as you recall, was the 90 million split roughly

14   equally between Mr. Tucker and Mr. LaFavor?

15   A.  As far as I know, yes.

16   Q.  Let me show you what has been marked as Government Exhibit

17   2801.  The pages will also come up on your screen.

18       Do you recognize 2801?

19   A.  I do.

20   Q.  What is it?

21   A.  It is the sale and purchase agreement for the acquisition

22   of Selling Source by London Bay Capital.

23            MR. VELAMOOR:  The government offers 2801.

24            MR. BATH:  No objection.

25            THE COURT:  Received.

1            (Government's Exhibit 2801 received in evidence)

2    BY MR. VELAMOOR:

3    Q.  Mr. Irby, this is a very long agreement and we are

4    certainly not going to go read all of it or go over it.

5            Specific pages will come up on the screen next to you.  So

6    it may be easier for you to just focus on the screen.

7            Why don't we go first to publish the cover page.

8            There are various entities mentioned there.  Do you see

9    that?

10   A.  Yes.

11   Q.  Again, there are many individuals as well as entities.  But

12   in general terms, is this, generally speaking, your purchase by

13   London Bay from Tucker and LaFavor and various entities

14   associated with those two individuals?

15   A.  And some other individuals, yes.

16   Q.  Why don't we turn to the sixth page, LB6 on the bottom.

17           Again, is this essentially, after the table of contents,

18   the first page of the agreement?

19   A.  Yes.

20   Q.  Do you see Scott Tucker mentioned there in the first

21   paragraph, around the fifth or sixth line from the bottom?

22   A.  Yes.

23           MR. VELAMOOR:  Just highlight that as well.

24   Q.  Do you also see a company called Black Creek Capital?

25   A.  I do.

1    Q.  Why don't we turn to the ninth page of the PDF.

2        The second line from the bottom, it says, "CLK."

3        Do you see that?

4    A.  I do.

5    Q.  Were you familiar with a company named CLK?

6    A.  I am.

7    Q.  What was CLK?

8    A.  CLK was the principal lender that we sold leads to.

9    Q.  Was that the principal lender at the time London Bay

10   acquired Selling Source?

11   A.  That's correct.

12   Q.  Whose company was CLK?

13   A.  I believe it was Scott Tucker's company.

14            MR. VELAMOOR:  I think we are highlighting the wrong

15   line.

16   Q.  At the time that London Bay acquired Selling Source, you

17   said that CLK was the principal lender.

18       When you say principal, approximately how much of Selling

19   Source's leads were being sold to CLK?

20   A.  I suspect, I believe, about 50 percent of the revenue was

21   derived from CLK.

22   Q.  Was there a provision that was part of this overall

23   acquisition agreement to ensure that CLK continued to be a

24   customer of Selling Source even after London Bay bought it?

25   A.  Yes.  As part of the purchase agreement, we ensured that we

1    had a ten-year exclusive contract with CLK to sell leads to

2    them, for them to buy leads from us.

3    Q.   When you say "exclusive contract"?

4    A.   Selling Source.

5    Q.   Who is obligated to do what under this agreement?

6    A.   CLK was obligated to buy leads from Selling Source for ten

7    years.

8    Q.   Why was that important to London Bay to include as part of

9    this agreement?

10   A.   Because it was 50 percent of the revenue of the business we

11   were buying, and the owner of the business that we were buying

12   also owned CLK.

13   Q.   So this paragraph we are highlighting mentions that CLK at

14   the meeting defined in a different section of the agreement,

15   4.12(e).

16        Do you see that?

17   A.   I do.

18        MR. VELAMOOR:  Let's turn to the 36th page of the PDF.

19   Can we highlight the paragraph (e) and also just the heading of

20   the next one.

21   Q.   Do you see that paragraph there?

22   A.   I do.

23   Q.   Can you read that paragraph.

24   A.   "The Master Services Agreement among Red Rock Colocation

25   Solutions, LLC and CB Services Corporation, Global Management,

1    Inc., National Money Services, Silver State Business

2    Administrators, Inc., and Universal Management Services, Inc.

3    (collectively, such entities are referred to as "CLK") requires

4    and will require for the ten-year period following the date of

5    this agreement CLK to purchase all of its online leads from

6    buyer sub and its affiliates, consistent with past practice

7    among CLK, sellers and the predecessors."

8    Q.  Now, in simple terms, is this part of the agreement that

9    essentially reflects the exclusive agreement you just

10   discussed?

11   A.  It is.

12   Q.  This paragraph I believe defines the term CLK to include

13   several entities.

14   A.  That's correct.

15   Q.  Are those entities CB Services Corp., Global Management,

16   National Money Service, Silver State Business Administrators,

17   and Universal Management Services?

18   A.  That's correct.

19          MR. VELAMOOR:  Why don't we turn to the 107th page of

20   the PDF.  Let's start by highlighting the (a) section at the

21   top.

22   Q.  What does this section indicate?

23   A.  This is a description of the percentage of total revenues

24   that were reflected for these customers.

25   Q.  The customers are CB Services, d/b/a Ameriloan.

1          Do you see that?

2    A.   That's right.

3    Q.   Silver State Business Administrators is d/b/a United Cash

4    Loans?

5    A.   That's correct.

6    Q.   Executive Global Management, d/b/a says One Click Cash.

7          Do you see that?

8    A.   Yes.

9    Q.   Also Universal Management Services?

10   A.   Yes.

11   Q.   NM Services, Inc., d/b/a 500 FastCash?

12   A.   Yes.

13   Q.   It also mentions Check Giant, TC Financial, and MTE

14   Financial Services.

15         Do you see that?

16   A.   That's correct.

17   Q.   The biggest buy, I guess in terms of potential revenue, are

18   CB Services, Silver State, Executive, Universal and NM,

19   correct?

20   A.   That's correct.

21             MR. VELAMOOR:  Can we turn to the 115th page of the

22   exhibit.

23   Q.   Can you read the title and the top paragraph, please.

24   A.   "Schedule 4.28, Affiliate and Related Party Transactions.

25         "Scott Tucker owns and/or controls Executive Global

1    Management, Inc., NM Service Corp., CB Services Corporation,

2    Silver State Business Administrators, Inc., and Universal

3    Management Services, Inc.  These companies represent sellers,

4    the largest customers.

5              "WebYes, LLC" --

6    Q.  Just the top paragraph is fine.

7         Are those entities you mentioned the entities that are

8    subject to the ten-year exclusive agreement?

9    A.  That's correct.

10             MR. VELAMOOR:  Let's turn to the 71st page of this

11   PDF.

12   Q.  Can you make out who signed at the bottom?

13   A.  It says Scott Tucker.

14             MR. VELAMOOR:  We can take that down.

15   Q.  Mr. Irby, around the time of this acquisition agreement we

16   just discussed, were you aware of any other agreement that also

17   memorializes this ten-year exclusive agreement?

18   A.  There would have been a master services agreement.

19   Q.  I am going to show you what has been marked as 2802,

20   Government Exhibit 2802.

21        Have you had a chance to look at 2802?

22   A.  I have.

23   Q.  What is it?

24   A.  It's a master services agreement.

25             MR. VELAMOOR:  Your Honor, the government offers 2802.

1          MR. BATH:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 2802 received in evidence)

4          MR. VELAMOOR:  Can we just highlight the top

5    paragraph, please.

6    A.  "The Master Services Agreement ('Agreement') is made as of

7    the effective date specified at the end of this agreement by

8    and between the Selling Source, Inc., a Nevada corporation

9    having a principal place of business at 325 East Warm Springs,

10   Suite 200, Las Vegas, Nevada 89119 (together" --

11   Q.  You can skip the paren.

12   A.  OK.

13        "(Together with its subsidiaries and affiliates,

14   hereinafter referred to as 'the Company') and CB Services

15   Corporation, Executive Global Management, Inc., NM Services

16   Corporation, Silver State Business Administrators, Inc.,

17   Universal Management Services, Inc., CLK Management and other

18   entities which are or may become affiliated with CLK Management

19   or Mr. Scott Tucker (collectively 'Customer')."

20   Q.  Do you understand this to be essentially the agreement

21   provided for the ten-year exclusive customer relationship for

22   the CLK-related entities?

23   A.  That's correct.

24   Q.  To your knowledge, when was this agreement effective?

25   A.  It would have been effective at the time of the sale and

1    purchase agreement.

2    Q.  Which is the agreement we just looked at before?

3    A.  Sorry?

4    Q.  That's the agreement we just went through?

5    A.  Exactly.

6            MR. SCOTTEN:  Can we put back up 2801.  Just highlight

7    the date on the bottom of the first page.

8    A.  December 21, 2007.

9    Q.  So both of these agreements would have been effective

10   December 21, 2007?

11   A.  That's correct.

12   Q.  Let's go back to 2802, to the eighth page.

13       Who signed this agreement?

14   A.  Derek LaFavor and Scott Tucker.

15           MR. VELAMOOR:  We can take that down.

16   Q.  Are you familiar with a company called Red River Ventures?

17   A.  I am.

18   Q.  Briefly, what was that company?

19   A.  Red River Ventures was a newly formed company that became a

20   customer of Selling Source.  It was a lender, a payday lender.

21   Q.  Did you at a certain point hear a problem or an issue

22   relating to that company?

23   A.  I did.

24   Q.  Who did you hear that from?

25   A.  I believe Tim Muir called my partner Sam Humphreys.

1    Q.  To say what?

2    A.  To say that his client had discovered, AMG had discovered

3    that Red River Ventures was stealing customer information from

4    Selling Source's computer systems and that those customers were

5    customers of AMG but that Red River were reselling those

6    customers to other lenders.

7    Q.  You said Tim Muir --

8    A.  I beg your pardon.  Not reselling.  Red River was lending

9    money to those customers.

10   Q.  Red River, at least the claim, was lending money to people

11   who came from leads that Mr. Muir believed belonged to AMG?

12   A.  We, Selling Source, had sold leads to AMG, but these leads

13   were being siphoned out of our IT system and loans were being

14   made to those leads by Red River.

15   Q.  You said Mr. Muir.  Who is Mr. Muir as far as you knew at

16   that point?

17   A.  I believe he was the lawyer to AMG Services and Mr. Tucker.

18   Q.  OK.  After you heard this information, what did you do

19   next?

20   A.  They asked us to investigate to see if that was correct.

21   Q.  Who is "they"?

22   A.  Mr. Muir acting on behalf of AMG.

23   Q.  Did you take any steps?

24   A.  Yes.  We had a private investigator and we had a lawyer in

25   San Francisco.

1    Q.  Did you, after consulting with the lawyer, participate in

2    any kind of legal steps?

3    A.  Yes.  The lawyer advised, because this information was

4    being held on servers owned by Red River, the lawyer and

5    private investigator recommended that we execute a civil search

6    warrant to effectively capture those servers and determine what

7    information was resident there.

8    Q.  In order to get that civil search warrant, did you have to

9    sign any kind of legal document?

10   A.  Our lawyer prepared a declaration for me to sign which was

11   used to present to the court in Las Vegas to obtain a federal

12   search warrant.

13   Q.  Did you take a look at and then sign that affidavit?

14   A.  Yes.  It was done on a Friday so that it could be served

15   over the weekend.

