H9P8TUC1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          16 Cr. 91 (PKC)

5   SCOTT TUCKER and
    TIMOTHY MUIR,                       Trial
6
              Defendants.
7
    ------------------------------x
8                                       New York, N.Y.
                                        September 25, 2017
9                                       12:30 p.m.

10

    Before:
11              HON. P. KEVIN CASTEL

12                                      District Judge
                                            and a jury
13                      APPEARANCES

14  JOON H. KIM
         Acting United States Attorney for the
15       Southern District of New York
    BY:  NIKETH V. VELAMOOR
16       HAGAN C. SCOTTEN
         SAGAR K. RAVI
17       Assistant United States Attorneys

18  FREEMAN NOOTER & GINSBERG
         Attorneys for Defendant Tucker
19  BY:  LEE A. GINSBERG
         NADJIA LIMANI
20          -and-
    STAMPUR & ROTH
21  BY:  JAMES M. ROTH

22  BATH & EDMONDS, P.A.
         Attorneys for Defendant Muir
23  BY:  THOMAS J. BATH
            -and-
24  BEVERLY VAN NESS

25

1    (Trial resumed; jury present)

2  CAROLYN WILLIAMS, resumed.

3    THE COURT:  Good afternoon, ladies and gentlemen.

4    I want to apologize to you for the late start today.

5  I felt the best way to handle the need for me to attend to a

6  matter relating to the case was by letting you know right up

7  front and letting you do something else with your time until

8  now, and I appreciate your being so cooperative and

9  understanding.  I take total responsibility, and it was an

10  unforeseen matter that we have taken care of, and we are back

11  in action and it's really good to see you.

12    So, Ms. Williams, the Court reminds you that you are

13  still under oath.

14    THE WITNESS:  Yes, sir.

15    THE COURT:  Mr. Ravi, you may continue.

16  DIRECT EXAMINATION (Cont'd)

17  BY MR. RAVI:

18  Q.  Ms. Williams, we ended last Wednesday by playing the first

19  of three recordings that you made with Mr. Brady, correct?

20  A.  Yes.

21  Q.  Those recordings took place in the same time the BA

22  licensing agreement for eCash was being presented to the AMG

23  board, is that correct?

24  A.  Yes, that's correct.

25  Q.  And eCash was the software that was used to administer and

1    process the loans?

2    A.  Yes.

3    Q.  AMG had already been using eCash at the time, correct?

4    A.  Yes.

5    Q.  What did you understand to be the purpose of this licensing

6    agreement, based on your discussions with Mr. Brady?

7    A.  Don told me that the purpose of the licensing agreement was

8    to facilitate Scott Tucker taking a large amount of money out

9    of the company.

10   Q.  Why was it necessary to have this agreement?

11   A.  Essentially to create a paper trail.

12   Q.  Now, at the time of these recordings, had the AMG board

13   approved the BA Services licensing agreement?

14   A.  No, they had not.

15   Q.  I would like to turn your attention now back to Government

16   Exhibit 408 T, which is in the transcript binder.

17           We already played this recording, Ms. Williams, but if

18   I could turn your attention to page 1, at line 16.

19           Mr. Brady states, "The only thing that we have even

20   been involved in is giving our sovereign immunity to help

21   protect all of Scott's money and all of his enterprise and all

22   of the -- everything.  Uh, that's the extent of our

23   participation."

24           What did you understand that to mean, Ms. Williams?

25   A.  That's the tribe's sole participation in the loan company

1 | was strictly to receive a small amount of money based on the

2 | total revenues overall, in exchange for which they would give

3 | him -- that they would shield him with their sovereign

4 | immunity.

5 | Q.  Turning to line 24, where you stated, "We've represented

6 | that we own 100 percent of that business."

7 |         What were you referring to there?

8 | A.  I was referring to the declarations that Don Brady had made

9 | for some of the state court litigations.

10 | Q.  Were those state court litigations relating to the payday

11 | loan business?

12 | A.  Yes, they were.

13 | Q.  Ms. Williams, what was your reaction to this conversation

14 | that you had with Don Brady on June 12, 2012?

15 | A.  I was horrified.  I was scared.  I was really terrified.  I

16 | didn't want to be involved in anything like this.  I felt that

17 | he misled me, and I felt that he was misleading everyone in the

18 | tribe.

19 | Q.  Did that include at some of the board meetings where he was

20 | presenting to the AMG board?

21 | A.  I'm sorry.  Can you repeat that, please?

22 | Q.  Did you believe he was misleading in the board meetings in

23 | which he presented to the AMG board?

24 | A.  Absolutely.

25 | Q.  I would like to now turn to the next recording, which is

1    Government Exhibit 409.

2           Ms. Williams, where specifically -- first of all, what

3    is the date of when this recording took place?

4    A.   The date is June 19, 2012.

5    Q.   Describe for the jury the context in which this recording

6    was made.

7    A.   Don had gone to Kansas City to the loan company offices

8    there, and he had called me -- I was away from my desk.  He

9    called me and asked me -- I was at the front desk, and he

10   wanted some information about one of the terms of the BA

11   licensing agreement.

12   Q.   So he was in Kansas City and where were you at the time

13   this recording was made?

14   A.   Initially, at the time of this recording, I went back to my

15   office, which was at the west end of his office, and I called

16   him back.

17   Q.   When you called him back, did you turn on the recording

18   device on your phone?

19   A.   I did.

20   Q.   At this time, I would like to start to play Government

21   Exhibit 409, and the transcript is 409T in the transcript

22   binder.

23           (Audiotape played)

24           MR. RAVI:  Let's stop there.

25   Q.   Ms. Williams, turning to line 4 of page 1 of the

1    transcript, you said, "You know, originally, we were just going

2    to pay back his capital."

3         What is the word "his" referring to there?

4    A.   Scott Tucker.

5    Q.   What did you mean when you said "we were just going to pay

6    back his capital," what were you referencing?

7    A.   The BA agreement was the second agreement that had been

8    basically put forward to authorize Scott Tucker to take several

9    hundred million dollars out of the loan company in a lump sum,

10   and they were characterizing it initially as working capital

11   that he had contributed, but that was owed to him.

12   Q.   Was that the purchase agreement you testified about last

13   week?

14   A.   Right.  That was the purchase agreement.

15        Then when the attorneys became concerned about the

16   phrasing of the purchase agreement and getting back into the

17   merger, then they brought forward the BA licensing agreement.

18   Q.   When you refer to attorneys, who are you referring to?

19   A.   Conly Schulte was particularly concerned because he was the

20   attorney who handled most of the state litigations where the

21   declarations had been filed.

22   Q.   Are you referring to any other attorneys at this time?

23   A.   Tim Muir was involved in those discussions as well.

24             THE COURT:  Please slow down and speak distinctly.

25             THE WITNESS:  Yes, sir.

1       THE COURT:  Thank you.

2   Q.  Then turning to line 5, you said, "And now, we're going to

3   pay him for his licensing?"

4       Was that a reference to the transition to the BA

5   Services licensing agreement?

6   A.  That's correct.

7   Q.  In line 6 you stated, "Then we are going to pay for a

8   purchase for a company we, we have already told our board that

9   we already own."

10      What were you referencing there?

11  A.  I was referencing the 2008 merger and acquisition of CLK by

12  AMG Services.

13  Q.  That was the supposed merger you testified about last week?

14  A.  Yes, sir.

15  Q.  Finally, at line 13 and 14, you talk about completing a

16  transaction that has already been completed according to all

17  the representations.  What transaction were you referencing

18  there?

19  A.  That was the purported acquisition of 100 percent of the

20  assets of CLK.

21      MR. RAVI:  Let's go ahead and start the recording

22  again.  Begin at line 19 on page 1.

23      (Audiotape played)

24  Q.  Ms. Williams, turning back to the transcript at page 1,

25  line 22, you mentioned "the Blitz deal."  What is that?

1  A.  The tribe had looked at purchasing a local plastics

2  manufacturing company in Miami that was called Blitz

3  Manufacturing, and there had been some issues with the product,

4  and so there was discussion about doing appropriate due

5  diligence to determine any potential liability going forward

6  because of product liability.

7  Q.  Why did you mention the Blitz deal in this conversation?

8  A.  Because the BA Services agreement, in its earliest versions

9  and then going forward a little bit was changed, would have

10  placed all the liability for any actions, either civil or

11  criminal, by Scott Tucker or Blaine Tucker or other employees

12  of the loan company and the Miami tribe would have assumed all

13  the responsibility for all of these actions without any money

14  to pay any fines or fees or penalties that might arise from

15  them.

16  Q.  Were you suggesting here that more due diligence was

17  necessary?

18  A.  Absolutely.  They needed to at least determine what their

19  potential liability would have been on the IRS audit, the FTC

20  lawsuit, any other litigations that were current.  They didn't

21  have any clue what assets they might have to be able to take

22  care of those potential obligations.

23  Q.  Ms. Williams, I would like to now turn your attention to

24  the third recording that you made with Mr. Brady, and this is

25  the final recording you made, correct?

1  A.  Yes, with Don.

2          MR. RAVI:  At this time, the government offers

3  Government Exhibit 410.

4          THE COURT:  Any objection?

5          MR. GINSBERG:  No, your Honor.

6          THE COURT:  Received.

7          (Government's Exhibit 410 received in evidence)

8  Q.  What was the date of this recording, Ms. Williams?

9  A.  June 20, 2012.

10  Q.  Describe the context in which this recording is made.

11  A.  It was after work on the 20th, and I went into Don's office

12  to talk with him.  I was, again, hoping to dissuade him from

13  the course of action that he was on.

14  Q.  Did you turn on your phone at some point when you walked in

15  his office?

16  A.  I did.

17          MR. RAVI:  Go ahead and start playing the transcript

18  of 410T.

19          (Audiotape played)

20          MR. RAVI:  Let's pause there for a moment.

21  Q.  Ms. Williams, when you said at the end there "it's all

22  liability," what were you referencing?

23  A.  I was referencing the terms of the agreement, the BA

24  licensing agreement, that placed all of the liability for the

25  actions of Scott Tucker and Blaine Tucker and other loan

1    company employees, it would place all of the liability for

2    those actions, if they were deemed civilly or criminally wrong,

3    back on the tribe.

4           MR. RAVI:  Let's continue playing the recording,

5    beginning on line 7 of page 2 of the transcript.

6           (Audiotape played)

7           MR. RAVI:  Pause there.

8    Q.  Turning back to page 2 of the transcript, Ms. Williams,

9    when you refer to the intellectual property on line 16, what

10   are you referring to?

11   A.  I'm referring to use of the eCash system.

12   Q.  And turning to line 20, when Mr. Brady states, "It's gonna

13   be liabilities.  There -- nothing's gonna happen here, dear.

14   It's pretty much business as usual except uh -- as we wait for

15   the final big agreement."

16           What did you understand Mr. Brady to mean there?

17   A.  That it was just another scam, that it was just paperwork

18   to dress up, that there was nothing changing.  There wasn't

19   going to be any increase in revenue for the tribe.  There

20   wasn't going to be any change in anything substantial.  It was

21   just a paper trail.

22   Q.  Turning to page 3, at line 14, when Mr. Brady refers to

23   "big bumps now put into 14 or 15 million this year if that

24   happens -- if some of them happens.  $15 million this year,

25   we'll get that.  But that's not, uh, the millions sitting in

1    the accounts.  That's Scott's."

2            What did you understand Mr. Brady to mean there?

3    A.   In addition to the 1 percent, roughly, that was supposed to

4    have been moneys collected during a period of month that the

5    tribe received off of their five loan portfolios, that they

6    were also going to be given a dollar per loan, and they had

7    already received a payment, I think, of $3 million, they were

8    anticipating up to 5.5 million for that, and that Scott was

9    giving them as an incentive to get them to enter into the BA

10   licensing agreement.

11           MR. RAVI:  Start playing now at line 7 on page 4 of

12   the transcript.

13           (Audiotape played)

14           MR. RAVI:  Let's pause there briefly.

15   Q.   Ms. Williams, at line 11, you mentioned that you provide

16   certain documentation.  What were you referring to there?

17   A.   Minutes of the meetings and anything that Don asked me to

18   type, anything that purported to make this thing look like

19   anything besides a scam.  There were so many people being

20   misled.

21   Q.   Let's go ahead and turn now to the last part of the

22   recording.

23           (Audiotape played)

24   Q.   Ms. Williams, turning to line 8 of page 5 of the

25   transcript, Mr. Brady references that he has made declarations

1    and things.  What was he referencing there?

2    A.  He is referring to signed declarations that were submitted

3    in some of the state court litigation.

4    Q.  The next line, line 10, Mr. Brady refers to "the IRS

5    thing."

6            What does that relate to?

7    A.  It's related to an IRS audit on withholding for the loan

8    company, for employees of the loan company.

9    Q.  Did that also include an audit of tribal entities?

10   A.  Well, it was for MNE Services in AMG.

11   Q.  What did Mr. Brady tell you about that IRS audit?

12   A.  He said that if there was money owed, that Scott would pay

13   it and we didn't have to worry about it.

14   Q.  Did Mr. Brady meet with the IRS in connection with that

15   audit?

16   A.  He did.  He was very worried about it.

17   Q.  What concerns did Mr. Brady express to you regarding that

18   meeting?

19   A.  He didn't have answers to information that he thought a

20   person that was representing himself as the CEO of a company

21   should have.  He didn't know anything about the finances.  He

22   didn't know some of the money -- where some of the money had

23   been spent, very significant amounts of money that he wouldn't

24   have answers for those questions.

25   Q.  We will turn now to a different topic, and you can put the

1    transcripts away for just a while.  We will return to them in a

2    bit.

3              Now, Ms. Williams, shortly after these recordings that

4    took place in June 2012, was the BA Services agreement

5    ultimately agreed to by the tribe?

6    A.  Yes, by AMG, by the board of AMG.

7    Q.  Ultimately, did Mr. Brady advise the AMG board to sign or

8    to not sign the BA Services agreement?

9    A.  He consistently pushed for it.

10   Q.  What reasons did he provide to the board as to why they

11   should sign this agreement?

12   A.  He said if they didn't sign it, that Scott was going to

13   take the loan company to another tribe, and we would be back

14   where we were with nine employees and most of the people on

15   those boards would have lost their jobs within the tribe.

16   Q.  How many times did Mr. Brady mention the possibility that

17   Mr. Tucker would take the loan business to another tribe?

18   A.  Many, many times, any time anybody resisted what he was

19   supposed to get done.

20   Q.  When Mr. Brady said Mr. Tucker might take the loan business

21   elsewhere, did any board members contest that statement?

22   A.  No.

23   Q.  Do you recall exactly when the BA Services agreement was

24   agreed to by the tribe?

25   A.  It was the end of June in 2012.

1   Q.  Turning to the declarations that were mentioned on the

2   recordings, those were filed in state court litigations

3   relating to the payday loan business, correct?

4   A.  That's correct.

5   Q.  How are you familiar with these declarations or filings in

6   state court?

7   A.  That was part of my job to organize these documents, and

8   they were part of the documents that I was creating indexes

9   for.  And then I also had to produce them to the attorneys in

10  the FTC lawsuit.

11  Q.  I am handing you a number of exhibits.  I would like to

12  show you now Government Exhibit 322.

13          Do you recognize this?

14  A.  I do.

15  Q.  What is it?

16  A.  It's a declaration that Don filed -- Don signed.  It's

17  called, "Second declaration of Don Brady in support of renewed

18  motion to quash and dismiss for lack of subject matter

19  jurisdiction."

20          MR. RAVI:  The government offers Government Exhibit

21  322.

22          THE COURT:  Any objection?

23          MR. GINSBERG:  No.

24          THE COURT:  Received.

25          (Government's Exhibit 322 received in evidence)

1           MR. RAVI:  Please publish that for the jury.

2           If you could highlight on page 1 the three lawyers

3    that are listed on the top left.

4    Q.  Do you recognize any of those names?

5    A.  I do.

6    Q.  Which ones?

7    A.  Shilee Mullin and Conly Schulte were two of the attorneys

8    that I had interactions with.

9           MR. RAVI:  If you can now zoom out and focus in on the

10   second declaration of Don Brady, in support of renewed motion

11   to quash and dismiss for lack of subject matter jurisdiction.

12          Can you turn now to page 6.

13          Zoom in on the date and the signature line.

14   A.  I'm sorry.  Page what?

15   Q.  Page 6.  These are on the screen in front of you as well.

16          What is the date of this declaration?

17   A.  May 30, 2012.

18   Q.  Who signed it?

19   A.  Don Brady.

20   Q.  If we can turn to the portion right above that, and just

21   read what that says.

22   A.  "I declare under the penalty of perjury under the laws of

23   the State of California that the foregoing is true and

24   correct."

25   Q.  Ms. Williams, were you at the tribe on May 30, 2012?

1    A.  I was.

2    Q.  Now turn to page 3.

3          If you can focus in on the first half of the paragraph

4    of paragraph 6.

5          Please read the first two sentences, Ms. Williams.

6    A.  "In performance of my duties as CEO of MNE, I manage the

7    services that MNE and its subdivisions provide, as well as

8    maintain the ultimate responsibility for its books, records and

9    accounts.  Also, I manage the operation of MNE, and am

10   ultimately responsible for marketing, strategy and compliance

11   with all regulations pertaining to MNE."

12   Q.  Now, the loan business was associated with MNES, correct?

13   A.  That's correct.

14   Q.  Did that fall under the umbrella of MNE?

15   A.  MNE was the parent organization of MNE Services.

16   Q.  When Mr. Brady stated that he manages the services that MNE

17   and its subdivisions provide, was at that accurate with respect

18   to the payday loan business?

19   A.  It was not.

20   Q.  Why not?

21   A.  Because he had no access to the books and records and the

22   accounts.

23   Q.  Did he manage the services that were provided by the payday

24   loan business?

25   A.  No.

1   Q.  Turning to the rest of that sentence it states, "as well as

2   maintain the ultimate responsibility for its books, records and

3   accounts."

4            Was that a true statement at the time?

5   A.  No, it was not.

6   Q.  Again, why was that not a true statement?

7   A.  Because he didn't have access to that information.

8   Q.  Turning to the next sentence, Mr. Brady states that he is

9   "ultimately responsible for marketing, strategy and compliance

10  with all regulations pertaining to MNE."

11           Was Mr. Brady responsible for marketing, strategy and

12  compliance with respect to the payday loan business?

13  A.  No, he was not.

14  Q.  Were these statements accurate with respect to MNE's other

15  businesses?

16  A.  Yes, they were.

17  Q.  But not with respect to the payday loan business?

18  A.  That's correct.

19  Q.  Let's turn to page 3, paragraph 7.

20           Can you just read the last sentence?

21  A.  "Also, one of the businesses that I operate as CEO of MNE

22  is Miami tribe's online short-term loan company, which was

23  originally operated by MTBE."

24           Was that a true statement?

25  A.  No.

1   Q.   Why not?

2   A.   Because he didn't operate it.

3   Q.   Turn now to page 4, at paragraph 13.

4        The first clause states, "MNE processes and approves

5   the loan applications pursuant to criteria that MNE has

6   approved," and states "underwriting" in parentheses.

