H9qWtuc1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        16 Cr. 91 (PKC)

 5   SCOTT TUCKER and
     TIMOTHY MUIR,                        Trial
 6
                 Defendants.
 7
     ------------------------------x
 8                                        New York, N.Y.
                                          September 26, 2017
 9                                        10:15 a.m.

10
     Before:
11                   HON. P. KEVIN CASTEL

12                                        District Judge
                                            and a jury
13                        APPEARANCES

14   JOON H. KIM
          Acting United States Attorney for the
15        Southern District of New York
     BY:  NIKETH V. VELAMOOR
16        HAGAN C. SCOTTEN
          SAGAR K. RAVI
17        Assistant United States Attorneys

18   FREEMAN NOOTER & GINSBERG
          Attorneys for Defendant Tucker
19   BY:  LEE A. GINSBERG
          NADJIA LIMANI
20           -and-
     STAMPUR & ROTH
21   BY:  JAMES M. ROTH

22   BATH & EDMONDS, P.A.
          Attorneys for Defendant Muir
23   BY:  THOMAS J. BATH
             -and-
24   BEVERLY VAN NESS

25
```

H9qWtuc1

1          (Trial resumed)

2          THE COURT:  Please be seated.

3          First of all, I want to thank the government for being

4     attentive to my comments of late yesterday, and I very much

5     appreciate the letter I received.  As a result, I think the

6     comments I begin this morning with are different than what they

7     might otherwise have been had the government not sent that

8     letter, so thank you.

9          With regard to the witness, why don't you tell me on

10    the record what has transpired.  I understand there is a

11    medical issue with regard to the witness who is presently on

12    the stand.

13         MR. RAVI:  Your Honor, while the witness was being

14    brought upstairs in order to get back on the stand, she was

15    brought to the fifth floor of the courthouse first, at which

16    time she told Agent Praiswater that she wasn't feeling OK, she

17    wasn't sure what was happening, and then she later experienced

18    what appeared to be a seizure.  She was then placed on a bench

19    laying down and medics were called to the scene.

20         She has been now taken to Downtown Presbyterian for

21    care.  An FBI agent is currently trying to get a hold of her

22    family and is going to be in touch with the hospital to ensure

23    she's OK and give us any status updates, as we learn more

24    information.

25         THE COURT:  OK.  And I think in this trial you have to

H9qWtuc1

be prepared for all contingencies, so one contingency is she is

well enough to come back and resume cross-examination.  Another

contingency is she is not and you have to figure out what

you're going to do in that eventuality.

        We are still missing a juror, is that correct, Madam

Deputy?

        THE DEPUTY CLERK:  Yes.

        THE COURT:  We will be in recess then until our juror

arrives.  The juror, by the way, had called to indicate that

they were delayed in transit, and they indicated to my law

clerk that they expected to be delayed by 15 minutes.  I think

that these jurors have been so wonderful in their attentiveness

to the schedule that I'm inclined to wait a few more minutes.

        Mr. Ginsberg.

        MR. GINSBERG:  Yes, there are a couple of small

issues, as long as we have this time, I want to raise and bring

to the Court's attention and see how the Court wants to proceed

with it.

        We, the defense, have spoken to the government about

requesting an instruction from the Court regarding Don Brady's

unavailability as a witness.  I proposed some language, and the

government's position is that they believe the only thing

necessary is what would be the standard charge regarding

unavailable witnesses, available or unavailable to both sides.

        We think that this is a unique situation because of

H9qWtuc1

1    his medical issue, he can't testify, so he's not ever really

2    available to us, and given the nature of the specific testimony

3    in this case, frankly, a lot of which is coming from the

4    current witness, Ms. Williams, we have a proposed instruction,

5    which we would give to the Court and ask, first of all, for the

6    Court's consideration to give it either at some point during

7    the trial or as part of the jury instructions, It's very short,

8    and I'll just read it so the Court has an idea.  Simply:

9         "Members of the jury, I wish to advise you that

10   because of Don Brady's physical and mental health, including

11   dementia, he is unable to testify in this proceeding."

12        Now, I understand what the general charge is and I

13   understand what the basis is behind the general charge, but we

14   do believe this is a very unique situation.  This is not like a

15   case where the defendant's going to get up and argue the

16   government could have called 20 more eyewitnesses to a crime or

17   20 more FBI agents.  This person would have been a critical

18   witness, in our view, that could have contradicted much of what

19   Ms. Williams is saying, and we are just unable to call him,

20   even though we would have liked to do it, even though we would

21   have taken our chances as to what his answers may have been.

22        THE COURT:  All right.  I'd be delighted to consider

23   it, and if you have any case law support for it, that's also

24   fine.  I think one of the thoughts that crossed my mind is,

25   would it cause jurors to begin to speculate?  Speculation would

H9qWtuc1

1    run along these lines:

2         Mr. Brady has some form of dementia.  I wonder how

3    long he had this form of dementia.  Maybe he had this form of

4    dementia when he made the statements on the tape.

5         And that begins a chain of speculation.  Now, I'll be

6    happy to consider it.  I'll hear what the government has to

7    say.  I'll see what you have for me, and then I will at some

8    point make a ruling.  OK?

9         MR. GINSBERG:  If the Court would consider an

10   instruction, if dementia is an issue for the Court, our

11   second-level position would be to remove that portion, just say

12   he is physically unable to testify at this trial.  That's an

13   alternative possibility.

14        THE COURT:  He's not available for medical reasons.

15        MR. GINSBERG:  Yes, exactly.  Something along those

16   lines.

17        THE COURT:  All right.  Let me consider it, and again,

18   if you have any wisdom, because I suspect that's a very common

19   reason why witnesses are not available to testify at trial.

20        Madam Deputy, our jury is here?

21        THE DEPUTY CLERK:  Yes.

22        THE COURT:  Bring them in, please.

23        MR. VELAMOOR:  We intend to offer two emails before we

24   call the witness to the stand and then call the witness.

25        THE COURT:  You have other witnesses ready now?

1191

H9qWtuc1

1          MR. VELAMOOR:  Yes.

2          THE COURT:  OK.  Thank you.  Bring our jury in.

3          (Continued on next page)

H9qWtuc1

 1          (Jury present)

 2          THE COURT:  Please be seated.

 3          Good morning, ladies and gentlemen.  One update for

 4   you is, as I've indicated, we're keeping the case on schedule

 5   and we remain on schedule, so we are not going any longer than

 6   we originally predicted.  I anticipate that the government may

 7   rest its case by the end of the day Thursday.  That's a good

 8   faith approximation, and that's all it is.  It could change.

 9          Now, one of the things that may cause that to change

10   slightly -- and I hope not -- is that a medical situation has

11   arisen with regard to the witness who was on the stand

12   yesterday.  We hope that she will be well enough to continue at

13   a later point, but in the meantime, the government has other

14   witnesses who they will call and some exhibits, I gather, they

15   wish to offer.

16          Without further ado, let's get to work.

17          MR. VELAMOOR:  Thank you, your Honor.  At this time

18   the government offers Government Exhibits 2601 and 2602.

19          THE COURT:  Any objection?

20          MR. GINSBERG:  Not as to 2601, your Honor.

21          No objection as to 2602.

22          THE COURT:  All right.  They're both received.

23          (Government Exhibits 2601-2602 received in evidence)

24          MR. VELAMOOR:  May I at this time show 2601 to the

25   jury.  I'll ask you to start on the second page and just

H9qWtuc1

1    highlight the signature, please.

2            OK.  Move to the previous page and just highlight the

3    bottom email.  Just highlight the subject, please.

4            We can move out of that and highlight the middle

5    email.  Highlight the "from" and "to."  Highlight the paragraph

6    beginning --

7            THE COURT:  One second, please.

8            MR. VELAMOOR:  Sorry.

9            THE COURT:  Go ahead.

10           MR. VELAMOOR:  Thank you.

11           Highlight the paragraph beginning "This is under the

12   understanding."  And then the next paragraph, beginning "Blaine

13   and I."  And then the paragraph with the stars, the line with

14   the stars.  And then just quickly the top email.

15           Now let's move to 2602.  Let's highlight the middle

16   email, "from," all the way across.  And just the first sentence

17   in the first paragraph.  And then just the first --

18           THE COURT:  Wait a minute.  Wait a minute.

19           MR. VELAMOOR:  Sorry, your Honor.

20           THE COURT:  OK.

21           MR. VELAMOOR:  Thank you.

22           Just the first two sentences of the next paragraph.

23           Now move to the email above and just highlight the

24   sentence beginning "Can you send."

25           Lastly, the top email, the "from," "to," and the

1    substance.

2              Thank you, Judge.

3              At this time the government calls Peter Smith.

4              THE COURT:  All right.

5     ROBERT PETER SMITH,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8              THE COURT:  You may inquire.

9              MR. VELAMOOR:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MR. VELAMOOR:

12   Q.  Mr. Smith, where are you from?

13   A.  Kansas City.

14   Q.  How old are you?

15   A.  I'm 71 years old.

16   Q.  What do you do for a living?

17   A.  I'm a lawyer.

18   Q.  What kind of practice do you have?

19   A.  I have a civil practice that encompasses about everything.

20   I am probably best known as a trial lawyer.

21   Q.  Do you work for a firm?

22   A.  Yes.

23   Q.  What's the name of your firm?

24   A.  McDowell, Rice, Smith & Buchanan.

25   Q.  Are you the Smith in that firm?

H9qWtuc1                              Smith - Direct

1   A.  Yes, I am.

2   Q.  I'm going to turn your attention to 2009.  Were you at that

3   time retained to represent Mr. Tucker in connection with any

4   matters?

5   A.  Yes, I was.

6   Q.  Briefly speaking, what was that matter about?

7   A.  It was a shareholder dispute between Mr. Tucker and a

8   gentleman named Charles Hallinan over ownership and money

9   distributed from a business.

10  Q.  You said it was a dispute over ownership?

11  A.  Yes.

12  Q.  Do you recall what the entity that they were disputing

13  ownership over was?

14  A.  I think it was a company called NM Service.  It was a

15  lending company.

16  Q.  Do you recall which kind of lending?

17  A.  They do consumer lending.  I think you call it payday

18  lending probably.

19  Q.  In the course of that work, did you become familiar with

20  someone named Tim Muir?

21  A.  Yes, I did.

22  Q.  Who was Tim Muir?

23  A.  Tim Muir was Scott Tucker -- Tim Muir had a firm called

24  Muir Law Firm, and he was a lawyer for Scott Tucker and for

25  Scott Tucker's businesses.

H9qWtuc1                          Smith - Direct

1    Q.  And did you come in contact with Mr. Muir in connection

2    with this matter involving Mr. Hallinan?

3    A.  Yes.

4    Q.  Now, without, obviously, going into any privileged

5    conversations you may have had with Mr. Tucker, Mr. Tucker was

6    your client, correct?

7    A.  Mr. Tucker was my client.

8    Q.  You understood in this context Mr. Muir was also

9    representing Mr. Tucker?

10   A.  Yes, he was cocounsel.

11   Q.  Without going into any privileged conversations, you said

12   it was a dispute over ownership.  Who had brought the action

13   against who?

14   A.  Charles Hallinan was the plaintiff, and he'd brought an

15   action under a stockholder's agreement alleging that he thought

16   Mr. Tucker had taken the business from him.

17   Q.  Now, in the course of that matter that you were working on,

18   did you at any point see any emails that had been exchanged

19   between Mr. Tucker and Mr. Hallinan prior to you becoming

20   involved?

21   A.  Yes.

22   Q.  Did those emails generally relate to the same dispute

23   between Mr. Tucker and Mr. Hallinan?

24   A.  Yes.

25   Q.  I'm showing you what's been marked as Government Exhibit

H9qWtuc1                          Smith - Direct

1    2615.  Have you had a chance to look at 2615?

2    A.  Yes, I have.

3    Q.  Is that one of the emails that we just discussed?

4    A.  Yes.

5    Q.  And again, who is it an email from and to?

6    A.  It's an email -- it's a series of emails or email exchanges

7    between Charles Hallinan and Scott Tucker.

8              MR. VELAMOOR:  Your Honor, the government offers 2615.

9              MR. GINSBERG:  Just one moment, your Honor.

10             No objection, your Honor.

11             THE COURT:  Received.

12             (Government Exhibit 2615 received in evidence)

13             MR. VELAMOOR:  Could we show the jury and turn to the

14   second page, which is the first email in the sequence, and

15   highlight the first part of that.

16   Q.  Mr. Smith, is this email from Mr. Hallinan to Mr. Tucker?

17   A.  Yes.

18   Q.  Dated June 4, 2008?

19   A.  Yes.

20   Q.  Again, that was before you became involved in the matter,

21   correct?

22   A.  Correct.

23   Q.  Can you please read the first part?

24   A.  "Thanks for your quick reply to my last email.  I

25   appreciate it.  However, I'm confused by your reply.  What do

1   you mean when you say that NM Service Corp. owns/controls/has

2   rights to all the assets in all the portfolios?"

3   Q.  Can you then continue on --

4           MR. VELAMOOR:  Could we zoom back out.

5   Q.  -- and finish reading the rest of the email?

6   A.  "Were the businesses reorganized without my knowledge and

7   consent?  Also, if you're the sole owner of those

8   businesses/entities, what's their relationship to NM Service

9   Corp.?  Is there a relationship?  I am totally confused and

10  would appreciate some clarification from you.  Charles

11  Hallinan.  President, Hallinan Capital Corp."

12          MR. VELAMOOR:  Now let's turn to the first page,

13  please.

14          THE WITNESS:  All right.

15          MR. VELAMOOR:  Just highlight first the from and to.

16  Q.  Again, is this an email from Mr. Tucker to Mr. Hallinan?

17  A.  Yes.

18  Q.  Dated June 5, 2008?

19  A.  Correct.

20          MR. VELAMOOR:  Zoom back out.  Let's start by

21  highlighting just the first paragraph and then the list of

22  entities.

23  Q.  Mr. Smith, could you go ahead and read that?

24  A.  "This traces back eight years...the 'Nevada nominee'

25  companies...as we refer to them...are the" companies -- "the

H9qWtuc1                         Smith - Direct

1    co's you received checks from for years..."

2    Q.  Can you read out the names of the companies?

3    A.  CB Service Corp., Universal Management, Silver State

4    Business Administrators, Executive Global Management, Consumer

5    Service.

6    Q.  When you read co's, you said companies.  Do you understand

7    co's to be a reference to companies?

8    A.  The email says C-O apostrophe S, which I read as companies,

9    I thought that was an abbreviation of it.

10   Q.  OK.  Why don't we go ahead and continue to read the next

11   part.

12   A.  You want me to read that?

13   Q.  Yes, please.

14   A.  "These companies filed and paid minimal taxes for years

15   (this was very aggressive but we grew fast and we grew when the

16   opportunity to grow at a low cost was available in the

17   market.)"

18   Q.  Could you go a little bit slower?

19   A.  Yes.

20       "They had 'nominee' managers/directors, etc....to keep our

21   anonymity and names out of lawsuits and investigations...this

22   structure worked well and accomplished what we needed...the

23   actual 'technical ownership' structure was very loose, they

24   were positioned as pass-throughs.  (That's all they really

25   did.)  I set it up that way initially, not to expose our names

1200

1    to County Bank in an ownership/shareholder position

2    but...especially to avert the lawsuits coming from Kansas,

3    Colorado, Texas, some class actions and a few other states,

4    when they were subpoenaing and suing the actual owners and

5    shareholders, et al.  Because of the loose setup we were never

6    named and we never had any judgments or litigation...against us

7    personally...this was always the goal...but all the time

8    technically behind the scenes NM Service Corp...had...total

9    control/ownership/interest...in them."  Period.

10   Q.  Turn to the next page, please, and can we go on just

11   reading the visible portions of the text.

12   A.  "All of the 'Nevada nominee' co's are dead...all activity

13   was ceased in those accounts in 2006 and all activity is in the

14   nations' d/b/a accounts since then.

15       "NM Service Corp....is just as it always has been, in good

16   standing with an 'S' election for you and I...and with total

17   control/ownership/interest/assignment of all of the assets in

18   the portfolios...the portfolio assets are in the safest, most

19   sound structure available while they continue to operate."

20           MR. VELAMOOR:  We can take that down.

21   Q.  OK, Mr. Smith.  So you started to say that you were

22   retained in around 2009 as part of, to represent Mr. Tucker in

23   connection with this lawsuit, correct?

24   A.  That is correct.

25   Q.  And so after these series of email exchanges, the dispute

H9qWtuc1                          Smith - Direct

1   between them had resulted in some kind of litigation?

2   A.  Apparently so.

3   Q.  And how was that litigation ultimately resolved?

4   A.  The lawsuit was dismissed and the case was settled.

5   Q.  So was there -- ultimately, was it dismissed because there

6   was a settlement?

7   A.  Yes.

8   Q.  I'm going to show you what's been marked as Government

9   Exhibit 811.  Have you had a chance to look at 811?

10  A.  Yes, I have.

11  Q.  What is 811?

12  A.  It is the settlement agreement between Mr. Hallinan and

13  Mr. Tucker, and attached to the settlement agreement are a

14  number of documents that were referred to, were called for by

15  the settlement agreement.

16  Q.  And together, are they all essentially the documents that

17  settled the dispute between Mr. Tucker and Mr. Hallinan?

18  A.  Yes, that would be true.

19          MR. VELAMOOR:  Your Honor, the government offers 811.

20          THE COURT:  Any objection?

21          MR. GINSBERG:  Yes, your Honor.

22          THE COURT:  Basis.

23          MR. GINSBERG:  Relevance and privilege.

24          THE COURT:  All right.  I'll allow it.  Received.

25          (Government Exhibit 811 received in evidence)

1     MR. VELAMOOR:  Ms. Grant, may we show it to the jury,

2  and start by, on the first page, focusing on the opening

3  paragraph.

4  Q.  OK, Mr. Smith, the parties listed there, are they the

5  ultimate parties to the settlement agreement?

6  A.  Yes.

7     MR. VELAMOOR:  Ms. Grant, can we highlight the

8  boldfaced names.

9  Q.  OK.  Can you please just read the names of the parties?

10  A.  Charles Hallinan ("Hallinan"), Hallinan Capital Corp.

11  ("HCC") --

12  Q.  Mr. Smith, I think you can leave out the parentheses and

13  just read the names.

14  A.  All right.

15     THE COURT:  I think the jury has this in front of

16  them.  They seem perfectly capable of reading the words on the

17  page, particularly with the highlighting.

18     MR. VELAMOOR:  Fair enough.

19  Q.  What's the date of the settlement?

20  A.  March 1, 2010.

21  Q.  All right.  We're not going to, obviously, go through all

22  of this agreement, but let's go through a few parts.

23     MR. VELAMOOR:  Can you turn to fifth page of this

24  settlement agreement, please, and highlight the middle

25  paragraph.

1    Q.  Can you briefly explain what the purpose is of this

2    paragraph as part of this agreement?

3    A.  Yes.  There were a number of documents that the parties had

4    produced with respect to the lawsuit, and the documents were

5    confidential or trade secrets or part of the business between

6    these two people.  And this paragraph provided, generally, that

7    after the litigation was over, Mr. Hallinan would put all of

8    his documents in a depository, and when the terms of the

9    settlement were completed, those documents would be -- I don't

10   remember whether they would be either -- I think they'd be

11   returned to Mr. Tucker.

12   Q.  And was the idea to make sure these documents were not

13   available for public access?

14   A.  Yes, they were private documents.

15   Q.  And did those documents that were covered by this paragraph

16   include, for example, the emails we just looked at?

17   A.  Yes, it would have.

18   Q.  All right.  You started to say that this lawsuit was

19   settled, and before we go to a particular part, can you just

20   describe the main terms of that settlement?

21   A.  The main terms of the settlement were that Mr. Hallinan

22   would cancel and release all of his claims against everyone

23   that was named in the lawsuit; he would give up any rights to

24   the business that was the subject matter of the lawsuit, and he

25   would be paid the sum of $30 million.

1    Q.  OK.  So you said Mr. Hallinan would give up his rights to

2    claims, right?

3    A.  Yes.  I think it was probably mutual release where

4    everybody, all parties, released each other from claims, which

5    means that they would no longer have any claims or demands or

6    lawsuits against each other.

7    Q.  OK.  And Mr. Hallinan would give up his ownership share in

8    the company NM Service?

9    A.  Yes.

10   Q.  And he would receive $30 million?

11   A.  Yes.

12   Q.  Were there provisions in the agreement that provided for

13   where that $30 million would come from?

14   A.  Those provisions were in the purchase agreement that was an

15   exhibit attached to and probably referenced in the settlement

16   agreement.  It's in these documents that you handed me as part

17   of the settlement package, but it wasn't in the 11 or 12 pages

18   of the settlement agreement itself.

19   Q.  OK.  And that part of the agreement, determining where the

20   money would come from, did you handle that part of the

21   agreement or did somebody else?

22   A.  Somebody else handled that.

23   Q.  Who handled that part?

24   A.  I think Tim probably handled that.

25   Q.  When you say Tim --

H9qWtuc1                          Smith - Direct

1    A.  Tim Muir.  You're talking about how the money would be paid

2    and how it would structured?

3    Q.  And also where it would come from.

4    A.  Yes.

5         MR. VELAMOOR:  Could we turn to 26.

6    Q.  And it's on the screen in front of you, Mr. Smith.  You

7    don't have to go --

8    A.  It's easier to see here.  Can you give me the Bates number

9    on the bottom?

10   Q.  103.

11   A.  All right.

12        MR. VELAMOOR:  Highlight the top.

13   Q.  Is this the purchase agreement you mentioned?

14   A.  Yes.

15   Q.  And this provides that -- or where the $30 million would

16   come from?

17   A.  Yes.

18   Q.  Based on this agreement, where does the $30 million come

19   from?

20   A.  The $30 million came from AMG Services Inc.

21   Q.  OK.  Now, in connection with the settlement, did you have

22   any dealings with any attorneys for AMG Services?

23   A.  I don't think I did.

24        MR. VELAMOOR:  Let's go back to the eighth page of the

25   PDF.

1  Q.  OK.  So there's a provision called notices.  See that?

2  A.  Yes.

3  Q.  What, generally speaking, is the purpose of this provision?

4  A.  It's a customary provision in the agreement so if there are

5  any documents or notices that have to be sent to someone after

6  the agreement is over, it specifies the persons to whom the

7  notice would be sent and the address of those persons.

8  Q.  And for Mr. Tucker, who is designated as the person to whom

9  notices will be sent?

10  A.  Notices to Mr. Tucker will be sent to Timothy J. Muir, the

11  Muir Law Firm LLC.

12          MR. VELAMOOR:  All right.  Could we turn to the 12th

13  page of the exhibit.

14  Q.  And just briefly, was the agreement signed on behalf of

15  Mr. Hallinan?

16  A.  I didn't get any of the -- there wasn't a signing in my

17  office.  I didn't go to any signing.  I didn't get any of the

18  signatures from any of the parties.  It has Mr. Hallinan's

19  signature on this.  I didn't see him sign, but I assume it is.

20  Q.  OK.  Who did get all the signatures on the document from

21  the Tucker side?

22  A.  Well, from the Tucker side, Tim Muir probably would have,

23  but I don't think Tim would have gotten the one you're talking

24  about here because that's Mr. Hallinan's.  His lawyer would

25  have gotten that.

H9qWtuc1                          Smith - Direct

1   Q.  From the Tucker side, who got the signatures?

2   A.  From the Tucker side, I think Tim Muir did.

3           MR. VELAMOOR:  OK.  Turn to the next page.

4   Q.  Do you see a signature on behalf of Scott Tucker?

5   A.  I see a signature above the signature line labeled Scott

6   Tucker, yes.

7           MR. VELAMOOR:  Turn to the next page, and could we

8   highlight the signature of the CLK management.

9   Q.  Mr. Smith, can you make out who signed on behalf of CLK

10  management?

11  A.  No.

12          MR. VELAMOOR:  All right.  Turn to the next page,

13  please.  Can you highlight the signatures.

14  Q.  Can you make out who signed on behalf of those five

15  entities, Universal Management Services, CB Service Corp.,

16  Executive Global Management, Consumer Service Corp., Silver

17  State Business?

18  A.  I cannot read the cursive signatures and tell you what name

19  it is.

20          THE COURT:  Cursive is what they call ordinary

21  handwriting, which is disappearing from the face of the earth,

22  unfortunately.

23          Go ahead.

24          MR. VELAMOOR:  Now let's turn to page 42.  And this

