H9R8TUC1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                          16 Cr. 91 (PKC)

5  SCOTT TUCKER and
   TIMOTHY MUIR,                       Trial
6
               Defendants.
7
   ------------------------------x
8                                      New York, N.Y.
                                       September 27, 2017
9                                      10:10 a.m.

10
   Before:
11              HON. P. KEVIN CASTEL

12                                     District Judge
                                          and a jury
13                      APPEARANCES

14 JOON H. KIM
        Acting United States Attorney for the
15      Southern District of New York
   BY:  NIKETH V. VELAMOOR
16      HAGAN C. SCOTTEN
        SAGAR K. RAVI
17      Assistant United States Attorneys

18 FREEMAN NOOTER & GINSBERG
        Attorneys for Defendant Tucker
19 BY:  LEE A. GINSBERG
        NADJIA LIMANI
20         -and-
   STAMPUR & ROTH
21 BY:  JAMES M. ROTH

22 BATH & EDMONDS, P.A.
        Attorneys for Defendant Muir
23 BY:  THOMAS J. BATH
           -and-
24 BEVERLY VAN NESS

25

1    (Trial resumed; jury not present)

2    THE COURT:  First of all, it looks like we have lost

3    Juror No. 12 to her husband's medical emergency last night.  I

4    will tell you -- I may give an edited version to the jury --

5    she lives in a split level house.  In the middle of the night

6    her husband fell and fell down about six steps and broke his

7    femur, and she is obviously attending to that.

8    Unless I hear otherwise from you, I propose to excuse

9    her from jury service.

10    Any objection?

11    MR. BATH:  No, your Honor.

12    MR. RAVI:  No, your Honor.

13    THE COURT:  What can the government tell me about Ms.

14    Williams?

15    MR. RAVI:  Ms. Williams was discharged early evening

16    yesterday from the hospital.  I spoke to her as well as an

17    agent.  She appears able to come back.  We expect her to be

18    here late this morning so that after this first witness or

19    second short witness she can resume her cross-examination.

20    THE COURT:  All right.  Do you want to call Troy

21    Little Axe at this point?

22    MR. RAVI:  Yes.

23     TROY LITTLE AXE,

24    called as a witness by the government,

25    having been duly sworn, testified as follows:

H9R8TUC1                    Little Axe - direct

1          THE DEPUTY CLERK:  State your name and spell it for

2     the record, please.

3          THE WITNESS:  Troy Little Axe.  T-R-O-Y, L-I-T-T-L-E,

4     A-X-E.

5          THE COURT:  All right.  Mr. Ravi, you may inquire.

6     DIRECT EXAMINATION

7     BY MR. RAVI:

8     Q.  Did there come a time, Mr. Little Axe, that you worked as a

9     CEO of Modoc Tribal Enterprises?

10    A.  I am going to exercise my Fifth Amendment right.

11    Q.  Is there a time when you signed certain affidavits in

12    connection with that role?

13    A.  Again, I want to exercise my Fifth Amendment right.

14    Q.  Mr. Little Axe, I think, as you just said, you have

15    asserted your Fifth Amendment right against self-incrimination

16    with respect to these two questions, correct?

17    A.  Correct.

18    Q.  Do I understand you correctly that you would similarly

19    invoke your Fifth Amendment right with respect to each future

20    question that I ask you regarding your involvement with Modoc

21    Tribal Enterprises and payday lending?

22    A.  Yes.

23    Q.  Have you had a chance to review an order, a proposed order

24    of immunity this morning?

25    A.  Yes.

1  Q.  Have you had a chance to review that and do you understand

2  what it requires you to do?

3  A.  Yes.

4          THE COURT:  Do you have counsel, sir?

5          THE WITNESS:  Yes.

6  Q.  Is counsel sitting in the courtroom here today?

7  A.  Yes.

8  Q.  Do you understand that that order compelled you to give

9  testimony and provide information in this case notwithstanding

10  your implication of your Fifth Amendment right?

11  A.  Yes.

12  Q.  Do you understand that because you are being compelled to

13  provide testimony and information in this case you are being

14  immunized for your testimony?

15  A.  Yes.

16  Q.  In other words, do you understand that the testimony can't

17  be used against you that you give today?

18  A.  Yes.

19  Q.  Do you also understand that even though you're being given

20  immunity that you are required to tell the truth because of the

21  oath you took a moment ago?

22  A.  Yes.

23  Q.  And that if you do not tell the truth, that you will be

24  subject to prosecution for perjury, making a false statement,

25  and obstruction of justice?

H9R8TUC1

1    A.  Yes.

2    Q.  You intend to abide by the terms of that order?

3    A.  Yes.

4            MR. RAVI:  That's all I have at this point, your

5    Honor.

6            THE COURT:  I have reviewed the application for

7    immunity, and it is well supported, and at this time I am going

8    to sign the order of immunity.  I am tendering it to the deputy

9    clerk and it is deemed filed in open court.

10           Madam Deputy, is our jury ready?

11           MR. RAVI:  We would like to put on a few exhibits that

12   don't relate to this witness.

13           THE COURT:  Sir, why don't you step down and you will

14   be recalled in a few minutes.  Thank you.

15           (Witness exits courtroom)

16           THE DEPUTY CLERK:  We are still waiting on one juror.

17           THE COURT:  That's fine.

18           One more juror beyond the one that we know is not

19   going to be here.

20           THE DEPUTY CLERK:  Yes.

21           (Recess)

22           THE DEPUTY CLERK:  The jury is here.

23           THE COURT:  Bring the jury in, please.

24           (Continued on next page)

25

1    (Jury present)

2        THE COURT:  Good morning, ladies and gentlemen.

3        One of our number is not with us this morning.  Let me

4    explain what's going on.

5        Flo has heard from her.  Last evening her husband had

6    a tumble and is all right, is being treated.  She indicated

7    she's making some chicken soup for him, but it's going to be

8    more than chicken soup that he is going to need.  So she is

9    taking good care of him and will be excused from the jury.

10       I do have an important message from her to her fellow

11   jurors.  She says you're all welcome to the Chinese noodles

12   that she bought and that are in the jury room there and please

13   help yourselves.

14       So with that, ladies and gentlemen, and with great

15   admiration for your hard work on this jury, the government may

16   proceed.

17        MR. VELAMOOR:  Thank you, your Honor.

18       At this time the government offers Exhibits 1410,

19   1405, 4031, 4030, and 1409.

20        THE COURT:  Any objection?

21        MR. GINSBERG:  We have an objection to 4030, your

22   Honor.

23        THE COURT:  Can you enlarge it on my screen, please.

24       Let me see the parties at sidebar.

25       (Continued on next page)

1    (At the sidebar)

2    THE COURT:  Let me say that I view this as similar to

3    the newspaper reports and the like.  If you want to elicit from

4    a witness, did there come a point in time that you received a

5    letter?  Did you do things any differently after you received

6    the letter, or how did you react to it?  That may be fine.

7    If I may see the exhibit in my hand here.

8    This is Exhibit 4030, which makes a number of factual

9    assertions.  Now I can say to the jury, they are not admitted

10   for the truth of their content, but I think the fact that the

11   assertions were made about 300 complaints, etc., etc., is not

12   probative of anything.

13   MR. VELAMOOR:  May I be heard briefly?

14   THE COURT:  Yes.

15   MR. VELAMOOR:  This exhibit goes along entirely with

16   4031.  4031 is a cover e-mail attaching essentially the same

17   letter, except attaching a letter to Chief Gamble of the Miami

18   tribe.  That e-mail is sent to both Mr. Tucker and Mr. Muir,

19   and therefore I think the contents are offered not for the

20   truth but to show that Mr. Muir and Mr. Tucker were advised of

21   that.

22   I think it is relevant here because yesterday there

23   was argument made to the jury that the number of complaints was

24   relatively small and that the feedback they were getting

25   internally from the company is that it's a very small

percentage, viewed industry-wide as a very small percentage of

the complaints.  Here we are seeing defendants being advised by

an outside source that in fact the number of complaints is

alarming.

I can simply offer 4031, which it's attached to the

cover e-mail.  That will be fine.

THE COURT:  Why isn't the government right that the

defense thrown open wide the door on the number of complaints?

I remember yesterday's examination well and it was very

effective in establishing some low percentage rate of

complaints.

MR. GINSBERG:  Because the number, the pure number

doesn't mean anything taken in isolation.  It's the number

compared to the amount of loans that were made.  So the Better

Business Bureau is referring to the number they are aware of,

and for their purposes they are referring to it as alarming.

It doesn't say, for example, we are aware you made a

million loans and we only have 300 complaints.  So it's sort of

couched in a different way than what was being done yesterday.

What was being done yesterday was the total amount of loans

versus the total amount of complaints.

THE COURT:  I think the point is this operation is

only serving, if I understand this correctly, Eastern Oklahoma

is claiming that they have received these complaints relating

to the Modoc tribal office.

1          MR. GINSBERG:  It would still be a small percentage.

2     I can't tell your Honor off the top of my head the percentage,

3     but it's the Better Business Bureau's assessment that number to

4     them is alarming, without further expansion of what the total

5     universe is.  So it's their opinion that gets in sort of that

6     way.

7          Since most of it is -- I didn't object to the other

8     letter because most of it is in there and most of it puts the

9     defendants on notice about the concerns that they have, but

10    standing alone I think it puts it in a different situation.

11         THE COURT:  I think the government is withdrawing 4030

12    and offering 4031.

13         Does that take care of it for you?

14         MR. GINSBERG:  I think it does.

15         THE COURT:  I also note for the record that because of

16    the defendants' cross-examination, the defense has its

17    counterargument to this exhibit.  So the prejudicial effect is

18    much less than I first thought.

19         But again, I will tell the jury that it's not for the

20    truth of its content but the fact that it was said, and that is

21    what it's for.

22         Thank you.

23         (Continued on next page)

24

25

1    (In open court)

2        MR. VELAMOOR:  Your Honor, the government withdraws

3    4030, but reoffers 4031.

4        THE COURT:  Ladies and gentlemen, as a result of

5    discussion with counsel, I am going to receive 4031 into

6    evidence.

7        There is an attachment which is part of 4031 which is

8    not for the truth of the statements that were made in it but

9    for the fact that the statements were made because that may

10   influence what people do upon hearing the information, whether

11   the information is true or not.  You know that from your daily

12   lives.  Somebody tells you something -- somebody told you your

13   house was on fire, you'd run to check to see whether it's true.

14   Now it may wind out that it's not true, but you would still run

15   to see if your house was on fire.  So that's what I mean by not

16   for the truth of its content but the fact that it was said

17   because it may influence your actions.

18       Go ahead.

19       MR. VELAMOOR:  Thank you, your Honor.

20       At this time the government would like to show 4031 to

21   the jury.

22       (Government's Exhibit 4031 received in evidence)

23       MR. VELAMOOR:  I will start by highlighting the bottom

24   e-mail, an e-mail from Melissa Davis to C. Schulte, Anita

25   Finney and copying Scott Tucker.  You can highlight the

1   substance, please.

2           Move up to the top e-mail.

3           Highlight "from."

4           Let's move to the attachment.

5           Can you start by highlighting the logo on the left.

6           The person to whom the letter is addressed.

7           Then the first paragraph.

8           You can move to the next paragraph.

9           We can take that down.

10          Judge, may I take it that the other three exhibits,

11  there is no objection to the other three exhibits, 1409, 1410

12  and 1405.

13          THE COURT:  Any objection?

14          MR. GINSBERG:  No, your Honor.

15          THE COURT:  Received.

16          (Government's Exhibits 1409, 1410 and 1450 received in

17  evidence)

18          MR. VELAMOOR:  Can we put up 1409, please.

19          Turn to the next page of the exhibit.

20          Turn to the next page of the exhibit.

21          Just highlight the bullet beginning with "a typical."

22          Lastly, can we show 1405, please.

23          Start at the bottom e-mail from Kathy Robinson.

24          Just highlight the substance.

25          Move to the next e-mail above.

H9R8TUC1                    Little Axe - direct

1          Then the e-mail at the top.

2          Highlight the "from."

3          "To."

4          Then the substance of the e-mail.

5          Thank you, your Honor.

6          THE COURT:  All right.  You may call your next

7    witness.

8          MR. RAVI:  The government calls Troy Little Axe.

9     TROY LITTLE AXE,

10        called as a witness by the government,

11        having been duly sworn, testified as follows:

12        THE DEPUTY CLERK:  State your name and spell it for

13   the record.

14        THE WITNESS:  Troy Little Axe.  T-R-O-Y, L-I-T-T-L-E,

15   A-X-E.

16        THE COURT:  You may inquire.

17   DIRECT EXAMINATION

18   BY MR. RAVI:

19   Q.  Mr. Little Axe, how old are you?

20   A.  50.

21   Q.  Where do you currently live?

22   A.  Miami, Oklahoma.

23   Q.  How far did you go in school?

24   A.  I graduated law school.

25   Q.  Are you a member of a Native American tribe?

1   A.  Yes.

2   Q.  Which one?

3   A.  Absentee Shawnee Tribe of Oklahoma.

4           THE COURT:  What was the first word before Shawnee?

5           THE WITNESS:  Absentee, A-B-S-E-N-T-E-E.

6   Q.  Are you currently employed, Mr. Little Axe?

7   A.  Yes.

8   Q.  Where at?

9   A.  Modoc Tribe of Oklahoma.

10  Q.  How long have you worked at the Modoc Tribe of Oklahoma?

11  A.  20 years.

12  Q.  Since approximately what year?

13  A.  1997.

14  Q.  Where is the Modoc Tribe of Oklahoma located?

15  A.  Miami, Oklahoma.

16  Q.  What was your position when you first started at the Modoc

17  tribe?

18  A.  I was a contract specialist.

19  Q.  Who was the chief when you started?

20  A.  Chief Bill Follis.

21  Q.  How long had he been chief at that time?

22  A.  Since 1973.

23  Q.  How many tribal members are in the Modoc around the time

24  you started?

25  A.  Around 150.

1    Q.  How about today?

2    A.  About 290.

3    Q.  Mr. Little Axe, are you testifying today pursuant to an

4    order of immunity?

5    A.  Yes.

6    Q.  What is your understanding of your obligations under that

7    order?

8    A.  To tell the truth.

9    Q.  If you testify truthfully today, in return for that, are

10   you not being prosecuted for anything that you say on the stand

11   today?

12   A.  Yes.

13   Q.  Does the order provide you with any protection if you do

14   not testify truthfully?

15   A.  No.

16   Q.  If you do not testify truthfully, can you be prosecuted for

17   perjury, obstruction of justice and making a false statement?

18   A.  Yes.

19   Q.  Mr. Little Axe, did there come a time when the Modoc tribe

20   entered into an agreement regarding the payday loan business

21   with Scott Tucker?

22   A.  Yes.

23   Q.  When was that, approximately?

24   A.  Approximately 2005.

25   Q.  Who came up with the proposal to enter into an agreement?

H9R8TUC1                    Little Axe - direct

1    A.  Scott Tucker.

2    Q.  I would like to show you Government Exhibit 826.

3           I am going to be handing you documents, but you can

4    also use the screen if that's more useful.

5    A.  OK.

6    Q.  Do you recognize this?

7    A.  Yes.

8           MR. RAVI:  Government offers Government Exhibit 826.

9           MR. GINSBERG:  No objection.

10          THE COURT:  Received.

11          (Government's Exhibit 826 received in evidence)

12          MR. RAVI:  Please publish that.

13   BY MR. RAVI:

14   Q.  What is the date on this letter, Mr. Little Axe?

15   A.  October 10, 2003.

16   Q.  Generally, what is this letter?

17   A.  It's a letter of intent regarding the payday loan business.

18   Q.  If you turn to the third page.  Who is this letter signed

19   by?

20   A.  Scott Tucker.

21   Q.  Turn back to the first page.

22          Can you just read the first paragraph.

23   A.  "I am the founder and president of National Money Service,

24   Inc., a proven and highly successful corporation that has been

25   involved in the payday loan business throughout the United

1  States for the past six years.  National Money Service, Inc.

2  employs nearly 300 people and has its principal offices in

3  Mission, Kansas, a suburb of Kansas City, Missouri."

4  Q.  Can we turn now to the second page.

5          Would you please read paragraph 2.

6  A.  "No cash required.  The tribe and the proposed tribal

7  entity will not be required to provide any investment, cash or

8  cash equivalent and will not be responsible for any losses."

9  Q.  If we turn to the fifth page.

10          Does this letter -- turn to the sixth page.  My

11  apologies.

12          Make that the seventh page.

13          Does this agreement attach -- does this letter attach

14  an agreement?

15  A.  Yes.

16  Q.  Who is that agreement with?

17  A.  It's with the Modoc tribe and Universal Management

18  Services.

19  Q.  Is the Modoc tribe spelled correctly in this agreement?

20  A.  No.

21  Q.  If you also turn to the next page.

22          At the bottom in the signature lines of this draft,

23  does it say Modoc Tribe of Nebraska?

24  A.  Yes, that's what it says.

25  Q.  Where is the Modoc tribe located?

1   A.  Oklahoma.

2           MR. RAVI:  You can take that down.

3   Q.  I would like to now show you Government Exhibit 801.

4           Do you recognize this?

5   A.  Yes.

6   Q.  What is it?

7   A.  This is the service agreement between the Modoc Tribal

8   Enterprises and Universal Management Services.

9           MR. RAVI:  Government offers Government Exhibit 801.

10          MR. GINSBERG:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 801 received in evidence)

13  BY MR. RAVI:

14  Q.  Were you familiar with UMS before this agreement was

15  signed?

16  A.  No.

17  Q.  "UMS" stands for Universal Management Services, Inc.,

18  correct?

19  A.  Yes.

20  Q.  Whose entity is that?

21  A.  Scott Tucker.

22  Q.  If we can turn to the second paragraph.

23          Can you just read that first sentence.

24  A.  "Capital provided by UMS.  UMS will or will arrange to

25  provide capital up to a maximum $5 million to MTE's payday loan

1   business to be administered wholly and only by UMS for the

2   purpose of funding a volume of payday loans and all operating

3   expenses in a manner similar to that now conducted by its

4   parent company, National Money Service, Inc."

5          MR. RAVI:  You can zoom out of that.

6   Q.  Turning to paragraph 4.  What does this paragraph describe?

7   A.  MTE's duties.

8   Q.  Just read that first sentence.

9   A.  "MTE shall furnish an office and one employee to act as

10  administrator of the loan program, whose office shall be on

11  Modoc tribal land."

12  Q.  Who was that one employee?

13  A.  That was me.

14  Q.  Did you have a title?

15  A.  Yes.

16  Q.  What was that title?

17  A.  CEO, president.

18  Q.  Go to the next page, paragraph 6.

19         Please read that sentence.

20  A.  "Fee agreement.  UMS will pay MTE a minimum fee of 20,000

21  and no dollars, $20,000 per month while the agreement is in

22  force, with a maximum fee equal to one percent of the gross

23  collected revenue of the payday loan operation."

24  Q.  Finally, let's go to paragraph 11.

25         Read that as well.

1   A.   "Investment and Risk.  MTE shall have no obligation to

2   invest money or pay expenses of the operation, except for its

3   office expense on the reservation and the salary and expenses

4   of its administrator."

5        MR. RAVI:  Can you zoom in now on the signature lines.

6   Q.   You signed this agreement?

7   A.   Yes.

8   Q.   As CEO of Modoc Tribal Enterprises?

9   A.   Yes.

10  Q.   Who signed for Universal Management Services, Inc.?

11  A.   Scott Tucker.

12  Q.   As president?

13  A.   Yes.

14       MR. RAVI:  We can take that down.

15  Q.   Did the Modoc tribe pay any money to acquire or purchase a

16  payday lending business or loan portfolio from Mr. Tucker?

17  A.   No.

18  Q.   Now based on this agreement, as well as any communications

19  you had with Mr. Tucker, did the tribe ever contribute any

20  money to the business?

21  A.   No.

22  Q.   Was the tribe taking any risk in this business?

23  A.   No.

24  Q.   Was the tribe contributing anything of value to the

25  operations of the payday lending business?

1   A.  No.

2   Q.  If the tribe was not investing any money or taking on any

3   risk, what was the tribe contributing to the payday loan

4   business in order to receive that $20,000 or one percent of the

5   revenues?

6   A.  The tribe's sovereignty.

7   Q.  So in other words, what was the tribe selling to Mr. Tucker

8   to receive that one percent?

9   A.  I don't think the tribe sold anything.

10  Q.  What was the tribe contributing to this business if there

11  was no investment or risk that the tribe was taking on?

12  A.  The company, the tribe's sovereignty.

13  Q.  Did Mr. Tucker tell you whether he had already been

14  operating payday loan businesses before he came to the Modoc?

15  A.  Yes.

16  Q.  What did he tell you about the payday loan businesses he

17  had been operating?

18  A.  That he was doing payday loan business through banks.

19  Q.  Did he tell you why he then came to the tribe?

20  A.  The regulations that would allow him to do it through the

21  banks was changing and that tribes were an opportunity to

22  continue the business.

23  Q.  Did Mr. Tucker explain to you -- again, this is at the

24  beginning of the relationship with Mr. Tucker, correct?

25  A.  Yes.

1    Q.  At that time, did Mr. Tucker explain to you whether he was

2    already working with tribes?

3    A.  Yes.

4    Q.  Did he tell you which tribes he was working with?

5    A.  Yes.

6    Q.  Which ones?

7    A.  The Miami Tribe of Oklahoma and the Santee Sioux Tribe of

8    Nebraska.

9    Q.  Did Mr. Tucker explain why he wanted to work with the Modoc

10   if he was already working with two other Native American

11   tribes?

12   A.  The Modoc tribe -- yes.  That the Modoc tribe was a stable

13   tribe leadership-wise.

14   Q.  What do you mean it was a stable tribe?

15   A.  We had -- our current leadership and council, there had

16   been little turnover the last 30 years.

17   Q.  I think you had testified Chief Follis had been chief since

18   1973, correct?

19   A.  Yes.

20   Q.  Is that typical to have a chief in place for that long?

21   A.  No.

22   Q.  Did Mr. Tucker explain to you why he wanted to work with a

23   third Indian tribe as opposed to just working with one tribe?

24   A.  Yes.

25   Q.  What did he tell you?

1   A.  That the -- well, the stability of tribes.  One of the

2   tribes dropped out, there were other tribes available to

3   continue the business.

4   Q.  Do you recognize Scott Tucker in the courtroom today?

5   A.  Yes.

6   Q.  Can you please identify him by an item of clothing, and

7   stand up if you need to.

8   A.  He has an American flag lapel pin.

9           THE COURT:  What table is he seated at, if he is

10  seated or at a table?

11          THE WITNESS:  The second table back.

12          THE COURT:  And how many places?

13          THE WITNESS:  The middle person.

14          THE COURT:  Identification noted.  Thank you.

15  Q.  Now, prior to entering into this relationship with Mr.

16  Tucker, were you familiar with payday lending?

17  A.  No.

18  Q.  Had the tribe ever engaged in payday lending prior to this

19  relationship?

20  A.  No.

21  Q.  Did you sign a power of attorney for Mr. Tucker?

22  A.  Yes.

23  Q.  I would like to show you Government Exhibit 802.

24          Is this the power of attorney?

25  A.  Yes.

1      MR. RAVI:  Government offers Government Exhibit 802.

2      MR. GINSBERG:  No objection.

3      THE COURT:  Received.

4      (Government's Exhibit 802 received in evidence)

5      MR. RAVI:  Please publish that.

6  BY MR. RAVI:

7  Q.  If you could read the first line.

8  A.  "Special power of attorney and corporate resolution granted

9  to Scott Tucker, Universal Management Services, Inc. and

10  National Money Service, Inc., and any of its and their

11  subsidiaries and affiliates."

12      MR. RAVI:  Zoom down now to the first paragraph.

13      Sorry.  The paragraph numbered 1.

14  Q.  Please read this paragraph, Mr. Little Axe.

15  A.  "To open, maintain and operate a checking account at US

16  Bank and any other qualifying and acceptable bank for the

17  purpose of depositing and expending funds to facilitate the

18  operation of MTE Financial Services, the tribe's loan service

19  managed by National Money Service, Inc., Universal Management

20  Services, Inc., Scott Tucker and/or any of its or his

21  subsidiaries and affiliates."

22  Q.  What did you understand that power of attorney to be

23  granting Mr. Tucker in this paragraph number 1?

24  A.  To open and operate a checking account.

25  Q.  At US Bank and any other qualifying acceptable banks,

1    correct?

2    A.   Correct.

3            MR. RAVI:   Zoom in on the second paragraph.

4    Q.   Mr. Little Axe, what did this paragraph provide in terms of

5    a power of attorney to Mr. Tucker?

6            I will repeat this.

7            What did this paragraph provide in terms of the power

8    of attorney?

9    A.   The authority to write checks, deposit checks.

10           MR. RAVI:   If we can zoom down now to the signature

11   line and the date that's right above it.

