H9sWtuc1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                           16 Cr. 91 (PKC)

5   SCOTT TUCKER and
    TIMOTHY MUIR,                           Trial
6
                  Defendants.
7
    ------------------------------x
8                                           New York, N.Y.
                                            September 28, 2017
9                                           9:35 a.m.

10

    Before:
11                    HON. P. KEVIN CASTEL

12                                          District Judge
                                               and a jury
13                          APPEARANCES

14  JOON H. KIM
         Acting United States Attorney for the
15       Southern District of New York
    BY:  NIKETH V. VELAMOOR
16       HAGAN C. SCOTTEN
         SAGAR K. RAVI
17       Assistant United States Attorneys

18  FREEMAN NOOTER & GINSBERG
         Attorneys for Defendant Tucker
19  BY:  LEE A. GINSBERG
         NADJIA LIMANI
20          -and-
    STAMPUR & ROTH
21  BY:  JAMES M. ROTH

22  BATH & EDMONDS, P.A.
         Attorneys for Defendant Muir
23  BY:  THOMAS J. BATH
            -and-
24  BEVERLY VAN NESS

25

H9sWtuc1

1          (Trial resumed)

2          THE COURT:  Good morning.  Please be seated.

3          Let me hear from the government on timing of the

4    evidence of when Mr. Tucker started recruiting Indian tribes

5    for the payday loan operation.

6          MR. SCOTTEN:  Your Honor, the defendant started

7    recruiting tribes for the payday lending operation in the late

8    summer, very early fall of 2003, and I think really the

9    important point is we know that he started doing this before he

10   ever spoke with Mr. Schulte, because that is how he met Mr.

11   Schulte.  He met Mr. Schulte when he approached the Santee

12   Sioux tribe, not the first tribe he approached, and Mr. Schulte

13   represented the Santee Sioux at the time.

14         THE COURT:  I understand that.  We'll get to that

15   point.

16         MR. SCOTTEN:  Understood.

17         THE COURT:  When did he first arrive at a meeting of

18   the minds with an Indian tribe?

19         MR. SCOTTEN:  He first entered a written agreement

20   with an Indian tribe in November of 2003 with the Miami.

21         THE COURT:  OK.  In the fall he spoke to the Preston

22   Gates firm or he was in contact with the Preston Gates firm.

23         MR. SCOTTEN:  Your Honor, no.  He had spoken with the

24   Preston Gates firm earlier.  He spoke with the Preston Gates

25   firm in June and July.  He obtained their advice letter in

H9sWtuc1

1    early July.

2         THE COURT:  All right.  So before, certainly before he

3    entered into any arrangement with any tribe.

4         MR. SCOTTEN:  Yes, your Honor.

5         THE COURT:  And you have no objection to the

6    defendant's use of such legal advice if and to the extent it

7    otherwise meets the requirements of the advice-of-counsel

8    defense.

9         MR. SCOTTEN:  Yes, your Honor.

10        THE COURT:  OK.  Let me hear from Mr. Tucker's lawyers

11   with regard to the fact that Schulte was a lawyer for the

12   Santee Sioux.  He owed a duty of loyalty, a fiduciary duty to

13   the Santee Sioux, and as I understand it, the deal was in the

14   economic self-interest of the Santee Sioux, at least in the

15   short range, and the Santee Sioux as a tribe is itself immune

16   from regulatory -- well, I don't know that it's regulatory

17   action, but at least enforcement by state government, certain

18   types of enforcement remedies by state government.  So how are

19   statements by a lawyer who owes no duty of loyalty to

20   Mr. Tucker and owes it only to the Santee Sioux, who stand to

21   earn 1 percent of the revenue stream from this course of

22   conduct, how is that advice that Mr. Tucker can rely on, or

23   reasonably rely on?

24        MS. VAN NESS:  Your Honor, the starting point here is

25   that the tribal model was brand-new.  It's not like this was

H9sWtuc1

1   all set up before, any people had paradigms to work with.  So

2   in this period, Mr. Tucker was exploring whether he could do

3   this with Indian tribes.  Mr. Schulte represented Santee at

4   that time, and Mr. Tucker spoke to him with the idea of setting

5   up this model.  It wasn't like, This is what I'm going to do

6   and do you want to participate.

7            Mr. Schulte had an obligation to the tribe if they

8   were going to participate to set up the lending model in a way

9   that would preserve his tribe's sovereign immunity.  So

10  therefore, he -- since it was a brand-new template, he had a

11  duty of loyalty that spilled over onto Mr. Tucker in the sense

12  that he was giving legal advice as to the legality of the

13  model, which he could only --

14           THE COURT:  No, no, no.  This is the fork in the road,

15  so you're going to have to help me with this, Ms. Van Ness, and

16  I don't want to interrupt you too much, but this is where I

17  think you have a problem.  When you say, and I'm not picking on

18  your choice of words, but I understood the concept, which was

19  that his duty of loyalty spilled over to Mr. Tucker, I don't

20  think that's true as a matter of law.  I don't think he owed

21  any -- any -- duty of loyalty to Mr. Tucker, any duty to

22  protect Mr. Tucker, any interest to protect Mr. Tucker.  His

23  interest was in protecting the client to whom he owed a duty of

24  loyalty, the Santee Sioux.

25           MS. VAN NESS:  All right.  I think I understand, your

1    Honor, and I misspoke.  He didn't have a duty of loyalty to

2    Mr. Tucker, but he was giving legal advice on the legality of

3    the proposed model for doing these payday loans online through

4    a federally recognized Indian tribe.

5            THE COURT:  He was giving legal advice to his clients.

6    He's not even permitted to give legal advice under most

7    jurisdictions' law to a nonclient, except to consult with a

8    lawyer.

9            MS. VAN NESS:  Well, Mr. Tucker was consulting with

10   him on, was consulting with him on whether this was going to be

11   a lawful operation, whether the tribe, however they set it up,

12   using non-Indian partners to service the business as an arm of

13   the tribe, whether this would -- because the tribes often

14   weren't able to do this on their own, whether this was going to

15   be lawful.

16           And also, the Santee, by the way, did not sign on to

17   this agreement until 2005, so this was an ongoing discussion

18   with Mr. Schulte, but it also, for our purposes here, was on

19   the legality of this brand-new model.

20           THE COURT:  But I don't think that's what lawyers do,

21   or lawyers should do.  Say I'm the lawyer for the seller of a

22   business and somebody else is the lawyer for a buyer of a

23   business.  As the lawyer for the seller, my job is not to

24   advise the buyer on the legality of the transaction.  My job is

25   to look at it with an eye single to the viewpoint of my client

to see whether or not my client's actions are lawful or have

any exposure to them.  In fact, in the case of a lay client, a

lawyer should not be saying, And by the way, your conduct will

be lawful also, because you're giving legal advice to an

unrepresented person.

Now, maybe you want to show me something where that's

not true under relevant legal principles, and I'm all ears, but

that's the general rule that I'm familiar with.

MS. VAN NESS:  I think they had a joint interest

because this business was not going to get off the ground

unless Mr. Tucker could recruit an Indian tribe, and in order

to do that, he vetted the model with a lawyer for an Indian

tribe, who said -- if the lawyer for the Indian tribe had said,

This is crazy, if you do this, the tribe's not going to be

protected, much less you --

THE COURT:  But he should be saying, This is crazy,

the tribe's not going to be protected.

MS. VAN NESS:  Which would mean --

THE COURT:  And that's advice he should be giving to

his client or simply saying, My client, the Santee Sioux, would

not be interested in this type of a transaction, if that's his

viewpoint, or, They are interested in this type of a

transaction.

MS. VAN NESS:  If he said I don't think this model

works, but if you do this, I think it would be fine and I would

1    recommend to my tribe to do it, they're discussing how to set

2    it up lawfully.  It's not -- it's a joint interest in doing a

3    business venture that will clearly benefit the tribe.

4              THE COURT:  When I go to a real estate closing and I'm

5    the buyer, and the seller's attorney says, You know, you, the

6    buyer, if you really want to protect yourself, should set this

7    up this way, it is not reasonable, I submit, for the buyer to

8    rely on the statements of the seller's attorney, and as I

9    pointed out, if the person is represented by counsel, the

10   seller's attorney is acting not in compliance with rules of

11   professional conduct.  But this is not an ethics case as such;

12   I'm just pointing that out.  That's not what they're allowed to

13   do, but go ahead.

14             MS. VAN NESS:  He's providing legal advice.  It's not

15   an attorney-client relationship per se, but there's no, there's

16   no --

17             THE COURT:  Then how about this --

18             MR. ROTH:  Judge, may I?  I'm sorry.

19             THE COURT:  No.  How about this then, and I think

20   Ms. Van Ness is doing just fine.  I'm going to hear from you,

21   Mr. Roth.  I'm not trying to restrict the debate, but by

22   operation and extension of that principle, one could say,

23   Here's my advice-to-counsel defense:  I went to the library and

24   I read a book.  I saw a documentary on PBS and a lawyer was

25   speaking, not my lawyer, but I heard what that lawyer had to

H9sWtuc1

say and I relied on his statements on the broadcast or in the

book.  How are Mr. Schulte's comments at this point any

different?

MS. VAN NESS:  They are based on a particular business

venture that is being discussed that could be of enormous

benefit to his client if it is set up properly, because

otherwise the tribes are going to lose too if the business is

found to be not a tribal business.  So it's not like watching a

video or reading a book.  This is a consultation with a lawyer

who has a mutual interest in setting up a brand-new model that

will benefit his client, and necessarily -- and furthermore, he

also read the Preston Gates memo, so they had that concrete

issue before them, and was talking about giving his opinion as

to whether that would satisfy the legal requirements of setting

up this business with his client.

It's not like a one-off, You know, I read a book.

This was about the actual business venture that was being

contemplated, and it had not yet been formed.  It was in the

talking stage.  No service agreement had been signed.  And even

if a service agreement had been signed, there was no -- no

loans had been done at that point, which is another question

that I wanted the Court to think about.

Like many other things in this case, this

advice-of-counsel defense is very complicated in this case.

It's not your usual defense.

1    If I can provide an example that makes it very simple,

2   my Aunt Millie died.  She left me an $8 million resort.  I go

3   to a lawyer and I say, Does this have tax consequences, do I

4   have to report this?  And the lawyer says, Yes, you do have to

5   report this.  So my return isn't due yet.  Months go by.  I hem

6   and I haw, I hem and I haw, and I say:  Well, I looked him up

7   in Martindale-Hubbell and he's not there.  He's a bad lawyer.

8   I don't have to follow his advice.

9    Then I say:  Well, maybe I should follow his advice.

10  He hasn't been disbarred.  He's still licensed.

11   But then right before I sign my name to the tax return

12  on April 15, I say I know what he told me, but I'm not going to

13  follow his advice because the IRS, Aunt Millie has a different

14  last name than I do, and so the IRS is never going to be able

15  to figure this out.  That would be, like, more ordinary

16  advice-of-counsel defense.  It wouldn't be an advice-of-counsel

17  defense if those are the facts, but my point is here, this is a

18  brand-new venture.  There weren't any templates.  There wasn't

19  any correct precedents about it one way or the other.

20   Mr. Tucker approached several lawyers in a very

21  discrete period before he did anything, and until the loans

22  started, he had not manifested any criminal intent.

23   The government's position is he had that intent all

24  along; that's their theory.  We don't agree with that theory.

25  We're trying to present evidence that he was engaging in this

1    business venture, hiring lawyers, consulting with lawyers,

2    spending lots of money to make sure that this new model was

3    legitimate, and as time went on during this ten-year period, he

4    consulted other lawyers, including Mr. Muir, about whether this

5    model was still legitimate.

6         I mean, if you embark on a legal undertaking and the

7    Supreme Court comes down with a case five years later and the

8    lawyer says to you, This is a problem, we should fix the model

9    this way and then we'll be fine, that is more advice of

10   counsel.  It's an ongoing operation.  It's not like one seeking

11   advice at the beginning, when an issue arises and then not

12   following the advice or following the advice.  It's a business.

13   It's a new model, so I think all advice that Mr. Tucker

14   received in this period before he actually did anything -- you

15   know, recruiting a tribe doesn't mean he's going to engage in

16   the loans.  He's still, he's trying to drum up interest, but

17   they haven't figured out the model yet.  So it's not that he's

18   manifested any criminal intent at that point until he actually

19   engages in the lending, and then it's a jury question as to

20   whether it was criminal intent or whether it was good faith.

21        THE COURT:  All right.  I'm going to hear from

22   Mr. Roth and then Mr. Ginsberg.

23        Mr. Eldridge.

24        Mr. Roth, you can go next.

25        MR. ROTH:  Thank you.

1    THE COURT:  And I think the record should reflect I'm

2  going to be hearing from three lawyers from Mr. Tucker on this

3  issue, and I'm dispensing with ceremony.  I'm not required to,

4  but I'm happy to do it.

5    Go ahead.

6    MR. ROTH:  I appreciate that, your Honor, and I think

7  what I'm going to say is to clarify and I think it will help

8  your Honor make the decision, the factual predicate for the

9  advice that he received from Conly and the timeline during

10  which he received this advice.

11    He received the advice in early -- he started speaking

12  to Conly after he, or almost simultaneously when he spoke to

13  Cohen about the Kickapoo enterprise that he was trying to get

14  off the ground in November of '03.  So Cohen reaches out, at

15  Scott's request to Conly.  At that juncture, Conly is engaged

16  to represent Scott.  There's not a formal engagement, but he's

17  drafting documents for the Kickapoo model, unrelated to the

18  Santee, unrelated to the Santee.  So there's that relationship

19  there.  There's a privity, I would argue, between him and Scott

20  at that point.

21    THE COURT:  Thank you.

22    Mr. Ginsberg.

23    MR. GINSBERG:  I think your Honor touched on the issue

24  in a different way, which I think is instructive.  You spoke

25  about the ethical considerations, which would be the ethical

H9sWtuc1

considerations of Conly Schulte, and that is, he was

representing the Santee Sioux.  At the same time, Mr. Tucker,

because he knows that Conly Schulte has this knowledge in this

particular area, consults with Conly Schulte, even knowing he's

representing the Santee Sioux.  The Santee Sioux, as far as we

know, I can't point to a document, but the Santee Sioux

encourages that interaction because it may inure to their

benefit in the long run.  They don't say, the client, Santee

Sioux doesn't say, Hey, you can't do this Conly, because it's a

conflict to represent us.  Instead, they encourage Conly

Schulte to speak with Mr. Tucker.

        Mr. Tucker is not told by Conly Schulte, I can't speak

to you at all because I represent the Santee Sioux.  In fact,

he speaks to him and he gives him advice.  If there is a

problem because of what your Honor pointed out, there are two

clients who could have, who could potentially have adverse

interests.  If not directly, it's effectively waived by both

the Santee Sioux agreeing and allowing Conly Schulte to speak

to Mr. Tucker, who wants to enter into business with them, and

vice versa.

        The problem, if any, there may be something that can

be raised and explored on cross-examination of Conly Schulte:

Didn't you realize that there was an ethical issue; you were

representing one side or the other?  And he might say, Well, my

clients, the Santee Sioux, I told them I was going to speak

H9sWtuc1

1    with Mr. Tucker, they had no problem with it.

2         Now, frankly, we know what the rules are, but in the

3    real world, there are many instances where lawyers in real

4    estate transactions and the best examples I can think of, even

5    in matrimonial actions, usually because the parties don't want

6    to expend additional moneys, they sit down with both sides and

7    say, Look, I'm representing the buyer first, the seller also

8    wants me to be his lawyer, because he doesn't want to get an

9    independent lawyer, explains what the conflict is, and both

10   clients say, We understand, but we'd like to have one lawyer

11   because it's only going to cost us $2,500 instead of $5,000.

12        It's not uncommon.  If it's done properly and the

13   clients are aware, then it can be done.  It's just a question

14   of the awareness and the advice, so that there's the rule, but

15   there are also exceptions to the rule if it's done in a way

16   that's permissible.  And here, I would suggest to you it's

17   being done openly by Conly Schulte in the sense that the Santee

18   absolutely knew that Conly Schulte was speaking to Mr. Tucker

19   and advising him about his views on the tribal model, and

20   Mr. Tucker knew, of course, that Conly Schulte was representing

21   the Santee Sioux.

22        So I don't think it's the same black-and-white issue

23   where there's a line and it can't be crossed if the other

24   circumstances are in place, and I suggest to you here, those

25   are the circumstances that were in place.  And the problem, if

H9sWtuc1

any, is Conly Schulte's, which the government would be free on

cross-examination to press him on, explore, try to show that he

wasn't giving the proper advice to Mr. Tucker because he may

have really had the Santee Sioux's interests at heart and

wanted the deal to go through.  But that's a different issue.

That doesn't mean he didn't give the advice, Mr. Tucker didn't

hear it, didn't take it, didn't accept it and didn't act upon

it in good faith.

THE COURT:  My reference to the ethical

considerations, I want to make sure that you understand --

MR. GINSBERG:  Yes.

THE COURT:  -- I'm not in any way suggesting that some

testimony in this trial is inadmissible because of Mr.

Schulte's violation of some ethical code.  I'm not suggesting

that at all.

And also, just to correct a possible misimpression

here, the reason for the prohibition in the rules is not

because you're violating your duty to your client by giving

advice to the other side.  In most of the instances where this

rule is violated, it's in your client's best interest that you

violate it.  You're telling the person on the other side of the

deal, Sign the deal, it's a great deal, you should do this,

which is exactly what your client wants, which is exactly the

facts at hand.  So the problem is not, Oh, well, the Santee

Sioux wanted him to do this.  Of course they would want him to

1  do it.  It would be in their economic interest for him to do

2  it, but legal ethics aside, it is not reasonable for the

3  adverse party in a transaction to rely on the counterparty's

4  lawyer's legal advice on the transaction.  That's not

5  reasonable reliance.  That's not your lawyer, and it's not

6  reasonable to rely on that any more than it's, as I said, legal

7  advice coming from are a PBS documentary or a book in the

8  library or a treatise on tribal law.

9          MR. GINSBERG:  I clearly understand what your Honor's

10  saying.  I guess my only quibble would be with reasonableness.

11  Mr. Tucker could have reasonably believed that Conly Schulte,

12  notwithstanding the fact that he was representing the Santee

13  Sioux, also had Mr. Tucker's interests at heart when he was

14  giving him that advice and he wasn't trying to undermine

15  Mr. Tucker to the advantage of the Santee Sioux.  Mr. Tucker

16  doesn't know that.  Mr. Tucker doesn't necessarily know that.

17          Your Honor may be correct in terms of the principle, I

18  understand that, but the lay client doesn't necessarily

19  understand it, and he can be under the belief that this lawyer,

20  he may be under the belief that this lawyer is saying to me, I

21  do represent them, but I believe in this instance, because they

22  have no objection, I can also fairly represent you and advise

23  you, and he as a layperson can believe that, in fact, that's

24  what Mr. Schulte's doing.

25          Now, maybe at heart, Mr. Schulte's not really doing

1    that, but that's not what is in the mind of Mr. Tucker.  He

2    reasonably believes that Schulte's trying to be fair, give the

3    advice that's appropriate to Mr. Tucker while he's advised the

4    Santee Sioux, and effectively, it's the same advice to two

5    different parties to try to get a mutual understanding.  And

6    he, Mr. Tucker, where this really goes to, What does Mr. Tucker

7    believe, what goes into his mind, how does he act thereafter,

8    what his state of mind is and his intent.

9            So while I understand your Honor's example, I think it

10   can be different, and I think in this case, Mr. Tucker believed

11   that, notwithstanding what he didn't know or knew about ethical

12   obligations or violations, Conly Schulte was giving him his

13   best legal advice that was to the benefit of Mr. Tucker while

14   it still may have been to the benefit of the Santee Sioux, and

15   he relied upon it.  If it turns out that he was not smart in

16   relying upon it because of this Santee Sioux relationship,

17   that's a different issue than his reliance and belief.

18           Is it reasonable, is it not reasonable?  Should he

19   have thought, This guy can't be giving me good advice because

20   he's the Santee Sioux's lawyer?  That's another issue, and

21   maybe that's something that within your Honor's instruction to

22   the jury and the jury's decision they have to make, but I don't

23   think it should prevent Conly Schulte from testifying and

24   saying:  This is what I did.  Yes, I was representing the

25   Santee Sioux.  Yes, I did advise Mr. Tucker.  And let him say I

H9sWtuc1

1    knew that there could be an ethical issue here, but my client,

2    the Santee Sioux, didn't have a problem with it; Mr. Tucker

3    understood that I was representing them and I did give them, I

4    did give Mr. Tucker my best advice, notwithstanding my current

5    or prior representation of the Santee Sioux.  And Mr. Tucker

6    shouldn't be punished, therefore, if it occurred in that way

7    because then he's sort of -- the rule is sort of being imposed

8    on to him that he didn't necessarily understand or know but had

9    a good faith belief that Schulte was acting also in his best

10   interest.

11              THE COURT:  Thank you, Mr. Ginsberg.

12              Let me hear from the government, and specifically, I

13   would ask you to respond to Mr. Roth's comments.

14              MR. SCOTTEN:  With respect to Mr. Roth's comments, I

15   guess there are two points are in order.  Factually, loans are

16   being issued at the time of Mr. Roth's comments.  In fact,

17   loans are issued continuously.  Just to choose the example that

18   pertains to both the Kickapoo and the Santee Sioux, because

19   it's the same portfolio, it just gets moved around between

20   tribes.  That portfolio, which began as PCL, was operating in

21   early 2003 with no tribal cover.  It was actually the subject

22   of a letter sent to Ms. Bachman.  When Mr. Tucker sent some

23   sample loan documents to Ms. Bachman saying, These are the kind

24   of loans I'm extending, he attached a PCL loan application.  So

25   it wouldn't be factually accurate to say there's a start-up of

H9sWtuc1

1    the unlawful conduct here.

2              In terms of an informal privity between Mr. Schulte

3    and Mr. Tucker in November of 2003, that's the first I've heard

4    of it, including for Mr. Schulte, who told us he was retained

5    by Mr. Tucker in May of 2004, which is considerably later,

6    obviously, but even if he's acting as a drafter of documents,

7    that does not imply that his earlier supposed advice in

8    September was in any way advice of counsel.

9              I think the Court has seen in this case and knows that

10   an attorney can perform services for a client, whether formally

11   retained or not, without rendering an opinion on the overall

12   legality of the client's actions.

13             For example, Mr. Smith testified yesterday, or the day

14   before, about doing something that was perfectly lawful so far

15   as we could tell for Mr. Smith to do.  He didn't have any duty

16   to say, Lay before me all the facts of your enterprise before I

17   file a single lawsuit, my point being that Mr. Schulte's

18   occasional, later involvement with Mr. Tucker does not suggest

19   either that he was his client at the time of the supposed

20   earlier meeting with the Santee Sioux, or that he was giving

21   him a legal opinion.

22             THE COURT:  When did Mr. Schulte first perform

23   services for Mr. Tucker or one of Mr. Tucker's companies?

24             MR. SCOTTEN:  My understanding was May of 2004, but

25   I'm going to take Mr. Roth's proffer, because I think we should

1  for purposes of the motion, that he did something for them --

2            Did you say November of 2003?

3            MR. ROTH:  Yes, that's as per Mr. Cohen's billing

4  records, and it's correct --

5            MR. SCOTTEN:  Not Conly Schulte.

6            MS. LIMANI:  Yes.

7            MR. ROTH:  No, no.  It's Mr. Cohen's billing records

8  that reflect conversations with Schulte in that period,

9  November '03.

10           It is correct, as the government states, that

11 Mr. Tucker didn't retain Schulte directly until later.

12           THE COURT:  Now who is Mr. Cohen?

13           MR. ROTH:  Mr. Cohen, Cliff Cohen, is an attorney that

14 Mr. Tucker went and consulted after Bachman.  He had already

15 been representing Mr. Tucker before that, but on the tribal

16 model, he specifically went to him in the summer of '03, and

17 Mr. Cohen is the one who actually drafted the Kickapoo service

18 agreement.

19           THE COURT:  And in the course of doing that, Mr. Cohen

20 spoke to Mr. Schulte.

21           MR. ROTH:  Correct.

22           THE COURT:  OK.  Now I understand.

23           This is what I see as to where we are now.  The

24 defendant may offer an advice-of-counsel defense and may offer

25 an advice-of-counsel defense as to a lawyer who Tucker engaged

H9sWtuc1

1   to advise him on the subjects, and that may include Preston

2   Gates & Ellis and also, of course, the reference to Mr. Cohen

3   and advice that they gave him.  At this stage, however, and in

4   the absence of any precedent that a counterparty's attorney's

5   viewpoint or advice or expression on the lawfulness of actions

6   can be relied upon for an advice-of-counsel defense, thus far,

7   there's been no showing that Mr. Schulte was anything other

8   than the lawyer for the Santee Sioux, and in the absence of

9   case law to the contrary, I will not permit Mr. Schulte to

10  testify as to statements made to Mr. Tucker in the course of

11  his representation of the Santee Sioux.

12          That's my ruling, subject to somebody giving me

13  further case law on the subject.  And the record should be

14  clear here, the parties have been very helpful on this.  I have

15  a letter from the government, dated September 25; a letter from

16  Mr. Tucker's counsel, dated the 27th; another letter from the

17  government, dated the 27th, and this is not the only briefing

18  or discussion we have had on the advice-of-counsel situation.

19          Tell me a little bit about Mr. Morgan.  Who is

20  Mr. Morgan and what is he going to say?  Is Mr. Morgan going to

21  be testifying, or did I get that wrong?  Lance Morgan?  No,

22  yes?

23          MS. VAN NESS:  Yes, your Honor.  As I understand it,

24  and this goes back to my example of entering into a business

25  venture that you believe is lawful and then subsequently

1  something happens, a Supreme Court case, whatever, new

2  regulation, and your lawyer says, We should do something about

3  this, that would be Mr. Morgan.  That would be during the

4  course of the ten years, he helped, as did other lawyers, in

5  revising the tribal model to make it, to change it to have it

6  be lawful.

7           THE COURT:  When was he first engaged?

8           MS. VAN NESS:  He's part of Mr. Schulte's firm, of

9  counsel to Mr. Schulte's firm.

10          THE COURT:  When did he first render services to

11  Mr. Tucker?

12          MR. SCOTTEN:  The defense can disagree, but to help

13  move things along, our records indicate it's very early 2006.

14          THE COURT:  Any disagreement with that?

15          MR. ROTH:  No, your Honor.

16          THE COURT:  All right.  So there would not be an

17  advice-of-counsel defense available there as to conduct that

18  was already under way, but as indicated, I have an

19  advice-of-counsel instruction in my proposed instructions to

20  the jury, and the defense is free to offer an advice-of-counsel

21  defense, cabined by the rulings that I've made this morning.

22          Are our jurors here?

23          THE DEPUTY CLERK:  Yes.

24          THE COURT:  OK.  You can bring them in.

25          Mr. Bath, you've been patiently silent.  Yes, sir.

H9sWtuc1

1          MR. BATH:  We can take this up on a break, but Lance

2     Morgan for Mr. Muir, as well as Mr. Conly, they're fact

3     witnesses for him, and I don't know if you want to hear about

4     that now or we can talk about that later.

5          THE COURT:  I accept that as to Conly Schulte, he is a

6     fact witness, as I understand it, and will be testifying at

7     trial.  I don't know anything about Mr. Morgan as a fact

8     witness, but my ruling doesn't have anything to do with him as

9     a fact witness.

10          MR. BATH:  Thank you, Judge.

11          THE COURT:  Bring our jury in, please.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

H9sWtuc1

```
 1        (Jury present)

 2        THE COURT:  Good morning, ladies and gentlemen.  I

 3   just want to assure you we were not out here having doughnuts

 4   and danish pastries and sipping juice and coffee.  We were

 5   actually working, and not on any matter that need concern you,

 6   routine things that go on in a trial, but it's good to see you.

 7    ALLISON HARRIS, resumed.

 8        THE COURT:  The Court reminds the witness that you're

 9   still under oath.

10        THE WITNESS:  Yes, your Honor.

11        THE COURT:  Mr. Ravi, you may continue.

12   DIRECT EXAMINATION CONTINUED

13   H9sWtuc1                    Harris - Direct

14   BY MR. RAVI:

15   Q.  Good morning, Ms. Harris.

16   A.  Good morning.

17   Q.  Before we ended yesterday, you testified you came to learn

18   that you were the vice president of AMG, correct?

19   A.  Yes.

20   Q.  And that's the loan company?

21   A.  Yes.

22   Q.  And who ran that loan company?

23   A.  Scott Tucker.

24   Q.  And where was it operating?

25   A.  Kansas City.
```

H9sWtuc1

1    Q.  I'd like to show you now Government Exhibit 502.  You can

2    see it on your screen.

