HA28TUC1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4        v.                              16 Cr. 91 (PKC)

5  SCOTT TUCKER and
   TIMOTHY MUIR,                        Trial
6
          Defendants.
7
   ------------------------------x
8                                       New York, N.Y.
                                        October 2, 2017
9                                       10:30 a.m.

10

   Before:
11                    HON. P. KEVIN CASTEL

12                                      District Judge
                                          and a jury
13                      APPEARANCES

14 JOON H. KIM
        Acting United States Attorney for the
15      Southern District of New York
   BY:  NIKETH V. VELAMOOR
16      HAGAN C. SCOTTEN
        SAGAR K. RAVI
17      Assistant United States Attorneys

18 FREEMAN NOOTER & GINSBERG
        Attorneys for Defendant Tucker
19 BY:  LEE A. GINSBERG
        NADJIA LIMANI
20         -and-
   STAMPUR & ROTH
21 BY:  JAMES M. ROTH

22 BATH & EDMONDS, P.A.
        Attorneys for Defendant Muir
23 BY:  THOMAS J. BATH
           -and-
24 BEVERLY VAN NESS

25

HA28TUC1

1          (Trial resumed; jury not present)

2          THE COURT:  Before we bring our jury in, just one

3  matter.

4          Mr. Bath, I have your letter regarding the subpoena.

5  I have considered the arguments therein, and as narrowed I am

6  going to deny the application to quash the narrowed subpoena.

7          MR. BATH:  May I be heard on that?

8          THE COURT:  I thought that's what your letter was.

9  You want oral argument; is that what you want?

10          MR. BATH:  Judge --

11          THE COURT:  Or you want to reconsider the ruling?

12          Go ahead.  Just tell me what it is.

13          MR. BATH:  The documents they are seeking, the ten

14  years of documents, would encompass privileged documents

15  because Mr. Schulte, as you know, is a lawyer, and the two of

16  them represented clients.  I don't know what the scope of the

17  Miami waiver would be.  We don't have access to all those

18  documents.  I don't think we can get -- it would take a

19  substantial amount of time to get ten years of documents and a

20  privilege log done in what may be a day and a half, Judge.

21          THE COURT:  I think what you can do, in terms of the

22  privilege log, is you can do that in open court, with a

23  description on the record, rather than going through the burden

24  of preparing a formal log.

25          MR. BATH:  I understand the Court's ruling.  It's not

HA28TUC1

1    relevant for right now, Judge.

2              THE COURT:  I understand.

3              Bring our jury in, please.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Jury present)

2    TOM GAMBLE, resumed.

3       THE COURT:  Good morning, ladies and gentlemen.  It's

4    good to see you.  We had some pretty good weather this weekend.

5    I hope you got to enjoy some of it and I hope you were able to

6    put things out of your mind, at least things in this courtroom

7    out of your mind for the weekend, and now we are back in

8    action.

9       Mr. Gamble, the Court reminds you that you are still

10   under oath.

11      Mr. Ginsberg, you may continue.

12      MR. GINSBERG:  Thank you, your Honor.

13      First, your Honor, when we left off, I think -- I

14   double-checked -- your Honor at the end of the day, after the

15   jury was absent, overruled the objection and allowed

16   Defendants' Exhibit D2700 to be admitted into evidence.  So

17   that's where I would like to begin.

18      THE COURT:  All right.  Fine.

19   DIRECT EXAMINATION (Cont'd)

20   BY MR. GINSBERG:

21   Q.  Mr. Gamble, there is now a set of documents in front of

22   you.  Hopefully they are in order.

23      The first one, if you pick that up, is Defendants'

24   Exhibit D2700.  Is that what you have in front of you?

25   A.  Yes, I do.

1   Q.  When we left off at the end of the day on Thursday, we were

2   discussing, if you recall, the meeting that took place in

3   Overland Park, Kansas.

4           Do you recall that?

5   A.  Yes, I do.

6   Q.  You indicated for us the individuals who were present at

7   that meeting, is that correct?

8   A.  Yes, I did.

9   Q.  Do you have an independent recollection of that meeting

10  taking place?

11  A.  Yes, I do.

12  Q.  Do you recall the meeting -- do you recall the purpose of

13  that meeting?

14  A.  Yes, I do.

15  Q.  What was the purpose of that meeting that was held in

16  Overland Park, Kansas?

17  A.  The main reason for the meeting is that the tribe was going

18  under a ten-year plan.  The name doesn't recall me right now,

19  but we were planning our future for the next ten years and we

20  wanted to include AMG folks with it, and what happens in the

21  meeting with these people were agenda items.

22  Q.  Among the things that were discussed at the meeting was a

23  report from Don Brady, who is the AMG CEO, is that correct?

24  A.  Correct.

25  Q.  He described revenues from the online lending operation,

HA28TUC1                    Gamble - Direct

1    correct?

2              If you look at the paragraph Roman numeral II.

3    A.  Yes.

4              MR. GINSBERG:  It's in evidence.

5    Q.  You see Roman numeral II?

6    A.  Yes, I do.

7    Q.  You see your report?

8    A.  Yes, I do.

9    Q.  And Don Brady is discussing the revenue increases from the

10   online lending operation, correct?

11   A.  Correct.

12   Q.  And he is describing how those revenues have permitted

13   contributions to the tribe for the benefit of the tribal

14   members, correct?

15   A.  Correct.

16   Q.  And he also reported on the IRS audit that we have heard

17   about, correct?

18   A.  Correct.

19   Q.  And he discussed various other aspects of the lending

20   organization structure, correct?

21   A.  Correct.

22   Q.  And compliance with tribal ordinances as well, correct?

23   A.  Yes, sir.

24              THE COURT:  The date of these minutes again, please.

25              MR. GINSBERG:  The date of these minutes on the top is

1  November 14, 2011, your Honor.

2           THE COURT:  Thank you.

3  Q.  Then there were further discussions from people from

4  various departments talking about internal operations, talking

5  about what individual people were doing in relation to the

6  lending operation.  As you go further down on page 2, you see

7  the department reports under Roman numeral VI?

8  A.  Yes.

9  Q.  And under VII, recognizing the contributions of Ms. Dempsey

10 and Ms. Grote?

11 A.  Yes.

12 Q.  And then on VIII is what I think you were referring to

13 before, which was the ten-year business plan?

14 A.  Yes.

15 Q.  And that was something that you indicated was maybe the

16 main reason for having this meeting, correct?

17 A.  Correct.

18 Q.  We can move on to the next document in front of you, which

19 should be Defendants' D729.

20          Is that what you have?

21 A.  Yes.

22 Q.  Do you recognize what that document is?

23 A.  It's a tribal resolution.

24 Q.  Looking at the second page, do you recognize the signatures

25 on that document?

1   A.  Yes, I do.

2   Q.  Whose signatures are they?

3   A.  That was principal Chief Floyd Leonard and

4   secretary-treasurer Julie Olds.

5   Q.  Was this one of the many resolutions that were required to

6   be passed?

7   A.  Yes.

8   Q.  To permit the online tribal lending to go on?

9   A.  Yes.

10          MR. GINSBERG:  I would offer Defendants' D729 in

11   evidence.

12          THE COURT:  Any objection?

13          MR. VELAMOOR:  No.

14          THE COURT:  Received.

15          (Defendants' Exhibit D729 received in evidence)

16          MR. GINSBERG:  Just put it up on the screen so the

17   jury can take a look at it.  I am not going to read through the

18   whole document.

19   BY MR. GINSBERG:

20   Q.  It does in the middle of it, however, talk about, in the

21   fourth paragraph, the legal infrastructure for the operation of

22   loan company, is that correct?

23   A.  Yes.

24          "Whereas?"

25   Q.  Yes.

1          Then after that it indicates "Whereas, the Miami Tribe

2    of Oklahoma, the MTBE, has been operating a loan company since

3    November 2003," correct?

4    A.  Yes.

5          MR. GINSBERG:  You can put that down.

6          MR. VELAMOOR:  I will just note that the whereas

7    clauses, as the court previously instructed, are not offered

8    for the truth.

9          THE COURT:  Ladies and gentlemen, it's merely for the

10   fact that they are said.  You can put anything in a whereas

11   clause.  It doesn't make it the truth.  But knowing that it's

12   there, it was something that was said, you can consider that.

13   Q.  I will ask you to take a look at Defendants' D728, please.

14         Do you have that in front of you?

15   A.  Yes, I do.

16   Q.  Do you recognize what that document is?

17   A.  One moment, please.

18         Yes.  This is a Miami Tribe of Oklahoma interest loan

19   and debt, chapter 1, interest rates and loans.

20   Q.  Was this something that the tribe was also required to pass

21   in terms of a provision or a law, under tribal law, in order to

22   continue the operation of the payday lending business?

23   A.  This is an operation of the MBR statement, which would be

24   the Miami business.

25   Q.  This document specifically relates to interest rates and

1    loans, is that correct?

2    A.  Yes, it does.

3           MR. GINSBERG:  Your Honor, I would offer Defendants'

4    Exhibit D728.

5           THE COURT:  Any objection?

6           MR. VELAMOOR:  Your Honor, this in fact is a legal

7    proportion of the provision.  I am not sure if it's being

8    offered for the truth of it or not, but this is actually, I

9    think, proffered as a piece of law.

10          THE COURT:  Is that correct?

11          MR. GINSBERG:  I think we had this discussion on

12   Thursday.  This is a tribal resolution.

13          THE COURT:  It's a resolution.  It's not a tribal

14   ordinance or regulation?

15          MR. GINSBERG:  It's an ordinance or regulation that's

16   required for the functioning of the business.

17          THE COURT:  Then the objection is sustained.

18          If it's a resolution, I will allow it.  If it's an

19   ordinance, I will not allow it.  If there is some principle of

20   law that the jury needs to be aware of, I will instruct them on

21   the law.

22          MR. GINSBERG:  Thank you, your Honor.

23   Q.  Mr. Gamble, is it correct to say that from time to time in

24   order to conduct the online payday lending business, the tribe

25   was required by its own rules to pass various regulations?

HA28TUC1                    Gamble - Direct

1          MR. VELAMOOR:  Objection only to the leading and form.

2          THE COURT:  I will allow it under the circumstances.

3          Go ahead.

4  A.  Could you restate the question?

5  Q.  Is it correct to say that in order to continue the payday

6  lending business, the tribe was required from time to time to

7  pass rules or regulations or laws regarding how that business

8  should be operated?

9  A.  Yes.

10  Q.  And the tribe did that, is that correct?

11  A.  Correct.

12  Q.  And did the tribe do that to be in compliance with tribal

13  laws?

14  A.  Yes.

15  Q.  Let's move on to 737.

16          Do you have that in front of you, D737?

17  A.  Yes, I do.

18  Q.  Do you recognize what this is?

19  A.  This is also a tribal resolution 5-14.

20  Q.  Do you recognize the signatures at the end of the page?  On

21  page 2.

22  A.  Yes, I do.

23  Q.  Whose signatures are those?

24  A.  Principle Chief Floyd Leonard and secretary-treasurer Olds.

25          THE COURT:  What is the date of the document?

HA28TUC1                    Gamble - Direct

1          MR. GINSBERG:  May 10, 2005, your Honor.  It's on the

2    second page, in the certification.

3          THE COURT:  All right.

4    Q.  Was this a resolution required to be passed regarding the

5    Miami Nation Enterprises?

6    A.  Give me a moment, please.

7          I believe that MTBE was formed under Miami Tribal

8    Science and Technology, and that particular document is

9    replaced with the MTBE.

10         MR. GINSBERG:  I'd offer Defendants' Exhibit D737,

11   your Honor.

12         THE COURT:  Any objection?

13         MR. VELAMOOR:  No, your Honor.

14         THE COURT:  Received.

15         (Defendants' Exhibit D737 received in evidence)

16   BY MR. GINSBERG:

17   Q.  As you say, this is basically amending a previous

18   resolution because of the change?

19   A.  I believe.

20   Q.  That's fine.

21         It discusses developing economic potential within the

22   jurisdiction of the Miami tribe in this resolution?

23   A.  Yes.

24   Q.  And it talks about the things that would be necessary to do

25   in order to enhance development opportunities, is that correct?

1   A.  Yes.

2   Q.  And this resolution was passed by the business committee of

3   the tribe, is that correct?

4   A.  Yes, it was.

5   Q.  We can move on.

6           Do you have D739 in front of you now?

7   A.  Yes, I do.

8   Q.  I would ask you similar questions.

9           Do you recognize what this is?

10  A.  This is tribal resolution 5-16.

11  Q.  Do you recognize the signatures on the second page?

12  A.  Yes, I do.

13          MR. GINSBERG:  I'd offer Defendants' D739 into

14  evidence.

15          THE COURT:  Any objection?

16          MR. VELAMOOR:  No, your Honor.

17          THE COURT:  Received.

18          (Defendants' Exhibit D739 received in evidence)

19  BY MR. GINSBERG:

20  Q.  Was this yet another tribal resolution that had to do with

21  the development of tribal opportunities?

22  A.  Yes, it was.

23  Q.  In fact, did this tribal resolution in the seventh whereas

24  paragraph name certain individuals to serve as members of the

25  board because they had the requisite experience?

1   A.   Yes.

2   Q.   And among those people were Julie Olds, is that correct?

3   A.   Correct.

4   Q.   Who is Julie Olds?

5   A.   Julie Olds was cultural presidential officer and

6   secretary-treasurer.

7   Q.   And Tami McKeon?

8   A.   Yes.

9   Q.   Who is Tami McKeon?

10  A.   Tami was the head over the grant department.

11  Q.   The grant department?

12  A.   Yes.

13  Q.   What did the grant department do?

14  A.   They administered a number of grants, and she was more of a

15  compliance officer, make sure everything in the grants were

16  being followed within the grant requirements.

17  Q.   And the third name in that paragraph?

18  A.   Kennis Bellmard.

19  Q.   Do you know who that is?

20  A.   Yes.  He was a tribal attorney.

21  Q.   He is being appointed to serve on the board of directors,

22  correct?

23  A.   Correct.

24  Q.   For what purpose was he being placed on the board of

25  directors?

1   A.  Governing board.

2   Q.  Did it have to do with his experience as an attorney?

3   A.  I would believe so.

4   Q.  I would like to move on to Defendants' D743.

5         Do you have that in front of you?

6   A.  Yes, I do.

7   Q.  Do you recognize what this document is?

8   A.  Yes, it is.  It's minutes from the monthly meeting.

9   Q.  As you testified last week, it was required to take minutes

10  of the meeting and then type them up and present them at the

11  next meeting and have them approved, correct?

12  A.  For approval.

13  Q.  And this is one of those sets of minutes, is that correct?

14  A.  Yes.

15        MR. GINSBERG:  I offer Defendants' D743 into evidence,

16  your Honor.

17        THE COURT:  Any objection?

18        MR. VELAMOOR:  No, your Honor.

19        THE COURT:  Received.

20        (Defendants' Exhibit D743 received in evidence)

21  BY MR. GINSBERG:

22  Q.  In these minutes, if you look at the first paragraph, it

23  references the individuals who were attending the business

24  committee meeting, is that correct?

25  A.  Yes, it does.

1   Q.  Among those individuals was a social services director?

2   A.  Yes.

3   Q.  Callie Lankford, correct?

4   A.  Callie.

5   Q.  Did Callie Lankford have any relationship to another tribal

6   member?

7   A.  Callie?

8   Q.  Callie.

9   A.  Callie Lankford is the wife of the son of Jerry Lankford.

10  Q.  And Jerry Lankford, is he related to anyone else in the

11  tribe?  Was anyone in that family eventually chief of the

12  tribe?

13  A.  Yes.

14  Q.  Who was that?

15  A.  Doug Lankford.

16  Q.  It mentions the human resource officer Charla Jimenez,

17  correct?

18  A.  Yes.

19  Q.  And Doug Lankford, correct?

20  A.  Yes.

21  Q.  Don Brady was president, correct?

22  A.  Let me catch up with you.

23  Q.  Next-to-last line.

24  A.  Yes, Don Brady.

25  Q.  And finally on the last line it references tribal attorney

1   Robin Lash, correct?

2   A.   Correct.

3   Q.   D747, do you recognize that document?

4   A.   Yes, I do.

5   Q.   What is that document?

6   A.   It's a business committee meeting.

7   Q.   The minutes of the meeting?

8   A.   I believe so.

9   Q.   Look at the last page, please, the signature line.

10  A.   Yes.

11  Q.   Do you recognize the signature?

12  A.   Principal Chief Floyd Leonard.

13  Q.   Is it dated next to his signature?

14  A.   Yes, it was.

15          MR. GINSBERG:  I would offer Defendants' D747, your

16  Honor.

17          THE COURT:  Any objection?

18          MR. VELAMOOR:  No, your Honor.

19          THE COURT:  Received.

20          (Defendants' Exhibit D747 received in evidence)

21  BY MR. GINSBERG:

22  Q.   Just again looking at the top paragraph, where it mentions

23  the individuals who were present, in this meeting there were

24  some additional people present who were not present in the

25  minutes of the previous meeting, is that correct?

HA28TUC1                    Gamble - Direct

1    A.  Yes.

2    Q.  Dick Lillard?

3    A.  Dick Lillard became our insurance representative.

4    Q.  And Barbara Mullin?

5    A.  Barbara was an executive assistant.

6    Q.  And again on the last line, does it reference tribal

7    attorney Ken Bellmard's presence at the meeting?

8    A.  Yes, it does.

9    Q.  And on the last page on the top, on the signature page,

10   there is an indication of an MNE report being given by Don

11   Brady, is that correct?

12   A.  Correct.

13   Q.  We can move on.

14          I think D748 is in front of you, but you can put that

15   aside and we will go to D763.

16          Do you have that in front of you?  We are going to go

17   to 763, which is the next document.

18          Do you have that?

19   A.  Yes, I do.

20   Q.  Could you tell us what this document is.

21   A.  This is a tribal resolution.

22          MR. GINSBERG:  I would offer D763, your Honor.

23          THE COURT:  Any objection?

24          MR. VELAMOOR:  No, your Honor.

25          THE COURT:  Received.

1          (Defendants' Exhibit D763 received in evidence)

2     BY MR. GINSBERG:

3     Q.  In this resolution, in the final paragraph, the business

4     committee authorizes the formation of AMG Services, Inc., a

5     wholly-owned corporation of the tribe.

6     A.  Correct.

7     Q.  And adopts the articles of incorporation for AMG Services,

8     is that correct?

9     A.  Correct.

10    Q.  And that was formalizing the beginning of AMG operating as

11    a wholly-owned corporation of the tribe and the rules in which

12    it had operated under, is that correct?

13    A.  Yes.

14          MR. VELAMOOR:  Objection to the leading.

15          THE COURT:  Try and avoid it.

16    Q.  What was the purpose of that last "now be it therefore

17    resolved" paragraph?

18    A.  This was forming AMG Services, Inc. and adopting the

19    articles of incorporation.

20    Q.  AMG, as it indicates here, was a wholly-owned corporation

21    of the tribe, correct?

22          MR. VELAMOOR:  Objection to the leading.

23          MR. GINSBERG:  I am reading from the document.

24          THE COURT:  If it's in the document, then it's in

25    evidence.

1          Next question.

2    Q.  We can move on.  You can put that aside.

3          We will go to D762.

4          Do you have that in front of you?

5    A.  Yes, I do.

6    Q.  What is D762?

7    A.  Articles of incorporation.

8    Q.  Do you recognize these?

9    A.  Yes.

10   Q.  On the last page, is there a certification with a

11   signature?

12   A.  Yes.

13   Q.  Do you recognize the signature?

14   A.  Secretary Julie Larson.

15   Q.  And on the page before that, do you recognize a series of

16   signatures?

17   A.  Yes.

18   Q.  Do you recognize the top signature?

19   A.  Yes.  That would be mine.

20          MR. GINSBERG:  I would offer Defendants' 762 into

21   evidence.

22          MR. VELAMOOR:  No objection, your Honor.

23          THE COURT:  Received.

24          (Defendants' Exhibit D762 received in evidence)

25   BY MR. GINSBERG:

1  Q.  The previous resolution that we discussed referenced

2  articles of incorporation for AMG Services.  Is this what this

3  document is?

4  A.  Yes.  Yes.

5  Q.  Then the document goes on to -- so we don't read it all --

6  describe the purposes.  The name first.  Article II, the

7  purposes.  Article III, the powers of AMG.  Correct?

8  A.  Yes.

9  Q.  On the second page, Article IV references the privileges

10  and immunities, is that correct?  Article IV on page 2.

11  A.  Just one moment, please.

12          Are we on Defendants' Exhibit --

13  Q.  D762.

14  A.  -- 762?

15  Q.  Yes.  The articles of incorporation.

16  A.  OK.  I'm on 64.

17  Q.  Then I am going to give you another copy of 762.  I

18  apologize.

19  A.  If I do have it, I don't see it.

20  Q.  You may have put it aside.

21  A.  Here it is.

22  Q.  So just go to page 2.  Article IV references the privileges

23  and immunities, correct?

24  A.  Correct.

25  Q.  And Article V specifically references the sovereign

1  immunity of the corporation?

2  A.  Yes, it does.

3  Q.  And it explains underneath that what that means, is that

4  correct?

5  A.  Just one moment.

6         Correct.

7  Q.  Then on page 4, it describes the operational requirements

8  under Article IX, correct?

9  A.  Yes.

10  Q.  Thank you.

11         D764, do you have that in front of you?

12  A.  Yes, I do.

13  Q.  Do you recognize what that is?

14  A.  This is an AMG board of directors' resolution.

15  Q.  Do you recognize on the second page the signatures?

16  A.  Yes, I do.

17  Q.  Do you recognize your signature?

18  A.  Yes, I do.

19         MR. GINSBERG:  I would offer D764 into evidence, your

20  Honor.

21         MR. VELAMOOR:  No objection.

22         THE COURT:  Received.

23         (Defendants' Exhibit D764 received in evidence)

24  BY MR. GINSBERG:

25  Q.  You indicated this is a resolution again of the board of

1   AMG Services, is that correct?

2   A.  Yes, it is.

3   Q.  And this specifically, in the second sort of bold small

4   portion on the top, authorizes the merger of CLK Management,

5   LLC into AMG Services, Inc., a tribal corporation, correct?

6   A.  Yes.

7   Q.  Was this document one of the documents referenced in the

8   earlier board minutes as necessary to begin operating AMG

9   Services?

10  A.  Yes, as a tribal entity.

11  Q.  As a tribal entity.  OK.  You can put that aside.

12          D766.  Do you have that?

13  A.  Yes, I do.

14  Q.  Do you recognize what that is?

15  A.  This is also an AMG board of directors' resolution.

16  Q.  Do you recognize the signatures on the second page?

17  A.  Yes.

18  Q.  Can you tell us the date of this document?

19  A.  26th day of June 2008.

20          MR. GINSBERG:  I would move Defendants' D766 into

21  evidence.

22          THE COURT:  Any objection?

23          MR. VELAMOOR:  No, your Honor.

24          THE COURT:  Received.

25          (Defendants' Exhibit D766 received in evidence)

HA28TUC1                    Gamble - Direct

1    BY MR. GINSBERG:

2    Q.  Now we are going to go to D780.

3           Do you have D780 in front of you?

4    A.  Yes, I do.

5    Q.  Can you tell us what that is.

6    A.  This is a resolution from the board of directors of Miami

7    Nation Enterprises.

8    Q.  Do you recognize the signatures on it?

9    A.  Yes, I do.

10   Q.  It may be hard to read, but can you tell us the date?

11   A.  20th day of August 2008.

12           MR. GINSBERG:  I would offer Defendants' D780 into

13   evidence.

14           THE COURT:  Any objection?

15           MR. VELAMOOR:  No, your Honor.

16           THE COURT:  Received.

17           (Defendants' Exhibit D780 received in evidence)

18   BY MR. GINSBERG:

19   Q.  Before that I might have skipped over D759.  If you would

20   go back.

21           Do you have D759?

22   A.  Yes, I do.

23   Q.  Do you recognize what D759 is?

24   A.  This is a purchase agreement.

25   Q.  Do you recognize the signatures on the last two pages of

HA28TUC1                    Gamble - Direct

1   the document?

2   A.  I see one.  Yes.  CEO Don Brady and Scott Tucker.

3           MR. GINSBERG:  I would offer Defendants' D759 into

4   evidence, your Honor.

5           THE COURT:  Any objection?

6           MR. VELAMOOR:  No, your Honor.

7           THE COURT:  Received.

8           (Defendants' Exhibit D759 received in evidence)

9   BY MR. GINSBERG:

10  Q.  What is this document?

11  A.  This document is a purchase agreement.

12  Q.  What company is purchasing what company?  If you need to

13  read it, you can read from the first paragraph.  It's in

14  evidence.

15  A.  CLK Management, LLC and AMG Services, Inc.

16  Q.  Is this the document which permitted AMG Services to

17  purchase CLK Management?

18  A.  Yes.

19  Q.  Was Don Brady authorized as the CEO and president to sign

20  this document?

21  A.  Yes, he was.

22  Q.  He was authorized to sign it on behalf of AMG and on behalf

23  of the tribe, is that correct?

24  A.  Well, on behalf of AMG and MNE and the tribe.

25  Q.  And the tribe.

1    And this purchase agreement, without going through all

2  of it, describes the terms of the purchase itself, is that fair

3  to say?

4    MR. VELAMOOR:  Objection.  Leading.

5    THE COURT:  Overruled.  Rather, sustained as to

6  leading.

7    Rephrase the question.

8  Q.  What is the purpose of this purchase agreement?

9  A.  To make AMG a tribally-owned entity.

10    THE COURT:  Say it again.

11  A.  To make AMG a tribally-owned entity, to purchase it as a

12  tribally-owned entity.

13  Q.  You can put that aside.

14    Do you have D786 in front of you?

15  A.  Can you repeat the number, please?

16  Q.  D786.

17  A.  Yes, I do.

18  Q.  Do you recognize that?

19  A.  This is Miami tribe business committee minutes.

20    MR. GINSBERG:  I would offer D786 into evidence, your

21  Honor.

22    THE COURT:  Any objection?

23    MR. VELAMOOR:  No, your Honor.

24    THE COURT:  Received.

25    (Defendants' Exhibit D786 received in evidence)

HA28TUC1                    Gamble - Direct

1  BY MR. GINSBERG:

2  Q.  You can put that aside.

3         Do you have D790 in front of you?

4  A.  Yes.  Some of these are repetitious.

5  Q.  Pardon me?

6  A.  The next one references 786.  So I just set it aside also.

7  Q.  OK.  Thank you.

8         D790, do you have that?

9  A.  Yes, I do.

10  Q.  Do you recognize that?

11  A.  Yes, I do.

12  Q.  Do you recognize the signatures on the second page?

13  A.  Yes, I do.

14         MR. GINSBERG:  I would offer D790 into evidence, your

15  Honor.

16         THE COURT:  Any objection?

17         MR. VELAMOOR:  No, your Honor.

18         THE COURT:  Received.

19         (Defendants' Exhibit D790 received in evidence)

20  BY MR. GINSBERG:

21  Q.  D791, do you have that in front of you?

22  A.  Yes, I do.

23  Q.  Can you tell us what that is?

24  A.  This is minutes of a meeting, business committee meeting.

25  Q.  Business committee meeting.  And you recognize this as

1    well, is that correct?

