Ha3Wtuc1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4          v.                16 Cr. 91 (PKC)

5   SCOTT TUCKER and
    TIMOTHY MUIR,             Trial
6
             Defendants.
7
   ------------------------------x
8                       New York, N.Y.
                       October 3, 2017
9                       10:00 a.m.

10

11  Before:
              HON. P. KEVIN CASTEL

12                       District Judge
                        and a jury
13                APPEARANCES

14  JOON H. KIM
        Acting United States Attorney for the
15      Southern District of New York
   BY:   NIKETH V. VELAMOOR
16       HAGAN C. SCOTTEN
        SAGAR K. RAVI
17       Assistant United States Attorneys

18  FREEMAN NOOTER & GINSBERG
        Attorneys for Defendant Tucker
19   BY:   LEE A. GINSBERG
        NADJIA LIMANI
20         -and-
   STAMPUR & ROTH
21   BY:   JAMES M. ROTH

22  BATH & EDMONDS, P.A.
        Attorneys for Defendant Muir
23   BY:   THOMAS J. BATH
         -and-
24   BEVERLY VAN NESS

25

Ha3Wtuc1

1           (Trial resumed)

2           THE COURT:  Please be seated.

3           I have a note:  "Can you confirm that DX2700 is

4  received?"

5           This is a request by somebody.  Who is it by?

6           THE DEPUTY CLERK:  For the record.

7           THE COURT:  By my deputy.

8           Is Defendants' Exhibit 2700 in evidence?

9           MR. SCOTTEN:  Yes, your Honor.

10          MR. GINSBERG:  We all believe it is.  This is the

11  exhibit that you had at the end of the day overruled the

12  government's objection, and the following morning I think I

13  began by saying you had made your ruling, and I offered it.  I

14  think I offered it or you said it's in evidence, or something

15  like that happened.

16          THE COURT:  Defendants' Exhibit 2700 is received into

17  evidence.

18          MR. GINSBERG:  Thank you.

19          (Defendants' Exhibit 2700 received in evidence)

20          THE COURT:  Bring our jurors in, please.

21          (Continued on next page)

22

23

24

25

Ha3Wtuc1

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.

3    Everyone else, please be seated.

4          Paige Smith, we're going to give you a change of

5    scenery.  You can move down to the front row and see what life

6    looks like from the front row.  That corner seat is not always

7    the best anyway, so the world looks better, or I hope so.

8          We're ready to begin.

9          The Court reminds you that you are still under oath.

10   DOUGLAS GLENN LANKFORD, resumed.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Mr. Ginsberg, whenever you're ready.

13         MR. GINSBERG:  Thank you, your Honor.

14   DIRECT EXAMINATION (cont'd)

15   Ha3Wtuc1                    Lankford - Direct

16   BY MR. GINSBERG:

17   Q.  Good morning.

18   A.  Good morning.

19   Q.  At the end of the day yesterday, we were talking about the

20   role you played as the IT administrator for the tribe back in

21   2002.  Do you recall that?

22   A.  Yes, sir.

23   Q.  And you told us that at some point, some computers arrived

24   from Kansas City, but you didn't know the purpose for the

25   computers.  Is that correct?

1   A.  That's correct.

2   Q.  Did there come a time after the computers arrived that some

3   servers arrived on the tribal land?

4   A.  There were devices that were brought early, and then very

5   much later, there was some more equipment brought that had --

6   one-use servers that were, I believe were used for the call

7   center that was located on tribal land.

8   Q.  Do you recall what year it was, how close in time to the

9   computers coming in?

10  A.  It was during the time -- it was after I became second

11  chief, so it would have been 2008, '9, somewhere in there.  I'm

12  not really sure when they came.

13  Q.  Before the servers came in, were any other additional

14  computers or any other equipment sent in or brought in, that

15  you can recall?

16  A.  Not that I know of, just the two boxes that came first.

17  Q.  I may have asked you this yesterday, and I apologize.  Did

18  you see who used the two computers that were brought in

19  initially?

20  A.  No one.  They sat in the server room.

21  Q.  When you say they sat in the server room, did you have a

22  server there already for the tribe's own purposes?

23  A.  Yes, sir.

24  Q.  And were you the person to take care of that?

25  A.  Our servers, yes.

1    Q.   Now, I'm going to skip ahead to the period when you became

2    second chief.  That was approximately 2008, is that correct?

3    A.   Yes, sir.

4    Q.   And when you became second chief, could you tell us,

5    because of that position, what boards you became a member of?

6    A.   I became the chairman of our tax commission.  Also became

7    vice chair of the AMG board.

8    Q.   Did you become a member of the business committee?

9    A.   Yes, sir.

10    Q.   And of the regulatory commission?

11    A.   Yes, sir.

12    Q.   Was the regulatory commission the same as the tax

13    commission?

14    A.   Yes, sir.

15    Q.   OK.  Thank you.

16         So it would be fair to say that beginning in 2008, you

17    began to attend board meetings of all of those groups?

18    A.   Yes, sir.

19    Q.   And by 2008, before you were elected second chief, did you

20    have an understanding what the computers that had originally

21    come in 2002 and 2008 or so were being used for?

22    A.   Not really.

23    Q.   Were you aware --

24              THE COURT:  I didn't hear the answer.

25              THE WITNESS:  Not really, your Honor.

Ha3Wtuc1

1          THE COURT:  Thank you.

2    BY MR. GINSBERG:

3    Q.  Were you aware before you became second chief about the

4    payday lending business?

5    A.  I knew the tribe was involved in payday lending.

6    Q.  And when did you first become aware of that, the best you

7    can tell us?

8    A.  2000 -- I'm not really sure about, I'm assuming soon after

9    it started.

10   Q.  OK.  And would that be sometime between 2002 and 2008,

11   prior to you becoming second chief?

12   A.  In the '2 closer than the '8, I would think.

13   Q.  OK.  Thank you.

14        I'm going to go over with you a series of documents.  I

15   placed a set of hard copies in front of you, but they're also

16   going to come up on the screen, so whatever's easiest for you

17   to look at, you can do that.

18        I'd like you to look at Defendants' Exhibit 2711 first, and

19   after you have had time to read it, tell us, please.

20   A.  I've reviewed it.

21   Q.  Looking at the second page of the document, do you

22   recognize any of the signatures on that page?

23   A.  I do.

24   Q.  And whose signatures do you recognize?

25   A.  Myself, Chief Gamble and Secretary-treasurer Sarah Lawson.

1    Q.   And do you recognize what this document is?

2    A.   Looks like a licensing agreement.

3    Q.   2711?

4    A.   Yes.  Or a license arrangement, I guess.

5    Q.   Let me just make sure.  I'm looking at the screen.  You're

6    looking at a piece of paper.  Could you look at the screen?  I

7    want to make sure you don't have the wrong document.

8              THE COURT:  Have you ever seen this document before?

9              THE WITNESS:  Well, I've signed it, so I'm assuming

10   I've seen it in the past, your Honor.

11             THE COURT:  OK.  Do you remember signing it?

12             THE WITNESS:  I do not.

13             THE COURT:  OK.

14   BY MR. GINSBERG:

15   Q.   Taking a look at the top portion of it, if you can't recall

16   what it is, can you tell us if that refreshes your recollection

17   as to what this document is?

18             THE COURT:  Now, the concept of refreshing your

19   recollection, you can read something, and you can read it and I

20   can read it and you can see the words on the page.  That's not

21   what refreshing the recollection is.  It's when you read it and

22   then you put the document facedown, ask yourself, do you have a

23   new and refreshed recollection on the subject?  If you do, then

24   it's refreshed your recollection.  If it's just a question, "I

25   read the words on the page," then you don't have a refreshed

Ha3Wtuc1

1    recollection.

2    A.   I'm not sure I know what this pertains to.

3    Q.   Well, you recognize your signature, correct?

4    A.   I do.

5    Q.   And you attended board meetings of AMG Services Inc.,

6    correct?

7    A.   Yes, sir.

8    Q.   And did you begin attending those board meetings as early

9    as 2008?

10   A.   In June of 2008, when I took the office of second chief.

11   Q.   So by 2012, you would still have been attending those board

12   meetings, is that correct?

13   A.   Yes, sir.

14   Q.   And do you recall at the board meetings somebody was taking

15   down notes, the recording secretary would take down notes?

16   A.   Yes.

17   Q.   And after the meeting was completed, the secretary would

18   type up those notes and then present it to the board at the

19   next meeting?

20   A.   Yes, sir.

21            MR. GINSBERG:  Your Honor, I offer Defendants' Exhibit

22   2711.

23            THE COURT:  Any objection?

24            MR. RAVI:  No objection.

25            THE COURT:  Received.

1             (Defendants' Exhibit 2711 received in evidence)

2      BY MR. GINSBERG:

3      Q.   Could you now read to us what's on the top of Defendants'

4      Exhibit 2711?

5      A.   "AMG Services Inc., minutes of the board of directors

6      special meeting, June 20, 2012, Miami, Oklahoma."

7      Q.   Who were the people who were attending that meeting?

8      A.   AMG chairman Chief Tom Gamble; AMG vice chairman Second

9      Chief Doug Lankford, AMG secretary-treasurer, Miami tribe

10     Secretary-treasurer Sarah Lawson, AMG CEO and President Don

11     Brady, Scott Tucker.

12     Q.   If you would look at Roman VI, please, Roman VI basically

13     says that "Chairman Gamble and AMG CEO and President Don Brady

14     led a discussion of the terms and conditions of the proposed

15     license agreement.  Chairman Gamble noted that the Miami tribe

16     business committee had been apprised of the terms of the

17     proposed license agreement by AMG CEO and President Don Brady

18     and Second Chief Doug Lankford.  No action was taken."  Do you

19     see that?

20     A.   I do.

21     Q.   As you sit here now, do you recall that taking place?

22     A.   I do not.

23     Q.   Do you recall discussions taking place about licensing

24     agreements regarding AMG?

25     A.   I do recall some.

1    Q.  All right.  You can put that aside.

2        Go to Defendants' Exhibit 844, please, and I'd ask you to

3    look at the document, particularly on the second page.  Do you

4    recognize the signatures?

5    A.  I do.

6    Q.  Do you recognize your own signature?

7    A.  I do, sir.

8    Q.  Chief Gamble?

9    A.  Yes, sir.

10   Q.  And Sarah Lawson?

11   A.  Yes, sir.

12   Q.  Do you recognize what this document is?

13   A.  Now what was your question, sir?

14   Q.  Do you recognize what this document is?

15   A.  I do not recall the meeting.  I know I was there because

16   I've signed the minutes, but --

17   Q.  OK.  Quickly, I'll ask you those same questions.  You

18   attended meetings of the AMG board during this June 2012 period

19   of time, is that correct?

20        MR. GINSBERG:  Your Honor, I'm told there's no

21   objection.

22        THE COURT:  All right.  Received then.

23        MR. GINSBERG:  I offer Defendants' Exhibit D844 into

24   evidence.

25        THE COURT:  Any objection?

1          MR. RAVI:  No objection.

2          THE COURT:  Received.

3          (Defendants' Exhibit D844 received in evidence)

4   BY MR. GINSBERG:

5   Q.  You were present at this meeting, is that correct?

6   A.  Yes, sir.

7   Q.  Don Brady was present, correct?

8   A.  Yes, sir.

9   Q.  And Scott Tucker and Blaine Tucker were present, correct?

10  A.  Yes, sir.

11  Q.  And if we look at Roman VI under old business, it indicates

12  that "Don Brady advised the board that the financial numbers

13  were reviewed by Mr. Brady and MNE Chief Operating Officer Joe

14  Frazier, with satisfactory acceptance of same.  Mr. Brady

15  further noted that some of the financial information was

16  related to the Miami tribe business committee subsequent to

17  Mr. Brady's and Mr. Frazier's review."  Do you see that?

18  A.  I do.

19  Q.  And would it be fair to say that at that meeting, based

20  upon these minutes, there was a presentation made by Mr. Brady,

21  who indicated both he and Joe Frazier had reviewed the

22  financial information?

23          MR. RAVI:  Objection to leading.

24          THE COURT:  Yes.  Please avoid it.  The document's in

25  evidence.

1          MR. GINSBERG:  Speaks for itself.

2          THE COURT:  The jury can read it.

3          MR. GINSBERG:  OK.

4          THE COURT:  It's up on the screen.

5          MR. GINSBERG:  Fine.

6    Q.  Now, who is Joe Frazier?

7    A.  At what point in time, sir?  I'm sorry.

8    Q.  At this point I'm talking about where it refers to him as

9    MNE chief operating officer.  Could you explain to us who he

10   was and what title he held?

11   A.  I know he was a person that did accounting and knew about

12   business, and he worked under Mr. Brady.

13   Q.  And do you recall when, about, in time, he began to work

14   either under or with Mr. Brady?

15   A.  I don't recall when he was exactly hired.

16   Q.  Did there eventually come a time where Joe Frazier played a

17   different role with the tribe?

18   A.  He did.

19   Q.  And do you recall about how many years later that was?

20   A.  It would have been after, after November of 2012.

21   Q.  We'll get back to that point.

22        Now we can move to Defendants' Exhibit 2710.  I know it's a

23   long document, because there are some attachments, but I would

24   ask you to first look at the signatures on the second page and

25   ask you if you recognize those signatures.

1    A.  I do.

2    Q.  And whose signatures are on the second page?

3    A.  Gena Lankford, chairperson; Vice Chair Scott Willard;

4    secretary-treasurer Donya Williams.

5    Q.  And who is Gena Lankford?

6    A.  She is my wife.

7    Q.  And what was her role at the time in relation to the MNE

8    Services board or committee?

9    A.  Her previous -- before she became my wife, she's been HR at

10   MNE, and she has been on the MNE board pre -- or she was on

11   this MNE -- MNES board previous to our marriage.

12   Q.  And at some time did she become chairperson?

13   A.  Yes.

14   Q.  Do you recall exactly when that was?

15   A.  I do not.

16   Q.  I'd ask you to look at the last two pages of this document.

17   On the bottom there's a number ending in 084 and 085.

18   A.  Is it on --

19   Q.  We can put it up there now.

20   A.  Yeah, I'll just deal with that; that way I make sure I get

21   the right page.

22        I've read it.

23   Q.  Do you recognize the signature at the bottom of the page?

24   A.  I do.

25   Q.  And whose signature is that?

1    A.  Gena Lankford.

2    Q.  And do you recognize what this document is?

3    A.  Not per se.  It looks like they're rescinding something.

4    Q.  From time to time, did the various committees of the board

5    of directors pass various resolutions?

6    A.  They would.

7    Q.  And it would be presented to the board for a vote, is that

8    correct?

9    A.  That's correct.

10   Q.  And the board would have to vote on it, is that correct?

11   A.  That is correct.

12   Q.  And that would be true of MNE Services as well as AMG or

13   tribal council, is that correct?

14   A.  That would be correct.

15   Q.  And after the resolutions were acted upon, there would be a

16   document prepared to reflect the resolution, is that correct?

17   A.  Yes, sir.

18   Q.  And then it would be signed by the chairperson of that

19   particular committee, is that correct?

20   A.  Yes, sir.

21   Q.  Let me just go through that.  085, do you recognize those

22   two signatures?

23   A.  I do.  Scott Willard and Donya Williams.

24   Q.  And those signatures relate to the page before, the

25   resolution page, correct?

1    A.  I assume so, sir, yes.

2            THE COURT:  You have to keep your voice up.

3            THE WITNESS:  Yes.

4            THE COURT:  No, no.  Say what you said again, if you

5    don't mind.

6            THE WITNESS:  Oh, sorry.  I forgot what the question

7    was.

8            THE COURT:  OK.

9    BY MR. GINSBERG:

10   Q.  I think the answer was "I assume so."

11   A.  Yes, sir.  I recognize those two signatures as Scott

12   Willard and Donya Williams, and I understand that to be part of

13   the second page.

14   Q.  Thank you.

15       And the same question as to the documents ending on the

16   bottom right in 086 and 087, do you recognize the signatures?

17   A.  Yes, sir.

18   Q.  And again, whose signature is on 086?

19   A.  Gena Lankford.

20   Q.  And 087?

21   A.  Scott Willard and Donya Williams.

22   Q.  Looking back at the first page of D2710, you told us before

23   that the minutes of the board of directors meetings were

24   recorded and then later typed up and presented to the board for

25   approval at the next meeting.  Is that correct?

1   A.  Yes, sir.  That's usually how it happened.

2   Q.  And one of the people present at this particular meeting

3   was the recording secretary, Carolyn Williams, is that correct?

4   A.  Yes, sir.

5             MR. RAVI:  Objection, your Honor.  I don't believe a

6   foundation has been laid that Mr. Lankford served on this board

7   or was present at this meeting.

8             MR. GINSBERG:  I didn't ask that question.

9             THE COURT:  Rephrase your question, please.

10  BY MR. GINSBERG:

11  Q.  The last question simply was, was Carolyn Williams present

12  at this meeting?

13            THE COURT:  If you know.  Do you know whether she was

14  there?  You can look at a piece of paper.  The piece of paper

15  can refresh your recollection or it may not refresh your

16  recollection.

17            THE WITNESS:  I don't, I can't say one way or the

18  other, because I don't think I was there, so I can't attest

19  that Carolyn Williams was there, your Honor.

20            THE COURT:  OK.  That's fine.

21            MR. GINSBERG:  Your Honor, I'd offer Defendants'

22  Exhibit D2710.

23            THE COURT:  Any objection?

24            MR. RAVI:  Yes, your Honor.

25            THE COURT:  Basis.

Ha3Wtuc1

1          MR. RAVI:  Foundation.  I can ask a couple questions

2     of the witness, but I don't believe the witness established

3     that he was a member of this board or as to his basis for any

4     knowledge as to the practices of this board and the way that

5     the meetings were recorded.

6          THE COURT:  Go ahead, Mr. Ginsberg.  If you'd like to

7     try to lay a foundation, you're welcome to do that, or you may

8     want to do this through another witness.

9     BY MR. GINSBERG:

10    Q.  Are you aware -- were you on the MNE Services board at any

11    time?

12    A.  No, sir.

13    Q.  Were you aware of what the MNE Services board was?

14    A.  I think so, sir.

15    Q.  And were you aware of that in your capacity as the second

16    chief of the tribe?

17    A.  Yes, sir.

18    Q.  And what was the MNE Services board's purpose?

19    A.  They were the managing board of the MNE Services business

20    portion of the lending company.

21    Q.  And who would that board report to in terms of whatever

22    work they were doing or things that they were acting on?

23    A.  Most of their interactions came from Mr. Brady.

24    Q.  And would their actions be eventually reported to the

25    tribal council as well?

1    A.  Usually.

2    Q.  And was that the practice of the MNE Services board and the

3    tribal council during 2012?

4    A.  Yes, sir.  I would say so.

5            MR. GINSBERG:  I reoffer Defendants' Exhibit D2710,

6    your Honor.

7            MR. RAVI:  Your Honor, may I ask a question of the

8    witness?

9            THE COURT:  Sure.

10   VOIR DIRE EXAMINATION

11   BY MR. RAVI:

12   Q.  Mr. Lankford, what you just testified to regarding the MNE

13   board, was that based on personal knowledge or what other

14   people have told you?

15   A.  I think it would maybe be personal, just because I knew

16   that they -- usually if there was a meeting, my wife might

17   mention that they had a meeting that day.  Somewhat personal.

18   Q.  So it was based on things that your wife told you, correct?

19   A.  Yes.

20   Q.  Not based on the fact that you were present at the meeting

21   and observed --

22   A.  No, sir.  I did not attend their meeting.

23           MR. RAVI:  Objection.  Foundation, your Honor.

24           THE COURT:  Sustained.

25           MR. GINSBERG:  I don't want to make a long speaking

Ha3Wtuc1

1    objection, your Honor.  Can I quickly approach the sidebar?

2              THE COURT:  You can do it at the next break.

3              MR. GINSBERG:  OK.  I'll put this aside.

4    BY MR. GINSBERG:

5    Q.  I'd ask you to look at Defendants' Exhibit 2714,

6    particularly the third page.  Do you recognize the signatures

7    on the third page?

8    A.  I do.

9    Q.  Whose signatures are those?

10   A.  Gena Lankford, Scott Willard and Donya Williams.

11   Q.  Do you recognize what this document is?

12   A.  I've reviewed it.

13   Q.  Do you recognize what it is?

14   A.  It looks like a regular meeting of the MNES board.

15   Q.  Were you present at this meeting?

16   A.  I don't believe I was, sir.

17   Q.  Now, as the second chief of the tribe, would you receive

18   information about the work of the MNE Services board through

19   either your presence on any of the other boards or your role as

20   the second chief of the tribe?

21   A.  Sometimes as second chief.

22   Q.  And how would that occur; how would you receive the

23   information as the second chief?

24   A.  Usually it would be at a meeting of the council and one or

25   the other of the Scott Willard or Donya Williams might bring up

1    something that happened or that we needed to be advised of.

2    Q.  So from time to time, they would advise you about things

3    that the MNE Services board was discussing, is that correct?

4    A.  Sometimes.

5    Q.  And it's also true that you were not present or regularly

6    present at the MNE Services board meetings, correct?

7    A.  I was not.

8    Q.  And then very quickly, 2717, D2717, if you'd look at the

9    scone page, without reading the whole document, do you

10   recognize the signatures?

11   A.  I do.

12   Q.  And whose signatures are they?

13   A.  Gena Lankford, Scott Willard and Donya Williams.

14   Q.  And is this another meeting that you did not attend?

15   A.  I don't believe I did.

16   Q.  And D2719, do you recognize the signatures on the second

17   page?

18   A.  Yes, sir.

19   Q.  And whose signatures are they?

20   A.  Gena Lankford, Scott Willard and Donya Williams.

21   Q.  Again, this is another meeting of MNE Services, a board

22   that you did not attend, correct?

23   A.  That's correct.

24   Q.  Now let's go to Defendants' Exhibit D2718A.  I would ask

25   you to look at the second page of this document and ask if you

1    recognize the signatures.

2    A.  I do.  Chief Gamble, myself and Sarah Lawson.

3    Q.  And do you recognize what this document is?

4    A.  I've read the document, sir.

5    Q.  Do you recognize what it is?

6    A.  I think so, sir.

7    Q.  What is it?

8    A.  I believe there was some money being transferred to the

9    tribe for the building of one of its casinos.

10   Q.  Before you tell us what's in the document, what type of

11   document is this?

12   A.  It's a board meeting of AMG Services.

13   Q.  Are these the minutes of that board meeting?

14   A.  I believe so, sir.

15   Q.  And is this a meeting that you attended?

16   A.  I believe so, yes.

17   Q.  And you signed it?

18   A.  I did.

19             MR. GINSBERG:  I'd offer D2718A.

20             THE COURT:  Any objection?

21             MR. RAVI:  No objection.

22             THE COURT:  Received.

23             (Defendants' Exhibit D2718A received in evidence)

24   BY MR. GINSBERG:

25   Q.  Now, you were about to explain something that took place at

1  the meeting.  Could you go ahead with your explanation of that?

2  A.  Oh, I'm sorry.  It just, it appears to be just where some

3  money was transferred to the tribe for the building of its

4  casino.

5  Q.  And in addition, under Roman II, in the second paragraph,

6  does it talk about Mr. Brady?

7  A.  It does.

8  Q.  And what does it say about Mr. Brady?

9  A.  It says that CEO AMG President Don Brady advised the board

10  MNE has agreed again to provide 2.5 million to the tribe's

11  operating budget.

12  Q.  And the paragraph beneath that?

13  A.  Mr. Brady reported to the board that AMG operations people

14  have approved an expansion of the loan-process employees in the

15  Miami office.

16  Q.  And it goes on to talk about the plans for that, is that

17  correct?

18  A.  That's correct.

19  Q.  And it goes on to say that Carolyn Williams was going to

20  head up the expanded operations, correct?

21  A.  It does.

22  Q.  And the next paragraph references AMG and the operations

23  and the costs of those operations as well, correct?

24  A.  Yes, sir.

25  Q.  Now, did there come a time in or about November of 2012

1    where Joe Frazier was appointed to a new position with MNE

2    Services?

3    A.  Yes, sir.

4    Q.  And what position was he appointed to?

5    A.  CEO.

6    Q.  And did he replace somebody else in that position?

7    A.  He did.

8    Q.  And who did he replace?

9    A.  Don Brady.

10   Q.  In order to do that, was it required that a resolution of

11   the board of directors of MNE pass upon that?

12   A.  Yes, sir.

13   Q.  I'd ask you to look at D853 and look at the signatures on

14   the bottom of that page and tell us if you recognize the

15   signatures.

16   A.  Gena Lankford, Scott Willard and Donya Williams.

17          MR. GINSBERG:  I'd offer Defendants' Exhibit D853,

18   your Honor.

19          THE COURT:  Any objection?

20          MR. RAVI:  No objection, as long as it's being offered

21   not for its truth.

22          THE COURT:  All right.  It's received.

23          (Defendants' Exhibit D853 received in evidence)

24          THE COURT:  As I told you, ladies and gentlemen, with

25   resolutions, with "whereas" clauses, they're not admitted for

1    the truth of their content.  Anybody can put anything in a

2    "whereas" clause.  It doesn't make it a fact, a proven fact, or

3    it doesn't even tend to prove the fact.  The exhibit is being

4    received because the resolution is an operative act, somebody's

5    action, and it's received for that purpose and because it may

6    have influenced the conduct of others.

7            Go ahead.

8            MR. GINSBERG:  Thank you, your Honor.

9    Q.  As you testified before, was it a fact that Don Brady was

10   removed as president of the company?

11   A.  It was.

12   Q.  And was it a fact that Joe Frazier replaced Don Brady?

13   A.  It is.

14   Q.  And was it a fact that the board of directors approved

15   those actions?

16           THE WITNESS:  Your Honor, some of this is getting into

17   confidential meetings with lawyers, how this action came to be.

18   I just, I need to say that.

19           THE COURT:  All right.

20           MR. GINSBERG:  So the question --

21           THE COURT:  Excuse me a second, sir.

22           MR. GINSBERG:  Sure.

23           THE COURT:  You need not reveal the content of any

24   confidential communication between you or the tribe and the

25   tribe's lawyer for the purpose of seeking or obtaining legal

1    advice.  But for example, you might talk to a lawyer about

2    whether you should engage in a particular transaction or do

3    something.  Now, the conversation with the lawyer may be

4    privileged, but what you ultimately decide to do is not

5    privileged.  All right?

6              THE WITNESS:  Yes, sir.  I just wanted --

7              THE COURT:  Does that help at all?

8              THE WITNESS:  Well, I'm just nervous about that.

9              THE COURT:  OK.

10             THE WITNESS:  In case I pause a lot to answer, I want

11   you to know why.

12             THE COURT:  Fair enough.

13             Put your question, Mr. Ginsberg.

14             MR. GINSBERG:  I'll put the question again.

15   Q.  Was it a fact that the board of directors of MNE Services

16   approved the removal of Don Brady and Joe Frazier?

17   A.  There was a removal of Don.

18   Q.  And the appointment of Joe Frazier?

19   A.  Yes, sir.

20             MR. GINSBERG:  I'm going to go to D854, your Honor.

21   Q.  Asking you to look at the second page, do you recognize the

22   signatures on that page?

23   A.  I do.

24   Q.  Whose signatures are they?

25   A.  Gena Lankford, Scott Willard and Donya Williams.

Ha3Wtuc1

1    Q.  And looking at this document, what does it appear to be?

2    A.  Like a resolution of the MNES, for MNE Services Inc. board.

3            MR. GINSBERG:  Your Honor, I'd offer Defendants'

4    Exhibit D854.

5            THE COURT:  Any objection?

6            MR. RAVI:  No objection, again, not for the truth.

7            THE COURT:  The same instruction applies here, ladies

8    and gentlemen.

9            Received.

10           (Defendants' Exhibit D854 received in evidence)

11   BY MR. GINSBERG:

12   Q.  This resolution, in the fourth paragraph, where it says

13   "whereas," do you see where it says, "The board finds it is in

14   the best interests of the company to remove Don Brady, Blaine

15   Tucker and Scott Tucker as signatories"?

16   A.  I do.

17   Q.  "From all company bank accounts," do you see that?

18   A.  I do.

19   Q.  And the paragraph underneath indicates those individuals

20   should have no wire authority as well, correct?

21   A.  That's correct.

22   Q.  And underneath that it indicates it's in the best interests

23   to appoint Joe Frazier as a signatory?

24   A.  I see that, yes.

25   Q.  And then it specifies certain accounts underneath it, on

Ha3Wtuc1

1    the bottom, is that correct?

2    A.   It does.

3    Q.   And to the best of your recollection, from 2012, did Joe

4    Frazier become a signatory on the bank accounts?

5    A.   I think so, but I'm -- I can't -- I believe so, sir.

6    Q.   OK.  And do you recall Don Brady and Blaine and Scott

7    Tucker being removed from the bank accounts at that time?

8    A.   Yes, sir.

9    Q.   Let's go to Defendants' Exhibit D855, second page.  I ask

10   you again if you recognize the signatures.

