HA48TUC1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              16 Cr. 91 (PKC)

5    SCOTT TUCKER and
     TIMOTHY MUIR,                            Trial
6
                   Defendants.
7
     ------------------------------x
8                                             New York, N.Y.
                                              October 4, 2017
9                                             10:10 a.m.

10

     Before:
11                      HON. P. KEVIN CASTEL

12                                            District Judge
                                                 and a jury
13                          APPEARANCES

14   JOON H. KIM
          Acting United States Attorney for the
15        Southern District of New York
     BY:  NIKETH V. VELAMOOR
16        HAGAN C. SCOTTEN
          SAGAR K. RAVI
17        Assistant United States Attorneys

18   FREEMAN NOOTER & GINSBERG
          Attorneys for Defendant Tucker
19   BY:  LEE A. GINSBERG
          NADJIA LIMANI
20            -and-
     STAMPUR & ROTH
21   BY:  JAMES M. ROTH

22   BATH & EDMONDS, P.A.
          Attorneys for Defendant Muir
23   BY:  THOMAS J. BATH
              -and-
24   BEVERLY VAN NESS

25

1                    (Trial resumed; jury present)

2     CLIFFORD COHEN, resumed.

3                    THE COURT:  Congratulations to all of you Yankee fans.

4     The dream continues.  As I said a couple of weeks ago, I am a

5     Met fan, but I have really gotten over that.  I remember when

6     the Mets and the Red Sox were in the '86 World Series and I had

7     a friend who was a Yankee fan and he actually rooted for the

8     Red Sox, and I have never forgiven him for that.  So I am going

9     to be rooting for the Yankees all the way through.  So let's

10    see what happens now.  Keep it going.

11                    Mr. Cohen, I remind you that you are still under oath.

12                    THE WITNESS:  Yes, sir.

13                    THE COURT:  You may, continue.

14    CROSS EXAMINATION (Cont'd)

15    BY MR. SCOTTEN:

16    Q.  Good morning, Mr. Cohen.

17    A.  Good morning, Mr. Scotten.

18    Q.  I think when we left off yesterday, we had talked about the

19    Bachman letter.  And after that point you began drafting some

20    agreements and doing some work for Mr. Tucker, is that right?

21    A.  Yes, sir.

22    Q.  And then in very early 2004, you were contacted by the

23    Kansas State Bank Commission, correct?

24    A.  That's correct.

25    Q.  And the particular person there was a staff attorney named

1    Danny Vopat?

2    A.  Yes.

3    Q.  There was some initial correspondence with that office in

4    which you copied Scott Tucker, correct?

5    A.  Yes.

6    Q.  And Scott Tucker became angry with you because of that,

7    right?

8    A.  Scott responded after getting his copy of my letter to

9    Vopat, which showed on the bottom that I had copied Scott

10   Tucker, and he reminded me that I was not to put his name on

11   letters related to his corporate business, and so I told him I

12   would be careful and not do that again.

13   Q.  And you were sufficiently upset that you lost a night's

14   sleep over it, correct?

15   A.  Well, it did bother me because he seemed disappointed that

16   I had made that mistake and I try to follow client's

17   instructions.  So yes, it did upset me a little bit.

18          MR. SCOTTEN:  Can we show Government Exhibit 4073 to

19   the witness.

20   Q.  Do you recognize this?

21   A.  I do recognize it, yes.

22   Q.  This is an e-mail from Scott Tucker to you and then your

23   response, correct?

24   A.  Yes.

25          MR. SCOTTEN:  Government offers 4073.

HA48TUC1                    Cohen - Cross

1          THE COURT:  Any objection?

2          MR. ROTH:  No, Judge.

3          THE COURT:  Received.

4          (Government's Exhibit 4073 received in evidence)

5    BY MR. SCOTTEN:

6    Q.  So if we start at the bottom --

7          MR. SCOTTEN:  Ms. Grant, can we zoom in on the body of

8    the text that Mr. Tucker sent?

9    Q.  So when you refer in the top line to being copied on the

10   Vopat letter, that's just a letter you sent Danny Vopat at the

11   Kansas Banking Commission, right?

12   A.  Yes.

13   Q.  And Tucker tells you it wasn't illogical for you to do that

14   because he was in fact a registered president of National Money

15   Service at a relevant time?

16   A.  Well, he was.

17         Are you asking me why I copied him on the letter?

18   Q.  No.  My questions will be very simple.  It's simply because

19   it says company here, that's National Money Service, that's the

20   company right?

21   A.  That's true.

22   Q.  Then in the second sentence Tucker instructs you not to

23   even blind copy him, that he should be either secretly or

24   openly copied on any correspondence you send relevant to his

25   company.  He just wants to know what you sent separately after

1    the fact, correct?

2    A.  I think you're correct.

3    Q.  Then in the third sentence he explains that he has already

4    installed a nominee president, someone else to formally show up

5    in his name, correct, for MN Services?

6    A.  Yes, sir.

7    Q.  Then the fourth paragraph, he is talking about a Web site

8    called webfastcash.com.  That's one of his lending Web site

9    names, correct?

10   A.  Yes.

11   Q.  And he is informing you that he changed the listed

12   registrant so that it shows that it's registered to Inajin

13   Enterprises, right?

14   A.  Yes.

15   Q.  Inajin Enterprises is another one of these tribal entities

16   that had been formed in the course of this venture, right?

17   A.  That's the best of my recollection.

18   Q.  You weren't involved in forming that one?

19   A.  I was not.

20   Q.  But you were involved in responding to this.  So your

21   understanding from Tucker was that it was one of those type of

22   corporations?

23   A.  Yes.

24   Q.  Here he just states that he, Scott Tucker, owned the name

25   of the Web site, but he is making it essentially appear to

1    those looking from the outside that it connects to Inajin

2    Enterprises, is that right?

3    A.  Well, webfastcash.com is a trade name, not an actual

4    company name, and so he's, in my opinion, changing the trade

5    name from webfastcash.com to Inajin Enterprises.

6    Q.  Sir, the letter here says he changed the registrant.  He

7    didn't change the name, right?

8            If you look at the third sentence -- go ahead.  Do you

9    have an answer?

10   A.  Mr. Tucker had a number of --

11   Q.  Sir, I am just asking you what the letter says from Mr.

12   Tucker.

13   A.  OK.  The letter says, "I changed the registrant of

14   webfastcash.com on the Internet."  That means, to me, not with

15   the Secretary of State of Nevada but a domain registration on

16   the Internet.

17   Q.  I think, if I am understanding you correctly, he is not

18   changing actual ownership -- he says even though I own the

19   name -- he is changing the Internet registration, which is what

20   you see if you look for it through the Internet, correct?

21   A.  I think you're correct.

22   Q.  If you can just go up to your response.

23           So here you in fact literally said you hardly slept

24   the night before, correct?

25   A.  Yes.  That's a true statement.

HA48TUC1                    Cohen - Cross

1   Q.  And you assure him in the future you would double and

2   triple check everything in responding to his complaints about

3   secrecy, correct?

4   A.  I meant by this statement that we would not reveal his name

5   because his instruction was not to.

6          MR. SCOTTEN:  We can take that down.

7   Q.  As you handled this response to the Kansas State Banking

8   Commission, you drafted a letter to respond to that commission,

9   correct?

10  A.  Yes, sir.

11  Q.  In the course of drafting that you looked at the Bachman

12  letter and did some of your own research?

13  A.  Yes.

14  Q.  And in addition to drafting a letter to the Kansas State

15  Banking Commission, you also wrote a letter to Scott Tucker,

16  right?

17  A.  Yes.

18  Q.  This letter brought concerns of yours to Mr. Tucker's

19  attention, correct?

20  A.  My letter to Tucker of March 25, 2004 did explain my

21  concerns about how to operate the relationship with the tribal

22  enterprise.

23         MR. SCOTTEN:  Let's show the witness Defense Exhibit

24  159.

25  Q.  I think you will recognize it.

HA48TUC1                    Cohen - Cross

1           MR. SCOTTEN:  Can we scroll down so we see all the

2      pages.

3      Q.  Is this the letter you sent to Scott Tucker as well as an

4      attached draft letter you were proposing to send to the Kansas

5      State Banking Commission?

6      A.  Yes.

7           MR. SCOTTEN:  Government offers Defendants' Exhibit

8      159.

9           MR. ROTH:  No objection.

10          THE COURT:  Received.

11          (Defendants' Exhibit 159 received in evidence)

12          MR. SCOTTEN:  This does contain some legal content, if

13     you want to give that instruction.

14          MR. ROTH:  I don't think it's necessary.

15          MR. SCOTTEN:  It's the same instruction you gave with

16     the Bachman letter.  There is case law in there.  I didn't know

17     if the Court wanted to instruct the jury that it's just for the

18     effect on the defendant and it's not for the truth of the law

19     in there.

20          THE COURT:  I think the jury understands the

21     statements of law in there, in fact, any factual statements

22     made in there are not for the truth of the statements, but that

23     they were made, because the fact that they were made may be

24     significant in this case.  It may tell you something about

25     somebody's motives or actions, and that's something that you,

1   ladies and gentlemen, decide as the triers of fact.  But you

2   don't consider the truth of the statements in it.  It's the

3   fact that they were said.

4           MR. SCOTTEN:  Thank you, your Honor.

5   BY MR. SCOTTEN:

6   Q.  So starting on the first page, this is a letter to Scott

7   Tucker, as you can see at the top?

8   A.  This is my letter to Mr. Tucker, March 25, 2004.

9           MR. SCOTTEN:  If we can just blow up the second

10  paragraph.

11  Q.  I am going to highlight a few portions.

12          Beginning in the first sentence, you are communicating

13  to him you need to reemphasize problems or weaknesses in the

14  argument you're planning to make to the Kansas State Banking

15  Commission, correct?

16  A.  Yes.

17  Q.  By reemphasize, I gather you informed Mr. Tucker of these

18  concerns before in some fashion?

19  A.  Yes.  We had had earlier discussions about the enterprise

20  and wanting it to be successful.

21  Q.  Going down to the last two paragraphs -- sorry, last two

22  sentences, is it fair to say you state that this is an

23  important issue for the jurisdictional arguments that you were

24  planning on making?

25  A.  That was my opinion.

1   Q.  When you were explaining this idea of a jurisdictional

2   argument to Mr. Tucker, a jurisdictional argument being

3   something that keeps you out of court, correct?

4   A.  Yes.  It had to do with whether the State of Kansas,

5   through the bank commissioner, had the legal ability to

6   regulate or restrict activities of a tribal enterprise and its

7   nontribal agent.

8   Q.  The idea behind jurisdiction is, even if you're doing

9   something intentional or in violation of the law, there is no

10  power to bring you into court because the court lacks

11  jurisdiction, lacks the authority to bring you in, correct?

12  A.  Within the context of this letter, it was focused on

13  convincing the bank commissioner that he did not have the

14  authority to regulate the activity.  I never addressed with the

15  bank commissioner whether the activity was good, bad, moral,

16  immoral or anything else.

17          MR. SCOTTEN:  Then we can go down to the next

18  paragraph.  If we can just highlight the words in italics.

19  Q.  All I want to ask you here, you referred yesterday in your

20  testimony with the defendants to a case in the Tenth Circuit

21  from 1987, correct?

22  A.  Yes.

23  Q.  That was a case that you had told Mr. Tucker was important

24  to what he was doing, right?

25  A.  I did tell him that.

HA48TUC1                    Cohen - Cross

1    Q.  That's this case right here, *Indian Country U.S.A.*?

2    A.  That's correct.

3    Q.  If we can go forward to the second page, and there is some

4    legal analysis of that case, correct?

5    A.  Yes.

6    Q.  I want to start at the third paragraph.

7              MR. SCOTTEN:  If we can blow that up.

8    Q.  Now you're essentially comparing Indian Country to Mr.

9    Tucker's conduct, correct?

10   A.  Yes.

11   Q.  So when you say, NM Service Corp., that's Mr. Tucker's

12   company?

13   A.  NM Service Corp. is Mr. Tucker's company at that time.

14   Q.  You explained the facts of Indian Country are not analogous

15   to the facts in Mr. Tucker's situation, correct?

16   A.  Yes.  In my opinion, they could be distinguished.

17   Q.  And just to be clear, to say they are not analogous is a

18   way a lawyer would express not the same, they are different in

19   some meaningful way?

20   A.  That's correct.

21   Q.  You regarded that as something of a problem, but you also

22   noted the Bachman letter addressed it to some degree?

23   A.  Both of those statements are true.

24   Q.  If we can move to the next paragraph.

25              Now, here you talk about what you term a more

1    disturbing factual difference between Indian Country U.S.A. and

2    Mr. Tucker's situation, correct?

3    A.  Yes.

4    Q.  And that disturbing factual difference is in the prior case

5    the Indian tribe, Native American tribe actually had control

6    over the business, correct?

7    A.  Yes.

8    Q.  That's what it says in the second sentence, "actually had

9    control," correct?

10   A.  Yes.

11           MR. ROTH:  I will object, your Honor.  It says

12   "compared to the control."

13           I'm sorry.  I apologize.

14           THE COURT:  Go ahead.

15   Q.  Then in the third sentence, you note that it would be much

16   more difficult for a court to determine that there was an

17   actual tribal enterprise here, correct?

18   A.  Well, it was a central concern of my letter and it was the

19   reason I outlined five major points on the last page of the

20   letter.

21   Q.  We will come to those points in a second.

22           For now, what you're contrasting is the difficulty in

23   finding that this was an actual tribal enterprise as opposed to

24   a conduit set up by the tribe for NM Service Corp., correct?

25   A.  Yes.

1   Q.  And conduit, that's the same term used in the Bachman

2   letter.  If it's just a pipeline, the analysis doesn't apply,

3   correct?

4   A.  That was Ms. Bachman's concern and that was my concern.

5   Q.  And specifically, at the end of the sentence, you say that

6   this can't be a situation where the tribe uses NM Service

7   Corp. -- NM Service Corp. uses the tribe's sovereign immunity

8   for its own financial gain, correct?

9   A.  That's what I wrote, yes.

10  Q.  You didn't verbally communicate anything different than

11  that to Mr. Tucker, did you?

12  A.  No.

13  Q.  Let's go to the next paragraph.

14          Now, in your first sentence here, you're telling

15  Tucker that your observations are based on facts that you and

16  Tucker know but the state bank commissioner does not know,

17  correct?

18  A.  That's what it says, yes.

19  Q.  Then you note that what little the state bank commissioner

20  does know may convince him to stay hands-off without delving

21  further into the actual facts, is that correct?  We will flip

22  the page, but is that correct so far?

23  A.  That's correct so far.

24  Q.  Let's flip to the next page.

25          Then you note there is a concern that if the bank

1  commissioner does investigate further, the facts may not be in

2  your favor, he may learn the facts are not in your favor,

3  correct?

4  A.  That's the concern I had expressed.

5  Q.  Let's skip down to the beginning of the next paragraph.

6          So now you're identifying another case that is much

7  less favorable to the legal position you want to take, correct?

8  A.  Yes.

9  Q.  And there's about a page or so of legal analysis of that

10  case, correct?

11  A.  Yes.

12          MR. SCOTTEN:  So if we can just go to the fourth page.

13          If you can highlight the first full paragraph.

14  Q.  Now, this is the paragraph you mentioned a minute ago where

15  you lay out five factors for Tucker that were important for him

16  to follow or adhere to or pay attention to?

17  A.  That's true.

18  Q.  I want to go through them one at a time.

19          The first is whether the tribe directs NM Service

20  Corp.'s activities, whether the tribe in fact is giving

21  direction here, correct?

22  A.  Yes.

23  Q.  The second is whether the tribe decides what loans are to

24  be made and what loans are to be rejected, correct?

25  A.  Yes.

1   Q.  The third is how involved the tribe is in financing the

2   activities, right?

3   A.  Yes.

4   Q.  And to be clear, in the case of each of these you are

5   telling him if the tribe is directing or if the tribe is making

6   the loans or is doing the financing, those are the facts that

7   would be in your favor?

8   A.  Yes.

9   Q.  And then the fourth line, you note there should be

10  employment opportunities for the tribe?

11  A.  Yes.

12  Q.  And then finally, the fifth line you refer to the benefit

13  received by the tribe in proportion to that received by NM

14  Service Corp., correct?

15  A.  Yes.

16  Q.  So that relates to how much of the benefit goes to the

17  tribe versus how much of it goes to Scott Tucker's company?

18  A.  Yes.

19  Q.  The more benefit the tribe got as opposed to what Scott

20  Tucker got, the better for your legal case, right?

21  A.  Yes.

22  Q.  Again in that last sentence, you refer to this conduit

23  idea.  These factors are important in making the tribal

24  corporation be not just a conduit used by Scott Tucker's

25  company, correct?

1    A.   Yes.

2    Q.   So let's go to the next paragraph.

3         Here you talk about what could happen if this

4    investigation and potential litigation continues.  At the end

5    you warn Tucker, just looking at the end of the last sentence,

6    you warn Tucker there could possibly be a finding that no

7    tribal business is actually conducting the lending business.

8    That's the financial business, right?

9    A.   I warned him that was a possibility, and my opinion was

10   based on how well he was able to adhere to the five factors in

11   a way to benefit the tribe and give the tribe involvement in

12   the enterprise.

13   Q.   Factors such as approving loans, actually directing the

14   activities, financing the loans, those factors, correct?

15   A.   All of the factors I mentioned in the letter, yes.

16   Q.   Then I want to go to the next paragraph.

17        Here, you note that you could do more research, but

18   the best way to avoid the scenario -- and that's the scenario

19   that there is no actual tribal enterprise -- is to strengthen

20   the factual argument?

21   A.   Yes, sir.

22   Q.   So what you're telling him is that it's not a question of

23   doing more research, it's a question of actually doing the

24   things you referred to in your letter, correct?

25   A.   That's correct.

1   Q.  Now after this -- you sent this to Mr. Tucker -- you also

2   went ahead and sent a letter to the Kansas State Banking

3   Commission, correct?

4   A.  I did.

5   Q.  In there you made arguments to the Kansas State Banking

6   Commission to not further continue its investigation, correct?

7   A.  I did.

8   Q.  As a lawyer that's permissible for you because you don't

9   have to be 100 percent sure your argument is right or

10  necessarily believe it's right to make it on behalf of your

11  client, correct?

12  A.  Well, the ethics rules say you're not to knowingly make

13  false statements, but you're allowed to make a good faith

14  argument for how the facts could be interpreted in your

15  client's favor, and I was attempting to do that.

16  Q.  As part of that, your strategy was to not reveal the

17  underlying facts to the Kansas State Banking Commission,

18  correct?

19  A.  That was my strategy, yes.

20  Q.  Yesterday Mr. Roth asked you about successfully warding off

21  the Kansas State Banking Commission.  You said it had succeeded

22  in that they didn't follow up, correct?

23  A.  Correct.

24  Q.  So when you wrote this letter, the Kansas State Banking

25  Commission never learned the underlying facts as far as you

1    know?

2    A.  I don't think they did.  It's an inference I drew from the

3    fact that we really never heard from them again, and I

4    concluded they decided to drop the matter.

5    Q.  All right.  We can take that down.

6          By the way, I wanted to be clear about the timing

7    here.  This letter is after you drafted the servicing agreement

8    to Kickapoo, correct?

9    A.  Yes.

10   Q.  In some sense there is a relationship there because you had

11   learned a little bit more about how Tucker was doing business

12   in the course of the Kickapoo business, correct?

13   A.  I didn't learn about the actual operation within his office

14   in Overland Park.  I learned what terms he was willing to agree

15   to and what terms the tribe was willing to agree to, and that's

16   how I was able to draft the agreement, and it was signed

17   February 23, 2004.

18   Q.  In terms of the underlying facts, how the lending operation

19   actually worked, you never learned those facts?

20   A.  I didn't know them then and I don't know them now.

21   Q.  There was no explanation of how the loan processing worked

22   or where things were physically put?

23   A.  I was never engaged to work on those details within his

24   office.

25   Q.  You did, however, have a subsequent exchange with Mr.

1   Tucker about the contents of the letter we just looked at,

2   correct?

3   A.  Yes.

4   Q.  In fact, you had an e-mail exchange, at least among other

5   things, correct?

6   A.  Yes.

7   Q.  I am going to show you what is marked Defense Exhibit 151.

8           Is this in fact the e-mail exchange I just referred to

9   between you and Scott Tucker?

10  A.  It is.

11          MR. SCOTTEN:  Government offers Defendants' Exhibit

12  151.

13          MR. ROTH:  No objection.

14          THE COURT:  Received.

15          (Defendants' Exhibit 151 received in evidence)

16  BY MR. SCOTTEN:

17  Q.  Let's start at the bottom with Mr. Tucker's e-mail to you.

18          So Mr. Tucker is referring to corporation documents

19  for the tribal entity and saying those documents look good to

20  him.  The first sentence.

21  A.  That's correct.

22  Q.  Then he refers to additional documents, resolutions, an

23  ordinance that Conly wanted, correct?

24  A.  Yes.

25  Q.  Conly is Conly Schulte, another lawyer who was involved in

1    this?

2    A.  Yes.

3    Q.  Moving on to the second sentence after the question mark.

4    Mr. Tucker says, we -- you and he -- need to see them and

5    determine what else is needed in terms of "making his deals

6    tight," is that correct?

7    A.  Yes.

8    Q.  He is referring here to what other documents do we need?

9    A.  Yes.

10   Q.  Let's go to the top e-mail.

11          MR. SCOTTEN:  If we can just highlight the second and

12   third sentences.

13   Q.  So you say to him, "My suggestions are not limited to

14   creating a bigger file, correct?

15   A.  Correct.

16   Q.  That means the file is the legal documents.  It's not just

17   that we need more documents, right?

18   A.  Right.

19   Q.  "It has more to do with substance than form."  You're

20   saying it's the facts you need here, not the paperwork,

21   correct?

22   A.  Yes, sir.

23   Q.  And you go on essentially to explain about those facts, the

24   theory here doesn't work?

25   A.  That was the point of my message, that it's the actual

1    involvement at some minimal level of tribal members in the loan

2    business.

3    Q.  More specifically, it's those five factors you identified

4    in your earlier letter, correct?  Those are the facts you were

5    communicating to him?

6    A.  This e-mail doesn't refer to those, but my thought process

7    was that those five factors are important.  It's not that we

8    needed more paperwork.  You need your operation to be factually

9    aligned with the five issues that identified.

10   Q.  The date of this e-mail is March 29, 2004, right?

11   A.  Yes.

12   Q.  That's just a few days after you had sent him the letter?

13   A.  Four days, yes.

14   Q.  I want to be clear here.  There was never a point in which

15   you advised Mr. Tucker that he could just create the appearance

16   those factors were being complied with, is there?

17   A.  Never.

18   Q.  You never told him that he didn't actually need to change

19   things but he needed his employees to make it seem that those

20   factors were being adhered to, did you?

21   A.  I did not.

22   Q.  Eventually in the 2005, 2006 period, Mr. Tucker stopped

23   using Mr. Cohen to do tribal work?

24   A.  Yes.

25   Q.  And your understanding was because Mr. Tucker wanted

1    someone more aggressive in the legal position they would take,

2    correct?

3    A.  I expressed that thought in one of my prior interviews with

4    you or other U.S. Attorneys.

5    Q.  I am not sure you can testify to your prior statements, but

6    is that your understanding?

7    A.  Let me tell you what my opinion is about that.

8    Q.  Can I first ask, is that statement true, that you believed

9    it was because he wanted a more aggressive attorney?

10   A.  He wanted a more aggressive attorney on all matters, not

11   just Indian issues.

12   Q.  And he also wanted an attorney who would ask less

13   questions, correct?

14   A.  He never said that to me.  I think that I had a concern

15   that was an issue at the time.

16   Q.  He also wanted someone who would be full time dedicated to

17   his business, correct?

18   A.  Yes.  His business was expanding.  When he relieved me of

19   duties, I thought it was because he really needed somebody

20   pretty much full time and I was not available to do that.

21   Q.  You learned that Mr. Muir took that position, correct?

22   A.  I did learn that.

23          MR. SCOTTEN:  One second, your Honor.

24          No further questions.

25          THE COURT:  Redirect.

HA48TUC1                    Cohen - Cross

1          MR. BATH:  Judge, somehow the order got reversed

2     yesterday.

3          MR. SCOTTEN:  My thought was, I don't think either

4     defendant rested.  I think they are putting on a joint case,

5     but maybe I am wrong about that.

6          THE COURT:  I think this witness was called by Mr.

7     Tucker.

8          MR. GINSBERG:  That's correct, your Honor.

9          THE COURT:  So, Mr. Bath, you're welcome to exam.

10    CROSS-EXAMINATION

11    BY MR. BATH:

12    Q.  Mr. Cohen, in the '03, '04, '05 time period, you never

13    worked with Tim Muir, did you?

14    A.  I did not.

15    Q.  You came to know Tim later, is that right?

16    A.  My recollection is 2006 or later.

17    Q.  And did you meet him because you were doing work on behalf

18    of Scott Tucker or did you meet him on bar activities?

19    A.   Initially I didn't meet him face-to-face.  We began talking

20    on the phone primarily about my law firm's role as registered

21    agent for a variety of Tucker organizations.

22    Q.  That was your initial contact?

23    A.  Yes, sir.

24    Q.  Did you ever have any subsequent legal work that you did

25    with Tim?

1    A.  I don't recall any.

2    Q.  When you were approached by Mr. Tucker in '03, he

3    essentially asked you to give him an opinion on the tribal

4    model, is that correct?

5    A.  Yes.

6    Q.  To give that opinion, you did research?

7    A.  Yes.

8    Q.  Looked at statutes?

9    A.  I looked primarily at federal district court opinions and

10   United States Court of Appeals opinions.

11   Q.  And you spent a lot of time doing that?

12   A.  I personally spent maybe a dozen hours.  My associate

13   Robert Massengill spent 40 hours or more, and we had a law

14   clerk named Burt Harriman who probably spent 40 hours.

15   Q.  Based on that research, plus the Preston Gates memo you

16   saw, you essentially came to the conclusion and opinion -- I am

17   not going to ask you what it was -- that you gave Mr. Tucker?

18   A.  All of those efforts formed the basis of my legal opinion.

19           MR. SCOTTEN:  Objection as cumulative and not relevant

20   to Mr. Muir.  This has all been gone through with Mr. Tucker.

21           THE COURT:  Overruled.  I will allow it.

22   Q.  The documents we have seen that the government and Mr. Roth

23   introduced contain the information you passed on to Mr. Tucker?

24   A.  Yes.

25   Q.  At the time you were doing that research, you had been a

1    lawyer for just about 30 years, is that right?

2    A.  Yes.  By May of 2004, I had finished 30 years.

3              MR. BATH:  Thank you so much.

4              THE COURT:  Any redirect?

5              MR. ROTH:  Yes, your Honor.

6    REDIRECT EXAMINATION

7    BY MR. ROTH:

8    Q.  Good morning, Mr. Cohen.

9    A.  Good morning Mr. Roth.

10             MR. ROTH:  Could we have D151 back on the screen,

11   please.

12             Can you highlight the first paragraph there, Eli,

13   please.

14   Q.  The government raised the last sentence with you.  "Without

15   that, these enterprises are too easy to attack as outside the

16   protection of sovereign immunity."

17             Do you see that?

18   A.  I do.

19   Q.  You never expressed an opinion that the tribal model as it

20   existed would fail an attack by government regulators, is that

21   fair to say?

22   A.  It's fair to say I never made a conclusion that they would

23   fail.  My concern was to have the facts best support the legal

24   rules that I had discovered through my research.

25   Q.  Right.  By the way, you're a very meticulous lawyer, is

1    that fair to say?  You take your job seriously?

2    A.  I do.

3    Q.  You talked about the Bachman memo.  The Bachman memo, if

4    you will, that wasn't like a recipe for like chocolate chip

5    cookies, where if you left out the chocolate you wouldn't have

6    chocolate chip cookies, is that fair to say?

7    A.  It is fair to say that.

8    Q.  What I am driving at, it listed some factors and some

9    suggestions, things that should happen, but it was not a

10   pronouncement of the law, is that fair to say?

11   A.  It was an opinion based on Ms. Bachman reviewing a variety

12   of cases, some of which were more helpful to the Tucker

13   enterprise model and others were less helpful.

14          It's typical of many areas of the law where things are

15   not entirely clear so lawyers try to find an argument that best

16   fits the client's situation.

17   Q.  Your whole intention in giving the advice and listing the

18   factors to be considered in evaluating the model was to

19   strengthen his arguments, to make his arguments more

20   defensible, that the model was a legitimate model, is that fair

21   to say?

22          MR. SCOTTEN:  Objection to form.

23   A.  Yes.

24          THE COURT:  Overruled.

25   Q.  And all of these suggestions you were making to him to

1    defend the tribal model, when you say defend, that was within

2    the context of a regulatory challenge, is that fair to say, or

3    a civil challenge?

