Ha5Wtuc1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

   v.       16 Cr. 91 (PKC)

SCOTT TUCKER and
TIMOTHY MUIR,      Trial

    Defendants.

------------------------------x

         New York, N.Y.
         October 5, 2017
         10:00 a.m.


Before:

     HON. P. KEVIN CASTEL

         District Judge
          and a jury
      APPEARANCES

JOON H. KIM
  Acting United States Attorney for the
  Southern District of New York
BY: NIKETH V. VELAMOOR
  HAGAN C. SCOTTEN
  SAGAR K. RAVI
  Assistant United States Attorneys

FREEMAN NOOTER & GINSBERG
  Attorneys for Defendant Tucker
BY: LEE A. GINSBERG
  NADJIA LIMANI
   -and-
STAMPUR & ROTH
BY: JAMES M. ROTH

BATH & EDMONDS, P.A.
  Attorneys for Defendant Muir
BY: THOMAS J. BATH
   -and-
BEVERLY VAN NESS

Ha5Wtuc1

1        (Trial resumed)

2        THE COURT:  Please be seated.  We have an issue we

3   have to address.

4        Madam Deputy, please recount the telephone

5   conversation that you had this morning.

6        THE DEPUTY CLERK:  Juror No. 6 called up and said that

7   there is starting to be a problem with this, and he said

8   there's -- one of the jurors is drinking rum in the jury room.

9   He said, but now the juror is putting it into a water bottle

10  and bringing it into the courtroom, and he doesn't want it to

11  affect anything, so -- he feels like it's starting to be a

12  problem.

13        That's what he said.

14        THE COURT:  All right.  This is what I propose to do,

15  and I want to hear from everybody.  This is the reason why I'm

16  letting it out.  You may have a better idea or you may have an

17  objection to my idea.

18        What I propose to do is call in four jurors.  One of

19  them will be juror No. 6, and the other three I'd be happy to

20  hear from you all if you have any preferences, but the idea is

21  to have a number that, in effect, gives juror No. 6 some degree

22  of anonymity in this regard with regard to his fellow jurors.

23  But I would question all four of them, because we'll get what

24  juror No. 6 has to say and we'll get what these three other

25  jurors have to say.

Ha5Wtuc1

1          At that point I will have some basis to say either the

2     allegation has support to it, the allegation does not have

3     support to it, or I need further inquiry on the subject.  If I

4     were to conclude that the allegation had support to it, I

5     believe that it would be proper at that point to question the

6     juror, who I would hope at this point would have been

7     identified, give him an opportunity to be heard, and then hear

8     from you as to what action to take.

9          That's what I propose to do, and that's why I raise it

10     with you.  I'll hear the government's position.

11          MR. VELAMOOR:  That's fine with the government, your

12     Honor.

13          THE COURT:  I'll hear Mr. Tucker's position.

14          MR. GINSBERG:  It's fine with us.  Maybe this is too

15     obvious, but of the four jurors, are you going to call them one

16     by one?

17          THE COURT:  No, I'm not going to do that.  I'll have

18     them sit in the box and then we'll do the questioning at the

19     sidebar.

20          MR. GINSBERG:  Oh, OK, yes.  That's all.  I just

21     wanted to know if they'd be segregated; it won't be like one

22     person will speak and the others will hear it.

23          THE COURT:  No.  We'll do all the questioning of

24     everybody at the sidebar, the jurors are used to that from the

25     voir dire process, and the others will sit over there.  We'll

Ha5Wtuc1

1    have the white noise on.  But by calling four right from the

2    get-go, then there will not be suspicion as to who is who.

3              MR. GINSBERG:  I'm fine with that.

4              THE COURT:  All right.

5              MR. BATH:  Judge, just so I understand, the juror who

6    is allegedly engaged in this conduct has not been identified?

7              THE COURT:  Correct.

8              MR. BATH:  So we might randomly get that juror.

9              THE COURT:  We might randomly get that juror.

10             MR. BATH:  We have no objection to that process.

11             THE COURT:  And that's just the reality.  I was going

12   to propose juror No. 1, juror No. 6.

13             Does the government want to pick one?  I'll tell you

14   what.  Why don't I let you all pick.  Or do you want me to

15   pick?

16             MR. SCOTTEN:  I think it would be fairer if the Court

17   picks.

18             MR. GINSBERG:  You can pick.  I don't think we have a

19   problem with that.

20             THE DEPUTY CLERK:  They're not all here yet.

21             MR. GINSBERG:  The only suggestion I would make about

22   picking is we did have that one note from that one juror who

23   seemed to be paying acute attention to everything when she

24   wrote the note.

25             THE COURT:  That was juror number?

Ha5Wtuc1

1    MR. GINSBERG:  11, I believe.  She's probably someone

2    who is really paying attention.

3    THE COURT:  I'm very open-minded.  I'm going to call

4    jurors 1, 6, 9 and 11.  Again, after hearing from the first

5    four, there may be further inquiry.  We'll see how it goes.

6    MR. GINSBERG:  Given the comment that you made earlier

7    at the sidebar, should we just have one from Mr. Tucker's team,

8    Mr. Bath and two from the government, so the jurors don't

9    feel --

10    THE COURT:  I think that's wise.  We don't want the

11    jurors to feel intimidated.  I want you to be in hearing

12    distance, but I will be right in front of the juror with the

13    court reporter and you'll be able to hear it all.

14    MR. GINSBERG:  Yes, your Honor.

15    THE COURT:  And then if there is some follow-up after

16    they return to the jury box, you can tell me what that is and

17    we'll see whether it's appropriate.

18    MR. GINSBERG:  Yes, your Honor.

19    THE COURT:  Where do we stand with the jury?

20    THE DEPUTY CLERK:  They're here.

21    THE COURT:  Go in the jury room and have them all come

22    at once.  Do you understand, Flo?

23    THE DEPUTY CLERK:  Yes.

24    (Jurors present)

25    THE COURT:  Please be seated.  Good morning, ladies

Ha5Wtuc1

1    and gentlemen.

2              This is a routine matter that happens in the course of

3    a trial.  There are some questions that I'm going to be asking

4    of jurors.  I'm starting with the four of you that I pretty

5    much just picked.  We're going to set up at the sidebar.

6              Nothing to worry about.  Nothing to worry about, so

7    please be nice and relaxed.  And you understand that the oath

8    that was administered to you during the voir dire questioning

9    still remains in force and effect.  I'll take you in numerical

10   order, and I just have a few questions to ask.

11             Carol, if you could set up at the sidebar, and the

12   lawyers can come to the sidebar.

13             (At sidebar; juror No. 1 present)

14             THE COURT:  How are you?

15             JUROR:  Good.  Thanks.

16             THE COURT:  I'm just going to ask you some questions.

17   Don't read anything into the questions.

18             Are you aware, have you observed any of your fellow

19   jurors drinking what you believe is an alcoholic beverage in

20   the jury room or in the courtroom?

21             JUROR:  Yes.

22             THE COURT:  That's the question.

23             JUROR:  Yes.

24             THE COURT:  Yes, OK.  And can you tell me which juror

25   that is?

1          JUROR:  I don't know the number.  I think --

2          THE COURT:  If you know the name or the first name, we

3     can look it up.

4          JUROR:  Ysrael.

5          THE COURT:  Who?

6          JUROR:  Ysrael.

7          THE COURT:  Ysrael.  OK.  Did he appear intoxicated to

8     you at any point?

9          JUROR:  No.

10         THE COURT:  OK.  And did he take the bottle out in

11    plain view of everybody?

12         JUROR:  Yes.

13         THE COURT:  All right.  Thank you very much.  You can

14    return to your seat.

15         JUROR:  OK.

16         THE COURT:  Thank you.

17         (Juror No. 6 present)

18         THE COURT:  Hi.

19         JUROR:  Hi.

20         THE COURT:  I have really only one or two questions.

21         During the course of the trial, have you observed any

22    of your fellow jurors drinking or consuming what you believed

23    to be an alcoholic beverage, either in the jury room or the

24    courtroom?

25         JUROR:  Yes.

1          THE COURT:  And which juror was that?

2          JUROR:  3.

3          THE COURT:  3.  And his first name, do you know?

4          JUROR:  Ysrael.

5          THE COURT:  All right.  Did he appear to you at any

6    time to be intoxicated?

7          JUROR:  Yesterday was the only day I've seen him doing

8    it, so -- I mean, he made an outburst at the end, when we

9    finished the trial.  He said something stupid, so I don't know.

10         THE COURT:  All right.  And yesterday was the first

11   time you observed this?

12         JUROR:  Uh-huh.  Yes.

13         THE COURT:  Thank you.  Thank you very much.

14         (Juror No. 9 present)

15         THE COURT:  Hi.  I have just one or two questions, so

16   be nice and relaxed.  Don't worry about anything.

17             In the course of the trial, have you observed any of

18   your fellow jurors consuming or drinking what you believed was

19   an alcoholic beverage, either in the jury room or in the

20   courtroom?

21         JUROR:  I think that someone took something in there.

22         THE COURT:  All right.

23         JUROR:  And that they were drinking something.

24         THE COURT:  Pardon me?

25         JUROR:  Someone took something in there, I think.

Ha5Wtuc1

1          THE COURT:  All right.

2          JUROR:  But I don't know what nature it is.  But I

3     took different seat, so every day someone take something

4     different, so -- someone different.

5          THE COURT:  Do you remember which juror it was?

6          JUROR:  That took it in?

7          THE COURT:  Yes.

8          JUROR:  I think Cece.  The name is Cece.

9          THE COURT:  The last name or the first name?

10          JUROR:  First name.  Sissy, Cicely, something like

11     that.

12          THE COURT:  All right.

13          JUROR:  I think she -- I don't know if it's a drink or

14     something, but it's something.

15          THE COURT:  Well, what did it look like to you?

16          JUROR:  It was a bottle.

17          THE COURT:  All right.  What kind of a bottle?

18          JUROR:  It was transparent.

19          THE COURT:  Right.  It was a clear liquid?

20          JUROR:  Clear liquid, yeah.

21          THE COURT:  And did it look like it was --

22          JUROR:  I did not look at it.  I just know that she

23     said she took it in there, and I saw the bottle.  But I

24     didn't --

25          THE COURT:  Say it again.

Ha5Wtuc1

1          JUROR:  She said that she took it in there, but I

2    didn't pay it no mind.  But I know it was a bottle with some

3    writings on it.

4          THE COURT:  Did you believe it to be alcohol?

5          JUROR:  I don't know.  It could be, but I think she

6    said she take it from her country, from Dominica, Dominican

7    Republic.

8          THE COURT:  OK.

9          JUROR:  Or something like that.  Some kind of a thing

10   that they drink there.

11         THE COURT:  Pardon me?

12         JUROR:  Something that they drink in that country.

13         THE COURT:  All right.  Did you observe her exhibiting

14   signs of drinking alcohol?

15         JUROR:  No.  Nobody, no.

16         THE COURT:  All right.  And you didn't see any other

17   juror consuming --

18         JUROR:  No.

19         THE COURT:  -- alcohol?

20         JUROR:  No.  But the bottle wasn't open.

21         THE COURT:  Oh, the bottle that you saw wasn't open.

22         JUROR:  No.

23         THE COURT:  OK.  Thank you very much.  You can return

24   to the jury box.

25         (Juror No. 11 present)

Ha5Wtuc1

1          THE COURT:  Hi.  Juror No. 11.

2          JUROR:  Yes.

3          THE COURT:  I just have one or two pretty

4    straightforward questions.  Have you seen any of your fellow

5    jurors consume what you believed to be an alcoholic beverage in

6    the jury room or in the courtroom during the course of this

7    trial?

8          JUROR:  Yes.

9          THE COURT:  And what did you see and who did you see?

10          JUROR:  I saw someone put alcohol in their juice

11    drink, and they brought it into the court.  Ysrael is the

12    person.

13          THE COURT:  OK.  Did he appear intoxicated to you?

14          JUROR:  No.

15          THE COURT:  OK.

16          JUROR:  He did it in the afternoon, so I don't know.

17          THE COURT:  All right.  And how many times did you see

18    him do it?

19          JUROR:  Just once.  Someone brought in a bottle from

20    the Dominican to give him.

21          THE COURT:  I see.

22          JUROR:  And he just poured a few -- a shot into it,

23    the juice.

24          THE COURT:  Did you see any other juror drinking any?

25          JUROR:  No.  No one.

1          THE COURT:  Thank you very much.  Do you know who

2    brought in the bottle?

3          JUROR:  I think her name is Nuria.

4          THE COURT:  I'm sorry?

5          JUROR:  Nuria.

6          THE COURT:  Urea?

7          JUROR:  Nuria.  N-U-R-I-A.

8          THE COURT:  Say the first --

9          JUROR:  N as in Nancy.

10          THE COURT:  All right.

11          Flo.

12          JUROR:  She just brought it as a gift.  I think she

13    said her mother had brought it from the Dominican.

14          THE DEPUTY CLERK:  What's her last name?

15          JUROR:  I don't know anyone's last name.

16          THE DEPUTY CLERK:  That's the first name?

17          JUROR:  That's the first name.  17, I think.

18          THE COURT:  OK.

19          JUROR:  Now, I might have them confused, the last two.

20    I think it's Nuria or Cecilia.

21          THE COURT:  All right.  Thanks very much.

22          (In open court)

23          THE COURT:  Ladies and gentlemen, I'm going to ask you

24    to return to the jury room.  Actually, I think I'll have you

25    stay out here.  It's probably a better plan, so stay here.  Let

Ha5Wtuc1

1  me talk to the lawyers for a second.

2         (At sidebar)

3         THE COURT:  I think for prudence' sake, I'd next like

4  to have both Cecilia and Nuria in.  We'll talk to them, and

5  then finally, we'll talk to No. 3.

6         Any thoughts?

7         MR. VELAMOOR:  That seems right to us.

8         THE COURT:  OK.  Bring them in, the two of them.

9         (At sidebar)

10        THE COURT:  Nuria, come on down.

11        (Juror No. 17 present)

12        THE COURT:  Hi.

13        JUROR:  Hi.

14        THE COURT:  Nuria, what's your last name?

15        JUROR:  Cornielle.

16        MR. SCOTTEN:  Your Honor, mind if we switch on the

17  white noise?

18        THE COURT:  Thank you.

19        I just have a couple of questions, and I have to tell

20  you that you're still under the same oath you were when I

21  questioned in voir dire.

22        Have you observed any of your fellow jurors drinking

23  or consuming any alcoholic beverage in the jury room or in the

24  courtroom?

25        JUROR:  Yes, I did.

1             THE COURT:  And tell me about that.

2             JUROR:  Well, somebody brought a bottle from my

3     country, and she just gave it to him.

4             THE COURT:  Gave it to this one juror?

5             JUROR:  Yeah, but to take it home.

6             THE COURT:  To take it home?

7             JUROR:  Yeah.  He just opened it.

8             THE COURT:  And which juror was this?

9             JUROR:  Ysrael.

10            THE COURT:  And you didn't bring the bottle, did you?

11            JUROR:  No.

12            THE COURT:  And you didn't have any of it?

13            JUROR:  No.

14            THE COURT:  And the juror who brought the bottle in

15    was?

16            JUROR:  Cecilia.

17            THE COURT:  OK.  Thank you very much.  You can return

18    to your seat.

19            Cecilia.

20            (Juror No. 18 present)

21            JUROR:  Good morning.

22            THE COURT:  Excuse me a second.

23            Hi, Cecilia.  How are you?

24            JUROR:  Good.

25            THE COURT:  Your last name is?

1          JUROR:  Rosa.

2          THE COURT:  And you're still under oath from the voir

3    dire we conducted a couple of weeks ago.

4          Just a few simple questions.  Have you seen or

5    observed any of your fellow jurors drink or consume any

6    alcoholic beverage, either in the jury room or in the

7    courtroom?

8          JUROR:  No.

9          THE COURT:  All right.  Did you or any other juror

10   bring a bottle that contained an alcoholic beverage into the

11   jury room?

12         JUROR:  No.

13         THE COURT:  All right.  Thank you very much.  You can

14   return to your seat.

15         JUROR:  OK.

16         THE COURT:  There's another juror?  Come over here,

17   Madam Deputy, and just state it on the record.

18         THE DEPUTY CLERK:  Kelcey McCarthy.  Kelcey?

19         THE COURT:  What juror number is that?

20         THE DEPUTY CLERK:  She's 15.

21         THE COURT:  OK.  Bring her in.

22         (Juror No. 15 present)

23         THE COURT:  How are you?

24         JUROR:  OK.

25         THE COURT:  Just relax.  Now, I've told every juror

1  this, so I'm going to say the same thing to you, that the oath

2  that I gave you during questioning still applies here.

3          JUROR:  OK.

4          THE COURT:  Your full name is?

5          JUROR:  Kelcey McCarthy.

6          THE COURT:  OK.  Did you observe any juror consuming

7  or drinking any alcoholic beverage in the jury room?

8          JUROR:  Uh-huh.

9          THE COURT:  You have to say it in words.

10          JUROR:  Yes.

11          THE COURT:  And what did you observe?

12          JUROR:  Some rum.

13          THE COURT:  OK.

14          JUROR:  Poured into coffee.

15          THE COURT:  Which juror was this?

16          JUROR:  Ysrael.

17          THE COURT:  I'm sorry?

18          JUROR:  I don't know his name -- Ysrael.

19          THE COURT:  You don't know his first name?

20          JUROR:  Ysrael.

21          THE COURT:  Oh, Ysrael.  I see.  Come a little closer.

22  I won't bite, I promise.

23          Now, do you know who brought the beverage in?

24          JUROR:  No.

25          THE COURT:  OK.  Thank you very much.  Did he appear

Ha5Wtuc1

1    intoxicated to you?

2              JUROR:  No.

3              THE COURT:  OK.  Thanks very much.  You can just have

4    a seat in the jury box.

5              (Jurors not present)

6              THE COURT:  At this stage what I propose to do is

7    bring in Ysrael and see what we find out.  Is there agreement

8    that if, at the conclusion, I conclude he's consuming alcoholic

9    beverages in the jury room or the courtroom that I should

10   excuse him?  It's not necessarily an obvious question, because

11   no juror has said he was intoxicated.  It sounds like this just

12   happened.  But I think the thing to do is for me to question

13   him and then we can make up our minds.  OK?

14             MR. VELAMOOR:  Yes, your Honor.

15             MR. GINSBERG:  Yes.

16             MR. BATH:  Yes.

17             THE COURT:  Bring him in.

18             (Juror No. 3 present)

19             THE COURT:  Hi, how are you?

20             JUROR:  Good.

21             THE COURT:  Your name is.

22             JUROR:  Ysrael Ventura.

23             THE COURT:  OK.  The oath that I gave everybody at the

24   beginning of the case, all the jurors, applies to you now.  OK?

25             Just a few simple questions.  Have you or any other

Ha5Wtuc1

1   juror that you've observed consumed what was or what appeared

2   to be any alcoholic beverages in the course of the trial,

3   either in the jury room or in the courtroom?

4           JUROR:  I did, yesterday.

5           THE COURT:  OK.

6           JUROR:  Yeah.

7           THE COURT:  And tell me about that.

8           JUROR:  It was -- another juror brought a bottle for,

9   for me to take it home.

10          THE COURT:  Right.

11          JUROR:  And then I pour a little bit in the coffee.

12          THE COURT:  All right.

13          JUROR:  Yeah.

14          THE COURT:  Did you observe any other juror taking

15  any?

16          JUROR:  No, no.

17          THE COURT:  And how much did you pour in?

18          JUROR:  Just a little bit.  In the coffee, in the

19  morning.

20          THE COURT:  In the morning?

21          JUROR:  Yeah.

22          THE COURT:  And which juror brought in the bottle?

23          JUROR:  It was -- I forgot her name.  Cecilia.

24          THE COURT:  Cecilia?

25          JUROR:  I think, yeah.

Ha5Wtuc1

1          THE COURT:  All right.  And why did she bring the

2     bottle in?

3          JUROR:  Because she just said she had three at home,

4     and she just wanted to give me one.

5          THE COURT:  Right.

6          JUROR:  So I can take it home.

7          THE COURT:  All right.

8          JUROR:  Yeah.

9          THE COURT:  Let me ask you, did you observe any other

10    jurors having any?

11         JUROR:  No.

12         THE COURT:  Anything to drink?

13         JUROR:  No.

14         THE COURT:  OK.  Well, I have to tell you that you

15    can't drink alcoholic beverages.

16         JUROR:  Yes, OK.

17         THE COURT:  Why don't you return to your seat in the

18    jury box.  OK?

19              (Juror not present)

20         THE COURT:  I'm going to call Cecilia back.

21         MR. VELAMOOR:  So we're clear, the Cecilia we called

22    was the only Cecilia?

23         THE COURT:  We had another name that sounded like

24    Cecilia, but it was Kelcey or something like that.

25              That's all we have, right?  Is that correct?

Ha5Wtuc1

1          THE DEPUTY CLERK:  There's only one Cecilia.

2          THE COURT:  There's only one Cecilia.

3          Cecilia, come on down.

4          (Juror No. 18 present)

5          THE COURT:  Cecilia, I know everybody has a lot on

6     their minds -- I do; it's just human nature; we all do -- and

7     at times we can forget things.  That's perfectly

8     understandable, at times.  I want you to think back.  Did you

9     bring in a bottle yesterday, one of three bottles that you had,

10    you had others at home?  Did you bring one in as a gift for one

11    of the jurors?

12          JUROR:  I brought it but not in the courthouse, and

13    that's what you asked me.  You asked me if I brought it in the

14    juror room or in the courthouse.

15          THE COURT:  Where did you bring it?

16          JUROR:  I gave it to him outside.

17          THE COURT:  All right.  And you didn't think that I

18    needed to know that when I asked you that question?

19          JUROR:  Maybe, yes.

20          THE COURT:  Pardon me?

21          JUROR:  I said yes, I didn't.  I admit that.

22          THE COURT:  And did you see him drink any of it?

23          JUROR:  No, I didn't.

24          THE COURT:  And why did you give him the bottle?

25          JUROR:  As a gift.  You know, we were talking about

Ha5Wtuc1

1   Dominican rum, and I told him that I have three bottles at

2   home, and I was, like, if you like them, I will bring you one.

3           THE COURT:  All right.  And I'm just curious, where

4   did you think he was going to keep it during the day?

5           JUROR:  No, I know he was coming in, but I don't know

6   he was going to, like, drink it.

7           THE COURT:  OK.  You can return to your seat.

8           (In open court)

9           THE COURT:  Ladies and gentlemen, I'm going to ask you

10  all to do something that's necessary, and it may be a little

11  bit difficult, but it will be as follows:

12          You're going to return to the jury room and you're

13  going to say, "We were instructed by the judge not to discuss

14  anything.  I can't talk about anything that happened in the

15  courtroom.  The judge said we can't talk about anything."

16          Can you follow that instruction?

17          OK.  Please return to the jury room.  Let me talk to

18  the lawyers.  And thank you very, very much, all of you.  Thank

19  you.

20          (Jury not present)

21          THE COURT:  You can return to your seats.  I'll give

22  defense counsel a minute to talk to their clients.

23          MR. VELAMOOR:  Judge, could we just ask, the juror we

24  just spoke to last, she's the next alternate?  She went back to

25  a seat in the top row.  I just want to make sure I understand

Ha5Wtuc1

1    from the seating.

2              THE DEPUTY CLERK:  She's the 18th juror.

3              MR. VELAMOOR:  She's the 18th juror, OK.

4              THE DEPUTY CLERK:  Yes.

5              MR. VELAMOOR:  In the back.  OK.  Thank you.

6              THE COURT:  Mr. Ginsberg, let me hear from you first.

7              MR. GINSBERG:  Your Honor, I've consulted with my

8    client and my cocounsel.  Notwithstanding some troubling

9    aspects of some of the answers, it's our view that there's been

10   no indication that any juror was in any way impaired or unable

11   to listen to or pay attention to the evidence, given what we

12   heard, and our view is that the jury should remain as is.

13             MR. BATH:  I've also consulted with Mr. Muir, and we

14   agree, Judge.

15             THE COURT:  All right.  Let me hear from the

16   government.

17             MR. VELAMOOR:  That's fine.  We take a similar

18   position with respect to that juror.  We're not seeking that

19   juror to be excluded.

20             We do have concerns about the last alternate, but

21   since that juror is the last alternate, it's not as pressing.

22   But the lack of candor with the Court with respect to that

23   juror, in our minds, presents a greater issue than what we

24   heard with respect to what we heard about the single incident

25   yesterday.

Ha5Wtuc1

1          THE COURT:  Thank you.

2          I've thought about the matter, and I'll take it first

3     with regard to juror No. 3.  It is established by his own

4     admission, and the recollections of other jurors, that he did

5     consume alcohol in the jury room.  It was the predominant view

6     that he was not impaired, although juror No. 6 said there was

7     an outburst at one point at the end of the day.  There was

8     something of a conflict as to whether it was in the morning in

9     coffee or whether it was at another point in the day.  I'm

10    going also, in part, on the conversation that my deputy had,

11    which indicated it may have been in a water bottle.

12          I think there is the possibility of embedded plain

13    error or structural error by having a juror who has consumed

14    alcohol during a jury trial and while listening to testimony on

15    a jury, and so I'm going to excuse juror No. 3.

