UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 16 Cr. 91 (PKC)

SCOTT TUCKER and
TIMOTHY MUIR, Trial

Defendants.

------------------------------x

New York, N.Y.
October 5, 2017
10:00 a.m.

Before:

HON. P. KEVIN CASTEL

District Judge
and a jury

APPEARANCES

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
BY: NIKETH V. VELAMOOR
HAGAN C. SCOTTEN
SAGAR K. RAVI
Assistant United States Attorneys

FREEMAN NOOTER & GINSBERG
Attorneys for Defendant Tucker
BY: LEE A. GINSBERG
NADJIA LIMANI
-and-
STAMPUR & ROTH
BY: JAMES M. ROTH

BATH & EDMONDS, P.A.
Attorneys for Defendant Muir
BY: THOMAS J. BATH
-and-
BEVERLY VAN NESS

(Trial resumed)

THE COURT: Please be seated. We have an issue we have to address.

Madam Deputy, please recount the telephone conversation that you had this morning.

THE DEPUTY CLERK: Juror No. 6 called up and said that there is starting to be a problem with this, and he said there's -- one of the jurors is drinking rum in the jury room. He said, but now the juror is putting it into a water bottle and bringing it into the courtroom, and he doesn't want it to affect anything, so -- he feels like it's starting to be a problem.

That's what he said.

THE COURT: All right. This is what I propose to do, and I want to hear from everybody. This is the reason why I'm letting it out. You may have a better idea or you may have an objection to my idea.

What I propose to do is call in four jurors. One of them will be juror No. 6, and the other three I'd be happy to hear from you all if you have any preferences, but the idea is to have a number that, in effect, gives juror No. 6 some degree of anonymity in this regard with regard to his fellow jurors. But I would question all four of them, because we'll get what juror No. 6 has to say and we'll get what these three other jurors have to say.

At that point I will have some basis to say either the allegation has support to it, the allegation does not have support to it, or I need further inquiry on the subject. If I were to conclude that the allegation had support to it, I believe that it would be proper at that point to question the juror, who I would hope at this point would have been identified, give him an opportunity to be heard, and then hear from you as to what action to take.

That's what I propose to do, and that's why I raise it with you. I'll hear the government's position.

MR. VELAMOOR: That's fine with the government, your Honor.

THE COURT: I'll hear Mr. Tucker's position.

MR. GINSBERG: It's fine with us. Maybe this is too obvious, but of the four jurors, are you going to call them one by one?

THE COURT: No, I'm not going to do that. I'll have them sit in the box and then we'll do the questioning at the sidebar.

MR. GINSBERG: Oh, OK, yes. That's all. I just wanted to know if they'd be segregated; it won't be like one person will speak and the others will hear it.

THE COURT: No. We'll do all the questioning of everybody at the sidebar, the jurors are used to that from the voir dire process, and the others will sit over there. We'll

have the white noise on. But by calling four right from the get-go, then there will not be suspicion as to who is who.

MR. GINSBERG: I'm fine with that.

THE COURT: All right.

MR. BATH: Judge, just so I understand, the juror who is allegedly engaged in this conduct has not been identified?

THE COURT: Correct.

MR. BATH: So we might randomly get that juror.

THE COURT: We might randomly get that juror.

MR. BATH: We have no objection to that process.

THE COURT: And that's just the reality. I was going to propose juror No. 1, juror No. 6.

Does the government want to pick one? I'll tell you what. Why don't I let you all pick. Or do you want me to pick?

MR. SCOTTEN: I think it would be fairer if the Court picks.

MR. GINSBERG: You can pick. I don't think we have a problem with that.

THE DEPUTY CLERK: They're not all here yet.

MR. GINSBERG: The only suggestion I would make about picking is we did have that one note from that one juror who seemed to be paying acute attention to everything when she wrote the note.

THE COURT: That was juror number?

MR. GINSBERG: 11, I believe. She's probably someone who is really paying attention.

THE COURT: I'm very open-minded. I'm going to call jurors 1, 6, 9 and 11. Again, after hearing from the first four, there may be further inquiry. We'll see how it goes.

MR. GINSBERG: Given the comment that you made earlier at the sidebar, should we just have one from Mr. Tucker's team, Mr. Bath and two from the government, so the jurors don't feel --

THE COURT: I think that's wise. We don't want the jurors to feel intimidated. I want you to be in hearing distance, but I will be right in front of the juror with the court reporter and you'll be able to hear it all.

MR. GINSBERG: Yes, your Honor.

THE COURT: And then if there is some follow-up after they return to the jury box, you can tell me what that is and we'll see whether it's appropriate.

MR. GINSBERG: Yes, your Honor.

THE COURT: Where do we stand with the jury?

THE DEPUTY CLERK: They're here.

THE COURT: Go in the jury room and have them all come at once. Do you understand, Flo?

THE DEPUTY CLERK: Yes.

(Jurors present)

THE COURT: Please be seated. Good morning, ladies

and gentlemen.

This is a routine matter that happens in the course of a trial. There are some questions that I'm going to be asking of jurors. I'm starting with the four of you that I pretty much just picked. We're going to set up at the sidebar.

Nothing to worry about. Nothing to worry about, so please be nice and relaxed. And you understand that the oath that was administered to you during the voir dire questioning still remains in force and effect. I'll take you in numerical order, and I just have a few questions to ask.

Carol, if you could set up at the sidebar, and the lawyers can come to the sidebar.

(At sidebar; juror No. 1 present)

THE COURT: How are you?

JUROR: Good. Thanks.

THE COURT: I'm just going to ask you some questions. Don't read anything into the questions.

Are you aware, have you observed any of your fellow jurors drinking what you believe is an alcoholic beverage in the jury room or in the courtroom?

JUROR: Yes.

THE COURT: That's the question.

JUROR: Yes.

THE COURT: Yes, OK. And can you tell me which juror that is?

JUROR: I don't know the number. I think --

THE COURT: If you know the name or the first name, we can look it up.

JUROR: Ysrael.

THE COURT: Who?

JUROR: Ysrael.

THE COURT: Ysrael. OK. Did he appear intoxicated to you at any point?

JUROR: No.

THE COURT: OK. And did he take the bottle out in plain view of everybody?

JUROR: Yes.

THE COURT: All right. Thank you very much. You can return to your seat.

JUROR: OK.

THE COURT: Thank you.

(Juror No. 6 present)

THE COURT: Hi.

JUROR: Hi.

THE COURT: I have really only one or two questions.

During the course of the trial, have you observed any of your fellow jurors drinking or consuming what you believed to be an alcoholic beverage, either in the jury room or the courtroom?

JUROR: Yes.

THE COURT: And which juror was that?

JUROR: 3.

THE COURT: 3. And his first name, do you know?

JUROR: Ysrael.

THE COURT: All right. Did he appear to you at any time to be intoxicated?

JUROR: Yesterday was the only day I've seen him doing it, so -- I mean, he made an outburst at the end, when we finished the trial. He said something stupid, so I don't know.

THE COURT: All right. And yesterday was the first time you observed this?

JUROR: Uh-huh. Yes.

THE COURT: Thank you. Thank you very much.

(Juror No. 9 present)

THE COURT: Hi. I have just one or two questions, so be nice and relaxed. Don't worry about anything.

In the course of the trial, have you observed any of your fellow jurors consuming or drinking what you believed was an alcoholic beverage, either in the jury room or in the courtroom?

JUROR: I think that someone took something in there.

THE COURT: All right.

JUROR: And that they were drinking something.

THE COURT: Pardon me?

JUROR: Someone took something in there, I think.

THE COURT: All right.

JUROR: But I don't know what nature it is. But I took different seat, so every day someone take something different, so -- someone different.

THE COURT: Do you remember which juror it was?

JUROR: That took it in?

THE COURT: Yes.

JUROR: I think Cece. The name is Cece.

THE COURT: The last name or the first name?

JUROR: First name. Sissy, Cicely, something like that.

THE COURT: All right.

JUROR: I think she -- I don't know if it's a drink or something, but it's something.

THE COURT: Well, what did it look like to you?

JUROR: It was a bottle.

THE COURT: All right. What kind of a bottle?

JUROR: It was transparent.

THE COURT: Right. It was a clear liquid?

JUROR: Clear liquid, yeah.

THE COURT: And did it look like it was --

JUROR: I did not look at it. I just know that she said she took it in there, and I saw the bottle. But I didn't --

THE COURT: Say it again.

JUROR: She said that she took it in there, but I didn't pay it no mind. But I know it was a bottle with some writings on it.

THE COURT: Did you believe it to be alcohol?

JUROR: I don't know. It could be, but I think she said she take it from her country, from Dominica, Dominican Republic.

THE COURT: OK.

JUROR: Or something like that. Some kind of a thing that they drink there.

THE COURT: Pardon me?

JUROR: Something that they drink in that country.

THE COURT: All right. Did you observe her exhibiting signs of drinking alcohol?

JUROR: No. Nobody, no.

THE COURT: All right. And you didn't see any other juror consuming --

JUROR: No.

THE COURT: -- alcohol?

JUROR: No. But the bottle wasn't open.

THE COURT: Oh, the bottle that you saw wasn't open.

JUROR: No.

THE COURT: OK. Thank you very much. You can return to the jury box.

(Juror No. 11 present)

THE COURT: Hi. Juror No. 11.

JUROR: Yes.

THE COURT: I just have one or two pretty straightforward questions. Have you seen any of your fellow jurors consume what you believed to be an alcoholic beverage in the jury room or in the courtroom during the course of this trial?

JUROR: Yes.

THE COURT: And what did you see and who did you see?

JUROR: I saw someone put alcohol in their juice drink, and they brought it into the court. Ysrael is the person.

THE COURT: OK. Did he appear intoxicated to you?

JUROR: No.

THE COURT: OK.

JUROR: He did it in the afternoon, so I don't know.

THE COURT: All right. And how many times did you see him do it?

JUROR: Just once. Someone brought in a bottle from the Dominican to give him.

THE COURT: I see.

JUROR: And he just poured a few -- a shot into it, the juice.

THE COURT: Did you see any other juror drinking any?

JUROR: No. No one.

THE COURT: Thank you very much. Do you know who brought in the bottle?

JUROR: I think her name is Nuria.

THE COURT: I'm sorry?

JUROR: Nuria.

THE COURT: Urea?

JUROR: Nuria. N-U-R-I-A.

THE COURT: Say the first --

JUROR: N as in Nancy.

THE COURT: All right.

Flo.

JUROR: She just brought it as a gift. I think she said her mother had brought it from the Dominican.

THE DEPUTY CLERK: What's her last name?

JUROR: I don't know anyone's last name.

THE DEPUTY CLERK: That's the first name?

JUROR: That's the first name. 17, I think.

THE COURT: OK.

JUROR: Now, I might have them confused, the last two. I think it's Nuria or Cecilia.

THE COURT: All right. Thanks very much.

(In open court)

THE COURT: Ladies and gentlemen, I'm going to ask you to return to the jury room. Actually, I think I'll have you stay out here. It's probably a better plan, so stay here. Let

me talk to the lawyers for a second.

(At sidebar)

THE COURT: I think for prudence' sake, I'd next like to have both Cecilia and Nuria in. We'll talk to them, and then finally, we'll talk to No. 3.

Any thoughts?

MR. VELAMOOR: That seems right to us.

THE COURT: OK. Bring them in, the two of them.

(Juror No. 17 present)

THE COURT: Nuria, come on down. Hi.

JUROR: Hi.

THE COURT: Nuria, what's your last name?

JUROR: Cornielle.

MR. SCOTTEN: Your Honor, mind if we switch on the white noise?

THE COURT: Thank you.

I just have a couple of questions, and I have to tell you that you're still under the same oath you were when I questioned in voir dire.

Have you observed any of your fellow jurors drinking or consuming any alcoholic beverage in the jury room or in the courtroom?

JUROR: Yes, I did.

THE COURT: And tell me about that.

JUROR: Well, somebody brought a bottle from my

country, and she just gave it to him.

THE COURT: Gave it to this one juror?

JUROR: Yeah, but to take it home.

THE COURT: To take it home?

JUROR: Yeah. He just opened it.

THE COURT: And which juror was this?

JUROR: Ysrael.

THE COURT: And you didn't bring the bottle, did you?

JUROR: No.

THE COURT: And you didn't have any of it?

JUROR: No.

THE COURT: And the juror who brought the bottle in was?

JUROR: Cecilia.

THE COURT: OK. Thank you very much. You can return to your seat.

Cecilia.

(Juror No. 18 present)

JUROR: Good morning.

THE COURT: Excuse me a second.

Hi, Cecilia. How are you?

JUROR: Good.

THE COURT: Your last name is?

JUROR: Rosa.

THE COURT: And you're still under oath from the voir

dire we conducted a couple of weeks ago.

Just a few simple questions. Have you seen or observed any of your fellow jurors drink or consume any alcoholic beverage, either in the jury room or in the courtroom?

JUROR: No.

THE COURT: All right. Did you or any other juror bring a bottle that contained an alcoholic beverage into the jury room?

JUROR: No.

THE COURT: All right. Thank you very much. You can return to your seat.

JUROR: OK.

THE COURT: There's another juror? Come over here, Madam Deputy, and just state it on the record.

THE DEPUTY CLERK: Kelcey McCarthy. Kelcey?

THE COURT: What juror number is that?

THE DEPUTY CLERK: She's 15.

THE COURT: OK. Bring her in.

(Juror No. 15 present)

THE COURT: How are you?

JUROR: OK.

THE COURT: Just relax. Now, I've told every juror this, so I'm going to say the same thing to you, that the oath that I gave you during questioning still applies here.

JUROR: OK.

THE COURT: Your full name is?

JUROR: Kelcey McCarthy.

THE COURT: OK. Did you observe any juror consuming or drinking any alcoholic beverage in the jury room?

JUROR: Uh-huh.

THE COURT: You have to say it in words.

JUROR: Yes.

THE COURT: And what did you observe?

JUROR: Some rum.

THE COURT: OK.

JUROR: Poured into coffee.

THE COURT: Which juror was this?

JUROR: Ysrael.

THE COURT: I'm sorry?

JUROR: I don't know his name -- Ysrael.

THE COURT: You don't know his first name?

JUROR: Ysrael.

THE COURT: Oh, Ysrael. I see. Come a little closer. I won't bite, I promise.

Now, do you know who brought the beverage in?

JUROR: No.

THE COURT: OK. Thank you very much. Did he appear intoxicated to you?

JUROR: No.

THE COURT: OK. Thanks very much. You can just have a seat in the jury box.

(Jurors not present)

THE COURT: At this stage what I propose to do is bring in Ysrael and see what we find out. Is there agreement that if, at the conclusion, I conclude he's consuming alcoholic beverages in the jury room or the courtroom that I should excuse him? It's not necessarily an obvious question, because no juror has said he was intoxicated. It sounds like this just happened. But I think the thing to do is for me to question him and then we can make up our minds. OK?

MR. VELAMOOR: Yes, your Honor.

MR. GINSBERG: Yes.

MR. BATH: Yes.

THE COURT: Bring him in.

(Juror No. 3 present)

THE COURT: Hi, how are you?

JUROR: Good.

THE COURT: Your name is.

JUROR: Ysrael Ventura.

THE COURT: OK. The oath that I gave everybody at the beginning of the case, all the jurors, applies to you now. OK?

Just a few simple questions. Have you or any other juror that you've observed consumed what was or what appeared to be any alcoholic beverages in the course of the trial,

either in the jury room or in the courtroom?

JUROR: I did, yesterday.

THE COURT: OK.

JUROR: Yeah.

THE COURT: And tell me about that.

JUROR: It was -- another juror brought a bottle for, for me to take it home.

THE COURT: Right.

JUROR: And then I pour a little bit in the coffee.

THE COURT: All right.

JUROR: Yeah.

THE COURT: Did you observe any other juror taking any?

JUROR: No, no.

THE COURT: And how much did you pour in?

JUROR: Just a little bit. In the coffee, in the morning.

THE COURT: In the morning?

JUROR: Yeah.

THE COURT: And which juror brought in the bottle?

JUROR: It was -- I forgot her name. Cecilia.

THE COURT: Cecilia?

JUROR: I think, yeah.

THE COURT: All right. And why did she bring the bottle in?

JUROR: Because she just said she had three at home, and she just wanted to give me one.

THE COURT: Right.

JUROR: So I can take it home.

THE COURT: All right.

JUROR: Yeah.

THE COURT: Let me ask you, did you observe any other jurors having any?

JUROR: No.

THE COURT: Anything to drink?

JUROR: No.

THE COURT: OK. Well, I have to tell you that you can't drink alcoholic beverages.

JUROR: Yes, OK.

THE COURT: Why don't you return to your seat in the jury box. OK?

(Juror not present)

THE COURT: I'm going to call Cecilia back.

MR. VELAMOOR: So we're clear, the Cecilia we called was the only Cecilia?

THE COURT: We had another name that sounded like Cecilia, but it was Kelcey or something like that.

That's all we have, right? Is that correct?

THE DEPUTY CLERK: There's only one Cecilia.

THE COURT: There's only one Cecilia.

Cecilia, come on down.

(Juror No. 18 present)

THE COURT: Cecilia, I know everybody has a lot on their minds -- I do; it's just human nature; we all do -- and at times we can forget things. That's perfectly understandable, at times. I want you to think back. Did you bring in a bottle yesterday, one of three bottles that you had, you had others at home? Did you bring one in as a gift for one of the jurors?

JUROR: I brought it but not in the courthouse, and that's what you asked me. You asked me if I brought it in the juror room or in the courthouse.

THE COURT: Where did you bring it?

JUROR: I gave it to him outside.

THE COURT: All right. And you didn't think that I needed to know that when I asked you that question?

JUROR: Maybe, yes.

THE COURT: Pardon me?

JUROR: I said yes, I didn't. I admit that.

THE COURT: And did you see him drink any of it?

JUROR: No, I didn't.

THE COURT: And why did you give him the bottle?

JUROR: As a gift. You know, we were talking about Dominican rum, and I told him that I have three bottles at home, and I was, like, if you like them, I will bring you one.

THE COURT: All right. And I'm just curious, where did you think he was going to keep it during the day?

JUROR: No, I know he was coming in, but I don't know he was going to, like, drink it.

THE COURT: OK. You can return to your seat.

(In open court)

THE COURT: Ladies and gentlemen, I'm going to ask you all to do something that's necessary, and it may be a little bit difficult, but it will be as follows:

You're going to return to the jury room and you're going to say, "We were instructed by the judge not to discuss anything. I can't talk about anything that happened in the courtroom. The judge said we can't talk about anything."

Can you follow that instruction?

OK. Please return to the jury room. Let me talk to the lawyers. And thank you very, very much, all of you. Thank you.

(Jury not present)

THE COURT: You can return to your seats. I'll give defense counsel a minute to talk to their clients.

MR. VELAMOOR: Judge, could we just ask, the juror we just spoke to last, she's the next alternate? She went back to a seat in the top row. I just want to make sure I understand from the seating.

THE DEPUTY CLERK: She's the 18th juror.

MR. VELAMOOR: She's the 18th juror, OK.

THE DEPUTY CLERK: Yes.

MR. VELAMOOR: In the back. OK. Thank you.

THE COURT: Mr. Ginsberg, let me hear from you first.

MR. GINSBERG: Your Honor, I've consulted with my client and my cocounsel. Notwithstanding some troubling aspects of some of the answers, it's our view that there's been no indication that any juror was in any way impaired or unable to listen to or pay attention to the evidence, given what we heard, and our view is that the jury should remain as is.

MR. BATH: I've also consulted with Mr. Muir, and we agree, Judge.

THE COURT: All right. Let me hear from the government.

MR. VELAMOOR: That's fine. We take a similar position with respect to that juror. We're not seeking that juror to be excluded.

We do have concerns about the last alternate, but since that juror is the last alternate, it's not as pressing. But the lack of candor with the Court with respect to that juror, in our minds, presents a greater issue than what we heard with respect to what we heard about the single incident yesterday.

THE COURT: Thank you.

I've thought about the matter, and I'll take it first

with regard to juror No. 3. It is established by his own admission, and the recollections of other jurors, that he did consume alcohol in the jury room. It was the predominant view that he was not impaired, although juror No. 6 said there was an outburst at one point at the end of the day. There was something of a conflict as to whether it was in the morning in coffee or whether it was at another point in the day. I'm going also, in part, on the conversation that my deputy had, which indicated it may have been in a water bottle.

I think there is the possibility of embedded plain error or structural error by having a juror who has consumed alcohol during a jury trial and while listening to testimony on a jury, and so I'm going to excuse juror No. 3.

With regard to juror No. 18, the last alternate, I don't need to address it at this stage, because she is the last alternate juror. It took follow-up questioning, and I think one would say, looking at, for example, *United States v. Bronston*, that the juror's answer to my question was literally truthful, but I would have appreciated greater candor from the juror; literally truthful in the sense that she did not give anybody any alcohol in the courthouse, it seems, or at least taking her recounting of events. I don't think there's anything I need to do with regard to juror No. 18, but I am going to excuse --

And the gentleman's full name for the record is, Madam

Deputy?

THE DEPUTY CLERK: Ysrael Ventura-Hiraldo.

THE COURT: All right. If you could ask that juror to come into the courtroom.

(Juror No. 3 present)

THE COURT: Come on in. Have a seat.

