HAA8TUC1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        16 Cr. 91 (PKC)

5    SCOTT TUCKER and
     TIMOTHY MUIR,                      Trial
6
                   Defendants.
7
     ------------------------------x
8                                       New York, N.Y.
                                        October 10, 2017
9                                       10:00 a.m.

10

     Before:
11                   HON. P. KEVIN CASTEL,

12                                      District Judge
                                            and a jury
13                   APPEARANCES

14   JOON H. KIM
          Acting United States Attorney for the
15        Southern District of New York
     BY:  NIKETH V. VELAMOOR
16        HAGAN C. SCOTTEN
          SAGAR K. RAVI
17        Assistant United States Attorneys

18   FREEMAN NOOTER & GINSBERG
          Attorneys for Defendant Tucker
19   BY:  LEE A. GINSBERG
          NADJIA LIMANI
20             -and-
     STAMPUR & ROTH
21   BY:  JAMES M. ROTH

22   BATH & EDMONDS, P.A.
          Attorneys for Defendant Muir
23   BY:  THOMAS J. BATH
               -and-
24   BEVERLY VAN NESS

25

HAA8TUC1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.  I thank you for

3     your letters.

4          The first question I want to turn to is on page 23 of

5     Exhibit 13, and I have a question for the government with

6     regard to the fifth element of Count One as compared to the

7     fourth element of Counts Two through Four.

8          MR. SCOTTEN:  Your Honor, I think the way the Court

9     has it now is correct.  I think it's actually slightly more

10    favorable to the defense.  At least as I read it, by putting

11    the mens rea in the fifth element, it requires the government

12    to prove that essentially the defendant is willful as to all

13    the relevant elements or factors there, whereas moving it up to

14    the fourth element would suggest the defendant only needs to be

15    willful as to the collection of unlawful debt.

16         THE COURT:  I am a little bit confused because the

17    fifth element in Count One should match up with the fourth

18    element of Counts Two through Four, I think.  And they appear

19    to describe different circumstances.

20         MR. SCOTTEN:  I am just comparing the two now, your

21    Honor.

22         THE COURT:  You can take a look at Court Exhibit 13,

23    which we were working off of when we were last together.

24         MR. SCOTTEN:  I believe that's what I have, your

25    Honor.

1          THE COURT:  It should say "Court Draft, 10/4/17."

2          That's Court Exhibit 13.  Court draft, 10/4/17.

3          MR. SCOTTEN:  I have 10/5, and I thought that was what

4     we were working off of at the charging conference.  I will

5     check to see if I have a 10/4 version.

6          THE COURT:  It appears to be on page 28 of Court

7     Exhibit 13, the last exhibit of the charge, which has been

8     marked as a court exhibit, that the fifth element focuses on

9     "whether the defendant you are considering was associated with

10    or employed by the Tucker payday lending organization."

11         That's the way it appears on page 28 as the fifth

12    element of Count One, which I believe corresponds -- is it to

13    the third element?

14         MR. SCOTTEN:  The defendant was associated with or

15    employed by the Tucker payday lending organization?

16         THE COURT:  Then I am a little bit confused.  Because

17    on page 23, there are the two elements to conspiracy, right,

18    one and two is conspiracy.

19         MR. SCOTTEN:  Yes, your Honor.

20         THE COURT:  Then there are the four elements -- third,

21    fourth, fifth and sixth -- to lay out the object of the

22    conspiracy.

23         Now, when we go to page 32 --

24         MR. SCOTTEN:  I think I see what the Court is getting

25    at.  Now you are at a substantive count, but it looks like this

1    is still a conspiracy count because we are talking about

2    associations.  Is that the concern?

3              THE COURT:  So the added element, the fourth element

4    is not present in the conspiracy but is present in the

5    substantive count.

6              MR. SCOTTEN:  I think that is correct, your Honor.  I

7    think that's the important distinction between the counts.

8              THE COURT:  On page 32, should the fourth and fifth

9    elements be flipped in their order of presentation?  Maybe

10   that's what is hanging me up.

11             MR. SCOTTEN:  It seems somewhat unnatural, just

12   because the fifth element seems inclusive of the fourth.

13             THE COURT:  Exactly.

14             MR. SCOTTEN:  But I actually think the Court may be

15   correct, that the fifth element is essentially still an element

16   that's relevant to conspiracy, whereas the fourth element is

17   unique to the substantive count.  So even though the fifth

18   seems inclusive, it is not, because what the current fourth

19   element is really meant to get at is the defendant's

20   substantive participation.

21             THE COURT:  But I did ask the question of whether you

22   get first to whether the defendant willfully and knowingly

23   conducted or participated in the affairs of the organization

24   through the collection of an unlawful debt, and then, finally,

25   did the defendant engage in the collection of an unlawful debt?

1 They do appear to be redundant. And, of course, the defendant

2 says, well, on that fourth element, shouldn't that incorporate

3 willfully and knowingly?

4 MR. SCOTTEN: I think that's where I started with my

5 answer, your Honor, because I was responding to what the

6 defendants had written.

7 I think on balance, it is clearest as written, and

8 what I was trying to suggest before was that the fifth element,

9 because it appears to encapsulate the fourth, and I think does,

10 means that the defendant must have done all these things

11 willfully and knowingly. So that in a substantive count,

12 saying he must have willfully and knowingly conducted or

13 participated in the conduct and affairs in the Tucker payday

14 lending organization through the collection of unlawful debt

15 means he must have a knowing and willful mens rea as to

16 collection of unlawful debt, which is what the fourth element

17 already says.

18 THE COURT: But the defendant is saying, if it's

19 subsumed in the fourth element, then what is the harm in saying

20 it?

21 MR. SCOTTEN: I don't think there is any harm.

22 THE COURT: I am wondering whether it should not read,

23 "The fourth element is that the defendant willfully and

24 knowingly conducted or participated in the conduct of the

25 affairs of the Tucker payday lending organization." Not with

1    the words "through the collection of unlawful debt."  And then

2    the fifth is that the defendant willfully and knowingly engaged

3    in the collection of an unlawful debt.

4            MR. SCOTTEN:  My colleague just pointed out to me, and

5    I believe he is correct, that, actually, what is probably

6    correct is to delete the fourth element, that for a substantive

7    racketeering offense, the substantive acts the defendant must

8    undertake is exactly what the fifth element already states.

9    The fourth element really is entirely redundant.  The

10   government's burden is not to prove the defendant ran out and

11   collected unlawful debts, but he participated in the

12   enterprise.

13           THE COURT:  Look, I want the government to not

14   consider this on the fly, and I want to hear from defense

15   counsel.  Are our jurors here?

16           THE DEPUTY CLERK:  Not yet.

17           THE COURT:  This is not the way that this should be

18   coming up.

19           Just to let you know, I have considered both sides'

20   letters with regard to the question to be presented, and on the

21   second line of the jury question -- well, I will read it.

22           "Has the government proven beyond a reasonable doubt

23   at the time of collection of" -- strike the word "the," insert

24   the word "any of the," then pick up with the words "loans."

25   And then strike the words "alleged in" and insert "you found as

1    the basis for a guilty verdict on Counts Two through Four."

2    And then it continues as written.

3         On page 24, picking up on Ms. Van Ness's letter of

4    October 9, I am going to change the first sentence of the

5    second full paragraph, where it reads, "Came to an

6    understanding to achieve," and I am going to strike "at least"

7    and then strike the words "one of the specified" and delete the

8    plural on "objects." So it will read "came to an understanding

9    to achieve the unlawful object charged in the count."

10         And that's the only change I propose to make on Count

11   One, first element.

12         Ms. Van Ness's helpful comment about the fourth

13   element on the substantive counts caused me to look at what I

14   looked at and get me to raise the questions that I raised.

15         Page 23, the fifth element, I am just going to conform

16   "Tucker payday lending enterprise," change it to "Tucker payday

17   lending organization."

18         Any objection from the defense to removing the law

19   enforcement testimony instruction as inapplicable?  This is the

20   government's letter.  It bears the date of September 29.  It

21   may be out of the draft already.  I think it's out of the draft

22   already.  Yes.

23         The government did not have any comments on the charge

24   following our conference on Thursday, is that correct?

25         MR. SCOTTEN:  That's correct, your Honor.

HAA8TUC1

1        THE COURT:  So that's already been incorporated.

2        Let me just check the page number.

3        On page 30, the second full paragraph, five lines up

4   from the bottom, it reads "ignorance of the law is no defense."

5   I propose to change that language to read, "In this

6   case" -- that's an insert -- "ignorance of the specific terms

7   of any law is no excuse to the charged conduct."  And then

8   strike "however," and then pick up, "The government can meet

9   its burden," and then insert the words "on the knowledge

10  element by proving defendant's knowledge of the actual interest

11  rates charged."  The balance of it remains the same.

12       Any objection from the government?

13       MR. SCOTTEN:  One second, your Honor.

14       THE COURT:  Sure.

15       MR. SCOTTEN:  Your Honor, we don't think that

16  language, which I think the Court has essentially adopted from

17  *Biasucci*, is limited to the knowledge element.  *Biasucci* was

18  about the overall mens rea for an unlawful debt racketeering

19  charge, and I think the defendants' objections to *Biasucci* was

20  very much geared towards willfulness, not just knowledge.

21       The question in *Biasucci* went to, what do you need to

22  show to show that the defendants knew they were breaking the

23  law, which is the willfulness question, not just knowledge.

24       THE COURT:  OK.  So this raises an interesting

25  question.  If you're right, then isn't there a problem with the

HAA8TUC1

1    instruction as written, because I don't see the word

2    "willfulness" mentioned.

3              MR. SCOTTEN:  I think that's right, your Honor.  We

4    would have preferred, I guess, what would be a stronger charge

5    in our favor here.  The Court had given the defendants

6    considerable ground generally on the willfulness conception

7    here, and so we assumed the Court was doing the same thing

8    here, which was sort of not narrowing them down to what we

9    thought under *Biasucci* it was narrowed to, so we didn't push

10   further on this language.

11             THE COURT:  But if willfulness is a required

12   element -- that's what you're telling me -- willfulness should

13   be in the sixth element then, no?

14             MR. SCOTTEN:  I am just going back to look at the

15   phrasing.

16             THE COURT:  Page 29.

17             In other words, when I propose to add in the section

18   that "to prove the defendant's agreement, the

19   government" -- where is the language now.

20             The way it reads now is, "However, the government can

21   meet its burden by proving a defendant's knowledge of the

22   actual interest rate charged on the loan."

23             Meet its burden on what?  It begs the question, on

24   what?  On the count?  That's all they have to find?  That can't

25   be right.  So it has to be meet its burden on something.  And I

HAA8TUC1

1    proposed on the knowledge element, and you're objecting saying

2    it should be the knowledge and willfulness element.  So I go

3    back and look at the charge on that section and I don't even

4    see the word willfulness mentioned in there.

5            MR. SCOTTEN:  I think in this case, and I realize

6    there is an overlap, but we are still in the conspiracy count,

7    you have essentially given the defense version of the

8    willfulness charge as to the first two elements as to

9    conspiracy.  So in order for them to be convicted of having

10   willfully joined the conspiracy, they must have willfully

11   joined it with general awareness of the unlawful purpose of the

12   act.  Specifically, on Count Six, Count Six doesn't have an

13   express mens rea on it.

14           THE COURT:  You're talking about Count One, sixth

15   element.

16           MR. SCOTTEN:  I am, your Honor.  I apologize.  Not

17   every count typically has a mens rea element -- every element.

18   I think, in fact, it's pretty normal for the mens rea only to

19   show up once in a given count.  I think here the Court has put

20   it where it belongs in a conspiracy count, and I don't think

21   there should be sort of a second interior examination of

22   willfulness just as to the sixth element.

23           THE COURT:  Maybe I missed something.  You stood up

24   here two minutes ago and said, the problem with the change is

25   it doesn't include willfulness.  Didn't you just argue that to

HAA8TUC1

1    me?

2            MR. SCOTTEN:  What I tried to argue, unsuccessfully I

3    gather --

4            THE COURT:  I haven't made any decision, so I don't

5    know that anybody is unsuccessful on anything yet.  But I could

6    have sworn that you objected to the language, "the government

7    can meet its burden on the knowledge element," and you said,

8    that's wrong, it should be the knowledge and willfulness

9    element.

10           MR. SCOTTEN:  So not so much unsuccessfully but

11   unclearly.  The objection, your Honor, is not that we should be

12   trying to satisfy willfulness here on element six, but, rather,

13   the way the Court's rephrasing, you would now make an express

14   reference to a mens rea, the Court was proposing to add on

15   knowledge, and we think that would be an unnecessary

16   constraint.  As it's written now, there is no express

17   incorporation of mens rea in the sixth element.  We think

18   that's the way it should stay.  We think if the Court did want

19   to put mens rea language in there, it shouldn't be limited to

20   knowledge.

21           THE COURT:  So if mens rea has no relevance, then why

22   do I have the last paragraph, the carry-over paragraph on page

23   30?  Why is any of that in the sixth element?

24           MR. SCOTTEN:  I think, your Honor, if the government

25   had its way, it wouldn't be.  It would be in the first element,

1    and the Court would charge the jury that, and that would carry

2    through the whole count.

3         THE COURT:  In the first element, the existence of a

4    conspiracy?

5         MR. SCOTTEN:  Ignorance of the law is no defense.

6    Yes, your Honor.

7         THE COURT:  In the existence of a conspiracy.  We are

8    just charging the jury on what a conspiracy is, is that

9    correct, just what it is?  It's an unlawful agreement to

10   achieve a criminal purpose.  And you think I should have an

11   instruction on usury law in that?

12        MR. SCOTTEN:  No.  I thought you were referring to the

13   "ignorance of the law is no excuse" portion of the paragraph.

14   I don't think you should charge the jury on usury law there.

15        THE COURT:  So take that paragraph out altogether, is

16   that what you're saying?

17        MR. SCOTTEN:  No, your Honor.

18        THE COURT:  How does it fit in that element?

19        MR. SCOTTEN:  If the government was drawing up the

20   charge, and I am trying to argue here from the position of not

21   asking the Court to reexamine decisions it made, the first

22   element here, the conspiracy definition of racketeering

23   conspiracy, would say that ignorance of the law is no excuse.

24   By the time the Court got to the sixth element, it wouldn't

25   need a reminder that ignorance of the law is no excuse, but it

1  would have essentially exactly the language the Court has right

2  now, which is just that the government can meet its burden by

3  showing either the defendants knew the interest rates or --

4  THE COURT:  Burden on what?

5  MR. SCOTTEN:  On proving the sixth element.

6  THE COURT:  Which is?

7  MR. SCOTTEN:  Which is the collection of unlawful

8  debt.  In this case, agreement to participate in the collection

9  of unlawful debt.

10  THE COURT:  What is the mens rea?

11  MR. SCOTTEN:  The mens rea is willfully, which is met

12  by showing -- in our view, by showing the defendant acted

13  deliberately and intentionally and not through mistake or some

14  other innocent reason, as the Court's original jury charge had

15  said.

16  So, here, as to the sixth element, showing that the

17  defendant acted deliberately and not through some innocent

18  reason requires the government to show either -- as *Biasucci*

19  says -- either that the defendant knew the exact interest rates

20  or that the defendant was aware of the generally unlawful

21  character of the loans.

22  THE COURT:  You do believe or you don't believe that I

23  should define an unlawful debt in the context of the sixth

24  element of Count One?

25  MR. SCOTTEN:  Do believe, your Honor.

1      We think the Court's current instruction is correct,

2   generally and as to Count Six.

3      THE COURT:  So you think it's a swell idea to say, the

4   government can meet its burden by proving the defendant's

5   knowledge of the actual interest rate charged on the loan?

6      MR. SCOTTEN:  Yes, your Honor.

7      THE COURT:  And not tell the jury the burden on what?

8   Meet its burden on what?  That's what the Court was endeavoring

9   to fill the gap on.  Because it just says, the government can

10  meet its burden by proving defendant's knowledge of the actual

11  interest rate charged on the loan.  So if they find that beyond

12  a reasonable doubt, they check the guilty box, is that what

13  you're saying?

14     MR. SCOTTEN:  I apologize, your Honor.  I think I

15  misunderstood what the Court was attempting to clarify.  I

16  would suggest there meet its burden with respect to this

17  element.

18     THE COURT:  Well, that's a little bit begging the

19  question.  If this is an element that requires -- you contend

20  it requires willfulness?

21     MR. SCOTTEN:  The count requires willfulness, your

22  Honor.  I do think the court has incorporated that directly out

23  of *Biasucci* by saying there's two ways to do it here -- one is

24  proving the exact interest rate, two is proving the general

25  unlawful nature of the loan -- which is what the Court's

1    instruction at 30 to 31 said.

2         THE COURT:  So why wouldn't I say the words "this

3    element requires the government to prove willfulness and

4    knowledge."  And then I can say, "the government can meet its

5    burden on willfulness and knowledge by doing the following."

6         MR. SCOTTEN:  I think that's fine.  Let me check with

7    my colleagues, your Honor.

8         We think that's fine, your Honor.

9         THE COURT:  I think willfulness and knowledge capture

10   two different concepts.  And on knowledge, it's knowledge of

11   the actual interest rate charged or awareness of the generally

12   unlawful nature of the loan and also that it was the practice

13   of the business engaged in lending money to make such loans.

14        I think I said it correctly in my proposed revision.

15   That goes to the knowledge component, not to the willful

16   component.  Willful is somewhat different.  They are not

17   interchangeable, are they?

18        MR. SCOTTEN:  They are not, your Honor, but generally

19   unlawful character is sort of classic willfulness language, not

20   knowledge language.  I think that's from the defendants'

21   proposed charge on willfulness.  When you say knowing the

22   generally unlawful character, you're saying willful conduct.

23        THE COURT:  Let's see if that's what we say earlier in

24   the charge.  Take a look.

25        "Willfully means to act deliberately and with a

1  purpose to do something that the law forbids.  The defendant

2  need not have known that he was breaking any particular law,

3  but he must have been aware of the generally unlawful nature of

4  his act.  Willfully means to act deliberately and with a

5  purpose to do something that the law forbids."

6  So subsumed in the concept of the deliberate

7  volitional act is a state of mind, which incorporates

8  knowledge.

9  MR. SCOTTEN:  As the Court has charged willfully, yes,

10  there is some degree of knowledge to act willfully.  You have

11  to know what you're doing to act willfully.

12  THE COURT:  Correct.

13  All right.  I propose the following:  "The government

14  can meet its burden on the willfully and knowingly requirement

15  by proving that a defendant acted deliberately with knowledge

16  of the actual interest rate charged on the loan.  It may also

17  meet its burden by showing a defendant acted deliberately with

18  an awareness of the generally unlawful nature of the loan and

19  also that it was the practice of the business engaged in

20  lending money to make such loans."

21  Any objection?

22  MR. SCOTTEN:  Not from the government, your Honor.

23  THE COURT:  Any objection from the defendant?

24  MR. GINSBERG:  I think your Honor had proposed

25  language earlier that included willful.

HAA8TUC1

1              THE COURT:  I am going to put it in the first sentence

2       of the sixth element, "that the defendant willfully and

3       knowingly agreed to participate directly or indirectly," etc.

4       Then I am going to include it two more times -- well, I am

5       including it one more time, and then I am including that the

6       defendant has to have acted deliberately with the knowledge,

7       and I say that twice.

8              MR. GINSBERG:  Yes, your, Honor.

9              THE COURT:  Now, there is a letter from Mr. Schulte's

10      lawyer.  I assume everybody has received it, from Mr. Cagney.

11             MR. VELAMOOR:  Yes, your Honor.

12             THE COURT:  Any objection from the government?

13             MR. VELAMOOR:  No, your Honor, we don't have any

14      objection.  Our understanding, obviously, is the Court's crime

15      fraud ruling only pertains to documents related to the lending

16      business.  So to the extent any documents were produced

17      unrelated to the lending business, we will not treat that as a

18      waiver.

19             THE COURT:  Any objection from the defendants.

20             MR. BATH:  No, Judge.

21             THE COURT:  Mr. Cagney, I take it, if I say any

22      documents unrelated to the payday loan business that are

23      produced, the privilege or protection is not waived by

24      disclosure in connection with the case pending before the

25      Court.

1          MR. CAGNEY:  Your Honor, do you mean add language?

2          THE COURT:  Pardon me?

3          MR. CAGNEY:  Do you mean add language to the letter,

4    is that what your question is?

5          THE COURT:  What I want to make sure is that my ruling

6    with regard to crime fraud exception is not subsumed within any

7    relief I grant.  Any inadvertent disclosures of material

8    unrelated to the payday loan business, your argument that that

9    production did not waive any privilege would be preserved.  But

10   any production that fell within the Court's crime fraud

11   exception, as perhaps another court may look at that ruling as

12   applied to a document, that ruling would stand.  That's not

13   inadvertent production.

14         MR. CAGNEY:  Your Honor, I think you're mixing your

15   ruling with the request under 502.  The request under 502 has

16   to do with the waivers and with other proceedings.  Your ruling

17   has to do with the crime fraud exception, which is not a

18   waiver, in this proceeding.

19         So I understand your ruling, it's on the record.  I

20   don't think you need to add anything to the language of the

21   rule that I quoted in the letter.

22         THE COURT:  Well, I have to draft an order, right?

23   You wrote me a letter and I am going to draft an order, right?

24         MR. CAGNEY:  Your Honor, I think you can so order my

25   letter.

1        THE COURT:  I could.  That's one thing I could do.

2   But that is, in essence, crafting an order, adopting your

3   language.

4        MR. CAGNEY:  Yes, it is, your Honor.

5        THE COURT:  But it seems to me that I could say -- and

6   I would have to tailor it -- that the production by Mr. Muir,

7   pursuant to the trial subpoena, shall not constitute a waiver

8   either in this matter or in any other federal or state

9   proceeding.  This, of course, has no effect on the Court's

10  prior ruling with regard to the crime fraud exception.  So

11  ordered.

12        Any objection?

13        MR. CAGNEY:  I don't think so, your Honor.  Let me see

14  if I can think about it.

15        THE COURT:  OK.  Take your time.

16        MR. CAGNEY:  Your Honor, I don't think anything you

17  say about your prior ruling is necessary, but I also agree that

18  it is not meant to have a bearing on my request and vice versa.

19        THE COURT:  I think we are in agreement.  So that's

20  what I am going to do, and I am granting your application.

21        MR. CAGNEY:  Thank you, your Honor.

22        THE COURT:  How long does the government think it

23  wants on closing arguments?

24        MR. RAVI:  The government is hoping to keep it to less

25  than two hours.

HAA8TUC1

1          I don't know if the Court is also including rebuttal

2     in that.

3               THE COURT:  Yes.

4               MR. RAVI:  Then two and a half hours, your Honor.

5               THE COURT:  That's the ask.

6               Let me hear from Defendant Tucker.

7               MR. GINSBERG:  Your Honor, I was anticipating an hour

8     and a half to an hour and 45 minutes.

9               THE COURT:  And on behalf of Mr. Muir.

10              MR. BATH:  I was not anticipating that much time.  I

11    think my position is different, Judge.  I think an hour and 15

12    is going to be plenty for us.

13              THE COURT:  This is what I am going to do.

14              Two hours for the government's opening summation, an

15    hour and a quarter for each of the defense, and 20 minutes for

16    the government's rebuttal.  All right.

17              Our jurors are here.  Please stand for the jury

18    entering.

19              (Continued on next page)

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  It's good to see everybody back safe and

3   sound after a long weekend.  I hope you got fully reacquainted

4   with your families, got caught up on your errands.  Judges have

5   errands and chores.  I did a lot of gardening, even in the

6   rain.

7        We are back in action, ladies and gentlemen.

8        At this time, Mr. Bath.

9        MR. BATH:  Yes, sir.  I call Tim Muir to the stand.

10  TIMOTHY JOHN MUIR,

11     called as a witness by the Defendant,

12     having been duly sworn, testified as follows:

13        THE DEPUTY CLERK:  State your name and spell it for

14  the record.

15        THE WITNESS:  My name is Timothy John Muir.

16  T-I-M-O-T-H-Y, J-O-H-N, M-U-I-R.

17        THE COURT:  Mr. Bath, you may inquire.

18  DIRECT EXAMINATION

19  BY MR. BATH:

20  Q.  Mr. Muir, how old are you?

21  A.  I'm 46 years old.

22  Q.  Where do you reside?

23  A.  I live in Overland Park, Kansas, which is a suburb of

24  Kansas City.

25  Q.  How long have you lived in Overland Park?

1    A.   Since 1978.

2    Q.   Where did you go to high school?

3    A.   Shawnee Mission West.

4    Q.   Is that located in Overland Park?

5    A.   Yes, it is.

6    Q.   What year did you graduate high school?

7    A.   1989.

8    Q.   After high school what did you do?

9    A.   I went to K-State University, Kansas State University, for

10   a year and a half.  I then took some time off, about a year and

11   a half, worked, and then I went to Johnson County Community

12   College for about a year and ultimately went to The University

13   of Kansas.

14   Q.   Did you get a degree from The University of Kansas?

15   A.   I do.  I have a BA in biochemistry.

16   Q.   What did you get that degree?

17   A.   My undergraduate degree was 1995.

18   Q.   After graduation from The University of Kansas, what did

19   you do?

20   A.   I worked for about five years.  I managed a pizza

21   restaurant.  I was saving up money to go to law school.

22   Q.   Primarily you were in the pizza business?

23   A.   I was in the pizza business.

24   Q.   Was that in Kansas City as well?

25   A.   Yes, Overland Park.

1    Q.  You went to law school in what year did you start?

2    A.  I started law school in 2001.

3    Q.  Where did you go to law school?

4    A.  I began law school in a school in Chicago called University

5    of Chicago-Kent.  That has a patent program.

6              THE COURT:  No.  Answer the question.

7              THE WITNESS:  I'm sorry.

8    Q.  Where did you attend law school?

9    A.  Chicago-Kent.

10   Q.  Was there a reason you chose Chicago-Kent?

11   A.  It had a patent program and I was going to utilize my

12   biochemistry degree.

13   Q.  How long were you at Chicago-Kent?

14   A.  I was there for one year.

15   Q.  What did you do after that one year?

16   A.  I transferred to The University of Kansas Law School.

17   Q.  Was there a reason for that?

18   A.  Yes.

19   Q.  What was that reason?

20   A.  My eldest brother had a tumor in his spine that hemorrhaged

21   my first year, and I moved back --

22             THE COURT:  That's enough.  Next question.

23             Family reasons, you moved back.

24             THE WITNESS:  Yes, your Honor.

25   Q.  Did you move back to The University of Kansas?

1   A.  Yes, I moved back to Kansas City.  I commuted for those

2   last two years.

