HabWtuc1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          16 Cr. 91 (PKC)

5    SCOTT TUCKER and
     TIMOTHY MUIR,                        Trial
6
               Defendants.
7
     ------------------------------x
8                                         New York, N.Y.
                                          October 11, 2017
9                                         9:50 a.m.

10

     Before:
11                     HON. P. KEVIN CASTEL

12                                        District Judge
                                             and a jury
13                     APPEARANCES

14   JOON H. KIM
          Acting United States Attorney for the
15        Southern District of New York
     BY:  NIKETH V. VELAMOOR
16        HAGAN C. SCOTTEN
          SAGAR K. RAVI
17        Assistant United States Attorneys

18   FREEMAN NOOTER & GINSBERG
          Attorneys for Defendant Tucker
19   BY:  LEE A. GINSBERG
          NADJIA LIMANI
20            -and-
     STAMPUR & ROTH
21   BY:  JAMES M. ROTH

22   BATH & EDMONDS, P.A.
          Attorneys for Defendant Muir
23   BY:  THOMAS J. BATH
             -and-
24   BEVERLY VAN NESS

25

HabWtuc1

1        (Trial resumed)

2        THE COURT:  Please be seated.  Thank you.

3        I have a letter from the government, and I want to

4    make sure I understand what they're urging, so if you could

5    take Court Exhibit 14 and tell me what it is you're proposing I

6    delete on what page.

7        MR. SCOTTEN:  Yes, your Honor.

8        Court Exhibit 14, which I believe is dated 10/10/17,

9    which was handed out yesterday.

10       THE COURT:  It is.

11       MR. SCOTTEN:  On page 32, four lines from the bottom,

12   there's a line that reads:  "Fourth, that the defendant engaged

13   in the collection of unlawful debt."  We propose the Court

14   strike that entirely and then on the next line replace "fifth"

15   with "fourth."

16       THE COURT:  I assume that's not the only change you're

17   proposing.

18       MR. SCOTTEN:  That is the only change.

19       THE COURT:  Then you would have me charge on the

20   fourth element?

21       MR. SCOTTEN:  Yes.  OK.  I'm sorry, your Honor.

22       THE COURT:  Help me out here.  Tell me the page.  Tell

23   me the line.  This is how I work.  I've made this clear to the

24   defendants, and I'm making it clear to you.  I mean, I don't

25   think it's an unreasonable request.

HabWtuc1

1          MR. SCOTTEN:  No, I don't think so, your Honor.

2          THE COURT:  I don't deal with concepts.  I deal with

3     words on a page, at this late stage.

4          MR. SCOTTEN:  Understood, your Honor.  I'll have to

5     slow down a bit here, but turning to the next page -- well,

6     your Honor, there are enough changes to follow that that I'm

7     going to have to do it line by line and come back to you after

8     lunch.

9          THE COURT:  All right, but the point is -- and I'll

10    say this again to the government, I'll say it again to defense

11    counsel -- I'm happy to consider your changes.  My unreasonable

12    request of you is that you take the draft instructions that

13    I've distributed and tell me the page and line so that nothing

14    is overlooked, so that it's not on my shoulders to make sure

15    that something didn't get missed, it's on your shoulders, if

16    you're proposing the change.

17         MR. SCOTTEN:  I also should be clear, your Honor, the

18    Court had asked us about this yesterday, and our answer was not

19    very helpful, so we were still trying to answer the Court's

20    question.  I don't think there's anything wrong with the

21    instructions as they sit now.  The Court was concerned with

22    redundancy.

23         THE COURT:  Yes.

24         MR. SCOTTEN:  We agree there is some, and I'm happy to

25    propose a change that will take that out.

HabWtuc1

1          THE COURT:  That's fine, but just complete the act

2     proposing the change.

3          Is there anything else the government has on Court

4     Exhibit 14 or 15?

5          MR. SCOTTEN:  No, your Honor.

6          THE COURT:  Ms. Van Ness.

7          MS. VAN NESS:  Yes, your Honor.

8          We strongly object to your eliminating the fourth

9     element.  I think that's the gravamen of the offense.  The

10    other elements of the substantive RICO charge are the

11    federalizing of the crime.  Engaging in the collecting of

12    unlawful debt is the actual commission of the offense.  The

13    five elements you have listed, including engaging in collection

14    of unlawful debt, are the same five elements that are in the

15    pattern charge in normal RICO cases, the pattern of

16    racketeering activity, and the element charges that the

17    defendant must have committed the following racketeering acts,

18    and then the Court instructs on the offenses.  And then it goes

19    on to talk about the pattern and they have to be related and

20    there have to be at least two, and so forth.  None of that's

21    relevant, but the actual commission of the criminal offense is

22    the fourth element, and if you look at page, the fifth element

23    you have on page 34, your Honor.

24         THE COURT:  Yes.

25         MS. VAN NESS:  You'll see you're referring back to

HabWtuc1

1  that element.  In the second paragraph of the fifth element,

2  you say, "It's not enough that there be an enterprise," and the

3  enterprise is a separate element, as you know, "and it's not

4  enough that the defendant engaged in the collection of unlawful

5  debt.  More is required."

6          Then the instruction goes on to talk about the

7  connection between the offense and the enterprise, so I think

8  that the fourth element is definitely required.  Otherwise,

9  you're basically going to have a strict liability crime, where

10 the defendant is accused of just the loan happens to be

11 unlawful and he's part of the enterprise and so he's convicted.

12 This is a substantive count, and the jury has to find that he

13 actually committed it.

14         THE COURT:  I may have misunderstood the government's

15 letter and their argument to me.  I didn't understand them to

16 suggest removing an element.  It's re-categorizing the

17 elements.  Whether I break something into six elements or eight

18 elements or twelve elements or two elements, the important

19 thing is that each and every thing that the law requires to be

20 proven must be proven by the government.  I didn't understand

21 them to urge that they thought they had a lesser burden or that

22 there was something they didn't need to prove.

23         I think they were advocating the combination, if you

24 will, of the fourth and fifth elements into a single element,

25 and that's a question of style.  Right?  We don't have to use

1    the word "element" even, I suppose.

2            MS. VAN NESS:  Your Honor, I just think that since the

3    fourth element as charged now is so critical, it would be

4    confusing and unnecessary to combine it with a totally

5    different element, which has different aspects to it.  I think

6    it's much clearer for the jury to follow if they're asked to

7    make specific findings on each of the elements, and commission

8    of the offense is definitely an element.

9            THE COURT:  What I'd like to do is I'd actually like

10   to hear the actual changes that the government proposes and

11   then I may wind up agreeing with you, Ms. Van Ness, that it is

12   more clear the way it is presently written.  But I think if I

13   understand the bid and the ask before me right now, no one is

14   suggesting, or the government hasn't suggested that it need not

15   prove that the defendant engaged in the collection of an

16   unlawful debt, either directly or as an aider and abettor.

17           The government agrees with that?

18           MR. SCOTTEN:  That's correct.  And your Honor, I'll

19   speak with Ms. Van Ness, because I don't think we're proposing

20   any removals at all.  We're just trying to solve the redundancy

21   problem, and we may even agree, so I'll incorporate that when I

22   come back with the proposed language.

23           MS. VAN NESS:  Can I just ask one question?

24           THE COURT:  Yes.

25           MS. VAN NESS:  Is the government suggesting that you

HabWtuc1

1  just take out the heading "fourth element" and you leave all of

2  the text?

3         THE COURT:  No.  I found that out.  I said, Is that

4  what you're proposing, and they quite clearly said no.

5         MS. VAN NESS:  Yes, so I think it's better to leave it

6  this way.  If you want, we can, I don't know when, but we

7  can --

8         MR. SCOTTEN:  We can talk right now.

9         MS. VAN NESS:  And I do have a couple of other

10  suggestions, your Honor.

11         THE COURT:  Sure.

12         MS. VAN NESS:  On the fourth element.

13         THE COURT:  Page?  Now where are we?

14         MS. VAN NESS:  Page 33.

15         THE COURT:  Yes.

16         MS. VAN NESS:  I believe that when you're talking

17  about the actual offense, which is the collecting of unlawful

18  debt, you must insert in the first sentence, "The fourth

19  element the government must prove is that the defendant

20  knowingly and willfully engaged in the collection of unlawful

21  debt."  Otherwise it's just he did something and it happened to

22  be unlawful.  The *mens rea* element has to be there, just like

23  any other state or federal offense that you're looking to

24  another set of law to incorporate into the racketeering act.

25         THE COURT:  OK.  I will consider that.  The question

1    is, again, maybe counsel is in favor of consolidating elements,

2    because then it gets wordy and begins to lose its clarity, but

3    I think your suggestion ties in intimately with the

4    government's suggestion.

5         MS. VAN NESS:  OK, as long as the jury understands

6    they have to make two different findings.

7         The final thing, and I know you're inpatient to get

8    the jury in, your Honor.

9         THE COURT:  No.  Take your time.

10        MS. VAN NESS:  The final thing I wanted to mention is

11   on page 30.  I know there was discussion of this yesterday; I

12   read the minutes.  On the last paragraph that spills over on to

13   page 31 --

14        THE COURT:  Yes.

15        MS. VAN NESS:  -- the gravamen of that paragraph is

16   the government doesn't have to prove that the defendant knew

17   the actual enforceable rate of interest in any state, New York

18   or otherwise.

19        Then you go on to say, "The government can meet its

20   burden on the willfully and knowingly element by proving he

21   acted deliberately with knowledge of the actual interest rate

22   or the generally unlawful nature of the loan."  I believe now

23   that I've looked at this more carefully, your Honor, that that

24   whole reference to the government can meet its burden by either

25   A or B is lifted from the *Biasucci* case, and I don't believe --

HabWtuc1

1    I think it's really confusing here and should be taken out

2    entirely.

3              THE COURT:  Take it all out.

4              MS. VAN NESS:  Take out those last two sentences.

5              THE COURT:  I get it.  I totally understand, take it

6    all out.

7              MS. VAN NESS:  Right, because the *Biasucci* case, just

8    briefly, the Court of Appeals said, you know, as a holding,

9    that this offense required that the defendant acted knowingly,

10   willfully and unlawfully, so that's where we've been talking

11   about knowingly and willfully.  But in the appeal, the

12   defendant had complained that the court did not tell the jury

13   that he must have known what the interest rate was.  That was

14   his issue on appeal, and the Court of Appeals said no, he

15   doesn't have to do that.  So in the context of that case and

16   the issue that was raised on appeal comes this language, but

17   it's not a legal requirement.  It's not an element.  It's just

18   based on what the defendant was arguing there.

19             I also believe that you can prove that "he knew of the

20   actual interest rate or was aware of the generally unlawful

21   nature of the act" is a reference to what he knew.  It doesn't

22   have anything to do with whether he acted willfully.  I think

23   it undercuts all of the willfully and --

24             THE COURT:  No.  The "willfully" is picked up with

25   "acted deliberately."  I understood from yesterday's discussion

1   that the defense was urging, and we had a big discussion on it,

2   What do we call this, what element is this called, meet its

3   burden on what?  There has to be a direct object of the

4   sentence, "It may meet its burden on," or maybe, I don't know

5   whether it's a direct object, but object of the preposition, on

6   what?

7          MS. VAN NESS:  Well, I --

8          THE COURT:  And willfully and knowingly, and it was

9   recrafted, so "willfully" is picked up by "acted deliberately

10  with," and the knowledge component is thereafter stated.

11         With due respect, I am concerned, quite frankly, from

12  the defendants' standpoint if I say, "Nor does the government

13  have to prove that a defendant knew the enforceable rate of

14  interest in any other state."  What it leaves up in the air is,

15  Well, what does the government have to prove?  They have to

16  prove something, and now the judge is telling me, Well, they

17  don't have to prove what the enforceable rate of interest is.

18  Well, I guess they don't have to prove anything then.

19         MS. VAN NESS:  They don't have to prove the defendant

20  knew the enforceable interest rate.  That's in keeping with he

21  doesn't have to know the actual statute language that he's

22  violating.

23         THE COURT:  So we know that they don't have to prove,

24  but what do they have to prove?

25         MS. VAN NESS:  They have to prove, as you said on page

1    25, when you defined "willfully," that he acts deliberately and

2    with purpose to do something that the law forbids, he need not

3    have known that he was breaking any particular law, but he must

4    have been aware of the generally unlawful nature of his acts."

5         That, in a nutshell, is what they have to prove to

6    show willfulness, and in this part of the charge that we're

7    just talking about, I think the *Biasucci* implant is undermining

8    that instruction and it's not necessary.

9         THE COURT:  All right.  Thank you, Ms. Van Ness.

10         Anything else?  You have the verdict sheet?  You have

11    the charge?

12         MS. VAN NESS:  Yes.  That's all I managed to look at

13    so far.

14         THE COURT:  Thank you very much.

15         Are our jurors here?

16         THE DEPUTY CLERK:  Not yet.

17         THE COURT:  All right.  We're in recess.

18         MR. GINSBERG:  Your Honor, were we going to discuss

19    the indictment and all the changes in the indictment?

20         THE COURT:  I didn't see them, if somebody can hand

21    them up to me.  They were emailed to my law clerk?

22         MR. SCOTTEN:  They were, your Honor.

23         THE COURT:  OK.  On Monday around 6:00, he was

24    admitted to the hospital and had surgery in the early morning

25    hours of Tuesday, so I don't have anything you emailed to

HabWtuc1

1    Mr. Eldridge.  I visited him last night in the hospital, and

2    he's recovering well after surgery.

3              MR. SCOTTEN:  We'll bring a written copy up at the

4    first break, your Honor.

5              THE COURT:  Thank you very much.

6              MS. VAN NESS:  Your Honor, I just want to add I have

7    not looked at the verdict sheet yet.

8              THE COURT:  Thank you.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HabWtuc1

1          (Jury present)

2          THE COURT:  Please be seated.

3          Good morning, ladies and gentlemen.  Thank you for

4    accommodating me yesterday.  I visited my work colleague, who

5    had had emergency surgery during the night, in the early

6    morning hours of Tuesday.  He's recovering really well, and it

7    was a great relief to see him doing so well.

8     TIMOTHY JOHN MUIR, resumed.

9          THE COURT:  Mr. Muir, the Court reminds you that

10   you're still under oath.

11         Mr. Bath, you may continue.

12         MR. BATH:  Thank you, your Honor.

13   DIRECT EXAMINATION CONTINUED

14   HabWtuc1                    Muir - Direct

15   BY MR. BATH:

16   Q.  Mr. Muir, when we left off yesterday, we were in the fall

17   of 2011, talking about the ITG, correct?

18   A.  Yes.

19   Q.  Again, what is ITG?

20   A.  Stands for Indian tribal government.  It's a division

21   inside the IRS.

22   Q.  And what was ITG doing as it related to the two tribes?

23   A.  It was conducting an audit.  It wasn't an income-type

24   audit.  Tribes don't pay taxes.  It was an return type of audit

25   for the tribes.

1    Q.   And was there a woman by the name of Mary Streitz involved?

2    A.   Yes.

3    Q.   Could you spell her name?

4    A.   S-T-R-E-I-T-Z.

5    Q.   Who is Mary Streitz?

6    A.   Mary Streitz is an attorney for a law firm called Dorsey

7    Whitney, and the tribe retained her firm to help them with that

8    ITG audit.

9    Q.   Dorsey Whitney is not affiliated with your firm?

10   A.   No.

11   Q.   I believe we had just looked at Defense Exhibit 991 that

12   had been admitted into evidence.

13           MR. BATH:  If we could put that up, please, Eli.

14   Could we go to the second page, just to take a look, Eli,

15   please.

16   Q.   Second page just has the end of the email string?

17   A.   Correct.

18   Q.   But no substantive information?

19   A.   Right.

20           MR. BATH:  Go back to the first page.  Let's look at

21   the top, Eli, and highlight that, please.

22   Q.   So we see Mary Streitz in the "from" line?

23   A.   Yes.

24   Q.   And the date is what?

25   A.   October 15, 2011.

1  Q.  I think we know most of those names on the top line.  Whose

2  are the names on the second line on the "to"?

3  A.  Allison Harris would have been the CFO for MNE and Melody

4  Wright was another employee for MNE.

5  Q.  Who is on the cc line?

6  A.  That was Ms. Chandra Kilgriff.  That was another lawyer

7  that worked at Dorsey Whitney.

8  Q.  The subject line, could you tell us what that means?

9  A.  So you see IDRs 1, 2 and 3 and then AMG IDR No. 1.  An IDR

10 is an informational document request.  It's how the IRS asks

11 for documents from taxpayers.

12 Q.  So this is talking about an IDR to MNE, correct?

13 A.  Yes, three of them.

14 Q.  And separately to AMG?

15 A.  Yes.

16 Q.  And then she has the attachments to this email, correct?

17 A.  Yes.

18 Q.  Why is she sending it to all these people, if you know?

19 A.  I think she was forwarding on to the group what she had

20 sent to the ITG.

21       MR. BATH:  All right.  If we could pull out of that,

22 please, Eli, and then just do the body of the email, please.

23 Q.  Again, this is from Ms. Streitz?

24 A.  Yes.

25 Q.  At this time, it's to whom?

HabWtuc1

| | |
|---|---|
| 1 | A. Amy Dunford. |
| 2 | Q. Who is Amy Dunford? |
| 3 | A. She was with the IRS. |
| 4 | Q. Was she involved in the audit? |
| 5 | A. Yes, she was the lead for the Miami audit. |
| 6 | Q. And this is essentially Ms. Streitz saying to Amy what |
| 7 | she's enclosed, correct? |
| 8 | A. Yes. |
| 9 | Q. The last few words of the line talk about a visit to MNE's |
| 10 | headquarters? |
| 11 | A. Yes, it does. |
| 12 | Q. Were you aware that the IRS was coming there? |
| 13 | A. Yes, I was. |
| 14 | Q. And why was the IRS coming to MNE? |
| 15 | A. They were coming to MNE to review financial documents and |
| 16 | financial statements. |
| 17 | Q. So what role, if any, did you play in helping AMG prepare |
| 18 | for the audit? |
| 19 | A. My office assisted in collecting any and all of the |
| 20 | financial documents, bank statements, anything that the IRS had |
| 21 | asked for, vendor agreements, contracts. Those requests were |
| 22 | very extensive, and so we assisted in collecting all of the |
| 23 | responses for those. |
| 24 | Q. We heard testimony from Ms. Harris about boxes coming to |
| 25 | MNE? |

HabWtuc1

1    A.   Yes.

2    Q.   Are these the boxes that you assisted with?

3    A.   Yes, these are the boxes.

4    Q.   Do you know about how many boxes of financial documents

5    arrived on MNE?

6    A.   I don't remember exactly, but I have no reason to doubt

7    Ms. Harris saying 10 to 12 boxes.

8    Q.   What time period did this process go through?

9    A.   It began, I think, sometime in maybe September 2011 and it

10   continued for quite some time.

11   Q.   And is this defense 991 the only correspondence that you

12   had received in relation to this, or is this an example?

13   A.   This is an example.  There was a lot of correspondence.

14   Q.   Once the documents went down to MNE, how long were they

15   there?

16   A.   They stayed there.

17   Q.   Did they ever come back?

18   A.   No.

19   Q.   The 12 boxes of financial documents were there for a long

20   time?

21   A.   I assume so, yes, sir.

22            MR. BATH:  All right.  Thank you, Eli.

23   Q.   At some point in time, did you attend any AMG board

24   meetings?

25   A.   Yes, I did.

1  Q.  Do you know when you would have started attending those?

2  A.  Sometime in 2011, late 2011.

3  Q.  What would be the circumstances why you would attend a

4  board meeting?

5  A.  If I was invited down.

6  Q.  Who would invite you?

7  A.  It would either be Mr. Brady or it would be Chief Gamble,

8  or sometimes I would be told the whole board would like me to

9  come down.

10  Q.  What would be the purpose of you going down there?  What

11  would you talk about?

12  A.  Primarily I would give the board updates on any of the

13  litigation that the companies were involved in.

14  Q.  Do you have an idea about how many board meetings you

15  attended?

16  A.  I don't.

17  Q.  I'm sorry.  Let me ask this.  In '11 and '12, did you

18  attend more than one?

19  A.  Yes.

20  Q.  Now, did anyone ever tell you that board meetings were

21  being taped?

22  A.  No.

23  Q.  And have you heard any such tapes with you on them?

24  A.  I have not heard any of me on them.

25  Q.  All right.  Would you object to that?

1    A.  No.  I would have liked that.

2    Q.  And why is that?

3    A.  Because that recording would have showed the interaction

4    that I was having with the board and what I was telling the

5    board.

6         MR. BATH:  Can we please show 2700.  I show that it's

7    been admitted.  D2700.  I'm sorry.  And can we blow up the top

8    and the date.

9    Q.  What is this document, Mr. Muir?

10   A.  This is the minutes of a board meeting held in AMG's

11   offices in Overland Park on November 14, 2011.

12   Q.  And were you present?

13   A.  Yes, I was.

14        MR. BATH:  And the list of people, can we blow that up

15   a little, make sure we have all those listed attending.

16   Q.  Mr. Schulte was there as well?

17   A.  Yes.

18        MR. BATH:  Can we go down, Eli, to the next line below

19   that.

20   Q.  Do the minutes indicate when the meeting started?

21   A.  It does, 8:45.

22   Q.  And do the minutes show when it ended, do you know?

23   A.  Usually the tribe would have put the time the meeting ended

24   at the end of the minutes, yes.

25        MR. BATH:  Can we go to the last page, please, Eli,

1    and -- thank you.

2    Q.  What does the document reflect?

3    A.  That the meeting was adjourned at 9:56.

4    Q.  Just under an hour and a half?

5    A.  Yes, that's right.

6            MR. BATH:  Can we go to, Eli, please, the second page

7    under new business, second-to-last paragraph from the bottom.

8    Q.  We saw an email yesterday about iPads, correct?

9    A.  That's correct, yes.

10   Q.  Is that in connection with what we see here on this

11   document, or is that different?

12   A.  No, it's a connection.

13   Q.  In the new business here, what did you do at this board

14   meeting, other than what it says?  Is there any more?

15   A.  In regards to the iPads?

16   Q.  Yes.

17   A.  No.  The board were given iPads.

18   Q.  Do you know whether those iPads were set up or were able to

19   connect as you had hoped they'd be connected?

20   A.  No, they never were.

21   Q.  Do you know why?

22   A.  Mr. Mitchell had stated that he could --

23           MR. VELAMOOR:  Objection, your Honor.

24           MR. BATH:  I'll rephrase.

25           THE COURT:  Yes.

1    Q.  To your knowledge, did they ever get set up?

2              MR. VELAMOOR:  Objection, your Honor.

3              THE COURT:  I'll allow it.  Go ahead.

4    A.  No, they did not.

5    Q.  Did you have anything to do with setting them up?

6    A.  No.

7              MR. BATH:  Thank you, Eli.

8    Q.  At some point in 2011, were you asked by Mr. Tucker to

9    assist with the technology transfer agreement?

10   A.  Yes.

11   Q.  And what were you asked to do?

12   A.  I was asked to reach out to the Selling Source, and

13   specifically Sam Humphreys, regarding that agreement.

14   Q.  And who is Sam Humphreys?

15   A.  He's one of the partners of London Bay that owned the

16   Selling Source at that time.

17   Q.  Were you the lead lawyer on drafting that agreement?

18   A.  No, I was not.

19   Q.  Who was that?

20   A.  We hired a long-term IP lawyer, intellectual property

21   lawyer, for Mr. Tucker, and Selling Source had a different firm

22   that represented them.

23             THE COURT:  Who is we?

24             THE WITNESS:  I'm sorry.  On behalf of Mr. Tucker.

25             THE COURT:  You said, "We hired."  Who do you mean by

HabWtuc1

```
 1    "we hired"?

 2              THE WITNESS:  Well, I would have hired on behalf of

 3    Mr. Tucker.

 4              THE COURT:  Thank you very much.

 5              THE WITNESS:  Sorry.

 6    BY MR. BATH:

 7    Q.  And Selling Source had a lawyer where?

 8    A.  A firm, a lawyer from the firm of Greenberg Traurig.

 9              MR. BATH:  Can we show just the witness Defense

10    Exhibit 1349.

11    Q.  Do you recognize that document, Mr. Muir?

12    A.  Yes, I do.

13              MR. BATH:  And can we go to page 7 for him.

14    Q.  Are there signatures on that page?

15    A.  Yes.

16    Q.  And what do you recognize that document to be?

17    A.  This is the technology transfer agreement.

18    Q.  What was the date of this, do you remember?

19    A.  It would have been sometime in December of '11.  I don't

20    remember the actual, the exact date.

21              MR. BATH:  Offer 1439.

22              THE COURT:  Any objection?

23              MR. VELAMOOR:  No objection.

24              THE COURT:  Received.

25              (Defendants' Exhibit 1439 received in evidence)
```

HabWtuc1

|       |                                                                           |
|-------|---------------------------------------------------------------------------|
| 1     | MR. BATH:  If we can blow up the top, first page, top                     |
| 2     | third or so, please.                                                      |
| 3     | Q.  There's no specific date, but we have a month and a year?             |
| 4     | A.  Yes.                                                                   |
| 5     | Q.  What is that?                                                         |
| 6     | A.  December of 2011.                                                     |
| 7     | Q.  And the parties to this agreement are whom?                          |
| 8     | A.  The Selling Source and Mr. Tucker.                                    |
| 9     | Q.  And that third paragraph that we have blown up there has a            |
| 10    | name in there.  What does that name mean?                                |
| 11    | A.  ECash system.                                                         |
| 12    | Q.  What does that refer to?                                              |
| 13    | A.  That was the software that serviced the loans for the                |
| 14    | tribes.                                                                    |
| 15    | MR. BATH:  If you could come out of that, please, and           |
| 16    | could we go to the next three paragraphs or so.                          |
| 17    | Q.  Now, the lawyer who drafted this, what was his name?                |
| 18    | A.  Andrew Colombo.                                                       |
| 19    | Q.  What role did you have in drafting this document?                    |
| 20    | A.  I would have got the first draft from Mr. Colombo.  I would          |
| 21    | have reviewed it, more than likely made a few suggestions and            |
| 22    | changes, and then I would have forwarded this document on to             |
| 23    | the Selling Source, to Mr. Humphreys.                                    |
| 24    | Q.  So this third paragraph that's blown up, what's that                 |
| 25    | telling us?                                                               |

1   A.  It's saying that in 2009, Selling Source delivered

2   exclusively to Mr. Tucker a version of the eCash system and

3   that it included what they called a base eCash system as well

4   as some of the Tucker contributions, which collectively was

5   called the Tucker version.

6   Q.  Does this Tucker version of this eCash come into place

7   after this date with the Miami tribe?

8   A.  Yes, it does.

9           MR. BATH:  Can we please go to the last page, Eli.

10  Q.  How many pages is this document, do you recall?

11  A.  It's a seven-page document.

12          MR. BATH:  If we could highlight the signatures.

13  Q.  Obviously we see Mr. Tucker, but Mr. Humphreys is again

14  who?

15  A.  He is a partner in London Bay, and in this document he

16  signed it in his capacity as a director of the Selling Source.

17  Q.  And what's London Bay's relationship to Selling Source?

18  A.  It owned it.

19  Q.  That was Alton Irby?

20  A.  Yes.

21  Q.  Is Mr. Irby partners with Humphreys?

22  A.  Yes.

23  Q.  And Dale Baker is who?

24  A.  Mr. Baker at that time was the president and CEO of the

25  Selling Source.

HabWtuc1

1  Q.  You didn't sign this document?

2  A.  No, I did not.

3          MR. BATH:  We can take that down.

4          Could we show just the witness Defense Exhibit 1449,

5  please.

6  Q.  Do you recognize this document?

7  A.  Yes.

8  Q.  And what do you recognize it as, generally?

9  A.  It's an email string between myself, Gary Patten, Brett

10 Chapin, Pauline Long, and Blaine Tucker and Scott Tucker cc'd.

11 Q.  And the date, what month and year?

12 A.  January 2012.

13         MR. BATH:  Judge, we would offer defendants' 1449.

14         MR. VELAMOOR:  Objection, your Honor.  Hearsay.

15         MR. BATH:  I wouldn't be offering the document as

16 other people quoted in it for truth of the matter, but the

17 comments by Mr. Muir at the very top, I'm offering for his

18 state of mind.  It goes to rebut some government evidence.

19         MR. VELAMOOR:  Judge, he can testify to his state of

20 mind.

21         THE COURT:  I don't understand.  Let me read the

22 email.

23         Can you blow it up, please, so I can see it.  Thank

24 you.

25         The objection to the exhibit is sustained.

HabWtuc1

1    BY MR. BATH:

2    Q.  In January of '12, did you have discussions with persons

3    about accounting entries?

4    A.  Yes.

5    Q.  What were those discussions concerning?

6    A.  It related to the ITG examination, and some of those IDRs

7    weren't just asking for documents.  They asked questions, and

8    so we were assisting in answering those questions.

9    Q.  What types of questions would they be asking?

10   A.  They'd be asking certain entries in the books and records

11   of the company.  They'd be asking for explanations of why

12   things were coded the way they were.

13   Q.  And did somebody from accounting have some discussions with

14   you about what they proposed to answer these questions?

15   A.  Yes.

16   Q.  And what, generally, were those questions to you?

17   A.  Well, usually it was a question that I had to them asking

18   for an explanation, and then they were telling me their

19   answers.

20   Q.  What was your position on the accounting entries and how

21   they should be treated?

22   A.  My position was nothing was to be changed, that we were

23   merely providing explanations that could be then given to the

24   IRS.

25   Q.  Why was that important?

HabWtuc1

1    A.  Well, the IRS was asking questions to those IDRs, and it

2    was important to truthfully respond to those.

3    Q.  Did you put that in email communications to accounting

4    people?

5    A.  Yes, I did.

6    Q.  To make it clear your position?

7    A.  Yes.

8            MR. BATH:  Can we please show defense 2701.  I show

9    that this has been admitted, if we could publish to the jury.

10   Q.  What are we looking at here?

11   A.  This is, page here is the agenda for a board of directors

12   meeting for AMG on January 19, 2012.

13           MR. BATH:  Could we blow up the top third, please,

14   Eli.

15   Q.  Were you present?

16   A.  Yes, I was.

17   Q.  Where was this held?

18   A.  It was in Miami, Oklahoma.

19           MR. BATH:  Could we go to the second page, please,

20   Eli.

21   Q.  And the second page repeats the attending people?

22   A.  Yes.

23   Q.  The meeting started --

24           MR. BATH:  Could we blow that up, the first sentence,

25   please.

1    Q.   The meeting started what time?

2    A.   9:30.

3    Q.   Could we go to the third page, when it was adjourned.

4    A.   1:00.

5         MR. BATH:  Back to the second page, please, Eli, and

6    if we could highlight the Roman II paragraph.

7    Q.   Do you recall the board meeting?

8    A.   Generally, yes.

9    Q.   And it talked about here closed session.  What does that

10   mean?

11   A.   The board would go into closed session any time there were

12   legal matters discussed.

13   Q.   Who was allowed in closed session and who wasn't?

14   A.   The board members were allowed.  The invitees were not

15   allowed for closed session.

16   Q.   And who would be an invitee?

17   A.   Sometimes they would have another person -- or a person

18   from another board, so maybe an MNE Services board member might

19   attend or MNE board, and those would be considered invitees

20   because they were not part of this actual board.

21   Q.   So the people listed at the top, the attending people, do

22   they all stay in this closed session?

23   A.   I believe so.

24   Q.   Except for the MNES people, or do they stay?

25        MR. VELAMOOR:  Objection, your Honor.  Leading.

1          MR. BATH:  I'll rephrase.

2     Q.  In the attending section, is anybody listed as being from

3     MNES?

4     A.  They are.

5     Q.  Did they stay for the closed session?

6     A.  They did.

7     Q.  Closed session, do you remember what the topic would have

8     been, your presentation?

9     A.  Yes, I do.

10    Q.  Tell us about that.

11    A.  I would have been giving an update on the litigations, so

12    both the California and the Colorado cases.  I would have

13    discussed some of the class action cases, and I also would have

14    begin discussing a new deal that the Miamis were interested in

15    negotiating with Mr. Tucker.

16    Q.  How about ITG; would that have been discussed?

17    A.  Absolutely.

18    Q.  How long do you think your presentation was?

19    A.  Probably a good amount of this meeting.

20    Q.  Did you ever make yourself available for questions at the

21    meetings?

22    A.  At the end of these meetings, I would always tell the board

23    members individually -- I would ask several of them, Do you

24    have any questions?  I would ask them, Have I answered all of

25    your questions?  I would give them my card, and I would tell

1    them that they could email me or call me any time.

2    Q.  You mentioned you would have presented something about a

3    potential deal between the tribes and Mr. Tucker, between the

4    Miami tribe and Mr. Tucker?

5    A.  Yes.

6    Q.  Why was that being discussed?

7    A.  There was a LOI that was signed by Mr. Brady at the end of

8    2011, and the board invited me down and wanted me to answer

9    some questions about that LOI.

10   Q.  What's an LOI?

11   A.  Letter of intent.

12   Q.  What does a letter of intent mean?

13   A.  It's what two parties will preliminarily sign when they

14   begin discussions for a new transaction, a new deal.

15   Q.  Did any transaction get completed right then?

16   A.  Oh, no.

17          MR. BATH:  Thank you, Eli.

18          Can we put up just for the witness Defense Exhibit

19   837, please.

20   Q.  Do you recognize this document?

21   A.  Yes.

22   Q.  What is this document, generally?

23   A.  This is the, this page here says the agenda of the board of

24   directors meeting for AMG on February 22, 2012.

25          MR. BATH:  Could we go to the last page, please.

HabWtuc1

1    Q.   Are there signatures on that document?

2    A.   Yes.

3    Q.   Are those people you know?

4    A.   Yes.

5    Q.   Whose signatures appear?

6    A.   So this would have been the board for AMG at the time.  The

7    top one would have been signed by Chief Gamble.  There's the

8    Second Chief Doug Lankford's signature, and then

9    secretary-treasurer, John Kelly.

10              MR. BATH:  Offer 837 into evidence.

11              MR. VELAMOOR:  To avoid having to call a custodian, we

12   won't object at this time.

13              THE COURT:  All right.  Received.

14              (Defendants' Exhibit 837 received in evidence)

15              MR. BATH:  Could we publish to the jury.  Could we

16   highlight, please, Eli, the top third of that document.

17   Q.   This tells us what type of information, Mr. Muir?

18   A.   The members and invited guests for the meeting.

19              MR. BATH:  Could we see the second -- let's do the

20   rest of that first page.  Sorry.

21   Q.   The rest of the first page tells us what?

22   A.   It's the agenda for the meeting.

23              MR. BATH:  And the second page, please, Eli.  If you

24   could highlight through the attending paragraph.

