HAC8TUC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                          16 Cr. 91 (PKC)

SCOTT TUCKER and
TIMOTHY MUIR,                     Trial

            Defendants.

------------------------------x

                       New York, N.Y.
                       October 12, 2017
                       10:15 a.m.


Before:

                HON. P. KEVIN CASTEL

                           District Judge
                            and a jury

                    APPEARANCES

JOON H. KIM
      Acting United States Attorney for the
      Southern District of New York
BY:   NIKETH V. VELAMOOR
      HAGAN C. SCOTTEN
      SAGAR K. RAVI
      Assistant United States Attorneys

FREEMAN NOOTER & GINSBERG
      Attorneys for Defendant Tucker
BY:   LEE A. GINSBERG
      NADJIA LIMANI
        -and-
STAMPUR & ROTH
BY:   JAMES M. ROTH

BATH & EDMONDS, P.A.
      Attorneys for Defendant Muir
BY:   THOMAS J. BATH
        -and-
BEVERLY VAN NESS

1        (Trial resumed)

2        THE COURT:  I understand our jurors are here.

3        I will get them from the jury room.

4        (Jury present)

5        THE COURT:  Please be seated.

6        Good morning, ladies and gentlemen.

7        As I told you, we are beginning now with the closing

8    arguments, and you have already heard me say this, that closing

9    arguments are not evidence.  They are the lawyers' view of what

10   the evidence shows.  If any lawyer states facts that doesn't

11   match up with your recollection, it's your recollection that

12   controls, and you will have the ability in the jury room, if it

13   becomes necessary, to have testimony read back to you if you

14   need it from the trial, the official record of the trial.

15       The other point is the law requires me to tell the

16   parties how I plan to instruct the jury on the law, and I have

17   done that in advance.  So it's appropriate for a lawyer to say

18   something like, I expect the judge will instruct you that.  But

19   if what comes after the word "that" is different from what I

20   tell you in the final instructions, it's my instructions on the

21   law that you will follow.

22       And with that, the government may begin.

23       MR. RAVI:  Thank you, your Honor.

24       THE COURT:  Mr. Ravi.

25       MR. RAVI:  As we told you when this case started a

1   month ago, this is at its heart a simple case about greed and

2   lies.  These two men ran a payday loan business that charged

3   illegal interest rates of over 600 percent, 700 percent, even

4   1,000 percent.  They lied to millions of customers about their

5   loan terms in order to take even more money from them, and then

6   they laundered the billions that they took through bank

7   accounts that they pretended belonged to someone else.

8           This man, the defendant, Scott Tucker, he started and

9   ran it all.  And because he knew that he was committing crimes,

10  he tried to hide his payday loan empire behind a series of

11  fronts, from County Bank, to the Nevada shell companies, to the

12  Native American tribes you heard so much about.

13          Then that man, over there at the end, Timothy Muir,

14  the defendant, he joined Tucker's scheme in the middle of it

15  and he helped Tucker come up with new lies in order to hide

16  their crimes.

17          You have heard testimony over the past month from 25,

18  over 25 witnesses.  So you know from the evidence in this trial

19  that Tucker and Muir knew that what they were doing was

20  illegal.  You know that from the fact that they tracked

21  thousands of complaints from customers, attorneys general, and

22  consumer agencies, telling them that what they were doing was

23  illegal.  You know that from the call center scripts that they

24  had prepared that deal with the customers who told them that

25  they were charging illegal interest rates.  You know that from

1    the sham loan approvals, the fake titles and names, the lies in

2    affidavits to courts, the lies to regulators, to banks, to

3    customers, and to their own employees.

4            These are just a few examples of the evidence that we

5    will be going through that proves that these defendants had a

6    guilty state of mind.

7            Now, the defendants did all of that for a single

8    purpose -- to make hundreds of millions of dollars, which they

9    kept hidden in bank accounts that supposedly belonged to

10   tribes.

11           Tucker spent that money for personal luxuries -- a

12   fleet of Ferraris and Porsches, his private jet, a mansion in

13   Aspen -- and he did all of this while their victims, like

14   Andrew Leibenguth, Richard Hamner, Athena Sanchez, they were

15   struggling to make it to their next paycheck.  In doing all

16   these things, these defendants committed federal crimes.

17           Now, in a minute I am going to talk in more detail

18   about how the evidence proves that these defendants are guilty

19   of these crimes.  But first I want to take a minute to talk

20   about the charges here.

21           So you will see on your screen in front of you there

22   are 14 counts in the indictment, but they can really be broken

23   down into four categories of crimes.

24           The first category is that the defendants participated

25   in an enterprise engaged in the collection of unlawful debt.

1    We will call that the collection of unlawful debt counts.

2            The second category, Counts Five through Six, the

3    defendants committed wire fraud by lying about loan terms and

4    the identity of the lender.  That's the second category, wire

5    fraud.

6            Then we get to the third category, which is money

7    laundering.  Money laundering to promote the wire fraud and to

8    conceal the source and ownership of the proceeds of that wire

9    fraud.

10           Finally, we have what is called Truth in Lending Act

11   violation for providing false information about the true cost

12   of the loans.

13           Counts One, Five, and Seven are conspiracy counts, and

14   we will talk about that in a bit.

15           I want to make clear right now that this case is not

16   about County Bank, it's not about Nevada shell companies, it's

17   not about Native American tribes.  It's about these two men,

18   none of who belonged to a tribe or to a bank, who charged

19   sky-high illegal interest rates, lied about loan terms and

20   laundered money through banks accounts belonging, supposedly

21   belonging to tribes.

22           These are the crimes we are going to talk about today.

23           The defendants went to great lengths to hide all of

24   these crimes behind tribes and banks and corporate fronts, and

25   we will get to talking about that, because it is only further

1    evidence of their crimes.

2            So let's turn to the first category of crimes,

3    collection of unlawful debt.

4            Now, I am going to be spending a majority of my time

5    with you talking about this first set of crimes.  That's not

6    because it's any more complicated than those other sets of

7    crimes.  They are all straightforward.  But only because once

8    we have gone through all the evidence for this first set of

9    crimes, there is no need to spend the time to go through it for

10   the other three sets of crimes.  We can just refer back to it.

11           So Count One is the conspiracy count, and the second

12   and third counts relate to the collection of unlawful debt

13   through specific portfolios that we have talked about

14   throughout this trial.

15           So turning first to conspiracy, to the elements for

16   conspiracy.  These first two relate to the elements for

17   conspiracy and then there are other elements that relate to the

18   object of the conspiracy.  Again, remember that what I say

19   about the law is not the law; it's only what Judge Castel tells

20   you.

21           So the first element of conspiracy is that there was a

22   conspiracy.  A conspiracy is simply an agreement or

23   understanding by two or more persons to accomplish an unlawful

24   objective.

25           The second element is that the defendant intentionally

1    joined the conspiracy at some point during its existence.  The

2    timing here is important because the defendant, like Timothy

3    Muir, can join the conspiracy at any time after it has begun.

4         You have heard overwhelming evidence that there was an

5    agreement or understanding since 1997 through 2013 to collect

6    unlawful debt.  You heard from Adrian Rubin and you saw the

7    County Bank agreements.  Tucker agreed with Hallinan to extend

8    unlawful debts as early as 1997.  And many others joined that

9    conspiracy over the following years.

10        Muir was one of those people who joined Tucker's team,

11   and he is undoubtedly part of the same agreement or

12   understanding that is that conspiracy.

13        Now, the other elements of conspiracy relate to the

14   object or purpose of a conspiracy.  Those elements are similar

15   to the elements for Counts Two through Four, so I am going to

16   go through them together.

17        There are five elements for Counts Two through Four.

18   But most of these elements can't reasonably be disputed.  So

19   let's take them one by one.

20        First, there is no reasonable dispute that the

21   enterprise that's referenced as the Tucker payday lending

22   organization in the indictment existed.  And I will just refer

23   to it as the Tucker enterprise to save some time.

24        The defendants used many different names to refer to

25   the Tucker enterprise, whether it's 500 FastCash, One Click

1    Cash, Ameriloan, or NMS, CLK, AMG, all the names you have heard

2    throughout this trial.  You heard from each and every one of

3    Tucker's employees and each and every one of the tribal

4    witnesses that that business was located right here in front of

5    you, in Overland Park, Kansas.

6           As each one of those witnesses told you and as all the

7    e-mails showed you, this here, in Kansas City, is where the

8    Tucker enterprise operated from, where it was managed, where

9    loans were approved, where call centers relating to the loans

10   were located, and where collections were made for those loans.

11          As the number of employees at the Tucker enterprise

12   grew from just a handful to over 1500, one thing did not

13   change:  Mr. Tucker was in control of that enterprise.

14          Now turning to some of the other elements that aren't

15   reasonably in dispute.

16          Second, there is no reasonable dispute that the Tucker

17   enterprise affected interstate commerce because of the

18   automatic withdrawals that were made from borrowers' banks

19   accounts from all over the country.  This is a necessary

20   element of every crime in the indictment, and it's not in

21   dispute.

22          Third, that the defendants were employed or associated

23   with the Tucker enterprise at some point during the period

24   charged in the indictment.  There can be no real dispute here

25   that Tucker and Muir were employed or associated with the

1    Tucker enterprise and at some point during that period that

2    they were aware of the nature of its business.

3         So now let's turn to the fifth element.  We will get

4    back to the fourth element.

5         This fifth element also can't reasonably be in

6    dispute.  The evidence overwhelmingly shows that Tucker and

7    Muir participated in the Tucker enterprise through the

8    collection of unlawful debt.  The interest rates charged by the

9    defendants' business were illegal in many of the states in

10   which the defendants loaned money.  That's really not in

11   dispute.

12        Regardless of the amount of the loan, the annual

13   interest rate was always in the hundreds of percent, ranging

14   from 600 percent to even 1,000 percent.

15        Crystal Grote, a senior manager in the Tucker

16   enterprise, testified that those interest rates were the same

17   when she began with the company in 1999.  And you can see from

18   these loan applications in front of you that those interest

19   rates did not change through at least December of 2012, in this

20   loan application for Amy Weatherwax, and that began almost six

21   months after the FTC investigation became public.

22        It's crystal clear that these interest rates broke the

23   law.  Judge Castel will instruct you that an interest rate is

24   unlawful if it is twice the limit set by state usury laws.

25        The judge will further instruct you, as we expect,

1   that the annual interest limit is 25 percent per year in New

2   York and 36 percent or less in ten other states.

3           The interest charged by the defendants to borrowers in

4   New York and those other states was clearly unlawful, because

5   it was many more than ten times the limit set by those states'

6   usury laws.

7           Let me be clear.  The interest rates here are illegal

8   even if there was no such thing as that automatic renewal you

9   heard so much about.  Those automatic renewals were

10  deliberately put in place to take even more money from

11  customers, more than the amount of the illegal interest that

12  was charged.  And that egregious conduct with the automatic

13  renewal is a whole other crime that we will talk about when we

14  get to the fraud counts.  For now, I only want to focus on the

15  illegal interest rates.

16          But even without those automatic renewals, the

17  interest rates charged by the defendants were still criminal in

18  states like New York.

19          By the way, the judge will also instruct you on

20  something that is called aiding and abetting, which just means

21  you don't need to find that the defendants themselves were the

22  ones on the phone with customers collecting their unlawful

23  debt.  Rather, they can act through their employees so long as

24  they intended that the crime happen and they took some steps to

25  commit the crime.  You know the defendants here were directly

1    involved in the collection of debt and they also acted through

2    their own employees.

3         So what is in dispute if none of those elements are

4    reasonably disputed?  Perhaps the core dispute in this case is

5    whether the defendants acted willfully and knowingly in the

6    collection of unlawful debt.

7         The dispute here focuses on whether defendants acted

8    willfully or, in other words, whether the defendants were

9    involved in collecting debt from customers at interest rates

10   that they knew were illegal.  But though the defendants dispute

11   it, the evidence establishes beyond a reasonable doubt that the

12   defendants knew exactly what they were doing when they were

13   committing these crimes.  It's clear as day.

14        Now, first, the defendants actually had scripts

15   prepared for call center employees to deal with customers who

16   complained that their interest rates were illegal.  Think about

17   that.  The number of complaints from customers regarding their

18   illegal interest rates were so high that they actually had to

19   come up with scripts to deal with customers about that.  And it

20   was company policy to use these scripts.

21        As Crystal Grote testified, Tucker created this policy

22   and Muir actually helped write this very script in front of

23   you.  And Mr. Muir also gave direction to the compliance

24   department on how to deal with customers who complained about

25   their illegal interest rates.  That's at page 760 of the

1    transcript.

2          Here is an e-mail showing that Muir was responsible

3    for developing scripts to cover these compliance issues.  And

4    you can see who is overseeing it all.  It's Scott Tucker at the

5    top of that chain.

6          But it was not only customers who complained.  The

7    Better Business Bureau told Tucker's company that there was

8    alarming number of complaints, and so did attorneys general

9    across the country, including the New York Attorney General.

10          For example, remember when the New York Attorney

11    General sent that letter to 500 FastCash following up on Athena

12    Sanchez's complaint that she was charged interest above New

13    York's 25 percent usury rate?  Indeed, there were so many law

14    enforcement agents and officers that were contacting the Tucker

15    enterprise, they had to have complaint procedures put in place

16    for what to do when all of these agencies contacted them about

17    their illegal interest rates.

18          There were so many complaints that Tucker and its

19    employees even tracked them, beginning as far back as 2004.

20          From 2004 to 2011, the number of complaints

21    skyrocketed as the Tucker enterprise grew in size.  They

22    received more than 1500 complaints in 2006, as you can see, and

23    as many as more than 6,000 complaints in 2011.  That's just

24    through July 31st of that year.  And these complaints included

25    internal complaints from customers as well as external

1    complaints from agencies and law enforcement agencies.

2            In total, according to Tucker's own records right

3    here, there were almost 25,000 complaints from customers from

4    2005 to 2011.  And what was Tucker's response when he was sent

5    this data?  He said, "We need a whole unit that is specialized

6    in dealing with this."

7            Tucker didn't do what a legitimate business person

8    does, because Tucker was not a legitimate business person.

9    Tucker didn't ask how these complaints could be reduced.  He

10   didn't ask why so many customers were complaining.  He didn't

11   need to.  Neither did Tim Muir.  They both already knew they

12   were charging illegal interest rates.

13           But Tucker and Muir did not care because that was

14   exactly what they were trying to do.  That was the plan all

15   along.

16           Ladies and gentlemen, based solely on the evidence we

17   have gone through, there is overwhelming evidence that both

18   Tucker and Muir are guilty of Counts One through Four for the

19   collection of unlawful debt through the charging of interest

20   rates that they knew to be illegal and for conspiring to do

21   that same very thing.

22           Now, in addition to all that evidence that we have

23   just talked about, you know that Tucker and Muir knew their

24   interest rates were illegal for another fundamental reason.

25   There is no other explanation for why they took so many steps

1    to hide their business.

2            As witness after witness has testified, the only

3    reason they needed County Bank, Nevada shell companies and

4    tribes to act as fronts for their business is because they knew

5    they could be sued and investigated for charging illegal

6    interest rates.

7            Use your common sense.  If the defendants didn't know

8    they were charging illegal interest rates, they would have no

9    reason to form these relationships with county banks or tribes

10   or shell companies.  Those relationships also weren't real.

11   They were shams.  And the fact that they were shams is just

12   more proof that the defendants were intentionally breaking the

13   law.

14           I am now going to walk you through three fronts, five

15   shams and ten lies that the defendants used to try to hide the

16   fact that Tucker was the man behind the curtain charging those

17   illegal interest rates and collecting billions of dollars from

18   ordinary Americans.

19           Keep in mind as we go through this that just because

20   Tucker hid behind different fronts to hide his crimes, this was

21   all one continuous scheme.  The crime is charging illegal

22   interest rates which Tucker never stopped doing.  All that

23   changed is the methods that he used to hide from the law.

24           Tucker started hiding behind County Bank and the

25   Nevada shell companies.  Then when County Bank can no longer be

1    used, Tucker turned to the tribes to hide his business, and

2    Muir helped him to it.  And for years Tucker was even charging

3    illegal interest rates and lending under just those Nevada

4    shell companies.  Regardless of which front he used, the goal

5    was always the same -- charge illegal interest rates and avoid

6    lawsuits and investigations by hiding behind fronts, shams and

7    lies.

8              So let's turn now to the first front, County Bank.

9              You learned how Tucker used County Bank as one of his

10   fronts.  You learned that Tucker began payday lending through

11   National Money Service, or NMS, in the late 1990s.  NMS was one

12   of those Nevada shell companies, those nominee companies that

13   Tucker used to hide his ownership with the help of people like

14   Aaron Shoaf, James Fontano, Michael Hicks.  Those men signed as

15   officers of these shell companies even though they knew nothing

16   about them.

17             As Crystal Grote testified, when she started with

18   Tucker in 1999, NMS was using the doing business name, or

19   d/b/a, 500 FastCash.  Then Tucker instructed her to begin

20   putting County Bank on those loan documents.

21             You heard about the County Bank front and it was

22   explained by Adrian Rubin, a twice convicted felon who has been

23   engaged in fraud for much of his life.  As you see here, Rubin

24   testified pursuant to a cooperation agreement after pleading

25   guilty to collecting unlawful debt because he used County Bank

1    and a Native American tribe as fronts in order to charge

2    exorbitant interest rates across the United States.

3            You also heard about County Bank from Crystal Grote,

4    another cooperating witness who was part of Tucker's enterprise

5    for nearly the entire period we have been talking about.

6            Grote pleaded guilty to making false and misleading

7    statements in a deposition with the FTC about her involvement

8    with Tucker's enterprise.

9            Now, both Rubin and Grote testified in this trial with

10   the hopes of receiving leniency at their sentencing, and you

11   should scrutinize their testimony for that reason.  But there

12   is no better way to learn about these defendants' crimes than

13   hearing about how they were committed by people with inside

14   knowledge of those crimes.  And as you will see for yourself,

15   the testimony of Grote and Rubin is corroborated by all the

16   other evidence in the trial.

17           So Adrian Rubin told you how he and Tucker used County

18   Bank as a front for their respective payday loan businesses as

19   well as why it was crime.  County Bank, as you recall, was a

20   single-branch back in Rehoboth Beach, Delaware.  Because it had

21   what was called a federal charter, it can extend payday loans

22   all across the country at any rate it chose without following

23   the usury limits in those different states.

24           But, as Rubin explained, County Bank wasn't actually

25   extending any loans to anyone.  He was pretending to be the

1    lender, when in reality so-called servicers were actually

2    extending the loans.  These so-called servicers included Adrian

3    Rubin and included Scott Tucker, who had both partnered with

4    Charles Hallinan, a man you have heard about throughout this

5    trial, a co-conspirator of Mr. Tucker's.

6            Tucker and Hallinan were 50/50 partners at NMS, which

7    itself was one of the so-called servicers in the County Bank

8    program.

9            Tucker's agreement with County Bank was signed in June

10   1998, and Rubin explained to you how this rent-a-bank scheme

11   worked.  The bank and the so-called servicers fashioned a fancy

12   agreement to make it seem like the bank was making the loans.

13   But the reality was very different.

14           Even though the agreements with County Bank said that

15   the bank makes the loans, it was actually Rubin and Tucker who

16   put up the money for the loans.  The County Bank agreement said

17   that County Bank determined all the conditions, terms and

18   services and made credit standards of the loans, where it was

19   actually Tucker and Rubin who approved the loans according to

20   their own credit standards.

21           Crystal Grote also explained to you that when Tucker

22   was lending under the name County Bank, borrowers applied to

23   500 FastCash at Tucker's offices in Kansas City, not at County

24   Bank in Delaware, and that agents in Kansas City approved those

25   applications.

1          But as Grote explained to you, no approval was

2     necessary from County Bank for that money to go out.

3          In addition, the agreement stated that County Bank

4     retained legal title to loan documents.  But it was actually

5     Rubin and Tucker who had possession of those documents.

6          The agreement also stated that County Bank sold 95

7     percent participation interest in its loans to NMS to make it

8     look like the bank took on some risk.  But County Bank simply

9     received a guaranteed 5 percent fee regardless of whether the

10    loan was paid back.  And there are even fake participation

11    agreements that were put in place to make sure it looked like

12    that was happening.

13         Finally, statements for bank accounts in County Bank's

14    name were actually funneled unopened through County Bank to

15    Rubin and Tucker to make it appear that County Bank was

16    managing the account.

17         Ladies and gentlemen, the County Bank agreement with

18    Tucker is just one of the multiple examples of how Tucker used

19    paper to cover up his crimes.  If there was nothing illegal

20    about Tucker being the lender and simply lending under County

21    Bank's name for a 5 percent fee, why didn't the agreements

22    reflect the true nature of the relationship between Tucker and

23    County Bank?

24         The reason is simple.  Because County Bank was only

25    supposed to be able to export interest rates for loans at issue

1    in Delaware, not loans that Tucker issued in Kansas.  And

2    Tucker knew that if he was exposed as the true lender that he

3    would be subject to all kinds of lawsuits and investigations

4    for charging illegal interest rates.

5            So Tucker paid a fee to rent County Bank's name for

6    his business that enabled him to pretend, at least on paper,

7    that he was a federally chartered bank issuing loans in

8    Delaware, when in fact he was a payday lender in Kansas.

9            County Bank began to face scrutiny from the FDIC and

10   imposed restrictions on Tucker's lending practices that he

11   didn't like, because it meant that he would make less money.

12   In fact, Tucker told Rubin and Hallinan, as you heard, that

13   they could make more money if they stopped using County Bank

14   because they were paying 5 percent for County Bank doing

15   absolutely nothing.  And that's exactly what Tucker did,

16   because he found a new front in Native American tribes that

17   would take 1 percent.

18           Now, before we turn to the Native American tribes, at

19   the same time that Tucker was lending through County Bank, he

20   was also lending through those Nevada shell companies that we

21   talked about.

22           Here you can see on your slide these Intercept

23   applications.

24           Tucker began to lend through four other Nevada shell

25   companies, four companies separate than NMS, each of which was

1     associated with a different portfolio of loans.  These

2     applications for loan processing through intercept were filled

3     out by Tucker beginning in 2002 for each of these shell

4     companies.  And you heard at trial that Intercept was one of

5     the many processing companies that Tucker used to disburse

6     loans to customer's accounts and then to automatically withdraw

7     those payments.

8            In this 2008 letter to his co-conspirator Charles

9     Hallinan, Tucker explained in his own words the history of this

10    scheme.  He explained how he and Charles Hallinan together used

11    the Nevada nominee cos, as Tucker called them, to conduct

12    payday lending.

13           He also explained that he used the Nevada shell

14    companies to keep their names out of lawsuits and

15    investigations.  Tucker made clear in this e-mail that all the

16    time NMS behind the scenes had total control, ownership and

17    interest in them.

18           Again, there is only one reason why Tucker had to keep

19    his name out of lawsuits and investigations.  Because he knew

20    he was charging illegal interest rates.

21           Importantly, in the second part of this e-mail Tucker

22    explained that he had been payday lending through these shell

23    companies through at least 2006.

24           Ladies and gentlemen, this e-mail was a confession.

25    It was a confession by Tucker that he was lending money in

1   violation of state law, and it was a confession that he was

2   using the shell companies to cover up his crimes.  This e-mail

3   is devastating.

4        And the timing here is important because when Tucker

5   is lending money at the same illegal interest rates through

6   these Nevada shell companies beginning in 2002, he did not have

7   the so-called cover of County Bank, which only involved 500

8   FastCash, and he hadn't started using the tribes.  He was just

9   charging illegal interest rates through shell companies that he

10  owned in Nevada.  This is plainly not legal.

11        Tucker just tried to hide behind shell companies so he

12  wouldn't get caught.  This evidence is all you need to know to

13  convict Tucker on Count One, a time during which there is no

14  dispute that Tucker was charging illegal interest rates through

15  the Nevada shell companies.

16        Now, after Tucker became frustrated with the

17  restrictions being imposed by County Bank and states started

18  investigating these shell companies, Tucker began to look for a

19  new front.  He came up with the idea of forming relationships

20  with Native American tribes to take advantage of their

21  sovereign immunity.  That's front number three.

22        Now, as Judge Castel I expect will instruct you,

23  tribal sovereign immunity protects federally-recognized tribes

24  from being sued by states and others.

25        That's why the defendants wanted to use the tribes,

1   because they could hide behind them, and the states couldn't

2   investigate the tribes due to their sovereign immunity.

3           But Judge Castel I expect will also tell you that

4   sovereign immunity doesn't give anyone -- not a tribe, and

5   definitely not these two defendants -- any rights to violate

6   the law, state or federal.

7           Scott Tucker and Timothy Muir are not Indian tribes

8   and sovereign immunity does not protect them or any business

9   owned or controlled by them.  So that's all this was.  Another

10  way to hide from the authorities, like the Nevada companies and

11  County Bank.

12          You heard about how Tucker started his relationship

13  with certain tribes.  In the fall of 2003, Tucker began

14  reaching out to several tribes about his lending business.  He

15  needed a relationship in more than one tribe because he wanted

16  to have a backup tribe on deck in case anything happened in

17  that relationship.

18          Over time, Tucker signed service agreements with four

19  tribes.  The first one signed was an agreement with the Miami

20  tribe in November 2003.

21          Then with the Modoc tribe in December 2003.

22          Kickapoo signed up in January 2004 and that, as you

23  know, was ultimately terminated a year later.

24          Finally, the Santee Sioux signed up February 2005.

25          There was also that attempt to sign an agreement with

1   the Yurok tribe, whose attorney Lisa Adams realized that Tucker

2   was just trying to run money through tribes.  When Adams

3   continued to press Tucker for more involvement in the lending

4   business, Tucker got angry and things went nowhere.  No

5   agreement got signed.

6           Why is the Yurok story important, ladies and

7   gentlemen?  Because it shows that Tucker did not want a real

8   tribal partner for his business.  He just wanted a front.  When

9   the tribes specifically pushed to get more involved in his

10  business, Tucker did not want it, and he was left with the

11  remaining tribes to be his fronts.

12          Now, these agreements with each of the tribes were

13  nearly identical and they reflected a pure rent-a-tribe

14  agreement.  Tucker provided the money for the loans.  Tucker

15  provided all the support staff, equipment, and business

16  arrangements, including advertising, promotion.  Tucker

17  reflected the loan payments.  Tucker paid the tribes a $20,000

18  per month minimum or 1 percent of gross collected revenues.

19  And the tribe had no obligation to invest money or pay

20  expenses.

21          Does this sound familiar?  It should because it's

22  nearly identical to County Bank, except this time Tucker only

23  had to pay 1 percent of his revenues, not the 5 percent he paid

24  to County Bank.

25          As you heard from Troy Little Axe, Russell Bradley and

1  Lisa Adams, and then the recordings of Don Brady, the tribe was

2  selling Tucker the ability to hide behind their sovereign

3  immunity for 1 percent of his revenues so that Tucker can then

4  go out and charge illegal interest rates and avoid being sued

5  and investigated.  That was the tribes' sole purpose and

6  involvement in the Tucker enterprise.

7          Now, let's listen for a moment to Don Brady explain to

8  Carolyn Williams during one of those recordings you already

9  heard in this trial, Government Exhibit 408.

10         If we can go ahead and play that now.

11         (Audiotape played)

12         MR. RAVI:  Don Brady, in an unguarded moment with

13  Carolyn Williams, exposed the true nature of the tribes'

14  relationship for Scott Tucker for what it was -- a front,

15  intended to protect Tucker while he cheated millions of

16  customers by charging illegal interest rates.

17         As you heard during the trial, Tucker provided the

18  tribes with a bunch of paperwork, such as resolutions and

19  ordinances to help form tribal corporations he would use to

20  hide his lending.  In other words, Tucker, through the

21  assistance of Conly Schulte, who we will talk about in a bit,

22  became a one-stop shop for creating tribal corporations.  He

23  created these official looking licenses with the tribal seals

24  that the defendants showed you during the trial.

25         Do you remember this?  On the next line you can see

1    Tucker asking his assistant Anita Finney to create these

2    licenses by finding the seals or logos for each of the tribes.

3            On the left, as you can see, when she can't find one

4    for Kickapoo, Tucker asked her to use the Santee Sioux logo.

5    These tribes were interchangeable to Tucker.

6            But like much of the paper in this case, it was simply

7    manufactured for a single purpose -- to make it look like the

8    tribe was the lender when it really wasn't.

9            As you heard witness after witness tell you, including

10   Tucker's own employees and the defendants' own tribal

11   witnesses, once tribal resolutions and ordinances were passed

12   and they were provided so that they could be rubber stamped by

13   the tribe, they did little to nothing else.  The tribes did not

14   make any decisions regarding the payday loan business, the

15   tribes did not set the illegal interest rates, they did not

16   provide the money for the loans, they did not approve the

17   loans, they did not collect money for the loans, they did not

18   have any access to the books and records.  Every single one of

19   those things was done by Tucker and his employees in Kansas

20   City.

21           You also know that certain steps that were taken by

22   the defendants and the tribes were taken.  There were other

23   steps that were taken to make it appear that these tribes were

24   actually involved in the lending business in order to make this

25   tribal front appear real.

