UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                                       :

UNITED STATES OF AMERICA,         :

         - v. -                       :          S1 16 Cr. 91 (PKC)

SCOTT TUCKER and               :
TIMOTHY MUIR,                   :

                Defendants.     :
------------------------------------------------------x

**GOVERNMENT'S SENTENCING MEMORANDUM**

                                              JOON H. KIM
                                              Acting United States Attorney for the
                                              Southern District of New York
                                              Attorney for the United States of America

Niketh Velamoor
Hagan Scotten
Sagar K. Ravi
Assistant United States Attorneys

       - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
:
UNITED STATES OF AMERICA,                   :
:
- v. -                                 :         S1 16 Cr. 91 (PKC)
:
SCOTT TUCKER and                            :
TIMOTHY MUIR,                               :
:
                Defendants.          :
------------------------------------------------------X

## GOVERNMENT'S SENTENCING MEMORANDUM

On October 13, 2017, defendants Scott Tucker and Timothy Muir were convicted after a jury trial of fourteen counts arising from their operation of an illegal payday lending scheme. For years, Tucker and Muir ran a payday loan business that charged millions of financially struggling Americans exorbitant, illegal interest rates of 600% and higher and lied to their customers about the terms of these loans to take even more money from them. As part of a multi-year effort to evade law enforcement, they formed sham relationships with Native American tribes and laundered the billions of dollars they took from their customers through nominally tribal bank accounts to hide Tucker's ownership and control of the business.

To reflect the seriousness of each defendant's conduct, to promote just punishment and respect for the law, and to deter these defendants and others like them, the Government respectfully requests that the Court impose a sentence of 240 months' imprisonment or more for Tucker and 120 months' imprisonment or more for Muir, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

I.     **Offense Conduct**

As the trial evidence showed, the defendants perpetrated a multi-faceted scheme to make hundreds of millions of dollars by charging their payday loan customers exorbitant amounts of interest that were illegal under most states' laws, including New York's.  For every $100 they lent, they charged $30 of interest per pay period, which translated to annual interest rates of over 600%, and they set up their loans to "automatically renew" so as to make sure their borrowers paid that kind of interest for as long as possible.  (GXs 1701, 2303.)  Specifically, at the end of two weeks, they applied the money they received from borrowers only to interest, putting nothing toward reducing the borrowers' debt.  (GX 1911.)  This automatic renewal went on and on such that after five cycles of paying just interest did the borrowers start to pay off their debt, $50 at a time.  (*Id*.)  This meant that, for a $300 loan, the defendants would charge their customers $675 in interest, which ultimately resulted in the borrower paying $975 total just to borrow $300.  (*Id*.)  As Kelly Rogers, an AMG manager, testified, approximately 60% of borrowers went through the entire repayment process on their loans.  (Tr. 180.)  Testifying victims Richard Hamner, Athena Sanchez, Amy Weatherwax and Andrew Leibenguth were just four examples of individuals who paid such exorbitant amounts for their loans.

In order to increase the number of customers who fell into this automatic renewal process, the defendants lied to their borrowers about the cost of their loans.  Although the Truth in Lending Act—or TILA—requires lenders like the defendants to accurately and prominently present the key terms, the defendants presented customers with false information in the TILA boxes that made it seem like there was no automatic renewal, as Tucker employees admitted at trial.  (Tr. 183.)  Thus, and for example, although the defendants designed their $300 loans to cost customers $975, they falsely claimed in the TILA boxes that the loans would cost only

$390, and buried in fine print an indecipherable "explanation" for how the loans would actually work. (GX 2202.) The defendants kept using these false disclosures for years, even though they were well aware that these disclosures, along with the renewal process, were a major source of confusion for their customers and the cause of large numbers of complaints to the Better Business Bureau and Attorneys General. (GX 1914, Tr. 1377.)

The defendants charged such large amounts of interest even though they knew that, with or without automatic renewal, doing so was forbidden by the laws of many states, including New York's, which prohibited payday lending by making it illegal to lend out money at annual rates higher than approximately 25%. Although the trial evidence focused on the defendants' willful violation of the laws of states that banned payday lending, the defendants also violated the laws of numerous states that regulate but do not prohibit payday lending, because the laws of these states also would have limited the amounts of interest they could have charged.

