UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
SCOTT TUCKER,                                         :
                                                      :
              Petitioner                              :
                                                      :
                                                      :
                                                      :
       -  v  -                                        :        No. 16-CR-91 (PKC)
                                                      :
                                                      :        Motion to Vacate, Set Aside,
                                                      :        or Correct Sentence
UNITED STATES,                                        :        Pursuant to 28 U.S.C. § 2255
                                                      :
              Respondent.                             :
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM IN SUPPORT OF DEFENDANT TUCKER'S MOTION TO VACATE,
SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

Scott Tucker ("Tucker") is entitled to a new trial pursuant to 28 U.S.C. § 2255 because he

was denied his choice of counsel, received ineffective assistance of counsel, and was convicted

with erroneous jury instructions. Tucker was prosecuted in a complex case following a lengthy

investigation and including millions of pages of discovery. Tucker had used over ten million

dollars of his own money to hire attorneys to represent him and had over ten million dollars

remaining in retainer with his chosen counsel to represent him through trial. The Government

used an illegal mechanism to improperly restrain all of Tucker's assets, including money held in

retainer by his counsel, which resulted in Tucker being forced to proceed to trial with only CJA

counsel. The Supreme Court has unanimously ruled that the restraint of these funds was illegal.

Tucker consistently objected to the removal of his retained counsel and his representation

by CJA attorneys. Tucker was then convicted following a trial in which he received ineffective

1

assistance of counsel, including being made aware mid-trial of a potential conflict of interest on the part of his lead counsel. In furtherance of his Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255, Tucker provides the following memorandum of law.

## BACKGROUND

In January of 2014, Tucker became aware that he was being investigated for federal criminal charges. (Ex. A, Aff. of Scott Tucker ("Aff. of S.T.") at ¶ 2). At this time, he had already retained attorney Paula Junghans of Zuckerman Spaeder to assist him with tax-related issues due to her expertise in this area; she assisted Tucker with this investigation from the start. (*Id*. at ¶ 1). Shortly after learning he was being investigated, Tucker hired attorney Paul Shechtman, also of Zuckerman Spaeder, and retained both Shectman and Junghans to represent him in this federal criminal investigation. (*Id.* at ¶ 3). Shechtman is a former Assistant U.S. Attorney and Chief of the Criminal Division in the Southern District of New York and Junghans is a former Acting Assistant Attorney General of the Tax Division of the U.S. Department of Justice; both attorneys had significant expertise handling white-collar criminal matters such as this one. (Exs. B and C).

On February 8, 2016, the Government charged Tucker with racketeering, conspiracy, and fraud in connection with an asserted "illegal payday lending scheme." (ECF 1); *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020). By this point, Shechtman and Junghans had been working on this investigation for over two years. (Aff. of S.T. at ¶ 4). Thereafter, attorneys Shechtman, Junghans, and Paul Hynes, Jr. appeared as retained counsel for Tucker in this case. (ECF 11, 16, 17, 23); (Aff. of S.T. at ¶ 13). Tucker paid Zuckerman Spaeder both for legal work done during the investigation of this case and a retainer for continued representation at trial. Tucker paid out over ten million dollars to this firm over the course of their representation. (Aff. of S.T. at ¶ 9).

While the criminal proceedings against Tucker were ongoing in the Southern District of New York, the Federal Trade Commission ("FTC") on March 31, 2016, obtained an injunction in the District of Nevada that froze all of Tucker's assets. *Federal Trade Commission* v. *Amg Services, Inc. et al.*, 2:12-cv-536 (D. Nev.)[1] Attorney Shechtman notified the Court about the injunction in an April 28, 2016, letter, explaining that the District of Nevada order "impose[d] an asset freeze on all the real and personal property of Tucker." (ECF 31).  This included "funds held by counsel (sic) the purpose of defending [the] case." (*Id.*). Because *all* of Tucker's assets were frozen, his retained counsel could not access any of the millions of dollars of attorney's fees held in trust. Additionally, Tucker was unable to access any other funds he could have used to replenish or replace this retainer. (NV-ECF 960). As a result, Tucker's defense counsel announced that it had "come to a standstill" as they were no longer being paid (ECF 31). Shechtman advised that there were ongoing negotiations between him and the "FTC and the government" to obtain a resolution so he could continue representing Tucker; however, no agreement had been reached as of the time of Shechtman's April 28, 2016, letter. (*Id.*).

At an April 22, 2016, hearing, prior to the filing of Shechtman's formal letter with the court on the issue, Shechtman told the Court that he wanted to discuss Tucker's "most significant problem, which is counsel's fees." (ECF 35 at 2). Shechtman explained that the Nevada injunction froze "all the money that ha[d] been advanced to [his firm] for purposes of representation." (*Id.* at 3). Shechtman said the freeze order put his firm in a "very difficult

---

[1]    The FTC's motion was originally filed in the District of Nevada on May 8, 2015. Docket entries from the Nevada case are referenced using "NV-ECF" followed by the docket entry number.

position" and "put everything on hold" in Tucker's defense. (*Id.*). Shechtman indicated that negotiations with the FTC and Government had been unsuccessful. (*Id.* at 4).

