# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SCOTT TUCKER | : | |
| Petitioner | : | No. 16-CR-91 (PKC) |
| v. | : | |
| UNITED STATES | : | |
| Respondent | : | |

## DECLARATION OF PAULA M. JUNGHANS

I, Paula M. Junghans, make this declaration under the penalties of perjury pursuant to 28 USC §1746 and in response to this Court's Order dated December 1, 2022 directing a response to Mr. Tucker's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 ("the Motion").

1. I am an attorney admitted to practice in Maryland (since 1976) and the District of Columbia (since 2001). I am admitted to the United States Supreme Court, the Court of Federal Claims, the United States Tax Court, and the United States District Courts for the District of Maryland and the District of Columbia. I am also admitted to several United States Courts of Appeals and have been admitted *pro hac vice* in approximately a dozen United States District Courts, including the Southern District of New York.

2. From October 2006 through December 31, 2022, I was a partner in Zuckerman Spaeder LLP. From April 2001 through October 2006 I was a partner in the firm now known as DLA Piper. From October 1998 through January 2001 I served as Deputy Assistant Attorney General for Criminal Matters and Acting Assistant Attorney General in the Tax Division of the United States Department of Justice. Prior to my government service, I engaged in the private

practice of law in several firms in Baltimore, Maryland. I withdrew from Zuckerman Spaeder and from the private practice of law on December 31, 2022.

3. I am a fellow of the American College of Trial Lawyers and the American College of Tax Counsel. Throughout my professional career, I have been a trial lawyer, focusing on criminal and civil tax litigation and (except for the period of my government service) white collar criminal defense.

4. In August 2011, I was contacted by Jeffrey Morris, an attorney with the Berkowitz Oliver firm in Kansas City, concerning the representation of Scott Tucker. I had known Mr. Morris since late 2002; we had worked together from that date through June 2011 on an extremely complex and contentious matter in the United States District Court for the District of Kansas that involved two trials, multiple appeals, and several collateral civil matters. I knew Mr. Morris to be an extremely able lawyer, and had also worked with several other attorneys at Berkowitz Oliver, including Nick Kurt.

5. Mr. Morris advised me that Mr. Tucker was the subject of an ongoing civil tax examination, that he wanted to retain an attorney with substantial tax experience, and that Mr. Morris was recommending me. I agreed to undertake the representation and on September 8, 2011 Mr. Tucker executed our engagement agreement dated August 31, 2011. (Ex. A) The engagement agreement explicitly provided that Zuckerman Spaeder would coordinate its representation of Mr. Tucker with others, including Mr. Morris. Paul Hynes, who was then an associate at Zuckerman Spaeder, assisted in the representation of Mr. Tucker.

6. It quickly became apparent to me that the IRS civil examination of Mr. Tucker was what is sometimes referred to as an "eggshell audit," *i.e.* a civil examination with a high risk of evolving into a criminal tax investigation. Mr. Tucker's tax affairs were quite complex,

2

involving many different entities and unusual issues, including the status and nature of his relationships with tribal entities in the payday lending business.

7. On April 2, 2012, the United States Federal Trade Commission filed suit against Mr. Tucker and others in the United States District Court for the District of Nevada, *Federal Trade Commission v. AMG Services, Inc., et al*, Case No. 2:12-cv-536 ("the FTC case"). In very general terms, the FTC alleged that the payday lending business that Mr. Tucker was involved in along with several Indian tribes was illegal because it extended loans at usurious rates, deceived borrowers about the terms of their loans, and was actually controlled by Mr. Tucker rather than the tribes.

8. On May 2, 2012, Mr. Morris and attorneys Nick Kurt and Ryan Hudson of the Berkowitz Oliver firm entered their appearances as counsel for Mr. Tucker in the FTC case.

9. The FTC case was heavily litigated by Mr. Tucker and the other defendants. I followed the case to the degree necessary to stay informed about important developments, and spoke regularly with Mr. Morris, and sometimes with Mr. Kurt, about it.

10. At some point in 2014, it became apparent that the United States Attorney for the Southern District of New York was conducting a criminal investigation that paralleled the allegations made in the FTC case. ("the SDNY case") Mr. Tucker expressed a desire to associate counsel with extensive experience in white collar criminal matters in the Southern District of New York. At that time, Paul Shechtman was a partner in Zuckerman Spaeder's New York office, and I asked him to join the team representing Mr. Tucker. As the investigation progressed, the Zuckerman Spaeder attorneys and the Berkowitz Oliver attorneys worked together as a team, with Berkowitz Oliver taking the lead in the FTC case and Zuckerman Spaeder taking the lead in the tax and SDNY cases.

