UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                    16-cr-91 (PKC)

              -against-                        OPINION AND ORDER

SCOTT TUCKER and TIMOTHY MUIR,

                        Defendants.
----------------------------------------------------------x
SCOTT TUCKER,
                        Petitioner,

                                                    22-cv-1470 (PKC)

              -against-

UNITED STATES OF AMERICA,

                        Respondent.
----------------------------------------------------------x

TIMOTHY MUIR,
                        Petitioner,

                                                    22-cv-8745 (PKC)

              -against-

UNITED STATES OF AMERICA,

                        Respondent.
----------------------------------------------------------x

CASTEL, U.S.D.J.

              Defendants Scott Tucker and Timothy Muir move to vacate, set aside or correct

their respective sentences pursuant to 28 U.S.C. § 2255.  (ECF 486, 493.)  Tucker separately

moves for a sentence reduction for "extraordinary and compelling reasons" pursuant to 18 U.S.C.

§ 3582(c)(1)(A).  (ECF 504.)  Tucker is represented by retained counsel, and Muir, who was

trained as a lawyer, represents himself pro se.

The Court will first address defendants' motions for relief under section 2255 and then address Tucker's motion for a sentence reduction.  For the reasons that will be explained, the motions will be denied.

BACKGROUND.

A Superseding Indictment charged Tucker and Muir with fourteen counts relating to an unlawful payday-lending scheme that sought to evade state usury laws through sham arrangements with Native American tribes.  (ECF 114.)  Count One charged defendants with conspiracy to collect unlawful debt in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d).  (Id. ¶¶ 1-36.)  Counts Two through Four charged them with the substantive RICO violations of collection of unlawful debts.  18 U.S.C. § 1962(c).  (Id. ¶¶ 37-45.)  Count Five charged conspiracy to commit wire fraud and Count Six charged the substantive crime of wire fraud, in violation of 18 U.S.C. §§ 1349, 1343 and 2.  (Id. ¶¶ 46-50.)  Count Seven charged money laundering conspiracy, Count Eight charged promotion money laundering, and Count Nine charged concealment money laundering, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 2.  (Id. ¶¶ 51-58.)  Counts Ten through Fourteen charged false disclosures under the Truth in Lending Act ("TILA"), in violation of 15 U.S.C. §§ 1611 and 2.  (Id. ¶¶ 59-63.)

Trial commenced on September 11, 2017.  The following is an overview of the evidence demonstrating defendants' years-long scheme to deceive customers and regulators about the costs of their loans and the true ownership of Tucker's money-lending businesses.

The government presented evidence that in or around 2000, Tucker began offering short-term, high-interest loans through internet sites.  (Tr. 700-22.)  Tucker's operation

ultimately grew to more than 1,500 employees and made loans to 4.65 million customers, generating $3.5 billion in revenue and $1.31 billion in profits.  (Tr. 1258, 1686, 1696.)

Tucker first began making loans through websites with names like "500 FastCash," "Telecash" and "Ameriloan," which, while held out to the public as separate businesses, were controlled by Tucker and administered by the same employees working from a common building.  (Tr. 700, 703-12, 719-22.)  The loans made by Tucker's businesses utilized similar structures.  For each $100 received by a borrower, a $30 interest charge was debited from the borrower's bank account on the following payday, none of which was applied toward the loan's principal, and the loan was "automatically renewed."  (Tr. 173-79.)  The cycle of $30 debits and "automatic renewals" continued for five paydays, at which point, another $50 was debited and applied to the principal, and a separate $30 debit was applied to interest.  (Id.)  A loan of $300 would require repayment of $975, with interest comprising $675 of that total.  (Tr. 109, 183-85; GX 1911.)  While annual interest rates on the loans varied, they often exceeded 600%, which significantly exceeded the permissible statutory maximums set by state usury laws. (GX 1501, 1503, 2303, 2701.)  Customers and state agencies regularly complained to Tucker's employees that the loans violated state laws.  (Tr. 211-24, 696-97, 758-72.)

The loan structure was never disclosed to borrowers, though a payment schedule was shown in a chart used to train new employees.  (Tr. 175.)  TILA requires disclosure using a "TILA Box," which lists basic information that includes the total amount of expected payments. The TILA Box shown to customers of the Tucker-controlled businesses falsely showed a total-payment amount of $390.  (GX 2701.)  Tucker's managers understood the TILA Box to be false. (Tr. 184, 751.)

The automatic-renewal process was described in intricate language using fine print. (Tr. 95, 369-70.) Tucker's businesses endeavored to reduce the number of borrowers who quickly repaid their loans in full, because repeat payments through the automatic-renewal process were more profitable. (Tr. 191-97, 747-49.) Borrowers testified that they were surprised to learn the repayment terms and the total amounts owed, and one of Tucker's employees testified that the companies kept tallies and summaries of customer complaints, which were discussed at meetings. (Tr. 99, 141-42, 212, 368-70, 668.) A former customer testified to paying $1,855 to a Tucker entity for a loan of $600, and described how his telephone interaction with customer service caused him greater confusion and anxiety. (Tr. 1667-68.) He explained why the online loan application caused him to believe that he would owe total repayment of $780. (Tr. 1665-66.)

Tucker orchestrated schemes to conceal the origins of these loans and his ownership of the businesses. From 1998 to 2004, he routed loans through a nationally chartered bank located in Delaware because Delaware does not limit the interest rates charged on a loan, even though Tucker continued to operate his business entirely from Overland Park, Kansas. (Tr. 397-406, 417-441, 720, 735.) Certain agreements between Tucker and the Delaware bank misrepresented the nature of their relationship, which ultimately ended because the bank limited Tucker's "automatic renewal" practice and Tucker was dissatisfied with the bank's cut of the proceeds. (Tr. 449-50, 745-53, 1351-52, GX 101, 102, 103.)

Tucker also formed a series of shell companies in Nevada to conceal the ownership of his businesses, using d/b/a aliases. (Tr. 447-48, 707, 921.) During this time, Tucker's businesses falsely listed Nevada addresses and Nevada owners, and Tucker instructed

employees to conceal their Kansas location in order to maintain the false appearance of a Nevada presence. (Tr. 911-22, 933-50, 782-86, 1353.)

Around 2003, Tucker began to implement a sweeping scheme to misrepresent his businesses as being owned and operated by three Native American tribes: the Miami Nation of Oklahoma, the Modoc Nation of Oklahoma and the Santee Sioux Tribe of Nebraska. (Tr. 997, 1411, 1339.) Each tribe claimed to own one or more of the companies previously associated with the Nevada shell companies. (GX 817, 1727, 2615.) Each tribe received 1% of the revenue earned from the Tucker business that the tribe falsely claimed to own. (GX 302, 801, 1204; Tr. 1465, 1902.) However, Tucker provided all capital for the loans, bore the risks of repayment, and administered the loans from his office in Overland Park, Kansas. (Tr. 294-95, 344, 1038, 1052-53, 1416-18, 1435, 1446-47.) Tucker also created bank accounts in the Tribes' names for the purpose of handling cashflow from the lending businesses, but personally retained control of those accounts and used them for personal expenses that included race cars, a private jet and a home in Aspen. (Tr. 294-95, 344, 1038, 1052-53, 1416-18, 1435, 1446-47, 1720, 2160; GX 3551, 3552.)

Beginning in 2005 or 2006, Muir began acting as general counsel to Tucker and the entities under his control. (Tr. 691-93.) In or around 2008, he formed the Muir Law Firm, though his pay from Tucker remained unchanged, and he was required to obtain Tucker's permission to work for other clients. (Tr. 2716-17 & GX 2601-02.) Employees of Tucker's businesses continued interacting with Muir as if he were general counsel. (Tr. 165, 215, 691, 1195.)

The government presented evidence that tribal involvement not only was intended to conceal Tucker's own role in the lending business but also to shield the businesses from state

usury laws based on principles of tribal immunity. (Tr. 281, 1015-16, 1046, 1096.) Carolyn Williams, who was recording secretary on the boards of Tucker's companies, described the arrangements as "a rent-a-tribe situation." (Tr. 1096.) When state authorities attempted to enforce state laws on Tucker's businesses, Muir and other legal counsel invoked tribal immunity, including through the submission of sham affidavits to state courts signed by tribal officials. (Tr. 1056-66, 1461-67.) The companies also cited to tribal immunity when confronted by customer complaints, responding that state laws did not govern because the loans were issued by a tribe. (Tr. 100 ("It seemed like the standard response to any of my questions was sovereign nation."), 144-45 ("They told me that they were part of a sovereign nation and not subject to U.S. law . . . ."), 767-78, 1668-69.)

Tucker employed various methods to misrepresent the lending companies as tribal entities, including the use of tribal mailing addresses, from which mail was forwarded unopened to Overland Park; directives to Overland Park employees to falsely claim they were located on tribal land; and providing employees with daily weather reports for the tribal reservations in order to more persuasively misrepresent the operation over the phone. (Tr. 617, 1031, 203-10, 786; GX 1408, 1903-04, 1906-09.) Employees who revealed their true location were terminated. (Tr. 205-06.) Each day, tribal officials logged into a tablet to nominally approve loans, an action that had no effect on whether the businesses controlled by Tucker actually issued the loans. (Tr. 1267-68.) Tribes also formed corporate boards to purportedly exercise control over the Tucker-controlled companies, but the boards rarely met and exercised no control over the companies. (GX 310, 406-T, 502.) Tucker had the authority to transfer the companies between tribes at will, and, in an email, stated that he controlled the tribes. (Tr. 2802-03; GX 1014, 2806.)

In 2008, Tucker and Muir engaged in a sham transaction to nominally transfer Tucker's loan-processing company to the Miami Nation of Oklahoma for $135,259. (Tr. 1088-89.) In this transaction, Tucker changed the name of that company from "CLK" to "AMG" using a bank account that he controlled, which had the effect of Tucker paying himself to acquire a company that he already owned. Muir then commenced a sham lawsuit in which Tucker sued AMG under a Kansas statute, seeking a court order compelling the Kansas Secretary of State to accept a certificate of filing related to the transaction. (Tr. 1209-31.) Muir paid counsel representing Tucker, and Tucker reimbursed Muir using a check drawn from an AMG account, meaning that AMG had paid for its own adversary's counsel. (GX 2623, 2602.)

After Muir's success in a different state court proceeding, Tucker gave him as a gift a decommissioned military tank, inscribed with the letters "FUMAGFST," which stood for "FU, Mr. Attorney General, from Scott Tucker." (Tr. 1295-96.)

Tucker called six witnesses in his defense, including the current and former chiefs of the Miami tribe. (Tr. 1752-2162.) Muir testified in his own defense, and on cross-examination agreed that he knew that Tucker's companies charged hundreds of percent in annual interest to borrowers around the country, including in states with usury limits of less than 50 percent a year. (Tr. 2901-02.) He agreed that the companies "entered into relationships with Indian tribes" "[b]ecause of those laws, yes." (Tr. 2904.)

On October 13, 2018, the jury returned a verdict of guilty against defendants Tucker and Muir on all fourteen counts. On January 5, 2018, the Court sentenced Tucker principally to 200 months of imprisonment and Muir to 84 months of imprisonment. The Bureau of Prisons website indicates that Muir was released from custody on February 17, 2023. Tucker has a projected release date of April 9, 2031.

Tucker and Muir filed a direct appeal to the Second Circuit. See United States v. Grote, 961 F.3d 105 (2d Cir. 2020). Tucker was represented on appeal by Beverly Van Ness, and Muir submitted a pro se brief on his own behalf. They principally urged that the Court gave an erroneous and prejudicial instruction to the jury as to the mental state required for unlawful-debt charges brought under RICO. Id. at 113-21. Applying plain-error review, the Second Circuit observed that the government "presented overwhelming evidence that Defendants were aware of the unlawful nature of the loans," including the "sham illusion that the lending was done by Native American tribes, precisely so that state usury laws would not seem to apply." Id. at 117. In light of the "overwhelming" evidence, the Second Circuit explained that it did not need to resolve conflicting lines of authority as to RICO's state-of-mind requirement for the collection of lawful debt. Id. at 117-21. The Second Circuit concluded that the remaining arguments of Tucker and Muir were without merit, including arguments that the Court erred by precluding defendants' proposed expert on tribal immunity, that there was insufficient evidence to support their convictions of wire fraud, and that the loans could not constitute unlawful debt under RICO. Id. at 121-22. The Supreme Court denied defendants' petition for certiorari. Tucker v. United States, 141 S. Ct. 1445 (2021).

LEGAL STANDARD.

A person in federal custody may collaterally attack a final judgment in a criminal case based on "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996) (quotation marks omitted). Review of a section 2255 motion "is 'narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources.'" United States

v. Hoskins, 905 F.3d 97, 102 (2d Cir. 2018) (quoting Graziano, 83 F.3d at 590).  "To warrant a

hearing, the motion must set forth specific facts supported by competent evidence, raising

detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief."

Gonzalez v. United States, 722 F.3d 118, 131 (2d Cir. 2013).

A defendant is in procedural default if a claim raised in a section 2255 motion

was not first raised in a direct appeal.  See Bousley v. United States, 523 U.S. 614, 622 (1998).