16   Q.  Let me show you what has been marked as 2803.

17        Have you had a chance to look at 2803?

18   A.  I have.

19   Q.  What is it?

20   A.  It is a declaration.

21   Q.  Is it yours?

22   A.  It's my declaration that I made, yes.

23   Q.  Did you sign it?

24   A.  I did.

25             MR. VELAMOOR:  The government offers 2803.

1          MR. BATH:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 2803 received in evidence)

4          MR. VELAMOOR:  Can we turn to the second page, please,

5    and the fourth paragraph.

6    BY MR. VELAMOOR:

7    Q.  Can you read what you said in that paragraph?

8    A.  "Selling Source largest customer is AMG, to whom it

9    provides many services, principally the sale of consumer leads.

10   The leads sold to AMG are exclusive and proprietary to AMG as

11   well as to Selling Source.  London Bay works consistently with

12   the owner of AMG to help manage its relationship with Selling

13   Source.  In 2008, AMG paid over $80 million to Selling Source."

14   Q.  When you said there the owner of AMG, who were you

15   referring to?

16   A.  In this declaration, I was referring to Scott Tucker.

17   Q.  It says there that in 2008 AMG paid over 80 million to

18   Selling Source.  Is that about how much Selling Source got from

19   AMG in 2008?

20   A.  That was what we received from AMG, yes.

21   Q.  Let's turn to the next page, paragraph 8.

22          Can you read what you wrote there?

23   A.  "On Sunday, July 12, I met with Scott Tucker, the owner and

24   principal manager of AMG, Selling Source's largest customer.

25   There were others at our meeting from Selling Source, London

1    Bay and AMG, including Selling Source's security adviser, Steve

2    Gudelj.  Selling Source is in contact with AMG to provide leads

3    under a master services agreement, which was entered into

4    initially with other entities controlled by Scott Tucker and

5    which has been expanded to include AMG as a party to the master

6    services agreement."

7    Q.  When you signed this, did you believe Mr. Tucker was owner

8    and principal manager of AMG?

9    A.  Actually he was, yes.

10   Q.  Why did you assume he was?

11   A.  Well, the original customer of ours was CLK.  At some

12   point, after 2007, CLK changed its name to AMG, and so I

13   assumed the ownership remained the same.

14   Q.  Did anything about Selling Source's or your interactions

15   with AMG change after that name change?

16   A.  Not that I was aware of.

17   Q.  Anything about your dealings with Mr. Tucker change after

18   that name change?

19   A.  Not that I was aware of.

20   Q.  Now after you filed this declaration, what happened next?

21   A.  We filed the declaration with the court in Nevada and the

22   next day after filing the declaration, my partner Sam Humphreys

23   received a call from Tim Muir, counsel to Mr. Tucker, who said

24   that the declaration was not accurate and that they wished me

25   to amend the declaration.

H9K8TUC2                        Irby - direct

1   Q.  Did Mr. Muir say which parts he thought were inaccurate?

2   A.  He said AMG was not owned --

3          MR. BATH:  Objection.  I think the witness is talking

4   about what Humphreys told him.  As long as we make that

5   clarification.  I don't think he talked to Mr. Muir directly.

6          THE COURT:  Did you talk to Mr. Muir directly?

7          THE WITNESS:  I did not.

8          THE COURT:  Go ahead.

9          You want to finish your answer?

10  A.  Repeat the question, please.

11  Q.  According to Mr. Humphreys, what did Mr. Muir believe was

12  inaccurate in your declaration?

13  A.  According to Mr. Humphreys, Mr. Muir said AMG was not owned

14  by Mr. Tucker.

15  Q.  Were you asked to take any steps?

16  A.  I was asked to change the declaration, to amend the

17  declaration to reflect that fact.

18  Q.  Did you in fact agree to do that?

19  A.  I did.

20  Q.  Did that ultimately happen?

21  A.  It did happen.

22  Q.  Was it changed or was some other step taken?

23  A.  The paragraphs that referred to Mr. Tucker as owner of AMG

24  were redacted from the declaration and it was refiled.

25  Q.  I will show you what has been marked as 2804.

1          Have you had a chance to look at 2804?

2     A.   I have.

3     Q.   What is 2804?

4     A.   It is the amended declaration.

5          MR. VELAMOOR:  Your Honor, the government offers 2804.

6          MR. BATH:  No objection.

7          THE COURT:  Received.

8          (Government's Exhibit 2804 received in evidence)

9          MR. VELAMOOR:  Can we just turn to the second page,

10    please.

11    BY MR. VELAMOOR:

12    Q.   Does paragraph 4 appear anymore in this version of the

13    affidavit?

14    A.   No, it's been redacted.

15    Q.   Is that one of the paragraphs we just read from the

16    previous version?

17    A.   It is.

18    Q.   Let's turn to the next page.

19         Paragraph 8, does that paragraph appear in this version of

20    the affidavit?

21    A.   It's also been redacted.

22    Q.   Again, is that also one of the paragraphs we just looked

23    at?

24    A.   It is.

25    Q.   I am going to show you what has been marked as 2805.

1          Have you had a chance to look at 2805?

2     A.   I have.

3     Q.   What is it?

4     A.   It is an e-mail from Tim Muir sent to Scott Tucker and

5     Blaine Tucker.

6     Q.   Is that an e-mail forward of an earlier e-mail?

7     A.   It is.

8     Q.   What does the earlier e-mail pertain to?

9     A.   The earlier e-mail is from Andrew Gordon, who is the

10    attorney to Selling Source, sent to Tim Muir, me, Sam Humphreys

11    and Douglas Tulley, a copy to Brian Grubb and Patrick Murch.

12    Q.   Does this e-mail generally pertain to this issue that we

13    have been talking about, these declarations?

14    A.   It refers to the original declaration being sealed.

15              MR. VELAMOOR:   The government offers 2805.

16              MR. BATH:   No objection.

17              THE COURT:   Received.

18              (Government's Exhibit 2805 received in evidence)

19    BY MR. VELAMOOR:

20    Q.   So the earlier e-mail you mentioned, Mr. Gordon's e-mail,

21    he is attaching the judge's order sealing the original

22    documents that had not been redacted?

23    A.   That's correct.

24    Q.   There is a subsequent e-mail from Mr. Muir to Mr. Tucker.

25    Do you see that?

1    A.  Yes.

2    Q.  What is the substance of Mr. Muir's e-mail?  What does he

3    say?

4    A.  Mr. Muir said it was great news.

5    Q.  Mr. Irby, just a couple of more questions.

6        Did there come a time when you were deposed in connection

7    with a California class action case?

8    A.  I was.

9    Q.  What, generally speaking, did that case relate to?

10   A.  It's a case brought, a class action alleging that Selling

11   Source was selling leads in California.

12   Q.  Did it generally relate to payday lending activities?

13   A.  Yes, selling leads to unlicensed payday lenders in

14   California.

15   Q.  To your knowledge, did this issue with these declarations

16   come up during that deposition?

17   A.  It was shown to me as part of it, yes.

18   Q.  From your work in this area, did you become aware of Mr.

19   Tucker's interest in car racing?

20   A.  I knew he was involved in car racing, yes.

21   Q.  Did Selling Source have any kind of relationship or

22   involvement in Mr. Tucker's car racing activities?

23   A.  I think for one year we sponsored the -- we were a sponsor

24   of his racing team, yes.

25   Q.  Do you recall approximately how much that sponsorship was?

1    A.  I don't remember.  It was a couple hundred thousand, I

2    think.

3    Q.  Do you know why Selling Source sponsored Mr. Tucker's

4    racing?

5    A.  He was our largest customer and he asked us to sponsor his

6    racing team.

7    Q.  Was the purpose to maintain a good business relationship?

8    A.  Maintain a business relationship with our largest customer.

9              MR. VELAMOOR:  No further questions.

10             THE COURT:  All right.  Any cross?

11             MR. BATH:  Yes, please.

12             THE COURT:  I will tell you what.  Mr. Bath, why don't

13   we give you a few minutes and we will take a break and we will

14   pick up in ten minutes with the cross-examination.

15             Remember, ladies and gentlemen, do not discuss the

16   case among yourselves or with anyone.

17             See you in ten minutes.  Thank you.

18             (Jury exits courtroom).

19             THE COURT:  See you in ten minutes.  Thank you.

20             (Recess)

21             (Continued on next page)

22

23

24

25

1    THE COURT:  All right.  Mr. Eldridge, if you'll bring

2  the jury in.

3    (Jury present)

4    THE COURT:  All right.  Please be seated.

5    Mr. Bath, whenever you're ready.

6    MR. BATH:  Thank you.

7  CROSS-EXAMINATION

8  BY MR. BATH:

9  Q.  Mr. Irby, as I understand it, you're in the business of

10  buying companies, getting them in better shape and selling

11  them?

12  A.  That's correct.

13  Q.  You've been doing that a long time?

14  A.  I've been doing this the last ten years, yeah.

15  Q.  All right.  And this purchase you talked about initially,

16  London Bay buying Selling Source, was about a $90 million deal?

17  A.  About that size, yes.

18  Q.  Is that the typical kind of deal you might do?

19    THE COURT:  Rephrase that.  Typical size, typical

20  what?

21    MR. BATH:  Thank you, Judge.

22  Q.  Typical in terms of money exchanged.

23  A.  It would be typical, yes.

24  Q.  Before you agreed to purchase Selling Source, I assume

25  there was some due diligence that was done?

1    A.  There was extensive due diligence done, yes.

2    Q.  I assume you probably had banks or other financial people

3    behind your company to loan you some of the money used in the

4    purchase?

5    A.  Are you asking if we had investors behind --

6    Q.  Yes, or banks that were loaning you money for this

7    purchase.

8    A.  Yes, we did.

9    Q.  When you do due diligence on a company, what does that

10   mean?

11   A.  Well, we would --

12           THE COURT:  You're asking when he does due diligence?

13           MR. BATH:  Yes.

14           THE COURT:  OK.

15           When you do due diligence, what does that mean?

16   A.  We typically hire an accounting firm, a legal firm, and we

17   may have other consultants, depending on the nature of the

18   business we're buying.

19   Q.  And you're essentially looking at the health of the

20   company?

21   A.  That's correct.

22   Q.  You did that in this case on Selling Source?

23   A.  We did.

24   Q.  Did that take a while?

25   A.  It did.

1    Q.  How long?

2    A.  My guess, nine months it took.

3    Q.  Attorneys were involved?

4    A.  I'm sorry?

5    Q.  Attorneys were involved?

6    A.  Attorneys were involved, yes.

7    Q.  Do you recall that Mr. Muir was not involved in this

8    transaction, if you know?

9    A.  I didn't -- I wasn't in, I wasn't directly or intimately

10   involved in the due diligence.  I don't know what role Mr. Muir

11   played in the negotiations to buy the company.

12   Q.  Fair enough.  The contract between London Bay and Selling

13   Source was completed about December of 2007, correct?

14   A.  That's correct.

15   Q.  And you also, we talked about and saw, there was a 2007, or

16   so, master service agreement, correct?