7        Was that a true statement?

8   A.   No.

9   Q.   Why is that a false statement?

10  A.   Because all of the operations took place in Kansas City.

11  All that happened -- all that happened on the tribal

12  headquarters was just a little dog and pony show.

13  Q.   Did MNE ever approve criteria pursuant to which the loans

14  were approved?

15  A.   They did not.

16  Q.   Going further in that sentence, Mr. Brady states, "I (or in

17  limited instances another MNE executive) approve the loan

18  applications daily at MNE headquarters located on the tribe's

19  trust land."

20       Was that a true statement?

21  A.   We went through a process that was called approving the

22  loans, I was one of those people that had the function a few

23  times, but we made no decisions about that.  It was strictly a

24  clerical function.  Enter a password in a particular portfolio,

25  you looked for the correct date, you scroll down, hit a button,

1    you close that out, and you go to the next one.

2    Q.  Was this the supposed loan approval process that you

3    testified about last week?

4    A.  Yes.

5    Q.  And when Mr. Brady refers to another MNE executive, is he

6    referring to you?

7    A.  I was third in line.  Gena Lankford was ahead of me.

8    Q.  Finally, in the second to last sentence, as well as the

9    last sentence, states, "Upon such approval the loan is

10   consummated."

11            Was that a true statement?

12   A.  I don't believe so.

13   Q.  And finally, it states that the loans are consummated on

14   Indian lands and within the jurisdiction of the Miami tribe.

15   Is that a true statement?

16   A.  No, it was not.

17   Q.  Let's turn now to page 5, paragraph 17.

18            If we can focus in on the first sentence.

19            Would you please read that sentence, Ms. Williams?

20   A.  "All profits that MNE and MNE Services, Inc. receive from

21   their loan business and profits received from AMG are utilized

22   for the benefit of the Miami tribe, and are distributed to many

23   different programs and for many different services."

24   Q.  Was that a true statement, Ms. Williams?

25   A.  No, it is not.

1   Q.  Why is that a false statement?

2   A.  Because the tribe only received a pittance.  They received,

3   roughly, 1 percent of the payments that had been received for

4   that month.  And the only money they had control over was that

5   money -- that check, that money that they received.  They had

6   no control over any of the significant money, and that other

7   money, with the exception of the 1 percent, was never used for

8   the benefit of the tribe.

9   Q.  Who provided those checks to the tribe of the 1 percent?

10  A.  Scott Tucker and Blaine Tucker.

11  Q.  Where did the rest of the 99 percent of the profit go?

12  A.  It went to them.

13  Q.  When you say "them," who are you referring to?

14  A.  To Scott Tucker and Blaine Tucker.

15  Q.  Ms. Williams, to your knowledge, were any of these

16  statements, these false statements that we have discussed

17  accurate at any time prior to when you returned to the tribe in

18  2011?

19  A.  No.

20          MR. GINSBERG:  Objection, your Honor.

21          THE COURT:  Basis.

22          MR. GINSBERG:  The way the question is framed, there

23  is a period of time where she is not working at the tribe.

24          THE COURT:  Rephrase your question, please.

25  Q.  Ms. Williams, you were previously at the tribe at some

1   point, correct?

2   A.  I was from mid-2003 through the fall of 2005.

3   Q.  Were you aware of whether the false statements that we just

4   discussed were accurate at the time that you were at the tribe

5   in 2003 through 2005?

6   A.  I don't believe the statement would have been accurate.

7   Q.  I would like to now turn to Government Exhibit 309.

8           MR. RAVI:  The government offers Government Exhibit

9   309.

10          THE COURT:  Any objection?

11          MR. GINSBERG:  No objection.

12          THE COURT:  Received.

13          (Government's Exhibit 309 received in evidence)

14          MR. RAVI:  Please publish that.

15  Q.  Ms. Williams, who is this e-mail from and to?

16  A.  The e-mail is from Conly Schulte to Scott Tucker.

17  Q.  What is the subject?

18  A.  Colorado filings.

19  Q.  If you would please read the bottom of the e-mail.

20  A.  "Scott.  Attached are the documents filed in Denver

21  district court yesterday.  The plan is to essentially make

22  these same arguments to the court on Friday in Denver, although

23  I suspect the state will ask for more time to respond to these

24  arguments.  I'll let you know how things go."

25  Q.  What is the date on this e-mail?

1  A.  July 20, 2005.

2  Q.  Turn now to the attachment.  What is the attachment?

3  A.  Affidavit of Don Brady in support of special appearance to

4  contest jurisdiction.

5  Q.  Is Conly Schulte one of the attorneys that is listed on

6  this?

7  A.  Yes, he is.

8  Q.  If we turn to the last page, what is the date of this

9  affidavit?

10  A.  July 15, 2005.

11  Q.  Who is it signed by?

12  A.  Don Brady.

13  Q.  Does that contain the same language that Mr. Brady swears

14  under penalty of perjury that what is contained in the

15  affidavit was true?

16  A.  Yes.

17  Q.  Let's turn now to page 2, and paragraph 2, focus in on the

18  second and third sentences.

19          Can you please read beginning with "in performance of

20  my duties"?

21  A.  "In performance of my duties as CEO of MNE, I manage the

22  services that MNE and its entities provide, as well as maintain

23  the ultimate responsibility for its books, records and

24  accounts.  Also, I manage the day-to-day operation of MNE, and

25  am ultimately responsible for marketing, strategy, and

1   compliance with all regulations."

2   Q.  Were you at the tribe at the time that this affidavit was

3   filed?

4   A.  I was, but I was not working with the loan company.

5   Q.  While you were working with the loan company, are you aware

6   whether this statement was true false or false?

7   A.  I do not believe it was true.

8   Q.  To your knowledge, based on working with Mr. Brady, you

9   don't believe this was true?

10  A.  No.

11  Q.  Turning now to page 3, paragraph 6.  Please read that

12  paragraph.

13  A.  "MNE, d/b/a Cash Advance (hereinafter 'Cash Advance')

14  provides cash advance services to eligible borrowers pursuant

15  to express loan agreements, and the loan transactions occur on

16  Indian lands of the Miami tribe of Oklahoma."

17  Q.  Are you aware of whether this statement was true or false

18  at the time that you were at the tribe and working with Don

19  Brady?

20  A.  I do not believe that was true.

21  Q.  Are these statements in this declaration filed in 2005

22  similar to the statements that we discussed were false in 2012?

23  A.  Yes.

24          MR. RAVI:  Take this down.

25          I would like to offer now Government Exhibit 323.

1        MR. GINSBERG:  No objection.

2        THE COURT:  Received.

3        (Government's Exhibit 323 received in evidence)

4   Q.  Ms. Williams, turning to the bottom e-mail first, what is

5   the date of that e-mail?

6   A.  July 14, 2005.

7   Q.  Who is this e-mail sent to?

8   A.  It says to elyons@joneskeller.com and to Richard C.

9   Wallace, with copies to Conly J. Schulte,

10  k.bellmard@miamination.com, and kbellmard@andrewsdavis.com.

11  Q.  Do you know who K. Bellmard is?

12  A.  Ken Bellmard was a part-time general counsel for the tribe

13  in that time period.

14  Q.  Go to the "from" and "to" lines at the top of the e-mail.

15  A.  From Conly J. Schulte to Scott Tucker.

16  Q.  What is the date of that e-mail?

17  A.  July 14, 2005.

18  Q.  Please read the body of that top e-mail?

19  A.  "Scott.  Attached are the current drafts of the filings.

20  The current plan is finalize tomorrow and file them on Monday."

21  Q.  Is there an attachment to this e-mail?

22  A.  There is.

23  Q.  Can you just turn to the second page.

24        Is this a draft of the Don Brady affidavit that we

25  just discussed that was filed in 2005?

1    A.  Yes.

2    Q.  Turn now to Government 316.

3            MR. RAVI:  The government offers Government Exhibit

4    316.

5            MR. GINSBERG:  No objection, your Honor.

6            THE COURT:  Received.

7            (Government's Exhibit 316 received in evidence)

8            MR. RAVI:  Publish this, please.

9    Q.  Ms. Williams, does this exhibit, Government Exhibit 316,

10   contain a subsequent e-mail on the same chain that we just

11   discussed?

12   A.  Yes.

13   Q.  And if we can focus on the top e-mail, what is the date of

14   that?

15   A.  Friday, July 15, 2005.

16   Q.  Who is that from and who is it to?

17   A.  From Scott Tucker to Conly Schulte.

18   Q.  Can you please read the body?

19   A.  "Conly.  I think (but you are the expert) that these look

20   good and to the point.  As I asked earlier, do we have to

21   disclose to them these before the hearing?  And if so, will the

22   hearing most likely be postponed once they receive these?"

23   Q.  Is this referring to the same draft of the Don Brady

24   affidavit?

25   A.  Yes.

1    MR. RAVI:  You can take this down.

2    The government now offers Government Exhibit 315.

3    MR. GINSBERG:  No objection.

4    THE COURT:  Received.

5    (Government's Exhibit 315 received in evidence)

6  Q.  Ms. Williams, on Government Exhibit 315, is this also a

7  subsequent e-mail on the same e-mail chain?

8  A.  Yes.

9  Q.  If you can now focus in on the second e-mail from the top.

10  A.  Yes.

11  Q.  What is the date of that e-mail?

12  A.  Thursday, July 14, 2005.

13  Q.  Who is the e-mail from and to?

14  A.  From Conly Schulte to Scott Tucker.

15  Q.  We are focusing on the e-mail the second from the top.

16  A.  OK.

17  Q.  Do you see that on the screen in front of you?

18  A.  I do.  Oh, I see.  Sorry.

19  Q.  Who is that e-mail from and to?

20  A.  From Scott Tucker to Blaine Tucker.

21  Q.  Read the body of the e-mail.

22  A.  "Check these out.  Let me know what you think."

23  Q.  This again is the same Don Brady, a draft of the Don Brady

24  affidavit?

25  A.  Yes.

1   Q.  Turn now to the top e-mail.

2           Who is this from and to?

3   A.  From Blaine Tucker to Scott Tucker.

4   Q.  What is the date of this e-mail?

5   A.  July 15, 2005.

6   Q.  Please read the body of the e-mail.

7   A.  "I like them, especially the one from Don B."

8           MR. RAVI:  We can take that down.

9   Q.  Ms. Williams, you mentioned you're familiar with other

10  declarations and affidavits of Mr. Brady that were filed in

11  state court litigations relating to the payday loan business,

12  correct?

13  A.  Yes.

14          MR. RAVI:  The government at this time offers

15  Government Exhibit 317, 318, 319, 320 and 321.

16          MR. GINSBERG:  I am trying not to be hypertechnical,

17  but the question was other affidavits, and now we are referring

18  to some exhibits.  I think we should identify that these are

19  some of the declarations she is familiar with.

20          THE COURT:  Why don't you lay a little bit of a

21  foundation, please, Mr. Ravi.

22  Q.  Ms. Williams, have you previously reviewed what is in

23  Government Exhibits 317, 318, 319, 320 and 321?  They should

24  also be in front of you.

25  A.  Yes, I am familiar with these.

1  Q.  Are those all affidavits or declarations of Mr. Brady that

2  were filed in state court litigations relating to the payday

3  loan business?

4  A.  Yes.

5          MR. RAVI:  The government offers Government Exhibits

6  317, 318, 319, 320 and 321.

7          MR. GINSBERG:  I have no objection, your Honor.

8          THE COURT:  Received.

9          (Government's Exhibits 317, 318, 319, 320 and 321

10  received in evidence)

11  Q.  You can put those exhibits aside for now, Ms. Williams.

12          Ms. Williams, you testified last week that you had

13  some concerns that made you question the tribe and Mr. Brady's

14  role regarding the payday loan business, correct?

15  A.  Yes.

16  Q.  One of things you mentioned was the signing of documents by

17  Mr. Brady, correct?

18  A.  Yes.

19  Q.  Who sent these documents to be signed by Mr. Brady?

20  A.  Generally, Natalie Dempsey would FedEx them.

21  Q.  How were they received at the tribe?

22  A.  They were sent by FedEx, and they were given to Don Brady,

23  and he would execute the documents, if that was required, and

24  then we would turn around and FedEx them back.

25  Q.  What types of documents are we generally talking about?

1    A.   Sometimes vendor contracts, sometimes declaration pages

2    similar to these.   Those are the principal ones.

3    Q.   Was Mr. Brady always provided the entire document when he

4    was asked to sign a document?

5    A.   No.   Sometimes he only got the signature page.

6    Q.   What would he have to do with the signature page?

7    A.   He would just sign it, have it notarized, and then return

8    it.

9    Q.   Did the tribe also receive mail in connection with the loan

10   company?

11   A.   We did.

12   Q.   What kind of mail?

13   A.   On a monthly basis, we received copies of the bank

14   statements, from Bay City Bank, US Bank, Welch State Bank, and

15   we would receive documents from consumer protection agencies,

16   offices of attorney general in different states, and also some

17   mail that was sent from, like, credit protection organizations,

18   nonprofits that helped people when they were struggling with

19   their bills.

20   Q.   Where was this mail specifically received at?

21   A.   The mail that I saw was sent to the MNE building at 3531 P

22   Street NW, in Miami.

23   Q.   Are you familiar with what happened to this mail?

24   A.   Yes.

25   Q.   How are you familiar with what happened with the mail?

H9P8TUC1                    Williams - Direct

1    A.  Because at times I would handle the mail as well.

2    Q.  What was done with this mail, generally?

3    A.   In the first few months I was there, before all the issues

4    with the BA Services agreement started to heat up and prior to

5    the FTC lawsuit being filed, the bank statements were simply

6    FedEx'd overnight to Natalie Dempsey unopened.  The things from

7    offices of attorney general or from consumer protection

8    agencies, I would make a copy of whatever pages were inside

9    those, keep a copy in my office, and those would be sent -- I'm

10   sorry, the ones from the offices of attorney general, anything

11   that alleged there was a complaint of some kind, would be sent

12   to Conly Schulte's office.  The other mail, which was from

13   organizations that made payment arrangements for people who

14   needed to pay out their loans and things, would be sent just

15   overnight to the Kansas City office as well.

16   Q.  Was anyone reviewing any of this mail at the tribe when it

17   was received?

18   A.  The pieces that appeared to be from, for example, the

19   attorney general's office, we would open those.  But the other

20   mail, until sometime mid-2012, the other mail was just

21   repackaged in FedEx packs and sent overnight.

22              (Continued on next page)

23

24

25

1    BY MR. RAVI:

2    Q.  Sent overnight where?

3    A.  To, generally, Natalie Dempsey at the Kansas City office.

4    Q.  Who instructed that the mail be handled in this manner?

5    A.  Don Brady.

6    Q.  Based on your conversations with Mr. Brady, why did the

7    mail come first to the tribe instead of just going directly to

8    Overland Park, Kansas?

9    A.  Because they were, Don said they needed, the mail was sent

10   to offices on tribal trust land so that it would appear that

11   the company, that the loan company was operated on trust land.

12   Q.  I'd like to now turn to a different topic.  Ms. Williams,

13   at some point did you have a position relating to the payday

14   loan business?

15   A.  I did.

16   Q.  And what was that position?

17   A.  I -- probably mid-2012, I, I became a supervisor for the

18   loan company employees that actually worked on property at --

19   that were designated as loan company employees working on

20   property at the P Street address in Miami.

21   Q.  How many employees are we talking about?

22   A.  Anywhere from two to four.

23   Q.  And where did these employees work?

24   A.  They occupied offices on the west end of the MNE building

25   on P Street.

H9pWtuc2                    Williams - Direct

1    Q.  You mentioned that you were a supervisor.  What did you do

2    as a supervisor of these employees?

3    A.  Well, I had no training in the loan business at all, so all

4    I did was just record their leave time.  I signed their leave

5    slips.  If they were absent for illness or medication --

6    vacation, and on occasion I would talk with them about any

7    disputes they had with each other.

8    Q.  So what did these two to four employees do?

9    A.  They sat at computer terminals, and I understood from

10   conversations with them that sometimes they would make calls

11   back to people who had applied for the loans but had not

12   consummated them.

13   Q.  And who trained these two to four employees?

14   A.  Crystal Grote.

15   Q.  Who is Crystal Grote?

16   A.  She was a supervisor, I'm not sure what her title was, in

17   the Kansas City loan company office.

18   Q.  And who did these employees get their directions from?

19   A.  From Crystal.

20   Q.  Was she their supervisor?

21   A.  I was their supervisor on paper.

22   Q.  And who paid these two to four employees that worked at the

23   Miami Oklahoma?

24   A.  My salary and their salaries were paid through MNE.

25   Q.  In other words, were they paid by the tribe, or were they

H9pWtuc2                    Williams - Direct

1    paid by the payday loan business?

2    A.   They were paid by the tribe.

3    Q.   Were any of these employees' salaries reimbursed by the

4    payday loan business?

5    A.   No, they were not, not in the time period that I was there.

6    Q.   Did these employees receive bonuses?

7    A.   No, they were not allowed to participate in the bonus

8    structure that the Kansas City employees had.

9    Q.   Did you ever provide these employees work to do?

10   A.   Yes, sometimes they would help me with scanning documents

11   and moving, reorganizing files.

12   Q.   And were those tasks related to the payday loan business?

13   A.   Well, from the standpoint that there was, it was a clerical

14   function.  It had nothing to do with what their job

15   designations were.

16   Q.   Did you ever provide these employees with any feedback on

17   how their work was?

18   A.   On two or three occasions that I recall, we received an

19   email from Crystal Grote talking about their production or

20   ranking their production among those four employees or two to

21   four employees, but that was it.

22   Q.   Were these employees involved in any decisions related to

23   reviewing and approving loan applications?

24   A.   They were not.

25   Q.   Now, based on your discussions with Mr. Brady, why were

H9pWtuc2                         Williams - Direct

1    these employees working from the tribe's offices rather than at

2    the payday loan business in Kansas City?

3    A.   Don said they thought having loan company employees

4    supported the idea that the business was being operated on

5    tribal trust land.

6    Q.   But again, were these employees doing anything related to

7    loan approvals?

8    A.   No.

9    Q.   Ms. Williams, you also participated in a board meeting

10   concerning these entities, correct?

11   A.   I did.

12   Q.   Which entities were they?

13   A.   AMG, MNE Services and later MNE.

14   Q.   In what capacity did you participate in these board

15   meetings?

16   A.   I was the recording secretary.

17   Q.   What did that mean?

18   A.   I prepared the agenda for the meetings, distributed any

19   documents earlier -- prior to the meetings and then recorded

20   the minutes during the meetings.

21   Q.   Was there an article that came out related to the payday

22   lending company at some point?

23   A.   Yes, there was a news article that came out --

24            MR. GINSBERG:   Objection.

25            THE COURT:   Sustained.

H9pWtuc2                      Williams - Direct

1    Q.  Approximately when did that article come out?

2    A.  It would have been late summer, early fall of 2011.

3    Q.  Without going into the substance of the article, what was

4    the impact of that article on AMG and MNES board members?

5    A.  They were not very happy about it.  They were receiving

6    phone calls from tribal members who were, some who were not

7    aware that the tribe --

8            MR. GINSBERG:  Objection, your Honor, unless the

9    witness has direct knowledge of those calls.