25  will be the last part.  Can you highlight the signature for AMG

H9qWtuc1                        Smith – Direct

1    Services.

2    Q.  Mr. Smith, can you make out any of the letters in that

3    signature?

4    A.  Yes.

5    Q.  Which ones can you make out?

6    A.  I can make out the letter J period, S period, and the

7    second -- and the last name starts with an R, and after that I

8    don't know what it is.

9    Q.  OK.  What's the title of that person?

10   A.  Vice president.

11          MR. VELAMOOR:  And very quickly, to page 45.

12   Q.  Do you see any of the same letters on that signature for

13   AMG Services?

14   A.  I do see the same three letters, JSR, and I can't make out

15   what's after that.  Could be an A after that.  I'm not sure.

16   Q.  And the same title, vice president?

17   A.  Yes.

18   Q.  Just to be clear, under this agreement, it's your

19   understanding AMG Services paid $30 million, correct?

20   A.  Yes, they were scheduled to pay it over a period of time.

21   Q.  All right.  I'm going to move on from this agreement now

22   and turn your attention to 2010.  Were you contacted in 2010 by

23   Tim Muir?

24   A.  Yes, I was.

25   Q.  And was this about a new and different matter?

1    A.   It was.

2    Q.   What did Mr. Muir call you about?

3    A.   Tim called me to explain that there was another matter he

4    would like for me to handle on behalf of Scott Tucker, that

5    Scott Tucker had owned a company called CLK Services LLC, and

6    several years earlier had sold it to AMG, the tribal entity,

7    and the tribal entity -- it had been merged into the tribal

8    entity and the tribal entity, AMG Services, had not filed a

9    certificate of merger with the secretary of state's office in

10   Kansas.

11   Q.   Let me just stop you at that point.  You mentioned

12   something about a certificate of merger.  What is a certificate

13   of merger?

14   A.   When a company is merged into another company, the company

15   that disappears, the company that it's being merged into, files

16   a certificate of merger in the secretary of state's office in

17   the state where it's incorporated, in this case Kansas, that

18   specifies that this company has been merged into another

19   company.

20   Q.   And so why in this case would such a document have been

21   filed in Kansas?

22   A.   Why would it have been filed in Kansas?

23   Q.   Yes.

24   A.   Because CLK Services LLC was a Kansas limited liability

25   company.

H9qWtuc1                          Smith - Direct

1   Q.  OK.  And is that a necessary part of the process of merging

2   two companies?

3   A.  That's the last step in the process, is filing a

4   certificate of merger.

5   Q.  OK.  Now, by the way, when Mr. Muir contacted you, did he

6   mention that he had represented or was representing AMG

7   Services at any time?

8   A.  No.

9   Q.  All right.  So you started to say that Mr. Muir called and

10   said that the certificate of merger had not been filed, right?

11   A.  Right, the certificate of merger had not been filed, and

12   the matter was made worse by the fact that since no one had

13   filed an annual report for CLK Services LLC with the secretary

14   of state's office, which is required each year, the Kansas

15   secretary of state had forfeited the charter of CLK and the

16   charter was forfeited.

17   Q.  OK.  So you mentioned a couple of things there.  A charter,

18   what's a charter?

19   A.  A charter is a document that the Kansas secretary of state

20   issues.  It's kind of like a birth certificate for a company, a

21   document that says, This company is formed and now exists.

22   Q.  And you mentioned that no one had filed an annual report.

23   What's an annual report and what's the significance of that?

24   A.  Every year a company in Kansas that is an entity is

25   required to file an annual report with the secretary of state's

H9qWtuc1                         Smith - Direct

1    office listing certain information about the company.  It's a

2    simple, one-page form that required to be filed.  And if it's

3    not filed, the state cancels the company and forfeits it.

4    Q.  In this case, according to Mr. Muir, no one had filed an

5    annual report for CLK, is that right?

6    A.  Right.

7    Q.  And you said as a result of that something was forfeited?

8    A.  Yes, the existence of CLK was forfeited.  But of course,

9    CLK had already merged into AMG, so it created a mess.

10   Q.  OK.  Now, did Mr. Muir explain why this turn of events was

11   a problem?

12   A.  Yes.  Anyone looking into CLK Services would think that it

13   was an entity that had been owned by Scott Tucker and had still

14   been owned by him at the time that the secretary of state

15   forfeited the company, and therefore, Scott Tucker might have

16   potential liability to be sued by he's a statutory trustee for

17   the company.

18   Q.  In other words, according to Mr. Muir, as a result of the

19   failure to file the certificate of merger, Mr. Tucker faced

20   additional liabilities?

21   A.  He could, potential future liabilities.

22   Q.  And who, according to Mr. Muir, should be facing those

23   potential liabilities?

24   A.  Well, the AMG Services.

25   Q.  So what were the options at this point to remedy these

1    problems as described by Mr. Muir?

2    A.  Well, Mr. Muir, after explaining to me that AMG had not and

3    would not file the certificate of merger with the state of

4    Kansas, said that his research had led to a statute in Kansas

5    that provided that if a company was required to file a

6    certificate but refused to do so, that the district courts in

7    Kansas could enter an order directing the secretary of state's

8    office to accept the certificate for filing even without the

9    signature.

10   Q.  OK.  So in other words, you could get a judge to order that

11   the certificate be filed?

12   A.  Correct.

13   Q.  Was there any other option that could have been followed?

14   A.  The only other option would have been to, for AMG, as the

15   owner, to -- the tribal entity, to file the annual reports that

16   had not been filed, get a clearance from the Kansas Department

17   of Revenue and file an application to reinstate CLK Services

18   LLC, and then after the reinstatement of LLC, of the LLC, AMG

19   Services, the tribal entity, could have signed the certificate

20   and filed it with the secretary of state's office.

21   Q.  To simplify that, there's the lawsuit option, right?

22   A.  Right.

23   Q.  There's also the option to bring the charter back to life,

24   in other words?

25   A.  Correct.

1    Q.  And then file the certificate at that point?

2    A.  By AMG, yes.

3    Q.  And if that option had been followed, bringing the charter

4    back to life and then filing the certificate, what would have

5    been the effective date of the merger?

6    A.  The date the certificate of merger was filed, whatever date

7    that would have been.

8    Q.  In this case it would have been around 2010, when you were

9    discussing these matters?

10   A.  Correct.

11   Q.  Now, at the time did Mr. Muir mention anything about this

12   case he wanted you to work on, helping with any ongoing state

13   litigation involving the payday lending business?

14   A.  No.

15   Q.  Did Mr. Muir explain why he or anyone else had waited at

16   least, as you put it, several years in order to address this

17   issue?

18   A.  There was no discussion of that.

19   Q.  And so what option ultimately was chosen?

20   A.  Well, I checked the statute that Tim referred to, and based

21   on what he told me -- that Scott couldn't do it and the tribal

22   entity would not do it -- the option was chosen to file a

23   lawsuit in the district court of Kansas to ask the secretary of

24   state to file it without the signature.

25   Q.  OK.  You mentioned about something about Scott couldn't do

1    it.

2    A.  Right.

3    Q.  What do you mean by that?

4    A.  In June of 2008, according to the documents that Tim

5    provided, Scott had transferred CLK to AMG, which was the

6    tribal entity, and after that, he didn't own it; he couldn't

7    sign anything on its behalf to be filed with a government

8    agency.  And so he didn't have -- he didn't have the power to

9    sign it on behalf of AMG.

10   Q.  Is that what Mr. Muir told you?

11   A.  Yes.

12   Q.  Let me show you what's been marked as 2604.  What is 2604?

13   A.  It's the new client/matter form for the McDowell Rice law

14   firm.

15   Q.  And does it relate to this matter that Mr. Muir brought to

16   you in 2010?

17   A.  Yes, it is this matter.

18             MR. VELAMOOR:  Your Honor, the government offers 2604.

19             MR. GINSBERG:  No objection.

20             THE COURT:  Received.

21             (Government Exhibit 2604 received in evidence)

22             MR. VELAMOOR:  Ms. Grant, may we show 2604 to the

23   jury.

24   Q.  Mr. Smith, is this a standard form you prepared in the

25   course of your work at this law firm?

1   A.   Yes.

2   Q.   What's, generally speaking, the purpose of a form like

3   this?

4   A.   It's our firm's record about the nature of the matter, what

5   type of matter it is, who the adverse parties are, who any

6   related parties might be.  And then on the second page it has a

7   bunch of administrative-type information.

8   Q.   Let's start with who is listed as the client name on there?

9   A.   The client was Scott Tucker.

10  Q.   And what's listed as the client address?

11  A.   The address is to care of Timothy Muir, which is where our

12  bills would be sent.

13  Q.   OK.  There's an email address for that client, correct?

14  A.   Yes.

15  Q.   What's the email address?

16  A.   Tmuir@muirlawfirmllc.com.

17  Q.   OK.  Now, there's a section at the bottom, conflicts

18  information.  Why did you keep track of conflicts information,

19  and what do you mean by that?

20  A.   Well, lawyers have rules that tell us who, who we might

21  have a conflict -- I mean, if I'm representing you and we want

22  to sue Joe Doe, I couldn't do that if I represented Joe Doe; it

23  would be a conflict.  I want to make sure that my party that

24  I'm representing, or that the adverse party is not a party that

25  we represent, we represent or is our separate client, so --

1    Q.  OK.

2              THE COURT:  I'm taking that testimony, ladies and

3    gentlemen, for the witness's explanation of what he did and why

4    he did it, but as I've told you and will tell you again, on

5    issues of law, you take my instructions on the law and no one

6    else's.

7              Go ahead.  Next question.

8              MR. VELAMOOR:  Thank you, your Honor.

9    Q.  And who is listed, what's the first party that's listed

10   here?

11   A.  AMG Services Inc.

12   Q.  How do you describe your relationship with AMG Services

13   Inc. here?

14   A.  There were two descriptions, one where they were the buyer.

15   No. 2, it was listed as adverse.

16   Q.  Why do you list them as adverse?

17   A.  Well, because we were suing them, so they were adverse to

18   us.  They were on the other side.

19   Q.  And us being Mr. Tucker, right?

20   A.  Yes.

21   Q.  OK.  After you had the initial conversation with Mr. Muir,

22   what happened after that?

23   A.  Well, I called him back.  He called me to tell me what the

24   situation was and that there was a statute that he had

25   identified that seemed to provide for filing with a court

H9qWtuc1                         Smith - Direct

1    order.  I looked at the statute -- then after that, I looked at

2    the statute and I called him back and told him that I thought

3    that he was correct, that the statute applied to this fact

4    pattern and thought that we could obtain the remedy that was

5    desired.

6    Q.  OK.  I'm going to show you what's been marked as 2605.

7              THE COURT:  Put the last exhibit back up on the

8    screen.

9              MR. VELAMOOR:  Sorry, your Honor.

10             THE COURT:  That's all right.

11             MR. VELAMOOR:  Ms. Grant, do you want to do that.

12             THE COURT:  Highlight box 8, if you will -- I'm sorry,

13   box 2 it is, at the bottom.  That's it.  Thank you.

14             OK.  Go ahead.

15   Q.  All right.  I've put in front of you 2605.  What is 2605?

16   A.  It's an email from Tim Muir, dated July 8, 2010, to my

17   secretary whose name is Cait Shively, which attaches the

18   petition that would be filed in the district court of Kansas to

19   seek the relief we just talked about.

20             MR. VELAMOOR:  The government offers 2605.

21             MR. GINSBERG:  No objection.

22             THE COURT:  Received.

23             (Government Exhibit 2605 received in evidence)

24             MR. VELAMOOR:  Please highlight the top part and

25   whatever substance is there.

H9qWtuc1                        Smith - Direct

1    Q.  Again, this is from Tim Muir, correct?

2    A.  It is.

3    Q.  And it attaches a document called "Tucker v. AMG petition

4    for Pete," right?

5    A.  Yes.

6    Q.  Pete is you, right?

7    A.  Pardon me?

8    Q.  Pete is you?

9    A.  Pete is me.

10   Q.  Did you draft the petition?

11   A.  No, I did not.

12   Q.  Who did?

13   A.  Tim Muir drafted it and sent it to my law firm, my

14   secretary, July 8.

15   Q.  And who was the source of the factual information and other

16   assertions that were in the petition?

17   A.  Tim drafted it.  Tim would have been.

18           MR. VELAMOOR:  Let's turn to the second page.

19   Q.  Now, there's something called a caption at the top, right?

20   A.  Yes.

21   Q.  And that sort of sets forth who is suing who?

22   A.  Correct.

23   Q.  What's listed in this caption?

24   A.  The caption is Scott Tucker, plaintiff, is suing AMG

25   Services, Inc., the defendant.

1  Q.  OK.  So Mr. Tucker is, in this petition, referred to as the

2  plaintiff, correct?

3  A.  That is correct.

4  Q.  And AMG Services is referred to as the defendant?

5  A.  Yes.

6  Q.  And AMG is the one being sued?

7  A.  Correct.

8          MR. VELAMOOR:  All right.  So why don't we turn to the

9  next page.  And can you highlight paragraphs 9 through 12.

10  Q.  Can you please read those paragraphs?

11  A.  No. 9, "Subsequent to the closing of the purchase

12  agreement, plaintiff had no ownership interest in or control of

13  CLK and could not therefore execute any documents on behalf of

14  CLK absent authorization from AMG.

15      "Subsequent to the closing of the purchase agreement" --

16      No. 10, "Subsequent to the closing of the purchase

17  agreement, plaintiff did not have and has never had an

18  ownership interest in AMG."

19      No. 11, "Subsequent to the closing of the purchase

20  agreement, plaintiff had no right to access any of the books or

21  record of CLK."

22      No. 12, "Upon information and belief, subsequent to the

23  closing of the purchase agreement, all originals, copies and

24  compilations of the books and records of the company were

25  transferred to AMG and remain under AMG's control."

H9Q8TUC2                          Smith - Direct

1    Q.  So overall, what is the purpose of including these

2    paragraphs in this petition?

3    A.  These paragraphs advise the court that Scott Tucker was out

4    of it, and he didn't have -- after the purchase agreement in

5    2008, he didn't have the ability to file these documents on

6    behalf of AMG.

7    Q.  Does it also --

8    A.  He didn't have the ability to file the certificate of

9    merger on behalf of AMG.

10   Q.  Does it also convey, particularly paragraph 12, that Mr.

11   Tucker did not have any access to the books and records of AMG?

12   A.  It says that they were transferred to AMG and remained

13   under AMG's control.

14   Q.  As opposed to Mr. Tucker's control?

15   A.  Yes.

16   Q.  Now, paragraph 2 mentioned a certain purchase agreement?

17   Do you see that?

18   A.  Yes.

19   Q.  Does the petition say at any point when AMG paid any money

20   to acquire CLK?

21   A.  No.  I think it says when the merger happened, but it

22   didn't provide any details about when things were done, when

23   money was paid, etc.

24   Q.  OK.  Turn to the next page.

25           MR. VELAMOOR:  Can we highlight 15 to 18.

1   Q.   You don't need to read them all.

2        15 says, "Plaintiff has no ability or authority to file

3   CLK's annual report."

4            Do you see that?

5   A.   Correct.

6   Q.   Then there's some references to Kansas law, right?

7   A.   Yes.

8   Q.   Then 18, "Despite requests, AMG has failed or refused to

9   file a certificate of merger with the Kansas secretary of

10  state."

11  A.   Yes, that's what it says.

12  Q.   What is, generally speaking, the significance of those

13  paragraphs?

14  A.   Well, that was the significant part of the lawsuit.  The

15  statute that Tim found said that if the surviving company fails

16  to and refuses to file the certificate of merger, then we can

17  ask the court to do it without the signature.  So here we were

18  telling the court that in this case the statute applies because

19  AMG has failed and refused to file the certificate of merger

20  with Kansas.

21  Q.   Why don't we turn to the next page.

22            MR. VELAMOOR:  Can we just highlight paragraph 22 and

23  23, please.

24  Q.   Can you read 22?

25  A.   22 says, "Plaintiff therefore unjustly faces potential

1  liabilities due to AMG's failure to file a certificate of

2  merger and annual reports with the secretary of state."

3  Q.  Again, are those the liabilities you mentioned before that,

4  according to Mr. Muir, Scott Tucker had potentially?

5  A.  Yes.

6  Q.  The next paragraph, "Plaintiff, however, has no authority

7  to execute and record annual reports or a certificate of merger

8  because plaintiff has no ownership interest in AMG."

9  A.  Correct.

10         MR. VELAMOOR:  Let's turn to the next page.

11         Now, can you highlight what is called the "wherefore"

12  clause.

13  Q.  So can you read beginning with "plaintiff" and ending with

14  the date?

15  A.  "Plaintiff prays for an order" -- where do you want me to

16  read?

17  Q.  "Plaintiff prays for an order."

18  A.  You said end at what point?

19  Q.  At the end of the date, June 24, 2008.

20  A.  OK.  "Plaintiff prays for an order directing AMG to execute

21  a certificate of merger, or, in the event AMG fails to answer

22  this petition or otherwise fails to comply with the orders of

23  this court, then plaintiff prays for an order directing the

24  Kansas secretary of state to record an appropriate certificate

25  reflecting the merger of CLK into AMG effective June 24, 2008."

1   Q.  So is this where essentially you asked the court to do

2   something?

3   A.  Yes.

4   Q.  What are the different things that this petition is asking

5   the court to do?

6   A.  We are asking the court to either order AMG to execute the

7   certificate of merger, if they answer the lawsuit, or, if AMG

8   does not answer the lawsuit, then we are asking the court to

9   direct the secretary of state to file the certificate of merger

10  effective June 24, 2008 without AMG signing it.

11  Q.  If someone doesn't answer a lawsuit, is there a term for

12  that?

13  A.  Default.  If they don't answer, they are in default and

14  subject to having a default judgment entered against them.

15  Q.  In this particular case, the request is that the merger be

16  effective June 24, 2008?

17  A.  Correct.

18  Q.  Who provided that date?

19  A.  Tim.  This was in the original petition sent over by Tim.

20  Q.  Now, is there a process by which, when you're suing

21  someone, you let them know that you're suing them?

22  A.  Yes, you have to -- you have to notify them of the lawsuit

23  if they have been sued.

24  Q.  How do you do that?

25  A.  After the lawsuit is filed, the clerk's office issues a

1    document called summons, and that summons form says you have

2    been sued and you have got, in this case, 20 days to file an

3    answer in the district court.  And attached to that summons is

4    a copy of this lawsuit.  That summons will then be served on

5    AMG, the defendant, by either the sheriff or a private process

6    server.

7    Q.  In this case, how was this lawsuit served?

8    A.  We never have the sheriff serve them because it takes too

9    long so we always use private process servers.  A private

10   process server is someone who is appointed by the district

11   court in Kansas with the power to serve process.  You can't

12   just have anybody serve it.  So a private process server was

13   utilized in this case.

14   Q.  Who handled that process?

15   A.  My secretary had the summons issued for service by private

16   process server and got what is called a service packet, which

17   is the summons and the -- probably an order appointing the

18   process server and the petition, and she got that together from

19   the district court and sent it out to Tim Muir for him to

20   provide to the process server.

21   Q.  So for him to ensure that it was served?

22   A.  Yes.  For him to provide to the process server.  The

23   private process server the court had appointed would serve the

24   document.

25              THE COURT:  Ladies and gentlemen, let me instruct you

1   on what a default is.

2           So in the systems as they exist in the many states of

3   this country, a lawsuit is begun by the service of process on

4   the party who you're suing.  That process gives the party the

5   knowledge that there is a proceeding that has been commenced

6   upon them and sets a time for the party to respond to that

7   lawsuit.  If they do not respond in the time designated by law

8   and do nothing to seek an extension of that time period, then

9   it is the same as if they had admitted the allegations of the

10  lawsuit.

11          So the party who commenced the lawsuit wins the

12  lawsuit by default, because the party sued had notice and had

13  the opportunity to be heard, but chose not to exercise that

14  right to be heard.  And, therefore, it's fair and just that a

15  default judgment be entered against the party who has not

16  responded.

17          Go ahead.

18          MR. VELAMOOR:  Thank you, your Honor.

19  BY MR. VELAMOOR:

20  Q.  I am showing you what has been marked as Government

21  Exhibits 2608 and 2610.

22          Have you had a chance to look at those?

23  A.  Yes, I have.

24  Q.  What is 2608?

25  A.  2608 is the original file stamped copy of the lawsuit that

1  I signed and filed in this matter.  It is the filed copy of

2  what was in draft in 2605.

3  Q.  What is 2610?

4  A.  2610, the first page is a certificate of merger with

5  respect to the CLK merger and AMG Services.  And the second,

6  third and fourth pages is a copy of the order signed by the

7  judge directing the recordation of the certificate of merger

8  that was on the first page.  In other words, this was the

9  document by which the court ordered the secretary of state to

10  file the certificate of merger.

11          MR. VELAMOOR:  The government offers Government

12  Exhibit 2608 and 2610.

13          MR. GINSBERG:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibits 2608 and 2610 received in

16  evidence)

17  Q.  Let's start with 2608 first.

18      Is 2608 essentially the filed version of the draft that you

19  received from Mr. Muir?

20  A.  Yes.

21  Q.  Is it substantially the same as the draft received from

22  Mr. Muir?

23  A.  Yes.

24  Q.  So this is what you filed in court, right?

25  A.  Yes, on July 8, 2010.

H9Q8TUC2                              Smith - Direct

1   Q.  Let's move to 2610.

2       You said this was the certificate of merger, right?

3   A.  Yes.

4   Q.  This is essentially the goal of the lawsuit?

5   A.  Yes.

6   Q.  As well as the order that begins on the next page, right?

7   A.  Correct.

8   Q.  Who drafted these documents?

9   A.  These were sent to me by The Muir Law Firm.  It was either

10  Tim Muir or one of the lawyers working in his office drafted

11  it.

12  Q.  Why don't we start with 2610 and just focus on the fourth

13  line there.

14  A.  All right.

15  Q.  Before I do that, what ultimately happened with this

16  lawsuit?

17  A.  Pardon me?

18  Q.  What ultimately happened with this lawsuit?

19  A.  Well, it was -- the lawsuit was terminated when -- the

20  court probably closed its file sometime after the order was

21  entered.

22  Q.  Who ultimately won the lawsuit?

23  A.  Oh, we did, by default.  Scott Tucker got the relief that

24  he had asked for in the petition.

25  Q.  You said Scott Tucker won by default?

1    A.  Yes.

2    Q.  And as a result of winning, the court ordered a certificate

3    of merger effective what date?

4    A.  June 24, 2008.

5          MR. VELAMOOR:  Why don't we turn to the third page and

6    highlight the second paragraph.

7    Q.  It says, "That AMG's failure to answer or otherwise respond

8    to this petition despite having been served."

9          Do you see that?

10   A.  Yes.

11   Q.  Is this explaining that AMG Services lost because they

12   didn't respond?

13   A.  Yes.  It's explaining to the court -- yes.

14   Q.  So just to be clear, after the court granted the relief,

15   what was done with the certificate?

16   A.  After the court entered the order and executed the

17   certificate, I took it to the clerk's office, filed it, got a

18   certified copy, three certified copies.  Then I had one of my

19   employees, a runner named Mark Schneblen --

20         THE COURT:  A runner?

21         THE WITNESS:  A runner.

22         THE COURT:  Go ahead.

23   A.  A courier named Mark Schneblen take the papers to Topeka,

24   Kansas, about 65 miles away, and file them with the secretary

25   of state's office there.

H9Q8TUC2                           Smith - Direct

1   Q.  So this began, obviously, with Mr. Muir's concerns about

2   Mr. Tucker facing potential liabilities, right?

3   A.  Yes.

4   Q.  So you were successful in this action, right?

5   A.  Correct.

6   Q.  So then who as a result of this faced those potential

7   liabilities?

8            THE COURT:  I didn't hear the question.

9   Q.  So who as a result of this action now faced those potential

10  liabilities?

11  A.  AMG faced the liabilities.

12  Q.  I am going to show you what has been marked 2611.

13       Mr. Smith, do you recognize 2611?

14  A.  I do.

15  Q.  What is it?

16  A.  They are the July 31, 2010 and the August 31, 2010 billings

17  from my law firm to Scott Tucker for handling this matter, the

18  charge for our time and our expenses.

19            MR. VELAMOOR:  The government offers 2611.

20            THE COURT:  Any objection?