12   Q.   Did you sign this document?

13   A.   Yes.

14   Q.   What is the date?

15   A.   January 23rd, 2004.

16           MR. RAVI:   We can take that down.

17   Q.   Mr. Little Axe, from time to time did you sign other

18   documents that were presented to you by Mr. Tucker?

19   A.   Yes.

20   Q.   As well as documents that individuals employed by Mr.

21   Tucker also provided you?

22   A.   Yes.

23   Q.   Did you typically read and understand those documents

24   before you sign them?

25   A.   I scanned them.

1419

1   Q.  You didn't fully read them?

2   A.  No.

3   Q.  But you always signed them, correct?

4   A.  Yes.

5   Q.  Did you open any bank accounts for the payday loan

6   business?

7   A.  No.

8   Q.  At this point in time, where did the tribe maintain its

9   bank accounts?

10  A.  It used local banks in Miami, Arvest Bank, IBC Bank, First

11  National Bank.

12  Q.  Did the tribe use any of the accounts at those local banks

13  for the payday loan business?

14  A.  No.

15  Q.  Did the tribe create a tribal entity for the purpose of

16  entering into this agreement with Mr. Tucker?

17  A.  Yes.

18  Q.  What was that entity called?

19  A.  MTE Financial Services.

20  Q.  What does that stand for?

21  A.  Modoc Tribal Enterprises Financial Services.

22  Q.  In creating that tribal entity, did you need to have

23  articles of incorporation?

24  A.  Yes.

25  Q.  Did anyone provide you with the articles of incorporation

1    for that entity?

2    A.   Yes.

3    Q.   Who did that?

4    A.   Scott Tucker.

5    Q.   Now, did you also need to pass any ordinances and

6    resolutions relating to payday lending?

7    A.   Yes.

8    Q.   Did anyone provide you with these ordinances and

9    resolutions to pass?

10   A.   Yes.

11   Q.   Who did that?

12   A.   Scott Tucker.

13   Q.   Did MTE have what is called a doing business name?

14   A.   Yes.

15   Q.   What was that?

16   A.   500 FastCash.

17   Q.   To your knowledge, was Mr. Tucker doing business under that

18   name 500 FastCash prior to entering into the agreement with the

19   tribe?

20   A.   I think so, yes.

21   Q.   Do you know how long?

22   A.   No.

23   Q.   Did MTE have a board of directors?

24   A.   Yes.

25   Q.   Who was on the board of directors?

1    A.  At the beginning it was Chief Follis, Bill Follis, and

2    myself.

3    Q.  Three people were initially on the board of directors of

4    MTE?

5    A.  Yes.

6    Q.  Did that membership change at a later time?

7    A.  Yes.

8    Q.  When did it change?

9    A.  I think just a year or so after we began operation.

10   Q.  So it began in 2003?

11   A.  Yes.

12   Q.  So about around 2004?

13   A.  Yes, I believe so.

14   Q.  So how did the membership of the board of directors change

15   around 2004?

16   A.  The council changed the makeup to make it just one member,

17   one board member.

18   Q.  Who was that one board member?

19   A.  That was me.

20   Q.  So you were the sole board member of MTE beginning around

21   2004?

22   A.  Yes.

23   Q.  You were also the president and CEO of MTE?

24   A.  Yes.

25   Q.  Now, since you were the only board member, were there board

1  meetings?

2  A.  No.

3  Q.  Were there any minutes of board meetings that were

4  maintained for MTE?

5  A.  No.

6  Q.  Now after you signed this service agreement, you served as

7  CEO of MTE, correct?

8  A.  Yes.

9  Q.  How long did you serve as CEO?

10  A.  Ten years.

11  Q.  So it began approximately 2003 until approximately 2013?

12  A.  2000 -- yes, '04 to '14, I think.

13  Q.  During that period of about ten years when you were the CEO

14  and president of MTE, what did you do as part of the payday

15  loan business?

16  A.  I received mail.  I took some phone calls.  I dealt with

17  Scott Tucker.  That's about it.

18  Q.  So other than receiving some mail and taking some phone

19  calls relating to the payday loan business, did you do anything

20  else as the CEO and president of MTE?

21  A.  No.

22  Q.  Did you manage any employees of the payday loan business?

23  A.  No.

24  Q.  Did you set any lending criteria for the payday loans?

25  A.  No.

1  Q.  Did you set any interest rates for the payday loans?

2  A.  No.

3  Q.  Did you review and accept and approve any loan

4  applications?

5  A.  No.

6  Q.  Did you make any policy decisions regarding the loans?

7  A.  No.

8  Q.  Did you issue or did the tribe issue any money to be lent

9  to borrowers for the payday loans?

10 A.  No.

11 Q.  Did you or the tribe collect any interest payments relating

12 to the loans?

13 A.  No.

14 Q.  Were you responsible for the books and records of the

15 payday loan business?

16 A.  No.

17 Q.  Did you manage any Web sites relating to the payday loan

18 business?

19 A.  No.

20 Q.  Did you manage any bank accounts relating to the payday

21 loan business?

22 A.  No.

23 Q.  Did you review any financial statements of the payday loan

24 business?

25 A.  We received a report every month with a check.  That's the

1   extent of any records.

2   Q.  So that report was relating to the checks you received as

3   part of the one percent, correct?

4   A.  Yes.

5   Q.  You didn't review any financial statements generally

6   relating to assets and liabilities of the payday loan company,

7   right?

8   A.  No.

9   Q.  Were you responsible for the books and records of the

10  payday loan business?

11  A.  No.

12  Q.  Were there any tribal members other than yourself who were

13  involved in any way in the payday loan business?

14  A.  No.

15  Q.  Were there any others at the tribe who engaged in any of

16  those activities that we discussed?

17  A.  No.

18  Q.  Now, if you were not operating the payday loan business at

19  the tribe, where were the day-to-day operations of that payday

20  loan business?

21  A.  Kansas City.

22  Q.  Were any of the loans issued on Modoc tribal land?

23  A.  No.

24  Q.  Were any of the loans approved on Modoc tribal land?

25  A.  No.

Q.  Were any of the loans processed or managed on tribal land?

A.  No.

Q.  Were any loan repayments transmitted to or accepted on tribal land?

A.  No.

Q.  Did any of the management or operations take place on tribal land?

A.  No.

Q.  As the CEO, did you have the capability to exercise any control over the payday loan company?

A.  No.

Q.  So if you as the CEO did not manage the operations, who did?

A.  The manager, Scott Tucker.

Q.  So who provided the personnel for the business?

A.  Scott Tucker.

Q.  Who provided the funding for the loans?

A.  Scott Tucker.

Q.  Who marketed the loans?

A.  Scott Tucker.

Q.  Who spoke to potential customers?

A.  Scott Tucker.

Q.  And when we are talking about Scott Tucker, it's Scott Tucker and any employees working for Scott Tucker, correct?

A.  Yes.

Q.  Who collected the principal and interest on the loans that
were issued?

A.  Employees, Scott Tucker.

Q.  Who set the interest rates on the loans?

A.  Scott Tucker.

Q.  Who drafted the loan contracts?

A.  Scott Tucker.

Q.  Who decided to issue a loan to a particular customer?

A.  Scott Tucker.

Q.  At any point in time during your ten years or so at MTE
with the Modoc tribe, did you play any greater role in the
payday lending company?

A.  No.

Q.  What business address was provided for 500 FastCash?

A.  515 G Street Southeast, Miami, Oklahoma.

Q.  Where was that?  In Miami, Oklahoma?

A.  Yes.

Q.  Did anything relating to the operations of the payday
lending company happen at that location?

A.  That's just where my office was.

Q.  And you weren't involved in any of the operations of the
payday loan business?

A.  No.

Q.  But you did receive mail relating to 500 FastCash at that
address, correct?

1    A.   Yes.

2              (Continued on next page)

1    BY MR. RAVI:

2    Q.  And what did you do with that mail?

3    A.  I had the tribal receptionist forward that to Kansas City.

4    Q.  Did you open the mail before it was sent over?

5    A.  No.

6    Q.  How often was the mail sent to Kansas City?

7    A.  Daily or every couple days.

8    Q.  How specifically was it sent over from the tribe to Kansas

9    City?

10   A.  It was put in an overnight bag and mailed or sent UPS or

11   FedEx.

12   Q.  And were you provided with prepaid packaging for the

13   mailings?

14   A.  Yes.

15   Q.  Who provided those to you?

16   A.  Scott Tucker's people.

17   Q.  At some point was there a flood on tribal lands?

18   A.  Yes, 2007.

19   Q.  What was the impact of the flood on the address where the

20   mail was being received?

21   A.  Well, the building was deemed uninhabitable, so we had to

22   move.

23   Q.  So there was no more building there; that was --

24   A.  Correct, it had to be demolished.

25   Q.  How did that affect the mail being received for 500

1  FastCash?

2  A.  We put up a post box, a mailbox and the mail was delivered

3  to the box and we would pick it up and forward it to Kansas

4  City.

5  Q.  At that time after the flood, there was a mailbox, but

6  there was no building actually next to the mailbox?

7  A.  Correct.

8  Q.  And did the mail that was received include bank statements?

9  A.  Yes.

10  Q.  And how did you know that if the mail wasn't opened?

11  A.  It would say a bank's name on the outside of the envelope.

12  Q.  Did you open any of the bank statements or mail relating to

13  the bank statements?

14  A.  No.

15  Q.  Do you know whether there were any bank accounts opened in

16  MTE's name for payday lending names other than 500 FastCash?

17  A.  I don't know.

18  Q.  Now, since the tribal address was given for the business

19  address of 500 FastCash, did any customers contact you at the

20  tribe regarding complaints for loans?

21  A.  Yes.

22  Q.  Generally, what was the nature of these complaints?

23  A.  They were complaining about paying the money back.

24  Q.  About --

25  A.  Their accounts, yes.  Complaining about their accounts.

1   Q.  Did these complaints relate to having paid too much money?

2   A.  Yes.

3   Q.  So what did you do when you received a complaint?

4   A.  We'd get their information and forward it to the -- Kansas

5   City.

6   Q.  Did you have a specific contact in Kansas City?

7   A.  Yes.

8   Q.  Who was that?

9   A.  That was Natalie Dempsey.

10  Q.  Apart from receiving mail and these complaints, did

11  anything else relating to the payday loan business happen on

12  Modoc tribal land?

13  A.  No.

14  Q.  Did you ever express concerns to Mr. Tucker about the lack

15  of tribal role in the business?

16  A.  Yes, after the flood.

17  Q.  Approximately how many times did you do this?

18  A.  Approximately three times.

19  Q.  And how did Mr. Tucker respond when you expressed these

20  concerns?

21  A.  That we -- he would look into it and see what we could do.

22  Q.  Did there ever end up being any increased role, tribal role

23  in the payday loan business?

24  A.  No.

25          MR. RAVI:  I'd like to show you Government Exhibit

1  806.

2  Q.  Do you recognize this?

3  A.  Yes.

4  Q.  Is this an email that you received?

5  A.  Yes.

6          MR. RAVI:  The government offers Government Exhibit

7  806.

8          MR. GINSBERG:  No objection.

9          THE COURT:  Received.

10          (Government Exhibit 806 received in evidence)

11          MR. RAVI:  Please turn to the second page and publish

12  that for the jury, and zoom in on the "from" and "to" of the

13  bottom email.

14  Q.  Who is this email from and to?

15  A.  From me --

16  Q.  To?

17  A.  Oh, to Scott Tucker.

18  Q.  What's the date of that email?

19  A.  January 20, 2005.

20  Q.  Will you please read the first half of that email?

21  A.  "Scott, hope things are well with you.  Chief and I just

22  had a meeting with Don Brady and Chief wants me to request the

23  same information for our enterprise as the Miamis are getting

24  for theirs.  I'm curious about the approval authority Don is

25  exercising.  Daily as I understand.  Does that effect

1  disbursements if he is late, sick, away from access, etc.  I

2  may just be satisfied with reports for our records."

3  Q.  Did you ever get an answer from Mr. Tucker about your

4  question as to whether Mr. Brady's role had an effect on

5  disbursements if he didn't do what he did?

6  A.  Not that I remember.

7  Q.  And was this email an example of one of the times you

8  contacted Mr. Tucker regarding having a larger tribal role in

9  the payday loan business?

10  A.  Yes.

11        MR. RAVI:  Let's go ahead and zoom out and go to the

12  next email.  Go to the first page.

13  Q.  Who is this email from and to?

14  A.  Scott Tucker to me.

15        MR. RAVI:  And just turn to the second page.

16  Q.  What did Mr. Tucker write back to you?

17  A.  "Troy, when would you like to come up?"

18        MR. RAVI:  And then go to the top email on the first

19  page.

20  Q.  And who is this email from and to?

21  A.  Scott Tucker to me.

22  Q.  Can you read the second paragraph?

23  A.  "I cannot make the Wednesday 26th date work.  Please give

24  me any other alternatives, the sooner the better.  I'm anxious

25  to accelerate the amount of business we are doing together.

1  Once we meet and you tour the facility and the operations, we

2  will come up with a system that works for you."

3  Q.  Did there ever come a time that you ended up having or

4  playing any role in the loan approval process?

5  A.  No.

6  Q.  Was there any system that has come up that worked for you

7  with respect to the loan approval?

8  A.  No.

9  Q.  Did you receive any reports of the numbers of loan

10  approvals on a certain day?

11  A.  I'm not sure what was in the reports that we received

12  monthly.  It may have been in that.

13  Q.  And when you say the reports, are you referring to the

14  reports that you got with the check?

15  A.  Yes.

16          MR. RAVI:  We can take that down.

17  Q.  Turning to those checks, how often did you receive those

18  checks?

19  A.  Once a month.

20  Q.  And where did you receive those checks from?

21  A.  Kansas City.

22  Q.  Who signed the checks?

23  A.  Scott Tucker.

24  Q.  And which entities were the checks from?

25  A.  MTE Financial Services and sometimes, I think, CLK and UMS.

1  Q.  Some of the checks were from MTE Financial Services?

2  A.  Yes.

3  Q.  And that is the entity you're president and CEO of,

4  correct?

5  A.  Yes.

6  Q.  And which banks were those checks issued from?

7  A.  U.S. Bank, I believe.

8  Q.  Did you have any control or access to those U.S. Bank

9  accounts in the name of MTE Financial Services?

10  A.  No.

11  Q.  And what did you do with the checks?

12  A.  We would deposit them into tribal accounts.

13  Q.  Where were those located?

14  A.  Arvest Bank in Miami, Oklahoma.

15  Q.  Describe approximately the range of the amounts of the

16  checks that you received.

17  A.  About $20,000 up to two checks for 70- to $80,000 each.

18  Q.  So you would receive sometimes two checks in a single

19  month?

20  A.  Yes, yes.

21  Q.  So that would total over a hundred thousand dollars?

22  A.  Over a hundred thousand dollars, yes.

23  Q.  And how was the amount of the checks calculated, to your

24  understanding?

25  A.  That was the one, 1 percent.

1    Q. And how did you know if the tribe was getting the 1 percent

2    that it was supposed to under the agreement with Mr. Tucker?

3    A. I didn't know.

4    Q. You said you received some reports, correct?

5    A. Yes, the reports matched the checks.

6    Q. Did you have any way to verify those reports?

7    A. No.

8    Q. Was that because you didn't have any access to the

9    financial statements of the payday loan company?

10    A. That's right.

11    Q. Did you ever try to negotiate with Mr. Tucker to receive

12    more than 1 percent?

13    A. Yes, one time.

14    Q. And what was Mr. Tucker's response?

15    A. We'd look into it.

16    Q. And did there end up being any change in the 1 percent?

17    A. No.

18    Q. Did you follow up with Mr. Tucker?

19    A. No.

20    Q. And why didn't you follow up with Mr. Tucker?

21    A. I -- it wasn't a directive from the chief or anything, so

22    it was just something I thought up, and I didn't want to mess

23    anything up for the tribe as far as the money it was receiving.

24    Q. At some point did you visit the payday loan business in

25    Kansas City?

H9rWtuc2                    Little Axe - Direct

1    A.   Yes.

2    Q.   Where did you go specifically?

3    A.   To the offices of MTE, CLK, Scott Tucker's office.

4    Q.   And what was the purpose of that visit?

5    A.   To see the operation, to make introductions with the other

6    tribes, just to have an informational meeting.

7    Q.   And approximately when was the first time you visited the

8    payday loan business?

9    A.   Could you repeat the question?

10   Q.   Sure.  When was the first time that you visited Scott

11   Tucker's offices in Kansas City?

12   A.   2005, I believe.

13   Q.   Was that approximately a year or so after you had started

14   in this relationship with Mr. Tucker?

15   A.   Yes.

16   Q.   Describe the offices.

17   A.   There was, I think, about three floors, office complex.

18   There was floors of computer stations, a lot of people on the

19   phone, talking, and then there were -- a big conference room

20   and Scott's office and some staff offices.

21   Q.   Did you visit Scott's office?

22   A.   Yes.

23   Q.   Describe it, if you recall.

24   A.   It was a pretty big office, had a lot of TVs, some trophies

25   and things like that.

1  Q.  So what happened during this visit?

2  A.  Oh, got a tour of the facility where they, where calls come

3  in, and met with some of the people that were on staff,

4  accountants and met Blaine Tucker, met with some of the other

5  tribal leaders from the Santee tribe.  And that was about --

6  had lunch.

7  Q.  How much discussion was there regarding the operations of

8  the payday loan business at that meeting?

9  A.  Not very much.

10  Q.  Was it more business or more of a social visit?

11  A.  I think it was a social visit.

12  Q.  Approximately how many times have you visited the office,

13  Mr. Tucker's offices in Kansas City?

14  A.  Probably three or four times.

15  Q.  And that's during the approximately ten years that you

16  worked as the president and CEO of MTE?

17  A.  Yes.

18  Q.  Were you compensated as the CEO of MTE?

19  A.  No.

20  Q.  In other words, were you getting any additional money from

21  your position as president and CEO of MTE than you would have

22  otherwise gotten from the tribe?

23  A.  No.

24  Q.  Did you receive any personal perks as a result of your

25  relationship with Mr. Tucker?

1    A.   Yes.

2    Q.   What perks are we talking about?

3    A.   Concert tickets, sporting -- tickets to sporting events,

4    baseball game, football games, in Kansas City, soccer games.

5    Q.   And who paid for all these tickets?

6    A.   Scott Tucker.

7    Q.   Who paid for transportation to these events?

8    A.   Well, I usually drove up myself, except for one event.

9    Q.   What happened during that one event?

10   A.   I -- me and my kids rode up and back with Scott on his

11   plane to Kansas City.

12   Q.   And approximately how many of these types of events and

13   concerts and sports events did you go to on Mr. Tucker's dime?

14   A.   Probably about ten.

15   Q.   Mr. Little Axe, did Mr. Tucker ever serve as an officer of

16   MTE Financial Services?

17   A.   No.

18          MR. RAVI:  I'd like to show you now Government Exhibit

19   17 -- Government Exhibit 817.

20   Q.   Do you recognize this?

21   A.   Yes.

22          MR. RAVI:  The government offers Government Exhibit

23   817.

24          MR. GINSBERG:  No objection.

25          THE COURT:  Received.

1            (Government Exhibit 817 received in evidence)

2    Q.  Does this exhibit contain four different corporate

3    certificates of authority, Mr. Little Axe?

4        I'll also hand you a hard copy if you want to flip through

5    it.

6    A.  What was the question again?

7    Q.  Does this exhibit contain four different corporate

8    certificates of authority?

9    A.  Yes.

10   Q.  And if you can just read the first sentence, first page of

11   Government Exhibit 817.

12   A.  "I, Scott Tucker, do hereby certify that I am secretary of

13   MTE Financial Services Inc., a corporation organized under the

14   laws of the state of Modoc reservation."

15   Q.  You can stop there.  Did Mr. Tucker ever serve as secretary

16   of MTE Financial Services Inc.?

17   A.  No.

18   Q.  And that was a tribal entity, correct?

19   A.  Correct.

20   Q.  And in fact, you were the only officer of MTE Financial

21   Services, correct?

22   A.  Correct.

23   Q.  And you were the only board member, correct?

24   A.  Correct.

25            MR. RAVI:  Turn to the second page.  If we could zoom

1    in next to account title, that's in the middle of the page.

2    Q.  Please read what's next to account title.

3    A.  "MTE Financial Services Inc. d/b/a Rio Resources."

4    Q.  Were you ever aware of MTE Financial Services doing

5    business as Rio Resources?

6    A.  I was aware that we used to receive reports that had Rio

7    Resources on the title.  That's the only time I had seen Rio

8    Resources.

9    Q.  Again, were those the reports relating to the 1 percent

10   check that you would receive?

11   A.  Yes.

12   Q.  What's the date of this corporate certificate of authority?

13   A.  January 15, 2005.

14            MR. RAVI:  Could we turn back to the first page and

15   the first "resolved" line, if you could zoom in on that.  Right

16   at the very top of that.

17   Q.  Is this a corporate certificate of authority relating to

18   U.S. Bank?

19   A.  Yes.

20            MR. RAVI:  Could we turn now to the fourth page of

21   this document.  Zoom in now again on account title.

22   Q.  Can you please read that?

23   A.  "MTE Financial Services Inc. d/b/a PC Today."

24   Q.  Were you ever aware of MTE doing business as PC Today?

25   A.  No.

1    MR. RAVI:  Turn to the sixth page.

2    Q.  Read that account title, please.

3    A.  "MTE Financial Services d/b/a Cash Advance."

4    Q.  Were you ever aware of MTE doing business as a company

5    called Cash Advance?

6    A.  No.

7        MR. RAVI:  If we could turn to the eighth page of the

8    document.

9    Q.  Would you please read next to account title?

10   A.  "MTE Financial Services d/b/a Preferred Cash Loans."

11   Q.  Were you ever aware of MTE Financial Services doing

12   business as Preferred Cash Loans?

13   A.  No.

14       MR. RAVI:  Zoom in on this page and focus in on the

15   signatures.

16   Q.  Whose signatures are those?

17   A.  Scott Tucker and Blaine Tucker.

18   Q.  And do you recognize Scott Tucker's signature?

19   A.  Yes.

20   Q.  Do you recognize Blaine Tucker's signature?

21   A.  Yeah.

22   Q.  So you were familiar with both of these signatures?

23   A.  Yeah, I've seen both of them on checks that the tribe

24   received.

25   Q.  And are these signatures the same on all of these four

1    corporate certificates of authority for U.S. Bank?

2    A.  Yes.

3           MR. RAVI:  We can take that down.

4    Q.  Mr. Little Axe, were you ever aware of MTE doing business

5    as a company called Instant Cash?

6    A.  No.

7    Q.  What about Extra Cash?

8    A.  No.

9    Q.  Now, at some point did you sign an updated service

10   agreement with Mr. Tucker?

11   A.  Yes.

12          MR. RAVI:  I'd like to show you now Government Exhibit

13   808.

14   Q.  And is this an email you received with the updated service

15   agreement?

16   A.  Yes.

17          MR. RAVI:  The government offers Government Exhibit

18   808.

19          MR. GINSBERG:  No objection.

20          THE COURT:  Received.

21          (Government Exhibit 808 received in evidence)

22          MR. RAVI:  Please publish it and focus on the "from"

23   and "to."

24   Q.  Who is this email from and to, Mr. Little Axe?

25   A.  From Scott Tucker to me.

1  Q.  Focusing on the body, can you please read the body of this

2  email?

3          THE COURT:  The jury has this in front of them.  Let's

4  move this along.  They can read it.

5          MR. RAVI:  Can we highlight beginning on the third

6  line from the bottom of the "Conly put" through the end.

7          THE COURT:  OK.  Is there a question pending?

8  Q.  Mr. Little Axe, from this document, do you understand that

9  Mr. Tucker is telling you that the prior service agreement and

10  this service agreement are essentially the same?

11  A.  Yes.

12          MR. RAVI:  Turn now to the service agreement.

13  Q.  This is titled the management agreement, correct?

14  A.  Yes.

15  Q.  And who is this management agreement between?

16  A.  N.M. Service Corporation and MTE Financial Services Inc.

17  d/b/a 500 FastCash.

18          MR. RAVI:  If we could turn now to the second page,

19  looking at 3.1, it states, the first line, "MTE will have the

20  sole proprietary interest in and responsibility for the conduct

21  of business of the lending business, and shall have financial

22  decision-making authority to approve or disapprove any loans to

23  be made by the lending business."

24  Q.  Mr. Little Axe, did you have any final decision-making

25  authority to approve or disapprove any loans being made by the

1   lending business?

2   A.  No.

3        MR. RAVI:  Moving to the next sentence, it says, "Said

4   authority may be exercised through advance instructions or

5   parameters issued to NMS."

6   Q.  Mr. Little Axe, did you ever provide any advance

7   instructions or parameters to NMS regarding loans or loan

8   approvals?

9   A.  Not that I'm aware of.

10       MR. RAVI:  Turning to the second, 3.2, it says, "MTE

11  shall be responsible for providing sufficient capital for the

12  operation of the lending business."