3            MR. RAVI:  The government offers Government Exhibit

4    502.

5            MR. GINSBERG:  I have no objection, your Honor.

6            THE COURT:  Received.

7            (Government Exhibit 502 received in evidence)

8    BY MR. RAVI:

9    Q.  Ms. Harris, is this a resolution of the board of directors

10   of AMG Services?

11   A.  Yes.

12           MR. RAVI:  Now, if we can zoom in on the

13   second-to-last paragraph.

14   Q.  Does that say that Don Brady continues to serve in the

15   capacity of the president and CEO of the company?

16   A.  Yes.

17   Q.  And do you understand Don Brady to be the president and CEO

18   of AMG, the loan company?

19   A.  I did not.

20   Q.  Did he hold himself out with that title?

21   A.  Not to me.

22   Q.  What did you know that Mr. Brady did for the loan company?

23   What did you see or hear him do for the loan company?

24   A.  I know that Mr. Brady had the relationship with Scott

25   Tucker and maintained that.  He also had a laptop computer that

1    he used for some purpose that he kept with him.  He also, I

2    know, was somehow involved in some of the litigation that was

3    going on related to the loan company.

4    Q.  Did you ever see what he did with that laptop?

5    A.  I did not observe it, no.

6    Q.  And skipping down, it states that Allison Harris will

7    continue to serve in the capacity as vice president of the

8    company.  Just to be clear, how was the company defined in this

9    resolution?

10   A.  AMG Services.

11   Q.  And that's the payday loan company, correct?

12   A.  Yes.

13   Q.  And were you ever aware that you were serving as vice

14   president of the company?

15   A.  No.

16   Q.  Do you know when you started serving as vice president of

17   the company?

18   A.  No.

19   Q.  Were you ever aware whether your service as vice president

20   of the company ended at any point while you were at the tribe?

21   A.  No.

22   Q.  Turning to the last sentence, it states that "Julie

23   Witcraft will continue to serve in the capacity as secretary

24   and treasurer of the company, is that correct?

25   A.  Yes.

H9sWtuc1

1    Q.  And do you know who Julie Witcraft is?

2    A.  Yes.

3    Q.  And what did she do at the tribe?

4    A.  She was secretary-treasurer, I believe, of the tribe at one

5    point.

6    Q.  And did you see or hear her do anything relating to the

7    payday loan company?

8    A.  I did not.

9         MR. RAVI:  We can take down this exhibit.

10   Q.  Ms. Harris, you left the tribe at some point, correct?

11   A.  Yes.

12   Q.  And when was that, approximately?

13   A.  Early February 2012.

14   Q.  And why did you leave the tribe?

15   A.  I found other employment.  One of the reasons I sought out

16   other employment --

17        MR. GINSBERG:  Objection, your Honor.

18        THE COURT:  Yes.  You've answered the question.

19        Next question.

20   Q.  Ms. Harris, why did you -- was there any particular reason

21   you left the tribe?

22        MR. GINSBERG:  Same objection, your Honor.  Same

23   question.

24        THE COURT:  Let me hear Mr. Ravi at sidebar.

25        (Continued on next page)

H9sWtuc1

1          (At sidebar)

2          THE COURT:  What's the answer?

3          MR. RAVI:  The answer will be that she left, in part,

4     because of her concern as to misrepresentations that were being

5     made as to the ownership of the loan company and how in her

6     position as CFO, supposedly, she didn't have access to the

7     books and records and she felt uncomfortable when

8     representations were being made that she was supposed to have

9     access to that and she did not.

10         THE COURT:  Why is that objectionable?

11         MR. GINSBERG:  First of all, she's testified to that

12    already, yesterday on direct.  He specifically asked her those

13    questions in a different form, but not at the time of her

14    resignation.  She was asked if she had access.  She was asked

15    specifically about her being uncomfortable, about whether she

16    had access to all the books and records of the company she

17    oversaw and not this company, and the same other questions that

18    were just asked were asked yesterday on direct.  This is sort

19    of a summation-type question to sum up her testimony and why

20    she left to just sort of put an exclamation point on it, once

21    again.

22         THE COURT:  The objection's overruled.

23         (Continued on next page)

24

25

H9sWtuc1                    Harris - Cross

1          (In open court)

2    BY MR. RAVI:

3    Q.  Ms. Harris, I'll go ahead and ask the question again.  Was

4    there any particular reason that you sought employment, sought

5    different employment than at the tribe?

6    A.  Yes.  One of the primary reasons is my discomfort over the

7    business activities of MNE, particularly the loan company.

8    Q.  Can you describe those circumstances in a little bit more

9    detail?

10         MR. GINSBERG:  Objection, your Honor.  I think that's

11   sufficient.

12         THE COURT:  No.  I'll allow it.  Go ahead.

13   A.  Yes.  I did not believe the representations that tribal

14   entities owned and controlled the lending business.

15   Furthermore, if they did, it concerned me that as CFO of MNE, I

16   did not have full access to the accounting records of the loan

17   company.

18         MR. RAVI:  No further questions, your Honor.

19         THE COURT:  All right.  You may cross-examine.

20         MR. GINSBERG:  Thank you.

21   CROSS-EXAMINATION

22   BY MR. GINSBERG:

23   Q.  Good morning.

24   A.  Good morning.

25   Q.  One of your last answers was you did not believe that the

H9sWtuc1                    Harris - Cross

1    tribes owned the loan companies, is that correct?

2    A.  That's correct.

3    Q.  Did you distinguish -- in forming that belief, did you

4    distinguish between whether or not the tribes owned the loan

5    company or were making the loans and some other company was

6    servicing the loans, in coming to that belief?

7              THE COURT:  Do you understand the question?

8              THE WITNESS:  I would like clarification, please.

9              THE COURT:  All right.  You can rephrase the question.

10   Q.  You said you formed the belief that the tribe didn't own

11   the loan company, correct?

12   A.  Yes.

13   Q.  In making that belief, were you making a distinction

14   between whether or not the tribes were simply making the loans

15   but some other company was servicing all of the other parts of

16   the loan company?

17             THE COURT:  The question is:  In your thinking, did

18   you make any such distinction?

19   A.  No.

20   Q.  Did you know if there was a company that was doing all of

21   the servicing of the loans that were being made?

22   A.  Yes.

23   Q.  And what company was that?

24   A.  Scott Tucker's company.

25   Q.  And did you know what all that servicing was?

H9sWtuc1                    Harris - Cross

1    A.  No.

2    Q.  Did you inquire of Don Brady what the servicing was?

3    A.  I don't recall if we specifically discussed what the

4    servicing was.

5    Q.  But you had concerns about the way it was operating, so

6    wouldn't you have wanted to know how the servicing was being

7    done, and by whom?

8    A.  Regardless of whether another company was servicing the

9    loans, the loans themselves were not part of the financial

10   statements of MNE, which was the source of my concern, one of

11   the concerns.

12   Q.  So your concern was based upon the fact that the

13   information wasn't contained in the financial records that you

14   had reviewed, is that correct?

15   A.  That was certainly part of my concern, yes.

16   Q.  And did you ask Don Brady for those financial records for

17   you to review?

18   A.  I don't recall the words I used.  I expressed my concerns

19   to him.

20   Q.  And do you know what he did after you expressed those

21   concerns to you?

22   A.  I did not receive any financial records.

23   Q.  From Don Brady?

24   A.  Correct.

25   Q.  And you don't know what, if anything, he did, is that

H9sWtuc1              Harris - Cross

1    correct?

2    A.   That's correct.

3    Q.   And you didn't know what, if any, access he had to the

4    records if he wished to get them, did you?

5    A.   That's correct.

6    Q.   You testified yesterday that there was a meeting with the

7    IRS about an audit, is that correct?

8    A.   Yes.

9    Q.   And you testified as to a statement that Don Brady made

10   during that meeting that also concerned you when he made the

11   statement, essentially about what you just said, which is that

12   the tribes were operating the payday lending business, correct?

13   A.   Correct.

14   Q.   Was Tom Gamble present at that IRS audit?

15   A.   Yes.

16   Q.   And who was Tom Gamble at the time of the IRS audit?

17   A.   He was the chief of the Miami tribe.

18   Q.   When Mr. Brady made this statement, did Mr. Gamble voice

19   any concerns with the statement that was being made by

20   Mr. Brady?

21   A.   I don't recall.

22   Q.   Do you know the purpose of Chief Gamble being present at

23   the IRS audit?

24   A.   Not specifically, no.

25   Q.   It wasn't a surprise to you that the chief of the tribe

H9sWtuc1                    Harris - Cross

1   would be present, is that correct?

2   A.  It was not a surprise to me.

3   Q.  And was he also on the board of directors at the tribe or

4   the tribal council?

5   A.  The chief was part of the tribal council, yes.

6   Q.  OK.  And the tribal council oversees the business

7   operations, among other things that they do, is that correct,

8   of the tribe?

9   A.  Yes.

10          MR. GINSBERG:  Could we please put up Government

11  Exhibit 502 that you were just shown.

12          THE COURT:  Keep going.

13          MR. GINSBERG:  Could we highlight the last paragraph,

14  please, and "Now be it further resolved."

15  Q.  Do you see that paragraph, Ms. Harris?

16  A.  Yes.

17  Q.  You were asked about specific names in that paragraph, is

18  that correct?

19  A.  Yes.

20  Q.  You were asked about Don Brady, correct?

21  A.  Yes.

22  Q.  And Julie Witcraft, correct?

23  A.  Yes.

24  Q.  But you weren't asked about the fact that Thomas Gamble's

25  name appears in that paragraph, correct?

1    A.  Correct.

2    Q.  And Thomas Gamble's name appears in that paragraph, and it

3    indicates that he continues to serve in the capacity as

4    chairperson of the board of directors, is that correct?

5    A.  Yes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. GINSBERG:

2  Q.  And, to your knowledge, that's a true statement, is that

3  correct?

4  A.  I have no knowledge one way or the other.

5  Q.  Well, you were at the tribe during the period of time that

6  this board of directors was operating and Don Brady was the

7  president and CEO of AMG, is that correct?

8  A.  That's correct.

9  Q.  And you knew that, correct?

10 A.  I'm sorry.  I knew what?

11 Q.  That Don Brady was serving in the capacity as president and

12 CEO of the company, just as you read before from the document,

13 correct?

14        MR. RAVI:  Objection.  Mischaracterization.

15        THE COURT:  Rephrase your question, Mr. Ginsberg.

16 Q.  You read the first sentence, correct?

17 A.  Yes.

18 Q.  And the first sentence says that Don Brady continues to

19 serve in the capacity as president and CEO of the company,

20 correct?

21 A.  Yes.

22 Q.  Did you know that to be the case?

23 A.  No.

24 Q.  Did you know that Tom Gamble was serving in the capacity as

25 chairperson?

1    A.  No.

2    Q.  Were you involved with Tom Gamble at all while you were

3    working there?

4    A.  Very little.

5    Q.  Did you know what function Chief Gamble served?

6    A.  Not with regard to the loan company.

7    Q.  Did you know who the chairperson of the board of directors

8    was of AMG?

9    A.  No.

10   Q.  Did you ever ask?

11   A.  No.

12   Q.  As the CFO, were you concerned to know who the people were

13   who were running AMG?

14   A.  I did not know that this board existed to inquire about it.

15   Q.  So when you were shown this document before and it

16   indicates that there is a board of directors of AMG, before you

17   saw this paragraph, did you not know that there was a board of

18   directors of AMG?

19   A.  I knew there were various boards that there was discussion

20   about.  I was not aware of their activities or their meetings

21   or who necessarily was on them.

22   Q.  Well, you said you knew there were various boards.  Did you

23   know that AMG had a board?

24   A.  At some point, yes, I did.

25   Q.  Prior to seeing this document here today?

H9S8TUC2                    Harris - cross

1    A.  Yes.

2    Q.  And did you ever inquire as to who were the members of the

3    board of directors of AMG?

4    A.  I don't recall specifically inquiring.

5    Q.  And as CFO with the concerns that you had, did you not wish

6    to attempt to speak to members of the board of directors to

7    tell them about your concerns?

8              THE COURT:  You were CFO of what at the time?

9              THE WITNESS:  Miami Nation Enterprises.

10             THE COURT:  Thank you.

11   BY MR. GINSBERG:

12   Q.  And you told us that as CFO of Miami Nation Enterprises you

13   had access to the books and records of all these other

14   companies except for the loan company, correct?

15   A.  That's correct.

16   Q.  And you're now telling us that -- the question is, were you

17   aware that the loan company, that AMG had a board of directors

18   at that same very time that you had your concerns?

19   A.  Yes.

20   Q.  And did you not try to seek out the members of the board of

21   directors in addition to Don Brady to tell them what your

22   concerns were?

23   A.  I did express my concerns to Don Brady.  I did not express

24   my concerns to other members of the board.  I believed the

25   board to be on paper only.

1  Q.  So you believed that Chief Thomas gamble, who here it

2  indicates was the chairperson, was on paper only even though he

3  was actually the chief of the tribe?

4  A.  Yes.

5  Q.  And how about Douglas Lankford, do you know who he is?

6  A.  I do.

7  Q.  Was he there when you were working for the tribe?

8  A.  Yes.

9  Q.  Did you know what capacity he served in?

10 A.  Yes.

11 Q.  What capacities did he serve in?

12 A.  He was second chief of the tribe at one point.  He also

13 served as IT manager or director.  I can't recall specifically.

14 Q.  Did you not know that he was vice chairperson of the board

15 of directors of AMG?

16 A.  No.

17 Q.  But you knew he held a position as second chief, correct?

18 A.  Yes.

19 Q.  You knew Thomas Gamble held the position as the chief,

20 correct?

21 A.  That's correct.

22 Q.  And those are positions of some authority within the tribe,

23 is that correct?

24 A.  Yes.

25 Q.  And those are individuals who you could have gone to to ask

1    questions about your concerns, is that correct?

2    A.  Yes.

3    Q.  But you chose not to, correct?

4    A.  Yes, I chose not to.  I expressed my concerns to my direct

5    supervisor who also was the one most involved with the loan

6    company.

7    Q.  You expressed your concerns to Don Brady, correct?

8    A.  Yes.

9    Q.  And you left it at that, correct?

10   A.  Yes.

11   Q.  And you were the CFO responsible for all the financial

12   operations of all of those businesses, correct?

13   A.  Yes.

14   Q.  And you had a fiduciary obligation and a duty to the

15   businesses and to the tribe, correct?

16   A.  Yes.

17          MR. GINSBERG:  Nothing further.

18          THE COURT:  Anything, Mr. Bath?

19          MR. BATH:  Yes, sir.  Please.

20   CROSS EXAMINATION

21   BY MR. BATH:

22   Q.  Ms. Harris, was there a time that you had contact with Tim

23   Muir?

24   A.  I don't recall.

25   Q.  Do you know who Tim Muir is?

1    A.  Yes.

2    Q.  Who is he?  Who do you know him to be?

3    A.  I believe he is Scott Tucker's attorney.

4    Q.  Do you know who else he represented?

5    A.  No.

6    Q.  Did there come a time during the IRS audit that you had

7    contact, at least through e-mails, with Tim Muir about

8    production of documents?

9    A.  I don't recall that they were specifically with Tim Muir.

10   That's possible.

11              MR. BATH:  Can we show the witness defense number 991.

12   I am going to put that up on the screen for you.

13              I also have copies.  Whatever is easier for you.

14   Q.  Do you recognize that document as being an e-mail that Mary

15   Streitz sent to a number of people, including you?

16   A.  Yes.

17   Q.  And that was in October of 2011?

18   A.  Yes.

19   Q.  And you're still with the tribe at that time, correct?

20   A.  That's correct, I was still with MNE.

21   Q.  And this e-mail related to the audit that was being done by

22   the IRS?

23   A.  Yes.

24   Q.  In particular, there was Indian tribal government audit, is

25   that right?

1   A.  I'm sorry.  Can you clarify?

2   Q.  Yes.

3       What kind of audit was it?

4   A.  I don't recall specifically.

5   Q.  Was it done through the Department of Interior, Department

6   of Indian Affairs, if you remember?

7   A.  I just recall that it was the IRS.

8   Q.  Did you help gather financial documents for that audit?

9   A.  Yes, I believe so.

10  Q.  And did Tim Muir help in that capacity?

11  A.  I don't recall.

12  Q.  This e-mail, Defendant's 991, though, do you remember

13  receiving that e-mail?

14  A.  I don't specifically remember receiving it.  I do see my

15  name on it.

16  Q.  Take a look at pages in that document and see if that

17  refreshes your recollection about that document.

18          Do you recall that Mary Streitz was a lawyer with the

19  Dorsey firm?

20  A.  I do recall that name.

21  Q.  And that she was sort of leading the gathering of documents

22  for this IRS audit?

23  A.  Yes.

24  Q.  And this IRS audit included documents related to the loan

25  company?

1  A.  Correct.

2  Q.  And AMG, correct?

3  A.  Correct.

4  Q.  And Mary Streitz, the lawyer, was sending you copies of

5  letters that she was sending to the IRS, correct?

6  A.  It appears so.

7  Q.  Those letters to the IRS talk about we are going to gather

8  all of these financial documents for the IRS and we are going

9  to have them at the tribe.

10      Do you recall that?

11 A.  Not specifically.

12 Q.  Were you involved in that?

13 A.  There were some documents that came from Kansas City to the

14 MNE office, a number of boxes.

15 Q.  Boxes of documents that were produced to the IRS, correct?

16 A.  Yes.

17      MR. BATH:  I am going to offer Defendant's 991 at this

18 time.

19      THE COURT:  Any objection?

20      MR. RAVI:  Yes.  Hearsay and offered for its truth.

21      It's mostly the attachments.

22      THE COURT:  Let me look at the attachments.

23      MR. BATH:  Your Honor, I'm sorry.  That's a new

24 exhibit.  It's not in your book.

25      May I hand this one up?

1        THE COURT:  Yes.  Thank you.

2        Let me see counsel at sidebar.

3        Sorry, ladies and gentlemen.  You can stand up and

4   stretch.

5        (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2    THE COURT:  All right.  Mr. Bath, what is the purpose

3    for which the attachments are being offered?

4    MR. BATH:  Judge, the attachments are being offered to

5    show that there was production of documents, not necessarily

6    the truth of these specific documents.  But this e-mail is from

7    the Dorsey lawyer to Ms. Harris, CFO.  Tim Muir is copied as is

8    Schulte and Don Brady.

9    It's a cover letter to the IRS that says we are going

10   to produce all of these various documents for the IRS's

11   inspection.  The fourth page of the document says it will be

12   available at the tribe for the IRS's inspection.

13   It goes to show two things.  One, there was a

14   production of financial documents at some time.  I understand

15   the government may argue that was late in the game.

16   Second, it shows at least Mr. Muir was involved, and

17   his only involvement, was when he was asked to help get these

18   documents, the financial documents, that he participated in

19   that process.

20   THE COURT:  How does it show Mr. Muir participated?

21   MR. BATH:  The witness, Ms. Harris, just testified

22   that he is copied on this e-mail.

23   THE COURT:  He was copied on the document?

24   MR. BATH:  Yes.

25   THE COURT:  Let me hear from the government.

1          MR. RAVI:  I think per Mr. Bath's proffer, he is

2    offering these attachments for the truth of what they say, that

3    production of the documents were made.  In addition, there are

4    statements as to MNE owning all of these enterprises.

5          To the extent there is any nonvalid non-hearsay

6    purpose, it is outweighed by the prejudicial effect of this

7    very lengthy set of documents going into detail as to things

8    that we believe that the defendant is offering for the truth,

9    and it's including from an attorney.

10         THE COURT:  What does that mean, including from an

11   attorney?  I know it's from an attorney, Dorsey & Whitney.  I

12   have got that part.  What does that mean it's from an attorney?

13   What is the import of it as opposed to from an airline pilot?

14         MR. RAVI:  I think it goes to the presence of lawyers,

15   presenting that there were lawyers involved in this.  Again,

16   some of the same stuff that we have discussed at length with

17   the court in terms of keeping it out in terms of its

18   prejudicial value.

19         THE COURT:  What I am going to allow counsel to do is

20   to develop further what, if anything, this witness did with the

21   attachments, what if anything she knows about the content of

22   the attachments, and based on that I may let you further

23   cross-examine as to the content of the attachments, but so far

24   I do believe there is a valid hearsay objection to the

25   statements.  But that's where you should head at this point,

1   Mr. Bath.

2              MR. BATH:   Thank you.

3              (Continued on next page)

1           (In open court)

2    BY MR. BATH:

3    Q.  Ms. Harris, I understand that Ms. Streitz, the lawyer for

4    Dorsey, is the lawyer for the tribe, correct?

5    A.  That sounds correct.

6    Q.  And she was alerting you and others, which is Don Brady,

7    Tim Muir and Melody Wright, that she was sending a letter to

8    the IRS about production of financial records, correct?

9           THE COURT:  Fix a point in time.

10          MR. BATH:  I'm sorry.

11   Q.  October of 2011.

12   A.  That appears to be correct.

13   Q.  And you recall you were involved in that production?

14   A.  Yes.

15   Q.  Why would Ms. Streitz be copying e-mails on the production

16   of documents to the IRS?

17   A.  Because I was involved in helping to produce the documents.

18   Q.  Because they are financial documents?

19   A.  Yes.

20   Q.  And that's what you do, you're in the financial area,

21   right?

22   A.  Yes.

23   Q.  In the production of the documents, they came from Kansas

24   City, is that what you recall?

25   A.  That is what I recall.

1  Q.  And you recall Mr. Muir being involved in making sure those

2  documents got down to Oklahoma, if you recall?

3  A.  I don't specifically recall Mr. Muir's involvement.

4  Q.  Did you talk to Mr. Muir at all?

5  A.  I don't recall.

6  Q.  Do you know who, if anyone, was involved in making sure the

7  documents came from Kansas City to the tribe?

8  A.  I don't specifically recall.

9  Q.  You do recall, though, that at about this time, October of

10 2011, boxes of documents came to the tribe?

11 A.  Yes.

12 Q.  When we say boxes, tell us how many.

13 A.  I don't recall specifically.  Perhaps 10 or 12, maybe more.

14 Q.  A lot.

15 A.  Yes.

16 Q.  Did you look through those boxes at all?

17 A.  I looked at some of them.

18 Q.  What kind of documents were in those boxes?

19 A.  I don't recall.  They were financial documents, and I don't

20 recall specifically.

21 Q.  What companies did they relate to?

22 A.  I don't recall.

23 Q.  Could that have related to AMG?

24 A.  They certainly could have.

25 Q.  Could they have been the kind of documents you talked about

H9S8TUC2                    Harris - cross

1    that Don Brady never got to you?

2    A.  Perhaps.

3    Q.  When the boxes came in and you started looking at them, did

4    you say to yourself, wow, these are documents I have been

5    looking for?

6              MR. RAVI:  Objection.

7              THE COURT:  Overruled.

8    A.  I don't recall specifically thinking that.  There were a

9    lot of documents.  Some were financial in nature.

10   Q.  Did they seem to be irrelevant to the financial nature of

11   the business or relevant?

12   A.  I don't recall.

13   Q.  Did you have any further discussions with Don or anyone at

14   the tribe after seeing those financial documents?

15   A.  I don't specifically recall.

16   Q.  Was there more than one set that came down or did they all

17   come at one time?

18   A.  I don't recall.

19   Q.  Do you recall it was a process with the IRS and it was sort

20   of like producing some documents at one time and then maybe

21   some a month later, if you recall?

22   A.  Yes, that sounds right.

23   Q.  So it was initially 10 or 12 boxes and then more boxes came

24   or was it 10 or 12 boxes total?

25   A.  I don't recall.

H9S8TUC2                    Harris - cross

1    Q.  You looked at the boxes, and was someone responsible for

2    organizing them or were they organized?

3    A.  They were in file folders.  I believe they were labeled.

4    Q.  So they had some organization to them?

5    A.  Yes.

6    Q.  They weren't just thrown in the box or anything?

7    A.  Correct.

8    Q.  Were they like check registers?

9    A.  I don't recall.

10   Q.  Or disbursements journals?  If you recall.

11   A.  I don't recall.

12   Q.  But you know that a lot of them were financial documents?

13   A.  Yes.

14   Q.  Did you have any involvement in taking those documents out

15   and putting them in a certain place for the IRS?

16   A.  I believe I did, but I don't recall the specifics of that.

17   Q.  So would you have been the lead person in producing those

18   financial documents for the IRS, from the tribe's perspective?

19   A.  From the tribe's perspective, yes.

20   Q.  Did the IRS come down and look at those documents?

21   A.  I believe so.

22   Q.  Were you there?

23   A.  I believe so.

24   Q.  Did they come down for hours or days, or how long?

25   A.  I don't recall.  I do believe it was more than one day.

1  Q.  Was anybody else present?

2  A.  I don't recall.

3  Q.  Do you remember ever reaching out, for instance, to Tim

4  Muir asking, hey, can you help me get -- I am missing this

5  document or this set of documents?

6  A.  I don't recall.

7  Q.  It's possible maybe you didn't talk to him at all?

8  A.  Perhaps.

9        MR. BATH:  That's all I have.  Thank you.

10        THE COURT:  Any redirect?

11        MR. RAVI:  Briefly, your Honor.

12  REDIRECT EXAMINATION

13  BY MR. RAVI:

14  Q.  Ms. Harris, you're aware of an article that came out

15  regarding the payday loan business, correct?

16  A.  Yes.

17  Q.  When those boxes came down from Kansas City, they came from

18  Scott Tucker's business in Kansas City, correct?

19  A.  Yes.

20  Q.  And those boxes came down after that article had come out

21  about the payday lending company, right?

22  A.  I believe so, yes.

23        MR. RAVI:  No further questions.

24        THE COURT:  You may step down.  Thank you very much.

25        (Witness excused)

1    MR. RAVI:  Your Honor, at this time we would like to

2    offer some exhibits.

3    THE COURT:  All right.

4    MR. RAVI:  The government offers Government Exhibit

5    503.

6    MR. GINSBERG:  No objection, your Honor.

7    THE COURT:  Received.

8    (Government's Exhibit 503 received in evidence)

9    MR. RAVI:  Publish that and zoom in on the bottom

10   e-mail.

11   Highlight the "from" and the "to."

12   Subject, please.

13   Go to the next e-mail.

14   Highlight the date.

15   Go to the next e-mail.

16   Highlight the body.

17   Go to the next e-mail.

18   Go to the next e-mail, please.

19   Highlight the "from" as well as the body.

20   You can take that down.

21   I would like to now offer Government Exhibit 4032.

22   MR. GINSBERG:  No objection.

23   THE COURT:  Received.

24   (Government's Exhibit 4032 received in evidence)

25   MR. RAVI:  Can we put that next to Defense Exhibit

1    D1038.

2           Just highlight the tribe name on the top of each

3    exhibit.

4           The effective and expiration dates on the bottom.

5           You can take that down.

6           I would like to now offer Government Exhibit 314.

7           MR. GINSBERG:  No objection.

8           THE COURT:  Received.

9           (Government's Exhibit 314 received in evidence)

10          MR. RAVI:  Zoom in on the bottom e-mail.

11          Highlight the "from" and the "to."

12          Highlight the first line of the body.

13          And the third line of the body.

14          Let's go to the top e-mail.

15          Zoom in on the top.

16          We can take that down.

17          The government now offers Government Exhibit 833.

18          MR. GINSBERG:  Objection, your Honor.

19          THE COURT:  Basis?

20          MR. GINSBERG:  Can we have a sidebar on this.

21          THE COURT:  All right, ladies and gentlemen.  You are

22   welcome to stand up and stretch.  Let me deal with this.