2    A.  Do I recognize?

3    Q.  Do you recognize it as the minutes of the business

4    committee meeting?

5    A.  Yes, I do.

6            MR. GINSBERG:  I would offer D791 into evidence.

7            THE COURT:  Any objection?

8            MR. VELAMOOR:  At least on this page I see nothing

9    relating to the loan business.  Maybe if there is, it's on

10   another page.

11           MR. GINSBERG:  Page 2, your Honor.

12           MR. VELAMOOR:  OK.

13           THE COURT:  Received.

14           (Defendants' Exhibit D791 received in evidence)

15   BY MR. GINSBERG:

16   Q.  I would ask you to go to the second page of the document,

17   under MNE.

18   A.  Yes, sir.

19   Q.  Does Don Brady give a report?

20   A.  Yes, he does.

21   Q.  Is part of his report a discussion of the loan business?

22   A.  Yes.

23   Q.  You can put that aside, please.  Thank you.

24           Defendants' D792.  Do you have that in front of you?

25   A.  Yes.

1    Q.  Do you recognize that?

2    A.  Yes, I do.

3    Q.  This one is not signed.

4    A.  Correct.

5    Q.  But does it appear to be minutes of the business regulatory

6    commission meeting?

7    A.  Yes.  There is no contents.

8                MR. GINSBERG:  I offer D792.

9                MR. VELAMOOR:  No objection.

10               THE COURT:  Received.

11               (Defendants' Exhibit D792 received in evidence)

12   BY MR. GINSBERG:

13   Q.  Under "new business," Roman numeral II, number 3, does it

14   reference AMG compliance?

15   A.  Yes.

16   Q.  You can put that aside.

17               If you have 795 in front of you.  Do you have that

18   now?

19   A.  Yes, I do.

20   Q.  Do you recognize this?

21   A.  Yes, I do.

22   Q.  What is this?

23   A.  This is the minutes from the business regulatory

24   commission.

25               MR. GINSBERG:  I offer D795 into evidence.

1       THE COURT:  Any objection?

2       MR. VELAMOOR:  No objection.

3       THE COURT:  Received.

4       (Defendants' Exhibit D795 received in evidence)

5   BY MR. GINSBERG:

6   Q.  When was this meeting held?

7   A.  July 13, 2009.

8   Q.  Under new business, is there an indication that there was a

9   review of the May and June financials?

10  A.  Yes.

11  Q.  And also of the AMG compliance report?

12  A.  Yes.

13  Q.  You can put that aside.

14      I would ask you to look at Defendants' D794.

15  A.  Yes.

16  Q.  Do you recognize what that is?

17  A.  Yes, I do.

18  Q.  Did you recognize the signatures on the bottom of the page?

19  A.  Yes, I do.

20      MR. GINSBERG:  I offer D794 into evidence.

21      THE COURT:  Any objection?

22      MR. VELAMOOR:  No objection, your Honor.

23      THE COURT:  Received.

24      (Defendants' Exhibit D794 received in evidence)

25  BY MR. GINSBERG:

1  Q.  Can you tell us what this document is?

2  A.   It is adopting the executive center leases, international

3  approval of lender for sovereign immunity.

4  Q.   This is, as it says on the top, a resolution of the board

5  of directors of AMG Services, correct?

6  A.   Correct.

7  Q.   And when you say adopting, you said something regarding

8  officers, in the third whereas paragraph, does it indicate that

9  AMG needs office space to effectively perform its work and

10  wishes to lease commercial property in Overland Park, Kansas?

11  A.  Yes, it does.

12  Q.   Does that indicate that AMG, the tribal company that you

13  referenced, is purchasing this space because they didn't have

14  enough space where they were currently operating?

15          MR. VELAMOOR:  Objection.

16          THE COURT:  Sustained.

17  Q.   What was the purpose of purchasing space by the tribe in

18  Overland Park, Kansas?

19  A.   I believe it was a lease.

20  Q.   A lease.  I'm sorry.

21          What was the purpose of having a lease in Overland

22  Park, Kansas?

23          MR. VELAMOOR:  Objection, your Honor.  Foundation.

24          THE COURT:  If you know.  Do you know the purpose?

25          THE WITNESS:  Yes.

1    THE COURT:  You can testify.

2  A.  AMG had taken on a very large growth period.  So they

3  needed to lease another building, to my recollection.

4  Q.  In the final paragraph where it says, "now be it further

5  resolved," it also discusses the lease and sovereign immunity,

6  is that correct?

7  A.  Yes.

8  Q.  We can move on from that document.

9    Now, from time to time, did you reach out to any

10  lawyers from the tribe in order to obtain legal advice

11  regarding MNE?

12    MR. VELAMOOR:  Objection, your Honor.

13    THE COURT:  One second.

14    I'm sorry.  Let me hear the question again.

15  Q.  From time to time, did you reach out for legal advice from

16  lawyers who represented the tribe or MNE?

17    THE COURT:  That's a yes-or-no question.

18    You may answer.

19  A.  Yes.

20  Q.  Did Don Brady do the same, to your knowledge?

21  A.  Yes, he did.

22  Q.  Looking at the top of Defendants' Exhibit D2060, do you

23  recognize the names on this document?

24  A.  Ho Chunk, Tom Gamble, Don Brady.  Yes, I recognize the

25  names.

HA28TUC1                    Gamble - Direct

1    Q.  Can you tell us who Ho Chunk is?

2    A.  Ho Chunk is -- no, no.

3    Q.  Pardon me?

4    A.  I know who they are, but I don't know if I can explain it.

5         Ho Chunk is in the economic development division for

6    the tribe.

7    Q.  You know who Tom Gamble is?

8    A.  Yes, I do.

9    Q.  And Don Brady?

10   A.  Yes.

11        MR. GINSBERG:  Your Honor, I would offer Defendants'

12   D2060 in evidence.

13        MR. VELAMOOR:  Objection on hearsay as well as

14   relevance.

15        THE COURT:  Can you make it a little bit larger,

16   please.

17        MR. VELAMOOR:  Also, may I add, it is essentially

18   legal advice, the substance of legal advice purportedly

19   provided to tribal members.

20        THE COURT:  Ladies and gentlemen, let's take our

21   mid-morning break.

22        Please do not discuss the case among yourselves or

23   anyone else.  Let me sort things out.

24        (Jury exits courtroom)

25        (Continued on next page)

1          (Jury not present)

2          THE COURT:  You can step out, Mr. Gamble.

3          (Witness excused)

4          Can you put the document back up on the screen, Mr.

5     Ginsberg.

6          MR. GINSBERG:  It's on my screen.  Is it on yours?

7          THE COURT:  Let me see.  There may be a problem here.

8          The document number is?

9          MR. GINSBERG:  We can give you the witness's copy.

10         THE COURT:  All right.

11         Let me hear the government on this.

12         MR. VELAMOOR:  Yes, your Honor.  I believe the court

13    throughout this trial has made at least two principles very

14    clear with respect to legal advice.  One, it needs to be legal

15    advice to the defendants and, second, that it needs to have

16    been provided prior to them beginning the activity.

17         This e-mail violates both of those principles.  It's

18    not provided to the defendants.  It comes well into the charged

19    conduct when they are in active litigation.  So it's both

20    irrelevant and hearsay.  It's attempt to offer legal advice

21    from lawyers into the case suggesting that all of this was

22    fine, this is an innovative legal strategy, etc. etc.  It's

23    prejudicial and totally irrelevant.

24         THE COURT:  Mr. Ginsberg.

25         MR. GINSBERG:  I don't believe it's actually legal

1    advice.  I have read this quite a number of times.  I think

2    it's instructive as to what the lawyers are doing generally in

3    terms of things that have arisen, but it's not specifically

4    legal advice.  It's just advising the tribe, these are things

5    that have come up and this is how we are approaching them.

6         I don't believe it has to be to the defendants because

7    the government has sort of put -- has not sort of, has put at

8    issue whether or not anything to do with the tribe was a sham,

9    and here there are lawyers advising the tribe that issues came

10   up that we are dealing with.

11        THE COURT:  I think you're confused, Mr. Ginsberg.

12        Is there any dispute from the government that the

13   tribes enjoyed tribal sovereign immunity with regard to the

14   payday lending operations?

15        MR. VELAMOOR:  No, your Honor.

16        THE COURT:  I think you're a little bit confused here,

17   Mr. Ginsberg, with all due respect, or it's an attempt to

18   confuse the jury.

19        MR. GINSBERG:  No, your Honor.  Respectfully, I am not

20   trying to confuse the jury at all.

21        THE COURT:  Then maybe you're confused or maybe your

22   clients were confused.  I have no idea.  But the reality is the

23   tribes enjoy tribal sovereign immunity.  That's the case here.

24   And someone telling the tribes that they have tribal sovereign

25   immunity.  I can tell the jury they have tribal sovereign

1    immunity.  It does not control the actions of your clients

2    necessarily, or what they believe.  Fervently believing that

3    the tribe had sovereign immunity doesn't help your client's

4    advice of counsel defense.

5           MR. GINSBERG:  That wasn't my purpose of this.  My

6    purpose was to show that, unlike the way the government is

7    trying to portray this, that the tribes were, A, involved in

8    the business and, B, because they were involved in the business

9    they were concerned to reach out to the attorneys to see what

10   the attorneys were doing in relation to the overall tribal

11   lending business.  It wasn't specifically --

12          THE COURT:  Excuse me.  I have allowed you to do

13   precisely what you say you want to do.  That's what you're in

14   the process of doing.  That's why resolutions and board minutes

15   are coming in.  Exactly on that theory.

16          MR. GINSBERG:  Yes.

17          THE COURT:  But the objection to this exhibit is

18   sustained, number one, on the basis of relevance, and number

19   two, under 403, because any probative value it may have is

20   substantially outweighed by the danger of jury confusion.  So

21   the objection is sustained as to D2060.

22          Now, while we are on our break, let me ask the

23   government a question, if I may.

24          With regard to Counts Two through Four, the loans in

25   Counts Two through Four are all part of the conspiracy in Count

1   One, correct?

2           MR. SCOTTEN:  Yes, your Honor.

3           THE COURT:  And it is the government's position, if I

4   understand this case correctly, that in fact the lenders on

5   each of the loans in Counts Two, Three and Four, were Scott

6   Tucker or a company or entity controlled by Scott Tucker, is

7   that correct?

8           MR. SCOTTEN:  That is correct, your Honor.

9           THE COURT:  And it is the defense position that that's

10  not true at all, that the lender was a tribal entity.  Is that

11  correct?

12          MR. GINSBERG:  Yes, your Honor.

13          THE COURT:  So let me mark as the next court exhibit,

14  and I will ask that it be handed out by my clerk, a question

15  that I propose to ask the jury, and it reads as follows:  Has

16  the government proven beyond a reasonable doubt that at the

17  time of making the loans alleged in Counts Two through Four,

18  the lender in fact was Scott Tucker or an entity owned or

19  controlled by him?  Yes or no?

20          Mr. Ginsberg.

21          MR. GINSBERG:  Could you add either, and not a tribal

22  entity, or -- because it's not giving them an alternative by

23  phrasing it that way.

24          THE COURT:  You can argue it to the jury.  You can

25  argue it to the jury.

1          MR. GINSBERG:  I understand.  But if your Honor poses

2    the question, even though you're going to tell the jury you

3    don't have a view on it, but if your Honor poses the question

4    only with Scott Tucker in it, it seems to exclude by omission

5    the possibility that it was the tribe.

6          THE COURT:  I don't think it does at all.  But that's

7    a question of the wording in the question, I suppose.

8          MR. GINSBERG:  Yes.

9          THE COURT:  Let me hear from the government.

10          MR. SCOTTEN:  Your Honor, if the court has time, I

11    would like to look into this and see if there is any case law.

12          As a general matter, your Honor, if the question is to

13    be asked, I do think it should be phrased the way it is.  It

14    wouldn't be an exclusive question.  It's not either/or.  There

15    is aiding and abetting liability.  There can be more than one

16    person to commit a crime.  So it doesn't have to be one or the

17    other.

18          I think I see why the court wants to ask this

19    question, but I certainly wouldn't want to make it, it must be

20    Scott Tucker or the tribe.  The evidence is pretty clear the

21    tribe has some peripheral involvement at least.

22          THE COURT:  I understand that.  Well, that's something

23    for you all to chew on.

24          A couple of other points.

25          I see the letter of October 1 regarding Mr. Schulte.

1   And in that letter there is a factual assertion made that

2   Mr. Schulte considered Mr. Tucker to be his client, and this is

3   as of early December 2003.  That, I take it, would not speak to

4   a period of time before December 2003, correct?

5           It says, if I am reading -- I am just trying to make

6   sure I am reading the words.  "By early December 2003, well

7   before any lending with the three tribes referenced in the

8   indictment began, Mr. Schulte considered Mr. Tucker to be his

9   client, as he will testify."

10          Correct?

11          MR. ROTH:  That is correct, your Honor.

12          THE COURT:  And I take it there were conversations

13  which the defense had hoped to offer from Mr. Schulte which

14  took place I think in the late summer or early September up

15  through November, is that correct?

16          MR. ROTH:  Yes, your Honor.

17          THE COURT:  I just wanted to understand that point.

18          MR. SCOTTEN:  Did the court receive the government's

19  response on that?

20          THE COURT:  I don't think I did.

21          MR. SCOTTEN:  It was finalized this morning.

22          THE COURT:  Maybe I have it here.

23          Oh, I have it here.  I have your response.

24          MR. SCOTTEN:  I just wanted to make sure you had it.

25          THE COURT:  Thank you.

1    I think I understand the defense's argument under

2   1962(a) and the incorporation of the definition of unlawful

3   debt.

4    Do you maintain that any of these debts in Counts Two

5   through Four were enforceable in a state court?

6    MR. GINSBERG:  I think we had this discussion

7   previously about unlawful or enforceable.

8    Under state law, if the jury were to find that the

9   tribes were the lenders, that's enforceable.

10    THE COURT:  Let's take that proposition for a second.

11   Let's just take a different case.  Let's assume that the loan

12   was made by the tribe, of tribal funds on the tribe.  Would

13   that loan be enforceable under New York law?

14    MR. GINSBERG:  It would be enforceable because, if it

15   was made by the tribe, New York law wouldn't apply because of

16   sovereign immunity.  There is a distinction, again, between

17   whether it was unlawful under New York law or enforceable.

18    THE COURT:  I will speak to lawfulness, but for the

19   moment I am focusing on enforceability.  With all the thousands

20   of loans extended over the period of this conspiracy, did the

21   defendants or any company at issue in this case ever endeavor

22   to enforce a loan against a borrower in any state court, ever?

23    (Continued on next page)

24

25

1          MR. GINSBERG:  You mean by virtue of a legal action?

2          THE COURT:  Yes, sir.

3          MR. GINSBERG:  I don't know that I know the answer to

4     that.  It's just that I don't know the history of every single

5     loan.

6          THE COURT:  OK.

7          MR. GINSBERG:  I don't want to guess.  If I had a

8     couple of minutes, maybe over the break --

9          THE COURT:  You have more than a couple of minutes,

10    because I'm posing that question.

11         MR. GINSBERG:  OK.

12         THE COURT:  As I read New York choice of law

13    principles, as outlined recently by Judge Seibel of this court,

14    I agree with her, and I do not believe that in New York a court

15    would apply tribal law to the loan, because it offends New York

16    public policy, among other things, and it's not an issue of

17    tribal law.  In Judge Seibel's case, it was Delaware law, and

18    she held that a New York court would not apply Delaware law

19    because of New York's public policy against usurious loans.

20    You're welcome to take a look at her case, but I'm not sure

21    your reading of the statute is correct, that it's a question of

22    enforceability in some abstract sense.  But even if your

23    reading the statute is correct, I don't think your factual

24    premise is correct.  It's 237 F.Supp.3d 130, and it was decided

25    on February 27 of this year.  You can take a look at it.

1     MR. GINSBERG:  We will.

2     THE COURT:  All right.  I wanted to get that out into

3  the open.

4     MR. GINSBERG:  I appreciate it.  It's obviously a

5  concept, I could speak for myself, that I've wrestled with

6  because of the different parts to it, unlawfulness and

7  enforceability and all of those things.  I think we did have a

8  brief discussion about this week or two ago, but I'd like to

9  consult with my colleagues, particularly Ms. Van Ness, who is

10  our legal writer person.

11     THE COURT:  All right.  We're in recess.  Thank you.

12     (Recess)

13     THE COURT:  Bring the witness back, please, and bring

14  our jurors in.

15     (Jury present)

16     THE COURT:  Please be seated.

17     You may continue.

18     MR. GINSBERG:  Thank you, your Honor.

19  Q.  Mr. Gamble, I'd like you to go to Defendant's Exhibit D828.

20  It may be one or two down.

21  A.  Yes.

22  Q.  Do you recognize this document?

23  A.  No.

24  Q.  Pardon me?

25  A.  No, I have not.

Ha2Wtuc2

1   Q.  Do you recognize who it's addressed to?

2   A.  Yes, I do.

3   Q.  And do you recognize the signatures on the last two pages?

4   A.  Don Brady, CEO, and Scott Tucker.

5   Q.  Let me just ask you this.  Do you recall if there came a

6   time when there was a letter of intent that was submitted to

7   you and Mr. Brady regarding ecash?

8   A.  Oh, yes.  Yes.

9   Q.  All right.

10  A.  Well, I remember the event.

11          THE COURT:  "I remember the event"; is that what you

12  said?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Thank you.

15  BY MR. GINSBERG:

16  Q.  And do you remember receiving a letter to you and Mr. Brady

17  regarding acquisition of ecash?

18  A.  No, I don't.

19  Q.  Look at the document, D828 and look at as much as you need

20  to, but particularly the top portion of the page, and see if

21  that refreshes your recollection.

22  A.  Yes.

23  Q.  Does that refresh your recollection?

24  A.  Of the event, it was --

25  Q.  So it refreshes your recollection of the event, you just

Ha2Wtuc2

1    don't recall this particular document, is that correct?

2    A.   Correct.  It was --

3    Q.   All right.

4           MR. GINSBERG:  Your Honor, I'd offer D828, given the

5    fact that he recognizes his signature and he remembers the

6    event.

7           MR. VELAMOOR:   Objection, your Honor.  He also

8    testified, obviously, he does not recognize the document.

9           THE COURT:  All right.  The objection is sustained

10   without prejudice to your raising a better foundation for the

11   document.

12          MR. GINSBERG:  All right.

13          THE COURT:  All right.

14   BY MR. GINSBERG:

15   Q.   Did there come a time where the tribe began to enter into

16   discussions -- that is, AMG -- for the purchase of ecash?

17   A.   Yes.

18   Q.   And were you part of those discussions?

19   A.   Yes.

20   Q.   And did there come a time where Mr. Brady was part of those

21   discussions?

22   A.   Yes.

23   Q.   And did there come a time where the discussion led to a

24   request for the details of what that purchase would look like,

25   what the terms would be?

Ha2Wtuc2

1   A.  Yes.

2   Q.  And were the terms put into some type of a writing at some

3   point?  Some kind of a document that was submitted to you.

4   A.  I don't recall.

5   Q.  But did AMG purchase ecash?

6   A.  Not while I was chief.

7   Q.  While you were chief, did AMG begin the process of

8   discussions for the purchase of ecash?

9   A.  Yes.

10  Q.  And what do you recall in terms of the discussions, whether

11  there were oral discussions, emails, written documents, or

12  anything of that nature?

13  A.  I do.

14  Q.  And what do you recall occurring?

15  A.  That the ecash acquisitions for the -- for the software

16  were going to fill it with a temporary agreement and until the

17  software could be valued.

18  Q.  And prior to the temporary agreement being submitted, do

19  you recall a letter being sent to you and Mr. Brady discussing

20  the potential terms of the temporary agreement?

21  A.  No, I never seen this, until --

22  Q.  You never saw this?

23  A.  No, until right now.

24  Q.  But do you recall that there was a letter submitted?

25  A.  No.  No, I don't.

1  Q.  You don't, at all?

2  A.  No.

3       MR. GINSBERG:  I think I'll move on, Judge, rather

4  than try to belabor it.

5       THE COURT:  Thank you.

6       MR. GINSBERG:  In terms of the document.

7  Q.  For how long a period of time while you were chief were the

8  discussions going on about the purchase of ecash?

9  A.  To the best of my recollection, it was late 2011, 2012.

10  Q.  And did there come a time where the discussions, to the

11  best of your knowledge, continued when you were not chief?

12  A.  Yes.

13  Q.  When you were not chief, were you still on the business

14  committee?

15  A.  No.

16  Q.  Were you on the tribal council?

17  A.  No.

18  Q.  Were you aware of the additional discussions that led --

19  were you aware of any additional discussions that took place

20  regarding the purchase of ecash by AMG while you were not on

21  the committee?

22       MR. VELAMOOR:  Objection.  Can I ask a quick question

23  of the witness?

24       THE COURT:  Sure.

25       MR. VELAMOOR:  Does everything you know from after you

Ha2Wtuc2

1    were chief come from what other people told you was going on?

2              THE WITNESS:  Yes, that would be -- that would be safe

3    to say, word of mouth.

4              MR. VELAMOOR:  Objection on hearsay.

5              THE COURT: All right.  Sustained.

6    BY MR. GINSBERG:

7    Q.  Did you participate, continue to participate with the tribe

8    after you stopped being tribal chief?

9    A.  No.

10   Q.  You had nothing to do with the tribe anymore?

11   A.  No.

12   Q.  How did you become aware of the purchase of ecash?

13   A.  Just on -- I can't tell you for sure, but I still had

14   people that would cite that to me.

15   Q.  So again, it was only by people telling you, correct?

16   A.  Uh-huh.

17             THE COURT:  You have to answer in words.

18             THE WITNESS:  Oh.

19   A.  Yes.

20             THE COURT:  Thank you.

21   Q.  Would an event like that, the purchase by the tribe of

22   another business, be put in any kind of a newsletter or

23   information to all the tribal members?

24             MR. VELAMOOR:  Objection, your Honor.  This is all

25   after he left and established it's all based on hearsay.

Ha2Wtuc2

1    THE COURT:  Yes.  And sustained as to "would have."

2    Q.  Did the tribe --

3    THE COURT:  Mr. Ginsberg, you've asked the witness how

4    he learned of it and he told you.

5    MR. GINSBERG:  Yes.

6    THE COURT:  If you have something you want to use to

7    refresh his recollection, that's a different story.

8    MR. GINSBERG:  Right.

9    THE COURT:  If not, move on.

10   BY MR. GINSBERG:

11   Q.  Let me just ask you generally, was there a tribal

12   newsletter that was prepared on a regular basis and sent to all

13   tribal members?

14   A.  There's a tribal newspaper.

15   THE COURT:  Newspaper.

16   THE WITNESS:  Yes.

17   THE COURT:  OK.

18   THE WITNESS:  Tribal newspaper.

19   Q.  And how frequently is that put out?

20   A.  It's generally put out quarterly, but it covers events that

21   usually are cultural in nature.

22   Q.  Does it cover any business events of the tribe?

23   A.  If it does, it does by the chief's report.

24   Q.  By the chief's report?

25   A.  Yeah.

Ha2Wtuc2

1    Q.  And the chief's report, is that part of the tribal

2    newsletter?

3    A.  Yes, sir.

4    Q.  OK.  And you don't have any specific recollection -- do you

5    have any specific recollection of reading a tribal newsletter?

6    A.  No, I don't.

7            MR. VELAMOOR:  Objection.

8            MR. GINSBERG:  He answered no.

9            THE COURT:  OK.  The answer will stand.

10   Q.  I'd ask you to take a look at D835.  Do you have that in

11   front of you?

12   A.  Yes, I do.

13   Q.  And do you recognize that?

14   A.  This is the minutes for an AMG Services Inc. board meeting.

15   Q.  Do you recognize the signatures on the second page?

16   A.  Yes, I do.

17   Q.  Particularly, do you recognize your own signature?

18   A.  Yes, I do.

19   Q.  And the date of this, what is the date of these minutes?

20   A.  January 3, 2012.

21           MR. GINSBERG:  I'd offer Defendant's Exhibit D835,

22   your Honor.

23           THE COURT:  Any objection?

24           MR. VELAMOOR:  No, your Honor.

25           THE COURT:  Received.

| | |
|---|---|
| 1 | (Defendant's Exhibit D835 received in evidence) |
| 2 | BY MR. GINSBERG: |
| 3 | Q. At this meeting, you were present, correct? |
| 4 | A. Correct. |
| 5 | Q. Second Chief Doug Lankford was present, correct? |
| 6 | A. Correct. |
| 7 | Q. Did he eventually become president -- I'm sorry. Did he |
| 8 | eventually become chief of the tribe? |
| 9 | A. Correct. |
| 10 | Q. As chief of the tribe, did he become chairman of AMG? |
| 11 | A. Yes, he did. |
| 12 | Q. Don Brady was present, correct? |
| 13 | A. Yes. |
| 14 | Q. And Carolyn Williams was present, correct? |
| 15 | A. Correct. |
| 16 | Q. Now, if we look down to Roman II, there's a CEO report, is |
| 17 | that correct? |
| 18 | A. Yes. |
| 19 | Q. And Don Brady provided a "general overview of tribal online |
| 20 | lending business operations"? |
| 21 | A. Yes.d. |
| 22 | Q. Correct? |
| 23 | A. Correct. |
| 24 | Q. Under new business, does it indicate that you discussed "a |
| 25 | letter of intent executed December 28, 2011, by Don Brady and |

1    Scott Tucker, authorizing the parties to commence negotiations

2    to acquire certain proprietary information from Tucker"?  And

3    then it goes on to describe that information, is that correct?

4    A.  Yes, it is.

5    Q.  Do you recall discussing that letter of intent?

6    A.  Again, I don't think -- I don't recall.

7    Q.  To the best of your knowledge, these minutes are accurate?

8    A.  Yes.

9    Q.  So is it that you may have discussed the letter of intent,

10   but as you sit here now, you just don't recall it?