11   A.   I do.

12   Q.   And whose signatures are they?

13   A.   Gena Lankford, Scott Willard and Donya Williams.

14   Q.   And what does this document appear to be?

15   A.   Resolution of the board of directors MNE Services Inc.

16          MR. GINSBERG:  I'd offer D855, your Honor.

17          THE COURT:  Any objection?

18          MR. RAVI:  No objection, again, not for its truth.

19          THE COURT:  All right.  It's subject to the same

20   instruction I've given, and with that understanding it's

21   received.

22          (Defendants' Exhibit D855 received in evidence)

23   BY MR. GINSBERG:

24   Q.   If you can read underneath where it says resolution of the

25   board of directors of MNE Services, could you read the next

1    line?

2    A.   You mean the first "whereas"?

3    Q.   No.   Before that, "demanding."

4    A.   "Demanding the return of MNE Services Inc. funds held at

5    multiple law offices."

6    Q.   And the fourth "whereas" paragraph?

7    A.   "During the special meeting on the 16th of November 2012,

8    the board of directors was informed that, on or about May 2,

9    2012, significant moneys were transferred from company bank

10   accounts to various law firms, including McDowell Rice Smith &

11   Buchanan, the Muir Law Firm LLC and" -- I don't know how to say

12   that.

13   Q.   Berkowitz.

14   A.   "Berkowitz, Oliver, Williams, Shaw" --

15   Q.   Eisenbrandt.

16   A.   "Eisenbrandt, and" --

17   Q.   And?

18   A.   "And, whereas the board of directors finds it in the best

19   interests of the company for those amounts to be returned to

20   the company."

21   Q.   And then could you read under that?

22   A.   "Now therefore, be it resolved"?

23   Q.   Yes.

24   A.   "That the following amounts shall be returned to the

25   company immediately from McDowell Rice Smith & Buchanan, 21

1    million; from the Muir Law Firm LLC, 7 million; from Berkowitz,

2    Oliver, Williams, Shaw & -- 8 million."

3    Q.   Eisenbrandt.  OK.

4         Now, in November 2012, what positions did you hold in

5    relation to the Miami Tribe of Oklahoma?

6    A.   I was still second chief and vice chairman.

7    Q.   Were you aware that significant amounts of money had been

8    transferred from tribal accounts to various law firms?

9    A.   Can you rephrase that?

10   Q.   Were you aware that significant amounts of money, prior to

11   the date of this resolution, November 16, 2012, had been

12   transferred from tribal accounts to various law firms?

13   A.   I don't know that I was aware of that.

14   Q.   Were you aware that the MNE Services board resolved that

15   those moneys should be transferred back to the tribal accounts?

16   A.   I think I was aware that, at a point in time that those

17   moneys were starting to be transferred back.

18   Q.   Now, the moneys that were transferred back was money that

19   was transferred back to the tribe, is that correct?

20   A.   I believe they came to MNE.

21   Q.   And that's a tribal --

22   A.   Entity.

23   Q.   -- entity, correct?

24   A.   That's correct.

25   Q.   And the moneys on this page, the total would be $36

Ha3Wtuc1

1   million, if we total 21, 7, and 8?

2   A.   I believe so.

3   Q.   And that was money that -- that was the tribe's money,

4   correct?

5   A.   I believe so.

6   Q.   And do you know how the tribe had earned that money?

7   A.   I believe that money came from the online lending business.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. GINSBERG:

2    Q.  I am going to move to Defendants' D856.

3        In D856, do you recognize the signatures on the bottom?

4    A.  I do.

5    Q.  Whose signatures are they?

6    A.  Gena Lankford, Scott Willard and Donya Williams.

7    Q.  What does this document D856 appear to be?

8    A.  A resolution of that board, MNE Services, Inc.

9            MR. GINSBERG:  I would offer Defendants' Exhibit D856.

10           THE COURT:  Any objection?

11           MR. RAVI:  No objection.

12           THE COURT:  Received with the same instruction.

13           (Defendants' Exhibit D856 received in evidence)

14   BY MR. GINSBERG:

15   Q.  Is it a fact that at some point in around November of 2012,

16   that Don Brady, Blaine Tucker and Scott Tucker no longer had

17   wire authority for the company?

18           MR. RAVI:  Objection to leading.

19           THE COURT:  Avoid the leading.  Start over again.

20   Q.  Could you please read the "whereas" paragraph.

21   A.  "Whereas, the board of directors also finds it is in the

22   best interests of the company to order that Don Brady, Blaine

23   Tucker and Scott Tucker have no wire authority for the company,

24   and no authority to draw on any lines of the company's lines of

25   credit."

HA38TUC2                    Lankford - Direct

1    Q.  Is it fair to say there is additional language in there

2    regarding --

3              MR. RAVI:  Objection, your Honor.  This appears to be

4    used for its truth, the "whereas" clause.

5              THE COURT:  Ladies and gentlemen, as I have instructed

6    you, the statements in the "whereas" clause are not admitted to

7    prove the truth of the statements in the whereas clauses.  They

8    were just simply said.  That's all.

9    Q.  To the best of your recollection, was Don Brady, Blaine

10   Tucker and Scott Tucker, were they removed from having wire

11   authority for the company?

12   A.  As far as I know, yes.

13   Q.  And removed as signatories.  Were Don Brady and Blaine

14   Tucker removed as signatories, to best of your knowledge, were

15   they removed as signatories on the bank accounts?

16   A.  I believe so, yes.

17   Q.  Was that at the direction of the MNE Services board of

18   directors?

19   A.  It was.

20   Q.  I would ask you to look at D857.

21        Do you recognize the signatures on the bottom?

22   A.  I do.

23   Q.  Whose signatures are they?

24   A.  Gena Lankford, Scott Willard and Donya Williams.

25   Q.  What does this document appear to be?

1  A.  A resolution from MNE Services.

2          MR. GINSBERG:  I would offer D857 into evidence.

3          MR. RAVI:  No objection.  Again, not for its truth.

4          THE COURT:  Same instruction applies.

5          (Defendants' Exhibit D857 received in evidence)

6  BY MR. GINSBERG:

7  Q.  I would ask you to look at the fourth "whereas" paragraph

8  and read it to us, please.

9  A.  "The board of directors finds it in the best interests of

10  the company to remove Don Brady as president of the company."

11  Q.  Then the next paragraph.

12  A.  "Don Brady is removed as president of MNE Services, Inc.,

13  effective immediately.  Approved and executed by a majority of

14  the board of directors of MNE Services, Inc. on the 16th day of

15  November 2012."

16  Q.  Without reference to that document, on or about November

17  16, 2012, was Don Brady formally and officially removed as

18  president by the MNE Services board?

19  A.  I believe so, yes.

20  Q.  I would ask you to look at D2729, please.

21          First, I would ask you to look at page 3, the signature

22  page.

23          Do you have it in front of you?

24  A.  Which?

25  Q.  D2729.

1   A.   I have it.

2        I recognize these signatures.

3   Q.   Whose signatures are they?

4   A.   Tom Gamble, myself, and Sarah Lawson.

5   Q.   What does this document appear to be?

6   A.   A board meeting of AMG Services, Inc.

7   Q.   Were you present for this board meeting?

8   A.   I believe I was.

9        MR. GINSBERG:  I would offer Defendants' Exhibit

10  D2729.

11       THE COURT:  Any objection?

12       MR. RAVI:  No objection.

13       THE COURT:  Received.

14       (Defendants' Exhibit D2729 received in evidence)

15  BY MR. GINSBERG:

16  Q.   Mindful of the fact that on the top portion it indicates

17  apparently that there were three lawyers telephonically at this

18  meeting, I am going to ask you questions so you can be careful

19  of not talking about anything that was discussed with them.

20  OK.

21       In Roman numeral III, it talks about new business.  Is that

22  correct?

23  A.   It looks like it does.

24  Q.   It says that Chairman Gamble advised MNES CEO Joe Frazier

25  and Miami tribe CFO Bill Chase of the board's decision-making

1    process for dedication of certain loan company revenues for

2    tribal initiatives, and directed Mr. Frazier and Mr. Chase to

3    advise the board of the status of such dedicated accounts, and

4    of funds required to complete projects."

5        Do you see that?

6    A.   I do.

7    Q.   Do you recall discussions in or about November 2012 where

8    Chairman Gamble and Joe Frazier did in fact discuss the

9    dedication or use of certain loan company revenues for tribal

10   purposes?

11   A.   I believe I recall some of those.

12   Q.   Further, do you recall them both being directed to advise

13   the board of the status the dedicated accounts?

14   A.   Yes, sir.

15   Q.   Does that indicate to you, when it says to advise the

16   board, that they were being told to report back to the board as

17   to how the funds were going to be used?

18   A.   Yes, sir.

19   Q.   Do you recall funds which were the proceeds of the loan

20   business being used for certain tribal purposes?

21   A.   Yes, sir.

22   Q.   What purposes were they used for?

23   A.   According to this document?

24   Q.   According to your recollection.

25   A.   For various different things, like elder benefit,

1   scholarships, back-to-school funds, language revitalization and

2   things to do with cultural revitalization efforts.

3   Q.  Move to D864.

4       Do you recognize the signatures on the bottom of this

5   document?

6   A.  I do.

7   Q.  Whose signatures are those?

8   A.  Tom Gamble, myself, and Sarah Lawson.

9   Q.  What does this document appear to be?

10  A.  A resolution of the board of directors of AMG Services,

11  Inc.

12          MR. GINSBERG:  I would offer D864 in evidence.

13          MR. RAVI:  No objection.  Not for its truth.

14          THE COURT:  Received.

15          (Defendants' Exhibit D864 received in evidence)

16          THE COURT:  Same instruction.

17  BY MR. GINSBERG:

18  Q.  Look at the fourth "whereas" paragraph.

19      "The board finds it is in the best interests of the company

20  to remove Don Brady as a signatory from all company bank

21  accounts."

22      Is that what it says on the document?

23  A.  Yes.

24          THE COURT:  Ladies and gentlemen, that's not for the

25  truth of its content.

1              Go ahead.  Next question.

2    Q.  Let me ask you this.  Did the board in fact remove Don

3    Brady as signatory on the bank accounts?

4    A.  I know that Don was removed from bank accounts.

5    Q.  And you know that separate and apart from this resolution,

6    is that correct?

7    A.  Yes, sir.

8    Q.  In fact, he was terminated, his services were terminated,

9    correct?

10   A.  Yes, sir.

11   Q.  I am going to ask you to look at D2738A.

12        I would ask you to look at the third page, the signature

13   page.  It may be out of order.

14   A.  I will just refer to the screen.

15   Q.  Thank you.

16   A.  I recognize the names.

17   Q.  Whose signatures do you recognize?

18   A.  Tom Gamble, myself, and Sarah Lawson.

19   Q.  What does this document appear to be?

20   A.  AMG Services, Inc., minutes of the board of directors'

21   meeting.

22   Q.  When did it take place?

23   A.  January 24, 2013.

24   Q.  Who was present at the meeting?

25   A.  Chief Gamble, myself, Sarah Lawson, interim CEO president

1    Joe Frazier, and recording secretary Carolyn Williams.

2    Q.  Don Brady was no longer present at the meetings of this

3    board, is that correct?

4    A.  That's correct.

5    Q.  Was that because his services had been terminated?

6    A.  Yes, sir.

7    Q.  I would ask you to look at Roman numeral III, CEO report.

8        Is it fair to say, in summary, that says that interim CEO

9    Joe Frazier --

10           MR. RAVI:  This document is not in evidence, your

11   Honor.

12           MR. GINSBERG:  I would offer D2738A in evidence.

13           THE COURT:  Any objection?

14           MR. RAVI:  No objection.

15           THE COURT:  Received.

16           (Defendants' Exhibit D2738A received in evidence)

17   BY MR. GINSBERG:

18   Q.  Is it fair to say that Roman numeral III indicates, in

19   summary, that interim CEO Joe Frazier advised the board that he

20   continued to maintain full visibility of all MNES and AMG

21   operating accounts with Bay Cities Bank?

22   A.  Yes, sir.

23   Q.  And he reported the balances on the accounts?

24   A.  Yes, sir.

25   Q.  And he advised that Don Brady had been removed as a

1    signatory?

2    A.  Yes, sir.

3    Q.  I would ask you to go to Defendants' Exhibit 2748A.  It may

4    be out of order.

5    A.  2748?

6    Q.  2748A.

7         Do you have that?

8    A.  I believe so.

9    Q.  Do you recognize the signatures on the second page?

10   A.  I do.

11   Q.  Whose signatures are on that page?

12   A.  Chief Gamble, myself, Sarah Lawson, Gena Lankford, Scott

13   Willard and Donya Williams.

14   Q.  For the first three signatures, who was Tom Gamble,

15   yourself and secretary-treasurer Lawson signing for, what

16   business?

17   A.  AMG Services, Inc.

18   Q.  Ms. Lankford, Mr. Willard and Ms. Williams, who were they

19   signing for?

20   A.  MNE Services, Inc.

21   Q.  What do you recognize this document to be?

22   A.  It's the minutes of a special joint meeting of the two

23   boards.

24   Q.  Were there frequent joint meetings of the two boards?

25   A.  Not very often, but yes.

1        MR. GINSBERG:  Your Honor, I would offer D2748A into

2   evidence.

3        MR. RAVI:  No objection.

4        THE COURT:  Received.

5        (Defendants' Exhibit D2748A received in evidence)

6   BY MR. GINSBERG:

7   Q.  I would ask you to look at Roman numeral II under "new

8   business."

9        Under (a), you see where it talks about Bay Cities Bank?

10  A.  I do.

11  Q.  Do you recall what Bay Cities Bank had indicated, if

12  anything, to the tribe about the amount of money that Bay

13  Cities Bank had in the account and what they wanted the tribe

14  to do about it?

15  A.  I think they were trying to liquidate some of the funds.

16  Q.  Whose funds were they?

17  A.  The loan company's funds.

18  Q.  Did they belong to the tribe?

19  A.  I believe so, yes.

20  Q.  In this paragraph it talks about $10 million, correct?

21  A.  Yes, sir.

22  Q.  Then the following paragraph (b) talks about, as a result

23  of this liquidation, what might take place is that fair to say?

24  A.  Yes, sir.

25  Q.  And it says, "The foregoing requirement would place

1   increased administration pressures on the Kansas City operation

2   and will require frequent transfer of funds in and out of the

3   operating accounts to maintain lending operations."  Correct?

4   A.  Yes, sir.

5   Q.  Then on the next page, at the end of Roman numeral II, the

6   last paragraph, it discusses a -- Mr. Frazier advised that he

7   had authorized the final payment of $29 million to BA Services

8   for outstanding fees owed for 2012.

9        Do you see that?

10  A.  I do.

11  Q.  Do you know what that payment was for?

12  A.  I believe it was for use of software.

13  Q.  It was use of software owned by someone else?

14  A.  Scott Tucker.

15  Q.  Was the tribe paying for use of that software over a period

16  of time?

17  A.  We paid for use, yes.

18  Q.  Was that one of the services that Scott Tucker or his

19  company provided to the tribe?

20          MR. RAVI:  Objection to leading.

21          THE COURT:  Avoid leading, please.

22  Q.  Had Scott Tucker or one of his companies provided services

23  to the tribe in terms of the payday lending business?

24  A.  Yes.

25  Q.  Was one of those services software use?

1   A.   Yes.

2   Q.   Was BA Services, to the best of your knowledge, an entity

3   that had software that was provided to the tribe?

4             MR. RAVI:  Objection.

5             THE COURT:  Basis.

6             MR. RAVI:  Leading.

7             THE COURT:  OK.  Mr. Ginsberg, please avoid leading.

8   Q.   What did BA Services provide to the tribe?

9   A.   They provided software for the lending company.

10  Q.   I am going to ask you to look at Defendants' Exhibit D877.

11       Do you recognize what this document is?

12  A.   I'm not sure what it is, sir.  It looks like a banking

13  document.

14  Q.   You have never seen this before?

15  A.   I have not, that I recall.

16  Q.   Do you recognize on the third page of the document, where

17  there are some signatures underneath the Roman numeral V?

18  A.   Yes, sir.

19  Q.   Do you recognize the signature on the top line?

20  A.   Joe Frazier.

21  Q.   Do you recognize the name of the person who notarized the

22  document?

23  A.   Gena Lankford.

24  Q.   Without reference to this document, do you recall a time in

25  or about March 2013 where Blaine Tucker was given trading

1   authorization or power of attorney to act on behalf of the

2   tribe?

3   A.  I don't recall that.

4   Q.  As of March 2013, what were your positions with the tribe?

5   A.  I believe I was still second chief.

6   Q.  You simply don't recall that?

7   A.  I do not.

8   Q.  Do you know who Gary Patton is?

9   A.  I know his name.

10  Q.  Beyond knowing his name, do you know who he is?

11  A.  I know he worked at the Kansas City office at the loan

12  company.

13  Q.  Do you know if he was ever given authorization by the

14  tribe, by Joe Frazier, trading authorization and power of

15  attorney on behalf of the tribe in March of 2013?

16          MR. RAVI:  Objection.  Foundation and leading.

17          MR. GINSBERG:  I am just asking if he knows.

18          THE COURT:  Sustained.

19          Rephrase it.

20  Q.  Do you know who, if anyone, was given trading authorization

21  and power of attorney by Joe Frazier on behalf of the tribe in

22  March of 2013?

23  A.  I do not know.

24          MR. GINSBERG:  One second, your Honor.

25  Q.  I ask you to look at Defendants' Exhibit D882, please.

1    A.   882?

2    Q.   882.

3         Do you recognize the signatures on the bottom of that page?

4    A.   I do.  Gena Lankford, Scott Willard and Donya Williams.

5    Q.   Do you recognize what this document is?

6    A.   A resolution of the board of directors of MNE Services,

7    Inc.

8              MR. GINSBERG:  I offer Defendants' D882 into evidence.

9              THE COURT:  Any objection?

10             MR. RAVI:  No objection, subject to not being offered

11   for the truth.

12             THE COURT:  Subject to the same instruction, ladies

13   and gentlemen.

14             (Defendants' Exhibit D882 received in evidence)

15   BY MR. GINSBERG:

16   Q.   I would ask you to look at the fourth "whereas" paragraph,

17   where it says, "whereas, the board of directors."

18        Do you see that?

19   A.   I do.

20   Q.   Can you read that to us, please.

21   A.   "Whereas, the board of directors finds it is in the best

22   interests of the company to rescind Resolution 13-01 and to

23   adopt Resolution 13-02, granting limited trading and

24   disbursement authorization to Joe Frazier, Blaine Tucker and to

25   Natalie Dempsey, or either of them, to make trades in and

1    disbursements from accounts owned by the company and which are

2    held and/or managed by Central States Markets, LLC, subject to

3    limitations on the types of trades which can be made and

4    subject to limiting disbursements from said account into

5    accounts owned by the company."

6            THE COURT:  I have given a little bit of latitude to

7    both sides to read from documents, but it's to be avoided when

8    the document is in evidence.  It's up on the screen and the

9    jurors can see it.

10           MR. GINSBERG:  I understand.

11   Q.  And to the best of your recollection, in March of 2013,

12   without reference to this document, were you aware that the MNE

13   Services board granted authority to Joe Frazier, Blaine Tucker

14   and Natalie Dempsey to act on its behalf in relation to certain

15   banking activities?

16           MR. RAVI:  Objection to leading.

17           THE COURT:  One second, please.

18           Sustained.

19   Q.  Did you become aware independent of this document, in your

20   role as second chief or as a member of any of the boards?

21   A.  I don't recall.

22   Q.  You don't recall?

23   A.  I don't recall.

24   Q.  Does looking at D882 refresh your recollection?

25   A.  Not really.  I don't recall -- I don't recall this.

HA38TUC2                    Lankford - Direct

1              THE COURT:  Excuse me a second.

2              Go ahead.

3    Q.  I would ask you to look at Defendants' D883.

4        Do you recognize the signatures on the second page?

5    A.  Gena Lankford, Scott Willard, and Donya Williams.

6    Q.  You recognize what this is?

7    A.  A resolution of the board of MNE Services, Inc.

8              MR. GINSBERG:  I would offer Defendants' Exhibit D883.

9              THE COURT:  Any objection?

10             MR. RAVI:  No objection.  Again, not for its truth.

11             THE COURT:  Subject to the same instruction, received.

12             (Defendants' Exhibit D883 received in evidence)

13   BY MR. GINSBERG:

14   Q.  I would ask you just to look down at the "now, therefore,

15   be it resolved portion."

16       Do you see that?

17   A.  Yes.

18   Q.  Without reading the whole thing, did the board resolve that

19   certain individuals were authorized to open accounts and act on

20   behalf of the tribe?

21   A.  It appears to be that's what they did.

22   Q.  In the paragraph before, "now, therefore, be it resolved,"

23   the "whereas" paragraph, did the board find it in the best

24   interests of the company to appoint Joe Frazier and Blaine

25   Tucker as signatories?

HA38TUC2                    Lankford - Direct

1   A.  It appears to be so, yes.

2   Q.  And now we are going to D886.

3       Do you recognize the signatures on the second page?

4   A.  I do.

5   Q.  Whose signatures are those?

6   A.  Myself, Sarah Lawson, Dustin, Donya Williams, Scott

7   Willard.

8   Q.  What does this document appear to be?

9   A.  It's a resolution of the Miami Tribe of Oklahoma.

10          MR. GINSBERG:  I would offer Defendants' D886.

11          MR. RAVI:  No objection, not for its truth.

12          THE COURT:  Received subject to the same instruction.

13          (Defendants' Exhibit D886 received in evidence)

14  BY MR. GINSBERG:

15  Q.  What was the purpose of this resolution?

16  A.  Because I was elected as chief of the Miami tribe, there

17  was a resolution changing my position on the AMG board, it

18  appears.

19  Q.  What position did you assume based on this resolution?

20  A.  Chairman of the board.

21  Q.  Did you in fact assume that position?

22  A.  I did.

23  Q.  Now I would like to go to D894.

24      You have it up on the screen.

25      I would ask you to look at the second page of the document,

1    the signature page.  Do you recognize the signatures?

2    A.  Myself, Dustin Olds and Sarah Lawson.

3    Q.  What does this document appear to be?

4    A.  A resolution of the board of directors of AMG Services,

5    Inc.

6           MR. GINSBERG:  I would offer Defendants' D894 in

7    evidence.

8           MR. RAVI:  No objection, with the same instruction.

9           THE COURT:  Received with the same instruction.

10           (Defendants' Exhibit D894 received in evidence)

11    BY MR. GINSBERG:

12    Q.  Without reading through it, if you can just glance at it,

13    does this resolution appear to relate to various actions,

14    rights, privileges, immunities, regarding AMG?

15    A.  Yes, it appears.

16    Q.  Now, in addition, does D894, the resolution 13-03, if you

17    read it, does it approve agreements regarding the loan

18    operation of the tribe?

19    A.  It appears to be.

20    Q.  This is the tribal entity that's approving it, correct?

21    A.  Yes.

22    Q.  I would ask you to go to D896, please.

23           Do you recognize the signatures on the second page?

24    A.  I do.  Myself, Dustin Olds, and Sarah Lawson.

25    Q.  Do you recognize what this is?

1    A.  Yes, a resolution of the AMG board.

2            MR. GINSBERG:  I would offer Defendants' D896, your

3    Honor.

4            THE COURT:  Any objection?

5            MR. RAVI:  No objection, with the same instruction.

6            THE COURT:  Same instruction given.  Received.

7            (Defendants' Exhibit D896 received in evidence)

8    BY MR. GINSBERG:

9    Q.  Again, in summary, does this resolution speak to rights,

10   privileges and immunities concerning the operation of AMG?

11   A.  Yes, sir, it appears to be.

12   Q.  Does it also discuss, in the third from the bottom

13   "whereas" clause, talk about the tribe owning, servicing and

14   operating Internet lending portfolios and activities?

15           MR. RAVI:  Objection to reading the "whereas" clause.

16   It's not being offered for the truth.

17           MR. GINSBERG:  It's in evidence.  I am just reading.

18           THE COURT:  Put a question.  It's not received for the

19   truth of its content.

20           If you want to ask the witness, when you saw this,

21   when you read this, what did you do?  Or if you want to ask a

22   question which parallels the statement, but ask whether or not

23   the fact is true, I will allow it.  OK?

24   Q.  Did the board of directors of AMG Services authorize

25   certain entities of the tribe to own, service and operate

HA38TUC2                    Lankford - Direct

1    Internet lending portfolios and activities?

2    A.  Yes, sir.  I believe so.

3    Q.  D897.  Third page first, please, the signature page.

4        Do you recognize the signatures?

5    A.  I do.

6    Q.  Whose signatures are they?

7    A.  Myself and Sarah Lawson.

8    Q.  What does this appear to be?

9    A.  It appears to be a resolution.  It appears to be an AMG

10   resolution.

11           MR. GINSBERG:  I would offer Defendants' Exhibit 897.

12           THE COURT:  Any objection?

13           MR. RAVI:  No objection, with the same instruction.

14           THE COURT:  Received.  Same instruction.

15           (Defendants' Exhibit D897 received in evidence)

16   BY MR. GINSBERG:

17   Q.  Without reference to this document, at this point in time,

18   on August 11, 2013, were you chief of the tribe?

19   A.  Yes, sir.

20   Q.  Were you chair of certain committees of the tribe?

21   A.  Yes, sir.

22   Q.  Were you a member of other committees of the tribe?

23   A.  I was removed when I became chief, I was removed from the

24   task commission.

25   Q.  Were you still on the AMG Services board?

1    A.  I was.

2    Q.  In the position that you were in at that time, do you

3    recall AMG and MNES entering into a settlement agreement with

4    Scott Tucker and BA Services?

5    A.  I know there was negotiations.

6    Q.  There were negotiations about it?

7    A.  Yes.

8    Q.  Is that what you said?

9    A.  Yes.

10   Q.  You recall that independent of this document, is that

11   correct?

12   A.  Yes, sir.

13   Q.  Did you play any role in those negotiations?

14   A.  I did not.

15   Q.  That was done by either the CEO, CFO, or someone else?

16        MR. RAVI:  Objection to leading.

17        THE COURT:  Rephrase.

18   Q.  Who were the negotiations done with?

19   A.  I believe Joe Frazier.

20   Q.  What was his title at that time?

21   A.  CEO.

22   Q.  D899, please.  Second page.

23        Do you recognize the signatures?

24   A.  I do.  Myself and Sarah Lawson.

25   Q.  You recognize what this document is?

1   A.  It appears to be, I am not quite so sure, because the

2   resolution doesn't say AMG, but that seems to be what it's

3   talking about.

4   Q.  You're saying it appears to be a resolution regarding AMG?

5   A.  Yes.

6           MR. GINSBERG:  I would offer Defendants' Exhibit D899,

7   your Honor.

8           THE COURT:  Any objection?

9           MR. RAVI:  No objection, subject to the same

10  instruction.

11          THE COURT:  Subject to the same instruction, received.

12          (Defendants' Exhibit D899 received in evidence)

13          THE COURT:  Ladies and gentlemen, we will take our

14  mid-morning break.

15          Please do not discuss the case among yourselves or

16  with anyone.

17          We will be back in action in ten minutes.  Thank you.

18          (Jury exits courtroom)

19          (Continued on next page)

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  You may step down.

3          (Witness excused)

4          THE COURT:  We are in recess.

5          MR. GINSBERG:  Your Honor, when you come back, you

6     wanted me to raise an issue.

7          THE COURT:  You can raise it right now.

8          This is with regard to the exhibit that I sustained

9     the objection to?

10         MR. GINSBERG:  There are three similar exhibits where

11    Mr. Lankford was not present at the meetings.  He recognized

12    signatures and he recognized generally what they were.  It's

13    our position that when Carolyn Williams was on the witness

14    stand, through the questions of Mr. Bath, he established that

15    these minutes were kept in the regular course of the business

16    of the tribe, and she testified that she would take notes or

17    sometimes she recorded things and eventually she would type

18    them up and present it to the board at the next meeting for

19    their approval.  So we believe that these are, based upon

20    that --

21         THE COURT:  So it has nothing to do with this witness.

22    You're offering it as a business record.

23         MR. GINSBERG:  As a business record, established

24    through Ms. Williams, and I wanted to ask some questions, once

25    it came into evidence, of this witness, even though he wasn't

1   present at the meeting.

2          THE COURT:  Let me hear the government's position.

3          MR. RAVI:  Your Honor, the defendants had an

4   opportunity to present these board minutes to Ms. Williams and

5   ensure that these were parts of the records that she maintained

6   in the ordinary course, and I don't believe that these

7   particular minutes were done with Ms. Williams when she was on

8   the stand.

9          THE COURT:  But you have no objection if Mr. Ginsberg

10  calls a record custodian?  Is that what you're telling me?

11  You're going to require him to call a records custodian?

12         MR. RAVI:  Your Honor, we are not going to make him

13  call a records custodian.