4    A.  Yes.

5    Q.  You never told Mr. Tucker to cease his tribal model

6    activities, is that fair to say?

7    A.  I never told him to cease his plan.

8    Q.  Thank you.

9            MR. ROTH:  No further questions.

10           THE COURT:  You may step down.

11           (Witness excused)

12           THE COURT:  Ladies and gentlemen, why don't we stand

13   up and stretch for a moment.

14           The defendant may call its next witness.

15           MR. ROTH:  The defense calls Conly Schulte.

16    CONLY JOHN SCHULTE,

17       called as a witness by the defendants,

18       having been duly sworn, testified as follows:

19           THE DEPUTY CLERK:  State your name and spell it for

20   the record.

21           THE WITNESS:  My name is Conly John Schulte.

22   C-O-N-L-Y, J-O-H-N, S-C-H-U-L-T-E.

23           THE COURT:  You may inquire.

24           MR. ROTH:  May I give him some water?

25           THE COURT:  Yes.

1    DIRECT EXAMINATION

2    BY MR. ROTH:

3    Q.  Good morning, Mr. Schulte.

4    A.  Good morning.

5    Q.  How old are you, sir?

6    A.  I am 49 years old.

7    Q.  Where were you born, sir?

8    A.  I was born in a town called Hartington, Nebraska.

9    Q.  Where do you currently reside?

10   A.  Boulder, Colorado.

11   Q.  What is your educational background, sir?

12   A.  I received a bachelor's degree in political science from

13   the University of Nebraska and a law degree from Creighton

14   University School of Law.

15   Q.  When you got out of law school, sir, where were you first

16   employed?

17   A.  I was first employed as a law clerk to Judge John Irwin on

18   the Nebraska Court of Appeals.

19   Q.  And subsequent to that, sir?

20   A.  After that I was employed at a law firm called Peebles &

21   Evans in Omaha, Nebraska.

22   Q.  What areas of practice did you conduct at that firm?

23   A.  That firm was formed to focus exclusive or nearly

24   exclusively on federal Indian law and in the representation of

25   American Indian tribes and their interests.

HA48TUC1                     Schulte - Direct

1    Q.  Did you continue staying at that firm?

2    A.  Yes.  Although the name of the firm has changed since that

3    time, I have been employed and now currently a partner in that

4    law firm.

5    Q.  How big is that law firm, sir?

6    A.  I think we have approximately 40 attorneys.

7    Q.  Where are the offices of that firm, sir?

8    A.  We have offices in Washington, D.C.; Omaha, Nebraska; Rapid

9    City, South Dakota; Louisville, Colorado; Peshawbestown,

10   Michigan; and Sacramento, California.

11   Q.  You indicated, sir, you do Native American law, is that

12   correct?

13   A.  That is correct.

14   Q.  And approximately how many tribes does the firm represent?

15   A.  Wow.  I would say -- this is kind of ballpark because at

16   any one given time it can change -- I would say between 40 and

17   50.

18   Q.  Sir, what type of practice do you do in respect to those

19   tribes, what type of law?

20   A.  Well, it varies by the tribe.  For some tribes we are their

21   general legal counsel, which means we are kind of like an

22   attorney general for the tribe, but also corporate counsel

23   because they engage in business activities.  So we do all of

24   their day-to-day legal counseling.

25            For other tribes we may have specific engagements for

1   a particular piece of litigation or a particular project.

2   Q.  Do you do tribal governance as well, sir?

3   A.  Yes.

4   Q.  Do you do anything in respect to law enforcement with the

5   tribe, sir?

6   A.  Our firm does advise with regard to tribal law enforcement

7   from time to time.

8   Q.  Does the firm engage in counseling for nontribal parties

9   contracting with tribes?

10          MR. SCOTTEN:  Objection.  Relevance.  It's a fact

11  witness.

12          THE COURT:  Sustained.

13  Q.  Did there come a time, sir, when you had contact with Scott

14  Tucker?

15  A.  Yes.

16  Q.  Do you recall the nature of the initial contact that you

17  had, sir?

18  A.  Yes.  My recollection is that I was invited to a meeting of

19  a current client of the firm called Santee Sioux Nation, which

20  is Indian tribe, to attend a meeting with regard to a business

21  opportunity that someone wished to present to the tribe

22  council.

23  Q.  Did he at some point contact you by fax or e-mail, sir?

24  A.  Yes.  After that initial meeting, I believe I received a

25  fax from Mr. Tucker and had a phone call.

1    Q.  What was the nature of that fax, sir?

2    A.  My recollection is the fax contained a letter from Mr.

3    Tucker to the tribe explaining a business opportunity, I

4    believe a draft service agreement, and then also an opinion

5    letter from a law firm out of Seattle.

6            MR. ROTH:  I would ask that the witness be shown

7    Defendants' 406.

8    Q.  It should be on the screen in front of you, sir.

9            Do you recognize this document, sir?

10   A.  Yes.

11           MR. ROTH:  If you can flip through the pages, Eli,

12   please.

13   Q.  It's an 11-page document?

14   A.  How do I flip through them?

15   Q.  No.

16   A.  Sorry.

17   Q.  Having reviewed that, do you recognize that document before

18   you?

19   A.  Yes.  That appears to be the fax that I received from Mr.

20   Tucker, and it's dated September 30, 2003.

21           MR. ROTH:  I would move that into evidence, your

22   Honor.

23           MR. SCOTTEN:  Objection.  Relevance.

24           THE COURT:  Let me see you at sidebar.

25           (Continued on next page)

1        (At the sidebar)

2        THE COURT:  What is the date of the fax?

3        MR. ROTH:  September, I think it's 23rd.

4        THE COURT:  What is the relevance?

5        MR. ROTH:  It sets the initial meeting agenda that

6   they had and the predicate for his later engagement.

7        THE COURT:  You can establish the predicate for his

8   later engagement without offering the document.  I am not going

9   to preclude you from establishing the later engagement.  But we

10  have had extensive colloquy on this.  So I am going to sustain

11  the objection on relevance grounds.

12       MR. ROTH:  Your Honor, in respect to the other

13  question that was sustained, the objection, as to his

14  relationship and practice with nontribal entities, I think

15  ultimately as a fact witness he will be talking about

16  activities that he did, specific things that he did, in respect

17  to Tucker's organization vis-a-vis the Indians as a factual

18  matter.

19       It's our position, Judge, that their prosecution

20  theory is very, very direct, that this is all sham

21  organizations, one, two, three, whatever it is.  And that to

22  rebut that we want to establish why he created certain entities

23  and their relationship to Tucker's entities to show that his

24  intention was, and that was also communicated to Mr. Tucker and

25  influenced Mr. Tucker's state of mind, that these were

1   legitimate endeavors and enterprises that were created.

2           THE COURT:  What are you trying to elicit from him?  I

3   am still a little bit uncertain of what you want to establish

4   from him in this regard.

5           MR. ROTH:  Well, he helped the business model.  He

6   helped on various aspects of the business model between Tucker

7   and the tribes, that that was a legitimate endeavor and it

8   wasn't a sham.  Everything that he did in terms of his

9   organization.

10          THE COURT:  That's your argument.  I am trying to find

11  out what facts are you trying to elicit from him.

12          MR. ROTH:  That he set up this corporation.

13          THE COURT:  For whom?

14          MR. ROTH:  He advised and set it up for Tucker and the

15  Indians.  At some point they had a joint -- they had waivers.

16  They had waivers of any conflict.

17          THE COURT:  I don't know what you're talking about.

18  You have to make yourself clear.  What waivers?  This is the

19  first time I am hearing waivers.

20          MR. ROTH:  Conflict waivers.

21          THE COURT:  So tell me about this because this is the

22  first time I am hearing it in this case.

23          MR. ROTH:  I apologize, your Honor.

24          After he was retained by Mr. Tucker, he had a conflict

25  waiver signed by the Santee, and he advised Mr. Tucker as well.

1          THE COURT:  I am still not understanding what you

2    believe that you have been precluded from establishing that

3    you're trying to establish.

4          MR. ROTH:  Right now you haven't precluded me from

5    anything.

6          THE COURT:  Ask your next question.

7          MR. GINSBERG:  Just clarification.  I think there is a

8    fax cover sheet with this exhibit and the attachment is the

9    opinion letter.

10         MR. ROTH:  Yes.

11         MR. GINSBERG:  It is the opinion letter, which is

12   already in evidence through another witness.  So I don't know

13   if your Honor --

14         THE COURT:  I understand it's already in evidence.

15         MR. GINSBERG:  The letter part is in evidence.  It's

16   just a fax cover sheet really that needs to be moved into

17   evidence at this point.

18         MR. SCOTTEN:  I don't think we are disputing that Mr.

19   Tucker sent a fax to him.  I am not sure what the fax cover

20   page adds, but if they want to redact it with just the fax

21   cover page, we have no objection to put in the fax cover page.

22         MR. GINSBERG:  But it doesn't need to be redacted

23   since the rest of it is already in evidence.

24         MR. SCOTTEN:  They are trying to work in that

25   Mr. Schulte received this e-mail and he has got all this

1   expertise, and look, here is how blessed this was going

2   forward.  It's already in evidence.  There is no reason to

3   introduce it for the fact that it was also sent to him.

4              MR. GINSBERG:  It's still in evidence.

5              THE COURT:  It is in evidence.

6              MR. GINSBERG:  Once it's in evidence, as long as

7   something improper isn't done in relation to asking questions

8   about it, that your Honor wouldn't permit, he is allowed to

9   indicate, here is the fax cover sheet and what is attached.

10             THE COURT:  What is the relevance to this case of Mr.

11  Tucker providing a copy of the Bachman letter?  What is the

12  relevance to this case?

13             MR. ROTH:  The relevance is later it's the basis for

14  them to form the relationship, the legal relationship, where

15  Tucker engages --

16             THE COURT:  How does that work?  Excuse me a second.

17  I don't understand how the transmittal of the Bachman letter

18  can lead to the formation of a relationship.

19             MR. ROTH:  Judge, because it was an understanding

20  between the parties that later they would talk and have a

21  relationship.

22             THE COURT:  I will tell you what.  Try and lay your

23  foundation for that through this man, and if you lay the

24  foundation, then the fax comes in.  OK?  It's as simple as

25  that.  So far I haven't heard how it's relevant.

1          MR. SCOTTEN:  I suppose my concern is laying the

2     foundation is essentially going to be the prejudicial questions

3     we are trying to keep out, which is, well, wasn't this really a

4     great legal opinion so you were willing to go into business

5     with the man.

6          MR. GINSBERG:  It's a precursor.  It's the first thing

7     this witness received.  Mr. Schulte then goes on from there to

8     do whatever he does, in terms of getting waivers, ultimately

9     giving advice.  I know that's a separate issue, but it's the

10    precursor to his beginning to understand what it is both the

11    tribe and Mr. Tucker want him to do.  And it's just the

12    beginning of how he understands what it is they are asking him

13    to do when he looks at this letter and he looks at this letter

14    as the beginning piece of that.

15         MR. SCOTTEN:  They are trying to show the state of

16    mind of the witness, which is not relevant.  Trying to show

17    that the witness, with all his great expertise, believed this

18    was legitimate is not proper.

19         MR. ROTH:  Right after this, to show why this is the

20    foundation for the relationship that grew, is when Tucker

21    contracted Conly Schulte to work on the Kickapoo.

22         THE COURT:  So far you haven't shown me that it's

23    relevant.  Ask a question.  Let's see what happens.

24              (Continued on next page)

25

1           (In open court)

2    BY MR. ROTH:

3    Q.  Mr. Schulte, when you received the fax from Mr. Tucker, did

4    he indicate to you that he was going to have a call with you in

5    the future?

6    A.  I don't recall the specifics of the conversation, but I do

7    recall that I subsequently reviewed that fax and the

8    information in it, and subsequently had conversations with

9    Mr. Tucker.

10   Q.  I'm asking, if you look at the fax cover sheet, and if you

11   look at the message on it, does that indicate, sir, that

12   Mr. Tucker asked you to give a call?

13           MR. SCOTTEN:  Objection.

14   A.  It does.

15           THE COURT:  Overruled.

16   BY MR. ROTH:

17   Q.  Does that refresh your recollection --

18           MR. ROTH:  I'm sorry.

19           THE COURT:  OK.  Go ahead.

20   A.  Yes.  It indicates that he asked me to call him after I had

21   had a chance to review it.

22   Q.  And did you eventually call him, sir?

23   A.  Yes.

24   Q.  And what was your understanding of Mr. Tucker's intention

25   to have a conversation with you to be?

1   A.  I -- well, I understood that he wished to discuss with me

2   the contents of that opinion letter and whether -- and my

3   thoughts and views on the content of that letter.

4           THE COURT:  Were you his lawyer at the time?

5           THE WITNESS:  At this particular point in time?

6           THE COURT:  Yes.

7           THE WITNESS:  No.  I subsequently was retained by him.

8           THE COURT:  And when were you retained by him?

9           THE WITNESS:  We had a written engagement in, I

10  believe, May of 2004, your Honor.

11          THE COURT:  All right.  When in your mind did you

12  become Mr. Tucker's lawyer?  At the time of that engagement, or

13  some other time?

14          THE WITNESS:  Well, I believe that the conversations

15  that I had with Mr. Tucker would have been privileged within

16  the attorney-client relationship even prior to the official

17  written engagement.

18          THE COURT:  Right.  And at what point in time was

19  that?

20          THE WITNESS:  I believe that would have been

21  approximately December of 2003.

22          THE COURT:  All right.  I'm going to allow the witness

23  to testify to the conversations as of December 2003.

24          But the conversations prior to that time, you were the

25  lawyer for the Santee Sioux tribe, is that correct?

1          THE WITNESS:  That is correct, your Honor.

2          THE COURT:  All right.

3          MR. ROTH:  Thank you.

4          THE COURT:  Ask your next question, please.

5          MR. ROTH:  Can I admit the cover sheet, Judge?

6          THE COURT:  No.  Sustained.

7          MR. ROTH:  Thank you.

8   Q.  Did Mr. Tucker -- withdrawn.

9          Did you come to know an attorney named Clifford Cohen?

10  A.  Yes.

11  Q.  And how did you come to know him, sir?

12  A.  Mr. Cohen, I believe, either phoned me or sent me a fax or

13  a letter at some point in time, with regard to the Kickapoo

14  tribe.

15  Q.  And what was the content of that fax, if you recall?

16          MR. SCOTTEN:  Objection.

17  A.  I recall that --

18          MR. SCOTTEN:  Hearsay.

19          THE COURT:  Yes.  Sustained.

20  BY MR. ROTH:

21  Q.  You said that Mr. Tucker retained you to do some work on

22  the Kickapoo tribe.  What specifically did he retain you to do?

23  A.  I was introduced to the Kickapoo tribe's general legal

24  counsel through Mr. Cohen and was asked to assist the Kickapoo

25  tribe in the drafting of tribal, tribal ordinances, lending

1  ordinances, I believe, and perhaps even a corporation's code or

2  organizational documents for a tribal entity.  I'm not sure if

3  it was both, but it was one or the other, possibly both.

4  Q.  And were you actually formally engaged by the Kickapoo?

5  A.  I was.

6  Q.  And who paid your legal fees, sir?

7  A.  There was an understanding that Mr. Tucker's company would

8  pay the legal fees for my work for the Kickapoo tribe.

9  Q.  Was that an unusual arrangement, retention arrangement, in

10 your experience?

11 A.  No.

12 Q.  Sir, did you have occasion to do any work with the Yurok

13 nation?

14 A.  Yes, I did.

15 Q.  And what was the nature of the work that you did with the

16 Yurok nation?

17 A.  It was similar to the work that I'd been asked to do for

18 the Kickapoo tribe, to assist the Yurok's general legal counsel

19 with the drafting of tribal lending laws and the formation of a

20 tribally owned entity that would be formed under tribal law to

21 engage in lending activities.

22 Q.  Who was the Yurok's counsel at that time?

23 A.  I believe her name was Lisa Adams.

24 Q.  And did you, in fact, draft ordinances and other documents

25 in respect to the Yurok nation?

Ha4Wtuc2                    Schulte - Direct

1   A.  Yes.  I prepared draft, I believe, lending ordinances and

2   organizational documents for a tribal entity.

3            THE COURT:  How is any of this relevant to this case?

4            MR. ROTH:  Judge, there was testimony from the Yurok

5   people that suggested that Mr. Tucker blew them off, so to

6   speak, and I think this witness will testify why the

7   relationship did not come to fruition, to directly rebut it.

8            THE COURT:  All right.  I'll allow it for the moment.

9   Go ahead.

10  BY MR. ROTH:

11  Q.  To your knowledge, sir, did the Yurok nation pass those

12  ordinances?

13  A.  My recollection is that they did not.

14  Q.  And based on that, sir, did you communicate to Mr. Tucker

15  that it would not be suitable to pursue that?

16           MR. SCOTTEN:  Objection.  Leading.

17           THE COURT:  Yes.  Avoid the leading.

18  Q.  Did you at some point indicate to Mr. Tucker the problem

19  with not having those ordinances signed?

20  A.  Yes.

21           MR. SCOTTEN:  Objection.  Relevance.

22           THE COURT:  Yes.

23           This was at what point in time, sir?

24           THE WITNESS:  Your Honor, I believe this was sometime

25  in mid to late 2004.

1          THE COURT:  All right.  And you were acting as

2   Mr. Tucker's lawyer when you did this?

3          THE WITNESS:  Yes, your Honor.

4          THE COURT:  OK.

5          MR. SCOTTEN:  Can we approach, your Honor?  I don't

6   want to speak.

7          THE COURT:  No.  I'm going to allow it.

8          Go ahead.

9          MR. ROTH:  I'd ask that the witness be shown D304,

10  please.

11  Q.  I'd ask you to read that to yourself, sir, and I'd ask

12  whether or not that's a communication from you to Mr. Tucker

13  regarding your recommendation on the Yurok issue.  And I would

14  direct your attention to paragraph 3.

15  A.  Yes.

16  Q.  Do you recognize that to be an email that you sent to him,

17  to Mr. Tucker?

18  A.  Yes.

19          MR. ROTH:  Judge, I ask that that be moved into

20  evidence.

21          THE COURT:  Any objection?

22          MR. SCOTTEN:  Yes, your Honor.  Can I ask the witness

23  a question?

24          THE COURT:  Yes.

25  VOIR DIRE EXAMINATION

1    BY MR. SCOTTEN:

2    Q.  Mr. Schulte, do you know if at this time Mr. Tucker was

3    already engaged in payday lending?

4    A.  I'd have to look at the date.

5           MR. ROTH:  Objection, your Honor.  In respect to this

6    document, I don't think it's proper voir dire.

7           THE COURT:  I think it goes to the date.

8           Go ahead.

9    A.  It was my understanding that there was some lending

10   activity taking place, although I don't believe it was with the

11   Yurok tribe.

12          MR. SCOTTEN:  Objection based on the prior motions we

13   filed, your Honor, as to the timing of the two events.

14          THE COURT:  Ladies and gentlemen, I'll give you

15   instructions at the conclusion of this case on what's called

16   advice of counsel, and I'll tell you about the timing of when

17   the advice needs to be given in order for it to be properly

18   considered or how the timing of that advice factors into your

19   proper consideration.  But I'll allow this in for the moment.

20          (Defendants' Exhibit D304 received in evidence)

21          MR. ROTH:  Thank you, your Honor.

22          Could you publish that, Eli, and if you could

23   highlight the third paragraph.

24   BY MR. ROTH:

25   Q.  Could you tell us what you said in that paragraph to

1    Mr. Tucker, what you communicated?

2    A.   Would you like me to read it?

3    Q.   If you could, at least the first couple of sentences.

4    A.   OK.  It says, "On the Yurok issue, if they're not willing

5    to enact the ordinances, I recommend that we cancel the

6    contract.  Not worth the risk when you've got other tribes that

7    are willing to do what it takes to put up a best defense."

8    Q.   That's dated when, sir?

9    A.   December 16, 2004.

10            MR. ROTH:  You can take that down, Eli.  Thank you.

11   Q.   Did there come a time, sir, when you actually, on behalf of

12   Mr. Tucker, wrote a letter to Lisa Adams, the tribal counsel,

13   in regard to this matter for the Yurok?

14   A.   I believe that I did.

15            MR. ROTH:  I'd ask that the witness be shown D2602,

16   please.  That's a two-page letter.  If you could just flip the

17   page, Eli.

18   Q.   You can take your time and review that, sir.

19   A.   OK.

20   Q.   OK.  You recognize that as a letter that you wrote to

21   Ms. Adams?

22   A.   I do.

23            MR. ROTH:  I'd move that into evidence, your Honor.

24            THE COURT:  Any objection?

25            MR. SCOTTEN:  Yes, your Honor.  Relevance.  It's a

1   letter between two attorneys.

2           MR. ROTH:  Judge, as I stated before, this is just

3   straight-up rebuttal to their argument that they made why the

4   relationship didn't go forward.

5           MR. SCOTTEN:  He can state it, but the relevance of

6   two pages of legal correspondence between lawyers is not at all

7   relevant.

8           THE COURT:  I'll sustain the objection.  You can

9   elicit testimony from the witness.

10          MR. ROTH:  Thank you.

11          You can take that down, Eli.

12  Q.  Why did you tell Ms. Adams that the relationship with

13  Mr. Tucker's entity and the Yuroks could not go forward?

14          MR. SCOTTEN:  Objection.  Still hearsay, what

15  happened.

16          THE COURT:  I'll take it for the fact that it was said

17  to this individual.

18          Go ahead.

19  A.  I recall that I explained to her that the Yurok tribe

20  needed to enact the lending ordinances and also establish a

21  tribal entity, wholly owned by the tribe, to engage in lending,

22  and that unless those actions took place, the loans -- there

23  could be no lending that would be lawful, and therefore, the

24  relationship with Mr. Tucker's company could not continue.

25  Q.  Thank you.

1           Did there come a time, sir, when you were formally

2    engaged by Mr. Tucker in terms of an actual retainer agreement?

3    A.  Yes.

4    Q.  And do you recall approximately when that was, sir?

5    A.  I believe it was approximately May of 2004.

6           MR. ROTH:  I'd ask that the witness be shown

7    defendants' 407.

8    Q.  Do you recognize that letter, sir?

9    A.  I do.

10   Q.  And what do you recognize that letter to be?

11   A.  It's a special counsel contract between my law firm and

12   National Money Service.

13   Q.  And what is a special counsel contract?  Explain it, if you

14   would, for the jury.

15   A.  A special counsel contract is where a law firm is engaged

16   for a particular purpose.

17   Q.  And what was the purpose that you were engaged for in

18   regard to National Money Service?

19   A.  May I look at the, just read and see if it states in

20   there --

21          Yes.  It states that Monteau & Peebles, my law firm, shall

22   provide legal counseling with regard to client services related

23   to tribally regulated lending activities.

24          MR. SCOTTEN:  Objection.  He's reading from an exhibit

25   not in evidence.

Ha4Wtuc2                    Schulte - Direct

1           THE COURT:  Yes.

2           MR. ROTH:  I would move it in, your Honor.

3           THE COURT:  Any objection?

4           MR. SCOTTEN:  No, your Honor.

5           THE COURT:  All right.  It's received.

6           (Defendants' Exhibit 407 received in evidence)

7    BY MR. ROTH:

8    Q.  Sir, when you were retained -- after you were retained by

9    Mr. Tucker's entity National Money Service, were you at the

10   time retained by the Santees as well, engaged by them?

11   A.  Yes.  My firm -- Santee Sioux had been a long-time client

12   of my law firm, dating even prior to the time that I was hired

13   by the firm.

14   Q.  And what kind of matters were you doing for the Santee?

15   A.  We were their general legal counsel, so all sorts of

16   matters, from day-to-day counseling to litigation and other

17   matters.

18   Q.  Once you became retained by Mr. Tucker, did you notify the

19   Santee of any potential conflict of interest?

20   A.  Yes.

21   Q.  And what did you do?  Were any actions taken in respect to

22   your notification?

23   A.  Yes.  I notified both the Santee Sioux and Mr. Tucker that

24   I was representing both parties and requested a waiver of

25   conflict of interest from both of them.

1          MR. ROTH:  I'd ask that the witness be shown D312,

2     please.

3     Q.  Do you recognize this document, sir?

4     A.  Yes.

5     Q.  And what do you recognize it to be, sir?

6     A.  It is a resolution of the tribal council of the Santee

7     Sioux Nation.

8     Q.  And what does the resolution concern?

9     A.  Is there a second page to the resolution?

10    Q.  Yes.

11         MR. ROTH:  We can flip it.

12    A.  It acknowledges --

13    Q.  I'm just asking, do you recognize the document?

14    A.  Yes, I do.

15    Q.  Did you draft that document, sir?

16    A.  It would either have been me or someone working under my

17    supervision.

18    Q.  And that was signed by the Sioux nation as well?

19    A.  Yes, it was signed by the tribal council of the Santee

20    Sioux Nation.

21         MR. ROTH:  I'd offer that exhibit, your Honor, D312.

22         MR. SCOTTEN:  Objection.  I don't believe he's the

23    proper witness to lay a foundation for a tribal ordinance.

24    Q.  Was this a document that you had or your office had a hand

25    in preparing?

Ha4Wtuc2                    Schulte - Direct

1   A.   Yes.

2   Q.   And what does the document purport to say, the resolution

3   clause?

4            MR. SCOTTEN:  Objection.  It's not in evidence.

5            MR. ROTH:  If he understands.

6            THE COURT:  No, no.  Lay the foundation.

7            Did you prepare this document?

8            THE WITNESS:  It would either have been myself or

9   someone under my supervision, your Honor.

10           THE COURT:  All right.

11           And your objection, sir, is?

12           MR. SCOTTEN:  I don't believe that an outside party

13  can lay the foundation for a passed tribal ordinance.  If there

14  was a draft he wanted to submit, perhaps, but the fact that it

15  was enacted by the Santee Sioux is not proper for this witness.

16           THE COURT:  Do you know whether or not it was enacted

17  by the Santee Sioux?

18           THE WITNESS:  Yes, I do.

19           THE COURT:  Overruled.

20  BY MR. ROTH:

21  Q.   And was it enacted?

22           THE COURT:  Was it enacted?

23           THE WITNESS:  Yes, your Honor.

24           THE COURT:  Overruled.

25           MR. ROTH:  I'd move D312.

Ha4Wtuc2                    Schulte - Direct

1          THE COURT:  Received.

2          (Defendants' Exhibit D312 received in evidence)

3    BY MR. ROTH:

4    Q.  And you indicated, sir, that you also notified Mr. Tucker

5    of any potential conflict of interest that might arise as a

6    result of you representing both he and the Santee Sioux.  Is

7    that correct?

8    A.  That is correct.

9    Q.  And did you have occasion to write him a letter indicating

10   that, sir?

11   A.  I believe I did.

12         MR. ROTH:  I'd ask that the witness be shown

13   defendants' 409.

14   Q.  And you could read that to yourself.  It's a one-page

15   letter.

16         Do you recognize that letter, sir?

17   A.  I do.

18   Q.  What do you recognize it to be, sir?

19   A.  It is a letter notifying Mr. Tucker that our firm

20   represents the Santee Sioux Nation and that there is a

21   potential conflict of interest in representing both

22   Mr. Tucker's company and the Santee Sioux Nation in an

23   anticipated transaction, and requests that Mr. Tucker waive

24   that conflict of interest.

25   Q.  And do you know whether Mr. Tucker -- this is not executed,

1  but executed a copy of that document?

2  A.  Yes.

3         MR. ROTH:  I would move in 409, your Honor.

4         THE COURT:  Any objection?

5         MR. SCOTTEN:  No objection.

6         THE COURT:  Received.

7         (Defendants' Exhibit D409 received in evidence)

8  BY MR. ROTH:

9  Q.  Directing your attention now to the Miami Tribe of

10 Oklahoma, could you tell us your scope of representation or

11 history with that tribe?

12 A.  Yes.  I was introduced to the Miami Tribe of Oklahoma by

13 Mr. Tucker, after I was retained by his company, UMS.  I was

14 requested by the legal counsel for the Miami tribe, Mr. Ken

15 Bellmard, to assist them in preparing draft lending codes and,

16 I believe, also organizational documents for a tribally owned

17 entity that would engage in lending.

18        MR. SCOTTEN:  Your Honor, could we have a date?

19        THE COURT:  Yes, please.

20 Q.  Do you recall when that was, sir?

21 A.  I believe that was sometime in the middle of 2004.

22 Q.  And did you ever see the actual -- to your knowledge, was

23 there a service agreement between the Miami Tribe of Oklahoma

24 and Mr. Tucker's entity, UMS?

25 A.  Yes, there was an agreement between the Miami tribe and

1  Mr. Tucker's company prior to my being hired by Mr. Tucker's

2  company.

3  Q.  What type of advice did you give and for what period of

4  time did you give it to the Miami nation?