16          With regard to juror No. 18, the last alternate, I

17    don't need to address it at this stage, because she is the last

18    alternate juror.  It took follow-up questioning, and I think

19    one would say, looking at, for example, *United States v.*

20    *Bronston*, that the juror's answer to my question was literally

21    truthful, but I would have appreciated greater candor from the

22    juror; literally truthful in the sense that she did not give

23    anybody any alcohol in the courthouse, it seems, or at least

24    taking her recounting of events.  I don't think there's

25    anything I need to do with regard to juror No. 18, but I am

Ha5Wtuc1

1    going to excuse --

2            And the gentleman's full name for the record is, Madam

3    Deputy?

4            THE DEPUTY CLERK:  Ysrael Ventura-Hiraldo.

5            THE COURT:  All right.  If you could ask that juror to

6    come into the courtroom.

7            (Juror No. 3 present)

8            THE COURT:  Come on in.  Have a seat.

9            I appreciate your being very straightforward with me

10   and being a gentleman and a man and an honest person about

11   everything.  Let me say that I understand human nature and we

12   can all make a mistake, and I accept it as that.  But what I'm

13   going to do, to avoid any problems, is I'm going to excuse you

14   from jury service in this case.  I do appreciate your being

15   here every day and being a good juror, with the exception of

16   this one instance here, which was not appropriate conduct.

17           Thank you very much.  You can return to the jury room.

18   Do you have anything inside to take?

19           JUROR:  Yes.

20           THE COURT:  OK.  Why don't you do this.  I'm going to

21   bring out the other jurors, but if you could stand over here at

22   the sidebar, and as soon as the jurors come out, then I'll let

23   you go into the jury room and get your things.

24           Flo, should he return to the central jury room, or

25   will you take care of the paperwork?

Ha5Wtuc1

1          THE DEPUTY CLERK:  I'll take care of the paperwork.

2          THE COURT:  We'll take care of it.  Thank you very

3     much, and I appreciate your honesty and candor.  Why don't you

4     stand over here and then we'll have you go back to the jury

5     room in a moment.  Actually, why don't you stand right there,

6     and when the jurors come in, you can go into the jury room.

7          Flo, if you'll bring in the other jurors.

8          (Continued on next page)

Ha5Wtuc1

1          (Jury present)

2          THE COURT:  Thank you, ladies and gentlemen.

3   Everybody can be seated.

4    CONLY JOHN SCHULTE, resumed

5          THE COURT:  I've excused one of our jurors, and we're

6   going to reorder the seating as soon as my deputy returns, but

7   this is not anything that should enter into your thinking in

8   this case.  I want to again commend my jurors for their good,

9   loyal service in this case.

10         We are ready to proceed.

11         Mr. Scotten.

12         MR. SCOTTEN:  Thank you, your Honor.

13  DIRECT EXAMINATION CONTINUED

14  Ha5Wtuc1                    Schulte - Direct

15  BY MR. SCOTTEN:

16  Q.  Good morning, Mr. Schulte.

17  A.  Good morning.

18  Q.  I want to start with something we touched on yesterday,

19  which I asked you about 1 percent of the profits going to the

20  tribal entities.  Do you remember that?

21  A.  Yes, I do.

22  Q.  And you sort of made the point in your answer that really

23  it's gross revenues, 1 percent of gross revenues, correct?

24  A.  I believe it was 1 percent of gross collected revenues.

25  That is correct.

1    Q.  And that's an important difference, because gross collected

2    revenues would tend to be more than profits, correct?

3    A.  Well, I'm not an accountant, but that's my understanding,

4    yes.

5    Q.  So let's take an example and see if that makes sense.  MTE

6    is what you've described as one of the lenders, right?

7    A.  I'm sorry.  MTE?

8    Q.  Let's take MNE, actually.  MNE is what you've described as

9    one of the lenders, right?

10   A.  Correct.

11   Q.  So let's say that in a given month MNE gets in a million

12   dollars in collections, so a million dollars in gross collected

13   revenues.  Make sense so far?

14   A.  OK.

15   Q.  If the tribe gets 1 percent of gross collected revenues,

16   then it gets $10,000 that month, is that right?

17   A.  That's my understanding.

18   Q.  OK.  So it got 1 percent from the gross collected revenues

19   generated from MTE?

20   A.  MNE.

21   Q.  MNE.  I keep switching my example.  That's my mistake.

22   A.  Yes.

23   Q.  Now, to understand how that's different from profits, let's

24   suppose in that same month expenses were $500,000.  So profits

25   generated from MNE are $500,000 also.  500,000 for expense,

Ha5Wtuc1

1   $500,000 profit, right?

2   A.   That, that would -- that seems right.

3   Q.   So if there's $500,000 in profit generated from MNE, and

4   the tribe is only getting 1 percent profit, it would only get

5   $5,000, right?

6   A.   That seems right.

7   Q.   So because the tribe is getting 1 percent of gross

8   collected profits -- sorry, gross collected revenues generated

9   from MTE, it's getting essentially twice as much as if it was

10   getting 1 percent of profits generated from MTE, is that right,

11   in this example?

12   A.   In that example, that seems right.

13   Q.   And it could actually vary, because in my example I just

14   made up the numbers, right?

15   A.   I assume so.

16   Q.   The amount that the tribe gets from profits generated from

17   MNE would actually vary from month to month?

18   A.   Yes.

19   Q.   OK.   I want to show you what's in evidence as Defendants'

20   Exhibit 753, and we talked about this yesterday.   This is one

21   of the Don Brady declarations, correct?

22   A.   Yes, that's a September -- well, it's a declaration of Don

23   Brady that appears to have been filed on September 12 of 2007.

24   Q.   And this is one of the affidavits you testified you

25   believed to be true, correct?

Ha5Wtuc1

1    A.  Correct.

2           MR. SCOTTEN:  Let's go to page 4, and if we can blow

3    up paragraph 11.

4    Q.  So you just testified about the tribe getting some share, 2

5    percent, in my example, of the profits generated from MNE.  We

6    just went through that example, right?

7    A.  That was a hypothetical, yes.

8    Q.  But we agree that the way it was structured, we talked

9    about it getting a share of the profits generated from MNE,

10   right?

11   A.  In that -- that's what we discussed, yes.

12   Q.  Right, and so here, however, it says 100 percent of the

13   profits generated from MNE go to the tribe, right?

14   A.  Correct.

15   Q.  So we just walked through a whole example using that same

16   phrase, and we came out with 2 percent, and we said it could

17   vary somewhat, but we came out with 2 percent, right?

18   A.  In that hypothetical, that's what you came up with, yes.

19   Q.  Well, I mean, you agreed with it all the way, right?

20   A.  With the hypothetical, yes.

21   Q.  But the whole point there was you agreed that $500,000 in

22   my hypothetical was profits generated from MNE, right?

23   A.  That's not how the tribe calculated profits internally.  It

24   calculated the profits as the 1 percent that it received,

25   because that's what it was entitled to pursuant to the service

Ha5Wtuc1

1   agreements.

2   Q.  Right.  I think you testified yesterday that where it says

3   100 percent here, it means 100 percent, right?

4   A.  100 percent of the 1 percent, yes.

5   Q.  But your testimony is also that MNE is the lender, right?

6   A.  Yes.

7   Q.  And so you testified that MNE is the lender, and this right

8   here says a hundred percent of the profits generated from the

9   lender go to the tribe, right?

10  A.  Correct.

11  Q.  So either MNE is not the lender or the tribe is not getting

12  a hundred percent of the profits from MNE, right?

13  A.  I don't understand what you're saying.  The way the

14  tribe --

15  Q.  I'm not asking how the tribe calculated it.

16  A.  The way the tribe calculated --

17  Q.  I'm asking --

18          THE COURT:  Put a question to the witness.

19          MR. SCOTTEN:  Yes, your Honor.

20  Q.  If MNE is the lender, then all the profits MNE generates

21  would go to the tribe, right?  That's what this affidavit says.

22  A.  That's what it says, 100 percent of the profits generated

23  from MNE, which was what it was entitled to pursuant to the

24  service agreements, which was 1 percent of the gross collected

25  revenues.

Ha5Wtuc1

1    Q.  And you just explained a minute ago that, in fact, 100

2    percent -- that MNE's profits were far larger than just that 1

3    percent, right?

4    A.  No.

5    Q.  Just with that --

6    A.  No, because in your hypothetical, there was no service

7    agreement taken into account.

8    Q.  So, in my hypothetical -- well, let's go through that.

9    Suppose there's a service agreement, right, in the same

10   hypothetical?  There's a service agreement.  MNE, which is the

11   lender, takes in $500,000 in profit, right?

12   A.  Under the service agreement, the profit is 1 percent of the

13   gross collected revenues.

14   Q.  Well, shouldn't the affidavit say what the service

15   agreement says, then?

16   A.  No.  The affidavit doesn't discuss the service agreement.

17   Q.  But if the service agreement's the truth, why wouldn't the

18   truth be in the affidavit?

19           MR. GINSBERG:  Objection, your Honor.

20           THE COURT:  Yes.  Argumentative.  Ask your next

21   question.

22   BY MR. SCOTTEN:

23   Q.  What's the source of your understanding that this affidavit

24   is true?

25   A.  The source would be my discussions with Mr. Brady or --

Ha5Wtuc1

1    yeah, discussions with Mr. Brady and likely my understanding of

2    the business through discussions with both Mr. Brady and

3    Mr. Tucker and others.

4    Q.  Did Don Brady tell you that 100 percent of the profits

5    generated from MNE went to these tribal businesses?

6    A.  Yes.  Yes, that information came from Don Brady, that all

7    of the money that the tribe received pursuant to the service

8    agreement, which was 1 percent of the gross collected revenues,

9    went for these purposes.

10   Q.  And did he tell you that a hundred percent of the profits

11   from MNE are the same thing?

12   A.  I don't recall any specific discussions, but if it's in the

13   declaration, I assume that it came from Mr. Brady.

14            MR. SCOTTEN:  Can we put up sort of side by side

15   here --

16            THE COURT:  Just so I understand, this is not your

17   word choice; this is Mr. Brady's word choice?  Is that your

18   testimony?

19            THE WITNESS:  It is his declaration, your Honor.

20            THE COURT:  I know it's his declaration.  You

21   participated in the drafting of the declaration, you and your

22   colleagues at your firm?

23            THE WITNESS:  Yes, me or someone under my supervision

24   would have, yes.

25            THE COURT:  OK.  So the question still stands.  Is

1    this your or your firm's drafting of the language, or is this

2    what Mr. Brady told you the facts were?  Or you can explain.

3              THE WITNESS:  I believe that is how Mr. Brady

4    understood the term "100 percent of the profits."  He

5    understood it to mean the revenues that were paid to the tribe

6    pursuant to the service agreements.

7              THE COURT:  So this is not the language that your firm

8    drafted for Mr. Brady; this is Mr. Brady's formulation.  Is

9    that what your testimony is?

10             THE WITNESS:  Your Honor, this occurred 12 years ago,

11   and so I don't have a specific recollection of the debate or

12   discussion over the terminology, but --

13             THE COURT:  Thank you.  Next question.

14             MR. SCOTTEN:  If we can put up 824, zoom out and put

15   up 824 alongside this.

16   Q.  You can see 824 right now, right, sir?

17   A.  Yes.

18   Q.  This is a separate declaration, right?

19   A.  Yes.  This is an affidavit of Troy Little Axe.

20             MR. SCOTTEN:  And here, can we go to page 5, paragraph

21   14.  Actually, could you make that smaller so we just get the

22   first sentence of paragraph 14.  And put up the first sentence

23   of paragraph 11 in the other declaration.

24   Q.  Other than the names of the enterprises, the wording here

25   is identical, correct?

1  A.  Not identical.  No, wait.  Other than the names, yes, it

2  appears to be.

3  Q.  And what is your source for believing that the information

4  in paragraph 14 of Troy Little Axe's affidavit is true?

5  A.  That would have likely been through discussions with

6  Mr. Little Axe, Mr. Tucker and others.

7  Q.  I think the judge just asked you whether or not it was

8  actually your law firm that drafted this language, right?

9  A.  It was.

10  Q.  And does seeing that the same exact language is used in two

11  different affidavits by two different people from two different

12  tribes refresh your recollection as to who prepared this

13  language?

14  A.  Someone in my law firm would have definitely prepared --

15  drafted that language for review by the -- Mr. Little Axe and

16  Mr. Brady, yes.

17  Q.  Right.  Mr. Brady didn't call you and say, you know, a

18  hundred percent of the profits generated from MNE d/b/a

19  Ameriloan, US FastCash and United Cash Loans are reinvested in,

20  and so on and so on; that's your firm, right?

21  A.  Right.  We would have drafted that language and sent it

22  over to Mr. Brady or Mr. Little Axe for their review.

23  Q.  So it's based on your conversations with these two separate

24  people that you came to testify yesterday that 1 percent equals

25  a hundred percent?

Ha5Wtuc1

1  A.  I don't know if it was my conversation, or it may have been

2  a conversation of someone under my supervision who worked with

3  these individuals to prepare the declarations.

4  Q.  Because when you just went through an example a minute ago,

5  you came up with profits generated from MNE that were far

6  higher, correct?

7  A.  Without taking into account the service agreements,

8  correct.

9  Q.  Well, does the service agreement change what's profit and

10  what's revenue?  There's no definition there for each, is

11  there?

12  A.  Again, I'm not an accountant, but that is -- that was the

13  understanding at the time, that the profits that were received

14  by the tribal entities constituted the 1 percent of gross

15  collected revenues, because that's the agreement it had with

16  the servicer.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  Even though MNE is the lender and MNE is actually

2    generating far more profit.  That's your testimony?

3    A.  No, that's not my testimony.

4    Q.  MNE is generating far more profit than the 1 percent,

5    correct?

6              MR. GINSBERG:  Objection, your Honor.  I think profit

7    is not being used properly in this context.

8              THE COURT:  Overruled.

9    A.  No.  Because, per its contract with the servicer, it agreed

10   to 1 percent of the gross collected revenues.

11   Q.  I don't think that's exactly what I am asking.

12             If MNE is generating all these profits -- and that's

13   what it says, profits generated from MNE, right?

14   A.  Well, it really begs the question, because if you take into

15   account the service agreement, contractually MNE was only

16   entitled to 1 percent of the gross collected revenues, and

17   contractually obligated any other allowance to the servicer.

18   Q.  Is MNE the lender or is not the lender?

19   A.  It is the lender.

20   Q.  Do the profits, all of the profits that the lender

21   generates by making loans go to the tribe in these agreements?

22             MR. GINSBERG:  Objection, your Honor.

23             THE COURT:  Overruled.

24   A.  Yes.  Because the profits it was entitled to are the 1

25   percent of gross collected revenues.

1    Q.  But I am not asking the profits it's entitled to.

2              I am asking, do all profits generated from the lending

3    lender go to the tribe?

4    A.  Yes.  Because, per agreement with the servicer, that was

5    considered an operating cost.  So 1 percent of gross collected

6    revenues constituted the profits of MNE.

7    Q.  So the lender, MNE, is generating profit, and all that

8    profit is operating costs except the 1 percent?

9    A.  That's not what I said.

10             MR. GINSBERG:  Objection.

11             THE COURT:  Overruled.

12   A.  That's not what I said.

13   Q.  What did you say?

14   A.  I said the profits that MNE received were the 1 percent of

15   gross revenues, per its contractual arrangement with the

16   servicer.

17   Q.  Yes.  But the affidavit, it doesn't say received, it says

18   generated.  It's talking about how much MNE is generating,

19   correct?

20   A.  Generating, taking into consideration the service

21   agreement.

22   Q.  Well, MNE is the lender, correct?

23   A.  Correct.

24   Q.  So if the lender is generating profits, that's all the

25   profits from the loans, is it not?

1   A.  Not in this context.

2           THE COURT:  Move on, please.

3   Q.  You could have just put in here that MNE receives 1 percent

4   of gross collected revenues from the loans, could you not?

5   A.  Certainly could have.

6   Q.  That's what the service agreements actually say, correct?

7   A.  That is correct.

8   Q.  And there wouldn't be this distinction between 100 percent

9   equals 1 percent; it would just say exactly what the service

10  agreements say, correct?

11  A.  Hypothetically, that could have been done, correct.

12  Q.  But if that was hypothetically done, then a court would

13  know that a tribe is only getting a tiny percentage of the

14  total money here, correct?

15          MR. GINSBERG:  Objection.

16          THE COURT:  Overruled.

17          MR. GINSBERG:  Objection to what a court would know.

18  It's too limited of a context.

19          THE COURT:  Overruled.

20  A.  I'm sorry.  Can you repeat the question?

21  Q.  Because these are affidavits you're submitting to a court,

22  had you put in there that the tribe received 1 percent of gross

23  collected revenues, then the court would know that the tribes

24  are only getting a tiny portion of the money that was being

25  dealt with here, correct?

1    A.  Yes.  But what is also not in the affidavits is that the

2    tribes acquired a very valuable asset worth millions of

3    dollars, above and beyond the 1 percent of gross collected

4    revenues.

5    Q.  So it was OK to hide one thing from a court because there

6    is something else otherwhere that equals it out, that's your

7    testimony?

8    A.  I disagree with your characterization of hiding.

9    Q.  Let's just stay on this 1 percent.

10        If you had put in there that a tribe was making only 1

11   percent of gross collected revenues, a court would have known

12   it was receiving only a tiny percentage of the revenue,

13   correct?

14   A.  I don't believe that would be considered a tiny percentage

15   of revenues.  1 percent of gross could be a very large portion

16   of net revenues, depending upon the operating costs.

17   Q.  So 1 percent isn't necessarily a tiny percentage of

18   revenue?

19   A.  1 percent of gross collected revenues could equal a very

20   large percent of net revenues.

21   Q.  Could have put that in the affidavit too, right?

22   A.  I'm sorry?

23   Q.  What you just said, you could have put that in the

24   affidavit too, right?

25   A.  I could have put a lot of things in the affidavit.

1  Q.  But what you did put in was 100 percent of the profits, and

2  that's because it gave the court the impression the tribes were

3  in control here, isn't that right?

4  A.  The tribes were in control, the tribes were the lender.

5  Q.  I am not going go back into it.  Didn't you just say that,

6  in fact, most of the profits generated by the lender did not go

7  to the tribe?

8  A.  No.  That was not my testimony.

9  Q.  If you had -- let me not make it a hypothetical.

10      Saying 100 percent of the profits generated from MNE

11  creates a much more favorable impression on the court than if

12  you just put what is in the servicing agreement, is that

13  correct?

14  A.  I'm not sure that it does.  100 percent of what they

15  received was -- the purpose of this paragraph was to show that

16  the money that it received pursuant to the business was used

17  for tribal purposes, all of it was used for tribal purposes.

18  Everything that the tribe received from the business was used

19  for tribal purposes.  That was the purpose of this paragraph in

20  the memo.

21  Q.  Isn't that kind of hiding the question, though, since, of

22  course, all the money the tribe actually got was used for

23  tribal purposes; isn't that sort of obvious?

24  A.  Not necessarily.  It could have been used for other

25  purposes.

1   Q.  The tribe could have giving that money away?

2   A.  The tribe is a sovereign government, it's entitled to do

3   what it wants with its money, but in this instance, all the

4   money it received from the lending business was used for tribal

5   purposes, and that was the intent of this paragraph.

6   Q.  Even though, in fact, there is a lot more profit out there

7   than in fact is going somewhere else, you can't tell that from

8   this affidavit, can you?

9              THE COURT:  Sustained as to form.  I think you're

10  getting repetitive.

11             MR. SCOTTEN:  Fair enough, your Honor.  We can move on

12  from this.

13             Let us just go to 824 now.

14             Can we go to paragraph 2, which is probably on the

15  second page.

16             Let's just blow that up.

17  Q.  Do you see at the bottom the statement, "Also, I oversee

18  management of the day-to-day operation of MTE"?

19  A.  I do.

20  Q.  MTE, again, according to you, is the lender, correct?

21  A.  Correct.

22  Q.  What is your source for the belief that Troy Little Axe

23  oversaw the management of the day-to-day operation of the

24  lender?

25  A.  Basically, Troy Little Axe was the only person from the

1    tribe that really actively worked for MTE on a daily basis.  So

2    he would have been the only person to manage MTE.

3    Q.  So you did not speak with him?  How did you learn that?

4    A.  I assume that myself or someone else spoke with him and

5    gained the knowledge that, yes.  And through my experience,

6    Troy was the point of contact for MTE and was the only person

7    who really, to our knowledge, had any management

8    responsibilities for MTE.

9    Q.  In fact, you visited the Modoc reservation from time to

10   time, correct?

11   A.  Yes.

12   Q.  A couple times a year?

13   A.  Roughly.

14   Q.  So you were there in 2007 probably?

15   A.  Possibly, likely.

16   Q.  Likely?

17        This is a 2007 affidavit, is that correct?

18            If you don't remember, we can go back to the first

19   page.

20   A.  I believe that's correct.

21   Q.  Then we will just stay there.

22        So this is a 2007 affidavit, and you had formed a personal

23   belief that Troy Little Axe managed the day-to-day operation of

24   the lender based on your experience in 2007?

25   A.  Correct.

HA58TUC2                    Schulte - Cross

1    Q.  And because you visited the reservation and spoke with Troy

2    Little Axe, you knew there had been a flood on the reservation

3    and there was no office for MTE, correct?

4    A.  I'm not sure and I don't recall what point in time that

5    occurred.  But yes, there was a flood at some point in time

6    that flooded the offices of MTE.

7              THE COURT:  Let the witness finish his answer before

8    you ask your next question.

9              MR. SCOTTEN:  Yes, your Honor.

10   Q.  So in 2007, the only thing on the reservation for MTE was a

11   mailbox, correct?

12   A.  No.  That's not my understanding.  Mr. Little Axe could

13   have been working out of a different office at the tribal -- on

14   the reservation.

15   Q.  So it would surprise you to learn that Mr. Little Axe --

16             MR. GINSBERG:  Objection.

17             THE COURT:  I don't think the question is what's

18   surprising.  Rephrase your question.

19   Q.  In 2007, you formed the belief that Troy Little Axe was

20   managing the day-to-day operations of the lender, correct?

21   A.  Correct.

22   Q.  And you had been to the Modoc reservation, correct?

23   A.  Correct.

24   Q.  And you had also been to Kansas City, correct?

25   A.  Correct.

1    Q.  Went there several times and saw that there were hundreds

2    of people at telephone banks, correct?

3    A.  Yes.  At the servicing company, correct.

4    Q.  And you saw Mr. Tucker in his corner office, correct?

5    A.  I would likely have seen him.

6    Q.  And Mr. Muir and a lot of other managerial folks, correct?

7    A.  Mr. Muir was not a managerial person.

8    Q.  Executive, senior?

9    A.  In 2007, I probably would have met with him there.  He was

10   the legal counsel.

11   Q.  So you saw all of this in Kansas City in 2007, and you knew

12   that there was just Troy Little Axe on the reservation hundreds

13   of miles away, and from that you formed the belief that Troy

14   Little Axe managed the day-to-day operation of the lender?

15   A.  Of the lender, not the servicer.

16   Q.  And in this affidavit, you informed the court of that

17   distinction, correct?

18   A.  I don't know that there is any mention of the servicer in

19   the affidavit.

20   Q.  And you think a court would have just figured out that when

21   you said the lender, they meant just Troy Little Axe in his

22   office supervising himself, his own day-to-day operations?

23              MR. GINSBERG:  Objection to what a court might figure

24   out.

25              THE COURT:  Sustained.  Rephrase it.

HA58TUC2                    Schulte - Cross

1    Q.  You were attempting to candidly communicate to the court

2    through this affidavit that Troy Little Axe was managing the

3    day-to-day operation of the lender, meaning he was managing

4    himself, since he was the only person there?

5    A.  He was managing MTE, which was owned by the tribe and was

6    the lender, correct.

7    Q.  And without mentioning the servicer at all, you felt you

8    had accurately communicated how this operation worked to the

9    court?

10   A.  Correct.

11   Q.  You felt that a court would understand that the lender is a

12   single person, who doesn't have an office at the time, and all

13   the lending stuff going on in Overland Park is irrelevant?

14           MR. GINSBERG:  Objection to "the lending stuff going

15   on in Overland Park."

16           THE COURT:  Try rephrasing your question.

17   Q.  All the people working on the loan in Overland Park,

18   Kansas -- let me rephrase the whole question.

19           You felt a court reading this would understand that

20   when you said Troy Little Axe was managing the day-to-day

21   operation at MTE, he was managing himself and not the hundreds

22   of people working on loans in Kansas City?

23   A.  He was managing MTE, a tribally-owned entity, that was the

24   lender, correct.

25   Q.  You said correct, but I'm not sure you actually said what

1   you believed the court would understand from this

2   communication.

3           MR. GINSBERG:  Objection to the form of the question.

4           THE COURT:  What did you expect the court to

5   understand?

6           THE WITNESS:  That Troy Little Axe -- exactly what it

7   says -- managed the day-to-day operations of the tribal entity,

8   your Honor.

9           THE COURT:  Next question.

10  Q.  So you're saying that no part of MTE was doing anything in

11  Overland Park?

12  A.  Overland Park -- servicing of the loans was done in

13  Overland Park by the servicing entity, not the lender.

14  Q.  So no part of MTE was doing --

15  A.  It's commonplace for lenders to contract out to servicing.

16  It's just the way lending is in this country.  When you get a

17  loan from a bank, many times you will have a different entity

18  servicing the loan.

19          MR. SCOTTEN:  I am not sure this is responsive.

20          THE COURT:  I will let it stand.

21          Next question.

22  Q.  The question is, no part of MTE was doing anything in

23  Overland Park, correct?

24  A.  No, that's not correct.  Mr. Little Axe would visit

25  Overland Park, have meetings with Mr. Tucker and others at the

1   servicing entity.  He would interact with them.