I appreciate your being very straightforward with me and being a gentleman and a man and an honest person about everything. Let me say that I understand human nature and we can all make a mistake, and I accept it as that. But what I'm going to do, to avoid any problems, is I'm going to excuse you from jury service in this case. I do appreciate your being here every day and being a good juror, with the exception of this one instance here, which was not appropriate conduct.

Thank you very much. You can return to the jury room. Do you have anything inside to take?

JUROR: Yes.

THE COURT: OK. Why don't you do this. I'm going to bring out the other jurors, but if you could stand over here at the sidebar, and as soon as the jurors come out, then I'll let you go into the jury room and get your things.

Flo, should he return to the central jury room, or will you take care of the paperwork?

THE DEPUTY CLERK: I'll take care of the paperwork.

THE COURT: We'll take care of it. Thank you very

much, and I appreciate your honesty and candor. Why don't you stand over here and then we'll have you go back to the jury room in a moment. Actually, why don't you stand right there, and when the jurors come in, you can go into the jury room.

Flo, if you'll bring in the other jurors.

(Continued on next page)

(Jury present)

THE COURT: Thank you, ladies and gentlemen. Everybody can be seated.

CONLY JOHN SCHULTE, resumed

THE COURT: I've excused one of our jurors, and we're going to reorder the seating as soon as my deputy returns, but this is not anything that should enter into your thinking in this case. I want to again commend my jurors for their good, loyal service in this case.

We are ready to proceed.

Mr. Scotten.

MR. SCOTTEN: Thank you, your Honor.

DIRECT EXAMINATION CONTINUED

Ha5Wtuc1 Schulte - Direct

BY MR. SCOTTEN:

Q. Good morning, Mr. Schulte.

A. Good morning.

Q. I want to start with something we touched on yesterday, which I asked you about 1 percent of the profits going to the tribal entities. Do you remember that?

A. Yes, I do.

Q. And you sort of made the point in your answer that really it's gross revenues, 1 percent of gross revenues, correct?

A. I believe it was 1 percent of gross collected revenues. That is correct.

Q. And that's an important difference, because gross collected revenues would tend to be more than profits, correct?
A. Well, I'm not an accountant, but that's my understanding, yes.
Q. So let's take an example and see if that makes sense. MTE is what you've described as one of the lenders, right?
A. I'm sorry. MTE?
Q. Let's take MNE, actually. MNE is what you've described as one of the lenders, right?
A. Correct.
Q. So let's say that in a given month MNE gets in a million dollars in collections, so a million dollars in gross collected revenues. Make sense so far?
A. OK.
Q. If the tribe gets 1 percent of gross collected revenues, then it gets $10,000 that month, is that right?
A. That's my understanding.
Q. OK. So it got 1 percent from the gross collected revenues generated from MTE?
A. MNE.
Q. MNE. I keep switching my example. That's my mistake.
A. Yes.
Q. Now, to understand how that's different from profits, let's suppose in that same month expenses were $500,000. So profits generated from MNE are $500,000 also. 500,000 for expense,

$500,000 profit, right?
A. That, that would -- that seems right.
Q. So if there's $500,000 in profit generated from MNE, and the tribe is only getting 1 percent profit, it would only get $5,000, right?
A. That seems right.
Q. So because the tribe is getting 1 percent of gross collected profits -- sorry, gross collected revenues generated from MTE, it's getting essentially twice as much as if it was getting 1 percent of profits generated from MTE, is that right, in this example?
A. In that example, that seems right.
Q. And it could actually vary, because in my example I just made up the numbers, right?
A. I assume so.
Q. The amount that the tribe gets from profits generated from MNE would actually vary from month to month?
A. Yes.
Q. OK. I want to show you what's in evidence as Defendants' Exhibit 753, and we talked about this yesterday. This is one of the Don Brady declarations, correct?
A. Yes, that's a September -- well, it's a declaration of Don Brady that appears to have been filed on September 12 of 2007.
Q. And this is one of the affidavits you testified you believed to be true, correct?

A. Correct.

MR. SCOTTEN: Let's go to page 4, and if we can blow up paragraph 11.

Q. So you just testified about the tribe getting some share, 2 percent, in my example, of the profits generated from MNE. We just went through that example, right?

A. That was a hypothetical, yes.

Q. But we agree that the way it was structured, we talked about it getting a share of the profits generated from MNE, right?

A. In that -- that's what we discussed, yes.

Q. Right, and so here, however, it says 100 percent of the profits generated from MNE go to the tribe, right?

A. Correct.

Q. So we just walked through a whole example using that same phrase, and we came out with 2 percent, and we said it could vary somewhat, but we came out with 2 percent, right?

A. In that hypothetical, that's what you came up with, yes.

Q. Well, I mean, you agreed with it all the way, right?

A. With the hypothetical, yes.

Q. But the whole point there was you agreed that $500,000 in my hypothetical was profits generated from MNE, right?

A. That's not how the tribe calculated profits internally. It calculated the profits as the 1 percent that it received, because that's what it was entitled to pursuant to the service

agreements.

Q. Right. I think you testified yesterday that where it says 100 percent here, it means 100 percent, right?

A. 100 percent of the 1 percent, yes.

Q. But your testimony is also that MNE is the lender, right?

A. Yes.

Q. And so you testified that MNE is the lender, and this right here says a hundred percent of the profits generated from the lender go to the tribe, right?

A. Correct.

Q. So either MNE is not the lender or the tribe is not getting a hundred percent of the profits from MNE, right?

A. I don't understand what you're saying. The way the tribe --

Q. I'm not asking how the tribe calculated it.

A. The way the tribe calculated --

Q. I'm asking --

THE COURT: Put a question to the witness.

MR. SCOTTEN: Yes, your Honor.

Q. If MNE is the lender, then all the profits MNE generates would go to the tribe, right? That's what this affidavit says.

A. That's what it says, 100 percent of the profits generated from MNE, which was what it was entitled to pursuant to the service agreements, which was 1 percent of the gross collected revenues.

Q. And you just explained a minute ago that, in fact, 100 percent -- that MNE's profits were far larger than just that 1 percent, right?

A. No.

Q. Just with that --

A. No, because in your hypothetical, there was no service agreement taken into account.

Q. So, in my hypothetical -- well, let's go through that. Suppose there's a service agreement, right, in the same hypothetical? There's a service agreement. MNE, which is the lender, takes in $500,000 in profit, right?

A. Under the service agreement, the profit is 1 percent of the gross collected revenues.

Q. Well, shouldn't the affidavit say what the service agreement says, then?

A. No. The affidavit doesn't discuss the service agreement.

Q. But if the service agreement's the truth, why wouldn't the truth be in the affidavit?

MR. GINSBERG: Objection, your Honor.

THE COURT: Yes. Argumentative. Ask your next question.

BY MR. SCOTTEN:

Q. What's the source of your understanding that this affidavit is true?

A. The source would be my discussions with Mr. Brady or --

yeah, discussions with Mr. Brady and likely my understanding of the business through discussions with both Mr. Brady and Mr. Tucker and others.

Q. Did Don Brady tell you that 100 percent of the profits generated from MNE went to these tribal businesses?

A. Yes. Yes, that information came from Don Brady, that all of the money that the tribe received pursuant to the service agreement, which was 1 percent of the gross collected revenues, went for these purposes.

Q. And did he tell you that a hundred percent of the profits from MNE are the same thing?

A. I don't recall any specific discussions, but if it's in the declaration, I assume that it came from Mr. Brady.

MR. SCOTTEN: Can we put up sort of side by side here --

THE COURT: Just so I understand, this is not your word choice; this is Mr. Brady's word choice? Is that your testimony?

THE WITNESS: It is his declaration, your Honor.

THE COURT: I know it's his declaration. You participated in the drafting of the declaration, you and your colleagues at your firm?

THE WITNESS: Yes, me or someone under my supervision would have, yes.

THE COURT: OK. So the question still stands. Is

this your or your firm's drafting of the language, or is this what Mr. Brady told you the facts were? Or you can explain.

THE WITNESS: I believe that is how Mr. Brady understood the term "100 percent of the profits." He understood it to mean the revenues that were paid to the tribe pursuant to the service agreements.

THE COURT: So this is not the language that your firm drafted for Mr. Brady; this is Mr. Brady's formulation. Is that what your testimony is?

THE WITNESS: Your Honor, this occurred 12 years ago, and so I don't have a specific recollection of the debate or discussion over the terminology, but --

THE COURT: Thank you. Next question.

MR. SCOTTEN: If we can put up 824, zoom out and put up 824 alongside this.

Q. You can see 824 right now, right, sir?
A. Yes.
Q. This is a separate declaration, right?
A. Yes. This is an affidavit of Troy Little Axe.

MR. SCOTTEN: And here, can we go to page 5, paragraph 14. Actually, could you make that smaller so we just get the first sentence of paragraph 14. And put up the first sentence of paragraph 11 in the other declaration.

Q. Other than the names of the enterprises, the wording here is identical, correct?

A. Not identical. No, wait. Other than the names, yes, it appears to be.
Q. And what is your source for believing that the information in paragraph 14 of Troy Little Axe's affidavit is true?
A. That would have likely been through discussions with Mr. Little Axe, Mr. Tucker and others.
Q. I think the judge just asked you whether or not it was actually your law firm that drafted this language, right?
A. It was.
Q. And does seeing that the same exact language is used in two different affidavits by two different people from two different tribes refresh your recollection as to who prepared this language?
A. Someone in my law firm would have definitely prepared -- drafted that language for review by the -- Mr. Little Axe and Mr. Brady, yes.
Q. Right. Mr. Brady didn't call you and say, you know, a hundred percent of the profits generated from MNE d/b/a Ameriloan, US FastCash and United Cash Loans are reinvested in, and so on and so on; that's your firm, right?
A. Right. We would have drafted that language and sent it over to Mr. Brady or Mr. Little Axe for their review.
Q. So it's based on your conversations with these two separate people that you came to testify yesterday that 1 percent equals a hundred percent?

A. I don't know if it was my conversation, or it may have been a conversation of someone under my supervision who worked with these individuals to prepare the declarations.
Q. Because when you just went through an example a minute ago, you came up with profits generated from MNE that were far higher, correct?
A. Without taking into account the service agreements, correct.
Q. Well, does the service agreement change what's profit and what's revenue? There's no definition there for each, is there?
A. Again, I'm not an accountant, but that is -- that was the understanding at the time, that the profits that were received by the tribal entities constituted the 1 percent of gross collected revenues, because that's the agreement it had with the servicer.

(Continued on next page)

Q. Even though MNE is the lender and MNE is actually generating far more profit. That's your testimony?
A. No, that's not my testimony.
Q. MNE is generating far more profit than the 1 percent, correct?

MR. GINSBERG: Objection, your Honor. I think profit is not being used properly in this context.

THE COURT: Overruled.

A. No. Because, per its contract with the servicer, it agreed to 1 percent of the gross collected revenues.
Q. I don't think that's exactly what I am asking.

If MNE is generating all these profits -- and that's what it says, profits generated from MNE, right?

A. Well, it really begs the question, because if you take into account the service agreement, contractually MNE was only entitled to 1 percent of the gross collected revenues, and contractually obligated any other allowance to the servicer.
Q. Is MNE the lender or is not the lender?
A. It is the lender.
Q. Do the profits, all of the profits that the lender generates by making loans go to the tribe in these agreements?

MR. GINSBERG: Objection, your Honor.

THE COURT: Overruled.

A. Yes. Because the profits it was entitled to are the 1 percent of gross collected revenues.

Q. But I am not asking the profits it's entitled to.

I am asking, do all profits generated from the lending lender go to the tribe?

A. Yes. Because, per agreement with the servicer, that was considered an operating cost. So 1 percent of gross collected revenues constituted the profits of MNE.

Q. So the lender, MNE, is generating profit, and all that profit is operating costs except the 1 percent?

A. That's not what I said.

MR. GINSBERG: Objection.

THE COURT: Overruled.

A. That's not what I said.

Q. What did you say?

A. I said the profits that MNE received were the 1 percent of gross revenues, per its contractual arrangement with the servicer.

Q. Yes. But the affidavit, it doesn't say received, it says generated. It's talking about how much MNE is generating, correct?

A. Generating, taking into consideration the service agreement.

Q. Well, MNE is the lender, correct?

A. Correct.

Q. So if the lender is generating profits, that's all the profits from the loans, is it not?

A. Not in this context.

THE COURT: Move on, please.

Q. You could have just put in here that MNE receives 1 percent of gross collected revenues from the loans, could you not?

A. Certainly could have.

Q. That's what the service agreements actually say, correct?

A. That is correct.

Q. And there wouldn't be this distinction between 100 percent equals 1 percent; it would just say exactly what the service agreements say, correct?

A. Hypothetically, that could have been done, correct.

Q. But if that was hypothetically done, then a court would know that a tribe is only getting a tiny percentage of the total money here, correct?

MR. GINSBERG: Objection.

THE COURT: Overruled.

MR. GINSBERG: Objection to what a court would know. It's too limited of a context.

THE COURT: Overruled.

A. I'm sorry. Can you repeat the question?

Q. Because these are affidavits you're submitting to a court, had you put in there that the tribe received 1 percent of gross collected revenues, then the court would know that the tribes are only getting a tiny portion of the money that was being dealt with here, correct?

A. Yes. But what is also not in the affidavits is that the tribes acquired a very valuable asset worth millions of dollars, above and beyond the 1 percent of gross collected revenues.
Q. So it was OK to hide one thing from a court because there is something else otherwhere that equals it out, that's your testimony?
A. I disagree with your characterization of hiding.
Q. Let's just stay on this 1 percent.
If you had put in there that a tribe was making only 1 percent of gross collected revenues, a court would have known it was receiving only a tiny percentage of the revenue, correct?
A. I don't believe that would be considered a tiny percentage of revenues. 1 percent of gross could be a very large portion of net revenues, depending upon the operating costs.
Q. So 1 percent isn't necessarily a tiny percentage of revenue?
A. 1 percent of gross collected revenues could equal a very large percent of net revenues.
Q. Could have put that in the affidavit too, right?
A. I'm sorry?
Q. What you just said, you could have put that in the affidavit too, right?
A. I could have put a lot of things in the affidavit.

Q. But what you did put in was 100 percent of the profits, and that's because it gave the court the impression the tribes were in control here, isn't that right?
A. The tribes were in control, the tribes were the lender.
Q. I am not going go back into it. Didn't you just say that, in fact, most of the profits generated by the lender did not go to the tribe?
A. No. That was not my testimony.
Q. If you had -- let me not make it a hypothetical.
Saying 100 percent of the profits generated from MNE creates a much more favorable impression on the court than if you just put what is in the servicing agreement, is that correct?
A. I'm not sure that it does. 100 percent of what they received was -- the purpose of this paragraph was to show that the money that it received pursuant to the business was used for tribal purposes, all of it was used for tribal purposes. Everything that the tribe received from the business was used for tribal purposes. That was the purpose of this paragraph in the memo.
Q. Isn't that kind of hiding the question, though, since, of course, all the money the tribe actually got was used for tribal purposes; isn't that sort of obvious?
A. Not necessarily. It could have been used for other purposes.

Q. The tribe could have giving that money away?
A. The tribe is a sovereign government, it's entitled to do what it wants with its money, but in this instance, all the money it received from the lending business was used for tribal purposes, and that was the intent of this paragraph.
Q. Even though, in fact, there is a lot more profit out there than in fact is going somewhere else, you can't tell that from this affidavit, can you?

THE COURT: Sustained as to form. I think you're getting repetitive.

MR. SCOTTEN: Fair enough, your Honor. We can move on from this.

Let us just go to 824 now.

Can we go to paragraph 2, which is probably on the second page.

Let's just blow that up.

Q. Do you see at the bottom the statement, "Also, I oversee management of the day-to-day operation of MTE"?
A. I do.
Q. MTE, again, according to you, is the lender, correct?
A. Correct.
Q. What is your source for the belief that Troy Little Axe oversaw the management of the day-to-day operation of the lender?
A. Basically, Troy Little Axe was the only person from the

tribe that really actively worked for MTE on a daily basis. So he would have been the only person to manage MTE.

Q. So you did not speak with him? How did you learn that?

A. I assume that myself or someone else spoke with him and gained the knowledge that, yes. And through my experience, Troy was the point of contact for MTE and was the only person who really, to our knowledge, had any management responsibilities for MTE.

Q. In fact, you visited the Modoc reservation from time to time, correct?

A. Yes.

Q. A couple times a year?

A. Roughly.

Q. So you were there in 2007 probably?

A. Possibly, likely.

Q. Likely?

This is a 2007 affidavit, is that correct?

If you don't remember, we can go back to the first page.

A. I believe that's correct.

Q. Then we will just stay there.

So this is a 2007 affidavit, and you had formed a personal belief that Troy Little Axe managed the day-to-day operation of the lender based on your experience in 2007?

A. Correct.

Q. And because you visited the reservation and spoke with Troy Little Axe, you knew there had been a flood on the reservation and there was no office for MTE, correct?
A. I'm not sure and I don't recall what point in time that occurred. But yes, there was a flood at some point in time that flooded the offices of MTE.
THE COURT: Let the witness finish his answer before you ask your next question.
MR. SCOTTEN: Yes, your Honor.
Q. So in 2007, the only thing on the reservation for MTE was a mailbox, correct?
A. No. That's not my understanding. Mr. Little Axe could have been working out of a different office at the tribal -- on the reservation.
Q. So it would surprise you to learn that Mr. Little Axe --
MR. GINSBERG: Objection.
THE COURT: I don't think the question is what's surprising. Rephrase your question.
Q. In 2007, you formed the belief that Troy Little Axe was managing the day-to-day operations of the lender, correct?
A. Correct.
Q. And you had been to the Modoc reservation, correct?
A. Correct.
Q. And you had also been to Kansas City, correct?
A. Correct.

Q. Went there several times and saw that there were hundreds of people at telephone banks, correct?
A. Yes. At the servicing company, correct.
Q. And you saw Mr. Tucker in his corner office, correct?
A. I would likely have seen him.
Q. And Mr. Muir and a lot of other managerial folks, correct?
A. Mr. Muir was not a managerial person.
Q. Executive, senior?
A. In 2007, I probably would have met with him there. He was the legal counsel.
Q. So you saw all of this in Kansas City in 2007, and you knew that there was just Troy Little Axe on the reservation hundreds of miles away, and from that you formed the belief that Troy Little Axe managed the day-to-day operation of the lender?
A. Of the lender, not the servicer.
Q. And in this affidavit, you informed the court of that distinction, correct?
A. I don't know that there is any mention of the servicer in the affidavit.
Q. And you think a court would have just figured out that when you said the lender, they meant just Troy Little Axe in his office supervising himself, his own day-to-day operations?

MR. GINSBERG: Objection to what a court might figure out.

THE COURT: Sustained. Rephrase it.

Q. You were attempting to candidly communicate to the court through this affidavit that Troy Little Axe was managing the day-to-day operation of the lender, meaning he was managing himself, since he was the only person there?

A. He was managing MTE, which was owned by the tribe and was the lender, correct.

Q. And without mentioning the servicer at all, you felt you had accurately communicated how this operation worked to the court?

A. Correct.

Q. You felt that a court would understand that the lender is a single person, who doesn't have an office at the time, and all the lending stuff going on in Overland Park is irrelevant?

MR. GINSBERG: Objection to "the lending stuff going on in Overland Park."

THE COURT: Try rephrasing your question.

Q. All the people working on the loan in Overland Park, Kansas -- let me rephrase the whole question.

You felt a court reading this would understand that when you said Troy Little Axe was managing the day-to-day operation at MTE, he was managing himself and not the hundreds of people working on loans in Kansas City?

A. He was managing MTE, a tribally-owned entity, that was the lender, correct.

Q. You said correct, but I'm not sure you actually said what

you believed the court would understand from this communication.

MR. GINSBERG: Objection to the form of the question.

THE COURT: What did you expect the court to understand?

THE WITNESS: That Troy Little Axe -- exactly what it says -- managed the day-to-day operations of the tribal entity, your Honor.

THE COURT: Next question.

Q. So you're saying that no part of MTE was doing anything in Overland Park?

A. Overland Park -- servicing of the loans was done in Overland Park by the servicing entity, not the lender.

Q. So no part of MTE was doing --

A. It's commonplace for lenders to contract out to servicing. It's just the way lending is in this country. When you get a loan from a bank, many times you will have a different entity servicing the loan.

MR. SCOTTEN: I am not sure this is responsive.

THE COURT: I will let it stand.

Next question.

Q. The question is, no part of MTE was doing anything in Overland Park, correct?

A. No, that's not correct. Mr. Little Axe would visit Overland Park, have meetings with Mr. Tucker and others at the

servicing entity. He would interact with them.
Q. Was he supervising their day-to-day operations?
A. Not the day-to-day operations of the servicers, no.
Q. So no part of MTE was taking place in Overland Park, that's your testimony?
A. No, that's not my testimony. Mr. Little Axe would visit Overland Park. He would have meetings with Mr. Tucker. They would discuss the business and various matters. So to say no part of MTE occurred in Overland Park is incorrect.
Q. Were the day-to-day operations of MTE taking place in Overland Park?
A. No.
Q. No part of the day-to-day operations of MTE were taking place in Overland Park, is that correct?
A. The day-to-day operations of MTE would have taken place on the reservation.
Q. By that you mean Troy Little Axe?
A. Yes.
Q. Let's go to another affidavit, 309A.
There's two in this exhibit. Let's flip down about four more pages.
MR. SCOTTEN: Is this 309A?
Q. While we are getting the exhibit, you testified yesterday about certain affidavits that the defense showed you, correct?
A. Yes.