3   Q.  Did you attend The University of Kansas?

4   A.  Yes.

5   Q.  Did you graduate from there?

6   A.  I did, yes.

7   Q.  What year was that?

8   A.  2004.

9   Q.  While you were at The University of Kansas, did you do any

10  work or write any law journals?

11  A.  Yes.  I was on the Journal of Public Policy for The

12  University of Kansas and my third year everybody who was on the

13  journal writes a paper.

14  Q.  What is the Journal of Public Policy?  Just generally, what

15  does that mean?

16  A.  It is a journal that's published quarterly and has

17  different styles of articles about different areas of the law.

18  Q.  You wrote a paper?

19  A.  I did, yes.

20  Q.  What was your paper on?

21  A.  My paper was on internet jurisdiction, and specifically

22  regarding the Uniform Consumer Credit Code, which is Kansas's

23  law for lending.

24  Q.  That's called the UCC?

25  A.  It's called the U3C generally.

1   Q.  It deals with lending?

2   A.  Yes.

3           MR. BATH:  Can we show the witness Defense Exhibit

4   1430, please.

5   Q.  Do you see that on your screen, Mr. Muir?

6   A.  Yes, sir.

7   Q.  What is that?

8   A.  That is the paper that I wrote.

9   Q.  When you were in law school?

10  A.  Yes, sir.

11          MR. BATH:  Offer 1430.

12          THE COURT:  Any objection?

13          MR. VELAMOOR:  Yes, your Honor.

14          THE COURT:  Sustained.

15  BY MR. BATH:

16  Q.  That article that you wrote, was that published?

17  A.  No, it was not selected for publication.

18  Q.  So everything that the students write is not necessarily

19  published?

20  A.  No.

21  Q.  While you were in law school, did you clerk anywhere?

22  A.  I did.

23  Q.  Where did you clerk?

24  A.  I clerked for a firm in Shawnee, Kansas, called Evans &

25  Mullinix.

1  Q.  What years did you clerk there?

2  A.  I began working there the spring of 2002.  I'm sorry.  Fall

3  of 2002.

4  Q.  How many lawyers are at Evans & Mullinix, approximately?

5  A.  About 10 to 12 lawyers, depending.

6  Q.  How much work did you do while you clerked there?

7  A.  I would work in the afternoons generally two to three days

8  a week, and then in the summertime I would work full time.

9  Q.  You worked there which summers?

10 A.  I worked there the summer after my second year.

11 Q.  How about your third?  So that would be 2003 or 2002?

12 A.  Summer of 2002 through the summer of 2003.

13 Q.  Was that full time in the summer of 2003?

14 A.  Yes.

15 Q.  What types of work were you doing as a clerk in Evans &

16 Mullinix?

17 A.  That firm had two primary practices.  The first one was

18 bankruptcy.  So I would assist the bankruptcy lawyers

19 researching.  It had a pretty large collection practice.  So I

20 would help lawyers in those cases as well.

21 Q.  Upon your graduation in 2004, did you sit for the bar exam?

22 A.  I did, yes.

23 Q.  Where did you sit?

24 A.  I took the Kansas bar.

25 Q.  So what year would that have been?

1    A.   That would have been summer of 2004.

2    Q.   Were you admitted in the State of Kansas?

3    A.   Yes.  I passed the bar.

4    Q.   Were you admitted anywhere else?

5    A.   In 2005 I took the Missouri bar.

6    Q.   Did you pass that bar?

7    A.   Yes, I did.

8    Q.   Are you in good standing in both states?

9    A.   Yes.

10   Q.   You still practice today?

11   A.   I still practice.

12   Q.   Are you married?

13   A.   Yes, I am.

14   Q.   What is your wife's name?

15   A.   Stephanie.

16   Q.   How long have you been married?

17   A.   We have been married since 2007.

18   Q.   She lives with you in Overland Park?

19   A.   Yes, she does.

20            THE COURT:  Let me see you at the sidebar.

21            (Continued on next page)

22

23

24

25

1          (At the sidebar)

2          THE COURT:  How is that relevant?

3          MR. BATH:  His personal background, Judge?

4          THE COURT:  Yes.

5          MR. BATH:  His state of mind and willfulness and lack

6     of willfulness is all wrapped in what is going on here.

7          THE COURT:  His wife's name, how long he was married?

8          MR. BATH:  Yes.  I think it's appropriate.  It gives

9     some context to the jurors.  When the defendant is on trial, he

10    should be able to present some personal information.

11         THE COURT:  How about his brother's medical condition?

12         MR. BATH:  It was relevant to see why he didn't finish

13    in Kent law school.  He didn't get kicked out.

14         THE COURT:  He could have said personal health

15    condition, family member, the like.

16         MR. BATH:  OK.

17         THE COURT:  I am telling you to avoid introducing

18    irrelevant and prejudicial material or I will shut it down and

19    I will instruct the jury to disregard it.

20         MR. BATH:  Can I ask for a little guidance, Judge?

21         THE COURT:  That was the guidance.

22         MR. BATH:  Can I ask if he has any children?

23         THE COURT:  How is that relevant?

24         MR. BATH:  I think it's relevant to go into his

25    background so the jury understands who he is.  But if the judge

1    is telling me no personal information --

2              THE COURT:  I'm asking.  How about if he is a soccer

3    coach?  How about what his hobbies are?

4              MR. BATH:  I think some of that is relevant.

5              THE COURT:  How?

6              MR. BATH:  Because I think it's important to the jury

7    to understand who the criminal defendant is.  I understand

8    there is a length at which we can do that.

9              THE COURT:  It's not that you're consuming time.

10   That's not the issue.  We have all the time we need.  That's

11   not it.  It's whether it has probative value and whether the

12   probative value is substantially outweighed by the danger of

13   unfair prejudice.

14             MR. BATH:  I understand, Judge.  I won't ask him those

15   questions then.

16             THE COURT:  OK.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MR. BATH:

3    Q.  Mr. Muir, after graduating from law school in '04, you had

4    clerked at Evans & Mullinix.  Where do you go to work?

5    A.  I accepted a job at Evans & Mullinix.

6    Q.  You worked at Evans & Mullinix from when to when?

7    A.  I was an associate at that firm till June of 2006.

8    Q.  What types of matters did you work on once you became an

9    associate at the firm?

10   A.  I continued to assist the bankruptcy practice.  I would

11   help the collections practice.  I started doing estate

12   planning.  There was some divorce cases, domestic cases.  There

13   was general business litigation and general corporate work.

14   Q.  When you say "collections," just generally what does that

15   mean?

16   A.  So if certain clients -- the biggest group of collection

17   clients for that practice were apartment complexes.  So if a

18   partner had a large group of apartment complexes and they would

19   bring actions for unpaid rent and then the firm would help

20   collect on unpaid rent.

21   Q.  When you say collect on unpaid rent, did that involve court

22   appearances?

23   A.  Yes.

24   Q.  Is there a body of law that applies to collections?

25   A.  Yes.  Very specific.

1    Q.  Did you learn that while you were at Evans & Mullinix?

2    A.  I did, yes.

3    Q.  Was there any one area that took up more of your time than

4    another area?

5    A.  No.  It's one of the things I liked in the firm.  I could

6    be involved in a lot of different areas.

7    Q.  Are you familiar with the term "continuing legal

8    education?"

9    A.  Yes, sir.

10   Q.  What does that mean?

11   A.  Each state has different requirements for what a lawyer

12   needs to do to stay in good standing, and in Kansas we have to

13   take every year 12 hours of CLE credit.

14   Q.  Continuing legal education is called CLE?

15   A.  Yes.  I'm sorry.

16   Q.  How does one get that kind of credit?

17   A.  Different organizations, different bar associations will

18   put on different types of classes for different areas of the

19   law, and throughout the course of the year you need to take 12

20   hours.

21   Q.  You said you are also a member of the Missouri bar?

22   A.  Yes.

23   Q.  Is that a separate requirement for CLE?

24   A.  No.  It's reciprocal.  If you're in good standing in one

25   state, the other state will accept that for CLE purposes.

1   Q.  Is it important for a lawyer to take the CLE?

2   A.  Yes.

3   Q.  Why is that?

4   A.  They help you stay up-to-date on areas of the law.

5   Different classes will present topics on new cases, changes in

6   the law.  So it just helps the lawyer stay up-to-date.

7   Q.  When you say take the CLE classes, do you do something, is

8   it submitted to something for approval?

9   A.  Yes.  In Kansas you have to submit it to the Kansas CLE

10  Commission.

11  Q.  Have you kept up with your CLE requirements in the State of

12  Kansas?

13  A.  Yes.

14  Q.  Each year you have been a lawyer?

15  A.  Yes.

16  Q.  Have you also done the same for Missouri?

17  A.  Yes.

18  Q.  Is there a particular requirement that you have to take CLE

19  in a certain area of law?

20  A.  The only particular requirement, you need two hours of

21  ethics every year.  Other than that, you're free to take

22  whatever area you would like to take.

23  Q.  At some point in time were you hired by CLK?

24  A.  Yes, I was.

25  Q.  When was that?

1    A.  In the summer of 2006.

2    Q.  How did that take place?

3    A.  Mr. Tucker had been a client of Evans & Mullinix and so I

4    had gotten to know him through the representation of the firm,

5    and then I understood he was looking for a full-time lawyer.

6    Q.  Did you interview, I assume?

7    A.  I did, yes.

8    Q.  How long did that process take?

9    A.  I went over and met with Blaine and Scott and had a

10   interview in Scott's office.  They said they would take some

11   time to think it and I said I would take some time to think

12   about it, and then I was hired.

13   Q.  What kind of position was it?

14   A.  My title was general counsel.  So for the company CLK, I

15   became the general counsel for that company.

16   Q.  What did you understand CLK to be?

17   A.  CLK was a big call center.  It was engaged in servicing the

18   loans for tribal payday lenders, which is the big call centers.

19   Q.  Had you worked directly with Mr. Tucker or CLK prior to you

20   joining as counsel?

21   A.  Not directly, no.

22   Q.  Starting then or any time while you were there, did you

23   have any ownership in any of these companies?

24   A.  No.

25   Q.  How were you paid?

1   A.   Paid a salary.

2   Q.   When you took the job, did you tell Mr. Tucker about any

3   concerns you had about your level of expertise?

4   A.   Well, I advised him that I was very inexperienced and that

5   there would be, I imagine there would be certain areas of law,

6   if not quite a few, that I had no experience on and that I

7   would need to engage outside lawyers for those certain areas of

8   the law.

9   Q.   At the time you joined CLK, how many employees were there?

10  A.   About 300.

11  Q.   Was the address on Lowell that we heard about?

12  A.   Yes.

13  Q.   What was your impression generally when you started there?

14  A.   It was a well-run operation, very professional.  The

15  building was tidy.  People seemed to be going about their work.

16  Q.   While you were there in 2006 through the time period we are

17  talking about, 2013, did you ever open any bank accounts?

18  A.   No.

19  Q.   Did you ever write any checks?

20  A.   No.

21  Q.   Did you ever make any wire transfers?

22  A.   No.

23  Q.   Were you involved in the preparation of any of the

24  financial documents?

25  A.   No.

1    Q.  What was the status of the relationship between CLK and the

2    three tribes -- the Miami, the Santee and Modoc -- when you

3    stared in 2006?

4    A.  When I started, I understood they were providing the

5    employees for the servicing of the tribes' lending businesses.

6    Q.  When you started there in 2006, what was your understanding

7    of who the lender was?

8    A.  The tribes.

9    Q.  What did CLK's employees do?

10   A.  They provided all the servicing, the day-to-day servicing

11   and collections for the tribes' loans.

12   Q.  Had you had any experience with servicers and lenders prior

13   to joining CLK?

14   A.  Yes.

15   Q.  In what context?

16   A.  In the bankruptcy context, around that time, there was a

17   lot of litigation around servicing for mortgages and, in

18   particular, there was an entity called MERS.  It's the Mortgage

19   Electronic Registration Services.  And the reason it came up in

20   the bankruptcy context is because MERS was becoming a named

21   party trying to enforce promissory notes and mortgages, and the

22   law developed where debtors were arguing that's not my lender,

23   that's just a servicer.

24   Q.  So you brought that sort of understanding when you came to

25   join CLK?

1   A.  Yes.

2   Q.  Now, once you began in mid-2006, were you ever asked to

3   give any kind of tax advice?

4   A.  No.

5   Q.  Did somebody else handle that?

6   A.  Yes.  Mr. Tucker had other lawyers who did his taxes for

7   him.

8   Q.  Outside counsel or inside counsel?

9   A.  Outside counsel.

10  Q.  Who was that?

11  A.  His name was Ernie Fleischer.

12  Q.  Can you spell that for the reporter.

13  A.  E-R-N-I-E, and Fleisher, F-L-E-I-S-C-H-E-R.

14  Q.  Were you ever asked to give, while you were with Mr.

15  Tucker, him personal tax advice?

16  A.  No.

17  Q.  Was there ever -- moving forward, was there ever inside

18  counsel that came in and helped Mr. Tucker with tax?

19  A.  There was an inside counsel.  Eventually he hired another

20  lawyer who had his own firm to help him.  Not full time, but

21  quite a bit.

22  Q.  Is that different than Mr. Fleischer?

23  A.  Yes.

24          His name was Brett Chapin.

25  Q.  What year did Mr. Chapin start working?

1          MR. VELAMOOR:  Objection.  Relevance.

2          THE COURT:  I will allow it.

3   A.  I believe late 2007, early 2008.

4   Q.  And Mr. Chapin was an attorney?

5   A.  He was a JD and CPA.  So he was both an attorney and an

6   accountant.

7   Q.  Moving to some different areas then, what kinds of work did

8   you do in the fall of '06 through early '07?  Do you remember

9   the kind of work you had been asked to do on behalf of Mr.

10  Tucker?  For instance, was there anything involved in credit

11  cards?

12  A.  Yes.  Mr. Tucker was looking at doing a credit card deal.

13  Q.  What does that mean?

14  A.  He was trying to -- he was exploring a matter in which he

15  could partner with a bank and the bank can offer credit cards

16  and Mr. Tucker would service those credit cards.

17  Q.  What did you do to help him with that transaction?

18  A.  I sought the expertise of a banking lawyer in Kansas City.

19  Q.  Did you work on that transaction or did the outside lawyer

20  do that?

21  A.  I worked on it a little bit, but it was primarily

22  spearheaded by the outside lawyer.

23  Q.  Did you work on anything in 2006 regarding the airplane?

24  A.  Yes.

25          MR. BATH:  Can we show the witness Defendants' 2822,

1    please.  Just the witness.

2    Q.  Generally, is this document an e-mail that you were

3    involved in in 2007?

4    A.  Yes, it is.

5    Q.  Both between you and Mr. Tucker?

6    A.  Yes.

7            MR. BATH:  I offer 2822.

8            THE COURT:  Any objection?

9            MR. VELAMOOR:  Yes, your Honor.  Hearsay.

10           THE COURT:  Not offered for the truth of its content.

11           MR. BATH:  That's correct.

12           THE COURT:  I will allow it.

13           (Defendants' Exhibit 2822 received in evidence)

14           MR. BATH:  Can you publish it to the jury, please.

15   BY MR. BATH:

16   Q.  What is the date of this e-mail?

17   A.  It's November 6, 2007.

18   Q.  There is a discussion here about what transaction?

19   A.  It would have been the acquisition of the plane.  Mr.

20   Tucker financed that purchase, and PNC Bank was the lender.

21   Q.  The second entry from the top, there is a question to you

22   about you liking this firm.  You see that?

23   A.  Yes.

24   Q.  What is your response?

25   A.  I say they are very competent and knowledgeable.

HAA8TUC1                    Muir - Direct

1          MR. VELAMOOR:  Counsel is going through the document

2     as if it's offered for the truth.

3          THE COURT:  I don't think so.

4     Q.  Tim, did you have somebody else, outside counsel, work on

5     this g issue?

6     A.  Yes, I did.

7     Q.  Like the credit card, why did you have someone else work on

8     this?

9     A.  Early on in the transaction a dry lease was sent over for

10    my review, and I told Mr. Tucker that I had no idea what a dry

11    lease was and that he needed to get a lawyer that had a lot of

12    experience in this area of the law.

13    Q.  So if you didn't believe you had the expertise, you asked

14    for outside help?

15    A.  Yes.

16    Q.  Did you do any intellectual property work for Mr. Tucker?

17    A.  I was aware of them, but again, there was an existing IP

18    lawyer, intellectual property lawyer, who was working for Mr.

19    Tucker when I started.  So I coordinated with him.

20    Q.  So in these transactions that we talked about -- the

21    airplane, the credit card and the IP work -- were you point on

22    any of those?

23    A.  I don't know what you mean by point.

24    Q.  Were you the lead counsel involved in that?

25    A.  No.

1    Q.  But you were aware of what was going on?

2    A.  Yes.

3    Q.  Did Mr. Tucker have a business outside CLK?

4    A.  Yes.

5    Q.  Did you help him with that?

6    A.  Yes.  He had a lot of businesses.

7    Q.  Give us examples of the type of businesses he had.

8    A.  Well, primarily he was in investing.  So people would

9    approach Mr. Tucker for business deals.  He would generally

10   form a new LLC that would the vehicle for that type of

11   investment, and then --

12          THE COURT:  Limited liability company, correct?

13          THE WITNESS:  Correct, your Honor.  Thank you.

14   Q.  What kind of investments would those be?

15   A.  All across the board.

16   Q.  Give us examples.

17   A.  A fire insulation type of product for new construction of

18   buildings.  A recyclable plant in San Antonio that was going to

19   use microwaves on a large scale to reduce tires to

20   environmentally-friendly byproducts.

21   Q.  Would certain kinds of documents regarding those

22   transactions be looked at by you?

23   A.  Yes.

24   Q.  What kind of legal work would you be doing?

25   A.  Initially, like I said, I would set up the limited

1    liability company.  So I helped form that document.  Then if

2    Mr. Tucker wanted me to look at any sort of investment document

3    or there was a contract, he would send it my way.  I didn't

4    look at all of them.  I just looked at what he wanted me to

5    look at.

6    Q.  You weren't necessarily tasked with doing anything that

7    came across -- I will rephrase that.

8            How did projects come to you?

9    A.  Mr. Tucker would tell me about them.

10   Q.  And ask you for your help?

11   A.  Yes.

12   Q.  I want to talk about the fall of 2006.  While you're

13   working on these other products, did you come to learn about

14   CLK?

15   A.  Of course.  Yes.

16   Q.  How was CLK sort of split up, the divisions, departments?

17   Tell me how that worked.

18   A.  It was broken up into different departments.

19   Q.  What were the departments?

20   A.  It would be operations.  There were collections.  There was

21   an HR department, human resources.  There was the compliance

22   and fraud department.

23   Q.  What kind of interaction during the fall of '06 did you

24   have with those departments?

25   A.  My primary interaction at that point would have been with

1    the HR department, with the compliance and fraud department,

2    and a little bit of the collection department.

3    Q.  What kind of work would you have been doing with the

4    collections department?

5    A.  They would come and ask me on different topics.  But at

6    that point CLK was just beginning to grow its collections.

7    Previously I believe they had sent out the collections.  They

8    didn't do it in-house.  As they were beginning to grow and

9    build this collection department, they would come and ask me

10   from time to time.

11   Q.  How many collections -- how many different portfolios for

12   collections were being handled there?

13   A.  Five.

14   Q.  The five we have heard about?

15   A.  Yes.

16   Q.  Were you ever asked about the appropriateness of one

17   portfolio collecting on behalf of another portfolio?

18   A.  Yes.

19   Q.  Tell us what you would be asked.

20   A.  Well, it was possible for one customer to have loans with

21   two different portfolios.  So a collection agent would be on

22   the phone with a customer for a loan in portfolio number one,

23   and after that call had been resolved, that collection agent

24   then would want to take the opportunity to try to resolve

25   portfolio number two.

1    Q.  Was that appropriate?

2    A.  I did not think so, no.

3    Q.  Why not?

4    A.  Because at this point CLK employees are sitting in a

5    first-party collection role and I wanted to maintain that CLK

6    stayed in a first-party collection role and did not become a

7    second-party collection role.

8    Q.  Please explain.  What do you mean first party versus second

9    party?

10   A.  First party is term of art that comes up in collection law.

11   So therefore it refers to the Fair Debt Collections Act.

12   Q.  Would there be a problem with somebody from One Click Cash

13   trying to collect a loan from 500 FastCash?

14   A.  The problem would be that somebody could suggest that CLK

15   is no longer in a first-party collector role and now is in a

16   second-party collector role and therefore that's going to

17   trigger different obligations under the Fair Debt Collections

18   Act.

19   Q.  Did you tell the collections department that information?

20   A.  Yes, I did.

21   Q.  Were you ever asked to look at the loan notes?

22   A.  In 2006?

23   Q.  Correct.

24   A.  No.

25             MR. BATH:  Show the witness Defense Exhibit 2817,

1   please.

2   Q.  Do you recognize that?

3   A.  I do, yes.

4   Q.  Is that an e-mail?

5   A.  Yes.

6   Q.  That you're involved in?

7   A.  Yes.

8   Q.  Regarding some work you did?

9   A.  Yes.

10          MR. BATH:  Offer 2817.

11          THE COURT:  Any objection?

12          MR. VELAMOOR:  Yes.  Hearsay.

13          THE COURT:  Can you blow it up, please.

14          Let me see you at sidebar.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  I assume that this is to rebut the

3    government's evidence regarding keeping the phone lines

4    separate for each doing business as company.  Right?

5          MR. BATH:  That's one of the issues.  If I can

6    continue, Judge, this email certainly has some other people

7    quoted on it, people who we've seen emails the government

8    introduced.  I don't necessarily have to offer that for the

9    truth of the matter, but then we have Tim's responses, and on

10   this one I think he's working on the ACH part of the loan as

11   well.  That part I am offering for the truth, and I don't think

12   it's hearsay because he's testifying and he's available to be

13   cross-examined.  It's not a question that these are in the

14   regular course, so I think it's important that I be able to

15   show the kind of work he was doing and the kinds of things he

16   was involved in.

17         THE COURT:  I agree with you some of the way, and

18   that's why we're at the sidebar.

19         MR. BATH:  Right.

20         THE COURT:  It seems to me that some of it may be

21   admissible to show how he did business.

22         MR. BATH:  Right.

23         THE COURT:  Not for the truth of the contents of the

24   statements.  But as to what you're offering for the truth of

25   its content, it seems to me that what you have to do is wait

1  until the government comes back and, in effect, argues recent

2  fabrication, and then you can get it in.  But in the absence of

3  a claim of recent fabrication, the fact that the declarant on

4  the stand said the same thing a month or a year ago as he's

5  saying on the stand doesn't avoid the hearsay problem.

6            MR. BATH:  Right.

7            THE COURT:  I'll let you get it in not for the truth

8  of its content.

9            MR. BATH:  OK.  Understood.

10           THE COURT:  All right.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Ladies and gentlemen, I'm letting D2817

3    in, but not for the truth of its content, just the fact that

4    this is interaction between people.

5           (Defendant's Exhibit 2817 received in evidence)

6           MR. BATH:  Thank you, Judge.  We can publish that for

7    the jury.

8    Q.  This is November of 2006, Mr. Muir?

9    A.  Yes.

10   Q.  And Mr. Buckley is on this email, is he not?

11   A.  Yes.

12   Q.  Who is he?

13   A.  Mr. Buckley was a manager of one of the portfolios.

14   Q.  And he's communicating directly to you?

15   A.  Yes.

16   Q.  Was it unusual for managers to reach out to you from time

17   to time?

18   A.  No.

19   Q.  And ask you for assistance or help?

20   A.  Yes.

21   Q.  And this is an exchange that you were having with him back

22   in the fall of '06, correct?

23   A.  That's right.

24          MR. BATH:  We can take that down.  Thanks.

25   Q.  Does that refresh your recollection as to whether you

1  worked on some of those loan notes in '06?

2  A.  Yes.

3  Q.  What portions were brought to your attention; what were you

4  requested to do?

5  A.  In that particular situation, Mr. Buckley had a question

6  about the ACH authorization in the form.  That's part of the

7  loan doc set.

8  Q.  What does ACH stand for?

9  A.  Stands for automatic clearinghouse.  It's a bank debit.

10  Q.  How would we understand that?

11  A.  Probably the most common example would be that most people

12  pay their monthly bills through ACH, so your gas bill, your

13  cable bill, any type of bills you pay through the ACH network.

14  Q.  In the fall of '06, you looked at the loan notes regarding

15  ACH, correct?

16  A.  Yes.

17  Q.  Generally, what were you doing with them?

18  A.  I was making sure that the language as written accurately

19  reflect -- reflected what the transactions were going to be in

20  the future.

21  Q.  What does that mean exactly?

22  A.  Well, ACH rules -- they are provided by NACHA; that is,

23  N-A-C-H-A.  That's the National Automated Clearing House

24  Association, and they lay down a certain set of rules that

25  anybody who uses the ACH network needs to follow.  So in this

1    particular instance, I was trying to ensure that the ACH

2    authorization for the loan notes was compliant with NACHA.

3    Q.  We've heard about the TILA box in this case, correct?

4    A.  Yes.

5    Q.  Were you asked to look, in 2006, at TILA?

6    A.  No.

7    Q.  Do you recall when you were asked to look at TILA?

8    A.  I was not asked to look at TILA until the FTC lawsuit in

9    2012.

10   Q.  What month was that, do you remember?

11   A.  April.

12   Q.  The first six months or so of your being at CLK, were you

13   asked to perform any legal work regarding the servicing

14   business?

15   A.  Other than what I previously testified to, the HR and

16   things like that, no.

17   Q.  What kinds of things would you be involved in with HR?

18   A.  Employee situations, terminations, discipline-type matters.

19   Q.  How would you be involved with those?

20   A.  The HR manager would email me and ask me to become

21   involved.

22   Q.  What type of level of involvement would you have?

23   A.  It depended on the specific situation.  Sometimes I was to

24   be made aware of.  Other times they'd ask me to do an

25   investigation if there was a particular incident.

1   Q.  How did you conduct legal research when you were at CLK

2   then?

3   A.  When I was hired by Mr. Tucker, I told him that I needed to

4   get a subscription to Westlaw.

5   Q.  What is Westlaw?

6   A.  Westlaw is an online legal service, and it has -- depending

7   upon what subscription or what level you get, you have access

8   to thousands of databases that contain cases, statutes, law

9   journals, articles, treatises.  Just depending upon what you

10  want, that's -- your subscription would be tailored to what you

11  need.

12  Q.  Did you get Westlaw?

13  A.  Yes.

14  Q.  Why did you think you needed Westlaw?

15  A.  I needed to be able to do research, and I'm not in a firm.

16  I don't have any books, so I needed an online service.  And

17  Westlaw is very well known.  I used Westlaw in law school.

18  Q.  When you log on to Westlaw and then use it, just describe

19  very briefly how you access cases and laws.