25   Q.   Does this read people we saw in the agenda?

1    A.  Yes, it does, except -- yeah it does.  You're right.

2    Q.  And Mr. Schulte was present?

3    A.  Yes.

4    Q.  And when did the meeting start?

5    A.  It started at 9:00.

6    Q.  Let's go to the next page and see when it ended.

7    A.  Ended at 11:30.

8            MR. BATH:  Thank you.  If we can go back to the first

9    page and just blow up the 1 through 4 for Mr. Muir.  Thank you.

10   Q.  Paragraph 3 tells us there was closed session?

11   A.  Yes.

12   Q.  All right.  Do you recall whether you or Mr. Schulte made a

13   presentation that day?

14   A.  I'm sure we would have.

15   Q.  All right.  Would there be a reason that both you and Mr.

16   Schulte were present?

17   A.  We were both invited down.

18   Q.  Was there a specific topic you were covering, do you

19   remember?

20   A.  More than likely it would have been the potential

21   transaction.

22   Q.  Between whom?

23   A.  Between Mr. Tucker and between the tribe.

24   Q.  Do you remember specific to whether you or Mr. Schulte made

25   a presentation, though?

HabWtuc1

1    A.  We would have made a joint presentation.

2    Q.  When you went down for a meeting like this in Miami, would

3    you go back, down and back in a day?  Would you stay the night?

4    How would that work?

5    A.  Generally down and back in a day.

6    Q.  What time typically -- I'm sorry.  We already had that.

7    The meeting started at nine?

8    A.  Yes.

9    Q.  You would go down in the morning?

10   A.  Yes.

11          MR. BATH:  We can take that down.

12   Q.  Now, this is early 2012, correct?

13   A.  Yes.

14   Q.  At some point in time, did you hire counsel, outside

15   counsel to assist in, assist you in looking at the paperwork,

16   the business, the servicing, everything?

17          MR. VELAMOOR:  Objection, your Honor.  Form.

18          MR. BATH:  I'll rephrase.

19          THE COURT:  Thank you.

20   BY MR. BATH:

21   Q.  Who is Andrew Smith?

22   A.  Andrew Smith is, was a lawyer with a firm Morrison Foerster

23   down in Washington, D.C.

24   Q.  In 2012, did you engage Mr. Smith?

25   A.  Yes.

1    Q.   What did you engage him for?

2    A.   I engaged Mr. Smith for what I call a top-to-bottom review

3    of the loan documents and the lending practices of the tribe.

4    Q.   Why did you pick Mr. Smith?

5              MR. VELAMOOR:  Objection, your Honor.  Relevance.

6              THE COURT:  I'll allow it.

7    A.   We did some research.  We looked into -- well, I did

8    research, as well as another lawyer assisted me, a gentleman

9    named Jeff Morris.  We were looking for people who had a very

10   strong reputation and a lot of experience in this area of the

11   law, and Mr. Smith came out, we thought was the best choice.

12   Q.   Did Mr. Smith come to Kansas City?

13   A.   Yes, he did.

14   Q.   When would that have been?

15   A.   That would have been around March of 2012.

16   Q.   And he was engaged?

17   A.   Yes, he was.

18   Q.   Did something happen regarding the litigation about that

19   time?

20   A.   Shortly after Mr. Smith was engaged, the FTC filed suit on

21   April 2, 2012.

22   Q.   Was there a board meeting with AMG shortly after that?

23   A.   Yes.

24             MR. BATH:  Can we show just the witness D839, please.

25   Q.   Do you recognize that document, Mr. Muir?

1    A.  Yes.

2    Q.  What do you recognize it to be?

3    A.  This here is agenda of the board of directors meeting for

4    AMG on April 10, 2012.

5    Q.  Can you go to the last page and see if it has signatures on

6    it.

7    A.  Yes, it does.

8    Q.  And are they signatures of board members?

9    A.  They are.

10            MR. BATH:  Offer 839, D839.

11            THE COURT:  Any objection?

12            MR. VELAMOOR:  Can I see the second page?

13            MR. BATH:  Can we see the second page.

14            MR. VELAMOOR:  No objection, your Honor.

15            THE COURT:  Received.

16            (Defendants' Exhibit D839 received in evidence)

17            MR. BATH:  If you could publish, please, and look at

18    the top third.

19    Q.  Is this first page the agenda?

20    A.  Yes, it is.

21    Q.  Are you and Mr. Schulte there?

22    A.  Yes, we are.

23    Q.  And like the others before, Ms. Williams is there too?

24    A.  Yes.

25            MR. BATH:  Can we go to the next page, please, Eli.

HabWtuc1

1    And can we highlight the attending.

2    Q.   The last name on there is Joe Frazier, correct?

3    A.   That's right.

4    Q.   Who is Joe Frazier?

5    A.   Joe Frazier was or became the CFO for MNE.  He replaced

6    Ms. Harris.

7    Q.   And subsequently, sometime in 2012, did Joe Frazier have a

8    different position?

9    A.   Yes.

10   Q.   What was his position in late 2012?

11   A.   In November of 2012, he replaced Mr. Brady as the CEO of

12   MNE.

13   Q.   If we could go back to when the meeting started?

14   A.   9:15.

15   Q.   Could we go to the last page and show when it ended?

16   A.   10:40.

17   Q.   What was the location again, do you remember?

18   A.   It was in Miami, Oklahoma.

19   Q.   And this would have been after the FTC lawsuit?

20   A.   Yes, right after it was filed.

21   Q.   Would that be one of the purposes you were down there?

22   A.   The main purpose we were down there.

23   Q.   Did you make any kind of presentation at all?

24   A.   I would imagine that Mr. Schulte and I both made a joint

25   presentation about the FTC lawsuit.

HabWtuc1

1    Q.  And you had said in the last --

2            MR. BATH:  Let's go to that third page, in fact, and

3    the top Roman numeral.

4    Q.  We see there's something about a closed session?

5    A.  Yes.

6    Q.  Of course, when we see closed session, we don't see what

7    was discussed?

8    A.  No.  There are no minutes taken about what was discussed in

9    closed session.

10   Q.  The two or so prior board meetings we discussed this

11   morning, you were talking with the board about a potential deal

12   between Mr. Tucker and the tribe, right?

13   A.  Yes.

14   Q.  Had the position, had your advice about the deal changed at

15   this board meeting?

16   A.  Yes.

17   Q.  And what did you tell them about whether or not you thought

18   any deal should be done?

19           MR. VELAMOOR:  Objection, your Honor.  Hearsay.

20           THE COURT:  Let me see you at sidebar.

21           By all means, stand up and stretch, and don't forget

22   the deep breath either.  Thank you.

23           (Continued on next page)

24

25

HabWtuc1

1           (At sidebar)

2           THE COURT:  Why isn't it hearsay?

3           MR. BATH:  Judge, his testimony would be that he

4    advised the board that the deal they had been discussing

5    between the tribe and Tucker was not a good idea because of the

6    FTC lawsuit, and that's all he was going to say, that this

7    shouldn't be done.

8           THE COURT:  Right.

9           MR. BATH:  I think him telling that information isn't

10   hearsay.  He's telling them what he told the board.

11          THE COURT:  Right.

12          MR. BATH:  I'm not going to ask him what they asked

13   him or anything like that.

14          THE COURT:  Right.  At a board meeting, it's an event.

15   Why can't he recount that event?  It's not offered for the

16   truth that the deal was a bad idea.

17          MR. BATH:  Right.  It's offered that he said that.

18          MR. VELAMOOR:  I think we've allowed, we've not

19   objected to him testifying to the fact that it was a meeting

20   topic and discussed in the meeting, but now he's taking it a

21   step further to offer specifically what he said at that meeting

22   so that he can argue to the jury exactly the substance of what

23   he told them, which is, "I was on the tribe's side, I told them

24   not to take this deal."

25          THE COURT:  Could he say "I was against the deal"?

1          MR. VELAMOOR:  Yes.  I think he could testify that his

2     position was that it was a bad deal for the tribe.  I don't

3     think he can testify that he advised the tribes previously at

4     this meeting he told them it was a bad idea.

5          MR. BATH:  And I think it was a strategy call by them,

6     which is fine, but I elicited testimony that he was discussing

7     the deal in the first two board meetings, so to complete that,

8     I think even if I didn't have evidence in, I think he should be

9     able to say he said he advised against going forward with the

10    deal.

11         To preview, Judge, for you, what happened was Tucker

12    and the tribe later did the deal.  Mr. Muir was aware of it,

13    but he wasn't involved in negotiating the financial settlement

14    at all, and the point being that Mr. Muir is exercising some

15    independence here and said to everybody, "I don't think you

16    should do that deal."

17         THE COURT:  I'm going to allow it for state of mind.

18         (Continued on next page)

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Go ahead.

3          MR. BATH:  Thank you, Judge.

4   Q.  At the board meeting, did the topic of a potential deal

5   between Mr. Tucker and the tribe come up?

6   A.  Yes.

7   Q.  And did you give the board your opinion of whether or not

8   that should happen, that deal should go forward?

9   A.  Yes, I did.

10  Q.  What did you tell them?

11  A.  I told them I didn't think it was prudent to be doing any

12  sort of deal at this time in the face of the FTC lawsuit.

13  Q.  Mr. Muir, we've heard testimony in this trial about the

14  TILA boxes, correct?

15  A.  Yes.

16  Q.  Prior to the FTC lawsuit, had you been asked to provide

17  legal advice as to the TILA boxes?

18  A.  No, I had not.

19  Q.  After the FTC lawsuit, in fact, were you asked to look at

20  that?

21  A.  Absolutely.

22  Q.  By Mr. Tucker?

23  A.  By the tribes.

24  Q.  OK.  And did you do research?

25  A.  Yes.

1    Q.  All right.  And look into what TILA requires and doesn't

2    require?

3    A.  Yes.

4    Q.  All right.  And did you come to an understanding for

5    yourself what TILA requires?

6    A.  For these loans, yes, I did.

7    Q.  And what was that?

8            MR. VELAMOOR:  Objection, your Honor.  We're way past

9    now the filing of the FTC lawsuit.  His views aren't relevant.

10           THE COURT:  Yes.  Sustained.

11   Q.  Did you do that research in 2012?

12   A.  I did it right after the FTC filed the lawsuit.

13   Q.  And looked at the law in that area?

14   A.  Yes.

15           MR. BATH:  Your Honor, could we approach?

16           THE COURT:  Sure.

17           Ladies and gentlemen, you can stand up again.  Thank

18   you.

19           (Continued on next page)

20

21

22

23

24

25

HabWtuc1

1          (At sidebar)

2          MR. BATH:  Your Honor, I don't know if the

3   government's position is I can't ask him his understanding of

4   what TILA was at all or whether that I had narrowed it to 2012

5   was the problem.  But if they have such a motion, I think we

6   ought to hear it here.

7          MR. VELAMOOR:  Your Honor, Mr. Muir's testified

8   essentially that he had no involvement in TILA up until 2012.

9          THE COURT:  Right.

10          MR. VELAMOOR:  Now, after the FTC's filed a lawsuit,

11  at which point Tucker's company decides to change the loan

12  disclosures to meet the FTC's demands, he wants to offer an

13  opinion as to whether or not presumably what his views are on

14  TILA.  At that point after he's taken himself out of that

15  discussion up until after there's active litigation on the

16  issue can't bear on his state of mind in terms of the issues of

17  whether or not the loan disclosures were proper or not.

18          THE COURT:  At an earlier point in time.

19          MR. VELAMOOR:  At an earlier point in time.

20          THE COURT:  Right.

21          MR. BATH:  And I don't disagree with that, but I'm

22  charged past that point in time, past the FTC lawsuit.

23          THE COURT:  2013.

24          MR. BATH:  Right.

25          THE COURT:  I think on further reflection, Mr. Bath is

HabWtuc1

1   right and I'll allow it, but I'm going to give an instruction

2   to the jury.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HabWtuc1

1          (In open court)

2          THE COURT:  Ladies and gentlemen, the testimony I'm

3     allowing as to a viewpoint held, let's say, in 2012 is

4     admissible because the conspiracy alleged in the indictment is

5     alleged to have continued into 2013.  As you know, it's alleged

6     to have commenced in 1997, and a person can join a conspiracy

7     at any point in time, any point during its existence, as you'll

8     come to learn in the final instructions, and can also withdraw

9     from a conspiracy, but because the conspiracy is alleged to

10    have continued into 2013, I will allow this testimony insofar

11    as it relates to the defendant's state of mind in 2012.

12          Go ahead.

13          MR. BATH:  Thank you, Judge.

14          MR. VELAMOOR:  Your Honor, now that I understand the

15    Court's ruling, could we briefly approach?

16          THE COURT:  All right.

17          It's important that I get things right, ladies and

18    gentlemen, so you'll have to forgive me.  I take

19    responsibility.  Sometimes I need to hear from the lawyers.

20    That's why they're here.  OK?

21          (Continued on next page)

22

23

24

25

1          (At the sidebar)

2          MR. VELAMOOR:  Judge, as I understood the Court's

3    ruling, dependent on if we charged TILA into 2013, I just

4    wanted to point out to the Court we only charged TILA up to

5    2012.

6          THE COURT:  Mr. Ginsberg, now that you have been

7    instructed on which button to press, let's see whether you can

8    implement.

9          Start again.

10         MR. VELAMOOR:  As I understood the Court's ruling,

11   dependent at least in part on the fact that Mr. Muir could have

12   joined the conspiracy to extend loans with false disclosures

13   into 2013, I thought I should point out our TILA counts end at

14   the end of 2012.  And the reason why they end at the end of

15   2012 is because the company, at the behest of the FTC, changed

16   its loan disclosures right at the beginning of 2013.  So

17   throughout 2012 they are being told by the FTC the disclosures

18   are false.

19         THE COURT:  Is the TILA conduct one of the objects of

20   the charged conspiracy in Count One, or any of the other

21   charged conspiracies?

22         MR. VELAMOOR:  So the false TILA disclosures do play

23   into the wire fraud counts, but the wire fraud counts are based

24   on two theories, one being false statements by the owner of the

25   lender, and, secondly, there are some false statements about

1   the terms of the loans.  The false statements about the terms

2   of the loans I think, viewing the indictment as a whole, do not

3   extend into 2013.  Those would have to end at the end of 2012

4   because we allege throughout the indictment that those

5   disclosures changed at the beginning of 2013.

6           MR. SCOTTEN:  The fraud counts also don't depend on

7   failure to comply with TILA.  We are certainly alleging the

8   loan disclosures are false and fabricated, and if Mr. Muir

9   wants to say that I didn't believe the loan disclosures were

10  false or fabricated at any particular point, that's fine.  But

11  the relevance of his belief on TILA compliance ceased at the

12  point the TILA count ceases.

13          THE COURT:  Let me just ask you, is there a month

14  given, or is it given in the TILA counts, a month given, or is

15  it just 2012?

16          MR. VELAMOOR:  In or about 2012.  No month given.

17          THE COURT:  Go ahead, Mr. Bath.

18          MR. BATH:  That leaves us with this obvious gap, being

19  April 2nd to the end of '12.  I am happy to adjust the

20  testimony to cover that time.  I think I have to at least cover

21  2012, unless the government is willing to concede that Mr. Muir

22  had no involvement in TILA.

23          MR. VELAMOOR:  But we are not in that gap because

24  Mr. Muir just testified that he only decided to look at this

25  after April of 2012, after we are outside of the gap.

1          THE COURT:  This is what I am going to do.  I am going

2     to tell the jurors that the TILA counts charge conduct ending

3     in or about 2012, that I was mistaken, the conspiracy count

4     goes to 2013, the TILA counts end in or about 2012.

5     Nevertheless, I will take the testimony for what it's worth.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (In open court)

2       THE COURT:  So, ladies and gentlemen, I stand

3   corrected on something that I told you because it was

4   incomplete.

5       The conspiracy counts in this case extend through in

6   or about 2013.  The Truth in Lending Act counts, the TILA

7   counts, end in or about 2012.  I am going it take this

8   testimony in 2012 for what it's worth.  You will decide what

9   weight, if any, to give on the counts.

10      Now just to put you a little bit at ease, I am going

11  to give you my final instructions on the law.  I am going to

12  give you a copy of the indictment.  So I am throwing around

13  terms here.  And you will also have a verdict sheet that will

14  take you count by count.

15      So what might sound a little bit like maybe a big

16  jumble, I hope will not be so when I take you through the

17  counts, you see the verdict sheet, you see the language of the

18  indictment, and as I told you when we first got together, an

19  indictment is just the allegations that the government must

20  prove; it's not evidence of anything.  But it gives you the

21  allegations.  My instructions give you what the government

22  needs to prove, and the verdict sheet takes you through how to

23  answer the questions.

24      So just be patient.  But you have heard my

25  instructions correcting that the TILA counts end in or about

1    2012.

2              Thank you.

3              You may proceed.

4              MR. BATH:  Thank you, Judge.

5    BY MR. BATH:

6    Q.  Mr. Muir, were you involved in the FTC lawsuit?

7    A.  Yes.

8    Q.  Did you enter an appearance?

9    A.  No.

10   Q.  Did you provide advice?

11   A.  Yes.

12   Q.  The TILA box, did you guys come to agreement on changing

13   the TILA box at some point?

14   A.  Yes, with the FTC.

15             MR. BATH:  Can we show the witness Government's 2702,

16   please.

17             This is admitted.

18   Q.  Mr. Muir, what is the first page of 2702?  What are we

19   looking at?

20   A.  It's an e-mail that was sent from customer service at One

21   Click Cash.

22             MR. BATH:  Can we blow up that top half or so, please.

23   Q.  Who is this sent to?

24   A.  It was sent to Richard Hamner.

25   Q.  He testified earlier at this trial?

HAB8TUC2                    Muir - Direct

1    A.  Yes.

2              MR. BATH:  Can we go to the second page, please, Eli.

3              Can we blow up the top half or so.

4    Q.  Mr. Muir, what are we seeing here?

5    A.  This is the One Click Cash account summary.

6    Q.  Do you see a box that says "pay off amount"?

7    A.  Yes.

8    Q.  Then there is the box to the right of it as well, correct?

9    A.  Yes.

10   Q.  After the FTC lawsuit, did you become familiar with

11   documents like this?

12   A.  Yes.

13   Q.  That was part of the litigation, right?

14   A.  Yes.

15   Q.  Prior to that, did you necessarily review documents like

16   this?

17   A.  No.

18             MR. BATH:  This document -- if we can come back out

19   now, Eli.

20   Q.  How does this document, if you know, get generated?

21   A.  My understanding was that the customer would have had to

22   log in to the company portal and then made some affirmative

23   choices and that would have generated this document.

24             MR. BATH:  Can we go back into the pay off amount box,

25   please, Eli.

1    Q.  So what information in the pay off box is being

2    communicated?

3    A.  It shows that he is scheduled a payment of $325 on November

4    2, 2012.

5            MR. BATH:  Can we go back to the first page of this

6    document.

7            If we can blow up from the very top through to the

8    bottom of that box, please, Eli.

9    Q.  This document is dated when?

10   A.  October 25, 2012.

11   Q.  And it is to whom again?

12   A.  To Mr. Hamner.

13   Q.  It tells him about a payment due?

14   A.  Yes.

15   Q.  What is the payment?

16   A.  $325.

17   Q.  Would this first page of 2702 have come after the second

18   page?

19   A.  Yes.

20   Q.  What is the purpose of this e-mail being sent to Mr.

21   Hamner?

22   A.  This is advising the customer that the company will debit

23   $325 from his account on the due date.

24   Q.  Did you come to learn, is it normal for the company, One

25   Click Cash, for instance, to communicate electronically?

1    A.  Yes.

2    Q.  Why is that?

3    A.  That was the normal course of how the company communicated

4    with the customers.

5          MR. BATH:  Eli, can we take that down and show just to

6    Mr. Muir Defendants' Exhibit 1207.

7    Q.  Do you recognize that document?

8    A.  Yes, I do.

9    Q.  Generally, what is that document?

10   A.  This is an e-mail that would have went to customers

11   advising them how they would log in to the Web site to look at

12   their account.

13   Q.  This e-mail would have been done in the normal or ordinary

14   course of business?

15   A.  Yes.

16         MR. BATH:  Offer 1207.

17         MR. VELAMOOR:  Objection, your Honor.  This is not a

18   business record.  There is no reason why he should aware.

19         THE COURT:  This is purportedly a business record of

20   what entity?

21         MR. BATH:  This would be 500 FastCash, your Honor.

22         I thought our stipulation covered these documents and

23   then in addition Mr. Muir's testimony.

24         MR. VELAMOOR:  We are not doubting that it's

25   authentic.  We are saying that an e-mail sent to a customer is

1   not a business record.

2           THE COURT:  If you can tie this in to this witness,

3   maybe you can get it in.

4   BY MR. BATH:

5   Q.  Mr. Muir, this document that we are looking at, does it

6   pertain to somebody who testified in this trial?

7   A.  Yes, it does.

8   Q.  And would this document be kept in the ordinary course of

9   the business of 500 FastCash?

10  A.  Yes.  ECash would have stored it.

11          THE COURT:  What business is -- 500 FastCash is doing

12  business as name, is that correct, Mr. Bath?

13          MR. BATH:  Yes.

14          THE COURT:  Why don't you ask it as to the entity.

15  Q.  500 FastCash is a d/b/a for which entity?

16  A.  At this particular time it would have been Red Cedar

17  Services.

18  Q.  Would this document have been kept in the ordinary course

19  of Red Cedar Services' business?

20  A.  It would have been kept in the ordinary course by AMG

21  Services for Red Cedar Services.

22  Q.  You said it was stored and created by eCash?

23  A.  ECash kept copies of any correspondence that was sent to

24  customers.

25          MR. BATH:  I offer 1207.

1      MR. VELAMOOR:  Except Mr. Muir has been telling us

2  that he works for an independent law firm.

3      THE COURT:  You can object --

4      MR. VELAMOOR:  Object.

5      THE COURT:  -- or if you want a brief voir dire, I

6  will allow you a brief voir dire.

7  VOIR DIRE EXAMINATION

8  BY MR. VELAMOOR:

9  Q.  Sir, you testified that you were a part of an independent

10  separate law firm, correct?

11  A.  Yes.

12  Q.  With The Muir Law Firm?

13  A.  Yes.

14  Q.  A separate entity from the one that you claim is

15  maintaining these business records?

16  A.  That is correct.

17  Q.  Yet you're trying to offer testimony --

18      THE COURT:  Sustained as to that question and

19  sustained as to the objection.

20      MR. BATH:  Thank you, Judge.

21      You can take that down now.

22      Can we put up for Mr. Muir Defendants' Exhibit 1451.

23  BY MR. BATH:

24  Q.  Mr. Muir, do you recognize that document?

25  A.  Yes.

1    Q.  Is that an e-mail that you were involved in?

2    A.  Yes, it is.

3    Q.  You were the author of?

4    A.  Yes.

5    Q.  Generally, what topic does it relate to?

6    A.  It relates to a license agreement.

7    Q.  Between whom?

8    A.  It would have between BA Services, a company that Mr.

9    Tucker owned, and AMG Services, the Miami tribe's company.

10            MR. BATH:  Offer Defendants' Exhibit 1451.

11            MR. VELAMOOR:  No objection, your Honor.

12            THE COURT:  Received.

13            (Defendants' Exhibit 1451 received in evidence)

14            MR. BATH:  Can you publish that please, Eli.

15            Does that have two pages, Eli?

16   BY MR. BATH:

17   Q.  The second page, what information is contained there?

18   A.  That would be my e-mail signature block.

19            MR. BATH:  Can we go to the first page.  Can we do the

20   bottom half of the page.

21   Q.  First let's start with the date.

22   A.  June 25, 2012.

23   Q.  It's from you to whom?

24   A.  I am sending it to Tom Gamble and Don Brady, and Scott

25   Tucker is cc'd.

1   Q.  Can you tell us what this is.

2   A.  Mr. Brady and Mr. Gamble and Mr. Tucker had asked me to

3   make revisions to a license agreement.  So I am telling them,

4   as you requested, here is a draft of that.  I say it's almost

5   complete.  And then I reiterate that I made revisions as they

6   requested, and I further reiterate, as I have stated many

7   times, I have reviewed, revised this agreement for structure

8   and protection of the business, in quotes, and I have not

9   participated in the negotiation of the financial terms.

10  Q.  What does that mean?

11  A.  At this particular time, and actually going back to January

12  of 2012 when Mr. Tucker and the tribe first began their

13  negotiations, I made it clear that my services -- I cannot

14  provide advice on any financial terms between the two parties.

15  Q.  Why is that?

16  A.  Because I would be conflicted at that point.

17  Q.  Why is that?

18  A.  Because if two sides of a deal, you try to take a position

19  that is to the benefit of one to the detriment of the other,

20  you have an inherent conflict right there.

21  Q.  That's what you're telling them in this e-mail?

22  A.  Yes.

23          MR. BATH:  Can we go up to the top part of that

24  document, please.

25  Q.  This e-mail at the bottom of this is what?

A.  This is where I forwarded on the e-mail I had sent and I am

telling them, I said -- and, again, this would have been Mr.

Gamble, Mr. Brady and Mr. Tucker, and I say, "I cannot find his

e-mail address.  So please e-mail it on to him."

    Then the followup e-mail, I define "his" as Doug.

Q.  Who is Doug?

A.  That would have been Doug Lankford.

          MR. BATH:  Thank you.  You can take that down.

          Can we show Mr. Muir only Defense Exhibit 1452,

please.

Q.  Do you recognize this?

A.  Yes.

Q.  What do you recognize it as?

A.  It's not entirely, but it is almost the same e-mail we were

just looking at.

Q.  Same topic?

A.  Yes.

          MR. BATH:  Offer 1452.

          MR. VELAMOOR:  Objection.  Hearsay.

          MR. BATH:  We are just offering it to show that he

forwarded the information.

          THE COURT:  Yes.  Overruled.

          (Defendants' Exhibit 1452 received in evidence)

          MR. BATH:  Can you publish, Eli.

BY MR. BATH:

1  Q.  Let's start at the bottom half of the document.

2      This is the same we just saw in the prior e-mail?

3  A.  It is the middle e-mail on the prior e-mail, yes.

4          MR. BATH:  If we can go up, please.

5  Q.  This top part is different than the last document, is that

6  correct?

7  A.  Yes.

8  Q.  How so?

9  A.  I am forwarding this e-mail on to Mr. Schulte.

10 Q.  Why are you doing that?

11 A.  I wanted to make sure he was apprized.

12 Q.  Of?

13 A.  Of the document that they had asked me to revise and that I

14 sent to them.

15         MR. BATH:  Thank you, Eli.

16         You can take that down.

17 Q.  Were you involved in whether or not that document got

18 executed?

19 A.  That one, no.

20     Well, I had printed it for them for them to sign.  That was

21 the extent of my involvement.

22 Q.  After you printed it, did you do anything more with it?

23 A.  No.

24 Q.  Let's go to the fall of 2012.  Is Don Brady no longer

25 working for the tribe?

1   A.  At the end of November 2012, yes.

2   Q.  Somebody else is promoted to his position?

3   A.  Yes.

4   Q.  Who is that?

5   A.  Joe Frazier.

6   Q.  Spell that last name.

7   A.  F-R-A-Z-I-E-R.

8   Q.  At some point in time, sometime in '12, were there any

9   negotiations, other than the license agreement you just

10  mentioned, negotiations between the tribe and Mr. Tucker, if

11  you're aware?

12  A.  I don't think so.  I think it ended with the license

13  agreement.

14  Q.  Sometime in 2013, did you attend a CLE regarding the

15  sovereign model?

16  A.  Yes, I did.

17  Q.  Where did you attend that CLE?

18  A.  It was in Washington, D.C.  It was put on by the American

19  Bar Association.

20  Q.  Generally, what were the topics of that CLE?

21          MR. VELAMOOR:  Objection, your Honor.

22          CLE in 2013?

23          THE COURT:  Why don't you fix a date and time.

24          MR. BATH:  I will.

25  Q.  Do you remember the month?

1    A.  I do not remember the month.

2    Q.  Would a document help refresh your memory?

3    A.  Yes, it would.

4            MR. BATH:  Can we show just the witness Defendants'

5    1427, please.

6    A.  OK.

7    Q.  Does that refresh your memory at all on the date?

8    A.  Yes, it does.

9    Q.  What was the date?

10   A.  It was April of 2013.

11           THE COURT:  I will allow the testimony.

12           Go ahead.

13   Q.  That CLE you said was where?

14   A.  It was in D.C.  It was put on by the American Bar

15   Association.

16   Q.  What is the American Bar Association?

17   A.  It's a nationwide bar association.

18   Q.  They put on lots of different CLEs?

19   A.  All different types of topics.

20   Q.  This topic was specifically what?

21   A.  The sovereign model, and the sovereign model was referring

22   to tribal online lending.

23   Q.  Did you attend with anybody else?

24   A.  Yes.  I attended with my partner, Matt Dykstra.

25   Q.  How many people were there?

1    A.   These types of CLEs were very large.

2    Q.   This CLE?

3    A.   This CLE?  A couple of hundred people.

4    Q.   Was it a couple of hours, was it a day long?

5    A.   This CLE, probably 90 minutes.

6    Q.   In that CLE were topics discussed similar to ones you have

7    told us about?

8    A.   Yes.

9    Q.   Were you a presenter?

10   A.   No.

11   Q.   There were other lawyers?

12   A.   Yes.  I think the panel had about five different lawyers.

13   Q.   Were any of those lawyers known to you?

14   A.   Yes.

15   Q.   Were any of them you had worked with?

16   A.   At this time, no.

17   Q.   For instance, Conly Schulte or no one in his firm was

18   presenting?

19   A.   No.

20   Q.   You say how many lawyers presented?

21   A.   I think it was five lawyers, four or five lawyers.

22   Q.   Did they cover tribal sovereignty?

23   A.   Yes.

24   Q.   Sovereign immunity?

25   A.   Yes.

1    Q.  And lending under the tribal model?

2    A.  That's right.

3    Q.  And that information that was presented at that CLE was

4    part of what you relied on on your belief that this model was

5    lawful?

6            MR. VELAMOOR:  Objection, your Honor.  Leading as

7    well.

8            THE COURT:  Sustained as to form.

9    Q.  Was the information presented at this seminar by these

10   lawyers consistent or inconsistent with what you understood?

11           MR. VELAMOOR:  Objection, your Honor.

12           THE COURT:  Sustained.

13   Q.  How did this information presented at the seminar impact

14   you, Mr. Muir?

15           MR. VELAMOOR:  Objection, your Honor.

16           THE COURT:  I will allow it.

17   A.  This was a CLE put on by the ABA for an online lending

18   model that I had been representing since 2006.  So as a

19   nationwide panel in 2013, they are putting on a CLE about the

20   exact model I had been involved with.

21       For me --

22           THE COURT:  You have answered the question.

23           THE WITNESS:  Sorry, your Honor.  I didn't think I

24   did.

25           THE COURT:  Next question.

1   Q.  Did anything presented at that CLE change your opinion on

2   the tribal model?

3   A.  No.

4   Q.  In 2013, early 2013, were there any plans made for you or

5   the tribes to meet with federal regulators?

6   A.  Yes.

7   Q.  When did you begin planning to have those meetings?

8   A.  We had been planning in August of 2013.

9   Q.  Do you remember what -- were there meetings?

10  A.  There were meetings, yes.

11  Q.  What month did that take place?

12  A.  A couple were in September and I think one was in October.

13          MR. VELAMOOR:  Objection, your Honor.  That's outside

14  the charged conduct.

15          THE COURT:  The jury is aware and will be aware of the

16  dates covered by the charged conduct.

17          Next question.

18  Q.  At some point in time in August of '13, was there an

19  agreement between the tribe and Mr. Tucker?

20  A.  The Miami tribe, yes.

21          MR. BATH:  Can we show just the witness Defense

22  Exhibit 1456.

23  Q.  Do you recognize that document?

24  A.  Yes, I do.

25  Q.  What is that document generally?

1  A.  It is a settlement agreement and release between Mr.

2  Tucker, several of the companies that he owns, and MNE

3  Services, Inc. and AMG Services, Inc., owned by the Miami

4  tribe.

5         MR. BATH:  Can we go to the last page of that

6  document.

7         I'm sorry.  That's an exhibit.

8  Q.  Do you see a signature on page 11?

9  A.  Yes, I do.

10  Q.  Whose signature?

11  A.  I recognize that as Joe Frazier's signature.

12  Q.  What is his position at this time?

13  A.  At this time he is the CEO of AMG Services and MNE

14  Services.

15  Q.  Are there signatures on page 10?

16  A.  Yes.

17  Q.  Whose signature is that?

18  A.  Those are all Mr. Tucker's signatures.

19         MR. BATH:  Can we go back to the first page, Eli, and

20  blow up the date for Mr. Muir.

21  A.  It's dated July 1, 2013.

22         MR. BATH:  Offer 1456.

23         MR. VELAMOOR:  May I ask a few questions?

24         THE COURT:  Yes.

25

1   VOIR DIRE EXAMINATION

2   BY MR. VELAMOOR:

3   Q.  Mr. Muir, this was purportedly an agreement to provide the

4   terms for future lending between Mr. Tucker and the tribes,

5   right?

6   A.  No.  This looks backwards.

7   Q.  The settlement agreement and release did not set forth the

8   different financial terms going forward?

9   A.  No.  That was a separate document.

10            MR. VELAMOOR:  No objection.

11            THE COURT:  Received.

12            (Defendants' Exhibit 1456 received in evidence)

13            MR. BATH:  Can we just publish that?

14            MR. VELAMOOR:  Judge, in light of that we object to

15  certain content and think it should be redacted, and it's

16  irrelevant for the purposes of the Act.

17            MR. BATH:  We can maybe work on that during the break.

18            THE COURT:  Why don't you do that on the break.  Just

19  don't display it for the moment.

20            MR. BATH:  We can take that down.

21  BY MR. BATH:

22  Q.  Regarding 1456, what would you call that document?

23  A.  The one we just looked at?

24  Q.  Yes.

25  A.  That was an agreement that was looking back and settling up

1   the terms between Mr. Tucker and the Miami tribe for the years

2   2009 through, I think, 2012.

3   Q.  Had there been a written agreement in place -- when was the

4   last written agreement placed between the tribe and Mr. Tucker,

5   do you know?

6   A.  Would have been late 2008 or probably -- they were

7   terminated because of the Hallinan lawsuit in November 2008.

8   Q.  That was the last written agreement?

9   A.  That I was aware of, yes.  Then there was the license

10  agreement in '12.

11  Q.  That's one you were involved in negotiating?

12  A.  Yes.

13  Q.  The settlement agreement we just looked at 1456, were there

14  other agreements executed at that time?

15  A.  Yes.

16  Q.  What were the names of those agreements?

17  A.  There was a subsequent license agreement and there was also

18  a data analytics and consulting agreement.

19  Q.  Did you draft -- what was your involvement in that

20  agreement?

21      Bad question.

22      Defendant's 1456 that was admitted, what was your

23  involvement in that agreement?