1          So we have gone through those three fronts and now

2     it's time to talk about five of the many tribal shams that you

3     heard about throughout this trial to make it appear that these

4     tribes were real when they weren't.

5          We will start with the biggest sham first, the sham

6     approvals.

7          You remember that magic button that Don Brady pressed

8     to supposedly approve the loans.  Brady logged into a computer,

9     scrolled down a list of customers, and clicked that magic

10    button to make it look like he had reviewed loan paperwork and

11    approved the issuance of the loans.

12         You heard multiple witnesses, including Tucker's own

13    employees, and the Miami tribal witnesses testified that Don's

14    clicking of that button didn't do anything at all.  Tucker's

15    senior manager at work testified that no approvals from tribes

16    were needed for loans to be issued for borrowers.  As Carolyn

17    Williams and the defendants' own witnesses, Doug Lankford and

18    Tom Campbell told you, there were no loans being reviewed or

19    processed or approved in tribal land.

20         And also, Brady and others serving as backup for the

21    sham approval, they didn't have any access to loan applications

22    or any financial documents.  They didn't have or know of any of

23    the criteria for approving loans.  And they couldn't deny loans

24    if they wanted to.  There wasn't even a button to deny the

25    loans.  There was only an approval button.  That's how little

1    control that these tribes had.

2           This was a complete sham, a process put in place by

3    Tucker and Muir to enable Tucker to falsely claim that loan

4    operations were happening on tribal land.

5           You specifically know that Muir put this procedure in

6    place knowing that it was a sham.  Remember that testimony

7    right in front of you by Scott Mitchell.  Muir directed Scott

8    Mitchell to set up an iPad for Brady so that there would be the

9    illusion that Brady was clearing or approving the payday loans.

10          That testimony by itself proves Muir's criminal

11   intent.  If he thought the relationship with the tribe is

12   legally defensible, he would have had no reason to instruct

13   Mitchell to create some sort of sham approval through an iPad.

14          Like so much other evidence, the fact that Muir is

15   orchestrating a sham approval establishes his willful

16   participation in collecting unlawful debt.

17          It's also important to remember that the sham approval

18   process was not even set up at the Modoc tribe.  Troy Little

19   Axe told you that the only tribal employee involved in the

20   Modoc's business, that he didn't even intend to approve loans

21   and he was not involved in approving loans in any way, shape or

22   form.

23          Let's turn to sham number two, sham business

24   addresses.

25          This second example has to do with the mail.  As you

 1   heard, mail and bank statements were sent to an address on

 2   tribal land.  You heard from multiple witnesses that the mail

 3   received each day was actually packaged up and sent to Kansas

 4   City unopened where Tucker's employee would review and process

 5   the mail.

 6          Tucker and Muir chose to make these business addresses

 7   on tribal land, even though nothing actually happened there,

 8   because they were trying to create the false impression that

 9   the businesses were actually located on tribal land.

10          As Troy Little Axe testified, at one point mail

11   received at a mailbox on tribal land, even though there was no

12   building there because it had been destroyed in a flood, that

13   single mailbox, ladies and gentlemen, is what Tucker

14   represented to the world as the business address for a billion

15   dollar company.

16          Let's go now to the third sham, the tribal boards.

17          You heard testimony about tribal boards that were set

18   up for each of the tribal entities through which Tucker did

19   lending.  These boards, again, were set up to make it appear

20   that the lending was tribally managed.  But in reality, they

21   were just dummy boards.  You knew that from this e-mail where

22   Muir is asking to set up an annual meeting, which he put in

23   quotes by the way, with Don Brady due to the Colorado

24   litigation.

25          (Continued on next page)

1          MR. RAVI:  Muir basically admitted that this was a

2     sham during the cross-examination.  That wasn't a meeting.  It

3     was to help set up Tucker and Muir to lie in court that these

4     boards were real when they really weren't.  And at the Modoc,

5     there wasn't even a semblance of a board.  Troy Little Axe

6     served as the president and the CEO, and he was a one-member

7     board for almost the entirety of the Modoc's relationship with

8     the Tuckers.

9          Turning to the Miami, you heard every Miami tribal

10    witness testify that the board barely met prior to 2011.  And

11    to the extent they did meet, they only met to discuss how much

12    money they were getting from Scott Tucker.  They made no

13    decisions regarding the payday loan business, and in fact, they

14    didn't even know what the companies they were supposedly

15    serving did.  You heard them in their own board meetings as

16    late as fall 2012.

17          Let's listen to Government Exhibit 404.

18          (Audio played)

19          MR. RAVI:  This recording that you just heard took

20    place after all those board meetings that Tim Muir testified

21    about, when he tried to get you to believe that these were real

22    boards.  As late as August 2012, Gena Lankford, the chair of

23    the MNES board, asked what MNES did and what AMG did.  The

24    defense kept flashing those board minutes in front of you, but

25    the chair of that board didn't even know what the company did.

1  You know that those board and their minutes were just another

2  way to cover their tracks.

3          Let's go ahead and hear one more excerpt of another

4  MNES board meeting.  This is Government Exhibit 406.

5          (Audio played)

6          MR. RAVI:  This recording that you just heard makes it

7  clear that the boards themselves knew that they were lying to

8  the outside world about the tribe owning AMG and that it was

9  really Tucker's business.

10         Let's turn to the fourth sham.

11         You heard about other shams, such as the use of

12 titles, like president and CEO for Don Brady and Troy Little

13 Axe, when Scott Tucker, the person ultimately in control of the

14 company, didn't even have one.  Common sense tells you why.

15 Tucker knew that if he identified himself as what he was, the

16 real CEO, it would make it impossible to pretend that a tribal

17 official was running this company, and it might result in

18 Tucker having to answer for the illegal interest rates that he

19 charged millions of customers.  So instead of naming himself,

20 Tucker named people like Brady and Allison Harris as management

21 of his enterprise, even though Brady did little more than click

22 that magic button, and Allison Harris didn't even know that she

23 was vice president of the company.

24         This is a resolution of the board of directors saying

25 that Allison Harris will continue to serve in the capacity as

1   vice president of the company.  This is AMG, which was based in

2   Kansas City, and Allison Harris didn't even know that she was

3   that vice president.  These tribal resolutions were just

4   another example of form over substance, used to make the tribe

5   appear like it was a real participant when it wasn't.

6           Now that takes us to sham No. 5.

7           From the beginning of these relationships, the tribes

8   themselves viewed the participation as a front to shield Tucker

9   if questions were asked, and that's because they were a front.

10  Many of the ways that you know that the tribes' so-called

11  ownership of these portfolios wasn't worth the paper it was

12  written on is because of the Kickapoo.

13          As Russell Bradley testified, as you can see from

14  Government Exhibit 204, Tucker assigned his portfolio Preferred

15  Cash Loans to be the doing-business name associated with the

16  Kickapoo's tribal shell corporation KLC.  But once the

17  relationship with the Kickapoo ended a short while later,

18  Tucker began working with the Santee Sioux and assigned them

19  the same Preferred Cash Loans portfolio, which later became

20  OneClickCash.  And then around the same time, Tucker opened a

21  bank account at U.S. Bank in the name of the Modoc's tribal

22  entity, MTE, doing business as Preferred Cash Loans, and he

23  falsely represented himself to be a secretary of that company.

24          Ladies and gentlemen, this tells you all you need to

25  know about the defendants' arguments that the tribes were the

1   lenders here and owned the portfolios.  Tucker just moved

2   Preferred Cash around to wherever he wanted, whenever he

3   wanted.  Could he do that if someone else, like a

4   Native-American tribe, owned it?  Of course not.  He could do

5   that because the portfolios were his property, and he could

6   maneuver them around as he pleased.

7        Tucker also continued to have the ability to move his

8   portfolios between tribes throughout the conspiracy.  As late

9   as 2011, when that news article you heard so much about came

10  out and was published, that led the Modoc tribe to reevaluate

11  whether it wanted to continue its relationship with Mr. Tucker.

12  At that time, even Troy Little Axe offered to help Tucker find

13  a replacement tribe for the 500 FastCash portfolio.

14       Let's pause there for a moment.  The fact that both

15  Little Axe and Tim Muir were considering a replacement tribe

16  for the Modoc shows you right there that the tribes didn't

17  actually own anything.  Again, just like how Preferred Cash

18  went from the Kickapoo to the Santee Sioux and even to the

19  Modoc, here's another example of Tucker considering moving one

20  established portfolio to another tribe because it was

21  convenient for him at the moment, and he could do that because

22  he is the only one who actually owned and controlled the

23  portfolios.

24       But there are still even more examples of how you know

25  Tucker controlled and operated the business and how the tribes

1    were used as fronts to make hundreds of millions of dollars.

2    Let's go through a couple of the examples of many, many emails

3    that show this.

4         This, again, is Government Exhibit 2615.  You've

5    already seen this email once today, but I want to show you

6    again, because this email by itself is enough to show that as

7    late as June 2008, right before the so-called AMG merger, when

8    all the activity is running through the tribal accounts, Tucker

9    still believed that MNES, his company from the beginning, had

10   total control, ownership, interest, assignment of all the

11   assets in the portfolios.  And this one email proves that the

12   defendants were just using the tribe as a front.  Even if this

13   were the only email that we showed you throughout this case,

14   and you know there are plenty more, it is enough to prove the

15   defendants guilty beyond a reasonable doubt of Counts One

16   through Four.

17        Here's now another email, Government Exhibit 2806.

18   This email shows you exactly what Tucker was thinking about the

19   tribes' role in his business, but he emails his business

20   partner here in 2006, and he tells that business partner that

21   he has full authority and control of five sovereign nation

22   entities that are in a position to do about any type of deal

23   that makes sense.  Again, this is a confession by Tucker that

24   the tribes are really fronts controlled by him.

25        Here's one more.  Here's Tucker exercising his full

control and authority over the tribes.  He writes in the

subject line:  "I want whatever is needed from the Santees

tomorrow.  End of story.  No more BS.  I want the packages sent

to the banks, Santees or not."

Then he says below:  "Seriously, they are out.  When

we need something, they need to comply."  This shows again that

the tribes clearly had no control or authority over these

businesses.

Now we've talked about the three fronts.  We've talked

about the five tribal shams, examples of various shams that

you've seen, and now I want to talk about lies, the ten lies

that we went through.

There have already been so many lies that have been

presented throughout this trial, but I'm going to focus on the

ten biggest lies that we haven't already gone through.  You can

call it a top-ten list if you'd like, but these are just ten

ways that you know that Tucker and Muir had criminal intent and

fully intended to charge illegal interest rates of up to 1,000

percent.  Let's go through each one of these lies now.

Lie No. 1.

It was Tucker's choice that the tribes played little

to no role in his payday loan business.  And it was because of

that choice that Tucker had to have attorneys, like Conly

Schulte, submit false affidavits to state courts when the

payday loan business, Tucker's business, was being sued for

1   charging illegal interest rates.  These affidavits were

2   reviewed by Tucker and Muir.  That is not in dispute, and these

3   affidavits again had one purpose: to permit Tucker, through the

4   tribes, to falsely assert that his payday loan business could

5   not be sued because of sovereign immunity.

6           As Carolyn Williams, Troy Little Axe and the

7   defendants' own witnesses, Gamble and Lankford, testified, and

8   as you also heard from Don Brady in those recordings, these

9   affidavits contained several lies.  Here's one of them from Don

10  Brady in August 2007 that submitted to the California state

11  court after Muir had joined the scheme.  You're already

12  familiar with these lies.  Let's just go through a couple of

13  them.

14          You know from the evidence that Don Brady did not

15  manage the services or day-to-day operations of the payday loan

16  business.  Tucker did.  You know that Don Brady did not

17  maintain the books and the records.  Tucker did.  You know that

18  the portfolios did not operate within the Miami tribe's

19  reservation.  They operated in Tucker's offices in Overland

20  Park.  And finally, you know that 100 percent of the profits

21  did not go to the tribe.  Everything went to Tucker after that

22  1 percent was paid.

23          These were all lies.  The only witness who really

24  tried to defend these affidavits was Conly Schulte, even though

25  all of his supposed clients, including Brady, Little Axe, and

1    even the Miami tribal entities through a nonprosecution

2    agreement with the government -- all those people -- agreed

3    that they were lies in the affidavits.

4          Schulte was the lawyer who tried to convince you that

5    he was always acting in the tribes' best interests, until he

6    was confronted by all those checks that were signed by Scott

7    Tucker showing that he and his firm had been paid $16 million.

8    You saw Schulte squirm on the stand when he tried to explain

9    how 100 percent of profits actually meant 1 percent of the

10   revenues in the affidavits he submitted to courts.  That

11   doesn't make any sense.  100 percent means 100 percent, plain

12   and simple.

13         You also heard how Schulte lied to courts, not telling

14   judges basic facts, like how he learned about the suits he was

15   defending, because he didn't want to admit that Scott Tucker

16   was behind them.  You even heard him dodge the truth on the

17   stand.  Confronted with an obvious lie in his own filings, he

18   couldn't defend it as true, but he also couldn't admit to you

19   that he had lied.  All he could say is that he could have

20   phrased filings to the courts more accurately.

21         Separate from these affidavits being another example

22   of Tucker telling lies, why is this important?  Because these

23   lies showed you that Tucker knew that what the tribes were

24   doing, or what they weren't doing, didn't make his business

25   legal.  Use your common sense.  Of course Tucker knew that what

1    he was doing with the tribes was a sham, and so did Tim Muir.

2    That's why they needed to cover up what was actually happening

3    through false affidavits that overstated the tribes'

4    involvement.  And that's why there's not a single mention of

5    Kansas City, so-called servicers or Scott Tucker in any of

6    these affidavits.  That's exactly what they were trying to

7    cover up.

8         And you know that there were not just one or two false

9    affidavits submitted.  There were more, many more, as you can

10    see on your screen.  From 2005 to 2012, there were 15

11    affidavits containing the same lies that were submitted in

12    multiple states by multiple tribal officials.  Each of these

13    false affidavits, and we've included the government exhibit

14    numbers as well, was submitted by Conly Schulte, that shows you

15    just what Tucker was paying Schulte for with that $16 million.

16         You know from the evidence that both defendants were

17    deeply involved in these litigations.  Indeed, within just one

18    year of joining Tucker's scheme, Muir got involved in these

19    litigations, and he played this role in helping to hide

20    Tucker's business, and this email showed you that, in speaking

21    to representatives in the state of Colorado in 2007, Muir took

22    on his role in this scheme to help Tucker remain the man behind

23    the curtain.

24         Let's turn to lie No. 2, lies about location.

25         Another way you know that Tucker and Muir knew that

1   they were breaking the law were the other lies they made to

2   customers about where they were located.  It was company

3   policy, set by Tucker and enforced by Muir, to lie about being

4   in Kansas.  As you saw during Grote's testimony, this policy

5   was in place at least as far back as 2005 with the managed

6   shell companies when Tucker coached employees on how to lie to

7   customers, stating that they were located in Nevada when they

8   were really in Kansas.

9          This email here is Tucker directly instructing Grote

10  to lie to customers and tell them that the call switch is

11  located in Kansas and they already explained why the Kansas

12  area code is coming up on caller ID when it's supposed to be in

13  Nevada.  The defendant directed the same type of lies for the

14  tribes to use them as cover.  Employees were forbidden to tell

15  customers that they were in Kansas.  Instead, they had to tell

16  customers Oklahoma or Nebraska, depending on which tribe and

17  the portfolio it was associated with.

18         And this policy of lying was so important that it was

19  grounds for termination.  You can see the conclusion here:  "Do

20  not disclose our actual location to customers."  Remember that

21  you heard from Kelly Rogers that lying to customers was one of

22  the reasons that she left the company.

23         Now, lying to thousands of customers on the grand

24  scale that was the Tucker enterprise created some problems.

25  One problem that you heard about is that sometimes customers on

1   the phone would begin to engage in conversations about weather

2   with the call center reps.  For a legitimate company, to engage

3   in small talk with customers about weather is not a big

4   problem.  But for Tucker's company, it was a big problem.

5   Talking about the weather in Kansas could alert a customer in

6   Oklahoma that the call center rep is not on the reservation in

7   Oklahoma that he or she said that they were.

8          This issue came up so much that Tucker's management

9   team had to make it a company policy to not talk about weather

10  to customers.  In fact, Crystal Grote went even further.  That

11  solution was to circulate weather forecasts for Miami,

12  Oklahoma, and Niobrara, Nebraska, daily so that call center

13  reps knew what the weather was like near the tribe that was

14  associated with the portfolio they were representing.  That way

15  the rep knew what the weather was like in the location that

16  they were pretending to be.

17         Why was location so important that Tucker and Muir

18  directed employees to lie about it?  Because Tucker and Muir

19  knew that if charging millions of people illegal interest rates

20  and saying they can't be sued because they are a tribe, they'd

21  better pretend to be located on tribal land.  So when, in

22  February 2011, the chief of the Modoc tells a reporter that the

23  payday loan business is located somewhere in Kansas, that's why

24  Muir specifically quotes what the chief said.  And when Blaine

25  responds, he says:  "Great.  Thanks, Chief."  You know why he

1    said that.  The chief was not supposed to disclose Kansas as

2    the real location of the business, because Kansas City is not

3    on a reservation.  That's evidence right there that they were

4    trying to hide their business, and that's why Muir advises the

5    Tuckers not to email about it outside his presence so that

6    anything they say is protected by the attorney-client

7    privilege.

8            Let's turn to lie No. 3.

9            You heard that the defendants suggest to you that they

10   believed that the loans they issued were regulated by tribal

11   law and not state law, but you know, based on the evidence,

12   that this is just another lie.  There is absolutely no evidence

13   that these defendants or anyone working for them actually tried

14   to enforce a single loan in tribal court.  In fact, you heard

15   the Modoc tribal judge didn't even know that the tribe was

16   engaged in payday lending.  On the contrary, they just wrote

17   them off at the first sign of trouble.  When a customer

18   complained about illegal interest rates, Muir advised that

19   balances be quietly written off when a customer complained.

20           And that's not the only example of the defendants'

21   handling of complaints, as you can see from this email here,

22   when Crystal Cram Grote is saying that Muir and she decided to

23   collect the principal.  And that same thing happened when

24   Athena Sanchez complained about illegal interest rates and the

25   New York AG's office got involved.  Her account got written

1    off.

2          You know that Tim Muir was in charge of the legal

3    department that made these decisions.  Think about that.  If

4    the defendants are making loans, but if their victim just

5    pushed back hard enough, they didn't even try to enforce those

6    loans, because even they knew that those loans wouldn't hold up

7    in court.  And why?  Any attempt to enforce them would expose

8    the true owners and managers of this business.

9          Let's go to lie No. 4, false statements to Intercept.

10          Around the same time that the false affidavits were

11   signed by Tucker in 2005, he submitted lies on an application

12   to Intercept, that loan processing company.  He lied on one

13   application for his company Pinion Management, which you heard

14   was a second-tier collections business, and he lied for another

15   company of his, Black Creek Capital Corp., one of the companies

16   you saw received millions of dollars from tribal bank accounts.

17          In these applications, Tucker lied about two important

18   things:  First, that he never filed for bankruptcy; and second,

19   that he had never been convicted of a crime.

20          You know both of those are lies.  As the parties have

21   agreed in a stipulation, Tucker was convicted of mail fraud in

22   federal court for misleading customers in order to obtain fees.

23   He falsely told clients that his company was owned by the

24   well-known banks, Chase, Lloyds and J.P. Morgan, and had access

25   to financing when, in fact, the company was owned by Tucker and

1    he didn't have any access to financing.  In other words, Tucker

2    lied to customers by telling them that his company was owned by

3    another company when it was really owned by him.  And he told

4    lies about who owned his company in order to get money from

5    customers.

6         Now, I expect the judge will instruct you that you may

7    not consider this evidence that Mr. Tucker committed the crimes

8    charged in the indictment, or that Mr. Tucker has any sort of

9    criminal propensity or bad character.  You can't use it for

10   that, but you can consider this prior conviction as evidence

11   that Tucker did know full well that in pretending to be a tribe

12   and lying about who owned and managed his companies, he was

13   knowingly evading the law and trying to mislead customers.

14        With respect to that bankruptcy lie, the parties have

15   also agreed that Tucker filed for personal bankruptcy in 1997.

16   And the parties have also agreed that under penalty of perjury

17   in that bankruptcy application, Tucker lied.  He failed to

18   disclose his position as president of National Leasing Service,

19   which ultimately became National Money Service, and he also

20   lied under penalty of perjury by failing to disclose that

21   Charles Hallinan had a secured claim against Tucker.  Again,

22   you can, and you should, consider these lies as further

23   evidence of Tucker's criminal intent.

24        Let's go to lie No. 5.

25        In 2004 and 2005, in the beginning of Tucker's

1    relationship with the tribes, he falsely told U.S. Bank that he

2    served as the secretary of three different tribal entities, one

3    for the Kickapoo, one for the Modoc and one for the Miami.  As

4    Russell Bradley, Troy Little Axe and Carolyn Williams all

5    testified, Tucker never served as secretary of any of those

6    tribal entities, nor did the powers of attorney he was given

7    authorize him to represent himself as secretary.

8            Think about that.  Tucker is not only claiming to be a

9    member of a Native-American tribe, he's claiming to be one of

10   its officials, just another example of Tucker lying every step

11   of the way to accomplish this crime.  And you also saw Muir

12   trying to help explain away these lies in the litigation

13   involving U.S. Bank when he testified yesterday.

14           Lie No. 6.

15           Almost four years after Tucker began using the tribes

16   as a cover, he sold his company Selling Source to London Bay

17   Capital in December 2007 for $90 million.  In signing that

18   agreement, Tucker represented that all of the Nevada shell

19   companies will continue to lend under their own names and not

20   in the names of tribal entities.

21           Members of the jury, this is important, because by

22   this time, in 2007, Tucker had been signing off representations

23   made in court that lending was being done through the tribal

24   entities.  But this agreement right here in front of you makes

25   it clear that Tucker was still lending through the Nevada shell

1    companies.  This is just another reason you know that the paper

2    that the defendants have been relying on throughout this case

3    is just that: paper.  You know by Tucker's own representations

4    right in front of you that that paper was meaningless.  When

5    Tucker stood to make money, like he did with Selling Source, he

6    didn't even follow his own lies that the tribes were the

7    lenders.  He did whatever he wanted in order to make more

8    money.

9            Lie No. 7.

10           In June 2008, within six months of those

11   representations in the Selling Source agreement, Tucker, Muir

12   and lawyers with Conly Schulte's firm came up with the idea to

13   draft paperwork to merge this company CLK, which was named

14   after a Mercedes model, into a new Miami tribal entity, which

15   Tucker named AMG after another Mercedes model.  You know what

16   the purpose of this so-called merger was.  It was to hide CLK

17   behind a tribe.  As every witness at trial has testified and as

18   Tucker himself told Brady in this email, there was no substance

19   to this merger.  It was just a name change, from one Mercedes

20   model to another.  There was no actual transfer of any assets,

21   just a piece of paper that said there was one.  All of the

22   operations of the Tucker enterprise were still controlled and

23   operated in Kansas City, and there does not appear to be a

24   dispute that no payment was made for the supposed merger until

25   two years later.

 1          Now, I want to talk for a moment about that payment.

 2     You saw that about two years after that merger took place,

 3     Tucker directed here that a check be written to himself for

 4     about $135,000 from the U.S. Bank account of AMG Services, an

 5     account you know from the evidence had been fully and totally

 6     under Tucker's control.  But you know that this check, this

 7     payment, didn't pay for anything.  Tucker was just writing a

 8     check to himself between two different bank accounts that he

 9     controlled.  This so-called payment was made to simply make it

10     appear that there had been an acquisition of Tucker's nontribal

11     company CLK by AMG.  And the person directing that the payment

12     be made was Tim Muir, so that he could falsely represent in

13     court that CLK had been acquired by the Miami tribe.  That was

14     the only reason that Muir wanted that check cut.

15          Another way you know that Tucker was lying about the

16     so-called merger is that in four separate applications to

17     Boardwalk Ferrari, late in 2010, Tucker represented that he was

18     employed as the chairman of CLK Management.

19          The best evidence that Tucker was lying to hide his

20     business is, again, that Tucker didn't even follow his own

21     lies.  When he was dealing with the state regulators, he had

22     his lawyers say that CLK doesn't exist, but when he was dealing

23     with the Ferrari dealer, he said he was employed as the

24     chairman of that business.

25          Lie No. 8.

1      You remember hearing testimony from a number of

2  witnesses about the settlement in 2010 with Charles Hallinan,

3  Tucker's long-term partner in payday lending.

4      Now, you heard Pete Smith testify that Charles

5  Hallinan sued Tucker and Tucker settled that lawsuit.  That was

6  a personal lawsuit.  Tucker agreed to pay $30 million to

7  Hallinan, which is part of a separate purchase agreement with

8  AMG, not with Tucker.  Tim Muir structured that $30 million

9  payment to come from the U.S. Bank account of AMG, which

10  supposedly belonged to the Miami.  And who signed off on that

11  $30 million payment on behalf of AMG?  Vice president Joseph

12  Ragman.  You've heard that name before, and you know that J.S.

13  Ragman was a fake person.  He never existed.  Tim Muir himself

14  admitted that he signed that name.

15      Let me pause there.  The general counsel of a

16  billion-dollar company signed the name of a fake person and

17  gave this fake person a fake title on a $30 million contract,

18  and the best explanation that he could give you was that he was

19  panicked because he couldn't get a signature page from Don

20  Brady?  Come on, ladies and gentlemen.  This is blatant fraud.

21      You also know that wasn't the only time Muir used that

22  fake name.  As Scott Mitchell testified, and Muir also

23  admitted, he told Mitchell to sign Mr. Ragman on contracts,

24  some of which were very large contracts.  As you saw document

25  after document, that name was being used for contracts in

1    website domain registrations so they would not come back to

2    Scott Tucker.  What kind of general counsel uses a fake person

3    to sign million-dollar settlements and contracts?  One who is

4    willing to lie to keep Tucker behind a curtain of lies.

5              Let's go now to lie No. 9.

6              You heard throughout this trial about the lawsuit

7    Scott Tucker v. AMG Services.  Just the title of this lawsuit

8    should give you pause.  It's Scott Tucker suing AMG, the

9    company that he goes to every day in the morning for work.

10   That lawsuit, like the payment structured for the Hallinan

11   settlement, was orchestrated by Tim Muir.  Muir came up with

12   the idea for the lawsuit.  Muir hired Pete Smith to represent

13   Tucker and file the papers.  Muir drafted the petition of the

14   lawsuit.  And Muir celebrated when that lawsuit was successful.

15             The real reason for this lawsuit was to keep Scott

16   Tucker from getting sued for charging illegal interest rates

17   through CLK.  To do this, the defendants used a court in Kansas

18   as a tool to bless that sham merger.  By getting the

19   certificate of merger filed retroactively, it made that merger

20   look real back in June 2008.  That also meant that Tucker could

21   claim that he was under the cover of a tribal entity since June

22   2008, even though there was no actual merger.

23             In order to accomplish this, Tim Muir, on behalf of

24   Tucker, had to tell more lies.  He had to make it seem that

25   this was a real or adverse lawsuit in which Tucker was suing

1    AMG because AMG failed to file a certificate of merger.  In the

2    draft petition that Muir sent over to Pete Smith, Muir lied

3    about several things: that Tucker could not execute any

4    documents on behalf of CLK absent authorization from AMG, even

5    though Tucker was, in fact, the person that controlled AMG.  He

6    said Tucker did not have any right of access to any of the

7    books and records of CLK.  He said that Tucker was, in fact,

8    the one in control of those books and records.  And he also

9    wrote that despite repeated requests, AMG failed or refused to

10   file a certificate of merger.

11        You know that never happened.  Even Conly Schulte

12   admitted to you that Muir made no requests of AMG before the

13   complaint was filed.  And Muir couldn't give you a straight

14   answer on how he made that request to Conly Schulte or whether

15   it was one or more than one request.  He also even ultimately

16   admitted that this could have been inaccurate.  This is an

17   admission that this petition was not true.

18        So what was not mentioned to Pete Smith or to the

19   Kansas court?  That Tim Muir was the general counsel for AMG

20   and initiated this lawsuit against AMG, as opposed to his

21   employer and client; that Scott Tucker was in the corner office

22   of AMG, with complete control and authority over its books and

23   records; and that AMG actually paid for this lawsuit against

24   itself.

25        Remember these checks that Tim Muir's law firm paid to

1    Pete Smith for this lawsuit?  It was structured this way so

2    that Pete Smith, who represented Tucker, would not realize that

3    the company he filed the lawsuit against actually paid his

4    bills.  And Pete Smith's fees were paid from the same AMG

5    account at U.S. Bank from which Tucker paid himself millions of

6    dollars in cash.  There's this cash from that account for the

7    Aspen home that paid for the title.  You see even more checks

8    that were signed on that same account.

9              All that money was money that Tucker used for the

10   Aspen home, and even the same account that he used to pay

11   himself for the CLK-AMG sham merger, right there.  That's that

12   check right in front of you.  All of those checks came from the

13   same U.S. Bank account.