Knowing that they were violating state usury laws, the defendants crafted schemes to hide the fact that Tucker was "the man behind the curtain" who was actually making the loans. (GX 2109.) Initially, and prior to Muir's involvement in the business, Tucker hid behind the County Bank of Rehoboth Beach Delaware in order to make it seem like the bank, and not him, was the real lender. In order to use County Bank as a front, Tucker paid a 5% fee to rent the bank's name under the pretense of a participation agreement that falsely represented the bank as the lender. (Tr. 424-431.) Tucker also used shell companies incorporated in Nevada to hide his involvement in illegal lending and hired other people to appear on paper as the president and owners of the companies. (GXs 1734-1737.) Eventually, and for the most substantial portion of the scheme, Tucker entered into rent-a-tribe agreements with multiple Native American tribes wherein he paid the tribes one percent of his revenues in exchange for the tribes' willingness to

3

claim that they were the owners of the businesses.  (GXs 302, 801, 1204.)  Despite these efforts to hide Tucker's role, it was always Tucker who was the true lender, as the jury ultimately found in response to a specific interrogatory from the Court.

As explained in detail in the Government's summation at trial, the foundation of these sham relationships was lies.  Muir, along with other lawyers paid by Tucker whom Muir supervised, drafted and edited bogus resolutions that they told the tribes to pass, claiming ownership of parts of Tucker's business.  To defeat enforcement actions by state regulators seeking to protect their citizens, as well as class action lawsuits, they also filed false affidavits in state courts across the country, claiming that the Tribes, not Tucker, were the lenders and managers of the business in order to gain the protection of tribal sovereign immunity.  (GXs 317-323.) They also orchestrated a sham merger of Tucker's loan servicing business, CLK Management, into a tribal entity, AMG Services, that Tucker himself admitted was just a "renaming [of] CLK" to make it appear that one of the Tribes had bought the business.  (GX 312.)  When the defendants realized that this so-called merger had not been completed in accordance with Kansas law and therefore would not defeat litigation brought against the business, Muir orchestrated a sham lawsuit, *Tucker v. AMG*, that relied on false and misleading assertions about Tucker's ongoing control and involvement in order to convince a Kansas court to both finalize and backdate the merger.  (GX 2605.)   When the Kansas court granted them the relief they were seeking, the defendants celebrated how they had successfully struck a blow against their legal opponents and dumped millions of dollars in liabilities on the tribes.  (GXs 2618-20.)

To maintain the illusion that these were tribal businesses, the defendants lied not only to courts but also to their customers.  The defendants instructed their employees to falsely claim

4

that they were physically located on tribal reservations in Nebraska or Oklahoma, when in fact they were in Tucker's offices in Overland Park, Kansas. (Tr. 786.) And to further make it appear that the loan business was located on tribal land, they directed that all mail related to the loan business be sent first to tribal reservations only to be packaged up and mailed to Tucker's offices in Overland Park at the end of each day. (GX 1408.) They also concocted a sham loan approval process to create the "illusion" that tribal officials were playing a meaningful role in the issuance of loans to customers. (Tr. 1267-68.) And if the sham approval process was not enough, the defendants gave fake titles like "CEO" to tribal officials to make it appear that they were in charge, when in reality the tribal officials had little to no knowledge of, nor involvement in, the actual management or operation of the loan business. (GXs 502, 404-T, 406-T.) Even more brazenly, Muir used the name of a fake person, "Joseph Ragman," to sign formal agreements and other documents on behalf of tribal entities. (GX 811.) Tucker also did his banking through accounts nominally in the Tribes' names but actually controlled by Tucker, and used these accounts to pay millions toward luxury expenses including a vacation home in Aspen, a private jet, and the expenses of his Ferrari racing team. (GX 3551.) Finally, when the defendants' businesses started to receive more scrutiny, they orchestrated a licensing agreement between Tucker's entity, BA Services, and the tribes to create a paper trail justifying the transfer of tens of millions of dollars to Tucker. (GX 409-T.)