Although Tucker's counsel had entered into representation with full knowledge of all the legal issues he was facing, including the possibility that the Government could attempt to freeze some or all of his assets, they disregarded their obligations to their client as soon as the Government actually froze Tucker's assets and counsels' access their retainer was cut off. (Aff. of S.T. at ¶ 12). Tucker's retained counsel never discussed with him possible legal action they could have taken to try and have some or all of his assets released. (*Id.*. at ¶ 14). Instead, Shechtman just asked the Court to adjourn Tucker's case for six weeks while the parties waited for the Nevada court to resolve the matter. (ECF 35 at 4). The Court denied Shechtman's request and instead ordered Shechtman to "work as hard as you would if you were staying in as counsel in the case." (*Id.* at 14). Tucker advised the Court that he was not interested in having his retained counsel withdraw and that did not want an appointed attorney. (*Id.* at 19, 21).

Although the U.S. Attorney and the FTC both act on behalf of the Government, the U.S. Attorney tried to distance itself from the FTC action by telling the Court that the Nevada freeze order and resolution was "between [Tucker] and the FTC." (*Id.* at 5, 9). They refused to attempt to obtain a release of any funds so that Tucker could continue with counsel of choice.

On May 31, 2016, the District of Nevada Court altered its March 31, 2016, injunction to permit the FTC to release funds subject to restraint "without leave of court" and appointed a monitor. (NV-ECF 1007). Tucker's counsel never challenged the monitor's authority or requested the monitor release funds for legal fees.

On May 31, 2016, Shechtman again wrote to the Court advising that the issue of obtaining a release of some of Tucker's funds had not been resolved. (ECF 56). Shechtman

further stated in his letter that he *hoped* the Nevada court would release funds or "transfer the criminal defense fee issues (should funds be released, and, if so, in what amount) to this Court for resolution." (ECF 56). This never happened. Furthermore, no motion was ever filed by Tucker's retained counsel or CJA counsel in order to put this issue before this Court.

On June 3, 2016, the Court conducted a hearing in which it noted the unresolved freeze order and Tucker having no access to funds, but declined to stay the case for 90 days as Shechtman had previously requested. (ECF 64 at 11). Immediately thereafter, Shechtman moved to withdraw. (*Id.* at 11-12). Tucker again told the Court "I would like to have my right to counsel. They have been with me for a long time. I have got escrowed money with them specifically for this case for *over a year*, and *I would like my right to choose my counsel*." (Id. at 16) (emphasis added). The Court granted Shechtman's motion to withdraw over Tucker's objections and set the matter for a hearing on appointment of counsel. (*Id.* at 16).

The Court subsequently appointed James Roth, Lee Ginsberg, and Beverly Van Ness ("CJA Counsel") to represent Tucker. Ginsberg acted as lead counsel during the trial, with Roth acting as second chair. (*See, e.g.,* ECF 267 at 18). Van Ness was present for portions of the trial, although was not trial counsel, and acted as appellate counsel. Tucker was convicted following a jury trial, and the Second Circuit affirmed Tucker's convictions. *Grote*, 961 F.3d 105. Tucker sought review, but was denied *certiorari* on February 22, 2021. *Tucker v. United States*, 141 S. Ct. 1445 (2021). As of the filing of this motion, Tucker is incarcerated pursuant to his sentence in this matter.

In 2021, the Supreme Court unanimously held that the FTC had used an illegal mechanism when it restrained Tucker's assets – this restraint is what caused Tucker to lose

access to any funds by which to pay his counsel of choice. *AMG Capital Mgmt. LLC et al. v. Federal Trade Commission*, 593 U.S. (2021).

## ARGUMENT

**I.      A New Trial Must be Granted Because Tucker's Conviction Was Obtained and His Subsequent Sentence Was Imposed in Violation of the Constitution When He Was Denied His Counsel of Choice.**

The Second Circuit has held that the Sixth Amendment "protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." *United States v. Stein*, 541 F.3d 130, 156 (2d Cir 2008). The right to be represented by one's chosen counsel is such an important right that violation requires a new trial be granted regardless of any showing of prejudice. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006). "Where the right to be assisted by counsel of one's choice is wrongly denied…it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id.* at 148.

Here, Tucker clearly expressed his counsel of choice. Shectman and Junghans had entered their appearance as Tucker's trial counsel. This Court need not make any guesses as to whether Tucker would have been able to secure his counsel of choice, as he already had done so by paying millions of dollars to Shechtman and Junghan's law firm, Zuckerman Spaeder, in retainer. (Aff. of S.T. at ¶ 9). However, Tucker's ability to proceed with his counsel of choice was thwarted when the Government, through the FTC, used an illegal mechanism to freeze all of Tucker's assets – including the money he had paid to Zuckerman Spaeder and which was then

held in retainer. This prevented Zuckerman Spaeder from using these pre-paid funds for their legal fees.

Retained counsel had been paid a several million dollar retainer, received fees for prior legal work, and entered their appearance. Although they could have continued with representation, they requested and were allowed to withdraw over a fee issue that Tucker did not create. These actions resulted in Tucker being unconstitutionally denied representation by his counsel of choice. Because of this, Tucker is entitled to a new trial.

    a.   <u>Tucker Clearly Expressed His Counsel of Choice and They Were Prepared to Represent Him</u>

There is no mystery as to Tucker's counsel of choice. Tucker had hired Paul Shechtman and Paula Junghans on or before January of 2014 and they had been working with him on the criminal investigation for approximately two years prior to indictment. (Aff. of S.T. at ¶ 1-4). Retained counsel entered their appearance for Tucker in this matter. (*Id.* at ¶ 13). Tucker frequently expressed that retained counsel was his counsel of choice. (*see, e.g.* ECF 64 at 16). Tucker wanted retained counsel to represent him both because of their involvement in representing him for years before the indictment in this matter and because of their white-collar criminal experience. (*Id.* at ¶ 5-8).