8519364.1

11. Mr. Tucker, for obvious reasons, was concerned that he might be prosecuted in the SDNY case, and wanted to secure our ability to represent him if that occurred. We discussed what a lengthy and complex case in New York might cost. I made some very general estimates based on experiences I had had in similar complex trials. Mr. Tucker proposed to pay a $6 million retainer. Accordingly, on January 28, 2015, I prepared a revised engagement agreement providing that Mr. Tucker would transfer $6 million to Zuckerman Spaeder as a retainer for trial if there were an indictment. (Ex. B) Mr. Tucker did not execute this agreement.

12. On May 18, 2015, I prepared another revised engagement agreement to address the potential criminal prosecution in SDNY. This agreement provided for a $5 million retainer for trial, and was executed by Mr. Tucker on May 19, 2015. (Ex. C) Zuckerman Spaeder received a wire for $5 million into its trust account from Mr. Tucker on May 20, 2015.

13. On May 22, 2015, Zuckerman Spaeder received a wire for an additional $2 million into its trust account from Mr. Tucker. On May 26, 2015, I prepared another revised engagement agreement, providing for a $7 million retainer for trial, which was executed by Mr. Tucker on the same day. (Ex. D)

14. The changes in the amount of the retainer were a result of Mr. Tucker's continuing re-assessment of the amount he could pay, and his desire that his defense be funded as fully as possible. While we anticipated that any trial would be lengthy and very costly, we did not insist on any of these specific amounts. Each of the agreements provided that the cost of any trial might be more or less than the retainer amount, and that any unused portion of the retainer would be returned to Mr. Tucker when our engagement ended. At all times, it was understood that the retainer funds were Mr. Tucker's property and that Zuckerman Spaeder had no interest in the funds unless and until services to be paid from the retainer were performed.

8519364.1

15. In December 2015, Messrs. Shechtman, Morris, Hynes and I made a presentation to the United States Attorney for the Southern District of New York arguing why Mr. Tucker should not be prosecuted.

16. On January 10, 2016, without any prior notice, Mr. Tucker was arrested in Kansas on an indictment that had been returned in the Southern District on January 8, 2016. Mr. Tucker made an initial appearance in Kansas and was released on certain conditions.

17. Mr. Shechtman, Mr. Hynes and I entered our appearances on behalf of Mr. Tucker in this case on March 4, 2016. (ECF 16, 17, 18). Mr. Hynes entered his appearance on March 17, 2016. (ECF 23-24)

18. On March 31, 2016, the Court in the FTC case issued an Order granting a preliminary injunction in favor of the FTC which, *inter alia,* imposed an asset freeze on all of Mr. Tucker's assets. It was clear to me that this order attached to the funds held in our trust account, and that we could do nothing with the retainer funds without the concurrence of the FTC and approval of the Nevada court. (Ex. E)

19. On April 8, 2016, this Court issued an order preliminarily restraining certain assets of Mr. Tucker that could be subject to forfeiture. (ECF 30) That order did not reach the funds held in our trust account.

20. Discussions immediately commenced with the FTC concerning Mr. Tucker's need for funds to defend himself in the SDNY criminal case. The primary person participating in the discussions on behalf of Mr. Tucker was Mr. Morris, but he kept me informed of those discussions as they were occurring, and I spoke to FTC counsel directly once or twice. The FTC was utterly intransigent on the issue; it refused to accede to the release of the $7 million or to even discuss any other amount necessary to cover the cost of Mr. Tucker's defense. Indeed, the

FTC did not even agree that Zuckerman Spaeder – or any other firm representing Mr. Tucker – should be paid for services rendered before the freeze order was issued.

21. On April 18, 2016, Mr. Shechtman wrote to this Court, advising it of the freeze order issued in the FTC case, and reporting that counsel were attempting to negotiate the release of funds for the criminal case. (ECF 31)

22. On April 22, 2016, this Court held a status conference in the criminal case. Mr. Shechtman and I appeared for Mr. Tucker. We discussed the adverse effect the entry of the freeze order in the FTC case would have on our ability to represent Mr. Tucker, and proposed that the Court pause the criminal case for six weeks while the fee issues were litigated. The Court declined that request, scheduled trial for October 17, 2016, and scheduled another status conference for June 3, 2016. The Court advised counsel that in the time between April 22 and June 3, they were expected "to work as hard as you would if you were staying in as counsel in the case." We did so.