However, "[a] defendant can raise new arguments in a § 2255 motion if the defendant establishes

(1) cause for the procedural default and ensuing prejudice or (2) actual innocence."  United

States v. Pena, 58 F.4th 613, 621 (2d Cir. 2023) (quotation marks omitted).

TUCKER'S SECTION 2255 MOTION WILL BE DENIED.

I.      Tucker Is Not Entitled to Section 2255 Relief Based on the Claimed
        Denial of His Choice of Counsel under the Sixth Amendment.

        A.  Overview of Tucker's Choice of Counsel Claims.

Tucker asserts that he should receive a new trial because he was tried, convicted

and sentenced after being deprived of the right to be represented by counsel of his choosing in

violation of the Sixth Amendment.  See generally United States v. Stein, 541 F.3d 130, 154-57

(2d Cir. 2008).

Tucker's claimed constitutional injury stems from an asset freeze ordered by the

district court of the District of Nevada in FTC v. AMG Services, Inc., et al., 12 Civ. 536 (D.

Nev.) (the" Nevada FTC Action.").  That order, which was issued in a civil proceeding brought

by the Federal Trade Commission (the "FTC") against Tucker and related parties, had the effect

of freezing $7 million that Tucker had deposited into a joint escrow account for the purpose of

funding his retained counsel in this case, Paula Junghans and Paul Schechtman, then of the law

firm Zuckerman Speader LLP.

Approximately seven weeks after Schechtman first advised this Court that Tucker was no longer able to pay for attorneys' fees or the services required from an outside vendor, the Court granted the motions to withdraw brought by Schechtman and Junghans. Pursuant to the CJA Act, the Court appointed four attorneys to represent Tucker through trial: Lee Alan Ginsberg, James Roth, Beverly Van Ness and Nadjia Limani. The withdrawal of Tucker's retained counsel and the appointment of CJA counsel took place approximately four months after the indictment was filed and fifteen months before trial.

On December 3, 2018, the Ninth Circuit affirmed the relief ordered by the District of Nevada, with two members of the panel writing a concurrence explaining that the decision adhered to Ninth Circuit precedent that appeared to have been wrongly decided. FTC v. AMG Cap. Mgmt., LLC, 910 F.3d 417, 429-37 (9th Cir. 2018). The Supreme Court granted Tucker's petition for certiorari, and, in April 2021, unanimously reversed the Ninth Circuit, holding that section 13(b) did not authorize a court to order monetary relief, and exclusively allowed for prospective injunctive relief. AMG Cap. Mgmt., LLC v. FTC, 593 U.S. 67 (2021). Tucker urges that the relief ordered in Nevada FTC Action led to the withdrawal of his retained counsel against his wishes, resulting in the denial of his right to be represented by counsel of his choosing.

Tucker asserts that his attorneys performed ineffectively in regard to the withdrawal of Junghans and Schechtman. First, he urges that both retained and appointed counsel performed ineffectively by not raising a challenge to the asset freeze order entered in the Nevada FTC Action, in either this Court or in the District of Nevada. Second, he urges that his appointed counsel performed ineffectively by not filing a motion to reconsider this Court's order granting the withdrawal motion filed by Tucker's retained counsel. Third, he urges that his

appellate counsel, Beverly Van Ness, performed ineffectively by not raising the claimed denial

of the counsel of his choosing on direct appeal to the Second Circuit.  Fourth, he urges that

retained counsel was ineffective in failing to structure Tucker's payment of a $7 million advance

on attorneys' fees in a manner that could have shielded the payment from any asset freeze

obtained by the FTC.  Finally, Tucker has argued that he is entitled to a new trial because the

relief ordered in the Nevada FTC Action prevented him from proceeding to trial with his choice

of counsel, which he describes as a "structural error" that exempts him from the obligation to

show cause and prejudice in order to excuse his procedural default.  As will be shown, a claim of

"structural error" not raised on direct appeal but first raised on collateral review is subject to the

cause and prejudice requirement to excuse a procedural default, and Tucker has not made a

showing of either cause or prejudice.

      B.  The Standard for Demonstrating Ineffective Assistance of Counsel.

      A defendant asserting that counsel's performance was constitutionally deficient

under the Sixth Amendment must satisfy a two-prong test.  "[A] convicted defendant must show

both (a) 'that counsel's representation fell below an objective standard of reasonableness . . .

under prevailing professional norms,' and (b) 'that the deficient performance prejudiced the

defense,' i.e., 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a

trial whose result is reliable.'"  Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting

Strickland v. Washington, 466 U.S. 668, 688, 687(1984)).  "The challenger's burden is to show

'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed

the defendant by the Sixth Amendment.'"  Harrington v. Richter, 562 U.S. 86, 104 (2011)

(quoting Strickland, 466 U.S. at 688)).  "The determinative question at this step is not whether

counsel deviated from best practices or most common custom, but whether his representation

amounted to incompetence under prevailing professional norms." <u>Harrington v. United States</u>, 689 F.3d 124, 129-30 (2d Cir. 2012).

In deciding whether counsel's performance was objectively unreasonable, a court "must make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time,' and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" <u>Henry</u>, 409 F.3d at 63 (quoting <u>Strickland</u>, 466 U.S. at 689). In deciding the prejudice prong, a court must "determine whether, but for counsel's deficient performance, 'there is a reasonable probability that . . . the result of the proceeding would have been different,' for an 'error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" <u>Henry</u>, 409 F.3d at 63 (quoting <u>Strickland</u>, 466 U.S. at 694, 691).

C. Tucker Does Not Demonstrate Ineffective Assistance Based on His Counsel's Decision Not to Seek Relief from the <u>District of Nevada's Asset Freeze Order.</u>

Tucker urges that his retained counsel performed ineffectively by "failing to try to protect some of" the funds dedicated for use as attorneys' fees and by failing to challenge the asset restraints in the Nevada FTC Action. (ECF 487 at 13-17.) He also urges that appointed counsel performed ineffectively by not moving for a release of funds in order to protect his choice of counsel. (<u>Id.</u>)

This argument is without merit. Tucker was well-represented by counsel in the District of Nevada, where his attorneys vigorously opposed the relief sought by the FTC. (D. Nev. Action ECF 797.) Almost four years before Tucker was indicted, the FTC commenced its

civil proceeding against Tucker, Muir and other entities, seeking injunctive and other equitable relief.  On March 31, 2016, the District of Nevada granted the FTC's motion for a preliminary injunction, which had the effect of freezing Tucker's assets, including the funds in the joint escrow account.  (D. Nev. Action ECF 960.)  The judge in the District of Nevada provided that Tucker and his wife could retain access to $75,000 for attorneys' fees and living expenses for the two months following the date of its Order.  (Id. at 8, 15.)  The Order further provided that after the two-month period expired, the FTC and Tucker "shall confer regarding future allowances for attorneys' fees and living expenses."  (Id. at 16.)

On April 26, 2016, Tucker's counsel in Nevada moved for reconsideration and modification of the March 31 Order, asserting, among other things, that the injunction interfered with Tucker Sixth Amendment right to retain the counsel of his choosing in the criminal proceeding in this Court.  (ECF 506-6; D. Nev. Action ECF 975, at 5-9.)  The brief was filed on Tucker's behalf by attorneys from Quinn Emanuel Urquhart & Sullivan, LLP, Lewis Roca Rothgerber Christie LLP, and Berkowitz Oliver LLP.  (See id.)  It included extensive discussion of the Supreme Court's then-recent Luis opinion and argued that the FTC had not shown that all of Tucker's assets were "tainted."  (See id.).  On September 30, 2016, the District Judge issued a 37-page Order that granted a motion for summary judgment filed by the FTC.  (D. Nev. Action ECF 1057.)  The Order directed the payment of $1,266,084,156 in restitution from Tucker and his co-defendants jointly and severally under section 13(b) of the FTC Act.  (Id. at 21-26.)  It denied as moot Tucker's motion to reconsider the preliminary injunction order of March 31 "[b]ecause the Court grants the FTC's request for equitable monetary relief . . . ."  (Id. at 2 n.2.)  It did not address Luis or any issues related to Tucker's criminal representation.

Tucker's Nevada counsel filed papers in opposition to the FTC's application for a preliminary injunction, urging that an asset freeze was an improper remedy under the FTC Act at that stage of the proceeding, that the FTC had not established an entitlement to monetary relief, and that the proposed relief did not properly carve out funds to pay for attorneys' fees. (See id.)  After the District of Nevada granted the FTC's motion for an injunction, Tucker's attorneys moved for reconsideration.  (D. Nev. Action ECF 975.)  By that point, Tucker had been indicted, and his attorneys in Nevada emphasized Tucker's need to fund his criminal defense. (Id.)  His Nevada attorneys urged that "a freeze cannot be permitted where it works to prejudice an individual's Sixth Amendment rights, which is exactly the result obtained by the FTC with the terms propounded to this Court for adoption."  (Id. at 4.)  They discussed in detail the then-recent Luis decision that distinguished restraints on tainted and untainted assets needed to pay for a defendant's chosen counsel.  (Id. at 5-9.)

The District of Nevada did not address these arguments.  In a footnote, it denied the motion for reconsideration as moot in light of its grant of equitable monetary relief on summary judgment.  (D. Nev. ECF 1057 at 2 n.2.)

Neither Tucker's retained counsel nor the appointed counsel who appeared as counsel for Tucker in the prosecution before this Court were objectively unreasonable in failing to make further application on Tucker's behalf regarding the relief ordered in the Nevada FTC Action.  The three law firms representing Tucker in the Nevada FTC Action advocated forcefully on his behalf.  Tucker suggests that his counsel in this action could have taken additional steps, such as making separate application to the FTC, requesting that the prosecutors in this case work with the FTC to facilitate a release of funds, making an application to this Court, or seeking emergency relief from the Ninth Circuit.  (ECF 487 at 14.)  Tucker's attorneys in the Nevada

FTC Action were more than capable of acting on his behalf, as demonstrated by their ultimate success before the Supreme Court. The prosecutors in the case before this Court represented on the record that they had no role in the FTC's civil proceedings. Paula Junghans, one of Tucker's retained counsel, states that counsel in the Nevada FTC Action brought "a vigorous challenge to the freeze order" and that Junghans and Schechtman were "fully informed of the proceedings as they unfolded. No purpose would have been served by duplicate or additional submissions from us." (Junghans Dec. ¶ 34 (ECF 506).) Lee Ginsberg, one of Tucker's appointed counsel, states that he was "relatively familiar" with the efforts of Tucker's counsel to access the assets in order to pay for his defense, and that "the issue regarding the funds was being separately litigated in other forums . . . ." (Ginsberg Dec. ¶¶ 20, 23 (ECF 505).)

Similarly, it was not objectively unreasonable of Tucker's criminal defense counsel, retained or appointed, to refrain from bringing an application to this Court directed to the Nevada FTC Action. Junghans notes that "there was no proceeding in *this* Court in which such an order could have been requested." (Junghans Dec. ¶ 33; emphasis in original.) She further states, "I do not think it would have been appropriate or ethical for us to orchestrate an evasive maneuver designed to prevent the FTC from enforcing its rights if the Nevada court agreed with the FTC's position." (Junghans Dec. ¶ 33.) Tucker does not now point to any procedural mechanism or statutory basis that would have permitted this Court to compel access to assets restrained in the Nevada FTC Action.

For much the same reason, Tucker does not identify prejudice. He does not identify any argument or procedural avenue that would plausibly have led to an outcome that would have varied from the outcome obtained by his highly capable civil attorneys in the Nevada FTC Action.

Tucker's <u>Strickland</u> argument directed to his retained and appointed criminal defense counsel's failure to bring an application directed to the Order in the Nevada FTC Action is meritless.

### D. Tucker Does Not Make Out a Strickland Claim Based on Counsel's Failure to Move for Reconsideration of the Withdrawal Order.

#### 1. Background on the Withdrawal of Tucker's Retained Counsel.

Schechtman first informed the Court of the asset freeze in a letter of April 18, 2016, advising that an Order in the Nevada FTC Action "has the effect of restraining the funds held by counsel for the purpose of defending this case.  It has caused the defense to come to a standstill.  On April 1, 2016, for example, the vendor tasked with processing the discovery material was directed to stop because the freeze order precludes payment to it."  (ECF 31.) Schechtman stated that defense counsel was negotiating with the FTC and the government for the release of funds.  (<u>Id.</u>)  At the pretrial conference of April 22, 2016, Schechtman advised the Court that Tucker "literally has no money to pay counsel."  (<u>Id.</u>)  Referencing the FTC freeze and the Nevada proceedings, the government stated that "it's obviously not our case" and "we don't control it," and that "whatever solution the defendant comes up with respect his counsel – I mean, it's his solution; it's certainly not ours – it has to be a solution that anticipates and takes into account whatever might happen in the FTC case going forward."  (<u>Id.</u> at 9-10.)  At that conference, the Court asked Tucker whether he wished to permit his counsel to withdraw and retain a new lawyer, have counsel appointed on his behalf, or represent himself <u>pro se</u>; Tucker answered in the negative as to all three options.  (<u>Id.</u> at 19.)  Tucker confirmed that he wished to continue to be represented by Junghans and Schechtman.  (<u>Id.</u> at 21.)