17   A.  That is correct.

18   Q.  And that master service agreement was between CLK and

19   Selling Source?

20   A.  That's correct.

21   Q.  The master service agreement was not between London Bay and

22   AMG?

23   A.  That's -- you're correct.  It was not.

24   Q.  The purpose of the master service agreement is you wanted

25   to secure for the ten-year period a steady stream of business?

1    A.  That's correct.

2    Q.  At some point -- you testified to this in direct.  At some

3    point that agreement, or there were other agreements that

4    affected your business and the leads, is that correct?

5    A.  You have to be specific in terms of other agreements.

6    Q.  Fair enough.  Were there other master service agreements

7    entered into between Selling Source and, for instance, the

8    Miami tribe?

9    A.  There could have been.  I don't have any direct knowledge

10   of those.

11   Q.  I have copies to show you, but if you don't think that will

12   refresh your memory, I won't do that.  You never saw those?

13   A.  I didn't see them, no.

14   Q.  OK.  Can you tell me who Glenn McKay is?

15   A.  Glenn McKay is currently the chief executive of Selling

16   Source.

17   Q.  OK.  And when did he start to become the chief executive?

18   A.  He became chief executive when Mr. Derek LaFavor retired

19   from Selling Source.

20   Q.  When did that take place?

21   A.  My guess, it had been 2010, 2011.

22   Q.  Would Glenn McKay have been with the company, though, in

23   2008?

24   A.  He was.  He was chief operating officer at the time we

25   acquired the company.

1    Q.  All right.  And I assume you've got lots of companies you

2    own?

3    A.  We have a few that we own, yes.

4    Q.  Right.  And so sometimes the day-to-day operations are

5    conducted by other people?

6    A.  That's exactly correct, yes.

7    Q.  You're not saying that Selling Source didn't enter into

8    agreements with, for instance, the Miami tribe; you just don't

9    have personal knowledge of those?

10   A.  I wouldn't have had -- I'm chairman of London Bay and the

11   direct operations of Selling Source are dealt with by other

12   people.

13   Q.  All right.  Thank you so much.

14       Now you talked about at some point in time Tim Muir talked

15   to Sam about potential thefts of data from you?

16   A.  Sam Humphreys, yes.

17   Q.  Sam, Sam Humphreys.  I'm sorry.

18   A.  Yes.

19   Q.  And then Sam contacted you?

20   A.  We're in the same office, so he --

21   Q.  OK.  Whether he saw you that day or he telephoned you --

22   A.  Exactly.

23   Q.  -- he relayed the information, is that correct?

24   A.  That's correct.

25   Q.  And there was a concern that essentially Red River, which

1   was a competitor of yours, was stealing data?

2   A.   Red River was a customer of ours.

3   Q.   Sorry.  And they were stealing the leads?

4   A.   They were stealing data.  They had actually penetrated our

5   IT system and were actually stealing the information; that is,

6   information on people who were borrowing money.  We had sold

7   those leads to AMG, and they were recycling, effectively, those

8   leads.

9   Q.   You followed up on the information that Tim provided to

10  Mr. Humphreys and determined it was accurate?

11  A.   That's correct.

12  Q.   You hired some lawyers and a private detective and

13  essentially went after Red River?

14  A.   That's correct.

15  Q.   And in that lawsuit that you filed against Red River, you

16  made the declaration we saw?

17  A.   That's correct.

18  Q.   Where you believed at the time that Mr. Tucker was the

19  owner of AMG?

20  A.   That's what I believed, yes.

21  Q.   Then there was subsequent contact by Mr. Muir to, again,

22  Mr. Humphreys or your lawyer, or somebody?

23  A.   To Mr. Humphreys.

24  Q.   All right.  Indicating that that was not accurate in the

25  declaration?

1   A.  That's correct.

2   Q.  You and your lawyers then, I assume, looked into it, did

3   something about it?

4   A.  That's correct.  We were told he was not the owner and

5   asked us to correct it.  We said we would do so.

6   Q.  And you corrected it?

7   A.  We did.

8   Q.  And that's the other document the government showed us,

9   correct?

10  A.  That's correct.

11  Q.  And in fact, the judge, the federal judge -- it was a

12  federal lawsuit?

13  A.  I believe it was, yes.

14  Q.  The judge granted your request to redact your declaration?

15  A.  That's correct.

16          MR. BATH:  That's all I have.  Thank you so much.

17          THE COURT:  Any other cross?

18          Redirect?

19          MR. VELAMOOR:  Very briefly.

20  REDIRECT EXAMINATION

21  BY MR. VELAMOOR:

22  Q.  Mr. Irby, you mentioned the master service agreement was

23  with Selling Source on one side and CLK, right?

24  A.  That's correct.

25  Q.  And it was also with several other entities as well,

1    correct?

2    A.  That's correct.

3              MR. VELAMOOR:  Could we put up very quickly 2802.

4    Q.  And those entities are listed in the top paragraph,

5    correct?

6    A.  That's correct.

7    Q.  They include CB Services Corp., Executive Global

8    Management, NM Services Corp., Silver State Business

9    Administrators and UMS, correct?

10   A.  That's correct.

11             MR. VELAMOOR:  No further questions, your Honor.

12             THE COURT:  All right.  You may step down, sir.  Thank

13   you.

14             (Witness excused)

15             THE COURT:  The government may call its next witness.

16             MR. VELAMOOR:  Your Honor, we just have two exhibits

17   we intend to offer, 2806 and 2807.

18             THE COURT:  Any objection?

19             Hearing none, they are received -- oh, one second.

20             MR. VELAMOOR:  On 2806 we're only offering the first

21   page and the top email on the second page.

22             MR. BATH:  No objection to 2807.

23             THE COURT:  And 2806?

24             MR. GINSBERG:  No objection.

25             THE COURT:  All right.  They're both received.

1          (Government Exhibits 2806 and 2807 received in

2     evidence)

3          THE COURT:  You may publish.

4          MR. VELAMOOR:  Thank you, your Honor.

5          Could we start with 2806 and go to the second page,

6     the bottom email, highlight who it's from and to.  And then

7     move now just to the first paragraph of the email.

8          Let's turn back to the first page and the "to" and

9     "from" of the middle email.  And now just highlight the first

10    and second paragraphs of that email.  And Ms. Grant, can you

11    highlight the sentence beginning with "I," at the end of the

12    third line, the rest of -- yes.

13         OK.  We can take that down, please, and may we show

14    2807, beginning with the top email on the second page.  OK,

15    back to the first page, starting with the bottom email.

16         OK.  Move to the next email up.  OK.

17         OK.  Next one up.  And could we just highlight the

18    substance of that email.

19         OK.  And then the final email on top.

20         Thank you, your Honor.

21         THE COURT:  All right.  Call your next witness.

22         Mr. Ravi.

23         MR. RAVI:  The government calls Carolyn Williams.

24         THE COURT:  All right.

25         (Continued on next page)

1    CAROLYN WILLIAMS,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Mr. Ravi, you may inquire.

5              MR. RAVI:  Thank you.

6    DIRECT EXAMINATION

7    BY MR. RAVI:

8    Q.  Good morning, Ms. Williams.  How old are you?

9    A.  I'm 62.

10   Q.  Where do you currently live?

11   A.  I live in Monkey Island, Oklahoma.

12   Q.  How long have you lived there?

13   A.  Since 2003 -- well, in that vicinity since 2003.

14             THE COURT:  All right.  I'm going to ask that you just

15   pull that microphone a little bit closer so everyone can hear

16   you.  That's fine, but get comfortable in the chair.  You don't

17   have to lean.  That's fine.

18             THE WITNESS:  Thank you.

19   Q.  How far did you go in school, Ms. Williams?

20   A.  I have about 30 hours of college credit.

21   Q.  Did you graduate from college?

22   A.  I did not.

23   Q.  Do you have any licenses or certifications?

24   A.  I do.  I have an Oklahoma real estate brokers license and I

25   have a paralegal certification.

1    Q.   And how long have you had both of those, the license or the

2    certification?

3    A.   Both since 2012.

4    Q.   Are you currently employed?

5    A.   I am.  I'm self-employed.

6    Q.   What do you do?

7    A.   I'm a real estate broker.

8    Q.   How long have you been a real estate broker?

9    A.   Since 2012.

10   Q.   Can you briefly describe your work history?

11   A.   I've done many different jobs.  The area that my family

12   lives in is, has a seasonal economy, and I have been a -- I've

13   been a real estate agent, real estate broker.  I've been a

14   clerical worker.  I have been a cook, a babysitter, a waitress,

15   a lobbyist.  I've done some public relations work as well.

16   Q.   Have you also done paralegal work?

17   A.   I have.

18   Q.   Ms. Williams, was there a time that you worked, began to

19   work at the Miami tribe?

20   A.   Yes.

21   Q.   And when was that?

22   A.   My first period of employment with the Miami tribe was in

23   2003 to 2005, and my --

24   Q.   Did you later work there at a different time period?

25   A.   I did, from roughly June of 2011 through April of 2013.

1          THE COURT:  And so we're clear about this, when you

2    refer to the Miami tribe, you're referring to the tribe located

3    in Oklahoma, is that correct?

4          THE WITNESS:  Yes, Miami Tribe of Oklahoma.

5          THE COURT:  Thank you very much.

6          MR. RAVI:  Thank you, your Honor.

7    Q.  How did you come to work at the Miami tribe the first

8    period, from 2003 to 2005?

9    A.  Don Brady called and offered me a job.

10   Q.  And how did you know Don Brady at the time?

11   A.  He and his wife were members of our social circle, friends,

12   in -- where we lived.

13   Q.  And what kind of job did he offer you?

14   A.  The first time I went to work there, I was working as

15   principally his office manager, bookkeeper-type position for

16   the -- and Don's personal assistant.

17   Q.  Were you working in relation to a particular entity?

18   A.  Yes.  At that time -- pardon me.  Don was CEO of Miami

19   Tribe Business Enterprises, MTBE.

20   Q.  And what was MTBE?

21   A.  MTBE was a subdivision of the Miami tribe that basically

22   ran or oversaw their small business operations.

23   Q.  And generally, what kinds of small businesses are we

24   talking about?

25   A.  There were several small ones, the Leonard Learning Center,

1  which was a day care center.

2          THE COURT:  The what?

3          THE WITNESS:  Leonard Learning Center.

4          THE COURT:  Thank you.

5  A.  The --

6  Q.  Were there other small businesses?

7  A.  Yes.  I'm sorry.  There was an environmental group.  There

8  was a, a print shop that did T-shirts and caps.  There was a

9  gift shop, a small gift shop on the tribal headquarters, and a

10 pecan farm.

11 Q.  Ms. Williams, can you describe generally what you did as

12 part of your position with MTBE and as Mr. Brady's assistant?

13 A.  I would type things, take some dictation from Don, type

14 things, file.  I entered some of the financial records into a

15 bookkeeping system.  I collected the hot checks from a little

16 casino -- oh, small casino was also one of MTBE's enterprises.

17 Q.  Go ahead.  Are you finished?

18 A.  That's principally what I did.

19 Q.  And where was your office in relation to Mr. Brady's

20 office?

21 A.  My desk was directly outside of his office.

22 Q.  And how often did you see Mr. Brady when you were his

23 personal assistant during this time period?