10           THE COURT:  Sustained.

11   Q.  Ms. Williams, are you aware of whether the AMG board or the

12   MNES board met regularly prior to when that article came out in

13   2011?

14   A.  I found no evidence of regular meetings when I was

15   assembling the documents.

16   Q.  When you say you were assembling the documents, why were

17   you assembling documents?

18   A.  One of the jobs, reasons that I was hired was to organize

19   and provide indexes of all of the organizational documents,

20   which would have included minutes of meetings and the

21   incorporation documents.

22   Q.  Are you aware of any board meetings or board minutes that

23   occurred prior to 2011 for the AMG and MNES boards?

24   A.  Just the initial organizational documents in the 2008 time

25   period.

1    Q.   And AMG and MNES were formed when?

2    A.   In 2008.

3    Q.   So between approximately 2008 to 2011, other than the

4    initial board meetings, you're not aware of any board meetings

5    or board minutes that took place during that time?

6            MR. GINSBERG:  Objection, your Honor.  She wasn't

7    there during that whole period of time.

8            THE COURT:  Rephrase.

9    BY MR. RAVI:

10   Q.   Ms. Williams, would you be familiar whether or not there

11   were board minutes recorded between the time period between

12   2008 and 2011?

13   A.   I would have been.

14   Q.   And why would you -- how would you be familiar with that?

15   A.   Because part of my job included organizing these documents

16   and providing them to the attorneys for discovery in the state

17   litigations.

18   Q.   So even though you weren't at the tribe between 2008 and

19   2011, you were tasked with finding board minutes that occurred

20   prior to when you were there and organizing those documents for

21   litigation, correct?

22   A.   That's correct, from after 2008 as relates to AMG and MNE

23   Services.

24   Q.   Are you aware of any board meeting minutes that the tribe

25   had between 2008 and 2011 other than the initial meeting?

1    A.  I don't recall any.

2    Q.  Ms. Williams, approximately when did the FTC investigation

3    become public?

4    A.  The complaint was filed in early April.  I don't recall

5    whether there was any press prior to that.

6    Q.  Does April 2012 sound about right?

7    A.  Yes.  I'm sorry.  2012.

8    Q.  Now, prior to that FTC investigation that became public in

9    April 2012, what was discussed regarding the payday loan

10   business in board meetings at AMG and MNES?

11   A.  A typical agenda included Don providing a financial

12   overview, which was essentially reporting on the amount of

13   check that was received from the previous month, or whatever

14   time period.  And there would also be status updates on, for

15   example, on any state litigation, and -- that was still

16   pending, and also on the status of the IRS audit.

17   Q.  When did that IRS audit begin?

18   A.  I believe it began at some point in 2011.  I can't tell you

19   exactly the date.

20   Q.  So other than the amount of money the tribe was receiving

21   and the status of the state court litigation or the IRS audit,

22   was anything else, any other topics relating to the payday loan

23   business, discussed in these board meetings prior to April

24   2012?

25   A.  On occasion they would discuss the use of their, the

1  payment they received.

2  Q.  Prior to the FTC investigation becoming public, did AMG and

3  MNES act as real boards?

4       MR. GINSBERG:  Objection, your Honor.

5       THE COURT:  Rephrase it.

6  Q.  Ms. Williams, prior to the FTC investigation becoming

7  public in April 2012, did the AMG or MNES boards ever make

8  decisions regarding the policies and procedures of the payday

9  loan business?

10 A.  They did not.

11 Q.  Did they ever make decisions regarding the operations of

12 the payday loan business?

13 A.  No, they did not.

14 Q.  Did they ever make decisions regarding the terms of loans

15 or criteria for loan approval?

16 A.  No.

17 Q.  Did they ever make decisions regarding the collection of

18 loans?

19 A.  No.

20 Q.  Did they ever make decisions or review the books and

21 records of the payday loan business?

22 A.  No.

23 Q.  Did they ever initiate any resolutions that should be

24 passed regarding the payday loan business?

25 A.  On occasion they were directed to do resolutions that

H9pWtuc2                     Williams - Direct

1    related to opening bank accounts and authorizing certain

2    signatories on the bank accounts.

3    Q.   And who directed those resolutions to be passed?

4    A.   Usually that would have been -- well, the attorneys would

5    have prepared them, but they would have been authorized by

6    Scott and Blaine Tucker.

7    Q.   Who are the attorneys you're referring to?

8    A.   Conly Schulte.

9    Q.   Are you referring to any other attorneys?

10   A.   Conly Schulte and Shilee Mullin would send drafts of

11   resolutions.

12   Q.   And after the FTC investigation became public in April of

13   2012, did the boards begin to act differently?

14   A.   Oh, yes.

15   Q.   And how did they begin to act differently?

16   A.   They started asking questions.  They were concerned about

17   their lack of knowledge.

18   Q.   And can you describe those concerns more specifically?

19   A.   They were concerned that if they were subpoenaed to testify

20   in any court proceedings --

21            MR. GINSBERG:  Your Honor, I object to this general

22   narrative, "they."  It's a board.  There are a lot of different

23   members.  There were different meetings.

24            THE COURT:  Put a new question to the witness.

25   BY MR. RAVI:

1   Q.  Ms. Williams, when you're speaking about the boards acting

2   differently, who are you referring to?

3   A.   The members of the MNE Services board were particularly

4   concerned because their entity that they supposedly oversaw was

5   responsible for the money.  AMG's board seemed to have less

6   concern because they were over the people and the buildings and

7   vendor contracts and things of that nature.  But Gina Lankford,

8   Donya Williams and Scott Willard, who were the NME Services

9   board, expressed concern on multiple occasions.

10  Q.   And were these concerns as a result of the things we've

11  been talking about, the FTC investigation becoming public?

12  A.   Yes.

13  Q.   The IRS audit?

14  A.   Absolutely.

15  Q.   As well as that news article that came out?

16  A.   Yes.

17  Q.   Ms. Williams, you mentioned --

18          THE COURT:  Do you have much more, Mr. Ravi?

19          MR. RAVI:  Yes, your Honor.

20          THE COURT:  Let's take a brief recess, ladies and

21  gentlemen.  Please do not discuss the case among yourselves.

22  Keep an open mind.  See you in ten minutes.

23          (Jury not present)

24          THE COURT:  See you in ten minutes.

25          (Recess)

H9pWtuc2                    Williams - Direct

1      THE COURT:  Bring our jurors in, please.

2      (Jury present)

3      THE COURT:  Please be seated.

4      You may continue.

5      MR. RAVI:  Thank you, your Honor.

6  Q.  Ms. Williams, prior to the break, you talked about how

7  prior to April 2012, the boards talked about the amount of

8  money they were receiving from the payday loan business,

9  correct?

10 A.  Yes.

11 Q.  And how did that money come in?

12 A.  It came in a monthly check.  It was usually a check that

13 was stapled to an adding machine tape that -- the numbers on

14 the adding machine tape represented the amounts that they were

15 due from the individual portfolios.

16 Q.  And how was that check, the amount on those checks supposed

17 to be calculated?

18 A.  1 percent.

19 Q.  It was the same 1 percent we've talked about before,

20 correct?

21 A.  Yes.

22 Q.  And what was your role with respect to these checks?

23 A.  I would make copies of them and put them in a binder.

24 Q.  How often would they come in?

25 A.  Monthly.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H9pWtuc2                    Williams - Direct

1    Q.  And roughly how much money was received in these checks?

2    A.  Varying amounts.  I'm going to say 150 to 450,000.  More

3    money closer to the holidays.

4    Q.  More money came out around the holidays?

5    A.  Yes.

6    Q.  Who were the checks made out from?

7    A.  MNES and Tribal Financial Services, TFS.

8              THE WITNESS:  God bless you.

9              THE COURT:  Thank you.

10   Q.  To your knowledge, did the tribe verify the amount of money

11   it was receiving?

12   A.  They did not.

13   Q.  Did the tribe ever exercise any due diligence as to whether

14   the amount on the check equaled 1 percent of the revenues?

15   A.  They did not.

16   Q.  To your knowledge, did the tribe have any way of verifying

17   the amount it received was 1 percent?

18   A.  No.

19   Q.  And why is that?

20   A.  They didn't have access to the financials.

21   Q.  The financials of the payday loan business?

22   A.  That's correct.

23   Q.  Ms. Williams, you mentioned last week that there was no

24   payment by the tribe for the supposed merger of CLK to AMG

25   until two years later, correct?

1    A.   That's correct.

2            MR. RAVI:  At this time the government offers

3    Government Exhibit 1313.

4            THE COURT:  Any objection?

5            MR. GINSBERG:  No objection, your Honor.

6            THE COURT:  Received.

7            (Government Exhibit 1313 received in evidence)

8    BY MR. RAVI:

9    Q.  Ms. Williams, could you please read the name that's on the

10   top in the center of this document?

11           MR. GINSBERG:  Your Honor, could we just take it down

12   for a second?

13           THE COURT:  Take it down for a second, please.

14           MR. GINSBERG:  Do you see the issue, your Honor?

15   Could I approach?

16           THE COURT:  What portion should I look at?

17           MR. GINSBERG:  The side.

18           THE COURT:  The side?

19           MR. GINSBERG:  The left-hand side, yes.

20           THE COURT:  Let me see you at sidebar.

21           (Continued on next page)

22

23

24

25

1    (At sidebar)

2        THE COURT:  The marking on the side would appear to

3    indicate that it was produced by the IRS, I suppose, as part of

4    the investigation that it conducted.

5        MR. GINSBERG:  I suspect.  I mean, I think, frankly, I

6    have no problem stipulating that they received a check in the

7    amount of whatever.  I think that obviates any problem.  I

8    don't really think the government needs more than that for what

9    they're doing.  That would be my proposal.

10        THE COURT:  Is that acceptable?

11        MR. RAVI:  No, your Honor.  We believe that the page,

12    the cover page for the check, there's some handwriting that

13    shows exactly what the check was for and specifically states on

14    that handwriting that the check is not supposed to mention

15    anything in the memo line, thereby indicating that there was

16    some intention at least to ensure that this check could not be

17    connected to the merger payment that was made.

18        THE COURT:  All right.  I'm going to allow the exhibit

19    as is.  I'm going to tell the jury to ignore any of the

20    markings that were put on after the document was generated,

21    markings about where it came from, etc.  There's no prejudice

22    here, because the jury already has heard testimony that there

23    was an IRS investigation.

24        MR. GINSBERG:  OK.

25        THE COURT:  Thank you.

1              (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    THE COURT:  Government Exhibit 1313 is received.

3    Ladies and gentlemen, you'll see that there are some

4    stampings on the document, some markings on the document.  You

5    can ignore them.  They were put on presumably after the

6    document was generated.

7    Go ahead, Mr. Ravi.

8    BY MR. RAVI:

9    Q.  Ms. Williams, at the top, in the center, can you just read

10   what's listed?  Is there a name there?

11   A.  Yes.  There's a company named Westfund and then Scott

12   Tucker, principal.

13   Q.  And then below that, do you see some handwriting, ignoring

14   the stamp that's across the document?

15   A.  I do.

16   Q.  What does that say?

17   A.  "AMG to Scott Tucker, $135,259, re purchase," and then

18   "purchase agreement CLK."

19   Q.  That's to the right-hand side of the document, correct?

20   A.  Yes.

21   Q.  Then is there also some writing, handwriting on the bottom

22   left side of the document?

23   A.  Yes, it says "I," and then underscored "do not want

24   anything in the memo line on check.  See me."

25   MR. RAVI:  Could we now turn to the third page of this

1  document.

2  Q.  Is this a check, Ms. Williams?

3  A.  Yes, it is.

4  Q.  What's the date of this check?

5  A.  June 29, 2010.

6  Q.  And who does this check pay?

7  A.  It's paid to Scott A. Tucker.

8  Q.  Who is it signed by?

9  A.  Don Brady.

10  Q.  And who is the check from?

11  A.  The account is from AMG Services Inc.

12  Q.  And what's the amount on this check?

13  A.  $135,259.17.

14  Q.  Do you know how that amount was calculated?

15  A.  The amortization schedule.  The original purchase price was

16  $120,000.

17  Q.  Is that amortization schedule on page 2 of this document?

18  A.  Yes.

19      MR. RAVI:  Please turn to that and publish it for the

20  jury.  You can take that down.

21      The government would now offer Government Exhibit

22  4026.

23      THE COURT:  Any objection?

24      MR. GINSBERG:  No, your Honor.

25      THE COURT:  Received.

H9pWtuc2                    Williams – Direct

1        (Government Exhibit 4026 received in evidence)

2        MR. RAVI:  Could we focus on the bottom of the email

3   and publish.

4   Q.  Who is this email to and from?

5   A.  From Tim Muir to Scott Tucker.

6   Q.  What's the date?

7   A.  Wednesday, June 30, 2010.

8   Q.  Please read the body of the email?

9   A.  "Did you ever get that check down to Don for his sig?"

10       MR. RAVI:  Go to the next email above that.

11   Q.  Did Scott Tucker respond to that email?

12   A.  He did.

13   Q.  And what did he respond with?

14   A.  "Yes, I have it.  It is signed and in my office."

15   Q.  When was that email sent?

16   A.  June 30, 2010.

17   Q.  And is that the day after the check that we just saw was

18   dated?

19   A.  That's correct.

20       MR. RAVI:  Turn to the next email.

21   Q.  Who is this from and who is this to?

22   A.  From Tim Muir to Scott Tucker.

23       MR. RAVI:  I'll just have you highlight the body of

24   the email.

25       Turn to the next email above that.

1   Q.  Who sent this email?

2   A.  Scott Tucker.

3   Q.  And what did he write?

4   A.  "Yes.  I will have Blaine give it to you tomorrow."

5           MR. RAVI:  Finally, could we just go to the top email.

6   Q.  Does Mr. Muir respond?

7   A.  Yes.

8   Q.  What does he respond with?

9   A.  "Thank you."

10          MR. RAVI:  You can take that down.

11          The government now offers Government Exhibit 1213.

12          THE COURT:  Any objection?

13          MR. GINSBERG:  No, your Honor.

14          THE COURT:  Received.

15          (Government Exhibit 1213 received in evidence)

16          THE COURT:  1213, correct?

17          MR. RAVI:  1213.

18          THE COURT:  Received.

19          MR. RAVI:  Focus on the top paragraph and the heading.

20  Q.  Read the first line, please.

21  A.  "I, Scott Tucker, do hereby certify that I am secretary of

22  Tribal Financial, a corporation organized under the laws of the

23  state of" blank.

24  Q.  You can stop there.  What is Tribal Financial?

25  A.  Tribal Financial Services was a company that was formed by

1    Miami tribe.

2    Q.  Was it formed in relation to the payday loan business?

3    A.  Yes, it was.

4         MR. RAVI:  Could we just turn to the second page.

5    Please turn to the date of this, in the middle.

6    Q.  The date?

7    A.  January 18, 2005.

8         MR. RAVI:  Focus in on the signatures.

9    Q.  What's written next to the signatures?

10   A.  Scott Tucker and Blaine Tucker.

11   Q.  Were you ever aware of whether Scott Tucker served as

12   secretary of Tribal Financial?

13   A.  Not to my knowledge.

14        MR. RAVI:  You can take that down.

15   Q.  We had mentioned Mr. Muir last week, correct?

16   A.  Yes.

17   Q.  And what was Mr. Muir's role in the payday loan business?

18   A.  He was Scott Tucker's lawyer.

19   Q.  And when did you first interact with Mr. Muir?

20   A.  In November of 2011.

21   Q.  And where did you interact with him?

22   A.  In Kansas City or Overland Park, at the loan company

23   offices.

24   Q.  You visited the loan company offices?

25   A.  I did, with the board members, with the AMG board members.

1   Q.  And this took place approximately November 2011, you said?

2   A.  Yes.

3   Q.  Describe the offices of the payday loan business that you

4   visited.

5   A.  It was a large building, three or four stories high.  The

6   offices were full.  They had a very, very large, nice-sized

7   conference room with the largest conference table I've ever

8   seen.  And then there were multiple offices.  They were

9   cubbies, basically, in the, in the call center.  And then there

10  were individual offices in the administrative section.

11  Q.  And you mentioned that this was a meeting that took place

12  at the offices?

13  A.  Yes, it was a board meeting.

14  Q.  Which board?

15  A.  AMG Services.

16  Q.  What happened at this meeting?

17  A.  There were general discussions.  Some of the people in

18  Kansas City office were introduced and the board members and

19  Wes Gamble, who was Chief Gamble's son, received iPads.

20  Q.  What were these iPads for, if there was any discussion at

21  the board meeting?

22  A.  They were told that, that they would allow them to have

23  confidential communications.

24  Q.  And who said this?

25  A.  I don't remember whether it was Scott or, or Tim Muir.

1  Q.  And was there also a social aspect to this meeting that

2  took place in Kansas City?

3  A.  Yes, we had a very nice dinner, stayed in a nice hotel,

4  came back.

5  Q.  And approximately how much time was spent, if any,

6  discussing the payday loan business at this meeting?

7  A.  Not a great, not a great length of time.  The entire board

8  meeting only took about an hour, and that was after all the

9  introductions were made and people's jobs were described.

10  Q.  Did the AMG board take any action or make any decisions

11  based on the information that was provided at that meeting?

12  A.  Not that I recall.  I would have to review the minutes.

13  Q.  Now, Ms. Williams, at some point when you were employed at

14  the Miami tribe from beginning of 2011, did you consider

15  reaching out to government authorities?

16  A.  I did.

17  Q.  And when did you first consider doing that?

18  A.  After Don told me that the whole thing was just a scam.

19  Q.  And was that the first recording that was played here?

20  A.  Yes.

21  Q.  And after that recording, after that conversation took

22  place, did you reach out, did you attempt to reach out to the

23  IRS?

24  A.  Not until after the, the second and third conversations

25  that I had with him when I was imploring him to just, you know,

1  fix this, do it right, and after that, I called -- I contacted

2  the IRS office in Oklahoma City.

3  Q.  And approximately when did you do that?

4  A.  It would have been sometime late June, early July, some,

5  some, somewhere in that time frame, I think.  Somewhere in

6  July, possibly.

7  Q.  Why did you consider reaching out to the government, to the

8  IRS, after those three conversations with Mr. Brady?

9  A.  Because I was terrified.  And I wanted to be on the right

10 side.

11 Q.  Now, did there come a time after you were employed at the

12 Miami tribe that you made a whistleblower's submission to the

13 IRS?

14 A.  I did, after I left the tribe in 2013.

15 Q.  And why were you no longer working at the tribe in -- let

16 me rephrase.

17        What were you told as to why you were no longer

18 working at the tribe?

19 A.  My termination letter was fairly benign.  It didn't cite a

20 particular cause, just that my services weren't -- if I recall,

21 just that my services were no longer needed.

22 Q.  And after you were -- is it fair to say you were fired?

23 A.  I was fired, yes.

24 Q.  After you were fired, did you make a formal whistleblower's

25 submission to the IRS?

1    A.   Yes.

2    Q.   And as a factual matter, can you please generally describe

3    what you recorded in your whistleblower's submission?