21            MR. BATH:  No.

22            THE COURT:  Received.

23            (Government's Exhibit 2611 received in evidence)

24            MR. VELAMOOR:  Can we show this to the jury, Ms.

25  Grant.

H9Q8TUC2                          Smith - Direct

1    Q.  Let's focus briefly on the middle portion there with the

2    dates.

3        Is this essentially your bill?

4    A.  It is.

5    Q.  Do you customarily, as you did in this case, describe some

6    of the things you did that you're charging for?

7    A.  Yes.  The individual entries are recorded by me on the

8    dates that are indicated there, and then at the end of the

9    month, they take all of our entries up through a cutoff date

10   and put them on a bill.

11   Q.  There's references here to phone conferences with Tim.  Who

12   was the Tim who you had the phone conferences with?

13   A.  Tim Muir.  Those are the first two calls I mentioned to

14   you.

15   Q.  Why don't we go to the last page.

16       Approximately how much did your firm charge to handle this

17   matter?

18   A.  We charged about, somewhere around -- I can do the math

19   here, but about $2900.  And there was $278.66 involved in

20   filing fees and service fees.  So the total bill with all that

21   is about $3,100.

22   Q.  Was that paid in two different installments?

23   A.  Yes.  The July 31 bill was paid timely.  Therefore, on the

24   August 31 bill, you can see the previous statement balance and

25   the fact that it was paid.

H9Q8TUC2                          Smith - Cross

1   Q.  Let's quickly focus on less total disbursements.  It says

2   $859.52.  Do you see that?

3   A.  Yes.

4   Q.  Was that the first payment that was made?

5   A.  Yes.

6   Q.  The amount remaining that was due was the second amount,

7   which is $2325.89?

8   A.  Yes.

9   Q.  Was that also ultimately paid?

10  A.  Yes.

11          MR. VELAMOOR:  No further questions, your Honor.

12          THE COURT:  Ladies and gentlemen, let's take our

13  mid-morning recess.

14          Please do not discuss the case among yourselves or

15  with anyone.  We will be back in action in ten minutes.  Thank

16  you.

17          (Jury exits courtroom)

18          (Recess)

19          (Jury present)

20          THE COURT:  Mr. Bath, you may inquire.

21  CROSS-EXAMINATION

22  BY MR. BATH:

23  Q.  Mr. Smith, I want to ask you a little bit about the

24  Hallinan lawsuit.  OK?

25  A.  OK.

H9Q8TUC2                         Smith - Cross

1   Q.  You recall, I think you testified, that it was settled

2   March of 2010.  Does that sound right?

3   A.  Yes.  It was settled around late winter, early spring of

4   2010.

5   Q.  You recall it took about 18 months to get that settlement?

6   A.  Approximately.

7   Q.  More than a year?

8   A.  Correct.

9   Q.  So perhaps the suit started sometime in '08?

10  A.  It was filed on my birthday 2008, October 30.

11  Q.  You were contacted initially by Ernie Fleischer, who is a

12  lawyer in Kansas City?

13  A.  Yes.

14  Q.  He is not affiliated with Tim?

15  A.  He's not.

16  Q.  He is in what we might call a big firm?

17  A.  He is with Blackwell Sanders, a very big firm.

18  Q.  And he came to you because you had been practicing for a

19  long time, correct?

20  A.  A long time.

21  Q.  And done a lot of heavy lifting in business litigation,

22  correct?

23  A.  Correct.

24  Q.  A lot of complex matters you handled?

25  A.  I've handled some substantial matters for Mr. Fleischer's

H9Q8TUC2                           Smith - Cross

1    savings and loan.

2    Q.  Many years ago?

3    A.  Yes.

4    Q.  So Ernie asked you to get involved, and you get involved on

5    behalf of Scott Tucker in the Hallinan suit, correct?

6    A.  Yes.

7    Q.  And it's filed in Nevada?

8    A.  Yes.  State court in Nevada.

9    Q.  Lots of companies and people were sued, correct?

10   A.  Correct.

11   Q.  We saw some of the parties or all the parties listed on

12   that Government Exhibit 811, when the government highlighted

13   the parties, is that correct?

14   A.  On the settlement agreement, yes.

15   Q.  One of the parties that was sued was CLK, correct?

16   A.  That is correct.

17   Q.  And CLK was represented by Conly Schulte?

18   A.  That is correct.  And Mr. Rose.

19   Q.  Chris Rose?

20   A.  Chris Rose.

21   Q.  Out of Nevada?

22   A.  Correct.

23   Q.  They represented CLK because AMG had purchased CLK?

24   A.  Correct.

25   Q.  And that's how you first got to meet Conly Schulte?

H9Q8TUC2                         Smith - Cross

1    A.  That is true.

2    Q.  I assume there were a number of hearings and meetings

3    involved in that litigation?

4    A.  In Nevada, yes, there were.

5    Q.  Even some in Philadelphia?

6    A.  Yes.

7    Q.  And you made those trips?

8    A.  I made those trips.

9    Q.  And Conly Schulte was there on behalf of CLK?

10   A.  Conly Schulte was in Nevada.  I don't think Conly Schulte

11   was involved in the meetings we had in Philadelphia.

12   Q.  Eventually the matter gets settled, but during that 14, 15,

13   16 months, whatever it takes, you did a lot of work on that

14   case?

15   A.  Yes.

16   Q.  And Tim was involved as well?

17   A.  Tim Muir was involved as well.

18   Q.  You were lead counsel?

19   A.  I was lead counsel for Scott Tucker.

20   Q.  And Tim assisted you?

21   A.  Yes.

22   Q.  And you got to know Tim?

23   A.  I got to know Tim.

24   Q.  And worked with him?

25   A.  I did.

H9Q8TUC2                          Smith - Cross

1   Q.  Got to know his reputation for being a lawyer?

2   A.  Yes.

3   Q.  Saw the kind of work he did?

4   A.  Yes.

5   Q.  Feel like you had a pretty good handle on who Tim was and

6   what kind of lawyer he was at the end of that litigation?

7   A.  I did.

8   Q.  So now we move into 2010 and you get contacted by Tim about

9   this lawsuit against AMG, correct?

10  A.  Yes.

11  Q.  And would it be fair to call this a friendly suit?

12          THE COURT:  At what point in time?

13  Q.  When Tim first contacts you and talks about the lawsuit,

14  would it be fair to say it's not a friendly suit?

15  A.  I'm not sure what -- I think a friendly suit is something a

16  parent files on behalf of a child.

17  Q.  I will move on.

18      He explains, Tim explains to you, we have got a situation

19  here, CLK is still in existence in the state of Kansas,

20  correct?

21  A.  CLK had been forfeited by Kansas, but the certificate of

22  merger had not been filed at that time.

23  Q.  You talked about the state having sort of a birth

24  certificate for a corporation.  The merger would sort of be the

25  death certificate?

1   A.  Yes.

2   Q.  And you explained that AMG --

3          THE COURT:  At that point in time, the certificate of

4   incorporation of CLK had been forfeited, is that correct?

5          THE WITNESS:  That is correct.

6          THE COURT:  So did it continue as a corporation at

7   that point?

8          THE WITNESS:  No.

9          THE COURT:  Next question.

10  Q.  The merger had not been filed?

11  A.  The certificate of merger had not been filed.

12  Q.  That's right.  And Tim explained to you that AMG -- he had

13  talked to counsel for AMG, and they said they wouldn't file the

14  certificate of merger.  Is that what he told you?

15         MR. VELAMOOR:  Objection, your Honor.  Hearsay.

16         THE COURT:  No.  For the fact that it was said, if it

17  was said.  It's a question.

18         Do you understand the question?

19         THE WITNESS:  Yes, I understand the question.

20  A.  I don't remember the exact conversation a number of years

21  ago, but he did tell me that AMG refused to file it.

22  Q.  He wanted you to represent Scott in a lawsuit?

23  A.  Correct.

24         MR. BATH:  Can we have Government Exhibit 2604.  It's

25  been admitted.

H9Q8TUC2                          Smith - Cross

1   Q.  The middle of that page is described as "long matter name."

2   Is that correct, Mr. Smith?

3   A.  Would you highlight it?

4   Q.  Yes.  There is a description there, it begins "our client."

5   Do you see that description?

6   A.  Oh, yes.  You're talking about the five sentences down

7   there under "long matter name"?

8   Q.  Yes, sir.

9   A.  Yes.  I can see that.

10  Q.  The box is called "long matter name."  And I assume you put

11  that information below that, correct?

12  A.  Either I or my secretary, Cait Shively.

13  Q.  She did based on what you told her?

14  A.  Yes.

15  Q.  Does that accurately describe the matter?

16  A.  Yes, it does.

17  Q.  If you need to refer to your time records or something like

18  that to refresh your memory, just let us know.

19  A.  OK.

20  Q.  Tim explains to you the situation, and he says he has

21  located the statute, explains the situation, and you then begin

22  to look into it on your own, correct?

23  A.  After the telephone call, first telephone call, I looked up

24  the statute myself, yes.

25  Q.  You thought, based on your experience, that the statute fit

1   what was being described to you?

2   A.  I did.

3   Q.  At some point in time after that first call, Tim sent over

4   a draft petition that we have seen, correct?

5   A.  The very next day, yes.

6   Q.  There may have been some minor changes, but essentially

7   that's the petition that you file on behalf of Scott Tucker?

8   A.  That is correct.

9   Q.  You filed the petition and essentially then send out the

10  summons, correct?

11  A.  Correct.

12  Q.  You wait for the other party to respond or to fail to

13  respond?

14  A.  That's correct.

15  Q.  And the other party did respond, correct?

16  A.  Not to the lawsuit.  The lawyer for the tribal entity sent

17  me a letter, but they did not respond to the lawsuit.

18  Q.  I'm sorry.  After the lawsuit was filed, Conly Schulte sent

19  you a letter?

20  A.  Yes, he did.

21  Q.  On behalf of AMG?

22  A.  On behalf of AMG, yes.

23  Q.  The other side that you were suing?

24  A.  Correct.

25            MR. BATH:  Can we show the witness Government Exhibit

H9Q8TUC2                        Smith - Cross

1    2612, please.

2    Q.  Don't read that letter out loud, Mr. Smith.

3         Is that the letter you received from Conly Schulte?

4    A.  It is.

5    Q.  Do you keep that in your records there at the law firm?

6    A.  Yes.  That's my handwriting where it's circled "Scott

7    Tucker."  It says "file," believe or not, with a line across

8    it.

9    Q.  And when you produced the documents, this is one of the

10   documents that was in your records, correct?

11   A.  It was in my file in this case, yes.

12              MR. BATH:  I offer 2612.

13              THE COURT:  Any objection?

14              MR. VELAMOOR:  Yes, your Honor.  Hearsay.

15              THE COURT:  Is this offered for the truth of its

16   content, Mr. Bath?

17              MR. BATH:  It's offered for why Mr. Smith took the

18   action he did subsequent to this letter, not offered for the

19   truth of the matter.

20              THE COURT:  It's received to the extent it explains

21   the actions of the witness.

22              (Government's Exhibit 2612 received in evidence)

23              MR. BATH:  If we can publish it.

24              If you can just blow up the first paragraph.

25              THE COURT:  In other words, you read the letter,

H9Q8TUC2                          Smith - Cross

1    ladies and gentlemen.  You don't assume that the statements of

2    the person who wrote the letter are true, but you understand

3    that the author of the letter said these things because it then

4    may explain what the witness did next.

5              MR. BATH:  Can you get the date first?  Let's start

6    with the date.

7    Q.  The date of the letter is July 26, 2010, correct?

8    A.  Yes.

9              MR. BATH:  The next paragraph, please.

10             If we can go to the next paragraph.

11             Thank you.

12             And last, the signature.

13   Q.  Of course, you explained you met Mr. Schulte through his

14   representation of AMG in the Hallinan suit?

15   A.  Yes, I did.

16             MR. BATH:  You can take that down.  Thank you.

17   Q.  So that letter has a date of July 26, 2010.

18       If we look at your time records, does it indicate that you

19   reviewed that letter sometime before going to court?

20   A.  I have two time entries for July 28, one going to court and

21   one reading the letter.  The reading the letter time entry

22   comes after the going to court, but that doesn't mean that that

23   happened first.  There were two time entries for July 28, one

24   of which was to receive and review the letter from Conly

25   Schulte.

H9Q8TUC2                              Smith - Cross

1    Q.  That communicated to you that AMG was not going to respond

2    to the lawsuit?

3    A.  Yes.

4    Q.  So with that information then you went to court to meet

5    with the judge -- have a hearing at some point in time?

6    A.  Yes.  I don't remember whether I read the letter before or

7    after I went over to court, but they were in default anyway and

8    I was not anticipating that they would be answering.  This

9    letter came as no surprise.

10             THE COURT:  This letter came as no surprise, is that

11   what you said?

12             THE WITNESS:  Yes.

13   Q.  At some point in time you had a court hearing?

14   A.  July 28.

15   Q.  And did you go in front of a state court judge?

16   A.  Yes.

17   Q.  And explained the situation to him or her?

18   A.  Yes.

19   Q.  And the judge entered the order?

20   A.  Yes.

21   Q.  Do you remember, was Mr. Muir present with you or not?

22   A.  You know, I think Tim, knowing that I was going to go over

23   that day, went over with me.  I couldn't be a hundred percent

24   certain, but I am fairly sure that Tim went to court with me

25   that day.

1   Q.  I assume it was a short hearing?

2   A.  Yes.

3   Q.  You explained to the judge what was taking place, correct?

4   A.  Yes.

5   Q.  The judge entered the order and subsequently you recorded

6   that with the Kansas secretary of state, correct?

7   A.  Correct.

8   Q.  I just have a couple of other things, Mr. Smith.

9          MR. BATH:  Can we put up Government's Exhibit 2611.

10  It's been admitted.

11  Q.  Mr. Smith, we are looking at your bill, correct?

12  A.  It is.

13  Q.  And you were explaining to the government, it's made up of

14  two things, one is how much time is spent and also expenses, is

15  that right?

16  A.  That is correct.

17  Q.  Like on 7/7 of '10 --

18          MR. BATH:  Can you blow that up in the lower third,

19  under expenses.

20  Q.  So, for instance, this district court filing fee, when you

21  file a lawsuit you have to pay a fee?

22  A.  Yes.

23  Q.  And your firm paid that fee on behalf of Mr. Tucker?

24  A.  We did.

25  Q.  And then there is mileage from the courier?

1    A.  Yes.

2    Q.  It's not unusual for a firm to advance costs that are

3    related to legal representation, is it?

4    A.  It is not unusual at all.

5    Q.  And then you put that on your bill and you get that back

6    from the client?

7    A.  Right.

8    Q.  Thank you, Mr. Smith.

9            MR. VELAMOOR:  Judge, I am informed that Mr. Tucker

10   has no questions so may I proceed with redirect?

11           THE COURT:  You may.

12   REDIRECT EXAMINATION

13   BY MR. VELAMOOR:

14   Q.  Mr. Bath mentioned that you explained the situation to the

15   judge.  Do you recall that?

16   A.  I recall that I went over to court and had a hearing before

17   the judge, where the judge had the file, and I would have told

18   him what the case was about.  I don't remember the

19   conversations that occurred July 28th of 2010, but I would have

20   done that, yes.

21   Q.  As part of your explanation, did you explain to the judge

22   that Mr. Muir, who had brought this lawsuit to you, was at the

23   same time holding himself out as general counsel of AMG?

24   A.  He was what?

25   Q.  He was holding himself out as general counsel for AMG?

1   A.  No.

2   Q.  Did you explain that to the judge?

3   A.  No.

4   Q.  Did Mr. Muir explain that to you?

5   A.  No.

6   Q.  If you had known that Mr. Muir was holding himself out as

7   general counsel of AMG, would you still have gone ahead and

8   filed this lawsuit?

9   A.  I would have talked to my law firm's general counsel, Tom

10  Buchanan, to ask him what he thought about it.

11  Q.  Is that someone you consult with when you're presented with

12  ethical dilemmas or problems?

13  A.  Yes.

14  Q.  If you had known that in fact Mr. Tucker was paying

15  Mr. Schulte's bills, would you have looked at that letter,

16  Government Exhibit 2612, any differently?

17  A.  If I knew that Mr. Tucker was paying Mr. Conly's bills?

18  Q.  Yes.

19  A.  I don't know.  I would have to know more circumstances

20  about what matter it would be relating to.

21  Q.  Would you have wanted to know something more about that

22  before deciding what actions to take after receiving that

23  letter?

24  A.  I would have.

25              THE COURT:  I think the question that was asked was if

H9Q8TUC2

1    you knew, with regard to the letter, that the bill for

2    preparing the letter was paid by the individual.

3            THE WITNESS:  I would have looked into it more.

4    A.  Tell me what the question is again.  I am confused.

5    Q.  I think the judge clarified it.  Let's move on.

6        If you knew or believed that Mr. Tucker remained in control

7    of AMG and CLK, including its books and records, would you have

8    filed this lawsuit, Mr. Smith?

9    A.  Not if he had authority to use those records to file with

10   the secretary of state's office.

11           MR. VELAMOOR:  No further questions.

12           THE COURT:  Thank you very much, sir.  You may step

13   down.

14           THE WITNESS:  Am I excused for the balance of the

15   trial?

16           THE COURT:  You are unless there is any objection to

17   that.

18           You're excused.

19           (Witness excused)

20           MR. VELAMOOR:  Prior to calling the next witness,

21   there are a few e-mails we would like to offer.

22           THE COURT:  Yes.

23           MR. VELAMOOR:  So, your Honor, at this time, the

24   government offers Exhibits 2607, 2618, 2620, 2619, and 2623.

25           THE COURT:  Any objection?

1246

H9Q8TUC2

1     MR. BATH:  Not to 2607.

2     THE COURT:  That's received.

3     (Government's Exhibit 2607 received in evidence)

4     MR. BATH:  Not to 2618.

5     THE COURT:  Received.

6     (Government's Exhibit 2618 received in evidence)

7     MR. BATH:  Not to 2620.

8     THE COURT:  Received.

9     (Government's Exhibit 2620 received in evidence)

10    MR. BATH:  Not to 2619.

11    THE COURT:  Received.

12    (Government's Exhibit 2619 received in evidence)

13    MR. BATH:  Not to 2623.

14    THE COURT:  Received.

15    (Government's Exhibit 2623 received in evidence)

16    MR. VELAMOOR:  Could we show 2607 to the jury first.

17    Just focus on the top e-mail, please.

18    The "from."

19  And the substance.

20    Let's turn to 2618, please.

21    Start with the bottom e-mail.

22    From.

23    To.

24    Subject.

25    And the substance.

1247

H9Q8TUC2

1     Move up to the next e-mail and go in sequence.

2     Just the substance.

3     Move on up to the next one.

4     From.

5     And highlight the substance.

6     Quickly, let's go through the next e-mails.  They are

7  short.

8     The next one up.

9     The next one up.

10    Let's go on to 2620.

11    Go to the next page, please.

12    We will start with Scott Tucker's e-mail at the

13 bottom.

14    So we start with the next e-mail at the beginning.

15 Just go back to the previous page, at the bottom.

16    From.

17    Just highlight the substance.

18    Move on to the next page, finish out that e-mail.

19    THE COURT:  Who is the "to" and "from" on this?

20    MR. VELAMOOR:  Let's go back to the previous page and

21 start on the bottom.

22    Just highlight "from" and "to."

23    THE COURT:  This is part of that e-mail?

24    MR. VELAMOOR:  Yes.

25    Let's move on up to the next.

H9Q8TUC2

1           The next e-mails are again quick.

2           Can you highlight the substance?

3           Move up.

4           And to the last one.

5           2619, please.  Start with the bottom e-mail.

6           The "from" and the "to."

7           Then the substance.

8           Move up to the next e-mail.

9           Then up to the subsequent e-mail.

10          Can you highlight who it's from.

11          Who it is to.

12          And then highlight the two lines of substance.

13          On up to the next.

14          Go to the top e-mail, please.

15          Just highlight the substance, please.

16          Lastly, your Honor, 2623.

17          Can you put it up next to the last page of 2611, which

18   is in evidence.

19          Can you just highlight the 859.52 number on 2611.

20          Now, can you expand the check on the left, please.

21   Maybe just the left side of the check, it's easier to read.

22          The top left, the source of the check.

23          And to.

24          The amount.

25          And the signature.

H9Q8TUC2

1          Can you go to the next check, please.

2          Who is that check from?

3          Who is that check to.

4          And the amount.

5          And the signature, please.

6          Can you come out of that check for a second.

7          On 2611, can you highlight the balance at the balance,

8   $2325.89.

9          Now, go to the next check on the left and just

10  highlight the check.

11          From, the source of the check.

12          Pay to.

13          The amount.

14          And the last page of the exhibit, please.

15          The source of that check.

16          The destination.

17          The amount.

18          MR. RAVI:  At this time, your Honor, the government

19  calls Scott Mitchell.

20   SCOTT WILLIAM MITCHELL,

21      called as a witness by the government,

22      having been duly sworn, testified as follows:

23          THE COURT:  State your full name for the record and

24  spell it.

25          THE WITNESS:  Scott William Mitchell, S-C-O-T-T,

H9Q8TUC2

1     W-I-L-L-I-A-M, M-I-T-C-H-E-L-L.

2              (Continued on next page)

1    THE COURT:  You may inquire.

2    DIRECT EXAMINATION

3    BY MR. RAVI:

4    Q.  Mr. Mitchell, how old are you?

5    A.  50 years old.

6    Q.  Where do you currently live?

7    A.  Latham, Kansas.

8    Q.  How far did you go in school?

9    A.  I just finished my associate's degree last May and am

10   continuing on.

11   Q.  And you previously graduated from high school?

12   A.  Yes, I did.

13   Q.  What is your associate's degree in?

14   A.  Computer networking.

15   Q.  Are you currently employed?

16   A.  Yes, I am.

17   Q.  What do you do?

18   A.  I'm a chief technology officer.

19   Q.  How long have you been doing that?

20   A.  A little over three years.

21   Q.  Describe briefly your work history prior to 2003.

22   A.  Worked in computers up in Iowa and then moved to Kansas.

23   Q.  At some point did you begin working at CLK Management?

24   A.  Yes, I did.

25   Q.  When was that?

H9qWtuc3                          Mitchell - Direct

1   A.  2003.

2   Q.  Where was CLK located at that time?

3   A.  In Overland Park, Kansas.

4   Q.  What was your position?

5   A.  I was the IT manager.

6   Q.  What experience had you had that prepared you for that job?

7   A.  I had been doing computer work for most of my adult life at

8   that point in time.

9   Q.  Did you have any reservations about taking this job?

10  A.  Initially, yes, I did.

11  Q.  What were those reservations?

12  A.  A little bit of the stigma between payday loans and call

13  centers.

14            THE COURT:  Sustained.  Stricken.

15            Go ahead.  Next question.

16  Q.  Did you try to find out information about the company?

17  A.  Yes, I did.

18  Q.  What did you try to do?

19  A.  Tried to do some Internet searches, Google searches on some

20  of the names of the companies.

21  Q.  Were you able to find much information about CLK

22  Management?

23  A.  No.  Very little information was available.

24  Q.  Did you end up taking the job?

25  A.  Yes, I did.

H9qWtuc3                        Mitchell - Direct

1   Q.   What was your title at CLK?

2   A.   Didn't really have titles within CLK Management.

3   Q.   Describe your general job responsibilities.

4   A.   I was the general day-to-day IT manager for the IT staff.

5   Q.   What generally did you do for the company?

6   A.   We did everything from simple little "my mouse doesn't

7   work," "my keyboard doesn't work" to adding users and removing

8   users as they was hired and terminated in the computer systems.

9   Q.   You also worked with predictive dialers?

10  A.   Correct.

11  Q.   What are those?

12  A.   Predictive dialers are the machines that allow you to load

13  mass quantities of phone numbers into them and try to come up

14  with an algorithm to be able to call consumers in the most

15  efficient way.

16  Q.   Were those used for call centers at CLK Management?

17  A.   Yes, they were.

18  Q.   Particularly what departments used those predictive

19  dialers?

20  A.   The collections companies.

21          THE COURT:  The what?

22          THE WITNESS:  Collections companies.

23          THE COURT:  Thank you.

24  Q.   What were the names of those collections companies?

25  A.   Final collection and recovery were the internal names.

H9qWtuc3                          Mitchell - Direct

1   Q.  Did they have other names or external names?

2   A.  Yes, Pinion Management.

3   Q.  What kind of business was CLK Management involved with?

4   A.  They were payday loan companies.

5   Q.  Did it have any doing-business names?

6   A.  Yes, 500 FastCash, Ameriloan, United Fast Cash.

7   Q.  Describe how the loan companies were organized in the

8   building when you started.

9   A.  When I first started the loan companies were up on the

10  third floor of the building, and the collections companies were

11  downstairs on the first floor of the building.

12  Q.  Did it eventually expand?

13  A.  Yes, over time it expanded and took over the entire

14  building.

15  Q.  And how long were you working at that building at CLK

16  Management?

17  A.  About ten years.

18  Q.  Are you familiar with National Money Services?

19  A.  Yes, I am.

20  Q.  What's that?

21  A.  National Money Service, when I started, was the name of the

22  computer domains that everybody logged into.

23  Q.  And what's the relationship between CLK and National Money

24  Service?

25  A.  I was hired to work with the company CLK and my paycheck

1    came from CLK, but all the computer systems at that time were