13  Q.  Mr. Little Axe, did the tribe ever provide any capital for

14  the operation of the lending business?

15  A.  No.

16       MR. RAVI:  Finally, turning to section 3.3, turning to

17  the second clause, "MTE shall assure" -- actually, I'll read

18  this whole thing:  "MTE shall assure that the lending business

19  at all times is in compliance with all laws of the Modoc tribe

20  of Oklahoma and shall consummate all transactions within the

21  jurisdiction of the Modoc Tribe of Oklahoma."

22  Q.  Mr. Little Axe, were all loan transactions consummated

23  within the jurisdiction of the Modoc Tribe of Oklahoma,

24  according to this management agreement?

25  A.  No.

1   Q.  Is there some language that's struck out here?

2   A.  Yes.

3   Q.  What's struck out?

4   A.  The Miami tribe was struck out and replaced with Modoc.

5           MR. RAVI:  Turn to page 7 on the screen.  Let's turn

6   to page 6.

7           THE COURT:  Let's move it along, please.

8   Q.  Who signed this document?

9   A.  Me and Scott Tucker.

10          MR. RAVI:  We can take that down.

11  Q.  Mr. Little Axe, was MTE ever a party to a lawsuit?

12  A.  Yes.

13  Q.  What kinds of lawsuits?

14  A.  There was a class action lawsuit in California, some

15  customer lawsuits in Florida and some other states.

16  Q.  And were these all relating to the payday loan business?

17  A.  Yes.

18  Q.  Mr. Tucker, correct?

19  A.  Yes.

20  Q.  And after some of these lawsuits were filed, did the name

21  of MTE change?

22  A.  Yes.

23  Q.  What did it change to?

24  A.  Red Cedar Services.

25  Q.  And approximately what year did that happen?

1    Approximately.

2    A.   Approximately 2010.

3    Q.   And were there any differences between MTE and Red Cedar

4    Services?

5    A.   No.

6    Q.   Was there any change in your position or role as president

7    and CEO?

8    A.   No.

9    Q.   Under Red Cedar Services, was the tribe's role in the

10   lending operation still limited to forwarding mail and

11   receiving some phone calls?

12   A.   Yes.

13   Q.   Was Red Cedar also doing business as 500 FastCash?

14   A.   Yes.

15   Q.   Were you ever aware of Red Cedar doing business as anything

16   other than 500 FastCash?

17   A.   The Rio Resources was about the only one I remember being

18   involved, other name.

19   Q.   And again, is that from the same reports that you got with

20   the checks?

21   A.   Yes.

22   Q.   Did Mr. Tucker open bank accounts for Red Cedar?

23   A.   Yes.

24   Q.   Did you provide a power of attorney for him to do that?

25   A.   Yes.

1  Q.  Did you ever have access to any of those bank accounts

2  opened by Mr. Tucker for Red Cedar?

3  A.  No.

4  Q.  Did you ever actually sign any control over those bank

5  accounts opened by Mr. Tucker for Red Cedar?

6  A.  No.

7          MR. RAVI:  I'd like to show you now Government Exhibit

8  811, which is in evidence.

9  Q.  Are you familiar with the settlement agreement, Mr. Little

10 Axe?

11 A.  Yes.

12 Q.  And is this agreement between Charles Hallinan, Scott

13 Tucker and various other entities?

14 A.  Yes.

15 Q.  Is this dated March 1, 2010?

16 A.  Yes.

17          MR. RAVI:  I'd like to turn now to page 12.

18          THE COURT:  OK.  We're on page 12.  Go ahead.

19          MR. RAVI:  Let's go three more pages down.  My

20 apologies.  Zoom in on the signatures on that page.

21 Q.  Mr. Little Axe, did you sign this document?

22 A.  Yes.

23 Q.  And which entities did you sign on behalf of?

24 A.  I signed or -- signed on behalf of Universal Management

25 Services, CB Services, Executive Global Management, Consumer

1    Services Corp., Silver State Business Administrators Inc.

2    Q.  And did you understand at the time you signed this document

3    what the purpose of this document was?

4    A.  It was to settle this case that Scott had with Hallinan.

5    Q.  Did you know anything about that settlement?

6    A.  No.

7    Q.  Were you, in fact, president of any of these companies?

8    A.  Not that I was aware of.

9    Q.  Well, do you know whether you were president of these

10   companies?

11   A.  No.

12   Q.  And Universal Management Services was one of the parties to

13   the original service agreement, correct?

14   A.  Yes.

15   Q.  And did you hold any positions in any of these five

16   companies at any time?

17   A.  No.

18   Q.  Why did you sign this document?

19   A.  It was sent to me, had signature signs on it, and they said

20   they needed it to settle the, the court case, so I signed.

21   Q.  So you signed even though you weren't an officer or

22   president of any of these companies, correct?

23   A.  Yes.

24   Q.  Did you ever authorize any payments to be made as part of

25   the settlement to Charles Hallinan?

1   A.  No.

2   Q.  Did you ever authorize any payments from MTE bank accounts

3   to Charles Hallinan?

4   A.  No.

5   Q.  At any point in time, did MTE or the tribe purchase any of

6   these five companies that are listed?

7   A.  Not that I'm aware of.

8              MR. RAVI:  I'd like to show you now Government

9   Exhibit --

10             THE COURT:  How much more do you have in your

11   examination, Mr. Ravi?

12             MR. RAVI:  I have about 20 minutes, your Honor.

13             THE COURT:  All right.  We're going to take a break,

14   and during that break, I suggest you trim down your

15   examination.

16             Ladies and gentlemen, enjoy your break.  Please do not

17   discuss the case among yourselves or with anyone.  We'll be

18   back in action in ten minutes.

19             (Jury not present)

20             THE COURT:  See you in ten minutes.

21             (Recess)

22             THE COURT:  Please remain standing for the jury.

23             (Jury present)

24             THE COURT:  All right.  Please be seated.

25             Mr. Ravi, you may continue with your abbreviated

1   examination.

2           MR. RAVI:  Yes, I'm certainly doing my best, your

3   Honor.

4   Q.  Mr. Little Axe, before we started the break, we were

5   talking about these five corporations that you signed as

6   president for, correct?

7   A.  Yes.

8           MR. RAVI:  I'd like to show you Government Exhibit

9   4024.

10          The government offers Government Exhibit 4024.

11          MR. BATH:  No objection.

12          THE COURT:  Received.

13          (Government Exhibit 4024 received in evidence)

14          MR. RAVI:  Please publish that and zoom in on the top

15  half of the document, above with the date as well and the

16  heading.

17  Q.  What does that say at the top left?  Does that say the Muir

18  Law Firm?

19  A.  Yes.

20  Q.  Is this dated December 19, 2011?

21  A.  Yes.

22  Q.  Is this regarding Scott Tucker 2008, 2009 and 2010 document

23  production?

24  A.  Yes.

25  Q.  And does the first line read "Enclosed please find

1   taxpayer's initial responses to your form 4564 IDR, dated

2   November 11, 2011?"

3   A.  Yes.

4           MR. RAVI:  Can we go to the second page.

5   Q.  Who is this document signed by?

6   A.  Timothy J. Muir.

7           MR. RAVI:  Please go to the third page.

8   Q.  At the top, it says, lists CB Services Corp., correct?

9   A.  Yes.

10  Q.  And looking below, next to "What is his ownership interest

11  in this business," what does it say?

12  A.  No.

13  Q.  Right above that, actually, "What is his ownership in this

14  business?"

15  A.  "Mr. Tucker previously owned 100 percent of this business."

16  Q.  And then what does it say, what's the answer to "Does

17  Mr. Tucker still own this business?"

18  A.  "No."

19  Q.  What's the answer to, "If no, was it sold?"

20  A.  "Yes, on or about October 24, 2008, MTE services purchased

21  all outstanding shares of company via stock purchase agreement

22  for $10,000."

23  Q.  As president and CEO of MTE Financial Services, are you

24  aware that Mr. Tucker -- that MTE Financial Services purchased

25  all outstanding shares?

H9rWtuc2                    Little Axe - Direct

1              THE COURT:  Rephrase your question.  Start from the

2      beginning.

3              MR. RAVI:  Thank you.

4      Q.  Mr. Little Axe, are you aware as president and CEO of MTE

5      Financial Services whether MTE purchased all the shares of CB

6      Services Corp.?

7      A.  Not that I --

8              THE COURT:  Do you understand the question?

9              THE WITNESS:  Yes.

10             THE COURT:  OK.  Go ahead.  You can answer.

11     A.  Not that I remember.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. RAVI:

2  Q.  Let's go to the next page.

3        Is this page regarding Consumer Services Corp.?

4  A.  Yes.

5  Q.  Is the same answer provided for when this company was sold?

6  A.  Yes.

7  Q.  Let's go to the next page.

8        Is that for Executive Global Management?

9  A.  Yes.

10  Q.  Is the same answer provided that MTE Financial Services

11  purchased all shares of Executive Global Management?

12  A.  Yes.

13  Q.  Are the same answers also provided in later pages for

14  Universal Management Services and Silver State Business

15  Administrators?

16  A.  Yes.

17        Yes.

18  Q.  Did you ever authorize any payments to Mr. Tucker for MTE's

19  purchase of these companies?

20  A.  No.

21  Q.  So you're not aware whether these companies were ever

22  purchased by MTE, correct?

23  A.  No.

24  Q.  Turning now to Government Exhibit 825.

25        MR. RAVI:  Government offers Government Exhibit 825.

H9R8TUC3                    Little Axe - Direct

1      MR. GINSBERG:  No objection.

2      THE COURT:  Received.

3      (Government's Exhibit 825 received in evidence)

4      MR. RAVI:  Zoom in on the second check.

5  BY MR. RAVI:

6  Q.  Who is this check from, Mr. Little Axe?

7  A.  Red Cedar Services, Inc., d/b/a 500 FastCash.

8  Q.  Which bank is this issued from?

9  A.  US Bank.

10 Q.  Who is the payment to?

11 A.  Scott Tucker.

12 Q.  What is the amount?

13 A.  $3,356,053.67.

14 Q.  Did you authorize this payment?

15 A.  That's my signature.

16 Q.  Did you authorize this payment?

17 A.  I don't remember authorizing this payment.

18 Q.  But that's your signature, correct?

19 A.  Yes.

20 Q.  Let's go to the second page.

21      Is this another check to Level 5 Motorsports?

22 A.  Yes.

23 Q.  Also from Red Cedar Services account at Bay Cities Bank?

24 A.  Yes.

25 Q.  Is that your signature as well?

1    A.  Yes.

2    Q.  Did you authorize this payment?

3    A.  I don't remember authorizing this payment.

4    Q.  Did you sign this check?

5    A.  I don't think so.

6    Q.  Did you ever provide -- was there a way for anyone else to

7    sign your name?

8    A.  Yes.  I provided a signature for a signature stamp to be

9    made up.

10   Q.  Who did you provide that signature stamp to?

11   A.  Either Natalie Dempsey or Scott.

12   Q.  Turn to the next page.

13            THE COURT:  Let me ask you, did you have blank checks

14   for Red Cedar Services?

15            THE WITNESS:  No, I never had any checks.

16            THE COURT:  Thank you.

17   Q.  The next page is another check, correct?

18   A.  Yes.

19   Q.  To Black Creek Capital Corp.?

20   A.  Yes.

21   Q.  Do you believe that was also signed by using a stamp?

22   A.  Yes, it looks like a stamp.

23   Q.  If we can just put the first page -- the second page and

24   third page next to each other.

25            Mr. Little Axe, do those signatures look identical to

1    you?

2    A.  Yes.

3            MR. RAVI:  We can take that down.

4    Q.  At some point was there an article relating to payday

5    lending that was published?

6    A.  Yes.

7    Q.  When was that, approximately?

8    A.  2011.

9    Q.  Let me show you Government Exhibit 813, which the

10   government now offers.

11           MR. GINSBERG:  No objection, your Honor.

12           THE COURT:  No objection you say?  I just didn't hear

13   you.

14           MR. GINSBERG:  No objection.

15           THE COURT:  Received.

16           (Government's Exhibit 813 received in evidence)

17   BY MR. RAVI:

18   Q.  Focus in on the bottom e-mail.

19           Is this e-mail from you?

20   A.  Yes.

21   Q.  Who did you send it to?

22   A.  Scott.

23   Q.  What did you write?

24   A.  "Getting some questions from tribal members on 500 FastCash

25   and it's been a while since we started this thing.  Will you

1  send me operational guidelines of some sort that I can easily

2  explain to them.  As always, thanks for your help."

3  Q.  Did you send this e-mail after that article came out?

4  A.  Yes.

5  Q.  How much time between when the article came out and when

6  you sent this e-mail, approximately?

7  A.  A day, maybe.

8  Q.  Why did you send this e-mail?

9  A.  To give information that we could pass on to tribal members

10  that were asking about the 500 FastCash.

11  Q.  Is that because you were not aware of the operational

12  guidelines of the payday loan company?

13          MR. GINSBERG:  Objection, your Honor, as to leading.

14          THE COURT:  We will avoid the leading.

15  Q.  When this e-mail was sent, were you aware of the

16  operational guidelines of the payday loan company?

17  A.  Today there have been some changes, I believe, from when we

18  started.

19  Q.  Were you aware of how --

20  A.  No.  That's why I asked for it.

21          MR. RAVI:  We can zoom out of that.

22  Q.  Just look at the next e-mail, the response.

23          What is the response from Mr. Tucker?

24  A.  "OK."

25  Q.  Turn now to Government Exhibit 815, which the government

1    now offers.

2           MR. GINSBERG:  No objection.

3           THE COURT:  Received.

4           (Government's Exhibit 815 received in evidence)

5    BY MR. RAVI:

6    Q.  Focusing on the bottom e-mail, who is this e-mail from?

7    A.  Gina McGaughey.

8    Q.  What is her position at the tribe?

9    A.  She was the tribal judge and tribal member.

10   Q.  Why do you understand she sent this e-mail to you?

11   A.  She had seen the article and was concerned about the tribe

12   being in the payday lending business.

13   Q.  How many tribal judges were there at the Modoc tribe?

14   A.  One.

15   Q.  You testified earlier that you received some complaints or

16   adjudications, some complaints relating to the payday loan

17   business, correct?

18   A.  Yes.

19   Q.  Were any of those complaints or anything else relating to

20   the payday loan business adjudicated in tribal courts?

21   A.  No.

22           MR. RAVI:  We can take that down.

23   Q.  Did Chief Follis take any action as a result of that

24   article that came out?

25   A.  Yes.

H9R8TUC3                    Little Axe - Direct

1    Q.  What did he do?

2    A.  He instructed me to notify Scott that we were going to get

3    out of the business.

4    Q.  I would like to show you Government Exhibit 814.

5            MR. RAVI:  Government offers 814.

6            MR. GINSBERG:  No objection.

7            THE COURT:  Received.

8            (Government's Exhibit 814 received in evidence)

9            MR. RAVI:  If you can focus in on -- just highlight

10   the e-mail below on the bottom.

11   BY MR. RAVI:

12   Q.  Who did you send this e-mail to?

13   A.  Tim Muir and Scott.

14   Q.  What did you write?

15   A.  I wrote, "Let me know if you are looking for a replacement

16   tribe.  I have some ideas."

17   Q.  Did you send this e-mail after you learned from Chief

18   Follis that he wanted to get out of the payday loan business?

19   A.  Yes, this is after I notified Scott that we were going to

20   get out of the business.

21   Q.  Why were you suggesting a replacement tribe?

22   A.  To take the business to my tribe if they were interested.

23   Q.  This is the Absentee Shawnee tribe?

24   A.  Yes.

25   Q.  So was that in the event that the Modoc tribe ended its

1  relationship with Mr. Tucker?

2  A.  Yes.

3  Q.  You were hoping that Absentee Shawnee would take over?

4  A.  Yes.

5          MR. RAVI:  We can zoom out of that.  And if we can

6  just focus in on the top e-mail.

7  Q.  Who is this e-mail from?

8  A.  Tim Muir.

9  Q.  And it copies Mr. Tucker, correct?

10  A.  Yes.

11  Q.  If you could just read the first line.

12  A.  "FYI:  We'll get you a formal response to your prior

13  e-mail."

14  Q.  Read the next sentence.

15  A.  "I would suggest on this topic you make sure I'm cc'd if

16  you e-mail Scott and keep Conly off for now."

17  Q.  Did the Modoc tribe end up terminating its relationship

18  with Mr. Tucker?

19  A.  No.

20  Q.  Why not?

21  A.  The tribe had a council meeting and decided to stay in the

22  business.

23  Q.  Did you present at that council meeting?

24  A.  I gave them information on how much money the tribe had

25  made up to that point prior to the meeting.

1   Q.  After that meeting the tribe decided to continue in its

2   relationship?

3   A.  Yes.

4   Q.  Did the tribal council have any involvement in the

5   day-to-day operations of MTE?

6   A.  No.

7   Q.  Mr. Little Axe, we already discussed that MTE was involved

8   in certain lawsuits, correct?

9   A.  Yes.

10  Q.  Were you asked to sign affidavits in connection with those

11  lawsuits?

12  A.  Yes.

13  Q.  Did you draft those affidavits?

14  A.  No.

15  Q.  Who drafted them?

16  A.  Conly Schulte or Joe Messineo from Fredericks Peebles &

17  Morgan law firm.

18  Q.  Did you provide the information that was supposed to be the

19  basis of those affidavits?

20  A.  No.

21  Q.  I would like to show you Government Exhibit 824.

22          Is this one of those affidavits?

23  A.  Yes.

24  Q.  Is this relating to a lawsuit filed in the State of West

25  Virginia?

1    A.  Yes.

2    Q.  Is MTE a party to this lawsuit?

3    A.  Yes.

4    Q.  Turn to the sixth page.

5           MR. RAVI:  The government offers Government Exhibit

6    824.

7           MR. GINSBERG:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibit 824 received in evidence)

10          MR. RAVI:  Zoom in on the top of this as well as the

11   signature.

12   BY MR. RAVI:

13   Q.  Just read that sentence.

14   A.  "I declare the above-stated facts to be known to me as

15   indicated, and make this declaration under penalty of perjury

16   under the laws of the State of Oklahoma.

17          "Executed this 22nd day of October 2007, at Miami,

18   Oklahoma."

19   Q.  Did you sign this document?

20   A.  Yes.

21          MR. RAVI:  Zoom back to the first page.

22          Can we zoom in on the affidavit of Troy Little Axe on

23   the right.

24          Turning now to page 2.  Zoom in on paragraph 2.

25   BY MR. RAVI:

H9R8TUC3                        Little Axe – Direct

1    Q.  The second sentence reads:  "In performance of my duties as

2    director of MTE, I manage the services that MTE and its

3    entities provide, as well as maintain the ultimate

4    responsibility for its books, records and accounts."

5              Mr. Little Axe, was it true that you managed the

6    services that MTE and its entities provided?

7    A.  No.

8    Q.  Was it true that you maintained ultimate responsibility for

9    its books, records and accounts?

10   A.  No.

11   Q.  Was it true that you oversaw the management of the

12   day-to-day operations of MTE?

13   A.  No.

14   Q.  Was it true that you ultimately were responsible for

15   marketing, strategy and compliance with all regulations

16   pertaining to MTE?

17   A.  No.

18             MR. RAVI:  Zoom out and turn to page 3.

19             Zoom in on paragraph 8.

20   Q.  It reads:  "MTE does or has done business under the trade

21   names 500 iFastCash, nofaxingpaydayloan.com, paychecktoday.com,

22   quickestpaydayloan.com, Rio Resources and xtracash.com."

23             Other than 500 FastCash, were you aware when you

24   signed this document whether or not MTE did any business with

25   the other names listed in this paragraph?

1    A.  Yes, just Rio Resources.  That's the only other name I

2    recognize.

3         MR. RAVI:  Go to paragraph 9 on the same page and zoom

4    in.

5    Q.  Reading beginning on the third line at the end:  "And the

6    loan transactions are approved and consummated on Indian lands

7    and within the jurisdiction of the Modoc Tribe of Oklahoma."

8         Was that a true statement?

9    A.  No.

10   Q.  Why was that false?

11   A.  The transactions weren't approved or consummated on Indian

12   lands.

13   Q.  Go to page 4, paragraph 11.

14        It reads:  "MTE, doing business as number of entities,

15   operates on federal Indian lands belonging to the Modoc tribe."

16        Is that a true statement?

17   A.  No.

18   Q.  Why is that false?

19   A.  They don't operate on federal Indian lands.

20   Q.  Finally go to paragraph 14, the bottom of the same page.

21        Just reading the first line:  "100 percent of the

22   profits generated from MTE as well as these doing-business

23   entities are reinvested in economic and governmental purposes

24   of the Modoc tribe."

25        Was that a true statement?

1   A.  No.

2   Q.  Why is that false?

3   A.  We only received one percent of the profits.

4   Q.  Go to Government Exhibit 812.

5           The government offers Government Exhibit 812.

6           MR. GINSBERG:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 812 received in evidence)

9   BY MR. RAVI:

10  Q.  Is this another declaration, Mr. Little Axe?

11  A.  Yes.

12  Q.  Does this declaration also contain false statements?

13  A.  Yes.

14  Q.  Turning to the last page -- actually, the third page.

15          What is the date of this declaration?

16  A.  May 20, 2011.

17  Q.  Did you again sign this under penalty of perjury?

18  A.  Yes.

19  Q.  Going to page 2 at paragraph 3.

20          It states again that you manage the services that MTE

21  provides as well as maintain the ultimate responsibility for

22  its books, records and accounts, correct?

23  A.  That's what it says, yes.

24  Q.  Was that a true statement?

25  A.  No.

1   Q.  Mr. Little Axe, all of the statements that you have said

2   are false, were those true at any time that you were president

3   and CEO of MTE?

4   A.  No.

5   Q.  Did you also sign other similar affidavits that contained

6   similar false statements?

7   A.  Probably.

8           MR. RAVI:  I am not going to go through these, but the

9   government offers Government Exhibits 827, 828, 829, 830 and

10  831.

11          MR. GINSBERG:  I have no objection, your Honor.

12          THE COURT:  Received.

13          (Government's Exhibits 827, 828, 829, 830 and 831

14  received in evidence)

15          MR. RAVI:  Finally, the government also offers

16  Government Exhibit 832.

17          MR. GINSBERG:  I object to this one.

18          THE COURT:  832?

19  BY MR. RAVI:

20  Q.  Mr. Little Axe, do you recognize what is in Government

21  Exhibit 832?

22  A.  Yes.

23  Q.  If we just go to page with the date again.

24          What is the date that's listed?

25  A.  May 1, 2012.

1    Q.  Were you involved still as president and CEO of MTE at this

2    time?

3    A.  Yes.

4              MR. RAVI:  Government offers Government Exhibit 832.

5              MR. GINSBERG:  I still object, your Honor.

6              THE COURT:  It's received.

7              (Government's Exhibit 832 received in evidence)

8    BY MR. RAVI:

9    Q.  If we could go to the first page.

10             Whose declaration is this?

11   A.  Second Chief Judy Cobb.

12   Q.  If we can go to page 5.

13             THE COURT:  What organization was she second chief of?

14             THE WITNESS:  Modoc Tribe of Oklahoma.

15             THE COURT:  Thank you.

16   Q.  Is this declaration filed in relation to the FTC

17   investigation?

18   A.  Yes.

19   Q.  Turning to page 5, paragraph 10.

20             MR. RAVI:  If we can zoom in on that.

21   BY MR. RAVI:

22   Q.  It states:  "Red Cedar Services accepts online applications

23   for short-term loans from qualified individuals.  All loans are

24   approved by Red Cedar Services on federal trust land."

25             Was that true in 2012 when this was signed?

H9R8TUC3                    Little Axe - Direct

1    A.  No.

2              MR. RAVI:  You can take that down.

3    Q.  Mr. Little Axe, what was the purpose of submitting these

4    affidavits of false statements?

5              THE COURT:  You can ask the witness as to his own

6    affidavit, unless you can establish a foundation that he knows

7    as --

8              MR. RAVI:  I will ask about his own, your Honor.

9    Q.  Mr. Little Axe, what was the purpose of you submitting your

10   affidavits that contained false statements?

11   A.  To protect the tribe's sovereignty.

12   Q.  Were those false statements in relation to exaggerating the

13   amount of tribal control there was over the payday loan

14   business?

15   A.  Yes.

16   Q.  At some point did you stop working for Red Cedar Services?

17   A.  Yes.

18   Q.  When was that, approximately?

19   A.  About 2014.

20   Q.  Why did you stop working at Red Cedar Services?

21   A.  Due to the different litigations.

22   Q.  Did you resign?

23   A.  Yes, I resigned.

24             MR. RAVI:  One moment, your Honor.

25             No further questions.

1    THE COURT:  All right.  You may cross.

2    CROSS EXAMINATION

3    BY MR. GINSBERG:

4    Q.  Good afternoon, Mr. Little Axe.

5    A.  Good afternoon.

6    Q.  Going back a little while in your testimony, do you

7    remember you were asked about certain corporations that you

8    signed on behalf of in terms of the settlement in the Hallinan

9    lawsuit?