23          (Continued on next page)

24

25

1    (At the sidebar)

2    THE COURT:  Let me see the exhibit.

3    MR. RAVI:  Sure.

4    THE COURT:  Go ahead.

5    MR. GINSBERG:  Unless my memory is faulty, I thought

6    where we left off with this is that your Honor sustained the

7    objection even with the redactions because the information, as

8    I had put it, is just out in the air someplace without any

9    explanation about it.  And now they are trying to offer it

10   through -- now they are offering it without any witness, nobody

11   to explain what it means.

12   THE COURT:  The entities ceased to be owned by Tucker

13   in 2008, is that correct?

14   MR. RAVI:  That's right.  October 24, 2008, according

15   to those documents, the stock purchase agreements.

16   THE COURT:  I am going to sustain the objection

17   because they don't really speak for themselves.

18   I don't know if you wind down a business in '08

19   whether you could or could not have legitimate expenses or

20   income attributable to the now defunct entity that you once

21   owned.  I don't know the answer to that, and neither does the

22   jury, and this is an exhibit that's walking in on its own two

23   feet.  So it's sustained.

24   MR. RAVI:  Your Honor, their own document talks about

25   how, the stock purchase agreements talk about how the

1  liabilities of those companies were all taken by the tribe.  So

2  to the extent there were any liabilities according to that

3  document, that could be claimed as expenses.

4         THE COURT:  This is too ambiguous and there is a

5  danger of jury confusion.  There is confusion in my own mind.

6  I really don't know.  So therefore I am not letting it in.

7         MR. RAVI:  Thank you, your Honor.

8         (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. RAVI:  The government offers Government Exhibit

3     4020, 4021, and 4022.

4           THE COURT:  Any objection to 4020?

5           MR. GINSBERG:  No.

6           I have an objection to 4021.

7           THE COURT:  Go ahead.

8           MR. GINSBERG:  And to 4022.

9           THE COURT:  I didn't understand.

10          MR. GINSBERG:  I have an objection to 4022.

11          THE COURT:  Put up 4021 again, please.

12          MR. RAVI:  Judge, can we show the fourth page as well.

13          MR. GINSBERG:  It's not so much the fourth page.  My

14    objection is to the date and the relevance.

15          THE COURT:  I will allow all three exhibits.  In the

16    case of 4021 and 4022, it's subject to connection.

17          (Government's Exhibit 4020 received in evidence)

18          THE COURT:  Go ahead.

19          MR. RAVI:  You can take those down.  I am not going to

20    publish them at this point.

21          MR. GINSBERG:  I am not sure there is a witness --

22    given what I know of the government's case, I don't think there

23    is a connection.

24          MR. RAVI:  I can proffer a connection.

25          THE COURT:  We will do that out of the presence of the

H9S8TUC2

1    jury since it is not being published now and I will reverse

2    myself and reserve on 4021 and 4022.

3          MR. RAVI:  At this time, I would like to now play

4    Government Exhibit 406, which is in evidence.

5          THE COURT:  And this relates to the transcript binder

6    that the jurors have?

7          MR. RAVI:  That's correct.

8          I don't believe that officially Government Exhibits

9    404T, 406T, 407T were moved into evidence.  I know they are not

10   actually being offered as the truth.

11         THE COURT:  As transcripts they are being offered.

12         Any objection?

13         MR. GINSBERG:  I do have an objection.

14         My best recollection, it may be one of the earlier

15   rules, 101, 102, the way it's being done -- I don't want to do

16   a speaking objection in front of the jury.

17         THE COURT:  The tapes are in evidence, correct?

18         MR. GINSBERG:  The tapes are in evidence.  It's just a

19   question of how this is being done considering the witness is

20   no longer on the witness stand.

21         THE COURT:  I am going to allow the transcripts in.

22         Ladies and gentlemen, as I have indicated to you, the

23   transcripts are just aids to listening.  If when you listen you

24   hear something different on the tape than what you see in the

25   transcript, it is what you hear on the tape that controls.

H9S8TUC2

1    This is just an aid that sometimes could be helpful in

2    listening to the tapes which are already in evidence.

3            Go ahead.

4            (Government's Exhibits 404T, 406T, 407T received in

5    evidence)

6            MR. RAVI:  Let's start on Government Exhibit 406 and

7    start on page 2 of the transcript.

8            (Audiotape played)

9            THE COURT:  Start from the beginning.  We are at 406,

10   right?

11           MR. RAVI:  Correct, your Honor.

12           THE COURT:  And there is an ambiguity here.  The

13   second page of 406T is page 1.  Is that what you're referring

14   to?

15           MR. RAVI:  Page 1, listed as page 1 of the transcript.

16           THE COURT:  I foolishly went to the page that was

17   labeled page 2 for the second page.  And judging from some

18   reactions of jurors, I might not have been alone in that.

19           So now I am back on page 1.

20           Go ahead.

21           (Audiotape played)

22           MR. RAVI:  Then let's go ahead and start the next

23   section which begins on line 20, listed as page 1.

24           (Audiotape played)

25           MR. RAVI:  You can take that down.

H9S8TUC2

1          We are done with the transcript binders for now.

2          Now I would like to read Government Exhibit 5006,

3     which is a stipulation.  I will go ahead and offer that into

4     evidence.

5          THE COURT:  It's a stipulation of fact or a

6     testimonial stipulation?

7          MR. RAVI:  A testimonial stipulation.

8          THE COURT:  All right.  A testimonial stipulation is a

9     stipulation that a witness, if called, would testify in a

10    various manner, would say certain things under oath.  And when

11    it's a stipulation and all parties in the case have agreed to

12    it, then you must accept that, if called, the witness would

13    testify in that manner.  The weight or significance that you

14    place on such testimony is entirely for you, the jury, to

15    decide, however.

16         Go ahead.

17         MR. RAVI:  I am reading now from Government Exhibit

18    5006.

19         It is hereby stipulated and agreed by and among the

20    United States of America, by Joon H. Kim, Acting United States

21    Attorney, for the Southern District of New York, Niketh

22    Velamoor, Hagan Scotten, and Sagar Ravi, Assistant United

23    States Attorneys, of counsel, Scott Tucker, the defendant, by

24    his attorneys James Roth, Esq., Lee Ginsberg, Esq. and Nadjia

25    Limani, Esq., and Timothy Muir, the defendant, by his

H9S8TUC2

1    attorneys, Tom Bath, Esq. and Marc Agnifilo, Esq. that:

2         1.  If called as a witness at trial, a representative

3    of Automatic Data Processing ('ADP') would testify that:

4         At all times relevant to this case, ADP provided

5    payroll processing services for AMG Services, Inc. ('AMG').

6         There are no AMG payroll records for any individual

7    named Donald Brady; and

8         There are no AMG payroll records for any individual

9    named JS Ragman.

10        It is further stipulated and agreed that the

11   stipulation, marked as Government Exhibit 5006, is admissible

12   in evidence at trial.

13        THE COURT:  It is received without objection.

14        (Government's Exhibit 5006 received in evidence)

15        MR. RAVI:  At this time the government calls Jack

16   Gausnell.

17    JACK GAUSNELL,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20        THE DEPUTY CLERK:  State your full name and spell your

21   name for the record.

22        THE WITNESS:  My name is Jack Gausnell.  It's spelled

23   G-A-U-S-N-E-L-L.

24        THE COURT:  And your first name is?

25        THE WITNESS:  Jack.

1    THE COURT:  Spell that.

2    THE WITNESS:  J-A-C-K.

3    THE COURT:  All right.  Mr. Ravi, you may inquire.

4  DIRECT EXAMINATION

5  BY MR. RAVI:

6  Q.  Mr. Gausnell, how old are you?

7  A.  73.

8  Q.  Where do you currently live?

9  A.  In Jacksonville, Florida.

10  Q.  How far did you go in school?

11  A.  College education.

12  Q.  Do you currently work?

13  A.  I do.

14  Q.  What do you do?

15  A.  I own a real estate company in Colorado.

16  Q.  What area or locations does that real estate company focus

17  on?

18  A.  Roaring Fork Valley going from Aspen to Glenwood Springs.

19  Q.  What is the name of your real estate company?

20  A.  Roaring Fork Realty.

21  Q.  Did there come a time when you were involved in a real

22  estate transaction for Scott and Kim Tucker?

23  A.  There was.

24  Q.  How did you get involved in that transaction?

25  A.  Tim Tucker came on to my Web site.  This was in 2009.  She

1  was searching for properties in the Aspen area, and I followed

2  up.  She registered on the Web site.  I followed up and talked

3  to her.  We talked about the possibility of them coming out to

4  take a look at some of the homes that they sell on the Web

5  site, and they later did that.

6  Q.  Approximately when did you first interact with the Tuckers?

7  A.  February of 2009.

8  Q.  Did there end up being a time when you met with the

9  Tuckers?

10  A.  There was.

11  Q.  When was that, approximately?

12  A.  March of 2009 they flew into Aspen to look at homes.

13  Q.  So where did you meet them?

14  A.  I met them in the Aspen airport.

15  Q.  They flew in, correct?

16  A.  They flew in in their own jet.

17  Q.  Do you know what kind of jet it was?

18  A.  I think I asked Scott and Scott indicated it was a Lear 60.

19  Q.  What did you do when they arrived?

20  A.  Well, we got into my car and then we took a small tour of

21  about six homes.

22  Q.  During the course of your interactions with the Tuckers,

23  did you have any understanding of what Mr. Tucker did for a

24  living?

25  A.  At one time I think I asked his wife Kim and she indicated

1  that he was a private equity investor.

2  Q.  Did Mr. Tucker ever mention to you that he was involved in

3  payday lending?

4  A.  He did not.

5  Q.  Did Mr. Tucker ever mention to you that he was employed by

6  a Native American tribe?

7  A.  He did not.

8  Q.  Did the Tuckers eventually make an offer on a home?

9  A.  They did.

10  Q.  Which home was that?

11  A.  It was a home on Park Avenue.  They offered $7 million.

12  Q.  I would like to show you Government Exhibits 3301, 3302,

13  3304 and 3305.

14          MR. RAVI:  The government offers those four exhibits.

15          MR. GINSBERG:  No objection.

16          THE COURT:  Received.

17          (Government's Exhibits 3301, 3302, 3304 and 3305

18  received in evidence)

19          MR. RAVI:  Let's publish 3301.

20  BY MR. RAVI:

21  Q.  Mr. Gausnell, you might see it on the screen.  It might be

22  easier.

23          THE COURT:  It's right here on the screen.

24  Q.  What is Government Exhibit 3301?

25  A.  This is an MLS detail listing record and it shows all the

H9S8TUC2                          Gausnell – direct

 1  details about the home that they purchased.  Six bedrooms, six

 2  baths.

 3          THE COURT:  You have answered the question.

 4          Next question.

 5          MR. RAVI:  At the top left, if you could just zoom in

 6  on the address.

 7  Q.  What is the address?

 8  A.  259 Park Avenue.

 9          MR. RAVI:  Right above that, actually.

10  Q.  What is the address that's listed at the top there?

11          THE COURT:  Very top.

12  A.  269 Park Avenue, Pitkin, Aspen, Colorado 81611.

13  Q.  What is the listing price for this house at the top right?

14  A.  $8,750,000.

15  Q.  Can you briefly describe the house.

16          MR. GINSBERG:  Your Honor, it's in evidence.

17          THE COURT:  I don't think we need it.

18          Next question.

19  Q.  Let's turn now to Government Exhibit 3302.

20      What is in Government Exhibit 3302?

21  A.  This is the initial offer that was made on the house.

22          MR. RAVI:  If we can now zoom in on 2.1, next to buyer

23  and below buyer.  The middle area, 2.1.

24  Q.  Who is listed as the buyer here?

25  A.  Kim and Scott Tucker.

 1   Q.  What was the initial offer on the home?

 2   A.  $7 million.

 3   Q.  Was there a counterproposal?

 4   A.  There was.

 5          MR. RAVI:  If we can turn now to page 14 of the PDF.

 6          Let's go two more pages, please.

 7          THE WITNESS:  How about page 11?

 8          MR. RAVI:  Ms. Grant, can you focus on page 16.

 9   Q.  We will just go ahead and continue while the screen is

10   fixing itself.

11          So what was the counteroffer on this house, Mr. Gausnell?

12   A.  The counteroffer was $8 million with the seller financing.

13   Q.  What does that mean?

14   A.  In many cases a buyer makes an offer on a home.  It's not

15   acceptable to the seller.  So the seller does a counterproposal

16   saying what they would take.

17   Q.  So what was the amount of financing here?

18   A.  $6 million financing, seller procure it back.

19          THE COURT:  Meaning that the seller would finance it?

20          THE WITNESS:  Correct.

21          THE COURT:  Thank you.  Witness.

22   A.  That would mean that the buyer would put $2 million up

23   front and the seller procure it back, $6 million.

24   Q.  Here the buyers were the Tuckers?

25   A.  Correct.

H9S8TUC2                    Gausnell - direct

1   Q.  Who was the seller?

2   A.  Cami Cooper.

3   Q.  At the last page of your document, do you see some

4   signatures?

5   A.  I do.

6   Q.  Whose signatures do you see?

7   A.  Scott and Tim Tucker's.

8   Q.  Do you also see a signature for the seller?

9   A.  No.  I am looking at the offer, so there wouldn't be a

10  signature on that.

11  Q.  If you look at the last page --

12  A.  On the counterproposal there would be a signature by both

13  parties, and that's what I am looking at now, is the last page

14  of the counterproposal.

15  Q.  Who signs for the seller?

16  A.  Cami.

17          THE COURT:  Up on the screen now, ladies and

18  gentlemen.  Do you have it?

19  Q.  Is there an entity that's listed for the seller?

20  A.  It's signed by all parties to the transaction, Scott and

21  Tim Tucker and Cami Cooper.

22  Q.  Above Cami Cooper's name does it say CMC Aspen Homes?

23  A.  Yes.  That's her LLC, and then that's her signature.

24  Q.  I would like to turn now to Government Exhibit 3305.

25          What is this document, Mr. Gausnell?  You might also be

H9S8TUC2                    Gausnell - direct

1    able to see it on your screen.

2    A.  This is an assignment of the property over to an LLC.

3    Q.  What is the LLC's name?

4    A.  It is CMC Aspen Homes, LLC.

5    Q.  Looking at the --

6    A.  That's the seller's LLC.  They are transferring it to a new

7    LLC that was set up called Park 269, LLC.

8    Q.  If we can go to the last page of this document.

9    A.  Yes.  On the last page the assignor is Scott and Tim

10   Tucker, and signing for the new LLC of Park 269, LLC is Kim

11   Tucker.

12   Q.  Tim Tucker signs as a member or manager of Park 269, LLC?

13   A.  Correct.

14   Q.  As part of a purchase of a home in Aspen, does there need

15   to be a payment to a title company?

16   A.  Usually the title company handles all of the money.  They

17   take the money in and they do the disbursements.

18   Q.  In connection with this transaction, what is the relevance

19   of Pitkin County Title?

20   A.  Pitkin County Title was the title company that was used in

21   the transaction.

22   Q.  Did this purchase of the house by the Tuckers successfully

23   close?

24   A.  It did.

25        MR. RAVI:  At this time the government offers

1    Government Exhibit 3306.

2            THE COURT:  Any objection?

3            MR. GINSBERG:  Objection, your Honor.

4            THE COURT:  Sustained.

5            MR. RAVI:  No further questions, your Honor.

6            THE COURT:  Cross-examination?

7            MR. GINSBERG:  No.  Thank you, your Honor.

8            THE COURT:  Any cross?

9            MR. BATH:  No.

10           THE COURT:  Thank you very much, sir.  You are

11   excused.

12           (Witness excused)

13           MR. RAVI:  At this time, the government would like to

14   offer Government Exhibit 5001, which is a stipulation.

15           THE COURT:  A stipulation of fact or of testimony?

16           MR. RAVI:  One moment, your Honor.

17           Another testimonial stip.

18           THE COURT:  All right.  I have explained that to you

19   already.

20           MR. RAVI:  It is hereby stipulated and agreed by and

21   among the United States of America, by Joon H. Kim, acting

22   United States Attorney, for the Southern District of New York,

23   and Niketh Velamoor, Hagan Scotten and Sagar Ravi, Assistant

24   United States Attorneys, of counsel, Scott Tucker, the

25   defendant, by his attorneys James Roth, Esq., Lee Ginsberg,

1  Esq. and Nadjia Limani, Esq., and Timothy Muir, the defendant,

2  by attorneys Tom Bath, Esq. and Marc Agnifilo, Esq. that:

3         If called as a witness at trial, a representative of

4  each of the following producing institutions would testify that

5  the documents within the following Bates ranges consist of true

6  and accurate copies of records of the institutions, originals

7  of which were made at or near the time by or from information

8  transmitted by with a person of knowledge and that they were

9  kept in the course of regular business activity of the

10  institutions, it being the regular practice of that business

11  activity to make such records.

12         In lieu of reading the institutions and Bates ranges,

13  the government proposes to publish them for the jury.

14         THE COURT:  That's fine.

15         MR. RAVI:  Let's go to the second page, or the third

16  page of this document.

17         Then finally, finish reading the stipulation:

18         It is further stipulated and agreed that this

19  stipulation, marked as Government Exhibit 5001, is admissible

20  in evidence at trial.

21         THE COURT:  All right.  The exhibit is received.

22         (Government's Exhibit 5001 received in evidence)

23         MR. SCOTTEN:  Your Honor, the government calls Andrew

24  Leibenguth.

25   ANDREW LEIBENGUTH,

1          called as a witness by the Government,

2          having been duly sworn, testified as follows:

3              THE DEPUTY CLERK:  State your name and spell it for

4    the record.

5              THE WITNESS:  Andrew Leibenguth.  A-N-D-R-E-W,

6    L-E-I-B-E-N-G-U-T-H.

7              THE COURT:  All right.  Thank you.  You may inquire.

8    DIRECT EXAMINATION

9    BY MR. SCOTTEN:

10   Q.  Good morning, Mr. Leibenguth.

11   A.  Good morning.

12   Q.  Mr. Leibenguth, how old are you?

13   A.  39.

14   Q.  Where are you from?

15   A.  Florida.  Originally from Tamaqua, Pennsylvania.

16   Q.  How far did you go in school?

17   A.  Business school and Marine Corps school.

18   Q.  So you said you were in the Marine Corp.?

19   A.  Yes, eight years.

20   Q.  Do you work now?

21   A.  I am in between jobs.

22   Q.  Do you have any source of income?

23   A.  Yes.  Disability from the VA, Veterans Administration.

24   Q.  Why do you get disability?

25   A.  I have PTSD.  Sorry.  I have issues and other stuff from

1   the service.

2   Q.  Where did you acquire those injuries?

3   A.  Iraq.

4   Q.  Mr. Leibenguth, did you used to take payday loans?

5   A.  Yes.

6   Q.  Do you take payday loans now?

7   A.  No.

8   Q.  Was there a particular reason you stopped?

9   A.  I got ripped off.

10  Q.  Right.  Let me show you -- I am going to hand you up three

11  documents, but just look at the top one.

12  A.  OK.

13  Q.  If you can flip through what I am showing as Government

14  Exhibit 1501.  Tell me if you recognize it.

15  A.  Yes.

16  Q.  In general terms, what is it?

17  A.  It's an application for me to get cash on oneclickcash.com.

18          MR. SCOTTEN:  Your Honor, the government offers 1501.

19          MR. BATH:  No objection.

20          THE COURT:  Received.

21          (Government's Exhibit 1501 received in evidence)

22          MR. SCOTTEN:  If we can just publish the first page.

23  BY MR. SCOTTEN:

24  Q.  Mr. Leibenguth, just a couple of questions about this.

25          What is the date that you took this loan out or applied for

1   this loan with One Click Cash?

2   A.  8/17/2011.

3   Q.  Where were you living at the time?

4       If you look on the screen, it should blow up for you.

5   A.  Sorry about that.

6   Q.  No problem.

7   A.  Tamaqua, Pennsylvania.

8   Q.  Do you remember how many loans you took out from One Click

9   Cash?

10  A.  No, I don't.

11  Q.  Could it have been more than one or two?

12  A.  It was more than one or two, yes.

13          MR. SCOTTEN:  Can we go to the third page and

14  highlight the top four boxes.

15  Q.  Does this accurately reflect the terms of your loan as best

16  you remember them?

17  A.  Yes, it does.

18          MR. SCOTTEN:  You can take down 1501.

19  Q.  If you can now pick up 1503 and flip through that.

20      Do you recognize it?

21  A.  Yes.

22  Q.  What is it?

23  A.  It's an application for oneclickcash.com dated October 10,

24  2012.

25          MR. SCOTTEN:  Your Honor, the government offers 1503.

1       THE COURT:  Any objection?

2       MR. BATH:  No, sir.

3       THE COURT:  Received.

4       (Government's Exhibit 1503 received in evidence)

5   BY MR. SCOTTEN:

6   Q.  Just, again, a couple of questions.

7       On the first page, you have already given the date.  Where

8   were you living when you took this loan out?

9   A.  Same address, Tamaqua, Pennsylvania.

10  Q.  Can we go to page 7.

11      If we can again focus on those top four boxes.

12  A.  Yes.  That is correct.

13  Q.  Mr. Leibenguth, do you remember this loan?

14  A.  Vaguely, but yes.

15  Q.  Did you have an understanding at the time you took

16  it -- let me ask first, how much was this loan for?

17  A.  It was for $600.

18  Q.  Did you have an understanding at the time you took it of

19  how much it was going to cost you in interest?

20  A.  Yes.  I thought it was going to cost $180.

21  Q.  Why did you think that?

22  A.  Because it said it right on the contract.  It says finance

23  charge and total of payments.  It was only $180 more.

24  Q.  So you mentioned total of payments.  Did you have an

25  understanding what your total payments would be?

H9S8TUC2                       Leibenguth - direct

1    A.  Yes.

2    Q.  What did you think it would be?

3    A.  $780.

4    Q.  Why did you think that?

5    A.  Because that is what I signed online.  I wouldn't expect it

6    to be anything else.

7    Q.  Mr. Leibenguth, do you remember about how much you actually

8    paid for this loan?

9    A.  Actually, I don't remember.  I didn't find out until I got

10   an overdraft in my bank account.  I had to do a stop payment.

11   So no, I don't.  Sorry.

12   Q.  No problem.  Let me see you if there is something that will

13   remind you.

14          MR. SCOTTEN:  If the court wants to take the morning

15   break, now is a good time.  We are going to take a moment to

16   find the document for Mr. Leibenguth.

17          THE COURT:  That's what we will do.  Ladies and

18   gentlemen, please do not discuss the case among yourselves or

19   with anyone else.  We will be back in action in ten minutes.

20   Thank you very much.

21          (Jury exits courtroom)

22          THE COURT:  Out of the presence of the jury, I think I

23   speak for all the parties in the case in thanking you for your

24   service.

25          We are in recess.

H9S8TUC2                          Leibenguth - direct

1    (Recess)

2    (Jury present)

3    THE COURT:  You may continue.

4    MR. SCOTTEN:  Thank you, your Honor.

5    BY MR. SCOTTEN:

6    Q.  Mr. Leibenguth, I have put before you a document.  Have you

7    had a chance to look through it and see if it refreshes your

8    memory?

9    A.  Yes, it does.

10    MR. SCOTTEN:  Ms. Grant, can we leave that up.

11   Q.  How much in total did you pay for that loan we were just

12   talking about?

13   A.  It was supposed to be 780 total, but it was actually

14   $1,855.

15   Q.  Was that all money paid to One Click Cash?

16   A.  Yes.

17   Q.  Were there any overdraft fees in addition to what you paid?

18

19   A.  There were overdraft fees, but I complained to the bank and

20   I got a reversal.

21   Q.  At some point in the course of all these payments, did you

22   complain?

23   A.  Yes, I did.  I complained because I couldn't -- because of

24   my -- I had some issues because of my service.  So I avoided

25   stress.  Sorry.

H9S8TUC2                        Leibenguth - direct

1    Q.  No problem, sir.  Take your time.

2    A.  I complained.  I called the 800 number or something like

3    that.  I don't remember.  But I called and I talked to, it was

4    a lady, and I asked why was it so high?  And she was

5    saying -- she would say -- sorry.  I have anxiety and

6    depression.  I'm fine.

7             THE COURT:  Take your time.

8    A.  So I complained.  She said some stuff that made no sense to

9    me in regards to why -- let me just get to the point.  Yes, I

10   complained.  She said -- she told me -- she read what was on

11   the agreement.  She read it to me.  It made no sense to me.

12   All it did was further confuse me.

13            Then I just said, you know what, I don't care.  How can you

14   do this to people?  And the person I was talking had a rebuttal

15   to everything I said.  I remember that.  She was confident in

16   talking to me.  I said, this can't be right.  She added

17   something about tribal -- I remember that was part of the

18   conversation.  I said it doesn't matter.  We are in America.

19   Q.  I was going to ask you to take a look at 1504 and tell me

20   if you recognize it.

21   A.  Let me find it here.

22            Yes.  My memory is bad.  I vaguely remember this.

23   Q.  Can you describe in general terms what you're looking at?

24   A.  It's a letter, rebuttal letter from One Click Cash to me.

25            You want me to read it?

H9S8TUC2                    Leibenguth - direct

1   Q.  No.

2            MR. SCOTTEN:  The government offers 1504.

3            MR. BATH:  No objection.

4            THE COURT:  Received.

5            (Government's Exhibit 1504 received in evidence)

6   BY MR. SCOTTEN:

7   Q.  Now look up on your screen.  It should be there too.

8   A.  Yes.

9            MR. SCOTTEN:  If we can just highlight the first

10  paragraph.

11  Q.  Sir, if I could just ask you to read the second sentence of

12  that paragraph.

13  A.  "We are disappointed that you are no longer satisfied with

14  your loan."

15  Q.  Go on to the third.

16  A.  "However, the loan agreement you entered into with One

17  Click Cash was and is a valid agreement which is governed by

18  the laws of the Santee Sioux Nation of Nebraska, a federally

19  recognized Indian tribe."

20       That's what she said.

21  Q.  Before you heard this over the phone or had seen this

22  letter, did you have any idea this loan had anything to do with

23  Native American tribes?

24  A.  No.

25  Q.  Do you remember how you ended that conversation?

1  A.  I said I was upset.  I actually don't remember.  Sorry.

2  Q.  Do you know about how much had -- had you paid that whole

3  $1800 at the time?

4  A.  Say that again.

5  Q.  Had you paid that whole $1800 at that time?

6  A.  Yes.  They would take out more too because online it said I

7  still owed $800.

8          THE COURT:  Mr. Scotten, do you have much more?

9          MR. SCOTTEN:  I don't, your Honor.

10         THE COURT:  Get to it.

11 Q.  Have you ever taken another payday loan again?

12 A.  No, not that I recall.

13 Q.  Why not?

14 A.  Because I got ripped off.

15         MR. SCOTTEN:  That's all I have.

16         THE COURT:  Cross-examination.

17         MR. BATH:  No questions.

18         THE COURT:  Thank you.  You may step down.

19         THE WITNESS:  Thank you.

20         (Witness excused)

21         MR. SCOTTEN:  Your Honor, at this time the government

22 would like to offer Exhibit 4013.

23         THE COURT:  Any objection?

24         MR. GINSBERG:  No objection, your Honor.

25         THE COURT:  Received.

H9S8TUC2

1           (Government's Exhibit 4013 received in evidence)

2           MR. SCOTTEN:  If we can publish it.

3           Before we focus on the first page, can we start with

4    page 2.

5           Can I ask you to highlight just the signature block

6    and the two lines above it.

7           Now we can go back to the first page.

8           Can we start in the second paragraph, can we just

9    highlight -- actually, the first paragraph, the last sentence.

10          Now, if we can go to the second paragraph, and just

11   highlight the first sentence.

12          Then can we go to the list of corporations.  If you

13   can blow them up.

14          Can we now go to the paragraph below it.

15          Would you take that down.

16          The government would like to offer 5003, your Honor,

17   which is a stipulation.  It is a factual stipulation.