11   A.  I just don't recall it.

12   Q.  OK.  Fair enough.

13          MR. GINSBERG:  Your Honor, if I tried again to offer

14   the other document, you'd sustain the objection?  Now that we

15   have the minutes with the mention of the letter of intent?

16          MR. VELAMOOR:  Your Honor, the witness also has no

17   recollection, even after reading the minutes.

18          THE COURT:  Yes.  Sustained.

19          MR. GINSBERG:  OK.

20   Q.  In that same paragraph, "new business," on page 1, it

21   discusses a proposal by the "Miami tribal business committee to

22   create a new tribally owned division, Tribal Financial

23   Management."  Do you see that?

24   A.  Yes.

25   Q.  And do you recall that being discussed at that meeting?

1   A.  Yes.

2   Q.  Do you recall the purpose of creating that new tribally

3   owned division; that is, Tribal Financial Management?

4   A.  Yes.

5   Q.  And what was the purpose?

6   A.  Purpose was the temporary or the stopgap commitment to

7   buying software, and we allocated that some of the moneys would

8   go in the tribal, to the tribe proper account, and these would

9   be areas in which they would be distributed to.

10  Q.  And then finally, in Roman IV, No. 2, at the bottom,

11  there's a proposal that "AMG Services expand its operations to

12  serve as service company for all Native American online lending

13  operations."  Do you see that?

14  A.  Yes, I do.

15  Q.  Do you recall that being discussed?

16  A.  I do recall that.

17  Q.  And what did it mean that AMG was going to expand to serve

18  as service company for all Native American online lending

19  operations?

20  A.  I don't have a short answer for that, but I can answer it.

21  Q.  Well, we don't want a long answer that's too long.

22  A.  OK.

23          MR. GINSBERG:  If I may, your Honor, just lead a

24  little bit, rather than get the long answer.

25          THE COURT:  Try it with a question.  Let's see what

Ha2Wtuc2

1    happens.

2    BY MR. GINSBERG:

3    Q.  Did that indicate that AMG was intending to service the

4    lending business of other Native American tribes --

5    A.  Yes.

6    Q.  -- besides --

7    A.  Yes.

8    Q.  -- Miami of Oklahoma?

9    A.  Yes.

10   Q.  And in fact, did AMG go on to service the online payday

11   lending business of other Native American tribes?

12          THE COURT:  In what time period?

13          MR. GINSBERG:  Subsequent to this meeting that

14   occurred on January 3, 2012.

15   A.  No new tribes.

16   Q.  Which tribes did it service?

17   A.  I can't give you an accurate answer on that.

18   Q.  But did it service other Native American tribes?

19   A.  What -- the intent was to service other Native American

20   tribes, tribes that were already in the lending business, I

21   don't know how their -- you know, I don't know what their

22   organization was.

23          THE COURT:  Do you have any firsthand knowledge as to

24   any activities by AMG servicing any other tribes' lending?

25          THE WITNESS:  No.

Ha2Wtuc2

1          THE COURT:  OK.

2     BY MR. GINSBERG:

3     Q.  So in other words, it was the intent to do that, but

4     nothing beyond that?

5     A.  No.

6     Q.  OK.  Go to D2701.  Do you have that in front of you?

7     A.  Yes, I do.

8     Q.  Do you recognize what that is?

9     A.  Yes, I do.

10    Q.  Could you tell us what you recognize that to be?

11    A.  This is the minutes of a meeting that took place in January

12    19, 2012.

13          MR. GINSBERG:  I'd offer D2701, your Honor.

14          THE COURT:  Any objection?

15          MR. VELAMOOR:  Your Honor, could we just have a moment

16    to look through the other pages?

17          THE COURT:  Yes.

18          MR. VELAMOOR:  No objection, your Honor.

19          THE COURT:  Received.

20          (Defendant's Exhibit D2701 received in evidence)

21    BY MR. GINSBERG:

22    Q.  I'd ask you to look at page 2 -- there are two pages that

23    are both numbered one at the bottom, but the second of the

24    two -- and I'd ask you to look at Roman II, if you will, where

25    it says CEO report.  Do you see that?

1    A.  Yes, I do.

2    Q.  Does it say "AMG CEO and President Don Brady deferred his

3    report to AMG counsel Tim Muir" --

4    A.  Correct.

5    Q.  "-- who made a subsequent presentation in closed session"?

6    A.  Correct.

7    Q.  Do you see that?

8    A.  Correct.

9    Q.  What would it mean to make a presentation in closed

10   session?

11   A.  There were two reasons for closed session.  One would be

12   personnel and the other would be financial or legal.

13   Q.  Do you know what the purpose of this closed session was?

14   A.  I don't recall.

15   Q.  Would all the members who were listed at the top as

16   attending the meeting still be present if it was a closed

17   session?

18   A.  Yes, they would.  Visitors would be asked to leave.

19   Q.  Visitors would be asked to leave.  OK, thank you.

20          And this request by Don Brady, fair to say, appears to

21   be a request to get information regarding AMG operations,

22   correct?

23          MR. VELAMOOR:  Objection, your Honor.  Leading.

24          THE COURT:  Sustained.

25   Q.  What was it a request for Mr. Muir to do?

1    A.  I don't recall.

2          THE COURT:  Next question.

3    A.  He --

4          MR. GINSBERG:  I don't know if the witness was

5    completely finished.  Should I just move on?  I think he

6    started to say another word.  I couldn't tell.

7          THE COURT:  Sir, are you finished with your answer?

8          THE WITNESS:  Yes.

9          THE COURT:  Thank you.  Next question.

10   BY MR. GINSBERG:

11   Q.  On the next page, six, new business, there's an indication,

12   it says, "Chief Gamble also discussed the need for the tribe to

13   be proactive at the federal level and, at his request, Carolyn

14   Williams presented a brief overview of the tribe's

15   relationships with Native American congressional members and

16   staff."  Do you see that?

17   A.  Yes, I do.

18   Q.  Do you recall that occurring?

19   A.  We were very active in, in, in political life, and this was

20   related to some of the activities.

21   Q.  Related to some of the activities of whom and about what?

22   A.  AMG and, and the tribe.  There's one spot that I didn't --

23   I was both.  I was both.

24   Q.  OK.  So this would have related to AMG and the tribe being

25   active on a federal level, proactive, correct?

1  A.  Proactive, yes, especially in education.

2           THE COURT:  What was the last phrase?

3           THE WITNESS:  Especially, especially in education.

4           THE COURT:  Thank you.

5  BY MR. GINSBERG:

6  Q.  Could we move on to, do you have D2061 before you?

7  A.  Yes, I do.

8  Q.  Now, did there come a time when there were articles -- did

9  there come a time when there were articles either in magazines

10  or newspapers regarding the payday lending business that came

11  to the attention of the Miami Tribe of Oklahoma?

12  A.  Yes, there was.

13  Q.  And in response to that, did you prepare anything for the

14  employees of AMG Services?  2061.

15  A.  There was a document that wasn't -- that was prepared.

16  Q.  And what was the purpose of preparing that document?

17  A.  I would have to review the document because I didn't sign

18  it.

19  Q.  Is it your document, though?

20  A.  It had my name.

21  Q.  So if you need some time to review it, you may.

22  A.  OK.  I believe this document was prepared for the employees

23  to kind of give them a general heads-up of activities that were

24  swirling around us at the time.

25  Q.  Now, this particular document is a draft.  Do you recall if

1    there was a final version of this document ever prepared --

2    A.  I don't recall.

3    Q.  -- and released?

4    A.  I don't recall if it was ever released.

5    Q.  Did you release a statement in one form or another to the

6    AMG employees regarding the subject that's in this draft

7    document?

8    A.  I don't recall.

9    Q.  And what was it that you wanted to communicate to the AMG

10   employees regarding these articles that were in the newspapers

11   or other sources of news?

12          MR. VELAMOOR:  Objection, your Honor.  The witness has

13   said he doesn't remember whether he actually communicated

14   anything.

15          THE COURT:  Sustained.

16   BY MR. GINSBERG:

17   Q.  Well, did you ever speak to the AMG employees about these

18   articles?

19   A.  No.  I -- no.

20   Q.  Did you speak to the board about the articles?

21   A.  Perhaps, perhaps, but I don't recall any -- if I did, it

22   would be a matter of minutes.

23   Q.  Pardon me?  It would be a matter of the --

24   A.  It would be --

25   Q.  -- minutes?

1    A.  It would be listed in the minutes.

2    Q.  OK.  We can move on to 2709.  Do you have that in front of

3    you, 2709?

4    A.  Yes, I do.

5    Q.  And do you recognize that?

6    A.  It's also AMG board of directors meeting of May, May 7,

7    2012.

8    Q.  And although this is unsigned, does it appear to be in the

9    same format and manner as all the other board meetings that

10   we've reviewed?

11   A.  Yes.

12            MR. GINSBERG:  I'd offer defendant's D2709, your

13   Honor.

14            THE COURT:  Any objection?

15            MR. VELAMOOR:  Just take a quick look.

16            It's a draft and it's unsigned.

17            THE WITNESS:  Correct.

18            MR. VELAMOOR:  I'm not sure how it's a business

19   record.

20            THE COURT:  Why don't you work on the foundation,

21   Mr. Ginsberg, if you want to get it in.

22   BY MR. GINSBERG:

23   Q.  Do you have any, do you have a recollection that the AMG

24   Services board began to meet on a regular basis?

25   A.  Yes, we did.  We started meeting regularly.

Ha2Wtuc2

1    Q.  And did you --

2              THE COURT:  Whoa, whoa, whoa.  Stop.

3              When somebody puts a document in front of you and you

4    look at it, there's a possibility it refreshes your

5    recollection, or it's just a possibility that you look at the

6    document and you say, Well, it says what it says.

7              THE WITNESS:  Yes.

8              THE COURT:  These are two different things, so in your

9    answers, you're not to guess.

10             THE WITNESS:  OK.

11             THE COURT:  If you recall, you recall.  If you don't

12   recall, say you don't recall.

13             THE WITNESS:  OK.  Thank you.

14             THE COURT:  All right?

15             THE WITNESS:  Thank you.

16             THE COURT:  But if you remember, tell us what you

17   remember.

18             THE WITNESS:  OK.

19             (Continued on next page)

20

21

22

23

24

25

1  Q.  Do you remember a board meeting of AMG taking place on May

2  7, 2012?

3  A.  I recall from this document.

4  Q.  So that document refreshed your recollection as to that

5  meeting, correct?

6  A.  Yes.

7          MR. GINSBERG:  I would offer D2709.

8          MR. VELAMOOR:  He can ask him about the meeting, but

9  this is still not a business record.  It's unsigned in this

10  draft.

11          THE COURT:  Sustained.

12          You can use it to refresh the witness's recollection,

13  if his recollection can be refreshed.

14          MR. GINSBERG:  I will.

15  Q.  Looking at the people attending, does that refresh your

16  recollection as to who attended the meeting on May 7, 2012?

17  A.  These are the people that normally attend.

18  Q.  Normally?

19  A.  This would be the AMG board.

20  Q.  If you look at the second page, under Roman numeral VII,

21  beginning with the word "resolutions," would you look at that,

22  please?

23          Do you recall a resolution being passed, unanimously

24  approved regarding AMG and expenses and indemnification of AMG?

25  A.  Yes.

1  Q.  That would have taken place at this May 7th meeting, is

2  that correct?

3  A.  It would have been introduced at this meeting.  I don't see

4  the resolution.

5          THE COURT:  Again, the document is not in evidence,

6  correct?

7          Is the document in evidence, Mr. Ginsberg?

8          MR. GINSBERG:  The document is not in evidence.

9          THE COURT:  So the only question with a document not

10 in evidence like this is you look at it.  Then you turn it face

11 over and you ask yourself the question, does it give me a new

12 and refreshed recollection?  OK.

13         It's not a reading exercise to see if you can read

14 what the document says.  It's you look at it and you say, oh,

15 now I remember, it was my cousin's birthday that day, or

16 something rings a bell in your brain, and then you have a new

17 and refreshed recollection, and then you can testify about

18 that.  OK?

19 Q.  I am going to ask you to look at Roman numeral VII, the

20 first paragraph where it says "resolutions."

21         Do you have that?

22 A.  Yes, I do.

23 Q.  If you'd read that first paragraph, those three lines, the

24 question is, after reading those three lines, tell us if your

25 recollection is refreshed as to whether the board unanimously

1    approved AMG resolution 12-01?

2    A.  Yes.

3    Q.  Yes, it does refresh your recollection?  Is that your

4    answer?

5    A.  Yes.

6    Q.  Thank you.

7           And that resolution was regarding AMG, correct?

8    A.  Correct.

9           THE COURT:  Well, you can ask the witness what the

10   resolution was.

11   Q.  If you'd look underneath it --

12          THE COURT:  It's not in evidence.  The question is, if

13   the witness has a refreshed recollection.

14          Sir, when you are finished reading, if you have a

15   refreshed recollection, you can testify about your refreshed

16   recollections.  If really what is going on is you're reading a

17   document and learning what the document says and you're just

18   restating what the document says, then that's not a refreshed

19   recollection.

20          THE WITNESS:  I understand.

21   Q.  Having had your recollection refreshed that the board of

22   directors unanimously approved that resolution, do you now

23   recall independently what that resolution was about?

24   A.  No, I don't.

25   Q.  Looking at the next paragraph, if you read the next

1    paragraph to yourself, tell us if reading the next paragraph

2    refreshes your recollection as to what that resolution was

3    about?

4         Does it refresh your recollection as to what it was

5    about?

6    A.  Yes.

7    Q.  Now that your recollection is refreshed, could you tell us

8    what it was about?

9    A.  It was about indemnifying -- if I am correct with my

10   recollection, it was about pending court cases or litigations,

11   being indemnified.

12   Q.  Let's move on from that document.

13        D847.  Do you have that in front of you?

14   A.  Yes, I do.

15   Q.  Do you recognize what this document is?

16   A.  This is AMG board minutes.

17   Q.  Looking at the last page, do you recognize the signatures

18   on the last page?

19   A.  Yes, I do.

20        MR. GINSBERG:  I'd offer D847 into evidence.

21        THE COURT:  Any objection?

22        MR. VELAMOOR:  No.

23        THE COURT:  It's received.

24        (Defendant's Exhibit 847 received in evidence)

25   Q.  What is the date of this?

1   A.   June 27, 2012.

2   Q.   I specifically refer you to the third page, although on the

3   bottom it's numbered page 2, and Roman numeral V, where it says

4   "old business."

5        Are you there?

6   A.   OK.   Just a second.

7        Yes, I refreshed my memory.

8   Q.   It doesn't have to be refreshed -- I know we have all these

9   rules, but this is in evidence.

10  A.   Yes, it is.

11  Q.   Since it is in evidence, you don't need to have your

12  recollection refreshed.   You can actually read from the

13  document.

14       So if you just read to us Roman numeral V, old

15  business.   Could you read that paragraph, please?

16  A.   "Chairman Gamble noted that the importance of expanding the

17  AMG loan servicing business to ensure the continuation and

18  long-term viability of its online short-term loan portfolios

19  and to enhance the AMG loan servicing business by entering into

20  a long-term, exclusive agreement with BA to assure AMG's access

21  to and use of certain proprietary -- whatever -- especially

22  software based intellectual properties owned by BA."

23       THE COURT:   Pause.   The resolution is up on the screen

24  or the portion of the minutes are up on the screen?

25       MR. GINSBERG:   I am going to stop him right there so

1    the jury can read the rest of it.

2              THE COURT:  Ladies and gentlemen, you will have all of

3    the exhibits with you in the jury room during deliberations.

4    Anything you want to look at you can look at.

5    Q.  Then paragraph 6 just below it, "resolutions," there's a

6    reference to approving the attached license agreement in the

7    fourth line of that paragraph, is that correct?

8    A.  Correct.

9    Q.  And basically authorizing Don Brady to execute the

10   agreement on behalf of AMG, correct?

11   A.  Correct.

12   Q.  Can we move to D2720.

13             Do you recognize that document?

14   A.  These also would be AMG board of directors meeting,

15   September 25, 2012.

16             THE COURT:  The question is, do you have it in front

17   of you?

18             THE WITNESS:  Do I have --

19             THE COURT:  Do you have the document in front of you?

20             I think the question -- let's go back now.

21             The question, do you recognize the document?

22             THE WITNESS:  Yes, I do.

23   Q.  You recognize the signatures?

24   A.  Yes, I do.

25   Q.  One of those signatures is your signature?

1    A.  Yes, it is.

2              MR. GINSBERG:  I offer D2720 into evidence.

3              THE COURT:  Any objection?

4              MR. VELAMOOR:  No, your Honor.

5              THE COURT:  Received.

6              (Defendant's Exhibit 2720 received in evidence)

7    Q.  Just going briefly to Roman numeral II, CEO report, again,

8    Don Brady provided update on AMG finances for the month of

9    September, correct?

10   A.  Correct.

11   Q.  He reported attending the AMG monthly financial meeting in

12   Kansas City, correct?

13   A.  Yes.

14   Q.  He advised about the number of funded loans, that they will

15   be substantially higher, correct?

16   A.  Yes.

17   Q.  He reported on the loan revenues substantially increasing?

18   A.  Correct.

19   Q.  Achieving new records, correct?

20   A.  Yes.

21   Q.  He further reported that repeat business is increasing as

22   well, which reflects the higher levels of customer satisfaction

23   with the financial product.  Is that correct?

24   A.  Yes.

25              THE COURT:  Mr. Ginsberg, the document is up on the

1   screen.  It's not necessary for either you or the witness to

2   read it at length.  I am a little bit relaxed on this.  I will

3   allow some of it.

4            MR. GINSBERG:  I am finished with that.

5            THE COURT:  OK.

6   Q.  Now, if you skip to D873.  Do you have that in front of

7   you?

8   A.  Yes, I do.

9   Q.  Do you recognize what that is?

10  A.  Yes, I do.

11  Q.  What is that document?

12  A.  It's Miami Nation Enterprises annual report.

13  Q.  Was this something that was prepared every year at the end

14  of the fiscal year?

15  A.  Yes.

16  Q.  Who was it presented to you and by whom was it presented?

17  A.  It was presented to the Miami Tribe's business committee by

18  Miami Nation Enterprises' board of directors.

19  Q.  Could you tell us what is contained in the annual report?

20  A.  It would be a balance sheet of all MNE's companies.

21           MR. GINSBERG:  One second, your Honor.  I am almost

22  finished with my examination.

23           THE COURT:  Ladies and gentlemen, you can stand up and

24  stretch.

25           You too, yes.

1      And take a deep breath also.

2           MR. GINSBERG:  Your Honor, I offer Defendant's 873

3      into evidence.

4           THE COURT:  Any objection?

5           MR. VELAMOOR:  Objection, your Honor.  I think

6      substantial portions are not business records.

7           THE COURT:  I will sustain it as an entire exhibit.

8      If there is some portion you want to show that is relevant.

9           MR. GINSBERG:  It's a pretty long exhibit.  If I

10     might, since I laid the foundation, hopefully, if I might

11     redact it and then present it to the Court in the redacted

12     form, rather than spend time going through it now.

13          MR. VELAMOOR:  That's fine.  We will wait to see what

14     he proposes.

15          THE COURT:  That's fine.

16     BY MR. GINSBERG:

17     Q.  I would ask you to look at D2754.  Do you have that in

18     front of you?

19     A.  Sir, did you say 34?

20     Q.  2754.  If you don't, I have another copy.

21     A.  2754.  Just one second, please.

22          I don't see it.

23     Q.  Do you recognize what this document is?

24     A.  Yes.  This was a joint meeting.

25     Q.  A joint meeting between who?

1  A.  The MNE board and the Miami business committee.

2         MR. GINSBERG:  Your Honor, I would offer Defendant's

3  D2754 into evidence.

4         MR. VELAMOOR:  Your Honor, we do object just like one

5  of the other ones.  It's not signed.  It appears to be a draft

6  and many parts it's just a stream of consciousness of different

7  comments.

8  BY MR. GINSBERG:

9  Q.  It's unsigned, is that correct?

10  A.  Correct.

11  Q.  Does this document appear to be prepared in the exact same

12  form, typed just like all the other minutes that we saw of the

13  Miami Tribe business committee?

14  A.  Yes.

15  Q.  To the best of your recollection, was this typed after the

16  meeting so it can be presented for approval at the next

17  meeting?

18         THE COURT:  Let me pause.

19         Sir, have you ever seen this document before?

20         THE WITNESS:  No, sir.

21         THE COURT:  Do you recall ever seeing it before?

22         THE WITNESS:  I was present at the meeting, but I

23  don't recall ever voting on the minutes or any action of the

24  minutes.

25  Q.  You recall being present at the meeting at Gordon House, in

1    Miami, Oklahoma, on January 26, 2013?

2    A.  Yes, I do.

3    Q.  Do you recall participating in the meeting?

4    A.  Yes.  I chaired it.

5    Q.  As you said before, the format of these minutes is the same

6    as all the other minutes, is that correct?

7    A.  Yes.

8    Q.  This is not a stream of consciousness; this is actually

9    typed words of what occurred at the meeting, is that correct?

10         THE COURT:  Sustained as to form.

11   Q.  To the best of your recollection, how were these minutes

12   prepared?

13         THE COURT:  When you say "these minutes," you mean how

14   are minutes prepared?  This witness has testified he hasn't

15   seen these before, has no recollection.  If you want to ask him

16   how are minutes prepared, that's a different question than how

17   are these minutes prepared.

18         MR. GINSBERG:  I think I have previously, but I will

19   do it again.

20   Q.  How are the minutes prepared for these meetings?

21   A.  The minutes are prepared by the recording secretary who

22   works off of the agenda, and then whatever is in that agenda

23   item is recorded as minutes of the meeting and then passed at

24   the next meeting.

25   Q.  To the best of your recollection, being president at many

HA28TUC3                    Gamble - Direct

1    of these meetings, does the recording secretary write down what

2    is taking place at the meeting while it's going on?

3    A.   Correct.

4    Q.   And subsequent to that, does the recording secretary type

5    up the minutes of the meeting?

6    A.   Correct.

7              MR. GINSBERG:  Your Honor, I would offer D2754.

8              THE COURT:  Any objection?

9              MR. VELAMOOR:  I think it's the same objection given

10   it's unsigned and other differences between these and the other

11   minutes.

12             THE COURT:  If you want to voir dire, you can voir

13   dire.

14   VOIR DIRE EXAMINATION

15   BY MR. VELAMOOR:

16   Q.   Mr. Gamble, typically, minutes of the different committees

17   the tribe signed?

18   A.   Yes, upon approval the following month.

19   Q.   And that process is important, correct, to ensure the

20   minutes are accurate?

21   A.   Yes, to show that the minutes were accurate.

22   Q.   In fact, these minutes have not been signed by anybody,

23   right?

24   A.   No.  I don't see a signature page.

25             THE COURT:  Objection sustained.

HA28TUC3                    Gamble - Direct

1    BY MR. GINSBERG:

2    Q.  Do you know where the original of these minutes signed, if

3    they were signed, is?

4    A.  It would have been in the tribal records.

5    Q.  Is there any doubt in your mind that these are minutes from

6    that the meeting, having chaired that meeting?

7    A.  No doubt.

8            MR. GINSBERG:  I would offer it again.

9            THE COURT:  I didn't quite understand what you said in

10   response to the other question, that the minutes are signed to

11   ensure their accuracy and these are not signed.  But you have

12   no doubt that these are the minutes, the approved minutes for

13   the meeting?

14           THE WITNESS:  Yes, sir.  I had very good confidence in

15   our recording secretary at the time that she took accurate

16   records even though they were never ensured of accuracy by

17   signing those minutes.

18           THE COURT:  Then I am going to receive the exhibit.

19           (Defendant's Exhibit 2754 received in evidence)

20   BY MR. GINSBERG:

21   Q.  Among the people attending this meeting was yourself,

22   correct?

23   A.  Correct.

24   Q.  Second Chief Doug Lankford, correct?

25   A.  Correct.

1   Q.  Carolyn Williams, the recording secretary, correct?

2   A.  Yes.

3   Q.  And then it says, right above Carolyn Williams, MNE COO/CFO

4   Joe Frazier.  Who is Joe Frazier?

5   A.  Joe Frazier took Don Brady's place when Don Brady was let

6   go.

7   Q.  Who let Don Brady go?

8   A.  The business committee.

9   Q.  Why did the business committee let Don Brady go?

10  A.  It was a recommendation from an attorney group, and it was

11  voted to let go 3 to 1 by the business committee.

12  Q.  Were you on the business committee?

13  A.  Yes, I chaired the business committee.

14  Q.  Were you part of the discussion to make the final

15  determination to let Don Brady go?

16  A.  Yes, I was.

17  Q.  Was there a dissatisfaction of how he was doing his job?

18  A.  Yes, there was.

19  Q.  Is that why Joe Frazier was hired?

20          THE COURT:  Avoid leading, please.

21  Q.  Why was Joe Frazier hired?

22  A.  Joe Frazier was already an employee of the tribe and he

23  just got moved real quick to this position.

24  Q.  So he was moved from another position into this position,

25  is that correct?

HA28TUC3                    Gamble – Cross

1    A.  Yes.

2            MR. GINSBERG:  I have no further questions at this

3    time, your Honor.

4            THE COURT:  Mr. Bath, do you have anything?

5            MR. BATH:  Sure.  Thank you, Judge.

6    CROSS-EXAMINATION

7    BY MR. BATH:

8    Q.  Mr. Gamble, I understand you took what I am going to call

9    leadership roles sometime in 2001, is that correct?

10           MR. VELAMOOR:  Objection.  Candidly, I'm not sure Mr.

11   Bath can lead.  I have never had this situation before.

12           THE COURT:  He didn't call the witness, and I suppose

13   in that sense it's a form of cross-examination.

14           MR. VELAMOOR:  Fair enough, your Honor.  I will

15   withdraw the objection.

16   A.  Yes, sir.

17   Q.  You were elected as second chief?

18   A.  I was elected second chief.

19   Q.  You became a member or attended the business committee

20   meetings?

21   A.  Yes.

22   Q.  In 2008, Chief Leonard passed away?

23   A.  Yes.

24   Q.  Because you were second chief, you ascended to first chief?

25   A.  Yes.  By Constitution.

HA28TUC3                    Gamble - Cross

1   Q.  In 2010, you then were elected first chief?

2   A.  Correct.

3   Q.  And you continued then as your role on the various boards,

4   correct?

5   A.  Correct.

6   Q.  And you left the boards when?

7   A.  After the election.

8   Q.  What year was that election?

9   A.  I believe it was '13.

10  Q.  In 2013, Chief Lankford was elected, correct?

11  A.  Correct.

12  Q.  So you stand '01 to '13, correct?

13  A.  Yes.

14  Q.  Mr. Ginsberg has been asking you questions for a long time,

15  asking you to think back on things that happened 15, 16 years

16  ago, correct?