14         THE COURT:  So the objection is withdrawn.

15         Received.  Happiness prevails.  Have a nice break.

16         (Recess)

17         THE COURT:  Bring our jurors in, please.

18         (Continued on next page)

19

20

21

22

23

24

25

1              (Jury present)

2       DOUGLAS GLENN LANKFORD, resumed.

3              THE COURT:  We are back in action.  Please be seated.

4              Mr. Ginsberg, you can pick up where you left off.

5              MR. GINSBERG:  Thank you, your Honor.

6              With the court's permission, based upon the ruling

7       that your Honor made and on agreement with the government as to

8       additional documents, the defendants offer Defendants' D2710,

9       which is two pages long, D2714, which is three pages long,

10      D2717, which is two pages long, and D2719, which is two pages

11      long, all of which are minutes of the board of directors of MNE

12      Services on various dates.

13             THE COURT:  And you discussed this with opposing

14      counsel and they have no objection.

15             MR. RAVI:  No objection.

16             THE COURT:  Received.  Thank you.

17             (Defendants' Exhibits D2710, D2714, D2717 and D2719

18      received in evidence)

19      BY MR. GINSBERG:

20      Q.  Mr. Lankford, did the Miami Nation Enterprises have an

21      annual report prepared for it at the end of each fiscal year in

22      September?

23      A.  Yes.  They were supposed to.

24      Q.  Was the annual report presented to the board of directors

25      at the Miami Nation Enterprises?

1    A.  I assume it was presented to the MNE board.

2    Q.  And to your recollection, was the annual report prepared in

3    2013 by the chief executive officer, Joe Frazier?

4    A.  I assume that was his job.

5    Q.  There is a document, Defendants' Exhibit 921A, in front of

6    you.  If you need to refresh your recollection as to who it was

7    presented by, you can look at the first page, and I will ask

8    you, does that refresh your recollection as to who prepared it

9    and presented it?

10   A.  Yes, sir.

11   Q.  Who --

12   A.  Joe Frazier.

13   Q.  -- presented it?

14   A.  Joe Frazier was chief executive officer.

15   Q.  What was the purpose of the annual report?

16   A.  I believe this report is supposed to be submitted -- they

17   are supposed to do this report and submit it to the tribe, the

18   Miami tribe.

19   Q.  What would be contained in the annual report?

20   A.  Financial statements, different things about MNE's year.

21   It's an annual report of how MNE's businesses were doing.

22        (Continued on next page)

23

24

25

1   BY MR. GINSBERG:

2   Q.  And I'd ask you to look at the last page of the document,

3   page 21, and ask if you recognize the signature on the last

4   page.

5   A.  Joe Frazier.

6   Q.  And I'd ask you if you recognize what Defendants' Exhibit

7   D921A is.

8   A.  Yes.  It's a report of MNE, annual report.

9           MR. GINSBERG:  Your Honor, I wish to offer certain

10  pages of the annual report based upon prior discussions that

11  we've had.

12          THE COURT:  Did you show them to opposing counsel?

13          MR. GINSBERG:  I believe they've been provided with a

14  copy earlier.

15          THE COURT:  Of the pages?

16          MR. GINSBERG:  Of all the pages, yes.

17          THE COURT:  No, that's not the point, not all the

18  pages.

19          MR. GINSBERG:  All the pages that we intended to

20  introduce.

21          THE COURT:  All right.  Any objection?

22          MR. RAVI:  Your Honor, may I ask a couple questions of

23  the witness?

24          THE COURT:  Sure.

25

1  VOIR DIRE EXAMINATION

2  BY MR. RAVI:

3  Q.  Mr. Lankford, do you know with respect to this particular

4  document who it was prepared by?

5  A.  Well, it's presented by Joe Frazier.  I'm assuming he's got

6  help from other people to help build this document, if I

7  understand what you're asking me.

8  Q.  Well, you're assuming, but are you just assuming that based

9  on what you see in front of you?

10  A.  Well, no.  No.  It would have been Joe Frazier.  I'm sorry,

11  I probably shouldn't have used "assume."  It would have been

12  Joe Frazier that did present the document.  He may have had

13  help preparing the document.

14  Q.  And you have a specific recollection as to this particular

15  document being prepared by Joe Frazier as part of the annual

16  report?

17  A.  I don't know that I per se remember this document, but it

18  seems similar to other documents that have been presented.  It

19  seems as -- it appears as it should be.  I just don't know that

20  I recall -- actually can recall this exact document.

21         MR. RAVI:  No objection, your Honor.

22         THE COURT:  All right.  Received.

23         (Defendants' Exhibit D921A received in evidence)

24         THE COURT:  Ladies and gentlemen, I want to clarify a

25  point on which I may have been misunderstood.

1          When a resolution comes in, the resolution has

2     "whereas" clauses.  The "whereas" clauses recite circumstances.

3     They cite facts, but what is adopted and what you may consider

4     are the content of the resolution, which is not preceded by a

5     "whereas" but is the act, and you may take that as an action

6     taken.  But the "whereas" could say on a resolution, "Whereas

7     the moon is made of green cheese"; "Whereas I hope to win the

8     lottery next week"; "Whereas I won the lottery last week."

9          Those things which purport to recite reasons for

10    adopting the resolution may not be considered for the truth of

11    their content.  That is not evidence that the facts in the

12    "whereas" clauses are true.  However, the resolution you may

13    consider.  The resolution is the operative act, and you can

14    consider it and give it such weight as you, the jury, choose is

15    appropriate.

16         When we're talking about the resolutions, we're

17    drawing a distinction between the clauses which are the prelude

18    to the resolution and the resolution itself, and as to the

19    resolution itself, you can give that such weight as you choose.

20    You may not consider the content of the "whereas" clauses as

21    proof of the facts, proof of the statements made therein.

22         All right?  I hope that clarifies it.

23         Next question.

24    BY MR. GINSBERG:

25    Q.  I refer you to the first page of 921A.  Would that be the

Ha3Wtuc3                    Lankford - Direct

1   cover page of the report?

2   A.  Yes, sir.

3   Q.  And then I'm going to refer you to another page right after

4   it that doesn't have a number one or two, but it ends with a

5   series of numbers, 32636.  Do you see that?

6   A.  Yes, sir.

7   Q.  The next page after the cover page.

8   A.  Yes, sir.

9   Q.  Could you tell us what that page is demonstrating?

10  A.  Seems to be an organizational chart.

11  Q.  Does it show the various boards and committees underneath

12  the Miami Tribe of Oklahoma?

13  A.  Yes, sir.

14  Q.  I'd ask you to go to the next page, which is numbered page

15  16.  Could you just read the top line first?

16  A.  "Highlights for the tribe's short-term loan business in

17  Kansas City of the past year are set forth below."

18  Q.  And the next paragraph.

19  A.  "In August 2013, the business relationships between the

20  tribe's short-term lending entities and the management and

21  software providers in Kansas City were formally memorialized

22  with a set of agreements.  A good foundation has been laid

23  going forward."

24  Q.  Next paragraph, please.

25  A.  "The CPA firm engaged by the tribe has conducted and

1    continues to perform audits on the books for each of the

2    tribal-owned short-term lending companies."

3    Q.  Skip the next one and go to the financial results and just

4    read that.

5    A.  "The financial results for the nine months ended September

6    30, 2013, are summarized as follows:

7         "Total gross revenues were $233,370,000;

8         "Net income was 71,450,000;

9         "Total assets were 189,490,000;

10        "Total liabilities were 47,000 -- 47 million, sorry, 200;

11        "The tribal equity in the short-term loan business was

12   142,200,000."

13   Q.  And finally, the last paragraph.

14   A.  "The success of the short-term lending operations of the

15   Miami tribe has provided MNE with sustained resources that can

16   and are being used for fund investment opportunities.  These

17   investments give the tribe the financial resources necessary to

18   insure our long-term prosperity and financial stimuli."

19   Q.  And then would it be fair to say that the next two pages,

20   17 and 18, are financial reports with a series of numbers on

21   them?

22   A.  Yes, sir.

23   Q.  And would it be typically included in the annual report?

24   A.  Yes, sir.

25   Q.  And the last page, 21, appears, which has been already

1    referenced, signed by Joe Frazier, correct?

2    A.  Yes, sir.

3    Q.  Now, did there come a time when AMG Services or MNE

4    Services entered into an agreement with the United States

5    Attorney's Office?

6    A.  There did.

7    Q.  And without going into the details about any of the things

8    you discussed with your lawyers, was that something that your

9    lawyers were involved in negotiating?

10   A.  Yes, sir.

11   Q.  And entering that agreement with the United States

12   Attorney's Office, what is your understanding of the

13   nonprosecution agreement?

14   A.  That the tribe would not -- the business entities of the

15   tribe would not be prosecuted.

16   Q.  In addition to that portion of it, was the tribe required

17   to forfeit any money to the government?

18   A.  Yes, they were.

19   Q.  And how much was the tribe required to forfeit?

20   A.  Around $48 million.

21   Q.  And how much was the tribe permitted to keep of the money

22   that it had earned from the short-term lending?

23   A.  Probably in the range of 12 to -- 12 or so million.

24   Q.  And that was the money that was on hand in 2016, when the

25   agreement was signed, is that correct?

 1    A.  Yes, sir.

 2    Q.  And that $12 million was money earned as a result of the

 3    short-term lending business by the tribe, correct?

 4              THE COURT:  If you know.

 5              THE WITNESS:  I don't know that all of it was, but I

 6    know a portion of it was, your Honor.

 7              THE COURT:  OK.  Thank you.

 8    BY MR. GINSBERG:

 9    Q.  Now, did you sign the nonprosecution agreement?

10    A.  I did.

11    Q.  And did you sign -- in what capacity did you sign?  And if

12    you need any reference, you can go to defendant's D2052.

13              MR. GINSBERG:  I think the better way to do it, your

14    Honor, is I offer that.

15              THE COURT:  All right.  Any objection?

16              That being?

17              MR. GINSBERG:  Defendants' Exhibit D2052.

18              THE COURT:  Any objection?

19              MR. RAVI:  No objection.

20              THE COURT:  Received.

21              (Defendants' Exhibit D2052 received in evidence)

22    BY MR. GINSBERG:

23    Q.  When you signed this agreement, did you read the entire

24    agreement?

25    A.  Yes, sir, I believe so.

1   Q.  And did you read the attachment, the exhibit A statement of

2   facts that's attached to the agreement?

3   A.  Yes, sir.

4   Q.  And I'd ask you specifically to look at the final page,

5   which is exhibit A, and paragraph 4.  Do you see that?

6   A.  Yes, sir.

7   Q.  Now, when you signed this nonprosecution agreement and

8   paragraph 4 was contained in the statement of facts, did you

9   sign it because you believed paragraph 4 to be true or because

10  someone else told you it was true?

11  A.  I signed it because I believed it to be true.

12  Q.  And what you believed to be true was that in certain

13  declarations that certain individuals made, they overstated

14  involvement of the tribe or their involvement in the payday

15  lending business, is that correct?

16  A.  That's correct, sir.

17  Q.  But it does not say, in paragraph 4 or anywhere else, that

18  the tribe was not involved in the payday lending business, does

19  it?

20        THE COURT:  Sustained as to form.

21  Q.  Is there any other paragraph in this document that

22  indicates something that the tribe did that you believe was

23  wrong?

24  A.  I -- I don't understand your question.

25  Q.  Paragraph 4 talks about something you believe was done that

 1  was not correct, is that right?

 2  A.  Yes.

 3  Q.  Is there any other paragraph in the statement of facts, or

 4  otherwise in the document, that you signed, that indicates a

 5  belief on your part of anything else you believe the tribe had

 6  done wrong?

 7          MR. RAVI:  Objection to form, your Honor.

 8          THE COURT:  Sustained.

 9  Q.  Was it -- did you sign this document based upon the advice

10  of counsel?

11          MR. RAVI:  Objection.

12          THE COURT:  Sustained.

13  BY MR. GINSBERG:

14  Q.  Did you review the entire exhibit A statement of facts?

15  A.  What was that?

16  Q.  Did you review the entire exhibit A statement of facts?

17  A.  Yes.

18  Q.  Did you request or did the government request that you add

19  anything to that statement of facts?

20  A.  Than what we signed?  I don't think so.

21  Q.  And as to paragraph 4, the overstatements that you're

22  referring to, were they principally done by Don Brady?

23          MR. RAVI:  Objection as to leading.

24          THE COURT:  Rephrase it, please.

25  Q.  Who were the overstatements principally done by that you're

1   referring to in paragraph 4?

2           THE COURT:  Rephrase your question.

3   Q.  In paragraph 4, you're referring to overstatements by

4   certain individuals or representatives of the tribe, is that

5   correct?

6           THE COURT:  Why don't you read paragraph 4, sir.  Take

7   your time and read paragraph 4.

8           THE WITNESS:  All right, sir.

9           THE COURT:  OK.  Now ask your question.

10  BY MR. GINSBERG:

11  Q.  Were the overstatements that you're referring to in that

12  paragraph principally done by Don Brady?

13  A.  Yes, sir.

14  Q.  And in that paragraph, or anywhere else in the document,

15  did you say that Don Brady or any other representative of the

16  tribe had made declarations that were completely false?

17          MR. RAVI:  Objection.

18          THE COURT:  Yes.  This is not cross-examination.

19  Sustained as to form.

20          MR. GINSBERG:  I have nothing further at this time.

21          THE COURT:  OK.  Mr. Bath.

22          MR. BATH:  Eli, can we put 2052 back up, please.

23  FURTHER DIRECT EXAMINATION

24  BY MR. BATH:

25  Q.  Mr. Lankford, it's going to be up on the screen.  Let me

1   know if you see that or you don't see it.

2   A.  OK.

3   Q.  This is the document Mr. Ginsberg asked you about a minute

4   ago.  Do you recall that?

5   A.  I do.

6           MR. BATH:  Can we go to the signature page, please,

7   and that's 2 or 3.

8   Q.  We see that you signed, correct?

9   A.  That's correct.

10  Q.  Ms. Williams signed, is that correct?

11  A.  That's correct.

12  Q.  And you signed on behalf of AMG, correct?

13  A.  That's correct.

14  Q.  And Ms. Williams signed on behalf of MNES, correct?

15  A.  That's correct.

16  Q.  All right.  And then there's a Guy Petrillo who signed as

17  attorney for AMG and MNES, is that correct?

18  A.  That's correct.

19          MR. BATH:  Thanks.  You can take that down.

20  Q.  I understand this agreement, as you told us, is that you

21  forfeited -- you being the tribe -- forfeited about $48

22  million?

23  A.  Yes, sir.

24  Q.  And kept about $12 million?

25  A.  Yes, sir.

1    Q.  All right.  And that was as of 2016, was it not?

2    A.  That's correct.

3    Q.  We saw the financial statements that Joe Frazier presented

4    in 2013, just before that document.  Do you remember that?

5    A.  Yes, sir.

6    Q.  And you remember that document, and I can put it up for you

7    if you need it, that showed that the tribe had tens of millions

8    of dollars, did it not?

9            THE COURT:  There was an audibility issue.  That the

10   tribe had?

11           MR. BATH:  Tens of millions of dollars.

12           THE COURT:  OK.  Go ahead.

13   A.  Yes.

14   Q.  All right.  Is it fair to say, between 2013 and the time of

15   the agreement you made with the U.S. Attorney's Office, that

16   the tribe had spent some of that money?

17   A.  Yes, sir.

18   Q.  You had bought lots of businesses, the tribe had, hadn't

19   you?

20   A.  It had bought some businesses, yes, sir.

21   Q.  Right.  And can you give an estimate, as chief of the

22   tribe, how much money you spent on buying businesses from 2013

23   to 2016?

24   A.  I really -- I can't.  I don't even know how to ballpark

25   that --

1  Q.  OK.

2  A.  -- because there's a lot, a lot of things involved in those

3  business purchases and things.

4  Q.  All right.  Can you recall and account for us the

5  businesses that you did buy between 2013 and 2016?

6  A.  Most of them, I think, were purchased -- yes, there was CK

7  Construction, Carnahan-White, Excel Utility, TSI-Global, Ohio

8  Ambulance Company, BJ Tidwell Enterprises and Hoffman

9  Countertops, I believe.

10 Q.  Those ones you've listed for us were purchased before 2016?

11 A.  Yes.

12 Q.  All right.  And sometime in the range of '13 to '15?

13 A.  Yes.

14 Q.  2013 to 2015, correct?

15 A.  Yes, sir.

16 Q.  OK.  All right.

17      Did there come a time that the tribe got out of the lending

18 business?

19 A.  It did.

20 Q.  Do you know when that was, year first?

21 A.  It was sometime in 2014, I believe.

22 Q.  You don't you know if it was early or late?

23      Fair enough.  OK.  Just sometime in 2014, correct?

24 A.  Yes.

25           THE COURT:  Ladies and gentlemen, you should be aware

1    that the indictment in this case charges a conspiracy from at

2    least in or about 1997 up to and including in or about August

3    2013.  Any evidence of conduct after August 2013 is not to be

4    considered as proof of the charges in the indictment.  It is

5    not conduct that is alleged to be unlawful in any respect, and

6    it may not be considered by you as proof of the charges in the

7    indictment, nor is it a valid comparison, because you're not to

8    speculate as to why any conduct after August 2013 is not

9    included in the charges.  That's just not something that's

10   before you in this case.

11             All right, ladies and gentlemen?

12             Go ahead.

13             MR. BATH:  Thank you, Judge.

14             Eli, could we please put up 854.

15   Q.  Is 854 up on your screen, Mr. Lankford?

16   A.  Yes, sir.

17   Q.  You may recall this is one of the numerous resolutions you

18   saw on direct examination.  Do you recall that?

19   A.  Yes, sir.

20   Q.  All right.  And this, as we talked about earlier, has these

21   first six "whereas" clauses, correct?

22   A.  Yes, sir.

23   Q.  Then after the last "whereas" clause, it says, it now

24   therefore be resolved, "Joe Frazier is appointed as signatory

25   on the following bank accounts at Central States Capital

1  Market."  Do you see that?

2  A.  I do.

3  Q.  Then below that, they list a number of accounts --

4          MR. BATH:  Thank you, Eli.

5  Q.  -- portfolios at Central States, correct?

6  A.  Yes, sir.

7  Q.  Independent of 854, are you aware that, in fact, the tribe

8  had bank accounts at Central States?

9  A.  I knew we had bank accounts.  I'm not sure I knew Central

10  States.

11  Q.  You probably don't -- you don't recall the names of the

12  banks?

13  A.  The one kind of jogged my memory, but I can't remember what

14  document it was on.

15  Q.  OK.  Fair enough.  You don't have information to think you

16  didn't have accounts at Central States, did you?

17  A.  No, sir.

18  Q.  All right.  Fair enough.

19      And this resolution that therefore be resolved is that

20  you're putting Joe Frazier on your account, on the tribal

21  account, correct?

22  A.  Yes, sir.

23  Q.  Because it's your account, right?

24  A.  Yes, sir.

25  Q.  Because as the owner of the bank account, you can put

1  people on and you can take people off, right?

2  A.  Yes, sir.

3  Q.  And we saw that with a number of resolutions.

4       MR. BATH:  You can take that down.  Thanks, Eli.

5  Q.  We saw that with a number of resolutions, because you own

6  the accounts, you put people on and you take them off, right?

7  A.  Yes, sir.

8  Q.  Just like you might do on a personal bank account, right?

9  A.  Yes, sir.

10      MR. BATH:  855, please, Eli.

11 Q.  Let me know when that's on your screen, sir.

12 A.  It's there.

13 Q.  Down there after the "whereas" clauses, "therefore, be it

14 resolved," it talks about NEMS --

15      MR. BATH:  No.  Above that.  I'm sorry.  Two "be it

16 resolveds."  Thank you.

17 Q.  It talks about, that the tribe wanted some return of funds.

18 Do you remember that?

19 A.  I see that.

20 Q.  And that's not because any of those firms are doing a bad

21 job; they just were holding money for the tribe, is that right?

22 A.  That's -- I'm -- I --

23 Q.  If you know.

24 A.  I don't know.

25 Q.  Fair enough.  Do you know after this date, and the date of

Ha3Wtuc3                    Lankford - Direct

1    this --

2              MR. BATH:  Could we go to the top.  No, not the top,

3    Eli.  I'm sorry.  Go down.  Maybe it's the second page.

4    Q.  You see the date is the 16th of November 2012?

5    A.  Yes, sir.

6    Q.  Right.  Do you recall that after that date, Tim Muir's firm

7    continued to do work for AMG?

8    A.  I don't know.

9    Q.  OK.  Fair enough.

10             MR. BATH:  If we could look at 2738A, please, Eli.

11   Q.  I'm going to put that up for you, Mr. Lankford.  Let me

12   know when it's there.

13   A.  It's there.

14   Q.  All right.  This is an AMG board meeting, January 24 of

15   '13, correct?

16   A.  Yes, sir.

17             MR. BATH:  If you go to the second page, please, Eli.

18   Could we go down to the "old business (a)" and just highlight

19   that paragraph, please.

20   Q.  Mr. Frazier is the CFO at the time, is that correct?

21   A.  Yes.

22             MR. BATH:  And could we go to the next page.  Thank

23   you, Eli.

24             Finally, if we could go to 833.

25   Q.  Let me know when you have that, Mr. Lankford.

1          MR. BATH:  Oh, I'm sorry.  If I could just have one

2     second, Judge.  I apologize.  It's 883.

3          I'm sorry, Mr. Lankford.

4          If we could blow up the last two lines of that

5     document.

6     Q.  This is, again, a resolution.  Do you see that,

7     Mr. Lankford?

8     A.  I do.

9     Q.  I want to blow up a certain section and there's another

10    name of a bank account there, First International Bank.  Do you

11    see that?

12    A.  I do.

13    Q.  And that's under the resolved portion of this document, is

14    it not?

15    A.  Yes, sir.

16    Q.  Does that trigger your memory that the tribe had a bank

17    account at First International?

18    A.  I don't recall that bank account.

19          MR. BATH:  Fair enough.  I understand.  Thank you so

20    much.

21          That's all I have, Judge.

22          THE COURT:  All right.

23          You may cross-examine.

24          MR. RAVI:  Thank you.

25    CROSS-EXAMINATION

Ha3Wtuc3                    Lankford - Cross

1    BY MR. RAVI:

2    Q.   Good afternoon, Mr. Lankford.

3    A.   Good afternoon.

4    Q.   Now, you first learned about the tribe's involvement in

5    payday lending when you were IT administrator, correct?

6    A.   Yes, sir.

7    Q.   That was approximately after 2002, right?

8    A.   Sometime in there, yeah.

9    Q.   And you didn't know much about the loan business at that

10   time, right?

11   A.   No, sir.

12   Q.   And you weren't involved in the decision to enter that

13   business, right?

14   A.   I was not.

15   Q.   And all you knew was that there was this lending business

16   and that Don Brady was involved in it, right?

17   A.   Yes, sir.

18   Q.   And you mentioned that while you were IT administrator, you

19   mentioned during direct that you had received a couple

20   computers, right?

21   A.   Yes, sir.

22   Q.   Those were basically personal-use computers, correct?

23   A.   They were, they were computers that were very similar to a

24   home PC.

25   Q.   And you don't know how those computers were involved in the

1    loan business, right?

2    A.  I do not.

3    Q.  To your knowledge, they weren't involved in any processing

4    of loans, correct?

5    A.  I don't know what they did.

6    Q.  And also, while you continued to be IT administrator, what

7    you did know about the loan business was that it wasn't

8    operated at the tribe, right?

9    A.  I knew it was based in Kansas City.

10   Q.  It was based in Kansas City, right?

11   A.  Yes, sir.

12   Q.  And it was being operated by Scott Tucker, right?

13   A.  Yes, sir.

14   Q.  And it was being managed by Scott Tucker and other people

15   working for Scott Tucker, right?

16   A.  Yes, sir.

17   Q.  And you also knew that the loan business was important to

18   the tribe because it generated money, right?

19   A.  Yes, sir.

20   Q.  And Chief Gamble was the chief at that time, right?

21   A.  He was.

22   Q.  And you knew, while you were IT administrator, that the

23   loan business was important to Chief Gamble?

24   A.  I'm --

25   Q.  IT administrator.

1    A.  Well, Chief Gamble, it was actually, when I was -- back in

2    2002, Chief Leonard would have been chief at that point.

3    Q.  OK, but you understood that the loan company was important

4    to the tribe?

5    A.  Yes, sir.

6    Q.  Now, you became second chief around 2008?

7    A.  Yes, sir.

8    Q.  And because you were second chief, you began -- you had a

9    position on the AMG board, correct?

10   A.  Yes, sir.

11   Q.  Now, the AMG board didn't sit frequently when it began in

12   2008, right?

13   A.  No.

14   Q.  In fact, the board, it may have had an initial meeting, but

15   it didn't really meet between 2008 and 2011, right?

16   A.  I don't recall how many times, but it wasn't a regular

17   meeting.

18   Q.  And when the board did begin meeting, it was only really

19   after an article came out about the payday loan business,

20   right?

21   A.  There were, there were things that triggered meetings.  I

22   mean that -- I recall that one.

23   Q.  Do you recall an article coming out about the payday loan

24   business, without going into the contents of it?

25   A.  I do.

1  Q.  And you also know that the FTC investigation became public

2  in 2012, right?

3  A.  Yes, sir.

4  Q.  And there was also an audit, an IRS audit of the tribe and

5  various of its entities, correct?

6          THE COURT:  Fix a time.

7          MR. RAVI:  Around 2011 and 2012.

8  A.  I assume.  I'm not real positive about that, that IRS

9  audit.

10  Q.  OK, but because of this article that came out and because

11  of the FTC investigation, AMG's board started actually meeting,

12  correct?

13  A.  Meeting more often.

14  Q.  And the FTC investigation was a big problem for the tribe,

15  right?

16  A.  It was a problem, yes.

17  Q.  And it was brought by a federal agency, right?

18  A.  It was.

19  Q.  And the tribe doesn't have sovereign immunity against a

20  federal agency, correct?

21  A.  No, they do not.

22  Q.  At the times the board did sit, it mostly talked about the

23  money the tribe was receiving from Scott Tucker, correct?

24  A.  That would be one of the topics, yes.

25  Q.  And it would receive, the tribe would receive checks,

1    correct, from Scott Tucker?

2    A.  From the lending company, yes.

3    Q.  Now, to your knowledge, prior to any of the FTC

4    investigations becoming public, the AMG board didn't make any

5    decisions regarding the operations of the loan company,

6    correct?

7    A.  They did not.

8    Q.  Scott Tucker made those decisions, to your knowledge,

9    right?

10   A.  I don't know that he made a decision.  I just know we did

11   not.

12   Q.  The AMG board did not make any decisions?

13   A.  No, sir.

14   Q.  The AMG board didn't set any interest rates for the loans

15   that were issued as part of the loan company, correct?

16   A.  They did not.

17   Q.  And AMG's board and the tribe did not provide any money

18   that was being lent out as part of the loan company, correct?

19   A.  They did not.

20   Q.  And in fact, even while you were sitting on the AMG board,

21   you didn't know much about the operations that were occurring

22   in Kansas City, right?

23   A.  I did not.

24   Q.  You didn't know who managed the day-to-day operations up

25   there, right?

1   A.  Not really.  I knew -- I know of certain people.

2   Q.  One of those people, Scott Tucker, you know was involved?

3   A.  Yes, sir.

4   Q.  But you didn't know all the people below Scott Tucker and

5   what they were doing at the company, correct?

6   A.  No, sir.

7   Q.  Now, you met Scott Tucker about, between approximately

8   eight and 15 times, would you say?

9   A.  Somewhere in that range, yes, sir.

10  Q.  At some point you went to the Kansas City loan company,

11  correct?

12  A.  I did.

13  Q.  And you also went to a couple baseball games, paid for by

14  Scott Tucker, correct?

15  A.  Went to some baseball games, yes, sir.

16  Q.  In Kansas City?

17  A.  Yes, sir.

18  Q.  And other people on the tribe also went to those games,

19  right?

20  A.  Yes, sir.

21  Q.  You've also flown in Scott Tucker's jet a few times, right?

22  A.  I have.

23  Q.  Four or five times?

24  A.  I'm not positive about the number, but a few times, yes,

25  sir.

1   Q.  And one of the times you met with Scott Tucker was at a

2   Mexican restaurant, correct?

3   A.  Yes.

4   Q.  And that was prior to the FTC litigation?

5   A.  Yes, sir.

6   Q.  Chief Gamble was there, right?

7   A.  Yes, sir.

8   Q.  And Don Brady was there?

9   A.  Yes, sir.

10  Q.  And at that lunch meeting, you made a statement that the

11  money and the loan company belonged to the tribe, right?

12  A.  I did.

13  Q.  And when you said that, you said that because it was based

14  on what you had been told by Tom Gamble and Don Brady, correct?

15  A.  Yes.

16  Q.  And Scott Tucker was present when you said that the money

17  and the loan company belonged to the tribe, right?

18  A.  Well -- can we go back?

19  Q.  Sure.

20  A.  Well -- never mind.  Go ahead.  I'm confused.  Sorry.

21  Q.  So while Scott Tucker was present, you said the statement

22  that the money and the loan company belonged to the tribe,

23  right?