5          MR. SCOTTEN:  Objection.  Relevance.  Advice as to

6  Mr. Tucker's relevant, not other entities.

7          THE COURT:  Rephrase the question, please.

8  Q.  What kind of advice did you give to Mr. Tucker in general

9  in respect to his relationship with the Miami nation?

10 A.  Well, generally I counseled Mr. Tucker and his company

11 about the Indian law related to aspects of the lending

12 operation, both with regard to structure of tribal entities

13 that would need to be in place as well as tribal laws that

14 would need to be enacted in order to regulate the lending

15 transactions.

16     At the time, this was a very new area of the law.  The law

17 of the Internet in general was very new.

18         MR. SCOTTEN:  Objection.  Appears to be expert

19 testimony.

20         THE COURT:  Yes.  Sustained, and stricken as to the

21 last part.

22         Next question.

23 Q.  Did you have discussions with Mr. Tucker in regard to

24 sovereignty and sovereign tribal immunity?

25 A.  Yes.

1          MR. SCOTTEN:  Could we have a time of these

2     discussions, your Honor?

3          THE COURT:  Yes.

4     BY MR. ROTH:

5     Q.  At the initial period of time, in 2003, 2004.

6          THE COURT:  No, no, no.  Mr. Roth, you've been here

7     for the last several days, sir.

8     BY MR. ROTH:

9     Q.  After -- in 2004, sir.

10    A.  Yes.

11         MR. SCOTTEN:  If we could have more specificity, your

12    Honor.

13    BY MR. ROTH:

14    Q.  In December of 2004.

15         THE COURT:  Did you have discussions in December of

16    2004.  That's the present question.

17         THE WITNESS:  I would have had ongoing discussions

18    with Mr. Tucker beginning in May of 2004, so yes, December of

19    2004 would have been within that time frame.

20         MR. SCOTTEN:  I guess the point in time I would fix,

21    your Honor, if we're permitted, is, were Mr. Tucker's

22    corporations already involved in litigation by the time this

23    advice was given.

24         MR. GINSBERG:  Your Honor, respectfully, could we have

25    a sidebar if there are going to be speaking objections?

1        THE COURT:  Yes, we'll do this at the sidebar.

2            Ladies and gentlemen, let me just take a moment here.

3            The witness may be excused.  Sir, you can step down.

4        MR. SCOTTEN:  Your Honor, is there a chance we could

5    approach and discuss it and do the instruction after the break,

6    if we may have objection to allowing that?  I can't be sure.

7        MR. ROTH:  I didn't hear what he said.

8        THE COURT:  You're excused.  Thank you.

9        (Witness not present)

10       THE COURT:  Ladies and gentlemen, the concept of

11   advice of counsel is that you seek, in good faith, the advice

12   of a lawyer before you embark on a course of action.  That is

13   the concept, and it may go to reflect on the state of mind of

14   the individual who receives the advice.  Of course, the advice

15   of counsel is dependent upon what's disclosed to the lawyer as

16   well.  These are factors that you will be taking account of,

17   and I'll give you further instructions on it as we go on.  But

18   as you can see from what I've said, the timing becomes

19   important.

20           Now, it's a very bad analogy and imperfect analogy,

21   but when we were little, we would ask our moms if we could take

22   a cookie out of the cookie jar, perhaps, and you asked before

23   you engaged in dipping your hand in the cookie jar.  And we

24   remember what happened when we didn't.  Well, that's a very

25   imperfect analogy, but the concept is that you get advice

1    before you embark on a course of conduct, not after you've

2    already gone down that route.

3            That's the general concept I wanted to convey to you.

4    I'll tell you more about how you can consider it, or not

5    consider it, when we get to the final instructions in the case.

6            Ladies and gentlemen, we're going to take a recess and

7    see you in ten minutes.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Yes, Mr. Scotten.

2          MR. SCOTTEN:  Your Honor, I take it from the Court's

3     ruling that it's inclined to at least allow testimony during

4     the contracting phase of this, even if you later accept

5     reference to the phase where maybe a tribe hasn't started

6     having loans issued in its name but while Mr. Schulte is sort

7     of running around drafting agreements.

8          I think we're now into the area, however, where

9     they're trying to elicit testimony that is postlitigation,

10    where the state has actually already reached out to Mr. Tucker

11    and contacted him.  The testimony, actually this morning from

12    Mr. Cohen, was that in early 2004, the Kansas state banking

13    commission began looking into this.  The letters, which are now

14    in evidence, show that that was no later than March 10, 2004.

15    I don't think there's any precedent or reason that someone

16    could testify as to essentially advice of counsel they received

17    during their litigation defense.

18         Many organizations retain attorneys to defend a case,

19    and they can do so ethically, one, not even believing conduct

20    was correct *ex ante*.

21         THE COURT:  *Ex ante*.  That's a $2 expression here.

22         MR. SCOTTEN:  Beforehand.  My apologies, your Honor.

23         THE COURT:  All right.  Go ahead.

24         MR. SCOTTEN:  The idea that you have an attorney

25    counseling you on how to proceed with a venture once you've

1   already been told by regulatory authorities that it at least

2   may be improper, that they want to investigate you, I think,

3   would be without support, and it certainly can't go to

4   Mr. Tucker's state of mind to say:  "I've been lending for a

5   while now.  Kansas state banking commission's after me.  I've

6   retained an attorney who is going to be my litigator, who is

7   going to be in court advocating my defense.  I want to tell the

8   jury about all the things he said to me when he was telling me

9   how he was going to defend my case," as though that's

10  equivalent to advice of counsel.

11          It's actually very different and, I think,

12  prejudicial.  I'm sure all these attorneys here would say

13  wonderful things about Mr. Tucker's legal position to a court.

14          THE COURT:  I got your point.

15          Mr. Roth.

16          MR. ROTH:  Judge, I think that Mr. Schulte told you

17  when he thought the lawyer-client relationship formed, which

18  was at a certain point after he was initially contacted by

19  Mr. Tucker.

20          THE COURT:  He said December 2004.

21          MR. ROTH:  2003.

22          THE COURT:  2003.

23          He said there was a formal retainer in May of 2004,

24  and I followed up, because we all know a formal retainer is not

25  necessary in order to form an attorney-client relationship, and

1    he responded December 2003.

2              OK.  Yes?

3              MR. ROTH:  I believe that's the starting point.

4              THE COURT:  Yes, I got that.  Now do you want to

5    respond to Mr. Scotten's argument?

6              In essence, if I understand it, there is a starting

7    point for advice of counsel, but in essence, there's an ending

8    point, and there are some factual questions here.  This is why

9    I've given the defense a little bit of latitude about when it

10   engaged in certain payday lending activities.  I think

11   Mr. Scotten takes a different and narrower view than the

12   defense has, and my view is that I'm giving the defense some

13   latitude because it's really up to the jury to decide when

14   Mr. Tucker began.  But once we're at a point when he's engaged

15   in payday lending activities utilizing the tribal model, then

16   at that point, the testimony regarding advice of counsel, if I

17   understand Mr. Scotten's argument, is no longer something that

18   you can elicit, because the course of conduct is now embarked

19   on, you got the advice of counsel before you embarked on it,

20   and that's all fair game.  But once, and it may be terrible

21   analogy, once the ship has sailed, then the subsequent advice

22   is not relevant to the advice-of-counsel defense.

23             MR. ROTH:  We understand that position, and we tried

24   to fix the time of the first lending, which was not so easy to

25   do, Judge.

Ha4Wtuc2                    Schulte - Direct

1           THE COURT:  Right.

2           Let me hear from Mr. Scotten.

3           MR. SCOTTEN:  I think their own evidence fixed the

4    time of first lending at least as of March 10, 2004.  This is

5    when the Kansas state banking commission, according to

6    Mr. Cohen and the documents he submitted, reaches out to them

7    and says, What's going on with National Money Service?  And

8    they respond, We are in league with the Inajin, which is one of

9    the tribal model tribes they are using.  I think the evidence

10   would actually show, if we cared to introduce it, it's January.

11   But their evidence already establishes March.  That's got to be

12   beyond dispute.

13          MR. ROTH:  Judge, I think far beyond, it is in dispute

14   because it's referencing a tribe that's not even charged in the

15   indictment.  It's not even clear that the tribe is some name

16   attached to it.  There's no evidence adduced in the record

17   exactly what the nature of that lending was.

18          THE COURT:  Let me ask a question, and this is a

19   question.  When did the lending activity begin with the first

20   of the three tribes that are charged in the indictment?

21          MR. SCOTTEN:  Here, since there hasn't been precise

22   evidence, I do think the Court would take the defendant's

23   proffer that it's around June or July.  However, your Honor --

24          THE COURT:  Of what year, sir?

25          MR. SCOTTEN:  Sorry.  2004, your Honor.  2004.

Ha4Wtuc2                    Schulte - Direct

1           THE COURT:  Was I supposed to guess that, or what?

2           MR. SCOTTEN:  You were not, your Honor.

3           THE COURT:  OK.  All right.

4           MR. SCOTTEN:  I would, however, say I think the way

5    your Honor phrased it a minute ago was the correct way, "using

6    the tribal model."  There is no uniquely unlawful conduct here

7    about these particular tribes, and in fact, the indictment does

8    not charge this tribe or that tribe as unlawful.  It charges a

9    conspiracy to extend illegal loans.  And even in terms of the

10   tribal model, we broke down the counts by portfolio, which the

11   defendants would say are associated with particular tribes, but

12   the best case for them is, Well, we have a special

13   advice-of-counsel argument for the tribal model; not for, Well,

14   it was legal to do it with the Miami but not with the Inajin.

15   So I do think assuming he's using the tribal model, as the

16   Court's question was phrased, is the correct period of time.

17          THE COURT:  What's your proffer on when the first

18   loans were extended by using the three tribes, identified as

19   tribes 1, 2 and 3 in the indictment, and we all know which ones

20   they are?

21          MR. ROTH:  We believe, your Honor, it's around July of

22   '04.

23          THE COURT:  All right.  You and the government are not

24   far off, June, July of '04.  Let me think about it on the

25   break.  Thank you for your arguments.    (Recess)

1          (Jury present)

2          THE COURT:  Go ahead, Mr. Roth.

3          MR. ROTH:  Thank you, your Honor.

4    BY MR. ROTH:

5    Q.  Getting back, Mr. Schulte, as of no later than December of

6    '03, had you had conversations with Mr. Tucker regarding the

7    tribal model?

8    A.  Yes.

9    Q.  What was the substance of those conversations, sir?

10         MR. SCOTTEN:  Objection.  I don't know if we fixed

11   this date.

12         (Record read)

13         THE COURT:  I will allow it.

14         Go ahead.

15   Q.  What was the nature of those conversations, sir?

16   A.  Generally, the nature of those conversations would have

17   been how the lending operation operated and how it would

18   operate under tribal law.

19         THE COURT:  When were these conversations?

20         THE WITNESS:  Your Honor, these began in about

21   December of 2003, I believe.

22         THE COURT:  OK.

23   Q.  And specifically, what specific aspects of the lending

24   operation did you discuss with Mr. Tucker at that time?

25   A.  Well, I don't recall specific conversations, but I can tell

1   you generally.  It would have been what the tribes would need

2   to do.  For instance, enacting tribal laws that would govern

3   the lending transaction, forming a tribal entity that would be

4   the lender and have the sole contractual right to enforce the

5   loans with consumers.  The entity would have to be informed

6   such that it would be wholly owned by the tribe and

7   sufficiently close to the tribe so that the tribes could apply

8   their laws and jurisdictions to the loan transactions.

9           And then also the terms and conditions of the loans in

10  general probably, and things of that nature.

11  Q.  Did you tell him if those conditions were met what the

12  effect of the contract would be in respect to -- the service

13  agreement be in respect to the activities of the tribal lending

14  model?

15  A.  Can you repeat that?

16  Q.  I apologize.

17          Did you discuss sovereign immunity with Mr. Tucker?

18  A.  Yes.

19  Q.  Did you discuss tribal sovereign immunity with Mr. Tucker?

20  A.  Yes.

21  Q.  What were those discussions at that time in December?

22  A.  Well, in contemplating a tribally-owned lending operation,

23  wherein Mr. Tucker's company would service those loans, we

24  anticipated that because there were Internet transactions, and

25  the law regarding Internet transactions was less than entirely

1    clear at that time because it was developing under the law --

2            MR. SCOTTEN:  Objection.  Getting into expertise

3    again, I think.

4            THE COURT:  What you should confine your testimony to

5    is your best recollection of your conversation with Mr. Tucker.

6    By that, there is a temptation that we all have in life when we

7    can't remember something to think about what we would have said

8    or might have said under the circumstances.  That's not what

9    you're being asked.  You're being asked for your best, honest

10   recollection of what he said to you and what you said to him.

11   All right?

12           THE WITNESS:  Yes, your Honor.

13           THE COURT:  And confine your answer to that.  And if

14   you don't recall, you don't recall.  If there is a document

15   that can refresh your recollection, counsel will show you that.

16   All right?

17           MR. ROTH:  I thought the objection was about the

18   Internet lending or something.

19           THE COURT:  No.  I could explain the objection to you

20   if you would like me to do it at the sidebar.

21           MR. ROTH:  I will move on.  Thank you very much.

22           THE COURT:  I understood the objection, and my

23   direction, I believe, was responsive to the objection, which

24   was it's not an opportunity for the witness to give his views

25   of what he believes the state of the law was in 2004.  That's

1    not the question that he was asked.  That's why I gave the

2    direction I did.

3              MR. ROTH:  Thank you, Judge.

4    BY MR. ROTH:

5    Q.  In your conversations with Mr. Tucker, did you discuss what

6    the controlling factors were in the service agreement?

7              THE COURT:  No leading.  No leading.  And I have told

8    you what you can ask.  You can ask him what Mr. Tucker asked

9    him and what advice he gave Mr. Tucker.

10   Q.  What did Mr. Tucker ask you in regard to the obligations of

11   the servicers under the terms of the service agreement would

12   be?

13   A.  The obligations of the servicer or the tribes?

14   Q.  Both, if he asked you both.

15             THE COURT:  Do you recall what he asked you?

16             THE WITNESS:  I recall having discussions about the

17   respective obligations of the parties.

18             THE COURT:  OK.

19   Q.  What were those discussions?

20   A.  Well, we discussed that, again, the tribe would need to

21   enact the laws, to regulate the transactions.  The tribes would

22   need to form tribally-owned organizations such that tribal law

23   would apply to the transactions.

24             The servicer was responsible for servicing the loans,

25   which meant sort of a day-to-day servicing of the applications,

1  taking phone calls and collections on the loans.

2  Q.  At some point, sir, did you actually do an assessment for

3  Mr. Tucker of the service agreements, a written assessment?

4  A.  I believe that I did.

5           MR. ROTH:  I would ask that the witness be shown

6  Defendants' 301.

7  Q.  I ask you whether that refreshes your recollection of what

8  that document is first.

9           MR. ROTH:  In the meantime, Judge, I will hand the

10 witness a hard copy.

11 Q.  It's up on your screen now, sir.

12          Do you recognize that document, sir?

13 A.  Yes.

14 Q.  What do you recognize that document to be, sir?

15 A.  That is a letter that I sent to Scott Tucker on June 11,

16 2004, after I had performed an initial review of agreements

17 between his company and tribal entities.

18 Q.  At that point, had you seen the Miami servicing agreement

19 that was executed?

20 A.  I believe I would have, yes.

21          MR. ROTH:  I would move that into evidence, your

22 Honor, at this time.

23          THE COURT:  Any objection?

24          MR. SCOTTEN:  Yes, your Honor.  We may have some more

25 information for the court on the date issue, if we may

1    approach.

2              THE COURT:  Is that the basis for your objection?

3              MR. SCOTTEN:  Yes, your Honor.

4              THE COURT:  Let me see everybody at sidebar.

5              Ladies and gentlemen, please stand up and stretch.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Yes, sir.

3          MR. SCOTTEN:  I don't know what the court has

4    determined is relevant.  If it agrees with the government's

5    position when tribal lending began, this is already outside the

6    date period.  If the court wants to focus on the three tribes

7    named in the indictment, we just went back down in the files

8    and the Miami Tribe of Oklahoma was also engaged in lending as

9    of at least March 1, 2004.  This is based on documents supplied

10   by the Miami tribe showing that TFS, which there is no dispute

11   was Miami's early lending entity, was issuing loans as of March

12   1.

13         THE COURT:  The tribe was engaged in lending activity.

14   Was Mr. Tucker engaged in lending activity with the tribe?

15         MR. SCOTTEN:  Yes, your Honor.

16         THE COURT:  You didn't say that.  You said the tribe

17   was engaged in it.  That's not the issue.

18         MR. SCOTTEN:  I certainly don't want to say that, your

19   Honor.

20         THE COURT:  The issue is Mr. Tucker's activities.

21         MR. SCOTTEN:  Yes, it is, your Honor.

22         THE COURT:  And you're representing that Mr. Tucker

23   was engaged in payday lending activities with which tribe?

24         MR. SCOTTEN:  Miami tribe, your Honor.

25         THE COURT:  As of what date?

1          MR. SCOTTEN:  No later than March 1, 2004.

2          THE COURT:  Why don't you show the document to Mr.

3     Roth and to Mr. Bath and give them an opportunity to look at

4     it.

5          MR. BATH:  Judge, we had some e-mails that we cited to

6     the court in a letter last weekend where there are e-mails with

7     the Miami folks talking about we would like to get this

8     business started.  That was late May and June.  That's why we

9     fixed the date then.  I am not saying what he is showing you

10    isn't -- well, we haven't seen it.  We haven't had a chance to

11    talk to our clients about it.  I would still say it started in

12    December of '03, which is prior to March.  If we are using

13    Miami tribe as the baseline, then I think we have established.

14         THE COURT:  Your question is directed, or this

15    document is directed to what time period?

16         MR. SCOTTEN:  June 11.

17         THE COURT:  Here is what I am going to do.  I am going

18    to allow you to offer the document and the government is free

19    to, on its rebuttal case or however it wants to do it, to show

20    when the lending activity actually began, and it's a question

21    for the jury.

22         MR. ROTH:  Fair enough.

23         (Continued on next page)

24

25

1          (In open court)

2          MR. ROTH:  I would offer at this time D301.

3          THE COURT:  Subject to the colloquy at the sidebar,

4     it's received.

5          (Defendant's Exhibit D301 received in evidence)

6     BY MR. ROTH:

7     Q.  Directing your attention to the first page there,

8     Mr. Schulte, what was your scope of that letter, the retention?

9     What were you retained to review?

10    A.  I was reviewing the agreements between Mr. Tucker's company

11    and tribal entities.  I believe at that time it would have been

12    between Mr. Tucker's company and the Miami Tribe of Oklahoma

13    and the Modoc Tribe of Oklahoma.

14    Q.  What about the Kickapoo?

15    A.  And possibly the Kickapoo as well, yes.

16    Q.  Going to the first paragraph there, the last sentence

17    there, what was your conclusion, in essence?

18    A.  The last paragraph of the letter?

19    Q.  The last sentence of the first paragraph.

20    A.  OK.  Basically that I had reviewed those agreements and I

21    was providing Mr. Tucker with my comments, observations and

22    recommendations for amending the agreements, and the

23    relationship between Mr. Tucker's company and the tribal

24    entities, such that the tribal regulations of the lending

25    transactions would be more defensible.

1    Q.  More defensible to what, sir?

2    A.  To any -- it was anticipated that there would be

3    disagreements with at least some states over whose law applied

4    to the transactions.  So in anticipation that any state

5    regulator somewhere would either take some action or file suit

6    or question whose law applies to the lending transactions.

7    Q.  Can we go to the first paragraph, the first numbered

8    paragraph there.

9            Have you had a chance to read that or have you

10   refreshed your recollection in respect to this document?

11   A.  I did review it during the sidebar.

12   Q.  In essence, what are you saying in that paragraph, if you

13   can paraphrase?

14   A.  I was recommending that the tribes bring more value to the

15   overall transaction.  According to case law developed in other

16   contexts, it's always a good idea to have more tribal activity

17   occur in a transaction because it strengthens the argument that

18   tribal law applies to a transaction.

19   Q.  And you communicated that to Mr. Tucker in this letter, is

20   that correct?

21   A.  Yes.

22   Q.  Go to paragraph 2.

23   A.  I have got my hard copy here.

24   Q.  Paragraph 2.  What does that indicate to Mr. Tucker?

25   A.  I recommended -- at that time there were broad powers of

1    attorney between the tribal entities and Mr. Tucker's company,

2    and I recommended that the duties be made more specific.

3    Q.  Do you know whether that was done?

4    A.  I believe it was done at some point.

5    Q.  Paragraph 3, sir.

6    A.  Paragraph 3 recommends that every tribe with whom Mr.

7    Tucker's company did business should have in place a tribal

8    lending code in order to regulate the lending transactions.

9    Q.  And paragraph 4, sir.

10   A.  I say while it's not essential, but it might be a good idea

11   for the agreements to have an option for the tribes to buy out

12   Mr. Tucker's operation after a certain amount of time.

13   Q.  How long were the agreements for, as you understood them?

14   A.  My recollection is five years.

15   Q.  That was to comply with this recommendation, or did that

16   comply with this recommendation?

17   A.  Yeah.  The agreements were in place and they did have a

18   duration of five years.  They did not have the buyout provision

19   in that time, though.

20   Q.  Paragraph 5, sir.  What was that recommendation, sir?

21   A.  I believe at the time the agreements between UMS and the

22   tribes that were in place had some language that obligated the

23   tribe to raise sovereign immunity, and I recommended that that

24   reference be omitted from the agreements.

25   Q.  Was that, to your knowledge?

1    A.  Yes, I believe it was.

2    Q.  What was the significance of sovereign immunity, sir?

3    A.  Again, we anticipated or I anticipated that state

4    regulators --

5            MR. SCOTTEN:  Objection, unless communicated to Mr.

6    Tucker.

7            THE COURT:  Yes.  Sustained.

8    Q.  Tell us only what you communicated to Mr. Tucker.

9    A.  I communicated to Mr. Tucker that it would be likely that

10   there would be state regulators that would claim that state law

11   applied to the loan transactions and may file actions against

12   the tribal entities, and that in those actions the tribes would

13   have sovereign immunity so that they would not be subject to

14   those actions.

15   Q.  And paragraph 6, sir.  What was that recommendation?

16   A.  There was a recommendation that each of the tribal

17   corporations keep the appearance that it is actually engaged in

18   lending.

19           As I recall, after reading this, there was a tribal

20   entity that Mr. Tucker either had an agreement with or was

21   contemplating an agreement with, which was a tribally-owned

22   Veteran's association, and it appeared to me that would not be

23   the type of entity that would typically lend money.

24   Q.  This reference is not to the Modoc or the Miami, or is it?

25   A.  No, it is not.

1  Q.  And paragraph 7.

2  A.  Yeah.  I recommended that the agreements eliminate

3  references to off reservation conduct.

4  Q.  Why was that, sir?

5  A.  Again, because the more conduct that occurs on reservation,

6  the stronger argument you have for the application of tribal

7  law and regulation.

8  Q.  What was your concluding remarks to Mr. Tucker?

9  A.  I state in the letter, "I recommend that UMS consider

10  amending its agreements with its tribal entities to incorporate

11  the suggestions above.  I am available at your convenience to

12  discuss accomplishing this task."

13  Q.  After you wrote this letter in 2004, for how many years did

14  you advise Mr. Tucker on the tribal lending model?

15  A.  I had ongoing conversations with Mr. Tucker about the

16  tribal lending model directly until at least 2008 and

17  indirectly through his legal counsel thereafter.

18  Q.  Who are you referring to as his legal counsel?

19  A.  That would have been Tim Muir.

20  Q.  With what frequency did you have contact with Mr. Tucker in

21  advising him in regard to his lending activities during that

22  period of time?

23          MR. SCOTTEN:  Objection.

24          THE COURT:  Sustained.

25          MR. ROTH:  You can take that down, Eli.

1  Q.  Did you come to represent the Santee Nation?  You already

2  testified to that.

3          For how long did you represent the Santee Nation?

4  A.  I still represent them to this day.

5  Q.  In what type of matters do you represent the Santee Nation

6  today?

7          MR. SCOTTEN:  Objection.  Relevance.

8          THE COURT:  No.  I will allow it.

9  A.  I represent them in various matters, both on a day-to-day

10  basis in general counseling, assistance with preparation of

11  tribal resolutions, to financing of their casino, to litigation

12  of employee claims, to the lending company that it still

13  operates.

14  Q.  What type of lending company do they still operate?

15  A.  They continue to operate -- SFS is a tribally-owned company

16  that continues to issue loans online to consumers.

17          MR. SCOTTEN:  Objection.  Relevance.  2017.

18          THE COURT:  Sustained.  Stricken.

19  Q.  What if any relationship do you have with the Modoc nation?

20          THE COURT:  At what point in time?

21  Q.  Did you form a relationship with the Modoc nation of legal

22  representation?

23  A.  Yes, I did.

24  Q.  When was that, sir?

25  A.  I can't recall an exact date, but I believe it would have

1    been likely in 2005 or 2006, in that neighborhood.

2    Q.  Did you give any advice to Mr. Tucker regarding his

3    relationship with the Modoc nation?

4    A.  Yes.

5         THE COURT:  At what point in time?

6    A.  It would have been with regard to the previous exhibit,

7    beginning in June of 2004, your Honor.

8         THE COURT:  Go ahead.

9    Q.  Was it similar advice, if you will -- withdrawn.

10        What type of advice did you give him in regard to his

11   relationship with the Modoc nation at that time?

12        MR. SCOTTEN:  Object.  Can we fix a end date, your

13   Honor?

14        THE COURT:  When were these conversations?

15        THE WITNESS:  I would have had ongoing conversations,

16   your Honor.

17        THE COURT:  I will allow it up to June of 2004.

18        Ladies and gentlemen, there is a question for you to

19   decide, when the activity was first embarked on by Mr. Tucker,

20   if you find it was embarked on by Mr. Tucker, the tribal

21   relationships relating to payday loans.  And that's a question

22   for you to decide.  The parties are not in absolute agreement

23   on the starting date of that, but the starting date becomes

24   relevant because the advice of counsel defense requires that

25   you get the advice before you embark on a course of action.

1          So I am taking this testimony now subject to your

2     consideration of when the course of action was embarked on, if

3     you find that it was embarked on at all.

4          Go on, Mr. Roth.

5     BY MR. ROTH:

6     Q.  Do you recall what the last question was, sir?

7     A.  I do not.

8          THE COURT:  You're going to confine your answer,

9     though, to conversations you had prior to and end in June of

10    2004.

11         MR. ROTH:  Prior to and end?

12         THE COURT:  Up to and including June of 2004.

13         Why don't you put a new question to the witness.

14         MR. ROTH:  Very good.

15    BY MR. ROTH:

16    Q.  Did there come a time, sir, when you proposed to the Miami

17    tribe an alteration in their business structure?

18    A.  Yes.

19    Q.  Do you recall what that was or when that was, sir?

20    A.  Yes.  I believe that was in the middle of 2008, when that

21    actually took place.  The discussions probably began in early

22    2008, would be my best educated guess.

23    Q.  Did you have discussions with Mr. Muir in that regard?

24    A.  Yes.

25    Q.  And Mr. Tucker?

1    A.  Yes.

2    Q.  Did you lay out potential alternative business structures

3    for the tribal lending model?

4    A.  Yes.

5            MR. ROTH:  I would ask that the witness be shown

6    Defendants' 1442.

7    Q.  I ask you whether you recognize that, sir?

8    A.  Can I have the second page of the exhibit, please?

9    Q.  Certainly.

10   A.  Yes, I recognize that.

11   Q.  What do you recognize that to be, starting with the first

12   page, sir?

13   A.  The first page is an e-mail from myself to Scott Tucker,

14   Tim Muir, and copying my partner Lance Morgan.

15   Q.  The second page, sir?

16   A.  It is the first page of a memorandum that was authored by

17   myself and my partner Lance Morgan to Scott Tucker and

18   Mr. Muir.

19           MR. ROTH:  I would move it in at this time.

20           THE COURT:  Any objection?

21           MR. SCOTTEN:  Yes, your Honor.  It's legal advice from

22   2006.

23           THE COURT:  Sustained.

24           MR. ROTH:  Your Honor, on the basis that we made at

25   the sidebar with regard to the corporate structures that were

1    being proposed as direct rebuttal to the prosecution case, as

2    to the nature of the organizations.

3            THE COURT:  Response.

4            MR. SCOTTEN:  I will try not to speak to this too

5    extensively.

6            The charged conduct has already indisputably began.

7    The advice on how to make it more defensible during ongoing

8    litigation, which this is, is not admissible for that basis,

9    and the mere --

10           THE COURT:  Let me see the rest of the memo.  Do you

11   have a copy for me?