2   Q.  Was he supervising their day-to-day operations?

3   A.  Not the day-to-day operations of the servicers, no.

4   Q.  So no part of MTE was taking place in Overland Park, that's

5   your testimony?

6   A.  No, that's not my testimony.  Mr. Little Axe would visit

7   Overland Park.  He would have meetings with Mr. Tucker.  They

8   would discuss the business and various matters.  So to say no

9   part of MTE occurred in Overland Park is incorrect.

10  Q.  Were the day-to-day operations of MTE taking place in

11  Overland Park?

12  A.  No.

13  Q.  No part of the day-to-day operations of MTE were taking

14  place in Overland Park, is that correct?

15  A.  The day-to-day operations of MTE would have taken place on

16  the reservation.

17  Q.  By that you mean Troy Little Axe?

18  A.  Yes.

19  Q.  Let's go to another affidavit, 309A.

20      There's two in this exhibit.  Let's flip down about four

21  more pages.

22          MR. SCOTTEN:  Is this 309A?

23  Q.  While we are getting the exhibit, you testified yesterday

24  about certain affidavits that the defense showed you, correct?

25  A.  Yes.

1    Q.  And you testified you believed them to be true, correct?

2    A.  Correct.

3    Q.  Your answer wasn't limited to those affidavits, was it?

4    A.  I'm not sure.

5    Q.  Do you believe all the affidavits that you approved were

6    true?

7    A.  Yes, of course.

8    Q.  So as soon as we have 309A up, we will proceed.

9         I am going to hand you a hard copy so we can get started.

10   And I think you saw this yesterday.

11        If you want to flip to the second affidavit in there.

12   A.  The affidavit of Robert Campbell?

13   Q.  Correct.  Who is Robert Campbell?

14   A.  Robert Campbell was the treasurer of the Santee Sioux

15   Nation, a member of the tribal council, and also the treasurer

16   for SFS.

17   Q.  And with Lee Ickes, he was one of the two people at Santee

18   Sioux most involved in the lending operation, correct?

19   A.  At that point in time, yes.

20             MR. SCOTTEN:  If we can turn to the next page.

21             MR. BATH:  What year is this?

22             MR. SCOTTEN:  Turn to the last page so we can see the

23   date.  And blow up the date where it says "subscribed and sworn

24   to."

25   Q.  This affidavit is dated July 15, 2005?

1   A.  Correct.

2           MR. SCOTTEN:  Let's go back to the second page.

3           Can we blow up the top paragraph.  It's the first one

4   labeled 3.

5   Q.  Sir, what was your basis for believing this statement to be

6   true?

7   A.  Likely the discussions with Mr. Campbell.

8   Q.  So based on your discussions with Mr. Campbell, you

9   believed that he was familiar with the --

10          THE COURT:  These were your discussions, not somebody

11  else's?

12          THE WITNESS:  Well, it was likely someone else who was

13  working on the matter.

14  Q.  Sir, to be clear, this is the Santee Sioux, correct?

15  A.  Correct.

16  Q.  Santee Sioux is the tribe you had a preexisting

17  relationship with?

18  A.  Yes.

19  Q.  You visited them more often than the other tribes, correct?

20  A.  Yes.

21  Q.  And in 2005, would I be right in believing you were sort of

22  still particularly close to them because they are the tribe you

23  had gotten into this through?

24  A.  I had the longest relationship with this tribe, yes.

25  Q.  So your basis for believing this to be true is either you

1    or someone you spoke to told you that Robert Campbell had

2    reported that he was familiar with the day-to-day operations of

3    SFS and the marketing and strategy pertaining thereto, is that

4    correct?

5    A.   Correct.

6    Q.   Sir, do you recall this is the same tribe that three months

7    earlier you had to write Scott Tucker to ask are we even

8    lending yet?

9    A.   I'm not sure that that's the exact words, but I inquired

10   whether the lending was taking place for SFS, yes.

11   Q.   And Scott Tucker informed you, yes, the lending has been

12   taking place for about a month now, correct?

13   A.   Something to that effect.

14   Q.   And despite that, you had formed a personal belief three

15   months later that the tribe was familiar not only with the

16   day-to-day operations of SFS, but the marketing and strategy

17   pertaining thereto?

18   A.   Yes.

19   Q.   Do you care to explain how you formed that basis again?

20   A.   Yes.  Mr. Campbell would have attended meetings, which I

21   also attended, with Mr. Tucker and others at the loan servicer

22   that thoroughly explained the services that were being

23   provided, including the marketing and strategy.

24   Q.   So despite the tribe not even knowing that lending was

25   taking place, you felt comfortable telling a court that the

1  tribe was familiar with the day-to-day operations of SFS and

2  the marketing and strategy?

3  A.  Yes.

4  Q.  Would you like to offer a further explanation why you felt

5  comfortable telling a court that?

6  A.  I already told you.  Mr. Campbell was involved in meetings,

7  in which I attended, with Mr. Tucker in Kansas City and

8  marketing was discussed.  He became familiar with it through

9  those meetings.

10  Q.  So your submission is that the tribe need not even know

11  lending was occurring in order to tell the court it's familiar

12  with the day-to-day operations, strategy and marketing?

13  A.  No, that's not my testimony.

14  Q.  Well, the tribe was not, in fact, familiar that lending was

15  going on, correct?

16  A.  At this point in time, it certainly was.

17  Q.  It learned somewhere in those intervening three months?

18  A.  Yes.

19  Q.  So that's all it took, is to get an e-mail from Scott

20  Tucker saying the lending is going, and now it's OK to tell a

21  court, in your view, that you're familiar with the day-to-day

22  operations, marketing and strategy?

23  A.  Yes.  There were meetings, several meetings with Mr. Tucker

24  and Mr. Campbell and others from the Santee Sioux Nation, and

25  the operations and marketing was thoroughly explained.  They

1  were familiar.

2  Q.  And your intent, as an officer of the court, was to fully

3  convey an understanding of how this business worked through

4  this paragraph?  Let me withdraw that.  To accurately convey

5  how this business worked?

6  A.  It says what it says, and it was true.

7  Q.  Let me ask you a question.  Were you trying to accurately

8  convey how the business worked?

9  A.  I was accurately conveying that Mr. Campbell was familiar

10  with the day-to-day operations of SFS, which he was.

11  Q.  You don't feel there was anything that might be missing

12  from the court's understanding there?

13  A.  Not at all.

14  Q.  Let's go next to a couple of lawsuits that I think you

15  testified about yesterday.

16      You talked about both *Tucker vs. AMG* and *Hallinan vs.*

17  *Tucker*, correct?

18  A.  I believe we discussed that, yes.

19  Q.  Just a couple of questions on *Tucker vs. AMG*.

20      You worked with Mr. Muir on that?

21  A.  Mr. Muir represented CLK Management in that, yes.

22  Q.  He also represented Mr. Tucker?

23  A.  I meant Mr. Tucker.

24  Q.  And you worked with him on that?

25  A.  If I worked with him on that?  I was familiar with it.  I

1    knew that he was working on some research and drafting of that

2    lawsuit.

3    Q.  Did you talk to him before it was filed?

4    A.  I did.

5    Q.  What requests did he make of you or your client before the

6    suit was filed?

7    A.  What requests were made of me or my client?

8        I was asked to review a draft of the complaint, to review

9    it for accuracy.  I'm not sure there were any other requests

10   that were made.

11   Q.  So he asked you to review for accuracy a complaint against

12   your client?

13   A.  Correct.

14   Q.  And that was the request he made of you?

15   A.  That is the only request that I recall.

16   Q.  Let's move on then to the *Hallinan vs. Tucker* lawsuit.

17       In that lawsuit, you represented AMG, MTE, and the Modoc

18   tribe, is that correct?

19   A.  I did not appear in that lawsuit as counsel.

20   Q.  Is it fair to say you had involvement in that lawsuit?

21   A.  I was familiar with it, and I monitored it on behalf of my

22   clients, correct.

23   Q.  And the clients you were monitoring on behalf of were AMG,

24   MTE and the Modoc?

25   A.  I believe so, yes.

Schulte - Cross

1    Q.  In fact, the other one I wanted to ask about was, also, you

2    represented CLK in that lawsuit, although CLK was in the

3    process of being merged into AMG?

4    A.  At that time, CLK had been merged into AMG.

5    Q.  CLK was a named party in the lawsuit, nonetheless, right?

6    A.  Yes.

7    Q.  So to the extent they needed representation, you

8    represented them?

9    A.  Yes.  To the extent that CLK had been merged into AMG, I

10   represented its interests, yes.

11   Q.  And your testimony is you were not representing Scott

12   Tucker at that time, correct?

13   A.  Correct.

14   Q.  And you testified that you and Muir monitored the suit,

15   correct?

16   A.  Yes.  We did not make any court appearances as legal

17   counsel for those entities in that lawsuit.

18   Q.  You actually played a very significant role in the suit

19   though, correct?

20   A.  I'm not sure if I did.

21   Q.  You didn't work very hard to resolve it, you personally?

22   A.  When it was first filed, I wrote some letters, I believe,

23   to counsel for Mr. Hallinan and Mr. Tucker and urged them to

24   resolve the lawsuit.

25   Q.  But after that you were just monitoring?

1   A.   Correct.

2           MR. SCOTTEN:  Let's show the witness Government

3   Exhibit 4138.

4   Q.   It is an e-mail, the bottom e-mail, between Scott Tucker

5   and Don Brady, copying you and Tim Muir?

6   A.   OK.

7   Q.   Is that correct?

8   A.   Yes.

9           MR. SCOTTEN:  The government offers 4138.

10          THE COURT:  Any objection?

11          MR. ROTH:  No, your Honor.

12          THE COURT:  Received.

13          (Government's Exhibit 4138 received in evidence)

14          MR. SCOTTEN:  We can publish it, and let's just blow

15  up the bottom e-mail and leave the boilerplate on the bottom

16  out.

17  Q.   Can I ask you just to read the first sentence?

18  A.   "Don, we are very close to finalizing a settlement deal.

19  Conly and Tim have worked for the past 18 months getting this

20  put to bed.  They have done a fantastic job."

21  Q.   So you and Mr. Muir worked on this for 18 months to get it

22  settled, right?

23  A.   I was not involved in the settlement discussions.

24  Q.   What do you understand the reference to "getting this put

25  to bed" to mean?

HA58TUC2                    Schulte - Cross

1    A.   To getting the lawsuit settled.

2    Q.   OK.  By the way, CLK was one of your clients, correct, to

3    the extent they were still in existence?

4    A.   AMG was my client.

5    Q.   That included CLK's interests because AMG had acquired CLK?

6    A.   CLK was not a legal entity once it merged into AMG.

7    Q.   So neither CLK nor AMG would be threatened by a lawsuit

8    from a private individual, correct?

9    A.   CLK would, to the extent that it does not enjoy tribal

10   immunity like AMG.

11   Q.   To the extent CLK was part of AMG now, there would be no

12   threat from a private individual, correct?

13   A.   Well, there is a possible threat if the merger was not

14   recognized.

15   Q.   We just talked about you fixed that through a separate suit

16   through *Tucker vs. AMG*, right?

17   A.   I am trying to recall the date when that occurred.  It may

18   or may not have.  I believe it was subsequent to this.

19   Q.   Your position was that the merger had already been

20   effected, though, because it was effected under the law of

21   Miami, correct?

22   A.   That's correct.

23   Q.   So under your position, CLK and AMG would not be threatened

24   by a suit from a private individual, correct?

25   A.   Well, this was -- part of the problem is that this was a

1    suit in a state court in Nevada, and there is always

2    uncertainty as to whether a state court judge would recognize a

3    merger under tribal law.

4    Q.  So is that why your clients settled this suit for something

5    like $30 million?

6    A.  I imagine that there was some liability that was -- a

7    potential for liability, the potential to interrupt the

8    business operations.  There are a number of considerations for

9    why one settles.

10   Q.  Scott Tucker was the lead defendant in this case, right?

11   A.  I don't recall how it was captioned.

12          MR. SCOTTEN:  Can we show the witness Government

13   Exhibit 4139.

14   Q.  Do you recognize this?

15   A.  Yes.  This is the first amended complaint in a lawsuit

16   called Charles Hallinan, among others, against Scott Tucker and

17   other entities.

18          MR. SCOTTEN:  The government offers 4139.

19          MR. GINSBERG:  Your Honor, there is an objection that

20   has multiple parts to it.

21          MR. SCOTTEN:  I am happy to offer the cover page, if

22   that alleviates the concern.

23          THE COURT:  Does that alleviate the problem?

24          MR. GINSBERG:  I just want to read till the bottom.

25          I have no objection to the cover page.

1          THE COURT:  Received 4139, just page 1 bearing the

2    word "original" and labeled "verified first amended complaint,"

3    just the cover page.

4          (Government's Exhibit 4139, page 1, received in

5    evidence)

6          MR. SCOTTEN:  If we just publish that page and not go

7    beyond it.

8    Q.  Does this refresh your recollection as to whether Scott

9    Tucker was the lead defendant in *Hallinan vs. Tucker*?

10   A.  He was the first named defendant in the caption.

11   Q.  I think you testified yesterday that this was a suit

12   against Mr. Tucker from a former business partner; that's how

13   you described it yesterday, correct?

14   A.  A former business partner, shareholder; it's a shareholder

15   lawsuit.

16   Q.  Targeting Scott Tucker based on his prior business with

17   Mr. Hallinan and others, correct?

18   A.  In part, yes.

19   Q.  You counseled your tribal clients to pay $30 million to

20   settle a lawsuit by a private individuals against Scott Tucker?

21   A.  Again, I wasn't involved in the settlement negotiations and

22   how those negotiations went.  I was aware of the final

23   settlement terms, though.

24   Q.  Your testimony is you were not involved in settling this

25   lawsuit for $30 million?

1    A.   Not in the actual settlement discussions.  I was aware of

2    the terms and received drafts of the terms of the settlement as

3    it was nearing completion.

4              THE COURT:  Let me ask you, Mr. Schulte, did you

5    advise or represent as a lawyer any party to the settlement?

6              THE WITNESS:  Yes.  That would have been AMG Services.

7              THE COURT:  Any other party to the settlement?

8              THE WITNESS:  Yes.  MTE.

9              THE COURT:  Anyone else?

10             THE WITNESS:  Not that I recall.

11             THE COURT:  All right.  Did you advise Mr. Tucker with

12   regard to the settlement?

13             THE WITNESS:  No, I did not, your Honor.

14             THE COURT:  All right.  Why don't we take our

15   mid-morning break.

16             Ladies and gentlemen, please do not discuss the case

17   among yourselves or with anyone else.

18             Ms. McCarthy, you're going to move down to seat number

19   3 when we return from break.  Thank you very much.

20             (Jury exits courtroom)

21             THE COURT:  See you in ten minutes.

22             (Recess)

23             THE COURT:  Please bring our jurors in.

24             (Jury present)

25             THE COURT:  You may proceed.

1          MR. SCOTTEN:  Thank you, your Honor.

2     BY MR. SCOTTEN:

3     Q.  I think before the break you had just told the Court that

4     you were representing AMG and MTE, at least in this lawsuit,

5     you provided service to them, correct?

6     A.  Correct.

7          MR. SCOTTEN:  Can we put back up 4138.

8          If we can blow up enough to get both of the texts.

9     Q.  So, again, starting at the bottom, here we have Scott

10    Tucker e-mailing Don Brady, right?

11    A.  Yes.

12    Q.  And that's your client, right?

13    A.  Yes.

14    Q.  He is the CEO and president of AMG?

15    A.  Yes.

16    Q.  And he is cc'ing you, correct?

17    A.  Yes.

18    Q.  The subject is finalizing settlement deal?

19    A.  Yes.

20    Q.  The text says that you and Tim Muir have worked for 18

21    months getting this put to bed, correct?

22    A.  That's what it says.

23    Q.  So this is about settling *Tucker vs. Hallinan*, correct?

24    A.  Yes.

25          THE COURT:  Keep your voice up, Mr. Scotten.

1    A.  *Hallinan vs. Tucker* and a number of others, yes.

2    Q.  So when you saw this e-mail urging Brady to sign, did you

3    counsel your client on signing this multimillion dollar

4    settlement deal?

5    A.  I know settlement discussions had been ongoing for months

6    prior to this date.  Mr. Brady as CEO of AMG also had an office

7    in Kansas City and was there very often during that period of

8    time.  He was aware of it, and so would have been involved in

9    and apprised of the terms.

10   Q.  So did you counsel your client prior to him signing this

11   deal?

12   A.  I believe I would have had discussions with Mr. Brady.  I

13   don't recall any specific discussions.

14   Q.  So Mr. Tucker is sending an e-mail, referring to you as

15   having worked on settling this lawsuit, to Don Brady for his

16   signature, and you believe you counseled him on it?

17   A.  I would have had discussions with him, yes.

18   Q.  Mr. Brady did, in fact, sign for one of the parties in this

19   lawsuit, correct?

20   A.  I believe so.

21        MR. SCOTTEN:  Can we show what is in evidence as

22   Government Exhibit 811.

23   Q.  This is already in evidence, but do you recognize this as

24   the first page --

25        MR. SCOTTEN:  Am I correct?

1    Q.  Do you recognize this as the first page of the settlement

2    agreement?

3    A.  It appears to be, yes.

4    Q.  So you had said a minute ago that you were representing AMG

5    and MTE, CLK didn't exist anymore, correct?

6    A.  It had been merged into AMG Services.

7              THE COURT:  Can you answer the question that was

8    asked?

9              Can I have the court reporter read back the question,

10   please.

11             (Record read)

12   A.  As a matter of tribal law, it did not.  There was an open

13   issue whether CLK existed under the laws of the state of Kansas

14   because it had not been registered at that time under the laws

15   of the state of Kansas.

16   Q.  Am I right in between the time I asked my question and the

17   judge asked you to repeat, you were shown a signature page

18   where Don Brady is signing for CLK Management?

19   A.  Yes.

20   Q.  That's your client, who you were counseling, had just been

21   sent something to be signed by Scott Tucker, right?

22   A.  In that e-mail, yes.

23   Q.  And Don Brady is with the Miami tribe, right?

24   A.  Correct.

25   Q.  You expect him to follow Miami law?

1  A.  Oh, yes, of course, but that doesn't change the fact that

2  there was an open question of whether the merger would be

3  recognized by a court in the state of Nevada.

4  Q.  Don Brady didn't sign for AMG, did he?

5  A.  AMG was not a named party to the suit.

6  Q.  So despite counseling your client -- well, is it your

7  testimony that AMG didn't sign this?

8  A.  AMG was not a party to the suit.

9  Q.  That's not my question.  Do you know if AMG signed the

10  settlement agreement?

11  A.  There is no signature line for AMG Services.  So no, there

12  is no signature for AMG Services.  There is one for CLK

13  Management because CLK Management was merged into AMG pursuant

14  to tribal law.

15  Q.  So you do not believe AMG signed this?

16  A.  AMG -- to the extent that CLK was merged into AMG, then

17  yes, I suppose legally you could say that AMG signed, but there

18  is no signature line for AMG.

19  Q.  AMG was your client, right?

20  A.  Correct.

21  Q.  They were a significant client, right?

22  A.  Yes.

23  Q.  You were familiar with the senior people in the entity,

24  correct?

25  A.  Yes.

1   Q.  Do you remember who the vice president was for AMG at the

2   time of this?

3   A.  I don't recall.

4   Q.  Do you remember anybody who ever served as vice president

5   of AMG?

6   A.  I don't recall who would have been there.  My primary

7   contact would have been Mr. Brady.

8   Q.  He was the president.  Did you talk to the vice president

9   who was below him?

10  A.  I'm sorry?

11  Q.  Did you ever talk to the vice president?

12  A.  I had meetings with the AMG board from time to time.

13  Q.  Do you remember any conversations with J.S. Ragman?

14  A.  About this particular, I don't recall any conversations

15  about this.

16  Q.  You had other conversations with J.S. Ragman?

17  A.  I don't recall having any conversations with him.

18  Q.  So who is J.S. Ragman?

19  A.  I'm not sure.

20          MR. SCOTTEN:  Can we please go to page 42.

21          Can we blow up the signature at the bottom.

22  Q.  So this is AMG Services, correct?

23  A.  That's what it says, yes.

24  Q.  This was your client, correct?

25  A.  Yes.

1  Q.  And you just said you weren't aware of them signing this,

2  right?

3  A.  Correct.

4  Q.  You're not aware of J.S. Ragman, correct?

5  A.  I don't recall J.S. Ragman.

6  Q.  You're also not aware of anybody who was ever the vice

7  president of AMG, correct?

8  A.  I don't recall.  AMG was governed by a board.

9  Q.  So no vice president that you are aware of?

10  A.  I don't recall ever meeting with the vice president.

11  Q.  Given that you don't know who this person is and didn't

12  believe your client had signed this document, do you have any

13  understanding as to how this document got signed by J.S. Ragman

14  as vice president of AMG Services?

15  A.  I do not.

16  Q.  Just one more topic, Mr. Schulte.  It's a timing point.  I

17  apologize.  I am going to have to go back to the beginning.

18      When you first began working with Mr. Tucker, you were

19  aware that he had used various companies in Nevada set up by a

20  firm called Laughlin to receive mail for his lending business,

21  correct?

22  A.  I'm sorry.  Can you repeat that question?  I am trying to

23  get the time frame that you're talking about.

24  Q.  I can be more precise, but I am just saying for now in the

25  beginning.  The first couple of years you learned that Mr.

1   Tucker had used a shell company set up in Nevada to receive

2   mail for his lending businesses, correct?

3   A.  I would have learned that probably a couple of years after,

4   probably sometime in 2005.

5   Q.  The firm involved in setting those up was called Laughlin,

6   correct?

7   A.  That's my recollection.

8           MR. SCOTTEN:  If we can show the witness 4103.

9   Q.  This is an e-mail exchange between you and Scott Tucker,

10  correct?

11  A.  Correct.

12          MR. SCOTTEN:  Your Honor, the government offers 4103.

13          THE COURT:  Any objection?

14          MR. ROTH:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 4103 received in evidence)

17          MR. SCOTTEN:  Can we just blow up the bottom e-mail

18  first.

19  Q.  This is an e-mail from Scott Tucker to you, correct?

20  A.  Correct.

21  Q.  Dated March 28, 2005?

22  A.  Correct.

23  Q.  He is sort of asking you exactly what you need to know

24  about Laughlin acting as a registered agent for his company in

25  Carson City, Nevada, correct?

1  A.  Yes.  It says, "Tell me exactly what you need to know about

2  Laughlin being the registered agent for my management companies

3  in Carson City, Nevada."

4  Q.  And a registered agent, among other things perhaps, is

5  someone that can receive service of a subpoena on behalf of the

6  person being subpoenaed, correct?

7  A.  Yes.

8         MR. SCOTTEN:  Can we go up to the top e-mail.

9  Q.  So then here in March 2005, you're being specific, you're

10 saying you need to know what companies Laughlin is a registered

11 agent for, correct?

12 A.  Yes.

13        MR. SCOTTEN:  And can we also show the witness 4108.

14 Q.  This is another e-mail exchange between you and Mr. Tucker,

15 correct?

16 A.  Yes.

17        MR. SCOTTEN:  Your Honor, the government offers 4108.

18        MR. ROTH:  No objection.

19        THE COURT:  Received.

20        (Government's Exhibit 4108 received in evidence)

21        MR. SCOTTEN:  If we can go to the second page.

22        If we can blow up the middle e-mail with the gray bar

23 above it.

24 Q.  So in this e-mail you're declining an invitation to racing

25 from Scott Tucker?

1    A.  The subject is racing.

2           MR. SCOTTEN:  Let's zoom out real quick so we can see

3    the bottom e-mail.

4    A.  If I could see the bottom part.

5    Q.  If you look at the bottom --

6    A.  OK.  I see you.

7    Q.  -- he is inviting you to something called the Kings

8    Experience at the Petty School of Racing?

9    A.  Yes.

10   Q.  You're declining that; you're saying you would go but

11   you're busy?

12   A.  Yes.  I said, "I appreciate the invitation however.  I

13   certainly would join you but for the arbitration."  Correct.

14   Q.  Then on the bottom, you say, "On another note, are you free

15   to talk with Fred Assam and me tomorrow about your e-mail

16   regarding forming tribal corporations to perform the services

17   that Laughlin provides," correct?

18   A.  Correct.

19   Q.  This is about using a tribal corporation to then become the

20   registered agent, or at least receive the mail for Scott

21   Tucker's companies, correct?

22   A.  I don't know if it was for Scott Tucker's companies or the

23   tribal companies at this point in time that we would have been

24   discussing that.  I believe it would have been for the tribal

25   entities.

1  Q. Well, as we discussed, you knew that the same

2  doing-business-as addresses moved from the Nevada companies to

3  being at least tribes using those names, correct?

4  A. Yes. The trade names were transferred to the tribal

5  entities.

6  Q. And this is in April of 2005, correct?

7  A. It appears to be, yes.

8      MR. SCOTTEN: We can take that down.

9  Q. You also knew that at some point in early 2005, the

10 Kickapoo tribe was using the Preferred Cash name, correct?

11 A. I think that was the intent. I'm not sure that that ever

12 was actually implemented.

13      MR. SCOTTEN: Can we show the witness Government

14 Exhibit 207.

15 Q. This is an e-mail between Scott Tucker and another person

16 in your firm named Jennifer Bliss, correct?