Q. And you testified you believed them to be true, correct?
A. Correct.
Q. Your answer wasn't limited to those affidavits, was it?
A. I'm not sure.
Q. Do you believe all the affidavits that you approved were true?
A. Yes, of course.
Q. So as soon as we have 309A up, we will proceed.

I am going to hand you a hard copy so we can get started. And I think you saw this yesterday.

If you want to flip to the second affidavit in there.
A. The affidavit of Robert Campbell?
Q. Correct. Who is Robert Campbell?
A. Robert Campbell was the treasurer of the Santee Sioux Nation, a member of the tribal council, and also the treasurer for SFS.
Q. And with Lee Ickes, he was one of the two people at Santee Sioux most involved in the lending operation, correct?
A. At that point in time, yes.

MR. SCOTTEN: If we can turn to the next page.

MR. BATH: What year is this?

MR. SCOTTEN: Turn to the last page so we can see the date. And blow up the date where it says "subscribed and sworn to."
Q. This affidavit is dated July 15, 2005?

A. Correct.

MR. SCOTTEN: Let's go back to the second page.

Can we blow up the top paragraph. It's the first one labeled 3.

Q. Sir, what was your basis for believing this statement to be true?

A. Likely the discussions with Mr. Campbell.

Q. So based on your discussions with Mr. Campbell, you believed that he was familiar with the --

THE COURT: These were your discussions, not somebody else's?

THE WITNESS: Well, it was likely someone else who was working on the matter.

Q. Sir, to be clear, this is the Santee Sioux, correct?

A. Correct.

Q. Santee Sioux is the tribe you had a preexisting relationship with?

A. Yes.

Q. You visited them more often than the other tribes, correct?

A. Yes.

Q. And in 2005, would I be right in believing you were sort of still particularly close to them because they are the tribe you had gotten into this through?

A. I had the longest relationship with this tribe, yes.

Q. So your basis for believing this to be true is either you

or someone you spoke to told you that Robert Campbell had reported that he was familiar with the day-to-day operations of SFS and the marketing and strategy pertaining thereto, is that correct?

A. Correct.

Q. Sir, do you recall this is the same tribe that three months earlier you had to write Scott Tucker to ask are we even lending yet?

A. I'm not sure that that's the exact words, but I inquired whether the lending was taking place for SFS, yes.

Q. And Scott Tucker informed you, yes, the lending has been taking place for about a month now, correct?

A. Something to that effect.

Q. And despite that, you had formed a personal belief three months later that the tribe was familiar not only with the day-to-day operations of SFS, but the marketing and strategy pertaining thereto?

A. Yes.

Q. Do you care to explain how you formed that basis again?

A. Yes. Mr. Campbell would have attended meetings, which I also attended, with Mr. Tucker and others at the loan servicer that thoroughly explained the services that were being provided, including the marketing and strategy.

Q. So despite the tribe not even knowing that lending was taking place, you felt comfortable telling a court that the

tribe was familiar with the day-to-day operations of SFS and the marketing and strategy?
A. Yes.
Q. Would you like to offer a further explanation why you felt comfortable telling a court that?
A. I already told you. Mr. Campbell was involved in meetings, in which I attended, with Mr. Tucker in Kansas City and marketing was discussed. He became familiar with it through those meetings.
Q. So your submission is that the tribe need not even know lending was occurring in order to tell the court it's familiar with the day-to-day operations, strategy and marketing?
A. No, that's not my testimony.
Q. Well, the tribe was not, in fact, familiar that lending was going on, correct?
A. At this point in time, it certainly was.
Q. It learned somewhere in those intervening three months?
A. Yes.
Q. So that's all it took, is to get an e-mail from Scott Tucker saying the lending is going, and now it's OK to tell a court, in your view, that you're familiar with the day-to-day operations, marketing and strategy?
A. Yes. There were meetings, several meetings with Mr. Tucker and Mr. Campbell and others from the Santee Sioux Nation, and the operations and marketing was thoroughly explained. They

were familiar.
Q. And your intent, as an officer of the court, was to fully convey an understanding of how this business worked through this paragraph? Let me withdraw that. To accurately convey how this business worked?
A. It says what it says, and it was true.
Q. Let me ask you a question. Were you trying to accurately convey how the business worked?
A. I was accurately conveying that Mr. Campbell was familiar with the day-to-day operations of SFS, which he was.
Q. You don't feel there was anything that might be missing from the court's understanding there?
A. Not at all.
Q. Let's go next to a couple of lawsuits that I think you testified about yesterday.
You talked about both *Tucker vs. AMG* and *Hallinan vs. Tucker*, correct?
A. I believe we discussed that, yes.
Q. Just a couple of questions on *Tucker vs. AMG*.
You worked with Mr. Muir on that?
A. Mr. Muir represented CLK Management in that, yes.
Q. He also represented Mr. Tucker?
A. I meant Mr. Tucker.
Q. And you worked with him on that?
A. If I worked with him on that? I was familiar with it. I

knew that he was working on some research and drafting of that lawsuit.

Q. Did you talk to him before it was filed?

A. I did.

Q. What requests did he make of you or your client before the suit was filed?

A. What requests were made of me or my client?

I was asked to review a draft of the complaint, to review it for accuracy. I'm not sure there were any other requests that were made.

Q. So he asked you to review for accuracy a complaint against your client?

A. Correct.

Q. And that was the request he made of you?

A. That is the only request that I recall.

Q. Let's move on then to the *Hallinan vs. Tucker* lawsuit.

In that lawsuit, you represented AMG, MTE, and the Modoc tribe, is that correct?

A. I did not appear in that lawsuit as counsel.

Q. Is it fair to say you had involvement in that lawsuit?

A. I was familiar with it, and I monitored it on behalf of my clients, correct.

Q. And the clients you were monitoring on behalf of were AMG, MTE and the Modoc?

A. I believe so, yes.

Q. In fact, the other one I wanted to ask about was, also, you represented CLK in that lawsuit, although CLK was in the process of being merged into AMG?
A. At that time, CLK had been merged into AMG.
Q. CLK was a named party in the lawsuit, nonetheless, right?
A. Yes.
Q. So to the extent they needed representation, you represented them?
A. Yes. To the extent that CLK had been merged into AMG, I represented its interests, yes.
Q. And your testimony is you were not representing Scott Tucker at that time, correct?
A. Correct.
Q. And you testified that you and Muir monitored the suit, correct?
A. Yes. We did not make any court appearances as legal counsel for those entities in that lawsuit.
Q. You actually played a very significant role in the suit though, correct?
A. I'm not sure if I did.
Q. You didn't work very hard to resolve it, you personally?
A. When it was first filed, I wrote some letters, I believe, to counsel for Mr. Hallinan and Mr. Tucker and urged them to resolve the lawsuit.
Q. But after that you were just monitoring?

A. Correct.

MR. SCOTTEN: Let's show the witness Government Exhibit 4138.

Q. It is an e-mail, the bottom e-mail, between Scott Tucker and Don Brady, copying you and Tim Muir?

A. OK.

Q. Is that correct?

A. Yes.

MR. SCOTTEN: The government offers 4138.

THE COURT: Any objection?

MR. ROTH: No, your Honor.

THE COURT: Received.

(Government's Exhibit 4138 received in evidence)

MR. SCOTTEN: We can publish it, and let's just blow up the bottom e-mail and leave the boilerplate on the bottom out.

Q. Can I ask you just to read the first sentence?

A. "Don, we are very close to finalizing a settlement deal. Conly and Tim have worked for the past 18 months getting this put to bed. They have done a fantastic job."

Q. So you and Mr. Muir worked on this for 18 months to get it settled, right?

A. I was not involved in the settlement discussions.

Q. What do you understand the reference to "getting this put to bed" to mean?

A. To getting the lawsuit settled.
Q. OK. By the way, CLK was one of your clients, correct, to the extent they were still in existence?
A. AMG was my client.
Q. That included CLK's interests because AMG had acquired CLK?
A. CLK was not a legal entity once it merged into AMG.
Q. So neither CLK nor AMG would be threatened by a lawsuit from a private individual, correct?
A. CLK would, to the extent that it does not enjoy tribal immunity like AMG.
Q. To the extent CLK was part of AMG now, there would be no threat from a private individual, correct?
A. Well, there is a possible threat if the merger was not recognized.
Q. We just talked about you fixed that through a separate suit through *Tucker vs. AMG*, right?
A. I am trying to recall the date when that occurred. It may or may not have. I believe it was subsequent to this.
Q. Your position was that the merger had already been effected, though, because it was effected under the law of Miami, correct?
A. That's correct.
Q. So under your position, CLK and AMG would not be threatened by a suit from a private individual, correct?
A. Well, this was -- part of the problem is that this was a

suit in a state court in Nevada, and there is always uncertainty as to whether a state court judge would recognize a merger under tribal law.

Q. So is that why your clients settled this suit for something like $30 million?

A. I imagine that there was some liability that was -- a potential for liability, the potential to interrupt the business operations. There are a number of considerations for why one settles.

Q. Scott Tucker was the lead defendant in this case, right?

A. I don't recall how it was captioned.

MR. SCOTTEN: Can we show the witness Government Exhibit 4139.

Q. Do you recognize this?

A. Yes. This is the first amended complaint in a lawsuit called Charles Hallinan, among others, against Scott Tucker and other entities.

MR. SCOTTEN: The government offers 4139.

MR. GINSBERG: Your Honor, there is an objection that has multiple parts to it.

MR. SCOTTEN: I am happy to offer the cover page, if that alleviates the concern.

THE COURT: Does that alleviate the problem?

MR. GINSBERG: I just want to read till the bottom.

I have no objection to the cover page.

THE COURT: Received 4139, just page 1 bearing the word "original" and labeled "verified first amended complaint," just the cover page.

(Government's Exhibit 4139, page 1, received in evidence)

MR. SCOTTEN: If we just publish that page and not go beyond it.

Q. Does this refresh your recollection as to whether Scott Tucker was the lead defendant in *Hallinan vs. Tucker*?
A. He was the first named defendant in the caption.
Q. I think you testified yesterday that this was a suit against Mr. Tucker from a former business partner; that's how you described it yesterday, correct?
A. A former business partner, shareholder; it's a shareholder lawsuit.
Q. Targeting Scott Tucker based on his prior business with Mr. Hallinan and others, correct?
A. In part, yes.
Q. You counseled your tribal clients to pay $30 million to settle a lawsuit by a private individuals against Scott Tucker?
A. Again, I wasn't involved in the settlement negotiations and how those negotiations went. I was aware of the final settlement terms, though.
Q. Your testimony is you were not involved in settling this lawsuit for $30 million?

A. Not in the actual settlement discussions. I was aware of the terms and received drafts of the terms of the settlement as it was nearing completion.

THE COURT: Let me ask you, Mr. Schulte, did you advise or represent as a lawyer any party to the settlement?

THE WITNESS: Yes. That would have been AMG Services.

THE COURT: Any other party to the settlement?

THE WITNESS: Yes. MTE.

THE COURT: Anyone else?

THE WITNESS: Not that I recall.

THE COURT: All right. Did you advise Mr. Tucker with regard to the settlement?

THE WITNESS: No, I did not, your Honor.

THE COURT: All right. Why don't we take our mid-morning break.

Ladies and gentlemen, please do not discuss the case among yourselves or with anyone else.

Ms. McCarthy, you're going to move down to seat number 3 when we return from break. Thank you very much.

(Jury exits courtroom)

THE COURT: See you in ten minutes.

(Recess)

THE COURT: Please bring our jurors in.

(Jury present)

THE COURT: You may proceed.

MR. SCOTTEN: Thank you, your Honor.

BY MR. SCOTTEN:

Q. I think before the break you had just told the Court that you were representing AMG and MTE, at least in this lawsuit, you provided service to them, correct?

A. Correct.

MR. SCOTTEN: Can we put back up 4138.

If we can blow up enough to get both of the texts.

Q. So, again, starting at the bottom, here we have Scott Tucker e-mailing Don Brady, right?

A. Yes.

Q. And that's your client, right?

A. Yes.

Q. He is the CEO and president of AMG?

A. Yes.

Q. And he is cc'ing you, correct?

A. Yes.

Q. The subject is finalizing settlement deal?

A. Yes.

Q. The text says that you and Tim Muir have worked for 18 months getting this put to bed, correct?

A. That's what it says.

Q. So this is about settling *Tucker vs. Hallinan*, correct?

A. Yes.

THE COURT: Keep your voice up, Mr. Scotten.

A. *Hallinan vs. Tucker* and a number of others, yes.

Q. So when you saw this e-mail urging Brady to sign, did you counsel your client on signing this multimillion dollar settlement deal?

A. I know settlement discussions had been ongoing for months prior to this date. Mr. Brady as CEO of AMG also had an office in Kansas City and was there very often during that period of time. He was aware of it, and so would have been involved in and apprised of the terms.

Q. So did you counsel your client prior to him signing this deal?

A. I believe I would have had discussions with Mr. Brady. I don't recall any specific discussions.

Q. So Mr. Tucker is sending an e-mail, referring to you as having worked on settling this lawsuit, to Don Brady for his signature, and you believe you counseled him on it?

A. I would have had discussions with him, yes.

Q. Mr. Brady did, in fact, sign for one of the parties in this lawsuit, correct?

A. I believe so.

MR. SCOTTEN: Can we show what is in evidence as Government Exhibit 811.

Q. This is already in evidence, but do you recognize this as the first page --

MR. SCOTTEN: Am I correct?

Q. Do you recognize this as the first page of the settlement agreement?
A. It appears to be, yes.
Q. So you had said a minute ago that you were representing AMG and MTE, CLK didn't exist anymore, correct?
A. It had been merged into AMG Services.
THE COURT: Can you answer the question that was asked?
Can I have the court reporter read back the question, please.
(Record read)
A. As a matter of tribal law, it did not. There was an open issue whether CLK existed under the laws of the state of Kansas because it had not been registered at that time under the laws of the state of Kansas.
Q. Am I right in between the time I asked my question and the judge asked you to repeat, you were shown a signature page where Don Brady is signing for CLK Management?
A. Yes.
Q. That's your client, who you were counseling, had just been sent something to be signed by Scott Tucker, right?
A. In that e-mail, yes.
Q. And Don Brady is with the Miami tribe, right?
A. Correct.
Q. You expect him to follow Miami law?

A. Oh, yes, of course, but that doesn't change the fact that there was an open question of whether the merger would be recognized by a court in the state of Nevada.

Q. Don Brady didn't sign for AMG, did he?

A. AMG was not a named party to the suit.

Q. So despite counseling your client -- well, is it your testimony that AMG didn't sign this?

A. AMG was not a party to the suit.

Q. That's not my question. Do you know if AMG signed the settlement agreement?

A. There is no signature line for AMG Services. So no, there is no signature for AMG Services. There is one for CLK Management because CLK Management was merged into AMG pursuant to tribal law.

Q. So you do not believe AMG signed this?

A. AMG -- to the extent that CLK was merged into AMG, then yes, I suppose legally you could say that AMG signed, but there is no signature line for AMG.

Q. AMG was your client, right?

A. Correct.

Q. They were a significant client, right?

A. Yes.

Q. You were familiar with the senior people in the entity, correct?

A. Yes.

Q. Do you remember who the vice president was for AMG at the time of this?
A. I don't recall.
Q. Do you remember anybody who ever served as vice president of AMG?
A. I don't recall who would have been there. My primary contact would have been Mr. Brady.
Q. He was the president. Did you talk to the vice president who was below him?
A. I'm sorry?
Q. Did you ever talk to the vice president?
A. I had meetings with the AMG board from time to time.
Q. Do you remember any conversations with J.S. Ragman?
A. About this particular, I don't recall any conversations about this.
Q. You had other conversations with J.S. Ragman?
A. I don't recall having any conversations with him.
Q. So who is J.S. Ragman?
A. I'm not sure.

MR. SCOTTEN: Can we please go to page 42.

Can we blow up the signature at the bottom.

Q. So this is AMG Services, correct?
A. That's what it says, yes.
Q. This was your client, correct?
A. Yes.

Q. And you just said you weren't aware of them signing this, right?
A. Correct.
Q. You're not aware of J.S. Ragman, correct?
A. I don't recall J.S. Ragman.
Q. You're also not aware of anybody who was ever the vice president of AMG, correct?
A. I don't recall. AMG was governed by a board.
Q. So no vice president that you are aware of?
A. I don't recall ever meeting with the vice president.
Q. Given that you don't know who this person is and didn't believe your client had signed this document, do you have any understanding as to how this document got signed by J.S. Ragman as vice president of AMG Services?
A. I do not.
Q. Just one more topic, Mr. Schulte. It's a timing point. I apologize. I am going to have to go back to the beginning.
When you first began working with Mr. Tucker, you were aware that he had used various companies in Nevada set up by a firm called Laughlin to receive mail for his lending business, correct?
A. I'm sorry. Can you repeat that question? I am trying to get the time frame that you're talking about.
Q. I can be more precise, but I am just saying for now in the beginning. The first couple of years you learned that Mr.

Tucker had used a shell company set up in Nevada to receive mail for his lending businesses, correct?
A. I would have learned that probably a couple of years after, probably sometime in 2005.
Q. The firm involved in setting those up was called Laughlin, correct?
A. That's my recollection.
MR. SCOTTEN: If we can show the witness 4103.
Q. This is an e-mail exchange between you and Scott Tucker, correct?
A. Correct.
MR. SCOTTEN: Your Honor, the government offers 4103.
THE COURT: Any objection?
MR. ROTH: No objection.
THE COURT: Received.
(Government's Exhibit 4103 received in evidence)
MR. SCOTTEN: Can we just blow up the bottom e-mail first.
Q. This is an e-mail from Scott Tucker to you, correct?
A. Correct.
Q. Dated March 28, 2005?
A. Correct.
Q. He is sort of asking you exactly what you need to know about Laughlin acting as a registered agent for his company in Carson City, Nevada, correct?

A. Yes. It says, "Tell me exactly what you need to know about Laughlin being the registered agent for my management companies in Carson City, Nevada."

Q. And a registered agent, among other things perhaps, is someone that can receive service of a subpoena on behalf of the person being subpoenaed, correct?

A. Yes.

MR. SCOTTEN: Can we go up to the top e-mail.

Q. So then here in March 2005, you're being specific, you're saying you need to know what companies Laughlin is a registered agent for, correct?

A. Yes.

MR. SCOTTEN: And can we also show the witness 4108.

Q. This is another e-mail exchange between you and Mr. Tucker, correct?

A. Yes.

MR. SCOTTEN: Your Honor, the government offers 4108.

MR. ROTH: No objection.

THE COURT: Received.

(Government's Exhibit 4108 received in evidence)

MR. SCOTTEN: If we can go to the second page.

If we can blow up the middle e-mail with the gray bar above it.

Q. So in this e-mail you're declining an invitation to racing from Scott Tucker?

A. The subject is racing.

MR. SCOTTEN: Let's zoom out real quick so we can see the bottom e-mail.

A. If I could see the bottom part.

Q. If you look at the bottom --

A. OK. I see you.

Q. -- he is inviting you to something called the Kings Experience at the Petty School of Racing?

A. Yes.

Q. You're declining that; you're saying you would go but you're busy?

A. Yes. I said, "I appreciate the invitation however. I certainly would join you but for the arbitration." Correct.

Q. Then on the bottom, you say, "On another note, are you free to talk with Fred Assam and me tomorrow about your e-mail regarding forming tribal corporations to perform the services that Laughlin provides," correct?

A. Correct.

Q. This is about using a tribal corporation to then become the registered agent, or at least receive the mail for Scott Tucker's companies, correct?

A. I don't know if it was for Scott Tucker's companies or the tribal companies at this point in time that we would have been discussing that. I believe it would have been for the tribal entities.

Q. Well, as we discussed, you knew that the same doing-business-as addresses moved from the Nevada companies to being at least tribes using those names, correct?
A. Yes. The trade names were transferred to the tribal entities.
Q. And this is in April of 2005, correct?
A. It appears to be, yes.
MR. SCOTTEN: We can take that down.
Q. You also knew that at some point in early 2005, the Kickapoo tribe was using the Preferred Cash name, correct?
A. I think that was the intent. I'm not sure that that ever was actually implemented.
MR. SCOTTEN: Can we show the witness Government Exhibit 207.
Q. This is an e-mail between Scott Tucker and another person in your firm named Jennifer Bliss, correct?
A. Yes.
Q. And it makes reference to you, at least at one point?
A. Yes.
MR. SCOTTEN: Your Honor, the government offers Exhibit 207.
MR. ROTH: No objection.
THE COURT: Received.
(Government's Exhibit 207 received in evidence)
MR. SCOTTEN: Let's start all the way down on the

fourth page.

If we can highlight the body of that e-mail.

Q. So here, in January of 2005, Ms. Bliss is telling Scott Tucker that your firm is going to prepare a response to subpoenas for Preferred Cash Loan and Cash Advance, correct?