20  A.  Sure.  You'd pick up a particular database, and then from

21  inside that database, you would then do your search.  So if

22  you're looking for a particular case, then you'd hit key search

23  terms that you think would be in that particular case.

24  Q.  And how often would you use Westlaw?

25  A.  All the time.

HaaWtuc2                    Muir - Direct

1    Q.   What's that mean?

2    A.   If not daily, three to four times a week.

3    Q.   Are you billed hourly on that; how does the fee work?

4    A.   Usually Westlaw bills hourly or by the database.  Certain

5    databases are more expensive.  I was able to get a flat-fee

6    subscription, so since CLK was a company, they offered a

7    different subscription to companies, and therefore it was just

8    a flat fee.

9    Q.   No matter how much you used it, it didn't cost any more?

10   A.   No.  It was the same.  It was a monthly -- a set monthly

11   amount.

12   Q.   Did you continue to have this Westlaw through the time you

13   were there?

14   A.   Yes.

15   Q.   Did other lawyers join you in later years?

16   A.   Yes.

17   Q.   Were they able to use the Westlaw?

18   A.   Yes, I'd expand the Westlaw account so that everybody had

19   access.

20   Q.   Going back to 2006, were you aware of Mr. Tucker's

21   convictions?

22   A.   No, I was not.

23   Q.   When did you become aware of them?

24   A.   In late 2007, maybe early 2008.

25   Q.   And how did you become aware of that?

1    A.  In the California case, there was a pleading that was state

2    filed that made it known of his prior conviction.

3    Q.  And upon learning of that, what, if anything, did you do?

4    A.  Well, there was another lawyer that was representing

5    Mr. Tucker in the Colorado case, that I came to know pretty

6    well, and so I called him and discussed the matter with him.

7    Q.  And after discussing the matter with him, did you feel at

8    that time you had to take any action?

9    A.  No, I did not.

10   Q.  Were you aware of Mr. Tucker's bankruptcy?

11   A.  At the time in 2006, I wasn't.  In subsequent years I came

12   to learn of it, yes.

13   Q.  The government's introduced what are called Intercept

14   applications.  You saw those?

15   A.  Yes.

16   Q.  And when did you become aware of those?

17   A.  In this trial.

18   Q.  Do you remember the years that those applications were

19   introduced?

20   A.  2005.

21   Q.  Was that before you joined CLK?

22   A.  Yes.

23   Q.  We heard testimony about weather reports --

24   A.  Yes.

25   Q.  -- correct?  All right.

1       Were you aware of that activity?

2    A.  Not when it was happening, no.

3    Q.  When did you become aware?

4    A.  In the FTC lawsuit.

5    Q.  How is it you became aware of it in the FTC lawsuit?

6    A.  I read Ms. Grote's deposition transcript.

7    Q.  When did you become aware of the County Bank model?

8    A.  Early on.  Late 2006, maybe early 2007.

9    Q.  Do you remember how you learned about that?

10   A.  I don't remember how I learned, no.

11   Q.  Upon learning about it, what, if anything, did you do?

12   A.  I researched the issue.

13   Q.  Did you know what that was?

14   A.  Yeah.  I was generally familiar with the relationship, yes.

15   Q.  And what kind of research did you do?

16   A.  I did a combination of Google and of Westlaw, because there

17   was litigation involved.

18   Q.  Litigation involving whom?

19   A.  The New York Attorney General's office and County Bank.

20   Q.  And so you looked at what you could find about it, correct?

21   A.  Yes.

22   Q.  Mr. Muir, did you, sometime in 2006, early 2007, come to a

23   conclusion regarding the lawfulness of the tribal model?

24   A.  Yes, I did.

25   Q.  And what was that conclusion?

1    A.  That it was lawful.

2    Q.  Did the process of you coming to that conclusion happen

3    overnight?

4    A.  No.

5    Q.  Tell us about how that process worked.

6    A.  Well, obviously I didn't know all the facts of, and the

7    relationships when I first started, so I became aware of how

8    the businesses were structured, the relationships between the

9    parties.  I obtained that by asking questions and reviewing

10   documents.  I also then began researching the law.

11   Q.  And how many hours or how much effort did you put into

12   researching the law?

13   A.  In this time period?

14   Q.  Yes.

15   A.  Hundreds, I'd say.

16   Q.  Did that research and this process continue from 2006 to

17   2013?

18   A.  Yes.

19   Q.  Did it ever stop?

20   A.  Has never stopped.

21   Q.  And over the course of those six or seven years, how many

22   hours of research do you think you had?

23   A.  I would say thousands.

24   Q.  Did you make an effort to understand the law, as you

25   understood it, in this area?

1    A.  Yes.

2    Q.  And were there particular topics you researched to come to

3    your conclusion?

4    A.  Yes.

5    Q.  All right.  And can you tell us what those topics would be

6    that you would have researched?

7    A.  Sure.  I would begin with federal Indian law, and under

8    that there would have been a subset of tribal sovereignty,

9    tribal sovereign immunity.  I would have looked at all of the

10   cases that would have involved that area of the law.  I would

11   have researched federal consumer lending laws.  I would have

12   looked at usury laws.  I would have looked at basic contract

13   law.  I would have looked at choice of law, which is a

14   different area of the law as well.  I would -- that's about it,

15   probably.

16   Q.  Doing this research on these topics, what kind of sources

17   would you have relied on?

18   A.  Well -- I'm sorry.  I don't understand your question.

19   Q.  What kind of sources, where would you go to look to do this

20   research?

21   A.  Primarily I would have went to Westlaw.

22   Q.  OK.  And then within Westlaw, what would you look at?

23   A.  I would look at cases.  I would look at articles that other

24   lawyers had written.  I would look at treatises.  I would look

25   at statutes.  I would look at regulations, a little bit

1  different than a statute.

2  Q.  When you say cases, what kind of cases?  Were those --

3  A.  Generally -- sorry.

4  Q.  -- state cases?  What kind of cases?

5  A.  Primarily I'd be looking at federal cases and as well as

6  United States Supreme Court cases.

7  Q.  Did you rely on the opinions of any other lawyers?

8  A.  Yes, frequently.

9  Q.  And why would you do that?

10  A.  I was always part of a big legal team and so it was a

11  collaborative effort, and we would always bounce ideas off each

12  other.  A new case would come out, people would talk about it,

13  you'd look at it for yourself and then you'd call, call another

14  lawyer and talk about it.

15  Q.  Would these lawyers have less or more experience than you

16  did?

17  A.  Most of them had a lot more than I do.

18  Q.  Did you monitor proposed legislation from 2006 through '13?

19  A.  Yes.

20  Q.  Why would you be monitoring proposed legislation?

21  A.  I was looking at primarily federal legislation.

22        MR. VELAMOOR:  Objection, your Honor.  Relevance.

23  Proposed legislation.

24        THE COURT:  Sustained.

25  Q.  Did actions by regulators -- well, let me just ask.  When

1    we use the term "regulator," what does that mean?

2    A.  Primarily it's the federal level.  At that time, it would

3    have been Federal Trade Commission.  Might have been FDIC or

4    the -- that's just the Federal Deposit Insurance Corporation.

5    Could have been the OCC, Officer of the Comptroller of the

6    Currency.  There also would have been state regulatory bodies,

7    whether an attorney general or state banking commission.

8    Q.  And do those regulators bring actions and lawsuits?

9    A.  Yes.  They can bring either an action in court, or they can

10   also bring an administrative action.

11   Q.  And would sometimes those lawsuits involve -- or an action

12   involve lending?

13   A.  Yes.

14   Q.  And lending that might be similar to tribal lending?

15   A.  Yes.

16   Q.  And would you monitor those cases?

17   A.  Absolutely.

18   Q.  Why are those cases helpful to you in you coming to your

19   opinion and your belief?

20   A.  Sure.  At that point in time, there wasn't a lot of

21   guidance available.  There weren't statutes directly on point.

22   There weren't regulations, and so a good way to try to advise

23   your client in a particular area like that is to go see, What

24   are the regulators saying is not acceptable?

25   Q.  And how do you keep abreast of that?

1    A.  Generally, those types of cases come with press releases,

2    so they make it well known what they're doing.

3    Q.  So you see a press release, and is that it, or do you do

4    more after that?

5    A.  Well, you follow the case.

6    Q.  How do you follow the case?

7    A.  You'd look at the docket, and you'd see what --

8          MR. VELAMOOR:  Objection, your Honor.  Relevance.

9    This is also not relevant, just pending cases out there.

10         THE COURT:  I'll allow it.  Go ahead.

11   Q.  What would you do once you saw the press release?

12   A.  Well, if it was filed in court, generally you'd see --

13   you'd get access to the docket.  You'd see the complaint that

14   was filed, and then you'd follow the pleadings back and forth,

15   and ultimately you'd wait for the resolution by the court.

16   Q.  Did you rely on any sources, in coming to your opinion, on

17   newsletters?

18   A.  Yes.

19   Q.  Give us an example of the type of newsletter.

20   A.  I subscribe to a monthly consumer lending-type newsletter,

21   and in that newsletter, they would publish any recent case.  So

22   an opinion came down or a change in the law, it just depended

23   on the particular area of lending that was involved.

24   Q.  What about websites; any websites that assisted you?

25   A.  Yes.

1  Q.  Give us an example.

2  A.  The primary one I went to was called Turtle Talk.

3  Q.  Turtle like the reptile?

4  A.  Yes, turtle.

5  Q.  And where was that out of?

6  A.  That is, and still, run by a professor out of Michigan

7  state.

8  Q.  Generally, what types of information would be on Turtle

9  Talk?

10  A.  Turtle Talk is a website that specializes in all things

11  Indian law.

12  Q.  Do you have any idea why it was called Turtle Talk?

13  A.  Turtle is sacred to Native American culture.

14  Q.  How often would you visit that Turtle Talk website?

15  A.  Almost daily.  Every morning they'd have new posts about

16  any particular cases or developments.

17  Q.  Did your continued legal education assist you over the

18  years in coming to your opinion?

19  A.  Yes.

20  Q.  And how would that help?

21  A.  Beginning in about 2011, there began to be national

22  seminars on tribal online lending.

23  Q.  Did you attend some of those?

24  A.  Yes, I did.

25  Q.  And would materials be distributed?

1    A.  Yes.

2    Q.  And would you look at those materials?

3    A.  Yes.

4    Q.  Sometime in 2006, did you come to meet Conly Schulte?

5    A.  I did.

6    Q.  And how is it you first were introduced to him or found out

7    about him?

8    A.  Mr. Schulte and his partner Lance Morgan came to Kansas

9    City for a meeting.

10   Q.  Before the meeting, were you informed about Mr. Schulte and

11   his involvement?

12   A.  Yes.

13   Q.  Who informed you of that?

14   A.  Mr. Tucker told me.

15   Q.  What would he tell you?

16   A.  He told me that Conly was a tribal law expert.

17            MR. VELAMOOR:  Objection, your Honor.

18            THE COURT:  Yes.  Sustained.

19   Q.  Before the meeting, you knew he was going to be coming to

20   the meeting?

21   A.  Yes.

22   Q.  All right.  And do you remember what month the meeting was?

23   A.  Maybe September.

24   Q.  Conly and who else came down?

25   A.  His partner, Lance Morgan.

HaaWtuc2                         Muir - Direct

1   Q.  Who is Lance Morgan?

2   A.  Lance is a Native American himself who has his law degree

3   but primarily is involved in the economic development for his

4   tribe, the Ho-Chunk.

5   Q.  He's a law partner of Conly's?

6   A.  Yes.

7   Q.  What was the purpose of the meeting?

8   A.  I think it was part introduction and part discussing the

9   structure of the business and any potential improvements.

10  Q.  When you joined in 2006, had there already been litigation

11  in one of the states?

12  A.  Yes.

13  Q.  Was it active at the time?

14  A.  Yes.

15  Q.  Do you remember which state?

16  A.  It was Colorado.

17  Q.  And how long had that litigation been going on?

18  A.  It began in 2005.

19  Q.  Who were the parties in that suit?

20  A.  So there were three parties, if you will.  There was the

21  state of Colorado, and then there were two different groups of

22  defendants.  There were Mr. Tucker's -- two of Mr. Tucker's

23  nominee companies and then there were two tribal entities.

24  Q.  And what was the lawsuit about?

25  A.  It was Colorado's attempt to enforce an administrative

1    subpoena.

2    Q.  What were they trying to get with the subpoena?

3    A.  Just documents in question.

4    Q.  Who represented the tribal entities?

5    A.  Conly Schulte's firm, and they had a local counsel there, a

6    gentleman named Ed Lyons.

7    Q.  Did you ever come to meet or talk with Ed Lyons?

8    A.  Oh, yes.

9    Q.  And who represented Mr. Tucker?

10   A.  Mr. Tucker had counsel from Kansas City, primarily Gerry

11   Handley, and the Rick Wallace with the firm of Evans &

12   Mullinix, and they also had local counsel.

13   Q.  In the fall of '06, this litigation in Colorado still

14   exists?

15   A.  Uh-huh.

16   Q.  Is that is yes?

17   A.  Yes.  I'm sorry.

18   Q.  Did you enter your appearance?

19   A.  No.

20   Q.  Did you ever enter your appearance?

21   A.  No.

22   Q.  What was your involvement in '06 with the Colorado

23   litigation, if any?

24   A.  Just general awareness.  Mr. Schulte provided me with all

25   the pleadings in the case.  I was researching those and just

HaaWtuc2                    Muir - Direct

1    trying to come up, trying to get up to speed as best I could.

2    Q.  And what were the legal issues that were being debated at

3    that time in the Colorado lawsuit?

4    A.  The primary issue in that case was tribal sovereign

5    immunity.

6    Q.  Did you have any information or knowledge before you met

7    with Mr. Schulte or Mr. Morgan?

8    A.  I probably was provided with a big binder of all the

9    pleadings, but it probably would have been right around the

10   same time.

11   Q.  You meet in the fall of '06 with these two gentlemen.  Was

12   anyone else present?

13   A.  Mr. Tucker.

14   Q.  Is that it, just the four of you?

15   A.  I believe so, yes.

16   Q.  During this meeting, do you discuss the Colorado

17   litigation?

18   A.  Yes.

19   Q.  And essentially, was Conly or Lance doing the talking in

20   the litigation?

21   A.  For litigation it would have been Conly.  Lance is not a

22   litigator.

23   Q.  Do you know if Mr. Morgan ever entered his appearance in

24   Colorado?

25   A.  I don't know that he formally entered his appearance.  I do

1    know he was involved with settlement discussions with the

2    state.

3    Q.  And were there discussions in that meeting about CLK?

4    A.  Yes.

5    Q.  Were there discussions about the future of CLK and where

6    the company was headed?

7              MR. VELAMOOR:  Objection, your Honor.  Hearsay.

8              THE COURT:  Sustained.

9    Q.  Who were Mr. Morgan and Mr. Schulte representing?

10   A.  They would have been representing the Santee and the

11   Miamis.

12   Q.  OK.  And did they also represent Mr. Tucker?

13   A.  They did at that time, yes.

14   Q.  All right.  What other topics, other than the Colorado

15   litigation, did you discuss in the meeting?

16   A.  Discussed the structure of CLK and its relationships with

17   the tribal lenders.

18   Q.  Was there any action taken in the future that was discussed

19   at that meeting?

20   A.  Subsequently the AMG purchase in 2008, yes.

21   Q.  AMG purchase of?

22   A.  AMG purchased CLK.

23   Q.  We'll get to that; and that was in '08?

24   A.  Yes.

25   Q.  Do you remember the month?

1  A.   June.

2  Q.   Was part of your --

3          MR. BATH:  Judge, could we approach for a second?

4          THE COURT:  Sure.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At sidebar)

2            MR. BATH:  Judge, I had planned to ask Mr. Muir next

3    about his understanding and belief of specific topics, such as

4    tribal sovereignty, sovereign immunity, and I don't want to get

5    into going back and forth and objecting a bunch.  I think it's

6    permissible, because his belief -- it goes to good faith and

7    goes to willfulness.  At the same time, I don't want to delay

8    everything and have a bunch of objections and us have to come

9    back and forth.  I'm looking for a little direction.  If that's

10   inappropriate, then I'll go back and I'll ask the questions.  I

11   wonder if that makes sense, what I'm seeking here, What are the

12   bounds of my being able --

13           THE COURT:  Ladies and gentlemen, it looks to me that

14   it's time for our midmorning break, so let's take it.  Please

15   do not discuss the case among yourselves with anyone.  We'll be

16   back in action in ten minutes.

17           (Jury not present)

18           THE COURT:  Flo, you can turn off the white noise.

19           Mr. Muir, you can step down.

20           THE WITNESS:  Thank you.

21           MR. VELAMOOR:  Judge, if couched in the context of

22   what the defendant himself believed was legal, we don't have

23   any objection to him describing his legal beliefs.  We would

24   ask that the judge perhaps give its cautionary instruction

25   that, of course, the Court provides instructions on the law.

1    What we don't think the defendant should do is to express

2    whether and to what extent he articulated his beliefs to

3    Mr. Tucker or to anybody else.  The only issue is his belief

4    inside his own mind and why he acted in a certain way.

5            MR. BATH:  I wasn't going to ask him who he expressed

6    that to, but I had topics such as sovereign immunity and Indian

7    commerce clause, abrogation, his understanding, and why that

8    was important for him to come to the position and belief that

9    he had.

10            THE COURT:  Right.  I reserve the right, as I do

11    throughout the trial, on things not admitted for the truth of

12    their content, whatever it may be, to reiterate to the jury:

13    Again, ladies and gentlemen, as I've told you, this only goes

14    to Mr. Muir's state of mind.  It's not to be taken by you as

15    the law.  Only the judge can give you instructions on the law.

16            And I propose to give that when I think it's

17    appropriate to be given.

18            MR. BATH:  I understand that's well within the Court's

19    discretion to do that.

20            THE COURT:  OK.

21            MR. BATH:  I have one last thing.

22            THE COURT:  Yes.

23            MR. BATH:  There was an objection -- I thought while

24    we're up here, we'll talk about that, and that is, Mr. Muir was

25    going to testify that he monitored legislation from the '6 to

1    '13 period, and there's a couple of things that got proposed.

2    One was, and I guess I'm making a proffer, Judge.

3            THE COURT:  Go ahead.

4            MR. BATH:  One is there was a national usury rate that

5    was proposed in Congress that did not pass.  Another one was, I

6    think, law that would be sort of choice of law would be the

7    consumer's location, residence, so it would be sort of by state

8    by state, that way, and it was important for him to be watching

9    for that because that fits in with the fact that there is no

10   national usury rate and also his belief that if that law had

11   passed, they would have changed their practices.  I understand

12   there's been objection to that.  I just want to proffer that.

13           THE COURT:  I hear what you're saying.  OK.  We're in

14   recess.

15           MR. BATH:  Thank you, Judge.

16           (Recess)

17           (In open court)

18           THE COURT:  Please remain standing for the jury.

19           (Continued on next page)

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.

3          Mr. Bath, you may continue.

4    BY MR. BATH:

5    Q.  Mr. Muir, was part of your belief that the tribal model was

6    lawful based on specific legal concepts?

7    A.  Yes.

8    Q.  And did you research those specific concepts?

9    A.  Yes, I did.

10   Q.  I'd like you to tell us your understanding of tribal

11   sovereignty.

12   A.  My research led me to believe that tribal sovereignty

13   allows a tribe or equates a tribe even greater than the power

14   of the states, and I believe that because a lot of the cases

15   I've read stress that tribes predate the Constitution.  They

16   were sovereigns before this country was formed, and therefore,

17   their sovereignty, just because of time purposes, is a little

18   greater than a state's.  And with that sovereignty, tribes can

19   pass any laws they want to.  Tribes are entitled to

20   self-determination, and tribes decide for themselves how

21   they're going to govern themselves.

22          THE COURT:  Ladies and gentlemen of the jury, as I've

23   told you from time to time in this case, if there's any legal

24   principle you need to know to decide this case, it will be in

25   my jury instructions, and if it's not in my jury instructions,

1    then it's not a legal principle that you need to decide this

2    case.  I have, however, allowed this testimony because it may

3    go to the defendant's state of mind, so you're not considering

4    it as legal principles that govern this case, but you may

5    consider it as to what Mr. Muir believed at the time.

6         Go ahead.

7    BY MR. BATH:

8    Q.  Tim, what was your understanding of Indian commerce clause

9    in the U.S. Constitution?

10   A.  So that's a clause in the Constitution that says Congress

11   shall have the exclusive authority over Indian tribes, and so I

12   came to understand that it's only Congress that can rein in the

13   sovereignty of a tribe, and it's often referred to as

14   abrogation.  That -- sorry.

15   Q.  What's that mean?

16   A.  Well, for me, I looked at it this way.  Tribe sovereignty

17   predates the Constitution so they start at a hundred, and they

18   can exercise their sovereignty in any way -- I should back

19   up -- from zero to a hundred.  It started at 100, and they are

20   free to exercise their sovereignty how they see fit.

21        There is the possibility, and it has happened, where

22   Congress actually says, No, we're not going to let you do that;

23   we're going to abrogate your sovereignty and start to reduce

24   it.

25   Q.  Did you do some research and find, for your understanding,

HaaWtuc2                         Muir - Direct

1    an example of where Congress abrogated the Native-American

2    tribes?

3    A.  Yes.

4    Q.  Can you give us that example of your understanding?

5            MR. VELAMOOR:  Objection.

6            THE COURT:  No.  I'll allow it on the same principle.

7    Go ahead.

8    A.  For me the greatest example was IGRA.  That's the Indian

9    Gaming Regulatory Act.  IGRA was passed by Congress, I recall,

10   sometime in the late -- early 1990s, in response to a string of

11   cases between states and tribes over a --

12           THE COURT:  All right.  Now I think we're too far

13   afield.  You can ask your next question.

14           MR. BATH:  Thank you, Judge.

15   Q.  Did you research the legal concept of choice of law to come

16   to your understanding?

17   A.  Yes, I did.

18   Q.  Tell us about that.

19   A.  So choice of law, and it's also referred to as conflicts of

20   law, is a body of law that looks to decide which law applies to

21   which particular transaction.  And in this instance, in

22   consumer lending, there is oftentimes, almost every time,

23   inside a loan contract there is a provision where the parties

24   agree, This law will control this transaction.  So credit

25   card's a great example.  Bank in South Dakota, Citibank, can

1    offer credit cards to residents all across the country, and in

2    the terms and conditions, the parties agree that the laws of

3    South Dakota is going to control that transaction, not the law

4    of where the resident lives.

5    Q.  How did that help form your belief here?

6    A.  Because in these loan notes, there was a choice of law

7    provision where the parties agree that law of the lender --

8    here, the tribe -- was going to control -- I'm sorry, was going

9    to govern this transaction.

10   Q.  Did you research the concept or come to an understanding

11   about what the tribes needed to do to be able to operate this

12   lending?

13   A.  Yes.

14   Q.  And what was your belief?

15   A.  First and foremost, it had to be a federally recognized

16   Indian tribe.  Secondly, it had -- the tribe had to establish a

17   tribal entity, and that entity had to be established under

18   tribal law, and it had to be wholly owned by the tribe.  Next,

19   the tribe had to enact laws that would have allowed this type

20   of lending to take place.  And fourth, the tribe had to have

21   the ultimate control over their entity.

22   Q.  And what was your understanding of ultimate control?

23   A.  Ultimate control to me is when the board directs the entity

24   what to do, they have the ultimate say.  They can do other

25   things -- I should say -- for me, I almost look at it as a

1    negative, what they didn't have to do, because I believe as a

2    sovereign, the tribes could run their business however they

3    wanted to do.  Some could be more involved, some could be less

4    involved.  It's up to each individual tribe how they want to

5    do.

6    Q.  Based on your research, did you have a belief on factors

7    that were not relevant to you in terms of this model?

8    A.  To me, yes.

9    Q.  And what would those be?

10   A.  Day-to-day control was not important.  Management was not

11   important.  The source of capital was not important.

12   Q.  How about the type of business it was?

13   A.  My research showed me that any time a court's looking at

14   tribal entity engaged in conduct off the reservation, it

15   doesn't matter what type of business it is; you don't look to

16   that at all.

17   Q.  Mr. Muir, were you aware of any court decision that held

18   the tribal model was criminal?

19   A.  No.

20          MR. VELAMOOR:  Objection.

21          THE COURT:  Again, it's the same thing, ladies and

22   gentlemen.  There may be a lot of things that he considered.  I

23   don't know what the significance of that is, but I'll let the

24   answer stand.

25   BY MR. BATH:

1    Q.  Mr. Muir, is it possible you're mistaken regarding your

2    belief?

3    A.  Yes.

4    Q.  Did you operate under that belief from 2006 to 2013?

5    A.  Yes, I did.

6    Q.  We're now into 2007.  I want to go back to 2007 --

7    A.  OK.

8    Q.  -- and ask you what other types of work, what kind of legal

9    issues were you working on on behalf of CLK?

10   A.  In 2007, I still would have been monitoring the Colorado

11   litigation.  Sometime maybe the middle of the year, the

12   California litigation began.

13   Q.  So when you say monitoring the Colorado litigation, what

14   does that entail?

15   A.  I would have been aware, I would have had all the pleadings

16   sent to me.  I would have been just keeping up to speed with

17   how that case was going.

18   Q.  Did you travel to Colorado at all?

19   A.  I did.

20   Q.  And more than one time, or do you remember how many times?

21   A.  In 2007, maybe just once.  There was a settlement

22   discussion.

23        MR. BATH:  Can we show government's 2109, please.  Is

24   there more than one page?  OK.  Just the one page.  Would you

25   please blow up everything above that says Timothy Muir, general

1    counsel.  Thank you.

2    Q.  Mr. Muir, do you recognize this document?

3    A.  I do.

4    Q.  And it's an email between whom?

5    A.  That's an email that I sent to Mr. Tucker.

6    Q.  What's the date?

7    A.  October 3, 2007.

8    Q.  Generally, what information are you passing on?

9    A.  I'm giving him an update about the settlement discussions

10   that were had with the state of Colorado.

11   Q.  The second full paragraph -- well, first of all, in that

12   second line in the first paragraph begins "Also."

13   A.  Yes.

14   Q.  You talk about there were no people from the tribes?

15   A.  Yes.

16   Q.  All right.  What is that about?

17   A.  Whenever the tribes engage in settlement discussions with

18   states, they style them as government-to-government

19   discussions, and in this instance, I do not believe Colorado

20   brought their tribal liaison, so no representatives from the

21   tribes attended the meeting.

22   Q.  OK.  What's a tribal liaison?

23   A.  Different governmental agencies will have an actual

24   position that's dedicated to communications with tribal

25   officials.