24  A.  I helped draft that agreement.

25  Q.  Were other lawyers involved?

1    A.  Yes.  There were a lot of lawyers involved.

2    Q.  Who represented whom?

3    A.  Mr. Tucker had a transactional lawyer named Joe Harter.  He

4    had an IP lawyer, Andrew Colombo, that we heard about.

5    Mr. Fleischer weighed in for tax purposes.  Mr. Chapin also

6    advised for tax purposes.

7    Q.  And counsel for the tribe?

8    A.  The tribe had Mr. Schulte's firm and some of their

9    transactional lawyers.  They also had it looked at by Stinson

10   Morrison & Hecker, a firm out of Kansas City, Dorsey & Whitney

11   reviewed it, Kirkland & Ellis reviewed it, and there was a

12   midsized, smaller firm out of Springfield, Missouri, that the

13   tribe also retained to review the document.

14   Q.  This document had been worked on for a period of time?

15   A.  About eight months.

16        MR. BATH:  Your Honor, given our issue with that one

17   document, would this be a good time to break?

18        THE COURT:  That's fine.  It's about the time we break

19   anyway.

20        Ladies and gentlemen, please do not discuss the case

21   among yourselves or with anyone.  We will be back in action in

22   ten minutes.

23        (Jury exits courtroom)

24

25

1           (Jury not present)

2           THE COURT:  All right.  Do you want to have a chance

3    to see whether you can agree on redactions?  Let's try that.

4           We are in recess.  Thank you.

5           (Recess)

6           THE COURT:  Do we have any kind of an agreement?

7           MR. BATH:  We have an agreement.  I am only going to

8    show some portions today before lunch, and those aren't

9    objected to, and then we will work on sections of it.

10          THE COURT:  Very good.  Thank you.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2               THE COURT:  Please be seated.

3               Mr. Bath, you may continue.

4     BY MR. BATH:

5     Q.  Mr. Muir, I am going to show you 1456.

6          Is that up on your screen?

7     A.  Yes, it is.

8               MR. BATH:  Eli, can you publish that.

9     Q.  This is a settlement agreement we spoke about?

10    A.  Yes.

11    Q.  And the date again is?

12              MR. BATH:  Highlight that date, Eli.

13    A.  July 1, 2013.

14    Q.  Who are the parties?

15    A.  It is between Scott Tucker, BA Services, LLC, Black Creek

16    Capital Corporation, NM Service Corp., and then MNE Services,

17    AMG Services, and that's it.

18    Q.  This document you said had been worked on by a number of

19    lawyers, is that right?

20    A.  Yes.

21    Q.  Who on behalf of Mr. Tucker?

22    A.  Before the break I was wrong.  It was not Joe Harter.  He

23    did not work on this.  This was two gentlemen who had a small

24    firm, Ricardo Fontg and Chad Hansen.

25    Q.  Harter didn't work on the document?

1   A.  I don't think Mr. Harter was involved anymore.  I could be

2   wrong.

3   Q.  In prior documents?

4   A.  In prior documents, yes.

5            MR. BATH:  Can we go to the signature page, please,

6   Eli.

7   Q.  So this page 10 has the same person signing.

8        Who is that?

9   A.  That is Mr. Tucker's signature.

10  Q.  On behalf of the companies you have described earlier?

11  A.  Himself, individually, and on behalf of those companies.

12           MR. BATH:  Can we go to the next page, Eli.

13  Q.  And we have the same person signing for whom?

14  A.  Mr. Frazier signs for AMG Services and MNE Services.

15           MR. BATH:  Thank you, Eli.

16           Can we please show Defense 921A, Eli.

17           This is admitted.

18           Please publish this to the jury.

19  Q.  What is this, Mr. Muir?

20  A.  This is an annual report for MNE for the fiscal year ending

21  September 30, 2013.

22  Q.  And we see a name on behalf of MNE, do we not, there?

23  A.  Yes, Joe Frazier.

24  Q.  Is that the same Mr. Frazier we saw earlier?

25  A.  Yes, it is.

1            MR. BATH:  Can we go to the third page of that

2    document be, Eli.

3            Can we blow up the second-to-last paragraph,

4    "financial results."

5    Q.  Mr. Muir, the total asset number we see there, what is that

6    number?

7    A.  That number is $189,490,000.

8    Q.  Did you have any hand in preparing this document?

9    A.  No.

10            MR. BATH:  Can we go to the next page, please.

11            Go down to the last entry, "net income."

12    Q.  What is that number for MNES?

13    A.  $99,979,099.

14            MR. BATH:  Go to the fifth page.

15            I'm sorry.  Can we look at the top columns.

16            MR. VELAMOOR:  I believe the witness testified he had

17    no involvement in this document.  Him reading from it, which

18    has already been put into evidence, and having it read from

19    through another witness I think is not relevant.

20            THE COURT:  What are we doing?

21            MR. BATH:  I am going to ask Mr. Muir to look at this

22    document, and I have got one last summary chart that the

23    government introduced and have him take a look at that.

24            THE COURT:  I don't think anybody is objecting to you

25    having him look at it.  I don't think that's the thrust of the

1    objection.

2               Are you going to ask him about the document?

3               MR. BATH:  I was going to ask about specific numbers.

4    I can just highlight those numbers.

5               THE COURT:  All right.  If it's in evidence, you can

6    refer to it in your closing.

7               MR. BATH:  Yes, sir.  I understand that.

8               THE COURT:  Go ahead.  Let me hear the question.

9    BY MR. BATH:

10   Q.  Can you highlight that top column there.

11       What two companies are involved on this document, Mr. Muir?

12   A.  MNE Services and AMG Services.

13              MR. BATH:  If we can go to the very bottom of that

14   document, the last question on this document.

15   Q.  Does that far right number match up, as you can see, with

16   the consolidated totals?

17   A.  It appears to, yes.

18              MR. BATH:  Thank you, Eli.

19              Eli, can we show Government Exhibit 3551.

20              Can we show just the first page.

21              Can we go to page 48 of this document.

22              This has been admitted.  Can we publish that?

23   BY MR. BATH:

24   Q.  You saw this document?  It was introduced by the

25   government.

1    A.  Yes, I did.

2    Q.  At the top, on the right-hand column, what years does that

3    cover?

4    A.  It says 2008 to 2012.

5    Q.  So the annual report we looked at on D921A and those

6    numbers you just gave us, are they included on this summary

7    chart?

8    A.  It does not appear to be.

9              MR. BATH:  Thank you, Eli.

10             That's all I have.

11             THE COURT:  All right.  Cross-examination.

12             I'm sorry.  Mr. Ginsberg.

13             MR. GINSBERG:  I just have a few questions.

14   CROSS-EXAMINATION

15   BY MR. GINSBERG:

16   Q.  Good afternoon, Mr. Muir.

17   A.  Good afternoon, Mr. Ginsberg.

18   Q.  Earlier in your testimony you mentioned an individual by

19   the name of Mr. Chapin.

20   A.  Yes.

21   Q.  Who worked for Scott Tucker, is that correct?

22   A.  Yes.

23   Q.  And in what capacity, can you remind us, did he work in?

24   A.  I'm sorry?

25   Q.  What capacity did he work for Mr. Tucker?

1    A.  He was his tax attorney.

2    Q.  If you know, in that capacity, did Mr. Chapin advise Mr.

3    Tucker on the amount of capital investments Mr. Tucker had made

4    to fund the travel loans?

5              MR. VELAMOOR:  Objection, your Honor.

6              THE COURT:  Sustained as to form.  This is beyond the

7    scope of the direct and, therefore, you're making him your own

8    witness, and you must avoid leading.

9              MR. GINSBERG:  Can I do that?  Can I make him my own

10   witness to do that then?

11             THE COURT:  Pardon me?  You can, but you can't lead.

12             MR. GINSBERG:  OK.

13   BY MR. GINSBERG:

14   Q.  Were you aware of the kinds of financial information that

15   Mr. Chapin was providing to Mr. Tucker?

16   A.  I was aware of the legal services that Mr. Chapin was

17   providing Mr. Tucker, yes.

18   Q.  Were you aware of the financial services that he was

19   providing?

20   A.  Yes.

21   Q.  Were you aware of whether or not he provided information

22   regarding Mr. Tucker's capital investments in the lending

23   business?

24   A.  Yes, I was.

25             MR. VELAMOOR:  Objection.  Relevance.

1    THE COURT:  I will allow that answer to stand.

2          Please confine yourself to relevant inquiries.

3   Q.  In addition, were you aware if Mr. Chapin in his capacity,

4   in his financial capacity, advised Mr. Tucker as to the various

5   portfolios or bank accounts?

6          MR. VELAMOOR:  Same objection, your Honor.

7          THE COURT:  Sustained.

8   Q.  Generally, what financial type of information or work did

9   Mr. Chapin do for Mr. Tucker?

10         MR. VELAMOOR:  Same objection, your Honor.

11         THE COURT:  If you know.

12         THE WITNESS:  I do know, your Honor.

13         THE COURT:  What type?

14  A.  Mr. Chapin was retained for a large study to determine how

15  much capital Mr. Tucker had initially provided to the tribal

16  lenders.

17         THE COURT:  Thank you.

18  Q.  And in doing that, were you aware if he analyzed the moneys

19  that were in various bank accounts?

20  A.  Yes.

21         THE COURT:  What point in time was this?

22         THE WITNESS:  Your Honor, this would have been for

23  several years, beginning in 2007.

24         THE COURT:  No.  What point in time did Mr. Chapin do

25  his work?

1        THE WITNESS:  I was answering your Honor.  It was a

2    multi-year project.

3        THE COURT:  I see.  He started his work in 2007?

4        THE WITNESS:  Either late 2007 or --

5        THE COURT:  When did he complete his work?

6        THE WITNESS:  He never completed it.

7        THE COURT:  Next question.

8    BY MR. GINSBERG:

9    Q.  Did there come a time when the Miami tribe fired Blaine

10   Tucker?

11   A.  Yes.

12   Q.  Did there come a time where the Miami tribe fired Scott

13   Tucker?

14   A.  Yes.

15   Q.  Did there come a time when the Miami tribe terminated the

16   servicing agreements with Scott Tucker and the entities that he

17   was involved in?

18   A.  Yes.

19   Q.  Approximately what year was that that these things took

20   place?

21   A.  The termination of employment, probably in 2014, maybe

22   2013, somewhere around that period.  The service agreement,

23   there was a termination of the original one in 2008.  And then

24   they terminated all their agreements with Mr. Tucker in 2014.

25        MR. GINSBERG:  Thank you.

1          I have no further questions.

2          THE COURT:  All right.  Cross-examination.

3          MR. VELAMOOR:  Thank you, your Honor.

4    CROSS-EXAMINATION

5    BY MR. VELAMOOR:

6    Q.  Mr. Muir, you testified that the loan business was up and

7    running when you joined the company, right?

8    A.  Yes.

9    Q.  So you joined an operation that was already in place?

10   A.  That's right.

11   Q.  You came in as general counsel of CLK?

12   A.  Yes.

13   Q.  In that position you became the senior legal person in the

14   company, right?

15   A.  I was the only legal person in the company.

16   Q.  As the only legal person in the company, you were

17   ultimately responsible for the company's legal issues, right?

18   A.  I don't think that I would have been ultimately responsible

19   for the legal issues.

20   Q.  You were the only person providing any kind of advice

21   internally on the legal issues, right?

22   A.  Internally, correct.

23   Q.  It was important for you to bring yourself up to speed on

24   how the business was running, right?

25   A.  Yes.

1    Q.  As well as all the legal issues the company was facing?

2    A.  Yes.

3    Q.  You needed to bring yourself up to speed in order to do a

4    good job, right?

5    A.  Yes.

6    Q.  Regardless of whether you were using outside counsel to

7    help you or not?

8    A.  That's right.

9    Q.  And you did that in this case?  You brought yourself up to

10   speed in this case?

11   A.  I tried my best, yes.

12   Q.  As part of that process you became familiar with the terms

13   of the loans that the business offered, right?

14   A.  Through the years, yes.

15   Q.  So you knew what the annual interest rates were on these

16   loans, right?

17   A.  Yes.

18   Q.  You knew that the annual interest rates were in the

19   hundreds of percent and higher?

20   A.  Yes.

21   Q.  You knew the portfolios were lending in most states around

22   the country, right?

23   A.  Yes.

24   Q.  Including in New York?

25   A.  Yes.

1    Q.  Including in many states with usury limits of less than 50

2    percent per year, right?

3    A.  Yes.

4    Q.  Such states including New York, right?  You knew that?

5    A.  Yes.

6    Q.  Pennsylvania, North Carolina, New Hampshire, other states

7    with similar usury limits, right?

8    A.  Yes.

9    Q.  The company was lending in those states?

10   A.  Yes.

11   Q.  And in fact, you knew that the rates that the company was

12   charging were way more than two times as high as the limits in

13   those states?

14   A.  I would have known that, yes.

15   Q.  In fact, usually more than ten times as high, right?

16   A.  In some instances it could have been, yes.

17   Q.  You knew that these states, including New York, outlawed

18   loans with rates as high as those, right?

19   A.  I was aware of the New York usury law, yes.

20   Q.  And that usury law outlawed or banned the kinds of loans

21   that this business was offering, right?

22   A.  That wasn't my position.

23   Q.  That was certainly the position of New York, right?

24   A.  I disagree with that.

25   Q.  That was the position of New York, right?

1    A.   I disagree with that question.

2    Q.   You disagree with the question?

3    A.   As I read the New York usury statutes, I did not think that

4    was outright ban, no.

5           THE COURT:  The question that you were asked was:

6    "That was certainly the position of New York, right?"

7           You can say yes, it was, no, it wasn't, but you can't

8    disagree with the question.

9    A.   Then I say no, it wasn't.

10          THE COURT:  Next question.

11   Q.   You received complaints from attorneys general from around

12   the country, right?

13   A.   Yes.

14   Q.   Including from the Attorney General of New York, right?

15   A.   Yes.

16   Q.   Complaining about the loans that this business was

17   offering, right?

18   A.   Correct.

19   Q.   Claiming that those loans that the company was offering

20   were illegal in New York, right?

21   A.   That's what their position was, yes.

22   Q.   You also received and reviewed complaints from the Better

23   Business Bureau, right?

24   A.   That's right.

25   Q.   Hundreds, if not thousands, of complaints from the Better

1  Business Bureau as well as attorneys general?

2  A.  From all over the country, yes.

3  Q.  And you knew that the company was already in active

4  litigation against at least one state when you joined, right?

5  A.  Yes.

6  Q.  And that it would soon enter into active litigation with

7  yet another state, right?  California?

8  A.  That happened, yes.

9  Q.  And had already entered into an agreement and resolutions

10  with other states to stop lending, right?

11  A.  I don't know when the West Virginia resolution was, but,

12  yes, that happened.

13  Q.  So you knew that the reason that Tucker entered into these

14  relationships with Indian tribes was to evade these laws,

15  right?

16  A.  I did not know that.

17  Q.  You knew that the reason why you entered into relationships

18  with Indian tribes was because of these state laws, right?

19  A.  Because of those laws, yes.

20  Q.  And you also knew that the loan business had to follow

21  federal laws regarding loan disclosures, right?

22  A.  Yes.

23  Q.  In fact, you testified that you researched federal consumer

24  lending laws, right?

25  A.  Yes, I did.

1   Q.  You knew that regardless of any kind of relationship with

2   Indian tribes, federal laws had to be followed?

3   A.  My understanding is for the most part, yes.

4   Q.  And including, for example, the Truth in Lending Act,

5   right?

6   A.  Yes.

7   Q.  No tribal relationship of any kind can be a defense, for

8   example, to federal claims relating to the Truth in Lending

9   Act?

10  A.  That's correct.

11  Q.  Or a wire fraud claim based on false disclosures, tribes

12  wouldn't help you with that, right?

13  A.  I don't understand your question.  I'm sorry.

14  Q.  Federal claims relating to false disclosures, no tribal

15  relationship could help you with that, right?

16  A.  For the false disclosures?

17  Q.  Yes.

18  A.  Under TILA?  No.

19  Q.  Now, you testified that you weren't asked to look at the

20  loan disclosures before 2012, but you made yourself aware of

21  them in your capacity as general counsel?

22  A.  I was aware of them, yes.

23  Q.  In fact, you reviewed complaints not only that loans were

24  illegal in certain states, but you also reviewed complaints

25  that the company's loan terms were false and misleading, right?

1    A.   Yes.

2    Q.   The customers were being misled by the renewal process?

3    A.   That's what the customers were saying, yes.

4    Q.   As well as by the TILA disclosures, right?

5    A.   I don't ever recall a complaint referring to TILA

6    disclosure until the FTC lawsuit.

7    Q.   There were certainly complaints that people were being

8    mislead by disclosures the company was making about the loans,

9    right?

10   A.   That's what they were saying, yes.

11   Q.   Regardless of whether you recall them mentioning the Truth

12   in Lending Act or not?

13   A.   Correct.

14   Q.   You reviewed reports totaling and categorizing these

15   complaints, right?

16   A.   Yes, I did.

17   Q.   And customers being deceived by the loan terms was one of

18   the more common complaints the company had, right?

19   A.   There was confusion about the loan terms with some of those

20   complaints, yes.

21   Q.   So you knew, as a result of familiarizing yourself with the

22   loan terms, you knew how the company was describing the terms

23   of the loans, right?

24   A.   I had a general understanding, yes.

25   Q.   You looked at these disclosures, right?

1   A.   Yes.

2   Q.   Regardless of whether as general counsel someone gives you

3   a task to look at something, if it's a legal issue relating to

4   the company, it's something that you need to pay attention to,

5   right?

6   A.   I agree with that.

7   Q.   And you knew, for example, that all of the loan portfolios

8   used the same loan disclosures, right?

9   A.   Correct.

10  Q.   As well as the same formulas for filling out the Truth in

11  Lending Act boxes, right?

12  A.   Yes.

13  Q.   Including, to be more specific, the information that was

14  presented in the finance charge box as well as the total of

15  payments box, right?

16  A.   Right.

17  Q.   You knew that in every loan disclosure the company issued

18  the finance charge always equaled the amount of a single

19  finance charge, right?

20  A.   Yes.

21  Q.   So, for example, on a $300 loan, the disclosure always said

22  the finance charge was $90, right?

23  A.   Yes, it did.

24  Q.   The total of payments box always said that the total

25  amount, total payment equaled the total amount borrowed plus a

1    single finance charge?

2    A.  Yes.

3    Q.  So, for example, on a $300 loan, disclosures always said

4    for the total of payments $390?

5    A.  That's correct.

6    Q.  You also knew that the company's loans were structured to

7    automatically renew, right?

8    A.  I came to learn that, yes.

9    Q.  I am assuming you learned relatively soon when you started

10   that they were automatic renewals, right?

11   A.  Correct.

12   Q.  So in other words, when I say automatically renew, it means

13   that the default setting was that the customer would not pay

14   off the loan in full at the first payday, correct?

15   A.  That's correct.

16          MR. VELAMOOR:  Let's put up Government Exhibit 1911.

17   I think it's in evidence.

18   Q.  You have seen this before, right, Mr. Muir?

19   A.  In this case, yes.

20   Q.  You say you never saw the company's training materials

21   before this case?

22   A.  I'm not saying that.  I don't recall seeing this in the

23   company's training materials.

24   Q.  You knew that -- the box at the bottom describes the

25   payment process for a $300 loan, right?

1   A.  Yes.

2   Q.  By automatic renewal it meant that unless the customer took

3   some action to pay off the loan earlier, the schedule here is

4   the schedule that the customer would pay to pay off the loan,

5   right?

6   A.  Yes.

7   Q.  And that's the schedule here in 1911?

8   A.  If they made all the payments, that would be the schedule.

9   Q.  And according to this schedule, then, the customer would

10  pay $675 in finance charges, right?

11  A.  Correct.

12  Q.  On a $300 loan?

13  A.  Correct.

14  Q.  So the total of payments for a $300 loan would be $975,

15  right?

16  A.  Under the terms of that loan, yes, it would be.

17  Q.  As general counsel of the company you could have proposed,

18  for example, changes in the content of the TILA boxes at any

19  point, right?

20  A.  I could have suggested it, yes.

21  Q.  Now, in fact, there were people at the company who raised

22  concerns about the loan disclosures, right?

23  A.  I have come to learn that, yes.

24  Q.  You have only come to learn that during this trial?

25  A.  No.  I was made aware of that in the FTC lawsuit.  I saw

1   the documents in that case.

2   Q.  Also in the FTC lawsuit, you also heard about Tim Buckley's

3   testimony, right?

4   A.  Yes.

5   Q.  Tim Buckley, for example, told management -- sorry.  Let me

6   restart that.

7       Tim Buckley testified that he had been telling management

8   for years that customers were confused about the loan terms,

9   right?

10          MR. BATH:  I object.  I don't think Mr. Buckley

11  testified.

12          THE COURT:  If you're talking about testimony in

13  another lawsuit, the objection is sustained.

14          MR. VELAMOOR:  I can connect it up in a second, your

15  Honor.

16          THE COURT:  Sustained as of now.  Lay your foundation.

17  BY MR. VELAMOOR:

18  Q.  You heard about the substance of Tim Buckley's testimony at

19  the FTC, correct?

20  A.  I don't know that Mr. Buckley ever gave testimony in the

21  FTC case.

22  Q.  You don't know if Mr. Buckley gave testimony in the FTC

23  case?

24  A.  Not that I was aware of.

25  Q.  You don't recall Conly Schulte giving you a rundown of the

1  testimony that Tim Buckley had given in the FTC case?

2  A.  I think that might have been an interview by Mr. Buckley.

3  I don't think anybody ever testified in the FTC case.  The only

4  testimony I was aware of Ms. Grote's deposition and Natalie

5  Dempsey's deposition and couple of the tribal individuals.

6  Q.  You recall Mr. Buckley giving evidence in an interview in

7  the FTC case, correct?

8  A.  Yes.

9  Q.  To representatives of the FTC, right?

10 A.  I don't recall Mr. Buckley was ever interviewed by the FTC.

11 Q.  You certainly recall hearing information about

12 Mr. Buckley's interview from Mr. Schulte, right?

13 A.  Yes.

14 Q.  And you, in fact, responded to the substance of that

15 interview that was provided by Mr. Schulte, right?

16 A.  In an e-mail I probably did.

17 Q.  Among other things, in that interview you learned from Mr.

18 Schulte that Mr. Buckley had said that customers had been

19 complaining for a long time and he had been raising concerns

20 about those complaints, right?

21 A.  I was made an ware of that through the course of the FTC

22 case, yes.

23 Q.  And that the practices of the company were generating a ton

24 of complaints?

25 A.  There were complaints, yes.

1   Q.  You heard that Mr. Buckley had said that not applying part

2   of the payments or principal was one of the key problems,

3   right?

4   A.  Yes.

5   Q.  You got an update of this interview from Mr. Schulte and

6   you responded, right?

7           MR. BATH:  Judge, can we have a time?

8           THE COURT:  Yes.

9   Q.  You responded in July 2013, correct?

10  A.  I probably did.

11  Q.  You were angry that Mr. Buckley had testified, correct?

12  A.  I wasn't aware that Mr. Buckley had said that until I saw

13  that.

14  Q.  When you heard that he said those things, it made you

15  angry, right?

16  A.  I probably had a reaction to that.

17  Q.  Because he had not given information that was helpful to

18  the company, correct?

19  A.  I was not aware that Mr. Buckley had made those statements.

20  Q.  After you became aware of those statements you reacted

21  negatively, correct?

22  A.  Probably did, yes.

23  Q.  Because he had given information that was not helpful to

24  the company, right?

25  A.  No, because I didn't know he felt that way.

HAB8TUC2                    Muir - Cross

1  Q.  Well, your response was to say that, "Someone might want to

2  tell KE" -- Kirkland & Ellis -- "about Mr. Bucket-o-shit about

3  his other business interests in this space," right?

4  A.  Yes.

5          MR. VELAMOOR:  Can we show Government Exhibit 4271.

6  Q.  Do you see that?

7  A.  I do.

8  Q.  That's an e-mail that you sent to Conly Schulte after he

9  sent you notes from Mr. Buckley's interview?

10 A.  It is.

11         MR. VELAMOOR:  The government offers 4271.

12         MR. BATH:  No objection.

13         THE COURT:  Received.

14         (Government's Exhibit 4271 received in evidence)

15 BY MR. VELAMOOR:

16 Q.  So Mr. Schulte sends you notes of Mr. Buckley's interview,

17 correct?

18 A.  Yes.

19 Q.  And your response is on the top, right?

20 A.  Yes.

21 Q.  "Perhaps someone should retaliate against Mr. Buckley and

22 give KE," which is the law firm, "information about

23 Mr. Bucket-O-shit's other interests."

24 A.  That wouldn't have been retaliation.  That would have been

25 making sure KE heard the full context of Mr. Buckley's

1  statements.

2  Q.  You were not happy that Mr. Buckley had told KE about some

3  of the company's lending practices, correct?

4  A.  I thought Mr. Buckley was being very hypocritical.

5  Q.  Well, you saw an exhibit in this trial, correct, where

6  Mr. Buckley was raising his concerns well back in 2006?

7  A.  I did see that.  I was not aware of that until the FTC

8  case.

9          THE COURT:  Who was KE representing at the time?

10          THE WITNESS:  Your Honor, they would have been

11  representing the Miami tribe.

12          THE COURT:  Thank you.

13  Q.  Now, you said that you learned information about Crystal

14  Grote's deposition testimony, correct?

15  A.  Yes.

16  Q.  That's how you said that you learned about the company's

17  letters -- lies?

18  A.  That's how I became aware that it was a policy of Ms.

19  Grote's.

20  Q.  That's the FTC testimony that, for example, she pleaded

21  guilty to lying, right?

22  A.  Yes.

23  Q.  And you also got an update of that testimony from Ms.

24  Grote, right?

25  A.  From Ms. Grote?

1    Q.  Sorry.  From Mr. Schulte about Ms. Grote.

2    A.  I would imagine I was sent the deposition transcript.

3    Q.  You and Conly Schulte were not upset with Ms. Grote for the

4    substance of her testimony, were you?

5              MR. BATH:  Objection.  Calls for speculation by Mr.

6    Schulte.

7              THE COURT:  Exactly.

8              Rephrase your question.

9    Q.  You and Mr. Schulte, you certainly weren't upset with Ms.

10   Grote for the substance of her testimony, right?

11   A.  I don't recall what I was.

12   Q.  I will show you Government Exhibit 4312.

13   A.  OK.

14   Q.  This is an e-mail exchange you had with Mr. Schulte about

15   Ms. Grote's testimony?

16   A.  It seems to be part.

17             Can I see the whole exchange?

18   Q.  Sure.

19   A.  OK.

20   Q.  That is in fact what it is, right?

21   A.  Yes.

22             MR. VELAMOOR:  Your Honor, government offers 4312.

23             MR. BATH:  No objection.

24             THE COURT:  Received.

25             (Government's Exhibit 4312 received in evidence)

1              MR. VELAMOOR:  May we show this to the jury?

2       BY MR. VELAMOOR:

3       Q.  To be clear, this is the testimony that Ms. Grote lied in,

4       correct?

5       A.  Well, to be clear, this e-mail would have been sent at the

6       end of the deposition and I hadn't seen her transcript yet.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. VELAMOOR:

Q.  My question was, this is the testimony Ms. Grote lied in, correct?

A.  Yes.

Q.  Lied in in a way to help the company, right?

A.  She did, yeah.

Q.  And Mr. Schulte here is telling you that Crystal deserves a medal, right?

A.  That's what he says.

Q.  This is what Mr. Schulte thought made sense to send to you, right?

A.  At this particular time, that's what he said, yes.

Q.  Now, you also, in addition to bringing yourself up to speed on the loan interest rates and the loan terms, brought yourself up to speed on Mr. Tucker's history in payday lending as well, right?

A.  I don't know what you mean by "history."

Q.  Well, some of the structure of his previous payday lending organization, some of the previous relationships he'd been involved in.  Things like that, right?

A.  Yes, I became aware of some of the prior relationships, yes.

Q.  In fact, I think you testified that you learned about the County Bank relationship soon after you joined, in the late 2006, 2007 period, right?

1  A.  Yes.  I would hear people talk about County Bank, yes.

2  Q.  And you knew that Tucker's relationship with County Bank

3  related to the Fast Cash portfolio, right?

4  A.  What I came to learn, yes.

5  Q.  And later that Fast Cash portfolio became the 500 FastCash

6  portfolio, right?

7  A.  Correct.

8  Q.  And you came to understand and believe that Tucker had used

9  County Bank for regulatory purposes, right?

10  A.  I did, yes.

11  Q.  And that even while using County Bank for regulatory

12  purposes, you knew that the 500 FastCash portfolio continued to

13  be operated exclusively under Mr. Tucker's management and

14  guidance, right?

15  A.  I just want to be clear.  What time frame are we talking

16  about?

17  Q.  Well, as you came to understand and learn about

18  Mr. Tucker's relationship with County Bank --

19  A.  OK.

20  Q.  -- one of the things that you learned is that even while he

21  had this relationship with County Bank, Mr. Tucker continued to

22  exclusively manage and operate the Fast Cash portfolio, right?

23  A.  Inside County Bank?  I apologize.

24  Q.  While he had a relationship with County Bank.

25  A.  I'm not understanding question.  I want to be clear.  So I

1    don't understand what time frame and exactly what structure

2    you're talking about.  I'm sorry.

3    Q.  Well, the County Bank relationship, correct?

4    A.  So Mr. Tucker's the servicer for County Bank, correct?

5    Q.  Unfortunately, this is where I ask the questions.

6    A.  I'm trying to understand.  I'm sorry.

7    Q.  You came to understand that Mr. Tucker had had a

8    relationship with County Bank, correct?

9    A.  Correct.

10   Q.  And that relationship related to the 500 FastCash

11   portfolio?

12   A.  Correct.

13   Q.  You also came to learn information about the nature of the

14   relationship between Mr. Tucker and County Bank, right?

15   A.  I did, yes.

16   Q.  OK.  And one of the things you learned is that even under

17   the County Bank umbrella, Mr. Tucker exclusively managed and

18   operated that portfolio?

19   A.  Yes.

20   Q.  And you also learned that Mr. Tucker left County Bank

21   because he realized that many of the policies and the

22   guidelines set by County Bank were too restrictive?

23   A.  I never had a discussion with Mr. Tucker of why he left.  I

24   do know that he left the County Bank program.

25   Q.  You never had a discussion with Mr. Tucker about that?

1   A.  No.  He'd already left by the time I started.

2   Q.  I understand that, but you came to an understanding of why

3   he left, right?

4   A.  I think I formed my own understanding.

5   Q.  And that understanding was not based at all on any

6   conversations with Mr. Tucker?

7   A.  I don't recall any specific conversations.

8   Q.  Well, nonetheless, you came to the understanding that part

9   of the reason why he left was because the policies and

10  guidelines set by County Bank were too restrictive on him,

11  right?

12  A.  Yes.

13  Q.  Now, you also, again, as you were bringing yourself up to

14  speed on the business you're joining here, knew that prior to

15  the tribes, Mr. Tucker had started new loan portfolios that had

16  no affiliation with County Bank, right?

17  A.  I subsequently learned that, yes.

18  Q.  And again, you're learning these things relatively early on

19  in your time with the company, right?

20  A.  I was not made aware -- made aware of that until the

21  Hallinan lawsuit.

22  Q.  Until the Hallinan -- until 2008, 2009?

23  A.  2008, yes.

24  Q.  Certainly by that point, you're aware of all this?

25  A.  I became aware of it at that point in time.

1   Q.  OK, and one of the things you learned was that Mr. Tucker

2   started new portfolios that had no affiliation with County

3   Bank, right?

4   A.  I learned that, yes.

5   Q.  That he was simply lending, using Nevada nominee companies?

6   A.  Yes.

7   Q.  And you knew that was a risky endeavor that Mr. Tucker had

8   been involved in, right?

9   A.  I recall that, yes.

10  Q.  Because ultimately, he had no bank charter to hide behind,

11  right?

12  A.  Did I say that?

13  Q.  Did you?

14  A.  I don't think I said that.

15  Q.  Well, didn't you, in connection with the Hallinan lawsuit,

16  prepare a summary of Mr. Tucker's history of payday lending?

17  A.  I assisted Mr. Smith, and we jointly prepared several

18  documents in that case.

19  Q.  And you circulated a draft of this to Mr. Tucker, right?

20  A.  Yes.

21  Q.  On August 30, 2009?

22  A.  Sounds about right.

23  Q.  And in that document that you sent to Mr. Tucker, you said

24  that these Nevada company portfolios had no bank charter to

25  hide behind?

1   A.  I don't know if I typed those words.  That might have been

2   Mr. Smith.  We jointly worked on that document.

3   Q.  Those words were in a document that you sent to Mr. Tucker,

4   correct?

5   A.  That's correct.

6   Q.  And that's a document that you described as the story of

7   Mr. Tucker's payday lending, right?

8   A.  Yes.

9   Q.  Now, by the time you joined, Mr. Tucker's agreements with

10  the tribes had been in effect for at least a couple of years,

11  right?

12  A.  Yes.

13  Q.  But you also learned Mr. Tucker was not even using bank

14  accounts in the names of the tribes to fund the loans, right?

15  A.  At the very beginning, yes.

16  Q.  Well, at your very beginning, right?

17  A.  Correct, my beginning.

18  Q.  And your very beginning came at least two years after he'd

19  already been having relationships with these Indian tribes,

20  right?

21  A.  That's correct.

22  Q.  Where you say that these Indian tribes had become the

23  lenders, right?

24  A.  They were always the lenders.

25  Q.  They were always the lenders, right?

A.  Yes.

Q.  Even when Mr. Tucker wasn't even using bank accounts in the tribes' names to fund the loans?

A.  Yes.

Q.  He was continuing to use the bank accounts in the names of the Nevada shell companies?

A.  Yes.

Q.  And your exploration of the law and your ultimate determination that this was entirely appropriate didn't give you any concerns that Mr. Tucker wasn't even using tribal bank accounts to fund the loans that you claim the tribe lent?

A.  It gave me concern, yes.

Q.  It gave you concern because there's really no plausible argument that loans coming out of Mr. Tucker's Nevada companies were really tribal loans, right?

A.  I disagree with that.

Q.  So during the time between the 2004 and into the 2006 time period, it gave you concerns, but you still thought that they were tribal loans?

A.  I would take, I would take the position that under the service agreements, those were tribal loans.

Q.  Because there was a service agreement that said they were tribal loans?

A.  There was a service agreement and special power of attorneys granted by the tribes that allowed him to operate

1    that business as he saw fit.

2    Q.  To operate bank accounts for the tribes, right?

3    A.  Yes.

4    Q.  And Mr. Tucker was continuing to operate his Nevada shell

5    company bank accounts, right?

6    A.  I had come to learn that, yes.

7    Q.  Now, another thing that was important to you was, I think,

8    as you described it, choice of law clauses in these contracts,

9    right?