14             And you know that Tucker and Muir both knew that they

15   had pulled a fast one on the Kansas court.  You saw those

16   emails between Tucker and Muir and Conly Schulte, who all

17   worked together to pull this off.  Here Tim Muir's telling

18   Scott Tucker that he'd just dumped untold liabilities which

19   could've gotten to millions or tens of millions of dollars.

20   Here he is talking about how this was the sexual chocolate of

21   his legal career, that he could just drop the mike and walk off

22   stage.  And below here talking about showing his aces.

23             Members of the jury, these are the words of people who

24   get away with telling lies to a court in order to protect

25   themselves from being sued by Americans who were cheated out of

1   hundreds and sometimes thousands of dollars each by the illegal

2   interest rates they were charging.

3           That brings us now to lie No. 10, the final lie that

4   we'll go through.

5           About six months after the Tucker v. AMG lawsuit in

6   July 2010, you heard about how Tucker's enterprise began to get

7   scrutinized more carefully.  There was an IRS audit of the

8   Miami tribe in 2011 during which Brady made false

9   representations that the Miami were 100 percent owners of the

10  lending company.  Those were the same false representations

11  that you heard made Allison Harris, a CPA with 30 years'

12  experience, leave the Miami tribe, because she knew the Miami

13  had no access to the books and records of the lending company.

14          Then there was that story that came out in September

15  2011 about the enterprise, which caused everyone in the tribe

16  to pay more attention to what was going on and to try to learn

17  more about the loan company, in case questions were asked.

18  Here you see one of those examples.  This is Troy Little Axe,

19  the sham president and CEO of the lending business for the

20  Modoc asking Tucker for information about the operational

21  guidelines for the loan company, so that he can answer

22  questions if he's asked.  You notice that he says here, "It's

23  been a while since we started this thing."

24          The defendants addressed that article that came out by

25  lying to employees.  They told employees that, like you, Scott

1    Tucker is just an employee of AMG.  And they he even told you

2    that Scott Tucker does not own or operate any online lending

3    business.  But you know from the evidence that, of course,

4    Tucker was operating the business.  That's a blatant lie.

5    There's no serious dispute that Scott Tucker operated an online

6    lending business and that he was, in fact, the key decision

7    maker for all aspects of the loan business.

8         Then, as time went on in 2011, more people began to

9    ask questions of Tucker, and he kept trying to find ways to

10   dodge them.  But even he didn't know how to answer simple

11   questions.  Here's a question he's asked:  "What is your

12   affiliation with online payday loan companies, and what, if

13   any, affiliation do they have with American Indian tribes?"

14   What was Tucker's answer to Tim Muir, his draft answer?  "Not

15   sure on how I would answer that one right now."

16        Then, in No. 4, he's asked, "What work do you perform

17   on reservations, and what percentage of your revenues goes to

18   Indian tribes?"  His answer to that one:  "All of the revenue

19   goes to owners; it initially does."

20        Ladies and gentlemen, this is another confession.  It

21   shows that Scott Tucker was using those bank accounts to hide

22   his money, and the fact that he can't answer simple questions

23   about what affiliation he has with the tribes shows you that he

24   was trying to hide something, and that he knew, and that he was

25   trying to hide it because he knew that what he was doing was

1  illegal.

2          THE COURT:  Let me pause for a second.

3          Ladies and gentlemen, Mr. Ravi has about a half an

4  hour, a little over half an hour left in his closing.

5          MR. RAVI:  Your Honor --

6          THE COURT:  I'm sorry?

7          MR. RAVI:  I think we had about an hour.

8          THE COURT:  I think we began at 10:15 and it's now

9  11:44.

10         Anyway, I was going to ask you, ladies and gentlemen,

11 would you like a break at this point, or do you want to keep

12 going for another half hour?  Keep going?

13         OK.  Keep going.  We're going to keep going.

14         MR. RAVI:  Now, the FTC investigation became public in

15 April 2012, which caused everyone to scramble, but none of this

16 kept Tucker from continuing to use and take his money from bank

17 accounts that on paper belonged to the tribes.  It's just that

18 now he needed a better paper trail, because the eyes of

19 investigators were on them, and that better paper trail was the

20 BA Services licensing agreement.  As Carolyn Williams, Doug

21 Lankford and Tom Gamble testified, Tucker got the tribes to

22 agree to pay millions of dollars to Tucker's BA Services

23 company in order to license a Tucker version of eCash software

24 for the lending company.

25         Let's listen now to Carolyn Williams and Don Brady

1    talk about that so-called licensing agreement.

2              (Audio played)

3              THE COURT:  Please adjust the volume.

4              (Audio played)

5              MR. RAVI:  As every witness for the Miami testified,

6    AMG, operated by Scott Tucker, had already been using this

7    eCash software for years.  So why did they, all of a sudden,

8    need to license software from Tucker?  Your common sense tells

9    you why, because again, Tucker needed a paper trail to take his

10   money out of tribal bank accounts, and that's just what he did.

11   In the end, Tucker was able to take over a hundred million

12   dollars of money from accounts that were supposedly held by

13   tribes, all under the cover of the BA Services licensing

14   agreement.

15             We're now done with the ten lies, ladies and

16   gentlemen.  Those are just ten different ways -- ten more

17   ways -- that you can find that the defendants acted for the

18   purpose of charging illegal interest rates.  They lied to

19   courts, regulators, banks, loan processers and customers.  They

20   also lied to third parties and their own employees.

21             Now, as you know, the Miami tribe hired counsel who

22   were not in Tucker's pocket.  The people in Tucker's pocket

23   were Schulte and Muir, but Miami then hired their independent

24   counsel after the FTC investigation, and the tribe realized

25   that it needed to start protecting itself rather than Tucker,

1    so they began to identify bank accounts that had been

2    controlled by Scott Tucker, and they discovered all of the

3    extravagant spending from those accounts.  Those bank accounts

4    contained tens of millions of dollars from Tucker's operations

5    that were left there by Tucker.

6          But eventually, with all these investigations going

7    on, Tucker couldn't just go and get at those tribal bank

8    accounts on his own.  If he did, he would essentially be

9    admitting that the money had been his all along and that he'd

10   been laundering it.  The fact that Tucker left money in bank

11   accounts to avoid getting caught is further evidence that he

12   knew he was breaking the law.  The Miami eventually terminated

13   their relationship with Tucker, and as you know, they entered

14   into a nonprosecution agreement with the government, in which

15   they agreed to forfeit the $48 million of the payday lending

16   money that they had found in bank accounts that Scott Tucker

17   had set up in their name.

18         So where are we?  We've gone through the three

19   different fronts that Tucker and Muir had used to hide their

20   crimes.  We've gone through most of their lies, but before we

21   stop talking about this first set of counts, there is still a

22   fourth front that Tucker used and that he attempted to use in

23   this very courtroom through the witnesses he called to pretend

24   that he wasn't willfully breaking the law, and that is Tucker's

25   use of lawyers to carry out this scheme.

1          As you heard, Tucker talked to lawyers and he used

2     them to carry out his plans, but like his other fronts, he

3     didn't do that because he wanted to follow the law.  He did

4     that because he knew that what he was doing was illegal, and he

5     wanted to make it appear that he wanted to follow the law, and

6     Tucker only got cover from lawyers after he had already begun

7     committing his crimes to be able to say later on that he sought

8     out lawyers' advice.

9          Let's first talk about Leonard S. Goodman.  You

10    remember him, how evasive he was on cross-examination.  To

11    start, the timing is important.  Remember that Tucker had been

12    lending under the cover of County Bank since as early as at

13    least 1998.  Then, for the first time, in November 2000, Tucker

14    decided to ask for legal advice regarding the County Bank

15    program.  It is, therefore, undisputed that Tucker only sought

16    this advice after he had already been using County Bank as a

17    front.  That alone tells you that Tucker wasn't honestly

18    relying on lawyers when he used County Bank because he used

19    County Bank for two years before he ever bothered to get

20    advice.

21         What's another way you know that Tucker was simply

22    using these lawyers as cover and not because he wanted to

23    follow the law?  Because Tucker was not even honest with the

24    lawyers that he used to paper his file.  You can see here that

25    Tucker flat out lied to Goodman and his partner regarding

1   National Money Service not having an office in Kansas, a lie

2   the lawyers passed on to Kansas regulators.

3           Let me pause.  Mr. Tucker has no burden to call any

4   witnesses in his defense, but here he chose to put on a person

5   to whom he lied about where his office was located.

6           Let's now turn to the lawyers that Tucker called

7   regarding the tribes.  The timing here, again, is important as

8   well.  Tucker did not receive any legal advice regarding tribes

9   until at least July 2003 when he first got that opinion letter

10  from Ellen Bachman.  But by that time, Tucker had already been

11  making payday loans at illegal interest rates for at least five

12  years.  That categorically means that he did not seek or obtain

13  legal advice prior to engaging in this conduct.  He did so only

14  after the fact, to find new ways to hide his conduct.

15          Second, not a single one of the letters that you saw

16  from those lawyers told Tucker that what he was actually doing

17  was legal.  In fact, it was just the opposite.  Every lawyer

18  told him that the tribes cannot simply be used as a front or

19  conduit.

20          This is Ellen Bachman's letter telling him that if the

21  tribes were used solely as a conduit, it would of course the

22  ability destroy for them to claim sovereign immunity.

23          Here's a letter from Cliff Cohen that specifically

24  told Tucker that based on what he knew of Tucker's business,

25  there could be a finding that no tribal enterprise is actually

1    conducting the lending business.  And even Conly Schulte, who

2    Tucker paid millions of dollars and was part of the scheme,

3    advised Tucker that the way Tucker was doing business did not

4    adequately reflect the tribes actually adding value to the

5    business.

6         Schulte also advised that the tribes can't simply

7    appear to be a front used to market exemption from state

8    regulation, which as you know from the evidence, is exactly

9    what Tucker was doing.  But Tucker did not attempt to follow

10   any of this advice, even from Conly Schulte.  He continued to

11   keep his business the way it was for more than a decade, with

12   him controlling and operating everything and the tribe

13   receiving their 1 percent.  And he did that because he didn't

14   want the tribes really to add any value.  He wanted to be the

15   one to make decisions over his lending company.

16        Finally, I just want to focus you on this email from

17   Cliff Cohen, that shows you, if you read, "my suggestions are

18   not limited to creating a bigger file; it has more to do with

19   substance than form."

20        Throughout this trial, Tucker has been trying to

21   convince you that because tribal corporations were formed and

22   tribal resolutions and ordinances were passed this somehow was

23   not a sham.  Use your common sense.  You know the difference

24   between form and substance, and so does Tucker.  He was

25   specifically advised on that in 2004, and yet he chose to

1    ignore that advice.  These lawyers are not a defense.  They're

2    simply more evidence of Tucker's guilty state of mind.

3         I want to now talk to you a little bit about Tim

4    Muir's testimony.  As the judge will instruct you, a defendant

5    has no obligation to present any evidence at all.  Only the

6    government has the burden of proof, and that's a burden that we

7    embrace.

8         Here, Timothy Muir made his choice to testify in his

9    defense and so you can, and should, scrutinize his testimony.

10        Now, you heard about all the advice that Scott Tucker

11   got, that he couldn't just use Indian tribes as a conduit for

12   his business.  Well, Muir sat through this entire trial and

13   heard all of the evidence showing that the tribes were exactly

14   just that, a conduit or a front.  So Muir got up on the witness

15   stand and he said the only thing he could, and he came up with

16   his own legal theory: that based on supposed Internet research

17   that he'd done, he believed the businesses were legal,

18   regardless of the fact that the tribes hadn't done anything.

19        But if he really believed that, ladies and gentlemen,

20   why was he involved in reviewing false affidavits claiming that

21   the tribes operated and managed the business on tribal lands?

22   If it didn't matter that Tucker played such an important role,

23   why was he helping hide Scott Tucker behind that curtain?

24        Now, Muir had an opportunity to try to go and explain

25   away all the mountains of evidence in this case.  He had an

1   opportunity to explain all the lies and incriminating

2   statements and all the emails he sent and received.  But

3   instead, he just glossed over the bad parts.  He gave no

4   explanations whatsoever for the incriminating things he did

5   say.  And when he was pressed to explain what he did on

6   cross-examination and during his testimony, his story fell

7   apart.

8           When Muir was asked the simple question of whether

9   Tucker operated the lending business, he couldn't even answer

10   that question.  He said it was a legal concept.  Every single

11   other witness in this case, lawyer or not, knew how to answer

12   that question.  It was Scott Tucker, but Muir didn't know how

13   to answer at first, so he dodged it.  Then, when he was asked

14   about whether it was a requirement that some act important to

15   the issuance of the loan take place on tribal land, Muir

16   initially said yes, but when he was asked that question ten

17   seconds later, he said no.  Muir couldn't figure out what

18   answer would best help him, so he switched gears from moment to

19   moment throughout his testimony.

20           Finally, when Muir was asked about some trademark

21   issues that he'd put to bed to sort of make it easier for the

22   tribes to pretend to be the lenders, Muir first said that he

23   didn't think the trademarks were a problem; that should be

24   corrected.  Then, when he realized that his answer didn't

25   really make any sense, Muir was forced to admit that he had to

1    change his answer.

2          Members of the jury, at the end of the day, the Tim

3    Muir that you saw on the stand is the same Tim Muir that you

4    saw in those emails, like the one in which he was holding an

5    annual meeting just to say they had one, or he was discussing

6    fake names in documents, or he's talking about dumping millions

7    in liabilities.  He was always twisting the facts in a way to

8    make it work, and that's how you know that his testimony is

9    just another cover-up for the crimes that he committed.

10          Going back to the elements, these are the four counts

11   for collection of unlawful debt, and I'm going to move on now

12   to the fraud counts.

13          These are the fraud counts and the instructions that

14   the judge will give you.

15          The issue here is whether there was a scheme to lie to

16   customers about the true cost of their loans and the identity

17   of the lender, and also whether the defendants were part of

18   that scheme.  Based on the evidence in this case, you know that

19   the answers to both of these questions has been proven beyond a

20   reasonable doubt.

21          You have seen and heard throughout this trial about

22   the four boxes on each of the loan disclosures called the Truth

23   In Lending Act, or TILA, boxes.  There are separate crimes

24   under the Truth In Lending Act that we'll go through when we

25   get to those counts, but for now, I'm focusing on the lies in

1    these TILA boxes as the basis for the fraud counts.

2           These boxes are supposed to provide the various

3    borrowers with important information about their loans.  For

4    example, here, for Richard Hamner, who you heard from on the

5    first day of trial, the defendant charged $90 for a $300 loan

6    with the total payment being $390.  It's clear as day how much

7    he needed to pay back.  There's no ambiguity whatsoever.  But

8    you know that the loans issued by the defendant's company

9    didn't actually work the way they were represented in these

10   boxes.  They were specifically structured so that the loan

11   would be automatically renewed, with only the finance charge

12   being withdrawn during the first four pay periods and with no

13   principal being paid until the fifth renewal.

14          You see how it worked here for Amy Weatherwax, where

15   they were taking out only the $150 finance charge for her $500

16   loan that was supposed to cost a total of $650.  But as you can

17   see here, she ended up paying $1,860, and the same thing

18   happened to each of the victims that you saw and heard from

19   throughout this case.  None of them agreed to have their loan

20   terms automatically renewed.  None of them agreed to pay more

21   than the total amount that the defendant's loan disclosures

22   said it would cost them.  And you already know from the

23   evidence that we've gone through that Tucker and Muir knew that

24   customers didn't understand their loan disclosures.

25          In emails that were sent to Tucker from as early as

1    2006, Tucker was specifically told that 90 percent of the

2    issues we have with customers stem from them not understanding

3    the process of renewals and pay downs; they were constantly

4    battling with them.  Of course Tucker knew that customers were

5    being misled about renewals, and Tim Muir did too.  He admitted

6    that on the stand, that he knew that customers were being

7    confused by the renewal process.

8         But despite the number of complaints increasing over

9    the years, Tucker and Muir did not make any changes to the

10   automatic renewal structure of the loans, and they did not even

11   change the confusing language under the TILA boxes, not at all,

12   because Tucker and Muir intended to deceive customers about

13   these loan terms.  You know that because when they wanted to,

14   they could easily explain them, like they did for their own

15   employees.  But then this is what they gave to customers.

16        The defendants could have given the same clear

17   explanation to their victims, but they didn't, and you know

18   why.  As Crystal Grote testified, Tucker and his management

19   team specifically encouraged employees to get customers to pay

20   down their loans over time rather than pay the loan off in

21   full.  That was because they made more money with the automatic

22   renewals.  This goes to the overriding theme of the defendants'

23   conduct.  Every action they took, or did not take, was

24   calculated to make more money.

25        Simply put, the TILA boxes were false.  Muir admitted

1    this on the stand.  He acknowledged that the loan disclosures

2    for a $300 loan always said that the total of payments was

3    $390.  Then when Muir was asked what the total of payments

4    actually was, he admitted that, under the terms of the loan, it

5    would be $975.

6            You also know from his testimony that he was aware

7    that customers were misled by those boxes and that he, as the

8    general counsel, could have proposed changes but chose not to

9    do so.  That shows you that he intended to deceive customers,

10   and that makes him guilty of fraud.  It's that simple.

11           Now, the defendants have tried to point to that fine

12   print language under the TILA boxes to try to explain the

13   baldfaced lies.

14           First, even if that language was crystal clear, which

15   it wasn't, it doesn't make the disclosures in the boxes any

16   less false, and borrowers had a right to rely on those TILA

17   boxes to figure out how much loans would cost.  Indeed, that's

18   the reason for the boxes in the first place.  You've seen that

19   fine print.  You've read it, and it is far from clear.  It

20   simply doesn't make sense.  That language doesn't explain to

21   anyone that the loans will be automatically renewed four times

22   without any pay down in principal, and it does not clearly

23   explain how a customer could avoid having that happen.  The

24   fact that the defendants agreed to bury all that confusing

25   language below the TILA boxes just confirms, again, that they

1    were lying.

2         Finally, Richard Hamner, Amy Weatherwax and Andy

3    Leibenguth testified that they were told that they had to

4    continue to pay money to the defendant's business because it

5    was owned by a tribe and that it was not subject to state law.

6    You know by now that those statements were blatantly false.

7    I'm not going to go through all the evidence again.  That's

8    another lie, and as you know, many of the defendants' victims

9    knew that state law was supposed to protect them, and they even

10   included those state laws in their complaints.  So the

11   defendants just lied and said it doesn't apply.

12        You know this to be true because of scripts that were

13   approved by Muir, which employees were told to tell customers

14   that they had to pay back their loans, even if they were in

15   violation of state law, because the defendant's company was

16   owned by a tribe.  This was company policy, and you saw this

17   email that was sent to Mr. Leibenguth about how the company

18   told him that his loan agreement was governed by the laws of

19   the Santee Sioux.

20        (Continued on next page)

21

22

23

24

25

1          MR. RAVI:  As Muir admitted, the loan disclosures

2     prior to 2011 didn't even mention a tribe or a tribal

3     corporation, so there was no way for a customer to know that

4     they were agreeing to tribal law.  This caused victims like

5     Richard Hamner to feel like they were trapped.

6          The defendants surely knew that their victims couldn't

7     afford a lawyer to help them with these problems.  Just more

8     evidence that you know the defendants were lying about their

9     loan terms.

10          Based on this evidence regarding the fraud counts,

11     ladies and gentlemen, and everything else that you have seen

12     throughout this trial, there is overwhelming evidence that the

13     defendants lied to customers about the true cost of the loans

14     and about being owned by a tribe in order to trick them into

15     paying more money.

16          I am going to turn now to the money laundering counts.

17     That's the third category of crimes that we have talked about.

18          Now, if you find the defendants committed wire fraud,

19     which we submit you should, based on the evidence that's been

20     presented, then the defendants are also guilty of money

21     laundering.

22          These are the instructions on money laundering in

23     front of you.  The main dispute in these elements is the fourth

24     element, whether the defendants engaged in a financial

25     transaction with the intent to promote the carrying on of

1    specified unlawful activity, namely, advertising and generating

2    leads for in a fund, new payday loans.

3            As Judge Castel, I expect, will instruct you,

4    specified unlawful activity refers to wire fraud.

5            So there are two types of money laundering:  Promotion

6    money laundering and concealment money laundering.

7            Let's go through first how the defendants are guilty

8    of promotion money laundering.

9            Plain and simple, the money that Tucker's business

10   received from customers by defrauding them was used to fund new

11   loan transactions, meaning new frauds.

12           As Ms. Espinoza testified about this slide from her

13   presentation, loan payments that came in from payment

14   processors, such as Intercept, were deposited into bank

15   accounts under Tucker's control.  And then that same money was

16   used to fund new loans.

17           And these transactions happened on a daily basis.  For

18   example, here in April 2013, for one of the bank accounts, in

19   the name of Red Cedar, about $8.7 million came into the

20   account, which represents the loan payments, and about $6.1

21   million went out of the account, which represents funding for

22   new loans.

23           You know from the evidence we just discussed regarding

24   the wire fraud, the money coming in was money that was paid to

25   customers that were lied to about their loan terms.  And

1   because there were no changes to any of the loan disclosures

2   through August 2013, you know that the new loans were funded

3   using the same money that was extended on the basis of those

4   same misleading loan disclosures.

5           Both Tucker and Muir were integral to these new loans

6   being funded, and that's why they are guilty of promotion of

7   money laundering.

8           You also know that they are guilty of promotion of

9   money laundering for another reason.  Here you see Ms.

10  Espinoza's presentation about $412 million that was given to

11  Selling Source.

12          As you heard from Alton Irby's testimony, Selling

13  Source, specifically, Partner Weekly, was involved in selling

14  leads to the defendants' business so that they could issue new

15  loans to these borrowers.  Because the money used to pay

16  Partner Weekly came from the portfolio accounts that received

17  the same loan payments that were obtained through the wire

18  fraud, the money that was paid to Partner Weekly was therefore

19  used to promote the fraud by obtaining the names of new

20  borrowers to defraud.

21          Both Tucker and Muir facilitated these payments that

22  were being made to Partner Weekly in order to buy leads to fund

23  new fraudulent loans.  This evidence proves that the defendants

24  are guilty beyond a reasonable doubt of promotion money

25  laundering.

1          Let's now turn to concealment money laundering.

2          Concealment money laundering is what you may think of

3     when you hear about money laundering.  It's about hiding the

4     profits from crimes.  It also has four elements, and again,

5     only the third element is really in dispute.  Excuse me.  The

6     fourth element is really in dispute.  And that requires that

7     the defendant engaged in a financial transaction knowing that

8     the transaction was designed to conceal or disguise the nature,

9     location, source, ownership, or control of the proceeds of the

10    wire fraud.

11         Members of the jury, there is overwhelming evidence of

12    the defendants' guilt when it comes to concealment money

13    laundering.  Earlier in the summation we talked about the

14    lengths that the defendants took to use tribes as fronts in

15    order to hide Mr. Tucker's business and his money.  One big

16    part of that whole scheme was Tucker's use of bank accounts

17    that were in the names of tribal entities, but that were

18    actually controlled by Tucker and used as his own accounts.

19         Ms. Espinoza showed you that Tucker used those

20    accounts like they were his own piggy banks, with over $10

21    million going to his brother Blaine and over $380 million going

22    to himself and his wife and their related entities.  As you

23    know, Tucker spent that money on everything from Ferraris and

24    his racing team, to paying for his jet expenses and his

25    personal taxes.

1      There is no real dispute regarding any of the

2  spending, which together with all the other evidence we went

3  through shows you that Tucker, and only Tucker, was fully in

4  control of these accounts, no matter what name was on them.

5  His use of these accounts for personal spending is devastating,

6  ladies and gentlemen, for concealment money laundering.

7      I want to play now briefly Government Exhibit 410,

8  which shows you that you know it's true because Don Brady told

9  you it was true.

10      (Audiotape played)

11      MR. RAVI:  Don Brady told you that the point of

12  Tucker's money sitting in bank accounts, nominally held by the

13  Miami, was to launder it.  If Don Brady understood that, you

14  know that Tucker and Muir did too.  They are the ones who set

15  it up.  But let's go through a couple of examples of how you

16  know that Tucker and Muir are guilty.

17      As Ms. Espinoza testified, Tucker bought a Ferrari for

18  $300,000 in February of 2011.  But in order to pay for that

19  Ferrari, he didn't just cut a check from his personal bank

20  account.  He cut a check from five different tribal accounts,

21  in the amount of $100,000 each, on February 24, 2011, and then

22  he deposited that into a Level 5 Motorsports account.  You can

23  see Scott Tucker's signature.  Then the very next day, he cut a

24  check from the Motorsports account to Boardwalk Ferrari for

25  $300,000.

1        Ladies and gentlemen, there is only one reason why

2   Tucker funneled the money through the Level 5 account rather

3   than paying Boardwalk Ferrari directly from the portfolio

4   accounts.  Use your common sense.  Because Tucker was trying to

5   conceal the fact that $300,000 for his Ferrari was coming from

6   accounts that were supposedly owned by tribes, but they were

7   really owned and controlled by him.

8        Finally, another example of concealing money

9   laundering are those checks that were cut to Pete Smith's law

10  firm for the *Tucker v. AMG* lawsuit.  Within days of Muir

11  cutting those checks, Tucker signed checks from AMG's bank

12  account to Muir's law firm for the exact same amount.  These

13  payments to Pete Smith did not come directly from AMG for a

14  simple reason.  It would have raised suspicion that AMG was

15  paying a lawyer to file a lawsuit against itself.  So Tucker

16  and Muir came up with the solution, funnel the money through

17  Muir's law firm to disguise the source of the funds, and that's

18  what they did.

19       Based on all of this evidence, the defendants are also

20  guilty of concealment money laundering, as well as the

21  conspiracies to commit money laundering.

22       So we have gone through the first three categories of

23  crimes.  We just have one more.  The Truth in Lending Act

24  violations.

25       There is one count here for each of the five loan

1    portfolios you have heard about throughout this trial.  And

2    Judge Castel will instruct you, under TILA, loan disclosures

3    must accurately reflect the terms of the loans.  If the

4    defendants knowingly and willfully gave materially false and

5    inaccurate information regarding the finance charges and the

6    total payments for these loans, then they are guilty of the

7    TILA counts as well.

8            Unlike the fraud count, there is no specific intent to

9    defraud that is required for these.  In other words, you don't

10   need to make a finding that the defendants acted to deceive

11   customers.  All you need to find is that those TILA boxes were

12   false.

13           You know from the evidence that we have already gone

14   through that, of course, they lied about that information and

15   that they knew it was false.  End of story.  The defendants are

16   guilty of these five counts as well beyond a reasonable doubt.

17           Now, at the end of the verdict sheet, you will see

18   another question that you need to answer if you find the

19   defendants guilty of Counts Two through Four.  This question

20   asks whether the government has proven beyond a reasonable

21   doubt that, at the time of the collection of any of the loans

22   that you found as the basis of a guilty verdict on Counts Two

23   through Four, that the lender in fact was Defendant Scott

24   Tucker or an entity owned or controlled by him.  You know what

25   the answer is to this question, and you know that the answer is

1    yes, an obvious one.

2          Here below on this slide are some of the factors that

3    the judge will provide to you in the instructions that you

4    should consider when you're determining that Scott Tucker was

5    the lender.  And you know, again, that the answer here is yes.

6          Tucker was the initial source of money for the loans.

7    You know that from the agreements themselves.  No one else put

8    a single dollar up for any of the loans at issue in this trial.

9          Tucker, and only Tucker, took on the risk of

10   nonpayment of the loans.  That can't reasonably be disputed.

11         And no one else but Tucker directed the day-to-day

12   operations and activities of the Tucker enterprise.  He made

13   all the lending decisions.  He controlled the bank accounts.

14   He made all the profit, after the tribes were paid their 1

15   percent.  He hired and fired employees.  He maintained the

16   books and records.  And he managed advertising and solicitation

17   of customers, as well as third party relationships.

18         Every single one of these factors point to yes.

19         Members of the jury, you have listened to me patiently

20   as we have gone through all of this evidence.  I am going to

21   sit down very soon.  Let me just remind you of where we

22   started.  I told you that this is a simple case at heart.

23   Tucker and Muir cheated millions of hard-working Americans out

24   of billions of dollars by charging them illegal interest rates

25   and lying to them about the true cost of their loans.  And

because they knew what they were doing was illegal, they used front after front, sham after sham, and lie after lie to cover up their identity, hide their business, and launder their money. There is simply overwhelming evidence of their guilt for all these crimes.

I would like to leave you with an image in your head. Think back to when Scott Mitchell told you about that tank that Scott Tucker had bought for Muir during the course of the Colorado state litigation. That tank was so big that it came in on a semi and cars had to be moved to park it. There was an inscription on that tank, that I am sure you remember, that Tucker had put there for Muir on this gift. It read, "FUMAGFST." You know what that means. FU, Mr. Attorney General, from Scott Tucker.

Ladies and gentlemen, these two men never elected to follow the law. Instead, they intentionally broke the law, they mocked the law, and they hid from the law. And they did all of that in order to cheat hard-working Americans out of millions of dollars.