## II.     Discussion

### A.     Background

The United States Sentencing Guidelines continue to provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the

5

Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In connection with the defendants' scheduled sentencings on January 5, 2018, in its Presentence Reports, the United States Probation Office calculates an applicable Guidelines range of life imprisonment for each defendant, and recommends a total sentence of 28 years' imprisonment for Tucker and 25 years' imprisonment for Muir. While we do not believe a life

6

sentence is necessary for either defendant, the Government respectfully submits that a substantial sentence of twenty years or more for Tucker and ten years or more for Muir would be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

> **B.     The Nature and Circumstances of the Offenses Weigh In Favor of Sentences of At Least Twenty and Ten Years**

Tucker's and Muir's crimes were serious in numerous ways. First and foremost was the harm they caused their victims. They callously and repeatedly victimized financially struggling people who came to their businesses for help in a time of need, and took advantage of that need in order to defraud their customers for as much money as they could. The defendants' scheme to achieve these ill-gotten gains was multi-faceted, involving not only the willful violation of state usury laws around the country, but also various lies to their customers. In order to convince customers to take out the loans, the defendants lied about the cost of their loans, and in order to discourage their customers from complaining to law enforcement, the defendants also lied about who was lending the money and therefore whether state laws applied. (GX 1401.) As Richard Hamner explained, when the defendants' employees told him that the lender was an Indian tribe that was not subject to U.S. law, he felt that he had no choice but to make additional payments. (Tr. 100-101.) As a result of these various lies, individuals who took out payday loans because they needed a few hundred dollars ended up paying the defendants' businesses a long series of payments totaling well over a thousand dollars.

The defendants' crimes were made all the more serious by the duration and scope of the offenses. Tucker engaged in illegal lending for more than 15 years, of which Muir participated for at least six years, and during that time the defendants victimized a staggering number people and caused massive losses. As the Government proved at trial, during only a portion of that time period, from 2008 through 2012, the defendants victimized approximately 4.65 million different

7

customers—well over one percent of all Americans—all of whom received the defendants' false and misleading loan disclosures.  (GX 3551, at p. 2.)  That included 287,070 victims in New York, of whom 78,448 were in the Southern District of New York.  (*Id*. at p. 4.)

The losses stemming solely from the defendants' false loan disclosures—that is, the money the defendants received from customers over and above a principal repayment plus a single finance charge—was approximately $1.3 billion.  (Muir Presentence Investigation Report ¶ 48.)  The Government's evidence further demonstrated that, from 2008 through 2012, the defendants took in approximately $3.5 billion in payments from customers, and received net payments of $1.31 billion.  (GX 3551, at p. 11.)  For customers in states such as New York that banned payday lending, and states that regulated payday lending by licensed lenders, not only were the fraudulent "automatic renewal" payments crime proceeds; revenues from charging even a single finance charge were also illegal proceeds, because charging that interest at all violated state law.[1]

From these illegal profits, defendant Tucker took an extraordinary amount of crime proceeds.  As established at trial, during only a portion of the scheme from 2008 to July 2013, Tucker and his companies received almost $400 million directly from the operating "tribal" accounts of the businesses.  (GX 3551, at p. 46.)  He spent these amounts on other businesses, as well as various luxury expenses such as his Ferrari racing team, luxury homes and other extravagant items.  (*Id*.)  As Muir points out in his submission, his proceeds from the offense were a small fraction of Tuckers, though in absolute terms were also substantial, netting him several million dollars that he otherwise would not have earned.

---

[1] Both defendants argue that the fraud Guideline generally overstates the seriousness of offenses like these, but this argument is particularly unpersuasive here, where the most conservative calculation of the loss amount in this case is more than twice the highest loss amount contemplated by the Guideline.

    **C.**    **The Terms of Incarceration Requested By the Government Are Necessary to Promote Respect for the Law and Afford Adequate Deterrence to Criminal Conduct**

The harm caused by the defendants' crimes was not limited to their financial impact on millions of customers. The defendants' willingness to submit false affidavits and file sham lawsuits perpetrated a fraud on courts and regulators around the country. In using such fraudulent tactics, the defendants wasted the time and resources of state regulators who tried for years to enforce their laws and protect their citizens, while demonstrating outright contempt for courts and the legal process. With the defendants having treated the law as an illegitimate obstacle to their pursuit of profits, substantial terms of imprisonment are necessary to promote respect for the law.