Shechtman served two terms as an assistant U.S. Attorney in the Southern District of New York, including serving as the Chief of Appeals and Chief of the Criminal Division. He has over 30 years of experience representing clients in criminal and regulatory matters at both the federal and state level. He has received substantial recognition for his legal work, including being named a Leading Lawyer in Corporate Investigations and White-Collar Criminal Defense between 2013-2020, the years in which he was working for Tucker. (Aff. of S.T. at ¶ 5; Ex. B).

Junghans has over 40 years of experience working on federal tax litigation and white-collar criminal matters as both a prosecutor and defense attorney. She is a former Acting Assistant Attorney General of the Tax Division of the U.S. Department of Justice. (Aff. of S.T. at ¶ 6; Ex. C). Her practice focuses on the very areas where Tucker needed expertise: white-collar defense, business litigation, investigations, and tax controversy. *Id.*

b.  <u>The Government Improperly Restrained All of Tucker's Funds and This Prevented Him From Being Able to Pay for His Counsel of Choice.</u>

The Supreme Court has clearly stated that "pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Luis v. United States*, 578 U.S. 5, 10 (2016). That is precisely what occurred here. In *Luis*, the Court explained that "to permit the Government to freeze [a defendant's] untainted assets" would "erode the right to counsel to a considerably greater extent," *Id.* at 20-21.

The Supreme Court held that the Federal Trade Commission illegally froze all of Tucker's assets when the Nevada District Court "granted the Commission's request for an injunction and directed Tucker to pay $1.27 billion in restitution and disgorgement." *AMG Capital Mgmt. LLC et al. v. Federal Trade Commission*, 593 U.S. (2021). In analyzing the method used by the FTC to take these assets, the Supreme Court unanimously held that §13(b), which the FTC relied upon, was an illegal mechanism of restraint to use here as it "does not grant the Commission authority to obtain equitable monetary relief," and therefore reversed the Ninth Circuit holding that had upheld the Commissions' restraint of these funds. *Id.*

Not only were Tucker's assets that had been placed in retainer with his chosen counsel frozen, but *all* of Tucker's assets were frozen. The Government used an illegal mechanism to freeze these assets. The Government may argue that the funds held by Tucker's counsel were tainted and *could* have been properly restrained, but this is a distraction from the real issue. First,

because there was no proper restraint of these funds, the Government cannot now argue that it *could* have accomplished this restraint properly when it never tried to do so. The only facts before this Court show that the Government did not restrain Tucker's funds properly and that the improper restraint of these funds caused him to lose access to his chosen counsel. Furthermore, even if the Government were able to show that the funds held by Tucker's counsel were tainted, Tucker must still prevail here because the issue is not just the seizure of his retainer with counsel, but the seizure of all of his assets. Even if the Government can show that the retainer held by counsel was tainted, had all of his funds not been seized, Tucker could have replaced this retainer with other funds.

Because the restraint of Tucker's funds by the Government was illegal, and because Tucker was unable to pay his chosen counsel because of this restraint, he was improperly denied his choice of counsel and his Sixth Amendment rights were violated, requiring a new trial.

The U.S. Attorney in this case benefited from Tucker's assets being frozen and him losing retained counsel. Although there is no direct evidence on the face of the record of this case to show cooperation between the U.S. Attorney and the FTC, there are indications that the U.S. Attorney was at least involved in some of the discussions between the FTC and Tucker's retained counsel, indicating there was cooperation amongst the two Government actors. For this reason, Tucker requests discovery be granted to allow him to request any and all copies of communications between the FTC and the U.S. Attorney for the Southern District of New York related to any coordination between these two Government agencies regarding Tucker's assets.

    c.   <u>Tucker's Counsel of Choice Was Allowed to Withdraw From Representation Due Solely to Financial Considerations and Against Tucker's Wishes.</u>

Tucker's retained counsel was improperly allowed to withdraw because of a fee dispute that was created entirely by the Government's improper restraint of all of Tucker's assets, as

discussed above. While it is understandable that retained counsel sought to withdraw when Tucker's funds were restrained –- and while non-payment of funds can sometimes provide good cause for withdrawal –- they should not have been permitted to withdraw in this case. In *United States v. Parker*, the Second Circuit said:

> In most cases, however, courts have permitted counsel to withdraw for lack of payment only where the client either deliberately disregarded financial obligations or failed to cooperate with counsel. Non-payment of legal fees, without more, is not usually a sufficient basis to permit an attorney to withdraw from representation…
>
> New York State courts interpreting the Code of Professional Responsibility have reached similar results. Indeed, the disciplinary rules of the Code permit a lawyer to withdraw from representing a client for the non-payment of fees only if the client deliberately disregards an agreement or obligation to the lawyer as to expenses or fees. N.Y. Code of Prof'l Responsibility D.R. 2-110(C)(1)(f) (emphasis added). Moreover, the ethical considerations of the Code advise that the full availability of legal counsel requires … that lawyers who undertake representation complete the work involved.
>
> There is little question that a defendant's failure to pay fees may cause some divisiveness between attorney and client, but we presume that counsel will continue to execute his professional and ethical duty to zealously represent his client, notwithstanding the fee dispute.

*United States v. Parker*, 439 F.3d 81, 104 (2d Cir. 2006) (internal citations and quotations omitted).