23. On April 26, 2016, Mr. Tucker filed a motion in the FTC case seeking modification of the asset freeze order that would permit him to use his funds to retain counsel for the criminal case. (Ex. F) The motion explained that the freeze order rendered Mr. Tucker completely incapable of retaining counsel for the criminal case and requested relief from the freeze order for funds sufficient to enable Mr. Tucker to defend himself. The motion specifically cited *Luis v. United States,* 578 US 5 (2016), which held that pre-trial restraint of <u>untainted</u> substitute assets was not permitted. The FTC vigorously objected to the motion, arguing that *Luis* was not applicable because all of Mr. Tucker's assets (included the advance retainers) were derived from his criminal activity and that the Sixth Amendment did not guaranty Mr. Tucker the right to spend what was (in the FTC's view) other people's money on his criminal defense. (Ex. G) Mr.

Tucker submitted a reply, again explaining why *Luis* was not applicable, the importance of Mr. Tucker's Sixth Amendment rights, and the reasonableness of the proposed fees for the criminal case. (Ex. H)

24. I did not sign the documents filed in the FTC case on behalf of Mr. Tucker, as I was not counsel of record in that case. However, I did assist in preparing them and was fully involved in discussions with Mr. Tucker about how the FTC case would affect the criminal case.

25. On May 31, 2016, Mr. Schectman again wrote to this Court,[1] advising that Mr. Tucker was litigating the request for release of funds in the FTC case, but could not predict when the Nevada court would decide the issue. (ECF 56) The letter explained: "We respect the fact that the Court has a calendar to manage and that there is no certainty as to whether sufficient funds will be released. If the Court is determined to keep the October 2016 trial date, we have no alternative but to seek withdrawal from the case, as we have explained to Mr. Tucker. CJA counsel will need time to prepare and delaying his or her appointment would disserve Mr. Tucker's interests."

26. This Court held another status conference on June 3, 2016. (ECF 64) Mr. Shechtman and I attended. The Court announced that it would not delay the proceedings in the criminal case for ninety days, as had previously been discussed, and that "the trial date is holding." Therefore, the Court explained that it would "work backwards from [the trial date] to make sure that Mr. Tucker is well represented." *Id.* Id. at 11. Before determining whether the Zuckerman Spaeder/Bracewell attorneys would be permitted to withdraw, the Court asked Mr. Tucker for his preference concerning counsel. Mr. Tucker responded that he "would like to have my right to counsel" who "have been with me for a long time." *Id.* at 13. Mr. Tucker

---

[1] Mr. Shechtman left the Zuckerman Spaeder firm in late April or early May, 2016, and joined the Bracewell firm. He notified the Court of this change on May 31, 2016. (ECF 55).

8519364.1

acknowledged his understanding of the freeze order issued in the FTC case and the efforts that were underway to obtain relief from it. *Id.* at 14. The Court indicated that if the freeze order were modified at a time that did not disrupt the trial schedule, Mr. Shechtman and I might be permitted to re-enter the case. *Id.* at 14-15.

27. At the June 3, 2016 status conference, the Court requested Mr. Shechtman to provide legal authority concerning Mr. Tucker's ability to invoke his Fifth Amendment right against self-incrimination rather than complete a financial affidavit as a pre-requisite to appointment of counsel to represent him. Mr. Shechtman wrote to the Court on June 7, 2016 providing authority that completion of such an affidavit could not be compelled. (ECF 59) On June 10, Mr. Shechtman and Mr. Tucker again appeared in court; the Court appointed James Lee Roth to represent Mr. Tucker and ordered that Mr. Shechtman be permitted to withdraw.

28. On June 14, 2016, I wrote to this Court requesting that the Court issue an order formally permitting Mr. Hynes and me to withdraw our appearances for Mr. Tucker, as we had not been included in the order issued as to Mr. Shectman. The court granted that request the same day. ( ECF 62)

29. After withdrawing as counsel, I provided Mr. Roth with as much information as I could about the case to that point, including paper and electronic documents, legal research, factual materials, and the like. On July 7, 2016, I traveled to New York and met with Mr. Roth in person to further orient him to the case.