At a pretrial conference of June 3, 2016, Schechtman stated that while he and Junghans wished to remain as counsel, Tucker's accounts remained frozen, and that they "have

no choice but to withdraw, most reluctantly." (ECF 64 at 12.) The Court explained to Tucker that he had the right to effective assistance of counsel under the Sixth Amendment, and that he also had the right to be appointed counsel at public expense and a right to self-representation. (Id.) Tucker then stated, "I would like to have my right to counsel. They have been with me for a long time. I have got escrowed money with them specifically for this case for over a year, and I would like my right to choose my counsel." (Id. at 13.) Schechtman, confirmed on the record that the accounts in escrow remained frozen. (Id. at 13-14.) The Court reviewed with Tucker his inability to continue to pay for his retained attorneys, stating that "I would be pleased . . . if you have appointed counsel in this case and for some reason you have the funds to pay Mr. Schechtman and his colleagues, and leave to withdraw is granted now, allow them to appear once again in the case. . . . If for some reason a week later you had access to funds to pay Mr. Schechtman, and Mr. Schechtman wanted to appear in this case, that is something that the Court would be open to. In fact, I think that unless it disrupted the schedule in the case, you would have a near absolute right to do so." (Id. at 14-15.) The Court stated that it "propose[d] to . . . appoint counsel" for Tucker from the District's CJA panel, explaining: "These are lawyers who go through an elaborate screening process. . . . And they are men and women who are most comfortable in handling complex criminal matters." (Id. at 15.)

At a conference of June 10, 2016, Schechtman read into the record a statement written by Tucker. (ECF 81 at 3-4.) It stated in part that the restraints on his funds "make it impossible for me to pay for lawyers, let alone confront any other expenses and financial obligations necessary to defend a case of this magnitude . . . . I am now prevented from having access to the lawyers of my choice, and I am the person to suffer the prejudice of that circumstances." (Id.) It stated that "I am compelled to take the appointment of CJA counsel and

let the American taxpayers pay for my defense." (Id. at 4.)  According to Tucker, Junghans and

Schechtman knew from the outset of their representation that his assets could be frozen in a

government proceeding yet agreed to represent him despite that risk.  (Tucker Dec. ¶ 12.)

On June 10, 2016, the Court entered an Order that substituted James Roth, a

member of the District's CJA Panel, for Schechtman.  (ECF 61; see also ECF 81.)  Lee Alan

Ginsberg. Nadjia Limani and Beverly Van Ness were subsequently appointed as additional

counsel to Tucker.  (ECF 84, 86, 90.)  Ginsberg ultimately served as lead trial counsel.

### 2.  Tucker Does Not Demonstrate Ineffectiveness.

Tucker urges that his appointed attorneys were ineffective in failing to move for

reconsideration of the Order permitting Junghans and Schechtman to withdraw.  He cites to the

Second Circuit's decision in United States v. Parker, 439 F.3d 81, 104 (2d Cir. 2006), which

stated that "[n]on-payment of legal fees, without more, is not usually a sufficient basis to permit

an attorney to withdraw from representation . . . ."

The circumstances in Parker were very different than the one presented here.

Parker reviewed a practice in the Western District of New York in which courts inquire whether

attorneys are "fully retained" for the duration of proceedings, in an attempt to head off situations

in which the depletion of funds results in a "bail out" of an attorney under the CJA, as well as to

prevent attorneys from limiting representation "to only a discrete stage of the criminal

proceedings . . . ."  See id. at 99-104.  In this context, the Second Circuit summarized authority

that weighed against attorney withdrawal based on non-payment of legal fees, and emphasized

attorneys' ethical responsibilities to continue with representation unless a client deliberately

disregards an agreement to pay fees.  Id. at 104-05.  The Second Circuit concluded, among other

things, that the "fully retained" inquiry prevents retained attorneys from using an initial

appearance to secure CJA appointment outside of the CJA Plan. Id. at 105.

Here, the Court granted the motion to withdraw after a thorough airing of the

circumstances related to the lack of funds available to pay for Tucker's retained counsel. Tucker

does not identify any change to the underlying facts, such as the release of funds subject to the

freeze Order or some newly available funding source to pay for retained counsel. As has been

summarized, Tucker unambiguously communicated to the Court his desire to continue with the

representation of his retained counsel. Ginsberg notes that the Court "was apparently cognizant

of Mr. Tucker's professed desire to have retained counsel represent him at the trial." (Ginsberg

Dec. ¶ 22 (ECF 505).) It was reasonable for Tucker's appointed counsel to conclude that a

motion for reconsideration of the withdrawal order was unlikely to succeed.

3.   Tucker Does Not Demonstrate Prejudice.

Had Tucker's counsel moved to for reconsideration of the withdrawal order, the

motion would have been denied.

The Court accepts that the asset freeze in the Nevada FTC Action was later held

to have been based upon an erroneous interpretation of the FTC Act and that it had the effect of

thwarting Tucker's payment arrangement with his counsel in the prosecution brought in this

Court. But a foundational premise of any argument that a defendant was deprived of his right to

counsel of his own choosing under the Sixth Amendment is that the Court presiding over the

prosecution committed some form of error. See United States v. Gonzalez-Lopez, 548 U.S. 140,

148 (2006) ("Deprivation of the right is 'complete' when the defendant is erroneously prevented

from being represented by the lawyer he wants, regardless of the quality of the representation he

received."). In Gonzalez-Lopez, the district court erroneously denied an application for pro hac

vice admission based upon an erroneous application of a rule of professional conduct. Id. at 143.
Here, Tucker can point to no error by this Court.

Defendants are frequently deprived of their choice of counsel because they cannot
afford the lawyers they desire. "[A] defendant may not insist on representation by an attorney he
cannot afford or who for other reasons declines to represent the defendant." Wheat v. United
States, 486 U.S. 153, 159 (1988). The inability to pay for counsel of one's choosing could be the
result of a reversal in financial fortune, a collapse in a market, a secured judgment issued in
another court or other circumstance known or unforeseen. To use a simple hypothetical, an
attachment of assets belonging to a charged defendant by a judgment creditor obtained in a state
court that had the practical effect of depriving the defendant of counsel of his own choosing in a
federal prosecution would give rise to no meritorious federal claim because the federal court
lacked the power to alter or modify the attachment.

Here, the apparent cause of the inability to pay for counsel was an asset freeze
Order issued in the Nevada FTC Action. The asset freeze was set aside as a result of a Supreme
Court ruling having nothing to do with criminal prosecutions or Sixth Amendment rights but
statutory construction of the FTC Act. That the court issuing the asset freeze was a federal
district court in another district and the application for the freeze was made by the FTC, an
agency of the federal government, does not, on these facts, alter the conclusion that there was no
cognizable error by this Court.

The Nevada FTC Action was filed in 2012, four years before the indictment was
returned in this case. The motion for a preliminary injunction that resulted in the asset freeze
was filed nine months before the indictment. At no point did Tucker or his counsel suggest that
this Court had the authority to vacate or modify the Nevada asset freeze. Tucker presented no

briefing to this Court on the issue that was addressed by the Supreme Court: the scope of FTC authority under section 13(b) of the FTC Act to obtain equitable monetary relief such as restitution or disgorgement. <u>AMG Capital Management, LLC v. Federal Trade Commission</u>, 593 U.S. 67, 70 (2021). This Court was not asked to modify the asset freeze Order issued by the Chief Judge Navarro, had no jurisdiction to do so and committed no error by not doing so. The circumstance that caused Tucker's inability to pay his attorneys was wholly beyond this Court's control.

Nor is there any basis to lay the FTC proceedings at the feet of the United States Attorney's Office for the Southern District of New York ("USAO-SDNY"). There is no evidence of a joint prosecution, or that the Nevada asset freeze was sought by the FTC or the USAO-SDNY in order to aid the USAO-SDNY's prosecution of Tucker or disadvantage Tucker in defending the case. Tucker attempts to elide the distinction between the FTC and the USAO-SDNY, sometimes referring to them in the aggregate as "the Government." (ECF 487 at 8-9.) But Tucker points to no basis in fact or law to support a claim that his prosecution by the USAO-SDNY was a joint effort with the FTC. He acknowledges that "there is no direct evidence on the face of the record of this case to show cooperation between the U.S. Attorney and the FTC . . . ." (<u>Id.</u> at 9.) Tucker's own attorneys and the USAO-SDNY have described a lack of coordination between the FTC and the prosecution team. Shechtman states that he "tried to persuade the Southern District prosecutors to intervene in the FTC case, but they did not see it as their fight." (Schechtman Dec. ¶ 6 (ECF 516-1).) Junghans states that "[t]he United States Attorney took a 'hands off' approach to the issue." (Junghans Dec. ¶ 36 (ECF 506).) The USAO-SDNY has consistently represented to this Court that it was not involved in the FTC action, stating that "it's obviously not our case" and "we don't control it." (ECF 35 at 9.)

In a somewhat analogous context, courts in this Circuit have found that the government's <u>Brady</u> obligations extend to another state or federal agency only where the agency was part of a joint investigation or joint prosecution with the government.  See, e.g., <u>United States v. Collins,</u> 409 F. Supp. 3d 228, 241-43 (S.D.N.Y. 2019) (government's <u>Brady</u> obligation not extended to SEC where there was no joint investigation or joint fact-finding) (Broderick, J.); <u>United States v. Gupta</u>, 848 F. Supp. 2d 491, 495 (S.D.N.Y. 2012) (government's <u>Brady</u> obligation extended to documents held by the SEC because 44 joint interviews were conducted by prosecutors and SEC investigators) (Rakoff, J.).  No rule of law has been adopted to this Court's knowledge attributing actions by one federal agency to a local USAO simply because the two are part of the Executive Branch of government.

The Court also notes that there was a Post-Indictment Restraining Order ("PIRO") entered in this district in this case by Judge Oetken on February 9, 2016.  (ECF 30.)  Junghans states that the PIRO "did not reach the funds held in our trust account."  (Junghans Dec. ¶ 19.) This statement, which the Court fully accepts, does not address whether any assets that were restrained by the PIRO might have been otherwise available to pay counsel.  It suffices to note that no application was made to this Court by Tucker to modify the PIRO.[1]

Simply put, no ruling of this Court erroneously deprived Tucker of counsel of his own choosing.  Had Tucker's counsel moved for reconsideration, the motion would have been denied.  Tucker therefore cannot point to prejudice as a result of any failure to move for reconsideration.

---

[1] An otherwise properly obtained restraint on a defendant's tainted assets is not subject to modification simply because it impedes a defendant's right to select counsel of his own choosing.  See <u>Caplin & Drysdale, Chartered v. United States</u>, 491 U.S. 617, 626  (1989) ("A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice.")  This remains the law post-<u>Gonzalez-Lopez</u>.  See <u>Kaley v. United States</u>, 571 U.S. 320, 327 (2014).  A restraint imposed by the Court on untainted, legitimate assets of the defendant obtained by the prosecution may result in a Sixth Amendment violation. See <u>Luis v. United States</u>, 578 U.S. 5, 12-13 (2016).

### E. Tucker Does Not Make Out a Strickland Claim Based on Appellate Counsel's Failure to Raise a Choice-of-Counsel Argument.

Tucker's section 2255 motion raised no constitutional claim related to the effective assistance of appellate counsel. More than three months after the government filed its answering brief, Tucker's new section 2255 counsel first raised ineffectiveness of appellate counsel in a reply brief. The government has not responded to the reply brief and Tucker's appellate counsel has not made any submission. As explained, the Court exercises its discretion not to consider this improperly raised claim.

Beverly Van Ness served as Tucker's appellate counsel. She made an appearance in this Court and argued certain legal issues at the trial but had no role in the presentation of evidence. The Second Circuit granted her request to file an oversized brief of not more than 18,000 words. See ECF 487-5, Brief of Defendant-Appellant Scott Tucker, United States v. Grote, No. 18-184 (2d Cir. July 27, 2018). The bulk of the 65-page brief was directed to the Court's jury instructions on the state-of-mind requirement on willfulness relating to the collection of unlawful debt, see id. at 34-55, an issue that the Second Circuit discussed at length in its published opinion that summarized the "tension" between authorities applying the state-of-mind requirement under RICO and state anti-usury laws. Grote, 961 F.3d at 115-21. That brief also argued that this Court erred by precluding Tucker's proposed expert on tribal immunity and testimony about Tucker's reliance on the advice of counsel. (See ECF 487-5 at 56-64.)

"In attempting to demonstrate that appellate counsel's failure to raise a state claim constitutes deficient performance, it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made. However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while

pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (citation omitted); accord McKee v. United States, 167 F.3d 103, 106-07 (2d Cir. 1999) (applying Mayo to section 2255 motion). "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" Smith v. Robbins, 528 U.S. 259, 288 (2000) (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)).

In his reply memorandum on this section 2255 motion, Tucker asserts for the first time that any procedural default is excused because his appellate counsel, Van Ness, performed ineffectively by not raising the choice-of-counsel argument on direct appeal. (See ECF 527.) "[I]neffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim." Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

"The district court has discretion to consider arguments made and evidence submitted for the first time in a reply brief . . . ." Kingstown Cap. Mgmt., L.P. v. Vitek, 2022 WL 3970920, at *1 (2d Cir. Sept. 1, 2022) (summary order); see also Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co., 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009) ("the Second Circuit has made it abundantly clear that a district court has discretion to consider a belatedly-raised argument.") (emphasis in original) (McMahon, J.). After Tucker's section 2255 motion was filed, the Court granted his attorney's motion to withdraw, and a notice of appearance was then filed on Tucker's behalf by Benjamin Adam Silverman, whose two requests for extensions of time to file a reply brief were granted. (ECF 518, 519, 521, 522, 526.)