24 A.  When he was in town, I saw him every day.

25 Q.  How often was he out of town?

1    A.  Not a great deal.

2    Q.  And did you maintain his schedule?

3    A.  I did.

4    Q.  How did Mr. Brady typically spend his days at that time?

5    A.  He was trying to turn around the small businesses, and so

6    he reviewed a lot of the financial statements, met with the

7    people running the different businesses, and he attended

8    meetings with the tribal leadership.  That was the majority of

9    what he did.

10   Q.  Do you recall what businesses he was spending most of his

11   time on at that time?

12   A.  Yes.  The print shop, that had -- that was most likely to

13   be the biggest revenue generator at that time because of the

14   economic environment there.

15   Q.  Did you also overhear Mr. Brady's phone conversations?

16   A.  Some, yes.

17   Q.  Was that because you were sitting right outside of his

18   office?

19   A.  Yes, I could hear if his door was open.

20   Q.  How old was Mr. Brady at this time, from 2003 to 2005,

21   approximately?

22   A.  Don would have been in his -- let me think.  He would have

23   been in his 70s, I believe, early 70s then.

24   Q.  Did there come a time that you learned that the Miami tribe

25   was involved in the payday lending business?

1    A.   Yes.

2    Q.   And when did you learn that, approximately?

3    A.   Sometime around November of 2003.

4    Q.   Did you have discussions with Mr. Brady about that payday

5    loan business?

6    A.   Some.

7    Q.   Can you describe those discussions?

8    A.   We didn't discuss the operation per se, but he told me that

9    this was, that this particular business enterprise was

10   something that needed to be kept very quiet.

11   Q.   Did Mr. Brady, did you have discussions with Mr. Brady

12   about who operated this business?

13   A.   I did.

14   Q.   And what did Mr. Brady tell you?

15   A.   That Scott Tucker was the principal in the operation.

16   Q.   And where was this payday loan business based at that time?

17   A.   At that time I can't recall the specific address for them.

18   I'm sorry.  The National Money Service, which was the entity

19   that brought the opportunity to the tribe, they were not

20   located on tribal land.

21   Q.   So you knew the payday loan business to be called what?

22   A.   Well, the operate -- within the tribe, it was referred to

23   as Tribal Financial Services, I believe, but maybe -- I'm not

24   sure whether that was originally, but at a later time it was.

25   Q.   What did you know about National Money Services at the

1    time?

2    A.  I knew nothing except they were the entity that contract --

3    that brought the offer to the tribe.

4    Q.  And what did Mr. Brady tell you about Mr. Tucker, if

5    anything else?

6    A.  Just if he called, I was to try and track Don down so he

7    could return his calls.

8    Q.  I'm handing you what has been marked as Government Exhibits

9    301, 302 and 303.  Turning first to Government Exhibit 301, do

10   you recognize that?

11   A.  I do.

12   Q.  What is it?

13   A.  This is the letter of intent regarding the payday loan

14   business agreement addressed to Chief Leonard and the tribal

15   council, from Scott Tucker.

16        MR. RAVI:  The government offers Government Exhibit

17   301.

18        THE COURT:  Any objection?  Hearing none, received.

19        (Government Exhibit 301 received in evidence)

20   Q.  Ms. Williams, can you please read the first paragraph of

21   this letter?

22   A.  "Dear Chief Floyd Leonard and council members, I am the

23   founder and president of National Money Service Inc., a proven

24   and highly successful corporation that has been involved in the

25   payday loan business throughout the united for the last six

1    years --"

2              THE COURT:  Past six years.  Thank you.

3              THE WITNESS:  Yes.

4              THE COURT:  Go ahead.

5    A.  "National Money Service Inc. employs nearly 300 people and

6    has its principal offices in Mission, Kansas, a suburb of

7    Kansas City, Missouri."

8              MR. RAVI:  If we could zoom out and focus on the date,

9    on the top left.

10   Q.  What's the date on this letter?

11   A.  October 10, 2003.

12             MR. RAVI:  Now turn to page three and just focus on

13   the signature.

14   Q.  And who signed this letter, Ms. Williams?

15   A.  Scott Tucker.

16             MR. RAVI:  Turn now to page 2.

17   Q.  If you could just read paragraph 2 next to "no cash

18   required"?

19   A.  "The tribe and the proposed tribal entity will not be

20   required to provide any investment, cash or cash equivalent and

21   will not be responsible for any losses."

22   Q.  Does this document also attach a draft service agreement?

23             MR. RAVI:  Turn now to page 7.

24   Q.  Ms. Williams, you might also be able to see it on your

25   screen in front of you.

1    A.  Oh.  I'm sorry.  Yes.

2              MR. RAVI:  If we could zoom in on the first line and

3    the header.

4    Q.  Could you please read that?

5    A.  "This agreement is entered into this" blank "day of October

6    2003 by and between the Miami tribe in Oklahoma," in

7    parentheses, "tribe and Universal Management Services Inc.," in

8    parentheses "UMS."

9              MR. RAVI:  If we could turn to page 8, and then just

10   zoom in on the signature spaces.

11   Q.  Read what it says next to tribal name.

12   A.  Miami Tribe Nebraska.

13   Q.  What was the Miami tribe you were associated with?

14   A.  Oklahoma.

15   Q.  Turning now to Government Exhibit 302 --

16             MR. RAVI:  You can take that down, Ms. Grant.

17   Q.  -- do you recognize this document?

18   A.  I do.

19   Q.  What is it?

20   A.  It's the service agreement between MTBE, or the Miami Tribe

21   Business Enterprises, and Universal Management Services.

22             MR. RAVI:  The government offers Government Exhibit

23   302.

24             THE COURT:  Any objection?

25             MR. GINSBERG:  No objection.

1           THE COURT:  Received.

2           (Government Exhibit 302 received in evidence)

3           MR. RAVI:  Please publish that.

4    Q.  Ms. Williams, is this the executed version of the service

5    agreement?

6    A.  It is.

7    Q.  And what's the date that it was signed?

8    A.  The 14th day of November 2003.

9           MR. RAVI:  Could we turn now to paragraph 2.

10   Q.  Can you please read that paragraph.

11   A.  "Capital provided by UMS.  UMS will or will arrange to

12   provide capital up to a maximum $5 million," in parentheses

13   "five million dollars to the MTBE's payday loan business to be

14   administered wholly and only by UMS for the purpose of funding

15   a volume of payday loans and all operating expenses in a manner

16   similar to that now conducted by its parent company, National

17   Money Service Inc."

18   Q.  Thank you.  Could you please also read paragraph 3.

19   A.  "Services provided by UMS.  UMS will furnish for the

20   benefit of the MTBE all support staff, equipment and business

21   arrangements required to conduct an efficient payday loan

22   business, including advertising and promotion, all sufficient

23   to achieve competitive results with the capital allocated to

24   the enterprise."

25           MR. RAVI:  If we can turn now to page 2.

1    Q.  Could you please read paragraph 6, next to fee arrangement?

2    A.  "Fee agreement.  UMS will pay the MTBE a minimum fee of

3    twenty thousand and no dollars, $20,000 per month while the

4    agreement is in force, with a maximum fee equal to 1 percent,"

5    in parentheses "1 percent of the gross collected revenue of the

6    payday loan operation."

7    Q.  Just to be clear, that paragraph 6, the heading is fee

8    agreement, correct?

9    A.  That is correct.

10   Q.  Finally, can you please read paragraph 11, next to

11   investment and risk?

12   A.  "The MTBE shall have no obligation to invest money or pay

13   expenses of the operation, except for its office expenses on

14   the Miami Indian Country and the salary and expenses of its

15   administrator."

16             MR. RAVI:  Could we focus now on the signature line.

17   Q.  Who signed below Universal Management Services Inc.?

18   A.  Scott Tucker, as president.

19   Q.  And who signed as the authorized agent of the Miami tribe?

20   A.  Don Brady, as chief executive officer of MTBE.

21             MR. RAVI:  Let's turn now to Government Exhibit 303.

22   Q.  Do you recognize that?

23   A.  I do.

24   Q.  And what is that?

25   A.  A special power of attorney and corporate resolution.

1   Q.  And is this signed by Mr. Brady?

2   A.  It is.

3       MR. RAVI:  The government offers Government Exhibit

4   303.

5       THE COURT:  Any objection?

6       MR. GINSBERG:  No objection.

7       THE COURT:  Received.

8       (Government Exhibit 303 received in evidence)

9       MR. RAVI:  If we could focus on the heading and the

10  first line.

11  Q.  Ms. Williams, could you read that first line?

12  A.  "Special power of attorney and corporate resolution granted

13  to Scott Tucker, Universal Management Services Inc., CVC

14  Services Inc., NM Service Corporation and any of his, its and

15  their subsidiaries and affiliates."

16      MR. RAVI:  Turn now to the first paragraph.

17  Q.  Could you please read that paragraph, Ms. Williams?

18  A.  The first paragraph, or paragraph No. 1?

19  Q.  Yes.  Paragraph No. 1.

20  A.  "To open, maintain and operate bank, ACH and ATM accounts

21  at U.S. Bank and any other acceptable U.S. bank or company for

22  the purpose of depositing and expending funds to facilitate the

23  operation of the tribe's loan service managed by NM Service

24  Corporation, Universal Management Services Inc., CVC Services

25  Inc., Scott Tucker and/or any of its or his subsidiaries and

1    affiliates."

2            MR. RAVI:  Can we focus now on the signature line.

3    Q.  Again, who signed this, and what was the date it was

4    signed?

5    A.  Don Brady.  Don E. Brady, CEO.  It was signed June 10,

6    2004.

7            MR. RAVI:  Thank you.  We can take that down,

8    Ms. Grant.

9    Q.  Ms. Williams, at this time when you were at the tribe,

10   around 2003 to 2005, what did you see Mr. Brady do as part of

11   the payday loan business?

12   A.  He would receive a packet of papers, and he would initial

13   those and then return them.

14   Q.  And who was sending these packets of information?

15   A.  The loan company operation.

16   Q.  Do you know where these packets were sent from?

17   A.  No, I don't specifically.

18   Q.  And can you describe what was contained in these packets?

19   A.  They were lists of people's names and the amount of the

20   loans that they had applied for.  There may have been other

21   information, but I didn't review these.

22   Q.  And what did you see Mr. Brady do with these lists of

23   people and loan amounts?

24   A.  He would initial them.

25   Q.  Did you see him do anything else with these papers?

1   A.  No.

2   Q.  You indicated that it was then sent back?

3   A.  That's correct.

4   Q.  Where was it sent back to?

5   A.  I don't recall the exact address.

6   Q.  Did you ever see Mr. Brady review any financial paperwork

7   related to the individuals in these lists?

8   A.  No.

9   Q.  To your knowledge, did Mr. Brady review any underwriting

10  criteria relating to any of the loans of the payday lending

11  business?

12  A.  Not to my knowledge.

13  Q.  And what did you do with respect to these packets or lists

14  that you were provided -- that Mr. Brady was provided?

15  A.  Nothing, except I would deliver them from the mail or I

16  would return them to be mailed.

17  Q.  And other than initialing these lists of individuals and

18  sending them back to the loan business, did you see Mr. Brady

19  do anything else as part of this payday loan business?