4    A.   That the loan company operation that -- that it was

5    basically just a scam.  It was a rent-a-tribe, a rent-a-tribe

6    situation.

7    Q.   What do you mean by rent-a-tribe?

8    A.   Oh, when a tribe is paid a pittance to offer their

9    sovereign immunity to protect someone from violations of state

10   laws.

11   Q.   Ms. Williams, did you also take documents from the tribe in

12   connection with your whistleblower's submission?

13   A.   I did take documents.

14   Q.   When did you take those documents?

15   A.   Sometime around the time that I was fired.

16   Q.   That was before you were fired, correct?

17   A.   Yes.

18   Q.   Or shortly before?

19   A.   Yes.  I expected to be fired.

20   Q.   What kinds of documents did you take?

21   A.   I took all kinds of documents.  The organizational

22   documents, the minutes of board meetings.  They were scanned

23   copies; I took them on a thumb drive.

24   Q.   Were you authorized to take these documents from the tribe?

25   A.   I was not.

H9pWtuc2                    Williams - Direct

1    Q.  Did you also access a computer that you weren't authorized

2    to access?

3    A.  I did.

4    Q.  Whose computer was that?

5    A.  That was Joe Frazier's, who was the CEO of MNE and of AMG

6    and MNE Services that took over after Don Brady was fired.

7    Q.  We'll get into Don Brady being fired in a moment.  Why did

8    you access Joe Frazier's computer?

9    A.  Joe had been delegated by the boards to try and negotiate a

10   business-going-forward agreement with Scott Tucker that would

11   have possibly put them in a little bit better situation in

12   terms of risk to revenue, and he said he'd been asked to assume

13   all of the risk for the loan company and to indemnify Scott and

14   Blaine Tucker for any actions.  Then the boards at some point

15   decided that they wanted, that they thought that the percentage

16   that they received from the loan company for him using their

17   name should be significantly higher.

18   Q.  And you were trying to access his computer for what

19   specific reason?

20   A.  Oh, well, over the course of these negotiations, Joe was

21   more and more entrenched in, in what I would say is the Tucker

22   camp, and he was doing some things without advising the board.

23   And one of the things that he was doing was that he had agreed

24   to transfer over a hundred million dollars back to the, back to

25   Scott Tucker, which would have taken the last reserves that the

H9pWtuc2                    Williams - Direct

1   tribe had access to, that they would need if they had to pay

2   any fines or penalties.

3   Q.  And were you accessing his computer to find evidence of

4   this?

5   A.  I did.

6   Q.  Did you end up -- did you find anything?

7   A.  I did.  I found one page and I gave it to Gina Lankford,

8   the chairman of MNE Services.

9   Q.  Were you fired shortly after that had happened?

10  A.  Not for that.

11  Q.  At some point later on, you were fired?

12  A.  I was.  I was put on administrative leave, I believe, on

13  April 18 of 2013, and I was subsequently terminated at the

14  board meeting the following Tuesday.

15  Q.  Now, Ms. Williams, did you make that submission, that

16  whistleblower's submission to the IRS because you were aware of

17  a whistleblower program?

18  A.  I did.

19  Q.  And under that program, did you understand that you could

20  get money if amounts were recovered as a result of the

21  information that you provided?

22  A.  Yes, I did.

23  Q.  Does your testimony here today have anything to do with

24  your whistleblower's submission?

25          MR. GINSBERG:  Objection, your Honor.

1    THE COURT:  Overruled.

2    A.  No, it does not.

3    Q.  Are you eligible to obtain any money as a result of

4    testifying in this case?

5    A.  No, I am not.

6    Q.  Does whether or not there's a conviction in this case

7    affect the fact that you're not eligible to receive any money?

8    A.  It has no impact on me at all.

9    Q.  Are you testifying today pursuant to a subpoena?

10   A.  I am.

11   Q.  And if you were not subpoenaed to testify, would you still

12   have testified?

13   A.  Yes, if the government asked me to.

14   Q.  Now, Ms. Williams, in addition to your recordings with

15   Mr. Brady, did you also make recordings of certain board

16   meetings?

17   A.  I did.

18   Q.  How did you make those recordings?

19   A.  On my cell phone.

20   Q.  Is this the same cell phone that you used to record

21   meetings of Mr. Brady?

22   A.  Yes.

23   Q.  Why did you make these recordings?

24   A.  I was listening more, paying more attention.  There were

25   more discussions before and after the meetings with the board

H9pWtuc2                        Williams - Direct

1    members, and they were asking me what I thought, what I heard,

2    and when you're trying to type and record the minutes at the

3    same time, it's -- becomes more difficult, and there were

4    nuances of things that I wanted to, that I wanted to have.

5    Q.   Why were you typing?

6    A.   I was recording the minutes of the meetings, during the

7    course of the meetings, board meetings.

8    Q.   When approximately did you begin recording board meetings?

9    A.   After my conversation with Don.  After the initial

10   conversation with Don.

11   Q.   Were there also some recordings that took place prior to

12   your recordings with Mr. Brady?

13   A.   I'm trying to remember.  I don't know.  I would have to

14   refresh my memory.

15   Q.   I don't believe that's necessary.

16          Ms. Williams, did you make these recordings as a

17   result of the conversations you had with Mr. Brady, or were

18   they as a result of --

19          MR. GINSBERG:  Objection, your Honor.

20   A.   I was --

21          THE COURT:  Hold on.

22          MR. GINSBERG:  I'm objecting before because of the way

23   it's coming out.

24          THE COURT:  Rephrase.

25   BY MR. RAVI:

1    Q.  Ms. Williams, why did you make these board meeting

2    recordings?

3    A.  So that I would have a, a better record of the things that

4    were said.  And if I may backtrack, your Honor, I recall

5    recording a board meeting that was a combined board meeting

6    prior to my conversation with Don.  In fact, that was the

7    meeting from which my conversation with Don occurred, as a

8    result of that.

9    Q.  And the fact that you recorded these board meetings, was it

10   related to the conversations you had with Don Brady, or did you

11   record them for separate reasons?

12   A.  You know, at the time it was -- at the time I think I

13   thought that it was important to have a good record.  The

14   boards were asking questions that they were being denied

15   answers to, and I guess I saw it as part and parcel of making

16   sure that they had all the information, that there was some

17   record of all the information.  I mean, a lot of it was just

18   being sure that I actually had recorded things properly,

19   because I felt intense pressure that there were, that there

20   were some things that were going to be coming out of these, out

21   of these, these litigations.

22   Q.  I'm handing you what you've been previously handed,

23   Government Exhibit 415.  On Government Exhibit 415, did you

24   listen to certain excerpts of the recordings of the board

25   meetings that have been marked as Government Exhibits 404 and

1   406?

2   A.  Yes.

3   Q.  And are those excerpts that you listened to true and

4   accurate copies of portions of the recordings that you made?

5   A.  Yes.

6           MR. RAVI:  The government offers Government Exhibits

7   404 and 406.

8           MR. GINSBERG:  No objection.

9           THE COURT:  Received.

10          (Government Exhibits  404 and 406 received in

11  evidence)

12          MR. RAVI:  There should also be transcripts that are

13  marked, Government Exhibits 404T and 406T.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. RAVI:

2    Q.  Did you sign those transcripts?

3    A.  I did.

4    Q.  What did you do once you signed them?

5    A.  I initialed them and gave them back to you.

6    Q.  Did you initial them after you reviewed the transcripts for

7    their accuracy?

8    A.  Yes.

9         MR. RAVI:  At this time, I would like to play

10   Government Exhibit 404.

11        It should be the transcript at 404T in your binders.

12        (Audiotape played)

13        MR. RAVI:  Pause there.

14   Q.  Ms. Williams, there are some names here that we may not

15   have previously discussed.  Can you describe who can be heard

16   on this recording and what their positions are and what board

17   they sit on?

18   A.  Don Brady, who was CEO of MNE Services and AMG.  He was not

19   a member of the board; he reported to the board.

20        Donya Williams, who was the secretary-treasurer of the

21   MNE Services board.

22        Gena Lankford, who was the chair of the MNE Services

23   board.

24   Q.  Turning to line 2 and 3 of page 1 of the transcript, Mr.

25   Brady refers to "account names."  Whose accounts is he

1   referring to?

2   A.  He is talking about bank accounts of the loan companies.

3   Q.  When Donya Williams refers at line 4 to "if they happened

4   to get us up on a witness stand," what do you understand her to

5   be referring to?

6   A.  Donya was talking about the possibility that she might be

7   subpoenaed or called to testify as a witness in any of the

8   litigations -- the FTC litigation, the IRS audit.

9   Q.  What is the date of this recording?

10  A.  August 7, 2012.

11  Q.  Did this recording take place after the FTC investigation

12  had become public?

13  A.  Yes.

14  Q.  After the IRS audit?

15  A.  Yes.

16  Q.  Also after that article that we discussed?

17  A.  Yes.

18  Q.  Beginning on line 12, Ms. Lankford mentions, "The first

19  time I've seen these statements that came from the Welch State

20  Bank.  And this is the first time that we've seen the Bay City

21  Bank statements."

22          What did you understand Ms. Lankford to be referring

23  to?

24  A.  She was saying that this is the first time she had seen the

25  bank statements from those bank accounts that had been opened

1    under MNE Services.

2    Q.  And she later mentions the name Natalie.  Who is that a

3    reference to?

4    A.  Natalie Dempsey.

5    Q.  At the end of page 1, there is a reference to a stamp by

6    Mr. Brady.  What was he referring to?

7    A.  Don's signature on these checks was done by auto signature,

8    so it was printed on the checks.

9    Q.  Did Mr. Brady have access to that stamp?

10   A.  No.  It wasn't a hand stamp.  It was printed signature on

11   the checks, and that was all done out of the Kansas City

12   office.

13          MR. RAVI:  Can we continue playing page 2 of the

14   transcript.

15          (Audiotape played)

16          MR. RAVI:  Pause there.

17   Q.  When Mr. Brady says on line 12, "he's pretty strict about,"

18   who did you understand him to be referring to?

19   A.  Scott Tucker.

20          MR. RAVI:  Please continue.

21          (Audiotape played)

22          MR. RAVI:  Pause there.

23   Q.  Ms. Williams, when Mr. Brady mentions in line 3 on page 3,

24   "if they ask you details," who is the "you" that he is

25   referring to?

1   A.  He is referring to the board members of MNE Services.  So

2   that would be Gena Lankford, Donya Williams and Scott Willard.

3   Q.  What is the context of this discussion?

4   A.  Basically, Don was telling them what to say if they were

5   asked, if they were subpoenaed to testify.  So, you don't know

6   this information, you're not supposed to know this information,

7   just say that Don Brady knows this information.

8           MR. RAVI:  Let's continue, starting at page 3, line 12

9   of the transcript.

10          (Audiotape played)

11          MR. RAVI:  Pause there.

12  Q.  Ms. Williams, beginning at page 3, line 12, Donya Williams

13  appears to be reading something.  What do you understand her to

14  be reading?

15  A.  She is reading from the secretary-treasurer's

16  responsibilities pursuant to the bylaws of MNE Services.

17  Q.  Why do you understand her to be reading this here?

18  A.  Because I copied those documents and provided them to her.

19  Q.  Why was she reading those duties in the context of this

20  conversation?

21  A.  She wanted Don to understand that she had a duty as a board

22  member, in that capacity as treasurer, to have all this

23  information, to know all of this information, and to provide it

24  if asked.

25  Q.  On page 4, line 6, Donya Williams states, "We don't have

1    those things here, nor do we know."

2           What do you understand her to be referring to there?

3    A.   That they had no financial information; they were not

4    allowed any financial information.

5    Q.   You also referenced in line 8 of page 4 an amendment.   What

6    were you referencing?

7    A.   Yes.   Donya had -- there was a provision in the bylaws that

8    says "or the treasurer's duly appointed agent."   We were

9    actually going to add that as an amendment to the bylaws so

10   that might take some of the liability off of Donya for not

11   having that information.

12          MR. RAVI:   If we can continue now playing the

13   recording, at line 16, page 4.

14          (Audiotape played)

15   Q.   When Donya Williams states a reference to "somebody up

16   there," who do you understand her to be referring to?

17   A.   She was wanting to have somebody in the Kansas City office

18   that might have access to that information, who can in turn

19   report to her.   So it would be a subordinate position to

20   treasurer.   But at least someone, if we amended the bylaws to

21   create that position, at least someone would have that

22   information so it would be in conformance with the

23   organizational documents.

24          MR. RAVI:   Let's continue playing the recording.

25          (Audiotape played)

1  Q.  Ms. Williams, turning to page 5 of the transcript, at line

2  15, Mr. Brady makes a reference to Blaine being listed as an

3  officer and Scott and Blaine being employees.  What do you

4  understand Mr. Brady to be referring to?

5  A.  He is referring to Blaine Tucker, that he may be listed as

6  an officer of the loan company, but he didn't know.  He said

7  that Scott is an employee, and he thought that Blaine was an

8  employee, and that they were employed at $200 a month.

9  Q.  When he says "listed," what do you understand him to be

10  referring to as "listed"?

11  A.  I'm not sure what he meant by listed.  I don't know if they

12  had an organizational chart there or not.

13  Q.  You don't know what the reference of listed was?

14  A.  That's correct.

15          MR. RAVI:  Let's go on and continue playing the next

16  section.

17          (Audiotape played)

18  Q.  Ms. Williams, turning back to page 6 of the transcript, Mr.

19  Brady refers on line 20 to "but the other stuff wasn't so

20  one-sided."  What do you understand him to be referring to?

21  A.  He was saying that in his business experience, that board

22  members were entitled to that, but that the other businesses he

23  has dealt with, the structure, the revenue structure was not

24  set up like this, it wasn't so one-sided.  He was always

25  telling them, basically, shut up, take the money, don't ask any

1    questions, don't rock the boat.

2              MR. RAVI:  Let's go on and play the final portion of

3    the recording.

4              (Audiotape played)

5    Q.  Turning to line 3, Ms. Lankford mentions, "and his company

6    has grown to me so fast."

7              Who is the "his company" referring to?

8    A.  Scott Tucker.

9    Q.  At the bottom, Ms. Lankford states at line 9, "What I want

10   to know is what MNE Services does and what AMG does, and how

11   they interact and how they pay each other and connect."

12             What was Ms. Lankford's position?

13   A.  She was chairman of the MNE Services board.

14   Q.  Finally, line 11, there is a reference from Mr. Brady to

15   "make a list of questions."

16             What does that refer to?

17   A.  The board members continued asking questions; they were

18   demanding more information.  And, finally, Don said, just make

19   a list of questions, and I will send them to Tim Muir and to

20   Conly Schulte and see if they will answer them.

21   Q.  Was there a list of questions that was created?

22   A.  Yes.  Scott Willard initiated the list of questions.  There

23   were a few more added to it in consultation with the other

24   board members.

25   Q.  What was done with that list of questions?

1    A.  They were e-mailed to Scott and Conly.

2    Q.  Was there any response that was given to that list of

3    questions?

4    A.  Well, subsequently -- no, there were no answers given

5    during the time period that I was there.  Subsequently, Don

6    reported to the board that Tim Muir was furious and that he

7    wasn't going to answer the questions.

8             MR. RAVI:  We can take down that, and I think we are

9    done with the transcripts, for the rest of my portion at least.

10   Q.  Ms. Williams, at some point was Mr. Brady fired by the

11   tribe, you had mentioned?

12   A.  He was.

13   Q.  When did that occur, approximately?

14   A.  In November of 2012.

15   Q.  Was that, again, after the FTC investigation became public?

16   A.  Yes.

17   Q.  After the FTC investigation became public, did the tribe

18   retain Kirkland & Ellis in connection with that investigation?

19   A.  Yes.

20   Q.  Was Mr. Brady fired after Kirkland & Ellis was retained?

21   A.  Yes.

22   Q.  Turning back to that FTC investigation, did you have any

23   responsibilities regarding the tribe's response to that

24   lawsuit?

25   A.  Yes.  My job was to collect the documents that were

1   requested in the discovery requests by the Federal Trade

2   Commission.

3   Q.  What kind of documents are we talking about?

4   A.  Organizational documents, minutes of board meetings,

5   information about bank accounts.

6   Q.  At some point, did you attempt to contact any banks to

7   obtain records relating to bank accounts?

8   A.  I did.

9   Q.  Describe what you did to try to get those bank account

10  records.

11  A.  There were actually two efforts.  One was I had contacted

12  Natalie Dempsey, I believe, and asked her for information

13  related to the banks and to contracts with vendors, and I

14  subsequently got a telephone call from her and she said Blaine

15  Tucker had instructed her to tell me to stand down.

16          At a later time, we had not provided all the

17  information in the initial discovery, and so I had an assistant

18  in our financial department, in the CFO's office, contact, I

19  think it was US bank to see if there were other bank accounts

20  for which we didn't have information, to be sure that we were

21  submitting all of the financial information.

22  Q.  Did that contact eventually take place?

23  A.  Yeah.  It would have been in, I think, January.  Initially

24  I thought it was closer to the time of the first production,

25  but it's later in January -- in January 2013, around in there.

1  Q.  January 2013 is about when this contact was made to US

2  Bank?

3  A.  Yes.

4  Q.  Did this assistant indeed contact US Bank?

5  A.  She did.

6  Q.  Was she able to obtain any information regarding bank

7  accounts?

8  A.  No.  She was told that they would not provide her with the

9  information because she was not a signatory on the accounts.

10 Q.  These are accounts in whose names?

11 A.  We had asked for information about any accounts held in the

12 names of Miami tribe or any of its subordinate corporations.

13 Q.  Did you subsequently have a conversation with Scott Tucker?

14 A.  I did.

15 Q.  When did this conversation take place in relation to when

16 the contact was made at US Bank?

17 A.  Very shortly after that.

18 Q.  Where were you when you received this contact?

19 A.  I was in my office at the Miami tribe.

20 Q.  Was it a phone call?

21 A.  It was.

22 Q.  Describe that conversation with Mr. Tucker.

23 A.  He was very angry.  He said that I was interfering with

24 sensitive relationships that had taken years to build with

25 these banks, and basically to butt out.

1    Q.  What was his demeanor on this call?

2    A.  He was angry.  He dropped a few cuss words.

3    Q.  How long did the call last, approximately?

4    A.  Not very long.  I told him I was doing what I was tasked to

5    do, and I think he hung up on me.

6    Q.  Ms. Williams, at any point in time, were you aware of

7    whether the AMG board or any tribal entity authorized payments

8    from AMG or any lending entities to level five racing?

9    A.  No, they did not.

10   Q.  At any point in time, are you aware of whether the AMG

11   board or any tribal entity authorized payments from AMG or any

12   lending entities to Charles Hallinan?

13           MR. GINSBERG:  I am going to object to the first

14   question.  At any time is broader than the scope of her contact

15   with the tribe.

16           THE COURT:  Rephrase both questions, please.

17   Q.  While you were participating in board meetings from 2011 to

18   2013, are you aware during that period of time of the board's

19   authorizing payments to level five racing or Charles Hallinan?

20   A.  No, that did not occur while I was there, nor did I find

21   any record of it when I was assembling the other documents.