2    under NM Services, or National Money Services.

3    Q.  Who was your direct supervisor when you started?

4    A.  Ed Cross.

5    Q.  And who was Ed Cross' boss?

6    A.  Blaine Tucker.

7    Q.  Who was Blaine Tucker's boss?

8    A.  Scott Tucker.

9    Q.  What was Blaine Tucker's title?

10   A.  Again, the company didn't really have titles.  Internally,

11   we called him the COO, or chief operating officer.

12   Q.  What was Scott Tucker's title?

13   A.  CEO.

14   Q.  Was that a title that he had?

15   A.  No, it was not a title that was given.  It was just an

16   internal title.

17   Q.  Do you recognize Scott Tucker in the courtroom today?

18   A.  Yes, I do.

19   Q.  Can you please point him out by an article of clothing?

20   A.  Yes, he's in the back row back there, third from the

21   right -- sorry, third from the left.

22           THE COURT:  Stand up, please, and tell me, which table

23   are you talking about?

24           THE WITNESS:  The far back table.

25           THE COURT:  The second table, yes.

H9qWtuc3                          Mitchell - Direct

 1              THE WITNESS:  Sorry.  Fourth from the right.

 2              THE COURT:  Fourth from the right?

 3              THE WITNESS:  Yes.

 4              THE COURT:  An article of clothing the person is

 5    wearing?

 6              THE WITNESS:  Red tie.

 7              THE COURT:  All right.  Identification noted.  Thank

 8    you.

 9    BY MR. RAVI:

10    Q.  Describe the rest of the management at CLK.

11    A.  We had Crystal Grote.  She ran several of the payday loan

12    companies.  Tim Buckley ran a few of the payday loan companies.

13    Chris Becker ran one of the collections companies, and Glenn

14    Fisher ran another one of the collections companies.  Natalie

15    Dempsey was kind of an overall person, like an office manager.

16    Q.  Was there also corporate counsel?

17    A.  Yes.  Corporate counsel was Timothy Muir.

18    Q.  Did he have a specific title?

19    A.  Corporate counsel.

20    Q.  Was that an official title or again another internal title?

21    A.  Internal title.

22    Q.  So who was ultimately in charge of CLK at the time you

23    started?

24    A.  Scott Tucker.

25    Q.  When did you first meet Mr. Tucker?

1   A.  It was a couple weeks after I started the company.

2   Q.  Did you meet him or see him before that?

3   A.  Yeah, before I actually started for the company, I was

4   coming back from a vacation.  I stopped up in my hometown, Des

5   Moines, Iowa, and went to a race in a town not too far away

6   called Newton, Iowa, at the Iowa Speedway, and there was a race

7   going on.  The race was actually -- had a driver in there named

8   Scott Tucker with a horseshoe that said 500 FastCash on the

9   side of it, and I told my dad at that point in time, I think

10  that's one of the gentlemen I'm going to be going to work for.

11  Q.  Are you familiar with Mr. Tucker's racing?

12  A.  Yes, I am.

13  Q.  Is there a company that's associated with that?

14  A.  Levelfive Motorsports.

15  Q.  I'd like to show you on your screen Government Exhibit

16  1212.  Do you recognize that?

17  A.  Yes, that's the Levelfive Motorsports logo.

18          MR. RAVI:  The government offers 1212.

19          MR. GINSBERG:  No objection.

20          THE COURT:  Received.

21          (Government Exhibit 1212 received in evidence)

22          MR. RAVI:  Please publish that for the jury.

23  Q.  Now, how often did you interact with Mr. Tucker during the

24  first few years you worked at CLK?

25  A.  A couple times a week.

H9qWtuc3                          Mitchell - Direct

1    Q.  I'd like to show you now Government Exhibit 4009, which is

2    in evidence.  And what is this?

3    A.  That is the office that CLK Management was located in that

4    I worked in.

5    Q.  Where was Scott Tucker's office?

6    A.  On the left side of the screen, in the back of the

7    building.  So you're looking at the front of the building, he

8    was in the back of the building.

9    Q.  Describe Mr. Tucker's office.

10   A.  It was a corner office on the third floor, very large, very

11   nice office.

12   Q.  What did -- did it contain anything in it?

13   A.  It had an engine from a Ferrari, a hood from a race car and

14   a door from a race car.

15        MR. RAVI:  You can take that down.

16   Q.  During your time at CLK and at those offices in Government

17   Exhibit 4009, how did the number of employees expand at that

18   building?

19   A.  When I started, the number was somewhere around 500

20   employees, and at the height of it, it was around 1,500

21   employees.

22   Q.  At some point were you promoted?

23   A.  Yes, I was.

24   Q.  When was that?

25   A.  A couple years after I started, Ed Cross had some medical

1    issues and so he left the company, and I took over his

2    position.

3    Q.  And then who was your direct supervisor?

4    A.  Blaine Tucker at that point in time.

5    Q.  Are you familiar with ecash?

6    A.  Yes, I am.

7    Q.  What is that?

8    A.  Ecash was the payday loan software that was on the servers

9    out in Las Vegas.

10   Q.  Who was responsible -- were you responsible for ecash?

11   A.  No, my department was not responsible for that.  There was

12   a third-party company called the Selling Source.

13   Q.  Do you know who was in charge of the Selling Source?

14   A.  The gentleman I know as Derek LaFavor.

15   Q.  How was ecash accessed at that time from the Overland Park

16   offices of CLK?

17   A.  Across the Internet on a virtual private network.

18   Q.  Mr. Mitchell, while you were working at CLK, did you come

19   to learn about a company named AMG?

20   A.  Yes.

21   Q.  How did you come to learn about AMG?

22   A.  Mr. Muir came down to my office and told me that the

23   company was switching over to a new company name, AMG Services,

24   and we needed to change all the computer equipment over to that

25   company as soon as possible.

1    Q.  When approximately did you hear this from Mr. Muir?

2    A.  2005, 2006.

3    Q.  And do you recognize Mr. Muir in the courtroom today?

4    A.  Yes, I do.

5    Q.  Can you please point him out the same way you did for

6    Mr. Tucker?

7    A.  Yes, he's in the back row, back table, with kind of a gold,

8    yellowish tie.

9              THE COURT:  Where is he seated?

10             THE WITNESS:  Far left corner.

11             THE COURT:  Identification noted.  Thank you.

12   BY MR. RAVI:

13   Q.  And who oversaw the transition from CLK to AMG?

14   A.  Mr. Muir.

15   Q.  When I talk about the transition, it's the IT transition,

16   correct?

17   A.  Yes.

18   Q.  How long did that transition take place?

19   A.  Several months.

20   Q.  When was the first time that you heard about Native

21   American tribes getting involved in the business?

22   A.  After Mr. Muir gave me direction to move over to AMG

23   Services.

24   Q.  And who did you hear about, who did you hear from that

25   Native American tribes were getting involved in the business?

1    A.   Originally Mr. Muir.

2    Q.   Were there any changes, from your perspective, to the

3    operations of the payday loan business as a result of the

4    change from CLK to AMG?

5    A.   No, sir.

6    Q.   Was there any change in management as a result of the

7    transition from CLK to AMG?

8    A.   No, there was not.

9    Q.   Was there any change to Scott Tucker's role as CEO and head

10   of the company?

11   A.   No, there was not.

12   Q.   Did you believe that a Native American tribe had taken over

13   the company?

14   A.   No.

15            MR. GINSBERG:   Objection, your Honor.

16            THE COURT:   Overruled.

17   A.   No.

18   Q.   Why not?

19   A.   There was no physical change.   The -- my day-to-day job

20   responsibilities in acquiring equipment and functionality had

21   remained the same.

22   Q.   Did you attend management meetings for the company?

23   A.   Yes, I did.

24   Q.   And who generally attended these management meetings?

25   A.   Crystal Grote, Natalie Dempsey, Blaine Tucker, myself,

1    Chris Becker and Glenn Fisher.

2    Q.   Did anyone from a Native American tribe ever attend these

3    meetings?

4    A.   No.

5    Q.   So after CLK became AMG, who did you believe was the head

6    of AMG?

7    A.   Scott Tucker.

8    Q.   Was there another person that was listed as the CEO of AMG?

9    A.   Yes.

10   Q.   Who was that?

11   A.   Don Brady.

12   Q.   And where was he listed as the CEO of AMG?

13   A.   There was a placard on the door to his office.

14   Q.   Did Mr. Brady always have an office in Overland Park,

15   Kansas?

16   A.   No, he did not.

17   Q.   When do you first recall understanding that he had an

18   office?

19   A.   It was several months after the transition from CLK to AMG.

20   Q.   And where was Mr. Brady's office located?

21   A.   It was one office north of Blaine Tucker's office on the

22   third floor.

23   Q.   Can you compare Mr. Tucker's office to Mr. Brady's office?

24   A.   Mr. Tucker had a very nice, very large office.  Mr. Brady

25   had what I would consider a very standard size, much smaller

1    office.

2    Q.  And where was the title of CEO listed?

3    A.  On a placard on, next to the door.

4    Q.  Did Mr. Tucker have any title listed outside of his office?

5    A.  No, he did not.

6    Q.  Did Blaine Tucker?

7    A.  No, he did not.

8    Q.  What was Mr. Brady's office used as before he assumed that

9    office?

10   A.  Mostly just a general office where other people could come

11   in and sit down and use an office as they were traveling into

12   the Overland Park area.

13   Q.  To be clear, did anyone else have titles outside of their

14   offices?

15   A.  Not at that time, no.

16   Q.  Just Mr. Brady?

17   A.  Correct.

18   Q.  When did you first meet -- did you at some point, did you

19   meet Mr. Brady?

20   A.  Yes, I did.

21   Q.  Where did you meet him?

22   A.  I met him at a few different sporting events that we had

23   gone to and some of Scott Tucker's races.

24   Q.  Did you discuss the payday loan business with him?

25   A.  No, we did not.

1  Q.  What did you discuss with him?

2  A.  General stuff, day to day, racing, and the fact that at one

3  point in time he asked me if I would be interested in hiring

4  his stepson to come work for me in the information technology

5  department.

6  Q.  Mr. Mitchell, you may want to put that microphone a little

7  bit closer to you.

8      How often did you interact with Mr. Brady in AMG's offices?

9  A.  Never did.

10 Q.  And how often did you pass by his office?

11 A.  Several times a day.

12 Q.  For approximately how many years?

13 A.  About seven years after it became AMG Services.

14 Q.  So during those approximately seven years or so, you never

15 saw Mr. Brady in his office?

16 A.  No.

17 Q.  Did you think Mr. Brady was the real CEO of AMG?

18 A.  No, I did not.

19 Q.  Who did you believe was the real CEO?

20 A.  Scott Tucker.

21 Q.  I'd like to now show you Government Exhibit 1603.  Is this

22 an email that you received?

23 A.  Yes, it is.

24          MR. RAVI:  The government offers Government Exhibit

25 1603.

1          THE WITNESS:  Pardon?

2          MR. ROTH:  No objection.

3          THE COURT:  Received.

4          (Government Exhibit 1603 received in evidence)

5          MR. RAVI:  Can we zoom in on the bottom of this

6     email --

7          THE WITNESS:  Uh-huh.

8          MR. RAVI:  -- ms. Grant, and can we focus in on the

9     "to," "from" first.

10    Q.  Who is this email from, Mr. Mitchell?

11    A.  It is from Tim Muir.

12    Q.  Who is it to?

13    A.  Myself and John McManus.

14    Q.  Who is copied?

15    A.  Natalie Dempsey, Blaine Tucker and Scott Tucker.

16         MR. RAVI:  And if we could just highlight the issue in

17    the first line, and the next sentence as well.

18    Q.  What did you understand Mr. Muir to be describing to you

19    with respect to this sentence that's highlighted?

20    A.  When he types the name Mike into the address bar of an

21    email, it popped up Mike Lane, and then afterwards there's some

22    computer information about the address and the address book.

23    Q.  And did some of that information contain CLK?

24    A.  Correct, it says CLK Management.

25    Q.  What's the date of this?

H9qWtuc3                        Mitchell - Direct

1  A.  The date on that is February 18, 2011.

2  Q.  Is that about three years or so after the transition from

3  CLK to AMG?

4  A.  Yes, it is.

5  Q.  Could I just have you read the next two sentences?

6  A.  OK.  "What the hell is this??  'Mike Lane,'" in quotes, "in

7  the system is bad bad bad...(1) he was a TSS person and (2) he

8  ended up leaving TSS and stole data."

9  Q.  Could you read the next sentence as well?

10  A.  "And 'CLK,'" in quotes, "still around is bad bad."

11         MR. RAVI:  Could we zoom out of this.

12         THE WITNESS:  Pardon?

13         MR. RAVI:  I'm speaking with Ms. Grant in terms of

14  zooming out on the screen.

15  Q.  Did you end up addressing this issue?

16  A.  Yes, I did.

17  Q.  And what did you do?

18  A.  I looked in his mailbox, but -- and saw personal contact

19  that he had in his computer system from Mike Lane, and then I

20  asked him if he wanted me to go ahead and delete it.

21  Q.  And what did you understand Mr. Muir to be referring to

22  when he said "CLK still around is bad bad"?

23  A.  After the merger we weren't supposed to talk about CLK

24  anymore; everything was supposed to be referred to as AMG

25  Services.

1         MR. RAVI:  You can take that down.

2    Q.  Mr. Mitchell, were you involved at some point in providing

3    an iPad to Mr. Brady?

4    A.  Yes, I was.

5    Q.  And when was this, approximately?

6    A.  Approximately 2009, 2010.

7    Q.  And who did you speak with about setting up this iPad?

8    A.  Mr. Muir.

9    Q.  And what did Mr. Muir tell you about the purpose of this

10   iPad?

11   A.  Needed to be able to have Mr. Brady have the illusion he

12   was clearing, or approving, the payday loans.

13   Q.  So did you set up this iPad?

14   A.  Yes, I did.

15   Q.  And how did you set it up?

16   A.  Generic with his email on there.

17   Q.  How else did you set up the iPad?

18   A.  The standard iPad setup.  It had a web browser on there

19   called Safari and a couple of other standard options on it.

20   Q.  And you said before that Mr. Muir told you that you need to

21   set up the iPad so it would have the illusion that Mr. Brady

22   was approving loans or doing something with loans, correct?

23   A.  Correct.

24   Q.  So what did you set up on the iPad related to the loans?

25   A.  We put a website, what's called a URL, into the browser

1    under a favorite.

2    Q.  All right.

3    A.  So when you pulled up Safari and clicked on your favorites,

4    that website would be available so you didn't have to type it

5    in.

6    Q.  And if Mr. Brady clicked on that website, what would appear

7    on that iPad screen?

8    A.  It was a screen with lots of names and lots of different

9    information on it.

10   Q.  What were the names listed?

11   A.  The names were supposed to be the people who were applying

12   for those loans.

13   Q.  Was there other information?

14   A.  The information was so small, it was really hard to read on

15   that page.

16   Q.  And then was there a button or something else relating to

17   this?

18   A.  There was an "approve" button at the bottom of the page

19   that internally we just called the magic button, that if you

20   pushed, it would make it look like the loans are being approved

21   at that point in time.

22   Q.  Could Mr. Brady access any loan applications as a result

23   when he viewed this web page?

24   A.  No, not on that page.

25   Q.  What if Mr. Brady wanted to deny the loan?

1  A.  I don't believe that was possible.

2  Q.  What did you do with the iPad once you configured it?

3  A.  I gave it to Mr. Muir.

4  Q.  Were you involved in giving the iPad to Mr. Brady?

5  A.  No, I was not.

6  Q.  Are you aware of any -- other than what you did with

7  Mr. Brady, are you aware of any tribal involvement with loans?

8  A.  No, I am not.

9  Q.  Are you aware of whether the loans were automatically

10  approved?

11  A.  They appeared to be automatically approved, yes.

12  Q.  And I'm talking about generally, through the payday loan

13  business.  Correct?

14  A.  Uh-huh, correct.

15       THE COURT:  OK.  You answered verbally.

16  Q.  How, how often did you interact with Mr. Muir when you were

17  at the company?

18  A.  Several times a week.

19  Q.  You mentioned his position was corporate counsel, correct?

20  A.  Correct.

21  Q.  His internal position?

22  A.  Correct.

23  Q.  Describe why you primarily interacted with Mr. Muir.

24  A.  Any time that we had a document that we were setting up for

25  a new company, we were trying to get like a net-30 account with

1    to be able to purchase through, we would send that contract to

2    Mr. Muir for him to be able to look over the language on it to

3    approve it.  He would red line that language and then send me

4    back the document for me to send off to the third party to be

5    able to have them have their counsel look at it.

6              THE COURT:  Did you refer to net 30?

7              THE WITNESS:  Correct.

8              THE COURT:  What is net 30?

9              THE WITNESS:  Net 30 is when you go to a business and

10   you're trying to purchase some equipment and you're not paying

11   cash for it, you're getting net terms for 30 days, and then you

12   pay the company back.

13   BY MR. RAVI:

14   Q.  And so were you generally dealing with Mr. Muir with

15   respect to these types of contracts?

16   A.  Correct.

17   Q.  Vendor contracts?

18   A.  Uh-huh.

19             THE COURT:  You have to answer in words.

20   A.  Correct, yes.

21   Q.  Did Mr. Muir ever instruct you not to use his name in

22   connection with the review of these contracts?

23   A.  Correct.  He actually told me specifically to extract the

24   document from the email and put it into a new document instead

25   of sending it over to the third party.

1  Q.  Once Mr. Muir had reviewed and signed off on a vendor

2  contract, what was the next step in getting the contract

3  signed?

4  A.  I would take it up to Natalie Dempsey and ask who would be

5  signing that document.

6  Q.  And who signed the vendor contracts?

7  A.  Sometimes myself, sometimes Blaine Tucker, sometimes

8  Natalie, and then there was a new person, Joseph Ragman, that

9  was signing those contracts.

10  Q.  Who is Joseph Ragman?

11  A.  He had a title on the paper of VP.

12  Q.  Have you ever met Mr. Ragman.

13  A.  No, I have not.

14  Q.  And do you know why Mr. Ragman was signing contracts?

15  A.  I do not.

16  Q.  Do you believe that Mr. Ragman was a real person?

17  A.  In the beginning, yes, I did.

18  Q.  Did that --

19  A.  But --

20  Q.  Did that change at some point?

21  A.  Yes.  After time I noticed that I was sending documents up

22  to get signed by an individual and just in a matter of moments

23  that document would be approved, and not being able to lay eyes

24  on this person, I couldn't figure out why he was able to sign

25  that so quickly.

H9qWtuc3                          Mitchell - Direct

1    Q.  Who would you have heard give instructions that this

2    Mr. Ragman sign documents?

3    A.  I got that a couple times from Mr. Muir.

4    Q.  Did you get it from anyone else?

5    A.  Natalie Dempsey.

6    Q.  I'd like to show you now on the screen Government

7    Exhibit --

8           THE COURT:  Ladies and gentlemen, sorry to hold you in

9    suspense like that, but it's time for lunch.  Seems to be some

10   pretty good weather going on.  I'll see you back for a 2:00

11   start.  Remember, do not discuss the case among yourselves or

12   with anyone.  We'll be back in action at 2:00.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  When the jury leaves, you may step down.

3          (Witness not present)

4          THE COURT:  I received a note, which has been marked

5    as Court Exhibit No. 9:

6          "Your Honor, I wanted to remind you of my inability to

7    serve as a juror from the afternoon of Wednesday, October 5,

8    eve of Sukkoth, through October 7, as well as the afternoon of

9    Wednesday, October 11 through Friday, October 13, in observance

10   of the Jewish holiday of Sukkoth.  I hope the Court understands

11   my need and apologize for any inconvenience.  Thank you.  Juror

12   No. 5."

13         I'd like to hear from counsel as to what they think I

14   should do.  I obviously know what I can do, but I want to hear

15   from counsel what they think I should do.  We're adjourned.

16         MR. VELAMOOR:  Judge, very briefly on a housekeeping

17   matter, sorry to interrupt.  There is a witness who may testify

18   this afternoon who is going to be testifying pursuant to an

19   immunity order.  Just to avoid wasting the jury's time, I

20   wonder if we could bring the witness up maybe five minutes

21   before two to handle the invocation, if that's convenient for

22   the Court.

23         THE COURT:  Yes.  That's fine.  We'll resume at five

24   minutes to two and get that done.  Thank you.

25         (Luncheon recess)

1                          AFTERNOON SESSION

2                              1:55 p.m.

3          THE COURT:  Please be seated.

4          You may proceed.

5          MR. VELAMOOR:  Thank you, your Honor.  The government

6    calls Mary Porting, and she's here with counsel, Margaret

7    Shalley.

8          THE COURT:  Excellent.  Come on up, ma'am.

9     MARY L. PORTING,

10        called as a witness by the Government,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. VELAMOOR:

14   Q.  Good afternoon, Ms. Porting.

15        Did there come a time when you worked for a company called

16   National Money Service?

17   A.  I assert my, I assert my Fifth Amendment right not to

18   incriminate myself.

19   Q.  In the course of that work, were you involved in the

20   compliance department of that company?

21   A.  I assert my Fifth Amendment right not to incriminate

22   myself.

23   Q.  Ms. Porting, as you said, you've asserted your Fifth

24   Amendment right against self-incrimination with respect to the

25   two questions I've posed to you, correct?

H9qWtuc3                         Porting - Direct

1   A.  Correct.

2   Q.  Do I understand that you intend to similarly invoke those

3   rights with respect to any other questions I ask you?

4   A.  Yes.

5   Q.  Have you had a chance -- I'm going to show you a copy of an

6   order.  Have you a chance to review that order in advance of

7   taking the stand?

8   A.  Yes.

9   Q.  And did you review it along with Ms. Shalley, who is your

10  counsel in the courtroom today?

11  A.  Yes.

12  Q.  And do you understand what this order requires you to do?

13  A.  Yes.

14  Q.  Do you understand that the order requires you to give

15  testimony and provide information in this case notwithstanding

16  the fact that you've invoked your Fifth Amendment rights?

17  A.  Yes.

18  Q.  And do you understand that because you're being compelled

19  to provide testimony, you're being immunized for that

20  testimony?

21  A.  Yes.

22  Q.  Do you understand that, as a result, any testimony you give

23  in this case cannot be used against you?

24  A.  Yes.

25  Q.  That, in other words, you cannot be prosecuted on the basis

1    of any testimony you provide in this trial?

2    A.   Yes.

3    Q.   Do you understand that even though you are being given that

4    immunity for your testimony, you are required nonetheless to

5    tell the truth because of the oath you took a moment ago?

6    A.   Yes.

7    Q.   And do you understand that even though you're being

8    immunized, if you don't tell the truth, you could be prosecuted

9    for perjury, making a false statement or obstruction of

10   justice?

11   A.   Yes.

12   Q.   Do you intend to abide by the terms of the order?

13   A.   Yes, I do.

14   Q.   Thank you.

15           THE COURT:  All right.

16           MR. VELAMOOR:  Your Honor, I'm going to provide your

17   deputy with the application as well as the proposed order.

18           THE COURT:  All right.  I find that the application is

19   in good order and I've granted the application.  I have signed

20   the order, and I deem both the order and the application to be

21   filed in open court.

22           MR. VELAMOOR:  Thank you, your Honor.  May the witness

23   be excused, obviously subject to further recall?

24           THE COURT:  Yes.  Thank you very much.

25           (Witness excused)

H9qWtuc3                          Porting – Direct

1          THE COURT:  Are our jurors ready yet?

2          THE DEPUTY CLERK:  Yes.

3          THE COURT:  OK.  Bring our jury in, please.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H9qWtuc3                          Mitchell - Direct

1            THE COURT:  Please be seated.

2            Pretty nice outside, I hope.

3            JUROR:  Very nice.

4            THE COURT:  Yes, we're lucky to have this weather.

5            Go ahead, Mr. Ravi.  You may continue.

6            MR. RAVI:  Thank you, your Honor.

7    DIRECT EXAMINATION CONTINUED

8    Q.  Mr. Mitchell, before the break, we had talked about an iPad

9    that you had configured for Mr. Brady that you gave to

10   Mr. Muir, correct?

11   A.  Correct.

12   Q.  Did you see that iPad at a later point in time?

13   A.  Yes, I did.

14   Q.  Where did you see it?

15   A.  We were at a Kansas City Chiefs football game at Arrowhead

16   Stadium, Kansas City.

17   Q.  What were the circumstances under which you saw this iPad?

18   A.  Mr. Brady had pulled the iPad out and loaded the web page

19   up and pressed the button at the bottom of the page.

20   Q.  This is the magic button?

21   A.  Correct.

22   Q.  How long did it take for him to do that?

23   A.  A matter of seconds.

24   Q.  Were you on tribal lands when he pushed that button?

25   A.  No, sir.

H9qWtuc3                        Mitchell - Direct

1   Q.  Now, right before the break, we talked about Mr. Ragman,

2   correct?

3   A.  Correct.

4   Q.  That was a name that was used to sign documents?

5   A.  Correct.

6           MR. RAVI:  I'd like to show Government Exhibit 1601 on

7   the screen.

8   Q.  Is this an email you received?

9   A.  Yes, it is.

10          MR. RAVI:  The government offers Government Exhibit

11  1601.

12          THE COURT:  Any objection?

13          MR. BATH:  No, sir.

14          THE COURT:  Received.

15          (Government Exhibit 1601 received in evidence)

16          MR. RAVI:  Please publish it, and if we could zoom in