10   A.  Yes.

11   Q.  And you indicated that although you signed on behalf of

12   those businesses or those corporations, you were not an officer

13   of any of those corporations?

14   A.  Yes.

15   Q.  And that MTE Financial Services had never purchased those

16   corporations?

17   A.  Correct.

18   Q.  I am going to show you what has been marked Defendants'

19   Exhibit D2215.

20        Take a look at the whole document and after you're

21   finished, let us know.

22   A.  OK.  I'm finished.

23   Q.  The third to the last page, if you will go to that, right

24   before the page that's marked schedule A, I will ask you to

25   take a look at that specifically.

1      Are you there?  It's a signature page.

2  A.  OK.  Yes.

3  Q.  Do you recognize the signature on that page?

4  A.  Yes.

5  Q.  Whose signature is that?

6  A.  That's mine.

7  Q.  That's not a stamp, is it?

8  A.  I don't believe so.

9  Q.  This is a document that you signed, is that correct?

10 A.  Yes.

11     MR. GINSBERG:  Your Honor, I would offer Defendants'

12 Exhibit D2215 into evidence.

13     THE COURT:  Any objection?

14     MR. RAVI:  No objection.

15     THE COURT:  Received.

16     (Defendants' Exhibit D2215 received in evidence)

17 BY MR. GINSBERG:

18 Q.  Mr. Little Axe, would you tell the ladies and gentlemen of

19 the jury what this document is.

20 A.  It's a stock purchase agreement.

21 Q.  Who is the stock purchase agreement between?  Which parties

22 is it between?

23 A.  Consumer Service Corp. and MTE Financial Services.

24 Q.  Who is the purchaser in this agreement?

25 A.  MTE Financial Services.

H9R8TUC3                    Little Axe - cross

1    Q.  And what company are they purchasing?

2    A.  They are purchasing Consumer Services Corp.

3    Q.  On what date was this entered into?

4    A.  October 24, 2008.

5    Q.  This is a document you signed, correct?

6    A.  Yes.

7    Q.  So in fact, MTE Financial Services, as of the date of this

8    stock purchase agreement, purchased the stock of Consumer

9    Services Corp., is that correct?

10   A.  Yes.

11   Q.  So it owned Consumer Services Corp., correct?

12   A.  Yes.

13   Q.  The purchaser, MTE Financial Services, you are authorized

14   to sign on behalf of that corporation, is that correct?

15   A.  Can you repeat the question?

16   Q.  You were authorized to sign on behalf of MTE Financial

17   Services, is that correct?

18   A.  Yes.

19   Q.  And you purchased this Consumer Services Corp. from Scott

20   Tucker, is that correct?

21   A.  Yes.

22   Q.  So this corporation did change hands from Scott Tucker to

23   MTE Financial Services, correct?

24   A.  Yes.

25   Q.  So when you signed the Hallinan settlement agreement, MTE

1     Financial Services did own Consumer Services Corp., is that

2     correct?

3     A.  Yes.

4     Q.  So when you signed it, it was true that you owned it,

5     correct?

6     A.  Yeah.

7     Q.  And you had the authority to sign on behalf of the

8     corporation that MTE had purchased, correct?

9     A.  Can you repeat that question?

10    Q.  You had the authority to sign to purchase that corporation,

11    correct?

12    A.  Yes.

13    Q.  On behalf of MTE, correct?

14    A.  Yes.

15    Q.  And when you signed the Hallinan settlement agreement

16    saying that you were authorized by Consumer Services

17    Corporation to settle that lawsuit, you had the authority to do

18    so because MTE had purchased that corporation, correct?

19    A.  Yes.

20    Q.  On direct examination you said you didn't have the

21    authority because you didn't ever own that corporation,

22    correct?

23    A.  Yes.

24    Q.  So which is the truth?

25    A.  I didn't realize this or remember this agreement.  So this

1    is the truth.

2    Q.  So this is the truth?

3    A.  This stock purchase agreement, yes.

4    Q.  In fact, what you testified to on direct examination was

5    incorrect --

6    A.  Incorrect.

7    Q.  -- is that fair to say?

8    A.  Yes.

9         MR. GINSBERG:  You can put that down.

10        I am approaching the witness and showing the witness

11   D2216.

12   Q.  I will ask you to take a look at that and tell us when you

13   have had enough time to read that document.

14   A.  OK.

15   Q.  Do you recognize this document?

16   A.  I don't remember it.

17   Q.  Can you look at page 4?

18   A.  Yes.

19   Q.  Do you recognize the signature on the document?

20   A.  Yes.

21   Q.  Whose signature is that?

22   A.  Mine.

23   Q.  That's not a stamp, correct?

24   A.  Correct.

25        MR. GINSBERG:  Your Honor, I offer D2216 in evidence.

H9R8TUC3                    Little Axe - cross

1            THE COURT:  Any objection?

2            MR. RAVI:  No objection.

3            THE COURT:  Received.

4            (Defendant's Exhibit D2216 received in evidence)

5    BY MR. GINSBERG:

6    Q.  This is also a stock purchase agreement, is it not?

7    A.  Yes.

8    Q.  And this is a stock purchase agreement by MTE Financial

9    Services as the purchaser purchasing all the shares in CB

10   Service Corp. as the company, is that correct?

11   A.  Yes.

12   Q.  This was entered into on October 24, 2008, is that correct?

13   A.  Yes.

14   Q.  And you had the authority to sign this document on behalf

15   of MTE Financial Services, is that correct?

16   A.  Yes.

17   Q.  And you purchased this company from Scott Tucker, is that

18   correct?

19   A.  Yes.

20   Q.  So was this one of the other companies that you signed on

21   behalf of in the Hallinan settlement agreement?

22   A.  Yes.

23   Q.  So when you testified on direct examination that MTE did

24   not own that company and didn't have the authority to sign,

25   that was incorrect, correct?

1  A.  Yes, that was a mistake.

2  Q.  Did you simply forget that MTE Services had purchased CB

3  Service Corporation in 2008?

4  A.  Yes, I forgot.

5  Q.  How many times did you speak or meet with the United States

6  Attorney's Office, prosecutors or agents, in preparation for

7  your testimony here today?

8  A.  Counting today, four times.

9  Q.  About when was the first time you met with them?

10  A.  January 2015, I believe.

11  Q.  And then subsequently you met with them on at least three

12  other occasions after that?

13  A.  Yes.

14  Q.  Did you meet in person?

15  A.  Yes.

16  Q.  Did you go over documents with them?

17  A.  Yes.

18  Q.  Was one of the documents that you went over with them the

19  Hallinan settlement agreement?

20  A.  Yes.

21  Q.  And did they ask you at that time whether or not you were

22  authorized to sign on behalf of the corporations that settled

23  in the Hallinan agreement with your name on it?

24  A.  Right.  Yes.

25  Q.  Did you tell them that you didn't have the authority to do

1    it because MTE did not own those corporations?

2    A.  Yes, that's what I told them.

3    Q.  Did the government ever show you the stock purchase

4    agreements that I just showed you?

5    A.  No.

6    Q.  Did they ever discuss them with you?

7    A.  No.

8            MR. GINSBERG:  Your Honor, I am going to approach and

9    show the witness D2217.

10   Q.  Once again, take a look at the document and tell us when

11   you have had an opportunity to read it.

12   A.  OK.

13   Q.  Did you recognize your signature on this document?

14   A.  Yes.

15   Q.  Again, that's not a stamp, correct?

16   A.  Correct.

17           MR. GINSBERG:  I would offer D2217 into evidence.

18           THE COURT:  Any objection?

19           MR. RAVI:  No objection.

20           THE COURT:  Received.

21           (Defendant's Exhibit D2217 received in evidence)

22   BY MR. GINSBERG:

23   Q.  This is another stock purchase agreement, correct?

24   A.  Yes.

25   Q.  It's also dated October 24, 2008, correct?

1   A.  Yes.

2   Q.  In this one MTE Financial Services as the purchaser is

3   purchasing Executive Global Management, Inc., is that correct?

4   A.  Yes.

5   Q.  And you signed on behalf of MTE Financial Services,

6   correct?

7   A.  Yes.

8   Q.  And Scott Tucker signed --

9   A.  Yes.

10  Q.  -- correct?

11          And this is another one of the companies that you said

12  you didn't have the authority to sign on behalf of or MTE

13  Services did not own when you entered into the Hallinan

14  settlement, is that correct?

15  A.  Yes, that's correct.

16  Q.  So that was another misstatement or incorrect piece of

17  information you gave on direct examination?

18  A.  Yes, it is.

19          MR. GINSBERG:  I am going to approach with D2218.

20          MR. RAVI:  No objection to this, your Honor.

21          THE COURT:  All right.  Received.

22          (Defendant's Exhibit D2218 received in evidence)

23  BY MR. GINSBERG:

24  Q.  Is this another stock purchase agreement, Mr. Little Axe?

25  A.  Yes.

1   Q.  Is this a stock purchase agreement where MTE Financial

2   Services is purchasing Silver State Business Administrators?

3   A.  Yes.

4   Q.  Is it dated October 24, 2008?

5   A.  Yes.

6   Q.  Did you sign on behalf of MTE Financial Services?

7   A.  Yes.

8   Q.  And Scott Tucker signed it on behalf of Silver State

9   Business Administrators?

10  A.  Yes.

11  Q.  And again, this is one of the companies that you signed for

12  in the Hallinan settlement agreement, is that correct?

13  A.  Yes.

14  Q.  When you testified on direct examination, you said you

15  didn't have the authority to sign on behalf of Silver State

16  because MTE Financial Services did not own Silver State, is

17  that correct?

18  A.  That's correct.

19  Q.  And that was wrong?

20  A.  Yes.  It was a mistake.

21  Q.  Finally, D2219.

22          MR. RAVI:  No objection, your Honor.

23          THE COURT:  Received.

24          (Defendant's Exhibit D2219 received in evidence)

25  BY MR. GINSBERG:

1   Q.   Is that another stock purchase agreement?

2   A.   Yes.

3   Q.   Is the purchaser once again MTE Financial Services?

4   A.   Yes.

5   Q.   And did MTE Financial Services purchase Universal

6   Management Services, Inc.?

7   A.   Yes.

8   Q.   And did you sign on behalf of MTE Financial Services?

9   A.   Yes.

10  Q.   Is it dated October 24, 2008?

11  A.   Yes.

12  Q.   And Scott Tucker signed on behalf of Universal Management

13  Services as the seller to you MTE Financial Services as the

14  purchaser, correct?

15  A.   Yes.

16  Q.   And that was the fifth of the five companies that you were

17  asked about in the Hallinan settlement agreement, is that

18  correct?

19  A.   Yes.

20  Q.   And that also was a company that you testified you didn't

21  have the authority to sign on behalf of when you testified on

22  direct examination, correct?

23  A.   Yes.

24  Q.   But that was incorrect, is that right?

25  A.   Correct.   It was a mistake.

1  Q.  So you had the authority to sign and to settle on behalf of

2  all five of those companies, correct?

3  A.  Yes.

4  Q.  And during all the times that you met with the government,

5  with the agents and with the prosecutors, the subject of these

6  stock purchase agreements was never raised with you, is that

7  correct?

8  A.  That's correct.

9  Q.  You never raised it, correct?

10  A.  No.

11  Q.  And they never raised it, correct?

12  A.  Correct.

13  Q.  So your testimony on direct examination was either mistaken

14  or false, correct?

15  A.  Correct.

16  Q.  Under oath, correct?

17  A.  Correct.

18  Q.  You told us before that you're aware that having received

19  immunity you cannot testify falsely because you could still be

20  prosecuted for making false statements, is that correct?

21  A.  That's correct.

22  Q.  Now, during the entire time that you were involved in the

23  payday lending operation on behalf of the Modoc tribe, you were

24  an attorney, correct?

25  A.  Yes.

H9R8TUC3                    Little Axe - cross

1  Q.  And when you received documents, did you review them

2  yourself in your capacity as the attorney for the tribe?

3  A.  Yes.

4  Q.  Were there times where you presented the documents to the

5  tribal council or to the chief to review or discuss as well?

6  A.  Yes.

7  Q.  And if you didn't present it to them, would it be fair to

8  say that you at least advised the tribal council or the chief

9  about documents that you had received in relation to the payday

10 lending business?

11          MR. RAVI:  Objection.

12          THE COURT:  Basis?

13          MR. RAVI:  Relevance, motions in limine.

14          THE COURT:  I will allow it.

15          Do you understand the question?

16 A.  Repeat the question, please.

17 Q.  Basically, would it be fair to say if you received a

18 document that you reviewed but didn't give it to the council or

19 the chief, you made them aware of these legal documents in

20 relation to the payday lending business, is that fair to say?

21 A.  Yes.

22 Q.  And that was your function, correct?

23 A.  Yes.

24 Q.  To advise them, correct?

25 A.  Yes.

1    Q.  And then ultimately it was the chief or the tribal council

2    or another entity of the tribe that had to pass on whether or

3    not they wanted to enter into agreements with a payday lending

4    business or any business, is that correct?

5    A.  Correct.

6    Q.  Now, while you were advising the tribe in your capacity as

7    its attorney, were you overseeing any other businesses on

8    behalf of the tribe?

9    A.  Yes.

10   Q.  What businesses would that be?

11   A.  Let's see.  There was Medcorp Inc., which was a personnel

12   services corporation that the tribe had.  Red Cedar

13   Enterprises, which is an IT business.  That was it.

14   Q.  Were you involved at all in The Stables Casino?

15   A.  I am the gaming commissioner for the gaming commission that

16   regulates the casino.

17   Q.  And that casino is a casino operated or was operated

18   jointly between the Modoc and Miami tribes, is that correct?

19            MR. RAVI:  Objection, your Honor.

20            THE COURT:  Overruled.

21   A.  Repeat the question.

22   Q.  That is a joint venture, The Stables Casino is joint

23   venture between the Modoc and Miami tribes?

24   A.  Yes.

25   Q.  And that casino, that business, is completely operated by

1  Butler National Services Corporation, is that correct?

2              MR. RAVI:  Objection, your Honor.

3              THE COURT:  Sustained.

4  Q.  Prior to entering Modoc entering into the agreement in the

5  payday lending business, did you assist the tribe in entering

6  into any other business contracts?

7              MR. RAVI:  Objection.

8              THE COURT:  Sustained.

9              MR. GINSBERG:  May I approach briefly, your Honor?

10             THE COURT:  I think I understand the issue.

11             Go ahead.

12 Q.  Is it fair to say that the tribe, the Modoc tribe, had

13 other businesses that it had entered into during the time you

14 were working there where the business was operated solely by an

15 outside enterprise?

16             MR. RAVI:  Same objection.

17             THE COURT:  Sustained.

18 Q.  Did the Modoc operate The Stables Casino?

19             MR. RAVI:  Objection.

20             THE COURT:  Sustained.

21 Q.  Did you learn, because of the joint venture between the

22 Modoc and the Miami tribes in relation to the casino, did you

23 learn about the Miami tribe being involved in the payday

24 lending business?

25 A.  Yes.

1    Q.  And did you learn that the Miami tribe was involved in the

2    payday lending business in conjunction with Scott Tucker?

3    A.  Yes.

4    Q.  Do you recall who brought that to your attention?

5    A.  The chief of the Miami tribe, Floyd Leonard, and Chief

6    Follis had a meeting and they brought me in.

7    Q.  The two chiefs had a meeting and you were brought into the

8    meeting?

9    A.  Yes.

10   Q.  You learned during the course of that meeting about the

11   Miami tribe's business, payday lending business with Mr.

12   Tucker, correct?

13   A.  Correct.

14   Q.  Was it subsequent to that that you received the letter of

15   intent that we reviewed here today?

16   A.  Yes.

17   Q.  After you received the letter of intent, there was a

18   service agreement, is that correct?

19   A.  Yes.

20   Q.  The tribe agreed to enter into that service agreement, is

21   that correct?

22   A.  Yes.

23   Q.  Now, who would have needed to approve entering into that

24   service agreement on behalf of the Modoc tribe?

25   A.  The council would have to approve the agreement.

1  Q.  That's the tribal council?

2  A.  Yes.

3  Q.  Was it presented, to your knowledge, to the tribal council?

4  A.  Yes.

5  Q.  Were you present when it was presented?

6  A.  I don't remember.

7  Q.  In any event, it was presented at some point?

8  A.  Yes.  I was instructed by the tribal council and the chief

9  to sign the agreement.

10  Q.  You were instructed by the chief to sign it?

11  A.  Yes.

12  Q.  Which would indicate that the tribal council had agreed to

13  it, correct?

14  A.  Yes.

15  Q.  And prior to the meeting that led to the tribal council

16  agreeing to enter into it, had you discussed and advised the

17  chief and/or the tribal council about the nature of the service

18  agreement?

19           MR. RAVI:  Objection.  Relevance and privilege.

20           THE COURT:  Overruled.

21           If you can answer it without disclosing any privileged

22  information, you may answer it.  And you can answer it yes or

23  no.

24           THE WITNESS:  What was the question?

25           MR. GINSBERG:  I need that one to be read back.

1         THE COURT:  "And prior to the meeting that led to the

2    tribal council agreeing to enter into it, had you discussed and

3    advised the chief and/or the tribal council about the nature of

4    the service agreement?"

5    A.  Yes.

6    Q.  Was it your belief after you advised -- did you advise the

7    chief, the council, or both?

8    A.  The chief.

9    Q.  After you advised them, was it your belief or understanding

10   that he understood what you had explained to him about the

11   agreement?

12   A.  Yes.

13   Q.  Do you recall one way or the other whether he asked you to

14   be present at the tribal council meeting when it was put up for

15   a vote?

16   A.  I just don't remember whether he had asked me to be there

17   or not.

18   Q.  OK.  And you would have explained all the terms that were

19   in the service agreement, is that correct?

20   A.  I don't think I would have explained all the terms, just

21   what it was generally.

22   Q.  Would you have explained the important terms in the

23   agreement?

24   A.  Yes, the important terms.

25   Q.  And the board concepts?

1    A.  Yes.

2    Q.  After the service agreement was signed, did the tribe need

3    to do anything further before it could actually begin in the

4    payday lending business?

5    A.  Yes.

6    Q.  What else did the tribe need to do in order to be able to

7    go forward in the payday lending business?

8    A.  It needed to create the tribal company.

9    Q.  Which tribal company was it that they created?

10   A.  MTE Financial Services.

11   Q.  And how was that done?  What was the process to doing that?

12   A.  They have a meeting authorizing the resolution to create

13   the company.

14   Q.  And they did?

15   A.  And appoint the board of directors.

16   Q.  And did they do that?

17   A.  Yes, they did that.

18   Q.  Did they appoint a board of directors?

19   A.  Yes.

20   Q.  Was that when they initially appointed three people?

21   A.  Yes.

22   Q.  And eventually I think you said maybe it became a one

23   person board of directors later on?

24   A.  Yes.  Not too long after that they dropped it down to one.

25   Q.  And that was you?

1  A.  Yes.

2  Q.  Was there anything else that the tribe needed to do to

3  comply with laws and regulations in order to begin operating

4  the payday lending business?

5  A.  Yes.  The tribe didn't have any laws or regulations

6  relating to payday lending so they needed to pass some laws.

7  Q.  Did they pass the laws?

8  A.  Yes.

9  Q.  I believe you told us that you received materials, various

10  materials from Scott Tucker in relation to some of the things

11  that the tribe had to review and pass before they can enter

12  into the business, is that correct?

13  A.  Yes.

14  Q.  Was that because the tribe had never been in this business

15  before?

16  A.  Yes.

17  Q.  And the tribe didn't have those agreements on hand, is that

18  correct?

19  A.  That's correct.  That's correct.

20  Q.  Did you request Mr. Tucker to provide them to you so the

21  tribe could have a format to work from?

22  A.  Yes.  I didn't want to draft them myself.

23  Q.  And he did that, correct?

24  A.  Yes.

25  Q.  Do you remember if you received those from Mr. Tucker or

1  from an attorney representing Mr. Tucker or one of his

2  businesses?

3  A.  I don't remember.

4  Q.  Do you recall at or about the same time you received these

5  various documents from Mr. Tucker that you were also provided

6  with an opinion letter from a law firm?

7  A.  Yes.

8  Q.  Did you request that from Mr. Tucker?

9  A.  It was given to us in the beginning.

10  Q.  Was it provided to you?

11  A.  It was provided to the tribe and the chief and the chief

12  gave it to me.

13  Q.  Did he give it to you to review?

14  A.  Yes.

15  Q.  Without going into the contents of that document, is it

16  fair to say it was an opinion from a law firm signed by a

17  lawyer?

18  A.  Yes.

19  Q.  And it had to do with the payday lending business, correct?

20  A.  Yes.

21  Q.  And was that something that you or the chief thought was

22  important to review first before embarking on this business?

23          MR. RAVI:  Objection.  Relevance.

24          THE COURT:  Overruled.

25  A.  Yes.

1    Q.  And in all, can you tell us how many different resolutions

2    or other measures the tribal council and the tribe had to

3    approve before they can begin the lending, the payday lending

4    business?

5    A.  There was probably three or four resolutions, including the

6    incorporation of the company, the various laws and there were

7    some additions, sections to the business code.

8    Q.  Was all that done?

9    A.  Yes.

10   Q.  And was it done with the assistance of either Scott Tucker

11   or one of his lawyers by providing you with information that

12   you needed?

13   A.  Yes.

14   Q.  And did you review all of those things?

15   A.  Yes.

16              MR. GINSBERG:  I would like to show the witness

17   Defendants' Exhibit D1007.

18   Q.  I would ask you to take a look at that document and tell us

19   when you have had an opportunity to read it.

20   A.  Yes.

21   Q.  Do you recognize what that is?

22   A.  Yes.

23   Q.  You recognize the signatures on the bottom?

24   A.  Yes.

25   Q.  You recognize your signature?

1    A.  Yes.

2    Q.  Who else's signature do you recognize?

3    A.  Bill Follis, the chief.

4            MR. GINSBERG:  Your Honor, I would offer Defendants'

5    Exhibit D1007 into evidence.

6            MR. RAVI:  Objection.

7            May we approach as well, your Honor, if necessary?

8            THE COURT:  Ladies and gentlemen, we are going to

9    break a little bit early for lunch.

10           Please do not discuss the case among yourselves or

11   with anyone.  We will be back in action at 2:00.

12           Thank you.

13           (Jury exits courtroom)

14           (Witness exits courtroom)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    (Jury not present)

2    THE COURT:  Mr. Ravi, basis.

3    MR. RAVI:  Both on hearsay, as well as we understand

4  that is a legal document.

5    THE COURT:  Illegal document?

6    MR. RAVI:  A legal document.  This is based on tribal

7  law.  Essentially it's the same as us putting in New York

8  Business Corporation's Law into the record, and we understand

9  the law is the province of the judge.

10    THE COURT:  No, it's not that at all.  It's a

11  resolution.  It's not a law.  It's a resolution amending the

12  bylaws and articles of incorporation for MTE Financial

13  Services.

14    Objection is overruled.

15    (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

H9rWtuc4                    Little Axe - Cross

                          AFTERNOON SESSION

 1                         AFTERNOON SESSION

 2                            2:10 p.m.

 3          THE COURT:  All right.  Bring in the jury, please.

 4          (Jury present)

 5          THE COURT:  Please be seated.

 6          Mr. Ginsberg, you may continue.

 7          MR. GINSBERG:  I believe, your Honor, you made a

 8   ruling when the jury was not present as to the last document.

 9          THE COURT:  Yes.  Overruled.  What's the exhibit

10   number?

11          MR. GINSBERG:  Defendant's D1007.

12          THE COURT:  It's received.

13          (Defendant's Exhibit D1007 received in evidence)

14          THE COURT:  Ladies and gentlemen, it's a resolution.

15   You are to consider it for what the resolution purports to do.

16   You'll see that in making the resolution, there are a lot of

17   "whereas" clauses, three of them in particular.  They're not

18   admitted for the truth of their content; they're just things

19   that were said at the time.

20          Go ahead.

21   CROSS-EXAMINATION CONTINUED

22   BY MR. GINSBERG:

23   Q.  Mr. Little Axe, now that Defendant's Exhibit D1007 is in

24   evidence, can you tell us what that document is?

25   A.  It's a resolution to amend the bylaws and articles of

1  incorporation for MTE Financial Services.

2  Q.  What was the purpose, ultimate purpose of this particular

3  resolution?

4  A.  After the initial creation and the -- there needed to be an

5  amendment to the bylaws and articles of incorporation.

6  Q.  And that was done, correct?

7  A.  Yes.

8  Q.  And that needed to be done based on tribal law?

9  A.  Based on -- yes, as far as I knew, the council wanted it

10  done.

11  Q.  OK.  I'll show you also now defendant's D1008.

12          MR. GINSBERG:  Actually, if I may, Judge, I'm going to

13  put a few documents up at the same time to make it easier.