18          THE COURT:  A factual stipulation is an agreement by

19   the parties to the case that a certain fact is true.  You must

20   accept that fact as having been established for the purposes of

21   this trial.  The weight or significance of that fact is

22   entirely up to you to decide.

23          MR. SCOTTEN:  It is hereby stipulated and agreed by

24   and among the United States of America, by Joon H. Kim, Acting

25   United States Attorney, for the Southern District of New York,

1    Niketh Velamoor, Hagan Scott, and Sagar Ravi, Assistant United

2    States Attorneys, of counsel, Scott Tucker, the defendant, by

3    his attorneys, James Roth, Esq., Lee Ginsberg, Esq., and Nadjia

4    Limani, Esq., and Timothy Muir, the defendant, by his

5    attorneys, Tom Bath, Esq. and Marc Agnifilo, Esq., that:

6            1.  At all times relevant to this case, Scott Tucker

7    held 100 percent of the stock or membership interests of the

8    following entities:

9            AMG Capital Management, LLC.

10           BA Services, LLC.

11           Black Creek Capital Corp.

12           Broadmoor Capital, LLC.

13           DF Services Corporation.

14           Geo Capital Services, LLC.

15           Key Financial Systems Corp.

16           Level 5 Motorsports, LLC.

17           National Leasing Services.

18           PSB Services, LLC.

19           RE Capital Services, LLC.

20           SCL Services, LLC.

21           ST Capital, LLC.

22           Westfund, LLC.

23           2.  At all times relevant to this case, Timothy Muir

24    held 100 percent of the membership interests of The Muir Law

25    Firm, LLC.

H9S8TUC2

1    At all times relevant to this case, Blaine Tucker held

2    100 percent of the stock or membership interests of the

3    following entities:

4         BAT Service, Inc.

5         El Dorado Services, LLC.

6         Lead Flash Consulting, LLC.; and

7         At all times relevant to this case, Kim Tucker held

8    100 percent of the membership interest of Park 269, LLC.

9         It is further stipulated and agreed that this

10   stipulation, marked as Government Exhibit 5003, is admissible

11   in evidence at trial.

12        The government offers 5003.

13        THE COURT:  Without objection, it is received.

14        (Government's Exhibit 5003 received in evidence)

15        MR. VELAMOOR:  At this time pursuant to a previous

16   stipulation, business records stipulation, the government

17   offers a hard drive, which has been marked as 3552, containing

18   records described in the business records stipulation from the

19   following entities:  Intercept, Global Pay, Billing Tree,

20   MoneyGram, TransFirst, Spirit Jets, Boardwalk Ferrari,

21   Boardwalk Porsche, and CMC Aspen Homes.

22        THE COURT:  Any objection?

23        MR. GINSBERG:  No objection.

24        MR. BATH:  No.

25        THE COURT:  Received.

1          (Government's Exhibit 3552 received in evidence)

2          MR. VELAMOOR:  At this time the government calls

3    Kimberly Espinoza.

4     KIMBERLY ESPINOZA,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7          THE DEPUTY CLERK:  State your name and spell it for

8    the record.

9          THE WITNESS:  Kimberly Espinoza.  K-I-M-B-E-R-L-Y,

10   E-S-P-I-N-O-Z-A.

11         THE COURT:  If you would like to bend the microphone

12   down, that's fine.

13         Go ahead.

14   DIRECT EXAMINATION

15   BY MR. VELAMOOR:

16   Q.  Good morning, Ms. Espinoza.

17   A.  Good morning.

18   Q.  Where do you work?

19   A.  RGL Forensics.

20   Q.  Is that an accounting company?

21   A.  Yes, it is.

22   Q.  Have you assisted the prosecution team in preparing for

23   this trial?

24   A.  Yes, I have.

25   Q.  What are some of the kinds of things that you have done to

1    assist the prosecution team in this case?

2    A.  I have reviewed bank records and spreadsheets.

3    Q.  Did you ever have to review those to prepare charts that

4    summarized the contents of both the spreadsheets as well as the

5    bank records?

6    A.  Yes, I did.

7    Q.  Let's talk about the spreadsheets first.

8        Can you describe the size of those spreadsheets.

9    A.  They are very large spreadsheets containing thousands of

10   line items.

11   Q.  The bank records, can you describe the volume of the bank

12   records you have looked at.

13   A.  I reviewed approximately 50 bank accounts for the time

14   frame of five and a half years, and they contained thousands of

15   pages.

16   Q.  To assist you in reviewing and summarizing those bank

17   record, did you utilize computer software to help you out?

18   A.  Yes, I did.

19   Q.  I am going to show you what has been marked as Government

20   Exhibit 3550.

21       Do you recognize 3550?

22   A.  Yes, I do.

23   Q.  What is it?

24   A.  It's a hard drive containing all of the bank records and

25   spreadsheets that I relied upon.

1    Q.  Relied upon in doing what?

2    A.  In performing the summary information.

3    Q.  Did you use those to prepare your charts and summaries?

4    A.  Yes.

5            MR. VELAMOOR:  The government offers 3550 pursuant to

6    the business records stipulation already in evidence.

7            THE COURT:  Any objection?

8            MR. GINSBERG:  No, your Honor.

9            THE COURT:  Received.

10           (Government's Exhibit 3550 received in evidence)

11   BY MR. VELAMOOR:

12   Q.  Let me show you what has been marked as Government Exhibit

13   3551.

14           Do you recognize 3551?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  It's a presentation I prepared that has summary charts of

18   the bank records and spreadsheets that I reviewed.

19   Q.  Including the spreadsheets and bank records contained in

20   the hard drive?

21   A.  Yes, that's correct.

22           MR. VELAMOOR:  Your Honor, the government offers 3551.

23           THE COURT:  Let me hear everybody at sidebar for a

24   moment.

25           Please stand up and stretch.

H9S8TUC2                    Espinoza - direct

1          (At the sidebar)

2          THE COURT:  Mr. Ginsberg, I understand from the note

3    that was handed me that you have objections to certain pages

4    within the exhibit.

5          MR. GINSBERG:  Yes.  I marked the pages for you.

6          THE COURT:  You probably have your -- you have your

7    pages?

8          MR. GINSBERG:  I do.

9          THE COURT:  OK.  Talk to me about pages 1 to 4.  What

10   is the objection?

11         MR. GINSBERG:  I don't see the relevance of describing

12   payday loan customers by every state in the union.  The

13   government hasn't, as far as I can tell, put forth any evidence

14   about many of these states, number one.  The fact of numbers of

15   people in states who took out loans I think is prejudicial and

16   not particularly relevant to this case.  So that's the first

17   two because there is a cover page and then the chart.

18         THE COURT:  Understood.

19         Let me hear from the government.

20         MR. VELAMOOR:  I believe the number of customers and

21   the location of those customers is very relevant to this case.

22   As the court knows, the government alleges that the defendant

23   violated the usury laws of various states.

24         I understand from the court's proposed jury

25   instructions it has identified particular states, specifically

1  because of the usury laws that those states have, and the jury

2  needs to know that there were in fact customers from those

3  states.

4         In addition, there has been evidence in this trial

5  about the company's policies in terms of certain states they

6  were not doing business in by policy.

7         THE COURT:  And the witness is going to be able to say

8  that this is based on her analysis of records or somebody's

9  analysis of records?

10         MR. VELAMOOR:  She is going to testify that she was

11  provided spreadsheets of customer lists that are actually

12  company documents and they were very large spreadsheets and she

13  used those and address fields to come up with the numbers for

14  each state.

15         THE COURT:  I will allow it.

16         Page 9.

17         MR. GINSBERG:  Did we do page 1, 2, 3 and 4?

18         THE COURT:  Yes.  I understand that.  The objection is

19  overruled.

20         Do you have an objection to page 9?  Yes?

21         MR. GINSBERG:  I do.  I have an objection to page 9

22  because it appears to be a random selection of a particular

23  month.  This case is charged over a long period of time, as

24  your Honor knows.  So picking a particular month randomly to

25  show a set of numbers, without having all the other

1   information, I think it's prejudicial.

2           I don't have all the other material and information

3   and frankly we didn't have the time to spend going through

4   everything else to see whether this is a fair comparison to the

5   other months, other years, or anything like that.  I don't

6   think it's appropriate for that reason, and I guess 403 would

7   be the major one.

8           THE COURT:  I understand.

9           I think it goes to the weight and it's based on

10  documents in evidence and I will allow it.

11          Page 30.

12          MR. GINSBERG:  Page 30 was principally the --

13          THE COURT:  This is what I have for page 30.

14          MR. VELAMOOR:  I think you may have an old draft.

15          THE COURT:  Who me?

16          MR. VELAMOOR:  Mr. Ginsberg.

17          THE COURT:  Mr. Ginsberg has an old draft.

18          So page 30 -- let's cut to the chase here.  Are there

19  any pictures of the house in there?

20          MR. VELAMOOR:  Anticipating that the court might keep

21  that out, we have a new version with no pictures.

22          THE COURT:  Good job in predicting my ruling.

23          MR. VELAMOOR:  I think we saw where the wind was

24  blowing on that.

25          THE COURT:  41 to 43.

1    MR. GINSBERG:  41 is the Don Brady.

2    THE COURT:  Don Brady signature.

3    MR. GINSBERG:  Yes.  I just don't think that's

4    appropriate.  It's a 403 objection.  But Don Brady's signature

5    comparison, I don't think this witness is in a position to say

6    anything about it.  To put in a summary chart with other

7    summary documents and financials when it's really something

8    that would go to either an expertise or maybe, maybe asking the

9    jury to make their own determination, but to put it in here

10   with the witness testifying the way she is going to be

11   testifying I think is not appropriate.

12   THE COURT:  She is not testifying as an expert on this

13   subject as an handwriting expert.

14   MR. VELAMOOR:  Nor am I going to ask her whether she

15   thinks they look the same.  The reason why we are offering this

16   is because there was evidence in the trial of the Don Brady

17   signature stamp.  I am going to ask her did you overlay three

18   of Don Brady's checks under each other, what was the result at

19   the bottom.  We hope the jury will conclude it's the result of

20   the stamp.

21   THE COURT:  That's fine.

22   41 to 43.

23   MR. GINSBERG:  The next two, the payments to Kansas

24   Income Tax, the problem I have with that is that it appears to

25   show a linear -- well, I guess it is linear from the portfolio

H9S8TUC2                    Espinoza - direct

1    accounts down to the payment.  But there is no way to know, as

2    far as I can tell, whether the money that began going from the

3    portfolio account into the first circled account of Scott

4    Tucker is the same money that then went into the next one to

5    the next one to the next one to the next one.  It's just an

6    assumption that it's the same money.

7              THE COURT:  Money is fungible always.

8              MR. GINSBERG:  Yes, money is fungible.

9              THE COURT:  I will allow it.  It goes to weight.

10             Anything else on the exhibit?

11             Yes, sir.

12             MR. BATH:  Judge, if you can go to page 26.  There are

13   two things involving Muir.

14             THE COURT:  Yes.

15             MR. BATH:  This shows they are tracing moneys from

16   portfolio AMG into two different accounts.  The top account is

17   an IOLTA account.  Then they trace -- they take out from the

18   IOLTA account money to outside firms and then they essentially

19   do the arrows and say, remaining proceeds to the Muir firm.

20             IOLTA money is not proceeds of the Muir firm until

21   it's earned.  It's trust account money, Judge.

22             THE COURT:  I assume the testimony will be that it

23   went not as a violation of any escrow rule necessarily, but it

24   went from the IOLTA account into the regular accounts of the

25   law firm.

1    Is that accurate, or not?

2    MR. VELAMOOR:  No.  The reason why we separated it

3    out, frankly, is to facilitate Mr. Bath making the point that

4    he is making, which is that if he wants to point out some of

5    this money went just to the IOLTA account, then we have

6    separated it out so that the first top box applies to IOLTA,

7    the bottom box applies only to the checking account.

8    THE COURT:  Here is the problem.  The big blue where

9    it says $11 million to the Muir law firm, if it's not fees but

10   it's some moneys that Mr. Muir is holding in escrow for a third

11   party, then it shouldn't be listed as proceeds to Muir Law Firm

12   of $11 million.  It never was Mr. Muir's money and it never

13   will be Mr. Muir's money.  It belonged to somebody else.

14   MR. VELAMOOR:  Assuming that's ultimately what

15   happened to it.  I think our position is that during this time

16   period it reflects transactions to that account, and we

17   provided the data in a way that that argument can be made.

18   THE COURT:  What Mr. Bath said, which I thought was

19   interesting and consistent with I think the practices of some

20   lawyers, is that they get an advance payment from a client and

21   it goes into their attorney trust account.  It sits there until

22   they have earned the fee.  Then when they have earned the fee,

23   it's paid from their IOLTA account to their own checking

24   account.

25   And is that what happened with the 6.6 here?

1      MR. BATH:  Yes.  I don't think that's they are not

2  proceeds of Muir Law Firm.  That's all held in trust.

3      THE COURT:  No, no.  But at the end of the day, is

4  this a situation where the 6.6 was in the IOLTA account and

5  then one would say Mr. Muir earned the fees and then the 6.6

6  came out of his IOLTA account into his operating account.

7      MR. BATH:  That's how I understand it.  I haven't done

8  the accounting, but until it goes to the bottom account, it's

9  not earned.

10      THE COURT:  I understand.  Then I think it's a fair

11  representation.  That's the point.  You can make your point on

12  cross-examination.

13      MR. BATH:  I don't think they can say that that ever

14  went to the operating account.

15      THE COURT:  That's what I was asking you.  That's what

16  I was inquiring about.

17      6.7 went into the IOLTA.  72,000 went to outside law

18  firms.  What the government appears to be saying, and maybe

19  it's not true, is that 6.6, which had been originally resident

20  in the IOLTA account, was paid into an operating account over

21  which Mr. Muir had control.

22      MR. VELAMOOR:  I can't suggest that at this point.

23  This is a total of the money, to my knowledge, that went to

24  both accounts during the relevant time period.  It is not the

25  case that --

 1              THE COURT:  Whose money is the 6.6?

 2              MR. VELAMOOR:  The 6.6 million was paid from portfolio

 3     accounts to The Muir Law Firm IOLTA account.  I don't believe

 4     we followed that money to other destinations other than to the

 5     extent it went to other law firms.

 6              THE COURT:  But it's so incredibly significant.  If

 7     the money was paid into the IOLTA for the purpose of being paid

 8     out to Mr. Muir, that's one kettle of fish.

 9              If on the other hand it was paid into the IOLTA

10     account to be paid to the IRS or some third party, or to

11     purchase a computer system for his client, that's a whole

12     different, other kettle of fish.

13              MR. VELAMOOR:  May I propose that I go no farther than

14     the slide before this before lunch.  At lunch I will see if I

15     can trace any money from there to personal interest.

16              THE COURT:  Fair enough.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1      (In open court)

2            MR. VELAMOOR:  Thank you, your Honor.

3            Is 3551 received?

4            THE COURT:  3551 is received subject to possible

5  revisions on page 26.

6            (Government's Exhibit 3551 received in evidence)

7            MR. VELAMOOR:  May we show 3551 to the jury?

8            THE COURT:  You may with the exception of the one

9  page.

10  BY MR. VELAMOOR:

11  Q.  Ms. Espinoza, is this the first page of the PowerPoint

12  slides that you prepared?

13  A.  Yes, it is.

14  Q.  It says "payday loan customers by state."

15       Do you see that?

16  A.  Yes.

17  Q.  So what kinds of documents did you summarize to prepare

18  this section of your presentation?

19  A.  We received seven AMG spreadsheets detailing customers that

20  had information such as their name, address, e-mail address,

21  state.

22  Q.  Were those spreadsheets organized by loan portfolio?

23  A.  Yes, they were.

24  Q.  Was there one spreadsheet for each different loan

25  portfolio?

1   A.  Yes, there was.

2   Q.  Let's turn to the next slide.

3       You said at the top, "total of 4.65 million unique

4   customers."

5       Do you see that?

6   A.  Yes.

7   Q.  Is this a total you add up the customers in all seven of

8   the spreadsheets?

9   A.  It's a total of removing duplicates.  So we looked at the

10  name, address and state and removed any duplicates based on

11  those three criteria and also removed any line items that

12  indicated that it was a test.

13  Q.  So in other words, if a customer appeared on the customer

14  list for two different portfolios, you only included them once?

15  A.  That's correct.

16  Q.  And the way you tried to do that is by cutting out

17  duplicates based on name and address?

18  A.  Yes.

19  Q.  You said you removed line items that said test?

20  A.  There were some line items with a name or an e-mail address

21  that said test within it.  So we assumed those were not valid

22  and executed.

23  Q.  Taking out duplications like the total of unique customers,

24  as you put it, was what?

25  A.  4.5 million.

H9S8TUC2                    Espinoza - direct

1   Q.  And the time period for these spreadsheets was January 1,

2   2008 through December 31, 2012?

3   A.  Yes.

4   Q.  You also put down numbers on a map obviously.

5       What did you try to do there?

6   A.  Based on the state, we created this map and entered out of

7   the 4.65 million customers how many were within each state.

8   Q.  I see different shades and colors.  Can you explain what

9   you did there?

10  A.  This is considered a e-map, where it's arranged from

11  the -- the lower values having a lighter color and the higher

12  value having a darker reddish color.

13  Q.  So it appears that California, Texas, Florida and New York

14  have the darkest color?

15  A.  Yes.

16  Q.  What is the total number of unique customers you found for

17  New York?

18  A.  287,070.

19  Q.  It looks like you found a very low number in Kansas.  Is

20  that right?

21  A.  Yes.  144.

22  Q.  Why don't we turn to the next slide.

23      What does the next couple of slides present?

24  A.  Of the 287,000 which resided in New York, how many resided

25  in the Southern District of New York.

1    Q.  When you say the Southern District of New York, what do you

2    mean?

3             THE COURT:  Well, ladies and gentlemen, Southern

4    District of New York is the judicial district in which this

5    court sits and it consists by law of the counties of New York

6    County, that's Manhattan, the Bronx, Westchester, Dutchess,

7    Orange, Rockland, Putnam, and Sullivan counties.

8             Go ahead.

9    Q.  With that, why don't we turn to the next slide.

10        So, for example, on the left, did you again include the

11   image of New York and surrounding states?

12   A.  Yes.

13   Q.  And then the right is what?

14   A.  Of the 287,000 New York customers, 78,448 are in the

15   Southern District of New York.

16   Q.  You said 78,000, right?

17   A.  Yes.

18   Q.  What county did you find the highest number in?

19   A.  The Bronx.

20   Q.  What was that number?

21   A.  32,116, I believe, or 10.

22   Q.  It's a little hard to read from the line in the map.

23        What about New York?

24   A.  19,150.

25   Q.  From the information on the spreadsheet, how did you know

1  which customers allocated to which towns?

2  A.  Based on their zip code.

3  Q.  Now, did you receive from us any customer records prior to

4  January 2008?

5  A.  No.

6  Q.  Now, also, you mentioned that you got spreadsheets from

7  each of the different portfolios?

8  A.  Yes.

9  Q.  Did you find at least one customer from the Southern

10  District of New York in each of those spreadsheets?

11  A.  Yes.

12       MR. VELAMOOR:  Why don't we move on to the next.

13  Q.  You mentioned you also looked at bank records, right?

14  A.  Yes.

15  Q.  Let's turn to the next slide.

16       What did you include on this slide?

17  A.  All the bank accounts we relied upon.

18  Q.  For what purpose?

19  A.  To demonstrate the following summaries we relied upon for

20  those bank accounts.

21  Q.  It's the recordings of these accounts that you relied on

22  for the charts?

23  A.  Yes.

24  Q.  Which different institutions did these records come from?

25  A.  Bay Cities, US Bank, Commerce Bank, Midwest Trust,

1  Pershing, Plains Capital and Welch Bank.

2  Q.  On this page did you include information about the

3  different bank accounts?

4  A.  Yes.

5  Q.  What did you include?

6  A.  The bank account number, the bank account name and the

7  bank.

8  Q.  When you say the bank account name, what do you mean?

9  A.  That's the name that's on the bank, the bank record itself.

10  Q.  There is a time frame that appears on the top.

11  A.  Yes.

12  Q.  What is the significance of the time frame?

13  A.  That's the time frame that we reviewed.

14  Q.  Is that the time frame for which you had records relating

15  to these accounts?

16  A.  Yes.

17  Q.  Let's turn to the next slide.

18      This slide is titled Portfolio Accounts and AMG Accounts.

19      Do you see that?

20  A.  Yes.

21  Q.  What appears on this slide?  What did you include on this?

22  A.  From the prior slide it's just the accounts that are

23  portfolio accounts and AMG accounts.

24  Q.  To the extent in other parts of the presentation there is a

25  reference to portfolio accounts, what accounts are included?

1  A.  The ones listed here under Bay Cities Bank and US Bank

2  towards the top.

3  Q.  Do those include all of the accounts essentially with a

4  corporate name and a d/b/a name associated with them?

5  A.  Yes.

6  Q.  For example, d/b/a 500 FastCash, One Click Cash, and so on?

7  A.  Yes.  And the Red Cedar Services bank account.

8  Q.  Is that the only one that didn't have a d/b/a name in the

9  name of the account?

10  A.  Yes.

11  Q.  These accounts came from two institutions, Bay Cities and

12  US Bank?

13  A.  Yes.

14  Q.  Below you listed AMG accounts.  If there is a reference in

15  the presentation to AMG accounts, do the records come from

16  those two accounts?

17  A.  Yes.

18  Q.  Let's turn to the next.

19      What is included in this part of the presentation?

20  A.  Some examples of the portfolio accounts, inflows and

21  outflows from payment processors.

22  Q.  When you say "payment processors," which entities would

23  that include?

24  A.  Billing Tree, Global Pay, TransFirst, Intercept and

25  MoneyGram.

H9S8TUC2                    Espinoza - direct

1    Q.  Did transactions involving those entities make up most of

2    the activity in these accounts?

3    A.  Yes, it did.

4    Q.  Were there similarities in the kinds of activity involving

5    these entities?

6    A.  Yes.  There were reoccurring transactions almost on a daily

7    basis.

8    Q.  The slide of inflows and outflows, did you see inflows and

9    outflows from these entities?

10   A.  Yes.

11   Q.  Why don't we turn to the next page.

12       What did you present on this page?

13   A.  For one month, August 2008, for TFS Corp., d/b/a US

14   FastCash, the total inflows and total outflows for the month

15   and towards the bottom are some examples from the bank

16   statements.

17   Q.  So the bottom is essentially an image taken from a bank

18   statement during that month?

19   A.  Yes.

20   Q.  There is a total of inflows on the top.  What does that

21   total reflect?

22   A.  That's the total payment processor of money coming into the

23   account.

24   Q.  During this month?

25   A.  Right.  Just for August 2008, for that one account.

H9S8TUC2                    Espinoza - direct

1   Q.  The total is what?

2   A.  $8,694,441.

3   Q.  The outflows, what is the total outflows for that month?

4   A.  $6,467,329.

5   Q.  Just to be clear, did the inflows and outflows to and from

6   payment processors occur within the same account?

7   A.  Yes.

8   Q.  Same money going out, some going out, so on and so forth?

9   A.  That's correct.

10  Q.  How often did you observe transactions with the payment

11  processors that you mentioned?

12  A.  Typically it was on a daily basis.  It did seem on weekends

13  there were not any transactions generally.

14  Q.  Why don't we just turn to the next page.

15      Is this another example of similar activity?

16  A.  Yes.

17  Q.  For which account in this case?

18  A.  Red Cedar Services, d/b/a 500 FastCash.

19  Q.  Again, what did you find in terms of inflows and outflows

20  during this month?

21  A.  Payment processor inflows were 8.6 million and payment

22  processor outflows were 6.1 million.

23  Q.  Was the payment of activity similar to the payment in the

24  other account?

25  A.  Yes.

1  Q.  Was it similar to all the other months for all the other

2  accounts that you looked at?

3  A.  Yes.

4  Q.  In the last few slides you essentially show an example of

5  particular months, is that right?

6  A.  Yeah.

7  Q.  Did you also endeavor to create annual totals, totals

8  across the year for total payment activities?

9  A.  Yes.

10  Q.  The total figures you came up with appear on the next

11  slide?

12  A.  Yes.

13       (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. VELAMOOR:  I want to turn to that.  OK.

2  Q.  So the title of this slide is total of payment processer

3  inflows and outflows (2008-June 2013), correct?

4  A.  Yes.

5  Q.  Can you describe what you're presenting on this slide and

6  how you're presenting it?

7  A.  For all the portfolio accounts, these are total payment

8  processer inflows and outflows by year.

9  Q.  And so, for example, that's a total across the different

10  payment processers you mentioned, right?

11  A.  Yes.

12  Q.  Was there one payment processer that accounted for most of

13  the activity in both directions?

14  A.  Yes.

15  Q.  What was that?

16  A.  Intercept.

17  Q.  All right.  So for 2008, for example, please describe

18  roughly the total numbers you found for 2008.

19  A.  About 400 million is outgoing and close to 600 million is

20  incoming.

21  Q.  And so the lighter gray is outgoing, darker towards black

22  is incoming?

23  A.  That's correct.

24  Q.  Then there's green appearing behind it.  Can you just

25  explain what you're doing there?

1    A.   That's the total.  That's a cumulative total for all year,

2    so that's the inflows less the outflows, and the total's $1.31

3    billion for all years.

4    Q.   So adding up the total net difference between the amount of

5    money that came in minus the money that went out?

6    A.   That's correct.

7    Q.   And so, the total net inflows, as you put it, for these

8    five years was what?

9    A.   $1.31 billion.

10   Q.   Billion with a B?

11   A.   Yes.

12   Q.   And do you have the totals broken out by inflows and

13   outflows and net at the bottom as well?

14   A.   Yes.

15   Q.   So you got to that net of 1.31 billion by how?  Tell me

16   how.

17   A.   3.5 billion minus 2.19 billion.

18           MR. VELAMOOR:  Why don't we turn now to the next

19   slide.

20   Q.   What did you present in these slides?

21   A.   From the portfolio accounts, the money going to Partner

22   Weekly, Selling Source and DataX LTD.

23   Q.   From where?

24   A.   From the portfolio accounts.

25           MR. VELAMOOR:  Why don't we move on to the next slide.

1    Q.  OK, so there's some accounts listed at the top.  Again,

2    what are those accounts?

3    A.  The portfolio accounts.

4    Q.  So those are essentially the source of the money that's

5    presented below?

6    A.  Yes.

7    Q.  And what did you find in terms of payments to those three

8    entities?

9    A.  A total of $412 million.

10   Q.  Can you break that down by the three different

11   destinations?

12   A.  Partner Weekly received $357,410,392.  Selling Source

13   received $32,022,910, and DataX received $22,967,247.

14   Q.  And that yields a total of $412,400,549?

15   A.  Yes.

16   Q.  By the way, this is activity from the same accounts we

17   looked at before where you talked about the payment processer

18   inflows and outflows?

19   A.  Yes.

20   Q.  And what kinds of payments did you see that were made to

21   these entities?

22   A.  Checks and wires.

23          MR. VELAMOOR:  All right.  Why don't we move on to the

24   next.

25   Q.  What did you summarize in this section?

H9sWtuc3                    Espinoza – Direct

1   A.  Payments from portfolio and AMG accounts to Levelfive

2   Motorsports.

3           MR. VELAMOOR:  All right.  Could we go to the next.

4   Q.  OK.  So the time period that you summarized for these

5   payments is what?

6   A.  January 10, 2008, through October 29, 2012.

7   Q.  And what do the kind of different, the black, accounts

8   mentioned in the black squares represent?

9   A.  Those are the portfolio and AMG accounts.

10  Q.  And there are numbers there.  What do those numbers

11  represent?

12  A.  That's how much money is coming from the portfolio and AMG

13  accounts to Levelfive Motorsports.

14  Q.  Just to be clear, the account names, again, the money is

15  coming from include TFS Corp., right?