17  A.  Correct.

18  Q.  It's difficult for anyone including you?

19  A.  Yes.

20          THE COURT:  Ask your next question.

21  Q.  So he presented a lot of documents to you, and we have seen

22  lots of boards and resolutions, have we not?

23  A.  Yes, we have.

24  Q.  As I understand it, essentially the tribe hired Don Brady

25  in 2001 or 2002?

1   A.  Yes.  '02 or '03.

2   Q.  In any event, Don Brady was hired before there was any

3   contact between the Miami tribe and Scott Tucker, is that

4   right?

5   A.  I don't recall.

6   Q.  Do you remember when the contact with Mr. Tucker was?

7   A.  I believe 2003.

8   Q.  Do you remember that Don Brady was before then?

9   A.  Yes, I do.

10  Q.  The Miami tribe hired Don Brady because one of the things

11  you want to do, the tribe that is, is to get into business?

12  A.  Yes.

13  Q.  In fact, the Miami tribe had an annual report way back in

14  2001 that encouraged the Miami tribe to get into business with

15  little or no capital, is that correct?

16  A.  Yes.

17  Q.  And also little or no risk, correct?

18  A.  Correct.

19  Q.  Because you didn't have any capital, did you?

20  A.  Not too much.

21  Q.  Not back in 2001, correct?

22  A.  Correct.

23  Q.  So Don Brady is hired and he is going to run these various

24  businesses?

25  A.  Correct.

HA28TUC3                    Gamble - Cross

1   Q.  We have heard there have been a number of businesses over

2   the years like a movie theater, correct?

3   A.  Yes.

4   Q.  And other kinds of businesses, correct?

5   A.  Yes.

6   Q.  At some point in time, '03 or '04 we'll call it, the tribe

7   had an opportunity to meet with Mr. Tucker and do business with

8   him, is that right?

9   A.  Correct.

10  Q.  And to do that, AMG had passed certain -- the tribe had

11  passed certain laws to get into the lending business, correct?

12  A.  Yes.

13  Q.  And we saw lots of those when Mr. Ginsberg asked you

14  questions, correct?

15  A.  Right.

16          MR. VELAMOOR:  Objection to laws.

17          THE COURT:  Overruled.

18  Q.  There were resolutions?

19  A.  Yes.

20  Q.  There were lots and lots of them?

21  A.  Yes.

22  Q.  We didn't see all of them, did we?

23  A.  No.

24  Q.  Because the way the tribe is set up, you have to do those

25  things before you can get into certain kinds of businesses,

1  correct?

2  A.  Yes.

3  Q.  And I assume the tribe is not in the business of passing

4  resolutions for companies it does not own, is it?

5  A.  Correct.

6  Q.  So all those things got passed, people had meetings, those

7  things went on, and you got into the lending business in '03 or

8  '04?

9  A.  Yes.

10  Q.  Don Brady is in charge of it, correct, from your

11  perspective?

12  A.  Can I clarify?

13  Q.  Yes.  From the tribe's perspective, Don Brady is in charge

14  of overseeing the businesses?

15  A.  The businesses.

16  Q.  And that included the lending business?

17  A.  Yes.

18  Q.  Don Brady worked for you, the tribe, correct?

19  A.  Yes.  I need to tell you more about that.

20  Q.  Sure.

21  A.  During extension of the business act that Don Brady worked

22  under, he had a governing board.

23  Q.  What board was that?

24  A.  That was beginning Miami business -- Miami Tribal Business

25  Enterprises, which was shortened later to Miami Nation

1   Enterprises.

2   Q.  It was MTBE, correct?

3   A.  Yes, was existing.

4   Q.  Then later it was MNE?

5   A.  Yes.

6   Q.  Don reported to that board, correct?

7   A.  That was his governing board, yes.

8   Q.  But the tribe, through the board, directed Don Brady on

9   what to do and not to do, correct?

10  A.  Not on a day-to-day basis.

11  Q.  I understand that.  Ultimately, he worked for the tribe,

12  did he not?

13  A.  Yes, everybody worked for the tribe.

14  Q.  In the end, when Don Brady wasn't doing what you wanted him

15  to do, you being the tribe, you let him go, right?

16  A.  Correct.

17  Q.  Sometime during your period, about 2008 when you were

18  there, AMG was formed?

19  A.  Yes.

20  Q.  We saw the documents on your direct exam?

21  A.  Yes.

22  Q.  And AMG bought CLK?

23  A.  Yes.

24  Q.  That now means that the tribe owned AMG, the servicing

25  company, correct?

1   A.  Yes.

2   Q.  You also created at the tribe at the same time MNES, did

3   you not?

4   A.  Yes, we did.

5   Q.  What was the purpose of creating MNES?

6   A.  MNES was created to manage the finances.

7   Q.  That was 2008 or so as well, correct?

8   A.  Yes, sir, about the same time.

9   Q.  So about 2008, we have got AMG and MNES, correct?

10  A.  Yes.

11  Q.  Those are separate boards, are they not?

12  A.  Yes, they are.

13  Q.  And we have seen AMG board meetings because you as the

14  chief were the chairman of that board, correct?

15  A.  Correct.

16  Q.  But you were not on MNES, were you?

17  A.  No.

18  Q.  Who got on the MNES board?

19  A.  I don't recall the original members, but the members that I

20  do recall were second council person.

21  Q.  I am not looking for names.  Just generally, how did people

22  get on the MNES board?

23  A.  They were appointed.

24  Q.  Who appointed them?

25  A.  I believe Don Brady presented it, and the proper way would

HA28TUC3                        Gamble - Cross

1   be that MNE would have OK'd it.

2   Q.  So MNES, which began in existence in '08 or so, was under

3   MNE?

4   A.  Yes.

5   Q.  AMG was off to the side, was it not?

6   A.  Correct.  AMG was under the tribe proper.

7   Q.  AMG was not under MNE or MNES, was it?

8   A.  No.

9   Q.  The two boards were separate?

10  A.  Correct.

11  Q.  Sometimes you had joint meetings, or not?

12  A.  I believe we probably over time had joint meetings, but I

13  don't recollect.  I think one of the minutes reflected that

14  there was a joint meeting.

15  Q.  In any event, MNES and MNE were controlled by a board of

16  directors?

17  A.  Yes.

18  Q.  The people on the board of directors were tribal members?

19  A.  The majority.

20  Q.  It's your understanding as chairman of AMG all the bank

21  accounts were in the names of the tribes, were they not?  The

22  portfolios.

23  A.  The portfolios?  I can't give you a good answer on that.

24  To my knowledge, I couldn't give you a good answer.

25          THE COURT:  With that, ladies and gentlemen, let's

HA28TUC3                    Gamble – Cross

1    take our break for lunch.  Remember, keep an open mind, do not

2    discuss the case among yourselves or with anyone.  We will be

3    back in action for a 2:00 start.  Thank you.

4              (Jury exits courtroom)

5              THE COURT:  Enjoy lunch.

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         AFTERNOON SESSION

2                              2:10 p.m.

3              (Jury present)

4    TOM GAMBLE, resumed.

5              THE COURT:  I hope everybody had a good lunch.  Hope

6    it's pretty nice out.  We are getting spoiled with this

7    weather.  And we are back in action.

8              Mr. Bath, whenever you're ready.

9    BY MR. BATH:

10   Q.  Mr. Gamble, I understand that the tribe fired Don Brady

11   sometime in 2012?

12   A.  Yes.

13   Q.  And Joe Frazier was already working for the tribe?

14   A.  Yes.

15   Q.  What was his position?

16   A.  Joe Frazier, I believe, was CFO, chief financial officer.

17   Q.  And chief financial officer of MNE or which division?

18   A.  MNE.

19   Q.  How long had he been there, Joe?

20   A.  Not too long, probably a year, maybe a year.

21   Q.  Then he was appointed to essentially replace Mr. Brady?

22   A.  Yes, he was.

23   Q.  Now, at some point in time you met or had contact with Tim

24   Muir?

25   A.  Yes.

HA28TUC3                    Gamble - Cross

1    Q.  Do you remember when that would have been?

2    A.  I believe Tim came on somewhere '06 or '07.

3    Q.  How often would you have contact with Tim?

4    A.  I don't know at first.  I had more contact later.

5    Q.  So initially not a lot of contact, but more as the years

6    went on?

7    A.  More as the years went on, yes.

8    Q.  Did you have in-person contact or on phone or both?

9    A.  I may have talked to Tim on the phone, but usually it was

10   personal.

11   Q.  That's because he was -- we have seen some of the

12   documents -- he was at some of the board meetings?

13   A.  Yes.

14   Q.  Did he go to the AMG board meeting sometimes?

15   A.  I don't recall.

16   Q.  What board meetings do you recall him being at?

17   A.  I think he was at the joint board meeting.  He may have

18   been at an AMG, but I don't recall.

19   Q.  We saw one document on direct examination where it went to

20   a closed session and Tim made a presentation?

21   A.  Yes.

22   Q.  Is it fair to say whenever you had contact with Tim, he

23   answered all your questions?

24   A.  Yes.

25   Q.  He kept you fully informed with whatever you wanted to know

1   about?

2   A.  Yes, he did.

3   Q.  Did he ever refuse any information whatsoever?

4   A.  No.

5   Q.  Was he responsive when you reached out to him and wanted

6   information?

7   A.  Yes.  But I very seldom ever reached out.  It was usually

8   through MNE and AMG.

9   Q.  So you pretty much -- most of your contact would have been

10  at those board meetings with Tim?

11  A.  Yes, and some social.

12          MR. BATH:  Thank you.  That's all I have.

13          THE COURT:  Cross-examination by the government.

14  CROSS-EXAMINATION

15  BY MR. VELAMOOR:

16  Q.  Good afternoon, Mr. Gamble.

17          We have met before, correct?

18  A.  Yes, we have.

19  Q.  Along with other members of the prosecution team?

20  A.  Yes.

21  Q.  You weren't just an employee of the tribe, you were also a

22  member of the tribe, right?

23  A.  Yes, I was.

24  Q.  You became the chief of the tribe, right?

25  A.  Yes, I did.

1   Q.  You cared a lot about the tribe?

2   A.  Yes, I do.

3   Q.  You care a lot about the tribe even now?

4   A.  Even now.

5   Q.  And you knew that the tribe needed money for essential

6   services, right?

7   A.  Yes.

8   Q.  Prior to the loan business, the tribe was dependent

9   primarily on grants, right?

10  A.  Yes, it was.

11  Q.  The loan business as a result was very important to the

12  tribe, right?

13  A.  Yes.

14  Q.  It was important because it generated a lot of revenues for

15  the tribe that the tribe needed, right?

16  A.  Yes.

17  Q.  Now, it was while Chief Leonard was in charge that the

18  tribe made its agreement with Mr. Tucker, right?

19  A.  Yes.

20  Q.  I think you mentioned you didn't know much about the loan

21  business at that time, right?

22  A.  Right.

23  Q.  You weren't involved in the decision to enter into that

24  agreement?

25  A.  No, I wasn't.

1    Q.  But you knew some basic facts?

2    A.  Yes.

3    Q.  For example, you knew that Scott Tucker brought this

4    proposal to the tribe, right?

5    A.  Yes.

6    Q.  You knew that Scott Tucker had already been in the payday

7    lending business long before approaching the Miami tribe,

8    right?

9    A.  Yes, I eventually knew that.

10   Q.  You knew that as part of this agreement the tribe didn't

11   start a brand-new loan business, right?

12   A.  Right.

13   Q.  The tribe didn't buy any part of Mr. Tucker's business or

14   the entirety of Mr. Tucker's business?

15   A.  A partnership.

16   Q.  The tribe didn't buy any part of the business?

17   A.  No.

18   Q.  The tribe never took any control of Mr. Tucker's business,

19   right?

20   A.  No.

21   Q.  Or any part of it?

22   A.  No.

23   Q.  You knew that the tribe didn't put up any money for the

24   business, right?

25   A.  Correct.

1    Q.  The tribe didn't borrow any money for the business, right?

2    A.  No.

3    Q.  There was a reason for that, that was important to Chief

4    Leonard, right?

5    A.  Yes, it was.

6    Q.  Because Chief Leonard -- it was very important to Chief

7    Leonard that the tribe not take on any risk, right?

8    A.  Right.

9    Q.  So you knew that the tribe was partnering with Scott

10   Tucker's loan business, right?

11   A.  Yes, eventually.

12   Q.  You also didn't know really much about how the business

13   worked, right?

14   A.  No, I didn't.

15   Q.  Especially in that early stage, you didn't really know what

16   the tribe was doing as part of this business, right?

17   A.  No, I didn't.

18   Q.  Or if the tribe was doing anything at all?

19   A.  Correct.

20   Q.  You knew that Don Brady was the one who was assigned to be

21   the tribe's contact person for the business, right?

22   A.  Yes.

23   Q.  That was his job, right, Don Brady's job?

24   A.  I would like to make a correction.  It was assigned to MNE

25   where Don Brady was CEO, so he took --

HA28TUC3                    Gamble - Cross

1    Q.  The responsibility?

2    A.  The responsibility.

3    Q.  So as far as you knew, he was the only person at the tribe

4    who really had any role at all in the loan business, right?

5    A.  Correct.

6    Q.  So if you're looking to know what the tribe is doing or not

7    doing, particularly during that early stage, Don Brady would be

8    the one to ask about that, right?

9    A.  Yes.

10   Q.  Now, unfortunately, Chief Leonard passed away in 2008,

11   right?

12   A.  Yes, he did.

13   Q.  Since you were the second chief, you became chief at that

14   time?

15   A.  Yes, by Constitution.

16   Q.  So around that time, you began to learn a bit more about

17   the loan business at that time?

18   A.  I became more involved.

19   Q.  You had some discussions with Mr. Brady, right?

20   A.  Yes.

21   Q.  You saw Mr. Brady on a somewhat regular basis?

22   A.  Yes, I did.

23   Q.  You learned more about what Mr. Brady was doing as part of

24   this loan business, right?

25   A.  Yes.

1 Q. Don Brady had the title of CEO, but you learned that Brady

2 wasn't doing much of anything for the loan business, right?

3 A. With the exception of loan authorizations.

4 Q. We will get to those in a second. But you knew that Mr.

5 Brady didn't have any control over the loan business, right?

6 A. Yes.

7 Q. Nor did any of the boards or anyone else at the tribe,

8 right?

9 A. Yes.

10 Q. So you mentioned loan authorizations.

11      Now, this was what Mr. Brady did sometimes in his

12 office, right?

13 A. Yes, he did.

14 Q. Initially, you thought he was authorizing loans, as you put

15 it, right?

16 A. Yes.

17 Q. But pretty soon, or at least sometime thereafter, you

18 realized that Don Brady was often skipping these approvals,

19 right?

20 A. Later on he wasn't in the office as much as when he used

21 to, after I took over as chief, so I didn't know if he was

22 still -- if he was still approving or wasn't approving.

23 Q. You knew, for example, he was traveling all the time,

24 right?

25 A. Yes.

1   Q.  You knew the loans were still going out, right?

2   A.  Yes, I assumed.

3   Q.  So you came to realize that this so-called loan approval

4   process wasn't really a necessary part of the loans going out

5   from Kansas City, right?

6   A.  Correct.

7   Q.  It was a process to try to make it seem like the tribes

8   were involved, but it didn't really matter for the loans going

9   out the door, correct?

10          THE COURT:  Do you understand the question?

11          THE WITNESS:  I think I do.

12  A.  Can you restate your question?

13  Q.  You knew that it wasn't a necessary part of -- whatever Don

14  Brady was doing wasn't a necessary step for the loans going out

15  the door?

16  A.  In my opinion, it wasn't.

17  Q.  So you came to realize that the whole thing was sort of for

18  show, right?

19  A.  It was -- I don't think show would be the correct word.

20  Q.  To sort of make it seem like the tribe had some involvement

21  in the process, right?

22  A.  Yes.

23  Q.  But you knew that the real loan approvals, they were taking

24  place in Kansas City, in Overland Park, right?

25  A.  The process was.  For many years I assumed that the loan

1  approval was being generated from trust land.  But as time went

2  by and Mr. Brady was gone from the offices a lot, it didn't

3  seem to be as critical.

4  Q.  But you knew all along that the real loan approvals were

5  being handled in Kansas City by people working for Scott

6  Tucker, right?

7  A.  The applications were generated through there.  So I would

8  assume the loan approvals were approved from Overland Park.

9  Q.  By the way, that's where the business was located, right,

10  in Overland Park?

11  A.  Yes, it was.

12  Q.  That's where Scott Tucker managed the entire loan business,

13  right?

14  A.  Scott Tucker had a management team and that's where they

15  were located.

16  Q.  Fair enough.  Scott Tucker and people working for Scott

17  Tucker?

18  A.  Yes.

19  Q.  And Scott Tucker and people working for Scott Tucker

20  controlled the loan business, right?

21  A.  Yes.

22  Q.  Scott Tucker and his people opened and controlled the bank

23  accounts for the business, right?

24  A.  I don't have direct knowledge of that, but it felt that

25  way.

1   Q.  The tribe did get its one percent, right?

2   A.  Yes.

3   Q.  But Tucker got the rest?

4   A.  The understanding was that the rest went into making other

5   loans, but he had control of how the moneys were invested.

6   Q.  So whatever was done with the rest of the 99 percent, that

7   was up to Scott Tucker?

8   A.  Yes.

9   Q.  Now, Mr. Tucker also kept the books and records of the

10  business, right?

11  A.  I assume so.

12  Q.  He controlled access to them, right?

13  A.  Yes.

14  Q.  For example, you know that because there was a time when

15  the tribe needed to do an audit, right?

16  A.  Correct.

17  Q.  That was when you were chief, right?

18  A.  Yes.

19  Q.  And you asked Brady to get the accountants the access to

20  the books and records, right?

21  A.  Yes.

22  Q.  You knew that Brady had to go to Scott, Mr. Tucker, to get

23  those books and records, right?

24  A.  Yes, that's what I assumed.  The orders were given to Don

25  Brady and MNE, and in turn they would work with Scott and his

1    people.

2    Q.  These books weren't located on Miami tribal lands, right?

3    A.  Not that I know of.

4    Q.  So Mr. Tucker and his people, they also made the decisions

5    regarding the loan business, right?

6    A.  Yes.

7    Q.  They set, for example, the terms and the conditions of the

8    loans, right?

9    A.  Yes, sir.

10   Q.  You were asked questions about the tribe regulating the

11   business.  Do you remember that?

12   A.  Yes, I did.

13   Q.  By regulating, you mean that the tribe passed an ordinance,

14   right?

15   A.  We passed ordinances and codes.

16   Q.  And those were sent and drafted and provided by lawyers,

17   right?

18   A.  Yes.

19   Q.  But apart from passing those ordinances, you're not aware

20   of the tribe doing anything else to regulate the ongoing

21   operations of the business, right?

22   A.  Just the agenda items for Don Brady as CEO to update us on

23   any activities.

24   Q.  In terms of regulating or setting rules or overseeing,

25   you're not aware of anything other than passing the ordinances,

1    right?

2    A.  Correct.

3    Q.  We will come to Mr. Brady's updates in a second.

4            Also, the licenses, for example, you signed, you don't

5    even know who drafted or prepared those either?

6    A.  No, I don't.

7    Q.  Now, you mentioned that Mr. Brady provided updates from

8    time to time, right?

9    A.  Yes, he was required.

10   Q.  These updates were very brief, right?

11   A.  Very brief.

12   Q.  Typically, he would just say or comment on how much the

13   monthly checks had been during the recent time periods, right?

14   A.  Yes.

15   Q.  That was usually the extent of his update, right?

16   A.  Yes.  Generally, they were better or they were worse.

17   Q.  So the checks were going up or down?

18   A.  Yes.  They continued on an upward trend after a few years.

19   Q.  He had good news to report?

20   A.  Yes.

21   Q.  He wasn't providing overall financial information about the

22   entire business, right, his information focused on the monthly

23   checks?

24   A.  Yes.

25   Q.  Now, apart from giving those updates, Mr. Brady's primary

1   role here was to maintain a good relationship with Scott

2   Tucker, right?

3   A.   Yes, it was.

4   Q.   Because Scott Tucker had the power to put more loan

5   portfolios under the Miami tribe's name if he wanted, right?

6   A.   I believe so.  I believe they were being negotiated.

7   Q.   But Scott Tucker also had, if he wanted, the power to take

8   portfolios away from the tribe if he wanted, right?

9   A.   I believe -- yes.

10  Q.   So it was important then to keep Scott Tucker happy?

11  A.   I think Don Brady conveyed that that was -- keeping the

12  company happy, but we didn't pay it much mind.

13             THE COURT:  Keeping who happy?

14             THE WITNESS:  The loan company personnel up in

15  Overland Park.

16  Q.   That was primarily Scott Tucker, right?

17  A.   Yeah.

18  Q.   To do that, in part, for example, you and Mr. Brady went to

19  races sometimes, right?

20  A.   Went to a few races as public relations, yes.

21  Q.   Just to show support for Mr. Tucker?

22  A.   Show support.

23  Q.   Now, there was one time, though, when Mr. Tucker got pretty

24  angry at the tribe, right?

25  A.   At the tribe?

1  Q.  Yes.  Or at least at someone at the tribe.

2  A.  Yes.

3  Q.  Specifically, he got angry at Ken Bellmard, right?

4  A.  Yes.

5  Q.  Bellmard, I think as you testified to, was an attorney for

6  the tribe, right?

7  A.  Yes.

8  Q.  And there was a case against the loan business from

9  California, right?

10  A.  Yes.

11  Q.  And Mr. Bellmard thought that, as a result of this case,

12  the tribe should stop lending in California, right?

13  A.  I know there was a conflict.  I don't know exactly what the

14  content was, but that's what I came to believe, that it was

15  something to do with California.

16  Q.  Essentially, Mr. Bellmard wanted to take a cautious

17  approach, in general, right?

18  A.  Yes.

19  Q.  And that made Mr. Tucker pretty angry, right?

20  A.  I believe so.

21  Q.  And he threatened at that point to take the business away

22  from the tribe, right?

23  A.  Let me rephrase that.  If the tribe didn't want to

24  participate in that portfolio that it can go somewhere else.

25  Q.  Like to another tribe, right?

HA28TUC3                    Gamble - Cross

1   A.  Yes.  That would have been his business.

2   Q.  "His" as in Mr. Tucker?

3   A.  His would be Mr. Tucker's.

4   Q.  As a result of that, the tribe decided to remove

5   Mr. Bellmard from any involvement in the loan business going

6   forward, right?

7   A.  Yes.  Don Brady made the decision, but I think there was

8   influence.

9           THE COURT:  But I think there was?

10          THE WITNESS:  I felt it was kind of a mutual agreement

11  between Brady and Scott Tucker.

12  Q.  Now, you also mentioned the CLK/AMG issue.  Do you recall

13  that?

14  A.  Yes.

15  Q.  Now, you knew that one of Scott's companies in Kansas City

16  was CLK, right?

17  A.  Yes.

18  Q.  There was nothing tribal about CLK, right?

19  A.  We were partnered at the time.

20  Q.  But that business particularly, there was nothing tribal

21  about it?

22  A.  Yes.

23  Q.  And you learned, for example, that that fact --

24          THE COURT:  Yes, there was nothing tribal about CLK?

25          THE WITNESS:  CLK was not a tribal company when we

1  started partnering with them.

2  Q.  Because it was solely Mr. Tucker's company, right?

3  A.  Yes.

4  Q.  You learned that that fact, the fact that it was nothing

5  tribal about it, was a problem in some of these state cases,

6  right?

7  A.  Yes.

8            (Continued on next page)

Ha2Wtuc4                    Gamble - Cross

1    BY MR. VELAMOOR:

2    Q.  And so, Mr. Tucker came up with the idea to try to make CLK

3    a tribal company, right?

4    A.  Let me think.  I'm trying to think how to say that when he

5    brought the letter of intent to Chief Leonard, that may have

6    been what was on his mind, in '03.

7    Q.  As far as you knew, this whole idea came from Scott Tucker,

8    right?

9    A.  Well, I don't know if it was just Scott, but he was

10   involved.

11   Q.  OK.  And you were chief at the time, right?

12   A.  No.  I -- I was the second chief.

13   Q.  Second chief.  OK.

14       Now, to your knowledge, the tribe didn't pay any money, or

15   pay any of its money to buy CLK, right?

16   A.  Not that I know of.

17   Q.  The tribe's bank accounts were at Arvest at that time,

18   right?

19   A.  Yes.

20   Q.  And you're not aware of any money coming from the Arvest

21   bank accounts, right, to pay for CLK?

22   A.  To buy CLK, no, I'm not.

23   Q.  And those were the accounts that you believed were the real

24   tribal bank accounts, right?

25   A.  Yeah.  The accounts that we had were generally grants,

1  grant accounts, and that's where they'd be deposited and then

2  distributed to, distributed to -- once you accomplish your

3  mission in the grant, that's basically what the tribe was when

4  I got there.

5  Q.  OK.  That money went into the Arvest bank accounts, right?

6  A.  Yes, to the Arvest Bank.

7  Q.  That's also where the tribe would put these 1 percent

8  checks, right?

9  A.  No.

10  Q.  Where did the tribe put the 1 percent checks?

11  A.  I believe 1 percent went into the bank accounts of, of MNE,

12  Miami business enterprises, and the distributed on budget

13  request back to the tribe proper, and then they would go in,

14  just --

15  Q.  Fair enough, but those were all accounts that the tribe was

16  controlling, right?

17  A.  The Arvest, yes.

18  Q.  As well as the accounts into which the 1 percent checks

19  were deposited, right?

20  A.  When the distribution was made.  I can tell you, if you

21  want to know how, how the distribution was set up.  Right.

22  Q.  No.  I'm just saying you got these checks from Scott

23  Tucker, right?

24  A.  Got them from Scott.

25  Q.  And the bank would deposit those checks into some of the

1  bank accounts, right?

2  A.  In the MNE bank accounts, and that was a different bank.

3  Q.  That was a different bank, but those were the accounts the

4  tribe controlled, right?

5  A.  Yes.

6  Q.  Those were unlike the accounts that the loan business was

7  using; those accounts were controlled by Mr. Tucker, right?

8  A.  Yes.

9  Q.  Now, as far as you knew -- the CLK/AMG thing happened, but

10  as far as you knew, the tribe didn't own anything more as a

11  result of that transaction, right?

12  A.  Well, they acquired, but, but it was still managed the same

13  way, just came out of the tribal.