24  A.  Yes.

25  Q.  And Scott Tucker responded to your statement, correct?

1    A.  He did.

2    Q.  What did Scott Tucker say?

3    A.  He said that money was his.

4    Q.  Did he say anything else?

5    A.  No.  I don't believe so.  He made the statement.

6    Q.  What was his demeanor when he said that?

7    A.  He was upset.

8    Q.  And Don Brady also wasn't happy that you said that

9    statement there, correct?

10   A.  I didn't think he was happy with my statement.

11   Q.  And Tom Gamble wasn't happy with the fact that you said

12   that statement, correct?

13   A.  Yes, sir.

14   Q.  And it was pretty awkward when Mr. Tucker said that to you

15   in that lunch meeting, right?

16   A.  Yes.

17   Q.  But you let it go, correct?

18   A.  I did.

19   Q.  You didn't bring it up again during that meeting?

20   A.  I did not.

21   Q.  And that was because the tribe's relationship with

22   Mr. Tucker was too important, right?

23   A.  That is correct.

24   Q.  And Mr. Gamble told you that, right?

25   A.  Yes, sir.

1   Q.  And Mr. Brady told you that, right?

2   A.  Yes, sir.

3   Q.  And you understood that Scott Tucker could take the payday

4   loan business and go somewhere else, right?

5   A.  I knew that he worked with two other tribes.

6   Q.  And you knew that he could take the payday loan business

7   from the Miami and go to those other tribes if he wanted,

8   right?

9   A.  Yes, sir.

10  Q.  Now, after the FTC investigation became public in April

11  2012, you remember discussing something called the BA Services

12  licensing agreement?

13  A.  Yes, sir.

14  Q.  And BA Services, I think you testified on direct, was a

15  company owned by Scott Tucker, right?

16  A.  Yes, sir.

17  Q.  And you were told -- and this BA Services licensing

18  agreement was presented to the AMG board, correct?

19  A.  Yes, sir.

20  Q.  And you were told that the purpose of that agreement was to

21  acquire some software from Mr. Tucker, correct?

22  A.  I believe it was for use of software.

23  Q.  For use of software, right?

24  A.  Yes, sir.

25  Q.  And the software's referred to as ecash; does that sound

1    familiar?

2    A.  I'm not positive -- it was an agreement to use software.

3    Q.  It was the software to operate the loan company, correct?

4    A.  Yes, sir.

5    Q.  But the loan company was already operating using that same

6    software when this agreement was presented to you, correct?

7    A.  Yes.  I'm assuming so, yes, sir.

8    Q.  Scott Tucker was using that software to operate the loan

9    company, right?

10   A.  Yes, sir.

11   Q.  But even though the loan company was already being operated

12   using that software, you were told you needed to agree to this

13   BA Services agreement in order to use that software for the

14   loan company, correct?

15   A.  For continued use, yes, sir.

16   Q.  And Mr. Brady told you that you should agree to that

17   agreement, correct?

18   A.  Yes, sir.

19   Q.  Mr. Gamble told you that you should agree to that

20   agreement?

21   A.  Yes, sir.

22   Q.  And again, you understood that if you didn't sign on to

23   that agreement, Mr. Tucker could take the loan business to

24   another tribe, right?

25   A.  I understood that if we didn't come to an agreement, that

1  we might not be in the lending space, lending business.

2  Q.  And that generated significant income for the tribe,

3  correct?

4  A.  It did.

5  Q.  You then ran for chief.  You ran for chief in 2013,

6  correct?

7  A.  Yes, sir.

8  Q.  And when you ran for election, you ran against Chief

9  Gamble, right?

10  A.  I did.

11  Q.  And you ran against Chief Gamble, in part, because you

12  believed he was too beholden to Mr. Tucker, correct?

13  A.  That's correct.

14  Q.  That Chief Gamble let Mr. Tucker do whatever he wanted,

15  correct?

16  A.  You could say that, yes, sir.

17  Q.  And you won that election, correct?

18  A.  I did.

19  Q.  And when you won that election in 2013, you weren't very

20  familiar with any of the agreements that Mr. Gamble and

21  Mr. Brady had made with Mr. Tucker, correct?

22  A.  No.

23  Q.  You weren't familiar with the agreement in which the tribe

24  came to enter this business, correct?

25  A.  Only from history's point of view.

1    Q.  That all happened before you became chief, correct?

2    A.  Yes.

3    Q.  Now, you were shown Exhibit D921A, correct?  Do you still

4    have that in front of you?

5    A.  No, there's nothing in front of me, sir.

6        Oh, there it is.  Yes, sir.

7    Q.  This is that annual report, correct?

8    A.  Yes, sir.

9    Q.  And it contains various financial statements, correct?

10   A.  Yes, sir.

11   Q.  Now, the tribe has to provide -- has to do audits on a

12   regular basis, correct?

13   A.  Yes, sir.

14   Q.  And it has to provide those audits to the department of

15   interior, correct?

16   A.  That's correct.

17   Q.  And as part of those audits, the tribe has to include in

18   those audits any businesses that are owned by the tribe,

19   correct?

20   A.  That's correct.

21   Q.  As far as its financial statement?

22   A.  That's correct.

23   Q.  Prior to 2012, you're not aware of the loan company being

24   on the audits that were provided to the department of interior,

25   correct?

1    A.  I believe that's correct, yes, sir.

2    Q.  Just to confirm, it's true that the tribe's audits did not

3    list the loan company as part of what its businesses were,

4    correct?

5    A.  I believe that at one time that they had not being, been

6    listed on those.

7    Q.  Was that prior to 2012?

8    A.  It was pre -- it was during the time while Chief Gamble was

9    chief.

10   Q.  And he was chief up to 2013, correct?

11   A.  Yes.

12   Q.  So prior to that --

13   A.  It was sometime while he was chief.  I recall that there

14   had been a note that they -- those businesses had not been

15   being audited as part of the tribe's and submitted as part of

16   the tribe's.

17   Q.  So in other words, up to when Chief Gamble was no longer

18   chief in 2013, the loan company was not included in the audits

19   that the tribe provided to the department of interior?

20   A.  That's correct.

21   Q.  Now, after the FTC investigation became public, the tribe

22   as well as AMG and MNES retained counsel, correct?

23   A.  They did.

24   Q.  And that was Kirkland & Ellis?

25   A.  It was.

Ha3Wtuc3                    Lankford - Cross

1    Q.  And after Kirkland & Ellis was retained, Don Brady was

2    fired, right?

3    A.  Yes, sir.

4    Q.  And that was around November 2012?

5    A.  Yes, sir.

6    Q.  And Joe Frazier took Don Brady's place?

7    A.  He did.

8    Q.  He became the main tribal contact with Scott Tucker at that

9    time?

10   A.  For the lending company, yes, sir.

11   Q.  And also after Kirkland & Ellis was retained and Don Brady

12   was terminated, in around November 2012, the tribe began to

13   identify bank accounts that were in the names of AMG and MNES,

14   correct?

15   A.  Yes, sir.

16   Q.  And those accounts had been under the exclusive control of

17   Mr. Tucker, correct?

18   A.  Yes, sir.

19   Q.  The tribe didn't even have signature authority on those

20   accounts, right?

21   A.  No, they did not.

22   Q.  But after the tribe retained counsel, the tribe began to

23   identify those accounts, correct?

24   A.  Yes, sir.

25   Q.  And as the tribe identified these accounts, the tribe then

1   began to take some control over those accounts, correct?

2   A.  Yes, sir.

3   Q.  And when the tribe took control of those accounts, there

4   was money sitting in them, correct?

5   A.  That's correct.

6   Q.  There were millions of dollars sitting in there, right?

7   A.  Yes, sir.

8   Q.  And that money, did you understand that that money came

9   from the payday loan business?  Correct?

10  A.  I did.

11  Q.  And that money had previously been under the control of

12  Mr. Tucker, correct?

13  A.  Yes.

14  Q.  Now, after the tribe -- we saw some resolutions where

15  Mr. Tucker was taken off as signatory, signature authority on

16  some accounts, correct?

17  A.  Yes, sir.

18  Q.  But then later on, in March 2013, we also saw some

19  resolutions where Blaine Tucker and Natalie Dempsey were put

20  back on to some bank accounts, correct?

21  A.  Yes, sir.

22  Q.  And those were people associated with Mr. Tucker's loan

23  business, correct?

24  A.  Yes, sir.

25  Q.  And part of the reason was that the tribe was still

Ha3Wtuc3                    Lankford - Cross

1    engaging in lending with Mr. Tucker, correct?

2    A.  Yes, sir.

3    Q.  And the tribe couldn't operate a lending business without

4    Mr. Tucker, correct?

5    A.  No, sir.

6    Q.  It was Mr. Tucker's business, right?

7    A.  Yes, sir.

8    Q.  And then after March 2013, you were also shown several

9    resolutions regarding various agreements that were signed with

10   Mr. Tucker, correct?

11   A.  The date?  Could you repeat that, sir?

12   Q.  Sure.  After March 2013.

13   A.  Yes.

14   Q.  And you're not familiar with the terms and conditions of

15   those various agreements, correct?

16   A.  I don't believe so, no, sir.

17   Q.  And then in December 2013, the tribe, AMG and MNES received

18   a subpoena from the U.S. Attorney's Office, correct?

19   A.  Yes, sir.

20   Q.  And that subpoena specifically asked for documents and

21   information relating to Scott Tucker, correct?

22   A.  Yes, sir.

23   Q.  And around this exact same time, the tribe was -- the loan

24   business was having a problem finding a bank account to process

25   the loans, correct?

1    A.  Yes, sir.

2         MR. RAVI:  If we could show D2748A.

3    Q.  If you look to Roman II(a), in the last three lines, it

4    says, "Bay cities has advised after the end of March 2013, they

5    will no longer work online lending companies' ACH and

6    electronic billing companies, which are integral to the

7    operation of the online loan company."  Correct?

8    A.  That's correct.

9    Q.  So the loan company, which was still being operated by

10   Mr. Tucker, was looking for a bank to conduct its business,

11   right?

12   A.  Yes, sir.

13   Q.  But it was having a hard -- it was difficult to find a bank

14   that would process the loans after these various investigations

15   came to light, correct?

16   A.  Yes, sir.

17   Q.  And then you said in April 2014, approximately, the tribe

18   was no longer in payday lending, correct?

19   A.  Yes, sir.

20   Q.  And the tribe was no longer in a relationship with Scott

21   Tucker then as well, correct?

22   A.  Yes, sir.

23   Q.  And that's because once the relationship with Mr. Tucker

24   terminated, after that criminal subpoena was served, the tribe

25   could no longer do business, right?

1  A.  We weren't able to operate online lending.

2  Q.  You were asked during direct about that nonprosecution

3  agreement, correct?

4  A.  That's correct.

5  Q.  And through counsel, the tribe engaged in discussions with

6  the United States Attorney's Office for the Southern District

7  of New York about the nonprosecution agreement, correct?

8  A.  That's correct.

9  Q.  And the tribe agreed to forfeit $48 million, correct?

10  A.  That is correct.

11  Q.  And that $48 million, part of it was from the money that

12  was sitting in those bank accounts that came from the payday

13  loan company, correct?

14  A.  That's correct.

15  Q.  And you mentioned that there was some other spending of

16  some of that money on various businesses for the tribe,

17  correct?

18  A.  Yes, sir.

19  Q.  And a lot of -- there was other money that was also spent

20  on lawyers, right?

21  A.  Yes, sir.

22  Q.  There were a lot of lawyers that the tribe had hired --

23  A.  Yes, sir.

24  Q.  -- by that point in December -- sorry, in 2016, correct?

25  A.  Yes, sir.

Ha3Wtuc3                    Lankford - Cross

1   Q.  And in the discussions with the U.S. Attorney's Office, you

2   personally had discussions regarding letting the tribe keep

3   some money for tribal programs, correct?

4   A.  I did.

5   Q.  And can you describe what some of those tribal programs

6   are?

7   A.  Again, that would have been our elder benefit card, for our

8   elders; scholarships; back-to-school funds, language

9   revitalization efforts and cultural revitalization efforts; our

10  annual powwow; things that, all the events we do for our tribal

11  citizens.

12  Q.  And without the income that the tribe had become reliant on

13  from Scott Tucker's loan company, if there wasn't money to --

14  that was coming in anymore from the loan company, you couldn't

15  continue those tribal programs, correct?

16  A.  We would not have been able to.

17  Q.  And so you specifically asked to be able to keep some of

18  that money in order to run those tribal programs?

19  A.  I did.

20  Q.  And you were allowed to keep approximately $12 million, you

21  said?

22  A.  Yes, sir.

23  Q.  I want to turn now to D2052.

24          THE COURT:  All right.  Ladies and gentlemen, we're

25  going to break a little bit early for lunch.  Please do not

Ha3Wtuc3                    Lankford – Cross

1    discuss the case among yourselves or with anyone.  Please have

2    a good lunch, and we'll see you back in action.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ha3Wtuc3

1          THE COURT:  And you may step down.

2          (Witness not present)

3          THE COURT:  All right.  Please be seated.

4          After the testimony resumed, after the break, the

5    Court was handed a note by my deputy, which has been marked as

6    Court Exhibit 11, which reads:

7          "Judge Castel, resolutions appear to be the method

8    used for tribes to affirm actions taken.  Therefore,

9    resolutions appear to play an integral role in tribes' business

10   processes.  Thus, I do not understand your instructions to not

11   take the resolutions for truth of fact.  I understand and have

12   used resolutions in their 'generic' sense, mostly for

13   recognition, but in the operations of the tribes, resolutions

14   appear to have a different purpose and appear as a vehicle to

15   document statements, actions of fact.  What is the purpose of

16   these 'signed,' 'dated' resolutions by the tribes?"

17         And it's signed by juror No. 11.

18         You'll note that I clarified that my assertion that

19   "whereas" clauses in a resolution are not admitted for the

20   truth of their content and gave some intentionally absurd

21   examples, such as the moon being made of green cheese, but made

22   the point that the resolution itself is the action of the tribe

23   and may be considered for that purpose.

24         If anybody wants me to give an additional instruction,

25   I'll be happy to consider it.

Ha3Wtuc3

1                    See you after lunch.

2                    (Luncheon recess)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HA38TUC4

AFTERNOON SESSION

2:00 p.m.

1

2

3          (Jury not present)

4          THE COURT:  I understand somebody wants to talk to me?

5     Yes, no?

6          MR. BATH:  Judge, it won't come up for these first two

7     witnesses, but maybe at the break.  We'd just like you to know

8     we would like to address the court.

9          The issue is going to be the scope of Conly Schulte's

10    testimony and also the subpoena issue of Mr. Muir.  We can get

11    these next witnesses done without that.

12         THE COURT:  All right.

13         What did you want to know?

14         MR. BATH:  The government filed last night the crime

15    fraud requests, and they are asking the court to make that

16    finding.  They are indicating they want the documents, and I

17    understand that.  If we produce those documents, it seems that

18    two witnesses this afternoon, Schulte and Morgan, would be

19    impacted by those documents and it may be premature to call

20    them as witnesses until we produce those documents for both

21    direct and potential cross.

22         THE COURT:  What is the government's position?

23         MR. VELAMOOR:  Judge, our position is we served an if,

24    as and when subpoena on defendants.  It's our understanding the

25    documents produced in response to that subpoena are customarily

1    and appropriately produced if, as and when Mr. Muir testifies.

2    So we don't understand how it relates to calling Mr. Schulte or

3    Mr. Morgan.

4            THE COURT:  The reason why I think it relates or

5    applies is because these are communications between Mr. Schulte

6    and Mr. Muir.

7            MR. VELAMOOR:  I certainly understand that.

8            THE COURT:  So you want to make sure that the

9    defendant can't ask Mr. Schulte about them before you get a

10   chance to ask Mr. Muir, is that the plan?

11           MR. VELAMOOR:  Certainly not to make sure they can't

12   do anything.  Our position is the only appropriate time we

13   understand that we could ask for these documents is upon the

14   defendant himself testifying.

15           THE COURT:  Where does that come from?  Because he

16   hasn't testified.  If it's the fact that he is going to

17   testify, we have known that since September 12th.  If it's the

18   fact that he is testifying, he hasn't done that.  So how does

19   this just ripen in the last 24 hours?  Because he hasn't

20   testified, he is not on the stand, and he said he was going to

21   testify on September 12.  So why yesterday or today or last

22   night?  The answer is?

23           MR. VELAMOOR:  I may be misunderstanding, and I

24   apologize if I am.  My understanding --

25           THE COURT:  You're only entitled to this upon Mr. Muir

HA38TUC4

1    testifying.

2            MR. VELAMOOR:  Correct.

3            THE COURT:  Either that literally means upon him

4    testifying, which hasn't happened, which means you're not

5    entitled to it.  Or it means upon realizing that Mr. Muir is

6    going to testify.  That happened on September 12th.

7            Is this a toss-up question here?  What are we doing

8    here?

9            MR. VELAMOOR:  Again, I apologize if I am

10   misunderstanding, but my understanding is that we are entitled

11   to the documents only upon Mr. Muir testifying.

12           THE COURT:  So your request for the documents is

13   withdrawn, is that right?

14           MR. VELAMOOR:  No, it's not withdrawn.  But it's

15   withdrawn -- it's not withdrawn.  It's made requesting

16   compliance if, as and when Mr. Muir testifies.

17           THE COURT:  So then you can explain why you're doing

18   this now.  Because I think that's what I was asking about and

19   you said, well, I am not entitled to it until he testifies.

20           MR. VELAMOOR:  I think we are not entitled to receive

21   them until he testifies.

22           THE COURT:  Why did you wait until now to ask for it

23   under the crime fraud exception?  You raised the crime fraud

24   exception in this case last April, no?  It was before last

25   April, I think.

1          MR. VELAMOOR:  We raised the crime fraud exception

2     with respect to documents in the possession of the Buchanan law

3     firm.  We made the request for the Muir documents if, as and

4     when Mr. Muir testifies last week.

5          THE COURT:  Why did you wait until last week?

6          MR. VELAMOOR:  Judge, we were not deciding to wait

7     until any point.

8          THE COURT:  You weren't deciding to wait, but you did.

9     So why?  It wasn't a decision to wait, but what was it a

10    decision to do?  It didn't occur to you, or what?

11         MR. VELAMOOR:  I think that's right.

12         THE COURT:  Say the words.  If that's the truth, say

13    it.

14         MR. VELAMOOR:  In the press of trial, we were

15    preparing for the following week, we served the subpoena.  We

16    understood Mr. Bath --

17         THE COURT:  I know you served the subpoena.  I am

18    trying to find out why you waited so long, and I really haven't

19    gotten a straight answer.

20         MR. VELAMOOR:  Because in the press of preparing for

21    the other parts of the trial, it did not occur to us to do that

22    until we did it.

23         THE COURT:  OK.  And when it occurred to you to do it,

24    why didn't it occur to you to raise the crime fraud exception?

25         MR. VELAMOOR:  The crime fraud exception occurred to

1  us because we were thinking through questions that Mr. Bath

2  raised on the record yesterday, in which he pointed out that he

3  thought that privilege issues were going to make it more

4  difficult for him to produce the documents.

5          We sat around.  We thought through that issue.  It

6  occurred to us in the context of those conversations that we

7  believe we have met the burden for a crime fraud motion, based

8  on the evidence that's been presented at this trial.  And based

9  on that evidence, we believe that a crime fraud exception would

10 cover conversations between Mr. Muir and Mr. Schulte and that

11 that would simultaneously also, we thought, mitigate concerns

12 that Mr. Bath raised about having to go through the documents

13 and address a privilege log question with respect to each of

14 the documents.

15         THE COURT:  You thought you would make Mr. Bath's life

16 easier by raising the crime fraud exception so he wouldn't have

17 to sort through documents, he could turn them all over.  Is

18 that what you're telling me?

19         MR. VELAMOOR:  We think we have a valid basis for Mr.

20 Bath to turn over all communications between Mr. Muir and

21 Mr. Schulte relating to the payday lending business because of

22 crime fraud.

23         THE COURT:  Right.  I accept your answer as honest.  I

24 don't know if it's satisfactory.  But when you say it didn't

25 occur to you until last week, and then it didn't occur to you

HA38TUC4

1    until yesterday, I accept all that.  I don't know that that's a

2    satisfactory answer.

3              Bring our jury in, please.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2     DOUGLAS GLENN LANKFORD, resumed.

3          THE COURT:  You may continue.

4          MR. RAVI:  Your Honor, at this time, with the

5     agreement of counsel for both defendants, the government offers

6     Government Exhibit 4085, which are four directors' meetings on

7     November 6, 2012 by MNE Services, Inc.

8          THE COURT:  And you're offering the exhibit?

9          MR. RAVI:  Yes.

10          THE COURT:  Any objection?

11          MR. GINSBERG:  No.

12          THE COURT:  It's received.

13          (Government's Exhibit 4085 received in evidence)

14     BY MR. RAVI:

15     Q.  Mr. Lankford, before we broke for lunch we were talking

16     about the non-prosecution agreement, correct?

17     A.  Yes, sir.

18          MR. RAVI:  If we can put up Defense Exhibit 2052.

19     Q.  You signed this agreement on behalf of AMG and MNES,

20     correct?

21     A.  I did.

22          MR. RAVI:  If you would go to the last page, Ms.

23     Grant.

24     Q.  That agreement attaches a statement of facts that Mr.

25     Ginsberg put up earlier?

HA38TUC4                    Lankford - Redirect

1    A.  It does.

2    Q.  You agree this is all statements in the statement of facts,

3    correct?

4    A.  I do.

5              MR. RAVI:  If we could just zoom in on paragraphs 2

6    and 3, which was not shown on direct, and just publish that for

7    the jury.

8              MR. GINSBERG:  Objection to that.  It was shown.  It

9    wasn't read.

10             MR. RAVI:  Withdrawn.

11             THE COURT:  So the comment by Mr. Ravi is stricken.

12             Go ahead.

13             MR. RAVI:  No further questions, your Honor.

14             THE COURT:  Any redirect?

15             MR. GINSBERG:  Yes.  Thank you, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. GINSBERG:

18   Q.  Mr. Lankford, I just want to go over a few things with you

19   that you were asked on cross-examination.

20        First, you were asked about a lunch meeting at a Mexican

21   restaurant.

22        Do you recall that?

23   A.  Yes.

24   Q.  You made a statement at the lunch meeting, something to the

25   effect that the money belonged to the tribes, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  A.  Yes, sir.

2  Q.  And people at the table got upset?

3  A.  Yes.

4  Q.  In fact, Mr. Tucker responded to that, correct?

5  A.  He did.

6  Q.  But in fact, the moneys that were being referred to, a good

7  part of it did belong to the tribe, isn't that correct?

8  A.  I believe it did.

9  Q.  And the tribes eventually took approximately $119 million

10 out of the moneys that were in those accounts, according to the

11 annual report in 2013, correct?

12         MR. RAVI:  Objection.

13         THE COURT:  Objection.  Basis.

14         MR. RAVI:  Foundation.

15         THE COURT:  Well, the witness can answer.

16         Do you know?

17         THE WITNESS:  I don't know an exact accounting, your

18 Honor.  I know there was a sum of money that the tribe got from

19 this over the total time.

20         THE COURT:  But do you have a good faith

21 approximation?  Do you know what the number is approximately?

22         THE WITNESS:  I do not.

23         THE COURT:  Next question.

24 Q.  You reviewed the annual report before, correct?

25 A.  I did.

HA38TUC4                    Lankford - Redirect

1   Q.  It had a number which was the total amount that the tribe

2   had in its accounts at the time of that annual report in 2013,

3   correct?

4   A.  That was what was reported to us.

5   Q.  And you also told us that between that time and 2016, the

6   tribe went out and purchased a number of companies, correct?

7   A.  That is correct.

8   Q.  You said you didn't have a recollection of how much money

9   the tribe used to purchase those companies, but it was probably

10  in the tens of millions of dollars, correct?

11  A.  It was a lot of money.

12  Q.  And that money came from money that was in those accounts,

13  correct?

14  A.  I would say yes, sir.

15  Q.  So it wasn't all Scott Tucker's money.  A good portion was

16  the tribe's money, correct?

17          THE COURT:  Objection as to form.  Define good in your

18  question.

19  Q.  The tribe spent a significant portion of the money that was

20  reported in the annual report in 2013 in the purchase of

21  various businesses, correct?

22  A.  We spent a large amount of money on buying businesses, yes,

23  sir.

24  Q.  That money that they used came from those accounts that you

25  were referring to at that Mexican restaurant lunch meeting,

1   correct?

2   A.  I'm not sure.  All I know is I was referring to the money

3   that was in the accounts that was being lent.

4   Q.  Were there any other accounts that you were aware that had

5   $119 million in there?

6   A.  No.

7   Q.  Also, you were asked about a software purchase of BA, is

8   that correct?

9   A.  Software usage.

10  Q.  Software usage and purchase, correct?

11          MR. GINSBERG:  Withdraw the question.  I will ask it

12  again.

13  Q.  You were asked about software usage, correct?

14  A.  Yes, sir.

15  Q.  And you were asked about software that you said Scott

16  Tucker owned, correct?

17  A.  Yes, sir.

18  Q.  And the tribe was using that software in terms of having

19  the payday lending business operate, is that correct?

20  A.  Yes, sir, I believe so.

21  Q.  But the tribe didn't own the software, is that correct?

22  A.  No, I don't believe so.

23  Q.  But there came a time where there were discussions about

24  purchasing the software that Scott Tucker owned from Scott

25  Tucker by the tribe, correct?

1   A.  Chief Gamble told me that there might be an opportunity to

2   purchase that.

3   Q.  And the reason there was going to be a purchase is so that

4   the tribe would then own the software and the tribe could use

5   it however it wished to use without having to pay anything more

6   to Scott Tucker, correct?

7   A.  I don't know.  I assume yes, we would not have to pay him

8   if we purchased it.

9   Q.  But it wasn't the tribe's initially, correct?

10  A.  No.

11  Q.  And then eventually the tribe entered into a license

12  agreement instead of a purchase so that they could use the

13  software by virtue of a license which they paid Scott Tucker

14  for, correct?

15  A.  I believe so.

16  Q.  You also mentioned that Scott Tucker controlled the

17  accounts that the money was in that we have been talking about,

18  correct?

19  A.  He did.

20  Q.  Scott Tucker was given, was he not, by the tribe power of

21  attorney over the accounts, is that correct?

22  A.  I don't know.

23  Q.  Do you know if Don Brady ever gave him power of attorney?

24  A.  I don't know who -- I don't know.  I'm assuming that may

25  have happened before I was ever elected.

1    Q.  You just don't know, correct?

2    A.  I just don't know, sir.

3    Q.  In any event, notwithstanding what you said about Scott

4    Tucker controlling the money in the accounts, the tribe was

5    able to take out tens and tens and tens of millions of dollars

6    from those very same accounts for the purchases that we just

7    talked about of the businesses, correct?

8            MR. RAVI:  Objection to form.

9            THE COURT:  Sustained.

10   Q.  Did the tribe take money out of those accounts to make the

11   purchases of the businesses?

12   A.  It went towards some of the purchases, yes.

13   Q.  And Scott Tucker didn't take the money out and give it to

14   you to buy the businesses, correct?

15   A.  No.

16   Q.  Somebody from the tribe had authorization to write checks

17   from those accounts and make the purchases, correct?

18           THE COURT:  At what point in time Mr. Ginsberg?

19   Q.  Between 2013 and 2016.

20   A.  Yes.  I believe that's correct.

21   Q.  You were also asked ultimately if you forfeited $48 million

22   to the federal government as a result of the non-prosecution

23   agreement, correct?

24   A.  That's correct.

25   Q.  And the tribe did do that, correct?

1    A.  We did.

2    Q.  And that was money that the tribe had and the tribe had

3    control over so the tribe could pay that forfeiture, correct?

4    A.  It is.

5    Q.  And most of that $48 million had come from the payday

6    lending business, is that fair to say?

7    A.  That would be a fair statement.

8    Q.  And the tribe, as the government asked, the tribe was

9    permitted to keep $12 million, correct?

10   A.  That's correct.

11   Q.  That $12 million that the tribe kept was in addition to all

12   the other money that the tribe had earned but had already spent

13   on the purchase of those businesses, is that correct?

14   A.  I believe so, yes.

15          MR. GINSBERG:  I have no further questions.

16          THE COURT:  You may step down.

17          (Witness excused)

18          THE COURT:  You may call your next witness.

19          Who called the witness?

20          MR. BATH:  I did, Judge.

21          THE COURT:  You are calling who?

22          MR. BATH:  Derek Douglas.

23          THE COURT:  Thank you.

24   DEREK DOUGLAS,

25      called as a witness by the Defendants,

1          having been duly sworn, testified as follows:

2                THE DEPUTY CLERK:  State your name and spell it for

3    the record, please.