12           MR. ROTH:  Yes, your Honor.

13           THE COURT:  Sustained.

14   Q.  Who is the point of contact that you had with the Miami

15   nation, sir?

16   A.  At what point in time?

17   Q.  From the beginning of your contact with them to the very

18   end.

19   A.  In the beginning it would have been Don Brady and Ken

20   Bellmard.

21   Q.  And Ken Bellmard is who?

22   A.  He was the general legal counsel for the Miami Tribe of

23   Oklahoma.

24   Q.  During the period of time that you had the relationship

25   with the Miamis, how frequently did you speak to Don Brady?

A.  Well, it varied over time and depending upon what was going

on.  Sometimes it was daily, at other times it would have been

maybe once a week or once every couple of weeks.  We frequently

had discussions either by phone or e-mail.

Q.  Did you ever meet with him personally?

A.  Yes.

Q.  At the tribe?

A.  Yes.

Q.  During this period of time that you represented him over

the course of these years, how many times would you say you

went to the Miami tribe?

A.  Gosh, between 20 and 30 times probably.

Q.  Did you ever meet with him in Kansas City?

A.  Yes.

Q.  In Overland?

A.  Yes.

Q.  Did you attend board meetings with him?

A.  Yes.

          MR. SCOTTEN:  Objection.  Relevance.

          MR. ROTH:  Judge, there's affidavits from Mr. Brady

that the government has introduced.

          MR. SCOTTEN:  If that's where it's going, then

withdrawn.

          THE COURT:  Go ahead.

Q.  Did you attend board meetings with Mr. Brady over the

1    course of this period of time?

2    A.   Yes, on occasion.

3    Q.   What type of board meetings did you attend with him?

4    A.   They would have been meetings of the business committee of

5    the Miami tribe, which was the governing body of the tribe,

6    which he would attend.  Also, meetings of the board or Miami

7    Nation Enterprises, which was the lending company that was

8    owned by the tribe, and AMG Services, which began sometime

9    after -- during 2008.

10   Q.   Did you have a role in the creation of AMG Services, your

11   firm?

12   A.   Yes.

13   Q.   What was that role?

14   A.   We advised the tribe on that transaction and drafted the

15   documents to accomplish that transaction.

16        MR. SCOTTEN:  I renew my objection to relevance.  The

17   affidavits I thought is where it was going.

18        THE COURT:  Get to the affidavits if you want to get

19   to that.

20        MR. ROTH:  Thank you, your Honor.

21   Q.   I will just go through a few more points with the other

22   tribes.

23        Regarding the Modocs, who did you interact with with

24   the Modocs as a point of contact during your period of

25   representation?

1    A.   Troy Little Axe.

2    Q.   Do you know if he held any other titles or held any

3    degrees?

4    A.   Yes.  Troy was an attorney and general counsel for the

5    Modoc Tribe of Oklahoma.

6    Q.   Is he still?

7    A.   Yes.

8            MR. SCOTTEN:  Objection.  Relevance.

9            THE COURT:  Sustained.  Stricken.

10   Q.   In the Santee Nation, during the period of time that you

11   represented the Santee Nation, who was your point of contact

12   there?

13   A.   Most frequently it would have been Mr. Lee Ickes.

14   Q.   What was his title?

15   A.   He was originally the business manager for the tribe when I

16   first met him.  Over time his title changed.  I believe his

17   title is president of SFS, which was the tribe's lending

18   company.

19   Q.   Had you visited the tribe and Mr. Ickes on occasion during

20   the period of your representation?

21   A.   Yes.

22   Q.   Approximately how many times?

23   A.   It would have been more frequently than the Miami and Modoc

24   tribes because we represented the Santee Sioux as general

25   counsel.  So I would say probably on average five or six times

1    a year, perhaps more often.

2    Q.  At a certain point, did you get involved in some litigation

3    regarding the tribes in Colorado?

4    A.  Yes, with regard to the Miami tribe and the Santee Sioux

5    tribe.

6    Q.  What was your role in that litigation, sir?

7    A.  I was engaged by the Miami tribe and the Santee Sioux tribe

8    to represent their tribal lending companies, which would have

9    been MNE and SFS.

10   Q.  What was the nature of that action?

11   A.  The State of Colorado or one of its agencies had issued

12   administrative subpoenas to, I believe it was One Click Cash.

13   It was in the name of trade names utilized by the tribal

14   lending companies.

15   Q.  When did that litigation start, sir?

16   A.  My recollection is that we entered our appearance in that

17   litigation in July of 2005.

18   Q.  Was that a test case or the first case of such an action?

19            MR. SCOTTEN:  Objection.

20   A.  To my knowledge --

21            THE COURT:  Sustained.

22   Q.  Was any criminal activity, conduct alleged?

23            THE COURT:  Sustained.

24   Q.  What other attorneys from your firm were involved in that

25   litigation?

HA48TUC3                    Schulte - Direct

1              MR. SCOTTEN:  Objection.

2              THE COURT:  Sustained.

3              MR. ROTH:  Your Honor, it has to do with the

4     affidavits.

5              THE COURT:  Get to the affidavits and then you can

6     reask the question and I will allow it.  But asking in the

7     abstract, you haven't laid a foundation yet for its relevance.

8              MR. ROTH:  Very good, your Honor.

9     Q.  Could you describe the findings in the Colorado litigation?

10             MR. SCOTTEN:  Objection.

11             THE COURT:  Mr. Scotten, I would advise you to modify

12    your tone of voice.

13             MR. SCOTTEN:  Yes, your Honor.

14             MR. ROTH:  The reason I am asking this, your Honor, is

15    because affidavits were submitted at different periods of time

16    with regard to different stages of the litigation.  So it's

17    relevant for the purposes of the affidavits.

18             THE COURT:  Sustained.

19    Q.  Sir, how long did the litigation go on?

20             THE COURT:  Mr. Roth, I would advise you to ask

21    questions for which you have a good faith basis that the

22    question leads to admissible evidence.

23             MR. ROTH:  Very well, your Honor.

24    Q.  Did you draft certain affidavits by, among other people,

25    Don Brady to be submitted in conjunction with the Colorado

1   litigation?

2   A.   Yes.   It would have been either myself or someone under my

3   guidance.

4   Q.   Could you tell us, sir, when you talk to under your

5   guidance, what do you mean by that?

6   A.   It would have been another attorney working on the case

7   that was on the team who I supervised.

8   Q.   What attorneys were on your team that you supervised?

9   A.   At the time, when the litigation, when we entered our

10  appearance and the original declarations were filed?

11  Q.   Yes.

12  A.   That would have been of course myself, Shilee Mullin,

13  Joseph Messineo, Ben Fenner, and perhaps Jennifer Bliss.

14  Q.   Were you the point person for that litigation, sir?

15  A.   Yes.

16  Q.   What was the process that you used in respect to Mr. Brady

17  in obtaining affidavits from him?

18  A.   Generally, we would have a conversation, or one of the

19  attorneys would have a conversation with Mr. Brady about the

20  contents of the affidavit.  After that conversation, a draft

21  would be prepared.  The draft would be sent to Mr. Brady,

22  either by fax or by e-mail, for his review.  Mr. Brady would

23  review and then if he had any edits or revisions or additional

24  information that needed to be supplied -- sometimes we would

25  send blanks that needed to be filled in -- he would make those

HA48TUC3                    Schulte - Direct

1   edits.  He would send them back to one of the attorneys in our

2   firm and those changes and edits would be made to the affidavit

3   and it would be resent to Mr. Brady.  And if he had further

4   edits, he would send them back.  If he had no further edits,

5   then he would sign the affidavit and send it back to us.

6            THE COURT:  Now what you just described, is that your

7   process of how you, in the course of your practice, prepare

8   affidavits and have them executed?

9            THE WITNESS:  It is, your Honor.

10            THE COURT:  The question is, do you recall whether

11   this happened in the case of Mr. Brady?

12            THE WITNESS:  I do have specific recollections of --

13            THE COURT:  Speak into the microphone.

14            THE WITNESS:  I do have a specific recollection of Mr.

15   Brady making edits to affidavits, or calling to make changes to

16   draft affidavits.

17            THE COURT:  Thank you.

18            MR. ROTH:  Thank you.

19            I ask that the witness be shown D345.

20   Q.  And ask if you can identify that document.  Read that to

21   yourself.

22   A.  Yes, I recognize it.

23   Q.  What do you recognize it to be, sir?

24   A.  That's an e-mail from me to Mr. Brady.

25            MR. ROTH:  I offer that into evidence at this point,

1    your Honor.

2              THE COURT:  Any objection?

3              MR. SCOTTEN:  Relevance and hearsay.

4              MR. ROTH:  I can establish it's a business record,

5    your Honor.

6              THE COURT:  First of all, who are you acting as

7    counsel for at this point in time, Mr. Schulte?

8              THE WITNESS:  At this point in time, I was counsel to

9    the Miami Nation Enterprises in ongoing litigation.

10             THE COURT:  Were you counsel to anyone else?

11             THE WITNESS:  In 2009, yes, I was counsel to the

12   Santee Sioux Nation and the Modoc Tribe of Oklahoma.

13             THE COURT:  Were you counsel to Mr. Tucker?

14             THE WITNESS:  At this point in time, I don't believe

15   that I was counsel to Mr. Tucker's company.  I believe he was

16   separately represented.

17             THE COURT:  Whether he was separately represented or

18   not, were you still his lawyer?

19             THE WITNESS:  I did not consider our firm to be his

20   lawyer at this particular point in time.

21             THE COURT:  When did you cease to be Mr. Tucker's

22   lawyer?

23             THE WITNESS:  I don't recall an exact date, your

24   Honor.  I believe it would have been sometime at the end of

25   2007 or beginning of 2008.

1          THE COURT:  Did Mr. Tucker pay any of your fees after

2    that date?

3          THE WITNESS:  He did not.

4    BY MR. ROTH:

5    Q.  Did you have a joint representation agreement in place at

6    that time with Mr. Tucker's lawyers?

7    A.  Yes.

8          MR. ROTH:  Your Honor, I am offering this in respect

9    to the affidavit, the way it was prepared, not for legal advice

10   to Mr. Tucker, to show the review process that he did with Mr.

11   Brady in the affidavits that the government has introduced.

12   Specifically the last sentence, your Honor.

13         THE COURT:  I am going to allow it.  It's received.

14         (Defendant's Exhibit D345 received in evidence)

15         MR. ROTH:  Can you highlight the last sentence of that

16   first paragraph.

17   BY MR. ROTH:

18   Q.  Can you read that, sir?

19   A.  It says, "Please review the attached and if it meets your

20   approval, sign and e-mail/fax the signed declaration and

21   overnight the original to me."

22   Q.  Is that the procedure that you used, sir, with him in

23   regard to obtaining affidavits?

24   A.  That's typical of the language that we would use, yes.

25         MR. ROTH:  You can take that down, Eli.

Q.  I would ask that Mr. Conly Schulte be shown Defendants'

D346, please, and ask you whether you recognize that document.

A.  Yes, I do.

Q.  What do you recognize it to be?

A.  It's an e-mail to me -- I'm sorry, from me to Don Brady.

Q.  What is the subject line?

A.  It's a May 7, '09 declaration of Brady in support of motion

to quash.

        MR. ROTH:  I would move that in, your Honor.  D346.

        THE COURT:  Any objection?

        MR. SCOTTEN:  No new objections, your Honor.

        THE COURT:  Received.

        (Defendant's Exhibit D346 received in evidence)

        MR. ROTH:  Can you publish that, Eli.  Can you

highlight the body of that e-mail, sir.

BY MR. ROTH:

Q.  What does that say, sir?

A.  Would you like me to read it?

Q.  Yes.

A.  It says, "Don, hope all is well.  Please find attached a

declaration that we will need to file in conjunction with our

motion to quash the latest subpoena to US Bank issued by the

State of California.  Please review and contact me if you would

like to discuss.  Otherwise, please sign and e-mail/fax the

signed version to me, and overnight the original.  I'm

1    available on my cell phone today," and I wrote my cell phone

2    number.

3    Q.  Did Mr. Brady avail himself of calling you on his cell

4    phone in regard to affidavits or reaching out to you in regard

5    to your drafting of affidavits?

6    A.  I don't know with regard to this particular one, but he

7    would typically, I would say more often than not, contact me to

8    discuss the affidavits.

9    Q.  Did there come a time, sir, when there was some litigation

10   in California that you were involved in?

11   A.  Yes.

12   Q.  Who were you representing in the course of that litigation?

13   A.  I was representing Miami Nation Enterprises and SFS, which

14   would have been the Miami and Santee Sioux lending companies.

15   Q.  What if any other attorneys were involved in that?

16   A.  There were, from my firm, Shilee Mullin, John Nyhan, Tim

17   Hennessy, Joseph Messineo, and I believe John Peebles.  I think

18   he was counsel of record on the filings.

19   Q.  Did you prepare certain affidavits in connection with that

20   litigation?

21   A.  Either myself or someone under my supervision would have

22   prepared affidavits, yes.

23   Q.  When you say somebody under your supervision, ultimately

24   did any legal documents, including documents with affidavits,

25   go out from your law office without your reviewing it?

1   A.   No.  Not for this case.

2          MR. ROTH:  I am going to ask that you publish, Eli,

3   Government Exhibit 319.

4          If you can flip through the pages of that.

5   Q.   What is that document, sir, that you have in front of you?

6   A.   That is a declaration of Don Brady that was submitted to

7   the Superior Court of California in a lawsuit brought by the

8   State of California against the Miami and Santee Sioux lending

9   companies.

10  Q.   What was the purpose of Mr. Brady's affidavit that was made

11  a part of your submission there?

12  A.   It was submitted in support of a motion to dismiss on the

13  basis of tribal sovereign immunity.

14  Q.   Explain what that means, sir.

15         MR. SCOTTEN:  Objection.

16  Q.   Your understanding.

17         MR. SCOTTEN:  It's Mr. Tucker's understanding that

18  matters.

19         THE COURT:  Yes.  Sustained.

20  Q.   Did you discuss this affidavit with Mr. Tucker, sir?

21  A.   I don't believe I did, no.

22  Q.   Did you discuss this action, this legal action, with Mr.

23  Tucker?

24  A.   I would have likely discussed it indirectly with Mr. Tucker

25  to Mr. Muir.

1    Q.  What was Mr. Muir's relationship with Mr. Tucker at this

2    point?

3    A.  Mr. Muir was legal counsel to Mr. Tucker and some of his

4    companies, is my understanding.

5    Q.  So when you discuss legal matters, you discuss them with

6    Mr. Muir and sometimes with Mr. Tucker, is that fair to say, in

7    this period of time?

8    A.  Yes.  If I discussed it with Mr. Tucker, ordinarily

9    Mr. Muir would have been there.

10   Q.  This is a five-page document, is that correct?

11   A.  You would have to flip to the last page.

12          I believe it's six pages.

13   Q.  I'm sorry.  Thank you for the correction.

14          MR. ROTH:  Eli, if you could put up Defense 753 side

15   by side.

16          Just for the witness, Eli.

17   Q.  Do you see that in front of you now, sir?

18   A.  Yes, I do.

19   Q.  That page, how does it compare to 319?

20   A.  Exhibit marked 753 has a file stamp on it.  The other one

21   appears to be the same document, though before it was filed

22   with the court.

23          MR. ROTH:  Eli, for the witness, can you just flip

24   through the pages of 753.  Past page 6, if there is a page past

25   6.

HA48TUC3                    Schulte - Direct

1    Q.  Without counting the pages, does that document, the defense

2    exhibit, contain more pages than are contained in 319?

3    A.  Yes, it does.  It contains exhibits that are referenced in

4    the declaration that are not contained in the Government

5    Exhibit 319.

6    Q.  Do you recognize that document, sir, as a document that

7    your firm filed?

8    A.  Yes.

9    Q.  And that's one of the documents that you had a hand in

10   preparing, is that fair to say?

11   A.  Yes.

12   Q.  And that was filed in court, is that correct?

13   A.  Yes.

14           MR. ROTH:  Eli, if you can take down 319.

15           I would move in Defendants' D753 at this point, your

16   Honor.

17           MR. SCOTTEN:  Objection.  Relevance.  It appears to be

18   a legal filing with a bunch of exhibits.

19           MR. ROTH:  Judge, this is an affidavit that the

20   government introduced on their case and for the doctrine of

21   completeness, this has the exhibits to it which give meaning to

22   the affidavit that's in question.

23           THE COURT:  All right.  Ladies and gentlemen, this is

24   a good time for our lunch break, mid-day break.

25           Enjoy the continued good weather.  Have a pleasant

1    lunch.

2             Don't discuss the case among yourselves or with

3    anyone.  See you back in action for a 2:00 start.

4             (Jury exits courtroom)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  You may step down.

3          (Witness excused)

4          THE COURT:  What is the problem with the exhibits?

5          MR. SCOTTEN:  Your Honor, it appears to be a legal

6     filing attaching a bunch of exhibits like the Constitution of

7     the Miami tribe.  I don't see how they give meaning to

8     Mr. Brady's affidavit.  The question here is the factual

9     accuracy of his affidavit.  There is no contention he lied

10    about what the Miami Constitution says or what ordinances were

11    passed by the Miami tribe.  I think it's attempt to show, look

12    at all of this tribal law that was submitted in this

13    litigation, which is not relevant.

14         THE COURT:  Mr. Roth.

15         MR. ROTH:  That's not what the intent is to do at all.

16    There are documents in there that speak to some of the aspects

17    of the affidavit itself.

18         THE COURT:  Give me a for instance.  Tell me.

19         MR. ROTH:  For instance, the responsibilities of

20    approving loans.  That's been a contention here, who has to

21    approve the loans.

22         MR. SCOTTEN:  The fact that there is an ordinance that

23    says that, as the Court has already said, does not go to the

24    truth.  The question is whether that actually happened in fact.

25         THE COURT:  These ordinances have not come into

1   evidence previously?

2           MR. SCOTTEN:  I don't know as to these particular

3   ordinances, your Honor.

4           THE COURT:  Take a look at it over the lunch break and

5   let me know whether any of this is already in evidence.

6   Because if it's already in evidence, why am I wasting my time?

7   So take a look.

8           MR. SCOTTEN:  Yes, sir.

9           THE COURT:  See you all at 2:00.

10           (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ha4Wtuc4

1                        AFTERNOON SESSION

2                            2:00 p.m.

3          THE COURT:  Please remain standing while we bring in

4     the jury.

5          MR. SCOTTEN:  Your Honor, I think you were waiting for

6     us to get back to you to rule on an evidentiary objection.

7          THE COURT:  Yes.

8          MR. SCOTTEN:  We looked.  The four exhibits to this

9     affidavit are not in evidence, except it's possible a portion

10    of one exhibit is, and also, just to be clear, we're not making

11    a custodian of records-type objection.  Our objection is these

12    are documents, like Miami constitution, the Miami board

13    minutes, that the Court has already ruled inadmissible, and

14    they're certainly inadmissible for the use to backstop the

15    truth of the affidavit.

16         THE COURT:  How do they go to the truth or falsity of

17    the affidavit?

18         MR. ROTH:  Specifically, your Honor, directing your

19    attention to the second-to-last page of the ordinance of

20    interest loans and debt of the exhibit, it specifically

21    indicates how the loan approval process should work.  This is

22    also a document that this witness authored.

23         THE COURT:  I'm going to allow it.  They'll come in.

24         Bring our jury in.

25         (Continued on next page)

1        (Jury present)

2              THE COURT:  Welcome back, ladies and gentlemen.

3              Everybody else, please be seated.

4              I hope you got outside.  By all reports, it's pretty

5    nice out.  We're back in action.

6              Mr. Roth, whenever you're ready.

7              MR. ROTH:  Thank you, your Honor.

8              I offer at this time Mr. Brady's affidavit marked

9    D753.

10             THE COURT:  That's received.

11             (Defendants' Exhibit D753 received in evidence)

12             MR. ROTH:  Thank you.

13             And could you take this down for a second, Eli.

14   Q.  Was it your practice, Mr. Schulte, to send a copy of

15   affidavits of Mr. Brady to his counsel as well for approval at

16   the time you sent them to Mr. Brady?

17   A.  Yes.  When Mr. Bellmard was serving as counsel for the

18   tribe, my recollection is I would have copied Mr. Bellmard on

19   it as well.

20             MR. ROTH:  I'd ask that the witness be shown D2022.

21   Q.  I ask you if you recognize that document.

22   A.  Yes, I do.

23   Q.  What do you recognize it as, sir?

24   A.  It's an email -- excuse me, from Shilee Mullin, who is an

25   attorney working for my firm, to Ken Bellmard, and copying

1    myself, regarding an affidavit of Don Brady.

2              MR. ROTH:  Judge, I offer 2022.

3              MR. SCOTTEN:  No objection.

4              THE COURT:  Received.

5              (Defendants' Exhibit 2022 received in evidence)

6              MR. ROTH:  Eli, could you publish that, please, and

7    highlight the substance of that email, after Ken.

8    Q.  What does that say, sir?

9    A.  It says, "Ken, here is the revised affidavit wherein I have

10   corrected paragraph 11.  If you have any questions, feel free

11   to contact me.  Thanks."

12   Q.  What time is that email, sir?

13             THE COURT:  Wait a minute.  It's not up on the screen.

14             MR. ROTH:  Oh, I'm sorry.

15   Q.  What date and time is that, sir?

16   A.  That is July 15, 2005, at 4:34 p.m.

17             MR. ROTH:  Thank you.  You can take that down, Eli.

18             I'd ask that the witness be shown 2023.

19   Q.  Do you recognize that, sir?

20   A.  Yes.

21   Q.  And what do you recognize it to be, sir?

22   A.  It's an email from Shilee Mullin to Ken Bellmard with a

23   copy to me.  The subject is the latest version of the Don Brady

24   affidavit.

25             MR. ROTH:  I would move that into evidence at this

1    time, your Honor.

2               MR. SCOTTEN:  No objection.

3               THE COURT:  Received.

4               (Defendants' Exhibit 2023 received in evidence)

5    Q.  Is that on the same date?

6    A.  Yes, it appears to be.

7    Q.  And it's a little later in the day, does it appear to be?

8    A.  Yes, it's about 30 minutes later.

9    Q.  And what is the text of that document?

10   A.  It says, "Ken, I made one small additional revision to

11   paragraph 11 of Don's affidavit.  Would you have him execute

12   this version?  Contact me with any questions.  Thank you."

13   Q.  That was an exchange back and forth with Mr. Brady and your

14   office, your associate, and Mr. Bellmard was in the chain as

15   well?

16   A.  It was an exchange between Ms. Mullen at my office and

17   Mr. Bellmard regarding Mr. Brady's affidavit.

18   Q.  A couple change, minor edits, is that correct?

19   A.  That's -- it says one small additional revision, yes.

20               MR. ROTH:  Thank you.  You can take that down.

21               And I'd ask that the witness be shown 2025.

22   Q.  Do you recognize that document, sir?

23   A.  Yes, I do.

24   Q.  And who is that from and to?

25   A.  It's an email from Shilee Mullin of my firm to Don Brady

1  and Ken Bellmard, on which I'm copied, regarding Don Brady's

2  affidavit.

3            MR. ROTH:  I'd move 2025 into evidence, your Honor.

4            MR. SCOTTEN:  No objection.

5            THE COURT:  Received.

6            (Defendants' Exhibit 2025 received in evidence)

7  Q.  Could you read us the text in that affidavit, please?

8  A.  It says, "Don, please execute the attached affidavit and

9  overnight it today.  Ken, if you have any revisions to the

10 affidavit, please contact us on Monday morning, and we can

11 discuss the revisions.  However, we need to have an executed

12 signature page in our possession on Monday."

13           MR. ROTH:  Thank you.  You can take that down, and

14 Eli, please bring back up D753, please.

15 Q.  This is the Brady affidavit that we were discussing before,

16 sir.  Did Mr. Brady swear to the truth of the contents of that

17 affidavit?

18 A.  Yes, he did.

19 Q.  And sir, what other than Mr. Brady affirming to the truth

20 of that affidavit leads you to believe it's true -- or do you

21 believe it's true, the contents?

22 A.  Yes, I do.

23 Q.  Could we direct your attention to paragraph 2 of that

24 affidavit, on page 2.

25           MR. ROTH:  Could you highlight that, Eli.

1   Q.  Can you read that?

2   A.  Yes.

3   Q.  Out loud.

4   A.  Oh, I'm sorry.  "I am employed as the chief executive

5   officer of the Miami Nation Enterprises business management

6   division, P.O. Box 1525, 3531 P Street NW, Miami, Oklahoma

7   74354.  In the performance of my duties as CEO of MNE, I manage

8   the services that MNE and its entities provide as well as

9   maintain the ultimate responsibility for its book, records and

10  accounts.  Also, I manage the day-to-day operation of MNE and

11  am ultimately responsible for marketing, strategy and

12  compliance with all regulations pertaining to MNE."

13  Q.  Is that true, to your knowledge?

14  A.  Yes, it is.

15          THE COURT:  All right.  I've allowed the reading

16  there, but avoid the reading.  It's up on the screen.

17          MR. ROTH:  Judge, if I may just get to the paragraph

18  in particular.

19          THE COURT:  I understand, but you can display them to

20  the jury; they don't have to be read aloud.

21          MR. ROTH:  Very good.

22  Q.  Could you summarize paragraph 3, sir, and tell me whether

23  that's true, to your knowledge?

24  A.  In that paragraph, Mr. Brady states that he's familiar with

25  the operations of Miami Nation Enterprises and that it's

1  organized as a political and economic subdivision of the tribe

2  and at all times acted wholly as -- I'm sorry, acted as a

3  wholly owned subdivision of the Miami tribe.

4  Q.  And did you have a role in forming MNE, your law firm?

5  A.  I believe that it did.

6  Q.  Do you know what that role was, to incorporate --

7  A.  We would likely have drafted the organizational documents

8  for MNE, its corporate charter and bylaws.

9  Q.  And directing your attention to page 3, paragraph 8, can

10 you read that, sir, and tell me, summarize that and tell me

11 whether that's correct?

12 A.  It says that MNE, doing business under trade names

13 Ameriloan, US FastCash and United Cash Loans, provides

14 short-term loans to borrowers pursuant to loan agreements, and

15 those transactions are approved and consummated on tribal

16 lands, of the Miami Tribe of Oklahoma.

17 Q.  Is that true, sir, to your knowledge?

18 A.  Yes.

19 Q.  And when you had discussions with Mr. Tucker during your

20 initial review of the service agreements, did you tell him that

21 each and every loan had to be approved by somebody on tribal

22 land?

23 A.  Not each loan individually, no.

24 Q.  What did you inform him were the requirements for loan

25 approval?

Ha4Wtuc4                    Schulte – Direct

1    A.   That the tribe needed to approve the terms and conditions

2    of the loans and the terms and conditions on which the loans

3    would be approved, or would be -- the money would be lent, I

4    should say.

5    Q.   To your knowledge, was Mr. Brady familiar with the terms

6    and conditions of the loans?

7    A.   Yes, to my knowledge.

8    Q.   And what is that knowledge based on, sir?

9    A.   I attended several meetings between Mr. Brady and

10   Mr. Tucker.

11            THE COURT:  In what time period?

12            THE WITNESS:  That would have been beginning in 2004,

13   your Honor.

14            THE COURT:  All right.  And when you say beginning in

15   2004, when were the other meetings?  How many meetings were

16   there; when were they?

17            THE WITNESS:  There would have been numerous meetings

18   periodically beginning in, I would say middle to late 2004, all

19   the way up until post-2012.

20            THE COURT:  All right.  Next question.

21   BY MR. ROTH:

22   Q.   Paragraph 11 on page 4, sir --

23            MR. ROTH:  Could you highlight that, Eli.

24   Q.   -- could you summarize what that says in terms of the

25   profits?

1   A.  It says a hundred percent of the profits generated from MNE

2   are reinvested in economic and governmental purposes of the

3   tribe and used for various tribal governmental purposes,

4   including services to its members, law enforcement, poverty

5   assistance, housing, nutrition, preschool, elder care programs,

6   school supplies and scholarships.

7   Q.  And what was your understanding, sir, of what 100 percent

8   of the profits generated by MNE meant in that paragraph?

9   A.  It meant all of the moneys paid to MNE or that MNE derived

10  from the lending business.

11  Q.  And what were the terms of the revenue split between the

12  servicers and the tribes?

13  A.  MNE --

14  Q.  Servicers.

15  A.  Pursuant to the service agreements, MNE received 1 percent

16  of the gross collected revenues monthly.

17  Q.  Did you finish your answer?  I'm sorry.

18  A.  I was going to say that that 100 percent refers to the 1

19  percent of the gross collected revenues that MNE itself would

20  receive.

21  Q.  Thank you.

22      Directing your attention to paragraph 13 on that page, what

23  does that indicate, sir?

24  A.  It states that as a tribally owned and operated entity, MNE

25  enjoys sovereign immunity from suit.