17 A. Yes.

18 Q. And it makes reference to you, at least at one point?

19 A. Yes.

20      MR. SCOTTEN: Your Honor, the government offers

21 Exhibit 207.

22      MR. ROTH: No objection.

23      THE COURT: Received.

24      (Government's Exhibit 207 received in evidence)

25      MR. SCOTTEN: Let's start all the way down on the

1   fourth page.

2          If we can highlight the body of that e-mail.

3   Q.  So here, in January of 2005, Ms. Bliss is telling Scott

4   Tucker that your firm is going to prepare a response to

5   subpoenas for Preferred Cash Loan and Cash Advance, correct?

6   A.  Correct.

7   Q.  And she is inquiring what tribes those businesses are

8   associated with, correct?

9   A.  Yes.

10         MR. SCOTTEN:  I think we can go all the way up to the

11  top page again.

12         If we can highlight Scott Tucker's message.

13  Q.  So here Scott Tucker, in January of 2005, is

14  informing -- is Ms. Bliss your partner or your associate at the

15  time?

16  A.  I believe she is an associate at the time.

17  Q.  -- informing your associate that these are two different

18  trade names that the Kickapoo are using, Preferred Cash and

19  Cash Advance, correct?

20  A.  That's what the e-mail says, yes.

21  Q.  In fact, she references -- Scott references you again, Mr.

22  Tucker references you again, it says you drafted the articles

23  for the deal that put Cash Advance and Preferred Cash Loans

24  under this name, right?

25  A.  I would have drafted the articles of incorporation for KLC,

1   Inc.

2             MR. SCOTTEN:  If we go to the top.

3   Q.  So here we are talking about, again, a response to a

4   subpoena for Cash Advance and Preferred Cash Loans and

5   inquiring about where the Kickapoo tribe are in the process,

6   correct?

7   A.  This is an e-mail from Jennifer Bliss to Scott Tucker.  It

8   says, "In Conly's response this morning he asked the name of

9   the tribe to determine whether to respond or not.  I assume

10  this is because some of the tribes have not yet passed the

11  proper corporation documents and may weaken our argument."

12  Q.  So you're determining whether or not to respond to this

13  Colorado subpoena request, correct?

14  A.  That's what the e-mail says.

15  Q.  Do you believe it to be an accurate e-mail?

16  A.  I don't know that it's inaccurate.

17  Q.  Your associate referring to you what you said, correct?

18  A.  Yes.  That's what it says.

19  Q.  I think you testified earlier that you knew a little while

20  later Preferred Cash Loans was being used by the Santee Sioux,

21  right?

22  A.  Yes.  Once SFS became operational, it was utilizing

23  Preferred Cash Loans, is my understanding, correct.

24  Q.  So it's sort of between this time -- well, before this

25  time, right before this time, that Preferred Cash Loans is

1  getting served with process by the state of Colorado, correct?

2  That's why you have a subpoena you respond to?

3  A.   I believe that's correct.

4       (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ha5Wtuc3                    Schulte - Cross

1    Q.  But the subpoena had gone to the old Nevada address used

2    by -- when McLaughlin was doing this, correct?

3    A.  I don't recall, but that's -- that's a possibility.

4    Q.  Well, I mean, that's how -- Scott Tucker certainly is how

5    you found out about the subpoena, correct?

6    A.  I believe so.

7         MR. SCOTTEN:  If we can go back to Government Exhibit

8    4122, and if we can go to page 10, footnote 2.

9    Q.  Can I ask you to read the first sentence?

10   A.  "No other contacts are alleged in the pleadings that

11   Preferred Cash has by happenstance received."

12   Q.  So here you are stating that it is by happenstance that

13   Preferred Cash received the pleadings, correct?

14   A.  That's the sentence I read.  That's what it says, yes.

15   Q.  And this is, as we discussed yesterday, your brief.  You

16   either wrote it or approved it, correct?

17   A.  I would have been involved in the process.

18   Q.  I think you testified yesterday that no briefs in this

19   matter went out without your approval, correct?

20   A.  Without my review, correct.

21   Q.  You just walked us through the whole process of how

22   Preferred Cash Loans, the name, moved among various entities

23   associated with Scott Tucker, correct?  That's what we just did

24   five minutes ago.

25   A.  It appears that it was utilized by the kick -- well, I'm

1    not sure if the Kickapoo ever actually engaged in lending,

2    but --

3    Q.  And you just told us that --

4    A.  But it was assigned to the Santee Sioux.

5    Q.  And you just told us that the way you learned about this

6    subpoena was Scott Tucker?

7    A.  I believe that it would have been forwarded to our office

8    by Mr. Tucker, correct.

9    Q.  So in fact, you knew exactly how Preferred Cash had gotten

10   it, and it wasn't by happenstance, was it?

11   A.  Well, I think the point of this footnote was that there was

12   no -- that SFS was utilizing Preferred Cash trade name, had not

13   been properly served with process in accordance with the court

14   rules.  It is improper service to -- I mean, it's not

15   considered proper service of process when someone else hands

16   you a subpoena.

17   Q.  In fact, this brief has arguments about improper service,

18   correct?

19   A.  I believe so.

20   Q.  But in this footnote, you're not saying improper service;

21   you're saying that Preferred Cash received the subpoena by

22   chance, by randomness, it just happened to become aware of it,

23   correct?

24   A.  Actually, we are saying that.  The next sentence says,

25   "However, as respondent was not properly served with process."

1  Q.  OK, that is what the next sentence says.  But by

2  happenstance, that is not a true statement, is it, sir?

3  A.  Well, what do you mean by -- I believe it is true.  I mean,

4  the fact that it was not served by a proper, a person

5  authorized to serve and instead was sent to Nevada, to Kansas

6  City and then to us, I think that the point of it is that,

7  yeah, I mean --

8  Q.  Well --

9  A.  There was no duty on the part of anyone to send that to, to

10  us, but it was.

11         THE COURT:  Ladies and gentlemen of the jury, I'll

12  simply say that when a lawsuit is commenced, there are

13  procedures for how a person properly receives notice of that

14  lawsuit, and there are technical procedures as to how process

15  is to be served.  There's nothing unusual or wrong about a

16  party who believes they were not properly served asserting that

17  they were not properly served.

18         All right.  Go ahead.

19  BY MR. SCOTTEN:

20  Q.  And essentially, that's the argument you're making here,

21  correct, Mr. Schulte; you're saying this entity was not

22  properly served?

23  A.  Correct.

24  Q.  And you can say that even if you know exactly how you were

25  served, but as a -- I'm not using it pejoratively, as a

1   technicality, the service went to the wrong company, you can

2   say X company or Y company were not properly served, correct?

3   A.  I suppose that could be done, yes.

4   Q.  But here what you're saying is it was random, happenstance,

5   that you received the pleadings in this case?

6   A.  I don't think it was the intent to say randomly.  I think

7   the intent was to say that it was not received and how

8   subpoenas are ordinarily received.

9   Q.  Well, you knew that the subpoena had come to you from Scott

10  Tucker, because he had been involved in all three of the

11  entities whose names it had been moved around among, correct?

12  A.  Well, I'm not sure that it was actually looped around,

13  because I'm not sure that the Kickapoo ever actually utilized

14  it.

15  Q.  Two entities then, two or three?

16  A.  That's fair, yes.  Sure.

17  Q.  So an accurate statement would have been Preferred Cash

18  received this because Scott Tucker forwarded it to its counsel;

19  it was previously associated with the company in Nevada it was

20  sent to, correct?

21  A.  It could have been stated that way, correct.

22  Q.  And that's not happenstance at all, that's a definitive

23  explanation of how the company actually came to receive

24  process, right?

25  A.  It's a description of how process was actually -- wound up

1  with Preferred Cash.

2  Q.  That's not what's here, though?

3  A.  That's not what's stated there.

4  Q.  This also happened with the Miami tribe, didn't it?

5  A.  The Miami tribe, yes, was also involved in this as well.

6          MR. SCOTTEN:  If we can show the witness -- is 4117 in

7  evidence?  If we can show the witness 4117.

8  Q.  And so this is a response on behalf of Cash Advance,

9  correct?

10  A.  I can't tell from the first page.

11  Q.  Oh, OK.

12          MR. SCOTTEN:  Let's do two things.  Let's go one page

13  so the witness can see a bit more of it.

14  A.  Yes.

15  Q.  OK.

16          MR. SCOTTEN:  And let's go to the back page so

17  Mr. Bath can see the date.

18  Q.  And so this is also July 15, 2005, correct?

19  A.  Yes.

20  Q.  This is actually the affidavit we're looking at, but for

21  the July 2005 period, right?

22  A.  Correct.

23          MR. SCOTTEN:  Let's now go to page 8, note 2.

24  Q.  This is essentially identical language, except with respect

25  to Cash Advance, correct?

1   A.  It is.

2   Q.  And so here you are stating that Cash Advance has by

3   happenstance received the pleadings, correct?

4   A.  That's what it says.

5   Q.  And you, in fact, knew that Cash Advance had received the

6   subpoena because Scott Tucker was keeping you aware of these

7   matters, correct?

8   A.  The subpoena was -- yes, sent -- sent to our office, and

9   again the point was that it was not properly served in

10  accordance with the rules.

11  Q.  To be clear, it was sent to your office by Scott Tucker,

12  right?

13  A.  Correct.

14  Q.  And you knew that Scott Tucker had been associated with the

15  Cash Advance business going back to at least January of 2005,

16  correct?

17  A.  Yes.

18  Q.  So again, you knew how the subpoena had come to Cash

19  Advance; it was through the continuous involvement of Scott

20  Tucker, correct?

21  A.  It was forwarded by Scott Tucker.

22  Q.  And so the reason you are telling the court this happened

23  by happenstance, as opposed to what you knew had happened, is

24  because you didn't want there to be a connection between Scott

25  Tucker and these companies, correct?

1   A.  No, I don't believe so.  I believe -- and I don't recall

2   why that choice of language was used, but, I mean, the purpose

3   was to argue to the court that there was no proper service of

4   process.  And I don't think it matters how it was received.  If

5   it wasn't properly served, it wasn't properly served.

6   Q.  But you chose to tell the court something untrue about how

7   it was received?

8   A.  I wouldn't say that it was untrue.  It may be a poor choice

9   of words, but I wouldn't say it's untrue.

10  Q.  Because the truth was Scott Tucker sent me a subpoena and

11  it's a poor choice of words to say that it happened by

12  happenstance?

13  A.  It may -- it could have been phrased more accurately.

14  Q.  Mr. Schulte, you began your testimony by saying you were a

15  tribal attorney, correct?

16  A.  Yes, I do represent a number of Indian tribes, and -- and

17  that is the focus of the practice that my firm engages in.

18  Q.  And you look out for those tribes' interests?

19  A.  Yes.

20  Q.  And you were involved in the matter surrounding all these

21  businesses for over ten years, right?

22  A.  Yes.

23  Q.  Your firm made millions from it, right?

24  A.  Over the course of time, yes.

25  Q.  And made millions from checks signed by Scott Tucker,

1    right?

2    A.  Signed by Scott Tucker on behalf of the tribal entities,

3    yes.

4    Q.  And you rode on Scott Tucker's private jet during this

5    period?

6    A.  I have done that on a few occasions.

7    Q.  And you advised tribal entities who were settling a

8    personal lawsuit against Scott Tucker's business for about $30

9    million, correct?

10   A.  Correct.

11   Q.  And at the end of all this, the Miami tribe fired you,

12   because they realized you were working for Scott Tucker and not

13   them, correct?

14   A.  That is not correct.

15            MR. SCOTTEN:  No further questions.

16            THE WITNESS:  The Miami tribe was well aware at all

17   times that I represented Scott Tucker at the beginning of the

18   relationship.

19            THE COURT:  All right.  Cross-examination.

20            MR. SCOTTEN:  Redirect.

21            THE COURT:  I'm sorry.  We had cross-examination.

22   Redirect.

23            MR. ROTH:  It's been a while.

24            THE COURT:  Forgive me.  It's been a while.

25            Mr. Roth.

1    REDIRECT EXAMINATION

2    BY MR. ROTH:

3    Q.  Good afternoon, Mr. Conly.

4    A.  Good afternoon.

5    Q.  Do you have enough water there?

6    A.  I do.  Thank you.

7    Q.  I want to go back to your initial legal opinion that you

8    rendered to Mr. Tucker in 2004 regarding the tribal model.  Do

9    you recall that?

10   A.  The one -- are you talking about the email or -- sorry, the

11   memo of June, in June of 2004?

12   Q.  Yes.

13   A.  Yes, I recall that.

14   Q.  And that was your initial review of the tribal model and

15   his participation in that model, is that correct?

16   A.  That is correct.

17   Q.  And your recommendations in that memo were ways to

18   strengthen the tribal model both for Mr. Tucker and the tribal

19   entities, is that correct?

20   A.  Correct.

21   Q.  And you outlined ways to make it more defensible, is that

22   fair to say?

23   A.  Yes, that's fair to say.

24   Q.  And when you used the word "defensible," were you

25   anticipating regulatory challenges to the model?

1   A.  When you represent Indian tribes, you always anticipate

2   challenges from states on -- any time a tribe tries to engage

3   in any sort of economic development.

4   Q.  And is that one of the reasons why you have to be an

5   aggressive lawyer, if you will, as the government has

6   characterized you?

7   A.  I believe it's expected of me as a tribal attorney.

8   Q.  And you have to take innovative strategy, is that fair to

9   say?

10  A.  Yes, I mean, if tribes wouldn't innovate and were unable to

11  do things like acquire outside capital and expertise, they

12  would still be locked in a 19th century economy with a horse

13  and a plow.

14  Q.  And in regard to the recommendations or suggestions that

15  you made to make the model more defensible, over the course of

16  that ten-year period, when you were counseling both the tribe

17  and Mr. Tucker, were many of those suggestions implemented?

18          MR. SCOTTEN:  Objection.

19  A.  Yes.

20          MR. SCOTTEN:  Advice past the relevant time period.

21          MR. ROTH:  I'll confine it to 2008, your Honor.

22          THE COURT:  Thank you.

23          MR. SCOTTEN:  2004?

24          MR. ROTH:  I think he --

25          THE COURT:  Set a time period in your question and

1    then we'll see whether there's an objection.

2    BY MR. ROTH:

3    Q.  Well, you represented the tribe and tribal corporations all

4    the way to the end, until the Miami fired you, is that correct?

5    A.  Yes.  They stopped using our services.

6    Q.  Right.

7    A.  Correct.

8    Q.  And in fact, in respect to the Modoc, you still represent

9    them, is that correct?

10   A.  That is correct.

11   Q.  Do you represent the Santee still?

12   A.  Yes.

13   Q.  And both the Modoc and the Santee, today, as we sit here

14   now, are engaged in payday lending, is that correct?

15              MR. SCOTTEN:  Objection.  Relevance.

16              THE COURT:  Sustained.

17   Q.  Do you still represent both those tribes?

18   A.  I do.

19   Q.  And some of the things that you suggested in your June '04

20   memo were things like getting the tribal corporate governing

21   documents in place, is that right?

22   A.  Yes.

23   Q.  And the jury's seen, many of those were introduced over the

24   course of this lengthy trial?

25              MR. SCOTTEN:  Objection.

1          THE COURT:  Ask a question.

2          MR. ROTH:  I apologize, sir.

3          THE COURT:  Sustained.

4    BY MR. ROTH:

5    Q.  And you drafted many ordinances and codes in connection

6    with the lending activities of the tribal corporations, is that

7    correct?

8    A.  It is.

9    Q.  And you drafted licenses in regard to the lending operation

10   for the tribes?

11   A.  Yes, or -- me or my firm would have done that, yes.

12   Q.  And you set up management contracts with the tribes, is

13   that correct?

14   A.  Yes, we did draft management contracts.

15   Q.  And over the course of time, one of the objectives that you

16   suggested was that the tribes -- to Mr. Tucker, was that the

17   tribes got more involved in the operation, is that correct?

18          MR. SCOTTEN:  Objection.  Can we fix a date, your

19   Honor?

20   Q.  In your initial memo.

21   A.  Yes.

22   Q.  Is that correct?

23   A.  Yes.  Generally, that is -- and we were following the

24   Indian gaming model --

25          MR. SCOTTEN:  Objection.

1   A.  -- in providing that advice.

2          MR. ROTH:  Judge, I think they opened the door a lot.

3          THE COURT:  Overruled.  Next question.

4   BY MR. ROTH:

5   Q.  I didn't hear the answer.  I'm sorry.

6          THE WITNESS:  Can you read back my answer, please?

7          THE COURT:  No.

8   BY MR. ROTH:

9   Q.  You said something about the Indian gaming model?

10  A.  Yes, yes.  The advice that was given in that June, that

11  particular piece of advice in that June 2004 memo was based

12  upon our experience with the Indian gaming model wherein tribes

13  initially have no capital, no expertise --

14         MR. SCOTTEN:  Objection.

15  A.  -- so have to bring it in from --

16         MR. SCOTTEN:  Objection.  This is the Court's prior

17  ruling.

18         MR. ROTH:  This is 2004, Judge.

19         THE COURT:  No.  The point is that the witness is

20  permitted -- the witness is not here as an expert witness on

21  law.

22         MR. ROTH:  I appreciate that.

23         THE COURT:  The only person who gives you the law here

24  in this case is me.  The testimony of this witness goes to the

25  question of Mr. Tucker's willfulness and intent, and in that

1    regard, he is permitted to offer, and has offered, testimony

2    from this witness in an effort to establish that he did not act

3    willfully or with intent, but acted in good faith and relied on

4    what a lawyer told him was lawful.

5         Now, there's more to the good faith advice-of-counsel

6    argument than what I've just said.  I'll give you that in the

7    final instructions.  But that's the purpose for which the

8    testimony has been received, and therefore, the witness needs

9    to confine himself to what he told Mr. Tucker that Mr. Tucker

10   relied upon.

11        MR. ROTH:  Thank you, your Honor.

12        THE COURT:  And as I will tell the jury, on this

13   defense, you consider whether Mr. Tucker honestly and in good

14   faith sought the advice of a competent lawyer as to what he

15   might lawfully do.  This means that he sought and obtained

16   legal advice regarding a proposed course of conduct before

17   proceeding with that course of conduct.

18        You also will consider whether he fully and

19   honestly -- he, Mr. Tucker -- fully and honestly presented all

20   relevant facts to his lawyer and whether he honestly followed

21   such advice in good faith, relying on it and believing it to be

22   correct.

23        I will give you more on this in the final

24   instructions, but that's the limited purpose for which this

25   witness's testimony has been admitted.  No witness and no

1    lawyer may advise the jury on the law that applies in this

2    case.  That is solely my function, and I will do it in the

3    final instructions.  And as I told you when we first got

4    together, I will give you the oral instructions orally, but

5    I'll also give you a copy of them so you'll have them with you

6    in the jury room during deliberations.

7              Next question, Mr. Roth.

8              MR. ROTH:  Thank you, your Honor.

9    Q.  Mr. Schulte, in your June 2004 advice opinion to

10   Mr. Tucker, is one of the suggestions in the business model

11   that over time, that there should be tribalization of the

12   model?

13   A.  Yes.  I believe I advised that over time tribes should have

14   increased participation and perhaps eventually even buyouts of

15   the operation.

16   Q.  Buy what?

17   A.  Purchase.

18   Q.  And did that occur at some point in regard to any tribes?

19   A.  Well, in the end, the Modoc and Santee Sioux -- I mean, let

20   me change my answer and start over.  Yes, Miami's AMG Services

21   acquired the servicing company in 2008.

22   Q.  Well --

23   A.  And then starting in the beginning of 2016, both the --

24             MR. SCOTTEN:  Objection.

25   A.  -- Modoc and Santee --

1          THE COURT:  Sustained, sustained.

2     Q.  Let me stop you there?

3          MR. ROTH:  Judge, I'll ask another question.

4          THE COURT:  Stricken.

5     BY MR. ROTH:

6     Q.  Did you advise Mr. Tucker in 2000 -- did you advise him in

7     regard to the merger, the CLK-AMG merger?

8          MR. SCOTTEN:  Objection.  Time period.

9          THE COURT:  Let me hear the answer to the question.

10    A.  I advised AMG, and yes, there was discussions with me and

11    Mr. Morgan that involved Mr. Tucker about that.

12         THE COURT:  No, no, no.  That wasn't the question that

13    you were being asked.  As I understood the question, you were

14    asked whether you advised him in regard to the merger, and I

15    understand that question to mean you were acting as his lawyer,

16    giving him legal advice.

17         Were you acting as his lawyer, giving him legal

18    advice, on the merger?

19         THE WITNESS:  I do recall a memorandum in 2006

20    memorializing that advice, and yes, I did.

21         THE COURT:  So you were acting as Mr. Tucker's lawyer,

22    not lawyer for some other party?

23         THE WITNESS:  In 2006, I was.

24         THE COURT:  Thank you.

25    BY MR. ROTH:

1    Q.  And what was that advice, sir?

2            MR. SCOTTEN:  Objection.  It's 2006, as the witness

3    just clarified.  It's outside the Court's ruling.

4            THE COURT:  Let me see the parties at sidebar.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. SCOTTEN:  Your Honor, this came up yesterday on

3    his direct.  The same exact memo was offered.  The Court

4    sustained the objection to it.  It's legal advice in 2006,

5    which is undisputedly not only during the charged conduct but

6    when they were litigating in Colorado in defense of the charged

7    conduct.  It's outside the Court's ruling.

8          MR. ROTH:  Judge, yesterday, I think that both sides

9    agreed that Mr. Schulte was Mr. Tucker's lawyer to at least

10   2008 and was rendering legal advice up to that point.  If I am

11   not allowed to do it in terms of legal advice, I would like to

12   ask him factually, because as we indicated before, we believe

13   it is in direct rebuttal to their case in terms of their saying

14   that this merger was a sham.  And if he can factually talk

15   about the merger, without legal advice, I think that that

16   should be permitted.

17         MR. SCOTTEN:  And we have no objection to that, your

18   Honor.

19         THE COURT:  OK.  Good.

20         (Continued on next page)

21

22

23

24

25

1          (In open court)

2          THE COURT:  Please be seated.

3  BY MR. ROTH:

4  Q.  Mr. Conly, without indicating what legal advice you gave to

5  Mr. Tucker, if any, regarding that merger, what was the purpose

6  of that merger, factually?

7  A.  The purpose of that transaction?

8  Q.  Yes.

9  A.  The purpose was to --

10          THE COURT:  Whose purpose?  Can you please establish

11  that.

12  BY MR. ROTH:

13  Q.  What was the purpose for Mr. Tucker and what was the

14  purpose for the tribal entities?

15  A.  The purpose was the same.  It was to strengthen the

16  business model such that it would be wholly owned by the tribe

17  and therefore resolve any uncertainties with regard to whether

18  state jurisdiction would apply to some portion of the servicing

19  of the loan -- loans.

20  Q.  And when did that merger actually occur?

21  A.  I believe it was in June of 2008.

22  Q.  And at any point between your initial review of the lending

23  documents and the service agreements in June of 2004, did you

24  ever render an opinion to the tribes or Mr. Tucker in regard to

25  the illegality of the operations?

1          MR. SCOTTEN:  Objection as to tribes.

2          THE COURT:  Sustained.

3          MR. ROTH:  OK.  Withdrawn.  To Mr. Tucker.

4    Q.  Did you ever change your opinion about the legality,

5    illegality of the lending documents?

6          MR. SCOTTEN:  Change his opinion?  The witness's views

7    are not relevant.

8          MR. ROTH:  It's my last question on the subject,

9    Judge.

10          THE COURT:  No.  No, that's not the point.  The point

11    is, again, what's relevant is the communication between this

12    individual and Mr. Tucker.

13          MR. ROTH:  And Mr. Tucker, very well.

14          THE COURT:  Go ahead.

15    BY MR. ROTH:

16    Q.  Did you ever tell Mr. Tucker during that time frame that

17    his participation as a servicer to the tribal entities, the

18    lenders, was illegal?

19    A.  No.

20    Q.  The government asked you many, many questions in regard to

21    the division of revenue under the terms of the service

22    agreement, is that right?

23    A.  Yes.

24    Q.  That's the 99 to 1 percent of the gross collected revenues,

25    is that correct?

1    A.  We did discuss that, yes.

2    Q.  And is it correct, sir, that if there's no money, no

3    profits, the 1 percent is the better deal?  You're guaranteed

4    some money under 1 percent of the gross revenues, is that

5    correct?

6    A.  Yes.  If you're operating costs exceed your revenues, then

7    there is no profit at all.

8    Q.  And it's easier accounting, so to speak, if you will,

9    because it's just based on the money coming in, is that

10   correct?

11   A.  Yes.  It's an easy calculation.  You take the gross

12   collected revenues times 1 percent.

13   Q.  And the government asked you why you didn't step up for a

14   tribe and say, Why didn't you get 2 percent instead of 1

15   percent.  Do you recall those questions?

16   A.  I do.

17   Q.  Was a revenue split like this unusual in Native Americans

18   contracting with -- in your experience, Native Americans

19   contracting with outside vendors?

20          MR. SCOTTEN:  Objection.

21          THE COURT:  Basis.

22          MR. SCOTTEN:  Court's ruling, relevance of other

23   businesses and so on.

24          THE COURT:  Sustained.

25          MR. ROTH:  Judge, I think he went into this quite a

1    bit in terms of the proposed inequities, I would suggest.

2              THE COURT:  Next question, please.  I only sustain

3    objections to questions, not to areas of inquiry.  The

4    objection to that question was sustained.  Ask your next

5    question.