A. Correct.

Q. And she is inquiring what tribes those businesses are associated with, correct?

A. Yes.

MR. SCOTTEN: I think we can go all the way up to the top page again.

If we can highlight Scott Tucker's message.

Q. So here Scott Tucker, in January of 2005, is informing -- is Ms. Bliss your partner or your associate at the time?

A. I believe she is an associate at the time.

Q. -- informing your associate that these are two different trade names that the Kickapoo are using, Preferred Cash and Cash Advance, correct?

A. That's what the e-mail says, yes.

Q. In fact, she references -- Scott references you again, Mr. Tucker references you again, it says you drafted the articles for the deal that put Cash Advance and Preferred Cash Loans under this name, right?

A. I would have drafted the articles of incorporation for KLC,

Inc.

MR. SCOTTEN: If we go to the top.

Q. So here we are talking about, again, a response to a subpoena for Cash Advance and Preferred Cash Loans and inquiring about where the Kickapoo tribe are in the process, correct?

A. This is an e-mail from Jennifer Bliss to Scott Tucker. It says, "In Conly's response this morning he asked the name of the tribe to determine whether to respond or not. I assume this is because some of the tribes have not yet passed the proper corporation documents and may weaken our argument."

Q. So you're determining whether or not to respond to this Colorado subpoena request, correct?

A. That's what the e-mail says.

Q. Do you believe it to be an accurate e-mail?

A. I don't know that it's inaccurate.

Q. Your associate referring to you what you said, correct?

A. Yes. That's what it says.

Q. I think you testified earlier that you knew a little while later Preferred Cash Loans was being used by the Santee Sioux, right?

A. Yes. Once SFS became operational, it was utilizing Preferred Cash Loans, is my understanding, correct.

Q. So it's sort of between this time -- well, before this time, right before this time, that Preferred Cash Loans is

getting served with process by the state of Colorado, correct? That's why you have a subpoena you respond to?

A. I believe that's correct.

(Continued on next page)

Q. But the subpoena had gone to the old Nevada address used by -- when McLaughlin was doing this, correct?
A. I don't recall, but that's -- that's a possibility.
Q. Well, I mean, that's how -- Scott Tucker certainly is how you found out about the subpoena, correct?
A. I believe so.
MR. SCOTTEN: If we can go back to Government Exhibit 4122, and if we can go to page 10, footnote 2.
Q. Can I ask you to read the first sentence?
A. "No other contacts are alleged in the pleadings that Preferred Cash has by happenstance received."
Q. So here you are stating that it is by happenstance that Preferred Cash received the pleadings, correct?
A. That's the sentence I read. That's what it says, yes.
Q. And this is, as we discussed yesterday, your brief. You either wrote it or approved it, correct?
A. I would have been involved in the process.
Q. I think you testified yesterday that no briefs in this matter went out without your approval, correct?
A. Without my review, correct.
Q. You just walked us through the whole process of how Preferred Cash Loans, the name, moved among various entities associated with Scott Tucker, correct? That's what we just did five minutes ago.
A. It appears that it was utilized by the kick -- well, I'm

not sure if the Kickapoo ever actually engaged in lending, but --

Q. And you just told us that --

A. But it was assigned to the Santee Sioux.

Q. And you just told us that the way you learned about this subpoena was Scott Tucker?

A. I believe that it would have been forwarded to our office by Mr. Tucker, correct.

Q. So in fact, you knew exactly how Preferred Cash had gotten it, and it wasn't by happenstance, was it?

A. Well, I think the point of this footnote was that there was no -- that SFS was utilizing Preferred Cash trade name, had not been properly served with process in accordance with the court rules. It is improper service to -- I mean, it's not considered proper service of process when someone else hands you a subpoena.

Q. In fact, this brief has arguments about improper service, correct?

A. I believe so.

Q. But in this footnote, you're not saying improper service; you're saying that Preferred Cash received the subpoena by chance, by randomness, it just happened to become aware of it, correct?

A. Actually, we are saying that. The next sentence says, "However, as respondent was not properly served with process."

Q. OK, that is what the next sentence says. But by happenstance, that is not a true statement, is it, sir?
A. Well, what do you mean by -- I believe it is true. I mean, the fact that it was not served by a proper, a person authorized to serve and instead was sent to Nevada, to Kansas City and then to us, I think that the point of it is that, yeah, I mean --
Q. Well --
A. There was no duty on the part of anyone to send that to, to us, but it was.

THE COURT: Ladies and gentlemen of the jury, I'll simply say that when a lawsuit is commenced, there are procedures for how a person properly receives notice of that lawsuit, and there are technical procedures as to how process is to be served. There's nothing unusual or wrong about a party who believes they were not properly served asserting that they were not properly served.

All right. Go ahead.

BY MR. SCOTTEN:
Q. And essentially, that's the argument you're making here, correct, Mr. Schulte; you're saying this entity was not properly served?
A. Correct.
Q. And you can say that even if you know exactly how you were served, but as a -- I'm not using it pejoratively, as a

technicality, the service went to the wrong company, you can say X company or Y company were not properly served, correct?
A. I suppose that could be done, yes.
Q. But here what you're saying is it was random, happenstance, that you received the pleadings in this case?
A. I don't think it was the intent to say randomly. I think the intent was to say that it was not received and how subpoenas are ordinarily received.
Q. Well, you knew that the subpoena had come to you from Scott Tucker, because he had been involved in all three of the entities whose names it had been moved around among, correct?
A. Well, I'm not sure that it was actually looped around, because I'm not sure that the Kickapoo ever actually utilized it.
Q. Two entities then, two or three?
A. That's fair, yes. Sure.
Q. So an accurate statement would have been Preferred Cash received this because Scott Tucker forwarded it to its counsel; it was previously associated with the company in Nevada it was sent to, correct?
A. It could have been stated that way, correct.
Q. And that's not happenstance at all, that's a definitive explanation of how the company actually came to receive process, right?
A. It's a description of how process was actually -- wound up

with Preferred Cash.

Q. That's not what's here, though?

A. That's not what's stated there.

Q. This also happened with the Miami tribe, didn't it?

A. The Miami tribe, yes, was also involved in this as well.

MR. SCOTTEN: If we can show the witness -- is 4117 in evidence? If we can show the witness 4117.

Q. And so this is a response on behalf of Cash Advance, correct?

A. I can't tell from the first page.

Q. Oh, OK.

MR. SCOTTEN: Let's do two things. Let's go one page so the witness can see a bit more of it.

A. Yes.

Q. OK.

MR. SCOTTEN: And let's go to the back page so Mr. Bath can see the date.

Q. And so this is also July 15, 2005, correct?

A. Yes.

Q. This is actually the affidavit we're looking at, but for the July 2005 period, right?

A. Correct.

MR. SCOTTEN: Let's now go to page 8, note 2.

Q. This is essentially identical language, except with respect to Cash Advance, correct?

A. It is.
Q. And so here you are stating that Cash Advance has by happenstance received the pleadings, correct?
A. That's what it says.
Q. And you, in fact, knew that Cash Advance had received the subpoena because Scott Tucker was keeping you aware of these matters, correct?
A. The subpoena was -- yes, sent -- sent to our office, and again the point was that it was not properly served in accordance with the rules.
Q. To be clear, it was sent to your office by Scott Tucker, right?
A. Correct.
Q. And you knew that Scott Tucker had been associated with the Cash Advance business going back to at least January of 2005, correct?
A. Yes.
Q. So again, you knew how the subpoena had come to Cash Advance; it was through the continuous involvement of Scott Tucker, correct?
A. It was forwarded by Scott Tucker.
Q. And so the reason you are telling the court this happened by happenstance, as opposed to what you knew had happened, is because you didn't want there to be a connection between Scott Tucker and these companies, correct?

A. No, I don't believe so. I believe -- and I don't recall why that choice of language was used, but, I mean, the purpose was to argue to the court that there was no proper service of process. And I don't think it matters how it was received. If it wasn't properly served, it wasn't properly served.
Q. But you chose to tell the court something untrue about how it was received?
A. I wouldn't say that it was untrue. It may be a poor choice of words, but I wouldn't say it's untrue.
Q. Because the truth was Scott Tucker sent me a subpoena and it's a poor choice of words to say that it happened by happenstance?
A. It may -- it could have been phrased more accurately.
Q. Mr. Schulte, you began your testimony by saying you were a tribal attorney, correct?
A. Yes, I do represent a number of Indian tribes, and -- and that is the focus of the practice that my firm engages in.
Q. And you look out for those tribes' interests?
A. Yes.
Q. And you were involved in the matter surrounding all these businesses for over ten years, right?
A. Yes.
Q. Your firm made millions from it, right?
A. Over the course of time, yes.
Q. And made millions from checks signed by Scott Tucker,

right?
A. Signed by Scott Tucker on behalf of the tribal entities, yes.
Q. And you rode on Scott Tucker's private jet during this period?
A. I have done that on a few occasions.
Q. And you advised tribal entities who were settling a personal lawsuit against Scott Tucker's business for about $30 million, correct?
A. Correct.
Q. And at the end of all this, the Miami tribe fired you, because they realized you were working for Scott Tucker and not them, correct?
A. That is not correct.

MR. SCOTTEN: No further questions.

THE WITNESS: The Miami tribe was well aware at all times that I represented Scott Tucker at the beginning of the relationship.

THE COURT: All right. Cross-examination.

MR. SCOTTEN: Redirect.

THE COURT: I'm sorry. We had cross-examination. Redirect.

MR. ROTH: It's been a while.

THE COURT: Forgive me. It's been a while.

Mr. Roth.

REDIRECT EXAMINATION
BY MR. ROTH:
Q. Good afternoon, Mr. Conly.
A. Good afternoon.
Q. Do you have enough water there?
A. I do. Thank you.
Q. I want to go back to your initial legal opinion that you rendered to Mr. Tucker in 2004 regarding the tribal model. Do you recall that?
A. The one -- are you talking about the email or -- sorry, the memo of June, in June of 2004?
Q. Yes.
A. Yes, I recall that.
Q. And that was your initial review of the tribal model and his participation in that model, is that correct?
A. That is correct.
Q. And your recommendations in that memo were ways to strengthen the tribal model both for Mr. Tucker and the tribal entities, is that correct?
A. Correct.
Q. And you outlined ways to make it more defensible, is that fair to say?
A. Yes, that's fair to say.
Q. And when you used the word "defensible," were you anticipating regulatory challenges to the model?

A. When you represent Indian tribes, you always anticipate challenges from states on -- any time a tribe tries to engage in any sort of economic development.

Q. And is that one of the reasons why you have to be an aggressive lawyer, if you will, as the government has characterized you?

A. I believe it's expected of me as a tribal attorney.

Q. And you have to take innovative strategy, is that fair to say?

A. Yes, I mean, if tribes wouldn't innovate and were unable to do things like acquire outside capital and expertise, they would still be locked in a 19th century economy with a horse and a plow.

Q. And in regard to the recommendations or suggestions that you made to make the model more defensible, over the course of that ten-year period, when you were counseling both the tribe and Mr. Tucker, were many of those suggestions implemented?

MR. SCOTTEN: Objection.

A. Yes.

MR. SCOTTEN: Advice past the relevant time period.

MR. ROTH: I'll confine it to 2008, your Honor.

THE COURT: Thank you.

MR. SCOTTEN: 2004?

MR. ROTH: I think he --

THE COURT: Set a time period in your question and

then we'll see whether there's an objection.

BY MR. ROTH:

Q. Well, you represented the tribe and tribal corporations all the way to the end, until the Miami fired you, is that correct?

A. Yes. They stopped using our services.

Q. Right.

A. Correct.

Q. And in fact, in respect to the Modoc, you still represent them, is that correct?

A. That is correct.

Q. Do you represent the Santee still?

A. Yes.

Q. And both the Modoc and the Santee, today, as we sit here now, are engaged in payday lending, is that correct?

MR. SCOTTEN: Objection. Relevance.

THE COURT: Sustained.

Q. Do you still represent both those tribes?

A. I do.

Q. And some of the things that you suggested in your June '04 memo were things like getting the tribal corporate governing documents in place, is that right?

A. Yes.

Q. And the jury's seen, many of those were introduced over the course of this lengthy trial?

MR. SCOTTEN: Objection.

THE COURT: Ask a question.

MR. ROTH: I apologize, sir.

THE COURT: Sustained.

BY MR. ROTH:

Q. And you drafted many ordinances and codes in connection with the lending activities of the tribal corporations, is that correct?

A. It is.

Q. And you drafted licenses in regard to the lending operation for the tribes?

A. Yes, or -- me or my firm would have done that, yes.

Q. And you set up management contracts with the tribes, is that correct?

A. Yes, we did draft management contracts.

Q. And over the course of time, one of the objectives that you suggested was that the tribes -- to Mr. Tucker, was that the tribes got more involved in the operation, is that correct?

MR. SCOTTEN: Objection. Can we fix a date, your Honor?

Q. In your initial memo.

A. Yes.

Q. Is that correct?

A. Yes. Generally, that is -- and we were following the Indian gaming model --

MR. SCOTTEN: Objection.

A. -- in providing that advice.

MR. ROTH: Judge, I think they opened the door a lot.

THE COURT: Overruled. Next question.

BY MR. ROTH:

Q. I didn't hear the answer. I'm sorry.

THE WITNESS: Can you read back my answer, please?

THE COURT: No.

BY MR. ROTH:

Q. You said something about the Indian gaming model?

A. Yes, yes. The advice that was given in that June, that particular piece of advice in that June 2004 memo was based upon our experience with the Indian gaming model wherein tribes initially have no capital, no expertise --

MR. SCOTTEN: Objection.

A. -- so have to bring it in from --

MR. SCOTTEN: Objection. This is the Court's prior ruling.

MR. ROTH: This is 2004, Judge.

THE COURT: No. The point is that the witness is permitted -- the witness is not here as an expert witness on law.

MR. ROTH: I appreciate that.

THE COURT: The only person who gives you the law here in this case is me. The testimony of this witness goes to the question of Mr. Tucker's willfulness and intent, and in that

regard, he is permitted to offer, and has offered, testimony from this witness in an effort to establish that he did not act willfully or with intent, but acted in good faith and relied on what a lawyer told him was lawful.

Now, there's more to the good faith advice-of-counsel argument than what I've just said. I'll give you that in the final instructions. But that's the purpose for which the testimony has been received, and therefore, the witness needs to confine himself to what he told Mr. Tucker that Mr. Tucker relied upon.

MR. ROTH: Thank you, your Honor.

THE COURT: And as I will tell the jury, on this defense, you consider whether Mr. Tucker honestly and in good faith sought the advice of a competent lawyer as to what he might lawfully do. This means that he sought and obtained legal advice regarding a proposed course of conduct before proceeding with that course of conduct.

You also will consider whether he fully and honestly -- he, Mr. Tucker -- fully and honestly presented all relevant facts to his lawyer and whether he honestly followed such advice in good faith, relying on it and believing it to be correct.

I will give you more on this in the final instructions, but that's the limited purpose for which this witness's testimony has been admitted. No witness and no

lawyer may advise the jury on the law that applies in this case. That is solely my function, and I will do it in the final instructions. And as I told you when we first got together, I will give you the oral instructions orally, but I'll also give you a copy of them so you'll have them with you in the jury room during deliberations.

Next question, Mr. Roth.

MR. ROTH: Thank you, your Honor.

Q. Mr. Schulte, in your June 2004 advice opinion to Mr. Tucker, is one of the suggestions in the business model that over time, that there should be tribalization of the model?

A. Yes. I believe I advised that over time tribes should have increased participation and perhaps eventually even buyouts of the operation.

Q. Buy what?

A. Purchase.

Q. And did that occur at some point in regard to any tribes?

A. Well, in the end, the Modoc and Santee Sioux -- I mean, let me change my answer and start over. Yes, Miami's AMG Services acquired the servicing company in 2008.

Q. Well --

A. And then starting in the beginning of 2016, both the --

MR. SCOTTEN: Objection.

A. -- Modoc and Santee --

THE COURT: Sustained, sustained.

Q. Let me stop you there?

MR. ROTH: Judge, I'll ask another question.

THE COURT: Stricken.

BY MR. ROTH:

Q. Did you advise Mr. Tucker in 2000 -- did you advise him in regard to the merger, the CLK-AMG merger?

MR. SCOTTEN: Objection. Time period.

THE COURT: Let me hear the answer to the question.

A. I advised AMG, and yes, there was discussions with me and Mr. Morgan that involved Mr. Tucker about that.

THE COURT: No, no, no. That wasn't the question that you were being asked. As I understood the question, you were asked whether you advised him in regard to the merger, and I understand that question to mean you were acting as his lawyer, giving him legal advice.

Were you acting as his lawyer, giving him legal advice, on the merger?

THE WITNESS: I do recall a memorandum in 2006 memorializing that advice, and yes, I did.

THE COURT: So you were acting as Mr. Tucker's lawyer, not lawyer for some other party?

THE WITNESS: In 2006, I was.

THE COURT: Thank you.

BY MR. ROTH:

Q. And what was that advice, sir?

MR. SCOTTEN: Objection. It's 2006, as the witness just clarified. It's outside the Court's ruling.

THE COURT: Let me see the parties at sidebar.

(Continued on next page)

(At sidebar)

MR. SCOTTEN: Your Honor, this came up yesterday on his direct. The same exact memo was offered. The Court sustained the objection to it. It's legal advice in 2006, which is undisputedly not only during the charged conduct but when they were litigating in Colorado in defense of the charged conduct. It's outside the Court's ruling.

MR. ROTH: Judge, yesterday, I think that both sides agreed that Mr. Schulte was Mr. Tucker's lawyer to at least 2008 and was rendering legal advice up to that point. If I am not allowed to do it in terms of legal advice, I would like to ask him factually, because as we indicated before, we believe it is in direct rebuttal to their case in terms of their saying that this merger was a sham. And if he can factually talk about the merger, without legal advice, I think that that should be permitted.

MR. SCOTTEN: And we have no objection to that, your Honor.

THE COURT: OK. Good.

(Continued on next page)

(In open court)

THE COURT: Please be seated.

BY MR. ROTH:

Q. Mr. Conly, without indicating what legal advice you gave to Mr. Tucker, if any, regarding that merger, what was the purpose of that merger, factually?

A. The purpose of that transaction?

Q. Yes.

A. The purpose was to --

THE COURT: Whose purpose? Can you please establish that.

BY MR. ROTH:

Q. What was the purpose for Mr. Tucker and what was the purpose for the tribal entities?

A. The purpose was the same. It was to strengthen the business model such that it would be wholly owned by the tribe and therefore resolve any uncertainties with regard to whether state jurisdiction would apply to some portion of the servicing of the loan -- loans.

Q. And when did that merger actually occur?

A. I believe it was in June of 2008.

Q. And at any point between your initial review of the lending documents and the service agreements in June of 2004, did you ever render an opinion to the tribes or Mr. Tucker in regard to the illegality of the operations?

MR. SCOTTEN: Objection as to tribes.

THE COURT: Sustained.

MR. ROTH: OK. Withdrawn. To Mr. Tucker.

Q. Did you ever change your opinion about the legality, illegality of the lending documents?

MR. SCOTTEN: Change his opinion? The witness's views are not relevant.

MR. ROTH: It's my last question on the subject, Judge.

THE COURT: No. No, that's not the point. The point is, again, what's relevant is the communication between this individual and Mr. Tucker.

MR. ROTH: And Mr. Tucker, very well.

THE COURT: Go ahead.

BY MR. ROTH:

Q. Did you ever tell Mr. Tucker during that time frame that his participation as a servicer to the tribal entities, the lenders, was illegal?

A. No.

Q. The government asked you many, many questions in regard to the division of revenue under the terms of the service agreement, is that right?

A. Yes.

Q. That's the 99 to 1 percent of the gross collected revenues, is that correct?

A. We did discuss that, yes.

Q. And is it correct, sir, that if there's no money, no profits, the 1 percent is the better deal? You're guaranteed some money under 1 percent of the gross revenues, is that correct?

A. Yes. If you're operating costs exceed your revenues, then there is no profit at all.

Q. And it's easier accounting, so to speak, if you will, because it's just based on the money coming in, is that correct?

A. Yes. It's an easy calculation. You take the gross collected revenues times 1 percent.

Q. And the government asked you why you didn't step up for a tribe and say, Why didn't you get 2 percent instead of 1 percent. Do you recall those questions?

A. I do.

Q. Was a revenue split like this unusual in Native Americans contracting with -- in your experience, Native Americans contracting with outside vendors?

MR. SCOTTEN: Objection.

THE COURT: Basis.

MR. SCOTTEN: Court's ruling, relevance of other businesses and so on.

THE COURT: Sustained.

MR. ROTH: Judge, I think he went into this quite a

bit in terms of the proposed inequities, I would suggest.

THE COURT: Next question, please. I only sustain objections to questions, not to areas of inquiry. The objection to that question was sustained. Ask your next question.

BY MR. ROTH:

Q. Did the economic terms, the 99 to 1 percent, in your opinion that you rendered to Scott Tucker, reflect that because Tucker got the 99 percent that he was the owner of the operation?

A. Mr. Tucker owned the servicing operation up until 2008.

Q. And the mere fact that the split was 99 to 1 didn't mean that if he potentially got the greater portion of the lending operation that he was the owner of the operation, is that correct?