1    Q.  In the second paragraph, you name a couple of people.

2    Lance is Lance who?

3    A.  Lance Morgan.

4    Q.  And Ed Lyons is who?

5    A.  Ed is the local counsel for the tribe in that case.

6    Q.  He had offices in Colorado?

7    A.  Yes.

8    Q.  And you're talking about potential settlement, is that

9    right?

10   A.  Yes.

11   Q.  In the very last line of that second paragraph, it says

12   "Bad news"?

13   A.  Yes.

14   Q.  What are you referencing there, "the man behind the

15   curtain"?

16   A.  That was the phrase the state of Colorado used, so I was

17   relaying to Mr. Tucker that phrase.

18          MR. BATH:  All right.  Thank you.  You can take that

19   down, Eli.  Thanks so much.

20   Q.  Did you do any work in 2007 regarding any marketing

21   contracts, do you remember?

22   A.  Yes.

23   Q.  What do you remember doing in that regard?

24   A.  I would have probably reviewed the contract.  Might have

25   made some suggestions.

HaaWtuc2                    Muir - Direct

1    Q.  When I say marketing contracts, what's that mean?

2    A.  In that particular time, it may still have been the Yellow

3    Pages.  I don't remember.

4    Q.  In 2007, did you have any direct contact with the tribes?

5    A.  I would have had some.  I would not have had much.

6    Q.  When you say some, what would that mean?

7    A.  I would imagine I would have at least one time that year

8    went down to each of the tribal locations, and I would have to

9    imagine that they would have been in Kansas City for meetings

10   as well.

11   Q.  Were you involved in any HR issues in 2007?

12   A.  I'm sure, yes.

13   Q.  And do you remember any with any particularity?

14   A.  I do not.

15   Q.  Would looking at a document refresh your memory?

16   A.  Yes.

17            MR. BATH:  Could we show him Defense Exhibit 1440,

18   please.

19   Q.  Take a look at that and let me know once you have had a

20   chance to review it.

21   A.  OK.

22   Q.  Does that refresh your memory?

23   A.  It does.

24            MR. BATH:  Eli, could we take that down.

25   Q.  What do you recall being involved in some HR issues?

1   A.  There was an EEOC complaint.  That stands for the Equal

2   Employment Opportunity Commission.  And an employee would have

3   filed a claim, and then the company would have had to file a

4   formal response.

5   Q.  What would your involvement have been?

6   A.  I probably would have had --

7           MR. VELAMOOR:  Objection, your Honor.  Relevance.

8           THE COURT:  Sustained.

9   Q.  Any other issues you would have worked on that had nothing

10  to do with servicing or the lending business?

11  A.  I would imagine compliance and fraud.

12  Q.  OK.  Do you remember any issues involving past leases?

13  A.  Yes.

14  Q.  And were you involved in those in 2007?

15  A.  I was, yes.

16  Q.  What do you remember about that?

17  A.  It was the prior building that the company had moved from,

18  and I believe that that landlord was trying to seek payment for

19  improvements to the building.

20  Q.  Was there litigation, or just discussion?

21  A.  It was almost litigation, but it was resolved without

22  litigation.

23  Q.  Sometime in 2007, were you asked to look at legal bills?

24  A.  Yes, I was.

25  Q.  Who asked you to do that?

1    A.  Mr. Tucker.

2    Q.  Whose legal bills?

3    A.  Any legal bill.  In this particular instance, it was

4    probably -- definitely would have been for lending, yes.

5    Q.  So we've talked earlier about outside counsel involved in

6    the airplane and the credit card, right?

7    A.  Right.

8    Q.  Sometime in '07, in your role, you were asked by Mr. Tucker

9    to look at all the legal bills?

10   A.  Yes.

11   Q.  Anything in particular you were supposed to look for?

12   A.  I took it upon myself to look for value, and what I mean by

13   that is when you're doing -- when a law firm is billing a lot,

14   sometimes -- a lot of different lawyers, sometimes the time

15   entries just kind of seem a little fluff, and so I would take

16   it upon myself to review those entries just to make sure that

17   the clients were getting value for the legal bills.

18   Q.  Did you handle any real estate closings in 2007?

19   A.  I did, yes.

20   Q.  What would those involve, generally?

21   A.  Generally, Mr. Tucker had another business that was

22   involved in real estate lending, and I was involved in those

23   transactions.

24   Q.  What kind of real estate lending?

25   A.  Well, like flipping, so people would want to buy a house

1   and rehab it and sell it, and so they would come to Mr. Tucker

2   for the financing.

3   Q.  Would you be involved in the closings?

4   A.  Yes.

5   Q.  What would your role have been?

6   A.  At that time, I was probably the nominee officer for Black

7   Creek, and therefore, I needed to go closings and sign on

8   behalf of Black Creek Capital Corporation.  That was one of

9   Mr. Tucker's other companies.

10  Q.  How was Black Creek involved in the lending?

11  A.  It wasn't.

12  Q.  Why would Black Creek have been there?

13  A.  Well, which lending?

14  Q.  The lending --

15  A.  The real estate lending?

16  Q.  Yes.

17  A.  It was the lender.  I'm sorry.

18  Q.  Bad question.  Sorry.

19      It was the lender on the real estate?

20  A.  Yes.

21          MR. BATH:  Could we show Defendants' Exhibit 1400,

22  please.

23  Q.  Were you involved in making sure that CLK was complying

24  with agreements that had been made with attorney generals'

25  offices?

HaaWtuc2                      Muir - Direct

1    A.  I would have been involved with making sure that the

2    lenders in CLK were compliant, yes.

3    Q.  And was this D1400 an email where you're involved in

4    passing along information?

5    A.  Yes, it is.

6              MR. BATH:  Offer D1400.

7              THE COURT:  Any objection?

8              MR. VELAMOOR:  No.  No, your Honor.

9              THE COURT:  Received.

10             (Defendants' Exhibit D1400 received in evidence)

11             MR. BATH:  Can we publish that.

12   Q.  It's a one-page document, right, Mr. Muir?

13   A.  Yes.

14             MR. BATH:  We can highlight the top third there,

15   please, Eli.

16   Q.  What's the date?

17   A.  March 26, 2007.

18   Q.  And from whom?

19   A.  I sent it.

20   Q.  And who are you sending it to?

21   A.  I'm sending it to Crystal Cram, Tim Buckley, Glenn Fisher

22   and Chris Becker, and I cc'd Scott Tucker and Blaine Tucker.

23   Q.  Crystal Cram is Crystal Grote?

24   A.  Yes.  Sorry.

25   Q.  We talked about Buckley earlier?

1    A.  Yes.

2    Q.  Who is Fisher?

3    A.  Mr. Fisher ran one of the collection groups.

4    Q.  And then how about Becker, Chris Becker?

5    A.  Mr. Becker also ran a collection group.

6    Q.  The first line talks about an opening account for a

7    borrower, an open account for a borrower in West Virginia,

8    correct?

9    A.  Yes.

10   Q.  What does that mean?

11   A.  That means that somebody who was residing in West Virginia

12   would have had an account with one of the lenders.

13   Q.  And there was a problem?

14   A.  Yes, at this particular time, it would have been.

15   Q.  Why is that a problem?

16   A.  Because in 2006 the lenders had entered into a settlement

17   with the state of West Virginia wherein they said they wouldn't

18   loan anymore in West Virginia.

19   Q.  What are you trying to make sure that everybody's doing?

20   A.  I'm making sure that there should not be any activity with

21   any resident of West Virginia.

22   Q.  Would this be an example of some of the things you were

23   doing while you were working there?

24   A.  Yes.

25           MR. BATH:  Thank you, Eli.

HaaWtuc2                    Muir - Direct

1    Q.  Did there come a time where you requested from Mr. Tucker

2    to see copies of the management agreements?

3    A.  Yes, I did.

4         MR. BATH:  Could you please put up defendants' 1447,

5    please.

6    Q.  Is this a request you're making, Mr. Muir, to Mr. Tucker?

7    A.  It is, yes.

8    Q.  It's an email?

9    A.  Yes.

10        MR. BATH:  Offer D1447.

11        MR. VELAMOOR:  Objection, your Honor.  Hearsay.

12        THE COURT:  Pardon me?

13        MR. VELAMOOR:  Hearsay.

14        THE COURT:  Sustained.

15        MR. BATH:  Thank you, Eli.  You can take that down.

16   Q.  Had you seen the management agreements in 2007?

17   A.  In early 2007, no.

18   Q.  When I say management agreements, what agreements are we

19   talking about?

20   A.  I imagine it would have been the service agreements from

21   2003 and 2005.

22   Q.  With what entities?  Between what entities?

23   A.  It would have been between UMS, and it would have been at

24   that time between the Miami tribe, the Santee Sioux and the

25   Modoc tribe.

1  Q.  You were not involved in setting up any of those

2  agreements?

3  A.  No.

4  Q.  You had not been asked to review them from the time you

5  arrived there, is that correct?

6  A.  Correct.

7  Q.  Do you recall why you were asking -- was there any

8  particular reason you were asking to see them?

9  A.  At that particular time, Mr. Tucker and Mr. Morgan were in

10  discussions for Ho-Chunk Inc. to purchase CLK.

11         MR. BATH:  Can we show Mr. Muir, please, Government

12  Exhibit 1915, which actually has been admitted.

13         Is there a second page to that document?  Can we

14  publish that for the jury.

15  Q.  Do you have the second page in front of you there,

16  Mr. Muir?

17  A.  Yes.

18  Q.  If you need to go back to the first page, let me know, and

19  I can find it for you.  I can find a hard copy for you.

20         Do you recall this email?

21  A.  I don't recall it, no.

22  Q.  Do you recall it was admitted in the government's case?

23  A.  Yes, I do.

24  Q.  OK.  All right.  And someone named Christian is writing an

25  email in the second page, is that right?

1    A.  Yes.

2    Q.  What is he --

3            MR. BATH:  If we can go to that paragraph, "I spoke."

4            Actually, you can highlight the whole document, Eli.

5    Thank you.  OK.

6    Q.  What are they talking about, multiple accounts and the

7    companies' separation?

8    A.  This would have been an instance where a customer had two

9    different loans with two different portfolios.  And down there

10   at the bottom, where Christian's name is Corley -- writes

11   cross-pitch.  That was the phrase they used when they would

12   have a customer in this type of scenario where they had made

13   arrangements to resolve one particular loan and they wanted to

14   make a cross-pitch for the other one.

15           MR. BATH:  Can we highlight that.  Thank you.

16   Q.  When you say they use, who is they?

17   A.  The collection groups.

18   Q.  The collection groups, how are they paid?

19   A.  Collectors?

20   Q.  Yes.

21   A.  They were paid on commission.

22   Q.  And so the more they collected, the more they made?

23   A.  Right.

24   Q.  They had an incentive to cross-pitch?

25   A.  Yes, that was -- that was the problem.

1          MR. BATH:  If we could go to the first page, just the

2     bottom half.

3     Q.  So the very bottom of that we have highlighted was the

4     start of the last page?

5     A.  That's right.

6     Q.  And he's asking about this, his issue, correct?

7     A.  Right.  You see in the subject line, he referred to it as a

8     multiple-account waiver.

9     Q.  All right.  And what are you telling him in the "I am sorry

10    but do not want"; what are you conveying?

11    A.  I'm going back to what I talked about earlier and wanting

12    to ensure that CLK stays in the first-party collector role,

13    because if any of the agents affirmatively say that they're

14    affiliated, then that's going to create obligations for CLK as

15    a debt collector.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1   BY MR. BATH:

2   Q.  So you're communicating compliance to the law?

3   A.  Yes.

4           MR. BATH:  Go to the top part of that document.

5   Q.  This is the last part of that e-mail of that document?

6   A.  Right.

7   Q.  It's the Glenn we talked about before, correct?

8   A.  Yes.

9   Q.  Do you understand that they are going to follow your

10  advice?

11  A.  Yes.  I hope so.

12          MR. BATH:  Thank you.  You can take that down.

13  Q.  Were there occasions when there would be writeoffs by the

14  company regarding loans owed?

15  A.  Yes.

16          MR. BATH:  Can we please put Government Exhibit 1724

17  up.  Can you please show Mr. Muir the entire document, Eli.

18  Q.  Mr. Muir, this is the last page of that document.

19  A.  Yes.

20  Q.  Not much on that, correct?

21  A.  No.

22          MR. BATH:  Can we go to the page before, Eli.

23  Q.  Do you remember this particular e-mail?

24  A.  This particular e-mail, no.

25  Q.  What information is being conveyed on this page here that's

1  up?

2  A.  I would imagine it was e-mailed in.  But it was from Shilee

3  Diaz, and she is saying she is not going to pay the loan, that

4  she has e-mailed more than two dozen times and hasn't gotten a

5  response and that she is complaining about her loan.

6          MR. BATH:  Go to the next page.

7  Q.  We see the start of that e-mail from Ms. Diaz, is that

8  correct?

9  A.  Correct.

10  Q.  Is this e-mail then forwarded by Mr. Tucker to someone?

11  A.  Yes.  Mr. Tucker forwarded it to Crystal Cram, Crystal

12  Grote, and cc'd me.

13  Q.  What is the date?

14  A.  August 24, 2007.

15  Q.  At the bottom Crystal responds --

16          MR. BATH:  Can we blow up half of that page, please.

17  Q.  -- Crystal responds only to Scott, right?

18  A.  That's right.

19  Q.  Then Mr. Tucker responds back to Crystal?

20  A.  Yes.

21  Q.  In the middle of that page, "unless she agrees to pay

22  balance only," what does that mean?

23  A.  I would imagine Ms. Cram is suggesting that if the customer

24  agrees to settle for the balance of whatever was owed, it

25  should be OK.

1              MR. BATH:  If we can go to the top part of that.

2    Q.  You're not on this e-mail string.  You don't reply, is that

3    correct?

4    A.  I do not, no.

5    Q.  We see here that Crystal is quoting that she got together

6    with you?

7    A.  Yes.

8    Q.  Do you remember if that happened or not?

9    A.  I don't remember.

10   Q.  Could it have happened?

11   A.  It could have, yes.  It probably did.

12   Q.  It says, "Tim and I decided to collect the principal."

13             What does that mean?

14   A.  That would have been the principal -- she misspelled it.

15   It should be P-A-L.  But the principal of the balance.  So we

16   have heard earlier about the $300 loan.  That's what the

17   principal would be, the $300.

18             MR. BATH:  If we can put up Government Exhibit 1401,

19   which I have been told has been admitted.

20             If we could show all three pages to Mr. Muir.

21   Q.  We will start with the third page of 1401, Mr. Muir.

22             Do you recall specifically this e-mail?

23   A.  Specifically, no.

24   Q.  What is this e-mail about?

25   A.  This looks like an e-mail that the collections group had

1   sent out where they were trying to settle loans via e-mail

2   instead of phone calls.

3            MR. BATH:  Can we go to the second page?

4   Q.  What are we seeing here on the second page?

5   A.  We are seeing the consumer's response to this e-mail.

6   Q.  Essentially the consumer is saying what?

7   A.  She is saying she resides in Pennsylvania and she cites

8   Pennsylvania laws.  Then she said she is not going to pay.

9            MR. BATH:  Go to the first page, please, Eli.  Blow up

10  the bottom.

11  Q.  On this government exhibit -- it's from Kim Brennan.  Do

12  you know who that is?

13  A.  I believe she works with Mr. Becker's group.

14  Q.  Mary Porting we heard from, correct?

15  A.  Yes.

16  Q.  And we talked about Chris Becker, correct?

17  A.  Yes.

18  Q.  Kim is e-mailing to the other two about Ms. Vaughn,

19  correct?

20  A.  That is correct.

21  Q.  This is 2010?

22  A.  May of 2010, yes.

23            MR. BATH:  Eli, can we go up.

24  Q.  You're not on this chain, correct?

25  A.  That's right.

1   Q.  There is a Chris Muir, correct?

2   A.  Yes.

3   Q.  Who is Chris?

4   A.  Chris is my brother.

5   Q.  Did he work for CLK?

6   A.  Yes, he did.

7   Q.  This is 2010.  Were you working for AMG?

8   A.  Yes.

9   Q.  What was his position?

10  A.  Chris helped with the compliance department.

11  Q.  This talks about here, "would like this account quietly

12  written off."

13          Do you know what that refers to?

14  A.  Yes, I do.

15  Q.  What is that?

16  A.  The compliance department, when they would get involved

17  with certain accounts they would try to resolve them as well,

18  and they also received bonuses for any accounts that they had

19  resolved and the customer had paid.  And I always thought it

20  was problematic, especially with Ms. Porting, because she was

21  hesitant to settle accounts because she was trying to get the

22  bonus for payment made by the customer.

23          So here we are suggesting Mr. Becker just tell Ms.

24  Porting to quietly write it off.

25  Q.  Do you know if this was done here?

1    A.  I have no reason to think it wasn't.

2    Q.  Was there a legal or a business reason on why you might

3    write off accounts?

4    A.  I think it was more of a business reason.

5    Q.  What is that?

6    A.  These loans were not that much and usually my experience

7    was the balances were not a whole lot of money in the grand

8    scheme of things.  Like this loan here was $500.  If the

9    company wanted to institute any legal action to recover that

10   money, it was my position they would have spent more money just

11   on trying to file the lawsuit and hire an attorney to file the

12   lawsuit.  And in the end the net recovery would have been

13   minus.  They may have gotten the judgment and they may have

14   gotten paid, but they would have spent more money on trying to

15   get the judgment.

16   Q.  Why would that be?

17   A.  Well, that was Pennsylvania.  So we would have had to

18   retain counsel in Pennsylvania.  They would have obviously

19   wanted to see all the documentation in the account.  We would

20   have provided that.  That lawyer would have reviewed all that

21   documentation.  That lawyer then would have drafted a lawsuit

22   and would have filed that lawsuit.  And the costs involved in

23   that would have been whatever hourly rate that lawyer was

24   charging as well as the filing fee to file the lawsuit.

25   Q.  It was not uncommon for there to be writeoffs?

1   A.  No, not at all.

2   Q.  Was there litigation in 2007 in California?

3   A.  Yes.  The California Corporations commissioner brought an

4   action against the Santee and the Modoc -- I'm sorry.  The

5   Santee and Miami.

6   Q.  Did you appear in that case?

7   A.  No.

8   Q.  Who represented whom?

9   A.  Mr. Schulte's firm represented both of the entities and

10  they had a lawyer who was a California lawyer in their firm and

11  so he joined the team for that case as well.

12          THE COURT:  What did you mean by both of the entities?

13          THE WITNESS:  The entities in that case were MNE,

14  Miami Nation Enterprises, and SFS, Inc.

15  Q.  Who was SFS associated with?

16  A.  SFS, Inc. was owned by Santee and Miami Nation Enterprises

17  was owned by Miami.

18  Q.  Did you attend any of those hearings?

19  A.  Yes, I did.

20  Q.  Was the Colorado litigation now in 2007 still continuing?

21  A.  It was.  It might have been at the Court of Appeals at that

22  point.

23  Q.  In 2007, who was the primary contact regarding legal

24  counsel with the tribes?

25  A.  That would be Conly Schulte.

1    Q.  Did you have much contact with them?

2    A.  Yes.  I had a lot of contact.

3    Q.  What would your contact have consisted of?

4    A.  We would at that point probably almost talk exclusively

5    about the two cases, the California and Colorado cases.  There

6    may have been some compliance issues that would come up from

7    time to time.  In certain instances if there was a direct

8    letter from the attorney general, Mr. Schulte would respond

9    directly on behalf of the lending entities.

10   Q.  Now, when you say we would talk about the cases, who would

11   you have contact with?

12   A.  I would talk to Conly directly.  I would talk to other

13   lawyers in his firm that were on the case with him.

14   Q.  Would you be having contact with any people from the tribes

15   regarding the litigation?

16   A.  In 2007, probably not.

17   Q.  Did you come to learn about the Selling Source transaction?

18   A.  I did, yes.

19   Q.  When did you learn about that?

20   A.  I learned it after it had closed.

21   Q.  Which would have been when, do you know?

22   A.  Late 2007.  Maybe right around Christmastime.

23        MR. BATH:  Can we have Government Exhibit 2801.  It's

24   been admitted.

25   Q.  Do you have that on the screen, Mr. Muir?

1    A.  I do.

2    Q.  This is a long document, is it not?

3    A.  It looks like it was a 360-page document.

4    Q.  This is the first page we are looking at?

5    A.  Yes.

6    Q.  So this closed out sometime -- is the date on there correct

7    to you, December 21, 2007?

8    A.  Yes, that seems right.

9    Q.  How did you learn about the transaction?

10   A.  There was a press release that London Bay issued.

11   Q.  Were you involved in the sale at all?

12   A.  No, not at will.

13   Q.  Were you involved in negotiating the sale?

14   A.  No.

15   Q.  Drafting any documents?

16   A.  No.

17   Q.  Did you know Mr. Tucker owned Selling Source?

18   A.  I don't recall if I did or not.

19          MR. BATH:  You can take that down.  Thanks, Eli.

20   Q.  Did your legal status in terms of your relationship with

21   CLK change at all in 2007?

22   A.  Near the end of 2007, yes, it did.

23          MR. BATH:  Can you put up Government Exhibit 2601,

24   please.  It's been admitted.

25          I believe this is a two-page document.

1          Can we go to page 2.

2     Q.  Does the second page have any substantive content,

3     Mr. Muir?

4     A.  Not really.  Just some math, if you will.

5          MR. BATH:  Can we highlight the top paragraph.

6     Q.  This is the end of the e-mail?

7     A.  Yes.

8     Q.  Generally what information are you communicating?

9     A.  I am providing a basis for why I had made an offer of a

10    monthly retainer that I would like to be paid.

11    Q.  For your costs?

12    A.  Yes.

13         MR. BATH:  Can we go to the first page.

14    Q.  Is this the first e-mail in the string?

15    A.  Yes, it is.

16    Q.  What is the date?

17    A.  November 1, 2007.

18    Q.  You're proposing a flat rate?

19    A.  Yes.

20    Q.  Why was that advantageous to you?

21    A.  I wanted to no longer be an hourly employee and I wanted to

22    be Tim Muir, The Muir Law Firm and bill the client directly.

23    Q.  What advantage does that have to you?

24    A.  It would have been flexibility and independence for me.

25    Q.  Would you have set up your own law firm?

1  A.  I did.  I set my own law firm up actually in January of

2  '07.

3  Q.  How would your law practice be any different having your

4  own law firm versus being general counsel?

5  A.  I wouldn't be an employee and, therefore, I would be my own

6  boss.  I wanted to own my own firm.  I wanted the opportunity

7  to build a practice.

8           MR. BATH:  If we could go to the rest of that

9  document.  Blow that up.

10 Q.  Mr. Tucker responds to you with his e-mail, correct?

11 A.  Yes.

12 Q.  Is that how you moved forward at that point?

13 A.  Yes, it is.  Yes.

14 Q.  It's a monthly number?

15 A.  Yes.

16 Q.  Thank you.

17          Would forming your own law firm enable you to do

18 different representations then?

19 A.  Yes, it would have.

20 Q.  Could you have done it before or not?

21 A.  As an employee, I would have had to have asked for

22 permission to do that.

23 Q.  As your own law firm you have your own flexibility?

24 A.  I would have had the flexibility.

25 Q.  So now we are in 2008.  Were there a couple of big

1    transactions and things that you worked on in that year?

2    A.   Yes, several big things.

3    Q.   What were they?

4    A.   It was the CLK merger into AMG, which was the purchase of

5    CLK by AMG.  There was the Hallinan litigation that occurred in

6    the end of 2008.  The California and the Colorado cases would

7    have been still progressing.

8    Q.   And you had various levels of work involved in each of

9    those?

10   A.   Yes.

11   Q.   Let's start early in the year.  I am going to show you

12   Government Exhibit 1211, which has been admitted.

13           What is this document?

14   A.   This is an annual filing in the State of Nevada for Black

15   Creek Capital Corporation.

16   Q.   It is a multipage document.

17           Do you recall that?

18   A.   I do, yes.

19   Q.   We see a name in the middle of that page.

20           Do you see that?

21   A.   Yes, I do.

22   Q.   Who is that?

23   A.   Michael Hicks.

24   Q.   We heard from him earlier, did we not?

25   A.   That's right.

1   Q.  Now, were you involved in the legal work on behalf of Black

2   Creek?

3   A.  Yes, I was.

4   Q.  What kind of work?

5   A.  It was real estate lending.

6   Q.  On flipping the houses?

7   A.  Right.

8   Q.  Did there come a time where you became listed on the Black

9   Creek Capital Corporation documents?

10  A.  Yes.

11  Q.  Why is that?

12  A.  Mr. Tucker was traveling a lot and Black Creek started

13  doing sometimes two to three loans a week, and so he wanted me

14  to be the officer such that I could then sign for those loans

15  if he was out of town and wouldn't uphold the closing of those

16  loans.

17          MR. BATH:  We can take that down.

18          Would you put up, please, only for Mr. Muir

19  Defendants' Exhibit 1406, please.

20  Q.  Do you recognize that document, Mr. Muir?

21  A.  I do, yes.

22  Q.  What is it?

23  A.  It is an action by written consent for Black Creek Capital

24  Corporation.

25          MR. BATH:  Offer 1406.

1          THE COURT:  Any objection?

2          MR. VELAMOOR:  No objection, assuming it's offered for

3     the fact that it happened.

4          THE COURT:  Not for the truth of its content but the

5     fact that it happened.

6          (Defendant's Exhibit 1406 received in evidence)

7          MR. BATH:  Can we post that for the jury.

8          Can we blow up the third paragraph, third "resolved,"

9     please, Eli.

10          I'm sorry.  Let's back out of that.  I apologize.

11     BY MR. BATH:

12     Q.  First of all, what is this document, Mr. Muir?

13     A.  It is a series of resolutions signed by Mr. Tucker as the

14     sole shareholder of Black Creek Capital Corporation.

15     Q.  What is the date on the bottom of the page?

16     A.  Yes.

17     Q.  What is that?

18     A.  February 15, 2008.

19     Q.  Did these resolutions have anything to do with you?

20     A.  It did, yes.

21          MR. BATH:  That third paragraph, "resolved" paragraph,

22     if we can blow that up.

23     Q.  Was 1406 essentially your understanding, passed so you can

24     close these real estate deals?

25     A.  Yes, it was passed, at my request.

1  Q.  And this paragraph that we are looking at, what was your

2  understanding of what your authority was on behalf of Black

3  Creek.

4  A.  As the officer for Black Creek, the only authority I had

5  was whatever express resolution Mr. Tucker had given.