10   A.  Correct.

11   Q.  And you said that those were important to you forming your

12   belief that this was a lawful, appropriate lending operation,

13   right?

14   A.  That's right.

15   Q.  But you knew that Mr. Tucker's loan documents never even

16   mentioned the names of the tribes or tribal corporations until

17   2011, right?

18   A.  I learned that, yes.

19   Q.  Well, you learned that relatively soon after you joined,

20   right?

21   A.  I don't remember exactly when I first saw the loan note,

22   but yes.  It would have been relatively early, yes.

23   Q.  So something that was important to you in forming your

24   belief that something like this could be lawful was not even in

25   place until 2011?

1    A.  The choice of law clause in the contract was in place.

2    Q.  Which never mentioned the name of the tribe or a tribal

3    corporation until 2011, right?

4    A.  That's correct.

5    Q.  It just mentioned the portfolio name, right?

6    A.  It mentioned the portfolio name, and it said the

7    jurisdiction of the lender would control.

8    Q.  Just the word "lender," right?

9    A.  Correct.

10   Q.  And so some customer would have no idea what the name of

11   the tribe was or the tribal corporation, correct?

12   A.  That's correct.

13   Q.  The customer, would you say, was agreeing to do business

14   with an Indian tribe or an Indian tribal corporation?

15   A.  Yes.

16   Q.  Now, you also said by 2007 you had reviewed the service

17   agreements, right?

18   A.  Sometime, I think, in 2007 I asked for a copy of them.  I

19   don't remember exactly when.

20   Q.  As you put it, those were the agreements that governed

21   Mr. Tucker's relationships with the tribes, right?

22   A.  Yes.

23   Q.  And these were the agreements that said that Mr. Tucker

24   would give the tribes monthly checks equal to 1 percent of the

25   revenues, right?

1    A.  Yes.

2    Q.  And that those payments were described in the agreement as

3    a fee, right?

4    A.  Correct.

5    Q.  And not a fee that the tribe was paying Mr. Tucker to

6    supposedly service loans but a fee that Tucker was paying the

7    tribe, right?

8    A.  That's what it said.

9    Q.  You saw that in the governing agreement, right?

10   A.  When I first saw them, yes, I would have read that.

11   Q.  And you said you had no involvement in payments, in

12   financial documents; did you testify to that?

13   A.  I didn't quite get your question.  I'm sorry.

14   Q.  Probably a bad question.

15       You testified that you had no involvement in financial

16   documents at the company, right?

17   A.  Can you clarify "involvement"?

18   Q.  Well, this is what you testified to yesterday.  Did you

19   have any role in --

20   A.  I think I testified I didn't prepare financial documents.

21   Q.  You did not prepare financial documents, right?

22   A.  Right.

23   Q.  And you didn't have any training in accounting, right?

24   A.  I did not, no.

25   Q.  But you did give instructions to accounting employees on

1    how to characterize these payments to the tribes, right?

2    A.  Probably, yes.

3    Q.  You found out that they were being described as expenses,

4    right?

5    A.  Probably.

6    Q.  You wanted them to be recharacterized as distributions,

7    right?

8    A.  That's what they were, yes.

9    Q.  That's what they were?

10        And you did that to make it seem like the tribes were the

11   owners of the company, right?

12   A.  I did it because the tribes were the owner of the

13   portfolios.

14   Q.  But you're saying that the term "distribution" is

15   appropriate because distributions are what owners of the

16   company get?

17   A.  That's correct.

18   Q.  And so in your mind, they had been distributions since the

19   agreements with the tribes were signed in 2004, right?

20   A.  I would say under those original service agreements, they

21   were called fees.

22   Q.  They were called what?  Sorry.

23   A.  In the original service agreement, they called them fees.

24   Q.  Fees, but you believed that contrary to what they said in

25   the agreement, the appropriate way to characterize them was

1    distributions?

2    A.   Yes.

3    Q.   Because in your view, the tribes were the owners, correct?

4    A.   Yes.

5    Q.   And owners get distributions?

6    A.   Correct.

7    Q.   And so you're saying that no money that Mr. Tucker got from

8    the portfolios after those agreements could be called

9    distributions, right?

10   A.   That they should not be called distributions.

11   Q.   Should not, because in your mind, Mr. Tucker was not the

12   owner, right?

13   A.   Mr. Tucker never owned those tribal companies.

14   Q.   Yet you yourself described payments to Mr. Tucker as

15   distributions, right?

16   A.   I don't recall that.

17   Q.   Well, you described payments to Mr. Tucker as distributions

18   numerous times in that same document that we just discussed

19   that you prepared in connection with the Hallinan litigation,

20   right?

21   A.   I don't remember it.  I'm sorry.

22            MR. VELAMOOR:  Why don't we show 4255 just to the

23   witness to refresh his memory.

24            THE COURT:  And the date of this is?

25            MR. VELAMOOR:  The cover email is August 30, 2009,

1  your Honor.

2          THE COURT:  Thank you.

3          MR. VELAMOOR:  And why don't we turn to the 25th page

4  and highlight 71 for him.

5  Q.  Take a look at that and read that to yourself.

6  A.  OK.

7  Q.  Does that refresh your memory that you referred to payments

8  to Mr. Tucker as distributions?

9  A.  Again, I didn't write this entire document, and I would say

10  this is a draft that Mr. Smith would have written.

11  Q.  This is a draft that you sent to Mr. Tucker on August 30,

12  2009, correct?

13  A.  Yes, I did.

14  Q.  That you red-lined, right?

15  A.  I did.

16  Q.  And you had not corrected any of these references to

17  distributions to Mr. Tucker, had you?

18  A.  At that time I did not.

19  Q.  You did not.  In fact, there are numerous other payment

20  references to payments to Mr. Tucker as distributions as well,

21  right?

22  A.  In this document?

23  Q.  Yes.  I can show you.

24          MR. VELAMOOR:  Why don't we go to page 27.

25  A.  OK.

1    Q.  Page 27, paragraph 83.  Does that refresh your recollection

2    that there is yet another reference by you to money being

3    distributed to Mr. Tucker?

4    A.  I disagree that it was made by me.  Mr. Smith would have

5    written this.

6    Q.  Mr. Smith would have written it?  You sent it, you never

7    changed it, right?

8    A.  I did not change it, no.

9    Q.  So you're running away from it now, right, sir?

10   A.  I disagree with your characterization.

11   Q.  And it's not just that you overlooked these references

12   those two times; on page 32, there's yet another one, right?

13       Why don't you take a look at the second paragraph there.

14   Yet another reference to distributions to Mr. Tucker, right?

15   A.  Well, in that particular paragraph, NMS was owned by

16   Mr. Tucker and Mr. Hallinan, so they would be making

17   distributions to themselves.  It's referring to NMS.

18   Q.  So there you're OK with the reference?

19   A.  Reading it now, yes.

20           MR. VELAMOOR:  Why don't we go to 34.

21   Q.  This is a reference to the nominee portfolio companies,

22   correct, in the middle paragraph?

23   A.  Could you blow it up, please?

24   Q.  Yes.

25       Those were the lending companies, correct?

1   A.   Those were the servicing companies.

2   Q.   The nominee portfolio companies were just the servicing

3   companies?

4   A.   Yes.

5   Q.   So Mr. Tucker's Nevada companies that were the lenders

6   before the tribal relationships had now become the servicing

7   companies?

8   A.   Mr. Tucker's audit at this time covered the years, I

9   believe, 2004 and '5, and maybe '6.  At that particular time,

10  those companies are servicing for the tribal lenders.

11  Q.   Mr. Muir, Mr. Tucker's nominee portfolio companies were the

12  lenders, correct?

13  A.   At this particular time that covers the audit, no.

14  Q.   The nominee portfolio companies are the entities that

15  continued to be the lending companies through the end of 2006,

16  correct?

17  A.   I want to be clear on that question.  Can you ask that

18  again, please?

19  Q.   Mr. Tucker continued to use these same Nevada portfolio

20  companies to fund the loans through 2006, correct?

21  A.   In the servicing capacity of the tribal lenders, yes.

22  Q.   And here, this paragraph refers to payments to Mr. Tucker

23  as distributions, correct?

24  A.   From his companies, yes.

25  Q.   And just to be clear, "distribution" is the term you say

1    should be used only for the owners, correct?

2    A.  Correct.

3    Q.  OK.  Mr. Muir, you also testified that you thought that the

4    tribal model was entirely legal; that's how you put it, right?

5    A.  Yes, I did.

6    Q.  Presumably, you were also testifying that the so-called

7    tribal model in this case was also legal, right?

8    A.  Was legal?  Yes.

9    Q.  From the beginning of your involvement?

10   A.  Yes.

11   Q.  And I believe you testified that all you believed that was

12   required for this so-called tribal model to work was there to

13   be a federally recognized tribe, right?

14   A.  Yes.

15   Q.  An established tribal entity?

16   A.  Yes.

17   Q.  And to enact lending laws, right?

18   A.  Correct.

19   Q.  And for the tribes to have, as you put it, ultimate control

20   over the entity, right?

21   A.  Correct.

22   Q.  And that's it?

23   A.  Yes.

24   Q.  Now, presumably within that, and tell me if I'm wrong,

25   there's a requirement that the tribe or the tribal company has

1   to actually be the lender, right?

2   A.   Yes.

3   Q.   So the tribe has to make the loans?

4   A.   Yes.

5   Q.   But you also said that there are a few things that were not

6   important, right?

7   A.   OK.

8   Q.   You said one of those things was the source of capital was

9   not important, right?

10  A.   Yes.

11  Q.   So you're saying that the tribe could make the loans but

12  not provide any of the money for the loans?

13  A.   I was referring to the initial source of capital, yes.

14  Q.   OK.  So in your mind, a tribe can be a lender from day 1,

15  even though they have not put up any money from the loans at

16  that point?

17  A.   From day 1 that they went and sought capital to make those

18  loans, yes.

19  Q.   Even if none of the capital is theirs, they're the lenders

20  of the loans?

21  A.   What I was referring to, Mr. Velamoor, was in order to make

22  those loans, they're going to need some capital, and if they

23  don't have it, they can go source that capital.

24  Q.   They can go source that capital?

25  A.   Yes.

1   Q.  Despite not providing any of the capital, they can be the

2   lender?

3   A.  For the initial loans yes.

4   Q.  And another thing you said was it's not important who has

5   day-to-day control of the business, right?

6   A.  Yes.

7   Q.  It's also not important who manages the enterprise, right?

8   A.  You know, I don't know that I said important.  I think we

9   were talking about requirements.  Did I say important?

10  Q.  You tell me.

11  A.  I don't recall.

12  Q.  It was your --

13  A.  But I don't think I said important.

14  Q.  Well, what's the difference, in your mind, between

15  important and required?

16  A.  Well, if it's required, then it's an absolute.  If it's

17  important, then it's probably something that should be done or

18  would be better if it was done.

19  Q.  OK.  So your testimony here is that it was not required

20  that the tribes have any day-to-day control of the business?

21  A.  Yes, that's my testimony.

22  Q.  Not required that the tribes have any role in the

23  management of the lending business?

24  A.  Yes.

25  Q.  Not required that the tribes provide any capital for the

1  lending business?

2  A.  Yes.

3  Q.  Is it also not required that the loans go out from tribal

4  lands?

5          THE COURT:  You're asking about this witness's --

6          MR. VELAMOOR:  This witness's understanding.

7          THE COURT:  -- views on the subject?

8          MR. VELAMOOR:  Correct, your Honor.

9          THE COURT:  OK.

10  A.  What do you mean by "loans go out" -- excuse me, "loans go

11  out from tribal lands"?

12  Q.  Well, does it matter where the loans are issued from?

13  A.  No, it doesn't.

14  Q.  Does it matter who makes --

15          THE COURT:  In your mind.

16          THE WITNESS:  Yes.

17          MR. VELAMOOR:  In his mind.

18          THE COURT:  If you're asking him what the law is, the

19  objection is sustained.  If you're asking him what he thought

20  the law was, then I'll allow the questioning.

21  BY MR. VELAMOOR:

22  Q.  In your own mind, Mr. Muir, it doesn't matter who makes the

23  decisions to issue any particular loans?

24  A.  In my own mind, it's not required that the tribe does.

25  Q.  And in your own mind, it doesn't matter where the loan

1   transactions take place?

2   A.  That's correct.

3   Q.  Or where the loan transactions are consummated?

4   A.  I think ultimately it is important that the loans are

5   consummated on tribal lands.

6   Q.  So it doesn't matter where the loan transactions take

7   place, but it matters where the loan transactions are

8   consummated, in your mind?

9   A.  In my review of the law, yes.  That's a distinction.

10  Q.  A distinction between taking place and consummated?

11  A.  Well, when you say taking place, what are you referring to?

12  Q.  Mr. Muir, you testified that it doesn't matter, in your

13  mind, where the loan transactions take place, correct?

14  A.  Are you talking about yesterday or just now?  I'm getting a

15  little confused on this question.  I'm sorry.

16  Q.  Is your testimony different from yesterday to today?

17  A.  No, it's not.

18  Q.  So I'm asking you now, does it matter whether the loan

19  transactions take place on tribal lands or not, in your own

20  mind?

21  A.  And I'm asking for a clarification about "takes place."

22  Q.  The words "take place" don't mean anything to you,

23  Mr. Muir?

24  A.  In the context of lending, from filling out applications to

25  answering questions, I mean, those are all taking place.  For

1    the final act that completes the loan, that's different.

2    Q.  So does it matter, in your mind, that some act that's

3    important to the ultimate issuance of the loan take place on

4    tribal lands?

5    A.  Yes.

6    Q.  And that, in your mind, is a requirement?

7    A.  The final act, yes.

8    Q.  So that process needs to be a critical or important process

9    in the actual issuance of the loan, right?  In your mind.

10   A.  I feel like I'm getting very confused with your

11   questioning, so can we start that line again, please?

12   Q.  In your mind --

13   A.  Right.

14        THE COURT:  You can just say "I don't understand the

15   question."

16        THE WITNESS:  I'm sorry.  I don't understand the

17   question.

18   Q.  In your mind, is it necessary, for this to be legal, for

19   there to be a necessary step in the issuance of loans that

20   takes place on tribal lands?

21   A.  To be legal, no.

22   Q.  So it's not a necessary step?

23   A.  No.

24   Q.  So nothing relating to the process of issuing loans to

25   customers needs to take place on tribal lands?

1    A.  To make it legal, no.

2    Q.  Now, you testified that one of the sources you relied on in

3    forming these partnerships is a blog, right?

4    A.  Yes.

5    Q.  The Turtle Talk blog, I think you said?

6    A.  Yes.

7    Q.  By the way, that blog, you're aware, only started in the

8    fall of 2007, right?

9    A.  I thought 2008, but yes.

10   Q.  So that's not something you relied on when you started in

11   the company in 2006?

12   A.  No, it's not.

13   Q.  And by the way, are you aware that one of the first

14   articles that appeared on that blog was about the Colorado

15   case?

16   A.  I was not aware.

17   Q.  You're not aware that that article called the Colorado case

18   an ugly case because it was a possible rent-a-tribe scheme?

19   You don't recall that?

20   A.  I don't recall that.

21   Q.  I'll show you Government Exhibit 4319 to refresh your

22   recollection.

23   A.  OK.  Can I see the whole document, please?

24   Q.  Sure.

25   A.  This is a screenshot?

1      OK.  I don't recall the story.

2   Q.  Does this appear to be an article on the Turtle Talk blog?

3   A.  It does.

4   Q.  An article on the blog that you testified that you closely

5   relied on in forming your views about the legality of this

6   business?

7   A.  I don't think I said I closely relied upon it.  I said I

8   visited, and there were stories or cases and from there I

9   formed a view.

10  Q.  You certainly relied on this blog as a source for your

11  information?

12  A.  I got information from it, yeah.

13          MR. VELAMOOR:  Your Honor, the government offers 4319.

14          THE COURT:  Any objection?

15          MR. BATH:  Yes.  Can we approach?

16          THE COURT:  No.  I'm going to sustain the objection,

17  though.

18          Go ahead.

19  BY MR. VELAMOOR:

20  Q.  Now, among the issues that you say are not critical or

21  don't matter to legality was day-to-day control of the lending

22  business, right?

23  A.  That's correct.

24  Q.  And there's no doubt that Mr. Tucker had that control,

25  correct?

1  A.  That's correct.

2  Q.  He also managed the loan business, right?

3  A.  Yes.

4  Q.  He ran the operations of the loan business, right?

5  A.  Yes.

6  Q.  He handled the marketing and strategy as well, right?

7  A.  Part of his duties, yes, he was involved in that.

8  Q.  And he was ultimately responsible for all these things,

9  correct?

10 A.  No, I don't think he was ultimately responsible.

11 Q.  There were people, in your mind, above him in terms of

12 these areas?

13 A.  Yes, the tribes.

14 Q.  The tribes?

15 A.  If you're talking ultimate control, yes, the tribes.

16 Q.  I didn't ask you about control.  He was the person who

17 actually handled marketing and strategy, correct?

18 A.  He handled it, yes.

19 Q.  You're not aware of tribes getting involved in marketing

20 and strategy, correct?

21 A.  No, I'm not.

22 Q.  He also operated the lending business, right?

23 A.  I think "operated" is a legal term of art, so I'm not sure

24 what you're --

25 Q.  Well --

1    A.  My experience with the word "operate" in this business is a

2    legal conclusion from all the state cases.

3    Q.  And your view is, sir, that "operate" doesn't just mean

4    what common people understand the word "operate" to be when

5    they're talking about payday lending?

6    A.  My experience with the word "operate" with this model come

7    from cases where that was the ultimate legal determination.

8    Q.  Well, let's leave legal concepts aside.

9    A.  OK.

10   Q.  And just use the common English understanding of "operate."

11   A.  OK.

12   Q.  In the common English understanding of "operate," Mr.

13   Tucker operated the lending companies, correct?

14   A.  He was part of the operations, yes.

15   Q.  And in fact, you had no problem in your letters to

16   Mr. Hallinan saying in numerous different places that

17   Mr. Tucker was operating the lending business, correct?

18   A.  Probably did, yes.

19   Q.  So you were familiar with the natural English understanding

20   of the word "operate," correct?

21   A.  Yes.

22   Q.  And you have used it to describe Mr. Tucker's operation of

23   the lending businesses?

24   A.  I don't recall the specific instances, but I probably did.

25   Q.  And he operated those lending businesses from his facility

1    in Kansas City, correct?

2    A.   From his business in Kansas City, yes.

3    Q.   He was also the source of the capital for the loans,

4    correct?

5    A.   The initial source, yes.

6    Q.   And that facility in Overland Park is also where you worked

7    as well, right?

8    A.   I had an office there, yes.

9    Q.   And your view is that, just to be clear, there's nothing

10   wrong with the role that Mr. Tucker or his companies were

11   playing in the loan business, right?

12   A.   There was nothing wrong in his role?

13   Q.   Yes.   There was nothing wrong with his playing the role he

14   was playing in the loan businesses, right?

15   A.   Correct.

16   Q.   Nothing wrong with him operating the loan businesses from

17   Overland Park in Kansas City, correct?

18   A.   Said there's nothing illegal about it, yeah.

19   Q.   Nothing about his operating the businesses from Kansas City

20   made this enterprise, in your mind, any less legal?

21   A.   No.

22   Q.   So nothing wrong with him doing all of these things off of

23   tribal lands, in your mind, correct?

24   A.   Correct.

25   Q.   Now, Overland Park is also where the books and the records

HabWtuc3                    Muir - Cross

1   for these lending businesses were always maintained, correct?

2   A.  They were maintained electronically, yes.

3   Q.  In Overland Park, correct?

4   A.  Yes.

5   Q.  Including the records for the loan portfolios?

6   A.  At certain points in time, they were only in Kansas City.

7   It came to be they were in both places.

8   Q.  Sometimes there were copies sent to other places, correct?

9   A.  Yes.

10  Q.  But the originals, the main copies, they were always in

11  Overland Park, right?

12  A.  They were stored electronically, yes.

13  Q.  And that was true when you started in 2006, right?

14  A.  Yes.

15  Q.  And that was true of CLK's books, right?

16  A.  Yes.

17  Q.  That was also true of AMG's books after the so-called

18  CLK-AMG merger, right?

19  A.  I disagree that you call it a so-called merger, but yes,

20  that's correct.

21  Q.  And it remained true after that so-called merger, right?

22  A.  Correct.

23  Q.  And Mr. Tucker controlled access to those records, right?

24  A.  I don't know that he had exclusive control.  Did he have

25  some control, yeah.

1   Q.  He had ultimate control of those records, right?

2   A.  He did not have ultimate control over --

3   Q.  He did not have ultimate control over those records?

4   A.  Of AMG's records, no.

5   Q.  All right.  Well, let me show you what's been marked as --

6   let me do that in a second.

7       Let me show you what's been marked as Government Exhibit

8   4249.

9   A.  OK.

10      OK.

11  Q.  Do you recognize 4249?

12  A.  I do.

13  Q.  This is an email exchange between several people about

14  financial information about AMG, correct?

15  A.  Yes.

16          MR. VELAMOOR:  Your Honor, the government offers 4249.

17          THE COURT:  Any objection?

18          MR. BATH:  I just got handed this, if I could take a

19  second.

20          THE COURT:  Sure.  Take a second.

21          MR. BATH:  No objection.

22          THE COURT:  Received.

23          (Government Exhibit 4249 received in evidence)

24          MR. VELAMOOR:  Ms. Grant, could you show it to the

25  jury, and if we could blow up or expand the bottom portion.

1   Q.  So this is an instance in which Don Brady is asking for

2   financial numbers relating to AMG, correct?

3   A.  That is correct.

4   Q.  And he's suggesting that he would like to have financial

5   numbers in time for an annual meeting of certain tribal

6   entities, right?  Sorry.  In time for an annual report meeting

7   at the tribe.

8   A.  I'm sorry.  I don't see that in what's in front of me right

9   now.

10  Q.  Well, it says at the bottom there:  "It will be time to set

11  up our annual report meeting in the last week of October.  We

12  should have the financial numbers by then."  See that?

13  A.  Correct.  This would have been the AMG board, so I'm sure

14  he's asking for all the tribal financials.

15  Q.  OK, including, as you just testified, financials for AMG,

16  right?

17  A.  Yes.

18  Q.  An organization that you say is in the ultimate control of

19  Mr. Brady, because he's the tribal person, right?

20  A.  Yes.

21  Q.  And he's asking for records of it, correct?

22  A.  Yes.

23  Q.  And this request gets forwarded to you above, right?

24  A.  Yes, it does.

25  Q.  And Mr. Schulte asks you to take note of those last two

1    lines in Mr. Brady's email, right?

2    A.   Yes.

3    Q.   And you, upon hearing that the CEO, or who you believed to

4    be the CEO of AMG is asking for financials, forward this

5    request to Scott Tucker and Brett Chapin, correct?

6    A.   I think Mr. Tucker was on the original --

7    Q.   Correct?

8    A.   Correct.

9    Q.   So you reach out to them, and Mr. Chapin is Scott Tucker's

10   accountant, correct?

11   A.   Yes.

12   Q.   And you reach out to them after hearing from the CEO, who

13   wants financials for AMG, correct?

14   A.   Yes, I did.

15   Q.   Now, you're familiar with, an audit is kind of an official

16   examination of the books and records of a company, right?

17          MR. VELAMOOR:   We can take that down.

18   A.   Yes.

19   Q.   And so in order to do an audit of any value, you need

20   access to the books and records of the company, right?

21   A.   That's correct.

22   Q.   And in this particular case, when the tribe wanted to do an

23   audit of the loan company records, they needed Scott Tucker's

24   permission, right?

25   A.   When you say this particular case, what are you referring

1   to?

2   Q.  The case that we've been talking about for the last four

3   weeks.

4   A.  OK.  So can you ask your question again?  I'm sorry.

5   Q.  With respect to the lending business, when the tribe wanted

6   to do an audit, they needed to get Scott Tucker's permission,

7   right?

8   A.  I didn't think they did, no.

9   Q.  You didn't think they did?

10  A.  No.

11  Q.  Well, I'll just show you what's been marked as 4205.

12  A.  OK.

13  Q.  Is 4205 an email exchange relating to a tribal audit?

14  A.  It appears to be, yes.

15          MR. VELAMOOR:  Your Honor, the government offers 4205.

16          MR. BATH:  If I could have one second, Judge.

17          No objection.

18          THE COURT:  Received.

19          (Government Exhibit 4205 received in evidence)

20          MR. VELAMOOR:  May we show this to the jury?

21          THE COURT:  Yes.

22  Q.  Now, this is an email below from Mr. Schulte to Mr. Brady

23  about the CPA firm for the audit, correct?

24  A.  Correct.

25  Q.  And above, to focus on Don Brady's email, Don Brady talks

1    about how "Scott has approved the 2011 audit of your general

2    ledger for our self-governing purposes."  Do you see that?

3    A.  Yes, I do.

4    Q.  So Don Brady, who you say is the ultimate boss of this

5    enterprise, is clearly suggesting that he needs Scott Tucker's

6    permission for the tribe to do an audit, correct?

7    A.  I don't see the word "permission" in that email.

8    Q.  You don't infer from the need for approval the need for

9    permission from somebody?

10   A.  I don't.

11   Q.  So you can -- OK.

12       Just so I understand correctly, Mr. Brady needed Scott

13   Tucker's approval, but he didn't need Scott Tucker's

14   permission; that's your testimony?

15   A.  I don't see where this email suggested that Mr. Brady

16   thought he needed Mr. Tucker's approval.

17   Q.  Mr. Brady is suggesting here that they could go forward

18   because they have Scott Tucker's approval, correct?

19   A.  That's what it says, yes.

20   Q.  Now, you said that it was important that the tribes have

21   ultimate control over the portfolios, right?

22   A.  Yes.

23   Q.  And you knew that Mr. Tucker himself believed, long after

24   he made agreements with the tribes, that he still had complete

25   ownership and control over the lending businesses, right?

1   A.  I don't think he believed that he had complete ownership

2   and control.

3   Q.  Well, you saw and you were aware, you've seen Government

4   Exhibit 2615 in this case, right?

5          MR. VELAMOOR:  Why don't we show that to the witness.

6   Q.  So you've seen this email, right?

7   A.  Yes, I have.

8   Q.  You saw this email in this trial, right?

9   A.  I did.

10  Q.  And you'd seen it long before this trial as well, correct?

11  A.  That's correct.

12  Q.  You saw it no later than August 2009 as well, correct?

13  A.  I don't know when I saw it.  Sorry.

14  Q.  Well, you referenced this very email in the same story of

15  Mr. Tucker's payday lending that you sent --

16  A.  OK.

17  Q.  -- on August 30, 2009, correct?

18  A.  Correct.

19  Q.  And this is an email, to be clear, in which Mr. Tucker

20  says, and why don't we highlight the bottom, that technically

21  behind the scenes, NM had total control, ownership and interest

22  it in, correct?

23  A.  I saw -- I remember that, yes.

24  Q.  Total, correct?

25  A.  That's what he said in this email.

HabWtuc3                    Muir - Cross

1    Q.  And that is referring to the portfolios, correct?

2    A.  Correct.

3    Q.  Now, you also testified that --

4              MR. VELAMOOR:  We can now take that down.

5    Q.  -- that you formed your own firm for independence, is that

6    right?

7    A.  Yes.

8              THE COURT:  Ladies and gentlemen, this is a good time

9    for our luncheon break.  Enjoy lunch.  The weather seems to be

10   holding up.  See you back in action for 2:00.  Thank you.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HabWtuc3                    Muir - Cross

1          (Jury not present)

2          THE COURT:  Enjoy lunch.

3          MR. SCOTTEN:  Your Honor, I've spoken with Ms. Van

4    Ness, and we have agreed proposed edits to that element

5    question.  We don't need to do it now, just letting the Court

6    know.

7          THE COURT:  What would be most helpful is if you could

8    maybe hand up a marked copy and I could see what they are.

9          MR. SCOTTEN:  We can do that, your Honor.

10         THE COURT:  It will go more smoothly.  Thank you.

11         We're in recess.

12         MR. VELAMOOR:  Judge, I'm sorry to interrupt.

13         THE COURT:  Go ahead.

14         MR. BATH:  Judge, I inquired of the government,

15   because I'm not sure what the rule is, and I wanted to make

16   sure I'm within the rules; that is, there be no discussion

17   between me and Mr. Muir at all, because we're on

18   cross-examination?

19         THE COURT:  That's correct, unless you have some

20   authority to the contrary that applies to a party witness.  I'm

21   happy to consider that if anybody has any authority.

22         MR. BATH:  I'm not even seeking that.  I just wanted

23   to make sure I understood.  Thank you.

24         THE COURT:  Thank you.

25         (Luncheon recess)

1                         AFTERNOON SESSION

2                              2:00 p.m.

3               (Jury present)

4     TIMOTHY JOHN MUIR, resumed.

5               THE COURT:  Mr. Velamoor, whenever you're ready.

6               MR. VELAMOOR:  Thank you, your Honor.

7     BY MR. VELAMOOR:

8     Q.  Mr. Muir, you testified yesterday that you formed your own

9     law firm, I guess around 2007, is that right?

10    A.  Yes.

11    Q.  For independence, I think you put it, right?

12    A.  Yes.

13    Q.  To be able to choose your own clients?

14    A.  That was my ultimate goal, yes.

15    Q.  I believe you also testified that as an employee of Mr.

16    Tucker, you would have to ask permission to take on new

17    clients, who with your own firm you wouldn't have to do that,

18    right?

19    A.  That's correct.

20    Q.  But, in fact, Mr. Tucker imposed that very condition on

21    you, that you needed his permission to take on clients even in

22    the context of your new law firm, right?

23    A.  He did at the very beginning, yes.

24    Q.  Take a look at 2601.

25         This is an e-mail you were shown yesterday in direct

1    examination, right?

2    A.   Yes.

3    Q.   But you didn't talk about the second paragraph of Scott

4    Tucker's e-mail yesterday, did you?

5    A.   No, we did not.

6    Q.   And that paragraph says -- this is all with respect to the

7    new law firm in your name that you're proposing to start,

8    right?

9    A.   Yes.

10         MR. VELAMOOR:  Why don't we highlight that paragraph.

11   Q.   Mr. Tucker is saying, "This is under the understanding you

12   will not be working or engage services on the behalf of any

13   other clients unless directed and approved by me," right?

14   A.   That's what it says, yes.

15   Q.   You didn't push back on that condition, you just said to

16   that and all the other conditions, "understood," right?

17   A.   At that time, yes, that's what I said.

18   Q.   So you got no additional independence from starting this

19   new law firm, did you?

20   A.   Eventually I did, yes.

21   Q.   Mr. Tucker does not say in that e-mail, just at first this

22   is going to be a requirement, does he?

23   A.   He does not say that, no.

24   Q.   Nor did you ask for that clarification in this e-mail?

25   A.   In this e-mail, no.

1  Q.  Isn't it true, Mr. Muir, the real reason you wanted to

2  start your own law firm is because of liability, to minimize

3  your liability as an employee of Mr. Tucker's company?

4  A.  That's not the real reason, no.

5  Q.  It was important to you to be able to say down the road

6  that you were not an employee of AMG or CLK, right?

7  A.  I don't recall saying that.

8  Q.  In the FTC case, you were also sued in the FTC case,

9  correct?

10 A.  Correct.

11 Q.  You submitted an affidavit in connection with that case,

12 right?

13 A.  Yes.

14 Q.  One of the things you told the court in that FTC case was

15 that you were not an employee of AMG or any of these other

16 lending companies, correct?

17 A.  At that time I would have said that, yes.

18 Q.  That was something you were able to say, because you

19 started this new law firm, that Mr. Tucker controlled your

20 clients?

21 A.  I was able to say that because in 2012 I was no longer an

22 employee.

23 Q.  Now, you also testified that you believed that this

24 so-called CLK/AMG merger was a real merger, correct?

25 A.  Yes, it was a merger.

1    Q.   And that in your mind it actually changed the operations

2    and control of CLK, right?

3    A.   It changed the ownership of the servicing company.

4    Q.   But not the control of the servicing company?

5    A.   Not the day-to-day operations of it, no.

6    Q.   You're saying that Don Brady became your boss?

7    A.   I wasn't working for AMG.

8    Q.   Well, when AMG was your client, Don Brady was your ultimate

9    client?

10   A.   The company is the ultimate client.  Mr. Brady was never my

11   client.

12   Q.   Well, when you're interfacing with someone on behalf of

13   AMG, Don Brady was the highest authority in your mind?

14   A.   No, the board was the highest authority.

15   Q.   The board is above Don Brady?

16   A.   Yes.

17   Q.   But Mr. Brady over Mr. Tucker is what you would say,

18   correct?

19   A.   Yes, I would.

20   Q.   You say that Mr. Brady was a higher authority than Mr.

21   Tucker, but even after this supposed merger you continued to

22   take your marching orders from Scott Tucker, right?

23   A.   I took direction from Mr. Tucker, yes.

24   Q.   Ultimately you carried out Mr. Tucker's directives and

25   their objectives, right?

HAB8TUC4                    Muir - Cross

1   A.  Could you be more specific?  I don't understand your

2   question.

3   Q.  Ultimately you viewed it as your job to carry out Mr.

4   Tucker's directives and Mr. Tucker's objectives, correct?

5   A.  My job was to provide advice, and the clients could do what

6   they wanted to do.

7   Q.  But in doing that, you viewed your job as carrying out Mr.

8   Tucker's directives, correct?

9   A.  I would listen to Mr. Tucker, I would advise Mr. Tucker,

10  but the ultimate decision was by the tribe.

11  Q.  Let's take a look at 4229.

12  A.  OK.

13  Q.  This is an e-mail that you were essentially drafting up but

14  didn't ultimately send, correct?

15  A.  Correct.

16  Q.  This is an e-mail you were proposing to send to Gary

17  Patten, right?

18  A.  Yes.

19  Q.  Gary Patten had upset you because he had gone ahead and

20  signed an agreement with somebody, right?

21          Had an agreement signed on behalf of AMG, correct?

22  A.  Yes.

23  Q.  Why don't we focus in on the first paragraph.  I don't want

24  to go into all the details.

25          MR. VELAMOOR:  Your Honor, the government offers 4229.

1          MR. BATH:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 4229 received in evidence)

4          MR. VELAMOOR:  Can we show it to the jury.

5    Q.  So Mr. Patten essentially was drafting a separation

6    agreement for some employee, is that right?

7    A.  For an employee of a different investment that Mr. Tucker

8    had that had nothing to do with lending.

9    Q.  But he had gone off and -- well, first of all, Gary Patten

10   worked for AMG, correct?

11   A.  Yes, he did.

12   Q.  And you're saying this e-mail is not about AMG?

13   A.  He also assists Mr. Tucker in other investments.

14   Q.  So you're saying this relates to an investment or a

15   business other than payday lending?

16   A.  I recall Mr. Pearson being involved with the Eclipse

17   project.