If you look at all of the evidence you have seen and heard, and you weigh it and you apply your common sense to the facts in front of you, you will reach the only verdict that is consistent with the evidence, the law and your common sense: That the defendants here are guilty as charged.

THE COURT: Thank you, Mr. Ravi.

1      Ladies and gentlemen, we will take a ten-minute break.

2  You're still not allowed to discuss the case.  There is more to

3  come, in terms of the closing arguments, and we will pick up in

4  ten minutes.

5      I had hoped that your lunch might be here already.  I

6  am advised it's not.  But what we will do is we will do Mr.

7  Tucker's summation.  Then we will break for a short lunch

8  period today, because your lunch will be in the jury room, and

9  I don't want anybody to get ingestion, maybe a half hour or

10 something like that, and then we will pick up with Mr. Muir's

11 closing argument.  And then, as I indicated, there will be a

12 short rebuttal from the government.

13      All right.  Thank you.

14      (Jury exits courtroom)

15      THE COURT:  I am advised that the jurors' lunch has

16 arrived.  I am suspecting that the request is that they be

17 allowed to eat lunch before beginning the defendants'

18 summations.  If the defendants have a preference that they

19 would rather start right now, that's fine with me also.

20      MR. GINSBERG:  Actually, I would.

21      THE COURT:  Prefer to start right now?

22      MR. GINSBERG:  If you want to explain to the jury.  I

23 don't want the jury to be hungry in the middle of my summation.

24      THE COURT:  I don't think an explanation is what is

25 called for.  I told them it was a ten-minute recess.  So one

1     moment, please.

2               (Pause)

3               THE COURT:  Bring our jury in, please.

4               (Jury present)

5               THE COURT:  Mr. Ginsberg, you may proceed when you're

6     ready.

7               MR. GINSBERG:  Thank you, your Honor.

8               Good afternoon.

9               First, after hearing the government's summation, I

10    just want to begin by saying this is anything but a simple

11    case.  We have been here for four weeks, heard 25 witnesses, a

12    lot of testimony, a lot of documents, a lot of issues.  It's

13    not simple.  The government may want to make it appear simple

14    so that you don't look at all of the evidence in the case and

15    think about all the testimony in the case, but it's not simple.

16              Before I go on to the things I want to say about the

17    evidence and testimony, you have been thanked many times during

18    the course of this trial, particularly by the judge, for the

19    attention you have been paying to this case.  We all sit here

20    and we look over at you.  You look over at us.  We don't really

21    know each other that well.  We don't know what you're thinking.

22    You don't know what we are thinking, except for when we are up

23    there asking questions.  So it's hard to judge sometimes what

24    we are doing, what's taking place, how it's affecting

25    everybody.

1          But the most important thing is that we give you our

2      thanks, because without you, without jurors who are willing to

3      serve, without jurors who were chosen because they can be fair

4      in a case like this, all the rules that we have that apply to

5      trials -- the fact that defendants are presumed to be innocent,

6      the fact that the government has to prove each count and each

7      element beyond a reasonable doubt -- all of those rules and

8      others mean nothing.  They come from, really, the Constitution,

9      at the heart of it, but now you are the Constitution.  You give

10     life to the Constitution by sitting here patiently listening

11     and ultimately making a decision.  Without that, without people

12     like yourselves doing that, those concepts would have no real

13     meaning.

14         So we all thank you for everything that you have given

15     to us, the time, the patience and the attention.

16         Now, there are things that you heard during the course

17     of this trial about Scott Tucker that you may not particularly

18     like, and I'm not talking about proof about the charges

19     themselves in this case.  I am talking about things that you

20     heard about past events, maybe pictures or discussions of

21     tanks, which we just heard about, or cars, or planes, or

22     houses.  But that's not a substitute for evidence and proof

23     beyond a reasonable doubt.

24         Frankly, a lot of that are distractions from the real

25     evidence.  It doesn't mean because someone made a lot of money

1    that he is guilty of a crime.  It doesn't mean, as the judge

2    has told you, and he will tell you again during jury

3    instructions, that because in the past he has done some things

4    that were wrong, he is guilty of the crimes charged in this

5    case.  This is not about whether or not you like Scott Tucker,

6    whether you like the way he lived, or the things that he had,

7    or whether he was boastful or aggressive.  This is about

8    evidence and proof.

9         You have to, as you told us at the beginning, you have

10   to focus on what has been presented to you, and particularly

11   focus on whether the government has proven beyond a reasonable

12   doubt that Scott Tucker is guilty of each of the charges and

13   the elements of the charges.  And the judge will explain that

14   to you.

15        You will also hear, as you have heard to some degree

16   already, when the judge charges you on the law, that there are

17   various defenses to the charges in this case.  Beside the fact

18   that the government always has to prove the defendant's guilt

19   beyond a reasonable doubt, you have heard during the course of

20   this trial about lawyers, many lawyers that Scott Tucker

21   consulted with, beginning from Leonard Goodman and going up

22   through Tim Muir.

23        You have heard what advice he got.  You have heard

24   what he relied upon.  And also, and probably most importantly,

25   whatever took place in this case, however aggressive it was,

1    however much money Mr. Tucker earned from the business, that

2    does not make him guilty of the charges.  And he had no intent,

3    no intent to deceive or defraud.  He did things that were

4    inappropriate.  There were documents signed that probably

5    shouldn't have been signed.  There were e-mails written with

6    things said that didn't sound so terrific.  There was bragging.

7    There was boasting.  But again, that does not prove that he is

8    guilty of the charges in this case.

9            But I think what is really critical, the government

10   talked about some of the witnesses who testified here, and the

11   government chose which witnesses they wanted to call.  They

12   chose which witnesses they were willing to give cooperation

13   agreements to.  They chose to give an agreement to the Miami

14   tribe so that the Miami tribe, or the entities under the Miami

15   tribe, would not be prosecuted.  They chose to do those things,

16   and they chose to call those witnesses.  And what they are

17   asking you to do now, as they went through their summation, and

18   frankly during the course of the case, is they have almost

19   asked you to pick witnesses like Adrian Rubin, Carolyn

20   Williams, Crystal Grote, and Scott Mitchell, four examples, as

21   people who they ask you to believe.  They ask you to believe

22   that those witnesses are honest, truthful people, who testified

23   in an honest, truthful way when they got on the witness stand.

24           And then, on top of that, what they suggested in their

25   summation is that Leonard Goodman, a 75-year-old retired

1    lawyer, Cliff Cohen, Conly Schulte, the defense witnesses,

2    somehow were all part of this grand conspiracy.  Because there

3    is no way you can see it otherwise.  If they are telling you

4    that Adrian Rubin is truthful about County Bank, and he claims

5    that the County Bank was running a fraudulent lending

6    operation, then what does that make Leonard Goodman?  It makes

7    him a liar.  It makes him part of the conspiracy.

8           So they are asking you to believe those witnesses that

9    they put up, who we know from their past and from the testimony

10   in this case are not honest, truthful, believable people.  And

11   you can't walk away from that.  We didn't give those

12   cooperation agreements out.  We didn't tell Crystal Grote,

13   after four years of speaking to her attorneys and threatening

14   her to bring all the charges that were brought in this case

15   against Mr. Tucker and Mr. Muir, we didn't tell her, well,

16   after four years now, we will make a better deal with you,

17   because we want you to testify.  So what we will do is if you

18   agree to plead guilty to one charge, that carries a lesser

19   penalty, and we will drop the forfeiture allegation that was in

20   the first proposed cooperation agreement, if you will agree to

21   that, then we will sign you up as a cooperator.

22          That was a pretty good bargain for her, a pretty big

23   motive and incentive.  Instead of facing all those charges that

24   were put up here on the screen in front of you, the 14 charges,

25   she has one charge.

1              Adrian Rubin, I don't know what you can say about him.

2    The government comes up here now and wants you to believe what

3    he said about the County Bank model, when not only was Leonard

4    Goodman a witness, who came from a practice in a big firm in

5    Philadelphia, but if he is lying, and he is part of this

6    conspiracy, then all the people that Leonard Goodman worked

7    with at the County Bank -- the president, the compliance

8    officer, the regulators -- were they all part of that too?  Are

9    we supposed to believe Adrian Rubin's word?  And that's where

10   the government begins.  They start off talking about the County

11   Bank model being fraudulent, and then they take you right up to

12   the end.

13             Well, it wasn't fraudulent.  You heard that there are

14   rules that permitted the County Bank to make the loans that it

15   made.  You saw the agreements.  These weren't agreements

16   written by Scott Tucker and given to the bank.  These were

17   agreements that the bank prepared.  These were agreements that

18   required compliance with the bank's rules and regulations.

19             But Adrian Rubin, a man who said for 30 years he has

20   had a problem with honesty, is who they put up here to start

21   off their case and to begin this progression of telling you how

22   all of these things, these three different models, were

23   illegal.  Can you really believe anything Adrian Rubin says?

24             And they had him on the witness stand for a long time.

25   Partly because he had done so many bad things in the past, it

1    took a while just to get through that part of his testimony.

2    Don't forget, he is the one who told us how precious his

3    children were to him, and then got his own sons involved in a

4    credit card scheme.  So can he really be believed?  If he put

5    his own children in harm's way, deceived them, used his

6    in-laws' names, his best friends' names to do the things that

7    he did, and now you're being asked, believe him because he

8    signed a cooperation agreement.

9         And it's not the first time he has gotten a

10   cooperation agreement.  This is the way that man operates.  He

11   operates by committing crimes and then running to the

12   government and saying, well, I'll cooperate, I'll help you out,

13   and he gets his deal.  And the first time he served a year and

14   a day and he told the judge how he is going to change his life.

15   And as he was telling the judge that, he was thinking of his

16   next scheme.  And then he got involved in one crime after

17   another.  And then he came back to the government, after he was

18   charged again, to get a cooperation agreement again.  Why?

19   Because he is a truth-teller?  Because he is an honest man?

20   No.  Because he is a desperate man.

21        And he sat on that witness stand, and maybe you had a

22   different view or impression than I did of him, but he sat

23   there, I think he had a decent tan, he looked a little smug.

24   He told us that even though he has been convicted now twice,

25   even though he had forfeited money because of his tax problems

1    and other problems, he was still a relatively wealthy man.  So

2    for all we know, he is just going to continue to do it.

3    Commits crimes, makes deals, keeps money, keeps going on, and

4    then gets up here on the witness stand.  He is the biggest

5    example of somebody who is not a truth-teller.

6          There was also Carolyn Williams, who appeared to be

7    telling this sympathetic story about how she got this job with

8    Don Brady, and because she sat outside of his office in a

9    chair, could overhear conversations, and would occasionally

10   look at documents.  But when she was asked on

11   cross-examination, did you read them, did you pay attention?

12   No.  I saw a letter of intent, but I didn't really pay

13   attention to what it said.  I saw a service agreement, but I

14   really didn't pay attention to what it said.

15         And she testified that from 2003 to 2005, while she

16   was working there, she developed this view that there was

17   something wrong with the lending operation.  She knew almost

18   nothing about it.  And when on cross-examination she was

19   pressed to answer about what she saw, what she knew, what

20   meeting she attended, she didn't know very much.  She didn't

21   pay attention to the documents.  She didn't attend meetings.

22   And in fact, she all of a sudden, like many of the other

23   witnesses on cross-examination, all of a sudden her answers

24   were, well, that was 2003 to 2005, it's a long time ago.  I

25   really can't remember it that well.

1          That's not what she said on direct examination.  And

2     why does that happen?  Because witnesses sit and prepare with

3     the government and they know what they are going to be asked,

4     and on cross-examination, when they don't know what the

5     questions are going to be, or they don't have the answers, the

6     truthful answers, or they are getting asked questions that are

7     going to back them into a corner, the first thing they always

8     say is, well, that was a long time ago, I just don't recall.

9     Which is exactly what she did.  And it's all in the transcript.

10    No problem on direct examination, big problem on

11    cross-examination.  And I will get back to talking about her a

12    little bit later.

13         Crystal Grote.  Crystal Grote is someone who also got

14    a cooperation agreement, and she got that cooperation agreement

15    because she made a false statement and lied.  And that lie was

16    about the weather reports.  And the government talked about it

17    in summation as if that was a business-wide issue that

18    everybody was doing, when in fact she told us an employee in

19    her group came to her, gave her this idea about the weather

20    reports, and she said, I think that's a great idea, and she

21    started telling other people to do that same thing.  Not the

22    other groups, not the other hundreds of people who were working

23    there, but Crystal Grote did that.

24         Now she comes on the witness stand and tells us, Oh,

25    this was all scam, sham, fraudulent, embarrassing to her.  So

1    what is she doing when she is working there?  Now it's

2    different.  Why is it different?  She got her cooperation

3    agreement.  She got her bargain.  All those other charges

4    disappeared.

5            Finally, for purposes of making this comparison, I am

6    not sure I ever saw a witness like Scott Mitchell before, who

7    the government called, the government prepared, went over his

8    testimony with him, met with him for hours.  He gets on the

9    witness stand.  He tells you that he was working since about

10   2004 at Scott Tucker's companies.  He tells you all the things

11   that he learned and saw and heard while he was there during

12   2004 and 2005 and 2006, and how he knew how the business was

13   being operated and the things that were being done wrong.

14           And then on cross-examination he is asked a very

15   simple question:  Is it possible that you didn't begin working

16   there until July of 2007?  And what's his answer?  Yeah, it's

17   possible.  So it's possible that all the things you just told

18   us from the witness stand, after being prepared to testify,

19   that you saw and heard between 2004 and 2007, you actually

20   never heard, never saw, because you weren't even there?  And

21   what was his answer?  Yeah, that's possible.

22           How does something like that even happen?  How does a

23   witness like that even get on to the witness stand?  Did he not

24   tell the government that?  Did nobody realize that he wasn't

25   working there for those three years?  Was it OK to put him up

1    there and lie about all these things he is saying, about the

2    company that was bad, and he wasn't even there to hear it or

3    see it?

4           Those are government witnesses.  And if there was no

5    such thing as cross-examination, you would have never known

6    that he wasn't there.  If the government just had the right to

7    put up a witness and let him testify, nobody asked him more

8    questions, it would have been out there for you to accept that

9    he saw and did all those things, when we now know he didn't.

10          And, frankly, when he got off the stand, the way he

11   walked out was like he didn't have a care in the world, and so

12   what, I just got up there and made up three years of my life

13   and pieces of evidence, in a trial, in a federal courthouse,

14   where people are being accused of crimes.

15          I didn't call him as a witness.  I didn't prepare him

16   as a witness.  I didn't go over his background with him.  I

17   didn't determine when he started working there.  So what is

18   that?  It's another witness who is not believable.  You can't

19   believe a thing he said.  But instead, the government takes

20   witnesses like that and wants to tell you that witnesses that

21   were called by the defense -- Goodman, maybe even Cliff Cohen,

22   Conly Schulte, Chief Lankford -- you shouldn't believe them.

23   Why?  Mr. Goodman testified without immunity.  Chief Lankford

24   testified without immunity.  Conly Schulte testified without

25   immunity.  Derek Douglas testified without immunity.  Meaning

1   the government didn't give them protection and say, don't

2   worry, get up there and testify and you won't be charged with

3   any crimes.  They testified without any of that protection, and

4   they told you what happened, what they did.  And I suggest they

5   told you the truth.

6         Now, if you think that Adrian Rubin is more believable

7   than Leonard Goodman and the County Bank lending process was a

8   sham, I don't know if there is much more I can say to convince

9   you these charges and this case hasn't been proven beyond a

10  reasonable doubt.

11        How do you take two people like that, so different,

12  and be asked to believe an Adrian Rubin and not Leonard

13  Goodman?  How do you do that?  Because you want it to fit your

14  theory.  How do you forget about all the memos that were

15  written by the County Bank saying, this is our criteria, this

16  is what you have to follow.  Yes, we are only going to take 5

17  percent and you can have 95 percent.  That's a business

18  decision.  That's a business deal.  It doesn't make it illegal

19  or improper.  And you heard even from the government that

20  banks, because of certain regulations, are allowed to charge

21  rates to people in other states, depending on what the rate is

22  in their own state, in Delaware.

23        One final thing about Adrian Rubin.  For some reason

24  he wasn't asked to plead guilty to perjury, even though he

25  admitted to us that he committed perjury on two separate

1    occasions.  One was in a deposition, which is bad enough, but

2    the other one was at a trial in front of a judge, where he got

3    on the witness stand, swore to tell the truth, and lied.  So

4    why is it any different here?  You think because there is a

5    jury he is going to change the way he operates?  People like

6    that don't change.  If you're going to sit there and lie to a

7    judge's face, you will sit there and lie to a jury's face.  And

8    you will do it smugly, with a nice little tan, maybe because he

9    still has his house in Florida.

10            Now, I want to talk briefly about the customers.  We

11   are not unsympathetic sitting here and listening to the

12   testimony.  We are not unsympathetic to the financial and

13   emotional effect that repayment of the money borrowed had on

14   these people.  It wasn't pleasant to hear.  It wasn't fun to

15   hear.  But you were shown all the documents that they received.

16   You were shown the TILA box.  You were shown what it says right

17   under the TILA box.  You were shown documents that talked about

18   renewals right under the TILA box.  You were shown documents

19   that said they could cancel within one full business day after

20   they received the money.  You were shown the "congratulations"

21   e-mail with further explanation of the renewals.  But almost to

22   a person, each one of those customers said, Well, I didn't

23   really read the whole thing.  I didn't really pay attention to

24   the whole thing.  I don't remember if I received that e-mail.

25            And why did they do that?  Not because they were being

1   misled and fooled, but because for their financial needs and

2   reasons, they wanted to borrow the money.  And so they went

3   ahead and did it, even though the information was right there

4   for them to see.  It wasn't hidden.  It wasn't sent to them ten

5   days later.  It was right there.  And yeah, the top box had the

6   interest rate, when a payment has to be made, and how much it's

7   going to be, if you didn't renew.  And right underneath it, it

8   talked about renewals.  And then it talked about automatic

9   renewals.  And it talked about the right, if you give notice

10  three days before a payment is due, you won't have an automatic

11  renewal.

12          But at the time they wanted the loans, they wanted the

13  loans.  And so they didn't pay attention to it.  They didn't

14  focus on it.  And, therefore, it wasn't material to them.  It

15  wasn't essential to them because they didn't even bother to

16  read it, so how would they know what it said?  And there were

17  also documents where they had to check boxes off, and then sign

18  at the bottom that they read the material in the boxes, and

19  they are signing because they understand it and they want

20  loans.  And they went ahead and they did it.

21          After the fact, when the automatic renewals happened

22  and the payments went up, they were upset and they called and

23  wrote letters, but when they made the application the

24  information was there.  It wasn't put there to deceive them.

25  It was put there to have them on notice of how this works, if

1   you pay right away or if you don't pay right away, and if you

2   renew.

3            The slide in front of you talks about the renewal

4   terms, the other disclosures that were made at the time of the

5   application.  In the e-mail follow-up letter that I think Mr.

6   Hamner said he didn't remember getting, the same day as he made

7   the application, renewal appears 15 times.  How could you not

8   see that?  How could you not know it says that?  You can't miss

9   the whole thing.  You can't miss that word over and over and

10  over again.  Therefore, they were not misled or tricked or

11  deceived.

12           And the government makes an issue about all the

13  complaints.  They throw out numbers.  I think they said 1500,

14  whatever it was.  Well, you heard testimony from the

15  government's own witnesses that the customer complaint rate was

16  one percent or less.  Now, maybe you would say even one

17  complaint is too many.  Well, I suggest to you your common

18  sense tells you one percent or less complaint is probably lower

19  than many businesses operating in this country.  Complaints

20  when you have a cell phone service and you have a problem and

21  you call up, how many times do people do that?  Cable TV and

22  there is a problem and people call up to complain, I didn't pay

23  for this service, I'm not getting this service, where is this

24  charge coming from?  One percent is a very low rate.  And they

25  are talking about millions of loans.

1          And the complaints were handled and responded to.

2     Maybe not the way the government would like, but they were

3     responded to.  And if they weren't resolved, it went to another

4     level.  So that doesn't prove anything.

5          And we are told by Crystal Grote that there was a high

6     rate of repeat customers.  So are people who are being deceived

7     and defrauded going to continue to apply for another loan

8     again?  Not just a renewal, but a new loan?  That doesn't seem

9     likely that they would do that.

10          Crystal Grote also told you that when the County Bank

11     model was in place, customers wanted to have an automatic

12     renewal.  They didn't like the idea that they had to actually

13     do something to get a renewal, and they told the business about

14     it.  And when the model changed from the County Bank to the

15     tribes, the automatic renewals was put into place, which they

16     had notice of.  So it wasn't something that was just created to

17     make people take out more loans.  It was something the

18     customers were asking for.  It's not coming from me.  It's

19     coming from Crystal Grote who is a government witness.

20          I talked already about the County Bank model and

21     Leonard Goodman.  An important thing about Leonard Goodman's

22     testimony is the fact that Mr. Tucker asked him for his legal

23     opinion about participating in a program through NMS as a

24     servicer for the bank.  And he said, "Yes, that's correct."

25          And he answers the next question:  "Well, I went back

1    and looked at the applicable law that I had been referring to

2    all along in designing the program and just wrote him an

3    opinion that said, "you're in compliance with the law."

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. GINSBERG:  So is that a lie?  Did Leonard Goodman

2    lie on the witness stand about being asked the question by

3    Scott Tucker, going back and looking at the law again and then

4    giving him an opinion saying, You're in compliance with the

5    law?  That's what the government would have you believe.

6          And if Goodman did it, then the president and all

7    those other people that he was working with at the bank had to

8    know he was doing that too, so they're all part of this, and

9    that's pretty hard to believe.  And I think he told us that Mr.

10   Slatcher, and I think the name was pronounced wrong a few time

11   times, but he's still president of the bank.  He's still

12   running that bank.  So what did he do wrong?  Was he removed by

13   some agency or regulatory organization?  No, because that model

14   was permissible, and it wasn't as Adrian Rubin would have you

15   believe.

16         And one little last piece about Adrian Rubin, there

17   were those questions about the platinum cards that he did, this

18   other fraud that he got his sons involved in.  Every time he

19   was asked about doing that, his answers always began with,

20   Well, this guy Mr. Corby brought it to me; it was Mr. Corby's

21   idea, like shifting it away from himself.  And that's what he

22   tries to do.  He tries to shift it away from himself until he

23   really gets caught, and then he signs a cooperation agreement,

24   to try to avoid going to jail for however many years he's now

25   facing.

1      Again, he's the one the government asks you to

2  believe, and not Leonard Goodman and not the other people at

3  the bank.

4      Crystal Grote, again, had to seek approval from County

5  Bank for the materials that were being prepared, from Scott

6  Walsmith, who was in charge of compliance.  You think Scott

7  Walsmith was another coconspirator, along with Leonard Goodman?

8  Do you think he believed that the loans weren't being made by

9  the bank and he just went along with it too?  That's what the

10 government would have you believe.

11     And again Crystal Grote:

12 "Q.  Is it fair to say that the lending entities that Scott

13 Tucker was involved in were required by the bank to follow the

14 compliance directions from County Bank?

15 "A.  Yes."

16     Was she lying about that, a government witness?  Was

17 she lying when she says Scott Tucker had to be in compliance

18 with the bank's rules?  And if he was in compliance and they

19 had their own rules, then it's not a sham.  The government

20 can't have it both ways; it can't have her being a truth teller

21 and a liar.  So what do we make of that?

22     We know that the banks were regularly audited from

23 year to year, whether it be the state regulators or the federal

24 regulators.  So did somehow they all get fooled?  Were the bank

25 regulators not able to tell who was lending the money, that it

1   was the bank that was lending the money?  Did they all get

2   fooled year after year after year?  I suggest that is not the

3   case.

4          Now, let's move on to Lisa Adams, because she was

5   mentioned in closing.  She was a lawyer for the Yurok, and the

6   way the government phrases her position is that Scott Tucker

7   somehow didn't want to do business with the Yurok because the

8   Yurok wasn't willing to play ball with the way he wanted to do

9   it.  She wasn't on the stand for a really long time, but what

10  we learned from her is that week after week, month after month,

11  maybe up to a year or more, she was told on behalf of her

12  tribe, In order to be involved in this lending program, you

13  need to pass certain regulations and ordinances to make it

14  legal.  And for whatever reason, the Yurok wasn't ever able to

15  do it.

16         She said they were spread out all over the place.

17  They didn't have meetings that often.  They sort of operated on

18  their own at times.  It was hard to control them, and she

19  finally got a letter from Conly Schulte saying:  I'm sorry.

20  We've waited all this time.  You haven't passed the regulations

21  and ordinances that you have to pass, and we just don't want to

22  do business with you, because we're not going to do business

23  with a tribe that doesn't follow the rules and regulations.

24  And now somehow that's Scott Tucker's fault.  Scott Tucker

25  should have written all the regulations and rules?

1      If Scott Tucker was writing all the regulations and

2   rules, as the government suggests with other tribes, he could

3   have done it for the Yurok too.  He could have said, Here's the

4   20 things you have to do; get some meetings together and pass

5   them.  But it never happened, and now it says Scott Tucker

6   wanted to run it in some improper way, and that's why it didn't

7   happen, when that's not the case at all.

8      And by the way, the Yurok was the tribe that because

9   there was a letter of intent to be involved in this business,

10  they were receiving checks for $12,500 in advance of the

11  business getting started.  And they received four checks and

12  they received $50,000, and they never entered into an

13  agreement, and she told us -- Lisa Adams did -- that they had

14  no ability to be paid that money.  They knew they were getting

15  the money.  They didn't know if the business was going to get

16  started.  She couldn't get the regulations passed, but they

17  kept the money.  So they got a free $50,000 for not doing

18  business with Scott Tucker.  And now all of a sudden, it's

19  Scott Tucker's fault, the government says, another example of

20  how he defrauded somebody or cheated somebody.

21     The Kickapoo was in business doing loans for about, I

22  don't know if it was a year, year and a half, and Russell

23  Bradley was called to testify about that.  And it appeared that

24  Russell Bradley didn't really like the idea of payday loans,

25  but he wasn't the one making the final decisions for the tribe.

He told us, however, that Steve Cadue, who was in a position of

authority at the tribe, wanted the deal to go through.  The

tribe wanted the deal to go through.  They passed regulations.

They passed ordinances.  They made an agreement with UMS.  They

gave Scott Tucker power of attorney.  They made money.  They

had lawyers representing them.  Elsa Smith and Conly Schulte

were helping the tribe, and Cliff Cohen was helping Scott

Tucker.  And then they decided not to continue with the

business.

        Where was the crime there?  They just didn't want to

do it anymore.  He didn't like it?  OK.  A lot of you may be

sitting here now thinking, "I don't like payday lending," but

that doesn't mean that Scott Tucker is guilty beyond a

reasonable doubt.  And what the Kickapoo did doesn't speak to

that either.

        The terms that Scott Tucker set out for the tribes

were tribal ownership.  The letter of intent was the first

thing that the tribes got.  And in the letter of intent, it

spells out what the tribes need to do to make this truly a

tribal business, not simply lending its name to some distant

commercial enterprise.  And I know what the government said,

and they're going to probably say it again at the end: it was

just paper.

        Well, it wasn't just paper, and we'll demonstrate that

to you.  But they started with the letter of intent and were

1     told in the letter of intent that that's the way this would

2     operate.  There were service agreements and there were other

3     documents that we saw, but I want to for a moment skip to the

4     Miami tribe and the nonprosecution agreement.

5            The nonprosecution agreement tells the tribe, or two

6     of its entities, that if they agree to this nonprosecution

7     agreement, they -- MNES and AMG, MNE -- will not be prosecuted

8     for committing any crimes, and they signed the agreement.  When

9     they signed the agreement, they were required to pay $48

10    million, and when the government was asking about it on

11    cross-examination, the government made it seem like:  Well,

12    we're going to be really nice to you.  We're going to let you

13    keep $12 million for education and things that you need on

14    tribal land, but they forgot about the $119 million or the $189

15    million that appears in the annual reports that the Miami tribe

16    made from the payday lending business.

17           Now, first of all, that's not 1 percent.  Second of

18    all, they made that money, it was their money to make, it was

19    their money to use, and you were told that they bought

20    businesses with that money.  So it wasn't Scott Tucker's money.

21    It wasn't Scott Tucker's money the way you heard on these tapes

22    when there's a discussion between Don Brady and Carolyn

23    Williams, where they say, Well, all the money in the accounts

24    is Scott Tucker's.

25           Well, it wasn't.  How did the tribe get that money,

1    120, 150, $200 million?  Because it was Scott Tucker's money?

2    The tribes got what they had bargained for and more.  And more.

3         What's also very interesting and, I think, significant

4    about the nonprosecution agreement is that attached to the

5    nonprosecution agreement was Exhibit A, the statement of facts

6    prepared by the government, to be signed by the representatives

7    of the Miami tribe in entering into this agreement.  What it

8    says, and what is admitted by the representatives of the tribe

9    who signed the document, is, "In certain state court

10   litigations, a then representative of the Miami," Don Brady,

11   "who was also then an officer of entities controlled by the

12   Miami that were involved in the loan business submitted factual

13   declarations.  These declarations were false, in part, because

14   they overstated the involvement of such former representative

15   and that of the Miami and entities controlled by the Miami in

16   the operations of the loan business."