A strong message to promote respect for the law is also needed to deter others. Imposing the sentences requested by the Government will send an important message to other payday lenders that state usury laws cannot be evaded by erecting sham relationships with banks or Indian tribes. Such sentences would also make clear that they cannot use false and misleading loan disclosures to dupe consumers into obtaining loans that they cannot afford. Sending such a message to payday lenders is particularly important given that payday loan customers, by definition, are more likely to be financially vulnerable to predatory lending practices. Finally, although lawyers are expected to defend their clients from lawsuits or against regulatory action, a substantial sentence will send a message that lawyers who assist their clients in perpetrating frauds on consumers and the courts will be punished severely.

    **D.**    **The History and Characteristics of Defendant Tucker Also Require A Sentence of At Least Twenty Years To Deter Him And To Protect The Public**

A sentence of 20 years or more is also necessary to protect the public from further crimes by Tucker. As the Court is aware from the trial evidence, Tucker's payday lending crimes are

not his first financial crimes. Prior to starting his illegal payday lending businesses, Tucker was convicted in federal court and served a year in prison for fabricating a relationship with well-known financial institutions in order to fraudulently obtain advance fees from clients. (GX 5004.) The defendant has also lied in bankruptcy filings, tax filings and on bank documents. (GXs 5005,1213.) In short, Tucker's career in business since the 1990s has been marked by a chain of frauds and false statements.

Just as notable as Tucker's criminal history is his complete lack of recognition about the nature and extent of his wrongdoing. Tucker's lack of recognition extends not only to the instant offenses but also to the defendant's prior offense, for which he pleaded guilty. In his letter to the Court, Tucker describes the conduct that led to his first fraud conviction as "bad business decisions" including "spending the advance funds I received before I delivered the service." (Tucker Submission Ex. A at p. 4.) With respect to the instant offenses. Tucker describes his conviction as the result of his failure to "communicate the business model and industry appropriately" and "gather better advice" as well as the jurors' misperception of his conduct. (*Id*. at 10, 11, 12 ("I am remorseful, Your Honor, to have left a single person with the misperception that I do not recognize my responsibility to live as a good and fair business man, employer, and American citizen.")). He also claims that he was "never deliberately deceptive of where we were located" (*id.* at 7), did not "try to hide anything" (*id.* at 9), and "operated transparently" (*id.* at 12), despite the overwhelming evidence against him at trial, which included his company's policy of disciplining employees for disclosing their location (GX 1904), his tactic of submitting over a dozen false affidavits to courts stating that loan transactions occurred on tribal lands (*see, e.g.*, GX 309A), and emails in which he admitted to hiding behind, and laundering money through, shell companies and Native American tribes. (GXs 2615, 2806.)

10

While Tucker still appears to view himself as having provided "resources to millions of customers," he fundamentally fails to appreciate that his entire business model and relationship with the tribes was solely aimed to make huge profits by taking advantage of all of those customers by charging them illegal interest rates and defrauding them out of money they really needed. And Tucker's lack of insight into his criminal conduct appears to be shared by most if not all of the people who wrote letters on his behalf. It is one thing for a defendant who chose to go to trial to maintain his innocence and refuse to accept responsibility for his conduct. But a defendant who is so completely lacking in basic honesty, who is willing to brazenly contradict evidence seen by the Court at his trial, and who is apparently surrounded by people who reinforce his persistent efforts to divert responsibility and blame others, poses a particular threat to a public that needs to be protected from his schemes. In short, Tucker's past history, instant offense conduct, and his submissions here should give the Court every reason to believe he will again defraud others as soon as he has a chance to do so.

### III. Conclusion

For these reasons, and all the reasons set forth above, the Government respectfully submits that substantial terms of imprisonment of twenty years or more for Tucker and ten years or more for Muir are sufficient, but not greater than necessary, to achieve the legitimate goals of sentencing.

                                      Respectfully submitted,

                                      JOON H. KIM
                                      Acting United States Attorney

                      By: _____/S/_____
                           Niketh Velamoor
                           Hagan Scotten
                           Sagar Ravi
                           Assistant United States Attorneys
                           (212) 637-1076/2410/2195

cc:    Lee Ginsberg, Esq.
       James Roth, Esq.,
       Tom Bath, Esq.
       (by ECF)