Tucker's retained counsel moved to withdraw solely because their substantial retainer was seized and they did not know if their future bills would be paid due to the Government's restraint of Tucker's assets. (ECF 35 at 6). The Court noted that retained counsel could be made to stay in the case and be paid at CJA rates. (*Id.*). Tucker had hired and paid Zuckerman Spaeder over ten million dollars and believed that they would be available to represent him through trial. (Aff. of S.T. at ¶ 9-11). Withdrawal was not mandatory and should not have been granted in this case.

Tucker did not want his retained counsel to withdraw. (*Id.* at ¶ 15). Indeed, when the Court asked Tucker whether he assented to his retained counsel's withdrawal, Tucker told the Court that

he wanted his chosen counsel to represent him and reminded the court that they had been with him for over two years. (ECF 64 at 16).

There is nothing in the record to indicate that Tucker 'deliberately disregard[ed]' his fee agreement with his retained counsel. *See Parker*, 439 F.3d at 104. Rather, due to the illegal Government restraint of all of Tucker's assets, the fees he had in retainer with his counsel were improperly seized. (Aff. of S.T. at ¶ 18). Tucker had no access to other funds with which to replace this retainer as all his assets were taken in a seizure later deemed to be unconstitutional by the Supreme Court in a 9-0 ruling. A concern regarding payment of fees when the defendant has not acted deliberately to cause the issue, and in fact has paid millions of dollars to counsel, is not "good cause" for withdrawal. *See Parker*, 439 F.3d at 104.

Although the Court was understandably concerned about forcing Tucker's retained counsel to stay in the case without assurance of being paid their full rate in the future, it went against Second Circuit caselaw and the New York Code of Professional Responsibility to allow withdrawal in this instance. While acknowledging that an attorney who files his or her appearance does not have an absolute right to withdraw, the Court indicated it believed that Tucker might not want attorneys who were not being paid to stay in the case, knowing there was work to be done and they were not being paid. (ECF 64 at 13). Even in the face of this proposition from the Court, Tucker assured the Court he would rather his retained counsel stay in the case. (*Id.*).

Tucker's retained counsel entered into an agreement with him to represent him through trial with an understanding of the legal issues he was facing, having worked with Tucker on his legal matters and this investigation for approximately two years. (Aff. of S.T. at ¶ 12). They had already been paid significant funds for their work and a significant retainer had been provided in contemplation of their continued work. (*Id.* at ¶ 9-12). As his attorneys, they were obligated to

provide him representation once they agreed to act as his counsel. Rather than receiving the representation he chose, Tucker was abandoned by his chosen counsel due to a fee issue created entirely by the government that was prosecuting him. With this, the Government succeeded in denying Tucker his choice of counsel in direct violation of the Sixth Amendment.

Although the issue of this illegal restraint was never put squarely before this Court, the Government's illegal seizure of Tucker's assets nevertheless resulted in Tucker being denied access to counsel of choice in this Court. The unconstitutional restraint of Tucker's assets set off a chain reaction in this proceeding during which Tucker was not effectively represented, as discussed further below. Due to this ineffective representation, serious issues regarding choice of counsel were never put before this court as they should have been. The issue of denial of choice of counsel has now come before this Court. Because denial of counsel of choice is a structural issue, a new trial is required regardless of a showing of prejudice.

**II.   Tucker is Entitled to a New Trial Because He Was Denied Effective Assistance of Counsel and There is a Reasonable Probability That, But For This Ineffective Assistance, Tucker Would Not Have Been Convicted of All Counts At Trial.**

The Sixth Amendment of the U.S. Constitution guarantees defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984).[2] *Strickland* sets out the test for a claim of ineffective assistance of counsel, requiring that a petitioner show "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Id.* at 669. "[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the

---

[2] The laws of the United States also confer upon a defendant the right to receive "adequate representation." 18 U.S.C. § 3006A(a). Thus, not only was this conviction obtained in violation of Tucker's Sixth Amendment rights, but it was also obtained contrary to the laws of the United States.

petitioner could have raised the claim on direct appeal." *Massaro v. United States,* 538 U.S. 500, 504, 123 S. Ct. 1690, 1694, 155 L. Ed. 2d 714 (2003)

An attorney's performance is judged against "that of reasonably effective assistance." *Strickland* at 669. Prejudice is determined by a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 669. Here, Tucker received ineffective assistance of counsel both from his retained and appointed counsel. These errors fell below a reasonable standard of effective representation and there is a reasonable probability that, but for these errors, the result at trial would have been different. For these reasons, Tucker is entitled to a new trial.

a. Tucker's Retained and Appointed Trial Counsel Failed to Act Reasonably When They Did Not Seek to Gain Access to Tucker's Funds, Which Had Been Illegally Restrained by the Nevada Court, So That He Could Pay His Counsel of Choice.