30. Even after I withdrew from the criminal case, I continued to respond to Mr. Tucker's occasional requests for information about discrete issues. For example, at Mr. Tucker's request, I assembled a package of documents relating to the forfeiture of an aircraft and provided it to him on July 6, 2016. Mr. Tucker thanked me, and added that he "appreciate[d] very much all

8

that you have done for me." Tucker e-mail to Junghans, July 6, 2016. (Ex. I) At no time prior to the filing of the Motion has Mr. Tucker ever expressed any dissatisfaction with any of my work for him, or suggested that there was something more that I should have done to secure access to the retainer funds.

31. The Motion alleges that, "Tucker's retained counsel moved to withdraw solely because their substantial retainer was seized and they did not know if their future bills would be paid due to the Government's restraint of Tucker's assets." ECF 487, at 10. This is true. It further alleges that, "Tucker had hired and paid Zuckerman Spaeder over ten million dollars and believed that they would be available to represent him through trial." This is incorrect. Attached hereto as Ex. J is a summary of all bills issued to and paid by Tucker in the course of Zuckerman Spaeder's representation of him in the tax case and the SDNY cases.[2] As shown in detail on the exhibit, Mr. Tucker was billed and paid fees and expenses of $447,365.96 in the tax case, and $545,979.63 in the SDNY case – or slightly less than $1 million in total - over a period of almost five years.

32. Also attached is a summary of Tucker-related activity in the Zuckerman Spaeder attorney trust account. (Ex.K) In the tax matter, in 2013 Mr. Tucker transferred $7,620,700 to the Zuckerman Spaeder trust account. But those funds were not for the benefit of Zuckerman Spaeder; rather, they were to pay advance deposits to the Internal Revenue Service for amounts that might be due as a result of the IRS examination, and were remitted to the IRS.[3] In the SDNY matter, Mr. Tucker transferred $7 million as a retainer in the criminal case, as discussed

---

[2] Tucker's client number in the Zuckerman Spaeder system was 12959. The tax case was listed as matter 00001 and the SDNY case was matter 00002.

[3] Specifically, the amounts paid were $21,281 for 2006, $105,001 for 2007, $4,242,447 for 2010, and $3,25,970 for 2011.

8519364.1

above; those funds were deposited into an interest-bearing account and earned interest of $15,524.97. Eventually, after extensive negotiations with the FTC, $82,914.92 was paid to Zuckerman Spaeder for work done before entry of the freeze order. The remaining $6,932,610.05 was remitted to the FTC on November 30, 2016.[4]

33. The Motion alleges that, "Tucker's retained counsel was ineffective … in failing to try to protect some of Tucker's fees to be used as attorney's fees *prior to Nevada court's freeze order*.... (Motion, at 13, emphasis added.) The Motion speculates that Mr. Shechtman and I "could have moved for an order of this Court that required the funds then held in trust by the attorneys be deposited into the registry of the Court. *See* 28 U.S.C. 2041-2042." This ignores the fact that at the time Zuckerman Spaeder received the $7 million retainer – and for some eight months thereafter - there was no proceeding in *this* Court in which such an order could have been requested. Nor could such a payment into the registry of this Court been made prior to Mr. Tucker's indictment, since 28 U.S.C. §2041 provides only for payments into court related to cases that are "pending" or "adjudicated" in that court. In any event, we did not consider this course of action in the six weeks between Mr. Tucker's indictment and the issuance of the freeze order. Although we were aware that the FTC had filed for a preliminary injunction, we did not know if, or when, it might be granted or whether funds dedicated to Mr. Tucker's criminal defense would be excepted. I do not think it would have been appropriate or ethical for us to orchestrate an evasive maneuver designed to prevent the FTC from enforcing its rights if the Nevada court agreed with the FTC's position.

34. The Motion further alleges that, "After the Nevada court's freeze order was entered,

---

[4] The $6,932,610.45 remitted to the FTC was ultimately forfeitable to the United States as substitute assets in satisfaction of the $3.5 billion money judgment of forfeiture entered against Mr. Tucker. *See* Second Preliminary Order of Forfeiture as to Substitute Assets, October 7, 2022 (ECF 490).

and while retained counsel still represented Tucker, they could and should have moved the Nevada court to release some funds for attorneys' fees and challenged the illegal mechanism used to restrain all of Tucker's asset, as the Supreme Court later founds to be the case." The short answer to this claim is that a vigorous challenge to the freeze order *was* lodged in the Nevada case; the mere fact that counsel of record in that case signed the pleadings and Mr. Shechtman and I did not is irrelevant. We assisted in the presentation of the issues and were fully informed of the proceedings as they unfolded. No purpose would have been served by duplicate or additional submissions from us.