This Court exercises its discretion to disregard a new constitutional argument, i.e., that appellate counsel was ineffective, first raised by Tucker in a reply brief to this Court.

Tucker, represented by counsel, was granted more than three months to prepare his reply brief. (ECF 527.)  That the attorney who filed the original 2255 motion was not the attorney who filed the reply brief is hardly an excuse for raising this new constitutional claim.  He offered no arguments why this belatedly raised argument should be considered, and the Court declines to do so.  At no point did Tucker seek leave to amend his petition to raise new arguments.  The government neither sought nor was granted leave to reply to the new arguments raised in Tucker's reply.

If the Court were to consider the argument challenging the effectiveness of appellate counsel, Tucker would fare no better.  A reasonable attorney would have seen it as an act of futility to construct a claim around the denial of choice of counsel, piecing together the District of Nevada's application of the FTC Act with the withdrawal of counsel in this action. The Supreme Court granted its writ of certiorari in the FTC case on July 9, 2020.  See AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n, 141 S. Ct. 194 (2020).  By that time, Tucker's direct appeal in this case had been fully briefed, argued and decided.  The Second Circuit issued its decision in Grote on June 2, 2020.  Van Ness filed Tucker's appellate brief on July 27, 2018, about four months before the Ninth Circuit called into question its own precedent applying the FTC Act while also affirming the relief ordered in the Nevada FTC Action.  Tucker's appellate counsel appears to have made the reasonable strategic choice to focus on claimed errors in this Court's instructions to the jury relating to Tucker's state of mind and the preclusion of expert testimony, rather than asserting that the Ninth Circuit had misinterpreted the FTC Act and wrongfully caused the withdrawal of Tucker's retained attorneys.

Tucker says little about why Van Ness performed ineffectively by advancing other, alternative arguments on his direct appeal.  He asserts in conclusory fashion that Van Ness

"behaved unprofessionally by failing to raise the Sixth Amendment challenge on direct appeal," (ECF 527 at 23) but offers no argument as to why the issue is clearly stronger than those raised in its place. Though Tucker's direct appeal was unsuccessful, the Second Circuit's published opinion suggests that the panel thought his arguments concerning the wording of the Court's instructions to the jury on the mental state required to convict defendants on the substantive counts charging the collection of unlawful debts had some merit and warranted careful attention. Grote, 961 F.3d at 113-21. In the course of its discussion, Grote noted that the Circuit's own RICO precedent included "two incompatible state-of-mind standards," and that competing lines of authority required proof of scienter for federal criminal statutes while separately stating that no mental-state requirement existed when a RICO predicate act was the violation of state civil usury laws. See id. at 117, 118. Though Grote affirmed defendants' judgment and conviction based on the "overwhelming" evidence against them, and elected not "to resolve those difficulties" about RICO's mental-state requirement, id. at 121, the panel nevertheless gave serious and detailed consideration to the arguments raised by Van Ness.

Tucker also does not address the other issue raised in his direct appeal, which urged that this Court erred by precluding him from calling an expert witness on the topic of tribal sovereign immunity and offering evidence about counsel's advice on applicable law. (ECF 487-5 at 56-64.) The Second Circuit concluded that the Court did not err by precluding expert testimony on legal matters, which is inadmissible under Rule 702. Grote, 961 F.3d at 121. Though the panel seemingly viewed the argument as having little merit, Tucker has not explained why his argument concerning the right to chosen counsel was more significant and obvious than the preclusion of his proposed expert.

Tucker does not explain why the Sixth Amendment argument he now raises was a "significant and obvious" issue that should have been raised in place of the "clearly and significantly weaker" issue of RICO's state-of-mind requirement. Mayo, 13 F.3d at 533. He faults Van Ness for not foreseeing two later-issued decisions, including one from the Supreme Court, that respectively questioned and reversed the Ninth Circuit's interpretation of the FTC Act. The argument is grounded in "the distorting effects of hindsight" that does not account for "counsel's perspective at the time." Henry, 409 F.3d at 63. If the ineffective assistance of appellate counsel claim had been properly raised – and it was not – it would not have provided a basis for section 2255 relief.

F.  Tucker Does Not Make Out a Strickland Claim Based on His Retained
    Counsel's Failure to Shield the Attorney Escrow Account from the FTC.

In his reply memorandum, Tucker asserts for this first time that his retained counsel performed ineffectively by depositing attorney-retainer funds into a joint client escrow account, rather than into a prepayment account owned exclusively by the Zuckerman law firm. (ECF 527 at 24-28.) Alternatively, he also has proposed that counsel could have deposited the retainer into the Court's registry pursuant to 28 U.S.C. § 2041. (Id. at 29; ECF 487 at 13.)

For the reasons previously explained, the Court in the exercise of discretion declines to consider Tucker's argument directed to his retained attorneys' use of a joint escrow account because it was raised in reply for the first time. If the Court had exercised its discretion to consider the claim, it would not have any merit.

Junghans states that, pursuant to a May 18, 2015 retainer agreement, Tucker wired $5 million on May 20, 2015 into a trust account intended to fund his criminal defense. (Junghans Dec. ¶ 12.) Two days later, Tucker wired an additional $2 million, and Tucker executed a revised retainer agreement. (Id. ¶ 13 & Ex. D.) Junghans states that at all times, it

was understood that the funds were property of Tucker, and that the Zuckerman firm had no interest in the funds unless and until services to be paid from the retainer were performed.  (Id. ¶ 14.)  She states that when the District of Nevada issued its injunction order in favor of the FTC, "[i]t was clear to me" that the order applied to the funds in the trust account, "and that we could do nothing with the retainer funds" without consent of the FTC and the Nevada court.  (Id. ¶ 18.)  She states that the FTC was "utterly intransigent" as to the release of funds needed to pay Tucker's defense.  (Id. ¶ 20.)  She states that Tucker paid slightly less than $1 million for legal services over a five-year period, with $447,365.96 paid for a tax proceeding and $545,979.63 paid for his criminal representation.  (Id. ¶ 31.)  She states that "after extensive negotiations with the FTC," an additional $82,914.92 was paid to the Zuckerman firm from the retainer account, with $6,932,610.05 remitted to the FTC.  (Id. ¶ 32.)

Junghans states that she and Schechtman "did not consider" depositing the retainer fund in the Court's registry pursuant to 28 U.S.C. § 2041.  (Id. ¶ 33.)  She states that while she and Schechtman were aware of the FTC's then-pending motion, they did not know whether funds dedicated for Tucker's criminal defense would be exempted.  (Id.)

Tucker's retained counsel was not objectively unreasonable in failing to foresee that the FTC injunction would apply to Tucker's retainer fund and failing to take additional measures intended to shield those funds from the District of Nevada.  This goes well beyond the standard of representation required by Strickland and suggests that an attorney who places a retainer fee in escrow rather than in a lawyer-owned, advance-payment account performs ineffectively in the event that the client's funds become subject to a freeze order.  It also is not apparent that the maneuver would have been successful because the authorities cited by Tucker seem to recognize that property may be subject to forfeiture if it is transferred following an arrest

or indictment.  (ECF 527 at 27.)  In the context of the FTC's civil action, the gambits proposed by Tucker may have been viewed by the FTC and the Nevada court as an effort to secret or protect funds that were properly subject to the injunction.  The success or failure of Tucker's proposals is speculative and may have risked serious negative consequences for Tucker and his counsel.

Tucker has not made a showing of ineffectiveness or resulting prejudice based on the failure to shield his retainer funds from the relief ordered by the District of Nevada.

G.  Separate from the Claims Raised Pursuant to Strickland, Tucker Has Not Made the Showing Required to Excuse Procedural Default.

Tucker's opening brief urged that he is entitled to section 2255 relief because "the Government" improperly restrained his assets, resulting in the denial of his chosen counsel pursuant to Luis, 578 U.S. at 10, 20-21.  Tucker did not cite to Van Ness's failure to raise this argument on his direct appeal or invoke Strickland, but described "[t]he unconstitutional restraint" on his assets as "set[ting] off a chain reaction" that both deprived him of his chosen counsel and caused the appointment of attorneys who he deems ineffective.  (ECF 487 at 6-12.) He states that "[b]ecause denial of counsel of choice is a structural issue, a new trial is required regardless of a showing of prejudice."  (Id. at 12.)

As already discussed, Tucker did not raise a choice-of-counsel argument in his direct appeal to the Second Circuit.  A defendant is in procedural default if a claim raised in a section 2255 motion was not first raised in a direct appeal.  Bousley, 523 U.S. at 622.  However, "[a] defendant can raise new arguments in a § 2255 motion 'if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence.'"  Pena, 58 F.4th at 621. "The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's

- 29 -

important interest in the finality of judgments." Massaro v. United States, 538 U.S. 500, 504 (2003).

The denial of a defendant's choice of counsel "unquestionably qualifies as 'structural error.'" Gonzalez-Lopez, 548 U.S. at 150. "Despite its name, the term 'structural error' carries with it no talismanic significance as a doctrinal matter." Weaver v. Massachusetts, 582 U.S. 286, 299 (2017). Weaver affirmed a decision of the Massachusetts Supreme Judicial Court, which concluded that while defendant's Sixth Amendment right to a public trial had been violated and was a structural error, the defendant had not demonstrated that counsel's failure to object to the courtroom's closure caused prejudice warranting a new trial. See id. at 303-04. The issue was not raised in a direct appeal but instead through a post-conviction motion asserting ineffective assistance under Strickland. See id. at 293.

Weaver observed that a structural error raised in a trial objection and on direct appeal "generally" entitles a defendant to automatic reversal. Id. at 299. "[I]f a new trial is ordered on direct review, there may be a reasonable chance that not too much time will have elapsed for witness memories still to be accurate and physical evidence not to be lost. There are also advantages of direct judicial supervision." Id. at 302. "[I]n postconviction proceedings, the costs and uncertainties of a new trial are greater because more time will have elapsed in most cases. The finality interest is more at risk, and direct review often has given at least one opportunity for an appellate review of trial proceedings. These differences justify a different standard for evaluating a structural error depending on whether it is raised on direct review or raised instead in a claim alleging ineffective assistance of counsel." Id. at 302-03 (internal citation omitted). Accordingly, a defendant who identifies a structural error in a post-conviction Strickland motion is not relieved from the obligation to "show[ ] prejudice in the ordinary sense,

i.e., a reasonable probability that the jury would not have convicted him if his attorney had objected" or that the error caused "a fundamentally unfair trial."  Weaver, 582 U.S. at 303-04.

The reasoning of Weaver, which concluded that the label of "structural error" does not relieve a defendant of the obligation to meet Strickland's burdens, is consistent with other Supreme Court and Second Circuit precedent requiring a defendant to identify cause and prejudice in order to overcome procedural default.  "While the nature of a constitutional claim may affect the calculation of cause and actual prejudice, it does not alter the need to make that threshold showing."  Engle v. Isaac, 456 U.S. 107, 129 (1982).  "[A]ny prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief."  Id. at 129.  "Liberal allowance of the writ . . . degrades the prominence of the trial itself.  . . .  Passage of time, erosion of memory, and dispersion of witnesses may render retrial difficult, even impossible."  Id. at 127-28; see also Napoli v. United States, 32 F.3d 31, 36-37 (2d Cir. 1994) ("It is settled that a procedural default of even a constitutional issue will bar review under section 2255 unless the petitioner can show cause excusing the default and actual prejudice resulting from the challenged error."); Campino v. United States, 968 F.2d 187, 190 (2d Cir. 1992) ("[F]ailure to raise a claim on direct appeal is itself a default of normal appellate procedure, which a defendant can overcome only by showing cause and prejudice.  . . .  [F]inality, accuracy and the integrity of prior proceedings, as well as concerns of judicial economy, weigh in favor of applying the cause and prejudice standard."); Jennings v. United States, 2005 WL 1387987, at *7 (S.D.N.Y. June 6, 2005) (defendant must demonstrate cause for procedural default and resulting prejudice even if he claims structural error) (Stein, J.); Pugliano v. United States, 2005 WL 3478360, at *6 (D. Conn. Dec. 19, 2005) ("even though the petitioners' jury composition claim may involve a structural error, there is no

authority that recognizes 'structural error' as an exception to the cause and prejudice requirement for procedurally-defaulted constitutional claims.").

Because Tucker cannot make out a showing that Van Ness was ineffective in failing to raise this Sixth Amendment issue on direct appeal, Tucker has failed to show cause. See Tavarez v. Larkin, 814 F.3d 644, 650 (2d Cir. 2016) ("There is no doubt that ineffective assistance of counsel can serve as cause to excuse a procedural default.").

Tucker also cannot demonstrate prejudice, for the reasons already discussed. To demonstrate the prejudice required to excuse a procedural default, the movant "must show not merely that the errors at trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions. Such a showing of pervasive actual prejudice can hardly be thought to constitute anything other than a showing that the prisoner was denied 'fundamental fairness' at trial." Murray v. Carrier, 477 U.S. 478, 494 (1986) (emphasis in original; internal citation, quotation marks and alterations omitted). "The burden therefore falls upon petitioners to demonstrate their entitlement to relief under § 2255 in this case based on an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Napoli v. United States, 45 F.3d 680, 683 (2d Cir. 1995) (quotation marks omitted).