20  A.  No.

21  Q.  Did you ever see or hear Mr. Brady discuss the operation of

22  the payday loan business?

23  A.  No.

24  Q.  To your knowledge, was Mr. Brady operating any aspect of

25  the loan business?

1    A.  Not that I was aware of.

2    Q.  And at that time, did anyone else, to your knowledge, do

3    anything else relating to the operations of the payday loan

4    business?

5    A.  Not -- no one within the -- the staff members that I worked

6    with did not, no.

7    Q.  Were the offices related to the payday loan business at the

8    Miami tribe when you were there from 2003 to 2005?

9    A.  I'm sorry.  Could you repeat that, please.

10   Q.  Were there any offices specifically related to the payday

11   loan business while you were there at the tribe from 2003 to

12   2005?

13   A.  Not that I'm specifically aware of.  The offices where we

14   worked were on North Main Street in Miami.  I think it was 18

15   North Main.  The tribal headquarters were on trust land at

16   another location.

17   Q.  Now, Ms. Williams, at some point you stopped working

18   directly for Mr. Brady?

19   A.  I did.

20   Q.  And what did you end up doing after that?

21   A.  I was promoted to a public relations position, and then I

22   also assisted the general counsel, who was a part-time

23   employee, and did some business development work.

24   Q.  And this is all with the Miami tribe, correct?

25   A.  It is.

1    Q.  At some point, did you stop working for the Miami tribe?

2    A.  I did, in 2005.

3    Q.  Why generally did you stop working for the tribe at that

4    point?

5    A.  I had been working on several different business

6    opportunities, and I just didn't feel like we were going

7    anywhere with that, and I decided I wanted to do something

8    different.

9    Q.  So what kind of work did you do after you left the tribe in

10   2005, before you returned to the tribe?

11   A.  A variety of different things.  I, I had my real estate

12   license and I did some real estate.  I worked in clerical

13   positions.  My husband worked, most of the jobs my husband had

14   at that time were -- half of his, half of his salary was based

15   on commission, and we had four children and it was difficult to

16   live with everybody making commissions, so sometimes I worked

17   regular jobs that had guaranteed weekly or biweekly salaries,

18   and sometimes I did self-employment.

19   Q.  Now, Ms. Williams, when did you return to working at the

20   Miami tribe?

21   A.  In -- I believe it was June of 2011, June or July.

22   Q.  And under what circumstances did you return to the tribe?

23   A.  Don Brady called me and asked me to come back to work.

24   Q.  And did you end up working for him?

25   A.  I did.  It was a part-time position.

1  Q.  And what were you asked to do?

2  A.  He offered me the position as a part-time paralegal.  I

3  told him I was not certified as a paralegal, which at that

4  point in time had become important to the industry, and so I --

5  my job was to organize the legal documents and the

6  organizational documents of the tribe so they could be produced

7  more readily in discovery and also to create indices of all of

8  these documents.

9  Q.  And when you're talking about organizing all these

10  documents and creating indices, what are these related to,

11  generally?

12  A.  To the state litigations.

13  Q.  And the state litigation involving the payday loan

14  business?

15  A.  Yes.  The state -- the loan company had been sued in

16  multiple jurisdictions.

17  Q.  And what states were some of these litigations in?

18  A.  The biggest ones were in California and Colorado.  There

19  were many other states, some of them just only letters of

20  complaint filed.  Some of them were, you know, had actually

21  gone as far as petitions filed in court.

22  Q.  And who directed you to organize these documents and

23  indices for purposes of this litigation?

24  A.  Don Brady.

25  Q.  And what did Mr. Brady do with all these documents when

1    they were organized by you?

2    A.  Nothing.

3    Q.  When you were back at the Miami tribe, were you working for

4    a different entity than MTBE?

5    A.  Yes, the successor to MTBE was MNE, Miami Nation

6    Enterprises, and that was now the entity that oversaw the

7    businesses.

8    Q.  Describe how MNE was structured.

9    A.  MNE was a business subdivision of the tribe.  It was -- it

10   had a board member -- excuse me, a board that was appointed,

11   and Don Brady was the CEO.  There was, there were also other,

12   CFO and other employees.

13   Q.  And just like MTBE, did MNE manage certain businesses?

14   A.  It did.

15   Q.  And what was your title when you came back to the tribe?

16   A.  Well, initially, as a part-time employee.  Just part time;

17   I don't remember exactly what they classified me as, perhaps

18   legal assistant.  I don't know whether it was paralegal or not.

19   When I became a full-time employee, Don created a position

20   called law center manager.

21   Q.  And what were you doing as the law center manager?

22   A.  Principally organizing these documents.

23   Q.  Did you also serve as an assistant to Mr. Brady?

24   A.  I did, although I was not his personal assistant until some

25   months later.

1   Q.  Now, during the course of your time at the Miami tribe,

2   when you returned in 2011, how often did you interact with

3   Mr. Brady?

4   A.  If he was in town, on a daily basis.

5   Q.  And how often was he out of town?

6   A.  Not very often.

7   Q.  Were you also familiar with his schedule at this time?

8   A.  I was.

9   Q.  And how were you familiar with his schedule?

10  A.  Once I became his assistant, I maintained his schedule.

11  Q.  Where was your office in relation to Mr. Brady's?

12  A.  My initial employment, my office was on the west end of his

13  office, and my -- once his personal assistant, or executive

14  assistant, was promoted, Melissa Barnes, and I moved into her

15  office, which was on the east end of Mr. Brady's office and had

16  a connecting door.

17  Q.  So when you first started in 2011, your office was right

18  next to Mr. Brady's?

19  A.  It was.

20  Q.  And then afterwards, when you took on the personal

21  assistant role, you had an office that actually had a

22  connecting door?

23  A.  That's correct.

24  Q.  At this time how old was Mr. Brady?

25  A.  I remember we celebrated Don's 80th birthday in an office,

1  with a cake in the office, so he was probably 79 when I went to

2  work there, but I'm not sure what year he turned 80.

3  Q.  Describe a typical day for Mr. Brady at this time period.

4  A.  He would come into the office.  He always read the Tulsa

5  World.  We had a subscription to the newspaper that was

6  delivered to the door, and he would check his email.  He would

7  review, just look at things on his iPad, and he would do the

8  loan approvals.  Not really -- ostensibly do the loan

9  approvals.

10 Q.  And we'll get back to the loan approvals, as you call it, a

11 little bit later on.

12     And what time did Mr. Brady typically leave?

13 A.  He usually took a nice long lunch, and then sometimes he

14 would leave between three and four.  On occasion he would stay

15 later.

16 Q.  Could you also overhear Mr. Brady's phone conversations?

17 A.  Yes, once I moved into the office next to him.

18 Q.  Now, when you returned with the Miami, they were still

19 involved with the payday loan business, correct?

20 A.  Yes.

21 Q.  What was it called this time?

22 A.  There were two companies, MNE Services, which was a

23 subdivision of MNE, and the other was AMG Services, and AMG was

24 organized beneath the tribal business council.

25 Q.  Did AMG have any business names it was associated with?

1   A.  Yes, there were some portfolio names.

2   Q.  Do you recall any of those names?

3   A.  Ameriloan was, I think, the biggest one, most active at

4   that time.  United Fast Cash or United Cash.  United.  Maybe

5   500 FastCash.  There were five portfolios under the Miami

6   tribe, and there were two others that were managed by, or

7   supposedly managed by other tribes, and I don't recall those

8   specific names.  I'm sorry.

9   Q.  During this time period, what, if anything, did Mr. Brady

10  tell you about who ran the operations of the payday loan

11  business?

12  A.  He said that Scott Tucker ran the operations.

13  Q.  And Ms. Williams, looking around the courtroom today, do

14  you recognize Scott Tucker?

15  A.  I do.

16  Q.  And could you just identify where he's located and maybe

17  identify him by an item of clothing?

18  A.  He is --

19          THE COURT:  You can stand up, if you'd like.

20          THE WITNESS:  OK, yeah.

21  A.  He's on -- fourth from the left on the back row of the

22  counsels' table, wearing a red or burgundy tie.

23          MR. RAVI:  Thank you.

24          THE COURT:  Identification noted.

25  BY MR. RAVI:

1   Q.  Where was AMG headquartered, Ms. Williams?

2   A.  It was headquartered in Overland Park, Kansas.

3   Q.  What position, if any, did Mr. Brady hold at AMG?

4   A.  Mr. Brady was the CEO.

5   Q.  Do you believe that Mr. Brady acted as the CEO?

6   A.  No, he did not.

7   Q.  And why do you say that?

8   A.  Because he didn't have any control over the business.  He

9   had none of the financial information.  He didn't make any

10  decisions as to hiring.  There were multiple reasons over time

11  that made me question that.

12  Q.  And we'll get into some of those reasons.

13      What did you see or hear Mr. Brady do as part of the loan

14  business?

15  A.  He would sign declarations that the attorneys sent him

16  relating to the state court litigation.  He would sometimes

17  sign vendor contracts that were FedExed to him from the Kansas

18  City office.  That was principally it.

19  Q.  And how much time, if you could estimate, was Mr. Brady

20  spending on the payday loan business versus the other

21  businesses held by MNE?

22  A.  He spent less than 5 percent of his time.

23  Q.  To your knowledge, did Mr. Brady ever discuss or make

24  decisions about the operations of the loan business?

25  A.  No.

1   Q.  To your knowledge, did Mr. Brady ever discuss or review the

2   loan applications customers filled out?

3   A.  There was an approval process, but none of the actual

4   applications themselves.

5   Q.  To your knowledge, did Mr. Brady ever discuss or make

6   decisions regarding the criteria to approve loans?

7   A.  No.

8   Q.  Did Mr. Brady ever discuss decisions regarding marketing of

9   the loans to customers?

10  A.  No.

11  Q.  Did Mr. Brady ever discuss or review the books and records

12  of AMG?

13  A.  No.

14  Q.  Did Mr. Brady ever give instructions to any employees in

15  Kansas City?

16  A.  No.

17  Q.  Was Mr. Brady ever involved in the collection of loans from

18  customers?

19  A.  No, he was not.

20  Q.  Did Mr. Brady ever interact with anyone at U.S. Bank

21  concerning the loan business?

22  A.  Not to my knowledge.

23  Q.  How often was Mr. Brady at AMG's headquarters in Kansas

24  City?

25  A.  Once a month.  Once, maybe twice a month, but generally

1    just once a month, beginning sometime around April of 2012.

2    Q.  How did he travel there?

3    A.  Generally he drove.  On occasion he would fly with other

4    members of the tribe.  Sometimes they would -- Scott Tucker

5    would send a plane.

6    Q.  And who was Mr. Brady paid by?

7    A.  He was paid by MNE, Miami Nation Enterprises.

8    Q.  Was he paid by AMG?

9    A.  No.

10   Q.  Was his salary reimbursed by AMG in any way?

11   A.  No.

12   Q.  And who were you paid by?

13   A.  I was paid by MNE also.

14   Q.  Based on your discussions with Mr. Brady, do you know what

15   AMG was named after?

16   A.  Don told me it was named after Scott Tucker's favorite car.

17   Q.  What names did the tribe generally choose for its

18   businesses?