22   Q.  Are you aware of the board or any other tribe entity, while

23   you were at the tribe from 2011 to 2013, authorizing payments

24   from any of the lending entities for an Aspen house for Scott

25   Tucker?

1   A.  No.

2   Q.  Are you aware of the AMG board or any tribal entity

3   authorizing payments for any lending entities for Mr. Tucker's

4   jet?

5   A.  No.

6           MR. RAVI:  No further questions, your Honor.

7           THE COURT:  All right.  Ladies and gentlemen, why

8   don't you stand up and stretch.

9           Who is going to conduct the cross?

10          MR. GINSBERG:  I will, your Honor.

11          THE COURT:  I will give you a second to get organized.

12          While you're up, take a deep breath.

13          Whenever you're ready, Mr. Ginsberg.

14          MR. GINSBERG:  Thank you, your Honor.

15  CROSS-EXAMINATION

16  BY MR. GINSBERG:

17  Q.  Good afternoon, Ms. Williams.

18  A.  Good afternoon.

19  Q.  You told us that you first began to work for the Miami

20  tribe at the invitation of Don Brady, is that correct?

21  A.  That's correct.

22  Q.  That occurred sometime around 2003, is that correct?

23  A.  Yes.  My initial term of employment.

24  Q.  And Don Brady and his wife were social friends of yours, is

25  that correct?

1  A.  Yes.

2  Q.  Did you contact him or did he contact you and offer you a

3  job?

4  A.  He contacted me.

5  Q.  Then you began working at the Miami tribe, is that correct?

6  A.  Yes.

7  Q.  For which entities were you working initially?

8  A.  Initially, I was working for MTBE, Miami Tribe Business

9  Enterprises.

10  Q.  I think you also told us that you learned after you began

11  to work there that part of what Mr. Brady's job was was to

12  oversee the businesses that were already being run by the

13  tribe, is that correct?

14  A.  Yes.

15  Q.  And to try to enhance those businesses, correct?

16  A.  That's correct.

17  Q.  Is it fair to say that also part of his function was to

18  seek new opportunities for the tribe?

19  A.  That's correct.

20  Q.  And at some point in time, you became aware that an

21  opportunity was presented to the tribe through Don Brady

22  regarding payday lending, is that correct?

23  A.  I became aware that the tribe had entered into an agreement

24  sometime, I believe, in October of 2003.  I found out

25  subsequent to the initial offer in 2003, in October of 2003.

H9P8TUC3                    Williams - Cross

1    Q.  On direct examination you identified initially a letter of

2    intent from Scott Tucker.  Do you recall that?

3    A.  I do.

4    Q.  That was just sort of an introductory letter describing the

5    nature of the payday lending business that Scott Tucker was

6    involved in, is that fair to say?

7    A.  That's correct.  National Money Service.

8    Q.  That wasn't the agreement that was entered into, is that

9    correct?

10   A.  No.  The agreement was entered into with Universal

11   Management Service, UMS.

12   Q.  But there was a letter of intent, is that correct?

13          There was a letter from Scott Tucker to Don Brady

14   and/or the tribe describing a business proposal, correct?

15   A.  Yes.  I don't recall exactly who it was addressed to.

16   Q.  You testified about it on direct examination, correct?

17   A.  Yes, because I could see a copy of it at that time.

18   Q.  Did you see a copy of it when you were testifying?

19   A.  Yes.

20          MR. GINSBERG:  Can we put that exhibit up, please.

21          I'm sorry, your Honor.

22   A.  That's not the document.

23          THE COURT:  Go ahead.

24          MR. GINSBERG:  Thank you.  I appreciate that.

25   Q.  You were asked questions about this document, is that

1    correct?

2    A.  Right.

3    Q.  At some point in time, while you were employed during the

4    2003 and 2005 period, did you see this document?

5    A.  I did.

6    Q.  Did you read the document?

7    A.  Yes.

8    Q.  When you read the document, did you come to understand that

9    what was being proposed by Scott Tucker to the tribe and at

10   that time to Chief Floyd Leonard was that the tribe would lend

11   money and that Scott Tucker would service the lending and

12   provide the money for them to lend?

13        Is that what you understood the letter to mean?

14   That's the question.

15   A.  At that time, I didn't really pay that much attention to

16   it.  I was not really directly involved in the loan company

17   operation.

18   Q.  Then why did you read the letter at that time?

19   A.  I read every letter that came across my desk.

20   Q.  So if you read the letter that came across your desk,

21   wouldn't you have paid attention to what the letter said?

22   A.  Yes, I'm sure I did.  But I would have to reread it again

23   to be sure of what my interpretation is.

24   Q.  You didn't have that problem on direct examination, you

25   didn't ask to have to reread it again, did you?

1  A.  I don't know that they asked me what my interpretation of

2  the document was.

3  Q.  Take your time, read the letter again.

4          I guess you need to tell us when you need to have the

5  page turned.

6  A.  Please turn the page.

7          And again, please.

8          I am finished.

9  Q.  Have you had an opportunity to read it now?

10  A.  I did.

11  Q.  Let's just leave the last page up there for the moment.

12          MR. GINSBERG:  If we can highlight the top paragraph

13  on page 3, please.  Thank you.

14  Q.  Do you see that paragraph?

15  A.  I do.

16  Q.  The second line in that paragraph says, does it not, "It is

17  assumed that the tribe will have legal authority to review all

18  activities of this payday loan business so that the business is

19  truly a tribal business and not simply lending its name to some

20  distant commercial enterprise."

21          Do you see that?

22  A.  I do.

23          MR. GINSBERG:  Can we go back to the first page,

24  please.

25  Q.  On the first page, in the second full paragraph, do you see

1    reference to the fact that the tribe will be the lender, "Miami

2    Tribe of Oklahoma, whereby the tribe will become an authorized

3    lender and earn substantial income, while relying upon an

4    authorized subsidiary of National Money Service to provide not

5    only the capital to fund all loan transactions and all working

6    capital requirements, but also the personnel, equipment,

7    marketing and knowledge to make the business an immediate

8    success."

9            Do you see that?

10   A.  I do.

11   Q.  Now, do you recall, having read it now, looking at it now,

12   do you recall at the time reading it and understanding that

13   that's what that letter said?

14   A.  I recall reading that, yes.  I didn't pay a lot of

15   attention to the loan company business.  I was not engaged in

16   that.

17   Q.  You told us that --

18   A.  From 2003 to 2005.

19   Q.  Your job was what again, your job title was what?

20   A.  I was an office manager and Don's assistant and other tasks

21   that fell underneath that.

22   Q.  Was one of the tasks that fell underneath that reading the

23   letters that came in?

24   A.  I assume so.

25   Q.  Well, you were the one who was doing the job, correct?

1    A.  Yes.

2    Q.  This letter was addressed to Chief Floyd Leonard and the

3    tribal council, correct?

4    A.  That's correct.

5    Q.  It was not addressed to Don Brady?

6    A.  That's correct.

7    Q.  But you told us that in any event you read the letter,

8    except that you didn't pay attention to what it said, correct?

9    A.  I wasn't engaged in working with that business.  It didn't

10   have any impact on me.  It was simply a document that I was

11   keeping in a folder.

12   Q.  But you read it.  You didn't just take it and -- you didn't

13   just open it up and put it in a folder and file it away in a

14   drawer, is that correct?

15   A.  That's correct.

16   Q.  You read it?

17   A.  I did.

18   Q.  And when you read it, did you understand what the letter

19   was talking about?

20   A.  I guess I would have understood what it was saying.

21   Q.  Well, you told us that during the 2003-2005 period, you had

22   various conversations with Don Brady about the payday lending

23   business, is that correct?

24   A.  I had limited conversations with Don Brady about the payday

25   lending business during that time period.  I had many, many

H9P8TUC3                        Williams - Cross

1    conversations with him in my second term of employment.

2    Q.  I am not the judge here and I can't direct you how to

3    answer, but the question I asked you was, during 2003-2005, you

4    told us that you had numerous conversations with Don Brady

5    regarding the payday lending business, is that correct?  Yes or

6    no?

7              MR. RAVI:  Objection.

8              THE COURT:  Overruled.

9    A.  I did have some conversations with Don Brady during that

10   time period.

11   Q.  In fact, you told us, on questioning from the government,

12   that you apparently had enough conversations about the payday

13   lending business, and knew enough from sitting outside of Mr.

14   Brady's office during that period of time, to develop your

15   opinion, even between 2003 and 2005, that the payday lending

16   business was a sham, isn't that true?  Isn't that what you

17   testified to?

18   A.  No, I don't think that's what I said.

19   Q.  What word did you use then?

20   A.  I did come to that conclusion after my second term of

21   employment.  Had I known that it was a scam, I would never have

22   gone back to work for him.  I did not want to be associated

23   with that.

24   Q.  I know that.  And I also didn't ask you that.  But during

25   2003 and 2005, you had conversations about the payday lending

1   business, is that correct?

2   A.  Yes.  Don told me that, if Scott Tucker called, I was to

3   find him, and he would direct me to take a packet to the mail

4   or to pick up a packet.  And he also told me not to discuss the

5   operation or the existence of the loan company because he did

6   not want the tribal members to know about it because they would

7   want to use that money for other purposes besides the

8   businesses.

9   Q.  So when that piece of information was told to you, you did

10  nothing with that piece of information at that period of time

11  while you were working there?

12  A.  No.

13  Q.  You didn't alert anybody else at the tribe?

14  A.  No.

15  Q.  You didn't alert any law enforcement authorities?

16  A.  I had no reason to believe that it was not legitimate.

17  Q.  It didn't alarm you the way he was describing what he

18  wanted you to do and not do at that time in the way you have

19  just told us?

20  A.  I didn't approve of the way he regarded the tribal members,

21  but it didn't necessarily alarm me.

22  Q.  Did you attend any of the tribal meetings during that

23  period of time, between 2003 and 2005?

24  A.  On occasion.

25  Q.  What meetings did you attend?

1  A.  MTBE board meetings on occasion.  I would prepare the

2  agendas for some of them.

3  Q.  On any of those agenda, was there a mention of the payday

4  lending business?

5  A.  Not that I recall -- not that I recall of discussions then.

6  Q.  I am talking about the agendas that you prepared.  Did you

7  prepare any agendas that referenced the payday lending

8  business?

9  A.  If it was discussed, I probably would have.  I just don't

10  have a strong recollection of that.  I'm sorry.

11  Q.  What does that mean if it was discussed?  Was the payday

12  lending business discussed during those tribal meetings between

13  2003 and 2005?

14  A.  Most of my recollection of the discussions that I

15  participated in were related to tribal gaming and the tribe's

16  efforts to increase that.

17  Q.  But you told us you prepared the agendas, is that correct?

18        Is that correct?

19  A.  I would have early, during the period of six months or so

20  that I worked for Don then, almost 15 years ago.

21  Q.  What do you mean by almost 15 years ago?  Are you

22  suggesting you don't remember now what agendas you prepared and

23  what you put on the agendas for those meetings because it's 15

24  years ago?

25  A.  From 2003 to 2004, yes, I will tell you that's probably the

1   case.

2   Q.  Did you say that at all on direct examination, that you

3   were having trouble remembering anything that went on with your

4   relationship with Don Brady while you were working for the

5   Miami tribe between 2003 and 2005?

6           MR. RAVI:  Objection.

7           THE COURT:  Overruled.

8   Q.  Did you say that at all on direct examination, that you

9   were having trouble recalling events between 2003 and 2005

10  relating to working at the Miami tribe and Don Brady?

11  A.  No, I don't believe I did say that.  I don't think that I

12  said anything that would have any importance related to that at

13  that time.

14  Q.  You don't think that when you testified on direct

15  examination, you said anything about the 2003 to 2005 period

16  that related to any knowledge you gained about Don Brady and

17  the payday lending business for the Miami tribe?

18          THE COURT:  I will sustain the objection to that.

19          Ask a new question.  Argumentative.

20  Q.  Do you recall testifying on direct examination about

21  knowing about Tribal Financial Services while you were at the

22  Miami tribe between 2003 and 2005?

23  A.  I don't recall when Tribal Financial Services was set up.

24  I recall subsequently having some knowledge of that.

25          MR. GINSBERG:  Your Honor, respectfully, if my

1  questions are not clear, I will rephrase them, but I believe I

2  am asking clear questions and the answers are not responsive.

3          THE COURT:  The question is, do you recall testifying

4  on direct examination about knowing about Tribal Financial

5  Services while you were at the Miami tribe between 2003 and

6  2005?  That's the question.  Do you recall testifying about

7  that?

8          THE WITNESS:  No, I don't recall testifying about

9  that.

10         THE COURT:  Next question.

11 BY MR. GINSBERG:

12 Q.  You did testify or you recall testifying that you were

13 aware of a services agreement that was entered into between the

14 tribe and National Money Service or Universal Management

15 Service?

16 A.  Yes.  That's the document before us, that would have been

17 the attachment to the document before us.

18 Q.  That was something that you testified about that occurred

19 between 2003 and 2005, is that correct?

20 A.  Yes.

21 Q.  How did it come to be that you read that document and knew

22 about that document when you were working there between 2003

23 and 2005?

24 A.  When I was working as Don's assistant, I would have created

25 a file for it.

1  Q.  Well, if you would have created a file for it, you could

2  have just created a file that said agreement between Miami

3  tribe, or whatever entity it was, and Universal Management,

4  taking the document and put it in the file, is that correct?

5  You could have done that, right?

6  A.  I beg your pardon?

7        THE COURT:  You could have done that, is that correct?

8  A.  Yes, that's correct.

9  Q.  But you told us, I believe, instead, that you actually

10 recalled reading that document and you knew what was in the

11 contents of that document, is that correct?

12 A.  Yes.

13 Q.  Was that part of your job function and title during that

14 time, to review the contracts that the tribe was entering into

15 in relation to the job you had, the job function or title you

16 had working for Don Brady?

17 A.  I believe -- I would say that that is how I handled my job.

18 I don't know that there were specific instructions or

19 prohibitions against it, but that's what I did.

20 Q.  If you read it, why would you have done it?

21       Why would you have read that document if you were not

22 one of the parties to it and one of the signatories to it and

23 not a member of the tribal board?

24 A.  I read many documents that I was not a party to.  I just

25 did.  It was a company that Don Brady was involved with.

1  Q.  Now, you were shown a document as well on direct

2  examination, if you recall, where at the end of it it referred

3  to the Miami Tribe of Nebraska.  Do you remember that?

4  A.  I do.

5  Q.  You were asked about that, correct?

6  A.  Yes.

7  Q.  Did that appear to you to be simply a mistake that it said

8  Miami Tribe of Nebraska?

9  A.  Yes.

10  Q.  So that was just a mistake; there was nothing mysterious,

11  illegal, improper, as far as you believed, about the fact that

12  Nebraska appeared on that document, is that correct?

13          MR. RAVI:  Objection.

14          THE COURT:  Overruled.

15  A.  No, I think it was a typo.

16  Q.  The actual agreement that you saw eventually was entered

17  into with the Miami Tribe of Oklahoma, correct?

18  A.  Right.

19  Q.  And that was a service agreement, correct?

20  A.  I believe it was an agreement.  I just don't recall if it

21  said service agreement right now.

22  Q.  Didn't that agreement describe all of the things that

23  Universal Management Services would do to assist the Miami

24  Tribe of Oklahoma in a payday loan business?

25  A.  That sounds right.

1  Q.  Didn't it say that the payday loans were going to be made

2  by the Miami Tribe of Oklahoma?

3  A.  I apologize.  It's been five days since I have seen that.

4  I would have to read it again.

5  Q.  I believe that's Government Exhibit 302.

6  A.  I don't want to make a misstatement.

7          THE COURT:  Ma'am, just sit back and relax.  I think

8  they are going to get the document for you.

9  Q.  Is the document up in front of you now?

10  A.  Yes.

11  Q.  Is that the same document that we are talking about, the

12  service agreement?

13  A.  Yes.

14  Q.  And that was the one that you, although you're not sure

15  why, you read and then you filed it?

16  A.  Yes.

17  Q.  And that's between the Miami Tribe of Oklahoma (MTBE) and

18  Universal Management Services, correct?

19  A.  Yes.

20  Q.  And it's for the purpose of setting up a payday loan

21  business, is that correct?

22  A.  Yes.

23  Q.  On the first page, reading down, does it describe, when it

24  gets to the point where it has paragraphs that are numbered,

25  does it describe how that business will operate?

1   A.  Yes, generally.

2   Q.  In describing how it would operate, is MTBE designated as

3   the lender of the funds in the payday lending business?

4   A.  Yes.

5   Q.  And UMS is described as furnishing all other kinds of

6   services and support, staffing, equipment, business

7   arrangements to make that an efficient payday loan business, is

8   that fair to say?

9   A.  Yes.

10  Q.  And it further says at the bottom of the page, paragraph 4,

11  that "MTBE shall furnish an office and one employee to act as

12  administrator of the loan program, whose office shall be on

13  Miami Indian country."  Is that correct?

14  A.  Yes.

15  Q.  Now, was it your belief in 2003 that Don Brady was that

16  employee acting as the administrator of the loan program?

17  A.  Yes.

18  Q.  And that was consistent with the service agreement, is that

19  correct?

20  A.  Yes.

21  Q.  Now, you told us at various times that either you were not

22  aware or you didn't believe there were any criteria for the

23  loans being made.  Am I stating that correctly?

24  A.  I was not aware.

25  Q.  So if you were not aware in the 2003 and 2005 period, if

1    there were criteria that had been established by the parties,

2    that is, Universal Management Services and MTBE, you just

3    didn't know about them, is that correct?

4    A.  Yes, that could be correct.

5    Q.  And one of the reasons you wouldn't know about that is

6    because it wasn't your job to know those things, is that

7    correct?

8    A.  Not until after 2011.

9    Q.  We are talking about between 2003 and 2005.  It was not

10   your job during that period of time to know about things such

11   as criteria that may have been established to make payday

12   loans, is that fair to say?

13   A.  Yes.

14   Q.  You told us now that you are unaware of criteria if there

15   were any, fair to say?  Is that fair to say?

16   A.  Yes.

17   Q.  Did you ever ask Don Brady if there were criteria that had

18   been set forth by the parties and discussed by the parties for

19   the purpose of determining making of the payday loans?

20   A.  Not at that time.

21   Q.  Meaning not during the 2003 and 2005 period, correct?

22   A.  Right.

23   Q.  Also, when you say "not at that time," is it fair to say

24   you're suggesting at a later time, when you came back to work

25   there later on, that you had other discussions or you had other

1    knowledge about the criteria?

2    A.  I knew that the boards never acted on any particular

3    criteria.

4    Q.  Did you know when you came back to work for the Miami

5    tribe -- in 2011 was it?

6    A.  Yes.

7    Q.  -- that a company known as Selling Source had established

8    through electronic means and devices a method by which

9    electronically it could be determined whether a person applying

10   for a loan was somebody who would fall into any particular

11   category?  Were you aware of that at all?

12   A.  I was aware that the loan company business did business

13   with Selling Source, and I understood from Don Brady that Scott

14   Tucker owned that.

15   Q.  Were you aware that Selling Source had developed its own

16   method of establishing criteria to make payday loans?

17   A.  I didn't know what their technical expertise was.  I didn't

18   know the specifics of it.