17  on the body of the email.

18  Q.  Who is this email to, Mr. Mitchell?

19  A.  It was to me -- sorry.  Originally it was to Mr. Muir.

20  Q.  From who?

21  A.  From myself.

22  Q.  And what's the date on the email?

23  A.  November 9, 2010.

24  Q.  And what did you write?

25  A.  "Me, Blaine or Mr. Ragman?"

1    Q.  Why did you send this email to Mr. Muir?

2    A.  It was about a contract to be signed.

3           MR. RAVI:  Could we go to the next email.

4    Q.  And did Mr. Muir respond to your email?

5    A.  Yes, he did.

6    Q.  What did he respond?

7    A.  "You is fine."

8           MR. RAVI:  We could go to the top email.

9    Q.  Did you forward this email to Mr. Blaine Tucker?

10   A.  Yes, I did.

11          MR. RAVI:  I'd like to now show Government Exhibits

12   4025, 4027 and 4028, and I'd like to offer those as well.

13          THE COURT:  Any objection?

14          MR. GINSBERG:  I don't have one, your Honor.

15          THE COURT:  Received.

16          (Government Exhibits 4025 and 4027-4028 received in

17   evidence)

18          MR. RAVI:  Please publish 4028 first.

19   Q.  Who is this email from?

20   A.  The original email is from Karen Kelley.

21   Q.  Who is that?

22   A.  She worked for Chris Becker, down in the collections

23   company on the first floor.

24   Q.  Who is the email to?

25   A.  The email is to Natalie Dempsey.

H9qWtuc3                          Mitchell - Direct

1    Q.  What was her position again?

2    A.  I just called her the IT -- pardon me, sorry, the office

3    manager.

4    Q.  Just read the body of the email.

5    A.  "This is a rough draft of the new chargeback letters to

6    payment plans set up after the last week in April.  If you have

7    any suggestions or revisions, please let me know.  Thanks for

8    your help.  Karen Kelley."

9    Q.  Is there an attachment?

10   A.  Global letter 5-email.doc is the attachment.

11          MR. RAVI:  Let's turn to that attachment, and can you

12   just focus on the signature, the "thank you" and below.

13   Q.  What name is listed under thank you?

14   A.  Karen Kelley, chargeback processer.

15          MR. RAVI:  If we could now go to Government Exhibit

16   4025.

17   Q.  Is this an email that's subsequently in the same chain?

18   A.  Correct.

19   Q.  And who is this email from?

20   A.  That email is from Natalie Dempsey.

21   Q.  Can you just read the body of that email?

22   A.  "Karen, I've made a few changes.  I've removed the SSN that

23   was listed on the letter.  We should not disclose that

24   information to a third party.  I've also edited the second

25   paragraph a little.  I would like to avoid using the rep's

H9qWtuc3                          Mitchell - Direct

1   names in these letters.  You'll also notice that I changed the

2   signature line.  Please let me know if you have any questions."

3   Q.  Thank you.  Is there also an attachment to this email?

4   A.  Yes, global letter 5-email.doc.

5          MR. RAVI:  Could we go to the attachment and focus on

6   "thank you" and below.

7   Q.  What's the name listed under thank you?

8   A.  J.S. Ragman, chargeback processer.

9          MR. RAVI:  If we could now turn to Government Exhibit

10  4027.

11  Q.  And is this a subsequent email in the same chain?

12  A.  Yes, it is.

13  Q.  And who is this email from?

14  A.  This email is from Chris Becker.

15  Q.  Who is it to?

16  A.  It is to Natalie Dempsey.

17  Q.  And what's Chris Becker's position?

18  A.  Chris Becker was one of the gentlemen that ran the

19  collection agency downstairs.

20  Q.  And what does Chris Becker write?

21  A.  "That Joe Shit gets around."

22  Q.  Do you know what the Joe Shit is a reference to?

23  A.  Joe Ragman, the name.

24  Q.  Do you know what J.S. Ragman, or Joe Shit the Ragman, is a

25  reference to?

1    A.   Yes.

2    Q.   What is it a reference to?

3    A.   It's a -- I looked it up on dictionary.com.  It's a

4    reference to Joe Shit the Ragman.  The definition was a normal

5    soldier.

6              MR. RAVI:  We can take that down.

7              If we could now go to Government Exhibit 1602, I'd

8    like to offer this in evidence.

9              Ms. Grant, if you could zoom in.

10             MR. GINSBERG:  I have no objection, your Honor.

11             THE COURT:  Received.

12             (Government Exhibit 1602 received in evidence)

13   BY MR. RAVI:

14   Q.   Mr. Mitchell, who is in the "from" line?

15   A.   Glenn Fisher.

16             MR. RAVI:  We can publish that to the jury.  Thank

17   you.

18   Q.   Who is it to and who is copied?

19   A.   To Jared Marsh, cc Blaine Tucker, myself, Bob Little.

20   Q.   Can you focus in and read the first line of the body, where

21   it begins "copies of agreement," and just read that?

22   A.   "Copies of the agreement and addendums attached.  AMG

23   agreement signed by Joseph Ragman, vice president," smiley

24   face.

25             MR. RAVI:  Turn to the attachments.

1   Q.   What's attached to this email?

2   A.   Addendums for a contract.

3           MR. RAVI:  If we could turn to page 2 of the

4   attachment and zoom in on the signature line.

5   Q.   What does it say under "agreed and accepted for AMG

6   Services Inc."?

7   A.   J.S. Ragman, VP, 1-7-09.

8           MR. RAVI:  Turn to page 4 of the PDF.

9   Q.   What is this document?

10  A.   That is a composite agreement, the original agreement from

11  Noble Systems to AMG systems for the predictive dialer.

12  Q.   Is this a large contract?

13  A.   Yes, it is.

14  Q.   Do you know in terms of value how big a contract this is?

15  A.   Several hundred thousand dollars.

16          MR. RAVI:  If we could turn to page 21 of this

17  contract, or page 21 of the exhibit.  Just could focus in on

18  the signature line.

19  Q.   What is signed by customer?

20  A.   AMG Services, signed by Joseph S. Ragman, printed Joseph S.

21  Ragman, VP.

22          MR. RAVI:  You can take that down.

23          At this time I'd like to offer Government Exhibits

24  1311, 1316, 1317, 1318 and 1319.

25          THE COURT:  Any objection?

1    MR. GINSBERG:  No to 1311.  No to 1316.  No to 1317.

2    Is that all?  Oh.  1318, no objection.  1319, no objection.

3    THE COURT:  All right.  They are received.

4    (Government Exhibits 1311 and 1316-1319 received in

5    evidence)

6    BY MR. RAVI:

7    Q.  Mr. Mitchell, generally what are these five documents that

8    were just shown on the screen to you?

9    A.  Those were invoices to purchase domain names.

10   Q.  From who?

11   A.  Company GoDaddy.

12   Q.  And what was the purpose of purchasing the domain names?

13   A.  So you'd have a web page to be able to go to or an email to

14   be able to sent from.

15   MR. RAVI:  Let's publish Government Exhibit 1311;

16   we'll just go through a couple of these.

17   Q.  If you can, what's the date of this invoice?

18   A.  2/13, 2009.

19   MR. RAVI:  Highlight what's under billing information.

20   Q.  If you could just read that for us.

21   A.  Joseph Ragman, AMG Services Inc., 3531 P Street NW, P.O.

22   Box 111, Miami, Oklahoma, 7433 -- sorry.  74355.

23   Q.  Thank you.  And below that is there some payment

24   information?

25   A.  Correct.

1   Q.  What's the name listed for the payment information?

2   A.  Tim J. Muir.

3            MR. RAVI:  Let's turn now to Government Exhibit 1319.

4   Q.  Does this exhibit, what's the date on this invoice?

5   A.  10/20, 2010.

6   Q.  Does this also list Joseph Ragman under shipping

7   information and billing information?

8   A.  Yes, it is.

9   Q.  And what's the name for the payment that's provided?

10  A.  The Muir Law Firm LLC.

11  Q.  And what are the domain names that are being purchased

12  there?

13  A.  SFSincorporated.com, mnescrb.com and redcedar.com.

14           MR. RAVI:  Turn now to 1317.

15  Q.  What's the date on this invoice?

16  A.  6/8, 2011.

17  Q.  Does this similarly have Joseph Ragman listed under

18  shipping and billing information?

19  A.  Yes, it does.

20  Q.  Does it have the Muir Law Firm under, as part of the

21  payment information?

22  A.  Yes, it does.

23  Q.  And does this invoice relate to Eclipse Renewables, if you

24  turn to the second page?

25  A.  Yes, there's a few different Eclipse Renewables domains on

1    there.

2    Q.  What is Eclipse Renewables?

3    A.  That was a company that Scott Tucker owned out of Texas.

4              MR. RAVI:  If we could turn now to Government Exhibit

5    1318.

6    Q.  Does this again have Joseph Ragman listed under shipping

7    and billing information?

8    A.  Yes, it does.

9    Q.  And the Muir Law Firm as payment information?

10   A.  Yes, it does.

11             MR. RAVI:  We can take that down.

12             I'd like to publish now Government Exhibit 811, which

13   is already in evidence, and if you could just zoom in on

14   settlement agreement.

15   Q.  And the second line, does that list Charles Hallinan?

16   A.  Yes.

17             MR. RAVI:  Turn now to page 42 of the exhibit.

18   Q.  And what does it list under AMG Services?

19   A.  J.S. Ragman, vice president.

20   Q.  Is that next to the signature line for Charles Hallinan?

21   A.  Yes.

22             MR. RAVI:  Could we turn now to page 115 of this

23   exhibit.  And could we turn to the next page.

24             We can take that down.  Now let's go to Exhibit 1312.

25   Q.  And what is this that's in front of you?

1   A.   That is a contract from Natalie Ragman for a domain log-in

2   for Ace Cash Services.

3   Q.   Is this from GoDaddy.com as well?

4   A.   Yes, it is.

5        MR. RAVI:  The government offers 1312.

6        MR. GINSBERG:  No objection.

7        THE COURT:  Received.

8        (Government Exhibit 1312 received in evidence)

9        MR. RAVI:  Please publish it for the jury, and if you

10  could just zoom in on first name through company.

11  Q.   Are you familiar with who Natalie Ragman is?

12  A.   No, I'm not.

13  Q.   Are you familiar with a Natalie at the company?

14  A.   Yes, I am.

15  Q.   Which Natalie is that?

16  A.   Natalie Dempsey.

17  Q.   You just testified that Natalie Dempsey had given you the

18  name Ragman to use on contracts, correct?

19  A.   Correct.

20  Q.   Now, to be clear, is Joseph S. Ragman a real person?

21  A.   No, he is not.

22       MR. RAVI:  You can take that down, Ms. Grant.

23  Q.   Mr. Mitchell, when it came to approving vendor contracts,

24  who gave the approvals for vendor contracts?

25  A.   They came from Scott Tucker, Blaine Tucker, Natalie Dempsey

H9qWtuc3                          Mitchell - Direct

1  or Tim Muir.

2  Q.  And did it depend on the amount or the value of the

3  contract that you'd need to get a certain person to approve it?

4  A.  There was no written amount, but the higher-dollar

5  contracts did get approved by Scott Tucker himself.

6  Q.  Did anyone associated with a Native American tribe approve

7  any vendor contracts?

8  A.  Not to my knowledge, no.

9  Q.  At some point were you asked to purchase some phones?

10  A.  Yes.

11  Q.  What types of phones were you asked to purchase?

12  A.  TracFones, otherwise known as burner phones.

13  Q.  And when were you asked to purchase these?

14          MR. GINSBERG:  Objection, your Honor.

15          THE COURT:  Overruled.

16          MR. GINSBERG:  Relevance.

17  A.  I believe it was winter of 2010.

18  Q.  And who asked you to purchase these phones?

19  A.  Natalie Dempsey.

20  Q.  And were you specifically given any instructions about

21  where you were to purchase these phones?

22  A.  Yes, I was told to go down the street to the Target and

23  purchase those phones.

24  Q.  Were you given any instructions as to how to purchase the

25  phones?

1  A.  Yeah, I was told to pay with cash and then turn in a

2  reimbursement form.

3  Q.  How many times were you asked to buy these burner phones?

4  A.  I made two separate trips down.

5  Q.  And how many phones did you purchase each time?

6  A.  Two phones each time.

7  Q.  Mr. Mitchell, at some point did you make a trip to a Native

8  American reservation, at some time?

9  A.  Yes, I did.

10 Q.  When was that, approximately?

11 A.  Summer of 2010, I believe.

12 Q.  Summer of 2010?

13 A.  Sorry.  '12.  Sorry.  2012.

14 Q.  2012, to be clear?

15 A.  Yes.

16 Q.  Did anyone travel with you there?

17 A.  Yes.  Mr. Tucker and Mr. Muir.

18 Q.  How did you travel to that reservation?

19 A.  Mr. Tucker's private airplane.

20           MR. RAVI:  I'd like to show Government Exhibit 4029 on

21 the screen.  The government offers Government Exhibit 4029.

22           THE COURT:  Any objection?

23           MR. GINSBERG:  Objection.  Relevance.

24           THE COURT:  Sustained.

25           MR. RAVI:  Your Honor, I can make a proffer as to

H9qWtuc3                        Mitchell - Direct

1    relevance.

2            THE COURT:  You can do it at the sidebar.

3            MR. RAVI:  OK.

4            THE COURT:  You can do it later.  Go on with your

5    examination.

6            MR. RAVI:  For the record, in case this witness isn't

7    on the stand, could I have him at least identify it?

8            MR. GINSBERG:  If he identifies it --

9            THE COURT:  Yes.  Let me see you at the sidebar.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At sidebar)

2    THE COURT:  What's the relevance of the picture?

3    MR. RAVI:  At a later point in trial, a witness is

4    going to be providing information about how tribal accounts

5    were used to fund various expenses relating to Mr. Tucker's

6    private jet and large amounts of money being used towards that

7    private jet, and this identification provides the jury with an

8    idea of what this money's going towards in terms of the type of

9    jet it is.

10   THE COURT:  An identification does, but not a picture.

11   What does a picture do?  It's a fancy jet, is that it?

12   MR. RAVI:  The number that's on the jet.

13   THE COURT:  No problem there.  You can have him read

14   the number into the record.  That's not a problem.

15   MR. RAVI:  That's fine, your Honor.

16   THE COURT:  OK, good.

17   (Continued on next page)

18

19

20

21

22

23

24

25

1           (In open court)

2    BY MR. RAVI:

3    Q.  Mr. Mitchell, are you aware of a number that was listed on

4    Mr. Tucker's jet?

5    A.  Yes, I am.

6    Q.  And what number is that?

7    A.  No. 55.  You want -- the whole tail number is N551ST.

8    Q.  Did you ever learn what the significance of those numbers

9    are?

10   A.  55 was the number of one of Scott's race cars.  In one way,

11   shape or another, he liked to have the 55.  And then 1ST was

12   for 1 Scott Tucker, because you're either first or you're last.

13   Q.  Now, you said you traveled --

14           MR. RAVI:  You can take that off the screen.

15   Q.  So what was the purpose of this trip to the Miami

16   reservation -- sorry.  Which tribe did you go to?

17   A.  We went down to visit the Miami Tribe of Oklahoma.

18   Q.  What was the purpose of this trip?

19   A.  We wanted to go down and look to see if there was a

20   possibility of the Miami tribe purchasing a facility to make a

21   call center down there.

22   Q.  After this trip did you become aware of some litigation

23   involving the FTC?

24           MR. GINSBERG:  Objection.  Leading, your Honor.

25           THE COURT:  Yes.  Avoid leading.

H9qWtuc3                         Mitchell - Direct

1    I'll tell you what.  I'll allow it in this instance

2    because it's the only way to set the time frame, so I'm going

3    to reverse myself and say you can ask the question.  Go ahead.

4    Q.  Did this trip occur after you became aware of an

5    investigation that became public relating to the FTC?

6    A.  Yes.

7    Q.  And so what occurred during this trip?

8    A.  Went down to look at a building that was in Miami to see if

9    it was suitable for high-speed Internet and telephone lines for

10   a call center.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H9Q8TUC4                        Mitchell - Direct

1  Q.  What was the result of your review of the site?

2  A.  Because of the small town that it was located in, there was

3  not enough Internet speed to be able to have that type of

4  facility in that town.

5  Q.  What kind of facility were you looking to have there?

6  A.  I was going to add a call center.

7  Q.  Do you know if there was ever any call center set up there?

8  A.  No.

9         THE COURT:  No, you don't know, or no, there wasn't a

10  call center?

11         THE WITNESS:  No, we did not set up a call center down

12  there.

13  Q.  Mr. Mitchell, did you become aware of a gift that Mr.

14  Tucker purchased for Mr. Muir as a result of a development in a

15  state court litigation relating to the payday loan business?

16         MR. GINSBERG:  Objection, your Honor.  Relevance.

17         THE COURT:  I will allow it.

18  A.  Yes.

19  Q.  How did you learn about this gift?

20  A.  A tank was driven in on a semi, and we had to move some

21  cars around to be able to pull the tank down into a parking lot

22  behind our facility.

23  Q.  So you saw this tank come in?

24  A.  Yes.  I saw the tank come in, and Mr. Muir made us aware

25  that the tank was coming in and we needed to park it

H9Q8TUC4                         Mitchell - Direct

1   downstairs.

2   Q.  How did you learn that it was a gift?

3   A.  Mr. Muir told me it was a gift.

4   Q.  Was there anything that was inscribed on this tank?

5   A.  Yes.  There was numbers and letters on the side, like you

6   would see on a normal oil tank or maybe an airplane.

7   Q.  What was inscribed on this tank?

8   A.  F-U-M-A-G-F-S-T.

9   Q.  Who told you what that meant?

10  A.  Mr. Muir told me.

11  Q.  You can just use the initials of the first two letters.

12  A.  FU, Mr. Attorney General, from Scott Tucker.

13  Q.  Mr. Mitchell, at some point did you stop working for Mr.

14  Tucker?

15  A.  Yes.

16  Q.  When was that?

17  A.  In 2014.

18  Q.  Why did you end up leaving?

19  A.  With the downsizing of the company and learning about all

20  the lies and deception.

21          MR. GINSBERG:  Objection.  Move to strike.

22          THE COURT:  There came a point in time that you left

23  the company, is that correct?

24          THE WITNESS:  Correct.

25          THE COURT:  Next question.

1  Q.  Now, you worked for the company for over ten years?

2  A.  Correct.

3  Q.  Were you ever aware during those ten years of anyone other

4  than Mr. Tucker that controlled the payday loan business?

5  A.  No, I'm not.

6  Q.  Did anyone other than Mr. Tucker operate the payday loan

7  business?

8  A.  No.

9  Q.  Was anyone other than Mr. Tucker the top decision-maker in

10  this payday loan business?

11  A.  No.

12  Q.  In those ten years, were you ever directed by someone

13  associated with a Native American tribe?

14  A.  No.

15  Q.  How important would you consider your position was to the

16  payday loan business?

17  A.  I would consider it very important.

18  Q.  Why is that?

19  A.  Without my team the technology wouldn't work, so the call

20  center agents wouldn't be able to log into a phone, wouldn't be

21  able to log into their computers, and they wouldn't be able to

22  do their day-to-day operations.

23  Q.  Is it fair to say that the majority of the employees at the

24  payday loan company were related to the call centers?

25  A.  Yes.

H9Q8TUC4                    Mitchell – Direct

 1   Q.  In those ten years, how many people did you learn have

 2   titles in the company?

 3   A.  Two.

 4   Q.  Who were those two people?  Who is the first person?

 5   A.  Don Brady.

 6   Q.  What was his title?

 7   A.  CEO.

 8   Q.  Of AMG?

 9   A.  Correct.

10   Q.  Who is the second person that had a title?

11   A.  Joe or Joseph Ragman.

12   Q.  What was his title?

13   A.  VP or vice president.

14   Q.  That's a fake person, right?

15   A.  Correct.

16   Q.  Mr. Mitchell, when you were at the company, did you believe

17   you were lied to?

18   A.  Yes.

19   Q.  Who lied to you?

20   A.  Mr. Muir and Mr. Tucker, actually both Tuckers, Natalie

21   Dempsey, basically everybody that was above me in the chain of

22   command.

23   Q.  What did you believe they lied to you about?

24   A.  The actual ownership of the company and that we were doing

25   a true, good business and everything we were doing was on the

1   up-and-up.

2           MR. RAVI:  Nothing further, your Honor.

3           THE COURT:  Cross-examination.

4           MR. GINSBERG:  Thank you, your Honor.

5   CROSS-EXAMINATION

6   BY MR. GINSBERG:

7   Q.  Mr. Mitchell, I want to take you back to the beginning of

8   your testimony.  Did you indicate that you began to work for

9   CLK in about 2003?

10  A.  Either 2003 or 2004, correct.

11  Q.  You indicated certain people who you interacted with

12  shortly after you became employed, is that correct?

13  A.  Yes.

14  Q.  I believe you indicated that Ed Cross was your boss?

15  A.  Correct.

16  Q.  And Blaine Tucker was there at the time?

17  A.  Correct.

18  Q.  And Scott Tucker?

19  A.  Correct.

20  Q.  And Crystal Grote?

21  A.  Yes.

22  Q.  Natalie Dempsey?

23  A.  Correct.

24  Q.  Also, I believe you indicated that Tim Muir was corporate

25  counsel?

1    A.  Correct.

2    Q.  That was in 2003 or '04, correct?

3    A.  Correct.

4    Q.  You're certain of the time period, is that correct?

5    A.  Yes.

6    Q.  You're sure that you didn't begin working for CLK until

7    July of 2007?

8    A.  I don't believe so, no.

9    Q.  Well, what do you mean you don't believe so?  There is a

10   big difference between 2003 and '04 and 2007, isn't there?

11   A.  Yes, there is.

12   Q.  Is it possible you didn't begin working there until 2007?

13   A.  Yes, it is.

14   Q.  It is possible?

15   A.  Uh-huh.

16   Q.  So you could be off by three years in terms of when you

17   began working there?

18   A.  I could be, I guess, yes.

19   Q.  So anything you testified to about what you observed or

20   heard or saw in 2004 or '05 or '06 you wouldn't have known

21   because you wouldn't have been working there, correct?

22   A.  Correct.

23           MR. GINSBERG:  I have nothing further.

24           THE COURT:  Any other cross-examination?

25           MR. BATH:  No.

H9Q8TUC4

1           THE COURT:  Redirect.

2           MR. RAVI:  No further questions, your Honor.

3           THE COURT:  All right.  You may step down, sir.  Thank

4      you.

5           (Witness excused)

6           THE COURT:  Call your next witness.

7           MR. RAVI:  We have one exhibit we would like to

8      publish.

9           THE COURT:  All right.

10          MR. RAVI:  At this time, the government offers

11     Government Exhibit 313.

12          MR. BATH:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 313 received in evidence)

15          MR. RAVI:  If we can zoom in on the bottom e-mail, the

16     "from" and "to" on the bottom.

17          Highlight the "from," the "to" and the "cc," as well

18     as the date.

19          If we can highlight the body.

20          You can now turn to the next e-mail in the chain.

21          Highlight who it's from.

22          Go to the next e-mail in the chain.

23          Highlight who it is from and to.

24          Go to the next e-mail in the chain.

25          Highlight who this e-mail is from.

H9Q8TUC4                          Sanchez – Direct

1           Finally, go to the top e-mail in the chain.

2           Who it is from and to, as well as the cc.

3           At this time, the government calls Athena Sanchez.

4    ATHENA SANCHEZ,

5        called as a witness by the government,

6        having been duly sworn, testified as follows:

7           THE DEPUTY CLERK:  State your name and spell it for

8    the record, please.

9           THE WITNESS:  Athena Sanchez, A-T-H-E-N-A,

10   S-A-N-C-H-E-Z.

11          THE COURT:  You may inquire.

12   DIRECT EXAMINATION

13   BY MR. RAVI:

14   Q.  Ms. Sanchez, how old are you?

15   A.  44.

16   Q.  Where do you currently live?

17   A.  Manhattan.

18   Q.  Have you lived somewhere previously?

19   A.  I lived in the Bronx for 15 years.

20   Q.  How long have you lived in Manhattan?

21   A.  About a year.

22   Q.  How far did you go in school?

23   A.  12th grade.

24   Q.  Do you work?

25   A.  Yes, I do.

H9Q8TUC4                          Sanchez - Direct

1    Q.  What do you do?

2    A.  Medical billing.

3            THE COURT:  Medical?

4            THE WITNESS:  Billing.

5    Q.  Do you have a family?

6    A.  Yes, I do.

7    Q.  Do you have children?

8    A.  I have three.

9    Q.  Are you married?

10   A.  No.

11   Q.  Ms. Sanchez, have you ever taken out what are called payday

12   loans?

13   A.  Yes.

14   Q.  Did you take out payday loans from a company called 500

15   FastCash?

16   A.  Yes.

17   Q.  How did you learn about 500 FastCash?

18   A.  I was doing research online with regard to payday loans and

19   they contacted me.

20   Q.  How did 500 FastCash contact you?

21   A.  I filled out a survey and put my telephone number and they

22   called me.

23   Q.  You were called by a representative of 500 FastCash?

24   A.  Yes.

25   Q.  Why did they call you?

 1   A.  To inform me that I was eligible for a $300 loan.

 2   Q.  How many loans did you end up taking out with 500 FastCash?

 3   A.  Three in total.

 4   Q.  What were the amounts of those loans?

 5   A.  Two were 300 and one was 400.

 6   Q.  Around what period of time did you take out these loans?

 7   A.  I would say from 2010 to 2011.

 8   Q.  Every time you took out one of those three loans, was it

 9   initiated by a phone call?

10   A.  Yes.

11   Q.  From 500 FastCash?

12   A.  Yes.

13   Q.  Why did you take out these three loans from 500 FastCash?

14   A.  I was having some financial issues, putting a kid through

15   college, one graduating high school, baby-sitting fees, and I

16   was doing it on my own.

17   Q.  I would like to now show you Government Exhibits 2202, 2204

18   and 2206.

19       Are these the loan applications that you filled out for 500

20   FastCash?

21   A.  Yes.

22   Q.  Are they three separate loan applications?

23   A.  Yes.

24           MR. RAVI:  The government offers Government Exhibits

25   2202, 2204 and 2206.

1     MR. BATH:  No objection.

2     THE COURT:  Received.

3     (Government's Exhibits 2202, 2204 and 2206 received in

4  evidence)

5  Q.  Let's turn first to Government Exhibit 2202.

6     What is the date on this loan application?

7  A.  July 11, 2010 -- July 1.  I'm sorry.

8  Q.  If you turn to the second page.

9     Turn to the next page.

10     What was the amount of the loan that you took out?

11  A.  $300.

12  Q.  How much did you believe this loan would cost you?

13  A.  $390.