14          THE COURT:  All right.  Thank you.

15          What's the question?

16  Q.  Have you had an opportunity to review D1008?

17  A.  Yes.

18  Q.  Do you recognize that document?

19  A.  Yes.

20  Q.  Is your signature on the first page of that document?

21  A.  Yes.

22  Q.  Do you recognize the other signature on the first page of

23  the document?

24  A.  Yes.

25  Q.  And whose signature is that?

H9rWtuc4                    Little Axe - Cross

1    A.  Phil Follis, the chief.

2            MR. GINSBERG:  Your Honor, I offer defendant's D1008

3    into evidence.

4            THE COURT:  All right.  Any objection?

5            MR. RAVI:  Objection, your Honor.  This appears to be

6    a law or an act, which is different than the previous exhibit.

7            MR. GINSBERG:  It is different.

8            THE COURT:  It's a statute, or what have you?

9            MR. GINSBERG:  It's a resolution, again, and it

10   attaches to it some terms that go along with the resolution.

11           THE COURT:  I'll allow that.  Having reviewed it

12   further, I'll allow it.

13           (Defendant's Exhibit D1008 received in evidence)

14   BY MR. GINSBERG:

15   Q.  Can you tell us what D1008 is?

16   A.  It's a resolution to enact the loans and debt act for the

17   tribe and to appoint me director of the -- to oversee and

18   administer Cash Advance Services, in section 2.

19           THE COURT:  Again, things in a "whereas" clause are

20   not admitted for the truth of their content.

21           Go ahead.

22   Q.  And this resolution was passed on November 1 of 2004, is

23   that correct?

24   A.  Yes.

25   Q.  By a vote of four to nothing, by the council, correct?

1    A.   Yes.

2    Q.   And attached to the first page, the resolution, is a longer

3    document that we won't go into, all of it, but it generally

4    lays out terms and conditions regarding loans and rates of

5    interest and things of that nature, is that fair to say?

6    A.   Yes.

7    Q.   And that was part of what the council passed, correct?

8    A.   Yes.

9    Q.   I also put in front of you a document that's marked D1004,

10   if you would take a look at that, please.

11   A.   Yes.

12   Q.   Do you recognize what that is?

13   A.   Yes.

14   Q.   On the last page of this document, do you recognize your

15   signature?

16   A.   Yes.

17   Q.   And the signature, the other signature is whose signature?

18   A.   Yes, Phil Follis or Phil A. Follis and Phil W. Follis.

19            MR. GINSBERG:  I'd offer Defendant's Exhibit D1004

20   into evidence, your Honor.

21            THE COURT:  All right.  Let me see the second page of

22   the document.  It's four pages?  Is it one page, two pages, or

23   four pages?

24            MR. GINSBERG:  I think it's out of order.  I think the

25   pages are stapled out of order, so it's more than four pages,

1    but the second page is the ultimate signature page.

2              THE COURT:  All right.  Let me just see.  And the

3    exhibit number is?

4              MR. GINSBERG:  D1004.  I have an extra copy, your

5    Honor.

6              THE COURT:  One second.

7              Any objection?

8              MR. RAVI:  No objection, your Honor.

9              THE COURT:  All right.  It's received.

10             (Defendant's Exhibit D1004 received in evidence)

11   BY MR. GINSBERG:

12   Q.  Could you tell us what this document is, Mr. Little Axe?

13   A.  It's the articles of incorporation for MTE Financial

14   Services.

15   Q.  And what body had to approve this document?

16   A.  The tribal elected council.

17   Q.  And they did so, correct?

18   A.  Yes.

19   Q.  And that was in, according to this document, that would

20   have been on November 1 of 2004, is that correct?

21   A.  Yes.

22   Q.  If you look at --

23   A.  Yes.

24   Q.  Yes.  Thank you.

25        And this was another document that was required in order

H9rWtuc4                    Little Axe - Cross

1    for the tribe to enter into the -- to enter into a business, to

2    begin with, correct?

3    A.  Yes.

4    Q.  And specifically to enter into this business, correct?

5    A.  Yes.

6            THE COURT:  Required by whom, sir?

7            THE WITNESS:  Required by the, the tribe.

8            THE COURT:  OK.  Thank you.

9    BY MR. GINSBERG:

10   Q.  Also, I believe, before you is Defendant's Exhibit D1038.

11   Do you see that?

12   A.  Yes.

13   Q.  Do you recognize what that is?

14   A.  Yes.

15   Q.  Do you recognize the signature on that document?

16   A.  Yes, that's my signature.

17           MR. GINSBERG:  I'd offer Defendant's Exhibit D1038,

18   your Honor.

19           THE COURT:  Any objection?

20           MR. RAVI:  No objection.

21           THE COURT:  Received.

22           (Defendant's Exhibit D1038 received in evidence)

23   BY MR. GINSBERG:

24   Q.  Can you tell us what this document is?

25   A.  This is a license to, for MTE Financial Services to operate

1    as a lending entity on tribal land.

2    Q.  And can you read underneath the top portion where it says

3    Modoc Tribe of Oklahoma?  Can you just read the next few lines?

4    A.  "The United States of America Federally Recognized

5    Sovereign Tribal Government."

6    Q.  And the next.

7    A.  "Pursuant to the United States of America, Federal Law 25

8    U.S.C. 501–510(c), Federal Register 68180, Public Loan No.

9    103–454 (1994); 108 Stat. 4791, 4792."

10           THE COURT:  Ladies and gentlemen, again, statements

11   like this on the document are not admitted for the truth of

12   their content.  To the extent they purport to state some

13   principle of law, disregard it.  It's my instructions on the

14   law that govern in this case.

15           Go ahead.

16           MR. GINSBERG:  Thank you, your Honor.

17           You can take that down.

18   Q.  You testified on direct examination about, you were asked a

19   series of questions as to what you did or the board of

20   directors did in relation to the payday lending business.  Do

21   you recall those questions?

22   A.  Yes.

23   Q.  And particularly, you were asked when you became the

24   one-member board, if you had any, if you held any meetings.  Do

25   you recall that?

1   A.  Right.

2   Q.  And you said you didn't, correct?

3   A.  Correct.

4   Q.  Did anybody prevent you from holding any meetings?

5   A.  No.

6   Q.  And of course, there were no minutes because you didn't

7   hold any meetings, correct?

8   A.  Correct.

9   Q.  Also, you said that you were the CEO for ten years,

10  correct?

11  A.  Yes.

12  Q.  During those ten years, would it be fair to say that you

13  met with Tim Muir on at least 10 or 12 occasions, either on

14  tribal land or in Oklahoma -- or in Kansas City?

15  A.  Yes.

16  Q.  And the purpose of those meetings was to discuss the payday

17  lending business, is that fair to say?

18  A.  Yes.

19  Q.  And during those meetings, would it be fair to say that he

20  discussed with you how the payday lending business was being

21  serviced?  Correct?

22  A.  Yes.

23  Q.  And you discussed the payments that the tribe was

24  receiving, is that correct?

25  A.  Yes.

1  Q.  And in addition, he discussed with you the way that the

2  servicer, that is, the operation in Kansas City, had

3  established the criteria to approve the payday loans, is that

4  correct?

5          MR. RAVI:  Objection to form.

6          THE COURT:  Rephrase it, please.

7  Q.  Did he discuss with you during any of those meetings the

8  manner in which the criteria had been established by the

9  servicing company to approve the payday loans?

10         MR. RAVI:  Objection to servicing company.

11         THE COURT:  No.  I'll allow the question.

12         Do you understand the question?

13         THE WITNESS:  Yes, I understand the question.

14         THE COURT:  All right.  Then see whether you can

15 answer.

16 A.  Yes.

17 Q.  At some point do you recall him explaining to you that

18 there was a program called DataX, criteria to establish whether

19 a loan should be approved or not?

20         MR. RAVI:  Objection.  Hearsay.  Not a party

21 admission.

22         THE COURT:  What's the purpose of offering this?

23         MR. GINSBERG:  Because on direct examination, the

24 government attempted to establish that he knew nothing about

25 how the loans were being approved or the criteria.

1    THE COURT:  All right.  This is, in essence,

2    impeachment, right?  You're not offering it for the truth of

3    its content.

4    MR. GINSBERG:  No, no.

5    THE COURT:  OK.  You can answer it if you can.

6    A.  I didn't know -- I don't recall direct or DataX, but I knew

7    that there was a formula of some sort that was being used to

8    determine to issue out a loan or not.

9    Q.  And you were made aware of that as the CEO, correct?

10   A.  Yes.

11   Q.  And you were OK with it, is that correct?

12   A.  Yes.

13   Q.  And you were OK with it because it was being done by the

14   company that was doing all the servicing work for the tribe in

15   order for the loans to be made, is that fair to say?

16   A.  Yes.

17   Q.  Now, did there come a point in time where the tribe decided

18   that it wanted to terminate its relationship with Mr. Tucker or

19   his businesses?

20   A.  The tribe -- yes.

21   Q.  And do you recall -- well, was the tribe at some point, was

22   MTE Financial Services at some point in a relationship with NM

23   Service Corporation?

24   A.  Yes.

25   Q.  And the tribe determined at some point that it wanted to

1    terminate that relationship, is that correct?

2    A.  Yes.

3    Q.  And it was the tribe's decision to terminate that

4    relationship, correct?

5    A.  Yes.

6    Q.  And do you recall being directed or told or asked by the

7    council or the chief to send a letter to NM Services

8    corporation advising them that you wanted to terminate your

9    relationship?

10   A.  Yes.

11        MR. GINSBERG:  May I approach with defendant's D2202?

12   Q.  Again, I'll ask you a similar question as the other

13   documents.  Do you recognize that document?

14   A.  Yes.

15   Q.  Do you recognize your signature?

16   A.  Yes.

17        MR. GINSBERG:  I'd offer Defendant's Exhibit D2202,

18   your Honor.

19        THE COURT:  Any objection?

20        MR. RAVI:  Yes, your Honor.  Hearsay.

21        THE COURT:  No.  I think it's an operative fact.  It's

22   not a statement.  What's the fact in there?  What fact do you

23   think exists in there?

24        It's overruled.

25   BY MR. GINSBERG:

1   Q.  Could you read --

2            MR. GINSBERG:  The jury has it in front of them.  I

3   offered it and it's overruled.  It's in evidence, so it can be

4   shown to the jury.

5            THE COURT:  Received, yes.

6            (Defendant's Exhibit D2202 received in evidence)

7   BY MR. GINSBERG:

8   Q.  This letter was sent to NM Service Corp., correct?

9   A.  Yes.

10  Q.  And you asked NM Service Corp. to refer all inquiries to

11  your legal counsel Conly Schulte, correct?

12  A.  Yes.

13  Q.  And you give the address of his firm, correct?

14  A.  Yes.

15  Q.  And then you sign as the chairman, correct?

16  A.  Yes.

17  Q.  So at the time that this was done, you were the CEO, the

18  chairman, correct?

19  A.  Yes.

20  Q.  You were an attorney, correct?

21  A.  Yes.

22  Q.  You were advising the tribe, correct?

23  A.  Yes.

24  Q.  And in addition, you had legal counsel from the firm of

25  Fredericks Peebles & Morgan, correct?

1    A.  Yes.

2    Q.  And you were asking NM Service to respond to that firm and

3    basically to begin negotiations to terminate the relationship,

4    correct?

5    A.  Yes.

6    Q.  And you did so because you were directed to do that by the

7    council or by the chief, correct?

8    A.  Yes.

9    Q.  If you're unsure --

10   A.  I really don't remember.

11   Q.  OK.  Did somebody direct you, or was it your own

12   determination to terminate the relationship?

13   A.  I -- I don't remember.

14   Q.  Would you have been in a position to terminate the

15   relationship without the approval of either the chief or the

16   tribal council?

17   A.  No.

18   Q.  So you just don't recall now who it was, but somebody --

19   either the chief or the council -- asked you to do this,

20   correct?

21   A.  Correct.  I don't recall.

22   Q.  And was the relationship terminated?

23   A.  With NMS, yes.

24   Q.  And did you begin a relationship with another company?

25   A.  Yes.

1   Q.  And do you recall what the next company was that you began

2   a relationship with regarding the payday lending business?

3   A.  I -- it was either UMS or CLK.

4   Q.  So it was another company, correct?

5   A.  Yes.

6   Q.  And eventually, did you enter into a relationship with AMG?

7   A.  Oh, yes.  Yes.

8   Q.  Was it at this time, or was it --

9   A.  It could have been, yes.

10  Q.  So it could have been at this time that the Modoc tribe

11  entered into a relationship with AMG?

12  A.  Yes.

13  Q.  Correct?

14  A.  Yes.

15  Q.  And the purpose of that relationship was for AMG to take

16  over the servicing of the loan business that the Modoc tribe

17  was involved in, is that correct?

18  A.  Correct.

19  Q.  And at the time you entered into that agreement, AMG was

20  being operated by the Miami Tribe of Oklahoma, is that correct?

21  A.  That's correct.

22  Q.  And you knew that because of your relationship with the

23  Miami tribe and certain individuals at the Miami tribe,

24  correct?

25  A.  Correct.

1  Q.  Prior to entering into that relationship, had you had

2  discussions with Don Brady?

3  A.  Yes.

4  Q.  And was it about your potentially entering into this

5  relationship with AMG?

6  A.  Yes.

7  Q.  And in fact, you entered into that relationship, and then

8  AMG took over the servicing and all the other things about the

9  loans that had previously been done by NM Service Corp., is

10  that correct?

11  A.  That's correct.

12  Q.  And you knew that AMG was tribally run by the Miami Tribe

13  of Oklahoma, correct?

14  A.  Yes.

15  Q.  And how long, if you recall, did that relationship

16  continue?

17  A.  Until about 2012 or 2014.  I'm not really sure.

18  Q.  OK.  During that period of time, I think you told us on

19  direct examination there came a point where the chief was upset

20  because he was getting a lot of either information or calls

21  from tribal members about the tribe being involved in the

22  payday lending business.  Is that correct?

23  A.  Yes, that's correct.

24  Q.  And he spoke with you about continuing that business or

25  not, correct?

1    A.  Correct.

2    Q.  And that was about 2011, is that correct?

3    A.  Yes, 2011.

4    Q.  And that was after an article had been written and various

5    tribal members had read the article, correct?

6    A.  Yes.

7    Q.  But notwithstanding the information he had received, the

8    tribe continued at that point in the tribal lending business --

9    in the payday lending business, correct?

10   A.  Yes.

11   Q.  And when that was happening, when the chief was considering

12   possibly terminating the payday lending business, you had the

13   idea of speaking with Scott Tucker that if the Modoc ended

14   their relationship, you would like Mr. Tucker to entertain

15   bringing that same relationship to your tribe, correct?

16   A.  Yes.

17   Q.  That is, the tribe that you're a member of, correct?

18   A.  Correct.

19   Q.  And that didn't happen because the relationship with the

20   Modoc continued, correct?

21   A.  Correct.

22   Q.  And did there come a time when -- withdrawn.

23        When did Red Cedar Services become involved in the

24   payday lending operation on behalf of the Modoc tribe?

25   A.  Around 20 -- 2010.

1  Q.  And was there a particular reason why Red Cedar Services

2  came into existence?

3  A.  Yes.

4  Q.  And what was that reason?

5  A.  To replace MTE's services.

6  Q.  And Red Cedar Services, then, without going through all the

7  documents again, did Red Cedar Services then go through the

8  same process of incorporation within the tribal council rules?

9  A.  Yes.

10  Q.  And everything else that needed to be done to allow Red

11  Cedar Services to operate the payday lending business, correct?

12  A.  Correct.

13  Q.  And those same resolutions and acts and incorporations

14  would have had to be done by the tribal council, correct?

15  A.  Correct.

16  Q.  And that was all done, correct?

17  A.  Yes.

18  Q.  And Red Cedar Services then began its operation, correct?

19  A.  Yes.

20  Q.  Now, did there come a time in about 2013 when Red Cedar

21  Services had a problem continuing the payday lending because of

22  certain governmental actions or regulatory actions?

23  A.  Yes.

24  Q.  And when that happened, did Red Cedar Services need to and

25  attempt to find another processer to process the loans that

1    were being made?

2    A.  Yes.

3    Q.  And was it Red Cedar Services that reached out to try to

4    get another processer?

5    A.  No.

6    Q.  Who did that for Red Cedar Services?

7    A.  Tim Muir, I think.

8    Q.  And he assisted --

9    A.  Scott.

10   Q.  -- Red Cedar Services, correct?

11   A.  Red Cedar Services, yes.

12          THE COURT:  I didn't hear.  Back up.  I didn't hear

13   your answer, sir.  Who did what?

14          THE WITNESS:  Tim Muir.

15          THE COURT:  Did what?

16          THE WITNESS:  Assisted Scott and Red Cedar Services.

17          THE COURT:  Thank you.

18   BY MR. GINSBERG:

19   Q.  And that was to try to get another, what's called an ACH, a

20   bank, to process the loans, correct?

21   A.  Yes.

22   Q.  And was an attempt, was there an attempt to enter into an

23   agreement with Marion Bank, if you recall?

24   A.  Yes.

25   Q.  Did that succeed?

1    A.  No.

2    Q.  Did Red Cedar Services eventually obtain another bank or

3    another method to process its loans?

4    A.  Yes.

5    Q.  And did there come a time where Red Cedar Services, in or

6    around 2013 or 2014, operated on its own, without a servicing

7    company?

8              MR. RAVI:  Objection.  Scope.

9              THE COURT:  I'll allow it.

10   A.  Yes.

11   Q.  And Red Cedar Services, by that time, was able to do its

12   own servicing, is that correct?

13   A.  Yes.

14   Q.  Because through all the years of having other companies do

15   the servicing, Red Cedar Services and the Modoc tribe had

16   learned how to do that work on its own, correct?

17   A.  Yes.

18   Q.  And basically could become self-sufficient in running the

19   business without an outside company, correct?

20   A.  Correct.

21   Q.  And that was beneficial to the tribe because the tribe

22   could make more money that way, correct?

23   A.  Correct.

24   Q.  Now, before that happened, at the time you were searching

25   for another ACH processer and the relationship with any other

H9rWtuc4                    Little Axe - Cross

1    servicer terminated, about how much money did the tribe have in

2    the bank as a result of the payday lending business?

3              MR. RAVI:  Objection.  Foundation.

4              THE COURT:  Overruled.

5    A.  Probably about --

6              THE COURT:  Don't give us "probably."

7              THE WITNESS:  I don't know.

8              THE COURT:  If you know or you can provide a good

9    faith estimate, you can provide a good faith estimate, but

10   don't guess.

11   A.  A good faith estimate would be $9 million.

12   Q.  Was there a point in time that the tribe had $23 million

13   before it began to operate on its own as a result of its prior

14   relationships?

15   A.  Could you repeat the question again?

16   Q.  Was there a time when the tribe had amassed approximately

17   $23 million in profits, on its own account, as a result of its

18   payday lending business?  And if you don't know the exact

19   number --

20   A.  No.  The 23 million would include gaming revenue.

21   Q.  OK.  So the loan -- the amount would be closer to $9

22   million?

23   A.  Yes.

24   Q.  And was that $9 million as a result of one year, two years,

25   or over the whole period of time?

1  A.  The whole period of time.

2  Q.  OK.  So the tribe made $9 million, correct?

3  A.  Yes.

4  Q.  And then the tribe terminated its relationship, as you told

5  us, with any of the other outside companies or servicers,

6  correct?

7  A.  Correct.

8  Q.  And the tribe continued to make payday loans on its own,

9  correct?

10  A.  Correct.

11  Q.  And it's still doing it to this day, correct?

12  A.  Correct.

13          MR. GINSBERG:  I have no further questions.

14          THE COURT:  All right.  Redirect.

15          I'm sorry, Mr. Bath.  My apologies, sir.

16          MR. BATH:  No worries.  Thank you, Judge.

17  CROSS-EXAMINATION

18  BY MR. BATH:

19  Q.  Hello, Mr. Little Axe.

20  A.  Hello.

21  Q.  You met Tim Muir about when, do you recall?

22  A.  I don't recall the, the date.  I can recall the setting.

23  Q.  What was the setting?

24  A.  It was at, it was at Joplin, Missouri.  I received a call

25  to meet with Tim and Tom Gamble.  I think Tim was getting ready

1  to fly back to Kansas City, and just to have lunch.

2  Q.  OK.

3  A.  And so -- I'd met him before, but I didn't remember where

4  I'd met him before.

5  Q.  Your first recollection is meeting him with Chief Tom

6  Gamble?

7  A.  Yes.

8  Q.  And Chief Tom Gamble at that time was the chief of the

9  Miami tribe?

10  A.  Yes.

11  Q.  And the three of you had lunch?

12  A.  Yes.

13  Q.  And Joplin's not very far from Miami, Oklahoma, is it?

14  A.  Correct.

15  Q.  How far is it?

16  A.  About 20 miles.

17  Q.  So you had lunch on that day, and would it be fair to say

18  the loan business had been up and going for a number of years

19  by then?

20  A.  Yes.

21  Q.  So by the time you meet Tim, everything was up and running

22  from the Modoc position?

23  A.  Right.

24  Q.  And Tim was introduced to you as an attorney for the

25  entities, for Mr. Tucker's entities, is that right?

1   A.  Yes.

2   Q.  From that point forward, how often would you see Tim?

3   A.  I probably saw him, oh, once or twice a year.

4   Q.  And would you talk to him on the phone or email?

5   A.  It was email and some phone calls, yes.

6   Q.  How often by email or phone would you talk to him?

7   A.  That's -- once, once a week or once every couple weeks.

8   Q.  Fair to say he was available when you wanted to reach out

9   to him?

10  A.  Yes.

11  Q.  And he provided information when you wanted it?

12  A.  Yes.

13  Q.  He never refused you any information?

14  A.  No.

15  Q.  And you found him to be helpful in answering your

16  questions?

17  A.  Yes.

18  Q.  And there were times he came back, came down to the tribe

19  and met with the council, is that right?

20  A.  Yes.

21  Q.  How many times do you think he did that?

22  A.  Quite often.  Four or five times a year.

23  Q.  When he met with the council -- how many people are on the

24  council?

25  A.  Five.

1   Q.  Right.  Now, are you on the council?

2   A.  No.

3   Q.  What would your position have been?

4   A.  Just, I'm the -- well, I'm the attorney for the tribe and

5   then I'm assistant tribal administrator, so I helped administer

6   all the tribe's programs and stuff.

7   Q.  You have a couple of different hats?

8   A.  Yeah.

9   Q.  And Tim would come down four or five times a year.  Would

10  that always be at the tribe's request or sometimes at his

11  request; how would that work?

12  A.  Both, sometimes one or the other, yeah.

13  Q.  And he was there to discuss the business?

14  A.  Yes.

15  Q.  And answer any questions?

16  A.  Yes.

17  Q.  And were questions asked in those meetings?

18  A.  Yes, they'd want an update on how the business was doing

19  and any legal issues going on.

20  Q.  He'd update you, perhaps, on litigation?

21  A.  Yes.

22  Q.  OK.  Now, at that time, was he representing -- who was he

23  representing, if you recall?

24  A.  I don't know.

25  Q.  All right, because there came a time when he represented

1  Red Cedar, is that right?

2  A.  I think so.

3  Q.  Right.  And he still does work --

4  A.  Yes.

5  Q.  -- for the tribe, doesn't he?

6  A.  Yes.

7  Q.  On a number of different, various areas, right?

8  A.  Right.

9  Q.  So you maintained that, the tribe has maintained that

10  relationship with Tim all these years?

11  A.  Yes.

12  Q.  OK.  Was there ever a time that you recall that the tribe

13  would have provided the law firm, Tim's law firm with money to

14  hold in the trust account?

15  A.  Yes.

16  Q.  And sometimes that would be returned and sometimes it might

17  be forwarded to other lawyers?

18  A.  Yes.

19  Q.  Meaning sometimes you wrote checks to him -- and there's

20  different kinds of accounts for lawyers, correct?

21  A.  Yes.

22  Q.  One's might call an operating account, correct?

23  A.  Yes.

24  Q.  And the other is a trust account, where money's held in

25  trust?

1    A.  Right.

2    Q.  And it has to be accounted for, correct?

3    A.  Right.

4    Q.  And if it's not all earned or spent, then the client, like

5    the tribe, might ask for it to be returned or moneys paid to

6    someone else?

7    A.  Right.

8    Q.  And that happened with the Muir Law Firm over the years,

9    did it not?

10   A.  Yes.

11          MR. BATH:  Could we have Government Exhibit 4024,

12   please, which has been admitted.

13   Q.  Mr. Little Axe, do you have that on the screen in front of

14   you?

15   A.  Yes.

16   Q.  Do you remember that was shown to you by the government

17   during your direct examination?

18   A.  Yes.

19          MR. BATH:  If we could turn to page 3, Eli, please.

20   Q.  Do you remember this is a document that the government was

21   asking you about various corporations, correct?

22   A.  Correct.

23   Q.  And do you remember the very top of page 3 talks about CB

24   Services Corp.  Do you see that?

25   A.  Yes.

1  Q.  And then in the middle of the page, there is some

2  discussion.