16  A.  Yes.

17  Q.  MNE Services, right?

18  A.  Yes.

19  Q.  MTE Financial Services?

20  A.  Yes.

21  Q.  Red Cedar Services, right?

22  A.  Yes.

23  Q.  SFS Inc.?

24  A.  Yes.

25  Q.  As well as AMG Services?

1  A.  Yes.

2  Q.  Money came directly from those accounts with those names to

3  Levelfive?

4  A.  Yes.

5  Q.  What's the total that came to those accounts?

6  A.  $56,745,468.

7  Q.  And approximately how many checks did you have to add up to

8  get to that total?

9  A.  2,483.

10  Q.  That number appears on the slide as well, correct?

11  A.  Yes.

12         THE COURT:  Yes?

13         THE WITNESS:  Yes.

14         THE COURT:  Thank you.

15         MR. VELAMOOR:  Let's turn to the next slide.

16  Q.  What do you present on this slide?

17  A.  Some examples of the payments to Levelfive Motorsports from

18  the portfolio accounts.

19  Q.  Examples of some of the checks that were referenced on the

20  previous slide?

21  A.  Yes.

22         MR. VELAMOOR:  Why don't we just highlight or expand a

23  couple of those checks.  And by the way, can you just highlight

24  the memo of that check as well as part of the signature that

25  appears.

1          And then let's move to the next.

2    Q.  What did you include on the right?

3    A.  Ferrari purchase agreement.

4    Q.  Was that a document that we provided you?

5    A.  Yes.

6          MR. VELAMOOR:  All right.  Why don't we move on to the

7    next slide.

8    Q.  All right.  This and the next couple of slides, what do you

9    present?

10   A.  Purchases made by Levelfive Motorsports for vehicles.

11   Q.  When you say purchases by Levelfive, what do you mean?

12   A.  A check was written out of, or a wire was written out of

13   Levelfive Motorsports' account.

14   Q.  Again, is that the same account into which the, I guess, 56

15   million or so you summarized in the previous slide went?

16   A.  Yes.

17         MR. VELAMOOR:  All right.  Why don't we turn to the

18   next slide.

19   Q.  What documents did you rely on in preparing this slide?

20   A.  There were Ferrari purchase agreements as well as checks

21   and wires from the Levelfive Motorsports bank account.

22         MR. VELAMOOR:  Why don't we highlight the first car on

23   the left there.

24   Q.  To include the information on the page related to this car,

25   what records did you rely on?

1    A.   There was a Ferrari purchase agreement, which stated the

2    name of the, of the car, the 2008 Ferrari Challenge, and then

3    there was also a check provided with that agreement, which

4    stated the, who it was payable to, Boardwalk Ferrari; the check

5    date, February 23, 2008; and the check was written for

6    $256,634.

7    Q.   And you found that check in the bank records as well?

8    A.   Yes.

9    Q.   True of all the cars listed on this slide?

10   A.   Yes.

11           MR. VELAMOOR:  Why don't we just zoom out of that.

12           And Ms. Grant, why don't you highlight each of the

13   cars for a few seconds.

14           Go ahead.  Go ahead.

15   Q.   OK.  Now, the car on the top right, the 2011 Ferrari 458

16   Challenge, did you look at additional records relating to that

17   car?

18   A.   Yes.

19   Q.   What did you look at?

20   A.   We reviewed the Levelfive Motorsports account around the

21   date of the transaction.

22           MR. VELAMOOR:  OK.  Why don't we turn to the next

23   page.  OK.

24   Q.   So on the right, let's just start on the right, the check

25   on the right.  What check is that?

1  A.  That's the same check listed on the prior slide.  It's

2  Levelfive Motorsports to Boardwalk Ferrari on February 25,

3  2011, for $300,695.35.

4  Q.  Then the memo line, can you make out any part of that?

5  A.  "Purchase of second 2011 458 Challenge car."

6  Q.  And the date, again, of this check is what?

7  A.  February 25, 2011.

8        MR. VELAMOOR:  OK.  Come back out of that.

9  Q.  Below that is that a document relating to the purchase of

10 that car?

11 A.  Yes, it is.

12       MR. VELAMOOR:  If we could just highlight the

13 description of the sale unit there.

14 Q.  Do you see some of the same information that's on the

15 check?

16 A.  Yes.

17 Q.  As well as the amount is also the same, right?

18 A.  Yes, and the date.

19 Q.  Now, you said you also looked at activity in that

20 account -- sorry, in the Levelfive Motorsports account around

21 the same date, is that right?

22 A.  Yes.

23       MR. VELAMOOR:  Come back out of that for a second.

24 Q.  So the check for the car, again, you said was February 25,

25 2011.  What did you find in terms of additional activity in the

1    Levelfive account around February 25, 2011?

2    A.  On February 24, 2011, there was a deposit of $500,000

3    consisting of five checks from the portfolio accounts.

4    Q.  OK.  So just one day before the purchase of the car?

5    A.  Yes.

6           MR. VELAMOOR:  Why don't we just highlight the first

7    check there.

8    Q.  So the date again, February 24, 2011, right?

9    A.  Yes.

10   Q.  That's the date before the check to buy the car, right?

11   A.  Yes.

12   Q.  And the source of this is what?

13   A.  The Levelfive Motorsports account.

14   Q.  I'm sorry.  The source of the money for this check.

15   A.  Oh, sorry.  TFS Corp. d/b/a Ameriloan.

16   Q.  By the way, what's the address there listed for that?

17   A.  3531 -- I can't read the next letter, Street NW, Miami,

18   Oklahoma 74355.

19   Q.  Pay to the order of Levelfive Motorsports, right?

20   A.  Yes.

21   Q.  And it says sponsorship, right?

22   A.  Yes.

23           MR. VELAMOOR:  Come back out of that.

24           Just zoom in to each one of the next checks as well.

25   Q.  Same date; this time a different source of the money?

1   A.  Yes.

2   Q.  What's the source of the money this time?

3   A.  SFS Inc. d/b/a OneClickCash.

4   Q.  Can you at least make out any of the city and state?

5   A.  I can't seem to read that.

6   Q.  OK.

7   A.  Blurry.

8           MR. VELAMOOR:  OK.  You can come back out.

9           And next.

10  Q.  This one is Red Cedar Services, right?

11  A.  Yes.

12          MR. VELAMOOR:  Keep going.

13  Q.  And this is TFS with a different d/b/a?

14  A.  Yes.

15  Q.  And the last one is TFS this time as US FastCash?

16  A.  Yes.

17          MR. VELAMOOR:  All right.  Why don't we go on to the

18  next.

19          THE COURT:  Ladies and gentlemen, we're going to break

20  for lunch.  Please do not discuss the case among yourselves or

21  with anyone else.  Please enjoy your lunch, and I'll see you

22  back in action at 2.  Thank you.

23          One question.  Does the government have any witnesses

24  after this witness?

25          MR. VELAMOOR:  No, your Honor.

1    THE COURT:  OK.  Thank you.

2    (Jury not present)

3    THE COURT:  Have a pleasant lunch.

4    MR. VELAMOOR:  Thank you.

5    (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:00 p.m.

3              THE COURT:  I understand there's an issue of some

4      sort.  Yes, no?

5              MR. RAVI:  Yes, your Honor.  Before the government

6      rests, we just want to resolve this one objection to the

7      document.

8              THE COURT:  Yes.

9              MR. RAVI:  Previously the government introduced

10     Government Exhibit 309.  We have that on the screen right now

11     before you now.  This is the email from Conly Schulte to Scott

12     Tucker attaching an affidavit from Don Brady.  The government

13     seeks to add another, one of the other attachments to this, to

14     the same email, to the same exhibit, but mark it as 309A.

15             THE COURT:  309?

16             MR. RAVI:  A.

17             THE COURT:  8?  A?

18             MR. RAVI:  A, as in Apple.

19             THE COURT:  What's on the screen now is 309A.

20             MR. RAVI:  OK.  And what we plan to do is, the only

21     difference between 309 and 309A is the addition of the last two

22     pages, which is an affidavit of Robert Campbell.  He is

23     treasurer of SFS with the Santee Sioux.  We seek to add this,

24     and we believe there's evidence in the record to establish that

25     this affidavit is false as well.

1       THE COURT:  All right.  Any objection?

2       MR. BATH:  Yes, Judge.

3       THE COURT:  Basis.

4       MR. BATH:  I believe it's hearsay.  If they're not

5  offered for the truth of the matter, I don't have an objection.

6       THE COURT:  The affidavit is certainly not offered for

7  the truth of its content.  No.

8       Are you going to offer this in front of the jury?

9       MR. RAVI:  We're going to offer it, but we're not

10  going to actually publish it at this time.

11       THE COURT:  No, but when you offer it, you're going to

12  offer it in front of the jury, and if Mr. Bath would be kind

13  enough to remind me, if I forget, I'm going to say the

14  attachment is not offered for the truth of its content.

15       MR. RAVI:  Sure.

16       THE COURT:  All right.  What else?

17       MR. BATH:  Judge, I still have an objection to the new

18  and improved page 26 of Government Exhibit 3551.

19       THE COURT:  Can you put the new and improved version

20  up.  All right.

21       And again, it's with regard to the IOLTA account?

22       MR. BATH:  Yes, your Honor.

23       THE COURT:  I still don't know what one is to make of

24  the IOLTA account.  For example, you buy a house.  The down

25  payment goes in the attorney's IOLTA account.  It's not the

1   attorney's money.  He doesn't pay taxes on it.  He doesn't own

2   it.  It's a trust account.  So unless you're differentiating

3   between nature of funds, and I'm repeating myself now, because

4   we've had a discussion of whether they were fees, prepayment of

5   fees to the Muir Law Firm, which the Muir Law Firm over time

6   took down into income.

7           In other words, a client gives you $500,000 in legal

8   fees but you haven't done anything to earn it, and maybe it's a

9   $500,000 payment against a $50,000 a month set-fee retainer,

10  you take down 50,000 a month out of the IOLTA account.  If your

11  point is all of that is money that's going to the Muir Law

12  Firm, that's one thing, but it's entirely different if it's

13  simply that one of your clients is giving you money to hold on

14  a real estate deal or some other type of transaction.  You

15  haven't differentiated that, and this chart doesn't

16  differentiate that.

17          MR. VELAMOOR:  As I understand it, as I understood the

18  points Mr. Bath made yesterday on cross, which is what we were

19  responding to by separating it out, is that, first of all, the

20  point is this money is coming from the portfolio and the AMG

21  accounts, which is to feed money to the entire presentation,

22  money coming from accounts nominally in the name of tribal

23  entities, and some of this money went into the IOLTA account.

24  As I understood it from Mr. Bath's cross-examination, as the

25  Court pointed out, it may be fees that they have already earned

1    or may earn in the future, but they're nonetheless moneys going

2    to the firm, and we've not suggested -- we took out, per the

3    Court's direction, the subsequent arrow suggesting that all of

4    it went to the Muir Law Firm for Tim Muir's personal benefit.

5    Now all it does is point out the total amounts that went to the

6    two different accounts.

7              THE COURT:  Yes, and I'm suggesting it's misleading to

8    the jury.  If the money represents client funds being held

9    separately, it implies that somehow the Muir Law Firm gets some

10   benefit out of it.  They don't even get the interest on the

11   money.  You break out payments to outside law firms because

12   obviously that has nothing to do with Mr. Muir --

13             MR. VELAMOOR:  Right.

14             THE COURT:  -- but you don't distinguish between what

15   was the prepayment of a legal fee to Mr. Muir from what was

16   just something that he held in the account for somebody else.

17             MR. VELAMOOR:  OK.  We'll take out the bottom line.

18   We'll find a way to either redact it or just take out that

19   line.

20             THE COURT:  OK.  And that may actually be the most

21   accurate, because it went into the IOLTA account, and we know

22   that 72,000 went out to outside law firms.  You haven't shown

23   me what came out of the IOLTA account and where it went.

24             MR. VELAMOOR:  That's fine.  For now we can take it

25   out.

1        THE COURT:  All right.  Thank you.

2        Bring our jury in, please.

3        Do you want this back?  Why don't we mark this as

4   3551A.

5        (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated.  I'm going to have

2    marked as Government Exhibit 3551A page 26, revised page 26 of

3    Government Exhibit 3551, which we just had a discussion about.

4          You may continue.

5          MR. VELAMOOR:  Thank you, your Honor.

6          Let's put back up 3551, where we were before, and it

7    should be the 20th page.  OK.  That's fine.

8    Q.  Ms. Espinoza, what's the next thing you're summarizing

9    that's in this section?

10   A.  Payments to Kim Tucker accounts from portfolio and CLK/AMG

11   accounts.

12         MR. VELAMOOR:  Why don't we turn now to the next page.

13   Q.  What's the time period that you summarized for deposits

14   into Kim Tucker's accounts?

15   A.  January 15, 2008, through August 30, 2013.

16   Q.  Again, on this slide and all the other slides, do you list

17   at the bottom the source records of what you're summarizing on

18   the slide at issue?

19   A.  Yes.

20   Q.  In this case you listed different Kim Tucker accounts that

21   are totaled up at the bottom?

22   A.  Yes.

23   Q.  Again, this is money coming from which accounts?

24   A.  Portfolio and AMG -- well, portfolio accounts and then we

25   were reviewing Kim Tucker's accounts, so there is also direct

1    deposits into her accounts.

2    Q.  So you're looking at the destination of Kim Tucker accounts

3    and totaling it up from there?

4    A.  Yes.

5    Q.  Again, the source is these accounts in the names of TFS

6    Corp. and SFS?

7    A.  Yes.

8    Q.  The total up here for this category is what?

9    A.  $5,867,544.

10   Q.  There is also payroll direct deposited from AMG Services?

11   A.  Yes.

12   Q.  Included in that total?

13   A.  Yes.

14   Q.  And what was the total for that?

15   A.  $2,675,949.

16   Q.  Was there also a payroll deposit from CLK Management?

17   A.  Yes, totaling $86,595.

18           MR. VELAMOOR:  All right.  Why don't we go on to the

19   next slide.

20   Q.  OK.  What's displayed on this page?

21   A.  These are examples of the checks deposited from the

22   portfolio accounts into Kim Tucker's accounts.

23   Q.  And so you just displayed some individual checks here?

24   A.  Yes.

25           MR. VELAMOOR:  Why don't we just highlight a check

1    that's in the middle there, middle at the top.

2    Q.  I notice this is paid to the order of Scott Tucker.  How

3    come you included it on this total?

4    A.  Because at the back of the check, it says that the check

5    was deposited into the account ending 8147, which is a Kim

6    Tucker account.

7    Q.  So the total for deposits into Kim Tucker's accounts

8    includes deposits made to the order of Scott Tucker but

9    deposited into a Kim Tucker account?

10   A.  Yes.

11          MR. VELAMOOR:  OK.  Move on to the next.

12   Q.  What is summarized in this section?

13   A.  Payments to Blaine Tucker entities from portfolio and AMG

14   accounts.

15          MR. VELAMOOR:  Move on to the next slide.

16   Q.  OK.  Again, what is the time frame for this?

17   A.  February 7, 2008, through March 31, 2012.

18   Q.  And again, the source accounts are, again, the portfolio

19   accounts in the names of MNE, SFS, BAT, Tucker?

20   A.  Yes.

21   Q.  What's the total that went into Blaine Tucker-related

22   entities?

23   A.  $10,116,464.

24   Q.  Did you define what you mean by Blaine Tucker-related

25   entities?

1  A.  Yes.  At the bottom it says that BAT Services, Lead Flash

2  Consulting and Blaine Tucker personal accounts are included.

3          MR. VELAMOOR:  Let's move up a little bit.

4  Q.  What did you summarize in the next section?

5  A.  We reviewed Muir Law Firm's bank account and looked at

6  portfolio and AMG account money coming in, and then outside

7  payments to law firms.

8          MR. VELAMOOR:  Why don't we move on to the next slide.

9  Q.  And again, what's the time period that you summarize here?

10  A.  January 3, 2008, through August 30, 2013.

11  Q.  So you totaled up the amount of deposits from the portfolio

12  and AMG accounts into the Muir Law Firm checking account?

13  A.  Yes.

14  Q.  And what was that total?

15  A.  $10,703,871.

16  Q.  And there's an arrow pointing out to outside law firms.

17  What does that represent?

18  A.  Any payments to other law firms.

19  Q.  And how did you know what to include in that category?

20  A.  We provided a list of outgoing check payments -- so, the

21  payees -- to government attorneys and agents, and they directed

22  us as to which ones were law firms.

23  Q.  And based on our direction, did you then total the payments

24  to those payees?

25  A.  Yes.

1  Q.  Then did you exclude that total from the bottom circle?

2  A.  Yes, the remainder.

3  Q.  What does that circle below represent?

4  A.  That's the remainder, so that's the 10.7 million less the

5  5.4 million to out outside law firms, and so the remainder is

6  $5,214,536.

7         MR. VELAMOOR:  All right.  Let's move on to the next.

8  Q.  What did you summarize in this?

9  A.  Any payments to Scott Tucker's personal accounts from

10 portfolio and AMG accounts.

11 Q.  And was it just personal accounts, or were they also

12 accounts in the names of entities?

13 A.  This particular slide is Scott Tucker's personal accounts.

14 Q.  Which slide?

15 A.  It says Scott Tucker entities.

16         MR. VELAMOOR:  OK.  Why don't we turn to the next

17 slide.

18         THE WITNESS:  Sorry.  Yeah.

19 Q.  OK.  What is it?

20 A.  This is Scott Tucker entities, not Scott Tucker's personal

21 bank accounts.

22 Q.  When you're distinguishing between personal accounts and

23 entities, what's the difference?

24 A.  Scott Tucker's personal accounts are accounts written in

25 his name whereas these are entities which government agents and

1    attorneys told us are affiliated with Scott Tucker.

2    Q.  OK.  And again, the source of payments in these accounts

3    were the accounts listed in the black box?

4    A.  Yes.

5    Q.  Those are, again, the portfolio and AMG accounts?

6    A.  Yes.

7    Q.  Can you read out the amounts to the different entities?

8    A.  PSB Services received $127,550.  Key Financial Systems

9    Corp. received $800.  CLK Management received $25,565,845.  GEO

10   Capital Services LLC received $58,450.  SCL Services received

11   $1,115,000.  DF Services received $130,000.  NM Services

12   received $5,050,000.  Eclipse Renewables received $8,826,254.

13   Westfund received $637,090.  Black Creek Capital received

14   $30,245,441.  Pinion Management received $437,766.  BA Services

15   received $145,625,588.  ST capital LLC received $4,213,172.

16   Q.  When you add all that up, what do you get?

17   A.  $222,032,966.

18   Q.  And there's a note relating to the BA Services transaction.

19   What does that note mean?

20   A.  The transactions began March 2012, so the money from the

21   portfolio accounts to BA Services started March 2012.

22           MR. VELAMOOR:  All right.  Let's go on to the next.

23   Q.  What do you summarize in this section?

24   A.  Scott Tucker Aspen home payments.

25           MR. VELAMOOR:  Move on to the next slide.

1  Q.  Again, the time period for this?

2  A.  April 10, 2009 through May 14, 2012.

3  Q.  What's the total amount that went to Aspen home-related

4  payments?

5  A.  $8,824,991.

6  Q.  And that includes payments to the entities mentioned in

7  that bubble?

8  A.  Yes.  CMC Aspen Homes LLC, Pitkin County Title.

9  Q.  OK.  And the three boxes above represent what?

10 A.  The source of those payments, so AMG Services, Scott

11 Tucker's personal account and Black Creek Capital.

12 Q.  Why is there -- first of all, the amount coming from AMG

13 Services is what?

14 A.  $4,623,325.

15 Q.  And Black Creek Capital?

16 A.  $183,333.

17 Q.  So the amount from Scott Tucker's personal accounts,

18 $4,018,333?

19 A.  Yes.

20         (Continued on next page)

21

22

23

24

25

1    Q.  How come you included the box above?

2    A.  To show the money coming from portfolio accounts.

3    Q.  The money that went to the Scott Tucker personal accounts?

4    A.  Yes.

5    Q.  So why don't we go on to the next slide.

6        There is an account mentioned in the middle.  Do you see

7    that?

8    A.  Yes.

9    Q.  That's a Plains Capital account?

10   A.  Yes.

11   Q.  In the name of who?

12   A.  Scott Tucker.

13   Q.  Is that the account that's referenced on the previous

14   slide, the personal account you mentioned?

15   A.  Yes.

16   Q.  What are the checks on the left supposed to represent?

17   A.  Those are five checks written from portfolio accounts to

18   Scott Tucker and deposited into his Plains Capital account.

19   Q.  So why don't we just do one check at a time.

20       The date of that check is?

21   A.  February 14, 2012.

22   Q.  That's from Red Cedar?

23   A.  Yes.

24   Q.  In the amount of 3.3 plus million dollars?

25   A.  Correct.

1    Q.  Keep going down.

2        The same date for this one?

3    A.  Yes.

4    Q.  Where is this one coming from?

5    A.  TFS Corp., d/b/a Ameriloan.

6    Q.  What is the total there?

7    A.  $6.9 million.

8    Q.  Keep going down.

9        What is the source here?

10   A.  TFS Corp., d/b/a United Cash Loans.

11   Q.  Same date, right?

12   A.  Yes.

13   Q.  And the approximate amount?

14   A.  $6.2 million.

15   Q.  Go down.

16       Same date?

17   A.  Yes.

18   Q.  The source here?

19   A.  SFS, Inc., d/b/a One Click Cash.

20   Q.  What is the total there?

21   A.  $4.5 million.

22   Q.  The last one.

23       The source here?

24   A.  TFS Corp., d/b/a US FastCash.

25   Q.  Same date?

1    A.  Yes.

2    Q.  What is the total?

3    A.  $3.8 million.

4    Q.  If you total that up, if you total those five checks up,

5    what do you get?

6    A.  $24,975,059.

7    Q.  There is information that you included in a box below that.

8    Can you read that out?

9    A.  "The account balance prior to the deposits is $12,496.70.

10   Interest received between February 14, 2012 and May 14, 2012

11   totals $9,422.61.  No other deposits are received during this

12   time frame."

13   Q.  Does that mean, essentially, that other than around $12,000

14   in prior deposits and $9,000 of interest, there were no other

15   deposits into this Scott Tucker account other than the five

16   checks we looked at?

17   A.  Yes.  That's correct.

18   Q.  But prior to this payment relating to the Aspen home?

19   A.  Yes.

20   Q.  What do you present on this page?

21   A.  This is an example of one of the payments to Pitkin County

22   Title.  It was payable on May 11, 2009 from AMG Services

23   account, ending in 0270, for $1.8 million.

24   Q.  What do you present above that?

25   A.  Checks deposited on the same day, May 11, 2009, from the

1    portfolio accounts, totaling $1.8 million.

2           MR. VELAMOOR:  Why don't we enlarge one of those

3    checks.

4    Q.  This is a check from where?

5    A.  TFS Corp., d/b/a US FastCash.

6    Q.  To where?

7    A.  AMG Services.

8    Q.  What is the amount?

9    A.  $360,000.

10   Q.  What is in the memo line?

11   A.  "Loan for 269 investment."

12   Q.  Is there a similar memo in some of the other checks?

13   A.  Yes.

14   Q.  By the way, what is the date of these checks in the

15   portfolio accounts?

16   A.  May 11, 2009.

17   Q.  Is that the same date as the payment to Pitkin County

18   Title?

19   A.  Yes.

20          MR. VELAMOOR:  We can move forward from that.

21   Q.  What do you present in this slide?

22   A.  Payments to aircraft expenses.

23   Q.  Move to the next slide.

24       What is the time frame for this?

25   A.  March 12, 2009 through January 13, 2012.

1   Q.  And the source of these payments was what?

2   A.  AMG Services.

3   Q.  What payments did you include?

4   A.  Only payments to Spirit Jets, LLC.

5   Q.  Why did you include payments to Spirit Jets, LLC?

6   A.  Because I was instructed to do so by the government.

7   Q.  Let's move on to the next.

8       What do you present in this next slide?

9   A.  Hallinan Capital's settlement account.

10  Q.  On to the next page.

11      What do you present in this page?

12  A.  Payments from the portfolio accounts to AMG Services

13  settlement account, and then payments going out to Hallinan

14  Capital Group.

15  Q.  The AMG Services settlement account, is that different than

16  the AMG Services account we have been talking about previously?

17  A.  Yes.

18  Q.  It's a separate account created for the purpose of each

19  transaction?

20  A.  Yes.

21  Q.  How much money went into that account?

22  A.  $27,501,000.

23  Q.  Where did that money come from?

24  A.  Portfolio accounts and AMG accounts.

25  Q.  Those are accounts in the names of SFS, TFS, and MTE?

1    A.  Yes.

2    Q.  As well as money from AMG's account as well?

3    A.  Yes.

4    Q.  You displayed a page on the right.  Why did you include

5    that page?

6    A.  The government agents and attorneys provided us with this.

7    Q.  So the total amount of money coming from the portfolio

8    accounts was what?

9    A.  27,501,000, and then also 2,500,000.

10   Q.  Where did that money come from?

11   A.  The 27,501,000 came from portfolio accounts.

12   Q.  What about the 2.5 million on the bottom left?

13   A.  It was various sources of that money.

14   Q.  Did it come from AMG Services' Bay Cities account?

15   A.  Yes, into Hallinan Capital Group.

16   Q.  And the total is what?

17   A.  $30 million.

18   Q.  Move on to the next.

19       What is presented here?

20   A.  Payments to Scott Tucker's personal accounts from portfolio

21   accounts.

22   Q.  When you say, again, personal accounts, meaning accounts in

23   Mr. Tucker's name?

24   A.  Yes.

25   Q.  What is the time frame for these payments?

1  A.  February 16, 2012, through March 13, 2013.

2  Q.  So you didn't see any payments like this before February

3  2012?

4  A.  No.

5  Q.  Again, these are moneys coming from the portfolio accounts,

6  right?

7  A.  Yes.

8  Q.  Can you read out the amounts that are coming from each of

9  the different accounts?

10 A.  Red Cedar Services, $22,874,054.

11     TFS Corp., d/b/a US FastCash, $3,825,373.

12     SFS, Inc., d/b/a One Click Cash, $25,572,062.

13     TFS Corp., d/b/a United Cash Loan, $6,258,486.

14     TFS Corp., d/b/a Ameriloan, $6,963,085.

15 Q.  Now, the amounts for SFS and Red Cedar are different,

16 right?

17 A.  Yes.

18 Q.  If you add up the amounts for the three TFS accounts, is

19 the total the same or different as the amount to SFS and Red

20 Cedar?

21 A.  They are different.

22 Q.  The total is what, grand total?

23 A.  $65,493,060.

24 Q.  What did you present in this page?

25 A.  These are some of the payments to Scott Tucker from the

1    portfolio accounts.

2    Q.  Are these line-by-line the payments reflected on the

3    previous slide?

4    A.  Yes.  It's 40 million of the previous slide.

5    Q.  Coming from SFS, Inc. and Red Cedar?

6    A.  Yes.

7    Q.  We can go on to the next.

8        What is presented in this slide?

9    A.  These are the remaining transactions to make up the 65

10   million.  These are five checks from portfolio accounts into

11   Scott Tucker's account, totaling $24.9 million.

12   Q.  Have we seen these payments before?

13   A.  Yes.

14   Q.  Where did we see these payments before?

15   A.  The payments for the Aspen home.

16   Q.  We saw that same $24 million figure?

17   A.  Yes.

18   Q.  These all took place on the same date?

19   A.  Yes.

20   Q.  Move on to the next page.

21       What did you do on this page?

22   A.  I took three checks from the prior slide and overlaid them.

23   Q.  Did you overlay all of the TFS-related slides?

24   A.  The TFS checks, yes.

25   Q.  So the three checks on are the top, right?

1  A.  Yes.

2  Q.  And we put them on top of each other and that's what

3  appears on the bottom?

4  A.  Yes.

5          THE COURT:  What do you mean "on top"?  Explain what

6  you mean you put the three checks on top of one another?

7          THE WITNESS:  Well, I put them in three different

8  colors, and then they are all electronic images, so we just

9  overlaid them on top of each other.

10          THE COURT:  Thank you.

11          MR. VELAMOOR:  Can you just highlight the signature in

12  the bottom check.