14  Q.  It was --

15  A.  -- tribal employment.

16  Q.  It was primarily a name change, right?

17  A.  Yes.

18  Q.  The control, for example, of the business remained exactly

19  the same, right?

20  A.  Yes, it was still managed the same.

21  Q.  And the tribe didn't come to control the loan servicing

22  business at that point, right?

23  A.  No.  At --

24  Q.  Or really any part of the business, right?

25  A.  No, we didn't exercise control.

Ha2Wtuc4                    Gamble - Cross

1    Q.  And the terms of the deal for the tribe, they didn't change

2    as a result of this transaction either, right?

3    A.  No, they didn't.

4    Q.  Still 1 percent every month, right?

5    A.  Yes, every --

6    Q.  Now, you were asked a little bit about the post, the period

7    which Mr. Brady was fired, do you recall that?

8    A.  Yes, sir.  Yes, I do.

9    Q.  That came after the tribe learned of an FTC investigation,

10   right?

11   A.  That was in that, in that time period.

12   Q.  And that investigation was a major, major problem for the

13   tribe, right?

14   A.  Yes.

15   Q.  It was viewed as much more serious than, for example, any

16   ongoing battles the tribe had with state regulators, right?

17   A.  Yes.

18   Q.  And that's because the tribe really values its relationship

19   with the federal government, right?

20   A.  Yes.

21   Q.  In part, because the tribe relies very heavily on grants

22   from the federal government, right?

23   A.  Yes.

24   Q.  So it's important to maintain good relations there?

25   A.  Good relation.

1    Q.   Right?

2    A.   Yes.

3    Q.   And so the FTC case, that caused some of the tribal boards

4    and other people to begin to take the loan business much more

5    seriously, right?

6    A.   Yes.

7    Q.   And one of the things that the tribal people learned for

8    the first time was about extravagant spending by Mr. Tucker

9    from bank accounts that were in the tribe's name, right?

10   A.   Well, I -- we learned about them earlier than that, because

11   of newspaper articles and stuff of that nature.

12   Q.   But -- you learned about the spending, but the fact that it

13   was coming out of the bank accounts in the tribe's name, that's

14   something they learned about primarily after the FTC

15   investigation, right?

16   A.   Yes.

17   Q.   And so the in response to all these developments, the tribe

18   hired new lawyers, right?

19   A.   Yes.

20   Q.   Kirkland & Ellis are those lawyers, right?

21   A.   Yes.

22   Q.   And Mr. Brady was fired in November 2012, right?

23   A.   Yes.

24   Q.   There was a meeting, a joint meeting of the AMG and MNES

25   boards, right?

1    A.  Yes.

2    Q.  And you were the chief of the tribe at that point, right?

3    A.  Yes, I was.

4    Q.  But prior to that meeting, you had not considered or

5    decided to fire Don Brady, right?

6    A.  No.

7    Q.  You didn't even know at that point that firing Don Brady

8    was contemplated, right?

9    A.  No.

10   Q.  So then you go into the meeting, right?

11   A.  Right.

12   Q.  There's lawyers at the meeting, right?

13   A.  Yes, bunch of them.

14   Q.  After the meeting Don Brady got fired, right?

15   A.  Yes.

16   Q.  Now, another agreement that you learned about or you heard

17   about was this BA Services agreement, right?

18   A.  Yes.

19   Q.  You were asked some questions about that on

20   cross-examination -- sorry, on direct examination?

21   A.  Yes.

22   Q.  That was again around the 2012 time period?

23   A.  Yes.

24   Q.  And again, this is something that Mr. Tucker proposed,

25   right?

1  A.  Yes.

2  Q.  And from your perspective, this was part of maintaining the

3  relationship with Mr. Tucker, right?

4  A.  I don't feel like it was critical, but I think it was just

5  time that the software come under the governing of the Miami

6  tribe or AMG or whatever the entity was going to be that would

7  cover it.

8  Q.  But you weren't sure what prompted that agreement to come

9  up at the time that it did, right?

10  A.  No.

11  Q.  You didn't really understand all the details of what the

12  agreement was, right?

13  A.  No.

14  Q.  Did you know that it was relating to software that AMG was

15  already using?

16  A.  It was -- yes, it was the software that ran the, that ran

17  the loan application system and probably a lot more than what I

18  know about.

19  Q.  And AMG was already using that software, right?

20  A.  Yes.

21  Q.  There was discussion about this agreement and talk about it

22  being a purchase agreement, do you recall that?

23  A.  Yes, I do.

24  Q.  Do you remember if it was changed to a licensing agreement

25  at some point?

Ha2Wtuc4                    Gamble - Cross

1  A.  I don't recall.  I don't recall.  What I recall is the

2  purchase agreement.

3  Q.  You understood it as something like a stopgap-type

4  agreement, right?

5  A.  Yes, while I was there -- the -- the main point that we

6  were -- talked about was we didn't know what the value of the

7  software was, so that was, that was being valued, so we put a

8  temporary agreement in place until it, until the value of the

9  software could be, be --

10 Q.  OK.

11 A.  Whatever that, whatever that value is.  I --

12 Q.  Whatever that value is, while you were there, no purchase

13 agreement was completed, right?

14 A.  No.  We had a, had a --

15 Q.  You don't know if one was ever completed, right?

16 A.  No, I don't.

17 Q.  And you didn't think that, by this agreement, the tribe was

18 buying Mr. Tucker's loan business, right?

19 A.  Well, I -- I can't -- I can't say yes or no on that one,

20 because I was -- the point of the 2012 agreement was to see

21 what the value was.

22 Q.  Right, as you put it a stopgap agreement?

23 A.  A stopgap to see what the value was, and I didn't know if

24 at the end we were going to purchase it or -- I didn't know if

25 we were going to share revenue on it.  I didn't know how, I

1    didn't know how the end result, end agreement would be.

2    Q.  The agreements you were aware, the stopgap agreement, the

3    tribe didn't acquire or purchase anything?

4    A.  It didn't purchase, but it -- it's stock benefit.

5    Q.  None of these agreements we've talked about, the initial

6    agreement, CLK issue or this stopgap agreement, none of these

7    agreements changed who controlled the loan business, right?

8    A.  No.

9    Q.  None of these agreements changed the terms of the deal with

10   Scott Tucker, right?

11   A.  No.

12   Q.  It was always the 1 percent deal, right?

13   A.  Yes.

14   Q.  And Tucker's people controlled and managed the business

15   from Kansas City, correct?

16   A.  Yes, with the exception, with this exception of a stopgap

17   agreement, which donated money to tribe in AMG, which went

18   straight into the tribal, into the tribal bank account.

19   Q.  To be clear, on the stopgap agreement, there was some

20   provision that the tribe might get an additional dollar per

21   loan, right?

22   A.  Per loan.

23   Q.  Apart from that, nothing else changed, right?

24   A.  No, not that I --

25   Q.  You know that the tribe got named in a lawsuit relating to

Ha2Wtuc4                    Gamble - Cross

1    that loan business, right?

2    A.  Yes, we --

3    Q.  Or certain tribal entities?

4    A.  Certain tribal entities.

5    Q.  The cases were in California and Colorado, right?

6    A.  Yes.

7    Q.  And you testified that Mr. Brady and Mr. Bellmard were sort

8    of the tribe's representatives on issues relating to this

9    litigation, right?

10   A.  Can you repeat your question?

11   Q.  Mr. Brady and Mr. Bellmard were kind of the point people

12   for the tribe relating to these litigations, right?

13   A.  Yes.

14   Q.  But all the strategy and the decision-making for these

15   cases, that came out of Kansas City, right?

16   A.  Yes.

17   Q.  Kansas City folks paid all the legal service bills for

18   those cases, right?

19   A.  Yes, by agreement.

20   Q.  The tribe didn't have the money to pay those expenses,

21   right?

22   A.  No.

23   Q.  Mr. Brady would give updates from time to time on how they

24   were going, right?

25   A.  Yes.

1  Q.  He also signed some affidavits in this case, right?

2  A.  Yes.

3  Q.  And you've seen some of those affidavits, right?

4  A.  Yes, just recently.

5  Q.  And those affidavits contained false statements about the

6  roles he and others were playing, right?

7  A.  I felt that that stated that Don took too much of a, that

8  don took credit for more management than what I -- he was

9  actually involved in.

10 Q.  They overstated the role that he was playing in the

11 business, right?

12 A.  That's a better way to say it.

13 Q.  And you also signed some affidavits in these cases, right?

14 A.  Yes.

15 Q.  And today, because you're testifying pursuant to an order

16 of immunity, right?

17 A.  Right.

18 Q.  That means you're protected from any of your testimony

19 being used against you, right?

20 A.  Yes.

21 Q.  Now, these affidavits, they were prepared by lawyers,

22 right?

23 A.  Yes.

24 Q.  Conly and Tim Muir, right?

25 A.  Yes, or that --

1  Q.  You said you'd seen those affidavits and you think that

2  those affidavits were not accurate, right?

3  A.  Are you referring to Don Brady's affidavit?

4  Q.  Yes.

5  A.  Yes, I felt it --

6  Q.  And so, the --

7        MR. VELAMOOR:  Well, why don't we put up Government

8  Exhibit 309.  Why don't we turn to the next page.  I want to

9  show him --

10        I can give you a paper copy.  It will be easier for

11  you to see all the pages this way.

12        MR. BATH:  Could we have a date on that document,

13  please?

14        THE COURT:  Yes.  Fix the date, Mr. Velamoor.

15        MR. VELAMOOR:  Why don't we go back to the previous

16  page.

17  Q.  This looks like an email dated July 20, 2005, right?

18  A.  July 20, yeah.  Yes, sir.

19  Q.  And this email attaches affidavits, including Don Brady's

20  affidavit, right?

21  A.  Yes, it was -- yes.

22        MR. VELAMOOR:  Why don't we go to the next page.  All

23  right.  Focus on the second paragraph at the bottom there.

24  Q.  OK.  You understood this was an affidavit about the loan

25  business, right?

Ha2Wtuc4                    Gamble - Cross

1    A.   Yes.

2    Q.   It was submitted in a case that was all about the loan

3    business, right?

4    A.   Yes.

5    Q.   And so here it says that Mr. Brady "manages the services of

6    MNE and its entities provide."  Do you see that?

7    A.   Yes.

8    Q.   Mr. Brady didn't really manage any part of the loan

9    business, did he?

10   A.   I felt that that's overstated or false.

11   Q.   I mean, it's false, right?  It's false, correct,

12   Mr. Gamble?

13   A.   Yes, yes.

14   Q.   And when it says that he maintained "ultimate

15   responsibility for books, records and accounts," that's not

16   true either, right?

17   A.   Not to my knowledge.

18   Q.   It says that he "manages the day-to-day operations of MNE";

19   he didn't manage the MNE operations of the loan business,

20   right?

21   A.   No, he didn't.

22   Q.   He certainly was not "responsible for marketing, strategy

23   and compliance --"

24   A.   No.

25   Q.   -- in the loan business, right?

1    A.  No.

2            MR. VELAMOOR:  Why don't we go to the next page.  Why

3    don't we turn to paragraph 6.

4    Q.  Talks about the loan transactions occurring on Indian

5    lands, see that?

6    A.  Yes.

7    Q.  You learned, as you testified before, that there was

8    nothing on Indian lands that actually was necessary for the

9    loan transactions to go forward?

10   A.  My belief in the beginning was that the -- all contracts

11   came from trust land.

12   Q.  Right, but ultimately --

13   A.  And down the road a ways, it  didn't seem to be that Don

14   Brady was there much, so --

15   Q.  But ultimately, you learned that that, in fact, was not the

16   case, right?

17   A.  Correct.

18   Q.  It says in paragraph 8 that "Cash Advance operates within

19   the Miami tribe's reservation boundary."  See that, in

20   paragraph 8 there?

21   A.  Yes.  Yes, I do.

22   Q.  And in fact, this business operated in Kansas City, right?

23   A.  The bulk of the employees were in Kansas City.

24   Q.  That wasn't true either, right?

25   A.  No.  That would be overstated with the exception of the

1    loan approval.

2    Q.  But again, as you pointed, the loan approval --

3            THE COURT:  Put a new question to the witness.  Listen

4    to the question.

5    Q.  Mr. Gamble, as you realized, the loan approval wasn't

6    actually determining whether the loans went out, right?

7    A.  Over time I felt that that was something that wasn't

8    happening as regularly as it was early on in the, in the --

9    Q.  All right.  So, now, you were also asked about board

10   meetings, right?

11   A.  Yes.

12   Q.  Now, you were not on any board at any point, right?

13   A.  I wasn't on any boards?

14   Q.  On the MNE board.

15   A.  No, no, no.

16   Q.  You weren't on the MNE Services board either, right?

17   A.  No.

18   Q.  Now, you were on the AMG board, right?

19   A.  Yes.

20   Q.  Now, the AMG board was created in 2008, right?

21   A.  Yes.

22   Q.  But it never even met until late 2011 or 2012, right?

23   A.  If there was any -- if there were any meetings, they were

24   far between.

25   Q.  OK.  Sitting here today, do you remember any meetings

1    before late '11, 2012?

2    A.  No.

3    Q.  They started meeting after a certain news report, right,

4    that came out?  Right?

5    A.  News report, are you referring to --

6    Q.  I don't want to get into the details of it, but there was a

7    big news report about the Miami tribe's involvement in the loan

8    business, right?

9    A.  There was a number --

10   Q.  Number of?

11   A.  Ones with the highest profile.

12   Q.  And they didn't start meeting until around the time of the

13   FTC lawsuit, right?

14   A.  Yes, in, in negotiation for -- the BA agreement.

15   Q.  BA agreement, right?  OK.

16        Now, you were asked about the minutes of one of those

17   meetings, and that's Defense Exhibit 2700.

18        MR. VELAMOOR:  Could we put that up on the screen real

19   quick, and put that over to the side.

20   Q.  The date of this is November 14, 2011, right?

21   A.  Yes, it is.

22        MR. VELAMOOR:  Why don't we put up next to it

23   Government Exhibit 313, already in evidence.  Let me just focus

24   again on the email at the bottom, 313, from Tim Muir.

25   Q.  What's the subject line of this, do you know?

Ha2Wtuc4                    Gamble - Cross

1    A.  This, this was giving Don an office in, in --

2    Q.  Mr. Gamble, the subject line is November 14 --

3    A.  Oh, OK.  November 14.

4    Q.  OK.  It says there, "FYI, we also need to get Don an

5    'office' set up here by the 14th because apparently he's told

6    all the board members he already has one up here."  See that?

7    A.  Yes, I do.

8    Q.  And the subject is the same date as the meeting, right;

9    they're both November 14?

10   A.  Yes, they are.

11   Q.  OK.

12            MR. VELAMOOR:  You can go back to the email for a

13   second.

14   Q.  OK.  In the email Mr. Tucker responds "cubicle," see that?

15   A.  Yes, I do.

16   Q.  And moving on, Mr. Muir says, "Nope, he called me, said

17   office.  "See that?

18   A.  Yes.

19            MR. VELAMOOR:  Keep going.

20   Q.  Blaine Tucker says, "or he could use Scott's conference

21   room, Patten's office."  See that?

22   A.  Yes.

23            MR. VELAMOOR:  All right.  We can take that down.

24   Q.  Now, you were also shown many board, board resolutions,

25   right?

1    A.  Correct.

2    Q.  And the boards, in fact, did pass resolutions, right?

3    A.  Yes, they did.

4    Q.  Generally speaking, these resolutions were drafted by

5    lawyers, right?

6    A.  Yes.

7    Q.  Mr. Schulte and Mr. Muir drafted some of these as well,

8    right?

9    A.  Yes.

10   Q.  Now, you didn't really quite understand all the details of

11   all these resolutions or what the boards were being asked to

12   do, right?

13   A.  Did I understand?

14   Q.  You didn't necessarily understand everything that --

15   A.  Well --

16   Q.  -- boards were asking, what they were asking the boards to

17   do, right?

18   A.  Right.

19   Q.  But you knew that, from the lawyers, it was necessary to do

20   these things and say the things in the resolutions in order for

21   this loan business to work, right?

22   A.  Loan business.  Yes.

23   Q.  And that loan business, as you mentioned before, was very

24   important to the tribe, right?

25   A.  It became very important.

Ha2Wtuc4                    Gamble - Cross

1   Q.  Important source of revenue, right?

2   A.  Yes.

3   Q.  And you knew that the board, boards had to pass these

4   things in order for this relationship to work, right?

5   A.  Yes, in a resolution, you have a presenter.  Presenter

6   makes the case, and then the board votes on it, so you probably

7   understood more of it at the time, but then so many other

8   things happened that you kind of lose sight of what the

9   direction was.

10  Q.  And that was a huge part of what the tribe's role was in

11  this business, right?  To pass these resolutions and pass these

12  other things that were provided by the lawyers, right?

13  A.  Yes, it would be, in my view, governing.

14  Q.  But that's really primarily what the tribe did --

15  A.  Tribe.

16  Q.  -- as part of this business, right?

17  A.  Yup.

18          MR. VELAMOOR:  Nothing further, your Honor.

19          THE COURT:  All right.

20          Any redirect?

21          MR. GINSBERG:  No.  Thank you, your Honor.

22          THE COURT:  All right.  You may step down.  Thank you.

23          (Witness excused)

24          THE COURT:  Call your next witness.

25          MR. ROTH:  The defense calls Leonard Goodman, your

1  | Honor.

2  | LEONARD STEPHEN GOODMAN,

3  |        called as a witness by the Government,

4  |        having been duly sworn, testified as follows:

5  |            THE COURT:  You may inquire.

6  |            MR. ROTH:  Thank you, your Honor.

7  | DIRECT EXAMINATION

8  | BY MR. ROTH:

9  | Q.  How old are you, Mr. Goodman?

10 | A.  I'm 75 years old.

11 | Q.  And where were you born?

12 | A.  I was born in Philadelphia.

13 | Q.  And where do you currently reside, sir?

14 | A.  In Voorhees, New Jersey.

15 | Q.  Are you currently employed?

16 | A.  No.  Retired.

17 | Q.  What is your educational background, sir?

18 | A.  I went to Penn State University and got a degree in

19 | mechanical engineering and took a year off to work and pay

20 | partway through Temple Law School, where I graduated in 1968.

21 | Q.  After you graduated law school, could you tell the members

22 | of the jury a little bit about your professional background,

23 | what firms you were in?

24 | A.  I spent a six-month preceptorship, which was then required

25 | by the Pennsylvania Bar Association, at a law firm in

1   Philadelphia, Cohen, Shapiro, Berman, Polisher, Shiekman &

2   Cohen, and then was fortunate to get a job in the Philadelphia

3   District Attorney's Office.  I worked there for three years.

4   Q.  Would that be the state district attorney, the

5   counterpart --

6   A.  Philadelphia County.

7   Q.  -- counterpart of the federal government?

8   A.  Philadelphia County.

9   Q.  I'm sorry?

10  A.  Philadelphia County District Attorney's Office.

11  Q.  OK.

12  A.  It was the city and county.

13      I worked there for three years, and after that I found a

14  job at First Pennsylvania Banking and Trust Company.  I worked

15  there from 1972 through 1977.  I left the bank to join a firm,

16  Fellheimer, Krakower & Eichen, which engaged in litigation and

17  banking, and three years later that firm changed structure.  I

18  became a name partner, and the firm became Fellheimer Krakower

19  & Goodman -- sorry, Fellheimer Eichen & Goodman.  I was at that

20  firm from, I guess, '77 to '85, at which point Fellheimer and

21  Krakower, who were married, decided to go to Pittsburgh and

22  take up banking.  I left to start up my own firm, and I was in

23  practice by myself from 1985 to 1990.  I joined Montiverdi

24  Hemphill Massimire & Elbert.  In 1990, it became Montiverdi &

25  Hemphill, and I left in 1995 to join the firm, Weir & Partners.

1    Now, Walter Weir had been my partner when I was with

2    Fellheimer Eichen & Goodman, so I was joining an old partner.

3    I was with Walter from 1995 through the end of 2014 when I

4    retired.

5    Q.  What was the name of that firm, the last one you were with?

6    A.  Weir & Partners.

7    Q.  During the course of your legal career that you just

8    mentioned, did you develop any particular professional

9    expertise in any particular areas?

10   A.  Well, I was hired by First Pennsylvania Bank to do consumer

11   lending and compliance.  At that time truth in lending was

12   fairly new.  Equal credit opportunity was new.  Leasing

13   regulations came out, and I was not only doing the compliance

14   work, but I was drafting all of the contract forms for the

15   bank, including credit card forms.  So I was doing all kinds of

16   forms.  I did aircraft loans, ship mortgage loan, car loans,

17   installment credit, so I got quite a background at First

18   Pennsylvania Bank.  And when I left the bank, that was my

19   expertise until I retired.

20   Q.  Did there come a time, sir, when your firm, Weir &

21   Partners, were retained by County Bank of Rehoboth in Delaware?

22   A.  I did work for a bank in Philadelphia called Republic Bank.

23   Republic Bank made refund anticipation loans in conjunction

24   with Jackson Hewitt.

25   Q.  I think my question was --

1    A.  I'll get there.

2    Q.  Oh, OK.

3    A.  And it was determined that it would be more prudent if the

4    loans were made through a Delaware bank.  So County Bank was

5    brought in, and they entered into an agreement with Republic

6    Bank.  Now, at that time, I did not represent County Bank, but

7    I was instructed by Republic Bank that when I drafted

8    documents, they were to be very, very protective of County

9    Bank.

10         After that program ended -- I think it was after the

11   program ended, I was asked by County Bank to come down to the

12   Delaware department of banking and meet with them with the

13   FDIC, with the president and chairman of the bank, and with

14   brokers who were offering the bank a $40 million portfolio of

15   credit card receivables.  And I sat through the meeting, and

16   after the meeting was over, I got up and walked out with the

17   bankers, and in the parking lot, I told them, Do not buy that

18   portfolio; it's fraudulent.  So they did not buy the portfolio.

19   And that was a one-day engagement.

20         About, sometime in 1998, I got a call from a fellow

21   named Charlie Hallinan, who had talked to the president of

22   County Bank, Harold Slatcher, and Harold told him there was a

23   lawyer in Philadelphia called Steve Goodman, because I used my

24   middle name, and if he wanted to do a payday loan program, he

25   would do it if I would sign off on the program.  So at that

1   time, Harold -- through Harold's recommendation, Charlie

2   Hallinan --

3   Q.  Harold, again, is who?

4   A.  Harold is the president of County Bank.

5   Q.  Of Rehoboth?

6   A.  He recommended he come to my office, so Charlie and his

7   partner Rick Mickman came to my office, and they were my

8   clients, not County Bank.  And I advised them that although

9   they were my clients, the fact was any program that I created

10  would have to be protective of County Bank and they would be

11  essentially paying me to actually work for County Bank even

12  though County Bank was not my client.  And they agreed, it made

13  sense.

14  Q.  Sir, what type of bank is County Bank of Rehoboth?

15  A.  County Bank is a state-chartered nonmember bank, which

16  means that it's subject to regulation by the Delaware

17  department of banking and the Federal Deposit Insurance

18  Corporation.  If it was a member bank, it would also have been

19  regulated by the Federal Reserve Bank, but it was not.

20  Q.  And so, what, if any, special powers or effect does that

21  have on the ability of County Bank to make loans outside of

22  Delaware?

23  A.  Well --

24          MR. SCOTTEN:  Objection.  Calls for legal conclusion.

25          THE COURT:  Yes.

Ha2Wtuc4                    Goodman - Direct

1    BY MR. ROTH:

2    Q.  In your opinion.

3              THE COURT:  Sustained.  Sustained.  You can ask

4    questions about what people did, not legal principles.  Go

5    ahead.

6              MR. ROTH:  Can I ask what his opinion is, Judge?

7              THE COURT:  No.

8              MR. ROTH:  Very well.  I'll move on.

9              THE COURT:  Is he designated as an expert?

10             MR. ROTH:  No, your Honor.

11             THE COURT:  OK.  Move on.

12   BY MR. ROTH:

13   Q.  At some point, sir, did you conceive a program for County

14   Bank, a short-term lending program?

15   A.  Yes, I did.

16   Q.  And in general, what was the business model?

17   A.  Well, County Bank would adopt credit-granting factors that

18   if each of the factors was met, then it would agree to make a

19   loan.  It also established compliance procedures for the Truth

20   In Lending Act, for the Equal Credit Opportunity Act, and would

21   engage the servicer to provide these services pursuant to

22   County Bank's very, very strict lending policies and

23   procedures.  And I proceeded to prepare policies and procedures

24   and the forms, and set the program up.

25   Q.  So you prepared the transactional documents for the loans

1    that the servicers would be providing through County Bank?

2    A.   Yes.

3    Q.   And you provided a policy manual, is that correct?

4    A.   Yes.

5           MR. ROTH:  I'm going to ask that the witness be shown

6    D40.

7    Q.   I'll ask you if you recognize that document.

8    A.   Where is it?

9           MR. ROTH:  And if you could flip through the pages.

10   Q.   That's a document --

11          MR. ROTH:  Flip through to the last page of that

12   document.

13   A.   How do I flip through?

14   Q.   No, no.  You won't.  Eli will.

15        Do you recognize your signature there?

16   A.   Yes, that's my signature.

17   Q.   And do you recognize, sir, what stationery that's on?

18   A.   That's the firm's stationery, my firm.

19   Q.   And the name of that firm again is?

20   A.   Weir & Partners LLP.

21   Q.   Who is that letter to, sir?

22   A.   That -- could you go back to the first page.

23        It was to all of the then servicers that had entered into

24   agreements with County Bank.

25   Q.   And the caption on that is what, sir?

1    A.   Policy and procedures manual for short-term loans.

2              MR. ROTH:  Your Honor, I'd offer that now.

3              THE COURT:  Any objection?

4              MR. SCOTTEN:  No, your Honor.

5              THE COURT:  Received.

6              (Defendant's Exhibit D40 received in evidence)

7              MR. ROTH:  Eli, could you highlight just the first

8    sentence and a half on the first page.

9    A.   "County Bank's policy and procedures manual for short-term

10   loans ('the policy') is intended as more than a quick desk

11   reference.  It covers the bank's very important policies and

12   nondiscrimination in lending, credit approval, collections,

13   privacy --"

14             MR. ROTH:  And the next page.

15   A.   "-- of bank records and compliance with applicable law,

16   such as the federal Truth In Lending, Electronic Funds Transfer

17   and Fair Credit Reporting Acts.  It also contains emergency

18   guidance on subprime lending."

19   Q.   You can stop there, sir.

20             MR. ROTH:  Pick up on the last sentence, Eli, in that

21   paragraph and highlight that.