4                THE WITNESS:  Derek Douglas.  D-E-R-E-K,

5    D-O-U-G-L-A-S.

6                THE COURT:  Mr. Bath, you may inquire.

7    DIRECT EXAMINATION

8    BY MR. BATH:

9    Q.  Mr. Douglas, how old are you?

10   A.  I am 42.

11   Q.  Where do you live?

12   A.  Kansas City, Missouri.

13   Q.  How long have you lived in Kansas City, Missouri?

14   A.  42 years.

15   Q.  Did you attend college?

16   A.  I did attend college.

17   Q.  Where did you go?

18   A.  Springfield, Missouri.  Southwestern Missouri State.

19   Q.  When did you graduate?

20   A.  1998.

21   Q.  What was your degree?

22   A.  Accounting.

23   Q.  You took your CPA exam?

24   A.  I did.

25   Q.  When did you take that exam?

HA38TUC4                    Douglas - Direct

1    A.   In 2008.

2    Q.   Are you currently a CPA?

3    A.   Yes.

4    Q.   You have been an accountant since graduating, but a CPA

5    since '08?

6    A.   That is correct.

7    Q.   Who do you currently work for?

8    A.   I currently work for Miami Nation Enterprises.

9    Q.   How long have you worked for them?

10   A.   Since April of 2015.

11   Q.   I want to go to your work history prior to that.

12        Let's say from 2000 forward, can you give us your work

13   history.

14   A.   In 2004 I was working at State Street Bank and Trust.

15             THE COURT:  One second.

16   A.   From 2005 to 2007 I worked as financial analyst at Sprint.

17   Q.   After that?

18   A.   2008 to 2010, I worked for Digital Allied, Inc.

19   Q.   What did you do for Digital Allied?

20   A.   I was their corporate controller.

21   Q.   What is Digital Allied?

22   A.   They are a manufacturer of rearview mirrors for law

23   enforcement.

24   Q.   When you say you were controller for them, what does that

25   mean?

1  A.  I handled all the books and records for them.

2  Q.  After Digital Allied, where did you go?

3  A.  Concorde Career College.

4  Q.  What did you do for Concorde?

5  A.  I was their director of accounting.

6  Q.  What does that mean?

7  A.  Basically the same thing as controller.  I was responsible

8  for all of the financial books and records.

9  Q.  When did you leave Concorde?

10  A.  In 2012.

11  Q.  Where did you go when you left Concorde?

12  A.  I went to AMG.

13  Q.  Is that the AMG related to the Miami tribe?

14  A.  That is correct.

15  Q.  So you still work for the tribe, just in a different

16  capacity?

17  A.  That is correct.

18  Q.  So in 2012 you were what for AMG?

19  A.  The corporate controller there.

20  Q.  How long were you the controller for AMG?

21  A.  Until April of 2015.

22  Q.  Approximately three years?

23  A.  Yes.

24  Q.  Then after AMG, what did you do?

25  A.  I worked for Miami Nation Enterprise.

1    Q.  What was your position initially for MNE?

2    A.  The corporate auditor.

3    Q.  How long did you hold that position?

4    A.  Until March of this year.

5    Q.  Then in March of this year what happened?

6    A.  Then chief operating officer.

7    Q.  For MNE?

8    A.  Yes.

9    Q.  As chief operating officer for MNE, what are your duties

10   and responsibilities?

11          MR. SCOTTEN:  Objection.  Relevance.  I think we are

12   in 2017 now, your Honor.

13          THE COURT:  Sustained.

14   Q.  Let's talk about 2012 through '15.  2012 through '13, you

15   were controller for AMG Services?

16   A.  That's correct.

17   Q.  What did you do for them?

18   A.  I again was responsible for all their financial books and

19   records.

20   Q.  Did you replace somebody else?

21   A.  No, sir.

22   Q.  So was anybody the controller before you got there?

23   A.  No.

24   Q.  It was a newly-created position?

25   A.  That is correct.

Douglas - Direct

1  Q.  Who did the books and records prior to you joining, if you

2  know?

3  A.  There were a couple of accounting managers there at the

4  time I arrived, and Gary Patton was there as well.

5  Q.  I am going to show you 832.  Take a look at that.

6      You can look at it on paper or on the screen.

7      Do you recognize that document?

8  A.  Yes, sir.

9  Q.  What is it, just generally?

10 A.  It is the financial, audited financial statements for AMG.

11 Q.  For what year?

12 A.  2011.

13 Q.  Have you seen this document before today?

14 A.  Yes.

15 Q.  As part of your duties and responsibilities?

16 A.  Yes, that's correct.

17 Q.  Is this document kept in the normal and ordinary course of

18 business for AMG?

19 A.  Yes.

20 Q.  What types of information is contained in the document?

21 A.  It's financial information about AMG.

22          MR. BATH:  I offer 832.

23          MR. SCOTTEN:  No objection.

24          THE COURT:  Received.

25          (Defendants' Exhibit 832 received in evidence)

1          MR. BATH:  Show that to the jury.

2     BY MR. BATH:

3     Q.  We are looking at the first page here, correct?

4     A.  Yes.

5     Q.  Who would have prepared this document, if you know?

6     A.  It would have been the auditors.

7     Q.  Who were the auditors at that time?

8     A.  John Ober.

9     Q.  If we go to the second page, please, what does that

10    generally tell us?

11    A.  It's just the index of the financial statements.

12    Q.  Page 3.  At the top, do we see the Ober you're referring

13    to?

14    A.  Yes.

15    Q.  They are located in Miami, Oklahoma?

16    A.  That is correct.

17    Q.  This page we are looking at essentially is information,

18    just background information about what Ober was doing, correct?

19    A.  Yes, that is correct.

20    Q.  If I could get you to turn to page 6 -- actually, it's page

21    5 on the document.

22          MR. BATH:  Next page.

23    Q.  Page 5 at the bottom, is that correct, Mr. Douglas?  You

24    see at the bottom --

25    A.  Yes.

1   Q.  -- the pagination.

2           MR. BATH:  Eli, if we can just highlight that first

3   paragraph.

4   Q.  AMG Services is the company you worked for when you first

5   started there, correct?

6   A.  That is correct.

7   Q.  Through about '15?

8   A.  Yes.

9           MR. BATH:  If we can do the next box, please, Eli.

10  Q.  What is the importance of these financial statements in

11  terms of a company?  What are done with these documents?

12  A.  Sometimes they are used for bank loans, sometimes they are

13  used for investors.

14  Q.  How would they be used for bank loans, for instance?

15  A.  They are prepared by a third party, a third independent

16  party.  So banks tend to trust those more.

17  Q.  That independent party being Ober?

18  A.  Being Ober, yes.

19  Q.  Can we turn to page 9 at the bottom, Mr. Douglas.

20          MR. BATH:  If we could highlight, Eli, that first

21  paragraph, "software licensing fee."

22  Q.  I am not going to ask you to read that, Mr. Douglas, but

23  essentially this is explaining a licensing agreement with BA

24  Services?

25  A.  That is correct.

1   Q.   Why would this type of information be in the financial

2   papers?

3   A.   Because it was a significant transaction.

4   Q.   What does that mean in CPA talk?

5   A.   It means it's a big transaction for that year.

6   Q.   When someone is doing an independent audit, they typically

7   want to highlight large transactions?

8   A.   Large transactions.

9   Q.   Go two more paragraphs below, "aircraft rental."

10  A.   Yes.

11  Q.   What is that telling whoever reads the document, generally?

12  A.   That there was an aircraft rental by a member of

13  management.

14  Q.   Thank you.  You can put that document down.

15       Mr. Douglas, I am going to hand you what has been marked as

16  D872.

17            MR. BATH:  Would you put that up for Mr. Douglas,

18  please.

19  Q.   Do you recognize that document, Mr. Douglas?

20  A.   Yes.

21  Q.   What is 872?

22  A.   It is the audited financials for AMG Services for 2012.

23  Q.   Same document we just saw, just for the next year?

24  A.   Correct.

25  Q.   Kept in the ordinary course of the business for AMG?

1   A.  Yes.

2            MR. BATH:  Offer 872.

3            THE COURT:  Any objection?

4            MR. SCOTTEN:  No, your Honor.

5            THE COURT:  Received.

6            (Defendants' Exhibit 872 received in evidence)

7            MR. BATH:  If we can post that for the jury.

8   BY MR. BATH:

9   Q.  We are seeing the front page again, correct?

10  A.  That is correct.

11  Q.  Now, for this audit and the one we saw before, the

12  financial statement, rather, do you know when these were

13  completed?

14  A.  I want to say it was sometime in 2013.

15  Q.  So it wasn't necessarily done contemporaneous with the

16  year, it's just reporting what happened that year?

17  A.  That is correct.

18  Q.  You didn't have any involvement preparing either of these

19  documents we have seen?

20  A.  I had involvement in getting the numbers.

21  Q.  Tell us about that.

22  A.  I provided the numbers to the auditors and then I also had

23  to provide some financial backup with it.  They do a lot of

24  testing.  So they may not look at every transaction, but they

25  will pull out a few of the transactions, whether they be

1   expenses or balance sheet items, and they test those.

2   Q.  When you say you provided the numbers, what does that mean?

3   A.  I went through and made sure all the numbers were

4   materially correct.

5   Q.  When you say numbers, though, give us somewhat more detail,

6   please.

7   A.  The expenses, making sure the revenues were correct,

8   expenses, and then there is called the balance sheet as well.

9   We have to make sure cash is right, fixed assets are right, and

10  then the liabilities are correct as well.

11  Q.  So it's more than just sending bank statements along?

12  A.  That is correct.

13  Q.  How many hours do you think you would have had involved in

14  preparing the information your provided for the outside

15  auditors?

16  A.  Usually a typical audit takes about three hours.

17  Q.  For you?

18  A.  Yes.

19  Q.  It may take a lot more.

20  A.  Correct.

21  Q.  What other documents do you look at to pass on your

22  numbers?

23  A.  It depends on what the auditors are asking for, but a lot

24  of time invoices from vendors.

25  Q.  I want to go to the third page of this document.

1            MR. BATH:  Please, Eli.

2    Q.  Mr. Douglas, essentially, again, we see something from Ober

3    that just gives background about what they are doing here,

4    correct?

5    A.  That is correct.

6            MR. BATH:  If we can go to the next page, Eli.

7            Can you highlight the box "adverse opinion."

8    Q.  This adverse opinion language, is that standard in

9    financial statements?

10   A.  Depending on what kind of audit is done, yes.

11   Q.  What does that generally mean in the accounting world,

12   "adverse opinion?"

13   A.  Usually it means it's not something you can rely a hundred

14   percent on.  There is some material information missing.

15   Q.  In this paragraph that we are looking at, it says, "It

16   doesn't present fairly the financial position of the Miami

17   Tribe of Oklahoma as of 12/31/12," and it continues.

18           Did I quote that correctly?

19   A.  That is correct.

20   Q.  Because this isn't an audit for the tribe, is it?

21   A.  No.  This is just an audit for AMG Services.

22   Q.  Just as a tribally-owned company, that's the audit for

23   them?

24   A.  Correct.

25   Q.  So the auditors are trying to say, listen, this isn't the

1   tribe's audit, correct?

2   A.   That is correct.

3   Q.   If we can go to the next page, we see essentially an asset

4   section, correct?

5   A.   Yes.

6   Q.   And the total assets listed there is what?

7   A.   The total assets is $85,302,934.

8   Q.   Essentially if we go above that line, is that where we get

9   that total from?

10  A.   Yes.

11  Q.   So cash and cash equivalents sort of speaks for itself, is

12  that right?

13  A.   Correct.

14  Q.   "Due from affiliates," what would that mean?

15  A.   I am not sure what that is, but it would be due from

16  affiliated companies.  It could be due from the portfolios.

17  Q.   And the portfolios would be like, give us an example.

18  A.   The lending arms of MNE Services.

19  Q.   Then you have accounts receivables listed, correct?

20  A.   That is correct.

21  Q.   What kind of accounts receivables, what would that

22  generally be for AMG?

23  A.   It would be receivables usually from the portfolios.

24  Q.   How is that different from due from affiliates?

25  A.   There was just some sloppy accounting done in the past.

HA38TUC4                    Douglas - Direct

1    Q.  So we are trying to clean up the accounting?

2    A.  That is correct.

3    Q.  At some point in time are you familiar whether or not the

4    Miami tribe was charging the Modocs and the Santee for

5    processing loans?

6    A.  Was the Miami tribe?

7    Q.  Yes.

8         MR. SCOTTEN:  Objection.  No testimony of Miami tribe

9    doing anything.  He is testifying about AMG.

10         MR. BATH:  I'm sorry.  I will rephrase, Judge.

11   Q.  Were you familiar with your time at AMG that AMG was

12   collecting a dollar a loan from the Modocs or the Santee?

13   A.  Yes, there were fees per loan.

14   Q.  Because AMG was doing the servicing for all three tribes?

15   A.  That is correct.

16         MR. SCOTTEN:  Objection.  Foundation.  Tribes.  Modoc.

17   None of that is in evidence, your Honor.

18         THE COURT:  Lay a foundation for the question.

19   Q.  In your job as the controller for AMG, did you become

20   familiar with the business of AMG?

21   A.  Yes.

22   Q.  Income and expenses and those sorts of things?

23   A.  Yes.

24   Q.  What kinds of documents would you look at to become

25   familiar with those?

1   A.  Invoices from vendors, invoices to the affiliates.

2   Q.  You say AMG invoices, is that what you mean?

3   A.  Yes.

4   Q.  When you say "affiliates," what do you mean?

5   A.  To the portfolios, all the portfolios.

6   Q.  Name the portfolios for me.

7   A.  Ameriloan, United Fast Cash, US FastCash, Star Cash

8   Processing, Advantage, 500 FastCash, and One Click Cash.

9   Q.  You would see the invoices of the charges AMG would send to

10  those portfolios?

11  A.  That is correct.

12  Q.  And would you be responsible for sending them out?

13  A.  Yes.

14  Q.  Essentially telling the portfolios what they owed AMG?

15  A.  Yes.

16  Q.  Were any of those portfolios affiliated with the Modoc

17  tribe?

18  A.  Yes.

19  Q.  Do you know who the Modoc tribe is?

20  A.  Yes.

21  Q.  What do you know about who the Modoc tribe is?

22  A.  They are an Indian tribe down in Miami, Oklahoma.

23  Q.  They have a relationship, to your knowledge, with one of

24  the portfolios?

25  A.  They did.

1    Q.  Which one was that?

2    A.  500 FastCash.

3    Q.  What about the Santee Sioux tribe?

4    A.  Yes.

5    Q.  Did they have an affiliation or a relationship with any of

6    the portfolios?

7    A.  Yes.  One Click Cash.

8    Q.  Were you in charge of sending out invoices from AMG to

9    those tribes, those portfolios?

10          MR. SCOTTEN:  Objection.  There is no testimony of the

11   invoices going to tribes.  They went to portfolios.

12          THE COURT:  Did you send any invoices to tribes?

13          THE WITNESS:  No.

14          THE COURT:  Next question.

15   Q.  Where did you send the invoices to?  What was the address?

16   A.  It was the portfolios.

17   Q.  What was their address?

18   A.  Somewhere -- one was in Niobrara, Nebraska, and one was in

19   Miami, Oklahoma.

20   Q.  Do you know where the Santee Sioux is located?

21   A.  Niobrara, Nebraska.

22   Q.  And the Modocs are located where?

23   A.  Miami, Oklahoma.

24   Q.  Do you know if those addresses were the same addresses

25   where you sent the invoices?

HA38TUC4                    Douglas - Direct

1   A.  I don't remember the exact addresses.

2   Q.  Can we go to page, it says page 6 at the bottom of that

3   document, Mr. Douglas.

4       You see the last paragraph at the bottom it says "Revenue

5   recognition - servicing fees"?

6   A.  Yes.

7   Q.  Would this be related to the invoices you sent out?

8   A.  Yes.

9   Q.  Can we go to, it says page 9 at the bottom, Mr. Douglas, on

10  the left.

11      Could we go to the "software licensing fee."

12      Would this paragraph again be part of the significant

13  transactions being reported?

14  A.  Yes.

15  Q.  And the next page, again, there is aircraft rental listed,

16  is that right?

17  A.  That is correct.

18  Q.  Again, because it's significant?

19          MR. SCOTTEN:  Objection.  Leading.

20          THE COURT:  Rephrase.

21  Q.  Why would an aircraft rental be listed in this document?

22  A.  Because it's a significant transaction and owned by a

23  member of management.

24  Q.  Can we go down to the new agreement section.

25  A.  Yes.

1   Q.  One of the things listed there is the software licensing

2   agreement with BA Services, is that correct?

3   A.  That is correct.

4   Q.  You weren't a member of the AMG board, were you?

5   A.  I was not.

6   Q.  Did you attend any of the meetings?

7   A.  No, I did not.

8   Q.  Were any of the board meetings for MNE or MNES?

9   A.  No.

10  Q.  Thank you.

11          I am going to show you what has been marked as

12  Defendants' Exhibit 831.

13          Do you recognize that document?

14  A.  Yes.

15  Q.  What is that document, generally?

16  A.  It's the audited financial statements for MNE Services for

17  December of 2011.

18  Q.  Would you have any involvement in this document?

19  A.  Yes, in providing the numbers to the auditors.

20  Q.  Even though you worked for AMG, you would have helped on

21  the MNES document?

22  A.  That is correct.

23  Q.  So you sort of worked -- you did work on behalf -- for both

24  companies, is that right?

25  A.  That is correct.

HA38TUC4                    Douglas – Direct

1    Q.  Is this 831 kept in the ordinary course of business?

2    A.  Yes.

3              MR. BATH:  I offer 831.

4              MR. SCOTTEN:  No objection.

5              THE COURT:  Received.

6              (Defendants' Exhibit 831 received in evidence)

7              MR. BATH:  If we can publish that to the jury, please.

8    BY MR. BATH:

9    Q.  So this looks like the other two documents, it's just a

10   different company, correct?

11   A.  That's correct.

12   Q.  It says it's MNE Services, Inc., correct?

13   A.  That is correct.

14   Q.  What is your understanding of what MNE Services, Inc. does?

15   A.  It lended money.

16   Q.  How so?

17   A.  Online.

18   Q.  If we can turn to the third page of that document,

19   Mr. Douglas.

20         Again, this was done by Ober?

21   A.  Yes, that is correct.

22   Q.  Same as the other two?

23   A.  Yes, that is correct.

24             MR. BATH:  If we can go two more pages forward, Eli.

25   Q.  Mr. Douglas, I am on page, it says 3 on the page.

1   A.  OK.

2          MR. BATH:  If we can blow up the asset section,

3   please.

4   Q.  This asset section is for the different company, of course,

5   correct?

6   A.  That is correct.

7   Q.  Again, though, it lists what the assets of the company are?

8   A.  That is correct.

9   Q.  And the total assets is what, please.?

10  A.  $161,802,193.

11  Q.  And this is as of December 31 of '11, correct?

12  A.  That is correct.

13  Q.  And the cash and cash equivalents would be moneys in the

14  bank?

15  A.  That is correct.

16  Q.  Now, this advance and fees receivable, net is about 70

17  million?

18  A.  Yes.

19  Q.  What is that made up of?  How is that calculated?

20  A.  That is the loan balances outstanding.

21  Q.  What does that mean?

22  A.  That was all of the loan balances that were outstanding as

23  of December 31 that was still receivable by the company.

24  Q.  So if a loan is paid to somebody, a customer, $500, until

25  that loan is paid back, that $500 goes into the advance and

1  fees receivable?

2  A.  That is correct.

3  Q.  What about the interest, is that included in that number or

4  is that just the $500?

5  A.  That is included in there as well.

6  Q.  How do you calculate that interest?

7  A.  It was actually done by a third party in the software and

8  they had an access database that they had written.

9  Q.  That's a number you passed on, you didn't calculate?

10  A.  That is correct.

11       MR. BATH:  If you can go to the next page for me, Eli.

12  Q.  We have portfolio revenues.  274,852,630 is the top number

13  correct?

14  A.  That is correct.

15  Q.  What is the credit loss?  What does that mean?

16  A.  That was for bad loans, loans that weren't paid back.

17  Q.  And that left a total revenues there for MNE Services?

18  A.  Yes.

19  Q.  198?

20  A.  198 million.

21       MR. BATH:  Then if we go to the next page, and just

22  blow up those first two paragraphs, please, Eli.

23  Q.  I am not going to ask you to read this.  This is

24  essentially the auditor telling somebody who reads it what MNES

25  is about, correct?

1    A.  Yes, that is correct.

2              MR. BATH:  Can we go to page 8, please, Eli.

3              It's 8 at the bottom of the page.

4              If we can highlight the related transactions and

5    services paragraph.

6    Q.  Mr. Douglas, what does "related party transactions" mean?

7    A.  It would be transactions with, it could be any member of

8    management, it could be with a sister company.

9    Q.  In this case it's describing AMG, correct?

10   A.  That is correct.

11   Q.  Which obviously is also a tribal corporation, correct?

12             MR. SCOTTEN:  Objection.  Leading.

13             THE COURT:  I will allow it this time, but, Mr. Bath,

14   please.

15             MR. BATH:  Yes, sir.  Thank you.

16             Go to the last line and just highlight that last line,

17   Eli, of that second paragraph.

18   Q.  What does that sentence mean, Mr. Douglas, if you know?

19   A.  AMG's expenses, they basically had all the employees in the

20   organization.

21   Q.  It says, "AMG receives revenues from other tribes for its

22   management services."

23             Did I read that correctly?

24   A.  Yes.

25   Q.  What does that mean?

1   A.  The Modocs and the Santees also paid AMG.

2           MR. BATH:  If we can go to the last paragraph on that

3   page.

4           Can we catch the header above that.  I'm sorry.

5   Q.  This is talking about the software licensing, correct?

6   A.  That is correct.

7   Q.  Thank you.

8       I am going to hand you what has been marked as Defendants'

9   Exhibit 871.

10      Mr. Douglas, do you recognize that document?

11  A.  Yes.

12  Q.  What is that document?

13  A.  It is the audited financial statements for MNE Services for

14  2012.

15  Q.  You're familiar with the document?

16  A.  Yes.

17  Q.  Kept in the ordinary course by MNE Services and the tribe?

18  A.  Yes.

19          MR. BATH:  Offer 871.

20          MR. SCOTTEN:  No objection.

21          THE COURT:  Received.

22          (Defendants' Exhibit 871 received in evidence)

23  BY MR. BATH:

24  Q.  871 is essentially the next year from the document we just

25  saw, correct?

1   A.   That is correct.

2   Q.   And it substantially has the same types of information,

3   doesn't it?

4   A.   That is correct.

5   Q.   For instance, if we go to page 4, 4 at the bottom, we have

6   the asset section as of December 31 of '12, correct?

7   A.   That is correct.

8   Q.   Again, the listing of the cash –- the listing of the assets

9   are very similar in terms of the categories that we saw before,

10  right?

11  A.   Yes.

12  Q.   And the total assets now are 184 million?

13  A.   Yes.

14          MR. BATH:  Go to page 10 of this document, please,

15  Eli.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

Ha3Wtuc5                    Douglas - Direct

1   BY MR. BATH:

2   Q.  And there's a paragraph, Mr. Douglas, that says due from

3   and to affiliates.  Do you see that?

4   A.  Yes.

5   Q.  What does, generally, due from and to affiliates mean?

6   A.  Again, due the sister companies or a closely related party.

7   Q.  OK.  And closely related party doesn't necessarily mean

8   it's owned by one company, does it?  Or does it?

9   A.  No.  That is correct.

10  Q.  What, generally, is this paragraph telling us?

11  A.  That on December 31, 2012, the company was owed 8.1 million

12  from AMG and 3.9 million from Red Cedar and then 1.1 million

13  from OneClickCash.

14  Q.  And the next sentence tells what AMG owes --

15  A.  Yeah.

16  Q.  -- to Red Cedar and OneClickCash?

17  A.  That is correct.

18          MR. BATH:  That's all I have for that.  Thank you.

19  Q.  I'm going to show you what's been marked as defendants'

20  963.  Do you recognize that document?

21  A.  I do not recall it.

22  Q.  All right.  Do I understand that you don't recall it, or

23  you've never seen it?

24  A.  I don't recall it.

25  Q.  OK.  Either way, is that right?

1    A.  Yes.

2    Q.  Let me show you, let me ask you a question before I show

3    you this document, and that is, what is a cash balance report?

4    A.  This looks like --

5    Q.  No, no.  I'm sorry.  Without looking at that document --

6    A.  Oh.

7    Q.  -- generally, what's a cash balance report?

8    A.  I guess a cash balance report would be a report that would

9    say how much cash you had on hand.

10   Q.  Were those kinds of reports done for MNE Services?

11   A.  I believe so, yes.

12   Q.  Were you involved in doing that?

13   A.  I believe probably my department had some involvement in

14   it.

15   Q.  And how many people did you have in your department?

16           THE COURT:  At what point in time?

17           MR. BATH:  I'm sorry, Judge.

18   Q.  You started there in '12, is that right?

19   A.  That is correct.

20   Q.  At what point did you have the department?

21   A.  In 2012.

22   Q.  How many people did you have working there?

23   A.  There was, I think, a total of eight.

24   Q.  And how many CPAs?

25   A.  Including me?

1    Q.  Uh-huh.

2    A.  Just one.

3    Q.  And the others had degrees or what kinds of --

4    A.  Yes, most of them had degrees.

5    Q.  All right.  What kinds of work would your department be

6    doing?

7    A.  Accounting.

8            THE COURT:  Again, you're talking about in 2012?

9            MR. BATH:  Yes, sir.  Thank you, Judge.

10   Q.  In 2012, what kind of work would your eight employees be

11   doing?

12   A.  Accounting.

13   Q.  Was that full time?

14   A.  Yes.

15   Q.  Where were you physically located?

16   A.  Overland Park, Kansas.

17   Q.  OK.  And the accounting work you oversaw, but you may not

18   have had involvement in a particular document?

19           MR. SCOTTEN:  Objection.  Leading.

20           THE COURT:  Sustained.  Rephrase it, please.

21   Q.  Were multiple documents produced by the department?

22   A.  Yes.

23   Q.  Did you necessarily have involvement in producing every one

24   of those documents?

25   A.  No.

1    Q.  And you may not have seen all the documents?

2    A.  That is correct.

3    Q.  Fair enough.  I'm going to show you what's been marked as

4    defendants' 1081, and I'll take that other one back from you.

5         Do you recognize that document?

6    A.  Looks like the same thing you just provided.

7    Q.  Well, my question is, do you recognize it, and if you

8    don't, you don't.

9    A.  No.

10   Q.  All right.  In 2012 and '13, cash balance reports, just

11   generally, without looking at that document, what's the cash

12   balance tell you?

13   A.  How much cash is on hand.

14   Q.  All right.  And were those kinds of reports done for AMG?

15   A.  Most likely, yes.

16   Q.  And how about MNES?

17   A.  Yes.

18   Q.  OK.  And just generically, were you involved in working up

19   those cash balance reports in '12 and '13?

20   A.  I had access to the bank accounts.

21   Q.  But that doesn't mean necessarily you worked up those

22   reports?

23   A.  That is correct.

24   Q.  Somebody in your department in '12 and '13 might have done

25   that?

1   A.  Sure.

2   Q.  OK.  I'm going to show you one more and see if you

3   recognize it.  And I'll take that one back from you.

4       What is that exhibit number, please?

5   A.  1190.

6   Q.  Right.  Do you recognize that?

7   A.  No.

8   Q.  I'm going to show you 2802 and see if you recognize that.

9   I'll take that one back.  Do you recognize 2802?

10  A.  No.

11  Q.  Do you know if you've ever seen a document like that

12  before?

13  A.  It looks familiar.

14  Q.  Back to the cash balance reports, would those be kept in

15  the ordinary course of business, as part of your business?

16  A.  Normally we would do a bank reconciliation every month as

17  part of our closing process.

18  Q.  What would that do, the bank reconciliation?

19  A.  It would reconcile our bank accounts with what our cash

20  account said on the general ledger.

21  Q.  And those are different than the cash balance reports?

22  A.  That is correct.

23  Q.  What's the purpose of running those reconciliation reports?

24  A.  To see what checks you have outstanding, is the main

25  purpose of it; make sure that your bank balances, there's no

1    fraudulent activity going on.

2    Q.  We have had testimony that, from the period of '13 to '15,

3    the tribe bought some businesses.  Are you familiar with any

4    businesses that were purchased in that time period?

5    A.  Yes, there were.

6    Q.  Were you involved in that at all?

7    A.  I was involved in one business.

8    Q.  OK.  And which business were you involved in?

9    A.  There was a cabinet company down in San Antonio that was

10   purchased.

11   Q.  San Antonio, Texas?

12   A.  That's correct.

13   Q.  What was your involvement?

14   A.  I went down there to do some due diligence.

15   Q.  Why did you do due diligence?

16   A.  Just to make sure it was a valuable -- or a company that we

17   could use to make money.

18   Q.  Did you have any other involvement in the purchase of the

19   company?

20   A.  No.  No, sir.

21   Q.  You weren't involved in the negotiations of the sale

22   transaction, or anything like that?