 1    Q.  Thank you.

 2            And that affidavit --

 3            MR. ROTH:  Go back to the front page, Eli.  Thank you.

 4    Q.  -- there were at least three lawyers that submitted that

 5    affidavit, is that correct?

 6            MR. SCOTTEN:  Objection.  Relevance.

 7            THE COURT:  Yes.  Sustained.

 8            MR. ROTH:  I'll move on.

 9    Q.  There was some litigation in West Virginia, is that

10    correct, sir?

11    A.  Excuse me.  Yes, I do recall that.

12    Q.  And what was the nature of that litigation?

13    A.  I believe that the, or my recollection is that the state of

14    West Virginia brought suit against a number of online lenders,

15    alleging that the lenders needed to be licensed in the state of

16    West Virginia.

17    Q.  And what was your role in that lawsuit?

18    A.  I represented the Modoc, Santee and Miami tribes in that

19    litigation, because they were named defendants.

20    Q.  And in connection with the court pleadings or papers that

21    he submitted, did you submit an affidavit on behalf of Troy

22    Little Axe?

23    A.  Yes, I recall that we did.

24            MR. ROTH:  I'd ask that the witness be shown

25    Government Exhibit 824.  And if you could flip through, that's

1   only six pages, Eli.

2   Q.  Do you recognize that, sir?

3   A.  Yes, I do.

4   Q.  And is that an affidavit that you submitted on behalf of

5   Troy in combination with the court pleadings in that matter?

6   A.  Yes, it is.

7              MR. ROTH:  I'd move that into evidence, your Honor.

8              MR. SCOTTEN:  I think it's in evidence, your Honor.

9              MR. ROTH:  Oh, I'm sorry.  It's a government exhibit.

10  I apologize.

11  Q.  Turning, sir, to the second page, paragraph 2, could you

12  summarize that and what that says in that paragraph?

13  A.  Troy says that he's employed as the director of MTE

14  services, and in performing his duties, he manages the services

15  that MTE provides and maintains the ultimate responsibility for

16  its books, records and accounts and oversees the day-to-day

17  management of MTE.

18  Q.  And what services do they provide?

19  A.  MTE was a tribal lender.  It made loans over the Internet

20  to consumers.

21  Q.  And did you create MTE?

22  A.  I don't recall if MTE was already created by the time we

23  were retained or if our firm formed it.

24  Q.  Fair enough.  Did you tell Mr. Tucker that the tribe had to

25  actually manage day-to-day operations?

1  A.  The tribe needed to manage the day-to-day operations of the

2  tribal entity.

3            MR. SCOTTEN:  Objection.  Advice to Mr. Little Axe.

4            THE COURT:  Sustained.

5            MR. ROTH:  I'm sorry.  I didn't hear the objection.

6            MR. SCOTTEN:  My objection was that it's advice to

7  Mr. Little Axe, which is irrelevant.

8            THE COURT:  Sustained.

9  BY MR. ROTH:

10  Q.  When you spoke to Mr. Tucker with your initial review of

11  the service agreements, did you indicate to him that as part of

12  the service agreement, the tribes had to manage the day-to-day

13  management of the lending operation?

14            THE COURT:  Fix a point in time.

15  Q.  In 2004, when you did your initial review.

16  A.  Can you clarify what you mean by the lending operation?

17  Q.  Well, there were roles that the servicers played under the

18  lending operation, is that correct?

19  A.  That is correct.

20  Q.  And there were roles that the tribe played, is that

21  correct?

22  A.  That is correct.

23  Q.  And if the tribe had the final say in how the operation

24  runs, was that OK and did you tell that to Mr. Tucker?

25            THE COURT:  Whoa.  Avoid leading.

1              MR. ROTH:  I'm sorry.

2    Q.  What did you tell Mr. Tucker in respect to the authority

3    that the tribe had to exercise over the lending operation in

4    2004?

5    A.  My recollection is that I would have advised Mr. Tucker

6    that the tribe had to be the lender and let -- be the entity

7    that actually loaned the money.  The tribe had to own and

8    control the lender.  That's distinct from the servicer that --

9    that was -- Mr. Tucker's company was the servicer.

10   Q.  Directing your attention to the eighth paragraph on page 3,

11   paragraph 8 on page 3, is that a true statement, to your

12   knowledge?

13   A.  Yes, to my knowledge, that is true.

14   Q.  And paragraph 9, is that a true statement, to your

15   knowledge, on page 3?

16   A.  Yes, it is.

17   Q.  And paragraph 10, is that a true statement?

18   A.  Yes, to my knowledge, that is a true statement.

19   Q.  And this exhibit does not have the attachments, but some of

20   the attachments that are referenced there, are those exhibits

21   documents that you created, some of them?

22   A.  I believe so.  I believe that they are.  I know that the

23   interest loan and debt act was a document that our firm drafted

24   for sure, and given the dates of those resolutions, I believe

25   that our firm likely drafted those documents.

1   Q.  And you considered those documents when this affidavit was

2   drawn, is that fair to say?

3   A.  Yes.

4   Q.  And Mr. Little Axe is an attorney, is that correct?

5   A.  Correct.

6   Q.  Did there come a time, sir --

7           MR. ROTH:  You can take that down, Eli.  Thank you.

8   Q.  -- when Mr. Tucker sued AMG?

9   A.  Yes.

10  Q.  And what was the nature of that lawsuit?

11          THE COURT:  Fix a point in time, if you will, sir.

12          THE WITNESS:  Yes.  That was, I believe, in July of

13  2010.

14  Q.  And what was the nature of the lawsuit, sir?

15  A.  The suit was a --

16          THE WITNESS:  Can I give a little background?

17          THE COURT:  First of all, did you act as counsel for

18  Mr. Tucker in that suit?

19          THE WITNESS:  No.  I acted as counsel for AMG

20  Services, your Honor.

21          THE COURT:  All right.  You were counsel for AMG

22  Services in that suit?

23          THE WITNESS:  I was counsel for AMG Services.

24          THE COURT:  Put your next question to the witness.

25  BY MR. ROTH:

1    Q.  And did you consult Mr. Muir in connection with that suit?

2    A.  I did discuss it with him, yes.

3    Q.  Before the lawsuit was filed?

4    A.  Yes.

5    Q.  And after the lawsuit was filed, is that correct?

6    A.  Yes.

7    Q.  And what was the nature of that lawsuit, sir?

8    A.  At the time AMG was involved in a class action lawsuit in

9    the state of California.  The plaintiffs' attorney in that

10   lawsuit attempt -- named CLK Management as a defendant in the

11   lawsuit.  At the time CLK had been merged into AMG through a

12   merger transaction that had previously occurred, and so our

13   position as counsel for AMG was that CLK was no longer a legal

14   entity because it had merged into AMG.  That merger had taken

15   place under tribal law, pursuant to the tribe's corporation's

16   code.  We were concerned, and the plaintiffs' counsel argued to

17   the Court that it should not recognize that merger transaction

18   because it was not accomplished under Kansas law, and CLK had

19   been a Kansas corporation.

20           And so, one way to resolve that dilemma was to --

21           THE COURT:  The question was, what was the nature of

22   the lawsuit?

23           THE WITNESS:  Right.

24           THE COURT:  That's the question you're answering.  OK?

25           THE WITNESS:  Yes.

Ha4Wtuc4                    Schulte - Direct

1          THE COURT:  And the lawsuit was not the California

2     lawsuit.

3          THE WITNESS:  Correct.

4          THE COURT:  So please answer the question.

5     A.  So the nature of the lawsuit was a suit to force AMG to

6     register the merger transaction with the secretary of state of

7     Kansas so that it would be recognized as a matter of Kansas

8     State law.

9     Q.  And did the tribe agree to participate in that lawsuit?

10    A.  No, it did not.

11    Q.  And did you inform the tribe that it would not -- what the

12    position is?  Did you keep them informed?

13         MR. SCOTTEN:  Objection.  Relevance.

14         THE COURT:  Yes.  Sustained.

15         MR. ROTH:  Judge, without a speaking objection, the

16    government has said that this lawsuit was contrived.

17         THE COURT:  Yes.

18         MR. ROTH:  And a sham.  That's why I tried to get into

19    the history before of the merger of CLK and AMG as a predicate.

20         THE COURT:  Yes.  OK.  I only ruled on one question.

21    BY MR. ROTH:

22    Q.  Did you write a letter to plaintiffs' counsel indicating,

23    sir, that the Miami tribe would not consent to jurisdiction?

24    A.  I believe that I did write a letter saying that the tribe

25    and AMG Services would not consent to jurisdiction of the state

1   of Kansas or appear in that lawsuit.

2          MR. ROTH:  Could the witness see Government Exhibit

3   2612, and it can be published.

4   Q.  Is that the letter that you wrote, sir?

5   A.  Yes, it is.

6   Q.  And can you summarize that letter for us, without reading

7   the whole thing?

8   A.  Sure.  It is a letter to Mr. Smith, who represented

9   Mr. Tucker, saying that AMG Services is a wholly owned and

10  controlled entity of the Miami Tribe of Oklahoma, and as such,

11  it's entitled to sovereign immunity and would not appear in

12  that suit because to do so would, or could be interpreted as a

13  consent to the jurisdiction of the state of Kansas and

14  potentially a waiver of that sovereign immunity.

15         MR. ROTH:  Thank you.  You can take that down.

16         MR. SCOTTEN:  Your Honor, this was not originally

17  offered for the truth.  To the extent it's now being used for

18  the truth, I don't think it should be admitted on that basis.

19         THE COURT:  And I don't think it is.

20         MR. ROTH:  No.  It's just a letter he wrote.

21         THE COURT:  I have it.  Next question, please.

22  BY MR. ROTH:

23  Q.  Mr. Schulte, in the course of your representation with the

24  tribe, did you brief the tribe on legal matters when you

25  appeared in front of them?

1          MR. SCOTTEN:  Objection.

2          THE COURT:  Sustained.

3          MR. ROTH:  I have one document, Judge, I'd like to

4     show the witness, once I lay a foundation.

5          THE COURT:  Show him the document, but the question

6     you just asked I sustained an objection to.  You can show him a

7     document.

8          MR. ROTH:  Could you publish just for the witness

9     D367, Eli.  Thank you.

10    Q.  Mr. Schulte, do you recognize that document?

11         MR. ROTH:  And you can flip through the pages, Eli.

12    A.  Yes, I do.

13    Q.  And what do you recognize it to be, sir?

14    A.  It is a cover letter accompanying a legal invoice to AMG

15    Services.  It's a letter to Don Brady.

16         MR. ROTH:  Judge, I'd move that into evidence at this

17    point and establish it as a business record.

18         THE COURT:  Any objection?

19         MR. SCOTTEN:  On relevance, not authenticity, your

20    Honor.

21         THE COURT:  All right.  Received.

22         (Defendants' Exhibit 367 received in evidence)

23         MR. ROTH:  You can publish that.  Thank you, Eli.

24    Q.  Was it your regular practice when you submitted monthly

25    invoices to Don Brady and the tribe to keep them informed of

1    legal actions?

2    A.  Yes, it was.

3    Q.  And directing your attention to the last paragraph, or the

4    second-to-last paragraph --

5            MR. ROTH:  That's it, Eli.  Thank you.

6    Q.  -- in essence, were you informing them in that paragraph of

7    the nature of the lawsuit you just testified about?

8    A.  Yes.

9            MR. ROTH:  You can take that down.  Thank you.

10   Q.  You indicated, sir, that on more than one occasion you

11   attended board meetings of AMG.  Is that correct?

12   A.  Yes.

13   Q.  And do you recall who the recording secretary of the AMG

14   board was in 2011 or 2012?

15   A.  I believe it was Carolyn Williams.

16   Q.  What's that belief based on, sir?

17   A.  Well, she was present for some of the meetings during that

18   time, as I recall.

19   Q.  And some of those meetings were recorded and some of them

20   were not, is that correct?

21   A.  That's --

22   Q.  If you know.

23   A.  I know that she recorded some meetings.  I don't know that

24   she recorded all of them.  And when I say record, I mean audio

25   recording.

Ha4Wtuc4                    Schulte - Direct

1    Q.  Sir, were there occasions when the board minutes were sent

2    to you for your approval?

3    A.  Yes.  That's not unusual.

4    Q.  And how often did that happen, sir?

5    A.  I guess, depending upon -- you're talking about the Miami

6    tribe.  It wouldn't happen for every board meeting, but I would

7    say it was not uncommon.  Several times a year, perhaps.

8    Q.  And minutes were sent for your approval of board meetings,

9    some that you were not in attendance for?

10   A.  That would happen on occasion, yes.

11   Q.  Do you recall, sir --

12          MR. ROTH:  If we could put up in front of Mr. Schulte

13   Government Exhibit 401, and if you could highlight the second

14   header in the middle of the page there.

15   Q.  The caption of that is minutes of February 1, 2012, AMG

16   board meetings, is that correct?

17   A.  Correct.

18   Q.  And what does the body of that say?

19   A.  It says, "Don asked me to follow up to see if you have any

20   comments regarding the draft of minutes of the February 1,

21   2012, AMG board meeting emailed to you on February 7."

22   Q.  And did they attach the actual board minutes to that email?

23   A.  Can you close the --

24          MR. ROTH:  Can you close the box, Eli.

25   A.  I believe so.  Yes, it appears that they were attached to

1    the email.  The prior email.  Sorry.

2    Q.  This is a string of emails, but do you see some edits on

3    the third page, in paragraph Roman V?

4    A.  I do.

5           MR. ROTH:  Now, jumping back, Eli, if you will, to

6    page 1.

7    Q.  That first email was from Mr. Muir to Carolyn Williams, and

8    it's his suggestions for edits, is that correct?

9    A.  Yes.

10           MR. ROTH:  You can take that down, Eli, now.

11           Could you show the witness 402 and the jury as well.

12    Q.  And the top part indicates this was an email from you to

13    Tim and Brady, Don Brady, concerning those minutes, is that

14    correct?

15    A.  Correct.

16    Q.  And the body says "my suggested edits," is that correct?

17    A.  That is correct.

18    Q.  And if we turn to the third page, same Roman V, are those

19    the edits that you made, sir, the proposed edits?

20    A.  Yes.

21    Q.  And could you tell the members of the jury why you made

22    those proposed edits?

23           MR. SCOTTEN:  Objection.

24           THE COURT:  Sustained.

25    Q.  What was your understanding, sir, of the nature --

1    withdrawn.

2            Were you involved in the negotiations between AMG and

3    Mr. Tucker regarding the acquisition of proprietary software

4    and other intellectual properties?

5    A.   Yes.

6    Q.   And you were knowledgeable about the scope and the nature

7    of those negotiations, is that correct?

8    A.   Correct.

9    Q.   And did you make these proposed edits based on your

10   understanding of the nature of that transaction?

11   A.   Yes.

12   Q.   To your knowledge, Carolyn Williams, who was the recording

13   secretary, did she have any law degree?

14   A.   Not to my knowledge.

15           MR. SCOTTEN:  Objection.

16           THE COURT:  Overruled.

17           MR. ROTH:  You can take that down, Eli.

18   Q.   Did you represent the tribes in some FTC litigation, sir?

19   A.   Yes, I did.

20   Q.   And what was the nature, without going into all the detail,

21   of that litigation?

22   A.   That was a suit brought by the Federal Trade Commission

23   against a number of entities, including the tribal lending

24   entities of the Miami tribe, the Modoc tribe and the Santee

25   Sioux Nation, alleging violation -- that the loan documents

1  violated the Truth In Lending Act and the FTC Act, and that was

2  the general nature of it.

3  Q.  And did you ultimately reach a settlement in 2013 with the

4  FTC to change the loan policies?

5          MR. SCOTTEN:  Objection.

6          THE COURT:  One second, please.

7          Restate your question, please.

8  Q.  You represented the tribes in that litigation, you

9  indicated, is that right?

10 A.  I represented the Modoc tribe and the Santee Sioux Nation.

11 And originally I also represented the Miami tribe, but at some

12 point in that litigation, they retained separate counsel.

13 Q.  In 2013, sir, did you, on behalf of the defendants, enter

14 into a consent decree to modify the loan renewal policy?

15         MR. SCOTTEN:  Objection.

16         THE COURT:  Sustained.

17         Mr. Roth, you may recall the discussion we had on this

18 prior to trial.

19         MR. ROTH:  I thought the date was within the --

20         THE COURT:  Prior to trial.  Unless you want to open

21 the door here.

22         MR. ROTH:  No.

23         THE COURT:  You can open the door.  It's your

24 decision.

25         MR. ROTH:  I will move on, Judge.

1    Q.   Did you submit an affidavit by Chief Judy Cobb in

2    connection with the FTC litigation?

3    A.   Yes, I recall that our firm did submit an affidavit of Judy

4    Cobb in that litigation.

5    Q.   And who was Judy Cobb?

6    A.   She was, I believe her title was second chief, but she was

7    a member of the business -- or, I'm sorry, the elected council

8    of the Modoc Tribe of Oklahoma, which is its governing body.

9             MR. ROTH:   I'd ask that the witness be shown

10   Government Exhibit 832, and the jury as well.

11   Q.   Is this an affidavit from Ms. Cobb that you submitted in

12   those pleadings?

13   A.   Yes, it appears to be.

14   Q.   And did your office draft that?

15   A.   Someone at my office would have drafted that, correct.

16   Q.   There's other law firms on the front page, but if you turn

17   to the second page, does your name appear there, and your law

18   firm?

19   A.   Yes.

20   Q.   And with another attorney from your firm, Ms. Denton, is

21   that correct?

22   A.   That is correct.

23   Q.   Directing your attention, sir, to page 4 of the

24   affidavit -- I'm sorry, page 5, paragraph 10, is that a true

25   statement, to your knowledge, sir?

1   A.  Yes, it is.

2   Q.  And what is the basis of your knowledge, sir, other than

3   that she swore to it?

4   A.  I had knowledge of that through discussions with Troy

5   Little Axe and likely Mr. Muir and possibly Mr. Tucker.

6   Q.  And directing your attention, sir, to paragraph 12 on page

7   5, indicating that the profits are used exclusively for the

8   benefit of the Modoc tribe, is that correct, sir, to your

9   knowledge?

10  A.  It is.

11  Q.  And paragraph 11, that Red Cedar Services is governed by

12  the laws of the Modoc, etc., is that true, to your knowledge?

13  A.  Yes, it is.

14  Q.  Is there anything false in this affidavit, to your

15  knowledge?

16  A.  Not to my knowledge.

17          MR. ROTH:  I have no further questions, your Honor.

18          THE COURT:  All right.  Ladies and gentlemen, let's

19  stand up and stretch for a moment.  Deep breath also, please.

20  We may have to appoint a calisthenics coordinator to get us

21  going with the jumping jacks and everything.

22          Please be seated.

23          You may inquire.

24          MR. VELAMOOR:  Mr. Bath or Mr. Scotten?

25          THE COURT:  I'm sorry?  Mr. Bath goes next.

1   FURTHER DIRECT EXAMINATION

2   BY MR. BATH:

3   Q.  Mr. Schulte, I understand that you began giving legal

4   advice to Scott Tucker sometime in 2003?

5             MR. SCOTTEN:  Objection.

6   A.  That is my recollection.

7             MR. SCOTTEN:  I'm sorry, your Honor.  2003 is OK.  My

8   mistake.

9   A.  Yes, that is my recollection.

10  Q.  You continued to give him some advice into early 2004?

11  A.  Correct.

12  Q.  You looked at service agreements?

13  A.  Correct.

14  Q.  Moving forward, as I understand it, then, the next few

15  years, the Miami and the Modoc and the Santee established

16  tribal corporations?

17  A.  Correct.

18  Q.  Passed resolutions and laws to engage in lending?

19  A.  Correct.

20  Q.  And you helped a lot with that?

21  A.  Yes.

22  Q.  What we might call tribal governance?

23  A.  Yes.

24  Q.  OK.  And I'm going to take you now from that time to '03 to

25  '06.  Let's just take that snapshot of time.

Ha4Wtuc4                    Schulte - Direct

1   A.  OK.

2   Q.  You had occasion to visit all these reservations?

3   A.  Yes.

4   Q.  And you met with people like Lee Ickes with the Santee?

5   A.  Yes.

6   Q.  Troy Little Axe with the Santee -- with the Modoc?

7   A.  Yes.

8   Q.  Don Brady and Ken Bellmard with the Miami?

9   A.  Correct, among others.

10  Q.  You went to and met with tribal councils?

11  A.  Yes.

12  Q.  And how many times in those three years did you meet with

13  each tribe individually?  From '03 to '06, on average, how

14  often would you visit the Miami tribe?

15  A.  The Miami tribe, maybe -- at Miami or anywhere?

16  Q.  Anywhere.

17  A.  Gosh.  At least six times a year, I would say.

18  Q.  And how many times at the reservation?

19  A.  Maybe twice a year.

20  Q.  And how about the Santee, same time period, '03 to '06?

21  A.  That would have been more frequent.  Probably a dozen times

22  a year.

23  Q.  How many times at the tribe per year?

24  A.  Maybe half a dozen.

25  Q.  And they're in Nebraska?

1    A.  Yes.

2    Q.  And you were general counsel, your firm, for them?

3    A.  Yes.

4    Q.  And you're in Nebraska?

5    A.  I was at the time.

6    Q.  So it was a closer drive than Oklahoma?

7    A.  Yes, and we represented them as general counsel, so there

8    was many issues other than lending that we --

9    Q.  '03 to '06 with the Modoc, how often would you see them?

10   A.  That would have been less frequently.  I would say maybe

11   two or three times a year.

12   Q.  And I've called them tribal councils for all three, but

13   each may have a different name for the sort of governing body,

14   is that fair to say?

15   A.  Correct.

16   Q.  And when you went to these meetings, did you sometimes meet

17   with the tribal council?

18   A.  Yes.

19   Q.  And answered any questions they had?

20   A.  Yes.

21   Q.  It would be fair to say you were familiar with the tribal

22   model of all three by 2006?

23   A.  Yes, that's fair to say.

24   Q.  Had any litigation begun before 2006?

25   A.  Yes.

1    Q.  In what state?

2    A.  Colorado.

3    Q.  That was civil, state regulators?

4    A.  It was an attempt to enforce an administrative subpoena.

5    Q.  Who did you represent in '05 in Colorado?

6    A.  The Miami tribal entity, which is MNE, and the Santee Sioux

7    lending entity, which was SFS.

8    Q.  Did you ever assist the tribes in what I'm going to call

9    getting their licenses, creating licenses?

10   A.  Yes.

11   Q.  I'm going to show you --

12            MR. BATH:  Can we show to the witness Government

13   Exhibit 1013.

14   Q.  Do you recognize that?

15   A.  Yes.

16   Q.  What is that, generally?

17   A.  It's an email from me to Scott Tucker, attaching a draft

18   agreement for SFS.

19            MR. BATH:  Offer 1013.

20            THE COURT:  Any objection?

21            MR. SCOTTEN:  Is there an attachment?

22            MR. BATH:  Not to this, no.  Just the one page.

23            MR. SCOTTEN:  No, your Honor.

24            THE COURT:  Received.

25            (Government Exhibit 1013 received in evidence)

1          MR. BATH:  Publish that for the jury.

2     Q.  First let's have the date, Mr. Schulte.

3     A.  February 13, 2005.

4     Q.  It is sent to Mr. Tucker, correct?

5     A.  Correct.

6     Q.  From Carol Thompson?

7     A.  Correct.  She was a legal secretary at my firm.

8     Q.  This says it's a draft agreement for SFS, same agreement we

9     prepared for Kickapoo.  Do you remember which agreement that

10    was?

11    A.  I believe that would have been a service agreement with

12    Mr. Tucker's company.

13    Q.  All right.

14         MR. BATH:  Can we put up for the witness only -- take

15    that down, Eli and put up for the witness only defense 1112.

16    Q.  Do you recognize that?

17    A.  Yes.

18    Q.  And is that a letter from you to Mr. Ickes?

19    A.  It is.

20    Q.  Does it look fair and accurate and complete?

21    A.  It does.

22    Q.  And regards SFS?

23    A.  Yes.

24         MR. BATH:  Offer defendants' 1112.

25         MR. SCOTTEN:  Objection.  The Court's prior ruling;

1   I'm trying not to elaborate.

2              THE COURT:  I'll allow it.

3              (Defendants' Exhibit 1112 received in evidence)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. BATH:  Publish it, please.

2     Q.  What is the date first, Mr. Schulte?

3     A.  It's November 23rd of 2005.

4     Q.  Who is it addressed to?

5     A.  Lee Ickes.

6     Q.  He is associated with the Santee?

7     A.  Yes.  He is the business manager of the Santee Sioux

8     Nation.

9     Q.  You identify a couple of documents there.  A license to

10    SFS, is that correct?

11    A.  Correct.

12    Q.  What does that mean, license?

13    A.  Well, the tribal lending ordinance required that a

14    tribally-owned entity be licensed by the tribe to engage in

15    lending activity.

16    Q.  Would this be an example of the kind of involvement you had

17    from '04 to '05, before '06, for the tribes?

18    A.  It would be an example, yes.

19         MR. SCOTTEN:  Objection.  This is between the tribes

20    and the witness has no bearing on Mr. Tucker or Mr. Muir's

21    state of mind.

22         THE COURT:  Sustained.

23         MR. BATH:  That's not what it's being offered for

24    that.  It's offered to rebut the government's evidence

25    submitted by the government earlier in their case.

1          THE COURT:  Why don't you rephrase it and bring it

2     home to the point you're trying to make.

3     BY MR. BATH:

4     Q.  You were involved in a licensing process, helping the

5     tribes get licensed under tribal law?

6     A.  Yes.

7     Q.  This document is an example of that?

8     A.  That is correct.

9          MR. SCOTTEN:  Objection, your Honor.  Our objection is

10    the Court's ruling that just because a lawyer is involved does

11    not add legitimacy.  That is not rebuttal.

12         THE COURT:  It will stand.

13         Go ahead.

14    Q.  Sometime in 2006, did you meet Tim Muir?

15    A.  Yes.  I recall that it was about sometime in 2006.

16    Q.  Did you initially -- did you talk to him on the phone, meet

17    him in person?

18         Let's just talk about 2006.  Mid-2006 to the end of

19    '06, do you remember how you first either met him or talked to

20    him?

21    A.  I don't recall if it was through an introduction by phone

22    with Mr. Tucker or through a meeting.  It may have been both.

23    Q.  What did you understand Mr. Muir's role was?

24    A.  Mr. Muir at that time was retained to represent CLK

25    Management.

HA48TUC5                    Schulte - Cross

1    Q.  Was he acting sort of like the general counsel for CLK?

2    A.  I think that's an accurate description.

3    Q.  Did you understand Mr. Muir had been out of law school for

4    about a couple of years at that time?

5    A.  Yes.

6    Q.  My point going forward from '06 is you got to know Mr. Muir

7    pretty well; is that fair to say?

8    A.  Yes.

9    Q.  You worked with him on lots of litigation?

10   A.  Correct.

11   Q.  The '05 litigation from Colorado was still going on?

12   A.  Correct.

13   Q.  Was there any other litigation at that time?

14   A.  In 2006?

15   Q.  Yes, sir.

16   A.  There may have been.  The West Virginia case may have been

17   filed at some point in 2006.  Other than that, I don't believe

18   there was any other litigation active at that time.

19   Q.  Did you have occasion to meet Mr. Muir in person in '06?

20   A.  I believe so.  To the best of my recollection, yes.

21   Q.  Do you remember where that might have taken place?

22   A.  It would have taken place at the offices of CLK Management

23   in Kansas City, or Overland Park, Kansas.

24   Q.  Is it fair to say within the first 60 to 90 days of

25   Mr. Muir starting at CLK you would have had contact with him?

1    A.   Yes.

2    Q.   During that time period --

3            THE COURT:  This is not cross-examination.  You're now

4    developing evidence, which you're allowed to do, but not

5    allowed to lead.

6            MR. BATH:  Thank you, Judge.

7            THE COURT:  You're going beyond the scope of the

8    examination, right?

9            MR. BATH:  On this topic, yes, I think so, Judge.

10           THE COURT:  Avoid leading, please.

11   Q.   Did you have discussions with Tim Muir in the first 90 days

12   he started at CLK about the tribal model?

13           MR. SCOTTEN:  Objection.

14           THE COURT:  Basis.

15           MR. SCOTTEN:  We are well into the period of the

16   charged conduct, and so Mr. Muir has, by this question, already

17   joined the charged conduct.  It's too late for any advice of

18   counsel defense.

19           THE COURT:  Sir, you can answer that question yes or

20   no.

21   A.   Yes.

22           THE COURT:  Next question.

23   Q.   Did he ask you to tell him about your understanding of the

24   tribal model?