6    BY MR. ROTH:

7    Q.  Did the economic terms, the 99 to 1 percent, in your

8    opinion that you rendered to Scott Tucker, reflect that because

9    Tucker got the 99 percent that he was the owner of the

10   operation?

11   A.  Mr. Tucker owned the servicing operation up until 2008.

12   Q.  And the mere fact that the split was 99 to 1 didn't mean

13   that if he potentially got the greater portion of the lending

14   operation that he was the owner of the operation, is that

15   correct?

16             THE COURT:  Sustained.  Mr. Roth, you're familiar with

17   my ruling.

18             MR. ROTH:  Very well, your Honor.

19   Q.  There was testimony yesterday on cross-examination from

20   Mr. Hagan Scotten about a proceeding in Colorado on a Cash

21   Advance matter, is that correct?

22   A.  Yes.

23   Q.  And you asked to see the transcript of that proceeding, the

24   transcript, to amplify your answer, to put your answer in

25   context to some of the questions, is that right?

1   A.  I believe -- are you referring to the transcript of the

2   telephonic hearing --

3   Q.  Yes.

4   A.  -- in that matter?  Yes.

5   Q.  Government Exhibit 4131 that was shown to you, the excerpt

6   of that.

7   A.  Yes.

8   Q.  And have you had an opportunity to see that?

9   A.  Not since yesterday.

10  Q.  In that matter, you were not representing Scott Tucker, is

11  that correct?

12  A.  That is correct.

13  Q.  And you were representing MNE doing business as Cash

14  Advance, is that correct?

15  A.  That was one of the clients that I represented, yes.

16  Q.  One of the clients, OK.

17  A.  Yes.

18  Q.  And ultimately a bench warrant was issued for Mr. Tucker,

19  is that correct?

20  A.  Yes.

21  Q.  To your recollection, did you try to stop that bench

22  warrant?

23  A.  I had no further participation in that matter with regard

24  to Mr. Tucker's -- with the bench warrant.

25  Q.  Or the issuance of it?

1    A.  Correct.

2    Q.  Now, yesterday, the government showed you a bunch of

3    billing records.  Do you recall that?

4    A.  Yes.

5    Q.  A one-month billing record.

6        Is it fair to say, sir, that in respect to the millions of

7    dollars that the government said your firm received as a result

8    of your legal efforts, you actually did the legal work that you

9    billed for?

10   A.  Absolutely.

11   Q.  OK.  And for members of the jury who may not be --

12           THE COURT:  Ask your question.

13   Q.  What timing increments do you bill in, sir?

14   A.  One-tenth of an hour.

15   Q.  And that's six minutes?

16   A.  Correct.

17   Q.  Do you do detailed billing records?  Is that fair to say?

18   A.  Yes.

19   Q.  And you did so in all of these matters, is that correct?

20   A.  That is correct.

21   Q.  And those were approved at one point by the Miami nation,

22   is that correct?

23   A.  Yes, the invoices would have been sent to the Miami nation

24   for approval.

25   Q.  And the government introduced a stack of checks that were

1    made out to your law firm.  Do you recall that?

2    A.  I do recall that.

3    Q.  And those were checks that were issued by, from bank

4    accounts from various tribal entities, is that correct?

5    A.  That is correct.

6    Q.  And they were signed by Mr. Tucker, is that right?

7    A.  Yes.

8    Q.  And did Mr. Tucker have the lawful authority to sign those

9    checks?

10   A.  He did.

11   Q.  And --

12          MR. SCOTTEN:  Objection, your Honor.  Sorry I was

13   slow.

14          THE COURT:  All right.  Stricken.

15          MR. ROTH:  I didn't hear the objection.  I'm sorry.

16          MR. SCOTTEN:  The objection is to the question "And

17   did Mr. Tucker have the lawful authority to sign those checks,"

18   and I was slow, your Honor.

19   BY MR. ROTH:

20   Q.  To your knowledge, were those checks -- was he a signatory

21   on those accounts?

22   A.  Yes, he was a signatory on those accounts.

23   Q.  And had he gotten the power of attorney, to your knowledge,

24   to exercise authority over those accounts?

25   A.  Yes, each of those tribes had granted him the power of

1  authority -- I'm sorry, power of attorney to exercise authority

2  over those accounts.

3  Q.  But the tribes were still the owners of those accounts, is

4  that correct?

5  A.  That's correct.

6          MR. SCOTTEN:  Objection.  Legal conclusion.

7          THE COURT:  Sustained as to a legal conclusion.

8  Q.  The tribes could revoke any powers of attorney that they

9  gave to Mr. Tucker over those accounts at any point, is that

10  correct?

11  A.  Yes, the powers of attorney were revocable powers of

12  attorney, and in fact, they were revoked at some point in time.

13  Q.  They had the final ability to pull the plug, so to speak,

14  is that right?

15  A.  That's correct.

16  Q.  Your law firm grew to be the largest Native American law

17  firm in the country, you testified to, is that correct?

18          MR. SCOTTEN:  Objection.

19          THE COURT:  Overruled.

20  A.  I don't know that I testified to it, but I have been told

21  that we are, yes.

22  Q.  And your law firm grew to that status by promoting the

23  interests of justice of Native Americans and tribal entities,

24  is that correct?

25  A.  Yes.

Ha5Wtuc3                    (Continued on next page)

1   Q.  And your law firm didn't grow to be the most prominent

2   Native American law firm by representing businessmen like Scott

3   Tucker, is that right?

4   A.  That's correct.

5           MR. ROTH:  No further questions, Judge.

6           THE COURT:  All right.  You may step down.

7           Ladies and gentlemen, we're going to take our lunch

8   break.

9           Sir, you may step down.

10          THE WITNESS:  Sorry.

11          (Witness excused)

12          THE COURT:  Let me see the lawyers at the sidebar on

13  for one moment.  You can stand up and stretch, but just one

14  moment so I can give you further instructions.

15

16

17

18

19

20

21

22

23

24

25

Ha5Wtuc3                    (Continued on next page)

1           (At sidebar)

2           THE COURT:  Is Mr. Tucker calling Mr. Morgan?

3           MR. ROTH:  No.

4           THE COURT:  So I can send the jury home at this point?

5    You're going to rest?

6           MR. ROTH:  We're not going to rest until we get those

7    other documents.

8           MR. GINSBERG:  We can't rest until we see them.  As

9    the government usually phrases it, out of an abundance of

10   caution, until we get all of those emails and get to look at

11   them over the weekend in case there's something that we never

12   saw before or didn't have the ability to obtain, we don't want

13   to rest now.

14          THE COURT:  Do you have any other witnesses?

15          MR. GINSBERG:  I don't think we have any other

16   witnesses.

17          THE COURT:  But you may have other witnesses?  What's

18   going on here?

19          MR. GINSBERG:  There could be documents.

20          MR. ROTH:  Schulte could be recalled.

21          MR. GINSBERG:  I can't in good faith give you an

22   answer until we look at all the emails.

23          THE COURT:  The government created this, so I'm not

24   going to worry too much about it.  They're the ones who want

25   this.  They're the ones who have to bear the consequences of

Ha5Wtuc3                    (Continued on next page)

1    it.  OK.  But there's nothing else for this jury to do today?

2              MR. GINSBERG:  I think that's it for today.

3              MR. ROTH:  That's correct.

4              MR. GINSBERG:  That's correct.

5              THE COURT:  OK.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ha5Wtuc3                    (Continued on next page)

1          (In open court)

2          THE COURT:  Ladies and gentlemen, please be seated for

3     a moment.

4          Our workweek together has come to an end.  We're in

5     the final stages of the case, and while I can't make a final

6     prediction, because there are some issues, I presently

7     anticipate that there may be only one remaining witness left in

8     the case.  That could change, but that's as I see it now.

9          What we're going to do is break and pick up on Tuesday

10    morning at 10 a.m. sharp, and we will have that remaining

11    witness.  Thereafter, I anticipate that there will be closing

12    arguments from the lawyers.  The defendants have no obligation

13    to make a closing argument; defense counsel may, if they

14    choose.  Then I will give you final instructions on the law,

15    and at that point you'll begin your deliberations.

16         As I see it, that will probably be on the 11th of

17    October, exactly one month from the day that we first met.

18         Monday is the celebration of Columbus Day, and the

19    court is closed.  It's important over the long weekend that you

20    follow my instruction not to discuss the case among yourselves

21    or with anyone -- with your family, your friends; not to email

22    anyone, not to text anyone, not to do any searches on your own.

23         I've said this to you before and I'll say it again.

24    If you or a family member were involved in an important legal

25    proceeding, you would want that case decided only on what comes

Ha5Wtuc3                    (Continued on next page)

1    out in the courtroom.  That's what's fair, and that is what

2    compliance with my order requires.  So put the case out of your

3    minds for the weekend.  Leave your notebooks in the jury room.

4    Please remember to get here for a start at 10:00 on Tuesday.

5           You may have to get here a little bit early, because

6    Tuesday in this courthouse will be like a Monday.  It will be

7    the first day of the workweek because of the holiday, so

8    getting into the courthouse may be a little bit more difficult.

9    But I wish the Yankees good luck.  I wish everybody good

10   health, a good, peaceful weekend.  Put it out of your minds,

11   and I'll see you bright and early on Tuesday.

12          Thank you, ladies and gentlemen.

13          (Jury not present)

14          THE COURT:  And we'll pick up on the charge at 2:15.

15          Yes, sir.

16          MR. GINSBERG:  While Mr. Schulte's attorney is still

17   here, I hate to do this to him, but I guess to be very

18   cautious, I would ask the Court to instruct his counsel to

19   instruct Mr. Schulte that subject to our review of these other

20   documents, Mr. Schulte is potentially subject to recall as a

21   witness on Tuesday.

22          THE COURT:  All right.

23          Counsel will identify himself, please.

24          MR. CAGNEY:  Good afternoon, your Honor.

25          William Cagney, with Windels Marx, and I understand

Ha5Wtuc3                    (Continued on next page)

1   the request and that the recall application is outstanding.

2              THE COURT:  Yes, and so he is subject to recall.

3   Thank you.

4              MR. GINSBERG:  Thank you.

5              THE COURT:  See you at 2:15.

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HA58TUC4

AFTERNOON SESSION

2:30 p.m.

1
2
3    THE COURT:  So you all may remain seated during the

4 charging conference because I think it will be a little bit

5 easier to work with the documents.

6    What I would like to do is start from page 2 through

7 the section on the indictment on page 19.  And I know the

8 government has -- I will begin with the government -- the

9 government has proposed changes on, I guess page 10 and 11.  It

10 may refer to the prior draft page numbers.  No law enforcement

11 witness testified so you're suggesting that that be stricken.

12    MR. SCOTTEN:  I believe, your Honor, that the version

13 the Court -- I am standing.  I believe the version you have

14 circulated already has those changes.

15    THE COURT:  So that's taken care of.

16    Do I have a plural for cooperating witnesses?

17    MR. SCOTTEN:  I believe so, your Honor.

18    THE COURT:  So what does the government have at this

19 stage up to page 19?

20    MR. SCOTTEN:  Nothing, your Honor.

21    THE COURT:  Defendant Tucker, up to page 19.

22    You may remain seated, Ms. Van Ness.

23    MS. VAN NESS:  We have nothing, except we are going to

24 rely on objections that we have already made and have been

25 denied.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  No, you're not.  We are not going to have

2     an ambiguous record.  That is why we are having this charging

3     conference.  I have had everybody's instructions, everybody's

4     objections, everybody's paper.  I have taken it into account,

5     and I have incorporated it into what is now the second draft of

6     the instructions.  So now I want particularity as to what it is

7     that you're objecting to.

8          Now, I do know that on the bottom of page 14, uncalled

9     witnesses, one of the things you're objecting to is the giving

10    of an uncalled witness charge.  Correct?

11         MS. VAN NESS:  We are objecting to the phrasing of the

12    charge that the Court has put in its draft.

13         THE COURT:  Tell me what you would like me to change.

14         Now, if you have something before page 14, please tell

15    me.

16         MS. VAN NESS:  Your Honor, I apologize.  I thought

17    that given that you had revised your charge after looking at

18    our first set of objections, that the objections you denied,

19    for which we had no further support, would not be raised.

20         THE COURT:  They are all on the table.  This is why

21    it's a charging conference.  This is why I put out the draft.

22    It's Court Exhibit 13.  We are not going to have a sandbag in

23    the United States Court of Appeals for the Second Circuit,

24    where if you look at footnote 12 on my letter of September 15,

25    we clearly asked for this, that, or the other thing, or

1    objected to, and we assume the court denied it, because when we

2    got the second version of the charge it wasn't in there, and so

3    we claim that the court committed reversible error by

4    overlooking our instruction.

5            Now, I have put the instruction out here.  I have been

6    very clear.  I was very clear several times that we are going

7    go on the basis of Court Exhibit 13, and we are going to go

8    page by page, line by line.  I think I even said that

9    yesterday.  That's what we are doing.

10           MR. BATH:  Maybe I can address that paragraph.

11           THE COURT:  Sure.  Do you have anything up to that

12   point?

13           MR. BATH:  I do not.

14           MS. VAN NESS:  Yes, your Honor, I do, actually on page

15   5 of the revised charge.

16           At the end of the third full paragraph, that paragraph

17   ends with the statement, "The fact that one party called more

18   witnesses and introduced more evidence does not mean that you

19   should find in favor of that party."

20           We had asked that you add the uncontroversial

21   instruction:  It is the quality of the evidence, not the

22   quantity that matters.

23           THE COURT:  Any objection from the government?

24           MR. SCOTTEN:  Your Honor, one, we think sometimes

25   quantity does matter.  Two, as I think we stated in our letter,

1  there are a lot of instructions that are commonly given and

2  upheld by the Second Circuit as to reasonable doubt we would

3  also like given.  We think the Court should stick with this

4  existing charge and not have the parties go back and forth on

5  ten other ways to phrase it.

6  THE COURT:  I am going to do the following.  I am

7  going to add at the bottom of page 5 the following sentence:

8  "It is the quality of the evidence that matters."

9  Next.

10  MR. BATH:  I think that takes us to page 14, your

11  Honor.

12  THE COURT:  Good.

13  MR. BATH:  I suggest that the second sentence be

14  stricken.  It begins "I instruct you."  And, also, the first

15  word "therefore" of the second sentence.  So that that second

16  sentence would begin, "You should not draw any inferences."

17  THE COURT:  Why?

18  MR. BATH:  In this case, given the Fifth Amendment

19  issues -- and I know they happen in other cases, but here I

20  don't think it's accurate to say each party had equal

21  opportunity or lack of opportunity to call witnesses.  It

22  didn't because some took the Fifth, and we don't have that

23  ability to immunize anybody.

24  THE COURT:  Well, the equal opportunity or lack of

25  opportunity arises from their assertion of the Fifth Amendment.

1    I think it prompts speculation if I say something further

2    about -- by the way, who are the witnesses that said they would

3    assert the Fifth?

4              MR. BATH:  Joe Frazier, the former CFO, advised

5    through counsel he would.  Natalie Dempsey advised through her

6    counsel that she would.  Those are two.  I could think of more.

7              THE COURT:  I recall that there was an application at

8    one point that the Court compel the government to confer

9    immunity on various witnesses, and that application was

10   withdrawn.

11             MR. BATH:  You're correct.

12             THE COURT:  So I think this language is correct, and I

13   am going to give it.

14             MR. BATH:  Judge, in conjunction with that, we also,

15   in our first letter to you, asked that an instruction be given

16   about Don Brady.  I think this is an appropriate time to talk

17   about that.

18             THE COURT:  Yes.

19             MR. BATH:  We stand on our prior request.

20             THE COURT:  As to Mr. Brady, I have given this

21   thought.  I think saying more or highlighting him winds up with

22   juror speculation.  Remember, we had a discussion, What would I

23   say?  Would I say because of dementia?  Well, if I said because

24   of dementia, that would cause speculation as to whether he

25   suffered from dementia at some other point in time, earlier

1    point in time.  If I say illness, then it causes speculation,

2    well, maybe he is going to get better, maybe this was somehow

3    strategic.  I think it causes speculation.

4         I will not have a problem if either side says, you

5    know, Don Brady didn't testify.  I expect the Court will

6    instruct you each party had an equal opportunity or lack of

7    opportunity to call any of these witnesses, and you shouldn't

8    draw any inference.  You're allowed to say that.  But that is

9    something that would be left to argument.  I think it's not

10   appropriate to highlight one witness, and saying something

11   about the reason causes speculation.  But thank you for raising

12   it.  I had it very much in mind.

13        What next?

14        MS. VAN NESS:  Your Honor, on page 22, before you get

15   to the discussion of Count One, which is the RICO conspiracy,

16   we had requested that you charge the substantive law on RICO

17   before the conspiracy because we thought it would make it more

18   comprehensible.

19        THE COURT:  So is there anything further up to the

20   indictment on page 19?

21        MS. VAN NESS:  No.

22        THE COURT:  So now let me continue the way I was

23   going, which is I am going to turn to the government in the

24   first instance, from page 19 through the end of Count One,

25   which ends on page 31.

1          MR. RAVI:  With respect to Count One, as described on

2     page 23, it's really more of a renumbering.  The government

3     would submit that right now Count One is phrased as having six

4     elements, whereas the conspiracy is really two elements, and

5     would prefer that the language be parallel to what is described

6     for Count Five and Count Seven, where it describes two elements

7     for conspiracy and then describes separately four elements for

8     the object of the conspiracy as in the RICO count.

9          THE COURT:  I have to tell you, Mr. Ravi, when I read

10    through the charge, I felt I was lying to the jury.  I said to

11    them:  There are two elements to Count One, one and two.  Oh,

12    yeah, and then I forgot to tell you there are four more

13    elements to Count One.

14         These are the six things they need to find in order to

15    convict on Count One, is that correct?

16         MR. RAVI:  They only need to find the first two

17    elements, one of which is that there is an object of a

18    conspiracy, which are the four elements described in the

19    substantive count.

20         THE COURT:  Then what you're suggesting is that I can

21    tell the jury that if they find the first two elements

22    satisfied, they may convict on Count One, is that what you're

23    urging on me?

24         MR. RAVI:  So long as the agreement that they are

25    finding as to the object of the conspiracy is the four counts

1    described in the substantive RICO count.

2          THE COURT:  So then you agree with the defendant.  I

3    should not charge any of this on Count One?

4          MR. RAVI:  That is not what we are saying.

5          THE COURT:  It sounds to me what you're saying is,

6    find the first two, then find the next four.  Is that what

7    you're saying?

8          MR. RAVI:  I think what we are trying to get at, your

9    Honor, maybe charge the substantives first.

10          THE COURT:  That's exactly what the defendants asked

11    for, and maybe we have an agreement on it.

12          MR. RAVI:  Can we confer one moment, your Honor?

13          THE COURT:  Yes.

14          MS. VAN NESS:  Your Honor, may I say something while

15    the government is conferring?

16          THE COURT:  Sure.

17          MS. VAN NESS:  Having looked at the way your new draft

18    is structured, which is different from the way it was

19    structured in the old draft, I am going to withdraw the request

20    that you discuss the substantive counts before the conspiracy

21    counts.  This format is fine.

22          THE COURT:  Thank you.

23          MR. VELAMOOR:  Judge, we are just searching for

24    whether or not something that was in the original charge is in

25    the revised charge.

1          THE COURT:  That's fine.

2          MR. VELAMOOR:  What we are searching for is what was

3     on page 26, which is the instruction that conspiracy is

4     separate and distinct from the actual violation.

5          THE COURT:  I will tell you where it is.  In fact, my

6     recollection, Ms. Van Ness, is that you actually did have an

7     objection or a request, and I thought it was a good one.  So we

8     are going to go back and revisit it and maybe this will remind

9     you.  Let me just find it myself.

10          It's page 21.  Actually, I am a human being.  I know

11     this can be done better and that's why we have charging

12     conferences.  But it's page 21, the third full paragraph.

13          But I start off on 20 by saying, "There are 14 charges

14     and they fall into two types of charges:  Conspiracy charges

15     and substantive charges.  I will explain the difference as I go

16     along."

17          Then after Count One I say, "So Count One is a

18     conspiracy count, and Counts Two, Three and Four are

19     substantive counts."  And I do the same thing with Count Five

20     and Count Six.

21          I am happy to repeat the same sentence after Counts

22     Seven, Eight and Nine.  So Count Seven is the conspiracy

23     charge, Count Eight and Nine are the substantive charges.

24          Then I follow up with the following:  "So you can see

25     there are three different conspiracies charged in the

1    indictment.  A conspiracy is an agreement by two or more people

2    to commit a crime."  And I remember that Ms. Van Ness had a

3    language change you wanted to make there, and I will hear you

4    on that.  "I will tell you more on conspiracy in a moment, but

5    you should know that the conspiracy to commit a crime is,

6    itself, a separate crime."

7         MR. VELAMOOR:  We would just ask the Court to add the

8    sentence that was previously right after the substance of what

9    the Court just read, which is, "Indeed, you may find the

10   defendant guilty of the crime of conspiracy, even if you find

11   that the substantive crimes that were the objects of the

12   conspiracy were never committed."

13        THE COURT:  I think that's a correct statement of the

14   law.  I think it's implicit in what -- what would be the

15   confusion without that language?

16        MR. VELAMOOR:  I am not sure it's confusion.  I do

17   think it sort of brings it home to make sure there is no -- as

18   opposed to an abstract instruction as to what conspiracies are

19   and what they are not, this would make clear, in terms of the

20   actual function that the jury is performing, that they can find

21   guilt with respect to one.

22        THE COURT:  You guys don't need to hear philosophical

23   thoughts and all that, but I have cut down the instructions not

24   by much, but I have cut them down, and I believe the

25   instructions that are routinely submitted to courts in this

HA58TUC4

district are confusing, difficult to understand, verbose, and

they so over-explain things at times as to distract from juror

comprehension.  And if the name of the game here is to try and

get the Court to just drone on for hours so that comprehension

is lost, I am not in favor of it.  But let me hear the language

you want to add so I can at least consider it.

Indeed?

MR. VELAMOOR:  You may find the defendant guilty of

the crime of conspiracy, even if you find that the substantive

crimes that were the objects of the conspiracy were never

committed.

If the Court is not inclined to add any total words,

we would propose including that sentence and not the previous

sentence about conspiracy is separate and distinct from the

actual violation.

THE COURT:  What I propose to do is strike the

preceding sentence, the last sentence of that middle paragraph.

"You may find a defendant guilty of the crime of conspiracy,

even if a substantive crime that was the object of the

conspiracy is not proven."

Any objection from the government?

MR. VELAMOOR:  No, your Honor.

THE COURT:  From the defendant, to that language, to

the striking the sentence and inclusion of that language?

MS. VAN NESS:  No, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HA58TUC4

1          THE COURT:  Now, you had a change you wanted to make

2     in the second sentence of that paragraph?

3          MS. VAN NESS:  Yes.  I had actually flagged it for

4     page 24, but I see it is also on page 21.

5          Since you're giving sort of a preview of what

6     conspiracy law is, or general principles, I would ask that you

7     charge, if I can find it -- I am just looking for it, your

8     Honor.

9          THE COURT:  Take your time.

10          MS. VAN NESS:  Yes.  Define a conspiracy as, "A

11     conspiracy is a kind of criminal partnership, an agreement of

12     two or more persons to join together to accomplish some

13     unlawful purpose."

14          So that would go in replace of the second sentence of

15     that third full paragraph.

16          THE COURT:  Well, what I propose to give is, "A

17     conspiracy is an agreement by two or more people to join

18     together to accomplish some unlawful purpose."

19          Any objection?

20          MR. SCOTTEN:  No, your Honor.

21          THE COURT:  Any objection?

22          MS. VAN NESS:  I think adding "a kind of criminal

23     partnership" would be worthwhile, simply because it's true and

24     because it underscores that it must be a criminal agreement.  I

25     would just ask that you include the entire phrase.

1          THE COURT:  That objection is overruled.

2          So that paragraph is going to read:  "So you can see

3     there are three conspiracies charged in the indictment.  A

4     conspiracy is an agreement by two or more people to join

5     together to accomplish some unlawful purpose.  You may find a

6     defendant guilty of the crime of conspiracy, even if a

7     substantive crime that was the object of the conspiracy is not

8     proven."

9          What's next from the government?

10          Have you conferred and are you asking me to charge on

11     the substantive crimes before the conspiracy?  What do you want

12     me to do?  Do you want me to give the elements twice?

13          MR. SCOTTEN:  I think we are good with it as written.

14          THE COURT:  What I can do, if this is what you want, I

15     will charge on conspiracy and I will say, but you must find the

16     elements of Counts Two, Three and Four are met, and I will give

17     it once there.

18          MR. SCOTTEN:  I think we are comfortable as written,

19     your Honor.

20          THE COURT:  So what else through Count Four, from the

21     government?

22          MR. SCOTTEN:  I don't think anything.  Let me confirm.

23          Nothing, your Honor.

24          THE COURT:  Now, we will stop at page 37, up to advice

25     of counsel.

1          Let me inquire of the defendants whether there are any

2     objections up to advice of counsel on page 37?

3          MS. VAN NESS:  Yes, your Honor.

4          First of all, we reiterate our request for a different

5     definition of willfully.

6          THE COURT:  What page are you on?

7          MS. VAN NESS:  Page 25.

8          THE COURT:  Tell me what you would like me to strike

9     and what you would like me to add.