THE COURT: Sustained. Mr. Roth, you're familiar with my ruling.

MR. ROTH: Very well, your Honor.

Q. There was testimony yesterday on cross-examination from Mr. Hagan Scotten about a proceeding in Colorado on a Cash Advance matter, is that correct?

A. Yes.

Q. And you asked to see the transcript of that proceeding, the transcript, to amplify your answer, to put your answer in context to some of the questions, is that right?

A. I believe -- are you referring to the transcript of the telephonic hearing --
Q. Yes.
A. -- in that matter? Yes.
Q. Government Exhibit 4131 that was shown to you, the excerpt of that.
A. Yes.
Q. And have you had an opportunity to see that?
A. Not since yesterday.
Q. In that matter, you were not representing Scott Tucker, is that correct?
A. That is correct.
Q. And you were representing MNE doing business as Cash Advance, is that correct?
A. That was one of the clients that I represented, yes.
Q. One of the clients, OK.
A. Yes.
Q. And ultimately a bench warrant was issued for Mr. Tucker, is that correct?
A. Yes.
Q. To your recollection, did you try to stop that bench warrant?
A. I had no further participation in that matter with regard to Mr. Tucker's -- with the bench warrant.
Q. Or the issuance of it?

A. Correct.
Q. Now, yesterday, the government showed you a bunch of billing records. Do you recall that?
A. Yes.
Q. A one-month billing record.
Is it fair to say, sir, that in respect to the millions of dollars that the government said your firm received as a result of your legal efforts, you actually did the legal work that you billed for?
A. Absolutely.
Q. OK. And for members of the jury who may not be --
THE COURT: Ask your question.
Q. What timing increments do you bill in, sir?
A. One-tenth of an hour.
Q. And that's six minutes?
A. Correct.
Q. Do you do detailed billing records? Is that fair to say?
A. Yes.
Q. And you did so in all of these matters, is that correct?
A. That is correct.
Q. And those were approved at one point by the Miami nation, is that correct?
A. Yes, the invoices would have been sent to the Miami nation for approval.
Q. And the government introduced a stack of checks that were

made out to your law firm. Do you recall that?
A. I do recall that.
Q. And those were checks that were issued by, from bank accounts from various tribal entities, is that correct?
A. That is correct.
Q. And they were signed by Mr. Tucker, is that right?
A. Yes.
Q. And did Mr. Tucker have the lawful authority to sign those checks?
A. He did.
Q. And --
MR. SCOTTEN: Objection, your Honor. Sorry I was slow.
THE COURT: All right. Stricken.
MR. ROTH: I didn't hear the objection. I'm sorry.
MR. SCOTTEN: The objection is to the question "And did Mr. Tucker have the lawful authority to sign those checks," and I was slow, your Honor.
BY MR. ROTH:
Q. To your knowledge, were those checks -- was he a signatory on those accounts?
A. Yes, he was a signatory on those accounts.
Q. And had he gotten the power of attorney, to your knowledge, to exercise authority over those accounts?
A. Yes, each of those tribes had granted him the power of

authority -- I'm sorry, power of attorney to exercise authority over those accounts.
Q. But the tribes were still the owners of those accounts, is that correct?
A. That's correct.
MR. SCOTTEN: Objection. Legal conclusion.
THE COURT: Sustained as to a legal conclusion.
Q. The tribes could revoke any powers of attorney that they gave to Mr. Tucker over those accounts at any point, is that correct?
A. Yes, the powers of attorney were revocable powers of attorney, and in fact, they were revoked at some point in time.
Q. They had the final ability to pull the plug, so to speak, is that right?
A. That's correct.
Q. Your law firm grew to be the largest Native American law firm in the country, you testified to, is that correct?
MR. SCOTTEN: Objection.
THE COURT: Overruled.
A. I don't know that I testified to it, but I have been told that we are, yes.
Q. And your law firm grew to that status by promoting the interests of justice of Native Americans and tribal entities, is that correct?
A. Yes.

 (Continued on next page)

Q. And your law firm didn't grow to be the most prominent Native American law firm by representing businessmen like Scott Tucker, is that right?
A. That's correct.

MR. ROTH: No further questions, Judge.

THE COURT: All right. You may step down.

Ladies and gentlemen, we're going to take our lunch break.

Sir, you may step down.

THE WITNESS: Sorry.

(Witness excused)

THE COURT: Let me see the lawyers at the sidebar on for one moment. You can stand up and stretch, but just one moment so I can give you further instructions.

 (Continued on next page)

(At sidebar)

THE COURT: Is Mr. Tucker calling Mr. Morgan?

MR. ROTH: No.

THE COURT: So I can send the jury home at this point? You're going to rest?

MR. ROTH: We're not going to rest until we get those other documents.

MR. GINSBERG: We can't rest until we see them. As the government usually phrases it, out of an abundance of caution, until we get all of those emails and get to look at them over the weekend in case there's something that we never saw before or didn't have the ability to obtain, we don't want to rest now.

THE COURT: Do you have any other witnesses?

MR. GINSBERG: I don't think we have any other witnesses.

THE COURT: But you may have other witnesses? What's going on here?

MR. GINSBERG: There could be documents.

MR. ROTH: Schulte could be recalled.

MR. GINSBERG: I can't in good faith give you an answer until we look at all the emails.

THE COURT: The government created this, so I'm not going to worry too much about it. They're the ones who want this. They're the ones who have to bear the consequences of

it. OK. But there's nothing else for this jury to do today?

MR. GINSBERG: I think that's it for today.

MR. ROTH: That's correct.

MR. GINSBERG: That's correct.

THE COURT: OK.

(Continued on next page)

(Continued on next page)

(In open court)

THE COURT: Ladies and gentlemen, please be seated for a moment.

Our workweek together has come to an end. We're in the final stages of the case, and while I can't make a final prediction, because there are some issues, I presently anticipate that there may be only one remaining witness left in the case. That could change, but that's as I see it now.

What we're going to do is break and pick up on Tuesday morning at 10 a.m. sharp, and we will have that remaining witness. Thereafter, I anticipate that there will be closing arguments from the lawyers. The defendants have no obligation to make a closing argument; defense counsel may, if they choose. Then I will give you final instructions on the law, and at that point you'll begin your deliberations.

As I see it, that will probably be on the 11th of October, exactly one month from the day that we first met.

Monday is the celebration of Columbus Day, and the court is closed. It's important over the long weekend that you follow my instruction not to discuss the case among yourselves or with anyone -- with your family, your friends; not to email anyone, not to text anyone, not to do any searches on your own.

I've said this to you before and I'll say it again. If you or a family member were involved in an important legal proceeding, you would want that case decided only on what comes

out in the courtroom. That's what's fair, and that is what compliance with my order requires. So put the case out of your minds for the weekend. Leave your notebooks in the jury room. Please remember to get here for a start at 10:00 on Tuesday.

You may have to get here a little bit early, because Tuesday in this courthouse will be like a Monday. It will be the first day of the workweek because of the holiday, so getting into the courthouse may be a little bit more difficult. But I wish the Yankees good luck. I wish everybody good health, a good, peaceful weekend. Put it out of your minds, and I'll see you bright and early on Tuesday.

Thank you, ladies and gentlemen.

(Jury not present)

THE COURT: And we'll pick up on the charge at 2:15.

Yes, sir.

MR. GINSBERG: While Mr. Schulte's attorney is still here, I hate to do this to him, but I guess to be very cautious, I would ask the Court to instruct his counsel to instruct Mr. Schulte that subject to our review of these other documents, Mr. Schulte is potentially subject to recall as a witness on Tuesday.

THE COURT: All right.

Counsel will identify himself, please.

MR. CAGNEY: Good afternoon, your Honor.

William Cagney, with Windels Marx, and I understand

(Continued on next page)

the request and that the recall application is outstanding.

THE COURT: Yes, and so he is subject to recall. Thank you.

MR. GINSBERG: Thank you.

THE COURT: See you at 2:15.

(Luncheon recess)

AFTERNOON SESSION

2:30 p.m.

THE COURT: So you all may remain seated during the charging conference because I think it will be a little bit easier to work with the documents.

What I would like to do is start from page 2 through the section on the indictment on page 19. And I know the government has -- I will begin with the government -- the government has proposed changes on, I guess page 10 and 11. It may refer to the prior draft page numbers. No law enforcement witness testified so you're suggesting that that be stricken.

MR. SCOTTEN: I believe, your Honor, that the version the Court -- I am standing. I believe the version you have circulated already has those changes.

THE COURT: So that's taken care of.

Do I have a plural for cooperating witnesses?

MR. SCOTTEN: I believe so, your Honor.

THE COURT: So what does the government have at this stage up to page 19?

MR. SCOTTEN: Nothing, your Honor.

THE COURT: Defendant Tucker, up to page 19.

You may remain seated, Ms. Van Ness.

MS. VAN NESS: We have nothing, except we are going to rely on objections that we have already made and have been denied.

THE COURT: No, you're not. We are not going to have an ambiguous record. That is why we are having this charging conference. I have had everybody's instructions, everybody's objections, everybody's paper. I have taken it into account, and I have incorporated it into what is now the second draft of the instructions. So now I want particularity as to what it is that you're objecting to.

Now, I do know that on the bottom of page 14, uncalled witnesses, one of the things you're objecting to is the giving of an uncalled witness charge. Correct?

MS. VAN NESS: We are objecting to the phrasing of the charge that the Court has put in its draft.

THE COURT: Tell me what you would like me to change.

Now, if you have something before page 14, please tell me.

MS. VAN NESS: Your Honor, I apologize. I thought that given that you had revised your charge after looking at our first set of objections, that the objections you denied, for which we had no further support, would not be raised.

THE COURT: They are all on the table. This is why it's a charging conference. This is why I put out the draft. It's Court Exhibit 13. We are not going to have a sandbag in the United States Court of Appeals for the Second Circuit, where if you look at footnote 12 on my letter of September 15, we clearly asked for this, that, or the other thing, or

objected to, and we assume the court denied it, because when we got the second version of the charge it wasn't in there, and so we claim that the court committed reversible error by overlooking our instruction.

Now, I have put the instruction out here. I have been very clear. I was very clear several times that we are going go on the basis of Court Exhibit 13, and we are going to go page by page, line by line. I think I even said that yesterday. That's what we are doing.

MR. BATH: Maybe I can address that paragraph.

THE COURT: Sure. Do you have anything up to that point?

MR. BATH: I do not.

MS. VAN NESS: Yes, your Honor, I do, actually on page 5 of the revised charge.

At the end of the third full paragraph, that paragraph ends with the statement, "The fact that one party called more witnesses and introduced more evidence does not mean that you should find in favor of that party."

We had asked that you add the uncontroversial instruction: It is the quality of the evidence, not the quantity that matters.

THE COURT: Any objection from the government?

MR. SCOTTEN: Your Honor, one, we think sometimes quantity does matter. Two, as I think we stated in our letter,

there are a lot of instructions that are commonly given and upheld by the Second Circuit as to reasonable doubt we would also like given. We think the Court should stick with this existing charge and not have the parties go back and forth on ten other ways to phrase it.

THE COURT: I am going to do the following. I am going to add at the bottom of page 5 the following sentence: "It is the quality of the evidence that matters."

Next.

MR. BATH: I think that takes us to page 14, your Honor.

THE COURT: Good.

MR. BATH: I suggest that the second sentence be stricken. It begins "I instruct you." And, also, the first word "therefore" of the second sentence. So that that second sentence would begin, "You should not draw any inferences."

THE COURT: Why?

MR. BATH: In this case, given the Fifth Amendment issues -- and I know they happen in other cases, but here I don't think it's accurate to say each party had equal opportunity or lack of opportunity to call witnesses. It didn't because some took the Fifth, and we don't have that ability to immunize anybody.

THE COURT: Well, the equal opportunity or lack of opportunity arises from their assertion of the Fifth Amendment.

I think it prompts speculation if I say something further about -- by the way, who are the witnesses that said they would assert the Fifth?

MR. BATH: Joe Frazier, the former CFO, advised through counsel he would. Natalie Dempsey advised through her counsel that she would. Those are two. I could think of more.

THE COURT: I recall that there was an application at one point that the Court compel the government to confer immunity on various witnesses, and that application was withdrawn.

MR. BATH: You're correct.

THE COURT: So I think this language is correct, and I am going to give it.

MR. BATH: Judge, in conjunction with that, we also, in our first letter to you, asked that an instruction be given about Don Brady. I think this is an appropriate time to talk about that.

THE COURT: Yes.

MR. BATH: We stand on our prior request.

THE COURT: As to Mr. Brady, I have given this thought. I think saying more or highlighting him winds up with juror speculation. Remember, we had a discussion, What would I say? Would I say because of dementia? Well, if I said because of dementia, that would cause speculation as to whether he suffered from dementia at some other point in time, earlier

point in time. If I say illness, then it causes speculation, well, maybe he is going to get better, maybe this was somehow strategic. I think it causes speculation.

I will not have a problem if either side says, you know, Don Brady didn't testify. I expect the Court will instruct you each party had an equal opportunity or lack of opportunity to call any of these witnesses, and you shouldn't draw any inference. You're allowed to say that. But that is something that would be left to argument. I think it's not appropriate to highlight one witness, and saying something about the reason causes speculation. But thank you for raising it. I had it very much in mind.

What next?

MS. VAN NESS: Your Honor, on page 22, before you get to the discussion of Count One, which is the RICO conspiracy, we had requested that you charge the substantive law on RICO before the conspiracy because we thought it would make it more comprehensible.

THE COURT: So is there anything further up to the indictment on page 19?

MS. VAN NESS: No.

THE COURT: So now let me continue the way I was going, which is I am going to turn to the government in the first instance, from page 19 through the end of Count One, which ends on page 31.

MR. RAVI: With respect to Count One, as described on page 23, it's really more of a renumbering. The government would submit that right now Count One is phrased as having six elements, whereas the conspiracy is really two elements, and would prefer that the language be parallel to what is described for Count Five and Count Seven, where it describes two elements for conspiracy and then describes separately four elements for the object of the conspiracy as in the RICO count.

THE COURT: I have to tell you, Mr. Ravi, when I read through the charge, I felt I was lying to the jury. I said to them: There are two elements to Count One, one and two. Oh, yeah, and then I forgot to tell you there are four more elements to Count One.

These are the six things they need to find in order to convict on Count One, is that correct?

MR. RAVI: They only need to find the first two elements, one of which is that there is an object of a conspiracy, which are the four elements described in the substantive count.

THE COURT: Then what you're suggesting is that I can tell the jury that if they find the first two elements satisfied, they may convict on Count One, is that what you're urging on me?

MR. RAVI: So long as the agreement that they are finding as to the object of the conspiracy is the four counts

described in the substantive RICO count.

THE COURT: So then you agree with the defendant. I should not charge any of this on Count One?

MR. RAVI: That is not what we are saying.

THE COURT: It sounds to me what you're saying is, find the first two, then find the next four. Is that what you're saying?

MR. RAVI: I think what we are trying to get at, your Honor, maybe charge the substantives first.

THE COURT: That's exactly what the defendants asked for, and maybe we have an agreement on it.

MR. RAVI: Can we confer one moment, your Honor?

THE COURT: Yes.

MS. VAN NESS: Your Honor, may I say something while the government is conferring?

THE COURT: Sure.

MS. VAN NESS: Having looked at the way your new draft is structured, which is different from the way it was structured in the old draft, I am going to withdraw the request that you discuss the substantive counts before the conspiracy counts. This format is fine.

THE COURT: Thank you.

MR. VELAMOOR: Judge, we are just searching for whether or not something that was in the original charge is in the revised charge.

THE COURT: That's fine.

MR. VELAMOOR: What we are searching for is what was on page 26, which is the instruction that conspiracy is separate and distinct from the actual violation.

THE COURT: I will tell you where it is. In fact, my recollection, Ms. Van Ness, is that you actually did have an objection or a request, and I thought it was a good one. So we are going to go back and revisit it and maybe this will remind you. Let me just find it myself.

It's page 21. Actually, I am a human being. I know this can be done better and that's why we have charging conferences. But it's page 21, the third full paragraph.

But I start off on 20 by saying, "There are 14 charges and they fall into two types of charges: Conspiracy charges and substantive charges. I will explain the difference as I go along."

Then after Count One I say, "So Count One is a conspiracy count, and Counts Two, Three and Four are substantive counts." And I do the same thing with Count Five and Count Six.

I am happy to repeat the same sentence after Counts Seven, Eight and Nine. So Count Seven is the conspiracy charge, Count Eight and Nine are the substantive charges.

Then I follow up with the following: "So you can see there are three different conspiracies charged in the

indictment. A conspiracy is an agreement by two or more people to commit a crime." And I remember that Ms. Van Ness had a language change you wanted to make there, and I will hear you on that. "I will tell you more on conspiracy in a moment, but you should know that the conspiracy to commit a crime is, itself, a separate crime."

MR. VELAMOOR: We would just ask the Court to add the sentence that was previously right after the substance of what the Court just read, which is, "Indeed, you may find the defendant guilty of the crime of conspiracy, even if you find that the substantive crimes that were the objects of the conspiracy were never committed."

THE COURT: I think that's a correct statement of the law. I think it's implicit in what -- what would be the confusion without that language?

MR. VELAMOOR: I am not sure it's confusion. I do think it sort of brings it home to make sure there is no -- as opposed to an abstract instruction as to what conspiracies are and what they are not, this would make clear, in terms of the actual function that the jury is performing, that they can find guilt with respect to one.

THE COURT: You guys don't need to hear philosophical thoughts and all that, but I have cut down the instructions not by much, but I have cut them down, and I believe the instructions that are routinely submitted to courts in this

district are confusing, difficult to understand, verbose, and they so over-explain things at times as to distract from juror comprehension. And if the name of the game here is to try and get the Court to just drone on for hours so that comprehension is lost, I am not in favor of it. But let me hear the language you want to add so I can at least consider it.

Indeed?

MR. VELAMOOR: You may find the defendant guilty of the crime of conspiracy, even if you find that the substantive crimes that were the objects of the conspiracy were never committed.

If the Court is not inclined to add any total words, we would propose including that sentence and not the previous sentence about conspiracy is separate and distinct from the actual violation.

THE COURT: What I propose to do is strike the preceding sentence, the last sentence of that middle paragraph. "You may find a defendant guilty of the crime of conspiracy, even if a substantive crime that was the object of the conspiracy is not proven."

Any objection from the government?

MR. VELAMOOR: No, your Honor.

THE COURT: From the defendant, to that language, to the striking the sentence and inclusion of that language?

MS. VAN NESS: No, your Honor.

THE COURT: Now, you had a change you wanted to make in the second sentence of that paragraph?

MS. VAN NESS: Yes. I had actually flagged it for page 24, but I see it is also on page 21.

Since you're giving sort of a preview of what conspiracy law is, or general principles, I would ask that you charge, if I can find it -- I am just looking for it, your Honor.

THE COURT: Take your time.

MS. VAN NESS: Yes. Define a conspiracy as, "A conspiracy is a kind of criminal partnership, an agreement of two or more persons to join together to accomplish some unlawful purpose."

So that would go in replace of the second sentence of that third full paragraph.

THE COURT: Well, what I propose to give is, "A conspiracy is an agreement by two or more people to join together to accomplish some unlawful purpose."

Any objection?

MR. SCOTTEN: No, your Honor.

THE COURT: Any objection?

MS. VAN NESS: I think adding "a kind of criminal partnership" would be worthwhile, simply because it's true and because it underscores that it must be a criminal agreement. I would just ask that you include the entire phrase.

THE COURT: That objection is overruled.

So that paragraph is going to read: "So you can see there are three conspiracies charged in the indictment. A conspiracy is an agreement by two or more people to join together to accomplish some unlawful purpose. You may find a defendant guilty of the crime of conspiracy, even if a substantive crime that was the object of the conspiracy is not proven."

What's next from the government?

Have you conferred and are you asking me to charge on the substantive crimes before the conspiracy? What do you want me to do? Do you want me to give the elements twice?

MR. SCOTTEN: I think we are good with it as written.

THE COURT: What I can do, if this is what you want, I will charge on conspiracy and I will say, but you must find the elements of Counts Two, Three and Four are met, and I will give it once there.

MR. SCOTTEN: I think we are comfortable as written, your Honor.

THE COURT: So what else through Count Four, from the government?

MR. SCOTTEN: I don't think anything. Let me confirm.

Nothing, your Honor.

THE COURT: Now, we will stop at page 37, up to advice of counsel.

Let me inquire of the defendants whether there are any objections up to advice of counsel on page 37?

MS. VAN NESS: Yes, your Honor.

First of all, we reiterate our request for a different definition of willfully.

THE COURT: What page are you on?

MS. VAN NESS: Page 25.

THE COURT: Tell me what you would like me to strike and what you would like me to add.

MS. VAN NESS: One moment, your Honor.

We would like you to define willfully as "to act --"

THE COURT: Where are you looking now?

MS. VAN NESS: The first full paragraph, second sentence, "willfully means."

THE COURT: Now, you want me to strike the entirety of that paragraph?

MS. VAN NESS: That sentence.

THE COURT: Just the sentence.

MS. VAN NESS: And substitute, "Willfully means to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids, that is to say, with a bad purpose to disobey or to disregard the law."