6  Q.  So was it an open resolution or was it a binding one?

7  A.  It wasn't open.  It was binding.  So for all these real

8  estate transactions, there would be a subsequent resolution

9  that would then authorize me to sign on behalf of Black Creek

10 Capital in order to close the deal.

11         MR. BATH:  Thank you, Eli.

12 Q.  Is there a Colorado litigation going on in 2008?

13 A.  Yes.

14 Q.  Did you go out there at all and monitor those?

15 A.  I don't think I went in 2008.  That mostly would have been

16 at the Court of Appeals where the parties were waiting for a

17 decision.

18 Q.  Is information then relayed back to you by the lawyers

19 involved in that?

20 A.  Yes.

21 Q.  What do you do with that information, if anything?

22 A.  I would relay it to Mr. Tucker.

23 Q.  In June of that year was there a CLK and AMG merger?

24 A.  Yes, there was.

25 Q.  What was your involvement in that merger?

1    A.  I was generally aware of that merger.  There obviously had

2    been discussions about that for quite some time.  The extent of

3    my involvement would that was the general awareness.

4    Q.  Did you draft any documents?

5    A.  No, I did not.

6            MR. BATH:  Can we put up Government Exhibit 312, which

7    has been admitted.

8            Can we put that second page up.

9    Q.  The second page doesn't have any substance, does it?

10   A.  No.

11           MR. BATH:  Can we go back to the first.

12           Can we blow the whole document up a little more.

13   Q.  So in this government exhibit we have an e-mail from Ho

14   Chunk?

15   A.  Yes.

16   Q.  Who is that?

17   A.  That would have been Lance Morgan.

18   Q.  Conly's partner?

19   A.  Yes.

20   Q.  He is e-mailing to whom?

21   A.  He is e-mailing to Don Brady, Dbrady@mne.com would have

22   been Mr. Brady, and he was e-mailing Conly Schulte, and cc'ing

23   Mr. Tucker.

24   Q.  You're not on that e-mail?

25   A.  No, I'm not.

HAA8TUC3                    Muir - Direct

1    Q.   Then the very top e-mail is Scott responding, correct?

2    A.   Yes.  Scott responds just to Mr. Brady.

3    Q.   The date of that was?

4    A.   June 4, 2008.

5            MR. BATH:  Thank you, Eli.

6            Can we put up D759, which has been admitted.

7            This is a two-page document.

8            Can we show the second page.

9            It's a four-page document.  Let's just show the last

10   page.

11   Q.   This is the purchase agreement by AMG, is that correct?

12   A.   Yes.

13   Q.   This is Defense Exhibit 759 entered earlier, correct?

14   A.   Yes.

15           MR. BATH:  Can we go back to the first page, Eli.

16   Q.   That's one of the documents regarding the transaction?

17   A.   Yes, it is.

18   Q.   You're aware of it but you didn't draft any of this?

19   A.   That's right.

20           MR. BATH:  Thank you, Eli.

21           Can you show us Government Exhibit 412, which has been

22   admitted.

23   Q.   So this government exhibit is dated when?

24   A.   The e-mail string is dated August 19, 2008.

25   Q.   A few months after the transaction?

1    A.   That's right.

2    Q.   What are you telling Blaine and Scott?

3    A.   The subject line says, "forward EIN number, AMG Services."

4          So I am informing them that there is EIN number,

5    meaning there would have been a letter from the IRS being sent

6    to the Miami address.

7    Q.   What does "EIN" stand for?

8    A.   I believe it's an employee identification number.  It's

9    similar to Social Security number for an entity.  An entity

10   will need an EIN to open bank accounts and really just begin

11   business.

12   Q.   Thank you.

13         Is that pretty much your extent of your being involved

14   in that transaction?

15   A.   At that time, yes.

16   Q.   Now move to fall of 2008, and we have heard a lot about

17   this.  There was a lawsuit by Mr. Hallinan?

18   A.   Yes.

19   Q.   Prior to the lawsuit, what did you know about Hallinan?

20   A.   All I knew was that he was a long-time partner of Mr.

21   Tucker.  I knew he lived in Philadelphia and had a house in

22   Florida.

23   Q.   Had you been involved in any contact with Mr. Hallinan

24   prior to the lawsuit?

25   A.   I met him one time.

1  Q.  When was that?

2  A.  Sometime I think in early 2008.

3  Q.  What was the purpose of that meeting, if you recall?

4  A.  It was a social meeting.

5  Q.  Where did that take place?

6  A.  I think in Florida.

7  Q.  Do you remember when the lawsuit was filed?

8  A.  It's either October 30 or October 31, 2008.

9  Q.  Who filed suit?

10 A.  Mr. Hallinan sued Mr. Tucker.

11 Q.  Who were the other parties?

12 A.  He filed suit on behalf of himself and at that time it was

13 called NM Service, and he sued Mr. Tucker, he sued Blaine

14 Tucker, he sued CLK, and he sued five of Scott's Nevada nominee

15 companies.

16 Q.  Did you enter your appearance in that litigation?

17 A.  No, I did not.

18 Q.  Who entered their appearance on behalf of the parties?

19 A.  So on behalf of Scott and Blaine, it would have been

20 Mr. Smith.  And then on behalf of CLK and the five Nevada

21 companies, as far as appearance, there was a lawyer in Nevada

22 called Kurt Rhodes, and then for Mr. Tucker and Mr. Smith there

23 was another lawyer representing them called Pat Reilly.

24 Q.  Was Conly Schulte involved at all?

25 A.  He was involved, yes.  He did not enter his appearance.

1    Q.  Who was he involved with?

2    A.  He was representing CLK, because by that time AMG had

3    acquired CLK, and he was representing the other five Nevada

4    companies because MTE had acquired them.

5    Q.  You mentioned there was a lawyer in Las Vegas.  Where was

6    the lawsuit filed?

7    A.  It was filed in Las Vegas.

8    Q.  And this suit was simple, complex?

9    A.  It was very complicated.

10   Q.  Why was that?

11   A.  It was filed as a shareholder suit.  That's why

12   Mr. Hallinan sued on behalf of NM Service, the company that him

13   and Mr. Tucker owned together.

14   Q.  When you say it was complicated, why does that make it

15   complicated?

16   A.  It's called a shareholder derivative suit.  It's not your

17   traditional business litigation suit.  It was further

18   complicated by Mr. Hallinan naming CLK and those other

19   companies, he was alleging he had an ownership of those

20   companies.

21        It was further complicated because National Money

22   Service in its bylaws had a binding arbitration provision,

23   which meant Mr. Hallinan should not be filing a lawsuit in

24   court.  He should be arbitrating that.

25   Q.  What does arbitration mean?

1   A.   Arbitration is a venue in which parties can go resolve

2   their disputes and, unlike in a courtroom, the parties hire a

3   private arbitrator, often a retired judge, and they conduct the

4   litigation inside of an arbitration hearing as opposed to

5   inside of a courtroom.

6   Q.   What was your role in the lawsuit?

7   A.   My role was I was representing Scott and Blaine and then as

8   part of that entered into a joint defense agreement with Mr.

9   Schulte that covered CLK and the five Nevada nominee companies.

10  Q.   Who was point on behalf of Scott and Blaine Tucker?  Who

11  was the lead lawyer?

12  A.   Mr. Smith.

13  Q.   Pete Smith?

14  A.   Pete Smith.

15  Q.   Were there hearings in Nevada?  Did you attend any of them?

16  A.   There were a lot of hearings in Nevada, yes.  I went to

17  almost every single one of them.

18  Q.   Were there depositions or exchange of discovery?

19  A.   There was a limited discovery between Mr. Hallinan and Mr.

20  Tucker, and also Blaine Tucker, but not as to all the parties.

21       There were no depositions.

22  Q.   How long did that litigation take?

23  A.   It was filed in October of 2008 and it was settled in March

24  of 2010.

25  Q.   A lot of time.  Did you spend a lot of time on this case?

1    A.  Yes, a lot of time.

2    Q.  So filed in the fall of '08.  Is there some kind of

3    settlement discussion sometime in 2009?

4    A.  Yes.

5    Q.  Where did that take place?

6    A.  The initial settlement discussions were mediation.  That

7    took place if Philadelphia in September of 2009.

8    Q.  Did you attend?

9    A.  Yes, I did.

10   Q.  After the September mediation, were there more settlement

11   discussions?

12   A.  Yes.  The mediation was a formal mediation conducted with a

13   third-party mediator and, even though the case was not resolved

14   that day, we did spend almost the entire day in mediation.

15   Subsequent to that Mr. Smith engaged in direct settlement

16   discussions with Mr. Hallinan's lead lawyer.

17   Q.  Where did that take place?

18   A.  It took place several ways.  There were e-mails and phone

19   calls, but also Mr. Smith flew back to Philadelphia and spent a

20   day with Mr. Stutzman -- that was the lawyer's name --

21   discussing settlement.

22   Q.  Did there then become settlement discussions?

23   A.  Yes.

24   Q.  When did those start to take place, serious discussions

25   take place?

1   A.  They picked up, I would say, in a serious point in December

2   of 2009.

3   Q.  Were you involved in those discussions or how would you be

4   aware of them?

5   A.  Yes, I was involved.  Usually Mr. Smith would either e-mail

6   Mr. Stutzman or they would have a call and then he would refer

7   back, or report back to Scott and I the substance of those

8   discussions.

9   Q.  Did there come a time when there was a sort of a drop-dead

10  line about settling the suit?

11  A.  Eventually there did become one, yes.

12  Q.  What when was that?

13  A.  March 1, 2010.

14  Q.  Who announced that deadline?

15  A.  Mr. Hallinan's lawyers.

16  Q.  Why was there a drop-dead deadline?

17  A.  We began the discussions in September of '09 and they

18  continued in December of '09 and they seemed like they were

19  dragging for a variety of reasons and, finally, I don't know

20  whether it was Mr. Stutzman or another lawyer said our

21  drop-dead date is March 1, 2010.

22  Q.  Was there work done leading up to March 1 to get a

23  settlement?

24  A.  Yes, there was a lot of work.  It began back in December of

25  '09.

1   Q.  Did it get settled?

2   A.  Ultimately, yes.

3   Q.  What was the date on that?

4   A.  March 1, 2010.

5         MR. BATH:  Can we show Defendants' Exhibit 2811, which

6   has been admitted.

7         Can you show the second page of that document.

8         Can you highlight the end of the first page and second

9   page for us.

10  Q.  What is the date of this e-mail?

11  A.  February 25, 2010.

12  Q.  From whom to who?

13  A.  Mr. Brady is e-mailing Mr. Schulte and he is cc'ing Shilee

14  Mullin, who is a lawyer in Mr. Schulte's firm, and myself.

15  Q.  This is just a few days before you get this matter settled?

16  A.  Yes.

17        MR. BATH:  Can we go up a little.

18  Q.  What is this e-mail string generally about, Mr. Muir?

19  A.  It begins with a topic not related to the Hallinan lawsuit

20  and then Mr. Schulte in that, I guess the third e-mail coming

21  up tells, they are planning on closing that settlement tomorrow

22  so they will need you to overnight the originals to K.C. today

23  if at all possible.

24  Q.  The settlement being Hallinan?

25  A.  Yes.

1  Q.  At the very top Conly is communicating to everybody to talk

2  to Don?

3  A.  That's right.

4  Q.  Where would Don have been located then?

5  A.  He would have been in Miami, Oklahoma.

6  Q.  Did you have communication with Don?

7  A.  I did not have direct communication with Mr. Brady on this

8  particular day, no.

9          MR. BATH:  Can we just show the witness Defendants'

10  Exhibit 2812.

11  Q.  Are you on this e-mail string?

12  A.  I'm on the first e-mail.  I am not on the second one.

13  Q.  This is about the Hallinan settlement?

14  A.  Yes.

15          MR. BATH:  I offer Defendant's 2812.

16          THE COURT:  Any objection?

17          MR. VELAMOOR:  Objection.  Hearsay.

18          MR. BATH:  I would offer it for the state of mind,

19  Judge.

20          THE COURT:  I will allow it for state of mind.

21          (Defendant's Exhibit 2812 received in evidence)

22          MR. BATH:  Can we blow that up for the jury and

23  publish it.

24  Q.  This is the same day?

25          THE COURT:  Excuse me, please.  Do we need a recess?

1    MR. VELAMOOR:  We are just pointing out if it's

2    offered for this defendant's state of mind, it wouldn't be

3    necessary to --

4    THE COURT:  Why don't you save it for a break instead

5    of speaking audibly in the courtroom.

6    You may continue, Mr. Bath.

7    Q.  What is the date on this?

8    A.  February 25, 2010.

9    Q.  And the time?

10   A.  The bottom one is sent at 12:55 p.m.

11   Q.  The top one says 8:55?

12   A.  Yes.

13   Q.  You're in the string on the second one but not the first

14   one, correct?

15   A.  I'm in the 12:55 p.m. one, yes.

16   MR. BATH:  Thank you.  You can take that down.

17   Q.  So are you anticipating that night that you're going to get

18   the deal done?

19   A.  I am anticipating that docs are going to be finalized and

20   sent to Mr. Brady for signature, yes.

21   Q.  When you say the documents are going to be finalized, what

22   does that mean?

23   A.  There was a large doc set that ended up being a very

24   complicated settlement because there were tax concerns for both

25   Mr. Tucker and Mr. Hallinan and they kind of dictated the way

1    in which the parties wanted the transaction structured.

2    Q.  When you say document set, are you talking about multiple

3    pages of documents?

4    A.  Not just pages, multiple parts and different agreements

5    that would cover different parts of the settlement.

6    Q.  Who was doing the last-minute edits of those documents?

7    A.  I was primarily doing those, yes.

8    Q.  You were doing the edits along with who else?

9    A.  It would be a communication between Mr. Smith and

10   Mr. Stutzman and Mr. Kundra, who was a transactional lawyer for

11   Mr. Hallinan, and myself.

12   Q.  And we see these e-mails about Don being ready.  Are there

13   other e-mails flying around --

14   A.  Yes.

15   Q.  -- about getting the documents in final form?

16   A.  Yes.

17           MR. BATH:  Can we show Defense Exhibit 2816, please.

18   Q.  Does the deal get done on the 25th?

19   A.  No.  The deal does not get done until Monday, March 1.

20           THE COURT:  With that, ladies and gentlemen, we are

21   going to break for lunch.

22           Please do not discuss the case among yourselves or

23   with anyone.

24           Please have a pleasant lunch, and we will be back in

25   action for a 2:00 start.

1            Thank you.

2            (Jury exits courtroom)

3            THE COURT:  See you after lunch.

4            (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HAA8TUC3                          Muir - Direct

1                         AFTERNOON SESSION

2                              2:00 p.m.

3           (Jury not present)

4           THE COURT:  I am going to hand out as Court Exhibit 14

5    a revised version of the jury instructions, and as Court

6    Exhibit 15 a verdict sheet in this case, a verdict form.

7           Mr. Bath, one is for Mr. Roth.

8           Bring our jurors in.

9           (Jury present)

10   TIMOTHY JOHN MUIR, resumed.

11          THE COURT:  Good afternoon, ladies and gentlemen.  We

12   are ready to proceed.

13          Mr. Bath, whenever you're ready.

14   BY MR. BATH:

15   Q.  Mr. Muir, when we broke for lunch, we were talking about

16   late February '10 and the Hallinan settlement, correct?

17   A.  Yes.

18   Q.  When we left off, we were talking about Friday the 26th.

19   Do you recall that?

20   A.  Yes.

21   Q.  At this point, on the 26th, on the Friday, what is the

22   status of things, what is supposed to happen next?

23   A.  The status of things is all the documents should have been

24   signed, and I was in the process of assembling the documents --

25   have originals to be FedEx'd out Monday morning.

1    Q.   So the documents are going to be signed by whom?

2    A.   Depending upon the particular party and depending upon a

3    particular document.  So, obviously, Mr. Hallinan would have

4    signed a lot of documents, Mr. Tucker would have signed a lot

5    of documents, Mr. Brady would have signed, and Mr. Little Axe

6    would have signed.

7    Q.   Who was Don Brady signing for?

8    A.   Don was signing in two capacities for the settlement

9    agreements.  He was signing on behalf of CLK and also signing

10   on behalf of AMG Services.

11   Q.   Because people were located in different parts of the

12   country, how was the signing going to take place?

13   A.   Documents had been e-mailed to the different parties for

14   signatures, and then I was, on behalf of Mr. Tucker, AMG and

15   CLK, assembling them in Kansas City, and Mr. Hallinan's lawyers

16   were assembling their documents in Philadelphia.

17   Q.   So on the 26th, on that Friday, did you send documents to

18   Don Brady?

19   A.   Yes.  I had realized I had forgot to send him one document.

20   Q.   How many documents was he signing?

21   A.   He was signing four.

22   Q.   When did you send them to him?

23   A.   I forwarded the e-mail to Mr. Tucker to send it to Mr.

24   Brady I think Friday afternoon.

25   Q.   When did you realize that one of the documents didn't get

1    signed?

2    A.  That day, on Friday.

3    Q.  What efforts did you make to get in touch with Don?

4    A.  I didn't make any efforts.  I understood Mr. Tucker had

5    e-mailed and called him and could not get in touch with him.

6    Q.  Did Mr. Brady in fact end up signing the documents?

7    A.  Yes, he did.

8           MR. BATH:  Can we show him 2815.

9    Q.  Mr. Muir, I am going to give you a paper copy.  There is

10   also one on your screen.

11          Do you recognize that document?

12   A.  I do.

13   Q.  What is that?

14   A.  It's the purchase agreement, which was one of the documents

15   that was part of the entire settlement.

16   Q.  For the Hallinan case?

17   A.  Yes.

18          MR. BATH:  Offer 2815.

19          THE COURT:  Any objection?

20          MR. VELAMOOR:  May we ask the witness how he actually

21   recognizes this version of the document.

22          THE COURT:  You may ask the question.

23   VOIR DIRE EXAMINATION

24   BY MR. VELAMOOR:

25   Q.  Mr. Muir, how do you recognize this version of the

1   document?

2   A.  I helped prepare this document.

3   Q.  This particular version of it?

4   A.  If this is the signed version, then yes.

5        MR. VELAMOOR:  Can we see the signed page, please.

6   Q.  Is that signature the reason why you recognize this version

7   of the document?

8   A.  Well, that signature and the one before, Mr. Tucker's

9   signature.

10       MR. VELAMOOR:  No objection.

11       THE COURT:  Received.

12       (Defendant's Exhibit 2815 received in evidence)

13       MR. BATH:  Can you publish to the jury.

14       Eli, can you highlight the first paragraph of the

15   document for us, please.

16  BY MR. BATH:

17  Q.  This is a stupid question, Mr. Muir, but there are multiple

18  documents involved?

19  A.  Yes.

20  Q.  In 2815, what is this document?

21  A.  This is a purchase agreement for Mr. Hallinan's NMS royalty

22  interest.

23  Q.  That's the name of the company, NMS royalty interest?

24  A.  The name of the copy is NMS, which would have been National

25  Money Services.

1   Q.   The other parties involved here are who?

2   A.   By and among AMG Services, Mr. Tucker, and Mr. Hallinan.

3            MR. BATH:  Can we go to the last page, please.

4   Q.   Whose signature is on that page?

5   A.   That's Mr. Brady's signature.

6   Q.   On behalf of whom?

7   A.   AMG Services, Inc.

8   Q.   And you mentioned when you were questioned a minute ago --

9            MR. BATH:  The page before that, Eli.

10  Q.   Whose signature is on that page?

11  A.   That's Mr. Tucker's signature.

12           MR. BATH:  Eli, can we go back to the first page,

13  please.

14  Q.   This is a multipage document?

15  A.   Yes.

16  Q.   Can you synopsize what this does?

17  A.   The document, the NMS royalty was a concept that

18  Mr. Hallinan's tax counsel had requested in order for

19  Mr. Hallinan to be able to claim long-term capital gains on his

20  interest in NMS.

21  Q.   And that is what took three or four pages, five pages to

22  explain?

23  A.   Yes.

24  Q.   This document 2815, before it was signed, did you e-mail it

25  or it was e-mailed to Don Brady?

A.  I did not e-mail it to Don Brady.  I understood that it had

been e-mailed to him or explained to him.

Q.  When did you receive this document?

A.  I would have finalized this document on Thursday the 25th.

Q.  When did you receive it signed?

A.  I'm sorry.  Mr. Brady would have FedEx'd it to me -- would

have FedEx'd it.  I would have gotten it on Friday the 26th.

Q.  So this is one of the documents that Don needed to sign?

A.  Yes.

Q.  Was there another document he needed to sign?

A.  On behalf of AMG, yes.

Q.  I am going to hand you what has been marked D1450.

        MR. BATH:  Would you put that up for the witness,

please.

Q.  Do you recognize D1450?

A.  I do.

Q.  What is that?

A.  This is entitled, "A Conditional Assignment of NMS Royalty

Interest."

Q.  Part of the Hallinan package?

A.  Yes.

Q.  Is this signed by somebody?

A.  Yes.

Q.  Who is that?

A.  Mr. Brady.

1          MR. BATH:  I offer D1450.

2          THE COURT:  Any objection?

3          MR. VELAMOOR:  No objection, your Honor.

4          THE COURT:  Received.

5          (Defendant's Exhibit 1450 received in evidence)

6          MR. BATH:  Can we put that up for the jury, please.

7          Could you please highlight the first paragraph above,

8   Eli.

9   Q.  So, again, it's titled as it is, correct?

10  A.  Yes.

11  Q.  How is this different from the purchase agreement?

12  A.  This document is called a conditional assignment because

13  the purchase agreement, the document we previously looked at,

14  provided for $30 million of payment, but over time.  It wasn't

15  being all made at once.  The last payment was going to be due

16  on September 30, 2010.

17          And the reason for this conditional assignment was

18  such that, if all the payments were not made, then the entire

19  settlement agreement was going to become null and void, and the

20  parties were going to go back and start litigating, and had

21  that occurred, then Mr. Hallinan wanted his interest in NMS

22  coming back to him.  So that's why it's a conditional

23  assignment.

24  Q.  Again, the parties are who in this agreement?

25  A.  In the conditional assignment, it's just AMG and

1    Mr. Hallinan.

2    Q.  How many pages is this document?

3    A.  It's a two-page document.

4         MR. BATH:  Can you go to the second page, please, Eli.

5    Q.  We see the signature there, sir?

6    A.  Yes.

7    Q.  Who is that?

8    A.  Mr. Brady.

9    Q.  On behalf of whom?

10   A.  On behalf of AMG Services.

11   Q.  So this document, Defendants' 1450, conditional assignment,

12   when did you receive that from Mr. Brady?

13   A.  Mr. Brady signed that on Monday, March 1st.  I was out of

14   town that day.  I probably didn't get it back till maybe

15   Wednesday.

16   Q.  So the prior document, the purchase agreement, and this

17   document did not come back to you at the same time?

18   A.  No, they did not.

19   Q.  When they both didn't come back to you at the same time,

20   did you contact someone and ask them about that?

21   A.  When Mr. Brady was not responding to calls or e-mails on

22   Friday, that Mr. Tucker trying to reach him, I was speaking to

23   Mr. Tucker.

24   Q.  Did you ever reach Don that weekend?

25   A.  That weekend, no.

HAA8TUC3                    Muir - Direct

1  Q.  Although we saw e-mails earlier that Don said he was ready

2  to sign?

3  A.  Yes.

4  Q.  Did you ever talk to Don subsequently about what happened

5  to him that weekend?

6  A.  I talked to Mr. Brady Monday morning.

7  Q.  What did you find out from him on Monday?

8          MR. VELAMOOR:  Objection, your Honor.

9          THE COURT:  I have to hear the answer first.

10         What did you hear on Monday?

11  A.  Initially Mr. Brady e-mailed, when he got back into the

12  office, the e-mail where Mr. Tucker e-mailed him the signature

13  page for this document, and Mr. Brady responded, I just got

14  this, I was out of town this weekend.

15         THE COURT:  Go ahead.

16  Q.  So going back now to Saturday morning, you have one but not

17  both of the documents, is that correct?

18  A.  Yes.

19  Q.  Has there been a deadline imposed?

20  A.  The deadline to send documents enclosed was Monday, March

21  1.

22  Q.  When had you planned to send the documents to Hallinan?

23  A.  They were going to be FedEx'd that Monday.

24  Q.  They were going out Monday or Saturday?

25  A.  They were going out Monday.

1   Q.  Did you anticipate you were going to have both documents by

2   Monday?

3   A.  I did on Friday, but then when Mr. Brady was not responding

4   to calls or e-mail, I became very concerned.

5   Q.  What was your concern?

6   A.  We had been working on this settlement for four months and

7   the other side was adamant that Monday was the drop-dead date,

8   and on Saturday I am assembling all of the originals and all

9   the documents to be FedEx'd, and I am missing a document.

10  Q.  And that is the conditional assignment?

11  A.  Yes.

12  Q.  What did you do?

13  A.  I panicked.

14  Q.  What did you do when you panicked?

15  A.  I came up with plan B.

16  Q.  What was plan B?

17  A.  I put a different signature on both of the AMG documents

18  such that I could FedEx originals to Mr. Hallinan's attorneys

19  on Monday.

20  Q.  What signature did you put on there?

21  A.  I put J.S. Ragman.

22  Q.  Did you send those documents out that way?

23  A.  Yes.

24  Q.  Even though you had the purchase agreement?

25  A.  Yes.

1   Q.  Why wouldn't you send the purchase agreement?

2   A.  Because we had two documents that Mr. Brady needed to sign

3   on behalf of AMG, and I only had one in my possession that he

4   had signed.

5   Q.  Did you ever subsequently talk to Mr. Brady about this?

6   A.  Yes, I did.  Mr. Brady called me after he responded to that

7   e-mail on Monday morning.

8   Q.  Did you advise him what took place?

9   A.  I told him what the plan was.

10  Q.  Did he object to the plan?

11  A.  No.

12          MR. VELAMOOR:  Objection.

13          THE COURT:  Sustained.  Stricken.

14  Q.  When you signed Ragman to the documents, two documents,

15  what was your intent?

16  A.  My intent was to get documents to Hallinan such that we

17  close the deal.  I understood that Mr. Brady had been explained

18  all of the terms and all of the amount of money to be paid and

19  how the deal was going to be structured, and so from my point

20  of view Mr. Brady understood the deal.

21  Q.  What were you afraid would happen if you didn't send them

22  out on Monday?

23  A.  That the deal wouldn't close and we would be back

24  litigating.

25  Q.  Did the deal close?

1   A.  Yes, it did.

2   Q.  Were there any defaults or anybody objecting?

3   A.  No.

4   Q.  Was there any allegation that there was anything -- that

5   you deceived or defrauded anyone?

6           MR. VELAMOOR:  Objection, your Honor.

7           THE COURT:  Sustained.

8   Q.  Was there any difficulties with the deal closing?

9   A.  No.

10  Q.  Have there been any difficulties between Hallinan and AMG

11  since?