18   Q.  So this had nothing to do with Don Brady, is that right?

19   A.  This separation agreement here did not.

20   Q.  In any event, you're concerned here that he had this

21   agreement signed, correct?

22   A.  If you can show me some of the e-mail.

23   Q.  Sure.

24          MR. VELAMOOR:  Why don't you show him the rest of the

25   e-mail.

1    A.  Are you referring to the last paragraph?

2    Q.  First they are discussing the separation agreement and then

3    it also discusses a lease, correct?

4    A.  The last paragraph says "additionally"?

5    Q.  Right.

6    A.  Yes.

7    Q.  So here you say, for example, in this e-mail, "I receive my

8    marching orders from Scott and Blaine," correct?

9    A.  I say that, yes.  I am referring to the Eclipse project.

10   Q.  You're not referring to AMG which comes up in the next

11   paragraph?

12   A.  No.  That's why that paragraph begins with "additionally."

13   There was another issue.

14   Q.  "Don Brady executing all agreements on behalf of AMG."  Do

15   you see that?

16   A.  Yes, I do.

17   Q.  And you're concerned, at the bottom, that -- go to the next

18   page.  You talk on the next page about, "Our main mantra is no

19   unintended consequences."

20          Do you see that?

21   A.  I do.

22   Q.  You're concerned there about what happens when agreements

23   are signed that don't have Don Brady's name on it, correct?

24   A.  Correct.

25   Q.  Now, Mr. Tucker also determined your compensation from AMG,

1    correct?

2    A.  From time to time, yes.

3    Q.  There were times that Mr. Tucker did not determine your

4    compensation?

5    A.  Later on Mr. Tucker did not set my hourly rate; I set that

6    rate.

7    Q.  Ultimately your payments and your checks came from Mr.

8    Tucker, correct?

9    A.  No.  My payments and checks came from various entities

10   through the years, from CLK to AMG and also to the tribal

11   lending entities.

12   Q.  When AMG sent you checks, more often than not Scott Tucker

13   signed those checks, correct?

14   A.  Yes.

15   Q.  For example, when you got bonuses, Scott Tucker signed

16   those bonuses, correct?

17   A.  Yes.

18   Q.  And you understood him to be the person who is determining

19   how much money you were making?

20   A.  From time to time, yes.

21   Q.  Well, take a look at 4224.

22   A.  OK.

23   Q.  This is your "thank you" e-mail to Scott and Blaine Tucker

24   regarding your bonus, correct?

25   A.  I imagine it was a check.

1           MR. VELAMOOR:  The government offers 4224.

2           THE COURT:  Any objection?

3           MR. BATH:  No, sir.

4           THE COURT:  Received.

5           (Government's Exhibit 4224 received in evidence)

6     Q.  Do you have any doubt that this relates to money that Scott

7     Tucker and Blaine Tucker had given you?

8     A.  No, I have no doubt.

9     Q.  So you're thanking them very much for the money?

10    A.  Correct.

11    Q.  You didn't thank Don Brady here, did you?

12    A.  I did not.

13    Q.  In fact, years after the so-called AMG merger you weren't

14    even sure what Mr. Brady's title was at AMG, were you?

15    A.  I always knew Mr. Brady was the CEO.

16    Q.  You always knew that, never had any doubt about that?

17    A.  I don't think so.

18    Q.  Didn't you e-mail Conly Schulte to ask him what Don Brady's

19    title was at AMG?

20    A.  I may have.

21    Q.  I will show you what is marked as 4309.

22    A.  OK.  OK.

23    Q.  This is an exchange between you and Conly Schulte, correct?

24    A.  Correct.

25    Q.  You're asking -- this is 2011, right?

1    A.  Yes.

2              MR. VELAMOOR:  The government offers 4309.

3              MR. BATH:  No objection.

4              THE COURT:  Received.

5              (Government's Exhibit 4309 received in evidence)

6    Q.  So this is around almost three years after you say the

7    merger, the so-called merger was complete, right?

8    A.  This is three years after the merger, yes.

9    Q.  And three years after you would say that Mr. Brady became

10   your ultimate boss?

11   A.  He was the CEO of the client, yes.

12   Q.  Here you're having to ask Conly Schulte what his title was

13   at AMG, is that right?

14   A.  I was looking for clarification of whether he was president

15   or CEO.

16   Q.  Now, even when you were at AMG, you thought that it was

17   ultimately Scott Tucker who would decide how long you would

18   represent AMG, correct?

19   A.  I don't remember thinking that.

20   Q.  Do you recall that there was a point where you were

21   considering joining Pete Smith's law firm?

22   A.  There was, yes.

23   Q.  That was around 2010, right?

24   A.  Yes.

25   Q.  That was two years after what you say is the CLK/AMG

1  merger?

2  A.  Yes.

3  Q.  One of the things that you did in preparation for that

4  merger was to ask Scott Tucker if he would continue to use you

5  as a lawyer for AMG if you would go over to Pete Smith's firm.

6  Do you recall that?

7  A.  I don't recall it specifically.  I recall it generally.

8  Q.  So you generally recall asking Scott Tucker, will you keep

9  me as a lawyer for AMG if I go work for Pete Smith's firm?

10 A.  I don't recall saying AMG.

11 Q.  Do you have any doubt that you were referring to AMG

12 business in that conversation with Scott Tucker?

13 A.  If you have an e-mail you can show me.  I don't

14 specifically remember.

15 Q.  Take a look at 2622.

16 A.  OK.  OK.

17 Q.  Does that refresh your recollection as to whether or not

18 your conversation with Mr. Tucker was about AMG or other

19 businesses?

20 A.  I don't see AMG on there.

21 Q.  Regardless of what is written, were you asking -- let me

22 ask you this.

23         Your primary business at the time -- your primary

24 client continued to be the lending businesses, correct?

25 A.  That is correct.

1   Q.  The primary reason why you would be attractive to Pete

2   Smith's firm is that you would be able to bring some of this

3   lending business work to it, correct?

4   A.  Correct.

5   Q.  So of most interest at the time to your marketability would

6   be your ability to take AMG business, correct?

7   A.  To take the lending business, yes.

8   Q.  Here you're asking Mr. Tucker if he would continue to use

9   you, correct?

10  A.  Yes, that's what I said.

11  Q.  You don't specifically mention any particular matter,

12  right?

13  A.  I do not.

14  Q.  Logic would suggest the most important thing would be the

15  lending business work, correct?

16  A.  Yes.

17  Q.  And you asked Mr. Tucker, right?

18  A.  Would you continue to use me.

19          MR. BATH:  It's not in evidence.

20          MR. VELAMOOR:  I wasn't reading from the document.

21          We can take that down.

22  Q.  Do you also recall that Mr. Tucker used AMG employees for

23  some of his other business interests?

24  A.  Yes, I was aware of that.

25  Q.  For example, some of his other outside ventures he

1   frequently used, for example, accounting people, correct?

2   A.  Did he use accounting people?

3   Q.  And other employees at AMG to further some of his other

4   business interests, you knew that was going on, right?

5   A.  I became aware of that, yes.

6   Q.  You're not aware of him asking Don Brady for permission to

7   do that, are you?

8   A.  I am not.

9   Q.  He just felt like he could do it, right?

10  A.  I guess so.

11  Q.  You knew he was doing it, right?

12  A.  I became aware of it, yes.

13  Q.  You did not stop him from doing that or advise him not to

14  do it, right?

15  A.  No.

16  Q.  Or speak up on who you say was your client, AMG's behalf?

17  A.  I did not.

18  Q.  In fact, even after this AMG merger, Mr. Tucker would

19  continue to give you or Mr. Tucker would continue to give

20  direction to Don Brady, right?  Are you aware of times where he

21  would give direction to Don Brady?

22  A.  I'm fully aware that they spoke.  I don't know if he gave

23  direction.

24  Q.  For example, when Mr. Tucker wanted to start a new

25  enterprise relating to the loan business, Mr. Tucker on at

1    least one occasion told Mr. Brady what to do, right?

2    A.  I don't remember that.  If you have something to show me, I

3    can look at it.

4    Q.  Take a look at 4288.

5    A.  OK.

6    Q.  Did you get a chance to look at 4288?

7    A.  Yes.

8    Q.  It's an e-mail from Scott Tucker to Don Brady?

9    A.  Yes.

10   Q.  You're copied on?

11   A.  Yes, I am.

12   Q.  Regarding a new company?

13   A.  I am on the first e-mail, not on the second e-mail.

14   Q.  On the bottom e-mail?

15   A.  Yes.

16            MR. VELAMOOR:  The government offers 4288.

17            MR. BATH:  I have no objection, Judge.

18            THE COURT:  Received.

19            (Government's Exhibit 4288 received in evidence)

20   Q.  Why don't we focus on the bottom e-mail.

21   A.  OK.

22   Q.  So Mr. Tucker, who you say was just an employee of AMG,

23   right?  That was your testimony yesterday?

24   A.  Yes.

25   Q.  He is here telling Don that he is going to start a new

1    business that strategizes and aligns with the loan business,

2    right?

3    A.  It says "we."

4    Q.  Right?

5    A.  Correct.

6    Q.  He says that he needs a tribal corporation set up as soon

7    as possible, right?

8    A.  Yes.

9    Q.  He doesn't ask Don Brady, would you please open up a tribal

10   corporation, does he?

11   A.  He did not say please.

12   Q.  Didn't really ask at all, right?

13   A.  No.

14   Q.  You also knew that Mr. Tucker could dispose of his tribal

15   relationships whenever he wanted with any of the tribes, right?

16   A.  He could end his relationship, yes.

17   Q.  The tribes you say are the lenders, who own this business,

18   right?

19   A.  Correct.

20   Q.  But he could end their lending activities whenever he

21   wanted, right?

22   A.  He could end his servicing participation, yes.

23   Q.  And they would continue, in your mind, to be lenders

24   without Scott Tucker?

25   A.  If they continued to lend without him, yes.

1    Q.  You know that Mr. Tucker told these tribal people on

2    several occasions that they're out; he is working for them as a

3    servicer, but he told them on several occasions, "you're out"?

4    A.  I understand that he said that, yes.

5    Q.  So Mr. Tucker as the servicer is firing the lender, who you

6    say hired him, right?

7    A.  I would say he is ending the relationship.

8    Q.  The servicer you understand to be working for the lender,

9    correct?

10   A.  Yes.

11   Q.  And you're aware of several instances in which Scott Tucker

12   working for the lender threatened to terminate those lenders,

13   right?

14   A.  I'm familiar with him as the servicer threatening to end

15   the relationship with the lender.

16   Q.  And you know that happened more than once, right?

17   A.  What happened more than once?  I'm sorry.

18   Q.  Mr. Tucker threatening to end relationships with these

19   servicers, right?

20   A.  I believe it happened twice.

21   Q.  Take a look at 1014, which is in evidence.

22   A.  OK.

23   Q.  You mentioned that by 2011 you represented the lenders,

24   right?

25   A.  Correct.

1   Q.  They were your clients, right?

2   A.  They were and Mr. Tucker, yes.

3   Q.  Both at the same time?

4   A.  Yes.

5   Q.  But here you're presented with a situation in which Mr.

6   Tucker is threatening to do something adverse to your client,

7   the Santee Sioux, right?

8   A.  Yes.

9   Q.  And he is saying they need to comply or they are out,

10  right?

11  A.  That's what it says.

12  Q.  And you didn't stand up there and speak up for your client,

13  the Santee Sioux, did you?

14  A.  No.  I said "understood."

15  Q.  You just accepted what Mr. Tucker said?

16  A.  That was a pretty consistent response I had in e-mails,

17  "understood."

18  Q.  It certainly was consistent to agree with what Mr. Tucker

19  said, that's true.

20          Now, your testimony yesterday, trademarks you

21  understand to be a form of intellectual property, correct?

22  A.  Yes.

23  Q.  You also testified that you didn't do any intellectual

24  property work, right?

25  A.  I didn't say I didn't do any.

1          THE COURT:  Can you go back to the last exhibit, just

2     put it up.

3          MR. VELAMOOR:  1014?

4          THE COURT:  Yes.

5          Mr. Muir, at the time you wrote your e-mail at the

6     bottom there, November 13, 2011, at 7:39 p.m. --

7          THE WITNESS:  Yes, sir.

8          THE COURT:  -- who were you acting as a lawyer for?

9          THE WITNESS:  I would say in that capacity, I was

10    representing AMG.

11         THE COURT:  Thank you very much.

12    BY MR. VELAMOOR:

13    Q.  I believe you testified that you didn't handle intellectual

14    property matters, correct?

15    A.  I was involved with them; I was not the primary lawyer on

16    intellectual property matters.

17    Q.  You were not the primary lawyer.  You were involved in

18    hiring outside counsel to help you?

19    A.  Yes.

20    Q.  If you needed intellectual property work, you would get

21    outside counsel to help you?

22    A.  If I needed a certain expertise, I would reach out for

23    outside counsel, yes.

24    Q.  You did in fact do trademark work for Mr. Tucker, right?

25    A.  I may have, yes.

1    Q.  For example, you found out that Mr. Tucker initially filed

2    trademarks in CLK's name, right?

3    A.  I was aware of that.

4    Q.  You found out about that after -- these trademarks, for

5    example, were the so-called d/b/a lending names of the

6    business, right?

7    A.  When Mr. Tucker owned CLK, he acquired a lot of trademarks.

8    Q.  Those trademarks included the d/b/a as the lending

9    businesses, right?

10   A.  Yes, they did.

11   Q.  He acquired those in the name of CLK, right?

12   A.  I think he acquired all the trademarks in CLK.

13   Q.  At a time when you would say, and you would have this jury

14   believe, that the tribes were the lenders who were operating

15   through those d/b/a's?

16   A.  Yes.

17   Q.  And you found out about that and you knew that was a

18   problem for Mr. Tucker's argument that the tribe was supposedly

19   the lenders, right?

20   A.  I didn't think it was a problem.  I thought it should be

21   corrected.

22   Q.  You didn't think it was a problem, but you thought it

23   should be corrected?

24   A.  I didn't think it was a problem for Mr. Tucker.  I thought

25   it should be corrected and the trademark should be over in the

1    lending entity's name.

2    Q.  Your testimony is that you didn't think it would be a

3    problem for Mr. Tucker?

4    A.  I thought it could be improved.

5    Q.  So you did or you didn't think it would be a problem for

6    Mr. Tucker?

7    A.  It could have been a problem, yes.

8    Q.  Just a second ago you said you didn't think it would be a

9    problem.

10   A.  I am changing my answer and saying it could have been a

11   problem, yes.

12   Q.  Let's take a look at 4018.

13   A.  OK.

14   Q.  Do you recognize 4018?

15   A.  Yes.

16   Q.  This is an exchange you had with Scott Tucker and Blaine

17   Tucker about trademarks, correct?

18   A.  Correct.

19            MR. VELAMOOR:  The government offers 4018.

20            MR. BATH:  No objection.

21            THE COURT:  All right.  Received.

22            (Government's Exhibit 4018 received in evidence)

23            MR. VELAMOOR:  Can we show it to the jury.

24            Focus on the bottom e-mail.

25   Q.  Now, again, this is 2010, correct?

1    A.  Correct.

2    Q.  This is the time frame, again, where you said you were now

3    representing the tribes, right?

4    A.  Yes.

5    Q.  I believe you testified yesterday 2010, 2011, and 2012 were

6    years where you were at that point representing the tribes,

7    right?

8    A.  Yes.

9    Q.  So we are in the heart of that period here.  And you write

10   here that, "I believe I have found a way to put the fact that

11   the trademarks were originally in CLK's name to bed, as in

12   disarm any potential negative argument against you because of

13   the way they were originally filed."

14          Do you see that?

15   A.  Yes, I do.

16   Q.  So you were concerned here about a potential argument

17   against Mr. Tucker, right?

18   A.  Yes.

19   Q.  About the fact that when these loan companies are

20   supposedly tribal, he was getting trademarks in the name of his

21   wholly-owned company CLK, right?

22   A.  I was concerned that CLK had acquired the trademarks, yes.

23   Q.  Because of the impact it would have on arguments you had

24   made that these are really tribal lenders, right?

25   A.  No.  Because of the impact it would make that he would say

1    CLK was the lender; and it wasn't the lender, it was the

2    servicer.

3    Q.  So it would make it harder to say the tribes were lenders,

4    right?

5    A.  It would make it easy to say CLK was the lender, yes.

6    Q.  And?

7    A.  CLK wasn't a lender.

8    Q.  And the converse of that, making it easier to say CLK is

9    the lender is the same as making it harder to say the tribes

10   were the lender, right?

11   A.  You can put it that way, yes.

12   Q.  You say at the top -- first of all, Mr. Tucker

13   congratulates you or compliments you, correct?

14   A.  Correct.

15   Q.  "You are the best"?

16   A.  That's what he said.

17   Q.  And you say, "It's what I am good at, and also why I love

18   my job," right?

19   A.  Yes.

20   Q.  Fixing legal problems for Scott Tucker was your job,

21   correct?

22   A.  Fixing legal problems was my job.

23   Q.  Now, you also testified earlier today, just to be clear,

24   you had no concerns about the role that Scott Tucker and people

25   working for Scott Tucker were playing in this lending business,

1  correct?

2  A.  I had no concerns?

3  Q.  Yes.

4  A.  No.

5  Q.  You had no concerns about him operating portfolios in

6  Kansas City, correct?

7  A.  I had no concerns about AMG and CLK operating from Kansas

8  City, yes.

9  Q.  And that's where the operations for the loan portfolios

10  were, correct?

11  A.  That's where the day-to-day servicing occurred, yes.

12  Q.  As well as all the operations of the loan portfolios,

13  correct?

14  A.  I don't agree that all of the operations occurred there.

15  Q.  Well, what didn't occur there?

16  A.  The final acts for the loans.

17  Q.  The final acts.  So everything except the so-called tribal

18  approval occurred in Kansas City, correct?

19  A.  Correct.

20  Q.  Including customers around the country sending in

21  applications and those being received in Kansas City, correct?

22  A.  They would send them over the Internet.  I don't know that

23  you can say they were received in Kansas City.

24  Q.  People on the phones, looking at the computer, they were

25  all in Kansas City, correct?

1   A.  Correct.

2   Q.  People who were processing those loans and sending them in

3   batches were in Kansas City, correct?

4   A.  Yes.

5   Q.  The batches going out to processors, they went from Kansas

6   City?

7   A.  Correct.

8   Q.  And that's the issuance of loans, correct?

9   A.  I think the issuance of the loans would be what I consider

10  the final act.

11  Q.  So the issuance of loans only included the final act?

12  A.  It's a long process.  Like you mentioned, the application,

13  all those things that you mentioned.

14  Q.  Those are part of the issuance of loans, correct?

15  A.  They are part of it, yes.

16  Q.  Most of those things, if not all of it, except for whatever

17  Don Brady was doing, was in Kansas City, correct?

18  A.  That's correct.

19  Q.  You had no concerns about that, correct?

20  A.  I think it could have been improved.

21  Q.  But you had no concerns about the role -- you certainly

22  didn't quit, right?

23  A.  No, I did not.

24  Q.  You were happy to continue on, right?

25  A.  I liked my job, yes.

1    Q.  You had no concerns about Scott Tucker and the people

2    working for him playing all the roles they were playing,

3    correct?

4    A.  Correct.

5    Q.  Yet you were part of the deliberate strategy to hide Mr.

6    Tucker's role in the business, right?

7    A.  I disagree with that.

8    Q.  You did not want it to come out -- you did not want Mr.

9    Tucker's role in the business to come out, right?

10   A.  No, I disagree with that.

11   Q.  Why don't we take a look at 2109.

12   A.  OK.

13   Q.  This is an e-mail you talked about yesterday, right?

14   A.  That's right.

15   Q.  What you said yesterday was that the phrase "looking for

16   the man behind the curtain" came from Colorado, right?

17   A.  Yes.

18   Q.  But just to be clear, the man behind the curtain was Scott

19   Tucker, right?

20   A.  Yes.

21   Q.  And you thought it was bad news that they were looking for

22   Scott Tucker, correct?

23   A.  Correct.

24   Q.  Because it would be bad if they found out all the things

25   that Mr. Tucker was doing in his business, correct?

1    A.  I don't think it would be bad.  I think Mr. Tucker might

2    have wound up in litigation in Colorado.

3    Q.  You don't think it would be bad that --

4    A.  That's the bad news, he would have wound up in litigation.

5    Q.  And you were concerned about Scott Tucker's interest again

6    here?

7    A.  Yes.

8    Q.  Just to be clear, you said --

9            THE COURT:  Who were you representing at the time of

10    this e-mail?

11            THE WITNESS:  In 2007, your Honor, that would have

12    been CLK.

13            THE COURT:  Thank you.

14    Q.  Just to be clear, you're saying that you are just repeating

15    an expression that Colorado used?

16    A.  Yes.

17    Q.  You didn't use that expression yourself?

18    A.  I may have.

19    Q.  You used it also to describe Mr. Tucker, right?

20    A.  I may have, yes.

21    Q.  So you also referred to him as "the man behind the

22    curtain"?

23    A.  Yes.

24    Q.  Again, the reason why he is behind the curtain is because

25    the strategy here is to make it seem like the tribes are doing

1  everything in this business, right?

2  A.  The strategy was never to say the tribes were doing

3  everything.  The strategy was to say the tribes were the

4  lender.

5  Q.  And to minimize the amount of things that the courts knew

6  that Scott Tucker was doing, correct?

7  A.  I think the courts were very well aware of what Scott was

8  doing.

9  Q.  So you didn't feel the need when you were describing it to

10 mention Scott Tucker at all, right?

11 A.  Describing it when?

12 Q.  In any affidavits that were submitted or any other briefs,

13 you didn't feel like it was important to talk about all the

14 functions that Scott Tucker was playing or the functions that

15 were being performed in Kansas City, correct?

16 A.  I didn't file any of those briefs.  I didn't file any

17 affidavits.  I was part of those, but most of those briefs

18 would have been in response to briefs from the state who were

19 making all their arguments about what Mr. Tucker was doing and

20 what his involvement was.

21 Q.  So just to be clear, on the affidavits, you did review

22 these affidavits?

23 A.  I reviewed them from time to time, yes.

24 Q.  You also reviewed the briefs, correct?

25 A.  Yes.

1    Q.  You reviewed them all before they were filed, correct?

2    A.  Not all of them, no.  I reviewed a lot of them.  I wouldn't

3    say I reviewed all of them.

4    Q.  You reviewed many of the affidavits that were presented in

5    this case, right?

6    A.  Well, you showed some affidavits in this case that were

7    drafted in 2005.  I wasn't there yet.

8    Q.  That's a fair point.  So any affidavit that was after you

9    joined CLK in 2006, you would have reviewed, correct?

10   A.  More than likely, yes.

11   Q.  Now, you also testified about Government Exhibit 1714

12   yesterday, correct?

13            MR. VELAMOOR:  Put that up.

14   A.  Yes, I did.

15   Q.  So you in here describe Scott Tucker as an employee just

16   like everyone else in the building, correct?

17   A.  That's what this memo says, yes.

18   Q.  You stand by that as accurate?

19   A.  Yes, he was an employee.

20   Q.  Just like everyone else in the building?

21   A.  No.

22   Q.  Well, you say, "Just like you, Scott Tucker is an

23   employee."

24   A.  That's what they were communicating to the employees.

25   Q.  Who is "they"?

1   A.  I believe this was a memo that came out from the HR

2   department.

3   Q.  Why don't we take a look at 1713.

4   A.  OK.

5   Q.  Which is in evidence.

6       This is the cover e-mail to the document we just looked at,

7   right?

8   A.  It is.

9   Q.  This is a cover e-mail sent to you, right?

10  A.  Cover e-mail sent to me, yes, it is.

11  Q.  It's being sent to you in your capacity as lawyer, correct?

12  A.  Correct.

13  Q.  So just to be clear, this was something that was reviewed

14  by legal, looked at by legal, including you, right?

15  A.  Yes.

16  Q.  Before it went out, before the information was disseminated

17  to employees?

18  A.  Yes.

19          MR. VELAMOOR:  We can take that down.

20  Q.  It was also important as part of this strategy to not even

21  mention Scott Tucker, right?

22  A.  Do you have a specific instance?  I don't know what you're

23  talking about.

24  Q.  Didn't you give direction to people that there should be no

25  mention or reference to Scott Tucker at all?

1   A.  Do you have some context that could help me?

2   Q.  For example, when there were press inquiries, it was

3   important, according to your directions, to not even mention

4   Scott Tucker, right?

5   A.  I don't remember that.

6   Q.  Why don't we take a look at 4019.

7   A.  OK.  Is there more than one page to this document?

8   Q.  I think the next page is just the e-mail signature.

9   A.  OK.

10  Q.  Is this an exchange between yourself, Blaine Tucker, Tim

11  Muir regarding Scott Tucker and a press inquiry?

12  A.  It was from Jared to me and Blaine cc'd, is that what you

13  mean?

14  Q.  I think you also write an e-mail.

15  A.  The e-mail was between me and Mr. Marsh and Blaine was

16  cc'd.

17              MR. VELAMOOR:  I offer 4019.

18              THE COURT:  Any objection to 4019?

19              MR. BATH:  No.

20              THE COURT:  Received.

21              (Government's Exhibit 4019 received in evidence)

22              MR. VELAMOOR:  Can we show 4019 to the jury.

23              Why don't we focus on the bottom e-mail from Jared

24  Marsh.

25  Q.  So this is Jared Marsh circulating a press strategy,

1    correct?

2    A.  Yes.

3    Q.  And he suggests that the -- because there have been press

4    inquiries after the news article we talked about, correct?

5            MR. VELAMOOR:  We won't show it.  We will just have it

6    on the screen for the witness.

7    A.  OK.

8    Q.  So the e-mail says, from Jared Marsh, "Written statements

9    were provided to a news organization.  There will be no further

10   comment coming from the company or Mr. Tucker."

11           That's what he proposes to say, correct?

12   A.  That's what he proposes, yes.

13   Q.  Your response is, "There is to be no mention or reference

14   of, quote, Mr. Tucker," right?

15   A.  That's what I write, yes.

16   Q.  "Our primary strategy has and will continue to be to

17   deflect and direct to the company or to the tribe," right?

18   A.  That's what I write, yes.

19   Q.  Again, this is the time period in which you're representing

20   both the tribe and Mr. Tucker, right?

21   A.  Correct.

22   Q.  And these annoying press people are showing up and shoving

23   microphones in people's faces, correct?

24   A.  One way to say it.

25   Q.  And you don't want Mr. Tucker mentioned at all, right?

1    A.  I don't from this statement because Mr. Tucker gave them

2    his own statement.

3    Q.  It doesn't say that anywhere here.  You don't say there

4    should be no mention because Mr. Tucker has given another

5    statement?

6    A.  I don't say that here, no.

7    Q.  What you say is, "Our primary strategy to deflect and

8    direct to the company or to the tribe," right?

9    A.  That's what I wrote, yes.

10   Q.  So you want all the annoying press microphones to go to

11   tribal headquarters instead, right?

12   A.  I wanted any sort of response from the lending business to

13   come directly from the tribe and Mr. Tucker to have his own

14   response.

15   Q.  All that additional stuff is not in here.  What you want is

16   everything to be deflected, all the inquiries, all the press

17   attention to go to the tribe, right?

18   A.  That's what this e-mail says.

19   Q.  Your other so-called clients, right?

20   A.  For my clients.

21   Q.  You don't mention, for example, that Mr. Tucker is just

22   providing servicing operations, that's not part of your

23   proposed strategy, correct?

24   A.  Correct.

25   Q.  Now, it wasn't just about minimizing and concealing Mr.

1    Tucker's role, part of your strategy was also making it seem

2    like the tribes were more involved, correct?

3    A.   Again, you're being very general.  Do you have anything

4    specific?

5    Q.   Was that part of your strategy, to try to make it seem like

6    the tribes had more involvement in the business?

7    A.   Part of my strategy with the clients was for them to be

8    more involved.

9    Q.   So you want them to be more involved so you can say they

10   are more involved, correct?

11   A.   I wanted them to be more involved so they were more

12   involved.

13   Q.   Take a look at 503, which is in evidence.

14   A.   OK.

15   Q.   This is an e-mail exchange about having a meeting with Don

16   about financials, correct?

17   A.   Correct.

18   Q.   You say that you wanted to have the tribes involved just so

19   that they could be more involved, right?

20   A.   Yes.

21   Q.   But that's not what you say in this e-mail, is it?

22   A.   I don't say those words in this e-mail, no.

23   Q.   In fact, you say contrary words; you say that you want to

24   have this meeting because of the California litigation,

25   correct?

1   A.  That was the core reason to have it, yes.

2   Q.  That's the reason why you propose having this particular

3   meeting, correct?

4   A.  Yes.

5   Q.  That's what you say in that second line?

6   A.  That's what I say.

7   Q.  You don't say, for example, it's important to do it so that

8   the tribes have more involvement in the financial affairs of

9   our business, you do not say that, right?

10  A.  I do not say that.

11  Q.  The same reason why, for example, you wanted to get an

12  office for Don Brady, correct?

13  A.  Mr. Brady wanted an office.

14  Q.  He wanted an office after the news article we talked about?

15  A.  Probably the same timing, yes.

16  Q.  And you knew that the tribal people were coming for the

17  first board meeting of AMG, correct?

18  A.  It wasn't the first board meeting.  I knew they were coming

19  to Kansas City for a board meeting, yes.

20  Q.  You heard Mr. Gamble testify that he doesn't recall any

21  meetings at AMG until late 2011, early 2012?

22  A.  Correct.

23  Q.  He was on the board of AMG, right?

24  A.  Yes.

25  Q.  In fact, according to you, he was the chairperson of the

1   board?

2   A.   Yes.

3   Q.   This is a meeting that happens in November of 2011?

4   A.   Right.

5   Q.   They are coming, correct?

6   A.   Correct.

7   Q.   And Mr. Brady told people that he had an office, correct?

8   A.   That's what he told me, yes.

9           MR. VELAMOOR:  Put up 313.

10          Focus on the bottom.

11  Q.   He told you that he told all the board members that,

12  correct?

13  A.   Correct.

14  Q.   You then proceed to joke with Mr. Tucker and Blaine Tucker

15  about the kind of office space you're going to give Mr. Brady

16  because he happened to tell people that he has office space,

17  right?

18  A.   I don't think I am joking in this e-mail.

19  Q.   So Scott Tucker says, "Huh, cubicle?"

20          Do you see that?

21  A.   That's what he said, yes.

22  Q.   You said, "Nope, he said office," correct?

23  A.   I said, "Nope, he called me, said office."

24  Q.   Then Blaine suggests using a conference room or Patten's

25  office, right?

1    A.   Yes.

2    Q.   You say, Anything would be good," right?

3    A.   That's what I said, yes.

4    Q.   For the person who you claim to be your ultimate boss when

5    it comes to AMG business, right?

6    A.   Yes.

7    Q.   The importance of the tribes being more involved was also

8    the reason why you were annoyed with Chief Follis, right, when

9    he gave that interview?

10   A.   Pardon me?

11   Q.   The strategy, the need to show the tribes as being more

12   involved and aware of the business, that also was the reason

13   why you were annoyed with Chief Follis, correct?

14   A.   I wished Chief Follis would have said something better than

15   he thought it was somewhere in Kansas.

16   Q.   Because it was embarrassing that the so-called lenders here

17   didn't even know where the business was located, right?

18   A.   The reason why it bothered me when he said that is that

19   Chief Follis never had any direct involvement, as far as I

20   knew, with Red Cedar Services, that was more Troy Little Axe.

21   So the fact that the chief of the tribe wasn't particularly

22   familiar with the business was concerning, yes.

23   Q.   Well, you didn't express frustration with the fact that the

24   statement came from Chief Follis, you expressed frustration

25   with what Chief Follis said, right?

1    A.  Correct.

2    Q.  That's on 822, correct?  Let me show that.

3            Focus on the bottom e-mail from you.

4        You're concerned about the quote that Chief Follis gave,

5    right?

6    A.  Yes.

7    Q.  You don't say, Gee, I wish Troy Little Axe had spoken about

8    the business, right?

9    A.  I did not say that.

10   Q.  Take a look at 411.  You saw this in 411 about the iPads.

11   Do you recall that?

12   A.  I recall that.  Can I get the e-mail on the screen?

13   Q.  Sure.

14           You were shown an extended version of this e-mail from

15   your counsel, Mr. Bath?

16   A.  Yes, he showed me the full version.

17   Q.  That explained what ultimately happened with the iPads,

18   correct?

19   A.  Correct.

20   Q.  You weren't asked about your statement there that you "do

21   not want to have to explain that down the road."

22           Do you see that?

23   A.  Yes.

24   Q.  Again, what you did not want to explain was the idea that

25   board members were not getting something that people in Kansas

1    City were getting, right?

2    A.   That's correct.

3    Q.   Because that wouldn't be consistent with the tribes really

4    controlling and running this business, right?

5    A.   I disagree with that.

6    Q.   That's what you said, you did not want to have to explain

7    that down the road, right?

8    A.   That's what I wrote, yes.

9    Q.   Explaining that in this business was explaining it to class

10   action lawyers, state regulators, those kind of contexts,

11   right?

12   A.   Correct.

13   Q.   Those lawsuits, to be clear, those were always brought on

14   behalf of people who were claiming these loans were illegal,

15   right?

16   A.   Yes.

17   Q.   Now, you also worked hard to keep the US Bank records to

18   getting out in the open as well, right?

19   A.   I believe we opposed subpoenas to US Bank, yes.

20   Q.   Those are the same records that, in large measure, form the

21   basis for Kim Espinoza's PowerPoint presentation we saw in this

22   trial, right?

23   A.   Bank records, yes.

24   Q.   Those are the records showing hundreds of millions of

25   dollars from so-called tribal accounts to Mr. Tucker's personal

1   interests, right?

2   A.   That's right.

3   Q.   State regulators tried to get those records, right?

4   A.   Yes, they did.

5   Q.   And you did everything you possibly could to prevent that

6   from happening, correct?

7   A.   The litigation strategy was to oppose those subpoenas.

8   Q.   Because those records coming into the open certainly would

9   not have been helpful to the litigation strategy, right?

10  A.   Those records ultimately did come into the litigation.

11  Q.   Can you say that again?

12  A.   The bank records did come into that litigation.

13  Q.   They did, but they did over your extensive efforts,

14  correct?

15  A.   Over the litigation strategy, yes, they did.

16  Q.   Again, those were cases brought on behalf of people who

17  were claiming these loans were illegal, right?

18  A.   Those cases, I believe, were the Colorado and California

19  cases.

20  Q.   Brought on behalf of states that believed these loans were

21  illegal, correct?

22  A.   Correct.

23  Q.   In fact, you testified about how you fixed or came up with

24  a strategy to solve Mr. Tucker's problem with the trademarks,

25  right?