17        That is the only fact that was admitted to by the

18   Miami that they did wrong that had them sign this

19   nonprosecution agreement.  Now, if the government wanted --

20   they prepared this document -- they could have put in Exhibit A

21   paragraph 5:  And we, the Miami, state that we were never the

22   lenders.  We, the Miami tribe, state we never had anything to

23   do with any part of the operation of the lending business.  We,

24   the Miami tribe, entered into a sham.  We, the Miami tribe,

25   just created a paper trail.

1          The government had every right to put whatever they

2     wanted into that document and ask the Miami to sign it.

3     Instead, what we have here is an overstatement by Don Brady.

4     That doesn't make Scott Tucker guilty.  Don Brady made a lot of

5     overstatements.

6          Don Brady was, I think the way it sounds, sort of

7     being paternalistic towards the tribe.  He was in his 70s and

8     then he turned 80.  We heard they had a party for him.  He was

9     in big businesses before, and it appears that he believed that

10    he knew how to run this operation.  For the tribe, he didn't

11    give them a lot of information, and he conducted his business.

12    He met with Scott Tucker.  He went to Kansas City, people came

13    down to meet with him.  He had the choice to be involved as

14    much or as little as he wanted to.  That was his choice, and if

15    the tribe wanted to ask him questions at the board meetings --

16    and there were plenty of board meetings.  The government says

17    there was only a few.  That was AMG.  That wasn't the other

18    entities.  They were having board meetings all the time and

19    tribal council meetings all the time.

20         So why is this the only thing in Exhibit A?  Because

21    the Miami wouldn't say -- didn't say -- that we weren't the

22    lenders, that it wasn't our money, that we didn't make 120 or

23    150 or $190 million.

24         I didn't write this agreement.  This agreement is

25    between the Miami and the government, but there's a lot

1   missing.

2          They discussed the payday business on a regular basis,

3   monthly meetings.  Did they discuss it as much as they should

4   have or could have?  Maybe not.  Was anybody prevented from

5   asking questions of Don Brady?  Go to his office, call him up?

6   No.  And if Don Brady didn't give the information, that's Don

7   Brady's fault.  It doesn't make Scott Tucker guilty of a crime.

8          There were tribal representatives that testified,

9   called by the government and called by the defense.  Troy

10  Little Axe, of the Modoc, testified.  He said he didn't do very

11  much, but he knew and he was aware of the procedures that were

12  in place for the approvals, for the lending operation, how it

13  was being run.  He went up to Kansas City, and he decided to do

14  as much or as little as he wanted to do.  Nobody prevented him

15  from doing more or asking more.  Nobody.

16         Interestingly, with Troy Little Axe, the government

17  asked, if you'll remember, on direct examination, about that

18  Hallinan settlement, where he signed on behalf of five

19  companies, and the government tried to demonstrate on direct

20  examination that he had no authority to sign; he didn't own

21  those companies.  So basically what he did was false and

22  fraudulent.  And then on cross-examination, when he was shown

23  the stock purchase agreements for those five businesses, that

24  had occurred prior to the Hallinan settlement, he said, Oh,

25  yeah.  Either I was mistaken, I was incorrect.  He didn't say

1    lie.  Maybe he didn't mean to lie, but those documents were

2    signed, and the government had him say just the opposite.

3            Did they not have those documents?  Did they not

4    review them with him?  Did they allow him to say something on

5    direct examination that was not truthful, with all the

6    preparation they had?  Why does that happen on direct

7    examination and on cross-examination you get the opposite

8    answer?  Because he's not prepared?  Because he wants to please

9    the government?  Because he has a nonprosecution agreement and

10   he's afraid he might lose it?  I don't know what the answer is,

11   but that's what happened.  And it wasn't just one.  It was five

12   companies.

13           You don't just forget those things.  And if they're

14   there and you have the documents, which we had, you show them

15   to him, if you're the government, and ask him for an

16   explanation.  You don't just forget about it.

17           There was Chief Gamble, who testified.  He's a very

18   nice man who didn't seem to remember a whole lot, but he

19   remembered that he was updated monthly by Don Brady.  He

20   remembered all the resolutions that were passed, all the board

21   meetings that he attended and council meetings, all the things

22   he was told were required to be done in order to have this

23   business operate.  And he testified about that.

24           Chief Lankford also testified about that, and Chief

25   Lankford's the one who testified about the nonprosecution

1    agreement and paragraph 4 that we just talked about.  He knew

2    that the Miami were making money.  He was there towards the end

3    when those annual reports were shown, when the businesses were

4    being purchased with the 120, 130, $140 million.

5         I'm being told periodically how much time I have left.

6    That's what that is.

7         THE COURT:  Ladies and gentlemen, why don't you stand

8    up and stretch for a moment, please.

9         MR. GINSBERG:  Can I keep that extra moment?

10        THE COURT:  I'm watching it.  I didn't say you

11   couldn't talk while the jurors were stretching.

12        MR. GINSBERG:  I'm being respectful.

13        THE COURT:  I have it.

14        And the deep breath, please.

15        All right.

16        MR. GINSBERG:  Evidence of tribal ownership.

17        The lending businesses were registered under tribal

18   charter.  They passed the regulations that needed to be passed

19   in order to do that.  They had service agreements, signed

20   between the servicer and the tribe, which spelled out what the

21   tribe was going to do and what the servicer was going to do.

22   This one's signed by Don Brady.

23        They passed resolutions, which were required to be

24   done, unlike the Yurok that couldn't get it together to do all

25   these things.  They amended their lending codes so that under

1    tribal law they were allowed to be lenders and could

2    participate in this business.

3         There was testimony about how each tribe, through the

4    representative of the tribe, knew and approved of the loan

5    criteria.  Now, the government tried to make a big deal about

6    it during the course of the trial, that the tribes didn't know

7    the criteria.  Remember all the testimony about Selling Source

8    and DataX, which was something that was created to do sort of

9    an automatic electronic processing of applications?  There was

10   green light, red light, yellow light?  Every tribe, each person

11   who was a representative for the tribe, knew about that, either

12   discussed it on tribal land, discussed it when they went to

13   Kansas City, were told what the criteria was, and they agreed

14   with it.  They knew what it was.  If they didn't want to

15   participate further once they agreed with the approval method

16   being used by the servicer, that was OK.  And that's what they

17   chose to do.

18        There were powers of attorney that were granted to

19   Scott Tucker, which allowed him to do certain things with the

20   accounts, the checking accounts.  And again, we hear about that

21   from the government, as if Scott Tucker could go in, take all

22   the money and walk away.  Well, guess what?  If he could have

23   and wanted to, he certainly didn't do it.  He got money.  He

24   got paid, because there was an agreement that the servicer

25   would get 99 percent, which, it turns out, they got less than

1    that, and the tribes made more than that.  He didn't just go in

2    and raid all those accounts and take all the money, because at

3    the end of the day, the power of attorney could be revoked at

4    any time.

5         The tribes could go in and take all the money that was

6    in those accounts, and Scott Tucker had no way to stop them,

7    because they were their accounts, not his.  He only had the

8    power of attorney.  He didn't have the control over those

9    accounts.  And that's why, in 2013, when you see the financials

10   for Miami Nation Enterprises, it had total gross revenues of

11   $233 million, total assets of $189 million.  That's way more

12   than 1 percent.  So if the government's trying to make you feel

13   sorry for the tribes, that they're being taken advantage of,

14   that's not what happened.

15        The Modoc, I think Troy Little Axe said they had 9 or

16   $10 million when they stopped the servicing with Scott Tucker,

17   and then they went on their own to do their own lending,

18   because they had learned how to do the servicing from AMG,

19   which was being run by the Miami tribe.  So they weren't being

20   taken advantage of.  In fact, they made a lot of money,

21   probably more money than tribes could make from any operation

22   except for the ones who are fortunate enough to have casinos

23   near big cities.  So that wasn't being taken advantage of.  And

24   they took the money and they used the money as they saw fit.

25        There was a chart that the government used, Government

1    Exhibit 3551, which was the comparison of the management fees

2    compared to Scott Tucker's receipts, and I'm sure you can't

3    forget that testimony, because an accountant came in here, a

4    forensic accountant, a CPA, to use these charts to show you

5    that the tribes only got 1 percent. And how did she do that

6    magic when she was asked to add the numbers on the chart? The

7    numbers for Scott Tucker's receipts and the management fees?

8            She told us that $41 million is 1 percent of about 400

9    and something million dollars. Well, of course it isn't. It's

10   about 10 percent. How did she come up with 1 percent? You

11   think it was just a math mistake? By a CPA, who ended up

12   needing a calculator? Or do you think that the 1 percent was

13   in her head because all the information she had been provided

14   to prepare these charts was given to her by the government, and

15   that 1 percent fits their theory? Because it was wrong, and it

16   was wrong by a lot. And there's no explanation for how you can

17   do that. A third grader can do that, let alone a CPA. How

18   does something like that happen? And even when she had the

19   calculator, she got the percentages wrong.

20           But it also shows Scott Tucker didn't take all the

21   money, didn't have control of all the money. In this instance,

22   the Miami had plenty of money, more than they probably ever

23   dreamed they could make from this, whether or not they decided

24   to participate a lot or a little.

25           We talked a little bit about the loan criteria and

1    Selling Source and DataX, and there was testimony about the

2    purchase of Selling Source and then DataX and how that was used

3    for credit-reporting purposes and criteria purposes.  That

4    wasn't something that was made up.  That was information given

5    to the tribes and given to whoever was in charge from the

6    tribes of knowing how the business operated.  And in fact,

7    there were payments made to Selling Source by MNE, TFS, Red

8    Cedar, all the tribal companies, for the use of DataX, the

9    criteria.  Did they just pay the money fictitiously to DataX?

10   Did they believe there was no such thing as DataX?  Did they

11   not understand that DataX was the one that created the process

12   by which loans should be approved or not approved?  This

13   demonstrates that that's not the case.

14          There's plenty of evidence of tribal ownership.  Every

15   one of those tribal charters, the lending codes, the bank

16   accounts, the loan criteria, the power of attorney, and

17   finally -- there's more power of attorney documents I have

18   here, but I'm going to move through it quickly; the Modoc gave

19   power of attorney; Don Brady, for Miami, gave power of

20   attorney -- what really demonstrates the control, the

21   ownership, that the tribes had is you heard they were able to

22   terminate Scott Tucker's services and their relationship with

23   his businesses.

24          Now, only somebody who is in the position in a

25   relationship where their owner can turn around and say, You're

HacWtuc4                    Summation - Mr. Ginsberg

1    fired, we don't want to work with you anymore -- Scott Tucker

2    didn't do that with the tribes -- the tribes did that with

3    Scott Tucker, because they had the ability and control to do

4    that.  And they did it.  And then the Modoc and Santee went on

5    to have their own businesses, and the Miami terminated its

6    business.

7            We heard testimony even from Crystal Grote that she

8    believed the tribes owned the business.

9            There were lots of witnesses.  I don't have the time

10   to mention each one of them.  Allison Harris wanted all the

11   financial documents, didn't get them, but 12 boxes arrived.

12   She's been complaining she never saw the financial documents,

13   the boxes arrived, and she never looked at the financial

14   documents.

15           Crystal Grote we've talked about already.  Crystal

16   Grote took her plea, made her deal, told us not that the tribes

17   didn't have involvement, but didn't have much involvement.

18           We talked about Lee Ickes, Troy Little Axe and Don

19   Brady.  But there was no requirement for the amount of

20   involvement that they needed to have.  You heard the testimony

21   from the lawyers.  All the lawyers were doing the research.

22   There was no set regulations about tribal lending and what the

23   specific rules were as to how that should take place, how much

24   the tribe needed to do, how much they didn't need to do.

25           That started out with Ellen Bachman, Cliff Cohen,

HacWtuc4                    Summation - Mr. Ginsberg

1    Conly Schulte, Tim Muir.  They researched cases, Supreme Court

2    cases, appellate court cases, state court cases.  There was no

3    rule.  There was no regulation that was made that said, If you

4    want to be a tribal lender, you need to do 1 through 10,

5    otherwise you can't do it.  So they looked at it, and each one

6    had a different view about how much needed to be done or didn't

7    need to be done, and they gave their opinion to Scott Tucker.

8    And he relied on it in good faith.

9            Quickly, the Nevada companies.  You heard the two

10   witnesses say they were legal, legitimate.  They did it all the

11   time; it was for privacy.  And there was testimony from one of

12   the lawyer witnesses that it was permissible to make the loans

13   the way they were made out of Nevada because of Nevada state

14   laws.  So again, it fails.

15           Carolyn Williams.  Carolyn Williams decided, near the

16   end of her second term working for Scott Tucker, that she

17   didn't like what was going on.  She has those recordings with

18   Don Brady and some recordings with the board.  She doesn't

19   start making those recordings of the board or Don Brady until

20   she gets into her head the idea that she wants to become a

21   whistleblower --

22           THE COURT:  All right.  Start bringing it to a close,

23   Mr. Ginsberg.

24           MR. GINSBERG:  -- where she could make a lot of money.

25   She had opportunity after opportunity after opportunity to

1    record the earlier meetings, and she never did.  And she didn't

2    tell people that she was recording them.  And then she didn't

3    even tell us that she had two recorders until the middle of

4    Mr. Bath's cross-examination.  So she had a motive.  It didn't

5    work out for her, but she had a motive.  And then she also took

6    documents and other material in the eight months that she

7    worked there, after she went to the whistleblower, to try to

8    make her case as good as it could be.

9            Now, the government went through the chart of all the

10   charges, and I'll very quickly do it and then I will end.

11           THE COURT:  All right.  You're at your time limit even

12   as extended.

13           MR. GINSBERG:  Could I have two minutes?  Thank you.

14           To convict Scott Tucker, you have to find that he was

15   aware of the generally unlawful nature of his acts as to

16   certain of the counts.

17           As to other counts, he had advice of counsel that he

18   relied upon.

19           As to other counts, he acted in good faith, without

20   ever having the intent, the specific intent, to defraud.  And

21   that goes to the wire fraud, which underlies all of the counts

22   that follow it, the promotion of money laundering, concealment

23   of money laundering.

24           So it's not so simple.  It could be made to appear

25   simple so the jury doesn't look at all of these witnesses, all

1    of the testimony, all of the things that were said that support

2    the concept that this was a business deal that didn't have

3    specific regulations to it, that Scott Tucker took advantage of

4    a business deal that was out there to be taken advantage of,

5    but it doesn't make him guilty of the crimes that are charged.

6    If he was aggressive, if he was pushy, that's not guilt beyond

7    a reasonable doubt.

8            Ladies and gentlemen, I thank you again for your

9    patience, and ask you to think of all of those concepts and

10   ideas.  I don't get a chance to speak again.  Mr. Bath will

11   speak with you, and then the government gets a rebuttal.  It's

12   the hardest thing for a lawyer to do, shut up.  I have to sit

13   down now.  I can't talk to you again.  But I trust that if

14   things are raised by the government later on, you'll remember

15   what was said just now in thinking about responses to what they

16   may raise.

17           Thank you very much.

18           THE COURT:  All right.  Thank you, Mr. Ginsberg.

19           Ladies and gentlemen, why don't we take a half an hour

20   for lunch, and then we'll come in and get you and pick up with

21   the remaining closing arguments.

22           If it is not inconvenient for you, and you'll let me

23   know, I would like us to finish the jury instructions today,

24   and that way you can start deliberating tomorrow morning.  This

25   may mean that we may spill over a bit this afternoon.  If

HacWtuc4

1  that's a severe hardship for anyone, please send a note through

2  my deputy, and I'll reconsider on that, but I would like to get

3  this case to you for your deliberations as quickly as possible.

4  All right?

5           Enjoy lunch.

6           (Jury not present)

7           THE COURT:  All right.  I've read and reread the

8  proposed redactions to the superseding indictment, which is

9  Court's Exhibit 17, and with that review, the redacted

10  indictment, as tendered to me, is approved, with the deletions

11  that I directed in paragraphs 4 and 5.  So you should prepare

12  that for the jury.

13           MR. SCOTTEN:  Will do, your Honor.

14           THE COURT:  Enjoy lunch.  See you in half an hour.

15           (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

HAC8TUC5                    Summation - Mr. Bath

1                          AFTERNOON SESSION

2                             2:20 p.m.

3          (Jury not present)

4          THE COURT:  Check on our jurors, please.

5          MR. SCOTTEN:  Your Honor, would you like us to hand up

6     a copy of the fully redacted indictment?

7          THE COURT:  How many copies do you have?

8          MR. SCOTTEN:  We have a bunch of copies being made.

9          THE COURT:  One will be marked as the next court

10    exhibit.

11         MR. SCOTTEN:  Do you want us to go ahead and make

12    enough copies for the jury or is the court going to do that?

13         THE COURT:  No.  You should make two copies for the

14    jury.

15         MR. SCOTTEN:  Will do, your Honor.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.  I hope no one has

3     indigestion.

4          In any event, Mr. Bath, whenever you are ready.

5          MR. BATH:  May it please the court, counsel, ladies

6     and gentlemen.

7          I want to go back with you and review what has the

8     government proven against Tim Muir in this case.

9          Let's first start with 1997 and move forward.

10         This timeline gives a snapshot of what was going on

11    from 1998 through 2006.

12         As you recall from Mr. Muir's testimony, about this

13    time, '98, '99, 2000, he was in the pizza business, managing a

14    pizza restaurant.  He was in law school and graduated in 2004.

15         What we know this trial has proven is that he wasn't

16    involved in this:  County Bank.  He wasn't involved with Rubin.

17    He wasn't involved in the nominee companies.  He wasn't

18    involved with Shoaf.  He wasn't involved with Fontano.  He

19    wasn't involved with Yurok.  He wasn't involved with Lisa

20    Adams.  He wasn't involved with Bradley Russell or the

21    Kickapoos.  He wasn't involved in the agreements that got

22    drafted in 2003 or '04 with the Miami or the Santee or the

23    Modoc.  He wasn't involved with the tribal corporation

24    formation or the resolutions, tribal boards, for any of the

25    three that took place.  He wasn't involved at the start of the

1    lending.  He wasn't involved in any of the lending that took

2    place at any time along 2006.  He begins about June of 2006.

3         What else has it shown he wasn't involved in?  He

4    wasn't an owner.  He wasn't an operator.  He didn't get any of

5    the profits.  He didn't control the entities.  He didn't do any

6    advertising.  He didn't do hiring for his personal law firm.

7    He didn't do firing.  He didn't write any checks.  Except I

8    guess the checks he wrote for his own law firm.  The government

9    is suggesting in their closing today because he sent that one

10   check for the $2300, that was money laundering.  Really, it's

11   money laundering?  The $2300 check he sent to Pete Smith for

12   the legal services.  Those are the checks he was involved in.

13   He wasn't involved in preparing the financials.  He wasn't

14   involved in discussing the financials in terms of profit and

15   loss.  You had no testimony about that whatsoever.  No

16   day-to-day management by Tim Muir.

17        We heard about the Selling Source sale to London Bay,

18   which was 2007.  He wasn't involved in that.

19        The AMG/CLK merger.  That was in 2008.  In 2008, that

20   merger, he said he wasn't involved.  He became aware of it, but

21   that deal was done by Conly Schulte.

22        He wasn't involved with drafting the affidavits or

23   declarations.  The government suggested, well, he saw some of

24   them, some of them may have come across his desk.  He admitted

25   to that.  But he didn't draft any of those affidavits or

1   declarations.

2          He wasn't involved in the weather reports.  The

3   government suggested in its closing argument, well, everybody

4   knew about the weather reports and that Crystal did that

5   because she was lying on behalf of the company.  But you

6   remember Crystal's testimony, and I know you have notes.

7          The great thing about there being 12 of you is that

8   four of you may remember something and two others may add to

9   that when you get to deliberations and you will say, let's look

10  at our notes and look at what we remember.  The testimony was

11  clear that Crystal said her group, and her group only, created

12  the weather reports.  Neither Tucker nor Mr. Muir knew anything

13  about these weather reports.

14         I will loop back to yesterday to an exhibit that was

15  shown to you.  Remember there was an exhibit shown on

16  cross-examination where after the depos in the FTC case, Conly

17  Schulte sent an e-mail to Tim and said:  Depos just ended and

18  Crystal deserves a medal.

19         It was suggested in cross-examination that what that

20  was about was she was to be congratulated somehow about the

21  weather, about the fact she lied about the weather in that FTC

22  depo.

23         Crystal Grote lying about the weather in the FTC depo

24  had nothing to do with anybody but Crystal.  There is no

25  information whatsoever that Mr. Tucker or Mr. Muir knew

1    anything about that weather.  And that e-mail doesn't even say

2    anything about the weather.

3            It's an attempt, as we have seen, at least my argument

4    is, throughout this entire trial to try to connect Tim Muir

5    when he is not connected.  It's a disjointed, cobbled-together

6    argument trying to post together things -- even some things go

7    back to 2005 and 2006 -- and say, well, Tim must have been

8    aware of that because Tim gave legal advice, then he should be

9    convicted.  That's the government's theory.

10           I will get into the more specifics.

11           They have one e-mail, I think, maybe two that they

12   have shown about scripts, but they don't show Tim Muir was in

13   charge of scripts.  Could scripts have come across his desk or

14   e-mail.  Perhaps.  I think the one they showed you earlier in

15   summation was from Jared Marsh, who under the government's

16   theory must also be a co-conspirator along with everybody else

17   who was involved in this business.

18           There was nothing about Tim being involved in

19   representations regarding the location.  We haven't heard any

20   evidence about that for a long time.  But the trial has shown

21   there is no evidence he was involved in that kind of e-mail

22   chain between the management people, because he wasn't

23   management.

24           Tim was never the only lawyer involved in any of these

25   transactions.  That doesn't mean he doesn't have responsibility

1    for whatever he was involved in.  My point is, is that the acts

2    of a criminal, where he goes out and gets people like Chris

3    Rose from Vegas or Richard Fontg, Columbo, all these lawyers

4    were involved in all of this?  This is all hidden?  There are

5    lawyers from all over the country working on different

6    transactions.  Is that hiding?  Is that the activities of a

7    criminal?  No.  It's somebody who is giving legal advice and

8    giving the best legal advice to his client.

9         Even before Tim was involved, you had lawyers on both

10   sides of the transaction.  Remember Ken Bellmard represented

11   Miami.  He was on the board for the Miami.  Troy Little Axe is

12   a lawyer, and he of course represented the Modoc.  He was the

13   general counsel.  I can't remember the exact term he used.

14        I asked you in the opening, why is Tim Muir charged?

15   Why did he get charged?  What evidence have they proven he was

16   involved in some kind of criminal conspiracy?  I want you to

17   keep that thought in your mind when the government gets up and

18   talks to you on their second rebuttal or on their rebuttal.

19        I want to transition now and talk about what the trial

20   did show Tim was involved in.

21        It showed he was involved in lots of research when he

22   started there.  It's been belittled as Internet research, but

23   the fact of the matter is if you use a book nowadays, it's very

24   rare.  I like to use paper.  I like to use books.  He is on the

25   Internet.  He is on Westlaw.  He is researching statutes, the

1    United States Constitution, U.S. Supreme Court cases.  He is

2    looking at legislation.  He is reviewing active cases.  That

3    sort of proved Tim was involved.

4         He consulted with other lawyers.  He asked other

5    lawyers about their opinion about this tribal model.  He went

6    to CLEs.  Particularly, he went to CLE in 2013 where 200

7    lawyers are in a room in Washington, D.C., sponsored by the

8    American Bar Association, talking about tribal model.

9         Is that the conduct of somebody who has got a guilty

10   mind, somebody who thinks he is committing a crime?  I submit

11   it is not.

12        We heard about his involvement in the Modoc, that he

13   interacted with Troy Little Axe, that he talked to him

14   frequently, that he visited four or five times a year -- the

15   trial has proven that -- that he kept Troy up-to-date, and Troy

16   felt like he was fully informed, that Tim answered all his

17   questions.

18        We heard from Lankford and Gamble, and they said the

19   same thing about Tim.  He went down and visited them or talked

20   to them on the phone or would send them e-mails.  He went to

21   board meetings.  He kept them fully informed as well.

22        We didn't hear from any witnesses involved in Santee.

23   Think about that when you're deliberating in this case.  It's

24   the government's burden to prove this case and they don't call

25   one person from the Santee.  Did they prove their case?

1       Tim testified he did talk with Lee Davis.  He kept in

2   contact with him, and he kept up with the tribal council and

3   the chief and also informed them on what was going on.

4       We know he was involved in the Hallinan paperwork.  He

5   wasn't involved in the settlement discussions so much because

6   that was Pete Smith and I think it was Chris Rose and Conly on

7   behalf of the tribal entities.  But he was involved in the end

8   in getting the paperwork signed.  The case has proved that he

9   is involved in *Tucker v. AMG*, and we will get into more detail

10  about that.

11      We have heard a little bit in the government's first

12  portion about what their argument is of how this furthered the

13  alleged criminal enterprise.

14      Essentially the government is arguing, well, because

15  this protected Mr. Tucker from liabilities, then this must have

16  furthered the criminal enterprise.  It's undisputed that AMG

17  was formed in 2008, that AMG purchased CLK.  It's undisputed

18  that AMG, when they got CLK, took over the liabilities.

19      Put up the next slide.  Thank you.

20      You recall Pete Smith testified.  He testified

21  essentially that this lawsuit would have been Mr. Muir carrying

22  out his duties to his client.

23      Mr. Smith told you -- second to last, the last

24  question -- "According to Mr. Muir, as a result of the failure

25  to file the certificate of merger, Mr. Tucker faced additional

1   liabilities?"

2           "A.  He could, potential future liabilities."

3           Mr. Muir testified to you it would be a default

4   judgment because Mr. Tucker had no way, because CLK no longer

5   existed, to come into court and defend themselves in a class

6   action.

7           We know that Tim was involved in the ITG audits.  That

8   was the fall of 2011.  We heard that the IRS through ITG was

9   asking for financial documents of all three tribes.  We know

10  Tim was involved in that -- the trial's proved that -- in

11  getting 12 boxes of financial documents down to the Miami tribe

12  so that the Miami tribe would have all those financial

13  documents.  We know Tim was involved in that.

14          He monitored the California and Colorado litigations.

15  He did that.  Conly was the lead on that, and Tim monitored

16  that.

17          We know Selling Source v. Red River, Tim had

18  involvement in that.  You recall Tim was put on notice that

19  someone was stealing, Red River was stealing data, leads from

20  Selling Source.  He then passed that information on to Alton

21  Irby.  Alton Irby, on behalf of Selling Source, sues Red River,

22  and that's when that Alton Irby declaration was filed.  The

23  declaration where he first said, I think Scott Tucker was the

24  owner of AMG.  Muir read it.  Muir got ahold of Irby's lawyers

25  and said that's not accurate.  That declaration was asked to be

1     removed or altered in a federal court.  It was redacted, is a

2     better word.

3          We know from this trial that Tim was involved in the

4     2011 Tucker eCash transaction.  He contacted Sam Humphreys, who

5     contacted his lawyer in San Francisco, and there was a deal

6     struck between Mr. Tucker, and I think he was represented by

7     Colombo at that time, and Selling Source for the Tucker version

8     of eCash.

9          We know that in 2012 there was some kind of licensing

10    agreement between the Miami tribe and Mr. Tucker regarding the

11    eCash.  There was an e-mail that was introduced.  Mr. Muir

12    testified about that.  He said, I couldn't represent either

13    side on the financial side of it, but I forwarded the agreement

14    to Mr. Gamble, Mr. Brady and Mr. Tucker and then later

15    forwarded the agreement to Conly Schulte.  So we know he was

16    involved in that.

17         We know ultimately in '13 there was a brand-new

18    agreement between Mr. Tucker and the Miami tribe.  The

19    settlement agreement is what it was called.  We introduced that

20    document for you.

21         There were a number of attorneys involved.  The Miami

22    represented by Kirkland & Ellis, Dorsey & Whitney, and Mike

23    Tulley.  Mr. Tucker was represented by Ricardo Fontg and I

24    think Chad Hansen.  Tim had some involvement in that.  But

25    again, he wasn't on point on that transaction.

1              That transaction is something to keep in mind.  That

2      was 2013.  I think it's August of 2013.  Maybe July 31st.  You

3      remember we had testimony that, and we heard the tapes today,

4      where Brady is saying certain things to at least the one board,

5      and that's the NMES board, not the AMG board.  We never heard

6      tapes about AMG.  That Brady is saying things, and the

7      government is arguing that Brady is saying things it shows and

8      that Brady thinks things are illegal.

9              Mr. Ginsberg argued to you that perhaps Mr. Brady was

10     being paternalistic and was trying to look out for the tribe

11     and not being very cooperative.  I suggest to you Mr. Brady was

12     hired by the tribe well before Scott Tucker came along.  The

13     tribe had him in place and he was running their businesses.

14             As Mr. Ginsberg said, I guess he turned 80 sometime in

15     that period and perhaps he wasn't very easy to get along with.

16     In any event, he wasn't Mr. Tucker's employee; he was the

17     tribe's employee.  And we know in the fall he gets fired.