Tucker's retained counsel was ineffective both in failing to try to protect some of Tucker's fees to be used as attorney's fees prior to Nevada court's freeze order and in failing to challenge the illegal restraint of all of Tucker's assets by the Government, which resulted in Tucker losing access to any funds with which to pay retained counsel. Attorney Shechtman acknowledged that he knew the Government had sought restraint of Tucker's assets in the Nevada case "well before the indictment was returned." (ECF 31). Until the Nevada court entered its freeze order on March 31, 2016, retained counsel could have sought to protect some of Tucker's assets for attorney's fees. For example, they could have moved for an order of this Court that required the funds then held in trust by the attorneys be deposited into the registry of the Court. *See* 28 U.S.C. § 2041-2042. Once the funds were deposited in the Court's registry, no other Court could have entered an order to restrain those funds. *Id.*

13

After the Nevada court's freeze order was entered, and while retained counsel still represented Tucker, they could and should have moved the Nevada court to release some funds for attorney's fees and challenged the illegal mechanism used to restrain all of Tucker's assets, as the Supreme Court later found to be the case. *See AMG Capital Mgmt. LLC et al. v. Federal Trade Commission*, 593 U.S. (2021). They failed to do this. In fact, none of Tucker's retained counsel even discussed with Tucker the possibility of challenging the restraint of his funds in order to allow him access to funds for legal fees. (Aff. of S.T., ¶ 14). When CJA counsel represented Tucker, they also could and should have filed for release of these funds.

Additionally, the Nevada Court was not the only entity that could have released these funds. On May 31, 2016, before retained counsel was allowed to withdraw on June 3, 2016, the Nevada court altered its March 31, 2016, injunction to permit the FTC to release funds subject to restraint "without leave of court." (NV-ECF 1007). At this point, retained counsel could have requested the FTC release funds or requested that the U.S. Attorney for the Southern District of New York, an actor for the U.S. Government, work to secure release of funds for attorney's fees from the FTC, also an actor for the U.S. Government, in order to ensure Tucker's access to counsel of choice. They could have petitioned this Court to order the Government to request the FTC release funds for this purpose. No such actions were taken. When CJA counsel represented Tucker, they also could and should have taken these same actions to ensure that their client received the representation he desired. Additionally, both retained and CJA counsel could have filed a writ of mandamus or an interlocutory appeal regarding the improper restraint of funds and resultant denial of choice of counsel.

Retained and CJA counsel had multiple avenues available to mount legal challenges to the illegal restraint of funds that caused Tucker to be unable to pay his counsel of choice, and yet none

of his counsel took any of these steps. Based on the Supreme Court's unanimous ruling that the Government, acting through the FTC, did not have the authority to restrain all of Tucker's funds, it is evident that there were sufficient grounds to challenge that restraint. Thus, there is a reasonable probability that a challenge against the Government's restraint of Tucker's assets would have been successful, as it ultimately was.

As explained above, Tucker's retained counsel had significant experience in handling white-collar criminal cases, had worked on both the prosecution and defense of these types of matters, and had been involved with this complicated case for a lengthy period of time during the investigation phase. Although they provided ineffective assistance of counsel in failing to ensure their continued access to funds for representation, this failure is not indicative of how they would have performed at trial on the underlying issues in this matter. Given the complex nature of this case, it is reasonably probable that Tucker's chosen counsel would have presented a more thorough defense and that the result at trial would have been different had he been represented by his counsel of choice throughout trial.

Furthermore, not only would access to his assets have allowed Tucker to continue with his chosen counsel, it also would have allowed him to retain more experts and attorneys to review the lengthy discovery in this case and pursue a more in-depth analysis of the discovery than his appointed counsel could do based on their resources and limited time in the case. (Aff. of S.T. at ¶ 10). Here, Tucker's CJA counsel had to seek approval for all trial expenses. (ECF 183 at 24). A budget for expenses had to be created, submitted, and approved, rather than Tucker being able to choose from all available options of experts and discovery software and to decide on his own timeline what expenses he wanted to spend on his own defense. *Id.*

It is apparent from appointed counsel's own statements that they did not request and/or receive adequate funds to challenge the government's experts and that Tucker was prejudiced by this. Ginsberg says, in an unsuccessful challenge against evidence brought in by the Government's accounting expert Espinoza that "picking a particular month randomly to show a set of numbers, without having all the other information, I think its prejudicial… frankly *we didn't have the time to spend going through everything else to see whether this is a fair comparison to the other months*, other years, or anything like that." (ECF 290 at 1678-79, emphasis added). Ginsberg admits that his representation of Tucker is not sufficient to meet the Government's experts. Espinoza later explains that she spent approximately ten percent of her time for the four years prior to trial working on this project. (*Id.* at 1739). The discrepancy between the Government's expert, who spent ten percent of her time for four years working on this, against Tucker's CJA attorneys, who admit they did not even have time to look through all the documents to see if the Government was showing representative data, can be attributed to Tucker's CJA attorneys' failure to seek access to adequate funds and their more limited time in this complex case. This ineffective assistance caused Tucker to put forth a weaker case; had he been able to produce stronger experts and challenge the Government's experts, it is reasonably probable that the result of the trial would have been different.

As discussed above, because the denial of choice of counsel is a structural issue, it requires no showing of prejudice to require a new trial. However, even when this issue is analyzed for prejudice based on counsel's ineffective assistance that furthered Tucker's inability to proceed with choice of counsel, there is actual prejudice. "Different attorneys will pursue different strategies with regard to myriad trial matters, and the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains,

or decides to go to trial." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 141, 126 S. Ct. 2557, 2559, 165 L. Ed. 2d 409 (2006). As the Supreme Court has recognized, a defendant's attorney has a huge impact on how a case is tried, submitted, and decided.