35. The Motion further alleges that "none of Tucker's retained counsel even discussed with Tucker the possibility of challenging the restraint of his funds in order to allow him access to funds for legal fees." Motion, at 14. This is plainly untrue. This issue was dominant soon as the freeze order was entered, and Mr. Tucker was fully informed about the efforts to obtain relief from the order. Mr. Tucker was present at the April 22 and June 3, 2016 court conferences at which the attempt to achieve the release of funds was discussed. Each of those court appearances was preceded by a meeting with Mr. Tucker in the Zuckerman Spaeder offices in New York, at which the status of the issue was reviewed. In addition, Mr. Tucker had ongoing meetings in person with Mr. Morris in Kansas City concerning the fees issue, as well as other issues relating to the freeze order, which impacted not only Mr. Tucker's legal fees but all of his daily living expenses. Mr. Morris regularly reported the substance of those meetings to Mr. Shechtman and me, and we sometimes participated in all or part of the discussions by telephone. See, *e.g.* E-mail from J. Morris to P. Shechtman and P. Junghans dated May 22, 2016, outlining a lengthy agenda for a meeting with Mr. Tucker, including legal fee, asset freeze and Sixth Amendment issues. (Ex. L) As discussed, Mr. Shectman and I worked closely with Mr. Morris

8519364.1

on Mr. Tucker's case, and it was not necessary for us to duplicate Mr. Morris' work.

36. The Motion also asserts that, since the freeze order was modified to permit the FTC to authorize the release of funds "without leave of court" I "could have requested the FTC release funds or requested that the U.S. Attorney for the Southern District of New York…work to secure release of funds for attorney's fees from the FTC." It also says that I "could have petitioned this Court to order the Government to request the FTC release funds for this purpose." Motion, at 14. These claims are fatuous and do not reflect the realities of the situation as it then existed. The FTC had made it abundantly clear that it was *never* going to agree to the release of any amount of money for Mr. Tucker's criminal trial. The United States Attorney took a "hands off" approach to the issue.[5] Similarly, on April 22, 2016, this Court inquired whether we had "spoken to the government in this district about their willingness to approach the FTC on this issue." Mr. Shectman replied, "We have spoken some, and I don't want to put words in their mouth, but I think the answer is it's between you and the FTC."[6] The Court then immediately moved on to setting a trial date. I am not aware of any authority that would have permitted this Court to order the United States Attorney to make such a request and, in any event, the request would have been denied. In short, the steps the Motion suggests could have been taken would have been futile.

37. The Motion argues that because the Supreme Court eventually decided that the FTC did not have the right to monetary relief, the freeze order which preserved assets to provide that relief was invalid, and that therefore a challenge to the freeze order as it applied to Mr. Tucker's

---

[5] *See* ECF 35, Transcript of April 22, 2106 hearing, at which AUSA Velamoor stated, "…I think whatever solution the defendant comes up with respect to his counsel – I mean it's his solution, it's certainly not our – it has to be a solution that anticipates and takes into account whatever might happen in the FTC case going forward."

[6] *Id.* at 5.

8519364.1

legal fees likely would have been successful.  Motion, at 15.  To begin with, the Defendants in the FTC case had already argued to the Nevada court that the FTC lacked the right to monetary relief, and the Court rejected that argument.  So did the Ninth Circuit in 2018.  *Federal Trade Commission v. AMG Capital Management, LLC,* 910 F. 3d 417 (9th Cir. 2018).  Notably, the Ninth Circuit acknowledged that, "Tucker's argument has some force, but it is foreclosed by our precedent." *Id.* at 426.  It was not until 2021 that the Supreme Court decided that, after all, the FTC never had a right to monetary relief; a corollary of that determination is that it never had a right to obtain the freeze order.  The notion that I or any other attorney representing Mr. Tucker could have compelled a district court sitting in the Ninth Circuit to decide this issue in Mr. Tucker's favor *in 2016 and in time for Mr. Tucker's trial* is wishful thinking.

      I DECLARE under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

                                              PAULA M. JUNGHANS

                                        Executed:  February 2, 2023