While Tucker asserts that he need not demonstrate prejudice because he has identified a structural error, he also has asserted that the outcome of his trial would have been different had he been represented by Schechtman and Junghans. He states that "[g]iven the complex nature of this case, it is reasonably probable that Tucker's chosen counsel would have presented a more thorough defense and that the result at trial would have been different had he been represented by his counsel of choice throughout trial." (ECF 487 at 15.) He points to

Schechtman's history of work in criminal litigation and Junghans's expertise in tax litigation and white-collar defense.  (Id. at 7-8.)  He urges that the government benefited from the withdrawal of his retained counsel.  (Id. at 9.)

Tucker's assertion that it is "reasonably probable" that the outcome of trial would have been different is belied by what the Second Circuit described as "overwhelming" evidence of his guilt.  See Grote, 961 F.3d at 109, 117, 121.  Aside from citing the background and credentials of his retained counsel, Tucker does not identify how those attorneys may have performed more effectively in light of the overwhelming evidence offered by the government. The Court concludes that Tucker has not identified "an error of law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice."  Napoli, 45 F.3d at 683.

II.    Tucker Has Not Otherwise Identified Ineffective Assistance of Counsel.

A.  Tucker Does Not Make Out a Strickland Claim Based on
Counsel's Claimed Failure to Object to the Jury Charge.

Tucker urges that his counsel performed ineffectively by not objecting to portions of the state-of-mind element charged to the jury, thus causing the Second Circuit to review the issue under a "plain error" standard rather than the "harmless error" standard urged by Tucker. (ECF 487 at 18-19.)  He argues that if the issue had been properly preserved, there is a reasonable probability that the outcome on appeal would have been different.  (See id.)

Count One of the S1 Indictment charged Tucker with conspiracy to collect unlawful debts, and Counts Two through Four charged him with the substantive crime of collecting unlawful debts.  (ECF 114.)  In defining in the elements of the conspiracy charged in Count One, the Court charged that "[w]illfully means to act deliberately and with a purpose to do something that the law forbids.  The defendant need not have known that he was breaking any

particular law, but he must have been aware of the generally unlawful nature of his act." (Trial Tr. 3287-88 (ECF 308).)

On Counts Two through Four, the Court also charged the jury on the element that the defendant must have willfully and knowingly agreed to participate in the collection of an unlawful debt. (Id. 3292-94.) It stated as follows:

> The government is not required to prove that the defendant knew what the usury rates were in the states that the borrowers lived. For example, in the case of a New York borrower, the government does not need to prove that the defendant you are considering knew that New York's highest enforceable rate of interest on consumer loans was 25 percent. Nor does the government have to prove that a defendant knew the enforceable rate of interest in any other state. In this case, ignorance of the specific terms of any law is no excuse to the charged conduct. The government can meet its burden on the "willfully" and "knowingly" element by proving that a defendant acted deliberately, with knowledge of the actual interest rate charged on the loan. It may also meet its burden by showing a defendant acted deliberately, with an awareness of the generally unlawful nature of the loan, and also that it was the practice of the business engaged in lending money to make such loans.

(Id. at 3293-94.)

In his appeal to the Second Circuit, Tucker devoted 21 pages of his memorandum to arguing that this Court's mens rea instructions "were materially flawed" and favored the government. (See ECF 487-5.) He urged that the Court's instruction "effectively mooted" his defense that he believed the loans were lawfully made by tribal entities, and instead instructed the jury to make a finding of guilt if the jury merely found that he had knowledge of the interest rates charged in the loans. (See id. at 39-47.)

The Second Circuit applied plain error review, noting that the defense had objected to the charge at a mid-trial conference, but not following the delivery of the charge to the jury. Grote, 961 F.3d at 114-15. It then explained that in charging the jury on the willfulness

element in Count One, "the court barred the jury from rendering a guilty verdict on that count unless it found beyond a reasonable doubt that the Defendants were aware of the unlawfulness of their lending scheme."  <u>Id.</u> at 116.  "The guilty verdict on Count 1 thus demonstrates that the jury was satisfied beyond a reasonable doubt that the Defendants acted with the mental state that Defendants argue was required for Counts 2-4. . . .  [T]here is no risk that the jury could have found them guilty on the 'collection of an unlawful debt' element of Counts 1-4, involving the loans that were the object of the conspiracy charged in Count 1, without being satisfied beyond a reasonable doubt that the Defendants were aware of the unlawful nature of their conduct."  <u>Id.</u> at 116-17.  The Second Circuit proceeded to review the "overwhelming evidence that Defendants were aware of the unlawful nature of the loans," including "extensive efforts to conceal their lending activities and to create a sham illusion" that the loans were issued by tribal entities.  <u>Id.</u> at 117.  The panel "express[ed] no view on whether willfulness or awareness of unlawfulness was required for conviction under Counts 2-4," noting the Circuit's "confusing and arguably incompatible precedents regarding the required mental state for a RICO offense involving unlawful debt."  <u>Id.</u>  After detailing the tension in existing precedent, it noted that it did not reach the issue because "the jury necessarily found that the Defendants acted willfully in rendering a guilty verdict on Count 1, and because the evidence of willfulness was overwhelming in any event . . . ."  <u>Id.</u> at 121.

In a declaration filed in connection with this motion, Van Ness urges that she raised a timely objection at trial, and that both the defendant and the government believed that the issue had been properly preserved for appeal.  (Van Ness Dec. ¶ 4 (ECF 503); <u>see</u> <u>also</u> Ginsberg Dec. ¶ 29 (ECF 505); Gov't Mem. at 25 (ECF 516) (noting that government did not urge on appeal that defendants failed to preserve objection to jury charge).)

Assuming that Tucker's counsel was objectively unreasonable in failing to preserve an objection to the state-of-mind charge, Tucker has not demonstrated prejudice resulting from the oversight. He contends that "there is a reasonable probability . . . that the result of the appeal would have been different" if the Second Circuit had applied harmless error review. As described by the Second Circuit, "[i]f the defendant objected to an erroneous jury instruction at trial and raises the same claim of error on appeal, a harmless error standard of review applies. Under this standard of review, a conviction will be affirmed only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." United States v. Botti, 711 F.3d 299, 308 (2d Cir. 2013) (quotation marks and internal citation omitted).

Tucker's assertion of prejudice is belied by Grote's observation that "we have no doubt that, if the willfulness instruction challenged by Defendants was erroneous, the error did not affect the verdict." Grote, 961 F.3d at 117. As noted, the Second Circuit concluded that the jury found "that the Defendants were aware of the unlawful nature of the lending scheme" "based on overwhelming evidence of that fact." Id. As support for this conclusion, Grote cataloged trial evidence that included false representations about the businesses' tribal character, "fake loan approvals" from tribal officials, "a sham transaction" to give the false appearance of tribal ownership, and the submission of false attorney affidavits in state-court actions. See id. Tucker has not provided a plausible basis to conclude that the Second Circuit would have concluded otherwise had it applied harmless error review instead of plain error review.

Tucker's ineffective-assistance claim directed to his attorneys' failure to timely object to the jury charge will be denied.

B.  Tucker Does Not Make Out a Strickland Claim Based on His
    Counsel's Questions in Cross-Examination.

Tucker urges that at trial, his attorney James Roth "routinely failed to pursue relevant matters on cross examination and even elicited harmful testimony on cross examination." (ECF 487 at 20-21.) He characterizes the errors as "significant" and not entitled to the deference afforded by Strickland. (See id.)

The government called as a witness Kelly Rogers, who testified about her 11 years of employment at CLK Management, which she described as an "online payday loan lending company" owned by Tucker. (Tr. 147-224 (ECF 269).) Rogers testified about the company's business operations, the processing of loan applications, and the fees and interest charged to borrowers. (See id.) She testified that annual interest rates "were always in the 100s, even up to the thousands." (Tr. 184.) She testified that customer-service representatives were instructed to falsely inform callers that they were in certain locations associated with Native American tribes, rather than their true location, and received daily weather updates about the weather in those locations in order to deceive customers. (Tr. 202-11.)

Tucker urges that Roth did not conduct an effective cross-examination of Rogers. He notes that Roth did not inquire about Rogers's "cooperation agreement" with the government, confront her about conflicting statements she made to the government before trial, and did not follow up after Rogers agreed that certain of her statements were speculation. (ECF 487 at 20.) In an affirmation, Roth states that his cross-examination was conducted with the input of Tucker and others on the defense team. (Roth Aff. ¶ 7 (ECF 507).) He states that Tucker knew Rogers from her time as his employee, and that he did not inquire about Rogers's "cooperation" due to Tucker's knowledge about the witness's history. (Roth Aff. ¶ 7.) He states that it was a strategic choice not to inquire further about Rogers's conflicting testimony. (Id.)

Tucker has not explained why it was objectively unreasonable of Roth not to pursue certain lines of inquiry.  The government points out that Rogers never entered into a cooperation agreement, but instead entered into a non-prosecution agreement, and points to the relevant agreement provided in discovery.  (Gov't Mem. at 26 n .8.)  To the extent that Roth purportedly did not inquire about "speculation," his exchange with Rogers was as follows:

> Q. So some of what you testified about is a little bit of speculation, is that fair to say, in terms of the conclusions?
>
> A. All I said was they had meetings.  I don't know what they were discussing.

(Tr. 230.)  Rogers did not agree that she engaged in speculation, and seemed to reject the suggestion that she did.  Tucker does not identify the contents of the "conflicting" statements she gave to the government before trial.  Tucker does not explain why it was objectively unreasonable of Roth not to further pursue these lines of inquiry and does not articulate how further cross-examination on these topics could have "[u]ndermin[ed]" Rogers's testimony.  Roth made his point in front of the jury that Rogers did not know what the meeting participants were discussing.  Continued probing once the point has been established could have led to a devastating retraction by the witness.  Tucker's experienced counsel avoided this trap.  Tucker has not made any showing of ineffectiveness or resulting prejudice based on Roth's cross-examination of Rogers.

Separately, Tucker asserts that Roth was ineffective in his cross-examination of Adrian Rubin.  Roth asked a series of questions to Rubin about one of his businesses, which was "a payday operation" that obtained a license in Utah through "a straw person" and operated a call center in Delaware without a license to make loans in other states.  (Tr. 506.)  Rubin agreed that it was an "illegal and criminal" operation.  (Tr. 507.)  Tucker points out that these same

characteristics described many of Tucker's businesses, and that Roth highlighted the unlawfulness of Rubin's activities without distinguishing them from Tucker's.

In his affirmation, Roth states that he elicited testimony about Rubin's business as impeachment, based on Rubin's failure to disclose his illegal business activities in proffer sessions with the government.  (Roth Aff. ¶ 8.)  Roth states that Rubin's business model was not identical to Tucker's and that the impeachment value outweighed any potential prejudice.  (Id.)

Tucker does not explain why it was objectively unreasonable of Roth to attempt to impeach Rubin by inquiring about his history of illegal activities and the completeness of his disclosures to the government.  These lines of inquiry had the potential to undermine the credibility of a government witness.  Tucker also does not explain how he was prejudiced by Roth's cross-examination, offering only the conclusory argument that "[i]t is reasonably likely" that "the jury would have reached a different verdict" if Roth had not pursued this line of inquiry. (ECF 487 at 21.)

Tucker's ineffective-assistance claim directed to the conduct of Roth's cross-examinations will be denied.

C.  Tucker Does Not Make Out a Strickland Claim
     Based on the Potential Conflict of Ginsberg.

1.  The Curcio Hearing of September 25, 2017.

In a letter dated September 24, 2017, an attorney to Ginsberg advised the Court in writing that the day before, Ginsberg had initiated a meeting with the U.S. Attorney's Office for this District in connection with "a sophisticated extortionate blackmail scheme" that had targeted Ginsberg.  The letter requested that a hearing pursuant to United States v. Curcio, 680 F.2d 881 (2d Cir. 1982), be immediately held in connection with Ginsberg's ongoing representation of

Tucker.  The government separately submitted a letter stating its belief that a <u>Curcio</u> hearing was required before the trial could proceed.

As now characterized by Ginsberg, he was being "blackmailed and defrauded by a former client of mine" during the period that he was representing Tucker.  (Ginsberg Dec. ¶ 5 (ECF 505).)  Ginsberg states that to the best of his recollection, he advised Tucker of the issue early in the trial.  (Ginsberg Dec. ¶ 9.)

On September 25, 2017, two weeks after the commencement of the trial, the Court conducted a <u>Curcio</u> hearing to address a potential conflict relating to his lead trial attorney, Lee Ginsberg.  There is no claim that the Court could have acted any sooner than it did.  The Court held the hearing the morning after receiving a letter from the government raising the conflict based upon statements made by Ginsberg the day before the letter.  The Court questioned Tucker on the record in order to confirm Tucker's understanding of the situation and to determine whether it was Tucker's wish that Ginsberg continue to represent him.  Tucker agreed on the record to waive any potential conflict held by Ginsberg and any future challenge or argument based on that conflict.  The Court found that Tucker's waiver was knowing and voluntary, and accepted the waiver.