19   A.  Their businesses generally had some direct link to the

20   Miami tribe or to a leader, as honorarium, or Miami language,

21   Miami tribe language name, like Leonard Learning Center, which

22   was the day care center, it was named after Chief Leonard, the

23   former chief.  It was actually named after him while he was

24   chief, I believe.  And the farm had a Miami tribe language

25   name.

1    Miami Nation Enterprises, MNE Services, which was Miami

2    Nation Enterprise Services.  With the exception of Service

3    World, most of them had -- which was a company they bought

4    intact, they had Miami tribe names.

5    Q.  Are you aware of an entity called CLK?

6    A.  I am.

7    Q.  And what do you know about CLK?

8    A.  In 2008 -- pardon me.  In 2008, the Miami tribe merged,

9    created a company, a corporation that merged with CLK; that was

10   AMG.  And CLK was the actual loan company operated by Scott

11   Tucker at that time.

12        MR. RAVI:  Your Honor, I'm going to pass the witness a

13   bottle of water.

14        THE WITNESS:  Thank you.

15        THE COURT:  All right.  Thank you very much.

16        THE WITNESS:  Thank you so much.

17        THE COURT:  Ladies and gentlemen, let's take a

18   ten-minute recess.  Please do not discuss the case among

19   yourselves or with anyone.  We'll see you in ten minutes.

20        Everyone in the back of the courtroom, please stand

21   and do not leave the courtroom at this moment, until the jury

22   has exited.

23        (Jury not present)

24        THE COURT:  All right.  We're on a ten-minute recess.

25        (Recess)

1   (Jury not present)

2   THE COURT:  Bring our jury in, please.

3   MR. RAVI:  Your Honor, can I just confirm that we are

4   going to 1:30 today.

5   THE COURT:  We are going to go to 1.  So if you have

6   any dramatic moves you want to make before the weekend, you

7   have got to do them by 1:00, not at 1:28.  That's a heads-up.

8   MR. GINSBERG:  Judge, I am not sure that you made a

9   final ruling on admissibility of the tapes and transcripts,

10  that whole issue we had with the affidavit and everything.

11  THE COURT:  No.  In fact, I had ruled that they were

12  required to provide a log, and they did.  And at that point,

13  the defense has been free all along, since that moment, to make

14  any further applications.

15  MR. GINSBERG:  I am not arguing that.  I just want to

16  make sure, since they provided it, that means they are

17  admissible as far as you're concerned and that's it.

18  THE COURT:  Subject to somebody saying, I have got

19  this log, it's a fraud, they didn't make out any claim of

20  privilege.

21  MR. GINSBERG:  No.

22  THE COURT:  That, as far as I was concerned, having

23  heard nothing further, disposed of the issue.  But thank you

24  for raising it and that's how I see it.  Thank you.

25  (Continued on next page)

1           (Jury present)

2    CAROLYN WILLIAMS, resumed.

3           THE COURT:  You may resume the witness stand, please.

4           You may continue.

5    BY MR. RAVI:

6    Q.  Ms. Williams, before the break, you were talking about a

7    merger of CLK into AMG, correct?

8    A.  Yes.

9    Q.  When did you say that happened?

10   A.  In June of 2008.

11   Q.  Based on your discussions with Mr. Brady, what did you

12   learn about that merger?

13   A.  Don said that it didn't change anything, that it was

14   basically just a paper trail and it was done because of the

15   pressures from the Colorado litigation.

16   Q.  When you say paper trail, what do you mean?

17   A.  Well, none of the -- nothing changed except on paper.  So

18   now it appears that AMG is in charge of that aspect of the loan

19   company instead of CLK, but nothing changed, there were no

20   organizational changes, there were no changes in the duties of

21   anyone within the Miami tribe.

22   Q.  What did you understand from Mr. Brady to be the purpose of

23   the supposed merger?

24   A.  They were hoping that this would impact the Colorado

25   litigation by providing the tribe sovereign immunity so that

1    there wouldn't be any more issues with it.

2    Q.  What would making a paper merger of a supposed merger, how

3    would that assist with that, as you understood from Mr. Brady?

4    A.  Because the organizational documents of AMG said that they

5    assumed 100 percent of CLK, and so that they were now the

6    entity that was providing the loan service.

7    Q.  Do you understand whether there was any payments that were

8    made in 2008 when this merger happened for an acquisition of

9    any assets?

10   A.  At a later time there was a payment, but no money exchanged

11   hands at that time, even though it was provided for in the

12   agreement.

13   Q.  What later time was any money provided, if any?

14   A.  I think my recollection is that it was paid in 2010.

15   Q.  That was two years after the supposed merger occurred?

16   A.  Yes.

17   Q.  Ms. Williams, were you familiar with the relationship

18   between Mr. Brady and Mr. Tucker?

19   A.  Yes.

20   Q.  Describe their relationship.

21   A.  Don thought of him as being a very close friend.  He and

22   his wife socialized with Scott Tucker and his wife.  They spent

23   holidays together.  And Don was -- Don was considered to be

24   Scott's biggest fan in the racing industry.

25   Q.  How do you know that?

1  A.  Well, he received an award for that, and there is a video

2  of Scott calling him that.

3  Q.  Describe what the award is.

4  A.  It was just honoring him as his fan.

5  Q.  Is this in connection with Mr. Tucker's racing?

6  A.  Yes.

7  Q.  Did Mr. Brady attend races of Mr. Tucker?

8  A.  Yes, he frequently did.

9  Q.  Where did Mr. Brady travel to to go to these races?

10  A.  Many different locations.

11  Q.  Do you know if he ever travelled internationally?

12  A.  I think he told me at one point that they had planned to.

13  I don't recall though if they actually went or not.

14  Q.  This award you're talking about, is it a physical award?

15  A.  Yes, it was a plaque.

16       THE COURT:  You have to speak in words.

17  A.  Yes, it was a plaque.

18  Q.  Have you seen this plaque?

19  A.  At one time it was in his office.

20  Q.  Are you also familiar with the relationship between -- who

21  was the chief of the Miami tribe at that time?

22  A.  Tom Gamble.

23  Q.  Describe his relationship with Mr. Tucker.

24  A.  Tom was very enamored of Scott Tucker.  He was impressed by

25  his racing career.  He was impressed by his money.

1    Q.  To your knowledge, did Mr. Gamble socialize with Mr.

2    Tucker?

3              MR. BATH:  Objection.  Foundation.

4    Q.  Are you familiar with whether or not they socialized?

5    A.  Yes.  I understood that he attended some of the race meets.

6              MR. BATH:  Objection.  Foundation.  He didn't

7    establish how she knows.

8    Q.  How are you familiar?

9    A.  I was told that he had attended some of the race meets, and

10   I was aware --

11             THE COURT:  Told by whom?

12             THE WITNESS:  I was told by Don Brady.

13             THE COURT:  Thank you.

14   Q.  Go ahead and answer.  How did they socialize together,

15   Mr. Gamble and Mr. Tucker?

16   A.  They would go to dinner, Tom would go to Kansas City on

17   occasion and they would have dinners.  Sometimes he was hosted

18   at some sporting events, he and his son and other members of

19   their family, for the Kansas City football team and the

20   baseball team.

21   Q.  Just to be clear, who is hosting who?

22   A.  Scott and Blaine Tucker was hosting Chief Gamble.

23   Q.  When Mr. Brady was going to these race meets and Mr. Gamble

24   was attending various sporting events, do you know who paid for

25   those trips?

1   A.  Yes.  Actually, they were paid for by the Tuckers, or

2   through the loan company by the Tuckers.

3   Q.  Now, Ms. Williams, you mentioned before, you called the

4   loan -- you referred to ostensible loan approvals, right?

5   A.  Yes.

6   Q.  Why did you use the word "ostensible"?

7   A.  Because it was just a sham.  It was just a series of

8   entering passwords into a laptop computer and scrolling down

9   and hitting the approval button and then going to the next

10  portfolio and doing the same thing.

11  Q.  How did you learn about the sham approval process?

12  A.  Because I was asked to do it.

13  Q.  Who asked you to do it?

14  A.  Don Brady.

15  Q.  What did Mr. Brady tell you about the sham approval

16  process?

17  A.  That they did this because they had to demonstrate that the

18  approval process was on tribal land, on trust land.

19  Q.  How do you know how the sham approval process worked?

20          MR. BATH:  I object to the characterization by the

21  government.  It's argumentative.

22          THE COURT:  Rephrase your question.

23  Q.  Ms. Williams, how are you aware of how this supposed

24  approval process worked?

25          MR. BATH:  Same objection.

1  THE COURT:  Overruled.  That's appropriate.  I don't

2  know how else you propose it be phrased, Mr. Bath.

3  Q.  Ms. Williams, should I repeat the question for you?

4  A.  Please.

5  Q.  How do you know how the supposed approval process worked?

6  A.  Because I had to do it a few times.

7  Q.  Who showed you how to do this?

8  A.  Don Brady.

9  Q.  How many times have you done the supposed approval?

10  A.  Five or six times.

11  Q.  Have you also observed Mr. Brady do the supposed approvals?

12  A.  Yes, several times.

13  Q.  So describe how the supposed approval process worked.

14  A.  There was a small laptop on Don's credenza behind his desk,

15  and he would open the laptop, turn it on, and then he would

16  enter his password, and then he would enter the passwords for

17  the different portfolios, scroll down and hit a button that

18  basically approved them, and then he would exit that, go to the

19  next portfolio, and then he would log off.

20  Q.  How many portfolios are we talking about?

21  A.  At that time there were five.

22  Q.  Approximately how many customers were listed?

23  A.  It varied.  There were a couple of portfolios that had

24  more, Ameriloan was generally one of the largest.  And, of

25  course, closer to the holidays, there were significantly more

1    names in the portfolios.

2    Q.  When you were doing the supposed approval process, were you

3    viewing any customer information?

4    A.  It wasn't necessary to.  I know the names and the amount of

5    the loans were listed by line.

6    Q.  Were you reviewing any loan applications for example?

7    A.  No, no, I never saw those.

8    Q.  Were you ever told to look at any customer information when

9    you did the supposed approval process?

10   A.  No.  This was strictly a mechanical function.

11   Q.  Could you even access any of the loan applications through

12   this program?

13   A.  No.

14   Q.  Were you aware of any of the criteria that should be used

15   in determining whether these loans should be approved?

16   A.  No.  There was no judgment involved.

17   Q.  To your knowledge, did Mr. Brady ever review any loan

18   applications when he went through the supposed approval

19   process?

20   A.  Not to my knowledge.

21   Q.  Did Mr. Brady ever discuss the criteria that should be used

22   in order to hit the approved button?

23   A.  No.

24   Q.  How long did it take to go through all of these five

25   portfolios and hit that approve button?

1   A.  Well, if you entered the passwords in correctly, it would

2   only take a couple of minutes to do each one.

3   Q.  So what affected how much time this would take?

4   A.  Whether or not you hit the right keys to enter the

5   passwords.

6   Q.  How often were these supposed approvals supposed to be

7   done?

8   A.  They were done in the office Monday through Friday.

9   Q.  Were there times that this supposed approval process did

10  not take place on a given day?