19   Q.  Were you aware that Don Brady knew what that criteria was

20   that had been established through the Selling Source's product?

21   A.  No, I was not aware that Don Brady knew that.

22   Q.  Were you aware that the product had developed a method by

23   which it could determine categories of individuals and

24   establish them as either green, red or yellow for purposes of

25   loans?

1  A.  No.  For all the titles that I held --

2  Q.  The question is, were you aware of that?

3  A.  No.

4  Q.  So if you're not aware of that, I assume you were not aware

5  of what the green, red or yellow would mean, in terms of

6  whether or not to approve a loan, is that correct?

7  A.  That's correct.

8  Q.  And you didn't know whether or not Don Brady had discussed

9  and met with Scott Tucker and other people at Universal

10  Management Services as to those criteria, is that correct?

11  A.  That's correct.

12          THE COURT:  Ladies and gentlemen, as I told you at the

13  outset of this trial, a lawyer's questions are not evidence.

14  It's only the witness's answer that makes the question

15  evidence.

16          You may continue.

17          MR. GINSBERG:  Thank you, your Honor.

18  BY MR. GINSBERG:

19  Q.  Would it be fair to say that there were a lot of things

20  about the payday lending business that you did not know about?

21  A.  Yes.

22  Q.  You told us in addition that Don Brady, in the 2011-12

23  period I believe, would either once, or maybe sometimes twice a

24  month go up to Kansas City to the offices where Scott Tucker

25  was, is that correct?

1  A.  Yes.

2  Q.  And when he went up there, it was for the purpose of

3  meeting or talking to people like Scott Tucker or other people

4  associated with the payday lending service business, is that

5  fair to say?

6  A.  Yes.

7  Q.  But you weren't present at the meetings up there when Don

8  Brady went, were you?

9  A.  No.

10  Q.  And you don't know what they discussed, do you?

11  A.  No.

12  Q.  You don't know what was explained to Don Brady, do you?

13  A.  No.

14  Q.  Now, I will come back to the earlier period, but I want to

15  skip ahead to sort of the very end of your relationship with

16  the Miami tribe, and that would have been in about 2013, is

17  that correct?

18  A.  That's correct.

19  Q.  When you were terminated from the Miami tribe, it wasn't by

20  Don Brady, correct?

21  A.  Don had already been fired by then.

22  Q.  So it wasn't by Don Brady?

23  A.  That's correct.

24  Q.  It was by someone else, correct?

25  A.  Yes.

1  Q.  Was there a specific person who signed the letter that they

2  gave to you to terminate your services?

3  A.  I don't recall who signed the letter, but it was based on

4  board action.

5  Q.  Which board would that be?

6  A.  I want to say it was the MNE Services board.

7  Q.  That's your best recollection, is that fair to say?

8  A.  Yes.

9  Q.  Do you remember at the time who was on the MNE Services

10  board?

11  A.  Yes.

12  Q.  Who was?

13  A.  Gena Lankford was the chairman, Donya Williams was

14  secretary-treasurer, and Scott Willard was the vice chair.

15  Q.  So some of the same people whose voices we heard on the

16  recordings that you made of the board meetings that were played

17  in court, correct?

18  A.  That's correct.

19  Q.  Some of those same people and maybe another individual were

20  part of terminating you or sent you the letter that terminated

21  your services, correct?

22  A.  Yes.

23  Q.  And before your services were terminated, you told us that

24  you impermissibly and illegally, basically stole documents from

25  the company, is that correct?

1  A.  That's correct.

2          MR. RAVI:  Objection to the characterization.

3          THE COURT:  Overruled.

4  Q.  And, in addition, you impermissibly and illegally, I don't

5  know, hacked in or got into somebody's computer without

6  permission, is that correct?

7  A.  I read Joe Frazier's e-mail, yes.

8  Q.  You did that by getting into the computer that you weren't

9  supposed to have access to, is that correct?

10 A.  Yes.

11 Q.  What other illegal actions did you take prior to your

12 termination while you were working for the Miami tribe in 2012

13 or 2013?

14 A.  Well, I told Gena Lankford that I had looked at Joe

15 Frazier's e-mail, and I gave her a copy of the e-mail that I

16 had printed on that, and she told me not to do it again, and I

17 didn't do it again.  But that's all.  I think just those two

18 things.

19 Q.  You also told us and we played some of these recordings

20 that you made, is that correct?

21 A.  That's correct.

22 Q.  Now, prior to the first recording you made of the board

23 meeting, you were already the recording secretary of that

24 board, is that correct?

25 A.  Yes.

H9pWtuc4                    Williams - Cross

1    BY MR. GINSBERG:

2    Q.  For how long prior to the first recording you made were you

3    the recording secretary at that board meeting?

4    A.  I would say about five months, six months.

5    Q.  And during those five or six months, prior to your first

6    recording of that board meeting, approximately how many

7    meetings had taken place, to the best of your recollection?

8    A.  Each of the boards probably would have met maybe once a

9    month, up to that point, maybe more.

10   Q.  I'm sorry.  I'm sorry.  Continue your answer.  You said

11   once a month or maybe more?

12   A.  Yes.

13   Q.  So about how many meetings during that five-month period

14   did you attend as the recording secretary before you began to

15   tape record the meetings?

16   A.  I'm going to say five to six of each board.

17   Q.  And how many in total would that be?

18   A.  Of those two?  It's going to be 10 to 12.

19   Q.  OK.  And then it occurred to you that it would be a good

20   idea to record the meetings because trying to type and listen

21   and take everything down, you might not be able to accurately

22   capture everything that was said; is that fair to say?

23   A.  Yes.

24               THE WITNESS:  Pardon me.  Excuse me.

25               THE COURT:  Do you need some water there?

1    THE WITNESS:  I have it, sir.  Thank you.

2    THE COURT:  All right.

3  BY MR. GINSBERG:

4  Q.  When you began to record the meetings, you didn't use a

5  tape recorder, is that correct?

6  A.  No, we didn't have a tape recorder.

7  Q.  What you did do is you had a cell phone, correct?

8  A.  That's correct.

9  Q.  And you used your cell phone basically as a recording

10  device, is that correct?

11  A.  Yes, that's correct.

12  Q.  But you didn't tell anybody who was at the board meetings

13  that you were recording the board meetings, did you?

14  A.  No.

15  Q.  Why didn't you tell them?

16  A.  I'm not sure.  I'm not sure that it was significant at the

17  time.  The first time I recorded, the first meeting that I

18  recorded, I had been asked by Gina Lankford to find a recorder

19  for it, and when I inquired whether we had one or not, of the

20  receptionist, and we looked for one, there was not a tape

21  recorder in there.  And subsequently, when I went back in, I

22  told her that, and then after the meeting started, I thought,

23  Oh, I'll just use my phone, so I just used my phone.

24  Q.  And you also thought, Well, I just won't tell anybody that

25  I'm recording it, correct?

1   A.  I'm not sure I thought about it at that time.

2   Q.  But you didn't tell anyone, correct?

3   A.  I believe I told our attorneys at a later time.

4   Q.  At a later time?

5   A.  Right.

6   Q.  At a much later time?

7   A.  Right.

8   Q.  Correct?

9   A.  Yes.

10  Q.  I didn't ask you about the attorneys, did I?

11  A.  No.

12  Q.  I asked you about the people who were present at the

13  meetings, is that correct?

14  A.  That's correct.

15  Q.  And you didn't tell Don Brady you were recording him, is

16  that correct?

17  A.  No, I did not.

18  Q.  And the reason that you didn't tell anybody that you were

19  recording them is because at some point in time, you had

20  decided that you were going to try to collect information so

21  that you could become a whistleblower and try to make a whole

22  bunch of money, is that correct?

23  A.  No.

24  Q.  Well, after you made the recordings, you tried to become a

25  whistleblower, correct?

1  A.  Yes, sometime earlier.  Yes.

2  Q.  Well, when did you first contact the lawyer who handles

3  whistle-blowing cases?

4  A.  That would be in the mid to late summer of 2012.

5  Q.  While you were still working at the Miami tribe, correct?

6  A.  That's correct.

7  Q.  Right at about the time you were recording the meetings and

8  Don Brady, correct?

9  A.  No, not conversations, recorded conversations with Don

10  Brady.  Those particular recordings occurred before that.

11  Q.  In June, correct?

12  A.  That's correct.

13  Q.  And you contacted the lawyer in July, correct?

14  A.  I think don't that -- it may have been sometime around in

15  there or after that.

16  Q.  But right at about the same time or shortly thereafter, you

17  went to a whistle-blowing lawyer, correct?

18  A.  I did speak with one, yes.

19  Q.  And the purpose of that was because you were hoping to be

20  able to bring a lawsuit, or to have the government initiate an

21  action and have a lawsuit brought, and you, as the

22  whistleblower, would collect a percentage of money from

23  whatever the government was able to obtain.  Is that fair to

24  say?

25  A.  Yes.

1   Q.  And about how much money did you expect or hope to receive

2   as a result of being a whistleblower?

3   A.  I don't know.

4   Q.  Without telling us any discussions you had with your

5   attorney that you went to, you have no idea of what amount of

6   money was involved, could be involved in a lawsuit and what

7   amount you could recover?  You have no idea whatsoever?

8   A.  I thought it would be significant.

9   Q.  And is significant more or less than $10 million?

10  A.  Are you talking about what I expected to receive?

11  Q.  You just used the word "significant."  I'm asking you if

12  significant to you means more or less than $10 million.

13          THE COURT:  No, no.  The witness asked a fair

14  question.  Perhaps she didn't understand your question.

15          MR. GINSBERG:  I'm sorry.

16          THE COURT:  Are you asking about what she expected to

17  receive?

18  BY MR. GINSBERG:

19  Q.  In terms of what you expected to receive, you said you

20  expected to receive something significant, correct?

21  A.  That's correct.

22  Q.  And what I'm trying to ask, and maybe inartfully, is what

23  significant means to you in terms of millions of dollars.

24  A.  Well, you don't have to hit a million dollars to be

25  significant at my household.

1      MR. GINSBERG:  I know I'm not allowed to respond,

2   Judge, but --

3   Q.  That's not the question I asked, was it?  Was that the

4   question that I asked?

5      MR. RAVI:  Objection.

6      THE COURT:  Sustained, sustained.

7   Q.  I'm not talking about your household.

8      THE COURT:  Excuse me, excuse me.

9      Do you understand the question?  Did you have an

10  expectation as to, you said something about you expected that

11  the amount you personally would get would be significant.

12     THE WITNESS:  Yes, sir.

13     THE COURT:  Did you at any time have an expectation or

14  an idea of what that amount could be?

15     THE WITNESS:  Not really.

16     THE COURT:  OK.  Next question.

17     THE WITNESS:  Not in terms of dollars.

18  BY MR. GINSBERG:

19  Q.  Did you meet with a lawyer on multiple occasions concerning

20  this potential whistleblower action?

21  A.  In conjunction with the whistle, with my initial work,

22  meeting with the lawyer, I met with them, I believe, one time.

23  After, after the law enforcement agencies became involved, he

24  attended some meetings with me.

25  Q.  Well, I'm asking you how many times you met with the lawyer

1  who you went to regarding bringing a whistleblower action.  How

2  many times all together did you meet with that person?

3  A.  In 2012, I met with him one time.

4  Q.  And subsequent to that, 2012, how many times did you meet

5  with him?

6  A.  In 2013, after I was contacted by the IRS, I met with him

7  again.

8  Q.  Now, after you went to him, you had already formed the idea

9  that you wanted to pursue a whistleblower action, is that

10  correct?

11  A.  I did at that time, yes.

12  Q.  But you didn't leave your work at the Miami tribe, did you?

13  A.  No.  I was looking for other jobs.

14  Q.  You didn't leave your job the first time, did you?

15  A.  No, I did not.

16  Q.  And you remained there until you were terminated, correct?

17  A.  Yes.

18  Q.  So how long was it from the time you met with the lawyer

19  involving the whistleblower action until the time that you were

20  terminated?

21  A.  I'm going to say eight months or so.

22  Q.  And did you stay working at the Miami tribe for the sole

23  purpose of trying to gather additional information for your

24  whistleblower lawsuit?

25  A.  No.

1  Q.  Well, you told us certainly by the time you met with the

2  lawyer, and maybe before then, you believed that you were

3  working in a business that was a sham business, was operating

4  illegally; you were terrified and you wanted nothing to do with

5  it, correct?

6  A.  That's correct.

7  Q.  But you stayed for eight or nine more months, until you

8  were terminated, correct?

9  A.  There was an effort by the boards to rectify some of the

10  issues.  They were not successful, but they were at least

11  trying to, and although I continued to look for other jobs, I

12  did not find another job during that time period, and I have to

13  work.

14  Q.  So you stayed?

15  A.  That's correct.

16  Q.  You didn't quit?

17  A.  That's correct.

18  Q.  Because you needed to get paid, correct, to take care of

19  your family?

20  A.  That's correct.

21  Q.  Is that correct?

22  A.  Yes.

23  Q.  Even though you believed you were involved with something

24  that you have told us was illegal, correct?

25  A.  Yes, that's true.

H9pWtuc4                    Williams - Cross

1    Q.  During the 2003 and 2005 period, did the lawyer -- did the

2    tribe, to your knowledge, have lawyers?

3              MR. RAVI:  Objection.

4              THE COURT:  Overruled.

5    A.  Yes, they did.

6    Q.  And do you know who the lawyers for the tribe were in the

7    2003 to 2005 period?

8    A.  Robin Lash and Ken Bellmard.

9    Q.  And to your knowledge, did either or both of those

10   individuals review the letter of intent that was sent to the

11   tribe and/or the service agreement?

12             MR. RAVI:  Objection, your Honor.

13             THE COURT:  I'll allow the question.

14             Do you know?

15   A.  I don't know.

16   Q.  Did Don Brady, to your knowledge, have any interaction with

17   the lawyers for the tribe?

18   A.  Yes.

19   Q.  And because you told us you sat outside of his office and

20   you overheard his conversations and you saw who went in and

21   out, were you ever aware of the nature of conversations he was

22   having with the lawyers?

23   A.  During my employment from 2003 to 2005?

24   Q.  Yes.

25   A.  No.

1   Q.  Did you have any interaction with Ken Bellmard?

2   A.  I did.

3   Q.  Was it in relation to any of the businesses that the Miami

4   tribe was involved in?

5   A.  Mostly it was in relationship to casino gaming.

6   Q.  Was it in relation to other things too, because you just

7   said mostly?  So it was mostly that, but was it also in

8   relation to some of the other things?

9   A.  Yes, the land claim.

10  Q.  And did at any time you have any conversations with Ken

11  Bellmard regarding his involvement on behalf of the tribe and

12  the payday lending business?

13  A.  Not in that time period.

14  Q.  Do you recall seeing some government exhibits played about

15  an hour, hour and a half, put up on the screen about an hour,

16  hour and a half ago that had reference to Ken Bellmard or his

17  name was on it?

18  A.  Yes.

19  Q.  Did those have emails have to do with the payday lending

20  business?

21  A.  Yes.

22  Q.  And had you been shown those emails by the government in

23  preparation for your testifying in this case?

24  A.  I'm sorry?

25  Q.  Had you been shown those same emails that you saw here in

1  court today where Ken Bellmard's name appears previously by the

2  government in preparation for your testimony in this case?

3  A.  I don't remember seeing his name on an email that they

4  showed me previously.

5  Q.  So is it your testimony that today, when the government put

6  up the exhibit that had Ken Bellmard's name on it in relation

7  to payday lending, that was the first time that you saw that

8  document?

9  A.  No.  What I'm saying is I don't recall, I don't recall

10  seeing -- noticing Ken Bellmard's name on the document before.

11  Q.  Didn't the government go over with you, in preparation for

12  your testifying in this case, all the exhibits that they were

13  going to present to ask you to testify about when you were on

14  the witness stand?

15  A.  Yes.  Briefly.

16  Q.  And wasn't one of those documents, at least one of them

17  with Ken Bellmard's name on it?

18  A.  Yes.

19  Q.  So you did see it previously, correct?

20  A.  I noticed it this morning.  I don't recall noticing it,

21  Ken's name on there before, that I remember.

22  Q.  Are you telling us that you may have seen a document

23  previously presented to you by the government in preparation

24  for testifying, but you don't recall if you saw Ken Bellmard's

25  name on any of the documents that were presented to you?

1    MR. RAVI:  Objection.

2  Q.  Is that your testimony, yes or no?

3         THE COURT:  Sustained.  Asked and answered.

4         Ladies and gentlemen, let's take another ten-minute

5  break.  Please keep an open mind and do not discuss the case

6  among yourselves or with anyone.  See you in ten minutes.

7         (Jury not present)

8         THE COURT:  See you in ten minutes.

9         (Recess)

10        THE COURT:  All right.  Bring our jury in, please.

11        (Jury present)

12        THE COURT:  Please be seated.

13        Mr. Ginsberg, you may continue.

14        MR. GINSBERG:  Thank you, your Honor.

15 Q.  When we left off, I think you were talking about Ken

16 Bellmard.  Do you recall that?

17 A.  Yes.

18 Q.  And I think you said that during the 2003 to 2005 period,

19 there was another lawyer who worked with the tribe.  Is that

20 correct?

21 A.  Robin Lash.

22 Q.  And is Robin a man or woman?

23 A.  Woman.

24 Q.  Ms. Lash, was she a member permanently hired by the tribe,

25 or did she work for a firm and work when they needed her?

1     MR. RAVI:  Objection, your Honor.

2     THE COURT:  Overruled.

3  A.  She was a full-time tribal employee.

4  Q.  And did you have any contact with her?

5  A.  Yes, on a variety of different things.

6  Q.  And were you aware one way or the other whether she

7  reviewed any of the documents related to payday lending?

8     MR. RAVI:  Objection.  Relevance.

9     THE COURT:  Sustained.

10  Q.  You said you worked with her on a number of things,

11  correct?

12  A.  Yes.

13  Q.  What were the things that you worked with her on?

14     MR. RAVI:  Objection.  Relevance.

15     THE COURT:  I'll allow it.

16  A.  I worked with her on casino gaming, on the -- there was a

17  federal government filing that would have -- if it was

18  successful, would have granted the tribe special preference in

19  bidding for government contracts, and also on the land claim in

20  Chicago -- excuse me, in Illinois and Indiana.

21  Q.  Do you know if she, without going into any substance,

22  worked directly on any matters with Don Brady?

23  A.  Yes.

24  Q.  And were you present all the times that they spoke about

25  matters?

1  A.  No.

2  Q.  And do you know how frequently they spoke about matters?

3          MR. RAVI:  Objection, your Honor.  May we approach?

4          THE COURT:  No.

5          Overruled.

6  A.  I don't know.

7  Q.  The question is were you present?

8  A.  Oh, I'm sorry.

9  Q.  Were you present when she and Don Brady spoke about legal

10  matters?

11         THE COURT:  Wait a minute.

12         MR. GINSBERG:  If we could go back, I don't know if I

13  stated exactly --

14         THE COURT:  No, that's not the question.

15         MR. GINSBERG:  I don't remember exactly what the

16  question was.