14  Q.  How did you come to that belief?

15  A.  Where it says "total of payments," will be $390.

16  Q.  Is that the fourth box from the left?

17  A.  Yes.

18     MR. RAVI:  Can we just highlight that.

19  Q.  Let's move on to Government Exhibit 2204.

20     Is this the second loan that you took out?

21  A.  Yes.

22  Q.  What is the date on this one?

23  A.  December 9, 2010.

24  Q.  Can we turn to the third page.

25     How much was this loan for?

H9Q8TUC4                        Sanchez - Direct

1    A.   $300.

2    Q.   How much did you understand that this loan would cost you?

3    A.   $390.

4    Q.   If we can turn now to the third application.  That's

5    Government Exhibit 2206.

6         What is the date of this application?

7    A.   May 10, 2011.

8    Q.   If we turn now to the third page.

9         What was the amount of this loan?

10   A.   $400.

11   Q.   How much did you understand that this loan would cost you

12   once you took it out?

13   A.   $520.

14             MR. RAVI:  If you can zoom out.

15   Q.   So was that a finance charge of $120?

16   A.   Correct.

17   Q.   Again, where did you understand that it would cost $520?

18   A.   Where it says "total of payments," it says $520.

19   Q.   Were you also told anything on these phone calls about the

20   cost of your loan?

21   A.   That there would be a $120 financing fee.

22   Q.   So in connection with this particular loan, the third loan

23   that we talked about, you had a discussion with a

24   representative of 500 FastCash regarding how much your loan

25   would cost you?

1   A.  Correct.

2   Q.  What were you told on that phone call?

3   A.  That it would be $520.

4   Q.  Now, Ms. Sanchez, there is some language that's below those

5   four boxes.  Do you see that?

6   A.  Yes.

7   Q.  Do you recall whether you read that language at the time

8   you took this loan out?

9   A.  No, I did not.

10  Q.  Have you since read that language?

11  A.  Yes.

12  Q.  Is reading that language change your impression that your

13  $400 loan cost you $520?

14  A.  No.

15  Q.  Now, how was the amount of these loans deposited into your

16  account?

17  A.  The withdrawal from the company -- deposit from the

18  company.

19  Q.  It was done directly?

20  A.  Directly, correct.

21  Q.  What about the withdrawals for the payments?

22  A.  They were taken out directly from my bank account.

23  Q.  Did you encounter any problems with the third loan?

24  A.  I noticed that I kept getting overdraft fees for

25  withdrawals being taken out, so I started checking through my

H9Q8TUC4                      Sanchez - Direct

1   accounts and I saw that there was more than a thousand dollars

2   taken out of my account.

3   Q.   More than a thousand dollars for your $400 loan?

4   A.   For my $400 loan.

5   Q.   What was the first thing you did when you realized there

6   was a problem?

7   A.   I started investigating.  I tried calling, and I didn't get

8   through.  So I started doing some research online, and I saw

9   that there were a whole bunch of disputes online in regards to

10  this, these payday loans.

11  Q.   What did you do after that?

12  A.   I followed the link to a Web site which gave me advice on

13  how to send a cease and desist letter, which in turn I sent to

14  the company.

15  Q.   I would like to show you now on the screen Government

16  Exhibit 2210.

17       Is this a copy of your cease and desist?

18  A.   Yes.

19            MR. RAVI:  The government offers Government Exhibit

20  2210.

21            MR. BATH:  No objection.

22            THE COURT:  Received.

23            (Government's Exhibit 2210 received in evidence)

24            MR. RAVI:  If we can focus in on the "from" and "to"

25  at the bottom.

1    Q.  Who is this e-mail from and to, Ms. Sanchez?

2    A.  It's from me to customer service at 500 FastCash.

3    Q.  What is the date?

4    A.  September 9, 2011.

5    Q.  What is the subject line?

6    A.  Cease and desist.

7            MR. RAVI:  We can zoom out of that.

8            Let's just turn to the second page and publish it.

9            Turning back to the first page.  And if we can now

10   focus in on the top e-mail.

11   Q.  What is the date of this e-mail?

12   A.  September 22, 2011.

13   Q.  Why did you send this e-mail?

14   A.  The advice that I got from sending the first letter said to

15   follow-up after a certain amount of days if I didn't hear back

16   from the company, which is when I sent the second e-mail.

17           MR. RAVI:  You can take that down.

18   Q.  Ms. Sanchez, did you end up getting a response from your

19   cease and desist letter?

20   A.  I called and I finally got through to someone, and I had a

21   conversation with them, and they told me that I had agreed to

22   extending the loan and that they weren't going to give me any

23   money back.

24   Q.  After you received that response, did you contact anyone

25   else?

1   A.  I sent the letters to Federal Trade Commission, Attorney

2   General and the Better Business Bureau.

3   Q.  Would that be the New York Attorney General's Office?

4   A.  Correct.  Yes.

5   Q.  I would like to show you now Government Exhibit 2207.

6       Is this the letter that you sent to the New York Attorney

7   General's Office?

8   A.  Yes.

9   Q.  Actually, turn to the third page of this letter.

10      Is this the letter that you sent?

11  A.  Yes.

12          MR. RAVI:  The government offers Government Exhibit

13  2207.

14          MR. BATH:  Only this letter or everything in there?

15          MR. RAVI:  Everything in there.

16          MR. BATH:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 2207 received in evidence)

19  Q.  If we can now turn to the first page.

20      Do you know what this first page of Government Exhibit 2207

21  is, Ms. Sanchez?

22  A.  I can't see.

23  Q.  Have you seen this letter before?

24  A.  Yes.

25  Q.  Who is this letter from?  Is it from the New York Attorney

1    General's Office?

2    A.  Yes, from the New York Attorney General's Office.

3              THE COURT:  Keep your voice up, please.

4              THE WITNESS:  I'm sorry.

5    A.  From the Attorney General's Office.

6    Q.  Is it addressed to 500 FastCash?

7    A.  Yes.

8    Q.  Is this a letter that's basically sending your complaint to

9    500 FastCash through the New York Attorney General's Office?

10   A.  Yes.

11   Q.  Was the letter you sent very similar to what was contained

12   in your cease and desist e-mail?

13   A.  Yes.

14             MR. RAVI:  We can take that down.

15   Q.  Ms. Sanchez, did you ever get a refund of the over $1,000

16   that you paid to 500 FastCash?

17   A.  No.

18   Q.  At some point were you informed that your loan was written

19   off?

20   A.  Yes.

21   Q.  The rest of the payments for your loan?

22   A.  Well, I had paid way more than what I was supposed to, so

23   yes.

24   Q.  How were you informed of that?

25   A.  I received a letter.

1   Q.  I would like to show now Government Exhibit 2208.

2            MR. RAVI:  The government offers Government Exhibit

3   2208.

4            MR. BATH:  No objection.

5            THE COURT:  Received.

6            (Government's Exhibit 2208 received in evidence)

7   Q.  Ms. Sanchez, is this the letter from 500 FastCash?

8   A.  Yes.

9   Q.  What is the date on this letter?

10  A.  February 17, 2012.

11  Q.  Is this letter actually addressed to Tyler Fane of the

12  Bureau of Consumer Frauds and Protection?

13  A.  Yes.

14  Q.  If you could just read the body of the e-mail?

15  A.  "Please be advised that 500 FastCash has written off Ms.

16  Sanchez's account to zero balance.  At this time it is

17  considered closed.  As such we consider this matter closed."

18  Q.  Do you understand this to be a response to the complaint

19  that was sent through the New York Attorney General's Office to

20  500 FastCash?

21  A.  Yes.

22            MR. RAVI:  We can take that down.

23  Q.  Ms. Sanchez, you had mentioned earlier overdraft fees?

24  A.  Yes.  I had over $300 in overdraft fees.

25  Q.  Were those associated with 500 FastCash?

1   A.  Yes.

2   Q.  So, Ms. Sanchez, in total, how much did you pay for that

3   third loan that you took out?

4   A.  I believe it was $1,070.

5   Q.  Not including the overdraft fees?

6   A.  Not including overdraft fees.

7   Q.  I would like to now show you Government Exhibit 2213.

8       Do you recognize this?

9   A.  Yes.

10  Q.  What is it?

11  A.  It's a breakdown of all the payments that I made.

12  Q.  Have you reviewed bank statements of yours from TD Bank

13  relating to deposits and withdrawals relating to 500 FastCash?

14  A.  Yes.

15  Q.  Did you check those bank statements against this chart to

16  determine whether or not this chart accurately reflects the

17  dates and amounts of certain withdrawals and deposits?

18  A.  Yes.

19          MR. RAVI:  The government offers Government Exhibit

20  2213.

21          MR. BATH:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibit 2213 received in evidence)

24          MR. RAVI:  Please publish the first page.

25          We can zoom in on the first portion all the way

H9Q8TUC4                           Sanchez - Direct

1    through subtotal.

2    Q.  Are these the credits and debits associated with the first

3    loan you took out?

4    A.  Yes.

5    Q.  And how much in total was the loan?

6    A.  $300.

7    Q.  How much was debited?

8    A.  975.

9    Q.  At the time when these debits were happening, did you

10   recognize there was a problem with your first loan?

11   A.  No.

12        MR. RAVI:  Can we actually put the first and second

13   page side by side.

14   Q.  The next loan occurred approximately a week after you paid

15   out in full for the first loan?

16   A.  Correct.

17   Q.  The next one was December 10, 2010, correct?

18   A.  Yes.

19   Q.  Ms. Sanchez, do you think you would have had to have taken

20   out another loan on December 10, 2010 had you only paid $390

21   for your first loan?

22   A.  No.

23   Q.  How much did you pay in total for your second loan of $300?

24   A.  975.

25   Q.  Approximately two weeks later, after you had paid out for

1    that loan, you took out the third loan of $400, correct?

2    A.  Yes.

3    Q.  Do you think you would have had to take out that $400 loan

4    had you only paid $390 for your second loan?

5    A.  No.

6    Q.  It was only during this third loan that you realized there

7    was a problem, correct?

8    A.  Correct.

9    Q.  In total, what was the loan amounts that you received from

10   500 FastCash?

11   A.  A thousand dollars.

12   Q.  In total, how much did you pay back to 500 FastCash?

13   A.  3,000 --

14   Q.  Does that say $3,020?

15   A.  Yes.  $3,020.  Sorry.

16           MR. RAVI:  No further questions.

17           THE COURT:  Cross-examination.

18           Mr. Bath.

19   CROSS-EXAMINATION

20   BY MR. BATH:

21   Q.  Ms. Sanchez, as I understand it, you got three loans from

22   500 FastCash, is that correct?

23   A.  Yes.

24   Q.  The first one was in July of 2010, correct?

25   A.  Yes.

H9Q8TUC4                           Sanchez - Cross

1   Q.  Then December of 2010, correct?

2   A.  Yes.

3   Q.  Then May of '11, correct?

4   A.  Yes.

5   Q.  Didn't you have payday loans prior and during this time

6   with other companies?

7   A.  I don't recall.

8   Q.  You don't recall having six loans with seven or eight

9   different payday loan companies during this time period?

10  A.  No.

11  Q.  Have you reviewed your bank statements before you came here

12  today?

13  A.  Yes, I did.

14          MR. BATH:  Can we put 2212 up for her, please.

15  Q.  Is 2212 the bank statements that you provided the

16  government in preparation for today?

17  A.  Yes.

18  Q.  Did you provide them so that they could create that summary

19  chart that we saw at the very end?

20  A.  The bank did.

21  Q.  I know that.  But that summary chart --

22  A.  Yes.

23  Q.  That's where all that information came out of these bank

24  records, didn't it?

25  A.  Yes.

1    　　　　　MR. BATH:  I would offer 2212 in evidence.

2    　　　　　THE COURT:  Any objection?

3    　　　　　MR. RAVI:  No objection.

4    　　　　　THE COURT:  Received.

5    　　　　　(Government's Exhibit 2212 received in evidence)

6    Q.  Let me show you the first page.

7    　　　Is that first page up for you, Ms. Sanchez?

8    A.  Yes.

9    Q.  Can we go to the bottom two entries -- I'm sorry.  Before

10   that.

11   　　　This document, the first one is June through July of 2010.

12   Can you see that?  I can blow it up for you.

13   A.  No, I can see it.

14   Q.  So this is before you even take a loan out with 500

15   FastCash, correct?

16   A.  Yes.

17   　　　　　MR. BATH:  If we can go to the bottom two entries on

18   that first page.

19   Q.  Am I reading that correctly, on 6/23 there is a withdrawal

20   from National PDL.  Do you see that?

21   A.  Yes, I do.

22   Q.  Does that PDL stand for payday?

23   A.  I have no idea.  I don't recall those.

24   Q.  This is your account?

25   A.  It is.

1    Q.  You're not suggesting that National PDL debit of 125 has

2    anything to do with 500 FastCash, correct?

3    A.  No.

4    Q.  But you're not sure if it's a payday loan or not?

5    A.  No, I'm not.

6    Q.  Below that, we have another debit, Nationwide Cash.  Do you

7    see that?

8    A.  Yes, I do.

9    Q.  For $90?

10   A.  Yes.

11   Q.  Is that a payday loan?

12   A.  I'm not sure.  I just went through that today.

13   Q.  You just went over these records today?

14   A.  Yes.  I just double-checked over everything and noticed all

15   of these today.

16   Q.  Was somebody else on this account with you?

17   A.  I'm sorry?

18   Q.  Was anybody else on this account?

19   A.  No.

20   Q.  Just you?

21   A.  Yes.

22        MR. BATH:  Can we turn to the third page of that

23   document, the very first top three.

24   Q.  This is still in June of 2010, correct, Ms. Sanchez?

25   A.  Yes.

H9Q8TUC4                        Sanchez – Cross

1   Q.  And we see a debit from NLS Cash Adv, is that correct?

2   A.  Yes.

3   Q.  For $61?

4   A.  Yes.

5           MR. RAVI:  Objection.  Relevance.

6           THE COURT:  I will allow it.

7   Q.  Did I read that correctly?

8   A.  Yes.

9   Q.  Is that a payday loan?

10  A.  I'm not sure.

11  Q.  Below that, there is a debit from Paycheck Today.  Do you

12  see that?

13  A.  Yes.

14  Q.  For $60?

15  A.  Yes.

16  Q.  Is that a payday loan?

17  A.  I don't know.

18  Q.  If these aren't payday loans, do you have any idea what

19  these debits are?

20  A.  I didn't check my bank statements regularly.

21  Q.  My question is then, you were blaming or said that you

22  wouldn't have gotten that second or third loan from FastCash if

23  it hadn't been for the first one sort of charging you too much,

24  correct?

25  A.  Correct.

1   Q.  But is it fair to say, as we look at your bank statements,

2   there were lots of other debits that you can't explain as you

3   sit here today?

4   A.  Yes.

5   Q.  There are probably more if we went through here?

6   A.  Probably.

7   Q.  Have you looked at them recently before you came in?

8   A.  Yes.

9   Q.  Do you see more like that?

10  A.  Yes.

11  Q.  And they have the same similar names we went over, right?

12  A.  Yes.

13  Q.  Multiple times throughout your bank records, correct?

14  A.  Yes.

15  Q.  Then I won't take you through all of those then.

16          MR. BATH:  If we can put up 2202.  This has been

17  admitted.

18  Q.  This is the application for the very first loan, correct,

19  Ms. Sanchez?

20  A.  Yes.

21          MR. BATH:  If we can go to page 2.

22  Q.  You see that under the privacy policy it says, "application

23  supplement"?  Do you see that language?

24  A.  Yes.

25  Q.  It begins, the first three words are "short terms loans."

H9Q8TUC4                        Sanchez - Cross

1    Do you see that?

2    A.  Yes, I do.

3    Q.  Did you read this when you did the application?

4    A.  No.

5    Q.  Have you read it before coming in here today?

6    A.  Yes.

7              MR. BATH:  The same document, please, if we can go to

8    the last page.

9              If we can blow up box 8, payment options.

10   Q.  Do you see that, Ms. Sanchez?

11   A.  Yes.

12   Q.  Did you read this at all?

13   A.  No.

14   Q.  Have you read it before you came in today?

15   A.  Yes.

16   Q.  Do you see that it talks about renewals or paydowns,

17   correct?

18   A.  Yes.

19             MR. BATH:  You can take that down.  Thank you.

20   Q.  So you get that first loan July 1st of 2010 for $300,

21   correct?

22   A.  Correct.

23   Q.  And we saw the summary chart the government put up, and if

24   you need it, I will get it back up for you.  But, essentially,

25   it took money out so many weeks, the six or seven or eight

1   weeks we saw, correct?

2   A.  Yes.

3   Q.  What you're telling us today then is that you just weren't

4   checking your bank statements?

5   A.  No, I didn't.

6   Q.  So you had no idea how much that loan was costing you?

7   A.  Exactly.

8   Q.  But we do know that you didn't apply for the second loan

9   from 500 FastCash until that first one was done, correct?

10  A.  Correct.

11  Q.  Did you try to apply before the first one was paid off and

12  they wouldn't let you?

13  A.  No.

14  Q.  You just went and got a second loan?

15  A.  Correct.

16  Q.  Again, the same language is in that application we just

17  saw, isn't it?

18  A.  Yes.

19  Q.  Again, you didn't read either of those boxes or this

20  language, is that fair to say?

21  A.  Yes.

22  Q.  Again, that loan went through a number of payments, did it?

23  A.  Yes.

24  Q.  Just like the first one did?

25  A.  Yes.

1   Q.  And again, what you're telling us today is you just didn't

2   pay attention?

3   A.  No, I didn't.

4   Q.  I asked you before about the first loan.

5        When that second loan was going, were there any other

6   kind of loans you were taking out then, payday loans?

7   A.  I don't remember.

8   Q.  It's possible?

9   A.  Possible.

10  Q.  Those other payday loans, or whatever those debits were,

11  did that cause you a lot of overdraft fees as well?

12  A.  No.

13  Q.  None of those caused you any overdraft fees?

14  A.  No.

15  Q.  Then you got the third loan, which is in May of '11,

16  correct?

17  A.  Correct.

18  Q.  It had the same kind of language as the first two, right?

19  A.  Yes.

20  Q.  Again, you didn't read it?

21  A.  No.

22  Q.  It was after a few payments there, that's when you saw it

23  in your statements?

24  A.  Yes.

25  Q.  That's when you began to make complaints?

1   A.  After I calculated everything, yes.

2              MR. BATH:  That's all I have.  Thank you.

3              THE COURT:  Redirect?

4              MR. RAVI:  Brief redirect, your Honor.

5   REDIRECT EXAMINATION

6   BY MR. RAVI:

7   Q.  Ms. Sanchez, at any time when you were taking these loans

8   out from 500 FastCash, did you agree to an automatic renewal of

9   your loan?

10  A.  No.

11  Q.  You were called by 500 FastCash in connection with these

12  three loans, correct?

13  A.  Yes.

14  Q.  And on those calls, they told you were prequalified for a

15  loan?

16  A.  Yes.

17  Q.  And on these calls, they never told you that your loan

18  would be automatically renewed, correct?

19  A.  Correct.

20             MR. RAVI:  No further questions.

21             THE COURT:  You may step down.  Thank you very much.

22             (Witness excused)

23             THE COURT:  You may call your next witness.

24             Ladies and gentlemen, you can stand up and stretch.

25  And remember to take a deep breath also.

1          MR. RAVI:  The government calls Michael Hicks.

2    MICHAEL HICKS,

3        called as a witness by the government,

4        having been duly sworn, testified as follows:

5          THE DEPUTY CLERK:  State your name and spell it for

6    the record, please.

7          THE WITNESS:  My name is Michael, M-I-C-H-A-E-L,

8    Hicks, H-I-C-K-S.

9          THE COURT:  You may inquire.

10   DIRECT EXAMINATION

11   BY MR. RAVI:

12   Q.  Mr. Hicks, how old are you?

13   A.  I'm 66.

14   Q.  Where do you currently live?

15   A.  I split my time between Venice, Florida, and Kansas City,

16   Missouri, as my wife recently passed away.

17   Q.  How far did you go in school?

18   A.  I went through a senior in high school.

19   Q.  Are you currently employed?

20   A.  Semi-retired.

21   Q.  What do you currently do in semi-retirement?

22   A.  I would work on telephone systems.

23   Q.  Generally describe your work history.

24   A.  I was a road musician for six years, and then gone in the

25   telephone business and continued to work in that business for

1    some time.

2    Q.  At some point did you come to meet an individual named

3    Scott Tucker?

4    A.  Yes, I did.

5    Q.  Describe the circumstances how you initially met Scott

6    Tucker.

7    A.  We were living in the same neighborhood in Leawood, Kansas,

8    and I collected muscle cars, and he would stop occasionally and

9    look at the cars and we would talk about them.

10   Q.  Approximately when was this first meeting?

11   A.  Probably '95 or '96.

12   Q.  What is a muscle car?

13   A.  It's a car that Detroit produced through the 60s.

14   Basically, they used their largest engine in their intermediary

15   cars and were a lot of fun to drive.

16   Q.  Did you eventually begin to work for Mr. Tucker?

17   A.  Yes.

18   Q.  In what capacity?

19   A.  Originally, we got into a discussion about what I did for a

20   living, and when I told him I worked on telephones, he

21   suggested I might come by his office and see if there are any

22   improvements I could make to his phone system.

23   Q.  Did you end up doing some work for Mr. Tucker relating to

24   various telephone systems?

25   A.  Yes.  I did some improvements to his voice mail and added a

1   phone or two to his system.

2   Q.  Was this related to call centers?

3   A.  I didn't understand that at the time.

4   Q.  Did you later learn what type of business the call centers

5   were related to?

6   A.  Eventually, yes.

7   Q.  What type of business was that?

8   A.  It was payday loans.

9   Q.  What kind of business at the time did Mr. Tucker tell you

10  he was involved in?

11  A.  I don't know that we really discussed that.

12  Q.  Approximately what years did you end up doing work for Mr.

13  Tucker relating to telephone systems?

14  A.  Well, that time frame was the '97 to '98 range at that

15  time, the first time that I did some work for him.

16  Q.  Did you continue to work with Mr. Tucker at a later time?

17  A.  There was a later time.  I sold my business out and my role

18  in the new company was as a salesman, and I made a sales call

19  to talk about a call center.

20  Q.  Did you continue to do work with Mr. Tucker relating to the

21  call center?

22  A.  I prepared a proposal and a competitor bid, and I

23  recommended he go with the competitor because it was a better

24  fit, because it was a call center at that point.

25  Q.  Did he go with that competitor?

1   A.   I think so, yes.

2   Q.   After that project, did you then do additional work with

3   Mr. Tucker relating to telephones?

4   A.   In 2002 or so, I had left the company I sold out to, and

5   I'm not sure how we reconnected, but we reconnected and he had

6   me come over and install a couple of phone systems for some

7   companies he was starting up.

8   Q.   What kind of business were those companies involved in?

9   A.   At the time I didn't exactly know, but I came to understand

10  they were payday loan businesses.

11  Q.   At some point, did you begin to do other types of work for

12  Mr. Tucker?

13  A.   Yes.

14  Q.   What year was that, approximately?

15  A.   Probably in the 2003-2004 range.  I built a car for him and

16  some real estate, we did some real estate work, and we talked

17  about, I guess -- probably that's all at that point.

18  Q.   Let's briefly talk about the car.

19       Did you build cars for Mr. Tucker?

20  A.   I did.  I built a car called an Eleanor Mustang for the

21  movie Gone in 60 Seconds, and it took a year to complete and

22  delivered it to him.

23  Q.   Approximately how many total cars did you build for Mr.

24  Tucker?

25  A.   Probably over a period of four to five years, it would have

1    been eight to ten of them.

2    Q.  Were you paid for this work?

3    A.  Yes.

4    Q.  Through which company were you paid?

5    A.  To the best of my knowledge, it was a company called DF

6    Services.

7    Q.  DF Services?

8    A.  D as in dog, F as in Frank Services.

9    Q.  Are you familiar with an individual named Charles Hallinan?

10   A.  I met him once at a race in Italy.

11   Q.  What type of race was this?

12   A.  It was a Ferrari challenge international meet in Milan I

13   think.

14   Q.  Who was racing?

15   A.  Scott was racing in the Ferrari challenge.

16   Q.  Describe your discussion with Charles Hallinan.

17   A.  It was small talk, but he introduced himself as Scott's

18   partner.

19   Q.  Are you aware of how often Mr. Hallinan and Mr. Tucker

20   spoke?

21          MR. GINSBERG:  Objection, your Honor.  There is no

22   foundation for this.

23          THE COURT:  We will find out what the answer is.

24          Do you know or are you aware?

25          THE WITNESS:  Yes.  I was aware of Saturday

H9Q8TUC4                          Hicks - Direct

1    conversations.  There were conversations that they would have

2    on Saturdays.

3    Q.  Do you know how often?

4    A.  There was a time when it was every Saturday, to my

5    knowledge.

6    Q.  At some point did you have a discussion with Mr. Tucker

7    about whether you had Native American heritage?

8    A.  Yes.  The legend in my family is that my great-grandmother

9    was 100 percent Cherokee, and I was pretty proud of that and

10   talked about it, and one day he asked me if I was on the rolls.

11   Q.  What are the rolls?

12   A.  Well, the Indian tribes maintain rolls of people on their

13   lists, you know, so that you can be a card-carrying Native

14   American.

15   Q.  Why did Mr. Tucker approach you about whether you were on

16   the rolls?

17   A.  The premise, I suppose you would say, was that he would

18   like me to go out and visit Indian tribes for a possible

19   business venture.

20   Q.  Did Mr. Tucker explain to you why he wanted to approach

21   Native American tribes?

22   A.  The tribes are sovereign nations, and when you do business

23   with them, you're doing business with a nation and you follow

24   federal laws, not state laws.

25   Q.  Did Mr. Tucker tell you anything about what the relevance

1    of a bank that he was working with was to approaching the