3          MR. BATH:  Can you highlight the middle of the page,

4  Eli, for me, please.

5  Q.  The document asks, "Does Mr. Tucker still own the

6  business?"  Do you see that?

7  A.  Yes.

8  Q.  Then the question said, the response is that on October 24,

9  2008, MTE Financial Services purchased the outstanding shares.

10  Do you see that?

11  A.  Yes.

12          MR. BATH:  You can take that down.

13  Q.  Do you remember this document also went through Consumer

14  Services Corporation, Executive Global Management -- there were

15  about five.  Does that sound right?

16  A.  Yes.

17  Q.  And then we saw on examination by Mr. Ginsberg when he

18  showed you Defendant's Exhibits 2215 through 2219, those were

19  the stock purchase agreements, correct?

20  A.  Yes.

21  Q.  And the information there in Government Exhibit 4024

22  submitted by Mr. Muir was accurate, correct?

23  A.  Yes.

24  Q.  And the date, in fact, was accurate as well?

25  A.  Yes.

1   Q.  OK.  Great.

2       Do you remember there was a time when MTE entered into an

3   employment services agreement with AMG?

4   A.  Yes.

5   Q.  Do you remember what year that would have been?

6   A.  Around 2010, after Red Cedar Services was -- I think --

7   Q.  OK.

8           MR. BATH:  Could we show the witness defense 2214,

9   please.

10  Q.  Do you have that up on the screen before you, Mr. Little

11  Axe?

12  A.  Oh, yes.

13          MR. BATH:  Could we turn to the next page, Eli, for

14  him, and then the next, and then the fourth page there.

15  Q.  Does that look like your signature?

16  A.  Oh, yeah.

17  Q.  You remember this agreement you entered into on behalf of

18  MTE with AMG?

19  A.  Yes.

20          MR. BATH:  Offer 2214 into evidence.

21          MR. RAVI:  No objection.

22          THE COURT:  Received.

23          (Defendant's Exhibit 2214 received in evidence)

24          MR. BATH:  If we could just show the front page

25  briefly, Eli.

1    Q.  The top paragraph tells us it's between MTE doing business

2    as 500 FastCash and AMG Services, correct?

3    A.  OK, yes.

4    Q.  This would be an example of an agreement you would have

5    entered into on behalf of MTE as part of your job as CEO,

6    correct?

7    A.  Yes.

8        MR. BATH:  Thank you.  You can take that down.

9    Q.  Mr. Little Axe, was there a time where the tribe went

10   through an audit for the 2011, 2012 years of the books and

11   records, an outside audit?

12   A.  Oh, yes.

13   Q.  OK.  All right.  And you remember that; you were involved

14   in that, were you not?

15   A.  Yes.

16   Q.  And why was there -- what was the purpose of the audit, do

17   you remember?

18   A.  Well, the tribe was audited every year.  It's required to

19   by its, because it receives grants from the federal government.

20   Q.  All right.  And that is, somebody looks, an outside auditor

21   looks at the books and records and prepares a document that

22   tells whoever's looking at it for what the situation of the

23   tribe is, correct?

24   A.  Yes.

25   Q.  And then you apply, you being the tribe, apply for grants,

1    that information, the audit's given to those contractors or

2    grant folks?

3    A.  Yes, it's given to the clearinghouse and they have access

4    to it.

5    Q.  I'm going to hand you, just look at these D1085 and D1086.

6              MR. BATH:  If we could put 1085 up on the screen, just

7    for the witness, please, your Honor.

8    Q.  It's on the screen for you, Mr. Little Axe, or however you

9    prefer to look at it.

10   A.  OK.

11   Q.  Do you recognize 1085 as being the letter regarding the

12   2011 and '12 audits?

13   A.  Yes.

14   Q.  And your signature is on the fourth page, is that correct?

15   A.  Yes.

16             MR. BATH:  Offer 1085.

17             MR. RAVI:  Objection.  Hearsay.  Offered for its

18   truth.

19             THE COURT:  Go back to page 1, please, if you will.

20             This is an engagement letter.  I don't understand your

21   objection on the basis that it's offered for the truth of its

22   contents.

23             MR. RAVI:  It explains certain things that are being

24   done.

25             THE COURT:  I think it relates to things that are

1  going to be done.  No?  Am I wrong about that?  It's an audit

2  engagement letter.

3          Is that what this is, an audit engagement letter?

4          THE WITNESS:  Yes.

5          THE COURT:  OK.  That's what I thought.

6          Overruled.

7          (Defendant's Exhibit D1085 received in evidence)

8          MR. BATH:  If we could display 1085, please, the first

9  page, Eli.

10 Q.  We're not going to go too much into this, Mr. Little Axe,

11 but this is essentially an engagement letter, that this company

12 up top, out of California, is going to do an audit for Red

13 Cedar Services for 2011 and 2012, is that right?

14 A.  Yes.

15 Q.  And then essentially it tells you and the CEO, Here's the

16 kind of things we're going to do, and the next two or three

17 pages goes over the criteria, does it not?

18 A.  Correct.

19         MR. BATH:  If we could show page 4, Eli, please.

20 Q.  That's the signature page where you signed and said I

21 understand this is what's going to take place, correct?

22 A.  Correct.

23         THE COURT:  Ladies and gentlemen, the fact that there

24 is this document does not mean that any of the services

25 described in that document were actually performed.  OK?

1    Q.  Now, I want you to look at --

2          MR. BATH:  And put on the screen for the witness, if

3    you would, please, only, 1086.

4    Q.  Do you see that there, Mr. Little Axe?

5    A.  Yes.

6    Q.  And is 1086 the audit that was performed by the company

7    that was described in the previous document?

8    A.  Yes.

9    Q.  And you, you being the tribe, received this, correct?

10   A.  Yes.

11   Q.  You kept this in your ordinary books and records?

12   A.  Yes.

13   Q.  And you relied on this, the tribe relied on this for

14   grants?

15   A.  It was included in our tribal audit.

16   Q.  Right.  It becomes part of the tribe's books and records,

17   correct?

18   A.  Yes.

19          MR. BATH:  Offer 1086.

20          THE COURT:  Any objection?

21          MR. RAVI:  Brief voir dire, your Honor?

22          THE COURT:  Yes.  Go ahead.

23   VOIR DIRE EXAMINATION

24   BY MR. RAVI:

25   Q.  Mr. Little Axe, who directed that this audit be prepared?

1        THE COURT:  One second, please.

2        Go ahead, Mr. Ravi.

3   Q.   Who directed that this audit be prepared?

4   A.   Our tribal external auditor said that we need audits for

5   the business.

6   Q.   Who hired that firm?

7   A.   The Red Cedar, AMG, Scott Tucker, those guys.

8   Q.   Scott Tucker hired the firm that prepared this audit?

9   A.   As far as I know.

10  Q.   And did you ever see this document before today?

11  A.   The audit?  Yeah, it was given to me and I gave it to the

12  tribe's auditor to put in our audit.

13  Q.   Where was this audit conducted?

14  A.   Kansas City.

15  Q.   Not at the tribe, correct?

16  A.   No.

17       THE COURT:  All right.  I'll allow it in.

18       MR. BATH:  Thank you, Judge.

19       If we could display to the jury the first page.

20       (Defendant's Exhibit 1086 received in evidence)

21  BY MR. BATH:

22  Q.   After this was received, Mr. Little Axe, you said you gave

23  it to your outside auditor?

24  A.   Yes.

25  Q.   And what does that mean, the outside auditor?

1  A.  We have an external auditor that audits the tribe for the,

2  for the audit that we submit to the federal government.

3          THE COURT:  And that's not the firm that's engaged in

4  this one.

5          THE WITNESS:  No, this is not the firm.

6          MR. BATH:  Thank you, Judge.

7  Q.  This firm is located, in 1086, in California, and they

8  provided this audit to you, correct?

9  A.  Yes.

10  Q.  You gave it to your, like a local outside auditor?

11  A.  Yes, they're in Dallas, but yes.

12  Q.  OK.  So they're an accounting firm in Dallas?

13  A.  Yes.

14  Q.  All right.  So you gave this to them and you asked them to

15  look over it?

16  A.  Yes.

17  Q.  And after they looked over it, then the tribe made this

18  part of your official documents?

19  A.  Yes.

20  Q.  And then you relied on it when you gave it to various

21  government agencies?

22  A.  Yes.

23  Q.  OK.  All right.

24          MR. BATH:  If we can look at page -- well, it's the

25  third page.  We're not going to go over all this document, but

1  if we could blow up the second paragraph that begins "We have

2  audited."

3  Q.  Mr. Little Axe, it talks about auditing Red Cedar Services

4  d/b/a 500 FastCash, a subsidiary of the Modoc tribe, correct?

5  A.  Yes.

6  Q.  Do you understand that both this company and then your

7  outside auditor looked at financial documents to come to this

8  final conclusion in these documents?  If you know.  Do you know

9  what they looked at?

10  A.  Did I -- what?

11  Q.  To create this document, 1086, what did the auditors look

12  at, if you know?

13  A.  Just financial documents at Kansas City.

14  Q.  OK.

15          THE COURT:  Do you know that?

16          THE WITNESS:  I don't know.

17  BY MR. BATH:

18  Q.  OK.  You weren't present when they did it?

19  A.  I wasn't present when they did it.

20  Q.  Fair enough.  And you weren't involved in providing the

21  documents?

22  A.  No.

23  Q.  You just know you had the outside and then your external

24  auditor look at it all?

25  A.  Correct.

1     MR. BATH:  We can take that down.  Thanks.

2  Q.  Mr. Little Axe, I want to go forward from this time of this

3  audit.  This audit came to you in about 2013, correct?

4  A.  Yes.

5  Q.  Was there a time in 2013 when you and other tribal members

6  went to a meeting with the FDIC?

7  A.  Yes.

8  Q.  And did you go to that meeting in Washington, D.C.?

9  A.  Yes.

10  Q.  And was the purpose to meet the tribal representatives

11  regarding payday lending?

12     MR. RAVI:  Can we get a time frame, your Honor?

13     THE COURT:  Yes.

14     MR. BATH:  I'm sorry.  I thought I said 2013.

15  Q.  Does that sound correct?

16  A.  Yes.

17     MR. RAVI:  Specific month, your Honor, if possible.

18     MR. BATH:  OK.  Let's do it this way.  Put up 2213 for

19  the witness, please.

20     THE COURT:  Do you know when in 2013 it was?

21     THE WITNESS:  No.

22     THE COURT:  OK.  Go ahead.

23  BY MR. BATH:

24  Q.  I'm going to show just you Exhibit 2213 and ask if you

25  recognize that.

1   A.  Yes.

2   Q.  And is that a brochure that was prepared by the Modoc for

3   the meeting with the FDIC?

4   A.  Yes.

5   Q.  Did you help prepare that?

6   A.  I provided the pictures of my kids.

7   Q.  All right.  And there's information in there as well.  Did

8   you prepare that or oversee it?

9   A.  I had to see the information to see if I --

10          MR. BATH:  OK.  If we could look at the next page,

11  please, just for the witness.

12  A.  Yes, the history and --

13          THE COURT:  Did you prepare it, or did you oversee it?

14          THE WITNESS:  I provided it.  I provided -- there's

15  tribal information in there I sent to the person who developed

16  this.

17          THE COURT:  Who is the person who developed this?

18          THE WITNESS:  I don't know.  I either sent it to Tim

19  Muir or Natalie Dempsey.

20          THE COURT:  Natalie who?

21          THE WITNESS:  Dempsey.  Dempsey.

22          THE COURT:  Where were they?

23          THE WITNESS:  AMG.

24          THE COURT:  Where?

25          THE WITNESS:  Kansas City.

H9rWtuc4                    Little Axe - Cross

1          THE COURT:  OK.  Next were question.

2     BY MR. BATH:

3     Q.  The information in here came from you, is that right?

4     A.  Yes.

5     Q.  And you used this to provide to the FDIC when you met with

6     them in 2013?

7     A.  Yes.

8               MR. BATH:  I offer 2213.

9               MR. RAVI:  Objection.  Hearsay.

10              THE COURT:  Why is this not for the truth of its

11    content?

12              MR. BATH:  Well, Judge, he says he provided the

13    information.  The source was him.  I don't think it's hearsay

14    because it came from him.

15              THE COURT:  Then you can elicit the information from

16    the witness on the stand.

17              MR. BATH:  I understand.  I'm still offering 2213.

18              THE COURT:  If you're offering it for the truth of its

19    content, then the objection is sustained.

20              MR. BATH:  Very well.

21    Q.  You prepared this brochure and gave it to the federal

22    regulators in D.C., is that right?

23    A.  Yes.

24    Q.  And one of the things you told them in this meeting was

25    that the tribal lending entities were formed pursuant to tribal

1    law?

2    A.  Yes.

3              MR. RAVI:  Objection.

4              THE COURT:  No.  You can't ask the question that way.

5    You can ask him, What did you tell them, or you can ask him

6    about a statement.  You can ask the question without reference

7    to the statement.

8              MR. BATH:  All right.  We can take that down, please.

9    Q.  When you went to the meeting in the FDIC, how many people

10   were there?

11   A.  I don't remember.

12   Q.  Was it a meeting of 50 people or a hundred, if you

13   remember?

14   A.  I think there were about -- excuse me.  About seven.

15   Q.  Seven people?

16   A.  I believe so.

17   Q.  Right.  You were one of them, correct?

18   A.  Yes.

19   Q.  And Chief Follis, your chief was there?

20   A.  FDIC -- yes, yes.

21   Q.  And Chief Lankford for the Miami tribe was there?

22   A.  Yes.

23   Q.  And Joe Frazier was there?

24   A.  Yes.

25   Q.  And the chairman of the FDIC was there?

1    A.  Yes.

2    Q.  And the purpose of that meeting was to have a discussion

3    with federal regulators about payday lending, correct?

4    A.  Yes.

5    Q.  And was Tim Muir there?

6    A.  Yes, I think so.

7    Q.  Did anybody else, any other tribes go with you as well?

8    A.  Yes, representatives of the Santee Sioux.

9    Q.  Lee Ickes, was he there?

10   A.  Yes.

11   Q.  I-C-K-E-S, is that the right spelling?  Is that how you

12   spell that?

13   A.  Yes, I believe so.

14   Q.  And was Chairman Trudell there?

15   A.  Yes.

16   Q.  Do you know how to spell his last name?

17   A.  T-R-U-D-E-L-L.

18   Q.  Thank you.

19       Did you also meet with the Treasury in 2013?

20           MR. RAVI:  Objection.  Relevance.

21           THE COURT:  Sustained, unless you want to show me

22   something at the sidebar.  Why don't you try and fix a time in

23   the first instance.

24           MR. BATH:  Sure.

25   Q.  Did you meet in Washington, D.C., in 2013 with the

1    Treasury?

2    A.  Yes, I believe so.

3    Q.  Do you remember what the date and the month was?

4    A.  No.

5    Q.  Do you remember whether it was spring or fall?

6    A.  No.

7    Q.  Did any -- what was the purpose, to discuss payday loans?

8    A.  Yes.

9         MR. RAVI:  Objection.  Relevance.

10        THE COURT:  Yes.  Sustained.

11   BY MR. BATH:

12   Q.  Was there any effort by the Modoc tribe to hide what you

13   were doing regarding payday loans?

14   A.  No.

15   Q.  In fact, you made every effort to contact and meet with

16   regulators, did you not?

17   A.  We did.

18   Q.  Did you ever refuse to meet with any regulators?

19   A.  No.

20   Q.  And did Tim Muir accompany you sometimes?

21   A.  Yes.

22   Q.  And did your chief accompany you sometimes?

23   A.  Yes.

24   Q.  And other chiefs of other tribes?

25   A.  Yes.

1  Q.  In an effort to have a discourse with regulators?

2  A.  Yes.

3  Q.  And was there more than one meeting?

4  A.  Yes.

5  Q.  Do you remember being asked on direct examination by the

6  government about the Hallinan lawsuit?

7  A.  Yes.

8       MR. BATH:  I want to put 1086 back up, would you

9  please, Eli, first page.  It's been admitted.

10  Q.  Do you remember this is the audit that we talked about

11  earlier, Mr. Little Axe?

12  A.  Yes.

13       MR. BATH:  And if we could go to page 17 -- well,

14  you're doing probably the PDF.  That's page 15, on the bottom.

15  two more pages, please.

16  Q.  Do you see that, Mr. Little Axe, where it says legal

17  settlements?

18  A.  Yes.

19       MR. BATH:  Blow that paragraph up, under No. 7, Eli.

20  Thank you.

21  Q.  I'm not going to ask you to read it, but do you see it

22  listed in your audit there's a lawsuit that was settled and Red

23  Cedar was involved?

24  A.  Yes.

25  Q.  And this is the document in the official books and records

1    of the Modoc, is that correct?

2    A.  Yes.

3    Q.  All right.

4             MR. BATH:  Thank you, Eli.

5             That's all I have.  Thank you so much.

6             THE COURT:  All right.  Redirect, please.

7             Ladies and gentlemen, why don't you stand up and

8    stretch while Mr. Ravi gets ready at the podium.

9    REDIRECT EXAMINATION

10   BY MR. RAVI:

11   Q.  Mr. Little Axe, you were asked on cross about that audit in

12   2013, correct?

13   A.  Yes.

14   Q.  And that audit occurred after the FTC investigation

15   occurred, right?

16   A.  Yes, I think so.

17   Q.  And that audit, had MTE Financial Services, it hadn't

18   previously been audited prior to that, correct?

19   A.  Correct.

20   Q.  That was the first time that there was an audit there, in

21   2013, correct?

22   A.  Correct.

23   Q.  And the reason there was an audit there was because it was

24   as a result of litigation involving the FTC investigation,

25   correct?

1    A.  Yes.

2    Q.  And you were contacted by the tribe's normal external

3    auditor that such an audit had to occur, correct?

4    A.  Yes.

5    Q.  And when you received that call, you called Scott Tucker,

6    correct?

7    A.  Yes.

8    Q.  And what did Scott Tucker -- Scott Tucker told you he'll

9    take care of this external audit, correct?

10   A.  Yes.

11   Q.  And did you choose the firm that conducted that audit of

12   MTE Financial Services?

13   A.  No.

14   Q.  Scott Tucker chose that firm, correct?

15   A.  As far as I know.

16   Q.  And Scott Tucker paid for the audit, correct?

17   A.  I don't know who paid for it.

18   Q.  The tribe didn't pay for it --

19   A.  The tribe didn't pay for it.

20   Q.  And also, prior to this, MTE, any of these assets and

21   liabilities of MTE Financial Services weren't part of the

22   tribe's financial statements, correct?

23   A.  Correct.

24   Q.  In fact, all those years prior to the FTC investigation,

25   there were no assets and liabilities relating to MTE Financial

1    Services in the tribes books and records, correct?

2    A.  Correct.

3    Q.  The only thing that was listed in the tribe's books and

4    records was relating to the checks or to the 1 percent the

5    tribe received, correct?

6    A.  Correct.

7    Q.  And there were a number of meetings that you testified

8    about with regulators, you said, correct?

9    A.  Yes.

10   Q.  And those meetings didn't occur until after the FTC

11   investigation occurred, right?

12   A.  Correct.

13   Q.  And that audit occurred entirely in Kansas City, right?

14   A.  Yes.

15   Q.  And it occurred in Kansas City because the tribe didn't

16   have the financial statements relating to MTE Financial

17   Services, correct?

18   A.  Correct.

19   Q.  And Kansas City was where the books and records relating to

20   MTE Financial Services were, correct?

21   A.  Correct.

22   Q.  There was also some discussion on cross about various

23   processers that were sought regarding, for example, Marion

24   Bank, correct?

25   A.  Correct.

1   Q.  And Marion Bank was a bank that was approached in order to

2   handle money relating to the payday loan business, right?

3   A.  Correct.

4   Q.  And that occurred, again, after the FTC investigation

5   became public, right?

6   A.  Yes.

7   Q.  And at that time -- and it was necessary to go to Marion

8   Bank because all those many other banks refused to process

9   these payday loans, correct?

10  A.  Correct.

11  Q.  Now, you testified about the various so-called servicers on

12  cross-examination, right?

13  A.  Yes.

14  Q.  And the relationship between the Modoc began with UMS,

15  correct?

16  A.  Yes.

17  Q.  That's Universal Management Service Inc., correct?

18  A.  Yes.

19  Q.  And then, in 2008, you talked about you entered into an

20  agreement with NMS, correct?

21  A.  Yes?

22  Q.  National Money Services, right?

23  A.  Yes.

24  Q.  And then after that, you testified on cross that you then

25  entered into a relationship with AMG, correct?

H9rWtuc4                    Little Axe - Redirect

1    A.  Correct.

2    Q.  And all three of those entities were operating from Kansas

3    City, right?

4    A.  Yes.

5    Q.  And all three of those entities were controlled by Scott

6    Tucker, right?

7    A.  The two, UMS and NMS.  As far as AMG, I wasn't sure.

8    Q.  You knew that AMG was operating out of Kansas City,

9    correct?

10   A.  Yes.

11   Q.  It wasn't operated in Miami, Oklahoma, right?

12   A.  No.

13   Q.  And all those entities were being run by Scott Tucker,

14   employees working for Scott Tucker, out of Kansas City, right?

15   A.  Yes.

16   Q.  And didn't matter that the Miami tribe, that AMG was a

17   Miami tribal entity, correct?  Let me rephrase.

18       Regardless of whether or not AMG was a Miami tribal entity,

19   it was still operated by Scott Tucker in Kansas City, correct?

20   A.  Yes.

21   Q.  You talked about, you talked on cross about potential

22   termination of your relationship with Scott Tucker, right?

23   A.  Right.

24   Q.  And you knew that if you terminated this relationship with

25   Scott Tucker, Mr. Tucker would still be engaged in payday

1    lending, right?

2    A.   Yes.

3    Q.   You couldn't stop Mr. Tucker from engaging in payday

4    lending, right?

5    A.   No.

6    Q.   In fact, you actually tried to propose your own tribe to

7    replace the Modoc as the tribe through which Mr. Tucker would

8    do payday lending, correct?

9    A.   Yes.

10   Q.   And there would have been no changes in any of the ways

11   that the loans were operated and controlled from Kansas City,

12   right?

13   A.   I don't know.

14   Q.   Well --

15   A.   I wouldn't control -- I didn't have any relation or any --

16   any relationship with my tribe other than just being a member,

17   so I don't know what they would do.

18   Q.   But your proposal was for your tribe to replace the Modoc

19   if they terminated the relationship?

20   A.   Yes.

21   Q.   And at some point you said you resigned as a result of

22   litigation from Red Cedar Services, correct?

23   A.   Yes.

24   Q.   And you were no longer involved with the payday lending

25   business that the Modoc operated after that, right?

1   A.  Correct.

2   Q.  And therefore, you don't know whether or not the loan

3   contracts changed in terms of their disclosures to customers,

4   correct?

5   A.  I don't know.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Mr. Little Axe, you have signed many documents for Mr.

2  Tucker, right?

3  A.  Yes.

4  Q.  And oftentimes you signed these documents without even

5  reading them, right?

6  A.  Yes, sometimes.

7  Q.  And sometimes it didn't matter what the documents were for,

8  you simply signed them, correct?

9  A.  Correct.

10  Q.  And that's because you didn't want to rock the boat with

11  respect to your relationship with Mr. Tucker, right?

12  A.  I wanted to continue the relationship.

13  Q.  You wanted the tribe to continue earning money, correct?

14  A.  Yes.

15  Q.  You were shown those stock purchase agreements, correct?

16  A.  Excuse me?

17  Q.  You were shown some stock purchase agreements during

18  cross-examination?

19  A.  Yes.

20  Q.  You didn't believe that the tribe had purchased any of

21  those five companies before today, right?

22  A.  I didn't remember.  No, I didn't.

23  Q.  Today is the first day that you ever believed that the

24  tribe had purchased those five companies?

25          MR. GINSBERG:  Objection.  That wasn't the answer.

1    THE COURT:  Let's hear the question.

2    Q.  Today, Mr. Little Axe, was the first day that you believed

3    that the tribe had purchased those five companies, right?

4    A.  As far as I can remember, yes.

5    Q.  And you didn't authorize any payments from the tribe to Mr.

6    Tucker for those five entities, correct?

7    A.  No.

8    Q.  You're not aware of any payments; you don't know that any

9    payments went to Mr. Tucker regarding those five entities,

10   right?

11   A.  Correct.

12   Q.  You're not aware of the tribe taking any action or making

13   any certificates or filings as a result of its purchase of

14   those companies, right?

15   A.  Correct.

16   Q.  The tribe didn't pay any taxes for those companies, right?

17   A.  No.

18         MR. RAVI:  Please show the witness Government Exhibit

19   833.