13  Q.  What is presented here?

14  A.  Payments to Kansas income tax, IRS, and U.S. Treasury.

15  Q.  Turn to the next page.

16          The heading is what?

17  A.  I'm sorry?

18  Q.  What is the title of this slide?

19  A.  "Example of tracing source of payment to United States

20  Treasury."

21  Q.  Is the payment at issue in this slide the check on the top

22  right?

23  A.  Yes.

24          MR. VELAMOOR:  Why don't we just enlarge that.

25  Q.  What is the amount of this check?

1    A.  $9,500,000.

2    Q.  Where is it going?

3    A.  To United States Treasury.

4    Q.  Where is it coming from?

5    A.  Scott Tucker.

6          MR. VELAMOOR:  Why don't we come out of this.

7    Q.  Now, did you try to follow the money in that check

8    backwards to see where it came from?

9    A.  Yes.

10   Q.  So why don't we start at the bottom right.

11         So there is a square that says "United States Treasury,"

12   right?

13   A.  Yes.

14   Q.  And that's the check that's above.

15         So where did the money come from immediately prior to being

16   paid to the United States Treasury?

17   A.  Scott Tucker's US Bank account ending in 4475.

18   Q.  Then do you see where that money came from when it got to

19   the US Bank account?

20   A.  Yes.  A few days before, on June 13, 2013, 9.5 million was

21   sent from the Midwest Trust -- Scott Tucker's Midwest Trust

22   account ending in 5021 to his US Bank account ending in 4475.

23   Q.  Before the money came from Midwest Trust to the US Bank

24   account, did you look at what was already in the US Bank

25   account?

1   A.  Yes.

2   Q.  Where is that information presented?

3   A.  41.3 million is transferred from Scott Tucker's Pershing

4   account to the Midwest Trust account.

5   Q.  Before the 9.5 came from Midwest Trust to the US Bank

6   account ending in 4475, did you look at what was previously in

7   the US Bank account ending in 4475?

8   A.  Yes.

9   Q.  What is that amount?

10  A.  The balance as of that date was $756,000.

11  Q.  Now, you started to talk about where the money came from

12  when it went to the Midwest Trust account, right?

13  A.  Yes.

14  Q.  Where did that money come from?

15  A.  Scott Tucker's Pershing account.

16        MR. VELAMOOR:  Can we highlight Scott Tucker's

17  Pershing account.

18  Q.  How much did you see going from the Scott Tucker Pershing

19  account to the Midwest Trust account?

20  A.  $41.3 million.

21  Q.  That was on May 14, 2013?

22  A.  Yes.

23  Q.  Similar exercise.  Did you look to see how much was in the

24  Midwest Trust account before that money came from the Scott

25  Tucker Pershing account?

1   A.  Yes.

2   Q.  What did you find for that?

3   A.  There were no other deposits.

4   Q.  Actually, I think that's the one below the Midwest Trust

5   account, right?

6   A.  Yes.

7           MR. VELAMOOR:  Let's highlight the "no other deposits

8   prior to 6/13/13."

9   Q.  So I think we are at the Scott Tucker Pershing account now,

10  right?

11  A.  Yes.

12  Q.  Did you look at where the money came from before it got to

13  the Scott Tucker Pershing account?

14  A.  Yes.

15  Q.  Where did it come from?

16  A.  $40.5 million came from portfolio accounts, and $20.9

17  million came from Scott Tucker's Plains Capital account.

18  Q.  Now, the Scott Tucker Plains Capital account, that was the

19  account we were talking about, the five checks totaling around

20  24 million, right?

21  A.  Yes.

22  Q.  Now, did you look at how much was in the Pershing account

23  before money came from the portfolio accounts to the Plains

24  Capital account?

25  A.  Yes.

1   Q.  How much was in there?

2   A.  There are no other deposits.

3   Q.  Before that money came in, there were no other deposits,

4   but it received some interest totaling around 60,000?

5   A.  Yes.

6           MR. VELAMOOR:  We can go on to the next slide.

7   Q.  Now, what is presented on this slide?

8   A.  Payments from Scott Tucker account to Kansas income tax,

9   Internal Revenue Service, and U.S. Treasury, totaling $54.5

10  million.

11  Q.  So does that include the $9.5 million check we looked at

12  before?

13  A.  Yes, it does.

14  Q.  And the total of all those checks was what?

15  A.  54.5 million.

16  Q.  Did you similarly follow the money backwards in the case of

17  some of these other checks?

18  A.  Yes.

19  Q.  Where did the money ultimately come from?

20  A.  The portfolio and the AMG accounts.

21          MR. VELAMOOR:  We can go to the next.

22  Q.  So what is presented in this section?

23  A.  The summary of the total payments to Scott Tucker and

24  related entities from portfolio and AMG accounts.

25  Q.  In calculating the total, did you take steps to make sure

1    that no money was double counted?

2    A.  Yes.

3    Q.  So this represents totals from some of the different slides

4    we have been looking at before?

5    A.  Yes.

6    Q.  What is the ultimate total that went to Scott Tucker and

7    related entities?

8    A.  $388,152,889.

9         MR. VELAMOOR:  Why don't we go on to the next.

10   Q.  So, lastly, what did you present in the last section here?

11   A.  Nation Management fees that were paid.

12        MR. VELAMOOR:  Let's go to the next slide.

13   Q.  First of all, the time frame here is 2008 through

14   2012/2013.  Why is that?

15   A.  Because for moneys to Scott Tucker we were able to go up

16   until 2013, but for moneys to Nation Management fees we only

17   had data up until 2012.

18   Q.  The left column is the total that we have just looked at

19   before, right?

20   A.  Yes.

21   Q.  Based on review of the bank records?

22   A.  Yes.

23   Q.  What did you actually rely on for the Nation Management

24   fees total?

25   A.   Internal AMG summaries, which listed out the portfolio

1    names and the amounts paid to Nation Management fees by year.

2    Q.  Those appear to be financial records of AMG itself?

3    A.  Yes.

4    Q.  Did you also try to calculate using the bank records what

5    the Nation Management fees total was?

6    A.  Yes.

7    Q.  Did the total from the bank records come out lower or

8    higher?

9    A.  Lower.

10   Q.  You used the higher number here?

11   A.  Yes.

12   Q.  So it's possible there were some payments that didn't

13   include Nation Management fees on the memo line?

14   A.  That's correct.

15   Q.  On the next page, did you include a slightly different

16   comparison?

17   A.  Yes.

18   Q.  Limiting both sides to 2008 through 2012?

19   A.  Yes.

20   Q.  So the total for Scott Tucker is what?

21   A.  294.73 million.

22   Q.  And the Nation Management fees total?

23   A.  41 million.

24            MR. VELAMOOR:  No further questions, your Honor.

25            THE COURT:  You may cross-examine.

1           (Continued on next page)

2    CROSS-EXAMINATION

3    BY MR. GINSBERG:

4    Q.  I just have a few questions.

5        I just want to go to those last two pages where you

6    compared the Scott Tucker receipts to the Nation Management

7    fees.  And the next-to-last page has Scott Tucker's receipts

8    through 2013, is that correct?

9    A.  I'm sorry.  I don't have it in front of me.  But one is

10   comparing to 2013 and one is comparing to 2012.

11   Q.  This is the page I was referring to.  I'm sorry.

12       It shows Scott Tucker receipts 2008 to 2013, correct?

13   A.  Yes.

14   Q.  The Nation Management fees only go up to 2012?

15   A.  Yes.

16   Q.  And what was the reason for that, that it only went to 2012

17   for the Nation Management fees?

18   A.  The data we were provided with only went up to 2012.

19   Q.  Who provided you with the data?

20   A.  Government agents and attorneys.

21   Q.  So they didn't provide you with the Nation Management fees

22   information for the year 2013?

23   A.  No.

24   Q.  But they did provide you with the 2013 receipts for Scott

25   Tucker?

1  A.  We had bank statements up until 2013.

2  Q.  But you weren't provided with 2013 information by the

3  government for the Nation Management fees, correct?

4  A.  Correct.

5  Q.  Were you ever provided with a cash balance report for

6  Nation Management fees as of August 31, 2013 that showed that

7  Nation Management had $117 million in its account?

8  A.  I don't believe so.

9  Q.  Are you aware of that at all, that document at all?

10  A.  No.

11  Q.  In any event, let's take the page that we are looking at.

12          The Scott Tucker receipts totaled $388 million, is

13  that correct?

14  A.  Yes.

15  Q.  And the Nation Management fees, although they are one year

16  less, total $41 million, is that correct?

17  A.  Yes.

18  Q.  So if you took those two numbers and combined them, would

19  that be approximately $429 million, the 388 and the 41?

20  A.  Yes.

21  Q.  What percentage then, if it's 429, what percentage would

22  $41 million be of the total?

23  A.  About 1 percent?  You're saying 41 million out of --

24  Q.  429 million.

25  A.  That's 10 percent?

H9S8TUC4                    Espinoza - Cross

Q.  You're the accountant.  10 percent or 1 percent?

A.  10 percent.

        THE COURT:  Let me ask you a question.  When you refer

to Nation Management fees, tell me again, what is included in

that concept, as you use it on your chart?

        THE WITNESS:  We were provided with summaries, and

they were titled Nation Management fees.

        THE COURT:  So that's all you know?

        THE WITNESS:  Yes.

        THE COURT:  OK.

Q.  To the best of your understanding, did that mean to

represent fees that were obtained by tribes, Native American

tribes, as a result of the payday lending business?

A.  I'm not 100 percent sure.  I'm not familiar with that.

Q.  The government didn't tell you what those two things

represented?

        The Scott Tucker receipts we know, right?  You know

what that means, right?

A.  Yes.

Q.  The government didn't tell you what Nation Management fees,

what that alternative represented?

A.  No.

Q.  You didn't know what two things you were comparing, what

Scott Tucker's receipts were being compared to when you

compared it to the Nation Management fees?

1  A.  Not in detail, no.

2  Q.  What do you mean by not in detail?  Did you have some idea

3  presented to you by the government that that second number

4  represented fees earned by some other entity other than

5  entities related to Scott Tucker?

6  A.  Yes.  I know they were non-Scott Tucker related entities.

7  Q.  Did you know what non-Scott Tucker entities they

8  represented?

9  A.  Well, we had seen checks, and some of them said tribal

10  distributions, Nation Management fees, things of that nature.

11  Q.  So you saw the checks and you saw those kinds of words

12  written on the checks, is that correct?

13  A.  That's correct.

14  Q.  But you weren't told or no other description was given to

15  you other than Nation Management fees to use in this chart, is

16  that correct?

17  A.  That's correct.

18  Q.  And that's because you derived all of your underlying

19  information from the government, correct?

20  A.  What is displayed is, we relied upon the government telling

21  us what to display.

22  Q.  And what to put into the chart, correct?

23  A.  Not the numbers, but the concept, yes.

24  Q.  If you go to the last page, where we had 294 million, Scott

25  Tucker receipts going through 2012, and Nation Management fees

1  going through 2012, and you took the total of those two, it

2  would be approximately $335 million total, $336 million total?

3  A.  Yes.

4  Q.  And what would $41 million represent as a percentage of

5  that total?

6  A.  Perhaps around 9 percent.

7  Q.  You want to think about that again?

8          THE COURT:  Do you have a calculator, Mr. Ginsberg?

9          MR. GINSBERG:  That's why I became a lawyer, but I do

10  have one.

11  Q.  We are talking about 41 million.

12          THE COURT:  If you have a calculator, why don't you

13  give it to the witness.  If you don't, you don't.

14          MR. GINSBERG:  I have my cell phone, which has on it

15  someplace a calculator.

16          We have one.

17          I am handing a cell phone with a calculator on it to

18  the witness.

19          THE WITNESS:  I apologize.  Most of our calculations

20  are done in Excel.

21  Q.  So let's first do it this way, the old-fashioned the way.

22  Let's add 294.73 million, plus 42 million, and come up with a

23  total number.

24  A.  335 million point 73.

25  Q.  Now, let's determine what percentage $41 million is of 335

1    million point 73.

2    A.  It's 12 percent.

3    Q.  Thank you.

4         MR. GINSBERG:  No further questions.

5         THE COURT:  Any redirect?

6         MR. VELAMOOR:  Very briefly.

7         THE COURT:  Oh, I'm sorry.  Mr. Bath.

8    CROSS EXAMINATION

9    BY MR. BATH:

10   Q.  How long have you been working on this project?

11   A.  About four years.

12   Q.  Were you the only one working on it or were you the lead of

13   your group?

14   A.  I was the lead of the group.

15   Q.  How many in the group?

16   A.  We had four or five people.

17   Q.  I'm sorry.  You are an accountant and CPA?

18   A.  Yes.

19   Q.  Are they all CPAs?

20   A.  No.

21   Q.  How many CPAs in the group?

22   A.  Four.

23   Q.  How many hours do you estimate you spent in the last four

24   years working on this project?

25   A.  I'm not sure.  It's a lot.

1   Q.   Thousands?

2            THE COURT:  Don't guess.  If you can estimate, you can

3   estimate, but don't guess.

4   A.   I'm not sure.

5   Q.   How many hours do you think you spent?

6   A.   I'm not sure of that either.

7   Q.   What percentage of your time in the last four times has

8   been spent on this project?

9   A.   Of my total time?

10  Q.   Yes.

11  A.   Maybe 10 percent.

12  Q.   Over four years?

13  A.   Yes.

14  Q.   Do you know what the billing to the United States

15  government was for your project?

16           MR. VELAMOOR:  Objection.

17           THE COURT:  Overruled.

18  A.   Yes.

19  Q.   How much was the United States billed for this?

20  A.   Approximately $460,000.

21  Q.   You looked at a lot of documents?

22  A.   Yes.

23  Q.   Spent a lot of hours putting together numbers, etc.,

24  correct?

25  A.   Correct.

1   Q.  They are not all banking records, but they are spreadsheets

2   as well, correct?

3   A.  Yes.  Both.

4   Q.  You were provided access to those documents so you could

5   come up with these calculations, correct?

6   A.  Yes.

7           MR. BATH:  Could we put up page 26?

8           Can we take that down.

9           Does the government have a corrected 26 to put up?

10  Q.  I don't have it up on my screen, but I can ask you

11  questions.  Do you have it?

12  A.  Yes, I do.

13  Q.  What this tells us is you looked at moneys that went to The

14  Muir Law Firm, correct?

15  A.  Yes.

16  Q.  And your group calculated there was about 10.7 million over

17  the years that went into the law firm account, correct?

18  A.  Yes.

19  Q.  And then you calculated what went to outside law firms,

20  correct?

21  A.  Yes.

22  Q.  But you did that based on a list of names given to you by

23  investigators, correct?

24  A.  Well, we provided the list of names to them.

25  Q.  You provided a list of all names of all checks that went

1   out from The Muir Law Firm to the investigators?

2   A.  Yes.

3   Q.  And then they came back and told you which ones were law

4   firm related?

5   A.  Correct.

6   Q.  So assuming that's accurate, what your calculation was is

7   that $5.4 million went to other law firms, is that right?

8   A.  Yes.

9   Q.  And a little less than that went to The Muir Law Firm

10  account, is that right?

11  A.  It remained in that account, yes.

12  Q.  That's what I mean.  The split was more went out to other

13  law firms, according to this chart, than was in The Muir Law

14  Firm account?

15  A.  Yes.

16  Q.  And you didn't do any kind of calculation on how many hours

17  were billed by The Muir Law Firm or anything like that?

18  A.  No.

19  Q.  You weren't asked to do that, correct?

20  A.  That's correct.

21          MR. BATH:  Thank you so much.

22          THE COURT:  Redirect.

23  REDIRECT EXAMINATION

24  BY MR. VELAMOOR:

25  Q.  Just a couple of questions.

1    MR. VELAMOOR:  Put that slide back up there.

2    Is it back up on the screen?

3    THE COURT:  Do you have it, ladies and gentlemen?  You

4  have got it.

5  Q.  Just to be clear, the total from outside law firms, you see

6  that number, 5.4 million?

7  A.  Yes.

8  Q.  That's all the money that came from The Muir Law Firm

9  checking account to outside law firms, right?

10 A.  That's correct.

11 Q.  But we took a conservative approach because --

12    MR. GINSBERG:  Objection, your Honor.

13    THE COURT:  Rephrase your question, without the "we"

14 and the "conservative" and all the rest of it.  Do it all over

15 again.

16 Q.  The total amount that came from the portfolio and AMG

17 accounts was 10.7 million, correct?

18 A.  Correct.

19 Q.  We did not --

20    THE COURT:  Strike the "we."

21 Q.  There was no effort to ensure that the outside law firm

22 money was related in any way to portfolio and AMG account

23 issues, correct?

24 A.  No.  We provided a listing to the government agents, and

25 they told us which law firms to include.

1   Q.  So we included all payments to outside law firms regardless

2   of ultimate source?

3   A.  Yes.

4           MR. VELAMOOR:  We can take that down.

5   Q.  Now, you were asked some questions about the amount of

6   money paid to RGL, correct?

7   A.  Yes.

8   Q.  As well as the length of the time that you worked on this

9   project, right?

10  A.  Correct.

11  Q.  RGL was retained several years ago, correct?

12  A.  Yes.

13  Q.  And has provided assistance in connection with the entire

14  investigation, correct?

15  A.  Correct.

16  Q.  And that has been going on for a few years, as you said,

17  right?

18  A.  Yes.

19  Q.  And that includes projects entirely unrelated to anything

20  that appeared in these slides, correct?

21  A.  Yes.

22  Q.  In fact, the vast majority of the work relating to --

23          MR. GINSBERG:  Objection.  Leading.

24          THE COURT:  It's allowed.

25  Q.  The vast majority of work relating to these slides took

1    place over the last few weeks, correct?

2    A.  That's correct.

3    Q.  As well as the vast majority of RGL's billings to the

4    government, correct?

5    A.  That's correct.

6    Q.  Now, you were also asked some questions about what

7    direction you were given from the government and what you

8    totaled yourself, correct?

9    A.  Yes.

10   Q.  Now, government agents directed you what totals to make,

11   right?

12   A.  What to summarize.

13   Q.  What to summarize, correct?

14       What to include in the summaries?

15   A.  That's correct.

16   Q.  But the math was yours?

17   A.  Yes.

18   Q.  The review of the bank records was yours?

19   A.  Yes.

20   Q.  And the review of the spreadsheets was yours?

21   A.  Yes.

22           MR. VELAMOOR:  Nothing further, your Honor.

23           THE COURT:  You may step down.

24           (Witness excused)

25           MR. RAVI:  At this time, your Honor, the government

would like to withdraw admission of Government Exhibit 309 and

offer Government Exhibit 309A, as in apple.

THE COURT:  All right.  Any objection?

MR. BATH:  Pursuant to what we discussed earlier,

Judge.

THE COURT:  Ladies and gentlemen, the attachment to

309A is not admitted for the truth of its contents but for the

fact that it was said.

(Government's Exhibit 309A received in evidence)

MR. RAVI:  Can we just briefly publish the attachment,

the second page from the end, so that the jury knows what we

are referring to.

If you can just zoom in on the affidavit of Robert

Campbell.

Go to the next page.

Zoom in on paragraph 7.

Highlight the last clause, beginning with "the loan

transactions."

You can take that down.

Government now offers Government Exhibit 5005, which

is a factual stipulation.

THE COURT:  Any objection?

MR. GINSBERG:  Not if we stipulated to it.

THE COURT:  Received.

(Government's Exhibit 5005 received in evidence)

1      MR. RAVI:  Please publish that for the jury so they

2  can follow along.

3      "It is hereby stipulated and agreed by and among the

4  United States of America --"

5      THE COURT:  It's before the jury.  They can read the

6  intro paragraph.

7      Go ahead.

8      MR. RAVI:  I will start at paragraph 1.

9      "1.  On October 28, 1997, Scott Tucker, the defendant,

10  filed a voluntary petition for personal bankruptcy (also known

11  as 'the bankruptcy petition').  In his bankruptcy petition,

12  Tucker made materially false and misleading statements.

13      "In response to a question on the bankruptcy petition

14  asking Scott Tucker, the defendant, to list the names and

15  addresses of all businesses in which he was an officer,

16  director, partner, or managing executive of a corporation,

17  Tucker falsely answered 'none.'  In truth and in fact, on

18  September 19, 1997, Scott Tucker, the defendant, formed

19  National Leasing Service, Inc. and served as president of NLS.

20      "In response to a question on the bankruptcy petition

21  asking Scott Tucker, the defendant, to disclose his stock and

22  interests in incorporated and unincorporated businesses, Tucker

23  falsely answered 'none.'  In truth and in fact, Tucker owned

24  shares of NLS, which was incorporated in the state of Missouri.

25      "In response to an inquiry on the bankruptcy petition

1 asking Scott Tucker, the defendant, to disclose creditors

2 holding secured and unsecured claims against him, Tucker failed

3 to disclose that Hallinan Capital Corp. ('Hallinan Capital')

4 had a secured claim against certain of Tucker's stock of NLS.

5 In truth and in fact, Tucker had pledged stock of NLS to

6 Hallinan Capital in exchange for a revolving line of credit of

7 up to $500,000 from Hallinan Capital.

8         "Scott Tucker, the defendant, signed a bankruptcy

9 petition, below language, stating, 'I declare under penalty of

10 perjury that the information provided in this petition is true

11 and correct.'

12         "On March 9, 1998, Scott Tucker, the defendant,

13 successfully received bankruptcy protection."

14         On the third page, it's signed by the parties and

15 states, "It is further stipulated and agreed that this

16 stipulation is admissible in evidence at trial."

17         THE COURT:  And it's a stipulation only with Mr.

18 Tucker, not with Mr. Muir, is that correct?

19         MR. RAVI:  That is correct.

20         THE COURT:  So it may only be considered as to Mr.

21 Tucker.  And again, the truth of the facts established in the

22 stipulation, or the facts in the stipulation are treated as

23 proven, but the weight or significance, if any, of them is

24 entirely up to you, ladies and gentlemen.

25         MR. RAVI:  Finally, the government introduces

1    Government Exhibit 4014.

2              THE COURT:  I should also say that evidence of that

3    nature is not a substitute for proof of the crimes charged, nor

4    may it be considered on issues of the defendant's character or

5    propensity in any respect.  It only goes to shed light on

6    absence of mistake and intent of the crimes charged in the

7    indictment.

8              Go ahead.

9              MR. RAVI:  The government offers Government Exhibit

10   4014.

11             THE COURT:  Any objection?

12             MR. GINSBERG:  No, your Honor.

13             THE COURT:  Received.

14             (Government's Exhibit 4014 received in evidence)

15             MR. RAVI:  Publish the first page and if we can zoom

16   in on "company legal name" and the company following it.

17             Zoom out of that.

18             Now zoom in starting with "entity," with the "X" next

19   to Corp. in the middle of the page, and with the two officers

20   and directors below that.

21             Go now to the fourth page and zoom in beginning with

22   the last paragraph, "company acknowledges," and then the

23   signature and the date.

24             Highlight that first sentence, as well as the date.

25             If you can go now to the second page.

1           Focus on paragraph 3 and the lines below it.  Just the

2    immediately below paragraph.

3           Just highlight the question in number 3.

4           Focus on number 4.

5           Focus on number 7.

6           If you can go to the first page and zoom in on the

7    very top right.  It says "Intercept EFT."

8           We can take that down.

9           THE COURT:  So, ladies and gentlemen, as with the

10   prior exhibit, this evidence was offered to endeavor to

11   establish what the government views as Mr. Tucker's intent and

12   knowledge and the absence of mistake or accident as to the

13   offenses charged in the indictment.

14          You may not consider this evidence as a substitute for

15   proof that Mr. Tucker committed the crimes charged in the

16   indictment, nor may you consider this evidence as proof that

17   Mr. Tucker has a criminal personality or bad character or

18   propensity to commit any kind of crime.

19          The evidence may only be used for the limited purpose

20   that I have described and may not be considered by you as to

21   Defendant Timothy Muir.

22          MR. RAVI:  At this time, the government rests.

23          THE COURT:  All right.  Ladies and gentlemen, this is

24   also a good time for a mid-afternoon break.  We will take ten

25   minutes and we will be back in action.

1    (Jury exits courtroom)

2    THE COURT:  Mr. Ginsberg.

3    MR. GINSBERG:  Respectfully, your Honor, I would move

4    under Rule 29(a) for a judgment of acquittal on behalf of Scott

5    Tucker on the grounds that there is insufficient evidence to

6    prove any of the charges brought against him in the indictment

7    based upon the government's presentation and the facts put

8    before the jury.

9    THE COURT:  Mr. Bath.

10   MR. BATH:  We have the same motion.  Thank you, Judge.

11   THE COURT:  Anything the government wishes to say in

12   response?

13   MR. SCOTTEN:  Your Honor, we believe we have submitted

14   sufficient proof of all the elements of all crimes charged.

15   THE COURT:  I am going to deny the motion, and if

16   necessary, at a later point in time, I will elaborate reasons,

17   if there is a need for a post verdict motion, but I have been

18   through the indictment, each of the charges, with the evidence

19   in this trial in mind, and in my judgment there is sufficient

20   evidence to make out a case under each count.

21   We will be in recess for ten minutes.

22   Yes, sir.

23   MR. GINSBERG:  We have a little bit of an unusual

24   situation with the first defense witness.  The government has

25   agreed to immunize this witness.  They were going to call him,

1    but they didn't.  So we have to bring the witness in, and I

2    guess, I have never done this before, but I guess I have to

3    first ask him some questions, have him assert his Fifth

4    Amendment.

5        THE COURT:  You want to do that now and then we can

6    take our recess?

7        MR. GINSBERG:  Yes, sure.

8        I may need some help from the Court.  It's my first

9    time with that.

10       THE COURT:  I think as a member of the bar, Mr.

11   Velamoor will be happy to give you tips and ideas on how to do

12   this, but I know you're a good, careful observer of the

13   process, and you have seen it twice in this trial, and I am

14   confident you will get it done.

15       MR. GINSBERG:  May the witness take the witness stand?

16       THE COURT:  Yes.

17       The defense calls.

18       MR. GINSBERG:  Chief Tom Gamble.

19    TOM GAMBLE,

20        called as a witness by the defendant,

21        having been duly sworn, testified as follows:

22       THE DEPUTY CLERK:  State your name and spell it for

23   the record, please.

24       THE WITNESS:  Tom Gamble, T-O-M, G-A-M-B-L-E.

25       THE COURT:  You may inquire.

1          (Continued on next page)

2     DIRECT EXAMINATION

3     BY MR. GINSBERG:

4     Q.  First of all, would you prefer to be called Mr. Gamble or

5     Chief Gamble?

6     A.  I respectfully invoke my Fifth Amendment.

7          THE COURT:  In this courtroom it's going to be

8     Mr. Gamble.

9          Go ahead.

10         MR. GINSBERG:  OK.  Fine.

11    Q.  Mr. Gamble, at some point in time, were you chief of the

12    Miami Tribe of Oklahoma?

13    A.  I invoke the Fifth Amendment.

14    Q.  Mr. Gamble, at some point were you involved with the Miami

15    Tribe of Oklahoma in a payday lending business that the tribe

16    was involved in?

17    A.  I invoke the Fifth Amendment.

18    Q.  If I were to ask you any other questions along these same

19    lines, Mr. Gamble, would it be correct that you would invoke

20    your Fifth Amendment rights as well as to each one of those

21    questions?

22    A.  Yes.

23         THE COURT:  I have been handed up by the defendant an

24    application for immunity prepared by the government, and I

25    would invite you to inquire as to whether the individual is

1    familiar with the terms of it, that it does not cover false

2    statements or perjury, and that if immunized, he would comply

3    and testify and testify truthfully.

4          MR. GINSBERG:  Thank you, your Honor.

5    BY MR. GINSBERG:

6    Q.  Mr. Gamble, have you received and reviewed an application

7    for immunity with your attorney?

8    A.  Yes.

9    Q.  In fact, is your attorney present here in court?

10   A.  Yes.

11   Q.  Did you review that document with him at some point earlier

12   today?

13   A.  Yes.

14   Q.  Did you understand his explanation of the terms that are

15   contained in that document?

16   A.  Yes.

17   Q.  Did he answer any questions that you had regarding the

18   nature of the document and the meaning of the document?