22   Q.   Could you read that, sir?

23   A.   "If the bank's subprime loan program is at any time

24   determined not to be operating in a safe and sound fashion, so

25   as to expose the bank to what the regulators deem an undue risk

Ha2Wtuc4                    Goodman - Direct

1    of loss, the guidance prescribes that the bank's regulators can

2    require the bank to cease offering subprime loans."

3            MR. ROTH:  Can you go out of that now, Eli, to just

4    the first sentence of the next paragraph.

5    Q.  Sir, if you could read that.

6    A.  "The bank's regulators will have the new guidance in hand

7    when they next examine the bank's subprime lending program with

8    regard to safety and soundness and compliance with law."

9            MR. ROTH:  You can take that down, Eli.  Thank you.

10   Q.  Who are you talking about in terms of the bank's compliance

11   officers, the regulators?

12   A.  The bank's compliance officer was Scott Walsmith, but in a

13   sense, I was telling Scott Walsmith how to run the program.

14           THE COURT:  No, no.

15           THE WITNESS:  I'm sorry.

16           THE COURT:  Listen to the words of the question.

17   Answer what the question asks and nothing else.

18           THE WITNESS:  I'm a little hard of hearing, your

19   Honor.

20           THE COURT:  OK.  If you don't hear a question, the

21   thing to do is to stop and ask the questioner to repeat it, but

22   the point I was making is you listen to the words of the

23   question and you answer only what the question asks and nothing

24   else.

25           THE WITNESS:  OK.  Could you --

Ha2Wtuc4                        Goodman - Direct

1          THE COURT:  You're a lawyer, I understand that, but

2    your job here is to respond to the questions.  So listen to the

3    questions.

4          THE WITNESS:  OK.

5          Could you repeat the question.

6          MR. ROTH:  Yes.

7    Q.  In the portion that you read from the policy manual, what

8    regulators were you referring to that audited the program?

9    A.  That would be the Federal Deposit Insurance Corporation and

10   the Delaware department of banking.

11   Q.  And did the bank have its own internal compliance officer

12   as well, sir?

13   A.  Yes, Scott Walsmith.

14   Q.  And was he copied on all documents as well?

15   A.  Unless I forgot to, yes, he would be.

16   Q.  And were all of the transactional documents that you talked

17   about developing for this program available to all of those

18   regulators?

19   A.  Yes.

20   Q.  And how often did those regulators audit the program?

21   A.  I don't know when they started.  I do know that they did

22   audit the program in 2000, but they may have also audited it in

23   1999.  The way it worked, the Delaware department of banking

24   would examine the bank in one year and the following year the

25   FDIC would examine the bank and then they would go back to the

Ha2Wtuc4                    Goodman - Direct

1  Delaware department of banking the following year, so the bank

2  was examined every year.

3  Q.  OK.  And they had full reign of the bank and the servicers'

4  records and bank accounts?

5  A.  Absolutely.

6  Q.  Did there come a time, sir, when you were hired by Scott

7  Tucker on behalf of one of his entities, NMS?

8  A.  Yes.

9  Q.  And do you recall when that was exactly, sir?

10  A.  I think it was in 1998.

11         MR. ROTH:  I'd ask that the witness be shown

12  defendant's 1.

13  Q.  I'd ask you whether you recognize that as -- that document,

14  sir.  Take your time.  It's a pretty thick document.

15  A.  Yes, sir.

16  Q.  And we can turn to the third page.

17  A.  That's April 2, 1998.

18         MR. ROTH:  If we could turn to the third page, Eli.

19  A.  And that's my signature.

20  Q.  And who else's signature do you see there, sir?

21  A.  Scott Tucker, individually, and in his capacity as

22  president of National Money.

23  Q.  And that's a document you signed?

24         MR. ROTH:  I would offer that at this time, your

25  Honor.

1       THE COURT:  Any objection?

2       MR. SCOTTEN:  No, your Honor.

3       THE COURT:  Received.

4       (Defendant's Exhibit 1 received in evidence)

5       MR. ROTH:  Could we go back to the first page, Eli.

6   Q.  Sir, could you read the first two sentences in the first

7   paragraph in terms of the scope of your retention, what it

8   covered.

9   A.  "You advise that National Money Service Inc. ('the

10  company') desires to enter into an arrangement with a Delaware

11  bank to make and service 'payday loans,'" in quotes, "to

12  consumers in various states.  You desire to engage the firm of

13  Weir & Partners with regard to consumer compliance issues that

14  may arise under state and federal law, such as with regard to

15  licensing documentation and compliance questions in regard to

16  such loans."

17  Q.  OK.  Thank you.  So he was your client then, is that

18  correct?

19  A.  Yes.

20  Q.  And it was your job to make sure that everything that he

21  did complied with the law, is that fair to say?

22  A.  Yes.

23      MR. SCOTTEN:  Objection.  Leading.

24      THE COURT:  Avoid the leading.

25  Q.  What was your responsibility, as you saw it, to Mr. Tucker

1    and NMS in respect to the short-term lending program?

2    A.  To make sure that they made the loans in compliance with

3    law.

4    Q.  You used the term "servicer."  Was Mr. Tucker considered a

5    servicer?

6    A.  National Money Service Inc. would have been a servicer of

7    the bank.

8    Q.  Thank you.

9         MR. ROTH:  I'd ask that the witness be shown

10   Government Exhibit 103, which is admitted.  Could you blow up

11   the top of it, small print.

12   Q.  Do you recognize that?

13   A.  Yes, I do.  Nonexclusive master sale, participation,

14   servicing and indemnification agreement.

15   Q.  Who is that signed by, sir, on the last page?  Or page 4.

16   A.  This is signed by Adrian Rubin and Harold Slatcher.

17        MR. ROTH:  I'm sorry.  Can we put up 102.  I'm sorry,

18   Eli.  This is the wrong copy that I have.  Could you go to the

19   last page, Eli?

20   A.  It --

21   Q.  Can you recognize that signature?

22   A.  Not really.  But I would assume it's Scott Tucker.

23        MR. ROTH:  First page, Eli.

24   A.  And Harold Slatcher.

25   Q.  Do you see --

1          MR. ROTH:  If you could highlight the top right there.

2    Q.  Do you see the words "county" and "NMS"?

3    A.  Yes.

4    Q.  OK.  And who is this agreement between?

5    A.  It was between County Bank and National Money Service Inc.

6          MR. ROTH:  And could we turn to the first --

7    Q.  Who is the buyer in this and who is the seller?

8    A.  The buyer would be National Money Service and the seller

9    would be County Bank.

10   Q.  OK.  If you could, sir, without reading the whole document,

11   would you go through the paragraphs starting at 1(a).  The

12   jury's had the benefit of this once before, at least seeing the

13   document.  But could you explain the general terms of this

14   master sale, participation, servicing and indemnification

15   agreement, what the obligations of the seller were and what the

16   obligations of the buyer were?

17   A.  Well, in paragraph 1(a), essentially County Bank is saying

18   it makes loans in the normal course of business and it will

19   offer participations in those loans.  And paragraph 1(b) says

20   that seller has agreed to sell a continued 95 percent

21   participation in all existing and future loans to buy.

22   Q.  What does that mean, sir?

23   A.  It means the bank is committing to sell a participation on

24   an ongoing basis.

25   Q.  And how does that actually happen, sir?

Ha2Wtuc4                      Goodman - Direct

1    A.  Well --

2              THE COURT:  So the bank is selling a 95 percent

3    interest and the bank would keep a 5 percent interest?

4              THE WITNESS:  Yes.

5              THE COURT:  Is that the way it works?

6              THE WITNESS:  Yes.

7              THE COURT:  Thank you.

8    A.  That created a problem for the bank, by the way, a safety

9    and soundness problem.

10   Q.  And how was that resolved, sir?

11   A.  Well, the problem that the bank had was that the agreement

12   provides that the purchase of the participation would occur on

13   the day following the day that the bank made the loan, and that

14   meant that there was an overnight obligation of the buyer to

15   pay the purchase price.  And at the time the agreement was

16   signed, no one had any idea what the volume would be.  The

17   banking laws of Delaware -- and of New York and of New Jersey

18   and Pennsylvania -- provide that in order to preserve the

19   structure and integrity of a bank --

20             MR. SCOTTEN:  Your Honor, objection.

21   A.  -- it cannot engage --

22             THE COURT:  Sustained.

23             Go ahead.  Next question.

24   BY MR. ROTH:

25   Q.  What was the financial arrangement between the buyer and

1    the seller?

2    A.   The buyer was an agent of the seller.

3    Q.   And in terms of the financial arrangement, in terms of what

4    money was going to be made by the bank.

5    A.   Well, the bank would make 5 percent of the interest earned

6    on the loans and the seller would earn 95 percent.

7    Q.   Did the bank need to -- or did the bank have any risk on

8    the loan?

9    A.   Not really.

10   Q.   And were they required to?

11   A.   At that time, no.

12   Q.   Who was going to make the credit determinations in respect

13   to the loans?

14   A.   Well, one of the problems, in determining who the lender

15   is, is who makes the actual credit decision, and normally, when

16   you're dealing with credit, somebody uses his or her discretion

17   that says, OK, we're going to make the loan.  This program

18   couldn't work that way, because the bank established credit

19   criteria and either the applicant met the criteria and was

20   approved or didn't meet the criteria and would be rejected.

21   Q.   Could I stop?

22   A.   So when the --

23   Q.   Could I stop you there, sir.

24   A.   OK.

25            MR. ROTH:  I'd ask that the witness be shown

1    Defendant's Exhibit 39.

2    Q.  Do you recognize that?

3          MR. ROTH:  You can turn to the last -- the second

4    page, Eli.

5    Q.  Do you recognize that as a document you authored, sir?

6    A.  Well, it's the cover letter for the document that I

7    offered -- that I authored.

8    Q.  Yes.  And what is the subject matter of that document, sir?

9    A.  I believe it's the policy and procedures manual.

10   Q.  And again, that is copied to all the servicers, including

11   Scott Tucker, is that right?

12   A.  Yes.

13   Q.  And it's copied to Harold Slatcher?

14   A.  Slatcher.

15   Q.  Slatcher, the president?

16   A.  Yes.

17         MR. ROTH:  And if we could, the second paragraph, if

18   you could highlight that, Eli.

19   Q.  And if you could read to us just the first sentence.

20   A.  "Under the revised requirements for credit approval, the

21   applicant need only meet seven of the first eight requirements

22   in order to be approved automatically by the bank.  Meeting six

23   of the first eight requirements or less will result in

24   automatic rejection unless the servicer marks the application

25   for special processing by the bank."

1      This was a disaster.

2   Q.  I'm sorry, sir, to cut you off.

3           So this is what you were talking about that the

4   bank -- did the bank set this criteria for the loans --

5   A.  Yes.

6   Q.  -- for the servicers to follow?

7   A.  Yes, but not long after this procedure went into effect, I

8   got a call from Harold Slatcher, and he said that when they

9   were reviewing the loan where seven of the eight criteria were

10  met, they couldn't tell you why they would approve a loan that

11  was missing one criteria and they would deny another loan that

12  was missing the same criteria.  So essentially, discretion had

13  to leave the program, because there was no way to justify the

14  bank's discretion; it didn't know what it was doing.  So we

15  went back to a meet all or -- to be approved or not.  If you

16  didn't meet all, you were not approved.

17  Q.  Did, in addition to -- withdrawn.

18          Did there come a time, sir, when Scott Tucker, on

19  behalf of NMS, specifically asked for your legal opinion about

20  the soundness of this program and the legality of the program?

21  A.  Yeah, I believe he did, later.

22  Q.  OK.

23          MR. ROTH:  I'd ask that the witness be shown

24  Defendant's Exhibit 24.

25  Q.  And if you could see, sir, the second page, is that your

1    signature -- or the third page?

2    A.   Yes.

3    Q.   And is that a document you authored?

4    A.   Yes.

5    Q.   And could you read just the first sentence of the first

6    paragraph, sir?

7    A.   Of the third page or the first page?

8    Q.   The first page.

9    A.   "As special compliance counsel to National Money Service

10   Inc. and as well to County Bank of Rehoboth Beach, Delaware,

11   you have asked our opinion regarding the legality of County

12   Bank's short-term loan program."

13   Q.   In addition to being special compliance counsel to National

14   Money Service, you were special compliance counsel to the bank

15   as well, is that fair to say?

16   A.   Yes.  You previously asked about the times that County Bank

17   approached me, but they also approached me in 1999 to look at

18   another payday loan program that was being offered.

19   Q.   If you can answer the question --

20   A.   Well, at that time they retained me.

21   Q.   OK.  And when Mr. Tucker asked you for your legal opinion,

22   he was already participating in this program through NMS as a

23   servicer for the bank, is that correct?

24   A.   That's correct.

25   Q.   And tell the members of the jury what you did at that point

1  to come to a conclusion, if you came to a conclusion.

2  A.  Well, I went back and looked at the applicable law that I

3  had been referring to all along in designing the program and

4  just wrote him an opinion that said, You're in compliance with

5  the law.

6           MR. ROTH:  Judge, at this time, I'd ask --

7  A.  In my opinion.

8           MR. ROTH:  I'd ask to move in D24, and I think I

9  failed to move in D39 previously.

10          THE COURT:  All right.  D24?

11          MR. SCOTTEN:  No objection.  I need to look back at

12  39, your Honor.

13          THE COURT:  D24 is in.

14          (Defendant's Exhibit D24 received in evidence)

15          THE COURT:  You're going to look back at D39.  One

16  moment, please.

17          MR. SCOTTEN:  No objection on D39.

18          THE COURT:  Received.

19          (Defendant's Exhibit D39 received in evidence)

20  BY MR. ROTH:

21  Q.  Was there any particular case that you looked at to form

22  the basis of your opinion, sir, if you recall now?

23          MR. SCOTTEN:  Objection.  Unless he informs

24  Mr. Tucker, his underlying reasoning is irrelevant.

25          MR. ROTH:  Well, it's in the letter, Judge.

1      MR. SCOTTEN:  OK.

2   A.  There was a slew of cases that started way back after the

3   Civil War with regard to the most-favored lender rule.

4      THE COURT:  You have to confine yourself to what you

5   told Mr. Tucker.

6      THE WITNESS:  In the letter?  OK.

7      Could I see page 2?

8      THE COURT:  Or what you may have told him orally for

9   that matter, but take a look at it.

10      THE WITNESS:  Can I see page 2?

11  Q.  Certainly.

12  A.  Marquette National Bank of Minneapolis v. First of Omaha

13  Service Corp., a 1978 Supreme Court case -- can I see the next

14  page, please?  Smiley v. Citibank South Dakota N.A., a 1996

15  case.

16  Q.  OK.  I won't test your memory from 17 years ago, but those

17  cases were used to form the basis of your opinion?

18  A.  In this case, yes, but there was other cases that went way

19  back.

20  Q.  This was not the first time you analyzed the loan program

21  from a legal perspective?

22  A.  No.

23  Q.  Is that correct?

24  A.  No.

25  Q.  Did there come a time, sir, when the bank president asked

Ha2Wtuc4                    Goodman - Direct

1  you to render an opinion in respect to the soundness of the

2  program?

3  A.  I believe so.  I believe in 1998.

4          MR. ROTH:  I'd ask that the witness be shown D26.

5  A.  2001.

6  Q.  Do you recognize that, sir, as a letter that you wrote to

7  Mr. Slatcher?

8  A.  Slatcher.

9  Q.  Slatcher.  Sorry.

10         MR. ROTH:  And if we could turn to the last page, Eli,

11 please.  Second page.

12 A.  This is not really an opinion letter.

13 Q.  Well, I'm going to, if I may, ask you, sir, was that letter

14 copied to the servicers, including --

15         MR. ROTH:  I don't see Mr. Tucker's name.

16         MR. SCOTTEN:  He's the fourth one.

17         MR. ROTH:  I'm sorry.

18 Q.  Was Mr. Tucker copied on that, sir?

19 A.  Yes.

20         MR. ROTH:  I would move that in at this time, your

21 Honor.  D26.

22         MR. SCOTTEN:  May I ask the witness a question or two,

23 your Honor?

24         THE COURT:  Sure.

25 VOIR DIRE EXAMINATION

1    BY MR. SCOTTEN:

2    Q.  At this time you were advising the president of the bank,

3    correct?

4    A.  Yes.

5    Q.  You were not advising Mr. Tucker, although you did cc him,

6    right?

7    A.  That's correct.

8    Q.  This is what you advised the bank about what it might loan,

9    correct?

10   A.  Yes.

11        MR. SCOTTEN:  Objection, your Honor.

12        THE COURT:  Sustained.

13   BY MR. ROTH:

14   Q.  Did you at any time author in your manual an addendum that

15   permitted County Bank servicers to use their d/b/as or

16   doing-business names, fictitious names to consummate their

17   loans?

18   A.  I may have.  You know, I don't remember.

19   Q.  I --

20   A.  But it would have --

21        MR. ROTH:  If the witness could be shown defendant's

22   D7.

23   Q.  I'll ask you, do you recognize that as a letter that you

24   wrote to Mr. Tucker?

25   A.  Yes.

1    Q.  On your stationery?

2    A.  Yes.

3    Q.  And take a moment, sir --

4         MR. ROTH:  I would ask that that be moved into

5    evidence.  D7, your Honor.

6         THE COURT:  Any objection?

7         MR. SCOTTEN:  No, your Honor.

8         THE COURT:  Received.

9         (Defendant's Exhibit 7 received in evidence)

10        MR. ROTH:  Eli, if you could just highlight the last

11   sentence of the first paragraph.

12   A.  "This authorization should further insulate the parties

13   from liability, as the continued marketing of loans using this

14   trade name can truly be said to be done by and on behalf of

15   County Bank."

16   Q.  And that's in regard to the use of a trade name in

17   marketing loans, correct?

18   A.  Yes, and to assure compliance with Delaware law.

19   Q.  And when you were talking about insulate the parties from

20   liability, were you talking about civil liability at that

21   point?

22   A.  Yes.

23   Q.  You weren't talking about criminal liability, is that

24   correct?

25   A.  No.  It was --

1   Q.  Did there come a time, sir, when you ended your

2   representation of National Money Services?

3   A.  Yes.

4   Q.  And why was that, sir?

5   A.  The Delaware department of banking, in 2001, noticed that

6   we were representing both the servicer and the bank, so

7   although we had begun our representation of the servicers, we

8   had also begun to do work for County Bank.  So the Delaware

9   department of banking advised the bank to advise us that we

10  either worked for the bank or we worked for the servicers, but

11  not both.  So we fired the servicers.

12  Q.  But during the period of time when there was dual

13  representation by you, your firm, of both the bank and NMS,

14  whose allegiance primarily did you have at heart?

15  A.  County Bank.

16  Q.  OK.  To your knowledge, sir, do you recall whether or not

17  in addition to the multiple regulators that you talked about --

18  the FDIC, the bank's special compliance officer, and the state,

19  Delaware state banking commission -- were the servicers also

20  required as part of the servicing agreement to have an

21  independent audit done over year?

22  A.  I believe so, by the bank's auditors.

23          MR. SCOTTEN:  I was going to object to form, your

24  Honor.

25          THE COURT:  Overruled.

1  Q.  But did they have to have an independent auditor as well?

2  A.  No, I don't believe they did.  No.

3  Q.  I'll show you Government Exhibit 102, if that could be

4  shown, and that's in evidence.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. ROTH:  I will just show it to the witness and we

2     will mark it after.

3     Q.  I will show you a defendant's exhibit and direct your

4     attention to paragraph 3, the agreement to be amended.  I would

5     ask you to read that to yourself and ask if you recognize that

6     agreement and the amendment.

7     A.  Yes.

8     Q.  Does that refresh your recollection, sir, as to whether or

9     not the services were required to have an independent audit at

10     their cost done every year?

11     A.  I don't know what you mean by an independent audit.

12     Q.  That they had to hire somebody from the outside,

13     independent --

14     A.  You mean a CPA to provide financial statements.

15     Q.  Yes.

16     A.  I think you pointed to the wrong part of the letter.

17          "Buyer shall provide financial statements to

18     seller --"

19          MR. SCOTTEN:  Objection.  It's not in evidence.

20     Q.  Is that part of the County Bank policy manual that you

21     testified to earlier?

22     A.  Yes.

23     Q.  That you created, is that correct?

24     A.  Yes.

25          MR. ROTH:  I would move that in as D50.

1          THE COURT:  Any objection?

2          MR. SCOTTEN:  No objection.

3          THE COURT:  Received.

4          (Defendant's Exhibit D50 received in evidence)

5   Q.  You can continue with your answer, sir.

6   A.  "Buyer shall provide financial statements to seller,

7   prepared by buyer's independent accountant, at least annually."

8   Q.  So that's still another level of eyes, if you will,

9   oversight on the servicers?

10  A.  Yes.  But it was important to the program as it existed up

11  until the middle of 1999.  It was not that important

12  thereafter.

13  Q.  Did County Bank itself get annual ratings from the State

14  Department on Banking?

15         MR. SCOTTEN:  Objection.  Relevance.

16         THE COURT:  Sustained.

17  Q.  Was part of the reason that all these audits of the

18  servicers were in place was to ensure that the bank's policies

19  were sound and would get a good rating?

20         MR. SCOTTEN:  Objection.  Leading.

21         THE COURT:  Sustained.

22  Q.  What was the annual ratings of County Bank by the Delaware

23  State Commission based on?

24         MR. SCOTTEN:  Objection.  Relevance.

25         THE COURT:  Sustained.

H2A8TUC5                    Goodman - Direct.

1          Ladies and gentlemen, let's take our mid-afternoon

2     break.  Please do not discuss the case among yourselves or with

3     anyone.  We will be back in ten minutes.  Thank you.

4          (Jury exits courtroom)

5          THE COURT:  You may step down.

6          THE WITNESS:  Thank you.

7          THE COURT:  We are in recess.  Thank you.

8          (Recess)

9          (Jury present)

10         THE COURT:  Mr. Roth, you may continue.

11         MR. ROTH:  Thank you, your Honor.

12    BY MR. ROTH:

13    Q.  Mr. Goodman, when is the last time you saw Mr. Tucker?

14    A.  Besides in the lunchroom today, it must be 17 years ago.

15    Q.  Can you identify him in the courtroom today?

16    A.  Yes.  He's sitting right over there.

17         THE COURT:  Which table?  What is he wearing?

18         THE WITNESS:  Blue tie, a little flag in the lapel.

19         THE COURT:  First table?

20         THE WITNESS:  Second table.  He is the third in from

21    the left.

22         THE COURT:  Identification noted.

23         MR. ROTH:  Thank you, your Honor.

24    BY MR. ROTH:

25    Q.  Was one of your servicers during the program CRA?

1    A.   Yes.

2    Q.   Was one of the principals of that Adrian Rubin?

3    A.   Yes.

4    Q.   Do you recall, sir, if at any time the FDIC audit resulted

5    in any actions by County Bank in regard to Mr. Rubin's

6    participation in the program?

7    A.   Yes.

8    Q.   What was that action, sir?

9    A.   The FDIC in 2000 audited the bank and advised the bank that

10   Adrian Rubin was a convicted felon who had spent time in

11   prison.

12   Q.   What was the result of that action, if any, by the bank to

13   Mr. Rubin?

14   A.   The bank -- I believe the bank advised Rubin that if he

15   didn't sell CRA to a nonaffiliated person, a nonrelative, that

16   they would be terminated.

17   Q.   And to your understanding, did the bank's in-house counsel

18   vet that sale to make sure it was an arm's-length transaction

19   to whoever bought his shares?

20   A.   Well, I can't tell you what in-house counsel did, other

21   than to approve the transfer of the shares to another person.

22   Q.   Sir, without going into the details of it, in the early

23   2000 period, did the New York attorney general bring a civil

24   lawsuit against County Bank?

25   A.   Yes, it did.

1    Q.  And others as well?

2    A.  Yes.

3    Q.  Was CRA named in that action?

4    A.  I don't believe so.  Or if it was, it was excused because I

5    don't believe it was a defendant in the action.

6    Q.  Did there come a time when you appeared at a deposition in

7    connection with that action?

8    A.  Yes.

9    Q.  Who were you representing at that deposition?

10   A.  County Bank.

11   Q.  That was in approximately 2006, is that correct?

12   A.  Around 2006.

13   Q.  Who was being deposed at that time?

14   A.  Adrian Rubin.

15          MR. SCOTTEN:  Objection.  I think we are going into

16   extrinsic matters for no other purpose, your Honor.

17          MR. ROTH:  Judge, this is clear impeachment as to his

18   view of what Mr. Rubin testified about at his deposition.

19          THE COURT:  You're cross-examining this witness?

20          MR. ROTH:  I am just laying the foundation.  I am not

21   cross-examining -- you're correct.

22          THE COURT:  That's the problem.  You can ask the

23   witness a question.  But you can't cross-examine your witness

24   about this deposition, unless you show me you're trying to

25   impeach him.  Are you trying to impeach him?

H2A8TUC5                    Goodman - Direct.

1          MR. ROTH:  No.  I will ask him as a fact witness.

2          THE COURT:  So ask him.

3     BY MR. ROTH:

4     Q.  What was your role at that deposition, sir, your attendance

5     there?

6     A.  Well, I'm not a litigator so it was really just to watch.

7     Q.  Who was being deposed?

8     A.  Adrian Rubin.

9     Q.  Did you hear the testimony?

10    A.  Yes, I did.

11         THE COURT:  Being present in the deposition room

12    doesn't make the deposition any more admissible.  Is this a

13    foundation to get the deposition of Mr. Rubin in?

14         MR. ROTH:  Not to get the actual deposition in, your

15    Honor.

16         THE COURT:  Or his recollection of what he heard at

17    the deposition?

18         MR. SCOTTEN:  Or his opinion on it would also be

19    inadmissible.

20         MR. ROTH:  Can we have a sidebar?

21         THE COURT:  We can definitely have a sidebar.

22         (Continued on next page)

23

24

25

1   (At the sidebar)

2   THE COURT:  What are you trying to do?

3   MR. ROTH:  Your Honor, Mr. Rubin testified that he

4   testified falsely at that deposition.  Mr. Goodman was at that

5   deposition.  He is prepared to say he listened to that

6   testimony, and as he understood it, that testimony that Mr.

7   Rubin gave at the deposition was in fact true, thereby

8   impeaching Mr. Rubin who said that it was false.

9   THE COURT:  This is what I think you can do.  You can

10  ask him questions and you can argue in summation that Mr. Rubin

11  may have thought he testified falsely; this witness says those

12  facts are true.  But you're trying to cross-examine him based

13  on the testimony Rubin gave, or you're trying to impeach Rubin

14  based on his testimony.  What you can do is you can say, how

15  tall was the building?  He says four stories.  Rubin says it's

16  two stories.  You are can argue in summation whatever you want

17  to argue based on that.