23   A.  No.

24   Q.  Do you know what year that would have been?

25   A.  That was April of 2015.

1   Q.  Do you know who would have been involved on behalf of the

2   tribe for the sale?

3   A.  It was Joe Frazier and David Hayes.

4   Q.  OK.  I'm going to take that document back from you.

5            MR. BATH:  Judge, if I could just have one second.

6            THE COURT:  All right.

7            MR. BATH:  That's all I have.  Thank you so much.

8            THE COURT:  All right.  Mr. Ginsberg or Mr. Roth, any

9   cross-examination?

10           MR. GINSBERG:  No, your Honor.

11           MR. ROTH:  No, your Honor.

12           THE COURT:  Government.

13           MR. SCOTTEN:  Thank you, your Honor.

14  CROSS-EXAMINATION

15  BY MR. SCOTTEN:

16  Q.  Good afternoon, Mr. Douglas.  How are you?

17  A.  Good.  How are you?

18  Q.  Good.  Thank you.  You started at --

19           MR. SCOTTEN:  Hold on a second.  This microphone is

20  always too low for me.

21  Q.  You started at AMG in April of 2012, right?

22  A.  That is correct.

23  Q.  You remember the exact day you started, don't you?

24  A.  Yes, sir.

25  Q.  Why do you remember that exact day?

Ha3Wtuc5                    Douglas - Cross

1    A.  That was the same day the FTC filed charges against AMG.

2    Q.  That's the day you were coming in to fix the books, the AMG

3    FTC charges?

4    A.  That is correct.

5    Q.  And fair to say over the course of the next few years, you

6    became pretty familiar with the books?

7    A.  Yes.

8    Q.  And you just answered a lot of questions from Mr. Bath

9    about tens or even hundreds of millions of dollars that were

10   there, right?

11   A.  Yes.

12   Q.  And it's fair to say that as you sit here today, you have

13   no idea who that money belonged to when you got there?

14   A.  No.  Well, I knew it belonged to AMG.

15   Q.  Right, but whether that belonged to Scott Tucker or the

16   Miami tribe or somebody else, you have no opinion on?

17   A.  I do not have an opinion.

18   Q.  And that's despite reviewing all these books, right?

19   A.  That is correct.

20   Q.  And when you got there, Scott Tucker was in charge, right?

21   A.  Yes.

22   Q.  He was your boss' boss?

23   A.  Correct.

24   Q.  Your boss was Gary Patten?

25   A.  That is correct.

1  Q.  And Scott Tucker had signature authority on all these

2  accounts we've been talking about, right?

3  A.  Yes, when I first got there.

4  Q.  When you got there.  That was changed later?

5  A.  Yes.

6  Q.  And he directed a lot of payments to be issued, right?

7  A.  Yes.

8  Q.  Expenses were also brought in for things he did, right?

9  A.  Yes.

10  Q.  Sometimes on handwritten notes or even Post-its?

11  A.  Yes.

12  Q.  Direct that the company pay for things for Scott Tucker on

13  these handwritten notes?

14  A.  Yes.

15  Q.  When you got there, Timothy Muir was the general counsel,

16  right?

17  A.  Yes.

18  Q.  And he brought bills to your department also to be paid,

19  right?

20  A.  Yes.

21  Q.  In particular, he brought bills for payments to law firms,

22  right?

23  A.  That is correct.

24  Q.  He directed the payment of millions of dollars, in

25  particular, to a firm called Fredericks Peebles & Morgan,

1    right?

2    A.  Correct.

3    Q.  And particularly to an attorney there named Conly Schulte,

4    right?

5    A.  Correct.

6    Q.  And you also learned when you got there that Tim Muir had

7    been involved in the accounting previous to you getting there,

8    correct?

9    A.  Correct.

10   Q.  You learned that he had been directing alterations to the

11   books?

12   A.  Yes, him and Brett Chapin.

13   Q.  Who was Brett Chapin?

14   A.  He was a tax attorney they had hired to help with the

15   books.

16          THE COURT:  Who do you mean by "they"?

17          THE WITNESS:  AMG.

18   Q.  So, are you familiar with an expression in the accounting

19   business, something along the lines of "crap in, crap out"?

20   A.  Yes.

21   Q.  And that means that if the inputs are bad, the outputs are

22   bad, right?

23   A.  That is correct.

24   Q.  An honest accountant like yourself could work hard on

25   numbers, but if the numbers you start with are inaccurate, your

1    result is going to be bad no matter how hard you work, right?

2    A.  That would be correct.

3    Q.  And so if you're starting with cooked books, you can't

4    reach an honest result absent somebody telling you how to fix

5    those books?

6    A.  Correct.

7    Q.  You were asked a few times -- well, actually, let's do

8    this.  And you're not here to vouch for the accuracy of any of

9    these Ober reports, correct?

10   A.  The Ober reports, yeah, they're a little more accurate,

11   because they were audited.

12   Q.  The calculations are accurate, the numbers you fed into

13   them you're not here to vouch for?

14   A.  Sure.

15        MR. SCOTTEN:  Could we pull up, I can't remember what

16   the first defense exhibit was.  Was it 831?

17   Q.  Let's do 831.

18   A.  OK.

19        MR. SCOTTEN:  Could we go to the last page.

20   Q.  And you see here this is the conclusion of the report, and

21   it's talking about the policies and procedures and risk

22   management in place at MNE Services for the year-end reporting,

23   right?

24   A.  That is correct.

25        MR. SCOTTEN:  Can we just blow up the line that says

Ha3Wtuc5                    Douglas - Cross

1    "effect."

2    Q.  Can I ask you to read that?  It's very short.

3    A.  "MNES is susceptible to incorrect financial reporting,

4    misappropriation of assets and possible fraudulent activities

5    that may not be discovered in the normal course of business."

6    Q.  All right.

7         MR. SCOTTEN:  Let's take a look at 871.

8    Q.  This is going to be the Ober report for the next year?

9    A.  Correct.

10   Q.  This is the year after what we just looked at?

11   A.  Correct.

12        MR. SCOTTEN:  Can we go to the last page.  And can we

13   blow up "effect."

14   Q.  And again it says that MNES is still susceptible to

15   incorrect financial reporting, misappropriation of assets and

16   possible fraudulent activities that may not be discovered in

17   the normal course of business, is that right?

18   A.  That is correct.

19        MR. SCOTTEN:  Let's go to the next defense exhibit.  I

20   think that's 832.

21   Q.  And now we're looking at AMG, right?

22   A.  That is correct.

23   Q.  And this is for the 2011 year?

24   A.  Yes.

25        MR. SCOTTEN:  Let's go to the last page, and we can

1   look at "effect" for AMG.

2   Q.  So this is a different company, 2011?

3   A.  Correct.

4   Q.  Different than MNES that we just looked at?

5   A.  Correct.

6   Q.  And again, it says it's susceptible to incorrect financial

7   reporting, misappropriation of assets and possible fraudulent

8   activities that may not be discovered in the normal course of

9   business, correct?

10  A.  That is correct.

11  Q.  By the way, in case it's not a common term, what does

12  "misappropriation of assets" mean?

13  A.  It could be taking a piece of equipment home, cash --

14  Q.  Writing yourself a check out of the company's books?

15  A.  Yes.

16          MR. SCOTTEN:  All right.  Let's go to 872.

17  Q.  And this is now for the second year of that company, right;

18  second year that you were there, 2012?

19  A.  Yes, that's correct.

20          MR. SCOTTEN:  Let's go to the last page.

21  Q.  And there's no change here, right; still talking about

22  incorrect financial reporting, misappropriation of assets and

23  possible fraudulent activities?

24  A.  Yes.

25          MR. SCOTTEN:  All right.  We can take that down.

Ha3Wtuc5                    Douglas - Cross

1   Q.  So the defense attorney asked you a bunch of times about

2   tribal this and tribal that, right?  You remember a lot of

3   questions where "tribe" was worked in?

4   A.  Yes.

5   Q.  You came to believe that a tribe was involved initially --

6   you were initially told a tribe owned this when you

7   interviewed, correct?

8   A.  That is correct.

9   Q.  And then, Tim Muir told you that when you got there, right?

10  A.  That is correct.

11  Q.  You don't have any independent expertise in accounting to

12  figure out whether a tribe was involved; you didn't see tribes,

13  did you, when you got there?

14  A.  No, I did not.

15  Q.  When you looked through the books when you got there, you

16  didn't see anything in the books that confirmed or made you

17  say, Oh, Tim Muir must be right when he told me a tribe owns

18  this, did you?

19  A.  Other than payments to MNE Services or MNE and the Modoc

20  tribe and the Santee Sioux tribe.

21  Q.  Right.  In fact, when you got there, you saw that a lot of

22  those payments had been classified as expenses, right?

23  A.  That is correct.

24  Q.  An expense isn't consistent with ownership, right?

25  A.  That is correct.

Ha3Wtuc5                    Douglas - Cross

1   Q.  You don't regard the owner of the business as an expense,

2   right?

3   A.  That is correct.

4   Q.  Owners are paid distributions?

5   A.  Yes.

6   Q.  And they own the business, they get a distribution of

7   profits?

8   A.  Yes, that is correct.

9   Q.  And you saw that someone had been going back into the books

10  and changing that over to now say distributions?

11  A.  Yeah, there was a Sqar Milner study that was ongoing when I

12  arrived.

13  Q.  And they were changing it over to say, Well, let's not have

14  it look like the tribe doesn't own this, let's make it look

15  like the tribe did own it?

16  A.  I don't know what they said to re-class the distributions.

17          THE COURT:  One second.  You referred to a something

18  Milner report.

19          THE WITNESS:  Sqar Milner.

20          THE COURT:  Can you spell that first name.

21          THE WITNESS:  It's S-Q-A-R.

22          THE COURT:  Thank you.

23  BY MR. SCOTTEN:

24  Q.  Right.  Nobody told you why these changes were being made?

25  A.  That is correct.

1    Q.  You could just see that they were being made?

2    A.  That is correct.

3    Q.  As an accountant you could tell it was changing the

4    appearance from one of an expense to make it look like there

5    was ownership?

6    A.  Correct.

7    Q.  I want to ask you a bit about the money flowing out.  We

8    talked a bit about money flowing out to certain entities that

9    you were told were associated with the tribe, correct?

10   A.  Yes.

11   Q.  And I believe Mr. Bath showed you entries in reports for

12   aircraft owned by a member of the management, is that right?

13   A.  That is correct.

14   Q.  And that was Scott Tucker, right?

15   A.  That is correct.

16   Q.  Those were $400,000 payments going to the private jet

17   leasing company owned by Scott Tucker, right?

18   A.  That is correct.

19   Q.  And those weren't the only moneys going out to Scott

20   Tucker, were they?

21   A.  No.

22   Q.  He was getting paid a salary of over a million dollars?

23   A.  Correct.

24   Q.  And by the way, Blaine Tucker was also?

25   A.  Correct.

1    Q.  And so was your boss, Gary Patten?

2    A.  Yes.

3    Q.  But Scott Tucker was also getting huge payments directed to

4    Levelfive racing company, was he not?

5    A.  Yes.

6    Q.  And then there were even larger payments going to BA

7    Services, right?

8    A.  Yes.

9    Q.  And you were asked about some of those payment, right?

10   A.  Yes.

11          THE COURT:  Objection as to form, as to statements and

12   questions using the word "huge."  Please be more specific.

13          MR. SCOTTEN:  Absolutely, your Honor.

14   Q.  In 2012, so the 2011 report, $64 million to BA Services?

15   A.  I believe that was correct.

16   Q.  And then in the next year, $100 million to BA Services, a

17   little bit more, right?

18   A.  Yes.

19   Q.  And you knew that BA Services was a Scott Tucker property,

20   right?

21   A.  That is correct.

22   Q.  Now, I want to ask you a little bit now about when the

23   Miami tribe left.  You essentially came in -- well, the Miami

24   tribe asked you to help get them out of this business, correct?

25   A.  That is correct.

1    Q.  And you helped wind down their role in payday lending?

2    A.  Yes.

3    Q.  And when the tribe left, it took with it essentially the

4    money that was found in accounts with their name on it, right?

5    A.  That is correct.

6    Q.  If the Miami's name was on the account, they wanted to take

7    that money with them?

8    A.  Yes.

9    Q.  And when they left, as far as you could tell, the payday

10   lending business just kept on going, right?

11   A.  Yes.

12   Q.  You were working in the same Overland Park office of AMG,

13   right?

14   A.  That is correct.

15   Q.  And the Miami gets out and takes the money in the accounts

16   with their name on it with them, right?

17   A.  Yes.

18   Q.  Scott Tucker's still there in the corner office, right?

19   A.  Yes.

20   Q.  Natalie Dempsey's replaced Blaine Tucker as day-to-day

21   manager?

22   A.  Yes.

23   Q.  She works for Scott Tucker?

24   A.  Yes.

25   Q.  Tim Muir's still there, and his office being general

Ha3Wtuc5                    Douglas - Cross

1    counsel, right?

2    A.  Yes.

3    Q.  The Miami are gone, the payday lending's still going on,

4    right?

5    A.  Yes, as far as --

6    Q.  Same building in Overland Park, Kansas?

7            MR. GINSBERG:  Your Honor, I think we need a time

8    period.

9            THE COURT:  Yes, I agree.

10   BY MR. SCOTTEN:

11   Q.  So this is when the tribe gets out of the business,

12   correct, and that's in around 2014 that the Miami's leaving?

13   A.  That's when they started to wind down the business, 2014.

14           MR. GINSBERG:  I would object to this answer and all

15   the prior answers that didn't have dates in them based on what

16   your Honor indicated before.

17           THE COURT:  Yes.  Go ahead, Mr. Scotten.

18           MR. SCOTTEN:  Your Honor, either it is or is not

19   relevant what happened afterwards.  There's been a lot of

20   questions asked about the tribe getting money after the period

21   of the indictment.  It either all comes out or it all stays in.

22           MR. GINSBERG:  I would request a sidebar if we're

23   going to have a speech.

24           THE COURT:  No.  You're going to fix the dates.

25           MR. SCOTTEN:  Absolutely, your Honor.

1    Q.   When did the Miami tribe start to wind down, you said 2014?

2    A.   Yes, in 2014.

3    Q.   And by when are they completely out?

4    A.   April of 2015.

5    Q.   And the fact that they --

6    A.   But they never completely -- there are ongoing cases.

7    Q.   There are still multiple litigations as a result of it?

8    A.   That's correct.

9              THE COURT:  Ladies and gentlemen, as I told you

10   before, the conspiracy charged in the indictment is alleged to

11   have come to an end in August 2013.  You may not consider any

12   evidence of what transpired after that date as evidence of the

13   charged crimes.

14             MR. SCOTTEN:  I think that's all I have, your Honor.

15   Let me just check.

16             Nothing further, your Honor.

17             THE COURT:  Thank you.

18             Redirect.

19             MR. BATH:  Thank you, Judge.

20   REDIRECT EXAMINATION

21   BY MR. BATH:

22   Q.   Mr. Douglas, am I correct that when you're winding things

23   down for the Miami, Tim Muir helped you with that?

24   A.   I don't think he helped with that too much.  I don't know.

25   Q.   Do you know?

1   A.  No.

2   Q.  OK.  So when you say winding things down and who was

3   present and who's not present, you don't know what everybody's

4   doing there, do you?

5   A.  Right.

6   Q.  OK.  You talked about, I think you said Tim and Brett

7   Chapin made alterations to the books; that was your testimony?

8   A.  They were -- when I got there, the two accounting managers

9   said they had directed them to make certain entries.

10  Q.  OK.  Is an entry different than alteration?

11  A.  Yes.

12  Q.  Sounds different, and how is it different?

13  A.  An entry is just going in and putting in what, what you're

14  told.

15  Q.  All right.  Is there something improper about an accounting

16  entry?

17  A.  I mean, there's nothing improper about it unless it's done

18  wrong.

19  Q.  OK.  And you're not saying they were done wrong, are you?

20  A.  It was pretty sloppy accounting when I got there.

21  Q.  OK, but we're not talking about what the entries, and you

22  said Timothy Muir and Brett Chapin made -- are you saying they

23  were wrong on those entries, or are you just giving examples?

24  A.  Just giving examples.

25  Q.  OK.  You're not here to give us any specific examples of

1   something Mr. Muir did wrong with the books, are you?

2   A.  No.

3   Q.  And Chapin, who is Mr. Chapin?

4   A.  He was just a tax attorney when I got there.  He was still

5   around for a little bit, but not too often.

6   Q.  He was not employed by the Muir firm, or was he?

7   A.  Not that I'm aware.

8   Q.  So he was an independent lawyer and accountant, is that

9   right?

10  A.  That is correct.

11  Q.  And he was working for Mr. Tucker?

12  A.  Yes.

13  Q.  All right.  So when you were questioned earlier about them

14  doing things together, meaning Muir and Chapin, they weren't

15  doing things together, to your knowledge, were they?

16  A.  Not that I'm aware of.

17  Q.  OK.  Chapin may have done some things, and then separately,

18  there may have been entries Mr. Muir required, is that right?

19  A.  That may be correct.

20  Q.  Or that Mr. Muir asked for, but you weren't involved in

21  those entries, were you?

22  A.  No, I was not there at the time.

23  Q.  So when you're talking about alterations made by these two

24  people, are you saying you're testifying about things you were

25  told about or things you knew about?

1   A.  Things that I was told about.

2   Q.  OK.  Who told you about that?

3   A.  Again, the two accounting managers --

4   Q.  OK.

5   A.  -- at AMG when I arrived.

6   Q.  All right.  And who were they?

7   A.  Mark -- Gary Hamilton.  I can't think of Mark's last name

8   off the top of my head.

9   Q.  So if we wanted to know whether or not there was really

10  something improper about those entries or alterations, we would

11  have to hear from them, wouldn't we?

12          MR. SCOTTEN:  Objection.

13          THE COURT:  If you know.  Do you know the answer to

14  that question?

15          THE WITNESS:  I'm not sure.

16  BY MR. BATH:

17  Q.  All right.  Well, you don't know, do you?

18  A.  I don't know.

19  Q.  We know that you're not the person to tell us anything

20  about that, fair to say?

21  A.  Yes.

22  Q.  OK.  You were shown financial statement, that last page,

23  and if you need to look at any of them, tell me and I'll put

24  them up.  But you were asked about the word "effect," remember

25  that?

1   A.  Yes.

2          MR. BATH:  In fact, let's put that up, Eli.  Put the

3   last page of 872 up for Mr. Douglas.

4   Q.  So this last page, it starts -- at the top, it says

5   accounting policies and procedures and risk management, does it

6   not?

7   A.  Yes.

8   Q.  Then we have all these definitions, do we not?

9   A.  That is correct.

10  Q.  One of those definitions was effect, was it not?

11  A.  Yes.

12  Q.  And are these definitions used typically by auditors when

13  they do these reports?

14  A.  Yes.

15  Q.  OK, so you don't know -- so you've seen these before in

16  other work papers?

17  A.  Yes.

18  Q.  OK.  Including the word "effect"?

19  A.  Yes.

20  Q.  All right.  And the definition of effect?

21  A.  Yes.

22  Q.  All right.  So that's the standard sort of cover-yourself

23  language that auditors use?

24  A.  Most generally, yes.

25          MR. BATH:  That's all I have.  Thank you.

1          THE COURT:  All right.  You may step down, sir.

2          (Witness excused)

3          THE COURT:  Ladies and gentlemen, let's take our

4     midafternoon break.  Please do not discuss the case among

5     yourselves or with anyone.  We'll be back in five minutes, ten

6     minutes.

7          Sir, you can leave all the papers right there.  Thank

8     you.

9          (Jury not present)

10         THE COURT:  See you in ten minutes.

11         (Recess)

12         THE COURT:  Bring our jury in, please.

13         MR. ROTH:  Judge, may I seat the witness, our next

14    witness?

15         THE COURT:  Yes.

16         (Jury present)

17         THE COURT:  The defense may call its next witness.

18         MR. ROTH:  Thank you, your Honor.  The defense calls

19    Clifford Cohen.

20     CLIFFORD COHEN,

21         called as a witness by the Defendants,

22         having been duly sworn, testified as follows:

23    DIRECT EXAMINATION

24    BY MR. ROTH:

25    Q.  Good afternoon, Mr. Cohen.

1    A.   Good afternoon.

2    Q.   Where do you reside, sir?

3    A.   In Leawood, Kansas.

4    Q.   Where were you born, sir?

5    A.   I was born in Kansas City, Missouri.

6    Q.   How old are you, sir?

7    A.   68.

8    Q.   Tell the members of the jury, if you would, sir, your

9    educational background.

10   A.   I have a B.S. in education, 1970, from the university of

11   Kansas, and I have a J.D., a law degree, from University of

12   Missouri at Kansas City in 1974.

13   Q.   When you got out of law school, could you just take us

14   through your professional career, your background, sir?

15   A.   I practiced with a small general practice firm in Kansas

16   City, Kansas, for a year and a half, and in September of '75, I

17   was appointed an assistant public defender in Kansas City,

18   Missouri.  In January of '77, I became chief public defender in

19   Kansas City; stayed in that position through the end of 1980;

20   went into private practice and have been with two firms, but

21   self-employed since 1980.

22   Q.   And what areas of expertise did you develop over that

23   course of your professional training and practice?

24   A.   I think I had expertise in criminal law, which I did

25   primarily for 12 years.  After that I did commercial trial work

1   and general corporate law, and in the last eight years, I've

2   changed my focus to education law.  I primarily represent

3   students, teachers and professors in educational disputes.

4   Q.  Have you served on any professional committees?

5   A.  Yes.  I've been an investigator for the Kansas disciplinary

6   system for 30 years, through the county ethics and grievance

7   committee.  That's been my primary bar activity.

8   Q.  Mr. Cohen, do you know Scott Tucker?

9   A.  I do.

10  Q.  And was he a client of yours?

11  A.  Yes.

12  Q.  Can you identify him in the courtroom today?

13  A.  Scott's got a red tie on.  He's right there.

14          THE COURT:  Identification noted.

15          MR. ROTH:  Thank you.

16  Q.  And when was the last time you saw Mr. Tucker?

17  A.  Well, before yesterday in the hallway, I had seen him

18  roughly a year ago in his attorney's office in Kansas City,

19  Missouri.

20  Q.  When was the first time he was a client of yours, sir?

21  A.  My best recollection is 1998.

22  Q.  And what type of matters were you handling for him then,

23  sir?

24  A.  A variety of commercial law, consumer law advice; some real

25  estate transactions; some HR-personnel issues.  I was kind of a

1  generalist for him.  Whatever he needed that I could help him

2  with, I did.

3  Q.  Did there come a time, sir, when he asked you for legal

4  help or advice in regard to a business model concerning tribes

5  lending?

6  A.  Yes, sir.

7  Q.  And do you recall exactly when that was, more or less?

8  A.  I have reviewed my billing records to refresh my

9  recollection, and so based on that, I believe that was August

10  of 2003.

11  Q.  And at that time, just in general terms, what did he tell

12  you about his business plan?

13  A.  He told me that he was interested in partnering with

14  American Indian tribes, who he had been advised had sovereign

15  immunity, and that as a partner with them, he believed he also

16  could have sovereign immunity, and he provided me a copy of a

17  letter from an attorney in Portland, Oregon, who had given him

18  this advice.

19  Q.  If I could stop you for a moment, based on your discussions

20  with him, did you compose a letter of intent?

21  A.  Yes.

22          MR. ROTH:  I'd ask that the witness be shown

23  Government Exhibit 208, that's in evidence.  And you could flip

24  to the last page, if you could, Eli.  I think that's a

25  three-page document.

Ha3Wtuc5                    Cohen - Direct

Q.  Could you summarize, starting at the second page, the

general terms of the proposed agreement?

A.  Now, this is a letter that I wrote for Mr. Tucker to sign

that outlined the key terms of a partnership, for lack of a

better word, between a Tucker enterprise that actually hadn't

been incorporated yet, but that was part of the plan, to

incorporate a specific corporation to do business with the

Kickapoo tribe or its tribal corporation, and so these eight

items, very quickly, that the tribe would --

Q.  If you could just give the general headings of those.

A.  Yeah, tribal entity, National Money Service subsidiary.

            (Continued on next page)

1    Q.  You were referring to what there?

2    A.  Well, that would be the specific new entity, which I think

3    ended up being Universal Management Services; that would be a

4    subsidiary of National Money Service, Inc.

5    Q.  Go on through the points, just briefly.

6    A.  So the tribe and the tribal entity will not be required to

7    provide investment capital, Mr. Tucker's company was going to

8    do that.

9         The fee agreement was a minimum fee of $20,000 for a

10   month.

11        The duration of the agreement was five years at the

12   outside, but it was going to be cancelable by either party

13   within 90 days' notice.

14        Next, the duties of the Kickapoo tribe.  It must

15   incorporate and provide office space on tribal land, designate

16   at least two individuals to serve as officers and be

17   responsible for working with Universal Management Services.

18   And then kind of a general promise that the tribe would agree

19   to do all things reasonably necessary to carry on the payday

20   loan business as a lender, with the full support of Universal

21   Management Services, Inc.

22        You want me to go to the next one?

23   Q.  Briefly summarize it.

24   A.  Item 7, tribal employment.  It really just says there can

25   be employment opportunities on the reservation for tribal

1    members.

2        And, finally, termination of agreement.  Each party to the

3    agreement will have clearly stated rights to terminate the

4    agreement if they are dissatisfied.

5    Q.  Thank you, sir.

6        That was just a letter of intent, is that correct?

7    A.  Yes, sir.

8    Q.  And did you also, sir, create a plan overview for the

9    Kickapoo Sovereign Lending Corporation?

10   A.  I did.

11           MR. ROTH:  I'd ask the witness be shown D109, please.

12   Q.  That's again a three-page document.  You can just flip

13   through that and see if that refreshes your recollection of

14   whether that's a document that you drew up on behalf of Mr.

15   Tucker.

16   A.  Well, I can tell you without reading the whole document

17   that it is a document I drew up because that's my handwriting

18   at the upper right that says, "Final sent to Jerry Aday

19   10/9/03." I wrote that.

20   Q.  We will come back to who Jerry Aday is in a moment.

21           MR. ROTH:  Judge, I ask that that be moved into

22   evidence.

23           THE COURT:  Any objection?

24           MR. SCOTTEN:  No, your Honor.

25           THE COURT:  Received.

(Defendants' Exhibit D109 received in evidence)

Q.  You mentioned before, sir, that Mr. Tucker told you he had

consulted with another attorney about this business plan before

he came to you, is that correct?

A.  Yes, sir.

Q.  Did he ask that attorney the same advice that he was asking

you for?

A.  Well, of course I wasn't present for his initial

conversation with her.  Her name is Ellen Bachman.  I concluded

that he asked her for advice because she wrote him a nine-page,

single-spaced advice letter, dated in July of '03, and I got a

copy of it.

Q.  Sir, when you were introduced to Ms. Bachman, had you known

her previously?

A.  No.

Q.  Did Mr. Tucker provide you with anything in regard to

Ms. Bachman's professional background?

A.  He provided me a multipage biography that had the name of

her law firm, Preston Gates & Ellis, of Portland, Oregon.  It

had her photo and it described her specialty in American Indian

tribal law.

        MR. ROTH:  I would ask that the witness be shown

Defendants' 104, please.

Q.  Does that look like the bio that was published on her Web

site that you viewed in 2003?

1          THE COURT:  Sustained as to form.

2          Why don't you rephrase it.

3    Q.  Does that refresh your recollection as to the document

4    you're talking about in regard to Ms. Bachman?

5          MR. SCOTTEN:  Objection.

6          THE COURT:  Sustained.

7    Q.  What is that document, sir?  Do you recognize it?

8    A.  I do.

9    Q.  What do you recognize it as, sir?

10   A.  It is Ellen Bachman's biography that I looked at in August

11   of 2003.

12         MR. ROTH:  I would move that in, your Honor.

13         THE COURT:  Any objection?

14         MR. SCOTTEN:  I have objection on relevance and

15   hearsay.

16         THE COURT:  I will allow it.

17         (Defendants' Exhibit 104 received in evidence)

18   Q.  What background of her professional background struck you

19   when you read that, if anything?

20   A.  A couple of things.  She had a degree with distinction and

21   was a Phi Beta Kappa at Stanford University.  She had been with

22   this prominent Portland law firm for 27 years, and had done

23   many transactions involving American Indian tribes, and had

24   written extensively about those matters.  And so I believed

25   that she had expertise in tribal law and tribal entities.

1    Q.  In the course of your representation of Mr. Tucker

2    regarding this business venture, did you have conversations

3    with her?

4    A.  I had two conversations that I can recall.

5    Q.  Did she seem knowledgeable --

6    A.  Yes.

7    Q.  -- on the subject matter?

8    A.  She did.

9           MR. ROTH:  We can take that down now, Eli.

10   Q.  I think you indicated that Mr. Tucker gave you a letter

11   that she had provided him, is that correct?

12   A.  Yes, sir.

13          MR. ROTH:  I would ask that the witness be shown D202,

14   please.