25           MR. SCOTTEN:  Objection.

1          THE COURT:  Sustained.

2          MR. BATH:  Judge, may we approach?

3          THE COURT:  You may.

4          (At the sidebar)

5          MR. BATH:  Judge, I understood I was going to be

6    allowed to present evidence about Mr. Muir having conversations

7    with other lawyers, and doing his own research and looking at

8    statutes, etc., etc., to obviously form the basis for good

9    faith as it relates to any of the statutes and willfulness as

10   it relates specifically to Count One.

11         I am not going to ask this witness what he told him,

12   but I am just looking for direction, because I understood I

13   could ask him if Mr. Muir asked him about tribal sovereignty

14   and sovereign immunity and those types of things.  And if I am

15   not allowed to do that, I apologize, but that's where I was

16   going with this.

17         THE COURT:  You're right that Mr. Muir, if he takes

18   the stand, can testify to what he did and what he learned, as

19   bearing on his own intent and willfulness.  As to the, in

20   essence, establishing that there were conversations is

21   consistent with that.

22         So let me hear the government's objection, as framed

23   by Mr. Bath, which is not getting into the substance but

24   establishing the fact of the conversations.

25         MR. SCOTTEN:  Your Honor, if it's just that there was

1   a fact of the conversation, he has done that.  That came in.

2   We didn't even object.  The next question is, Well, did you

3   discuss the tribal model?  So now we are getting into

4   substance, and I do think it is sneaking in of an implicit

5   advice of counsel, you talked to this very knowledgable lawyer.

6        It's not going to be a disputed issue on Mr. Muir's

7   cross that he talked to Mr. Schulte.  We may try to impeach him

8   on many things, but we are not going to claim that you made up

9   the fact that you spoke to Mr. Schulte or Mr. Morgan, and we

10  certainly are not going to suggest you're lying about the

11  subjects.  He doesn't need to start saying here are the

12  subjects I discussed with other experienced lawyers.  That's an

13  advice of counsel defense which he has disclaimed.

14       THE COURT:  I think the way to do it is to establish

15  the frequency of his conversations with Mr. Muir, which I will

16  allow you to do, Mr. Bath.

17       MR. BATH:  May I ask permission because I don't want

18  this witness to go outside those bounds.  If I can do a little

19  leading, I think I can get through that.  Can I name the

20  topics?

21       THE COURT:  No, I think that's a disguised advice of

22  counsel defense.

23       You can put your own time frame on the question.  I

24  don't consider that leading.  In the early part of 2006 or fall

25  of 2006, how often did you meet with him, how often did you

1    have conversations with Mr. Muir?

2              MR. BATH:  So I understand, I will stay away from the

3    topics.  I can talk about frequency.  And then, if and when

4    Mr. Muir testifies --

5              THE COURT:  That's a different story.

6              MR. BATH:  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (In open court)

2    BY MR. BATH:

3    Q.  So in 2006, once Mr. Muir began with CLK, you had

4    conversations with Mr. Muir?

5    A.  Correct.

6    Q.  Telephonic?

7    A.  Both telephonic and in person.

8    Q.  Did you exchange e-mails?

9    A.  Yes.  At that period of time, I would say fairly

10   frequently, maybe daily.

11   Q.  Would you look at -- just for the witness only, please --

12   Defense Exhibit 1442.

13              I am not asking questions right now.  Just look at

14   that for yourself, Mr. Schulte.

15              MR. BATH:  Do we have a second page we can show the

16   witness?

17   Q.  I will give you a paper copy if that's easier.

18              Do you recognize that exhibit?

19   A.  Yes, I do.

20   Q.  Is that a document that would have been prepared in your

21   normal course of business?

22   A.  Yes, it would.

23   Q.  Are you one of the authors of that document?

24   A.  Can you repeat that?

25   Q.  Are you one of the authors of the document?

1    A.  Yes.

2    Q.  Did you keep it in the ordinary course of your business?

3    A.  Yes.

4    Q.  Is that document, as it looks like you have it in front of

5    you, is it complete?  Is there anything missing?

6    A.  It appears to be complete.

7    Q.  That's all I need for that now.  Thank you.

8            THE COURT:  All right.

9    Q.  As you went forward from 2006 to 2007, you continued to

10   have contact with Mr. Muir?

11   A.  Yes.

12   Q.  That continued till when?

13   A.  Up until maybe 2016.

14   Q.  There were a lot of cases you were involved in?

15   A.  Yes.

16   Q.  A litigation we heard back in Colorado?

17   A.  Correct.

18   Q.  And in California?

19   A.  Correct.

20   Q.  And the Colorado litigation just didn't end at one level of

21   the court, did it?

22   A.  No.  It was appealed multiple times.

23   Q.  There was some appellate work, and then it came back to the

24   district court, correct?

25   A.  Correct.

1   Q.  So there were lots of court hearings in Colorado?

2   A.  Yes.

3   Q.  The same with California?

4   A.  Yes.

5           MR. SCOTTEN:  Objection.  Relevance.

6           THE COURT:  I would just advise that if you want to

7   ask these questions, there is an issue of door opening, and if

8   you open the door, so be it.

9           MR. BATH:  Yes, sir.

10          THE COURT:  Do you want to withdraw those questions?

11          MR. BATH:  At this time I will, Judge.

12          THE COURT:  That's fine.

13  Q.  Was there a merger of CLK and AMG in 2008?

14  A.  Yes.

15  Q.  Were you involved in that?

16  A.  I was.

17  Q.  What was your -- who did you represent?

18  A.  I represented AMG Services and the Miami Tribe of Oklahoma.

19  Q.  Was Mr. Muir involved in that?

20  A.  I believe he was.

21  Q.  Do you recall necessarily his level of involvement?

22  A.  I believe he represented CLK Management.

23  Q.  Going forward in 2010, you have already discussed with us

24  the *Tucker vs. AMG* lawsuit, correct?

25  A.  Correct.

HA48TUC5                    Schulte - Cross

1    Q.  You represented AMG, correct?

2    A.  Correct.

3    Q.  We saw the letter you wrote to Pete Smith who represented

4    Mr. Tucker?

5    A.  Correct.

6    Q.  But you talked to Mr. Muir before the lawsuit was filed?

7    A.  I did.

8    Q.  And after the lawsuit was filed?

9    A.  I did.

10   Q.  At some point in time, there was a lawsuit involving

11   Hallinan?

12   A.  Yes.

13   Q.  Were you involved in that?

14   A.  I was.  Yes, I was involved with that.

15   Q.  What was your involvement?

16   A.  Well, initially, when the suit was filed, I believe I

17   prepared some correspondence on behalf of AMG to Mr. Hallinan's

18   attorney, and I believe Mr. Tucker's attorney, in an attempt to

19   get them to resolve the dispute.  And then after that, I didn't

20   appear in the litigation as counsel of record, but I attended

21   some hearings and generally monitored the status of the

22   litigation.

23   Q.  Did somebody else represent -- was AMG in the suit?

24   A.  CLK Management was, although at the time it had been merged

25   into AMG, as I recall.  So indirectly it was.

HA48TUC5                    Schulte - Cross

1    Q.  Who represented AMG?

2    A.  I believe both myself and Mr. Muir.

3    Q.  Was there counsel in Las Vegas on behalf of AMG?

4    A.  There was, yes.  There was local counsel who appeared on

5    behalf of AMG and CLK I believe.

6    Q.  What was Mr. Muir's involvement, do you recall?

7    A.  He didn't appear in the litigation, as I recall, but it was

8    much like me, kind of monitoring the status of the litigation.

9    Q.  Did you meet Pete Smith in that lawsuit?

10   A.  I did.

11   Q.  Who did he represent?

12   A.  I believe he represented Mr. Tucker and Mr. Tucker's

13   companies that were named in the litigation.

14   Q.  Do you remember at some point there was a settlement of

15   that lawsuit?

16   A.  I do recall a settlement, yes.

17          MR. BATH:  Can you put up for the witness Defense

18   2811.

19   Q.  Is that up on your screen, Mr. Schulte?

20   A.  Yes, it is.

21   Q.  There is a second -- take a second with the first page, if

22   you would, please.

23          There is a second page on that as well.

24          MR. BATH:  Can we show that to him, Eli.

25   Q.  Have you had a chance to look at that document?

1    A.  Can you go back to the first page?

2    Q.  Sure.

3    A.  OK.  Yes, I recall.

4    Q.  Generally, what is this document?

5    A.  It's an e-mail from me to -- well, it's a forwarded e-mail.

6    It's an e-mail that I forwarded -- let me start over.

7         It's an e-mail from myself to Don Brady that's been

8    forwarded to Tim Muir and Scott Tucker.

9    Q.  Forwarded by whom?

10   A.  By me.

11   Q.  What does this involve?  I don't want you to read it, but

12   what is the subject matter?

13   A.  As I recall, the subject matter is --

14        MR. SCOTTEN:  Objection.  At some point it should be

15   offered or not.

16        MR. BATH:  I will offer it.

17        THE COURT:  Any objection?

18        MR. SCOTTEN:  Objection.  It appears to be hearsay.

19        THE COURT:  Let me see the full document, please.

20        This relates to which litigation?

21        MR. BATH:  This relates to the Hallinan litigation,

22   Judge.  I have the complete document marked.  Our purpose would

23   be relating to Mr. Schulte relaying information to Mr. Muir.

24   It's the last e-mail that's going to be relevant, which I will

25   tie up later.  Perhaps I can offer it subject to further

1   tie-up.

2          THE COURT:  Who were you representing at the time,

3   Mr. Schulte?

4          THE WITNESS:  At this time in the Hallinan litigation

5   or just in general?

6          THE COURT:  In general.

7          THE WITNESS:  I am representing the Modoc tribe, the

8   Santee Sioux Nation, and Miami Tribe of Oklahoma.

9          THE COURT:  Who were you representing in the

10  litigation?

11         THE WITNESS:  It would have been AMG Services, which

12  is the Miami tribal entity, and I believe also MTE Services,

13  which was the Modoc tribal entity.

14         THE COURT:  I will receive it.  Overruled.

15         (Defendants' Exhibit 2811 received in evidence)

16         MR. BATH:  If we can publish that for the jury.

17         If we can go to the bottom third of the first page.

18  Q.  Mr. Schulte, what is the date?

19  A.  It is February 25, 2010.

20  Q.  At the bottom of the page is an e-mail from Don Brady to

21  you?

22  A.  It is.

23  Q.  We have heard about Shilee.  Who is she?

24  A.  She is an attorney that worked at my firm.  She was either

25  an associate attorney or my partner at this point in time.

1          MR. BATH:  If we can go to the last page just so the

2     jury can see the whole document.

3     Q.  The top of that page is a carryover from the page before,

4     is that correct?

5          MR. BATH:  We can blow that up just so everybody can

6     read it.

7          Can we go back to the first page, Eli.

8          If we can go to the top half of that page.

9     Q.  Mr. Schulte, the middle e-mail talks about overnighting

10    documents to Don Brady, is that correct?

11    A.  That is correct.

12    Q.  What documents are we talking about?

13    A.  As I recall, those would have been the settlement documents

14    in the Hallinan lawsuit.

15    Q.  Your top e-mail there is relaying that you had talked to

16    Don?

17    A.  Yes.

18    Q.  And Don is who?

19    A.  That's Don Brady.

20         MR. BATH:  Thank you, Eli.

21    Q.  And that lawsuit got settled, is that right?

22    A.  Yes.

23    Q.  And that was March 2010, does that sound about right?

24    A.  Yes.

25         MR. BATH:  That's all I have.  Thank you.

1          THE COURT:  All right.  Ladies and gentlemen, you will

2     have -- I will tell you what.  Let's take our ten minutes now

3     and then we will be back in action with the government's

4     cross-examination of the witness.

5          Please do not discuss the case among yourselves or

6     with anybody.  Enjoy the break.

7          (Jury exits courtroom)

8          THE COURT:  I am asking that a "marked to show

9     changes" version of the draft jury instructions be marked as

10    the next court exhibit, which is?

11         THE DEPUTY CLERK:  12.

12         THE COURT:  Court Exhibit 12.  And a clean copy of the

13    jury instructions be marked as Court Exhibit 13.

14         When we discuss the instructions, we are going to work

15    off of Court Exhibit 13, and you will tell me on what page,

16    what line you have an issue.

17         We are in recess.  Thank you.

18         (Recess)

19         MR. ROTH:  Judge, may we raise a brief scheduling

20    issue with you?

21         THE COURT:  Go ahead.

22         MR. ROTH:  It's in regard to our next witness, Lance

23    Morgan, who is a member of the same firm as Mr. Schulte.  We

24    just wanted to proffer what his testimony will be to make sure

25    you are going to permit the testimony.

1          THE COURT:  Why don't we do it after 5:00?

2          MR. ROTH:  He has been here for five days, and in

3   terms of scheduling, he is trying to get out of town.  I am not

4   clear that, your Honor --

5          THE COURT:  Listen, if I got fair warning, if you

6   asked me this morning, if you asked me during lunch.  I have

7   got a jury in the box, and I have a clock running down on

8   what's left of the day.  I will pick it up at 5:00.

9          MR. ROTH:  Thank you.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2     CONLY JOHN SCHULTE, resumed.

3          THE COURT:  Please be seated.

4          Mr. Scotten, you may inquire.

5          MR. SCOTTEN:  Thank you, your Honor.

6     CROSS-EXAMINATION

7     BY MR. SCOTTEN:

8     Q.  Good afternoon, Mr. Schulte.

9     A.  Good afternoon.

10    Q.  I want to start by making sure I am correct on the timing.

11         You first meet Scott Tucker in September of 2003,

12    correct?

13    A.  I believe I had a telephone conversation with him in

14    September of 2003.  That is correct.

15    Q.  And you had not met him or talked to him before that time?

16    A.  No, I had not.

17    Q.  At that time, you are representing the Santee Sioux?

18    A.  Correct.

19    Q.  You continue to represent the Santee Sioux in their

20    negotiation with Tucker, negotiations on the opposite side,

21    correct?

22    A.  Correct.

23    Q.  In December of that same year 2003, you are still

24    representing the Santee Sioux, correct?

25    A.  That is correct.  I believe at that point in time, they

1    decided not to proceed with an agreement with Mr. Tucker at

2    that time.

3    Q.  So the answer is yes?

4    A.  Yes.  We still acted as general counsel of the Santee Sioux

5    Nation.

6    Q.  And that is the point at which you decided -- you testified

7    that you viewed Mr. Tucker as your client, although you hadn't

8    entered any -- he actually didn't retain you, but you viewed

9    him as your client?

10   A.  I had a phone discussion with Mr. Tucker I know in the

11   early part of December 2003.

12   Q.  Let me ask again.  That is the point at which you began

13   regarding Mr. Tucker as your client?

14   A.  I considered that conversation to be privileged within the

15   attorney-client privilege, yes.

16   Q.  Did you consider Mr. Tucker to be your client in December

17   of 2003?

18   A.  Yes.

19   Q.  Then you did some work for him, although he had not

20   retained you, for the next four or five months?

21   A.  I didn't do work for Mr. Tucker during that time period.  I

22   did work for the Kickapoo Tribe of Kansas, is my recollection.

23   Q.  So when you provided the advice that you just testified

24   about, you were not working for Mr. Tucker?

25   A.  I had a separate engagement with the Kickapoo Tribe of

1    Kansas to draft their code, lending code, and I believe their

2    organizational entity.

3    Q.  But my question is about Mr. Tucker.

4    A.  That's correct.

5    Q.  You testified before you provided advice to Mr. Tucker in

6    this window between December of 2003 and May or June of 2004,

7    correct?

8    A.  Correct.

9    Q.  And you were not working for Mr. Tucker then?

10   A.  I engaged in discussions with Mr. Tucker then.  We were not

11   formally engaged, in terms of having a written engagement

12   letter or attorney-client agreement, until May of 2004.

13   Q.  So you considered yourself to be informally working for Mr.

14   Tucker?

15   A.  There was no work that was done; there were just

16   discussions.

17   Q.  Those discussions included you providing your legal opinion

18   to him?

19   A.  My recollection is we discussed, yes, the concepts

20   contained in the Preston Gates letter, and perhaps some other

21   ideas that I had about the tribal model.

22   Q.  So your testimony is that you provided your opinion to him

23   as a client?

24   A.  Yes.

25   Q.  I would like to -- let's continue with the timing first.

1              Mr. Tucker formally retained you around May of 2004?

2    A.  Yes, at some time during May of 2004 is my best

3    recollection.

4    Q.  And you're also still representing the Santee Sioux?

5    A.  Correct.

6    Q.  And you have some other tribal clients who at least

7    eventually will become involved in this?

8    A.  Yes.

9    Q.  You also acquire clients that you have stated are tribal

10   entities while you're representing Mr. Tucker?

11   A.  Yes.

12   Q.  In the 2005, maybe 2006 time period, you are representing

13   both Mr. Tucker and the tribal entities on the other side of

14   the agreements with him?

15   A.  Correct.

16   Q.  And you did a conflict waiver, at least for the Santee

17   Sioux, correct?

18   A.  Yes.

19   Q.  Did you do conflict waivers for the other tribes?

20   A.  I believe that we did at some point in time, but I don't

21   recall the date.

22   Q.  Those would have been necessary, right, because you were

23   working on both sides of the transaction?

24   A.  I did not represent any transaction between the Miami tribe

25   and Mr. Tucker at that time.  When I was retained by Mr.

1    Tucker, he had already had agreements with the Miami tribe and

2    the Modoc tribe.

3    Q.   And those were agreements in which Mr. Tucker kept 99

4    percent of the profits from the deals, correct?

5    A.   No, that's not correct.

6    Q.   Those were deals in which Mr. Tucker's company kept 99

7    percent of the gross total revenues from the lending business?

8    A.   Mr. Tucker was entitled to 99 percent of the gross total

9    revenues, but also had the responsibility to pay the operating

10   costs of the operation.

11   Q.   So the answer is yes?

12   A.   As I stated it, yes.

13   Q.   So you were on both sides of an agreement where one of your

14   clients was getting 1 percent and the other client was getting

15   99 percent, although they had to pay expenses?

16   A.   I did not negotiate those agreements between Modoc and

17   Miami.  I represented them at the same time, yes, and they both

18   had an agreement, and I represented both parties, that is

19   correct.

20   Q.   And you didn't go to your clients, the Modoc or the Santee

21   Sioux, and say, you could ask for 2 percent, did you?

22   A.   I don't recall any specific conversations about that, no.

23   Q.   It would have been awkward because then you would have been

24   taking a percentage from Mr. Tucker, right?

25   A.   Perhaps, yes.

HA48TUC5                    Schulte - Cross

1    Q.  So then you continue to represent Mr. Tucker and these

2    tribal clients till around when, when is it that you cease

3    representing Mr. Tucker?

4    A.  Again, I don't recall any specific dates, but my best

5    recollection is somewhere around the end of 2007 or beginning

6    of 2008.

7    Q.  What is the latest date on which you represented Mr.

8    Tucker?

9    A.  Again, I can't remember a specific date.

10   Q.  No later than the fall of 2008?

11   A.  I would place it earlier than that.  Probably no later than

12   March of 2008.  That's my best guess.

13          THE COURT:  Well, you're not to guess.  You can give

14   an estimation or your best recollection, that you can testify

15   to, but guesses are not permitted.

16   A.  My best estimation would have been, again, the early part

17   of 2008.  I would say March would be the latest, March of 2008.

18   Q.  Not too far in 2008?

19   A.  Yes.  That's my best recollection.

20   Q.  Let's look at Defendants' Exhibit 301, if we can.

21          MR. SCOTTEN:  If we can zoom in on the fifth line of

22   paragraph 1.

23   Q.  So this is from the letter that you gave Mr. Tucker after

24   he formally retained you, correct?

25   A.  Correct.

1   Q.  In here you essentially were giving him a series of

2   recommendations of changes to what you had already seen,

3   correct?

4   A.  Yes.  I was giving him recommendations, yes.

5   Q.  Here what we are looking at is, in terms of the

6   recommendation you want to make, or in terms of how the

7   business should be structured, it should not be marketing an

8   exemption from state regulation, correct?

9   A.  That's correct.

10  Q.  And the idea is a tribe can have a business in partnership

11  with others, but it can't just sell that business the right to

12  get around state regulation, correct?

13  A.  I believe that's generally an accurate statement, yes.

14  Q.  And you knew that in this case, a big part of what Mr.

15  Tucker was looking to do was get around the state regulation,

16  correct?

17  A.  He wanted his business to be lawfully operated.

18  Q.  And it wouldn't be lawfully operated because of state

19  regulation, right?

20  A.  Absent the tribes being the lender, no.  If Mr. Tucker was

21  the lender instead of the tribes, then it would have been

22  regulated by state law, that's correct.

23  Q.  Which would have made it illegal?

24  A.  In some states.

25  Q.  You knew that some states had usury laws that prohibited

1    charging 700 percent interest for a loan, correct?

2    A.  Yes, some states did.

3    Q.  I suppose, more importantly, you knew that Mr. Tucker knew

4    that?

5    A.  Yes.

6    Q.  And you knew that Mr. Tucker was extending Internet loans

7    throughout the country at the time, correct?

8    A.  That was part of the plan to deal with the tribal lenders,

9    correct.

10   Q.  It's your testimony that you did not know Mr. Tucker was

11   lending before you entered these agreements with the tribes?

12   A.  I believe he was lending under a different model, called

13   the County Bank model at some point, prior to that.

14   Q.  So you knew he was engaged in the business of extending

15   payday loans before any of this tribal involvement, correct?

16   A.  That was my understanding.

17   Q.  And you knew that the interest rates he was charging were

18   illegal in some of the states he was charging them in, correct?

19   A.  If the state law applied to those loans, correct.

20   Q.  And so that was why he needed to seek out this, what you

21   call a tribal model, correct?

22   A.  Yes.  He wanted the loans to be lawful.

23   Q.  Well, specifically, he needed state regulation -- he needed

24   to not have state regulation apply to his loans, correct?

25   A.  Yes.  Tribal regulation instead of state regulation,

1    correct.

2    Q.  So that is why he was seeking out the tribes?

3    A.  Correct.

4    Q.  And you were advising here that if the tribe isn't adding

5    value other than marketing an exemption from state regulation,

6    that's a problem, correct?

7    A.  In other contexts it had been a problem, yes.

8          MR. SCOTTEN:  We can zoom back out.

9    Q.  Let's go down to the last sentence on page 1.

10         There at the bottom it says, "As it stands now, the

11   UMS agreements with the tribal corporations do not adequately

12   reflect the tribal corporation or tribal government adding

13   value to the transaction."  Correct?  Is that what it says?

14   A.  That's what it says.

15   Q.  And UMS was Mr. Tucker's company, correct?

16   A.  That is correct.

17         MR. SCOTTEN:  We can go on to the next page.

18         If we can just highlight what is left of that

19   paragraph on the top four lines.

20   Q.  So here you discuss one possibility was to have tribal

21   employees perform some kind of work on the reservation,

22   correct?

23   A.  That is correct.

24   Q.  And you also said that it is important that the

25   agreement -- and that's the agreement between Mr. Tucker and

1    the tribal entity, correct?

2    A.   That is correct.

3    Q.   "The agreement reflect that it is the tribe's

4    responsibility to make the decision over whether to lend the

5    money."  Correct?

6    A.   That's what it says.

7    Q.   It does not say over the terms and conditions of loans in a

8    general matter, correct?

9    A.   No, it does not say that.

10   Q.   It says over whether to make the loan, correct?

11   A.   Correct.

12   Q.   Let's go down to paragraph 6.

13          Now, here you're advising this tribal corporation

14   needs to keep up the appearances that they are in the business

15   of lending money, correct?

16   A.   Right.

17   Q.   And it is not beneficial to the legal position you're

18   taking if the tribal corporation appears to be just a front,

19   correct?

20   A.   That is right.

21   Q.   If it is just a front that provides cover for the business,

22   that doesn't benefit your legal position, correct?

23   A.   That's right.  You need to actually be in the business of

24   lending money.

25          MR. SCOTTEN:  Let's take that down.

1  Q.  I also wanted to ask you, during this period, from December

2  of 2003 up to about June of 2004, you didn't tell Mr. Tucker

3  that you disagreed with what you just referred to as the PG

4  letter, did you?

5  A.  I don't ever recall telling him that I disagreed with that

6  letter, no.

7  Q.  And you also noted some other flaws at some point in his

8  business, the wording of the choice of law clauses in these

9  contracts?

10  A.  I had discussions and made recommendations on ways that

11  those clauses could be made better, yes.

12  Q.  You told him it was important that the name of the tribe or

13  the tribal entity be mentioned in there somewhere, correct?

14  A.  Yes.

15  Q.  It was early on in your involvement with him?

16  A.  I believe it was fairly early on, yes.

17  Q.  I want to talk a little bit about affidavits now and then I

18  will come back to them.

19          As a general matter, as an attorney, you are going to

20  be dependent on others for the facts to be placed in your

21  affidavits, correct?

22  A.  Yes.

23  Q.  And you testified a lot about speaking with Mr. Brady, Mr.

24  Little Axe, Mr. Ickes, and a couple of other folks in the

25  process of drafting those, right?

1    A.  Yes.

2    Q.  And you also spoke with Mr. Muir about those affidavits,

3    correct?

4    A.  Depending upon the time that the affidavits were prepared,

5    yes, I would likely have either discussed them or he would have

6    gotten a copy of them.

7    Q.  By time frame, I assume you mean after 2006 when he is

8    involved in the business?

9    A.  Yes.

10   Q.  Before then, you're obviously not sending them to him?

11   A.  Right.

12   Q.  But after that, because you perceive him as an important

13   figure, you're sending him the affidavit or discussing them

14   with him or both?

15   A.  Generally, he would have gotten a copy of them.  I don't

16   believe he was involved in drafting or editing, to my

17   recollection.

18   Q.  You remember him editing if you sent him copies, as you do

19   with many legal documents, before filing, correct?

20   A.  Yeah.  Either before or when I filed them, yes.  It would

21   not be uncommon for me to send him drafts of filings before

22   they were filed.

23   Q.  In the early going especially, before Mr. Muir came on, you

24   also sent affidavits to Mr. Tucker, correct?

25   A.  He would certainly have gotten copies of the completed

1    affidavits.

2    Q.  Your testimony is that you didn't send them to him before

3    filing also?

4    A.  I may have.

5    Q.  Let's look at Government Exhibit 309A.

6            So this here is an example of you copying him after

7    filing, correct?

8    A.  Yes.

9    Q.  You're also telling him what statements you are going to

10   make in court, correct?

11   A.  Yeah.  Making the same arguments that were in the documents

12   that I had sent him, yes.

13   Q.  This is in the Colorado litigation in July 2005?

14   A.  Yes.

15   Q.  Let's also look at 315.

16           MR. SCOTTEN:  Let's start at the bottom e-mail.

17           Can we add just a couple of the top lines there.

18           Where it starts Conly J. Schulte.

19           I'm sorry, Ms. Grant.  I am trying to get the bottom

20   e-mail only.

21           That's perfect.  Thank you.

22   Q.  So here what we have is Shilee Mullin sending an e-mail to

23   you and Ken Bellmard, correct?

24   A.  Yes.

25   Q.  And you testified that Ms. Mullin was a lawyer at your

1    firm?

2    A.   Yes.

3    Q.   So here what is being attached are drafts, correct?

4    A.   Yes.  That's what it says.

5         MR. SCOTTEN:  Now let's go up to the e-mail above it.

6    Q.   Here you're forwarding that e-mail to Mr. Tucker, right?

7    A.   Yes.

8    Q.   And you're telling him you're attaching drafts that are

9    going to be finalized and filed in the future, correct?

10   A.   Yes.

11   Q.   So here you are in fact sending him drafts in advance of

12   filing?

13   A.   That is correct.

14        MR. SCOTTEN:  Now let's go to the top e-mail.

15   Q.   So here you can see a couple of e-mails between Blaine

16   Tucker and Scott Tucker, correct?

17   A.   That's what it appears to be, yes.

18   Q.   By the way, who is Blaine Tucker?

19   A.   Blaine Tucker was Scott Tucker's brother.

20   Q.   Do you see on the top where Blaine Tucker says that he

21   likes the one from Don Brady, Don B, correct?

22   A.   That's what it says.

23   Q.   Don Brady didn't write any legal arguments, did he?

24   A.   No.

25   Q.   So if you send a piece of paper from Don Brady to Mr.

1    Tucker, that's a Don Brady affidavit?

2    A.  That would be referring to his declaration or affidavit,

3    correct.

4    Q.  Now, before I come off the affidavits for a second, you

5    testified here that you had an independent belief that these

6    affidavits were true, correct, at least some of them?

7    A.  I believed them to be true, yes.

8    Q.  That's what I wanted to ask.  Did you believe them to be

9    true in the sense that you didn't think you were lying, or did

10   you believe them to be true independent -- did you believe them

11   to be true only in the sense that you didn't believe you were

12   lying?