10         MS. VAN NESS:  One moment, your Honor.

11         We would like you to define willfully as "to act --"

12         THE COURT:  Where are you looking now?

13         MS. VAN NESS:  The first full paragraph, second

14    sentence, "willfully means."

15         THE COURT:  Now, you want me to strike the entirety of

16    that paragraph?

17         MS. VAN NESS:  That sentence.

18         THE COURT:  Just the sentence.

19         MS. VAN NESS:  And substitute, "Willfully means to act

20    with knowledge that one's conduct is unlawful and with the

21    intent to do something the law forbids, that is to say, with a

22    bad purpose to disobey or to disregard the law."

23         We have alternate requests for that definition, but

24    this refers to the legal argument we have made in various

25    pleadings, but most particularly in our initial charge requests

1   and exceptions, which is ECF 241, as supplemented by a filing

2   yesterday, which is ECF 250.

3          We rely on many cases.  The government, as we have

4   argued, has relied solely on the *United States v. George* case.

5   I know your Honor has read all this argument.  We believe that

6   they are using *George* as a decision by the Court of Appeals

7   which irrevocably modifies the standard definition of

8   willfully, even though it's not in the pattern charge, and that

9   the pattern charge correctly defines willfully, which requires

10  some knowledge, a general awareness of the unlawfulness of

11  one's conduct.

12         So we have made that argument.  We have cited cases

13  after *George*, where those pattern charges were given, and not

14  just in cases involving specific intent, though the *George* case

15  itself does not require a specific intent crime in order to get

16  the pattern charge language.

17         In the subsequent filing that we filed yesterday, ECF

18  250, I added a case, your Honor, from the Court of Appeals.  It

19  was *People v. Kelly*.

20         THE COURT:  Give me the *George* cite.

21         MS. VAN NESS:  386 F.3d 383.

22         I misspoke.  The filing I am relying on from yesterday

23  is ECF 249, not 250.

24         THE COURT:  You're talking about the letter of October

25  4th, is that what you're referring to?

1          MS. VAN NESS:  Yes.

2          THE COURT:  The four-page letter of October 4?

3          MS. VAN NESS:  No.  That's the charge request we filed

4     last night.  This was a two-page letter that was filed in the

5     afternoon, I believe.  ECF 249.

6          THE COURT:  I have a two-page letter also dated

7     October 4.

8          MS. VAN NESS:  Right.  It starts, "Your Honor recently

9     raised the issue of the enforceability of tribal laws."  That's

10    the document I am talking about.

11         The *Kelly* case that I am mentioning now is discussed

12    on page 2 of that letter.

13         THE COURT:  Let me say, with regard to, quote unquote,

14    pattern instructions, I am a great fan of Judge Weinfeld, of

15    Judge Sand, of Judge Rakoff, of John Siffert, but it's a

16    treatise, commercially sold.  That's all it is.  It has no

17    special status.  Great book.  Rely on it a lot.  But it has no

18    particular significance, and I think the aforementioned jurists

19    and lawyer would acknowledge that.

20         MR. SCOTTEN:  I don't know if this is helpful, your

21    Honor, but I don't think we are actually really relying on

22    *George* to make argument at this point.  So I don't want the

23    Court to spend too much time on it, and then have me say we are

24    not really talking about *George*.

25         THE COURT:  All right.  What then is the government

1  relying on?

2       MR. SCOTTEN:  It's not that we are disclaiming *George*.

3  I think, really, I should explain this in two parts.  One, we

4  think the Court has given the defendants what they asked for

5  and rejected the government's argument.  Our argument is that

6  in racketeering there is no requirement to show a purpose to do

7  something that the law forbids.  The Court's original

8  instruction, which simply required deliberate and intentional

9  action, was sufficient.

10      I think the most relevant case on that, which we have

11  cited essentially in every filing, is *United States v. Scotto*,

12  where, like this, with a racketeering conspiracy case, and like

13  this, it was not a case where it was conspiracy to commit

14  murder or something that self-evidently had a bad intent, and

15  the defendant raised an argument similar to one here, which is

16  that we should get some kind of instruction that we are acting

17  with a purpose that the law forbids.  The district court gave

18  that instruction, and then the circuit court said, in fact, the

19  district court's instruction was more favorable than the law

20  entitled the defendant to.

21      Now, we were not going to further press the fight.

22  There is no point in the government preserving objections.  So

23  if the Court intends to instruct willfully means to act

24  deliberately and with a purpose to do something that the law

25  forbids, that is giving the defendants their requirement of

1    some kind of unlawful purpose, which we have objected to.  To

2    the extent the defendants would expound upon that and use

3    additional language, I think that would be inconsistent with

4    the Court's general direction to keep this short, it would be

5    unnecessary for them to make the defense that they are laying

6    out, and would further, I think, confuse the jury into

7    considering some of the choice of law, immunity, and sort of

8    "we had a bunch of lawyers present" arguments that, for all the

9    reasons we have argued, are not relevant or correct law.

10            THE COURT:  What about an instruction that the

11   defendant need not have known that he was breaking any

12   particular law, but he must have been aware of the generally

13   unlawful nature of his act?

14            MR. SCOTTEN:  No objection.  If the Court wants to add

15   that, we don't think it's too material a change from what is

16   already there.

17            THE COURT:  Any objection from the defendant?

18            MS. VAN NESS:  Can you say that again?

19            THE COURT:  Sure.  The defendant need not have known

20   that he was breaking any particular law, but he must have been

21   aware of the generally unlawful nature of his act.

22            MR. SCOTTEN:  Your Honor, we just want to make sure,

23   are you adding that or replacing it?

24            THE COURT:  Adding that.

25            MS. VAN NESS:  You would add that to the sentence you

1    already have in the charge?

2             THE COURT:  Yes.

3             MS. VAN NESS:  So "willfully means to act deliberately

4    and with a purpose to do something that the law forbids," and

5    then the sentence your Honor just said.

6             THE COURT:  Yes.  Exactly.  Any objection?

7             MS. VAN NESS:  No.  That's fine.

8             THE COURT:  So I am adding the words -- I will read

9    them again -- the two sentences will be, "Willfully means to

10   act deliberately and with a purpose to do something that the

11   law forbids.  The defendant need not have known that he was

12   breaking any particular law, but he must have been aware of the

13   generally unlawful nature of his act."

14             All right?

15             MS. VAN NESS:  Your Honor, we consent to that, but for

16   the record, I just want to reiterate that our first request

17   from long ago, and reiterated in additional filings, was

18   that -- this is from the pattern charge as well -- if conduct

19   is not willful, if it was the result of the good-faith

20   misunderstanding of the requirement of the law.  In this

21   connection, it is for you to decide whether the defendant acted

22   in good faith, that is, whether he sincerely misunderstood the

23   requirements of the law or whether he knew what he was required

24   to do and deliberately did not do so.  That's Sand's

25   instruction 3A-3.

1          THE COURT:  What are you asking me to do?

2          MS. VAN NESS:  I am asking you to give that

3   instruction that I just read, in addition to the instruction

4   you have agreed to give, because all of those instructions are

5   in the pattern charge and they are all about different aspects

6   of the rule.  So I don't think they are redundant.

7          THE COURT:  The fact that they are in a

8   well-recognized treatise does not indicate that they represent

9   the law at all.  So therefore it's denied.

10         MS. VAN NESS:  I will just add a support for that

11  additional request.  The application of the collection of

12  unlawful debt statute to these facts in this context, where

13  tribal sovereign immunity is all over the case, this makes the

14  law's application at least as complicated as the tax laws and

15  the securities law, where good faith has been deemed to be a

16  part of the willfully instructions.  So that's the reason we

17  ask for it, your Honor.

18         THE COURT:  Do you urge that tribal sovereign immunity

19  makes the extending of a loan lawful?

20         MS. VAN NESS:  We urged that the fact that a state can

21  enforce its usurious interest rate against an entity means that

22  it is not an unlawful debt, and we have discussed this in other

23  parts of our charge.

24         THE COURT:  I am happy to talk about this any time you

25  want, but I think that flips it around entirely.  Why do you

1    talk about a state going after somebody?  That's not how this

2    works.  The debt is not enforceable under state law.  If you

3    went into a state court to enforce the debt, it likely would

4    not be enforceable.  That doesn't mean that the state has to

5    sue anybody.  It doesn't mean that a state actor would be

6    involved.

7              MS. VAN NESS:  Right.

8              THE COURT:  It doesn't mean that somebody would go to

9    jail.  The debt would not be enforceable.

10             MS. VAN NESS:  Right, your Honor.

11             THE COURT:  And, by the way -- and I am just going to

12   raise this again -- I invited the defendants to point to any

13   instance where any debt incurred by any of the lenders referred

14   to in the indictment during the course of the conspiracy was

15   sought to be enforced in a state court.  And as of the moment,

16   I have heard of no such instance.

17             MS. VAN NESS:  Your Honor, I am going to take full

18   responsibility for this.  I have said this in the two-page

19   letter you have, ECF 249, from yesterday.  My original

20   formulation of the argument about the enforceability aspect of

21   the RICO statute being part of the definition of unlawful debt,

22   I had flipped the parties, if you will look at the first

23   paragraph on page 1.  What I meant to say is -- and I think

24   that's what spawned the discussion on the record the other day

25   about whether a tribal loan would be enforceable in the state

1    of New York and public policy and so forth.  What I meant to

2    say is, the definition of unlawful debt requires that the rate

3    of interest charged be at least twice the enforceable rate.

4    That's part of the statute, the RICO statute.  Enforceability

5    is therefore part of the statutory definition of the offense.

6    Therefore, if the state's interest rate cap is unenforceable

7    because of tribal sovereign immunity and sovereign immunity,

8    then the debt is not unlawful.

9            I stuttered there.  Would you like me to say that

10   again?

11           (Continued on next page)

1          THE COURT:  No, but why do you import the concept of a

2     state actor being on the scene?  How do you read the statute to

3     require a state actor to do something?

4          MS. VAN NESS:  I'm not requiring the state to do

5     anything.  The definition of unlawful debt in 1961(6) is the

6     rate of interest must be "twice the enforceable rate," so our

7     position is that if the state rate, any state rate, is not

8     enforceable by virtue of tribal sovereign immunity, then it is

9     not an unlawful debt.

10          THE COURT:  And if a tribe went into a state court and

11     sought to enforce the debt, the state's cap on interest rates

12     would render that debt unenforceable.

13          MS. VAN NESS:  But that's not what we're maintaining

14     here, and this is covered in the two-page letter.

15     Respectfully, your Honor, I think that that switches the burden

16     of proof.  It's not that we have a burden of proving that a

17     tribal loan would be enforceable in New York or any other

18     state.  The government has to prove that it is twice the

19     enforceable rate.

20          THE COURT:  Right.

21          MS. VAN NESS:  It's their burden.

22          THE COURT:  I don't think I'm grasping your point.

23     I'm happy to read your two-page letter, but I don't know that

24     I'm grasping your point.  I got the statement in the second

25     sentence about the error in the prior submission.

1          MS. VAN NESS:  Right.

2          THE COURT:  Doesn't this imply that somebody is trying

3     to enforce something?  If the tribe sued on a debt in state

4     court, it wouldn't be enforceable, and if a debtor brought a

5     declaratory judgment action, the debt wouldn't be enforceable.

6          MS. VAN NESS:  But the definition of unlawful debt

7     does not simply refer to the usurious rate.  It refers to the

8     enforceable rate.

9          THE COURT:  That's why I'm talking about the

10    enforceable rate, a rate in excess of the rate provided by law.

11    A rate of 700 percent would not be enforceable.

12         MS. VAN NESS:  But the definition in the RICO statute

13    says that the rate has to be at least twice the enforceable

14    rate.

15         THE COURT:  And the enforceable rate in New York is 25

16    percent.  Twice that is 50 percent.

17         MS. VAN NESS:  But if it's not enforceable in New York

18    as a result of tribal sovereign immunity, it's not unlawful.

19    That's my point.

20         THE COURT:  But it's an enforceable rate if the

21    application of that rate renders the debt unlawful or

22    uncollectible, and that would be true if the tribe itself --

23         There's a concession in this case.  Tribes enjoy

24    sovereign immunity.  Let's take Mr. Tucker out of this.  Let's

25    take Mr. Muir out of it.  A tribe lends money and then the

1    tribe goes into a New York court.  Would not the cap render the

2    loan unenforceable because it's twice, or even once, or it's

3    above the enforceable rate in the state?

4              MS. VAN NESS:  Well, a bank that charges credit card

5    interest of a thousand percent could charge that in New York,

6    and the 25 percent criminal usury rate would not be enforceable

7    against the bank.

8              THE COURT:  It applies in consumer loans.  It doesn't

9    apply to certain categories of loans.  Right?  If you have a

10   loan, I think, in excess of 250,000 or a loan by a bank, the

11   rate doesn't apply.  Right?  It's not necessarily relevant to

12   this case, but I think there's a dollar amount, and there are

13   institutions to which the rate would not apply.

14             MS. VAN NESS:  And we're saying that the rate doesn't

15   apply here because of tribal sovereign immunity.

16             THE COURT:  What's your support for that?  What's your

17   support for the proposition that if a tribe went into a state

18   court in New York, New York's limitation on interest rates on a

19   consumer loan wouldn't be enforceable?

20             MS. VAN NESS:  Well, we're not talking about the tribe

21   trying to enforce its own loan.

22             THE COURT:  No.  I said the rate being enforceable,

23   the court says "I am enforcing New York's cap, and therefore,

24   this loan is uncollectible.  I enforce the cap."

25             MS. VAN NESS:  I'm focusing on another part of the

1    definition of unlawful debt, your Honor, which I quoted in that

2    letter, the two-page letter.

3              THE COURT:  I got your two-page letter.

4              MS. VAN NESS:  OK.

5              THE COURT:  Just tell me part you're relying on.  I

6    have the statute right in front of me.

7              MS. VAN NESS:  The definition of unlawful debt

8    requires that the rate of interest charge be "at least twice

9    the enforceable rate."

10             THE COURT:  Yes.

11             MS. VAN NESS:  So our position is it's not

12   enforceable.

13             THE COURT:  The enforceable rate would be the 25

14   percent, not 50 percent.  Correct?

15             MS. VAN NESS:  It's a question of whether the --

16             THE COURT:  When it refers to twice the enforceable

17   rate, the rate it's referring to, if you're talking about New

18   York, is 25 percent, correct?

19             MS. VAN NESS:  In general, yes.

20             THE COURT:  OK.

21             MS. VAN NESS:  That's the criminal usury statute.

22             THE COURT:  OK.  So why, because the tribe enjoys

23   sovereign immunity, would that rate not be enforceable, the 25

24   percent rate?

25             MS. VAN NESS:  If the tribe is immune --

1          THE COURT:  From suit.

2          MS. VAN NESS:  -- that means that the usury rate is

3     not enforceable against the tribe.

4          THE COURT:  That's a big leap.  I'm going to suggest

5     you read Justice Kagan's opinion in *Michigan v. Bay Mills*

6     *Indian Community*, in 2014.  She makes the point it's an

7     immunity; it doesn't even mean that you couldn't get an

8     injunction against tribal officials, just as you could get an

9     injunction against state officials who work for a sovereign

10    state.  It's not a question of anything other than who enjoys

11    an immunity from suit, and she points out that there are other

12    ways to enforce the law, other than suing a tribe.

13         MS. VAN NESS:  All right, your Honor.  I think I've

14    said what I can say, except that I will also point out that if

15    we're focusing on the New York State statute, the New York

16    State statute itself, the usury statute says "unless otherwise

17    authorized or permitted by law --"

18         THE COURT:  Right.

19         MS. VAN NESS:  "-- the rate is X."

20         THE COURT:  Right, and when the New York State

21    legislature puts a tribe, and maybe they someday will do it, in

22    the same category as a bank, then you have that argument.  It's

23    undisputed that a tribe cannot be sued.  They can't be

24    prosecuted under the criminal usury statute.  That is not the

25    equivalent of saying that the New York rate is unenforceable on

1    a loan by a tribe.  Those are two different things.

2          MR. BATH:  Judge, just for record purposes, and I

3    don't do civil work, but as I understand it Capital One gets to

4    charge a rate that's higher than the New York usury rate

5    because of the National Bank Act, because Congress has

6    essentially passed a law that they can do that.

7          Our position is because the tribes have sovereignty,

8    and part of that sovereign immunity is the sovereignty that

9    they get to pass -- unless Congress takes the power away from

10   them, which it hasn't, and there's been multiple times where

11   Congress, in the last five to seven years, has proposed

12   legislation that would do just that, to say there's a national

13   usury rate, unless they take that power from the tribes, then

14   the tribes can pass those laws, the tribes pass the law.

15         That's still doesn't mean, I agree with you, what the

16   New York court might or might not do, but that would seem to

17   come down to choice of law, and at the time of charged conduct,

18   there are not any cases that indicate that that rate that was

19   being charged by the tribes, that's alleged here, was

20   unenforceable.

21         THE COURT:  And I think yesterday I mentioned Judge

22   Seibel's decision in, I think, February 2017, but that's where

23   we are.

24         What else, Ms. Van Ness?

25         MS. VAN NESS:  Page 26.  This is somewhat of a

1  housekeeping matter, but when you are talking about Count One,

2  third element, you actually don't say, as you do with respect

3  to every other element, "The third element the government must

4  prove beyond a reasonable doubt is," so I would propose that

5  you add as a first sentence, "The third element that the

6  government must prove beyond a reasonable doubt is that the

7  enterprise alleged in the indictment that it calls the Tucker

8  Payday Lending Organization existed," and then you would modify

9  the second sentence, because you just defined the Tucker Payday

10  Lending Organization --

11          THE COURT:  One second now.

12          MS. VAN NESS:  OK.

13          THE COURT:  All right.  I propose to start it off, if

14  this is what you want me to do, "The third element the

15  government must prove beyond a reasonable doubt is the

16  existence of an enterprise that the indictment calls the Tucker

17  Payday Lending Organization."

18          Is that acceptable to the defendants?

19          MS. VAN NESS:  Yes.

20          THE COURT:  Is that acceptable to the government?

21          MR. SCOTTEN:  Yes, your Honor.

22          THE COURT:  OK.  And then it would pick up with, "The

23  alleged purpose of this enterprise was to enrich its leaders,"

24  etc.

25          All right.  What else?

1          MS. VAN NESS:  Before that sentence, the alleged

2     purposes of this enterprise, I would propose adding the

3     sentence, "The indictment charges that this enterprise is a

4     criminal organization, and that the alleged purposes," etc.

5     The language that says "the indictment charges that it is a

6     criminal organization" was in the Court's prior draft.

7          THE COURT:  I know.  I took it out.  Why do I need it?

8     It was in there.  I took it out.  I shortened a lot of things.

9     I think I told everybody at the outset, I tried to squeeze as

10    much out as I possibly could for the purposes of juror

11    comprehension.  This charge, as I see it now, is probably going

12    to go on for two hours, at least, maybe longer.

13         Go ahead.  Why do I need it?

14         MS. VAN NESS:  I just think it makes it clear that

15    since the Tucker Payday Lending Organization, so-called, is a

16    business, not the Mafia or a gang, a criminal street gang,

17    which is what we usually associate with racketeering statutes,

18    that it would be helpful to the jury to repeat the indictment's

19    definition of the enterprise as a criminal organization.

20         THE COURT:  And then we put in the instruction that an

21    enterprise can be a lawful business, an incorporation, a

22    partnership or an LLC or it need not be such a lawful business.

23    We're going to go around the block.  Do you want that also in

24    there, put in it's a criminal enterprise, but it could be a

25    duly incorporated corporation?

1      Ms. Van Ness.

2      MS. VAN NESS:  No.

3      THE COURT:  OK.  Because if I give one, I have to give

4  the other.

5      Go ahead.  Next point.

6      MS. VAN NESS:  Page 29.

7      THE COURT:  29?

8      MS. VAN NESS:  Yes.

9      THE COURT:  OK.

10      MS. VAN NESS:  26?  I'm sorry, your Honor.  Page 26.

11      THE COURT:  All right.

12      MS. VAN NESS:  In the last sentence of that page, it

13  reads, "The indictment further charges that the enterprise was

14  in the business of lending money at rates that were unlawful

15  under state usury laws, and that the rates of interest charged

16  were at least twice the maximum legal rates of interest."  We

17  would ask the Court to delete "maximum legal" and insert

18  instead "enforceable."

19      THE COURT:  Let me hear from the government.

20      MR. SCOTTEN:  I think in this context, your Honor, we

21  have no objection.

22      I suppose we should be clear, your Honor.  I think

23  that is literally what the law says.  We don't think that opens

24  the door to jury argument proposing the legal interpretation

25  that Ms. Van Ness just argued for.  That word "enforceable"

1    still means what the Court said it means, and we would object

2    and we would ask that the objection be sustained if they start

3    arguing the legal case Ms. Van Ness just made.  But this one

4    word appears to be consistent with the statute.  We don't want

5    it to be seen as changing the Court's interpretation of the

6    law.

7                THE COURT:  OK.

8                Go ahead.  Next point, Ms. Van Ness.

9                MS. VAN NESS:  Your Honor's already rejected our next

10   request, that we filed last night, about if we wanted the Court

11   to charge if the state is unable to enforce its usury rate

12   against an entity, the debt is not an unlawful debt.

13               THE COURT:  Whoa, whoa, whoa.  Say that again.

14               MS. VAN NESS:  If the state is unable to enforce its

15   usury rate against an entity, the debt is not an unlawful debt.

16               THE COURT:  I think, again, this highlights the

17   problem here, and this is where Justice Kagan's opinion is

18   rather helpful.  She makes the point that the conduct doesn't

19   become lawful; it's there is an actor who is immune from suit,

20   and the state may have other ways to enforce it other than

21   against the actor.  And she even suggests, for example, an

22   injunction and prosecution of people who assist in the unlawful

23   activity.  It's just the tribe is immune.  That's all.

24               Go ahead.

25               MS. VAN NESS:  In the last paragraph on page 29, the

Ha5Wtuc5

1    second sentence, the draft says, "In New York, the highest

2    enforceable rate of interest on consumer loans is 25 percent

3    per year," etc.

4            THE COURT:  Right.

5            MS. VAN NESS:  We ask that you modify that sentence to

6    read, "In New York, except as otherwise provided, authorized or

7    permitted by law, the highest enforceable rate on consumer

8    loans is," etc., and for that we rely on New York's definition

9    of criminal usury in penal law 190.40.

10           If you're having trouble following that, Judge, in our

11   charge request filed last night, it's No. 7 on page 2.

12           THE COURT:  Let me hear from the government.

13           MR. SCOTTEN:  Your Honor, this, I think, I'm sure, is

14   an attempt to bring in legal argument before the jury again.  I

15   think this New York statute cited here is actually exactly what

16   was referred to a minute ago when the Court made the point that

17   none of these authorizations or permissions by law apply here.

18   We're not dealing with, for example, a bank.  This is not a

19   question for the jury whether there is some legal exemption

20   here that applies, and if it were, as I think the Court said in

21   the charging conference, if it did, the Court would render a

22   judgment of acquittal.  But there is no ground for the jury to

23   start doing legal analysis to decide if it agrees, contrary to

24   *Bay Mills*, with its position on sovereign immunity.

25           THE COURT:  Ms. Van Ness, do you want to respond?

Ha5Wtuc5

1          MS. VAN NESS:  Only to say that you are citing the

2     definition of usury statute in New York, and this is part of

3     the definition, and we think it's appropriate for you to

4     include it.

5          THE COURT:  I would charge it if you could point me to

6     a relevant exception, and then I would charge the jury on that

7     relevant exception, so I would say "otherwise permitted by

8     law," and then I would say, "Law permits it if the following

9     circumstances are met," and then I would charge that.  But in

10    the absence of that, the instruction is correct.

11         Next point.

12         MS. VAN NESS:  Your Honor, on page 29 --

13         THE COURT:  Right.

14         MS. VAN NESS:  -- asking you to define or instruct the

15    jury on what the usury rate is in New York, we request that you

16    delete the balance of that paragraph and as well as the --

17         THE COURT:  Is this the second paragraph or the third

18    paragraph?

19         MS. VAN NESS:  The last paragraph.

20         THE COURT:  Last paragraph.  Go ahead.

21         MS. VAN NESS:  Just to delete the "So as to New York"

22    and basically doing the math for the jury.  We think it's

23    sufficient if you simply tell them what the rate is.

24         THE COURT:  What's wrong with saying twice 25 is 50?

25    Because it's going to come up later on when we get to 36

Ha5Wtuc5

1    percent, and I don't want a jury making an arithmetic mistake

2    on this.

3              MS. VAN NESS:  As I understand it, the rates are --

4              THE COURT:  Look, we could do jury instructions this

5    way.  I could sit here and I could read statutes.  I could read

6    the New York usury law.  I could read 1961, 1962(a), and just

7    read the statutes.  My job, as a judge, is to explain the law.

8              To say, Well, it's one thing to tell them the legal

9    rate is 25 percent, but don't tell them that twice the legal

10   rate means 50 percent, I don't get it.  What's your argument?

11             MS. VAN NESS:  Well, I just think it's unnecessary,

12   your Honor, and similarly on the next page, I would ask that

13   the example, which includes the first paragraph, which includes

14   the doing the math for the other states of 72 percent is not

15   necessary, and I would ask that the judge simply state that

16   some states, including that list you have, have rates of

17   interest different or even higher than New York, but none of

18   these states allows greater than 36 percent.

19             THE COURT:  All right.  Let me hear from the

20   government.

21             MR. SCOTTEN:  We think the Court's instruction is

22   helpful, and certainly legally permissible and should be

23   maintained.