We have alternate requests for that definition, but this refers to the legal argument we have made in various pleadings, but most particularly in our initial charge requests

and exceptions, which is ECF 241, as supplemented by a filing yesterday, which is ECF 250.

We rely on many cases. The government, as we have argued, has relied solely on the *United States v. George* case. I know your Honor has read all this argument. We believe that they are using *George* as a decision by the Court of Appeals which irrevocably modifies the standard definition of willfully, even though it's not in the pattern charge, and that the pattern charge correctly defines willfully, which requires some knowledge, a general awareness of the unlawfulness of one's conduct.

So we have made that argument. We have cited cases after *George*, where those pattern charges were given, and not just in cases involving specific intent, though the *George* case itself does not require a specific intent crime in order to get the pattern charge language.

In the subsequent filing that we filed yesterday, ECF 250, I added a case, your Honor, from the Court of Appeals. It was *People v. Kelly*.

THE COURT: Give me the *George* cite.

MS. VAN NESS: 386 F.3d 383.

I misspoke. The filing I am relying on from yesterday is ECF 249, not 250.

THE COURT: You're talking about the letter of October 4th, is that what you're referring to?

MS. VAN NESS: Yes.

THE COURT: The four-page letter of October 4?

MS. VAN NESS: No. That's the charge request we filed last night. This was a two-page letter that was filed in the afternoon, I believe. ECF 249.

THE COURT: I have a two-page letter also dated October 4.

MS. VAN NESS: Right. It starts, "Your Honor recently raised the issue of the enforceability of tribal laws." That's the document I am talking about.

The *Kelly* case that I am mentioning now is discussed on page 2 of that letter.

THE COURT: Let me say, with regard to, quote unquote, pattern instructions, I am a great fan of Judge Weinfeld, of Judge Sand, of Judge Rakoff, of John Siffert, but it's a treatise, commercially sold. That's all it is. It has no special status. Great book. Rely on it a lot. But it has no particular significance, and I think the aforementioned jurists and lawyer would acknowledge that.

MR. SCOTTEN: I don't know if this is helpful, your Honor, but I don't think we are actually really relying on *George* to make argument at this point. So I don't want the Court to spend too much time on it, and then have me say we are not really talking about *George*.

THE COURT: All right. What then is the government

relying on?

MR. SCOTTEN: It's not that we are disclaiming *George*. I think, really, I should explain this in two parts. One, we think the Court has given the defendants what they asked for and rejected the government's argument. Our argument is that in racketeering there is no requirement to show a purpose to do something that the law forbids. The Court's original instruction, which simply required deliberate and intentional action, was sufficient.

I think the most relevant case on that, which we have cited essentially in every filing, is *United States v. Scotto*, where, like this, with a racketeering conspiracy case, and like this, it was not a case where it was conspiracy to commit murder or something that self-evidently had a bad intent, and the defendant raised an argument similar to one here, which is that we should get some kind of instruction that we are acting with a purpose that the law forbids. The district court gave that instruction, and then the circuit court said, in fact, the district court's instruction was more favorable than the law entitled the defendant to.

Now, we were not going to further press the fight. There is no point in the government preserving objections. So if the Court intends to instruct willfully means to act deliberately and with a purpose to do something that the law forbids, that is giving the defendants their requirement of

some kind of unlawful purpose, which we have objected to. To the extent the defendants would expound upon that and use additional language, I think that would be inconsistent with the Court's general direction to keep this short, it would be unnecessary for them to make the defense that they are laying out, and would further, I think, confuse the jury into considering some of the choice of law, immunity, and sort of "we had a bunch of lawyers present" arguments that, for all the reasons we have argued, are not relevant or correct law.

THE COURT: What about an instruction that the defendant need not have known that he was breaking any particular law, but he must have been aware of the generally unlawful nature of his act?

MR. SCOTTEN: No objection. If the Court wants to add that, we don't think it's too material a change from what is already there.

THE COURT: Any objection from the defendant?

MS. VAN NESS: Can you say that again?

THE COURT: Sure. The defendant need not have known that he was breaking any particular law, but he must have been aware of the generally unlawful nature of his act.

MR. SCOTTEN: Your Honor, we just want to make sure, are you adding that or replacing it?

THE COURT: Adding that.

MS. VAN NESS: You would add that to the sentence you

already have in the charge?

THE COURT: Yes.

MS. VAN NESS: So "willfully means to act deliberately and with a purpose to do something that the law forbids," and then the sentence your Honor just said.

THE COURT: Yes. Exactly. Any objection?

MS. VAN NESS: No. That's fine.

THE COURT: So I am adding the words -- I will read them again -- the two sentences will be, "Willfully means to act deliberately and with a purpose to do something that the law forbids. The defendant need not have known that he was breaking any particular law, but he must have been aware of the generally unlawful nature of his act."

All right?

MS. VAN NESS: Your Honor, we consent to that, but for the record, I just want to reiterate that our first request from long ago, and reiterated in additional filings, was that -- this is from the pattern charge as well -- if conduct is not willful, if it was the result of the good-faith misunderstanding of the requirement of the law. In this connection, it is for you to decide whether the defendant acted in good faith, that is, whether he sincerely misunderstood the requirements of the law or whether he knew what he was required to do and deliberately did not do so. That's Sand's instruction 3A-3.

THE COURT: What are you asking me to do?

MS. VAN NESS: I am asking you to give that instruction that I just read, in addition to the instruction you have agreed to give, because all of those instructions are in the pattern charge and they are all about different aspects of the rule. So I don't think they are redundant.

THE COURT: The fact that they are in a well-recognized treatise does not indicate that they represent the law at all. So therefore it's denied.

MS. VAN NESS: I will just add a support for that additional request. The application of the collection of unlawful debt statute to these facts in this context, where tribal sovereign immunity is all over the case, this makes the law's application at least as complicated as the tax laws and the securities law, where good faith has been deemed to be a part of the willfully instructions. So that's the reason we ask for it, your Honor.

THE COURT: Do you urge that tribal sovereign immunity makes the extending of a loan lawful?

MS. VAN NESS: We urged that the fact that a state can enforce its usurious interest rate against an entity means that it is not an unlawful debt, and we have discussed this in other parts of our charge.

THE COURT: I am happy to talk about this any time you want, but I think that flips it around entirely. Why do you

talk about a state going after somebody? That's not how this works. The debt is not enforceable under state law. If you went into a state court to enforce the debt, it likely would not be enforceable. That doesn't mean that the state has to sue anybody. It doesn't mean that a state actor would be involved.

MS. VAN NESS: Right.

THE COURT: It doesn't mean that somebody would go to jail. The debt would not be enforceable.

MS. VAN NESS: Right, your Honor.

THE COURT: And, by the way -- and I am just going to raise this again -- I invited the defendants to point to any instance where any debt incurred by any of the lenders referred to in the indictment during the course of the conspiracy was sought to be enforced in a state court. And as of the moment, I have heard of no such instance.

MS. VAN NESS: Your Honor, I am going to take full responsibility for this. I have said this in the two-page letter you have, ECF 249, from yesterday. My original formulation of the argument about the enforceability aspect of the RICO statute being part of the definition of unlawful debt, I had flipped the parties, if you will look at the first paragraph on page 1. What I meant to say is -- and I think that's what spawned the discussion on the record the other day about whether a tribal loan would be enforceable in the state

of New York and public policy and so forth. What I meant to say is, the definition of unlawful debt requires that the rate of interest charged be at least twice the enforceable rate. That's part of the statute, the RICO statute. Enforceability is therefore part of the statutory definition of the offense. Therefore, if the state's interest rate cap is unenforceable because of tribal sovereign immunity and sovereign immunity, then the debt is not unlawful.

I stuttered there. Would you like me to say that again?

(Continued on next page)

THE COURT: No, but why do you import the concept of a state actor being on the scene? How do you read the statute to require a state actor to do something?

MS. VAN NESS: I'm not requiring the state to do anything. The definition of unlawful debt in 1961(6) is the rate of interest must be "twice the enforceable rate," so our position is that if the state rate, any state rate, is not enforceable by virtue of tribal sovereign immunity, then it is not an unlawful debt.

THE COURT: And if a tribe went into a state court and sought to enforce the debt, the state's cap on interest rates would render that debt unenforceable.

MS. VAN NESS: But that's not what we're maintaining here, and this is covered in the two-page letter. Respectfully, your Honor, I think that that switches the burden of proof. It's not that we have a burden of proving that a tribal loan would be enforceable in New York or any other state. The government has to prove that it is twice the enforceable rate.

THE COURT: Right.

MS. VAN NESS: It's their burden.

THE COURT: I don't think I'm grasping your point. I'm happy to read your two-page letter, but I don't know that I'm grasping your point. I got the statement in the second sentence about the error in the prior submission.

MS. VAN NESS: Right.

THE COURT: Doesn't this imply that somebody is trying to enforce something? If the tribe sued on a debt in state court, it wouldn't be enforceable, and if a debtor brought a declaratory judgment action, the debt wouldn't be enforceable.

MS. VAN NESS: But the definition of unlawful debt does not simply refer to the usurious rate. It refers to the enforceable rate.

THE COURT: That's why I'm talking about the enforceable rate, a rate in excess of the rate provided by law. A rate of 700 percent would not be enforceable.

MS. VAN NESS: But the definition in the RICO statute says that the rate has to be at least twice the enforceable rate.

THE COURT: And the enforceable rate in New York is 25 percent. Twice that is 50 percent.

MS. VAN NESS: But if it's not enforceable in New York as a result of tribal sovereign immunity, it's not unlawful. That's my point.

THE COURT: But it's an enforceable rate if the application of that rate renders the debt unlawful or uncollectible, and that would be true if the tribe itself --

There's a concession in this case. Tribes enjoy sovereign immunity. Let's take Mr. Tucker out of this. Let's take Mr. Muir out of it. A tribe lends money and then the

tribe goes into a New York court. Would not the cap render the loan unenforceable because it's twice, or even once, or it's above the enforceable rate in the state?

MS. VAN NESS: Well, a bank that charges credit card interest of a thousand percent could charge that in New York, and the 25 percent criminal usury rate would not be enforceable against the bank.

THE COURT: It applies in consumer loans. It doesn't apply to certain categories of loans. Right? If you have a loan, I think, in excess of 250,000 or a loan by a bank, the rate doesn't apply. Right? It's not necessarily relevant to this case, but I think there's a dollar amount, and there are institutions to which the rate would not apply.

MS. VAN NESS: And we're saying that the rate doesn't apply here because of tribal sovereign immunity.

THE COURT: What's your support for that? What's your support for the proposition that if a tribe went into a state court in New York, New York's limitation on interest rates on a consumer loan wouldn't be enforceable?

MS. VAN NESS: Well, we're not talking about the tribe trying to enforce its own loan.

THE COURT: No. I said the rate being enforceable, the court says "I am enforcing New York's cap, and therefore, this loan is uncollectible. I enforce the cap."

MS. VAN NESS: I'm focusing on another part of the

definition of unlawful debt, your Honor, which I quoted in that letter, the two-page letter.

THE COURT: I got your two-page letter.

MS. VAN NESS: OK.

THE COURT: Just tell me part you're relying on. I have the statute right in front of me.

MS. VAN NESS: The definition of unlawful debt requires that the rate of interest charge be "at least twice the enforceable rate."

THE COURT: Yes.

MS. VAN NESS: So our position is it's not enforceable.

THE COURT: The enforceable rate would be the 25 percent, not 50 percent. Correct?

MS. VAN NESS: It's a question of whether the --

THE COURT: When it refers to twice the enforceable rate, the rate it's referring to, if you're talking about New York, is 25 percent, correct?

MS. VAN NESS: In general, yes.

THE COURT: OK.

MS. VAN NESS: That's the criminal usury statute.

THE COURT: OK. So why, because the tribe enjoys sovereign immunity, would that rate not be enforceable, the 25 percent rate?

MS. VAN NESS: If the tribe is immune --

THE COURT: From suit.

MS. VAN NESS: -- that means that the usury rate is not enforceable against the tribe.

THE COURT: That's a big leap. I'm going to suggest you read Justice Kagan's opinion in *Michigan v. Bay Mills Indian Community*, in 2014. She makes the point it's an immunity; it doesn't even mean that you couldn't get an injunction against tribal officials, just as you could get an injunction against state officials who work for a sovereign state. It's not a question of anything other than who enjoys an immunity from suit, and she points out that there are other ways to enforce the law, other than suing a tribe.

MS. VAN NESS: All right, your Honor. I think I've said what I can say, except that I will also point out that if we're focusing on the New York State statute, the New York State statute itself, the usury statute says "unless otherwise authorized or permitted by law --"

THE COURT: Right.

MS. VAN NESS: "-- the rate is X."

THE COURT: Right, and when the New York State legislature puts a tribe, and maybe they someday will do it, in the same category as a bank, then you have that argument. It's undisputed that a tribe cannot be sued. They can't be prosecuted under the criminal usury statute. That is not the equivalent of saying that the New York rate is unenforceable on

a loan by a tribe. Those are two different things.

MR. BATH: Judge, just for record purposes, and I don't do civil work, but as I understand it Capital One gets to charge a rate that's higher than the New York usury rate because of the National Bank Act, because Congress has essentially passed a law that they can do that.

Our position is because the tribes have sovereignty, and part of that sovereign immunity is the sovereignty that they get to pass -- unless Congress takes the power away from them, which it hasn't, and there's been multiple times where Congress, in the last five to seven years, has proposed legislation that would do just that, to say there's a national usury rate, unless they take that power from the tribes, then the tribes can pass those laws, the tribes pass the law.

That's still doesn't mean, I agree with you, what the New York court might or might not do, but that would seem to come down to choice of law, and at the time of charged conduct, there are not any cases that indicate that that rate that was being charged by the tribes, that's alleged here, was unenforceable.

THE COURT: And I think yesterday I mentioned Judge Seibel's decision in, I think, February 2017, but that's where we are.

What else, Ms. Van Ness?

MS. VAN NESS: Page 26. This is somewhat of a

housekeeping matter, but when you are talking about Count One, third element, you actually don't say, as you do with respect to every other element, "The third element the government must prove beyond a reasonable doubt is," so I would propose that you add as a first sentence, "The third element that the government must prove beyond a reasonable doubt is that the enterprise alleged in the indictment that it calls the Tucker Payday Lending Organization existed," and then you would modify the second sentence, because you just defined the Tucker Payday Lending Organization --

THE COURT: One second now.

MS. VAN NESS: OK.

THE COURT: All right. I propose to start it off, if this is what you want me to do, "The third element the government must prove beyond a reasonable doubt is the existence of an enterprise that the indictment calls the Tucker Payday Lending Organization."

Is that acceptable to the defendants?

MS. VAN NESS: Yes.

THE COURT: Is that acceptable to the government?

MR. SCOTTEN: Yes, your Honor.

THE COURT: OK. And then it would pick up with, "The alleged purpose of this enterprise was to enrich its leaders," etc.

All right. What else?

MS. VAN NESS: Before that sentence, the alleged purposes of this enterprise, I would propose adding the sentence, "The indictment charges that this enterprise is a criminal organization, and that the alleged purposes," etc. The language that says "the indictment charges that it is a criminal organization" was in the Court's prior draft.

THE COURT: I know. I took it out. Why do I need it? It was in there. I took it out. I shortened a lot of things. I think I told everybody at the outset, I tried to squeeze as much out as I possibly could for the purposes of juror comprehension. This charge, as I see it now, is probably going to go on for two hours, at least, maybe longer.

Go ahead. Why do I need it?

MS. VAN NESS: I just think it makes it clear that since the Tucker Payday Lending Organization, so-called, is a business, not the Mafia or a gang, a criminal street gang, which is what we usually associate with racketeering statutes, that it would be helpful to the jury to repeat the indictment's definition of the enterprise as a criminal organization.

THE COURT: And then we put in the instruction that an enterprise can be a lawful business, an incorporation, a partnership or an LLC or it need not be such a lawful business. We're going to go around the block. Do you want that also in there, put in it's a criminal enterprise, but it could be a duly incorporated corporation?

Ms. Van Ness.

MS. VAN NESS: No.

THE COURT: OK. Because if I give one, I have to give the other.

Go ahead. Next point.

MS. VAN NESS: Page 29.

THE COURT: 29?

MS. VAN NESS: Yes.

THE COURT: OK.

MS. VAN NESS: 26? I'm sorry, your Honor. Page 26.

THE COURT: All right.

MS. VAN NESS: In the last sentence of that page, it reads, "The indictment further charges that the enterprise was in the business of lending money at rates that were unlawful under state usury laws, and that the rates of interest charged were at least twice the maximum legal rates of interest." We would ask the Court to delete "maximum legal" and insert instead "enforceable."

THE COURT: Let me hear from the government.

MR. SCOTTEN: I think in this context, your Honor, we have no objection.

I suppose we should be clear, your Honor. I think that is literally what the law says. We don't think that opens the door to jury argument proposing the legal interpretation that Ms. Van Ness just argued for. That word "enforceable"

still means what the Court said it means, and we would object and we would ask that the objection be sustained if they start arguing the legal case Ms. Van Ness just made. But this one word appears to be consistent with the statute. We don't want it to be seen as changing the Court's interpretation of the law.

THE COURT: OK.

Go ahead. Next point, Ms. Van Ness.

MS. VAN NESS: Your Honor's already rejected our next request, that we filed last night, about if we wanted the Court to charge if the state is unable to enforce its usury rate against an entity, the debt is not an unlawful debt.

THE COURT: Whoa, whoa, whoa. Say that again.

MS. VAN NESS: If the state is unable to enforce its usury rate against an entity, the debt is not an unlawful debt.

THE COURT: I think, again, this highlights the problem here, and this is where Justice Kagan's opinion is rather helpful. She makes the point that the conduct doesn't become lawful; it's there is an actor who is immune from suit, and the state may have other ways to enforce it other than against the actor. And she even suggests, for example, an injunction and prosecution of people who assist in the unlawful activity. It's just the tribe is immune. That's all.

Go ahead.

MS. VAN NESS: In the last paragraph on page 29, the

second sentence, the draft says, "In New York, the highest enforceable rate of interest on consumer loans is 25 percent per year," etc.

THE COURT: Right.

MS. VAN NESS: We ask that you modify that sentence to read, "In New York, except as otherwise provided, authorized or permitted by law, the highest enforceable rate on consumer loans is," etc., and for that we rely on New York's definition of criminal usury in penal law 190.40.

If you're having trouble following that, Judge, in our charge request filed last night, it's No. 7 on page 2.

THE COURT: Let me hear from the government.

MR. SCOTTEN: Your Honor, this, I think, I'm sure, is an attempt to bring in legal argument before the jury again. I think this New York statute cited here is actually exactly what was referred to a minute ago when the Court made the point that none of these authorizations or permissions by law apply here. We're not dealing with, for example, a bank. This is not a question for the jury whether there is some legal exemption here that applies, and if it were, as I think the Court said in the charging conference, if it did, the Court would render a judgment of acquittal. But there is no ground for the jury to start doing legal analysis to decide if it agrees, contrary to *Bay Mills*, with its position on sovereign immunity.

THE COURT: Ms. Van Ness, do you want to respond?

MS. VAN NESS: Only to say that you are citing the definition of usury statute in New York, and this is part of the definition, and we think it's appropriate for you to include it.

THE COURT: I would charge it if you could point me to a relevant exception, and then I would charge the jury on that relevant exception, so I would say "otherwise permitted by law," and then I would say, "Law permits it if the following circumstances are met," and then I would charge that. But in the absence of that, the instruction is correct.

Next point.

MS. VAN NESS: Your Honor, on page 29 --

THE COURT: Right.

MS. VAN NESS: -- asking you to define or instruct the jury on what the usury rate is in New York, we request that you delete the balance of that paragraph and as well as the --

THE COURT: Is this the second paragraph or the third paragraph?

MS. VAN NESS: The last paragraph.

THE COURT: Last paragraph. Go ahead.

MS. VAN NESS: Just to delete the "So as to New York" and basically doing the math for the jury. We think it's sufficient if you simply tell them what the rate is.

THE COURT: What's wrong with saying twice 25 is 50? Because it's going to come up later on when we get to 36

percent, and I don't want a jury making an arithmetic mistake on this.

MS. VAN NESS: As I understand it, the rates are --

THE COURT: Look, we could do jury instructions this way. I could sit here and I could read statutes. I could read the New York usury law. I could read 1961, 1962(a), and just read the statutes. My job, as a judge, is to explain the law.

To say, Well, it's one thing to tell them the legal rate is 25 percent, but don't tell them that twice the legal rate means 50 percent, I don't get it. What's your argument?

MS. VAN NESS: Well, I just think it's unnecessary, your Honor, and similarly on the next page, I would ask that the example, which includes the first paragraph, which includes the doing the math for the other states of 72 percent is not necessary, and I would ask that the judge simply state that some states, including that list you have, have rates of interest different or even higher than New York, but none of these states allows greater than 36 percent.

THE COURT: All right. Let me hear from the government.

MR. SCOTTEN: We think the Court's instruction is helpful, and certainly legally permissible and should be maintained.

THE COURT: All right. I'm going to give the instruction as written in that regard.

Go ahead. Next point.

MS. VAN NESS: One moment, your Honor.

MR. BATH: Judge, while she looks at that, can I add something?

THE COURT: Sure.