12  A.  No.

13  Q.  Prior to that date, that weekend, had you heard the term

14  "Ragman"?

15  A.  Yes.

16  Q.  In what context had you heard that?

17  A.  In this context, in late 2008, Mr. Mitchell had become the

18  head of IT, and as AMG was becoming an active entity, they

19  needed to buy domains for e-mail and Web sites and the like.

20  So at that point, AMG doesn't have any financials and there is

21  no company credit card for CLK, and so --

22  Q.  What do you mean AMG doesn't have financials?

23  A.  It's not in existence yet, so to speak, it's not operating;

24  they are still operating CLK.  CLK continued to operate through

25  12/31 of 2008.  A tax lawyer had suggested, since AMG owned the

1    units, they could continue to operate the business as CLK

2    Management all the way to the end of the year.  So AMG didn't

3    become an operating business until January 1, 2009.

4    Q.   What did Mr. Mitchell need to do with these domains?

5    A.   He needed to buy the domains so they can begin and start

6    building Web sites and e-mail servers for AMG Services.

7    Q.   What do you mean domains?

8    A.   Well, I believe it was amgsrv.com, which would have been

9    the Web site for the company, and that would have been an

10   e-mail domain for any of the employees.

11   Q.   How were those purchased then?

12   A.   Buy them online.  Mr. Mitchell was going to godaddy.com, as

13   well as the Domains by Proxy, and he was registering those

14   domains.

15   Q.   How were they paid for?

16   A.   He used my firm credit card.

17   Q.   What did you do with those expenses?

18   A.   I would submit those expenses back to AMG and they were

19   reimbursed.

20   Q.   How did that relate to the term "Ragman"?

21   A.   As Mr. Mitchell was filling out the application for that

22   first domain, one of the requirements was to put a webmaster,

23   which is basically a point of contact for that domain, and Mr.

24   Mitchell told me he didn't want to put his name and asked me

25   who should I put, or who should he put.

```
 1    Q.  What did you tell him?

 2    A.  I said, I don't care.  I said, put Joe Shit the Ragman.

 3              MR. BATH:  Can we have Government Exhibit 1601, which

 4    has been admitted, up.

 5              Can we publish that to the jury, please.

 6              Can we blow up the bottom half of that, please.

 7    Q.  What is the date of this e-mail, Mr. Muir?

 8    A.  November 9, 2010.

 9    Q.  Mr. Mitchell is e-mailing you?

10    A.  Yes.

11    Q.  What is he asking?

12    A.  I would imagine it was either who should sign a document or

13    whose point of contact should go on some document.

14    Q.  Does he give you three suggestions?

15    A.  He does.

16    Q.  What are those?

17    A.  Me would be Mr. Mitchell, Blaine would have been Blaine

18    Tucker, or Mr. Ragman would have been Joe Ragman.

19    Q.  What do you tell him?

20    A.  I tell him, "You is fine."

21    Q.  The top essentially has a header of the document.

22    A.  The header of the e-mail, yes.

23    Q.  There is no other discussion, is there?

24    A.  No.  This is Mr. Mitchell forwarding my response on to

25    Blaine Tucker.
```

1    Q.  So Hallinan goes from '08 to early '10, correct?

2    A.  Yes.

3    Q.  It gets filed in the fall of '08?

4    A.  Yes.

5    Q.  Let's go back to the fall of '08 now.  All right?

6    A.  OK.

7            MR. BATH:  Can we put up, please, Defendants' 2202.

8    Q.  This has been admitted, Mr. Muir.

9            MR. BATH:  Can you blow that up, Eli, for us.

10   Q.  What is the date of this document?

11   A.  November 21, 2008.

12   Q.  It's from whom?

13   A.  It is from MTE Financial Services, signed by Troy Little

14   Axe.

15   Q.  It's addressed to NM Service?

16   A.  Yes.

17   Q.  What is it saying?

18   A.  It is saying that MTE is terminating its relationship with

19   NM Service Corp., including all agreements and powers of

20   attorney.  It specifically references the special power of

21   attorney dated July 31, 2008, and it's terminated and effective

22   immediately.

23   Q.  Did other tribes do this as well?

24   A.  Yes.  The Miami did it and the Santee.

25   Q.  Do you know why it was done?

1  A.  Yes.  When Mr. Hallinan filed the lawsuit, Mr. Schulte

2  reached out to Mr. Hallinan's lawyers, as well as to Mr. Smith,

3  and advised them he did not think it was a good idea for

4  Mr. Hallinan to be litigating in the manner that he was, and he

5  advised Mr. Hallinan that if he did not --

6          MR. VELAMOOR:  Objection.  Hearsay.

7          THE COURT:  Sustained.

8          Put a new question.

9  Q.  All three tribes terminated their agreement?

10  A.  Yes.

11  Q.  Are those the service agreements?

12  A.  I think they were management agreements.

13  Q.  Is that different than the service agreements that were

14  signed in '03 or '04, if you know?

15  A.  Yes.

16  Q.  So upon the termination, for instance, in Defendants' 2202

17  of the agreement, what is the agreement, if you know, between

18  Mr. Tucker and the tribes at that time?

19  A.  I don't think there was an agreement.

20          (Continued on next page)

21

22

23

24

25

1   Q.  There was no written agreement?

2   A.  No written agreement.

3   Q.  That you're aware of?

4   A.  No.

5   Q.  All right.  And that's the status for all three tribes?

6   A.  Yes.

7           MR. BATH:  You can take that down.

8   Q.  End of 2008, Colorado and California court actions are

9   still alive, going on?

10  A.  Yes.

11  Q.  Did anything happen for 2008 that changed your opinion on

12  the lawfulness of the tribal model?

13  A.  No.

14  Q.  I want to now go into 2009 and show you some exhibits that

15  have been admitted.

16          MR. BATH:  Can we show him government's 4031, please.

17  Could we blow that up.

18  Q.  What's the date of this email, do you know?

19  A.  It's -- pardon me.  It's dated February 5, 2009.

20  Q.  And the first, the bottom part of the email, who is Melissa

21  Davis?

22  A.  She was, I believe, Don's assistant.  I know she worked for

23  MNE.

24  Q.  And she's forwarding something to a number of people,

25  correct?

1  A.  Yes.

2  Q.  And somehow you get the email then?

3  A.  Yes.

4  Q.  How do you get it?

5  A.  Somebody would have forwarded it to me.  I don't know.

6  Q.  All right.  This document doesn't reflect how you got it?

7  A.  No.

8  Q.  And who do you send it to; what do you say?

9  A.  I then forward it, or respond and send it to Mr. Schulte,

10  and I say "Troy got one too; let's talk when you have time."

11  Q.  Do you know what this is about?

12  A.  I see the title of the attachment up there BBB.  I assume

13  this was a letter that the Better Business Bureau had sent to

14  Mr. Brady and apparently Mr. Little Axe.

15          MR. BATH:  Is there a second page to this, Eli?  Can

16  you look?  No?  Yes.  Can you show us the next page.  And can

17  you blow up the first third, top of that document, please.

18  Q.  Can you see that, Mr. Muir?

19  A.  Yes.

20  Q.  What's the date of this letter?

21  A.  January 30, 2009.

22  Q.  Who is it addressed to?

23  A.  Tom Gamble, Chief, Miami Tribe.

24  Q.  And it's from whom?

25  A.  The Better Business Bureau.

HaaWtuc4                    Muir - Direct

1          MR. BATH:  Can we come back out of that document just

2     a little bit.

3     Q.  It's a one-page letter?

4     A.  Yes.

5          MR. BATH:  Go back to the first page, please.

6     Q.  At some point in time, you get, you're made aware of this,

7     is that right?

8     A.  Yes.

9     Q.  What are you doing with the information?

10    A.  Probably assessing the situation and discussing it with Mr.

11    Schulte.

12    Q.  When you say Troy got one, who is Troy?

13    A.  That would be Troy Little Axe.

14    Q.  And why is Conly involved?

15    A.  He represents the tribes.

16    Q.  Do you remember anything more specifically about this?

17    A.  No.

18         MR. BATH:  All right.  Thank you, Eli.

19         Can we show defendants' 1304, which I show has been

20    admitted.  And can we blow that up, please, Eli.

21    Q.  What month are we in in 2009 here?

22    A.  This is March 26, 2009.

23    Q.  Who is Jared Marsh?

24    A.  Jared was a lawyer that I hired, and he was with my firm

25    and then eventually he became the general counsel for AMG

1  Services.

2  Q.  When did he come to join your firm?

3  A.  Probably late 2008, early 2009.

4  Q.  And then when did he become general counsel for, you say

5  AMG?

6  A.  Yes.

7  Q.  When did that take place?

8  A.  I think shortly after this email.

9  Q.  How many years had Mr. Marsh been out?

10  A.  I think Jared had about eight to ten years' experience at

11  that point.

12  Q.  He'd been in private practice?

13  A.  Yes.

14  Q.  When he joined you in the fall of '8 or so, did you have

15  other lawyers there at the time?

16  A.  Jared was the first lawyer that joined me.  Ultimately

17  there was two more.

18  Q.  Why is it he transitioned over to AMG?

19  A.  AMG wanted a full-time general counsel kind of in the

20  office to handle any of the normal HR issues, employment

21  issues, and so I suggested Mr. Marsh and he accepted.

22  Q.  Was he an associate or partner; what was his status with

23  your firm?

24  A.  My firm?  No, just an employee, associate.

25  Q.  When he moved to this AMG, did that change?

1    A.  Yes.  He became, he became a full-time employee of AMG.

2    Q.  But he was no longer associated with your firm?

3    A.  Yes.

4    Q.  OK.

5    A.  Well, he remained of counsel with my firm for quite some

6    time.

7    Q.  What's that mean, of counsel?

8    A.  It was an arrangement where Mr. Marsh could send

9    correspondence, appear in court under my law firm, but I didn't

10   pay him.  He wasn't my employee.  He had freedom to do what he

11   wanted to do, but he still was affiliated with my law firm.

12   Q.  This March 2009 email you're sending to a number of people

13   who are generally management?

14   A.  Yes.

15   Q.  What's the purpose of this communication?

16   A.  I was advising people that Mr. Marsh was going to take over

17   day-to-day operations or day-to-day legal responsibilities for

18   AMG.

19          MR. BATH:  All right.  Thank you.

20   Q.  From time to time, there was news articles you became aware

21   of, is that right?

22   A.  Yes.

23          MR. BATH:  I want to show him Government Exhibit 413,

24   please.  413, is there a second page?  Can you show the bottom

25   of the first page and the top of the second and highlight that

1    for us.  First message, please.

2    Q.  What's the month and year, please?

3    A.  April 13, 2009.

4    Q.  All right.  Who is this from?

5    A.  From Conly Schulte.

6    Q.  To whom?

7    A.  Me.

8    Q.  OK.  He references John Nyhan?

9    A.  Yes.

10   Q.  Who is John Nyhan?

11   A.  John was a lawyer with Conly's firm who practiced in

12   California.

13   Q.  This is Conly passing on some information about a potential

14   news story, is that right?

15   A.  Yes.

16           MR. BATH:  All right.  Can we scroll up, please, Eli.

17   And the second email, the next email, can you highlight that,

18   please.

19   Q.  And what do you tell -- what do you do with this

20   information?

21   A.  I forwarded this information on to Scott Tucker and Blaine

22   Tucker that night, and I said let's discuss in the morning.

23           MR. BATH:  Could we have the top email, please.

24   Q.  In the progression, the next thing is Mr. Tucker

25   responding?

1   A.  Yes.

2   Q.  And you, finally, respond to Scott and Blaine, correct?

3   A.  Yes.

4   Q.  Tell us what you mean when you say "the worst thing would

5   be for them to show up and Don begins to talk."

6   A.  What I mean there is for -- when a client or client

7   business is in the middle of litigation, I don't think it's a

8   good thing to show up and start talking to reporters.

9   Q.  Was AMG in litigation?

10  A.  Oh, yes.

11  Q.  Where was that?

12  A.  Pardon me?

13  Q.  What state?

14  A.  AMG at that point would have been -- well, I don't know.

15  AMG eventually got in the California case, but at this point

16  MNE is definitely and has been for quite a while in the

17  California and Colorado case, and I think there was probably a

18  class action in New Mexico by this point.  So the Miami's

19  businesses are definitely in quite a bit of litigation.

20  Q.  Do you know if a TV crew ever showed up?

21  A.  I don't think they did.

22          MR. BATH:  Thank you, Eli.

23  Q.  We've had some testimony about confidentiality agreements,

24  do you recall that?

25  A.  Yes.

1    Q.  I want you to take a look at a couple of emails about that.

2              MR. BATH:  Government Exhibit 1405, please.  This has

3    been admitted.  Is there a second page, Eli?  Can you just blow

4    up the bottom half, please.

5    Q.  This is what year?

6    A.  2009.

7    Q.  April?

8    A.  Yes.

9    Q.  All right.  Who is Kathy Robinson?

10   A.  Kathy was the head of HR.

11   Q.  And do other people work under her?

12   A.  Well, the "to" line, it was a management group, so that

13   would have been sent to quite a few people, and then all the

14   cc's were probably her staff.

15   Q.  When it says to management, there could have been a whole

16   bunch of other people in that group?

17   A.  Yes.

18   Q.  You're not in this email, correct?

19   A.  No.

20   Q.  But you're aware there were confidentiality agreements?

21   A.  Yes, I drafted them.

22   Q.  And what was the purpose of those agreements?

23   A.  Well, at that point AMG is becoming a pretty big company,

24   and we were also becoming aware that there were new

25   requirements coming up for entities that handled PII, which is

1  personal identifiable information.  So as a call center that's

2  handling loan products and taking payments, AMG is going to

3  start becoming responsible to ensure that it is protecting this

4  PII.

5      Additionally, the servicing business became very, I would

6  say, competitive, and a lot of the employees would leave and

7  maybe come -- they'd leave for certain periods of time.  They

8  would come back, especially a lot of the debt collectors.  So

9  what I wanted to ensure is that all the employees understood

10  the seriousness of the confidentiality of the information that

11  they would be handling on their day-to-day jobs.

12          MR. BATH:  Eli, could we pop out of that one and move

13  up to the next email.

14  Q.  This is a continuation of the discussion?

15  A.  Yes.

16  Q.  You're not in this email, is that correct?

17  A.  No.

18  Q.  OK.  And it says there "temporary and contract employees

19  sign the agreements"?

20  A.  Yes.

21  Q.  What is a temporary -- I know what temporary means.  What

22  is a contract employee?

23  A.  Some employees, primarily on the IT side of things -- I

24  should say people, would not become formal employees of AMG.

25  They'd work there under a contract, like an independent

1    contractor-type relationship.

2    Q.  So the agreements were signed, supposed to be signed?

3    A.  Yes.

4    Q.  By everyone?

5    A.  Yes.

6          MR. BATH:  Eli, if we could come out of that, please.

7    Q.  And this is from Mr. Tucker to yourself and Blaine?

8    A.  Yes.

9    Q.  Do you remember anything in particular about this email?

10   A.  No.

11         MR. BATH:  Pull out of there, please.

12         Could we have government's 1407.  I show that that's

13   been admitted.

14   Q.  Take a look at this, Mr. Muir, if you can.  I'm not sure if

15   this is --

16         MR. BATH:  Is there a second page, Eli?  No?  All

17   right.  Let's look at the bottom half or so.  Let's blow that

18   up.

19   A.  It's the same email.

20   Q.  Right.  That's what my question was.  Does it look to be

21   the same email?

22   A.  Yes.

23         MR. BATH:  OK.  Let's go to the top, Eli.

24   Q.  Same one?

25   A.  Yes.

1      MR. BATH:  Thanks very much, Eli.

2   Q.  Did the compliance department or did any departments ever

3   work with law enforcement agencies?

4   A.  Yes.

5   Q.  Which department would that be?

6   A.  The fraud department, that was inside the compliance

7   department, did.

8   Q.  What kind of work would they be doing with law enforcement

9   agencies?

10      MR. VELAMOOR:  Objection, your Honor.  Relevance.

11      THE COURT:  Sustained.

12  BY MR. BATH:

13  Q.  Did you ever have any contact with law enforcement

14  agencies?

15      MR. BATH:  Same objection.

16      THE COURT:  Sustained.

17  BY MR. BATH:

18  Q.  Do you remember there was a witness the government called,

19  Alton Irby?

20  A.  Yes, I do.

21  Q.  Did you know Alton?

22  A.  I did.

23  Q.  When did you first meet him?

24  A.  I think I was on some teleconferences with Mr. Alt -- Irby

25  in late 2008, and I met him in person in 2009.

1    Q.  Do you remember he testified about a declaration he made in

2    the case?

3    A.  Yes.

4    Q.  All right.  Did you have involvement in -- with Mr. Irby or

5    with people --

6           MR. BATH:  Bad question.  I'm sorry.  Rephrase.

7    Q.  What did that lawsuit allege that Mr. Irby was involved in?

8    A.  The lawsuit alleged that a different customer of Selling

9    Source, run by former employees of Selling Source, had hacked

10   into their network and were stealing leads.

11   Q.  Was Mr. Irby involved in the purchase of Selling Source?

12   A.  Purchase of Selling Source?

13   Q.  Did he purchase it?

14   A.  Oh, London Bay.  He was the primary partner of London Bay,

15   the entity that purchased Selling Source, yes.

16   Q.  What year would that be?

17   A.  2007.

18   Q.  Now we're in 2009?

19   A.  Right.

20   Q.  Did it come to your attention about potential theft of

21   information from Alton Irby's company?

22   A.  Yes.

23   Q.  Generally, how did that information come to you?

24   A.  A lawyer named John Hancock, who used to be the in-house

25   lawyer for Selling Source and then left and started his own

1    firm, began representing the company that was stealing the data

2    from Selling Source, and as part of his work for that new

3    company, he sat in on a solicitation that those individuals

4    made to try to raise funds for their new business.  And during

5    that presentation, those gentlemen made it clear that they

6    weren't paying for leads, and that's why this business was

7    going to be very profitable.

8        That was quite a surprise to Mr. Hancock, because from his

9    prior days at Selling Source, he knew how expensive they were.

10             MR. VELAMOOR:  Objection.  Relevance.

11             MR. BATH:  I'll connect it, Judge.  I'm not offering

12   it for the truth.

13             THE COURT:  That's fine.

14   Q.  Go ahead.

15   A.  I was done.

16   Q.  OK.  All right.  So Mr. Honeycock received this

17   information?

18   A.  Hancock, yes.

19   Q.  What's he tell you about it?

20   A.  He actually called me that night to tell me about it.

21   Q.  When he said, We're not paying for lead, what do you mean

22   by leads?

23   A.  So Selling Source was a lead generator, and it would sell

24   leads to online lenders.

25   Q.  What's that mean, leads?

A.  If somebody went to a website and typed payday loan, and

the different priorities of where you'd be on that first page

for Google search was set by how much different companies were

paying to be on that first page.  And Selling Source had a vast

array of websites, and I think they're called aggregators,

where they would try to get as many of those applications as

they could.  They would score those applications and then

they'd sell them to lenders.

Q.  And are those leads part of the cost of being in the payday

lending business?

A.  Probably the biggest cost.

Q.  So Hancock has this information, and he calls you?

A.  Yes.

Q.  Did he tell you about the information?

A.  Yes.

Q.  What do you do, if anything, with the information?

A.  I call Mr. Tucker and tell him.

Q.  Are you involved any more in communicating that

information?

A.  At that point, no.

Q.  But at some point in time, Mr. Irby's company sues the

alleged thief?

A.  Yes.

Q.  And in that lawsuit, Mr. Irby files this declaration?

A.  Yes.

1   Q.  That was introduced at the trial, correct?

2   A.  Correct.

3   Q.  This trial?

4   A.  Yes.

5           MR. BATH:  Can we show Government Exhibit 2803.  And

6   is that published to the jury?

7           Could you zoom in on the bold part in the middle of

8   the page.

9   Q.  What is this document, Mr. Muir?

10  A.  This is a declaration that Mr. Irby signed in filing that

11  motion where they were trying to get a temporary restraining

12  order.

13  Q.  And the parties to this lawsuit are on the left-hand side?

14  A.  Yes.

15  Q.  And one is Selling Source?

16  A.  Yes, it's the plaintiff.

17  Q.  That's Mr. Irby's company?

18  A.  Yes.

19  Q.  And Red River Ventures is who they're suing?

20  A.  Right, and those are all the individuals.

21  Q.  Subsequent to this, Mr. Irby filed another document, did he

22  not?

23  A.  The --

24  Q.  In this lawsuit?

25  A.  The company filed another -- filed a pleading.

HaaWtuc4                    Muir - Direct

1    Q.  OK.

2            MR. BATH:  Can we show 2804, please.  I show that's

3    been admitted.

4    Q.  Do you see 2804?

5    A.  I do.

6    Q.  All right.  And what is this document?

7    A.  I think it's the same document.  Well, it's titled page 1

8    of the declaration of Alton Irby.

9            MR. BATH:  Let's go to the second page, please, Eli.

10   Q.  Do you see in this document paragraph 4 is gone?

11   A.  Yes.

12   Q.  What is your understanding?

13   A.  My understanding is that Selling Source filed a motion in

14   that court and wanted certain pleadings and documents redacted

15   because they had since realized they were not accurate when

16   they were filed.

17   Q.  In the original declaration --

18           MR. BATH:  Can we go back to 2803, please.

19   Q.  This is the first one I showed, correct?

20   A.  Yes.

21           MR. BATH:  Can we go to that second page, Eli.  I'm

22   sorry.  I'm looking for the paragraph.  Go to the next page,

23   Eli.

24           THE WITNESS:  I think you're looking for paragraph 4

25   on the prior page.

1      MR. BATH:  I'm looking at 8 first.  Let's go to

2  paragraph 8, Eli, and blow that up, please.

3  Q.  Do you see paragraph 8 there?

4  A.  Yes.

5  Q.  This was in the original declaration?

6  A.  Yes.

7  Q.  At some point in time, did you become aware of the

8  information here?

9  A.  Yes, I did.  When Mr. Irby first filed it, I became aware

10  of it.

11  Q.  All right.  Once you reviewed this, what did you do, if

12  anything?

13  A.  I called Mr. Douglas -- I'm sorry, Mr. Humphreys, Sam

14  Humphreys.

15  Q.  Who is he?

16  A.  He's one of the three partners of London Bay with Mr. Irby

17  and then Douglas Tulley.

18  Q.  And what did you tell him?

19  A.  I asked him if he had seen the declaration that Mr. Irby

20  had filed, because he was incorrectly saying that AMG is

21  Selling Source's largest customer and that Mr. Tucker owned

22  AMG.

23  Q.  Subsequent to that conversation, did 2804 get filed?

24  A.  Yes.

25      MR. BATH:  Could we put 2804 back up.  And can we go

1    to paragraph 8 of that document, please, Eli, and blow that up,

2    7 and 8, for some context.

3    Q.  So 2804 gets filed by Selling Source, correct?

4    A.  Yes.

5    Q.  And Mr. Irby, in fact, testified about why he filed this

6    second declaration at this trial?

7    A.  Yes.

8         MR. BATH:  OK.  Thank you, Eli.

9    Q.  Did you at some point in time meet with Mr. Irby in San

10   Francisco?

11   A.  I met him once in San Francisco, and then I also met with

12   him in Las Vegas.

13   Q.  OK.  I want to show you government's 2807.

14        MR. BATH:  Is there a second page, please, Eli?  Put

15   that up for the jury, please.  Can we go to -- is there a third

16   page, or is this all there is?  There's four pages?  Let's

17   scroll.

18   Q.  This last page, Mr. Muir, is this part of your email?

19   A.  Yes.

20        MR. BATH:  Could we go to the third page, Eli.

21   Q.  Does this page have anything to do with Alton Irby?

22   A.  No.

23   Q.  What's this have to do with?

24   A.  This was Whamtech, was another one of Mr. Tucker's

25   investments.

1              MR. BATH:  Let's go ahead and blow up the date and

2      time so we can all see this.

3      Q.  What's the date?

4      A.  January 3, 2011.

5              MR. BATH:  Could we go down to the first two

6      paragraphs.

7              MR. VELAMOOR:  Objection, your Honor.  Relevance.

8              MR. BATH:  Since the government introduced this, I'm

9      just going to quickly get through here, but I don't want

10     anybody to think I don't want to show the whole document.

11             MR. VELAMOOR:  That's fine.  Withdrawn.

12     Q.  You said Whamtech, and that's listed in that second

13     paragraph, is that right?

14     A.  Yes.

15     Q.  All right.  And this was a separate business you were

16     working on for Mr. Tucker?

17     A.  Yes.

18             MR. BATH:  Great.  Let's go to the next page.

19     Q.  See the bottom half?

20     A.  Right.

21     Q.  What's this portion deal with?

22     A.  Again, it's Whamtech.

23     Q.  Nothing to do with Mr. Irby?

24     A.  Nothing.

25             MR. BATH:  OK.  Do the top half, please.

1   Q.  And then the topic changes, is that correct?

2   A.  Yes.

3   Q.  Where does it change on this document?

4   A.  I forward this email on to Mr. Tucker, and then in

5   responding to the email about Whamtech, he asks me, How bad is

6   Alton.

7   Q.  That's the top email?

8   A.  Yes.

9          MR. BATH:  If we could go to the first page then, Eli,

10  and the bottom third.

11  Q.  You respond what?

12  A.  I say physically, question mark, he's fine.

13  Q.  And Mr. Tucker asks what?

14  A.  Mentally.

15         MR. BATH:  Can we move up then, Eli.

16  Q.  You talk about this prep will have him ready; what's going

17  on?  What's this in relation to?

18  A.  In the Red River lawsuit, Mr. Irby was going to be deposed,

19  and so Selling Source had hired new counsel, and Mr. Humphreys

20  and Mr. Douglas asked me to go out and help the new lawyers

21  prep Mr. Irby for his deposition.

22         MR. BATH:  OK.  Can we go to the top, whole top third.

23  There you go.  Thank you.

24  Q.  Mr. Tucker says what?

25  A.  Mr. Tucker said he needs not to talk.

1    Q.  What's your response to that?

2    A.  I say not really, we're trying to clean up and correct that

3    declaration, and I'm meaning that they would talk about that

4    and do that.

5    Q.  The declaration being what we saw earlier?

6    A.  Yes.

7              MR. BATH:  Thank you, Eli.

8    Q.  I want to move to the New York AG and County Bank.  Do you

9    recall becoming aware of that at some point?

10   A.  Yes.

11   Q.  Do you remember when that would have been?

12   A.  Early 2007, maybe late 2006.

13   Q.  And was there some type of settlement at some point between

14   the New York AG and County Bank?