1    A.   Yes.

2    Q.   You also worked on coming up with a strategy to deal with

3    Mr. Tucker's false statements and these bank records that he

4    was secretary of tribal corporations, right?

5    A.   I don't remember that specifically.

6    Q.   Well, why don't we take a look at 4300.

7    A.   OK.

8    Q.   Do you recognize this as an exchange about Mr. Tucker's

9    statements and bank records that he was secretary of SFS and

10   MNE?

11   A.   Yes.

12             MR. VELAMOOR:  The government offers 4300.

13             MR. BATH:  No objection.

14             THE COURT:  Received.

15             (Government's Exhibit 4300 received in evidence)

16   Q.   Focus on the bottom.  We don't have to go through every

17   word, but you have seen some of these declarations in this

18   case, correct?

19   A.   Correct.

20   Q.   Mr. Tucker signed this supposedly as the secretary of

21   tribal corporations, right?

22   A.   Correct.

23   Q.   Those declarations would have come up in some of these

24   state litigations as well, right?

25   A.   To be clear, whose declarations?

 1  Q.  Mr. Tucker signing as secretary of SFS or MNE.

 2  A.  They were corporate certificates of authority, yes.

 3  Q.  Thank you.  That was the correct term.

 4          Those were a problem, correct?

 5  A.  Yes.

 6  Q.  You came up with a strategy to try to deal with those,

 7  correct?

 8  A.  Well, this e-mail says Mr. Schulte wanted my input, and I

 9  gave him my input.

10  Q.  You came up with language that could be used to try to

11  explain those things away, right?

12  A.  I gave him suggested language, yes.

13          MR. VELAMOOR:  If we can go to the top.

14  Q.  Again, this is the same time that you're suggesting that

15  you're representing tribes and Mr. Tucker, right?

16  A.  Yes.

17  Q.  Now, you were asked by Mr. Bath yesterday about the

18  "titles" e-mail.

19          You said that -- 1733 -- about getting Mr. Tucker a

20  new title.  Do you recall that?

21  A.  Yes.

22  Q.  You testified that no one at AMG had titles, right?

23  A.  That was my understanding, there were no formal titles

24  besides the board and Don Brady.

25  Q.  That's not what you said yesterday.  Yesterday you said

1  there were no titles, correct?

2  A.  Correct.

3  Q.  In fact, two people had a title, right?

4  A.  Mr. Brady had one.

5  Q.  That's one person.  And one fake person had a title, right,

6  J.S. Ragman?

7  A.  Correct.

8  Q.  He was the vice president, according to you?

9  A.  Yes.

10  Q.  Now, on 1915, you were asked yesterday about this first

11  party collection issue?

12  A.  Yes.

13  Q.  You gave some information about that first party collection

14  issue?

15  A.  Right.

16  Q.  But in your e-mail at the bottom, you were specifically

17  asked about the fact that the tribal people were affirmatively

18  saying that they were not associated with any of the other

19  portfolios, right?

20  A.  Right.

21  Q.  And you gave your explanation relating to these collection

22  rules, right?

23  A.  Right.

24  Q.  But in your e-mail, the collection rules are not the only

25  reason why you have a problem with customer service people

1   associating themselves with other portfolios, right?

2   A.  I am not following.

3   Q.  You say, "Moreover, doing that, especially as a course of

4   action, runs the risk of us losing our position as a first

5   party collector," right?

6   A.  I wrote that.

7   Q.  That's the explanation you talked about yesterday, right?

8   A.  Correct.

9   Q.  But that's the second reason that you provided in this

10  e-mail, correct?

11  A.  They are related.

12  Q.  One says "moreover," correct?

13  A.  Correct.

14  Q.  And before that you just said, declaratively, you do not

15  want people to affirmatively represent anyone who we are

16  affiliated together, right?

17  A.  That's what it says, yes.

18  Q.  Moreover, there is this first party collection rule that

19  also makes it problematic, right?

20  A.  I am trying to communicate they are related.

21  Q.  What you communicated, is it not, was that there were at

22  least two reasons why you wanted this to happen, right?

23  A.  There were two reasons, but they were related reasons; they

24  were not independent reasons.

25  Q.  But what you wrote here is "moreover," correct?

1    A.   That's what I wrote, correct.

2    Q.   Like, for example, also, right?

3    A.   Sure.

4              MR. VELAMOOR:   You can take that down.

5    Q.   You testified on direct that the *Tucker vs. AMG* lawsuit was

6    both truthful and entirely appropriate?

7    A.   Yes.

8    Q.   Now, you claimed, for example, in that lawsuit -- which you

9    drafted, correct?

10   A.   Yes, I drafted it.

11   Q.   -- that the AMG purchase of CLK closed in 2008?

12   A.   Yes.

13   Q.   That's what you told the Kansas court, right?

14   A.   Yes.

15   Q.   In fact, the transaction never closed in 2008, correct?

16   A.   I disagree.  I thought it did close in 2008.

17   Q.   Well, you know that no payment was made in 2008, correct?

18   A.   That's correct.

19   Q.   And the payment was an important step for that transaction

20   to close, right?

21   A.   Not to close.

22   Q.   Sorry.

23   A.   My understanding is that the transaction closed when the

24   tribe merged CLK into AMG under tribal law.

25   Q.   So your testimony is that the payment of money for the

1    company was not a necessary part of the closing, is that it?

2    A.  No, I don't think it was.

3    Q.  Why don't we take a look at 4244.

4    A.  OK.

5    Q.  This is the purchase agreement, correct?

6    A.  Correct.

7         MR. VELAMOOR:  I think the agreement is in evidence

8    under a defense number, your Honor.  It was put in yesterday.

9    Q.  This is the so-called merger between CLK and AMG Services,

10   correct?

11   A.  This is a purchase agreement wherein AMG Services buys the

12   units of CLK.

13   Q.  This is the agreement that provides for what you describe

14   as a merger, right?

15   A.  Yes.

16   Q.  Turn to the second page.

17        MR. VELAMOOR:  Your Honor, I can offer the same

18   document in evidence yesterday under a defense number.  The

19   government offers 4244.

20        THE COURT:  It's already in evidence as a defense

21   exhibit?

22        MR. VELAMOOR:  Yes.

23        THE COURT:  Then it's in evidence.

24        MR. VELAMOOR:  That's fine, your Honor.

25   Q.  Why don't we turn to the second page.

1          You see that paragraph "closing"?

2     A.   Yes.

3     Q.   So this is the paragraph that describes the closing,

4     correct?

5     A.   Correct.

6     Q.   One of the things that happens, and has to happen at the

7     closing of this transaction is the purchaser delivering the

8     money to the company, right?

9     A.   That's what the document says, yes.

10    Q.   So you're saying what the document says about the merger

11    doesn't really matter?

12    A.   I am not saying that.  I am just saying that's what the

13    document says.

14    Q.   So the document says that the closing of this transaction

15    occurred when money was paid, correct?

16    A.   That's what it says, yes.

17    Q.   And you know the money wasn't paid, correct?

18    A.   Correct.

19    Q.   And you knew that money being paid was important because

20    otherwise there was an argument that the merger wasn't even

21    complete under Kansas law, right?

22    A.   I don't think those two were related in my mind.

23    Q.   Yesterday you testified you were concerned when you heard

24    about the fact that the money hadn't been paid, that otherwise

25    there was an argument that the merger wasn't complete under

1    Kansas law.

2    A.  I don't remember saying that.  If I did, I was wrong.

3    Q.  Do you recall being asked this question and giving this

4    answer yesterday:

5    "Q.  What legal importance, if any, did it have to make sure

6    that the check got issued?"

7              Do you recall being asked that question yesterday?

8    A.  I do.

9    Q.  Do you recall saying:

10   "A.  There was a class action in California, and in that

11   litigation, these arguments had made the argument that the

12   CLK/AMG merger wasn't complete under Kansas law, and therefore

13   they were asking the court not to recognize the merger of CLK

14   and AMG."

15   A.  I remember saying that.

16   Q.  So in a direct question about the significance of the

17   check, you said that there was a concern under Kansas law that

18   the merger may not have been complete in 2008, correct?

19   A.  I didn't recall you saying anything about a check when you

20   read from that transcript.

21   Q.  I can read it again.  Page 2776 of the transcript:

22   "Q.  What legal importance, if any, did it have to make sure

23   that the check got issued?"

24   A.  OK.

25   Q.  So you're testifying about the check, correct?

1    A.  Correct.

2    Q.  Because you knew that a Kansas court may not think this

3    merger was actually completed in 2008 because no check had been

4    paid in 2008, correct?

5    A.  I did not contemplate the check not being paid when

6    drafting the petition, although I think I testified there could

7    be an argument that could be made.

8    Q.  You think there could be an argument under Kansas law,

9    correct?

10   A.  Correct.  Yes.

11   Q.  In the merger, you're seeking relief under Kansas law,

12   correct?

13   A.  Yes.

14   Q.  And you didn't tell the Kansas court what you knew may have

15   been significant under Kansas law, correct?

16   A.  I did not say -- you're right, it does not say in the

17   petition that the check had been paid.

18   Q.  In fact, on the contrary, you say that the merger closed in

19   June 2008, correct?

20   A.  Yes, because I believed it did.

21   Q.  Even though you knew no check had been paid and that was

22   potentially a problem under Kansas law?

23   A.  Yes, because the Miami tribe had been operating AMG

24   Services with employees and a large payroll for the better part

25   of a year and a half and acting like it was an operating

1    company.

2    Q.  Mr. Muir, you were asked questions yesterday about the

3    check, correct?

4    A.  Yes, I was.

5    Q.  And you responded, the failure to pay a check was

6    potentially significant under Kansas law, correct?

7    A.  I said an argument could be made, yes.

8    Q.  And you drafted this petition for a Kansas court, right?

9    A.  Yes.

10   Q.  And you told that court, in no uncertain terms, that the

11   merger was complete in 2008, correct?

12   A.  Because I believe it was.

13   Q.  Now, the same closing agreement -- we can go back to that,

14   4244 -- that same closing --

15            MR. VELAMOOR:  Can we go to the third page, paragraph

16   8.

17            Can you put that up?  I don't have it on my screen.

18   Q.  This talks about the books and records after the closing,

19   correct?

20   A.  Yes.

21   Q.  It says, "Upon the closing, the company" -- which is CLK,

22   right?

23   A.  It would probably be AMG.

24   Q.  Turn to the first page.  I think the company is CLK.

25   A.  I believe you.

1    Q.  "The company shall cause to be transferred to the

2    reservation -- to the reservation -- all originals, copies and

3    compilations of the books and records."

4           Do you see that?

5    A.  Yes.

6    Q.  That never happened, right?

7    A.  No.

8    Q.  Yet you told the court that, despite the fact that these

9    records remained in Scott Tucker's office in Kansas City, that

10   he had no right to access them, right?

11   A.  When that lawsuit was filed in July of 2010, that office

12   was AMG Services.  That's where those records resided.

13   Q.  Just to be clear, despite no payment, no transfer of books,

14   both of which were called for by CLK's own agreement, you told

15   the court the transaction closed in 2008, right?

16   A.  Yes, I did.

17   Q.  Now, you were asked yesterday on direct examination if you

18   made the requests of AMG to file the certificate of merger?

19   A.  Yes.

20   Q.  Do you recall that?

21   A.  I do.

22   Q.  That's an important point, because in this lawsuit you

23   drafted, you told the court that, despite requests, AMG has

24   failed or refused to file the certificate of merger with the

25   Kansas secretary of state, right?

1    A.   Yes.

2    Q.   And yesterday when you were asked on direct examination if

3    you made that request of Mr. Schulte, you gave two different

4    answers, right?

5    A.   Yes.

6    Q.   The first time you suggested you hadn't because you said it

7    would have been a hollow request, right?

8    A.   Correct.

9    Q.   And then you went back a moment later in response to a

10   different question and you changed your story, right?

11   A.   I changed my answer, yes.

12   Q.   And you said that you did make the request of Conly Schulte

13   and he said no?

14   A.   Yes.

15   Q.   And you changed your story because you knew that you

16   claimed in this lawsuit that you had made the request, correct?

17   A.   I changed my answer because that was the truth.

18   Q.   Well, you heard Mr. Schulte's testimony, correct?

19   A.   Yes.

20   Q.   And he testified, on page 2490 of the transcript, that the

21   only request you ever made of him prior to this lawsuit was to

22   review a draft of the complaint.

23   A.   I don't remember Mr. Schulte saying he was never asked if

24   AMG would file a certificate of merger.

25   Q.   He was actually asked more broadly than that, Mr. Muir.  He

1    was asked, did Mr. Muir ask you anything?  And he said no.

2    A.   OK.

3    Q.   So from 2489 and 2490 of the transcript, this is Mr.

4    Schulte's testimony.  Do you recall Mr. Schulte being asked

5    this question and giving this answer:

6    "Q.   Did you talk to him before it was filed?"

7         Referring to the *Tucker vs. AMG* lawsuit.

8    "A.   I did.

9    "Q.   What request did he make of you or your client before the

10   suit was filed?

11   "A.   What requests were made of me or my client?  I was asked

12   to review a draft of the complaint, to review it for accuracy.

13   I am not sure there were any other requests that were made.

14   "Q.   So he asked you to review for accuracy a complaint against

15   your client?

16   "A.   Correct.

17   "Q.   That was the request he made of you?

18   "A.   That is the only request that I recall."

19        Do you recall that testimony?

20   A.   Yes.

21   Q.   So according to Mr. Schulte, you made no such request of

22   him, correct?

23   A.   Well, I disagree with that because Mr. Schulte said he

24   reviewed the petition, and inside that petition it says, even

25   though requested, AMG refused to file a certificate of merger.

1   Mr. Schulte never suggested to me that that language should be

2   changed after he reviewed the petition.

3   Q.  So your position is that you implicitly asked Mr. Schulte

4   to file a certificate of merger, by submitting a draft of the

5   complaint to him, in which you assert you had already asked him

6   to file a certificate of merger?

7   A.  No.  My testimony is I had a phone call from Mr. Schulte

8   about that and specifically mentioned that, about would AMG

9   file a certificate.  I knew what the answer was going to be,

10  and he said no, as I expected.

11  Q.  So a second ago you just said that you believed you made

12  your request of him by sending him a draft of the complaint.

13  Did I hear you correctly?

14  A.  No.  I did say that, but previously I had told you I had a

15  phone call with Mr. Schulte.

16  Q.  OK.  So you're saying that Mr. Schulte was wrong when he

17  testified that you made no such request of him?

18  A.  Mr. Schulte may not have remembered it, but I did.

19  Q.  Just to be clear, I have heard you just say, you didn't do

20  it because it would be a hollow request, you did do it, or you

21  did it by sending him a draft of the complaint in which your

22  assertion was included.  So which of the three is it, Mr. Muir?

23          MR. BATH:  Objection.  Argumentative.

24          THE COURT:  Sustained.

25  Q.  Just to be clear, by the way, your testimony then at this

1    point is that you made a single request of Mr. Schulte in a

2    phone call?

3    A.  I don't know if it was just a single request.  I know we

4    would have talked about this.

5    Q.  So now you think you may have requested it more than once?

6    A.  As far as a specific request, no, there probably was one

7    phone call when we were contemplating this transaction.

8    Q.  OK.  So there is, at most, one request?

9    A.  Yes.

10   Q.  Yet in this petition, in paragraph 18 -- we can put that on

11   the screen -- you say there was more than one request, right?

12        MR. VELAMOOR:  Can we put up 2605, please, in

13   evidence.

14   Q.  Do you see paragraph 18?

15   A.  Yes, I do.

16   Q.  You refer to more than one request there, correct?

17   A.  That's what it says, yes.

18   Q.  Just to be clear, when you said more than one request in

19   the petition, that was inaccurate, that was false, correct?

20   A.  I wouldn't call it false.  It could have been inaccurate.

21   Q.  I'm sorry.  You wouldn't call it false, but you would be

22   happy to call it inaccurate?

23   A.  I said it could be inaccurate.  I wouldn't call it false.

24   Falsity, to me, says you're trying to deceive somebody.  There

25   was no doubt AMG was not going to file a certificate.  And I

1   know I had discussions with Mr. Schulte about that.

2   Q.  So your view is you could say whatever you want in a

3   petition --

4   A.  No.

5   Q.  -- as long as, in a larger sense, you were confident that

6   Mr. Schulte was OK with it?

7   A.  That's not what I am saying.  My point is I don't think

8   when I wrote "despite request," I was sitting there consciously

9   thinking, well, I know there were at least two times that it

10  happened, so I am going to make request plural.  That's my

11  testimony.

12  Q.  It wasn't an accurate statement to the court, correct?

13  A.  I don't know if it was.  I don't know how many we had.

14  Q.  So now you're back to wondering how many times you made the

15  request of Mr. Schulte?

16  A.  We would have talked about this several times.  We would

17  have talked about this when class action lawyers made the

18  argument in California in that case; we would have talked about

19  it when I was drafting this; we would have talked about it when

20  we were contemplating this.

21       You asked me for one specific memory.  That's what I

22  have.  I couldn't tell you exactly the time and the places, but

23  like I said, when I was typing "despite request," I wasn't

24  counting this time, this time and this time.

25  Q.  So just to be clear, in the last few minutes, you now

1    recall asking Mr. Schulte this in the context of several other

2    litigations?

3    A.  I didn't say I recall.  I said I would imagine that we did.

4    Q.  This is not something you said three minutes ago, correct?

5    A.  Correct.

6    Q.  When I asked you the only thing you recalled is the one

7    phone call, right?

8    A.  You asked me the phone call I specifically recalled.

9    Q.  You generally recall these other conversations around these

10   litigations?

11   A.  I said I imagine we would have had those discussions.

12   Q.  Now, you testified today that Mr. Tucker -- that the books

13   and records were in Kansas City, correct?

14   A.  Correct.

15   Q.  For both CLK and AMG?

16   A.  Correct.

17   Q.  And Mr. Tucker had right of access to all those books and

18   records, correct?

19   A.  In his role as an employee, yes, he did.

20   Q.  In his role as an employee?

21   A.  Yes.

22   Q.  And you testified that he did not have the right to access

23   to these records in what you called his individual capacity,

24   correct?

25   A.  Yes, that's correct.

1    Q.  That's also not a distinction that you spelled out for the

2    court, is it?

3    A.  That is correct.

4    Q.  You just said that he had no right to access them, right?

5    A.  Correct.

6    Q.  Knowing that Scott Tucker had access to those books and

7    records at AMG every day, correct?

8    A.  And the court was made aware of that too.

9    Q.  In this petition?

10   A.  No.

11   Q.  Not in the petition you sent to the court in order to get

12   relief from the court?

13   A.  Not in the petition, no.

14   Q.  You had left out the individual capacity assertion even

15   though you knew that Don Brady was still asking Scott Tucker

16   for permission when he wanted to do a tribal audit, correct?

17   A.  I don't think I would have considered that when I was

18   drafting that petition.

19   Q.  You don't think you would have considered that, right?

20   A.  No.

21   Q.  Now, you're saying that Mr. Tucker did not have access as

22   an employee of AMG, correct?

23   A.  No.  What I said is he would have had access as an

24   employee.  He would not have had access in his individual

25   capacity.

1   Q.  He was not bringing this case as an employee, correct?

2   A.  Correct.

3   Q.  He was bringing this case as an individual?

4   A.  Correct.

5   Q.  In fact, the purpose of this lawsuit was to protect him,

6   right?

7   A.  It was to protect both parties.

8   Q.  Well, it was to protect Scott Tucker from tens of millions

9   of dollars in liabilities, correct?

10  A.  And it was to protect AMG in the class action litigation

11  that it was in.

12  Q.  What you testified to yesterday was that it was to protect

13  Scott Tucker from tens of millions of dollars in liabilities,

14  right?

15  A.  That is correct.

16  Q.  And that is also what you told Scott Tucker when you

17  boasted to him about dumping tens of millions of dollars in

18  liabilities, right?

19  A.  Correct.

20  Q.  You also testified that your petition was true because, as

21  you just put it, that Tucker had no right to access these

22  records as an individual, correct?

23  A.  Correct.

24  Q.  You also testified that it was fine for AMG to pay for this

25  lawsuit because it was done for the lending business, right?

1    A.  Yes.

2    Q.  And we saw those checks, correct?

3    A.  Yes.

4    Q.  Scott Tucker signed those checks, correct?

5    A.  That's correct.

6    Q.  He signed those checks as an employee of AMG, correct?

7    A.  Correct.

8    Q.  So, in your view, Scott Tucker could pay for this lawsuit

9    as an employee?

10   A.  Yes.

11   Q.  At the same time that he could not authorize or perform any

12   of the functions described in the lawsuit that he was paying

13   for?

14   A.  The check was written by AMG so that's who paid for that

15   lawsuit.

16   Q.  He signed it in his capacity as an employee?

17   A.  He signed it, yes.

18   Q.  He signed that check in his capacity as an employee,

19   correct?

20   A.  Correct.

21   Q.  So he can sign checks for AMG in his capacity as an

22   employee, right?

23   A.  Yes.

24   Q.  Pay money in his capacity as an employee?

25   A.  He could sign checks, yes.

1   Q.  And pay for this lawsuit?

2   A.  Yes.

3   Q.  Which said that he did not have authority to get to the

4   books and records, correct?

5   A.  In his individual capacity, correct.

6   Q.  Which, by the way, you never specified in this lawsuit,

7   correct?

8   A.  No, but I did tell the judge in chambers.

9   Q.  You told the judge in chambers?

10  A.  Yes, I did.

11  Q.  You mentioned to the judge in chambers that, where I wrote

12  in the petition he did not have access to the books and

13  records, I am going to clarify he had access to the books and

14  records, but only in his capacity as an employee?

15  A.  What I told the judge in chambers is that Mr. Tucker was

16  still working for AMG, the parties were still very friendly,

17  but because of the intricacies of a potential waiver of tribal

18  sovereign immunity, AMG was not going to file a certificate of

19  merger.

20  Q.  So you decided to tell the judge all that stuff when you're

21  at the point of getting the order signed, that's what you say

22  you told the judge, but you didn't put any of that information

23  in the petition, correct?

24  A.  That is correct.

25  Q.  You also testified about the Hallinan settlement, correct?

1   A.  Yes.

2   Q.  And you testified about the reason you now say you signed

3   J.S. Ragman to the settlement, right?

4   A.  Yes.

5   Q.  You say that you panicked with the deadline approaching,

6   right?

7   A.  Yes.

8   Q.  To be clear, you're saying AMG was supposedly your client,

9   right?

10  A.  At that particular time, no.

11  Q.  Was not your client?

12  A.  No, on that lawsuit.

13  Q.  Because you're saying this happened only in 2010?

14  A.  Yes.

15  Q.  But the settlement was in 2010, correct?

16  A.  I am talking about during this entire lawsuit, all the way

17  up to the settlement, I was representing Mr. Tucker.  Mr.

18  Schulte's firm and their local counsel was representing AMG and

19  CLK and the tribal entities.

20  Q.  You testified that by 2010 you were representing the

21  tribes, correct?

22  A.  Yes.

23  Q.  And this settlement was in 2010, right?

24  A.  Yes.  This was in March of 2010 and subsequent to this.

25  Then I began representing the tribes.

1  Q.  You were representing the tribes at the time of this

2  settlement, correct?

3  A.  No.  Subsequent to this lawsuit, I will not say that I had

4  them as my client.  I was definitely involved in representing

5  them through a joint defense agreement, but they were not my

6  client.

7           THE COURT:  And the "they" in your answer is whom?

8           THE WITNESS:  The tribal entities, the lending

9  entities.

10          THE COURT:  Thank you.

11  Q.  So you're now saying that in 2010 the tribes were not your

12  clients?

13  A.  What I was trying to convey is that I believe that the

14  lending entities became my client after this lawsuit was

15  settled.

16  Q.  It just happened right after this lawsuit?

17  A.  Yes.

18  Q.  Before it was just 2010.  Now that we are talking about the

19  Hallinan lawsuit, it was 2010 after this lawsuit?

20  A.  We are talking about the tribal lending entities.  So Red

21  Cedar Services, SFS, and MNE.

22  Q.  So AMG was not your client in 2010?

23  A.  AMG was my client, yes.

24  Q.  According to the settlement, according to you, AMG paid $30

25  million in the settlement?

1    A.  Yes.

2    Q.  At the time of this settlement that you signed with a fake

3    individual?

4    A.  When I put that signature on that agreement, yes.

5    Q.  And you did that all because it was necessary to meet the

6    deadline imposed, you say, by Charles Hallinan's lawyers,

7    right?

8    A.  Yes.

9    Q.  That was necessary to settle Scott Tucker's lawsuit, right?

10   A.  That was necessary to settle that lawsuit, yes.

11   Q.  This was a lawsuit primarily between Scott Tucker and

12   Charles Hallinan, correct?

13   A.  Those were definitely the parties, but AMG was in the

14   lawsuit as well as the Modocs, yes.

15   Q.  This is a dispute that Scott Tucker had with Charles

16   Hallinan stretching long before any relationship with Indian

17   tribes, correct?

18   A.  That is correct.

19   Q.  Now, you say that you used this fake signature because you

20   panicked at that moment, correct?

21   A.  I panicked, yes.

22   Q.  But you also admitted to allowing that name to be used as a

23   webmaster for a domain registration, right?

24   A.  I was aware that it was used, yes.

25   Q.  I think you testified yesterday that you were asked what to

1    use and you said use Joe Shit the Ragman?

2    A.   What I said was, I don't care who you use, use Joe the

3    Ragman.

4    Q.   So you told him to use Joe S. the Ragman, right?

5    A.   I said I don't care who you use.

6    Q.   And the next sentence was?

7    A.   Joe Shit the Ragman.

8    Q.   And a Web domain is a company's address online, right?

9    A.   Yes.

10   Q.   You testified that a webmaster is the point of contact for

11   the domain, right?

12   A.   Yes.

13   Q.   When you were asked what to use as the point of contact for

14   the domain for these lending businesses, you suggested a fake

15   person, right?

16   A.   Mr. Mitchell is asking me who to put, and I said I don't

17   care who you put, and I said a fake name, yes.

18   Q.   So you suggested that Mr. Mitchell use a fake person to be

19   the webmaster for the lending entity's Web site, correct?

20   A.   I told Mr. Mitchell I don't care who he put.

21   Q.   Then you suggested use Mr. Ragman, correct?

22   A.   That is correct.

23   Q.   So you knew that he was then going to be using a fake

24   person as the contact person on these Web domains, right?

25   A.   Sure.

1    Q.  So the outside world would think that these domains, which

2    are associated with this lending business, there would be no

3    real person associated with those domains, right?

4    A.  I don't think I thought that.

5    Q.  Well, that was certainly consistent with the strategy of

6    keeping Scott Tucker out and keeping real people away from this

7    business as far as possible, correct?

8    A.  I don't think anybody was suggesting that Scott Tucker was

9    going to be the domain contact.

10   Q.  Well, you certainly didn't put a real number who could be

11   contacted about these lending businesses, correct?

12   A.  That's correct.

13   Q.  By the way, the Web domain is not the only instances in

14   which Mr. Ragman appeared in official documents, is it?

15   A.  I came to learn that, yes.

16   Q.  You became aware of that?

17   A.  Yes.

18   Q.  You were not aware of it at the time?

19   A.  I did not know they were doing that at first.

20   Q.  You were the general counsel of the company?

21   A.  Yes.

22   Q.  And you were not aware of agreements the company was

23   signing?

24   A.  Not every one of them, no.

25   Q.  The company was signing agreements without the general

1   counsel aware of them?

2   A.  Which company are we talking about?  Are we talking about

3   CLK or AMG?

4   Q.  You tell me.  Would the difference matter?

5   A.  Yes.  Because I don't think in settlement of AMG I was

6   aware of every single contract that was ever signed.  Mr. Marsh

7   took over those day-to-day responsibilities.  He would not have

8   run every contract by me.

9   Q.  But you knew that they were signing these things with J.S.

10  Ragman, correct?

11  A.  I became aware of that, yes.

12  Q.  You didn't stop anyone from doing that, correct?

13  A.  No.

14  Q.  Official documents of the company, right?

15  A.  No.

16              (Continued on next page)

1          THE COURT:  I don't understand the question.  When the

2    question was asked "official documents of the company" and you

3    said no, what did you mean by your answer no?

4          THE WITNESS:  I meant correct, to agree with

5    Mr. Velamoor.

6          THE COURT:  All right.

7    BY MR. VELAMOOR:

8    Q.  For example, 1402 is also an example regarding this case,

9    correct?

10   A.  Can I see it, please?

11   Q.  Yes.

12   A.  OK.

13   Q.  That's an example of a contract in this case that you

14   signed with Mr. Ragman, correct?

15   A.  It is an example, yes.

16         MR. VELAMOOR:  Turn to the third page.

17   Q.  And you heard Mr. Mitchell testify that this was a contract

18   worth hundreds of thousands of dollars, right?

19   A.  Yes.

20   Q.  And you found out about this at some point, correct?

21   A.  I think I found out about this in this case.

22   Q.  You never heard about that until this case?

23   A.  I don't recall, no.

24   Q.  But you signed the $30 million settlement with Mr. Ragman;

25   you authorized domains to be in the name of Mr. Ragman, but

1    this particular agreement you just found out about in this

2    case?

3    A.   Yes.

4    Q.   Let's take a look at 4320.

5    A.   OK.

6    Q.   Do you recognize the agreement in 4320?

7    A.   I don't recognize it.  I can see what it is.

8    Q.   And what is it?

9    A.   It's a mutual nondisclosure agreement.

10            MR. VELAMOOR:  Your Honor, the government offers 4320.

11            THE COURT:  Any objection?

12            MR. BATH:  No objection.

13            THE COURT:  Received.

14            (Government Exhibit 4320 received in evidence)

15   BY MR. VELAMOOR:

16   Q.   This is an agreement --

17            MR. VELAMOOR:  Can we show it to the jury, please.

18   Q.   This is an agreement with Selling Source, correct?

19   A.   Yes.

20   Q.   A very important partner of the company, right?

21   A.   Yes.

22   Q.   In fact, as you saw during Ms. Espinoza's examination,

23   hundreds of millions of dollars worth in that contract, right?

24   A.   I think 400 million, yes.

25   Q.   400 million.  And this is an agreement --

HabWtuc5                    Muir - Cross

1              MR. VELAMOOR:  Turn to the third page.

2    Q.  -- again, signed by Mr. Ragman?

3    A.  Yes.

4              THE COURT:  All right.  We're going to take our

5    midafternoon break, ladies and gentlemen.  Please do not

6    discuss the case among yourselves or with anyone.  We'll be

7    back in action in ten minutes.  Thank you.

8              (Jury not present)

9              THE COURT:  You may step down.

10             (Recess)

11             THE COURT:  Remain standing for the jury, please.

12             (Jury present)

13             THE COURT:  All right.  Please be seated.

14             You may continue, Mr. Velamoor.

15             MR. VELAMOOR:  Thank you, your Honor.

16   Q.  Just a few more topics.  We have on the screen Government

17   Exhibit 4320.  Do you see that?

18   A.  Yes.

19   Q.  That's, as we discussed, an agreement between AMG and

20   Selling Source, right?

21   A.  Yes.

22   Q.  Signed by Mr. Ragman, right?

23   A.  Yes.

24   Q.  And to your knowledge, there was no panic or deadline

25   associated with that agreement, was there?

1   A.  Correct.

2   Q.  Now, you testified about the time period when the Modoc

3   tribe initially considered leaving the business, correct?

4   A.  Right.

5   Q.  And that was after the news article in 2011, right?

6   A.  That's correct.

7   Q.  You had concerns that or there was concern that the Modoc

8   tribe might drop out?

9   A.  Yes, they said they were going to drop out.

10  Q.  In fact, they initially decided to, and then during that

11  time period, you were concerned about keeping Mr. Little Axe

12  close, keeping him, a friend like him, close, right?

13  A.  After he reached out and said that he might have another

14  tribe interested, yes.

15  Q.  In fact, you also considered paying him off, right?

16  A.  No.

17  Q.  You did not consider paying him off?

18  A.  No.

19  Q.  Well, why don't we take a look at Government Exhibit 4264.

20  A.  OK.

21  Q.  Do you recognize this as an email exchange between yourself

22  and Mr. Tucker?

23  A.  I do.

24          MR. VELAMOOR:  Your Honor, the government offers 4264.

25          MR. ROTH:  We need a copy.

1           THE COURT:  Received.

2           (Government Exhibit 4264 received in evidence)

3           MR. VELAMOOR:  Show it to the jury.

4    Q.  This is an email exchange about following up on Mr. Little

5    Axe's email, correct?

6    A.  Yes.

7    Q.  You write at the bottom that you're beginning to think that

8    the Modoc move could ultimately prove incredible for us, right?

9    A.  Yes.

10   Q.  And by us, you mean yourself and Mr. Tucker, right?

11   A.  Sure.

12   Q.  And again, this is 2011, when you say you're representing

13   the Modoc, right?

14   A.  Yes.

15   Q.  And Mr. Tucker said:  "Understood.  I agree.  Start getting

16   a team on it," right?

17   A.  Yes.

18   Q.  And then you say:  "Already have.  Troy is key.  Need to

19   keep him very tight.  And he needs to be along for the ride,

20   which is probably the kicker on the back end," correct?

21   A.  That's what it says, yes.

22   Q.  And the kicker there is with reference to the money for Mr.

23   Little Axe, right?

24   A.  The kicker I was referring to, that is, ultimately

25   Mr. Little Axe did negotiate a new relationship with a new

1    tribe, then I thought he should get compensated for it.

2    Q.  You described that as a kicker on the back end to keep him

3    tight, right?

4    A.  That's what I said, yes.

5    Q.  And this is during the time period when you were concerned

6    that the Modoc was leaving, correct?

7    A.  Yes.

8    Q.  And there was no actual agreement to continue with the

9    Modoc tribe at this point, right?

10   A.  At this point, I believe all he had said was that chief

11   wanted to leave.

12   Q.  Right.  In fact, this is the same day as Government Exhibit

13   814, right?

14   A.  Probably, sure.

15   Q.  This is long before the Modoc had said that they're

16   actually going to stick around, right?

17   A.  Yes.

18   Q.  And here you're saying, in the context of the Modoc

19   considering leaving, that you've got to keep Mr. Little Axe

20   tight and maybe give him a kicker on the back end, right?

21   A.  Well, the context is Mr. Little Axe had suggested he could

22   find a new tribe that might want to partner with Mr. Tucker's

23   servicing business.

24   Q.  And you say "need to keep him very tight with probably a

25   kicker on the back end, right?

1    A.  Yes.

2    Q.  You say on the top "keeping your friends closer," right?

3    A.  Yes.

4    Q.  This is, again, after the news article, right?

5    A.  Yes.

6    Q.  FTC is on the horizon, right?

7    A.  I have no idea about that at this time.

8    Q.  I also want to go back to the Hallinan --

9            MR. VELAMOOR:  We can take that down.

10   Q.  Go back to the Hallinan settlement.

11   A.  OK.

12   Q.  You testified that that agreement needed to be signed by

13   Brady, Tucker and Little Axe, right?

14   A.  Which agreement?

15   Q.  Sorry.  The Hallinan settlement.

16   A.  Yes.

17   Q.  Because in your view, Brady was representing CLK and AMG,

18   right?