18     Remember Joe Frazier replaces him.

19             So Joe Frazier, brand-new person, is replacing Brady.

20     So by January 1st of '13, you have Frazier in place and you

21     have Kirkland & Ellis in place.  You have brand-new legal

22     representation and a new person at the head of the tribe.

23             What do they do?  They enter into an agreement with

24     Mr. Tucker, the settlement agreement.  There were three

25     agreements.  We introduced the one to you.

1      My point is Brady is no longer there.  You can't blame

2 Brady.  The government tells you, well, Kirkland & Ellis came

3 in and saw all these bank accounts and discovered new bank

4 accounts.  There was no testimony about that.  But there is

5 testimony that Kirkland & Ellis came in.

6      Why would they cut a brand-new deal with Mr. Tucker?

7 If this was a big sham, wouldn't Kirkland & Ellis or Dorsey &

8 Whitney have said something like, hey, tribe, you can't be in

9 this business anymore, you can't cut a new deal with Mr.

10 Tucker.  That's not what happened.  A brand-new slate of

11 people, attorneys, brand-new CEO, Joe Frazier, and cut a

12 brand-new deal.  That's because no one believed they were

13 committing a crime, and that's going to be important when you

14 get the judge's instructions and you deliberate.

15      I agree with Mr. Ginsberg that the testimony from some

16 of the people you heard from, the customers here, was difficult

17 to hear.  This isn't a referendum on payday lending, and you

18 can certainly find payday lending to reprehensible, repugnant,

19 something no one should be involved in.  All we ask is that you

20 try to set that aside, and you do set that aside, and you look

21 at this case based on the facts, not based on this industry and

22 what you think of the people involved in this industry.

23      The government has the burden.  And what must they

24 prove?  As I said, you will get the instructions from the

25 judge.  They have to prove Tim was involved in a criminal

1   enterprise, and there will be some definitions about what that

2   means.  But it's more than mere association.  It's not just

3   giving legal advice to a company.  You don't get indicted for

4   giving legal advice to a company.  He has to have more than

5   mere association.

6           Second, they have to prove beyond a reasonable doubt

7   that a citizen, citizen has the willfulness to commit a crime.

8   They have the mens rea.  They have the criminal intent.  They

9   have to prove that for both of these individuals.  That Tim

10  Muir intended to commit a crime, that he believed he was

11  committing a crime.  It's called willfulness.

12          It's important here, and you will get this instruction

13  from the judge.  When you weigh this evidence -- that's why I

14  started out with '96 to '06.  You weigh the evidence as to each

15  defendant.

16          I believe the government here has tried to essentially

17  combine all of the evidence against both of these individuals

18  and say, well, Mr. Muir must have known everything that was

19  going on even if it happened before he got there.  But the law

20  is you're supposed to weigh the evidence against each

21  individual.

22          The verdict is for each individual, Mr. Tucker and

23  Mr. Muir, has to be separate.

24          They must prove that Tim acted willfully, and

25  willfully in the law has a powerful meaning.  It has a special

meaning.  It means to act deliberately and with a purpose to do

something the law forbids.  To do something the law forbids.

That means you have to find beyond a reasonable doubt that Tim

Muir was intentionally committing an act because he believed it

to be unlawful.

It's up to you, the jury, to determine as a finding of

fact whether or not the government has proven that beyond a

reasonable doubt.

There is also the wire fraud counts.  Those have a

little different element.  You still have to find willfulness,

but you also have to find that Tim acted with the intent to

defraud.  That means he intended to defraud somebody.  He knew

he was breaking the law and wanted to defraud the customers.

You will get an instruction called good faith.  And

good faith says if someone has an honest belief in the truth of

the representations, then you are to take that into

consideration as to whether Tim had a guilty mind.

You have heard a little bit from both sides so far

about our constitutional protections, and I know you all know

them.  We talked about them a little bit in the opening

statement.  And that is, in this country the government has the

burden, has the burden to prove someone who is presumed

innocent -- so we first start with Mr. Muir and Mr. Tucker are

both presumed innocent.  The government has the burden to prove

what they say is true beyond a reasonable doubt.  The defense

1     has no burden at all.  We wouldn't have to put on any evidence.

2     We don't have to cross-examine anybody.  We don't have to ask

3     any questions.  We wouldn't have to given a closing statement

4     or opening statement if we didn't want to.

5           But when we do, you are to evaluate that evidence.

6     And if we do cross-examination or if the evidence we put on the

7     witness stand creates reasonable doubt, then you take that into

8     consideration.  But we have no burden.  We have no duty to call

9     any witnesses.

10          You will get an instruction also from the judge called

11    aiding and abetting, and that's really what I propose to you

12    the government is counting on for you to try to find Mr. Muir

13    guilty.  Aiding and abetting is that you have to willfully

14    associate and willfully participate.  There's that willful word

15    again.  It's not mere association, it's not that he was there,

16    it's not that things went on.  He has to willfully with

17    criminal intent do something which the law forbids, be involved

18    as an aider and abettor.

19          When you get the verdict form, you are going to be

20    asked on each of those counts for each defendant and you are

21    going to be given the choice guilty or not guilty.  I know that

22    seems sort of very basic.  My point is this.  It's not guilty

23    or innocent.  Those aren't going to be your choices.  Because

24    if the verdict form read guilty or innocent, then you would

25    say, well, I can't find him innocent so I must find him guilty.

1     That's not what the framers of the Constitution established.

2     Instead it's guilty or not guilty.  Not guilty is just not

3     proven.

4          If you find the government hasn't met their burden,

5     then that's not guilty.  And their burden isn't he is probably

6     guilty, he may be guilty, he could be guilty.  Beyond a

7     reasonable doubt.  Anything short of beyond a reasonable doubt

8     is not guilty.

9          Regarding Tim, what are the government's allegations?

10    When you go back and start deliberating, what exactly are they

11    saying that he did?

12         I would like to direct you to Government's Exhibit

13    4024.

14         I submit to you, ladies and gentlemen, this is why Tim

15    Muir got indicted.  But this is also why he should be found not

16    guilty.

17         This exhibit was introduced when Troy Little Axe was

18    on the stand, which was September 27, 2011.  This is a December

19    19 -- I'm sorry.  2017.  When Troy Little Axe was on the stand,

20    they introduced this document.  It's a letter from Tim Muir to

21    Sharon Vandenberg with the IRS.

22         You will be able to take these documents back there

23    and look at them for yourself.

24         Can we go to that second page, Eli.

25         It's a two-page document.  It shows Mr. Muir's

1   signature.

2          Can we go back pack to the first page, please.  Thank

3   you.

4          This document -- is this just a two-page document,

5   Eli?

6          Can you go to the third page, please.  Let's walk

7   through that document.

8          There are representations made in this document by

9   Mr. Muir and they ask about certain companies.  The first one

10  here on this third page is CB Services Corp.  And in this

11  document, this page 3, it talks about the fact that Mr. Tucker

12  previously owned -- go to the top third of that page, Eli, and

13  pull that up.

14         It says Mr. Tucker previously owned 100 percent of

15  this business.

16         So in December of '11 Mr. Muir is submitting this to

17  the IRS saying that Mr. Tucker no longer owns CB Services Corp.

18         The government introduces this when Troy Little Axe is

19  on the stand because this is really sort of the government's

20  kill shot, at least that's what they thought, and I am going to

21  explain what that means.

22         So they introduce this document, even though Troy

23  wasn't involved, which is fine, and they show, look, Mr. Muir

24  is representing that CB Services is no longer owned by Mr.

25  Tucker.

1          Go to the next page.

2          Blow up that top third.

3          Then we have Consumer Services Corp.  You remember

4    these are the nominee corporations.

5          This document, this exhibit 4024, submitted by Tim,

6    that says Tucker doesn't own any of these businesses anymore.

7    They name the nominee companies.  I am not going to go through

8    all of them with you, but I am explaining exactly why this was

9    introduced by the government.

10          We can take that back down.

11          They then get Troy Little Axe on the stand and ask

12    Troy about the Hallinan settlement.

13          Can we go to Exhibit 811, please.

14          Can we go to page 15.

15          This is the Hallinan settlement agreement.

16          Can you blow up the bottom half of that page.

17          If you recall, Troy Little Axe on direct testimony

18    said, yeah, that's my signature for these companies.  There's

19    two of them we talked about.  CB Services Corp. and Consumer

20    Service Corp.  And Troy Little Axe on direct said, I don't know

21    why I signed this.  I don't know anything about this at all.

22          So what the government was setting up, and this is why

23    I submit to you why Tim got indicted, is because he had

24    submitted this document to the IRS and said that Scott didn't

25    own these companies, when in fact the government was going to

1    argue he did, because they had Troy Little Axe saying, well, I

2    don't know why I signed this, and then they were going to tie

3    this to the Hallinan settlement and say, see, this is just a

4    big fraud because the Modocs weren't involved in this at all

5    and Troy Little Axe either didn't sign this or didn't know when

6    he was signing it.  That's why they are trying to include Tim

7    Muir in on the fraud here.  That's the connection between those

8    two documents.

9         Remember on cross-examination Mr. Ginsberg got up and

10   he had Defense Exhibits 2215, 2216, 2217, 2218 and 2219.  You

11   know what each of those agreements was?  Those were agreements

12   for Troy Little Axe, stock purchase agreements for all five of

13   those companies.

14        Troy testified on direct, I don't know what this is

15   about and I don't know why I wouldn't sign this agreement.

16        On cross-examination by Mr. Ginsberg he said, Oh,

17   you're right.  That was a little uncomfortable because Troy had

18   been given immunity and now it's like if Troy didn't tell the

19   truth on direct, is that a problem for Troy?  Mr. Ginsberg

20   said, well, maybe you just didn't remember, maybe somehow you

21   forgot.  Troy is like, Yes, I guess I must have forgotten.

22        Mr. Ginsberg suggested to you in his closing how could

23   that be forgotten?  The bottom line is this.  When the

24   documents are shown to the witness, all that unravels and the

25   government's kill shot, 4024, falls apart.  And we never heard

1    from it again.  You never saw 4024 again.  Because they ran

2    from it like a scolded dog, because it completely fell apart.

3          Because Tim gave legal advice -- I will complete the

4    circle.  And I showed on cross of Troy the Modoc financial

5    documents.  1085 and 1086.

6          1085, Troy signed the audit.  1086 -- I know it's a

7    lot of documents.  It's a lot of information to give to you.

8    1086 showed the Hallinan settlement in the Modoc financial

9    documents.  There wasn't any fraud going on there.  Either Troy

10   forgot -- although he is a lawyer, you would think he would

11   remember some of that stuff -- or because of the pressure of

12   the moment, pressure of the situation, he was under a grant of

13   immunity, maybe he felt like he had to give the narrative that

14   fit with the government's story, with their argument.

15         In any event, that document, the government's theory,

16   I submit to you, one of the primary reasons, if not the primary

17   reason, why Tim Muir is in this case completely falls apart

18   right there.

19         They have argued this Ragman theory.  It's stupid.

20   Tim should have never put that signature and panicked the way

21   he did.  But let's not forget -- can we have 2811, please.

22         Don Brady knew about all about this settlement

23   agreement.  We introduced e-mails showing Don saying, I am

24   ready to stand by and sign.  Remember Mr. Muir explained that

25   Don was gone for the weekend and didn't get both the forms

1   back.

2           We are going to look at 2811, and that's going to be

3   an e-mail.

4           Blow up the top half.  Thank you, Eli.

5           2/25/10, just days before the settlement is supposed

6   to be done, Conly says to Don, Hey, they are going to close

7   this settlement, you need to overnight the originals.

8           Conly respond back says, Talk to Don.  He is standing

9   by waiting for the docs to sign and FedEx back.

10          Thank you, Eli.

11          Can you show Defense 2812, please.

12          Don responds back a few minutes later to Mr. Tucker's

13  e-mail, "I stand ready to sign and return.  FedEx guarantees

14  tomorrow morning."

15          The point being, it was important for us to at least

16  demonstrate to you that there wasn't any kind of fraudulent

17  deal.  Brady is ready to sign.  He said he is ready to sign at

18  9:00 at night, I believe a Friday.

19          Can we put up Defendants' Exhibit 2815.

20          Can we go to the signature page.  Can you blow up that

21  signature.

22          We introduced the fact that Don Brady in fact signed

23  that agreement as part of the Hallinan deal.

24          Thank you, Eli.

25          Can we show Defense Exhibit 1450 now, please.

1          That's the second part of that Hallinan agreement.

2          If we can show the signature page again.

3          Again, Don Brady signs that document.

4          Thank you, Eli.

5          So the government's theory is, well, he must be guilty

6     of these federal offenses because he panicked and put the

7     Ragman on there because he must be just untruthful or generally

8     not to be believed.  But the bottom line is, as we have shown

9     you, that Brady was ready to sign, he did sign, the documents

10    got all signed.  There is no suggestion that this was done to

11    deceive anybody or defraud anybody.

12          They have shown you a few other documents where Ragman

13    signed on there, but there is no connection to Tim.  In fact,

14    one of the e-mails says -- the only e-mail they have shown you,

15    Tim says to Mitchell you can sign your own name.

16          The point is, that's not proof beyond a reasonable

17    doubt.

18          The *Tucker v. AMG* is another allegation they are

19    making.  They are making an argument that this is a fraud

20    because Tim put the word "S" on the request.  Remember that was

21    a big part of the cross-examination yesterday.  How many

22    requests or did you make just one request of Conly Schulte.

23          There is no question that Conly Schulte knew about

24    that.  Schulte testified about it.  Schulte wrote a letter to

25    Pete Smith and said, I have got your petition.  I'm not filing

1    anything on behalf of AMG or a tribal corporation.  We don't

2    come into states and we don't file things.

3           Then Conly Schulte also wrote a letter to Don Brady,

4    that we also introduced, after it was over and said, Hey, Don

5    Brady, we got the result we desired.  We needed to make sure

6    this merger was going to be recognized under tribal law, and

7    that's why we did this transaction.  There is nothing to be a

8    sham about it.

9           AMG was formed in '08 and purchased CLK.  You saw the

10   tribal resolutions.  The government again is trying to fit this

11   piece of paper, this lawsuit, to fit their narrative.  It

12   doesn't show anything criminal.  He is protecting Scott Tucker

13   from liabilities.  That's what Pete Smith told you.  What about

14   that is criminal?  There is nothing about that that is

15   criminal.

16          Did they not pay, meaning AMG, when they should have?

17   Yes.  Is there any involvement other than Mr. Muir knowing they

18   didn't pay in a timely fashion?  Yes.  But how does that

19   further this criminal enterprise?  It doesn't.  It doesn't

20   prove anything.

21          As I said earlier, the government cobbles together --

22   and I ask you to think about their arguments they have made and

23   the evidence they have shown -- they have cobbled together

24   either e-mails that Tim is not directly on -- maybe he is

25   copied, maybe not.  One is from Tim Buckley.  Tim Buckley

1  spells Muir's name wrong.  He says, well, Tim will be doing

2  these things.  Tim isn't even cc'd on that e-mail.  So they

3  want you to infer that because Buckley sent an e-mail to

4  another manager and Muir is mentioned there that he must be

5  working on all those things.

6      Here is what my question is.  Where are the e-mails

7  from Muir that says he is actually working on those?  Or where

8  is Buckley coming in to testify and saying Muir worked on some

9  of those things?  That's one way to cobble together their

10  argument.

11      The other way is to call people like Crystal Grote who

12  essentially says, oh, I think Tim and Blaine and Scott knew

13  about that.  Tim and Blaine and Scott knew about this.  There

14  is a constant mantra by the government throughout this trial

15  without any specifics at all.  And I suggest to you they are

16  doing that because they don't have any evidence on certain

17  things regarding Tim being involved or where of particular

18  matters.

19      I suggest you think about, what evidence did the

20  government not provide to you, sort of missing evidence?  And

21  that is, have they shown you evidence that is contrary to Tim

22  Muir's testimony?  He was on the stand for ten hours.  And they

23  suggest to you on the first part of their closing, there were

24  two times that he didn't tell the truth.  He changed the answer

25  on the trademark situation and then he had another issue on

1    final act on approval on tribal land.  Those are the two

2    examples they gave you that demonstrates Tim Muir is not

3    telling the truth.

4          I suggest to you they have shown you multiple,

5    multiple private e-mails between he and Tucker and he and other

6    people, occurring over years and years and years.  There seems

7    to be no lack of any of those kind of e-mails.

8          Don't you think they would be able to show some e-mail

9    to you over all those years where these private e-mails are

10   engaging or bragging about criminal conduct, about taking

11   advantage of the tribe, something that is really substantive,

12   that doesn't just suggest, oh, and they get to argue this must

13   be something bad?  No e-mails like that at all proven to you.

14   Nothing that shows Mr. Muir's testimony is not correct or not

15   accurate.

16         I am going to talk about the Williams' recordings for

17   a minute.  If you remember Ms. Williams tells you, well, I

18   initially started recording because Gena Lankford asked me to

19   record the meetings.  That's her claim.  And she then went

20   looking in some closet somewhere for some recording device.

21   And because she couldn't find a recording device, then she

22   decided to use her phone.

23         So we went from authorized recording from Gena

24   Lankford, who we never heard from, by the way.  An authorized

25   recording by a board member, to I couldn't find it, to I am

1   going to use the phone and not tell anybody about it.  Really?

2   Does that make any sense to you at all?  That's the sequence of

3   the recordings?  And she didn't tell anybody.  Not only did she

4   not tell anybody, she doesn't keep them.  If she is making the

5   recordings to make sure we get the board minutes right, why

6   wouldn't you transfer them to some kind of device.  This is the

7   digital age.  This isn't 20 years ago where I understand it is

8   hard to do that.  You transfer it and keep it in the file so

9   anyone can come look at it at any time, two years from now,

10  three years from now.

11          Especially, she claims, I think this is all a bunch of

12  shenanigans.  I didn't like what was going on -- remember the

13  recordings are '11 and '12.  I don't like what is going on so I

14  am recording this so I can demonstrate what is bad about it.

15  Yet I don't tell anybody, I don't keep any copies, and when the

16  end comes here, this trial comes around, nobody can really tell

17  you how many recordings there are or where the recordings were

18  or how many phones there were or what the chain of custody and

19  the recordings were.  Why?  Because you find out she has the

20  whistleblower stuff going on.  That's why.

21          Where are the ones with Tim Muir?  He didn't attend

22  every board meeting, but he attended AMG board meetings.  And

23  those AMG board meetings were from one and a half to three

24  hours long.  What have you been provided?  Like two-and-a-half

25  minutes of recordings.

1          Where are the ones with Tim Muir on there if

2    everything was so bad?  Tim said I wish they were there.

3          Carolyn Williams said, I recorded every board

4    meeting -- I think she said like 16 of them or so -- during

5    that time period.  I think I pinned her down to say by late '12

6    or early '13, something like that.  Maybe before then.  There

7    were about 16 board meetings.  Tim would have been at least at

8    one or two of them.  How come we don't have any of those?

9    Where is that evidence?  Why don't you hear from Tim Muir on

10   any of those tapes?  Scott Tucker was shown on at least one.

11   Where are those tapes?  Isn't that the best evidence?  They are

12   suggesting to you it is the best evidence.  I suggest to you

13   those board meetings didn't need to be taped.  There were never

14   16 board meetings being taped.

15         One of the things I want you to think about for

16   ultimate control is whose money is it, who takes the money.

17   Mr. Ginsberg talked to you a little bit about that, but I would

18   like to circle back there for a second.

19         After 2009 there is no 1 percent deal.  The servicing

20   agreements all got canceled.  You heard that evidence.  There

21   was no written contract whatsoever between the tribes and Mr.

22   Tucker.  So business went forward.  I guess it went forward

23   just based on a handshake or trust.

24         As Mr. Ginsberg told you, all the accounts were in the

25   tribes' names.  The power of attorney was given by the tribes

1   to Scott Tucker and it could be revoked at any time.  If you

2   remember, there was evidence that it was revoked, and then

3   given back.  In fact, I think the evidence was it was given

4   back after Kirkland & Ellis and Dorsey & Whitney got involved.

5          So after we had new counsel, new Joe Frazier, they

6   took away the signature authority and gave it back.  That's

7   criminal?  Those activities are criminal?  Are Dorsey & Whitney

8   involved in the criminal activity now, Kirkland & Ellis, all

9   those people?  Is there no end to the, the end of the death of

10  the conspiracy here?

11         The point I want to get to is the ultimate control.

12         Can we have Defendants' 921A.

13         You recall this is the annual report for MNE,

14  September 30, 2013.  Joe Frazier is the middle.  He is the new

15  guy.  There is a whole new sheriff in town taking care of

16  everything.

17         Can we go to the third page, Eli.

18         You remember that this paragraph, the second-to-last

19  from the bottom, blow that up.

20         Total gross revenues, $233 million.

21         The net income, total assets, $189 million.

22         Now, can we go to Government Exhibit 3551, please,

23  Eli.

24         So that 921A we just saw was 2013.

25         Can we go to the RGL forensic counsel person and all

1    these charts.

2          On the left-hand side of this chart we have the Tucker

3    receipts from '08 to '13.

4          On the right-hand side we have the Nation Management

5    fees, '08 only to '12.

6          The accountant testified I never got any information

7    past 2012.  That's why I put that in there.  But this is just

8    the management fees that an accountant had on the books of the

9    tribes.  The $189 million we just looked at isn't even counted

10   here.  How is that?  What was this supposed to represent?  Is

11   this supposed to be fair representation of what the tribes got

12   versus what Tucker got?  Yes, that is what it was supposed to

13   be.  Is it?  No.  Does the 189 go on top of that and puts it at

14   220?  What has the government proven to you about that 189?

15         They say in closing argument today, at the end Tucker

16   realized he couldn't get the money and so because he never

17   tried to get the money, that means he and Muir are both

18   criminals.  That is another way of saying it wasn't Tucker's

19   money.

20         Chief Lankford told you they spent tens of millions of

21   dollars on corporations.  It wasn't that 40 million.  It was

22   the 189 million.  Where is that money?  Isn't that ultimate

23   control?  Who owns the business gets to keep the money and gets

24   to fire people.  That's what they do too.  You heard testimony

25   they fired Scott Tucker.

 1          That's just the Miami, the 189.  Troy told you 9 or 10

 2     million.  So now we are almost 200 million on top of that 41

 3     million.

 4          What about the Santee?  Who knows.  We don't have any

 5     evidence about that, do we?

 6          That exhibit is not worth anything to you.  It doesn't

 7     tell you anything.  In fact, I think it's misleading.  It

 8     doesn't accurately tell you anything at all.

 9          They had the accounts.  They fired people.  They kept

10     the money.  That's ultimate control and that's ownership.

11     That's what that is.

12          The government asked you to rely on a number of cast

13     of characters as sort of the foundation of their case and I am

14     not going to go over everything that Mr. Ginsberg went over.  I

15     think he did an effective job on that.

16          The foundation of the case begins with Rubin.  That's

17     the basement of their case.  That's what they are building

18     their house on top of.  They call Rubin to give you all this

19     information.  Rubin is essentially the ultimate expert.  He

20     tells you everything you want to know.  He can tell you about

21     true lender, so-called servicers, all those catch phrases that

22     were really cute between the government witnesses who had

23     immunity agreements.  They are happy to give all those catch

24     phrases.  And he tells you about true lender and County Bank

25     and everything else in the world.

1    He is like those dolls in the '70s or '80 where you

2    pull the string and the doll says one phrase.  That was a lie.

3    That was Rubin.

4    On the cross-examination I really was only asking him

5    one simple question.  I was asking him about the 2006

6    deposition he gave, because in 2006 he was in a deposition

7    about County Bank with the New York AG's Office.

8    He testified in that deposition, under oath,

9    everything in that program was fine, there was nothing unlawful

10   about that program.  And I was making sure that I understood

11   his testimony.  I got up and asked him.  I said, Did you

12   testify?  Yes.  Did you testify everything was fine, was proper

13   with that program?  Yes.  And that was a lie.  We went through

14   that.  It was like an Abbott & Costello routine.  We went

15   through that multiple times.

16   Finally, I went the other way.  I said, are you

17   telling me you said it was lie?  No, that's not what I said

18   then.  It was important because if you recall, Mr. Roth

19   established on the cross-examination of Rubin -- Rubin

20   cooperated.  I don't know how many times it was.  But it was

21   over three or four years he is cooperating with the government.

22   He doesn't start cooperating with this investigation until

23   almost 2015.  And I submit to you all of the sudden County Bank

24   becomes a problem.  Why?  Because that's his capital.  No pun

25   intended.  That's Rubin's capital in this case.  He can get

1    some goodwill up here and maybe against Hallinan.  So he says,

2    oh, County Bank, complete sham, complete fraud.

3            But then about that time, they are like wait a minute,

4    I heard you testified in '06 that there was nothing wrong with

5    County Bank.  That's a problem.  Imagine that conversation, the

6    government with Rubin and Rubin's lawyers.  Rubin, you're no

7    good to us if you're saying County Bank is no good but you

8    testified under oath '06 it was good.  We can't use you.

9    Rubin's lawyers is like, you're not going to get out of this.

10           This is exactly how this works, guys.

11           So all of the sudden Rubin is like, that was a

12   complete lie in '06 too.  Now he has got a problem because

13   there are other lawyers there.  Goodman was there and he says,

14   and you heard this on the stand, Goodman knew I was lying.

15           Stephen Goodman is going to put his whole career on

16   the line for Rubin to lie about County Bank in 2006.  That is

17   sort of my last addition to what Mr. Ginsberg started.

18           Did they produce one document that supports anything

19   that Rubin said?  Think about that.  They had some service

20   agreements from Goodman, but anything at all that ever

21   corroborated Goodman?  How could that possibly be so?  You

22   couldn't find one document that corroborated what Goodman had

23   to say.  Because it's not true.

24           Carolyn Williams.  No document to support what she

25   says either.  She says to you, Don was not the CEO.  One of the

1   reasons, I had no financial records.  Very adamant about that.

2   Sympathetic story that Mr. Ginsberg was telling you about.  Oh,

3   really?

4         What did Allison Harris, the CFO, tell you in 2011?

5   She told you that four months after Williams would have

6   started, because Williams started in June or so, four months

7   after Williams would have started, Tim Muir made sure, because

8   of the ITG audit, that 12 boxes of financial records got

9   delivered down to the Miami tribe.  12 boxes.  Don had no

10  financial records according to Carolyn Williams.

11        The office couldn't be very big.  She told us about

12  how she could overhear everyone's phone conversations and she

13  could see when the mail came in and all that kind of stuff.

14  Don't you think she would have noticed 12 boxes coming in?  Of

15  course she did.  It doesn't fit the government's narrative and

16  it doesn't fit her narrative.

17        She is on the stand for seven hours, just about.  In

18  my cross-examination she says two phones.  Two phones were used

19  to record because she got caught in the trick box, because she

20  had given the one phone to whoever it was, lawyer A.  If that

21  happened then, how did you record any other board meetings?

22  She said, well, there was a second phone.

23        There was no second phone.  She didn't record all

24  those board meetings.

25              (Continued on next page)

1

2          MR. BATH:  She also claims, Well, I got fired because

3     I found a document -- remember she said she stole a bunch of

4     documents or downloaded them on a thumb drive, but unauthorized

5     documents she was grabbing up for her whistleblower stuff --

6     But I found an email where Joe Frazier was going to give Scott

7     Tucker $100 million, and I gave that to Gena Lankford.  And

8     that's why I got fired.

9          That's what she says to you.  Really?  Gena Lankford

10    is with the tribe.  No proof of that at all, because Carolyn

11    Williams is just an untruthful witness.

12         Scott Mitchell.  He's told you about, Mr. Ginsberg

13    did, that they bring him in here why?  Because he looks like

14    he's in the inner circle.  That's really why Mitchell gets

15    called up here, and he regales you about 2003 or '4 -- I

16    thought he said 2003, but we'll just call it '4 -- things that

17    happened in '4, '5, '6, and all the things that happened.  And

18    he's the one that comes up with the catch phrase "magic

19    button."  Rubin had the supposed servicers, and now Mitchell's

20    got this cutesy magic button deal.  We don't see that in any

21    emails, by the way, anywhere, do we?  Any corroboration of that

22    at all.

23         So Mitchell gets up here, regales us all forever and

24    ever, for a long time, and tells us all kinds of stuff.  Now,

25    understand Mitchell was there.  We're not saying he didn't work

1   there.  But when Mr. Ginsberg gets up and asks him, he's, like,

2   I guess I wasn't there for those three years.  First when he

3   asked him, Mr. Ginsberg asked, Is it possible you weren't even

4   there in those three years, there was uncomfortable silence for

5   a long, long time.

6        I don't really understand, I submit to you, and this

7   is Mr. Ginsberg asking, How does that happen?  How do we come

8   to a federal trial, somebody gets up on the stand and swears to

9   tell the truth?  There are two men whose liberty is at stake.

10   And we're not talking about missing a month or a day or even

11   six months, missing three years of your life.  You're willing

12   to do that, and I don't know if it says more about the

13   investigation or more about Mitchell.  I'll let you decide

14   that, but it should be troubling that anybody would get up on

15   the stand and either be under so much pressure or meds or has

16   memory problems, one of those three things, and just misses

17   three years of his life, but it doesn't come out until

18   cross-examination.