Tucker's chosen counsel had over 70 years of collective white-collar criminal law experience, access to the resources of a large firm accustomed to handling complex white-collar matters, and years invested in understanding and working with Tucker on the investigation in this case as well as Tucker's other legal concerns that had been playing out favorably in states such as California and Colorado. Because it is reasonably probable that there would have been a different outcome had Tucker been able to continue with his preferred counsel, which he was unable to do because of ineffective assistant of counsel, a new trial must be granted.

     b.   <u>Tucker's Appointed Trial Counsel Failed to Act Reasonably When They Did Not Seek Reconsideration of Retained Counsel's Withdrawal.</u>

N.Y. Rule of Professional Conduct 1.1(c) states that "a lawyer shall not intentionally fail to seek the objectives of the client through reasonably available means permitted by law and these Rules." N.Y. Rule of Professional Conduct 1.1(c). Tucker was clear that he wanted to be represented by his counsel of choice.

"A district court has the inherent power to reconsider and modify its interlocutory orders prior to the entry of judgment." *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir.1982). As explained above, *Parker* clearly indicates that retained counsel should not have been permitted to withdraw in this case. Because of this caselaw from 2006, which was therefore in play at the time of these hearings in 2016, there is a reasonable probability that the Court would have reconsidered its prior order permitting withdrawal had CJA counsel brought *Parker* to the Court's attention. The Court had earlier disabused Shechtman of the notion that he could stop work after the Nevada court imposed the freeze order, indicating the Court's attentiveness to the

issue of counsel continuing to zealously advocate for their clients despite fee disputes. However, when retained counsel sought to withdraw, there were no attorneys in the case to bring arguments before the Court regarding why retained counsel should *not* be allowed to withdraw. Retained counsel was concerned about being paid and so would not have an interest in showing the court why they should be made to remain in the case. The Government receives no benefit from a defendant having a more robust legal team, so they also did not have any incentive to argue for Tucker's retained counsel to remain in the case.

There is a reasonable probability that the Court would have denied retained counsel's motion to withdraw or reconsidered the ruling had *Parker* been brought to its attention; Tucker's inability to pay was not deliberate and retained counsel had already been paid over ten million dollars in fees. Accordingly, Tucker's CJA counsel was ineffective for failing to pursue Tucker's objectives in being represented by his chosen counsel and failing to seek reconsideration of the Court's prior order permitting retained counsel to withdraw.

c.   Tucker's Appointed Trial Counsel Failed to Act Reasonably When They Did Not Preserve an Issue in Jury Instructions for Appeal.

Tucker appealed his conviction to the Second Circuit arguing, primarily, that "the district court erred in instructing the jury that the Government could satisfy the required state-of-mind element of collection of unlawful debt by proving that the defendants acted deliberately, "'with knowledge of the actual interest rate charged on the loan[s],'" regardless of "any good faith belief that their conduct was lawful." *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020). Tucker's appeal as to the jury instructions error was denied pursuant to a difficult-to-overcome plain error standard. *Id.* at 5. The Second Circuit found that "[b]ecause the Defendants did not preserve their objection… the 'plain error' standard of Rule 52 applies." *Id.* This jury instruction was harmful to Tucker because, as the Second Circuit recognized, "Defendants conceded at trial

that they were aware of the interest rates charged on the loans, but argued that they believed in good faith that their conduct was lawful." *Id* at 18.

It is well settled that "[i]f the defendant objected to an erroneous jury instruction at trial and raises the same claim of error on appeal, a harmless error standard of review applies." *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) This is an easier standard for an appellant to meet as, under this standard, "a conviction will be affirmed only 'if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.' *Id.* at 308 (citing *United States v. Mahaffy,* 693 F.3d 113, 136 (2d Cir.2012). Under the plain error standard that was applied here, though, "the Court of Appeals ha[d] discretion to reverse only if the instruction contain[ed] '(1) error, (2) that is plain, and (3) that affect[s] substantial rights.'" *Id.* at 308 (citing *Johnson,* 520 U.S. at 467, 117 S.Ct. 1544.

The 2021 treatise on Professional Responsibility in Criminal Defense Practice instructs that "an ineffective assistance claim can arise from defense counsel's failure to submit certain jury instructions to the prejudice of the accused or to object to instructions not supported by the law or facts of the case." § 10:46. Jury instructions and deliberations, Prof. Resp. Crim. Def. Prac. 3d § 10:46.

The Second Circuit denied Tucker's appeal pursuant to the plain error standard of review. No other standard is discussed. Because the harmless error standard is an easier burden for appellant to overcome and because there is a reasonable doubt as to whether a rational jury would have found Tucker guilty absent this erroneous instruction, there is a reasonable probability that, but for counsel's failure to preserve this issue for appeal, the result of the appeal would have been different.

d.  <u>Tucker's Appointed Trial Counsel Failed to Act Reasonably When They Failed to Pursue Viable Arguments on Cross Examination and Specifically Elicited Harmful Testimony</u>

Tucker's CJA counsel routinely failed to pursue relevant matters on cross examination and even elicited harmful testimony on cross examination. These errors are significant and not subject to deference under a *Strickland* analysis.

First, when cross-examining Kelly Rogers, a former CLK Payday Loan Company Employee, Tucker's counsel Roth failed to ask her about her cooperation agreement with the Government (ECF 269 at 226-248); failed to confront her with the conflicting testimony she had provided to the Government before trial (*Id.* at 236); and while he got her to agree that 'some of things she said' were speculation, failed to follow up on what those speculative things were (*Id.* at 230). Rogers was a government witness who testified that she believed the companies at issue were lying to customers and had misleading loan documents. (*Id.* at 147-217). Undermining her testimony would have been important to the defense, and yet Roth was half-hearted in his attack and left many attacks against her credibility and testimony out of his cross examination. There is a reasonable probability that had she been cross-examined more thoroughly, the jury would not have believed her testimony regarding Tucker lying to customers and using misleading loan documents and would have reached a different verdict as to at least one of the charges.