The Court conducted the <u>Curcio</u> hearing in the presence of all parties and counsel, as well Ginsberg's own attorney.[2]  The Court denied Roth's suggestion to appoint temporary additional counsel to advise Tucker on the potential conflict, concluding that Roth, who had been appointed as counsel by the Court pursuant to the Criminal Justice Act, was best-positioned to

---

[2] The transcript of this hearing is currently under seal. The government states that it sees no reason to maintain sealing "given that the investigation it described has long since been completed."  (Opp. Mem. at 29.)  The substance of Ginsberg's potential conflict is also detailed in the parties' public submissions in connection with this motion.  The Court will enter a separate Order directing the unsealing of the transcript.

advise Tucker on potential conflict and waiver.  (Curcio Tr. 5-7.)  The Court then adjourned the hearing so that Roth could confer further with Tucker.  (Curcio Tr. 8.)

When the hearing resumed, Tucker confirmed that he had reviewed the two letters and had the opportunity to speak with Roth and have any questions addressed.  (Curcio Tr. 9, 11.)  Tucker confirmed that he was satisfied with his representation.  (Curcio Tr. 11.)  Tucker confirmed his understanding that Ginsberg may have been the victim of a crime being investigated by law enforcement, including the U.S. Attorney's office and the FBI, and that the investigation related to an ongoing extortion and fraud scheme perpetrated by a former client of Ginsberg.  (Curcio Tr. 11.)  He confirmed his understanding that Ginsberg had lost large sums of money, may have suffered threats, believed he was the subject of surveillance by the perpetrator, and had experienced significant emotional and mental distress, including the fear of potential criminal prosecution.  (Curcio Tr. 11-12.)  He confirmed his understanding that Ginsberg had agreed to cooperate with the government against the scheme's perpetrator.  (Curcio Tr. 12.)  He confirmed his understanding that the possible extortion case was "totally unrelated factually" to the proceedings against Tucker.  (Curcio Tr. 12.)  He confirmed his understanding that Ginsberg could possibly be criminally charged in connection with the matter under investigation.  (Curcio Tr. 13.)  He confirmed his understanding that Ginsberg's role in connection with the investigation could potentially create a conflict of interest or cause him to take actions that benefited the government.  (Curcio Tr. 13-15.)

The Court asked Tucker to describe Ginsberg's role "in the defense of your case," and Tucker responded:  "He is our lead litigator.  He came on after Jim [Roth] came on and has gotten up to speed.  He's a key member of the team, and I have no reason to think that anything that we just discussed is going to inhibit his ability to defend me at the highest level."  (Curcio

Tr. 13.)  He stated that the potential conflict had "been fully explained, and I've had a lengthy

discussion with Jim [Roth] and Lee [Ginsberg] about that, and I'm satisfied that they're going to

represent me with the highest level of integrity."  (Curcio Tr. 14.)  When asked whether he was

"dissatisfied in any way" with Ginsberg's representation to that point, Tucker answered in the

negative.  (Curcio Tr. 15.)  When asked to explain in his own words his understanding of the

potential conflict, Tucker replied:

> Judge, the conflict is Lee's going to be cooperating with the
> government in the same office that is trying to prosecute me -- well,
> they are prosecuting me, and that all the things that we just talked
> about could come up.  And I've had, again, lengthy discussions with
> Jim and Lee specifically about that, and I feel confident moving
> forward with him, and I don't believe that those are going to be
> issues.

(Curcio Tr. 16.)  When the Court asked Tucker whether he wished to proceed with Ginsberg as

trial counsel despite the potential conflicts, Tucker responded, "Absolutely, nonnegotiable."

(Curcio Tr. 17.)  Tucker confirmed that he understood that he was agreeing to waive any future

argument or challenge related to Ginsberg's continued representation.  (Curcio Tr. 17-18.)

When the Court asked Ginsberg whether he wished to make any statements into

the record, Ginsberg responded that the situation had created "additional stress" and "pressure"

but that "there's no doubt in my mind that I'm able and prepared to proceed, have been."

(Curcio Tr. 18-19.)

The Court found that Tucker's waiver of any conflict or potential conflict was

knowing and voluntary, and accepted the waiver.  (Curcio Tr. 19.)

Tucker now urges that, in essence, he felt pressured into waiving any objection to

Ginsberg's possible conflicts due to the mid-trial timing of the hearing.  Based on the disclosure

to Tucker at the Curcio hearing, his clear understanding of the nature of the conflict and his

waiver of the conflict after conferring with appointed attorney Roth, the Court adheres to its conclusion that Tucker's waiver was knowing, voluntary and intelligent.

> 2.   Tucker Does Not Identify Attorney Ineffectiveness or
> Prejudice Arising out of Any Potential Conflict.

Tucker's ineffectiveness argument principally asserts that he "observed Lee Ginsberg to be distracted and inattentive throughout the trial in this matter." (Tucker Dec. ¶ 26 (ECF 487-1).) He states that, "at one time," Ginsberg left the courtroom during the direct examination of a witness that he later cross-examined. (Id.) He states that Ginsberg was "constantly checking his personal phone throughout trial and I believe he was distracted and inattentive due to the personal issue he was facing in which he was cooperating with the [government]." (Id.)

In his affidavit, Ginsberg states that he "was undoubtedly upset by the sequence of events that had unfolded for me," but that he has "no specific recollection" that he ever "absented myself from the courtroom during a substantial period of time on the direct examination of a witness whom I later cross-examined . . . ." (Ginsberg Dec. ¶¶ 14-15.) He also states that he has no specific recollection of checking his phone during trial, though notes that "it would not be unusual for me to check my phone for messages or emails during court breaks." (Ginsberg Dec. ¶ 16.)

Tucker's assertion of Ginsberg's ineffectiveness consists of little more than an impression that Ginsberg was distracted and insufficiently attentive during trial. He does not identify the witness who he believed was testifying at the time that Ginsberg purportedly exited the courtroom or point to any deficiencies in the ensuing cross-examination. To the extent that Ginsberg was purportedly distracted by his phone, Tucker does not point to any resulting oversights or errors on the part of Ginsberg. Tucker has not identified any objectively

unreasonable acts or omissions on the part of Ginsberg arising from the distractions of his potential conflict, and also has not identified any resulting prejudice.

Though asserted as part of an ineffectiveness claim, Tucker also points to what are, in essence, legal errors that he believes occurred in connection with the <u>Curcio</u> hearing. Because these contentions were not raised as part of Tucker's direct appeal, they are in procedural default. <u>See</u> <u>Bousley</u>, 523 U.S. at 622. The Court briefly addresses them nevertheless. First, Tucker suggests that Roth was not well-positioned to advise him on issues of Ginsberg's potential conflicts because he was "unprepared and not expecting to take lead in this case," and therefore was unable to provide "neutral advice" to assist him in understanding his options. (ECF 487 at 22-23.) But Tucker does not identify any deficiencies in the waiver advice that he received from Roth, and confirmed at the <u>Curcio</u> hearing that he understood the issues pertaining to Ginsberg and had adequate time to review the parties' letters to the Court. Tucker also states that the Court did not volunteer the option to stay or continue the trial in order to permit Roth to prepare to serve as potential lead counsel. (<u>Id.</u> at 22.) But there was no application to modify the trial schedule in the event that Ginsberg was relieved as counsel, and at the <u>Curcio</u> hearing, Tucker himself described his decision to proceed with representation from Ginsberg as "[a]bsolutely, nonnegotiable." (Curcio Tr. 17.) Tucker also suggests that he was not timely informed of Ginsberg's potential conflict, but both Ginsberg's own attorney and the government advised the Court in writing of the issue on September 24, 2017. The <u>Curcio</u> hearing took place on the morning of the next business day after the Court was apprised of the circumstance. At the <u>Curcio</u> hearing, Tucker implied that he had discussed the issue with Ginsberg ("I've had, again, lengthy discussions with Jim and Lee specifically about that . . . ."

(Curcio Tr. 16)), which is consistent with Ginsberg's recollection that he advised Tucker of the issue early in the trial (Ginsberg Dec. ¶ 9).

In his reply memorandum, Tucker asserts for the first time that Van Ness performed ineffectively as appellate counsel because she did not appeal any aspect of the <u>Curcio</u> hearing or Ginsberg's potential conflicts. The Court in the exercise of discretion declines to reach the merits of this constitutional claim raised for the first time in Tucker's reply brief. If the Court did reach the claim, it would conclude that Tucker's appellate counsel made the strategic choice to fully develop Tucker's arguments concerning the state of mind requirement and the Court's instructions to the jury. Separately, because there was no serious argument to be made concerning the <u>Curcio</u> hearing given Tucker's level of sophistication and his "nonnegotiable" stance, he was not prejudiced by the failure to raise the issue on appeal.

Tucker's ineffective-assistance claim directed to Ginsberg's potential conflict will be denied.

III.     <u>Adjudication of Tucker's Motion Does Not Require a Hearing.</u>

Lastly, the Court notes that nearly all of Tucker's arguments raise issues of law, and that an evidentiary hearing is not needed to decide his motion. The only apparent factual challenge raised by Tucker relates to his assertion that the prosecutors in this case engaged in some sort of coordination with the FTC in order to effect a restraint on the funds that Tucker had deposited to pay for his criminal defense. (ECF 487 at 9.) He requests discovery of all communications between the FTC and the USAO-SDNY. (<u>Id.</u>) He acknowledges that "there is no direct evidence" of such communications, but cryptically states that "there are indications" of some cooperation, pointing out that both entities are government actors. (<u>Id.</u>) Tucker points to no basis to infer coordination or collusion between the FTC and federal prosecutors in regard to

the asset restraint effected in the District of Nevada.  The Court concludes that neither discovery nor a hearing are warranted.

MUIR'S SECTION 2255 MOTION WILL BE DENIED.

A.  Overview of Muir's Motion.

Muir, who is trained as a lawyer, brings a separate motion under section 2255, and represents himself pro se.  (ECF 493.)  Muir was represented at trial by Thomas J. Bath, a privately retained attorney.  Muir separately retained Marc Antony Agnifilo, who filed a notice of appearance and appeared at some pretrial conferences but did not represent him at trial.

Muir asserts that Bath performed ineffectively at trial for some of the same reasons urged by Tucker.  Muir also asserts that Agnifilo, who he describes as his New York-based local counsel "inexplicably failed to show up at trial, contributing to the deprivation of my 6th Amendment right to the effective assistance of counsel."  (Id.)  Muir filed a written waiver of the attorney-client privilege, and Bath and Agnifilo have declarations in response.  (ECF 517-1, -2.)  After he filed his initial motion, Muir filed an amend motion that supplemented and expanded upon his arguments.  (ECF 513.)  The government's response addresses both the initial motion and the amended motion.

B.  Muir Does Not Make Out a Strickland Claim Based on Counsel's Claimed Failure to Object to the Jury Charge.

Like Tucker, Muir urges that his trial counsel was ineffective because he failed to preserve an objection to the jury charge on the willfulness element of the RICO charges in Counts Two through Four.  (ECF 500 at 1-8.)  In addition to the grounds asserted by Tucker, Muir notes that the jury requested portions of Muir's own testimony in which he testified as to his knowledge about the interest charged by Tucker's companies, pointing to the wording of the jury's note, which read: "Judge, can we get Tim Muir's transcript, please, October 11, during

- 46 -

cross-examination, when he stated that he knew that the interest rates were too high." (ECF 500 at 5-6; Tr. 3333.) Muir urges that the wording of the question demonstrates that he was prejudiced by the willfulness charge on Counts Two, Three and Four. (ECF 500 at 5-7.)

Muir's claim directed to the asserted failure to preserve an objection to the state-of-mind charge is not meaningfully different than the claim advanced by Tucker. As the Court has discussed at length, the Second Circuit concluded that the jury's guilty verdict on the conspiracy charged in Count One required a finding that defendants were aware that their conduct was unlawful. Grote, 961 F.3d at 117. That knowledge that they engaged in unlawful activity also applied to the substantive counts charged in Counts Two through Four: "Taking into account the charge as a whole, the jury did find (based on overwhelming evidence of that fact) that the Defendants were aware of the unlawful nature of the lending scheme." Id. "The guilty verdict on Count 1 thus demonstrates that the jury was satisfied beyond a reasonable doubt that the Defendants acted with the mental state that Defendants argue was required for Counts 2-4." Id. at 116. The jury's request for portions of Muir's testimony does not alter this analysis.

For the reasons previously discussed in regard to Tucker's ineffectiveness claim directed to the jury charge, the Court concludes that Muir has not demonstrated that he was prejudiced as a result of any claimed failure to preserve an objection to the jury charge.

C. Muir Does Not Make Out a Strickland Claim Based on Counsel's Claimed Failure to Seek a Judgment of Acquittal or New Trial Based on TILA's Definition of a "Creditor."

Muir asserts that trial counsel performed ineffectively by not moving for a judgment of acquittal or a new trial on the TILA counts. He urges that there was no evidence that he fell within TILA's statutory definition of a "creditor" under 15 U.S.C. § 1602(g). (ECF 500 at 8-10.)

Muir, who represented himself on his direct appeal, urged in his brief to the

Second Circuit that he could not fall within TILA's statutory definition of a "creditor" because

he never extended consumer credit and no consumer debt was payable to him. Supplemental

Brief of Defendant-Appellant Timothy Muir, United States v. Grote, No. 18-184 (2d Cir.