11  A.  Yes.  I actually missed a day and had to do two the next

12  day.

13  Q.  Did anyone ever tell you the issuance of loans for that day

14  had been delayed because you didn't click the approved button?

15  A.  No, I was not contacted by anyone.

16  Q.  So you made approvals for past days as well?

17  A.  I did.

18  Q.  Was there a process to deny the loan?

19  A.  No, not that I was informed, or not that was evident to me.

20  Q.  Was there a denial button you could access?

21  A.  No.

22  Q.  Could you select only certain customers in the list of

23  customers and approve only those?

24  A.  No, they were in batches.

25  Q.  So what would you do if you didn't want someone to get a

1   loan?

2   A.  I had no control over that.

3   Q.  Ms. Williams, do you have any qualifications to review any

4   loans?

5   A.  No, I have none.

6   Q.  Just to be clear, when you clicked that approved button,

7   did that supposedly approve the loans for all the customers in

8   the list for that portfolio?

9   A.  Yes.

10  Q.  Ms. Williams, are you familiar with -- hold on.

11      Ms. Williams, are you familiar with ecash?

12  A.  Yes.

13  Q.  What is that?

14  A.  Ecash was a software platform that supported the loan

15  company operations.

16  Q.  What is Mr. Tucker's relationship to ecash?

17  A.  Well, I understood that he owned it.

18  Q.  Now, you participated in board meetings with AMG at the

19  tribal office?

20  A.  I did.

21  Q.  At any point in time was a proposal presented to the AMG

22  board regarding ecash?

23  A.  Yes.

24  Q.  When was this, approximately?

25  A.  Sometime February or March of 2012, there was an initial

1    proposal for a purchase agreement, which AMG would have paid a

2    certain amount of money in order to have completed -- to

3    purchase the ecash system in completion of the merger of AMG

4    with CLK in 2008.

5    Q.  And that was the supposed merger we already discussed?

6    A.  Yes.

7    Q.  To your knowledge, was AMG already using ecash at this

8    time?

9    A.  Yes, it was.

10   Q.  Did anyone explain why AMG needed to buy it?

11   A.  Yes.  Don told me that the purpose of the purchase

12   agreement that was proposed at that time was to provide

13   documentation to support Scott Tucker for withdrawing a large

14   amount of money out of the company to repay his capital that he

15   had paid in.

16   Q.  Do you know why there had to be a purchase of ecash for

17   that purpose?

18   A.  To create a paper trail.

19   Q.  Now, at some point was this purchase agreement for ecash

20   changed to a licensing agreement?

21   A.  Yes, it was.

22   Q.  Do you understand from Mr. Brady why that change was made?

23   A.  Yes.

24   Q.  Please describe that conversation.

25   A.  Well, it morphed from a purchase agreement into -- it

1    morphed from a purchase agreement into a licensing agreement

2    because the attorneys were nervous that using -- that using the

3    term purchase agreement or completion of the merger would

4    contradict the previous declarations that had been filed in the

5    state litigations, saying that they had purchased 100 percent

6    of the assets of CLK.

7    Q.   What declarations are you referring to?

8    A.   These were declarations that Don Brady signed that were

9    used in the state court litigations.

10   Q.   Were these litigations relating to the payday loan

11   business.

12   A.   Yes, they were.

13   Q.   At the time that these agreements relating to ecash were

14   presented to the board, did you have any concerns with the

15   purchase agreement?

16   A.   I did.

17   Q.   What were your concerns?

18   A.   Well, I had that same concern, because I was familiar with

19   the language of the declarations, and I was concerned too that

20   it contradicted previous representations.

21   Q.   Then once the agreement morphed from a purchase agreement

22   to a licensing agreement, did you have any concerns about the

23   licensing agreement?

24   A.   I had huge concerns about the licensing agreement.

25   Q.   What were your concerns?

1    A.  Because in its initial versions, the licensing agreement

2    would have placed all the liability for any activities, civil

3    or criminal, by Scott Tucker, Blaine Tucker, and other

4    employees of the loan company, and all of the liability for

5    those actions would have been placed on the tribe, and the

6    tribe didn't have the resources to pay anything, they didn't

7    have the money.

8    Q.  Was there an AMG board meeting in February 2012 in which

9    these transactions regarding ecash were discussed?

10   A.  I couldn't tell you the exact date, but yes, there would

11   have been.

12   Q.  Did you also participate in drafting minutes for the

13   meetings of AMG?

14   A.  Yes, I was the recording secretary for AMG and MNES.

15   Q.  Did you draft the minutes during that time period?

16   A.  I did.

17   Q.  Were you ever asked to send minutes to anyone for their

18   review or comment?

19   A.  That was the first -- yes, that particular meeting, that

20   was the first time I was ever asked to send minutes to anyone

21   else.

22            MR. RAVI:  Please put on the screen Government Exhibit

23   401.

24   Q.  Do you recognize this e-mail?

25   A.  I do.

1    MR. RAVI:  The government offers Government Exhibit

2    401.

3    MR. BATH:  No objection.

4    MR. GINSBERG:  No objection.

5    THE COURT:  Received.

6    (Government's Exhibit 401 received in evidence)

7    MR. RAVI:  Would you please publish that and turn to

8    the bottom e-mail.

9    If you can turn to the to/from line.

10   Q.  Who did you send this e-mail to, Ms. Williams?

11   A.  To Conly Schulte and Tim Muir.

12   Q.  Who did you copy?

13   A.  Don Brady and myself.

14   Q.  Is it dated February 7, 2012?

15   A.  It is.

16   MR. RAVI:  Go to the next page, please.

17   Q.  Can you read what you wrote?

18   A.  "Attached are copies of draft minutes of AMG board and MNE

19   Services board meetings held February 1, 2012.  Don Brady asked

20   that I forward these to you for your review.  Please submit

21   comments, if any."

22   MR. RAVI:  Go to the first e-mail in that chain.

23   Q.  Did you receive any comments from Mr. Muir on the board

24   minutes that you drafted?

25   A.  I did.

1  Q.  Was Mr. Muir in attendance at that meeting?

2  A.  He was not.

3  Q.  But yet you still sent it to him to review?

4  A.  Yes, I was told to.

5  Q.  By Mr. Brady, correct?

6  A.  Yes.

7       MR. RAVI:  Can we turn now to the attachment.

8  Q.  Is this attachment on page 3 a draft of the board minutes

9  for February 1, 2012?

10  A.  Yes.

11  Q.  If you can focus in on Roman numeral V, old business.

12      Can you please read this paragraph?

13  A.  "Old business:  Chairman Gamble reviewed status of

14  negotiations between AMG and Scott Tucker regarding acquisition

15  of proprietary software and other intellectual properties to

16  expand AMG's capabilities of servicing online short-term loan

17  portfolios as well as completion of the transaction documents.

18  No action was required."

19  Q.  So some part in here is underlined, correct?

20  A.  Yes.  This was a red-line version.

21  Q.  So what were the changes that Mr. Muir provided to you?

22  A.  Mr. Muir inserted the phrase "to expand AMG's capabilities

23  of servicing online short-term loan portfolios as well as," and

24  then he deleted the word "merger" and added the word

25  "transaction."

```
 1   Q.  Thank you.
 2        Let's turn now to Government Exhibit 402.
 3        Are you familiar with this?
 4   A.  Yes.
 5            MR. RAVI:  The government offers Government Exhibit
 6   402.
 7            MR. BATH:  No objection.
 8            THE COURT:  Received.
 9            (Government's Exhibit 402 received in evidence)
10   Q.  Ms. Williams, is this another e-mail in that same e-mail
11   chain?
12   A.  Yes, it is.
13   Q.  Is this e-mail from Conly Schulte?
14   A.  Yes, it is.
15   Q.  What does Mr. Schulte sending you?
16   A.  His suggested edits.
17   Q.  Are these edits to the same draft of the board minutes?
18   A.  They are.  It's another red-line version.
19   Q.  Let's go to that attachment.
20        Where is there any changes that are suggested or given by
21   Mr. Schulte?
22   A.  In Roman numeral V, under old business.  Mr. Schulte
23   deleted the phrase "completion of merger documents."
24   Q.  Is that the only change that Mr. Schulte provided to you?
25   A.  Yes.
```

1   Q.  So did both Mr. Muir and Mr. Schulte delete the word

2   "merger" in the draft of the minutes that you provided?

3   A.  Yes, they did.

4   Q.  And neither of them were present at this board meeting,

5   correct?

6   A.  No, they were not.

7   Q.  What is the merger that you're referencing?

8   A.  The merger was the merger of AMG Services with CLK in 2008.

9   Q.  Did you have any discussions with Mr. Brady about why these

10  changes were made by Mr. Muir and Mr. Schulte?

11  A.  The changes were made because of the same concerns that I

12  had, which was that using the term merger contradicted

13  Mr. Brady's previous representations that they had acquired 100

14  percent of the assets of CLK in 2008.

15  Q.  Again, what was the date of this meeting?

16  A.  The meeting for where the red-line minutes were received?

17  Q.  Yes.

18  A.  February 1, 2012.

19  Q.  When did that supposed merger take place between CLK and

20  AMG?

21  A.  In June of 2008.

22  Q.  Now, Ms. Williams, what was the name of the licensing

23  agreement that you discussed earlier?

24  A.  We referred to it as the BA Services agreement.

25  Q.  What is BA Services?

1   A.  BA Services was a company owned by Scott Tucker.

2   Q.  At some point while the purchase agreement and the

3   licensing agreement relating to the ecash system were being

4   presented to the AMG board, did you begin to have concerns

5   about the loan company in the spring of 2012?

6   A.  I did.

7   Q.  Describe these concerns.

8   A.  It was a cumulative process.  In early 2012, Don was

9   interviewed because of a tax audit on AMG and MNE Services for

10  withholding, and he himself was concerned because he didn't

11  have the information that he thought he should have in order to

12  answer the questions properly.

13      Then there was the treatment of the mail.  The bank

14  statements were mailed.  They were not opened.  They were

15  FedEx'd overnight back to the Kansas City office.  All or most

16  of the mail was handled -- with the exception of letters that

17  were received from consumer departments and offices of attorney

18  general, which went to the law firm, the other mail was just

19  sent unopened to Kansas City.

20  Q.  Are we talking about bank statements, for example?

21  A.  Yes.

22  Q.  Were these bank statements relating to the payday loan

23  business?

24  A.  Yes.

25  Q.  Where were they received?

1   A.   They were received at the P Street address, 3531 P Street

2   NW, in Miami, which was the office of the MNE.

3   Q.   What was done this mail when it was received at the Miami

4   tribe?

5   A.   It was just FedEx'd overnight unopened.

6   Q.   To where?

7   A.   Early on.  And then at one point later in time, when the

8   MNE Services board began to have some concerns, then we opened

9   it and made copies and FedEx'd them on.

10  Q.   Where was this all FedEx'd?

11  A.   To the Overland Park office.

12  Q.   To whose attention?

13  A.   Natalie Dempsey.

14  Q.   Who is Natalie Dempsey?

15  A.   Natalie Dempsey was -- I think she functioned as Blaine

16  Tucker's assistant, but she was the person we dealt with for

17  all of the banking information.