17         THE COURT:  The question was, Were you present all the

18  times that they spoke about matters.  That was the question you

19  asked, and the witness answered that question.  The answer was

20  a no.

21         MR. GINSBERG:  Oh, OK.

22         THE COURT:  Next question.

23         MR. GINSBERG:  I didn't hear the answer because there

24  was an interruption.

25         THE COURT:  No, there was another question after that,

1  and then it was on the next question that there was an

2  objection.

3          MR. GINSBERG:  I'm sorry.  I just didn't hear it, your

4  Honor.

5  Q.  During the 2003 to 2005 period, other than those two

6  lawyers --

7          THE COURT:  What lawyers?

8  BY MR. GINSBERG:

9  Q.  The two lawyers that you've mentioned, Mr. Bellmard, right?

10 A.  Yes.

11 Q.  Ken Bellmard and Ms. --

12 A.  Lash.

13 Q.  -- Lash, were there any other lawyers to your knowledge

14 that were working with Don Brady on tribal matters?

15         MR. RAVI:  Objection.  Relevance.

16         THE COURT:  Sustained.

17 Q.  Are you aware one way or the other if Don Brady reviewed

18 the letter of intent that was sent to the tribe that we looked

19 at earlier today?  The letter of intent to get involved in the

20 payday lending business, are you aware if Don Brady read that

21 letter?

22 A.  Yes.

23 Q.  And are you aware Don Brady read the service agreement that

24 was entered into by the tribe with Universal Management

25 Services?

1   A.   I believe that he did.

2   Q.   Are you aware if he consulted with anyone prior to entering

3   into the service agreement?

4   A.   I don't know.

5   Q.   When you returned back to work for the Miami tribe in 2011

6   and you were there, let's say, until the 2012 period when Don

7   Brady was fired, were there lawyers working with the tribe

8   during that period of time?

9            MR. RAVI:  Objection, your Honor.  Relevance.

10           THE COURT:  Sustained.

11  Q.   Well, were you aware of Don Brady having any -- withdrawn.

12           Did Don Brady consult, to your knowledge, with anyone

13  regarding any of the payday lending business ventures while you

14  were there between 2011 until the time he was terminated?

15  A.   Yes.

16  Q.   And do you know, other than Scott Tucker, Blaine Tucker,

17  Tim Muir, who else he consulted with?

18           MR. RAVI:  Objection.  Relevance, your Honor.

19           THE COURT:  I'll allow it.

20  A.   He consulted with attorneys and the Fredericks Peebles &

21  Morgan law firm, Conly Schulte, Shilee.  He secured counsel,

22  personal counsel for himself, because of the IRS audit, and

23  I -- and then, of course, the -- forgot their names -- Chicago

24  lawyers.

25  Q.   You mean Kirkland?

1  A.  Yes.

2  Q.  Kirkland & Ellis?

3  A.  Kirkland & Ellis, yes.  Thank you.

4  Q.  Did Kirkland & Ellis come in before or after Don Brady was

5  terminated?

6  A.  Before.

7  Q.  So was there an overlap period when Kirkland & Ellis was

8  there, Brady was there, and then Don Brady left?

9  A.  Yes.

10  Q.  You were shown by the government a series of declarations

11  made by Don Brady.  Do you recall that?

12  A.  I do.

13  Q.  And at the time those declarations were prepared, did you

14  have familiarity with the declarations, at that time?

15  A.  No, not all of them.

16  Q.  Did Don Brady discuss the declarations or the contents of

17  the declarations with you at the time they were prepared or

18  signed?

19  A.  Declarations that were entered into in 2012 we would have

20  discussed.

21  Q.  Did, to your knowledge, did he also have discussions with

22  attorneys regarding those declarations?

23          MR. RAVI:  Objection, your Honor.  Relevance.  Motions

24  *in limine*, your Honor.

25          THE COURT:  One second, please.

1    MR. RAVI:  Yes.  Sure, your Honor.

2    THE COURT:  If you know.  Do you know?

3    THE WITNESS:  Yes.

4  BY MR. GINSBERG:

5  Q.  Yes, he did?

6  A.  Yes.

7  Q.  OK.  Thank you.  And do you know who those lawyers were,

8  who the lawyers were that he consulted with in reference to the

9  declarations?

10  A.  I know he consulted with Conly Schulte.

11  Q.  Anybody else?

12  A.  I can't say specifically, no.

13  Q.  Do you recall when the documents, when the declaration

14  front pages were put up on the screen before you, did you see

15  the names of a number of different attorneys?

16  A.  Yes.

17  Q.  On the top of the document?

18  A.  Yes.

19  Q.  Did you recognize -- and you said you recognized at least

20  two of those people?

21  A.  Yes.

22  Q.  And who were they again, those two?

23  A.  Conly Schulte and Shilee Mullin.

24  Q.  And I believe on at least one, there was a third name; you

25  just didn't recognize that name, is that fair to say?

 1  A.  I would have to look at it again, but I principally -- I

 2  would have to look at it again.

 3  Q.  I don't want to make you go through it again, but those are

 4  the two that you recall, is that correct?

 5  A.  Yes, that's correct.

 6  Q.  OK.  Now, let's go back to the tape recordings, if we may.

 7  Specifically, I want to ask you about the two recordings, two

 8  recordings that you made of Don Brady.  That would be in June

 9  of 2012, correct?

10  A.  Yes.

11  Q.  And those recordings were played for the jury, correct, and

12  transcripts were put up on the screen?  Is that correct?

13  A.  Portions of them.

14  Q.  Portions of them?

15  A.  Yes.

16  Q.  So the portion -- withdrawn.

17          MR. GINSBERG:  I'm sorry, your Honor.

18  Q.  The recordings themselves were longer than the portions

19  that were actually played in court, is that fair to say?

20  A.  Yes.

21  Q.  And do you recall how much longer, how much more in time,

22  how much longer in time there was on the recordings when you

23  originally recorded the two conversations with Don Brady?

24  A.  I think the first recording was most, almost, was complete

25  or almost complete.  The second and third I can't tell you how

1    long they were.  There may be notations on the transcription.

2    Q.  But in any event, it would be fair to say the full

3    recording wasn't played today, correct?

4    A.  Yes.

5    Q.  Now, when you made those recordings, did you eventually

6    turn those recordings over to someone else?

7    A.  I did.

8    Q.  And who did you turn them over to?

9    A.  I did to my attorney and then to Brad Weidenhammer of

10   Kirkland & Ellis.

11   Q.  And when you say my attorney --

12   A.  Yes.

13   Q.  -- who would that be, Brad Weidenhammer?

14   A.  No.

15   Q.  Or somebody different?

16   A.  Scott Knott.

17   Q.  Scott Knott?

18   A.  Yes.

19   Q.  Was he the attorney you went to regarding the whistleblower

20   action?

21   A.  He was.

22   Q.  Who did you give the tapes to first?

23   A.  To Scott Knott.

24   Q.  And at some point did he return them to you?

25   A.  Yes.  I gave him my phone and he returned my phone.

H9pWtuc4                    Williams - Cross

1    Q.  So when you got your phone back, did it have the recordings

2    on them?

3    A.  It did, and I gave my phone to Brad Weidenhammer.

4    Q.  And did you get your phone back from him as well?

5    A.  I did not.

6    Q.  Did not?

7    A.  Uh-huh.

8    Q.  After you gave the phone to the two lawyers, did you have

9    anything to do with preparing transcripts of the recordings

10   that were on your phone?

11   A.  In preparing the transcripts, no, only to review them as

12   they were, after they'd been transcribed.

13   Q.  And do you know who prepared the transcripts?

14   A.  I do not.

15   Q.  Did you become aware that the tapes and/or transcripts were

16   eventually turned over to the United States Attorney's Office?

17   A.  I did.

18   Q.  And when did you become aware of that?

19   A.  I'm not sure.

20   Q.  At any time after you became aware of that, did you listen

21   to the full recordings -- the full recordings -- again?

22   A.  Did I listen to the full recordings -- after what event?

23   Q.  After they were turned over eventually to the United States

24   Attorney's Office, did you have an opportunity to listen to the

25   complete original recordings?

1  A.  I don't recall if they were the full recordings.  I saw

2  larger segments than what was entered into as an exhibit today,

3  but I don't recall whether they were full or not.

4  Q.  Do you recall listening to the recordings and hearing that

5  in various places on the tape, white noise had been inserted

6  over what had previously been voices?

7  A.  I do.

8  Q.  Do you know how that occurred?

9  A.  I believe that it, the, the tribe's attorneys may have done

10  that because of privilege.

11  Q.  Did they tell you that?

12  A.  No.

13      THE COURT:  Ladies and gentlemen of the jury, in

14  pretrial matters, this issue has arisen, and I have ruled, that

15  the tapes are properly admissible and that there was nothing

16  about the exclusion of certain materials by attorneys reviewing

17  the tapes that was improper or would cause the tapes to be

18  inadmissible.  The weight, however, if any, to be given to the

19  tapes is entirely a matter for you, the jury, to decide.

20      Go ahead.

21      MR. GINSBERG:  Yes, your Honor.  Thank you.

22  Q.  Now, in 408, and 408T was the transcript, and if you need

23  to put it up, I'll ask that it be put up, but would it be fair

24  to say that --

25      MR. GINSBERG:  Could we go to page 1 on this?

1   Q.  -- there's a discussion between yourself and Mr. Brady?

2   Correct?

3   A.  Yes.

4   Q.  And part of that discussion has to do with the portfolios,

5   correct?

6   A.  Yes.

7   Q.  And the amount of money that may be in the portfolios,

8   correct?

9   A.  Yes, and the ownership of the portfolios.

10  Q.  And the ownership of the portfolios, correct?

11  A.  Yes.

12  Q.  Now, using the term "portfolios" does not necessarily mean

13  the portfolio where the money was being lent in, does it?

14  A.  My understanding of this was we were discussing the

15  portfolios of the loan company, specifically the ones that were

16  managed by the Miami tribe or that were ostensibly owned by the

17  Miami tribe.

18  Q.  There were many portfolios, is that fair to say?

19  A.  There were seven, to my knowledge, at that time.  Five were

20  attributed to the Miami tribe.

21  Q.  OK.  And in those portfolios, there was a substantial

22  amount of money, is that correct?

23  A.  Yes, that's what I understand.

24  Q.  And reflecting back on the service agreement that we've

25  talked about, the understanding was that the tribe was entitled

1  to $20,000 a month up to 1 percent of the gross revenues of the

2  payday lending business, is that correct?

3  A.  In the initial agreement.

4  Q.  Did that number increase at some point, or change?

5  A.  Well, the VA licensing agreement had a different proposal

6  in it.

7  Q.  But that was the agreement initially, correct?

8  A.  Yes.

9  Q.  And some of that money -- that is, the $20,000 a month up

10 to the 1 percent of the gross profits -- was money that was in

11 one of those portfolios that you and Don Brady were talking

12 about, is that correct?

13 A.  Could you repeat that question for me, please?

14 Q.  Some of the money -- that is, the $20,000 a month up to 1

15 percent of the gross revenues -- was in at least one of the

16 portfolios that you and Don Brady were talking about, is that

17 correct?

18           THE COURT:  Do you understand the question?

19           THE WITNESS:  No, I don't.  I'm sorry.

20           THE COURT:  All right.  Rephrase your question.

21 BY MR. GINSBERG:

22 Q.  To your knowledge, each portfolio represented moneys that

23 were derived for -- withdrawn.

24           Did you understand what was in each one of the

25 portfolios in terms of not just a dollar amount, but the source

1    of the money?

2    A.  The source of the money in the portfolios would have been

3    moneys that had paid, been paid on loans.

4    Q.  OK.  So there was a total amount that had been paid on

5    loans that was sitting in the portfolios, correct?

6    A.  I believe that's correct, yes.

7    Q.  You believe that's --

8    A.  I believe that's correct.

9    Q.  OK.  And there was in place at the time the moneys were

10   sitting in the portfolios, particularly in June of 2012 when

11   you were having this conversation with Mr. Brady, Whose money

12   was this that was in the portfolios, correct?  That was the

13   issue, is that correct?

14   A.  Yes.  Don said it was all Scott Tucker's.

15   Q.  Well, where was the money, where was the money that the

16   tribe had earned as the lender, the 20,000 a month up to 1

17   percent gross revenue?

18   A.  They would receive monthly checks.

19   Q.  And where would that go?

20   A.  It would go to Miami Nation Enterprises.

21   Q.  And what account would that go into?

22   A.  A Miami Nation Enterprises account.

23   Q.  Were any of these portfolios that you were talking about in

24   this conversation one of those accounts?

25   A.  Yes.

1  Q.  OK.  So among other things that you're discussing with

2  Mr. Brady here, at least one of the portfolios -- it's being

3  referred to as portfolios, correct?

4  A.  Yes.

5  Q.  But they're actually accounts; just a different word is

6  being used, is that fair to say?

7  A.  I don't know.

8  Q.  Well, you said that the money that the tribe had earned was

9  in an account in the name of the tribe and it was one of the

10  portfolios that's being discussed with Mr. Brady, correct?

11  A.  Oh, I'm sorry.  I misunderstood your question.  The money

12  that the tribe received for the 1 percent --

13  Q.  Yes.

14  A.  -- would have been deposited in accounts under Miami Nation

15  Enterprises.

16  Q.  OK.

17          THE COURT:  Go ahead.  Are you finished with your

18  answer?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Thank you.  Next question.

21  BY MR. GINSBERG:

22  Q.  Do you know, when you were talking about the portfolios in

23  this conversation, 408, do you know which portfolios, what

24  names of those portfolios were the portfolios you were talking

25  about?

1  A.  No.  I think, I think there's a misunderstanding about what

2  this conversation is about.

3  Q.  Well, I'm just asking.  I'm allowed to ask questions.  I'll

4  ask another question.

5           Universal Management Services and/or whoever was

6  servicing the loans was entitled by virtue of the agreement

7  with the Miami tribe to the vast majority of the revenues from

8  the lending business, is that fair to say?

9  A.  UMS was no longer in place at that time.

10  Q.  Whoever the servicer was at the time when you're talking to

11  Don Brady about the portfolios was entitled to a vast majority

12  of the money that was earned as a result of the loans, is that

13  fair to say?

14  A.  I'm not sure that's an accurate characterization, and it's

15  not -- it's not accurate of what our conversation was about.

16  Q.  The money that's in these accounts, I believe you said, was

17  money that came as a result of loans and then money being paid

18  back on the loans and interest on the loans.  Is that correct?

19  A.  Yes, I believe so.

20  Q.  And according to the service agreement, the servicer was

21  providing all these various services and was entitled to the

22  vast majority of the money that was being made -- profit --

23  from the lending business, is that correct?

24  A.  According to that service agreement, yes.

25  Q.  Well, do you think that the servicer was not entitled to

H9pWtuc4                    Williams - Cross

1   the vast majority of the money, based on the agreement?

2   A.  Based on the agreement, they were, but that's not the basis

3   of the -- that's not the issue here.

4   Q.  I'm asking you a question.

5   A.  Based on that agreement, that's -- that would be correct.

6   Q.  And the money that was sitting in those accounts was money

7   generated from the loan business that the servicer was entitled

8   to but hadn't yet been taken out of those accounts by the

9   servicer, is that correct?

10  A.  The tribe had made declarations saying that it owned 100

11  percent of the profits of the company.

12           MR. GINSBERG:  Your Honor, your Honor --

13           THE COURT:  Don't talk over the witness.

14           MR. GINSBERG:  But she's not responsive.  I don't know

15  how to do this.

16           THE COURT:  Except if I could listen to the answer, I

17  could tell whether it's responsive.

18           MR. GINSBERG:  I'm sorry.  I apologize.

19           THE COURT:  Go ahead.  "Do you know when you were

20  talking about the portfolios in this conversation, do you know

21  which portfolios, what names of those portfolios were the

22  portfolios you were talking about?"

23           That was not the last question.

24           MR. GINSBERG:  No.

25           THE COURT:  The last question was, "And the money that

1  was sitting in those accounts was money generated from the loan

2  business that the servicer was entitled to but hadn't yet been

3  taken out of those accounts by the servicer, is that correct?"

4          Do you understand the question?

5          THE WITNESS:  I do understand the question, your

6  Honor.

7          THE COURT:  And can you answer it?

8          THE WITNESS:  According to the initial agreement, that

9  would have been correct.  However, the boards were advised that

10  they had substantial ownership or should have substantial

11  ownership of those moneys, and Don Brady rejected that notion

12  in his conversation with me and said that that was not correct,

13  that the tribe owned nothing.

14  BY MR. GINSBERG:

15  Q.  He also told you that, or you also testified -- withdrawn.

16          There was a discussion about $15 million at some

17  point, is that correct?

18  A.  That's correct.

19  Q.  Had the tribe already received that $15 million during this

20  time period?

21  A.  I don't know what the total was that they received.

22          (Continued on next page)

23

24

25

H9P8TUC5                    Williams - Cross

1   Q.  Do you remember that number 15 million?

2   A.  I do.

3   Q.  Do you know where that number came from?

4   A.  I don't know what all of the components were.  I knew a

5   portion of it was -- would have been the 1 percent that they

6   would have received.  There were two subsequent payments that

7   would have been received that would total $5.5 million, and

8   those represented a dollar per loan, and that was during the

9   period of 2012.  I don't know that all of those numbers added

10  up to $15 million.

11  Q.  It was a substantial figure, somewhere in the many millions

12  of dollars, is that correct?

13          THE COURT:  What was a substantial figure?

14  Q.  You said you don't know what the total was.  But whatever

15  that total was, it was a substantial number in terms of

16  millions of dollars, correct?

17  A.  Yes.

18  Q.  If it wasn't 15, it was somewhere in that vicinity, is that

19  fair to say?

20  A.  I don't know what the total was for 2012 revenues, but it's

21  going to be in the millions of dollars.

22  Q.  That's money that the tribe received as a result of their

23  participation in the payday lending business, is that correct?

24  A.  Yes.

25  Q.  And in addition, there was a discussion about another 3 or

H9P8TUC5                    Williams - Cross

1  $3.3 million that the tribe was going to get, is that correct?

2  A.  Yes.

3  Q.  And that was another future payment?  Was that a future

4  payment to be made to the tribe?

5  A.  I am not sure whether they had received the initial payment

6  on that at that point in time.  There were going to be two

7  payments made totaling 5.5 million.

8  Q.  The rest of the money, besides the money we just talked

9  about, which was money that the tribe either had received or

10  was promised to receive, the rest of the money in those

11  portfolios was money that the servicer had earned as a result

12  of the servicing agreement, is that correct?

13       MR. RAVI:  Objection as to the term servicer.  I don't

14  remember previous testimony about that.

15       THE COURT:  Lay a foundation.

16  Q.  There was a service agreement, correct, between a

17  servicer -- a company and the tribes, correct?

18  A.  The original service agreement was between the tribe and

19  UMS.  AMG was the servicer during the latter period when I was

20  there.

21  Q.  Was there a business in Kansas City that was not owned by

22  the tribe that was providing services to assist the payday

23  lending business of the Miami tribe?

24  A.  Well, the license agreement was premised on the assertion

25  that the tribe did not own the eCash system.