2    Native American tribes?

3    A.  Well, I didn't understand completely at the time, but there

4    was a bank that he did business with, and he was no longer

5    going to be able to do business with them, and that the Indian

6    tribes would be a suitable replacement for that function.

7    Q.  Did Mr. Tucker explain to you how his payday business would

8    be impacted if he couldn't work with tribes?

9    A.  Well, as it relates to the bank, I understood that if the

10   bank relationship went away, he would be out of business.

11   Q.  How would that impact you?

12   A.  Well, at the time I was building cars for him and my car

13   business would be closed.

14   Q.  Did you end up approaching any Native American tribes for

15   Mr. Tucker?

16   A.  Yes.  I visited the Lac Vieux Desert in Michigan, and I

17   visited the Santee Sioux, and the Cheyenne River Sioux I

18   believe was the other tribe.

19   Q.  Did you end up having a meeting with the Santee Sioux?

20   A.  Yes.  With the Santee Sioux, I actually met with the

21   council.

22   Q.  The tribal council?

23   A.  Yes, the tribal council.

24   Q.  Where is the Santee Sioux located?

25   A.  It's in Northern Nebraska on the Missouri River, kind of

1    north central, something like that.

2    Q.  When you went to that location, what did you observe as to

3    the Santee Sioux's financial condition?

4    A.  It looked pretty poverty stricken to me.

5    Q.  So you met with the tribal council, correct?

6    A.  I did.

7    Q.  Describe generally what happened at that meeting.

8    A.  I was given a brochure with bullet points on it, and my

9    instructions were to present what was on the brochure, go

10   through the talking points, and then if there was any interest,

11   turn it over to Scott.

12   Q.  Who gave you that brochure?

13   A.  Scott did.

14   Q.  Who told you what to say?

15   A.  Scott did.

16   Q.  Mr. Tucker wasn't at that meeting?

17   A.  No.

18   Q.  It was just you and the tribal council?

19   A.  Correct.

20   Q.  So what happened after that meeting with the Santee Sioux

21   at the tribal council?

22   A.  Well, you know, they obviously said they would get back to

23   us if there was some interest.  As I was leaving out the back,

24   a fellow stopped me, gave me his card, Conly Schulte introduced

25   himself.

1   Q.  What did you do after you left that meeting?

2   A.  Well, at some point I came back and gave Scott a report of

3   how I thought the meeting went, and then gave him Conly

4   Schulte's business card.

5   Q.  Were you involved in any further negotiations relating to

6   the agreement with the Santee Sioux?

7   A.  No.

8   Q.  Did you later see the people you met at the Santee Sioux?

9   A.  The Santee Sioux, they came into our office one day.

10  Q.  This was after you had met with them, correct?

11  A.  Yes.  Yes.

12  Q.  Did you speak with them?

13  A.  You know, hi, how you doing type thing.  I recognized

14  Roger.  I didn't recognize some of the other guys.  I said hi

15  to Conly, he was there.

16  Q.  Do you know why he came to your offices?

17  A.  I found out that it was to sign -- to do some kind of a

18  deal.  I didn't know any particulars about it.

19  Q.  To do a deal with Mr. Tucker?

20  A.  Yes.

21  Q.  Which offices?

22  A.  The offices off of College Boulevard, I think it's Lowell.

23  Q.  Mr. Tucker's payday loan business offices?

24  A.  Yes.

25  Q.  Is that in Overland Park, Kansas?

H9Q8TUC4                            Hicks - Direct

1    A.  Yes, it is.

2    Q.  Were you invited to participate in that meeting with the

3    Santee Sioux?

4    A.  I was not.

5    Q.  Were you compensated for your work in introducing Mr.

6    Tucker to the Santee Sioux?

7    A.  During the period when I was doing the visitations, I was

8    on a salary.  Once the Santee Sioux signed, then my pay came

9    from real estate work that I did for him.

10   Q.  Mr. Hicks, did you also serve as a nominee for Mr. Tucker?

11   A.  I did.

12   Q.  When, approximately?

13   A.  From, you know, 2004, perhaps, to 2005 or '06.

14   Q.  Did you have discussions with Mr. Tucker about being a

15   nominee?

16   A.  Yes.  He had me in the office one day and explained to me

17   that he would compensate me for signing documents that would

18   allow him to remain anonymous.

19   Q.  Did you read any of these documents before you signed them?

20   A.  No.

21   Q.  Did you end up serving as a nominee?

22   A.  Say that again.

23   Q.  You ended up serving as a nominee, correct?

24   A.  Yes, I did.

25   Q.  I would like to show you Government Exhibits 1205 and 1206.

1              Do you recognize these documents, Mr. Hicks?

2     A.  I recognize my signature.

3     Q.  Mr. Hicks, are these documents relating to Mr. Tucker's

4     payday loan business?

5     A.  The explanation to me was it was a settlement agreement

6     with the State of Kansas.

7     Q.  If we can turn to the last page on these.

8     A.  You want me to turn there?

9     Q.  Yes, please.

10    A.  Yes.

11    Q.  Those are signatures on both 1205 and 1206?

12    A.  Yes.

13    Q.  On 1205, which company did you sign for?

14    A.  Cash Advance.

15    Q.  Can you continue reading?

16    A.  "Cash Advance, a business entity of CB Service Corp. in the

17    State of Kansas, Carson City, Nevada."

18    Q.  Turning to 1206, can you read what company you signed on

19    behalf of?

20    A.  "United Cash Loans, a business entity of Silver State

21    Business Administrators, Carson City, Nevada."

22    Q.  Are these both signed in 2005?

23    A.  Yes.

24              MR. RAVI:  You can take those down.

25    Q.  Mr. Hicks, approximately how many documents did you sign

H9Q8TUC4                          Hicks - Direct

1   for Mr. Tucker?

2   A.  Including the real estate transactions, there were hundreds

3   perhaps.

4   Q.  I would like to show you now Government Exhibits 1201,

5   1202, 1203 and 1211.

6            MR. RAVI:  The government offers those exhibits.

7            MR. GINSBERG:  No objection.

8            THE COURT:  Received.

9            (Government's Exhibits 1201, 1202, 1203 and 1211

10  received in evidence)

11  Q.  Now, are all of these exhibits, 1201, 1202, 1203 and 1211,

12  related to companies that you signed on behalf of Mr. Tucker?

13  A.  Yes.

14  Q.  Let's go to, for example, 1201.

15  A.  OK.

16  Q.  What is the company this relates to?

17           At the very top.

18  A.  NM Service Corp.

19  Q.  What is the date on the right side?

20  A.  9/21/2005.

21  Q.  Are you listed as the president, secretary, treasurer, and

22  director?

23  A.  Yes, all four.

24  Q.  Is that your signature on the bottom?

25  A.  Yes, it is.

1    Q.  Let's just turn to the second page.

2        Is that the same for 2006?

3    A.  Yes.

4    Q.  Turn to Government Exhibit 1202.

5        On the top left, which company did you sign on behalf of

6    here?

7    A.  Silver State Business Administrators.

8    Q.  Again, you were listed as president, secretary, treasurer,

9    and director?

10   A.  Yes, sir.

11   Q.  Is this for the years 2005 and 2006 as well?

12   A.  Yes.

13   Q.  Go to Government Exhibit 1203.

14       Here you signed on behalf of Universal Management

15   Services?

16   A.  Yes.

17   Q.  Is this also for 2005 and 2006?

18   A.  Yes.

19   Q.  Again, you are the president, secretary, treasurer, and

20   director?

21   A.  Yes.

22   Q.  Is that your signature at the bottom?

23   A.  That one I'm not sure about.  All the rest of them I

24   recognize.  This one I'm not sure about.

25   Q.  Finally, let's turn to Government Exhibit 1211.

1    Here, did you sign on behalf of Black Creek Capital

2    Corporation?

3    A.  Yes.

4    Q.  Again, is that for 2005 and 2006?

5    A.  Yes.

6    Q.  Can we turn to the third page of this PDF.

7    Did you also sign for Black Creek Capital Corporation in

8    2007?

9    A.  2007, I don't see my signature on here.

10   Q.  Mr. Hicks, you might be able to look on the screen as well.

11   A.  I still don't see my signature.

12   Q.  Your signature is not on this page, correct?

13   A.  Correct.

14   Q.  But are you listed as the president, secretary, treasurer,

15   and director of Black Creek Capital Corporation?

16   A.  Yes.

17   Q.  Turn to the next page.

18   Does this list now Tim Muir as the president, secretary,

19   treasurer, and director of Black Creek Capital Corporation?

20   A.  Yes.

21   Q.  If we continue, is he listed as those positions for several

22   years?

23   A.  Yes.

24        MR. RAVI:  We can take that down.

25   Q.  Turning to Government Exhibit 1204.

1           MR. RAVI:  The government offers Government Exhibit

2     1204.

3           MR. GINSBERG:  No objection.

4           THE COURT:  Received.

5           (Government's Exhibit 1204 received in evidence)

6     Q.  Do you know what this document is?

7     A.  It says "service agreement" on it.

8           MR. RAVI:  If we can just zoom in on the first

9     paragraph.

10    Q.  Can you just read that?

11    A.  "This agreement is entered into this 28th day of February

12    2005, by and between the SFS, Inc., a corporation wholly owned

13    by the Santee Sioux Nation, chartered pursuant to the laws of

14    the Santee Sioux Nation and Universal Management Services,

15    Inc."

16    Q.  The Santee Sioux Nation is the tribe you visited on behalf

17    of Mr. Tucker, correct?

18    A.  That's correct.

19          MR. RAVI:  Can we turn to the last page of this

20    document.

21          If we can zoom in on the signature line.

22    Q.  Did you sign this agreement on behalf of Universal

23    Management Services, Inc.?

24    A.  Yes.

25    Q.  What is the title that's provided there?

1   A.  Vice president contracts.

2   Q.  Were you the vice president of contracts for Universal

3   Management Services?

4   A.  Not that I was aware of.

5   Q.  Did you do any work for Universal Management Services?

6   A.  I did not.

7            MR. RAVI:  Take that down.

8   Q.  Mr. Hicks, were you ever involved in any legal proceedings

9   as a result of your role as a nominee?

10  A.  Yes.  I was arrested and jailed probably in 2007 or 2008

11  for failing to show up for a court subpoena for the state of

12  Colorado.

13  Q.  Was that one of those subpoenas issued to one of the

14  companies for which you signed on behalf of Mr. Tucker?

15  A.  Yeah, one of the Nevada corporations.  I don't remember

16  which one.

17  Q.  When were you arrested, approximately?

18  A.  I don't know exactly.  Like I say, 2007 or 2008, at 9:00 at

19  night.

20  Q.  What did you do when you got arrested?

21  A.  Well, I went to jail and got an orange suit, and was

22  allowed to make a phone call and I called my wife, and she

23  called Tim Muir.

24  Q.  Were you ultimately let out of jail?

25  A.  Yes.  23 hours later.

1   Q.  Mr. Hicks, other than what you testified about, did you

2   have conversations with Mr. Tucker about his payday loan

3   business?

4   A.  Generally speaking, if there was anything to do with his

5   payday loan business, I was always asked to leave his office.

6   Q.  Was there a reason --

7           THE COURT:  Mr. Ravi, do you have much more?

8           MR. RAVI:  Probably three more questions.

9           THE COURT:  Go ahead.

10  Q.  Is there any reason you didn't speak to him about his

11  payday loan business?

12  A.  Well, any time one of the people that worked within that

13  business would come in, I would always be asked to leave.

14  Q.  What locations were you asked to leave by Mr. Tucker when

15  he was talking about his payday loan business?

16  A.  Primarily his office, but on one occasion on the corporate

17  jet.

18  Q.  What did you do when you were on the jet and you were asked

19  to leave?

20  A.  Well, we were just visiting, and then the conversation

21  turned to business and he asked me to go to the back of the

22  plane.

23  Q.  Did Mr. Tucker ever instruct you how to characterize his

24  business?

25  A.  It was a financial services business.

1    Q.  Was there a time you didn't follow that instruction?

2    A.  There were occasions, but he would correct me if I said the

3    wrong thing.

4            MR. RAVI:  No further questions.

5            THE COURT:  All right.  Ladies and gentlemen, why

6    don't we take our mid-afternoon break.  Please do not discuss

7    the case among yourselves or with anyone.  Keep an open mind.

8    Take a deep breath while you're standing up and walking in the

9    jury room, and I will see you in ten minutes.  Thank you.

10           (Jury exits courtroom)

11           THE COURT:  See you in ten.

12           (Recess)

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Please get our jury.

3           (Jury present)

4           THE COURT:  Please be seated.

5           How's everybody doing?  All right?

6           You may cross-examine, Mr. Ginsberg.

7           MR. GINSBERG:  Thank you.  I'm doing OK.

8           THE COURT:  Good.  You're an everybody too.

9           MR. GINSBERG:  I appreciate that.

10   CROSS-EXAMINATION

11   BY MR. GINSBERG:

12   Q.  Good afternoon, Mr. Hicks.

13   A.  Hi.

14   Q.  You testified that on quite a few occasions you signed

15   documents as a nominee on behalf of Scott Tucker, is that

16   correct?

17   A.  Correct.

18   Q.  And on every occasion that you signed a document, would it

19   be fair to say that Scott Tucker authorized you to sign on his

20   behalf as his nominee?  Is that correct?

21   A.  That was my understanding.

22   Q.  OK.  And when you talked about the unpleasant incident

23   where you were arrested and ended up in an orange --

24   A.  Suit.

25   Q.  -- suit, that was because you were told you had failed to

1   appear in a court proceeding.  Is that correct?

2   A.  Correct.  There was a subpoena outstanding for me, which I

3   did not get served with.

4   Q.  Right.  So when you got arrested, you found out there was a

5   subpoena, you hadn't known until that time --

6   A.  Correct.

7   Q.  -- that there was a subpoena for you, is that correct?

8   A.  That's correct.

9   Q.  And that's why you had not appeared, correct?

10  A.  That's correct.

11  Q.  And that's what that arrest was about, correct?

12  A.  Correct.

13  Q.  And nothing else, correct?

14  A.  Correct.

15          MR. GINSBERG:  I have no further questions.

16          THE COURT:  All right.  Any redirect?

17          MR. RAVI:  No, your Honor.

18          THE COURT:  You may step down.

19          (Witness excused)

20          MR. RAVI:  At this time, your Honor, the government

21  would like to introduce three emails.

22          THE COURT:  All right.

23          MR. RAVI:  First, the government offers 1209 and 1208.

24          THE COURT:  Any objection?

25          MR. GINSBERG:  No.

1345

H9qWtuc5

1       THE COURT:  Received.

2       (Government Exhibits 1208-1209 received in evidence)

3       MR. RAVI:  Focus 1209 first and focus on the bottom,

4   please.  Highlight the date; now the body.

5       Turn to the next email up the chain and highlight the

6   "from Tim Muir" and the "to" line.

7       Next email up the chain.  Highlight the "from" and

8   "to" lines.  Highlight the last clause of that, "all the

9   stuff."

10      Go to the next email up the chain.

11      Then go to the next email.

12      And finally, go to the last email in the chain.

13      And publish Government Exhibit 1208.  Could we focus

14  on the email in the middle that begins "from Tim Muir to Angie

15  Lee, August 5 at 1923:27.

16      Highlight beginning with "please give me a specific

17  example."

18      Turn to the email above in the chain.  Highlight

19  "from" and "to"; highlight the first sentence.

20      Highlight now the first two lines of the next

21  paragraph.

22      Go now to the next email of the chain; highlight the

23  "from" and "to," please.

24      The government would like to now offer Government

25  Exhibit 1014.

H9qWtuc5

1          MR. BATH:  No objection.

2          THE COURT:  Received.

3          (Government Exhibit 1014 received in evidence)

4          MR. RAVI:  Could we focus on the subject lines and

5     "from" and "to" lines.

6          Highlight "from Tim Muir."

7          Highlight "to Scott Tucker."

8          Now please highlight the subject line.

9          Focus now on the first email in the chain under that

10    subject line.

11         Focus on the next email up the chain.  Highlight the

12    date and Tim Muir.

13         Please go to the next email of the chain.

14         Highlight the date and Scott Tucker.  Highlight the

15    body of that email.

16         And then finally, let's go to the top email of the

17    chain, from Tim Muir down to the body.

18         You can take that down, Ms. Grant.

19         MR. VELAMOOR:  The government calls Mary Porting, your

20    Honor.

21     MARY L. PORTING,

22         called as a witness by the Government,

23         having been duly sworn, testified as follows:

24         THE COURT:  You may inquire.

25         MR. VELAMOOR:  Thank you, your Honor.

1347

1    DIRECT EXAMINATION

2    BY MR. VELAMOOR:

3    Q.  Good afternoon, Ms. Porting.  Are you testifying this

4    afternoon pursuant to an order of immunity?

5    A.  Yes.

6    Q.  What is your understanding of your obligations under that

7    order?

8    A.  To tell the truth.

9    Q.  What is your understanding of any protections that you have

10   if you, in fact, tell the truth?

11   A.  That anything I say won't be used against me in a

12   prosecution against me.

13   Q.  Ms. Porting, how old are you?

14   A.  51.

15   Q.  Where are you from?

16   A.  Kansas City, Missouri.

17   Q.  How far did you go in school?

18   A.  Two years of college.

19   Q.  When did you finish your studies in school?

20   A.  1991.

21   Q.  And after you finished your studies, what kind of work did

22   you do?

23   A.  Payroll accounting.  Customer service.

24   Q.  How long did you do that type of work for?

25   A.  For about ten years.

1   Q.  Have you previously been convicted of any crimes?

2   A.  Yes.

3   Q.  How many times?

4   A.  Three.

5   Q.  What did you do generally to make you guilty of those

6   crimes?

7   A.  I stole from my employers.

8   Q.  And how many times did you do that?

9   A.  Three.

10  Q.  And during what time period did you commit those crimes?

11  A.  1993, 1998 and 2002.

12  Q.  And you said you stole from your employers?

13  A.  Yes.

14  Q.  How much, approximately, did you steal each time?

15  A.  $2,000, I believe, the first time and around 8,000 the

16  second, the two other times.

17  Q.  And were you convicted of felony offenses for those?

18  A.  Yes.

19  Q.  Did you go to trial, or did you plead guilty in those

20  cases?

21  A.  I pled guilty.

22  Q.  And did you serve any time in jail?

23  A.  No.

24  Q.  Were you subjected to any other penalties?

25  A.  Restitution and fines and home detention.

1   Q.  Are you still, in fact, paying fines?

2   A.  I'm paying restitution on a couple of them still.

3   Q.  So you mentioned before that you did payroll accounting

4   work, right?

5   A.  Right.

6   Q.  And that was after you finished your studies.  How long did

7   you do that kind of work for?

8   A.  From about 1991 until about 2002.

9   Q.  And after you finished that kind of work, what did you do

10  next?

11  A.  I got a job doing customer service with National Money.

12  Q.  And when you say National Money, what kind of a company was

13  National Money?

14  A.  Payday lending.

15  Q.  And approximately when did you start working for National

16  Money?

17  A.  June of 2003.

18  Q.  How did you hear about this company?

19  A.  There was an ad in the paper.

20  Q.  An ad for what kind of job?

21  A.  Customer service.

22  Q.  And obviously you responded to the ad?

23  A.  Right.

24  Q.  And then what happened after that?

25  A.  I was hired on.

1    Q.   And that was around 2003?

2    A.   Yes.

3    Q.   Did the people at the company come to know about your

4    criminal history?

5    A.   They did.

6    Q.   How did they learn about it?

7    A.   I was being sentenced in October of 2003, and I needed to

8    let my employer know, so I approached my employer.

9    Q.   And you told them about the case?

10   A.   Yes.

11   Q.   What was the reaction?

12   A.   They were supportive.  They wrote letters to the court

13   letting the court know that I will have a job.

14   Q.   And so you continued to work there?

15   A.   Yes.

16   Q.   You said National Money Service was a payday lending

17   company?

18   A.   Yes.

19   Q.   Whose company was it?

20   A.   Scott's and Blaine Tucker's, I believe.

21   Q.   When you started, how big was it?

22   A.   I don't know exactly, but I believe there were about 50 to

23   60 people working there.

24   Q.   And where were the offices initially?

25   A.   5700 Broadmoor in Mission, Kansas.

H9qWtuc5                        Porting – Direct

1    Q.  And did you work at a different office location at a

2    certain point?

3    A.  Yes.

4    Q.  Where did you move to?

5    A.  Overland Park, Kansas, in April of 2004.

6    Q.  And where did you sit when you moved to that office?

7    A.  At first I sat in the fraud department with Norma Tucker.

8    And then I sat with Anita Finney's group outside of Scott

9    Tucker's office.

10   Q.  Now, you mentioned the name National Money Service.  Was

11   that the name that the company did business under, or were

12   there other names?

13   A.  There were other names.

14   Q.  Do you recall any of those names?

15   A.  OneClickCash, Ameriloan, US FastCash, Ace Cash, Advantage,

16   500 FastCash.

17   Q.  And did you work for all of those different businesses or

18   just one of them, initially?

19   A.  Initially it was just Fast Cash, National Money.

20   Q.  And was Fast Cash affiliated, to your knowledge, with any

21   other entity out there?

22   A.  Affiliated with -- I'm not sure I understand what you're

23   asking.

24   Q.  Let me ask you a better question.  Are you aware of a

25   company called County Bank?

1   A.   Yes.

2   Q.   To your knowledge, was there some connection between 500

3   FastCash and County Bank?

4   A.   Yes.

5   Q.   Now, did you become familiar with something called loan

6   renewals?

7   A.   Yes.

8   Q.   What were loan renewals?

9   A.   Where the customer would, instead of paying the entire loan

10  amount that was due, they would be able to just pay a finance

11  charge and continue to roll over the loan.

12  Q.   And how do the loan renewals work for 500 FastCash?

13  A.   500 FastCash, when I began, the loan was automatically paid

14  in full on its first due date.  We had to email the customers

15  and ask them if they wanted to just pay the finance charge.

16  Q.   And that was for the 500 FastCash?

17  A.   Right.

18  Q.   What about the other portfolios?

19  A.   The other portfolios, I believe, were different, and they

20  would automatically renew.

21  Q.   All right.  Did there come a time when you learned that

22  Native American tribes had become involved in the business?

23  A.   Yes.

24  Q.   Approximately when was that?

25  A.   I believe in March, April of 2005.

1    Q.  And how did you come to learn about that?

2    A.  We started to get mail.  My department became responsible

3    for mail, and we were told that we were getting it, but the

4    addresses were in Oklahoma and in Nebraska on tribal land.

5    Q.  The addresses for the businesses?

6    A.  Yes.

7    Q.  What addresses had you been using before that?

8    A.  Addresses in Nevada.

9    Q.  But you throughout this time were located where?

10   A.  In Overland Park, Kansas.

11   Q.  Let me show you what's been marked Government Exhibit 1408.

12   Have you had a chance to look at 1408?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's an email regarding tracking of the mail from the

16   different places we were receiving it from in, on the tribal

17   lands.

18           MR. VELAMOOR:  Your Honor, the government offers 1408.

19           THE WITNESS:  Yes.

20           THE COURT:  Any objection?

21           MR. BATH:  No.

22           MR. GINSBERG:  No, your Honor.

23           THE COURT:  Received.

24           (Government Exhibit 1408 received in evidence)

25           MR. VELAMOOR:  Thank you, your Honor.  May we show it

1    to the jury?

2             THE COURT:  You may.

3             MR. VELAMOOR:  Let's just start with the header

4    information.

5    Q.  You said this is from someone called Anita Finney?

6    A.  Yes.

7    Q.  What job did she do at the company?

8    A.  She was the executive assistant to Scott Tucker.

9    Q.  And she sent this email, dated August 23, 2005, right?

10   A.  Correct.

11   Q.  And she sent it to Scott Tucker, right?

12   A.  Yes, that's what it says here.  Yes.

13   Q.  Crystal Cram.  Who was Crystal Cram?

14   A.  She was the operations manager.

15   Q.  And you're also copied on the email, right?

16   A.  Right.

17   Q.  And does this email relate generally to this mail process?

18   A.  Yes.

19   Q.  How did the mail work, as in the forwarding of mail?

20   A.  The mail, the addresses for the companies were given out as

21   Oklahoma and Nebraska.  They would receive the mail and then

22   FedEx the mail to us each day.  In Overland Park.

23            MR. VELAMOOR:  OK.  Let's move to the body of that

24   email.

25   Q.  Do you want to just read the third paragraph?

1  A.  You want me to read that?

2  Q.  Yes.

3  A.  "We have tested the mail for a substantial amount of time

4  at this point, and I am attaching the records for the return

5  mail for each location.  If all are in agreement that we have

6  sufficient data to make a decision on the change of addresses

7  we will cease the mail testing.  Please advise."

8  Q.  Just continue to the second one and we'll stop there.

9  A.  "It appears that only the MTE location may be an issue.

10  They continue to hold some of the mail for more than one day

11  before forwarding to KC.  The response I have gotten is that

12  there is so little they do not see a reason for forwarding."

13  Q.  Do you know what MTE stands for?

14  A.  I can't remember exactly.  It was one of the tribes.

15  Q.  OK.

16  A.  But I can't remember exactly what it meant.

17  Q.  OK.  At the end do you see where it says, "Lee at SFS

18  location has contacted me asking when the mail forwarding will

19  begin and is anxious to begin."  Do you see that?

20  A.  Uh-huh.

21  Q.  And on the next pate, there are some mail-tracking

22  statistics?

23  A.  Uh-huh.

24          THE COURT:  You have to answer in words.

25          THE WITNESS:  Oh, sorry.

H9qWtuc5                          Porting - Direct