20         The government offers Government Exhibit 833.

21         MR. GINSBERG:  I think we need to approach, your

22   Honor.

23         THE COURT:  All right.

24         Ladies and gentlemen, stand up and stretch, please.

25         (Continued on next page)

1    (At the sidebar)

2         MR. RAVI:  Here is a copy for your Honor.

3         Your Honor, we are offering this document, which is a

4    2009 tax return of Mr. Tucker's, showing that -- beginning on

5    Bates number 2469 -- there's expenses that are listed by Mr.

6    Tucker.  And on the following page, various expenses are listed

7    with companies, including the five companies for which it was

8    said, brought out on cross, that Modoc had purchased in 2008.

9         THE COURT:  And?  I lost you.

10        MR. RAVI:  And this is, therefore, to show that Mr.

11   Tucker is putting out these five companies as his own in 2009.

12        THE COURT:  Tell me what you're seeing here, because I

13   am not seeing it.

14        MR. RAVI:  The purchase agreements were in 2008.  And

15   here on 2470, Mr. Tucker lists UMS, Silver State Business

16   Administrators, Inc., and if you turn the page, he lists CE

17   Services, Consumer Services, and CB Services.

18        THE COURT:  How do you get this in through this

19   witness?

20        MR. RAVI:  We believe he will be able to authenticate

21   the signature.

22        THE COURT:  And why is anything else, other than that

23   reference on a schedule, relevant to anything?  Why does the

24   jury need to know what his gains and losses were, what his

25   wages were, what his home address is?

1    MR. RAVI:  We are happy to redact that information.

2    THE COURT:  Happy to redact it?  It's an income tax

3    return.  The only thing you're showing me that is arguably

4    probative is a line on a schedule, and when I give you some for

5    instances, you say you're happy to redact the for instance that

6    I happened to mention.  I haven't gone through line by line on

7    here.

8    MR. RAVI:  We can redact everything on the first page

9    other than simply the name.

10   THE COURT:  That's the first page.

11   Now, the second page, the third page, and the fourth

12   page.

13   MR. RAVI:  The signature, and we will skip all the

14   pages until the schedule.

15   THE COURT:  Let me hear from Mr. Ginsberg.

16   MR. GINSBERG:  That would solve part of the problem.

17   The other problem is, simply because there are

18   expenses listed in 2009 for companies that were sold in 2008

19   does not mean the expenses weren't being carried over to 2009.

20   That's number one.

21   Number two, this witness has no idea what it means,

22   and without putting some other witness on the witness stand to

23   explain this, it's sort of totally out in midair someplace.

24   THE COURT:  I am inclined to agree with you that it's

25   out in midair.  There is nothing that this witness can tell

1    anyone about this document.  You can agree with me that he has

2    never seen this?

3              MR. RAVI:  That's correct, your Honor.

4              THE COURT:  Do you know whether he has ever completed

5    an income tax return?

6              MR. RAVI:  This witness?

7              THE COURT:  Yes.

8              MR. RAVI:  I don't know.

9              THE COURT:  No.  You can't offer it through this

10   witness.  OK.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2   BY MR. RAVI:

3   Q.  Mr. Little Axe, again, during the ten years you were

4   president and CEO, there were no loan approvals that occurred

5   on tribal land, right?

6   A.  Correct.

7   Q.  And you didn't have any access to the books and records on

8   tribal land?

9   A.  Correct.

10  Q.  You didn't control any of the bank accounts in MTE's name

11  at US Bank or other bank accounts relating to payday lending,

12  correct?

13  A.  Correct.

14  Q.  In fact, there wasn't really anything happening on tribal

15  land other than you receiving some mail and forwarding it to

16  Kansas City and getting some phone calls, right?

17  A.  Right.

18  Q.  In fact, there was so little happening on tribal land that

19  you expressed concerns to Mr. Tucker as a result of the

20  complete lack of tribal involvement, correct?

21  A.  Yes.

22  Q.  You expressed those concerns because you realized that that

23  letter Mr. Tucker had provided you wasn't being followed,

24  right?

25          MR. GINSBERG:  Objection to leading, your Honor.

1    THE COURT:  Well, on redirect, one may lead.

2    MR. GINSBERG:  But also, the letter, I specifically

3    only referenced the fact, not the context of the letter because

4    of prior rulings in the case.

5    THE COURT:  Rephrase the question then.  Then it's

6    sustained.  That's a different objection.

7    Go ahead.

8    MR. RAVI:  Your Honor, I am not going to go into the

9    content of the letter, but the letter was mentioned briefly.

10   THE COURT:  Put a new question to the witness.

11   BY MR. RAVI:

12   Q.  Mr. Little Axe, because of your concern, you expressed

13   concerns to Mr. Tucker because you knew that the letter that

14   was provided by him was not being followed, right?

15   A.  Right.

16   Q.  And there were certain parts of that letter that said that

17   certain things needed to be done in order for this to be a

18   legal enterprise, right?

19   A.  Parts said certain things should be done.

20   Q.  Certain things should be done, correct?

21   A.  Yes.

22   Q.  And a lot of things in that letter were not done, correct?

23   A.  Correct.

24   Q.  And that's why you expressed concerns to Mr. Tucker, right?

25   A.  Yes.

1  Q.  When you expressed those concerns, Mr. Tucker said he'd

2  look into it, but he actually didn't change any way the payday

3  lending business operated, correct?

4  A.  Right.

5  Q.  It's part of the reason that there was such a lack of

6  tribal involvement, that false affidavits had to be submitted

7  in court, right?

8  A.  Right.

9        MR. RAVI:  No further questions, your Honor.

10       THE COURT:  You may step down.

11       (Witness excused)

12       THE COURT:  We will take our mid-afternoon break,

13  ladies and gentlemen.  Please do not discuss the case among

14  yourselves or with anyone else.  We will be back in action in

15  ten minutes.  Thank you.

16       (Jury exits courtroom)

17       (Continued on next page)

18

19

20

21

22

23

24

25

1    THE COURT:  For the record, can Mr. Little Axe's

2    attorney please identify himself.

3    MR. BERLIN:  Michael Berlin from the firm of Greenberg

4    Traurig.

5    THE COURT:  Any objection to excusing Mr. Little Axe?

6    MR. RAVI:  Not from the government.

7    MR. GINSBERG:  No.

8    THE COURT:  You're excused.  Thank you.

9    (Witness excused)

10    (Recess)

11    (Jury present)

12    THE COURT:  Government may proceed.

13    MR. RAVI:  Your Honor, at this time, I would like to

14    offer Government Exhibit 823.

15    THE COURT:  Any objection?

16    As redacted.

17    MR. RAVI:  That's correct.

18    MR. GINSBERG:  No objection.

19    THE COURT:  Received.

20    (Government's Exhibit 823 received in evidence)

21    MR. RAVI:  Please publish that.

22    If we can zoom in on the bottom, the first sentence,

23    beginning "Overland Park, Kansas."

24    You can zoom out of that.

25    Go to the subject line in the middle, from Matt

1   Dykstra.

2          Highlight the "from" and the "to."

3          Subject.

4          Zoom in on the body right below that.

5          Now go to the end of the document, and zoom in on

6   that.

7          Zoom out, please.

8          Go to the first page of the document.

9          Focus on the top e-mail, the whole part, the "from"

10  and the "to" and the body please highlight.

11         You can take that down.

12         The government now offers Government Exhibit 822.

13         THE COURT:  Any objection?

14         MR. GINSBERG:  No objection.

15         THE COURT:  Received.

16         (Government's Exhibit 822 received in evidence)

17         MR. RAVI:  Focus on the entire bottom e-mail.

18         Highlight the "from" and the "to".

19         Highlight the first sentence.

20         Go to the next e-mail, please.

21         Highlight Blaine Tucker.

22         Finally, focus on the top e-mail.

23         Highlight the "from," "to" and cc.

24         Now highlight the body.

25         Take that down.

1          The government now offers Government Exhibit 820.

2          MR. GINSBERG:  No objection.

3          THE COURT:  Received.

4          (Government's Exhibit 820 received in evidence)

5          MR. RAVI:  Go to the next page please, and focus on

6   the top e-mail.

7          Highlight the "from", the date, and the "to."

8          Highlight the first sentence.

9          Highlight the last sentence.

10         Let's go now to the first page.

11         Focus on the bottom e-mail.

12         Highlight the "from" and "to."

13         Highlight the body.

14         Go to the next e-mail up.

15         Highlight the "from" and the "to."

16         Highlight the second sentence.

17         Let's go to the next e-mail up.

18         Highlight the "from" and the "to."

19         Highlight the body.

20         Finally, go to the top e-mail.

21         Highlight the body.

22         We can take that down.

23         The government now offers Government Exhibit 821.

24         THE COURT:  Any objection?

25         MR. GINSBERG:  No objection.

1    THE COURT:  Received.

2    (Government's Exhibit 821 received in evidence)

3    MR. RAVI:  Zoom in on the third e-mail from the top.

4    Highlight the "from" and the "to."

5    Highlight the date.

6    Now the body.

7    Go to the next e-mail up.

8    Highlight the "from" and the "to."

9    And the body.

10   Finally, zoom in on the top e-mail and just highlight

11   the body.

12   You can take this down.

13   Finally, the government offers Government Exhibit 819.

14   MR. GINSBERG:  No objection.

15   THE COURT:  Received.

16   (Government's Exhibit 819 received in evidence)

17   MR. RAVI:  Just go to the second page and zoom in on

18   the e-mail from Scott Tucker and the body.

19   Highlight the "from" and the "to."

20   The two lines below the subject line.

21   Now just highlight the various d/b/a entities.

22   Finally, go to the first page and zoom in on the top

23   e-mail.

24   Highlight the "from" and the "to."

25   And the body.

H9R8TUC5                    Ponzo - Direct

1       We can take that down.

2              MR. SCOTTEN:  Your Honor, the government calls Frank

3   Ponzo.

4    FRANK PONZO,

5        called as a witness by the government,

6        having been duly sworn, testified as follows:

7              THE DEPUTY CLERK:  State your full name and spell it

8   for the record.

9              THE WITNESS:  Frank Ponzo, P-O-N-Z-O.

10             THE COURT:  You may inquire.

11  DIRECT EXAMINATION

12  BY MR. SCOTTEN:

13  Q.  Mr. Ponzo, are you employed?

14  A.  Yes.

15  Q.  Where do you work?

16  A.  Ferrari North America.

17  Q.  Do you work in a particular part of Ferrari North America?

18  A.  Yes, Financial Services.

19  Q.  What does Financial Services do for Ferrari North America?

20  A.  It's the finance division which provides leasing and

21  financing through our authorized dealer network.

22  Q.  Can you explain that in layman's terms?

23  A.  If someone goes in to buy a Ferrari, we offer them the

24  opportunity to finance or lease that vehicle through Ferrari

25  Financial Services.

1    Q.  In your employment with Ferrari Financial, have you become

2    familiar with certain documents?

3    A.  Yes.

4    Q.  I am going to hand you 3401, 02, 03, 05 and 06.

5            Can you just flip through all of them and look up when

6    you're done?

7    A.  Sure.

8    Q.  Do you recognize these documents?

9    A.  Yes.

10   Q.  What are they?

11   A.  Ferrari Financial Services credit applications.

12   Q.  Who is applying for credit in the case of all of these?

13   A.  Level 5 Motorsports.

14           MR. SCOTTEN:  The government offers 3401, 02, 03, 05

15   and 06.

16           MR. GINSBERG:  No objection, your Honor.

17           THE COURT:  Received.

18           (Government's Exhibits 3401, 3402, 3403, 3405 and 3406

19   received in evidence)

20           MR. SCOTTEN:  Let's just put up 3406, if we can.

21   Q.  First, in general terms, can you explain to the jury what

22   we are looking at?

23   A.  It is a Ferrari Financial Services credit application.

24   Q.  So when would somebody fill out one of these?

25   A.  When they are looking to finance or lease a vehicle and use

1   our services.

2           MR. SCOTTEN:  Ms. Grant, can we blow up essentially

3   the top third.

4   Q.  So what kind of vehicle is this for?

5   A.  This is a Ferrari 599XX.

6   Q.  Do you see a purchase price?

7   A.  Yes.

8   Q.  What is that purchase price?

9   A.  $1,333,000.

10  Q.  Is there a buyer here?

11  A.  Yes.

12  Q.  Who is that buyer?

13  A.  Level 5 Motorsports.

14          MR. SCOTTEN:  Now, can we blow up the portion just

15  below it.

16  Q.  Is there a listed owner for the buyer?

17  A.  Yes.

18  Q.  Who is that?

19  A.  Scott Tucker.

20  Q.  Does he list how much of the company he owns?

21  A.  Yes.

22  Q.  How long has he owned it?

23  A.  Since inception.

24  Q.  How much of the company did he own?

25  A.  100 percent.

H9R8TUC5                          Ponzo - Direct

1    Q.  Have you ever met Scott Tucker?

2    A.  Yes.

3    Q.  Where did you meet him?

4    A.  It was at Laguna Seca, a racetrack in northern California.

5    It was about five years ago during the Ferrari Challenge event.

6    Q.  What is a Ferrari Challenge event?

7    A.  A Ferrari Challenge event is a gentlemen's racing series

8    that is organized by Ferrari.  We hold about six events a year

9    and 12 races.

10   Q.  Do you know why Scott Tucker was there?

11   A.  Yes.

12   Q.  Why?

13   A.  He was a participant in the Ferrari Challenge series.

14   Q.  Do you know anything about level 5 racing generally?

15   A.  Generally, I know they were racing for Boardwalk Ferrari,

16   and I believe they were also involved in semi-professional

17   racing as well.

18   Q.  Would that be more serious races than just this gentlemen's

19   race?

20   A.  It's definitely a level above the Ferrari Challenge.

21   Q.  Did you speak with Mr. Tucker while you were there?

22   A.  Yes.

23   Q.  What was the subject of the conversation?

24   A.  It was in reference to opening up a line of credit to

25   leverage the equity in some of his collection, for cars in his

1    collection, to borrow against them.

2    Q.  Did you in fact open a line of credit for him?

3    A.  No, we did not.

4    Q.  Why not?

5    A.  Because he would not agree to disclose his personal

6    financials.

7            MR. SCOTTEN:  Can we blow up the bottom portion of

8    this.

9    Q.  Do you see Mr. Tucker's name again here?

10   A.  Yes.

11   Q.  In what capacity is this bottom portion being filled out?

12   A.  This would be the guarantor for Level 5 Motorsports.

13   Q.  Does he describe himself as having employment in his

14   capacity as guarantor?

15   A.  Yes.

16   Q.  Where did he work?

17   A.  CLK Management.

18   Q.  Did he have a position there?

19   A.  Yes.  As chairman.

20   Q.  Is there a date at the bottom of this application?

21   A.  Yes.  February 19, 2010.

22           MR. SCOTTEN:  Ms. Grant, can we pull up what is in

23   evidence as 2608 and put it alongside this.

24           If you can go down to sort of the seam of the second

25   and third pages.

1   　　　　If you can blow up paragraph 13.

2   Q.  Mr. Ponzo, can you just read that one sentence there?

3   A.  "On or about June 24, 2008, and subsequent to the closing

4   of the purchase agreement, CLK and AMG authorized, adopted,

5   certified, acknowledged, and executed an agreement of merger

6   wherein CLK and AMG would merge and AMG would be the surviving

7   entity."

8   Q.  Is that date there, June 24, 2008, before or after the date

9   on which Mr. Tucker listed himself as the chairman of CLK in

10  the application you just saw?

11  A.  That's before the date.

12  Q.  Before we move off this particular application, I would

13  like to show you Government Exhibit 3420.

14  　　　　Do you recognize it?

15  A.  Yes, I do.

16  Q.  What is it?

17  A.  That's the 599XX.

18  Q.  Is that the same make, model and color as the application

19  we just saw?

20  A.  Yes.

21  Q.  About how many cars like that are there?

22  A.  There's somewhere around 20 cars.

23  　　　　MR. SCOTTEN:  The government offers 3420.

24  　　　　MR. GINSBERG:  Objection, your Honor.

25  　　　　MR. SCOTTEN:  I can explain the connection, and I can

1   do it at sidebar or here, your Honor.

2          THE COURT:  I am sustaining it for the time period.

3   You can have the witness describe the vehicle, or any markings

4   on the vehicle, the color of the vehicle, but I don't think the

5   picture of the vehicle is particularly relevant.

6   Q.  Looking at this vehicle, can you generally describe what

7   kind of car it is?

8   A.  It is a Ferrari 599XX.  It's one of, as I said,

9   approximately 20 cars that were produced.  It's for track use

10  only.

11  Q.  Does it have a number written on the side and front?

12  A.  Yes.

13  Q.  What is that number?

14  A.  55.

15  Q.  Are those in a position where you would expect to see on a

16  race-type car where those numbers are typically put?

17  A.  Yes.

18  Q.  Can you see essentially the entire top and front and one

19  whole side of the vehicle?

20  A.  Yes.

21  Q.  Do you see any advertising emblems, any sponsorship emblems

22  on it?

23  A.  No.

24          MR. SCOTTEN:  I will offer 3420 again.

25          MR. GINSBERG:  I don't know that there is anything

1    different.  The same objection.

2              THE COURT:  Same ruling.

3    Q.  I am not going to ask you about the other applications I

4    just handed up, 3401, 02, 03 and 05, except just a couple of

5    generalities.

6              Is the applicant on each of them Level 5?

7    A.  Yes.

8    Q.  Is the owner for Level 5 listed to be Scott Tucker?

9    A.  Yes.

10   Q.  Is he also the guarantor?

11   A.  Yes.

12   Q.  Does he consistently describe himself as the chairman of

13   CLK?

14   A.  Yes.

15             MR. SCOTTEN:  Let's then just briefly pull up 3405.

16             For this one we can just blow up the bottom portion of

17   the date.

18             Ms. Grant, can I ask you to put next to it Government

19   Exhibit 2619.

20             MR. GINSBERG:  Your Honor, can we approach for a

21   moment?  A quick moment.

22             THE COURT:  Yes.  Take it down and let me see

23   everybody at sidebar.

24             Ladies and gentlemen, you can stand up for a moment.

25             (Continued on next page)

1    (At the sidebar)

2    THE COURT:  Go ahead.

3    MR. GINSBERG:  So I didn't anticipate that the

4  government was going to do what they are doing and the way they

5  are doing it, but what they are doing is showing prior bad

6  acts, basically, false statements in the Ferrari application,

7  by comparing the application with these other documents.

8    THE COURT:  I don't see it that way at all.

9    MR. GINSBERG:  I do.  So I made the objection.  If it

10  was coming in for something else related without the Ferrari,

11  but was related directly to the payday lending business, and

12  comparing one thing going on in the payday lending business to

13  another, I think maybe it would be different.  But to do it

14  with the Ferrari is I think a separate thing, and I think it's

15  a 404(b), 403-type issue.

16    I know there's a lot of statements already in the case

17  that may not be truthful, but still.

18    THE COURT:  All right.  I want to hear from the

19  government, but I do want to say a couple of things.

20    First of all, it is late in the game in the sense that

21  there was no objection to the price of the Ferrari.  It was not

22  objected to.  There was an objection to the photograph of the

23  Ferrari, and I sustained it.  I might have sustained an

24  objection to the price of the Ferrari.  I am going to hear from

25  the government, but what I thought this tended to show was not

1    direct evidence of a bad act, but direct evidence of a claim

2    that he was the chairman of CLK Management.

3            MR. SCOTTEN:  That's correct, your Honor.  We are not

4    trying to prove a bad act.  We are trying to prove that he in

5    fact still thinks of this company as running and operating that

6    he said was merged out of existence two years ago.  It's proof

7    that he thinks one of the things that the defense is saying he

8    doesn't.

9            MR. GINSBERG:  Given the way it's juxtaposed, either

10   the Ferrari application or the other document has to be false.

11   So one of his statements is not true.  That's what troubles me.

12   That's what the 404 issue was.  I understand what they were

13   doing and why they were doing it, but I just thought --

14           MR. SCOTTEN:  The false statement, in our position, is

15   that CLK was merged out of existence two years ago, and that it

16   ceased to exist.  That's the false statement, which is

17   intrinsic to the crime.  We are trying to prove his knowledge

18   of the falsity by showing it in another context.  He says, Hey,

19   I'm still in charge of CLK.

20           THE COURT:  The objection is overruled.

21           MR. ROTH:  Judge, before they submit it to the jury,

22   can they redact the telephone numbers?

23           MR. SCOTTEN:  It's the business telephone number that

24   showed up on everything, I think.

25           THE COURT:  Why don't the two of you talk.  If it's a

1    personal phone number that has not otherwise come in, then it

2    should be redacted.  OK.

3              MR. SCOTTEN:  Yes, your Honor.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (In open court)

2        THE COURT:  You may continue.

3        MR. SCOTTEN:  Let's highlight the e-mail at the bottom

4   of 2619, all of it.

5   BY MR. SCOTTEN:

6   Q.  Sir, do you see a date -- let me ask you this first.  What

7   does the body of the e-mail say?

8   A.  "The Web site shows CLK as merged out of existence doesn't

9   even mention AMG."

10  Q.  What is the date of this e-mail?

11  A.  July 30, 2010.

12  Q.  Is that date before or after the date on which Mr. Tucker

13  claimed to be chairman of CLK in his application to Ferrari?

14  A.  That's before.

15       MR. SCOTTEN:  We can take that down.

16  Q.  I am going to go briefly through the next set of documents.

17       I am going to hand you 3409 through 3415.

18  A.  OK.

19  Q.  Do you recognize these?

20  A.  Yes.

21  Q.  What are they?

22  A.  Purchase orders.

23  Q.  Is Level 5 the purchaser in each of them?

24  A.  Yes.

25       MR. SCOTTEN:  The government offers 3409 through 3415.

1           THE COURT:  Any objection?

2           MR. GINSBERG:  Not to the purchase orders, no, your

3  Honor.

4           THE COURT:  Received.

5           (Government's Exhibits 3409, 3410, 3411, 3412, 3413,

6  3414 and 3415 received in evidence)

7           MR. SCOTTEN:  Can we just put up 3415.

8  BY MR. SCOTTEN:

9  Q.  Mr. Ponzo, what is the difference between this type of form

10  and the forms we were looking at before?

11  A.  This type of form would be an agreement, essentially,

12  between the buyer and the dealership, and may not be submitted

13  to Ferrari Financial Services unless they were financing the

14  vehicle.  The other form is an actual credit application, which

15  they would submit to us if the buyer wanted to finance the

16  purchase of the vehicle.

17  Q.  These are essentially for outright purchases?

18  A.  Correct.

19  Q.  On this one, in addition to Level 5, do you see an e-mail

20  address?

21  A.  Yes.

22  Q.  What is that e-mail address?

23  A.  Stucker@fc500.com.

24  Q.  Do you see a physical address?

25  A.  Yes.

H9R8TUC5                        Ponzo – Direct

1    Q.   What is that address?

2    A.   10895 Lowell Avenue, Suite 300, Overland Park, Kansas.

3    Q.   I won't go through all of these, but is it fair to say that

4    each of these forms is a purchase by Level 5 of a Ferrari or

5    Porsche or other high-end vehicle?

6    A.   Yes.

7               MR. SCOTTEN:  Nothing further, your Honor.

8               THE COURT:  Any cross-examination?

9               MR. GINSBERG:  No, thank you.

10              THE COURT:  You may step down.  Thank you, sir.

11              Call your next witness.

12              (Witness excused)

13              MR. RAVI:  The government recalls Carolyn Williams for

14   cross.

15              THE COURT:  Could counsel take the documents from the

16   last witness away?

17              MR. SCOTTEN:  I will get them.

18              (Continued on next page)

19

20

21

22

23

24

25

1    CAROLYN WILLIAMS, resumed.

2           THE COURT:  The Court reminds you that you are still

3    under oath.

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Mr. Bath.

6           MR. BATH:  No further questions.

7           THE COURT:  Any redirect?

8           MR. RAVI:  Yes, your Honor, briefly.

9    REDIRECT EXAMINATION

10   BY MR. RAVI:

11   Q.  Good afternoon, Ms. Williams.

12   A.  Good afternoon.

13   Q.  You were asked on cross about the letter and the service

14   agreement that Mr. Tucker provided to the tribe in 2003,

15   correct?

16   A.  Yes.

17   Q.  And that letter talks about the tribe becoming an

18   authorized lender, correct?

19   A.  Yes.

20   Q.  But the Miami never served as the actual lender of any

21   money for the payday lending business, correct?

22          MR. GINSBERG:  Objection, your Honor.  Given her job

23   title during that period of time, she is not in a position to

24   give an answer to that.

25          THE COURT:  Why don't you lay a foundation for the

1  question.

2  Q.  Ms. Williams, based on your interactions and conversations

3  with Mr. Brady regarding the payday loan business, the Miami

4  never served as the actual lender of money for the payday loan

5  business, correct?

6          MR. GINSBERG:  Objection, your Honor.

7          THE COURT:  During the time that you had any

8  association with the tribe.  You can limit your answer to that

9  time period.

10  A.  To my knowledge, they did not.

11  Q.  In fact, the same letter and agreement that was provided in

12  2003 stated that the tribe didn't have to put up any money for

13  the payday loan business, correct?