19   A.  Could you repeat?

20   Q.  Did he answer any questions you may have had regarding the

21   nature of the document and anything that was contained within

22   the document?

23   A.  Yes.

24   Q.  Do you understand that if your immunity is conferred upon

25   you, you cannot be prosecuted for testimony that you give here

1   today in relation to the questions that you will be asked

2   regarding the payday lending business and other matters related

3   to that in relation to your positions and membership in the

4   Miami Tribe of Oklahoma?

5   A.  Yes.

6   Q.  Do you also understand that, notwithstanding immunity that

7   you may be given, you could still be prosecuted for making any

8   false statements or committing perjury while you're testifying

9   in this proceeding?

10  A.  Yes, I do.

11  Q.  Are you willing and prepared to comply with the terms of

12  that agreement knowing that you are required to tell the truth

13  about everything that you testify to, and that if you give a

14  false statement, you may still be prosecuted for making the

15  false statement or for perjury?

16  A.  Yes.

17          THE COURT:  Government satisfied with the inquiry?

18          MR. VELAMOOR:  Yes, your Honor.

19          THE COURT:  All right.  I have reviewed the

20  application for immunity.  I find it is well supported, and I

21  am going to sign the order.

22          I have now signed it, and I deem it filed in open

23  court together with the application for immunity.

24          Anything further?

25          MR. GINSBERG:  No.  Not until we continue.

1        THE COURT:  Thank you very much.  We are in recess.

2        (Recess)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H9sWtuc5                      Gamble - Direct

1        (Jury present)

2        THE COURT:  Please be seated.

3        The defense may call its first witness.

4        MR. GINSBERG:  Your Honor, the defense calls Tom

5   Gamble.

6        THE COURT:  Mr. Gamble, if you'd please stand.

7    TOM GAMBLE,

8        called as a witness by the Defense,

9        having been duly sworn, testified as follows:

10        THE COURT:  You may inquire.

11   DIRECT EXAMINATION

12   BY MR. GINSBERG:

13   Q.  Mr. Gamble, if you wish, you can pull the microphone a

14   little closer to you.  That may be easier.

15   A.  Thank you.

16   Q.  Mr. Gamble, are you a member of any Native American tribes?

17   A.  Yes, I am.  The Miami Tribe of Oklahoma.

18   Q.  Where were you born and raised?

19   A.  I was born in Roff, Oklahoma and raised in southern

20   California.

21   Q.  And tell us about your schooling, please, how far you went

22   in school.

23   A.  I graduated high school, went two years of junior college

24   with no degree.  Came back to attend a trade school for water,

25   waste water technologies in Neosho, Missouri.

1    Q.   You said Neosho, Missouri?

2    A.   Neosho.

3    Q.   Can you spell that?

4    A.   N-E-O-S-H-O.

5    Q.   And after you completed your studies at vocational school,

6    did you begin working?

7    A.   Yes, I did.  I became a operator and superintendent of a

8    community water supply in Searcy, Arkansas, on a lake.

9    Q.   And was that business in connection with the kind of

10   studies that you had done?

11   A.   Yes, it was.

12   Q.   And for how long did you remain at that job?

13   A.   I wasn't down there long.  Approximately a year.

14   Q.   And what kind of work did you do after that?

15   A.   I hired on to an industrial plant where I was industrial

16   waste operator.

17   Q.   And where was that located?

18   A.   That was located in Joplin, Missouri.

19   Q.   For how long were you working in Joplin?

20   A.   Approximately eight years.

21   Q.   And after that, did you have another job?

22   A.   Yes, I did.  I went to work for a privately owned water

23   company in Joplin, Missouri.

24   Q.   And for how long did you do that?

25   A.   I was there about 14 years.

1    Q.   Now, would that take us up to about 2000?

2    A.   2000.  Yes, it would.

3    Q.   In approximately 2000, did you begin any kind of formal

4    working relationship with the Miami Tribe of Oklahoma?

5    A.   Yes, I did.

6    Q.   And how did that come about?

7    A.   I was asked by a relative if I would join a board of

8    directors for economic development.

9    Q.   And that was for the Miami Tribe of Oklahoma?

10   A.   That was for -- yes.

11   Q.   And did you agree to do that?  Did you agree to do that?

12   A.   Yes, I did.

13   Q.   And did you then have to move to Oklahoma to do that work?

14   A.   No, sir.  Basically, the beginning was one meeting a month.

15   Q.   And what was the first position; was there a title to that

16   first position that you had with the Miami Tribe of Oklahoma?

17   A.   I was on the board of directors for the MBDA, Miami

18   Business Development Authority.

19   Q.   And what was the purpose of the Miami Business Development

20   Authority?

21   A.   To, to build and sell class II bingo machines.

22   Q.   And when you became a member of the MBDA, to your

23   knowledge, had that board just been established, or had it been

24   in operation already?

25   A.   No.  It was a new, it was a new venture for the Miami.

1  Q.  Beyond the operation you told us about that they were going

2  to get started, was there other purposes for the tribe to have

3  this new Miami Business Development Authority established?

4  A.  Revenue stream for -- and economic development.

5  Q.  And when you say revenue stream and economic development,

6  is it fair to say that would be to create new businesses for

7  the tribe?

8  A.  Create new businesses to support, to support tribal

9  efforts.

10 Q.  And what specifically did you do as a member of the MBDA

11 when you first came on board?

12 A.  We would attend board meetings once a month and go over

13 some of the activities and help, help guide that particular

14 entity.

15 Q.  And were the board meetings held on tribal land?

16 A.  Yes, they were.

17 Q.  So did you have to travel from wherever you were living at

18 that time to Miami?

19 A.  Yes.

20 Q.  And did there come a time when your role increased with the

21 Miami Tribe of Oklahoma?

22 A.  Yes, it did.  Shortly after becoming a board member, we --

23 the Miami applied for a economic development grant called the

24 ICDBG, which is an NEG development and then I was asked at that

25 time by Chief Leonard if I would manage that program.

1    Q.  You said Chief Leonard?

2    A.  Chief Leonard, yeah.

3    Q.  So he was chief of the tribe at that time?

4    A.  Yes.

5    Q.  Approximately what year was that?

6    A.  2000.

7    Q.  And did you agree to take on that role?

8    A.  Yes.

9    Q.  Was that a full-time position?

10   A.  Yes, it was.

11   Q.  And did you then move to Miami?

12   A.  No.

13   Q.  So you still were living somewhere else, but you took this

14   on as a full-time position, is that correct?

15   A.  Yes, I did.

16   Q.  And what work did you do in taking on this new role that

17   Chief Leonard asked you to assume?

18   A.  I was the grant administrator, so I overseen the grant and

19   the finances plus overseeing the building project.

20   Q.  And just going back for a second to the MBDA, were you

21   aware when the MBDA was created what process, if any, the tribe

22   had to go through to create that specific organization?

23          THE COURT:  I'm not sure I can see the relevance to

24   this.

25          MR. VELAMOOR:  Objection, your Honor.

1      THE COURT:  Sustained.

2  BY MR. GINSBERG:

3  Q.  Did the tribe -- were there any rules that you're aware of

4  or regulations of the tribe to create such an organization for

5  the tribe's purposes?

6      MR. VELAMOOR:  Same objection.  Relevance.

7      THE COURT:  Sustained.

8  Q.  How many people were on the MBDA board?

9      MR. VELAMOOR:  Same objection.  Relevance, not the --

10     THE COURT:  I didn't hear.

11     MR. VELAMOOR:  I don't believe this is the loan

12  business.

13     THE COURT:  Unless it has --

14     MR. GINSBERG:  This is the background to how he gets

15  there.

16     THE COURT:  All right.  Sustained.

17  BY MR. GINSBERG:

18  Q.  Did there come a time where you did things other than

19  working on the initial project and working as the grant

20  administrator for the tribe?  Did you begin to do anything else

21  for the tribe?

22  A.  I don't understand your question, sir.

23  Q.  In 2001, was there a first and second chief of the tribe?

24  A.  Yes, OK.

25  Q.  And in 2001, did something happen to the second chief?

H9sWtuc5                    Gamble - Direct

1  A.  The second chief, Wayne passed away, suddenly passed away.

2  Q.  Were you asked by anyone to do anything in relation to the

3  fact that he had passed away and there was this vacant

4  position?

5  A.  Yes, sir, I was asked by Chief Leonard to run for the

6  vacant position on the next annual meeting.

7  Q.  And did you do so?

8  A.  Yes, I did.

9  Q.  And were you elected?

10  A.  Yes, I was.

11  Q.  And what was your position then once you were elected?

12  A.  Second chief.

13  Q.  And when you became second chief, did you assume any other

14  duties or obligations in relation to the Miami Tribe of

15  Oklahoma?

16  A.  Not at first.

17  Q.  And did there come a time when you did assume other roles

18  for the Miami Tribe of Oklahoma?

19  A.  I continued to, to be a part of what we called the

20  infrastructure officer, where I developed different buildings

21  and infrastructure that the tribe grew.

22  Q.  As second chief, did you attend various meetings?

23  A.  Yes.

24  Q.  And were these meetings of various tribal organizations or

25  tribal council meetings?

H9sWtuc5                    Gamble - Direct

1    A.  Yes, sir, business committee met on the second Tuesday of

2    every month.

3    Q.  And in fact, at these meetings, were you asked from time to

4    time to appear when the chief could not appear?

5    A.  Yes.

6    Q.  And during the time that you began to attend these

7    meetings, did there come a time when you learned about the

8    involvement of the Miami tribe in connection with the payday

9    lending business?

10   A.  Yes.

11   Q.  And about when did that occur?

12   A.  That occurred in approximately '03.

13   Q.  And between the time that you were elected second chief in

14   '03, did you continue to perform the other job functions that

15   you told us about?

16   A.  Yes, I did.

17   Q.  And did you attend, did you regularly attend various

18   meetings of the tribe?

19   A.  Yes, I did.

20   Q.  Now, in '03, what position did you hold when you first

21   learned about the lending business that the tribe was involved

22   in?

23   A.  Infrastructure officer.

24   Q.  Were you still also second chief at that time?

25   A.  Yes, I was.

1    Q.  And did you attend any meetings as a second chief or in any

2    other role that you had where the payday lending business was

3    discussed?

4    A.  No, I wasn't -- no, I didn't.

5    Q.  And how did you first become aware of the Miami tribe's

6    involvement in the payday lending business?

7    A.  You know, I think I became aware of just the word of mouth.

8    Q.  Through word of mouth?

9    A.  Yeah.

10   Q.  OK.  Was there a later period of time when you understood

11   that the tribe was involved in the payday lending business for

12   the purpose of economic development?

13   A.  Yes.

14   Q.  And was that in and about 2003?

15   A.  Yes, it was.

16   Q.  And at that time did you learn and understand what kind of

17   regulations or rules the tribe had to be involved in in order

18   to participate in the loan business?

19   A.  We signed the, it was transferred to the MNE and they

20   signed an agreement.

21   Q.  And when you say it was transferred to the MNE, what was

22   transferred to the MNE?

23   A.  The economic development.

24   Q.  And what is the MNE again?

25   A.  Miami business enterprises, but I believe at the time it

1   was called the MTBE, which was the Miami tribal business

2   enterprises.

3   Q.  And was that an authorized subdivision of the tribe itself?

4   A.  Yes, it was always.  MBDA -- MNE was a political

5   subdivision.

6   Q.  And when it was transferred, did you play any role, were

7   you involved in the transfer procedure?

8   A.  No, I wasn't.

9   Q.  Was that transfer procedure done, to your knowledge,

10  through any of the tribal council or tribal committee meetings?

11  A.  Chief Leonard.

12  Q.  Chief Leonard?

13  A.  Yes.

14  Q.  You mean Chief Leonard was the one who put this into place

15  and made the transfer occur?

16  A.  Yes.

17  Q.  Yes?

18  A.  Yes.

19  Q.  And you became aware of it, but you weren't involved

20  directly in it, is that correct?

21  A.  But I wasn't -- yes.

22  Q.  OK.  Now, at some point in time, were you elected chief of

23  the Miami Tribe of Oklahoma?

24  A.  Yes.

25  Q.  And when was that?

1   A.  '10.

2   Q.  2010?

3   A.  Yes.

4   Q.  Prior to 2010 but after you first learned about the payday

5   lending business, did you participate on any of the boards or

6   councils where the payday lending business was discussed?

7   A.  Yes.

8   Q.  And when did you first participate in any of the board or

9   council meetings when the payday lending business was being

10  discussed?  Approximately what year would that be?

11  A.  '08.

12  Q.  '08?  And were you still the second chief at that point in

13  time?

14  A.  No, I wasn't.

15  Q.  What was your role at that time?

16  A.  Chief.

17  Q.  Oh, you were chief.  I'm sorry.  I apologize.  You were

18  chief.

19      So once you became chief, what was your relationship to,

20  for example, the tribal council?

21  A.  I chaired the tribal council or commonly referred to as the

22  business committee.

23  Q.  The business committee?

24  A.  Yes.

25  Q.  And as the chair of the business committee, did you attend

1   most, if not all, of the meetings of the business committee?

2   A.  Yes, I did.

3   Q.  And during your attendance at those meetings, were there

4   discussions held regarding the payday lending business?

5   A.  There were issues that came up.

6   Q.  And when issues came up, would they be discussed among and

7   between the members of the committee?

8   A.  Yes.

9   Q.  And in 2008, who were the members of the committee besides

10  yourself in your role as the chief?

11  A.  2008, myself; Second Chief Lankford; Secretary-treasurer

12  Lawson; first council person -- second council person, I

13  believe, was Scott -- my memory's failing, and I believe in

14  2008 it was Donya, Donya Williams.

15  Q.  Donya Williams?

16  A.  Yes.

17  Q.  OK.

18  A.  Yeah, if my memory serves me right.

19  Q.  What kinds of issues were raised at these board meetings

20  about the payday lending business?

21  A.  Whatever was presented to us by, we asked Don Brady to keep

22  us informed as to progress in the payday lending business, and

23  he would brief us at our, at our business committee meetings.

24  Q.  And who was Don Brady?

25  A.  Don Brady was the CEO of MNE.

1    Q.  When did you first meet Don Brady?

2    A.  Don Brady was hired in, I believe, '03.

3    Q.  And when Don Brady was first hired, did you work with him

4    on any projects?

5    A.  No.

6    Q.  Did you have any contact with him?

7    A.  Yes.

8    Q.  And what type of contact or relationship did you have with

9    him beginning in 2003?

10   A.  He officed with us, so we had quite, quite a few different,

11   the businesses that fell under his, the MNE, we would discuss

12   businesses to that nature.

13   Q.  When you say we would discuss, specifically, what kind of

14   businesses did you discuss with him from, beginning in 2003

15   when you first met him up through, let's just say, 2008?

16   A.  Well, we discussed various, various topics related to

17   economic development, government contracting, gaming, some

18   other small enterprises that we had.

19   Q.  And between 2003 and 2008, did you discuss with him, even

20   prior to your being chief, the payday lending business?

21   A.  Yes, there was conversations.

22   Q.  And how frequently would you have those conversations?

23   A.  Not often.

24   Q.  Did you discuss with him how the payday lending operation

25   ran?

1    A.  Yes.

2    Q.  And did he discuss it with you and answer any questions you

3    had?

4    A.  No.  What I got was like a 10,000-foot view of the

5    operation.

6    Q.  So he would give you some information --

7    A.  Yes.

8    Q.  -- but you were sort of pretty far removed, is that what

9    you mean?

10   A.  Yeah, because I was busy with my regular job.

11   Q.  So that wasn't your primary interest during those years, is

12   that correct?

13   A.  Not at that time.

14   Q.  If you recall, did there come a time when you were

15   requested to sign any loan licenses for the purposes of the

16   payday lending business?

17   A.  Yes, I was.

18   Q.  And do you recall when the first time was that you signed

19   any of the loan licenses?

20   A.  No, I don't.

21   Q.  OK.

22   A.  It was while I was second chief.

23   Q.  While you were second chief.  OK.  Bear with us a minute

24   and we'll try to get that up for you.

25       Let's just talk about those loan licenses for a minute.

H9sWtuc5                    Gamble - Direct

1    Were you asked to sign these loan licenses by the chief or the

2    council or someone else?

3    A.   I don't recall.  There is an entity within the Miami tribe

4    called the business development authority, and I chaired that.

5    Q.   OK.  So you're indicating that you may have as a member, a

6    chair of the business development committee been asked to sign

7    various licenses?

8    A.   Yes.

9    Q.   And do you recall what the purpose of signing those

10   licenses was?

11   A.   Regulatory.

12   Q.   And when you say regulatory, are you referring to

13   regulatory in terms of the tribe or regulatory in terms of the

14   United States government, or both?

15   A.   In terms of the tribe.

16   Q.   So it would be fair to say the tribe had its own rules and

17   regulations that needed to be followed and licenses needed to

18   be issued from time to time to do those things, correct?

19   A.   Right.

20   Q.   And even as second chief, as early as possibly 2005, 2006,

21   you signed licenses for the payday lending business?

22   A.   Yes.

23   Q.   And do you recall if any of those licenses involved Tribal

24   Financial Services doing business as US FastCash?

25   A.   Yes.

1  Q.  And was it your understanding at that time that those

2  licenses were required to allow the lending operation to

3  continue business in a proper way?

4          MR. VELAMOOR:  Objection, your Honor.  Leading.

5          THE COURT:  Yes.  Refrain from leading.  Sustained.

6  BY MR. GINSBERG:

7  Q.  What was your understanding of the purpose of those

8  licenses in terms of the operation of the lending business?

9  A.  Well, when I was -- understanding is that when the MBRC

10 created the rule and regulations and the license were issued in

11 compliance with the rules.

12         THE COURT:  Go ahead.

13 Q.  In addition to signing the licenses at some point in '05

14 and '06, did you do anything else, while you were second chief,

15 in relation to the payday lending business?

16 A.  Not that I recall.

17 Q.  At some later period of time, did you get more involved in

18 the payday lending business, either when you became elected

19 chief or prior to being elected chief?

20 A.  I became more involved when I took Chief Leonard's place.

21 Q.  Prior to that time -- that is, 2008, am I correct?

22 A.  Yes, it was.

23 Q.  Prior to that time, particularly in 2005, did you attend

24 any meetings of the business regulatory commission where you

25 were present as chairman of the commission and presentations

H9sWtuc5                    Gamble - Direct

1    were made to the commission about payday lending?  And if you

2    don't recall --

3    A.  I, I don't recall that.

4         MR. GINSBERG:  I'm going to approach the witness with

5    what's been marked for identification as Defendant's Exhibit

6    D744 for the purposes of seeing whether it refreshes the

7    witness's recollection.

8         THE COURT:  All right.

9    Q.  I've placed before you what's been marked as Defendant's

10   Exhibit D744, and simply at this time I'm asking you to read

11   through the document, and when you've read through it, tell us

12   you have had the opportunity to read through it, and then I'll

13   ask you another question.

14   A.  This was the minutes.

15   Q.  You have to do it a certain way.

16   A.  OK.

17   Q.  The question is, having reviewed that document, does that

18   refresh your recollection --

19   A.  Yes.

20   Q.  -- about attending at least this meeting of the Miami Tribe

21   of Oklahoma business regulatory commission in November of 2005?

22   A.  Yes, it does.

23   Q.  And having had your recollection refreshed, do you now

24   remember attending such a meeting?

25   A.  Yes, I do.

1   Q.  And do you remember at such a meeting who chaired that

2   meeting?

3   A.  I did.

4   Q.  And were there other members of the commission present at

5   that meeting?

6   A.  I think --

7           MR. VELAMOOR:  Your Honor, I believe the witness is

8   reading.

9           THE COURT:  Yes.

10  A.  No, no.

11  Q.  If you can't recall, if I ask you a question, for example,

12  Who was present, and you can recall from your own memory, you

13  can tell us.

14  A.  OK.

15  Q.  If you say I can't recall, let us know and then you can see

16  if the document refreshes your recollection.

17          THE COURT:  And with the document, the idea of

18  refreshing your recollection is you look at the document and

19  you see something written there.  Then kind of flip it over and

20  you say to yourself, now that I think about it, does that give

21  me a new, refreshed recollection, or is it just simply what the

22  piece of paper says?  And if you have a new, refreshed

23  recollection, then you tell us if it just is the words on the

24  page, then no, it doesn't refresh your recollection.  That's

25  what it's all about.

1    Next question.

2    BY MR. GINSBERG:

3    Q.  Having reviewed the document, is your recollection

4    refreshed as to who else attended the meeting in November of

5    2005?

6    A.  Yes.

7    Q.  And can you tell us, having had your recollection

8    refreshed, who attended that meeting?

9    A.  CFO Bill Chase, tax clerk Rhonda Gower, myself and Don

10   Brady as a guest.  And I believe either Ken Bellmard or --

11   yeah, Ken Bellmard as tribal attorney.

12   Q.  Did you say Ken Bellmard as tribal attorney?

13   A.  Yes.

14   Q.  And at this meeting, was there a discussion about a number

15   of different topics?

16   A.  Yes.

17   Q.  And was one of the topics discussed, particularly by Don

18   Brady, the payday lending business?

19   A.  Yes, he'd give us an update every month.

20   Q.  And were the members of the committee at this particular

21   meeting, or at any subsequent meeting, free to ask Mr. Brady

22   any questions about his presentation?

23   A.  Yes.

24   Q.  And from time to time, did members of the committee ask

25   Mr. Brady questions about --

H9sWtuc5                    Gamble - Direct

1    A.  Not that I recall.

2    Q.  OK, but nobody prevented anybody from asking questions,

3    correct?

4    A.  Oh, no.  No.

5    Q.  OK.  And the document that's placed before you, is it

6    signed at the end of the document?

7    A.  Yes.

8    Q.  And do you recognize the signature of the person who signed

9    it?

10   A.  Yeah, Rhonda Gower, tax agency -- tax agent and myself as

11   chair.

12           MR. GINSBERG:  Your Honor, I'd offer Defendant's

13   Exhibit D744 into evidence.

14           MR. VELAMOOR:  Objection, your Honor.  Hearsay.

15           THE COURT:  I'll look at the document over here.  Just

16   one second, please.

17           MR. GINSBERG:  Do you want me to lay more foundation

18   to make it easier?

19           THE COURT:  Yes, you can.

20   BY MR. GINSBERG:

21   Q.  Was there at each one of these meetings, particularly this

22   meeting in November, were there minutes taken of the meetings?

23   A.  Yes.

24   Q.  And was it the obligation of the recording secretary to

25   take minutes of the meetings?

1    A.  Yes.

2    Q.  And were the minutes taken, as best as you could tell, were

3    they written down initially while the meeting was occurring?

4    A.  Yes.

5    Q.  And subsequent to that, were the minutes typed up and

6    transcribed and presented to the members of the commission to

7    review the minutes of the meeting?

8    A.  On the very next meeting.

9    Q.  And were they then at the very next meeting, were they

10   adopted by the commission as the minutes of the prior meeting?

11   A.  Yes, as corrected.

12   Q.  Was that the regular practice of the business regulatory

13   commission in 2005 to operate in that manner?

14   A.  Yes, it was.

15          MR. GINSBERG:  I'd offer Defendant's Exhibit D744,

16   your Honor.

17          MR. VELAMOOR:  That's fine, your Honor.  No objection.

18          THE COURT:  All right.  Received.

19          (Defendant's Exhibit D744 received in evidence)

20          MR. GINSBERG:  Could we have that up there.

21   Q.  I would just refer you to first the top paragraph, which is

22   "call to order."

23   A.  Yes.

24   Q.  And there's a listing there of who was present at the

25   meeting, is that correct?

1    A.  Yes, it is.

2    Q.  And then there's a review of the minutes from the prior

3    meeting, is that correct?

4    A.  Yes.

5    Q.  And then financials were presented by the financial

6    officer, correct?

7    A.  Yes, it was.

8    Q.  And then there was a discussion about new software,

9    correct?

10   A.  Correct.

11   Q.  And then Don Brady made a presentation about loan revenue

12   having risen dramatically from the last four or five months and

13   continues to grow.  Is that a correct statement?

14   A.  Yes, it is.

15   Q.  And in addition, he presented information regarding certain

16   litigation in connection to the payday lending business?

17   A.  Yes.

18   Q.  Correct?

19   A.  Yes.

20   Q.  And the attorney, Ken Bellmard, also had a comment about

21   the fact that he's constantly involved keeping up on the nature

22   of that litigation, is that fair to say?

23   A.  That's fair, yes.

24   Q.  Now, from at least this period of time -- that is, November

25   22, 2005, onward, up until at least the time you became the

1    chief -- were there regular meetings of the Miami Tribe of

2    Oklahoma business regulatory commission to discuss the business

3    of the tribe and the commission?

4    A.  Yes.  Yes.

5    Q.  And would it be fair to say that at each one of those

6    meetings, similar discussions would take place about the nature

7    of things that were occurring regarding the businesses of the

8    tribe?

9    A.  The businesses that were regulated by the commission.

10   Q.  And one of those businesses was the payday lending

11   business, correct?

12   A.  It was regulated by the tribe.

13   Q.  And on each one of those meetings, would the recording

14   secretary take down minutes?

15   A.  Yes.

16   Q.  And would those minutes then be typed up?

17   A.  Yes.

18   Q.  And would they be presented at the next meeting to the

19   members of the committee to adopt the minutes?

20   A.  Yes.

21   Q.  Now, between 2005 and the time you were elected chief in

22   2008, can you recall approximately how many of those meetings

23   you attended of the business commission or business committee

24   of the tribe?

25   A.  As the, as the business committee?

1    Q.  Yes.

2    A.  All of them.

3    Q.  And how frequently would the business committee meet in

4    2005, 2006, 2007, up until the time you became chief?

5    A.  The second Tuesday of every month, by constitution.

6    Q.  By constitution.  So it was a requirement of the

7    constitution of the tribe to hold such meetings, correct?

8    A.  Correct.

9    Q.  And they were held unless there was some emergency

10   situation or a need to postpone, is that fair to say?

11            MR. VELAMOOR:  Objection, your Honor.  Leading.

12            THE COURT:  Sustained.

13   BY MR. GINSBERG:

14   Q.  They were held whenever they could be held, once per month,

15   is that correct?

16            MR. VELAMOOR:  Same objection.

17            THE COURT:  I'll allow it.

18            Go ahead.

19   BY MR. GINSBERG:

20   Q.  Is that correct; they were held once a month as best you

21   can recall?

22   A.  Yes.

23   Q.  And during the course of those meetings, were various

24   resolutions presented and passed upon by the committee?

25   A.  Yes.

1    Q.  And was Don Brady attendant at most, if not all, of those

2    meetings?

3    A.  Yes, we asked Don Brady to give us a monthly update after

4    his board meeting.

5    Q.  And at each one of those board meetings did Don Brady give

6    you a monthly update as to all of the businesses he had the

7    obligation to oversee?

8    A.  Yes.

9    Q.  And did that include his oversight of the payday lending

10   business?

11   A.  Yes.

12   Q.  Do you recall a meeting, for example, being held in January

13   of 2006?  And if you don't recall, I'll approach and show you a

14   document.

15   A.  I think I need to see the document.

16   Q.  That's fine.

17          MR. GINSBERG:  D745.

18          THE COURT:  Again, you look at the document, you say

19   to yourself, Gee, do I have a new and different recollection,

20   or the document says what it says, but I just don't remember

21   one way or the other?  So take a look at it.

22   A.  It appears to be just the normal minutes of the business

23   committee.

24   Q.  Does that refresh your recollection that there was a

25   business committee meeting that was held on or about January

1    10, 2006?

2    A.  Yes, it does.  Yes.

3    Q.  And does it refresh your recollection as to --

4           MR. GINSBERG:  Well, let me just make it simple.  I'd

5    offer D745, your Honor.  I'll go through the other litany if

6    your Honor wishes or the government wishes, but I'd offer it,

7    to make it easier.

8           MR. VELAMOOR:  Not for the same business committee, so

9    no objection.

10          THE COURT:  Received.

11          (Defendant's Exhibit D745 received in evidence)

12   BY MR. GINSBERG:

13   Q.  So this meeting is the Miami Tribe of Oklahoma business

14   committee meeting, is that correct?