18  Maybe I am missing something.

19  MR. GINSBERG:  I was trying to help.  I thought that

20  it would be permissible.  This witness heard the statement,

21  knew or believed it to be true when he heard it.  Rubin said it

22  was false, for his own reasons, and Rubin tried to suggest in

23  his testimony that he was put up to making that statement as

24  false by the lawyers who were present and had advised him on

25  how to testify.

H2A8TUC5                    Goodman - Direct.

1              MR. ROTH:  I will lay the foundation.

2              THE COURT:  That's a fair question:  Did you ever tell

3      Mr. Rubin to lie at his deposition?

4              MR. ROTH:  That's fine, Judge.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H2A8TUC5                    Goodman - Direct.

1                   (In open court)

2                   MR. ROTH:  Thank you, your Honor.

3       BY MR. ROTH:

4       Q.  Prior to attending that deposition in 2006, when was the

5       last time you had seen Mr. Rubin prior to that?

6       A.  Maybe 2000.

7       Q.  Did you have any role in preparing Mr. Rubin for his

8       deposition testimony in 2006?

9       A.  No.

10      Q.  You heard Mr. Rubin's testimony, is that correct, at the

11      deposition?

12      A.  Yes, I did.

13      Q.  Was the subject matter of that deposition his participation

14      in the County loan program?

15      A.  Yes.

16      Q.  Did you, sir, in any way, shape or form counsel him to lie

17      in the course of that deposition?

18      A.  No.  In fact, I thought he told the truth.

19                  MR. SCOTTEN:  Objection.  Move to strike.

20                  THE COURT:  Sustained.  Stricken.

21                  THE WITNESS:  I'm sorry.

22      Q.  Did anyone in your firm, to your knowledge, who was present

23      at the deposition, prepare Mr. Rubin for his deposition

24      testimony?

25      A.  Not to my knowledge.

H2A8TUC5                    Goodman - Direct.

1    Q.  Was the program, the short-term lending program for County

2    Bank terminated, ended at some point?

3    A.  It ended because it became unprofitable around the end of

4    2005.

5    Q.  But it was not ended by virtue of any regulators' actions,

6    is that fair to say?

7    A.  The regulators kept putting tighter constraints on the

8    program so that at some point in time it became unprofitable,

9    so the bank voluntarily terminated the program.

10   Q.  Sir, were any of the documents that you prepared, the

11   transactional documents, for the program, were any of those,

12   would you consider to be a sham?

13   A.  No.

14   Q.  Did you ever advise Mr. Tucker or National Money Services

15   that his exposure in the program, from participating in the

16   program, exposed him to criminal liability?

17          MR. SCOTTEN:  Objection.  It's not a relevant question

18   for an advice of counsel defense.

19          THE COURT:  Sustained.

20   A.  I don't remember.

21          THE COURT:  I will let the witness's answer stand.

22   Q.  Did you ever counsel Mr. Tucker to end his participation in

23   the program?

24   A.  No.

25          MR. ROTH:  No further questions.

1          THE COURT:  You may cross-examine.

2          MR. BATH:  Is it me, Judge, or the government?

3          THE COURT:  Go ahead, Mr. Bath.

4   CROSS-EXAMINATION

5   BY MR. BATH:

6   Q.  You were present at the deposition for Adrian Rubin in '06,

7   correct?

8   A.  Yes.

9   Q.  You sat there and listened to him?

10  A.  Yes.

11  Q.  You never told him to lie, did you?

12  A.  No.

13          MR. BATH:  Thank you.

14          THE COURT:  Now you may cross-examine.

15  CROSS-EXAMINATION

16  BY MR. SCOTTEN:

17  Q.  Good afternoon, Mr. Goodman.

18  A.  Good afternoon.

19  Q.  We have never met before, have we?

20  A.  No.

21  Q.  That's because you refused to talk to this office, right?

22  A.  Yes.

23  Q.  You were one of the more senior people involved in this

24  lending program with County Bank?

25  A.  I was an outside attorney.

H2A8TUC5                    Goodman - Cross

1   Q.  As an outside attorney, were you the senior partner at your

2   firm involved?

3   A.  I was a partner at the firm involved.

4   Q.  There was another man named John York involved also, right?

5   A.  Yes.

6   Q.  Were you senior to him?

7   A.  No, we were on equal stature.

8   Q.  Did you work closely together?

9   A.  Yes, we did.

10  Q.  You worked together on a lot of this project?

11  A.  Yes.

12  Q.  Did you review each other's work product?

13  A.  Yes.

14  Q.  So I want to get straight your involvement.  I think you

15  talked about it before.

16          Your involvement begins when Charles Hallinan

17  essentially comes to you to begin working with the bank, right?

18  A.  Yes.

19  Q.  And he needed a bank to originate his loans -- I had this

20  problem before.  Let me get something to prop it up.

21          He needed a bank to originate his loans, correct?

22  A.  He wanted to make the loans lawfully, and he thought that

23  it would be more prudent for him to do that through a bank.

24  Q.  He was already a payday lender?

25  A.  Yes.

1  Q.  When I use the term originate, that has meaning in the

2  lending industry, right?

3  A.  Yes.

4  Q.  As he originally approached you, he was going to be the

5  servicer and the bank was going to originate the loan, is that

6  accurate?

7  A.  Yes.

8  Q.  And am I right that servicing is the part of the loan

9  process that takes place after disbursal through collection?

10  A.  No.

11  Q.  Where does servicing start?

12  A.  It starts at the beginning of the loan.

13  Q.  What is origination then?

14  A.  It's part of the servicing.

15  Q.  So as you would define it, origination and servicing are --

16  originating is part of servicing?

17  A.  Yes.  That was written into the agreement.

18  Q.  Let me show you what is marked as Government Exhibit 27.

19          Sorry.  Defense Exhibit 27.

20          We already talked about this.  There where it says

21  National Money is going to originate loans, what does it mean

22  there?

23  A.  Well, it's going to advertise for loans and it was going to

24  take applications for loans, as agent for County Bank.

25  Q.  If I can now show you Government Exhibit 4043, which I

1   don't think is in evidence yet.

2           I don't know if this helps, sir.  You can have a hard

3   copy if you prefer it.

4           Can you just take a quick look through that and see if

5   you recognize it.

6   A.  OK.

7   Q.  You recognize it?

8   A.  Yes.

9   Q.  What is it?

10  A.  It's a litigation fund agreement to protect the bank in its

11  origination and lending activities in the short-term loan

12  program.

13  Q.  You wrote that, right?

14  A.  Yes.

15  Q.  You distributed it to Scott Tucker and the other servicers,

16  right?

17  A.  Yes.

18          MR. SCOTTEN:  The government offers 4043.

19          THE COURT:  Any objection?

20          MR. ROTH:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 4043 received in evidence)

23          MR. SCOTTEN:  Can we go to the third page, please.

24          Can we blow up the third paragraph.

25  A.  Paragraph 6?

1  Q.  Look up on the screen.  That will help us all stay in the

2  same place.

3        The buyers here are what you also referred to as the

4  servicers, right?

5  A.  Yes.

6  Q.  You see the paragraph where it says that the motion may

7  or -- the bank may or may not lose some kind of arbitration

8  dispute, or dispute to arbitrate?

9  A.  "However, the bank's motion to arbitrate the dispute is

10  denied and a class certified, discovery will soon reveal that

11  loans are originated by many buyers."

12  Q.  So the fact that buyers was originating was not publicly

13  known?

14  A.  The bank didn't publicly disclose what it was doing to

15  anybody.  It was doing it as known part of banking.

16  Q.  If it was known that buyers were originating, that would be

17  a concern in this lawsuit?

18  A.  No, not really.

19  Q.  The purpose of this litigation fund here was to have no

20  purpose?

21  A.  It was to protect the bank from class action liability.

22  Q.  I just want to make sure, your testimony is that, as an

23  expert in banking --

24        THE COURT:  What does class action liability mean to

25  you?

1    THE WITNESS:  Well, one of the risks of engaging in

2  lending to consumers is that a class action will be brought

3  against you.

4    THE COURT:  By who?

5    THE WITNESS:  By class action counsel anywhere in the

6  world.  And it doesn't matter if you win or lose the class

7  action, because it costs so much money to defend, that you lose

8  even if you win.

9    THE COURT:  A class action is brought by lawyers, not

10  by parties?

11    THE WITNESS:  Well, they name a party, but the party

12  is just being named because the party doesn't do anything.

13    THE COURT:  Thank you.

14    Next question.

15  BY MR. SCOTTEN:

16  Q.  So the class action would have been brought by borrowers?

17  A.  It would have been brought by attorneys who purportedly

18  represented borrowers, yes.

19  Q.  They would bring it against the payday lenders who were

20  originating the loans, right?

21  A.  They could have brought it against you.

22  Q.  You weren't concerned about them bringing against me, were

23  you?

24  A.  I was worried about a class action against any one of the

25  participants in the program because it would have been very,

1   very expensive.

2   Q.  You were worried about a class action against the servicers

3   or the bank?

4   A.  Yes.

5   Q.  Not me, you weren't worried they would come after me?

6   A.  No.  I actually made a joke in this building.

7   Q.  Let's go back to you getting into payday lending.

8           Hallinan brings you in?

9   A.  Hallinan, at the suggestion of Harold Slatcher, comes to me

10  and asks me to review what he is doing and see if I can come up

11  with a short-term loan program that the bank --

12  Q.  I think I have got your answer.  Thanks.

13          That's how Scott Tucker comes in.  Charles Hallinan

14  brings Scott Tucker in also?

15  A.  Scott Tucker came in later.

16  Q.  Through Charles Hallinan?

17  A.  I have no idea.

18  Q.  You have no idea how Scott Tucker came in?

19  A.  No.

20  Q.  Do you know whether he was a payday lender before?

21  A.  I have no idea.

22  Q.  No idea what Scott Tucker was doing before he came into the

23  program?

24  A.  That's right.

25  Q.  And you don't know how he came into the program?

H2A8TUC5                    Goodman - Cross

1    A.  No.

2    Q.  Do you know if Adrian Rubin came into the program through

3    Charles Hallinan?

4    A.  By reading Adrian's deposition and testimony, I believe

5    Adrian contacted the bank directly and the bank also directed

6    him to Charles Hallinan.

7    Q.  You learned later, but not at the time?

8    A.  Well, Adrian Rubin didn't come in directly through Charles

9    Hallinan; he came in through Harold Slatcher.

10   Q.  So you don't think Adrian Rubin came in through Charles

11   Hallinan?

12            I am just asking a question, sir.

13   A.  He contacted Harold Slatcher, and Harold Slatcher said go

14   talk to Charlie Hallinan.

15   Q.  And that's how Adrian Rubin came in?

16   A.  Yes.

17   Q.  You testified a minute ago that Rubin was essentially

18   kicked out when it was discovered he had committed serious

19   financial crimes?

20   A.  Yes.

21   Q.  That was an important fact, it was material to the bank

22   that he had committed serious financial crimes, right?

23   A.  I can't tell you that.  I would assume so, but I don't

24   know.

25   Q.  You don't know whether it was important to the bank?

H2A8TUC5                    Goodman - Cross

1   A.  It's up to the bank.  I would assume that it's material to

2   the bank, but whether it's material to the bank is really a

3   question for the bank.

4   Q.  Weren't you looking out for the bank's interest in this

5   program?  Did you testify to that?

6   A.  I was looking at this as special compliance counsel.  The

7   bank had inside counsel that was looking at those issues.

8   Q.  So whether or not Adrian Rubin had a prior serious

9   financial problem is not a concern to you?

10  A.  It was very much a concern to me.

11  Q.  And you didn't find out about it until the FDIC told you

12  about it, right?

13  A.  No.  I found out about it before then.

14  Q.  How did you find out?

15  A.  I got a phone call from another servicer who said to me --

16  I'm just wondering if this might involve --

17  Q.  Did you find out through counsel?  I can leave it at that,

18  if that's your concern.

19          Did you find out through somebody else's lawyer?

20          MR. ROTH:  I can represent, apparently there is a

21  privilege issue here.

22          THE COURT:  That's what I think the questioner is

23  trying to explore.

24  Q.  Did an attorney --

25  A.  No.  I didn't talk to an attorney about it.

1   Q.  Do you feel your answer would be privileged?

2   A.  Yes.

3   Q.  You can't explain why?

4   A.  Yes.

5   Q.  So it's safe to say you found out sometime before the FDIC

6   told you?

7   A.  Yes.

8   Q.  Did you regard that as a significant fact?

9   A.  Yes.

10  Q.  An important fact.  Did you bring it to the bank's

11  attention?

12  A.  I could not.

13  Q.  Would you have brought it to the bank's attention were you

14  were permitted to do so?

15  A.  Yes.

16  Q.  You viewed it as a material fact that was important to the

17  bank?

18  A.  Yes.

19  Q.  It would have been important to the integrity of the bank's

20  program to know they had a serious financial criminal?

21  A.  Yes.

22  Q.  Did you ever learn that Scott Tucker had been convicted of

23  a serious financial crime?

24  A.  Yes.

25  Q.  That would have been a material fact you would have wanted

1    to know?

2    A.   Yes.

3    Q.   You would have brought that to the bank's attention had you

4    known?

5    A.   If I was capable of, yes.

6    Q.   Assuming you learned it some way you could bring it to the

7    bank's attention?

8    A.   Yes.

9    Q.   That's because it's an important fact for the bank to know,

10   right?

11   A.   Yes.

12   Q.   It concerns at least the propriety of the bank's program?

13   A.   Yes.

14   Q.   As a general matter, in your position as outside counsel,

15   you're dependent on others for the facts, right?

16   A.   Yes.

17   Q.   Generally speaking, you don't have a lot of ability to

18   investigate, right?

19   A.   To investigate?

20   Q.   To investigate.

21   A.   No.

22   Q.   You know the facts as represented to you by your clients;

23   they tell you what the facts are and you advise them on

24   legality?

25   A.   Yes.  If you're asking did I audit?  I did not.

H2A8TUC5                    Goodman - Cross

1   Q.  I am just asking as a general matter.

2   A.  Yes.

3   Q.  Your opinions on legality are based on you knowing the

4   facts?

5   A.  Yes.

6   Q.  Like whether or not someone trying to participate in the

7   bank's program had a serious financial crime.  That's an

8   example of a fact that you wouldn't know on your own, right?

9   A.  That wasn't really my role.

10  Q.  No one is faulting you, sir.

11  A.  But if I found it out, I would have told the bank.

12  Q.  Now, I want to go back to your relationship with Scott

13  Tucker.

14          When did he become your client?

15  A.  I think in 1998.

16  Q.  I think you testified earlier that at that time, you viewed

17  your duties as primarily to the bank, not to the servicers?

18  A.  Yes.  And Scott was told that.

19  Q.  You told all the servicers, I am looking out for the bank's

20  interest?

21  A.  But you're paying me.

22  Q.  You're paying me, but I am looking out for the bank's

23  interest?

24  A.  Yes.

25  Q.  And when I am looking for legality, I am looking to make

1   sure the bank is adhering to the law?

2   A.   Because it was in everybody's interest.

3   Q.   So Scott Tucker had been lending for a couple of years with

4   the bank before you gave any opinion on its legality, correct?

5   A.   I gave it when he asked for it.

6            THE COURT:   Do you understand the question?

7   A.   Well, I think the opinion was given in 2000 or 2001.

8   Q.   I will show you the document in a second.

9   A.   And he came into the program in 1998.

10  Q.   But he didn't ask you for the opinion.  You didn't give an

11  opinion, because he didn't ask, until at least a couple of

12  years later?

13  A.   That's right.

14           MR. SCOTTEN:   So let's put up D24.

15           Can we just highlight the second paragraph?

16  A.   "In brief, by way of background, national markets --" you

17  want me to read it?

18  Q.   No.  You can read it to yourself if you want to.

19  A.   OK.

20  Q.   So this paragraph, this background paragraph, essentially

21  lays out basic facts as you understand them?

22  A.   Yes.

23  Q.   This is the factual part of the opinion letter that lays

24  out what you're going to analyze by applying the law, right?

25  A.   Yes.  Can I see the date of this letter?

1   Q.  Absolutely.

2         MR. SCOTTEN:  If we can just zoom back out.

3   A.  OK.

4         MR. SCOTTEN:  Blow it back up again.

5   Q.  So the rest of the opinion letter is legal analysis, right?

6   A.  Yes.

7   Q.  Is it a fair summary to say that that analysis concludes,

8   in short, because the Delaware bank is in fact a bank, it can

9   lend throughout the country using the interest rates of the

10  state it's based in?

11  A.  I think you better repeat that.  I missed a portion of it.

12  Q.  Basically, it's saying the Delaware bank -- this bank,

13  County Bank -- can extend loans at any interest rate it wants

14  throughout the country because what matters for it is the

15  interest rates in Delaware, right?

16  A.  Well, whatever interest rates Delaware law provides County

17  Bank could charge.

18  Q.  At that time there weren't limits on interest rates,

19  correct?

20  A.  That's right.

21  Q.  So that's the legal analysis.  But it's dependent upon the

22  facts in this paragraph, because it only matters if you're a

23  bank, right?

24  A.  If the bank is a lender.

25  Q.  The bank has to be the lender.

H2A8TUC5                    Goodman — Cross

1   A.   That's correct.

2   Q.   And some of the factors that would make the bank the lender

3   is the bank has to make the credit decision?

4   A.   It does, in every instance.

5   Q.   And also, it needs to be the bank's money that is being

6   lent out?

7   A.   Not necessarily in the beginning of the program, but later,

8   yes.

9   Q.   Legally speaking.

10  A.   That's right.

11  Q.   Legally speaking, the bank needs to make the decision?

12  A.   Yes.  And in every instance it did.

13          THE COURT:  Sir, you heard the question you were

14  asked.

15          THE WITNESS:  He says the bank --

16          THE COURT:  Listen to the words of the question.

17  Answer what is asked in the question and wait for the next

18  question.

19  Q.   So the bank had to make the credit decision?

20  A.   Yes.

21  Q.   Now, I want to ask you a little bit more about facts.

22          After you gave Scott Tucker this opinion -- actually,

23  during that time, you learned that he hadn't necessarily

24  informed you of every fact that was relevant, right?

25          MR. ROTH:  Objection.

1      THE COURT:  Overruled.  This is cross-examination.

2  Q.  I want to ask you to look through Government Exhibit 4040.

3      This may take a second.  I will hand it up to you.

4  It's several pages.

5      I apologize.  My colleague has pointed out you never

6  actually answered the prior question.

7      You learned that Scott Tucker hadn't provided you with

8  certain relevant information, didn't you?

9  A.  I don't remember.

10 Q.  You can take a look through that and you can flip through

11 it, and I will ask you what it is in a second.

12 A.  I was copied on one of these, but most of this

13 communication was with John York.

14 Q.  I haven't asked you a question yet, sir.

15 A.  OK.  I am just saying.

16 Q.  So my question is, is this an exchange primarily between

17 your partner, John York, Scott Tucker, and then some regulatory

18 authorities in Kansas?

19 A.  It appears to be.

20 Q.  Do you recognize John York's signature on it?

21 A.  Yes.

22 Q.  I think you testified before you can recognize your firm's

23 letterhead, correct?

24 A.  Yes.

25      MR. SCOTTEN:  The government offers 4040.

1      THE COURT:  Any objection?

2      MR. ROTH:  Judge, I will object.

3      THE COURT:  Basis.

4      MR. ROTH:  I don't believe he was copied on this

5   multipage document.

6      MR. SCOTTEN:  I am not offering it for its effect on

7   Mr. Goodman.  I am offering it for its effect on defendant

8   Scott Tucker.

9      THE COURT:  Any objection?

10      MR. ROTH:  No, your Honor.

11      THE COURT:  Received.

12      (Government's Exhibit 4040 received in evidence)

13   Q.  Let's start with page 12.

14      MR. SCOTTEN:  Can we publish it for the jury.

15   A.  What page?

16   Q.  Page 12.  If you look at the screen, we will flip around

17   and highlight what I am talking about.

18   A.  OK.

19   Q.  Do you see in paragraph 2 where it says that N.M. Service,

20   Inc. is a foreign corporation in Kansas, paying taxes in Kansas

21   as a foreign corporation?

22   A.  Yes.

23   Q.  It says on the top of this letter it's a draft, right?

24   A.  It says, "I am advised by the management of N.M. Service,

25   Inc. that it has filed as a foreign corporation in Kansas and

H2A8TUC5                    Goodman - Cross

1   is paying taxes in Kansas."

2   Q.  So this is an example of where you're dependent on facts

3   coming from someone else?

4          THE COURT:  You can't both talk at the same time.

5   Q.  So this is an example of where you're being advised on the

6   facts by someone else, the management of N.M. Service has given

7   your firm information?

8   A.  Well, it was my partner who was being advised.

9   Q.  I said your firm.  He is part of your firm.

10  A.  OK.

11         MR. SCOTTEN:  Let's go up one page to page 11.

12  Q.  You see here, sir, this is the fax form faxing that draft

13  to Scott Tucker?

14  A.  Yes.

15         MR. SCOTTEN:  Then let's go up to page 9.

16  Q.  You can see that somebody has hand-marked this up, right?

17  A.  Yes.

18         MR. SCOTTEN:  Let's go to 8.

19  Q.  You can see here that Scott, from National Money Service,

20  has written back telling your partner John that this looks good

21  to file?

22  A.  Yes.

23         MR. SCOTTEN:  Then let's go up to page 3.

24         If you can blow up the second paragraph, Ms. Grant.

25  A.  "I further certify that a search of our files fails to

1  reveal that a corporation by the name of N.M. Service, Inc. has

2  registered to do business in Kansas as a foreign corporation,

3  or that a corporation, limited partnership or limited liability

4  company by that name has been incorporated in Kansas as of that

5  date."

6       MR. SCOTTEN:  Then can we go up to the next page, page

7  2.

8  Q.  You may not have seen this before.

9       MR. SCOTTEN:  If we can blow up the body where it says

10  "John B. York."

11  Q.  So this is a response from some regulatory authority in

12  Kansas where they say to your partner, John B. York, "Please

13  advise, as this appears contrary to your correspondence."

14  Correct?

15  A.  That's what it says.

16  Q.  That's the correspondence claiming that N.M. Service was a

17  foreign corporation?

18  A.  Well, the documents speak for themselves.

19       MR. SCOTTEN:  Then let's go to the top page.

20       Actually, that's a perfect spot to be blown up.

21  Q.  Then your partner, John York, writes back to Kansas and

22  says, OK, we will fix it, essentially.  Thanks for sending the

23  clarification.

24       So this is an example where Mr. Tucker provided you

25  facts, but they didn't turn out to be accurate, correct?

1  A.  I don't know.  It's not addressed to me, and I was not

2  involved in this process.  So you're asking me to assume facts

3  that I just don't know.

4  Q.  Let's go to 4044.

5      Again, I am going to hand you the full piece of paper

6  so you can flip through it.  It's another series of papers.  I

7  want you to be able to look through all of it.

8      Did you have a chance to look through it?

9  A.  Well --

10  Q.  My question is, have you had a chance to look through it?

11  A.  Not really.

12  Q.  Go ahead then.

13  A.  OK.

14  Q.  Is this another set of exchanges between your partner, John

15  York, and Scott Tucker and some Kansas regulators?

16  A.  This letter is between -- it's a letter from the

17  commissioner or acting deputy commissioner of Consumer and

18  Mortgage Lending of Kansas to John York.

19  Q.  Then if you look at the back, there is also some

20  correspondence from Mr. York, correct?

21      Is this an exchange concerning Scott Tucker's National

22  Money Service Corporation between your partner, John York, and

23  some Kansas regulatory authorities?

24  A.  It actually involves more than the one corporation.  It

25  involves another.

1    Q.  So several you prefer to say?

2    A.  Pardon?

3    Q.  Several corporations related to Scott Tucker?

4    A.  Yes.

5            MR. SCOTTEN:  The government offers 4044.

6            THE COURT:  Any objection?

7            MR. ROTH:  No.

8            THE COURT:  Received.

9            (Government's Exhibit 4044 received in evidence)

10           MR. SCOTTEN:  May we publish to the jury, please.

11           I want to start on page 8, if we can.

12           Let's blow up the second paragraph first.

13   Q.  So this is telling Scott Tucker about your response, the

14   approach you are going to take, correct?

15   A.  Yes.

16   Q.  And the Steve mentioned in that last sentence, that's you,

17   right?

18   A.  That's me.

19   Q.  So you both worked on this matter?

20   A.  He would have talked to me about it, yes.

21           MR. SCOTTEN:  If we can now blow up the next

22   paragraph.

23   Q.  You see that in this letter your firm, Mr. York writing

24   that he is going to assert that National Money Service does not

25   have an office in Kansas, right?

1    A.  Yes.

2    Q.  And he is asking Scott Tucker, tell me if that's true,

3    right?

4    A.  Well, it says, "Please let me know if that is accurate."

5    Q.  Right.

6             But then he is also expressing some concerns that

7    maybe that's not true, right?

8    A.  Well, what he is saying is, we want to know.

9    Q.  He says, There are certain facts that seem to be

10   inconsistent with that assertion.

11   A.  That's right.

12   Q.  And one of the facts he notes is that Scott Tucker's fax

13   cover sheet says that National Money Service is in Overland

14   Park, Kansas, right?

15   A.  Yes.

16            MR. SCOTTEN:  Then if we go up a bit.

17            Scroll up through the pages.

18   Q.  So this is you faxing that letter to Mr. Tucker, right?

19   A.  John York faxing it, yes.

20   Q.  My apologies.  Your firm faxing it.

21   A.  Right.

22            MR. SCOTTEN:  Let's go up again.

23   Q.  That confirms receipt.  That little transmission "OK" at

24   the top shows the fax went through?

25   A.  Yes.

1                MR. SCOTTEN:  Let's go up again one more.

2     Q.  So this doesn't say draft on it, right?  It looks like it

3     could be a file copy?

4     A.  Let me see the next page.

5                (Continued on next page)

1    BY MR. SCOTTEN:

2    Q.  Sure.

3            MR. SCOTTEN:  Let's go up one more.

4    A.  I don't know.

5            MR. SCOTTEN:  And then go down one.  Go to the very

6    first page, if you would, Ms. Grant.

7    Q.  So it appears that, at the very least, Kansas got your

8    letter, eventually, correct?

9    A.  Yes.

10   Q.  And so there again, you're relying on Scott Tucker; he's

11   told you National Money Service isn't in Kansas, so you went

12   ahead and passed that on to state regulators?