15   Q.  Take a moment, sir, and if you need the pages turned, we

16   will turn them for you.

17       I will ask you if you recognize that document in front of

18   you.

19   A.  I do recognize that.  That is --

20   Q.  What do you recognize it to be?

21   A.  Well, this is the first of nine pages of Ellen Bachman's

22   letter to Mr. Tucker, dated July 28, 2003, on the subject of

23   the tribal partnership enterprise he proposed and her opinion

24   as to how it should be done properly.

25   Q.  Did you ultimately render an opinion, a legal opinion,

1    about the legal viability of the business model to Mr. Tucker?

2    A.  I did.

3    Q.  Did you use this letter in part to rely on?

4    A.  I think this letter was a significant part of the basis for

5    my opinion, but not the entire basis.

6              MR. ROTH:  I would move in Defendants' Exhibit 202.

7              MR. SCOTTEN:  No objection.

8              THE COURT:  Ladies and gentlemen, this testimony is

9    being taken solely as it bears on the willfulness and intent of

10   the defendant Tucker in connection with certain activities

11   taken, and will be explained further in my final instructions.

12   So that's the sole purpose of this testimony.

13             Go ahead.

14             (Defendants' Exhibit 202 received in evidence)

15   Q.  Did you do your own independent research in addition to

16   reading this letter?

17   A.  Yes.

18   Q.  Did Mr. Tucker restrain you, in terms of a budget

19   monetarily, in terms of how many hours you can expend or how

20   much money you can expend on research?

21   A.  No.

22   Q.  If you would, sir, walk us through your understanding of

23   the headings in this letter and your understanding of the law

24   as it applied.

25             MR. SCOTTEN:  Objection.  Relevance.  I think it

1   should be what was explained to the defendant.

2           THE COURT:  The question here is what this witness

3   told Mr. Tucker.  That's the issue.

4   Q.  Based on your independent research, sir, and reading this

5   letter, could you summarize the advice that you gave Mr. Tucker

6   in terms of the viability of the tribal lending model that he

7   proposed?

8   A.  The bottom-line advice that I gave him is that there was

9   precedent for a non-Indian corporation to partner with an

10  Indian tribe to implement a tribal enterprise, and that that

11  had been deemed lawful by a United States Court of Appeals in

12  1987 in a case involving a national bingo administrator who did

13  work for many tribes.  The case's name is *Indian Country USA*.

14          THE COURT:  Your testimony is what you said to Mr.

15  Tucker, orally or in writing.  Do you understand that?

16          THE WITNESS:  I do.

17          THE COURT:  Thank you.

18  A.  Quite specifically, my advice to Mr. Tucker was, having

19  read Ellen Bachman's letter, having done my own research, and

20  having focused on this Tenth Circuit Court of Appeals case, I

21  told Mr. Tucker that I thought if he followed my advice and

22  Ellen's advice about how to construct the relationship and how

23  to govern himself appropriately, that the arrangement would be

24  lawful.

25  Q.  Thank you.  We will get back to what, if any, documents you

1    drafted in connection with this.

2        Did you at a certain time visit the Kickapoo tribe

3    reservation?

4    A.  Yes.

5    Q.  Who did you go with, sir?

6    A.  I went with Mr. Tucker and a gentleman named Jerry Aday.

7    Q.  Is that the fellow whose name you wrote on the business

8    plan?

9    A.  Yes.

10   Q.  Who is Jerry Aday, to your knowledge?

11   A.  To my recollection, he was a former Kansas state

12   representative who had relationships with various tribes,

13   including the Kickapoo, and Jerry would be helpful in

14   introducing Mr. Tucker and his business idea to the tribe.

15   Q.  Did you drive out with Mr. Aday and Mr. Tucker?

16   A.  Mr. Tucker picked me up at my office.  We drove to Jerry

17   Aday's home, picked him up, and then drove to the reservation.

18   Q.  How far away was the reservation from you, more or less?

19   A.  It's a little more than an hour north of Topeka.

20   Q.  Did you make a presentation to the tribe at that time with

21   Mr. Tucker's business model?

22   A.  Yes.

23   Q.  Who was present for the tribe?

24   A.  The tribe had a tribal council president whose name is

25   Steve Cadue.  He was there with seven or eight other members of

1  the tribal council.

2  Q.  Did the tribe have an attorney at that point?

3  A.  We were told -- I was told that they had an attorney named

4  Elsa Smith.  She was not at that meeting, but she and I spoke

5  and met personally later.

6  Q.  Where did you meet Elsa Smith?

7  A.  She came to my office in Leawood, Kansas?

8  Q.  Was that part of the negotiation to see whether there could

9  be a so-called meeting of the minds between the tribe and Mr.

10 Tucker's entity?

11 A.  Yes.

12 Q.  How would you describe the nature of the negotiations?

13          MR. SCOTTEN:  Objection.  I don't think the defendant

14 is involved in this anywhere, the two lawyers' conversation.

15          MR. ROTH:  I am talking about during the presentation,

16 if I wasn't clear.  I apologize.

17          THE COURT:  Why don't you set the stage, sir.

18 Q.  When you were out at the tribe making the presentation to

19 the tribal council, how would you characterize the nature of

20 those negotiations?

21 A.  They were friendly.  Mr. Cadue had a number of questions

22 about the tribe's responsibilities, what Mr. Tucker was

23 bringing to the relationship, what level of financial

24 commitment he was making, and he was quite interested in

25 knowing if there would be a minimum payment to the tribe on a

1   monthly basis.

2   Q.  Would you characterize the negotiations as what we call an

3   arm's-length negotiation?

4   A.  Yes.  I mean, it was not a deal that had been previously

5   agreed to.  The tribe did not tell us that we had a deal when

6   we left the meeting.  They said they were going to talk about

7   it and let us know.

8   Q.  Did Mr. Tucker, with your assistance, engage another

9   attorney to assist the tribe in the course of this business

10  model?

11  A.  He engaged an attorney named Conly Schulte at some point,

12  and I believe that's the lawyer from Omaha who provided some

13  assistance.

14  Q.  Did you ever correspond or talk to Mr. Schulte?

15  A.  I did have some e-mail exchanges with him and a few

16  telephone calls.

17  Q.  What, if anything, was your understanding of the nature of

18  his background?

19  A.  I could tell you what he offered to do and what I agreed

20  that he should do.

21          THE COURT:  Can you fix a point in time on this, Mr.

22  Roth?

23  Q.  This was during the course of the negotiations with the

24  Kickapoo, is that correct?  Or had a deal been struck?

25  A.  I don't actually remember whether his work was -- well, I

1   can tell you this.

2              THE COURT:  Well, can you answer the question that was

3   asked?

4   A.  Would you repeat the question?

5   Q.  Was Mr. Schulte brought in to help consummate the deal or

6   before the deal was made, if you recall?

7   A.  I recall him being brought in before the deal was signed.

8   Q.  Specifically, what services was he brought in to do, if you

9   recall?

10  A.  To prepare tribal incorporation documents, including tribal

11  bylaws.

12  Q.  Who was paying for that, sir?  Who offered to pay for that,

13  if anyone?

14  A.  Mr. Tucker offered to pay for that.

15  Q.  What did you view Mr. Schulte's relationship to your law

16  firm to be in this project?

17  A.  I treated him as a co-counsel.  He helped me with my

18  objectives by preparing these tribal organizational documents

19  that were essential to getting the service agreement signed.

20  Q.  So you mentioned service agreement, sir.  At sometime, did

21  you draft what you just called a service agreement?

22  A.  Yes, sir.

23  Q.  That service agreement --

24             MR. ROTH:  I'd ask that the witness be shown 156B.

25  It's been admitted.

1   Q.  Take a moment and look at that.

2   A.  Yeah.  I recognize this as the service agreement that I

3   prepared, and it's got Mr. Tucker's signature, or initials,

4   with the date 2/3/2004.

5   Q.  On the last page, page 3, do you recognize the signatures

6   there?

7   A.  Yes.  That's Mr. Tucker's signature, with the date

8   2/3/2004.

9   Q.  Who, if anyone, signed for the KLC, Inc.?

10  A.  That's the tribal president, Steve Cadue.

11  Q.  I would like you to, sir, explain, if you will, first of

12  all, who were the parties to this agreement?

13  A.  Kickapoo Lending Corporation is a specifically formed

14  tribal authorized corporation.

15  Q.  Who incorporated them?

16  A.  Well, I believe Conly Schulte assisted the tribe, but Elsa

17  Smith was also involved in that.  And then I was advising

18  Universal Management Services, Inc., a newly formed corporation

19  owned by National Money Service, Scott Tucker's primary lending

20  company.

21  Q.  So could you go through, starting at the "now therefore" on

22  the bottom of the first page, the paragraph there, and tell me

23  the significance of why you drew this document as you did.

24       MR. SCOTTEN:  Objection, unless there is a connection

25  to the defendant.

1          THE COURT:  Try to lay a foundation.

2    Q.  You said you incorporated a newly incorporated corporation,

3    Universal Management Services, Inc.  Who did you understand was

4    the principal of that corporation?

5    A.  Well, that was a subsidiary of National Money Service, Inc.

6    So under Kansas law, National Money Service owned 100 percent

7    of the stock of Universal Management, but on a personal level,

8    National Money was a Tucker-owned entity, and therefore its

9    subsidiary would also be a Tucker-owned entity.

10   Q.  So this service agreement, although it's Universal

11   Management Services and the Kickapoo Lending Corporation, for

12   the purposes of this conversation, it's Scott Tucker, is that

13   correct, as the servicer here?

14   A.  I would agree that Scott Tucker was the key individual

15   behind the corporate entity, Universal Management Services,

16   Inc.

17   Q.  Briefly, sir, without reading everything, let's go to

18   paragraph 1.

19        That indicates that UMS was going to provide the capital

20   for the payday loan business to be administered by them, is

21   that correct?

22   A.  Yes.  That was a feature discussed in the meeting on the

23   reservation that I previously described.

24   Q.  Paragraph 2, UMS was going to furnish for the benefit of

25   KLC their support, equipment, business arrangements to conduct

1  the payday loan business, including things like advertising and

2  promotion, etc., is that correct?

3  A.  Yes.  Mr. Tucker already had an office with equipment and

4  personnel in Overland Park, Kansas.

5  Q.  What were the tribal duties?

6  A.  The tribe was to furnish an office on the reservation and

7  one employee to act as administrator of the loan program, and

8  other employees as were necessary to administer the loan

9  program.  So they promised to do all of that.  And it sort of

10 may be a little repetitious, but it clearly specifies that the

11 Kickapoo Loan Corporation's office was to be located on the

12 reservation, and that Kickapoo Loan Corporation would cooperate

13 with Universal Management to do whatever was necessary to carry

14 on the payday loan business.

15 Q.  Paragraph 4, was the agreement term for a period of five

16 years, but could be canceled on notice, 90 days, by either

17 party?

18 A.  That's true.

19 Q.  What was the fee arrangement, sir?

20 A.  The fee arrangement was a minimum of $20,000 per month,

21 with a maximum fee of 1 percent of the gross collected revenue

22 of the payday loan operation.

23 Q.  Sir, were you involved at all in those financial terms that

24 were negotiated, the fee arrangement?

25 A.  I was only involved to communicate to the tribe's attorney

1   what Mr. Tucker was willing to agree to, and I was told that

2   was acceptable to the tribe so I wrote it in the agreement.

3   Q.  Did you have any opinion, express an opinion to Mr. Tucker

4   whether that was an unfair agreement term?

5   A.  I don't think he asked my opinion about that.  I am pretty

6   sure I didn't offer it.  That was an issue that was discussed

7   in my presence with the tribal council, and so my belief was it

8   was not a contested issue.

9   Q.  What was the applicable law provision in paragraph 7?

10  A.  It was a general statement that the parties would observe

11  all applicable federal and state laws, to the extent they are

12  not deemed unenforceable based upon sovereign immunity.

13  Q.  How were the disputes to be resolved?

14  A.  They were to be resolved by a referral to the Kickapoo

15  Tribal Court, because as a sovereign nation, they couldn't be

16  compelled to come in to a Kansas state court or a federal

17  court.

18          MR. SCOTTEN:  Objection.

19  A.  That was my opinion.

20          MR. SCOTTEN:  Unless that opinion was expressed to

21  Scott Tucker, in which case I have no objection.

22          THE COURT:  Sustained.  You can ask a new question.

23          Go ahead.

24  Q.  Did you explain to Scott Tucker the concept of sovereign

25  immunity?

1    A.   I had several conversations with Mr. Tucker about sovereign

2    immunity, yes.

3    Q.   Can you summarize those conversations with Mr. Tucker, what

4    you conveyed to him?

5    A.   They were principally on the point of his work on behalf of

6    a tribal corporation being immune from regulation by Kansas

7    state regulators, such as the Department of Revenue or the bank

8    commissioner, because he would be clothed with the same

9    sovereign immunity that the tribe enjoyed.

10   Q.   Did you explain the concept of tribal sovereign immunity as

11   opposed to just sovereign immunity?

12   A.   Yes.  I told him tribal sovereign immunity had been a

13   concept known in the law for many years.  I made reference to

14   Ellen Bachman's opinion letter, and I specifically advised him

15   that being in Kansas, we were governed by the United States

16   Court of Appeals' decisions in the Tenth Circuit, and I

17   specifically referenced my opinion based on the 1987 Tenth

18   Circuit case that I mentioned.

19   Q.   In the last paragraph, last sentence in paragraph 7, it

20   indicates that nothing in the agreement was deemed to be a

21   waiver of the Kickapoo tribe's sovereign immunity, is that

22   correct?

23   A.   That's correct.

24   Q.   Finally, jumping ahead to paragraph 12, there was some

25   indemnification provision there, is that correct?

1   A.  Yes.

2   Q.  And UMS agreed to pay, for instance, for services of an

3   attorney to defend any actions that arose from this agreement,

4   is that correct?

5   A.  Yes.

6   Q.  Was it your intention in drafting this agreement, sir, that

7   the tribe would preserve its sovereign immunity and tribal

8   sovereign immunity?

9   A.  Yes.

10          MR. ROTH:  We can take that down now.

11          I ask that the witness be shown Defendants' 147.

12  Q.  I ask you if you recognize that document, sir.

13  A.  Yes.  This is the articles of incorporation for KLC, Inc.,

14  also known as Kickapoo Lending Corporation.

15  Q.  If you leaf through the pages there, towards the end do you

16  also see the bylaws as well?

17      I'm sorry.  I take that back.

18      The last page, which is Bates stamped 400, that is a fax

19  transmittal sheet, is that correct?

20  A.  That hasn't come up on the screen yet.

21  Q.  It will.

22      While we are waiting for that, is this the document that

23  you indicated that Mr. Conly drafted for the Kickapoos?

24  A.  I think you're referring to Conly Schulte.

25  Q.  Conly Schulte.  I'm sorry.

1  A.  Yes.  He is the draftsman of this agreement.

2  Q.  So that shows that you sent that to Mr. Tucker, is that

3  correct?

4  A.  Well, that is my best recollection that that's why it's

5  connected in the sequence that it is at the end of that

6  document, because I would have faxed that to Mr. Tucker.

7  Q.  Just going back to the first page, if we could look at, of

8  that document, paragraph 3.1, it's underlined.

9        If you could read that sentence that starts with "this

10  primary purpose."

11  A.  "This primary purpose specifically comprehends that the

12  corporation provide and/or administer short-term loans and cash

13  advance services ('payday loans') and associated services on

14  lands of the Kickapoo Tribe of Kansas."

15  Q.  When you received that document, that was signed by tribal

16  members who were the incorporators, is that correct?

17  A.  Yes.  It was sent to me with the communication that the

18  tribe had adopted this set of articles of incorporation.

19  Q.  In connection with setting up the tribal lending

20  corporation, did you cause to have a power of attorney prepared

21  for Mr. Tucker?

22  A.  Yes.

23        MR. ROTH:  I'd ask that the witness be shown

24  Government Exhibit 202, which has already been admitted.

25  Q.  Do you recognize this, sir, as the power of attorney that

1  you prepared for Mr. Tucker in connection with the Kickapoo

2  Lending Corporation?

3  A.  It is the power of attorney that I prepared for the

4  Kickapoo Lending Corporation agreement.

5  Q.  Is it fair to say, sir, that gives Mr. Tucker power to open

6  bank accounts on behalf of the Kickapoo Lending Corporation?

7  A.  Well, not only to open the account, but to operate the

8  account and to issue checks and to make deposits and to use the

9  account really as though it was his account.

10  Q.  Who was the, what we call the donor, who gave that power,

11  who signed that power?

12  A.  KLC, Inc., the Kickapoo tribal corporation.

13  Q.  Was there a person?

14       MR. ROTH:  If you could blow up, Eli, the first

15  sentence.

16  A.  Well, that's Steve Cadue, the gentleman that I met at the

17  first meeting I testified about.

18  Q.  Was that power of attorney inconsistent with the tribe's

19  ownership of the lending business?

20  A.  Not in my opinion.

21  Q.  Is that because this power was -- is this power revocable

22  at any time by the donor?

23  A.  Yes, because it expressly says in the final paragraph "and

24  may be modified or terminated by verified resolution of the

25  tribe upon notice in writing."

1   Q.  Sometime after the agreement was signed, did you have cause

2   to write Mr. Tucker an actual opinion letter concerning the

3   enterprise that he had formed?

4   A.  Yes.

5   Q.  Do you recall when that was, sir?

6   A.  March 25, 2004.

7   Q.  By the way, that was a long time ago.  Why do you have the

8   ability to recall the actual date?

9   A.  Knowing that these events are 13 to 14 years ago, I have

10  spent about 25 hours in the last month reviewing hundreds of

11  pages of documents, all my time records, and tried to refresh

12  my recollection.

13  Q.  Prior to testifying today, sir, did you make yourself

14  available to the government, the U.S. attorneys here, to be

15  interviewed?

16  A.  Yes.

17  Q.  How many times did they interview you, sir?

18  A.  They interviewed me in January of this year for four hours,

19  and they interviewed me Friday for about 45 minutes, and again

20  Sunday morning for 30 minutes.

21  Q.  What prompted you, sir, to issue the letter to Mr. Tucker

22  on March 25, 2004?

23  A.  Two things.  Mr. Tucker asked me to be careful and certain

24  that he was going to be successful in making this tribal

25  arrangement legally compliant.  So one was the client's

 1    request.  And the second was my own sense of obligation that I

 2    wanted him to clearly understand what the requirements were.

 3    Q.  Did you also in that letter do a draft to a Kansas agency

 4    as well?

 5    A.  The same day I wrote a letter to the Deputy Bank

 6    Commissioner, Danny Vopat, of the Kansas Banking Commission.

 7    Q.  What was the purpose of that letter, sir?

 8    A.  The purpose, frankly, was to discourage that agency from

 9    pursuing a subpoena for records of one or more corporations

10    operated by Mr. Tucker that were involved in tribal lending.  I

11    gave Mr. Vopat my opinion that his efforts were really

12    prevented by sovereign immunity, that he could no more get the

13    records of a tribal lending corporation partner than the tribal

14    lending corporation itself.

15    Q.  Was that letter successful?  Was there any further action

16    in regard to that subpoena?

17    A.  I concluded that the letter was successful because the

18    Kansas bank commissioner dropped the matter.

19    Q.  In your opinion, the legal opinions that you expressed to

20    Mr. Tucker, did you indicate ways that he could make his model

21    more defensible, if you will?

22    A.  Yes.  The last page of my opinion refers to five key

23    aspects of his company's behavior that I thought were important

24    to being considered a true agent of a tribal lending

25    enterprise.

1   Q.  By the way, did you consider the Bachman letter to be a

2   blueprint for what criteria had to be met?

3             MR. SCOTTEN:  Objection, unless there is communication

4   with the defendant.

5             THE COURT:  Sustained.  Rephrase it.

6   Q.  Did you communicate in your letter that we are talking

7   about, the March letter, to Mr. Tucker that there were any

8   absolute criteria that had to be met for his model to be

9   successful?

10            MR. SCOTTEN:  Objection.  Relevance.  Flipping the

11  standard for advice of counsel.

12            THE COURT:  Sustained.  Rephrase it.

13  Q.  Did you tell Mr. Tucker to discontinue his operation in any

14  way?

15            MR. SCOTTEN:  Objection.  Relevance.

16            THE COURT:  I will allow it.

17  A.  No.  I never told --

18            THE COURT:  You have answered the question.

19            THE WITNESS:  I'm sorry, your Honor.

20            THE COURT:  You answered the question, right?

21            THE WITNESS:  Thank you.

22            THE COURT:  Next question.

23  Q.  Did you ever advise Mr. Tucker that his business activities

24  with the tribal lending program exposed him to criminal

25  liability?

HA38TUC6                    Cohen - Cross

1          MR. SCOTTEN:  Objection.  Relevance.  Again, it's

2    flipping the standard.

3          THE COURT:  I will allow it.

4    A.  No.

5          MR. ROTH:  I have no further questions.

6          THE COURT:  You may cross-examine.

7    CROSS-EXAMINATION

8    BY MR. SCOTTEN:

9    Q.  Good afternoon, Mr. Cohen.

10   A.  Good afternoon, sir.

11   Q.  How are you?

12   A.  Fine.  Thank you.

13   Q.  We didn't meet in January, did we?

14   A.  No.  It was another assistant U.S. attorney on the

15   telephone in January.

16   Q.  But we spoke on the phone Friday and then briefly again

17   Sunday morning, right?

18   A.  That's correct.

19   Q.  I think you said this already.  Your practice with Scott

20   Tucker was sort of general, you weren't doing one particular

21   thing for him, at least until this payday lending thing began,

22   is that right?

23   A.  You are correct.

24   Q.  You knew when you started working with him on this Kickapoo

25   matter that he was already involved in payday lending, correct?

1   A.  Yes.

2   Q.  You hadn't provided him any advice that that was legal, had

3   you?

4   A.  No.  I didn't offer him specific advice about the legality

5   of his prior payday lending.

6   Q.  You didn't tell him it's legal to charge 700 percent in New

7   York state, did you?

8   A.  I did not.

9   Q.  You didn't review his loan contracts for the loans he was

10  making in New York state in any way, did you?

11  A.  I did not.

12  Q.  But you did start working on this Kickapoo matter?

13  A.  Yes, sir.

14  Q.  I think you testified that a big part of the start was the

15  letter Ellen Bachman wrote?

16  A.  I think that was the start.

17  Q.  That was addressed to Mr. Tucker, but then he sent it to

18  you also, correct?

19  A.  Correct.

20  Q.  So let's take a somewhat closer look at that, if we can.

21          MR. SCOTTEN:  Can we put up Defendants' Exhibit 202.

22  Q.  I don't know if the defendant has handed you a hard copy,

23  but is it fair to say that the first six pages are essentially

24  a summary of the law?  We can scroll through it if that helps.

25  A.  Yes, I agree with your characterization.

HA38TUC6                    Cohen - Cross

1    Q.  So then it's the sixth page where the letter starts

2    providing advice sort of on how to apply that law, what would

3    be legal applying the general law in the first six pages?

4    A.  I agree with that.

5          MR. SCOTTEN:  Let's just blow up the first paragraph

6    under "Sovereign Immunity - Consumer Finance Tribal

7    Enterprise."

8    Q.  So here we see Ms. Bachman, this letter that Scott Tucker

9    received is explaining sort of how things should be done?

10   A.  That is what she is doing, yes.

11   Q.  And the second sentence there talks about the goal of the

12   Consumer Finance Tribal Enterprise is to help the tribe?

13   A.  That is her opinion.

14   Q.  Just to be clear, when we say Consumer Finance Tribal

15   Enterprise, we are talking about something like the Kickapoo

16   Lending Corporation?

17   A.  I agree.

18   Q.  And the National is Scott Tucker's enterprise, National

19   Money Service or whatever name it was using then?

20   A.  That's correct.

21   Q.  So you also want to minimize the allegation that the tribe

22   is only acting as a conduit for National, correct?

23   A.  That's correct.

24   Q.  And conduit is like a pipeline; it shouldn't just be

25   something that passes Scott Tucker's loans through it?

1    A.  Yes.

2               MR. SCOTTEN:  So let's go to page 7.

3               We can zoom back out.

4               Can we focus on the first full paragraph.

5    Q.  So in this paragraph, it talks about the need to approve a

6    servicing agreement.  And we just talked about servicing

7    agreements, right?

8    A.  Yes.

9    Q.  And it also says -- and this is the sentence beginning

10   "need" -- the tribal enterprise will need to determine the

11   amount of the loans?

12   A.  Yes.

13   Q.  The payment terms, including interest rates of the loans,

14   correct?

15   A.  Yes.

16   Q.  It says the tribal corporation will need to make all credit

17   decisions, correct?

18   A.  That's what it says.

19   Q.  It also says the tribal corporation will need to make all

20   the enforcement decisions, correct?

21   A.  That's what it says.

22   Q.  And make all the loans -- make the loans, presumably all

23   the loans, not some, right?

24   A.  Again, that's what it says.

25   Q.  When you say "that's what it says," this was the letter

1    that Scott Tucker brought to you as, I think you said, the

2    blueprint for what needed to be done if it was going to be done

3    legally, correct?

4            MR. ROTH:  Objection.  He didn't say blueprint.

5    Q.  The plan; this was the advice he brought to you as to how

6    this can be done legally, correct?

7    A.  Yes.  This was clearly Ms. Bachman's legal opinion.

8    Q.  Well, you didn't tell Scott Tucker Ms. Bachman is wrong,

9    did you?

10   A.  I did not.

11   Q.  To the contrary, you also relied on this in formulating

12   your advice for Mr. Tucker?

13   A.  And I have testified that I did rely on it to a great

14   extent, and I did.

15   Q.  The last sentence does say that Tucker's enterprise can

16   make recommendations and can do servicing work on the loans?

17   A.  That is what it says.

18   Q.  The loans for which the tribes determine the amount,

19   payment terms and interest rates, made all credit decisions,

20   made all enforcement decisions, and in fact the loans the tribe

21   made.  Tucker can just help by servicing and recommending,

22   correct?

23   A.  This is all part of Ms. Bachman's advice, yes.

24   Q.  Let us go to the -- I think it was the last full paragraph

25   on this page.

1      This also talks about the need for the tribe, the tribal

2    corporation to do licensing so that it can review applications

3    and make final credit determinations, correct?

4    A.   That's what it says.

5    Q.   Let's go to the next paragraph.

6         I want to focus on the last sentence, which is going to

7    lead into the next page.

8         So here it suggests that Scott Tucker should not be the

9    sole source of funds for the loans that are going to be made,

10   correct?

11   A.   That is her suggestion, yes.

12   Q.   And the reason for that suggestion is it would indicate

13   that the tribal corporation is simply acting as a conduit?

14   A.   That was her concern, yes.

15   Q.   And you didn't tell Scott Tucker that concern was invalid,

16   did you?

17   A.   I did not tell him it was invalid.  I did express an

18   opinion also based on my own research.

19   Q.   We will come to your opinion letter in a moment.

20        The reason she says for the suggestion is it would destroy

21   the sovereign immunity exemption.  So she is warning that if

22   you do this, you may destroy the whole legality here, correct?

23   A.   Well, that is certainly the concern she has expressed.

24   Q.   Then let's go all the way on page 8 and the second full

25   paragraph.

1        Here, Ms. Bachman is giving an example of the sort of

2    regulations the tribe might enact, governing interest rates,

3    correct?

4    A.  With regard to three specific Indian reservations, the

5    Navajo, Hopi, and Zuni.

6    Q.  Unlike much of the rest of the letter, this is just an

7    example?

8    A.  It is an example, yes.

9    Q.  And the example she was contemplating was 24 percent

10   interest per year?

11   A.  Well, she uses it, in my opinion, as an illustration.

12   Q.  Is this an opinion that you gave to Scott Tucker?

13   A.  I can't tell you that I specifically discussed this Code of

14   Federal Regulation 141.45 that is cited there.  I don't

15   remember doing that.

16   Q.  So what we know is Scott Tucker, when he saw an example of

17   the contemplated things Ms. Bachman was thinking of, it said 24

18   percent interest; that's what we know?

19   A.  Well, sir, when I read this, I read the whole paragraph,

20   which ends, "We have not been able to find any similar

21   Department of the Interior regulations with respect to any

22   other tribes, however."

23       So I believe that I read the entire paragraph, not just

24   part of it.

25   Q.  I apologize.  And the significance of you reading the

1  entire paragraph?

2  A.  I didn't read it to put a 24 percent interest limit on the

3  Kickapoo project because it was not part of the Navajo, Hopi or

4  Zuni reservations.

5  Q.  Do you see here where it advises Scott Tucker that he can

6  charge 700 percent interest?  It does not, does it?

7  A.  It does not.

8  Q.  All right.  Let us move down to page 9.

9     If we can just look at the conclusion.

10     This conclusion says, in essence, if the things done in

11  this letter are followed, then this should be lawful.

12        It's a summary, but is that a generally accurate

13  summary?

14  A.  Yes.

15        MR. SCOTTEN:  We can zoom out of this.

16  Q.  Now, as an attorney advising Mr. Tucker, you're relying on

17  him generally to know the facts of what is going on on the

18  ground, correct?