13   A.  I believed them to be true, the contents.  I believed the

14   contents of the affidavits to be true.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    BY MR. SCOTTEN:

2    Q.  Did you believe the contents?

3    A.  I believe the contents of the affidavit to be true.

4    Q.  And you believed them to be true on based on your personal

5    knowledge and not just because Don Brady or Lee Ickes, or

6    whoever, was willing to sign them?

7    A.  The basis of my beliefs were with, in part, with

8    discussions of the clients, yes.

9    Q.  What was the other part?

10   A.  Probably discussions I had with Mr. Tucker.  Yes.

11   Q.  And in fact, there were times you had to learn essentially

12   all the essential facts from Mr. Tucker, weren't there?

13   A.  I'm not sure what you mean by all the essential facts.

14   Q.  Well, there were times when you had to learn basic facts of

15   the lending operation from Mr. Tucker relative to -- and not

16   from the tribal client, correct?

17   A.  I wouldn't say all, but there were some facts that I

18   would -- I would rely on Mr. Tucker for, yes.

19   Q.  Would those facts include the fact that loans were being

20   made by a tribal corporation?

21   A.  That information I -- I would have had discussions with

22   both the person who signed the affidavit and Mr. Tucker,

23   likely.

24   Q.  I'd like to show you what's marked as Government Exhibit

25   4116.  It's got a few pages to it, so I'm going to hand you a

1   copy you can flip through.

2   A.  OK.  Thank you.

3   Q.  Mr. Schulte, is this an email exchange, an email chain

4   essentially, between you and Mr. Tucker?

5   A.  Yes, it is.

6            MR. SCOTTEN:  Your Honor, the government offers 4116.

7            MR. ROTH:  No objection.

8            THE COURT:  Received.

9            (Government Exhibit 4116 received in evidence)

10  Q.  Now, this is concerning the SFS agreement, correct?

11  A.  Yes.

12  Q.  And that was the entity established relative to the Santee

13  Sioux, correct?

14  A.  It is.

15  Q.  And you testified that the Santee Sioux was the tribe that

16  you were closest with, because you had previously represented

17  them, correct?

18  A.  Yes.

19  Q.  And you also visited them more than the other tribes,

20  correct?

21  A.  Yes.

22  Q.  They were easy to get to, so you could get to the

23  reservation quite often?

24  A.  They were closer, yes.

25  Q.  I want to direct your attention to -- I believe we're going

1  to go to the second page, and if we can view the one that says

2  original message.  Sorry.  They all say original message, the

3  one with the gray bar above it.

4  A.  OK.

5  Q.  OK.  So you're talking about forwarding something to the

6  Santee Sioux?

7  A.  Yes.

8  Q.  And then you're also asking whether Mr. Tucker will be

9  sending instructions for some kind of mailing thing, correct?

10 A.  Well --

11 Q.  I'm looking at the second sentence.

12 A.  Two, yes.  Two.

13 Q.  The one that ends with a question mark.

14 A.  Yeah, I tell him that I'm sending him sending instructions,

15 mailing address, FedEx billing code, etc. -- or I'm asking him

16 for instructions.  I'm sorry.

17 Q.  Right, and that's because in addition to the lending stuff,

18 the Santee Sioux also acted as a mail processer, as the

19 agreement put it, for UMS, correct?

20 A.  That was contemplated at the time, though I'm not sure that

21 agreement ever was performed.

22 Q.  And so regardless of what that sentence is about, whether

23 or not that went into effect --

24 A.  Right, right.

25 Q.  And then in the third sentence, you ask, you say, "The

1     tribe," and that's the Santee Sioux, "was also wondering about

2     the status of the other agreement.  When will the lending

3     operation begin, and what do we need to do to get it going?"

4     Is that right?

5     A.  Where are you referring to?

6     Q.  Third sentence, ending with a question mark.

7     A.  Oh, yes.  Yes.  OK.

8     Q.  You're asking when is the lending relative to the Santee

9     Sioux going to start?

10    A.  Correct.

11    Q.  And what does the tribe need to do to make that happen?

12    A.  Yes.

13    Q.  And if we can go up to just the previous email.  I'm sorry.

14    When I say previous, I mean above in the document.

15    A.  I understand.

16    Q.  Later in time.

17    A.  Right.

18    Q.  Let's just view paragraph 3.

19        So here, Mr. Tucker's talking about the Santee's other

20    agreement, correct?

21    A.  Correct.

22    Q.  And the other agreement, from your prior email, that's the

23    lending agreement, in contrast to the mailing agreement?

24    A.  I believe that's correct.

25    Q.  And you had just asked him when is it going to start and

1    what the tribe needed to do to get it started, right?

2    A.  Right.

3    Q.  And he responds to you, We started that business in the

4    middle of March, the Santee will be getting their check for the

5    business we'd already done on the 20th of April?

6    A.  Yes.

7    Q.  And this email is dated April 1, correct, of 2005?

8    A.  Yes, it is.

9    Q.  So neither you nor the Santee Sioux knew there was a

10   lending business being conducted supposedly in their name at

11   this time, correct?

12   A.  Well, I can't speak for the Santee Sioux.  I'm not there on

13   a daily basis.

14   Q.  Well, let's go back to the previous email.

15   A.  Yes, but it's clear that I wasn't aware of it.

16   Q.  Well, let's go back to the previous email.  And if you look

17   at the third sentence, that states, "The tribe is also

18   wondering about the status of the other agreement," correct?

19   A.  That's what it says, yes.

20   Q.  I want to go on to another matter.  I want to ask you about

21   information you would get from your clients as opposed to

22   information you yourself knew.  I want to show you what's

23   marked as Government Exhibit 4122.  You know what, let me hand

24   up a copy again so you can see all of it.  This one's longer.

25   If you want to flip through it and see if you recognize it, I'm

1    sure there won't be time to read the whole thing.

2    A.  OK.

3        I've reviewed it.

4    Q.  And is it an email from you to Scott Tucker to which you

5    attach filings you had made in court?

6    A.  Yes.

7            MR. SCOTTEN:  Your Honor, the government offers 4122.

8            MR. ROTH:  No objection.

9            THE COURT:  Received.

10           (Government Exhibit 4122 received in evidence)

11   Q.  Starting on the first page, we actually just looked at this

12   email in another context, but without the attachment, correct?

13   A.  Correct.

14           MR. SCOTTEN:  I want to go to page 5, footnote 1, and

15   if you could just blow that up.

16   Q.  And take a second -- actually, you could read it aloud; I

17   just want the jury to hear it.  I'll blow it up for you to the

18   screen.  It'll be faster.

19   A.  It says, "The state has also erroneously assumed that

20   Preferred Cash is a d/b/a of Executive Global Management Inc.

21   Preferred Cash is not a d/b/a of Executive Global Management

22   Inc. nor is Preferred Cash a subsidiary, agent, partner,

23   associate or manager of Executive Global Management Inc."

24   Q.  And it also has citations to the Campbell affidavit, is

25   that correct?

1    A.  Correct.

2    Q.  Here, you are telling the Court that Preferred Cash is not

3    a doing-business-as name used by a company called Executive

4    Global Management, correct?

5    A.  Correct.

6    Q.  Preferred Cash was the name originally associated with the

7    tribal entity of the Santee Sioux, correct?

8    A.  That is my recollection, yes.

9    Q.  It changes to OneClickCash later?

10   A.  Yes.

11   Q.  And so the court is reading this, and it indicates there's

12   no link between these two things, Preferred Cash, on the one

13   hand, and Executive Global Management, on the other, right?

14   A.  It states that Preferred Cash is not a d/b/a of Executive

15   Global Management.  Correct.

16   Q.  Right.  It doesn't explain that there is some other

17   connection, correct?

18   A.  Correct.

19   Q.  In fact, it asserts that the state is making an erroneous

20   assumption that there's a connection between the two, right?

21   A.  That's what it says, yes.

22   Q.  And although you're citing an affidavit, this is in a brief

23   you worked on; these are your words, essentially?

24   A.  The brief would have been prepared by my firm, yes.

25   Q.  And you approved that, right?

1          THE COURT:  And just please tell the jury what d/b/a

2     stands for.

3          THE WITNESS:  It's doing business as.

4          THE COURT:  Thank you.

5     Q.  In this case, Executive Global Management could be a

6     corporate name but doing business as could be sort of their

7     public business name, right?

8     A.  Be like a trade name.

9     Q.  And so eventually -- eventually, in fact, Preferred Cash

10    was the d/b/a of the Santee Sioux Financial Services, correct?

11    A.  Preferred Cash, yes.

12    Q.  And my colleague reminded me, I don't think I waited for

13    your answer to the other question.  You approved these filings,

14    correct?  You're sending this to Mr. Tucker, right?

15    A.  Yes.  I would have reviewed and authorized the filings,

16    yes.

17    Q.  I want to show you what's already in evidence as Government

18    Exhibit 1735.

19          MR. SCOTTEN:  And can we highlight just the top

20    portion.  Yes, that's more than enough.

21    Q.  Do you see here where, on the left, it says company legal

22    name, Executive Global Management, Inc.?

23    A.  Yes.

24    Q.  And then there, on the right, it says d/b/a name Preferred

25    Cash?

1    A.  I see that.

2            MR. SCOTTEN:  And if we could go to the bottom.

3    Q.  And then there you see a signature and Scott Tucker's name,

4    correct?

5    A.  I see that, yes.

6    Q.  And it's dated 2002?

7    A.  Yes.

8    Q.  So assuming the validity of this document, there was, in

9    fact, at least a few years prior, Preferred Cash was literally

10   a d/b/a of Executive Global Management?

11   A.  It would appear so from this document, yes.

12   Q.  And this court filing, however, gave no indication of that;

13   it suggested that any link between the two was an erroneous

14   assumption, correct?

15   A.  It did -- it did state that, yes.

16   Q.  And this is a document you sent to Scott Tucker before it

17   was filed, correct?

18   A.  This document?

19   Q.  No.  The court filing.

20   A.  Oh.  The court filing, I believe that would have been among

21   the documents I sent to Mr. Tucker, yes.

22   Q.  Let's go back to 4122 and look at the attachments on the

23   front page.  Is it not definitely one of the documents you sent

24   to Mr. Tucker before filing?

25   A.  Yes.

Ha4Wtuc6                        Schulte - Cross

1          MR. SCOTTEN:  Let's put up Government Exhibit 1727.

2     Correct?  Not correct, please.

3          THE WITNESS:  Do I have that?

4          MR. SCOTTEN:  No, no.  It's going to be on the screen.

5     It's already in evidence.

6          And what I want to do is focus on the two lines of

7     text in the bottom email.  Actually, let's do the whole bottom

8     email from Crystal Cram.

9     Q.   This is a much later email, from 2010, correct?

10    A.   That's what it says, yes.

11    Q.   And if you look at the two lines of the body, it lays out a

12    whole history of Preferred Cash Loans, correct?  Whole history

13    might be excessive, a date progression for it, correct?

14        I'll read it.  It says, Preferred Cash Loans, Executive

15    Global, was started in October 2002.  It was converted to

16    OneClickCash, Executive Global, in 2003.  That was converted to

17    OneClickCash, Santee, in September 2005.  Correct?

18    A.   That's what it says.

19    Q.   Right.  You're not on this email, but Scott Tucker and

20    Blaine Tucker are, correct?

21    A.   Correct.

22    Q.   And I want to be clear, when you filed this piece of paper

23    suggesting there was no connection between the two, is that

24    because you intended to create that impression, or you believed

25    it to be true based on talking to Scott Tucker?

1    A.  My recollection is I believed it to be true.  It's -- yes.

2    Q.  You later learned about this connection yourself, didn't

3    you?

4    A.  I -- I subsequently learned that there was, that Executive

5    Global did do business as Preferred Cash Loans --

6    Q.  And --

7    A.  Yes.  Previous to the Santee Sioux acquiring the trade

8    name.

9    Q.  When did you file your correction with the court?

10   A.  I don't recall filing a correction with the court.

11   Q.  I want to move forward -- actually, let's do something else

12   really quickly.  Can I show you Government Exhibit 4117.  And

13   do you recognize this?  We can flip through the pages, but I'm

14   assuming you recognize it from the front page.

15          MR. SCOTTEN:  Let's scroll down a couple pages for the

16   witness.

17   A.  OK.  I recognize the document.

18          MR. SCOTTEN:  OK.  Let's go all the way to page 4,

19   note 1, very bottom.  You're on the right page, the footnote.

20   Q.  This is essentially the same language, except it's for Cash

21   Advance, correct?

22   A.  Yes.  And a different -- CB Service Corp.

23   Q.  Cash Advance was a business later claimed to be affiliated

24   with the Miami, correct?

25   A.  That is correct.

1    Q.  And here, you're making the same assertion with respect to

2    CB Service Corp., that it's an erroneous assumption, that it's

3    a d/b/a -- sorry, that Cash Advance is a d/b/a of it, correct?

4    A.  That's what it states, yes.

5    Q.  And here, you're citing, although the words are same,

6    you're citing the affidavit from Don Brady, correct?

7    A.  That is correct.

8    Q.  That's what "Brady Aff.," with the paragraph symbol, "16"

9    means?

10   A.  Yes.

11            MR. SCOTTEN:  If we could show the witness Government

12   Exhibit 1734 and the same top portion.

13   Q.  And here, we see that, in fact, Cash Advance is the d/b/a

14   of CB Service Corp., at least as of the time of this document,

15   correct?

16   A.  I assume that that document was true.  I had not seen that

17   document previous, previous to today.

18   Q.  Right, assuming it's a bona fide document.

19   A.  Right.

20            MR. SCOTTEN:  Let's go to the bottom of the page.

21   Q.  And there we see Scott Tucker's signature, name and date in

22   June of 2002, correct?

23   A.  That is his name and date.  I'm not a handwriting expert,

24   but I assume that's his signature.

25   Q.  You recall seeing that in connection with exhibits before

1    with Scott Tucker's signature on them; you identified them for

2    the defense, correct, 406?

3    A.  I may have, but --

4    Q.  I mean, you've seen Scott Tucker's signature a lot,

5    correct?

6    A.  Yeah.  I'm not saying that it is or is not his signature.

7    Q.  Again, you had filed this court statement suggesting the

8    erroneous assumptions were linked; when you filed that, did you

9    know that was inaccurate?

10   A.  The court filing does not say that it's an erroneous

11   assumption and that the two are linked.  It says erroneous

12   assumption that it is a d/b/a of -- entity's name.

13          MR. SCOTTEN:  Let's go back to the top of this

14   document so the witness can see it.

15   Q.  D/b/a of CB Service Corp., right?

16   A.  CB Service Corp., yes, yes.

17   Q.  And there's no helpful explanation to the court that, Well,

18   it used to be a d/b/a a couple months previous, correct?

19   A.  There is no explanation stating that, no.

20   Q.  And you did, in fact, learn at some later date that Cash

21   Advance had done business as -- or CB Service Corp. being the

22   corporate name of Cash Advance, correct?

23   A.  Yes, at some point I learned that prior to the Miami tribe

24   using the d/b/a Cash Advance, it had been used by CB Service

25   Corp.

1    Q.  But your testimony is you didn't learn that until the

2    future, until after this filing, correct?

3    A.  That is correct.

4    Q.  You didn't file a correction with the court, though, did

5    you?

6    A.  I did not.

7             MR. SCOTTEN:  We can take that down.

8    Q.  I want to go next into the question of your relationship

9    with Scott Tucker.

10            MR. SCOTTEN:  Your Honor, the witness already

11   testified about it, but I'm not sure I formally offered it.

12   Can I offer 4117?  I think there was no objection.

13            THE COURT:  Any objection?

14            MR. ROTH:  No, Judge.

15            THE COURT:  Received.

16            (Government Exhibit 4117 received in evidence)

17   BY MR. SCOTTEN:

18   Q.  You said you stopped representing Scott Tucker around 2008

19   or in late 2007, correct?

20   A.  That's my best recollection.

21   Q.  And you attended a court hearing around that time in the

22   Cash Advance v. Colorado case?

23   A.  I may have.

24   Q.  You certainly attended court hearings in Cash Advance v.

25   Colorado, right?

1   A.  Certainly, yes.

2   Q.  Do you recall this particular hearing where you were

3   representing Cash Advance?  You didn't represent Colorado,

4   right?

5   A.  Uh-huh.

6   Q.  You represented Cash Advance, correct?

7   A.  I was representing Miami Nation Enterprises doing business

8   as Cash Advance, yes.

9   Q.  And do you remember this hearing where the court wanted to

10  issue bench warrants for James Fontano, Michael Hicks and Scott

11  Tucker?

12  A.  I do recall that, yes.

13  Q.  And do you recall that with respect to Mr. Fontano and

14  Mr. Hicks, you took no position, because you stated that they

15  weren't your clients; you were representing Cash Advance?

16  A.  I don't recall that statement, no.

17  Q.  Do you recall that when the subject of Scott Tucker came

18  up, you did suggest a bench warrant should not be issued for

19  him?

20  A.  I don't recall that.  I'd have to see the transcript.

21          MR. SCOTTEN:  Let's show the witness 4131, the front

22  page.

23  Q.  Do you recognize this as the transcript of that proceeding?

24          MR. SCOTTEN:  Flip one page so that the witness can

25  see it.

Ha4Wtuc6                    Schulte - Cross

1   Q.  And this is an excerpt; it's not the entire proceeding,

2   correct?

3   A.  OK.  Can you show the front page again?

4   Q.  Absolutely.  Let's go back.  Actually, let me bring you a

5   copy.

6   A.  OK.

7           MR. ROTH:  Could we have a copy as well?

8           MR. SCOTTEN:  Yes.  Sorry.

9   Q.  Before you have a chance to read the whole thing, does this

10  appear to be the transcript?

11  A.  It does, yes.

12          MR. SCOTTEN:  Your Honor, the government offers 4131.

13          THE COURT:  Any objection?

14          MR. ROTH:  No, your Honor.

15          THE COURT:  Received.

16          (Government Exhibit 4131 received in evidence)

17          MR. SCOTTEN:  Put up the first page for the jury, if

18  we could.  And if we can go to the second page, and if we can

19  highlight essentially the bottom half, beginning at line 11,

20  down.

21  Q.  And so the court is asking you how your arguments protected

22  Mr. Tucker or how you even had standing to object to the bench

23  warrants as to Mr. Tucker, correct?

24  A.  Yes.

25  Q.  And as you understood that question, standing means why are

1   you objecting on behalf of Mr. Tucker if he's not your client,

2   correct?

3   A.  Correct.

4   Q.  And if we could just go down, looking at the bottom, you're

5   asked if you're representing Mr. Tucker, correct?

6   A.  That's correct.

7   Q.  And your answer is no?

8   A.  That's correct.

9          MR. SCOTTEN:  If we could go to the next page.  Now,

10  on this page, let's blow up everything from line 2 down to line

11  13.

12  Q.  Here, the court asks you if Mr. Tucker is part of the

13  tribal entities or connected to them in any way, correct?

14  A.  Yes.

15  Q.  And then you have a paragraph where you talk about the

16  legal issues, sort of where you see the case at right now,

17  correct?  In the big paragraph.

18  A.  Sure, yes.

19  Q.  And in the end, you respectfully decline to tell the court

20  whether or not Mr. Tucker is part of the tribal entities or is

21  connected to them in any way, correct?

22  A.  Yes, because the tribes --

23  Q.  I didn't --

24  A.  My client was immune from suit, and sovereign immunity

25  protects my clients from discovery, and this was, I believe, a

1    form of, you know, discovery, by a state court that did not

2    have jurisdiction over my clients.

3              MR. SCOTTEN:  If we could strike the portion that's a

4    legal answer.  I think "yes" would be the relevant part of the

5    answer.

6              MR. ROTH:  I think it calls for an explanation.

7              THE COURT:  Yes.  I'll let it stand.

8              Go ahead.

9              MR. SCOTTEN:  If we could go back to the first page.

10   Q.  And if you see right below "transcript of recorded

11   proceedings," where it says the date, this is March 20 of 2008,

12   correct?

13   A.  Yes.

14   Q.  There's nothing about the principle of sovereign immunity

15   that made you able to object to bench warrants for Scott Tucker

16   but not James Fontano or Michael Hicks, was there?

17             MR. GINSBERG:  Your Honor, I object.  I think this is

18   not relevant now.

19             THE COURT:  Overruled.

20             MR. GINSBERG:  It's going into a totally different

21   area now.  Could we approach the sidebar?

22             THE COURT:  No.  Overruled.

23   A.  I would need to more, know more about the context of the

24   discussion with -- about Hicks and the other, Mr. Fontano.

25   Q.  We'll see if we can get you the full transcript to review

1    overnight.

2              MR. SCOTTEN:  Let's go now to Government Exhibit 4132.

3              I apologize.  I want 4133.

4              MR. ROTH:  Could we have a copy?

5              MR. SCOTTEN:  Yes, absolutely.

6              I'll give you a copy too.

7              THE WITNESS:  Thank you.

8    Q.  If you could take a flip through that.

9    A.  OK.

10   Q.  And are these billing records that you submitted, formally

11   at least, to the Miami Nation Enterprises on April 30, 2008?

12   A.  This is an invoice for legal services performed by my law

13   firm for Miami Nation Enterprises.

14             MR. SCOTTEN:  Your Honor, the government offers 4133.

15             MR. ROTH:  No objection.

16             THE COURT:  Received.

17             (Government Exhibit 4133 received in evidence)

18             MR. SCOTTEN:  If we could blow up essentially the

19   letterhead and the date at the top.

20   Q.  This invoice is being sent on April --

21             MR. SCOTTEN:  We missed it by a hair.

22   Q.  -- April 30, 2008, is that correct?

23   A.  Yes.

24   Q.  And that's your firm at the top, correct?

25   A.  It is.

1   Q.  And it bills, at least an address, the Miami Nation

2   Enterprises, correct?

3   A.  Yes.

4           MR. SCOTTEN:  Can we go to page 2, and can we

5   highlight the entry for April 4, 2008.

6   Q.  And sir, here, you are billing Miami Nation Enterprises for

7   travel to Kansas City for a meeting with CLK and its attorneys

8   regarding Colorado litigation matters, and then your return

9   travel, correct?

10  A.  Correct.

11  Q.  And you're CJS, correct?

12  A.  I am.

13  Q.  Who is LGM?

14  A.  That is my partner, Lance Morgan.

15  Q.  And Lance Morgan spells it out in a little more detail

16  where he says the meeting is with you and Muir and Tucker,

17  correct?

18  A.  Yes.

19          THE COURT:  Would those two entries relate to the same

20  meeting, one for you and one for Mr. Morgan?

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  Thank you.

23  BY MR. SCOTTEN:

24  Q.  And to be clear, this is two weeks after this hearing,

25  correct?

1    A.  Approximately, yes.

2             MR. SCOTTEN:  Actually, let's go to page 3.

3             Well, let's go back to the previous screen.  And can

4    we blow up that same entry.

5    Q.  So you're conducting a strategic planning meeting here,

6    correct?

7    A.  I'm sorry?

8    Q.  At least according to Mr. Morgan, you're conducting a

9    strategic planning meeting here, correct?

10            THE COURT:  "At least according to Mr. Morgan."

11   A.  That is how Mr. Morgan described it.

12            MR. SCOTTEN:  Yes, your Honor.  I'm sorry.

13   A.  Yes.

14   Q.  And Mr. Muir is present; he's an attorney?

15   A.  Correct.

16   Q.  And Mr. Tucker is also present, correct?

17   A.  Correct.

18   Q.  And he is not an attorney, correct?

19   A.  Correct.

20   Q.  There are no tribal members present, are there?

21   A.  That's not uncommon to meet with opposing counsel --

22   Q.  Please answer the question, sir.

23   A.  -- without a client present.

24       No, they're not present.

25   Q.  OK.

1          MR. SCOTTEN:  We can take that one down.

2     Q.  Now, this is supposedly right after you stopped working for

3     Mr. Tucker, correct?

4     A.  That's the best of my recollection, yes.

5     Q.  Well, you had told the court two weeks prior that you were

6     not representing Scott Tucker, correct?

7     A.  Correct.  I did not represent him in that case, correct.

8     Q.  But you had billed Mr. Tucker's company -- well, how long

9     did you keep billing Mr. Tucker's company for your legal

10    services?

11    A.  I believe that would have ended about the same time, late

12    2007, early 2008.  It would have been prior to this, I believe,

13    because this was -- well, I'm not sure, but I would say late

14    2007, early 2008.

15    Q.  OK.  Now, your firm, you said, I think earlier today, it

16    was 40 attorneys or so?

17    A.  Currently.

18    Q.  How big do you think it was at that time, 2007, 2008?

19    A.  I'm not sure.  It, it was likely smaller at that time.

20    Maybe 20, 25, 30.

21    Q.  So that's not a tiny firm, but that's a smallish firm,

22    correct?

23    A.  Sure.

24    Q.  And you were a partner at that firm?

25    A.  Correct.

1    Q.  And you were concerned with billing, correct; all partners

2    are?

3    A.  It's part of my -- part of my job, yes.

4    Q.  And you knew that a lot of money was coming in from Scott

5    Tucker, correct?

6    A.  There was a lot of work being done with regard to Mr. --

7    yeah, are you talking about -- can you clarify the time frame?

8    Because I want to make sure I'm accurately representing this.

9    Q.  Sure.  Let's say a lot of money came into your firm from

10   Mr. Tucker between 2005 and 2013, correct?

11   A.  Yes, we performed -- well, at least to 2008, a lot of work

12   for Mr. Tucker's entity, UMS, up until early 2008.  Correct.

13   Q.  You were aware that even after 2008 Scott Tucker was paying

14   the bills, correct?

15   A.  No.  The tribal entities were paying the bills, as I

16   recall.

17   Q.  Would it surprise you to learn that between 2008 and 2013,

18   your firm took in $16 million from the various businesses that

19   are the subject of this case?

20   A.  Between 2008 and 2016?

21   Q.  '13.

22   A.  '13?  It's possible.  I've never done the calculations.

23   Q.  And as the senior partner -- I think you were the senior

24   partner on this matter, correct?

25   A.  Yes.

1  Q.  That's enough money that you'd pay attention to it,

2  correct?

3  A.  It is a substantial amount of money, correct.

4  Q.  And is it your testimony that Mr. Tucker was not paying

5  those bills?

6  A.  The tribal entities were paying those bills as operating

7  expenses of the, the lending company.

8          MR. SCOTTEN:  Can we show the witness Government

9  Exhibit 4114.

10  Q.  You can just flip through it.

11  A.  Sure.

12          OK.

13  Q.  Are these a series of checks written to your law firm?

14  A.  This is a -- copies of a series of checks written to my law

15  firm, correct.

16  Q.  And it looks like they've been cashed; you can see the

17  "deposit only" stamp?

18  A.  Yes.

19          MR. SCOTTEN:  Your Honor, the government offers 4114.

20          MR. ROTH:  No objection.

21          THE COURT:  Received.

22          (Government Exhibit 4114 received in evidence)

23          MR. SCOTTEN:  And if we can show the first page.

24  Q.  Mr. Schulte, this is a check from TFS Corp. to Fredericks

25  Peebles & Morgan for $40,000, correct?

1   A.  That is correct.

2   Q.  And TFS Corp. was one of the ones supposedly associated

3   with the Miami?

4   A.  TFS was a Miami, the name of a Miami tribal entity that the

5   tribe used -- it was -- interchangeably with MNE Services.

6   Q.  And on the right there, there's a signature, correct?

7   A.  Correct.

8   Q.  And that's the same signature -- well, it appears similar

9   to, and I know you're not a handwriting expert, but it appears

10  similar to the signature you recognized earlier when the

11  defendants showed you their exhibit, 406, correct?

12  A.  Yes.

13  Q.  And that was Scott Tucker's signature on 406, correct?

14  A.  It was -- yes, I believe it was.

15  Q.  It was on a fax from him to you?

16  A.  Sure, yeah.

17  Q.  You recognized that from him, correct?

18  A.  Yes.

19        MR. SCOTTEN:  Let's go to the next page.

20  Q.  This is a check for about a hundred thousand dollars to

21  your firm, correct?

22  A.  Correct.

23  Q.  And this one's in the name of the Santee Sioux, correct?

24  A.  That is correct.

25  Q.  Same signature, though, correct, as best you can tell?

1    A.  It appears to be, yes.

2            MR. SCOTTEN:  Let's go to the next page.

3    Q.  And here we have Red Cedar Services, correct?

4    A.  Correct.

5    Q.  And this is a check from Red Cedar Services to your firm

6    for about, almost $34,000, correct?

7    A.  Correct.

8    Q.  And that is an entity that is supposedly affiliated with

9    the Modoc, correct?

10   A.  That is owned -- entity owned by the Modoc tribe, yes.

11   Q.  And similar signature here, correct?

12   A.  Yes.

13   Q.  And that's the signature you've identified as appearing to

14   be Scott Tucker's, correct?

15   A.  Correct.

16           MR. SCOTTEN:  And let's go to the next page.

17   Q.  TFS Corp. again?

18           MR. SCOTTEN:  Next page.

19   Q.  This is AMG Services, correct?

20   A.  Correct.

21   Q.  And -- oh, I should note all these checks so far, and you

22   can flip back, these are all in 2011, correct?