24             THE COURT:  All right.  I'm going to give the

25   instruction as written in that regard.

1           Go ahead.  Next point.

2           MS. VAN NESS:  One moment, your Honor.

3           MR. BATH:  Judge, while she looks at that, can I add

4    something?

5           THE COURT:  Sure.

6           MR. BATH:  We went through 31 and then we went up to

7    37, and you're sort of progressing through the people, and I

8    don't want to think that it got skipped.  At one point in time,

9    we had objected to providing the indictment.  In pretrial

10   motions we talked about surplusage.  If the indictment's going

11   to go back, we'd renew that position, and I think we identified

12   the surplusage in the pretrial motions.

13          THE COURT:  I think you're raising an interesting

14   point, and I'm going to go through that with you on redactions.

15          MR. SCOTTEN:  Your Honor, a couple thoughts.  One, and

16   we apologize, we're not prepared for that.  I don't think we

17   have the indictment.

18          Two, there are certainly some portions of the

19   indictment that we agree wouldn't go back.  For example, on the

20   TILA counts, we didn't choose to submit proof of one of the two

21   objects.  Would it be helpful if the government proposed an

22   initial redacted indictment?  I'm sure the defense will still

23   have objections, but it might at least narrow things down.

24          THE COURT:  I think it would help, but I think

25   Mr. Bath's point is well taken.  To the extent that there's

Ha5Wtuc5

1  language in here that "the defendants systematically exploited

2  over 4-1/2 million working people throughout the United States,

3  who were struggling to pay basic living expenses, including for

4  food and housing," stuff like that, I am going to order

5  redacted.  You can take your best shot at it and send it to the

6  defense, and we'll see where we are from there.

7  MR. SCOTTEN:  Is there a particular time the Court's

8  going to want that in and to meet on it and so on, your Honor?

9  THE COURT:  I think it's reasonable to ask that you

10 get this to defense counsel by 2:00 tomorrow.  You can email

11 it.

12 Does that work for you, Mr. Bath?

13 MR. BATH:  Yes, sir.

14 THE COURT:  Does that work for the government?

15 MR. SCOTTEN:  We'll make it happen, your Honor.

16 THE COURT:  All right.

17 MR. SCOTTEN:  Does the Court want to, to the extent

18 it's going to do any --

19 THE COURT:  You can include me on what is sent.  You

20 can send it on to chambers, and any response I'll take a look

21 at.  That would be fine.

22 MR. SCOTTEN:  Understood, your Honor.

23 THE COURT:  Yes.

24 MR. BATH:  I have another, on page 24, Judge.

25 THE COURT:  Yes.

Ha5Wtuc5

1          MR. BATH:  The last line before Count One, second

2     element, it discusses, the government doesn't have to prove the

3     conspiracy in the entire time period.  I don't know that I've

4     ever, frankly, confronted this before, but obviously Mr. Muir

5     wasn't there for the first half, so I don't know if there's a

6     special verdict form.  I'm looking for some direction.

7          THE COURT:  I understand what you're saying, and I'm

8     not going to be able to give you the exact page number in here,

9     but I think it's in the instructions somewhere that you need

10    not be a member of the conspiracy for its entire time period.

11    Some people join, some people leave, membership changes.  The

12    important point is that during the life of the conspiracy, you

13    joined the conspiracy with knowledge of its unlawful purposes.

14         It's not at all uncommon in the garden-variety drug

15    conspiracy case that an indictment alleges the existence of a

16    conspiracy over a six-year period, and it's obvious from the

17    evidence that there are ten defendants and maybe only one or

18    two of them were in for the entire six-year period, the rest of

19    them joined later on, and some of them may have moved away and

20    left the country, and effectively withdrew.  But they're still

21    liable.  Withdrawal only has a relevance for statute of

22    limitations purposes.  That's the only significance there.

23         That, I believe, is an accurate statement of the law,

24    and although I can't tell you where it is in the charge, and I

25    stand to be corrected, I think that concept is in there.

1          Actually, it's on page 25, second full paragraph:  "He

2     can join the conspiracy at any point and need not have received

3     any benefit in return."

4          MR. BATH:  Thank you, Judge.

5          THE COURT:  Go ahead.

6          MS. VAN NESS:  We're up to the advice of counsel, your

7     Honor.

8          THE COURT:  All right.  And I think you had a helpful

9     suggestion that it should be labeled as applicable to Counts

10    One through Four.

11         MS. VAN NESS:  Yes.

12         THE COURT:  Was that your suggestion?

13         MS. VAN NESS:  Yes.

14         THE COURT:  So it's going to read "Counts One through

15    Four:  Advice of counsel as to Scott Tucker," and then in the

16    second paragraph, I'd start it off, "As to Counts One through

17    Four, in weighing this evidence, you must consider whether

18    Mr. Tucker honestly," etc.

19         MS. VAN NESS:  That's fine, your Honor.  Thank you.

20         THE COURT:  Any objection by the government?

21         MR. SCOTTEN:  To that modification, your Honor, no.

22         THE COURT:  OK.  Next.

23         MS. VAN NESS:  Your Honor, on page 38, this refers to

24    your special interrogatory.

25         MR. SCOTTEN:  Your Honor, before we do that, the

 1    government has a concern with advice of counsel.

 2              THE COURT:  Go ahead.

 3              MR. SCOTTEN:  We are not going to make an objection to

 4    the advice-of-counsel instruction.  One of the rare areas where

 5    there are cases suggesting that something about what the

 6    government did here, I just want to be clear, it is not because

 7    we think the evidence is legally sufficient.  It is only

 8    because there has been so much evidence about lawyers being

 9    involved here that we actually think the jury's already

10    thinking about it, and they need to hear the terms when it

11    doesn't apply, which are also in that instruction.

12              We do, however, request the addition of a single

13    sentence, on page 38 in the, I suppose, first full paragraph,

14    which is a single sentence, "On the other hand, no defendant

15    can willfully."  Following that sentence we would request the

16    Court also charge the jury, "A defendant is not immunized from

17    criminal prosecution merely because he consulted an attorney in

18    connection with a particular action."

19              THE COURT:  Why isn't that implicit in the sum and

20    substance of the charge I have given?  "As to Counts One

21    through Four, in weighing this evidence, you must consider

22    whether Mr. Tucker honestly, in good faith, sought the advice

23    of a competent lawyer as to what he may lawfully do"; and then

24    it goes on, "You must also consider whether he fully and

25    honestly presented all relevant facts and whether he honestly

1    followed such advice in good faith," so on and so forth, the

2    point being implicit in the instruction is the mere fact that

3    you talked to a lawyer is not a defense.

4          MR. SCOTTEN:  We certainly don't disagree with the

5    Court's reading of the instruction, but I think there are times

6    it's helpful to explain things to the jury.  The Court is

7    willing to do the math for the jury on the racketeering counts.

8    I think that is, frankly, a harder concept for them than this.

9    And it really goes to the argument we've been making throughout

10   the case where I think the Court has sustained our objections

11   in principle, although as a whole, we were utterly unsuccessful

12   in preventing the evidence coming in, that there was a lawyer

13   at every step, and the continuous argument by counsel, Well,

14   this person was a lawyer and that person was a lawyer and this

15   person was a lawyer and there were lawyers who filed this so it

16   implicitly must have been legal and lawyers were still willing

17   to work for you, and we think it is important for the jury to

18   understand, given the facts of this case, that the Court give

19   them an express instruction here, which is legally correct.

20         THE COURT:  I wish you better luck in drawing a

21   different judge out of the wheel on your next trial and one who

22   will faithfully adhere to the law of evidence, but you got what

23   you got.

24         MR. SCOTTEN:  We're not complaining about that, your

25   Honor.  We're simply noting at this point it's in the case, and

Ha5Wtuc5

1  we think the jury should be instructed on the principle of law

2  the Court, I think, has already suggested agrees here, I don't

3  think there's any dispute this principle of law is true, so we

4  think the jury needs to hear it.

5          THE COURT:  I'm not going to give it.  It's not

6  necessary.

7          One moment, please.

8          All right.  Go ahead.

9          MR. SCOTTEN:  Can I make one last pitch, your Honor?

10         THE COURT:  Yes.

11         MR. SCOTTEN:  I would only suggest if the Court agrees

12  it is legally correct, I think including it might help reduce

13  the risk of objections during summation.  Obviously nobody

14  wants to be objecting during closing arguments if it can be

15  avoided.  If the Court puts it in there, we can maybe sit on

16  our hands more and just let the rebuttal say:  Look, here's why

17  you should disregard that.  The Court is going to tell you this

18  principle.  Given it's an irrelevant proposition, and I think

19  the Court agrees with that, we don't want to be in the position

20  to stand up when we get two minutes of argument in summation

21  about how there were lawyers there.

22         MR. GINSBERG:  Do you want a nonlegal response to

23  that?

24         THE COURT:  Sure.

25         MR. GINSBERG:  It's sort of an implicit suggestion

1    that defense counsel ought to be careful of what we say because

2    the government might object, and it's up to us to say it right

3    and to know that the judge is going to instruct correctly on

4    the law, and we should behave appropriately in summation, not

5    to change the charge because the government may be forced to

6    object if they feel like it.

7              THE COURT:  Yes.  I endorse what you said.  I don't

8    disagree with anything you said.

9              MS. VAN NESS:  Can I say something else, your Honor?

10             THE COURT:  Yes.

11             MS. VAN NESS:  As I understand it, there has been

12   evidence that Mr. Tucker consulted the Preston Gates firm and

13   he consulted Cliff Cohen.  It's absolutely clear that he

14   retained those lawyers and that that advice is advice he got

15   within the rubric of attorney-client relationship, not just

16   some random lawyer that he met in a bar.  And then you have

17   also cabined Mr. Schulte's testimony, as I understand it, very

18   carefully to limit his testimony about the advice he gave to

19   Mr. Tucker to the period before the charged activity began, so

20   the jury hasn't heard testimony about lots of lawyers that he

21   might have seen on the television.

22             THE COURT:  Thank you.  This is what I propose to do,

23   add a second sentence under advice of counsel.  The first

24   sentence reads, "You have heard evidence that defendant Scott

25   Tucker received legal advice from lawyers, and you may consider

1    that evidence in deciding whether Mr. Tucker acted willfully

2    and with knowledge.  However, the mere consultation with a

3    lawyer is not itself a defense to criminal conduct.  In

4    considering whether Mr. Tucker acted willfully and with

5    knowledge as to Counts One through Four, you must consider

6    whether Mr. Tucker honestly and in good faith sought the advice

7    of a competent lawyer," etc., no further changes in the

8    entirety.

9         That's what I propose to do.  Any objection?

10        MS. VAN NESS:  Only insofar as consultation can

11   include legal advice, so I just don't think it's necessary,

12   your Honor.  I really don't.  And I think that what you've just

13   added, "However, the mere consultation with lawyers" -- I

14   didn't write down the rest of the phrase.

15        THE COURT:  "However, the mere consultation with a

16   lawyer is not itself a defense to criminal conduct."

17        MS. VAN NESS:  Well, seeking -- consultation with a

18   lawyer you have sought legal advice from is a defense.  I mean,

19   the word "consultation" --

20        THE COURT:  No, it's not.  Obtaining legal advice is

21   not a defense to criminal conduct.  No, it's not.  That's

22   exactly the vice that the government, quite appropriately, is

23   arguing that I negate, and I was taking the position before

24   that the charge sufficiently negated it.

25        Now, your argument convinces me that I need to make it

1    clear, quite frankly, because the charge couldn't be more

2    clear.  I thought before that mere consultation with a lawyer

3    does not provide for an advice-of-counsel defense, and if you

4    want to call it consultation or obtaining advice from a lawyer

5    doesn't provide a defense either.  The mere obtaining of advice

6    from a lawyer does not constitute the defense.  That was the

7    thrust of the charge, and apparently I need to make it clear.

8         MR. GINSBERG:  Not for us who are going to give the

9    summations, you don't.

10        THE COURT:  Pardon me?

11        MR. GINSBERG:  Not for those of us who are going to

12   give our summations, your Honor.

13        THE COURT:  I take your point, Mr. Ginsberg.  I'm not

14   doing it for that reason.  I don't think that's a valid reason.

15        I agree with you, and I have said that.

16        MR. GINSBERG:  OK.

17        THE COURT:  Anyway, that's what I propose to charge.

18   All right?  Any objection from the government?

19        MR. SCOTTEN:  No, your Honor.

20        THE COURT:  OK.  Now, additional questions.  Go ahead.

21        MS. VAN NESS:  The defense objects to that paragraph

22   in its entirety.  First of all, the definition you -- well, the

23   instructions suggest that the list of possible facts that you

24   have included as a matter of law constitutes ownership and

25   control.  We don't know, respectfully, I don't know where this

Ha5Wtuc5

1   list comes from, but I think that ownership and control are

2   concepts that jurors are familiar with, such as other concepts

3   in your charge, which you've said you can use your common

4   understanding of these terms, and that the whole issue should

5   be left for the jury to consider based on the parties'

6   arguments as to whether it's a sham or not a sham that they'll

7   make in summations, and that the list that you have provided to

8   define whether an entity is controlled by Mr. Tucker is, in

9   essence, a directed verdict.

10          THE COURT:  Wow.  I had the reverse reaction.  When I

11  started off, I wasn't going to define it.  What I constructed

12  here was the toughest standard that my brain could come up with

13  to hold the government to a standard.  Just saying control is

14  so loose, in my view, as to be -- I don't know if the point is

15  that if you make it really, really loose, then the answer to

16  the question won't mean anything.  I don't know if that's the

17  point.

18          Do you have a definition of "control" you want to

19  offer?

20          MR. GINSBERG:  If I may, here's our problem with it,

21  and I appreciate what your Honor just said.  The way we see it,

22  and this is conceptual, I guess, as well as the law, putting

23  this type of instruction, asking this type of question, with

24  the definition of "control" and "ownership," feels to us,

25  strikes us as something that the jury will hear and the jury

1    conceivably will say, What the judge is telling us is if we

2    find control and ownership, as the judge has asked us the

3    question and then defined it, and we find that Mr. Tucker

4    controlled and/or owned the business, he's guilty of the crimes

5    charged.

6         Now, you may not have intended it that way, but given

7    what's come out in the case and how it's come out in the case

8    and the distinctions that were being made and questions that

9    were being asked between who the lender was, who actually ran

10   the business or controlled the business, that question, sort of

11   in isolation, by itself, we think is problematic.

12        And then when we thought, Well, maybe if we add some

13   additional language separately but going along with it, Do you

14   find that the tribes were the lenders, it just starts to really

15   sort of complicate things and unravel it.  So we looked at not

16   only what your instruction was, but we looked at where it might

17   come from case law, and our concern became that there is some

18   case law, subsequent to the indictment, where there's what

19   appears to be more dicta/instructional language from the Court

20   of Appeals as to what might define control or ownership, but

21   that all of that postdated the charges and wouldn't apply, and

22   we were trying to figure out where else this came from.

23        Now, I understand by your explanation it didn't

24   necessarily come from there, but the more important point for

25   us is it just feels like this type of an instruction, without

Ha5Wtuc5

1    intending to do it, is sort of directing the jury to this

2    conclusion, If you answer the question this way and you find

3    these other things, you're on your way to finding Mr. Tucker --

4    and I'm just dealing with Mr. Tucker now -- guilty, because it

5    doesn't sort of fit with anything else.  Our preference would

6    be, even though your intention might have been to be neutral,

7    fair, even help the defense -- and I'm not suggesting you're

8    being biased towards us, but our preference would be not to

9    have that language in there for those reasons.

10         THE COURT:  All right.  One thing that, listening to

11   what you've said, I'm inclined to do is to put this question

12   after the charge on the last count, whatever it is.  I guess

13   it's 14, what have you.  I'll put it at the end.  The jurors

14   are to consider the charges in sequence, and it seems to me

15   this question should go on page 58, and after the jury has

16   considered the 14 counts in the indictment.

17         MR. GINSBERG:  The question here is, respectfully,

18   what does that do?  What does giving an answer to that question

19   and the jury determining those factors do when it doesn't

20   really fit into the elements of the crimes charged?

21         I think it would be different -- I mean, we all know

22   that, as a broad example, and maybe as your Honor has said, an

23   imperfect analogy, there are some cases where something like

24   this is required as a special interrogatory after the jury

25   finds something else, like in the narcotics counts, where there

Ha5Wtuc5

1    are quantities that need to be determined.  Once the jury

2    determines that the crime was committed, then there's, Did you

3    find this amount or this amount or this amount?  I don't think

4    we have that here, and I think that asking the jury to make a

5    finding on this isolated question and those isolated factors

6    doesn't advance the jury's determination of the necessity of

7    the government to prove all the elements of the crime beyond a

8    reasonable doubt, for the reasons I stated before, and also

9    because as critical a component as conceptually control and

10   ownership might be, in this particular case, with these

11   particular fact, so is, for example, who the lenders were.  And

12   I'm not suggesting you should do this, but then why wouldn't a

13   question be appropriate, Do you find that the tribes were the

14   lenders?

15            THE COURT:  And who would have the burden of proof on

16   that?

17            MR. GINSBERG:  It goes back to the control question.

18   I mean, is there any burden of proof on the control, and what

19   does that mean toward the rest of the charges?  It would be in

20   the same kind of category.

21            THE COURT:  But this question places the burden of

22   proof on the government.  Now, the government may object to

23   this.  Maybe they don't want me to ask the question.  Last time

24   I think they liked it, but people reserve the right to change

25   their minds, and I've heard some mind changing, which is fine.

Ha5Wtuc5

1    Maybe I've changed my mind on some things.

2         Let me hear what the government has to say.

3         MR. SCOTTEN:  Apologies, your Honor, if we had said we

4    liked it before, I didn't think we had.  We do object, your

5    Honor, sort of in two parts.  If the Court is inclined to give

6    it, we have wording objections.

7         THE COURT:  Let me hear the wording objections first.

8         MR. SCOTTEN:  OK.  The wording objections would be,

9    first, that because this is neither necessary nor sufficient to

10   a finding of guilt, it shouldn't be implied to be that.  I

11   think this is our concern in that it's not necessary to find

12   guilt and it's presumably the defendants' concern that it's not

13   sufficient, so we would suggest, similar to the drug analogy

14   that Mr. Ginsberg used, that it begin with something like, "if

15   and only if you have found the defendants guilty on one or more

16   of Counts Two through Four."

17        We agree with the Court's decision to move it, if the

18   Court is going to give it, to take it out of being considered

19   as anything the jury should consider when they're actually

20   determining the guilt of the substantive counts.

21        We also would change, in the second and third lines,

22   really in the third line, the sentence that begins, "Has the

23   government proven beyond a reasonable doubt," so that it reads,

24   starting at that point, "that at the time of any collection for

25   which you have found the defendant guilty, as to Counts Two

1    through Four," just because we think that the timing -- in the

2    substantive counts, there are particular collections and that's

3    really when the timing, I suppose, would matter.

4         And then our next wording objection, I think in large

5    part also go to why we object to the charge as a whole.

6         MR. GINSBERG:  And I would suggest given the way the

7    government phrases it --

8         MR. SCOTTEN:  Hold on.

9         MR. GINSBERG:  Oh, I'm sorry.

10        MR. SCOTTEN:  I'm not done.  I was just racing ahead

11   of the Court.

12        THE COURT:  Go ahead, Mr. Scotten.

13        MR. SCOTTEN:  We do think the Court did pretty

14   thorough work in making an incredibly high burden for us here,

15   and we don't think it's an accurate burden as to ownership and

16   control.

17        THE COURT:  You agree with Ms. Van Ness that I'm being

18   too tough on you.  She is concerned about that as well.

19        MR. SCOTTEN:  We appreciate that, your Honor.

20        THE COURT:  You might want to confer with her, and

21   maybe you all can agree on something more generous to the

22   government.

23        MR. SCOTTEN:  I think conceptually, because we don't

24   have to prove ownership or control to prove guilt here, we'd

25   rather it not be suggested to the jury that we do.  A huge

1    amount of this trial ended up talking about that, and so I

2    think the jury may be very inclined to think, That's the

3    question we have to decide here, and I think when they see it

4    in the Court's instructions, that may sort of take over their

5    thought process when, in fact, they should be focused on the

6    elements of the actual crimes charged.

7         THE COURT:  But here's the problem.  I threw you off

8    course by having you give me your alternate language, which I

9    find I liked.  "If, but only if, you have found any defendant

10   guilty on one or more counts of Counts One through Four."  I

11   have to figure out how to say it, though.

12        MR. SCOTTEN:  Your Honor, I would suggest that we

13   didn't throw you off course, but you pulled us onto your

14   course.  I was happy to give you my overall objection first.

15        THE COURT:  I understand.

16        MR. SCOTTEN:  And it is Counts Two through Four.  I

17   think the Court has it correctly there for substance.

18        THE COURT:  Yes.

19        MR. SCOTTEN:  The key wording objection, however, if

20   the Court again is inclined to do it, is we do think that if

21   you're going to give factors towards ownership and control, you

22   should say they're just factors.

23        THE COURT:  Right.

24        MR. SCOTTEN:  And they should be phrased in the

25   disjunctive.  I certainly don't think we have to prove, for

1    example, control of advertising in order to prove ownership and

2    control.  And this may help the defendants as much as us, but

3    we think they should just be listed as "some factors you may

4    wish to consider in assessing ownership and control are."  We

5    don't actually object to the Court's list as relevant things to

6    think about.  We just don't think we have to prove all of them

7    or that they're an exhaustive list.  I think the Court was just

8    suggesting to the jury these are relevant things to think

9    about.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. GINSBERG:  So my point is, if it were to come

2    after the jury were to determine guilt or nonguilt on the

3    counts, there is no need to ask them that question.  Because

4    the reason for the special interrogatories in other kinds of

5    cases is because -- I don't know how many years ago it was when

6    the Supreme Court began to instruct the courts in general that

7    it could not give sentences, impose sentences in certain areas

8    of the law without the jury's making a specific finding --

9          THE COURT:  Let me ask you, Mr. Ginsberg.  Here's the

10   question.

11         The defendants moved to dismiss the indictment based

12   on tribal sovereign immunity, is that correct?

13         MR. GINSBERG:  I believe we made that motion pretrial,

14   yes.

15         THE COURT:  And I said that I am not dismissing the

16   indictment, correct?

17         MR. GINSBERG:  Correct.  You may have said you're not

18   dismissing the indictment and you wanted to hear the evidence.

19         THE COURT:  I believe I did.

20         So what do you propose for me to do then, Mr.

21   Ginsberg?  Tell me about that.

22         If there is a verdict of guilty on Counts One through

23   Four, what will you ask me to do?  I would like to know that

24   now before I charge this jury.

25         MR. GINSBERG:  So you're suggesting to me that you

1  think that that answer is important to the Court, because if we

2  move to dismiss, without knowing that the jury determined that

3  Mr. Tucker controlled it, it might affect how your Honor rules

4  on the jury's verdict?

5       THE COURT:  I think something like that.  That isn't

6  exactly the way I would phrase it, but I think it's highly

7  relevant to that, if you're going to come back and you are

8  going to say either -- first of all, who decides tribal

9  sovereign immunity, the Court or the jury?

10       MR. GINSBERG:  You know, even sitting through this

11  whole trial and reading all the cases, I am not sure that the

12  application of sovereign tribal immunity is not a mixed

13  question, in some sense, of fact and law given the testimony in

14  this case.

15       THE COURT:  Were you going to tell me that after a

16  verdict or what?

17       MR. GINSBERG:  No.  I think we tried to sort of make

18  that argument earlier on.  I wasn't one of the real authors of

19  the pretrial motions.

20       THE COURT:  There was a motion addressed to the face

21  of the indictment.

22       MR. GINSBERG:  Yes.

23       THE COURT:  So now I am asking you, so we get a

24  verdict.  At that point, if it's a guilty verdict on Counts One

25  through Four, what do you say about tribal sovereign immunity

1    then?

2          MR. GINSBERG:  I think we would argue, and I don't

3    know if I could say -- putting aside your Honor's question, we

4    might still argue to the Court, and if we had to on appeal,

5    that given the facts of this case, tribal sovereign immunity

6    did apply on the facts of this case as they came out, and

7    therefore the verdict should be set aside.  But that's

8    different than control, because the way you're asking the

9    question and listing the factors of control, it's leaving out

10   at least, and I am not urging that your Honor keep it in, but

11   it's leaving out what we think is essential, which is who the

12   lender was.

13         THE COURT:  It doesn't leave it out at all.

14         MR. GINSBERG:  I think it does, because control and

15   ownership -- you can have control and ownership, under our view

16   of the evidence at least, and our view of what we have read,

17   even the most recent cases, you can have control and ownership,

18   but the tribes could still have been the lenders and the model

19   could still be permissible and/or the clients could have relied

20   upon what they were told.

21         THE COURT:  But the jury could not answer that

22   question yes if the tribes were the lenders, period.

23         MR. GINSBERG:  I don't know if --

24         THE COURT:  That's the fact.  And that's the end of

25   it.  Because the government will have failed to prove that the

HA58TUC6

1  lender was in fact Defendant Scott Tucker or an entity owned or

2  controlled by him.

3       MR. GINSBERG:  So can I ask you this question, to turn

4  the tables, which I don't get a chance to do too often.  If the

5  jury -- well, I did ask Judge Preska once if I could switch

6  places with her for one moment based on what my client said on

7  the witness stand, but it didn't work.