MR. BATH: We went through 31 and then we went up to 37, and you're sort of progressing through the people, and I don't want to think that it got skipped. At one point in time, we had objected to providing the indictment. In pretrial motions we talked about surplusage. If the indictment's going to go back, we'd renew that position, and I think we identified the surplusage in the pretrial motions.

THE COURT: I think you're raising an interesting point, and I'm going to go through that with you on redactions.

MR. SCOTTEN: Your Honor, a couple thoughts. One, and we apologize, we're not prepared for that. I don't think we have the indictment.

Two, there are certainly some portions of the indictment that we agree wouldn't go back. For example, on the TILA counts, we didn't choose to submit proof of one of the two objects. Would it be helpful if the government proposed an initial redacted indictment? I'm sure the defense will still have objections, but it might at least narrow things down.

THE COURT: I think it would help, but I think Mr. Bath's point is well taken. To the extent that there's

language in here that "the defendants systematically exploited over 4-1/2 million working people throughout the United States, who were struggling to pay basic living expenses, including for food and housing," stuff like that, I am going to order redacted. You can take your best shot at it and send it to the defense, and we'll see where we are from there.

MR. SCOTTEN: Is there a particular time the Court's going to want that in and to meet on it and so on, your Honor?

THE COURT: I think it's reasonable to ask that you get this to defense counsel by 2:00 tomorrow. You can email it.

Does that work for you, Mr. Bath?

MR. BATH: Yes, sir.

THE COURT: Does that work for the government?

MR. SCOTTEN: We'll make it happen, your Honor.

THE COURT: All right.

MR. SCOTTEN: Does the Court want to, to the extent it's going to do any --

THE COURT: You can include me on what is sent. You can send it on to chambers, and any response I'll take a look at. That would be fine.

MR. SCOTTEN: Understood, your Honor.

THE COURT: Yes.

MR. BATH: I have another, on page 24, Judge.

THE COURT: Yes.

MR. BATH: The last line before Count One, second element, it discusses, the government doesn't have to prove the conspiracy in the entire time period. I don't know that I've ever, frankly, confronted this before, but obviously Mr. Muir wasn't there for the first half, so I don't know if there's a special verdict form. I'm looking for some direction.

THE COURT: I understand what you're saying, and I'm not going to be able to give you the exact page number in here, but I think it's in the instructions somewhere that you need not be a member of the conspiracy for its entire time period. Some people join, some people leave, membership changes. The important point is that during the life of the conspiracy, you joined the conspiracy with knowledge of its unlawful purposes.

It's not at all uncommon in the garden-variety drug conspiracy case that an indictment alleges the existence of a conspiracy over a six-year period, and it's obvious from the evidence that there are ten defendants and maybe only one or two of them were in for the entire six-year period, the rest of them joined later on, and some of them may have moved away and left the country, and effectively withdrew. But they're still liable. Withdrawal only has a relevance for statute of limitations purposes. That's the only significance there.

That, I believe, is an accurate statement of the law, and although I can't tell you where it is in the charge, and I stand to be corrected, I think that concept is in there.

Actually, it's on page 25, second full paragraph: "He can join the conspiracy at any point and need not have received any benefit in return."

MR. BATH: Thank you, Judge.

THE COURT: Go ahead.

MS. VAN NESS: We're up to the advice of counsel, your Honor.

THE COURT: All right. And I think you had a helpful suggestion that it should be labeled as applicable to Counts One through Four.

MS. VAN NESS: Yes.

THE COURT: Was that your suggestion?

MS. VAN NESS: Yes.

THE COURT: So it's going to read "Counts One through Four: Advice of counsel as to Scott Tucker," and then in the second paragraph, I'd start it off, "As to Counts One through Four, in weighing this evidence, you must consider whether Mr. Tucker honestly," etc.

MS. VAN NESS: That's fine, your Honor. Thank you.

THE COURT: Any objection by the government?

MR. SCOTTEN: To that modification, your Honor, no.

THE COURT: OK. Next.

MS. VAN NESS: Your Honor, on page 38, this refers to your special interrogatory.

MR. SCOTTEN: Your Honor, before we do that, the

government has a concern with advice of counsel.

THE COURT: Go ahead.

MR. SCOTTEN: We are not going to make an objection to the advice-of-counsel instruction. One of the rare areas where there are cases suggesting that something about what the government did here, I just want to be clear, it is not because we think the evidence is legally sufficient. It is only because there has been so much evidence about lawyers being involved here that we actually think the jury's already thinking about it, and they need to hear the terms when it doesn't apply, which are also in that instruction.

We do, however, request the addition of a single sentence, on page 38 in the, I suppose, first full paragraph, which is a single sentence, "On the other hand, no defendant can willfully." Following that sentence we would request the Court also charge the jury, "A defendant is not immunized from criminal prosecution merely because he consulted an attorney in connection with a particular action."

THE COURT: Why isn't that implicit in the sum and substance of the charge I have given? "As to Counts One through Four, in weighing this evidence, you must consider whether Mr. Tucker honestly, in good faith, sought the advice of a competent lawyer as to what he may lawfully do"; and then it goes on, "You must also consider whether he fully and honestly presented all relevant facts and whether he honestly

followed such advice in good faith," so on and so forth, the point being implicit in the instruction is the mere fact that you talked to a lawyer is not a defense.

MR. SCOTTEN: We certainly don't disagree with the Court's reading of the instruction, but I think there are times it's helpful to explain things to the jury. The Court is willing to do the math for the jury on the racketeering counts. I think that is, frankly, a harder concept for them than this. And it really goes to the argument we've been making throughout the case where I think the Court has sustained our objections in principle, although as a whole, we were utterly unsuccessful in preventing the evidence coming in, that there was a lawyer at every step, and the continuous argument by counsel, Well, this person was a lawyer and that person was a lawyer and this person was a lawyer and there were lawyers who filed this so it implicitly must have been legal and lawyers were still willing to work for you, and we think it is important for the jury to understand, given the facts of this case, that the Court give them an express instruction here, which is legally correct.

THE COURT: I wish you better luck in drawing a different judge out of the wheel on your next trial and one who will faithfully adhere to the law of evidence, but you got what you got.

MR. SCOTTEN: We're not complaining about that, your Honor. We're simply noting at this point it's in the case, and

we think the jury should be instructed on the principle of law the Court, I think, has already suggested agrees here, I don't think there's any dispute this principle of law is true, so we think the jury needs to hear it.

THE COURT: I'm not going to give it. It's not necessary.

One moment, please.

All right. Go ahead.

MR. SCOTTEN: Can I make one last pitch, your Honor?

THE COURT: Yes.

MR. SCOTTEN: I would only suggest if the Court agrees it is legally correct, I think including it might help reduce the risk of objections during summation. Obviously nobody wants to be objecting during closing arguments if it can be avoided. If the Court puts it in there, we can maybe sit on our hands more and just let the rebuttal say: Look, here's why you should disregard that. The Court is going to tell you this principle. Given it's an irrelevant proposition, and I think the Court agrees with that, we don't want to be in the position to stand up when we get two minutes of argument in summation about how there were lawyers there.

MR. GINSBERG: Do you want a nonlegal response to that?

THE COURT: Sure.

MR. GINSBERG: It's sort of an implicit suggestion

that defense counsel ought to be careful of what we say because the government might object, and it's up to us to say it right and to know that the judge is going to instruct correctly on the law, and we should behave appropriately in summation, not to change the charge because the government may be forced to object if they feel like it.

THE COURT: Yes. I endorse what you said. I don't disagree with anything you said.

MS. VAN NESS: Can I say something else, your Honor?

THE COURT: Yes.

MS. VAN NESS: As I understand it, there has been evidence that Mr. Tucker consulted the Preston Gates firm and he consulted Cliff Cohen. It's absolutely clear that he retained those lawyers and that that advice is advice he got within the rubric of attorney-client relationship, not just some random lawyer that he met in a bar. And then you have also cabined Mr. Schulte's testimony, as I understand it, very carefully to limit his testimony about the advice he gave to Mr. Tucker to the period before the charged activity began, so the jury hasn't heard testimony about lots of lawyers that he might have seen on the television.

THE COURT: Thank you. This is what I propose to do, add a second sentence under advice of counsel. The first sentence reads, "You have heard evidence that defendant Scott Tucker received legal advice from lawyers, and you may consider

that evidence in deciding whether Mr. Tucker acted willfully and with knowledge. However, the mere consultation with a lawyer is not itself a defense to criminal conduct. In considering whether Mr. Tucker acted willfully and with knowledge as to Counts One through Four, you must consider whether Mr. Tucker honestly and in good faith sought the advice of a competent lawyer," etc., no further changes in the entirety.

That's what I propose to do. Any objection?

MS. VAN NESS: Only insofar as consultation can include legal advice, so I just don't think it's necessary, your Honor. I really don't. And I think that what you've just added, "However, the mere consultation with lawyers" -- I didn't write down the rest of the phrase.

THE COURT: "However, the mere consultation with a lawyer is not itself a defense to criminal conduct."

MS. VAN NESS: Well, seeking -- consultation with a lawyer you have sought legal advice from is a defense. I mean, the word "consultation" --

THE COURT: No, it's not. Obtaining legal advice is not a defense to criminal conduct. No, it's not. That's exactly the vice that the government, quite appropriately, is arguing that I negate, and I was taking the position before that the charge sufficiently negated it.

Now, your argument convinces me that I need to make it

clear, quite frankly, because the charge couldn't be more clear. I thought before that mere consultation with a lawyer does not provide for an advice-of-counsel defense, and if you want to call it consultation or obtaining advice from a lawyer doesn't provide a defense either. The mere obtaining of advice from a lawyer does not constitute the defense. That was the thrust of the charge, and apparently I need to make it clear.

MR. GINSBERG: Not for us who are going to give the summations, you don't.

THE COURT: Pardon me?

MR. GINSBERG: Not for those of us who are going to give our summations, your Honor.

THE COURT: I take your point, Mr. Ginsberg. I'm not doing it for that reason. I don't think that's a valid reason.

I agree with you, and I have said that.

MR. GINSBERG: OK.

THE COURT: Anyway, that's what I propose to charge. All right? Any objection from the government?

MR. SCOTTEN: No, your Honor.

THE COURT: OK. Now, additional questions. Go ahead.

MS. VAN NESS: The defense objects to that paragraph in its entirety. First of all, the definition you -- well, the instructions suggest that the list of possible facts that you have included as a matter of law constitutes ownership and control. We don't know, respectfully, I don't know where this

list comes from, but I think that ownership and control are concepts that jurors are familiar with, such as other concepts in your charge, which you've said you can use your common understanding of these terms, and that the whole issue should be left for the jury to consider based on the parties' arguments as to whether it's a sham or not a sham that they'll make in summations, and that the list that you have provided to define whether an entity is controlled by Mr. Tucker is, in essence, a directed verdict.

THE COURT: Wow. I had the reverse reaction. When I started off, I wasn't going to define it. What I constructed here was the toughest standard that my brain could come up with to hold the government to a standard. Just saying control is so loose, in my view, as to be -- I don't know if the point is that if you make it really, really loose, then the answer to the question won't mean anything. I don't know if that's the point.

Do you have a definition of "control" you want to offer?

MR. GINSBERG: If I may, here's our problem with it, and I appreciate what your Honor just said. The way we see it, and this is conceptual, I guess, as well as the law, putting this type of instruction, asking this type of question, with the definition of "control" and "ownership," feels to us, strikes us as something that the jury will hear and the jury

conceivably will say, What the judge is telling us is if we find control and ownership, as the judge has asked us the question and then defined it, and we find that Mr. Tucker controlled and/or owned the business, he's guilty of the crimes charged.

Now, you may not have intended it that way, but given what's come out in the case and how it's come out in the case and the distinctions that were being made and questions that were being asked between who the lender was, who actually ran the business or controlled the business, that question, sort of in isolation, by itself, we think is problematic.

And then when we thought, Well, maybe if we add some additional language separately but going along with it, Do you find that the tribes were the lenders, it just starts to really sort of complicate things and unravel it. So we looked at not only what your instruction was, but we looked at where it might come from case law, and our concern became that there is some case law, subsequent to the indictment, where there's what appears to be more dicta/instructional language from the Court of Appeals as to what might define control or ownership, but that all of that postdated the charges and wouldn't apply, and we were trying to figure out where else this came from.

Now, I understand by your explanation it didn't necessarily come from there, but the more important point for us is it just feels like this type of an instruction, without

intending to do it, is sort of directing the jury to this conclusion, If you answer the question this way and you find these other things, you're on your way to finding Mr. Tucker -- and I'm just dealing with Mr. Tucker now -- guilty, because it doesn't sort of fit with anything else. Our preference would be, even though your intention might have been to be neutral, fair, even help the defense -- and I'm not suggesting you're being biased towards us, but our preference would be not to have that language in there for those reasons.

THE COURT: All right. One thing that, listening to what you've said, I'm inclined to do is to put this question after the charge on the last count, whatever it is. I guess it's 14, what have you. I'll put it at the end. The jurors are to consider the charges in sequence, and it seems to me this question should go on page 58, and after the jury has considered the 14 counts in the indictment.

MR. GINSBERG: The question here is, respectfully, what does that do? What does giving an answer to that question and the jury determining those factors do when it doesn't really fit into the elements of the crimes charged?

I think it would be different -- I mean, we all know that, as a broad example, and maybe as your Honor has said, an imperfect analogy, there are some cases where something like this is required as a special interrogatory after the jury finds something else, like in the narcotics counts, where there

are quantities that need to be determined. Once the jury determines that the crime was committed, then there's, Did you find this amount or this amount or this amount? I don't think we have that here, and I think that asking the jury to make a finding on this isolated question and those isolated factors doesn't advance the jury's determination of the necessity of the government to prove all the elements of the crime beyond a reasonable doubt, for the reasons I stated before, and also because as critical a component as conceptually control and ownership might be, in this particular case, with these particular fact, so is, for example, who the lenders were. And I'm not suggesting you should do this, but then why wouldn't a question be appropriate, Do you find that the tribes were the lenders?

THE COURT: And who would have the burden of proof on that?

MR. GINSBERG: It goes back to the control question. I mean, is there any burden of proof on the control, and what does that mean toward the rest of the charges? It would be in the same kind of category.

THE COURT: But this question places the burden of proof on the government. Now, the government may object to this. Maybe they don't want me to ask the question. Last time I think they liked it, but people reserve the right to change their minds, and I've heard some mind changing, which is fine.

Maybe I've changed my mind on some things.

Let me hear what the government has to say.

MR. SCOTTEN: Apologies, your Honor, if we had said we liked it before, I didn't think we had. We do object, your Honor, sort of in two parts. If the Court is inclined to give it, we have wording objections.

THE COURT: Let me hear the wording objections first.

MR. SCOTTEN: OK. The wording objections would be, first, that because this is neither necessary nor sufficient to a finding of guilt, it shouldn't be implied to be that. I think this is our concern in that it's not necessary to find guilt and it's presumably the defendants' concern that it's not sufficient, so we would suggest, similar to the drug analogy that Mr. Ginsberg used, that it begin with something like, "if and only if you have found the defendants guilty on one or more of Counts Two through Four."

We agree with the Court's decision to move it, if the Court is going to give it, to take it out of being considered as anything the jury should consider when they're actually determining the guilt of the substantive counts.

We also would change, in the second and third lines, really in the third line, the sentence that begins, "Has the government proven beyond a reasonable doubt," so that it reads, starting at that point, "that at the time of any collection for which you have found the defendant guilty, as to Counts Two

through Four," just because we think that the timing -- in the substantive counts, there are particular collections and that's really when the timing, I suppose, would matter.

And then our next wording objection, I think in large part also go to why we object to the charge as a whole.

MR. GINSBERG: And I would suggest given the way the government phrases it --

MR. SCOTTEN: Hold on.

MR. GINSBERG: Oh, I'm sorry.

MR. SCOTTEN: I'm not done. I was just racing ahead of the Court.

THE COURT: Go ahead, Mr. Scotten.

MR. SCOTTEN: We do think the Court did pretty thorough work in making an incredibly high burden for us here, and we don't think it's an accurate burden as to ownership and control.

THE COURT: You agree with Ms. Van Ness that I'm being too tough on you. She is concerned about that as well.

MR. SCOTTEN: We appreciate that, your Honor.

THE COURT: You might want to confer with her, and maybe you all can agree on something more generous to the government.

MR. SCOTTEN: I think conceptually, because we don't have to prove ownership or control to prove guilt here, we'd rather it not be suggested to the jury that we do. A huge

amount of this trial ended up talking about that, and so I think the jury may be very inclined to think, That's the question we have to decide here, and I think when they see it in the Court's instructions, that may sort of take over their thought process when, in fact, they should be focused on the elements of the actual crimes charged.

THE COURT: But here's the problem. I threw you off course by having you give me your alternate language, which I find I liked. "If, but only if, you have found any defendant guilty on one or more counts of Counts One through Four." I have to figure out how to say it, though.

MR. SCOTTEN: Your Honor, I would suggest that we didn't throw you off course, but you pulled us onto your course. I was happy to give you my overall objection first.

THE COURT: I understand.

MR. SCOTTEN: And it is Counts Two through Four. I think the Court has it correctly there for substance.

THE COURT: Yes.

MR. SCOTTEN: The key wording objection, however, if the Court again is inclined to do it, is we do think that if you're going to give factors towards ownership and control, you should say they're just factors.

THE COURT: Right.

MR. SCOTTEN: And they should be phrased in the disjunctive. I certainly don't think we have to prove, for

example, control of advertising in order to prove ownership and control. And this may help the defendants as much as us, but we think they should just be listed as "some factors you may wish to consider in assessing ownership and control are." We don't actually object to the Court's list as relevant things to think about. We just don't think we have to prove all of them or that they're an exhaustive list. I think the Court was just suggesting to the jury these are relevant things to think about.

(Continued on next page)

MR. GINSBERG: So my point is, if it were to come after the jury were to determine guilt or nonguilt on the counts, there is no need to ask them that question. Because the reason for the special interrogatories in other kinds of cases is because -- I don't know how many years ago it was when the Supreme Court began to instruct the courts in general that it could not give sentences, impose sentences in certain areas of the law without the jury's making a specific finding --

THE COURT: Let me ask you, Mr. Ginsberg. Here's the question.

The defendants moved to dismiss the indictment based on tribal sovereign immunity, is that correct?

MR. GINSBERG: I believe we made that motion pretrial, yes.

THE COURT: And I said that I am not dismissing the indictment, correct?

MR. GINSBERG: Correct. You may have said you're not dismissing the indictment and you wanted to hear the evidence.

THE COURT: I believe I did.

So what do you propose for me to do then, Mr. Ginsberg? Tell me about that.

If there is a verdict of guilty on Counts One through Four, what will you ask me to do? I would like to know that now before I charge this jury.

MR. GINSBERG: So you're suggesting to me that you

think that that answer is important to the Court, because if we move to dismiss, without knowing that the jury determined that Mr. Tucker controlled it, it might affect how your Honor rules on the jury's verdict?

THE COURT: I think something like that. That isn't exactly the way I would phrase it, but I think it's highly relevant to that, if you're going to come back and you are going to say either -- first of all, who decides tribal sovereign immunity, the Court or the jury?

MR. GINSBERG: You know, even sitting through this whole trial and reading all the cases, I am not sure that the application of sovereign tribal immunity is not a mixed question, in some sense, of fact and law given the testimony in this case.

THE COURT: Were you going to tell me that after a verdict or what?

MR. GINSBERG: No. I think we tried to sort of make that argument earlier on. I wasn't one of the real authors of the pretrial motions.

THE COURT: There was a motion addressed to the face of the indictment.

MR. GINSBERG: Yes.

THE COURT: So now I am asking you, so we get a verdict. At that point, if it's a guilty verdict on Counts One through Four, what do you say about tribal sovereign immunity

then?

MR. GINSBERG: I think we would argue, and I don't know if I could say -- putting aside your Honor's question, we might still argue to the Court, and if we had to on appeal, that given the facts of this case, tribal sovereign immunity did apply on the facts of this case as they came out, and therefore the verdict should be set aside. But that's different than control, because the way you're asking the question and listing the factors of control, it's leaving out at least, and I am not urging that your Honor keep it in, but it's leaving out what we think is essential, which is who the lender was.

THE COURT: It doesn't leave it out at all.

MR. GINSBERG: I think it does, because control and ownership -- you can have control and ownership, under our view of the evidence at least, and our view of what we have read, even the most recent cases, you can have control and ownership, but the tribes could still have been the lenders and the model could still be permissible and/or the clients could have relied upon what they were told.

THE COURT: But the jury could not answer that question yes if the tribes were the lenders, period.

MR. GINSBERG: I don't know if --

THE COURT: That's the fact. And that's the end of it. Because the government will have failed to prove that the

lender was in fact Defendant Scott Tucker or an entity owned or controlled by him.

MR. GINSBERG: So can I ask you this question, to turn the tables, which I don't get a chance to do too often. If the jury -- well, I did ask Judge Preska once if I could switch places with her for one moment based on what my client said on the witness stand, but it didn't work.

If the jury were to answer that question by saying no, Scott Tucker was not the lender --

THE COURT: Or the government had failed to prove beyond a reasonable doubt he was a lender.

MR. GINSBERG: -- would your Honor then, no matter what the jury found on the other counts, would it be your Honor's position that your Honor would have to set aside the verdicts?