15   A.  Yes, there was.

16   Q.  Did you become aware of that?

17   A.  Yes, there was a press release.

18   Q.  And was there discussion between you and Mr. Tucker and

19   maybe others about that settlement?

20   A.  Yes.

21   Q.  And did you read -- you sort of looked into when the --

22             MR. BATH:  Bad question.

23   Q.  Did you have occasion to look at the website or look at a

24   press release or anything like that about that when that took

25   place?

1    A.  Yes, I did.

2    Q.  Again, you weren't involved in any County Bank lending?

3    A.  Not at all.

4    Q.  Didn't have any particular knowledge about anything, did

5    you?

6    A.  No.

7    Q.  I want to now move to 2010.  Did you begin to have more

8    contact with the tribes at that point?

9    A.  Yes, at the end of the Hallinan settlement, I began to more

10   frequently interact with the tribes as well as make more

11   visits, more frequent visits down to the reservations.

12   Q.  And did you visit all the reservations?

13   A.  Oh, yes.

14   Q.  How often, can you give us a sense, in 2010, '11, '12, you

15   went?

16   A.  It would depend.  The Santees were in remote Nebraska, so

17   maybe once a year for them.  The Miamis and the Modocs, it's

18   about a two hour and thirty-minute drive, direct south of

19   Kansas City, so I would see them much more frequently, four to

20   five, six times a year.  Additionally, they would come to

21   Kansas City as well.

22   Q.  Would the Santees come to Kansas City?

23   A.  Oh, yeah.

24   Q.  And your main contact person for the Miami was whom?

25   A.  The main, kind of combination of Mr. Brady and Chief

1   Gamble.

2   Q.   OK.

3   A.   Mr. Brady more so, but definitely Chief Gamble.

4   Q.   And how about the Modoc?

5   A.   That would have been Mr. Little Axe as well as Chief

6   Follis.

7   Q.   And how about the Santee?

8   A.   It would've been primarily Lee Ickes, and Robert Campbell

9   also would have been along with him as well as Chairman

10  Trudell.

11  Q.   Can you spell Ickes?

12  A.   I-C-K-E-S.

13  Q.   And how about Trudell?

14  A.   T-R-U-D-E-L-L.

15  Q.   When you went and visited at the reservations, did you ever

16  have occasion to meet with tribal council or business

17  committees?

18  A.   Yes.

19  Q.   And how would those come about, those meetings?

20  A.   They would have formal meetings, and oftentimes if I was

21  there, I was invited to attend those meetings.

22  Q.   Why would you be invited to attend?

23  A.   I would give a report on any legal issues.

24  Q.   You told us about how many times you would go per year.

25  How many times would you give a presentation, or would that

1   happen most of the time?

2   A.  It wouldn't happen most of the time.  I would say the

3   Santees maybe one a year.  The Modocs, that was a little more

4   frequent.  And the Miamis were more frequent, more frequent

5   than the other ones, maybe three to five times a year,

6   depending upon the year and what was going on.

7   Q.  Who were you representing at that time?  Let's call it

8   2010.

9   A.  At that particular time, I was representing the tribes.

10  Q.  Were you doing it in conjunction with anyone else?

11  A.  Yes.

12  Q.  And who was that?

13  A.  Mr. Schulte, Mr. Schulte's firm and other lawyers in the

14  firm.

15  Q.  I want to move to mid-2010 and talk about this Scott Tucker

16  v. AMG lawsuit.  All right?

17  A.  OK.

18  Q.  The AMG-CLK merger took place when?

19  A.  June 2008.

20  Q.  Were you involved at all in that?

21  A.  No.

22  Q.  We saw an email with you on the EINs, is that right?

23  A.  Right.

24  Q.  Now we're in 2010, and I want to show you Government

25  Exhibit 1313.

1    A.  OK.

2            MR. BATH:  Can we see the second page of that, Eli.

3    The bottom.  That's the third page?  All right.

4    Q.  Did you see this document or were you involved in this,

5    receiving this document or sending it out, anything like that,

6    if you know?

7    A.  I was aware of the check.  I had asked for it.  I'd asked

8    for it to be drafted.

9    Q.  OK.  Who did you ask the check -- who did you ask that of?

10   A.  I asked -- oh, I was having discussions with Mr. Brady, and

11   we were asking the AMG accounting department to draft the

12   check.

13   Q.  What's the check for?

14   A.  It's for the purchase of CLK back from 2008.

15   Q.  It had not been accomplished?

16   A.  No, it had not.

17   Q.  And when did you become aware of that?

18   A.  I was aware at, of it periodically, because Mr. Brady would

19   discuss it with me.

20   Q.  So you made the request for the check to be issued, is that

21   right?

22   A.  Yes.

23   Q.  But were not involved in this document?

24   A.  No.

25   Q.  Did you become aware of the check and the document at some

1    point?

2    A.  Yes.

3            MR. BATH:  I want to show you government's 4026,

4    please.  Government's 4026, which I show has been admitted.

5    Q.  Is this an email between you and Mr. Tucker?

6    A.  Yes, it is.

7            MR. BATH:  Is there a second page to this, Eli?  OK.

8    Can you blow up the bottom half.

9    Q.  What's the date of this?

10   A.  June 30, 2010.

11   Q.  Right.  And what are you talking about?

12   A.  This check that we previously looked at.

13   Q.  All right.  And what are you saying here?

14   A.  I was asking Mr. Tucker did he ever get the check down to

15   Mr. Brady for signature.

16   Q.  All right.

17           MR. BATH:  Can we go to the top email.

18   Q.  Did Mr. Tucker get back to you?

19   A.  Yes.

20   Q.  And you respond?

21   A.  I do.

22   Q.  What legal importance, if any, did it have to make sure

23   that the check got issued?

24           MR. BATH:  You can take that down, Eli.  Thanks.

25   A.  There was a class action in California, and in that

1    litigation, those attorneys had made the argument that the

2    CLK-AMG merger wasn't complete under Kansas law, and therefore,

3    they were asking the court not to recognize the merger of CLK

4    and AMG.

5    Q.  After those allegations were made, then what action did you

6    take?

7    A.  That's when I began researching the issue to see if there

8    was some way in which we could accomplish the merger in Kansas

9    law without AMG filing anything, because I knew they wouldn't.

10   Q.  Why wouldn't they?

11   A.  Because there's an argument that if a tribal entity files

12   anything with a state, such as -- or with an agency, like a

13   secretary of state, that they have then submitted to the

14   jurisdiction of that state and they can sue and be sued.

15   Q.  So what had not been completed under Kansas law?

16   A.  Under Kansas law, there was never a certificate of merger

17   filed with the Kansas secretary of state.

18   Q.  Why is that needed?

19   A.  That's a statute that we didn't know at the time, but the

20   statute mandated that in order to complete the merger under

21   Kansas law, the surviving entity, in this place -- in this

22   case, it's AMG -- had to file a certificate.

23   Q.  Were you involved in the AMG-CLK merger?

24   A.  No.

25   Q.  When were you first asked to look at this?

1  A.  In -- right about here in 2010, in response to the

2  allegations made in the lawsuit by the other attorney.

3  Q.  Was the check being issued one of the steps that you

4  recommended?

5  A.  Yes.

6  Q.  And then the next step was to do some research?

7  A.  Yes.

8  Q.  Before you did the research, did you talk to Conly Schulte

9  about AMG?

10  A.  Absolutely.  We, we would have discussed the allegations

11  made in the, in the litigation in California.

12  Q.  And did he file on behalf of AMG the merger?

13              MR. VELAMOOR:  Objection, your Honor, to the leading.

14              THE COURT:  Yes.  Avoid leading.  Sustained.

15              MR. BATH:  I'll rephrase it.

16  Q.  Were any documents filed with the state of Kansas by AMG?

17  A.  No.

18  Q.  Did you request that of Mr. Schulte?

19  A.  We discussed it.  I think that would be a hollow request.

20  Q.  What did you then do to determine what could take place?

21  A.  We researched it.  I want to go back, actually.  I mean, I

22  did request Mr. Schulte, I did request of Mr. Schulte if AMG

23  would be willing to file, and he told me no.  And so then I

24  began to research was there some other way to effectuate that

25  merger.

1    Q.  And so what was the first step in your research?

2    A.  I went to the statute.  I went to the Kansas limited

3    liability corporations act -- company act, rather.

4    Q.  Why did you do that?

5    A.  Because it was an LLC, and I figured that was the best

6    place to start.

7    Q.  And did you find a statute, a law, that you thought

8    applied?

9    A.  I did.  As I was reading the table of contents, a statute

10   jumped out at me, because the title was recordation by judicial

11   execution.

12   Q.  What's recordation mean?

13   A.  Recording a document with the secretary of state.

14   Q.  And the rest of the title is what?

15   A.  By judicial execution.

16   Q.  What's that mean?

17   A.  That would mean a judge or a court would order it be done.

18   Q.  Did you look at that statute?

19   A.  I did.

20   Q.  Did you come to a conclusion on its applicability?

21   A.  I did.

22   Q.  What did you determine?

23   A.  I determined that it was directly on point.

24   Q.  So what was the next step?

25   A.  I then began to draft a petition, wanted to see what that

1  would look like, because the statute talked about a party

2  needed to petition the district court, and so that's -- drafted

3  the petition.  As part of that, I reached out to Mr. Smith.  I

4  thought he'd be a good attorney to represent Scott on behalf of

5  that matter, and I also talked to Mr. Schulte about it.

6  Q.  Why did you tap Pete Smith?

7  A.  I hadn't been in court in a while, and I just didn't feel

8  comfortable going to court and asking for this, what I would

9  call a very obscure statute that I go ask a judge to enforce,

10  and I felt a more experienced attorney would be better, better

11  handle -- better equipped to handle that lawsuit.

12  Q.  So you drafted the petition?

13  A.  Yes, I did.

14  Q.  And what was the petition -- what was the lawsuit asking?

15  A.  The lawsuit simply asked that the court either ordered AMG

16  to file a certificate or it ordered the secretary of state to

17  file the certificate.

18       MR. BATH:  Can we look at government's 2605, which I

19  think has been admitted.  Can you blow up the top there.

20  Q.  So what are we seeing here on 2605?

21  A.  This is an email that I'm sending to Caitlin Shively,

22  that's Pete's assistant, and I'm sending a draft of the Tucker

23  v. AMG petition.

24  Q.  And that's what it says the attachment is, right?

25  A.  Right.

1          MR. BATH:  Can we look at 2608, please.

2     Q.  And what are we seeing here in 2608?

3     A.  This is an actual draft of the petition -- oh, I'm sorry.

4     This is the file-stamped copy.  This has been filed.

5     Q.  This is the petition that got filed?

6     A.  Yes.

7          MR. BATH:  All right.  Can we blow up the top half so

8     we can take a look at it.

9     Q.  Up in the upper right-hand corner, looks like a stamp?

10    A.  Right.

11    Q.  What is that?

12    A.  Filed, shows this petition was filed with the district

13    court on July 8, 2010.

14    Q.  Who puts that stamp on there?

15    A.  Court clerk.

16    Q.  Is that called a file stamp?

17    A.  Uh-huh.

18    Q.  Essentially we see the caption here, correct?

19    A.  Right.

20    Q.  And it's Mr. Tucker v. AMG?

21    A.  Yes.

22         MR. BATH:  Can we get to the next portion, Eli, and

23    blow that up.

24    Q.  So there's a case cap -- there's a section here that says

25    parties, jurisdiction and venue?

1  A.  Yes.

2  Q.  What information's being conveyed in the lawsuit here?

3  A.  In almost any lawsuit, there is a part of the preliminary

4  information that you put in the lawsuit to advise the court who

5  the parties are.

6  Q.  You give the court basic background?

7  A.  Yes.

8        MR. BATH:  Eli, can we go to the next section, the

9  next page, I guess, five through nine or so.

10 Q.  Now, Mr. Smith filed this, but you drafted it, correct?

11 A.  Yes.

12 Q.  I want to direct your attention to paragraph 9.

13 A.  OK.

14 Q.  What are you telling the court here?

15 A.  That as a result of the purchase agreement, Mr. Tucker no

16 longer owned CLK, and therefore, he can't execute any documents

17 on behalf of CLK unless AMG authorizes him to do so.

18 Q.  Can AMG authorize him to execute this document, execute a

19 merger document?

20 A.  No.

21       MR. BATH:  Can we go to the next section, Eli.

22 Q.  Now we're in paragraphs 10 through 13, correct?

23 A.  OK.

24 Q.  On paragraph 11, what are you telling the court?

25 A.  Well, there what we're saying is that plaintiff, and that's

1   Scott Tucker, has no right to access any of the books or

2   records of CLK.  And what we're referring to there is Scott

3   Tucker, the individual.  He clearly was still working at AMG,

4   but that didn't give him the right to go access any books or

5   records in his individual capacity.  He can only do that as an

6   employee.

7   Q.  What do you mean "right"?

8   A.  Had Mr. Tucker went in and taken books and records and

9   walked out, he would have been violating company policy.  He

10  couldn't go grab, for his own personal use, any books and

11  records of the company.

12          MR. BATH:  If we could go to the next few paragraphs.

13  Q.  What do these paragraphs tell the Court?

14  A.  It's saying -- No. 14 is saying that CLK is forfeited with

15  the Kansas secretary of state, hasn't filed any documents since

16  that time.

17          15 is saying that Mr. Tucker has no ability or authority to

18  file an annual report.  The reason that's relevant, had he done

19  so, he could have got the company out of forfeited status.

20          And then 16 and 17 are reciting the Kansas statutes upon

21  which this lawsuit is based.

22  Q.  Going back to 15, what do you mean Mr. Tucker had no

23  ability or authority to file an annual report?

24  A.  Once he had sold the units of CLK to AMG, he couldn't go

25  file anything on behalf of CLK or AMG.

1          MR. BATH:  All right.  If we could do below there,

2     Eli.  Thank you.

3     Q.  18 is telling the court what?

4     A.  That AMG has failed or refused to file a certificate with

5     the Kansas secretary of state.

6     Q.  19 is doing what?

7     A.  19 recites the statute of what a certificate of merger must

8     contain.

9          MR. BATH:  All right.  Could we go below that.

10    Q.  The top of this page is a continuation of the previous one?

11    A.  Direct quote from the statute.

12         MR. BATH:  Eli, can you go to the next -- thank you.

13    Q.  In 22, tell us what you're communicating to the court.

14    A.  We're saying that Mr. Tucker is facing potential

15    liabilities because of AMG's failure to file a certificate of

16    merger.

17    Q.  Why is that?

18    A.  Under Kansas law, if an entity becomes defunct, or here is

19    forfeited, and it's either in the middle of litigation or is

20    sued later, if it has no ability -- it can't defend itself.

21    You can't have a defunct corporation go into court and

22    represent itself.  The court will say I don't recognize your

23    status, you're forfeited.  Under that situation there's a

24    possibility that if that forfeited entity winds up in

25    litigation and a judgment is obtained -- and generally it would

be a default judgment -- since it can't represent itself, then

whoever has that judgment can go back to the last individual

owner of that company.  In this case, that would have been

Mr. Tucker.

Q.  That's what you mean by potential liabilities?

A.  Yes.  And they weren't just potential.

            THE COURT:  Stop.

            THE WITNESS:  I'm sorry.  OK.

            MR. BATH:  If we could go to the next paragraph.

Q.  Paragraph 25, what are you communicating?

A.  We're reciting the actual statute that the lawsuit was

based upon.

Q.  And 26?

A.  26 we're again reiterating that if the court doesn't direct

a certificate to be filed, Mr. Tucker will face potential

liabilities.

Q.  And 27?

A.  27 is almost like the conclusion to the lawsuit, that says

because of all the facts recited above, this court should order

the certificate to be recorded.

            MR. BATH:  Eli, is there anything below that?

Q.  And the last paragraph here generally is what?

A.  It's called a prayer for relief.  In lawsuits you need to

tell the court what you want, and so here, we're asking the

court to order the Kansas secretary of state to order an

1   appropriate certificate reflecting the merger of CLK into AMG

2   as of June 24, 2008.

3   Q.  Why that date?

4   A.  Well, that was the date of the original purchase agreement.

5   That was the date that the Miami tribe merged CLK into AMG

6   under tribal law.

7           MR. BATH:  Could we go back to the very first page,

8   the upper right-hand corner, Eli.

9   Q.  This is filed on what date, again?

10  A.  July 8, 2010.

11  Q.  I think we heard from Mr. Smith essentially the lawsuit

12  gets filed, and what's the next step that happens?

13  A.  In Kansas, in this particular lawsuit, AMG had 30 days to

14  respond.

15          MR. BATH:  Can we go to 2607, please, Eli, and I show

16  that's been admitted, so you can publish that.  If we could

17  blow that up, please.

18  Q.  Is this an email from you?

19  A.  Yes.

20  Q.  On July 8?

21  A.  Yes.

22  Q.  OK.  And what information are you transmitting?

23  A.  Again, this is with Mr. Smith's secretary, and I'm telling

24  her that the address for the summons, and that's the document

25  on which a court serves a lawsuit, should be 10895 Lowell.

1    Q.  There's something down below, paren, "I've seen the

2    clerk's"?

3    A.  Right.

4    Q.  Is that from her?

5    A.  Yes.

6    Q.  Is that necessarily relevant?

7    A.  It is, because if it's an in-state defendant, you only have

8    20 days, but since AMG was a wholly owned entity of a tribe, it

9    would have been considered an out-of-state defendant, and even

10   though it was served in Kansas, it would have 30 days to

11   respond.

12              MR. BATH:  OK.  Thank you, Eli.

13              Can we show government's 2612.  I show that's been

14   admitted.  Please publish that.  Go to the top third, please.

15   Q.  So what's the date of this?

16   A.  July 26, 2010.

17   Q.  And from whom to whom?

18   A.  It's from Mr. Schulte to Mr. Smith.

19   Q.  And what's it about?

20   A.  It is about the Tucker v. AMG lawsuit.

21              MR. BATH:  Eli, can we go down a little further,

22   please, to paragraph -- you can do both.

23   Q.  Is this before or after you'd gone to court?

24   A.  This is before.  I believe so.

25       No, I think toward -- the 28th, I believe.

1    Q.  Were you copied on this letter?

2    A.  No.

3    Q.  Do you know whether Mr. Smith advised you about the letter

4    or not?

5    A.  We discussed this letter.  I also discussed this letter

6    with Mr. Schulte before he sent it.  I think at some point Mr.

7    Schulte sent me a copy of this letter too.

8    Q.  Mr. Schulte essentially is indicating what to Mr. Smith?

9    A.  He's indicating to Mr. Smith that AMG is not going to file

10   an answer to this lawsuit.

11   Q.  Is that consistent with your discussions with Mr. Schulte?

12   A.  Yes.

13          MR. BATH:  Can we go to the bottom?  Is there any more

14   of that letter?

15          Thank you, Eli.

16   Q.  Did you attend a hearing, court hearing?

17   A.  I went to court with Mr. Smith that day, yes.

18   Q.  And did you ride together?  Did you meet him there?  Tell

19   us what happened next.

20   A.  His office was on the way to the courthouse from my office,

21   so I picked him up.

22   Q.  And you went and met with the judge?

23   A.  Yes.  It wasn't a hearing in the courtroom.  The judge

24   invited us back to his chambers.

25   Q.  And what took place back there?

1   A.  Mr. Smith began discussing the case.  Mr. Smith had brought

2   an actual statute book with him, and after the judge read the

3   petition and Mr. Smith reiterated the statute, the judge said,

4   Seems like the situation we have here, and he signed the order.

5        MR. BATH:  Can we look at government's 2610, please.

6   This is the first page of this document, and can you blow up

7   the first third or so, Eli, please.

8   Q.  What is this?

9   A.  This is a certificate of merger that was filed for this

10  case.

11  Q.  Right.  And the date it was filed?

12  A.  July 29, 2010.

13  Q.  With the clerk of Wyandotte County?

14  A.  Yes.

15  Q.  Does it discuss the relief you're seeking?

16  A.  Yes.

17        MR. BATH:  Can we go down just a little bit more, the

18  rest of that page.

19  Q.  Did you or Mr. Smith prepare the order?

20  A.  I prepared the order.

21  Q.  And we see a signature, a stamp of a Judge David Boal?

22  A.  Yes.

23  Q.  B-O-A-L?

24  A.  Yes.

25        MR. BATH:  Can we go to the next page.  The first --

1    we're still looking at government's 2610.  Eli, can we capture

2    right below where there's some verbiage there in bold.  There

3    you go.

4    Q.  What do we see on this page of the document?

5    A.  This is the order that Judge Boal signed that directed the

6    execution and recordation of the certificate of merger.

7    Q.  Same date as before, the 29th?

8    A.  Yes.

9            MR. BATH:  Go below that, please, Eli.

10   Q.  This would have been presented to the judge?

11   A.  Yes.

12   Q.  Would he have signed this?

13   A.  Yes, he would have.

14           MR. BATH:  Eli, can you go to -- let's blow up, maybe

15   it's the next page.

16   Q.  Does this order essentially set forth much of what's in the

17   petition, or is it different?

18   A.  It doesn't have as much detail as the petition, but it sets

19   forth many of the things that were needed in the petition to

20   get the relief that was requested.

21           MR. BATH:  Can we go to the bottom third and blow that

22   up.

23   Q.  And do we see the stamp with the signature of Judge Boal?

24   A.  Yes.

25   Q.  What's done with this government's 2610 once the district

1   court judge grants this; what happens next?

2   A.   Mr. Smith has a runner, which a lot of law firms do,

3   they're not as -- they're not as needed as they used to be

4   because of electronic filing, but he has a runner that works

5   for him who takes this order and he takes the certificate, and

6   he drives to Topeka, to the secretary of state's office, to

7   have it recorded.

8   Q.   Recorded meaning filed?

9   A.   Filed, yes.

10          MR. BATH:   Thank you, Eli.  You can take that down.

11  Q.   We've seen a series of emails introduced about you talking

12  with others about this result, is that correct?

13  A.   Yes.

14  Q.   How would you describe those emails?

15  A.   Bragging, arrogant, embarrassing.

16          MR. BATH:   Can we show 2618, government's 2618.  And

17  is there a second page?

18  Q.   The second page is the bottom part of your email message?

19  A.   Yes.

20          MR. BATH:   Go to the first bottom third or so, Eli.

21  Q.   Reading from the bottom to the top, tell us what's going on

22  here.

23  A.   I sent an email to Scott and Blaine that evening in very

24  large font with bold that says "filed with the Kansas secretary

25  of state."

1   Q.   And Mr. Tucker responds?

2   A.   Responds and says "Now what happens"?  And I respond in a

3   sentence or two of the email.

4   Q.   Is there more to this email then?

5           MR. BATH:  Thank you, Eli.

6   A.   Yes.  Scott says, "Wild."  I say, "Brilliant."  And he

7   says, "Yes, it is, counselor."

8           MR. BATH:  Thank you, Eli.

9           Can we look at 2619 now, and that's also been

10  admitted.  Is there a second page to this, Eli?  No?  OK.

11  Thank you.  I need you to do the bottom third or so.

12  Q.   What's going on here?

13  A.   This is a continuation of the email chain, about the

14  filing.  This was sent pretty early Friday morning.  I'm

15  reporting that the website shows CLK as merged out of existence

16  and there was no mention of AMG.

17  Q.   OK.

18  A.   Mr. Tucker asks, "Is that good?"

19  Q.   OK.

20          MR. BATH:  You can go up, Eli.

21  A.   I then respond and tell him, "From a legal point of view,

22  this is perhaps the best thing I'll ever pull off for you as a

23  lawyer.  You just 'dumped' untold liabilities, which could have

24  easily gone into the millions, tens of millions."

25  Q.   When you say pull off, do you mean something improper?

1    A.   No.

2    Q.   What do you mean by this?

3    A.   I mean I accomplished this in a very short period of time.

4    Q.   What do you mean by untold liabilities?

5    A.   CLK, and then AMG after, was in the middle of class action

6    lawsuits in New Mexico and California, and because Mr. Tucker

7    no longer owned CLK and couldn't defend himself in those

8    lawsuits, he would have been facing potentially tens of

9    millions of dollars in class action judgments.

10   Q.   Why would they become judgments?

11   A.   Because like I said earlier, CLK was forfeited, couldn't

12   defend itself.  They couldn't file anything.  If the court

13   didn't recognize the merger of CLK and AMG under tribal law,

14   then CLK would have become the defendant without any defense,

15   and a judgment more than likely would have been rendered.

16             MR. BATH:  Move to the top of that, please, Eli.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1    Q.  More discussions between you and Mr. Tucker?

2    A.  Yes.

3              MR. BATH:  Thank you, Eli.

4              Can we go to Government's 2620.

5              THE COURT:  Ladies and gentlemen, let's take our

6    mid-afternoon break.  Please do not discuss the case among

7    yourselves or with anyone.  See you back in ten minutes.

8              (Jury exits courtroom)

9              THE COURT:  See you in ten minutes.

10             (Recess)

11             (Jury present)

12             THE COURT:  You may continue, Mr. Bath.

13             MR. BATH:  Eli, can we please have Government Exhibit

14   2620, which is admitted.

15             Turn to the second page, please.

16             Can you blow up the top.

17   BY MR. BATH:

18   Q.  This is a continuation of these e-mails, Mr. Muir?

19   A.  Yes, it is.

20   Q.  You're communicating to who?

21   A.  Mr. Tucker on Saturday morning.

22   Q.  The last entry talks about Pete.  Who is that Pete?

23   A.  That would have been Pete Smith.

24   Q.  That was Pete telling you something?

25   A.  Yes.

1    Q.  The second line there -- the third, "want to be flies on

2    the wall when the opposing attorneys get this," who are you

3    referencing?

4    A.  That would have been the class action attorneys in

5    California.

6    Q.  Now you're referencing an Eddie Murphy movie?

7    A.  Yes.

8            MR. BATH:  Can we go up to the top one, please, Eli.

9            Thank you, Eli.

10   Q.  Mr. Muir, I want to next show you what has been admitted as

11   Defendants' 367.

12   A.  OK.

13           MR. BATH:  367, can we publish that.

14           Can you blow up the top half, please, Eli.

15   Q.  What is the date of this letter?

16   A.  August 18, 2010.

17   Q.  From whom to who?

18   A.  It's from Mr. Schulte to Mr. Brady.

19   Q.  There is a big block that's redacted in the middle,

20   correct?

21   A.  Yes.

22           MR. BATH:  If we can go below there and blow that

23   paragraph up, please.

24   Q.  You would not have been copied on this correspondence,

25   correct?

1   A.  No, I would not have.

2              MR. BATH:  Thank you, Eli.

3              Can we please show Government Exhibit 2623, which has

4   been admitted.