19   A.  He would have been the authorized signor for those two,

20   yes.

21   Q.  Right.  Tucker had entities involved in that deal as well,

22   right?

23   A.  That's right.

24   Q.  And Little Axe as well, correct?

25   A.  The Modoc did, yes.

HabWtuc5                    Muir - Cross

1    Q.  But the Santee Sioux didn't have any interest in that deal,

2    right?

3    A.  They did not, no.

4    Q.  So no one from the Santee Sioux needed to sign that deal?

5    A.  No, they did not.

6           THE COURT:  And who were you representing at the time,

7    sir?

8           THE WITNESS:  In that litigation, your Honor, I was

9    representing Mr. Tucker.

10          THE COURT:  Thank you.

11   BY MR. VELAMOOR:

12   Q.  So no reason for the Santee Sioux to sign that deal because

13   they had nothing anything on the line, right?

14   A.  Correct.  They weren't parties or they weren't in that

15   litigation.

16   Q.  But in the end, money from the settlement did, in fact,

17   come out of the accounts in the name of the Santee Sioux,

18   right?

19   A.  Yes, it did.

20   Q.  Even though they didn't sign any part of the agreement?

21   A.  That's correct.

22   Q.  And yet you knew that at the time, right?

23   A.  Yes.

24   Q.  So a party that had no signature involvement in this

25   agreement whatsoever, in your mind, paid money in connection

1    with this settlement, right?

2    A.   Yes.

3    Q.   But the reality is it was Scott Tucker's money, right, so

4    it didn't matter?

5    A.   No.

6    Q.   The money that was supposedly coming out of the Santee

7    Sioux bank accounts for a settlement that they had no role in

8    signing?

9    A.   The settlement benefitted the Santee.

10   Q.   A second ago you pointed out the Santee Sioux had no

11   interest in signing that agreement, correct?

12   A.   Correct.

13   Q.   And the money came out of bank accounts in the name of the

14   Santee Sioux, right?

15   A.   That is correct.

16   Q.   And that's because the money in those bank accounts was

17   really Scott Tucker's money, right?

18   A.   I disagree.

19   Q.   Now, you also testified that you didn't think -- you also

20   testified about the BA Services deal, right?

21   A.   Yes.

22   Q.   And you also testified that you claim that you advised the

23   tribe not to do the deal at a certain point, right?

24   A.   Right after the FTC filed suit, I did not think that was

25   the time to be doing any deals.

1  Q.  And you suggested that you advised the tribe in that way to

2  show that you were looking out for the tribe's interests,

3  right?

4  A.  That's what I told them.

5  Q.  Right, but the reality is you were, throughout this deal,

6  looking out for Scott Tucker's interests, right?

7  A.  No.  I was looking out for both interests.

8  Q.  Looking out for both interests?

9  A.  Yes.

10  Q.  Well, this agreement was about this eCash software, right?

11  A.  Yes.

12  Q.  That was the business that the -- that was the software

13  that the business had been running on up to, prior to and after

14  this deal, right?

15  A.  Yes.

16  Q.  And the ultimate agreement is about how much the tribe

17  would supposedly have to pay for the use of that software,

18  right?

19  A.  Just to be clear, Mr. Singh -- sorry, Mr. Velamoor, which

20  agreement are we talking about specifically?

21  Q.  The ultimate agreement between the tribe and Tucker was

22  ultimately about the use of that software, correct?

23  A.  The 2012 agreement?

24  Q.  Yes.

25  A.  OK.  I just want to be clear.

1   Q.  And you testified, you were shown government exhibit --

2   we'll put up defense 1451, because it's the same email.

3   A.  OK.

4   Q.  OK.  So this is an email that was shown during direct

5   examination by Mr. Bath, right?

6   A.  Yes.

7   Q.  And you pointed out, you focused on the language in the

8   bottom email, correct?

9   A.  Yes.

10  Q.  And you said that the reason why you told these tribal

11  members that you shouldn't be involved in the negotiations of

12  the final terms is because it was like a zero-sum game between

13  the tribes and Tucker, right?

14  A.  I think what I said is I couldn't give either one advice on

15  negotiating the amount of money for that transaction.

16  Q.  Because money from one is coming from one and going to the

17  other, right?

18  A.  No.  It's because when two parties are negotiating and one

19  gets something better, the other one gets something less.

20  Q.  Right.

21  A.  So --

22  Q.  Sorry.  In other words, it's essentially obviously a

23  conflict for a lawyer, correct?

24  A.  Yes.

25  Q.  And so you're telling the tribe here that you have not been

1    involved in any of the negotiations of the financial terms,

2    right?

3    A.   Yes.

4    Q.   Because it would be a conflict for you to be involved in

5    such discussions, right?

6    A.   Yes.

7    Q.   But in fact, you went and got the license from Selling

8    Source that provided the basis for the deal in the first place,

9    right?

10   A.   I went and was involved in negotiating the agreement.  I

11   didn't go get the license.

12   Q.   Well, you had the discussions with Selling Source to get

13   the license for Scott Tucker, right?

14   A.   On behalf of Mr. Tucker, yes.

15   Q.   Right, and before doing that, you recognized and you knew

16   that there was an argument the tribe had that Scott Tucker

17   wasn't even entitled to that license, right?

18   A.   I don't know about not entitled to it.  I knew that it

19   needed to -- the title needed to be cleaned up to it.

20   Q.   Well, you knew that the tribe had an argument that

21   Mr. Tucker didn't open the software, had no right to the

22   software, that he'd already sold his interests in the software,

23   right?

24   A.   Previously, yes.

25   Q.   All right.

1          THE COURT:  I don't understand what you mean by

2   previously.

3          THE WITNESS:  Well, he had sold it in 2007, your

4   Honor.

5          THE COURT:  Thank you.

6          Next question.

7   BY MR. VELAMOOR:

8   Q.  And he sold it, by the way, in that Selling Source

9   transaction, right?

10  A.  Correct.

11  Q.  Which you testified yesterday you didn't even recall that

12  you knew -- recall whether you knew that Scott Tucker owned

13  Selling Source, right?

14  A.  At that particular time I did not.

15  Q.  Let me show you Government Exhibit 2904.

16  A.  OK.

17  Q.  Have you had a chance to look at that?

18  A.  Is there more than one page?

19  Q.  Let me go to the next page.

20  A.  OK.

21  Q.  I think there is.

22  A.  OK.

23  Q.  OK.

24  A.  Go back to the first page, please?

25  Q.  Yes.

1      Do you recognize this as an exchange between yourself,

2   Brett Chapin, Matt Dykstra and Scott and Blaine Tucker?

3   A.  Yes, I do.

4   Q.  Relating to the eCash software, correct?

5   A.  Correct.

6            MR. VELAMOOR:  Why don't we just blow up the bottom

7   part.

8            Oh, I see.

9            Your Honor, the government offers 2904.

10           MR. BATH:  No objection.

11           THE COURT:  Received.

12           (Government Exhibit 2904 received in evidence)

13           MR. VELAMOOR:  OK.  Let's focus on the bottom email.

14  Q.  So Mr. Tucker's saying, There are many, many checks written

15  by the nominee companies, which are my companies, from late

16  1999 through the end of the nominee companies being active that

17  paid for the development of the software, correct?

18  A.  Correct.

19  Q.  In other words, he's saying, "I paid for it, it's mine,"

20  right?

21  A.  That's what he's saying here, yes.

22           MR. VELAMOOR:  OK.  Move up.

23  Q.  And you offer a counterpoint, right?

24  A.  Yes.

25  Q.  Your counterpoint to that IN that time period would be, You

1   were compensated for that at the time of the Selling Source

2   sale, right?

3   A.   Yes.

4   Q.   SO you're saying there's a counterargument that, in fact,

5   Mr. Tucker, you don't really own the software, right?

6   A.   What I'm trying --

7          THE COURT:   I couldn't hear your question.  Could you

8   repeat it slowly, Mr. Velamoor.

9          MR. VELAMOOR:   Sure.

10  Q.   Mr. Muir, you write there that the counterpoint to that

11  time period would be, You were compensated for that at the time

12  of the Selling Source sale, correct?

13  A.   Yes, I was telling Mr. Tucker he had already sold eCash in

14  2007.

15  Q.   Right, so there's an argument to be made that he had no

16  right to eCash at that point, correct?

17  A.   Yes.

18  Q.   The counterpoint to his argument that he owns it, you're

19  saying, Actually, you might have sold it?

20  A.   I'm telling him he did sell it.

21  Q.   He did sell it, right, and therefore could not use it to go

22  get money from the tribes, right?

23  A.   That's correct.

24  Q.   And that's a an argument that lawyers make, right?

25  A.   Yes.

1    Q.  And the tribe could have used a lawyer to make that

2    argument for them, right?

3    A.  Yes.

4    Q.  You didn't make that lawyer for the Miami tribe -- sorry.

5         You didn't make that argument for the Miami tribe, did you?

6    A.  Not at this point, no.

7    Q.  No, because you went to Selling Source and got the license,

8    despite recognizing that the tribe had an argument, right?

9    A.  No, that's not what I did.

10   Q.  You didn't go after that and have discussions with Selling

11   Source to get the license?

12   A.  I did have discussions with Selling Source, but what that

13   agreement made clear is that Mr. Tucker did have the eCash

14   software from 2009 on.

15   Q.  You're pointing out here, before you go to Selling Source

16   to get this license, that there's an argument to be made that

17   Scott Tucker does not have a right to eCash, correct?

18   A.  What I'm saying to Scott Tucker here is, You sold eCash in

19   2007.

20   Q.  And that he was compensated for eCash at the time of that

21   sale, correct?

22   A.  Yes.

23   Q.  Because as Mr. Irby testified in this trial, eCash was part

24   of Selling Source, right?

25   A.  Yes.

1  Q.  And that was sold, right?

2  A.  Yes.

3  Q.  So then this could not be something that Mr. Tucker could

4  use to extract money from the tribal bank accounts, right?

5  A.  I disagree.

6  Q.  You're disagreeing there's an argument to be made that you

7  yourself are making here that the tribe had an argument that

8  Scott Tucker did not own Selling Source and therefore could not

9  use it to get money from the tribe?

10  A.  Not on eCash.  I'm making this point that, You don't have

11  any ownership of eCash in 2007, you sold it.

12  Q.  Right.

13  A.  The point of the 2011 agreement with Selling Source was to

14  clarify and to, in fact, show that Mr. Tucker got the Tucker

15  version of eCash in 2009.

16  Q.  Right.  So you went, after telling Scott Tucker that

17  there's a counterpoint to his claim over eCash, correct, you go

18  and have discussions with Selling Source to get a license from

19  Selling Source?  Correct?

20  A.  Yes.

21  Q.  OK.  And if you go up the email chain, Brett Chapin chimes

22  in, correct?  And he's Scott Tucker's accountant, right?

23  A.  Yes.

24  Q.  And he says, "I agree with everyone's point, but at the end

25  of the day, it could be sold," right?  "There's a rep and

1    warranty that requires defense of ownership only if ownership

2    is challenged," right?

3    A.  That's what he wrote, yes.

4    Q.  So in other words, he says, Who is going to challenge

5    ownership here and how could they really have a claim to defeat

6    Scott's, right?

7    A.  That's what he wrote, yes.

8    Q.  And you knew that the Miami tribe was not going to

9    challenge ownership here, right?

10   A.  I didn't know if they would or not.

11   Q.  They were going to sign whatever agreement was necessary to

12   keep this relationship going, correct?

13   A.  I disagree with that.

14   Q.  And Matt Dykstra responds after that?

15   A.  Yes.

16   Q.  "Who might challenge this?"  Those are the names of state

17   regulators, correct?

18   A.  Mr. Chessin is in Colorado.  Sharon Vandenberg was an IRS

19   agent doing an audit of Mr. Tucker, and Uche represented the

20   state of California.

21   Q.  Two state regulators and an auditor, correct?

22   A.  Yes.

23   Q.  And then there's some further conversations about that,

24   correct?

25   A.  Correct.

1    Q.  About some of these regulators?

2            MR. VELAMOOR:  We can take that down.

3            THE WITNESS:  Correct.

4            THE COURT:  And again, who was Mr. Dykstra?

5            THE WITNESS:  He was my partner.

6            THE COURT:  Thank you.

7    BY MR. VELAMOOR:

8    Q.  So then having articulated an argument that Mr. Tucker does

9    not have ownership interest in eCash, correct, it was sold to

10   Selling Source?  Right?

11   A.  In 2007, yes.

12   Q.  You then have discussions with Selling Source, correct?

13   A.  Yes.

14   Q.  And take a look at Government Exhibit 2901.

15   A.  OK.

16   Q.  This is a markup from your law firm of this exact

17   agreement, correct?

18   A.  Yes, we had WordShare, which is a software that is a little

19   bit better, just showing red lines.

20   Q.  So this is a markup that you did, correct?

21   A.  It is, yes.

22           MR. VELAMOOR:  The government offers 2901.

23           MR. BATH:  No objection.

24           THE COURT:  Received.

25           (Government Exhibit 2901 received in evidence)

1   Q.  And one of the changes you made to this agreement was to

2   change the date from October 2011 to 2009, right?

3   A.  Can you show me where, please?

4   Q.  Yes, sure.  Second page, all the changes are listed, 17-18.

5   A.  Yes.

6   Q.  This is an agreement that's being signed in 2011, correct?

7   A.  Yes.

8   Q.  And one of the changes you made is to say something

9   happened two years earlier, right?

10  A.  That's what I did, yes.

11  Q.  And that's reflected in the final agreement, correct?

12  A.  That is correct.

13  Q.  And then ultimately, in the final agreement, Scott Tucker

14  had entered into -- well, we'll come to that in a second.

15      You get the final agreement; it gets sent to you, right,

16  Government Exhibit 2902?

17  A.  Yes.

18  Q.  This is the final agreement that gets sent to you, correct?

19  A.  If you can -- I don't see the agreement, but I assume it

20  was attached to this email.

21  Q.  I'll show the attachment.

22  A.  Thank you.

23      Yes.  This is the final agreement.

24              MR. VELAMOOR:  The government offers 2902.

25              MR. BATH:  It's in.  I think the final agreement is in

1   as a defense exhibit, but this has an email attached.  I'm not

2   opposed, Judge.

3            THE COURT:  All right.  Received.

4            (Government Exhibit 2902 received in evidence)

5   BY MR. VELAMOOR:

6   Q.  And then you proceed to forward the good news to Scott

7   Tucker, correct?

8   A.  Yes.

9   Q.  Why don't you take a look at 4250.

10       Do you recognize 4250 as an exchange with Mr. Tucker about

11  the license agreement you just got for him?

12  A.  I do, yes.

13           MR. VELAMOOR:  The government offers 4250.

14           MR. BATH:  No objection.

15           THE COURT:  Received.

16           (Government Exhibit 4250 received in evidence)

17           MR. VELAMOOR:  Let's turn to the second page.

18  Q.  So this is the email from Sam Humphreys attaching the

19  agreement, correct?

20  A.  Yes.

21  Q.  You forward that immediately to Scott Tucker, correct?

22  A.  Yes.  I do.

23  Q.  You didn't forward it to Don Brady, right?

24  A.  No.

25  Q.  Or anyone at the tribe?

1    A.  No.

2            MR. VELAMOOR:  Go back to the previous page, focus on

3    the bottom.

4    Q.  Mr. Tucker says:  "Very nice.  Thank you."

5    A.  Yes.

6            MR. VELAMOOR:  Move up.

7    Q.  "Very nice indeed," you say, right?

8    A.  That's what I wrote.

9    Q.  And then:  "Yes.  I just read it.  Very nice.  Thank you."

10           MR. VELAMOOR:  Why don't we just go to the top email.

11   Q.  "A beaut like that ain't just a 'piece,' it's freakin'

12   legal poetry," correct?

13   A.  That's what I wrote, yes.

14   Q.  In fact, that wasn't the end of the celebrations over this

15   license agreement, was it?

16   A.  I don't remember.  If you could show me something.

17   Q.  Very well.  I'll show you 4251.

18   A.  OK.

19   Q.  Do you recognize this as another exchange?

20   A.  Yes.

21   Q.  Relating to the same agreement?

22   A.  Yes.

23           MR. VELAMOOR:  The government offers 4251.

24           MR. BATH:  No objection.

25           THE COURT:  Received.

1              (Government Exhibit 4251 received in evidence)

2    BY MR. VELAMOOR:

3    Q.  And here Scott Tucker decides to thank you again for this,

4    correct?

5    A.  Yes.

6    Q.  Again, "very nicely done, counselor.  Reads perfect in my

7    opinion."  See that?

8    A.  I do.

9    Q.  And you agree?

10   A.  Yes.

11   Q.  And even that wasn't the end of the celebrations over this,

12   correct?

13   A.  I don't recall, but if you can show me something.

14   Q.  Take a look at 4252.

15   A.  OK.

16   Q.  Now, there's actually --

17              THE COURT:  Is this in evidence?

18              MR. VELAMOOR:  No, it shouldn't be shown to the jury.

19              THE COURT:  All right.

20   Q.  Actually, before that, let me just show you 4212.

21              MR. VELAMOOR:  Sorry, your Honor.

22   Q.  Right before this exchange of emails, you got the letter of

23   intent signed by Don Brady, correct?

24   A.  Yes.

25   Q.  And that's the letter of intent that you referred to in

1  direct examination, correct?

2  A.  Correct.

3  Q.  And then we come to 4252, right?

4  A.  OK.

5  Q.  OK.  And so the letter of intent was an agreement

6  essentially by the tribes to go forward with discussions about

7  paying Scott Tucker for the software, correct?

8  A.  Yes.

9  Q.  On the basis of the agreement that you'd just obtained from

10  Selling Source, correct?

11  A.  That's correct.

12  Q.  On Scott Tucker's behalf, correct?

13  A.  Yes.

14  Q.  And after that, we get to 4252.

15          MR. VELAMOOR:  Your Honor, the government offers 4252.

16          MR. BATH:  No objection.

17          THE COURT:  Received.

18          (Government Exhibit 4252 received in evidence)

19          MR. VELAMOOR:  Your Honor, can we show it to the jury?

20  Q.  And you tell Leonard to tell Mr. Tucker that the letter of

21  intent is signed at the bottom, correct?

22  A.  Correct.

23  Q.  Everyone's happy, right?

24  A.  Yes.

25  Q.  And then moving on up, Mr. Tucker says:  "Yes.  Thanks for

1   handling, counselor.  Nice stuff.  The software document was

2   very nice.  Thank you."  Correct?

3   A.  That's what it says, yes.

4   Q.  The software document meaning the license that you got for

5   him?

6   A.  The agreement, yes.

7   Q.  You say, "I'm here to serve," right?

8   A.  That's what I wrote.

9   Q.  You're here to serve Mr. Tucker?

10  A.  Here to serve my clients, yes.

11  Q.  Well, in this particular case, this is a transaction, as

12  you described it, where you're conflicted, correct?

13  A.  Which transaction are you talking about?

14  Q.  This matter of the licensing discussions between Tucker and

15  the tribes is, according to your own testimony, a matter on

16  which you're conflicted, correct?

17  A.  For the financial terms of it, yes.

18  Q.  You're saying your conflict does not extend to getting the

19  license that Tucker uses to get money from the tribe --

20  A.  No, I'm not.

21  Q.  -- as long as you're not ultimately involved in the

22  discussion over the terms?

23  A.  That's what I'm saying, yes.

24  Q.  So -- OK.  Just to be clear, when you say there, "I'm here

25  to serve," you're there to serve Mr. Tucker, right?

1    A.  I wrote this to Mr. Tucker, yes.

2    Q.  And then continuing on:  "You're way beyond your age.

3    Let's get this finished up."  This is Mr. Tucker talking,

4    right?

5    A.  Yes.

6    Q.  And then, "Go finish some business with some people and

7    agencies," right?

8    A.  Yes.

9    Q.  "You have the brain power, horsepower and budget from

10   interested parties," correct?

11   A.  That's what he wrote, yes.

12   Q.  And then you write at the top?

13   A.  Yes.

14   Q.  Mr. Muir said -- you write:  "Thank you for that.  The

15   three of us are a dangerous combination, surgical and lethal,"

16   right?

17   A.  That's what I wrote, yes.

18   Q.  And the three of us are the three people on that email,

19   correct?

20   A.  Correct.

21   Q.  Don Brady's not on that email, is he?

22   A.  He is not, no.

23   Q.  Tom Gamble is not on that email, is he?

24   A.  He is not.

25            MR. VELAMOOR:  We can take that down.

1    Q.  Now, you know that ultimately Mr. Tucker used that

2    agreement to extract tens of millions of dollars from tribal

3    bank accounts, right?

4    A.  I know that that agreement was the basis for an agreement

5    with the Miami tribe, yes.

6    Q.  And you, in fact, did have discussions with Mr. Tucker even

7    about how much money he should take, right?

8    A.  I don't remember that.

9    Q.  Take a look at 4230.

10   A.  OK.

11   Q.  Have you had a chance to look at 4230?

12   A.  Yes.

13   Q.  Is this a discussion between you and Mr. Tucker about how

14   much money he could demand in connection with the BA Services

15   matter?

16   A.  Yes.

17              MR. VELAMOOR:  Your Honor, the government offers 4230.

18              MR. BATH:  No objection.

19              THE COURT:  Received.

20              (Government Exhibit 4230 received in evidence)

21              MR. VELAMOOR:  Why don't we focus on the body.

22   Q.  This is an email that you write to Mr. Tucker, right?

23   A.  Yes.

24   Q.  And you're essentially considering what price Mr. Tucker

25   should set for this eCash software, right?

1    A.  No.  I had heard the numbers that were being discussed.

2    Q.  And the numbers being discussed is anything over one five.

3    What do you mean by one five?

4    A.  Probably 1.5 billion.

5    Q.  So you're discussing with Mr. Tucker financial terms,

6    correct?

7    A.  I'm discussing generally the financial terms, yes.

8    Q.  The same thing that you said a minute ago you simply could

9    not discuss because you were so conflicted, right?

10   A.  I said I couldn't negotiate between them.

11   Q.  But it's OK for you to have a conversation only with

12   Mr. Tucker about what he asked of the tribe?

13   A.  I thought it was, yes.

14   Q.  You say, "It's such a bad idea, it will only serve to

15   expose you," in all caps, to serious liabilities and risks."

16   See that?

17   A.  Yes.

18   Q.  "You've achieved too much and overcome such tremendous

19   obstacles in your life"; that's what you write, right?

20   A.  That's what I wrote.

21   Q.  And you write at the bottom:  "Preservation should be the

22   primary, overriding goal from your point of view.  And any

23   number greater than one five is not preservation; it's

24   self-destructive.  And I'm not talking negotiating," in quotes,

25   "wise for the deal"?

1   A.  Yes, I wrote that.

2   Q.  And then you write, "I'm talking solely about your personal

3   well-being and future," see that?

4   A.  Yes, I do.

5   Q.  "Which is always my primary, overriding concern"?

6   A.  Yes.

7   Q.  That's what you wrote, right?

8   A.  That's what I wrote.

9   Q.  And that was always your primary, overriding concern even

10  when you say you were representing the tribes, right?

11  A.  I feel like I sent this to Mr. Tucker more of a friend than

12  anything, and in fact, I wrote, "as your friend first and your

13  attorney second."

14  Q.  OK, so you're writing to him as a friend and attorney,

15  right?

16  A.  Yes.

17  Q.  But there was no difference; in your relationship with

18  Mr. Tucker, there wasn't much of a different, was there?

19          THE COURT:  I'm sorry.  I don't understand your

20  question.  Rephrase it.

21  Q.  You're writing this email to Mr. Tucker as both his friend

22  and his attorney, correct?

23  A.  Yes.

24  Q.  And this is about money that you say is going to be paid by

25  the tribes, correct?

1    A.  It was contemplated, yes.

2    Q.  Now, just to be clear, in the Hallinan deal, when the

3    Santee Sioux paid for the settlement, you weren't helping

4    Tucker steal money from the Santee Sioux tribe, were you?

5    A.  I never helped Mr. Tucker steal money from the Santee Sioux

6    tribe.

7    Q.  Right, and so this wasn't stealing from the Santee Sioux

8    when they paid for a settlement they never signed, right?

9    A.  No.

10   Q.  And in the Selling Source deal, you weren't helping Scott

11   Tucker steal money from the Miami tribe either, were you?

12   A.  I don't think so, no.

13   Q.  That's because you knew that no matter whose name was on

14   the bank account, this was Scott Tucker's money, right?

15   A.  No, I disagree with that.

16   Q.  You were always Scott Tucker's lawyer, right?

17   A.  I have always represented Scott Tucker.

18   Q.  His interests were always primary in your mind, right?

19   A.  At different times they were not primary.  They were

20   together.

21            THE COURT:  I'm sorry.  I didn't hear the last word.

22            THE WITNESS:  They were, they weren't always primary.

23   Sometimes they were equal, depending upon the litigation of the

24   matter.

25            THE COURT:  Was the word you said "together"?

1      THE WITNESS:  I said together, depending --

2      THE COURT:  That's what I didn't hear.  Thank you.

3      THE WITNESS:  Apologize, your Honor.

4  BY MR. VELAMOOR:

5  Q.  Mr. Muir, the deal from the beginning was that Scott Tucker

6  got 99 percent of the revenues, 99 percent was his money and 1

7  percent was the tribes', right?

8  A.  That was the original deal, yeah.

9  Q.  And that was the deal throughout, right?

10  A.  No.

11  Q.  99 percent was his, 1 percent was the tribes', right?

12  A.  No, it was not --

13  Q.  Your job --

14  A.  -- the deal.

15  Q.  Your job was to make sure he got that 99 percent, right?

16  A.  No.

17  Q.  And it didn't matter whose names were on the bank accounts?

18  A.  No.

19  Q.  Mr. Muir, there was testimony in this case about the tank,

20  right?

21  A.  Yes.

22  Q.  And the tank happened, right?

23  A.  Yes, it did.

24  Q.  And the tank had exactly the inscription that Scott

25  Mitchell testified about, right?

1   A.  I don't know exactly what it had, but it was something like

2   that, yes.

3   Q.  But there was a tank, and the message on that tank was

4   always a message to regulators, correct?

5   A.  I disagree with that.

6   Q.  The same regulators who were trying to protect their

7   constituents from loans of 700 and more percent per year,

8   right?

9   A.  I disagree.

10          MR. VELAMOOR:  No further questions.

11          THE COURT:  All right.  You may redirect.

12          MR. BATH:  Thank you, Judge.

13  REDIRECT EXAMINATION

14  BY MR. BATH:

15  Q.  Did you have discussions with the Santee Sioux about the

16  Hallinan settlement?

17  A.  No, I did not.

18  Q.  Were you aware that anybody did?

19  A.  Yes, I was.

20  Q.  Who was that?

21  A.  That was Mr. Schulte.

22  Q.  Mr. Schulte was involved in the Hallinan litigation?

23  A.  That's correct.

24  Q.  He represented -- in the litigation, Hallinan, he

25  represented the Miami and the Modoc?

1  A.  Yes.

2  Q.  Separate from that, he represented Santee Sioux?

3  A.  Yes.

4  Q.  He testified that he's represented the Santee Sioux, or his

5  firm has, for years and years?

6  A.  That's my understanding, yes.

7  Q.  Any question in your mind that the Santee Sioux had any

8  doubts or reservations about paying the Hallinan settlement?

9  A.  None that were ever expressed to me.

10        THE COURT:  I didn't understand your answer.  Could

11  you repeat it, please, sir.

12        THE WITNESS:  Apologize, your Honor.  None were ever

13  expressed to me.

14        THE COURT:  Thank you.

15  BY MR. BATH:

16  Q.  We'll work backwards and talk about this Selling Source.

17  A.  OK.

18  Q.  In that Tucker version of eCash, correct?

19  A.  Yes.

20  Q.  You told -- we saw the email, you told Mr. Tucker, Listen,

21  you're going to have to show that you actually had the Tucker

22  version, isn't that what you were saying?

23  A.  That's what I was saying, yes.

24  Q.  Did he tell you that he believed he had the Tucker version?

25  A.  Yes.

1    Q.  Did you reach out and contact somebody from Selling Source?

2    A.  Yes.

3    Q.  Who did you talk to?

4    A.  I talked to Sam Humphreys.

5    Q.  Now, we've heard Sam's name, but what's his relationship

6    with Selling Source?

7    A.  He's a principal of London Bay, and they were the owners of

8    Selling Source at that time.

9    Q.  And then you negotiated an agreement with Selling Source

10   over the Tucker version, correct?

11   A.  That's correct.

12   Q.  In fact, Selling Source had their lawyers?

13   A.  Yes.

14   Q.  And did you draft the agreement, or were you just the point

15   of contact?

16   A.  I was primarily the point of contact.  Andrew Colombo

17   drafted that, took the first draft of that agreement.

18   Q.  On behalf of Mr. Tucker?

19   A.  Yes.

20   Q.  The document where it shows that there was a change from

21   '11 to '9, you were involved in that?

22   A.  Yes.

23   Q.  And you made that change based on what?

24   A.  Talking to Mr. Tucker.

25   Q.  Did you also talk to Humphreys about that?

1    A.   Absolutely.

2    Q.   So Humphreys, on behalf of Selling Source, agreed to 2009?

3    A.   Yes.

4    Q.   You didn't make that date up?

5    A.   No.

6    Q.   The parties, meaning Selling Source and Tucker, knew the

7    date, right?

8    A.   That's what they agreed to, yes.

9    Q.   In fact, in 2009, you had discussions with Selling Source's

10   lawyers, did you not?

11   A.   Yes, I did.

12   Q.   What was his name?

13   A.   John Hancock.

14   Q.   So even two years before the exhibits we've seen here, you

15   had discussions with Hancock about the Tucker version, did you

16   not?

17   A.   Yes, we did.

18   Q.   Nothing got done in 2009, is that right?

19   A.   Nothing was done.

20   Q.   Is there anything nefarious about your selling or your

21   doing that agreement in '11 over the Tucker version?

22   A.   I didn't think so at all, no.

23   Q.   You were asked about being sued by the FTC by Mr. Velamoor.

24   Do you remember that?

25   A.   Yes, I do.

1    Q.  And you were seized then?

2    A.  I was.

3    Q.  And you fought back?

4    A.  Yes.

5    Q.  There was litigation, wasn't there?

6    A.  There was a lot of litigation.

7    Q.  And in the end, what happened with the FTC suit against

8    you?

9            MR. VELAMOOR:  Objection, your Honor.

10           THE COURT:  Sustained.

11           MR. BATH:  Judge, may we approach?

12           THE COURT:  Sure, you can approach.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            (At sidebar)

2            MR. BATH:  Judge, on cross-examination, the government

3     brought out that Mr. Muir had been sued by the FTC.

4            THE COURT:  I'm sorry.  That Mr. Muir had been?

5            MR. BATH:  Sued by the FTC.  That had not been brought

6     out by any party until the questioning.  It was brought out

7     because -- well, it didn't need to be brought out.  They

8     brought out the fact that Mr. Muir submitted an affidavit in

9     the FTC litigation.  They could have asked about the FTC

10    litigation or an affidavit without naming Mr. Muir as a party.

11    Now that they've brought that out and opened that door, I

12    should be able to explain that, in fact, the FTC dismissed the

13    suit with prejudice against Mr. Muir.  Otherwise, I think the

14    prejudice that exists, I think I should be able to neutralize

15    that.

16           THE COURT:  And then should I allow the government

17    recross to bring out the outcome of the FTC suit?

18           MR. BATH:  Against Mr. Muir, yes.

19           THE COURT:  How about anybody else, to avoid a

20    misleading impression?  And I'd like to hear from Mr. Tucker's

21    lawyers about that also.

22           MR. BATH:  Right.  I mean, my position is I'm

23    obviously representing Mr. Muir.  The fact of the matter is

24    they brought that out, which certainly implies there was some

25    wrongdoing.  I understand that they not only dismissed, he

1    didn't pay any money.  I think that should be brought to the

2    jury's attention and the government's opened that door.

3             MR. VELAMOOR:  Judge, the Court's ruling has been

4    clear since the beginning of this trial.  Results of these

5    cases are out, but the fact of the cases are in.

6             THE COURT:  Yes, but aren't you implying, You did

7    something really bad because you got named as a defendant,

8    right?  Isn't that the implication of that question?

9             MR. VELAMOOR:  First of all, Mr. Bath could have

10   objected at the time of the questioning.  He never objected.

11            THE COURT:  But I thought this was covered by my

12   rulings, by your motion.

13            MR. VELAMOOR:  I thought we were, in fact, within the

14   scope of the Court's ruling, but second of all, that's already

15   in the case against Mr. Tucker.  There's already extensive

16   testimony in the case about the fact that Mr. Tucker's already

17   been named in such a suit, so that's contained within the scope

18   of what the Court's ruling has been since the beginning, that

19   the fact of being sued is part of the case but results are not.

20   And we're certainly open to the Court's giving the jury another

21   instruction that there was testimony elicited about him being

22   sued and that it should not be considered in any way, but once

23   the results come in, they all have to come in.

24            THE COURT:  And Mr. Tucker's view?

25            MR. GINSBERG:  Well, we certainly didn't open the door

1    to it.

2              THE COURT:  I know you didn't.

3              MR. GINSBERG:  Nor did they ask about Mr. Tucker.

4              THE COURT:  But if the door gets opened --

5              MR. GINSBERG:  No.  I think it's very different.  It's

6    an individual.  He asked about an individual defendant, that he

7    was named.  He didn't ask about Mr. Tucker.  There was no

8    reason for me to object to it, to believe that it was going to

9    go further.

10             THE COURT:  Weren't there entities named in the FTC

11   suit?

12             MR. GINSBERG:  There were a lot of parties.  I don't

13   remember all of them, but there were other parties named.  But

14   I don't represent them.  And frankly, it was a result against

15   me but not against Mr. Muir, so it's different.

16             MR. VELAMOOR:  I don't think it can be that the

17   results come in only when they're favorable to the defendants.

18             MR. GINSBERG:  They can if he only asks about one

19   defendant.  He can't open the door against Mr. Muir and say it

20   also comes in against Mr. Tucker.  He didn't ask about it.

21             MR. SCOTTEN:  But talking about litigation has never

22   been opening the door in this case, and I think Mr. Velamoor

23   brought it up for a specific point, which was to show that Mr.

24   Muir was trying to distance himself from the enterprise.  It

25   has nothing to do with, Oh, you got sued, so you're bad.

1          THE COURT:  All right.  This is how I'm going to

2     resolve it.  I'm going to give an instruction to the jury about

3     I'm not allowing testimony about outcomes; the fact that

4     somebody is named in a lawsuit does not imply that they

5     necessarily did anything wrong and you cannot consider it as

6     evidence of any wrongdoing, the fact that you're named in a

7     lawsuit.