19        If it wasn't so serious, like a movie, it would be

20   comical.  Really?  Well, let me tell you about all this, I was

21   here blah-blah-blah.  Really?  Three questions:  Were you even

22   there then?  Hmmm, maybe I wasn't.

23        Really?  It's a federal criminal trial.

24        The presumption of innocence is enough for you to

25   acquit.  You'll get an instruction, I believe, from Judge

1    Castel on that.  Mr. Muir's testimony, I also submit to you, is

2    enough for you to find him not guilty.  He was truthful even

3    when it hurt him, even when we talked about Ragman.  He owned

4    it.  He didn't run from it.  He told you about, it was stupid.

5    He told you he panicked when he put that signature on the

6    Hallinan agreement.  He was on the stand for ten-plus hours.

7    The government's free to ask him any question they want, to go

8    at him as long as they want.

9           Really think about that.  How often does that happen?

10   The government gets to take full, free rein of this guy, and

11   the government suggests to you in their closing, Oh, well, how

12   come Mr. Muir didn't get asked these questions?  And they

13   rattle off two or three different kinds of subjects.  Really?

14          First of all, whose burden is it here?  It's not our

15   burden.  They could have asked him any of those questions that

16   they wanted.  Why didn't they ask him questions about scripts,

17   detailed questions about affidavits or the Brady tapes or the

18   magic button?  Why didn't they ask any of those questions?

19   Because they knew the answers wouldn't be good for them.

20          It's not a reverse analysis.  It's not our burden to

21   ask every question.  They can ask any question they want.  And

22   I think by inference the fact they didn't ask those questions

23   is more reasonable doubt for Tim Muir.

24          I want to close by asking you to think about Tim's

25   state of mind, because this goes back to willfulness, him

 1   knowingly doing something that the law forbids.  He tells you

 2   he spent hundreds and thousands of hours researching topics

 3   involving sovereignty and sovereign immunity; tribal law;

 4   e-commerce; choice of law provision; state usury law -- he read

 5   the usury law and understood that it said unless otherwise

 6   provided by law; the Constitution and cases he relied on; asked

 7   opinions of other lawyers, who had much more experience than he

 8   did.  He reviewed active cases and regulatory actions and

 9   reviewed pleadings and attended court hearings, and he told you

10   his belief.  His belief.

11        He believed that the tribal model was lawful, and he

12   believed that sovereignty and the U.S. Constitution, the Indian

13   commerce clause, those things, in his mind, meant that they

14   could make these loan, loans that were already being made,

15   remember, when he joined in 2006; about the abrogation, unless

16   Congress takes away the power, the tribes have the power.

17        That's what his belief was.  He did not believe that

18   the actions that were taking place were improper, unlawful in

19   any way; that he knew the tribal entities were formed pursuant

20   to tribal law; that they must pass laws and resolutions, and

21   that they had;

22        The contracts and choice of law provision, that the

23   tribes had the final say, and they did have the final say.  The

24   controlling factors like day-to-day control, financial

25   arrangements and the type of business did not impact his belief

1    that the model was lawful.

2         So then, I ask you, Well, what evidence did we see or

3    hear that supports his state of mind?  He told you about --

4    Crystal Grote actually first tells you that she had been

5    monitoring TILA disclosures for years on other companies, and

6    Tim told he'd watched regulatory actions to see if the

7    regulators had made allegations on that TILA that they were

8    unlawful, that other people had the identical, including the

9    little asterisk, language that they had.  That's why he didn't

10   think, in his mind, they were violating the law as relates to

11   TILA.

12        He told you he'd known there was congressional policy

13   that tribes should seek business opportunities with no capital.

14   Tom Gamble told you the same thing.  Tom Gamble said that was

15   one of the missions of the Miami tribe, to get involved in

16   businesses that had no capital.

17        The companies had been involved in lending for ten

18   years.  They were in at least three different states, West

19   Virginia, Colorado and California.  The government wants to

20   allege everybody was hiding.  These lawyers were entering

21   appearances, the tribes and their entities were entering

22   appearances.  This was all done out in the open.  No one was

23   hiding anything, and that goes to Tim's state of mind.

24        Troy Little Axe told you he, in fact, met with

25   regulators.  Does that sound like somebody who's a criminal,

1    who's hiding, who thinks he's committing a crime?  No, it does

2    not.  Tim told you there wasn't a single court decision that

3    held that the tribal model was unlawful.  That went to his

4    state of mind.

5         Going back to that 2013 CLE in Washington, D.C., 200

6    lawyers in a room, with like four presenters talking about the

7    tribal model, sponsored by the American Bar Association.

8    Really?  200 lawyers from across -- I don't know where they're

9    from, but 200 lawyers talking about tribal lending, the tribal

10   model.  Are they all, like, learning how to become a criminal

11   enterprise?  It goes to his state of mind.

12        Finally, I'd like you to look at this last slide,

13   defendants' 1407.  The email before this was Scott Tucker

14   saying to Tim about an article, "Hey, this sucks."  And Tim

15   responds back to Scott:  "I really don't see it that way.  Look

16   at Googel's, West Virginia AG's, comments."  And then he, he

17   being Tim, cuts and pastes part of that article right there.

18   Tim says, "Everybody else is doing rent-a-tribe.  This model is

19   not.  This model really is Indian tribes."  And he says, "The

20   others are going to get blown out or settled."

21        This is, like, a private email between him and Scott

22   Tucker, essentially two coconspirators in the government's

23   theory.  I think this was 2011, or so, but you'll be able to

24   see that in the jury room, the exact date.

25        Does this not reflect his state of mind?  He had no

1   reason to believe anybody was ever going to read this email.

2   This wasn't publicized.  This wasn't a press article.  This is

3   two people that worked together, the lawyer and the client, and

4   he's giving him his personal viewpoint.  And if you believe Tim

5   Muir didn't believe he was committing a crime, that he wasn't

6   doing something the law forbids, then he's not guilty.  He

7   never, Tim Muir never willfully believed he was committing any

8   type of crime here.

9        He acted in good faith, and the evidence supports

10  that.  Tim's presumed innocent.  The government has failed to

11  prove beyond a reasonable doubt that Tim's guilty.  Sometimes

12  lawyers get it wrong.  Sometimes their clients get sued for it,

13  but they don't get indicted for it.  They don't get convicted

14  of a crime.

15       I ask you to look at all the evidence, and I ask you

16  to return a verdict of not guilty.

17       THE COURT:  All right.  Thank you, Mr. Bath.

18       Ladies and gentlemen, why don't you stand up and

19  stretch.  If you'd like a break, you can let me know.

20       I know one of our jurors has a commitment.

21       You'd like to take a break?

22       JUROR:  No, no, no.  I have a commitment.

23       THE COURT:  You also have a commitment?  OK.

24       I think what I'll do is I will start the jury

25  instructions and finish them up tomorrow morning.  We'll do it

1    that way and break it up, because they are lengthy, and they're

2    very important, but it may be a little bit more tolerable for

3    you all to hear it in two sections, and then you'll have the

4    case tomorrow morning.

5         Would it be convenient to start at 9:30 tomorrow

6    morning?  OK.  Let's do that.  We'll start at 9:30 tomorrow

7    morning, and I'll ask you all to be here on time so we can do

8    that at 9:30, and when the instructions are finished, you will

9    then be able to begin your deliberations.

10        All right.  The government, as you know --

11        Yes?

12        JUROR:  I have to use the bathroom.

13        THE COURT:  OK.  Take a short recess and go into the

14   jury room, and the government will set up for their brief

15   rebuttal.  You can turn the light on when you're ready to come

16   back out and let me know that you're ready to come back out.

17        (Jury not present)

18        THE COURT:  We're on a brief recess.

19        (Recess)

20        THE COURT:  I have marked as Court Exhibit 20 the

21   final jury instructions, and the verdict sheet will be 21.

22   Copies are being handed out now.

23        MR. RAVI:  Thank you.

24        THE COURT:  All right.  Bring our jurors in, please.

25        (Jury present)

1          THE COURT:  Please be seated.

2          Mr. Velamoor, whenever you're ready.

3          MR. VELAMOOR:  Thank you, your Honor.

4          For two hours, Mr. Ravi talked about the evidence in

5     this case.  He quoted from testimony.  He showed emails and

6     other exhibits.  He played recordings.  He had so much evidence

7     he could barely fit it into two hours.  He could have gone on

8     for two days.  And when you have no answer to the evidence, you

9     do what the defense counsel did.  You come up here and you

10    create distraction after distraction after distraction.

11         When the evidence doesn't look so good against Scott

12    Tucker or Tim Muir, then you put Carolyn Williams, the

13    secretary, on the stand, on the stand or on trial.  Or you put

14    Scott Mitchell, the IT guy, on trial -- the IT guy -- for

15    getting a date wrong ten years ago.  And instead you ask the

16    jurors to speculate about the investigation, about how we chose

17    our witnesses or how they chose theirs, or why it was, how many

18    times we met them for prep.

19         Apparently when witnesses provide devastating

20    evidence, it's all scripted, and when they make an innocent

21    mistake about the dates, we didn't meet them enough times,

22    rather than focusing on the evidence that the investigation

23    produced.  Instead, you try to make up evidence from the

24    podium.

25         Just to be clear, the evidence comes from the podium,

1  comes from the exhibits; it doesn't come from the lawyers.  And

2  no lawyer testified, for example, that the Nevada shell company

3  model was lawful.  When that was proffered here, proposed to

4  you here, they didn't even mention a particular witness, and

5  that's because it never happened.

6          You were asked to say, Well, why does the

7  nonprosecution agreement with the tribe only include a

8  statement about the affidavits?  Well, it doesn't.  Take a look

9  at it.  It includes admissions about several other things as

10 well.

11          A very interesting thing happened during Mr. Bath's

12 summation.  He starts by saying Adrian Rubin had nothing to do

13 with his client, County Bank had nothing to do with his client.

14 Then what does he do?  He spends some of his time talking about

15 Adrian Rubin.  Why does he do that?  Because he has nothing to

16 say about the evidence against Tom Muir.  That's why Tom Bath

17 spent time talking about it to you.

18          We kept track.  Mr. Ravi painstakingly went through

19 ten lies, examples of tribal lies, examples of tribal shams.

20 They barely touched any of them.  They barely addressed any of

21 them, because there's no answer to any of them.

22          Let me spend a minute just to talk briefly about

23 what's not at issue.  Mr. Tucker is not on trial for how much

24 money he made.  He's on trial for how he made that money,

25 because he made it by flagrantly violating the law.  Mr. Tucker

1   is not on trial for lavish spending.  He's on trial because he

2   stashed the money in tribal bank accounts and spent it from

3   there, which is money laundering, to hide that the money was

4   his.  This is not about the payday lending business in general;

5   it's about their payday lending business and the crimes they

6   committed in conducting that business.

7         Now, for whatever reason, they picked on particular

8   witnesses.  They picked on Grote, Rubin, Williams and Mitchell.

9   And I don't want to spend too much time on any particular

10  witnesses in this case, because frankly, we could have called

11  half the witnesses we called and showed half the emails, and it

12  would still be enough to convict these guys ten times over.

13        I'll just spend a minute on the witnesses they

14  mentioned.  They talked about Adrian Rubin.  And look, Adrian

15  Rubin is an important witness for one part of the scheme, and

16  he does have a history of lying, and he owned up to it and you

17  should consider that.  But just think about what the defense

18  attorneys want you to ultimately believe about Adrian Rubin.

19  They ultimately want you to believe that he's a 30-year-long

20  liar, but his payday lending business was pure.  They want to

21  convince you he's a liar who ran a completely honest payday

22  lending business.  That's what they want you to ultimately

23  believe, and that doesn't make any sense.

24        They also picked on Crystal Grote.  Mr. Ginsberg

25  talked about Ms. Grote and called her a liar for the first ten

1    minutes and then for the next ten minutes put up her quotes on

2    the screen from her testimony, so I'm not even sure exactly

3    what it is.  But Ms. Grote made clear a couple of important

4    thing, and that is the direction to lie about where they were

5    located came from those two guys.  They knew about it and they

6    directed it.

7          She also said, quite clearly, that the weather thing

8    was something she came up with to implement that lie.  But if

9    she was really lying, if she was trying to come up with the

10   best story to help the government, wouldn't she say she

11   discussed that weather thing with them as well?  Of course she

12   would, but she didn't, because she told the truth and she told

13   the story that makes the most sense, which is the policy came

14   down from the bosses that you're supposed to lie about where

15   you're located, and the low-level people came up with ways to

16   implement it.  But it's the policy that counts, and it's the

17   policy that makes them guilty.

18         Now, they also talked about Carolyn Williams, and I'm

19   not sure why they spent so much time talking about Carolyn

20   Williams, because everything that Carolyn Williams said about

21   Don Brady was corroborated by the recordings.  They want you to

22   think about how she made those recordings, what her iPhone was

23   doing at the time, how many iPhones she had.  That's because

24   they don't want you to actively think about what Don Brady said

25   in those recordings, because what Don Brady said in those

1    recordings is devastating.  He made it clear in about four

2    sentences exactly what was going on in this case.

3           Scott Mitchell, the same way.  They're picking on

4    Scott Mitchell.  The most dramatic thing Scott Mitchell talked

5    about was the tank, but Mr. Muir admitted the tank yesterday

6    during his own testimony, so I'm not sure what the big story is

7    there.

8           But let me just be clear on Mr. Muir.  He is not

9    guilty of money laundering or any of these crimes because of a

10   single check.  He was involved in everything.  The whole scheme

11   here was to run payments through tribal bank accounts, and he

12   was involved in all of that.  The whole business was running

13   through tribal bank accounts, and he knew that.

14          Now, Mr. Muir's lawyer just tried to suggest to you

15   that he had no real involvement in the lending activities, and

16   to try to make that case, he told you that Mr. Muir wasn't

17   copied on one of the most important emails in the case,

18   Government Exhibit 1707.  But Mr. Muir was copied on that

19   email.  It says it right there, Tim Muir, and that email lists

20   numerous things that Mr. Muir is doing as part of this

21   business.  And what's the reason why he tried to pretend to a

22   jury that Mr. Muir's not copied on this email, because this

23   puts Mr. Muir at the center of the crime, making policies,

24   making manuals, doing the things that put him in the center of

25   the lending business.

1          Mr. Muir was also at the heart of the fraudulent

2    strategy to cover up this crime.  He was a huge part of the

3    scheme to hide their ownership.  That's what Tucker v. AMG was.

4    Mr. Bath asks, How did Tucker v. AMG further this scheme?

5    Well, what was the point of Tucker v. AMG?  It was to get the

6    so-called sham merger backdated to 2009.  Why did he want to do

7    that?  Because class action lawyers and regulators were going

8    after the business, and backdating that merger helped him do

9    that.

10          That's what Tim Muir did, and he was at the heart of

11   it, so to suggest that Tim Muir was off to the side somewhere,

12   all the evidence suggests to the contrary.  He was at the heart

13   of the BA Services deal, funneling money through nominee tribal

14   bank accounts to Scott Tucker.  You heard about that yesterday

15   during his cross-examination.  Instead, Mr. Bath wants you to

16   think about, again, another conspiracy theory.  He wants to

17   talk about this letter to the IRS that Mr. Muir wrote.

18          Let me be clear.  The fact that Troy Little Axe had no

19   idea that he'd purchased a bunch of companies, I'm not running

20   away from that.  That's at the heart of the government's theory

21   of this case, that these tribal people were signing on to

22   things that had no meaning.  So no one's running away from

23   that, but that's not why he got charged here.  He got charged

24   because he was at the heart of the lending business.

25          You're going to hear some instructions on this, so let

1    me just be clear.  Tim Muir doesn't have to be at the same

2    level as Scott Tucker to be guilty.  All right?  He doesn't

3    have to be at the very top in order to be guilty of these

4    crimes.  You're going to hear that from the judge, but Mr. Muir

5    was at the heart of these crimes, and he put himself at the

6    heart of these crimes with his own words.  Think about the

7    number of emails that you've seen in this case, where Mr. Muir

8    describes himself as part of the team, the three of us make a

9    great team, we're killer, we're crushing it, the three of us.

10   He put himself at the center of this case through his own

11   words.

12          Ultimately, what is Mr. Muir saying about this case?

13   What he's basically saying, after hearing all the evidence, his

14   basic point to you is to stand up at the end of this thing and

15   say:  Disregard all that evidence.  Pretend the bad stuff in

16   the emails wasn't there.  Pretend the Tucker v. AMG lawsuit

17   wasn't filled with lies, and just trust me.

18          Trust him?  Trust him?  Trust the guy who gave you

19   four different answers in two days on whether he asked Conly

20   Schulte to file the certificate of merger?  It wasn't just the

21   change in the trademarks or the tribal approval that he changed

22   his story on.  He changed his story from minute to minute.  He

23   couldn't remember his own so-called legal theory as to why this

24   whole thing was lawful.  He at one point asked me what he'd

25   said yesterday.  I have no idea what he said yesterday.

1          Trust the guy who told you over and over again that he

2     was representing Indian tribes while at the same time, in

3     private emails, he's telling Tucker, in words and in actions,

4     that he's really representing Tucker?  Trust that guy?  That's

5     ridiculous.  Ultimately, they're trying to convince you that

6     this whole business, this business that stinks, that they were

7     offering this business in good faith.

8          So why not do it honestly?  If this is really some

9     kind of good faith effort to follow the law, why are they lying

10    about everything?  If you believe what you're doing passes

11    muster, why send all these false affidavits to courts?  Why

12    have your employees lie about where they're located?  There's

13    no dispute at this point about that, so why do it?  If you

14    believe that all Scott Tucker is doing is supposedly servicing

15    the loans, as they put it, and that's perfectly fine in their

16    view of the law and view of the world, why are they hiding

17    behind the curtain?

18         If you believe the tribe is doing what it needs to do

19    to make this a lawful or appropriate venture, why are you

20    creating this paper trail to make it seem like they're doing

21    much more than they are?  Why do that?  Well, common sense

22    tells you that if you're lying, if you're hiding, if you're

23    dodging, if you're weaving, you're doing that because you know

24    what you're doing is wrong.  You know at all times you're

25    worried about getting caught, because you're covering something

1    up.

2           You know from this trial and from Mr. Ravi supposedly

3    that these two defendants showed no hesitation to lie.  That is

4    not something that comes with any difficulty to them.  But even

5    they don't lie for no reason.  They couldn't have run a real

6    tribal lending business because a real tribal lending business

7    would not have resulted in $400 million Ferraris and moneys for

8    all kinds of fun things like Aspen homes.  No business in rural

9    Nebraska or rural Oklahoma was going to result in that kind of

10   money.

11          So what did they do?  They created a fake tribal

12   business, but every lie they did was calculated to fill a hole

13   in that scheme.  They know the business should be on tribal

14   land, so they have call center folks pretending they're calling

15   from Nebraska and Oklahoma.  They know the tribes should be

16   issuing the loans, so what do they do?  They stash Scott

17   Tucker's money in bank accounts, slap the tribes' names on

18   those accounts and pretend that the money is the tribes'.  They

19   know that the tribes should be making the credit decisions on

20   the loans, so they create this magic button for Don Brady to

21   press.  No one at this point in this trial is suggesting that

22   Don Brady's magic button was approving anything.

23          None of these lies are accidents.  They're all

24   designed to cover up their crimes.

25          Let me talk a little bit about the misleading of

1    consumers, the false disclosures.  Mr. Ravi, during his

2    closing, started with things that were not in dispute, and he

3    left out at that point the fact that these disclosures were

4    false.  He can now add that to the list.  If he wants to do

5    this jury address again, he can add to the list that those

6    disclosures, it's undisputed now that those disclosures were

7    false, because you never hear any argument from anyone that

8    those Truth In Lending Act disclosures were true.  No one's

9    suggesting that anymore, because you can't.  Simple English

10   tells you the total-of-payment boxes and the finance-charge

11   boxes are straight false.  And those are material statements

12   that people relied on that you can use as a basis for wire

13   fraud as well as for the TILA accounts.

14          Now, you heard some more of these suggestions about

15   this fine print below these boxes.  Well, first of all, no one

16   is at this point trying to walk you through that fine print,

17   because everybody knows that that is indecipherable.  That fine

18   print doesn't make any sense, but even if it was crystal clear,

19   it wouldn't change the lies.  It wouldn't make the lies above

20   them go away.  There's no principle that you're going to hear

21   about that says you can lie in one part of a document and just

22   tell the truth somewhere else and everything is fine.  You're

23   not going to hear anything about that.

24          And the fine-print box did nothing to help.  You heard

25   and saw it.  It's completely confusing, and it's designed to be

1    confusing.  The whole purpose of having large-print disclosures

2    in clear terms is because, as normal people, you know that if

3    you put things in bigger print, they're going to get the most

4    attention.  When you put the essential information in big

5    print, people rely on it, and they knew that, and so it wasn't

6    an accident that they put the lies in the big print and some

7    other information in small print.

8         It's also not an accident that they had this so-called

9    congratulations email after the fact, after people had already

10   signed up for the loan.  Well, at that point it's too late.

11   People had already signed up for it, and they signed up for it

12   based on false statements.

13        If you wanted the customers to actually understand

14   what was going on, you'd present that information to them in

15   advance.  But if all you want is to have a congratulations

16   email to wave around in court sometime later when someone calls

17   you to account for your false disclosures, that's why you send

18   a congratulations email after the fact, after the loan has

19   already issued.

20        I will say this last point on these disclosures.  At

21   heart what their response is to these false disclosures is to

22   blame the victims for not figuring out sooner that they'd been

23   defrauded and done something to stop or protect themselves

24   before hundreds and hundreds of dollars got drained out of

25   their accounts.  I won't say too much about that except to say

1    that you're going to hear an instruction from the judge that

2    negligence of a victim is not a defense.  So even if you think

3    that the victims were careless, and frankly, it's a pretty

4    reasonable thing to rely on big-print disclosures, which

5    supposedly tell you how much a loan costs.  I think that's a

6    pretty reasonable thing, but even if you think the victims were

7    careless or gullible or negligent, you're going to find out

8    that that's not a reason not to find these guys guilty.

9            You also heard something about these repeat customers,

10   and let's just be clear.  Just because these people came back

11   for other loans doesn't mean they were happy customers, and I

12   think you learned about that in this case in great detail.  But

13   there's evidence in this case about how only 1 percent of these

14   people were complaining, well, there's also evidence in this

15   case that these defendants were told by the Better Business

16   Bureau that the number of complaints was alarming for these

17   companies.  And you also heard, on this 1 percent issue, and

18   also saw Government Exhibit 1509, a document from the company

19   itself, which says that typical organizations never hear from

20   91 percent of its unhappy customers.  That's for a typical

21   organization.  Imagine what it is for this organization.  I

22   don't think the 1 percent number is distracting.

23           And you know why some of these people came back for

24   more loans.  You learned about that in this case, because you

25   got to meet Athena Sanchez and people like her.  And you found

1    out that she didn't even find out she'd been defrauded until

2    the third loan.  Why is that?  Because they set up this scheme

3    so that it would work that way.  They would take small amounts

4    of money in multiple increments over a long period of time.

5    Take 90 at a time, take 90 at a time, take 0- at a time and

6    hope people don't notice.  And they end up, when this loan is

7    over, in the same financial problems they were in before so

8    they need another loan and they get another loan, and this

9    happens again, and happens over and over again.  And finally

10   they realize what's going on, but by then it's too late.

11   That's how this scheme was structured, so the fact that there

12   are repeat customers doesn't explain away the scheme.  They

13   explain how the scheme worked.

14        I also want to spend a little bit of time on this

15   issue of tribal ownership, and I just want to make one thing

16   clear on this.  When you're going through this case, focus on

17   the elements of the offenses to determine what issues

18   ultimately matter.  And when you read the elements and you hear

19   the elements about the first four counts for unlawful lending,

20   you're not going to hear anything that says that Mr. Muir

21   effectively has to own this business in order for him to be

22   guilty.  You're going to hear about how they needed to be

23   involved in extending illegal loans, and that's what they did.

24   So I don't want you to get distracted by this idea that this

25   question of tribal ownership hangs over the entirety of this

1    case.  It doesn't.  Of course they didn't own it.  You've seen

2    abundant evidence that the tribes did not own this business,

3    but regardless of your ultimate view on that issue, this does

4    not hang over the entire case.

5            Now there is this, which you're going to hear about,

6    advice-of-counsel issue, with respect to these first four

7    counts, and the tribal role is in some ways relevant to that.

8    But how is it relevant?  Well, it's relevant to the extent it's

9    relevant to the advice that Mr. Tucker got, and Mr. Tucker got

10   advice about the role that the tribes should play.  You saw

11   some of that advice.  You saw Ellen Bachman's letter and you

12   saw good things as well.  And you saw that nowhere does it say

13   that it's sufficient if the tribes quote/unquote owned the

14   business.  What it said, on the contrary, is paper ownership is

15   not enough.  You can't just run your business through a tribal

16   corporation; that it matters where the business takes place,

17   that it take place on tribal lands; that it matters who has

18   ultimate decision authority on issuing the loans, who provided

19   the capital.  It asks all those questions.

20           So is ownership some part of that?  Yes, but again,

21   whatever you ultimately do on this issue of tribal ownership,

22   if you conclude for some reason that the tribes owned this

23   business, that is not going to save these people, certainly not

24   on the first four counts.

25           On the wire fraud counts, again, focus on the

1   elements.  There are at least two different ways that the

2   defendants are guilty of wire fraud.  One is just by the

3   disclosures we just talked about, so again, they could be

4   guilty of wire fraud here regardless of what you think about

5   who owns this business, or who quote/unquote owns this

6   business.

7          Now, the tribes didn't really own this business, and I

8   think that's clear.  The tribes were never really the lenders.

9   And what's their argument ultimately that they did?  Well,

10  ultimately their argument that they did focuses primarily on

11  what happened at the end of the scheme, as the scheme was

12  starting to fall apart.  That's really where they focus,

13  because they really have nothing to say about what was going on

14  in the scheme for years, beginning in the late '90s for

15  Mr. Tucker and Mr. Muir beginning in 2006.  They have nothing

16  to say about all those years, so they start to focus on what

17  happens at the end, and you guys know.  You've learned what

18  happened at the end.

19         Before I talk about what changed at the end, let's

20  talk about what didn't change, because most things didn't

21  change at the end in the 2012 and 2013 period up to the end of

22  the conspiracy.  The business did not magically move to tribal

23  lands in 2012 and 2013.  It stayed where it was in Overland

24  Park.  Tucker and Muir remained in control of that business in

25  Overland Park.  They continued to operate that business in

1   Overland Park.  The loans continued to go out from Overland

2   Park.

3           So, much more stayed the same than changed during that

4   end period, but some things certainly did change.  And what

5   prompted these things to change?  First, there's this news

6   article you heard a lot about, which brought a lot of bad

7   publicity and caused a lot of concern, concern that it would

8   bring more attention to the business, and that's in end of

9   2011.  And then you hear about this FTC lawsuit, which comes,

10  which is of grave concern to everyone, including to the tribes,

11  who had grave concerns about having problems with federal

12  regulators.  You heard about that from Chief Gamble and others.

13  Ultimately, you heard about a grand jury criminal subpoena at

14  the end of 2013.

15          All these things did happen, and they caused people to

16  behave differently, and all of a sudden, one of the tribes

17  started to try to figure out what's going on here, and they

18  tried to take more control over bank accounts.  But again,

19  sure, did they take some more control over bank accounts in the

20  end of 2012?  Yes, but a bunch of money still went to Scott

21  Tucker in the end of 2012 through this BA licensing agreement,

22  tens and tens of millions of dollars.  So again, a lot of

23  things remained the same.  But look, Mr. Ginsberg and Mr. Bath

24  asked a fair question.  They asked the question, How did the

25  tribes, particularly the Miami tribe, end up with all this

1  money?

2          It's a fair question, so let's answer it.

3          Now, what was the deal?  In most of the scheme, the

4  deal was pretty simple between Tucker and the tribes.  Tucker

5  says to the tribes:  You guys hold onto my money, in an account

6  with your name on it, and I'll give you 1 percent of what I

7  make, and if someone comes calling or complaining, you tell

8  those people that the money's yours.

9          That was the deal.  It was a simple deal, and for many

10  years, Mr. Tucker had an understanding with people like Brady,

11  Gamble, all these people, that they would do that.  They would

12  pretend the money was theirs and they would get their 1 percent

13  and everyone would be happy.  But then, like all schemes, this

14  one didn't last forever.  The things we talked about happened:

15  the article, the FTC, criminal investigation, IRS audits.  So

16  people start to change.  Brady gets fired.  Gamble loses his

17  job.  Boards start to be concerned about what's going on, and

18  so people start to behave differently.

19          Mr. Tucker loses his partner in crime with the tribes.

20  Brady gets fired, Gamble gets voted out, like I said.  And then

21  what happens at the end?  The money is sitting there in tribal

22  bank accounts.  Well, look, the scheme all along has been, the

23  whole defense that Mr. Tucker has been planning with Mr. Muir's

24  help all along, is that "it's not really my money."  So what's

25  the last thing that Mr.  Tucker can do when all these law

1    enforcement agencies are looking at this?  The last thing, the

2    last thing that he could do at that point was to go and say,

3    That's my money.  He might as well just plead guilty at that

4    point, right?  Because his whole defense, he'd be giving up his

5    whole defense, admitting the whole thing was a sham.