When questioning government witness Adrian Rubin, Roth pointed out that Rubin was "operating [a payday loan business] illegally" when Rubin operated a business in Utah that "had a call center in Delaware, and [was] doing payday loans throughout the United States" even though, as Roth stated, Rubin was not "licensed to DO the payday loans in the other states." (ECF 274 at 506). The distinct characteristics of this business pointed out by Roth – being authorized in one state, having a call center in another, and doing business throughout the

country – are the same as many of the characteristics of the businesses that Tucker was involved in, which the government was attempting to show had been operated illegally. For Tucker's counsel to focus on an operation that, based on what was presented to the jury, appeared to have similarities to the ones Tucker was involved in, and then to highlight the illegality of this business – which had not been done by the government - without taking time to point out the differences between that and Tucker's business operations, was counterproductive to Tucker's defense. It is reasonably likely that had Tucker's own attorneys not pursued this line of questioning, the jury would have reached a different verdict as to at least one of the counts.

    e.   <u>Tucker's Lead Counsel Had a Conflict of Interest that was Raised too Late for Tucker to Proceed With Alternative, Effective, and Conflict-Free Counsel.</u>

During the trial in this matter, after jury selection and witness testimony had begun, the Court held a separate conference to address Tucker regarding whether he wanted his lead counsel, CJA attorney Lee Ginsberg, to be removed as his counsel. (Aff. of S.T. at ¶ 19; Ex. D, Aff. of Nadjia Limani ("Aff. of N.L.") at ¶ 4-5). Although no transcript of this proceeding is currently available on the Court's docket, a court reporter was present at this conference and so it is reasonable to believe that such could be found through discovery, which is requested as to this matter. (Aff. of S.T. at ¶ 19; Aff. of N.L. at ¶ 6). At this proceeding, the Court offered Tucker the unusual option of having his lead counsel taken off the case in the middle of trial. (Aff. of S.T. at ¶ 20; Aff. of N.L. at ¶ 9).

Tucker was informed that this choice was offered to him because Ginsberg was involved in an issue regarding allegations of blackmail by a former client and was meeting with the United States Attorney for the Southern District of New York, the same entity that was prosecuting Tucker, at the time of Tucker's trial. (Aff. of S.T. at ¶ 19; Aff. of N.L. at ¶ 8). Thus, a potential conflict of interest existed. (Aff. of S.T. at ¶ 19; Aff. of N.L. at ¶ 8). Tucker was not informed of

this potential conflict of interest, nor was he given the chance to be represented by alternative counsel, prior to the commencement of trial. (Aff. of S.T. at ¶ 25). Although the timing of this issue being raised to the Court was out of the Court's hands, Tucker's counsel should have raised it earlier and was ineffective in failing to do so.

The options available to Tucker by the time the conflict of issue was raised before the Court were, unfortunately, insufficient to solve the problem. Because the issue was raised once trial had already begun, Tucker reasonably believed he had to decide between proceeding with only Roth, who was unprepared and not expecting to take lead on this case, or proceeding with Roth AND Ginsberg, who Tucker believed had a conflict of interest but who had at least expected to act as lead counsel in this trial. (*Id.* at ¶ 21-22). Tucker felt it would be worse to lose his lead counsel and continue with only his second-chair, Roth, who Tucker felt was not equipped to handle this trial alone. (Aff. of S.T. at ¶ 23).

Tucker did not believe that he could be granted a stay of proceedings or a continuance for Roth to prepare to take over as lead because this option was not offered to him. (Aff. of S.T. at ¶ 21; Aff. of N.L. at ¶ 10). Tucker did not believe that he would be provided an additional attorney if Ginsberg were removed and there was no discussion of Tucker receiving additional counsel or assistance if this should happen. (Aff. of S.T. at ¶ 21; Aff. of N.L. at ¶ 9). There is no indication that Roth would have been ready to take on the position as lead counsel and Tucker felt that to put someone in charge of his defense, in the middle of trial, who had not planned for this role, would be just as bad as having Ginsberg continue. (Aff. of S.T. at ¶ 22). Tucker was offered the choice, essentially, between lead counsel with a conflict of interest and one who was unprepared.

Furthermore, during this hearing, Tucker did not have the ability to consult with an attorney other than one with a potential conflict of interest (Ginsberg and, by extension, Nadjia

Limani, from the same firm) or one who would be forced to take on the entire case should representation change (Roth). (Aff. of S.T. at ¶ 24). Neither of these attorneys was in a position to give Tucker neutral advice to assist him in understanding his options and how to proceed.

Additionally, because an attorney with a potential conflict of interest had already been representing him in trial, removal alone would not have sufficed to cure any prejudice. At the very least, Tucker should have been able to consult with neutral counsel to understand his options and been provided with the opportunity for a mistrial, which would have been the only way to truly cure any harm possibly done by being represented up to that point by counsel with a conflict of interest.