October 5, 2018). The government responded that the Indictment charged Muir as an aider and

abettor, stating: "Muir advised and assisted Tucker, who plainly was a creditor. 'Whoever . . .

aids, abets [or] counsels' a federal crime 'is punishable as a principal.' 18 U.S.C. § 2. . . . Muir

offers no explanation why he is not guilty as an aider and abettor." Brief for the United States of

America, United States v. Grote, No. 18-184 (2d Cir. Jan. 4, 2019). The Second Circuit did not

expressly address Muir's TILA argument but "reject[ed] the Defendants' further contentions as

frivolous." Grote, 961 F.3d at 122.

Given the Second Circuit's description of Muir's contention as "frivolous," he

does not now point to any basis to conclude that his trial counsel performed ineffectively or that

he was prejudiced based on his trial counsel's decision not to move for acquittal or a new trial on

the TILA counts charged in Counts Ten through Fourteen.

D. Muir Does Not Make Out a Strickland Claim
Based on Agnifilo's Non-Attendance at Trial.

Muir asserts that Agnifilo, who he describes as his local counsel, "inexplicably

failed to show up at trial, which contributed to the deprivation of his right to the effective

assistance of counsel." (ECF 500 at 11-12.) Muir states that he retained Agnifilo shortly after he

was indicted because his lead trial attorney, Bath, is based in Kansas. (Id.; Muir Dec. ¶ 3 (ECF

513).) Muir states that he expected Agnifilo to be present at trial, and found it "beyond

surprising" when Agnifilo was not present at the final pretrial conference. (ECF 500 at 11-12;

Muir Dec. ¶ 5.) According to Muir, Bath then contacted Agnifilo, and later told Muir without

explanation that Agnifilo would not be present at trial.  (ECF 500 at 11-12; Muir Dec. ¶ 8.)  Muir states "[t]here is no denying that Bath was masterful in examining the witnesses," but that Bath was unable "to handle all aspects of the six week-trial" in Agnifilo's absence.  (ECF 500 at 11-12.)

Bath and Agnifilo have filed affirmations in response.  Agnifilo states that he was retained as local counsel, and that Muir sought his input at pretrial conferences and certain meetings.  (Agnifilo Aff. ¶¶ 3-4 (ECF 517-2).)  This is consistent with Muir's statement that Agnifilo was present at arraignment, pre-trial conferences and some strategy sessions.  (Muir Dec. ¶ 4.)  Agnifilo states that "several months" before trial, he informed Muir and Bath that he was scheduled to commence trial in another matter in October 2017 and thus would be unavailable for Muir's trial.  (Agnifilo Aff. ¶ 5.)  He states that "Muir wished me luck" and never communicated disapproval that he would not be present at trial.  (Agnifilo Aff. ¶ 6.)  He states that Muir never asked him to act as trial counsel and that Muir asked him to formally withdraw from representation after the trial concluded.  (Agnifilo Aff. ¶¶ 7-8.)

Bath states that Muir's assertions concerning Agnifilo are "incorrect."  (Bath Aff. ¶ 6 (ECF 517-1).)  He states: "Mr. Agnifilo acted only as local counsel and Mr. Muir consented to and was aware that Mr. Agnifilo was not going to participate as trial counsel."  (Id.)

Muir does not identify ineffective performance or prejudice based on Agnifilo's absence at trial.  Muir is a sophisticated individual who is trained as a lawyer, and the evidence at trial showed him to be skilled in his understanding of litigation.  He does not assert that he directed Agnifilo to attend trial or made further inquiry after being "surprise[ed]" by Agnifilo's absence at the final pretrial conference.   Muir does not annex any communications or other records that reflect surprise and frustration with Agnifilo's absence.  No application was made to

the Court regarding Agnifilo's availability or any scheduling conflict. Muir also has not explained how he was prejudiced by Agnifilo's absence, other than to assert that Bath's "handling of the legal issues was deficient . . . ." (ECF 500 at 12.) Muir does not explain how Agnifilo's participation could altered the handling of any legal issues or why his absence rendered the trial unfair or the verdict unreliable. See Henry, 409 F.3d at 63.

E. Muir Does Not Make Out a Strickland Claim as to Bath's Legal Research on State-of-Mind Testimony.

Muir asserts that Bath performed ineffectively by failing to conduct adequate legal research on the "critical issues at trial . . . . ." (ECF 500 at 12-25.) Muir states that he and Bath "spent a lot of time together" and that he "was significantly more involved in trial preparations than the average client." (Id. at 12.) Muir states that he primarily conducted the initial review of discovery and researched certain legal issues himself. (Id.) He states while he and Bath sometimes spent more than 15 hours a day working together, "at no time . . . did I witness Bath conduct any legal research" in connection with the trial. (Id. at 12-13.) Muir states that Bath's failure to conduct legal research rendered his performance deficient under Strickland. (Id. at 13.)

Muir states that his sole defense was a state-of-mind defense premised on the belief that Tucker's lending-related activities were lawful. (Id. at 13.) He points to a portion of the Court's preliminary charge before the first witness was called, in which the Court stated as follows:

> In a trial the parties to the case are able to advance legal arguments to the Court, and then the Court formulates the instructions on the law that govern the case, and that's the division of labor in a trial between a judge and a jury and the lawyers. So law will not be a matter of evidence in the case, the governing legal principles. That will be something that I will instruct you at the end of the case so

you will know what the legal principles are that govern the charges
in this case.

(Tr. 85.)  According to Muir, this instruction was "extremely disconcerting" because he

considered it a restriction on his ability to testify as to his own state of mind about the lawfulness

of Tucker's lending businesses.  (ECF 500 at 13-14.)  Muir explains that he intended to testify

about his interpretation of Supreme Court precedent and federal statutes governing tribal gaming

activities and how they informed his state of mind.  (Id. at 14-15.)  According to Muir, Bath had

not researched Second Circuit caselaw sufficient to raise an objection to any limitation on Muir's

testimony about his understandings of federal Indian law as it pertained to gaming.  (Id. at 15-

20.)

 During his direct testimony, Muir described the basis for his belief that Tucker's

lending operations were lawful, including the reliance on tribal affiliations, stating that he spent

"thousands" of hours researching the issue from 2006 to 2013, and considered the substantive

law of tribal sovereign immunity, federal consumer lending, usury and contracts.  (Tr. 2673-76.)

Muir stated that he worked with "a big legal team" that included more experienced lawyers, that

he monitored proposed legislation, the actions of federal regulators and lawsuits that touched on

tribal lending.  (Tr. 2676-78.)  He described monitoring dockets and the role of court dockets.

(Tr. 2678.)  He described his close attention to a 2006 lawsuit in Colorado that related to tribal

immunity.  (Tr. 2682-84.)  Muir testified as to his understandings of tribal sovereignty, the

Indian Commerce Clause contained in the U.S. Constitution, and Congressional abrogation of

tribal immunity.  (Tr. 2689-91.)  He described how his review of choice-of-law issues informed

his conclusion that, based on the lender's identity, tribal law would control the lawfulness of the

loans' interest rates.  (Tr. 2691-92.)  He also testified to the basis for his belief that the tribes held

"ultimate control" over the loans.  (Tr. 2692-93.)  He described his attendance at an April 2013

CLE on tribal lending that, he said, described "the exact model I had been involved with." (Tr. 2883-85.)

      Contrary to the description in his current motion, Muir testified extensively about how he came to conclude that Tucker's lending operations were lawful. Outside of the presence of the jury, the government stated that it had no objection to Muir testifying about his legal beliefs. (Tr. 2686-87.) The Court responded that it may, throughout trial, instruct the jury that Muir's testimony went toward his state of mind but that only the Court would instruct the jury on the law. (Tr. 2687.)

      After Bath asked Muir for an example of Congressional abrogation of tribal immunity, Muir began to testify about the Indian Gaming Regulatory Act, at which point the Court stated that "we're too far afield" and directed Bath to ask his next question. (Tr. 2691.) Muir states that "the Court <u>sua</u> <u>sponte</u> cut off my testimony" when he began to discuss the gaming statute, and says the ruling was "devastating" to his state-of-mind defense. (ECF 500 at 14-15.) But no gaming statute was at issue in this case, and under Rule 403, the risk of juror confusion outweighed any probative value. Muir points to various authorities that allowed for state-of-mind testimony based on a defendant's understanding of applicable law, but does not acknowledge that he testified at length about the sources for his purported good-faith belief that Tucker's lending activities were lawful. He has not identified any legal error on the part of Bath or resulting prejudice based on any purported failure of Bath to conduct further legal research about state-of-mind testimony.

      F.  Muir Does Not Make Out a Strickland Claim as to Bath's
          <u>Failure to Cite Section 190.40 of the New York Penal Law.</u>

      Muir urges that Bath performed ineffectively by not requesting a jury instruction incorporating certain language from New York Penal Law section 190.40, which states:

> A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

The Court instructed the jury that "[i]n New York, the highest enforceable rate of interest on consumer loans is 25 percent per year, and loans above that rate are usurious and unenforceable." (Tr. 3292.) Counsel to Tucker requested that the instruction state, "In New York, except as otherwise provided, authorized, or permitted by law, the highest enforceable rate of interest on consumer loans is 25 percent per year . . . ." (Tr. 2574; emphasis added.)

> The Court declined to incorporate the language proposed by Tucker, stating:

> I would charge it if you could point me to a relevant exception, and then I would charge the jury on that relevant exception, so I would say "otherwise permitted by law," and then I would say, "Law permits it if the following circumstances are met," and then I would charge that. But in the absence of that, the instruction is correct.

(Tr. 2575.) This ruling came shortly after a discussion of Michigan v. Bay Mills Indian Community, 572 U.S. 782, 795-97 (2014), which distinguished the concept of legal immunity from a lawsuit afforded to a tribe as an entity from "the many other powers" that a state may enforce in its dealings with a tribe, such as seeking injunctive relief against individual tribal officials. (See Tr. 2568-69.) Discussing Bay Mills, the Court observed that "[t]hey [i.e., tribes] can't be prosecuted under the criminal usury statute. That is not the equivalent of saying that the New York rate is unenforceable on a loan by a tribe. Those are two different things." (Id.) Bath then spoke on the record, urging that absent Congressional abrogation, tribal sovereignty permitted tribes to "pass the law" setting a separate usury rate. (Tr. 2569.) Again referencing Bay Mills, the Court observed that the "opinion is rather helpful" because it "makes the point

that the conduct doesn't become lawful . . . .  It's just the tribe is immune.  That's all."  (Tr. 2573.)

Muir now urges that Bath misapprehended section 190.40 because the statute makes it the government's burden to prove that interest rate was not "authorized or permitted by law" and is not a burden carried by the defendant, akin to an affirmative defense.  (ECF 500 at 22.)

As with the contention about his status as a TILA creditor, Muir raised his understanding of section 190.40 in his direct appeal to the Second Circuit, stating that the Court "refused" to instruct the jury on the "authorized or permitted by law" language contained in the statute.  (Brief of Defendant-Appellant Timothy Muir at 57-65, United States v. Grote, No. 18-184 (2d Cir. July 25, 2018).)  As with Muir's TILA argument, the Second Circuit did not expressly address his argument about section 190.40, but characterized "Defendants' further contentions as frivolous."  Grote, 961 F.3d at 122.

Muir does not identify ineffectiveness or resulting prejudice relating to Bath's approach to section 190.40.  Trial counsel to both Tucker and Muir urged that the jury charge incorporate the language emphasized in Muir's motion.  The issue was litigated by counsel at trial and raised on appeal.  While Muir now offers an additional reason as to why the language should have been included, any failure to emphasize this reading of the statute was not professionally unreasonable.  See Henry, 409 F.3d at 63.

Muir also does not show prejudice.  The Second Circuit described his contention as "frivolous."  Grote, 961 F.3d at 122.  As has been discussed at length, it also concluded that the government "presented overwhelming evidence that Defendants were aware of the unlawful nature of the loans," including the "sham illusion that the lending was done by Native American

tribes, precisely so that state usury laws would not seem to apply." Id. at 117. The jury's guilty verdict on Count One necessarily found that defendants acted with the knowledge Tucker's lending companies were not authorized or permitted by law to make loans at usurious rates. Muir therefore cannot demonstrate prejudice based on the language's omission from the jury charge.

      G.   Muir Does Not Make Out a Strickland Claim as to the
           Cumulative Effect of Bath's Performance at Trial.

      Muir's Amended Petition asserts that Bath's purported errors cumulatively prejudiced him to the extent that a new trial is warranted. (ECF 513.) A Strickland analysis can weigh the cumulative effect of attorney errors "in the aggregate." Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001). He asserts that Bath's "deficient performance directly prejudiced 12 of the 14 counts the jury considered," which "undoubtedly" altered the outcome of the trial. (ECF 513 at 10-12.) For the reasons previously discussed, Muir has not identified prejudice attributable to Bath's performance, and the motion for section 2255 relief based on cumulative prejudice will be denied.

TUCKER'S MOTION FOR A SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c) WILL BE DENIED.

      Tucker separately moves for a sentence reduction under 18 U.S.C. § 3582(c), principally urging that he should be permitted to serve the remainder of his sentence on home confinement in order to care for his elderly and ailing mother. (ECF 504, 515, 524.) Tucker also points to the difficult conditions of his incarceration during the Covid-19 pandemic, his proximity to acts of violence committed by other inmates and the rehabilitative effects of his incarceration.