18  Q.   Describe specifically what your concern was regarding the

19  payday loan business.

20  A.   Well, it became more and more apparent to me that

21  everything that was in the declarations, which was my initial

22  exposure to how this thing was supposed to be operating, that

23  it was all a scam.  There were no decisions made about the loan

24  company.  There was no control over the loan company.  There

25  was no access to the financial information.  When the MNE

1   Services board attempted to get errors and omissions insurance

2   for the board members, they couldn't get it because they

3   wouldn't release the financial information to her in order to

4   apply for the insurance.

5   Q.  Who wouldn't release the financial information?

6   A.  Gena Lankford and Scott Tucker would not release the

7   information.

8   Q.  Ms. Williams, at some point did you have a conversation

9   with Mr. Brady that confirmed some of these concerns?

10  A.  I did.

11  Q.  Did you record that conversation?

12  A.  I did.

13  Q.  Why did you record it?

14  A.  I had been very vocal, very, very vocal against them

15  signing the BA Services agreement because of all the liability

16  that it put on the tribe and --

17          THE COURT:  Slow down.  Back up.

18          Say what you're saying slowly.

19  A.  Thank you.

20      I had been very vocal in opposition to the BA Services

21  agreement because I had great concerns that the tribe did not

22  have the resources, and since they had no access to the money

23  except for the 1 percent that they got, that they wouldn't be

24  able to pay any fines or penalties associated with either the

25  IRS audit or the BA Services agreement or any of the state

1    litigations; and because of that, I thought when Don came in my

2    office that day he was going to fire me because he was very

3    angry.

4    Q.  So is that why you recorded the conversation?

5    A.  He started the conversation and I thought, well, this is

6    it, and my phone was lying on my desk next to my office phone,

7    and for some reason I just picked it up and decided to turn it

8    on.

9    Q.  Did you also record a couple of other conversations with

10   Mr. Brady?

11   A.  I did subsequently.

12   Q.  Why did you record those conversations?

13   A.  I wanted a record to show that I had tried to talk him out

14   of this, that I tried --

15              THE COURT:  Here.

16              THE WITNESS:  Thank you.

17   Q.  Take your time, Ms. Williams.

18   A.  That I tried to get him to do the right thing.

19   Q.  Ms. Williams, you recorded these on your phone?

20   A.  Yes, on my cell phone.

21   Q.  I am going to hand you now, Ms. Williams, what has been

22   marked as Government Exhibit 415.

23       Do you recognize that?

24   A.  I do.

25   Q.  This government exhibit contains Government Exhibits 404,

1    406, 407, 408, 409, and 410.

2        Ms. Williams, have you initialed that CD that's Government

3    Exhibit 415?

4    A.  I have.

5    Q.  What date did you initial it?

6    A.  September 18, 2017.

7    Q.  Is that a date that you listened to Government Exhibits

8    407, 408 and 409?

9    A.  Yes.

10   Q.  Are those excerpts of recordings with Mr. Brady?

11   A.  Yes, they are.

12   Q.  The ones that we just discussed?

13   A.  Yes.

14   Q.  Are those excerpts that you heard fair and accurate copies

15   of the recordings that you made?

16   A.  Yes.

17            MR. RAVI:  The government offers just Government

18   Exhibits 407, 408 and 409 into evidence.

19            THE COURT:  Received.

20            (Government's Exhibits 407, 408 and 409 received in

21   evidence)

22   Q.  Now, Ms. Williams, I am also going to hand you a binder.

23        You can look at Government Exhibits 408T, 409T and 410T.

24   A.  Yes.

25   Q.  Are those transcripts of the excerpts of the recordings

1    that we just discussed?

2    A.  Yes, they are.

3    Q.  Have you reviewed those transcripts?

4    A.  I have.

5    Q.  Have you also initialed them?

6    A.  Yes.

7    Q.  Did you initial them on September 18, 2017?

8    A.  Yes.

9    Q.  Did you review these transcripts while you were listening

10   to the recording?

11   A.  I did.

12   Q.  Are those transcripts true and accurate transcriptions of

13   the excerpts of the recordings that are Government Exhibits

14   408, 409 and 410?

15   A.  Yes.

16           MR. RAVI:  The government offers Government Exhibits

17   408T, 409T and 410T.

18           THE COURT:  Any objection?

19           MR. BATH:  These are the transcripts that are offered

20   to assist and aid.  No objection.

21           THE COURT:  They are received.

22           (Government's Exhibits 408T, 409T and 410T received in

23   evidence)

24           THE COURT:  Ladies and gentlemen, I should explain to

25   you that the transcripts themselves are not the evidence.  The

1   recordings are the evidence.  The transcripts are aids for you

2   to follow the recordings, which are the evidence.  If you hear

3   something different when you listen to the recordings than what

4   you see on the transcript, it's what you hear that controls.

5   They are simply to help you in listening to the actual

6   recording.

7         Yes, you may distribute them.

8   BY MR. RAVI:

9   Q.  Ms. Williams, turning to the first recording you made with

10  Mr. Brady, where did that recording take place?

11  A.  In my office at the P Street office.

12  Q.  What was leading up to that recording?  Is that what you

13  had just described regarding Mr. Brady appearing to be angry?

14  A.  Yes.

15        MR. RAVI:  If I could ask the jury as well to turn to

16  Government Exhibit 408T in their binder.

17        THE COURT:  408T.  Go ahead.

18        MR. RAVI:  We can go ahead and play Government Exhibit

19  408.

20  Q.  Before we do that, Ms. Williams, what is the date of this

21  recording?

22  A.  June 12, 2012.

23  Q.  And this is between you and Mr. Brady, correct?

24  A.  Yes.

25  Q.  We will start on page 1 of the transcript.

1    MR. RAVI:  You can play the recording.

2    (Audiotape played)

3  Q.  Ms. Williams, what do you understand Mr. Brady to be

4  talking about when he is talking about bank accounts?

5  A.  He was saying that all of the bank accounts, except -- he

6  was saying all of the bank accounts were Scott Tucker's bank

7  accounts, even the ones that had the tribe's name on them, even

8  the ones in MNE Services and AMG.

9  Q.  At line 8, when Mr. Brady says "everything is still going

10  to be coming in the new thing is still coming our way uh, more

11  and more as whatever his, he's got coming out of that."

12    What did you understand Mr. Brady to be referring to?

13  A.  He was talking about the BA Services agreement and the

14  representations in it that implied that the tribe would be

15  getting more money, but they weren't really getting any more

16  money, they were just taking on all of the liability.  And

17  there had been an overture, as an incentive to get the tribe to

18  sign off on the BA Services agreement, Scott had offered to pay

19  them a dollar per loan going forward.  So they were

20  anticipating receiving a lump sum amount.

21    MR. RAVI:  We can now play the next portion of

22  Government Exhibit 408.  It begins on line 12 of page 1 of the

23  transcript.

24    (Audiotape played)

25  Q.  Let's go ahead and continue to the next portion.

1    (Audiotape played)

2        THE COURT:  We are going to break, ladies and

3    gentlemen.

4        Mr. Ravi, you may be seated.

5        First of all, to those who will be observing the

6    holiday, good yontif.  For the rest of you, enjoy your time

7    off.  And let me remind you of how serious it is that you

8    follow the instructions.  You are a great jury.  You listen to

9    the evidence, you watch the witnesses, you pay attention.  And

10   it's important that you follow the instruction not to discuss

11   the case with anyone.  That's a hard thing to do, as you go

12   back to your daily lives, not to discuss the case with anyone.

13       Remember what I told you about a little bit of

14   mystery.  Anybody who asks, I'm under a court order.  You might

15   add, You don't want to see me go to jail over this, do you?  I

16   am required to comply with the judge's order that we not

17   discuss the case, that I not discuss the case with anyone.  And

18   that order also includes doing any research on your own.  I

19   told you that would be terribly unfair to one side or the

20   other, and you wouldn't want a jury of people that were doing

21   such things if you or a family member were involved in a case.

22   So please observe those instructions.

23       Now, having said all of that, I hope you enjoy your

24   time off.  I am going to miss you.  I hope you miss me.  Please

25   leave your notepads in the jury room.  Please leave these

1    binders at your seat.  They will be here when you come back.

2    And see you bright and early for a 10:00 start on Monday.  And

3    Mondays it's a little difficult getting in traveling, and it's

4    also a little bit difficult getting into the building, so

5    please arrive early so we can have a good 10 a.m. start.

6            Thank you so much, ladies and gentlemen.  A lot more

7    to come so keep an open mind.

8            (Jury exits courtroom)

9            THE COURT:  And to all of you I wish, to the extent

10   applicable, a good holiday, and if otherwise not applicable, I

11   hope you get reacquainted with your family over the few days

12   that you have off, and I will see you bright and early on

13   Monday morning.

14           MR. GINSBERG:  Thank you, your Honor.

15           THE COURT:  We are adjourned.  Thank you.

16           (Adjourned to September 25, 2017, at 10:00 a.m.)

17

18

19

20

21

22

23

24

25

1          INDEX OF EXAMINATION

2     Examination of:                          Page

3     JAMES FONTANO

4     Direct By Mr. Scotten . . . . . . . . . . . 932

5     Cross By Mr. Roth . . . . . . . . . . . . . 950

6     Redirect By Mr. Scotten . . . . . . . . . . 956

7     ALTON IRBY

8     Direct By Mr. Velamoor . . . . . . . . . . . 958

9     Cross By Mr. Bath . . . . . . . . . . . . . 980

10    Redirect By Mr. Velamoor . . . . . . . . . . 986

11    CAROLYN WILLIAMS

12    Direct By Mr. Ravi . . . . . . . . . . . . . 989

13         GOVERNMENT EXHIBITS

14    Exhibit No.                          Received

15    1733  . . . . . . . . . . . . . . . . . . . 931

16    2104  . . . . . . . . . . . . . . . . . . . 934

17    2108  . . . . . . . . . . . . . . . . . . . 939

18    2107  . . . . . . . . . . . . . . . . . . . 941

19    2105  . . . . . . . . . . . . . . . . . . . 943

20    2112  . . . . . . . . . . . . . . . . . . . 945

21    2113  . . . . . . . . . . . . . . . . . . . 948

22    2109  . . . . . . . . . . . . . . . . . . . 957

23    2111  . . . . . . . . . . . . . . . . . . . 957

24    2801  . . . . . . . . . . . . . . . . . . . 963

25    2802  . . . . . . . . . . . . . . . . . . . 969

1    2803    . . . . . . . . . . . . . . . . . 973

2    2804    . . . . . . . . . . . . . . . . . 976

3    2805    . . . . . . . . . . . . . . . . . 977

4    2806 and 2807    . . . . . . . . . . . . . 988

5    301    . . . . . . . . . . . . . . . . . . 995

6    302    . . . . . . . . . . . . . . . . . . 998

7    303    . . . . . . . . . . . . . . . . . .1000

8    401    . . . . . . . . . . . . . . . . . .1027

9    402    . . . . . . . . . . . . . . . . . .1029

10    407, 408 and 409    . . . . . . . . . . . .1035

11    408T, 409T and 410T    . . . . . . . . . .1036

12

13

14

15

16

17

18

19

20

21

22

23

24

25