1           THE COURT:  You could have some latitude, but this is

2      an area where it seems to me some explanation is necessary for

3      an understanding.  So I am not going to strike the answer.

4           Put another question.

5           MR. GINSBERG:  OK.

6      Q.  One of the things you were discussing with Don Brady in the

7      recorded conversations was your concerns about tax

8      implications, correct?

9      A.  Yes.

10     Q.  And money laundering, correct?

11     A.  In one of the recordings, yes.

12     Q.  And that was because there was money sitting in those

13     accounts and it was your belief that that money did not belong

14     to the tribes and was sitting there and sort of being hidden

15     from taxing authorities or governmental authorities, is that

16     fair to say?

17     A.  Yes, that's what Don Brady told me.

18     Q.  But that money had actually been earned by a company that

19     had provided services to the tribe, it just hadn't yet been

20     taken out of those accounts, is that correct, if you know?

21     A.  I don't know.

22          MR. GINSBERG:  Can I have one moment, your Honor?

23          THE COURT:  Sure.

24     Q.  During these conversations with Don Brady, that is the

25     tapes with the transcripts, you are saying, basically, you were

1    very concerned, very worried, you express all of that to Don

2    Brady, is that correct?

3    A.  Yes.

4    Q.  And he is responding by saying, he's not worried; if there

5    is any tax consequences or liability, it's not mine, it's not

6    the tribe's, it's Scott Tucker's, correct?

7    A.  That's what he said, yes.

8            MR. GINSBERG:  I have nothing further.

9            THE COURT:  Mr. Bath.

10           MR. BATH:  Thank you, Judge.

11   CROSS-EXAMINATION

12   BY MR. BATH:

13   Q.  Ms. Williams, I want to take you back to your first few

14   years at the tribe and make sure I understand sort of the -- I

15   am going to call it the corporate structure of the tribe.  OK?

16   A.  All right.

17   Q.  So at the top, we have the Miami tribe, is that correct?

18   A.  At the top?

19   Q.  At the top of what we are going to call like a scaffold.

20   We have the Miami tribe at the top.  And then the Miami tribe

21   passed ordinances and had different businesses below that Miami

22   tribe, is that correct?

23   A.  That's correct.

24   Q.  One of them was Miami Nation Enterprises, is that correct?

25   A.  Subsequently, yes.

1  Q.  Before that it was MTBE?

2  A.  That's correct.

3  Q.  So the Miami tribe forms MTBE, which is below it on the

4  scaffold, correct?

5  A.  Yes.

6  Q.  Then later does MTBE become MNE?

7  A.  MNE was the successor to MTBE.

8  Q.  MNE sort of absorbs MTBE, correct?

9  A.  Assumes many of the same functions, yes.

10  Q.  Then under Miami Nation Enterprises, we have other things

11  below on the scaffolding, don't we?

12  A.  Yes.

13  Q.  On one side -- tell me if I am wrong -- we have TFS,

14  correct?

15  A.  I don't think TFS was ever under MNE.

16  Q.  Where do you think TFS was?

17  A.  I think it may have been under the tribal council.

18  Q.  Were there other businesses under the tribe, under MNE,

19  which would have been like the print shop?

20  A.  Yes.

21  Q.  And the learning center?

22  A.  Yes.

23  Q.  And down on the scaffolding the gift shop?

24  A.  Yes.

25  Q.  Then the casino?

1   A.  Yes.

2   Q.  Then EnviroTech?

3   A.  Yes.

4   Q.  Then the cineplex?

5   A.  Yes.

6   Q.  Then the pecan farm?

7   A.  Yes.

8   Q.  Then you said White Loon?

9   A.  White Loon Construction.

10  Q.  And when you came aboard in '03, Don Brady was in charge of

11  MNE, is that correct?

12  A.  He was in charge of MTBE, Miami Tribe Business Enterprises.

13  Q.  Which later became MNE?

14  A.  Yes.

15  Q.  Were you there when it became MNE?

16  A.  I was not working for Don at that time.

17  Q.  When you were there early time, it's MTBE?

18  A.  Yes.

19  Q.  But the print shop and the other businesses are below that?

20  A.  Some of those, not all of those were in existence at that

21  time.

22  Q.  The ones that were are below MTBE?

23  A.  Yes.

24  Q.  And Don, what was his title then, '03-'05?

25  A.  He was CEO.

1  Q.  He was CEO of MTBE?

2  A.  Yes.

3  Q.  And then he was the ultimate person in charge of those

4  businesses below that?

5  A.  Yes.

6  Q.  MTBE later becomes MNE, correct?

7  A.  Yes.

8  Q.  And Don is still in charge of all of the businesses we

9  talked about?

10  A.  To my knowledge, yes.

11  Q.  When you came back, the name had changed, but Don's

12  position over the print shop or whatever businesses existed at

13  the time was the same?

14  A.  Some of those businesses were not in existence when I came

15  back.

16  Q.  Don was in charge of the businesses that existed?

17  A.  Yes.

18  Q.  He wasn't in charge of businesses that didn't exist?

19  A.  No.

20  Q.  Miami tribe is at the top of the scaffolding, and we

21  already talked about MTBE and later MNE.

22          At some point, AMG was formed, is that correct?

23  A.  That's correct.

24  Q.  Would that be at the same level on the scaffolding as MNE,

25  if you know?

1  A.  They are conflicting organizational charts on that.

2  Q.  Tell us what your understanding was.

3  A.  My understanding is that AMG fell directly beneath the

4  Miami tribal council.

5  Q.  Does that mean it was below MNE or not?

6  A.  No.  It would have been a lateral role to MNE.

7  Q.  So AMG and MNE are on the scaffold equal, but below the

8  Miami tribe?

9  A.  Yes.

10  Q.  Then at some point in time, MNE Services was formed?

11  A.  That's correct.

12  Q.  Was that about the same time as AMG?

13  A.  Yes, I believe so.

14  Q.  Under MNE Services, is it also on the same scaffold with

15  MNE and AMG?

16  A.  MNE Services fell beneath MNE.  MNE was considered its

17  parent.

18  Q.  So it fell below MNE?

19  A.  That's correct.

20  Q.  The portfolios, where did they fall on the scaffolding, if

21  you know?

22  A.  MNE Services was the money side, allegedly.  And AMG was

23  the servicing side, with the equipment and the personnel and

24  the vendors, infrastructural-type contracts.  I believe that

25  the portfolios should have fallen under MNE Services.

1    Q.  But you're not sure?

2    A.  I'm not sure.

3    Q.  Because you probably weren't necessarily there when the

4    boards met and resolutions got passed, etc., is that fair to

5    say?

6    A.  No, I was not there.

7    Q.  Because AMG got formed in '08, correct?

8    A.  That's correct.

9    Q.  You were not there then?

10   A.  That's correct.

11   Q.  You have told us about the second time, the '11 through '13

12   period you were there, you were the recording secretary?

13   A.  Yes.

14   Q.  Does that mean you went to most, if not all the board

15   meetings?

16   A.  Yes.

17   Q.  The board meetings we are talking about is AMG?

18   A.  Yes.

19   Q.  And MNE?

20   A.  MNE Services.  Later on I started recording for MNE.

21   Q.  So first it was AMG and MNES?

22   A.  That's correct.

23   Q.  And then later on you did some board minutes for MNE?

24   A.  Yes.

25   Q.  As the recording secretary, it was your job to attend the

1    board meetings?

2    A.   That's correct.

3    Q.   And you took notes?

4    A.   I did.

5    Q.   And sometimes you typed or handwritten or both?

6    A.   Typed.

7    Q.   Were you taking those notes at the time the information is

8    being provided during the meeting?

9    A.   Yes.

10   Q.   While it's being said in the board meeting, you were taking

11   down the minutes?

12   A.   I was, yes, as best I could.

13   Q.   And you were recording it in your regular practice?

14   A.   I'm sorry?

15   Q.   That was your regular practice to take minutes during the

16   meetings?

17   A.   Yes.

18   Q.   And be as accurate as possible?

19   A.   Yes.

20   Q.   Then you would then type those up after the board meeting?

21   A.   Yes.

22   Q.   And then you would provide them to the board members to

23   review?

24   A.   Yes, and to be acted upon at the next regular meeting.

25   Q.   These minutes were kept in the ordinary course of the

1   tribe's business?

2   A.  Yes, of these boards when I was there.

3   Q.  I am only talking about when you were there.

4           Would one of the board members sign off on the

5   minutes?

6   A.  Yes.

7   Q.  Usually all three?

8   A.  No.

9   Q.  How many would usually sign?

10  A.  Just one.

11  Q.  Are you sure about that?

12  A.  Well, maybe it was two.  I'm sorry.  I was thinking

13  secretary, and maybe the president signed -- the chairman

14  signed off, I can't recall now.

15  Q.  Would looking at some board minutes when you were there

16  might help refresh your memory?

17  A.  That would be helpful.  Thank you.

18  Q.  Take a look at this and look at that time yourself, and

19  when you're done looking at it, let me know and see if this

20  refreshes your memory.

21  A.  Yes.

22  Q.  Does looking at that document help refresh your memory?

23  A.  Yes.

24  Q.  Is your memory refreshed that usually at least two and

25  sometimes three people?

1    A.   Yes.  I'm sorry.

2    Q.   Three people would sign the board minutes?

3    A.   Yes.

4    Q.   Those would be board members?

5    A.   Yes.  It was a three-member board.

6    Q.   They would be the people who were at the meeting?

7    A.   Yes.

8    Q.   Their signing that would be a way of signifying that the

9    minutes were correct?

10   A.   Yes.

11   Q.   I will take that back from you.  Thank you.

12            At some point in time, you recorded some of the board

13   minutes?

14   A.   Yes.

15   Q.   And Mr. Ginsberg talked to you about that.

16            My question is, how many recordings of board minutes

17   did you make?

18   A.   I don't know.  Several.  Probably most of the board minutes

19   through 2012 -- board meetings, after June, or maybe after.  I

20   don't remember now.

21   Q.   You don't know when they started?

22   A.   I believe the first one was in April.

23   Q.   Of?

24   A.   Of 2012.

25   Q.   So then once you began recording them, I think I understood

1  your testimony to be you did that so that you would have a

2  better record?

3  A.  Yes.

4  Q.  That's what you said, that's why you did it?

5  A.  Yes.

6  Q.  And if you were doing that to have a better record, then

7  you would probably record all the ones you went to?

8  A.  I think probably most of them after that, yes.

9  Q.  So there are at least two board meetings a month?

10  A.  Generally.

11  Q.  AMG and MNE Services?

12  A.  Yes.

13  Q.  So if it's April through December, there would be eight

14  months and about 16 meetings?

15  A.  Yes.  And there may have been more.  There were special

16  meetings called.

17  Q.  But your recollection is then that you made, at least, of

18  board meetings, 16 recordings?

19  A.  I can't really say for sure, but that wouldn't surprise me,

20  that number would not surprise me.

21  Q.  Those recordings were turned over to your lawyer Scott --

22  is that his name -- Knott?

23  A.  Knott.

24        A lot of those board meetings took place after that.

25  Q.  So whatever number of board minutes you say you recorded,

1    you did or did not turn them over to Mr. Knott?

2             THE COURT:  Do you understand the question?

3             THE WITNESS:  I do, your Honor.  Thank you.

4    A.  I gave him my phone -- let's see.  I gave my phone to Brad

5    Weidenhammer early in November, I believe, of 2012.

6    Q.  Who did you give the phone to first?

7    A.  Scott Knott, but it was earlier than that.

8    Q.  After you gave the phone to Scott Knott, did you make any

9    other recordings on a different device?

10   A.  I may have on the -- yes, on the other cell phone from the

11   tribe, but they had that.

12   Q.  So we now have two different phones that have recordings on

13   them?

14   A.  I may have.

15   Q.  The phone you gave to Knott?

16   A.  Is my personal cell phone.

17   Q.  However many recordings there were, he gave that phone back

18   to you, correct?

19   A.  Yes.

20   Q.  You then gave that phone to Brad?

21   A.  To Brad Weidenhammer, yes.

22   Q.  Who is he?

23   A.  He was the tribe's attorney.

24   Q.  What firm?

25   A.  Kirkland & Ellis.

1    Q.  And you never see that phone again, do you?

2    A.  No, I do not.

3    Q.  Did anybody ever come to you and ask you, well, hey, here's

4    the recordings on the phone, does that match up with your

5    memory of how many recordings you made?

6    A.  No.

7    Q.  Did you keep any kind of written log or any kind of

8    computer note or anything at all so that we can figure out how

9    many recordings were ever made?

10   A.  No, I didn't keep anything like that.  It was not that

11   organized, structured.

12   Q.  And no one ever came back to you and asked you to confirm

13   that the phone you gave to Scott, that he then gave to Brad,

14   has the same recordings?

15   A.  No.

16   Q.  Then we have another phone, we will call it phone number

17   two.  You now remember you made some recordings on that?

18   A.  I am trying to remember the time frame.  I'm sorry.  I'm

19   just not sure.

20   Q.  So it's fair --

21   A.  After Don was gone, I'm not sure.

22   Q.  You don't recall anybody ever coming back to you and asking

23   you, listen to these recordings, can you match them up to phone

24   number one or phone number two, no one has ever asked you to do

25   that?

1   A.  No.

2   Q.  As you sit here today, you really don't know what the

3   universe of recordings are, is that fair to say?

4   A.  No.  Both phones were -- the Miami tribe had both phones.

5   Q.  You never saw them after that?

6   A.  No.

7   Q.  Did you make any recordings of board meetings where Tim

8   Muir was present?

9   A.  When Tim Muir was present?  No.

10  Q.  Put it another way, in prepping for this trial, when you

11  met with the government or the agents, did you ever listen to a

12  recording where Tim Muir was on that recording?

13  A.  Not that I recall.  Oh, no, no.

14  Q.  You're sure?

15  A.  Well, I don't think so.

16  Q.  As you sit here, you don't think so?

17  A.  Right.

18          THE COURT:  I am going to give you the opportunity to

19  hold your question in suspense until tomorrow morning.

20          Ladies and gentlemen, it's been a long day.  I know we

21  had an unusual start this morning.  I will see you tomorrow

22  10:00 for a good 10:00 start.  Get here a few minutes early.

23  And remember, keep an open mind, do not discuss the case

24  amongst yourselves or with anyone.  No searches or Googling or

25  the like, no posting.

1          Have a great evening.  See you tomorrow.

2          (Jury exits courtroom)

3          THE COURT:  I have marked as Court Exhibit No. 8 draft

4     jury instructions, which my law clerk is handing out.

5          You may step down, and if you don't mind stepping out

6     of the courtroom.

7          (Witness exits courtroom)

8          THE COURT:  What does the government have left after

9     this witness?

10          MR. VELAMOOR:  In terms of numbers of witnesses,

11     Judge?

12          THE COURT:  I guess that means you have plural

13     witnesses after this witness.  Tell me who you have.  What do

14     you have?

15          MR. VELAMOOR:  Judge, we intend to call a lawyer who

16     pushed through the paperwork on the Tucker vs. AMG lawsuit.  We

17     intend to call an IT person at the company who can speak to

18     various things that have not been discussed yet in the trial.

19     We intend to call at least one person from one of the other

20     tribes other than the Miami tribe.

21          MR. GINSBERG:  Can we get names?

22          MR. VELAMOOR:  We have additional borrowers that we

23     intend to call, and we intend to -- we have conferred with

24     counsel.  They don't intend to object in terms of the numbers

25     of borrowers.

1          THE COURT:  I have a job here.  In terms of

2     cumulativeness, I get a vote on it also.  Do you understand

3     that?

4          MR. VELAMOOR:  Of course.

5          THE COURT:  It may be in the defense's interest to

6     prolong this case.  I am not going to allow repetitive

7     testimony to come in before the jury.  So it's whoopee do that

8     the defense doesn't object.  It's still a question of whether

9     it's cumulative.

10          What else?

11          MR. VELAMOOR:  We have a letter to explain why we

12     don't think it is.

13          THE COURT:  What else?

14          MR. VELAMOOR:  We intend to call our summary witness.

15          THE COURT:  What is your summary witness?

16          MR. VELAMOOR:  The summary witness is going to put

17     some figures, in terms of the volume of the loans, the number

18     of borrowers in New York, as well as put before the jury some

19     of the spending from nominally tribal bank accounts by the

20     defendants, which again goes to show that Mr. Tucker in fact

21     was the beneficial owner and controller over the bank accounts.

22          THE COURT:  What else?

23          MR. VELAMOOR:  Then we are going to have a few

24     custodial-type witnesses to get in very briefly just additional

25     documents, which I don't think will take very long at all.

1    THE COURT:  Do you ever have conversations with your

2 colleagues about juror comprehension and juror attention?  Do

3 you ever talk about that?  Or do you just talk about ones

4 you're going to put in?  You don't have to answer it.

5    Jurors set aside their personal lives to come and

6 listen to the case.  They don't need repetition and prolonging

7 the evidence to the nth degree.  I think I have been very

8 accommodating in allowing attorneys to conduct their

9 examinations, but that's been met with dragging things out.  So

10 I would urge you to be snappy about what you're doing or you're

11 going to be shut down, because it's apparent to me that at

12 least one side in this case, the side that's on their case in

13 chief, is not attentive to juror attention, and it's some form

14 of automatic pilot where there is not even a sense that there

15 is a jury in the room.  That's what I see.

16    Have a nice evening.

17    MR. GINSBERG:  Judge, we really need to know names of

18 who the witnesses are and when because this is going to be our

19 ultimate problem.  We have a number of witnesses who are all

20 out of state, and I think almost every one of them are

21 witnesses that would be Scott Tucker witnesses that we have to

22 arrange through an order from your Honor and then through the

23 marshal service -- well, e-voucher and then the marshal service

24 to have them come to New York, because that's how it has to be

25 arranged.

1       THE COURT:  Talk to the government.

2       MR. GINSBERG:  We just really need to know exactly

3   because we don't want to have people coming in on Thursday and

4   then there's four days and then we have a problem with the

5   marshal.

6       THE COURT:  That's why I am suggesting you talk to the

7   government.  I am trying to get some answers out of the

8   government about how long this is going to go on for, and I

9   have failed miserably, Mr. Ginsberg.

10      I will see you tomorrow.

11      (Adjourned to September 26, 2017, at 10:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

CAROLYN WILLIAMS

Direct By Mr. Ravi . . . . . . . . . . . . . .1044

Cross By Mr. Ginsberg  . . . . . . . . . . .1114

Cross By Mr. Bath  . . . . . . . . . . . . .1168

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 410  . . . . . . . . . . . . . . . . . . .1051

 322  . . . . . . . . . . . . . . . . . . .1056

 309  . . . . . . . . . . . . . . . . . . .1063

 323  . . . . . . . . . . . . . . . . . . .1066

 316  . . . . . . . . . . . . . . . . . . .1067

 315  . . . . . . . . . . . . . . . . . . .1068

 317, 318, 319, 320 and 321  . . . . . . . .1070

 1313   . . . . . . . . . . . . . . . . . .1085

 4026   . . . . . . . . . . . . . . . . . .1090

 1213   . . . . . . . . . . . . . . . . . .1091

  404 and 406  . . . . . . . . . . . . . . .1102