```
 1    A.  Yes.

 2              MR. VELAMOOR:  Thank you, your Honor.

 3              If we could focus on the top paragraph.

 4    Q.  Is this generally tracking how long it's taking for mail to

 5    get to Kansas City, to and from Kansas City and the tribal

 6    locations?

 7    A.  Yes.

 8    Q.  OK.  Now, when you learned that there were tribes becoming

 9    involved in the business, did anything other than the mail

10    procedures change, from your perspective?

11    A.  No.

12    Q.  Now, when you first started at the company, what kind of

13    position did you have?

14    A.  I was a loan processer with Fast Cash.

15    Q.  And does that mean you had interactions, for example, with

16    customers of the business?

17    A.  Correct.

18    Q.  I'm going to show you Government Exhibits 2502, 3001, 3203,

19    3202 and 3201.  Could you take a look at what those are.

20              Have you had a chance to look at those?

21    A.  Yes.

22    Q.  What are they?

23    A.  These are the Internet loan applications for, looks like

24    Ameriloan, United Cash Loans and 500 FastCash.

25    Q.  Are they for various different customers?
```

1   A.  It does look like they are for different customers.

2           MR. VELAMOOR:  Your Honor, the government offers 2502,

3   3001, 3201, 3202 and 3203.

4           THE COURT:  Any objection?

5           MR. BATH:  No.

6           THE COURT:  Received.

7           (Government Exhibits 2502, 3001, and 3201-3203

8   received in evidence)

9   BY MR. VELAMOOR:

10  Q.  Let's just go very quickly just through the first page, the

11  customer name and address for each one, so we'll start with

12  2502.

13  A.  OK.

14  Q.  Highlight the top part.

15  A.  Ashley Lane.

16  Q.  For which portfolio?

17  A.  500 FastCash.

18  Q.  And where is Ashley Lane from?

19  A.  Plattsburg, New York.

20  Q.  3001?

21  A.  Cicely Aronica.  I'm not sure how to pronounce her name.

22  Q.  Want to just spell it out?

23  A.  A-R-O-N-I-C-A, from Bronx, New York.

24  Q.  And which company?

25  A.  That's United Cash Loans.

1    Q.  All right.  3201.

2    A.  Debbie Case from Wilson, North Carolina.

3    Q.  And which company?

4    A.  OneClickCash.

5    Q.  3202?

6    A.  Kelly Burns from San Ramon, California, and that's for 500

7    FastCash.

8    Q.  And lastly, 3203.

9    A.  Nicole Balduf from Bristol, New Hampshire, and that's for

10   Ameriloan.

11   Q.  Now, when you were working in customer service, did you

12   come across loan documents like that, documents that were

13   presented to customers?

14   A.  I did come across loan documents when I did loan

15   processing.  In the beginning, we were still using faxed loan

16   documents, so it was a little bit different.

17   Q.  But you didn't stay in customer service for very long,

18   correct?

19   A.  No.

20   Q.  What job did you move to?

21   A.  The refinance department.

22   Q.  OK.  And how long did you do that work for?

23   A.  I can't remember exactly.  A few months.

24   Q.  Did you ultimately work for something called the compliance

25   department?

1    A.  Yes.

2    Q.  And approximately when did you start working for that

3    department?

4    A.  I started working in it when I was doing evening work.  I

5    believe it was around November of 2004.

6    Q.  And --

7    A.  Part time.

8    Q.  Sorry.

9        Did that department exist before you started doing work for

10   it?

11   A.  I do not believe so.

12   Q.  You were the first or one of the first members?

13   A.  Uh-huh.

14   Q.  What was the purpose of that department?

15   A.  To respond to Better Business Bureau complaints and state

16   attorney general complaints.

17   Q.  And how come a department was created to deal with the

18   Better Business Bureau and attorney general complaints?

19   A.  Because we were, companies were growing and receiving more

20   and more complaints.

21   Q.  And so, was there some procedure in place to make sure that

22   the compliance department dealt with complaints from either the

23   Better Business Bureau or attorney generals?

24   A.  A procedure was created.

25   Q.  What was, generally, that procedure?

 1    A.  That all the debits would stop on the account and generally

 2    the account was written off.

 3    Q.  So we'll come back to that in a second.  Did you become

 4    familiar with some of the substance of these different

 5    complaints from the Better Business Bureau and the state

 6    attorney generals?

 7    A.  Yes.

 8    Q.  What were some of the more common types of complaints?

 9    A.  That they didn't understand the terms --

10    Q.  Terms of what?

11    A.  The terms of the loan.  They didn't understand the terms of

12    the loan.

13    Q.  Which parts of the loan?

14    A.  The pay down, the refinance part.

15    Q.  OK.  Go ahead.

16    A.  They were upset about debits to their account, repeated

17    debits.  They were concerned about the laws of their state not

18    conforming to what we were charging.

19    Q.  Did you get complaints from various different states?

20    A.  Yes.

21    Q.  Did you get complaints from the state of New York?

22    A.  Yes.

23    Q.  How do you recall a complaint from the state of New York?

24    A.  I remember the name Eliot Spitzer from when he was an

25    attorney general, and that was on the letters.

H9qWtuc5                          Porting - Direct

1    Q.  OK.  Now, you said that you were in this department when it

2    was first being created, right, the compliance department?

3    A.  Correct.

4    Q.  How did you know initially how to respond to these

5    different complaints?

6    A.  I conferred with my boss, Anita Finney, and we spoke with

7    her boss, our boss, Scott Tucker.

8    Q.  What guidance did you get from Mr. Tucker about what to do

9    about these complaints?

10   A.  We were to not really address any of the issues they were

11   asking about as far as laws or anything, and to write off

12   the -- write off the balance of the account.

13   Q.  Did Mr. Tucker explain why that was the approach he wanted

14   you to take?

15   A.  No.

16   Q.  Did Ms. Finney ever describe the reasons for this approach?

17   A.  Pretty much her explanation several times was just to keep

18   the wolf at the door.

19   Q.  Keep the what?  Sorry?

20   A.  The wolf at the door.  We did not want to attract

21   attention.

22   Q.  Now, when you'd go to Mr. Tucker about these complaints,

23   did he ever ask you questions about the details of any

24   particular customer's loan?

25   A.  No.

1   Q.  What kind of -- what, if any, information did he want to

2   know about any individual complaints?

3   A.  Not really any details, just maybe what state it was from.

4   Q.  So you would get these complaints, you would write them

5   off, right?

6   A.  Right.

7   Q.  When you say write them off, what do you mean?

8   A.  The balance would become zero and the account would be

9   closed.  They would not have debits to their account any

10  longer.

11  Q.  And would you communicate your decision to anybody?

12  A.  Generally not.  If we answered the Better Business Bureau

13  or the state, we would let them know that the account balance

14  was zero.

15  Q.  Did you prepare these letters and send them out?

16  A.  In the beginning, yes.

17  Q.  And what, if any -- did you get any guidance from

18  Mr. Tucker?

19  A.  We did in the very beginning, and again, it was just to

20  tell the customer that their balance was zero and we were sorry

21  for any miscommunication about the loan.

22  Q.  I'm going to show you what's been marked as Government

23  Exhibit 1406.  Have you had a chance to look at 1406?

24  A.  Yes.

25  Q.  What is it?

1   A.  It's a, it's an account that we received a complaint from

2   the Better Business Bureau and from the state of New York.

3   Q.  And --

4   A.  We wrote off the balance of this account.

5   Q.  And is it an image from the ecash system?

6   A.  Yes, it is.

7   Q.  What was that system?

8   A.  It was the system that we issued loans from and did all of

9   our debiting, staged debiting and everything from.

10          MR. VELAMOOR:  Your Honor, the government offers 1406.

11          MR. BATH:  No objection.

12          THE COURT:  Received.

13          (Government Exhibit 1406 received in evidence)

14          MR. VELAMOOR:  Ms. Grant, would you show it to the

15  jury.  Can you zoom in on the top section there.

16  Q.  Can you tell the name of the customer whose account is at

17  issue here?

18  A.  Athena Sanchez.

19          MR. VELAMOOR:  Scroll down a little bit.  There's a

20  comment section there.  There's an agent listed on the top.

21  Q.  Who is that agent listed on the top?

22  A.  Mary Porting.

23  Q.  That's you, right?

24  A.  That's me, uh-huh.

25  Q.  Does that mean you've taken some action --

1    THE COURT:  You have to answer in words.

2    MR. VELAMOOR:  Sorry, your Honor.

3    THE WITNESS:  I'm sorry.

4    A.  Yes.

5    Q.  Does that mean you've taken some action on this account?

6    A.  Yes.

7    Q.  And you took that action after some complaints were

8    received, correct?

9    A.  Correct.

10   Q.  Complaints from where?

11   A.  From the state of New York and from the Better Business

12   Bureau.

13   Q.  And what did you do with this account after those

14   complaints were received?

15   A.  I wrote off the balance.

16   Q.  How can you tell that you wrote off the balance?

17   A.  At the top of the sheet, it says balance zero.

18   MR. VELAMOOR:  Zoom in on that, at the top.

19   Q.  And again, is the action you took here consistent with the

20   instructions you got from Mr. Tucker?

21   A.  Correct.

22   Q.  I'll show you what's been marked as Government Exhibit

23   1403.

24   MR. VELAMOOR:  Can we put it on the witness's screen.

25   It's on the screen?

1   Q.  Ms. Porting, I believe it's on the screen in front of you.

2   A.  Yes.

3   Q.  What is 1403?

4   A.  It is a online Better Business Bureau complaint that we

5   would receive.

6   Q.  From who?

7   A.  From the Better Business Bureau.

8   Q.  On behalf of who, can you tell?

9   A.  It is OneClickCash.

10  Q.  And can you tell who the consumer is?

11  A.  T. Martin.

12          MR. VELAMOOR:  Your Honor, the government offers 1403.

13          MR. BATH:  No objection.

14          THE COURT:  Received.

15          (Government Exhibit 1403 received in evidence)

16          MR. VELAMOOR:  Why don't we just turn to -- well,

17  let's focus on the top there.

18  Q.  There's an email from the OCC compliance department to you.

19  Do you see that?

20  A.  Yes.

21  Q.  What's the purpose of that?

22  A.  If I remember correctly, all the -- there were several

23  different email boxes for the compliance department for each

24  company, and that I had my own personal email, and the

25  complaints would be then forwarded to me from those.

1    Q.  For you to handle?

2    A.  For me to handle.

3    Q.  And what kind of complaint is this?

4    A.  A Better Business Bureau complaint.

5    Q.  And if you'd turn to the second page, do you see the

6    substance of the Better Business Bureau complaint that T.

7    Martin made?

8    A.  Yes.

9    Q.  And I believe that his name is actually spelled out

10   completely.  Do you see that?

11   A.  I didn't.  Oh, Tafoya Martin.  Yes.

12   Q.  OK.  Take a second, but what do you understand the essence

13   of Mr. Martin's complaint to be?

14   A.  Basically that he did not understand the repayment terms.

15   Q.  Again, was that a common complaint that you received?

16   A.  Yes, it was.

17   Q.  And can you tell what you did in response to this

18   complaint, or what you think you might have done?

19   A.  Not sure.  I may have went ahead and written it off.  We

20   may have asked him to pay the difference that he thought he

21   should owe, $120.  I'm not sure.

22   Q.  And generally speaking, if you were to ask someone to pay

23   the difference, what would the company generally do for a

24   person who refused?

25   A.  We would write them off.

1  Q.  Are you familiar with someone named Tim Muir?

2  A.  Yes.

3  Q.  Who is he?

4  A.  Lawyer at AMG.

5  Q.  And do you remember approximately when -- was he at AMG

6  when you started?

7  A.  No.

8  Q.  He came afterwards?

9  A.  Yes.

10 Q.  Do you recall approximately when?

11 A.  In 2006, I believe.

12 Q.  How, if at all, did -- were you still in the compliance

13 department at the time?

14 A.  Yes.

15 Q.  How, if at all, did your compliance work change when

16 Mr. Muir joined?

17 A.  They told me that I wouldn't be answering the state

18 complaints anymore; I would do the research and give the

19 information to the legal department, him, to answer the

20 complaints.

21 Q.  Would you still be involved in writing off the loans as

22 before?

23 A.  Yes.

24 Q.  So which part were you not going to be doing now?

25 A.  I was not going to be crafting the letters.

1   Q.  The letters to who?

2   A.  To the states.

3   Q.  Now, did you learn initially how Mr. Muir intended to

4   handle correspondence with the states?

5   A.  At first, at least this is what I was led to believe, that

6   we weren't answering the state letters.

7   Q.  So you would continue to write off the loans?

8   A.  Write off the loans, but we weren't answering the letters.

9   Q.  In other words?

10  A.  Responding.

11  Q.  Sending a response to the states?

12  A.  Correct.

13  Q.  Did that continue to be the approach, or did that change?

14  A.  It did change.  I don't know when it changed.

15  Q.  Now, to your knowledge, did Mr. Muir work by himself, or

16  did he have people working for him?

17  A.  He started to have people working for him.

18  Q.  Who do you recall were some of the people?

19  A.  Chris Muir, Jared Marsh, Kent Dreyer.  There were a couple

20  of others, but I don't remember their names.

21  Q.  And was Chris Muir related in any way to Tim Muir?

22  A.  I believe he was his brother.

23  Q.  You mentioned that the initial instruction you got from

24  Scott Tucker was to write off these loans, right?

25  A.  Correct.

1   Q.  Did that change when Mr. Muir arrived on the scene?

2   A.  No.

3   Q.  I'm going to show you what's been marked as Government

4   Exhibit 1401.  Have you had a chance to look at 1401?

5   A.  Yes.

6   Q.  What is it?

7   A.  It is an email from one of the collection groups and from

8   Chris Muir, and is asking us to quietly write off an account

9   due to a state complaint.

10              MR. VELAMOOR:  Your Honor, the government offers 1401.

11              MR. BATH:  No objection.

12              THE COURT:  Received.

13              (Government Exhibit 1401 received in evidence)

14              MR. VELAMOOR:  Could we show this to the jury, please.

15   All right.  Let's start on the second page.  Actually -- sorry.

16   Go to the third page.

17   Q.  Can you tell who the customer complainant is here?

18   A.  Not really.  Not from the second page.

19   Q.  Sorry.  Go to the third page.

20   A.  From -- yeah, Amanda Vaughn.

21   Q.  Now we can go to the second page.

22   A.  OK.

23   Q.  Let's just focus on the first paragraph.

24   A.  OK.

25   Q.  Do you want to just read the first couple sentences, up to

1    438, $438?

2    A.   "I reside in Pennsylvania, and have for the entire course

3    of the loan I received from you.  According to Pennsylvania

4    state statutes, United Cash Loans is in violation of

5    Pennsylvania's small loan rate cap, which states that loan fees

6    are limited to $9.50 per $100 per discount or 24 percent per

7    year, which means that the loan I have with United Cash Loans

8    in the amount of $400 on 10/9/09 by Pennsylvania state law

9    should have been charged $38 in interest for a principal of

10   $438."

11   Q.   OK.  Now, you mentioned before that one of the common

12   complaints was people complaining that the loan violated the

13   state laws.  Do you recall that?

14   A.   Correct.

15   Q.   Is this one such example?

16   A.   Yes.

17   Q.   What's the loan portfolio at issue for this one?

18   A.   United Cash Loans.

19   Q.   Now let's move to the first page.  And let's start with Kim

20   Brennan's email.  Is this email sent to you?

21   A.   Yes, it does look like that.

22   Q.   And who is Kim Brennan?

23   A.   She worked in the collections department, but I'm not sure

24   exactly what her role was.

25   Q.   When this complaint was sent to you, was it sent to you

1    because it was a state related, state law-related complaint?

2    A.   Right, because they mentioned their state laws.

3    Q.   And so if someone mentioned state laws, what happened to

4    those complaints?

5    A.   They would come to compliance.

6    Q.   So then the email is forwarded from Chris Becker, who is

7    copied on this email.  Who is it forwarded to, above?

8    A.   To Chris Muir.

9    Q.   And again, who did Chris Muir work for?

10   A.   Tim Muir.

11   Q.   And then Chris Muir responds above and copies you?

12   A.   Correct.

13              MR. VELAMOOR:  Why don't we just highlight Chris

14   Muir's response.

15   Q.   Can you read that out?

16   A.   "If not already done so, counsel would like this account

17   'quietly' written off.  Also, FYI, the attorneys do have, and

18   are working on, the state complaint."

19   Q.   And when it says counsel, who did you understand that to be

20   a reference to?

21   A.   Tim Muir.

22   Q.   And it says "quietly written off."  What does that mean?

23   A.   That it would be written off, then we didn't really -- we

24   didn't contact the customer.

25   Q.   Now, how did you typically communicate with Mr. Tim Muir?

H9qWtuc5                          Porting - Direct

1    A.  If I had to, I would -- it would be direct, face to face.

2    Q.  He wasn't copied on this email I just showed you, 1401,

3    correct?

4    A.  Correct.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Did you have a discussion with him about e-mailing with

2  Mr. Tim Muir?

3  A.  Early on, with Anita Finney, she told us that he did not

4  want e-mails sent to him from us, at least from me.

5          MR. VELAMOOR:  We can take that down.

6  Q.  Let me show you what has been marked as 1304.

7      Did you have a chance to look at 1304?

8  A.  Yes.

9  Q.  Is it an e-mail?

10 A.  Yes.

11 Q.  What is it generally about?

12 A.  It's about the states that we would not loan in.

13         MR. VELAMOOR:  The government offers 1304.

14         MS. LIMANI:  No objection.

15         THE COURT:  Received.

16         (Government's Exhibit 1304 received in evidence)

17 Q.  You said there were states you did not loan in.  Who

18 decided which states you would not loan in?

19 A.  That I am not sure of.  I'm assuming when we had legal

20 counsel that it was legal.  In the beginning, I am assuming it

21 was Scott or Blaine or the operations manager.

22         MR. VELAMOOR:  Ms. Grant, why don't we show 1304 to

23 the jury.

24 Q.  You weren't on this e-mail, right?

25 A.  No.

1   Q.  Do you know who Natalie Dempsey was?

2   A.  Yes.

3   Q.  Who is she?

4   A.  I am not sure what her title was.  She was my boss in

5   compliance from 2010 until I left in 2012.  She had something

6   to do with operations.

7           MR. VELAMOOR:  We can zoom out of that.

8   Q.  Was she higher up than you in terms of the hierarchy?

9   A.  Yes.

10  Q.  Why don't we focus in on Natalie Dempsey's e-mail by your

11  cursor there on May 21, 2012.

12      She says, "After a conversation Blaine and I had this

13  afternoon, I wanted to check with you on the non-funding

14  states."

15          Do you see that?

16  A.  Yes.

17          MR. VELAMOOR:  Why don't we zoom in on the list of

18  states.

19  Q.  So it says there, "Blocked for all companies."

20          Were there some states that were off-limits regardless

21  of which loan portfolio was at issue?

22  A.  Yes.

23  Q.  Do those appear to be the states for which none of the

24  companies did any lending?

25  A.  Correct.

1375

1   Q.  Georgia, right?

2   A.  Correct.

3   Q.  Kansas?

4   A.  Correct.

5   Q.  West Virginia?

6   A.  Correct.

7   Q.  Ohio?

8   A.  Correct.

9   Q.  Virginia and Arizona?

10  A.  Correct.

11  Q.  Do you know why any of those states ended up on that list?

12  A.  I do know in West Virginia and Ohio's case, we received a

13  great deal of state complaints, and once that happened, we

14  blocked those.  I believe something happened in Kansas before I

15  even started that caused that to be a state we didn't loan in.

16  Q.  Kansas was where your business was located?

17  A.  Right.

18  Q.  Then below it says, "States blocked for specific

19  companies."

20          Do you see that?

21  A.  Uh-huh.

22          THE COURT:  You have to answer in words.

23  A.  Yes.

24  Q.  It says, "Nebraska for OCC."

25          Do you know why Nebraska was blocked for OCC?

H9Q8TUC6                          Porting - Direct

1   A.   Presumably because that's where the tribe was located.

2   Q.   Which tribe?

3   A.   The Santee Sioux tribe.

4   Q.   OCC stands for what?

5   A.   One Click Cash.

6   Q.   Several companies are listed for Oklahoma.  Do you see

7   that?

8   A.   Yes.

9   Q.   Which ones?

10  A.   500 FastCash, Ameriloan, United Cash Loans, US FastCash,

11  that's Advantage Cash Services, and Star Cash.

12  Q.   Do you know why those portfolios were not doing lending in

13  Oklahoma?

14  A.   Again, presumably because the tribes that they are

15  affiliated with were located in Oklahoma.

16  Q.   So I understand this right, these portfolios were not

17  lending in the state where the tribe associated with that

18  portfolio was located?

19  A.   Correct.

20  Q.   Now, you mentioned complaints.  Did you ever prepare

21  reports summarizing or totaling up the number of complaints?

22  A.   Yes.

23  Q.   How come you did that?

24  A.   To show the trend of what kind of complaints and the number

25  that were coming in.

1    Q.  Who asked you to do that?

2    A.  Initially, Anita Finney.

3    Q.  Who did you prepare those reports or summaries for?

4    A.  Anita Finney in the beginning.  They went to Scott Tucker.

5    They went to Crystal Cram, or Grote, later.  They went to each

6    of the collection managers and the regular portfolio managers.

7    And Blaine Tucker.

8    Q.  Did the summaries go to Tim Muir?

9    A.  They did once he was on, yes.

10   Q.  Let me show you what has been marked 1306.

11       Have you had a chance to look at 1306?

12   A.  Yes.

13   Q.  What is it?

14   A.  It is a compilation of complaints from 1999 through 2011

15   that I had put together and sent to initially Natalie.

16   Q.  Is this an e-mail chain in which Natalie forwards the data

17   you put together to others?

18   A.  Correct.

19            MR. VELAMOOR:  The government offers 1306.

20            THE COURT:  Any objection?

21            MR. BATH:  No, sir.

22            THE COURT:  Received.

23            (Government's Exhibit 1306 received in evidence)

24            MR. VELAMOOR:  May we show this to the jury.

25   Q.  Let's start with the bottom e-mail from Natalie Dempsey to

1    Blaine Tucker.

2         So this is Natalie to Blaine, dated August 2, 2011?

3    A.   Correct.

4    Q.   The subject being compliance?

5    A.   Yes.

6    Q.   Can you read the first paragraph?

7    A.   "Here are the stats on how compliance has grown over the

8    last few years.  Agency cases are those that were the result of

9    a notification by the Attorney General's Office, Better

10   Business Bureau, client attorney, or other type of body filing

11   the complaint.  Internal are escalations coming from the floor

12   and customer threats of filing a complaint with a regulatory

13   body."

14            MR. VELAMOOR:  We can zoom out of that.

15   Q.   This is essentially totals for a series of years, right?

16   A.   Yes.

17   Q.   Are you struggling with your voice?

18   A.   I am.

19   Q.   Would you like a bottle of water?

20   A.   Sure.  That would be great.

21        Thank you.

22            THE COURT:  Ladies and gentlemen, why don't you stand

23   up and stretch, please.  With a deep breath.

24   Q.   Let's start with the 2004 total.  Do you see that?

25   A.   OK.  2004, there were 99 agency and zero internal.

1   Q.  If you can just move on to the next page.

2   A.  2005, there were 486 total, which included 97 agency and

3   389 internal.

4       2006, there were 1,728 in total, which included 326 agency

5   and 1,402 internal.

6       In 2007, there were 2,541 in total, which included 499

7   agency and 2,042 internal.

8   Q.  Ms. Porting, maybe I can be more considerate since your

9   voice is struggling.  Why don't I continue.

10      In 2008, 2893 total, 722 agency, 2171 internal?

11  A.  Correct.

12  Q.  2009, 4,262 total, which 891 are agency, 3371 are internal?

13  A.  Correct.

14  Q.  2010, 6,661 total of which 1509 are agency, 5,152 are

15  internal?

16  A.  Correct.

17  Q.  Then 2011, 6,069 total, as of July 31st, 1335 agency, 4,733

18  internal.  Do you see that?

19  A.  Correct.

20  Q.  Then there is a paragraph there at the bottom:

21          "If the pace continues, we will deal with

22  approximately 10,404 cases this year.  Over the last few

23  months, Mary has begun categorizing the cases that are coming

24  in so that we can look at root cause and identify process,

25  procedures, practices that could be altered."

1    Why don't we move up the chain.

2    A.  OK.

3    Q.  Blaine Tucker tells Natalie Dempsey, "Thanks for the stats.

4    Let's continue to discuss the ongoing functions of this."

5    Right?

6    A.  Yes.

7            MR. VELAMOOR:  Move it up.

8    Q.  Blaine Tucker writes, "This is another reason we are

9    continuing to hit the radar screen."

10            Do you see that?

11   A.  Correct.

12   Q.  At the top, Scott Tucker responds to Blaine, "We have to

13   brainstorm.  It is like we need a whole unit that is

14   specialized in dealing with this."

15   A.  Correct.

16   Q.  Now, you mentioned earlier that some of the more common

17   complaints, state laws, misunderstanding or not understanding

18   the terms.  Did those continue to be common complaints

19   throughout your time at the company?

20   A.  Yes.

21            THE COURT:  Move along, Mr. Velamoor.

22   Q.  Now, without going into any details, was there a news

23   article that came out that you became aware of in the fall of

24   2011?

25   A.  Yes.

1  Q.  Did any procedures, in terms of the loan documents, change

2  after that?

3  A.  Yes, I believe so.

4  Q.  What do you recall the changes?

5  A.  The changes I believe were, we put the names of the tribes

6  on the loan documents, and they became apparent on the Web site

7  as well.

8  Q.  I will show you what has been marked as 1301, 1302 and

9  1303.

10      Have you had a chance to look at those?

11 A.  Yes.

12 Q.  What are they?

13 A.  They are conversations regarding changing of the loan

14 documents.

15          MR. VELAMOOR:  Your Honor, the government offers 1301,

16 1302 and 1303.

17          THE COURT:  Any objection?

18          MR. BATH:  Not to 1301, Judge.

19          1302 or 1303, no objections.

20          THE COURT:  Thank you.

21          Received.

22          (Government's Exhibits 1301, 1302 and 1303 received in

23 evidence)

24          MR. VELAMOOR:  May we just show 1301 to the jury.

25 Q.  They are e-mail exchanges.  You were not copied on this

1    e-mail, correct?

2    A.   No, I was not.

3    Q.   Do you see Tim Muir on this chain?

4    A.   I do see him cc'd on this.

5    Q.   Are there attachments to this e-mail?

6    A.   It looks like there are, yes.

7    Q.   Let me just go to the third page.

8         Do the attachments include standard versions of the loan

9    documents sent to customers including the loan note and

10   disclosure?

11   A.   Yes.

12   Q.   Why don't we just go back to the first page.

13        The first line, do you see the body of Natalie Dempsey's

14   e-mail?

15   A.   Yes.

16   Q.   It says, "New versions of all documents are attached."

17            Do you see that?

18   A.   Yes.

19   Q.   The only change made was to make the first instance of the

20   company name in each document read as legal entity d/b/a

21   company name as opposed to just using the company name.

22            Do you see that?

23   A.   Yes.

24   Q.   So before, what names would appear on the loan documents?

25   A.   I believe it was just the names of United Cash Loans or 500

1  FastCash, One Click Cash.

2  Q.  At some point there was a change to add the names of the

3  legal entity as well?

4  A.  Yes.

5  Q.  Again, this e-mail is dated what?

6  A.  October 14th of 2011.

7  Q.  Why don't we go to 1302.

8       Do you see at the bottom, that same e-mail from Natalie

9  Dempsey at the bottom?

10  A.  Yes.

11  Q.  Crystal Cram writes something.  Do you see her e-mail?

12  A.  Yes.

13  Q.  She writes, "Are we getting these documents in play as is

14  or are we still waiting for approval of some sections?"

15          Do you see that?

16  A.  Yes.

17  Q.  Let's move up.

18      How does Natalie Dempsey respond?

19          "The arbitration sections are still not approved."

20          Do you see that?

21  A.  Yes.  "Not yet, heading back to work tonight, will look at

22  it."

23          No, that's not her.

24      "The arbitration sections are still not approved unless Tim

25  has told you otherwise."

1  Q.  Why don't we go to the top e-mail.  Who is that top e-mail

2  from?

3  A.  Tim Muir.

4  Q.  Who does Tim Muir write?

5  A.  "Not yet, heading back to work tonight, will look at it."

6  Q.  Very quickly, 1303.

7      Do you see at the bottom there Natalie Dempsey's e-mail,

8  one of the ones you just looked at?

9  A.  Yes.

10         MR. VELAMOOR:  Why don't we blow that up quickly.

11  Q.  The e-mail where she said, "The arbitration sections are

12  still not approved."

13         Do you see that?

14  A.  Yes.

15  Q.  Ultimately, this whole chain is forwarded to who?

16  A.  Scott Tucker.

17  Q.  At any point was your company asked to do a research

18  project on different state laws?

19  A.  Yes.

20  Q.  When was that?

21  A.  I believe it was in the spring of 2005 with Anita Finney.

22  Q.  What was the project?

23  A.  She said that we were looking up information on the

24  different states and what it would cost and what was needed to

25  do payday loans in that state.

1   Q.  Did you do that research project?

2   A.  I started working with her on it.  She was having me go on

3   the Internet and get information for different states.  I

4   started it.

5   Q.  Who was that project ultimately for, to your knowledge?

6   A.  She told me it was for Scott Tucker.

7   Q.  Did you complete it?

8   A.  No.

9   Q.  Why not?

10  A.  Not too long after we started it, she said we were stopping

11  it.

12  Q.  Was it her decision to stop or someone else's?

13  A.  I believe it was Scott's.

14  Q.  Now, you mentioned earlier that Tim Muir joined the

15  company?

16  A.  Yes.

17  Q.  After he joined, did he ask you to sign anything?

18  A.  Yes.  A confidentiality statement, I believe.

19  Q.  Was it a confidentiality agreement?

20  A.  Agreement.

21  Q.  What did the agreement say?

22  A.  I don't know.

23  Q.  Did you sign it?

24  A.  I did sign it.  We weren't allowed to read it.

25  Q.  Who didn't allow you to read it?

1    A.  Tim Muir.

2    Q.  What, if anything, did he say about it?

3    A.  He said that we weren't to discuss company business, that

4    we needed to sign this if we wanted to keep our job, and it was

5    serious; if we didn't sign it, we would be sued personally for

6    a million dollars, and it would happen if we violated it.

7    Q.  How long did you stay at the company for?

8    A.  For nine years.

9    Q.  How did you leave the company, what happened at the end?

10   A.  I was let go.  I think they hired someone else for the

11   compliance department so I was replaced.

12   Q.  Approximately when was that?

13   A.  April, the end of April of 2012.

14          MR. VELAMOOR:  No further questions, your Honor.

15          THE COURT:  Cross-examination.

16   CROSS-EXAMINATION

17   BY MR. BATH:

18   Q.  Ms. Porting, do I understand that you believe that Tim came

19   sometime in 2006?

20   A.  As much as I can recall, yes.

21   Q.  At some point in time, there was a meeting with him and you

22   say he said don't send any e-mails?

23   A.  Yes.

24   Q.  Yet we have seen lots of e-mails?

25   A.  Correct.

1   Q.  So that obviously changed at some point?

2   A.  There were some e-mails sent, but I was told specifically

3   not to send them.

4   Q.  Did that ever change?

5   A.  I was never told to specifically begin sending e-mails

6   again.

7   Q.  You said your communication with Tim was typically

8   face-to-face?

9   A.  Yes.  At some point I was told to communicate with Chris

10  Muir instead of Tim, that everything would go through Chris.

11  Q.  Before that, I think you testified your contact was

12  typically face-to-face with Tim, is that right?

13  A.  Typically, yes.

14  Q.  So in what years are we talking?

15  A.  I believe 2006, 2007.  I'm not really sure.

16  Q.  Do you know when it changed?

17  A.  That I'm not sure of either.

18  Q.  So for at least two years you had face-to-face

19  communication with Tim?

20  A.  I believe so.

21  Q.  Could you come by his office, is that how it worked?

22  A.  Yes, or I went through Anita Finney, my boss.

23  Q.  At that time in '06 or '07, how big was the company?

24  A.  I'm not sure.

25  Q.  Did it continue to grow?

1    A.  It did.

2    Q.  Significantly?

3    A.  Yes.

4    Q.  Obviously, the more people who were involved, the more work

5    for everybody, is that right?

6    A.  Correct.

7    Q.  At some point you went through Chris Muir, which he worked

8    for Tim?

9    A.  Correct.

10   Q.  You testified earlier about the complaints, and you showed

11   us that one e-mail with the total number of complaints,

12   correct?

13   A.  Correct.

14   Q.  We have to know how many loans were made in a total year to

15   understand what that percentage means, correct?

16   A.  Correct.

17   Q.  There was a time you kept track of that information, didn't

18   you?

19   A.  Yes.

20   Q.  If you need something to refresh your memory, you let me

21   know.  But would you agree that the complaint rate was one

22   percent or less?

23   A.  I believe that was true.

24   Q.  So if they made five million loans in one year, the

25   complaint numbers were one percent or less?

H9Q8TUC6

1    A.  I believe that is true.

2    Q.  Do you know how many loans in 2010 were made?

3    A.  No, I do not.

4    Q.  Or 2011?

5    A.  I don't.  I'm sorry.

6          MR. BATH:  That's all I have.  Thank you.

7          THE COURT:  Any redirect?

8          MR. VELAMOOR:  Two questions, your Honor.

9    REDIRECT EXAMINATION

10   BY MR. VELAMOOR:

11   Q.  Ms. Porting, you were in the compliance department, right?

12   A.  Correct.

13   Q.  And most of your work involved complaints from states and

14   the Better Business Bureau, correct?

15   A.  Correct.

16   Q.  Mr. Muir knew that's what your job involved, right?

17   A.  Correct.

18   Q.  And you understood his instruction was to you personally

19   not to e-mail him about those things, right?

20   A.  Correct.

21          MR. VELAMOOR:  No further questions.

22          THE COURT:  You may step down.

23          (Witness excused)

24          THE COURT:  Ladies and gentlemen, it's 4:57.  We are

25   going to take an early break tonight.  Please don't discuss the

```
 1   case among yourselves or with anyone.  Keep an open mind.  Have
 2   a pleasant evening.  Thank you for being such a hard-working
 3   jury.
 4             (Jury exits courtroom)
 5             THE COURT:  What does the government think I should do
 6   with regard to the note from Juror No. 5?
 7             MR. SCOTTEN:  Your Honor, I think if you want to
 8   answer the juror, I think we can agree that we wouldn't sit
 9   those days if the trial goes that far.  I wouldn't imply a
10   certainty that it would go that far.
11             THE COURT:  What is the defendants' position?
12             MR. GINSBERG:  It's not a legal answer that we don't
13   care, but I think that we are fine with whatever the Court
14   chooses to do.  We don't have a strong view.  It looks like we
15   are going to run into that.
16             THE COURT:  The alternatives are to break for that
17   period or obviously to excuse the juror.  We have six
18   alternates so we have that option.  That's why it's a
19   presenting question that arises next Wednesday.
20             MR. GINSBERG:  I think I should be more definitive.  I
21   think our preference would be to keep him on the jury now and
22   see how the rest of this weeks goes and the beginning next
23   week.  There are things that are pending that could change,
24   whether we are going to run through that, or it might even be
25   shorter.
```

H9Q8TUC6

1          THE COURT:  OK.  Let's see what happens then.  We will

2     ride it out a little longer.

3          I don't know whether this issue also applies to one of

4     our other jurors.  I think it's Juror No. 12, perhaps.

5          MR. GINSBERG:  I can only tell you, if it helps, not

6     everybody is that observant.  It's a smaller group.  I would

7     like to now say that I am that observant so we can take those

8     days off, but I think it's a little late in the game for me to

9     do that.

10         THE COURT:  Understood, Mr. Ginsberg.  I am generally

11    familiar with that, but your suggestion that we hold off making

12    any definitive decisions is not a bad one.  So let's see how

13    things go.

14              Have a very pleasant evening.  See you tomorrow.

15              (Adjourned to September 27, 2017, at 10:00 a.m.)

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2   Examination of:                          Page

3   ROBERT PETER SMITH

4   Direct By Mr. Velamoor . . . . . . . . . .1194

5   Cross By Mr. Bath . . . . . . . . . . . .1231

6   Redirect By Mr. Velamoor . . . . . . . . .1243

7   SCOTT WILLIAM MITCHELL

8   Direct By Mr. Ravi . . . . . . . . . . . .1251

9   MARY L. PORTING

10  Direct By Mr. Velamoor . . . . . . . . . .1274

11  SCOTT WILLIAM MITCHELL

12  Direct By Mr. Ravi.........................1278

13  Cross By Mr. Ginsberg . . . . . . . . . . .1299

14  ATHENA SANCHEZ

15  Direct By Mr. Ravi . . . . . . . . . . . .1302

16  Cross By Mr. Bath . . . . . . . . . . . .1315

17  Redirect By Mr. Ravi . . . . . . . . . . .1324

18  MICHAEL HICKS

19  Direct By Mr. Ravi . . . . . . . . . . . .1325

20  Cross By Mr. Ginsberg . . . . . . . . . . .1343

21  MARY L. PORTING

22  Direct By Mr. Velamoor . . . . . . . . . .1347

23  Cross By Mr. Bath . . . . . . . . . . . .1386

24

25
```

```
 1    Redirect By Mr. Velamoor . . . . . . . . . .1389

 2                        GOVERNMENT EXHIBITS

 3    Exhibit No.                              Received

 4    2601-2602   . . . . . . . . . . . . . . .1192

 5    2615   . . . . . . . . . . . . . . . . . .1197

 6    811  . . . . . . . . . . . . . . . . . . .1201

 7    2604   . . . . . . . . . . . . . . . . . .1214

 8    2605   . . . . . . . . . . . . . . . . . .1217

 9    2608 and 2610   . . . . . . . . . . . . . .1226

10    2611   . . . . . . . . . . . . . . . . . .1229

11    2612   . . . . . . . . . . . . . . . . . .1239

12    2607   . . . . . . . . . . . . . . . . . .1246

13    2618   . . . . . . . . . . . . . . . . . .1246

14    2620   . . . . . . . . . . . . . . . . . .1246

15    2619   . . . . . . . . . . . . . . . . . .1246

16    2623   . . . . . . . . . . . . . . . . . .1246

17    1212   . . . . . . . . . . . . . . . . . .1257

18    1603   . . . . . . . . . . . . . . . . . .1265

19    1601   . . . . . . . . . . . . . . . . . .1279

20    4025 and 4027-4028   . . . . . . . . . . .1280

21    1602   . . . . . . . . . . . . . . . . . .1283

22    1311 and 1316-1319   . . . . . . . . . . .1285

23    1312   . . . . . . . . . . . . . . . . . .1288

24    313  . . . . . . . . . . . . . . . . . . .1301

25    2202, 2204 and 2206   . . . . . . . . . . .1305
```

2210    . . . . . . . . . . . . . . . . . . . .1308

2207    . . . . . . . . . . . . . . . . . . . .1310

2208    . . . . . . . . . . . . . . . . . . . .1312

2213    . . . . . . . . . . . . . . . . . . . .1313

2212    . . . . . . . . . . . . . . . . . . . .1317

1201, 1202, 1203 and 1211    . . . . . . . .1336

1204    . . . . . . . . . . . . . . . . . . . .1339

1208-1209    . . . . . . . . . . . . . . . . .1345

1014    . . . . . . . . . . . . . . . . . . . .1346

1408    . . . . . . . . . . . . . . . . . . . .1353

2502, 3001, and 3201-3203    . . . . . . . .1357

1406    . . . . . . . . . . . . . . . . . . . .1363

1403    . . . . . . . . . . . . . . . . . . . .1365

1401    . . . . . . . . . . . . . . . . . . . .1369

1304    . . . . . . . . . . . . . . . . . . . .1373

1306    . . . . . . . . . . . . . . . . . . . .1377

1301, 1302 and 1303    . . . . . . . . . . .1381