14  A.  That's correct.

15  Q.  In fact, we heard Mr. Brady say in the recordings that all

16  that has happened money-wise is money that Scott Tucker and his

17  company sent to the tribe, right?

18          MR. GINSBERG:  Objection, your Honor.  We heard that

19  on direct.  It was crossed on, but now it's improper redirect.

20          THE COURT:  Overruled.

21          Go ahead.

22  A.  Yes, that's correct.

23  Q.  And Mr. Brady also in the recordings said that the tribe

24  hasn't been out a dime, is that right?

25  A.  Yes.

1           THE COURT:  Anything further?

2           MR. RAVI:  No, your Honor.

3           THE COURT:  Thank you, Ms. Williams.  I hope your

4    health continues to improve.

5           (Witness excused)

6           MR. RAVI:  At this time, the government wants to

7    introduce some exhibits, your Honor.

8           The government offers Government Exhibit 310.

9           THE COURT:  Any objection?

10          MR. GINSBERG:  Yes.

11          THE COURT:  Basis.

12          MR. GINSBERG:  Hearsay.  Also, it's inconsistent with

13   the government's former position about Ken Bellmard.

14          THE COURT:  Overruled.  I will allow it.

15          (Government's Exhibit 310 received in evidence)

16          MR. RAVI:  Please publish that.

17          THE COURT:  It's not accepted for the truth of its

18   content, just the fact that it was said.

19          MR. RAVI:  Please highlight the "from" and the "to,"

20   please.

21          Highlight the second two sentences.

22          Take that down.

23          The government now offers Government Exhibit 312.

24          MR. GINSBERG:  No objection.

25          THE COURT:  Received.

1     (Government's Exhibit 312 received in evidence)

2     MR. RAVI:  Focus just on the second e-mail from the

3  top.

4     Highlight the "from" and the "to" and the cc.

5     The first two sentences.

6     The next sentence.

7     Go to the first top e-mail in the chain.

8     Highlight the "from" and the "to" as well as the date.

9     Highlight the second sentence.

10    Take that down.

11    The government offers Government Exhibit 413.

12    MR. GINSBERG:  No objection.

13    THE COURT:  Received.

14    (Government's Exhibit 413 received in evidence)

15    MR. RAVI:  Highlight the bottom e-mail, "from" and

16  "to."

17    Highlight the body.

18    Go to the next e-mail.

19    Highlight the "from" and the "to."

20    Go to the next e-mail.

21    Highlight Scott Tucker.

22    Finally, go to the top e-mail.

23    Highlight the body.

24    The government now offers Government Exhibit 304.

25    MR. GINSBERG:  No objection.

1        THE COURT:  Received.

2        (Government's Exhibit 304 received in evidence)

3        MR. RAVI:  Highlight the bottom e-mail, just the first

4    sentence.

5        Highlight the top, just the "from" and the "to."

6        Take that down.

7        The government offers Government Exhibit 305.

8        THE COURT:  Any objection?

9        MR. GINSBERG:  No objection.

10        THE COURT:  Received.

11        (Government's Exhibit 305 received in evidence)

12        MR. GINSBERG:  I'm sorry for the delay.  Even with my

13    glasses I can't see the screen.

14        THE COURT:  That's absolutely fine.

15        MR. RAVI:  Highlight the "from" and the "to".

16        THE COURT:  In fact, you should let me know if you

17    need more time.

18        MR. GINSBERG:  Thank you.

19        MR. RAVI:  And the date.

20        And the body.

21        Take that down.

22        The government offers Government Exhibit 307.

23        MR. GINSBERG:  No objection.

24        THE COURT:  Received.

25        (Government's Exhibit 307 received in evidence)

1          MR. RAVI:  Zoom in on the bottom e-mail.

2          The "from" and the "to."

3          And the subject line.

4          Highlight the first sentence.

5          And the second sentence.

6          The third sentence.

7          Now the fourth sentence.

8          Please now zoom in on the top two e-mails.

9          Just highlight the "from" and the "to" at the top.

10          Highlight the date.

11          The government now offers Government Exhibit 308.

12          MR. GINSBERG:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 308 received in evidence)

15          MR. RAVI:  Please highlight the date.

16          The "from" and the "to."

17          Now please highlight the first main sentence in the

18    body.

19          Let's take that down.

20          Three more for now.

21          The government offers Government Exhibit 412.

22          MR. GINSBERG:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 412 received in evidence)

25          MR. RAVI:  Focus on the bottom e-mail.

1    The "from" and the "to" and the body.

2    Now go to the top e-mail.

3    THE COURT:  You can't see it?

4    THE JURY:  No.

5    MR. RAVI:  Sorry about that.

6    Let's put up 412.

7    THE COURT:  Do you have it?

8    THE JURY:  Yes.

9    MR. RAVI:  Go to the top e-mail.

10    Highlight the "from" and the "to."

11    And the body.

12    The government now offers Government Exhibit 411.

13    MR. GINSBERG:  No objection.

14    THE COURT:  Received.

15    (Government's Exhibit 411 received in evidence)

16    MR. RAVI:  Please publish.

17    Turn to the second page and focus on the bottom

18  e-mail.

19    Highlight the "from" and the "to."

20    Please focus on the next e-mail.

21    Focus on the next e-mail.

22    Focus on the next e-mail up.

23    Finally, focus on the top e-mail.

24    Highlight the "from" and the "to."

25    And the date.

1          Highlight the first two lines of the body.

2          Highlight the next sentence.

3          Finally, let's turn to Government Exhibit 414, which

4     the government offers at this time.

5          THE COURT:  Any objection?

6          MR. GINSBERG:  No, your Honor.

7          THE COURT:  Received.

8          (Government's Exhibit 414 received in evidence)

9          MR. RAVI:  Can you put pages 1 and 2 next to each

10    other, please.

11         Let's put up Government Exhibit 414.

12         THE COURT:  The document that's up now is 411.

13         You want 414?

14         MR. RAVI:  Yes, your Honor.

15         Can we zoom in on the bottom e-mail on the first page.

16         Highlight the "from" and the "to."

17         Highlight the first clause up to "November 3rd."

18         Beginning on the third line at the end, highlight

19    "some" and the next line.

20         Now, zoom in on number 1 on the second page.

21         Now, if you can highlight beginning "on number 2" on

22    the first page.

23         Just include the next line of the e-mail after "number

24    2."

25         Zoom out on both documents.

1        Then on the left, just zoom in on the body.

2        Highlight the second to last line "on number 4" and

3   the rest of the e-mail.

4        Then highlight number 4 on the letter.

5        At this time, the government calls Allison Harris.

6    ALLISON HARRIS,

7        called as a witness by the government,

8        having been duly sworn, testified as follows:

9        THE DEPUTY CLERK:  State your full name and spell it

10  for the record.

11       THE WITNESS:  Allison Harris, A-L-L-I-S-O-N,

12  H-A-R-R-I-S.

13       THE COURT:  You may inquire.

14  DIRECT EXAMINATION

15  BY MR. RAVI:

16  Q.  Good afternoon Ms. Harris.

17  A.  Good afternoon.

18  Q.  How old are you?

19  A.  49.

20  Q.  Where do you currently live?

21  A.  I live in Franklin, Tennessee.

22  Q.  How far did you go in school?

23  A.  I have a bachelor's degree.

24  Q.  What degree did you receive in college?

25  A.  I received a bachelor of business administration with an

1    accounting major.

2    Q.  Do you have any licenses?

3    A.  I am a certified public accountant in the state of

4    Oklahoma.

5    Q.  Is it also known as a CPA?

6    A.  Yes.

7    Q.  When did you earn your CPA?

8    A.  1994.

9    Q.  Where do you currently work?

10   A.  I work for Community Health Systems in Franklin, Tennessee.

11   Q.  What do you do there?

12   A.  I am director of corporate accounting.

13   Q.  How long have you worked there?

14   A.  I have worked for Community Health Systems two different

15   times, for a total of nine years.

16   Q.  And beginning when?

17   A.  I started in 2004 and I worked there from 2004 till 2008,

18   and then I have been working there since 2012.

19   Q.  How many total years have you done accounting work?

20   A.  27.

21   Q.  At some point were you employed by Miami Nation

22   Enterprises?

23   A.  Yes.

24   Q.  Is that also known as MNE?

25   A.  Yes.

1  Q.  How did you end up working there?

2  A.  I was living in Missouri at the time and a friend of mine

3  is a tribal member and a tribal employee.  She knew that I was

4  looking for employment and she sent my resume to someone at MNE

5  and they called me.

6  Q.  Did you end up taking a job there?

7  A.  I did.

8  Q.  What was your position?

9  A.  Chief financial officer.

10  Q.  Who was your supervisor?

11  A.  Don Brady.

12  Q.  What was Don Brady's position?

13  A.  He was chief executive officer.

14  Q.  When did you begin working at MNE?

15  A.  December of 2009.

16  Q.  Generally describe what MNE was.

17  A.  MNE was a political economic subdivision of the Miami Tribe

18  of Oklahoma.  It housed the tribe's business interests.

19  Q.  Did one of those business interests include the Payday Loan

20  Company?

21  A.  Yes.

22  Q.  How did you and others at the tribe refer to that company?

23  A.  We simply called it the loan company.

24  Q.  Did it have some other names?

25  A.  Yes.

1   Q.  What were those names?

2   A.  AMG was one name, TFS, MNE Services.

3   Q.  Who operated the loan company?

4   A.  Scott Tucker.

5   Q.  Where was it operated from?

6   A.  Kansas City.

7   Q.  What were your responsibilities as CFO of MNE?

8   A.  I was responsible for the financial activities, the

9   accounting records of MNE's business interests.

10  Q.  And in addition to the loan company, how many other

11  businesses did MNE have?

12  A.  I believe there were five others.

13  Q.  Did you also supervise any employees?

14  A.  Yes.

15  Q.  Approximately how many?

16  A.  Four or five employees.

17  Q.  Now, did you manage the financial activities of all of the

18  businesses under MNE?

19  A.  Except for the loan company, yes.

20  Q.  You didn't manage the financial activities of the loan

21  company?

22  A.  No.

23  Q.  Did you have access to the books and records of all the

24  companies held under MNE?

25  A.  Except for the loan company, yes.

1  Q.  Where was the accounting done for the loan company, if you

2  know?

3  A.  My understanding was that it was done in Kansas City.

4  Q.  Do you know who specifically maintained the books and

5  records for the loan company?

6  A.  I do not.

7  Q.  If you wanted to contact someone at the loan company

8  regarding the books and records, who would you contact?

9  A.  I didn't have any contacts there.

10 Q.  What role, if any, did you have in the loan company?

11 A.  Simply we received checks monthly, several checks per

12 month.  We deposited those into a bank account of MNE.  There

13 were also two employees in our office who performed certain

14 tasks related to the loan company, and they were on MNE's

15 payroll.

16 Q.  So first let's go to the checks.  How many checks were

17 received?

18 A.  I don't remember exactly.  I would say several, four or

19 five.

20 Q.  Where were those checks coming from?

21 A.  They came from Kansas City.

22 Q.  What did you do with those checks?

23 A.  Deposited them into a local MNE bank account.

24 Q.  In which banks were those held?

25 A.  Welch State Bank in Miami, Oklahoma.

1    Q.  You also mentioned that you took care of payroll for two

2    employees?

3    A.  Yes.

4    Q.  What did those employees do for the Payday Loan Company?

5    A.  They had the responsibility of making phone calls to

6    individuals who had started a loan application online but had

7    not completed it, and they would call and offer assistance to

8    complete the application.

9    Q.  Did those employees have anything to do with reviewing and

10   approving loan applications?

11   A.  No.

12   Q.  How was the amount of the checks determined, if you know?

13   A.  I do not know.

14   Q.  Did you have any access to records at the loan company to

15   understand how those payments were calculated?

16   A.  No, I did not.

17   Q.  Did you ever serve in any officer or board positions of the

18   loan company?

19   A.  I was told by my supervisor, Don Brady, at one point that

20   he was going to place me on one of the boards.  I never met

21   with the board or took any action related to the board.

22   Q.  You didn't attend any board meetings?

23   A.  No.

24   Q.  Did you also learn that you were appointed as the vice

25   president of AMG?

1    A.  Yes, I later learned that.

2    Q.  What did you do as the vice president of AMG?

3    A.  Nothing.

4    Q.  What, if anything, did you know about Scott Tucker when you

5    were working at the tribe?

6    A.  I knew that he ran the loan company, also that he drove

7    race cars, and that he was a friend of my supervisor, Don

8    Brady.

9    Q.  Was it unusual for you to not have access to the records of

10   the loan company as the CFO of MNE?

11   A.  Yes.

12   Q.  Did you ever voice any concerns about your lack of access

13   to the books and records of the loan company?

14   A.  Yes, I did.

15   Q.  To whom did you voice those concerns?

16   A.  I voiced concerns to several people, including Don Brady.

17   Q.  At the time you were at the tribe, did you ever get access

18   to the books and records of the loan company?

19   A.  No.

20   Q.  Which entity paid Mr. Brady?

21   A.  MNE.

22   Q.  In other words, did checks go out from tribal bank accounts

23   in MNE's name to pay Mr. Brady?

24   A.  Yes, that's correct.

25   Q.  Did there come a time when you attended a meeting relating

1  to an IRS audit of MNE, MNES, AMG, and the Miami tribe?

2  A.  Yes.

3  Q.  When did this meeting occur?

4  A.  I don't recall exactly.

5  Q.  Can you give an approximate year?

6  A.  I believe it was in 2011.

7  Q.  Who attended that meeting?

8  A.  There were representatives from the IRS, also Don Brady,

9  Tom Gamble, and I don't recall whether there were other

10  participants.

11 Q.  Were there any representations that were made at that

12  meeting regarding the ownership of the Payday Loan Company?

13 A.  Yes.

14 Q.  What representation was made?

15          THE COURT:  And by whom.

16          Go ahead.

17 A.  Representations were made by Don Brady that the loan

18 company was owned and operated by tribal entities.

19 Q.  Was that concerning to you?

20 A.  Yes, it was.

21 Q.  Why was that concerning?

22 A.  That had not previously been my understanding, nor did I

23 believe that to be the case.

24 Q.  Did it concern you as the CFO specifically?

25 A.  Yes, it did, because I did not have access to the

1    accounting records of the loan company, nor were the assets and

2    liabilities of the loan company included in our MNE

3    consolidated financial statements that I prepared.

4    Q.  I would like to show you Government Exhibit 501.

5              MR. RAVI:  The government offers Government Exhibit

6    501.

7              THE COURT:  Any objection?

8              MR. GINSBERG:  No objection.

9              THE COURT:  Received.

10             (Government's Exhibit 501 received in evidence)

11   Q.  Just focus on the bottom "from" and "to."

12   A.  Yes.

13   Q.  Who is this e-mail from?

14   A.  Julie Olds.

15   Q.  Who is she?

16   A.  Julie is a tribal member and employee of the tribe.  She is

17   also the friend that passed along my resume.

18   Q.  Who is this e-mail to?

19   A.  It is to Paul Strack and Roger Olds, with copies to Tim

20   Lafalier, Joseph Leonard, Don Brady, and myself.

21   Q.  How are all these people related?

22   A.  They are all members of the MNE board, except for Don Brady

23   and myself.

24             MR. RAVI:  If we can go down to the next page.

25   Q.  Can you just read the first sentence of the first

1    paragraph?

2    A.  Yes.

3            "To all:  I can see in reading Paul's

4    questions/concerns, as addressed to Roger and copied to us all,

5    that the MNE board needs to meet on site to discuss these

6    things and to provide Paul and Tim with some history to these

7    questions that will clarify, inform, etc."

8    Q.  If we just go to the next paragraph.

9            Read the first two sentences.

10   A.  "I would like to suggest that we begin looking at our

11   calendars now to plan an on-site meeting in Springfield,

12   Missouri to allow the board to meet the ServiceWorld team,

13   including Mr. Pitt, and to tour that business.  Following such,

14   I would suggest repeating such a meeting, at our earliest

15   convenience, in Kansas City to meet Scott Tucker and to tour

16   that business location as well."

17           MR. RAVI:  We can zoom out of that.

18   Q.  Were some of the board members, were they new board members

19   of MNE?

20   A.  Yes.

21   Q.  Generally, what is the concern or the discussion about?

22   A.  There had been discussion in the meeting, I believe,

23   concerning an accounting problem at ServiceWorld and what the

24   resolution to that had been.  I assume there had also been a

25   discussion about the loan company, although I don't remember

1   specifically.

2   Q.  What is ServiceWorld?

3   A.  ServiceWorld is a business in Springfield, Missouri that

4   was 75 percent owned by MNE.  It's an IT company.

5   Q.  Did you have access to the books and records of

6   ServiceWorld?

7   A.  Yes.

8           MR. RAVI:  If we can now go to the first page.

9   Q.  Was there an e-mail sent by Don Brady in response to that,

10  it's the third e-mail from the top?

11  A.  Yes.

12  Q.  Focus on that.

13          What day was this e-mail sent?

14  A.  June 30, 2010.

15  Q.  Can you please read this e-mail?

16  A.  The entire e-mail?

17          THE COURT:  No.  The jury can read it.  If you want to

18  highlight something, you can.

19          MR. RAVI:  Sure.

20          Let's highlight beginning the "loan company is

21  different."

22          THE COURT:  Go ahead.

23  Q.  I am just going to ask Ms. Grant to highlight various

24  passages here rather than have you read.

25          Can you now highlight the next sentence.

1    The next sentence.

2    Highlight the next sentence.

3  Q.  Can you please read the part of the next sentence that is

4  not highlighted, beginning with "that would end."

5  A.  "That would end up in an immediate thank you and goodbye

6  response followed by a message to me of don't bring them back."

7  Q.  The last sentence, it says, "Tom can handle it if something

8  happens to me."

9    Do you know who the reference is to Tom?

10 A.  Tom Gamble, the tribal chief.

11 Q.  Was there a response to this e-mail from Julie Olds?

12 A.  Yes.

13    MR. RAVI:  Focus on the next e-mail from Julie Olds.

14 That's the third from the top.

15 Q.  Just read the first two sentences of that e-mail?

16 A.  "This is simple.  If the board chooses to visit KC, then

17 you arrange for Scott to simply greet us, shake hands and then

18 disappear.  We can do the tour and leave for lunch and head

19 home."

20 Q.  Then just read the last sentence.

21 A.  "We can provide the board with whatever their interest may

22 be in visiting and shaking his hand and keep conversation from

23 occurring as well."

24 Q.  Was there a response from Mr. Brady?

25 A.  Yes.

1    MR. RAVI:  If we can zoom in on the response from Mr.

2    Brady.

3    Q.  Just read the first two sentences.

4    A.  "Well put, but I will strongly disagree.  I respectfully

5    submit that I know more about this situation than any of you."

6         MR. RAVI:  We can take that down.

7    Q.  Ms. Harris, how long did you end up working for MNE?

8         THE COURT:  Pause.

9         Ladies and gentlemen, I am going to hold you in

10   suspense with the answer to that question.  We are going to

11   break for the evening.  Please do not discuss the case among

12   yourselves or with anyone.  See you back in action for a good

13   10:00 start.

14        Thank you.

15        (Jury exits courtroom)

16        THE COURT:  I take it the government expects to rest

17   tomorrow?

18        MR. RAVI:  I believe so.

19        THE COURT:  When tomorrow?

20        MR. VELAMOOR:  It's a little harder to predict, but we

21   only have short witnesses left and not very many.

22        THE COURT:  All right.  Thank you.

23        MR. GINSBERG:  Your Honor, an administrative matter.

24        THE COURT:  Yes, sir.

25        MR. GINSBERG:  If the government is going to rest

1  tomorrow, does your Honor want to hear oral argument on Rule 29

2  or should we just make it and then it's reserved.  That's

3  number one.

4  The second question is, I think we are submitting, or

5  may have been submitted already, our response to the motion to

6  preclude witnesses that we would be otherwise bringing in next

7  week, and I wanted to know if your Honor wanted to hear a

8  response.

9  THE COURT:  I do.  Be prepared to argue that tomorrow

10  morning.  I will see you at 9:30.

11  With regard to any motion you want to make, you can

12  make it orally at sidebar.

13  MR. GINSBERG:  Was your Honor able to sign our

14  e-vouchers for transportation?

15  THE COURT:  That's been taken care of.

16  MR. VELAMOOR:  One last very brief matter.  I may have

17  missed this.  Can we get the number of the new juror who has

18  been seated as the new number 12?

19  THE COURT:  Juror No. 13 will be moved into number 12.

20  MR. VELAMOOR:  I meant the number from the voir dire.

21  I will figure it out.

22  THE COURT:  We will see whether we can help you with

23  that, but it would be the juror in the top row in the far

24  right, if the jurors have been seated correctly, and I assume

25  they have.  I will have my deputy look into it.

H9R8TUC5

1              Thank you.

2              (Adjourned to September 28, 2017, at 9:30 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           INDEX OF EXAMINATION

2    Examination of:                          Page

3    TROY LITTLE AXE

4    Direct By Mr. Ravi . . . . . . . . . . . . .1397

5    TROY LITTLE AXE

6    Direct By Mr. Ravi . . . . . . . . . . . . .1406

7    Cross By Mr. Ginsberg . . . . . . . . . . .1469

8    Cross By Mr. Ginsberg . . . . . . . . . . .1493

9    Cross By Mr. Bath . . . . . . . . . . . .1513

10   Redirect By Mr. Ravi . . . . . . . . . . .1535

11   FRANK PONZO

12   Direct By Mr. Scotten . . . . . . . . . . .1554

13   CAROLYN WILLIAMS

14   Redirect By Mr. Ravi . . . . . . . . . . .1568

15   ALLISON HARRIS

16   Direct By Mr. Ravi . . . . . . . . . . . . .1576

17               GOVERNMENT EXHIBITS

18   Exhibit No.                          Received

19     4031    . . . . . . . . . . . . . . . . .1404

20     1409, 1410 and 1450  . . . . . . . . . .1405

21     826  . . . . . . . . . . . . . . . . . .1409

22     801  . . . . . . . . . . . . . . . . . .1411

23     802  . . . . . . . . . . . . . . . . . .1417

24     806  . . . . . . . . . . . . . . . . . .1431

25     817  . . . . . . . . . . . . . . . . . .1439

1    808    . . . . . . . . . . . . . . . . . .1442

2    4024    . . . . . . . . . . . . . . . . .1450

3    825    . . . . . . . . . . . . . . . . . .1454

4    813    . . . . . . . . . . . . . . . . . .1456

5    815    . . . . . . . . . . . . . . . . . .1458

6    814    . . . . . . . . . . . . . . . . . .1459

7    824    . . . . . . . . . . . . . . . . . .1462

8    812    . . . . . . . . . . . . . . . . . .1465

9    827, 828, 829, 830 and 831  . . . . . . .1466

10   832    . . . . . . . . . . . . . . . . . .1467

11   823    . . . . . . . . . . . . . . . . . .1550

12   822    . . . . . . . . . . . . . . . . . .1551

13   820    . . . . . . . . . . . . . . . . . .1552

14   821    . . . . . . . . . . . . . . . . . .1553

15   819    . . . . . . . . . . . . . . . . . .1553

16   3401, 3402, 3403, 3405 and 3406  . . . . .1555

17   3409, 3410, 3411, 3412, 3413, 3414 and  . . .1566

18           3415

19   310    . . . . . . . . . . . . . . . . . .1570

20   312    . . . . . . . . . . . . . . . . . .1571

21   413    . . . . . . . . . . . . . . . . . .1571

22   304    . . . . . . . . . . . . . . . . . .1572

23   305    . . . . . . . . . . . . . . . . . .1572

24   307    . . . . . . . . . . . . . . . . . .1572

25   308    . . . . . . . . . . . . . . . . . .1573

1    412  . . . . . . . . . . . . . . . . . .1573

2    411  . . . . . . . . . . . . . . . . . .1574

3    414  . . . . . . . . . . . . . . . . . .1575

4    501  . . . . . . . . . . . . . . . . . .1584

5                    DEFENDANT EXHIBITS

6    Exhibit No.                              Received

7    D2215  . . . . . . . . . . . . . . . . .1470

8    D2216  . . . . . . . . . . . . . . . . .1474

9    D2217  . . . . . . . . . . . . . . . . .1476

10   D2218  . . . . . . . . . . . . . . . . .1477

11   D2219  . . . . . . . . . . . . . . . . .1478

12   D1007  . . . . . . . . . . . . . . . . .1493

13   D1008  . . . . . . . . . . . . . . . . .1495

14   D1004  . . . . . . . . . . . . . . . . .1497

15   D1038  . . . . . . . . . . . . . . . . .1498

16   D2202  . . . . . . . . . . . . . . . . .1504

17   2214  . . . . . . . . . . . . . . . . . .1520

18   D1085  . . . . . . . . . . . . . . . . .1523

19   1086  . . . . . . . . . . . . . . . . . .1525

20

21

22

23

24

25