15   A.  Correct.

16   Q.  And Chief Leonard chaired this meeting?

17   A.  Yes, he did.

18   Q.  There was a quorum, correct?

19   A.  Yes.

20   Q.  And there were various things discussed at the meeting,

21   correct?

22   A.  Yes.

23   Q.  In fact, you made a motion to adopt the minutes of the

24   prior meeting, is that correct?

25   A.  Yes, I did.

1  Q.  And then as we go on, there are various things that were

2  discussed; membership discussions, resolutions.  Is that

3  correct?

4  A.  Yes.

5  Q.  And then on the second page there's the MNE report, MNE

6  report, and there's a reference to Don Brady?

7  A.  Yes.

8  Q.  And he gave a report on the loan company, is that correct?

9  A.  Yes.

10  Q.  And he talked about the fact that it was holding in strong

11  numbers, correct?

12  A.  Yes.

13  Q.  And he further reported on litigation, in that second

14  paragraph under MNE report?  See where it says "Mr. Brady

15  reported that Colorado litigation was ongoing"?

16  A.  Yes.

17  Q.  And he reported to the committee that he and Attorney Ken

18  Bellmard had scheduled a meeting in Kansas City with attorneys

19  in the case?

20  A.  Yes.

21  Q.  To combat inquiries, is that correct?

22  A.  Yes.

23  Q.  And during this period of time, in 2006, 2005 to 2006, do

24  you recall that there was litigation taking place regarding the

25  payday lending business?

1    A.  Yes.

2    Q.  And that Don Brady, as the CEO and Ken Bellmard as the

3    attorney for the tribe, were the ones who were principally

4    involved in dealing with that?

5             MR. VELAMOOR:  Objection, your Honor.  Leading.

6             THE COURT:  Sustained.

7    BY MR. GINSBERG:

8    Q.  Do you recall who it was on behalf of the tribe who was

9    involved in representing the tribe in connection with this

10   litigation?

11   A.  CEO Don Brady and Tribal Attorney Ken Bellmard would have

12   been.

13   Q.  They were the primary people doing it, is that correct?

14   A.  Yes.

15   Q.  And then they would report back at these monthly meetings,

16   is that correct?

17   A.  Yes.

18   Q.  And while you were still second chief, did you continue to

19   attend these meetings throughout 2006 and 2007?

20   A.  The business committee meetings?

21   Q.  Yes, the Miami business committee meetings.

22   A.  Yes, I did.

23   Q.  And do you recall attending approximately one meeting a

24   month throughout the year 2006 and 2007?

25   A.  Yes.

1  Q.  And do you recall at each one of those meetings that Don

2  Brady was present and he presented information about the loan

3  business?

4  A.  Yes, we --

5  Q.  And at any of those meetings in 2006 or 2007, was any

6  member of the committee prevented from asking any question they

7  wished of Mr. Brady regarding the lending business?

8  A.  No.

9  Q.  Then taking us up to 2008, you told us that you were

10  elected chief of the tribe, correct?

11  A.  No, I wasn't elected in 2008.  By constitution I took the

12  position when Chief Leonard passed away.

13  Q.  I'm sorry.  I apologize.

14       So you became chief?

15  A.  Yes.

16  Q.  Because of the nature of the regulation, the chief passed

17  away and you took over his position?

18  A.  Yes, by constitution.

19  Q.  How long did you remain in that position after 2008?

20  A.  I fulfilled the two-year term and then was elected for a

21  three-year term.

22  Q.  So for 2008 and 2010, you filled the remainder of the term,

23  by constitution, and then you were elected and served another

24  three years, correct?

25  A.  Correct.

1  Q.  So were you chief for a total of approximately five years,

2  from 2008 to 2013?

3  A.  Yes, I was.

4  Q.  During that period of time, did you become more involved

5  and more knowledgeable about the payday lending business of the

6  Miami Tribe of Oklahoma?

7  A.  Yes, I was -- yes, I did.

8  Q.  And as the chief, when you took over for Chief Leonard, did

9  you begin attending meetings of other committees of the tribe

10 or tribal council meetings in which the payday lending business

11 was discussed?

12 A.  Tribal council meetings, and I believe the AMG board was

13 established in '08.

14 Q.  OK.  That's a separate matter and I'll get to that in a

15 minute.

16     Prior to the AMG board being established, did you attend

17 tribal council meetings as the chief?

18 A.  Yes, I did.

19 Q.  During the tribal council meetings, were there discussions

20 about the businesses of the tribe, including the payday lending

21 business?

22 A.  Yes.

23 Q.  Did Don Brady attend some or all of those meetings?

24 A.  Yes.

25 Q.  During those meetings, did he make any presentations

1    regarding the payday lending business?

2    A.   He would make updates, he would update us on various

3    business, including the payday lending company.

4    Q.   At any of the tribal council meetings, was anyone prevented

5    from asking Don Brady any questions they wished about the

6    payday lending business?

7    A.   No.

8    Q.   Was anybody prevented from asking him any questions about

9    the financial status of the business?

10   A.   No.

11   Q.   Was anybody prevented from asking him about looking at the

12   records or the income from the business?

13   A.   Could you restate the question?

14   Q.   Was anybody prevented from asking him about the income from

15   the business?

16   A.   No, not to my knowledge.

17   Q.   Did he present to the committee information regarding how

18   much the tribe was earning as a result of its participation in

19   the lending business?

20   A.   Yes, he would.

21   Q.   Were you aware, in your capacity as chief at that time, do

22   you have a recollection of approximately how much money per

23   month the tribe was earning beginning, let's say, in 2008 when

24   you were chief of the tribe?

25   A.   No, I don't.

1  Q.  And would Don Brady have that information?

2  A.  Yes, he would.

3  Q.  And was that available to you as the chief if you wished to

4  review it?

5  A.  Yes.

6  Q.  And was it available to the tribal council members?

7  A.  Yes.

8  Q.  Was it available to the members of the business committee

9  that you reported to?

10  A.  Yes.

11  Q.  Now --

12  A.  Can I add clarification.

13  Q.  Sure.

14  A.  When you refer to the tribal council and the business

15  committee, they're one and the same.

16  Q.  Oh, my apologies.

17     Were there other committees in addition to the business

18  committee, which you say is one and the same as the tribal

19  council, were there other committees of the tribe that met in

20  relation to any of the businesses that the tribe was operating?

21  A.  Yes.

22  Q.  And what committees were those?

23  A.  The overseeing board for the MNE, MNE board of directors.

24  Q.  And what was the function of that board?

25  A.  They would oversee, and that's who Don Brady actually

1    reported to.

2    Q.  They would oversee the business operations?

3    A.  The business operations and opportunities.

4    Q.  And Don Brady would report directly to that board?

5    A.  That was his governing board.

6    Q.  OK, but in addition he met with other boards or the tribal

7    council at their meetings as well, correct?

8    A.  Yes, he was asked to, for updates.

9    Q.  But he wasn't a member; he was asked to come and make those

10   presentations, correct?

11   A.  Yes.

12   Q.  And you mentioned before that there was something called

13   AMG that had a board established?

14   A.  Yes.

15   Q.  Can you tell us what AMG is?

16   A.  I -- if there's an acronym, I don't know what it is.  I

17   think it was just the name.

18   Q.  OK.  And what was the purpose of the AMG organization as

19   far as you knew?

20   A.  The employees of AMG become tribal employees and the

21   business, and equipment and the leases.

22   Q.  Now, prior to that time, prior to the establishment of AMG,

23   and when you say the tribal employees took over, took the

24   equipment, had that function been performed by some other

25   business or entity?

1   A.  Yes.

2   Q.  And what other business or entity was that?

3   A.  The entity was called CLK.

4   Q.  And to the best of your recollection, how did it turn out

5   that the CLK operation then became AMG?  Was there some type

6   of --

7           MR. VELAMOOR:  Objection.  The witness --

8   Q.  Was there some type --

9           THE COURT:  Let the witness answer the question.

10          MR. GINSBERG:  He was hesitating, so I wanted to help

11  him.

12          THE COURT:  No, no.  It doesn't work like that.

13          MR. GINSBERG:  OK.  I'll give him time to answer.

14  Q.  Can you answer the prior question, or do you need another

15  one?

16  A.  Could you ask me that question one more time?

17  Q.  How did it come about that the CLK operation changed to the

18  AMG operation?

19  A.  To come under the tribal heading as employees, we had the

20  employees, the equipment and the leases.

21  Q.  And how was that done?  Was there an agreement, a contract,

22  a merger?  Did something take place to allow that to happen?

23  A.  It was done by resolution.

24  Q.  And by resolution of whom?

25  A.  The business committee.

1    Q.  And the business committee, what did the business committee

2    have to do to create AMG and to take over those functions?

3              MR. VELAMOOR:  Objection, your Honor.  Foundation.

4              THE COURT:  Lay a foundation.

5    Q.  You said that the business committee had to do something,

6    is that correct?

7    A.  Yes, we passed a resolution of '08, in '08.

8    Q.  What did the resolution say that allowed the tribe to

9    create AMG to take over CLK?

10             MR. VELAMOOR:  Objection, your Honor.  Foundation.

11             THE COURT:  Lay a foundation.  Sustained.

12   Q.  Did the committee pass any kind of a resolution?

13   A.  Yes.

14   Q.  And do you recall what that resolution said that they could

15   do?

16   A.  That they would transfer, and I can't recite word for word,

17   but we would transfer CLK to the Miami as AMG.

18   Q.  And do you know who you were transferring CLK from to the

19   tribe as AMG?

20   A.  From the loan business.

21             (Continued on next page)

22

23

24

25

1   Q.  Did that take place, did they pass the appropriate

2   resolutions and did AMG begin to go into operation?

3   A.  Yes.

4   Q.  Was AMG tribally run and owned at that point in time after

5   that resolution was passed?

6   A.  I don't know how to answer that question.  The operation

7   stayed the same with management but became an entity of the

8   Miami tribe.

9   Q.  So who was doing the operational part?  When it became an

10  entity of Miami tribe, who was doing the operational work?

11  A.  It stayed with the Kansas City firm.

12  Q.  What did the tribe begin to do when AMG was created?

13  A.  The board was formed and basically was inactive for a

14  number of years.

15  Q.  Did the board meet with anyone from CLK, or the people who

16  were operating out of Kansas City, to review what was being

17  done during that period of time when you say the board was

18  inactive?

19  A.  I don't know.  I'm not understanding you.

20  Q.  Did Don Brady continue in his role as --

21  A.  Don Brady continued in his role as CEO of MNE and our

22  go-between with the organization.

23  Q.  When you say "go-between," you mean between AMG and the

24  operations that were being conducted out of Kansas City?

25  A.  Yes.

1   Q.  Did Don Brady continue to report --

2   A.  Yes.

3   Q.  -- to all the committees?

4   A.  He continued to report to his governing board.

5   Q.  And in addition to reporting to his governing board, was he

6   asked to appear from time to time at tribal council meetings?

7   A.  Yes, he still had his agenda spot.

8   Q.  And in that agenda spot, during these two years where you

9   said the AMG board was inactive, did Don Brady give updates to

10  the council as to the payday lending operation?

11  A.  Not that I recall.

12  Q.  Did there come a time when he began to do that, after those

13  two years, inactive period?

14  A.  Not that I recall.

15  Q.  Did the AMG board begin to meet on a regular basis?

16  A.  Yes.

17  Q.  When did that occur?

18  A.  That occurred, to the best of my recollection, between '11

19  and '12.

20  Q.  When the AMG board began to meet, how frequently did the

21  AMG board meet?

22  A.  There was no set time, but we met pretty regularly during

23  that period.

24  Q.  When you use the term "pretty regularly," how often would

25  you say?

1   A.  Maybe once a week.

2   Q.  Once a week?

3   A.  Once a week.  There was some ongoing.

4   Q.  What was the purpose of these weekly meetings of the AMG

5   board?

6   A.  To -- let me think how to put this.  We got updates from

7   the CEO Brady, and then we as a board would discuss and

8   finalize any type of resolutions, but mostly it was just a

9   meeting.

10  Q.  It was mostly updates?

11  A.  Yes, mostly updates, but no action, but there were some

12  actions.

13  Q.  And the actions were resolutions?

14  A.  Yes.

15  Q.  And the resolutions were resolutions for what purpose?

16  A.  Just various reasons.  I don't know right off.

17  Q.  Do you recall any of the specific resolutions that were

18  done?

19  A.  No, not without seeing it.

20  Q.  You said that the AMG board began to meet on a weekly

21  basis?

22  A.  This was later on.

23  Q.  2011?

24  A.  2011 and 2012 there were some other issues that we were

25  addressing.

1   Q.  Regarding AMG?

2   A.  Regarding AMG.

3   Q.  Did all of the issues that the AMG board was discussing, in

4   one way or another, relate to the payday lending business?

5   A.  Yes.

6   Q.  During the period of time prior to your being chief, were

7   you aware of whether the tribe had attorneys giving it advice

8   as to the payday lending business?

9   A.  Yes.

10  Q.  And prior to you becoming chief, who were those attorneys?

11  A.  Prior to me becoming chief?

12  Q.  Yes.

13  A.  I know we had attorney firms that were tribal attorneys,

14  Ken Bellmard, Peebles & Morgan.  I don't recall other ones.

15  Q.  You said Ken Bellmard and Peebles & Morgan.

16         Peebles & Morgan is a law firm?

17  A.  Yes.

18  Q.  Was there anybody in particular from Peebles & Morgan that

19  you can recall who advised the tribe?

20         MR. VELAMOOR:  Objection.  Relevance.

21         THE COURT:  Sustained.

22  Q.  You remember the firm's name, correct?

23  A.  Correct.

24  Q.  Were there individuals, individual people, human beings

25  from the firm who were lawyers who actually gave advice?

1          MR. VELAMOOR:  Objection.  The same objection.

2          THE COURT:  Sustained.

3   Q.  After that initial time period when Ken Bellmard and

4   Peebles & Morgan were advising the tribe, did there come a time

5   when the tribe had other lawyers after you were elected chief?

6          MR. VELAMOOR:  Same objection.

7          THE COURT:  Sustained.

8   Q.  You mentioned that there were numerous meetings of the AMG

9   board, is that correct, in 2011 or so, weekly meetings?

10  A.  There was more activity than normal.

11  Q.  At that those meetings, in addition to the board members,

12  were there any other people invited to attend those meetings?

13         THE COURT:  That's a yes or no question.

14  A.  Yes.

15  Q.  Were some of those people who were asked to attend those

16  meetings non-tribal members or non-members of the committee?

17  A.  Yes.

18  Q.  Let me ask you if you recall a meeting of the AMG board

19  that took place in November of 2011 in Overland Park, Kansas?

20  A.  Yes.

21  Q.  Was that a meeting of the board of directors of AMG?

22  A.  Yes, it was.

23  Q.  Do you recall who attended that meeting?

24  A.  There was -- I know the AMG board attended.  We had a

25  guest, and then we met with various employees of AMG.

1   Q.  Is it fair to say you don't recall all the names now

2   because of the time that has passed?

3   A.  Yeah.  But --

4   Q.  If I showed you a document, might it refresh your

5   recollection?

6   A.  Yes, it would.

7           THE COURT:  You have to establish some relevance for

8   the line of inquiry.

9           I will see you at the sidebar if you want to try and

10  establish.  We have discussed this in other contexts.

11          MR. GINSBERG:  I see the same connection so maybe I am

12  missing something.  I would appreciate it.

13          THE COURT:  I will tell you what, ladies and

14  gentlemen.

15          Let's do it at the sidebar.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            THE COURT:  Let's see how I do with guessing games.

3    Let me take a wild guess.  Might the person who you want to

4    refresh his recollection about be a lawyer?

5            MR. GINSBERG:  It's actually a number of people.

6            THE COURT:  Are any of them lawyers?

7            MR. GINSBERG:  Two of them are lawyers.

8            THE COURT:  So that was a pretty good guess.

9            MR. GINSBERG:  That was better than a guess.

10           THE COURT:  I have no idea, but it's a pretty good

11   guess.

12           MR. GINSBERG:  I will tell you the relevance.

13           THE COURT:  What is the relevance?

14           MR. GINSBERG:  The relevance is that this is a meeting

15   in Kansas City of the AMG board.  First of all, the government

16   has made it appear -- tried to make it appear that this board

17   was effectively nonexistent or it never did anything or didn't

18   know anything.  This is a meeting in which members of the

19   tribe, who were on the AMG board, and it's listed here on the

20   document, were present.  Carolyn Williams was present, Scott

21   and Blaine Tucker were present, Conly Schulte, Tim Muir,

22   Crystal Grote and Natalie Dempsey.

23           The point of it is is that the government has

24   consistently, with almost every one of their witnesses, tried

25   to press the point, which they will ultimately argue in

1   summation, that nobody in the tribe knew what was going on.

2   They couldn't get any information.  They weren't presented with

3   any information.  If they asked questions, they were

4   stonewalled.  And this is a board meeting in which there was a

5   discussion about the revenue, about the operation, about

6   updates about litigation.

7           THE COURT:  What date is this?

8           MR. GINSBERG:  This is November of 2011.  It's right

9   during the time of the conspiracy.  It's before the --

10          THE COURT:  I am going to allow it.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    BY MR. GINSBERG:

3    Q.  Having reviewed that document, does that refresh your

4    recollection as to who attended that board meeting?

5    A.  Yes, it does.

6    Q.  Can you tell us now, having had your recollection

7    refreshed, who attended that board meeting in November of 2011

8    in Overland Park, Kansas?

9    A.  Yes.  It was the AMG board, recording secretary Carolyn

10   Williams, Scott Tucker, Blaine Tucker, Tim Muir, Conly Schulte,

11   Crystal Grote, and Natalie Dempsey.

12   Q.  Obviously, prior to that time, you knew all the members of

13   the AMG board, correct?

14   A.  Yes.

15   Q.  That included second chief, Doug Lankford, correct?

16   A.  Correct.

17   Q.  And the secretary-treasurer, Mr. Kelly?

18   A.  Mr. John Kelly, yes.

19   Q.  And Wes Gamble?

20   A.  Wes Gamble was a guest.

21   Q.  Did you know Carolyn Williams prior to that meeting?

22   A.  Yes.

23   Q.  Did you know what role she had in relation to the Miami

24   Tribe of Oklahoma as of November of 2011?

25   A.  Carolyn was very good at recording the minutes, and so she

1  was invited for that particular reason.

2  Q.  Prior to that, did you know Scott and Blaine Tucker?

3  A.  Yes.

4  Q.  You mentioned Conly Schulte.  Who is Conly Schulte?

5  A.  Conly Schulte is an attorney.

6  Q.  Do you know what firm he worked for?

7  A.  He works for Peebles & Morgan.

8  Q.  Prior to that, did you know who Tim Muir was?

9  A.  Yes, I did.

10  Q.  Who was Tim Muir?

11  A.  Tim Muir was attorney for AMG.

12  Q.  And Crystal Grote, did you know her prior to that meeting?

13  A.  I knew Crystal.  I didn't know her position.

14  Q.  Do you know where she worked, if you didn't know her

15  position?

16  A.  She worked in the Overland Park office.

17  Q.  Natalie Dempsey?

18  A.  Also, the same.

19  Q.  Was this meeting held at the request of the AMG board?

20  A.  Yes.

21  Q.  And was the AMG board invited up to Overland Park to have

22  this meeting with the other individuals?

23  A.  I wouldn't say invited.  We said we were going to hold one

24  there, and it was suggested that we hold two.

25  Q.  You had this meeting there and all these people attended

1    the meeting.  And during the meeting, is it fair to say that

2    the nature of the discussions at the meeting had to do with AMG

3    Services, correct?

4    A.   Correct.

5    Q.   And were minutes taken of this meeting?

6    A.   Yes, they were.

7    Q.   And at the end of the meeting, were the minutes

8    transcribed, typed up?

9    A.   Yes.

10   Q.   Were they signed off on at some point?

11   A.   Normally the next meeting.

12   Q.   I just ask you to look at the third page of the document

13   and see if you recognize any of the signatures.

14   A.   Yes, I do.

15        THE COURT:  The document is not in evidence.

16   Q.   Do you recognize the signatures that are on there?

17   A.   Yes.

18   Q.   Do you recognize your own signature?

19   A.   Yes, I do.

20        MR. GINSBERG:  I would offer Defendant's D2700 into

21   evidence.

22        THE COURT:  Any objection?

23        MR. VELAMOOR:  Yes, your Honor.  I'm happy to be heard

24   at the sidebar.

25        THE COURT:  I will reserve on the objection.

1    Ladies and gentlemen -- please be seated, Mr.

2    Ginsberg -- this is the end of our workweek.  You have been

3    working very hard.

4        As you heard, the government has rested.  We are now

5    on the defense case, and there is no reason to believe that

6    this case is going to go longer than what was originally

7    anticipated.  So we are making good progress.  We are on

8    schedule.  We haven't lagged behind.  And that's really because

9    you have worked hard.  You have made it back here after lunch

10   breaks and in the morning, where none of us are perfect, the

11   transportation system isn't perfect, but you have done a

12   commendable job.

13       It's important that you follow the instructions that

14   you promised to follow, and that I have ordered you to follow,

15   about not discussing the case, about not doing research,

16   Googling, Internet searches.  A fair trial means it comes out

17   in the courtroom so that everyone has an opportunity to be

18   heard, can explain things.  That's what fairness means.  That's

19   what you would want if a family member were involved in a

20   trial.  And that's what you are obligated to give to the

21   parties in this case.

22       Put the case out of your mind.  We are going to start

23   at 10:30 on Monday morning, not 10, 10:30, one half hour.  Not

24   a lot of time.  So you may wind up taking the same exact train

25   and just relaxing for a few minutes before we get started.

1          The other thing is a housekeeping matter.  We are

2     required to make sure that we have our jurors in the proper

3     order, and Flo is going to take care of that right now.

4          THE DEPUTY CLERK:  Treena Williams is 1.

5          Nana is 2.

6          Ysrael is 3.

7          John is 4.

8          Leonard is 5.

9          Patrick is 6.

10          Christopher is 7.

11          Melissa is 8.

12          Sharon is 9.

13          Glorismer is 10.

14          Faye is 11.

15          Mariana is not here.  12 should be Maxwell.

16          THE COURT:  Where is Maxwell?

17          Maxwell, you are going to sit down in that seat there,

18     plea, if you will.  And I will ask you next week to sit there,

19     if you will.

20          THE DEPUTY CLERK:  Paige is 13.

21          Kelcey is 14.

22          Glenn is 15.

23          Nuria is 16.

24          Cecilia is 17.

25          THE COURT:  Thank you, ladies and gentlemen, and see

1    you 10:30 on Monday morning for a good start.

2              (Jury exits courtroom)

3              THE COURT:  I would just ask Mr. Gamble's attorney to

4    identify himself for the record, please.

5              MR. HOBBS:  Yes, your Honor.  James R. Hobbs, your

6    Honor, with the Wyrsch Hobbs & Mirakian law firm, Kansas City,

7    Missouri.

8              Thank you very much, sir.

9              THE COURT:  We will see Mr. Gamble on Monday morning.

10             Let me hear what the government has to say.

11             MR. VELAMOOR:  We do object to the admission of the

12   board minutes of the AMG board, in part, based on the testimony

13   of this witness and other witnesses, that this board just

14   started meeting in late 2011, 2012.  I think, as the Court

15   knows and has been established in this trial, that time frame

16   coincided with publication of news reports, the onset of the

17   upcoming litigation with the FTC, and as other witnesses have

18   made clear, these things were directed in large measure by

19   lawyers.

20             I think it is a very fair inference that these are

21   meetings that are being held, minutes that are being prepared,

22   in anticipation of litigation, and that they are not, in fact,

23   the kinds of things that are regularly conducted business

24   activity, like the business committee, which I think had a

25   consistent practice of meeting for many, many years up to,

1    during and after the payday loan business was in operation.

2             THE COURT:  The objection is overruled.  You can

3    address that in your cross-examination.

4             Yes, Mr. Bath.

5             MR. BATH:  If we could take up a housekeeping matter.

6             It's been a long four, five weeks, Judge.  I think in

7    the pretrial conference we discussed whether or not we are

8    going to be able to call an expert, Gavin Clarkson.  My

9    recollection is you were not inclined to allow us to call that

10   expert, but didn't make a final ruling.  I could be wrong.  It

11   seems to me that we wanted you to hear some evidence, and I

12   think you have now, and maybe you haven't changed your mind,

13   but I think it's incumbent upon me to again proffer that I

14   would like Mr. Clarkson to testify.  We had submitted a notice

15   to the government some time ago.  It was attached to one of the

16   pleadings.  I don't mean to go over it again, I know the Court

17   is very familiar with it, but I would ask the Court to

18   reconsider, if it ruled against us, or to make a ruling and

19   allow us to call Mr. Clarkson as an expert on tribal

20   sovereignty, tribal sovereign immunity.

21            THE COURT:  My preexisting ruling or incipient ruling

22   stands.  So I am granting the government's motion in limine to

23   preclude the testimony.  And I have thought about it.  You're

24   right, Mr. Bath.  The trial has progressed, and I have thought

25   about it, and I don't think it's an appropriate subject for

1   expert testimony at the trial.

2           Have a very pleasant weekend and see you on Monday

3   morning.

4           One other thing.  Comments on the charge are welcome

5   to be received by 4:30 tomorrow afternoon.  You can load them

6   up on ECF or you can fax them.  Make sure you serve them.  But

7   if you have any comments, suggestions, corrections, arguments,

8   that is the time and place to put it in there.

9           Have a pleasant evening.  Thank you.

10          (Adjourned to October 2, 2017, at 10:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          INDEX OF EXAMINATION

2    Examination of:                          Page

3    ALLISON HARRIS

4    Direct By Mr. Ravi . . . . . . . . . . . . .1616

5    Cross By Mr. Ginsberg . . . . . . . . . . .1621

6    Cross By Mr. Bath . . . . . . . . . . . . .1631

7    Redirect By Mr. Ravi . . . . . . . . . . . .1643

8    JACK GAUSNELL

9    Direct By Mr. Ravi . . . . . . . . . . . . .1653

10   ANDREW LEIBENGUTH

11   Direct By Mr. Scotten . . . . . . . . . . .1662

12   KIMBERLY ESPINOZA

13   Direct By Mr. Velamoor . . . . . . . . . . .1674

14   Cross By Mr. Ginsberg . . . . . . . . . . .1733

15   Cross By Mr. Bath . . . . . . . . . . . . .1738

16   Redirect By Mr. Velamoor . . . . . . . . . .1741

17   TOM GAMBLE

18   Direct By Mr. Ginsberg . . . . . . . . . . .1752

19   TOM GAMBLE

20   Direct By Mr. Ginsberg . . . . . . . . . . .1756

21            GOVERNMENT EXHIBITS

22   Exhibit No.                          Received

23    502   . . . . . . . . . . . . . . . . . . .1617

24    503   . . . . . . . . . . . . . . . . . . .1644

25    4032   . . . . . . . . . . . . . . . . . .1644

```
 1    314  . . . . . . . . . . . . . . . . .1645

 2    4020   . . . . . . . . . . . . . . . .1648

 3    404T, 406T, 407T . . . . . . . . . . .1650

 4    5006   . . . . . . . . . . . . . . . .1652

 5    3301, 3302, 3304 and 3305  . . . . . . .1655

 6    5001   . . . . . . . . . . . . . . . .1661

 7    1501   . . . . . . . . . . . . . . . .1663

 8    1503   . . . . . . . . . . . . . . . .1665

 9    1504   . . . . . . . . . . . . . . . .1669

10    4013   . . . . . . . . . . . . . . . .1671

11    5003   . . . . . . . . . . . . . . . .1673

12    3552   . . . . . . . . . . . . . . . .1674

13    3550   . . . . . . . . . . . . . . . .1676

14    3551   . . . . . . . . . . . . . . . .1685

15    309A   . . . . . . . . . . . . . . . .1745

16    5005   . . . . . . . . . . . . . . . .1745

17    4014   . . . . . . . . . . . . . . . .1748

18                   DEFENDANT EXHIBITS

19    Exhibit No.                      Received

20    D744   . . . . . . . . . . . . . . . .1776

21    D745   . . . . . . . . . . . . . . . .1781
```