13   A.  Well, I wouldn't use the term "lying."  I would say there

14   was problems with the facts, and we were trying to resolve the

15   facts.

16   Q.  I didn't ask you --

17   A.  John York --

18   Q.  I didn't even say he was lying, sir.

19           THE COURT:  All right.  Ask your next question.

20           MR. SCOTTEN:  Let's go back to page 3, and if we can

21   highlight paragraph 1 -- sorry, the paragraph numbered one.  My

22   apologies.

23   Q.  And do you see there you went back and asserted that

24   National Money Service had an office in Kansas, right?

25   A.  That's what it says.

1  Q.  And you also say there that NM Service's function is to

2  forward the loans to National Money Service in Henderson,

3  Nevada, for a credit decision, right?

4  A.  That's what it says.

5  Q.  The credit decisions here were made in -- well, let me ask

6  you.  Withdrawn.

7        You're saying the credit decision -- it's going to

8  Henderson, Nevada, for a credit decision, right?

9  A.  Well, you have to understand that the credit servicers

10  thought they were making the credit decision, but they were

11  not.  What the servicers were doing was performing a

12  ministerial act, and that was, all they were determining was

13  whether or not all of the credit criteria that had been

14  established by County Bank had been met.  If they were met, the

15  loan would be approved by County Bank.  It would not be

16  approved by the servicer.

17  Q.  So the --

18  A.  If there was, if it, if all of the criteria were not met,

19  the loan would not be approved.

20  Q.  Your testimony is the servicers thought they were making

21  the credit decisions, but they weren't?

22  A.  Yes.

23  Q.  But your firm wrote this letter, sir, isn't that correct?

24  A.  But the fact is, the fact is --

25        THE COURT:  Hold on.  Stop.

1       You heard the question?

2           THE WITNESS:  OK.

3   A.  Our firm wrote the letter.

4           THE COURT:  Next question.

5   Q.  Your firm wrote the letter, and the credit decision was

6   being made in Henderson, Nevada, correct?

7   A.  That's what the letter says.

8           MR. SCOTTEN:  Just a few more questions, your Honor.

9           THE WITNESS:  Sorry, your Honor.

10          THE COURT:  That's all right.

11          MR. SCOTTEN:  Can we show defendant's D8, Defendant's

12  Exhibit 8.  And I apologize, I don't have a hard copy of that.

13  We'll just flip through it so the witness can see all of it.  I

14  don't think it will take very long.

15  Q.  Oh, this will help you out, sir.  It's pretty long, and I'm

16  only going to ask you about one page in it, so I just wanted to

17  see if you recognize it.

18      The short answer here, sir, all I'm asking is this is

19  another document that you sent to Scott Tucker --

20  A.  Yes.

21  Q.  -- among other folks, correct?

22  A.  Yes.

23          MR. SCOTTEN:  Your Honor, the government offers

24  Defendant's Exhibit 8.

25          THE COURT:  Any objection?

Ha2Wtuc6                    Goodman - Direct

1       MR. ROTH:  No objection.

2       THE COURT:  Received.

3       (Defendant's Exhibit 8 received in evidence)

4       MR. SCOTTEN:  Can we go to page 4.

5  Q.  Now, sir, you knew you were involved in the payday lending

6  business, right?

7  A.  What are you referring to?

8  Q.  It's just a question.  You knew that Scott Tucker was

9  involved in the payday lending business, right?  The answer's

10  not there, sir.

11  A.  When you say I knew that Scott Tucker was involved in

12  payday lending --

13  Q.  Yes.

14  A.  No.  I don't -- I don't know how he came into the program.

15  I assume he had some experience, but that doesn't mean I knew.

16  Q.  Is it your testimony -- well, once he was working with you,

17  did you know he was involved in payday lending?

18  A.  Was he working with me?

19  Q.  Yes, with County Bank.  Once he was with County Bank, did

20  you know he was involved in payday lending?

21  A.  He would have been involved in County Bank short-term loan

22  program, and if you want to call that payday lending, that's

23  what he was doing.

24  Q.  But you didn't want to call it payday lending?

25  A.  No, because there was a legal problem with that.

1    MR. SCOTTEN:  Can we go to Defendant's Exhibit 1,

2    which I think is in evidence.  And could we highlight the

3    subject line.

4    A.  Look at the date of the letter.

5    Q.  Sorry, sir.  I don't think I've asked you a question.

6    A.  It's 1998.  It's the beginning of the program, and at that

7    point in time, we would -- I was trying to get my hands around

8    it.  Why is payday is bad term to use for these loans?  After

9    all, it was used throughout the entire community that was

10   making payday loan, and County Bank at my insistence called

11   them short-term loans.  The answer is under the Truth In

12   Lending Act --

13   Q.  Sir --

14   A.  -- if you disclose --

15   Q.  -- the judge will instruct on the law.

16   A.  There's a technical reason for it.

17   Q.  There's a technical reason for it?

18        THE COURT:  Thank you.  Pause.  One, pause.

19        MR. SCOTTEN:  My apologies, your Honor.

20        THE COURT:  One, two, three.  Now, ask your next

21   question.

22        MR. SCOTTEN:  Can I move to strike the prior response,

23   your Honor, at least where it got into the law.

24        THE COURT:  Yes.  It's stricken.

25        MR. SCOTTEN:  Thank you, your Honor.

1    Q.  My only question is, you called it payday loans when you

2    started the business, correct?

3    A.  Yes.

4    Q.  And then, a little while later, you told him not to call it

5    payday loans, correct?

6    A.  Yes.

7    Q.  But it was the same thing all the time, right?

8    A.  They were the same loans, but they had a different name.

9         MR. SCOTTEN:  Nothing further.

10        THE COURT:  Any redirect?

11        MR. ROTH:  No, your Honor.

12        THE COURT:  You may step down.

13        (Witness excused)

14        THE COURT:  You may call your next witness.

15        MR. GINSBERG:  The next witness is Douglas Lankford.

16   DOUGLAS GLENN LANKFORD,

17        called as a witness by the Defendants,

18        having been duly sworn, testified as follows:

19        THE COURT:  You may inquire.

20        MR. GINSBERG:  Thank you, your Honor.

21        Before we begin, do you have any water up there?  Do

22   you need --

23        THE WITNESS:  I do not have any water.

24        THE COURT:  All right.  Thank you.

25        MR. GINSBERG:  Thank you.

1    DIRECT EXAMINATION

2    BY MR. GINSBERG:

3    Q.  Good afternoon, Mr. Lankford.

4    A.  Good afternoon.

5    Q.  Are you a member of any Native American tribe?

6    A.  I am.

7    Q.  And what tribe would that be?

8    A.  It would be the Miami Tribe of Oklahoma.

9    Q.  And do you currently hold any positions with that tribe?

10   A.  I do.  I'm chief -- I do.  I am the chief.

11   Q.  And when did you become chief of that tribe?

12   A.  In June of 2013.

13   Q.  Were you elected to that position?

14   A.  I was.

15   Q.  Prior to June of 2013, did you hold any other positions

16   with the tribe?

17   A.  I did.  I was second chief.

18   Q.  Going back in time, to the earliest, could you tell us what

19   positions you held with the tribe?

20   A.  I was second chief.

21   Q.  And when did you become second chief?

22   A.  In June of 2008.

23   Q.  And when you became second chief, who was the chief of the

24   tribe?

25   A.  Chief Gamble.

1  Q.  And prior to becoming second chief, did you hold any other

2  positions?

3  A.  I was the network administrator.

4  Q.  And was that a business position as opposed to a tribal

5  position?

6  A.  That was an employed position.

7  Q.  OK.  And when did you become the network administrator for

8  the tribe?

9  A.  Around 2000.

10 Q.  Before you became network administrator --

11          THE COURT:  Excuse me a second, Mr. Ginsberg.

12          See if you can pull that microphone a little closer,

13 or your chair.  Thank you.

14          Go ahead.

15 Q.  Before you became network administrator, could you tell us

16 what your educational background was?

17 A.  I had a high school diploma, went just a little bit of

18 college, night school and then I went to work, and have been

19 working.

20 Q.  In high school or your prior work experience, had you done

21 any work in the IT field?

22 A.  I had not.

23 Q.  And when you became network administrator, were you the

24 first network administrator for the tribe?

25 A.  I was.

1    Q.  And was that a position that you were paid for?

2    A.  It was.

3    Q.  And what did you do when you first became network

4    administrator with the tribe?

5    A.  Then -- the tribe was very small then.  They had very few

6    computers, even -- we didn't even have a server when I began

7    this.  Basically I was the guy that helped take care of the

8    computers that we did have and helped people with problems they

9    had with those.

10   Q.  And when you say computers, are you talking about personal

11   computers for tribal members or computers for any of the

12   tribe's business, or both?

13   A.  Workstations at tribal headquarters was the PCs that I

14   worked on.

15   Q.  OK.  And how many people worked at tribal headquarters when

16   you first started there?  Approximately.

17   A.  20 or so.  Not positive.

18   Q.  How many computers did you have?

19   A.  When I first started they had about 13.

20   Q.  And you said that your job was to assist when there were

21   problems with the computers, is that correct?

22   A.  Yes, sir.

23   Q.  Did there come a time as the administrator for IT for the

24   tribe that you began a connection or relationship with

25   businesses in Kansas City?

1    A.  Yes, there was a time.

2    Q.  And approximately when did that happen?

3    A.  I, I can't recall when that all started.  It was kind of

4    slow, over time.  It was --

5    Q.  How long, about how long after you started working there

6    would it be, if you can recall?

7    A.  Probably 2002 or so, '3, maybe.

8    Q.  And what was the reason for that relationship developing?

9    A.  They had brought some equipment that needed to be connected

10   at our location.

11   Q.  And when you say they brought some equipment, who are you

12   referring to as they?

13   A.  Some IT people from the Kansas City business.

14   Q.  And did you know what that Kansas City business was?

15   A.  It was the lending company.

16   Q.  And did you know what association the tribe had with the

17   lending company in Kansas City?

18   A.  At that time I was told we owned it.

19   Q.  And who brought the equipment to the tribal offices from

20   Kansas City?

21   A.  I cannot recall the people that brought it's names.

22   Q.  And what is it that they first brought?

23   A.  I believe they brought two computers.

24   Q.  Was there a particular person that you had contact with in

25   Kansas City regarding the equipment that was coming or that

1  arrived at the tribal offices?

2  A.  I think there were two different people, and I can't -- I'm

3  having trouble even recalling his name.

4  Q.  Let me see if I can move it along a little.  Did you have

5  any communications with an individual whose name was Ed Cross?

6  A.  I did.  That's one.

7  Q.  And who was Ed Cross?

8  A.  He was someone in the IT department at Kansas City.

9  Q.  And when that equipment came to the tribal offices, did

10  somebody come with it from Kansas City?

11  A.  Yes, I believe so.

12  Q.  And did you work with that person to install that

13  equipment?

14  A.  I did.

15  Q.  And you said initially it was two just computers?

16  A.  Yes.

17  Q.  Did you know what the purpose of those computers was going

18  to be for?

19  A.  I don't recall what the purpose was for.

20  Q.  Do you remember having any discussions with Ed Cross

21  regarding the purpose of those computers?

22  A.  I can't recall any discussion.

23  Q.  Who was it at the tribal offices who was going to use those

24  computers, to the best of your recollection?

25  A.  I don't know who at the offices were going to use it.  I

1  just know that they were to connect back to Kansas City.

2  Q.  Did you know the nature of the program, or did you know if

3  there was a program that was being run between Kansas City and

4  the tribal offices using those computers?

5  A.  I'm not sure what it was.

6          THE COURT:  All right.  Ladies and gentlemen, what

7  we're going to do now is I'm going to ask you to return to the

8  jury room just for a few minutes.  We're going to end the

9  testimony for the day.  There's a matter I want to take up with

10  the attorneys, and then I'll call you back in.  OK?  And then

11  we'll break for the day.  Thank you.

12          And you may step down.

13          THE WITNESS:  Thank you.

14          THE COURT:  Just wait for the jury to exit.  Thank

15  you.

16          (Witness excused)

17          (Continued on next page)

18

19

20

21

22

23

24

25

1                    (Jury not present)

2          THE COURT:  Please be seated for a moment.  After this

3     witness, what is there in your case remaining?

4          MR. GINSBERG:  There is Derek Douglas, who is the CFO

5     for one of the tribes.  And then there's Cliff Cohen, who is an

6     attorney.  Conly Schulte, we're going to call him.  The nature

7     of his testimony depends on your Honor's ultimate ruling.

8     Lance Morgan, and then Mr. Muir.

9          THE COURT:  All right.  Is that right, Mr. Bath?  Does

10    that sound right to you?

11         MR. BATH:  Yes, sir.

12         THE COURT:  All right.  Here is the presenting

13    problem.  I got another note from juror No. 5:

14         "I wanted to remind you of my inability to serve as a

15    juror from the afternoon of Wednesday, October 5, eve of

16    Sukkoth, to Friday, October 7, as well as the afternoon of

17    Wednesday, October 11 through Friday, October 13, in observance

18    of the Jewish holiday of Sukkoth.  I hope the Court understands

19    my need and apologize for any inconvenience.  Thank you."

20         Now, a couple of additional things.  October 9 is the

21    observance of Columbus Day and a court holiday, so next week,

22    juror No. 5 would be able to sit half a day on the 10th.  He

23    lives in Spring Valley, New York.  Sundown is 6:33.  If it's

24    public transportation, it's about two hours.  If it's driving,

25    it's over an hour.  So the week of the 9th, there would be

1    about a half a day, and this week he would have to leave early

2    on the 4th and would not be able to sit the rest of the week,

3    so there would be no full days from the 4th through the 13th

4    that he would be able to sit, unless I missed something, and I

5    don't think I did.

6         MR. GINSBERG:  Is the 10th a full day?

7         THE COURT:  Yes, he would be able to sit the 10th.  He

8    could sit tomorrow and the 10th, and that would be it.

9         Let me hear from the defense.  What do you think I

10   should do?

11        MR. GINSBERG:  Well, for me, I don't know what your

12   Honor intended to do about this Friday to begin with, I have

13   been consistently going on Friday mornings for a weekly medical

14   appointment to get hydration.

15        THE COURT:  I was not planning on sitting on Friday.

16        MR. GINSBERG:  All right.  That helps me as far as

17   that's concerned.  In that event, not being selfish about it,

18   we believe he should be excused.

19        THE COURT:  All right.  Mr. Bath.

20        MR. BATH:  We agree.

21        THE COURT:  And the government.

22        MR. RAVI:  The government agrees.

23        THE COURT:  All right.  I'm going to call the jurors

24   in and just tell them that.  I suppose I could just call juror

25   No. 5 in.  I think it's maybe more elegant to do it with the

1    entire jury.

2              MR. GINSBERG:  And they'll be finished for the day at

3    that point?

4              THE COURT:  And they'll be finished for the day, yes.

5              Mr. Eldridge, if you could bring the jury in.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          MR. GINSBERG:  Problem solved.

3          THE COURT:  Come on in.  That's all right, quite all

4     right.

5          Please be seated.  Ladies and gentlemen, we're getting

6     closer to the end of the case, but there's more to come, and

7     what's left to come is very important to both sides.  I'm

8     trying to bring us in on schedule.  I'm very conscious of this

9     and also conscious of not trampling on anybody's rights, but in

10    order to accommodate the overall schedule, and with best wishes

11    for the holidays, I'm going to excuse Mr. Bessler, juror No. 5,

12    with the thanks of the Court.

13         The reason I called you in was to express my deep

14    appreciation to you for being here every day, just as it's true

15    for everybody.  Everybody on this jury is working hard, and I

16    so admire and am impressed by it.  What I want to tell you,

17    sir, is when this jury reaches a verdict, we will contact you

18    and we will let you know what that is, if there is a verdict or

19    if there's no verdict.  We'll let you know in any event how

20    this trial comes to an end, because you have been here for us

21    and you're entitled to that.  So with deep appreciation, you're

22    excused.  I would advise you that you need not discuss this

23    case with anyone.  I don't expect you to get any phone calls at

24    home or anything of the like, but if you did, you would be free

25    to say that you choose not to discuss the case.

1        That's what I have to say, and if we cross paths

2   again, I hope you'll remind me how we first met.  I know your

3   fellow jurors, I'm sure, will miss you as well, but thank you

4   very much.

5        We're done for the day.  See everyone else bright and

6   early tomorrow morning at 10:00 for a 10:00 start.  And a good

7   holiday, sir.

8        JUROR:  Thank you.

9        (Jury not present)

10        THE COURT:  See you all tomorrow morning.

11        MR. BATH:  Your Honor, do you recall this morning we

12   talked about the subpoena, and I said I wanted to talk to

13   Mr. Muir about that.  I have had a chance to talk to him.  I

14   guess I'm going to ask for the Court to reconsider my motion,

15   and perhaps I've done a poor job in explaining our position and

16   the difficulties with what we would argue is the oppressive

17   nature of the subpoena.

18        I would ask the Court for permission to Mr. Muir

19   address the Court, to be sworn in and explain to the Court what

20   would be required to try to get these ten years of documents.

21   I think he's going to have to travel to Kansas City to do that.

22   If the Court tells us to do it, we'll do that, Judge, but I

23   don't think he's going to be able to do it from here.

24        THE COURT:  How would this work?  He would take the

25   stand and testify as to what he relied on, and he couldn't be

1    cross-examined on it?

2            MR. BATH:  I'm sorry.  That's part of my poor job.  I

3    don't think that it's an issue of what he relied on.

4            We've been producing, I've been producing documents to

5    the U.S. Attorney's Office for a substantial period of time.

6    The part of the subpoena that is oppressive, in our minds, is

7    ten years of communication between him and Mr. Schulte.  I

8    don't think there's a real dispute about the other facts, other

9    documents that haven't been produced, because I've produced a

10   lot of documents.  And of course, with the AMG servers,

11   essentially, everything, as the Court knows, was turned over to

12   AMG when they bought the company, and that's why we've seen all

13   the emails they have and the private conversations between him

14   and Mr. Tucker.  So I don't expect there are going to be any

15   documents that he's going to say he relied on to form that

16   opinion.

17           THE COURT:  The other problem, as you know as a trial

18   lawyer, and a very good one, is that there is the danger of

19   cherry-picking, so I have 50 documents from Mr. Schulte and I

20   pick the 37 that favor my position, and the ones that don't I

21   leave behind.  That's the concern.

22           MR. BATH:  I don't think we've produced any documents

23   from Mr. Schulte that the government didn't have.  All the

24   documents -- that's not true.  There were some documents Mr.

25   Schulte produced through his -- Mr. Roth was involved, and I'm

1    trying to remember how they came, but it wasn't from Mr. Muir.

2            The documents that are in play regarding Mr. Schulte

3    have already been produced and they're not going to see new

4    documents from Mr. Schulte, any communication between him --

5    him being Mr. Muir -- and Mr. Schulte.

6            THE COURT:  Then I, quite frankly, am not

7    understanding the burden.  If there are none, the answer is

8    there are none, all have been produced, period, full stop.

9            MR. BATH:  No, no.  There are none we're going to rely

10   on.  Mr. Schulte and Mr. Muir have ten years of legal work for

11   various tribes, and they've asked for all ten years of that

12   communication, and some of those reside electronically.  Some

13   of them reside in Kansas City in paper form, and so the scope

14   of that subpoena is such that all those documents, to comply

15   with it, have to be produced.  They didn't necessarily involve

16   anything about Mr. Muir's testimony.

17           THE COURT:  That's what I'm saying.  There is the

18   danger of cherry-picking.  I'm only going to testify as to 37

19   documents, I'm not testifying as to 38, but if you had the

20   universe, you would see that in a larger context there was more

21   to the story.  That's the concern.

22           MR. BATH:  Right, and I recognize that.

23           So if we need to do that, I would like to present some

24   evidence to you, I guess, through Mr. Muir, to tell you why we

25   would need an adjournment to go get that accomplished.

1              THE COURT:  OK.  So what do you need?

2              MR. BATH:  Assuming that we would just come with all

3    the documents and the Court would order him to turn them over,

4    regardless of privilege, so he's not going to be crosswise with

5    anybody, let me consult with him.

6              THE COURT:  Sure.  Take your time.

7              MR. BATH:  Including travel, Judge, we need five days.

8              I'd also like to just complete the record.  I believe

9    that the party seeking the production, when they've waited till

10   the trial, has the burden to show that they couldn't with due

11   diligence get those documents prior to trial.

12             My letter spelled out, and I'll reiterate, that I had

13   contact with the U.S. Attorney's Office in the fall of --

14   almost two years ago, 18 months ago, and they said they were

15   going to subpoena documents from Mr. Muir.  I said, That's

16   fine, send me the subpoena, and the subpoena never came.  Now,

17   they're entitled to that, but when they subpoena us midtrial,

18   Judge, I think the burden is on them to prove they couldn't get

19   them without the due diligence and not interrupt my client's

20   rights to be able to prepare for his defense, prepare for his

21   testimony, etc.

22             The Court also knows, in my opening statement, I said

23   Mr. Muir was going to testify.  Conly Schulte has not been

24   somebody nobody knew about.  This has been known for two or

25   three years.

1    THE COURT:  OK.

2         Let me hear from the government.

3         MR. VELAMOOR:  Your Honor, as it currently stands, it

4    is a sharply limited subpoena focused on the issues that have

5    become clear during the trial regarding what Mr. Muir intends

6    to rely on.  It's now become clear through opening statement

7    and other parts of this trial that the focus here of the

8    defense is going to, in large measure, be conversations and

9    reliance on Mr. Schulte.

10        THE COURT:  So you urge that I grant the five-day

11   continuance?

12        MR. VELAMOOR:  Your Honor, we believe that this is not

13   something, in our experience, that would take that long to

14   produce.  Our understanding is that these are electronically

15   stored documents.  We've identified just a single party that

16   needs to be searched for with Mr. Muir.  There's a broad

17   privilege waiver relating to the Miami tribe, and it's date

18   limited.  There can also be efforts to exclude communications

19   with respect to the other tribes, so it's not clear to us

20   why --

21        THE COURT:  What do you mean there can be efforts to

22   exclude correspondence relating to the other tribes?  What does

23   that mean?

24        MR. VELAMOOR:  For example, to search and to exclude

25   by search documents that include the names of people, for

1    example, at the Santee Sioux tribe or the Modoc tribe.

2         THE COURT:  Did you discuss this with Mr. Bath?

3         MR. VELAMOOR:  We have had discussions with Mr. Bath.

4         THE COURT:  I know you have had discussions, but did

5    you discuss this, excluding certain people with Mr. Bath?

6         MR. BATH:  We certainly have -- you mean with respect

7    to the other two tribes?

8         THE COURT:  Yes.

9         MR. VELAMOOR:  We have not had that specific part of

10   the discussion, no.

11        THE COURT:  Why don't you have that discussion, and if

12   I'm not mistaken, we're going to have four days where we're not

13   sitting, in a row, this Friday, Saturday, Sunday and Monday.

14   It would seem to me that that would, with the narrowing the

15   government is proposing to make, enable the search to be done.

16   I'm going to direct that Mr. Velamoor talk to Mr. Bath now

17   about a narrowing of the subpoena, a further narrowing of the

18   subpoena, and maybe we can make this a less difficult task for

19   the defendant.  All right?

20        MR. BATH:  Very quick.  I would anticipate, then, that

21   obviously Mr. Muir would not be testifying until we produce the

22   documents.

23        THE COURT:  That seems to be the case.

24        MR. BATH:  Yes, OK.

25        THE COURT:  Is that right, Mr. Velamoor?  Is that what

Ha2Wtuc6

1   you want?

2           MR. VELAMOOR:  Your Honor, could we confer on that?

3           THE COURT:  All right.  Why don't you confer on it and

4   I'll talk to you all tomorrow morning.

5           (Adjourned to October 3, 2017, at 10:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                           Page

3   TOM GAMBLE

4   Direct By Mr. Ginsberg . . . . . . . . . . .1812

5   Cross By Mr. Bath . . . . . . . . . . . . .1883

6   Cross By Mr. Velamoor . . . . . . . . . . .1894

7   LEONARD STEPHEN GOODMAN

8   Direct By Mr. Roth . . . . . . . . . . . . .1928

9   Cross By Mr. Bath . . . . . . . . . . . . .1964

10  Cross By Mr. Scotten . . . . . . . . . . . .1964

11  DOUGLAS GLENN LANKFORD

12  Direct By Mr. Ginsberg . . . . . . . . . . .1993

13                    GOVERNMENT EXHIBITS

14  Exhibit No.                             Received

15    4043    . . . . . . . . . . . . . . . . .1967

16    4040    . . . . . . . . . . . . . . . . .1980

17    4044    . . . . . . . . . . . . . . . . .1984

18                    DEFENDANT EXHIBITS

19  Exhibit No.                             Received

20    D729    . . . . . . . . . . . . . . . . .1816

21    D737    . . . . . . . . . . . . . . . . .1820

22    D739    . . . . . . . . . . . . . . . . .1821

23    D743    . . . . . . . . . . . . . . . . .1823

24    D747    . . . . . . . . . . . . . . . . .1825

25    D763    . . . . . . . . . . . . . . . . .1827

1    D762 . . . . . . . . . . . . . . . . . . .1828

2    D764 . . . . . . . . . . . . . . . . . . .1830

3    D766 . . . . . . . . . . . . . . . . . . .1831

4    D780 . . . . . . . . . . . . . . . . . . .1832

5    D759 . . . . . . . . . . . . . . . . . . .1833

6    D786 . . . . . . . . . . . . . . . . . . .1834

7    D790 . . . . . . . . . . . . . . . . . . .1835

8    D791 . . . . . . . . . . . . . . . . . . .1836

9    D792 . . . . . . . . . . . . . . . . . . .1837

10   D795 . . . . . . . . . . . . . . . . . . .1838

11   D794 . . . . . . . . . . . . . . . . . . .1838

12   D835 . . . . . . . . . . . . . . . . . . .1858

13   D2701 . . . . . . . . . . . . . . . . . . .1862

14   847 . . . . . . . . . . . . . . . . . . .1872

15   2720 . . . . . . . . . . . . . . . . . . .1875

16   2754 . . . . . . . . . . . . . . . . . . .1881

17   D40 . . . . . . . . . . . . . . . . . . .1935

18   1 . . . . . . . . . . . . . . . . . . .1939

19   D24 . . . . . . . . . . . . . . . . . . .1947

20   D39 . . . . . . . . . . . . . . . . . . .1947

21   7 . . . . . . . . . . . . . . . . . . .1951

22   D50 . . . . . . . . . . . . . . . . . . .1955

23   8 . . . . . . . . . . . . . . . . . . .1990

24

25