19  A.  Yes.

20  Q.  An attorney, generally speaking, doesn't know the facts;

21  they assess the lawfulness of facts their clients bring to

22  them, right?

23  A.  Yes.  I think lawyers are always dependent on the client to

24  provide the blueprint, if you will, of the project, and then

25  the lawyer, taking that set of assumptions, renders an opinion.

1  Q.  So, for example, you were dependent on Scott Tucker to

2  inform you of the details of how the loans here would actually

3  be made, correct?

4  A.  Yes.

5  Q.  And that includes the details of how the bank accounts

6  would work, correct?

7  A.  Well, I don't think in this instance Mr. Tucker gave me the

8  fine-point specifics of the bank account arrangements, nor did

9  I ask him to give me those.

10  Q.  So Mr. Tucker didn't give you the details of how the bank

11  accounts would work?

12  A.  He did not.

13  Q.  We talked before about a power of attorney that allowed Mr.

14  Tucker to essentially have access to an account set up by the

15  Kickapoo Lending Corporation, correct?

16  A.  Correct.

17  Q.  And the purpose behind that was so that Scott Tucker could

18  use that bank account for the benefit of the lending program,

19  correct?

20  A.  Yes, sir.

21  Q.  That did not mean that Scott Tucker was authorized to use

22  it for his personal expenses, did it?

23          It's a yes or no question.

24          I will rephrase it.  Did you advise him that it

25  allowed him to use it for his personal expenses?

1    A.  No, I did not advise him in any regard about that subject.

2    Q.  I think we mentioned before Scott Tucker was going to

3    contribute the capital to the Kickapoo Lending Corporation's

4    account, correct?

5    A.  Yes.

6    Q.  And then the loans were going to be made from that account,

7    correct?

8    A.  Yes.

9    Q.  So the loans would be deemed made with the tribe's money,

10   although that money had been provided by Scott Tucker, correct?

11   A.  Yes.

12   Q.  And you certainly did not advise him that he could continue

13   to use that money as his own, for personal expenses and so on,

14   while claiming it all to be the tribe's money, did you?

15   A.  I did not.

16   Q.  I want to show you what is marked as Defendants' Exhibit

17   121.

18       Do you recognize this?

19   A.  I do recognize this.

20   Q.  Is it a fax that Scott Tucker sent you?

21   A.  Yes.  January 30, 2004.

22           MR. SCOTTEN:  The government offers Defendants' 121.

23           MR. ROTH:  No objection.

24           THE COURT:  Received.

25           (Defendants' Exhibit 121 received in evidence)

HA38TUC6

1          MR. SCOTTEN:  If we can just blow up the very first

2     paragraph of Scott Tucker's text.

3     Q.  I would just ask you to read this, sir.

4     A.  "Cliff, here is a copy of a resolution and power of

5     attorney to open a bank account to fund the loans for the

6     tribes portfolio.  We need this, if we were to get challenged,

7     we can say the loans are funded out of the tribals entities

8     bank account, not mine."

9          MR. SCOTTEN:  We can take that down.

10          THE COURT:  Ladies and gentlemen, on that note we are

11     going to end for the day.  Please do not discuss the case among

12     yourselves or with anyone.  We will be back in action tomorrow

13     morning at the usual time for a good 10:00 start.

14          Thank you, ladies and gentlemen.  Enjoy the evening.

15          (Jury exits courtroom)

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          THE COURT:  Have a very pleasant evening.  See you

2     tomorrow.

3          MR. GINSBERG:  Your Honor, we have some logistical --

4          THE COURT:  Yes, Mr. Ginsberg.

5          MR. GINSBERG:  We have some logistical --

6          THE COURT:  You can step down.

7          Yes, Mr. Ginsberg.

8          MR. GINSBERG:  I wasn't sure what paper you were being

9     handed, but in the last few minutes we were arranging with the

10    marshals, when it became clear Mr. Cohen's testimony wasn't

11    going to be completed, we dealt with that.

12         There are other witnesses, Conly Schulte and Lance

13    Morgan, who are here, and depending on your Honor's ruling, or

14    rulings, regarding the nature of Mr. Schulte's testimony or the

15    scope, and also your ruling as to the subpoena regarding

16    Mr. Muir, we don't know if there is going to be a break and

17    whether those witnesses should stay over, because they may

18    testify tomorrow.  Or if there is going to be a break in order

19    to get documents, which could impact specifically Mr. Schulte's

20    testimony, those witnesses wouldn't be able to go on until we

21    had those documents because we are in the middle of this

22    logistic thing.  I don't want to speak to the substantive

23    issue.

24         THE COURT:  With regard to the advice of counsel

25    defense, I think I have made this plain several times, and I

1    have a feeling that I am repeating myself, but maybe I am not.

2              Mr. Tucker is free to put on an advice of counsel

3    defense.  He can call attorneys who advised him prior to

4    engaging in the conduct alleged in the indictment, his

5    attorneys.

6              MR. GINSBERG:  Yes, your Honor.

7              THE COURT:  As I said, reading a book on law by a

8    noted professor, or watching an NPR special, or hearing the

9    views of the attorney for another party, and obviously the

10   party who stands on the other side of the transaction, the

11   counterparty, is not advice of counsel.  And Mr. Tucker may not

12   offer testimony from a lawyer for the Santee Sioux tribe as to

13   his views of the lawfulness of Mr. Tucker's actions at a point

14   in time when he was not acting as Mr. Tucker's lawyer.

15             Now, that's the general principle that's been teed up

16   by the objection and the ruling.  I don't know the facts.  If

17   the witness comes in and testifies differently from those

18   proffered facts, proffered by the government and not objected

19   to as a proffer by the defense, then that might be a different

20   story.  But if you need me to say the words "that's a ruling,"

21   I say them:  That's a ruling.

22             MR. GINSBERG:  I understand that, your Honor.  I

23   understood that ruling, and I understood that your Honor made

24   the ruling the other day.

25             There is now a second piece to Mr. Schulte's testimony

1    that was I think discussed earlier today, and that is the issue

2    concerning e-mails and the like that may have gone between

3    Mr. Schulte and Mr. Muir, or either or both were copied on

4    them, and Mr. Muir could conceivably use them when he

5    testifies, but it also would impact potentially on the

6    testimony of Mr. Schulte if he is a party to the e-mail.  And

7    the problem we have is that if he is called, and we can't use

8    it until Mr. Muir first testifies about that e-mail, we might

9    then have to recall Mr. Schulte to speak to that same document

10   if we weren't able to do it when he testified the first time.

11              THE COURT:  I appreciate that.  That's probably what

12   would happen.  And this is a product of the timing of the

13   government's application.

14              MR. GINSBERG:  If we have to do it that way we will.

15   We will have to deal with the marshals.  We have to send him

16   home, bring him back, and pay for it again.

17              THE COURT:  And extend the trial, if this is what the

18   government wants.  The thing that is apparent to me is this was

19   something the government could have anticipated.  So this

20   situation is one they created.  I understand and I believe the

21   representation by the government that they just thought of

22   this.  I believe them.  I don't think they are making that up.

23   But I don't find that a good reason.

24              So the government wants to hack up this trial and

25   delay this trial and prolong this trial, they have to tell me

1    that's what they want to do.

2            Now, I will give them -- do you want to confer with

3    one another?  I will give you a break and we will come back and

4    you will let me know if that's what you want to do.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MR. GINSBERG:  We appreciate that, so there's clarity

2    and so we can organize what we have to organize.

3        THE COURT:  All right.  We'll take a ten-minute

4    recess, and the government can decide what it wants to do here.

5    And then I'll decide what my ruling is.

6        MR. GINSBERG:  Yes, your Honor.

7        (Recess)

8        THE COURT:  Please be seated.

9        Let me hear from the government.

10        MR. VELAMOOR:  Judge, we are, as we have been,

11   concerned about delay in this trial.  We want to be respectful

12   of the jury's time, and we believe we have been.  At this

13   point, we don't believe our request for documents would result

14   in a delay of any more than a day, but we do think it's

15   important that the government have these documents, whatever

16   limited communications between Mr. Muir and Mr. Schulte.  As we

17   understand, at this point, the only party here who does not

18   know the content of those communications is the government, and

19   I think as the Court recognized yesterday from the bench, there

20   is a concern in this trial that these documents will come to

21   light, that the defendant Muir, in his testimony, would have

22   the ability essentially to cherry-pick what he relies on

23   without the full set coming to light for all the parties.

24        This gives us concern.  We are sincerely concerned

25   about the jury's time.  We understand from Mr. Ginsberg that

1    there are two additional witnesses in addition to Mr. Cohen who

2    are prepared to testify tomorrow.  Since Mr. Schulte has to be

3    aware of these communications, we don't believe that there

4    needs to be a reason or a likely reason for him to be recalled

5    in this case, again, because he's a party to the communications

6    that are at issue.

7             We are obviously open, obviously the Court's schedule

8    controls, to trying to use Thursday as productively as possible

9    to cover things that we may otherwise have covered next week,

10   during the short week.  Obviously we defer to the Court on that

11   in terms of the charging conference or otherwise.  But

12   obviously we'd be open to using that time as productively as

13   possible, consistent obviously with the schedules of the other

14   parties in the case.

15            We do believe that they're important documents to

16   complete the factual picture, and having come this far, I

17   think, in this trial, it is important that we go forward with

18   those documents.

19            THE COURT:  Let me ask, Mr. Bath, when did Mr. Muir

20   first consult with Mr. Schulte?

21            MR. BATH:  2006.

22            THE COURT:  At or about the time he went to work for

23   Mr. Tucker.

24            MR. BATH:  He went mid-'06, and so I'd say the first

25   90 to 120 days, is my best guess.

Ha3Wtuc7

1          THE COURT:  All right.  I've heard from the

2    government.  Let me hear from you on the crime fraud exception.

3          MR. BATH:  Your Honor, you're familiar with it.  You

4    saw the briefing earlier this year.  The law's not any

5    differently, certainly.

6          THE COURT:  Yes.  We have an opinion in this case on

7    the crime fraud exception.

8          MR. BATH:  Right.  You have now just application of

9    the facts; I think the government's letter indicated that they

10    believe because there's evidence regarding board meeting

11    minutes and there was some information regarding affidavits.

12    I'd submit to you I don't think they've tied the affidavits to

13    Mr. Muir.  They had one witness, when they said, Did Schulte

14    and Muir do it, I think the evidence, documentary evidence, has

15    been Schulte.

16          But at the same time, and I don't want to talk out of

17    both sides of my mouth, if you believe that Schulte was

18    involved and was communicating with Mr. Muir, I'm anticipating

19    this may be the Court's question, I'm not sure that that

20    wouldn't qualify.  I don't think they've met their burden, but

21    I don't have the exact universe of facts for you.  You've heard

22    the case, but we would oppose that finding.

23          THE COURT:  Right.

24          Let me hear from the government.

25          MR. VELAMOOR:  Judge, there are obviously different

Ha3Wtuc7

1    burdens here, and we do not, for example, need to prove beyond

2    a reasonable doubt that Mr. Muir was a knowing participant in

3    these false affidavits.  For example, in order to satisfy our

4    burden on crime fraud, what we need to show merely is that

5    there's probable cause that communications between Mr. Muir and

6    Mr. Schulte were in furtherance of the fraud.

7                THE COURT:  When were the affidavits?

8                MR. VELAMOOR:  The affidavits, according to the

9    evidence in this case, started 2005, extending through 2011.

10   And frankly, that's just one part of it.

11               I mean, frankly, it's been defense counsel who's made

12   clear and has taken numerous opportunities to remind the jury

13   of Mr. Schulte's involvement in all different aspects of this

14   business, from the beginning until the end, and there's no

15   requirement, as the Court knows from its opinion, that we prove

16   for crime fraud that Mr. Schulte was a knowing or culpable

17   participant, merely that he was involved in a crime for which

18   we've established probable cause.

19               THE COURT:  Well, no.  And that the advice was in

20   furtherance of the fraud, and again, as you correctly point

21   out, not that Mr. Schulte needs to be a knowing participant.

22               MR. VELAMOOR:  Correct, and I think that given that we

23   provided some examples in our briefing, the affidavits were one

24   example we provided.

25               THE COURT:  You mentioned the affidavits began in 2005

1    and ended in 2011.  What happened after Mr. Muir's arrival on

2    the scene?

3              MR. VELAMOOR:  To be clear, I think those affidavits

4    even extended -- I'm just standing here recalling, for example,

5    the FTC affidavits in the case as well.

6              THE COURT:  I didn't hear what you said.  The what

7    affidavits?

8              MR. VELAMOOR:  Just standing here --

9              THE COURT:  No.  I heard that part.  The what

10   affidavits?

11             MR. VELAMOOR:  FTC affidavits.

12             THE COURT:  FTC affidavits.

13             MR. VELAMOOR:  Correct.

14             THE COURT:  When were they filed?

15             MR. VELAMOOR:  FTC affidavits, I think, were filed

16   in -- the case certainly was filed in 2012, so that tells us --

17             THE COURT:  OK.

18             MR. VELAMOOR:  Right.

19             THE COURT:  The case you are trying to make out is

20   that beginning in or about 2006, up through the end of the

21   alleged conspiracy, communications by Mr. Muir with Mr. Schulte

22   were in furtherance of a crime or a fraud.

23             MR. VELAMOOR:  Or that there was probable cause to

24   believe that.

25             THE COURT:  Right.

1          MR. VELAMOOR:  Correct.

2          THE COURT:  I got it, but telling me what happened in

3     2012 doesn't tell me what happened in 2006.

4          Now, the thought occurs to me that there has been

5     substantial evidence presented from which I can comfortably

6     conclude that there was a crime in progress well before

7     Mr. Muir's arrival on the scene, and that crime was concealing

8     the identity of the lender; and that advice from Mr. Schulte to

9     the Tucker organization, obtained by and through Mr. Muir, but

10    any advice, whether it was Schulte giving it directly to Tucker

11    or giving it to Mr. Muir, was in furtherance of that crime.

12    That's why I don't know what your cherry-picking affidavit's

13    for.  I'm lost there.

14         MR. VELAMOOR:  That's what I tried to make clear, one,

15    to give some examples of particular instances that have come up

16    in this trial.  We agree absolutely with the proposition the

17    Court just made, that Mr. Muir was essentially the general

18    counsel of the enterprise upon his arrival in 2006; that we've

19    established probable cause that that enterprise was engaged in

20    an ongoing fraud; and that Mr. Schulte was retained and

21    involved in connection with that fraud throughout the time

22    period.  We've offered affidavits, board minutes, certain

23    examples, simply to highlight particular things that have come

24    up during the trial to show the ongoing involvement.  But we

25    absolutely agree that the request, and nor would the crime

1    fraud motion be limited to those examples.

2              THE COURT:  All right.

3              I'll give you an opportunity, Mr. Bath, if there's

4    anything further you want to say.

5              MR. BATH:  No, sir.

6              THE COURT:  I conclude that the crime fraud exception

7    applies because there is probable cause to believe that a crime

8    or fraud has been attempted or committed and indeed was

9    attempted or committed before Mr. Muir went to work for the

10   Tucker organization, and it goes back to late 2003, at least;

11   that communications with Mr. Schulte were in furtherance

12   thereof and were intended to enable, facilitate the criminal

13   activity.  Based on the evidence at trial, I find that the

14   communications between Mr. Schulte and the Tucker organization,

15   including, but not limited to, communications with Mr. Muir or

16   Mr. Tucker regarding the activities of the payday lending

17   business have lost their privileged character and the exception

18   applies.

19             That's where we are on the crime fraud exception.

20             Yes.

21             MR. GINSBERG:  If we're complete with the crime fraud

22   exception, I just want to speak to your Honor in terms of

23   scheduling.

24             THE COURT:  Right.

25             MR. GINSBERG:  We have Mr. Cohen to complete and then

1    Mr. Schulte and Mr. Morgan scheduled to testify tomorrow.  The

2    only witness we would have after that is Mr. Muir.  I don't

3    think that the witnesses we have, besides Mr. Muir, will take

4    us through the whole day tomorrow, and therefore, I think until

5    Mr. Muir can obtain those documents your Honor just ruled upon,

6    Mr. Muir's not going to be -- well, Mr. Bath can speak to that,

7    but I don't think he's going to be in a position to take the

8    stand until those documents have been turned over.

9              THE COURT:  Let me inquire of Mr. Bath and have him

10   make a representation on the record of the quantity of these

11   documents.  I think I heard hundreds or thousands before.

12             MR. BATH:  It will be thousands.

13             THE COURT:  Thousands of communications between?

14             MR. BATH:  Mr. Schulte and Mr. Muir.

15             THE COURT:  All right.

16             MR. BATH:  Or where perhaps it could be Mr. Muir

17   talking to another lawyer and Schulte's copied, I sort of

18   include that.

19             THE COURT:  Right.  I have it.

20             MR. BATH:  I think that would be --

21             THE COURT:  Covered by the ruling.

22             MR. BATH:  Right.  I think there are thousands of

23   emails.

24             THE COURT:  And included in the ruling are other

25   attorneys at Mr. Schulte's firm.

1          MR. ROTH:  To be clear, Judge, Lance Morgan, who is

2     our other witness who we're talking about, he's a partner,

3     Schulte's partner, so he's right in the mix here.

4          THE COURT:  Right, he is.  And I read from the emails,

5     there's a Mr. Nyhan also.

6          MR. ROTH:  Yes.

7          MR. BATH:  And there are other attorneys, but it would

8     be all that firm's lawyers, Judge.  The universe has gotten a

9     little bigger, because of the ruling, I respect that, but it

10    would be thousands of emails, and I would look for some

11    direction a little bit to make sure we're all on the same page

12    on the scope.  And that is, in the government's pleadings, the

13    papers indicated that the Miami had waived through 3/31/12.

14    However, with the crime fraud finding, I think that's sort of

15    out the window, and it would be any communications.

16         THE COURT:  Right.

17         MR. BATH:  Same with, it wouldn't just be the Miami

18    tribe.  It would be anything.

19         THE COURT:  Any tribe.

20         MR. BATH:  Any tribe, anything Conly Schulte's on

21    involving payday lending at all.

22         And so there would be thousands.  I think it doesn't

23    change our prediction yesterday, five days, including travel,

24    but obviously we'd want those documents before Mr. Muir were to

25    testify.  I have not seen those documents.  I have not

Ha3Wtuc7

1    collected or gathered them at all, prior to the trial -- at

2    all, frankly.

3            THE COURT:  And are there any documents in the

4    possession or control of Mr. Tucker of this nature?

5            MR. GINSBERG:  Well, the first thing I wanted to raise

6    is that we -- Mr. Tucker's lawyers -- I can't say we've never

7    seen any of these, but we probably have never seen the vast

8    majority of these because there was a privilege asserted on

9    behalf of Mr. Schulte and that firm, because they took the

10   position that UMS had been purchased by the Modocs, and the

11   Modocs never waived their privilege.  And so those documents

12   were never turned over to us with other materials when we

13   requested from Mr. Schulte for advice-of-counsel purposes.

14           THE COURT:  Never mind Mr. Schulte.  Mr. Tucker's

15   employee apparently had them in the ordinary course of his

16   employment.

17           MR. GINSBERG:  It was still privileged when we asked

18   for them, and we had no reason to look through all of those

19   documents until this time, and now our job is going to be to

20   look through them as well, because we don't know what impact it

21   may have on Mr. Tucker.

22           THE COURT:  Now let me go back to my question.  Does

23   Mr. Tucker have any communications with Mr. Schulte that have

24   not been produced?

25           MR. GINSBERG:  Mr. Roth has been dealing with Mr.

1    Schulte, so he's going to have to be the one to answer that.

2           MR. SCOTTEN:  I think this might help, unless the

3    defense contradicts me.  Because Mr. Tucker was offering an

4    advice-of-counsel defense and had to produce everything, our

5    understanding is the defense has produced to us everything

6    between Mr. Tucker and Mr. Schulte, so I would assume they have

7    had it also.

8           MR. GINSBERG:  No, that's not correct.  We produced

9    whatever we were given by Mr. Schulte's attorney when we

10   requested it.

11          THE COURT:  No.  This is a useful conversation.

12          MR. GINSBERG:  Yes.

13          THE COURT:  The question is whether Mr. Tucker has

14   produced everything in his possession or control relating to

15   the advice received from Mr. Schulte.

16          MR. GINSBERG:  Yes.

17          THE COURT:  That's the question.

18          MR. GINSBERG:  The answer to that is yes, in his

19   possession.

20          THE COURT:  Is that correct, Mr. Roth?

21          MR. ROTH:  Yes, your Honor.  To my knowledge, yes.

22          MS. LIMANI:  Yes.

23          MR. GINSBERG:  The answer is yes.

24          THE COURT:  OK.  So now the question is, when is

25   Mr. Ginsberg going to see those emails?

Ha3Wtuc7

1          MR. BATH:  He'll begin to see them as soon as we get

2    to Kansas City and start to be able to produce those.

3          THE COURT:  OK, and that is?

4          MR. GINSBERG:  Depends if we're working on Thursday or

5    not.

6          THE COURT:  Assuming you're working on Thursday, but

7    you're not working on Friday.

8          MR. BATH:  Right.  Mr. Muir plans to fly back to

9    Kansas City as soon as he can, as soon as the Court breaks, and

10   he'll begin producing those.

11         THE COURT:  Right.  And obviously if you're producing

12   them to Mr. Ginsberg, you're producing them to the government

13   at the same time.

14         MR. BATH:  Yes, sir.

15         MR. GINSBERG:  Was I clear, though, to your Honor,

16   that we don't have witnesses past possibly tomorrow afternoon?

17   Now, we may have other work on Thursday, but I just wanted to

18   make sure I was clear about that.

19         THE COURT:  Yes.  I don't anticipate that our work on

20   the jury charge is going to take very long, unless I'm missing

21   something.

22         MR. GINSBERG:  I don't want to respond to that.

23         THE COURT:  OK.

24         MR. GINSBERG:  We've been conferring with Ms. Van Ness

25   and she's been sending us material.  I don't know that it's

1    going to take -- we have issues, but I don't know that we're

2    going to have time to do it tomorrow afternoon and then break

3    so Mr. Muir can go back tomorrow night and have the extra day

4    on Thursday.

5              THE COURT:  All right.  I'll tell you one thing, with

6    regard to the submissions I got late on Friday night --

7              MR. GINSBERG:  Yes.

8              THE COURT:  -- in some respects, they were exactly

9    what I was looking for, which is identify what in the judge's

10   proposed instructions the defendant wanted to add language to

11   or delete language from or change or thought was wrong or more

12   should be added.

13             MR. GINSBERG:  Yes.

14             THE COURT:  That's what I was looking for.

15             MR. GINSBERG:  Yes.

16             THE COURT:  But much of it was very fine legal

17   argument on concepts, and that doesn't help anybody.  That was

18   great back when you were submitting your initial proposed

19   instructions, but I think at this stage of the game saying,

20   Well, let me tell you what I think willfulness is, isn't the

21   question.  The question is, what words on the page are wrong,

22   what words not on the page should be added?  That's what the

23   exercise is, and so I just alert you to that.

24             Now, I think I can help you out.  One second, please.

25             I'll try and get you a revised set tomorrow and you

1      can look at them.

2           MR. GINSBERG:  I assisted in drafting that, and I

3      thought we did both things; that is, put the concepts out and

4      then suggest the changes.  We probably weren't specific enough

5      to say, We think this should be changed and that should be

6      changed, and we'll do that now.

7           THE COURT:  Right.  That's what I really need.

8           MR. GINSBERG:  OK.  We'll do that.

9           THE COURT:  That's fine.

10          Yes, Mr. Bath.

11          MR. BATH:  As I understand where we are, we'll plan to

12     put Mr. Morgan and Mr. Schulte on tomorrow, but we would still

13     reserve the right to request the Court's permission, perhaps,

14     to recall them after we've looked at these documents.

15          THE COURT:  You can.  I can't rule on your application

16     to recall until I know more about the facts.

17          MR. BATH:  Yes, sir.

18          THE COURT:  That I have to honestly say, but that

19     said, you can put on Mr. Cohen and Mr. Morgan and Mr. Schulte,

20     and if there is some prejudice that I see, you'll make an

21     application, a timely application, to recall them.

22          MR. BATH:  Thank you.

23          MR. GINSBERG:  I don't want to make this Ping-Pong.

24     I'm sorry, but when your Honor raised the word "prejudice," I

25     raised before the idea that we've never seen these emails.

1    Now, where we are -- that is, Mr. Tucker's lawyers -- is

2    calling Mr. Schulte not having seen any of these emails, so

3    we're sort of putting him on from what we know absent --

4              THE COURT:  This is the part that's baffling me,

5    Mr. Ginsberg.

6              MR. GINSBERG:  Yes.

7              THE COURT:  And I say this just because I'm missing a

8    piece of information here.

9              MR. GINSBERG:  Right.

10             THE COURT:  I hear from Mr. Bath that Mr. Tucker's

11   employee, his lawyer --

12             MR. GINSBERG:  Yes.

13             THE COURT:  -- the person who's worked for the Tucker

14   organization since 2006, has thousands of emails from Schulte.

15   You don't need anyone's waiver of anything.  These presumably

16   belong to Mr. Tucker.  He had a right to see them.  He was

17   paying Mr. Muir a paycheck, and he could say "I want to see

18   them."

19             Did he ask for them from Mr. Muir?

20             MR. GINSBERG:  I understand what your Honor's saying.

21             THE COURT:  No.  Did you ask for them from Mr. Muir?

22             MR. GINSBERG:  We did not ask for them.  It's a

23   complicated situation.  The servers which they were on, the

24   Miami tribe apparently had control of them, and we didn't, for

25   some period of time.

1          I understand your Honor's point.  I understand what

2    your Honor's saying.  We have to deal with it now as best we

3    can.

4          THE COURT:  All right.  That's fine.

5          MR. GINSBERG:  I understand.

6          THE COURT:  But I wanted to get that out there.

7          MR. GINSBERG:  Yes, I understand.

8          THE COURT:  What else?

9          OK.  See you all tomorrow morning.

10          MR. SCOTTEN:  Thank you, your Honor.

11          (Adjourned to October 4, 2017, at 10:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

DOUGLAS GLENN LANKFORD

Direct By Mr. Ginsberg . . . . . . . . . . . .2014

DOUGLAS GLENN LANKFORD

Direct By Mr. Bath . . . . . . . . . . . . . .2077

Cross By Mr. Ravi . . . . . . . . . . . . .2086

Redirect By Mr. Ginsberg . . . . . . . . . .2115

DEREK DOUGLAS

Direct By Mr. Bath . . . . . . . . . . . . . .2122

Cross By Mr. Scotten . . . . . . . . . . . .2151

Redirect By Mr. Bath . . . . . . . . . . . .2164

CLIFFORD COHEN

Direct By Mr. Roth . . . . . . . . . . . . .2169

Cross By Mr. Scotten . . . . . . . . . . . .2196

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

  4085     . . . . . . . . . . . . . . . . . .2114

DEFENDANT EXHIBITS

Exhibit No.                                    Received

  2700     . . . . . . . . . . . . . . . . . .2013

  2711     . . . . . . . . . . . . . . . . . .2020

  D844     . . . . . . . . . . . . . . . . . .2022

  D2718A   . . . . . . . . . . . . . . . . . .2032

  D853     . . . . . . . . . . . . . . . . . .2034

1    D854    . . . . . . . . . . . . . . . . . .2037

2    D855    . . . . . . . . . . . . . . . . . .2038

3    D856    . . . . . . . . . . . . . . . . . .2042

4    D857    . . . . . . . . . . . . . . . . . .2044

5    D2729   . . . . . . . . . . . . . . . . . .2045

6    D864    . . . . . . . . . . . . . . . . . .2047

7    D2738A  . . . . . . . . . . . . . . . . . .2049

8    D2748A  . . . . . . . . . . . . . . . . . .2051

9    D882    . . . . . . . . . . . . . . . . . .2055

10   D883    . . . . . . . . . . . . . . . . . .2057

11   D886    . . . . . . . . . . . . . . . . . .2058

12   D894    . . . . . . . . . . . . . . . . . .2059

13   D896    . . . . . . . . . . . . . . . . . .2060

14   D897    . . . . . . . . . . . . . . . . . .2061

15   D899    . . . . . . . . . . . . . . . . . .2063

16   D2710, D2714, D2717 and D2719  . . . . . .2066

17   D921A   . . . . . . . . . . . . . . . . . .2069

18   D2052   . . . . . . . . . . . . . . . . . .2074

19   832     . . . . . . . . . . . . . . . . . .2126

20   872     . . . . . . . . . . . . . . . . . .2130

21   831     . . . . . . . . . . . . . . . . . .2139

22   871     . . . . . . . . . . . . . . . . . .2143

23   D109    . . . . . . . . . . . . . . . . . .2176

24   104     . . . . . . . . . . . . . . . . . .2177
     202     . . . . . . . . . . . . . . . . . .2179
25   121     . . . . . . . . . . . . . . . . . .2205