23   A.  Yes.

24   Q.  And if we could go back to the fifth page, this is AMG

25   Services, correct?

1    A.  Yes.

2    Q.  2011, and they're making out a $17,000 check to your firm.

3    And AMG Services is a sort of umbrella entity at this time

4    supposedly owned by the Miami, correct?

5    A.  Yes, it is a Miami -- it is owned by the Miami Tribe of

6    Oklahoma.

7    Q.  And again, same signature, best you can tell?

8    A.  Yes.

9    Q.  Scott Tucker's signature?

10   A.  It appears to be, yes.

11   Q.  And we don't have to go through all of these, but you can

12   flip through them, and we'll just flip down to the last page.

13   You can take a look at each one, because I'm going to ask you

14   to sort of summarize.

15   A.  I'm sorry?

16   Q.  You can take a look at each check.  I'm going to ask you to

17   summarize it.

18   A.  OK.  Yeah, I have -- when you originally handed me the

19   exhibit, I did leaf through all the pages.

20   Q.  OK.  So fair to say it contains about 22 checks?  I don't

21   know if you counted them.

22   A.  I didn't count them, but I'll take your word for it.

23   Q.  Well, bunch of checks in here, correct?

24   A.  They're copies of checks written to my firm, what appears

25   to be between 2008 and 2011.

1    Q.  From a variety of entities all supposedly associated with

2    different tribes, correct?

3    A.  Yes.  All from tribally owned entities, correct.

4    Q.  And all appearing to be signed by Scott Tucker, correct?

5    A.  Correct.

6    Q.  And so you knew that Scott Tucker was signing your checks,

7    right?

8    A.  Yes.  CLK Management and subsequently AMG Services, as part

9    of their servicing of the loans, would pay all of the

10   operational costs of the servicing company, and the -- our fees

11   were operational costs of the lender, lenders owned by the

12   tribes.  So it was an administrative function for CLK

13   Management to cut those checks to our firm.

14   Q.  Well, except there's no CLK during this time period,

15   correct?

16   A.  Well, it would have been AMG at that point in time, and at

17   that point in time, Mr. Tucker was employed by AMG.

18   Q.  So Mr. Tucker, as an employee of AMG, signed your checks

19   from AMG and every other business involved in this, correct?

20   A.  Yes, he had authority to do so.

21   Q.  Well, You certainly believed him to have authority to do

22   so?

23   A.  I believed he did, yes.

24   Q.  And by the way, Mr. Muir was the one who sort of approved

25   all your billing on a day-to-day basis, correct?

1    A.  No, he wouldn't approve it.  He would receive copies of the

2    invoices.

3    Q.  It wouldn't surprise you to learn that he was the one who

4    took it to accounting and made sure you got paid though, would

5    it?

6    A.  That could very well be, yes.

7    Q.  So as a practical matter, you knew that Scott Tucker was

8    signing your checks and Mr. Muir was getting your checks cut

9    during this entire time period, correct?

10   A.  Well, I generally don't see checks, actual copies of checks

11   from clients when they come into the firm; I'll just get a

12   report of -- from my billing secretary, who -- that invoices

13   were paid.  I don't normally see copies of checks.

14   Q.  Right, but you're a partner at a smallish firm that's made

15   in the ballpark of $16 million in five years off this client,

16   correct?

17   A.  I don't know that independently, but --

18   Q.  Well, you've seen a bunch of checks?

19   A.  Sure.

20   Q.  Made a lot of money, correct?

21   A.  Sure.

22   Q.  Actually, I misspoke when I said client; it's actually a

23   whole series of different named entities, correct?

24   A.  There would have been -- yeah, all tribally owned entities

25   and clients of my firm, yes.

1    Q.  And I want to make sure, Is your testimony that you didn't

2    see the checks or you didn't know that Scott Tucker and Tim

3    Muir were the ones who were controlling the billing?

4    A.  I disagree with the statement that they controlled the

5    billing.  They would have been responsible probably for the

6    administrative function of making sure that the operational

7    costs of the portfolios -- that is, Mr. Tucker would -- were

8    paid, and our legal fees were part of those operating expenses.

9    Q.  As a partner in a law firm, you're concerned with the money

10   coming in, correct?

11   A.  Well, yes.  The firm needs, needs to have bills paid in

12   order to continue operations.  Certainly.

13   Q.  You know who controls the payment of bills, correct?

14   A.  I knew that -- it didn't surprise me that Mr. Tucker would

15   be signing the checks, because he --

16           THE COURT:  Did you understand the question?

17           THE WITNESS:  Can you repeat the question?

18   BY MR. SCOTTEN:

19   Q.  At as a partner in a law firm, you knew who was controlling

20   your payments, correct?

21   A.  I did.

22   Q.  And you knew, because I think you just testified, that

23   Mr. Muir was the one going to Mr. Tucker to get these checks

24   sent to you, correct?

25   A.  He, he would likely have transmitted them to Mr. Tucker,

1    correct.

2    Q.  And you knew that the money would not come to you unless

3    Scott Tucker signed the checks, correct?

4    A.  It would have been him or anyone else authorized to sign on

5    those accounts.

6    Q.  OK.  And we've seen 22 checks for hundreds of thousands,

7    millions of dollars, maybe, from Scott Tucker, correct?

8    A.  These checks all appear to be signed by Mr. Tucker,

9    correct.

10   Q.  Now, you remained in close coordination with Scott Tucker

11   and Timothy Muir throughout this, correct?

12   A.  Yes.  Mr. Tucker had -- his interests were aligned with the

13   tribal lenders', correct.

14   Q.  OK.  So you -- and he was the one cutting your checks,

15   correct?

16   A.  He performed the function of, of signing the checks as an

17   operating expense of the loan portfolios, correct.

18   Q.  You also took direction from him in the conduct of the

19   litigation, correct?  And I'm talking post-2008, to be clear.

20   A.  No, I did not take direction from Mr. Tucker in the conduct

21   of the litigation.

22           MR. SCOTTEN:  Let's take a look at Government Exhibit

23   3146, if we could show it on the screen.

24   Q.  I think it's pretty short, but if you want a hard copy, let

25   me know.

1    A.  OK.

2    Q.  And is this an email chain between you, Scott Tucker and

3    Timothy Muir?

4    A.  It is.

5              MR. SCOTTEN:  Your Honor, the government offers 4136.

6              THE COURT:  Any objection?

7              MR. BATH:  No objection.

8              THE COURT:  All right.  Received.

9              (Government Exhibit 4136 received in evidence)

10             MR. SCOTTEN:  Could we go to the bottom of the page

11   and publish it.

12             Sorry.  Is there a second page?

13             And up one from that, I think there's a middle page.

14             Great.  Let's highlight the original message.

15   Q.  Here, we have an email from you seeing if you want to

16   discuss a subpoena served at U.S. Bank, correct?

17   A.  Correct.

18   Q.  And if we can go up, that's an email from Tim Muir,

19   correct?

20   A.  That is correct.

21   Q.  That's an email relative to Ameriloan, correct?

22   A.  Correct.

23   Q.  And then let's go up to your next email, top of the page.

24   You're informing Tim Muir and Scott Tucker, essentially, that

25   you are going to move to quash, meaning essentially not have to

1   comply with the subpoena, correct?

2   A.  Yes.

3            MR. SCOTTEN:  Let's go to the next page.  We don't

4   need to do that email.  Let's do the one above it.

5   Q.  So then Scott Tucker writes back, and he says, "At first

6   blush, it seems we need to have a very well written

7   brief/letter from the trible's attorneys," correct?

8   A.  That's what it says.

9   Q.  Do you have an understanding who the, and I'm just reading

10  literally -- the tribal's attorneys are?

11  A.  That would have been my firm.

12  Q.  And there it says, "supporting the quash of any subpoena on

13  any tribal bank account, across the board, that needs to be

14  setting," it says, but should be sitting "at U.S. Bank,"

15  correct?

16  A.  That's what it says, yes.

17  Q.  "And followed up immediately when we get notice of one

18  being served."  Is that what it says?

19  A.  Correct.

20  Q.  So Scott Tucker is directing, or suggesting, perhaps, to

21  your firm that the subpoena be drafted by you and that it be

22  sitting at a bank waiting there in case another subpoena was

23  served.

24  A.  He is suggesting that.  He's not directing.

25           MR. SCOTTEN:  OK.  Let's go up to the next email.

1  Q.  This is just informing Scott Tucker that you and Tim Muir

2  had talked?

3  A.  Yes.

4  Q.  And I won't go into it, but the next email, in brief, is

5  you sort of explaining the game plan to them?

6  A.  It appears that way, yes.

7  Q.  So you received this subpoena naming Ameriloan, correct?

8  A.  I don't know that I personally received it, but one of our

9  clients received it.

10 Q.  Well, you got it; it came to your attention?

11 A.  OK.  Fair enough.

12 Q.  And so you reached out to Tim Muir and Scott Tucker to find

13 out what to do, correct?

14 A.  No.  I notified them of -- that we received a subpoena,

15 yes.

16 Q.  You said, Let's discuss what to do, correct?

17 A.  I said, Let's discuss, yes.

18 Q.  And then Scott Tucker made a suggestion as to what to do?

19 A.  He made a suggestion, it appears, yes.

20 Q.  The guy who was cutting your checks, correct?

21 A.  The guy who was authorized --

22       MR. ROTH:  Objection, your Honor.

23 A.  -- by the tribes to -- that's correct.

24       THE COURT:  I'll allow it.

25       Go ahead.

Ha4Wtuc6                    Schulte - Cross

1   Q.  But your testimony is to this jury that --

2              THE COURT:  You didn't know whether he was

3   quote/unquote cutting the checks, but you knew he was signing

4   the checks?

5              THE WITNESS:  That is correct.

6              MR. SCOTTEN:  Thank you, your Honor.

7              THE COURT:  OK.  Go ahead.  Next question.

8   BY MR. SCOTTEN:

9   Q.  And your testimony here is that Scott Tucker was not in any

10  way directing you?

11  A.  No, I did not take direction from Scott Tucker on any

12  litigation.

13             MR. SCOTTEN:  Let's go to Government Exhibit 4135.

14  Q.  Well, let me ask you this, before I show you the exhibit.

15       You remained close enough with Scott Tucker and Timothy

16  Muir during this period; you were very close with them during

17  this period, correct?

18  A.  Our clients had mutual interests, and so we -- I worked

19  closely with Tim.

20             THE COURT:  Do you understand the question?

21             MR. SCOTTEN:  It may be too general.

22  Q.  You maintained a very close relationship with Muir and

23  Tucker, correct?

24  A.  I don't know what you mean by a very close relationship.

25  We had a professional relationship because our clients had

1   mutual interests.

2   Q.  And that relationship was close enough that you would --

3   well, you viewed yourself as adversaries together of the

4   states, correct?

5   A.  Yes.  Our interests were aligned in the -- that litigation,

6   correct.

7   Q.  And you were close enough to Muir and Tucker that you would

8   send them emails using very derogatory terms about the states,

9   correct?

10  A.  I'd have to see the email.

11  Q.  I'm going to show just you and counsel 4135.

12  A.  I've seen it.  Yes.

13  Q.  OK.  So it's fair to say that you shared very derogatory

14  insults about the state regulators with them, correct?

15  A.  This email appears to be sharing a -- calling names to

16  opposing counsel from the states, correct.

17  Q.  And I'm not going to offer it, but I mean, it's very harsh,

18  correct?

19  A.  It was unflattering and -- yes, correct.

20  Q.  You didn't share emails like that with, say, Don Brady or

21  Lee Ickes, did you?

22  A.  This particular email, no.

23  Q.  Emails like this; you didn't reach out to Lee Ickes to

24  suggest terrible things about the state regulators, did you?

25  A.  I may have.

1    Q.  Of the same -- let me ask you about Troy Little Axe,

2    specifically, since he testified here.  Did you share things

3    like this with Mr. Little Axe?

4    A.  When you say things like this --

5              MR. SCOTTEN:  Your Honor, the government offers 4135.

6              MR. ROTH:  Objection.

7              MR. SCOTTEN:  We should show it to the judge.

8              MR. GINSBERG:  I have an objection, your Honor, and I

9    would like to approach.

10             THE COURT:  No.  I'm going to sustain the objection

11   under 403.

12             MR. GINSBERG:  Thank you.

13   BY MR. SCOTTEN:

14   Q.  Without getting into exactly what's in there, my question

15   is, you didn't issue these sort of insults, you didn't trade

16   these around with your tribal clients; you were closer with the

17   men at this table, correct?

18   A.  Because -- well, I'm not sure.  I would maybe have had

19   discussions with my clients and Mr. Little Axe that may have

20   been -- you know, we would often discuss the litigation and --

21   but this one I did not, it appears.

22   Q.  I want to ask you about Mr. Tucker's first encounter, and

23   I'm backing up in time a little bit here to when you first came

24   on.  You understood you were replacing an attorney named --

25   well, withdrawn.

1    There was an attorney named Clifford Cohen in the case on

2    this matter before you, correct?

3    A.  Not on a case.  I did know Mr. Cohen was an attorney who

4    represented Mr. Tucker when I first was introduced to

5    Mr. Tucker.

6    Q.  And he at some point left, correct?

7    A.  I don't know what happened to him.  My communications with

8    Mr. Cohen were fairly brief in duration.

9    Q.  Is it fair to say that he did not take as aggressive a view

10   of the law as you?

11   A.  I would not know, because I did not really have any

12   extended conversations with Mr. Cohen.

13   Q.  Is it fair to say that you yourself had a very aggressive

14   view of the law?

15   A.  I aggressively represent my clients.

16   Q.  In terms of your legal representation, is it fair to say

17   you take positions that may not be in accordance with current

18   law but seek a change in the law?

19   A.  We do our best to advise our clients within the bounds of

20   the law as it exists.

21   Q.  Well, have you not bragged to Mr. Tucker and Mr. Muir about

22   your aggressiveness?

23   A.  I may -- I may have.

24            MR. SCOTTEN:  Your Honor, the government offers --

25   Q.  Let me show you 4104.  It's a single page.

1          Is this another email between you and Mr. Tucker and

2     Mr. Muir, and with Mr. Morgan copied?

3     A.  It is.

4               MR. SCOTTEN:  Your Honor, the government offers 4104.

5               MR. ROTH:  I'm trying to read it on the screen.

6               MR. GINSBERG:  Objection, your Honor.

7               THE COURT:  Basis.

8               MR. GINSBERG:  I think it would be inappropriate for

9     me to state it in front of the jury.  I mean, with all due

10    respect, it's 5:00, and I think this is going to go on for a

11    while.

12              THE COURT:  All right.  I'll take that suggestion.

13              Ladies and gentlemen, please do not discuss the case

14    among yourselves or with anyone.  We'll be back in action

15    tomorrow at 10:00 --

16              JUROR:  We'll be riding, yes.

17              THE COURT:  What?  What did you say?

18              Oh, OK.  See you tomorrow morning.  Let's hope the

19    good weather remains, and everybody stay healthy and happy.

20              And you don't have a game until Thursday night, right?

21              JUROR:  Tomorrow.

22              THE COURT:  Tomorrow, so that's Thursday.  It's a

23    nighttime game?  Nighttime game, right?

24              JUROR:  I honestly don't know.

25              THE COURT:  All right.

1           (Jury not present)

2           THE COURT:  And you may step down.

3           MR. SCOTTEN:  Your Honor, I think this is routine.  I

4    assume the witness may not speak with counsel while on

5    cross-examination.

6           THE COURT:  Yes.  There is a sequester.

7           Mr. Schulte, while you're on cross-examination, you

8    may not discuss the case or your testimony with counsel for

9    Mr. Tucker or Mr. Muir.  Do you understand that?

10          THE WITNESS:  I understand, your Honor.

11          THE COURT:  And counsel are under the same direction.

12   Thank you.

13          THE WITNESS:  Thank you.

14          (Witness not present)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  So let me hear, Mr. Ginsberg.

2          MR. GINSBERG:  I am taking a minute so I articulate

3     this properly.

4          To begin with, I didn't at least begin objecting to

5     this series of exhibits because although they were in

6     relativity discovery, the government chose not to put it on the

7     government exhibit list, nor did they choose to give it to us

8     until they were showing it to the witness.  So until the

9     questions were being put to the witness and we saw the

10    document, I didn't begin to recognize the direction they were

11    going in.

12         It seems to me that they are attempting to do a few

13    things and some of which cross the line, in my view at least.

14    Your Honor sustained an objection on 403 grounds, but I think

15    that was like a one-off because of the nature of the language.

16    It appears to me that what they are doing is attacking this

17    witness's credibility by showing bias and things of that

18    nature.  However, the way that they are going about doing it is

19    by introducing things that I thought were not permitted to be

20    the subject of this case; and that is, they are now attacking

21    him, for example, the last series of documents and questions,

22    about his aggressiveness, the difference of his attitude about

23    dealing with the law versus Cliff Cohen, about him being a more

24    aggressive lawyer, about Scott Tucker wanting to have a more

25    aggressive lawyer, that whole line of questioning with all

1    those documents.

2        There is an explanation for why he is a more

3    aggressive lawyer, and how he practices law in a more

4    aggressive way, and that's something which there were documents

5    earlier, which I am not sure if your Honor specifically ruled

6    on them or we didn't try to get them in completely because it

7    begins to talk about the aggressive nature of the practice of

8    this firm, and other individuals' aggressive position -- that

9    is, some of the tribal members -- vis-a-vis the government.

10   And the government here is now attacking this witness because

11   he has an aggressiveness, which arises from his hostility

12   towards the government, and it spills over into the way he

13   practices law.

14       In order to defend against that and to show that it is

15   not an improper, illegal way of practicing law, but it's

16   aggressive because in order to defend Native American tribes

17   and let them have businesses and make money and have

18   opportunities, a lawyer has to push regulatory agencies and the

19   government very hard because of the history that goes along

20   with it, and I don't think I need to go into all of that, I

21   think it's sort of a given.  And the government has opened that

22   door now, along with other things they have opened the door to,

23   with the checks being signed by Mr. Tucker, who had the

24   authority to sign the checks, who was an employee of AMG.

25       I know what they are trying to show, I understand

that, but by doing it the way they are doing it, they have now

opened, in my view, all kinds of doors that were previously

closed, particularly the last piece.  I want to think overnight

about some of the other things, but this last piece I think

gives us the opportunity now to have this witness, on redirect

examination, testify about what he means when he talks about

aggressive, why he was aggressive, how he was aggressive.  All

of those things I think are now fair game, because if you're

going to undermine him and attack him and try to make him look

like he is acting improperly as a lawyer, or unethically as a

lawyer, because he has this bias, but there is a legitimate

reason that is not something that's illegal, we should now be

able to do it.

Just the small separate little piece, maybe there is

no obligation to have put on the list that we get every day or

given us this morning these series of documents.  Maybe they

could have handed it to us before cross.  They decided not to.

OK.  We are doing it on the fly.  We are looking at the

documents.  As your Honor knows, there were millions of

documents.  We may have seen them before, and we are dealing

with them as we see them now.  So I am adding into the

equation, not to complain, but just to explain to your Honor

why my objection came a little late, and I am now piecing this

together for the Court.

So I think this shouldn't be allowed.  I think it

1    crossed over lines that were sort of set by the Court.  But if

2    the government has now chosen to do this, I believe the door is

3    open for us to go back on redirect and have this all explained

4    by the witness.

5         THE COURT:  Well, I am always happy to hear from you,

6    Mr. Ginsberg.  I thought I was going to hear the basis for the

7    objection to Government Exhibit 4104.

8         MR. GINSBERG:  I think what it's doing is it's taking

9    this aggressiveness issue and it's making it into a 403 issue.

10   It's beginning to go way past some relationship with Mr.

11   Tucker.  I know they want to undermine it, but they are doing

12   it document after document after document.  But now getting

13   into his aggressiveness and his mode and method of practicing

14   and so forth I think goes past where it goes.  So I object to

15   this document for that reason.  And I am sorry I sort of did it

16   in reverse order, but that's what I have to say.

17        THE COURT:  As to this document, I sustained the

18   objection because I do believe the probative value of this

19   document is substantially outweighed by the danger of jury

20   confusion.  My ruling is limited to this document.

21        Now, Mr. Roth, you had something you wanted to raise

22   with me?

23        MR. ROTH:  Yes, your Honor.  In part, it segues into

24   what Mr. Ginsberg just said.  It's in respect to the proposed

25   testimony of Lance Morgan.  We wanted to be sure, your Honor,

HA48TUC7

1  of the scope of the testimony that you would permit him to

2  offer at this point.

3          Mr. Morgan is a partner of Mr. Schulte's firm.  He

4  specializes in particularly Native American development,

5  economic development; he has his own company which does that,

6  employs a thousand people.  We would be offering his testimony

7  specifically in regard to the CLK/AMG merger and the fact that

8  that merger idea came from the Native Americans, the tribes,

9  not from Mr. Tucker, as was testified to by one of the

10  government witnesses in this case, to rebut that.

11          THE COURT:  Why wouldn't that be hearsay?

12          MR. ROTH:  It's Morgan himself, Judge.  He is the one

13  who conceived the plan, communicated it to Mr. Tucker.  It

14  affects Mr. Tucker's state of mind.  He can talk about it

15  himself.  It's his plan.

16          THE COURT:  I understand.  Let me hear from the

17  government.

18          MR. SCOTTEN:  Your Honor, my understanding is this is

19  going to be an attorney, Mr. Morgan, suggesting advice he gave

20  to Mr. Tucker mid-conduct.  As we have said, we have no

21  objection to Mr. Morgan's factual testimony.  I am not sure an

22  allegation has been made as to who carried the plan from who to

23  who, but assuming it's somehow relevant, if Mr. Morgan wants to

24  say, I took the plan and carried it down to Miami, or Miami

25  gave me the plan and I carried it to Tucker, we have no

1    objection.  I do think what is being proffered is Mr. Morgan is

2    going to explain, I came up with this idea, I counseled Tucker

3    on it, I explained to him why it would be a good idea, based on

4    my expertise as a tribal lawyer.

5              THE COURT:  I don't feel I need to apologize for the

6    following question that I am going to ask, which is whose

7    lawyer does Mr. Morgan think he was when he was having this

8    conversation with Mr. Tucker?  I think it's a very fair

9    question to ask, based on the testimony I have been hearing in

10   this case.

11             So, Mr. Roth, I put that question to you.

12             MR. ROTH:  Judge, he would testify that he was not Mr.

13   Tucker's lawyer, he was the tribe's lawyer at that point.

14             THE COURT:  I note the consultation on the record.

15             There is nothing inappropriate with the consultation,

16   but it seems to me that --

17             MR. ROTH:  He gave the advice directly to Mr. Tucker

18   and Mr. Muir.

19             THE COURT:  He is advising them or he is not advising

20   them?

21             MR. ROTH:  He gave the advice to them.

22             THE COURT:  So he is acting as their lawyer?

23             MR. ROTH:  Yes.

24             THE COURT:  So now you're changing the position you

25   just gave me a second ago.  Is that right?

1          MR. ROTH:  Yes.

2          MR. SCOTTEN:  For what it's worth, your Honor --

3          THE COURT:  This is not a criticism of you, Mr. Roth.

4    Lawyers are advocates for parties, and we as lawyers, or you as

5    lawyers, only know what you're told.  But I find it astounding.

6          MR. SCOTTEN:  Your Honor, we don't dispute that.  That

7    is our understanding, that Mr. Morgan was, in some sense,

8    acting as Tucker's counsel.  The issue is the timing issue the

9    Court has ruled on.  This is 2006.  In fact, if the evidence

10   came in, it's expressly formed in a litigation defense mode.

11   Colorado is suing us, here is some things we can do to fight

12   them off.  That's not an advice of counsel defense.

13         THE COURT:  How do you get around that?

14         MR. ROTH:  We are not offering it for advice of

15   counsel.

16         THE COURT:  So this is not advice of counsel.  This is

17   what then?

18         MR. ROTH:  It's directly to contradict the

19   government's theory that these corporations were formed as part

20   of this sham, that this is part of the fraud that they are

21   asserting.  And their witness said specifically this was

22   suggesting that this came from Mr. Tucker as a principal actor

23   in promoting this sham operation.

24         THE COURT:  I took the gist of what you said at the

25   outset that this came up from Mr. Morgan as an idea to benefit

1    the tribe.

2         MR. ROTH:  Judge, as everything else and the testimony

3    you just heard, it's mutually beneficial.  That's part of the

4    evidence that we want to go through, elicit through Mr. Morgan,

5    who knows about the benefits to the tribe, in this

6    relationship.

7         The government has been portraying that the tribe is

8    being abused by Mr. Tucker by this 99 to 1.

9         THE COURT:  Mr. Morgan in this conversation has a duty

10   of loyalty, a fiduciary duty to act in the best interests of

11   his client.  And now I hear his client is not the tribe, his

12   client is Mr. Tucker.  And if Mr. Tucker is his client, why is

13   he advising this?

14        MR. ROTH:  Judge, we were discussing whether or not

15   there was a joint defense agreement in place at that particular

16   time in 2006 between counsel.

17        THE COURT:  OK.  And?

18        MR. ROTH:  I would have to confirm with Mr. Morgan.

19        THE COURT:  Listen, I want to be very clear, honestly.

20   I am not into abusing people's schedules.  The first I ever

21   heard that Mr. Morgan has been here for five days was, I think,

22   coming back from the last break.  I have done nothing at all to

23   trample on somebody's schedule.  That's not my idea of a good

24   time, and I don't do that.  But based on this discussion, I

25   haven't a clue on how I am going to rule.  I really don't.

1    Again, this is not directed to you as a lawyer, Mr. Roth, but

2    how this has unfolded is a bit breathtaking to me, but that's

3    all right.

4              So I will see you tomorrow at 10:00.

5              MR. SCOTTEN:  Thank you, your Honor.

6              MR. GINSBERG:  Do you intend to have a charge

7    conference if we finish testimony tomorrow?

8              THE COURT:  Well, yes, if we do, we will.  If you are

9    resting -- if Defendant Tucker is resting tomorrow.

10             MR. GINSBERG:  Conceivably, we might rest tomorrow.

11             THE COURT:  That's the question I asked.  If Defendant

12   Tucker is resting tomorrow, and the only thing open is the

13   testimony of Mr. Muir, yes, we can take up the charge tomorrow,

14   and we will work off of Court Exhibit 13.  All right.

15             Thanks very much.  Have a great evening.

16             (Adjourned to October 5, 2017, at 10:00 a.m.)

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2     Examination of:                         Page

3     CLIFFORD COHEN

4     Cross By Mr. Scotten . . . . . . . . . . . .2230

5     Cross By Mr. Bath . . . . . . . . . . . .2251

6     Redirect By Mr. Roth . . . . . . . . . . . .2253

7     CONLY JOHN SCHULTE

8     Direct By Mr. Roth . . . . . . . . . . . . .2256

9     Direct By Mr. Bath . . . . . . . . . . . . .2349

10    Cross By Mr. Scotten . . . . . . . . . . . .2372

11                   GOVERNMENT EXHIBITS

12    Exhibit No.                          Received

13      4073    . . . . . . . . . . . . . . . . . .2232

14      1013    . . . . . . . . . . . . . . . . . .2352

15      4116    . . . . . . . . . . . . . . . . . .2388

16      4122    . . . . . . . . . . . . . . . . . .2392

17      4117    . . . . . . . . . . . . . . . . . .2400

18      4131    . . . . . . . . . . . . . . . . . .2402

19      4133    . . . . . . . . . . . . . . . . . .2405

20      4114    . . . . . . . . . . . . . . . . . .2410

21      4136    . . . . . . . . . . . . . . . . . .2418

22                   DEFENDANT EXHIBITS

23    Exhibit No.                          Received

24      159   . . . . . . . . . . . . . . . . . . .2236

25      151   . . . . . . . . . . . . . . . . . . .2247

1    D304  . . . . . . . . . . . . . . . . .2271

2    407   . . . . . . . . . . . . . . . . .2275

3    D312  . . . . . . . . . . . . . . . . .2278

4    D409  . . . . . . . . . . . . . . . . .2279

5    D301  . . . . . . . . . . . . . . . . .2297

6    D345  . . . . . . . . . . . . . . . . .2315

7    D346  . . . . . . . . . . . . . . . . .2316

8    D753  . . . . . . . . . . . . . . . . .2325

9    2022  . . . . . . . . . . . . . . . . .2326

10   2023  . . . . . . . . . . . . . . . . .2327

11   2025  . . . . . . . . . . . . . . . . .2328

12   367   . . . . . . . . . . . . . . . . .2341

13   1112  . . . . . . . . . . . . . . . . .2354

14   2811  . . . . . . . . . . . . . . . . .2368

15

16

17

18

19

20

21

22

23

24

25