8       If the jury were to answer that question by saying no,

9  Scott Tucker was not the lender --

10      THE COURT:  Or the government had failed to prove

11 beyond a reasonable doubt he was a lender.

12      MR. GINSBERG:  -- would your Honor then, no matter

13 what the jury found on the other counts, would it be your

14 Honor's position that your Honor would have to set aside the

15 verdicts?

16      THE COURT:  No.  I would hear from you and I would

17 hear from the government.  But I assume that you would have a

18 much better argument if that were the case.  That may be why

19 the government is not so smashed with this idea.

20      MR. GINSBERG:  I understand.  It's not an easy thing,

21 because part of it is what you're saying in terms of what

22 you're trying to do, and I understand it, and part of it is we

23 have to have a concern about how it might affect the jury.

24 Will it influence the jury's decision on the counts that they

25 are being asked to decide in some way?

1          THE COURT:  That's why, number one, it's going to go

2     after the verdicts, and the jury will be instructed to take the

3     questions in the order in which they are presented.  That's

4     number one.

5          Number two, it will lead off with, "If, and only if,

6     you have found any defendant guilty on any of the Counts Two

7     through Four," and then it proceeds.

8          MR. GINSBERG:  So it would be like a special

9     interrogatory after the jury made a determination as to the

10    counts?

11         THE COURT:  Correct.  And not before.

12         MR. GINSBERG:  Then we would ask, if the language is

13    going to remain the way it is, or even if it's changed

14    somewhat, we would suggest that in the fifth line, it should

15    read, "Was Defendant Scott Tucker or an entity owned and

16    controlled by him?"  Not "or."

17         MR. SCOTTEN:  So that certainly has no legal

18    relevance, your Honor.  If he owns or controls, it's not the

19    tribes.

20         THE COURT:  I'm sorry?

21         MR. SCOTTEN:  The Court's current phrasing is correct.

22    The question is, Did he own or control the lender?

23         THE COURT:  I am inclined to agree with the government

24    on that.

25         Now, the reality is, just to be very honest with you,

HA58TUC6

1    this is not the time or the place for counsel to make their

2    final arguments as to what's the consequence of a yes or what's

3    the consequence of a no.  I am not holding the defense to that,

4    and I am not holding the government to that, because I would

5    want full briefing on that, if it ever arose.  I am not holding

6    you to that, but suffice it to say, from the defendants'

7    standpoint, not to be flip about it, a no answer is better than

8    a yes answer, and from the government's standpoint, a yes

9    answer is better than a no answer.  I was going to use a

10   stronger analogy, but they get distorted when quoted in briefs

11   to the Court of Appeals anyway.

12             MR. GINSBERG:  Not by lawyers.

13             THE COURT:  Not by lawyers.

14             All right.

15             MR. BATH:  Your Honor, I don't know whether it would

16   be permissible for Mr. Muir to waive his appearance the rest of

17   this hearing, only because he has a 7:00 flight.

18             THE COURT:  Absolutely.

19             Mr. Muir, is that acceptable to you.

20             DEFENDANT MUIR:  Please, your Honor.

21             THE COURT:  You are excused with the permission of the

22   Court.  I hope you have as good of a weekend as you possibly

23   can.

24             DEFENDANT MUIR:  Thank you, your Honor.

25             MR. GINSBERG:  If your Honor is going to leave the

HA58TUC6

1    language as it is, I guess the other question is, should

2    anything be done with the list of factors, which I guess we

3    would think about, but whether there should be fewer or more?

4    It's not exclusive, and even from the cases that were decided

5    before and after this case went to trial, I think there were

6    various courts that had various sorts of criteria and that no

7    court ever said these are the absolute criteria that would

8    apply.  That's an open question too, I suppose.

9              THE COURT:  Yes.  That's right.  That's right.  I am

10   going to read how I propose to do this, and I am going to let

11   you -- I am just going to ask that anything you have you fax to

12   chambers or file on ECF by the end of the day, by 4:00

13   tomorrow, so I have the benefit of it and can take it into

14   account.

15             My whole purpose in looking and spending time reading

16   cases on control, and I looked at a lot, was to make it tough,

17   not easy.  There are cases on control that have standards that

18   I think are too low of a bar.

19             So the way it would go now -- it's on page 38 -- "if,

20   but only if, you have found any defendant guilty on any of the

21   Counts Two through Four, you should respond to the following

22   question on the verdict form."

23             And then the question would be as written, except I

24   would strike the word "making" and insert in its place

25   "collection of."

HA58TUC6

1          And then the last sentence on 38:  "For the purpose of

2    this question, and solely on the issue of control, you should

3    consider the following factors:  Whether Mr. Tucker was the

4    source of funds for the loans, whether he bore the risk of

5    nonpayment of the loans, whether he had the power to direct the

6    activities of the entity, including day-to-day operations,

7    finances, lending decisions, distribution of profits, hiring

8    and termination of employees."  I am happy to strike

9    "advertising" and leave it as "solicitation of customers, and

10   banking and other third-party relationships."

11          MR. SCOTTEN:  I don't know that it matters much, your

12   Honor.  We don't object to advertising being a relevant factor.

13   Since we didn't try to prove it very much, we didn't want to

14   have to absolutely prove it.

15          THE COURT:  So that's what I am proposing at this

16   stage.

17          Let's go on to other things, unless you have a

18   language change at this point.

19          MR. GINSBERG:  No.  I missed my CJA interview so I may

20   ask you to write a letter to the committee to approve me for my

21   next term.

22          MS. VAN NESS:  Your Honor, on page 39, the tribal

23   sovereign immunity instruction.  Forgive me, I didn't realize

24   we were going to be discussing prior objections.  I thought you

25   rejected some of them.  But we object to the Court's charge on

1    this and renew our request to provide the instruction we

2    proposed previously in our request to charge number 32.  And I

3    think if I remember -- I don't remember, your Honor.  I'm

4    sorry.

5           So that's one request, that you give the charge we

6    requested in our request to charge number 32.

7           The other request is that you add to this charge,

8    since you're instructing the jury on the doctrine, that:  "I

9    instruct you that the three tribes at issue in this case

10   enjoyed tribal sovereign immunity with regard to the payday

11   lending operations you have heard about."

12          We ask for that instruction.  I think this is

13   consistent with the Court's view that you have stated already

14   and the government's concession, which they made on the record

15   earlier this week, that the tribes themselves, apart from

16   anything else, the tribes themselves do enjoy tribal sovereign

17   immunity with respect to these payday loans.  We think it's

18   important that you tell the jury that so they understand maybe

19   why they have heard all this testimony, and as a matter of law,

20   the doctrine is not simply a figment of the defense

21   imagination, but it's actually, vis-a-vis the tribes

22   themselves, a real issue.

23          THE COURT:  So what I am considering, and I will hear

24   both sides, is:  "The three tribes involved in the payday loans

25   at issue in this case are immune from suit by any state,

1    including under a criminal usury statute.  Immunity, however,

2    does not make the conduct lawful."

3         How does that sound to you, Ms. Van Ness?

4         MS. VAN NESS:  Well, I would ask that you add that

5    they enjoy immunity with respect to the payday lending

6    operations specifically, just so it's clear.  And I object to

7    your adding that it does not make the conduct lawful, for the

8    reasons I guess I have already stated.  But, also, you have

9    already included in your charge -- that's the last sentence

10   that is in your draft on page 39 -- that "the immunity does not

11   provide a tribe or its members with any rights to violate the

12   laws of any state, but it does limit a state's ability to

13   enforce its laws."  So you have already made that point to the

14   jury.  I don't think you need to add the language that it does

15   not make the conduct lawful.  We are simply trying to get a

16   balance here to show that, with respect to these loans, for

17   these tribes, that tribal sovereign immunity applies.

18        THE COURT:  Let me hear from the government.

19        MR. SCOTTEN:  So we object to the addition for several

20   reasons.  First, we think it is irrelevant, in the sense that

21   there is no dispute these tribes had it.  It's also not at all

22   relevant to this case legally because the tribes are not

23   charged here.  Therefore, it's very distracting to say, well,

24   look, these folks are immune, and how close Mr. Tucker was to

25   them.

1          THE COURT:  Then why did the government ask that I

2     give a charge on tribal sovereign immunity if it's irrelevant?

3          MR. SCOTTEN:  Unless we were going to succeed, which

4     we don't think we were, in keeping any mention of sovereign

5     immunity out of the case, we felt it was important to instruct

6     the jury that it doesn't entitle anyone to break the law or

7     make their conduct lawful.

8          To other points on this, your Honor, I think it may

9     actually not be legally right in the context of this case,

10    because although nobody is proposing to charge a tribe here,

11    sovereign immunity doesn't protect a tribe against federal law,

12    and this is a federal court.  So though sovereign immunity

13    applies to these tribes, it's sort of, in a federal court case,

14    not particularly relevant that a tribe has sovereign immunity.

15         In fact, in this case, entered into evidence by the

16    defendants, there is a non-prosecution agreement between the

17    Miami tribe and the government, which wouldn't make any sense

18    if the Miami tribe could have just told us we have got

19    sovereign immunity.  Because they can't, they entered a

20    non-prosecution agreement.  So saying that the tribes have

21    sovereign immunity, whether generally or with respect to payday

22    lending, in a case where there is a tribe that has not been

23    prosecuted but entered a resolution that contained the idea

24    that the tribe could be prosecuted, I think is legally

25    problematic.

1      Finally, your Honor, this is a secondary objection, but we

2   would suggest there shouldn't be any limitation to three

3   tribes.  Although three tribes ended up extending the loans

4   mentioned in Counts Two, Three and Four, the jury has heard

5   evidence of the Kickapoo and the Yurok, and they are certainly

6   implicit in the conspiracy counts at the very least.

7             THE COURT:  You're right.

8             MS. VAN NESS:  Your Honor, may I?

9             THE COURT:  Yes.

10            MS. VAN NESS:  The prosecutor just argued that there

11   is no dispute that the tribes have sovereign immunity here.

12   That might be true, based on the government's point of view and

13   the lawyers' point of view, but the jury doesn't know that.  So

14   I think it would be helpful to instruct them on that.

15            The government has also said that they might -- I

16   can't remember what the government said.  I'm sorry.

17            A second point they made would be resolved by the

18   instruction the Court has given not to speculate on any other

19   individual, or what happened to any other individual or entity

20   in the case.  The case is only about these two defendants.  So

21   I don't think that it's going to confuse the jury.  I think

22   it's going to help the jury to be given this instruction.

23            THE COURT:  Thank you.

24            MR. SCOTTEN:  If that's the defendants' concern, your

25   Honor, you could consider where it says tribal sovereign

immunity means federally recognized Indian tribes.  So you have

already said it protects federally recognized Indian tribes,

which each of the tribes mentioned in this case is.  That's

really the point.  That makes the defendants' point without

attaching excess significance to it or implying it's an

independent fact of significance.

MS. VAN NESS:  Your Honor, the charge now reads,

"Sovereign immunity does not provide a tribe or its members

with any rights to violate the laws."  So to be balanced, the

Court should also tell the jury that the tribes at least have

tribal sovereign immunity with respect to these loans.  Whether

they have been given the right to violate their own law or not,

it's true, and it's been conceded by the government, that the

tribes the jury has heard about actually have immunity with

respect to these loans, and I think it would also balance the

charge.

MR. SCOTTEN:  To be clear, your Honor, we also concede

that the Fourth Amendment protects the defendant against

unreasonable search and seizure.  The fact that we have made a

concession doesn't make the principle at all relevant.  And as

my colleague just pointed out, there are states that have

disagreed that the suggested tribes are subject.  And I think

most importantly, certainly these tribes do not have sovereign

immunity with respect to payday loans, in the sense that it

provides them any protection from the federal government, and

1    there is evidence of that already in the case.

2              THE COURT:  I understand.

3              MR. GINSBERG:  If I may, if they are using the

4    non-prosecution agreement as a basis for it, just because the

5    lawyer for the tribes thought that --

6              THE COURT:  That's not the basis for it.  I don't

7    think that's the basis for it.  The basis for it is tribal

8    sovereign immunity is immunity from suit by states; it's not an

9    immunity to suits by the federal government.  Under the case

10   law, I don't care about a non-prosecution agreement.  I get

11   your point on that.  It doesn't necessarily prove a whole lot

12   because somebody entered into a non-prosecution agreement.  I

13   take your point on that.

14             MR. GINSBERG:  I think we did have an earlier

15   discussion about lawfulness versus enforceability, which then

16   goes to whether or not, even if tribes can be prosecuted by the

17   federal government, the loans, if made by the tribes, were

18   enforceable.  And so we get into another little twist on this,

19   because that then sort of falls under tribal sovereign immunity

20   because they are allowed to enforce those loans notwithstanding

21   what the state usury laws are.

22             THE COURT:  I think if you read Justice Kagan, if

23   there were in personam jurisdiction, maybe a Nebraska court

24   could enjoin a tribal official from engaging in loans that are

25   usurious under the laws of any state, and the attorney general

of Nebraska could go in and get an injunction against that.  I
am not convinced that a federal prosecutor couldn't bring an
indictment under 1962(a).

If we are going to tinker with what is on 39, what I
am considering is adding a sentence after "tribal sovereign
immunity is a principle of federal law that protects
federally-recognized Indian tribes from being sued by states or
others," "it does not preclude suits by a federal government
against the tribe," period.

And then at the end add, "The tribes mentioned in this
case are immune from suit by any state, including under a
criminal usury statute.  Immunity, however, does not make the
conduct of the tribe lawful."

Is that acceptable, Ms. Van Ness?

MS. VAN NESS:  I can't say that that's acceptable, but
I would appreciate it if I would be given an opportunity to
read this charge later and consult with my fellow lawyers and
make a further objection with some basis, if we have one.

THE COURT:  I will give you an opportunity to talk
about it.  In the meantime, let me find out from the
government.

MR. SCOTTEN:  We still object also, your Honor.  We
think that drawing any attention to the immunity of the tribes
is a problem for jury confusion.  It's simply not relevant to
the issues before the jury.

1    THE COURT:  All right.  Well, I find one of these

2   unusual situations where, I don't know, maybe one side or the

3   other is doing a head fake on the other, by objecting and

4   saying, well, if they are objecting, it must be good.  But I am

5   going to put it in the draft instructions.  Again, anything you

6   want to send me by 4:00 tomorrow, I will take a look at it.

7    MS. VAN NESS:  Judge Castel, can you read the last

8   sentence you proposed to add?

9    THE COURT:  Yes.

10    "The tribes mentioned in this case are immune from

11   suit by any state, including under a criminal usury statute.

12   Immunity, however, does not make the conduct lawful."

13    MS. VAN NESS:  OK.  We will get back to you.

14    THE COURT:  All right.

15    What else do we have?

16    We have nine more counts.

17    Go ahead.

18    MR. GINSBERG:  Move to dismiss.

19    THE COURT:  What else, Ms. Van Ness?

20    MS. VAN NESS:  I believe my next request comes on page

21   45.

22    THE COURT:  What is it?

23    MS. VAN NESS:  Your Honor, at the top of the page, you

24   have an instruction about how the mens rea elements in the wire

25   fraud counts are questions of fact for the jury to determine

HA58TUC6

1    like any other facts and they involve the defendant's state of

2    mind.

3            I believe that same instruction applies for all of the

4    mens rea elements of all the crimes charged.  So if you don't

5    want to put it earlier in the general instructions, I would

6    suggest that the last sentence of that first paragraph to read,

7    "This question, as applicable to all the counts charged,

8    involves the defendant's state of mind."

9            It is just odd to have this limited to just the wire

10   fraud.

11           THE COURT:  Where do you want me to put it earlier in

12   the charge?  You tell me.

13           MS. VAN NESS:  Maybe the first time you mentioned

14   state of mind element, which I am not going to be able to find.

15   I am looking back at the racketeering conspiracy to see where

16   you first --

17           THE COURT:  How about page 25?

18           MS. VAN NESS:  You can put that after the paragraph

19   that defines knowingly and willfully.

20           THE COURT:  Any objection to my moving it from page 45

21   to page 25, the first full paragraph?

22           MR. SCOTTEN:  I am uncertain what "it" is.

23           THE COURT:  "It" is the sentence which reads, "This

24   question involves the defendant's state of mind."

25           I guess I would say, "The question of whether a person

HA58TUC6

1  acted willfully and knowingly involves the defendant's state of

2  mind."

3              MR. SCOTTEN:  No objection.

4              MS. VAN NESS:  It's a question of fact for you to

5  determine like any other facts.  In other words, it's part of

6  the first sentence of that page.

7              THE COURT:  You want to move two sentences, taking out

8  the words "with intent to defraud"?

9              MS. VAN NESS:  Right.  Yes.

10             THE COURT:  All right.  Taking out the words "intent

11 to defraud," those two sentences will be moved from page 45 to

12 page 25, and added at the end of the first full paragraph.

13             MS. VAN NESS:  Your Honor, I am looking at my first

14 set of objections, and they have the wrong page numbers because

15 they were referring to the prior drafts.  It's the second

16 element of wire fraud.  So it's that same element.

17             MR. SCOTTEN:  Before we move off this subject, your

18 Honor.

19             THE COURT:  Yes.

20             MR. SCOTTEN:  Can I just clarify?  What is on page 45,

21 essentially the Court just deleted the top paragraph, and page

22 45 is now going to begin with "direct proof of willfulness."

23             THE COURT:  Correct.

24             MR. SCOTTEN:  No objection.  I just wanted to make

25 sure I had it.

HA58TUC6

| | |
|---|---|
| 1 | MS. VAN NESS: I'm sorry, your Honor. One moment. |
| 2 | I think we are up to money laundering. |
| 3 | THE COURT: OK. That begins on page 49, conspiracy to |
| 4 | commit money laundering. |
| 5 | Let me ask the government, do they have anything up to |
| 6 | page 49, money laundering? |
| 7 | MR. SCOTTEN: No, your Honor. We do not have any |
| 8 | objections till about the late 50s. |
| 9 | THE COURT: I know a couple of people who have got |
| 10 | objections in their late 50s. |
| 11 | MS. VAN NESS: Actually, I do have one more request on |
| 12 | wire fraud. It's on page 54. |
| 13 | THE COURT: Well, that's in money laundering. Go |
| 14 | ahead. Page 54. |
| 15 | MS. VAN NESS: Yes. |
| 16 | THE COURT: Go ahead. |
| 17 | MS. VAN NESS: The second full paragraph, "I instruct |
| 18 | you, as a matter of law, in New York it is a felony." |
| 19 | THE COURT: Yes. |
| 20 | MS. VAN NESS: Can we ask that you revise "it is a |
| 21 | felony to take or receive any money as interest on a loan at a |
| 22 | rate exceeding 25 percent per year" to "it is felony to charge |
| 23 | interest at a rate -- " |
| 24 | MS. LIMANI: Give us one moment, your Honor. |
| 25 | MS. VAN NESS: Your Honor, we had proposed in our most |

1    recent objections to this charge that your Honor change "in New

2    York it is a felony" clause that I just read to include the

3    concept of "unless otherwise provided, authorized or permitted

4    by law."  And given that you have already rejected that

5    earlier, then we accept the Court's ruling, but that's our

6    objection.

7              THE COURT:  Thank you.

8              MS. VAN NESS:  Your Honor, on page 57, the first full

9    paragraph, you are essentially giving a repeat of a

10   circumstantial evidence charge with respect to this element,

11   and we don't think it's needed.  It shouldn't be singled out

12   for this element.

13             THE COURT:  Tell me where you are.

14             MS. VAN NESS:  First full paragraph of 57.  Proof that

15   the defendant knew the purpose of the financial transaction may

16   be established by proof that he knew or knew because of

17   circumstantial evidence.  And then you basically discuss

18   circumstantial evidence.  But I think you already instructed

19   the jury back in the beginning in your general instructions

20   about direct versus circumstantial evidence.

21             THE COURT:  That objection is overruled.

22             Go ahead.

23             MR. SCOTTEN:  Your Honor, I think the defendants' next

24   objection is on TILA.

25             MS. VAN NESS:  Yes.

1    MR. SCOTTEN:  We are going to partly agree with them,

2    and that might help things along.

3         THE COURT:  Go ahead.

4         MR. SCOTTEN:  It appears that their edits essentially

5    go to the question of finding the defendant guilty of failing

6    to provide information which he was required to disclose under

7    the TILA.

8         Our argument is actually not that they failed to

9    disclose information.  Our argument goes to the first part,

10   which is that they made affirmatively false disclosures.  And

11   so I actually think the Court could simplify that -- well, wait

12   a second.  I am looking at the Court's instruction and there is

13   no mention of failing to disclose.

14        It's in the top of 58, first paragraph, where it says

15   "or failed to provide information which he was required to

16   disclose under the Truth in Lending Act."

17        THE COURT:  You would consent to?

18        MR. SCOTTEN:  Deleting "or failed to provide

19   information."

20        THE COURT:  All right.  I assume there is no

21   objection.

22        MS. VAN NESS:  No objection.

23        THE COURT:  What else?

24        MR. SCOTTEN:  The only question I have there, your

25   Honor, is we had objected to the previous language on page 57,

 1    which is taken from the Code of Federal Regulations.  I don't

 2    understand its relevance here.

 3              THE COURT:  Tell me which language you're talking

 4    about.

 5              MR. SCOTTEN:  Going back to page 57, the second

 6    sentence of the TILA counts.

 7              THE COURT:  OK.  You object to the inclusion of that

 8    language, is that what you're saying?

 9              MR. SCOTTEN:  It is what I am saying, but I am wrong

10    so withdrawn, your Honor.

11              MS. LIMANI:  One moment, your Honor, please.

12              THE COURT:  Yes.

13              MR. BATH:  Judge, if I may?

14              THE COURT:  Yes.

15              MR. BATH:  In our original submission, we had a couple

16    of other lines that we thought should be included in the TILA

17    counts.  One is, "The disclosures must accurately reflect the

18    terms of the legal obligations agreed to between the parties."

19    And then --

20              THE COURT:  Where would you be putting this in?

21              MR. BATH:  I think after --

22              THE COURT:  Page what?

23              MR. BATH:  Page 57, at the end of that paragraph.

24              THE COURT:  Go ahead.

25              MR. BATH:  I think the Court added the first sentence

1    we requested.  So the next two sentences would be, "The

2    disclosures must accurately reflect the terms of the legal

3    obligations agreed to between the parties."

4           MR. SCOTTEN:  I believe that's there, your Honor.

5           THE COURT:  What?

6           MR. SCOTTEN:  I believe that's already in there.  It's

7    at the bottom of 57.

8           MR. BATH:  I'm sorry.  It is.

9           Then the last one is, "The legal obligation is

10   determined by referring to the loan agreement."

11          THE COURT:  I think that is surplusage.  It says, as

12   written, "must accurately reflect the terms of the legal

13   obligations agreed upon by the parties."  That seems to me to

14   cover it.

15          MR. BATH:  Understood, Judge.

16          THE COURT:  I have one I am going to add.

17          I am not exactly sure where the placement is, although

18   I think it's probably on page 62 above "duty to

19   deliberate/unanimous verdict."

20          It would be labeled "verdict form."

21          "You will be given a verdict form to record your

22   verdicts in this case.  You should proceed through the

23   questions on the verdict form in the order in which they are

24   presented."

25          Any objection?

1          MR. SCOTTEN:  No, your Honor.

2          MS. VAN NESS:  No, your Honor.

3          THE COURT:  What else?

4          MR. SCOTTEN:  Nothing from the government, your Honor.

5          MS. VAN NESS:  Amazingly, I have nothing more to say.

6          THE COURT:  Mr. Bath, thank you.  The usually quiet

7    Mr. Bath.

8          MR. BATH:  Judge, if I can ask a question about the

9    subpoena to Mr. Muir.  And my question is, the subpoena served

10   on him said all communications.  So that would be ten years.

11   That would be past the charged conduct, '13 to '16.  When the

12   Court ruled on crime fraud, obviously it was ruling through

13   '13, and I am trying to determine the scope of the subpoena.

14   Obviously, that would help us be able to produce the documents

15   in a more timely fashion.  So I am looking for some direction.

16         MR. VELAMOOR:  Judge, we will limit our subpoena only

17   to the extent of the Court's crime fraud ruling.

18         THE COURT:  And the crime fraud exception, do you view

19   that as coextensive with the period that the government alleges

20   Mr. Muir was in the conspiracy, which would be 2006 to 2013?

21         MR. VELAMOOR:  Yes, your Honor.

22         THE COURT:  So that's it.

23         MR. BATH:  Thank you, Judge.  That's all I have.

24         THE COURT:  I am going to miss you all.

25         MR. ROTH:  Mutual.

HA58TUC6

1          THE COURT:  I look forward to hearing from you

2    tomorrow.  I am sure you will miss me as much as I will miss

3    all of you.

4          Have a very pleasant weekend.  I hope you get to

5    reacquaint yourself with your families and that everybody stays

6    in good health and is back ready in action for Tuesday.

7          We are adjourned.  Thank you.

8          (Adjourned to October 10, 2017, at 10:00 a.m.)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

INDEX OF EXAMINATION

Examination of:                                          Page

CONLY JOHN SCHULTE

Direct By Mr. Scotten  . . . . . . . . . . . .2463

Redirect By Mr. Roth . . . . . . . . . . . . .2518

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 4138   . . . . . . . . . . . . . . . . . . .2492

 4139, page 1,  . . . . . . . . . . . . . . .2495

 4103   . . . . . . . . . . . . . . . . . . .2503

 4108   . . . . . . . . . . . . . . . . . . .2504

 207 . . . . . . . . . . . . . . . . . . . .2506