THE COURT: No. I would hear from you and I would hear from the government. But I assume that you would have a much better argument if that were the case. That may be why the government is not so smashed with this idea.

MR. GINSBERG: I understand. It's not an easy thing, because part of it is what you're saying in terms of what you're trying to do, and I understand it, and part of it is we have to have a concern about how it might affect the jury. Will it influence the jury's decision on the counts that they are being asked to decide in some way?

THE COURT: That's why, number one, it's going to go after the verdicts, and the jury will be instructed to take the questions in the order in which they are presented. That's number one.

Number two, it will lead off with, "If, and only if, you have found any defendant guilty on any of the Counts Two through Four," and then it proceeds.

MR. GINSBERG: So it would be like a special interrogatory after the jury made a determination as to the counts?

THE COURT: Correct. And not before.

MR. GINSBERG: Then we would ask, if the language is going to remain the way it is, or even if it's changed somewhat, we would suggest that in the fifth line, it should read, "Was Defendant Scott Tucker or an entity owned and controlled by him?" Not "or."

MR. SCOTTEN: So that certainly has no legal relevance, your Honor. If he owns or controls, it's not the tribes.

THE COURT: I'm sorry?

MR. SCOTTEN: The Court's current phrasing is correct. The question is, Did he own or control the lender?

THE COURT: I am inclined to agree with the government on that.

Now, the reality is, just to be very honest with you,

this is not the time or the place for counsel to make their final arguments as to what's the consequence of a yes or what's the consequence of a no. I am not holding the defense to that, and I am not holding the government to that, because I would want full briefing on that, if it ever arose. I am not holding you to that, but suffice it to say, from the defendants' standpoint, not to be flip about it, a no answer is better than a yes answer, and from the government's standpoint, a yes answer is better than a no answer. I was going to use a stronger analogy, but they get distorted when quoted in briefs to the Court of Appeals anyway.

MR. GINSBERG: Not by lawyers.

THE COURT: Not by lawyers.

All right.

MR. BATH: Your Honor, I don't know whether it would be permissible for Mr. Muir to waive his appearance the rest of this hearing, only because he has a 7:00 flight.

THE COURT: Absolutely.

Mr. Muir, is that acceptable to you.

DEFENDANT MUIR: Please, your Honor.

THE COURT: You are excused with the permission of the Court. I hope you have as good of a weekend as you possibly can.

DEFENDANT MUIR: Thank you, your Honor.

MR. GINSBERG: If your Honor is going to leave the

language as it is, I guess the other question is, should anything be done with the list of factors, which I guess we would think about, but whether there should be fewer or more? It's not exclusive, and even from the cases that were decided before and after this case went to trial, I think there were various courts that had various sorts of criteria and that no court ever said these are the absolute criteria that would apply. That's an open question too, I suppose.

THE COURT: Yes. That's right. That's right. I am going to read how I propose to do this, and I am going to let you -- I am just going to ask that anything you have you fax to chambers or file on ECF by the end of the day, by 4:00 tomorrow, so I have the benefit of it and can take it into account.

My whole purpose in looking and spending time reading cases on control, and I looked at a lot, was to make it tough, not easy. There are cases on control that have standards that I think are too low of a bar.

So the way it would go now -- it's on page 38 -- "if, but only if, you have found any defendant guilty on any of the Counts Two through Four, you should respond to the following question on the verdict form."

And then the question would be as written, except I would strike the word "making" and insert in its place "collection of."

And then the last sentence on 38: "For the purpose of this question, and solely on the issue of control, you should consider the following factors: Whether Mr. Tucker was the source of funds for the loans, whether he bore the risk of nonpayment of the loans, whether he had the power to direct the activities of the entity, including day-to-day operations, finances, lending decisions, distribution of profits, hiring and termination of employees." I am happy to strike "advertising" and leave it as "solicitation of customers, and banking and other third-party relationships."

MR. SCOTTEN: I don't know that it matters much, your Honor. We don't object to advertising being a relevant factor. Since we didn't try to prove it very much, we didn't want to have to absolutely prove it.

THE COURT: So that's what I am proposing at this stage.

Let's go on to other things, unless you have a language change at this point.

MR. GINSBERG: No. I missed my CJA interview so I may ask you to write a letter to the committee to approve me for my next term.

MS. VAN NESS: Your Honor, on page 39, the tribal sovereign immunity instruction. Forgive me, I didn't realize we were going to be discussing prior objections. I thought you rejected some of them. But we object to the Court's charge on

this and renew our request to provide the instruction we proposed previously in our request to charge number 32. And I think if I remember -- I don't remember, your Honor. I'm sorry.

So that's one request, that you give the charge we requested in our request to charge number 32.

The other request is that you add to this charge, since you're instructing the jury on the doctrine, that: "I instruct you that the three tribes at issue in this case enjoyed tribal sovereign immunity with regard to the payday lending operations you have heard about."

We ask for that instruction. I think this is consistent with the Court's view that you have stated already and the government's concession, which they made on the record earlier this week, that the tribes themselves, apart from anything else, the tribes themselves do enjoy tribal sovereign immunity with respect to these payday loans. We think it's important that you tell the jury that so they understand maybe why they have heard all this testimony, and as a matter of law, the doctrine is not simply a figment of the defense imagination, but it's actually, vis-a-vis the tribes themselves, a real issue.

THE COURT: So what I am considering, and I will hear both sides, is: "The three tribes involved in the payday loans at issue in this case are immune from suit by any state,

including under a criminal usury statute. Immunity, however, does not make the conduct lawful."

How does that sound to you, Ms. Van Ness?

MS. VAN NESS: Well, I would ask that you add that they enjoy immunity with respect to the payday lending operations specifically, just so it's clear. And I object to your adding that it does not make the conduct lawful, for the reasons I guess I have already stated. But, also, you have already included in your charge -- that's the last sentence that is in your draft on page 39 -- that "the immunity does not provide a tribe or its members with any rights to violate the laws of any state, but it does limit a state's ability to enforce its laws." So you have already made that point to the jury. I don't think you need to add the language that it does not make the conduct lawful. We are simply trying to get a balance here to show that, with respect to these loans, for these tribes, that tribal sovereign immunity applies.

THE COURT: Let me hear from the government.

MR. SCOTTEN: So we object to the addition for several reasons. First, we think it is irrelevant, in the sense that there is no dispute these tribes had it. It's also not at all relevant to this case legally because the tribes are not charged here. Therefore, it's very distracting to say, well, look, these folks are immune, and how close Mr. Tucker was to them.

THE COURT: Then why did the government ask that I give a charge on tribal sovereign immunity if it's irrelevant?

MR. SCOTTEN: Unless we were going to succeed, which we don't think we were, in keeping any mention of sovereign immunity out of the case, we felt it was important to instruct the jury that it doesn't entitle anyone to break the law or make their conduct lawful.

To other points on this, your Honor, I think it may actually not be legally right in the context of this case, because although nobody is proposing to charge a tribe here, sovereign immunity doesn't protect a tribe against federal law, and this is a federal court. So though sovereign immunity applies to these tribes, it's sort of, in a federal court case, not particularly relevant that a tribe has sovereign immunity.

In fact, in this case, entered into evidence by the defendants, there is a non-prosecution agreement between the Miami tribe and the government, which wouldn't make any sense if the Miami tribe could have just told us we have got sovereign immunity. Because they can't, they entered a non-prosecution agreement. So saying that the tribes have sovereign immunity, whether generally or with respect to payday lending, in a case where there is a tribe that has not been prosecuted but entered a resolution that contained the idea that the tribe could be prosecuted, I think is legally problematic.

Finally, your Honor, this is a secondary objection, but we would suggest there shouldn't be any limitation to three tribes. Although three tribes ended up extending the loans mentioned in Counts Two, Three and Four, the jury has heard evidence of the Kickapoo and the Yurok, and they are certainly implicit in the conspiracy counts at the very least.

THE COURT: You're right.

MS. VAN NESS: Your Honor, may I?

THE COURT: Yes.

MS. VAN NESS: The prosecutor just argued that there is no dispute that the tribes have sovereign immunity here. That might be true, based on the government's point of view and the lawyers' point of view, but the jury doesn't know that. So I think it would be helpful to instruct them on that.

The government has also said that they might -- I can't remember what the government said. I'm sorry.

A second point they made would be resolved by the instruction the Court has given not to speculate on any other individual, or what happened to any other individual or entity in the case. The case is only about these two defendants. So I don't think that it's going to confuse the jury. I think it's going to help the jury to be given this instruction.

THE COURT: Thank you.

MR. SCOTTEN: If that's the defendants' concern, your Honor, you could consider where it says tribal sovereign

immunity means federally recognized Indian tribes. So you have already said it protects federally recognized Indian tribes, which each of the tribes mentioned in this case is. That's really the point. That makes the defendants' point without attaching excess significance to it or implying it's an independent fact of significance.

MS. VAN NESS: Your Honor, the charge now reads, "Sovereign immunity does not provide a tribe or its members with any rights to violate the laws." So to be balanced, the Court should also tell the jury that the tribes at least have tribal sovereign immunity with respect to these loans. Whether they have been given the right to violate their own law or not, it's true, and it's been conceded by the government, that the tribes the jury has heard about actually have immunity with respect to these loans, and I think it would also balance the charge.

MR. SCOTTEN: To be clear, your Honor, we also concede that the Fourth Amendment protects the defendant against unreasonable search and seizure. The fact that we have made a concession doesn't make the principle at all relevant. And as my colleague just pointed out, there are states that have disagreed that the suggested tribes are subject. And I think most importantly, certainly these tribes do not have sovereign immunity with respect to payday loans, in the sense that it provides them any protection from the federal government, and

there is evidence of that already in the case.

THE COURT: I understand.

MR. GINSBERG: If I may, if they are using the non-prosecution agreement as a basis for it, just because the lawyer for the tribes thought that --

THE COURT: That's not the basis for it. I don't think that's the basis for it. The basis for it is tribal sovereign immunity is immunity from suit by states; it's not an immunity to suits by the federal government. Under the case law, I don't care about a non-prosecution agreement. I get your point on that. It doesn't necessarily prove a whole lot because somebody entered into a non-prosecution agreement. I take your point on that.

MR. GINSBERG: I think we did have an earlier discussion about lawfulness versus enforceability, which then goes to whether or not, even if tribes can be prosecuted by the federal government, the loans, if made by the tribes, were enforceable. And so we get into another little twist on this, because that then sort of falls under tribal sovereign immunity because they are allowed to enforce those loans notwithstanding what the state usury laws are.

THE COURT: I think if you read Justice Kagan, if there were in personam jurisdiction, maybe a Nebraska court could enjoin a tribal official from engaging in loans that are usurious under the laws of any state, and the attorney general

of Nebraska could go in and get an injunction against that. I am not convinced that a federal prosecutor couldn't bring an indictment under 1962(a).

If we are going to tinker with what is on 39, what I am considering is adding a sentence after "tribal sovereign immunity is a principle of federal law that protects federally-recognized Indian tribes from being sued by states or others," "it does not preclude suits by a federal government against the tribe," period.

And then at the end add, "The tribes mentioned in this case are immune from suit by any state, including under a criminal usury statute. Immunity, however, does not make the conduct of the tribe lawful."

Is that acceptable, Ms. Van Ness?

MS. VAN NESS: I can't say that that's acceptable, but I would appreciate it if I would be given an opportunity to read this charge later and consult with my fellow lawyers and make a further objection with some basis, if we have one.

THE COURT: I will give you an opportunity to talk about it. In the meantime, let me find out from the government.

MR. SCOTTEN: We still object also, your Honor. We think that drawing any attention to the immunity of the tribes is a problem for jury confusion. It's simply not relevant to the issues before the jury.

THE COURT: All right. Well, I find one of these unusual situations where, I don't know, maybe one side or the other is doing a head fake on the other, by objecting and saying, well, if they are objecting, it must be good. But I am going to put it in the draft instructions. Again, anything you want to send me by 4:00 tomorrow, I will take a look at it.

MS. VAN NESS: Judge Castel, can you read the last sentence you proposed to add?

THE COURT: Yes.

"The tribes mentioned in this case are immune from suit by any state, including under a criminal usury statute. Immunity, however, does not make the conduct lawful."

MS. VAN NESS: OK. We will get back to you.

THE COURT: All right.

What else do we have?

We have nine more counts.

Go ahead.

MR. GINSBERG: Move to dismiss.

THE COURT: What else, Ms. Van Ness?

MS. VAN NESS: I believe my next request comes on page 45.

THE COURT: What is it?

MS. VAN NESS: Your Honor, at the top of the page, you have an instruction about how the mens rea elements in the wire fraud counts are questions of fact for the jury to determine

like any other facts and they involve the defendant's state of mind.

I believe that same instruction applies for all of the mens rea elements of all the crimes charged. So if you don't want to put it earlier in the general instructions, I would suggest that the last sentence of that first paragraph to read, "This question, as applicable to all the counts charged, involves the defendant's state of mind."

It is just odd to have this limited to just the wire fraud.

THE COURT: Where do you want me to put it earlier in the charge? You tell me.

MS. VAN NESS: Maybe the first time you mentioned state of mind element, which I am not going to be able to find. I am looking back at the racketeering conspiracy to see where you first --

THE COURT: How about page 25?

MS. VAN NESS: You can put that after the paragraph that defines knowingly and willfully.

THE COURT: Any objection to my moving it from page 45 to page 25, the first full paragraph?

MR. SCOTTEN: I am uncertain what "it" is.

THE COURT: "It" is the sentence which reads, "This question involves the defendant's state of mind."

I guess I would say, "The question of whether a person

acted willfully and knowingly involves the defendant's state of mind."

MR. SCOTTEN: No objection.

MS. VAN NESS: It's a question of fact for you to determine like any other facts. In other words, it's part of the first sentence of that page.

THE COURT: You want to move two sentences, taking out the words "with intent to defraud"?

MS. VAN NESS: Right. Yes.

THE COURT: All right. Taking out the words "intent to defraud," those two sentences will be moved from page 45 to page 25, and added at the end of the first full paragraph.

MS. VAN NESS: Your Honor, I am looking at my first set of objections, and they have the wrong page numbers because they were referring to the prior drafts. It's the second element of wire fraud. So it's that same element.

MR. SCOTTEN: Before we move off this subject, your Honor.

THE COURT: Yes.

MR. SCOTTEN: Can I just clarify? What is on page 45, essentially the Court just deleted the top paragraph, and page 45 is now going to begin with "direct proof of willfulness."

THE COURT: Correct.

MR. SCOTTEN: No objection. I just wanted to make sure I had it.

MS. VAN NESS: I'm sorry, your Honor. One moment.

I think we are up to money laundering.

THE COURT: OK. That begins on page 49, conspiracy to commit money laundering.

Let me ask the government, do they have anything up to page 49, money laundering?

MR. SCOTTEN: No, your Honor. We do not have any objections till about the late 50s.

THE COURT: I know a couple of people who have got objections in their late 50s.

MS. VAN NESS: Actually, I do have one more request on wire fraud. It's on page 54.

THE COURT: Well, that's in money laundering. Go ahead. Page 54.

MS. VAN NESS: Yes.

THE COURT: Go ahead.

MS. VAN NESS: The second full paragraph, "I instruct you, as a matter of law, in New York it is a felony."

THE COURT: Yes.

MS. VAN NESS: Can we ask that you revise "it is a felony to take or receive any money as interest on a loan at a rate exceeding 25 percent per year" to "it is felony to charge interest at a rate -- "

MS. LIMANI: Give us one moment, your Honor.

MS. VAN NESS: Your Honor, we had proposed in our most

recent objections to this charge that your Honor change "in New York it is a felony" clause that I just read to include the concept of "unless otherwise provided, authorized or permitted by law." And given that you have already rejected that earlier, then we accept the Court's ruling, but that's our objection.

THE COURT: Thank you.

MS. VAN NESS: Your Honor, on page 57, the first full paragraph, you are essentially giving a repeat of a circumstantial evidence charge with respect to this element, and we don't think it's needed. It shouldn't be singled out for this element.

THE COURT: Tell me where you are.

MS. VAN NESS: First full paragraph of 57. Proof that the defendant knew the purpose of the financial transaction may be established by proof that he knew or knew because of circumstantial evidence. And then you basically discuss circumstantial evidence. But I think you already instructed the jury back in the beginning in your general instructions about direct versus circumstantial evidence.

THE COURT: That objection is overruled.

Go ahead.

MR. SCOTTEN: Your Honor, I think the defendants' next objection is on TILA.

MS. VAN NESS: Yes.

MR. SCOTTEN: We are going to partly agree with them, and that might help things along.

THE COURT: Go ahead.

MR. SCOTTEN: It appears that their edits essentially go to the question of finding the defendant guilty of failing to provide information which he was required to disclose under the TILA.

Our argument is actually not that they failed to disclose information. Our argument goes to the first part, which is that they made affirmatively false disclosures. And so I actually think the Court could simplify that -- well, wait a second. I am looking at the Court's instruction and there is no mention of failing to disclose.

It's in the top of 58, first paragraph, where it says "or failed to provide information which he was required to disclose under the Truth in Lending Act."

THE COURT: You would consent to?

MR. SCOTTEN: Deleting "or failed to provide information."

THE COURT: All right. I assume there is no objection.

MS. VAN NESS: No objection.

THE COURT: What else?

MR. SCOTTEN: The only question I have there, your Honor, is we had objected to the previous language on page 57,

which is taken from the Code of Federal Regulations. I don't understand its relevance here.

THE COURT: Tell me which language you're talking about.

MR. SCOTTEN: Going back to page 57, the second sentence of the TILA counts.

THE COURT: OK. You object to the inclusion of that language, is that what you're saying?

MR. SCOTTEN: It is what I am saying, but I am wrong so withdrawn, your Honor.

MS. LIMANI: One moment, your Honor, please.

THE COURT: Yes.

MR. BATH: Judge, if I may?

THE COURT: Yes.

MR. BATH: In our original submission, we had a couple of other lines that we thought should be included in the TILA counts. One is, "The disclosures must accurately reflect the terms of the legal obligations agreed to between the parties." And then --

THE COURT: Where would you be putting this in?

MR. BATH: I think after --

THE COURT: Page what?

MR. BATH: Page 57, at the end of that paragraph.

THE COURT: Go ahead.

MR. BATH: I think the Court added the first sentence

we requested. So the next two sentences would be, "The disclosures must accurately reflect the terms of the legal obligations agreed to between the parties."

MR. SCOTTEN: I believe that's there, your Honor.

THE COURT: What?

MR. SCOTTEN: I believe that's already in there. It's at the bottom of 57.

MR. BATH: I'm sorry. It is.

Then the last one is, "The legal obligation is determined by referring to the loan agreement."

THE COURT: I think that is surplusage. It says, as written, "must accurately reflect the terms of the legal obligations agreed upon by the parties." That seems to me to cover it.

MR. BATH: Understood, Judge.

THE COURT: I have one I am going to add.

I am not exactly sure where the placement is, although I think it's probably on page 62 above "duty to deliberate/unanimous verdict."

It would be labeled "verdict form."

"You will be given a verdict form to record your verdicts in this case. You should proceed through the questions on the verdict form in the order in which they are presented."

Any objection?

MR. SCOTTEN: No, your Honor.

MS. VAN NESS: No, your Honor.

THE COURT: What else?

MR. SCOTTEN: Nothing from the government, your Honor.

MS. VAN NESS: Amazingly, I have nothing more to say.

THE COURT: Mr. Bath, thank you. The usually quiet Mr. Bath.

MR. BATH: Judge, if I can ask a question about the subpoena to Mr. Muir. And my question is, the subpoena served on him said all communications. So that would be ten years. That would be past the charged conduct, '13 to '16. When the Court ruled on crime fraud, obviously it was ruling through '13, and I am trying to determine the scope of the subpoena. Obviously, that would help us be able to produce the documents in a more timely fashion. So I am looking for some direction.

MR. VELAMOOR: Judge, we will limit our subpoena only to the extent of the Court's crime fraud ruling.

THE COURT: And the crime fraud exception, do you view that as coextensive with the period that the government alleges Mr. Muir was in the conspiracy, which would be 2006 to 2013?

MR. VELAMOOR: Yes, your Honor.

THE COURT: So that's it.

MR. BATH: Thank you, Judge. That's all I have.

THE COURT: I am going to miss you all.

MR. ROTH: Mutual.

THE COURT: I look forward to hearing from you tomorrow. I am sure you will miss me as much as I will miss all of you.

Have a very pleasant weekend. I hope you get to reacquaint yourself with your families and that everybody stays in good health and is back ready in action for Tuesday.

We are adjourned. Thank you.

(Adjourned to October 10, 2017, at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

CONLY JOHN SCHULTE

Direct By Mr. Scotten . . . . . . . . . . . . . .2463

Redirect By Mr. Roth . . . . . . . . . . . . . . .2518

GOVERNMENT EXHIBITS

Exhibit No. Received

4138 . . . . . . . . . . . . . . . . . . . . .2492

4139, page 1, . . . . . . . . . . . . . . . . .2495

4103 . . . . . . . . . . . . . . . . . . . . .2503

4108 . . . . . . . . . . . . . . . . . . . . .2504

207 . . . . . . . . . . . . . . . . . . . . . .2506