5              If we can blow that check up.

6   Q.  Mr. Muir, do you remember these being introduced --

7   A.  I do.

8   Q.  -- a week or so ago?

9              What are we seeing on this first page of 2623?

10  A.  That's a check that my firm would have written to McDowell,

11  Rice, Smith & Buchanan as Mr. Smith's firm.

12  Q.  For what?

13  A.  $859.52.

14  Q.  Bad question.  What did this relate to?

15  A.  This would have related to an invoice that Mr. Smith's firm

16  would have sent.

17  Q.  So Mr. Smith's firm sends invoices to whom?

18  A.  To me.

19  Q.  What do you do with those?

20  A.  I then pay him.

21  Q.  Pay him how?

22  A.  I write him a check.

23  Q.  Personally?

24  A.  No, the firm does.  Sorry.

25  Q.  Then do you then get reimbursed?

1  A.  Then I submit an invoice to AMG for reimbursement of that

2  fee.

3         MR. BATH:  Can we go to the next page.

4  Q.  Does this exhibit consist of checks related to Smith's

5  work?

6  A.  Yes.

7  Q.  This is dated what and for what?

8  A.  August 5, 2010, same amount, $859.52.

9  Q.  This time from whom to who?

10  A.  This is from AMG Services to me.

11  Q.  Same amount as the first check, correct?

12  A.  Yes.

13         MR. BATH:  Go to the next page, Eli.

14  Q.  This is from whom to whom?

15  A.  This is from my firm to McDowell, Rice, Smith & Buchanan,

16  for $2,325.89.

17  Q.  And the next check?

18         The same amount?

19  A.  Yes.

20  Q.  From whom to whom?

21  A.  From AMG to my firm.

22  Q.  Was that unusual, this process of an outside firm sending

23  an invoice to you?

24  A.  No.

25  Q.  What was the understanding of AMG paying the legal bills?

1    A.  My understanding was that any work done for the lending

2    business would be reimbursed by CLK before and then AMG.

3    Q.  I want to take you into 2011 now and ask you, did you hear

4    of an agency called the Consumer Financial Protection Bureau?

5    A.  Yes.

6    Q.  What is that agency?

7    A.  That was an agency that was created by legislation that

8    became, I think they called themselves "the consumer watchdog."

9    It's a federal agency.

10   Q.  When did that come in existence?

11   A.  2010 was the legislation.  There was some intricacies

12   before the agency was, quote, open for business.

13   Q.  When did it open for business, do you know?

14           MR. VELAMOOR:  Objection, your Honor.  Relevance.

15           THE COURT:  Overruled.

16           MR. BATH:  I think I can tie it up.

17           THE COURT:  Withdraw the question and ask a new

18   question and maybe you can.

19   Q.  Was there a time when you interacted on behalf of your

20   clients with CFPB?

21   A.  Yes.

22   Q.  In 2011?

23   A.  I don't recall the year.  It was several times.  I don't

24   know for sure if it was 2011.

25   Q.  Did the Consumer Financial Protection Bureau have a

1    registration requirement?

2    A.  Yes.

3    Q.  What was that requirement?

4    A.  They wanted to start a portal for any lender over which

5    they supervised, and the portal was for complaints that any

6    consumer may have.  You can go to the CFPB's Web site, and

7    because the lender had registered with the CFPB, then they can

8    direct the complaint directly to you through the portal.

9    Q.  What kind of lenders fell under --

10               MR. VELAMOOR:  Objection, your Honor.  Relevance.

11               THE COURT:  Sustained.

12               MR. BATH:  Judge, can we approach?

13               THE COURT:  Sure.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BATH:  Your Honor, my proffer would be that

3   Mr. Muir on behalf of his clients registered with the CFPB from

4   this portal, so that if there were complaints they could be

5   forwarded to Mr. Muir or to the businesses.  And I think his

6   interacting with, essentially, regulatory agencies is sign of

7   his good faith and his belief that there was nothing unlawful

8   about this enterprise.

9          THE COURT:  The question I sustained the objection to

10  was a different question though.  Do you recall what it was?

11         MR. BATH:  I thought the question was whether they had

12  a registration requirement.

13         THE COURT:  What kind of lenders fell under the

14  requirement?

15         MR. BATH:  Sorry, Judge.  OK.  I will just direct it

16  to them.

17         THE COURT:  You may get another objection.  You may be

18  back here again.  You're welcome to do as you please, but I

19  sustain them as they are teed up, or overrule them as they are

20  teed up.

21         MR. VELAMOOR:  For what it's worth, if it's helpful to

22  address now, we think this is an attempt to get good acts

23  evidence in, in other words, to suggest that some people

24  weren't defrauded.

25         THE COURT:  They paid their parking fines; they paid

1  their income taxes; they donated to the local police benevolent

2  association; they complied with the zoning laws.  I don't know

3  that this gets you anywhere, and I don't know if it's relevant.

4           MR. BATH:  I understand the government is essentially

5  making a motion in limine, and I understand the Court to be

6  sustaining it.  So I won't ask any more questions.  If I'm

7  wrong, I will continue to ask questions.

8           My colleague suggests to me it goes to the fact that

9  we weren't trying to hide, but I think your Honor has taken

10 that into consideration.

11          THE COURT:  I have.  Thank you.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2    BY MR. BATH:

3    Q.  Mr. Muir, sometime in 2011, did the Modoc communicate that

4    they wanted to leave the business?

5    A.  Yes, they did.

6    Q.  Did you have a discussion with somebody about that?

7    A.  Yes, I discussed it with Troy Little Axe.

8    Q.  Did he communicate that in some type of e-mail to you?

9    A.  Yes.

10          MR. BATH:  Can we show Government Exhibit 814, please.

11          Blow that up, please, Eli.

12   Q.  At the bottom we see an e-mail from Mr. Little Axe, is that

13   correct?

14   A.  Yes.

15   Q.  Is this part of that discussion you had with him?

16   A.  Yes, it is.

17   Q.  What did he mean by "replacement tribe"?

18   A.  There was a prior e-mail that Troy had sent communicating

19   that Chief Follis wanted to exit the business.  And then Mr.

20   Little Axe sends this e-mail that says, "Let me know if you're

21   looking for a replacement tribe, I have some ideas."

22   Q.  What did you respond to him?

23   A.  "Understood, Troy.  We will get you a formal response to

24   your prior e-mail.  I would suggest on this topic you make sure

25   I am cc'd if you e-mail Scott and keep Conly off for now."

1   Q.  What do you mean "keep Conly off for now"?

2   A.  Well, at that point I am assuming that the Modocs no longer

3   want to be in business with Mr. Tucker, and as part of that,

4   there is going to have to be some negotiated exit agreement,

5   and I would imagine that Conly was going to be representing the

6   Modocs on that agreement.

7        This scenario contemplated a new deal, and I didn't

8   think Conly would be involved in that particular transaction

9   since he would be representing the Modocs as they negotiated

10  their way out of the lending business.

11  Q.  Did you subsequently get any communication from Mr. Little

12  Axe?

13  A.  Yes.

14        MR. BATH:  Can we just show the witness Exhibit 1455,

15  Defense Exhibit 1455.

16  Q.  Did you receive this from Mr. Little Axe?

17  A.  Yes, I did.

18  Q.  Regarding this topic?

19  A.  I think this is a different topic.

20  Q.  Do you see the bottom e-mail?

21  A.  Yes.  Sorry.  I didn't read it all.  It's the same topic.

22        MR. BATH:  I offer Defense Exhibit 1455.

23        MR. VELAMOOR:  Objection on hearsay.

24        MR. BATH:  I think it goes to state of mind and what

25  Mr. Muir did in response to this.

1           THE COURT:  Overruled.

2           (Defendants' Exhibit 1455 received in evidence)

3           MR. BATH:  You can publish that.

4           Would you go to the bottom e-mail.

5    Q.  The one before we saw, if you remember, the government

6    exhibit was the 27th September?

7    A.  Yes.

8    Q.  What is the date on this one?

9    A.  This is September 30, 2011.

10   Q.  Three days later?

11   A.  Yes.

12   Q.  What is Troy telling you here?

13   A.  In the first paragraph, he is informing that there is going

14   to be a council meeting next week to bring up dissolving MTE,

15   and they will also discuss RCS's future.

16           In the next sentence he says, "I was instructed to

17   send that e-mail at that time.  However, cooler heads may be

18   prevailing.  Miami's staying in helped."

19   Q.  Who is RCS?

20   A.  Red Cedar Services.

21   Q.  Then he asks -- he sent this to Mr. Tucker as well,

22   correct?

23   A.  Correct.

24   Q.  He is asking about a meeting?

25   A.  "Chief wanted me to check your availability next week.  He

 1    may want to see if you can make a trip in or phone in at

 2    least."

 3              MR. BATH:  If we can go to the next e-mail above that.

 4    Q.  Your response, correct?

 5    A.  "Understood."

 6              MR. BATH:  And above that, please, Eli.

 7    A.  Troy says, "Tim, let me know what the next step is.

 8    Thanks, Troy."

 9    Q.  Then above that.

10    A.  I forward that on to -- I'm sorry.  I forward that on to

11    Mr. Schulte.  I say, "You have this, correct?"

12    Q.  "Have this" being?

13    A.  This e-mail string.

14    Q.  So you're keeping Mr. Schulte in the loop?

15    A.  Yes.

16    Q.  Did the Modocs stay in the business?

17    A.  Yes, they did.

18    Q.  If they had wanted to exit the business, like Government's

19    814, what would that mean legally?

20              MR. VELAMOOR:  Objection, your Honor.

21              THE COURT:  Sustained.

22              MR. BATH:  Can we show, please, Eli, Government

23    Exhibit 1301.  This has been admitted.

24              Is there a second page?

25              Let's just start with the first page.  Let's do it

1    from the middle down, if we can.

2    Q.  First, Mr. Muir, what is the date of the e-mail?

3    A.  October 14, 2011.

4    Q.  Who is it from?

5    A.  Natalie Dempsey.

6    Q.  Who is she?

7    A.  She was a person who worked at AMG Services.

8    Q.  You're copied on this, correct?

9    A.  Yes.

10   Q.  Then Crystal Cram is Crystal Grote?

11   A.  Yes.

12   Q.  And there is a discussion about three or four documents, is

13   that correct?

14   A.  Yes.

15   Q.  And we see those documents listed in that second full

16   paragraph?

17   A.  That's right.

18   Q.  Can you tell us just generally what those initials mean?

19   A.  Sure.  The first one there, ACH authorization, again, ACH

20   stands for automated clearinghouse.

21          The second one would be the application, which would

22   have been the loan application.

23          The third one would have been consent to electronic

24   disclosure.  That was a required document for any sort of

25   e-commerce transaction.

1              And the fourth one would have been the loan note.

2    Q.  And this is Natalie talking about what's going on with

3    these documents, correct?

4    A.  Yes.

5              MR. BATH:  Let's go up one, please, Eli.

6    Q.  It's again from Natalie?

7    A.  Yes.

8    Q.  Talking about new versions?

9    A.  She is talking about the current version of the documents.

10             MR. BATH:  Can we now go to the back of the documents,

11   Eli, the last page.

12   Q.  What is that document?

13   A.  That's an electronic disclosure and consent agreement.

14   Q.  It's a form?

15   A.  Yes.

16   Q.  Was that an attachment to this e-mail, do you think?

17   A.  Yes, it would have been.

18             MR. BATH:  Can we go to the next document, Eli.

19   Q.  What is that?

20   A.  It looks like it's the last page of the loan application.

21   Q.  And that document?

22   A.  That would be the first page of the loan application.

23   Q.  Next.

24   A.  This is the authorization to affect ACH entries.

25   Q.  Next.

1  A.  This is the loan note and disclosure.

2  Q.  Next.

3  A.  It would be the end of Natalie's e-mail.

4          MR. BATH:  And the next, Eli.

5  Q.  And that's where we started?

6  A.  Yes.

7  Q.  What was your involvement in any of these documents, if you

8  recall?

9  A.  My involvement and my firm's involvement was regarding the

10  arbitration provision in the loan note.

11  Q.  Why did you have involvement in that?

12  A.  There was a significant Supreme Court case that came out in

13  April of that year and it was favorable to arbitration, and so

14  we suggested that the loan note language be amended to include

15  and kind of follow the arbitration language that was used in

16  that case.

17  Q.  Did you research and work in that area?

18  A.  Yes.

19          MR. BATH:  Can we put up Government Exhibit 1302,

20  please, Eli.

21          Can we, please, blow up the top half.

22  Q.  This is the last e-mail in the string?

23  A.  Yes.

24  Q.  What is the discussion about here?

25  A.  I think Ms. Grote is asking about approval for some

1   sections, and Ms. Dempsey tells her that the arbitration

2   sections are still not approved unless Tim -- and that would be

3   me -- has told you otherwise.

4           I then respond to both of them and say, "It's not yet

5   done.  I am heading back to work tonight, I'll look at it."

6   Q.  What time did you send this e-mail?

7   A.  About midnight.

8   Q.  When they say "the arbitration sections are still not

9   approved," is that what you were working on?

10  A.  Yes.

11          MR. BATH:  Can we go to the next page, Eli.

12          Would you blow up that middle section for us.

13  Q.  Does this appear to be part of the string of the one before

14  this?

15  A.  It does.

16          MR. BATH:  Can we go to the next page.

17  Q.  Finally, Government Exhibit 1303.  That's been admitted.

18          MR. BATH:  Can we publish that, Eli.

19          Can we start from the top, the first half or so.

20          The part under Crystal, can we blow that up.

21  Q.  Is this exhibit, which is 1303, a continuation of the other

22  two exhibits?

23  A.  Yes, it is.

24  Q.  Is it more of the string?

25  A.  Yes.

1    Q.  Now there is more information about each of these sections,

2    correct?

3    A.  That's right.

4    Q.  It talks in that first bullet point that the "almost final

5    arbitration verbiage," is that right?

6    A.  That's right.

7    Q.  That's what you were working on?

8    A.  Yes.

9         MR. BATH:  If we can come out of there, Eli, and go to

10   the last page of the document, perhaps.

11   Q.  This last page, Mr. Muir, does it look like to be a

12   duplicate of two exhibits ago?

13   A.  It does.

14        MR. BATH:  Can we go to the next page, Eli.

15        Can we blow up that middle section.

16        Go back to the first page, the very top couple of

17   e-mails there.

18   Q.  That completes that document?

19   A.  Yes.

20        MR. BATH:  Thank you, Eli.

21        Can we please have Government Exhibit 1714, which is

22   admitted.

23   Q.  Do you recognize this document?

24   A.  Yes, I do.

25   Q.  What is the date on it?

1              MR. BATH:  Take that down.

2              I apologize.  Can we approach quickly?

3              THE COURT:  Yes.

4              (At the sidebar)

5              MR. BATH:  Judge, apparently Government's Exhibit 1714

6    was one of the -- maybe the first that had the news article

7    stuff in it, and it came in, and I think it got admitted

8    without being redacted.

9              MR. SCOTTEN:  You guys didn't object.

10             MR. VELAMOOR:  It wasn't objected to at the time.  It

11   didn't come up as an issue.

12             THE COURT:  It included a news article?

13             MR. VELAMOOR:  It mentioned the news organization CBS,

14   which the Court later deemed to be irrelevant.

15             THE COURT:  So how can I help you?

16             MR. BATH:  Maybe there isn't.  I just didn't want you

17   to see this and wonder why --

18             THE COURT:  Personally, I think it should be redacted.

19   I think it is not probative of anything.  The reason I allowed

20   it in was simply that it explains the actions of other people,

21   but I don't want the jury to put any weight on the fact that

22   the Colombia Broadcasting System thought this was worthy of

23   attention.

24             MR. BATH:  I don't disagree with the Court.  At the

25   same time, I didn't think I had any authority --

1          THE COURT:  You don't.  So do you consent to a

2    redaction?

3          MR. VELAMOOR:  That's fine, your Honor.

4          MR. BATH:  We will work it out.

5          THE COURT:  Done.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2              MR. BATH:  Just a moment, Judge.

3              THE COURT:  Sure.

4      BY MR. BATH:

5      Q.  Is 1714 on your screen, Mr. Muir?

6      A.  Yes, it is.

7              MR. BATH:  Is that published for the jury?

8              Thank you.

9      Q.  So the date of this is what?

10     A.  September 26, 2011.

11     Q.  How do you recognize this?

12     A.  It was a memo to employees regarding media coverage.

13     Q.  Who drafted it, do you know?

14     A.  A lot of people participated in this document.  I don't

15     know who took the first stab at the drafting.  Probably it was

16     Jared Marsh.

17     Q.  Did you have any hand in it?

18     A.  I would have reviewed it, and I probably made some

19     suggestions or redlines.

20     Q.  Look at the first bullet point.

21             MR. BATH:  Can we blow up the three bullet points.

22     Q.  The first bullet point says, "Mr. Tucker does not own or

23     operate any online lending business."  Is that correct?

24     A.  Yes.

25     Q.  Is that what it says?

1    A.  That's what it says.

2    Q.  Do you believe that to be true or false?

3    A.  I believe that to be true.

4    Q.  Why do you say that?

5    A.  At that particular time 2011, Mr. Tucker doesn't own any

6    businesses that are lending.  And the own or operate, at that

7    point, that's a legal determination that the state court

8    actions were about, and I didn't believe that he operated them.

9    Q.  While you may not have drafted this, you were part of this?

10   A.  Yes.

11            MR. BATH:  Thank you, Eli.

12            Eli, can you put up Government's Exhibit 1733, please.

13            Is there a second page to this?

14   Q.  You see the second page there, Mr. Muir?

15   A.  Yes.

16            MR. BATH:  You can go back to the first page and go to

17   the bottom third.

18   Q.  What is the date of this?

19   A.  This is November 9, 2011.

20   Q.  What is it generally discussing?

21   A.  This is discussing that draft memo that we looked at

22   previously.

23   Q.  That was September 26?

24   A.  I imagine -- well, I look at the subject, and it would have

25   been correspondence to probably another media outlet.

1  Q.  What is Mr. Tucker asking you and Blaine in that top e-mail

2  we see on the screen?

3  A.  He says, "You are not going to acknowledge me as an

4  employee."

5           MR. BATH:  Let's go to the next e-mail up.

6  Q.  What do you respond?

7  A.  I say, "No, that is getting changed Monday, AMG board

8  meeting, getting away from the 'title', want to get you a

9  'good' one."   "Title" is in quotes and "good" is in quotes.

10 Q.  What are you saying?

11 A.  In his reference to "employee," I was informing him that we

12 are going to get away from just calling him an employee; we are

13 going to get him a good title.

14 Q.  Were there titles in the business at this time?

15 A.  No.

16 Q.  Why do you say "that is getting changed Monday, AMG board

17 meeting"?

18 A.  Chief Gamble had requested a board meeting in Kansas City,

19 and so they were coming up for that board meeting.

20 Q.  Why do you need the board at all?

21 A.  It's their company.

22           MR. BATH:  Can we go above that, please.

23 Q.  Mr. Tucker responds and asks you a question?

24 A.  He says "Hmm, what is getting changed Monday?"

25 Q.  What is your response?

1    A.  I respond, "Titles."

2    Q.  Did that get changed at the board meeting, if you remember?

3    A.  I believe so.  I don't specifically remember.

4              MR. BATH:  Thank you, Eli.

5              Can we go to Government Exhibit 411, please.  That

6    shows it's been admitted.

7              Is there a second page, Eli.

8              If we can go to the bottom third or half and blow that

9    up.

10   Q.  So this e-mail string in this document begins November 10,

11   2011, at 1:05?

12   A.  Yes.

13   Q.  I'm sorry.  It is 1:05.  What is being discussed here?

14   A.  IPads.  And specifically iPads for the AMG board.

15             MR. BATH:  Can you go up, please, Eli.

16   Q.  Mr. Tucker says what to you?

17   A.  He says, "A gift, that is OK, but they have to get them set

18   up on 3G on their own.  We just give them to them.  Who are you

19   wanting to give them to?"

20   Q.  What do you respond?

21   A.  I respond, "Then should not do it.  Crystal's admin group

22   has 3G iPads paid for by company, and yet the board of the

23   company has to pay out of their own pocket.  Do not want to

24   have to explain that down the road.  Respectfully, the main

25   focus should be on fortifying that relationship above all else.

1    It's everything more than ever."

2    Q.  What do you mean by that?

3    A.  By the relationships?

4    Q.  Yes.

5    A.  At this particular time there was a lot of media and a lot

6    of press coverage, and the Modocs had thought about leaving,

7    the Miamis thought about leaving.  I thought this was a

8    critical time to fortify those relationships.

9              MR. BATH:  Thank you, Eli.

10             Eli, would you show just the witness 2800, please.

11   Q.  Do you recognize 2800, Mr. Muir?

12   A.  Yes, I do.

13   Q.  What is this, generally?

14   A.  That's an e-mail string between Mr. Tucker and myself,

15   again, on the issue of iPads.

16   Q.  Is this the same string as Government's 411?

17   A.  I can't tell.  Let me see the first page.

18             Yes, it looks that way.

19   Q.  So 2800 has more to it in the exchange, is that right?

20   A.  Yes.

21             MR. BATH:  Judge, I would offer Defendants' 2800.

22             THE COURT:  Any objection?

23             MR. VELAMOOR:  Your Honor, objection.  The additional

24   context we assert is hearsay.

25             THE COURT:  I didn't understand the last words you

1    spoke.

2            MR. VELAMOOR:  We believe it's hearsay.  The

3    additional unadmitted portions of this e-mail are hearsay.

4            THE COURT:  Can you highlight the unadmitted portions,

5    please.

6            MR. BATH:  Your Honor, I am offering this under the

7    rule of completeness.  It is a continuation of Government's

8    411.  It is just more discussion between the parties on the

9    very same topic.

10           THE COURT:  I will allow it.

11           (Defendants' Exhibit 2800 received in evidence)

12           MR. BATH:  Can you go to the second page, Eli.

13           If we can blow that page up.

14   Q.  This part of 2800, Mr. Muir, we saw earlier in the

15   government's exhibit, did we not?

16   A.  Right.

17   Q.  Again, it's about the iPads?

18   A.  Sorry.  Yes, it's about the iPads.

19           MR. BATH:  Can we go to the next page, and the bottom

20   third.  Thank you.

21   Q.  What we are seeing here is where Government Exhibit 411

22   ends, is that right?

23   A.  Yes.

24           MR. BATH:  Let's go up.

25   Q.  So picking up where 411 ended, Mr. Tucker responds to you?

1    A.  He says, "Still not clear.  Are they interfacing with us on

2    business with these things.  I'm not clear."

3    Q.  What do you say?

4    A.  I tell him yes.  I say, "VPN access" -- that's a virtual

5    private network term from the IT world that allows for secured

6    communications.  Mr. Mitchell was suggesting that he could have

7    these iPads connected through a VPN access and potentially the

8    board could use for videoconferencing and potentially Mr. Brady

9    could use to approve the batch.

10   Q.  Mr. Tucker responds what?

11   A.  He says, "Get them."

12           And I say, "Mitchell is on it.  We will be ready

13   today.  Very good move."

14   Q.  In late 2011 -- well, I will just ask you when.  Was there

15   an ITG audit at some point?

16   A.  Yes.

17   Q.  What is ITG?

18   A.  ITG stands for Indian tribal governments.  It's a division

19   inside the IRS.

20   Q.  And it's a division that deals with Native American tribes?

21   A.  Yes, exclusively to my understanding.

22   Q.  At some point in time, was there an audit with one of the

23   tribes?

24   A.  There was an audit involving three of the tribes.

25   Q.  It all happened simultaneously?

1    A.  Yes.  They didn't start right away at the same time, but

2    eventually within, I would say a month they were all going at

3    the same time had.

4    Q.  Do you remember what year that would have been?

5    A.  2011.

6    Q.  At some point in time, did you have involvement in

7    producing documents for that audit?

8    A.  Yes, for all three of the audits.

9    Q.  Now, we heard from Allison Harris a week or two ago,

10   correct?

11   A.  Yes.

12   Q.  Who is she?

13   A.  She, at this time 2011, would have been the CFO for Miami

14   Nation Enterprises, MNE.

15   Q.  Would you have had interaction with her about the ITG

16   audit?

17   A.  I would not have had direct involvement with Ms. Harris.  I

18   was on several e-mails that she was on and I was on; there were

19   several people on those e-mails.

20   Q.  What were those e-mails about?

21   A.  About the ITG audit.  I'm sorry.  To be clear, the ITG

22   audit for MNE.

23             MR. BATH:  Can we show the witness only D991, please.

24   Q.  Do you recognize that document?

25   A.  Yes.

1    Q.  Does that concern the ITG audit?

2    A.  Yes, it does.

3    Q.  Are you on that string?

4    A.  I'm on the last e-mail, yes.

5              MR. BATH:  I offer D991.

6              THE COURT:  Any objection?

7              MR. VELAMOOR:  Yes, your Honor.  Hearsay.

8              MR. BATH:  The exhibit is only the e-mail, by the way.

9              THE COURT:  Not the attachments.

10             MR. BATH:  That's correct.

11             There is a second page we can put up.

12             THE COURT:  Yes, please.

13             I will allow it.

14             (Defendants' Exhibit D991 received in evidence)

15             THE COURT:  Ladies and gentlemen, we are going to

16   break early for the evening, unaccustomed as we have been

17   throughout this trial, but I am going to visit someone who is

18   under the weather.  So that's what I am going to be doing.

19             We are going to pick up tomorrow morning at 10:00 for

20   a fresh start.  We are close to the end of the case.  I believe

21   this is probably our last witness.  And then we will have

22   closing arguments and my final instructions to you, and then

23   you will begin deliberations.

24             So at this critical point, it's important to remember

25   to keep an open mind, do not discuss the case with anyone, and

HAA8TUC5

1    not do any research on your own.

2            Have a great evening.  See you tomorrow morning.

3    Thanks.

4            (Jury exits courtroom)

5            THE COURT:  See you all at 9:45 tomorrow morning.

6    Thank you.

7            (Adjourned to October 11, 2017, at 9:45 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                              Page

TIMOTHY JOHN MUIR

Direct By Mr. Bath . . . . . . . . . . . . . .2641

DEFENDANT EXHIBITS

Exhibit No.                              Received

2822    . . . . . . . . . . . . . . . . . . .2658

2817    . . . . . . . . . . . . . . . . . . .2667

D1400   . . . . . . . . . . . . . . . . . . .2701

1406    . . . . . . . . . . . . . . . . . . .2720

2812    . . . . . . . . . . . . . . . . . . .2731

2815    . . . . . . . . . . . . . . . . . . .2738

1450    . . . . . . . . . . . . . . . . . . .2741

1455    . . . . . . . . . . . . . . . . . . .2804

2800    . . . . . . . . . . . . . . . . . . .2818

D991    . . . . . . . . . . . . . . . . . . .2821