8          MR. VELAMOOR:  Thank you.

9          THE COURT:  Stay where you are.

10          (Continued on next page)

1          (In open court)

2          THE COURT:  Ladies and gentlemen, please be seated.

3          I am not allowing any testimony in this case about the

4     outcome of any of these suits that you have heard about in the

5     course of this case, except there have been some that were

6     settled, I think the Hallinan lawsuit.  That's a different

7     story.  But as to everything else, the fact that somebody gets

8     named in a lawsuit does not mean that they did anything wrong.

9     OK?  That's the reality.  It's an accusation, and it's nothing

10    more than that.  I'm not opening the door and I'm not allowing

11    the door to be opened, and you're not to consider the outcome

12    of any of these regulatory lawsuits.  They're not relevant to

13    anything in this case.  You're not to speculate.  You're not to

14    draw any inferences against the government or against any

15    defendant in this case regarding those regulatory suits.

16          Thank you, ladies and gentlemen.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Anything else?  Thank you.

3          MR. BATH:  I appreciate what the Court did.  I'm not

4     changing my position.  I think for record purposes, I just want

5     to preserve that.

6          THE COURT:  Thank you.  That's fine.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. BATH:

3     Q.  Mr. Muir, you were cross-examined about state usury laws,

4     do you remember that?

5     A.  Yes, I do.

6     Q.  And you said you knew that most states have usury laws,

7     correct?

8     A.  Yes.

9     Q.  That you knew that the tribes' loans exceeded those rates,

10    didn't you?

11    A.  Yes.

12    Q.  And some by two times or more?

13    A.  Yes.

14    Q.  And did you believe that those loans were unlawful?

15    A.  The tribal loans?

16    Q.  Yes.

17    A.  No.

18    Q.  Why not?

19    A.  Because I believed there were other areas, other parts of

20    the law that would make those usury laws not enforceable to

21    these loans.

22    Q.  And why not?

23    A.  Well, specifically, New York law has a provision that says

24    unless otherwise provided by law, and it was my position that

25    that clause allowed other types -- allowed loans that exceeded

1    the usury rates in certain situations to be lawful.

2    Q.  You were asked about federal laws on cross-examination,

3    about how they applied to tribes, is that correct?

4    A.  Yes.

5    Q.  And you were asked about the fact that some federal laws or

6    federal laws would apply to tribes and the TILA loans, correct?

7    The TILA disclosures, correct?

8    A.  Yes.

9    Q.  And while you were, from '06 to '13, did you monitor

10   federal laws?

11   A.  Yes.

12   Q.  And proposed legislation?

13   A.  Yes.

14   Q.  And why did you monitor that?

15   A.  Because it goes back to my thought that Congress has

16   exclusive authority over Indian tribes, so if Congress is going

17   to pass a law, it could impact a tribe, and one way to impact

18   it, it could abrogate the tribe's sovereignty, so if you're

19   representing Indian tribes, it's important to see what Congress

20   is doing.

21   Q.  Did Congress pass any laws taking away the tribes' rights

22   to make these loans?

23            MR. VELAMOOR:  Objection, your Honor.

24            THE COURT:  Sustained.

25   Q.  During your time from '06 to '13, when you were legal

1  counsel, you gave legal advice on specific matters, is that

2  fair to say?

3  A.  Yes.

4  Q.  You were not asked to do a review of every document, of

5  every procedure, of every manual in the business, were you?

6  A.  No, I was not.

7  Q.  You were asked to do legal work on a specific matter, and

8  that's the legal work you did?

9  A.  Yes.

10 Q.  You were asked about TILA on cross-examination, remember

11 that?

12 A.  Yes.

13 Q.  You were asked whether or not you could have suggested

14 changes to TILA, correct?

15 A.  Correct.

16 Q.  During your time, '06 to '13, did you, in fact, monitor

17 federal regulatory actions against other lenders?

18 A.  Yes, I did.

19 Q.  That had TILA provisions in those loans?

20 A.  Some cases identical.

21 Q.  And you looked at those, you monitored those lawsuits to

22 make sure that you believed that you personally were operating

23 within the law, correct?

24          MR. VELAMOOR:  Objection.

25          THE COURT:  I'll allow it.

1    A.   Yes.

2    Q.   And none of those laws -- those TILA provisions in some of

3    those lawsuits you saw had exact kind of disclosures that are

4    here, correct?

5            MR. VELAMOOR:  Objection.

6            THE COURT:  Overruled.

7    A.   The TILA box and the terms, including the asterisk we've

8    seen, were identical in some of those lawsuits, yes.

9    Q.   In those lawsuits brought by the FTC, was there an

10   allegation that those disclosures were misrepresenting -- were

11   deceitful to consumers?

12   A.   No.

13   Q.   That's why you monitored those lawsuits, correct?

14   A.   Yes.

15   Q.   And that was the basis for you not believing there was a

16   need to suggest such a change to the TILA disclosures, correct?

17   A.   That's right.

18   Q.   You were also asked on cross-examination about the source

19   of capital, whether tribes had initial source of capital,

20   weren't you?

21   A.   Yes, I was.

22   Q.   And you said, no, it did not -- it was not a requirement

23   that they had initial capital, correct?

24   A.   That's correct.

25   Q.   And the basis for that, for your belief on that, is that

1    you know that Congress has encouraged tribes to get involved in

2    businesses with little or no capital?

3    A.  That is correct.

4    Q.  And that's one of the things you researched and why you had

5    the belief you did?

6    A.  Yes.

7    Q.  You were asked on cross-examination about the tribes'

8    lending without Tucker, do you remember that?

9    A.  Yes, I do.

10   Q.  It was suggested to you the tribes couldn't possibly lend

11   without Tucker, correct?

12   A.  Sure.

13   Q.  In fact, the Modoc and the Santee are both lending without

14   Mr. Tucker, aren't they?

15   A.  That is correct.

16   Q.  That happened after they fired him, right?

17   A.  After they ended their relationships with him.

18   Q.  You were asked about the Tucker v. AMG lawsuit, correct?

19   A.  Yes.

20   Q.  And there was discussion about the check and what needed to

21   be paid and when, correct?

22   A.  Yes.

23           MR. BATH:  Could we show defendants' 759, please; I

24   show that's been admitted.  And highlight the top paragraph,

25   please, Eli.  Thank you.

1   Q.  This is the purchase agreement?

2   A.  Yes, it is.

3   Q.  Between CLK and AMG, correct?

4   A.  Correct.

5           MR. BATH:  All right.  And could we go to the last

6   page, Eli.  Can you blow that paragraph up.

7   Q.  Do you remember on cross-examination you were asked about

8   the fact that, Well, if the check wasn't paid, then -- at the

9   time of closing, then the date of closing the transaction, the

10  June '08 date was no good?

11  A.  I remember that, yes.

12  Q.  I'm showing the last page of this purchase agreement.  Was

13  there going to be a payment done, like, on that date or that

14  month of June of '08?

15  A.  No.  This says that the payments were to be made in 12

16  equal monthly installments.

17  Q.  So the payment wasn't even going to be made within a few

18  months, was it?

19  A.  No, it was not.

20  Q.  The parties contemplated that the payments were going to be

21  made over a period of time, right?

22  A.  That's what the document says, yes.

23          MR. VELAMOOR:  Could we now go to Government Exhibit

24  1313, and if we could go to -- I think it's the last page, Eli,

25  please.

1  Q.  Do you recall that this is the check from Mr. Tucker for

2  the AMG-CLK transaction?

3  A.  Yes.

4  Q.  There was some discussion on cross-examination about the

5  date of this, and this check is dated before the lawsuit was

6  filed, is that right?

7  A.  It is, yes.

8  Q.  So this payment had been made before you filed the Tucker

9  versus -- or before Pete Smith filed the Tucker v. AMG, is that

10  right?

11  A.  Appears that way, yes.

12          MR. BATH:  Can we have 2608, please, government's

13  2608.

14  Q.  Just to confirm that, Mr. Muir, let's look at that lawsuit

15  and make sure we all have the dates.  Do you see the date in

16  the upper right-hand corner?

17  A.  I do, yes.

18  Q.  What date is that?

19  A.  July 8, 2010.

20  Q.  After the check, correct?

21  A.  Yes.

22  Q.  You were also asked on cross-examination about this date

23  with Don Brady asking for permission in some audit, do you

24  remember that?

25  A.  Yes.

1    Q.  OK.  So we know this lawsuit was in 2010, correct?

2    A.  Correct.

3            MR. BATH:  Let's go to government's 4205, please.

4    Let's blow up the bottom third of that page, please, Eli.

5    Q.  We can see the discussion between Don Brady and Conly about

6    this audit was 2012, correct?

7    A.  That's what the email says, yes.

8            MR. BATH:  All right.  Let's go to the next section,

9    just so we have the date, please, Eli.

10   Q.  That continues to confirm it's 2012, correct?

11   A.  Correct.

12   Q.  Any suggestion to you that the audit request somehow

13   predated the Tucker v. AMG lawsuit is mistaken?

14   A.  It's mistaken.

15           MR. BATH:  All right.  Thank you, Eli.

16           Can we show Mr. Muir, please, 1407A.

17   Q.  Do you remember on cross-examination you were asked about

18   news stories and such?

19   A.  Yes, I do.

20   Q.  And your response to those?

21   A.  Yes.

22   Q.  You were also asked about something that was posted on

23   Turtle Talk, do you recall that?

24   A.  Yes.

25   Q.  Generally, you've been asked questions about your responses

1    to news stories, right?

2    A.  Yes, I have.

3    Q.  I've got 1407A in front of you.  Do you recall that email?

4    A.  Yes, I do.

5    Q.  Was that between you and Mr. Tucker?

6    A.  Yes.

7    Q.  And this regards a news article?

8    A.  Yes, it does.

9    Q.  And there's more than one email that relates to this news

10   article, is there not?

11   A.  That's correct.

12           MR. BATH:  Judge, I offer 1407A.

13           MR. VELAMOOR:  No objection.

14           THE COURT:  Received.

15           (Defendants' Exhibit 1407A received in evidence)

16           MR. BATH:  If we could publish to the jury and please

17   blow it up.

18   Q.  What's the date?

19   A.  November 24, 2009.

20   Q.  From whom to whom?

21   A.  The first email I send to Mr. Tucker and Mr. Schulte.

22   Q.  And what do you say?

23   A.  I say:  "Interesting article.  Apparently, all eyes on

24   Colorado."

25   Q.  Mr. Tucker responds?

1   A.  He does.

2   Q.  What does he say?

3   A.  He says, "This really sucks."

4          MR. BATH:  We can take that down, please, Eli.

5          Could we please show Mr. Muir 1407, defendants' 1407.

6   Q.  What is this, Mr. Muir?

7   A.  This would have been a continuation of that email string

8   where I respond back to Mr. Tucker.

9   Q.  Just two different pages?

10  A.  Yes.

11  Q.  This is your response back to "this sucks"?

12  A.  Yes.

13         MR. BATH:  I offer 1407.

14         THE COURT:  Any objection?

15         MR. VELAMOOR:  Yes, your Honor.  Hearsay.

16         MR. BATH:  Could we blow that up for the judge,

17  please.

18         Judge, I believe this goes directly to rebuttal of

19  cross-examination.

20         THE COURT:  One second.

21         I'm going to allow it not for the truth of its

22  content.

23         (Defendant's Exhibit 1407 received in evidence)

24         THE COURT:  Go ahead.

25         MR. BATH:  Thank you, Judge.

1              Could we blow that up for the jury.

2   Q.  Mr. Muir, we've seen in this case a tremendous amount of

3   emails between you and other people, have we not?

4   A.  We have, yes.

5   Q.  And sometimes it's between you and Mr. Schulte?

6   A.  Yes.

7   Q.  Sometimes between you and Mr. Tucker?

8   A.  That's correct.

9   Q.  And these emails, some of them, like this one, haven't been

10  shared with anyone else in terms of the email traffic, correct?

11  A.  That's correct.

12  Q.  This is essentially a private email between you and Scott

13  Tucker talking about this news article?

14  A.  Yes, it is.

15  Q.  This is you talking about what you believed about this

16  tribal model, isn't it?

17  A.  It is.

18  Q.  All right, so tell us what you mean in the first sentence.

19  A.  When Mr. Tucker said, "This really sucks," I respond and

20  say, "I really don't see it that way."  And when I say, "Look

21  at Googel's (WV AG) comments, I'm referring to Norman Googel,

22  who was in the West Virginia attorney general's office.

23  Q.  You cut and paste, and are you citing Mr. Googel?

24  A.  I cut and paste from the article.

25  Q.  All right, and because the article is about Mr. Googel,

HabWtuc5

1    correct?

2    A.  It wasn't about him.  It was about lending in general, and

3    they had some comments from Mr. Googel.

4    Q.  You then continue on with this email to Mr. Tucker,

5    correct?

6    A.  Correct.

7    Q.  What do you say?

8    A.  I say:  "Everybody is doing the rent-a-tribe scheme.  This

9    model is not.  This model really is Indian tribes."  I left out

10   some punctuation there, but I was trying to say is that

11   everybody else is going to get blown out or so.

12   Q.  What did you mean by that, This really is Indian tribes?

13   A.  I was referring to the three tribes that I was

14   representing.

15   Q.  And you believed in this model?

16   A.  Yes.

17   Q.  And you believed it was lawful?

18   A.  Yes.

19             MR. BATH:  That's all I have.  Thank you.

20             THE COURT:  All right.  You can call your next

21   witness.

22             MR. BATH:  Mr. Muir rests.

23             THE COURT:  Mr. Tucker.

24             MR. GINSBERG:  Mr. Tucker rests.

25             THE COURT:  Is there a rebuttal case from the

HabWtuc5

1    government?

2            MR. VELAMOOR:  No, your Honor.

3            THE COURT:  Ladies and gentlemen, a month from the day

4    we first got together, the testimony in this case has been

5    concluded.  The case is not over.  Tomorrow we will start with

6    the closing arguments of counsel.  Because the only party in

7    this case with the burden of proof is the government, the

8    government gets to deliver an initial summation.  The defense

9    has no burden in a criminal case.

10           Mr. Muir, you may step down.

11           THE WITNESS:  Thank you, your Honor.

12           THE COURT:  And retake your seat.

13           (Witness excused)

14           THE COURT:  The defense has no burden in a criminal

15   case, and they may, if they choose, deliver a closing argument,

16   and I've been advised that defense counsel wish to deliver a

17   closing argument.  And then following that, the government, who

18   bears the sole burden of proof, gets to deliver a brief

19   rebuttal summation.

20           Following that, I will give you my instructions on the

21   law, and then you may begin your deliberation.  Tomorrow, lunch

22   is going to be provided for you, so when you get in, there will

23   be menus for you to select your lunch item for tomorrow.  I

24   think the reality is that I will not give my closing

25   instructions -- we will not have time for them all -- tomorrow.

1          I plan to sit in this case on Friday and get you the

2      case on Friday, after those instructions are over, so that

3      you'll be able to deliberate on Friday.  Whether it will be

4      Friday at 11:00 or Friday at 1:00 or Friday at 2:00, I'm not

5      that good at predicting at this stage of the game.  But that's

6      what I anticipate happening, and you'll have the case.  And

7      when I say, ladies and gentlemen, you may not discuss the case

8      among yourselves, that rule will be over with, and you'll be

9      required to deliberate.  But before that happens, you have to

10      keep an open mind, because this is the opportunity for the

11      lawyers to sum up what they believe the evidence is.

12          Tomorrow morning we're going to start at 10:00 sharp.

13      Please try and be here for a good, early start at 10:00 and

14      we'll get these closing arguments under way and get this case

15      to you in a timely fashion.

16          Thank you so much for your cooperation, your

17      attention, your service.  Thank you.

18          (Jury not present)

19          THE COURT:  All right.  Please be seated.

20          Now, I received pages 32, 33 and 34 from counsel, and

21      I want to make sure that the changes on those pages, which I'll

22      mark as Court Exhibit 16, are agreed upon by both sides.

23          MR. SCOTTEN:  They are by the government, your Honor.

24      I spoke with Ms. Van Ness by phone.  My understanding is

25      defense counsel for both parties are deferring to her, but

HabWtuc5

1    obviously they'll have to confirm.

2            THE COURT:  All right.  Let me hear from defense

3    counsel.

4            Any objections?

5            MR. GINSBERG:  No, your Honor.

6            THE COURT:  OK.  Now, that's the only change you're

7    proposing, Mr. Scotten?

8            MR. SCOTTEN:  That is correct, your Honor.  We think

9    this resolves the matter that's been going on about the

10   elements here in a way that both parties feel is accurate and

11   tailored to the facts of the case.

12           THE COURT:  I don't know that I agree, because we have

13   Count One, and I've told the jury that the last five elements

14   correspond to the elements in the conspiracy charge, and they

15   appear to me now to be out of whack, unless I've missed

16   something.  It would seem to me that now, on page 23, the fifth

17   element – does it now track the fourth element of Counts Two

18   through Four, or is it intentionally different?

19           MR. SCOTTEN:  I believe, your Honor, the Court's

20   instructions are that the third, fourth and fifth elements of

21   Count One track the first, second and third elements of Counts

22   Two through Four, and I believe that is unchanged.  There's

23   been no edits there, so I think the Court's comments would be

24   correct.

25           THE COURT:  The third, fourth and fifth.

HabWtuc5

1    MR. SCOTTEN:  Of Count One track the first, second and

2  third of Counts Two through Four.

3    Essentially, I think there's no change there, and I

4  think the Court has always charged, and this is on page 33 of

5  the Court's draft instructions, dated October 10, 2017.  I

6  think the Court has always instructed that the fourth and fifth

7  elements of Counts Two through Four are different than the

8  corresponding last element of the conspiracy count, Count One.

9  So I don't think by moving language between the fourth and

10  fifth elements of Counts Two through Four the Court's

11  instructions are disrupted.  Those have always been the area

12  were where the counts are different.  They continue to be the

13  area where the counts are different, but there was no

14  particular parallelism between the last element of Count One

15  and the last two elements of Counts Two through Four.

16    THE COURT:  OK.  Thank you very much.  I'll see you

17  all tomorrow morning.

18    MR. SCOTTEN:  Your Honor, we also have handed up a

19  copy of the proposed redacted indictment.  The version we

20  provided to the Court tracks our changes.  I don't know if the

21  Court wants a clean version.  I'd also note this is just the

22  government's document.  We, following the Court's instructions,

23  tried to redact anything we felt the Court would regard as

24  argumentative or unnecessarily colorful.

25    THE COURT:  What was the response of defense counsel?

1          MR. SCOTTEN:  Defense counsels' response essentially

2     would strike all the narrative language and make it essentially

3     a statutory indictment.  We don't think that's necessarily

4     within the case law, but they should be heard on that.

5          THE COURT:  Thank you.

6          Let me hear from counsel.

7          MR. GINSBERG:  Essentially, your Honor, beginning on

8     the first page of the indictment, we don't have a problem with

9     the paragraph 1 background.

10          Going through to the second page, the full paragraph,

11     sort of the fifth sentence from the bottom ends in "Overland

12     Park, Kansas."

13          THE COURT:  Yes.

14          MR. GINSBERG:  We're OK with that.  We would suggest

15     taking out the next line, and then we're OK with the last line,

16     "At times."

17          THE COURT:  I think it's a material part of the

18     allegation returned by the grand jury that "the business known

19     as AMG Services, formerly known as CLK Management, formerly

20     known as National Money Service, was at all relevant times

21     directly or beneficially owned and operated by Scott Tucker,

22     the defendant."

23          That's at the core of this case, is it not?

24          MR. GINSBERG:  It is.  We just don't think it should

25     be in this sort of preamble to the actual charges.

1        THE COURT:  All right.  That's overruled.

2        MR. GINSBERG:  Paragraph No. 3 we're OK with.

3        THE COURT:  By the way, I'm going to mark this, just

4   so we have a clear record, as Court Exhibit 17, and that's

5   going to be the marked-to-show-changes redacted indictment

6   submitted by the government.

7        Keep going, Mr. Ginsberg.

8        MR. GINSBERG:  Paragraph 3, we don't have an

9   objection.

10        Paragraph 4, beginning at the bottom of page 2, the

11   first line that runs over to page 2, up to "the defendants," we

12   have no objection.  I think the government struck portions.  I

13   don't know which your Honor has read.

14        THE COURT:  I think it's literally blue in my copy,

15   but I get the idea of what's crossed out.  They took out the

16   purple prose that I had highlighted.

17        MR. GINSBERG:  It would go from "the defendants" to

18   "extended loans."

19        THE COURT:  Yes.

20        MR. GINSBERG:  Then we're OK up through two lines

21   down, where it says "communications and contracts."

22        THE COURT:  Yes.

23        MR. GINSBERG:  And then we would ask that the balance

24   of that paragraph be stricken.

25        THE COURT:  This is what I'll do.  I'm going to put a

1   period after "New York State" and strike the phrase "that were

2   designed to protect residents from such conduct."  That's

3   stricken.

4           MR. GINSBERG:  And then the following sentence we'd

5   ask to be stricken, "cycles of debt."  That's certainly

6   inappropriate.

7           THE COURT:  Yes, I agree with you.  I sustain your

8   objection, and that's going to be redacted from the indictment.

9   Go ahead.

10          MR. GINSBERG:  Paragraph 5, we would ask that the

11  first sentence, beginning with "throughout" and going to

12  "usurious practices" be stricken.

13          THE COURT:  One second.  Yes, it seems to me that that

14  also should be stricken.

15          MR. GINSBERG:  Then at paragraph 5, the next

16  sentence --

17          THE COURT:  Paragraph 5 is going to begin with,

18  "Beginning in 2003."

19          MR. GINSBERG:  Right, and in that sentence we would

20  ask the Court to strike "abusive loans."

21              (Continued on next page)

22

23

24

25

1        THE COURT:  Let me hear from the government.  They are

2   abusive because they are usurious, is that correct?

3        MR. SCOTTEN:  I think they are abusive both because

4   they are usurious and because they are deceptive, because they

5   are misleading in their terms, is an overall allegation.

6        THE COURT:  OK.  That's why I asked the question.

7        Mr. Ginsberg, do you want to respond?

8        MR. GINSBERG:  I think usurious is sufficient because

9   that's the essence of charges later on.

10        Now, abusive, I guess, can be read in many ways, but

11   it can be read in a much more generic way than the government

12   suggests.

13        THE COURT:  I am going to allow it.  It's the verbiage

14   selected or adopted by the grand jury.

15        Go ahead.

16        MR. GINSBERG:  Then beginning on page 4, I believe our

17   view is the balance of the language, going through to page 7,

18   should be stricken.

19        THE COURT:  So all of paragraph 6, is that right?  You

20   want to strike all of paragraph 6?

21        MR. GINSBERG:  6, 7.

22        THE COURT:  Let's start with 6.  All of paragraph 6.

23   That's denied.

24        Let me look at paragraph 7.

25        That's also denied.

1          I should state for the record what I am endeavoring to

2    do is, number one, strike what I consider to be unnecessary

3    surplusage that is not supported by either the evidence in this

4    case or by the Court's instructions on what the legal standard

5    is.  In some instances, some of it is language -- not all of

6    it, some of it is language that if the government tried to

7    elicit testimony on it, I probably would sustain the objection.

8    That's some of the material that the government itself has

9    helpfully removed.

10          So applying that standard, I think paragraph 7 is

11   consistent with the evidence and consistent with a fair

12   recitation of the grand jury's allegation of what this

13   conspiracy is.

14          Paragraph 8, are you objecting to paragraph 8?

15          MR. GINSBERG:  Yes.  Our view is essentially paragraph

16   8 is almost like -- it's a combination of a count in the

17   indictment and then your Honor's charge regarding the

18   percentage of loans, and I don't think it needs to be in this

19   portion of the indictment.

20          THE COURT:  I think it's really very much at the heart

21   of the case.  I am going to allow it to stand.

22          Go ahead.

23          9 has been stricken by the government.

24          MR. GINSBERG:  There is a new 9.

25          THE COURT:  It is a new 9, yes.

1          MR. GINSBERG:  We would move to strike that.  I don't

2     remember the exact numbers, but I don't believe millions of

3     customers across the country.

4          THE COURT:  I remember seeing a chart with a map of

5     the United States.

6          MR. SCOTTEN:  4.5 million is in evidence, your Honor.

7     Or 4.15, but it's over 4 million.

8          THE COURT:  So I am going to allow new 9 to stand as

9     written.

10          11 is out.

11          MR. GINSBERG:  New 10 we don't object to.

12          We object to 11, the new 11.  I think, again, here it

13     goes on maybe for two or three pages explaining about the TILA

14     box, and that's something your Honor is going to charge on, and

15     it's almost as if this is proof to support the charge.

16          THE COURT:  Well, I am going to say it early and often

17     that this is simply the allegations.  What is here is no more

18     inflammatory than the evidence that was introduced.

19          MR. GINSBERG:  If I can address that sort of

20     generally.  The problem, besides the obvious, in terms of

21     things I have objected to, is your Honor is correct in terms of

22     what this is.  But what it also is is essentially the grand

23     jury marshaling the government's case for the jury.

24          The Court is not doing it.  The government hasn't

25     asked the Court to marshal the evidence.  But by leaving all of

1    these things in that we have been talking about, it's more than

2    what, first of all, my view, was traditionally found in sort of

3    the background preamble portions to the indictment.  It's

4    really a total marshaling of what the government's evidence is,

5    what they endeavor to prove throughout the trial.  And then the

6    government is going to get up in summation and they are going

7    to say almost the same thing that's in the preamble to the

8    indictment, and I think no matter what your Honor instructs,

9    and how many times your Honor instructs the jury on it, it's a

10   real problem.

11          THE COURT:  I hear what you say, and having presided

12   over cases, I have heard arguments from some defendants that

13   the indictment inadequately describes what it is that is

14   alleged to be unlawful.  This indictment charges a scheme that

15   allegedly took place over an extended period of time, 13 years,

16   and I think it's nothing more than laying out what the charge

17   is against the defendants.

18          Surplusage, I am open-minded about getting rid of it,

19   and particularly prejudicial language, and that's why we are

20   engaging in this exercise.  Mr. Bath and you raised this, and I

21   thought it was a very fair point.  So that's why we are having

22   the discussion.

23          But I don't agree that, for example, the allegations

24   in paragraphs 12 or 13 or 14 or 15 are any more inflammatory

25   than the evidence that sneak in to the jury room information

1  that I wouldn't allow a prosecutor to speak in front of the

2  jury.  If they said it in their closing argument, I would tell

3  them to stick to the evidence.  If they tried to offer it into

4  evidence, I would probably sustain it.  That's what I am trying

5  to get out of this indictment, and that's why we are having

6  this conversation.  But things that correspond to the evidence,

7  correspond to fair argument, that are the charges the grand

8  jury has laid out, that I am not inclined to strike.

9          MR. GINSBERG:  I think your Honor ruled up to

10  paragraph 15 or 16.

11          THE COURT:  Go ahead.  If there is something special

12  that you want to point out, I don't want to stop you from doing

13  that.

14          MR. GINSBERG:  No.  But 16 continues on about TILA.

15  There are four or five pages about the TILA box, which is

16  probably about 50 percent times more than was mentioned during

17  the trial.  So it just strikes me --

18          THE COURT:  Maybe the trial jury is going to say,

19  well, they fell flat on their face in proving that.

20          MR. GINSBERG:  You're very optimistic about our

21  ability to convince the jury, and I am glad for that, but I am

22  also concerned about that.

23          So 16 for the same reasons that I articulated before.

24          17, which talks about, caused accounts to incur

25  negative balances, forcing the customers to reimburse their

1   bank and incur additional bank fees, I don't think that needs

2   to be there and that's sort of at the heart of that paragraph.

3           THE COURT:  That was certainly what the jury heard

4   from witnesses.

5           MR. GINSBERG:  That's true.

6           THE COURT:  And what has been taken out here is what I

7   think is excessive or making it impossible for them to pay

8   their bills.  That's out, quite appropriately.

9           MR. GINSBERG:  Should I move on?

10          THE COURT:  Sure.  Move on.

11          MR. GINSBERG:  Paragraph 18, beginning at paragraph 18

12  is this whole argument about sham relationships.

13          Now, I know the government argued that during the

14  trial, but again, I think that's something, particularly that

15  type of language, that doesn't need to be in here.  They go on

16  to use that sham language quite a few times in the next two

17  pages.

18          So our first objection is to all of it.  If your Honor

19  is not inclined to do that, I guess your Honor can pick out

20  what you think is appropriate, but it continues on throughout

21  the balance of the paragraphs.  Sham relationships are almost

22  in every paragraph, duping customers, things like that, which

23  are sort of at the heart of what is in all those paragraphs, I

24  don't think should be in there.

25          Sham relationships is again in 26, it's again in 27.

1    And it's over and over and over again, which is, in my view, I

2    understand what your Honor said, but it's just reinforcing what

3    the government has tried to do during the trial and what they

4    are going to argue in summation, and I think it's just too

5    much.  I don't know that a 403 argument applies to surplusage,

6    but it's essentially the argument that I am making here.

7    Whatever you want to call it, I think that's what is happening

8    in those paragraphs.

9             THE COURT:  I largely accept the principle, and as you

10   say, it's whatever you want to call it, and it's not 403 as

11   such.  But the point is valid not only in the abstract, but as

12   applied to some of the language in the unredacted indictment,

13   and I am happy to police the removal of material that is not in

14   evidence and wouldn't have gotten into evidence.

15            So, for example, all the forfeiture allegations are

16   out.

17            Is there any finding that the jury needs to make with

18   regard to forfeiture?

19            MR. SCOTTEN:  No, your Honor.  It's a notice

20   provision, and in cases where the forfeiture provision remains

21   in, which happens, the court typically instructs the jury,

22   that's just a notice provision for the defendants, don't worry

23   about.  Here, we thought it better just to take it out since

24   there is no jury finding.

25            THE COURT:  It is, because it lays out a lot of assets

1    owned by the defendants, mostly Mr. Tucker, and it's just not

2    anything that the jury needs to know about.

3         MR. GINSBERG:  I don't want to put the burden on your

4    Honor, but if it's easier for your Honor to look at it

5    separately, you know what my arguments are.

6         THE COURT:  I will.  But I have given the government

7    additional instructions as to paragraphs 4 and 5, and I will

8    look at it with that view.  But in a case of this nature, this

9    is a case where transactions that are claimed to be and are

10   seemingly facially ordinary transactions, the grand jury needs

11   to explain, somebody needs to explain, if you want to say the

12   prosecutor needs to explain in a charging document if this were

13   an information, why it is that the transactions violate the

14   law, and that requires, in my view, more words.  And if I had

15   an indictment that just tracked the statutory language, I think

16   I already granted some kind of a bill of particulars in this

17   case, but it likely would have been more extensive.  My

18   recollection is I did grant a bill of particulars.

19        MR. SCOTTEN:  I think your Honor denied the bill of

20   particulars based, in large part, on the indictment.  There was

21   some specific piece of information that the defendants asked

22   for and we gave them.

23        THE COURT:  I thought I had.  It's not important.  The

24   point is the indictment gives a pretty good layout to the

25   defense of what it is the government is charging.

1          MR. GINSBERG:  I agree with that.  But laying it out

2     for the defendants, to put the defendants on notice so they can

3     defend at a trial, is different than laying it out for a jury

4     prior to the jury meeting the actual charges in the indictment

5     in summation and the Court's charge.

6          THE COURT:  I have heard what you have said.  I am

7     going to take this back.  I will look at it.  If there is

8     anything tonight that I want changed, I don't think the jury is

9     going to be getting this document anytime really soon, but I

10    will continue to review it.

11         MR. GINSBERG:  Yes, your Honor.

12         MR. SCOTTEN:  We will hold off.  I have marked down

13    the Court's changes, but we will have a new one when Mr.

14    Ginsberg finishes his objections, or however it works out.

15         THE COURT:  Mr. Ginsberg, I think, finished his

16    objections.  He is hoping for the Court to make additional

17    rulings.  Am I right?

18         MR. GINSBERG:  You are correct.

19         MR. SCOTTEN:  Thank you, your Honor.

20         THE COURT:  Anything else, Mr. Bath?

21         MR. BATH:  No, your Honor.

22         THE COURT:  Anything else from anybody?

23         MR. SCOTTEN:  No.  Thank you, your Honor.

24         THE COURT:  Thanks very much.

25         (Adjourned to October 12, 2017, at 10:00 a.m.)

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    TIMOTHY JOHN MUIR

4    Direct By Mr. Bath . . . . . . . . . . . . .2836

5    Cross By Mr. Ginsberg  . . . . . . . . . . .2896

6    Cross By Mr. Velamoor  . . . . . . . . . . .2900

7    Redirect By Mr. Bath . . . . . . . . . . . .3049

8                    GOVERNMENT EXHIBITS

9    Exhibit No.                        Received

10    4271    . . . . . . . . . . . . . . . . . . . .2913

11    4312    . . . . . . . . . . . . . . . . . . . .2915

12    4249    . . . . . . . . . . . . . . . . . . . .2944

13    4205    . . . . . . . . . . . . . . . . . . . .2947

14    4229    . . . . . . . . . . . . . . . . . . . .2957

15    4224    . . . . . . . . . . . . . . . . . . . .2960

16    4309    . . . . . . . . . . . . . . . . . . . .2961

17    4288    . . . . . . . . . . . . . . . . . . . .2965

18    4018    . . . . . . . . . . . . . . . . . . . .2971

19    4019    . . . . . . . . . . . . . . . . . . . .2981

20    4300    . . . . . . . . . . . . . . . . . . . .2991

21    4320    . . . . . . . . . . . . . . . . . . . .3019

22    4264    . . . . . . . . . . . . . . . . . . . .3022

23    2904    . . . . . . . . . . . . . . . . . . . .3031

24    2901    . . . . . . . . . . . . . . . . . . . .3036

25    2902    . . . . . . . . . . . . . . . . . . . .3038

```
1    4250    . . . . . . . . . . . . . . . . . .3038

2    4251    . . . . . . . . . . . . . . . . . .3040

3    4252    . . . . . . . . . . . . . . . . . .3041

4    4230    . . . . . . . . . . . . . . . . . .3044

5                      DEFENDANT EXHIBITS

6    Exhibit No.                           Received

7    1439    . . . . . . . . . . . . . . . . . .2845

8    837   . . . . . . . . . . . . . . . . . . .2854

9    D839    . . . . . . . . . . . . . . . . . .2858

10   1451    . . . . . . . . . . . . . . . . . .2878

11   1452    . . . . . . . . . . . . . . . . . .2880

12   1456    . . . . . . . . . . . . . . . . . .2888

13   1407A   . . . . . . . . . . . . . . . . . .3068

14   1407    . . . . . . . . . . . . . . . . . .3069

15

16

17

18

19

20

21

22

23

24

25
```