6            THE COURT:  Mr. Velamoor, you have to wind up your

7    summation.

8            MR. VELAMOOR:  So that money just stays in the bank

9    accounts.  It's just the cost of doing business.  He leaves it

10   there.

11           Here's a quick example that's very similar.  The fact

12   that he leaves that money there, that doesn't change the $40

13   million that he took out before.  He didn't give that money

14   back.  Nobody asked him to.

15           Think of a simple example.  A drug dealer rents out an

16   apartment.  He leaves a bunch of money in the basement.  He

17   finds out that law enforcement knows about this apartment.

18   He's not going to go back there and take his money back.  So he

19   gives up the apartment, he leaves the money and the landlord

20   walks in and takes the money and says, This is kind of nice.

21   And what happens?  Law enforcement comes along and takes the

22   money back.  He forfeits it.  And that's what we did, we took

23   most of it back.

24           Contrast that with the Kickapoo situation, which was

25   early in the scheme.  Tucker just took the money away.  He

1    didn't leave it there for the Kickapoo.  Russell Bradley

2    testified about that.

3         Let me just lastly end it with the resolutions.

4    Because, look, no one here is suggesting that all tribal

5    paperwork for everything tribes do is meaningless or not

6    important.  Nobody's suggesting that.  We're suggesting that

7    the paperwork in this particular case was meaningless, and if

8    you care about respecting tribes and tribal paperwork and

9    tribal resolutions, the tribal processes, you should be

10   offended by the way they manipulated those things in this case

11   and used them for their own benefit.  So no one's saying those

12   things are meaningless.

13        Now, what the tribal paperwork is in this particular

14   case is Scott Tucker and Tim Muir's last hustle.  This is what

15   they've been planning all along, that someone calls them to

16   account, holds them accountable for what they were doing, they

17   would walk up with a big sack of paper, like they did in this

18   case, and they'd drop it in a courtroom like this and they'd

19   try to convince people that the tribes were really involved in

20   that business.  And the cheapest, easiest way to do that is

21   with paperwork.  The way to hide the truth is paperwork.  But

22   this jury, you know more than that.  You know the truth behind

23   the paperwork.

24        You saw a resolution saying that Allison Harris was

25   the CFO of AMG, but you also met Allison Harris and so you know

1    that's not true.  You saw false affidavits saying that these

2    tribal officials were controlling and operating these

3    businesses, but you heard from the tribal officials and they

4    told you they were false.  You saw board minutes recounting

5    supposedly the words of Chief Gamble about the licensing

6    agreement, but you also met Chief Gamble.

7              THE COURT:  All right.  Finish it up.

8              MR. VELAMOOR:  You heard him try to say those words,

9    and you knew when he couldn't say them that the words weren't

10   his.  They were their words; they were their plan to escape

11   responsibility all along.

12             Ladies and gentlemen, buried below all the paperwork

13   they created, the fancy legal evidence they tried to hide

14   behind, buried below all that what you'll fine is a single

15   mother trying to put a smile on her kids' face at Christmas; a

16   college student who needed money to visit his grandmother, and

17   he came here to testify on the heels of an overnight shift at

18   Target.  You'll find a newlywed from California with a baby on

19   the way who fell behind on his bills; a mother from the Bronx

20   paying for college, high school, babysitting, and you'll find a

21   war veteran from Iraq suffering from PTSD and in need of a

22   little help.  You'll find millions more like them around the

23   country and including here in New York.  None of these people

24   were looking for free money.

25             For years, Scott Tucker and Tim Muir exploited and

1    cheated these people in their time of need.  They ran roughshod

2    over courts and regulators.  They were trying to enforce laws

3    that were in place to protect these people, and they tried to

4    cover it all up with lies.  This case really was about the lies

5    and greed of those two men.

6              THE COURT:  All right.  Thank you, Mr. Velamoor.

7              MR. VELAMOOR:  We'd ask you to find them guilty.

8              THE COURT:  Thank you.

9              Ladies and gentlemen, you can stand up and stretch.

10             Members of the jury, you have now heard all of the

11   evidence in the case as well as the final arguments of the

12   parties.  We have reached the point where you are about to

13   undertake your final duties as jurors.  You have paid careful

14   attention to the evidence.  I am confident that you will act

15   together with fairness and impartiality to reach a just verdict

16   in the case.

17             My duty is to instruct you as to the law, and it is

18   your duty to accept these instructions of law and to apply them

19   to the facts as you determine them.

20             On these legal matters, you must take the law as I

21   give it to you.  If any attorney has stated a legal principle

22   different from any that I state to you in my instructions, it

23   is my instructions you must follow.  You must not substitute

24   your own ideas of what the law is or ought to be.

25             You are not to infer from any of my questions or

1    rulings or anything else I have said during this trial that I

2    have any view as to the credibility of the witnesses or how you

3    should decide this case.

4           As members of the jury, you are the sole and exclusive

5    judges of the facts.  You pass upon the evidence.  You

6    determine the credibility of the witnesses.  You resolve such

7    conflicts as there may be in the testimony.  You draw whatever

8    reasonable inferences you decide to draw from the facts as you

9    have determined them.  You determine the weight of the

10   evidence.

11          It is the duty of the attorneys to object when the

12   other side offers testimony or other evidence that the attorney

13   believes is not properly admissible.  Therefore, you should

14   draw no inference from the fact that an attorney objected to

15   any evidence.  Nor should you draw any inference from the fact

16   that I sustained or overruled an objection.

17          From time to time, the lawyers and I had sidebar

18   conferences and other conferences out of your hearing.  These

19   conferences involved procedural and other matters, and none of

20   the matters relating to them should enter into your

21   deliberations.

22          Your verdict must be based solely upon the evidence

23   developed at trial, or the lack of evidence.  It would be

24   improper for you to consider any personal feelings you may have

25   about the defendants' race, religion, national origin, sex or

1    age.  The parties in this case are entitled to a trial free

2    from prejudice, and our judicial system cannot work unless you

3    reach your verdict through a fair and impartial consideration

4    of the testimony.

5          Similarly, under your oath as jurors, you are not to

6    be swayed by sympathy.  Once you let fear, prejudice, bias or

7    sympathy interfere with your thinking, there is a risk that you

8    will not arrive at a just verdict.  Your verdict must be based

9    exclusively upon the evidence, or the lack of evidence.

10          The fact that the prosecution is brought in the name

11   of the United States of America entitles the government to no

12   greater and no lesser consideration than accorded to any other

13   party to a litigation.  All parties, whether the government or

14   an individual, stand as equals under the law.

15          The two defendants in this case, Scott Tucker and

16   Timothy Muir, have separately entered pleas of not guilty to

17   the indictment.  As I told you before, the law presumes a

18   defendant to be innocent of all charges against him.  I

19   therefore instruct you that each defendant is to be presumed by

20   you to be innocent throughout your deliberations until such

21   time, if ever, that you, as a jury, are satisfied that the

22   government has proven its case beyond a reasonable doubt.

23          The presumption of innocence alone is sufficient to

24   require an acquittal of a defendant unless and until, after

25   careful and impartial consideration of all the evidence, you,

1    as jurors, are convinced unanimously of a defendant's guilt

2    beyond a reasonable doubt.

3          The question that naturally arises is: what is a

4    reasonable doubt?  The words almost define themselves.  It is a

5    doubt founded in reason and arising out of the evidence, or the

6    lack of evidence.  It is a doubt that a reasonable person has

7    after carefully weighing all the evidence.  Proof beyond a

8    reasonable doubt, therefore, must be proof of such a convincing

9    nature that a reasonable person would not hesitate to rely and

10   act upon it in matters of the most importance in his own or her

11   own personal affairs.

12         Reasonable doubt is a doubt that appeals to your

13   reason, your judgment, your experience, your common sense.  It

14   is not a caprice or whim; it is not speculation.  It is not an

15   excuse to avoid the performance of an unpleasant duty.  It is

16   not sympathy for a defendant.

17         The burden of proof here is upon the prosecution to

18   prove the guilt of each defendant beyond a reasonable doubt.

19   It must satisfy this burden as to each and every element of the

20   crimes charged.  The burden never shifts to a defendant.  The

21   law never imposes upon a defendant in a criminal case the

22   burden of calling any witnesses or producing any evidence.  The

23   fact that one party called more witnesses and introduced more

24   evidence does not mean that you should find in favor of that

25   party.  It is the quality of the evidence that matters.

1        If, after a fair and impartial consideration of all

2   the evidence, you can honestly say that you are not satisfied

3   of the guilt of a defendant -- that is, if you have such a

4   doubt as would cause you, as a prudent person, to hesitate

5   before acting in matters of importance to yourself -- then you

6   have a reasonable doubt.  In that circumstance, it is your duty

7   to return a not guilty verdict for that defendant.

8        On the other hand, if, after a fair and impartial

9   consideration of all the evidence, you can honestly say that

10  you are satisfied of the guilt of a defendant and that you do

11  not have a doubt that would prevent you from acting in

12  important matters in the personal affairs of your own life,

13  then you have no reasonable doubt.  Under that circumstance,

14  you should return a guilty verdict for that defendant on that

15  particular count.

16       The evidence in this case is the sworn testimony of

17  the witnesses, the exhibits received into evidence and any

18  stipulations made by the parties.  By contrast, and you've

19  heard me say this before, the questions of a lawyer are not

20  evidence.  It is the witness's answers that are evidence, not

21  the questions standing alone.

22       Testimony that has been stricken or excluded by me, or

23  I've sustained an objection, is not evidence and may not be

24  considered by you in rendering your verdict.  If I instruct you

25  that evidence is received for only a limited purpose -- in

1    other words, it may not be considered for the truth of its

2    content, only as it may bear on state of mind, and there are

3    other areas where I gave you limiting instructions -- then you

4    must consider it only for that limited purpose.

5         Arguments by lawyers are not evidence, because the

6    lawyers are not witnesses.  What the lawyers have said to you

7    in their openings and closings was intended to help you

8    understand the evidence.  As I said in the case of legal

9    principles, a similar thing is true with facts.  If any lawyer

10   has made a statement during the closing argument that is

11   different from your recollection of the evidence, it is your

12   recollection of the evidence that controls.  Of course, any

13   statements I have made during the trial also are not evidence.

14        To constitute evidence, exhibits first must be

15   admitted or received in evidence.  Exhibits marked for

16   identification but not admitted are not evidence, nor are

17   materials brought forth only to refresh a witness's

18   recollection.

19        It is for you alone to decide the weight, if any, to

20   be given to the testimony you have heard and the exhibits you

21   have seen.

22        Generally, there are two types of evidence that you

23   may consider in reaching your verdict.  One type is direct

24   evidence.  Direct evidence is when a witness testifies about

25   something he or she knows by virtue of his or her own senses --

1    something he or she has seen, felt, touched, smelled or heard.

2    The other type is circumstantial evidence, which is evidence

3    from which you may infer the existence of certain facts.  Let

4    me give you an example to help you understand the difference.

5         If you were outside this morning, standing in the

6    rain, getting wet and looking at that dark cloud pouring water

7    on you, you would have direct evidence that it was raining.

8    But now I want you to consider a very different situation.

9    Let's say you were in this courtroom, and let's say all the

10   windows were covered, and that when you came to court in the

11   morning, it was a bright, sunny day.  The windows are covered,

12   so you can't look out and see what's going on.  Now, imagine in

13   this hypothetical situation that the doors of the courtroom

14   opened up and one person walked in with a raincoat that was

15   visibly wet, and a few minutes later, someone else came in with

16   an umbrella that was wet, dripping wet.  On the combination of

17   those facts, it would be reasonable for you to infer that it

18   had been raining.

19        That is all there is to circumstantial evidence.  You

20   infer, on the basis of reason and experience and common sense,

21   from one established fact the existence or nonexistence of some

22   other fact.

23        Circumstantial evidence is of no less value than

24   direct evidence.  As a general rule, the law makes no

25   distinction between direct evidence and circumstantial

1   evidence.  It simply requires that your verdict be based on all

2   the evidence.

3           You have had the opportunity to observe all the

4   witnesses.  It is now your job to decide how believable each

5   witness was in his or her testimony.  You are the sole judges

6   of the credibility of each witness and of the importance of his

7   or her testimony.

8           You should carefully scrutinize all of the testimony

9   of a witness, the circumstances under which the witness

10  testified, the impression the witness made when testifying, and

11  any other matter in evidence that may help you decide the truth

12  and the importance of each witness's testimony.

13          In other words, in assessing credibility, you may size

14  up a witness in light of his or her demeanor, the explanations

15  given and all of the other evidence in the case.  In making

16  your credibility determinations, use your common sense, your

17  good judgment and your everyday life experiences.

18          If you believe that a witness knowingly testified

19  falsely concerning any important matter, whether at trial or in

20  a prior proceeding, you may distrust the witness's testimony

21  concerning other matters.  You may reject all of the testimony

22  or you may accept such parts of the testimony that you believe

23  are true and give it such weight as you think it deserves.

24          In deciding whether to believe a witness, you may take

25  into consideration any evidence of hostility or affection that

1    the witnesses may have towards one of the parties.  Likewise,

2    you should consider evidence of any other interest or motive

3    that the witness may have in cooperating with a particular

4    party.  You should also take into account any evidence that a

5    witness or party may benefit in some way from the outcome of

6    the case.

7             It is your duty to consider whether the witness has

8    permitted any bias or interest to color his or her testimony.

9    If you find that a witness is biased, you should view his or

10   her testimony with caution, weigh it with care and subject it

11   to close and searching scrutiny.

12            Of course, the mere fact that a witness is interested

13   in the outcome of the case does not mean that he or she has not

14   told the truth.  It is for you to decide from your observations

15   and applying your common sense and experience and all the other

16   considerations mentioned whether the possible interest of any

17   witness or of any party has intentionally or otherwise colored

18   or distorted his or her testimony.  You are not required to

19   disbelieve an interested witness.  You may accept as much of

20   his or her testimony as you deem reliable and reject as much as

21   you deem unworthy of acceptance.

22            You have heard testimony from government witnesses who

23   pleaded guilty to charges.  You are instructed that you are to

24   draw no conclusions or inferences about the guilt of any

25   defendant from the fact that a prosecution witness pled guilty

1   to charges, even if they are somehow related to the charges

2   against the defendants.  The decision of each witness to plead

3   guilty was a personal decision about his or her own guilt.  It

4   may not be used by you in any way as evidence against or

5   unfavorable to either of the defendants on trial here.

6           Experience will tell you that the government must rely

7   on the testimony of witnesses who admit to participating in

8   various crimes.  The law allows the use of accomplice

9   testimony.  The testimony of an accomplice may alone be enough

10  to establish an element of a crime if the jury believes that

11  the testimony establishes that element beyond a reasonable

12  doubt.

13          However, because of the possible interest an

14  accomplice may have in testifying, an accomplice's testimony

15  should be scrutinized with special care and caution.  It does

16  not follow that simply because a person has admitted

17  participating in one or more crimes, he or she is incapable of

18  telling the truth about what happened.

19          Like the testimony of any other witness, the testimony

20  of an accomplice witness should be given such weight as it

21  deserves in light of the facts and circumstances before you,

22  taking into account the witness's demeanor and candor, the

23  strength and accuracy of his or her recollection, his or her

24  background, and the extent to which his or her testimony is or

25  is not corroborated by other evidence in the case.

1       You may consider whether an accomplice witness -- like

2   any other witness -- has an interest in the outcome of the

3   case, and if so, whether it has affected his or her testimony.

4       In evaluating the testimony of an accomplice witness,

5   you should ask yourself whether the accomplice would benefit

6   more by lying or by telling the truth.  Was his or her

7   testimony made up in any way because he believed or hoped that

8   he or she would receive favorable treatment from testifying

9   falsely?  Or did he or she believe that their interests would

10  be best served by testifying truthfully?  If you believe that

11  the witness was motivated by hopes of personal gain, was the

12  motivation one that would cause him to lie, or was it one that

13  would cause him to tell the truth?  Did this motivation color

14  his or her testimony?

15      If you find that the testimony was false, you should

16  reject it.  However, if, after a cautious and careful

17  examination of an accomplice witness's testimony and assessment

18  of his or her credibility, you are satisfied that the witness

19  told the truth, you should accept it as credible and act upon

20  it accordingly.

21      As with any witness, the issue of credibility need not

22  be decided in an all-or-nothing fashion.  Even if you find a

23  witness testified falsely in one part, you still may accept his

24  testimony in other parts, or you may disregard all of it.  This

25  is a determination entirely for you, the jury.

1      The testimony of a witness may be discredited by

2 showing that the witness testified falsely concerning a

3 material matter, or by evidence that at some other time the

4 witness said or did something, or failed to say or do

5 something, which is inconsistent with the testimony the witness

6 gave at this trial.

7      Here, you have heard evidence that witnesses made

8 statements on earlier occasions that counsel argue are

9 inconsistent with the witness's trial testimony.  Evidence of a

10 prior inconsistent statement may not be considered by you as

11 affirmative evidence of the fact asserted in the statement.

12 Evidence of the prior inconsistent statement was placed before

13 you for the more limited purpose of helping you decide whether

14 to believe the trial testimony of the witness who contradicted

15 him or herself.  If you find that the witness made an earlier

16 statement that conflicts with his or her testimony, you may

17 consider that fact in deciding how much of his or her

18 testimony, if any, to believe.  If you believe that a witness

19 has been discredited in this manner, it is exclusively your

20 right to give the testimony of that witness whatever weight you

21 think it deserves.

22      In making this determination, you may consider whether

23 the witness purposely made a false statement or whether it was

24 an innocent mistake; whether the inconsistency concerns an

25 important fact, or whether it has to do with a small detail;

1    whether the witness had an explanation for the inconsistency,

2    and whether that explanation appealed to your common sense.

3          You have heard evidence during the trial that

4    witnesses have discussed the facts of the case and their

5    testimony with the lawyers before the witness appeared in

6    court.

7          You may consider that fact when you are evaluating a

8    witness's credibility, but there is nothing either unusual or

9    improper about a witness meeting with lawyers before testifying

10   so that the witness can be aware of the subjects he or she will

11   be questioned about, focus on those subjects and have the

12   opportunity to review relevant exhibits before being questioned

13   about them in court.  Such consultation helps conserve your

14   time and the Court's time.  In fact, it would be unusual for a

15   lawyer to call a witness without such consultation.

16         You may not draw any inference, favorable or

17   unfavorable, from the fact that any person in addition to the

18   two defendants is not on trial here.  You also may not

19   speculate as to the reasons why other persons are not on trial.

20   Nor may you consider the fact that the government has charged

21   others who are not being tried here.  Those matters are wholly

22   outside your concern and have no bearing on your function as

23   jurors.

24         (Continued on next page)

25

1        THE COURT:  There are persons whose names you have

2   heard during the course of the trial but who did not appear

3   here to testify.  I instruct you that each party had an equal

4   opportunity, or lack of opportunity, to call any of these

5   witnesses.  Therefore, you should draw no inference and reach

6   no conclusion as to what they would have testified to had they

7   been called.  Their absence should not affect your judgment in

8   any way.

9        You should, however, remember my instruction that the

10  law does not impose on a defendant in a criminal case the

11  burden or duty of calling any witnesses or producing any

12  evidence.

13       Under our Constitution, a defendant has no obligation

14  to testify or to present any evidence, because it is the

15  government's burden to prove the defendant guilty beyond a

16  reasonable doubt.  In this case, one of the defendants, Timothy

17  Muir, did testify, and he was subject to cross-examination like

18  any other witness.  You should evaluate and examine his

19  testimony, just as you would the testimony of any other

20  witness.

21       One of the defendants, Scott Tucker, did not testify.

22  That burden of proof remains with the government throughout the

23  trial and never shifts to the defendant.  So the burden of

24  proof to prove the case beyond a reasonable doubt remains with

25  the government and a defendant is never required to prove that

1    he is innocent.

2            You may not attach any significance to the fact that

3    Mr. Tucker did not testify.  No adverse inference against him

4    may be drawn by you because he did not take the witness stand.

5    You may not consider this against Mr. Tucker in any way in your

6    deliberations in the jury room.

7            Some of the exhibits that were admitted into evidence

8    were in the form of charts and summaries.  For these charts and

9    summaries that were admitted into evidence, you should consider

10   them as you would any other evidence.  You may consider the

11   underlying evidence in evaluating the charts.

12           There is no legal requirement that the government

13   prove its case through any particular means.  While you are to

14   carefully consider the evidence introduced by the government,

15   you are not to speculate as to why law enforcement used the

16   techniques that they did or why they did not use other

17   techniques.  Your concern is to determine whether, on the

18   evidence or the lack of evidence, the guilt of a defendant on a

19   particular count has been proven beyond a reasonable doubt.

20           Among the exhibits received into evidence, some

21   documents are redacted.  Redacted means that part of the

22   document was taken out.  You are to concern yourself only with

23   the part of the exhibit that has been admitted into evidence.

24   You should not consider or speculate on any possible reason why

25   other parts of the documents have been deleted.

1         In this case you heard evidence in the form of

2    stipulations of testimony.  A stipulation of testimony, as I

3    told you I think at the time, is an agreement between the

4    parties that, if called as a witness, the person would have

5    given certain testimony.  You must accept as true the fact that

6    the witness would have given that testimony.

7         You have also heard evidence in the form of

8    stipulations of fact.  A stipulation of fact is an agreement

9    between the parties that a certain fact is true.  You must

10   regard such agreed-upon facts as true.

11        The weight or importance of the testimony or the fact

12   is a matter for you, the jury, to decide.

13        The government has offered evidence to show that on a

14   different occasion, defendant Scott Tucker engaged in conduct

15   that it views as similar to the conduct charged in the

16   indictment.  The government offered this evidence to endeavor

17   to establish what it views as Mr. Tucker's intent and

18   knowledge, and the absence of mistake or accident as to the

19   offenses charged in the indictment.

20        You will recall there was evidence of a prior

21   conviction that was offered and received on this basis.  You

22   may not consider this evidence as a substitute for proof that

23   Mr. Tucker committed the crimes charged in this indictment.

24   Nor may you consider this evidence as proof that Mr. Tucker has

25   a criminal personality or a bad character or propensity to

1    commit any kind of a crime.  The evidence of Mr. Tucker's prior

2    conviction may not be considered by you for any other purpose

3    than what I explained to you.

4         This evidence may not be considered in any respect as

5    to defendant Timothy Muir.

6         Recordings of conversations have been received into

7    evidence and played for you.  Transcripts of these recorded

8    conversations have also been furnished to you.  Transcripts of

9    the conversations are being given to you solely for your

10   convenience and to assist you in following conversations or

11   identifying speakers.

12        The tapes themselves are the evidence in the case, and

13   the transcripts are not evidence, they are merely an aid to

14   listening.  If you perceive any difference between the

15   transcripts and the recordings, it is the recordings you should

16   consider, and not the transcripts.

17        I instruct you that anything you may have seen or

18   heard about this case outside the courtroom is not evidence and

19   must be disregarded.  Indeed, as I have instructed you

20   throughout the case, you may not read, view, or listen to any

21   media or press report or Internet or social media posting about

22   this case or about the people, companies, or issues referred to

23   during the trial.  Your verdict must be based solely on the

24   evidence or lack of evidence that came out in this courtroom

25   and the Court's instructions on the law.

1          In your deliberations and in reaching your verdict,

2     you must consider each count separately, and you must weigh the

3     evidence as to each charged defendant separately for each

4     count, and determine whether the government has carried its

5     burden of proof with respect to that defendant and that charge.

6     I will provide you with a verdict form, and you will need to

7     report the results of your deliberations for each defendant on

8     each count on the verdict form.  To do so, you will need to

9     keep track during your deliberations of which defendant and

10    which charge you are considering and the legal elements

11    applicable to the charge.  You are to proceed through the

12    questions in the verdict form in the order they are presented.

13    I will give you additional copies of the verdict form so that

14    you can have them during your deliberations, so each of you can

15    have a copy.  But you will only have the one verdict form,

16    returned at the conclusion of the case, signed and dated by

17    your foreperson.

18         I will also give you two copies of the indictment.

19    The indictment, I will not read it, but it will be with you in

20    the jury room, and you should remember the indictment is not

21    evidence.  It's the allegations in this case and it's what the

22    government must prove.  That's what the indictment is.

23         The indictment contains 14 counts.  Each count

24    constitutes a separate offense or crime.  You must consider

25    each count of the indictment separately, and you must return a

1    separate, unanimous verdict as to each count and to each

2    defendant separately.

3         You may only find a defendant guilty of a particular

4    count if the government has proven each element of the offense

5    charged with respect to that count beyond a reasonable doubt

6    against that defendant.  Your verdict as to one count or one

7    defendant should not control your decision as to any other

8    count or any other defendant.

9         The defendants, Scott Tucker and Timothy Muir, have

10   been charged in this indictment, and as I said, it's just a

11   accusation.  It's the means by which a criminal case is

12   started.  It creates no presumption and permits no inference

13   that a defendant is guilty.  You are to give no weight to the

14   fact that an indictment has been returned against the

15   defendants.

16        I am going to summarize the structure of the

17   indictment and the charges, and then we will break before I

18   give you instructions on the individual counts.

19        There are 14 charges, and they fall into two types of

20   charges:  Conspiracy charges and substantive charges.  I will

21   explain the difference between those two concepts as I go

22   along.

23        Count One charges that the defendants were members of

24   a conspiracy to operate an enterprise that collected one or

25   more unlawful debts.  Counts Two, Three and Four charge that

1  the defendants, through the enterprise, collected unlawful

2  debts.  So Count One is a conspiracy count, and Counts Two,

3  Three and Four are substantive counts.

4       Count Five charges that the defendants were members of

5  a conspiracy to commit wire fraud by misrepresenting the terms

6  and the identity of the lenders of the loans extended by the

7  enterprise.  Count Six charges the defendants with committing

8  the actual crime of wire fraud by misrepresenting the terms and

9  lenders of the loans extended by the enterprise.  So Count Five

10 is a conspiracy count and Count Six is a substantive count.

11      Count Seven charges that the defendants were members

12 of a conspiracy to commit money laundering.  Counts Eight and

13 Nine charge the defendants with the actual crimes of money

14 laundering.  So Count Seven is the conspiracy count and Counts

15 Eight and Nine are the substantive counts.

16      I assure you I am going to go through the elements of

17 each of these counts, but I am giving you kind of the overview.

18      Counts Ten through Fourteen charge that the defendants

19 gave false and inaccurate information, and failed to provide

20 information they were required to provide under federal law,

21 and used a chart or table so as to consistently understate the

22 annual percentage rate of loans, by making disclosures that

23 materially understated the true cost of loans extended by

24 lenders.

25      So you can see from what I have given you in the

overview that there are three different conspiracies charged in

the indictment.  A conspiracy is an agreement of two or more

people to join together to accomplish some unlawful purpose.

You may find a defendant guilty of the crime of conspiracy even

if a substantive crime that was the object of the conspiracy is

not proven.

Both defendants, Mr. Tucker and Mr. Muir, have pleaded

not guilty to all counts of the indictment.

By presenting a defense and pointing out evidence to

you, the defendants have not assumed any burden of proof.  The

burden remains on the government to prove each element and

every element of the crimes charged beyond a reasonable doubt.

In fact, no defendant had to present any defense.  Because a

defendant has presented a defense, you can consider that

defense in deciding if the government has proven its case

beyond a reasonable doubt.

Now, the indictment refers to various dates.  I

instruct you that it does not matter if a specific event is

alleged to have occurred on or about a certain date or month

but the testimony or other evidence indicates that in fact it

was a different date or month.  It is also not essential that

the government prove that a conspiracy started and ended on any

specific date.  The law requires only a substantial similarity

between the dates alleged in the indictment and the dates

established by the evidence.  Further, it is not required that

1    the defendant you are considering committed a charged crime

2    throughout the entire period charged in a particular count; it

3    is sufficient for the government to prove beyond a reasonable

4    doubt that at some time during the period charged in the

5    indictment, the defendant participated in the charged crime.

6           The indictment also refers to various amounts of

7    money.  If the indictment charges that certain monetary amounts

8    were involved, and the testimony or exhibits indicate that, in

9    fact, a different monetary amount was involved, it is

10   sufficient if you find that the amounts involved are

11   substantially similar to the amounts alleged in the indictment.

12          With that, ladies and gentlemen, we are going to break

13   for the evening.  Please do not discuss the case among

14   yourselves or with anyone.  There is more to come in my

15   instructions.  And I will see you all for a 9:30 start tomorrow

16   morning.

17          Have a very pleasant evening.

18          (Jury exits courtroom)

19          THE COURT:  I just want counsel to be aware of the

20   note, which was Court Exhibit 19, which was about the conflict

21   in schedule.

22          I hope everybody has a restful evening, and I will see

23   you tomorrow morning at 9:30.

24          (Adjourned to October 13, 2017, at 9:30 a.m.)

25