Tucker was unhappy with Ginsberg's representation throughout trial and believes that his representation was hindered by Ginsberg's focus on his personal issue that led to the potential conflict of interest. (*Id.* at ¶ 26). Tucker recognized that Ginsberg was distracted during the entire trial. For example, at one time, Ginsberg completely left the courtroom for a lengthy period of time to answer a phone call during the direct examination of a witness for whom Ginsberg then performed the cross examination. *Id.* Ginsberg was constantly checking his personal phone during trial and appeared distracted by the issue with his former client in which he was cooperating with the U.S. Attorney for the Southern District of New York. *Id.*

 f. <u>Any One of These Errors is Sufficient to Grant Tucker a New Trial.</u>

Tucker received ineffective assistance of counsel at many times and on significant issues throughout the pretrial and trial phase of this case. If this Court finds that just one of these instances of ineffective assistance is reasonably probable to have led to a different outcome at trial, then Tucker must be granted a new trial.

**III. Tucker Was Denied His Constitutional Right to a Fair Trial Due to Errors in the Jury Instructions Regarding the Mens Rea of Willfullness, an Issue Which is Not**

**Subject to Procedurally Default Because Counsel Was Ineffective in Failing to Preserve This Issue for Appeal.**

As explained above, Tucker's trial counsel was ineffective in failing to preserve for appeal the issue of the definition of willfulness in a jury instruction regarding collection of unlawful debt. This ineffective assistance of counsel claim is cause excusing the procedural default of the jury instruction error claim, just as ineffective assistance of counsel is cause excusing any possible procedural default of the choice of counsel claim. "The procedural default doctrine and its attendant 'cause and prejudice' standard are grounded in comity and federalism concerns, and apply whether the default occurred at trial, on appeal, or on state collateral attack. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640). Because procedural default does not apply to the issue of erroneous jury instructions due to the ineffective assistance of counsel, Tucker also raises here the arguments as raised in his appeal to the Second Circuit regarding the erroneous jury instruction on the mens rea of willfulness. (see Ex. E).

The challenged jury instruction was harmful to Tucker because Tucker's counsel had pursued a strategy in which they conceded the fact of Tucker being aware of the interest rates charged in the pay day loans at issue and focused on presenting witnesses to prove that Tucker believed his conduct was lawful based on good faith belief and the advice of counsel. This strategy, however, was completely ineffective because trial counsel failed to challenge a jury instruction that required the jury to find Tucker liable if they believed that the *conceded* fact of his knowledge of the actual loan amount had been proven. It is reasonably probable that, but for this erroneous jury instruction, the jury would not have found this element to be met and therefore would have reached a different conclusion at least as to the charge of collection of unlawful debt. *See, e.g., United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir 1006) (explaining

that jury instructions that incorrectly incorporate or set out required elements can mislead the jury). The Second Circuit, in rejecting Tucker's appeal regarding this jury instruction, determined only that "reversal is not warranted under the plain error standard." *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020). Due to the lack of procedural default on this issue, it is proper for this Court to grant a new trial based on this improper jury instruction.

## CONCLUSION

For the reasons stated above, Defendant Scott Tucker respectfully requests that this Court:

1. Vacate and set aside his sentence and order a new trial conducted;

2. Allow Tucker to conduct discovery to fully develop the record regarding the issues raised herein;

3. Require the Government to respond to this motion;

4. Set a hearing on this motion; and/or

5. For other and further relief as this Court deems just and necessary.

<div style="margin-left: 40%;">

Respectfully submitted
SCOTT TUCKER, DEFENDANT

/s/ Sarah Sherer- Kohlburn
Sarah Sherer-Kohlburn
Sherer Law Offices LLC
517 St. Louis Street
Edwardsville, Illinois 62025
618/692-6656 – telephone
618/692-0810 – facsimile
sarah@shererlaw.com
NY Bar Number: 5240015
MO Bar Number: 68617
IL Bar Number: 6329282
***Attorney for Defendant Scott Tucker***

</div>

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing document was electronically filed and served this 22nd day of February, 2022, to the following counsel of record:

Sagar Kananur Ravi
U.S. Attorney's Office, SDNY
Sagar.ravi@usdoj.gov

Hagan Cordell Scotten
U.S. Attorney's Office, SDNY
Hagan.scotten@usdoj.gov

Niketh Varadaraj Velamoor
U.S. Attorney's Office, SDNY
Niketh.velamoor@usdoj.gov

David Wayne Braswell
Armstrong Teasdale
Attorney for Spirit Jets LLC
dbrawell@armstrongteasdale.com

Richard Finneran
Bryan Cave Leighton Paisner LLP
Attorney for Kim Tucker
Richard.finneran@bclplaw.com

Andrey Spektor
Bryan Cave Leighton Paisner LLP
Attorney for Kim Tucker
Andrey.spektor@bclplaw.com

Philip Greenfield
GM Law PC
Attorney for Dylan, Jagger Investment Co.
philg@gmlawpc.com

Carol Lee
Pillsbury, Winthrop, Shaw, Pittman LLP
Attorney for Dylan, Jagger Investment Co.
Carol.lee@pillsburylaw.com

Carrie Savage
GM Law PC

Attorney for Dylan, Jagger Investment Co.
carries@gmlawpc.com

William Silas Hackney
Smith and Associates
Attorney for Truman Arnold Companies
whackney@salawus.com

Clifford Katz
Platzer, Swergolf, Levine, Goldnber, Katz and Jaslow LLP
Attorney for Ferrari Financial Services Inc.
ckatz@platzerlaw.com

Seetha Ramachandran
Proskauer Rose LLP
Attorney for MoloLamken LLP
sramachandran@proskauer.com

/s/Sarah Sherer-Kohlburn