The government has not submitted a response to Tucker's motion. Tucker is represented by counsel on this section 3582(c) motion.

Provided that the exhaustion requirement is met, a court may reduce a defendant's sentence if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Tucker states that he applied for a sentence reduction to the assistant warden of his facility on December 13, 2022 and to the warden of his facility on December 27, 2022, and that both requests were denied. He annexes his applications, which cited to his mother's stage 4 congestive heart failure and her testing positive for Covid-19. (ECF 504-8, -9, -10.) The Court concludes that Tucker has exhausted his administrative remedies.

"Before it can reduce a term of imprisonment or release a defendant under § 3582(c)(1)(A), a district court must 'find[ ] that . . . extraordinary and compelling reasons warrant such a reduction.'" United States v. Jones, 17 F.4th 371, 374 (2d Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). District courts have "broad discretion" when considering such motions and are free to "consider the full slate of extraordinary and compelling reasons that may warrant an imprisoned person's release." United States v. Amato, 48 F.4th 61, 66 (2d Cir. 2022) (quotation marks omitted). "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason'" for sentence reduction. United States v. Brooker, 976 F.3d 228, 237-38 (2d Cir. 2020) (quoting 28 U.S.C. § 994(t)) (emphasis in original).

The Sentencing Commission issued an updated policy statement in November 2023 as to extraordinary and compelling reasons to grant a motion for sentence reduction, including a defendant's family circumstances. U.S.S.G. § 1B1.13. This includes "[t]he incapacitation of the defendant's parent when the defendant would be the only available

caregiver for the parent."  Id. § 1B1.13(b)(3)(C).  Even so, section 3582(c) "only authorizes release where the family circumstances are truly 'extraordinary and compelling,' and not merely the inevitable circumstances families face when a family member is incarcerated.  Being separated from your wife and children and unavailable to care for aging parents are but two of the sad and inevitable consequences of incarceration."  United States v. John, 2020 WL 6581217, at *2 (S.D.N.Y. Nov. 10, 2020) (McMahon, J.).

        In a declaration, Tucker states that his 86-year-old mother Norma "is extremely ill and has no one to care for her other than me."  (Tucker Dec. ¶ 11(a) (ECF 504-18).)  He states that his mother lives alone and cannot afford in-home care or a nursing home.  (Id. ¶ 11(b).)  He states that she had three sons, including one who is now deceased, and that Tucker and a second brother are both incarcerated.  (Id. ¶ 11(c).)  Tucker has submitted a declaration from Chris Becker, a family friend who states that he "check[s] on" Norma Tucker daily but is unable to provide the around-the-clock care that he believes she needs.  (Becker Dec. ¶ 6 (ECF 504-14).)

        Tucker's counsel later supplemented the application to report that Tucker's mother had been the victim of a fraud that caused her to transfer $2,910 to a person falsely posing as Tucker's probation officer, which heightened Tucker's concern for her welfare.  (ECF 515.)  An additional letter reported that Tucker's mother had suffered two falls, resulting in a broken arm and three broken ribs.  (ECF 524.)  That letter annexes a declaration from Norma Tucker, who states that she lives alone, has Stage IV heart disease and recently suffered two falls.  (N. Tucker Dec. ¶¶ 2, 4 (ECF 524).)  She states that she also suffers from COPD, arthritis, high blood pressure and likely from an untreated kidney disease.  (Id. ¶ 6.)  She states that it is her "deepest wish" to be cared for by her son.  (Id. ¶ 7.)

Tucker cites to other circumstances that he characterizes as extraordinary and compelling. He notes that during the time he was incarcerated at the BOP facility in Leavenworth, Kansas, he was on lockdown for nearly 24 hours a day for 48 months due to Covid-19 and inmate violence. (Tucker Dec. ¶ 4.) Tucker states that he feared for his safety because of his proximity to violent offenders. (Id. ¶ 5.) Tucker points to evidence of his rehabilitation, stating that he has mentored inmates, taught them "to embrace a positive mindset," take responsibility for their actions and acquire useful skills. (Id. ¶ 7.) He annexes declarations and letters of support from current and former inmates Sierra Thompson, Albert Banks, Anthony Thompson, Jefferey Honeyball, Serge Francois and Robert Williams, who describe Tucker as a mentor and source of encouragement. (ECF 504-1 to -7.) The submissions variously cite to Tucker improving their financial literacy, offering book recommendations and encouraging them to maintain a positive outlook on life while accepting responsibility for their past mistakes. (See id.) Some of the submissions point to Tucker's devotion to his family and spiritual faith. (See id.)

Tucker states that if his motion is granted, he will submit to any conditions placed upon him, including house arrest and electronic monitoring. (Tucker Dec. ¶ 13.)

The Court is heartened by Tucker's description of his constructive use of time in BOP custody. It also is sympathetic to Tucker's concerns about his mother's welfare, as well as his mother's heartfelt desire to be attended by her son while in ill health.[3]

Tucker has not demonstrated that he "would be the only available caregiver for the parent." U.S.S.G. § 1B1.13(b)(3)(C). "[C]ourts generally require a showing of evidence from several sources indicating that the defendant is the only available caregiver for a family

---

[3] Tucker's Presentence Report referenced the care that he provided to his grandmother in 1985 following the death of his father. (PSR ¶ 116.) The Court credits the sincerity of Tucker's desire to assist his mother.

member in dire conditions before concluding that an extraordinary and compelling reason has

been established." United States v. Lindsey, 2021 WL 37688, at *3 (S.D.N.Y. Jan. 4, 2021)

(Swain, J.). Tucker, who is represented by counsel and has the burden to demonstrate

extraordinary and compelling circumstances, does not identify additional family members, their

locations, or why those individuals are less available to provide care and assistance than Tucker,

who is an incarcerated person. See, e.g., United States v. Castro, 2024 WL 1252127, at *3 n.9

(S.D.N.Y. Mar. 25, 2024) (denying motion where defendant failed to corroborate that he was the

only available caregiver) (Wood, J.); United States v. Romano, 2023 WL 8735203, at *3

(E.D.N.Y. Dec. 19, 2023) (denying motion because defendant failed to explain

"whether . . . friends in the community, or relatives other than his siblings . . . would have the

time, money, and resources" to assist ailing relative) (Matsumoto, J.); United States v. Burrell,

2020 WL 7646887, at *3 (S.D.N.Y. Dec. 23, 2020) (noting availability of other family members

to care for defendant's grandmother) (Nathan, J.). Based on the PSR, it appears that Tucker's

own children are now young adults (PSR ¶¶ 87-88), but he does not explain why they are

unavailable to assist. See United States v. Nguyen, 2023 WL 8368855, at *6 (S.D.N.Y. Dec. 4,

2023) (citing defendant's failure to explain why his own children were unavailable to act as

caregivers) (Cronan, J.); United States v. Rodriguez, 2024 WL 1464661, at *3 (S.D.N.Y. Apr. 4,

2024) ("inconvenience" to family members does not support a sentence reduction) (Torres, J.).

        Norma Tucker states that she cannot afford to pay for in-home assistance or entry

in an assisted-living facility. (N. Tucker Dec. ¶ 8.) But, other than this conclusory assertion,

Tucker's submissions include no evidence about his mother's finances and ability to pay for

care. By contrast, his mother has submitted some medical records that reflect on her health

conditions.  The absence of evidence about Norma Tucker's limited finances also weighs against the application.

Additionally, while the Court affords weight to Norma Tucker's advanced age and ailments, there is some indication in the record that aspects of her conditions may be manageable or temporary.  A 2022 written assessment from a medical provider states, "I discussed with the patient that I think her symptoms are due to post COVID infection and respiratory infection."  (ECF 504-12 at 5.)  The notation recommended at-home oxygen treatment and alterations to her nebulizer use.  (Id.)  Notes from that same visit state, "She wanted to know if I could write a letter indicating that she needed medical assistance that her son who is [sic] business was interrupted might be able to stay with her."  (Id. at 4.)  It later stated, "I told the patient I would write a letter for her although I could not promise of what benefit it will be."  (Id. at 5.)  Thus, while the record indicates that Norma Tucker is dealing with serious age-related health conditions, and would likely benefit from additional care, it falls somewhat short of demonstrating incapacitation that amounts to an extraordinary and compelling circumstance.

Separately, the difficult conditions of Tucker's confinement during the Covid-19 pandemic do not rise to the level of extraordinary and compelling circumstances that warrant a sentence reduction.  See, e.g., United States v. Davidson, 2024 WL 3518378, at *3 (S.D.N.Y. July 23, 2024) (Berman J.).  As noted, rehabilitation alone cannot be an extraordinary and compelling circumstance that warrants a sentence reduction.

Even if Tucker had demonstrated extraordinary and compelling circumstances, his motion would be denied based on the section 3553(a) factors.  The Guidelines calculation for Tucker was presented by the Office of Probation as single figure of 2,220 months' imprisonment, or 185 years.  (PSR ¶ 144; Sentencing Tr. 6 (ECF 331).)  Tucker's counsel urged a sentence of

15 years.  (Id. 11-12.)  The government did not seek a Guidelines sentence and urged that Tucker

be sentenced to at least twenty years, noting the duration of Tucker's unlawful activity and the

number of victims.  (Id. 17.)

In its statement of reasons, the Court noted the offenses' "utmost seriousness as a

financial fraud."  (Id. 19.)  Borrowers paid approximately $1.3 billion in unlawful overpayments,

a figure that the Court called "staggering."  (Id. 26.)  The Court described "a scheme to extract

money from people in desperate circumstances" that was carried out for approximately 15 years.

(Id. 20.)  The scheme affected 4.65 million different customers, which was more than one

percent of the U.S. population.  (Id. 26.)  The Court summarized the testimony of victims who

testified at trial, noting that Tucker's lending scheme caused "heartbreak and sorrow" that was

"not just a financial loss."  (Id. 22-23.)

The Court noted that Tucker had a history of lying to officials and concealing

past crimes.  (Id. 21-22.)  It described Tucker's reliance on tribal immunity as "a scheme and a

racket, a fraud."  (Id. 23.)  The Court reviewed the sham nature of the tribes' participation in

Tucker's loans.  (Id. 23.)  It contrasted the trial evidence with the written sentencing submission

that Tucker file on his own behalf, which characterized his criminal scheme as a family business

that operated transparently.  (Id. 19-20.)  In reviewing Tucker's sentencing submission, the Court

noted that while Tucker began by expressing remorse, it became "apparent" that Tucker did

"really not have any acceptance of the fact that his conduct was criminal."  (Id. 19.)  The Court

quoted passages in which Tucker stated, "I am remorseful, your Honor, for having failed to

accurately display, convey, and live up to the vision I had.  I am remorseful, your Honor, to have

left a single person with the misperception that I do not recognize my responsibility to live as a

good and fair businessman, employer and American citizen."  (Id. 19-20.)  Tucker also stated, "It

would have been more believable that we're all going to contract some type of Old Testament disease like leprosy than for anyone to believe that we were engaged in any type of illicit business venture." (Id. 20.)  The Court also noted Tucker's previous convictions for financial crimes based on fraud and misrepresentation, including a fraudulent lending operation that marketed itself as "Chase Morgan Stearns and Lloyd."  (Id. 24-26.)

The Court sentenced Tucker principally to 200 months' imprisonment, a term lower than the twenty years sought by the government.  (Id. 26-27.)  Tucker has a projected release date of April 9, 2031.[4]  He was remanded to BOP custody at the conclusion of his sentencing hearing on January 5, 2018.  (Minute Entry, 1/5/18.)  He has served approximately 49% of his total term of imprisonment.

The section 3553(a) factors weigh against Tucker's application.  The need for just punishment, the seriousness of the offense, the history and characteristics of the defendant and the need to protect the public all disfavor a sentencing reduction.  Tucker has engaged in fraud schemes for much of his adult life and he has a demonstrated history of intransigence toward courts and regulatory authorities.  Tucker's statement to the Court at the sentencing hearing displayed not only a lack of remorse, but an unwillingness to acknowledge responsibility for the unlawful character of his lending scheme, blaming himself principally for fostering a "misperception."  Tucker's blitheness stood in marked contrast to the trial testimony of his victims, as well the evidence of the many deceptions used to falsely hold out his companies as tribal entities.  As detailed throughout this Opinion and Order, the lending scheme at issue was sweeping and intricate.  And Tucker's decision to engage in criminal activity following two

---

[4] https://www.bop.gov/inmateloc/

earlier convictions underscores the need to protect the public from the defendant, promote respect for the law and advance just punishment.

Tucker's motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c) will be denied.

CONCLUSION.

The motions of Scott Tucker and Timothy Muir brought pursuant to 28 U.S.C. § 2255 are DENIED. Tucker's motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c) is DENIED. The Clerk is respectfully directed to terminate the motions (ECF 486, 493, 504, 513) and to close the civil cases docketed at 22-cv-1470 (PKC) and 22-cv-8745 (PKC).

Tucker and Muir have not made a substantial showing of the denial of a constitutional right, and accordingly, a certificate of appealability will not issue. 28 U.S.C. § 2253; see Blackman v. Ercole, 661 F.3d 161, 163-64 (2d Cir. 2011). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
　　　　August 28, 2024